IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company and Allergan USA, Inc.,

Plaintiffs,

v.

Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,

Defendants.

C.A. No. 21-1411-RGA-LDH

[redacted]

[redacted]

REDACTED - PUBLIC VERSION
Filed December 20, 2024

**EXHIBITS TO REVANCE'S MOTION IN LIMINE # 2 TO PRECLUDE ALLERGAN FROM REFERENCING OR ELICITING EVIDENCE AND/OR TESTIMONY REGARDING EMPLOYMENT HISTORY**

# Exhibits to Revance's Opening Brief in support of its Motion in Limine # 2 to Preclude Allergan from Referencing or Eliciting Evidence and/or Testimony Regarding Employment History

| Exhibit | Description |
|---|---|
| 1 | Rao October 17, 2024 email |
| 2 | Civil Minutes – General, Second Order Regarding Motions in Limine at 3–4, *Masimo Corp. et al. v. Apple Inc.*, No. SA CV 20-00048 JVS (JDEx) (C.D. Cal. Mar. 15, 2003), ECF 1469 |

# Exhibit 1

**From:** Sasha Rao
**To:** Ho, Krystina L.; Dittmann, Eric W.; Rupert, Melanie R.; Ashkenazi, Isaac S.; Peterman, Chad; Mays-Williams, Ashley; Wexler, Bruce M.; Allergan-BoNT-PH; Blumenfeld, Jack; "Tigan, Jeremy A."; Raucci, Anthony D.
**Cc:** Revance-DAXI; YCST_Revance_DAXI; Gaza, Anne Shea; Wilson, Samantha
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine
**Date:** Thursday, October 17, 2024 3:01:50 PM
**Attachments:** image001.png
image002.png

Krystina—

With respect to your first point, we are confused by Allergan's proposal that "neither party will provide testimony or evidence regarding alleged licenses that are comparable to the license that would be the subject of the hypothetical negotiation." No comparable licenses have been identified by either damages expert in this case. Regardless, the subject of Revance's MIL was the preclusion of agreements and the royalty rates therein discussed by Dr. Meyer that she found to be *not comparable*. *See* Meyer Op. Rpt. at ¶¶ 136-156. Please let us know your availability for a call this afternoon or tomorrow morning so that we can get clarity on Allergan's proposal. Otherwise, please let us know if Allergan intended to propose or agrees with the proposal that: "neither party will provide testimony or evidence regarding alleged licenses, identified in Meyer Op. Rpt. at ¶¶ 136-156, that were found to be non-comparable to the license that would be the subject of the hypothetical negotiation."

Second, with respect to "other litigation," Revance confirms that we have an agreement that neither party will refer to any litigation that either party is, was, or will be involved in, other than the immediate action. But we disagree with Allergan's position regarding the employment background of Revance's employees. Allergan misconstrues Revance's motion by arguing that "[i]t is entirely appropriate, however, to raise the employment background of Revance's witnesses with the jury, and any request to preclude Allergan from providing evidence at trial of such employment would be meritless." Revance's request is much narrower. Allergan must not present to the jury the prior work history of Revance's employees *at Allergan and its affiliates.* Allergan may otherwise present Revance's employees' work history, subject to Revance's objections, the Federal Rules of Evidence, and FRCP. With this clarification, please confirm whether Allergan is in agreement to preclude this aspect of Revance's employees' work history from presentation at trial.

Best,

Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

**From:** Ho, Krystina L. <krystinaho@paulhastings.com>
**Sent:** Wednesday, October 16, 2024 6:03 PM
**To:** Sasha Rao <SRao@sternekessler.com>; Revance-DAXI <Revance-DAXI@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha:

We write in response to your October 15 correspondence.

1. Allergan is amenable to agreeing that neither party will provide testimony or evidence regarding alleged licenses that are comparable to the license that would be the subject of the hypothetical negotiation or there are industry standard royalty rates that apply for the Asserted Patents. Please confirm that the parties have an agreement on this issue.

2. Allergan is amenable to a reciprocal agreement that the parties refrain from referring to any other litigations either party has been or may be involved in. Please confirm that we have an agreement by Thursday, October 17. It is entirely appropriate, however, to raise the employment background of Revance's witnesses with the jury, and any request to preclude Allergan from providing evidence at trial of such employment would be meritless.

Regards,

Krystina

---

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

---

**From:** Ho, Krystina L. <krystinaho@paulhastings.com>
**Sent:** Tuesday, October 15, 2024 4:42 PM
**To:** Sasha Rao <SRao@sternekessler.com>; Revance-DAXI <Revance-DAXI@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

Sasha,

Please see the attached correspondence.

Regards,

Krystina

---

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

---

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Tuesday, October 15, 2024 2:22 PM
**To:** Ho, Krystina L. <krystinaho@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

Counsel:

We write to follow-up with respect to certain issues discussed at the parties' Oct. 10 meet and confer regarding motions *in limine* in this case. As stated on the call, we believe the parties can and should reach an agreement with respect to at least the following two MILs.

First, Revance proffered a MIL seeking to "[p]reclude Plaintiffs from presenting to the jury directly or indirectly any license or royalty rate that Dr. Meyer determined to be incomparable in her expert disclosures (e.g., Expert Report of Christine S. Meyer, Ph.D. (Dec.

15, 2023), at ¶¶ 136-156).” During the meet and confer, Allergan stated that they could agree to such preclusion to the extent that neither party discusses comparability of any licenses. Revance is amenable to agreeing that there are no licenses identified by either party that are comparable to the license that would be the subject of the hypothetical negotiation and that, based on the record, there is no industry standard royalty rates for the Asserted Patents. Please confirm that the parties have an agreement on this issue.

Second, Revance proffered a MIL seeking to “[p]reclude Plaintiffs from mentioning or suggesting to the jury any trade secret disputes between Revance and Allergan, including any co-pending litigation between the parties (e.g., Allergan, Inc. et al. v. Revance Therapeutics, Inc., Case No. 23 431 (M.D. Tenn.)) as well as presenting to the jury evidence of employment of former Allergan employees by Revance.” During the meet and confer, Allergan proposed that neither party refer to any litigation other than the immediate action and would take the “evidence of employment of former Allergan employees by Revance” under advisement. Revance agrees with Allergan’s proposal that neither party will refer to any litigation other than the immediate action. To put this issue to rest, we request that Allergan confirm that it will agree to not present evidence, including deposition designations, regarding the employment of former Allergan employees by Revance.

Please confirm that the parties are in agreement by 5 pm ET tomorrow.

Thanks,

Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

---

**From:** Ho, Krystina L. <krystinaho@paulhastings.com>
**Sent:** Wednesday, October 9, 2024 9:18 PM
**To:** Sasha Rao <SRao@sternekessler.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha,

Allergan is available at 2PM ET. We can use the following dial in:

- Phone: 646.558.8656
- Meeting ID: 879 3016 1982
- Passcode: 80776252

Regards,

Krystina

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Wednesday, October 9, 2024 6:00 PM
**To:** Ho, Krystina L. <krystinaho@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

Hi Krystina,

Revance is available between 1 and 3 pm ET. Please circulate a dial-in for a time in that window.

Thanks,
Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

**From:** Ho, Krystina L. <krystinaho@paulhastings.com>
**Sent:** Wednesday, October 9, 2024 5:35 PM
**To:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <DVARUGHE@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Anna Phillips <aphillips@sternekessler.com>; Sasha Rao <SRao@sternekessler.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Counsel,

Please provide Revance's availability for a meet and confer on the parties' contemplated motions *in limine* tomorrow, Thursday, October 10.

Regards,

Krystina

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

**From:** Ho, Krystina L. <krystinaho@paulhastings.com>

**Sent:** Tuesday, October 8, 2024 6:33 PM
**To:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <DVARUGHE@sternekessler.com>; Byron L. Pickard (bpickard@sternekessler.com) <bpickard@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Anna Phillips <aphillips@sternekessler.com>; Sasha Rao <SRao@sternekessler.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Peterman, Chad <chadpeterman@paulhastings.com>; Mays-Williams, Ashley <ashleymayswilliams@paulhastings.com>; Wexler, Bruce M. <brucewexler@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Subject:** RE: Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

Counsel,

Replying to correct the recipients.

Regards,

Krystina

---

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

**From:** Ho, Krystina L.
**Sent:** Tuesday, October 8, 2024 6:06 PM
**To:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <DVARUGHE@sternekessler.com>; Byron L. Pickard (bpickard@sternekessler.com) <bpickard@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Anna Phillips <aphillips@sternekessler.com>; Sasha Rao <SRao@sternekessler.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <DVARUGHE@sternekessler.com>; Byron L. Pickard (bpickard@sternekessler.com) <bpickard@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; YCST_Revance_DAXI <YCST_Revance_DAXI@ycst.com>; Anna Phillips <aphillips@sternekessler.com>; Sasha Rao <SRao@sternekessler.com>; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** Allergan v. Revance, Case No. 21-1411 (D. Del.) - List of Contemplated Motions in Limine

Counsel,

In accordance with the parties' agreed-upon pretrial exchange schedule (*see* Minniti Email to Phillips (Oct. 2, 2024)), Allergan's list of contemplated motions *in limine* is as follows:

1. Motion to preclude Revance's expert, Dr. Raj Suryanarayanan, from offering opinions at trial that fall outside the scope of his expert reports
2. Motion to preclude Revance's expert, Dr. Michael Meagher, from offering opinions at trial that fall outside the scope of his expert reports
3. Motion to preclude Revance's introduction of any facts, through documents or witness testimony, on purported noninfringing alternatives and design around options that Revance did not disclose during fact discovery
4. Motion to preclude Revance's characterization of Allergan, Allergan's actions, or the consequences of a finding for Allergan in a disparaging manner (*e.g.*, that Allergan is an extortionist or seeking to stifle competition/innovation, or that a finding for Allergan will drive up drug prices) that is irrelevant to the issues that the jury will decide

Allergan reserves the right to further modify this list based on the parties' pretrial exchanges, the Court's pretrial rulings, or as otherwise necessary. Allergan further reserves to right to revise this list or combine one or more of these motions in light of the meet and confer process.

Please provide Revance's availability for a meet and confer on the parties' proposed motions *in limine* on Thursday, October 10.

Regards,

Krystina

---

**Krystina Ho | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6023 | Main: +1.212.318.6000 | Fax: +1.212.303.7023 | krystinaho@paulhastings.com | www.paulhastings.com

******************************************************************************************
This message is sent by a law firm and may contain informat on that is privileged or confidential. If you received this transmiss on in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal informat on including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please cl ck HERE. If you have any quest ons, please contact Privacy@paulhastings.com.

# Exhibit 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV 20-00048 JVS (JDEx) | Date | March 15, 2023 |
| Title | Masimo Corporation et al. v. Apple Inc. | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| | |
|---|---|
| Elsa Vargas | Not Present |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Second Order Regarding Motions *in Limine***

Plaintiffs, Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Plaintiffs") and Defendant, Apple Inc. ("Apple"), move the Court for relief by way of Motions *in Limine*. The Court now enters its rulings.

## I. Apple's Motions *in Limine*

### *A. Motion in Limine No. 1: Reference to Other Litigations and Proceedings*

Apple requests the Court "preclude Plaintiffs from offering any evidence, testimony, or argument about or making any reference before the jury to any other litigation or proceeding." (MIL 1, Dkt. No. 1296, at 6.) Plaintiffs opposed. (Opp'n 1, Dkt. Nos. 1332 (unsealed), 1333 (sealed).) Apple replied. (Reply 1, Dkt. Nos. 1383 (unsealed), 1384 (sealed).)

The Court finds that the evidence, rulings, and dispositions of other cases will shed little, if any, probative value. Fed. R. Evid. 401. Additionally, references to other litigations risks danger of unfair prejudice, confusion of the issues, and

misleading the jury. Fed. R. Evid. 403. Such evidence, regardless if they are patent or trade secret cases, could also lead jurors to "defer to findings and determinations relevant to credibility made by an authoritative, professional factfinder rather than determine those issues for themselves." United States v. Sine, 493 F.3d 1021, 1033 (9th Cir. 2007). To the extent Plaintiffs wish to present to the jury the actual prior rulings, such evidence would be hearsay. Fed. R. Evid. 801.

Plaintiffs, in their opposition, seek to preclude Apple from introducing evidence relating to the International Trade Commission investigation. (Opp'n 1 at 11–12.) The Court will not consider affirmative relief in an opposition to a motion.

The Court directs that if any testimony from a prior case is used for proper purposes (e.g., impeachment), the testimony be described as "sworn testimony given in a prior proceeding" or similarly. See also United States v. Gomez-Gallardo, 915 F.2d 553 (9th Cir. 1990) ("That is, impeachment is not permitted where it is 'employed as a guise for submitting to the jury substantive evidence that is otherwise unavailable.'"). If the parties have concerns that any specific evidence may violate this Order, the parties shall raise the matter with the Court out of the presence of the jury or make an objection in the usual course.

Accordingly, the Court **GRANTS** Apple's first motion *in limine*.

*B. Motion in Limine No. 2: References to Irrelevant Apple Operations*

Apple seeks an order excluding three categories of evidence it asserts are irrelevant and prejudicial. (MIL 2, Dkt. Nos. 1300 (unsealed), 1316 (sealed).) Plaintiffs opposed the motion. (Opp'n 2, Dkt. Nos. 1343 (unsealed), 1363 (sealed).) Apple responded. (Reply 2, Dkt. Nos. 1381 (unsealed), 1409 (sealed).)

First, Apple asks the Court to exclude statements or evidence about Apple's foreign operations, including Apple's international corporate structure, the location of its foreign partners, and negative press reports about poor working conditions in factories that manufacture Apple's products. (MIL 2 at 2.) Plaintiffs present no arguments regarding why such evidence would be relevant, and even state that they not intend to elicit such testimony "unless Apple opens the door." (Opp'n 2 at 4.)

The Court finds that evidence of Apple's foreign operations is irrelevant to the issues of trade secret misappropriation in the United States. Fed. R. Evid. 401. Admitting such evidence would cause undue delay and would likely confuse the jury. Fed. R. Evid. 403. However, should Apple, indeed, "open the door" to such evidence at trial, the Court may reconsider its ruling. See City of Pomona v. SQM N. Am. Corp., 866 F.3d 1060, 1070 (9th Cir. 2017).

Second, Apple seeks exclusion of all statements or evidence about Apple's size and overall financial resources. (MIL 2 at 3-4.) Apple contends such evidence is irrelevant to whether Apple misappropriated Plaintiffs' purported trade secrets, whether Apple, improperly failed to list Plaintiffs' employees as co-inventors on certain patents, and damages. (Id.) Plaintiffs argue that Apple's experts put Apple's overall financial size and resources at issue in their testimonies regarding how long Apple would have been able to discover the alleged trade secrets. (Opp'n 2 at 6-7.) Plaintiffs additionally argue Apple's overall financial resources are relevant to showing how easily Apple could have afforded to acquire Masimo. (Id. at 7-8.)

The Court finds that Apple's overall size and financial resources are largely irrelevant to the issues in this case. Fed. R. Evid. 401. However, Plaintiffs may be permitted to present evidence regarding the size and resources of Apple's teams that worked on or in relation to the alleged misappropriated trade secrets. For example, testimony about the size of the hardware team working on the Apple Watch is relevant to how quickly Apple could have discovered the trade secrets on its own.

Finally, Apple seeks to exclude testimony about Apple's recruitment of Plaintiffs' employees other than those alleged to have conveyed trade secrets to Apple. (MIL 2 at 4–5.) Plaintiffs contend such evidence is relevant to show intent, motive, knowledge, and plan to misappropriate Plaintiffs' trade secrets. (Opp'n 2 at 13.) However, Plaintiffs have not alleged that employees other than Drs. O'Reilly and Lamego misappropriated trade secrets, and therefore evidence of Apple's recruitment of other employees is irrelevant. Fed. R. Evid. 401. Additionally, employees are not only permitted but encouraged to move freely from one company to another under at-will employment. Therefore, absent allegations that these other employees misappropriated trade secrets, evidence of their hiring is largely irrelevant.

Plaintiffs contend evidence Apple's recruitment efforts of other employees is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident in misappropriate Plaintiffs' trade secrets. (Opp'n 2 at 13 (citing Fed. R. Evid. 404(b)(2).) While such evidence could give rise to an inference of plan, intent, etc., its admission would likely result in delay and confusion to the jury. See Fed. R. Evid. 403. Accordingly, the Court finds the prejudicial impact of Apple's recruiting employees Plaintiffs' employees other than O'Reilly and Lamego substantially outweighs its probative value. See id.

Accordingly, the Court **GRANTS** Apple's second motion *in limine*.

*C. Motion in Limine No. 3: Inflammatory Statements Attributed to Apple's Employees*

Apple seeks to exclude: (1) statements suggesting that Apple employs a strategy of "efficient infringement"; (2) statements of copying or stealing technology by the late Steve Jobs; (3) two offensive or derogatory statements by O'Reilly; and (4) "political positions attributed to Apple or its leadership, media reports unrelated to this litigation, and media speculation about Apple." (MIL 3, Dkt. Nos. 1303, 1317).

First, statements of "infringement" or "copying" have no relevance to whether Apple misappropriated trade secrets. Second, courts have routinely excluded the same, often-quoted statements by Steve Jobs, who died before the events at issue, as irrelevant or prejudicial. Pinn v. Apple, No. 19-1805, 2021 WL 4777134, at *2–3 (C.D. Cal. July 14, 2021); Contentguard Holdings, Inc. v. Amazon.com, Inc., Nos. 13-1112 & 14-61, 2015 WL 11089490, at *5 (E.D. Tex. Sept. 4, 2015); Optis Wireless Tech., LLC v. Apple Inc., Dkt. 437, No. 2:19-cv-66 (E.D. Texas July 29, 2020), Core Wireless Licensing S.A.R.L. v. Apple Inc., No. 15-CV-05008, Dkt. 362, slip op. at 3 (N.D. Cal. Nov. 17, 2016); Apple iPod iTunes Antitrust Litig., No. 05-CV-0037, 2014 WL 12719192, at *4 (N.D. Cal. Nov. 18, 2014); Emblaze Ltd. Inc. v. Apple Inc., No. 5:11-CV-01079, Dkt. 519, slip op. at 3 (N.D. Cal. June 18, 2014). Therefore, these statements will be excluded because they are irrelevant and risk confusing the jury. Fed. R. Evid. 402; Fed. R. Evid. 403.

Both parties appear to agree that O'Reilly's two statements, i.e. the use of

the term "tar baby," and the statement joking about Apple's lack of humor, should not be used. (See Opp'n at 16; Reply at 3.) Accordingly, the Court denies Apple's request as moot.

Finally, Apple has not pointed the Court to any specific evidence or testimony about the "political positions attributed to Apple or its leadership, media reports unrelated to this litigation, and media speculation about Apple" that it seeks to exclude. While other courts have excluded "political statement[s]" or media "statement[s] unrelated to the litigation," Optis Wireless Technology, Dkt. No. 437, at 247; Pinn, Dkt. 425-1, at 78–80, they did so under specific facts and with specific statements. While the Court agrees that such testimony is generally irrelevant, Apple's request is too vague to be granted. See Trovata, Inc v. Forever 21, Inc., No. 07-01196, 2009 WL 10671582, at *4 (C.D. Cal. Mar. 4, 2009) ("The Court cannot complete its Rule 403 analysis without the specific evidence to be offered."). Should Apple identify and specific statements which Masimo intends to offer, it is free to renew this portion of the motion.

Accordingly, the Court **GRANTS** Apple's third motion *in limine* with respect to the first two categories, **DENIES** as moot as to the third category, and **DENIES** as to the last category.

*D. Motion in Limine No. 4: Unlawful Confidentiality Provisions of Employee Agreements*

1. Motion Summary

Apple asks the Court to preclude Plaintiffs from "from offering any evidence, testimony, or argument about the confidentiality provisions of the [Masimo/Cercacor Employee Confidentiality] Agreements," because those provisions are so broad to constitute an improper restraint of trade under California Business & Professions Code § 16600; therefore, they are "irrelevant, unfairly prejudicial, and would lead to undue delay." (MIL 4, Dkt. Nos. 1306, 1318 (sealed).) Apple argues that "Plaintiffs should not be permitted to compel employees to sign agreements that are contrary to law, and then use those same agreements to their advantage in affirmative litigation." (Id. at 1.) Apple contends the confidentiality provisions are void because they restrain employee mobility by purporting to "prohibit[] the use of 'Confidential Information' outside of Masimo and define[] that term to include 'any information in any form that

Masimo considers confidential.'" (Id. at 4 (quoting Dkt. No. 1306-6, Ex. 4 at 4).) Apple argues this is especially inappropriate where Plaintiffs admit the provisions are unenforceable in California. (Id. at 5 (citing Dkt. No. 1306-3, Ex. 1, Kiani Dep. at 286:14-18, 287).) Because the provisions are void, Apple argues that Plaintiffs should not be allowed to rely on them at trial. (Id. at 8.)

Plaintiffs respond that this Court already upheld the challenged confidentiality provisions in the related True Wearables litigation, and another court has relied on them. (Opp'n 4, Dkt. Nos. 1375, 1334 (sealed).) Further, Plaintiffs challenge Apple's attempt to use a motion *in limine* to seek summary judgment on the enforceability of the confidentiality provisions. (Id. at 2.) In any event, Plaintiffs argue that California authority explains that agreements designed to protect proprietary information such as trade secrets do not violate section 16600. (Id. at 4–5.) Plaintiffs also argue that the provisions do not restrict trade because the covenant of good faith and fair dealing requires construing them narrowly. (Id. at 7–8.) Moreover, Plaintiffs distinguish provisions that relate to protecting confidential information while still employed and protecting such information generally. (Id. at 9.) Plaintiffs argue that, even if void, the provisions would be relevant to show Plaintiffs' efforts to tell their employees about the company's confidentiality expectations. (Id. at 10.) Finally, Plaintiffs argue that Apple would not be unduly prejudiced by admitting the agreements into evidence. (Id.)

Apple replies that the specific issue concerning facial validity was not presented in True Wearables. (Reply 4, Dkt. Nos. 1375, 1410 (sealed).) Apple contends that if it had been raised, Brown v. TGS Mgmt. Co., 57 Cal. App. 5th 303, 316–17 (2020), would have required this Court to hold the confidentiality provisions invalid." (Id. at 1.) Apple argues that, since the provisions are unenforceable, they are irrelevant under Rule 402 and unfairly prejudicial under Rule 403. (Id. at 8–9.)

2. Analysis

The Court declines to reach Apple's belated facial attack to the confidentiality provisions. The Court's Standing Order makes clear that "Motions in Limine should be used to raise legitimate evidentiary issues, and not as veiled motions for summary adjudication." (Dkt. No. 36 at 4.) Apple argues that "the confidentiality provisions [a]re *facially invalid as a matter of law*." (MIL 4 at 6

(emphasis added).) Indeed, Apple admits that an employee's "facial challenge to the legality of the confidentiality provisions is a legal issue" the Court "decide[s] de novo." Brown v. TGS Mgmt. Co., LLC, 57 Cal. App. 5th 303, 318, 271 Cal. Rptr. 3d 303, 317 (2020), as modified on denial of reh'g (Nov. 12, 2020). (See Reply 4 at 7 (Brown "held that the validity of comparable confidentiality provisions was 'a legal issue' and one that could be resolved without wading into the 'factual details'").) Accordingly, the Court finds that Apple's facial attack comes too late and **DENIES in part** MIL 4 on that basis.[1]

Because it is too late to raise a facial challenge, the Court instead considers whether the confidentiality provisions present any legitimate evidentiary issues, i.e., whether they should be excluded as irrelevant or unduly prejudicial. See Fed. R. Evid. 402, 403. Under the California Uniform Trade Secrets Act ("CUTSA"), a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d)(2). "[C]onfidentiality procedures, such as confidentiality agreements and document labeling, are often considered reasonable measures." United States v. Chung, 659 F.3d 815, 825 (9th Cir. 2011).

Applying this standard, the Court finds that the confidentiality provisions relevant to show Plaintiffs' alleged efforts to protect their alleged trade secrets.[2] The Court agrees with Apple, however, in one respect. The Court rules that this issue cannot evolve into a mini-trial about the validity of the provisions. Therefore, the Court is prepared to restrict the scope of any examination on this topic as a waste of time and confusing to the jury if not tailored appropriately. See Fed. R. Evid. 403.

The Court orders the parties to meet and confer to reach an agreement on a

[1] This is especially true considering the timing of the Court's Findings of Fact and Conclusions of Law issued in Masimo Corp. v. True Wearables, Inc., Case No. 8:18-cv-2001-JVS-JDE, which issued on November 7, 2022, one month before the summary judgment deadline in this case. See Dkt. No. 600 (entered 11/16/22). To the extent Apple was concerned about the confidentiality provisions and the lack of analysis concerning their facial validity, it could have addressed them at the summary judgment stage.

[2] This ruling is narrow and relates only to Plaintiffs' efforts to protect their trade secrets. It does not extend to, e.g., allowing the confidentiality provisions to be used to prove acquisition by improper means by O'Reilly or Lamego.

narrow set of questions and related impeachment concerning the existence of the confidentiality provisions, but unknown legal validity of them because the issue has not been adjudicated. For example, Plaintiffs may wish to examine Kiani about the existence of the provisions without going into detail of each and every provision and each and every signed agreement, whereas Apple may wish to cross-examine Kiani on his concession during deposition that part of the agreements are unenforceable in California.[3] Each party could then argue in closing what it believes the existence of the agreements shows. The Court cautions the party that it will not allow undue time to be wasted on this issue and the parties should not ask the jury to resolve the legal question. If necessary, the Court will consider a limiting instruction. Thus, the Court **GRANTS in part** MIL 4 on this limited basis.

For the reasons stated, the Court **DENIES in part** and **GRANTS in part** Apple's fourth motion in limine.

## II. Plaintiffs' Motion *in Limine*

Plaintiffs asks the Court to exclude "evidence or argument about their attorneys' involvement in this case." (MIL 1, Dkt. No. 1297-2 at 3.) Specifically, Plaintiffs seek to exclude evidence and argument regarding (1) attorney preparation of Plaintiffs' § 2019.210 trade secret disclosure and (2) attorney preparation of discovery responses allegedly sharing similarities with Dr. Palmatier's expert report. (Id.) Apple filed an opposition. (Dkt. Nos. 1337, 1336-1 (unredacted).) Plaintiffs filed a reply. (Dkt. No. 1371.)

### *A. Preparation of the § 2019.210 Trade Secret Disclosure*

Protracted evidence and argument concerning Plaintiffs' attorneys' preparation of the § 2019.210 trade secret disclosure is irrelevant and inadmissible. Fed. R. Evid. 401, 402. The fact that attorneys prepared a trade secret disclosure does not tend to prove or disprove the underlying trade secrets are valid and protectable:

[3] To the extent Apple believes it should be able to prove invalidity of the confidentiality provisions in support of its unclean hands defense, it may file an offer of proof of no more than five pages within seven days of this order, including addressing whether unclean hands is a jury question. Plaintiffs may respond in no more than five pages within seven days after receiving Apple's offer of proof.

> [T]hese documents are not relevant to show the "credibility" of any representation by Plaintiffs that they owned trade secrets at the time of any alleged misappropriation or breach of a non-disclosure agreement. Each document was created on a date subsequent to any accused conduct, and as such cannot make Plaintiffs' representations they owned trade secrets years prior—during the relevant period of accused conduct—any more or less probable.

BladeRoom Grp. Ltd. v. Facebook, Inc., No. 5:15-CV-01370-EJD, 2018 WL 1569703, at *1 (N.D. Cal. Mar. 30, 2018). Preparation of the disclosure document has no tendency to prove or disprove that Plaintiffs were in possession of the trade secrets at the time of litigation or that Plaintiffs created the trade secrets at issue. Id. Rather, the trade secret disclosure merely serves as an identification of the trade secrets for litigation purposes. See Advanced Modular Sputtering, Inc. v. Super. Ct., 33 Cal. Rptr. 3d 901, 907 (2005) ("The trade secret designation mandated by section 2019.210 is not itself a pleading but it functions like one in a trade secret case because it limits the scope of discovery in much the same way as the allegations of a complaint limit discovery in other types of civil actions.")

Apple raises two arguments regarding the relevancy of the trade secret disclosure. Neither are persuasive. First, Apple argues that Plaintiffs' witnesses' inability to describe Plaintiffs' trade secrets without referring to the disclosure created during this litigation "goes to the heart of" Plaintiffs' misappropriation claim.[4] (Dkt. No. 1336-1 at 5.) However Apple need not refer to the trade secret disclosure or Plaintiffs' attorneys' preparation of that document to question witnesses regarding pre-suit documentation of the trade secrets. In fact, the trade secret disclosure is, indisputably, not a pre-litigation document. To the extent a witness erroneously identifies the disclosure as a pre-litigation document, jury instructions may resolve the misunderstanding.[5]

---

[4] Apple identifies deposition testimony in which witnesses referred to discovery responses or mentioned their attorneys when asked about documentation for the trade secrets. (Dkt. No. 1336-1 at 4.) Apple may distinguish between pre-litigation and post-litigation documents, as needed, to establish a lack of pre-litigation documentation. Apple may not present protracted evidence or argument regarding Plaintiffs' attorneys' document preparation activities.

[5] Plaintiffs indicate they proposed a jury instruction explaining that Plaintiffs prepared a written description of the trade secrets at the beginning of the case. (Dkt. No. 1337 at

Second, Apple argues it should be able to cross-examine witnesses regarding a lack of written, pre-litigation documentation of the trade secrets, Apple's position that the trade secrets identified in the disclosure were copied from the patent, and Apple's position that Plaintiffs' attorneys defined the trade secrets after litigation began. (Id.) Apple may cross-examine witnesses regarding a lack of pre-litigation documentation without reference to the trade secret disclosure, as discussed above. As to the "copying" argument, Apple may argue the patent discloses the identified trade secrets and that the patent predates any evidence of creation or possession of the trade secrets. Apple need not argue that Plaintiffs' attorneys copied the patent. The "definition" argument is irrelevant. The trade secret disclosure identifies the trade secrets for litigation purposes but has no tendency to prove or disprove creation or possession at the time of the alleged misappropriation, as discussed above.

Accordingly, for the foregoing reasons, Plaintiffs' motion *in limine* is **GRANTED** as to the trade secret disclosure issue. Apple may not suggest that attorney preparation of the disclosure document is probative of creation or possession of the underlying trade secrets.

### *B. Purported Similarity between Discovery Responses and Dr. Palmatier's Expert Report*

Plaintiffs seek to exclude testimony and evidence suggesting that their expert, Dr. Palmatier, copied portions of his expert report from Plaintiffs' discovery responses. (Dkt. No. 1297 at 6.) Specifically, Plaintiffs ask the Court to exclude Dr. Kivetz' opinions offered at ¶¶ 211–212 and Table 3 of his report (Dkt. No. 1295-2) and related argument and evidence concerning the discovery responses. Apple contends the similarities between the discovery responses and Dr. Palmatier's report are relevant because they suggest that Dr. Palmatier did not perform an independent analysis and that he is not credible. (Dkt. No. 1336-1 at 7.) Apple asks the Court to permit cross examination of Dr. Palmatier on this topic to test for attorney ghost writing. (Id.)

Plaintiffs respond that the similarity does not support an inference of copying given the timing of the discovery responses and the expert report. (Dkt. No. 1371 at 13.) However, Plaintiffs explain that to rebut Apple's position, they would need to offer attorney testimony to explain the timing issue. (Dkt. No. 1371 at 14.) Plaintiffs

---

9.)

argue this would be prejudicial.

The purported similarity between the discovery responses and Dr. Palmatier's report have little, if any, relevance to Dr. Palmatier's credibility. Apple identifies only these purported similarities, and no other evidence of a lack of independence. By contrast, the cases Apple cites include situations in which the expert admitted to substantial attorney involvement in preparing the report. See Marbled Murrelet (Brachyramphus Marmoratus) v. Pac. Lumber Co., 880 F. Supp. 1343, 1364 (N.D. Cal. 1995), aff'd 83 F.3d 1060 (9th Cir. 1996) ("Kerns faxed his draft report to Pacific Lumber's attorneys and asked them 'How much flesh should be hung on the bones?'"); Howard v. City of Durham, No. 1:17CV477, 2021 WL 5086379, at *9 (M.D.N.C. Nov. 2, 2021) (citing expert testimony recounting a joint drafting effort between the expert and the attorney).

Further, argument and evidence specific to the discovery responses puts Plaintiffs in a potentially prejudicial situation as described above. Plaintiffs could decline to present attorney rebuttal testimony; however, Dr. Palmatier may appear less credible to the jury absent any explanation of the similarity. Moreover, Apple already questioned Dr. Palmatier about the discovery responses at his deposition. (Palmatier Dep. Tr., Docket No. 1336-2 at 318:2-11.) Dr. Palmatier testified that he reviewed the interrogatory responses but did not author them. (Id.) Dr. Palmatier's review likely explains the similarity. Here, the risk of prejudice outweighs the low probative value of the similarity evidence. Fed. R. Evid. 403. The evidence is not admissible.

Accordingly, for the foregoing reasons, Plaintiffs' motion *in limine* is **GRANTED** as to the discovery responses issue. Apple may generally cross examine Dr. Palmatier regarding the independent preparation of his report. Apple may also confirm that Dr. Palmatier reviewed the interrogatory responses, consistent with his deposition testimony. However, Apple may not ask Dr. Palmatier to explain the alleged similarities between the report and the discovery responses or otherwise implicate Plaintiffs' attorneys.

* * * * * * * * * * * * * *

The Court asked the parties to meet and confer and notify the Court via email to the Courtroom Deputy Clerk whether any parts of the sealed order should be redacted from the publicly-filed version of the order. Plaintiffs and Apple submitted proposed redactions which the Court reviewed. However, the Court finds they do not fall within the scope of the prior sealing orders. The proposed

redactions related to high-level, general information rather than confidential or trade secret information. Accordingly, this Order is published in its entirety without redactions.

**Counsel are ordered to advise the parties and all witnesses of the Court's rulings so that there are no inadvertent violations of this Order.**

**IT IS SO ORDERED.**

# Exhibits to Allergan's Opposition to Revance's Motion in Limine # 2 to Preclude Allergan from Referencing or Eliciting Evidence and/or Testimony Regarding Employment History

| Exhibit | Description |
|---|---|
| 1 | Conor Gallagher Resume |
| 2 | Excerpt of Responsive Expert Report of Christian Schöneich |
| 3 | Excerpt of Reply Expert Report of Michael M. Meagher |
| 4 | Excerpt of Deposition Transcript of Conor Gallagher |
| 5 | Excerpt of Deposition Transcript of Kellie R. Lao |
| 6 | Kellie R. Lao Resume |
| 7 | Excerpt of Expert Report of Christine S. Meyer |

# EXHIBIT 1

Contact

www.linkedin.com/in/conor-gallagher-34938b2a (LinkedIn)

Top Skills

Medical Affairs
Neuroscience
Pharmaceutical Industry

# Conor Gallagher

Vice President Medical Affairs and Scientific Innovation at Revance Therapeutics, Inc.
San Francisco Bay Area

## Experience

Revance Therapeutics, Inc.
Vice President Medical Affairs and Scientific Innovation
April 2018 - Present (5 years 7 months)
Newark, CA

Allergan
12 years 4 months

Executive Director, Medical Affairs, Global Lead Facial Aesthetics
January 2017 - March 2018 (1 year 3 months)
Irvine, CA

Sr. Medical Director, Facial Aesthetics
March 2016 - January 2017 (11 months)
Irvine, CA

Medical Director, Facial Aesthetics and Medical Dermatology
July 2012 - March 2016 (3 years 9 months)
Irvine, CA

Director, Global Neurotoxin Science, Medical Affairs
November 2008 - July 2012 (3 years 9 months)
Irvine, CA

Regional Scientific Services Manager
December 2005 - November 2008 (3 years)

The Hospital for Sick Children
Postdoctoral Fellow
2003 - December 2005 (2 years)

## Education

University of Toronto
PhD, Neuroscience · (1996 - 2002)



EXHIBIT 2
Gallagher
10/18/2023
Reported by: Michael P. Hensley, RDR
CA CSR #14114

[redacted]

University College Cork
M.Sc., Anatomy · (1994 - 1995)

University College Dublin
B.Physio. (hons), Physiotherapy · (1988 - 1992)

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals Ireland<br>Unlimited Company, and Allergan USA, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>Revance Therapeutics, Inc. and Ajinomoto<br>Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>Defendants. | Civil Action No. 21-1411-RGA<br><br>[redacted] |

**Responsive Expert Report of Christian Schöneich, Ph.D. Concerning**
**U.S. Patent Nos. 11,033,625, U.S. Patent No. 11,147,878, and U.S. Patent No. 11,285,216**

# TABLE OF CONTENTS


Page

I. QUALIFICATIONS ... 1
II. OVERVIEW OF MY REBUTTAL OPINION ... 4
III. DOCUMENTS CONSIDERED ... 4
IV. PERSON OF ORDINARY SKILL IN THE ART ... 4
V. BACKGROUND ON BOTULINUM TOXIN FORMULATIONS BEFORE 2005 ... 6
VI. LEGAL STANDARDS ... 12
A. Determining the Invention Dates of a Patent Claim ... 12
B. Written Description ... 13
C. Nonobviousness ... 13
VII. THE ASSERTED FORMULATION PATENTS ... 15
A. U.S. Patent No. 11,033,625 ... 15
B. U.S. Patent No. 11,147,878 ... 17
C. U.S. Patent No. 11,285,216 ... 18
VIII. THE INVENTION DATES OF THE ASSERTED FORMULATION CLAIMS ... 20
A. The ’126 Provisional Application and ’683 Application Provide Adequate Written Description Support for the Asserted Formulation Claims ... 24
1. Priority Support for the Asserted Claims of the ’625 Patent ... 24
a. Claim 1 of the ’625 Patent ... 24
b. Claim 2 of the ’625 Patent ... 33
c. Claim 6 of the ’625 Patent ... 33
d. Claim 8 of the ’625 Patent ... 34
e. Claim 9 of the ’625 Patent ... 34
f. Claim 10 of the ’625 Patent ... 35
g. Claim 11 of the ’625 Patent ... 35
h. Claim 14 of the ’625 Patent ... 36
2. Priority Support for the Asserted Claims of the ’878 Patent ... 36
a. Claim 1 of the ’878 Patent ... 36
b. Claim 2 of the ’878 Patent ... 38
c. Claim 4 of the ’878 Patent ... 38
d. Claim 6 of the ’878 Patent ... 39

**TABLE OF CONTENTS**
(continued)

**Page**


e. Claim 19 of the '878 Patent ........ 39

f. Claim 20 of the '878 Patent ........ 40

3. Priority Support for the Asserted Claims of the '216 Patent ........ 40

a. Claim 1 of the '216 Patent ........ 41

b. Claim 2 of the '216 Patent ........ 41

c. Claim 5 of the '216 Patent ........ 42

d. Claim 6 of the '216 Patent ........ 42

e. Claim 9 of the '216 Patent ........ 43

f. Claim 10 of the '216 Patent ........ 43

g. Claim 12 of the '216 Patent ........ 44

h. Claim 16 of the '216 Patent ........ 44

B. The Invention Dates Applicable to Each of the Asserted Formulation Claims Based on Terrence Hunt's and Reasonably Diligent Reduction to Practice ........ 45

1. The Asserted Claims of the '625 Patent ........ 68

a. Claim 1 of the '625 Patent ........ 68

b. Claims 2, 6, 8, 9, 10, 11, and 14 of the '625 Patent ........ 71

2. The Asserted Claims of the '878 Patent ........ 72

a. Claim 1 of the '878 Patent ........ 72

b. Claims 2, 4, 6, and 19 of the '878 Patent ........ 73

c. Claim 20 of the '878 Patent ........ 73

3. The Asserted Claims of the '216 Patent ........ 74

a. Claim 1 of the '216 Patent ........ 74

b. Claims 2, 5, 6, 9, 10, and 12 of the '216 Patent ........ 76

c. Claim 16 of the '216 Patent ........ 76

IX. REFERENCES CITED IN DR. SURYANARAYANAN REPORT ........ 77

A. WO 2006/005910 ("Webb") ........ 77

B. GB 2419527 ("Pickett") ........ 79

C. WO 2005/007185 A2 ("Frevert") ........ 81

**TABLE OF CONTENTS**
(continued)


**Page**

D. Carpenter, *et al.*, "Rational Design of Stable Lyophilized Protein Formulations: Some Practical Advice," Pharma. Res., vol. 14(8), pp. 969-75 (Aug. 1997) ("Carpenter 1997") ... 85

E. U.S. Patent Application Publication No. 2003/0118598 A1 ("Hunt '598") ... 85

F. U.S. Patent No. 5,756,468 ("Johnson '468") ... 88

X. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE '625 PATENT WOULD HAVE BEEN OBVIOUS TO A POSA AT THE TIME OF THE INVENTION ... 89

A. Obviousness Not Shown Over Webb ... 89

1. Claim 1 of the '625 Patent ... 89
2. Claim 2 of the '625 Patent ... 92
3. Claim 6 of the '625 Patent ... 93
4. Claim 8 of the '625 Patent ... 93
5. Claim 9 of the '625 Patent ... 93
6. Claim 10 of the '625 Patent ... 94
7. Claim 11 of the '625 Patent ... 94
8. Claim 14 of the '625 Patent ... 95

B. Obviousness Not Shown Over Pickett ... 95

1. Claim 1 of the '625 Patent ... 96
2. Claim 2 of the '625 Patent ... 96
3. Claim 6 of the '625 Patent ... 97
4. Claim 8 of the '625 Patent ... 97
5. Claim 9 of the '625 Patent ... 97
6. Claim 10 of the '625 Patent ... 98
7. Claim 11 of the '625 Patent ... 98
8. Claim 14 of the '625 Patent ... 99

C. Obviousness Not Shown Over Frevert and Carpenter 1997 ... 99

1. Claim 1 of the '625 Patent ... 100
2. Claim 2 of the '625 Patent ... 103
3. Claim 6 of the '625 Patent ... 104
4. Claim 8 of the '625 Patent ... 104

**TABLE OF CONTENTS**
(continued)

**Page**


5. Claim 9 of the ’625 Patent ..... 104
6. Claim 10 of the ’625 Patent ..... 105
7. Claim 11 of the ’625 Patent ..... 105
8. Claim 14 of the ’625 Patent ..... 106

D. Obviousness Not Shown Over Hunt 598 and Johnson 468 ..... 106

1. Claim 1 of the ’625 Patent ..... 107
2. Claim 2 of the ’625 Patent ..... 111
3. Claim 6 of the ’625 Patent ..... 111
4. Claim 8 of the ’625 Patent ..... 111
5. Claim 9 of the ’625 Patent ..... 112
6. Claim 10 of the ’625 Patent ..... 112
7. Claim 11 of the ’625 Patent ..... 113
8. Claim 14 of the ’625 Patent ..... 113

XI. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE ’878 PATENT WOULD HAVE BEEN OBVIOUS TO A POSA AT THE TIME OF THE INVENTION ..... 114

A. Obviousness Not Shown Over Webb ..... 114

1. Claim 1 of the ’878 Patent ..... 114
2. Claim 2 of the ’878 Patent ..... 117
3. Claim 4 of the ’878 Patent ..... 118
4. Claim 6 of the ’878 Patent ..... 118
5. Claim 19 of the ’878 Patent ..... 118
6. Claim 20 of the ’878 Patent ..... 119

B. Obviousness Not Shown Over Pickett ..... 119

1. Claim 1 of the ’878 Patent ..... 120
2. Claim 2 of the ’878 Patent ..... 121
3. Claim 4 of the ’878 Patent ..... 121
4. Claim 6 of the ’878 Patent ..... 121
5. Claim 19 of the ’878 Patent ..... 122
6. Claim 20 of the ’878 Patent ..... 122

**TABLE OF CONTENTS**
(continued)

**Page**

C. Obviousness Not Shown Over Frevert and Carpenter ..... 123
1. Claim 1 of the ’878 Patent ..... 123
2. Claim 2 of the ’878 Patent ..... 127
3. Claim 4 of the ’878 Patent ..... 128
4. Claim 6 of the ’878 Patent ..... 128
5. Claim 19 of the ’878 Patent ..... 129
6. Claim 20 of the ’878 Patent ..... 129
D. Obviousness Not Shown Over Hunt 598 and Johnson 468 ..... 130
1. Claim 1 of the ’878 Patent ..... 130
2. Claim 2 of the ’878 Patent ..... 134
3. Claim 4 of the ’878 Patent ..... 134
4. Claim 6 of the ’878 Patent ..... 135
5. Claim 19 of the ’878 Patent ..... 135
6. Claim 20 of the ’878 Patent ..... 136
XII. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE ’216 PATENT WOULD HAVE BEEN OBVIOUS TO A POSA AT THE TIME OF THE INVENTION ..... 136
A. Obviousness Not Shown Over Webb ..... 136
1. Claim 1 of the ’216 Patent ..... 136
2. Claim 2 of the ’216 Patent ..... 140
3. Claim 5 of the ’216 Patent ..... 140
4. Claim 6 of the ’216 Patent ..... 140
5. Claim 9 of the ’216 Patent ..... 141
6. Claim 10 of the ’216 Patent ..... 141
7. Claim 12 of the ’216 Patent ..... 142
8. Claim 16 of the ’216 Patent ..... 142
B. Obviousness Not Shown Over Pickett ..... 143
1. Claim 1 of the ’216 Patent ..... 143
2. Claim 2 of the ’216 Patent ..... 144
3. Claim 5 of the ’216 Patent ..... 144

**TABLE OF CONTENTS**
(continued)

**Page**


4. Claim 6 of the ’216 Patent ........ 144
5. Claim 9 of the ’216 Patent ........ 145
6. Claim 10 of the ’216 Patent ........ 145
7. Claim 12 of the ’216 Patent ........ 146
8. Claim 16 of the ’216 Patent ........ 146

C. Obviousness Not Shown Over Frevert and Carpenter 1997 ........ 146
1. Claim 1 of the ’216 Patent ........ 147
2. Claim 2 of the ’216 Patent ........ 150
3. Claim 5 of the ’216 Patent ........ 151
4. Claim 6 of the ’216 Patent ........ 151
5. Claim 9 of the ’216 Patent ........ 152
6. Claim 10 of the ’216 Patent ........ 152
7. Claim 12 of the ’216 Patent ........ 152
8. Claim 16 of the ’216 Patent ........ 153

D. Obviousness Not Shown Over Hunt 598 and Johnson 468 ........ 153
1. Claim 1 of the ’216 Patent ........ 154
2. Claim 2 of the ’216 Patent ........ 158
3. Claim 5 of the ’216 Patent ........ 158
4. Claim 6 of the ’216 Patent ........ 158
5. Claim 9 of the ’216 Patent ........ 159
6. Claim 10 of the ’216 Patent ........ 159
7. Claim 12 of the ’216 Patent ........ 160
8. Claim 16 of the ’216 Patent ........ 160

XIII. OBJECTIVE INDICIA DEMONSTRATE NONOBVIOUSNESS OF THE ASSERTED CLAIMS OF THE ’625, ’878, AND ’216 PATENTS ........ 161

A. Unexpected Results ........ 161
B. Long-Felt Need ........ 166
C. Industry Praise ........ 167
D. Skepticism ........ 167

**TABLE OF CONTENTS**
(continued)

**Page**


XIV. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE ’625 PATENT IS INVALID FOR LACK OF WRITTEN DESCRIPTION SUPPORT ..... 168

A. Claim 1 of the ’625 Patent ..... 169

B. Claim 2 of the ’625 Patent ..... 176

C. Claim 6 of the ’625 Patent ..... 177

D. Claim 8 of the ’625 Patent ..... 177

E. Claim 9 of the ’625 Patent ..... 178

F. Claim 10 of the ’625 Patent ..... 179

G. Claim 11 of the ’625 Patent ..... 179

H. Claim 14 of the ’625 Patent ..... 180

XV. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE ’878 PATENT IS INVALID FOR LACK OF WRITTEN DESCRIPTION SUPPORT ..... 180

A. Claim 1 of the ’878 Patent ..... 181

B. Claim 2 of the ’878 Patent ..... 188

C. Claim 4 of the ’878 Patent ..... 189

D. Claim 6 of the ’878 Patent ..... 189

E. Claim 19 of the ’878 Patent ..... 190

F. Claim 20 of the ’878 Patent ..... 190

XVI. DR. SURYANARAYANAN FAILS TO SHOW THAT ANY ASSERTED CLAIM OF THE ’216 PATENT IS INVALID FOR LACK OF WRITTEN DESCRIPTION SUPPORT ..... 191

A. Claim 1 of the ’216 Patent ..... 192

B. Claim 2 of the ’216 Patent ..... 199

C. Claim 5 of the ’216 Patent ..... 199

D. Claim 6 of the ’216 Patent ..... 200

E. Claim 9 of the ’216 Patent ..... 200

F. Claim 10 of the ’216 Patent ..... 201

G. Claim 12 of the ’216 Patent ..... 201

H. Claim 16 of the ’216 Patent ..... 202

[redacted]

## XIII. Objective Indicia Demonstrate Nonobviousness of the Asserted Claims of the '625, '878, and '216 Patents

468. For the reasons discussed above, Dr. Suryanarayanan has not shown that any of the Asserted Formulation Claims are invalid as obvious in view of the alleged prior art. As discussed in this section, numerous objective indicia further support the nonobviousness of the Asserted Formulation Claims, including (1) unexpected results, (2) long felt need, (3) industry praise, and (4) skepticism of others. Each of these objective indicia of nonobviousness further supports my opinion that Dr. Suryanarayanan fails to show that the Asserted Formulation Claims are obvious.

469. As discussed in Paragraph above, I incorporate herein my December 15, 2023 expert report in its entirety, including my opinions on Daxxify's infringement of the Asserted Formulation Claims. Among other things, it is my opinion that, because Daxxify infringes, and thus is co-extensive with and practices the Asserted Formulation Claims, this also shows there is a nexus between the objective indicia of nonobviousness associated with Daxxify and the Asserted Formulation Claims.

### A. Unexpected Results

470. Unexpected results is the first objective indicia of nonobviousness for the Asserted Formulation Claims. As discussed in Section IX of my expert report dated December 15, 2023, it is my opinion that, to the extent Revance's Daxxify product yields a longer duration of action profile as compared to other injectable toxin products on the market, this characteristic is attributable to, and thus has a nexus to, to the subject matter covered by the Asserted Formulation Claims.

471. For the purpose of this report, I have also been asked by Allergan's counsel to provide an analysis of the unexpected results of the Asserted Formulation Claims, and whether,

[redacted]

to the extent Revance's Daxxify product may yield a longer duration of action profile as compared to other injectable toxin products on the market, this characteristic is attributable to subject matter covered by the Asserted Formulation Claims.

472. For the sole purpose of this expert report, I assume that Revance's public statements about the duration profile of Daxxify as compared to other injectable toxin products on the market, including Botox, are accurate.[9] I take no position on whether any clinical trials concerning Daxxify support Revance's marketing claims. In consideration of this issue, I have reviewed certain sections of BLA No. 761127, public statements about Daxxify and RTP004 made by Revance, and a study conducted by Allergan analyzing a formulation designed to mimic Revance's Daxxify product.

473. Section 3.2.A.3 of BLA No. 761127 provides general information about RTP004, which is a peptide excipient that is included in Revance's Daxxify drug product. (*See* REV_DAX-00002851.) According to Revance, [redacted] Revance made the following representation to the FDA regarding R[redacted]:

[redacted]

[9] *See, e.g.*, www.daxxify.com ("Conventional frown line treatments last 3-4 months. At least 50% of patients in clinical studies had no or minor frown lines 6 months after treatment with DAXXIFY®. In other safety studies, between 5% and 17% of patients still had noticeable improvement 9 months later.") (last visited Feb. 9, 2024).

[redacted]

(*Id.*)

474. To my knowledge, the only two reports that Revance has submitted to the FDA pertaining to RTP004 are [redacted] (*See* REV_DAX 00002851; REV_DAX 00003437; REV_DAX 00003458.) I have reviewed both of those reports, and [redacted] Instead, these reports [redacted] (*See* REV_DAX-00003437; REV_DAX-00003458.)

475. In addition to Revance's BLA No. 761127, [redacted]

476. [redacted] (*See* ALGN-1844877.) [redacted]

[redacted]

[redacted]

[redacted]

(*See* ALGN-1844877 at 881.) [redacted]

[redacted] (*See* ALGN-1844877 at 886.) [redacted]

[redacted]

[redacted]

(*See* ALGN-1844877 at 886.)

479. [redacted] (*See* ALGN-1844877 at 886; *see also* ALGN-1845217.)

480. In considering this study, I have also considered the deposition testimony of Dr. Ron Broide, [redacted]

481. In my opinion, therefore, any "duration of action" effects that Daxxify exhibits are due to the combination of excipients recited in the Asserted Formulation Claims, rather than Revance's RTP004 peptide excipient.

482. It also my opinion that the superior "duration of action" effects attributable to combination of excipients in the Asserted Formulation Claims are unexpected and surprising in comparison to other injectable BoNT formulations that were available by January 2005. For example, by January 2005, a POSA would have understood that "the usual duration of an intramuscular injection of Botox is typically about 3 to 4 months." (*See* Hunt 598 at [0039].) It

[redacted]

in my understanding that Revance considers, for example, Botox and Dysport to be "conventional frown line treatments [that] last 3-4 months," and that Revance had made representations about Daxxify's duration profile to the FDA that [redacted]. (*See, e.g.*, REV_DAX-02105314 [redacted] *see also* REV_DAX-02105482 [redacted] Given this context, it is my opinion that a POSA would have found the duration profile attributable to the Asserted Formulation Claims a surprising and unexpected result when compared to the duration profiles of other BoNT injectable products that available by January 2005.

483. For the reasons discussed above, it is my opinion that the objective indicia of unexpected results supports the nonobviousness of the Asserted Formulation Claims.

**B. Long-Felt Need**

484. Long-felt need is another objective indicia of nonobviousness for the Asserted Formulation Claims. As of the time of the invention of the Asserted Formulation Claims (*see supra* Section VII), there was a long-felt need for a stable BoNT formulation that lacked human serum albumin. (*See supra* Section V.) It is my opinion that long-felt need is also shown by Revance's actions in seeking approval for Daxxify, which does not contain human serum albumin, and further touting the product's duration of action. Moreover, Revance states that, "unlike conventional neuromodulators," Daxxify "was developed to address duration of treatment effect, as nearly 90% of patients and physicians desire a treatment that lasts longer." (*See* Revance Therapeutics, Inc., Press Release (Oct. 26, 2023).)

[redacted]

485. For the reasons discussed above, it is my opinion that the objective indicia of long-felt need supports the nonobviousness of the Asserted Formulation Claims.

### C. Industry Praise

486. Industry praise is another objective indicia of nonobviousness for the Asserted Formulation Claims. Since the launch of Daxxify, it is my understanding that there have been a number of news articles touting the product's purported duration of effect[10] attributable to the subject matter of the Asserted Formulation Claims. For example, a recent TIME magazine article listed Daxxify as one of the "Best Inventions of 2023." (*See* TIME 2023.)

487. For the reasons discussed above, it is my opinion that the objective indicia of industry praise supports the nonobviousness of the Asserted Formulation Claims.

### D. Skepticism

488. Skepticism is another objective indicia of nonobviousness for the Asserted Formulation Claims. As of the time of the invention of the Asserted Formulation Claims (*see supra* VII), a POSA would have understood there was skepticism in the field as to whether a BoNT formulation that lacked albumin or other animal proteins could be sufficiently stable.

489. For example, Hunt '598 stated that the probability of finding a suitable substitute for human serum albumin was "realistically seen to approach zero."

---

[10] As discussed above, I take no position on whether any clinical trials concerning Daxxify support Revance's marketing claims.

[redacted]

> **[0058]** In light of the unique nature of botulinum toxin and the requirements set forth above, the probability of finding a suitable albumin replacement for the human serum albumin used in current botulinum toxin containing pharmaceutical compositions must realistically be seen to approach zero. Prior to the present invention, only the animal derived

(*See* Hunt '598 at [0058]; *see, e.g.*, Schantz 1992 at 82.)

490. For the reasons discussed above, it is my opinion that the objective indicia of skepticism supports the nonobviousness of the Asserted Formulation Claims.

## XIV. Dr. Suryanarayanan Fails to Show that Any Asserted Claim of the '625 Patent Is Invalid for Lack of Written Description Support

491. Dr. Suryanarayanan opines that the Asserted Formulation Claims of the '625 patent "are invalid for lack of written description" because the '625 patent specification does not convey to a POSA that Mr. Hunt was in possession of (i) "a large genus" of claimed compositions that incorporates "any other component," (ii) suitable concentrations of certain excipients that would "yield a composition that achieves the claimed retained potency," (iii) a composition with a pH of "from about 5 to about 7.3," (iv) buffers other than sodium citrate, potassium phosphate, and histidine, (v) suitable surfactants, or (vi) compositions that can achieve the claimed retained potency. (*See* Suryanarayanan Report at ¶¶ 318-26.) For the reasons discussed below, I disagree with these opinions from Dr. Suryanarayanan, including the unsupported statement that "Claim 2, 6, 9, 11, and 14 do not narrow the broad aspects of Claim 1." (*Id.* at ¶ 327.)

Christian Schöneich, Ph.D.

Dated: March 8, 2024

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

Allergan, Inc.,
Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,

*Plaintiffs,*

v.

Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio Pharma Services,

*Defendants.*

Civil Action No. 21-1411-RGA

[redacted]

**REPLY EXPERT REPORT OF MICHAEL M. MEAGHER, PH.D.**
**REGARDING DURATION OF ACTION ISSUES**

## TABLE OF CONTENTS


I. Introduction ........................................................................ 1

II. Background and Qualifications ........................................................................ 2

III. Materials Considered ........................................................................ 2

IV. Response to Dr. Schöneich's opinions pertaining to DAXXIFY®'s clinical duration of action. ........................................................................ 3

**IV. Response to Dr. Schöneich's opinions pertaining to DAXXIFY®'s clinical duration of action.[1]**

10. At ¶¶470-483 of his Rebuttal Report, Dr. Schöneich discusses [redacted] According to Dr. Schöneich, "to the extent Revance's Daxxify product yields a longer duration of action profile as compared to other injectable toxin products on the market, this characteristic is attributable to, and thus has a nexus to, to the subject matter covered by the Asserted Formulation Claims." *See* Schöneich Rebuttal Report, ¶470. Dr. Schöneich previously provided opinions concerning [redacted] to which I responded in my March 8 Rebuttal Report. I incorporate my March 8 Rebuttal Report herein by reference.

11. At the outset, in this section of Dr. Schöneich's Rebuttal Report, I understand him to be referring to DAXXIFY®'s clinical longer duration of action. *See* Schöneich Rebuttal Report, ¶¶198–208. However, the asserted claims of the '625 Patent, '878 Patent, and '216 Patent are directed to botulinum toxin pharmaceutical compositions that retain potency after storage "as a powder" for certain periods of time and under certain conditions. None of the asserted claims of the '625 Patent, '878 Patent, and '216 Patent recites any language directed to duration of action after administration. Therefore, in my opinion, the asserted claims of the '625 Patent, '878 Patent, and '216 Patent do not require that the botulinum toxin composition exhibit any particular duration of action profile. That is, "a longer duration of action profile as compared to other injectable toxin products on the market" (*see* Schöneich Opening Report, ¶198; Schöneich Rebuttal Report, ¶470) is not a required feature of the botulinum toxin compositions described in the asserted claims of the '625 Patent, '878 Patent, and '216 Patent. Indeed, the specifications of these patents and their

[1] I understand from counsel that other experts on behalf of Revance will address other aspects of Dr. Schöneich's opinions.

file histories are silent as to any effect the claimed compositions may have on the clinical duration of a botulinum toxin product.

12. Dr. Schöneich opines that "[i]n my opinion, any 'duration of action' effects that Daxxify exhibits are due to the combination of excipients in the Asserted Formulation Claims, rather than Revance's RTP004 peptide excipient." *See* Schöneich Opening Report, ¶¶207–208. Dr. Schöneich further agrees with the deposition testimony of Dr. Ron Broide, a group leader at Allergan that [redacted] *See* Schöneich Opening Report, ¶¶207–208; Schöneich Rebuttal Report, ¶480. [redacted] *See* Schöneich Opening Report, ¶¶202–207; Schöneich Rebuttal Report, ¶¶476-479; ALGN-1844877. [redacted]

13. As an initial matter, the [redacted] *See* ALGN-1844877 at -880. [redacted] *See* ALGN-1844877 at -881. However, there are important differences between [redacted]

14. For example, [redacted] Revance identifies [redacted] (*see, e.g.*, REV_DAX-02753892 at -892), so it is reasonable that [redacted].

15. As a second example of the differences between [redacted] *See* ALGN-1845217. [redacted] ALGN-1844877 at -881. [redacted]

---

2 [redacted] EV_DAX-02753892 at -892. Comparing the molecular weight of trehalose (https://pubchem.ncbi.nlm.nih.gov/compound/Trehalose) to trehalose dihydrate (https://pubchem.ncbi.nlm.nih.gov/compound/Trehalose-dihydrate), there is about [redacted] g trehalose per [redacted] g of trehalose dihydrate. Accordingly, [redacted], [redacted]

3 [redacted].

[redacted] ALGN-1844877 at -882 [redacted] The commercial DAXXIFY® product contains [redacted] REV_DAX-02755534 at -547. This represents a ratio of [redacted] on a mass basis. Accordingly, [redacted]. Accordingly, one cannot draw conclusions about DAXXIFY® [redacted].

16. As a third example of the differences [redacted]

[4] [redacted]

[5] [redacted]

[6] [redacted]

[7] [redacted]

[8] [redacted]

[redacted] The commercial DAXXIFY® product contains [redacted]. REV_DAX-02755534 at -547. 50 U/vial DAXXIFY® is [redacted] and 100 U/vial DAXXIFY® is [redacted]. REV_DAX-02755534 at -541. Accordingly, injectable 50 U/vial DAXXIFY® contains about [redacted], and injectable 100 U/vial DAXXIFY® contains [redacted]. [redacted]

17. As a fourth example of the differences between DAXXIFY® and [redacted] *See* ALGN-1845217 at Table 2. In contrast, DAXXIFY® is formulated at a [redacted] *See* REV_DAX-00003307 at -307 [redacted] Accordingly, [redacted] DAXXIFY® is formulated at the [redacted], and Allergan has failed to disclose appropriate comparability testing to show that Formulation 3 is equivalent to DAXXIFY®.

---

[9] [redacted]

[10] [redacted]

[11] ([redacted]

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: 19 April 2024

Michael M. Meagher, Ph.D.

# EXHIBIT 4

[redacted]



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC., ) Case No. 1:21-cv-01411-RGA
Plaintiffs,
v.
REVANCE THERAPEUTICS, INC., AND AJINOMOTO ALTHEA, INC., d/b/a AJINOMOTO BIO-PHARMA SERVICES,
Defendants.

[redacted]

VIDEO-RECORDED DEPOSITION OF
CONOR GALLAGHER
FRIDAY, OCTOBER 20, 2023
CUPERTINO, CALIFORNIA
9:11 A.M.

REPORTED BY: Michael P. Hensley, RDR-CA CSR No. 14114

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646



Deposition of CONOR GALLAGHER, held at the offices of:

Pacific Workplaces
19925 Stevens Creek Boulevard, Suite 100
Cupertino, California 95014

Pursuant to notice, before Michael P. Hensley, California Certified Court Reporter in and for the State of California, who officiated in administering the oath to the witness.



APPEARANCES:

ON BEHALF OF PLAINTIFFS ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC.:

PAUL HASTINGS LLP
By: CARL J. MINNITI, ESQ.
200 Park Avenue
New York, New York 10166
212.318.6000
carlminniti@paulhastings.com

ON BEHALF OF DEFENDANTS REVANCE THERAPEUTICS, INC., AND AJINOMOTO ALTHEA, INC., d/b/a AJINOMOTO BIO-PHARMA SERVICES:

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
By: SASHA S. RAO, ESQ.
1101 K Street NW, 10th Floor
Washington, DC 20005
202.772.8733
srao@sternekessler.com

ALSO PRESENT:

JINAH CHOI, Videographer



INDEX

WITNESS: CONOR GALLAGHER

EXAMINATIONS


| | Page |
|---|---|
| BY ATTORNEY MINNITI | 10 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Plaintiffs' Notice of Deposition of Conor Gallagher | 13 |
| 2 | LinkedIn Profile of Conor Gallagher | 14 |
| 3 | ALGN-0000142 - 0000182: United States Patent 11,033,625 | 35 |
| 4 | ALGN-0000212 - 0000251: United States Patent 11,147,878 | 35 |
| 5 | United States Patent 11,285,216 | 35 |
| 6 | ALGN-0000070 - 0000106: United States Patent 7,354,740 | 41 |
| 7 | ALGN-0000107 - 0000141: United States Patent 8,409,828 | 41 |

[redacted]

Page 125

[redacted]
A. Yes.
**Q. Can you read the next paragraph in the document out loud.**
A. Sure.
[As Read] [redacted]

Page 126

[redacted]
**Q. Do you have any reason to disagree with that statement?**
A. I don't know.
**Q. You don't know what?**
A. This is a regulatory document. I am not familiar with FDA language and guidances provided by the FDA.
**Q. I think this is also a factual statement by Revance to the U.S. government that:**
[redacted]

Page 127

**That factual statement, do you have any reason to disagree with it?**
A. I do not have a reason to disagree with that.
**Q. You can put that document to the side.**
ATTORNEY MINNITI: Dr. Gallagher, I'm handing you a document that has been marked Exhibit 23.
(Exhibit 23 was marked for identification.)
ATTORNEY MINNITI: This document is titled "A Cell-penetrating Peptide (CPP) Did Not Decrease a 150-kilodalton BoNT-A Toxin Adsorption to Surfaces or Increase Toxin Potency or Duration in a Prototype Formulation."
Did I read that correctly?
THE WITNESS: You did.
BY ATTORNEY MINNITI:
**Q. Have you seen this document before?**
A. No.
**Q. So in preparation for today's deposition, you did not see this document?**
A. No.
**Q. And in the past couple years since this abstract was published, have you been aware of this**

Page 128

**study that was done?**
A. Yes.
**Q. Okay. What is your aware -- withdrawn.**
**Has Revance ever publicly responded to this abstract?**
A. Not that I can recall.
**Q. Do you see there's a section marked "Design"?**
A. Yes.
**Q. And it says:**
**[As Read] A CPP with a sequence --**
**And the sequence is provided.**
**[As Read] -- was synthesized and tested for its effects on BoNT-A using toxin adsorption, in vivo potency, and duration analyses.**
**Do you see that?**
A. I see that it says that.
**Q. Okay.**
**Do you have any reason, sitting here today, to disagree with the conclusions reflected in this abstract?**
**Actually, let's back up, and I'll ask that question.**
**On the first page at the bottom, do you**

[redacted]



**see there's a parentheses that says "Conclusions"? Quote:**

> **[As Read] Inclusion of a CPP in a BoNT-A formulation neither prevents toxin adsorption or increases potency or duration.**

Do you see that?
A. I see that.
**Q. And you just testified that you have seen this work before; correct?**
A. I have seen this work, I believe, presented before.
**Q. Sitting here today, do you have any reason to disagree with the conclusions in this abstract?**
ATTORNEY RAO: Objection. Form.
THE WITNESS: I would have no reason to agree with the conclusions. I don't know the details of the study that was performed. It wasn't performed by me. I note that it was performed by Allergan; so I have no basis to agree with the conclusions scientifically.
BY ATTORNEY MINNITI:
**Q. And I appreciate that, but it's a different question.**



**Do you have a reason to disagree with the conclusions in this abstract, sitting here today?**
A. I would disagree with any conclusions that were drawn without the knowledge -- my knowledge of the experiment or the study that was performed and the details of that study; so I would not accept the conclusions of this study based on the limited information that is presented here.
**Q. I don't want to talk past each other. I just want to get right to the point.**
**I'm not asking whether you agree with it. I'm not asking whether you accept the results. I'm asking that, as you're sitting here today in this deposition under oath, do you have a reason to disagree with any specific portions of this abstract and its conclusions?**
A. I cannot agree with any aspect of this; therefore -- the corollary would be that I do not agree with it. Therefore, I disagree with it.
**Q. So you do disagree with it?**
A. I do not agree with it.
**Q. Do you disagree with it? And if you disagree with it, what specific portion of this abstract do you disagree with?**
A. You'd need to provide a full study report



so that I could examine the work that was done in detail in order for me to be able to draw a conclusion from this abstract and this work that was performed by Allergan on a product that was not Daxxify, purports to potentially refer to Daxxify; so --
**Q. Would you take the same position with respect to the Weisemann poster? That you cannot draw any conclusions from that without seeing the underlying reports and the internal data.**
A. I have more familiarity with the Weisemann study than this study. The Weisemann study was performed by Revance, with Revance's -- or under contract, presumably, from Revance with Revance's reagents and Revance's peptide.
I do not know what this represents. This is a CPP with a sequence here that is not Revance's CPP nor using Revance reagents or Daxxify.
**Q. Okay.**
**If such a study did exist, would you give more credence if it was using those components that you just talked about?**
ATTORNEY RAO: Objection. Form.
THE WITNESS: Hypothetically? You're asking me a hypothetical question?



BY ATTORNEY MINNITI:
**Q. Yeah.**
A. I can't answer that. I would need to know the content of the study and the design of the study. This is science. Every detail is important; so I couldn't speculate.
**Q. Do you see underneath there's a listing of individuals as the authors? One of them is David Rupp?**
A. Yeah.
**Q. The other is Gregory Nicholson?**
A. Mm-hmm.
**Q. Ron Broide?**
A. Mm-hmm.
**Q. Celina Nino, Marion Do?**
A. Mm-hmm.
**Q. Jinping Wan.**
A. Mm-hmm.
**Q. Edwin Vasquez-Cintron?**
A. Mm-hmm.
**Q. Cindy Wu?**
A. Mm-hmm.
**Q. Mitchell Brin?**
A. Mm-hmm.
**Q. Amy Brideau-Anderson?**

A. Yes.
**Q. Do you know any of those individuals?**
A. Yes.
**Q. Who do you know?**
A. I know Dave Rupp. I would know Ron Broide, Mitchell, and Amy.
**Q. Do you respect them as scientists?**
ATTORNEY RAO: Objection. Form.
THE WITNESS: I'm familiar with them personally. They work for a competitor. I can't comment on the degree to which I respect or don't respect them as scientists.
BY ATTORNEY MINNITI:
**Q. Well, if you knew them and you worked with them before you joined Revance, why couldn't you comment on that?**
ATTORNEY RAO: Objection. Form.
THE WITNESS: Because I did not work closely with them in the lab. I would've taken -- seen their data as an output from the R&D work, specifically Dave and Ron. And Mitchell is not a basic scientist or a lab scientist. And Amy oversees the group.
BY ATTORNEY MINNITI:
**Q. Do you know doctors -- I'm sorry, keep**



**going.**
A. That's all.
**Q. Do you know Doctors Mitchell Brin and Amy Brideau-Anderson?**
A. Yes.
**Q. Personally?**
A. Yes.
**Q. Do you have any reason to question their credibility or any of the other individuals' credibility when it comes to publishing scientific results in an abstract?**
A. The results as published will be a function of the work that was done, the design of the experiment, and the reagents that were used; so --
In this case, it says there was no conflicts of interests from David Rupp. I would say that there's a conflict of interest here, but, you know, I can't comment on this work. I wasn't there when it was done. I had no insight into the design of the experiment or the experiment that was being done or reported.
**Q. You can put the document to the side.**
ATTORNEY RAO: Could the videographer provide the amount of time that's been on the



record?
THE VIDEOGRAPHER: We are at 3 hours and 47 minutes.
ATTORNEY RAO: Thank you.
ATTORNEY MINNITI: Dr. Gallagher, I'm handing you a document that has been marked Exhibit 24.
(Exhibit 24 was marked for identification.)
THE WITNESS: Thanks.
ATTORNEY MINNITI: The cover page of this document says "RVNC Investor Day 2023."
BY ATTORNEY MINNITI:
**Q. Do you see that?**
A. I do.
**Q. Do you understand that to be Revance?**
A. Yes.
**Q. And is this the investor day presentation that was presented in September of 2023 to your understanding?**
A. From the title page, I would assume it contains that.
**Q. Okay.**
**Would you please turn to slide 60?**
A. Where are they numbered? Okay.



Maybe I'll need that -- no, just kidding.
**Q. Yeah. It would be my pleasure.**
A. Okay.
**Q. Okay. Back to the document.**
**And if you flip a couple pages to slide 63.**
A. Okay.
**Q. Revance recently obtained approval for the cervical dystonia market; is that correct? For Daxxify.**
A. Daxxify was recently approved for cervical dystonia in the U.S.
**Q. When, to your understanding, is Revance going to launch Daxxify into the cervical dystonia market?**
[redacted]
**Q. I'm sorry, you do have an understanding?**
A. Yes.
**Q. And why is that?**
[redacted]

# EXHIBIT 5

[redacted]



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC.,
Plaintiffs,
vs. Case No. 1:21-cv-01411-RGA
REVANCE THERAPEUTICS, INC. AND AJINOMOTO ALTHEA, INC. D/B/A AJINOMOTO BIO-PHARMA SERVICES,
Defendants.

[redacted]

VIDEOTAPED DEPOSITION OF
KELLIE R. LAO, INDIVIDUALLY AND ON BEHALF OF
REVANCE THERAPEUTICS, INC., PURSUANT TO
FED. R. CIV. P. 30(b)(6)
WEDNESDAY, SEPTEMBER 13, 2023, 9:13 A.M.
BREA, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:
CHERYL HAAB SCOTT, RDR, CRR, CCRR
CA CSR No. 13600
WA CCR No. 3499
NV CCR No. 1003

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646



Deposition of KELLIE R. LAO, held at the offices of:

Davinci Meeting Rooms
135 South State College Boulevard
Brea, California

Pursuant to notice, before Cheryl Haab Scott, RDR, CRR, CCRR, Certified Shorthand Reporter No. 13600 in and for the State of California, Certified Court Reporter No. 3499 in and for the State of Washington, and Certified Court Reporter No. 1003 in and for the State of Nevada.



A P P E A R A N C E S
--oOo--

ON BEHALF OF PLAINTIFFS ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC.:
PAUL HASTINGS LLP
BY: CARL J. MINNITI III, ESQ.
200 Park Avenue
New York, New York 10166
212.318.6000
carlminniti@paulhastings.com

ON BEHALF OF DEFENDANTS REVANCE THERAPEUTICS, INC. AND AJINOMOTO ALTHEA, INC. D/B/A AJINOMOTO BIO-PHARMA SERVICES:
STERNE KESSLER GOLSTEIN FOX
BY: DENNIES VARUGHESE, PHARM.D., ESQ.
SASHA RAO, ESQ.
1101 K Street NW, 10th Floor
Washington, District of Columbia 20005
202.772.8805
dvarughese@sternekessler.com
srao@sternekessler.com

Also Present:
KEITH FARRIS, VIDEOGRAPHER



I N D E X
--oOo--

WITNESS: Kellie R. Lao

| | PAGE |
|---|---|
| Examination By Mr. Minniti | 8 |

INDEX TO EXHIBITS
--oOo--

| EXHIBIT NO. | | PAGE |
|---|---|---|
| Exhibit 1 | "Plaintiffs' Notice of Deposition of Kellie Lao" | 9 |
| Exhibit 2 | "Defendants Revance Therapeutics, Inc.'s Responses and Objections to Plaintiffs' Notice of Deposition of Defendants Pursuant to Fed.R.Civ.P. 30 (b)(6)" | 10 |
| Exhibit 3 | LinkedIn profile of Kellie Lao | 57 |
| Exhibit 4 | "Highlights of Prescribing Information" | 62 |
| Exhibit 5 | "Daxxify Patient FAQs" (REV_DAX-02672691-699) | 73 |
| Exhibit 6 | Revance Aesthetics "FDA Approval FAQs" (REV_DAX-02687135-142) | 88 |
| Exhibit 7 | Revance Aesthetics "Healthcare Professional FAQs for Customers Service" (REV_DAX-02675392-404) | 88 |

Page 17

**Q And what is Porter Novelli?**
A It's a public relations agency.
**Q And after you worked at Porter Novelli, where did you go?**
A I went to work for Allergan. 09:26:49
**Q Approximately what year did you start working for Allergan?**
A I started working for Allergan in 2008.
**Q What was your first position at Allergan?**
A I was a communications manager in the 09:27:07 corporate communications department.
**Q And what would your responsibilities have been in that position?**
A I did a lot of media relations on behalf of some of Allergan's business franchises including 09:27:20 their eye care franchise, their breast aesthetics franchise, and their facial aesthetics franchise.
**Q When you say the facial aesthetics franchise, does that mean you had responsibilities with respect to Botox? 09:27:46**
A I handled media relations for Botox.
**Q And what would that have meant? Can you put some texture on that?**
A Sure. So I would field media's inquiries or questions about Botox or other products in the 09:28:04

Page 18

portfolio So I would arrange for key opinion leaders to meet with the beauty media, predominantly
**Q How long did you have this public relations position at Allergan? 09:28:31**
A I was on the corporate communications team for about four years
**Q And then did you transition to another position within Allergan after that?**
A I moved into a marketing role 09:28:46
**Q And was that as the -- was the title of that position consumer marketing director?**
A I think I was initially, like, a senior manager of consumer marketing, and then I was later promoted to director of consumer marketing 09:29:00
**Q What would -- what were your responsibilities in the consumer marketing position that you transitioned into?**
A I was responsible for direct-to-consumer advertising for Botox Cosmetic, Juvederm, and later, 09:29:20 Kybella
**Q And other than direct-to-consumer advertising, what other responsibilities did you have in that role?**
A I think coming up with a consumer -- 09:29:42

Page 19

consumer plans and overseeing the execution of our consumer marketing would have been included like managing agency partners, our media agencies.
**Q Anything else?**
A And managing our creative agency as well. 09:30:02
**Q Any other responsibilities?**
A Just like a lot of cross-functional collaboration. So you're working with your peers in different business units to make sure all of your plans are integrated. 09:30:21
**Q Did you work directly with consumers in that role?**
A I was responsible for marketing to consumers; and, on occasion, we would do market research with consumers. 09:30:35
**Q Were you involved with sales to consumers?**
A The products were not sold directly to consumers. The products were sold to health care providers and then other members of a team were responsible for managing the sale to health care 09:30:59 providers.
**Q At Allergan, who was your direct report?**
A My -- the manager I reported in to?
**Q Yes.**
A In which -- in which role? 09:31:17

Page 20

**Q In the -- let's take you to -- in the public relations role, the first role that you had. Who were you reporting in to?**
A When I was on the corporate communications team, I initially reported in to Caroline Van Hove 09:31:32
**Q Were there any other individuals that you reported to in the four years you were in that position?**
A I later reported in to Bonnie Jacobs
**Q And who were some of the individuals in the 09:31:54 public relations role that reported up to you?**
A I didn't have any direct reports until -- kind of the last three months I was in that role and to be honest, I don't remember -- I was responsible for hiring somebody I cannot recall if they 09:32:13 reported in to me or if I just was responsible for hiring them
**Q Who did you hire?**
A A person named Ember Garrett
**Q So then when you transitioned over to the 09:32:31 consumer marketing role, who were you reporting up to?**
A I reported in to Colleen McKenna
**Q And what was her position?**
A She was initially the senior director of 09:32:53

[redacted]



**Q And when you were on the same marketing**
**team, were you both working on Botox?**
A My recollection was that Cara didn't work at
Botox when I was at Allergan
**Q Do you know for sure that Ms. Chastain never 10:41:03**
**worked on Botox issues?**
A I don't know I don't know what she may
have worked on
MR MINNITI: So I'm handing you a document
that has been marked Exhibit 3 And I'll represent 10:41:16
to you, Ms Lao, that this is a PDF of your public
LinkedIn profile
(Plaintiffs' Exhibit 3 was marked )
BY MR MINNITI:
**Q Can you take a moment to read the document 10:41:27**
**and let me know if this is not an accurate**
**reflection of your LinkedIn.**
A Yeah Yes
**Q This document is an accurate reflection --**
**strike that. 10:42:32**
**Is Exhibit 3 your LinkedIn profile?**
A Yes, this looks -- this looks to be my
LinkedIn profile
**Q If we look at the first page, in summary,**
**can you -- the part that starts with "previously 10:42:53**



**led," can you read that out loud?**
A Just the sentence. Sure.
"Previously led direct-to-consumer marketing
and public relations strategy for leading medical
aesthetics brands and medical brands -- yeah -- and 10:43:06
medical aesthetics. Botox Cosmetic, Juvederm
fillers, and Kybella with track record for
acquisition programs that contribute" --
(Reporter clarification.)
THE WITNESS: -- "to double" -- should be 10:43:19
"double digit sales," not "double digital sales" --
"growth year over year."
BY MR. MINNITI:
**Q Why are you referencing Botox Cosmetic in**
**this summary in your LinkedIn profile? 10:43:38**
A Because it was -- I think at the time I
created this LinkedIn profile, it was before Daxxify
was approved; and it was just a good way to
summarize some of the brands I had previously worked
on. 10:43:51
**Q In your role today with Daxxify, that**
**requires an understanding of the toxin market;**
**correct?**
A I mean, it requires an understanding of the
facial aesthetics -- facial aesthetics market and 10:44:16



consumer market to a degree
**Q Have you benefitted in your current position**
**from the knowledge that you previously had with**
**respect to Botox Cosmetic working at Allergan?**
A No, I wouldn't characterize it as 10:44:39
benefitted I think all my professional experience
has just helped me, like, refine problem solving
skills I mean, even when I'm just reflecting on
these three brands summarized here -- Kybella, very
different -- different animal than some of these 10:44:56
other brands So, you know, different -- different
strategies were used for that So
**Q Okay. So I asked a specific question, which**
**is: Your prior experience with Botox Cosmetic, has**
**that informed any marketing strategies that you've 10:45:20**
**implemented with respect to Daxxify?**
A I don't think it's informed strategies I
think being aware of the different products that
Daxxify competes with, Botox Cosmetic is one of the
products we compete against, as is Juvederm, Xeomin, 10:45:42
and Dysport I think a culmination of understanding
all of those products has helped inform Daxxify
strategy
**Q How so?**
A Well, I think it's important to understand 10:46:04



the competitive landscape that we're in, and Botox
Cosmetic is one of several players in that
competitive landscape.
**Q I'm going to ask a more specific question,**
**which is: Not necessarily just the fact that you 10:46:23**
**know Botox Cosmetic is out there, but I'm asking**
**specifically about the work you've previously had**
**done with respect to Botox Cosmetic, those**
**strategies. Have you benefitted from your prior**
**experience with those strategies in your position 10:46:50**
**now with Daxxify?**
MR. VARUGHESE: Objection. Vague and
ambiguous.
THE WITNESS: Yeah, I don't know what, like,
other clarification -- I think Botox was one of 10:47:01
several competitors; so I think understanding all of
those is helpful.
BY MR. MINNITI:
**Q Do you have a better understanding of Botox**
**Cosmetic or Dysport? 10:47:21**
A I think I kind of understand them pretty
equally because they've both been on the market for
a while, and I've been aware of the marketing
activities for both Dysport and Botox for many
years, and it's something that I monitor. 10:47:39

# EXHIBIT 6

EXHIBIT 3
KELLIE LAO
9/13/23
Cheryl Haab Scott, RDR, CRR, CCRR
CA CSR No. 13600

Contact

www.linkedin.com/in/kellie-lao (LinkedIn)

Top Skills

Corporate Communications
Public Relations
Marketing Management

# Kellie Lao

Head of Consumer Marketing

## Summary

Results-driven marketing communication expert preparing a clinical-stage biotechnology company for successful commercial launch of innovative aesthetic treatment.

Previously led direct-to-consumer marketing and public relations strategy for leading medical aesthetics brands in medical aesthetics, Botox Cosmetic, Juvederm dermal fillers and Kybella, with track record for acquisition programs that contribute to double-digital sales growth, year-over-year.
Areas of Expertise
# Consumer Brand Management
# Direct-to-consumer Marketing Strategy
# Positioning and Message Development
# Integrated Advertising Channel Campaign Development and Execution: Broadcast, Print, Digital, Social and Influencer Channels
# Media Planning and Modeling
# Public Relations Strategies and Campaigns
# Corporate Communications
# Issues Management
# Media Analysis
# Consumer Education and Engagement Programs
# Team Leadership and Cross-Functional Integration
# Agency Management
# Campaign Measurement and Return-on-Investment Analysis
# Budget Management

---

## Experience

Revance
3 years 2 months

Head of Consumer Marketing
June 2019 - July 2022 (3 years 2 months)

[redacted]

Beauty is dynamic - and the beauty enthusiast today seeks smart content and services that address his, her and their evolving needs. Beauty standards are no longer standard, but personalized and diverse. We seek to building meaningful relationships with beauty enthusiasts who seek smart information and access to services to help them express their beauty goals. Revance Aesthetics builds brands that compliment consumer attitudes and behaviors and harness this into quantifiable leads for our customers who can fulfill consumer desire to look their best for longer.

Senior Director, Consumer Marketing and Practice Integration
June 2019 - January 2020 (8 months)

Leads all medical aesthetics consumer marketing at Revance, a clinical stage biopharmaceutical company preparing for commercialization. Develop strategy based on understanding of patient journey map and create innovative business model for future product launch to consumers with emphasis on seamlessly integrating a novel aesthetic treatment experience into the healthcare practitioner's practice.

Urovant Sciences, Inc.
Senior Director, Marketing
May 2018 - June 2019 (1 year 2 months)

Responsible for consumer marketing and advocacy relations for clinical-stage biopharmaceutical start-up company.

Allergan
Consumer Marketing Director
May 2012 - May 2018 (6 years 1 month)

Consumer acquisition strategy, campaign development and media execution for Allergan's flagship facial aesthetics brands: Botox Cosmetic, Juvederm and Kybella.

Responsible for consumer promotion, advertising and public relations strategy to drive consumer adoption to drive more than $1 billion sales target and market growth.

Leading expert medical aesthetic patient dynamics and trends

Allergan

[redacted]

Senior Manager, Global Corporate Communications & Public Relations
July 2008 - 2012 (4 years)

Corporate communications manager for Allergan's eye care, facial and breast aesthetics franchises. Develops and implements public relations campaigns to support consumer brands Botox Cosmetic, Juvederm, Natrelle and Restasis.

Porter Novelli
Account Manager
May 2007 - July 2008 (1 year 3 months)

Account Manager with medical device group of Porter Novelli. Oversees public relations strategy and day-to-day account management for healthcare clients, including Ethicon Endo-Surgery and ArthroCare Corp.

UnitedHealthcare
Marketing Manager
March 2003 - May 2007 (4 years 3 months)

Strategic planning and marketing communication campaign development and execution

## Education

University of Southern California
Master's Degree, Communication and Media Studies

University of California, Riverside
Bachelor of Art, Political Science

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>Revance Therapeutics, Inc., and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>Defendants. | Civil Action No. 21-1411-RGA |

**Expert Report of Christine S. Meyer, Ph.D.**

December 15, 2023

[redacted]

**I. Introduction ... 3**
A. Professional Qualifications and Experience ... 3
B. Retention and Assignment ... 4
C. Information Relied Upon ... 5
D. Summary of Opinion ... 5

**II. Background Information ... 8**
A. Plaintiffs ... 8
B. Defendants ... 9
C. Botulinum Neurotoxin Injectable Products ... 10
D. Allergan's Botox Cosmetic Product for Aesthetic Uses ... 12
E. Allergan's Botox Product for Therapeutic Uses ... 13
F. Revance's Daxxify Product for Aesthetic and Therapeutic Uses ... 14
G. Other Botulinum Neurotoxin Injectable Products ... 16
H. Asserted Patents ... 17
I. Revance's Accused Infringement ... 21

**III. Lost Profits ... 22**
A. Panduit Factor No. 1: Sufficient Demand for the Patented Product ... 24
B. Panduit Factor No. 2: Absence of Acceptable Non-Infringing Alternatives ... 28
C. Panduit Factor No. 3: Marketing and Manufacturing Ability to Exploit the Demand ... 30
D. Panduit Factor No. 4: Amount of Profit Allergan Would Have Made Absent Revance's Infringement ... 31

**IV. The Framework for Analyzing Reasonable Royalty Damages ... 37**
A. The Legal Framework Underpinning Reasonable Royalty Damages, Including the Use of a Hypothetical Negotiation to Quantify Those Damages ... 37
B. The Date of the Hypothetical Negotiation and Royalty Term ... 39

**V. Reasonable Royalty ... 39**
A. Analysis of the *Georgia-Pacific* Factors ... 39

**VI. Summary of Economic Damages ... 73**



[redacted]

Botox and Daxxify are competing products, [redacted] and Revance's marketing and launch strategies.

61. [redacted]

62. Indeed, Revance's marketing and launch strategies indicate that it launched Daxxify as a significant competitor to Botox. Kellie Lao, Director of Consumer Marketing for Revance, stated in her deposition that [redacted].[134] For instance, in June 2023, Revance launched its "Break Up with Botox" campaign, and stated "This campaign challenges the status quo, letting consumers know they can part ways with Botox if they are ready for something long-lasting."[135] Furthermore, regarding the [redacted], a Revance document stated that [redacted] In addition to naïve patients, a [redacted]

[130] ALGN-1844340-412 (Deposition of Charles Lindemann, October 25, 2023 ("Lindemann Deposition"), Exhibit 6) at 352.

[131] ALGN-1844340-412 (Lindemann Exhibit 6) at 355.

[132] ALGN-1844340-412 (Lindemann Exhibit 6) at 382.

[133] ALGN-1841463-519 (Lindemann Exhibit 7) at 475, 477.

[134] Deposition of Kellie Lao, September 13, 2023 ("Lao Deposition"), pp. 59-60; Bullock Deposition, p. 71; Stebbins Deposition, pp. 36-39.

[135] "Revance wants you to 'Break Up With Botox' as it goes to war with AbbVie in new anti-wrinkle market battle," *Fierce Pharma*, available at https://www.fiercepharma.com/marketing/revance-wants-you-break-botox-it-goes-war-abbvie-new-anti-wrinkle-market-battle, accessed on December 14, 2023.

[136] REV_DAX-02665466-468 at 466.



[redacted]

[redacted]"[137] Further, a Revance Therapeutics forecast indicates "[redacted][138] In an investor call from September 2023, Revance CEO Mark Foley, announcing a new pricing strategy for Daxxify, stated "we're continuing to evolve our strategy with the sole goal of taking meaningful share gain […] [a]nd so, as of September 1, we kicked off a pricing strategy […] [a]nd all this is designed to make switching to Daxxify easier for both patients and for the injector so that they can align and patients can experience the benefit of the product[.]"[139]

63. Therefore, I conclude that there exists significant demand for both Botox and Daxxify. In the growing BoNT injectable space, there is demand for longer acting toxins, as identified in internal business plans and supported by Revance's and Allergan's development of long-acting toxin formulations. Further, Revance has included references to Botox as part of its marketing efforts and acknowledges that some sales of Daxxify would be made at the expense of Botox. As shown by the evidence from both Revance and Allergan, though they are somewhat differentiated, Daxxify and Botox compete as cosmetic and therapeutic neurotoxins.

## B. Panduit Factor No. 2: Absence of Acceptable Non-Infringing Alternatives

64. The second *Panduit* factor seeks to determine if there are non-infringing alternatives ("NIAs") other than the Plaintiff's product to which Daxxify customers or Revance could have turned instead of using the infringing product. That is, this factor asks whether, in a but-for world without the alleged use of the patented technology, the accused infringer's customers would have purchased from the patent holder, or whether other NIAs are available and acceptable enough such that customers would not have turned to the patent holder's products. This factor also asks whether the accused infringer could have turned

[137] REV_DAX-02687206-228 at 222.

[138] REV_DAX-02686248-255 at 249.

[139] "Revance Therapeutics Investor Day Corrected Transcript," *Factset* ("Revance September 2023 Investor Day Transcript"), p. 8.



[redacted]

Manufacturing Patents on July 13, 2029.

2. Through November 10, 2023, damages in this scenario are [redacted].

f. If the finder of fact were to determine that lost profits are not a proper measure of damages, and only the Asserted Formulation Patents are found to be valid, enforceable, and infringed:

1. A reasonable royalty of [redacted] of Daxxify through expiration of the Asserted Formulation Patents on September 21, 2026.

2. Through November 10, 2023, damages in this scenario are [redacted].

g. If the finder of fact were to determine that a reasonable royalty is not the proper measure of damages, lost profits owed to Allergan due to Revance's infringement amount to [redacted], the latest Revance sales data produced as of the date of this report.

186. As shown in **Exhibits 7A-7B**, I have calculated damages on vials of Daxxify distributed through November 10, 2023 under each of these scenarios.

Signed this 15th day of December, 2023.

Christine S. Meyer

______________________________

Christine S. Meyer, Ph.D.



[redacted]

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 8, 2024, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Candace Polster
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
candacepolster@paulhastings.com

*Attorneys for Plaintiffs*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
karthikkasaraneni@paulhastings.com

Dated: November 8, 2024

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*