**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,<br><br>*Plaintiffs/Counterclaim Defendants*,<br><br>v.<br><br>Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>*Defendants/Counterclaim Plaintiffs*. | C.A. No. 21-1411-RGA-LDH<br><br>[redacted]<br><br>REDACTED - PUBLIC VERSION<br>Filed December 20, 2024 |

**DECLARATION OF BYRON L. PICKARD IN SUPPORT OF DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR PARTIAL MOTION TO DISMISS PLAINTIFFS ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY AND ALLERGAN USA, INC.**

I am an attorney with Sterne, Kessler, Goldstein & Fox P.L.L.C, and serve as counsel for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services (collectively "Revance") in the above-captioned action. I submit this declaration in support of Defendants' Reply Brief in Support of Their Partial Motion to Dismiss Plaintiffs Allergan Pharmaceuticals Ireland Unlimited Company and Allergan USA, Inc.

I have personal knowledge of matters stated in this Declaration and could testify to them competently if called upon to do so.

1. Attached hereto as **Exhibit 27** is a true and correct excerpted copy of the May 10, 2023 Deposition Transcript of Ron Broide, Ph.D.

2. Attached hereto as **Exhibit 28** is a true and correct excerpted copy of the November 21, 2024 Deposition Transcript of Jill Carey.

3. Attached hereto as **Exhibit 29** is a true and correct copy of Defendants' Second Set of Interrogatories to Plaintiffs (Nos. 8–12), dated August 29, 2023.

4. Attached hereto as **Exhibit 30** is a true and correct copy of Defendants' Second Set of Requests for the Production of Documents and Things (Nos. 132–164) to Plaintiffs, dated March 29, 2023.

5. Attached hereto as **Exhibit 31** is a true and correct copy of Defendants' Deposition Notice Pursuant to Fed. R. Civ. P. 30(b)(6), dated July 31, 2023.

6. Attached hereto as **Exhibit 32** is a true and correct copy of the email from B. Pickard to I. Ashkenazi, dated November 21, 2024.

7. Attached hereto as **Exhibit 33** is a true and correct copy of the letter from I. Ashkenazi to B. Pickard, dated November 22, 2024.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed this 22nd day of November 2024, in Washington, D.C.

*/s/ Byron Pickard*
Byron Pickard
**STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.**
1101 K Street NW, 10th Floor
Washington, DC 20005
(202) 371-2600
bpickard@sternekessler.com

*Of Counsel for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 22, 2024, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Candace Polster
Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
candacepolster@paulhastings.com
robertunikel@paulhastings.com

*Attorneys for Plaintiffs*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Karthik R. Kasaraneni
David M. Valente
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
karthikkasaraneni@paulhastings.com
davidvalente@paulhastings.com

Dated: November 22, 2024

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

# Exhibit 27

[redacted]



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc., | ) | |
| Plaintiffs, | ) | CASE NO. 1:21-cv-01411-RGA |
| v. | ) | |
| Revance Therapeutics, Inc., and Ajinomoto Althea, Inc., d/b/a Ajinomoto Bio-Pharma Services, | ) | |
| Defendants. | ) | |

[redacted]

VIDEOTAPED DEPOSITION OF RON BROIDE, PH.D.,
INDIVIDUALLY AND ON BEHALF OF REVANCE THERAPEUTICS, INC.,
PURSUANT TO FED. R. CIV. P. 30(b)(6)
Tuesday, November 7, 2023
CARLSBAD, CALIFORNIA
9:44 a.m.

STENOGRAPHICALLY REPORTED BY:
LINDSAY A. STOKER, RMR, CRR, CRC
CA CSR No. 14373

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

[redacted]



A. I do.
Q. Why did Allergan [redacted]
A. [redacted]
Q. If you could turn to the following slide, PDF page 3.
A. I am there.
Q. Do you see the header stating, [redacted]
A. Uh-huh.
Q. [redacted]
A. [redacted]
Q. And who was involved [redacted]
MR. MINNITI: Objection to the extent it calls for testimony beyond a Rule 30(b)(6) testimony, designated testimony.

[redacted]



STATE OF CALIFORNIA )
) ss.
COUNTY OF ORANGE )

I, LINDSAY ANNE STOKER, RMR, CRR, CRC, and Certified Shorthand Reporter and Deposition Notary Public of the State of California, does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof;

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript was not requested/offered on the record.

In witness whereof, I have subscribed my name, this 9th day of November, 2023.



LINDSAY STOKER
CSR 14373

# Exhibit 28

[redacted]

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC., Plaintiffs,

vs.

Civil Action No. 21-1411-RGA-JLH

REVANCE THERAPEUTICS, INC. AND AJINOMOTO ALTHEA, INC. d/b/a AJINOMOTO BIO-PHARMA SERVICES, Defendants.

[redacted]

November 21, 2024
12:24 p.m., Central Standard Time

Reported by: Lori J. Goodin, RPR, CLR, CRR, RSA, California CSR #13959

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

REMOTE VIDEOTAPED DEPOSITION of JILL CAREY,

Witness in the above-titled action, held on Thursday, November 21, 2024, commencing at approximately 12:24 p.m. CST before Lori J. Goodin, RPR, CRR, RSA, California CSR #13959, Registered Professional Reporter, Certified Realtime Reporter, Realtime Systems Administrator, and Certified Shorthand Reporter, and Notary Public of the State of Florida, State of California, State of Maryland, District of Columbia, State of Delaware, and Commonwealth of Pennsylvania.

Page 3

REMOTE APPEARANCES:

ON BEHALF OF PLAINTIFFS ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, ALLERGAN USA, INC. AND THE WITNESS:

PAUL HASTINGS LLP
BY: ISAAC S. ASHKENAZI, ESQUIRE
MetLife Building
200 Park Avenue
New York, New York 10166
212-318-6000
isaacashkenazi@paulhastings.com

AND

PAUL HASTINGS LLP
BY: KARTHIK KASARANENI, ESQUIRE
2500 M Street, Northwest
Washington, D.C. 20036
202-551-1700
karthikkasaraneni@paulhastings.com

ON BEHALF OF DEFENDANTS REVANCE THERAPEUTICS, INC., AND AJINOMOTO ALTHEA, INC., d/b/a AJINOMOTO BIO-PHARMA SERVICES:

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: BYRON L. PICKARD, ESQUIRE
1101 K Street Northwest, 10th Floor
Washington, D.C. 20005
202-772-8521
bpickard@sternekessler.com

Also Present:
Andy Mortensen, Video/Document Technician

Page 4

INDEX TO EXAMINATION

WITNESS: JILL CAREY


| EXAMINATION BY | PAGE |
|---|---|
| MR. PICKARD | 6 |


INDEX TO EXHIBITS

CAREY


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | AbbVie earnings call, 7/25/24 REV-DAX-03343145 | 22 |
| Exhibit 2 | AbbVie Company Conference Presentation, 6/12/24, REV-DAX-03343093 | 28 |
| Exhibit 3 | AbbVie Company Conference Presentation, 5/15/24 REV_DAX-03343078 | 30 |
| Exhibit | Carey Declaration Exhibit 2 Excel spreadsheet | 41 |
| Exhibit | Carey Declaration, 11/20/24 | 43 |


PRIOR MARKED EXHIBITS


| FIRST REFERRAL | PAGE |
|---|---|
| Revance MTD Ex. 9 | 88 |
| Revance MTD Ex. 10 | 66 |
| Paik Exhibit 31, flow chart | 57 |

[redacted]



THURSDAY, NOVEMBER 21, 2024, 12:24 p m. CST
PROCEEDINGS

THE VIDEOGRAPHER: This begins the media of the videotaped deposition of Jill Carey taken in the matter of Allergan Incorporated, et al., versus Revance Therapeutics, Incorporated, et al., in the United States District Court for the District of Delaware. Case Number 21-1411-RGA.

This deposition is being conducted by Zoom and recorded in Irving, Texas on November 21st, 2024. The time on the video screen is 12:24 p.m. Central Time.

My name is Andy Mortensen; I am the legal videographer from Digital Evidence Group. The court reporter is Lori Goodin, in association with Digital Evidence Group.

All parties for this deposition are appearing remotely and have agreed to this witness being sworn in remotely.

Due to the nature of remote reporting, please pause briefly before speaking to ensure all parties are heard completely.



Will counsel please introduce themselves for the record.

MR. PICKARD: Byron Pickard on behalf of the defendants.

MR. ASHKENAZI: Isaac Ashkenazi of Paul Hastings LLP on behalf of the witness, Ms. Carey, and plaintiffs.

MR. KASARANENI: And Karthik Kasaraneni from Paul Hastings LLP on behalf of the witness and plaintiffs.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

* * *

Whereupon,

JILL CAREY,

a witness called for examination, having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MR. PICKARD:

**Q. Hello, Ms. Carey. If you could just state your name for the record, please.**
A. Jill Marie Carey.



**Q. All right. Have you had your deposition taken before?**
A. I have not.
**Q. All right. So just a few ground rules.**
**You understand that you are under oath today?**
A. I do.
**Q. And that means you need to testify truthfully and accurately to the best of your abilities. You understand that?**
A. I understand.
**Q. So, as the videographer stated at the beginning, our court reporter is going to be transcribing everything, so it is important that you let me finish my questions before you provide an answer. And then Mr. Ashkenazi may have some objections.**
**So, provide a little space for that to happen.**
**Unless Mr. Ashkenazi gives you an instruction not to answer, I will need you to answer my questions. Do you understand that?**
A. I do.
**Q. All right. If you don't understand**



**any of my questions, I would like you to let me know so that I can rephrase them and be sure that you and I are connecting on our Q&A.**
**Do you understand that?**
A. I do.
**Q. Okay. And then, if for whatever reason you need a break, just let me know. We can break whenever. I just have one caveat to that. And that is if I've got a pending question, I would like to have that question answered and then we can break promptly after that.**
**Does that sound fair?**
A. Yes, that sounds fair.
**Q. Okay. Where are you today, Ms. Carey?**
A. Wisconsin.
**Q. At your home?**
A. Yes.
**Q. What, if anything, did you do to prepare for this deposition?**
MR. ASHKENAZI: And I would caution the witness not to reveal the substance of any communication with an attorney.
But please go ahead and answer to

[redacted]

Page 9

the best of your ability.
THE WITNESS: I spoke with the legal team.
BY MR. PICKARD:
**Q. And that included Mr. Ashkenazi and Mr. Kasaraneni, hope I've got that right.**
MR. PICKARD: Sorry, Karthik.
THE WITNESS: It did.
BY MR. PICKARD:
**Q. Anyone else?**
A. AbbVie's internal team.
**Q. Okay. Who from AbbVie's internal team did you meet with to prepare for today's deposition?**
A. Jorge Gonzalez. Laura Johannes, and Mike, whose last name I'm not recalling.
**Q. This Mike is an AbbVie employee; is that right?**
A. Yes.
**Q. And was this one meeting with the lawyers with these three individuals or were there separate meetings?**
A. There were a couple.
**Q. Okay. How about let's start with Jorge Gonzalez. What is his position?**

Page 10

A. He is Senior Counsel, I believe.
**Q. For AbbVie?**
A. Yes.
**Q. Does he have any role with respect to Allergan, Inc.?**
A. Allergan, Inc. is one of our subsidiaries; one of AbbVie's subsidiaries.
**Q. I understand that. What is his role with Allergan, Inc., if you know?**
A. I can't speak to Jorge's role.
**Q. All right, how about Allergan Pharmaceuticals Ireland Unlimited Company, what role does Mr. Gonzalez have with that entity?**
A. Again, I can't speak to his role. But I know they are subsidiaries of AbbVie, Inc.
**Q. Okay. Allergan USA, Inc., does Mr. Gonzalez have a role, to your knowledge, with that company?**
A. I don't know. I can't speak to that.
**Q. Mr. Gonzalez is an attorney. That is your understanding?**
A. Sorry, could you repeat that, please?
**Q. Is Mr. Gonzalez an attorney?**

Page 11

A. I believe so.
**Q. At your meeting with Mr. Gonzalez, was anyone else present?**
A. Present counsel.
**Q. Anyone other than that?**
A. At times, Laura and Mike, who I mentioned.
**Q. Let's talk about, it is Laura Johannes; is that right?**
A. I think so, yes.
**Q. Okay.**
A. I think it is pronounced that way.
**Q. Who does Ms. Johannes work for?**
A. Her employer is AbbVie.
**Q. And to your knowledge, does Ms. Johannes have any role or duties for the three plaintiffs in this case, that is Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company and Allergan USA, Inc.?**
A. I can't speak to that. I don't know.
**Q. Do you know what Ms. Johannes's title is?**
A. I do not.
**Q. Do you know if she is a lawyer?**

Page 12

A. I do not.
**Q. Okay. The Mike individual.**
**Do you know who he works for?**
A. AbbVie.
**Q. Do you know what his job title is?**
A. I do not.
**Q. Okay. Do you know if he has any roles or duties for the three plaintiffs in this case?**
A. I can't speak to that.
**Q. Do you know if Mike is a lawyer?**
A. I'm not sure.
**Q. Do you have any understanding generally of what either Ms. Johannes or Mike do at AbbVie?**
A. I believe they work for our -- I know they work in our Legal department. I'm not sure of what specific field.
**Q. Oh, okay. Does -- other than the discussions that we have gone over with Gonzalez, Johannes and Mike and the two attorneys here, did you meet with anybody else?**
A. To --
**Q. To prepare for your deposition.**
A. I did not.

**Q. Okay. And when did these meetings happen or meeting happen?**
A. Monday and Wednesday, I believe.
**Q. And about how long was the Monday meeting?**
A. Maybe three hours.
**Q. And then yesterday, how long was that?**
A. Yesterday was four hours, I think.
**Q. Okay. Other than those meetings, did you do anything else to prepare for your deposition?**
A. I reviewed the documents I had shared previously that I attached as part of my declaration.
**Q. All right. Let's talk a little bit about you. Who is your employer?**
A. AbbVie, AbbVie, Inc.
**Q. Are you employed by anyone else?**
A. I am not.
**Q. And what is your title?**
A. Senior Director, Head of Tax Controversy.
**Q. And how do you, would you describe your responsibilities in that role?**



A. I'm responsible for assisting our company with understanding corporate arrangements between our legal entities and ensuring -- helping to ensure we stay compliant with tax law and helping to defend when controversies arise, tax controversies.
**Q. What is a tax controversy?**
A. An audit, usually. Well, an issue that arises as a result of an audit.
**Q. So, it doesn't involve audits themselves, just issues coming out from audits; is that right?**
A. I manage the audits as well.
**Q. And are your duties limited to a particular tax authority or jurisdiction or are they global?**
A. No, they are global. So, we would help AbbVie, Inc. or any of our subsidiaries.
**Q. And how long have you been in your role as Senior Director, Head of Tax Controversies?**
A. Since August 2023.
**Q. And before that, did you have a role within AbbVie or any of its related companies?**
A. Prior to August of 2023, I was the



Senior Director, head of our Tax Transfer Pricing practice.
**Q. All right. And is there a relationship between the -- let me back up.**
**So, Tax Transfer Pricing, is that a group within AbbVie?**
A. It is a group within our Tax department.
**Q. Okay. And is that group sort of like on the org chart, parallel to tax controversy or does one report to the other?**
A. I would say parallel.
**Q. All right. What is Tax Transfer Pricing?**
A. Transfer Pricing deals with the intercompany transactions of affiliates that belong to the same ultimate corporation.
**Q. And, why does AbbVie have a Tax Transfer Pricing group or department?**
A. Because we are a very large organization and there are intercompany transactions to manage.
**Q. And is it fair to say that the reason that group exists is to make sure that various tax authorities' requirements are**



**complied with?**
A. Yes. That is the reason.
**Q. All right. You don't have a legal background, right?**
A. I do not.
**Q. Your background is primarily in business and finance; is that right?**
A. Yes.
**Q. All right. Let's talk about your current role.**
**Who do you report to?**
A. I report to Lindsey Bristow, Senior Vice President at AbbVie.
**Q. And would you consider Ms. Bristow to be part of the AbbVie leadership team?**
MR. ASHKENAZI: Objection.
BY MR. PICKARD:
**Q. You can answer.**
A. She is a Senior Vice President.
**Q. Yes, thank you for that. Given that, do you regard her as part of the AbbVie leadership team?**
A. I don't think she is part of the senior leadership team.
**Q. Is there a difference between the**

**leadership team and the senior leadership team in your mind within AbbVie?**
A. I guess I think there are certain people that are leaders that might not be the ultimate part of leadership in the organization.
**Q. Do you consider yourself a leader at AbbVie?**
A. I manage people.
**Q. We will get to that. My question is a little different.**
**Do you consider yourself a leader at AbbVie?**
A. I don't know that others outside the organization would view me as a leader, but I am considered a people leader because I manage people.
**Q. Okay. How about within the organization, do people regard you as a leader within the organization?**
A. I -- again because I manage people, I am considered a people leader. That is a role.
**Q. Okay. How many people do you manage in your current role as Head of Tax Controversy?**
A. I have three direct reports and then one independent contractor.



**Q. And is that, those four individuals, does that represent all of the people who work in the Tax Controversy group at AbbVie?**
A. No, there are others underneath my direct reports.
**Q. Okay. Like, so, you head the whole group, right, Tax Controversy?**
A. Yes. The corporate Tax Controversy, yes.
**Q. All right. And, underneath you, how many people are there?**
A. So, there is my three direct reports. There is the independent contractor. And then under them, there are six others.
**Q. So, about ten or so people total in the group?**
A. About ten or so, yes.
**Q. Okay.**
MR. PICKARD: Could we do a 30 second break? I need to get the realtime up. This will just take a moment.
THE VIDEOGRAPHER: Do you want to go off the record?
MR. PICKARD: Yes, let's do that, just for a second.



THE VIDEOGRAPHER: Okay. The time is 12:39 p m. Central Time. We are going off the record.
(Recess taken -- 12:39 p m.)
(After recess -- 12:46 p m.)
THE VIDEOGRAPHER: The time is 12:46 p m. Central Time. We are going back on the record.
BY MR. PICKARD:
**Q. I should have asked you before, Ms. Carey, do you have any notes or anything in front of you, any documents?**
A. I have my declaration and the exhibits attached to it.
**Q. Okay. But nothing beyond that?**
A. I have the Intellectual Property Economic Asset Purchase Agreement, dated January 21st, 2020.
**Q. Got it. Do you have any notes on those documents, any handwritten notes or anything like that?**
A. I do not.
**Q. Okay. Do you have any other windows open on your computer or whatever device you are using, other than this platform we are on?**



A. I have the note pad open where I noted the password and link to this Zoom.
**Q. Okay, great. Okay.**
MR. ASHKENAZI: Byron, just for completeness and, Ms. Carey, I don't know if you do or don't have it in front of you, but, we have referred to as Paik Exhibit 31, do you have?
MR. PICKARD: The infamous Paik 31, yes.
THE WITNESS: Yes, I do.
MR. ASHKENAZI: I just wanted to make sure that Mr. Pickard knows exactly what information you have in front of you.
THE WITNESS: I apologize for that.
MR. PICKARD: No worries. Thank you for that, Isaac.
BY MR. PICKARD:
**Q. Okay. Ms. Carey, do you know who Robert A. Michael is?**
A. He is the CEO of AbbVie.
**Q. Do you ever interact with Mr. Michael in your duties at the company -- while performing your duties at the company?**
A. Occasionally.

[redacted]

Page 21

**Q. And do you know who Jeffrey Ryan Stewart is?**
A. I believe his role is the Chief Commercial Officer.
**Q. Do you ever report to CEO, Mr. Michael, on Tax Controversy issues?**
A. I personally do not.
**Q. On what occasions have you spoken with Mr. Michael at AbbVie, I guess, why?**
A. We were both participants at larger meetings.
**Q. How about Mr. Jeffrey Ryan Stewart, have you ever reported to him on Tax Controversy issues?**
A. I do not.
**Q. And in your prior role as Head of Tax Transfer -- or Senior Director of Tax Transfer Pricing, did you ever report to either of those individuals?**
A. I did not report to the Chief Commercial Officer nor to the Chief Executive Officer.
**Q. Do you understand in this lawsuit that the three named plaintiffs are seeking to recover lost profits from Revance's sales of Daxxify; is that right?**

Page 22

MR. ASHKENAZI: Object to the form. I object to the form of the question.
THE WITNESS: Can you repeat the question, please?
BY MR. PICKARD:
**Q. Sure. Do you have an understanding that the plaintiffs in this lawsuit are asking for an award of lost profits attributable to the Revance sales of Daxxify?**
A. I understand there is a lawsuit that, with Revance.
**Q. Within that lawsuit, do you understand that the three AbbVie -- sorry, the three Allergan entities that I mentioned earlier, that they are seeking award of lost profits?**
A. Yes, that is my understanding.
**Q. All right.**
MR. PICKARD: Andy, I would like to present, it should be REV_DAX -- let's see here. It should end in 145.
All right. Why don't we just mark this Carey 1 Exhibit, if we could.
(Carey Exhibit Number 1 marked for identification.)

Page 23

BY MR. PICKARD:
**Q. All right, Ms. Carey, do you see the document? You should be able to download it if you need to.**
A. I can see it. I downloaded it.
**Q. This is a record of an earnings call that AbbVie held on January 25th, 2024.**
**I would like you to turn internally to -- there is -- if you look at the lower right-hand corner, you will see what we call in our business Bates Numbers.**
**There is a long series. And the one were looking at the screen ends in 145.**
**If you will turn to the number ending in 3343136 -- or, sorry, 163, which is on Page 19 of the document.**
A. 3343163?
**Q. Correct. And if we look down to the -- there is a bold printing of a Robert A. Michael. Do you see that?**
A. I see it.
**Q. All right. And I think we established he is the CEO of AbbVie. He was in July of 2024, correct?**
A. Yes, I see the date at the top, that is July 25th, 2024.

Page 24

**Q. Okay. Now, in that second paragraph it says that according to Mr. Michael, it says, "But when you look at, for example, share performance, we had the entry of Daxxify last year and we did not lose any market share."**
**Do you see that?**
MR. ASHKENAZI: Objection, lacks foundation.
THE WITNESS: I see the sentence you highlighted.
BY MR. PICKARD:
**Q. Do you have any reason to doubt that Mr. Michael made that statement to the shareholders and others at the earnings call in July of 2024?**
MR. ASHKENAZI: Objection, foundation.
THE WITNESS: Do I have doubt about what?
BY MR. PICKARD:
**Q. That he made that statement.**
A. This looks to be the call transcript.
**Q. I agree with you.**

[redacted]



**Do you recognize this as a transcript of that earnings call?**
MR. ASHKENAZI: Objection.
THE WITNESS: I didn't previously read the transcript.
BY MR. PICKARD:
**Q. Did you attend the earnings call?**
A. I listened.
**Q. Okay. So that is a yes, you attended by audio?**
A. Yes.
**Q. And Mr. Michael made that statement at the call, correct?**
MR. ASHKENAZI: Objection.
THE WITNESS: I see it is included in the call transcript. I don't recall hearing it.
BY MR. PICKARD:
**Q. To your understanding, you agree that AbbVie in its communications with its shareholders and the investing public that it does its best to be accurate in its statements about company performance, correct?**
A. I think so.
**Q. And, do you agree with Mr. Michael's**



**statement that we did not lose any market share?**
MR. ASHKENAZI: Objection.
THE WITNESS: I have -- about that.
MR. PICKARD: We had a little cross talk.
MR. ASHKENAZI: And if I can, just for one second.
Ms. Carey, I'm going to raise objections. Unless I instruct you not to answer, please do your best to answer. I think counsel mentioned that earlier.
And sorry for, you know, the cross talk.
Do you want to re-ask the question?
THE REPORTER: I did not get the answer, so --
MR. PICKARD: I will ask it again.
BY MR. PICKARD:
**Q. In Mr. Michael's statement there, we did not lose any market share, that's correct, correct?**
A. I have not done any analysis on that.
**Q. If Mr. Michael said that, you would agree it was accurate when stated, right?**



MR. ASHKENAZI: Objection.
THE WITNESS: I -- I would want to understand the context.
BY MR. PICKARD:
**Q. Why were you attending that earnings call?**
A. Employees are invited.
**Q. Is it a requirement for employees to attend?**
A. It is not.
**Q. Okay.** [redacted]
**Q.** [redacted]
MR. PICKARD: You can take that down. And then, Andy, if you could put up the next one beginning 3093 -- or ending in



3093, please.
BY MR. PICKARD:
**Q. All right. We have a record of the June 12, 2024, company conference presentation by AbbVie.**
**Do you see it?**
A. I see it on the Zoom screen -- oh, there it is.
MR. PICKARD: All right. Why don't we mark this Carey 2, please.
(Carey Exhibit Number 2 marked for identification.)
BY MR. PICKARD:
**Q. Did you attend the Company Conference Presentation on June 12, 2024, Ms. Carey?**
A. I did not attend.
**Q. If you could turn to Page 13, which ends in that Bates Number 3105, please.**
**Under the Jeffrey Ryan Stewart name, are you aware that Mr. Stewart stated at the conference that, "I think one of the things that I am personally and certainly the company is proud of is we're able to defend share very, very strongly."**

[redacted]



MR. ASHKENAZI: Objection, foundation.

THE WITNESS: I was not aware.

BY MR. PICKARD:

**Q. Were you aware that Mr. Stewart also said that, "So, for example, Rob mentioned it last year with Daxxify, they were not able to take any share from Botox."**

**Are you aware the Chief Commercial Officer said that?**

MR. ASHKENAZI: Same objection.

THE WITNESS: I was not aware.

BY MR. PICKARD:

**Q. Let me ask you this, Ms. Carey.**

**Have you talked to anyone inside the company about Botox's loss of market share to Daxxify?**

A. I have not.

**Q. Have you overheard comments or statements by others on that topic?**

A. I have not.

**Q. All right.**

MR. PICKARD: Take that down. Andy, why don't we put up, it should be the one ending 3078, please.



All right, we can call this Carey 3, please. Mark it as an exhibit as such.

(Carey Exhibit Number 3. marked for identification.)

BY MR. PICKARD:

**Q. This is a May 15, 2024, Company Conference Presentation.**

**Do you see that?**

A. I see it on your screen. Oh, there, yep.

**Q. Did you attend this conference?**

A. I did not attend.

**Q. I would like to turn you to Page 11, please.**

**Do you see that heading again, Robert A. Michael, the CEO, do you see that -- sorry. The COO.**

**Do you see that?**

MR. ASHKENAZI: Object to the form of the question. And I will object to the question, lacks foundation.

BY MR. PICKARD:

**Q. I was just asking if you see it, Ms. Carey.**

A. I see it.



**Q. Okay. And as of March -- sorry, May 15th, 2024, Mr. Robert A. Michael was then the COO and President of AbbVie, correct?**

A. I see that, yes.

**Q. And if we turn to Page 12, that first full sentence. Mr. Michael said, "There was a lot of questions around the impact of Daxxify, what that meant for Botox Cosmetic. We've held our share throughout that entire launch. And so it has been pretty resilient."**

**Do you see that?**

MR. ASHKENAZI: Objection, lacks foundation.

THE WITNESS: I see that.

BY MR. PICKARD:

**Q. Do you understand that is a statement that Mr. Michael said at this conference?**

MR. ASHKENAZI: Objection. Foundation.

THE WITNESS: I wasn't in attendance, but I understand you are showing me a transcript.

BY MR. PICKARD:

**Q. Let me ask you this -- I've shown**



**you I think two or three statements from Mr. Michael and one from Mr. Stewart.**

**Do you have any reason to doubt that those statements are accurate?**

MR. ASHKENAZI: Objection. Form. Foundation.

THE WITNESS: I would want to understand the context.

BY MR. PICKARD:

**Q. In the absence of that context, do you have any reason to doubt their accuracy?**

MR. ASHKENAZI: Same objection.

THE WITNESS: I don't feel comfortable answering without context.

BY MR. PICKARD:

**Q. Would you be concerned if either Mr. Stewart or Mr. Michael had made inaccurate statements to shareholders at a company conference presentation?**

A. Will you repeat the question?

**Q. Sure. Would you be surprised if Mr. Michael or Mr. Stewart had made inaccurate statements at a shareholder meeting or at company conference presentations?**

A. I would be surprised, but again I

Page 33

would think that everything is important in context of what they are saying.
**Q. And you mean surprised, because it is your understanding that in those types of communications it is important to be accurate, correct?**
MR. ASHKENAZI: Objection.
THE WITNESS: I think they strive to be accurate.
BY MR. PICKARD:
**Q. And that is true of AbbVie and its subsidiaries generally, correct, when they make communications to the public, they strive to be accurate; is that fair?**
MR. ASHKENAZI: Same objection.
THE WITNESS: I think it is fair to say that we are accurate based on what we know at the time.
MR. PICKARD: If we can take that down, please.
BY MR. PICKARD:
**Q. Okay. Ms. Carey, you -- have you ever met or spoken to someone named Christine Meyers [sic], a Ph.D. Economist?**
A. I have, yes.

Page 34

**Q. Okay. When did you speak to her?**
A. I don't remember the exact dates, but I feel like it was within the past couple months.
**Q. Would it refresh your recollection if I suggested it was on November 4th, 2024?**
A. That was a Monday, yes.
**Q. All right. And, is that the only occasion that you've communicated with Ms. Meyers -- or Dr. Meyers?**
A. That is the only time we've communicated.
**Q. About how -- what was the format of the communication? Was it phone, video? Do you recall?**
A. It was a video conference.
**Q. And who was on the conference?**
A. That I don't recall. I know it was Dr. Meyer. I believe somebody that worked for Dr. Meyer. And I believe Jorge Gonzalez was on that call.
**Q. Was it just the four of you, as best you recall?**
A. No, there were others.
**Q. Okay. Who were the others?**

Page 35

A. I don't recall.
**Q. Do you recall about how many there were?**
A. Will you repeat that name?
**Q. Yeah, sorry. Do you remember -- I think we've established that there were four people that you've identified. Some by name.**
**It was Dr. Meyers and her colleague. Your colleague, Mr. Gonzalez, yourself. And then you said there were some others.**
**And I would like to know about how many of these others were there?**
A. I don't remember.
**Q. Were they lawyers for Allergan in this lawsuit, to your knowledge?**
A. I think, I think there was a lawyer on. I apologize, I don't remember. I spoke to Dr. Meyer, so she is who I remember.
**Q. Okay. Were there any introductions at the beginning of the call?**
A. Yes, I told her who I was and what my background was.
**Q. How about these other people that you don't know who they were, did they introduce themselves?**

Page 36

A. I apologize. I don't remember. This was -- you know, there is a lot of calls in a day.
**Q. Okay. About how long did this meeting last?**
A. I think it was less than 30 minutes.
**Q. Did you provide any written information to Dr. Meyers or her colleague?**
A. I did not.
**Q. Did you bring any notes to this meeting?**
A. I did not.
**Q. Did you observe Dr. Meyers, herself, taking any notes, during the meeting?**
A. I recall her writing things down.
**Q. How about her colleague, did her colleague take any notes that you were able to see?**
A. I don't recall.
**Q. Okay. So, I guess what I would like to know is, what was your understanding that you came to this meeting?**
**Why did you think that you had been invited to meet with Dr. Meyers?**
A. I was helping her to understand a

[redacted]

Page 37

consolidated P&L.
**Q. And did someone ask you to meet with Dr. Meyers?**
A. Yes.
**Q. Who was that?**
A. Jorge Gonzalez.
**Q. And what did Mr. Gonzalez tell you was the purpose of the meeting?**
A. To explain the consolidated P&L.
**Q. This is a yes or no question.**
**Did anyone before the meeting instruct you on what you should or should not say to Dr. Meyers?**
MR. ASHKENAZI: Object to the form of the question. I will instruct you not to answer the question as it requests the substance of communication with an attorney.
MR. PICKARD: I think a yes or no question is fair here, Isaac.
MR. ASHKENAZI: I don't think if you are asking about what was said. It doesn't matter if it is phrased as a yes or no.
MR. PICKARD: All right. So, mark that.
You are instructing the witness not

Page 38

to answer on the basis of attorney/client privilege; is that right?
MR. ASHKENAZI: I am. If you want to ask the question a different way, I am more than happy to do that.
But, the way it was regarded is you were asking -- counsel, I apologize.
Can you repeat the question?
MR. PICKARD: Yes, I would like to --
MR. ASHKENAZI: Now I --
MR. PICKARD: It is a yes or no question.
BY MR. PICKARD:
**Q. In advance of your meeting with Dr. Meyers, did anyone instruct you what you should or should not communicate?**
**I don't want to know what the content of what that substance was, just whether or not there were things you should or should not say.**
MR. ASHKENAZI: Ms. Carey, I will allow you to answer the question provided you don't reference or mention the discussion with any attorney you may have had.

Page 39

THE WITNESS: We discussed what was going to be discussed. I --
MR. ASHKENAZI: I think that is -- that is fair enough.
BY MR. PICKARD:
**Q. All right. Did you do any preparation for the meeting?**
A. I did not.
**Q. And what did you tell Ms. Meyers at that meeting?**
MR. ASHKENAZI: And, counsel, just apologies, it is Dr. Meyer, no S. Just for yourself, for the record.
MR. PICKARD: Thank you.
BY MR. PICKARD:
**Q. You can answer the question.**
A. The consolidated P&L was on the screen and I explained it to her.
**Q. Did Ms. -- or, sorry, Dr. Meyer have any questions for you?**
A. She did.
**Q. And do you recall what her questions were?**
A. She asked, she asked about the -- where the intercompany transactions related to

Page 40

the P&L would have been.
**Q. Okay. Maybe this will be helpful.**
MR. PICKARD: Andy, if we can put up, there is an Excel document in the queue, with a name Carey Declaration Exhibit 2. Present that, please.
BY MR. PICKARD:
**Q. Okay, Ms. Carey, I'm showing you or you are being shown Exhibit 2 to the declaration that we got yesterday.**
**Was this the consolidated financial that you discussed with Dr. Meyer?**
A. Yes, this is the consolidated financial.
**Q. Right. So this might be helpful.**
**I will ask you again, what questions as you recall did Dr. Meyer have about the consolidated financial?**
A. She asked if in that [redacted]

[redacted]

Page 41

And we discussed that [redacted].
THE VIDEOGRAPHER: Counsel, excuse me. Did you want to mark this as an exhibit?
MR. PICKARD: Yes. I think we should. And I would like to have the record -- Isaac and I will talk about it. I think the court will be happy if we try to sync up the Carey exhibits with what we've got going in the motion to dismiss.
So, can we just call this Carey Declaration Exhibit 2.
(Carey Declaration Exhibit 2 marked for identification.)
MR. ASHKENAZI: Sorry, one second. I think you already have some Carey exhibits. For the purposes of this, given that this is the third document that you have published where I think -- or sorry, the fourth. Do you want to just do it Number 4?
MR. PICKARD: Well, I mean it is kind of in the record as Carey Declaration

Page 42

Exhibit 2.
MR. ASHKENAZI: Okay. So you want to refer to this as --
MR. PICKARD: Yes, I think -- I have a feeling that some of this is going to appear in a brief tomorrow. So, I would like to just, for Judge Andrews's benefit try to have things synced.
And to be clear, we have got Carey Exhibit 1 and 2. This will be Carey Declaration Exhibit 2.
MR. ASHKENAZI: That is fine.
MR. PICKARD: If you have a better way to do it, I -- you know, that is not important to me. I just think that we will all be a little happier if we end up --
MR. ASHKENAZI: That is fine.
MR. PICKARD: Okay. Sorry.
MR. ASHKENAZI: While we have this up and we have this little pause, could we please mark the transcript as Highly Confidential, Under the Protective Order. Please go ahead.
MR. PICKARD: All right. Okay. Why don't we do this. Let's, if we can --

Page 43

Is it possible, Andy, to keep that on the screen and to show Ms. Carey her declaration itself, which you should have in the queue. It is just called the Carey Declaration.
(Carey Declaration marked for identification.)
THE VIDEOGRAPHER: Because this is a spreadsheet, it is not going to come up very well but we --
MR. PICKARD: Okay. You can just take it down and we will toggle. So, maybe have it handy, Andy.
BY MR. PICKARD:
**Q. All right, Ms. Carey, he is pulling up your declaration. And I understand you have a copy in front of you. And we are hustling on time here, I want to respect your job duties outside of this deposition. So, maybe we can just read on your paper copy.**
**I would like you to look at Paragraph 7 -- sorry, Paragraph 8. And that first sentence where you wrote, "AUSA or AbbVie U.S. LLC,** [redacted]

Page 44

[redacted]
**And there is a parenthetical with the Bates Number.**
**Do you see that?**
A. I see it.
**Q. Okay. Just for the sake of completeness, Exhibit 2 that we just see in your Paragraph 8, that is the document that we just saw at the deposition here, correct?**
A. That is Exhibit 2.
**Q. And so, we should just refer to that as a consolidated financial statement. That is how AbbVie and its subsidiaries would refer to such document?**
A. That is how I would refer to it.
**Q. Okay. Great.**
**When you have that comma,** [redacted]
A. That --

[redacted]

Page 45

MR. ASHKENAZI: Objection.
BY MR. PICKARD:
**Q. Do you understand my question?**
A. I see -- [redacted]
**Q. Thank you. That was helpful.** [redacted]
A. They are our arm's length, our arm's length policies for transfer pricing.
**Q. Let's unpack that.**
**What do you mean by arm's length?**
A. The U.S. tax code requires that intercompany transactions be priced in accordance with the arm's length standard.
**Q. And is there a particular place or resource that one looks to, to ascertain the so-called arm's length standard?**
A. Section 482 of the Internal Revenue

Page 46

Code and the Treasury regulations promulgated thereunder.
**Q. And is it accurate to say that the situation such as the one** [redacted]
A. That is not --
MR. ASHKENAZI: Object to the form of the question.
BY MR. PICKARD:
**Q. What kind of restrictions, if any, does that regulation that you just mentioned put on Allergan, AbbVie or any of their affiliates' ability to set transfer prices as you understand it?**
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: They are required to be priced in accordance with the arm's length standard.
BY MR. PICKARD:
**Q. What does the arm's length standard**

Page 47

**require, for example, when there is** [redacted]
A. The arm's length standard requires that the affiliates come up with the most reliable way of pricing the transactions as if they were independent.
**Q. And, did that happen here? Has that happened here?**
A. [redacted]
**Q. Who sets the policies? And in particular I am interested in the** [redacted]
A. What was the question?
**Q. You said there was -- I believe you said there was a policy. I want to know** [redacted]
**Q.** [redacted]

Page 48

[redacted].
**Q. So,** [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: We -- [redacted]
BY MR. PICKARD:
**Q. If someone at** [redacted]**?**
MR. ASHKENAZI: Object to the form of the question. Calls for speculation.
THE WITNESS: [redacted].
BY MR. PICKARD:
**Q. Thank you for that. My question is a bit different.**
**Does** [redacted]

[redacted]

Page 49

[redacted]
MR. ASHKENAZI: I object to the form of the question.
THE WITNESS: I have never -- they, they need to be compliant with the arm's length standard.
BY MR. PICKARD:
**Q.** [redacted]
MR. ASHKENAZI: Objection. Mischaracterizes her testimony.
THE WITNESS: Can you explain what you mean [redacted]?
BY MR. PICKARD:
**Q. Yes. Well, here is what I understand this state of affairs to be.**
**Allergan Ireland ostensibly sells Botox to Allergan USA or AbbVie U.S. LLC, correct?**
MR. ASHKENAZI: Objection.
THE WITNESS: Allergan Ireland sells Botox to AUSA or AbbVie U.S. LLC for sales to third parties in the United States.

Page 50

BY MR. PICKARD:
**Q. And,** [redacted] **?**
A. The [redacted]
**Q. And my question is:** [redacted]
**Q. What I'm trying to get at is there is** [redacted]
**Q.** [redacted]

Page 51

[redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: When the intercompany arrangements were set up, the parties agreed to adhere to the arm's length standard.
BY MR. PICKARD:
**Q.** [redacted]
A. [redacted]
**Q.** [redacted]
MR. ASHKENAZI: I object to the form of the question. Mischaracterizes her testimony.
THE WITNESS: They would follow a policy that adheres to the arm's length standard.
BY MR. PICKARD:
**Q. Is it accurate to say that the**

Page 52

[redacted]
MR. ASHKENAZI: Objection.
THE WITNESS: Can you repeat the question?
BY MR. PICKARD:
**Q. Yes. Is it accurate to say that** [redacted]
A. It is designed to comply with the arm's length standard and that includes paying taxes.
**Q. And Allergan Ireland pays taxes in Ireland, right?**
A. Allergan Ireland pays Irish tax.
**Q. And AbbVie U.S. LLC and Allergan USA, they pay taxes in the United States for their sales, right? The income on their sales, I should say.**
A. AbbVie Inc. and its U.S. subsidiaries pay tax in the U.S.
**Q.** [redacted]
MR. ASHKENAZI: Objection.

[redacted]

Page 53

THE WITNESS: [redacted]
BY MR. PICKARD:
**Q. My question had nothing to do, I don't think, with AbbVie.**
**My question was about Allergan USA and AbbVie U.S. LLC. That might be our confusion.**
[redacted]
A. [redacted]
**Q. All right. Well, let me -- the Irish or Ireland's corporate tax rate is lower than the U.S. one, right?**
MR. ASHKENAZI: Objection.
THE WITNESS: Ireland's corporate income tax rate is lower than the United States's corporate income tax rate.
BY MR. PICKARD:
**Q. Do you know roughly what the two rates are today?**

Page 54

A. That is a complicated question. The standard rate in Ireland today, I believe is 12 and a half percent. The standard rate in the United States, I believe is 21 percent.
But, by way of U.S. tax law, we would pay profits on -- we would pay tax on profits in Ireland as well.
**Q. Is my understanding correct** [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: I didn't understand the question.
BY MR. PICKARD:
**Q. Fair.** [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: [redacted]

Page 55

[redacted]
BY MR. PICKARD:
**Q.** [redacted]
MR. PICKARD: Take that down for now. Let's get back to the consolidated financial, Carey Declaration Exhibit 2.
BY MR. PICKARD:
**Q. Do you have a paper copy of this with you, Ms. Carey?**
A. I do.
**Q. Feel free to use that as well. Sometimes the screen is not great.**
**So, this consolidated financial, this is sort of** [redacted]

Page 56

A. [redacted]
**Q. Okay.**
A. [redacted]
**Q. All right. And other than those three entities,** [redacted]

[redacted]

Page 57

**Q. Okay. How about prior periods?**
A. That is where AUSA would have been in place of AbbVie U.S. LLC.
**Q. Since you have it, let's go to Paik 31 for a moment.**
MR. PICKARD: Could you present that, Andy.
(Whereupon, previously marked Paik Exhibit 31, first referral.)
BY MR. PICKARD:
**Q. And I think you've got a copy there, Ms. Carey. So, feel free to look at your copy if you care to.**
**You recognize this document, right?**
A. I recognize it.
**Q. Did you participate in preparing this document?**
A. I prepared it.
**Q. And, did you prepare it at the direction of anyone?**
A. I prepared it for our Legal department.
**Q. Who asked you to prepare it?**
A. Jorge Gonzalez.

Page 58

**Q. Okay. Did you have an understanding of why it was needed?**
A. I did not.
**Q. Did you ever discuss this document with Mr. Jason Paik?**
A. I did.
**Q. We are looking at the first page of it. Why don't we go to the second page, go back in time.**
**So, what we see here, Ms. Carey, is this accurate, on Page 2 of Paik 31?**
A. That is accurate.
**Q. Now, this does not show --** [redacted]
A. I see it.
**Q. So,** [redacted]
A. Yes. [redacted]
**Q. And under the** [redacted]

Page 59

[redacted]
A. [redacted]
MR. ASHKENAZI: Counsel, just for the record, maybe it would be helpful to just refer to it as Page 1 or Page 2. I'm just making a suggestion. I will move on.
BY MR. PICKARD:
**Q. Yes, the question a moment ago that was asked of Page 1; is that right, Ms. Carey?**
A. Sorry, what was that?
**Q. Yeah. Isaac kindly suggested that I clean my record up so I would like to do that.**
MR. PICKARD: Thank you, Isaac.
BY MR. PICKARD:

Page 60

**Q. My question just a moment ago before my back and forth with Isaac, that was in regards to Page 1, which we see at the moment, correct?**
A. The first question you asked me was about Page 2. The second one was about Page 1.
**Q. Yes, thank you. I might have misspoken. You've cleared it up nicely.**
MR. PICKARD: We have gone for about an hour. Would you like a break, Ms. Carey?
THE WITNESS: Yes, please.
THE VIDEOGRAPHER: Let me take us off. The time is 1:34 p.m. Central Time. We are going off the record.
(Recess taken -- 1:34 p.m.)
(After recess -- 1:45 p.m.)
THE VIDEOGRAPHER: The time is 1:45 p.m. Central Time. We are going back on the record.
MR. PICKARD: All right. If we could put that same document back up, Andy, the Carey Declaration.
BY MR. PICKARD:
**Q. And, Ms. Carey, I would like you to look at Paragraph 9 of your deck.**
A. Yes.

[redacted]

Page 61

**Q. Do you recall this paragraph of your declaration that restated that everything -- excuse me.**
**All statements made herein are of your own knowledge.**
**Do you see that?**
A. Yes.
**Q. So, everything in here is things you know. Is that fair to say?**
A. Everything here is what?
**Q. Everything in your declaration are that things you, Jill Carey know. Is that fair to say?**
A. Yes, I know these things.
**Q. All right. Great.**
**So, let's go to Paragraph 1 where you wrote, "In the ordinary course of business, I have obtained an understanding of the various AbbVie and Allergan corporate entities, their relationships, intracompany agreements and assets which I use in my day-to-day work to provide tax controversy, tax planning and strategy, and other business advice."**
**Do you see that?**
A. I see it.

Page 62

**Q. Your declaration discusses that 2020 Asset Purchase Agreement, correct?**
A. Yes. I believe in Paragraph 5.
**Q. When did you first read that document?**
A. Probably shortly right after I joined the organization.
**Q. All right. And you joined I think in September of 2020, thereabouts?**
A. I joined in September of 2020.
**Q. And, the document, the 2020 Asset Purchase Agreement, it was signed in January of that year, right?**
A. Signed in January of 2020.
**Q. Do you understand the document?**
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: I understand the purpose of the document and the consequences as it relates what I have to do.
BY MR. PICKARD:
**Q. Okay. Have you read the entire document at any point?**
A. Yes.
**Q. And in reading it, did you come away**

Page 63

**with a full understanding of its meaning?**
MR. ASHKENAZI: Objection --
THE WITNESS: I'm not a lawyer, so I won't pretend to understand all of the technical legal speak.
But I understand the economic consequences.
BY MR. PICKARD:
**Q. Did you talk to a lawyer to answer any gaps you had as to the technical legal speak, as it were?**
A. I did not. I didn't need to for the economic consequences I needed to understand.
**Q. All right. Then let's turn to Paragraph 3 of your declaration. In that second sentence you wrote, "I have been asked to provide these entities's understanding of the legal and economic rights of the patents in suit."**
**Do you see that?**
A. Yes.
**Q. And, you understand the legal rights of the patent -- to the patents in suit, correct?**
A. I understand the legal ownership.
**Q. Is that the limit of your understanding as to the legal rights to the**

Page 64

**patents' ownership?**
A. I understand Allergan -- Allergan, Inc. retained their legal title to the patents in suit.
**Q. What does "bare legal title" mean?**
A. That they have the bare legal title, but that the [redacted] is with Allergan Ireland.
**Q. Could you explain in words not using the words bare legal title what the phrase "bare legal title" means?**
MR. ASHKENAZI: I object to the form of the question.
BY MR. PICKARD:
**Q. As you understand it. I want to be fair.**
MR. ASHKENAZI: Same objection.
THE WITNESS: Sorry, what was that?
MR. ASHKENAZI: Sorry. I just said same objection.
THE WITNESS: [redacted]
BY MR. PICKARD:
**Q. Your tone of voice suggests a question.**

[redacted]



**Are you giving me a statement of fact or are you asking me?**
A. I was trying to make sure I didn't use the phrase bare legal title.
**Q. Okay.** [redacted]
**Q. And what distinguishes in your mind the difference between legal title and bare legal title, if any, if there is any distinction?**
MR. ASHKENAZI: Object to the form of the question.
BY MR. PICKARD:
**Q. I guess I will repose it.**
**What do you understand all of these companies' understanding of bare legal title is versus legal title?**
A. My understanding is it is trying to clarify the legal title is just the legal title, and the economic rights are separate.
**Q. Okay. And, what do you understand**



**the so-called economic rights to include?**
A. I think it was defined in the agreement, but it is everything -- can I read from the agreement?
**Q. Of course.**
MR. PICKARD: And just for the record we can, Andy, let's put up -- it should be Exhibit 10, Revance MTD Exhibit 10.
Advance a page, please. Here we go.
Can we just call this Exhibit 10 today for our purposes, please?
(Whereupon, previously marked.
Revance MTD Exhibit 10,
first referral.)
BY MR. PICKARD:
**Q. Do you recognize what we have here, Carey Exhibit 10? It is the 2020 Intellectual Property Economic Asset Purchase Agreement, correct?**
A. I recognize it, yes.
**Q. And you said that the** [redacted] **in this document, correct?**
A. The [redacted]
**Q. And you are referring to 1.9**



**and 1.14, correct?**
A. 1.9 and 1.14.
And then, in Exhibit A of the agreement, there is the [redacted].
**Q. It is your understanding that those three provisions define what the companies, under the AbbVie umbrella, consider to be** [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: They form a part of it.
BY MR. PICKARD:
**Q. What else is there besides those three provisions?**
A. The way we operate and our actual actions.
**Q. So, the rights that Allergan Ireland holds is partly defined by the 2020 agreement, and it is also defined by how it operates. Is that fair?**
MR. ASHKENAZI: Objection, mischaracterizes her testimony.
THE WITNESS: I can tell you how we operate and how --



BY MR. PICKARD:
**Q. Yeah, I'm not asking that question. My question is a little different.**
**And so I asked you if those three provisions in, to your understanding, define the** [redacted] --
A. I think there is more --
**Q. I haven't asked the question yet so let me finish because we are under a tight set of time constraints here.**
**And you responded, "I can tell you how we operate," and there was a -- well, let me find it.**
**You said part of it, the way we operate and our actual operation.**
**I asked you, "Do those three provisions** [redacted]**?" You said in part, and then you continued when I asked what else is there, you said the way we operate and our actual actions.**
**And so what I want to understand is, the company's understanding is that you have the written agreement and then there is the conduct. And those two things collectively** [redacted]

**Is that what you are stating?**
MR. ASHKENAZI: I object to the form of the question. She is not here as a 30(b)(6) witness in terms of when you say the company's understanding.
BY MR. PICKARD:
**Q. Okay. You can answer the question, Ms. Carey.**
A. These agreements and the purchase that Allergan Ireland made, [redacted]
**Q. The question is a bit different.**
**Does one need to take into consideration, as you put it, the way we operate and our actual actions, [redacted]**
MR. ASHKENAZI: Objection, calls for a legal conclusion.
THE WITNESS: I was going to say I didn't understand the question.
BY MR. PICKARD:
**Q. Okay. Let me rephrase it.**
**To understand the scope of the**



**[redacted] Allergan Ireland holds, is it your understanding that one needs to take account of the written agreement and the actions of Allergan Ireland, AbbVie, Inc., AUSA, AbbVie U.S. LLC or AbbVie itself?**
MR. ASHKENAZI: Same objections.
THE WITNESS: I think there are a lot of factors that go into it. And I don't feel comfortable saying that is an exhaustive list of factors.
BY MR. PICKARD:
**Q. What else would you include in the list of factors that would need to be considered to understand the [redacted]?**
MR. ASHKENAZI: I object to the form of the question. Calls for a legal conclusion.
THE WITNESS: I think you are asking me to speak outside of what my job is in terms of --
BY MR. PICKARD:
**Q. Well, I --**
MR. ASHKENAZI: I'm sorry, counsel, please don't interrupt her. Don't cut her off.



MR. PICKARD: Isaac, I don't appreciate the tone. I am doing my best here. We are interrupting each other, and you are doing to me right now. I don't think you mean to do that. I think it is just the format.
MR. ASHKENAZI: Fair enough, counsel.
Ms. Carey, if you wanted to finish your answer, please go ahead and do so.
THE WITNESS: I was just going to say I think with regard to the [redacted].
BY MR. PICKARD:
**Q. Thank you. So, that is what I am trying to get to the bottom of.**
**If we could go back to Paragraph 3. I understand your declaration to be providing what you call these entities' understanding of [redacted] Correct?**
A. We talked about the [redacted]
**Q. So, and you have resisted my**



**question because it calls for some legal knowledge.**
**And so I'm just trying to understand your declaration. So, I haven't asked a question yet. I know you are eager to jump in.**
**Do you have an understanding of the legal rights to the patents as provided by the 2020 Asset Purchase Agreement?**
A. My understanding is that Allergan, Inc. retains legal title to the asset.
**Q. Do you think the [redacted] by that contract?**
A. No. I think the [redacted] in the Exhibit 2, I believe.
**Q. And it is also defined by the actions, the conduct of the companies, correct?**
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: [redacted]
BY MR. PICKARD:
**Q. Okay. That raises a question. The transfer pricing policies that you have referred**

[redacted]

Page 73

**to, those relate to the transfer of Botox products between the various AbbVie companies, correct?**

A. [redacted]

**Q. Whatever works for you.**

A. [redacted]

**Q. Okay. But what I was trying to get at simply was that those policies relate to the sale of Botox product, correct?**

A. It impacts the sale of Botox products, but the policy is set for the entity's function and risk and asset profile.

**Q. Okay. What I am trying to understand is, is my understanding, based on things that the plaintiffs in this lawsuit have said, that they don't sell a product that uses any of the patents that are in this lawsuit.**

**Do you have that understanding as well?**

Page 74

A. Could you please repeat that?

**Q. Yes. My understanding is that none of Allergan, Inc., Allergan Ireland or Allergan USA, none of them sell a product that uses the patented technology that is at issue in this case.**

**Do you have that understanding as well?**

MR. ASHKENAZI: Objection.

THE WITNESS: The understanding that these entities sell products that use IP? I apologize. I don't understand.

BY MR. PICKARD:

**Q. That is okay. I will break it down for you.**

**I understand that formerly it was AUSA and presently AbbVie U.S. sell Botox in the United States, correct?**

A. They sell Botox and other products in the United States.

**Q.** [redacted]

A. What do you mean by [redacted]

Page 75

[redacted]

**Q. Okay. So, ultimately it reaches one of those two distributors, depending on the time period, right?**

A. [redacted].

**Q. All right. I understand that Botox doesn't use any of the patented technology that is at issue in this case.**

**Do you have that understanding as well?**

A. Selling Botox products requires that the underlying IP is incorporated in the product.

That is my understanding.

**Q. Right. But my point is that the patents we are fighting over in this lawsuit are not part of that so-called underlying IP.**

Page 76

**Do you know that?**

MR. ASHKENAZI: Object to the form of the question.

THE WITNESS: I understand that there is a lot of patents and that there are byproducts that -- or I should say subsequent versions that trace back to other patents.

And that collectively the Botox products that we sell in the U.S. use the underlying IP that is associated with the toxins.

**Q. Okay. Let's -- maybe we can short circuit this.**

**I would like you to refer to Paragraph 2 of your declaration.**

A. Yes.

**Q. A moment ago you just mentioned underlying IP.**

**There are four patents. Do I have that right? Yes, four patents listed in Paragraph 2.**

A. Yes.

**Q. Are those four patents part of the underlying patents that you mentioned a moment ago?**

[redacted]

Page 77

A. The underlying, in -- in the underlying IP that I mentioned.
**Q. Yes.**
MR. ASHKENAZI: Object to the form of the question.
BY MR. PICKARD:
**Q. With that understanding, are these four patents part of the underlying IP necessary to sell Botox, in your view?**
A. My understanding is that they are. And that when [redacted]
**Q. And so given that, do I understand you correctly that** [redacted]
MR. ASHKENAZI: I object to the form of the question. Mischaracterizes her testimony.
THE WITNESS: I have -- [redacted]

Page 78

BY MR. PICKARD:
**Q. Okay. So, the allocation of profits has nothing to do with the** [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: [redacted]
BY MR. PICKARD:
**Q** [redacted] **Can you explain that to me?**
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: And can you repeat

Page 79

that question in its entirety for me, please?
BY MR. PICKARD:
**Q. Yes, yes. The lawyers in this case for Allergan have been quite clear that Botox does not use the asserted patents.**
**So, what I would like to know is,** [redacted]
MR. ASHKENAZI: Objection.
THE WITNESS: How does the sale of -- did you say of Botox?
BY MR. PICKARD:
**Q.** [redacted]
**Q.** [redacted]

Page 80

[redacted].
**Q. Okay. And I don't care about tax compliance. This is not a tax case. I'm interested in ownership.**
[redacted]
**Q. So, I want to focus on that issue. How does the** [redacted]
**Q. I don't know what that is. Is that the Paik 31?**
A. Paik 31. I apologize.
**Q. Yes, let's do that.**
A. So, these -- this U.S. supply chain flow.
**Q. Uh-huh.**

[redacted]

Page 81

A. So, you see on the right side, [redacted]
Q. Uh-huh?
A. [redacted].
Q. Okay. Are you done?
A. Yes.
Q. Okay. And so, here is -- and so, the product we are talking about or that is described in this, that is Botox broadly speaking. Is that fair?
A. Yes.
Q. Okay. And so it looks like I'm telling you for the first time, Botox doesn't use the asserted patents. Maybe that is news to you.
So, I want to understand what does this flow chart have to do with who owns the asserted patents?

Page 82

A. [redacted]
Q. Okay. Do you know whether any of these -- any entity under the AbbVie umbrella sells a product that uses the asserted patents?
A. I am not in the science department or commercial. I couldn't speak to that.
Q. Okay. Let's jump ahead to Paragraph 7, please, of your declaration.
MR. PICKARD: If you would take that down, Andy.
THE WITNESS: Uh-huh.
BY MR. PICKARD:
Q. And, you state that since 2020, it goes on, [redacted]."
So, I guess what I wanted to know is your statement there, is that based on that supply chain of Paik 31 that we saw a moment ago?
A. That is based on how we treated the

Page 83

[redacted].
The supply chain example I gave you for Botox shows the U.S. supply chain.
[redacted]
Q. How -- we can go to Paragraph 2, if you need to look at it. And I can show you the patents if that is helpful.
The four patents we have here, how is Allergan Ireland exploiting those four

Page 84

patents?
A. [redacted]
Q. You know, I gather that they have the right to exploit in your view.
I want to know have they, [redacted]
MR. ASHKENAZI: Object to the form of that question.
THE WITNESS: I don't know that.
BY MR. PICKARD:
Q. How has [redacted]
MR. ASHKENAZI: Objection.
THE WITNESS: [redacted]
BY MR. PICKARD:
Q. Okay. Again, your use of the word "would" is, raises question.

Page 85

[redacted]
Q. All right. So, we have kind of broadened it out beyond these patents.
What is Allergan Ireland doing to [redacted]
Q. But you can't say [redacted]
Q. What has Allergan Ireland done to maintain the four patents identified in

Page 86

Paragraph 2 of your declaration?
A. I can't speak to specific actions. I speak to their responsibility and rights.
Q. What has Allergan Ireland done to exercise its right to protect the four patents that are identified in Paragraph 2 of the declaration?
A. Based on my declaration, it has sued Revance and Ajinomoto for infringement.
Q. It certainly has. Anything else that it has done, to your understanding?
A. I don't know of specific examples.
Q. Okay. How about generally, do you have a general example?
A. If there were other infringements -- I think that is asking me to get into hypotheticals and I am not comfortable with that.
Q. Okay. Now, a few times when I asked you about the [redacted]
A. I think that is just my normal

Page 87

nomenclature in my field.
Q. Thank you for that. Now, earlier you said that Allergan, Inc. transferred the rights, [redacted]
Q. Yes. But Allergan, Inc. didn't affect that transaction solely by way of the 2020 agreement which is, I think Exhibit 10 here, correct?
A. What do you mean by that?
Q. Well, I guess for starters, Allergan, Inc. is not a signatory or a party to that agreement, right?
A. The 2020 agreement but the 20 -- it is a -- it is a signatory to the 2010 MOU that is Exhibit 2 to this agreement.
Q. All right. And I just want to focus -- we will get to the exhibit in a minute.
But, on the document executed in 2020, Allergan, Inc. didn't sign that, right?
A. Allergan Inc. did not sign that agreement.
Q. So, for Allergan, Inc. to have

Page 88

passed its rights ultimately to Allergan Ireland, we need to look at that 2010 agreement, that memorandum of understanding. Is that fair?
A. I believe that is. And that is why it is referred to in that first Whereas.
MR. PICKARD: Let's go ahead and share that. I will give you a number here in a second, Andy. That is Exhibit 9, MTD Exhibit 9. We can mark that here as Exhibit 9 here.
(Whereupon, previously marked MTD Exhibit 9, first referral.)
BY MR. PICKARD:
Q. All right. You've got 2010 memorandum of understanding there, Ms. Carey?
MR. ASHKENAZI: Counsel, it hasn't populated yet in the Box.
MR. PICKARD: Do you have a paper copy in front of you?
THE WITNESS: I have a paper copy.
BY MR. PICKARD:
Q. Okay. We can just work from that.
Have you ever read this document?
A. I have read it.

[redacted]



**Q. Do you remember the first time you read it?**
A. I do not.
**Q. Do you recall whether you read this before the lawsuit began that we are here for?**
A. I would have read it some time shortly after I started, as I mentioned before, when I read the 2020 agreements, since it is an exhibit.
**Q. Do you know who -- if you look at the back page, do you know who any of the signatories are?**
A. I don't know any of those names.
**Q. So, you haven't spoken to them?**
A. I have not spoken to them.
**Q. All right. Your declaration only covers things that happened after you began working at AbbVie; is that fair to say?**
MR. ASHKENAZI: Objection.
THE WITNESS: I would not say that. I -- the knowledge that I have gathered has been since I have worked at AbbVie.
But as an example, Paragraph 7 in my declaration refers to January 21st, 2020, and I was not an employee of AbbVie then.



BY MR. PICKARD:
**Q. That was a few months before you started?**
A. Roughly eight months.
**Q. Okay. So, you do go back eight months before your employment in Paragraph 7, correct?**
A. Yes. All of my knowledge that I included in my declaration is all knowledge I have gained after I started working at AbbVie.
**Q. All right. And at least of what you have included in your declaration, that knowledge extends only as far back as the January 21, 2020, date. Correct?**
A. My knowledge extends beyond that. But, I don't -- I am not sure I am clear on what you are asking.
**Q. Yeah. I'm not asking if you have knowledge. My question is simply you don't talk about, for example, conduct, operations and so forth of various companies prior to January 21 of 2020, correct?**
A. I do say in the ordinary -- in Paragraph 1, "In the ordinary course of business, I have obtained an understanding of the various



AbbVie and Allergan corporate entities, their relationships, intercompany agreements and assets."
**Q. Okay. And you intended by that to cover a period prior to January 21, 2020; is that right?**
A. In the ordinary course of business, my knowledge includes things that occurred prior to January 21st, 2020.
**Q. You don't specifically set that forth in your declaration, correct?**
A. I apologize. I didn't hear that.
**Q. But, whatever that knowledge is, it is not to be found in your declaration, correct?**
A. I only included in the declaration, yes, what is included in the declaration.
**Q. Okay. Thank you. All right.**
MR. PICKARD: You can take that down, Andy.
BY MR. PICKARD:
**Q. Do you know of a company called Allergan Services BMD, Ms. Carey?**
A. I have read -- or I see it is in the 2010 MOU.
**Q. Okay. Other than reading it in the**



**2010 MOU, do you have any knowledge of what that company is or does or has done?**
A. I do not.
**Q. Do you know its status today?**
A. I do not.
**Q. Do you know whether it ever disposed of any assets after 2010?**
A. I do not.
**Q. Do you know if it is still a going enterprise today?**
A. I do not.
**Q. Do you know what it owned in the way of assets as of January 1, 2010?**
A. I do not know if it owned any assets.
**Q. You don't know one way or the other, correct?**
A. I don't know.
MR. PICKARD: Why don't we do another short break. Let's go off the record.
MR. ASHKENAZI: Okay.
THE WITNESS: Sorry --
THE VIDEOGRAPHER: Let me take us off real quick. The time is 2:25 p m.

[redacted]

Page 93

Central Time. We are going off the record.
(Recess taken -- 2:25 p.m.)
(After recess -- 2:32 p.m.)
THE VIDEOGRAPHER: The time is 2:32 p m. Central Time, we are going back on the record.
MR. PICKARD: All right. Yeah, before we begin, so, Isaac, I understand from some of our off-the-record discussions that your side is planning to keep this strictly to a two-hour deposition; is that right, in view of the judge's order?
MR. ASHKENAZI: Yes.
MR. PICKARD: Okay. And, respectfully, I don't think that is appropriate. The scope of this deposition has broadened significantly from last week. And so, I would ask that I be allowed to complete my examination on the standing issues.
MR. ASHKENAZI: Counsel, if you wanted that, you should have informed us beforehand. Ms. Carey doesn't have an excessive amount of time today. She has a very busy season right now as we mentioned to

Page 94

you previously, but also as she made time to accommodate your requested depo date today.
So, we stand by our position.
MR. PICKARD: Okay. I understand your position. I – you know, if we don't have enough time, I will certainly be pointing this out in a brief.
I don't think I need to tell you that. I just want to give you fair warning.
BY MR. PICKARD:
**Q. All right. So, Ms. Carey, let's turn back to Allergan Services BMD for a moment.**
**Can you tell me why they are mentioned in the 2010 MOU, please?**
A. I cannot.
**Q. All right. And to round out some of my earlier questions on the four patents that are in your Paragraph 2, can you give me any examples where** [redacted]
MR. ASHKENAZI: Objection.
THE WITNESS: I know it has those rights. I can't provide any examples.
BY MR. PICKARD:
**Q. Ms. Carey, are you planning to**

Page 95

**attend the trial in this case?**
A. I am not attending the trial.
MR. PICKARD: All right. Let's go to the 2010 MOU for a moment. That is Exhibit 9, Andy.
And I would like to turn to the Section 1, [redacted].
BY MR. PICKARD:
**Q. You are familiar with this, right?**
A. I am.
**Q. Let me back up.**
**In preparing for your deposition today, did you look at your declaration?**
A. I did.
**Q. Fair to say that you anticipated I would ask you questions about it?**
A. Oh, I -- well, yes, because they were declarations I made.
**Q. Okay. And I just wanted to be clear. All right.**
**When is the last time you read Section 1 of the MOU?**
A. Earlier this week.
**Q. Okay. And did you come away with an understanding of what it meant?**

Page 96

MR. ASHKENAZI: Object to the form of the question.
BY MR. PICKARD:
**Q. Let me put it to you this way, did you understand what it means?**
A. [redacted] shall be considered the exclusive owner."
**Q. There is more to it, if you want to finish reading it.**
A. [redacted]
**Q. All right. Thank you. Now you have just quoted to me a portion of Section 1. Is that accurate?**

[redacted]

Page 97

A. Yes.
**Q. Okay. But there is more to Section 1 than that sentence; you would agree, right?**
A. I would agree there is other parts of the section.
**Q. All right. And so, the whole Section 1, have you read and do you understand it?**
A. I understand it.
**Q. Okay. I will tell you -- I will put my cards on the table. I don't. I am not sure I do. So, maybe you can help me.**
**And I would like to direct your attention to the, we will call it Paragraph 1. There is this A, B, C. If we can call that top bit Paragraph 1 and everything below A, B, C Paragraph 2, just for ease of reference.**
**Is that okay with you?**
A. Okay.
**Q. All right. So, it says in the second to the last sentence, "the extent of," do you see that sentence?**
MR. PICKARD: Maybe you can highlight that, Andy?

Page 98

The whole sentence, please.
BY MR. PICKARD:
**Q. So, I want to understand this sentence. And I want to -- well, more importantly, I want to understand how you understand it.**
**It says,** [redacted]
**Do you see that?**
A. I see it.
**Q. So, when I look at this, I first want to like focus on what** [redacted]
A. [redacted]
**Q. Okay. So that to me suggests that the companies to this MOU** [redacted]
MR. ASHKENAZI: Object to the form

Page 99

of the question.
THE WITNESS: [redacted]
BY MR. PICKARD:
**Q. Yes. Maybe I will come at this differently.**
[redacted]
**Q. Okay. You just read the contract to me, word for word, right?**
A. [redacted].
**Q. Yeah, well, here is what I want to know.**
[redacted]
**Q. All right.** [redacted] to the form

Page 100

of the question.
THE WITNESS: [redacted].
BY MR. PICKARD:
**Q. Well, it doesn't quite say that because it --** [redacted]
**Do you see that?**
A. I don't see, what are you referring to?
**Q. So, if you go to, you know,** [redacted]
**Do you see that?**
A. I see that.
**Q. So, it seems to me we** [redacted]
MR. ASHKENAZI: Object to the form of the question.
BY MR. PICKARD:

[redacted]

Page 101

Q. So, what I would like to know is -- [redacted]
Q. All right. I want to break this down.
So, if we accept your notion that [redacted]
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: Can you rephrase it or --
BY MR. PICKARD:

Page 102

Q. Yeah, I'm just trying to get your understanding.
A. Sure.
Q. It seems to me that you are saying [redacted]
Is that correct?
MR. ASHKENAZI: Object to the form of the question.
THE WITNESS: [redacted]
BY MR. PICKARD:
Q. Okay. [redacted]
MR. ASHKENAZI: Object to the form of the question.

Page 103

THE WITNESS: [redacted]
BY MR. PICKARD:
Q. [redacted]
Q. Right. And that is kind of what I am getting to.
[redacted]
Is that fair?
MR. ASHKENAZI: I object to the form of the question. Mischaracterizes the document. Mischaracterizes the witness's testimony.
THE WITNESS: Yeah, you will have to repeat it, please, because I didn't

Page 104

understand it.
BY MR. PICKARD:
Q. Well, I think -- I'm sorry.
I think you said a moment ago that -- I will just get to what you are saying precisely.
[redacted]
Is that your understanding?
MR. ASHKENAZI: Objection.
THE WITNESS: My --
BY MR. PICKARD:
Q. Ms. Carey, if you could repeat your answer?
A. [redacted].
Q. Now, if we look down at the A, B, C, there is that word [redacted]
I would like to know what the end period for C is. [redacted]

[redacted]

Page 105

[redacted]

**Q. Okay. How much time do you think you might need, given we are on a short fuse here apparently?**

A. Sure. Well, I think, I would -- I haven't thought about that in detail. I would need to spend time to be competent in my response.

**Q. All right. Let's set that aside.**

**Fair to say that in providing your declaration, you didn't have an understanding of that feature of the MOU?**

MR. ASHKENAZI: I object to the form of the question.

THE WITNESS: I do not think that is fair to say [redacted]

BY MR. PICKARD:

Page 106

**Q. Okay.** [redacted]

**Or maybe you didn't have it in mind at all. I would just like to know.**

THE WITNESS: Did I hear feedback? No.

[redacted]

BY MR. PICKARD:

**Q. And thank you for that. What I am trying to unpack is what does** [redacted].

**Can you give me your understanding?**

A. My understanding was that [redacted]

MR. ASHKENAZI: Objection.

THE WITNESS: Sorry, Isaac.

[redacted]

Page 107

[redacted].

BY MR. PICKARD:

**Q. Okay. What does it mean to have, the phrase in that sentence, we had it highlighted a second ago, the extent of --**

MR. PICKARD: Maybe we could highlight that again, Andy, that sentence.

BY MR. PICKARD:

**Q. I would like to understand what it means** [redacted]

**Do you agree with me there?**

MR. ASHKENAZI: Objection.

THE WITNESS [redacted]

BY MR. PICKARD:

**Q. Yeah.**

A. So, what is the question?

**Q. I guess I just want to go piece by piece, because it is complicated, and I do want you to follow.**

**This sentence that we have highlighted that starts,** [redacted]

Page 108

[redacted]

**Is that your understanding?**

MR. ASHKENAZI: Objection.

THE WITNESS: [redacted]

That is what it says.

BY MR. PICKARD:

**Q. Okay. I think we are on the same page.**

[redacted]

**Do you agree?**

A. [redacted]

A [redacted]

[redacted]

Page 109

Q. Okay. [redacted]

MR. ASHKENAZI: Object to the form of the question.

THE WITNESS: [redacted]

BY MR. PICKARD:

Q. All right.

MR. ASHKENAZI: Counsel --

MR. PICKARD: Yes.

MR. ASHKENAZI: Mr. Videographer, can you give us a time check?

THE VIDEOGRAPHER: Yes, that is time.

MR. ASHKENAZI: I just want to note on the record that much of this deposition did not relate to either what the court had asked for or to the declaration, but rather having the witness either talk about transcripts of earnings calls that she didn't actually -- wasn't actually providing any of

Page 110

those statements, or asking for interpretations of an agreement by a non-lawyer.

But, with that, we are going to end the deposition.

MR. PICKARD: I, of course, object to that. I understood that we would be covering this today, and I believe the witness anticipated as much.

And it is unfortunate that I'm not going to be able to complete my examination.

MR. ASHKENAZI: Counsel, again, you were asking her to interpret the agreement asking -- instead of focusing on her declaration and the statements that were made in her declaration. That is the difference.

MR. PICKARD: We can argue about it. You have provided a witness that says she is knowledgeable to the [redacted]

I think it is fair game. I know you disagree. That is what our jobs are to do. I will see you in a week.

MR. ASHKENAZI: That is okay. And

Page 111

before we go off the record, just two things. One, I want to make sure that the record again is marked as Highly Confidential, Pursuant to the Protective Order.

And I want to thank everyone, including counsel, Mr. Videographer, and the court reporter, as well as, and importantly, Ms. Carey for her time.

MR. PICKARD: Thank you, Ms. Carey. Congrats on your first depo.

THE VIDEOGRAPHER: Thank you. Let me wrap us up here. The time is 2:50 p.m. Central Time, and this concludes today's video deposition of Jill Carey.

(Whereupon, signature not having been waived, the deposition suspended at 2:50 p.m. CST)

* * *

Page 112

CERTIFICATE OF NOTARY

I, LORI J GOODIN, RPR, CRR, CA CSR # 13959 the Notary for this deposition, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action

________________________

LORI J GOODIN, RPR, CRR
Notary Public in and for:

STATE OF FLORIDA, COUNTY OF SARASOTA
Notary Commission Number: GG987804
My Commission expires: May 12, 2028
STATE OF CALIFORNIA, CA CSR# 13959
My Commission expires: February 22, 2025
STATE OF MARYLAND, COUNTY OF ANNE ARUNDEL
My Commission expires: August 2, 2025
DISTRICT OF COLUMBIA, WASHINGTON DC
My Commission expires: June 1, 2026
STATE OF DELAWARE, COUNTY OF KENT
My Commission expires: September 9, 2025
COMMONWEALTH OF PENNSYLVANIA, COUNTY OF LEHIGH
My Commission expires: April 5, 2025

[redacted]

Page 113

Jill Carey, c/o
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166

Case: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.
Date of deposition: November 21, 2024
Deponent: Jill Carey

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2024 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Page 114

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.
Witness Name: Jill Carey
Deposition Date: November 21, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:
(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

_____________ _________________________
DATE WITNESS SIGNATURE

_____________ _________________________
DATE NOTARY

Page 115

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D C 20036
(202)232-0646

ERRATA SHEET

Case: Allergan, Inc et al v Revance Therapeutics, Inc et al
Witness Name: Jill Carey
Deposition Date: November 21, 2024
Page No Line No Change

_________________________ ___________
Signature Date

# Exhibit 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals Ireland<br>Unlimited Company, and Allergan USA, Inc.,<br><br>*Plaintiffs,*<br><br>v.<br><br>Revance Therapeutics, Inc. and Ajinomoto<br>Althea, Inc. d/b/a Ajinomoto Bio-Pharma<br>Services,<br><br>*Defendants.* | C.A. No. 21-1411-RGA<br><br>[redacted] |

**DEFENDANTS' SECOND SET OF INTERROGATORIES TO PLAINTIFFS (NOS. 8–12)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware, Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services (collectively, "Defendants") hereby serve the following interrogatories upon Plaintiffs Allergan, Inc., Allergan Pharmaceuticals Ireland, and Allergan USA, Inc., (collectively "Plaintiffs"). Defendants hereby request that Plaintiffs answer the following interrogatories by serving written responses within thirty (30) days of service in accordance with Federal Rule of Civil Procedure 33. These interrogatories are continuing, requiring supplementation to the extent required by Federal Rule of Civil Procedure 26(e).

**DEFINITIONS AND INSTRUCTIONS**

Defendants incorporate the Definitions and Instructions from Defendants' First Set of Interrogatories to Plaintiffs, served on September 19, 2022, and Definitions from Defendants'

First, Second, and Third Sets of Requests for the Production of Documents and Things, served on September 19, 2022, March 29, 2023, and August 29, 2023, respectively.

**INTERROGATORIES**

**INTERROGATORY NO. 8:**

For each patent-in-suit, describe and identify by Bates number all license agreements, settlement agreements, technology transfer agreements, or any other agreements or contracts providing rights to patents or technologies entered into that (1) You contend are comparable to a license the parties would have agreed to at the hypothetical negotiation; (2) You claim relate to technology similar to the patents-in-suit; and (3) [redacted]. Your description of each agreement should include, at minimum, the parties to the agreement, the number of patents or patent applications covered by the agreement, the financial terms of the agreement, effective and termination dates of the agreement, exclusive or non-exclusive nature of the license, and identification of any documents related to the agreement.

**INTERROGATORY NO. 9:**

For each approved indication of BOTOX and BOTOX Cosmetic, state the total revenues, total gross profits, total net profits, and total units sold in the United States for each month since 2018.

**INTERROGATORY NO. 10:**

Describe in detail any analysis or valuation performed by Plaintiffs, or any other party, relating to any Asserted Patent, either individually or as part of a larger group of assets, including, but not limited to: any analysis or valuation relating to or concerning potential or actual cost (including, but not limited to, evaluation, acquisition, maintenance, licensing,

enforcement, or other costs); patent coverage; patent value; licensing revenue; return on investment; or apportionment or allocation of the cost, coverage, value, revenue, or return on investment of any Asserted Patent with respect to any other patent or any larger group of assets.

**INTERROGATORY NO. 11:**

To the extent an Investigational New Drug Application ("IND") or Biologics License Application ("BLA") has been filed with the FDA [redacted] identify each IND and BLA number, the date that each application was filed, the individuals most knowledgeable about the foregoing, and all documents relating to the foregoing.

**INTERROGATORY NO. 12:**

To the extent Plaintiffs admit in full or in part Defendants' Request for Admission Nos. 1, 3, 5, 7, 9, 11, 13, 15, 17, and 19 identify each product and process that serves as the basis for that admission, the patent claims that each product and process embody, the individuals most knowledgeable about the foregoing, and all documents relating to the foregoing.

Dated: August 29, 2023

Of Counsel:

Dennies Varughese, Pharm. D.
Eldora L. Ellison, Ph.D.
Adam C. LaRock
Olga A. Partington, Ph.D.
Anna G. Phillips
Ryan E. Conkin
Sasha S. Rao
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
dvarughese@sternekessler.com
eellison@sternekessler.com
alarock@sternekessler.com
opartington@sternekessler.com
aphillips@sternekessler.com
rconkin@sternekessler.com
srao@sternekessler.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 29, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Amanda E. Hoffman, Ph.D.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Dated: August 29, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

# Exhibit 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,<br><br>*Plaintiffs,*<br><br>v.<br><br>Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>*Defendants.* | C.A. No. 21-1411-RGA |

**DEFENDANTS' SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS (NOS. 132–164) TO PLAINTIFFS**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the applicable Local Rules of the United States District Court for the District of Delaware, Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services (collectively, "Defendants") request that Plaintiffs Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc. (collectively, "Plaintiffs") produce the documents and things requested herein at the offices of counsel for Defendants, or at an alternative location upon which the parties mutually agree, within thirty (30) days of the service of these Requests in accordance with the provisions prescribed by such rules. Plaintiffs are subject to a duty to supplement all responses in accordance with Federal Rule of Civil Procedure 26(e).

## DEFINITIONS AND INSTRUCTIONS

Defendants incorporate the Definitions and Instructions from Defendants' First Set of Requests for the Production of Documents and Things, served on September 19, 2022. The following additional definitions shall also apply:

1. The term "DasGupta 1984" means DasGupta et al., "Purification and Amino Acid Composition of Type A Botulinum Neurotoxin," Toxicon, vol. 22, no. 3, pp. 415–424 (1984).

2. The term "Johnson 468" means U.S. Patent No. 5,756,468.

3. The term "Goodnough Thesis" means Goodnough, "Characterization and Stabilization of Clostridium botulinum Neurotoxin for Medical use," PhD Thesis, The University of Wisconsin—Madison, pp. 1–212 (1994).

4. The term "Malizio" means Malizio et al., "Purification of Clostridium botulinum Type A Neurotoxin" in Bacterial Toxins: Methods and Protocols, vol. 145 (2000).

5. The term "Gessler" means Gessler et al., "Production and purification of Clostridium botulinum type C and D neurotoxin," FEMS Immunology and Medical Microbiology, vol. 24, pp. 361–367 (1999).

6. The term "Frevert 185" means WO 2005/007185 A2.

7. The term "Webb" means WO 2006/005910.

8. The term "Pickett" means GB 2419527.

9. The term "Panjwani I" means WO 2006/013357.

10. The term "Panjwani II" means WO 2006/013370.

11. The term "Hunt 598" means U.S. Patent Application Publication No. 2003/0118598 A1.

12. The term "Osterberg" means U.S. Patent No. 5,733,873.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 132:**

Documents sufficient to show any analyses conducted by or on behalf of Plaintiffs relating to the impact (or expected impact) of the competitive entry of the Accused Product to any commercial embodiment of the Patents-in-Suit and any product or process that Plaintiffs claim is impacted by alleged infringement of the Patents-in-Suit.

**REQUEST NO. 133:**

All documents and communications relating to any decision by or on behalf of Plaintiffs regarding whether to develop, implement, and/or commercialize a product or process that practices the Patents-in-Suit.

**REQUEST NO. 134:**

Documents sufficient to identify the entity that manufactures any commercial embodiment of the Patents-in-Suit and any product or process that Plaintiffs claim is impacted by alleged infringement of the Patents-in-Suit.

**REQUEST NO. 135:**

Documents sufficient to identify the entity that distributes any commercial embodiment of the Patents-in-Suit and any product or process that Plaintiffs claim is impacted by alleged infringement of the Patents-in-Suit.

**REQUEST NO. 136:**

Documents sufficient to identify the entity that sells in the United States any commercial embodiment of the Patents-in-Suit and any product or process that Plaintiffs claim is impacted by alleged infringement of the Patents-in-Suit.

**REQUEST NO. 137:**

Documents sufficient to show for any entity that manufactures, distributes, and/or sells any product or process Plaintiffs believe is impacted by the alleged infringement of the Asserted Patents, the annual manufacturing and distribution capacity for such activities in the United States and internationally since 2000.

**REQUEST NO. 138:**

Documents sufficient to show for any entity that manufactures, distributes, and/or sells any product or process Plaintiffs believe is impacted by the alleged infringement of the Asserted Patents, the costs associated with any expansion of manufacturing and distribution capacity associated with such activities since 2000.

**REQUEST NO. 139:**

All financial statements (income statement, balance sheet, statement of cash flow), ledgers, and other documents since 2000 that detail or describe Plaintiffs' revenues, costs (including production costs, costs of goods sold, and marketing and sales costs), gross margin, and profits from the sale of any product or process Plaintiffs believe is impacted by the alleged infringement of the Asserted Patents.

**REQUEST NO. 140:**

All documents related [redacted].

**REQUEST NO. 141:**

All documents related to the [redacted].

**REQUEST NO. 142:**

All documents related to any market analysis relating to the impact (or expected impact) [redacted].

**REQUEST NO. 143:**

All documents related to the decision-making and/or rationale for returning rights of [redacted].

**REQUEST NO. 144:**

Any agreements (including any settlement agreement, license agreement, or commercialization agreement) related to botulinum toxin pharmaceutical products, including [redacted].

**REQUEST NO. 145:**

All documents related to the decision-making and/or rationale for licensing any of the Asserted Patents, including the '567 patent.

**REQUEST NO. 146:**

All documents related to the decision-making and/or rationale for licensing the '567 patent to BioSentinel, Inc.

**REQUEST NO. 147:**

All documents related to any analysis of [redacted]

**REQUEST NO. 148:**

All documents relating to any agreement between Plaintiffs and their parent entities, subsidiaries, or affiliates for the distribution of profits from the development, manufacture, sale,

marketing, or promotion of BOTOX or BOTOX Cosmetic, any commercial embodiment of the Asserted Patents, or any subject matter or technology claimed in the Asserted Patents.

**REQUEST NO. 149:**

All documents relating to any agreement between Plaintiffs and any third party for the distribution of profits from the development, manufacture, sale, marketing, or promotion of BOTOX or BOTOX Cosmetic, any commercial embodiment of the Asserted Patents, or any subject matter claimed in the Asserted Patents.

**REQUEST NO. 150:**

All documents related to the purification of any botulinum toxin serotypes A-G using column chromatography, including any purification of botulinum toxin serotypes A-G using ion exchange columns and/or hydrophobic interaction chromatography columns.

**REQUEST NO. 151:**

All documents reflecting, describing, or relating to any analysis, study, evaluation, or assessment of the purification processes described in DasGupta 1984, Johnson 468, Goodnough Thesis, Malizio, or Gessler.

**REQUEST NO. 152:**

All documents reflecting, describing, or relating to any analysis, study, evaluation, or assessment of the botulinum toxin pharmaceutical products described in Frevert 185, Webb, Pickett, Panjwani I, Panjwani II, Hunt 598, Osterberg, or Johnson 468.

**REQUEST NO. 153:**

All documents Plaintiffs intend to rely on to assert (if Plaintiffs so assert) that any prior art reference identified in Defendants' Preliminary Invalidity Contentions, served on March 3,

2023, does not constitute prior art under 35 U.S.C. § 102(a) (pre-AIA) or 35 U.S.C. § 102(a)(1) (AIA).

**REQUEST NO. 154:**

All documents, including references, publications, and other public disclosures, whether published and disclosed in the United States or elsewhere, that Plaintiffs intend to rely on to rebut any argument that any Asserted Claim is invalid based on indefiniteness under 35 U.S.C. § 112(2).

**REQUEST NO. 155:**

Documents sufficient to show all the conditions under which resonance energy transfer is exhibited between a donor fluorophore and an acceptor fluorophore prior on a botulinum toxin serotype A substrate, including but not limited to, the distance between the donor and acceptor fluorophores, the orientation of the donor and acceptor fluorophores, and the length of the substrate proteins.

**REQUEST NO. 156:**

All documents, including references, publications, and other public disclosures, whether published and disclosed in the United States or elsewhere, that Plaintiffs intend to rely on to rebut any argument that any Asserted Claim is invalid based on lack of written description under 35 U.S.C. § 112(1).

**REQUEST NO. 157:**

All documents, including references, publications, and other public disclosures, whether published and disclosed in the United States or elsewhere, that Plaintiffs intend to rely on to rebut any argument that any Asserted Claim is invalid based on lack of enablement under 35 U.S.C. § 112(1).

**REQUEST NO. 158:**

All documents reflecting, describing, or relating to any analysis, study, evaluation, or assessment of the impact (or expected impact) of temperature on the stability and potency of botulinum toxins (including serotype A).

**REQUEST NO. 159:**

All documents reflecting, describing, or relating to potency determinations of lyophilized animal-protein free or animal-product free botulinum toxin serotype A compositions, including any composition disclosed or described in the ’625, ’878, or ’216 patents.

**REQUEST NO. 160:**

All documents reflecting, describing, or relating to the surfactants considered, analyzed, studied, evaluated, or assessed for use in lyophilized botulinum toxin serotype A pharmaceutical compositions.

**REQUEST NO. 161:**

All documents reflecting, describing, or relating to the pH buffers considered, analyzed, studied, evaluated, or assessed for use in lyophilized botulinum toxin serotype A pharmaceutical compositions.

**REQUEST NO. 162:**

All documents reflecting, describing, or relating to the disaccharides considered, analyzed, studied, evaluated, or assessed for use in lyophilized botulinum toxin serotype A pharmaceutical compositions, including but not limited to sucrose, trehalose, and lactose.

**REQUEST NO. 163:**

All documents reflecting, describing, or relating to the amount of disaccharides considered, analyzed, studied, evaluated, or assessed for use in lyophilized botulinum toxin

serotype A pharmaceutical compositions, including but not limited to all weight ratios of disaccharide to surfactant.

**REQUEST NO. 164:**

All documents reflecting, describing, or relating to botulinum toxin serotype A substrates that can exhibit resonance energy transfer under the appropriate conditions, including but not limited to the conditions that affect whether resonance energy transfer occurs.

Dated: March 29, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

Of Counsel:

Dennies Varughese, Pharm. D.
Eldora L. Ellison, Ph.D.
Adam C. LaRock
Olga A. Partington, Ph.D.
Anna G. Phillips
Ryan E. Conkin
Sasha S. Rao
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 New York Avenue NW
Suite 600
Washington, DC 20005
(202) 371-2600
dvarughese@sternekessler.com
eellison@sternekessler.com
alarock@sternekessler.com
opartington@sternekessler.com
rconkin@sternekessler.com
srao@sternekessler.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 29, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Amanda E. Hoffman, Ph.D.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

*Attorneys for Plaintiffs*

Dated: March 29, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

# Exhibit 31

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,<br><br>*Plaintiffs*,<br><br>v.<br><br>Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>*Defendants*. | C.A. No. 21-1411-RGA |

**DEFENDANTS' DEPOSITION NOTICE PURSUANT TO FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services, (collectively, "Defendants"), by and through their attorneys, will take the deposition upon oral examination of Plaintiffs Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc. (collectively, "Plaintiffs" or "Allergan"). The deposition will take place at a mutually agreeable time and place and shall continue thereafter until completed, or on such other date and at such other location as agreed upon by counsel. The deposition will be taken pursuant to the Federal Rules of Civil Procedure before an officer and reporter authorized to administer oaths. The deposition will be videotaped and recorded by stenographic means.

As required by Rule 30(b)(6), Plaintiffs shall designate one or more officers, directors, managing agents, or other persons who are knowledgeable to testify on their behalf with respect to topics set forth in the attached Schedule A. The persons so designated shall be required to

testify as to each of those matters known or reasonably available to Plaintiffs. Plaintiffs shall provide Defendants' counsel with written notice at least ten (10) business days before the date of the deposition of the name(s) and title(s) of the designee(s) who will testify on behalf of Plaintiffs and shall identify the matters to which each designee will testify.

Defendants reserve the right to amend or supplement this notice as more information becomes available to Defendants during the course of discovery.

Dated: July 31, 2023

Of Counsel:

Dennies Varughese, Pharm. D.
Eldora L. Ellison, Ph.D.
Adam C. LaRock
Olga A. Partington, Ph.D.
Anna G. Phillips
Ryan E. Conkin
Sasha S. Rao
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 New York Avenue, NW
Suite 600
Washington, DC 20005
(202) 371-2600
dvarughese@sternekessler.com
eellison@sternekessler.com
alarock@sternekessler.com
opartington@sternekessler.com
aphillips@sternekessler.com
rconkin@sternekessler.com
srao@sternekessler.com

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

## SCHEDULE A

## DEFINITIONS

1. The definitions set forth in Defendants' First Set of Requests for Production of Documents and Things to Plaintiffs, served September 19, 2022, and Defendants' Second Set of Requests for Production of Documents and Things to Plaintiffs, served March 29, 2023, are hereby incorporated by reference as if fully set forth herein.

2. "Asserted Patent(s)" shall mean, individually or collectively, U.S. Patent Nos. 7,332,567 (the "'567 patent"), 7,354,740 (the "'740 patent"), 8,409,828 (the "'828 patent"), 11,033,625 (the "'625 patent"), 11,124,786 (the "'786 patent"), 11,147,878 (the "'878 patent"), 11,203,748 (the "'748 patent"), 11,285,216 (the "'216 patent"), 11,326,155 (the "'155 patent"), and the patent and patent applications from which the Asserted Patents claim priority.

3. "Asserted Claims" refers to each of the claims of the Asserted Patents that Plaintiffs contend is infringed by Defendants.

4. "DAXXIFY®" means the botulinum toxin product that is the subject of Biologics License Application No. 761127.

5. [redacted]., any of its predecessors, and any of its subsidiaries, domestic or foreign divisions, departments, parents, affiliates, present or former officers, directors, employees, agents, representatives, all entities acting in consort, joint-venture, or partnership, and others acting on its behalf.

6. The term "Affiliate" shall refer to any current or future parents, subsidiaries, as well as any current or future corporations, business entities, trusts, commonly-owned corporations, as well as any other entity owning, owned by, controlling, controlled by or under common control or ownership of an entity (whether legally, beneficially, by agreement or through stock ownership or other equity interest, directly or indirectly) and their permitted

successors and assigns. For clarity, a corporation or other business entity is only an "Affiliate" during such time that it directly or indirectly controls, is controlled by, or is under common control with a given entity.

7. The term "Schmidt 280" means U.S. Patent No. 6,762,280.

8. The term "Schmidt 669" means U.S. Patent No. 5,965,699.

9. The term "Holskin" means Holskin, B. et al., "A continuous fluorescence-based assay of human cytomegalovirus protease using a peptide substrate," *Anal Biochem.*, 227(1):148–155 (1995).

10. The term "Mahajan" means Mahajan, N. et al., "Novel mutant green fluorescent protein protease substrates reveal the activation of specific caspases during apoptosis," *Chem Biol.*, 6(6):401–409 (1999).

11. The term "Schmidt 1997" means Schmidt. J. et al., "Endoproteinase activity of type A botulinum neurotoxin: substrate requirements and activation by serum albumin," *J Protein Chem.*, 16(1):19–26 (1997).

12. The term "Tsien" means WO 97/28261.

**TOPICS OF EXAMINATION**

1. The contributions of each person to the conception of the subject matter claimed in each of the Asserted Claims, including, but not limited to, the substance of any such contribution, the time, the place, and the manner of making any such contribution.

2. The facts and circumstances relating to the conception and reduction to practice of the subject matter claimed in each of the Asserted Claims, including, but not limited to, when any actual or constructive reduction to practice occurred and was completed, where any actual reduction to practice occurred, the persons involved in any reduction to practice, the subject matter actually reduced to practice, all acts performed which allegedly reduced or contributed in any way to any actual reduction to practice, and any diligence between any date of conception and the date of any actual or constructive reduction to practice.

3. The facts related to the research and development of the subject matter disclosed or claimed in the Asserted Patents.

4. The facts and circumstances relating to the preparation, filing, and prosecution, including any post-grant procedures, of the Asserted Patents before the PTO or other patent-examining authority, including, without limitation, (a) all persons who played any role in such preparation, filing or prosecution and the work they did related to same, (b) all statements made to the PTO or other patent-examining authority and the meaning and reasons for same, (c) all testing and other data referred to in such prosecution or that would refute or support positions taken in such prosecution, and (d) all communications with the PTO or other patent-examining authority, including, without limitation, all examiner interviews and communications related to examiner amendments.

5. Any study, testing, experiments, analysis, and/or evaluation described in, or relating to the subject matter of, the Asserted Patents, including any study, testing, experiments, analysis, and/or evaluation described in the specifications or examples contained in the Asserted Patents.

6. Facts related to the ownership of, assignment to, license to, or transfer of any right to the Asserted Patents.

7. The factual basis and support for Plaintiffs' responses to any interrogatories served in this Case.

8. Any study, testing, experiments, analysis, and/or evaluation of DAXXIFY®, DaxibotulinumtoxinA for Injection, or any drug substance or drug product described in Revance's BLA No. 761127.

9. Plaintiffs' knowledge and understanding of Defendants, DAXXIFY®, or DaxibotulinumtoxinA for Injection within the industry or in the commercial market.

10. Any study, testing, experiments, analysis, and/or evaluation of [redacted]

11. Plaintiffs' awareness of and the contents of any prior art to the Asserted Patents and whether or not such prior art was disclosed to the PTO.

12. Any study, testing, experiments, analysis, and/or evaluation of the Prior Art to the Asserted Patents, including any purification processes described in DasGupta 1984, Johnson 468, Goodnough Thesis, Malizio, and Gessler, any pharmaceutical products described in Frevert 185, Webb, Pickett, Panjwani I, Panjwani II, Hunt 598, Osterberg, and Johnson 468, and any substrate described in Schmidt 280, Schmidt 669, Holskin, Mahajan, Schmidt 1997, and Tsien.

13. The rationale for using, or selecting for use, an animal-protein or animal-product-free fermentation process for preparing botulinum toxin.

14. The rationale for using, or selecting for use, an animal-protein or animal-product-free purification process for preparing botulinum toxin.

15. The rationale of using, or selecting for use, column chromatography to purify botulinum toxin, including the rationale for using hydrophobic interaction chromatography columns, anion exchange columns, and/or cation exchange columns.

16. The rationale for preparing lyophilized or freeze-dried pharmaceutical compositions containing botulinum toxin, including lyophilized or freeze-dried pharmaceutical compositions containing botulinum toxin serotype A.

17. The rationale for using, or selecting for use, a surfactant in a pharmaceutical composition containing botulinum toxin, including the rationale for using or selecting polysorbate 80 for use in a botulinum toxin pharmaceutical composition.

18. The rationale for using, or selecting for use, 150 kDa botulinum toxin serotype A in a pharmaceutical composition.

19. The rationale for using, or selecting for use, a disaccharide in a powder pharmaceutical botulinum toxin composition, including the rationale for using, or selecting for use, sucrose, trehalose, or lactose in a powder pharmaceutical botulinum toxin composition.

20. The rationale for using, or selecting for use, a disaccharide in an amount of about 5 mg to about 250 mg in a botulinum toxin composition.

21. The rationale for assessing the recovered potency of powder pharmaceutical compositions containing botulinum toxin, including the rationale for assessing recovered potency at below freezing temperatures and room temperature.

22. The rationale for assessing the recovered potency of powder pharmaceutical compositions containing botulinum toxin initially, at 3 months, and/or at 12 months.

23. The rationale for using, or selecting for use, a buffer in a pharmaceutical botulinum toxin composition that is sufficient to maintain a pH from about 5 to about 7.3 upon reconstitution, including the rationale for using a buffer sufficient to maintain the pH from about 5.5 to about 6.5.

24. The rationale for using, or selecting for use, an amino acid buffer in a pharmaceutical botulinum toxin composition.

25. The rationale for using, or selecting for use, a weight ratio of disaccharide to surfactant is 2:1 or greater in a pharmaceutical botulinum toxin composition.

26. The rationale for using, or selecting for use, donor fluorophores and acceptor fluorophores that exhibit resonance energy transfer to assess the presence of botulinum toxin.

27. The factual basis for any objective indicia of non-obviousness Plaintiffs may allege.

28. The facts and circumstances of any business opportunities or sales Plaintiffs allegedly lost because of Defendants' alleged infringement, including any impact on prices negotiated with purchasers or potential purchasers of BOTOX® and BOTOX® Cosmetic, any impact on royalties negotiated with actual or potential licensees, and reasons provided to Plaintiffs regarding the decision not to conduct business with Plaintiffs.

29. The market for botulinum toxin products, including:

a. The identity of any competitors to BOTOX® and BOTOX® Cosmetic and estimates of their respective market share(s);

b. The identity of any competing products, services, or solutions to BOTOX® and BOTOX® Cosmetic, by manufacturer/vendor; and

c. The identities of any customers, customer bases, or market segments.

30. Any alternative products available to customers or potential customers of BOTOX® and BOTOX® Cosmetic, including the similarities and differences among the alternative products and BOTOX® and BOTOX® Cosmetic and any evidence of the availability, commercial acceptability, and development costs of any alternative.

31. Plaintiffs' market research and competitive intelligence activities regarding the products, services, or solutions that compete with BOTOX® and BOTOX® Cosmetic and DAXXIFY®.

32. Plaintiffs' marketing, promotion, commercialization, and advertising of BOTOX® and BOTOX® Cosmetic, including, without limitation, marketing, strategy, sales, business plans, direct-to-consumer marketing, tradeshow presentations, promotional materials, promotional campaigns, marketing strategies, and advertising material.

33. Plaintiffs' price-setting strategy for BOTOX® and BOTOX® Cosmetic, including the gross and net unit prices of each, discounting practices, and adjustments to other terms and conditions.

34. The facts and circumstances relating to [redacted]

35. Facts relating to the entities that manufacture, distribute, or sell BOTOX® and BOTOX® Cosmetic in the United States, including the manufacturing and distribution capacities

for such activities and costs associated with any expansion of manufacturing and distribution capacities.

36. Plaintiffs' past, current, and forecasted revenues, costs (including production costs, costs of goods sold, and marketing and sales costs), gross margin, and profits from the sale of any product or process Plaintiffs believe is impacted by the alleged infringement of the Asserted Patents.

37. The facts and circumstances relating to the [redacted]

38. The facts and circumstances relating to any license of, or any effort by or on behalf of Plaintiffs to license, or any requests from third parties to be granted a license to, any of Plaintiffs' Asserted Patents, including information regarding proposed financial terms or other consideration.

39. The facts and circumstances relating to any agreements (including any settlement agreement, license agreement, or commercialization agreement) related to botulinum toxin pharmaceutical products, [redacted]

40. The facts and circumstances relating to any valuation of any of the Asserted Patents.

41. Facts relating to the standard or effective royalty rates applicable to the licenses for any of the Asserted Patents and the royalty rates offered (whether or not accepted by potential licensees) for a license to the Asserted Patents.

42. Plaintiffs' policies and procedures for licensing intellectual property, including the Asserted Patents and any other patents related to the manufacture, testing, or composition of botulinum toxin products, and Plaintiffs' strategies, policies and procedures that govern licensing discussions with potential in- and out-license partners.

43. The facts and circumstances relating to any agreement between Plaintiffs and their parent entities, subsidiaries, or affiliates for the distribution of profits from the development, manufacture, sale, marketing, or promotion of BOTOX® and BOTOX® Cosmetic, any commercial embodiment of the Asserted Patents, or any subject matter or technology claimed in the Asserted Patents.

44. The facts and circumstances relating to any agreement between Plaintiffs and any third party for the distribution of profits from the development, manufacture, sale, marketing, or promotion of BOTOX® and BOTOX® Cosmetic, any commercial embodiment of the Asserted Patents, or any subject matter claimed in the Asserted Patents.

45. The identities of any individuals or entities receiving financial benefit from the Asserted Patents or having a financial interest in the Asserted Patents.

46. The factual circumstances surrounding any alleged irreparable harm Plaintiffs have suffered or would suffer if DAXXIFY® is not withdrawn from the market, including any loss of goodwill or reputational harm, and lost business opportunities.

47. Any alleged hardship on Plaintiffs if DAXXIFY® is not withdrawn from the market.

48. Any alleged interest of the public served by a withdrawal of DAXXIFY® from the market.

49. The identity and location of persons most knowledgeable about each of the foregoing topics.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiffs*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Amanda E. Hoffman, Ph.D.
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Dated: July 31, 2023

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

# Exhibit 32

**From:** Byron Pickard
**To:** Ashkenazi, Isaac S.
**Cc:** Revance-DAXI; Allergan-BoNT-PH; YCST_Revance_DAXI; MNAT Internal
**Subject:** Carey Depo
**Date:** Thursday, November 21, 2024 5:09:36 PM
**Attachments:** image001.png
image002.png

---

Dear Isaac,

We are disappointed that Ms. Carey was not permitted to testify beyond 2 hours. I understand your side's position that two hours is what the Court ordered. We disagree for the reasons stated on the record. My point in writing, however, is not to further litigate that dispute. Instead, we propose that we promptly reconvene Ms. Carey's deposition at a time convenient to her later tonight or first thing tomorrow, so we can complete our examination in time to present a complete record to the Court with our reply tomorrow evening.

Please let us know as soon as possible, so we can make the necessary arrangements if we are to have additional deposition time.

Sincerely,

Byron

Sterne Kessler
STERNE KESSLER GOLDSTEIN & FOX

**Byron Pickard**
Director
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
1101 K Street, NW, 10th Floor, Washington, DC 20005

**Email:** bpickard@sternekessler.com
**Direct:** 202.772.8521
**Administrative Assistant:** Jacob Bloomfield
**Main:** 202.371.2600 **Direct:** 202.772.8617

# Exhibit 33

PAUL HASTINGS

1(212) 318-6432
isaacashkenazi@paulhastings.com

November 22, 2024

**VIA E-MAIL**

Byron Pickard
Sterne, Kessler, Goldstein & Fox P.L.L.C.
bpickard@sternekessler.com

Re: *Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.*, Civil Action No. 21-1411 (RGA)

Dear Byron:

I write in response to your email from yesterday (Thursday) at 5:10 pm asking to reconvene Ms. Jill Carey's deposition later that evening or today.

As you know, the Court ordered that Revance could depose Ms. Carey for "up to two hours" on footnote 12 of Dr. Meyer's supplemental expert report. (Nov. 15, 2024 Pretrial Conf. Tr. at 74:10-11.) Despite the limited scope of this deposition, Revance came prepared to question Ms. Carey on the declaration she submitted yesterday in support of Allergan's opposition to Revance's motion to dismiss. Although we had no objection to Revance asking about Ms. Carey's declaration, Revance did not inform us ahead of time that it would be seeking to extend the deposition for that purpose, and, as you are aware, Ms. Carey had a hard stop and could not testify beyond the two hours allotted.

In any event, footnote 12 of Dr. Meyer's supplemental expert report contains only a two-sentence reference to her conversation with Ms. Carey. Likewise, Ms. Carey's short declaration contains roughly two pages of testimony, of which just over a page contains substantive statements. Revance had plenty of time to address those narrow issues in two hours, and indeed, Revance questioned Ms. Carey for over 100 transcript pages in that time. The deposition was adequate to cover those topics.

And for her part, Ms. Carey was prepared to testify about both footnote 12 and her declaration. (Nov. 21, 2024 J. Carey Tr. at 95:11-18.) For instance, Revance questioned Ms. Carey about Paik Exhibit 31 referenced in Dr. Meyer's footnote 12 (*see, e.g.*, *id.* at 57:8-60:5) and the facts contained therein, including specific details on the profit margins described in that exhibit. Ms. Carey confirmed, *inter alia*, that (a) she created Paik Exhibit 31 (*id.* at 57:17-19), (b) Paik Exhibit 31 is accurate and represents the U.S. supply chain flow (*id.* at 58:10-12, 80:10-24), (c) [redacted]

Revance also spent significant time asking Ms. Carey about her declaration, and she was prepared to testify in response to those questions, as well as answer questions about the declaration's underlying facts. For example, Ms. Carey testified that "[Allergan Ireland] is [redacted] 82:2-5) and that the

PAUL
HASTINGS



[redacted] (*id*. at 69:9-12).

That Revance squandered its time, or is disappointed with the substance of Ms. Carey's testimony, is not good cause to seek more time. Indeed, the very first area of substantive questioning and the first three marked exhibits, for example, were far afield from the footnote and declaration, and focused on statements made by others (such as AbbVie's CEO) about Allergan's market share. (*See id*. at 20:19-33:18.) Revance also questioned Ms. Carey about the extent of AbbVie and its subsidiaries' tax liability in the United States versus Ireland (*see id.* at 51:25-55:13), even though Revance's counsel admitted later in the deposition that those issues have no place in this case: "I don't care about tax compliance. This is not a tax case." (*Id.* at 80:2-3.) Moreover, after establishing that Ms. Carey is not a lawyer, Revance still proceeded to waste more time by improperly asking her to perform the legal exercise of contract interpretation, including defining specific terms. (*See, e.g.*, *id.* at 64:5 ("What does 'bare legal title' mean?"), 97:21-98:6 ("it says in the second to last sentence, 'the extent of,' . . . I want to understand how you understand it"); 106:15-21 ("What I am trying to unpack is what does the word 'onward' mean here . . . Can you give me your understanding?").) Ms. Carey's declaration, in contrast, was directed to Allergan's course of conduct and how Allergan understands the impact that certain agreements have on IP ownership rights.

Your email said that the purpose of Revance's request for additional deposition time is to "present a complete record" in its reply brief. We believe the record is sufficiently complete in the wake of Ms. Carey's deposition, and given the breadth of topics you covered beyond the footnote and declaration, we do not see how you could contend otherwise. If your intent is to criticize Ms. Carey's declaration or deposition in filings with this Court, we insist that you also attach this letter and a transcript of today's deposition excerpted to include any portions cited herein in order to "present a complete record" for the Court to consider.

Sincerely,

*/s/ Isaac S. Ashkenazi*

Isaac S. Ashkenazi
of PAUL HASTINGS LLP

ISA:DMV