IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

REVANCE THERAPEUTICS, INC.
Petitioner,

v.

MEDY-TOX, INC.
Patent Owner.

---

Case: IPR2021-01203
U.S. Patent No. 9,480,731

---

**PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,480,731 B2**

***Mail Stop "PATENT BOARD"***
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

EXHIBIT

ALGN-1848168

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

LIST OF EXHIBITS ........ vi

I. INTRODUCTION ........ 1

II. GROUNDS FOR STANDING (37 C.F.R. § 42.104(a)) ........ 5

III. PRECISE RELIEF REQUESTED (37 C.F.R. §42.22(a)) AND IDENTIFICATION OF CHALLENGE (37 C.F.R. § 42.104(b)) ........ 5

IV. OVERVIEW OF LEVEL OF SKILL AND CONTENT OF THE PRIOR ART ........ 6

A. Person of ordinary skill in the art ("POSA") ........ 6

B. Scope and content of the art before December 2013. ........ 8

1. *Botulinum* toxin A was known for treating the type of conditions claimed by the '731 patent. ........ 8

2. The use of animal proteins in pharmaceutical formulations containing *botulinum* toxins had known drawbacks. ........ 9

3. *Botulinum* toxin A formulations free of any animal protein were known to be advantageous. ........ 10

4. Petitioner's grounds rely specifically on the following two publications. ........ 12

a) Ruegg (EX1004) ........ 12

b) BOTOX® Label (EX1007) ........ 14

V. OVERVIEW OF THE '731 PATENT ........ 16

A. The challenged claims (1-2, 5-10, and 13-14). ........ 17

B. The '731 patent specification and prosecution history. ........ 18

VI. CLAIM CONSTRUCTION ........ 18

VII. THE CHALLENGED CLAIMS WOULD HAVE BEEN OBVIOUS OVER RUEGG IN VIEW OF BOTOX® LABEL ........ 20

A. Claim 1 ........ 21

1. Ruegg and BOTOX® Label teach treating facial wrinkles in humans with *botulinum* toxin compositions. ........ 24

2. Ruegg teaches animal-protein-free botulinum toxin compositions and their advantages. ........ 26

3. Ruegg teaches an animal-protein-free composition having a duration of action "longer" than an animal-protein-containing composition. .... 27
4. A POSA would have had ample reason to combine Ruegg's teachings with BOTOX® Label. .... 28
5. A POSA would have reasonably expected that the animal-protein-free composition would have had a "longer duration of action." .... 32

B. Claim 2 .... 38
C. Claim 5 .... 39
D. Claim 6 .... 39
E. Claim 7 .... 40
F. Claim 8 .... 41
G. Claim 9 .... 42
H. Claim 10 .... 52
I. Claim 13 .... 53
J. Claim 14 .... 53

VIII. THERE ARE NO OBJECTIVE INDICIA THAT WEIGH AGAINST THE STRONG OBVIOUSNESS SHOWING HERE. .... 55

A. There are no unexpected results over the closest prior art. .... 56
1. Medy-Tox's claimed methods are not "unexpectedly" superior over the closest prior art. .... 57
2. Medy-Tox's results are not commensurate across the full scope of the challenged claims .... 58
3. Medy-Tox's results are attributable to features that existed in the prior art; no nexus exists. .... 59

B. There is no evidence of "long-felt, unmet need" here. .... 60
C. The simultaneous invention by multiple research groups confirms obviousness. .... 61

IX. CONCLUSION .... 63

X. MANDATORY NOTICES (37 C.F.R. §42.8(a)(1)) .... 63

## I. INTRODUCTION

Revance Therapeutics, Inc. ("Revance" or "Petitioner") petitions for *Inter Partes* Review ("IPR"), seeking cancellation of claims 1-2, 5-10, and 13-14 of U.S. Patent No. 9,480,731 ("the '731 patent"), assigned to Medy-Tox, Inc. These claims are unpatentable under 35 U.S.C. § 103(a) in view of the prior art.

The challenged claims of the '731 patent are directed to "a method of treating a condition in a patient in need thereof," comprising "locally administering a therapeutically effective amount of an animal-protein-free botulinum toxin composition" that alleviates symptoms of the condition "for a period of time longer [or "greater … interval of time"] than that of an animal-protein-containing botulinum toxin composition," "wherein the condition is selected from the group consisting of glabellar lines, marionette lines, brow furrows, lateral canthal lines," *i.e.*, facial wrinkles. Dependent claims further recite the type of formulation (*e.g.*, liquid, lyophilized), certain duration of action and time intervals between doses.

But the treatment methods claimed in the '731 patent (which claims priority to 2013) were already known in the prior art well before the alleged priority date. For example, Ruegg[1] in 2010 disclosed an animal-protein-free *botulinum* toxin

---

[1] "Ruegg" refers to the prior art reference patent application filed by Ruegg et al. Dr. Curtis Ruegg, inventor on the Ruegg reference, has also submitted a declaration in support of this petition. *See* Section VIII.C "Dr. Ruegg" is used to

composition that had a longer lasting effect *in vivo* compared to an animal-protein-containing *botulinum* toxin composition. As further described below, Ruegg conducted experiments in a murine model, injecting mice with an animal-protein-free *botulinum* toxin composition and an animal-protein-containing[2] *botulinum* toxin—both injections at the same muscle site and with the same amount of *botulinum* toxin—and comparing the results. Ruegg demonstrated, among other things, that the animal-protein-free composition exhibited a longer duration of action—nearly twice as much—as the animal-protein-containing composition (*i.e.*, BOTOX®), as is claimed in the '731 patent.

Moreover, Ruegg also specifically teaches using animal-protein-free *botulinum* toxin compositions to treat facial wrinkles in humans. This teaching, along with Ruegg's specific reference to BOTOX®, provides express motivation for a person of ordinary skill in the art ("POSA") to combine Ruegg's teachings with the FDA-approved BOTOX® Label (also prior art) to treat the same types of facial wrinkles (*e.g.*, glabellar lines) that BOTOX® was approved to treat, at a therapeutically effective amount and for a longer duration of time than BOTOX®, precisely as claimed in the '731 patent. *Botulinum* toxins have been known since

---

describe his activities with respect to that declaration.

[2] Ruegg states the animal-protein-containing composition was commercially available BOTOX®.

the late 1980s to treat such facial wrinkles, as admitted by the '731 patent specification.

Ruegg's teachings combined with BOTOX® Label render each challenged claim *prima facie* obvious. Notably, neither Ruegg nor the BOTOX® Label were considered or even cited during prosecution of the '731 patent. As explained by Drs. Rummel and Solish (Revance's expert declarants), a POSA would have had reason and the know-how to prepare and administer the animal-protein-free *botulinum* toxin compositions as claimed in the '731 patent. Likewise, the POSA would have predicted and reasonably expected that the longer duration of effect of the animal-protein-free composition compared to animal-protein-containing composition demonstrated by Ruegg in mice would also manifest in human patients, as recited in the '731 patent. As such, the challenged claims are *prima facia* obvious, and there are no objective indicia of nonobviousness that weigh against that conclusion, as discussed below.

The challenged claims merely combine known elements to achieve predictable results, reciting a known compound (a *botulinum* toxin), in a known formulation design (animal-protein-free), to treat conditions known to be responsive to the claimed compound in the claimed animal-protein-free composition (*e.g.*, glabellar frown lines), to achieve expected and predictable results (longer duration of action). Consequently, the challenged claims fall

squarely within the Supreme Court's *KSR* decision and its extensive progeny as fatally obvious: "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). This petition and the supporting declarations confirm this.

As Drs. Rummel and Solish explain, an important objective of drug delivery and treatment is to enhance patient convenience, satisfaction, and compliance by, for example, reducing the number of administrations, particularly injections. Increasing the duration of action was known to achieve that goal. A POSA would have administered the animal-protein-free formulation disclosed in Ruegg, in the manner described in BOTOX® Label, to arrive at the longer duration of therapeutically effective action claimed in the '731 patent. And a POSA would have had a reasonable expectation of success in so doing because Ruegg demonstrated that its animal-protein-free composition exhibited a longer effect than an animal-protein-contain formulation.

Finally, although not required, there is additional real world corroborating evidence of obviousness in this case. Others, including Petitioner Revance, arrived at the claimed methods prior to or at the same time as Medy-Tox, which provides further evidence of obviousness under the Federal Circuit's "near-simultaneous-invention" jurisprudence.

**5. A POSA would have reasonably expected that the animal-protein-free composition would have had a "longer duration of action."**

Ruegg and BOTOX® Label, coupled with the high level of skill in the art, would have provided the POSA a reasonable expectation of success in treating, *e.g.*, glabellar lines, in humans using Ruegg's animal-protein-free *botulinum* toxin A composition. (EX1002, ¶¶72, 88; EX1019, ¶86.) "Obviousness does not require absolute predictability of success," only "a reasonable expectation of success." *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). The combination of Ruegg and BOTOX® Label, coupled with the POSA's high level of skill and general knowledge in the art, would have provided a POSA with an enabling disclosure that renders each challenged claim obvious.

Claim 1 is broadly directed to "alleviating" *any* "symptom" of *any* one of the recited facial wrinkle "conditions" using *any* botulinum toxin in *any* "animal-protein-free" composition. The burden of establishing a reasonable expectation of success is, therefore, easily met for the reasons explained below. *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (a POSA need only have a reasonable expectation of success of developing the claimed invention, not an embodiment exhibiting additional, unrequired features); *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 962-63 (Fed. Cir. 2014) (challenger did not have an "exacting burden" of proving a reasonable expectation given the breadth of the claims).

Ruegg teaches how to make its animal-protein-free formulation, including the excipients, such as "buffered saline (*e.g.*, phosphate buffered saline)," the specific "positively charged carrier" as the stabilizer, as well as "other ingredients typically found in injectable pharmaceutical or cosmeceutical compositions." (EX1004, Example 1, ¶[0044]; EX1002, ¶89; EX1019, ¶87.) And, as Dr. Solish explains, BOTOX® Label provides detailed instructions toward administering a *botulinum* toxin A composition to improve the appearance of glabellar lines. (EX1007, 548-551; EX1019, ¶¶87-88; EX1019, ¶¶33-38, 87.) A POSA would have readily followed the instructions in BOTOX® Label to inject Ruegg's animal-protein-free *botulinum* toxin composition appropriately. (EX1019, ¶87.)

Next, as Drs. Solish and Rummel explain, a POSA would have predicted and had a reasonable expectation of success that Ruegg's animal-protein-free *botulinum* toxin A composition (1) would effectively alleviate glabellar lines in human patients and (2) that this alleviation would last for a longer period of time than that of an animal-protein-containing *botulinum* toxin composition. (EX1002, ¶¶90-91; EX1019, ¶¶88-89.) BOTOX® Label teaches that local administration of a *botulinum* toxin reduced "the severity of glabellar lines [] for up to 120 days" in humans. (EX1007, 548, Tables 1-2; EX1002, ¶90.) A POSA would reasonably have expected Ruegg's animal-protein-free *botulinum* composition (*e.g.*, RT003) would be similarly effective, but with a longer duration of action, knowing that RT003

caused local muscle paralysis that "last[ed] approximately twice as long" as that of BOTOX®. (EX1004, ¶[0059]; Example 1; EX1002, ¶¶90-91; EX1019, ¶¶88-89.)

Ruegg also showed that RT003 "stays localized" upon injection, whereas the toxin in BOTOX® locally diffused after injection. (EX1004, ¶[0065]; Figure 3; Table 1; EX1002, ¶91.) A POSA would have understood that diffusion of the toxin decreases toxin's local concentration in the relevant muscle and decreases the therapeutic efficacy of the toxin in that muscle. (EX1002, ¶91.) A POSA, therefore, would have expected increased longevity of the desired local paralysis from Ruegg's animal-protein-free *botulinum* toxin A composition based on Ruegg's reported data, which showed less diffusion of RT003. (*Id.*)

If Medy-Tox somehow tries to diminish Ruegg's relevance toward reasonable expectation of success, simply because Ruegg's experiments involved mice and not humans, the Board should soundly reject that notion. "Obviousness does not require absolute predictability of success"; rather, "[a]ll that is required is a reasonable expectation of success" in making the invention *via* the combination. *Medichem*, 437 F.3d at 1165. Ruegg is "prior art for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested or even guarantee success before providing a reason to combine." *Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x. 289, 294 (Fed. Cir. 2011). The Federal Circuit "has long rejected a requirement of '[c]onclusive proof of efficacy' for

obviousness." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018).

And, in any event, as Dr. Rummel confirms, a POSA would have readily extrapolated Ruegg's mouse results to human outcomes with reasonable certainty. (EX1002, ¶92.) Dr. Rummel explains that *in vivo* mouse models were routinely and reliably used by artisans to evaluate the biological and therapeutic activity of *botulinum* toxins before 2013, including, *e.g.*, a "digital abduction score (DAS) assay," the very same assay used by Ruegg. (EX1029, 265; EX1030, 1816, 1818; EX1031, 217; EX1033, S9; EX1002, ¶¶46-52, 92.)

Prior to 2013, researchers used mouse assays to reliably compare the effects of different preparations of *botulinum* toxins. For example, Aoki evaluated "DAS assay reliability," and concluded that it is "a reliable and sensitive method for measuring muscle weakness," and that it "mimics both the clinical route of administration and the desired clinical outcome." (EX1030, 1816, 1819; EX1002, ¶48.) In a different study, Aoki also concluded that preclinical studies, such as the DAS assay, "provide important information relevant to future comparative clinical studies" of *botulinum* toxin preparations. (EX1033, S9; EX1002, ¶49.)

Prior to 2013, that the relative duration of effect elicited by *botulinum* toxins correlated between mice and humans was well established and generally known in

the art, as explained by Dr. Rummel and demonstrated in the following Table, reproduced from Montecucco and Molgo (EX1027, 275; EX1002, ¶50):

**Table 1**

**Average duration of muscle paralysis produced by a single local injection of distinct BoNTs into skeletal muscle of humans and mice.**

| | BoNT/A | BoNT/B | BoNT/C | BoNT/E | BoNT/F |
|---|---|---|---|---|---|
| Human | 4–6 mths | 2–3 mths | 4–6 mths | 4–6 wks | 1–2 mths |
| Mouse[a] | 21–30 d | 7–10 d | 21–30 d | 3–5 d | 7–10 d |

[a] Data are derived from different studies performed on different muscles and should be taken with caution, for the reasons exposed in the text. Data were obtained either by monitoring *ex vivo* the recovery of nerve-evoked contraction in the injected *Extensor digitorum longus* muscle, or *in vivo* by using the digit abduction score assay.

This data confirms that the duration of muscle paralysis in mice correlated to the duration of paralysis in humans—longer paralysis in mice translated to longer paralysis in humans. (EX1002, ¶50.) A POSA, therefore, would have expected that mouse bioassays, such as the DAS assay in Ruegg, are reliable predictors of biological activity (*e.g.*, duration of action) and safety of *botulinum* toxin preparations in humans, as explained by Dr. Rummel. (*Id.*; EX1027, 275, Table 1; EX1002, ¶51.) A POSA would have reasonably expected Ruegg's mice data to be predictive of clinical effects and longevity of an animal-protein-free composition as compared to BOTOX® in humans. As Drs. Rummel and Solish explain, a POSA would have understood that the results in mice leg muscles could be correlated to

how Ruegg's formulation would function in human face muscles. (EX1002, ¶52; EX1019, ¶89.)

* * *

Claim 1 of the '731 patent, therefore, would have been *prima facie* obvious to a POSA before 2013. (EX1002, ¶¶73, 93.) Claim 1 does nothing more than combine known cosmetic methods for treating facial wrinkles, comprising:

- locally administering a *botulinum* toxin composition—*a known technique to administer a known compound*;
- where the composition is free of any animal-protein-derived excipients—*a known formulation design with known advantages*;
- wherein the condition is selected from the group consisting of glabellar lines, marionette lines, brow furrows, lateral canthal lines, and any combination thereof—*conditions known to be treated with botulinum toxins*; and
- whereby the duration of treatment, or interval of time between multiple treatments, lasts for a period of time longer than that of an animal-protein-containing botulinum toxin composition—*a known, readily predictable, and expected result.*

independent inventions three and five years before and one year after the asserted patent's invention date as "near simultaneous invention").

## IX. CONCLUSION

IPR for each challenged claim of the '731 patent should be instituted.

## X. MANDATORY NOTICES (37 C.F.R. §42.8(a)(1))

Real party-in-interest (37 C.F.R. §42.8(b)(1)): Revance Therapeutics Inc.

Related Matters (37 C.F.R. §42.8(b)(2)): U.S. Patent No. 9,480,731 B2 is the subject of an *inter-partes* review proceeding *Revance Therapeutics, Inc. v. Medy-Tox, Inc.*, filed July, 1, 2021; U.S. Patent No. 10,143,728 B2 is the subject of a post-grant review proceeding *Galderma S.A. v. Medy-Tox, Inc.*, PGR2019-00062, filed September 4, 2019. Oral argument was heard in March 2021 and a Final Written Decision remains outstanding.

Lead and back-up counsel (37 C.F.R. §42.8(b)(3)) for Petitioner Revance Therapeutics, Inc. are:

| Lead Counsel | Back-Up Counsel |
|---|---|

| | |
|---|---|
| Eldora L. Ellison, Ph.D.<br>(Reg. No. 39,967)<br><br>STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.<br>1100 New York Avenue, NW<br>Washington, DC 20005<br>202.772.8508 (telephone)<br>202.371.2540 (facsimile)<br><br>eellison-PTAB@sternekessler.com | Dennies Varughese, Pharm.D.<br>(Reg. No. 61,868)<br><br>Olga A. Partington, Ph.D.<br>(Reg. No. 65,326)<br><br>STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.<br>1100 New York Avenue, NW<br>Washington, DC 20005<br>202.371-2600 (telephone)<br>202.371.2540 (facsimile)<br><br>dvarughese-PTAB@sternekessler.com<br>opartington-PTAB@sternekessler.com |

**Notice of Service Information** (37 C.F.R. §42.8(b)(4)): Please direct all correspondence regarding this Petition to counsel at the above addresses. Revance Therapeutics, Inc. consents to service by email at the addresses above.

**Procedural Statements**: This Petition is filed in accordance with 37 C.F.R. §42.106(a). Concurrently filed herewith are a Power of Attorney and Exhibit List under 37 C.F.R. §42.10(b) and §42.63(e), respectively. The required fee is paid through Deposit Acct. No. 19-0036 (Customer ID No. 45324). The Office is authorized to charge any fee deficiency, or credit any overpayment, to Deposit Acct. No. 19-0036 (Customer ID No. 45324).

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C

/Eldora L. Ellison/

Date: July 1, 2021
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

Eldora L. Ellison, Ph.D.
Registration No. 39,967
Lead Attorney for Petitioner