IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, and ALLERGAN USA, INC., | ) | |
| Plaintiffs, | ) | C.A. No. 21-1411-RGA |
| v. | ) | |
| REVANCE THERAPEUTICS INC., and AJINOMOTO ALTHEA, INC. d/b/a AJINOMOTO BIO-PHARMA SERVICES, | ) | |
| Defendants. | ) | |

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Wednesday, October 30, 2024
9:05 a.m.
Oral Argument

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JEREMY A. TIGAN, ESQUIRE

-and-

PAUL HASTINGS
BY: ERIC W. DITTMANN, ESQUIRE
BY: CARL J. MINNITI, III, ESQUIRE
BY: ISAAC S. ASHKENAZI, ESQUIRE
BY: KARTHIK R. KASARANENI, ESQUIRE

For the Plaintiffs

APPEARANCES CONTINUED:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY: SAMANTHA WILSON, ESQUIRE
BY: DANIEL G. MACKRIDES, ESQUIRE
BY: ANNE SHEA GAZA, ESQUIRE

-and-

STERNE KESSLER GOLDSTEIN & FOX
BY: DENNIES VARUGHESE, PHARM.D.
BY: ADAM C. LaROCK, ESQUIRE
BY: BYRON L. PICKARD, ESQUIRE
BY: NIRAV N. DESAI, ESQUIRE
BY: DEIRDRE M. WELLS, ESQUIRE
BY: ANNA G. PHILLIPS, ESQUIRE
BY: SASHA S. RAO, ESQUIRE

For the Defendants

*** PROCEEDINGS ***

DEPUTY CLERK: All rise. Court is now in session. The Honorable Richard G. Andrews presiding.

THE COURT: All right. Good morning, everyone. Please be seated.

We're here for the summary judgment and *Daubert* arguments in *Allergan vs. Revance*, Civil Action Number 21-1411.

I see Mr. Tigan over there. Okay. That's good.

Ms. Wilson. Yes, I see Ms. Wilson there. Thank you for standing up.

Okay. Well, so I sent out an Order asking you how I wanted you-all to argue this.

So, Defendant, you get to go first. What do you

want to do first?

MR. VARUGHESE: So Your Honor based on -- once again, Dennies Varughese, on behalf of the Defendant Revance. We structured the four issues in the following order.

MS. WILSON: Your Honor, may I approach with slides?

THE COURT: Yes.

MR. VARUGHESE: Your Honor, we'll start with summary judgment motion number one which concerns the earlier conception date.

THE COURT: Okay.

MR. VARUGHESE: My colleague, Adam LaRock, will be arguing that.

THE COURT: All right.

Mr. LaRock.

MR. LaROCK: Yes. Good morning, Your Honor.

So I'll be arguing summary judgment motion number one which seeks a judgment that Allergan's composition claims are not entitled to an earlier conception date before October 6th, 2005.

THE COURT: Okay.

MR. LaROCK: Now, the composition claims that are asserted in this case come from three patents. Those are the '625, '216 and '878 patents. Both of those patents

or all three of those patents list Terrence Hunt as the inventor. And on the face of those patents, they claim priority to a provisional filing on October 6th, 2005.

Now, the reason that this motion comes about, Your Honor, is since those patents have issued, Allergan has been completely happy with that invention date for those patents. But in the course of this case, Revance has identified prior art references, the *Webb* reference and the *Frevert* reference that predates Allergan's patents. And we say that they are invalidating of Allergan's patents.

So Allergan's now trying to say that they are entitled to an earlier date that predates those patents and predates the prior art references.

THE COURT: And you say Allergan's been happy with the date. Until this litigation, why would they have had any reason to be even thinking about it?

MR. LaROCK: I mean, during prosecution they could have argued for an even earlier date, but they did not. They were happy with the filing date of the provisional application as their invention date.

THE COURT: All right. I don't think I've ever seen a case, but I guess you're saying it could be done, where people got an earlier date while they were prosecuting the case. Usually every time I see it, it's brought up like it is here.

09:09:31 But go ahead.

09:09:32 MR. LaROCK: So Allergan, in the course of this
09:09:36 litigation, laid out three alternative dates that it
09:09:38 believes that it's entitled to. For purposes of this
09:09:40 motion, we're going to focus on the January 13th, 2005 date.
09:09:44 Because even as of that latest date, they're not entitled to
09:09:47 conception of the patented subject matter.

09:09:51 And the reason is conception is the formation in
09:09:56 the mind of the inventor of a definite and permanent idea of
09:09:59 the complete and operative invention. And that's --

09:10:02 THE COURT: And I'm sorry. You just had up on
09:10:04 the screen that you're going to focus on the January 13th
09:10:08 date. And underneath that, there are listed three of the
09:10:11 six claims that are at issue.

09:10:16 But are you saying there was no conception of
09:10:18 any of all six by January 13th?

09:10:22 MR. LaROCK: Yeah. I believe they have
09:10:23 alternative arguments for Claims 1, 4 and 6 of the '878
09:10:28 patent to say that they're also conceived of as of that
09:10:32 January date. So the January date, as I understand the
09:10:34 arguments, would apply to all three of the patents and all
09:10:36 eight of the asserted claims.

09:10:38 THE COURT: But that's not their only argument
09:10:44 for the '878 patent as to why it gets an earlier date;
09:10:48 right?

09:10:48 MR. LaROCK: Yeah. They do have an actual reduction to practice argument.

09:10:51 THE COURT: All right.

09:10:52 MR. LaROCK: And we'll get there. If you want me to skip ahead to that argument.

09:10:55 THE COURT: Well, no, no, no. I just wanted to make sure I had the framework right. I mean, I have read the briefing. Some of the briefing was clearer than other parts of the briefing.

09:11:10 So go ahead. And I think the briefing actually on this portion was the largest amount of briefing on any of the various topics that are at issue in the briefing.

09:11:21 So, but go ahead. I wanted to make sure I knew what you were arguing.

09:11:26 MR. LaROCK: So there's no conception -- no earlier conception here as of January 2005 for four reasons. One, the alleged conception as of that date did not encompass all the claim limitations of the '625 and '216 patents. There were experimental failures, and there's no dispute about those being experimental failures, that apply to all of the patents which would say that the inventor did not have a permanent and complete idea of the invention as of the time of those experiments.

09:11:56 Though Allergan had that actual reduction to conception practice, we don't believe that's the case. And

we're going to get to that.

And the last point is that the inventor's earlier conception story needs to be corroborated. We think that corroboration is lacking on many important points.

So I'm going to argue the '625 and '216 patents together. Just by way of background and important for this motion, those claims cover two asserted claims from those patents. They cover botulinum toxin compositions that require a combination of a surfactant, a disaccharide and a buffer.

THE COURT: This is what they call the three-month storage buffered patents; right?

MR. LaROCK: Yes. The three -- the buffered storage claims. And those patents require a recovered potency. And the recovered potency limitation is just the composition was put on a shelf under certain conditions for a certain period of time. And after time passed, they measured the potency of that product.

In the context of the '216, the potency needs to be at least 75 percent after three months below freezing conditions. And in the context of the '216 patent, the recovered potency needs to be at least 50 percent after three months storage at room temperature conditions.

Now, Allergan for the '625 and '216 anchors their earlier conception arguments on Experiment 17 and

09:13:17 three formulations from Experiment 17: Formulation 33, 78
09:13:21 and 80.

09:13:23 And important for this motion is that when you
09:13:25 look at Formulation 33, it contains a disaccharide and a
09:13:29 buffer, but it doesn't contain a surfactant. And
09:13:32 Formulation 78 and 80 contain a disaccharide and a
09:13:35 surfactant, but not a buffer. So none of the three
09:13:37 formulations that they're relying upon for these three
09:13:40 patents contain the required limitation of a combination of
09:13:44 a disaccharide, surfactant and a buffer.

09:13:46 And that's important because conception requires
09:13:49 all of the claim limitations in order for you to have
09:13:52 conception. And they don't have that.

09:13:56 Now, if you look further at the formulations
09:14:01 that Allergan is pointing to, and you look at the potencies
09:14:05 of them, Mr. Hunt, who is the inventor, he was asked at his
09:14:09 deposition about the formulations in Experiment 17, and he
09:14:13 said he would never have any expectations of what those
09:14:16 formulations would show. They just do the experiment and
09:14:18 gather the data.

09:14:20 And he said what he was doing was almost
09:14:22 absolutely and almost exclusively empirical which says that
09:14:27 he didn't have a definite and complete idea of the invention
09:14:31 as of the time of Experiment 17.

09:14:32 Ms. Tran, she was put forward as the

09:14:35 corroborating witness from Mr. Hunt's earlier conception story. She was asked about the 75-percent potency limitation for the '625 patents. She says that Mr. Hunt wasn't targeting any particular potencies. So, again, didn't have in his mind a complete idea of the invention that was later claimed.

09:14:52 THE COURT: The relationship of Tran to Hunt was that Tran was, I don't know, a lab scientist or something in a lab where Hunt was giving directions as to things he wanted done?

09:15:07 MR. LaROCK: Yeah. She worked within his group. There were others within the group as well working, but she was working within his group.

09:15:12 THE COURT: Okay. And his group was a group of, I don't know, half a dozen scientists or what?

09:15:17 MR. LaROCK: There were a number of scientists. I think over the course of the years, you know, the number of people changed and who they were changed. She was kind of a consistent throughout the course of the work. And she's being put forward as the only corroborating witness for this earlier conception story, not any of the other individuals who may have worked on this project.

09:15:35 THE COURT: Well, I thought they put forward, also, I don't know, emails and lab notebooks and -- but she's the only person who's speaking is what you're saying?

09:15:46 MR. LaROCK: Yeah, yeah. She's the only witness coming forward. And the lab notebooks -- lab notebooks and emails, they also come from her, rather than Mr. Hunt.

09:15:54 THE COURT: Okay.

09:15:55 MR. LaROCK: So she was asked at her deposition whether, you know, Mr. Hunt was targeting any particular potency, and she said, you know, she didn't recall him targeting 75-percent potency, again, showing that he didn't have in his mind, as of those experiments, a complete idea of what was later claimed.

09:16:10 THE COURT: Well, what she doesn't recall doesn't really show much of anything. It just doesn't corroborate whatever it is that --

09:16:17 MR. LaROCK: It certainly doesn't corroborate. It doesn't establish that he had that in his mind.

09:16:23 Dr. Schoneich, he's Allergan's expert. He looked at all the information, deposition testimony, lab notebooks. He couldn't figure out what Mr. Hunt settled upon and arrived at the 75-percent potency as claimed in the '216 patent. And he doesn't know when it was shown to anyone either or disclosed to anyone.

09:16:39 And Allergan's relying upon these same three formulations for conception of the '216 patent, right. And when we looked earlier at the '216 patent, the '216 patent required recovered potency at room temperature conditions.

09:16:54 Here, they only have data as under freezing conditions, not room temperature conditions. Room temperature conditions which, again, says that Mr. Hunt was not thinking at the time of this invention -- at the time of this experiment having potencies that maintained the room temperature storage conditions for the '216 patent.

09:17:12 And when asked about it at his deposition, Dr. Schoneich, Allergan's expert, confirmed there was no embodiment as of January 2005 of the '216 patent. In fact, when he looked at all three of the asserted patents --

09:17:26 THE COURT: The experts, Dr. Schoneich and whoever your guy is, did she submit reports that, you know, purported to say, Here's an embodiment that has all of the elements of the claim for this claim and that claim? Or on the other side, it's missing this element or that element?

09:17:54 MR. LaROCK: So they did put forward Dr. Schoneich. We do have a rebuttal expert to Dr. Schoneich's opinions.

09:18:00 THE COURT: What's the name of your person?

09:18:02 MR. LaROCK: Dr. Sridhar Sethuraman.

09:18:05 THE COURT: Okay.

09:18:07 MR. LaROCK: And but, you know, Dr. Schoneich doesn't put forward an opinion that, you know, or I guess there's no dispute that the formulations that they're relying upon are missing certain claim limitations. He

seems to kind of, you know, try to supplement that by saying, Well, you know, you have a little bit of a surfactant over here. You have a little bit of a buffer over here in these formulations. And so it was certainly being contemplated by the inventor, but that's just after-the-fact testimony based on nothing contemporaneous at the time to say that the inventor, as of the time of these experiments, was thinking about a combination of all three of those excipients.

THE COURT: If I don't agree with you on this argument you're making here, do you have other pieces of prior art that predate even the earliest claim dates here?

MR. LaROCK: We do have other prior art, Your Honor, and that's one of the reasons why this motion is important. The parties, as we're getting close to trial, have been narrowing down both the number of asserted claims and had discussions about narrowing down defenses as well.

And one of the gating issues for those negotiations is resolution of this motion because it might play into what prior art is available for us to make arguments about --

THE COURT: But regardless of the resolution, even if I were to say, You know what, I'm going to grant summary judgment, even though it wasn't asked for by Plaintiff saying, yeah, there's conception reduction to

practice, you'd then just go from these two pieces of prior art that are mentioned in your papers to other pieces of prior art; right?

MR. LaROCK: Yeah. We would have other prior art that we could use.

THE COURT: Okay.

MR. LaROCK: Another point I want to make on this conception issue is the three formulations that Allergan is relying upon, one of them is Formulation 33 from Experiment 17. And that's highlighted in yellow up on the screen. That has a disaccharide and a buffer. There's 15 other formulations that also had a disaccharide and a buffer that were made as contemporaneously as part of Experiment 17 that failed to achieve the potencies required by the '216 and '625 patents, again, showing that Mr. Hunt did not have, at the time of these experiments, a complete idea of what was later claimed.

And looking at the other formulations that are being relied upon, Formulation 78 and 80, they contained a disaccharide-surfactant combination. There's three formulations there that are part of Experiment 14 that fail to achieve potency, also. There's no dispute about that and no dispute that these formulations were failures.

Now, when we raised these formulation failures as part of our briefing, Allergan didn't say anything about

it in their rebuttal papers at all. So these are not only uncontested facts, but unrebutted arguments that go to showing that there's no conception as of the date that Allergan alleged for these patents.

And these formulation failures are important because conception is not complete if the subsequent course of experimentation, especially experimental failures, reveals uncertainty that so undermines the specificity in the inventor's idea that it is not yet complete and permanent reflection.

THE COURT: Doesn't that sound like a sort of factual question that if some experiments fail later on, whether -- which way -- whether that's enough to undermine the idea is something for a jury to decide?

MR. LaROCK: Well, none of these facts are in dispute, Your Honor. That's why I think it's ripe for summary judgment because no one's saying that any of these formulations that, you know, we say are failures actually were not failures and somehow were successful experiments that support conception.

THE COURT: Okay.

MR. LaROCK: So if Your Honor doesn't have any more questions about the '625 and '216 patent, I was going to turn to the '878 patent.

THE COURT: Go ahead.

MR. LaROCK: So the '878 patent is a little bit different than the other two. That claims methods of making botulinum toxin compositions that require a surfactant and a disaccharide.

THE COURT: And, actually, you're still talking about conception for this, but one of their arguments, I think, is that at least for Claims 1, 4 and 6 that they actually reduced this to practice sometime before January of --

MR. LaROCK: Right.

THE COURT: -- 2005. And I take it they're talking there about experiments where they actually had all the elements so that a lot of the issues that you're raising about other things are not there because they -- do you agree that they actually had experiments that have all the limitations, met all the limitations for those three?

MR. LaROCK: Yeah. Let me go -- so, yeah. So for the '878 patent, there's -- you know, we agree that they had formulations that met the limitations of those claims.

I think where the rubber meets the road on their actual reduction to practice argument is that actual reduction to practice requires that the invention be determined to work for its intended purpose. And here, we're missing that. We're missing that piece.

THE COURT: But what is the intended purpose, do

you think, here?

MR. LaROCK: Well, Mr. Hunt -- so we don't know what the intended purpose of those formulations and those experiments were in particular. Mr. Hunt testified at his deposition that he was trying to make botulinum toxin compositions that maintained potency for as long as he could. That doesn't necessarily say that these formulations work for that intended purpose because we don't know what that intended purpose was for these formulations.

THE COURT: Well, if -- and these three -- the ones we're talking about, they had, for lack of a better word, a stability limitation that they would keep potency for some period of time?

MR. LaROCK: Yeah. These particular limitations for the '878 patent, there's just a -- what's called an initial potency.

THE COURT: Okay.

MR. LaROCK: An initial potency is just basically a potency determination that's taken at time zero, right. So before it's put on a shelf, before it's stored.

THE COURT: So if the intended purpose was to get a certain potency and then they had experiments where they got the potency, why isn't that showing that it's good for its intended purpose?

MR. LaROCK: So, I mean, it's important to look

at what the initial potency limitation is. The initial potency is just the potency at time zero, right, so without any storage conditions. So if his goal is to get potency to maintain as long as possible, we don't know whether these formulations, because they haven't been stored, met that purpose because his purpose had to do with maintaining potency on storage for as long as he possibly could.

THE COURT: So even though stability over time is not a claim of -- element of the claim in effect for reduction to practice, it's like it was an element?

MR. LaROCK: Sorry. Could you say that again?

THE COURT: So what you're saying is the intended purpose was to get something that would maintain potency for a period of time. The claimed invention doesn't say anything about maintaining it for a period of time at all.

MR. LaROCK: Right. I mean, I think what we're saying about the not meeting the intended purpose is we don't know what the intended purpose of those formulations were. Even if you were to say that his intended purpose was for those formulations to maintain potency over a period of time, those formulations haven't been shown to do that because they weren't stored.

THE COURT: Why wouldn't the intended purpose of those be a formulation that has a certain potency, whatever

the potency range is? Why isn't -- you know, maybe there's some things you're conceiving of them and their intended purposes do X, Y, Z, but here isn't the intended purpose and, you know, what they were testing for was to have a certain potency?

And so they did it and they tested it and it had that potency. So --

MR. LaROCK: Yeah. Well, I mean, Mr. Hunt when he testified at his deposition said he wasn't targeting any particular potencies. So it's hard to say that these formulations in particular met an intended purpose because if he wasn't targeting a particular potency, how does he say that these formulations somehow met that target potency that he didn't have.

THE COURT: Okay.

MR. LaROCK: The last point I want to make, Your Honor, is Ms. Tran was put forward as the corroborating witness for Mr. Hunt's earlier conception story. She's not coming live to trial. We're only limited to her deposition testimony.

You know, she was asked whether Mr. Hunt came up with the idea of the claimed formulations, and she said she didn't know and deferred that question back to Mr. Hunt. So she was also asked about information she got from Mr. Hunt about preparing certain formulations that are being relied

09:27:33 upon. She couldn't recall the details of what she received from Mr. Hunt in terms of the formulation preparation work, which, again, doesn't say that he had a complete idea of the invention in his mind at the time if there's no corroboration that he was giving her --

09:27:49 THE COURT: But --

09:27:50 MR. LaROCK: -- that material.

09:27:50 THE COURT: But this, I presume, what their expert is kind of filling in is they -- I mean, tell me if I'm wrong about this, but the tests, the experiments are preserved in great detail in lab notebooks. And so now an expert looking at them can explain what was being done, when it was being done and maybe, maybe not, that corroborates the inventor's explanation of what he was thinking about at various times; right?

09:28:34 I mean, isn't that actually a lot more reliable way to do it then to find some other person who says, Oh, yeah, he told me this 20 years ago?

09:28:43 MR. LaROCK: Yeah. I mean, so certainly they're pointing to the lab notebooks, right. And the lab notebooks were hers. I think the issue is, you know, while she has formulation details in her lab notebook, she can't connect those formulation details back to Mr. Hunt to say that she got all of this information from Mr. Hunt and; therefore, this was a complete reflection of what he was thinking at

the time.

THE COURT: But we're only talking about corroboration. She doesn't have to -- you can corroborate something without saying it is 100 percent exactly what this person was thinking 20 years ago; right?

MR. LaROCK: Well, I mean, she would need to corroborate what he had in his mind, right, because, you know, if he had in his mind a complete idea of the invention, then she needs to support, you know, the fact that he had that in his mind, right. And they're relying upon these formulation details to do that.

But what's missing is whether she got those from Mr. Hunt. And from his perspective, Mr. Hunt's perspective he said that he prepared documents that had, you know, designed an experiment that had his goals, had his instructions to the team, had his --

THE COURT: And those are apparently lost.

MR. LaROCK: Yeah, which don't -- which, apparently, you know, were produced in the case and nobody's relying upon them. Sorry. Those are missing. So, you know, those certainly might be helpful to this issue, but we don't have that. We're left with, you know, kind of piecing stuff together after the fact with Ms. Tran and her lab notebooks. And it's got a lot of gaps.

The last point is with Ms. Tran's lab notebooks,

and the other documents and emails that she has, you know, that we talked about earlier. They don't show conception on the date that Allergan is alleging of the buffer, disaccharide and surfactant combination that's required by the '216 and '625 claims for the actual reduction to practice of the '878.

THE COURT: All right. Thank you.

Mr. Dittmann.

MR. DITTMANN: Thank you, Your Honor.

Further to a question Your Honor asked, I wanted to begin by noting that Revance hasn't cited one case where summary judgment was granted on a prior invention, much less any case involving facts like we have here with thousands of formulation experiments that were documented in lab notebooks, Excel spreadsheets, presentations, et cetera.

And while Allergan has the burden of producing evidence of a prior invention, Revance has the ultimate burden by clear and convincing evidence of proving that the invention occurred after its alleged prior art. And so Revance's burden is only magnified here because it's seeking summary judgment on this issue.

And I'll explain why it's our position they can't even come close to satisfying their burden. And I think I'll preview for Your Honor that when we look at the '878 claims, as you noted, there's really no dispute

whatsoever on reduction to practice.

Now, with that --

THE COURT: Well, so why don't we, so to speak, dispose of the first three '878 claims. The argument seems to be this intended purpose.

What was the intended purpose and what's the evidence of that?

MR. DITTMANN: Yeah. The intended purpose is self evident from the results. When you look at the formulations were tested for their initial potency, that is the only result reported for the experiments. And it satisfies the claim limitations. It's self evident from the document itself that the intended purpose was at that time to assess the initial potency.

This was a series of building experiments. They started off by looking at single excipient formulations they built to initial potency experiments. Then they go to three-month storage stability.

So it really can't be legitimately disputed that as of August and September of 2004 that the intended purpose of the experiments was initial potency.

THE COURT: So when the Courts talk about the intended purpose, we're talking about you've got something, you've reduced it to practice. It must be the case or is it the case that the intended purpose serves no point in the

analysis because if you reduce it to practice and the intended purpose is whatever it is that we reduced to practice, what's left?

MR. DITTMANN: Yeah. I think there certainly could be some cases where what the intended purpose is could matter because the claims could -- as to Your Honor's note, could have something different in it. But when you have exact identity with what the claims say and what the results from August of 2004 report, like literally word for word, there's no dispute here. That's an actual reduction to practice and this is really a non-issue.

THE COURT: Do you have a case that you cited in your briefs or that you can just pull out of your head that basically says that -- and you didn't say this, but I'm going to translate it into it is -- the intended purpose requirement is often a trivial thing in a reduction to practice analysis?

I don't expect a case to say that --

MR. DITTMANN: Yeah.

THE COURT: -- but is there a case that basically makes it as easy as you just made it sound?

MR. DITTMANN: I have to think about that, Your Honor. Nothing comes to the top of my head, but then, again, I've never seen anyone contest when a result is reported that corresponds literally with the claims that

they say, That's not the intended purpose, even though the experiment says that's what they were doing, assessing initial potency. I've just never seen anybody dispute something like this.

THE COURT: Okay. All right. So let's not address those three anymore.

MR. DITTMANN: Okay.

THE COURT: Because after all, all you're trying to do here is say, Don't grant them summary judgment. What about the other three?

MR. DITTMANN: And I would just say, Your Honor, obviously, we don't think there is any dispute on the '878, but I'll leave it at that.

With respect to the remaining claims which we referred to as the three-month storage buffer claims --

THE COURT: Well, so actually there's the fourth '878 claim which --

MR. DITTMANN: Right.

THE COURT: -- I take it is not reduced to practice.

MR. DITTMANN: Yeah. That is one of the ones that falls into the camp of the three-month storage claim. So there's one claim from '878.

THE COURT: Oh. Oh, okay. You've got three-month storage, buffered and unbuffered and now you're

grouping them.

MR. DITTMANN: Correct.

THE COURT: Okay. Sorry.

MR. DITTMANN: Grouping them together, Your Honor. Yeah, that's fine.

THE COURT: You know, I have to like write this down because this is not words that just roll off the tongue.

MR. DITTMANN: Yeah. So I just want to sort of frame the issue here. What we're talking about is, again, corroboration of a conception. And, you know, one thing I think that's missing and I want to explain from the outset --

THE COURT: Well, actually, when you say "corroboration of a conception," the first thing about conception, I take it you agree that the thing that is conceived has to have all the claim limitations of the thing that's eventually claimed; right?

MR. DITTMANN: Yes, and that's where I think there's a disconnect. I was about to address --

THE COURT: Oh, okay. And I was just going to say -- and if you're relying on, so to speak, embodiments, you need them all to appear in one embodiment. That's not to say that you couldn't have multiple embodiments floating around and say that's corroborating what the inventor had in

his head, which, you know, puts a credibility of the inventor at issue.

But -- and so what I've just said, do you agree with all that?

MR. DITTMANN: I want to make sure I understand Your Honor is, yes, you have to have conception of all the claim limitations. But really where the dispute lies is that what they're trying to impose is a standard that you have to show a document, a corroborating document that shows all the limitations as they expressly appear in the claim. And I would just --

THE COURT: Just to make sure we're on the same page, the jury would have to decide or the factfinder would have to decide that the inventor, whether he had it in a document or not, had the idea of all the limitations of the claim as a embodiment, or example or something. It's not enough for him to say, Yeah, I had these eight limitations in mind. You can take any five of them and --

MR. DITTMANN: No, correct. And Mr. Hunt will testify that he had the concept of all the requirements of the claim in a formulation as of the date we allege.

THE COURT: Okay.

MR. DITTMANN: And where -- and, of course, it doesn't have to know that it works at that point. That's not conception. That's reduction to practice when you know

it works.

But I want to just -- I think the *DuPont* case, I think, will be helpful here because I think it clears --

THE COURT: Is that the *Unifrax* --

MR. DITTMANN: Yes.

THE COURT: Yeah, yeah.

MR. DITTMANN: A case Your Honor knows quite well, but you know, I want to just frame one thing that the Court stated, which is that an inventor's testimony --

THE COURT: When you say "the Court stated," are you talking about me or the Court of Appeals?

MR. DITTMANN: The Federal Circuit --

THE COURT: Okay.

MR. DITTMANN: -- in this case. Good clarification, Your Honor.

"An inventor's testimony on conception can be corroborated from several pieces of evidence, even though no one piece of evidence independently proves conception, and even circumstantial evidence, so long as the evidence supports that the inventor's story is credible." And what we have here is an attempt by the other side. I think they're confusing that, Well, we don't see a single embodiment disclosed in a document or in a formulation.

But that's not required. The rule of reason says you look at all the evidence, all the thousands of

pages of lab notebooks, all the experimental results, power-point presentations, et cetera. And as a whole, is it credible that what the inventor says I invented it as of this date, which the inventor will say. Is there sufficient corroboration?

And, you know, what we have here -- and I actually have a few handouts that may help us kind of piece together the conception here to show you where it's supported by documents and testimony. If Your Honor wouldn't mind, I've got a couple of handouts that are just taken from the briefs and exhibits that might help a little bit.

THE COURT: Okay. All right. Go ahead.

MR. DITTMANN: All right. So starting with the fourth or, I'm sorry, the first handout slide, and what we have here, this is -- on the left side is Claim 1 of the '216 patent. And it's color coded. According to on the right side, we see an Experiment 17 formulation. This is EXP17-080R.

And what you can see is that it shows a very robust 90-percent recovery. This is after three months below freezing. And you see that it satisfies all of the ingredients of the formulation that are required by this claim except for a buffer, which I'll come back to. It has everything in terms of the ingredients except for a buffer.

09:40:20 And then, just for further context, the next slide does the same thing for the '625 patent. And while the '625 patent does not cover lactose -- and I'm going to come back to lactose in a moment -- it does cover the below freezing storage limitation that was tested in Experiment 17.

And so focusing on -- first on the buffer, that's the only ingredient that's missing for the '216 patent claims. If you look at the third handout slide, Your Honor, we see here that Experiment 17 didn't just test what I just showed you. It tested a number of formulations with respect to effects of buffers. And they tested numerous buffers in various formulations to see what would happen to the potency of these formulations.

And as we see from the testimony of Huong Tran, who we heard a bit about, she goes ahead and she verifies that based on this data as of mid-January 2005, they understood that in these types of formulations, the buffer was going to at least maintain potency. And that was the purpose of the -- of including a buffer.

And so she testifies, we see at the bottom of the slide, by January 2005, we know that the formulations with a buffer will improve, will maintain stability of the formulation.

Now, with respect to lactose which, again, is

the only ingredient missing for the '625 patent, if we take a look at the next slide, we, again, have at the bottom of the slide a document from Ms. Tran's lab notebooks. And it explains the whole point. One of the main points of Experiment 17 was that they tested lactose because they had already seen very good results for trehalose. And they said the hypothesis is, Well, since lactose is from the same family of disaccharides, let's test lactose to see if we're getting the same good results as trehalose.

So, in other words, lactose was a surrogate for trehalose. And this is something that is documented that they had in mind. And, in fact, we see here testimony from Ms. Tran saying that they, in fact, tested lactose because they were in the same family. And they were theorizing they would have the same results, same good results which they did, in fact, get.

So the bottom line is this: By January of 2005, there's been now hundreds of experiments, if not thousands. The inventors -- the inventor was building towards a theory of what would be the optimal formulations that would work for long-term, three-month storage stability and perhaps even longer.

You had great results with trehalose and sucrose. You now have great results with lactose. They've proven the hypothesis that a buffer would maintain potency.

So simply taking a formulation and sticking a buffer in to say maintain pH and maintain stability, they had the concept at that time mid-January 2005 that the buffered versions of these formulations would have three-month storage potencies. Mr. Hunt will testify to that, to the extent necessary, if it's even an issue as we go forward at trial.

And so the point here is that you don't need to have a single document that says, Here's the idea. These formulations with these ingredients with the very specific potency range, and it doesn't have to be written out like that. We have legions of data, power-point presentations, Excel spreadsheets, laboratory notebooks that were signed by third -- you know, witnesses that weren't even involved in the experiments to verify the results.

We have so much evidence here that, frankly, it's a bit absurd that we have a motion for summary judgment to deal with here.

So at this point, and I want to just clarify one other thing or actually two other things. There was some reference to Mr. Hunt's testimony about that he somehow admitted that there's really no target potencies that were ever in mind.

If you look carefully at what's cited, that's Pages 142 to 143 of Revance's exhibit or, I'm sorry, Allergan Exhibit G. It's clear that testimony is, in fact,

being taken out of context. Mr. Hunt was asked about "the moment Experiment 17 was designed." They're asking him about when you were about to perform the experiment, what were you targeting? So that's not even talking about after he has these results and he sees the potency, what potencies does he have in mind going forward?

And even in his answer, if you look at the answer to that question, he talks about "making conclusions based on the data." And so they're taking testimony that's about before the experiments were even performed, before the data that was obtained which was what provided the impetus to have this idea to test these formulations.

And on that note, it's not disputed that within a matter of weeks of January 2005, the claimed formulations for both the '216 and '625 patents, they were made, manufactured and actually put on stability, tested for three-month storage stability at below freezing and room temperature. And it worked.

So what we have here is an argument that, even though they don't dispute that there was a reduction to practice and there is diligence from this alleged conception to the reduction to practice, that somehow it's impossible to think that the inventor didn't have -- that they had this in mind not in January 2005, but he only just thought about this a few weeks later. It's perplexing how we could

possibly think this is not, at a minimum, a fact issue that could result in summary judgment.

THE COURT: So when we're discussing conception here, we have -- that's eventually going to fit into a framework where you have conception and diligent reduction to practice to follow; right?

MR. DITTMANN: Mm-hmm.

THE COURT: And if you got evidence of the diligent reduction to practice over some period of time after the supposed conception date, that's a form of corroboration of the conception, maybe not the exact date, but isn't it?

MR. DITTMANN: A hundred percent, Your Honor. You've got the point.

Yeah. And I just want to also address briefly the alleged failures that were talked about for Experiment 14. First of all, if you look at the *Burroughs Wellcome* case they cite, it's talking about conception. It's not talking about reduction to practice. So alleged failures are not even relevant to reduction to practice.

And by the way, there were like six formulations that worked. We just showed two exemplary ones that were reduced to practice. There were a bunch of them in Experiment 14, so that's a non-issue.

And Experiment 17, they keep touting this 16

failures. If you look at what they call failures -- this is really they're being inconsistent here -- those formulations don't have the requirements -- required ingredients of the claims. So they're not failures, they're just simply other formulations that didn't have what the invention requires. And so I think that evidence can just be moved to the side as well.

At this point, Your Honor, I don't have anything more because I think this is pretty straightforward.

THE COURT: All right. Thank you.

MR. LaROCK: Just a couple of points, Your Honor.

THE COURT: Sure, Mr. LaRock.

MR. LaROCK: So we heard Mr. Dittmann say that, you know, Mr. Hunt was going to come and testify at trial. Will come and testify at trial and kind of clarify the record, right.

My adversary had an opportunity to put forward a declaration from Mr. Hunt as part of their briefing papers to say under oath what he would say at trial and the fact that he was coming to trial. They didn't do that, right. So now all we have is, you know, unsupported attorney argument about what Mr. Hunt is going to say now at trial. And I don't think that's sufficient to defeat a motion for summary judgment. That's number one.

09:48:51 Number two, Mr. Dittmann pointed to a number of arguments and a number of pieces of evidence that, you know, he says supports his case. If you look closely at their briefing, none of that information was actually in their briefing. None of the arguments that they were making or the evidence they were pointing to was in their briefing. So I think that's all new testimony and new argument now that they're raising, you know, after the fact. That's number two.

09:49:19 THE COURT: Well, so sometimes that may or may not be a problem. If I have to decide this just based on what was in the briefing, I'm going to have to deny your motion because neither one of you made things clear to me.

09:49:36 So this is one where people, as long as they're actually citing the things that are in the record or could be, you know, they're not just making it up, I'm good with that at least on this argument.

09:49:52 MR. LaROCK: Understood, Your Honor. I just wanted to make the point that those arguments and that information was not appearing in the briefing.

09:49:59 THE COURT: Okay.

09:50:00 MR. LaROCK: And the other point that I want to respond to is Mr. Dittmann is pointing to testimony from Ms. Tran about, you know, as of a certain point of time, they knew that the buffer was maintaining the potency.

There's nothing that connects what they did. There's nothing that connects that testimony with what was in the mind of Mr. Hunt about combining a buffer then with a disaccharide and a surfactant.

Right. So they knew, you know, from her testimony that there were certain formulations where a buffer maintained that potency. That doesn't tell you anything about what was in his mind about combining the buffer with any other excipient. So I think there's still a disconnect about what was in Mr. Hunt's mind.

THE COURT: Okay. Thank you, Mr. LaRock.

MR. LaROCK: Thank you.

THE COURT: All right. So Plaintiffs' turn for an argument.

MR. ASHKENAZI: Your Honor, Isaac Ashkenazi for Plaintiff. We'll start with Allergan's Daubert number two.

THE COURT: Okay.

MR. ASHKENAZI: Just give me one moment. And just for reference, Your Honor, this is Allergan's Daubert number two, which is --

THE COURT: And I'm sorry, just for the record, you are?

MR. ASHKENAZI: Sorry. Isaac Ashkenazi.

THE COURT: Okay, Mr. Ashkenazi.

MR. ASHKENAZI: Thank you, Your Honor. And this

relates to Ms. Trexler's improper use of hypothetical non-infringing alternative design-arounds to limit lost profits.

THE COURT: Uh-huh.

MR. ASHKENAZI: Your Honor, there's not a shred of underlying factual evidence that Revance ever actually sold, implemented, tested or even designed a non-infringing alternative design-around to the asserted patents. There just simply isn't enough to say that a non-infringing alternative was "available" as required that could preclude the recovery of lost profits.

Ms. Trexler can only point to other expert witnesses, litigation-inspired opinions that Revance could have made or could have designed these non-infringing alternatives.

And *Grain Processing* says in no uncertain terms that "this kind of speculation," and I'm quoting here, "substitutes only theoretically possible" doesn't preclude lost profits.

THE COURT: So --

MR. ASHKENAZI: Yes.

THE COURT: -- basically this *Daubert* argument is about one of a number of different non-infringing alternatives that Defendants' putting forward through their experts; right?

MR. ASHKENAZI: That's correct, Your Honor. There's two arguments that Defendants make regarding non-infringing alternatives.

One regarding products that were on the market, Dysport, Xeomin and Jeuveau.

THE COURT: Right, right.

MR. ASHKENAZI: And we're not talking about those, exactly.

And the other one is the Defendants' experts have said that Revance could have designed around the patents and made -- and used a new and different type of process.

THE COURT: And how does the -- why is this particular non-infringing alternative argument important?

MR. ASHKENAZI: Well, so there's two reasons. For this one, it simply is not available under the Federal Circuit's case law from the *Grain Processing* and its progeny to even be referenced and to discuss a potential non-infringing alternative to the jury that, under no circumstances, under Federal Circuit law can be considered a design-around that would preclude lost profits would just cause confusion.

It's going to basically allow the jury to think, Oh, well, maybe there's this other thing that Revance could have done, so I can't award lost profits. But under the

Federal Circuit law, specifically *Grain Processing* and its progeny, that non-infringing alternative design-around had to be available.

THE COURT: So one of the things that I've been trying to figure out in the very recent past and also at other points in the past is exactly what *Grain Processing* and its progeny actually, for lack of a better word, mean. So *Grain Processing*, I think there's a portion of the opinion where the Court is talking about this analysis of the but-for world is hypothetical because it didn't happen; right?

MR. ASHKENAZI: Right.

THE COURT: And they say Plaintiff gets to be hypothetical. Defendant gets to be hypothetical. And so we're dealing with things that could have happened back when presumably infringement began or before it began, but somewhere in that time frame; right?

MR. ASHKENAZI: To a certain extent, Your Honor. And this is where, if I can, just to talk about *Grain Processing*.

In particular in that situation, the question was: In *Grain Processing*, there was this process for -- that was available as the Federal Circuit ended up concluding, but wasn't actually implemented. So, for example, if there's a non-infringing alternative on the

market that the alleged infringer could actually -- was actually selling, that's one thing. The Federal Circuit says, But, look, if they had something that they could have put onto the market, we'll consider it.

The question is: What does it mean to be available? What is that, you know -- to what Your Honor was saying, yes, they didn't actually implement it at the time. They weren't actually manufacturing it at the time, but was it available to them? And I think that's where you were going with this hypothetical world.

The problem there is it can't be theoretical or speculative, and that's exactly what we're talking about here. Revance actually has no --

THE COURT: And so when you say it can't be theoretical, you know, I hate to sound like an English major or something, but theoretical in what sense? Because it is theoretical in a sense that it wasn't actually done. So what's --

MR. ASHKENAZI: Right. If we look at *Grain Processing*, one of the key statements I think from *Grain Processing*, what was clear is that it said all of the -- basically everything existed. The only reason that it wasn't implemented, and I'm looking at -- this is 1348. It says, "The sole reason American Maize did not use process four to produce Lodex 10 prior to 1991 was economic."

They had everything else in hand. Everything was there. It was designed.

THE COURT: But --

MR. DITTMANN: It was not implemented.

THE COURT: But there are cases after *Grain Processing* that have dealt with other situations that were -- where somebody didn't have -- well, for sure, the only reason it wasn't implemented was economic reasons; right?

MR. ASHKENAZI: Right, but the problem here, Your Honor, with the motion we're dealing with right now is there's not a shred of evidence that Revance even considered, let alone could have implemented, had designed it, had anything. This is all from an expert saying, Oh, well, I could have designed a non-infringing alternative method; therefore, Revance could have implemented it.

Nothing without -- with any factual support. And I would say that every one of the cases from *Grain Processing* and its progeny is grounded in factual support from the alleged infringer that they actually were able to implement. And there are a number of cases who said, Look, even if you have a design, but then you took -- you know, there was some failures along the way afterwards implementing, that shows it was not available. Again, a very fact-intensive inquiry.

09:58:24 Here, there's not a shred of evidence. And their experts have said, They don't have any. They never evaluated or have no input at all on whether Revance even considered, let alone could actually have everything in hand to implement. That in and of itself shows that this theoretical possibility shouldn't be sufficient to satisfy availability.

09:58:45 I'll go one step further, Your Honor. The bigger problem here is that experts can get on the stand and say, I could think of a way to design around now that would open up the possibility for precluding lost profits in every single situation where an expert could, in hindsight, say, Well, maybe we could have pieced together these four or five things.

09:59:04 THE COURT: Well, I mean, there's always a credibility problem.

09:59:08 MR. ASHKENAZI: Fair enough, Your Honor. But I think there's not a single case that they can point to and nor have they pointed to where this type of theoretical possibility from a litigation-inspired testimony of an expert has been sufficient to -- sufficient for a non-infringing alternative design-around to preclude lost profits.

09:59:26 THE COURT: So, as I understand it, the non-infringing alternatives that were on the market as well

09:59:42 as Botox, they used animal protein to make their products; right?

09:59:49 MR. ASHKENAZI: Yes, Your Honor.

09:59:49 THE COURT: And how -- and the proposal of Defendants' experts, and I'm just getting this from the brief -- obviously, I would expect it's more complex than this -- is, well, when we're making ours, we could just add a drop of, you know, animal protein in there and, voila, we would not infringe the patent. So this is a trivial thing.

10:00:22 I don't know. That's what I get from the briefing. That may not be at all a fair summary.

10:00:30 Let's assume that, as a factual matter, that's true that, in fact, it would be incredibly easy to do that. You know, let's assume the reason they didn't was, Oh, we didn't know we were infringing, you know, or whatever. It doesn't matter what the reason is.

10:00:58 Why shouldn't that be -- I mean, if it really would be easy to take their process, alter it, why should that not be admissible?

10:01:15 MR. ASHKENAZI: Your Honor, none of that's coming from Revance. There's not a single piece of evidence that Revance said they could change their process to simply do this. There's not a single shred of evidence that Revance had the -- had everything in place to do it.

10:01:28 THE COURT: Well, not having everything in place

to do it, that's obviously a point, but if, in fact, that's true. But let's assume that, in fact, I'm saying hypothetically, they said, Yes, all you have to do is at the beginning of the process take a dropper, get a little of our secret minimally-infused protein material, animal-protein material, drop it in, and it would just work just as fine and not infringe the patents.

What would be wrong with that? If that were -- you know, if your only response to that was, Well, you didn't do it, and you didn't even think of doing it until, you know, a few months ago. But, yeah, now that you say it, yes, that would work.

MR. ASHKENAZI: I think that's what *Grain Processing* is getting towards. Mere speculation or conclusory assertions is not sufficient. You can't go back and say theoretically --

THE COURT: Right, right. But so conclusory assertions, let's assume it's not conclusory. Let's assume the expert went out and even just did a bunch of experiments and showed that it would work perfectly now.

MR. ASHKENAZI: Your Honor, the premise under *Grain Processing* is that the alleged infringer could have actually just substituted that process in and may not have done it for, let's call it, economic purposes. That premise, that concept can't apply if the company itself

never even thought about doing it.

If an expert is the one who thinks about it, if an expert's the one who comes out and says that, then they could never have just got out there and put forth that non-infringing product. And that's the -- I think that's the underlying premise of all *Grain Processing* which is in that case, they had a process for it, but they didn't implement it for economic reasons. But they -- it was there. And if this case was decided earlier, they would have done that, right. In that -- when I say that case was decided earlier.

In our situation, there's nothing. Their experts never -- don't shine a shred of evidence that Revance ever did what their experts are saying they could have done. When I say that, I'm talking about design, Your Honor. I'm not talking about actual implementation.

There's nothing about design. So that can't satisfy the availability requirement. And that's what I think when -- and I understand your portion about conclusory assertions, but speculation, hypothetical, this is what somebody could or would have done. That's the fundamental problem with what they're doing here, Your Honor.

THE COURT: Okay. Well, that's helpful.

Would it be a fair characterization of what you've just said to say the line in the sand that you're

10:04:36 drawing is somebody has to have thought of this before the experts start offering the opinions?

10:04:44 MR. ASHKENAZI: Yes, Your Honor. I mean, that's a far line. Obviously, *Grain Processing* puts the line before that.

10:04:48 THE COURT: Sure.

10:04:49 MR. ASHKENAZI: But that's the extreme line, and that's where we are. We're at that extreme now, Your Honor.

10:04:53 THE COURT: Okay. I understand your argument.

10:04:59 All right.

10:05:01 MR. ASHKENAZI: I think that -- unless there's any other questions, Your Honor, I think that touches --

10:05:04 THE COURT: No. I think the burden here is more on the Defendant than it is on you.

10:05:09 MR. ASHKENAZI: Thank you, Your Honor.

10:05:10 THE COURT: Thank you.

10:05:16 MS. PHILLIPS: Good morning, Your Honor. Anna Phillips for the Defendants.

10:05:18 THE COURT: All right. Good morning.

10:05:20 MS. PHILLIPS: I'd like to first tackle that point that Mr. Ashkenazi made arguing that Defendants' design-arounds are purely theoretical. And, you know, I would submit that they are not theoretical.

10:05:36 Our technical expert, Dr. Meagher, says you can design around the two patents, the two sets of patents in

two ways. For the manufacturing patents which require, I think, a manufacturing process to be substantially animal-protein free, you can add animal protein at the beginning of the manufacturing process in a weight greater than one percent. In a greater than one percent by weight, right.

And this technology has been around. It's well known. It's even acknowledged in the '740 patent that you can ferment, you can add animal protein to the fermentation culture at the beginning of the manufacturing process. And this is a well-known technique that's been around for 40, 50 years, according to Dr. Meagher. And it's even stated at the '740 patent at Column 1, 28 through 36.

And then the second set of patents where we have the composition patents, those patents basically say, Hey, we have a botulinum toxin composition that is animal-protein free, completely animal-protein free. So Dr. Meagher says a way to design around those patents is to add animal protein to the end drug product. And, again, the '625 patent acknowledges that as a technology that's been around at least as of the filing of the '625 patent. And that's at Column 1, 43 through 47.

THE COURT: The way that Dr. Meagher puts this, is this tied into the way Revance actually manufactures or has manufactured Daxxify or is this completely divorced from

that?

MS. PHILLIPS: I would say, Your Honor, because Revance manufactures a botulinum toxin product, it's not completely divorced. All that would be needed is to add animal protein to Revance's manufacturing process.

THE COURT: But, I guess, does your expert say, you know, here's a flow chart of the process or, you know, some technological specifications? And, you know, at this point, you add your one percent to the process or the formulation, you know, the same kind of analysis? Is that what he does?

MS. PHILLIPS: Yes, Your Honor. He basically -- he says all you would need to do in Daxxify's manufacturing process at the very beginning to design around those manufacturing patents is to put in some type of animal protein in the fermentation culture bath greater than one percent by weight. It could be HSA. It could be casein hydrolysate and it would work just fine.

THE COURT: All right. And I take it that what Mr. Ashkenazi says about nobody at Revance or there's no evidence that anybody at Revance ever actually thought about doing this or even something like this, this is essentially completely Dr. Meagher coming in and offering technical opinions.

Do you agree with that?

MS. PHILLIPS: You know, I will have -- I will say that Dr. Meagher did admit at his deposition he didn't talk to anyone at Revance, but that's not the test that *Grain Processing* puts forward. As your --

THE COURT: Well, so before we get to that, so you agree with that?

MS. PHILLIPS: Dr. Meagher did not consult with anyone at Revance. That's correct.

THE COURT: Okay. But so, in other words, there is no evidence that anybody at Revance ever thought of doing this?

MS. PHILLIPS: At present in the record, I believe that is, unfortunately, correct.

THE COURT: Okay.

MS. PHILLIPS: But that --

THE COURT: When you say "unfortunately" --

MS. PHILLIPS: Based on your question, Your Honor, but I still don't --

THE COURT: Okay. Well, no, no. I just want to -- when I'm trying to figure these things out, sometimes there's factual questions, sometimes there's legal questions. You wanted to address the legal question that you started to address before I cut you off, instead of answering my question, that you're saying it doesn't matter?

MS. PHILLIPS: That's correct, Your Honor. It

doesn't matter because *Grain Processing*, as you acknowledged, we're talking about the but-for world. We're talking about a hypothetical world where infringement is removed.

And *Grain Processing* says a Defendant would not just completely bow out of the market if they couldn't infringe -- you know, hypothetically infringe. What they would do is they would find a reasonable or foreseeable alternative available to them to continue competing in the market.

And that's exactly what Dr. Meagher has proposed in their design-around because there are marketable products out there like Botox, Dysport, et cetera that use exactly the solutions that Dr. Meagher is putting forward.

THE COURT: Well, to the extent there are these competitors, let's say, Dysport, that do something, that's essentially a different sort of non-infringing alternative argument; right?

And when I started off with Mr. Ashkenazi, and you've got multiple non-infringing alternatives arguments. We're just dealing with one here; right?

MS. PHILLIPS: That's -- the way you're framing the question, Your Honor, that's correct. But what I'm trying to say is that our design-around models, those products that are already on the market. So *Grain*

*Processing* says to be a non-infringing alternative or design-around, the design-around doesn't have to be on the market. But what we have here is that our design-around was on the market as of the accounting date which is September 2022. Well before that, like Botox itself came out in 1989.

We know from internal documents that Allergan uses animal protein in its manufacturing process, right. So that takes care of the manufacturing patents.

We also know, based on the labels for Botox, Dysport, Xeomin, Jeuveau, which came out in 2009, 2010, et cetera, that those products contain animal proteins in the product itself, in the end product.

THE COURT: So, you know, *Grain Processing* is a fairly old case. And I think I looked at your briefing for this, but I wouldn't swear to that.

In terms of a case that is factually analogous to this one as you can get, what's the best case out there where some Defendant has, you know, tested the limits of what is a non-infringing alternative that wasn't actually implemented and did not exist in the fashion -- you know, it's not something that you just go and buy off the shelf at a store -- what's the best case out there, the one that's most pro Defendant?

MS. PHILLIPS: Your Honor, I think *Grain*

*Processing* is that case, but there was another case *EMC Corporation vs. Pure Storage*, Inc. At 154 F.Supp.3d 81.

THE COURT: Yeah, yeah. I'm familiar with that case, too.

MS. PHILLIPS: Yes, Your Honor. In that case, the damages expert did rely on the technical expert for the premise that the proposed non-infringing alternative, which was never implemented by the Defendant, but was --

THE COURT: This was doing six months of computer coding.

MS. PHILLIPS: I believe that's correct, Your Honor.

THE COURT: Yeah, I think so. So, you know, part of the reason -- I'm always worried when the best case that you can cite is one of my cases. You're just asking me to repeat some error that I made before.

So do you have another case by somebody else?

MS. PHILLIPS: Your Honor, I don't have one at present. I will say there's another case from -- out of the Eastern District of Texas where Judge Bryson was sitting by designation which has to discuss -- which discusses the availability of a non-infringing alternative in a hypothetical negotiation context where --

THE COURT: And what is that case citation?

MS. PHILLIPS: That is *TQP Development vs.*

*Merrill Lynch.*

THE COURT: I didn't quite get all those letters there.

MS. PHILLIPS: *TQP Development vs. Merrill Lynch* --

THE COURT: Okay.

MS. PHILLIPS: -- at 2012 WL 3283354.

THE COURT: 3283354?

MS. PHILLIPS: Yes, sir.

THE COURT: Okay. Well, one thing I've seen is Judge Bryson, when he's a district judge, is always very thorough in explaining everything, so that might be very helpful.

MS. PHILLIPS: And, Your Honor, we're happy to, you know, supplement the record with additional case law at your request.

THE COURT: Well, so why don't we say that by the close of business tomorrow, you will send me exactly one case without argument, so they don't need to reply, that is the best case for this point. Ideally, it would be the Federal Circuit, but I suspect that's not available or there is no such Federal Circuit case. But, otherwise, then just a District Court case. Okay?

MS. PHILLIPS: Yes, sir. Will do.

THE COURT: All right. Anything else you want

to say now?

MS. PHILLIPS: Yes. I would like to point out that Allergan's motion is directed to Ms. Trexler's opinion on design-arounds as it pertains to lost profits, but Ms. Trexler also has a design-around opinion as it pertains to reasonable royalty. And so, I mean, Allergan -- so any relief that Allergan seeks would not exclude Ms. Trexler's design-around opinion or Dr. Meagher's design-around opinion as it relates to reasonable royalty at minimum.

THE COURT: And do you think it's fair to say that this is really more a *Daubert* motion about Meagher than it is about Trexler?

MS. PHILLIPS: Your Honor, to the extent that my colleagues attack the factual record, I would agree with that. But they haven't so moved, and I think that is telling.

Ms. Trexler relied on Dr. Meagher. Dr. Meagher's our technical expert. He puts the facts into the record in terms of analyzing the Botox label and the Botox manufacturing process to come up with these design-arounds to say, Yes, this technology was available way before the date of the accounting in September 2022. This technology was well known using animal proteins in botulinum toxin products and manufacturing processes has been known, you know, for 50 years.

And further, Dr. Meagher says this is a simple solution. It's just using animal protein just like Allergan does in their process.

THE COURT: Okay. Thank you.

MS. PHILLIPS: Thank you, Your Honor.

MR. ASHKENAZI: Your Honor, may I respond to a few points?

THE COURT: Sure.

MR. ASHKENAZI: Your Honor, I just want to be clear. Dr. Meagher actually didn't put forth any actual design, didn't actually go into Revance's process and say, This is how it would be done or implemented. But rather said, it can be. We could think about doing this and then someone would need to go forth and design it.

THE COURT: Well, so does Ms. Trexler, their damages expert, have information beyond whatever it is that Dr. Meagher put in his report?

MR. ASHKENAZI: No, Your Honor. And the reason we moved the way we did is because the key here is we're saying it should not be put forth, as my colleague said, as a non-infringing alternative to preclude lost profits.

And that's the key here. That's the unreliable methodology. Because the question is not is design-around at all relevant to the case, but rather the jury should not be presented with an assertion that lost profits could be

precluded because there was this non-infringing alternative available.

And I think that's the key. That also goes to one of the reasons why cases regarding non-infringing alternative design-arounds in the hypothetical negotiation for reasonable royalty is completely separate and distinct from what we're dealing with here. And that's why the Federal Circuit, when talking about non-infringing alternative design-arounds in *Grain Processing* and it's progeny talk about the availability.

Whereas in the hypothetical negotiation, the question is: How long would it take to design around the little -- and I could go into that further, Your Honor, but the key here is it's a completely different context.

And the fact of the matter is that Dr. Meagher, however he provides it, does not ground it at all in any actual evidence at all that Revance considered.

THE COURT: Well, and I think Ms. Phillips conceded that.

MR. ASHKENAZI: Yes. Your Honor, that's all I would like to add.

THE COURT: Okay. Thank you.

Let me just -- okay. So maybe we can do one more and then we'll take a break. So this would be Defendant.

MR. VARUGHESE: Good morning again, Your Honor. Dennies Varughese --

THE COURT: Good morning.

MR. VARUGHESE: -- for Defendant Revance.

THE COURT: Yeah.

MR. VARUGHESE: So, Your Honor, the next issue is Revance's *Daubert* motion number one which is to preclude Dr. Christine Meyer, Allergan's economic expert, from offering opinions about lost profits. I will say next on the list, Your Honor, is Revance's motion for summary judgment two which really completely subsumed all the arguments and issues within issue number one for this motion. So I don't think I'll be doing extra arguments on that, but I just wanted to flag that for Your Honor.

THE COURT: Okay. So are you telling me that the way this is going to work is, instead of you-all having four arguments you're going to present, you're going to present three?

MR. VARUGHESE: Correct.

THE COURT: Okay. You get one bonus point.

MR. VARUGHESE: There are four motions, but item number one here that Dr. Meyer --

THE COURT: Right, right. I understand --

MR. VARUGHESE: Yeah.

THE COURT: -- that it's not a complete victory

for me here, but I get it.

MR. VARUGHESE: Your Honor, as the Court is well aware, Rule 702 puts certain guidelines and requirements around expert testimony. In order for expert opinions to be valuable or useful for a trier of fact, among other things, they have to be based on sufficient facts and data, and they must be based on reliable principles and reliable methodology.

As I'm going to say here, Dr. Meyer, when it comes to her lost profits opinions, those opinions suffer from a number of flaws. Both are based on insufficient facts and data and grossly misapplies the relevant law of lost profits.

They, Allergan and Dr. Meyer, chose to use the *Panduit* test to establish lost profits here.

THE COURT: Well, so the -- you know, I saw in the briefing, I guess, argument, particularly by your side, but not really denied by the Plaintiff, that Dr. Meyer said she was doing *Panduit*. She also, I think, said she was doing market share. And those two are not exactly the same thing.

MR. VARUGHESE: Correct. I had a big windup, but I'll cut right to the chase. They don't deny that there is unrebutted, indisputable evidence of non-infringing alternatives. But what Allergan says is, Wait a second,

Dr. Meyer conducted a *Mor-Flo* analysis that alleviated her requirement to prove *Panduit* Factor Number 2.

And what we're saying is both on the law and on the procedure, that doesn't save them because, number one, *Mor-Flo* presented facts that are very different from this case that is consistent with a number of other Federal Circuit case law that talks about the importance of Factor Number 2.

And then the second reason is Dr. Meyer never did the *Mor-Flo* analysis when it came to Factor Number 2. And I'll show you that. What she did was she applied the *Mor-Flo* methodology to figure out the number, what figure they think they're entitled to in terms of damages by doing this market share apportionment. But she never talked or discussed about *Mor-Flo* to say, I acknowledge there are non-infringing alternatives, but because of *Mor-Flo* here's my analysis. And I am going to say it's still tied to lost profits.

But after the fact when we asked her, Why didn't you apply *Mor-Flo* in *Panduit* Factor Number 2, she just gave this generalized hand-waving answer, Well, *Mor-Flo* is all over my analysis. And that's not helpful for anyone, Your Honor. We are allowed to see her work. She needs to show her work for her conclusions. She did not do the *Mor-Flo* analysis when it came to *Panduit* two.

So just one quick point. The Federal Circuit has said over and over again, that *Panduit* is a nice test. We've adopted it, but it's not the only test.

But I respectfully submit once a party decides to go with that test, you have to do that test properly and neither Allergan or Dr. Meyer have.

THE COURT: Well, you know, I'm not so sure about that because I think it was *Mor-Flo* sets out the *Panduit* test and then says, with some modifications, it works for market share.

MR. VARUGHESE: It does.

THE COURT: So I'm not sure. I'm not sure. I'm just not sure.

MR. VARUGHESE: Well, let me answer that in two steps. One is to just go over two guiding principles. "If there was a non-infringing alternative, which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale."

And this comes from *Mentor Graphics*. *Mentor Graphics* is a case that Allergan relies on because in Footnote 5 they say, Well, when it comes to Factor 2, you know, courts have used a *Mor-Flo* analysis. But the same *Mentor Graphics* case says this, Your Honor, and I'll come back to it: "*Panduit's* requirement that patentees prove

demand for the product as a whole and the absence of non-infringing alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features."

And *Mor-Flo* did exactly that. Here's *Mor-Flo*. It was undisputed in *Mor-Flo* that all competitors infringed or sold a far less preferable alternative. So every alternative, alleged alternative, it was undisputed that they practiced the patent. And the one alternative that did not practice the patent, it was undisputed that it was materially inferior. And the patent owner's product for which they were claiming the lost sales practiced the patent.

So in *Mor-Flo's* analysis, even though in that complex multi-competitor market, they used a *Mor-Flo* analysis to determine the amount of damages that the patent owner was owed, it was clear that that analysis took into account the value of the patented features. It was not in isolation. And, in fact, in *Mor-Flo* when you look at the specific facts, they actually weren't even not acceptable non-infringing alternatives. Every one was either infringing or not acceptable.

Here, all the competitors are non-infringing and materially identical to patent owner's, Botox. Here's the undisputed facts. Every asserted claim in this case

requires the product be animal-protein free or an animal product. That's the key patented feature.

Undisputed fact number two, we have five players in the marketplace.

THE COURT: Right.

MR. VARUGHESE: Right. Botox for several decades, then Dysport, Xeomin, Jeuveau, and then most recently two-and-a-half years, Daxxify. All other competitors, including the patent owner, don't practice the patent. And they are completely interchangeable in that regard.

So Allergan and Dr. Meyer, for that reason, runs head long into a number of Federal Circuit cases that say when you have a real acceptable non-infringing alternative, that defeats lost profits. There's not a single case. They haven't presented one.

THE COURT: Well, so on that point, because you had up *Mentor Graphics*, and what I was trying to think about, because I have looked at *Mentor Graphics* recently, but I haven't looked at the whole case is whether -- because sometimes courts use language, you know, in the context of the case. And so when they said non-infringing alternatives sort of defeats the lost profits, were they talking about a third party's non-infringing alternatives?

MR. VARUGHESE: Yes. So that's what they were

10:28:50 talking about and that's how it works. So you have -- in the classic situation, you have a patent.

10:28:56 THE COURT: Well, in other words -- and I'm going to let you tell me what you're going to tell me in a second, but is it the case that a third party's non-infringing alternatives, without anything more, you know, let's just say Jeuveau --

10:29:24 MR. VARUGHESE: Mm-hmm.

10:29:25 THE COURT: -- is out there. It's stipulating it's a non-infringing alternative or that it doesn't practice the patent and that it's comparable to Botox. Stipulated to that. Is that all you need to say, can't do lost profits?

10:29:38 MR. VARUGHESE: I would say, yes, Your Honor. And I would say that pretty emphatically on the Federal Circuit case law. We see that -- if I can identify -- I'll ask my colleague to give me the pin cites, but the key cases here are the *Slimfold* case, the *Presidio* case, *Bic Leisure*, and I'd even say *Mor-Flo* itself.

10:29:57 Because they're relying on *Mor-Flo* where we all know you don't read cases in isolation. The facts are really important. In *Mor-Flo*, there was no acceptable non-infringing alternative. And that's where they did the market share analysis to derive the profits. They haven't pointed to a single case, a case like this where the patent

owner doesn't practice the patent, and neither does multiple -- not one, but neither does multiple third-party alternatives.

So the hypothetical world here is if Daxxify wasn't there, right. For purposes of this motion, we're assuming infringement. If Daxxify's infringement wasn't there, what would a consumer do?

And the test says if there's an acceptable non-infringing alternative and it's viewed relative to the patented product, if it's acceptable, meaning here identical, then you don't get the but-for causation. You don't get the but-for test. You don't get lost profits.

Now, it doesn't matter -- like Dr. Meyer said, Well, you know, if Daxxify had a hundred sales, who's to say that, you know, Allergan couldn't have gotten 30, or 40 or 50 of those?

But that's not the but-for test. That's not -- that analysis is completely untethered and unwarranted from a number of cases that say that you've got to -- the lost profits has to reflect the value of the patented features. If patients are using Botox randomly as opposed to Dysport because Botox has better brand recognition or marketing, some things that are completely unrelated to the patented features, they don't get lost profits.

And that *Mentor Graphics* case goes on for -- I

think it was Judge Moore -- for two pages where she says it is really hard to get lost profits.

THE COURT: No, no. I have recently seen that. Of course, saying "it's hard" doesn't necessarily resolve any particular individual case.

MR. VARUGHESE: I think this case is extreme, right. I mean, let's, again, compare it to *Mor-Flo*. *Mor-Flo*, the patent was front and center. The infringer practiced the patent. All the alternatives practiced the patent. The patent owner practiced the patent.

Here, the patent owner doesn't practice the patent. Not one, but two, three alternatives don't practice the patent. They're completely interchangeable.

So if Daxxify's not here, if there's no patent feature that ties a particular customer to gravitate toward Botox, they don't get lost profits. They get reasonable royalty, but they don't get lost profits.

THE COURT: That's what you say is the, for lack of a better word, saving grace of this is they still get the reasonable royalty on -- you know, using basically everything that Daxxify sold as a royalty base, even if in the real world, it was taking customers from Jeuveau.

MR. VARUGHESE: Correct. Correct. They'll get a reasonable royalty on -- if they win, obviously.

THE COURT: Right, right. We assume that.

MR. VARUGHESE: I just didn't want to be in a waiver situation here. If -- yes, for every sale of Daxxify, they will get a reasonable royalty.

Lost profits, I mean, there's a point there where Judge Moore said, It's hard. She even said the trend has been more and more patent owners have to rely or have to settle for getting a reasonable royalty because lost profits is an exacting standard.

What Allergan is essentially saying is -- and Dr. Meyer, any time, even when you have such a powerful case of acceptable non-infringing alternatives -- she doesn't dispute these are acceptable. All she says is, Well, maybe some patients would go to them or Botox. She gives no hard facts or data.

In this world if all you had to do was swap out *Panduit* two and always do *Mor-Flo*, then it completely eviscerates this part of the test in this requirement.

That doesn't make any sense to me, Your Honor, and that's why we don't see any cases that say that.

THE COURT: Well, yeah. Hold on a minute.

And so if I agree with you on this point, that would make all the other points you raise about Dr. Meyer's lost profits opinions moot; right?

MR. VARUGHESE: That's correct, Your Honor. And this issue, this first issue is part and parcel with the

summary judgment motion. We're saying, as a matter of law, given these facts, they do not get lost profits because there are acceptable non-infringing alternatives. It's unrebutted.

THE COURT: Okay. Do you mind just putting back up -- you had a slide earlier that had *Mentor Graphics*, two quotes from that.

Do you mind just putting that back up?

MR. VARUGHESE: Of course, Your Honor. I had this -- this one?

THE COURT: Yeah.

MR. VARUGHESE: And there was another *Mentor Graphics*. Maybe you were thinking about that slide.

THE COURT: The --

MR. VARUGHESE: The value of the patented features.

THE COURT: No, no, no. Go back to where you were.

What you're telling me in the earlier answer you gave is the first quote there. "If there is a non-infringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale."

And basically what you're saying is that literally, and not only literally, but also taken in

context, that sentence kills their lost profits case.

MR. VARUGHESE: That sentence and one other. If I could show you the very next slide.

We talked a lot about *Grain Processing*. It's, obviously, very good law, just it's articulated a known principle at that time which is consistent with this time.

"Prior cases illustrate that market sales of an acceptable non-infringing substitute often suffice alone to defeat a case for lost profits."

And that's what they did. And it was collecting cases.

And then there's the *Slimfold* case.

THE COURT: *Slimfold* is before *Grain Processing*; right, or is that before *Mentor Graphics*?

MR. VARUGHESE: *Slimfold* -- well, *Mentor Graphics* was 2017.

THE COURT: Right, right. I remember seeing it.

MR. VARUGHESE: *Slimfold* is -- I can go to the *Slimfold* case. That was 1991, Your Honor.

THE COURT: Yeah, okay. I thought it was an old case, too.

MR. VARUGHESE: And *Mor-Flo* was 1989, I believe. So if we go to *Slimfold*, it's consistent with what happened in *Mor-Flo* and it's consistent with the other authority right here.

So I already mentioned that Allergan and Dr. Meyer's approach to this by saying it doesn't matter that there are clear acceptable non-infringing alternatives eviscerates *Panduit* Factor Number 2. That can't be the law. There's no law that says, you know, you could always use *Mor-Flo* no matter what. That's not the case.

And *Slimfold* here, it's exactly what it did. Two years after *Mor-Flo*, the District Court there rejected *Mor-Flo* and rejected the request by the patent owner to apply a market share approach specifically because there were acceptable non-infringing substitutes there.

Again, consistent with what *Mentor Graphics* has said, lost profits has to be tied and commensurate with the patented features. Factor 1, a patent that simply says do people want to buy the patented product?

Doesn't matter if it's a limitation or not. If you're patented, do people want to buy it? Is there demand?

Factor 2 is where the specifics of the patent come into play. Here, in the traditional situation, if Botox was also animal-protein free, then Dr. Meyer and Allergan may have a triable issue where they say, Well, Jeuveau -- because I would say, Well, Jeuveau, Dysport and Xeomin are alternatives.

And they'll say, Well, they're not acceptable because they're inferior. And people want to buy Daxxify

10:38:04 because it's APF. And so if you weren't around, Daxxify, Botox would have gotten it because it's superior to those alternatives.

Here, you have an interesting case where Botox doesn't practice the patents, either. Now, I suppose Mr. Dittmann or someone from his team might get up here and say, Your Honor, it's well settled that a patent owner's product doesn't have to practice the patent in order to recoup lost profits.

That's true in very nuanced situations. In the classic cases, that *Rite-Hite* case, I'm sure Your Honor has read, you know, dozens of times --

THE COURT: Yeah, but not recently.

MR. VARUGHESE: -- that's a two-player market. That's very different.

*Mentor Graphics* also goes into -- it says, two-player markets are special. It's different than multi-competitor markets. There, if I have a product that does X, but I have a patent that does Y, and you do Y, but you and I compete in the same market, I can get lost profits on unpatented articles because it's a but-for causation self evident. There's only two players.

That is not what's going on here.

THE COURT: So in the two-player market, what you've just said, it's still the case that the Plaintiff has

to prove that the second player, the infringer, didn't have a non-infringing alternative themselves; right?

MR. VARUGHESE: Of course. And so --

THE COURT: Okay.

MR. VARUGHESE: Yeah, and even then that gets into the third-party line. Two-player market, there's no non-infringing alternative whether it's a third party or like *Grain Processing* by that person itself. But even there, the value of the patent is shown.

And here's why: There, even though the Plaintiff doesn't practice the patent, the infringer does. Check as to the value of the patent. And that sales by the infringer that practices the patent is siphoning sales away from the patent's unpatented product. Again, check.

In this situation, their claim for lost profits, given the multiple non-infringing alternatives that are identical to Botox, there's no justification for Botox claiming lost profits in a but-for world here because, as we saw from that other quote, if a patient would or could have turned to another product. And here, there's no reason why they wouldn't other than non-patented reasons like, again, Allergan and Botox's brand recognition, superior marketing, things that are not cognizable to defeat or say -- not cognizable to defeat a showing of substantial non-infringing alternatives.

THE COURT: I think I saw somewhere that the parties are filing at some point updated damages reports to take into account, I don't know, recent sales. Has that happened yet?

MR. VARUGHESE: That has not yet, Your Honor. We're still negotiating and --

THE COURT: Oh, okay.

MR. VARUGHESE: Yeah.

THE COURT: Well, whenever the last damages reports were filed, which I take it was probably, you know, six months ago at least, what was the Plaintiffs' expert's estimates of the lost profits? I want to say I think I saw a number like 65 million or something like that.

MR. VARUGHESE: Your Honor, I confess. I don't know the exact figures just because this motion didn't -- hang on.

THE COURT: Right, right. But --

MR. VARUGHESE: I can send that to Your Honor, obviously.

THE COURT: Well, do you have a ball park idea?

MR. VARUGHESE: Yeah, it was --

MR. ASHKENAZI: Your Honor, if I might, objection. I don't know who is in the courtroom right now and whether or not that number would be --

THE COURT: Well --

MR. ASHKENAZI: Okay.

THE COURT: If somebody's in the courtroom, the security guard there I'm sure will be rushing out to buy stock or maybe there's a reporter over there.

MR. ASHKENAZI: Fair. Fair, Your Honor.

MR. VARUGHESE: That's in the ball park, Your Honor. Yes.

THE COURT: In any event, what's the reasonable royalty ball park?

MR. VARUGHESE: So it fluctuates. If they get lost profits, again, ball park --

THE COURT: Right, right. And I'm sorry, I should have been more clear. The reasonable royalty, if there are no lost profits, what's --

MR. VARUGHESE: They're claiming a higher reasonable royalty to the tune of 40 or $50 million because they're saying, you know, we need a royalty. Because they can't double dip. If they get lost profits on a bunch of batches, then there's no royalty on there. So then the royalty goes down.

THE COURT: Right, right, right. So let's just assume there are no lost profits, then the reasonable royalty is 40 to 50 million.

MR. VARUGHESE: Yeah, because they're using a very high rate that we previously --

THE COURT: I don't care why.

MR. VARUGHESE: Yes. Yes, Your Honor. Sorry.

THE COURT: No, just trying to -- okay. Do you have anything more you want to say about this or about the other things?

MR. VARUGHESE: I think this is the last important thing here. I mentioned I wanted to talk to Your Honor about the substance. You know, we feel very confident that *Mor-Flo* does not apply here on the substance.

But this is also important: Dr. Meyer did not do the *Mor-Flo* analysis. We asked her: Why did you not cite *Mor-Flo* in your Factor 2 analysis? And then she, again, gave kind of a hodge-podge, wishy-washy answer where she said I -- you know, Factor 2 I was discussing non-infringing alternatives, but, of course, I -- you know, the economics of *Mor-Flo* applies everywhere. But I specifically cite *Mor-Flo* on Page 31.

So when she wanted to specifically rely on *Mor-Flo* with regard to Factor Number 4, she knew to do it. She cited it.

But then I -- we asked her, but you didn't do *Mor-Flo* to get rid of the requirement for acceptable non-infringing alternatives. And then, again, she didn't give a great, you know, like a damning admission where she said, Of course, I did it. But it's clear from the record

she didn't do the analysis, and they don't get a do-over. They don't get a do-over.

So that's the last point I want to make, Your Honor. With that, I'm happy to rest on the papers for the other issues.

THE COURT: Okay.

MR. VARUGHESE: And one -- I'm sorry.

THE COURT: No, go ahead. You wanted to -- yes, go ahead.

MR. VARUGHESE: And in terms of the numbers, I want to be careful. She claims to have done the *Mor-Flo* analysis there, but she didn't actually follow *Mor-Flo*. So she -- Allergan's market share is approximately six or seven percent. She said, I'm using a conservative amount and just asking for 50 percent. Well, are you doing *Mor-Flo* or not; right?

THE COURT: Well, of course, *Mor-Flo* itself had pretty much that; right?

MR. VARUGHESE: Yeah, yeah.

THE COURT: So I did have one question I wanted to ask you which had to do with, I believe, Dr. Meyer's -- an argument you made, I don't know, that is factually unreliable because for reasonable royalty and for lost profits, she uses different ratios of Botox to Daxxify. And I forget which is which, but one's two to one and one's one

to one.

Can you just tell me in two sentences what that argument is on your part and, also, whether or not your expert addresses that issue?

MR. VARUGHESE: Your Honor, if I may, can I invite my colleague, Deirdre Wells? She was going to handle this.

THE COURT: Okay. Sure.

Ms. Wells, good morning.

MS. WELLS: Good morning. Yes. So I'm happy to address that.

So, generally, the parties agree that the vials of Daxxify and Botox are both a hundred milliliters, but the dosages are different. So one dose of Daxxify is 40, so in one a hundred milliliter vial, you have two-and-a-half doses. One dose of Botox is 20. So in one 100-milliliter bottle, you have five doses. So essentially you need -- in order to get five doses of Daxxify, you have to use two vials as opposed to one vial for Botox.

So, in general, the parties agree that the ratio is two bottles of Daxxify to one bottle of Botox. And Dr. Meyer does talk about that.

But then when she uses lost profits, all of a sudden she says one bottle of Daxxify equates to one bottle of Botox. So, of course, in doing that, she's sort of

doubling the lost profits, right.

THE COURT: Well, so my understanding from something I read in the briefing somewhere was that the label says once you give one dose, throw out the rest; right?

MS. WELLS: Yes, that's correct, but the --

THE COURT: And so in terms of -- so to the extent that she's saying, Here's, in the lost profits world, what happened because one Daxxify is equal to one Botox, or every time Daxxify -- Revance sells two Daxxify, that's taking away two Botox, right, so that's a one-to-one ratio.

She's got a reasonable factual basis for that on the basis of what the FDA label tells people to do; right?

MS. WELLS: I would disagree there. So that would be true if somebody's only having a single injection. But often times with these patients, they're getting more than one injection at a time. And so I think what the FDA label is basically saying is, Look, you shouldn't use it on Patient A and then put it in the fridge or something and save it for Patient B.

THE COURT: And the reason is you might get one injection to take away forehead wrinkles and another to take away, I don't know, hand wrinkles?

MS. WELLS: Sure, crow's feet, sure. Different areas are getting injections and so you can use -- while,

you know, the dose is either the 40 or the 20 per injection, you can get five injections, ten injections at a single sitting.

THE COURT: So I think you have experts who say stuff that's consistent with what you just said saying, you know, in their experience, saying what their experience is. If that's true, why would the reasonable royalty analysis use a different ratio?

MS. WELLS: We don't think it should.

THE COURT: Yeah.

MS. WELLS: That's a --

THE COURT: You're going to say, yeah, that's my question, too; right?

MS. WELLS: Yes.

THE COURT: All right. Does your expert have an opinion as to which is the right way to do this?

MS. WELLS: Our expert believes that the two to one is the appropriate ratio and does have an opinion applying that correcting --

THE COURT: Both for lost profits and for reasonable royalty?

MS. WELLS: Correct.

THE COURT: Okay. All right.

Thank you, Ms. Wells.

MR. VARUGHESE: Your Honor, may I take a minute

10:49:20 to read those pin cites into the record?

10:49:23 THE COURT: Sure.

10:49:27 MR. VARUGHESE: Okay.

10:49:28 THE COURT: No. You know what, why don't you,
10:49:32 because it will be easier, why don't you just send us a
10:49:35 letter tomorrow with the letter saying whatever the pin
10:49:38 cites are.

10:49:39 MR. VARUGHESE: Certainly.

10:49:39 THE COURT: Okay. Mr. Ashkenazi.

10:49:45 MR. ASHKENAZI: Your Honor, just a quick
10:49:46 question. Would you like to deal with that last question
10:49:48 first because my colleague, Carl Minniti, would be dealing
10:49:53 with that.

10:49:54 THE COURT: Okay. Why don't we just deal with
10:49:55 that. Hopefully it won't take very long.

10:49:58 MR. ASHKENAZI: While it's fresh in your mind.

10:50:00 THE COURT: Okay. Mr. Castraminniti (sic)?

10:50:03 MR. MINNITI: Carl Minniti on behalf of the
10:50:06 Plaintiff, Your Honor.

10:50:06 THE COURT: Oh, I'm sorry.

10:50:08 MR. MINNITI: That's okay.

10:50:09 THE COURT: Sorry, I misheard.

10:50:13 Mr. Minniti, yes. Go ahead.

10:50:18 MR. MINNITI: Yes. To cut right to the point,
10:50:20 Dr. Meyer in the lost profits analysis, as Your Honor was

touching on, looks at a one-to-one vial ratio. And while my colleague on the other side raised a bunch of questions about the number of injections for a single patient, leaving aside that those are factual questions that the damages experts would be touching on, the one-to-one ratio is about for one Daxxify vial sold, it's going at the expense of Botox.

That's based on real-world evidence of the FDA labels, as Your Honor mentioned, saying one vial, one patient. That's lost profits. That's real-world evidence that's in the record.

For the two-to-one vial ratio, it's really important to put in context for the reasonable royalty that that ratio is coming in the context of a confirmatory opinion before the FDA label for Daxxify had ever been released because Daxxify had not been approved. And Dr. Meyer is looking at contemporaneous evidence around the time of the hypothetical negotiation before Daxxify approval and some surveys to look at a confirmatory look at what could be the price coming out of a treatment.

THE COURT: So confirmatory, that's not a word I hear too often. Are you talking essentially book of wisdom kind of stuff or what?

MR. MINNITI: No. I think the way to look at it is, as my colleague will talk about, Mr. Ashkenazi, with

respect to reasonable royalty, Dr. Meyer has a reasonable royalty opinion, but then she's also looking kind of as a -- confirmatory is the word that's coming to mind, but essentially, backstops and double-checking her work across additional evidence.

And that's what she's doing when she looks at a two-to-one ratio. But in that world in a reasonable royalty analysis, the Daxxify label had never been released because the product was not published and not approved. And, therefore, the bottom line is lost profits, real-world facts, the Daxxify label. And then on reasonable royalty, looking at evidence contemporaneous at the time of the hypothetical negotiation.

THE COURT: So the hypothetical negotiation is sort of comparing just the overall amounts of active ingredient that are out there?

MR. MINNITI: Yeah. The reasonable royalty analysis is really looking at the cost that could potentially come out of a vial and in certain circumstances. But, again, the Daxxify label was not available at the time of the hypothetical negotiation, so that one-to-one vial ratio considered for lost profits would not have been available at that time.

THE COURT: But the royalty rate is applied to the actual real-world sales; right?

10:53:31 MR. MINNITI: That's correct. And that's why I wanted to drive home the concept of this would be a confirmatory aspect of Dr. Meyer's opinions. Her royalty rate is coming from surveys that my colleague will talk about for the process patents, a completely different type of analysis. That is completely separate. The core basis of Dr. Meyer's opinion from any of the two-to-one ratio.

10:53:55 THE COURT: So the confirmatory -- so this whole two to one, one-to-one argument in your opinion is of pretty marginal relevance?

10:54:04 MR. MINNITI: Yes.

10:54:05 THE COURT: Okay. And the reason why -- in this confirmatory opinion, she's in some way comparing the -- she's comparing the number of patients theoretically as possible to treat or the number of doses actually based on not taking into account any instructions that could be interpreted to involve throwing out some of the material?

10:55:07 MR. MINNITI: Correct, because she's looking at some surveys and some analysis in the record that was done at the time. The Daxxify label was not released and the product had not been approved at that time.

10:55:20 THE COURT: Does it work out that the way she does it maximizes lost profits for Allergan and also maximizes reasonable royalty for Allergan?

10:55:34 MR. MINNITI: On lost profits, again, I want to

focus, we think and Dr. Meyer is going to testify to this and they can cross-examine her to the hill if they want to about it, we think the one-to-one vial ratio is reflective of what's actually happening in the market. They are sourcing --

THE COURT: So I understand that. You already said that. But is it, I don't know, a coincidence that this works out best for Allergan on both the lost profits and the reasonable royalty?

MR. MINNITI: No, I would disagree with that because the reasonable royalty opinion is not just based on this two to one.

THE COURT: So, Mr. Minniti, the ultimate result that she uses this to confirm results in twice the reason or, you know, allowing for other things -- twice the reasonable royalty for Allergan than if she used the same two to one that she's using for lost profits?

MR. MINNITI: No, because if Dr. Meyer were to get up on the stand and provide a reasonable royalty opinion without this confirmatory parallel two-to-one ratio opinion that she has in one sentence in her opinion, the royalty would still come out the same based on a number of other analyses that my colleague, Mr. Ashkenazi --

THE COURT: Okay. So let me try it this way: If she used the same two-to-one ratio that she's using for

lost profits as part of her confirmatory opinion, it would not confirm the opinion?

MR. MINNITI: I'm sorry. There's always a question about which two, is two Botox and one Daxxify.

THE COURT: Two Daxxify to one Botox.

MR. MINNITI: So if we're talking about for every two vials of Daxxify sold resulted in one vial of Botox lost, that has, I believe, a downward impact on the Botox lost profits.

THE COURT: I thought that was what went into the Botox lost profits.

MR. MINNITI: The Botox lost profits is for every one Daxxify sold, there is one Botox vial that is not sold. And, therefore --

THE COURT: Okay. So I got it backwards. So but the -- all right. I think, notwithstanding the fact that I don't think we've achieved a meeting of the minds here, I think I understand what's happening.

So thank you.

MR. MINNITI: I appreciate it. Thank you.

THE COURT: So you know what, Mr. Ashkenazi, I hate to interrupt in the middle of your argument, but I think we've been sitting here long enough to take a break. So we'll take a ten-minute break and then you can have the floor when we get back.

10:58:34 MR. ASHKENAZI: Sure. Your Honor, can I just address one point that was just being asked? I think it might help Your Honor --

10:58:39 THE COURT: Okay.

10:58:39 MR. ASHKENAZI: -- on the vials. I just want to be clear, Dr. Meyer says that in reality, because Daxxify lasts longer than Botox, it should be a two-to-one ratio in the opposite direction, meaning for every one vial of Daxxify sold would equate to two Botox. But she takes a conservative estimate and does a one to one. She's ignoring the duration.

10:59:04 I guess what I'm trying to get at, Your Honor, from a Daubert perspective, there's a lot of factual and scientific underpinnings to Dr. Meyer's opinion that she provides. And she sets forth, and we put this forth in our papers, on why that's a reliable and shouldn't be precluded under the Daubert -- at the Daubert stage.

10:59:22 That's all I wanted to add, Your Honor.

10:59:24 THE COURT: Okay. All right. Thanks. We'll take a ten-minute break.

10:59:27 DEPUTY CLERK: All rise.

10:59:28 (Recess was taken.)

11:03:51 DEPUTY CLERK: All rise.

11:13:04 THE COURT: All right. Everyone have a seat.

11:13:06 Mr. Ashkenazi.

MR. ASHKENAZI: Thank you, Your Honor. First, I just want to start off with, as my colleague on the other side referenced, he was talking about both the motion for summary judgment number two and the *Daubert* motion. I'm going to address them both together.

THE COURT: Okay.

MR. ASHKENAZI: But recognizing the difference in the standard, one would obviously -- they would have to show there's no genuine issue of material fact. And the other one, obviously, to show there's no unreliable methodology. To the extent that this entire issue is a question of what the law states about the availability -- sorry, about the ability to recover lost profit damages where there is a non-infringing alternative in the market, I want to start with that first, Your Honor.

THE COURT: Okay.

MR. ASHKENAZI: Now, basically from what I heard on the other side today, is that in a world where there's an acceptable non-infringing alternative, according to them, there is an inability to recover lost profits. Straight up, there was no ambiguity with what they said. That was their assertion of what the law is.

That's actually contrary to Federal Circuit law. Specifically *Mor-Flo* addressed -- the Federal Circuit case in *Mor-Flo* addressed the fact and said, I don't need to

address whether these are acceptable or not because it's irrelevant. You can still do in that case the market share analysis.

Your Honor, it's not just my interpretation of *Mor-Flo*, and I'd like to get into that in detail, but *Grain Processing* specifically when referencing *Mor-Flo*. And this is *Grain Processing* at 1350. So it says -- has a citation.

First, when it talks about that the recovery of lost profits is -- sorry -- that according to recovery, lost profits in a wide variety of forms meaning allowing the recovery of lost profits in a variety of different ways and proving that up, there's wide latitude that's provided. And it goes on and it lists a number of cases using different analyses for showing the availability of lost profits or the ability to recover lost profits.

In there it says -- it has -- states -- references state industries, which is what we've been referring to as *Mor-Flo*. And quote -- this is the parenthetical. "Upholding award of lost profits in proportion to patentee's market share of the relevant market, including acceptable non-infringing substitutes."

It's clear. And that -- and if we go through *Mor-Flo* itself, it's abundantly clear that the Federal Circuit in *Mor-Flo* was addressing the situation in which, despite what *Panduit* Factor 2 says, or we can talk about

whether it's *Panduit* Factor 2 or 4, how you do the calculation. Besides what this -- despite what that says, there's still an ability to recover lost profits. And specifically it references the fact that -- and this is a quote from *Mor-Flo* at 1578. So he's thinking -- "we think in these circumstances the presence or absence of an acceptable non-infringing alternative does not matter. The question then becomes whether an established market share, combined with the other *Panduit* factors is sufficient to show state's loss" of reasonable probability -- to a reasonable probability."

And, again, Your Honor, that's at *Mor-Flo* at 1578.

THE COURT: Wait. So hold on a second.

MR. ASHKENAZI: Sure.

THE COURT: Yeah. I'd have to think about that paragraph and in context, but so go ahead.

MR. ASHKENAZI: And, Your Honor, that's one of the reasons why, and I get it, *Mor-Flo*, there's a lot going on in the case. The Federal Circuit in *Grain Processing*, when addressing what the ultimate holding of *Mor-Flo* is, literally says that you can recover lost profits in a market where there's acceptable non-infringing substitutes.

THE COURT: But I would think what *Mor-Flo* actually says is more important than what I think you could

basically call dicta parenthetical description in a later case.

MR. ASHKENAZI: Your Honor, and we could -- if you would prefer, we could also go through *Mor-Flo* itself. My point is that reading *Mor-Flo*, going through it, to the extent there's non -- if there are no acceptable non-infringing alternatives, then it becomes a two-player market. Then it becomes lost profits should go straight to the -- that there shouldn't be an analysis of market share. Their interpretation of *Mor-Flo* doesn't make any sense if we say that those are not acceptable non-infringing alternatives.

THE COURT: So, you know, parsing Federal Circuit cases, and not only these two that you're citing, but also *Mentor Graphics* and whatever else I'm going to get pin cites for tomorrow, you know, all these statements of law sometimes are hard to reconcile.

So I want to ask you the same question I asked the Defendant in a slightly different context or in a different context. What is the -- can you show me some case since *Mor-Flo* where the Federal Circuit said, Yes, we approve lost profits, even though there were acceptable non-infringing alternatives? Or if not the Federal Circuit, some District Court?

MR. ASHKENAZI: Your Honor, if I can, like my

colleagues on the other side, can I get back to you with the best case?

THE COURT: Okay. No, no.

MR. ASHKENAZI: I'll come up with the best one to provide -- and I don't want to -- one versus the other.

THE COURT: No, no. That's fair. I ask this question a lot in Section 101 cases. I don't necessarily ask it in other kinds of cases. But, yes, tomorrow close of business, that would be great. No argument in your letter.

MR. ASHKENAZI: Okay.

THE COURT: Okay.

MR. ASHKENAZI: Your Honor, I would -- let's take a step back, if we can, for a moment. Whether we talk about *Panduit* or *Mor-Flo*, the question has always been: But for the infringement, can the patentee show that they lost profits? That's the fundamental question here.

And when we're talking about it from a -- whether we talk about it under the straight but-for world or like the Federal Circuit recognizes, there's many different ways of looking at it. Whether it's *Panduit*, whether *Mor-Flo* falls under *Panduit* or not, it doesn't matter.

THE COURT: Well, so actually just in that regard, does your expert say that, because my impression is she doesn't, that a *Panduit* analysis is set out by just the *Panduit* factors without some modification leads to a

11:20:23 conclusion that you should get lost profits?

11:20:25 MR. ASHKENAZI: What Dr. Meyer starts off with 11:20:27 is recognizing that the test is a but-for test and that 11:20:32 there's -- that there is a but-for test. She then walks 11:20:37 through a number of analyses. She has a heading that talks 11:20:40 about the *Panduit* factors. And in there, she goes through 11:20:44 using her economic analyses.

11:20:47 And I would like to get into some of that 11:20:49 because that's, I think, the key here. We're losing the 11:20:52 forest through the trees on some of this, but she goes 11:20:54 through an economic analysis. And then she also says -- and 11:20:57 when she gets to *Panduit* Factor 2 and 4, she references the 11:21:01 concept of non-infringing alternatives being on the market. 11:21:04 Specifically we're talking about Dysport, Jeuveau, Xeomin, 11:21:08 those ones that are on the market.

11:21:10 And she then accounts for it. She never says, 11:21:13 Let's just apply -- I'm only going to apply *Panduit* 11:21:15 straightforward, and that's all that there is. In fact, she 11:21:17 even cites *Mor-Flo*.

11:21:19 THE COURT: Well, so on *Panduit* as it is, does 11:21:24 it fail *Panduit* because there are plenty of non-infringing 11:21:31 alternatives on the market?

11:21:32 MR. ASHKENAZI: Your Honor, I would argue that 11:21:34 the case *Mor-Flo* acknowledges that, depending on how you 11:21:37 want to read *Mor-Flo*, and this is straight up a legal

argument. We could talk about how Dr. Meyer, while she could use certain frameworks, it doesn't make a difference. But one would argue that *Mor-Flo* allows for *Panduit*, a modification or an understanding of *Panduit*.

THE COURT: And *Mor-Flo* talks about modifying *Panduit*.

MR. ASHKENAZI: Exactly.

THE COURT: But I'm asking you unmodified *Panduit*, there's no lost profits, right.

MR. ASHKENAZI: Right. Because unmodified *Panduit*, I believe, Your Honor, it's straight. If there's no -- if you show there's no non-infringing alternatives, then you're basically establishing a two-player market. That's what *Panduit* is talking about there. It's trying to narrow the framework and in which they're going to analyze the but-for world to make it easier to address.

Again, Federal Circuit has made clear that there's no one way to address lost profits.

THE COURT: Right. But if there was only one way and it was *Panduit* --

MR. ASHKENAZI: Then it would.

THE COURT: -- then you would not be here?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: Okay. That's helpful.

MR. ASHKENAZI: But -- sorry, go ahead.

11:22:36 THE COURT: No, no. You go ahead. Sorry.

11:22:38 MR. ASHKENAZI: And that's where, again, going back to the facts, what Dr. Meyer does -- and, again, we could -- if someone wants to quibble that she puts something under one heading versus another, there's no dispute that Dr. Meyer did a number of thorough economic analyses to show that but for the infringement, Allergan -- that Botox -- the Botox sales would have been made. And what she does is, Your Honor, she walks through sales. She goes -- sorry.

11:23:05 THE COURT: So do you regard -- the but-for analysis, but-for causation, which everyone agrees is a requirement, is that a separate thing from, for example, a *Panduit* analysis or a *Mor-Flo* analysis or are -- and that those things are just: Can you get actual damages or do those things, they're vehicles for determining whether there is but-for cause?

11:23:48 MR. ASHKENAZI: The latter, Your Honor. The question -- the fundamental question for lost profits damages is: But for the infringement, would you have made the sales? How can one go about doing that? There's a number of -- and that's what the courts that we're dealing with in all of these cases.

11:24:04 One way is to prove -- is to use the *Panduit* test. And it's acknowledged as one way.

11:24:08 Then you have *Mor-Flo* saying, Well, look. If

it's a -- if there's a multi-player market, but let's think about that concept. It's talking about a multi-player market, they're essentially competing with each other, right. But if you have a multi-player -- and if they were not infringing -- if they were not acceptable, you wouldn't be looking at them under *Panduit*.

But if it's a multi-player market where there are acceptable non-infringing alternatives, here's another way. We'll look at market share. Because you -- one would assume in that situation that had -- if there were a hundred sales and 30 would have normally gone to the patentee, 30 of those sales will go to the patentee, right. That's the overall big picture.

But these were all different methods of determining the answering that but-for question. And, again, as I mentioned in *Grain Processing*, even just going back to that paragraph, still on 1350, they're explaining there's not one way. There's a wide variety of ways.

That's the point here, Your Honor, is they're trying to -- my colleagues on the other side -- saying there's only one world. There's only one world in which you could recover lost profits. There has to be no acceptable non-infringing substitutes. And that's not the case.

Dr. Meyer then walks through a plethora of evidence showing and proving that sales -- both of --

Daxxify were made at the expense of Botox. And I'd like to just walk through some of that, Your Honor, because I think it's indicative, and it goes to the fundamental understanding of how Dr. Meyer is showing, whether we call it *Panduit*, *Mor-Flo* or just the but-for world, that top-line question. She says -- she relies on Revance's public statements that sales of Daxxify were made at the expense or taken from Botox.

Revance surveys where they show that 50 percent of their sales they say came from Botox. How -- that is but for, but for Daxxify being on the market, 50 percent of those sales would have been made by Botox.

She relies on Allergan's surveys where they went to health care professionals and they said, If you were going to give -- for these sales of Daxxify, what other product would have been given? Either it's -- if they were new customers, she addresses that, which I didn't hear much about today, but it was addressed in the papers. Or whether it's people who are on existing neurotoxins.

She then also goes to customer-level data saying, Here's actual customers. This is what they were purchasing beforehand. Now, they're purchasing more Daxxify and less Botox. Direct correlation.

All of this is sound, reliable economic theory that should be applied and permitted here under the Daubert

11:26:54 standard and, at a minimum, for summary judgment raise a genuine issue of material fact, Your Honor.

11:27:02 I want to just address a couple things. They mention that Dr. Meyer in her report, when discussing *Panduit* Factor 2, doesn't reference the words *Mor-Flo*. And I don't disagree the words *Mor-Flo* are not --

11:27:16 THE COURT: Yeah, yeah. You know, she's an economics expert. I don't really care. You know, to me the more cases the economics expert or, for that matter, the technical experts cite, the less I believe that this is actually their independent opinion.

11:27:35 MR. ASHKENAZI: Okay. Well, Your Honor, I would just point out Paragraph 66 does reference the concept of non-infringing alternatives under *Panduit* Factor 2. And as Dr. Meyer explained in her deposition, how you do the counting, she did in *Panduit* Factor 4. She literally says sort of what Your Honor was just saying right now, which is, I look at this from an economic perspective and whether you put it under this bucket or that bucket, they're interrelated. And she provides that economic theory and analysis within her report.

11:28:05 Your Honor, I just want to make a quick note on *Slimfold* because that was referenced. I believe *Slimfold* was a design-around non-infringing alternatives case, and that's why it's a separate and distinct entity. That goes

back to our conversation from earlier this morning.

If the --

THE COURT: Design-around being a reasonable royalty?

MR. ASHKENAZI: If the Defendant could have, like in *Grain Processing*, and then similar to what happened in *Slimfold*, if the Defendants themselves had an available design-around, that precludes lost profits.

And that's what happened with *Slimfold* when they talked about *Kinkaid* actually having an old method -- using an old methodology that didn't infringe. My point is it's not in the -- that case doesn't stand for the preposition that you're never allowed to recover lost profits where there's non-infringing alternatives on the market.

THE COURT: So is there a contradiction between *Slimfold*, as you've just described it, where presumably *Slimfold* took sales from the patentee, sales from the patentee and then they were able to beat the lost profits, I gather, by saying, Well, we could have sold our old technology, so there was a non-infringing alternative?

Why does that fit in with having a bunch of non-infringing alternatives and yet, you can say, Yes, we get lost profits? Why doesn't the presence of non-infringing alternatives because, as a matter of fact, *Slimfold* just as much took away profits from whoever the

patentee's presumably patented product was.

How do you reconcile that?

MR. ASHKENAZI: So, Your Honor, I see these as two separate and distinct points and I'd like to go through them one at a time. In the world when we're talking about the competitive landscape where there's multi -- well, other competitors on the market, the question is not can, in this case, Revance have sold their own design-around. But rather, would the sale have gone to any of those other three? Remember, we had the three competitors. Would the sale have gone to any of those other three? Because if they would have gone to any of those other three non-infringing alternatives, Dysport, Jeuveau and Xeomin, if it would have gone to them, then I can't give it to -- I can't give those lost profits to the patentee. That's one world.

The world in *Slimfold* or when we talk about *Grain Processing* is the situation where the patentee themselves, for maybe only economic reasons decided, I'm going to sell widget A which infringes, instead of selling widget B which I have the design and capability of doing. I just didn't do it.

And in that situation, the Courts have said, Look, we're not going to penalize the patentee because -- I mean, the Defendant or the alleged infringer in that case because they could have just swapped out with something they

already had in hand.

That's what *Grain Processing* and *Slimfold* is dealing with. But it's -- if we think about it in the but-for world, it doesn't address the question we're dealing with here which is: Would Dysport, Jeuveau and Xeomin have made sales? And what Dr. Meyer does in lengthy detail going through all of this evidence, and we laid some of that out for Your Honor, is show that the sale would have been made by us, by Botox, or 50 percent, I should be clear.

Your Honor, does that address your question on the differences that I've --

THE COURT: Well, you have identified a difference, I think. I have to think about it some more whether it --

MR. ASHKENAZI: Sure.

THE COURT: But I understand what you've said.

MR. ASHKENAZI: Yeah. I would also say, Your Honor, again, there's no one way to do things. In that case in *Slimfold*, they sort of addressed the old -- it says *Slimfold* -- this is on -- apologies, Your Honor. I think it's 1458.

*Slimfold* contends that the old hardware used by *Kinkaid* and other companies cannot be acceptable non-infringing alternatives because they do not have the advantages. And then the Court goes on to say they find

that it would be.

Again, it's *Kinkaid,* as the Defendant there, had the ability to provide a design-around. Again, separate and distinct, you know, we have all those issues in this case regarding the design-around from this morning.

But, Your Honor, with that, unless you have any other questions, I think that's all I wanted to touch on.

THE COURT: You know, I'm still thinking about *Slimfold* and the market here and your reference of you said something like didn't want to punish *Slimfold* when they could have sold a different product or, you know, their old version. And I guess thinking that, I thought lost profits was focused more on the patentee than the infringer.

MR. ASHKENAZI: That's where the *Grain Processing* line of progeny comes from, and that's what's being sort of addressed there, Your Honor, which is the availability of a design-around. And that's an exception to the -- basically, if the patentee puts forth evidence with reasonable probability that there would be but-for loss of sales, the Defendant can put forth this argument, this limited exception of an available, non-infringing alternative available being available to them.

That's that exception to the rule, but we're still looking at it under the broader framework of the but-for causation. That's -- and that -- there's an

11:34:32 exception, but that doesn't mean that all of a sudden you
11:34:35 can never recover if there is some other company's
11:34:39 non-infringing alternative on the market.

11:34:40 That's literally the process that's used by
11:34:43 *Mor-Flo* to say, We look at market share. We say where --
11:34:47 what percentage would have been made by the patentee. And
11:34:50 we're going to not penalize the patentee for the fact that
11:34:53 some other people may be on the market because -- and if we
11:34:56 maybe take a step back, what's the purpose? It's to make
11:34:59 the patentee whole, to a certain extent, right. It's
11:35:02 to -- it's really to allow for the recovery of damages where
11:35:07 the patentee would have been otherwise able to exclude the
11:35:10 other party from being on the market, to a certain extent.

11:35:13 Otherwise, we look at reasonable royalty. And
11:35:15 in that world, the patentee would have made 30 percent of
11:35:19 the sales, for example, if it had 30-percent market share.
11:35:22 They would have been able to make 30 percent of the sales.

11:35:25 They now are going to be penalized because
11:35:28 there's a competitor in a multi-player market? No. And
11:35:32 that's what the but-for analysis and *Mor-Flo* is going to.

11:35:36 Your Honor, to that point I just want to get to
11:35:40 this reference because Dr. Trexler -- sorry, Ms. Trexler,
11:35:43 I -- you know, when we asked her about some of the
11:35:45 information and data, she acknowledged that in Revance's own
11:35:49 surveys, they acknowledge -- and this is where I think we

cite this, Your Honor, it's DI-349, Exhibit 7. It's Ms. Trexler's deposition at 176, 11 to 23.

But she goes through and she acknowledges that 50 percent of Daxxify's sales came at the expense of Botox. And at this stage, whether it's we're looking at *Daubert* or summary judgment, to preclude an ability for us to be able to present that testimony to the jury, I think wouldn't satisfy either of those standards.

THE COURT: Okay. Thank you.

MR. VARUGHESE: Hello, Your Honor. Dennies Varughese for Revance. Just a few points.

Let me start with the *Slimfold* case. I disagree with how Mr. Ashkenazi characterized the facts of this case. I'd like to read a quote for the Court. It's from page, I believe, 1458.

"It is not established that all that the alleged infringer would not have made a substantial portion or the same number of sales had it continued with its old hardware or with the hardware utilized by any of the other companies."

So that was not focused just on the infringers' prior manufacturing. Even if it was, that's not a material distinction. The point is if there's an acceptable non-infringing alternative, it's available to the infringer because they made it themselves or through other companies

11:37:22 like we have in *Slimfold*. That defeats *Panduit* lost
11:37:25 profits.

11:37:26 Now, Mr. Ashkenazi, I think, made a bunch of
11:37:30 points about the actual figures and how Dr. Meyer arrived at
11:37:36 her damages figure. Our motion is not based on that. We're
11:37:40 not moving for summary judgment if her number is not right.
11:37:43 I get it. If it goes to trial, then she gets a chance to
11:37:45 put on her numbers.

11:37:46 Our motion is simple, as a matter of law,
11:37:49 because the key facts are undisputed. Animal-protein free
11:37:53 is required. Neither Botox nor the competitors have it.
11:37:58 Those are all equally interchangeable non-infringing
11:38:01 alternatives. *Panduit* two is defeated.

11:38:03 Now, both sides have tried to proffer some case
11:38:07 law. And I think our case law is on point because we've
11:38:11 shown multiple cases where the District Court denied lost
11:38:17 profits because the presence of acceptable non-infringing
11:38:20 alternatives.

11:38:21 I believe and I know Your Honor invited them to
11:38:24 provide you other case law, but he got up here and he only
11:38:27 talked about *Mor-Flo*. He didn't talk about the specific
11:38:29 facts of *Mor-Flo*. And, in fact, the quote that he cited
11:38:31 from *Mor-Flo* began with, Under these circumstances, we do
11:38:36 not need to do X, Y and Z. And that goes back to my point
11:38:39 that *Mor-Flo* presented a special factual situation, and you

can't read that case divorced from the facts of that case.

THE COURT: Well, that's the reason -- because I still have that open to that page. That's the reason why I said I had to think about this. I mean, I don't know who's right, as I sit here right now, but --

MR. VARUGHESE: This is a purely legal dispute, Your Honor. It's a matter of law. There's no facts in dispute. It's whether or not they can take this issue to trial and present it to a jury when there's substantial non-infringing alternatives.

And, you know, I understood your point about experts don't need to cite case law, and I fully agree with that. The point that I was trying to make was when she wanted to apply the *Mor-Flo* analysis, she was clear to say it. It wasn't like a mistake of a heading. She said, I'm going to do *Mor-Flo* analysis to arrive at the numbers I know.

But when she discusses that second *Panduit* factor, she didn't have to name *Mor-Flo* by name, but she conducted no analysis to say, Hey, despite the presence of these non-infringing alternatives, under this other rubric I don't need to consider it. Because it probably would have been legal error and we would have cross-examined her on it.

Now, after the fact when presented with the summary judgment motion saying, Look, you have committed a

fatal error here, you want to allege lost profits under these extraordinary circumstances when everyone doesn't infringe, and the patentee doesn't practice the patent. Any sales you can't tie in any possible way to the value of the patented features, and you still want lost profits, that's a fatal error. And they can't walk that back like a get-out-of-jail free card by simply relying on *Mor-Flo*.

If there was any cases, and I look forward to seeing what they find that says, Under these circumstances, *Mor-Flo* can completely do away with that second requirement of *Panduit*, I would be really interested in reading that case.

THE COURT: I take it from what you've -- never mind. Go ahead.

MR. VARUGHESE: With *Grain Processing*, I was also a little surprised that Mr. Ashkenazi led with that because, number one, *Grain Processing* didn't apply to *Mor-Flo*. In fact, *Grain Processing* denied lost profits because of the existence of an acceptable non-infringing alternative.

The fact that that non-infringing alternative could have been, you know, supplied by the infringer itself, that is not a material distinction. The point is rather than infringing, is there something else that could have taken the place of that that's acceptable?

And that case is even more extreme than our case because the District Court denied, and the Federal Circuit affirmed denial of lost profits based on a nonexistent potential available acceptable non-infringing alternative. This case is a much stronger case for denying lost profits under prevailing law.

And, Your Honor, at the end of the day, nothing that they've said here accounts for that important fact that we've seen over and over again is that lost profits has to be tied in some way to the value of the patented features. It can't be based, like I said, on marketing or brand recognition, other things. That is not what the but-for test asks.

Like I said, it could be possible that if Daxxify wasn't around, some patients would use Botox instead of the alternatives. But the but-for test -- it's not turned on the Defendants. We don't have to prove that Botox would have gotten zero sales.

The point is was there any reason that patients would gravitate towards Botox other than the alternatives, and there is none. The but-for test is their job. It's not ours. They can't rely on sales that are unwarranted and untethered to the patented features.

THE COURT: You know, I should have probably asked Mr. Ashkenazi this, but let me just ask you. In

Dr. Meyer's analysis, the first of the *Panduit* factors is demand for the patented product. What did she do about this one?

MR. VARUGHESE: For that factor?

THE COURT: Yeah.

MR. VARUGHESE: So, Your Honor, I think that is a less important issue, but I will say she said Factor 1 is met because there's demand for the product. Now, the case law --

THE COURT: The demand for the product being Daxxify's product?

MR. VARUGHESE: Right, for the patented product. But as *Mentor Graphics* showed, that is a less exacting scrutiny than *Panduit* two. It just says: Is there a market for a product that practices the patent?

THE COURT: But what sense does it make to have -- I mean, are you saying -- when I looked at this or when I was thinking about this, demand for the patented product seems like it ought to be demand for the patentee's product, not the infringer's product if they're different.

MR. VARUGHESE: Well, normally, yes, right. In the case of typical lost profits, the patentee also practices the invention.

THE COURT: Right.

MR. VARUGHESE: The point is it's demand for the

patented product. That could be demand for the patentee's product and the infringing product, or it could be just the infringing product if it competes with the patentee's product, even though it's unpatented. So it's a less exacting inquiry.

We don't think that she did an adequate job establishing that because all she has is, Well, Daxxify has some sales. I don't think that's enough to show --

THE COURT: Okay. But that's --

MR. VARUGHESE: -- it's different.

THE COURT: -- a -- I understand why you're not raising that. But the idea that she could establish that by talking about demand for Daxxify's product, you're okay with that?

MR. VARUGHESE: Yeah. Can we go to that *Mentor Graphics*, the single one?

So in *Mentor Graphics*, Judge Moore talks about the different purposes that each factor plays. She said Factor 1, demand for the product looks at the product as a whole. Daxxify, for purposes of this motion, infringes. So it's the patented product.

I question whether she's shown actual demand, but that's all she has to show that Daxxify, there's a demand for Daxxify.

But then Judge Moore -- that's fine right there.

THE COURT: And the relevance of demand for Daxxify in this kind of analysis would be that it provides a basis for thinking you could draw away sales from other products?

MR. VARUGHESE: That's correct. So --

THE COURT: In other words, in the normal *Panduit* analysis, I would have thought the demand for the patented product is essentially if Plaintiff -- you know, would Plaintiff have been able to make more sales if the Defendant wasn't or wasn't there. So it seemed like, depending on whose patented product it is, that you're using it for different things?

MR. VARUGHESE: No, and I'll explain. I actually spent more time reading this then I care to admit, but it all goes towards the but-for test.

So Mr. Ashkenazi is right. The ultimate question is a but-for test. *Panduit* is one of the tests that you can use to establish it. You have to show all four and they work in tandem.

You've got to -- and that first prong also goes to show that lost profits has to be tied to the patent. So is there demand for the patented technology? No other alternatives that can serve as siphoning sales away from the patented technology, that the patent owner has a capacity to meet that demand.

THE COURT: Right.

MR. VARUGHESE: Right. And then they can actually prove the damages specifically. So that's -- taken in total, it accomplishes two things. It shows the but-for test and all four elements have to be met, but it also connects that but-for test to the patent.

THE COURT: Okay.

MR. VARUGHESE: So that's the demand prong.

THE COURT: Thank you.

MR. VARUGHESE: Thank you, Your Honor.

THE COURT: All right. So I think we're back to Plaintiff now.

MR. ASHKENAZI: Yes, Your Honor. Just on that last point, if I can?

THE COURT: Yes, sure.

MR. ASHKENAZI: Dr. Meyer does go, and through her analysis, also link explaining how sales in the main marketing messages for Daxxify relate to duration and APF, which are components or properties that result from the patents.

THE COURT: Right. That's her surveys and such?

MR. ASHKENAZI: Exactly. I just want to make sure the record is clear on that.

THE COURT: Okay.

MR. ASHKENAZI: Your Honor, at this point we

would like to address our *Daubert* two.

THE COURT: Right.

MR. ASHKENAZI: Your Honor, I apologize. *Daubert* three.

THE COURT: Oh, right. I understood what you meant.

MR. ASHKENAZI: Yeah. Well, I have to say the numbers are getting to me a little today, so apologies.

THE COURT: Yes. Okay.

MR. ASHKENAZI: Okay. Your Honor, this is -- I'd like to start off with what we assert is the unreliable way that Ms. Trexler uses the price premium in her reasonable royalty analysis.

THE COURT: So I understand some of this and it factors in the many different things. But in terms of just history, Daxxify was launched when?

MR. ASHKENAZI: I think they were approved in September 2022.

THE COURT: Okay. And launched more or less immediately thereafter?

MR. ASHKENAZI: We could quibble about the days and what exactly was done, but let's call it within the next three to six months, Your Honor.

THE COURT: Okay. Actually, someone must know: When did Daxxify launch?

MR. ASHKENAZI: December, Your Honor.

THE COURT: December 2022?

MR. ASHKENAZI: Yes.

THE COURT: Okay. And so as I understood it, the then sales price of Daxxify was set by Revance as 17.5 percent more than whatever Botox was. And that continued for eight months and then the price was lowered relative to Botox.

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: To the same price as Botox, more or less?

MR. ASHKENAZI: I believe that's correct, Your Honor.

THE COURT: And so that would take us to, you know, August 2023 or thereabouts. And we're now in October of 2024. It's always bad not to know where you are, so more than a year later. Is the sales price still essentially the same as Botox?

MR. ASHKENAZI: Your Honor, I think that may be referenced in these upcoming reports in terms of the supplement. I don't have the answer right now on where it stands.

THE COURT: Okay. And that's fair. More than fair.

But when the experts were doing their reports,

how long -- which presumably were some time?

MR. ASHKENAZI: December of 2023 and March of 2024. And then there was --

THE COURT: And so at least in the expert reports, Daxxify and Botox continued to be sold at -- with there being no price premium that was more or less agreed to by the experts for both sides?

MR. ASHKENAZI: Your Honor, I don't know if that was due to a lack of further information given that we -- once those -- you know, once we put those opening reports in and fact discovery closed, that sort of stops the spigot in terms of knowledge.

THE COURT: Okay.

MR. ASHKENAZI: That spigot opened up a little, so...

THE COURT: So in the world of Daxxify and Botox, do insurance plans reimburse customers for these treatments or is this, I don't know, elective surgery that only the rich can afford?

MR. ASHKENAZI: So there's two worlds. There's the cosmetic side and then there's the therapeutic side.

THE COURT: But I thought we were mostly on the cosmetic side here.

MR. ASHKENAZI: That mostly is true, Your Honor, yes. And that's not reimbursed by medical, by --

THE COURT: The therapeutic side is reimbursed by a lot of insurance?

MR. ASHKENAZI: Yes.

THE COURT: And in terms of what we're dealing with to date, what's the ratio between -- because I understand -- I think I understand cosmetic -- actually the therapeutic side, that's covered by at least one of the patents; right?

MR. ASHKENAZI: So if I can, just for a moment, Your Honor, it may help. I'm going to take a step back here and try to answer you.

THE COURT: Sure.

MR. ASHKENAZI: Daxxify didn't launch their product on the therapeutic cervical dystonia so we're already in the report stage of the case. Sorry. The point is is that for -- while we do believe we're entitled to have recovery of reasonable royalty for sales on the therapeutic side, that's not really going to be the focus in terms of how that's being reimbursed. Because, again, that occurs -- that's a subsequent event after the initial reports go in.

THE COURT: All right.

MR. ASHKENAZI: But to directly answer your question, they would be reimbursed -- for example, if the patient came in, has cervical dystonia, needs to take -- whether they take Daxxify or Botox, that would be reimbursed

to a certain extent by whatever medical plans, assuming they cover it.

THE COURT: All right. So in the record the experts relied -- did Daxxify rely on some kind of market research to set their initial price?

MR. ASHKENAZI: So, Your Honor, that's part of the problem here, right. And I would invite my colleagues to say how they -- Revance decided to set the price.

THE COURT: Well, I mean, either it's in the record or it's not.

MR. ASHKENAZI: So I will tell you what happened, what my understanding of the facts are here, Your Honor, which is when you are entering into a multi-player market, there's a number of factors that go into playing how they want to price their product. If they price it really high, are they going to be able to get market penetration? There's a lot of different factors.

THE COURT: Sure.

MR. ASHKENAZI: And especially in that first one, right, when you have to now -- you have -- Botox has been on the market for almost 30 years. You have the other players that have been entrenched. In order to displace that, a company like Revance is going to make a determination. I could price X in order to get my sales here and they're making a value. They have a value

11:53:44 preposition of how they want to do this.

11:53:46 THE COURT: Proposition.

11:53:47 MR. ASHKENAZI: Proposition. Thank you.

11:53:49 THE COURT: Though, I like a value preposition
11:53:56 more.

11:53:56 MR. ASHKENAZI: But the point is they make a
11:53:58 valued determination of how they want to do that. And then
11:54:01 it may be where they go and eight months pass, and they're
11:54:04 like, Look. Well, we're not getting enough market
11:54:07 penetration. We think we could get more if we just dropped
11:54:10 the price down. They then get their market penetration and
11:54:13 then in six months from now or a year from now, they raise
11:54:13 the price.

11:54:17 That's what happens. Companies don't stick with
11:54:19 one price. It's a dynamic. They did make a determination.
11:54:23 Whatever economics they had to say at the time of launch
11:54:26 which, again, is now we're talking about, we'll call it
11:54:30 December of 2022, that's the -- they made a determination at
11:54:34 that point in time. That's the -- that's one of the
11:54:37 problems here, Your Honor.

11:54:38 And I could go to the second part about -- the
11:54:40 second part of our motion which is this, Ms. Trexler says
11:54:44 that the hypothetical negotiation date should be in 2011.

11:54:48 THE COURT: Right. So just --

11:54:53 MR. ASHKENAZI: Sure.

THE COURT: -- on that subject, does Ms. Trexler have an opinion of the hypothetical negotiation date is in 2019 or 2022?

MR. ASHKENAZI: She did not provide an opinion on what the reasonable -- what the price premium would be understood to have been in 2019 when we say the date should be, which is the subject of our motion, Your Honor, or even later. She only looked at actual numbers and not what would have been understood at the time.

THE COURT: But her opinion is tied to the 2011 date?

MR. ASHKENAZI: Yes.

THE COURT: She doesn't have an opinion tied to any other date?

MR. ASHKENAZI: My read of it is that. I'm sure my colleague on the other side will say that she said my numbers wouldn't have changed if it was a later date.

THE COURT: Okay.

MR. ASHKENAZI: But the hypothetical negotiation --

THE COURT: And I'm sorry, so go back to where you were. You were talking about the price premium and you have a problem. So tell me about it. I think I under --

MR. ASHKENAZI: Right. Your Honor, if we can -- since we're providing this groundwork right now, I'm going

to touch the back end of the motion, first of all, so it's all fresh in the Court's mind, and then I'll move to the first point.

THE COURT: Okay.

MR. ASHKENAZI: So for a hypothetical negotiation, we need to consider what the negotiators would have understood at the time of the hypothetical negotiation. And simply put, Ms. Trexler just uses the price premium from that first eight months and doesn't consider at all what the negotiators would have thought at the time of the hypothetical negotiation.

According to her -- that hypothetical negotiation in 2011, she made no effort to say what they would think the price premium is. She doesn't make an effort to say what the price premium would be in 2019. She literally -- she actually states that, "I have made no determination on what it would be."

She also then doesn't consider what the hypothetical negotiators -- what the negotiators would have thought the price premium would be for the lifetime of the patents. Why are we only looking at the first eight months when Revance is the one who arbitrarily sets that price? If Revance set their price in the first eight months at zero percent price premium, because they wanted to get sales as fast as they could, they want -- then all of a sudden the

price premium goes to zero, according to her, which should be is the analysis of the entire time period of the patent life, which she acknowledges and says that she didn't do.

In fact, I have this here. Your Honor, this is at DI-349, Exhibit 7, which is Ms. Trexler's deposition, Lines 202 -- Page 202 and -- 202 and 201. She explicitly recognizes that she made no effort to determine what the price period would be over the lifetime of the patents.

It's not permissible to simply say, Okay. We'll use the book of wisdom. The exercise should have been, to the extent that a price premium is being applied, which I'll get to in a moment, but to the extent a price premium is going to be applied, it should be what the hypothetical negotiators would have thought at the time. Can you potentially supplement that and have other probative information about what happened later from the book of wisdom? Maybe. Maybe. But in no way, shape or form can you only take facts that were known after -- that were after the hypothetical negotiation without any attempt at all to decide or to discuss what happened during the hypothetical negotiation date.

And that is the fundamental -- one of the fundamental problems with Ms. Trexler's use of the price premium.

If Your Honor doesn't have any questions on

that, I'd like to go to --

THE COURT: So if -- and just on the subject of the hypothetical negotiation, your expert or Dr. Meyer says 2019. And that's based on the disputed date of when they had some commercial -- when they had some drug batches that they say were protected by the safe harbor and you say were, for commercial purposes, or I may not be summarizing exactly right.

That's what your expert says; right?

MR. ASHKENAZI: Yes. Yes, Your Honor. The day that the first batch, the drug substance batch DSO027, that time period when it was made that went into a commercial batch that was sold was in 2019. And that's the date that we assert.

THE COURT: And when was it sold?

MR. ASHKENAZI: It was sold in 2022 when it launched, December or whether it's December 2022, January 2023.

THE COURT: And the way I saw from the papers was your expert's opinions are flexible enough so that if it turns out there was a safe harbor in 2019, everyone agrees when it was actually sold in 2022, that's not protected. And so her opinions would be the same?

MR. ASHKENAZI: Yes.

THE COURT: All right.

MR. ASHKENAZI: Your Honor, if I can on that -- sorry, please finish.

THE COURT: No, no. I'm finished.

MR. ASHKENAZI: So just on that point, with respect to the 2011 date, I just want to be clear, and I know it's not the subject of this motion, but just because that was mentioned, I don't think anyone in here is disputing that that 2011 batch is protected by the safe harbor.

THE COURT: Yeah, yeah. Well, that's -- I was going to bring that up, so I'll just bring it up now which is Ms. Trexler needs to write -- Defendant needs to do something very quickly to have a hypothetical negotiation date that can be in 2019, or it can be in 2022, or it can cover both, but there's no way that it's 2011. And time is short between now and trial, so I think you need to expedite a supplemental opinion that covers whatever you need to cover or, otherwise, you're not going to have an admissible opinion from your damages on a reasonable royalty.

MR. VARUGHESE: Understood, Your Honor. Thank you.

THE COURT: Okay. Go ahead.

MR. ASHKENAZI: Your Honor, we can leave that for another time.

Okay. So if I can shift to the first issue we

had with the price premium, if that's okay with you?

THE COURT: Yeah. Sure.

MR. ASHKENAZI: Okay. So our concern is that sometimes in certain situations, a price premium is a proper methodology for doing an apportionment. In other situations, you could use surveys. The problem is that Ms. Trexler uses both at the same time and multiplies them by each other to get an artificially low reasonable royalty amount.

THE COURT: Well, so the surveys, I take it -- so the survey, there are one or more surveys from which she draws the conclusion that duration is 20 percent and non-animal is eight percent. The survey, was that designed -- I take it that the survey was designed independently of the price premium, and it was essentially why people buy Daxxify?

MR. ASHKENAZI: That's exactly right, Your Honor, and there were two surveys that are being evaluated by Ms. Trexler. Both are looking at: Why do people buy the product? So they're looking at the attribute and one of those --

THE COURT: They're looking at the attributes of the product as a whole?

MR. ASHKENAZI: Well, and then they break it down, right, and some are duration. Some are animal-protein

12:02:43 free. And that's what Ms. Trexler goes in to parse out: What's the value of those attributes that we call -- the ones that are attributed to the patents? What are those attributes -- value of that to the overall product, not to the price premium.

12:02:57 And that's the fundamental problem here is to say, Okay. Why are patients -- why are people buying Daxxify? Twenty percent -- I'm just using Ms. Trexler's numbers.

12:03:07 Your Honor, sorry. Go ahead.

12:03:08 THE COURT: And I'm sorry. I think this was -- did Dr. Meyer express any opinions on what Ms. Trexler did?

12:03:22 MR. ASHKENAZI: Yes. Dr. Meyer thinks it's fundamentally flawed from an economic perspective.

12:03:26 THE COURT: Did you, in your briefing, cite any of that?

12:03:31 MR. ASHKENAZI: I am not sure, Your Honor. I would have to check.

12:03:34 THE COURT: Okay.

12:03:38 MR. ASHKENAZI: Maybe one of my colleagues could do that now a little faster than I could.

12:03:41 THE COURT: The reason I ask is because I don't think you did. And, you know, it's suspicious to me when all I hear is the lawyers saying why the other side is wrong, why the other side's expert is, you know, having

methodological flaws or otherwise doing unreliable things and --

MR. ASHKENAZI: So, Your Honor, someone is better than I am. On Page 36 of our opening brief.

THE COURT: Hold on a minute. Page 36, yes.

MR. ASHKENAZI: There about two, four, six lines down, we have a citation to "Meyer reply."

THE COURT: Okay. All right.

MR. ASHKENAZI: Just for yourself, Your Honor, that's going to be DI-349 at Exhibit 9. And there's a citation to 9C-2.

THE COURT: Yeah, I see that.

MR. ASHKENAZI: And I will say it states here, "Her royalty analysis is fundamentally flawed and unreliable, including her use of price premium and her improper use of apportionment factors." By example, and she just gives one example, and then we also cite Paragraph 57, Your Honor.

And then over here it explains how, which is on Page 34 of the document, Your Honor, talks about her calculating the reasonable royalty rate based on the price premium. And it provides an economic -- it doesn't make sense from an economic perspective.

She goes on through the next couple of paragraphs looking at Page 34 through 37 of her report which

12:05:46 is part of the record right now, Your Honor, to address the fundamental flaws here.

12:05:50 THE COURT: Okay. Well, that's helpful. Thank you.

12:05:54 All right. Go ahead.

12:05:56 MR. ASHKENAZI: To go back to the point Your Honor raised, though, the surveys were not looking at the price premium like counsel for the Defendants state right now. So when we take a look at what she does, there's an apportionment done. And, again, we could quibble on whether that number is accurate or not from an -- at trial. But they cite -- Ms. Trexler says that the relative contribution to overall Daxxify for the manufacturing APF is eight percent and for the formulation is 20 percent.

12:06:27 There should be no further apportionment. That is the value of the patented feature to the overall product. And the inquiry should end there. It's by doing this -- sorry.

12:06:37 THE COURT: No, no. Sorry, I'm -- keep going.

12:06:40 MR. ASHKENAZI: Okay. It's doing this sequential methodology. That's the problem. Had -- and, again, there's no one way to do reasonable royalty. Had Ms. Trexler said, I'm just going to go forward with the price premium because I'm going to say the price premium which, again, I have explained why I disagree with her use

of the price premium, or how she -- what the number she chose. But if she used price premium by itself, maybe we wouldn't be here. But she -- the sequential use artificially lowering it down.

And, Your Honor, we had this -- an image. But you see we take what should be, according to Ms. Trexler, a 28-percent reasonable royalty, gets dropped down to 4.9 percent. And to put that unsound methodology before the jury to confuse them to think that there is scientific analyses and principles that allow for the starting point of the reasonable royalty to be 4.9 percent when it really should be 28 percent, according to Ms. Trexler, that it's just going to cause confusion and it's unreliable. It doesn't --

THE COURT: Well --

MR. ASHKENAZI: Sorry.

THE COURT: So I realize this is not really germane to the argument you're making, but in the survey, besides for the 28 percent that related to duration and non-animal, what was in the other 72 percent?

MR. ASHKENAZI: So there's a number of things like brand awareness, you know, the strength of the brand, something being new, the product being new. And I can pull up the surveys themselves.

There were a number of other things, factors of

why you would imagine a patient may decide to take it, may decide to choose Daxxify over Botox.

THE COURT: And the patients, the people who were taking the survey were the patients, not the doctors that the patients had --

MR. ASHKENAZI: I apologize, Your Honor, because there are different surveys.

THE COURT: Okay.

MR. ASHKENAZI: Sometimes it's a health care professional who is answering based on their conversations with their patients or consumers here. For example, if you go to a health care professional and say, Okay, for your patients that were being prescribed, you know, why did they choose Daxxify, because they're the ones that have the information and they're easy to access. It's harder to access patients. But the point being that it's a sound methodology used in the normal course of business to evaluate the markets in these situations, Your Honor.

THE COURT: All right. And so does Dr. Meyer, your expert, does she basically apportion for the 28 percent and just say price premium irrelevant?

MR. ASHKENAZI: So Dr. Meyer looks at the *Georgia-Pacific* factors, Your Honor. So I don't want to sort of simplify what is an extensive report, but essentially she does an apportionment and she does different

apportionment methodologies for the formulation patents as for the manufacturing.

But let's just take the formulation patent. She'll look at those surveys as a basis, as a starting point, not just one survey, but a number of different things. And then she will upward or downward adjust based on the *Georgia-Pacific* factors. And she goes through that analysis.

But that becomes -- because the survey provides -- in that situation, it provides an understanding of how valuable that patented attribute is -- I mean, the attribute is to the product. And that's what we're trying to figure out when we look for the reasonable royalty analysis.

THE COURT: Do --

MR. ASHKENAZI: So the short answer is, Your Honor, I think you were close, but I didn't -- I was afraid of an oversimplification.

THE COURT: Okay. And how do the reasonable royalty -- so there's two patents that are -- because they're not part of the conception reduction to practice, they were mentioned a lot less in the briefing. Two of the patents have to do with how you make the products; right?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: And then three or five, however --

three, I guess, have to do with formulations that we talked about earlier. How do the experts address the fact that it seems like some of the -- two of the patents are probably what lead to the other three patents to come up with a reasonable royalty that doesn't overstate or understate the case in terms of the patents being addressed to different things?

MR. ASHKENAZI: Sure. And, Your Honor, that is a pretty complicated question. I know --

THE COURT: Well, give me the very simplified answer.

MR. ASHKENAZI: So the simplified answer is that when you look at the manufacturing patents, one of the key -- sorry, when you look at the formulation patent, one of the key attributes as a result of the patent is a longer duration of action. In other words, Daxxify is listed as having two times the six-month duration --

THE COURT: Right.

MR. ASHKENAZI: -- of action. Duration, sorry. I'm confusing my cases, Your Honor. A six-month duration as compared to the other competitors, for example, Botox, which has three months.

That is an attribute that, as you can imagine, would drive sales. People want to take something less, so they take in the six -- in a 12-month time period, they take

two injections of Daxxify as opposed to four or, you know, four of Botox.

That is a straight-up driver of sales. And the question is: How does that -- how do you account for that? That's where the surveys would come in.

And there's an analysis. They take the surveys, the economists. They will then work through the surveys and say, Okay. Here's how many patients -- this is the percentage of people who -- percentage of customers that are having their sales driven by duration. The percentage of sales that are driven by duration and they come up with a number.

As I pointed out to you, if you look at Ms. Trexler, she has a 20 percent. If you look at Dr. Meyer, I'm going by memory right now, Your Honor, but I think it's about 24 percent. Okay.

The manufacturing patent is a different story. As you can imagine, manufacturing patents, it's not just the attributes that are going to be -- it's not just the finished product, but it's the steps in which you do the manufacturing. There's not one methodology to do a reasonable royalty, and Dr. Meyer points out. And what she says is that had they had to design around and put a new methodology in to design around that, it would have cost them 12 to 18 months of a time period of a delay.

And that delay is money. It's money lost. It's not on the market because they have to design it, implement it, test it, make sure it works and then get on. And as cases like the *AstraZeneca* case and also, for example, Your Honor like the *Prism* case, lost opportunity cost is something that those people involved in the hypothetical negotiation would consider. If I'm an executive at a company and somebody tells me that I'm not going to be able to be on the market -- sorry.

THE COURT: Well, so the point is Dr. Meyer has one number for the two manufacturing patents that is completely independent of whatever the number is for the three formulation patents?

MR. ASHKENAZI: Yes, and because the methodology is using the economic theories that are, you know, readily available and commonly used by economists, you look at them differently because you have duration as one thing driving sales. Other thing would be the design-around process.

THE COURT: And does the lost profits only overlap with the three formulation patents?

MR. ASHKENAZI: No, the lost profits in general, Your Honor, the way that it's set out is for this time period, and there's lost profits through whatever our accounting period is for trial. Afterwards there's going to be a running -- the experts are applying a running

reasonable royalty rate for that time period. Because as we pointed out, we have direct evidence of sales being lost, and it's going to cover both patents meaning -- and, again, as I pointed out earlier, Your Honor, part of their marketing message is duration, APF. That's part of their marketing metrics to drive the sales.

Those sales get -- the lost profits sales get taken out of the picture of reasonable royalty. So they're not -- those vials would only be lost profits vials. And then the reasonable royalty would then have a percentage for both manufacturing and formulation patents.

THE COURT: And in terms of, roughly speaking, the reasonable royalty leaving -- assuming there were no lost profits, the reasonable royalty -- you know, roughly what percentage is the formulation patents relative to the two manufacturing patents?

MR. ASHKENAZI: Your Honor, if I'm going by memory, formulation patents are 24 percent. The manufacturing patents, there's two different expiration dates. So those are combined because there's an -- you know, because --

THE COURT: Sure.

MR. ASHKENAZI: -- the time periods overlap. And I think the range is from 12.5 to 20.5 depending on certain scenarios analyses.

THE COURT: And those are --

MR. ASHKENAZI: Sorry, 12.5 to 20. So if we're looking at the high end for both, it's 20 for manufacturing and 24 for formulation.

THE COURT: And maybe you addressed this and I just missed it, but does that mean that essentially when you have one vial manufactured by the method, you're going to get a 40-percent royalty on the vial?

MR. ASHKENAZI: Yes.

THE COURT: Okay.

MR. ASHKENAZI: At the top end, it drops down and --

THE COURT: Right, right, right. We're just -- I'm just trying to get oriented.

MR. ASHKENAZI: Sure.

THE COURT: Okay. I'm sorry.

MR. ASHKENAZI: Your Honor, can I pass up some water?

THE COURT: No, I'll take water that's not tainted by one party's interest, but thank you for the offer.

Go ahead.

MR. ASHKENAZI: Your Honor, I think that addresses our *Daubert* number three.

THE COURT: All right.

12:18:04 MR. LaROCK: Good morning again --

12:18:09 THE COURT: Mr. LaRock.

12:18:10 MR. LaROCK: -- or afternoon. All right.

12:18:13 I'm going to start with the price premium issue because that was --

12:18:16 THE COURT: Sure.

12:18:16 MR. LaROCK: Your Honor had the first questions. So the book of wisdom permits Ms. Trexler to use post-hypothetical date information. That comes straight from the *Sinclair* case and the *Lucent Techs* case. In fact, the *Lucent Techs* case explicitly permitted the use of post-hypothetical date information to understand the extent to which the alleged infringer utilizes the invention.

12:18:38 And that's exactly what Ms. Trexler did here. She used the price premium between Daxxify and Botox to find the value of the features of Daxxify that were unique to Daxxify. And then from there, determined, using the market survey data, what percentage or what portion of that price premium that was unique to Daxxify related to the patents and what portion related to something else.

12:19:02 THE COURT: And when you say "the price premium unique to Daxxify," what you mean is just the price premium of Daxxify?

12:19:11 MR. LaROCK: Yeah, the price premium of Daxxify, but the premium is -- you know, would be a value of the

market demand and the market valuation for the features of Daxxify that are unique to Daxxify as opposed to Botox or some other competitor.

THE COURT: And in the surveys, are there any features -- so I take it in the surveys, some portion of this is brand awareness and that's unique to Daxxify, too?

MR. LaROCK: Well, I mean, there would be brand awareness relating to Daxxify, or Botox or whatever, what have you. So the whole idea of her apportionment analysis was to identify what features are unique to Botox -- what features are unique to Daxxify because Botox doesn't practice these patents, right.

The allegation is Daxxify does, so let's assume Daxxify does. So only by looking at the price premium of Daxxify can you find what the market is valuing for features of Daxxify that might include ones related to the patents, but might include others.

THE COURT: So the thing -- the market price of Daxxify or the price of Daxxify, at least in the beginning, that's not really set by the market; right? That's set by Revance.

MR. LaROCK: Yeah, that was set by Revance. I think there's some suggestion in the record that that was based by underlying data.

THE COURT: I'm sure they, you know, have a

theory, but it's not as though it was set by the market. I mean, I suppose. And, in fact, if it turns out that after eight months, it went from 17.5 percent to zero percent, which is what I understand happened, how does -- based on the briefing, I understand Ms. Trexler just ignored the zero percent.

Is that right?

MR. LaROCK: Well, she acknowledged that it existed, but then took a -- but because considering that information would have even further lowered the royalty.

THE COURT: Well, it would have lowered it to zero; right?

MR. LaROCK: Well, I mean, over the life of, you know, taking both the -- when there was a price premium and then considering when there was not a price premium, those two things in conjunction would have further lowered her royalty opinions. And so she said, I want to do a conservative analysis. I want to do a conservative estimate here, and so I'm not going to consider the zero because that would further lower my opinions. And I'm just going to consider where there was a price premium. So she only considered that date.

And I think that -- I mean, the underlying rationale there and whether that was a proper conservative estimate, I think that's an issue for the jury to decide

whether they agree with that.

THE COURT: Well, so if Daxxify had decided to enter the market and gain a large share by undercutting the price of Botox and the other competitors and priced it ten percent less, would they owe you a royalty?

I mean, would -- I mean, sorry. I'm confusing myself here.

It seems pretty arbitrary to base any kind of economic analysis on a variable that is not an established thing as evidenced by the fact that after eight months, they decided it would be better to not have a price premium.

MR. LaROCK: Well, I mean, I think it is a reliable opinion just simply because the price premium may go to zero just simply means that the market is not -- you know, the market cannot withstand or it cannot hold that price premium for the features that are unique to Daxxify. I think that's sound economics.

Let's just say, you know, you wanted to come into the market at X price because you thought your feature would demand that premium. That didn't happen, so the --

THE COURT: But doesn't it work just as well --

MR. LaROCK: -- unique features --

THE COURT: -- that you say, Hey, we're coming in at the same price and we've got this extra bell and whistle, a pretty good bell and whistle. And they start to

12:23:56 get customers. How -- I mean, they could have -- you could have valuable features and yet not have a price premium; right? I mean, valuable patented features.

12:24:16 MR. LaROCK: Perhaps, right, in this world, but you know, I don't -- you know, to use the analogy that my colleague used, you know, I don't want to look at the trees and not, you know, necessarily see the forest here. Dr. Meyer also used a price premium approach. She, you know, took that approach as well, you know, kind of -- you know, also putting forward a sound economic opinion as opposed to that, right.

12:24:40 So, you know, to say that Trexler did not put forward a sound economic opinion because she used the price premium, that same criticism would apply to Dr. Meyer.

12:24:48 THE COURT: And did Dr. Meyer use a price premium based on whatever Daxxify's selling price was for the first eight months?

12:24:55 MR. LaROCK: I believe that she did, Your Honor.

12:24:57 THE COURT: So she used 17.5 percent?

12:25:00 MR. LaROCK: The exact number, what it was, I'm not going to be able to tell you right now, but she definitely used the price premium. And I think she even factored in the later price premium where it went to zero.

12:25:12 THE COURT: Okay. Well, so the methodological question perhaps that the Plaintiff is raising has to do

with what -- they didn't say it today, but what they, I think, called double counting in the brief where they did the apportionment based on surveys. And I take it or you did the apportionment based on the surveys, as I gather they did, too.

And but you applied that to the price premium and I think you said in the briefing there were other things besides the patented features --

MR. LaROCK: Right, onset.

THE COURT: -- that contribute to Daxxify's sales. And I'm wondering if you can tell me, because I'm imagining -- so what -- is there anything in the hundred percent before the experts got around to apportioning it that was sort of a common feature that --

MR. LaROCK: That might be --

THE COURT: -- wasn't a reason to buy Daxxify as opposed to just buy one of the five competitors on the market?

MR. LaROCK: So I think, if I'm understanding your question correctly, I mean, like features as, you know, safety, efficacy, you know, side effects, things of that nature which are common amongst all botulinum toxin products, that would be included in kind of that 100 percent, right. And then there's additional features of Daxxify. It's made in the United States. It has --

THE COURT: But the surveys were not about the additional features, were they? They were about: Why do you take -- why are you taking Daxxify, something like that; right?

MR. LaROCK: Yeah, they were just focused on the product as a whole and looking at particular questions about the products.

THE COURT: So if somebody answered, I'm taking Daxxify because it's safe and effective and, you know, there's a provider nearby that sells it, that's -- those are things that are safety and availability and such, those are things that absolutely apply to everybody in the market.

MR. LaROCK: Yeah. It's all baked in already, right. So the market surveys on their own kind of don't give you what that valuation is because they're taking into account the safety, and efficacy and everything else, right. They're not taking into account the features that are unique to Botox, that are unique to Daxxify and that also relate to the patented technology as opposed to something else.

THE COURT: Well, so, you know, I think I asked the Plaintiff and, through my own fault, I didn't really get a full answer. What are the surveys that say 20 percent using the Plaintiffs' numbers here. No, these are your numbers. Twenty-percent duration, eight-percent non-animal products, what are the other 72 percent? I mean, what's top

on the other 72-percent list?

MR. LaROCK: From particular surveys?

THE COURT: Well, I mean, if your expert said 20 percent are doing duration and eight percent are doing non-animal products, what other things? She must have identified what the other 72 percent is.

MR. LaROCK: Yeah, I have a handout that I think would help.

THE COURT: Sure.

MR. LaROCK: That I think would be helpful.

THE COURT: Yeah.

MR. LaROCK: And, in particular, it's the -- it would be Slide 10 of that.

THE COURT: Yes.

MR. LaROCK: So this was included in our brief and I think the handout, you know, provides a little bit of a clearer picture in terms of the resolution. So this is what Ms. Trexler did as her apportionment analysis. They started with the price difference between Botox and Daxxify. That's the price of Botox on the left and then the higher column you see is the price of Daxxify.

THE COURT: Right. So the third column is the 17.5 percent?

MR. LaROCK: The premium, exactly. And then use the market surveys to then say, Okay. Well, these are

features that are unique to Daxxify, but some of those features have no relation to the patents like, you know, fast onset and being manufactured in the United States. And so that might be reasons why people are buying Botox. That might be reasons why there can be a price premium for Botox or for Daxxify. But those don't relate to the patented features, so I need to continue to apportion to find what's the valuation of those features that are related to the patented technology and what's not. And that's where she --

THE COURT: So I'm looking at your very nice demonstrative here, and so I figure out that Columns 4, 5, 6 and 7 --

MR. LaROCK: Yeah.

THE COURT: -- are basically the 20 percent for duration and the eight percent for non-animal --

MR. LaROCK: Exactly.

THE COURT: -- products. And then --

MR. LaROCK: All the way to the right.

THE COURT: So we have like about 12 bullet points.

MR. LaROCK: Exactly, and those are unique features.

THE COURT: I take it the bullet point for more profitable probably didn't come from customers.

MR. LaROCK: Yeah, exactly what's going on.

THE COURT: Okay. I mean, some of this looks definitely like doctor opinions. Better value to patients. Free samples. Net price.

MR. LaROCK: But in those surveys, reasons that people are buying, you know, or would want Daxxify as opposed to Botox that would be unique to Daxxify, but unrelated to the patented features.

THE COURT: But they're only unique to Daxxify in the sense that in the survey somebody answered, "This is the reason why I buy Daxxify."

MR. LaROCK: I believe that's correct.

THE COURT: The surveys, as I understand, one was done by Revance, and one was done by Allergan; right?

MR. LaROCK: I believe that's correct, Your Honor.

THE COURT: And basically both surveys, at least at some level, were companies doing the kind of things companies do, trying to figure out what's good about our product, what's not good about our product. What can we -- you know, in the end, trying to figure out how to make more money by selling more of the product or selling it at a different price or that kind of thing. That's the reason why both companies are -- at least are doing this is to gain useful knowledge for competing with the other; right?

MR. LaROCK: I believe that's correct. I mean,

it's part of all, you know, launching the commercial product, and setting the price and trying to make profit.

THE COURT: All right. Well, this is -- I'm glad you gave me this. This is helpful.

What else would you like to tell me?

MR. LaROCK: I mean, we started with the post-hypothetical date information. We kind of hit also the -- kind of the double discounting thing. I don't think I have anything more, unless you have something specific.

THE COURT: If the price premium were zero and the two parties had done the surveys with some minor differences, they would have basically gotten the same results from the survey; right?

You know, why do you switch to Daxxify? Duration, non-animal, patient request, want to offer the newest products. Very little would be different no matter what the price premium was other than possibly more profitable.

MR. LaROCK: That may be the case, Your Honor. I don't -- the parties haven't talked about that. There's been no information about that. There's no expert opinion on that issue.

THE COURT: But in terms of just trying to figure out whether, I guess, Ms. Trexler's analysis here is actually a methodologically sound way of trying to figure

out the footprint of the patents in Daxxify's product. It would seem to be only -- well, it would seem to be very randomly connected to whatever the price premium is.

But, in any event, I understand what you've said, so thank you. Anything else?

MR. LaROCK: No, Your Honor.

THE COURT: Okay. Thank you, Mr. LaRock.

MR. ASHKENAZI: Your Honor, if I may, just a couple of short points.

THE COURT: Sure.

MR. ASHKENAZI: I know it's before lunchtime, so I'll try to keep it very brief. Well, I don't want to be presumptuous on lunch, Your Honor.

THE COURT: You think I'm going to let you go to lunch? Okay.

MR. ASHKENAZI: Just a couple of quick points, Your Honor, just for yourself. You did ask the question, I didn't have it accessible. The surveys themselves, to the extent that Your Honor wants them, they were part of the record, DI-357 at Exhibit 40 -- 24. That's the Daxxify launch tracker. You could see there --

THE COURT: I'm sorry. That was DI-357, Exhibit 4?

MR. ASHKENAZI: Exhibit 24.

THE COURT: Okay. And that's whose launch

12:37:28 tracker?

12:37:29 MR. ASHKENAZI: I apologize, Your Honor. I gave
12:37:31 you the wrong citation. It's DI-361 at Exhibit 11.

12:37:40 THE COURT: Okay. And who's tracker is that?

12:37:44 MR. ASHKENAZI: That is Allergan's. It will be.
12:37:46 And the page specifically that will provide you with some of
12:37:50 this information is ALGN1834408. That shows you some of the
12:37:58 results of the survey.

12:38:00 The other one, Your Honor, is the Daxxify pulse
12:38:04 survey. That would be Revance. And that's DI-361 at
12:38:11 Exhibit V.

12:38:13 THE COURT: Exhibit?

12:38:15 MR. ASHKENAZI: V as in Victor.

12:38:17 THE COURT: Are you sure that the two docket
12:38:19 items, the one docket item has some exhibits that are
12:38:22 numbered and others that are lettered?

12:38:25 MR. ASHKENAZI: No, Your Honor. I made a
12:38:27 mistake. And my colleague -- I apologize for that. It's
12:38:31 DI-361 at Exhibit L and D.

12:38:33 THE COURT: 361 at Exhibit V.

12:38:36 MR. ASHKENAZI: Apologies.

12:38:37 THE COURT: I appreciate your tracking it down.

12:38:42 Yes. What else?

12:38:43 MR. ASHKENAZI: Your Honor, just when it comes
12:38:46 to the book of wisdom, I just want to point out, as we cited

to *Aqua Shield*, which makes very clear that it is incorrect to replace the hypothetical inquiry into what the parties would have anticipated looking forward when negotiating with the backward-looking inquiry into what turned out to have happened.

Now, you can -- information later can be probative in certain instances like discussed in Lucent, but that can't be the only basis. Dr. Meyer -- sorry, Ms. Trexler did no exercise at all to determine what would have been thought at the time of the hypothetical negotiation.

THE COURT: Well, so let's assume that in the near future, there's an opinion that's talking about what people would have thought in 2019 or 2022. But let's assume, because it's further away, it's 2019, what does -- what was -- and I believe -- well, in any event, some time in 2019, what kind of information would the hypothetical negotiators have about what Revance's expectations were once they got FDA approval?

MR. ASHKENAZI: So, Your Honor, first if I can, I think that question should be what would either side because it's --

THE COURT: Well, no, no, no. I understand it's both sides, but I'm -- in particular, because it's -- what you're tackling is what the Defendant is relying on, that's

why I'm asking about the Defendant.

MR. ASHKENAZI: There's other information that exists at the time. If they have market surveys, internal documents that they were -- either party would consider in terms of what the price premium would be. The point is looking at the information that they actually had in hand. As you can imagine, if a company is spending years developing a product they may be having to develop and we have some of that as part of the record. The problem is Ms. Trexler doesn't consider any of that.

THE COURT: Well, and so your expert, she also uses price premium?

MR. ASHKENAZI: She looks at price premium. I want to be -- she doesn't do a sequential multiplication of price premium.

THE COURT: Well, no, no, no. But this just gets to the point of what price premium is she looking at?

MR. ASHKENAZI: I'm quickly looking. I believe it's 17 percent and 29 percent. There's different documents, so she averages them out. But there's some in that range, Your Honor.

This is going to be -- she, Dr. Meyer, addresses this. This is DI-360 at Exhibit A.

THE COURT: Sure about that?

MR. ASHKENAZI: I hope I am, but I've been wrong

multiple times so far, Your Honor. No, I'm sure.

THE COURT: So, in fact, leaving aside the double --

MR. ASHKENAZI: Discount.

THE COURT: -- discount -- yes, thank you -- the price premium that your expert comes up with, using what I believe you think is a proper analysis in 2019, is actually higher than what the Defendants' using?

MR. ASHKENAZI: Yes, but and to be clear, Your Honor, our expert does numerous -- evaluates numerous different things, not just price premium, surveys, other pieces of information to come up with her value. But the specific price premiums that you're referencing were, yes, higher. One is 17. Obviously, a little lower than 17 and a half. Another one, I believe, is 29 percent.

THE COURT: But in terms of what Dr. Meyer eventually comes up with as a reasonable royalty is the average of 17 and 28 or whatever the other number was, is that an input at some point into the analysis?

MR. ASHKENAZI: It's an input into her analysis. Yes, Your Honor.

It's not the sole basis because, as you mentioned, price premiums themselves are -- you know, there's -- they could fluctuate. Thoughts on them could change. That's why Dr. Meyer doesn't rely solely on price

premiums. She relies on surveys and other things that go to show and she averages them out. This is on page -- at Paragraph 184 of her opinion. She averages them out, all this information, the aggregated data to provide her opinion of 24 percent for the formulation patents.

THE COURT: So if we move the hypothetical negotiation date to 2019 or 2022, but 2019 for ease of reference here, and the Defendants' expert said, Ah, you know what, I agree with Dr. Meyer. It's the average of 17 and 28 percent and goes from there. I guess you'd agree with that; right?

MR. ASHKENAZI: For the formulation patent, yes, Your Honor. The manufacturing patents, that's a different story which I'm sure we're going to get to on their side. But, ultimately, again, it's not -- the average of 17 to 29 percent is -- yes, I don't know exactly what that number is, but...

THE COURT: Yeah. Okay.

MR. ASHKENAZI: I thought I was really good at math when I went through school, but it seems as I stay in the profession, it gets a little harder to do on the fly.

THE COURT: All right. Well, so is there anything more you want to say about this?

MR. ASHKENAZI: Just on your question for the hypothetical, the question you raised to counsel which is:

Would anything change in that survey if the price premium was zero? And it's our position it would not. It's not asking about, except for that one question of profitability.

THE COURT: Yeah. I'd like to know how many health care providers said, Yeah, we do it on the basis of profit to us, but I guess it's a measurable amount.

Okay. Anything else?

MR. ASHKENAZI: No, Your Honor.

THE COURT: All right. Thank you.

All right. Hypothetical -- we've got, I believe --

MR. PICKARD: I think this is our last set of issues for Your Honor.

THE COURT: Yes. And I'm sorry, you are?

MR. PICKARD: Byron Pickard for Revance.

THE COURT: Mr. Pickard, okay.

MR. PICKARD: So we have a series of issues captured under our *Daubert* number two. I plan to focus my time on this first issue of apportionment. I gather from Your Honor's comments 20 minutes or so ago that issue two on the hypothetical negotiation date that you're planning to deny that. So unless I'm misreading you, we're not going to talk about that.

THE COURT: Dr. Meyer uses 2019. I would need time to deny that based on what I read because it seems to

me, there's a factual dispute as to whether or not the first infringement occurred in 2019 as opposed to sometime later, maybe 2022. So if you're saying she should be using 2011, yeah, I deny that.

MR. PICKARD: Okay. And I have a colleague who's prepared to address that if there's something else to talk about.

THE COURT: Yeah. I don't think that's a worthwhile use of our time.

MR. PICKARD: I don't have anything affirmative to say on Item 3, Your Honor. We'll be happy to address them.

THE COURT: Well, why don't you address manufacturing because I -- as you maybe can tell from what I said earlier, I didn't understand that.

MR. PICKARD: Fair enough. So with that, Your Honor, the motion --

THE COURT: And when I say I didn't understand that, I'm not saying I didn't understand you. I didn't understand the dispute at all.

MR. PICKARD: Right. And I think I understand where Your Honor is coming from. I hope to put some clarity on this.

THE COURT: Okay.

MR. PICKARD: So as Your Honor is aware, the

motion seeks to disclose Dr. Meyer's reasonable royalty analysis for the manufacturing patents only. And the reason for that is because, in our view, she failed to apportion for the value of the patented technology.

There's quite a bit in the briefing. I submit that Your Honor only needs to answer one question to decide this motion, and that is: Did Dr. Meyer's cost for time analysis, is that a reliable way to apportion the value of the patented technology?

THE COURT: Okay. So, right. So this is Dr. Meyer said designing around the manufacturing -- patented manufacturing process would have taken -- added 12 to 18 months to when FDA eventually approved; right?

MR. PICKARD: That's right. So that's what we're talking about.

THE COURT: And does it make any -- does it make -- the manufacturing patents, when roughly did they issue?

MR. PICKARD: I'll have to confer with a colleague.

THE COURT: I mean --

MR. PICKARD: Yeah, there are two dates. The first batch, yeah, my information is 2016 for the first grouping of them and then the rest came in 2021.

THE COURT: The rest, there's only one other

pack?

MR. PICKARD: Yeah, and maybe there's only one.

THE COURT: Okay. All right.

So, okay. That's helpful.

Thank you. So go ahead.

MR. PICKARD: All right. So the need to apportion in a reasonable royalty analysis to capture the value, the incremental value of the patented technology, I think this is an area where the Federal Circuit has been forceful and particularly clear. We cite the *MLS* case in our brief. And the *MLS Intellectual Property* case, they say we have repeatedly held that when the accused technology does not make up the whole of the accused product, apportionment is required.

And we have that situation here. The Daxxify product contains several features that are not claimed by the manufacturing patent. And, for example, we have the rapid onset. Extended duration. That's -- the extended duration is only --

THE COURT: Well, the extended -- the rapid onset, we're talking about the manufacturing process. The extended duration, that's not a claim of the manufacturing claims, but it's something that flows from practicing that manufacturing method?

MR. PICKARD: That is not what I understand

Plaintiffs' position here. I understand that to be their position solely for the formulation patents. And although they're not claimed, that is the natural or inherent consequence of the formulation that you achieve extended duration. They have not taken that position on the manufacturing patents.

But Your Honor doesn't need to get into that because there are other features in our product that are unclaimed. For example, the addition of the peptide. The point being is that the Daxxify product is not a one-for-one mapping to the claims; and therefore, it is necessary to do an apportionment. And when Allergan responds, they point to this cost for time analysis which is basically an opportunity cost calculation that Dr. Meyer performs. She's taken that 12-to-18-month interval, calculated the expected lost profits in that period and essentially amortized those lost profits over the period of the patents to arrive at a -- I forget. It's a $370 million figure that nets out to a 20-percent royalty.

Now, they say that is a measure of the patented value. And I want to step through why they say that is an appropriate way to do so.

So at Page 35 to 36 of their answering brief, they observe that using opportunity costs to determine the value of a business decision is a common practice in law,

business and economics alike. Now, they have no support for that. I'll grant you that sounds reasonable.

But even if it's true, it doesn't show that it is a good measure for the value of the patented features. Just because a tool is a useful way to assess a business deal, it doesn't tell you whether the patented features that may be part of that business deal are captured accurately by that exercise.

Elsewhere, Allergan says that using the cost of design-arounds are relevant to the reasonable royalty analysis. And they cite that *AstraZeneca vs. Apotex* case.

That is also true, but we're not saying that that analysis is irrelevant. AstraZeneca says it is, but also in AstraZeneca, the Court visited a separate apportionment analysis. So it's fine, if done properly, to include the opportunity costs as part of the reasonable royalty analysis, but it's not, in our view, a reliable and good fit for the facts of this case to determine the value of the patented technology.

Lastly, Allergan says, and they quote Dr. Meyer on this point, that "the opportunity costs directly reflect the benefit of receiving a license." And I don't have the paragraph number here, but it's at Page 3 of the Allergan brief. This is the closest that Dr. Meyer comes to explaining why she might have thought this was a good tool

for apportionment, but she doesn't land the move. The benefit of receiving --

THE COURT: I'm sorry, she doesn't what?

MR. PICKARD: She doesn't land the move. I want to explain that.

The benefit of receiving a license is not an accurate measure of the incremental value of the patented technology. And the reason for that is when you get a license, there are other benefits that come along with it. You get certainty. You no longer face the risk of expensive and time-consuming litigation, among other things.

So the things that Allergan has pointed to in the brief, respectfully we don't think show that this approach is a reliable and good fit to determine the claimed features in the manufacturing patents.

I will lastly offer that if you look elsewhere in Dr. Meyer's report, and this is at Paragraph 172 of her opening report, I believe Your Honor can find that at Exhibit 8 to the Plaintiffs' answering brief. I think there are two Exhibit 8s. And she says doing essentially the same cost for time analysis on the later issued set of manufacturing patents, she says, "I measure Revance's willingness to pay as the expected profit losses due to Daxxify."

And then she goes on to say, "That's not a

measure of the value of the patented technology. It's a value of the incremental willingness of Revance to pay."

And Revance's willingness to pay is not the same thing as the value of the patents. I think what her analysis is really doing is sort of capturing the opportunity costs imposed by the regulatory environment of the FDA here. So if you were to change any feature, Revance, regardless of whether it's patented or otherwise, Revance's stuck in this 12-to-15, 12-to-18-month delay period. And so it's not a good tool for measuring the value of the features themselves.

It makes a ceiling on the willingness of Revance to pay it. But the value of the technology is somewhere below that, and Dr. Meyer simply hasn't done the work to explain where that might be.

THE COURT: Does your expert try to value the manufacturing patents with a reasonable royalty?

MR. PICKARD: The contribution of the patented features?

THE COURT: Yes.

MR. PICKARD: I believe she does and she certainly hasn't -- I'm not aware of a challenge to her.

THE COURT: No, no. I was -- so the way that -- the objection you have to Dr. Meyer doing the opportunity cost approach to having to design around your manufacturing

12:55:28 patents is that that's a fine starting point, but there's some more stuff that needs to be done before you can get to a finishing point. That's your jump land?

12:55:43 MR. PICKARD: Yes. I think that's exactly right. We're not saying she can't talk about the opportunity cost. She certainly can; however, that is not a stand-in for the requirement that she apportioned some value to the patented features as part of her analysis.

12:55:57 I think that that AstraZeneca case that's cited by the parties is useful. There, the Court points to, you know, the most natural places where you expect to see apportionment are in, I think it's *Georgia-Pacific* Factors 9, 10 and 13. And if you look there, she really doesn't contend with the value of the features at all. And for that reason, they don't point to those portions of her report.

12:56:18 It's in Factor 15 where she does this opportunity cost analysis. And that's really about the willingness of the licensee to pay money.

12:56:26 THE COURT: The manufacturing patents, what's novel about them is that it allows you to make this without using animal protein; right?

12:56:47 MR. PICKARD: I will just put it that that appears to be a feature of the patent. I'm not prepared to say they're novel, but --

12:56:55 THE COURT: Yeah, yeah. I mean, the claim

12:56:57 novelty, okay.

12:57:05 And the -- how much of the -- is there technical expert input into -- you know, I remember seeing something about a FDA expert, but is there a technical expert opinion as to how you would actually design around the manufacturing process?

12:57:48 MR. PICKARD: There is, and you heard some of that this morning from Dr. Meagher -- referenced to Dr. Meagher on -- I can't remember which motion it was, Your Honor.

12:57:56 THE COURT: Yeah, don't try.

12:57:57 MR. PICKARD: There was discussion on that. And then on the other side for the Plaintiffs, they offered a report from a Ms. or Dr. Drago, and that's the source for this 12-to-18-month delay that Dr. Meyer uses.

12:58:11 THE COURT: And how -- and I guess the 12-to-18-month delay, is that, you know, two weeks to design around and almost 12 to 18 months for the FDA to approve it?

12:58:34 MR. PICKARD: I think for -- and I'm working from memory. I haven't looked closely at the Drago report in some time. I think she gives the benefit of the doubt. The design-around would have been essentially instantaneous, and that 12 to 18 month is just the regulatory delay.

12:58:55 THE COURT: Okay. And when you say "the regulatory delay," so earlier you said you thought

12:59:14 regulatory delay could be part of the analysis. But if the
12:59:18 assumption is the design change is instantaneous, why is --
12:59:24 and what we're trying to measure is, I don't know, the
12:59:27 footprint of the patent here, why isn't regulatory delay
12:59:32 sort of irrelevant or irrelevant as a way of measuring?

12:59:40 MR. PICKARD: Your Honor, I've thought about
12:59:42 that. Unfortunately, our motion doesn't present that issue,
12:59:44 but I think you make a good point. And that is it's
12:59:50 something that's, frankly, not teed up for Your Honor.
12:59:53 Perhaps we'll see that at trial.

12:59:53 THE COURT: Okay. All right.

12:59:54 MR. PICKARD: But this motion doesn't detect
12:59:56 that step where the or the mere use of that analysis. It's
12:59:59 simply that that analysis is not a reliable or a good fit
01:00:03 for the separate and necessary question of apportioning for
01:00:06 the value of the patented features.

01:00:09 THE COURT: Okay. All right.
01:00:10 Thank you, Mr. Pickard.

01:00:13 MR. PICKARD: Yes, thank you.

01:00:33 THE COURT: Mr. Ashkenazi.

01:00:34 MR. ASHKENAZI: Yes, Your Honor. I'm going
01:00:36 to -- I'd like to just address that last question first, if
01:00:40 I can.

01:00:40 THE COURT: Sure.

01:00:41 MR. ASHKENAZI: Dr. Meyer goes through the

calculation for the delay and the reports that she relies upon, including Dr. Drago -- well, she relies on Dr. Drago and the other experts to talk about the delay. And this is in DI-160, Exhibit A, Paragraph 168. She explains the delay itself.

The key here is this is not instantaneous. In order to design around -- these are complicated -- first of all, the active ingredient is a toxin. This is not a simple thing we're working with.

It takes time to design the design-around. I mean, to design it, to implement it, to test it. And then to verify the attributes of it to make sure it's safe and efficacious and all that other stuff, that is the key portion to the delay here. It's not -- the regulatory time period is not the full basis there, although they would have to communicate with the FDA, and there's going to be communications. Have they done steps right? But that's not the main -- the biggest part.

THE COURT: So what you're saying is the concept for the design change would be instantaneous, but the actual kind of reducing that to practice, even leaving aside the FDA, is a time-consuming process?

MR. ASHKENAZI: Absolutely, Your Honor. And let's think about this. You have to now change the products. You have to now -- whatever you need to do in the

plant to change the flow rates, whatever it may be to now change the process, you now have to make it and you've got to test it to make sure it's safe and efficacious. And it's going to go -- that's not an instantaneous process. That takes time.

And as you point out, this patent is going to the manufacturing of the product itself. We're not talking about some other cases where these are different -- you know, a multi-component system where you have to break out one piece of the system and then try to do the attribute.

It goes to the entire product itself, similar to in *AstraZeneca*, Your Honor, there, while omeprazole was old in that case, the formulation was still -- you know, goes to the entire product itself. And it's the time for delay, the lost opportunity costs, that was key there. And in *AstraZeneca*, she specifically recognized that. And we're looking at the product as a whole.

Now, it doesn't -- it's not completely divorced from the attributes. This is the attribute. It's the manufacturing process for the drug substance.

Your Honor, if I could take a step back. Revance's motion is premised on the fact that there's only one way to value a patent. Here, the lost opportunity cost is recognized, but it's not just *AstraZeneca*. There's other cases, for example, like --

01:03:42 THE COURT: Well, no. I don't think they're saying there's only one way. I mean, what they're saying is you have a way, but you haven't done it accurately.

01:03:53 MR. ASHKENAZI: Okay. We applied the same lost opportunity cost that was applied in *AstraZeneca*, similar -- a case like the *Prism* case, Your Honor, which was also part of the record here.

01:04:03 There's another case in which there is a lost opportunity cost. And in that case, Your Honor, we're looking at the cost in that situation, even though there was some patents covering some processes within a cellular network. It would be the cost to develop an entire network because it would take time to design around that, the lost opportunity costs to the party.

01:04:27 And that's exactly what Dr. Meyer was doing here. But I want to be clear, she's not doing it for the entire time period. She's just saying for the 12 to 18 months that it would take -- that it would delay your launch, that's what you would go into. That is an input into the hypothetical negotiation, and that's what Dr. Meyer used which is a sound methodology as shown in those two cases.

01:04:49 They haven't identified a single case that says what Dr. Meyer did was improper. Looking at cases that have multi-component systems, and saying, I need to break things

01:04:59 down, that doesn't really work, Your Honor. That's not applicable here.

01:05:03 (Phone going off in the courtroom.)

01:05:03 THE COURT: Sorry. What was that?

01:05:18 Is that your phone or something?

01:05:22 UNKNOWN SPEAKER: Yes, my phone.

01:05:23 THE COURT: All right. Well, it better not happen again.

01:05:30 Sorry, I lost my train of thought. Do you have anything more you want to say?

01:05:49 MR. ASHKENAZI: Your Honor, at best, this goes to -- the weight of this would go to the weight of Dr. Meyer's opinion, and they could cross-examine her on the veracity of it. She's applying the sound methodology of lost opportunity costs.

01:06:02 She explains how that should be applied. She explains how that relates to this specific product, and a potential design-around, and the time it would take and how that would go into the hypothetical negotiation. If they're not happy because they think, Well, she should have discounted or taken some more off, they're more than happy to cross-examine her on that. But it doesn't mean the methodology she used is unsound.

01:06:24 THE COURT: Did Ms. Trexler in her report challenge the methodology?

MR. ASHKENAZI: Ms. Trexler addresses the delay. She says it should be 11 months. I believe that Ms. Trexler says that -- I apologize, Your Honor. I'm trying to remember exactly.

THE COURT: Yeah, yeah. Well, let me -- you stay right there for a second.

MR. ASHKENAZI: Yeah.

THE COURT: Mr. Pickard, sorry.

MR. PICKARD: Pickard, yes.

THE COURT: Okay. Yes.

Did your expert challenge this?

MR. PICKARD: Yes, in the following way at least. I think the way that Dr. Meyer posed its opinion, and this is what Dr. Trexler says, it's essentially tantamount to her using the entire market value and Trexler attacked that.

And they have like stepped back from that, and they say, Oh, no, we're not using that. That's not helpful to them because in the absence of the application of that rule, apportionment is necessary. That's the one exception.

So in that regard, there was an attack by Trexler. There may be others. I haven't closely reviewed that in preparation for today.

THE COURT: You know, I don't think I've ever had -- the two manufacturing patents, are they method

patents or essentially --

MR. ASHKENAZI: I would say so, Your Honor. It's the steps you would use to manufacture the process --

THE COURT: Okay.

MR. ASHKENAZI: -- using X, Y and Z steps.

THE COURT: You know, I don't remember seeing apportionment requirements. I'm not saying they're not there, but I don't remember seeing them in method patents.

They usually come up with, you know, physical products, not processes. It seems a lot harder to figure out how you'd actually apportion a process.

MR. ASHKENAZI: Your Honor, I think that goes to the crux of it, right. There's different ways of doing apportionments. There's no wrong way. I think that's actually stated explicitly in --

THE COURT: Well, I'm sure that's right.

MR. ASHKENAZI: I believe it's the *Apple* case. I don't -- I forget what the other name of the party is. And in this situation, it's you're making a product, right. While -- one could imagine, for example, a much easier way of making a product that at the end of the day is the same product. So to look at the sale of the product itself and to say, I have to find the value in the product itself doesn't really give you the benefit of the process. That's why there's different ways of doing things.

Lost opportunity costs is a sound way, addressed both by the *AstraZeneca* case and the *Prism* case. And, in fact, while we're just on the point of *AstraZeneca*, on the entire market value rule, *AstraZeneca* recognizes that that doesn't necessarily apply when you're dealing with cases -- a pharmaceutical case because they're separate and distinct.

You see that in multi-component cases. For example, you have different software, you know, a software that has multiple components, and they try to break out the pieces of the components of the software.

That's not -- doesn't apply here, as *AstraZeneca* sort of recognizes. And, again, *Prism* lays out the foundation for -- as for allowing this opinion and the sound methodology that Dr. Meyer uses.

THE COURT: Okay. All right.

Listen, I hate to do this, but I think we ought to take at least another short break. I assume you would rather take a short break and deal with lunch later then take a lunch break and come back. I don't have much more, but I do have some other things that I want to bring up.

MR. PICKARD: I think a lunch break would be fine, then.

THE COURT: Lunch?

MR. ASHKENAZI: We're fine with, either.

MR. DITTMANN: Whatever Your Honor prefers.

THE COURT: All right. Why don't we take a 45-minute lunch break. So I'll see you again at five of 2:00.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: Have a seat, please. All right.

MR. ASHKENAZI: Your Honor, if I may clarify one thing that was said previously.

THE COURT: Sure.

MR. ASHKENAZI: Just you had asked, and I didn't have the information readily available, if Ms. Trexler had an opinion on the 2019 hypothetical negotiation.

THE COURT: Yes.

MR. ASHKENAZI: And in her report, this is DI-349 at Exhibit 6, Paragraph 20, she said, "My running reasonable royalty opinions remain unchanged if the hypothetical negotiation date moves to June 2019 or between June 2021 to March 2022."

THE COURT: All right. So you're saying there's no need for her to update her opinions?

MR. ASHKENAZI: That's what I'm saying, Your Honor. There's a portion of her opinion that will be eliminated from this, obviously, to the extent Your Honor rules in -- yeah.

THE COURT: Yeah. I think I pretty much ruled. Yes.

MR. DESAI: Your Honor, may I comment on that?

THE COURT: Sure. You are?

MR. DESAI: I'm Nirav Desai.

THE COURT: Yes. Mr. Desai, go ahead.

MR. DESAI: So what she said in her opinion is that if the hypothetical negotiation isn't 2011, it's 2019 instead, then the design-around that she was using as the basis for a lump sum reasonable royalty, that goes away. But her opinion was framed as a rebuttal to Dr. Meyer's opinion. And so -- and I sort of tried to look through it quickly to see what it was that -- what specifically she said about this. But I think the take away is that her -- as Mr. Ashkenazi said, that that part of it, her royalty analysis, which is based on pointing out the flaws in Dr. Meyer's opinion, those would stay the same.

THE COURT: So basically both of you agree she doesn't need to do anything more?

MR. ASHKENAZI: Yes, Your Honor.

MR. DESAI: Yeah. I mean, I think she would need to eliminate that small portion about the design-around piece of it.

THE COURT: Well, okay. And I'm sorry. Taking stuff out or stuff no longer being applicable, she doesn't

02:00:12 have to actually say, Okay, I'll write it again without that
02:00:14 paragraph.

02:00:17 I was more concerned that she had no opinions
02:00:19 other than ones that depended entirely on 2011. But you're
02:00:25 telling me that's not the case, so it all sounds good.

02:00:31 MR. DESAI: Yeah, I think so. I mean, I would
02:00:32 like to consult with her and make sure that her opinions
02:00:35 haven't changed based on the different take, but that's my
02:00:37 understanding of --

02:00:39 THE COURT: Okay. Well, you better consult
02:00:41 quick and then consult with Mr. Ashkenazi because time is
02:00:43 short.

02:00:44 MR. DESAI: I will. I will. Thank you.

02:00:46 THE COURT: Okay. All right.

02:00:53 So I wanted to follow up on one or two things
02:00:56 relating to some of these motions that we haven't argued.
02:00:59 And one of the Plaintiffs' summary judgment motions was for
02:01:06 partial summary judgment of infringement of eight of the
02:01:09 nine claims based on the stipulation. I was wondering how
02:01:17 this makes any practical difference, one way or the other,
02:01:20 whether I do this or I just say, Look, I'm going to tell the
02:01:25 jury that it's stipulated, blah, blah, blah.

02:01:29 Why are we arguing about this?

02:01:35 Mr. Minniti.

02:01:36 MR. MINNITI: Yes, Your Honor, briefly. I think

it's very straightforward. They've stipulated that their product and process "satisfies the claim."

THE COURT: But why are we arguing? What is the jury -- you're not going to have to prove this at the trial because they've stipulated to it.

MR. MINNITI: I think it's something as simple as we had this discussion as part of some motions in limine that were being contemplated that if they're going to try to stop us from saying that Revance is an admitted infringer, we think that's improper because they have admitted infringement.

THE COURT: Okay. Well, so that's -- you really just want to use this not so much for its merits, but as some kind of -- this is really just an argument about what exactly is going to be -- how things are going to be presented to the jury?

MR. MINNITI: I think that's fair, and it's also, we think, confusing to the jury for Revance to try to bob and weave away from the fact that they've stipulated to infringement by saying that they satisfy the claims. So I think the jury should be left with an understanding that they are infringers.

THE COURT: Well, they are -- you know, a lot of it is in presentation. What they say is if the patents are valid, they're infringers; right?

02:02:55 MR. MINNITI: Yeah, if the -- correct. If the patents are maintained to be valid, then they would be infringers. But, I mean, one response, and we've raised this in the papers, to the extent they were -- to the extent you can always point to a pending invalidity defense, then does that mean every motion for summary judgment is -- for infringement can never be granted because there's a pending --

02:03:21 THE COURT: Well, but it's different because in the motions for summary judgment, because I've granted summary judgment when somebody infringes a claim here or there, even though they have invalidity defenses, they're being presented as a disputed issue or, you know, Defendant is saying it's disputed. And I have to overrule that.

02:03:44 I don't have to overrule anything here. You-all have agreed.

02:03:47 MR. MINNITI: Your Honor, I think it's a fair point. I don't want to belabor it. I think a lot of this has come up --

02:03:52 THE COURT: Well, in any event, what you've said has been helpful. And --

02:03:55 MR. DITTMANN: Your Honor, if I could say one thing. We're mostly concerned with just avoiding any confusion with them suggesting somehow they're not infringing on the merits. And so that's partly why we just

want to remove this issue, making clear to the jury they only have to decide patent validity.

THE COURT: Well, so thank you, Mr. Dittmann.

The part of -- so think about this from my point of view. I don't want to discourage parties from stipulating to stuff. And if they do stipulate to stuff, maybe -- and then there's multiple ways you can present that to the jury. You know, I might be more inclined to do something that wouldn't discourage them from stipulating the next time around, or maybe you'll be on the other side and it would be you.

But so I think I'm going to deny the motion, but we're certainly going to work out some way of presenting this to the jury that means it's absolutely clear you don't have to prove anything. And that it's absolutely clear that if there's going to be -- invalidity defenses actually work, they're going to have to figure out how much damages to provide.

MR. DITTMANN: Yeah, and that sounds fine, Your Honor. We're mostly concerned with making sure we're on the same page there.

Thank you.

THE COURT: Okay. Thank you.

By the way, on that because, honestly, I was reading some of the briefs, and I got a long way into them

before I even noticed that there was this stipulation. I mean, I signed it some time ago. But when I saw that, I went back to look at the stipulation. And maybe this is a question that can't be answered now, but you wrote the briefs a long time ago. The ninth claim, I gather that there's at least some possibility that that might be stipulated to before all is said and done or is that not true?

MR. VARUGHESE: Good afternoon, Your Honor. We're working on it. Right now there are nine claims being asserted from the Defendants.

THE COURT: You said earlier something about narrowing.

MR. VARUGHESE: We think it should go down to at least three, and they've asked us to stipulate to infringement. We told them that we'd be willing to in order to streamline and narrow the case, but we --

THE COURT: Okay. You don't need to tell me about the negotiations back and forth.

MR. VARUGHESE: We're negotiating.

THE COURT: Okay. All right. Well, and -- right. Okay. Well, I encourage the negotiations to continue.

MR. VARUGHESE: Thank you, Your Honor.

THE COURT: Probably you don't need that from

me.

All right. So on the second of Plaintiffs' motions for summary judgment, part of the reason I didn't want to have that argued is because I thought you had pretty much resolved that yourselves in the course of the briefing, which is any sale -- no matter what the initial purpose of the batch being made, any subsequent sale is going to be infringing.

You both agree on that; right?

MR. DITTMANN: We agree it's infringing, Your Honor.

MR. DESAI: I mean, we agree with that, subject to invalidity defenses.

THE COURT: Right. Yeah. Thank you, Mr. Desai.

And so the -- but you very much dispute whether or not, and I gather you have experts on this topic, too -- whether or not the manufacturer of these batches in 2019 falls within the safe harbor or not; right?

MR. DESAI: Yes, sir.

THE COURT: Well, I know that's right from your point of view. But, right, there is a factual dispute over this; right?

MR. ASHKENAZI: Your Honor, I just want to be clear. We're only asserting infringement and damages of batches that were sold. So that should end the inquiry. It

should be done because that's all that's going to be presented to the jury. Batches -- for example, we put in there DSO27 was manufactured in 2019, put into a batch that was sold. That's what we're talking about.

THE COURT: But the sale was in 20 --

MR. ASHKENAZI: 2022, 2023.

THE COURT: So if that's all we're talking about, why is the hypothetical negotiation date in 2019?

MR. ASHKENAZI: Well, the actual manufacturer, that's the date right before they started to commercially manufacture the product to be sold.

THE COURT: But they, I believe, say, No, we were manufacturing it to, I don't know, meet FDA requirements of one kind or another; right?

MR. DESAI: That's correct, Your Honor.

MR. ASHKENAZI: And, Your Honor, at that point they start stockpiling it. There's statements from -- these are questions --

THE COURT: No, no, but there isn't a dispute. It may be the case that, for damages points of view, all you're concerned about is -- and I take it what you're saying is while we're going to, I guess, have a lot of dispute as to why these things were manufactured, the only thing we're trying to get damages for are the commercial sales. And I guess the manufacturing patents don't actually

involve whether or not you actually manufactured anything.

So that's the reason why you're saying you think the issue is just resolved?

MR. ASHKENAZI: I don't know what they were -- what's the reason or purpose to discuss safe harbor at all. If the jury doesn't have to make a finding, as we know both experts say, whether it's 2019, 2022, it's -- they're putting the same numbers out there. And the damages numbers don't change.

I think the presentation of sales -- of arguments regarding safe harbor for the DSO227 batch is simply going to be confusing.

THE COURT: So you'd be willing, other than possibly from the point of view of the hypothetical negotiation, to just say, Yeah, and we assume everything that wasn't sold was protected by the safe harbor?

MR. ASHKENAZI: For the facts of this case, Your Honor, I just want to make sure this is not a broader statement regarding how this is all working. But on these facts, assuming that the jury is not going to be presented with an argument that safe harbor somehow insulates damages, then I think that would be fine.

THE COURT: Mr. Desai.

MR. DESAI: I think the way Your Honor framed it is right, that there's sort of a narrow issue we decided

02:11:03 here which is: Does safe harbor apply to commercial sales? We have never said that that safe harbor applies to that extent. So summary judgment on that particular issue is correct, but yes, whether safe harbor applies to manufacturing activities is a contested issue and safe harbor is not appropriate.

Sorry. Summary judgment is not appropriate.

THE COURT: But the -- how do you -- so I probably heard this within the last four hours. So you're going to be saying or you're going to be saying, Mr. Ashkenazi, that the manufacturing that they did in 2019 is infringing manufacturing; right?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: And so then you're going to be seeking a reasonable royalty based on the amount that they manufactured?

MR. ASHKENAZI: No, I apologize. Maybe just if I could try to clarify.

The manufacture itself, whether or not it occurred at the instant it was done, it was used for submission to the FDA and is subject to safe harbor. Let's put that to the side.

The sale of a product made by a patented process is infringing --

THE COURT: Right, right.

MR. ASHKENAZI: -- under 271(a) or 271(g).

THE COURT: Right, right, right. So there's no contest about that. But what I'm trying to figure out and what Mr. Desai suggested is there's some amount of damages, at least I think this is what he suggested -- if I'm wrong I apologize -- but there's some amount of damages you're seeking that is tied, not just to commercial sales, probably relates to the manufacturing patents that will increase based on the amount that you -- the amount that they manufactured in 2019.

MR. ASHKENAZI: We're not seeking those damages here, Your Honor. In other words, we're only -- the damages in here are linked towards the -- right now for this portion of the case, the damages are for -- are linked to the sales of the product. Reasonable royalty is based on sales and lost profits. That's it.

I just want to make sure we're being clear is that the safe harbor doesn't apply to insulate those sales based on the fact that --

THE COURT: Yeah, yeah. Nobody questions that.

MR. ASHKENAZI: Okay. Well then, Your Honor, there's no -- then there's no problem. Then there's nothing. There's no concern.

THE COURT: Okay. And so all I'm doing is I'm sitting here listening, and I'm trying to figure out, and I

02:14:14 can't figure it out, but I hope you-all talk about it when
02:14:18 you're talking about narrowing the case, whether or not
02:14:21 there's any need for the jury to hear anything about safe
02:14:24 harbor, one way or the other. That seems to be what
02:14:26 Mr. Desai is -- or one of the two of you was saying. In any
02:14:34 event, I'll leave that thought with you.

02:14:35 But, you know, based on what I understand to be
02:14:45 the agreement that the -- so, wait. Let me hold on.

02:15:02 Mr. Desai, when Mr. Ashkenazi says the only
02:15:05 damages, the only reasonable royalty damages that we're
02:15:09 seeking are based on the actual sales for things that have
02:15:24 already occurred in the past, do you agree with that?

02:15:27 MR. DESAI: I'm sorry. Can you reask that one
02:15:34 more time for me?

02:15:34 THE COURT: Yes. So Mr. Ashkenazi says the only
02:15:38 damages we are seeking is for the commercial sales that
02:15:44 started in 2022. We're not seeking anything, any damages
02:15:53 for the manufacture -- for the 2019 batches other than if
02:16:03 they were -- to the extent that they then went into the
02:16:07 sales in 2022 for which we are seeking damages.

02:16:10 Right? Did I say that right?

02:16:12 MR. ASHKENAZI: You did, Your Honor.

02:16:13 THE COURT: Do you agree that that is what
02:16:15 they're doing?

02:16:16 MR. DESAI: So then the last part of that is the

confusing part. So and, again, the way Your Honor framed it, I think is the right way to think about it. Sales began in the end of 2022. Revance is not asserting safe harbor protection over those commercial sales, but Revance is asserting safe harbor over manufacturing sales.

So Your Honor said: Can there be agreement that safe harbor applies to activity that occurred making, you know, manufacturing, using that occurred prior to the commercial sales? And if we can agree to that then I think there's no --

THE COURT: Well, so one thing that I'm not entirely clear about is whether -- or a lot of things I'm not entirely clear about, but Mr. Ashkenazi, is it your client's position, your position that it's necessary to tell the jury at some point some portion of this 2019 manufacture was infringing?

MR. ASHKENAZI: Your Honor, the concern I have -- I'm going to try to get to the heart of your question. The concern I have here is what I believe is happening is there's going to be an argument that's going to be made that the 2019 batch, the manufacturing itself is completely insulated from damages, even if it was sold later, because the manufacture occurred under the guise of safe harbor.

THE COURT: Right. But I've heard Mr. Desai,

I'm pretty sure, say multiple times he's not -- they're not going to argue that.

MR. ASHKENAZI: If they're not going to argue that, so any batch --

THE COURT: So am I right?

MR. DESAI: That's correct. So if they're not going to argue that, I don't know why we have to mention safe harbor at all to the jury.

THE COURT: Well, that's where I was trying to get us is why one -- you know, you're trying to narrow the case. That's great.

You know, I've done one safe harbor case in my life. It's complicated. And if you can -- and it doesn't seem like it plays any necessary part in this case.

In any event, so all I'm going to say is I commend you to see if you can't figure out a way to get that out of the case. If you do, that's great. If you don't, okay.

But, you know, based on this discussion here, I'm not sure what the correct outcome of summary judgment motion two is other than to -- I'm actually thinking that I just dismiss it as moot because it's all over the record now that you agree that the commercial sales aren't protected by the safe harbor which you agreed to in the briefing.

Okay?

02:19:20 MR. ASHKENAZI: Thank you, Your Honor.

02:19:22 MR. DESAI: Thank you.

02:19:22 THE COURT: All right. So then the third summary judgment motion, you know, you've talked about you're working on motions in limine. Honestly, this seems like a motion in limine to me. You know, the briefing started talking about Rule 1006 and various other things, and it just seems to me that a summary judgment motion is not the place to be making evidentiary ruling. And I thought the basis for making the evidentiary ruling was just pretty unclear.

02:20:05 So is that something I'm likely to see again as a motion in limine?

02:20:11 MR. PICKARD: I believe, Your Honor, talking about Defendants' motion three?

02:20:16 THE COURT: I think I'm talking about -- wait. I can't even read my own -- hold on a minute here. Oh, yes. I was talking about the Defendants' motion.

02:20:32 So --

02:20:34 MR. PICKARD: So to answer Your Honor's question, we served a motion in limine on one of the exhibits they pointed to.

02:20:42 THE COURT: Okay. It's this Paik exhibit?

02:20:45 MR. PICKARD: Paik 31.

02:20:46 THE COURT: Okay. All right.

Well, that's fine. So, in any event, so that's the reason why -- okay. So that's the Defendants' -- what I'm calling Defendants' motion for summary judgment number three. And so basically I'm going to deny that without prejudice to raising the issue or raising the admissibility of the exhibit in the context of a motion in limine which the process is already started.

Sorry about that.

Okay. So now that I've looked at my notes and recalled what Plaintiffs' third motion is, it's the hypothetical negotiation date. And, you know, one of the things you either love or hate about patent cases is Plaintiff early on says, You infringed in 2011. Defendant responds, No, we didn't. Safe harbor. Time passes.

Now, Plaintiff says, Sorry, you don't infringe in 2011. You got the safe harbor. And Defendants saying, Prove it. Or even more unlikely, No, we did infringe in 2011, and there was no safe harbor. I think it's clear that the only evidence in this case -- because in the end, contentions and pleadings, that's not what establishes a hypothetical negotiation date. And it seems clear to me that the evidence of the hypothetical negotiation is either in 2019 or in 2022.

And so, in any event, let me just think about this for a second. So to the extent that the Plaintiffs'

motion is for a declaration to the hypothetical negotiation that did not occur in 2011, that's what you wanted; right?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: Okay. Well, I'm going to grant that.

All right. So we also have Plaintiffs' *Daubert* motion number one which seeks to exclude the opinions of Dr. Dover and Dr. Patel. Dr. Dover is an anesthetic, I don't know, plastic surgeon or doctor of some kind. And Dr. Patel is a doctor who -- I guess, I can't even remember what it's called, but the therapeutic use. He's a doctor in that field.

And in terms of these two doctors and their opinions, I assume that they're -- actually in the way this worked, the first round of briefing, they didn't participate in. They were in the second round of briefing?

MS. WELLS: Yes. That's correct, Your Honor.

THE COURT: And in terms of Plaintiff then lining up an aesthetics doctor and whatever the second label is, they passed on that opportunity; right?

MR. MINNITI: We are not putting forth a clinical expert, though I will say Dr. Meyer addressed a number of the points raised in these clinicians' expert reports.

THE COURT: Okay. Presumably she's not a

02:25:06 medical expert, so whatever it is she's raising is some kind
02:25:10 of economics-related rebuttal to this?

02:25:13 MR. MINNITI: Well, for example, one issue we
02:25:15 raised in the motion relates to this one-to-one vial ratio
02:25:20 we spoke about before which is really grounded in FDA labels
02:25:23 which it's a document. It's very clear it's one patient,
02:25:26 one vial, and Dr. Meyer applying that.

02:25:29 So, for example, that aspect of our motion, the
02:25:32 only evidence that Revance ever put forth with these experts
02:25:36 is these experts just pontificating based on their own
02:25:41 personal experience without any underlying empirical
02:25:43 evidence that is not one patient, one vial.

02:25:45 THE COURT: So you're saying they should have
02:25:47 sent out a survey to every medical practice that is in the,
02:25:50 I don't know, plastic surgery field or I don't know what --
02:25:53 is that the right field for Botox?

02:25:56 MR. MINNITI: For example, I think one thing
02:25:58 they could have done which they did not do.

02:25:59 THE COURT: Well, just before I lose the thread,
02:26:02 what is the relevant medical field here for Botox? Is it
02:26:05 plastic surgery?

02:26:06 MR. MINNITI: It's clinician dermatologist
02:26:09 that --

02:26:09 THE COURT: Dermatology, okay. All right.

02:26:12 I understand that. Yeah, because most plastic

surgeons, I guess, aren't dermatologists.

I'm sorry. Go ahead.

MR. MINNITI: Basically the point I'm trying to make is I don't think a survey is necessary in order for a clinician to provide an opinion, but there is nothing in those reports, and I think we block quote a lot of the deposition testimony here in which Dr. Dover is saying that, "They may use a vial for multiple patients."

THE COURT: Well, right. And I assume Dr. Dover is in a dermatology practice; right? He's not just a dermatologist hanging out by himself. He's probably got 12 other dermatologists who practice with him; right?

MR. MINNITI: It's a fair point, Your Honor, but the problem we're identifying here is when the testimony is contradictory to FDA labels and FDA statements that Revance made in their biologics license application, it goes to the unreliability and the lack of ability for us to empirically test: What is the basis for these clinicians' opinions?

MR. ASHKENAZI: Your Honor, if I can add one thing to that. The crux of the problem here is that a clinician can't -- if a clinician is just testifying about their own experience without backing it up with anything, whether it's an article, a survey. A survey doesn't have to be everyone. It could be a handful of surveys, just like we do polling or whatever it is. There -- it can't be

representative of the field where -- and, therefore, it can't be helpful to the jury if it's not grounded in any scientific principle other than their own observations.

And that's the fundamental problem with these opinions when they say it's just based on their experience. Not an article. Not an FDA guidance. Not a survey.

THE COURT: But the -- for example, one of the things that was in the briefing was a statement which I've seen a hundred times that doctors are not bound by FDA labels. They can prescribe off label. They can use their own medical judgment to supplement or, in fact, do something different than what the FDA label says.

MR. ASHKENAZI: Sure, Your Honor. The problem is a doctor can do whatever the doctor wants. The question is: For the purposes that these opinions are being provided, what is happening in the field? What is happening in the marketplace? And that's the disconnect.

To say that this one doctor could do -- that's exactly the point. The doctor could do whatever he wants, but is that doctor representative of all the doctors when looking at damages analyses? Because that's the way this is all coming in. They're trying to put forth personal experience and say that this is going to now be representative of the marketplace so we should either, in their case, lower the damages.

THE COURT: Well, so normally, and because I have a lot of cases where clinicians testify about one thing or another, and usually they're people who, besides for being highly qualified, are actively involved in whatever their field is. So they go to conferences. They talk to other doctors. They have -- they're in a good position to offer testimony that in a different context might be called custom or practice.

MR. ASHKENAZI: Well, so, Your Honor, the problem here, and it depends on what we're talking about here. If they're -- in this instance if you're just going to say, Oh, the doctor spoke to people in the industry, there's no way to test the veracity of that opinion.

Who did they speak to? Have no idea.

How can I cross-examine the witness at trial when it's just their word? There's no -- essentially what it comes down to is it's unreliable because there's no scientific methodology other than the own expert's ipse dixit. That's the problem here. There's no fact declarants. There's no article.

It's not they went to a conference and here's what the conference -- this conference speaker who's not them said. None of that. All it is is what they personally believe, which is how -- there's no way to cross-examine that or to test the veracity of that opinion.

02:30:42 THE COURT: All right. Thank you.

02:30:43 MR. VARUGHESE: Your Honor, I would respond to
02:30:45 that and say, you know, all the points that Mr. Ashkenazi
02:30:48 raises is classic cross-examination material. It goes to
02:30:50 credibility.

02:30:51 THE COURT: Do the two doctors -- because I
02:30:56 assume their reports are in the record somewhere, but I
02:30:59 haven't looked at them. Do the two doctors say this is --
02:31:05 you know, have a sentence that says something like, This is
02:31:09 based on my own personal experience. Those are the people I
02:31:13 practice with and what I've learned at conferences.

02:31:16 MR. VARUGHESE: I believe they say something to
02:31:18 that effect, Your Honor. I think a lot of it is their own
02:31:22 percipient experience. They do say this is based on my
02:31:23 experience, my practice. And --

02:31:26 THE COURT: Well, so but to the extent it's just
02:31:28 based on their practice, how do we know they aren't just a
02:31:31 lone wolf?

02:31:31 MR. VARUGHESE: Well, that's a question that can
02:31:34 be raised, but they're also preempted in the field. And
02:31:37 they're -- the resumes are attached. Their qualifications
02:31:39 speak for themselves.

02:31:40 THE COURT: Well, and I'm sure they're super
02:31:42 qualified. That's not the question.

02:31:52 I mean, do they in their reports purport to be

02:32:00 saying, you know, essentially what I think you would characterize in your briefing as custom or practice or is that basically your spin on them saying, Here's what I do?

02:32:11 MS. WELLS: Your Honor, Dr. Dover, he -- as you acknowledge, he's a medical practitioner. He has a practice. He sees thousands of clients.

02:32:21 THE COURT: Right, right. But him doing the same thing --

02:32:24 MS. WELLS: Right.

02:32:24 THE COURT: -- a thousand times doesn't really spread the wealth beyond him.

02:32:28 MS. WELLS: Understood. His opinion is based on his personal knowledge; however, his opinion in terms of what his patients choose to do and why they choose to do it is confirmatory of the documents that are in the record.

02:32:44 THE COURT: How long of a report did Dr. Dover write, do you think, roughly? Is it like 20 pages or less?

02:32:52 MS. WELLS: It's about 31 pages, Your Honor.

02:32:54 THE COURT: Okay. And Dr. Patel, similar length; do you think?

02:32:58 MS. WELLS: Less than that --

02:33:00 THE COURT: Okay.

02:33:01 MS. WELLS: -- Your Honor.

02:33:02 THE COURT: All right. Well, I'm going to reserve judgment on this until I have a chance to read the

02:33:08 reports.

02:33:09 MR. MINNITI: Your Honor, if I could just raise 02:33:10 one factual point to assist in that reading so you've --

02:33:14 THE COURT: I'm sure you'd like to assist. Yes, 02:33:17 go ahead.

02:33:17 MR. MINNITI: You bring up the idea of a lone 02:33:20 wolf. Factual evidence here is Dr. Dover is testifying that 02:33:24 he prescribes this product called Dysport at a completely 02:33:30 unrepresented percentage to the market. So Botox sells a 02:33:36 significant -- more than 50 percent --

02:33:37 THE COURT: I saw that in the papers, but I 02:33:39 wasn't sure how that made any difference as to what he knows 02:33:42 when we're kind of working on the assumption that the 02:33:47 Dysport, and the Botox and the other two -- the other two 02:33:50 are basically all the same product, the only difference is 02:33:52 marketing.

02:33:52 MR. MINNITI: Well, go ahead. Well, I think 02:33:55 that fact gets incorporated by the damages expert into some 02:33:58 of these conversion ratios into where Daxxify is sourcing 02:34:03 its sales from. So that's just one point.

02:34:05 And the last point I'll leave is there's at 02:34:07 least two other cases we've cited in our briefs. The *Pfizer* 02:34:11 case and the *Bracco* case where exactly this type of issue 02:34:14 was precluded where clinicians were going based on just 02:34:19 their informal discussions. And in *Pfizer*, we're dealing

with Pfizer-learned experts. *Pfizer Corp* is saying just because you're relying on your common sense based on your experience, that's not sufficient. So we'd refer to the case -- to the *Bracco* and *Pfizer* cases.

THE COURT: Okay. Thank you.

MR. VARUGHESE: Your Honor, can I make one last point, if I may?

THE COURT: Oh, sure.

MR. VARUGHESE: You heard from Ms. Wells earlier saying that despite the FDA label, clinicians often use the vials over and over again during the same sitting to apply injections to different sites in multiple injections. Looking just at the FDA label, like Dr. Meyer is planning to do, doesn't tell the full story. So we've got clinicians to be able to aid Dr. or Ms. Trexler in putting forth some of the opinions that deal with how clinical practice takes place. They could have brought in their own experts. They chose not to.

This -- I submit this is not a *Daubert* issue. It's a credibility issue, and they can impeach him if they want.

THE COURT: Okay. Thank you.

MS. WELLS: Your Honor, if I may, very candidly just -- you asked for whether or not the experts said based on my conversations with the --

THE COURT: I did, yes.

MS. WELLS: If you -- I would like to direct you to the Dover report at Paragraph 37 where Dr. Dover does reference his interactions with other botulinum toxin injectors at conferences and other gatherings to get an understanding of what is and is not important to customers. So Dr. Dover's opinions, as well as Dr. Patel's opinions, do assist the jury in what customer demand is of the botulinum toxin products that are out there on the market.

THE COURT: Okay. Thank you.

All right. I forget, between now, what we've argued and the, I guess, the five motions that I've just addressed, that's basically all of the motions; right?

MR. ASHKENAZI: I think that's correct, Your Honor.

MR. VARUGHESE: Yes, Your Honor.

THE COURT: Okay. So I think that's probably exhausted everything that I have in mind doing here.

Is there anything further? Yes, sir.

MR. PICKARD: One thing from Revance, Your Honor. In the preparation for today's hearing, we have come across what appears to be some rather significant deficiencies in the constitutional standing for at least some of the Plaintiffs' submissions. And I have shared our views on this matter just yesterday by letter to the

02:37:09 Plaintiffs, so I don't expect them to have a response to
02:37:12 what I'm saying. But I wanted to just let Your Honor know
02:37:14 that that is a live issue. We're trying to work with the
02:37:16 Plaintiffs to see if we can resolve it hopefully in time
02:37:19 before the submission of the Pretrial Order or proposed
02:37:22 Pretrial Order. But I just wanted to alert you --

02:37:24 THE COURT: Okay.

02:37:24 MR. PICKARD: -- that that may be coming in.

02:37:26 THE COURT: All right. Thank you.

02:37:29 Anything from your side? No.

02:37:32 Okay. Well, thank you for your time this
02:37:34 morning. It's certainly been informative and, therefore,
02:37:38 helpful. And I will see when I can get you some answers to
02:37:48 these questions.

02:37:49 Okay? So have a good day.

02:37:52 ALL COUNSEL: Thank you, Your Honor.

02:37:53 DEPUTY CLERK: All rise.

02:37:54 (Court was recessed at 2:37 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court