MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

JEREMY A. TIGAN
(302) 351-9106
jtigan@morrisnichols.com

February 24, 2025

The Honorable Richard G. Andrews
United States District Court for the District of Delaware
844 North King Street
Room 6325, Unit 9
Wilmington, DE 19801-3555

*VIA ELECTRONIC FILING*

**PUBLIC VERSION**

Re: *Allergan, Inc. v. Revance Therapeutics, Inc.* C.A. No. 21-1411 (RGA) (JLH)

Dear Judge Andrews:

Plaintiff Allergan writes pursuant to the Court's February 14, 2025 Oral Order (D.I. 530) asking whether Dr. Meyer's reasonable royalty analysis for the asserted manufacturing patents is contrary to *VirnetX, Inx. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014). Dr. Meyer's opportunity cost-based analysis is grounded in specific real-world facts and the relative bargaining position of the parties—she does not base her opinion on any arbitrary "rule of thumb" or allocate all of Revance's various cost savings to Allergan. Instead, Dr. Meyer's royalty rate corresponds to Revance's own forecasts of what a 12- or 18-month delay would cost in gross Daxxify profits from 2022 through [redacted] selecting this cutoff because it is when Revance expected to launch its second neurotoxin product. Thus, Dr. Meyer allocated only the [redacted] of this avoided opportunity cost to Allergan, leaving all its future value from [redacted] onward to Revance. Moreover, her royalty is conservative for being calculated from only this one opportunity cost and excluding the other substantial costs and risks that Revance would face to develop, test, and obtain approval for a new, non-infringing product. That is, the benefit of avoiding these additional design-around costs would also remain with Revance upon licensing the asserted manufacturing patents on Dr. Meyer's terms. Her opportunity cost-based analysis is therefore consistent with *VirnetX*, and the Court should reject Revance's motion to exclude it.

## I. *VirnetX* Applied the Nash Bargaining Solution, Which the Court Rejected as Insufficiently Tied to the Facts of the Case

The Federal Circuit's *VirnetX* decision at pg. 1331 focused on a significantly different type of analysis than the one conducted by Dr. Meyer in this case. In *VirnetX*, the patentee's expert applied the Nash Bargaining Solution ("NBS"), which is a game theory-based economic framework sometimes used to analyze parties' starting positions in a hypothetical negotiation. *Id.* at 1325, 1331. The NBS assumes parties are negotiating over incremental profits associated with the use of a patented technology, and applies a 50/50 split on those profits at the outset before assessing additional factors (*e.g.*, the *Georgia-Pacific* factors). *Id.* at 1325, 1331-32. The

Court rejected use of the NBS as a "rule of thumb" unless the expert first establishes that "the premises of the theorem actually apply to the facts of the case at hand." *Id.* at 1332.

## II. Dr. Meyer's Opportunity Cost-Based Methodology Is a Reliable, Fact-Specific Methodology for Apportionment

Dr. Meyer's reasonable royalty analysis for the asserted manufacturing patents applies a design-around opportunity-cost model, not an arbitrary starting point for profit splitting. She also considers a number of other risks and costs of developing a new product that Revance would have expected to incur if it declined to take a license at the hypothetical negotiation. Dr. Meyer's analysis is thus consistent with *VirnetX* and other Federal Circuit cases because it is reliable, tethered to real-world facts, and does not apply any "rule of thumb."

### A. Many Reliable Methods Are Available to Prove Damages

It is axiomatic that "there may be more than one reliable method for estimating a reasonable royalty." *Apple v. Motorola*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). One such fact-based methodology to apportion the value of a patented technology under *Georgia-Pacific* is to calculate a royalty based on the infringer's design-around costs if it were to forego a license. *See, e.g.*, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1333-35 (Fed. Cir. 2015) (holding "the costs the infringer would incur to produce a non-infringing product" are "relevant to the reasonable royalty for a license to sell a product covered by the patent"). For example, in *Prism Technologies v. Sprint Spectrum* (also of record here, D.I. 348 at 15), the Federal Circuit affirmed a royalty calculation based on the infringer's "cost savings" from taking a license rather than building its own noninfringing network. 849 F.3d 1360, 1375-76 (Fed. Cir. 2017) (trial evidence supported royalty based on willingness "to pay an amount calculated by reference to the costs that [the infringer], in order to provide its customers the kind of service it wanted to offer them, would have incurred if it had chosen not to infringe"). Dr. Meyer's analysis comports with those cases and does not contravene the Entire Market Value Rule, as this is not a multi-component case. Rather, like *AstraZeneca*, 782 F.3d at 1337-38, this dispute is about core manufacturing technology covering the infringing product as a whole, the need for which the hypothetical negotiators would have known was a significant gatekeeping issue for FDA approval that would impact Daxxify's launch timeline.[1]

### B. Dr. Meyer's Opinion Does Not Allocate Revance's Entire Cost Savings to Allergan

Dr. Meyer's 15-20% royalty appropriately allocates Revance's gross profit from Daxxify sales associated with licensing the asserted manufacturing patents, with Allergan receiving the value from 2022 to [redacted] and Revance retaining all such value after [redacted] in line with the real-world evidence of record.

---

[1] To the extent the Court finds that the Entire Market Value Rule should apply in this case, both parties' experts also analyzed survey data demonstrating the value of the animal-protein free feature alone, which provide at least a *minimum* value for the asserted manufacturing patents. (*E.g.*, D.I. 360, Ex. A at ¶¶ 126, 174; D.I. 361, Ex. J at ¶ 12; D.I. 349, Ex. 6 at ¶ 425.)

Dr. Meyer assessed that one type of cost Revance would expect to face for foregoing a license would be lost gross profits from Daxxify sales. She calculated that the cost to Revance from 2022 through [redacted] of delaying Daxxify's launch by 12 to 18 months would be $281 to $377 million based on Revance's internal Daxxify sales forecasts. (D.I. 360 Ex. A at ¶¶ 168-171.) Dr. Meyer explained that this amount is only what Revance would have considered its "difference in expected profit *through the end of* [redacted] (*id.* at ¶ 169 & n.302 (emphasis added)), even though the manufacturing patents run through July 2029, and Revance expected to sell Daxxify for longer still. Dr. Meyer identified this [redacted] cutoff based on the specific fact that Revance already planned to launch a second competing neurotoxin by the end of [redacted] and the influence this would have on the parties' hypothetical negotiation. (*Id.* ("I cut off Revance's expected profit losses in [redacted] due to the expected launch [by Revance] of a biosimilar to Botox, which would have a significant impact on the neurotoxin product space.").) This is not an arbitrary "rule of thumb" like the one criticized in *VirnetX*. The net effect is that Dr. Meyer's $281 to $377 million (which was already a conservative estimate, *id.* at ¶¶ 168, 173) is only part of Revance's opportunity cost of delaying Daxxify's launch, not the full cost of that delay through the term of the asserted manufacturing patents, let alone the life of Daxxify as a product. Nor does it account for any of the other design-around costs Revance would have expected to face if it declined to take a license.

Dr. Meyer will present to the jury the various calculations from her opening report that went into determining her reasonable royalty rate for the asserted manufacturing patents. In addition, Figure 1 below illustrates Dr. Meyer's division of avoided lost gross Daxxify profits between Allergan and Revance through Q2 2029 based on the data in her report's Exhibits 6A-E:

***Figure 1.*** *Division of projected loss of gross Daxxify profits through Q2 2029 by Dr. Meyer's royalty analysis for the asserted manufacturing patents in the 18- and 12-month delay scenarios*



As Figure 1 shows, Revance would have expected to lose gross Daxxify profits through patent expiration in Q2 2029 of about [redacted] for an 18-month delay and [redacted] for a 12-month delay.[2] Dr. Meyer's proposed royalty rates do not allocate those full amounts to Allergan; rather, they are calculated to award Allergan only the portion from 2022 through [redacted] and to award Revance the remaining portion from 2026 onward. This translates to allocating Allergan [redacted]% of this opportunity cost via a 20% royalty in the 18-month scenario, or [redacted]% of this opportunity cost via a 15% royalty in the 12-month scenario (*i.e.*, the green portions). And it thus necessarily allocates the remaining [redacted]% or [redacted]% of this opportunity cost to Revance, respectively (*i.e.*, the blue portions).

At trial, Revance is free to cross-examine Dr. Meyer on the intricacies of the calculations and facts underlying her opinions, including the specific facts supporting her [redacted] cutoff. But there can be no question that Dr. Meyer did not award Allergan any portion of Revance's avoided cost of delay (*i.e.*, Revance's lost incremental profits) based on a "rule of thumb," let alone an arbitrary one like in *VirnetX*. Dr. Meyer's methodology is reliable and should not be excluded.

### C. Dr. Meyer's Methodology Allocates Additional Cost Savings to Revance That Are Significant and Valuable

In addition to the costs retained by Revance in Figure 1 above, Dr. Meyer's royalty rate does not allocate to Allergan the direct program costs Revance would avoid "to develop, implement, test, and obtain FDA approval of [an] alternative reformulation" that does not infringe the asserted manufacturing patents. (*Id.* at ¶ 165.) Moreover, Revance's ability to even develop such a design-around "would have been highly uncertain" (*id.* at ¶ 166), and Revance "possibly would never have successfully commercialized an HSA-free and animal product-free product" at all (*id.* at ¶ 164). That is, in declining a license, Revance would incur a non-zero risk-adjusted cost that it would never profit from Daxxify at all, which Dr. Meyer's royalty does not allocate to Allergan despite her opinion expressly considering such costs. (*Id.* at ¶166 ("Revance would have considered [such] costs related to implementing an NIA," and the agreed royalty rate "would reflect these barriers to developing an NIA."); *id.* at ¶ 173 (noting not just "the delayed profitability," but also, *inter alia*, the "additional costs associated with developing a non-infringing product").)

Indeed, Dr. Meyer explained that her calculated opportunity cost of the delayed gross profit on Daxxify sales (already a conservative estimate, *id.* at ¶ 168 ("the 18-month timeline is not the maximum delay that Revance could reasonably expect")) was only the "minimum" cost that Revance would expect to incur by foregoing a license (*id.* at ¶ 166). That Revance had no

---

[2] Allergan proffers this analysis of the data in Exhibits 6A-E of Dr. Meyer's report as evidence she would provide if required to explain that the cost in gross Daxxify profits through [redacted] used to arrive at her 15-20% rate, is only part of Revance's lost gross profits from delaying launch. (D.I. 360, Ex. A at ¶ 169 & n.302.) This additional analysis is not required to calculate the 15-20% royalty itself, and is provided only to respond to the Court's present question. If requested to do so by the Court, Dr. Meyer can provide a declaration or supplemental report ahead of trial supporting these longer-term avoided opportunity cost calculations.

available noninfringing alternative at the time of the hypothetical negotiation (10/30/2024 Hr'g Tr. at 48:19-49:13) only emphasizes the scale of the development, implementation, testing, and approval costs it would have expected to face while designing around Allergan's patents, and the weakness of Revance's would-be bargaining position during the hypothetical negotiation with a direct competitor (at which patents are always assumed valid, enforceable, and infringed).

In sum, Dr. Meyer's royalty analysis allocates to Allergan only a portion of the gross Daxxify profits that Revance would have expected to lose by choosing to delay Daxxify's launch instead of licensing the asserted manufacturing patents. This limited award thus necessarily lets Revance retain all other avoided costs (*e.g.*, the remainder of the incremental gross profits; actual design-around costs; uncertainty of being able to get to market at all; potential loss of "first-to-market advantage"). (*See, e.g.*, D.I. 360, Ex. A, ¶ 173 ("My assessment of this opportunity cost is conservative in that it does not take into account the considerable risk that Revance would be facing in reformulating its product and the fact that Revance has not identified any available acceptable NIAs."), ¶¶ 112-13 (noting Daxxify's "first-to-market advantage" and "critical[] importan[ce]" to Revance).) *See also AstraZeneca*, 782 F.3d at 1335 ("[I]f avoiding the patent would be difficult, expensive, and time-consuming, the amount the infringer would be willing to pay for a license is likely to be greater," particularly where the infringer "would have faced substantial technical and practical obstacles to marketing a non-infringing [product].").
Dr. Meyer does not award Allergan Revance's entire expected cost savings from taking a license.

## III. Conclusion

Dr. Meyer's reasonable royalty analysis for the manufacturing patents is reliable and not contrary to the Federal Circuit's *VirnetX* decision. Revance's *Daubert* motion should be denied.

* * *

Respectfully,

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

JAT:lo
cc: All Counsel of Record (via e-mail)