# EXHIBIT 45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, Inc.,

Plaintiffs,

vs.

C.A. No. 21-1411-RGA-LDH

REVANCE THERAPEUTICS, INC. AND AJINOMOTO ALTHEA, INC. D/B/A AJINOMOTO BIO-PHARMA SERVICES,

Defendants.

* H I G H L Y  C O N F I D E N T I A L *

Deposition of MAURICE MULDERS, taken in the above-captioned cause, at Marriott Lincolnshire, 10 Marriott Drive, Lincolnshire, Illinois, before Rachel F. Gard, CSR, CCR, RPR, CRR, Notary Public, commencing at the hour of 9:09 a.m. Central on Wednesday, March 19, 2025.

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646



APPEARANCES (VIA ZOOM):

ON BEHALF OF THE PLAINTIFFS:
PAUL HASTINGS
BY: CARL MINNITI, ESQUIRE
200 Park Avenue
New York, New York 10166
609.922.0865
carlminniti@paulhastings.com

ON BEHALF OF THE DEFENDANTS:
STERNE KESSLER GOLDSTEIN & FOX
BY: BYRON PICKARD, ESQUIRE
NIRAV N. DESAI, ESQUIRE
1101 K Street NW
10th Floor
Washington, DC 20005
202.371.2600
bpickard@sternekessler.com
ndesai@sternekessler.com



I N D E X


| WITNESS | PAGE |
|---|---|
| MAURICE MULDERS | |
| Examination by Mr. Pickard | 4 |


E X H I B I T S


| MULDERS EXHIBIT | | PAGE |
|---|---|---|
| Number 44 | Declaration of Maurice Mulders | 4 |
| Number 37 | ASBV Botox Intellectual Property Purchase Agreement | 12 |
| Number 41 | Termination Agreement | 15 |
| Number 9 | 2010 MOU | 31 |
| Number 21 | Botox Services Agreement of January 1, 2001 | 41 |
| Number 38 | Call Agreement | 50 |
| Number 39 | Put Agreement | 50 |
| Number 10 | Intellectual Property Economic Asset Purchase Agreement | 61 |
| Number 31 (Paik) | Botox US Supply Chain Flows as of March 1, 2023 | 63 |




(Witness sworn.)
(Mulders Deposition Exhibit Number 44 marked for identification.)
WHEREUPON:
MAURICE MULDERS,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. PICKARD:
**Q All right. Good morning, Mr. Mulders. You've got what we marked as Exhibit Mulders 44 in front of you, correct?**
A Correct.
**Q All right. And that is the declaration you submitted in this case, correct?**
A That's indeed the declaration.
**Q All right. I'd like you to turn to paragraph 5 of your declaration. The first sentence reads: All statements made herein are of my own knowledge are true.**
**Do you see that?**
A Yes, I see that.
**Q It looks like to me there's a typographic error there. Do you agree?**
A No, I don't see.

Page 5

**Q Well, here's what I'm trying to understand. Are you saying that all statements made in this declaration are of your own knowledge or they are true or both? Because it doesn't say. There's a missing word or extra "are" there. Do you see that?**
MR. MINNITI: Counsel, do you have an extra copy of the exhibit?
MR. PICKARD: Yeah. Sorry about that, Carl.
**Q I'll repose the question. Is there a typographic error in that first sentence of paragraph 5, Mr. Mulders?**
A If you say there is a word missing, it might be often knowledge that it should be "and."
**Q Well, I'm asking you, is there a typographic error? Do you believe there is one or not?**
A Okay. I'm not a native English speaker, but I think there should be "and" after "knowledge."
**Q Okay. So all the statements in this declaration are of your own knowledge, correct?**
A Correct. To the best of my understanding, correct.

Page 6

**Q And they are true, correct?**
A Based on my understanding, these are true statements.
**Q Now, I asked you whether they were of your own knowledge, and you said they were of your understanding. Is there a difference between your knowledge and your understanding, Mr. Mulders?**
A Knowledge and understanding are, in my view, inter-exchangeable.
**Q All right. Thank you. Now, if we look at paragraphs 3 and 4, it seems to me that among your job duties is to understand the different rights in Botox IP that are held by the various Allergan entities. Do I have that right?**
MR. MINNITI: Objection to the form of the question.
**Q You may answer.**
THE WITNESS: Sorry, I didn't -- I didn't hear what you said.
MR. MINNITI: I objected to the form of the question. But you may answer, if you understand the question.
A Can you repeat the question?
**Q Yes.**
**Looking at your declaration, it appears to**

Page 7

**me that among your job duties is to understand the rights in Botox IP held by various Allergan entities; is that right?**
MR. MINNITI: Objection to the form of the question.
A It's my understanding -- it's my understanding, which entities have the economic rights to the Botox portfolio.
**Q All right. What are the economic rights? What I mean by that question is: What rights make up the category of economic rights?**
MR. MINNITI: Objection to the form of the question.
A Can you repeat it again? Sorry.
**Q Yeah, why don't we do this. Look at the second line of paragraph 3 where you wrote: Ownership of economic and legal rights of Botox intellectual property and where it exists.**
**Do you see that?**
A I'm sorry. I'm not there.
**Q It's the very last line on page -- on the first page of your declaration. It begins: The entities that hold ownership of economic and legal rights.**
**Do you see that? It's the very last line,**

Page 8

**Mr. Mulders.**
A Yes. I see it, yeah.
**Q What are the economic rights that you refer to in that line?**
A Economic rights are the rights to the residual profit of the Botox portfolio.
**Q What are residual profits as distinct from other types of profits?**
A Residual profits is what is -- what remains after the compensation of the routine functions in the product cycle, lifecycle of the product.
**Q All right. Other than the rights to residual profits, are there any other rights included in the category of economic rights to Botox intellectual property?**
A It also includes the rights to perform those activities.
**Q "Those activities" being what?**
MR. MINNITI: Objection to the form of the question.
THE WITNESS: Can you -- I'm having trouble hearing.
**Q So, Mr. Mulders, from time to time, Mr. Minniti will raise some objections. And**

**unless he gives you an instruction not to answer the question, you just need to answer the question.**
**Do you understand that?**
MR. MINNITI: Well, I'll jump in. I'll object from time to time. If you don't understand the question that's been asked, you may ask for the question to be repeated.
A Can you repeat the question?
**Q Yes. You told me that the economic rights also includes the rights to perform those activities. My question is: What are those activities?**
A To develop, enhance, maintain, protect, and exploit the product.
**Q Any other rights that are included among the category of economic rights to Botox intellectual property?**
A Those are the -- yeah, to develop, enhance, maintain, protect, exploit, defend the portfolio.
**Q What does it mean to defend the portfolio?**
A Oh, okay. I'm not a litigation or a lawyer. If there is like -- so I'm not really comfortable in explaining what is defend, but ...



**Q Fair. How about -- I think you used the word "protect." What does it mean to protect the Botox IP?**
A Protect and defend. Again, I'm not an expert in the legal cases. But protect is close to defend.
**Q All right. Now, that list -- develop, enhance, maintain, protect, exploit, and defend -- where do you get that information from? How do you know those are included among the economic rights?**
MR. MINNITI: Objection to the form of the question.
A Those functions are what we use in the tax world.
**Q Okay. My question is a bit different. You told me that those things I just listed -- that is develop, enhance, maintain, protect, exploit, and defend -- how do you know those are included in the economic rights to Botox IP?**
MR. MINNITI: Objection to the form of the question.
**Q What I'm asking is what's the basis of your knowledge?**
A That's my understanding of how we have



been acting as a company.
**Q No, I understand that that is your understanding. My question is: How did you arrive at your understanding? Can you answer that question?**
MR. MINNITI: Objection to the form of the question.
A From -- based on my work at the company.
**Q Did you look at any contracts to form that understanding?**
A I've looked at many, many agreements over the past 10 years.
**Q All right. And you're comfortable looking at contracts, then, as they relate to economic and legal rights to Botox intellectual property, correct?**
A As I answered, I'm not a legal expert.
**Q Okay. So are you comfortable or are you not comfortable answering questions about the contracts that define the legal and economic ownership rights to the Botox intellectual property?**
A I'm not a legal expert. I can't make a legal specific statement on contracts.



(Mulders Deposition Exhibit Number 37 marked for identification.)
**Q All right. Have you -- let's start here. Let's go to Exhibit 37, please. We'll call this Mulders 37.**
**All right. We're giving you what's marked as Mulders 37. So, Mr. Mulders, do you recognize the ASBV Botox Intellectual Property Purchase Agreement?**
A I think I've seen this, yeah.
**Q When did you first see it?**
A I don't remember.
**Q When did you last see it?**
A I think I might have seen it yesterday -- Monday.
**Q All right. Let's start here. I want you to look at the first page, and there's a little intro that says: In reference to the following facts, colon.**
**Do you see that?**
A Yeah.
**Q Right under the bolded paragraph. And it** says in paragraph A: Seller owns or has acquired a share in the beneficial rights to [redacted] Botox in the territory, paren, collectively

Page 13

the Botox rights, close paren.
Do you see that?
A I see that.
**Q What share -- well, first of all, the seller here is Allergan Pharmaceutical Holdings Ireland, Limited, right?**
A Ireland -- that is the seller in this agreement, yes.
**Q Can we call them APHI today?**
A That's perfect, yeah.
**Q Okay. So my question for you is: How did APHI come to own or acquire its share of the beneficial rights in Botox as of this 2006 purchase agreement?**
A You would have to go to the 2010 MOU where it is stipulated.
**Q Okay. Now, the 2010 MOU came 4 years or so after this agreement, right?**
MR. MINNITI: Objection to the form of the question.
A The agreement was dated 2010, yes.
**Q Okay. And it was signed in 2010 too, wasn't it?**
A The 2010 agreement is signed in 2010.
**Q Yeah, so I would like to -- let me start**

Page 14

**with some basic facts.**
**Did APHI own or acquire a share in the beneficial rights to** [redacted] **Botox as of the signing of the 2006 purchase agreement that we've marked as Exhibit 37?**
A Sorry, I was -- can you repeat?
**Q Yes.**
**My question is very simple. Is this paragraph A, is it true, was it true as of the signing of the purchase agreement?**
MR. MINNITI: I'm going to object to the form of the question. I'm just going to note for the record that the questions are being asked in a rapid fashion, and the witness has already noted that English is not his first language. So I'm just going to ask counsel to slow down in the questions.
**Q Is paragraph A correct, was it correct -- let me rephrase it.**
**Was paragraph A correct as of the signing of this purchase agreement, Exhibit 37?**
A I -- as I mentioned, I'm not a legal expert. I have looked at the 2010 MOU, and the 2012 termination agreement, and those I am familiar with.

Page 15

**Q All right. Are you familiar with the purchase agreement that we've marked here as Exhibit 37?**
A I've seen it, but I have not reviewed it in detail.
**Q Have you discussed it with anyone since you've been employed at Allergan/AbbVie?**
A I don't recall.
**Q All right. Let's go to the 2012 termination, then, which I believe is 42 -- 41, maybe.**
**(Mulders Deposition Exhibit Number 41 marked for identification.)**
**Q Mr. Mulders, I've handed you what we've marked as Exhibit 41. You referred to, a moment ago, a 2012 termination agreement. Is this what you were referring to?**
A Yes.
**Q All right. Did the 2012 termination agreement, Exhibit 41, terminate the 2006 purchase agreement?**
A I refer to section B, C of the whereas.
**Q All right.**
A And --
**Q Sorry.**

Page 16

A Can I continue? And Section 3.
**Q All right. Let's start this way: Can you show me where, if at all, the 2012 termination agreement expressly refers to the 2006 purchase agreement?**
A I refer to clause 3, which states: This agreement contains the entire understanding between the parties hereto with respect to the past relationship between the parties and supersedes and replaces all prior negotiations, proposed agreements, or agreements concerning the same.
**Q Thank you. You just read for me the entirety of paragraph 3, correct?**
A Yes, I read paragraph 3.
**Q Where in paragraph 3 is there an express reference to the 2006 purchase agreement?**
A Paragraph 3 is saying that it supersedes all prior arrangements.
**Q Yes, but where does it mention the 2006 purchase agreement expressly?**
MR. MINNITI: Objection to the form of the question. Asked and answered.
A The agreement is referring to all prior agreements.

Page 17

**Q That's -- you believe that is an express reference to the 2006 purchase agreement; is that right?**
A Prior agreements, 2006 is prior to 2012 so ...
**Q All right. Here's my next question: Do you see the word, the phrase "the same" that appears at the very end?**
A I see, yeah.
**Q That is a reference to this agreement, correct?**
MR. MINNITI: Objection to the form of the question. And objection to the extent it mischaracterizes the document.
MR. PICKARD: I'd appreciate not coaching the witness.
MR. MINNITI: It's not coaching.
MR. PICKARD: It is. You're --
MR. MINNITI: That's not --
MR. PICKARD: Let me finish my point.
MR. MINNITI: Counsel --
MR. PICKARD: Carl, let me finish. You're telling the witness my question is wrong. That's coaching the witness.
MR. MINNITI: That is not coaching the

Page 18

witness.
MR. PICKARD: If he disagrees, he can say so. He's a competent witness to answer the question.
MR. MINNITI: I'm going to respond to that. Counsel, it's not coaching the witness. It's an appropriate objection. I've been sitting here quietly as you have been raising your tone with the witness. Don't appreciate that. We can move forward with the deposition.
**Q Mr. Mulders, the phrase "the same" as it appears at the end of paragraph 3 in the 2012 termination agreement, that's referring to this agreement, the phrase that appears at the very beginning of paragraph 3, correct?**
MR. MINNITI: Same objection.
A I don't see it that way.
**Q What does it refer to, the phrase "the same"?**
A It refers to all prior agreements.
**Q I'd like you to look back at the 2006 purchase agreement, please. That was Exhibit 37. I'd like you to turn to paragraph 3.5. Have you read that before?**
A I haven't read these agreements in detail,

Page 19

as I mentioned before. It's a long time.
**Q That wasn't quite my question. Have you ever read that paragraph before?**
A I don't recall.
**Q All right. If you look down at the bottom, there's a third line from the bottom of that paragraph there's a comma after "hereof." And it says: And no agreement and understanding varying or extending the same shall be binding upon any party hereto unless in writing signed by a duly authorized officer or representative thereof in which this agreement is expressly referred to.**
**Do you see that?**
A I see that, yeah.
**Q And it's your position that all prior agreements in the 2012 contract is an express reference to the 2006 purchase agreement; is that right?**
A I am saying that the '12 agreement addresses all prior agreements. That's my understanding.
**Q My question wasn't whether it addressed all prior agreements. My question was whether it expressly referred to them. Do you understand the**

Page 20

**difference?**
MR. MINNITI: Objection to the form of the question.
A My answer is that I'm -- that it is superseding all prior arrangements.
**Q Yes, thank you. I'm not asking you what it means. I'm asking you if you understand the phrase "express reference."**
**Do you understand what that means?**
MR. MINNITI: Objection to the form of the question.
A I'm not a lawyer so ...
**Q Fair enough. I'll stipulate to that. My question stands, however, and that is: Do you understand what the phrase "express reference" means in the context of this 2006 purchase agreement?**
A I have --
MR. MINNITI: Objection to the form -- objection to the form of the question. You may answer, if you understand.
**Q You can answer the question.**
A I haven't read the 2006 agreement in detail.
**Q Did you read it in detail after preparing**

Page 21

**your declaration in this case?**
A I've not read this agreement in detail.
**Q All right. Let's look back at your dec, the declaration. In paragraph 4, you wrote: It is my understanding that while ASBV once allocated a -- was once allocated a specific income interest in the property rights for [redacted] Botox, those rights were terminated no later than 2012. And it continues.**
**My question is this: When you talked about ASBV was once allocated to specific interest, do you understand that that's the 2006 agreement, correct? It at least includes that?**
MR. MINNITI: Objection to the form of the question.
A No.
**Q Correct? No?**
A I was based on the 2001 agreement.
**Q So you weren't -- in paragraph 4, you're not even talking about the 2006 purchase agreement, correct?**
A I'm talking -- it's my understanding, as I stated here, that ASBV was once allocated a specific income interest in the intellectual property of Botox.

Page 22

**Q Okay. I understand that because you just read your dec.**
**My question is: Your paragraph 4, your discussion of things that were allocated to ASBV, did that take account of the 2006 purchase agreement?**
A It took account of the whole set and based on my understanding of the situation of ASBV.
**Q Is that a yes, you did take account of the 2006 purchase agreement?**
A I'm repeating. It's my understanding that ASBV was once allocated a specific income interest in intellectual property rights for [redacted] Botox. And those rights were terminated no later than 2012 during the restructuring effort at the company starting in approximately 2010.
**Q All right. My question is a little different.**
**When you talked about the allocation of specific income interest to ASBV, were you referring, at least in part, to the 2006 purchase agreement, yes or no?**
A I was referring to the prior agreements that were there.

Page 23

**Q And did those prior agreements include the 2006 purchase agreement?**
A I was referring to the whole set of agreements and not calling out a specific agreement.
**Q I agree you didn't call out specific agreements. That's why I'm asking you the question.**
**When you wrote those words, did you have in mind the 2006 purchase agreement, yes or no?**
A I had no specific agreement in mind. It's my understanding based on the work we did in 2015 that ASBV was once allocated a specific income right.
**Q What work was done in 2015 that you just referred to?**
A When we acquired Allergan, we got an understanding of how business was conducted at that time.
**Q So your understanding begins as of the state of affairs in 2015, correct?**
A Correct.
**Q Thank you. Let's go back to Exhibit 37, please.**
A Which one is 37?

Page 24

**Q Yeah, so --**
A Which one is 37?
**Q That's the one that's marked 37 on the front page. It's the purchase agreement.**
**The agreement is dated 1 January 2006, correct?**
A That's the date in the beginning, yeah.
**Q And it was signed about that time; is that right?**
MR. MINNITI: Objection to the form of the question.
A There was -- I cannot say when it was signed.
**Q Okay. Well, as of January 1st, 2006, did APHI own or acquire a share of the beneficial rights to [redacted] Botox?**
A Sorry. Can you repeat the question?
**Q Yeah. As of January 1, 2006, had APHI come to own or acquire a share in the beneficial rights to [redacted] Botox?**
A APHI was together with the two other parties mentioned in the MOU, the three beneficial owners.
**Q Okay. That's -- you just referred to the 2010 MOU, correct?**

Page 25

A I referred to the MOU.
**Q What I want to know is what was the state of affairs in 2006. So in 2006, had APHI come to own or acquire a share of the beneficial rights to [redacted] Botox?**
A As I said in my declaration, and what I mentioned to you, that when we took over in 2015, my statement is related to the 2015 affairs and that there was nothing in ASBV at that time.
**Q All right. That is not my question at all.**
**My question is: What did APHI own as of January 1, 2006? Do you know the answer to that question?**
MR. MINNITI: Objection to the form of the question.
A That was not part of my scope.
**Q All right. Well, you said in paragraph 4 of your declaration that "during the course of my employment and as part of my responsibilities, I have also developed knowledge about the historical rights that Allergan Services BV, you defined as ASBV, once held.**
**Would you agree that the 2006 purchase agreement is part of that historical knowledge**

Page 26

**that you claim to possess?**
A It's a matter of how you define historical knowledge.
**Q How do you define historical knowledge, Mr. Mulders?**
A I define it for the period until 2012 or 2010.
**Q Until, okay. So that includes prior to, correct?**
A No, from.
**Q From 2012?**
A Yeah.
**Q So you don't know anything about before 2012; is that right?**
A I might have an understanding.
**Q I thought you said understanding and knowledge are the same thing in your mind. So why are you changing the word?**
MR. MINNITI: Objection to the form of the question.
A As I said before, I'm not like a native English speaker, so sometimes it goes quickly.
**Q I understand that, but you have --**
MR. MINNITI: Objection. Allow the witness to finish his answer.

Page 27

**Q Had you finished, Mr. Mulders?**
A Sometimes you're going a bit quick.
**Q All right. I understand English is not your first language. You, however, have signed a declaration in English and the contracts in this case are all written in English, so I think it's fair for me to ask you questions that are in English.**
**Do you agree?**
A Yeah, it's just the speed.
**Q All right. My question is this: You said your knowledge, your historical knowledge was from 2012 onward, meaning from 2012 to the present, correct?**
A That's what my declaration says.
**Q All right. So you don't -- your declaration does not address facts or the understandings that you have from before 2012, correct?**
A My statement is related to the situation on 2015 what my understanding was on 2015, what the situation of ASBV was.
**Q What happened in 2015? You said, like, "we took over." Who's "we"?**
A Actavis.

Page 28

**Q And were you previously at Actavis?**
A Yes.
**Q And that's how you came to be employed at your current company, right?**
A No, that's even further.
**Q All right. Who's your employer today?**
A Central AbbVie Finance, BV.
**Q Central AbbVie Finance.**
A AbbVie Central, sorry. AbbVie Central Finance, BV.
**Q Do you hold or have you held any positions with APHI ever?**
A APHI, no.
**Q How about Allergan Ireland, the plaintiff, in this case?**
A No.
**Q So you can't tell me what rights Allergan Pharmaceutical Holdings Ireland Limited held as of 2006, correct?**
A What I stated in my declaration is, as of 2015, ASBV had no rights to the Botox intellectual property.
**Q I'm not asking you about 2015. Do you understand that?**
A I understand it. But you understand my

Page 29

answer.
**Q Yeah, I don't care about 2015 for purposes of this question. My question is about 2006. I just want to confirm, you do not know one way or the other what rights APHI held as of January 1, 2006, correct?**
A APHI is stipulated in the MOU as a beneficial owner.
**Q Okay. And so you do know the rights they held; is that right?**
A Based on the MOU, yes.
**Q Now, the MOU is a 2010 document, correct?**
A Correct.
**Q How is it that you can talk about the 2010 MOU if your historical begins in 2012?**
A Because 2010 and 2012 are interlinked.
**Q Okay. But 2006 purchase agreement and 2010 are not interlinked; is that your testimony?**
A For me, 2010 and 2012 are the key documents.
**Q Yeah, I guess for purposes of today, what you think are the key documents are not relevant. I have some very basic questions about what things mean and what things say. And so I know you may want to argue your case today, but that's not what**

Page 30

**this is about. Do you understand that?**
MR. MINNITI: Objection to the form of the question. A lecture to the witness is unnecessary.
MR. PICKARD: The witness is being unresponsive, Carl.
MR. MINNITI: I disagree.
**Q All right. What is a beneficial owner that you just used in your answer of a moment ago?**
A Beneficial owner is something we used in the tax world.
**Q What does it mean?**
A That's an entity that is entitled to the residual profit of a whole product portfolio.
**Q All right. Are there any other -- if someone is a beneficial -- a company is beneficial owner of rights, does that signify they own anything other than a right to residual profits?**
A They have the right to exploit it, develop it, maintain it, protect it, defend, and enhance it.
**Q Okay. And Allergan Services was a beneficial owner of Botox rights, wasn't it?**
A Allergan Services was at one point allocated a specific income interest in the

Page 31

property.
MR. PICKARD: Let's mark that as 9, please.
(Mulders Deposition Exhibit Number 9 marked for identification.)
**Q Do you recognize that as the 2010 MOU, Mr. Mulders?**
A Yes.
**Q All right. I'd like you to look at the whereas clause B. I'm sure you're familiar with this.**
**Have you seen that before?**
MR. MINNITI: Objection to the form of the question.
A Yeah, I'm looking at the B.
**Q All right. When did you first read the 2010 MOU?**
A Sorry. What is my first?
**Q When did you first read the 2010 MOU?**
A I don't recall.
**Q Was it about 2015?**
A I would be speculating. I don't recall.
**Q When you read it, did you understand it?**
A I think I had a pretty good understanding.
**Q Do you have any questions about what it**

Page 32

**meant at any point upon reading it?**
A I don't recall.
**Q Do you recall asking anyone inside the Allergan companies what the MOU meant by this language?**
A I'm pretty sure we had discussions, but I don't recall.
**Q All right. Let's look at paragraph -- the whereas paragraph B. And it says: APHI, ABL, and API and Allergan Services BV are [redacted] beneficial owners of the product known as Botox.**
**Do you see that?**
A I see that language, yes.
**Q So the MOU says that Allergan Services is the beneficial owner of the Botox product, correct?**
A That is the sentence that is stating that the four entities are mentioned therein.
**Q And that was true when the MOU was signed, correct?**
A It is stated in the whereas that these four entities are the worldwide beneficial owners.
**Q I understand what it says. My question is a little different, and that is: Is that a true**

Page 33

**statement, what it says there? Was it true in 2010?**
A It's in the agreement.
MR. MINNITI: Objection to the form. Question. Please slow down so the witness can answer the question that's actually being asked.
**Q Was it an accurate statement of fact when the MOU said that Allergan Services was a beneficial owner of the product known as Botox?**
A Beneficial owner is, like, a broad term. It depends on how you define or look at beneficial owner. There are four entities mentioned here.
**Q Yes. My question is not what beneficial owner means. We'll get to that. My question is: That statement as written in the 2010 MOU, was it true at the time of the MOU?**
A I don't understand why you refer to true. It's in the agreement.
**Q Well, there are things in the agreement that may not be true as a matter of fact. Parties can agree to their own understanding in a contract. My question is: Was it true -- let's say that the MOU didn't exist. Was it the case in 2010 that Allergan Services BV was a beneficial owner of the product known as Botox?**

Page 34

MR. MINNITI: Objection to the form --
A I don't feel comfortable --
MR. MINNITI: Hold on. Objection to the form of the question.
**Q You can answer now.**
A I don't feel comfortable answering that.
**Q Why not?**
A I cannot make a statement on true.
**Q So when you say you're not comfortable, you don't know the answer; is that right?**
A I wasn't there at the time, so I can't make a statement on what was done in that period.
**Q Why is it necessary for you to have been there at the time to know whether it was true?**
A I can't make a statement if I wasn't there if it is true. I can't confirm something like that.
**Q Okay. Now, you weren't there, as you put it, in 2010, correct?**
A Sorry, I wasn't?
**Q You weren't there in 2010?**
A There being?
**Q As you put it, "I wasn't there, so I can't tell you"?**
A I wasn't part of the company at that time.

Page 35

**Q Right. And the 2010 MOU, that was executed in 2010, correct?**
A It's signed in 2010, yes.
**Q And you weren't there at the company in 2010, correct?**
A I wasn't at the company in 2010.
**Q So you can't speak to the 2010 MOU because you don't know about it because you weren't there, right?**
A I can speak to the MOU that is in front of me, yeah.
**Q Then let's talk about the MOU at paragraph B. Was the MOU correct in its statement that Services, ASBV, was a beneficial owner of the product?**
A It is mentioned in the B whereas that it is, with the other three companies, a beneficial owner.
**Q Then it continues: With each entity holding a specific interest.**
**Do you see that?**
A Yes, I see that.
**Q That phrase "with each entity," that refers to all four of the preceding identified entities -- namely, APHI, ABL, API, and Allergan Services BV, correct?**
A That would be a safe assumption.
**Q And that was true, correct?**
A That's a safe assumption.
**Q All right. Now, what specific interest did each of those entities hold as of when they came to the 2010 MOU? Do you know the answer to that?**
A That is stipulated in 1.
**Q You're talking about the economic ownership section?**
A Correct.
**Q Now, I understand the economic ownership section to describe the rights that were granted by the MOU.**
**Do you have the same understanding?**
MR. MINNITI: Objection to the form of the question.
A No, it's determined in the MOU.
**Q It's determined?**
A Parties agreed.
**Q Okay. So I guess my question is: If we look at economic ownership, before the execution of the MOU, did the parties to the MOU, Allergan Botox Limited, APHI, and Allergan Pharmaceuticals**

Page 36

Page 37

**Ireland, did they already hold economic ownership interests or were they granted them by way of the MOU?**
A It's my understanding that they already owned it.
**Q That they already owned?**
A The economic.
**Q No, you dropped a word there. You said -- is it your understanding that they already owned it?**
A They already owned the economic ownership.
**Q Okay. So the --**
A Split between those three entities.
**Q So before 2010, those companies already owned what is described here as the economic ownership; that's right?**
A Yeah, that is what is stated in 1, yeah.
**Q Let me ask you this: Did the MOU change anything as between the parties to the contract, or did it simply memorialize what had come to exist as a matter of practice or understanding within the company?**
A If you look at F, following the series of reorganizations and the desire to achieve greater clarity and certainty over the legal and economic

Page 38

ownerships of Botox, the parties agree to memorialize the prior and current ownership of Botox IP rights.
**Q So is it your understanding that the MOU simply memorialized things that had already been agreed upon or had come to an understanding over, correct?**
A I'm reading, the parties agreed to memorialize the prior and current ownership of Botox IP.
**Q Thank you. I appreciate that you've read that. All of us here can do that.**
**My question is a little bit deeper, and that is: Given that language, is it your understanding that the MOU simply memorialized what had already come to be the case?**
MR. MINNITI: Objection to the form of the question.
A I'm repeating the sentence that is there. The parties -- I'm just reading the sentence: The parties agree to memorialize the prior and current ownership of Botox IP rights.
**Q Did the 2010 MOU terminate any Botox rights held by any company?**
MR. MINNITI: Objection to the form of the

Page 39

question.
A I would have to read the whole agreement again.
**Q I'll withdraw the question.**
**Let's look at your declaration, Mr. Mulders. You can put that aside.**
MR. MINNITI: Just want to be clear for the record, the witness asked -- suggested to read the entire document. Are you not allowing the witness to read the entire document?
MR. PICKARD: I've withdrawn the question, Carl. We're on very tight time frame. If you want to interrupt my questions with talking, I'd please ask you not to.
**Q Mr. Mulders, I'd like you to look at paragraph 4 of your declaration that has been marked as paragraph -- as Exhibit 44, forgive me. Are you there?**
A Yeah, I'm looking at it.
**Q You wrote in the middle: Those rights were terminated no later than 2012 during a restructuring effort at the company starting in approximately 2010.**
**Do you see that?**
A I see that.

Page 40

**Q Your reference to 2012, that was the termination agreement that you've looked at earlier today, correct?**
A That's the termination agreement, yeah.
**Q Now you said no later than. So it's possible it was terminated before the 2012 termination agreement, correct?**
A That's a possibility.
**Q Right. And I guess my question is: Did the MOU terminate it before 2012?**
A I have no knowledge of what happened between 2010 and 2012 in ASBV and at the latest it was terminated in 2012.
**Q And it's your testimony that the thing that terminated ASBV's rights was the 2012 termination agreement, correct?**
A I'm going back to Exhibit 41 where it indeed terminates the agreements, the prior agreements with ASBV.
**Q All right. How did APHI in the initial case come to hold Botox IP rights before 2006?**
MR. MINNITI: Objection to the form of the question.
A As I said before, I looked at many agreements. I don't know the full history how it

Page 41

went there.
(Mulders Deposition Exhibit Number 21 marked for identification.)
**Q Okay. You've got what we marked as Mulders 21. Do you recognize that as the Botox Services Agreement of January 1, 2001?**
A No, I don't immediately recognize this.
**Q Do you think you've seen it before?**
A I -- I don't know.
**Q All right. If you look at the whereas clause No. 2, it says: ABL, API, and APHI jointly known as the recipients, beneficially own and/or are licensees of certain intellectual property rights associated with the botulinum neurotoxin Type A, purified neurotoxin complex, sold under the brand name Botox, and then it continues.**
**Do you see that?**
A I see that section.
**Q It would appear, therefore, those three entities as of 2001 had come to beneficially own or be licensees of certain IP rights, correct?**
MR. MINNITI: Objection to the form of the question.
A Those three entities are mentioned here as beneficial owner.

Page 42

**Q Was that true in 2001, that those companies were beneficial owners and/or licensees?**
A I wasn't there in 2001.
**Q You don't know?**
A I wasn't there in 2001.
**Q And my question is: And, therefore, you do not know; is that right?**
A I keep saying I wasn't there in 2001. This ...
**Q I'm prepared to accept that, but I do need you to tell me you don't know because if you know, I'm entitled to get that answer.**
MR. MINNITI: Objection to the form of the question, if there even was a question.
**Q As of 2001, January 1, 2001, were ABL, API, and APHI beneficial owners or licensees of certain IP rights associated with the botulinum neurotoxin?**
A I wasn't -- I keep saying I wasn't there at the time, so ...
**Q So you don't know; is that correct?**
A I wasn't there.
**Q I understand that. My question is not whether you were there. My question is whether you know. Do you know whether it's true? That's**

Page 43

**a yes-or-no question.**
MR. MINNITI: Objection to the form of the question.
A This is the first time -- this is the -- I'm looking at this agreement now, so I would have to go through it again to refresh.
**Q You said this is the first time.**
A No, I didn't say the first. I corrected myself.
**Q Okay. Thank you. So you have seen this before today, correct?**
A I said I don't recall seeing this. I might have seen this.
**Q All right. But you don't know whether the whereas paragraph 2 is true or not, correct?**
A I'm not comfortable making statements like I don't know or I know.
**Q Why aren't you comfortable? Do you know whether or not you know?**
MR. MINNITI: Objection to the form of the question.
**Q Why are you uncomfortable answering my question whether you know something?**
A Because I wasn't there at the time in '21 -- 2001.

Page 44

**Q And you weren't there in 2010 either, correct?**
A I wasn't there in 2010.
**Q And you weren't there in 2012 either, correct?**
A I wasn't there in 2012.
**Q But you are comfortable answering questions about the 2012 contract that you say terminated ASBV's rights, correct?**
A Because there was clear language there that it was terminated.
**Q Ah, so what you need is simply clear language? It's not essentially "be there." You need a contract with clear language; is that right?**
MR. MINNITI: Objection to the form of the question.
A And an understanding how the business was done.
MR. MINNITI: Objection to the form of the question.
**Q If the 2012 termination agreement, which we've marked as Exhibit 41, did not terminate ASBV's rights to the Botox IP, was there any other termination of those rights that you were aware**

**of?**
MR. MINNITI: Objection to the form of the question.
A I can't call out the specific agreement.
**Q How about anything in general? Anything in general that you can offer on that?**
A No, I can't offer anything in general.
**Q All right. Let's go back to the 2012 agreement. That is Exhibit 41. In an earlier line of questioning, I asked you about where the 2006 purchase agreement was expressly referred to. You pointed me to paragraph 3. But you also pointed me to B and C.**
**Do you remember that?**
A Yes, I remember.
**Q All right. Now, where does paragraph B expressly refer to the 2006 purchase agreement?**
A B said: Whereby they agree that ASBV would yield up its licensing rights and sell its portions of the IP, which will render the agreement with no effect.
**Q Okay. Do you see the word "would yield up," that word "would"?**
A Yes, I see the word.
**Q You're aware that's in the subjunctive**



**mood, and that's talking about a future conditional.**
**Do you understand that?**
MR. MINNITI: Objection to the form of the question.
A I understand --
**Q Good.**
A -- the English.
**Q So --**
MR. MINNITI: Let the witness finish his answer.
**Q I'm sorry, I thought you had.**
A I understand the English. As I mentioned before, I'm not a contract lawyer.
**Q Okay. So the termination agreement, at least terminated the license agreement of 2001, correct?**
A It, based on 3, it terminated all prior agreements.
**Q And that included the 2001 license agreement, correct?**
A All prior agreements.
**Q That included the 2001 license agreement, correct?**
A I would assume so, yes.



**Q All right. Now, can you show me in this agreement where ASBV sold anything to APHI in the 2012 agreement?**
A It terminated.
**Q Thank you. There's no sale of anything in the 2012 termination agreement, is there?**
A It's a termination.
**Q That's correct. There's no sale. Do you agree with me?**
A There was no reference to sale.
**Q Thank you. Therefore, it's fair to read that as something that might have happened but didn't happen at least by way of the 2012 termination agreement, correct?**
MR. MINNITI: Objection to the form of the question.
A I'm not speculating on "might."
**Q Okay. If the 2012 agreement didn't sell ASBV's portion of the IP, what other act or contract did that, if at all?**
A That's a speculating question. It did. It's terminated.
**Q When you say "it is terminated," what are you referring to?**
A All prior agreements that Allergan BV



Services had with APHI.
**Q If a sale is closed, what does it mean to terminate the sale contract, in your mind?**
A All prior agreements have been terminated here.
**Q I understand you keep reading the contract. I have a different question. I'm not asking about the language in the contract.**
**My question is: The 2006 purchase agreement sold certain rights from APHI to ASBV, correct?**
A I'm not intimate involved -- intimate familiar with the 2006 agreement. As I state in my declaration, it's my understanding that ASBV, once allocated specific income interest, those rights were terminated no longer -- no later than 2012.
**Q Thank you. I'm trying to understand what you meant by that phrasing. That's why I'm asking these questions.**
**So I'm not terribly interested in the precise wording of your declaration and having you read it back to me. My question is this: The 2006 agreement, having looked at it, you understand that it sold certain rights from APHI**

**to ASBV, correct?**
A I am not into the details of the 2006 agreement.
**Q Where does the 2012 termination agreement sell anything from ASBV to APHI?**
A It was terminated, and it superseded all prior agreements. So what was there before '12 was terminated.
**Q So there's an example where you do understand contract law, right?**
MR. MINNITI: Objection to the form of the question.
**Q You're arguing with me about what the contract means. So it seems to me that you're in a position to engage with me on other portions of the contract, right?**
MR. MINNITI: Objection to the form of the question.
**Q So my question is this: If a sale has occurred, money has changed hands as is spelled out in the 2006 --**
A I don't know --
**Q Let me finish my question, Mr. Mulders. All right? Can we do that? Good.**
**If the 2006 agreement sold rights from**



**APHI to ASBV, money changed hands, how is it that terminating the sale agreement affected the return of those rights to APHI?**
A I wasn't there. I cannot comment how the 2006 agreement was executed.
**Q Thank you.**
**(Mulders Deposition Exhibit Number 38 marked for identification.)**
**(Mulders Deposition Exhibit Number 39 marked for identification.)**
**Q All right. We've handed you what's been marked Mulders 38 and 39. Do you recognize these exhibits, Mr. Mulders?**
A Yeah, I might have seen these, yeah, in the past years, yeah.
**Q When was the last time you saw them?**
A It could be in the last couple of weeks.
**Q Okay. Let's look at Exhibit 38. It says Call Agreement.**
**Do you see that?**
A Yeah.
**Q And, generally speaking, this agreement gave APHI the right to buy back the rights it sold in the 2006 purchase agreement, correct?**
A Sorry. Sorry, where were you?



**Q I'm at Exhibit 38.**
A No, no, which clause?
**Q I'm talking in general.**
A Oh.
**Q You read this in the last few weeks. It's only --**
A No, I didn't say I read it. I viewed it.
**Q Okay. What's the difference?**
A Viewing is like this. Reading is reading the whole document.
**Q Okay. When did you last review it?**
A I don't recall.
**Q Do you understand that this is an agreement that gave APHI the right to buy back those rights it had sold by way of the 2006 purchase agreement? I would direct your attention to 1.3.**
A That is stated in 1.3 that APHI has the right to purchase from ASBV.
**Q Did APHI ever exercise its call option?**
A I go back to the termination agreement, that this is a prior agreement, which was addressed in the termination agreement.
**Q Did APHI ever exercise its call option?**
A I go back to the termination agreement.



And it's effectively stated in 3, that the -- that it supersedes the prior agreements. And this call option is a prior -- this call agreement is a prior agreement.
**Q So it was terminated; it was never exercised, right?**
A I say it's terminated based on the termination agreement.
**Q Now, to exercise the option, APHI had to pay ASBV [redacted], correct?**
A That is what is annex A.
**Q Did APHI ever pay [redacted] to ASBV to reacquire its target Botox rights?**
A I wasn't there at the time. I don't -- I haven't seen the financial statements in that period.
**Q All right. Now, let's look at Exhibit 39, please. It's called Put Agreement. Have you ever read this before?**
A It's same answer as the previous agreement.
**Q All right. Now, 1.3, what the put agreement provided for was that ASBV had the right to sell back to APHI the target Botox rights it had acquired in 2006, correct?**

Page 53

A ASBV has the right to sell, transfer, and assign the target Botox rights at any time before the expiration of this agreement to APHI against the consideration mentioned in Exhibit A.
**Q Okay. And that consideration was [redacted], right?**
A [redacted]. That's in annex A.
**Q Did ASBV ever exercise its put option?**
A This is the same as with the termination agreement in Section -- in Section 3, it supersedes all prior agreements. And this put option is an agreement before the time.
**Q So is it your testimony that it didn't need to be exercised because it had been terminated, "it" being the 2006 purchase agreement?**
A I'm not -- I'm not making that statement that it didn't need to be exercised. It is addressed here that it supersedes the prior agreements.
**Q Just a yes or no, was it ever exercised?**
A I'm not aware of that.
MR. MINNITI: I'm going to note for the record we've been going 62 minutes, in case the witness wants to take a break or the court

Page 54

reporter.
MR. PICKARD: We can do a break. Go off the record.
(A short break was taken.)
**Q Mr. Mulders, during the break, did you talk to anyone?**
A We spoke.
**Q What did you talk about?**
MR. MINNITI: I caution the witness not to divulge any conversations with counsel.
A I'm relying on counsel.
**Q You're not going to answer the question?**
A I'm relying on counsel.
**Q Did you discuss the substance of your testimony or the questions I might ask during the break with Mr. Minniti?**
A No, we didn't.
**Q All right. Let's look at Exhibit 9, the 2010 MOU, please. I'd like you to look at Section 1, Economic Ownership.**
**Do you see that?**
A Yes.
**Q And the first sentence speaks of bifurcating legal and economic ownership.**
**Do you see that?**

Page 55

A I see that, yes.
**Q Here's my question: The rights and benefits covered by economic ownership and those covered by legal ownership, is there any overlap in those two?**
MR. MINNITI: Objection to the form of the question.
A For -- can you just repeat the question before?
**Q Yes. So that sentence, the first one in Economic Ownership, it mentions legal ownership and economic ownership. And what I would like to know is the rights and benefits that are covered by those two things, legal and economic ownership, are there -- is there any overlap in those two categories?**
MR. MINNITI: Same objection.
A The -- there can be overlap.
**Q What rights overlap between -- what are the overlapping rights covered by legal ownership and economic ownership, as you understand them?**
A With economic ownership, you have what I mentioned before. You develop, enhance, maintain, protect, and exploit the rights.
**Q Are you done?**

Page 56

A Yes.
**Q Okay. And which of those things are also included in legal ownership?**
A The legal ownership is where you have the registration of the rights.
**Q Now, what you've just identified for me, there is no overlap between legal ownership and economic ownership, at least so far, correct?**
MR. MINNITI: Objection to the form of the question.
A If the economic owner is protecting it, then it's the economic owner that is protecting it and defending it.
**Q Does the legal owner have a right to protect and defend?**
MR. MINNITI: Objection to the form of the question.
A I would be speculating. To the extent -- I refer to the last sentence here: For the avoidance of doubt, while AGN holds bare legal title to the Botox IP, ABL, APHI, and API, from the beginning of time and through the effective date, individually and collectively owns any and all rights necessary to enhance, exploit, commercially protect, defend, and maintain its

Page 57

economic rights to the Botox IP.
**Q Does Allergan, Inc., as the legal owner, possess any of the rights you've just identified for me?**
A It has the registration of the patents.
**Q And above it says in the first sentence, third line down, it says: Preventing others from infringing the Botox patents, trademarks, service marks, and other intellectual property rights.**
**Do you see that?**
A Correct.
**Q That's the right held by Allergan, Inc., correct, preventing others from infringing?**
A That's in the sentence of Allergan, Inc.
**Q Is that among the legal ownership rights?**
A That's -- that is part of the legal ownership.
**Q Okay. And so I'll put it to you again. What, if any, legal ownership rights overlap with economic ownership rights?**
A Whatever of those legal ownership rights are needed for the -- what I mentioned in the last sentence here, the enhancing, exploiting, commercialization, protect, and defend and maintenance of the economic rights.

Page 58

**Q All right. I'd like you to turn back to the Economic Ownership section where it begins on page 2 of the agreement. There's the A, B, C, do you see that in the middle of the paragraph?**
A Yes.
**Q If you look above, there's a sentence second-to-last, "The extent of."**
**Do you see that?**
A Yes.
**Q It says: The extent of ABL, APHI, or API's economic rights are determined based on the [redacted]**
**Do you see that?**
A I see that sentence.
**Q Do you understand what that sentence means?**
A Yes, I think I understand.
**Q What does it mean?**
A [redacted].
**Q Okay. What proportion of the R&D expenses did [redacted] incur?**

Page 59

A That's under B, incurred during the period from [redacted].
**Q Thank you. And here's where I'm confused. The sentence that we're focused on talks about the [redacted], right?**
A I'm sorry. The [redacted]
**Q Now, you've pointed me to paragraph B, and it doesn't have any amounts, correct?**
A It has the periods.
**Q But it does not have amounts, correct?**
A There are no amounts in B.
**Q So that's -- well, and if we wanted to know [redacted], we would also need to know [redacted] -- the [redacted], right?**
A That is what is stated in C from [redacted].
**Q But statement C doesn't give us the [redacted] correct?**
A There are -- no, there are no amounts mentioned in C.
**Q And the same is true for [redacted] right?**
A In A?
**Q There's no amounts --**

Page 60

A There's a reference --
**Q Sorry, let me finish the question, Mr. Mulders.**
**There's no [redacted] in statement A or elsewhere in the MOU [redacted] incurred for R&D expenditures, correct?**
MR. MINNITI: Objection to the form of the question.
A There's no [redacted] or [redacted] in A, B, and C.
**Q All right. I'd like you to look at legal ownership for a moment. That second sentence beginning with: For administrative convenience and legal considerations.**
**Do you see that?**
A Yes.
**Q Do you know what the legal considerations were that are referenced there?**
A I -- I wasn't there, and I'm not -- as I mentioned, I'm not a lawyer so I don't know what these considerations are.
**Q And then the administrative convenience, do you know what that refers to?**
A It's -- I would have to give the same answer.

**Q Do you know why the MOU doesn't list any patent numbers or patent application numbers?**
MR. MINNITI: Objection to the -- sorry. Objection to the form of the question.
A I wasn't there when this MOU was established, and I see a reference to hundred issues, issued Botox patents.
**Q The rights being discussed in the MOU, the Botox IP rights, those include rights to trademarks, right?**
A Where do you see the trademarks?
**Q Well, I don't see that. Do you agree that the Botox IP covers patents?**
A Patents are part of this.
**Q Why aren't trademarks also a part of this?**
A I wasn't there when the parties drafted this MOU.
**Q So you do not know whether the MOU covers Botox IP relating to trademarks, correct?**
A I see no reference to trademarks in the MOU.
(Mulders Deposition Exhibit Number 10 marked for identification.)
**Q I'll hand you Mulders 10 here. Now, this is the 2020 agreement. You recognize that**



**document, right, Mr. Mulders?**
MR. MINNITI: Objection to the form of the question.
A Yeah, I recognize the document.
**Q Okay. I'd like you to turn to paragraph 1.14 where it defines rights.**
**Do you see that?**
A I see 1.14.
**Q And rights means with respect to any seller, all right, title, and interest to the products, including all intellectual property rights, in and to the products held by such seller with respect to the territory as of the closing but excluding Irish rights.**
**Do you see that?**
A I see Section 1.14, what you just read.
**Q And Section 1.14 is defining the rights that were transferred by way of the 2020 intellectual property economic asset purchase agreement, correct?**
MR. MINNITI: Objection to the form of the question.
A In Section 2.1, there was the reference to the rights as defined in 1.14.
**Q All right. Now, if you look back at 1.14,**



**that second phrase beginning "Held by," do you see that? Held by such seller.**
A Yeah, I see that sentence.
**Q What's being transferred here are just those rights that ABL and APHI had held as of the 2020 purchase agreement, right?**
A I think that's a fair statement.
**Q And included in those rights are some trademarks, right, to Botox?**
A I don't know.
**Q Well, do you see at the bottom here, we call them Bates numbers. And there's L A N G N. I'd like you to turn to 12692.**
**Do you see that?**
A I'm on 12692.
**Q And what we see here are a series of trademarks that were being transferred by the 2020 agreement, right?**
A It says in the first column trademark.
(Paik Deposition Exhibit Number 31 marked for identification.)
**Q Okay. You can put that aside. I'll show you what's been previously marked as Paik 31.**
**All right. Have you seen this before, Mr. Mulders?**



A I haven't seen this exhibit.
**Q Okay. It's not so important. I want you to look in the lower left-hand corner. It doesn't matter, you can look at either page. There's a box, AGN, Inc. And below it says: Owns worldwide TM/TN, gets [redacted] of net sales excluding Canada.**
**Ms. Carey said that [redacted] was a payment for use of trademarks and trade dress. Do you understand that as of -- from 2020 to the present, that Allergan, Inc., has received a [redacted] -- has received [redacted] of net sales for trademarks associated with Botox sales?**
MR. MINNITI: Objection to the form of the question. You're also referring to testimony from another witness. If you have that available, can you bring that up?
MR. PICKARD: I'm not asking about the testimony.
**Q I've asked him: Do you understand from January 21, 2020, to the present, that Allergan, Inc., has been receiving a [redacted] -- has received [redacted] of net sales to compensate it for use of its trademarks in selling Botox?**
MR. MINNITI: I just need to object.

Page 65

There's a reference now in the record to Ms. Carey's testimony, and that is not before the witness.
**Q Okay. You can answer the question.**
A Allergan, Inc., is receiving [redacted].
**Q What trademarks is it receiving [redacted] for?**
A The Botox trademarks.
**Q If APHI sold the Botox trademarks to Allergan Ireland, why is Allergan Ireland paying Allergan, Inc., [redacted] of net sales to use the trademarks?**
A I can't determine from this first column here. It says "Trademarks." I don't know if that are the same trademarks as are with Allergan, Inc.
**Q Do you know who owns -- well, let me ask you this: The trademarks for Botox, the product, is that ownership interest divided among different Allergan or AbbVie companies to your knowledge?**
A It's divided between the U.S. entity and the Canadian entity.
**Q And what is the U.S. entity?**
A Allergan, I always confuse the comma and the dot. But Allergan, the U.S. -- one company is Allergan, comma, Inc., and other is Allergan dot

Page 66

Inc. But it's U.S. company and Canadian company.
**Q They own the trademarks to -- sorry, they own the Botox trademarks, correct?**
A That is my understanding.
**Q If they own the Botox trademarks, how is that the case that the 2020 purchase agreement purports to sell them?**
A I don't know if these trademarks are -- if that's the same as the ones that Allergan, Inc., owns.
**Q Oh, I thought you had said all of the Botox trademarks were owned between the Canadian entity and the U.S. entity?**
A The rights to them, that's -- the rights to these trademarks are owned by these two companies, worldwide rights.
**Q Okay. And that's all of the trademarks for Botox, correct?**
A That's the worldwide right to the Botox trademarks.
**Q And I'm just trying to understand how is it that if the 2020 agreement sold at least some Botox trademarks to Allergan Ireland, why is Allergan Ireland paying another company that purports to own them? It seems that we have a**

Page 67

**third company that ...**
A I -- what was exactly transferred in the trademarks in this 2020 document and how this relates to the two entities that I mentioned, I don't know the answer to the question.
**Q All right. Let's go back to the 2006 purchase agreement, please. I believe that's 37.**
A Which exhibit? Sorry.
**Q Exhibit 37. I'd like you to look at paragraph 1.2, please. And there it defines target Botox rights.**
**Do you see that?**
A I see target Botox rights.
**Q And it does so by stating: Target Botox rights is defined as the amount of Botox intellectual property owned by APHI in the territory represented by a value, which is more specifically set forth -- set out in Exhibit A.**
**Can you tell me what amount of Botox IP, APHI had owned?**
A I wasn't there at that time. I don't know the value.
**Q Can you tell me what patents or patent applications it held rights to under target Botox rights as of 2006?**

Page 68

A It's the same answer. I wasn't there. I don't know the answer to that question.
**Q For Botox rights as referred to in paragraph A above, can you tell me what's included there?**
A I -- I don't know what is exactly meant with this.
MR. PICKARD: Could we go off the record.
(A short break was taken.)
**Q All right. Welcome back, Mr. Mulders.**
**I'd like you to look again at your declaration, Exhibit 44, please. In the second sentence, you talk about a specific income interest.**
**Do you see that?**
A 4?
**Q Yes.**
A Yes.
**Q What are you referring to when you say specific income interest?**
A A specific income interest in the intellectual property for [redacted] Botox.
**Q All right. What was the specific interest? Sorry, the specific income interest.**

Page 69

A The income that ASBV made in that period.
**Q In what period?**
A In the period no later than 2012.
**Q Can you tell me when that period began? And that is the period in which ASBV had been allocated a specific income interest?**
A The -- I can't say when it materialized, when it was in the financial statements of ASBV; but the legal agreement might have been -- the cause of the legal agreement, or what is you say, the source of the legal agreement might be the '21 -- 2001 agreement.
**Q It might be or it is?**
A Might be.
**Q You can't say --**
A Yeah, might be, yeah.
**Q Okay. I'd like to continue down your paragraph 4 for a minute. You mention a restructuring effort that began in 2010. What was the purpose of that restructuring effort?**
A It was, I'm referring to F in the MOU, the desire to achieve greater clarity and certainty of the legal and economic ownership of Botox.
**Q Was there any other purpose than that for this restructuring effort you refer to in your**

Page 70

**declaration?**
A I wasn't there, so I'm just referring to what is in the MOU.
**Q Okay. I understand you weren't there. I'm trying -- but you did put it in your declaration, so that's why I want to ask you.**
**Is it your understanding simply based on a plain reading of the 2010 MOU? Is that it?**
A That's our understanding, what I mentioned in 2015 when we did the -- when we took over Allergan. And based on our understanding at the moment, that's where I base my statement on. And at that time, ASBV was a dormant company, of which I was a director, and that's based on my understanding at that time.
**Q Okay. Now, you were reading paragraph F from the MOU in response to my question, what the purpose of the restructuring effort was.**
**Other than what's stated in paragraph F, do you have any understanding of the purpose of the restructuring effort referred to in your declaration?**
A The restructuring effort was to include -- include a determination of the termination agreement of 2012 whereby whatever was with ASBV

Page 71

was terminated.
**Q Okay. I'd like to focus again on the 2010 MOU, and I don't think I've gotten a clear question [sic] to this.**
**To your understanding, did the 2010 MOU change the ownership or transfer the ownership in any Botox IP rights as compared to the state of affairs that existed before its execution?**
A What I mentioned before, the parties agree to memorialize the prior and current ownership of Botox IP rights. That's in the MOU, the last sentence of F.
**Q Yes. What I'm trying to understand is: What we see in the MOU, is it in any way different than what the parties had understood before they signed the MOU? Or was the MOU simply their first effort to put it in writing?**
A The agreement says it memorializes the prior and the current ownership of Botox IP rights.
**Q Yes. So my question is: Did it change -- if you can think of the parties to the contract, at the moment they arrive at the table to sign the document, did anyone to that contract transfer any rights to anyone else in the contract? Or had**

Page 72

**they already been transferred?**
A Contract, you mean the MOU?
**Q Yes, the 2010 MOU.**
A It is memorializing. I don't see a reference to any transfer in the MOU.
**Q Okay. And given that there's no reference to a transfer, is it therefore your understanding that there wasn't any?**
A Any what?
**Q Any transfer, transfer of rights.**
MR. MINNITI: Objection to the form of the question.
A It is memorializing. As I mentioned, I don't see a reference to transfer.
**Q Let me see if I can put it to you more succinctly. Did the 2010 MOU transfer any Botox IP rights whatsoever?**
A It memorializes who, which of the three parties owns the rights at that moment and how the economic ownership was split.
**Q Okay. But it did not transfer or change the rights that those parties held, correct?**
A I don't see a reference to transfer.
**Q All right. Thank you.**
MR. MINNITI: Just take a quick moment to

Page 73

mark the transcript as highly confidential.
MR. PICKARD: All right. I pass the witness.
MR. MINNITI: I have no further questions, but I want to make a note that throughout this deposition, I have given significant leeway to opposing counsel in the manner in which they have asked questions. But at times it had gone too far. Counsel may have thought because there was no video, that counsel could have raised their voice and at times screamed at the witness and opposing counsel. Allergan believes that was unacceptable during this deposition and inconsistent with their decorum as officers of the court. I want to make that note in the transcript because there is no video of what occurred on this day.
Nothing further.
MR. PICKARD: And I respectfully categorically disagree with Mr. Minniti's statements.
MR. MINNITI: Deposition closed.
(Witness excused, 11:04 a.m. Central.)

Page 74

C E R T I F I C A T E

I, RACHEL F. GARD, RPR, CCR, CRR, CSR No. 084-3324, No. 9315, No. 1010, a Certified Shorthand Reporter in and for the States of Illinois, Michigan, Nevada at large, do hereby certify that MAURICE MULDERS, the deponent herein, was previously duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of Defendants on the 19th day of March, 2025, at 9:00 a.m. Central, pursuant to the applicable rules;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by the said deponent; and that signature was requested by the deponent and all parties present;

That the parties were represented by their counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action, that I am not a relative or attorney of either party or otherwise interested in the event of this action, and that I am not in the employ of the attorneys for any party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal on this 21 day of March, 2025.

__________________________
COURT REPORTER

Page 75

Maurice Mulders, c/o
PAUL HASTINGS
200 Park Avenue
New York, New York 10166

Case: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.
Date of deposition: March 19, 2025
Deponent: Maurice Mulders

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected.
Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2025 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Page 76

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.
Witness Name: Maurice Mulders
Deposition Date: March 19, 2025

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:
(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

__________ ____________________
DATE WITNESS SIGNATURE

__________ ____________________
DATE NOTARY

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.
Witness Name: Maurice Mulders
Deposition Date: March 19, 2025
Page No. Line No. Change

__________________________ ____________
Signature Date

C E R T I F I C A T E

I, RACHEL F. GARD, RPR, CCR, CRR, CSR No. 084-3324, No. 9315, No. 1010, a Certified Shorthand Reporter in and for the States of Illinois, Michigan, Nevada at large, do hereby certify that MAURICE MULDERS, the deponent herein, was previously duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of Defendants on the 19th day of March, 2025, at 9:00 a.m. Central, pursuant to the applicable rules;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by the said deponent; and that signature was requested by the deponent and all parties present;

That the parties were represented by their counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action, that I am not a relative or attorney of either party or otherwise interested in the event of this action, and that I am not in the employ of the attorneys for any party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal on this 21 day of March, 2025.

______________________________

COURT REPORTER