IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., ALLERGAN PHARMACEUTICALS IRELAND UNLIMITED COMPANY, AND ALLERGAN USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> REVANCE THERAPEUTICS, INC. AND AJINOMOTO ALTHEA, INC. D/B/A AJINOMOTO BIO-PHARMA SERVICES, <br><br> Defendants. | Civil Action No. 21-1411-RGA |

MEMORANDUM OPINION

Jack B. Blumenfeld, Anthony David Raucci, Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Ashley N. Mays-Williams, Bruce M. Wexler, Carl J. Minniti III, Chad J. Peterman, Eric W. Dittmann, Isaac S. Ashkenazi, Krystina L. Ho, Melanie R. Rupert, PAUL HASTINGS LLP, New York, NY,

    Attorneys for Plaintiffs.

Anne Shea Gaza, Samantha G. Wilson, Daniel G. Mackrides, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE; Adam C. LaRock, Adil B. Moghal, Anna G. Phillips, Byron L. Pickard, Christopher M. Gallo, Deirdre M. Wells, Dennies Varughese, Louis P. Panzica, Jr., Marsha Rose Gillentine, Nirav N. Desai, Ryan E. Conkin, Sasha S. Rao, Tyler C. Liu, STERNE, KESSLER, GOLDSTEIN & FOX PLLC, Washington, D.C.,

    Attorneys for Defendants.

May 30, 2025

ANDREWS, UNITED STATES DISTRICT JUDGE:

Before me is Revance's partial motion to dismiss Allergan Pharmaceuticals Ireland Unlimited Company ("Allergan Ireland") and Allergan USA, Inc. ("Allergan USA") as parties to the case under Rule 12(h)(3) on the grounds that neither holds exclusionary rights in the asserted patents, depriving them of Article III standing to sue. (D.I. 437, 438). I have read the parties' briefing. (D.I. 438, 450, 464, 533, 534, 548, 550, 551). Revance's motion is GRANTED. Allergan USA has already agreed to dismissal from the suit (D.I. 450 at 2), so I now address the parties' dispute over Allergan Ireland's standing.

I. BACKGROUND

Three Allergan entities are named as plaintiffs in this case. They are Allergan, Inc. ("AGN"), Allergan Ireland, and Allergan USA (collectively, "Allergan"). Allergan has sued Revance for patent infringement. (D.I. 79). The crux of the parties' current dispute is whether Plaintiff Allergan Ireland is actually the exclusive licensee of the patents whose alleged infringement forms the basis of the suit. Several agreements between Allergan-related entities are relevant. The relevant entities are AGN, Allergan Botox Limited ("ABL"), Allergan Pharmaceuticals Holdings (Ireland) Limited ("APHI"), Allergan Services B.V. ("ASBV"), and Allergan Pharmaceuticals Ireland ("API").[1] I now describe the relevant agreements.

In May of 2001, in a set of agreements ("2001 License Agreements"), ASBV received and/or granted licenses from/to ABL, APHI, and API. Those licenses concerned intellectual property rights, at least some of which were related to Botox®. (D.I. 533-1, Exs. 34–36; D.I. 533 at 3 of 5).

---

[1] API is not the same entity as Plaintiff Allergan Ireland. (D.I. 438 ¶ 5).

In January of 2006, ASBV and APHI entered into an agreement called the "ASBV Botox® Intellectual Property Purchase Agreement" ("2006 Purchase Agreement"), in which APHI sold a "portion of the BOTOX® rights" it owned to ASBV. (D.I. 533-1, Ex. 37).

In January of 2010, AGN, ABL, API, and APHI all entered into a Memorandum of Understanding ("2010 MOU") that purported to memorialize rights to "Botox® IP." (D.I. 439-9 at 3–4 of 5).

In July of 2012, ASBV entered into agreements with ABL, API, and APHI ("2012 Termination Agreements") that canceled the 2001 License Agreements. (D.I. 533-1 at Exs. 40, 41, 42).

Finally, in January of 2020, APHI and ABL, in an Intellectual Property and Economic Asset Purchase Agreement ("2020 IP APA"), purported to transfer the rights memorialized in the 2010 MOU to Allergan Ireland. (D.I. 439-10 at 2 of 185).[2] There is no dispute that the 2020 IP APA purports to transfer rights in the asserted patents. (D.I. 438 at 11; D.I. 450 at 10). Therefore, the parties' dispute mostly focuses on the 2010 MOU. In the latest round of briefing, Revance distills that dispute into four questions:

1. Have Plaintiffs shown that any of the Asserted Patents were even the subject of the 2010 MOU?

2. Have Plaintiffs shown that ABL's and APHI's portion of "economic ownership" of the 2010 MOU included the Asserted Patents?

3. Have Plaintiffs shown the "economic ownership" of the 2010 MOU included the types of rights needed to confer standing?

4. Have Plaintiffs shown that [ASBV] did not (as of the [2020] IP APA) hold the necessary rights to the Asserted Patents?

---

[2] "Both ABL and APHI re-registered from limited to unlimited companies between the 2010 MOU and the 2020 [IP APA], but are otherwise the same entities." (D.I. 450 at 5 n.3).

(D.I. 548 at 1–2) (emphasis and citations omitted).

## II. LEGAL STANDARDS

### A. Rule 12(h)(3)

"If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "[A] Rule 12(h)(3) motion . . . may be asserted at any time and need not be responsive to any pleading of the other party." *Berkshire Fashions, Inc. v. M. V. Hakusan II*, 954 F.2d 874, 879 n.3 (3d Cir.1992). A Rule 12(h)(3) motion is analyzed under the same standard as a Rule 12(b)(1) motion (*id.*), which may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *See Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014). In reviewing a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* at 358 (quoting *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)). In reviewing a factual attack, the court may consider evidence outside the pleadings. *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

### B. Standing

*Intell. Ventures I LLC v. AT & T Mobility, LLC* summarizes the relevant legal principles:

> The requirement of constitutional standing derives from the Article III case or controversy requirement, compelling a plaintiff to demonstrate that he or she suffered (i) injury in fact, that (ii) the injury is fairly traceable to the actions of the defendant, and that (iii) the injury will likely be redressed by a favorable decision. The touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury.
>
> . . .
>
> [E]xclusive licensees—those parties who hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent—have constitutional standing.

4

203 F. Supp. 3d 436, 442–43 (D. Del. 2016) (cleaned up).[3]

### III. DISCUSSION

Because Revance's 12(h)(3) motion is based on a disputed contractual interpretation (D.I. 438) relating to contracts that are not referenced in the complaint (*see* D.I. 79), its motion is a factual challenge for which I may consider evidence outside the pleadings. *Mortensen*, 549 F.2d at 891.

"[T]he proper interpretation of [contract] language is a question of law." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). Both parties cite Delaware law in support of their arguments regarding the 2010 MOU. (*See generally* D.I. 450; D.I. 464 at 6–8). "[B]ecause Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party." *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017). Each term and provision should be given effect, "so as not to render any part of the contract mere surplusage," and the interpretation should not render a term or provision "meaningless or illusory." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted). "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id.* at 1159–60. "The determination of ambiguity lies within the sole province of the court." *Id.* at 1160.

I conclude that with respect to Questions #1–3 posed by Revance, Allergan has provided a sufficient answer. With respect to Question #4, however, it has not.

---

[3] To the same effect, *see Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007).

## A. The Answer to Question #1 Is "Yes."

The first question Revance poses is, "Have Plaintiffs shown that any of the Asserted Patents were even the subject of the 2010 MOU?" (D.I. 548 at 1). As a matter of plain language and extrinsic evidence, I conclude that they have.

### 1. The 2010 MOU's Plain Language Supports Allergan's View.

First, the plain language of the 2010 MOU suggests that the asserted patents are "Botox® IP."

I begin by describing the terms of the 2010 MOU.

It "memorialize[s] the prior and current ownership of Botox® IP rights" in the "desire to achieve greater clarity and certainty over the legal and economic ownership of Botox®. . . ." (D.I. 439-9 at 3 of 5). To that end, it describes a division between "legal ownership and economic ownership" between the parties—AGN "holds bare legal title" while "ABL, APHI and API collectively hold the economic rights." (*Id.*). The 2010 MOU lists ASBV as "holding a specific interest in the intellectual property rights of Botox®[,]" but does not include ASBV as a party to the agreement or mention it outside of a single recital. (*Id.* at 2–4 of 5).

Two excerpts from the 2010 MOU provide indications of the meaning of "Botox® IP," which is otherwise not defined. The first is the conclusion of the "Economic Ownership" section, which includes the following:

> [T]he parties agree that any Botox® technology, technical and other information, whether patented or unpatented relating to or developed, including, without limitation, trade secrets, know-how, processes, concepts, experimental methods and results and business and scientific plans and information developed, in the years noted above[4] shall inure to the benefit of the party bearing the expenses for its development and such party shall be considered the exclusive owner and holder of all such information listed herein.

---

[4] The years "noted above" are specified to the day for API, ABL, and APHI. (D.I. 439-9 at 3 of 5).

6

(*Id.* at 3 of 5) (footnote added). The second is under the "Legal Ownership" section, where the 2010 MOU notes that the multinational group of enterprises of which AGN is the parent company (*id.* at 2 of 5) maintains "over 100 issued Botox® related use and process patents, covering, for example, pain associated with cervical dystonia, treatment of chronic migraine, hyperhidrosis, overactive bladder and benign prostate hyperplasia in the name of AGN." (*Id.* at 3–4 of 5).

Revance contends that "Botox® IP," insofar as it covers patents, only covers patents "used by Allergan in its Botox products." (D.I. 438 at 12). Allergan contends that it covers any IP that "relate[s] to" Botox®. (D.I. 450 at 11). I side with Allergan, whose interpretation best comports with Delaware law's mandate that each term—here, "relating to"—be given effect. *See Osborn*, 991 A.2d at 1159. In both quoted excerpts above, the 2010 MOU provides that Botox® IP *relate* to Botox®, not that it be used in a Botox product at the time the 2010 MOU was signed.[5] Indeed, if the parties executing the 2010 MOU had intended only to cover patents used in then-existing Botox products, there would have been no reason to use the word "related" in describing the "over 100 issued Botox® *related* use and process patents[.]" (D.I. 439-9 at 3 of 5) (emphasis added).

The asserted patents relate to Botox®. "Relate" has a broad definition: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting *Relate*, Black's Law Dictionary (5th ed. 1979)). Though Allergan has not yet used the asserted patents in its Botox

---

[5] Revance is correct to point out that "relating to" in the Economic Ownership section lacks an object. (D.I. 464 at 3). In light of the 2010 MOU's reference to "over 100 issued Botox® related use and process patents[,]" however, "relate" is most naturally read as referring to Botox®. Revance itself suggests no alternative, instead simply arguing that the Economic Ownership section "is a syntactical and grammatical mess." (*Id.*). True, but that is no basis on which to adopt Revance's proposed definition limiting the 2010 MOU to patents used in Allergan's Botox products.

7

products, the asserted patents, which claim an animal protein free product derived from the same toxin as Botox (D.I. 79 ¶¶ 16–59), "relate" to Botox® in that they provide potential candidates for Botox successor products. (D.I. 450 at 3; D.I. 451-1 at 57 of 96). That is enough to conclude that they fall within the scope of the 2010 MOU.

In response, Revance points to several examples of Botox® IP listed in the 2010 MOU. The examples are patents covering "pain associated cervical dystonia, treatment of chronic migraine, hyperhidrosis, overactive bladder and benign prostate hyperplasia." (D.I. 439-9 at 3–4 of 5). Revance states each of the examples are "are indications that Botox is sold for, and none exemplify animal-protein-free inventions." (D.I. 438 at 12). Revance's point is well-taken: "a word in a contract is to be read in light of the words around it." *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 1001 (Del. Ch. 2023). It is important not to stretch this principle too far, however—this list does not purport to be exhaustive, and even omits Botox's most obvious well-known use for aesthetic purposes. (D.I. 79 ¶ 21). With such a notable omission, it is no surprise that even more obscure, yet-to-be-commercialized examples such as the asserted patents are not included. Besides, with "over 100" patents issued (D.I. 439-9 at 3 of 5), any exemplary list will leave out some patents intended to be covered. Read in light of the broad definition of "relate," the 2010 MOU's exemplary list does not persuade me that the asserted patents fall outside the 2010 MOU. Therefore, I find that, under the plain language of the 2010 MOU, the asserted patents are "Botox® IP."[6]

---

[6] Revance also questions whether the 2010 MOU covers the '748 patent, given that the '748 patent was not assigned to AGN until after the 2010 MOU was created. (D.I. 438 at 13). However, three of the four inventors assigned to AGN their interests in that patent in 2009, before the 2010 MOU was signed. (*Id.* at 3). The fourth assigned his rights to AGN a year later. (*Id.*)

8

## 2. Extrinsic Evidence Supports Allergan's View.

Even if I were to find the 2010 MOU to be ambiguous, extrinsic evidence would strongly counsel in favor of Allergan's interpretation.[7]

Start with the 2020 IP APA. There, ABL and APHI agreed to sell their ownership interest in "the Rights, as described in [the 2010 MOU]" to Allergan Ireland. (D.I. 439-10 at 2 of 185). I understand the 2020 IP APA to transfer rights co-extensive with those memorialized in the 2010 MOU. The 2020 IP APA identifies no sources of rights other than the 2010 MOU; further, I agree with Allergan that the comma following "Rights" is significant. (D.I. 450 at 14). Writing "I transfer the Rights as described in the MOU" leaves open the possibility that Rights described outside the MOU are not subject to the 2020 IP APA's transfer. But writing "I transfer the Rights, as described in the MOU" suggests that the MOU provides the authoritative description of what the "Rights" are. Having identified the rights it seeks to convey, the 2020 IP APA proceeds to define the "Rights" very broadly: "all right, title and interest to the Products[.]" (D.I. 439-10 at 3 of 185). "Products," in turn, is also defined broadly:

> biodegradable sustained release implants for the intraocular delivery of dexamethasone known as Ozurdex™ (fka Posurdex®), Bimatoprost SR, Brimonidine DDS, Bulk Toxin, Botox®, [and] any modifications, corrections, updates, improvements, derivatives, or enhancements thereto, and all products developed as a result of the development of Intellectual Property Rights by the Parties, together with documentation prepared in connection for use therewith[.]

---

[7] Revance takes issue with the use of extrinsic evidence, since the relevant cases "apply to disputes between parties to a contract who are positioned to submit competing evidence as to their mutual understanding. . . . These cases do not provide a rule or guide to resolving disputes over contract meaning involving a party not joined in the contract, as is present here." (D.I. 464 at 6–7). Revance was not a party to the contract. If Revance had thought Allergan Ireland's status as an exclusive licensee was at issue, it could have taken discovery to obtain relevant extrinsic evidence. I note that Plaintiffs from day one have repeatedly described Allergan Ireland as "the exclusive licensee." (*See* D.I. 1 at ¶¶ 24, 28, 32, 36.).

(*Id.* at 3 of 185). If not as a "modification" or "improvement" to Botox®, the asserted patents are "products developed as a result of the development of the Intellectual Property Rights."[8] Revance argues that an interpretation this broad is impossible, since the products listed in the 2020 IP APA include "related but distinct products such as 'Bulk Toxin' (listed as separate from Botox) and 'derivatives' of Botox." (D.I. 438 at 13). But in describing these products as "related but distinct," Revance implicitly concedes that these products are, in fact, "related" to Botox®. That satisfies the understanding evident in the 2010 MOU. It is clear from the definition of the "Rights" provided in the 2020 IP APA that the relevant Botox parties had an expansive view of the rights memorialized in the 2010 MOU.

Further supporting this expansive interpretation is the 2001 Botox Services Agreement ("2001 BSA"), in which AGN agreed to provide "Services" to ABL, API, and APHI—all parties to the 2010 MOU. (D.I. 451-1 at 21–26 of 96). The 2001 BSA recites, "ABL, API and APHI [] beneficially own and/or are licencees of certain intellectual property rights associated with botulinum neurotoxin Type A purified neurotoxin complex sold under the brand name of 'BOTOX®'. . . ." (*Id.* at 21 of 96). The 2001 BSA goes on to list, under the "Services" AGN is

---

[8] The 2020 IP APA defines "Intellectual Property Rights" as

> all intellectual property and proprietary rights and priorities of any kind, anywhere in the world, including all of the following, together with all rights therein and thereto, whether protected, created or arising under any law, whether registered or unregistered: (i) issued patents and patent applications, including continuations, divisional[s], continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade dress, logos, domain names and registrations and applications for registration thereof together with all of the goodwill associated therewith; (iii) copyrights and registrations and applications for registration thereof; and (iv) trade secrets, know-how, inventions (whether patentable or unpatentable and whether or not reduced to practice), designs, specifications, schematics, and all other proprietary or confidential information.

(D.I. 439-10 at 3 of 185).

10

to render, "[d]rafting and filing neurotoxin-related patent applications" and "[n]egotiating and drafting neurotoxin-related research and licensing agreements[.]" (*Id.* at 26 of 96). It would be inconsistent to include this broad description of "Services" in the 2001 BSA if the relevant parties believed that the "intellectual property rights associated with . . . 'BOTOX®'" were limited to the Botox® product itself, as Revance contends. Revance argues that the 2001 BSA and 2010 MOU should be read in contrast with one another, and that "the broader language of the [2001 BSA underscores] the narrowness [of] the MOU's scope." (D.I. 464 at 7). I disagree. Because the 2010 MOU says so little about what "Botox® IP" is actually intended to mean, the 2001 BSA is helpful extrinsic evidence shedding light on the 2010 MOU parties' interpretation of that term. The only indication in the 2010 MOU itself as to scope is the term "related to," which, as discussed above, has a broad definition. Therefore, extrinsic evidence, though unnecessary here, further supports Allergan's view that the asserted patents are "Botox® IP."

### B. The Answer to Question #2 Is "Yes."

Revance's next question asks, "Have Plaintiffs shown that ABL's and APHI's portion of 'economic ownership' of the 2010 MOU included the Asserted Patents?" (D.I. 548 at 1).[9] I conclude that they have.

This dispute focuses on how exactly the 2010 MOU memorializes economic ownership of the Botox IP. To this point, the 2010 MOU includes three, seemingly contradictory, provisions regarding economic ownership. First, in the beginning of the Economic Ownership section, the 2010 MOU provides, "The extent of ABL, APHI, or API's economic rights are based on the

---

[9] Presumably, Revance's question includes ABL and APHI, and not API, because API is not a party to the 2020 IP APA. (D.I. 439-10 at 2 of 185). "Allergan Pharmaceuticals Ireland" in the 2020 IP APA (*id.*) is a reference to Plaintiff Allergan Ireland, which previously went by that name. (D.I. 450 at iv).

11

*amount* of expenses each party incurs over the aggregate amount of all Botox® R&D expenses incurred to date." (D.I. 439-9 at 3 of 5) (emphasis added). Second, in the Recitals, the 2010 MOU states that each party's extent of economic ownership is "dependent on *when* each party funded the research and development ("R&D") of Botox®. . . ." (*Id.* at 2 of 5) (emphasis added). Third, near the end of the Economic Ownership section, the 2010 MOU provides, "[A]ny Botox® technology, technical and other information . . . shall inure to the benefit of the party bearing the expenses for its development and such party shall be considered the exclusive owner and holder of all such information listed herein." (*Id.*). These three provisions raise the issue of whether economic ownership is divided based on how much each party to the 2010 MOU contributed to Botox® R&D expenses (from the beginning to the end of time) or on the specific timeframe during which each party funded that research. Adopting the former interpretation, Revance argues that there is no way to determine whether APHI or ABL's ownership covers the asserted patents, since the 2010 MOU does not state the amount each party contributed to R&D research. (D.I. 438 at 14–15; D.I. 534 at 9–10; D.I. 548 at 6–7).[10] Allergan adopts the latter interpretation. It argues that APHI funded Botox® R&D expenses for the timeframe that would cover the asserted patents. (D.I. 550 at 6–8).

I disagree with Revance's interpretation. Delaware law requires that a contract be read as a whole. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). Here, Revance adopts an interpretation that defeats itself and contradicts the purpose of the 2010 MOU. The 2010 MOU memorializes ownership based on total spending, but fails to specify what that spending is, so, Revance argues, the 2010 MOU merely raises questions for which it has

---

[10] Maybe, for example, Revance argues, API has rights to the asserted patents, given that it also funded Botox® R&D. This would defeat Allergan Ireland's argument that it is the exclusive licensee to the asserted patents. (D.I. 438 at 14–15).

12

no answer. This hardly comports with the purpose of the 2010 MOU, which was "to achieve greater clarity and certainty over the legal and economic ownership of Botox®. . . ." (D.I. 439-9 at 3 of 5). It also calls into question why other provisions appear at all in the 2010 MOU. The three provisions identified above are just one example. Another is a list, appearing in the Economic Ownership section, of the "specific time periods [during which] the R&D expenses were borne by the parties. . . ." (*Id.* at 3 of 5). Under Revance's interpretation, an accounting of when each party to the 2010 MOU bore Botox® R&D expenses would be irrelevant. Under Allergan's interpretation, however, this list serves to specify which of the parties has economic ownership over certain IP, depending on when the R&D for the specific piece of IP was funded.

Because Allergan's interpretation fits better with the overall purpose of the contract, as well as the provisions in the Recitals and Economic Ownership section, I find that the 2010 MOU's "amount of expenses incurred" language refers to the costs incurred in a specific timeframe. APHI funded all of the R&D expenses during the development of the asserted patents.[11] It follows that that IP "inured to the benefit" of APHI. (D.I. 439-9 at 3 of 5).

Of course, this interpretation raises another issue: the role of ASBV, which is listed in the Recitals as holding economic rights in the Botox® IP but which has not, according to the 2010 MOU, funded Botox® IP R&D at any point. (D.I. 439-9 at 2–3 of 5). Outside of its single mention in the Recitals, ASBV does not appear in the 2010 MOU. (*Id.* at 2–5 of 5). Revance has argued that ASBV's presence in the 2010 MOU defeats any claim that APHI was the exclusive owner of

---

[11] The earliest priority date among the four asserted patents is September 2003. (D.I. 79-1 at 272, 313, 354, and 458 of 1811). According to the 2010 MOU, APHI bore the R&D expenses for Botox® IP from January 1, 2000 onward. (D.I. 439-9 at 3 of 5). Revance never challenges this assertion.

the asserted patents when the 2010 MOU was signed. (D.I. 438 at 13–14; D.I. 464 at 6).[12] I do not agree. ASBV is not mentioned anywhere in the agreement beyond the recital on the first page and is not a signatory to the agreement. The more plausible explanation of ASBV's inclusion in the Recitals is the 2010 MOU's signatories' acknowledgment that ASBV had entered into various arrangements with ABL, APHI, and API. (D.I. 533-1, Exs. 34–37). I consider the effect of some of those agreements below, *see* Section III.D, *infra*, but see no basis in the 2010 MOU itself to find that ASBV had rights to the asserted patents.

### C. The Answer to Question #3 Is "Yes."

Revance's next question is, "Have Plaintiffs shown the 'economic ownership' of the 2010 MOU included the types of rights needed to confer standing?" (D.I. 548 at 1–2). I conclude that they have.

The Legal Ownership section of the 2010 MOU provides,

> Under the Agreement, AGN is responsible for coordinating and obtaining patents, protecting trade secrets, and other proprietary technologies and processes, insuring that the Group operates without infringing upon the proprietary rights of others, and preventing others from infringing the Botox® patents, trademarks, service marks, and other intellectual property rights. For the avoidance of doubt, while AGN holds bare legal title to the Botox® IP; ABL, APHI and API, from the beginning of time and through the Effective Date, individually and collectively, own[] any and all rights necessary to enhance, exploit, commercialize, protect, defend and maintain [their] economic rights to the Botox® IP.

(D.I. 439-9 at 4 of 5). Interpreting the above, Revance argues that "economic ownership" does not include the rights needed to confer standing, or, at least, that Allergan has not demonstrated that it does. (D.I. 464 at 6; D.I. 548 at 7–8; D.I. 551 at 4–5).

---

[12] Separately, Revance argues that ASBV may have owned rights to the asserted patents through its Purchase Agreement with APHI. (D.I. 548 8–9). I address that argument in Section III.D, *infra*.

I disagree. The "touchstone" of Article III standing to sue in a patent infringement suit is the right to exclude. *See Intellectual Ventures*, 203 F. Supp. 3d at 442. The 2010 MOU states that the "economic rights" contemplated by that agreement "mean[] that ABL, APHI and API . . . have *exclusive* and perpetual rights to the Botox® IP throughout the world." (D.I. 439-9 at 3 of 5) (emphasis added). The 2010 MOU continues by providing that ABL, APHI, and API "own[] any and all rights necessary to enhance, exploit, commercialize, protect, defend and maintain [their] economic rights to the Botox® IP." (*Id.* at 4 of 5). Because the parties' "economic rights" are defined as providing "exclusive" rights to the Botox® IP, and the 2010 MOU acknowledges the parties' rights to "defend and maintain" those rights, it must be the case that the 2010 MOU acknowledges the parties' rights to maintain the exclusive nature of their economic ownership— i.e., to exclude. That is enough to confer rights necessary for Article III standing.

Revance's suggestion that the 2010 MOU's bifurcation between economic and legal rights left ABL, APHI, and API without the right to sue (D.I. 464 at 6) is unavailing. While AGN "is responsible" for preventing infringement (D.I. 439-9 at 4 of 5), the foregoing language makes clear that the economic owners of the Botox® IP had the same right, even if they were not tasked with that responsibility. The 2010 MOU's "[f]or the avoidance of doubt" (*id.*) language indicates that the legal responsibility attributed to AGN was not intended to limit the economic owners' rights to defend their rights to the IP.

### D. The Answer to Question #4 Is "No."

Revance's final question shifts focus from the 2010 MOU to the role of ASBV. That question is, "Have Plaintiffs shown that [ASBV] did not (as of the [2020] IP APA) hold the necessary rights to the Asserted Patents?" (D.I. 548 at 1–2) (emphasis and citations omitted). Revance argues that because of the 2006 Purchase Agreement, ASBV owned some portion of the

Botox-related IP rights that APHI had previously owned. ASBV never divested its ownership of those IP rights, Revance argues, and therefore, "APHI and ABL did not own all necessary rights to sell them to Allergan Ireland" (D.I. 548 at 8–9) in the 2020 IP APA. I agree with Revance: Allergan has failed to show that the 2006 Purchase Agreement did not include the asserted patents.

I begin by describing the 2006 Purchase Agreement and the 2012 Termination Agreements. The Purchase Agreement provides in its preamble,

> A. Seller owns or has acquired a share in the beneficial rights to make use and sell Botox® in [the world, excluding China and Japan] (collectively, the 'BOTOX® Rights').
>
> B. Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire from Seller, a portion of the BOTOX® Rights. . . .

(D.I. 533-1 at 63 of 96). The 2006 Purchase Agreement defines "Seller" as APHI and "Purchaser" as ASBV. (*Id.*). The body of the agreement continues, "Seller hereby sells, transfers and assigns to Purchaser, and Purchaser hereby purchases and acquires, the Target BOTOX® Rights of Seller. . . ." (*Id.*). The agreement defines "Target BOTOX® Rights" as "that amount of BOTOX® Intellectual Property owned by APHI in [the world, excluding China and Japan] represented by a value which is more specifically set out in Exhibit A hereto." (*Id.*). Exhibit A then lists a "Purchase Price" of two million euros. (*Id.* at 66 of 96). The 2006 Purchase Agreement also states, "To the extent that under applicable law any of the Target BOTOX® Rights may not be sold, transferred or assigned to Purchaser, Seller agrees to and hereby does grant Purchaser a fully paid up, exclusive, perpetual, royalty-free, irrevocable and unconditional license to the BOTOX® Rights, including the right to sublicense." (*Id.* at 64 of 96). Finally, the 2006 Purchase Agreement provides, "[N]o agreement or understanding varying or extending the [subject matter hereof] shall be binding upon any party hereto unless in writing signed by a duly authorized officer or representative thereof in which this Agreement is expressly referred to." (*Id.* at 65 of 96).

16

It is not clear what specific pieces of Botox® IP the 2006 Purchase Agreement was meant to convey. According to Exhibit B of the agreement, the overall value of APHI's share of Botox® IP was nearly five billion dollars as of December 31, 2004 (*id.* at 67 of 96), so conveying an "amount" of IP represented by two million euros might suggest that most of the IP was not included in the agreement. Furthermore, the agreement's preamble, which focuses on the "beneficial rights to make[,] use[,] and sell Botox®" (*id.* at 63 of 96), might suggest that the agreement is limited to the intellectual property for that specific product (D.I. 550 at 9), rather than any intellectual property that broadly "relat[es]" to Botox®, as in the 2010 MOU. (D.I. 439-9 at 3 of 5).

On the other hand, Allergan has offered no explanation for what the 2006 Purchase Agreement *is* meant to cover, instead arguing with no support that "the then-economic owners of Botox® granted ASBV a specific, pre-2010 income interest in the intellectual property rights needed to make, use, and sell [Botox®]." (D.I. 550 at 9).[13] Allergan points to deposition testimony from a former member of ASBV's board of directors suggesting that ASBV was a "dormant company" by 2015 (D.I. 550 at 9–10) (citing D.I. 548-1 at 70:7–15, 25:2–9), but the testimony provides little insight beyond that, and, in any event, does not provide any description regarding "what rights were transacted by the 2006 Purchase Agreement." (D.I. 548 at 9) (citing D.I. 548-1 at 67:6–68:7). Adding further confusion, the agreement is to be construed "in all respects by the laws of The Netherlands. . . ." (D.I. 533-1 at 64 of 96). Neither party has explained how the law of the Netherlands informs my analysis. Finally, Exhibit B to the 2006 Purchase Agreement refers to "APHI's Botox IP rights as set out in Annex A to the 2005 Licensing Income Analysis" (D.I. 533-1 at 67 of 96), but neither party has provided Annex A.

---

[13] It is not clear whether this section of Allergan's brief is referring specifically to the 2006 Purchase Agreement, or the various 2001 License Agreements. (D.I. 550 at 9).

Rather than addressing the meaning of the 2006 Purchase Agreement, Allergan argues the following: "Whatever rights ASBV once held in the Botox® product were terminated in 2012 and reverted to their grantors." (*Id.*). I do not accept that argument.

The 2012 Termination Agreement references the 2001 License Agreement between APHI and ASBV, as well as "subsequent [v]ariations and amendments" thereto in its preamble (D.I. 533-1 at 82 of 96), and provides, "The [2001 License] Agreement will be terminated. . . ." (*Id.*). The 2012 Termination Agreement also provides, "This Agreement contains the entire understanding between the parties hereto with respect to the past relationship between the parties and supersedes and replaces all prior negotiations, proposed agreements or agreements concerning the same." (*Id.*).

Allergan argues under the last quoted provision that the 2012 Termination Agreement terminates the 2006 Purchase Agreement. (D.I. 550 at 10). I disagree. First, the Termination Agreement only purports to terminate the 2001 License Agreement, and at no point mentions the 2006 Purchase Agreement. (D.I. 533-1 at 79 of 96). Second, to effectuate a buy-back of the intellectual property conferred by the 2006 Purchase Agreement, it would not be sufficient simply to say that the 2012 Termination Agreement "replaces" the 2006 Purchase Agreement; the 2006 Purchase Agreement provides that it can only be "var[ied] or extend[ed]" by a "writing . . . "in which [the 2006 Purchase] Agreement is expressly referred to." (D.I. 533-1 at 65 of 96).[14] It is also not clear what it would mean to "terminate" an agreement that, like the 2006 Purchase Agreement, did not establish an ongoing relationship and, by its nature, was concluded as soon as

---

[14] The 2012 Termination Agreement notes that ASBV and APHI had discussed, starting in November of 2010, a restructuring whose details included an agreement to sell ASBV's "portion of the IP. . . ." (D.I. 533-1 at 79 of 96). The 2012 Termination Agreement itself, however, does not effectuate any such sale, and any other documents that detail such a sale are not before me.

18

it was executed.[15] I also note that the 2012 Termination Agreement is to "be construed and interpreted in accordance with the laws of Switzerland." (*Id.* at 79 of 96). Allergan does not address how that should impact my analysis.

All of the foregoing leads me to believe that the 2012 Termination Agreement ended the 2001 License Agreement but had no effect on the 2006 Purchase Agreement, the scope of which is uncertain (and therefore might plausibly include the asserted patents). To the extent that some variables add uncertainty to my findings—for example, the interpretation of Dutch or Swiss law—they must necessarily do so to Allergan's detriment, as it is Allergan's burden to demonstrate standing. Because it is possible that the 2006 Purchase Agreement included rights to the asserted patents, and because Allergan has provided no rationale from which to conclude otherwise, I find that the answer to Question #4 is "no" and the motion to dismiss Allergan Ireland must be granted.

## IV.  CONCLUSION

I find that the 2010 MOU's reference to "Botox® IP" covered the asserted patents. However, I also find Allergan has failed to show that the 2006 Purchase Agreement, which pre-dated the 2010 MOU and was never terminated, did not contain rights to the asserted patents. Therefore, Allergan Ireland lacks standing and is not a proper party to this case. Allergan USA has already agreed to dismissal from the suit. (D.I. 450 at 2).

An appropriate order will follow.

---

[15] Alongside the 2012 Termination Agreement, ASBV and APHI executed a set of put and call options (D.I. 533-1, Exs. 38, 39), but Allergan does not contend that ASBV ever exercised either option.