**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

Allergan, Inc.,

Plaintiff,

v.

Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,

Defendants.

REDACTED - PUBLIC VERSION
(Filed August 6, 2025)

C.A. No. 21-1411-RGA-LDH

[redacted]

**DEFENDANTS' REBUTTAL TO ALLERGAN'S JULY 8, 2025 PROFFER**

Of Counsel:

Dennies Varughese, Pharm. D.
Adam C. LaRock
Byron L. Pickard
Nirav N. Desai
Deirdre M. Wells
Anna G. Phillips
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Peter J. Armenio
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. (f/k/a Ajinomoto Althea, Inc.)*

Dated: July 8, 2025

## I. Nature And Stage Of Proceedings

Pursuant to the Court's request during the July 1, 2025 pre-trial conference, on July 8, 2025, Plaintiff Allergan, Inc. ("Allergan") submitted a proffer of what its damages expert, Dr. Siegwarth, would say at trial regarding her reasonable royalty opinion for U.S. Patent Nos. 7,354,740 and 11,203,748 ("the Asserted Manufacturing Patents"). D.I. 590-591.

## II. Allergan's Proffer Includes Untimely New Opinions That Should Be Excluded

In its proffer, Allergan includes two untimely new opinions from Dr. Siegwarth that the Court should exclude: previously undisclosed reasonable royalty rates of 8% or 11% with respect to the Asserted Manufacturing Patents based on a previously undisclosed apportionment analysis for the Asserted Manufacturing Patents ("the 8/11 Opinions").

Allergan's failure to timely disclose its new 8/11 Opinions is confirmed by the record in multiple ways. Most recently, Allergan's proffer confirms that its new 8/11 Opinions were not previously disclosed. Indeed, after removing the discussion of Dr. Siegwarth's "cost for time" opinion for the Asserted Manufacturing Patents, "attribute allocation" opinion for the Asserted Formulation Patents, and various criticisms of Ms. Trexler—none of which has any bearing on whether Dr. Siegwarth previously disclosed Allergan's new 8/11 Opinions—Allergan's proffer is left with Paragraph 174 of Dr. Siegwarth's opening report and Paragraph 100 of her reply report. Those paragraphs nowhere disclose that Dr. Siegwarth would offer either an 8% or 11% reasonable royalty rate or an apportionment analysis for the Asserted Manufacturing Patents.

The lack of support for Allergan's new 8/11 Opinions in its proffer is not surprising given that none of Dr. Siegwarth's three prior reasonable royalty expert reports disclosed any such opinion. For example, Dr. Siegwarth's December 15, 2023 opening expert report (D.I. 360, Ex. A) ("Opening Report") stated clearly in the "Summary Of Opinion" that:

> A reasonable royalty for the Asserted Manufacturing Patents is 15 to 20 percent through September 25, 2023 and 12.5 to 17.5 percent thereafter, ***and would reflect Revance's expected opportunity costs related to implementing and gaining approval for a non-infringing alternative, if such an alternative could be implemented***." (¶11.b) (emphasis added)

There was no alternative reasonable royalty rate offered for the Asserted Manufacturing Patents and no alternative to Dr. Siegwarth's "cost for time" methodology.

In addition to the "Summary Of Opinion," the Opening Report discusses the "Negotiation For License To Asserted Manufacturing Patents" in Paragraphs 162 to 174. Nowhere in that section does Dr. Siegwarth mention any of Allergan's new 8/11 Opinions. In fact, in Paragraph 172, Dr. Siegwarth clearly states that her reasonable royalty opinion for the Asserted Manufacturing Patents is based on a "cost for time" approach, and does so with no equivocation and no alternatives:

> With Revance's willingness to pay in consideration, it is my opinion that ***an appropriate royalty on sales of Daxxify given an 18-month delay would be 20 percent through the expiration of the first APF process family and 17.5 percent thereafter*** through the expiration of the second APF process family. Similarly, ***when applied to the 12-month delay in Daxxify's launch, it is my opinion that an appropriate royalty on net sales of Daxxify would be 15 percent through the expiration of the first APF process family and 12.5 percent thereafter*** through the expiration of the second APF process family. (¶172) (emphasis added)

Allergan seeks to rely on Paragraph 174 of the Opening Report for its new 8/11 Opinions. But that paragraph offers no such support. Indeed, it does not even mention 8% or 11%. Nor does it suggest that Dr. Siegwarth had an alternate reasonable royalty methodology for the Asserted Manufacturing Patents. At most, Paragraph 174 bolsters Dr. Siegwarth's "cost for time" opinion, which is set forth in the preceding paragraphs.

If there were any doubt, the Opening Report includes a "Summary Of Economic Damages" at the end, in which Dr. Siegwarth specifies in ¶185 that "it is my opinion that damages owed to Allergan are:"

> 2. A reasonable royalty to the Asserted Manufacturing Patents of 15 to 20 percent through September 25, 2023, and 12.5 to 17.5 percent thereafter on net revenue of Daxxify not covered by lost profits through July 13, 2029. (¶185.a.2)

No alternative opinion was disclosed for the Asserted Manufacturing Patents. It would be incurably prejudicial to Revance for Allergan to try to cobble one together now, on the eve of trial.

Like the Opening Report, Dr. Siegwarth's April 19, 2024 reply report (D.I. 361, Ex. J.) ("Reply Report") does not disclose Allergan's new 8/11 Opinions. Indeed, the Reply Report nowhere even mentions an 8% or 11% royalty rate for the Asserted Manufacturing Patents. During the July 1, 2025 pre-trial conference and again in its proffer, Allergan confuses an 8% apportionment factor (which would be multiplied by any price premium for Daxxify according to Ms. Trexler) with an 8% royalty rate. The two are absolutely not the same, as hundreds of pages of damages expert reports confirm.

What Dr. Siegwarth's Reply Report does say, right in the "Summary Of Opinion," is that:

> ***Ms. Trexler's*** calculated royalty rates fail to account for the value associated with the Asserted Patents. Her ***royalty analysis is fundamentally flawed and unreliable, including her use of Daxxify's price premium and her improper use of "apportionment factors."*** (Reply Report at ¶9.c.2) (emphasis added)

Dr. Siegwarth continues in the "Summary Of Opinion" by stating that:

> Ms. Trexler undervalues Revance's willingness to pay for a license to the Asserted Manufacturing Patents by improperly adjusting the Meyer Damages Report's calculation of Revance's expected costs of pursuing a non-infringing alternative. ***Her methodology inappropriately applies an apportionment factor*** and undervalues Revance's willingness to pay for the hypothetical license. (*Id.* at ¶9.c.3) (emphasis added)

In contrast to Allergan's proffer, there is no alternative reasonable royalty rate or reasonable royalty methodology for the Asserted Manufacturing Patents in Dr. Siegwarth's Reply Report. Instead, there is unequivocal criticism of Ms. Trexler's use of "apportionment factor(s)."

Consistent with its "Summary Of Opinions," the Reply report continues to criticize Ms. Trexler's use of apportionment factors and states, repeatedly, that Dr. Siegwarth's "cost for time" methodology is the correct approach for the Asserted Manufacturing Patents. For example, in Paragraph 98, the Reply Report states that:

> According to Ms. Trexler, Revance could have switched to a non-APF production process at minimal costs and without any delay to the FDA approval of Daxxify. In contrast, the Meyer Damages Report considered an NIA that would delay Daxxify's launch timeline because Revance would need additional time to obtain FDA approval of a re-formulated version of Daxxify. That is, ***the Meyer Damages Report's royalty determination is based on Revance's cost of time (as proxied by its delayed profits) when pursuing such an NIA. This is a proper way for determining a royalty*** and does not rely on the Entire Market Value Rule as purported by Ms. Trexler—rather, it is a method for measuring Revance's cost of time, or opportunity. (emphasis added)

Similarly, Paragraph 99 of the Reply Report states that:

> Ms. Trexler analyzes several surveys and documents showing that many factors influence customer demand outside of Daxxify's HSA-free nature. In the Meyer Damages Report, I do not opine that any one feature is the sole driver of demand for Daxxify, and that is not a necessary component to my analysis of the costs related to implementing an NIA. ***Ms. Trexler's analysis of drivers of demand is not relevant to an analysis of the costs that Revance would incur from attempting to design-around the Asserted Manufacturing Patents.*** (emphasis added)

In its proffer, Allergan seeks to rely on Paragraph 100 of the Reply Report. But yet again, that paragraph nowhere discloses Allergan's new 8/11 Opinions. Dr. Siegwarth does not disclose any use of 8% or 11% as alternative reasonable royalty rates for the Asserted Manufacturing Patents, nor does she disclose any use of "apportionment factors" as an alternative reasonable royalty methodology to her "cost for time" approach for those patents. Dr. Siegwarth's own words are quite clear on these points, and flatly contradict Allergan's proffer:

> The costs, including opportunity costs, to implement a delay for designing around the Asserted Manufacturing Patents directly reflect the benefit of receiving a license at the time of the hypothetical negotiation. As a result, ***the difference in profit identified in the Meyer Damages Report requires no adjustment, and Ms.***

> ***Trexler's use of her calculated 8.2 percent weight attributable to APF as an apportionment factor for Daxxify's price premium is improper.*** (emphasis added)

After serving the Reply Report, Dr. Siegwarth was deposed on May 31, 2024. During that deposition, Dr. Siegwarth testified that she did not even do an apportionment analysis for the animal protein free ("APF") feature of DAXXIFY in connection with the Asserted Formulation Patents:

> **Q. And similarly, do you include the value of APF from the asserted formulation patents in your apportionment analysis?**
>
> A. And, again, I don't -- that's where I'm having trouble understanding your -- I guess what I'm having trouble understanding is your -- the wording that you're using of the -- something like the benefits of the APF -- of the formulation patents or something of that nature.
>
> I certainly look at overall the value -- or I should say overall the -- the -- the language of those formulation patents and the link to APF, the overall value of APF in -- and we talked about some of the -- some, but not all of the sources and exhibits, evidence that -- that speak to that in my report.
>
> But, again, if you're asking me did I specifically do a parallel analysis of the attributes of APF as I did with the long duration in the -- for the formulation patents, no, that, I did not do with regards to the formulation patents. I agree.

(Siegwarth Dep. Tr. 190:5-19:1 (D.I. 361, Ex. U)). This testimony flatly contradicts Allergan's suggestion that its proffer is just taking an analysis Dr. Siegwarth already did for the Asserted Formulation Patents and extending it to the Asserted Manufacturing Patents. Dr. Siegwarth, by her own admission, never did an APF apportionment analysis for the Asserted Formulation

Patents. There is nothing for Allergan to extend to the Asserted Manufacturing Patents in its proffer.

If there were any remaining doubt that Allergan's 8/11 Opinions are new, untimely, and should be excluded, Dr. Siegwarth's November 4, 2024 supplemental report served before the originally scheduled trial (Ex. 1) ("the First Trial Report") eliminates it. In that report, Dr. Siegwarth again provides a "Summary Of Opinion" section, which states one calculation of reasonable royalty damages for the Asserted Manufacturing Patents, with no caveats or alternatives: "If only the Asserted Manufacturing Patents are determined to be valid, enforceable, and infringed, and lost profits is not determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted] (First Trial Report at ¶8.e).

Later in the First Trial Report, Dr. Siegwarth states that:

> In the Meyer Damages Report, I opined that a reasonable royalty for the Asserted Manufacturing Patents would be 15 to 20 percent prior to the expiration of the first APF process family and 12.5 to 17.5 percent thereafter, applied to net sales of Daxxify. (*Id.* at ¶12)

When Dr. Siegwarth described her reasonable royalty opinion for the Asserted Manufacturing Patents in the First Trial Report in her own words, the language was clear and did not disclose any alternative rates or methodologies, much less the new 8/11 Opinions in Allergan's proffer.

Dr. Siegwarth was similarly singular in her reasonable royalty analysis for the Asserted Manufacturing Patents in the "Summary Of Economic Damages" section at the end of her First Trial Report: "[a] reasonable royalty for the Asserted Manufacturing Patents of 15 to 20 percent through September 25, 2023 and 12.5 to 17.5 percent thereafter on net revenue of Daxxify not covered by lost profits through July 13, 2029." (*Id.* at ¶14.a.2)

Dr. Siegwarth did not disclose Allergan's new 8/11 Opinions in her Opening Report, Reply Report, or First Trial Report. In each of those reports Dr. Siegwarth disclosed one, and only one, reasonable royalty analysis for the Asserted Manufacturing Patents: a "cost for time" approach with specific associated rates.

Allergan should not be allowed to offer a new reasonable royalty analysis for the Asserted Manufacturing Patents at trial. To do so would be incurably prejudicial to Revance, which first heard of Allergan's new 8/11 Opinions in Dr. Siegwarth's ***June 19, 2025*** supplemental damages report, which was only supposed to update sales figures and resulting total damages numbers.

Allergan argues in its proffer that Dr. Siegwarth used an apportionment analysis in connection with the Asserted Formulation Patents. But Dr. Siegwarth's deposition testimony confirms that she did not include the APF attributes of Daxxify in that analysis. And, in any event, those are different patents for which Dr. Siegwarth explicitly used a different analysis. Dr. Siegwarth's discussion of the Asserted Formulation Patents was neither a disclosure of Allergan's new 8/11 Opinions for the Asserted Manufacturing Patents nor a valid reason for their untimely disclosure on the eve of trial.

## III. Conclusion

Dr. Siegwarth never disclosed use of an 8% or 11% royalty rate, or use of an apportionment methodology, for the Asserted Manufacturing Patents. In fact, Dr. Siegwarth criticized the use of that methodology for the Asserted Manufacturing Patents. It is far too late for Allergan to change its damages opinions now, on the eve of trial. Allergan's new 8/11 Opinions should be excluded.

Dated: July 8, 2025

Of Counsel:

Dennies Varughese, Pharm. D.
Adam C. LaRock
Byron L. Pickard
Nirav N. Desai
Deirdre M. Wells
Anna G. Phillips
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Peter J. Armenio
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. (f/k/a Ajinomoto Althea, Inc.)*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 8, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jack B. Blumenfeld
Jeremy A. Tigan
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com
araucci@morrisnichols.com

Candace Polster
Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
candacepolster@paulhastings.com
robertunikel@paulhastings.com

*Attorneys for Plaintiff*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Karthik R. Kasaraneni
David M. Valente
Amanda K. Taylor
Vladimir J. Semendyai
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
karthikkasaraneni@paulhastings.com
davidvalente@paulhastings.com
amandataylor@paulhastings.com
vladimirsemendyai@paulhastings.com

Dated: July 8, 2025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. (f/k/a Ajinomoto Althea, Inc.)*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>Revance Therapeutics, Inc., and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services,<br><br>Defendants. | Civil Action No. 21-1411-RGA |

**Expert Report of Christine S. Meyer, Ph.D.**

November 4, 2024

**I. Introduction....................1**
A. Professional Qualifications and Experience....................1
B. Retention and Assignment....................1
C. Information Relied Upon....................1
D. Summary of Opinion....................3
**II. Calculation of Lost Profits....................4**
**III. Calculation of Reasonable Royalty Damages....................5**
**IV. Summary of Economic Damages....................5**


**HIGHLY CONFIDENTIAL - Subject to Protective Order**

# I. Introduction

## A. Professional Qualifications and Experience

1. I have previously submitted three expert reports in this matter. On December 15, 2023, I filed an expert report concerning economic damages (the "Meyer Damages Report").[1] On March 8, 2024, I filed an expert report concerning the commercial success of Defendants' Daxxify product and its nexus to the Asserted Formulation Patents (the "Meyer Commercial Success Report").[2] On April 19, 2024, I filed an expert reply report responding to the opinions of Ms. Dana Trexler (the "Meyer Reply Report").[3] Those reports are incorporated herein by reference, including my qualifications, the terms of my retainer, my understanding of certain facts, and my analyses and opinions as set forth in each report. A current version of my CV can be found at **Exhibit 18**.

## B. Retention and Assignment

2. In this report, I have been asked by Counsel for Allergan to update my calculation of lost profits and reasonable royalty damages through October 18, 2024 based on updated Daxxify sales data produced by Revance.

3. NERA was retained by Counsel according to our ordinary retention terms. That is, NERA is being compensated for the time that I spend on this matter at my standard hourly rate of $975.[4] In addition, NERA is separately reimbursed for reasonable out-of-pocket expenses. Neither my compensation nor NERA's is dependent on the outcome of this litigation or the nature of my opinions.

## C. Information Relied Upon

4. In preparing this supplemental report, I (or economists working under my direction) have

1 Expert Report of Christine S. Meyer, Ph.D., December 15, 2023. Throughout this report, I adopt the same monikers used throughout the Meyer Damages Report.

2 Expert Report of Christine S. Meyer, Ph.D., March 8, 2024. Throughout this report, I adopt the same monikers used throughout the Meyer Commercial Success Report.

3 Expert Reply Report of Christine S. Meyer, Ph.D., April 19, 2024. Throughout this report, I adopt the same monikers used throughout the Meyer Reply Report.

4 NERA is being compensated for the time spent by additional staff members working under my direction at NERA's customary hourly rates.



HIGHLY CONFIDENTIAL - Subject to Protective Order

reviewed information in addition to the information I identified in the Meyer Damages Report, the Meyer Commercial Success Report, and the Meyer Reply Report. A list of the additional sources of information and materials upon which I relied in forming my opinions can be found appended to this report as **Exhibit 19**. The specific information upon which I have relied is cited in the footnotes of the text. I also interviewed Jill Carey, Senior Director, Head of Tax Controversy at AbbVie Inc. on November 4, 2024.[5]

5. I understand that Revance has produced updated data on Daxxify sales in the United States through October 18, 2024. I understand from counsel that the updated data do not include therapeutic sales of Daxxify, despite the fact that Daxxify launched for the treatment of cervical dystonia in May 2024, after I filed the Meyer Reply Report.[6] As a result of this omission, I have been unable to update my lost profits and reasonable royalty damages figures to account for the launch of Daxxify for cervical dystonia. I therefore reserve the right to update my calculations of damages to include any therapeutic sales of Daxxify through the time of trial.

6. I further understand that Revance has not provided updated Daxxify profit and loss financial statements, Daxxify market share data, or any Daxxify market research reports. As such, I am unable to update the portions of my opinions that relied upon such information, nor am I able to address any of Ms. Trexler's opinions that relied on that information.

7. Since the submission of the Meyer Reply Report, I understand that the National Medical Products Administration in China has approved Daxxify for glabellar lines.[7] To the extent that Daxxify product manufactured in the United States and transferred overseas to, for example, Fosun, Revance's development partner for Daxxify in China, for use

---

5 Interview with Jill Carey, November 4, 2024 ("Carey Interview").

6 The data provided to me from November 12, 2023 through September 30, 2024 are contained within a tab called "Revenue Details ITD-0930 AES," where I understand "AES" to signify "aesthetic." REV_DAX-03343077.xlsx. The data provided to me for October 1, 2024 through October 18, 2024 provide no indication regarding whether therapeutic sales are included. REV_DAX-03343166.xlsx. "Revance Reports Second Quarter 2024 Financial Results, Provides Corporate Update," *Revance,* available at https://investors.revance.com/investors/Press-Releases/news-details/2024/Revance-Reports-Second-Quarter-2024-Financial-Results-Provides-Corporate-Update/default.aspx, accessed on November 4, 2024.

7 I understand that Shanghai Fosun Pharmaceutical Industrial Development Co. Ltd. ("Fosun") submitted the biologics license application for Daxxify in China. Revance Therapeutics, Inc. Form 8-K filed on September 9, 2024.

abroad is found to infringe the Asserted Patents, I reserve the right to update my calculations of damages to include product manufactured in the United States and sold for use outside of the United States through the time of trial.

## D. Summary of Opinion

8. Based on the information available to me and my analysis to date, I have reached the following conclusions.

a. If both the Asserted Manufacturing Patents and the Asserted Formulation Patents are determined to be valid, enforceable, and infringed, and lost profits is determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted];

b. If only the Asserted Manufacturing Patents are determined to be valid, enforceable, and infringed, and lost profits is determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted];

c. If only the Asserted Formulation Patents are determined to be valid, enforceable, and infringed, and lost profits is determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted];

d. If both the Asserted Manufacturing Patents and the Asserted Formulation Patents are determined to be valid, enforceable, and infringed, and lost profits is not determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted];

e. If only the Asserted Manufacturing Patents are determined to be valid, enforceable, and infringed, and lost profits is not determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted];

f. If only the Asserted Formulation Patents are determined to be valid,

enforceable, and infringed, and lost profits is not determined to be an appropriate measure of damages, total damages through October 18, 2024 would be [redacted]; and

g. If a reasonable royalty is not determined to be an appropriate measure of damages, total lost profits damages through October 18, 2024 would be [redacted].

## II. Calculation of Lost Profits

9. Revance has sold [redacted] vials of Daxxify in the United States from December 2022 through October 18, 2024, totaling about [redacted].[8] I calculate lost profits using the methodology described in the Meyer Damages Report, *i.e.*, Allergan's lost profits are determined as the profits it would have made on incremental sales but-for the alleged infringement by Revance of the Asserted Patents.[9]

10. **Exhibit 20** shows my calculation of lost profits by month due to the infringing Daxxify sales Revance made through October 18, 2024. To determine Allergan's lost sales, I account for a [redacted] percent market expansion effect resulting from the patients that would not have received any BoNT injectable treatment if Daxxify was not available. Among the remaining patients, I assume that half of them would have chosen Botox Cosmetic in the but-for scenario (*i.e.*, I apply a switch factor of 50 percent). It is my opinion that Allergan would have sold an additional [redacted] vials of Botox Cosmetic absent Revance's alleged infringement of the Asserted Patents.[10]

11. Applying Allergan's monthly average selling price ("ASP") for Botox and its margin of

[8] **Exhibit 20**. My calculation of vials of Daxxify sold does not include the [redacted] vials of Daxxify distributed as samples as of April 7, 2023 and accounted for in the Meyer Damages Report. **Exhibit 21** [redacted]

[9] Meyer Damages Report, ¶¶ 50-51.

[10] **Exhibit 20**; Meyer Damages Report, ¶¶ 83, 86, Exhibit 5. As in the Meyer Damages Report, my calculation of the vials of Botox Cosmetic that Allergan would have sold in the but-for world, I assume that a 100-unit vial of Daxxify is equivalent to a 100-unit vial of Botox. See, Meyer Damages Report, ¶ 86, FN 172.



HIGHLY CONFIDENTIAL - Subject to Protective Order

[redacted] to the total lost vials,[11] I calculate total lost profits from September 2022 through October 18, 2024 of [redacted].[12]

## III. Calculation of Reasonable Royalty Damages

12. In the Meyer Damages Report, I opined that a reasonable royalty for the Asserted Manufacturing Patents would be 15 to 20 percent prior to the expiration of the first APF process family and 12.5 to 17.5 percent thereafter, applied to net sales of Daxxify.[13] I also opined that a reasonable royalty for the Asserted Formulation Patents would be 24 percent, applied to net sales of Daxxify.[14] As calculated in the Meyer Damages Report, about [redacted] of Daxxify sales occurred before September 25, 2023, the expiration date of the first APF process family.[15] Total Daxxify sales from the expiration of the first APF process family through October 18, 2024 is about [redacted] based on the updated Daxxify sales data.

13. As shown in **Exhibits 21A-21B**, I have updated the damages scenarios presented in Exhibits 7A-7B of the Meyer Damages Report to reflect the updated Daxxify sales data.

## IV. Summary of Economic Damages

14. If the Asserted Patents are found to be valid, enforceable and infringed, it is my opinion

---

11 As in the Meyer Damages Report, I apply the Botox Cosmetic monthly ASP available through August 2024, and a [redacted] percent distribution margin to calculate total lost profits. Meyer Damages Report, ¶ 87, Exhibit 5. For September and October of 2024, I use the ASP recorded for August 2024. ALGN-1848432; ALGN-1848433.

12 I understand that Revance has challenged the entities that are party to this case. Jill Carey confirmed my understanding from the Meyer Damages Report regarding the entities mentioned in Paik Exhibit 31 and Mr. Paik's testimony, which explained that Allergan USA, Inc. or AbbVie US LLC receives 5 percent of Botox net revenue in the United States, while [redacted] that I understand from Ms. Carey is not reflected in consolidated financial statements such as ALGN-1848433. Jill Carey also confirmed that Paik Exhibit 31 is current through the present day. If I were to adjust the standard manufacturing margin of [redacted] percent (calculated as [redacted] / [redacted]) based on the flow of funds to Allergan USA Inc. or AbbVie US LLC, by implementing a 5 percent decrease relative to net sales of Botox, the margin would be [redacted] percent. If I were to further adjust the margin to deduct [redacted] percent times the [redacted], the margin would be [redacted] percent [redacted]). The resulting lost profits using a [redacted] percent margin would be [redacted]. If the finder of fact were to determine that these adjustments are necessary, the damages scenarios discussed in this report that include lost profits would each decrease by $6.7 million.

13 Meyer Damages Report, ¶ 11b.

14 Meyer Damages Report, ¶ 11c.

15 Meyer Damages Report, Exhibits 7A-7B.



HIGHLY CONFIDENTIAL - Subject to Protective Order

that damages owed to Allergan are:

a. If the finder of fact were to determine that lost profits are a proper measure of damages, and both the Asserted Manufacturing Patents and the Asserted Formulation Patents are found to be valid, enforceable, and infringed:

1. Lost profits on the Botox vials lost due to Revance's infringement;

2. A reasonable royalty to the Asserted Manufacturing Patents of 15 to 20 percent through September 25, 2023, and 12.5 to 17.5 percent thereafter on net revenue of Daxxify not covered by lost profits through July 13, 2029;[16] and

3. A reasonable royalty to the Asserted Formulation Patents of 24 percent on net revenue of Daxxify not covered by lost profits, through expiry of the Asserted Formulation Patents on September 21, 2026.

4. Through October 18, 2024, damages in this scenario are [redacted].

b. If the finder of fact were to determine that lost profits are a proper measure of damages, and only the Asserted Manufacturing Patents are found to be valid, enforceable, and infringed:

1. Lost profits on the Botox vials lost due to Revance's infringement; and

2. A reasonable royalty to the Asserted Manufacturing Patents of

[16] Consistent with my opinions in the Meyer Damages Report and the Meyer Reply Report, to the extent the royalty rate applied by the jury differs from those I apply here, the reasonable royalty award can be modified according to the jury's rate. For example, if a single reasonable royalty rate of 17.5 percent is applied to the Asserted Manufacturing Patents on all Daxxify sales from launch through July 13, 2029 (*i.e.*, the expiration date of the second APF process family), then the total reasonable royalty portion of the damages award would be adjusted accordingly.



**HIGHLY CONFIDENTIAL - Subject to Protective Order**

15 to 20 percent through September 25, 2023, and 12.5 to 17.5 percent thereafter on net revenue of Daxxify not covered by lost profits through the expiry of the Asserted Manufacturing Patents on July 13, 2029.

3. Through October 18, 2024, damages in this scenario are [redacted].

c. If the finder of fact were to determine that lost profits are a proper measure of damages, and only the Asserted Formulation Patents are found to be valid, enforceable, and infringed:

1. Lost profits on the Botox vials lost due to Revance's infringement; and

2. A reasonable royalty to the Asserted Formulation Patents of 24 percent on net revenue of Daxxify not covered by lost profits through the expiry of the Asserted Formulation Patents on September 21, 2026.

3. Through October 18, 2024, damages in this scenario are [redacted]

d. If the finder of fact were to determine that lost profits are not a proper measure of damages, and both the Asserted Manufacturing Patents and the Asserted Formulation Patents are found to be valid, enforceable, and infringed:

1. A reasonable royalty to the Asserted Manufacturing Patents of 15 to 20 percent through September 25, 2023 and 12.5 to 17.5 percent thereafter on net revenue of Daxxify through July 13, 2029; and

2. A reasonable royalty to the Asserted Formulation Patents of 24



**HIGHLY CONFIDENTIAL - Subject to Protective Order**

percent on net revenue of Daxxify, through expiry of the Asserted Formulation Patents on September 21, 2026.

3. Through October 18, 2024, damages in this scenario are [redacted].

e. If the finder of fact were to determine that lost profits are not a proper measure of damages, and only the Asserted Manufacturing Patents are found to be valid, enforceable, and infringed:

1. A reasonable royalty of 15 to 20 percent through September 25, 2023 and 12.5 to 17.5 percent thereafter on net revenue of Daxxify thereafter through expiry of the Asserted Manufacturing Patents on July 13, 2029.

2. Through October 18, 2024, damages in this scenario are [redacted].

f. If the finder of fact were to determine that lost profits are not a proper measure of damages, and only the Asserted Formulation Patents are found to be valid, enforceable, and infringed:

1. A reasonable royalty of 24 percent of net revenue of Daxxify through expiration of the Asserted Formulation Patents on September 21, 2026.

2. Through October 18, 2024, damages in this scenario are [redacted].

g. If the finder of fact were to determine that a reasonable royalty is not the proper measure of damages, lost profits owed to Allergan due to Revance's infringement amount to [redacted] on the Botox vials lost due to Revance's infringement from September 2022 through October 18, 2024, the latest Revance sales data produced as of the date of this report.



**HIGHLY CONFIDENTIAL - Subject to Protective Order**

15. As shown in **Exhibits 21A-21B**, I have calculated damages on vials of Daxxify distributed through October 18, 2024 under each of these scenarios.

Signed this 4th day of November, 2024.

Christine S. Meyer

Christine S. Meyer, Ph.D.



**HIGHLY CONFIDENTIAL - Subject to Protective Order**

NERA

**Christine Meyer, Ph.D.**
Senior Managing Director

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: 1 (914) 448-4119
christine.meyer@nera.com
www.nera.com

# CHRISTINE MEYER, Ph.D.

## Senior Managing Director

Featured as one of *Global Competition Review's* "Women in Antitrust," Dr. Christine Meyer is an economist specializing in the areas of complex commercial litigation involving intellectual property, antitrust claims, and commercial damages in the United States and Canada.

In the area of intellectual property, Dr. Meyer has analyzed damages and provided expert testimony concerning issues arising from patent, trademark, and copyright infringement, the misappropriation of trade secrets, and breaches of contract. She has considerable expertise in analyzing lost profits, reasonable royalties, price erosion, commercial success, and irreparable harm. Dr. Meyer has analyzed economic issues in a wide range of industries, with much of her recent work involving pharmaceuticals. She has been retained on behalf of both branded and generic firms in matters that have included small molecule as well as biologic products. Her work has also included the valuation of patents, licenses, and potential business acquisitions.

Dr. Meyer has evaluated antitrust claims and damages in numerous cases involving IP issues, including alleged reverse payment, antitrust counterclaims to patent cases, claims of fraudulently-obtained patents, and monopolization claims. She has also analyzed the competitive effects of mergers and acquisitions, the volume of commerce for criminal investigations, and economic issues involving alleged resale price maintenance, and price discrimination. In addition, Dr. Meyer has also written, testified, and presented white papers and expert reports to the U.S. Federal Trade Commission (FTC) and U.S. Department of Justice.

Dr. Meyer has testified as an expert witness in bench and jury trials in state and federal courts in the United States—including the Southern District of New York and the Southern District of California—and Canada, and before the High Court of Justice of England and Wales. She has also written articles and book chapters about patent infringement damages, and has been asked to speak about economic issues related to intellectual property on numerous occasions, including by the FTC in its hearings entitled, "*The Evolving IP Marketplace*."

Dr. Meyer earned her PhD in economics from the Massachusetts Institute of Technology, and a BS in economics from the United States Military Academy at West Point.

## Education

**Massachusetts Institute of Technology**
Ph.D., Economics, 1995

**United States Military Academy, West Point**
B.S., Economics, 1988

## Professional Experience

| | |
|---|---|
| | **NERA Economic Consulting** |
| 2023- | Senior Managing Director |
| 2019-2023 | Managing Director, Chair of Intellectual Property Practice |
| 2016-2018 | Managing Director |
| 2015-2016 | Senior Vice President |
| 2006-2015 | Vice President |
| 2002-2006 | Senior Consultant |
| 2000-2002 | Consultant |
| | **Colgate University** |
| 1999-2000 | Visiting Assistant Professor<br>Taught courses in Statistics and Introductory Economics. |
| | **Bentley College** |
| 1995-1999 | Assistant Professor<br>Taught courses in Statistics, Macroeconomics, Money and Banking, and the Economics of Race and Gender for undergraduate and graduate students. |
| | **Data Resources, Inc.** |
| 1995-1999 | Consultant<br>Wrote several industry studies for the *U.S. Industry and Trade Outlook*, a Department of Commerce publication. Consulted on local macroeconomic forecasts. |
| | **Massachusetts Institute of Technology** |
| 1993-1995 | Head Teaching Assistant<br>Taught courses in Macroeconomics. |

| | |
|---|---|
| 1992 | Research Assistant<br>Developed Fortran programs for Professor Jerry Hausman. |
| | **United States Army** |
| 1990-1991 | First Lieutenant<br>Assistant Battalion Operations Officer and Platoon Leader, 101st Military Police Company. Fort Campbell, Kentucky and Operation Desert Shield and Desert Storm, Saudi Arabia and Iraq. |
| 1988-1990 | Second Lieutenant<br>Platoon Leader and Executive Officer, Headquarters Company, Law Enforcement Command, Fort Campbell, Kentucky. |
| | **Office of Management and Budget, Personnel Policy Branch** |
| 1987 | Summer Intern<br>Analyzed military pay and recruiting. |

## Honors and Professional Activities

Associate Editor of ABA Section of Antitrust Law, *Antitrust Magazine*, 2013-present

Global Competition Review's 100 "Women in Antitrust," 2009

Patricia Roberts Harris Award for Excellence in Pro Bono, Fried Frank, Harris, Shriver & Jacobson LLP, 2004

The Legal Aid Society Pro Bono Award for Assistance to Victims of the World Trade Center Tragedy, 2002

Rauch Faculty Enrichment Grant, Bentley College, 1997

Summer Research Grant, Bentley College, 1996 and 1997

National Science Foundation Scholarship, 1992-1994

Army Commendation Medal and Army Achievement Medal, 1990-1991

## Testimony and Expert Reports (2020 – 2024)

Expert report, expert commercial success report, expert reply report, and deposition testimony in *Allergan, Inc. v. Revance Therapeutics, Inc.*, United States District Court for the District of Delaware, December 15, 2023, March 8, 2024, April 19, 2024, May 31, 2024.

Expert Report and deposition testimony in *Enanta Pharmaceuticals, Inc. v. Pfizer, Inc.*, United States District Court for the District of Massachusetts, March 29, April 22, 2024.

Declaration, expert report, deposition testimony, and trial testimony in *Geigtech East Bay, LLC v. Lutron Electronics Co., Inc.,* United States District Court for the Southern District of New York, February 12, 2021, January 12, January 20, 2023 and March 11, 2024.

Expert Report, deposition testimony in *Sunless, Inc. v. Palm Beach Tan, Inc. et al.*, United States District Court for the Northern District of Ohio, December 1, 2023, and February 9, 2024.

Expert Report, deposition testimony in *Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals, Inc.*, United States District Court for the District of Delaware, October 16 and November 20, 2023.

Expert Report, deposition testimony in *Lucasys, Inc. v. Powerplan, Inc.*, United States District Court for the Northern District of Georgia, December 16, 2022, and March 15, 2023.

Expert report, deposition testimony, supplemental expert report, trial testimony in *AbbVie Endocrine, Inc. v. Takeda Pharmaceuticals Company, Ltd.,* United States Court Chancery for the State of Delaware, September 6, October 26, December 16, 2022, and January 12, 2023.

Expert Report, expert rebuttal report, and deposition testimony *in Alexander Meshechok v. Lawrence Kaplan; and Corporate Solutions Group I, LLC, et al.*, Supreme Court of New York, County of New York, September 30, October 31, 2022, and January 5, 2023.

Expert Report, reply report, and deposition testimony in *Intercept Pharmaceuticals, Inc., and Intercept Pharma Europe Ltd. v. Apotex, Inc. and Apotex Corp*, United States District Court for the District of Delaware, September 9, November 14, and December 20, 2022.

Expert report, deposition testimony, trial testimony, declaration, and hearing testimony in *Seagen Inc. v. Daiichi Sankyo Co., LTD, AstraZeneca Pharmaceuticals LP, and AstraZeneca UK LTD.* United States District Court for the Eastern District of Texas, January 4, January 13, April 7, September 23, and September 29, 2022.

Affidavit and cross-examination in *Luc Bessette v. Her Majesty the Queen in Right of the Province of British Columbia and Ministry of Health Columbia,* Federal Court of Canada. August 29, September 9, 2022.

Expert report, supplemental expert report, and trial testimony in *Farmobile, LLC. v. Farmers Edge, Inc.*, Federal Court of Canada, September 2, 2020, July 19, and August 23, 2022.

Expert rebuttal report, expert commercial success report, supplemental expert report, deposition testimony in *The United States of America v. Gilead Sciences, Inc. and Gilead Sciences Ireland UC*, United States District Court for the District Court of Delaware May 17, June 16, August 5, and August 18, 2022.

Declaration in *Danieli Corporation and Danieli & C. Officine Meccaniche S.p.A. v. SMS Group, Inc., SMA Group GMBH, and Steel Dynamics, Inc*. United States District Court for the Western District of Pennsylvania, November 22, 2021, and July 13, 2022.

Expert report, expert reply report, deposition testimony, and trial testimony in *The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC.v. Adam Potter, PBIH, LLC and Business Insurance Holdings, Inc.,* United States District Court for the District of Delaware, October 15, December 10, 2021, January 19, and June 28, 2022.

Expert rebuttal report, deposition, and trial testimony in *Siemens Gamesa Renewable Energy A/S v. General Electric Co. and GE Renewables North America, LLC.* United States District Court District of Massachusetts, November 30, December 10, 2021, and June 15, 2022.

Expert report and deposition testimony in *Edge Systems LLC v. Cartessa Aesthetics LLC Inc.,* United States District Court for the Eastern District of New York, April 7, and May 25, 2022.

Expert report, reply report, and deposition testimony in *NRT Technology Corp. and NRT Technologies, Inc. v. Everi Holdings Inc. f/k/a Global Cash Access Holdings, Inc. and Everi Payments Inc. f/k/a Global Cash Access, Inc.,* United States District Court for the District of Delaware October 29, 2021, January 28, and February 25, 2022.

Expert rebuttal report and deposition testimony in the Matter of the Arbitration Between *Lyell Immunopharma, Inc. v. PACT Pharma, Inc.,* Judicial Arbitration Mediation Services, February 4 and February 15, 2022.

Expert report and deposition testimony in *Pfizer Inc. et al., v. Aizant Drug Research Solutions Pvt. Ltd.*, United States District Court for the District of Delaware, April 18 and July 16, 2021.

Expert report, rebuttal report, and deposition testimony in *Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue,* United States Tax Court, December 4, 2019, January 28, February 17, 2020, and June 21, June 22, 2021.

Expert report and deposition testimony in *Vertellus Holdings, LLC. Et al. v. W.R. Grace & Co-Conn, Inc.*, United States District Court for the District of Maryland, October 30, 2020, and February 2, 2021.

Expert report, deposition testimony, and hearing testimony in *Floodbreak, LLC v. Art Metal Industries, LLC and Kevin F. Biebel*, United States District Court for the District of Connecticut, August 7, December 18, 2019, and December 10, 2020.

Expert report, Second expert report, and Third expert report, in *the Matter of the Arbitration Between Confidential Parties*, International Chamber of Commerce, International Court of Arbitration, September 27, 2019, February 14, and October 7, 2020.

Expert report, expert reply report, and deposition testimony in *AstraZeneca AB and AstraZeneca Pharmaceuticals LP v. Mylan Pharmaceuticals Inc. and 3M Company and AstraZeneca AB and AstraZeneca Pharmaceuticals LP v. Mylan Pharmaceuticals Inc. and 3M Company*, United States District Court for the Northern District of West Virginia at Clarksburg, February 26, May 15, and July 20, 2020.

Expert report, supplemental expert report, deposition testimony and arbitration testimony, *Confidential Parties*, American Arbitration Association, December 6, 2019, January 30, February 6, June 17, and June 19, 2020.

Expert report and deposition testimony in *Kewazinga Corporation v. Microsoft Corporation*, United States District Court for the Southern District of New York, April 17 and June 5, 2020.

Expert report and deposition testimony in *Shire Viropharma Incorporated v. CSL Behring LLC and CSL Behring GmbH*, United States District Court for the District of Delaware, December 10, 2019, and March 12, 2020.

Expert report and deposition testimony in *Ibio, Inc. v. Fraunhofer USA, Inc*., In the Court of Chancery of the State of Delaware, December 13, 2019, and February 28, 2020.

Expert report, deposition testimony, and trial testimony in *Wasica Finance GMBH and BlueArc Finance AG v. Schrader International, Inc., Schrader Electronics Limited, Schrader Electronics, Inc., and Schrader-Bridgeport, International, Inc.*, United States District Court for the District of Delaware, June 26, August 6, 2019, and February 13, 2020.

## Publications (2014 – 2024)

"Economists Outside the Bubble: Antitrust Interview with Russ Roberts and Glen Weyl. Fall 2021, *Antitrust Magazine, Volume 36, No.1*

"Unpacking the Economic Toolbox: How to Make Sense of Your Economic Expert's Analysis," Spring 2018, *Antitrust Magazine*, Vol. 32, No. 2 (with Sheng Li and Gabriela Monahova).

"Mini-Roundtable: Calculating Damages in Patent Infringement," Jul-Sep 2016, *Corporate Disputes Magazine, 118-127* (with David Blackburn and Alan Cox).

"Demonstrating Faulty Predictions in Class Certification Analysis," Spring 2016, *Antitrust Magazine*, Vol. 30, No. 2, (with Lauren Stiroh and Claire (Chunying) Xie).

May 2024

**Exhibit 19**

**Additional Materials Relied Upon[1] by Christine S. Meyer, Ph.D.**

**Bates Stamped Documents[2]**

ALGN-1848430

ALGN-1848431

ALGN-1848432

ALGN-1848433

REV_DAX-03343077

REV_DAX-03343166

**Interviews**

Interview with Jill Carey, November 4, 2024

**Expert Reports**

Expert Reply Report of Christine S. Meyer, Ph.D., April 19, 2024

**SEC and Investor Filings**

Revance Therapeutics, Inc. Form 8-K filed on September 9, 2024

**Publicly Available Information**

"Revance Reports Second Quarter 2024 Financial Results, Provides Corporate Update," *Revance,* available at https://investors.revance.com/investors/Press-Releases/news-details/2024/Revance-Reports-Second-Quarter-2024-Financial-Results-Provides-Corporate-Update/default.aspx

---

[1] "Additional Materials Relied Upon" include any accompanying exhibits to the Court Filings, Data, Depositions and Transcripts, Expert Reports, and Bates Stamped Documents listed in this document.

[2] I do not specifically list other considered Bates Stamped Documents in this section if they are included elsewhere in this **Exhibit 19** as exhibits to Court Filings, Depositions and Transcripts, or Expert Reports.

# Exhibit 20
## Lost Profits on Botox Vials Lost Due to Revance's Alleged Infringement in the U.S.
## September 2022 through October 18, 2024

| Month | Vials of Daxxify Sold by Revance[1] | Sample Vials of Daxxify Distributed by Revance[2] | Market Expansion Factor[3] | Vials of Daxxify Distributed to Previous Users of Other BoNT Injectable Products | Switch Factor[4] | Lost Vials | Average Selling Price of 100 Unit Vial of Botox Cosmetic[3] | Allergan Profit Margin | Lost Profits |
|---|---|---|---|---|---|---|---|---|---|
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) | (j) |
| | | | | [(b)+(c)]*[1-(d)] | | (e)*(f) | | | (g)*(h)*(i) |
| Sep-Nov 22 | [redacted] | | | | | | | | |
| Dec-22 | | | | | | | | | |
| Jan-23 | | | | | | | | | |
| Feb-23 | | | | | | | | | |
| Mar-23 | | | | | | | | | |
| Apr-23 | | | | | | | | | |
| May-23 | | | | | | | | | |
| Jun-23 | | | | | | | | | |
| Jul-23 | | | | | | | | | |
| Aug-23 | | | | | | | | | |
| Sep-23 | | | | | | | | | |
| Oct-23 | | | | | | | | | |
| Nov-23 | | | | | | | | | |
| Dec-23 | | | | | | | | | |
| Jan-24 | | | | | | | | | |
| Feb-24 | | | | | | | | | |
| Mar-24 | | | | | | | | | |
| Apr-24 | | | | | | | | | |
| May-24 | | | | | | | | | |
| Jun-24 | | | | | | | | | |
| Jul-24 | | | | | | | | | |
| Aug-24 | | | | | | | | | |
| Sep-24 | | | | | | | | | |
| Oct-24 | | | | | | | | | |
| **Total:** | | | | | | | | | |

Notes: [1] I rely on Revance sales data for vials of Daxxify sold by Revance, which reports sales starting in December 2022. As described in the Meyer Reply Report, I update vials of Daxxify sold to exclude orders with "Order Status" equal to "Cancelled." I also exclude orders with "Order Status" equal to "Returned" or "Return Submitted."

[2] According to a Revance "business performance" presentation from April 7, 2023, Revance distributed [redacted] samples between launch and April 7, 2023 through its [redacted]. I assume samples in the [redacted] were distributed during September and November 2022, samples in the [redacted] were distributed during December 2022 through February 2023, and samples in the [redacted] were distributed in March 2023, which I understand are the approximate time periods of each program. To calculate monthly samples for December 2022 through February 2023, I added the samples distributed by Revance under its [redacted] and divided by 3.

[3] As discussed in Section II.D of the Meyer Damages Report, I rely on an Allergan survey from June 2023 that indicates that two percent of Daxxify sales were accounted for by patients who would not have otherwise received any BoNT treatment had Daxxify not been available to them.

[4] As discussed in Section II.C of the Meyer Damages Report, it is my opinion that 50 percent of Daxxify sales would have come from Botox.

[5] The ASP for September to November 2022 is the average monthly ASP reported by Allergan for the September to November 2022 period. The ASPs for September and October of 2024 are assumed to be the same as the ASP for August 2024.

Sources: REV_DAX-03316772, sheet "Daxxify Current Quarter Order D."
REV_DAX-03343077, sheet "Revenue Details ITD-0930 AES."
REV_DAX-03343166, sheet "Revenue Details AW."
REV_DAX-02691642-658 (Bullock Exhibit 10) at 645; Bullock Deposition, pp. 31-50.
ALGN-1834385-435 at 392.
ALGN-1845835 (Paik Exhibit 32).
ALGN-1848432.
ALGN-1848433.

## Exhibit 21A
## Damages Due to Revance's Alleged Infringement of Asserted Patents
## Under 18-Month Delay
## by Scenario

| | | Reasonable Royalty | | | | | | Total Damages through October 18, 2024 |
|---|---|---|---|---|---|---|---|---|
| | | Royalty Base | | Royalty Rate to Asserted Manufacturing Patents | | Royalty Rate to Asserted Formulation Patents | | |
| Scenario[1] | Lost Profits[2] | Through September 25, 2023[3] | After September 25, 2023[4] | Through September 25, 2023 | After September 25, 2023 | Patents | Royalty | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) (c)*[(e)+(g)]+(d)*[(f)+(g)] | (i) (b)+(h) |
| a | [redacted] | [redacted] | [redacted] | 20.0 % | 17.5 % | 24.0 % | [redacted] | [redacted] |
| b | [redacted] | [redacted] | [redacted] | 20.0 % | 17.5 % | N/A | [redacted] | [redacted] |
| c | [redacted] | [redacted] | [redacted] | N/A | N/A | 24.0 % | [redacted] | [redacted] |
| d | [redacted] | [redacted] | [redacted] | 20.0 % | 17.5 % | 24.0 % | [redacted] | [redacted] |
| e | [redacted] | [redacted] | [redacted] | 20.0 % | 17.5 % | N/A | [redacted] | [redacted] |
| f | [redacted] | [redacted] | [redacted] | N/A | N/A | 24.0 % | [redacted] | [redacted] |
| g | [redacted] | [redacted] | [redacted] | N/A | N/A | N/A | [redacted] | [redacted] |

Notes: This exhibit presents damages under the scenario in which Revance faces a delay of 18 months to Daxxify launch, as discussed in the Meyer Damages Report, Section V.A.15.a.

[1] Scenarios a-g correspond to the scenarios I discuss in Meyer Damages Report Section VI.

[2] I calculate lost profits in **Exhibit 20**.

[3] For the scenarios in which the finder of fact were to determine that lost profits are an appropriate measure of damages, the royalty base is 50 percent of total Daxxify sales during the relevant period.

[4] For the scenarios in which the finder of fact were to determine that lost profits are not an appropriate measure of damages, the royalty base is total Daxxify sales during the relevant period.

Sources: **Exhibit 20**.
REV_DAX-03316772, sheet ("Daxxify Current Quarter Order D").
REV_DAX-03343077, sheet ("Revenue Details ITD-0930 AES").
REV_DAX-03343166, sheet ("Revenue Details AW").

**Exhibit 21B**
**Damages Due to Revance's Alleged Infringement of Asserted Patents**
**Under 12-Month Delay**
**by Scenario**

| | | Reasonable Royalty | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Royalty Base | | Royalty Rate to Asserted Manufacturing Patents | | Royalty Rate to Asserted Formulation Patents | | Total Damages through October 18, 2024 |
| Scenario[1] | Lost Profits[2] | Through September 25, 2023[3] | After September 25, 2023[4] | Through September 25, 2023 | After September 25, 2023 | | Royalty | |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) (c)*[(e)+(g)]+(d)*[(f)+(g)] | (i) (b)+(h) |
| a | [redacted] | [redacted] | [redacted] | 15.0 % | 12.5 % | 24.0 % | [redacted] | [redacted] |
| b | [redacted] | [redacted] | [redacted] | 15.0 % | 12.5 % | N/A | [redacted] | [redacted] |
| c | [redacted] | [redacted] | [redacted] | N/A | N/A | 24.0 % | [redacted] | [redacted] |
| d | [redacted] | [redacted] | [redacted] | 15.0 % | 12.5 % | 24.0 % | [redacted] | [redacted] |
| e | [redacted] | [redacted] | [redacted] | 15.0 % | 12.5 % | N/A | [redacted] | [redacted] |
| f | [redacted] | [redacted] | [redacted] | N/A | N/A | 24.0 % | [redacted] | [redacted] |
| g | [redacted] | [redacted] | [redacted] | N/A | N/A | N/A | [redacted] | [redacted] |

Notes: This exhibit presents damages under the scenario in which Revance faces a delay of 12 months to Daxxify launch, as discussed in the Meyer Damages Report, Section V.A.15.a.

[1] Scenarios a-g correspond to the scenarios I discuss in Meyer Damages Report Section VI.

[2] I calculate lost profits in **Exhibit 20**.

[3] For the scenarios in which the finder of fact were to determine that lost profits are an appropriate measure of damages, the royalty base is 50 percent of total Daxxify sales during the relevant period.

[4] For the scenarios in which the finder of fact were to determine that lost profits are not an appropriate measure of damages, the royalty base is total Daxxify sales during the relevant period.

Sources: **Exhibit 20**.
REV_DAX-03316772, sheet ("Daxxify Current Quarter Order D").
REV_DAX-03343077, sheet ("Revenue Details ITD-0930 AES").
REV_DAX-03343166, sheet ("Revenue Details AW").