MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

JEREMY A. TIGAN
(302) 351-9106
jtigan@morrisnichols.com

July 15, 2025

**REDACTED - PUBLIC VERSION**

The Honorable Richard G. Andrews
United States District Court for the District of Delaware
844 North King Street
Room 6325, Unit 9
Wilmington, DE 19801-3555

*VIA ELECTRONIC FILING*

[redacted]

Re: *Allergan, Inc. v. Revance Therapeutics, Inc.* C.A. No. 21-1411 (RGA) (JLH)

Dear Judge Andrews:

Allergan writes in response to the Court's direction that the parties consider the impact of the Federal Circuit's decision in *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766 (2014), on the parties' dispute as to whether Revance may rely on so-called Book of Wisdom evidence postdating the hypothetical negotiation by years. *Aqua Shield*, joined by a line of cases stretching back to Justice Cardozo's seminal reference to the Book of Wisdom doctrine in *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933), demonstrates that use of this doctrine in the new way now requested by Revance is inappropriate.

In *Aqua Shield*, the Federal Circuit vacated a reasonable royalty award set by a district court based on a percentage of the accused infringer's actual profits, holding that evidence of actual profits postdating the hypothetical negotiation date did not show the real measure of the profits the parties would have *anticipated* at the hypothetical negotiation. 774 F.3d at 770-73. The Court explained that "[w]hat an infringer's profits actually turned out to have been during the infringement period may be relevant, but only in an indirect and limited way—as some evidence bearing on a directly relevant inquiry into anticipated profits." *Id.* at 770. That is because, "[i]n hypothetical-negotiation terms, the core economic question is what the infringer, in a hypothetical pre-infringement negotiation under hypothetical conditions, would have *anticipated* the profit-making potential of use of the patented technology to be." *Id.* (emphasis in original).

Recourse to the Book of Wisdom is sometimes necessary, the Federal Circuit explained, because the "[r]eal-world application of this" hypothetical negotiation "conceptual structure often involves 'approximation and uncertainty.'" *Aqua Shield*, 774 F.3d at 771. In the face of such uncertainty, where evidence of the parties' expectations at the time of the hypothetical negotiation is lacking, "[e]vidence of the infringer's actual profits generally is admissible as probative of his anticipated profits." *Id.* at 772 (alteration in original; quotation marks and citation omitted); *see Sinclair*, 289 U.S. at 698 (stating that the Book of Wisdom may be used "to correct *uncertain* prophecy") (emphasis added). The focus of the inquiry is not on the certainty of the damages

expert, *see* July 14, 2025 Trial Tr. at 15:13-17,[1] but rather on the certainty of the parties' expectations. Accordingly, in appropriate circumstances, the Book of Wisdom doctrine permits the use of facts postdating the hypothetical negotiation solely as a check to "asses[s] whether a royalty is [in fact] reasonable." *Lucent Techs., Inc.*, 580 F.3d at 1333-34; *see* J. Gregory Sidak, *How Relevant Is Justice Cardozo's "Book of Wisdom" to Patent Damages?*, 17 Colum. Sci. & Tech. L. Rev. 246, 277 & n.155 (2016) (Federal Circuit "has allowed reliance on post-infringement information only to the extent that that information could assist the court in inferring the parties' positions *at the time of the hypothetical negotiation*" (emphasis in original)).

But, the Court warned, courts must not "replac[e] the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened." *Aqua Shield*, 774 F.3d at 772 (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)); *see also Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) (a reasonable royalty calculation must "not be an after-the-fact assessment"). A reasonable royalty must still be determined "on the basis of what the parties . . . would have considered at the time of the [hypothetical] negotiations," and "not on the basis of a hindsight evaluation of what actually happened." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983). At all times, it is "expectations [that] govern, not actual results." *Aqua Shield*, 774 F.3d at 772.

Revance cannot show that the Book of Wisdom should apply in this case because ample, detailed evidence of Revance's—and Allergan's—expectations at the hypothetical negotiations in June 2019 and October 2021 exist in the record. There can be no serious dispute that Revance has always viewed Daxxify as a Botox competitor. For example, the record is replete with contemporaneous pre-launch evidence showing that Revance expected its Daxxify product to directly compete with Botox. *See*, *e.g.*, PTX-335 at 0001, 0013 (Revance's internal "December 2019" Market Background presentation stating that whereas "other brands" "compete on price against Botox," "DAXI is different – Daxi must *compete* differently" because it is NOT simply longer lasting Botox") (emphasis added); *id.* at 0016 (stating that "DAXI will immediately establish a new standard in facial aesthetics" and will raise the bar for the entire industry"); *id.* at 0018 (stating that Daxxify is the "[f]ifth entrant in *highly competitive market*" (emphasis added); *id.* at 0005 ("Allergan is validating Revance and DAXI *in the market* with acknowledgments in corporate communications") (emphasis added).

The record also contains an abundance of evidence showing Allergan also viewed Revance as its competitor. (*See, e.g.*, JTX-158.13 at 352 (Allergan viewing Revance as having a "high competitor challenge level."). Indeed, Allergan saw Revance as one of three "key emerging competitive threats" in both the aesthetic and therapeutic "neurotoxin market[s]." *Id.* at 353. Allergan also believed that "Daxxify would capture significant market share from Botox Cosmetic in 2021." *Id.* at 382.

---

[1] To the extent the Court was suggesting that Revance's Book of Wisdom evidence can be used to impeach Dr. Siegwarth's credibility by challenging her certainty, such use would be highly confusing and prejudicial to the jury, who would likely fail to understand that the proper focus of the reasonable royalty analysis should remain on the hypothetical negotiation date.

Both parties' damages experts also agreed that Revance and Allergan are competitors in the botulinum toxin market. Allergan's expert Dr. Siegwarth identified "[m]ultiple sources" evincing such competition, including Allergan's documents, Revance's documents, and "[r]eporting from industry observers." (D.I. 360, Ex. A), ¶¶ 108-114. Dr. Trexler, Revance's expert, expressly agreed with these opinions by Dr. Siegwarth. *See* (D.I. 361, Ex., AA, ¶¶ 315-318) ("I agree with the conclusion in the [Siegwarth] Report that the parties would approach the hypothetical negotiation as competitors.").

In fact, Revance's counsel all but admitted in his opening statement to the jury on the first day of trial that Daxxify and Botox compete with each other in the same market. *Compare* July 14, 2025 Trial Tr. at 146:4-5 (telling the jury "DAXXIFY was the fifth to enter, but DAXXIFY was special"), *with* PTX-335 at 0018 (stating that Daxxify is the "[f]ifth entrant in *highly competitive market*" for botulinum toxin, but "5th *to market* means we can learn from the mistakes and wins of *our competitors*") (emphasis added), *and* PTX-335 at 0013 (identifying four competitors with Daxxify, including "Botox").

Despite this mountain of record evidence, Revance admits that it now intends to contradict that evidence and argue to the jury that "Allergan's statements within DTX-315, DTX-318, DTX-319, and DTX-586 that Botox did not actually face direct competition from Daxxify." (D.I. 616 at 2.) But it points the Court to no record evidence *pre*dating the hypothetical negotiation to support its request that this Court permit Revance to introduce Book of Wisdom evidence.

For example, Revance posits that "Allergan's past experience with Botox," which purportedly shows that its "U.S. sales have consistently increased" even when other competitors entered the market, means that "at the time of the hypothetical negotiation regarding Daxxify, Allergan would have expected that the entrance of Daxxify would likewise have essentially no effect on Botox's increasing sales." (D.I. 616 at 1-2.) It is unsurprising that Revance cites noting from the record in support of this claim: the record flatly contradicts it. In fact, there is no uncertainty that at the time of the hypothetical negotiation, Allergan would have expected that the entrance of Daxxify would have a significant deleterious effect on Botox's sales. *See, e.g.*, JTX-158.13. As such, there is no legal basis for invoking the Book of Wisdom doctrine in these circumstances; what Revance says "happened following Daxxify's entry" (D.I. 616 at 2)—years after the hypothetical negotiation—cannot override available contrary evidence of the parties' expectations contemporaneous with that hypothetical negotiation. *See Aqua Shield*, 774 F.3d at 770-73.

To sum up, it appears Revance it not planning to use Book of Wisdom evidence for its established purpose of fact-checking the expectations of parties to hypothetical negotiations. Instead, Revance admits it intends to look years beyond the hypothetical negotiation date here to challenge a fact its own documents, witnesses, and experts all agree on—that Revance competes with Allergan's Botox product. This Court should not permit such misuse of the Book of Wisdom.[2]

---

[2] In the event the Court permits Revance to introduce Book-of-Wisdom evidence to argue to the jury that Revance somehow does not compete with Allergan in the botulinum toxin market, then Allergan should likewise be permitted to introduce its own evidence demonstrating direct

Respectfully,

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

JAT:lo
cc: All Counsel of Record (via e-mail)

---

competition between Botox (and its botulinum toxin products in the development pipeline) and Daxxify.