MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

JEREMY A. TIGAN
(302) 351-9106
jtigan@morrisnichols.com

July 17, 2025 **REDACTED - PUBLIC VERSION**

The Honorable Richard G. Andrews
United States District Court for the District of Delaware
844 North King Street
Room 6325, Unit 9
Wilmington, DE 19801-3555

*VIA ELECTRONIC FILING*

[redacted]

Re: *Allergan, Inc. v. Revance Therapeutics, Inc.* C.A. No. 21-1411 (RGA) (JLH)

Dear Judge Andrews:

Per the Court's directive, Allergan responds to Revance's two motions raised in its July 16, 2025 letter to the Court: (1) Revance's motion for a judgment as a matter of law ("JMOL") under Fed. R. Civ. P. 50(a) that Allergan has not shown unexpected results; and (2) its motion to strike certain testimony from Dr. Schöneich from the record. Revance has deliberately conflated multiple issues in its letter. When properly broken down, Revance cannot prevail on either motion.[1]

The record is replete with evidence comparing the invention claimed in claim 6 of U.S. Patent No. 11,147,878 ("the '878 patent") and the closest prior art, Botox® and U.S. Patent Publication No 2003/0118598A1 ("Hunt '598"). As discussed below, such comparisons are found in Mr. Hunt's testimony, the Hunt '598 publication itself, Dr. Schöneich's testimony, and through the consideration of Hunt '598 by the United States Patent Office. Putting aside that Revance carries the burden of persuasion on the issue, the substantial evidence of unexpected results is sufficient for a jury reasonably to find nonobviousness of the '878 patent. Accordingly, Revance's JMOL motion should be denied.

Revance does not provide any independent argument for striking Dr. Schöneich's testimony; its motion to strike should also be denied for the same reasons. Separately, Revance's motion to strike should also be denied for the additional reason that Dr. Schöneich's testimony is also relevant to damages issues in this case, including the dispute concerning the value of Allergan's '878 patent as compared to Revance's peptide.

---

[1] Revance also seeks a "curative instruction." (D.I. 624 at 1.) Because both motions should be denied, no curative instruction is necessary.

## I. Judgment as a Matter of Law

### A. Revance Is Violating the Parties' Stipulation

At the outset, Revance is violating the parties' stipulation that Revance will not use the Frevert, Webb, and Pickett "references at trial in [its] invalidity case with respect to claim 6 of the '878 patent." Yet, in its JMOL motion, Revance is expressly relying on these references to accuse Allergan of not comparing the claimed formulation invention to "the closest prior art" (D.I. 624 at 1), which Revance asserts is "Webb and Picket" and "Frevert and Hunt 598" (*id.*, Ex. A, ¶ 161). This is improper.

There can be no reasonable dispute that objective indicia of obviousness is one of the four factors that form the obviousness inquiry under Section 103, and is thus inherently part of an accused infringer's invalidity case. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013) ("[T]his court has emphasized that consideration of the objective indicia is *part of* the whole obviousness analysis . . . ."). Importantly, Revance's burden to prove invalidity by clear and convincing evidence never shifts to Allergan. *See ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1373 (Fed. Cir. 2018) ("Our precedent is clear that the burden of persuasion remains with the challenger *during litigation*," and a patent owner only "bears the burden of production with respect to evidence of secondary considerations of nonobviousness." (cleaned up; emphasis added)); *accord Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2018).

Revance's challenge to Allergan's evidence underpinning Allergan's unexpected results analysis is well within the scope of the Stipulation. Thus, Revance should not be permitted to rely on Frevert, Webb, or Picket to bolster its invalidity positions in view of its binding stipulation. *See, e.g.*, *Jackson v. Nuvasive, Inc.*, No. CV 21-53-RGA, 2025 WL 580306, at *3 (D. Del. Feb. 21, 2025).

### B. The Trial Record Contains Substantial Evidence of Unexpected Results

Putting Frevert, Webb, and Pickett aside, the closest prior art comparator in this case is Botox® and Hunt '598. (*See, e.g.*, D.I. 624, Ex. A, ¶ 161, ¶ 482.) The formulation in Hunt '598 is very similar to the Botox® formulation. The primary difference is that the invention in Hunt '598 uses recombinant human serum albumin ("HSA"), whereas Botox® uses regular HSA. Importantly, both have a duration of approximately 3 months. (*See* July 15, 2025 Rough Trial Tr. at 317:3-319:3) And the trial record contains substantial evidence of unexpected results as compared to the invention described in the Hunt '598, as well as Botox®.

Starting with Dr. Schöneich, he compared the invention of the claim 6 of the '878 patent with the closest prior art, Botox® and Hunt '598. *Cf. Application of Blondel*, 499 F.2d 1311, 1316 (C.C.P.A. 1974) (reversing obviousness rejection and relying on test results contained in two separate declarations to compare duration activity in two compounds as an indirect comparison of the claimed composition with the closest prior art). Revance all but admits that Dr. Schöneich made the correct comparison in its letter—it concedes that Dr. Schöneich's testimony "support[s]

an opinion that Revance's peptide does not contribute to DAXXIFY's extended duration." D.I. 624 at 2. This concession is critical, because all that is left is the disaccharide and surfactant—*i.e.*, the invention claimed in the '878 patent.

Revance attempts to evade this conclusion (*see id.*), but Dr. Schöneich's testimony contradicts Revance's attorney argument. Dr. Schöneich explained that the Allergan BIO-20-1288 study demonstrates conclusively that duration is caused by Allergan's inventive combination of disaccharide and surfactant. July 15, 2025 Rough Trial Tr. at 453:25-454:21 (discussing JTX-202). He further explained how the study results, displayed as a bar graph (with the red bar representing a formulation with no Revance peptide, the blue bar representing a formulation that does have the peptide, and a green bar representing a formulation that contains the peptide but no surfactant). *Id.* at 454:22-455:22 (discussing JTX-202.0010). The study showed that, without the combination from the '878 patent—but *with* Revance's peptide—there was no effect on duration. *Id.* at 455:13-456:9. In other words, this study *does* "support [his] opinion that the formulation described in claim 6 of the '878 patent is responsible for 'the unexpected property of longer duration of action.'" (D.I. 624 at 2.) And there is no dispute between the parties that Daxxify—the inventive embodiment of the asserted claims—has a longer clinical duration that Botox® and Hunt '598—the closest prior art. Thus, Revance's own words doom its argument.

Moreover, Dr. Broide explained that the control variable in the study is bovine serum albumin ("BSA"). (July 14, 2025 Rough Trial Tr. at 184:15-185:15; *see* JTX-202.004.) And BSA is covered by Hunt '598. (*See* DTX-209, ¶ 197). Thus, the study that is the subject of Dr. Schöneich's testimony also compares the invention of claim 6 of the '878 patent to the invention in Hunt '598. Similarly, because human and bovine serum albumin are both within the scope of Hunt '598 (*see* DTX-209, ¶¶ 197, 221), and both Botox® and the Hunt '598 formulation have similar durations of approximately 3 months, this study in essence also compares Botox® and the invention in the '878 patent. In short, Dr. Schöneich's testimony provides no basis on which Revance can be granted JMOL.

But Dr. Schöneich's testimony does not stand alone. For example, Mr. Hunt—the inventor on both the asserted '878 patent and Hunt '598, testified extensively that Hunt '598 discouraged the use of disaccharides because the prevailing belief in industry was that disaccharides were believed to have a detrimental effect on the BoNT/A product. *See, e.g.*, July 15, 2025 Rough Trial Tr. at 315:12-316:1 (testifying that Hunt '598 teaches that replacing human albumin "must realistically be seen to approach 0"); 319:16-24 (testifying that Hunt '598 "excludes form its scope disaccharide"); 320:12-19 (testifying that his team "had not been successful in utilizing [disaccharides]" before the invention of the '878 patent); 320:22-322:20 (explaining that prevailing thought contemporaneous with Hunt '598 was that disaccharides would not work because of "well-known reactions with sugars and proteins"); 324:3-14 (testifying that when he began working toward the invention described in the '878 patent, "we also thought it was going to be a really hard thing to do because all the evidence that we had seen that had been published and anything we had generated all indicated this was not going to be easy"); 327:7-328:8 (testifying that when he began working toward the invention described in the '878 patent, "everything we had seen showed [disaccharides] were not good"); 345:5-18 (Mr. Hunt testifying on cross that he

"didn't believe [disaccharides] would work" when he began his work on the invention of the '878 patent). Dr. Schöneich's trial testimony confirms Mr. Hunt's testimony, and through it, the disclosure in Hunt '598. *See* July 15, 2025 Rough Trial Tr. at 444:24-445:7 (Dr. Schöneich agreeing with Mr. Hunt's testimony in its entirety.).

The Hunt '598 publication itself (which is part of the trial record (*see* DTX-209)), likewise teaches that using disaccharides with botulinum toxin results in an "inherently unstable" pharmaceutical composition. (DTX-209 at ¶ 49 (explaining that "[S]accharides including polysaccharides are in general poor candidates to serve as protein stabilizers" because "it is known that a pharmaceutical composition containing a protein active ingredient is inherently unstable if the protein formulation comprises a saccharide such as glucose or a polymer of glucose . . . ."); *see also, e.g.*, *id.*, ¶ 48 ("For example the disaccharide cellobiose has been found to be unsuitable as a botulinum toxin stabilizer."); ¶ 68 ("[A]ttempts to stabilize botulinum toxin using cellobiose have been unsuccessful.")). Evidence of prior art teaching away is relevant to the unexpected results objective indicia factor. *See Melinta Therapeutics, LLC v. Nexus Pharms., Inc.*, No. 21-CV-02636, 2024 WL 4799896, at *49 (N.D. Ill. Nov. 15, 2024) (finding "unexpected results in the light of the prior art which taught away from these results" and where "these unexpected results were a clear improvement over the prior art").

Lastly, during prosecution of the '878 patent, the U.S. Patent Office considered Hunt '598 and issued that patent over that prior art. (*See* JTX-001.0002.) Thus, the Patent Office already made the very comparison Revance seeks, and it is in the trial record on the face of the '878 patent.

### C. Allergan's Evidence of Unexpected Results Is Reasonably Commensurate with the Scope of the Claims

Allergan also asserts that Allergan was required to test every embodiment of the claimed invention to prove that the evidence of unexpected results is "reasonably commensurate with the scope of the claims." (D.I. 624 at 2 (quoting *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011)).) But its own cited case explains that nothing suggests "that an applicant is required to test every embodiment within the scope of his or her claims." *Huai-Hung Kao*, 639 F.3d at 1068. Instead, the only requirement is to "demonstrate[e] that an embodiment has an unexpected result and provid[e] an adequate basis to support the conclusion that other embodiments falling within the claim will behave in the same manner." *Id.* Here, Mr. Hunt provided significant testimony showing that different surfactants can be used to practice the clamed invention without meaningfully affecting the duration of the botulinum toxin. *See, e.g.*, July 15, 2025 Rough Trial Tr. at 326:19-25; 330:19-25; 336:19-337:8; 353:1-3. This is confirmed by the '878 patent disclosure. *See, e.g.*, JTX-006.0052. This evidence provides a sufficient basis to conclude that other embodiments in the'878 patent will behave similarly.

## II. Motion to Strike

Here, too, Revance's motion is deficient. To begin with, Revance does not identify which portion of Dr. Schöneich's testimony it seeks to strike. As explained above, Dr. Schöneich's testimony and other record evidence provide more than substantial evidence to support a jury's

verdict. Thus, it is unclear on its face what Revance is seeking to strike. In any event, Revance does not identify any basis to strike any portion of Dr. Schöneich's testimony.

As explained above, Dr. Schöneich's testimony is relevant to unexpected results. But it is also relevant to damages. As Dr. Schöneich testified, one of the key issues in this case is the "value" of the asserted manufacturing patents to Revance's Daxxify drug product. (July 15, 2025 Rough Trial Tr. at 445:9-23 ("[I]t all boils down to value"); *id.* at 462:12-22. Allergan believes its asserted patents are valid, valuable, and claim foundational technologies. Revance disagrees. This is a critical dispute in the case, and must be resolved. The jury is entitled to hear the evidence in the first instance and, as factfinder in this case, decide on that evidence.

Respectfully,

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

JAT:ds
cc: All Counsel of Record (via e-mail)