# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Allergan, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>Revance Therapeutics, Inc. and PCI San Diego, Inc.,<br><br>    Defendants. | C.A. No. 21-1411-RGA-LDH |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTIONS FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B) AND, IN THE ALTERNATIVE, NEW TRIAL AND/OR REMITTITUR UNDER RULE 59

Dated: September 12, 2025

Of Counsel:

Dennies Varughese, Pharm. D.
Adam C. LaRock
Byron L. Pickard
Nirav N. Desai
Deirdre M. Wells
Anna G. Phillips
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN
  & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Peter J. Armenio
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................... iv

TABLE OF ABBREVIATIONS ................................................................... vii

I.      NATURE AND STAGE OF THE PROCEEDINGS .......................................... 1

II.     SUMMARY OF THE ARGUMENT ................................................ 1

III.    LEGAL STANDARDS .................................................................... 4

IV.     THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS ON THE
        FORMULATION CLAIM OR, IN THE ALTERNATIVE, A NEW TRIAL ................... 6

        A.      The Court Should Grant JMOL Of Obviousness ..................................... 7

                1.      Undisputed Evidence Shows That Each Element Of The Formulation Claim
                        Is Disclosed By Hunt 598 And Johnson 468 .................................... 7

                2.      Undisputed Evidence Shows A POSA Would, And Could, Combine Hunt
                        598 And Johnson 468 ........................................................... 8

                3.      Allergan Did Not Introduce Any Substantial Contrary Evidence ................. 11

        B.      Alternatively, The Court Should Grant A New Trial On Obviousness ................. 13

V.      THE COURT SHOULD GRANT JMOL ON DAMAGES OR, IN THE
        ALTERNATIVE, A NEW TRIAL OR REMITTITUR .................................... 14

        A.      The Evidence Presented By Allergan And Dr. Siegwarth Cannot Support
                The Jury's Reasonable Royalty For The Formulation Claim ............................ 14

                1.      Dr. Siegwarth's 24% Royalty Incorrectly Assumes That The Formulation
                        Claim Is Entirely Responsible For DAXXIFY's Longer Duration ................. 14

                2.      The Calculation Methodology Underlying Dr. Siegwarth's Formulation
                        Claim Reasonable Royalty Is Flawed For Several Additional Reasons .......... 17

        B.      The Trial Evidence Does Not Support The Jury's Royalties For The
                Manufacturing Claims ......................................................... 19

                1.      Dr. Siegwarth's Arbitrary End Of 2025 Cutoff Lacks Evidentiary Support ... 19

                2.      Allergan And Dr. Siegwarth Did Not Consider The Incremental, If Any,
                        Technical Benefit Of The Second Manufacturing Patent ........................ 21

        C.      In the Alternative, A New Trial Is Warranted On Damages For The
                Formulation And Manufacturing Claims ........................................... 22

1.   Allergan Presented Non-Apportioned Damages Opinions For Each Of The Asserted Claims At Trial ...............................................................................22

2.   Allergan Did Not Live Up To Its *Daubert* Damages Proffer .........................23

3.   Excluding Allergan's Executive Statements Prejudiced Revance And Skewed The Jury's Perception Of The Market Positions Of The Parties........24

VI.   CONCLUSION.................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*,
    797 F.3d 1350 (Fed. Cir. 2015)........................................................................6, 9

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    839 F.3d 1034 (Fed. Cir. 2016) (*en banc*) ................................................................6

*Aqua Shield v. Inter Pool Cover Team*
    774 F.3d 766 (Fed. Cir. 2014)....................................................................................24

*Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*,
    C.A. No. 02-1694-GMS, 2008 WL 11383361 (D. Del. Sept. 11, 2008) ...................6

*Buskirk v. Apollo Metals*,
    307 F.3d 160 (3d Cir. 2002)........................................................................................4

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015)..................................................................................21

*Cortez v. Trans Union, LLC*,
    617 F.3d 688 (3d Cir. 2010)........................................................................................6

*CSIRO v. Cisco Sys., Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015)...................................................................................5

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009).................................................................................10

*EcoFactor, Inc. v. Google LLC*,
    137 F. 4th 1333 (Fed. Cir. 2025) .......................................................16, 21, 23, 24

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014).................................................................................23

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018).................................................................................18

*Fromson v. Western Litho Plate & Supply Co.*,
    853 F.2d 1568 (Fed. Cir. 1988)...................................................................................5

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004).................................................................................10

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970).......................................................................5

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)................................................................................7, 8, 11

*KSR Int'l Co. v. Teleflex Inc.*
50 U.S. 398, 401 (2007).....................................................................7, 8, 11

*L-3 Commc'ns Corp. v. Sony Corp.*,
C.A. No. 10-734-RGA, 2014 WL 4674815 (D. Del. Sep. 12, 2014) ....................5, 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)...........................................................20, 22, 23

*LG Elecs. USA, Inc. v. Whirlpool Corp.*,
798 F. Supp. 2d 541 (D. Del. 2011)......................................................................5

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)..................................................5, 6, 14, 25

*Millennium Pharms., Inc., v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017)...........................................................12, 14

*Pannu v. Iolab Corp.*,
155 F.3d 1344 (Fed. Cir. 1998)..........................................................................5

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
563 F.3d 1358 (Fed. Cir. 2009)..........................................................................6

*Richardson-Vicks Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997)..........................................................................6

*Rite-Hite Corp. v. Kelley Co., Inc.*,
56 F. 3d 1538 (Fed. Cir. 1995) (*en banc*) ....................................................18

*TQ Delta, LLC v. 2Wire, Inc.*,
486 F. Supp. 3d 803 (D. Del. 2020)......................................................................5

*Trans-World Mfg. Corp. v. Al Nyman & Sons*,
750 F.2d 1552 (Fed. Cir. 1984)........................................................................25

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 ...........................................................................16, 19, 20

*VirnetX, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)........................................................................18

*Western Union Co.v. MoneyGram Payment Systems, Inc.*,
626 F.3d 1361 (Fed. Cir. 2010)...............................................................................................12

**Statutes**

35 U.S.C. §102(b) .....................................................................................................................13

**Other Authorities**

Fed. R. Civ. P. 50 .............................................................................................................1, 4, 25

Fed. R. Civ. P. 59 .............................................................................................................1, 5, 25

## <u>TABLE OF ABBREVIATIONS</u>

The following table lists the abbreviations used throughout this brief:

| Abbreviation | Description |
|---|---|
| '740 Manufacturing Patent | U.S. Patent No. 7,354,740 |
| '748 Manufacturing Patent | U.S. Patent No. 11,203,748 |
| Allergan | Plaintiff Allergan, Inc. |
| Asserted Claims | Claim 6 of U.S. Patent No. 11,147,878; Claim 8 of U.S. Patent No. 7,354,740; Claim 8 of U.S. Patent No. 11,203,748 |
| Carpenter | Carpenter et al., "Rational Design of Stable Lyopholized Protein Formulations: Some Practice Advice," *Pharma Res*, 14(8):969–75 (1997) (DTX-179) |
| Gaza Decl. | Declaration of Anne Shea Gaza in Support of Defendants' Opening Brief in Support of their Motions for Judgment as a Matter of Law Under Rule 50(b) and, in the Alternative, New Trial and/or Remittitur Under Rule 59 |
| Dr. Schöneich | Allergan's formulation expert Dr. Christian Schöneich |
| Dr. Siegwarth | Allergan's damages expert Dr. Christine Siegwarth |
| Dr. Sury | Revance's formulation expert Dr. Raj Suryanarayanan |
| Formulation Claim | Claim 6 of U.S. Patent No. 11,147,878 |
| Hunt 598 | U.S. Patent App. Pub. No. 2003/0118598 (DTX-209) |
| JMOL | Judgment as a matter of law |
| Johnson 468 | U.S. Patent No. 5,756,468 (DTX-207) |
| Manufacturing Claims | Claim 8 of U.S. Patent No. 7,354,740 and Claim 8 of U.S. Patent No. 11,203,748 |
| Ms. Trexler | Revance's damages expert Ms. Dana Trexler |
| Revance | Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. |
| Stone | Stone, H. et al, "Characterization of diffusion and duration of action of a new botulinum toxin Type A formulation," *Toxicon*, 58:159–167 (2011) (JTX-121) |

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. (collectively, "Revance") have moved for judgment as a matter of law under Fed. R. Civ. P. 50(b) ("JMOL") and, in the alternative, for a new trial and/or remittitur pursuant to Fed. R. Civ. P. 59 ("Motion").  (D.I. 666.) After a five-day invalidity and damages trial, the jury returned a verdict that each of the Asserted Claims is not invalid as obvious and awarded reasonable royalty damages to Plaintiff Allergan, Inc. ("Allergan") on that basis.  This is Revance's opening brief in support of its Motion.

## II.     SUMMARY OF THE ARGUMENT[1]

The Court should grant JMOL of obviousness with respect to the Formulation  Patent because "there is insufficient evidence for permitting any different finding."  As the Federal Circuit has explained, the ultimate question of obviousness is one of law.  This is the Court's first opportunity to address that question.  The trial record shows that the relevant evidence is not in dispute.  Revance, through its formulation expert, Dr. Sury, proved at trial that every limitation of the Formulation Claim is present in the prior art combination of Hunt 598 (DTX-209) and Johnson 468 (DTX-207).  Allergan and its formulation expert, Dr. Schöneich, did not rebut this evidence. Revance further proved a real-world reason to combine Hunt 598 and Johnson 468 to arrive at the claimed invention:  increasing the temperature at which the composition remains stable, thereby avoiding the need for cold storage.  Allergan, again, did not rebut this evidence.  In fact, Dr. Schöneich agreed with Dr. Sury on each of these factual predicates to obviousness.  At trial, Allergan sought to confuse the jury with baseless teaching away and expert experience arguments. Those arguments are insufficient to permit any finding other than obviousness.  The relevant

---

[1] Unless otherwise noted, internal citations, quotations, and quotation marks are omitted.  Unless otherwise noted, emphasis has been added.

evidence is undisputed and supports the legal conclusion that the Formulation Claim is obvious. The Court should enter JMOL on that basis.

Alternatively, the Court should order a new trial on obviousness. Allergan repeatedly made misstatements of law and fact regarding the Hunt 598 prior art patent application, launched irrelevant personal attacks against Dr. Sury, obtained prejudicial jury instructions, and thwarted Revance from obtaining corrective instructions. At a minimum, the Court should order a new trial because the jury's obviousness determination was against the clear weight of the evidence.

The Court should grant JMOL with respect to damages because the royalty rates awarded by the jury are neither supported by substantial evidence nor reasonable. With respect to the Formulation Claim, the evidence presented at trial cannot sustain the jury's 15% royalty. While that royalty is less than the 24% sought by Allergan, it is far more than the 1.75% proved by Revance and would not have been awarded absent Allergan improperly raising the damages horizon for the jury with Dr. Siegwarth's unreliable damages methodology. As one of many fundamental errors, Dr. Siegwarth baselessly assumed that all of the value attributable to DAXXIFY's longer duration of action should be 100 percent assigned to the Formulation Claim, with no apportionment or bargaining split. Revance presented ample evidence at trial showing that its proprietary peptide causes DAXXIFY's increased duration. At a minimum, this evidence would have given Revance negotiation leverage on the duration issue during any hypothetical negotiation. Dr. Siegwarth's unreliable damages methodology did not even consider—much less account for, apportion for, or include in a bargaining split—the strong evidence that the peptide alone was the cause of DAXXIFY's increased duration. Instead, Dr. Siegwarth baselessly assumed that the reasonable royalty should be the *entirety* of her calculated 24% duration value, which amounts to an impermissible 100 to 0 bargaining split. In doing so, Dr. Siegwarth failed to

account for the parties' positions and available evidence during the hypothetical negotiation and failed to apportion for the patented features. The result was an unreliable, inflated royalty opinion on the Formulation Claim, which improperly raised the jury's damages horizon and irreparably prejudiced the jury's damages analysis. Indeed, Dr. Siegwarth admitted at trial that without her assumed allocation of all 24% duration value to the Formulation Claim, her proposed royalty rate is wrong. Given Dr. Siegwarth's unreliable damages methodology, there is no legally sufficient evidentiary basis to support a 15% royalty for the Formulation Claim. The Court should enter JMOL that Allergan is entitled to no more than the 1.75% royalty for the Formulation Claim explained by Revance's damages expert, Dana Trexler.

Allergan is also not entitled to the jury's 12% and 4% royalties for the Manufacturing Claims. While those royalties are less than the 15 to 20% royalties for the Manufacturing Claims sought by Allergan, they are far more than the 1.4% proved by Revance and would not have been awarded absent Allergan improperly raising the damages horizon for the jury with Dr. Siegwarth's unreliable damages methodology. Notably, Dr. Siegwarth used a different—but still unreliable—methodology to inflate Allergan's damages claim for the Manufacturing Claims. Specifically, Dr. Siegwarth based her approach on an assumption that Revance would lose $280 to $377 million over six years due to a 12-month or 18-month design-around delay to launch DAXXIFY, modified by speculation that the parties would cut off that assumed loss at the end of 2025. This methodology was unreliable—and thus not legally sufficient evidence for the awarded royalties for the Manufacturing Claims—for several reasons. First, Dr. Siegwarth made no attempt to determine what portion of her assumed loss was attributable to patented versus non-patented features of DAXXIFY, *i.e.*, to apportion her royalty rates to the Manufacturing Claims. Second, Dr. Siegwarth's end of 2025 cutoff date was arbitrary, had no support in the evidence, and

functioned solely to inflate her royalty rates; it did not properly apportion anything. Third, Dr. Siegwarth failed to consider the minimal, if any, incremental benefit of the later expiring Manufacturing Patent given the inventor testimony that practicing the earlier expiring Manufacturing Patent alone was enough to produce toxin that met FDA requirements. At bottom, there is no legally sufficient evidentiary basis for the awarded 12% and 4% royalties for the Manufacturing Claims. The Court should enter JMOL that Allergan is entitled to no more than the 1.4% reasonable royalty for these claims explained by Revance's damages expert.

Alternatively, the Court should order a new trial on damages and/or remittitur for several independent reasons. First, the Court should have granted Revance's *Daubert* motion on Dr. Siegwarth's reasonable royalty testimony. Second, Allergan did not put into evidence, or introduce expert opinion on, any proper apportionment of the patented features, which improperly raised the damages horizon for the jury. Third, Allergan's damages trial presentation did not keep its *Daubert* hearing promises. Indeed, two of the three alleged facts that Dr. Siegwarth relied on for her end of 2025 cutoff at the *Daubert* hearing were not introduced at trial. The third alleged fact, a Mylan CEO statement, did not support Dr. Siegwarth's end of 2025 cutoff and instead said "by 2025." Fourth, Revance was improperly precluded from introducing Allergan executives' post-hypothetical negotiation statements, which confirmed the parties' pre-hypothetical negotiation expectations that they were unlikely to be serious competitors. Revance should have been permitted to introduce these statements, the exclusion of which changed the jury's damages analysis. The jury's damages award was also against the clear weight of the evidence.

## III.    LEGAL STANDARDS

In general, JMOL under Fed. R. Civ. P. 50 is appropriate where "there is insufficient evidence from which a jury reasonably could find liability," *Buskirk v. Apollo Metals*, 307 F.3d

160, 166 (3d Cir. 2002), and the verdict is "not supported by substantial evidence," *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998). Courts "must scrutinize the evidence carefully to ensure that th[is] 'substantial evidence' standard is satisfied." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009).

For a JMOL of obviousness, because the movant bore the burden of proof at trial, to succeed on its motion it "must establish there is insufficient evidence for permitting any different finding." *TQ Delta, LLC v. 2Wire, Inc.*, 486 F. Supp. 3d 803, 808 (D. Del. 2020); *L-3 Commc'ns Corp. v. Sony Corp.*, C.A. No. 10-734-RGA, 2014 WL 4674815, at *3 (D. Del. Sep. 12, 2014).

If a court does not grant JMOL, it may order a new trial or amend a judgment. Fed. R. Civ. P. 59(a)(1)(A) and 59(e). "The decision to grant or deny a new trial is within the sound discretion of the trial court." *LG Elecs. USA, Inc. v. Whirpool Corp.*, 798 F. Supp. 2d 541, 558 (D. Del. 2011). A new trial should be held where "the verdict was against the weight of the evidence . . . [and] a miscarriage of justice would result" if it stands. *Id.*

A court should grant JMOL on damages where the jury's award is not "reasonable." *See Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988) (overruled on other grounds) ("[t]he royalty arrived at must be reasonable under all circumstances"). A reasonable royalty may be based on a hypothetical negotiation between a willing licensor and licensee at the time of alleged infringement. *See, e.g.*, *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120–21 (S.D.N.Y. 1970). This framework requires a "flexible" analysis of relevant factors. *See Lucent Techs.*, 580 F.3d at 1355. The jury may also consider events after the hypothetical negotiation to assess reasonableness. *See, e.g.*, *Fromson*, 853 F.2d at 1575. The jury may resolve factual questions concerning the royalty, but the underlying methodology considered by the jury must be based on substantial evidence. *CSIRO v.*

*Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015); *Lucent Techs.*, 580 F.3d at 1335.

A new trial may be granted when the verdict is against the clear weight of the evidence, the trial was unfair, or substantial errors were made in the admission or rejection of evidence. *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, C.A. No. 02-1694-GMS, 2008 WL 11383361, at *2 (D. Del. Sept. 11, 2008); *see also Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1371–72 (Fed. Cir. 2009). A court should grant remittitur where the damages award is "clearly unsupported and/or excessive." *Cortez v. Trans Union, LLC*¸ 617 F.3d 688, 715–16 (3d Cir. 2010).

## IV. THE COURT SHOULD GRANT JMOL OF OBVIOUSNESS ON THE FORMULATION CLAIM OR, IN THE ALTERNATIVE, A NEW TRIAL

The ultimate question of obviousness is a question of law to be resolved by the Court. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1047 (Fed. Cir. 2016) (*en banc*). Following a verdict of non-obviousness, a court must presume that the jury resolved any underlying factual disputes in favor of the patentee. *Id.* at 1047. However, like all other facts underpinning a jury verdict, courts must review the implicit findings for substantial evidence. *Id.* The ultimate question of obviousness based on those facts is one of law and, therefore, appropriate for resolution by a JMOL. *See, e.g.*, *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1352–53 (Fed. Cir. 2015) ("[E]ven assuming that the jury correctly resolved pertinent factual disputes in favor of [plaintiff], the prior art still renders the claims of the patent obvious as a matter of law."); *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997) (noting that a jury verdict "does not mean that [courts] are free to abdicate [their] roles as the ultimate decision maker on the question of obviousness"). "District courts cannot accept a jury's finding that motivation is lacking when the motivation is evident in the prior art references themselves or a matter of common sense." *L-3 Commc'ns*, 2014 WL 4674815, at *3.

## A.    The Court Should Grant JMOL Of Obviousness

In *Graham v. John Deere Co.*, the Supreme Court explained that obviousness is a question of law that "lends itself to several basic factual inquires":

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.  Against this background, the obviousness or nonobviousness of the subject matter is determined.  Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.  As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

383 U.S. 1, 17–18 (1966).  In *KSR Int'l Co. v. Teleflex Inc.*, the Supreme Court refined the analysis for situations where, as here, the claim is a combination of elements found in the prior art:

> When a work is available in one field, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, §103 likely bars its patentability.  Moreover, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill.

550 U.S. 398, 401 (2007).

### 1.    Undisputed Evidence Shows That Each Element Of The Formulation Claim Is Disclosed By Hunt 598 And Johnson 468

It was undisputed at trial that Hunt 598 and Johnson 468 are prior art to the Formulation Claim.  (D.I. 584.)  Revance and its formulation expert, Dr. Sury, presented further undisputed evidence that each element of the Formulation Claim is disclosed by the combination of those prior art references.  Allergan did not present any contrary evidence.  Indeed, Allergan's formulation expert, Dr. Schöneich, admitted that he did not disagree with Dr. Sury regarding all of the claim elements being present in Hunt 598 and Johnson 468.  (Tr. 1206:18–1207:8.)

| Limitation | Disclosing Reference | Dr. Sury's Testimony | Dr. Schöneich's Testimony |
|---|---|---|---|
| Preamble | Hunt 598 | 961:24–964:3 | 1206:18–1207:8 |
| Step (a) | Hunt 598 | 964:4–965:23 | |
| Step (b) | Hunt 598 | 965:24–966:15 | |
| Step (c) | Hunt 598 ("surfactant") + Johnson 468 ("trehalose") | 966:16–968:15 | |
| Step (d) | Hunt 598 | 968:16–970:5 | |
| Step (e) | Hunt 598 | 970:6–970:21 | |
| Step (f) | Hunt 598 | 970:22–971:14 | |
| Step (g) | Hunt 598 | 971:15–972:13 | |

Given this record, point 1 and 2 of the *Graham v. Deere* test are undisputed, and *KSR* applies.

## 2. Undisputed Evidence Shows A POSA Would, And Could, Combine Hunt 598 And Johnson 468

Revance's expert, Dr. Sury, testified that a person of ordinary skill in the art ("POSA") had a real-world reason to combine Hunt 598 and Johnson 468 to arrive at the claimed invention. As Dr. Sury explained, "Hunt provides data for stability, but the constraint is the product would have to be stored under ***freezing conditions***," and "Johnson has shown ***room temperature*** stability for the albumin-containing toxin formulation." (Tr. 955:2–14.) Dr. Sury further explained how Hunt's frozen storage constraint creates "the challenge of maintaining cold chain" because the "product would have to be always stored frozen" and "transported frozen," and how "Johnson enables us to store the product at room temperature" allowing for "much more flexibility with respect to the transport, manufacture, and use of the product." (Tr. 957:9–25.)

Through his testimony, Dr. Sury identified a known problem with Hunt 598's formulation, and a logical solution to that problem disclosed by Johnson 468. On cross, Allergan's expert, Dr. Schöneich, not only agreed with the respective temperature disclosures of Hunt 598 and Johnson 468, but also agreed that there would be a benefit to achieving stability at higher temperatures. (Tr. 1208:24–1209:12 (Q: If you can get stability at higher temps, you agree there's a benefit

-8-

because you don't need to keep the formulation frozen; right? *A: I can agree with that.*).)

Accordingly, there is no dispute that the evidence showed a reason to combine.

Dr. Sury testified that trehalose "has a long history of being an effective stabilizer of protein formulations." (Tr. 958:1–9.) Dr. Sury's testimony on this issue was buttressed by the Carpenter reference (DTX-179), and Dr. Schöneich did not offer any contrary testimony or reference. As a result, the undisputed evidence at trial showed that use of trehalose as a protein stabilizer was available to a POSA in protein compositions—the pertinent art according to both Dr. Sury and Dr. Schöneich (Tr. 946:24–947:11; 1136:16–23)—and was not "beyond his or her skill."

Given the undisputed evidence showing the factual predicates of obviousness, this Court should grant JMOL that the Formulation Claim is obvious. In considering obviousness on appeal, the Federal Circuit would "first presume that the jury resolved the underlying factual disputes in favor of the verdict" and then "examine the [ultimate] legal conclusion [of nonobviousness] *de novo* to see whether it is correct in light of the presumed jury fact findings." *ABT Sys.*, 797 F.3d at 1357. Here, the key facts are not in dispute, and so the Federal Circuit need only consider the issue of obviousness *de novo*. This Court should do the same.

At trial, Allergan argued that the Formulation Claim is non-obvious because Hunt 598 allegedly teaches away from the claimed invention, because it allegedly "excludes from its scope disaccharides." (Tr. 1141:2; DTX-209.0020 at [0180].) Allergan's argument was not supported by the evidence at trial and does not change the JMOL analysis. Indeed, Dr. Schöneich admitted at trial that the embodiment in Hunt 598 that excludes disaccharides is separate from the embodiment that Dr. Sury relied on for his obviousness analysis. (Tr. 1216:20–1217:21.)

Specifically, Hunt 598 discloses an embodiment in the Summary "wherein the primary stabilizer present in the formulation is a recombinantly made albumin." (DTX-209.0013 at

[0093].)  Hunt 598 then describes this recombinant albumin embodiment in detail in paragraphs [0153] to [0174].  (*Id.* at DTX-209.0017-0019).  This is the Hunt 598 embodiment on which Dr. Sury relied at trial.  (Tr. 973:19–974:8; DDX-6.24–6.53.)

> Hunt 598 separately discloses that:
>
> > ***In another embodiment of my invention,*** I have surprisingly found that a suitable replacement for albumin can be a compound which is neither another protein, nor a low molecular weight, non-protein compound.  Thus, I have discovered that ***particular high molecular weight polysaccharides can function as neurotoxin stabilizers in a pharmaceutical composition***.

(DTX-209.0019 at [0175].)  Hunt then describes this other embodiment in detail in paragraphs [0175] to [0196].  (DTX-209.0019–0022.)  Allergan's cited language about excluding disaccharides appears in paragraph [180], squarely within the discussion of this separate embodiment.  It has no bearing on the recombinant albumin embodiment.  (Tr. 1214:10–20.)

As the Federal Circuit has explained, its precedent requires a reference to "criticize, discredit, or otherwise discourage" investigation into the claimed invention in order to find that a patent "teaches away" from the claimed invention.  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009).  The statement that the polysaccharide embodiment in Hunt 598 "excludes from its scope disaccharides" does not change anything about the recombinant albumin embodiment in that reference, much less rise to the level of the Federal Circuit's teaching away standard.  *See In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (finding the claimed invention "unpatentable based primarily on a prior art reference that disclosed two alternatives, one of which was the claimed alternative" and concluding that "mere disclosure of alternative designs does not teach away").  As a result, Allergan's teaching away argument is not supported by substantial evidence and need not be considered as part of the Court's JMOL analysis.

Tellingly, Allergan did not present any evidence at trial that would "criticize, discredit, or

-10-

otherwise discourage" addition of the disaccharide trehalose to stabilize a lyophilized composition containing a botulinum toxin and an albumin.  Indeed, Johnson 468 does just that, including in "[t]he preferred pharmaceutical composition of the present invention."  (DTX-207.0003.)  Moreover, Revance put in evidence the Carpenter reference, which showed, without rebuttal, that "the most effective stabilizers during the lyophilization cycle are disaccharides."  (DTX-179.0004; DDX-6.23.)  Carpenter further discussed the problem with reducing sugars—noted years later in the Formulation Patent—and made a clear stabilizer recommendation:  "At this point, the major component missing is a nonreducing disaccharide, which forms an amorphous phase with the protein in the dried solid and serves as the primary stabilizer.  *The main choices are sucrose or trehalose*."  (DTX-179.0005; DDX-6.23.)

### 3.  Allergan Did Not Introduce Any Substantial Contrary Evidence

At trial, Allergan tried to create the appearance of factual disputes regarding the definition of a POSA and certain secondary considerations.  It failed, however, to introduce substantial evidence supporting the existence of any such dispute and thus cannot use them to avoid JMOL.  With respect to the definition of a POSA, the parties' experts agreed that the pertinent art is protein compositions (Tr. 946:24–947:11; 1136:16–23), agreed that Hunt 598 and Johnson 468 are prior art references that disclose all of the elements of the Formulation Claim, and agreed that there was a real-world benefit to combining these references.  At trial, Allergan harped on whether Dr. Sury had toxin experience, but never introduced any evidence that such experience was relevant to the obviousness analysis.  Indeed, there is no evidence in the record that a pharmaceutical composition expert with toxin experience and a pharmaceutical composition expert without toxin experience would differ with respect to their view of any factor relevant under *Graham v. Deere* or *KSR*.

With respect to secondary considerations, Allergan failed to introduce substantial evidence

supporting any of them. For alleged skepticism, Dr. Schöneich testified about whether "a replacement formulation could be developed which does not contain human serum albumin" (Tr. 1138:15–23) or "could remove all proteins" (Tr. 1218:8–13). But that testimony was irrelevant, including because the Formulation Claim is a "comprising" claim that allows additional elements, and Dr. Schöneich admitted that recombinant albumin—which is animal protein free—is "meant to be the same as animal-derived proteins." (Tr. 1146:17–1147:18.) Allergan's alleged long-felt need evidence (Tr. 1218:15–24) suffers the same defect: the "comprising" Formulation Claim does not exclude all proteins, just animal-derived proteins. For alleged unexpected results, Dr. Schöneich testified based on testing comparing a single embodiment of the Formulation Claim to a formulation similar to Botox. (Tr. 446:23–447:4; 458:12–459:17.) But that testimony was again irrelevant: it was based on testing that did not compare against the closest prior art and was not commensurate with the scope of the claims. (*See* D.I. 624.) It would be error for the Court to consider it in deciding this JMOL motion. *See Millennium Pharms., Inc., v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir. 2017) ("When unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art.").

Even if the Court were to find that some or all of the asserted secondary considerations exist when the evidence is viewed in Allergan's favor, the Court can, and should, still enter JMOL on the ultimate legal question of obviousness. *See Western Union Co. v. MoneyGram Payment Systems, Inc.*, 626 F.3d 1361, 1373 (Fed. Cir. 2010) (reversing the district court's denial of JMOL of nonobviousness "where the inventions represented no more than the predictable use of prior art elements according to their established functions, the secondary considerations advanced [] are inadequate to establish nonobviousness as a matter of law").

Given the undisputed evidence at trial—and the lack of any substantial evidence to the

contrary—this Court should enter JMOL that the Formulation Claim is obvious.

**B.      Alternatively, The Court Should Grant A New Trial On Obviousness**

Alternatively, Revance seeks a new trial on obviousness.  Throughout the trial, Allergan improperly prejudiced the jury's perception of Revance's arguments and its expert.  Allergan also introduced irrelevant and prejudicial expert opinions that served only to confuse the jury.  Revance sought curative instructions on several of these issues, but its requests were denied.  Accordingly, the Court should order a new trial on obviousness.

First, during its opening, Allergan insinuated that Revance's use of Hunt 598 for obviousness was somehow improper because Mr. Hunt is also the named inventor on the Formulation Patent.  (*See* Tr. 122:14–16.)  Allergan's argument is contradicted by U.S. patent law and the Court's ruling that Hunt 598 is prior art.  *See* 35 U.S.C. §102(b).  (*See also* D.I. 584.)  Allergan's argument also confused the jury and prejudiced Revance.  Revance requested a curative instruction, but its request was denied.  (*See* Tr. 1178:24–1180:2.)  Revance similarly asked for an instruction to remove from the jury's consideration issues of skepticism and failure of others, issues for which no substantial evidence was adduced at trial.  Again, its request was denied.  (Tr. 1181:3–1182:4.)  Denying these instructions was error that supports a new trial.

Second, Allergan further prejudiced the jury's obviousness analysis with its baseless personal attacks on Dr. Sury.  Allergan repeatedly attacked Dr. Sury for his lack of work with toxins and questioned whether despite his 30-year career he would qualify as a POSA.  (*See, e.g.*, Tr. 981:17–983:16; 989:10–20; 1006:5–17.)  Tellingly, none of these attacks went to the substance of Dr. Sury's testimony.  Indeed, Dr. Schöneich agreed with the factual predicates of Dr. Sury's obviousness opinion.  (*See supra* § IV.A.1–2.)  Allergan's *ad hominem* attacks unfairly tainted the jury's perception of Dr. Sury and prejudiced Revance.

Third, Dr. Schöneich improperly provided testimony regarding alleged unexpected results based on testing that did not compare against the closest prior art and was not commensurate with the scope of the claims.  (Tr. 446:23–458:12; 458:12–459:17; D.I. 624.)  It was error by the Court to neither strike Dr. Schöneich's deficient testimony nor issue a curative instruction, further supporting a new trial.  *See Millennium Pharms.,* 862 F.3d at 1368.

## V.    THE COURT SHOULD GRANT JMOL ON DAMAGES OR, IN THE ALTERNATIVE, A NEW TRIAL OR REMITTITUR

It was Allergan's burden to prove damages that reflected the value of the Asserted Patents. *See Lucent Techs.*, 580 F.3d at 1324 ("The burden of proving damages falls on the patentee."). Allergan failed to carry that burden.  Accordingly, the jury's damages award lacks adequate support.  The Court should enter JMOL that Allergan is entitled to no more than 1.75% for the Formulation Claim and 1.4% for the Manufacturing Claims, or in the alternative, order a new trial on damages and/or remittitur.

### A.    The Evidence Presented By Allergan And Dr. Siegwarth Cannot Support The Jury's Reasonable Royalty For The Formulation Claim

The parties agree that DAXXIFY's longer duration would have been a central issue during the hypothetical negotiation of the Formulation Claim.  Yet, the unreliable methodology used by Allergan's damages expert rests on several flawed assumptions that skewed that negotiation.

#### 1.    Dr. Siegwarth's 24% Royalty Incorrectly Assumes That The Formulation Claim Is Entirely Responsible For DAXXIFY's Longer Duration

The first step of Dr. Siegwarth's methodology was to "look[] at surveys that were done around the time [] of the hypothetical negotiation" and approximate "the value of duration" at 24% of the value of DAXXIFY.  (Tr. 541:13–544:13.)  But from there, Dr. Siegwarth baselessly assumed that DAXXIFY's longer duration is 100 percent due to the Formulation Claim.  (*See* Tr. 642:2–4 ("**[M]y assumption is that, just to be clear, that the '878 patent is necessary for the long**

***duration, it drives the long duration. So, yes, that's my assumption.***").)  Dr. Siegwarth admitted at trial that if her 100 percent assumption were incorrect, then her royalty rate would also be incorrect.  (Tr. 642:5–8 ("Q: And if that assumption is wrong, all your formulation patent royalty rates wrong; correct?  ***A: Yeah, that's the – that's what I understand to be the case, and that's what my analysis is based on.***").)

Dr. Siegwarth's admission is telling because the trial evidence unequivocally proved that her assumption about the cause of DAXXIFY's longer duration is, indeed, incorrect.  Revance presented evidence from before the hypothetical negotiation showing that DAXXIFY's increased duration is due to its proprietary peptide and not, as Allergan contends, the Formulation Claim. For example, Stone (JTX-121), a Revance scientific paper, summarized the results of certain "mouse preclinical studies" of the DAXXIFY formulation.  (Tr. 674:15–675:15.)  As Dr. Ruegg, an author on the paper, explained at trial: "[W]e saw this unique, greater duration . . . the effect lasted longer when we had the peptide in our toxin, compared to BOTOX and also compared to BOTOX without the peptide, and the peptide was having a unique effect."  (Tr. 674:25–675:4.) Based on the benefits of the peptide, Revance also obtained several patents claiming the DAXXIFY formulation, including its proprietary peptide.  (*See* Tr. 679:14–687:24 (discussing DTX-520 and DTX-521, Revance's DAXXIFY patents).)  Dr. Ruegg, an inventor listed on the Revance patents, further explained how the "peptide influences the toxin," "makes the toxin last longer," and "reduces the diffusion or spread of the toxin."  (Tr. 681:17:682–1.)

Notably, Dr. Siegwarth agreed that Stone (JTX-121) and Revance's DAXXIFY patents (DTX-520, DTX-521) would have been available to the parties at the time of the hypothetical negotiation.  (Tr. 645:6–12 ("I don't disagree that these two documents would have been known at the time of the hypothetical negotiation.").)  Accordingly, a proper hypothetical negotiation

should have accounted for the fact that those documents were available to Revance, and that Revance would oppose any assumption that DAXXIFY's longer duration was attributable to the Formulation Claim. At the very least, the trial evidence showed that the cause of DAXXIFY's increased duration would have been in dispute at the time of the hypothetical negotiation. Dr. Siegwarth should have accounted for the duration dispute in her hypothetical negotiation because, as she explained, "both sides in this negotiation are going to be negotiating hard and bringing up all of their important points." (Tr. 632:7–9.) Yet, in Dr. Siegwarth's hypothetical negotiation, Revance would have withheld its strongest evidence and capitulated to Allergan's position that the Formulation Claim is 100 percent responsible for DAXXIFY's longer duration. That is not a plausible outcome of a hypothetical negotiation between Allergan and Revance. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313–14 (rejecting the "25 percent rule of thumb" for failing to account for the "idiosyncrasies of the patent at issue that would have affected a real-world negotiation").

"Where, as here, the relevant evidence is contrary to a critical fact upon which the expert relied, the district court failed to fulfill its responsibility as gatekeeper by allowing the expert to testify at trial." *EcoFactor, Inc. v. Google LLC*, 137 F. 4th 1333, 1346 (Fed. Cir. 2025) (finding the district court's admission of "unreliable testimony was undoubtedly prejudicial" where the expert's royalty rate was "both the starting point and the outcome of a hypothetical negotiation"). Dr. Siegwarth's hypothetical negotiation defies the trial evidence—and common sense—and is contrary to Federal Circuit law. The proper corrective action is JMOL, a new trial, or remittitur.

Further undercutting Dr. Siegwarth's testimony, she conceded that there could be other factors responsible for DAXXIFY's longer duration. (*See* Tr. 642:18–21 ("I didn't say that the long duration is only due to the patent. There could be other interacting factors.").) Yet, Dr.

-16-

Siegwarth did not account for or apportion these "other interacting factors" in the hypothetical negotiation. Accordingly, Dr. Siegwarth's methodology is unreliable and does not provide legally sufficient evidence to sustain the reasonable royalty on the Formulation Claim.

Revance, through its damages expert Ms. Trexler, offered a reasonable royalty opinion for the Formulation Claim that corrects the flaws in Dr. Siegwarth's methodology. For example, unlike Dr. Siegwarth, Ms. Trexler's hypothetical negotiation accounted for the parties' duration disagreement by assuming that reasonable parties faced with these facts "would compromise and agree to meet in the middle," which Ms. Trexler calculated at 1.75%. (Tr. 1041:1–19.) Because Ms. Trexler's methodology correctly implemented the hypothetical negotiation framework, and properly accounted for the central dispute that would arise therein, a reasonable jury would not have a legally sufficient evidentiary basis to support a royalty beyond 1.75%.

### 2. The Calculation Methodology Underlying Dr. Siegwarth's Formulation Claim Reasonable Royalty Is Flawed For Several Additional Reasons

Allergan's 24% reasonable royalty for the Formulation Claim also lacks support because it is based on an inherently flawed calculation that averages unrelated values and fails to properly apportion for the patented feature. Evidence at trial showed that Dr. Siegwarth's royalty rate of "24 percent really doesn't mean anything" because it represents an average of "two unlike things": (1) the price premium of DAXXIFY over Botox; and (2) customer preference survey results. (Tr. 1036:24–1037:6.) As Ms. Trexler explained, price premium 1 and 2 underlying Dr. Siegwarth's calculation represent "the combined dollar value of the unique DAXXIFY features, but not each [feature's] contribution" to that premium. (Tr. 1036:10–12.) If the price premium represents "the amount that [customers] are willing to pay for the extra benefits they get" from the complete DAXXIFY product compared to Botox, then "we need to determine what percentage of that premium goes to each one of the benefits" to properly apportion them. (Tr. 1036:13–16, 1037:16–

17.)  To do so, instead of arbitrarily averaging the price premium and consumer survey values, Dr. Siegwarth should have "multipl[ied] the price premium by the preference for duration to come up with a royalty rate."  (Tr. 1037:11–13.)  This "allows you to tease out what piece of the price premium goes to duration," which is the focus of the hypothetical negotiation.  (Tr. 1037:22–24.)

Federal Circuit precedent is clear that "apportionment [is] required to reflect the value of the patented technology compared to the value of the unpatented claims."  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018).  As presented, Dr. Siegwarth's reasonable royalty "takes the entirety of [the price premium] and assumes it goes to duration."  (Tr. 1039:4–6).  This leads to a hypothetical negotiation where Revance pays for DAXXIFY features that are unrelated to duration.  Such an outcome is wrong as a matter of law.  *See, e.g.*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F. 3d 1538, 1550 (Fed. Cir. 1995) (*en banc*) (damages may not be awarded for "items that have essentially no functional relationship to the patented invention").

To rescue its royalty rate, Allergan may argue that the jury's 15% royalty for the Formulation Claim effectively split the difference, standing in as a bargaining split between the parties' respective positions of 1.75% and 24%.  But that argument fails as a matter of law.  As discussed above, the supposed "split" is between completely different methodologies, with one that apportioned for the patented features and considered known disputes at the time of the hypothetical negotiation, and another that did not.  The jury therefore split the difference between a "floor" based in a sound damages methodology, and an inflated "ceiling" lacking legally sufficient evidentiary support, which cannot stand in as a substitute for a proper bargaining split during the hypothetical negotiation.  Indeed, the Federal Circuit has repeatedly cautioned against allowing this type of unreasonably high, un-apportioned testimony because of its potential to bias jurors.  *See VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014) (50/50

baseline split was "unjustified by evidence" and "would nevertheless run the significant risk of inappropriately skewing the jury's verdict"); *see also Uniloc*, 632 F.3d at 1320 (cautioning against the "danger of admitting consideration of the entire market value of the accused" product, because disclosure of "revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue"). Accordingly, even if the jury "split the difference," Dr. Siegwarth's unreliable, and unreasonably high, anchoring point contaminated the damages award.

For all these reasons, the Court should enter JMOL that Allergan is not entitled to the royalty for the Formulation Claim awarded by the jury.

### B. The Trial Evidence Does Not Support The Jury's Royalties For The Manufacturing Claims

Dr. Siegwarth based her testimony regarding the royalties for the Manufacturing Claims on an unreliable damages methodology that is insufficient to support the jury award. As Dr. Siegwarth explained, her royalty rate for the Manufacturing Claims equated to an alleged "Profit Boost ***through*** 2025" divided by her projected DAXXIFY's "Total Sales through 2029." (Tr. 599:1–2, *see also* PDX-17-7.) This was an unreliable damages methodology that included arbitrary inputs with no evidentiary support. It should have been excluded.

### 1. Dr. Siegwarth's Arbitrary End Of 2025 Cutoff Lacks Evidentiary Support

As just one arbitrary input, Dr. Siegwarth used an end of 2025 "focal point" or cutoff date for her reasonable royalty calculation for the Manufacturing Claims. Dr. Siegwarth testified that she used this cutoff date because there allegedly was "a lot of uncertainty in the marketplace in 2025, in large part because of" the planned Revance biosimilar to Botox. (*See* Tr. 531:4–20.) According to Dr. Siegwarth, the parties would have resolved that uncertainty by agreeing in the hypothetical negotiation "that Allergan would get the profit boost before 2025 and Revance would

keep the profit boost after 2025." (Tr. 531:17–19.) None of that had any evidentiary support.

To start, Dr. Siegwarth cited only a single, vague reference to 2025 to support her profit boost cutoff. Specifically, Dr. Siegwarth relies on PTX-643, a 2020 article with a quote from then Mylan President and Executive Director, stating that "[o]ur goal is to bring this product to the market **by 2025**." (PTX-643.0003.) Dr. Siegwarth relies on nothing else for her critical end of 2025 cutoff date. Such a "complete lack of economic analysis" "echoes the kind of arbitrariness" that the Federal Circuit has repeatedly rejected from damages experts. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (citing *Uniloc*, 632 F.3d at 1318 (cautioning against "arbitrary, unreliable, and irrelevant" damages methodologies for their potential to "taint[] the jury's damages calculation")).

Moreover, Dr. Siegwarth admitted that an earlier profit boost cutoff date would significantly reduce her royalty rate. (*See* Tr. 626:1–626:12 (Q: Any earlier profit allocation split date that the jury decides would move the line to the left and significantly lower your proposed royalty rates; correct? *A: Well, significantly. It obviously depends on what alternative date, say, the jury would pick.*).) [2] Yet Dr. Siegwarth offered no analysis of whether Revance would push for an earlier cutoff date during the hypothetical negotiation, including, for example, the September 2023 expiration of the first Manufacturing Patent. On cross, Dr. Siegwarth took the indefensible position that a profit boost cutoff date based on the expiration of one of the two at-issue patents would be "completely unreasonable" (Tr. 626:19), but a cutoff date that is 12 months later than the date in a single statement by a non-party executive is "a reasonable place to end up"

---

[2] Dr. Siegwarth also admitted that her selection of the end of 2025, as opposed to the last day of 2024 in conformance with the "by 2025" statement in PTX-643, significantly increased her royalty calculation. (Tr. 625:7–17 (a "one year" shift from Q4 2025 to Q4 2024 would lead to "a lot less red," which equals "the Allergan royalty calculation"); *see also* D.I. 640, Ex. A.)

(Tr. 531:19–20.)  In doing so, Dr. Siegwarth disregarded the record in favor of boosting the claimed damages number, the hallmark of an unreliable damages methodology.

### 2.  Allergan And Dr. Siegwarth Did Not Consider The Incremental, If Any, Technical Benefit Of The Second Manufacturing Patent

The toxin purity obtained by practicing the '740 Manufacturing Patent should have factored into Dr. Siegwarth's analysis of whether the later expiring '748 Manufacturing Patent had any incremental value.  But it did not.  That was wrong as a matter of law.  Even a willing patent licensee would be diligent and scrutinize the benefits of the technology claimed within each of the bargained for patents.  *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1204 (Fed. Cir. 2015) ("A key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use the patented technology"); *EcoFactor*, 137 F.4th at 1340 (a "critical consideration" is "the amount that the alleged infringer would agree to pay as a willing licensee").  That is especially true in this case, where an Allergan inventor testified at trial that practicing the first to expire '740 Manufacturing Patent alone was enough to meet FDA purity requirements.  (Tr. 386:13–24.)

Dr. Siegwarth did not consider any of this in her damages analysis and testimony.  Instead, she described the benefits of the Manufacturing Patents as allegedly relating to "timing" or a means for Revance to "avoid delay."  (Tr. 533:8–14.)  As a result of this unreliable methodology, Dr. Siegwarth failed to apportion her royalty to—and arbitrarily overstated the value of—the one Manufacturing Claim still in force after September 2023.  (*See* Tr. 533:8–22 ("So what I said was, what percentage of the timing comes from that first patent versus the second patent?  As you can see, the first patent expires pretty quickly, so it's a small amount.").)  Indeed, Dr. Siegwarth admitted on cross that Revance would have scrutinized the incremental technical benefit of the '748 Manufacturing Patent over the earlier-expiring Manufacturing Patent during the hypothetical

-21-

negotiation. (*See* Tr. 631:15–632:9 (agreeing that Revance would consider the "FDA requirement of purity" as it pertains to the first patent expiration, as part of a "normal back-and-forth" negotiation where both parties "bring[] up all their important points").)

The inventor admission that the purity obtained by practicing the earlier expiring '740 Manufacturing Patent was already enough to satisfy FDA requirements (Tr. 386:13–24) also shows that there was no FDA need for the later expiring '748 Manufacturing Patent. This is a critical fact. Dr. Siegwarth's entire Manufacturing Patents damages analysis was based on an alleged FDA delay calculation. If there was no FDA need for the '748 Manufacturing Patent, there was no basis for Dr. Siegwarth's opinion regarding that patent. Dr. Siegwarth never addressed this contradiction in her testimony, which renders it insufficient to support the awarded royalties for the Manufacturing Claims. *See LaserDynamics*, 694 F.3d at 81 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.")).

For all these reasons, the Court should enter JMOL that Allergan is not entitled to the royalties for the Manufacturing Claims awarded by the jury.

    **C.**    **In the Alternative, A New Trial Is Warranted On Damages For The Formulation And Manufacturing Claims**

        **1.**    **Allergan Presented Non-Apportioned Damages Opinions For Each Of The Asserted Claims At Trial**

As discussed, Dr. Siegwarth presented unreliable, un-apportioned damages opinions for each of the Formulation and Manufacturing Claims. Before trial, Revance moved to exclude Dr. Siegwarth's "opinions and testimony concerning reasonable royalties," including for "fail[ure] to

apportion for the patented features" of each of the Asserted Claims. (D.I. 344.)[3] The jury should not have been allowed to consider expert testimony that was not "tied to the claimed invention," as the Federal Circuit requires. *See LaserDynamics*, 694 F.3d at 67; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more"). On this record, with a complete lack of apportionment, the Court should not have allowed Dr. Siegwarth to testify at trial. *See EcoFactor*, 137 F. 4th at 1346 (reversing district court's denial of a new damages trial and remanding for new damages trial due to unreliable expert damages testimony that the Federal Circuit could not be sure "did not influence the jury or had but a very slight effect on its verdict"). The Court should thus grant a new trial on damages, or a remittitur.

### 2. Allergan Did Not Live Up To Its *Daubert* Damages Proffer

During her testimony at the pre-trial *Daubert* hearing, Dr. Siegwarth used a demonstrative outlining the "Economic Considerations for Licensing," which included her proffered reasons for the "2025 Focal Point." (Gaza Decl., Ex. A.) Dr. Siegwarth's demonstrative identified three separate bases for the selection of the end of 2025 as her focal point or cutoff date: (1) "Botox biosimilar launch"; (2) "Daxxify reaches peak market share"; and (3) "Planned LAI launch". *Id.* At trial, two of those three bases did not come into evidence at all. The remaining reason (the "Botox biosimilar launch") was shown to be based on an exhibit, PTX-643, that said "by 2025" and did not correspond to Dr. Siegwarth's end of 2025 cutoff date. (*See supra* §V.B.1.) The Court considered excluding Dr. Siegwarth's reasonable royalty testimony before trial, but allowed it because of a *Daubert* proffer that Allergan did not honor. In doing so, Allergan misled the Court

---

[3] Revance's motion, objecting to the admissibility of Dr. Siegwarth's testimony, suffices to preserve this issue for appeal. *See EcoFactor*, 137 F.4th at 1337, n.3 (citing FRE 103(b)).

and denied it the opportunity to "fulfill its responsibility as gatekeeper." The Court "cannot be sure" that Dr. Siegwarth's "testimony did not influence the jury's damages award," *see EcoFactor*, 137 F. 4th at 1346, and thus should grant a new damages trial, or a remittitur.

### 3. Excluding Allergan's Executive Statements Prejudiced Revance And Skewed The Jury's Perception Of The Market Positions Of The Parties

The Court's exclusion of the proffered post-hypothetical negotiation statements by Allergan executives was error and prejudiced Revance. Under *Aqua Shield v. Inter Pool Cover Team*, Allergan's statements should have been admitted because they confirm the parties' pre-negotiation views on their competitive positions. 774 F.3d 766, 770 (Fed. Cir. 2014) ("What an infringer's profits actually turned out to have been during the infringement period may be relevant" where it "bear[s] on" the profits the infringer "would have *anticipated*.").

For example, a November 2020 Allergan report (JTX-065) provided "Key insights" on long-acting competition, including: (i) "Longer duration of action is desirable, but how it is achieved is a key consideration as interest lessens if it is only possible by increasing the dose"; (ii) "New brands unlikely to see much uptake until they become established (unless also offering a substantial discount vs current products)"; (iii) "Rapid, widespread switch to a new LA toxin" would be "unlikely if released at a premium by a little known toxin manufacturer." (JTX-065.0026.) Dr. Siegwarth admitted that Revance fit squarely into this description. (Tr. 616:21–617:15.) This document shows Allergan's lack of concern about Revance as a competitor.

Additional documents reinforce this view. JTX-158, a 2020 Allergan presentation: (i) touted Allergan's "iconic brand that created the neurotoxin market" and its position as "the global market leader"; (ii) prioritized "[d]efend[ing] leadership position against competitive threats" and; (iii) outlined Allergan's vision to "continue to be the number one brand in neurotoxins with a trusted, robust neurotoxin portfolio." (JTX-158.0003–4; Tr. 620:3–622:3.) Revance's own pre-

negotiation document (JTX-091) similarly acknowledged its hurdles as the "[f]ifth entrant in [a] highly competitive market," with "[l]imited resources," "[l]imited awareness," a "[l]ack of aesthetic portfolio," and a "[p]remium price." (JTX-091.0003; Tr. 619:16–620:2.)

This evidence shows both parties understood the substantial difference in their marketplace positions. This difference was important, as the Court noted, because if the parties "weren't competitors, Allergan would be in a much different position" at the hypothetical negotiation. (Tr. 288:20–25.) The Court erred by barring Revance from introducing highly relevant post-hoc evidence that the parties' pre-negotiation expectations were reasonable. *See, e.g.*, *Trans-World Mfg. Corp. v. Al Nyman & Sons*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) ("[e]vidence of the infringer's actual profits generally is admissible as probative of his anticipated profits"); *see also Lucent Techs.*, 580 F.3d at 1333–34 ("Consideration of evidence of usage after infringement started can [] be helpful to the jury and the court in assessing whether a royalty is reasonable."). For example, Allergan's post-hypothetical statements that it lost no market share to Revance showed that it was reasonable for the parties in hypothetical negotiation to doubt Revance's ability to effectively compete in the marketplace. Excluding this evidence skewed the jury's understanding of the parties' hypothetical bargaining positions and the extent of Revance's threatened competition.

For these reasons, the Court should grant a new trial on damages, or a remittitur.

## VI.    CONCLUSION

Judgment as a matter of law under Rule 50(b) should be granted against Allergan, both with respect to obviousness and damages. Alternatively, a new trial should be granted under Rule 59(a) because the jury's verdict was against the clear weight of the evidence presented at trial, and a new trial or a remittitur must be granted to prevent a miscarriage of justice.

Dated: September 12, 2025

Of Counsel:

Dennies Varughese, Pharm. D.
Adam C. LaRock
Byron L. Pickard
Nirav N. Desai
Deirdre M. Wells
Anna G. Phillips
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN
 & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Peter J. Armenio
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance*
*Therapeutics, Inc. and PCI San Diego, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 12, 2025, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Jeremy A. Tigan
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
jtigan@morrisnichols.com
araucci@morrisnichols.com

Candace Polster
Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
candacepolster@paulhastings.com
robertunikel@paulhastings.com


*Attorneys for Plaintiff*

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Karthik R. Kasaraneni
David M. Valente
Amanda K. Taylor
Vladimir J. Semendyai
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
karthikkasaraneni@paulhastings.com
davidvalente@paulhastings.com
amandataylor@paulhastings.com
vladimirsemendyai@paulhastings.com

Dated: September 12, 2025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Anne Shea Gaza*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants*
*Revance Therapeutics, Inc.*
*and PCI San Diego, Inc.*

2