D.I. 672

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Allergan, Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Revance Therapeutics, Inc. and<br>PCI San Diego, Inc.,<br><br>*Defendants*. | C.A. No. 21-1411-RGA-LDH<br><br>[redacted]<br><br>**REDACTED - PUBLIC VERSION** |

**PLAINTIFF'S OPENING BRIEF**
**IN SUPPORT OF ITS MOTION FOR POST-TRIAL RELIEF**

**CONFIDENTIAL VERSION FILED - 9/12/25**
**REDACTED VERSION FILED - 10/3/25**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................ 1

II. NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 3

III. ARGUMENT ........................................................................................................ 3

A. The Court Should Award Allergan an Ongoing Royalty at the Jury-Determined Rates ........................................................................................................ 3

1. An Ongoing Royalty Is Appropriate and Necessary Under the Circumstances of This Case ........................................................................ 3

2. The Ongoing Royalty Should Be Set at the Rates the Jury Determined Should Apply ............................................................................................ 5

3. The Ongoing Royalty Should Cover Sales of U.S.-Made Daxxify to Revance's Foreign Partners ......................................................................... 17

4. The Ongoing Royalty Should Cover Revance Successors-in-Interest ..... 20

B. The Court Should Award Allergan Supplemental Damages ................................ 20

C. The Court Should Award Prejudgment Interest at the Prime Rate, Compounded Quarterly ........................................................................................................ 22

D. Allergan Is Entitled to Post-Judgment Interest at the Statutory Rate ................... 24

IV. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008)....6, 16

*Amgen, Inc. v. F. Hoffman-La Roche Ltd.*,
581 F. Supp. 2d 160 (D. Mass. 2008), *aff'd in part, vacated in part, remanded on other grounds sub nom. Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340 (Fed. Cir. 2009)....6

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017)....6, 9

*Ariba, Inc. v. Emptoris, Inc.*,
567 F. Supp. 2d 914 (E.D. Tex. 2008)....6

*Armadillo Glass, Inc. v. Emmegi U.S.A., Inc.*,
No. CIV.A.H-09-362, 2010 WL 1435159 (S.D. Tex. Apr. 7, 2010)....20

*Bayer Healthcare LLC v. Baxalta Inc.*,
No. 16-CV-1122-RGA, 2019 WL 4016235 (D. Del. Aug. 26, 2019), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021)....23, 24

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*,
807 F.2d 964 (Fed. Cir. 1986)....24

*Bos. Sci. Corp. v. Johnson & Johnson*,
No. C 02-00790 SI, 2009 WL 975424 (N.D. Cal. Apr. 9, 2009)....16

*ChromaDex, Inc. v. Elysium Health, Inc.*,
No. 8:16-CV-02277-FWS-DFM, 2024 WL 4804998 (C.D. Cal. Oct. 8, 2024)....25

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*,
850 F.3d 1302 (Fed. Cir. 2017)....23, 24

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*,
No. 12-CV-0205-RGA, 2015 WL 4730899 (D. Del. Aug. 10, 2015)....4

*Douglas Dynamics, LLC v. Buyer Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)....10

*E.I. du Pont de Nemours & Co. v. Unifrax I LLC*,
C.A. No. 14-1250-RGA, 2017 WL 4004419 (D. Del. Sept. 12, 2017)....21, 25

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)....................3, 21

*Gyromat Corp. v. Champion Spark Plug Co.*,
735 F.2d 549 (Fed. Cir. 1984)....................23

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
494 U.S. 827 (1990)....................25

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008)....................20

*Lummus Indus., Inc. v. D.M. & E. Corp.*,
862 F.2d 267 (Fed. Cir. 1988)....................24

*Mondis Tech. Ltd. v. Chimei Innolux Corp.*,
No. 2:11-CV-378-JRG, 2012 WL 1554645 (E.D. Tex. Apr. 30, 2012) ....................20

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007)....................3, 4, 5

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013)....................23

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992)....................17, 18

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) (en banc)....................24

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
959 F.3d 1065 (Fed. Cir. 2020)....................24

*Sun Ship Inc. v. Matson Navigation Co.*,
785 F.2d 59 (3d Cir. 1986)....................25

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
No. CV 17-1390-RGA, 2022 WL 3973499 (D. Del. Aug. 31, 2022)....................23, 24

*SynQor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013)....................17, 21

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
612 F.3d 1365 (Fed. Cir. 2010)....................3, 5

*TruePosition Inc. v. Andrew Corp.*,
568 F. Supp. 2d 500 (D. Del. 2008)....................17

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
939 F.2d 1540 (Fed. Cir. 1991)........................................................................................24

*US Iron FLA, LLC v. GMA Garnett (USA) Corp.*,
660 F. Supp. 3d 1212 (N.D. Fla. 2023)..............................................................................20

*Vectura Ltd. v. GlaxoSmithKline LLC*,
No. CV 16-638-RGA, 2019 WL 4346502 (D. Del. Sept. 12, 2019) ............................. *passim*

*XY, LLC v. Trans Ova Genetics*,
890 F.3d 1282 (Fed. Cir. 2018)....................................................................................9, 16

**Statutes**

28 U.S.C. § 1961(a) ..............................................................................................2, 25

35 U.S.C. §§ 283-84 ..................................................................................................2

35 U.S.C. § 284.......................................................................................17, 21, 23

**Other Authorities**

Federal Rule of Civil Procedure 59(e) ....................................................................2

U.S. Patent No. 7,354,740.........................................................................................1

U.S. Patent No. 11,147,878.......................................................................................1

U.S. Patent No. 11,203,748.......................................................................................1

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

On July 18, 2025, following a five-day trial, the jury returned a unanimous verdict in favor of Plaintiff Allergan, Inc. ("Allergan") on all issues. As part of that verdict, the jury determined that claim 6 of U.S. Patent No. 11,147,878 ("the '878 patent") and claim 8 of U.S. Patent No. 11,203,748 ("the '748 patent") were not invalid, and found Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc. (collectively, "Revance") liable for infringing those claims. (D.I. 636 at 2-4.)[1] The jury also found that the appropriate royalty rates for Revance's infringement of those two claims should be 15% for the '878 patent and 4% for the '748 patent, and awarded Allergan a royalty of $56 million on approximately $273 million of infringing Daxxify sales made through May 31, 2025. (D.I. 636 at 2-5.) The Court entered the $56 million verdict against Revance on July 24, 2025. (D.I. 639 ("Trial Verdict").)

This damages award, however, does not fully compensate Allergan for Revance's infringement, as the law requires, for four reasons. *First*, the Court should award an ongoing royalty on all revenue from Revance's continuing manufacture and sale in the United States of infringing Daxxify products after the Trial Verdict. At trial, both parties' damages experts agreed that damages in this case should be ongoing to compensate Allergan for any future infringing Daxxify sales. The jury likewise recognized the need for an ongoing royalty by determining the rates that should apply to both Revance's past and future infringement through the July 13, 2029 expiration of the '748 patent, the last patent-in-suit to expire. The post-verdict economic circumstances fully support adopting those jury-determined ongoing rates. The

---

[1] The jury also found claim 8 of U.S. Patent No. 7,354,740 ("the '740 patent") not invalid and awarded Allergan damages for Revance's infringement of that claim, including a royalty of 12%. (D.I. 636 at 2-5). As the '740 patent expired on September 25, 2023, it is not included in this motion for ongoing royalties or supplemental damages.

competitive landscape has not changed significantly from what the jury considered, and, if anything, justifies applying higher royalties going forward. Competition between the parties will likely only intensify as Revance begins supplying foreign markets with infringing, U.S.-manufactured Daxxify and Allergan begins marketing its own longer duration next-generation botulinum toxin product embodying the patented inventions. At the same time, the patents-in-suit remain indispensable to Revance, as it cannot design around them without incurring even greater and more certain economic losses than it faced at the original pre-launch hypothetical negotiations. Thus, the jury-determined ongoing royalty is both justified and necessary to adequately compensate Allergan for Revance's voluntary continued infringement.

*Second*, the jury's damages award does not account for Daxxify sales from June 1, 2025, through and inclusive of July 24, 2025, the Trial Verdict date. Nor does the damages award account for a limited number of Daxxify sales predating June 1, 2025, that Allergan could not present to the jury because of Revance's belated disclosure. *Third*, the jury's damages award excludes prejudgment interest, which is customarily awarded. *Fourth*, the jury's damages award excludes post-judgment interest, to which Allergan is statutorily entitled.

Accordingly, pursuant to Federal Rule of Civil Procedure 59(e), 35 U.S.C. §§ 283-84, and 28 U.S.C. § 1961(a), Allergan respectfully requests that the Court award full compensation to Allergan, including: (1) an ongoing royalty at the rates the jury already determined should apply going forward; (2) [redacted] in supplemental damages to cover all infringing Daxxify sales through July 24, 2025; (3) [redacted] in prejudgment interest on the total pre-Trial Verdict damages; and (4) post-judgment interest at the statutory rate of 4.09%, compounded annually.[2]

[2] Allergan reserves the right to amend and/or supplement any of the specific calculations underlying these requests after the Court's resolution of the parties' post-trial motions.

## II. NATURE AND STAGE OF THE PROCEEDINGS

This patent infringement case culminated in a five-day jury trial held July 14-18, 2025. The jury found in Allergan's favor on all issues. (D.I. 636; D.I. 639.) The jury concluded that none of the three patents-in-suit was invalid and, based on Revance's infringement stipulation, awarded Allergan a $56,000,000 royalty on $273,433,220 of Revance's infringing Daxxify sales through May 31, 2025. (D.I. 636 at 5.) As relevant here, the jury also determined the royalty rates that should apply to Revance's past and ongoing infringement: 15% for claim 6 of the '878 patent and 4% for claim 8 of the '748 patent. (*Id.*) The Court entered the Trial Verdict on July 24, 2025. (D.I. 639.) Revance's post-trial challenges are pending. (D.I. 666.)

## III. ARGUMENT

### A. The Court Should Award Allergan an Ongoing Royalty at the Jury-Determined Rates

#### 1. An Ongoing Royalty Is Appropriate and Necessary Under the Circumstances of This Case

"Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate" and a district court may, in its discretion, "awar[d] an ongoing royalty where 'necessary' to effectuate a remedy." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007); *see Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010) ("[T]he district court may, and is encouraged, to allow the parties to negotiate a license" for post-verdict infringement or, in the alternative, "may step in to assess a reasonably royalty should the parties fail to come to an agreement.") (citing *Paice*, 504 F.3d at 1315). "An award of an ongoing royalty is appropriate [where] the record supports the district court's finding that [the patent owner] has not been compensated for [defendant's] continuing infringement." *Telcordia*, 612 F.3d at 1379; *see Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) ("[A] patentee is 'not fully compensated' if 'the damages

award did not include future lost sales.'"");[3] *Vectura Ltd. v. GlaxoSmithKline LLC*, No. CV 16-638-RGA, 2019 WL 4346502, at *6 (D. Del. Sept. 12, 2019) ("While an ongoing royalty is not automatic, the Federal Circuit has indicated that a prevailing patentee should receive compensation for any continuing infringement."); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, No. 12-CV-0205-RGA, 2015 WL 4730899, at *10 (D. Del. Aug. 10, 2015) (granting an ongoing royalty where the jury awarded damages only "through the date of trial").

Here, where Revance is not enjoined from continuing to infringe, an ongoing royalty award is appropriate and necessary to compensate Allergan for Revance's ongoing infringement. *See Paice*, 504 F.3d at 1314-15. The jury's awarded "reasonable royalty amount" (D.I. 636 at 5 (Question 5)) compensated Allergan only for the portion of Revance's pre-May 31, 2025 infringing Daxxify revenue that Revance timely produced before trial, and Allergan's presently requested supplemental damages (and applicable interest) would compensate Allergan only for Revance's infringement through July 24, 2025. (*See* Sections III.B-C, *infra*.) But Revance continues to infringe each day that it continues to sell Daxxify. Indeed, Revance has not designed around the patents-in-suit because, as its witness Dr. Ruegg confirmed, it cannot. (*See* Trial Tr. at 711:24-712:9; *cf. id.* at 577:2-4 (Revance confirming it is "not offering a design-around")).[4] Allergan should be compensated for all of Revance's post-verdict infringement.

Revance's damages expert, Ms. Dana Trexler, agrees. At trial, she testified that Allergan should be awarded an ongoing royalty at the jury-determined rate to compensate for Revance's

---

[3] Unless otherwise indicated, all emphasis has been added, and all internal citations, footnotes, and quotation marks have been omitted.

[4] The final trial transcripts are not yet available on the Court's docket. Allergan therefore cites to the proofread transcripts the Court Reporter shared with the parties on August 5, 2025. Allergan will file corrected briefs with citations to the final transcripts once they become available.

post-judgment infringement. When asked how she calculated her proposed royalty, she explained that her royalty base included Daxxify sales only "through May 31, 2025," and that Revance "continue[s] to make sales, and so for each new sale [of Daxxify] you would also multiply that [sale] by the royalty rate[, s]o damages would be ongoing." (Trial Tr. at 1054:14-24; *see id.* at 1079:20-1080:4 (Ms. Trexler testifying that her damages calculation "is based on sales up through May 31, 2025" and "[t]hat number would continue going up with each sale of DAXXIFY going forward"); *see also* D.I. 349, Ex. 6 (Trexler Rebuttal Report), ¶ 307 ("The term of the hypothetical license between Allergan and Revance would run from the date of the hypothetical negotiation through the date that the last of the Asserted Patents expire.").) Thus, Revance has already conceded both that Allergan is entitled to an ongoing royalty, and that the Court should award that ongoing royalty at the jury-determined rates.

Moreover, the Court should award the ongoing royalty now because negotiation by the parties would be fruitless. *Cf. Telcordia*, 612 F.3d at 1379; *Paice*, 504 F.3d at 1314-15. Revance vigorously disputed the royalty amount at trial, seeking unreasonably low percentages far below the rates the jury awarded. (*See, e.g.*, Trial Tr. at 1052:25-24 (Ms. Trexler proposing royalty rates between 1.75% and 3.5% for the '878 patent and 1.4% for both the '740 and '748 patents).) Now, Revance is similarly resisting a reasonable ongoing royalty at the rates set by the jury. (*See* D.I. 666 at 1). Any post-verdict negotiation between the parties is thus "likely to be futile and only delay the entry of final judgment." *See Vectura*, 2019 WL 4346502, at *6-8 (forgoing ordering any negotiation and awarding an ongoing royalty at the jury-determined rate).

#### 2. The Ongoing Royalty Should Be Set at the Rates the Jury Determined Should Apply

"Generally, the jury's damages award is a starting point for evaluating ongoing royalties." *Vectura*, 2019 WL 4346502, at *7. Indeed, a jury may be asked to make a finding as

to "a proper future royalty rate." *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 917 (E.D. Tex. 2008); *see Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 581 F. Supp. 2d 160, 210 (D. Mass. 2008), *aff'd in part, vacated in part, remanded on other grounds sub nom. Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340 (Fed. Cir. 2009) (observing that asking a jury to determine an ongoing royalty rate may be "efficient" and "recognizes the vital role of the jury as fact finding partner"). A jury's ongoing-royalty-rate finding, however, does "not automatically result in an award of future damages in that amount." *Ariba*, 567 F. Supp. 2d at 917.

Instead, to determine an ongoing royalty rate, the Court "must consider (1) the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability, (2) changed economic circumstances, such as changes related to the market for the patented products, and (3) any other post-verdict factor that would impact what a hypothetical negotiation would look like after the prior infringement verdict." *Vectura*, 2019 WL 4346502, at *7 (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008), and *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297 (Fed. Cir. 2018)). These post-verdict economic circumstances may be shown by "a post-judgment hypothetical negotiation using the *Georgia-Pacific* factors." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1370 (Fed. Cir. 2017).

Here, the post-verdict economic circumstances support an ongoing royalty at least at the rates the jury found would compensate Allergan for both Revance's past and future infringement.

**a. The Jury Already Determined the Appropriate Ongoing Royalty Rates**

The jury awarded Allergan a reasonable royalty of 15% for Revance's infringement of claim 6 of the '878 patent and 4% for Revance's infringement of claim 8 of the '748 patent. (*See* D.I. 636 at 5.) Importantly, the jury found that these rates are reasonable for both Revance's past

and ongoing infringement. The verdict form asked the jury to determine a royalty rate "through the expiration of the '748 patent" (*i.e.*, the last-to-expire patent-in-suit), and it is only logical to assume the jury did so for all asserted patents. (*Id.*) Revance approved this verdict form. (*See* Trial Tr. at 1194:11-16 (Revance's counsel stating that "we need the royalty rates" for purposes of "considering" "an ongoing royalty").) The Court similarly observed that the verdict form may "establish royalties going into the future" and "provide a basis for motions about whether or not that rate should be adopted for after the final judgment." (*See id.* at 1194:2-1195:5.)

The jury's findings make sense because, throughout trial, both parties asked the jury to find royalty rates that would apply to past and future infringement. For example, Allergan's damages expert, Dr. Christine Siegwarth, presented the jury with a timeline of proposed royalty rates through the expiration of the last patent-in-suit:




(D.I. 641, Ex. G at PDX17-16; Trial Tr. at 601:17-603:2 (Dr. Siegwarth testifying that her proposed royalty rates shown on the above slide extend until the expiration of the '878 and '748 patents); *cf.* Ex. 1 (Siegwarth Decl., ¶ 32 (stating that a license resulting from the post-verdict

hypothetical negotiation would run through expiration of the ’748 patent in 2029))[5].) Revance’s damages expert, Ms. Trexler, likewise relied on the same slide to testify that a royalty should continue until the ’748 patent expires. (*See* Trial Tr. at 1058:16-1059:7 (Ms. Trexler referring to Dr. Siegwarth’s “last slide that stacks her rates” (*i.e.*, the slide shown above) and testifying that “the relevant time period” for a royalty only excludes the period “after the ’748 patent expires in 2029”).) Ms. Trexler also applied the same rates for both past and post-verdict infringement. (*See id.* at 1052:25-1054:24; *see also id.* at 1080:9-17 (Ms. Trexler testifying that the royalty rates she “put forward” to the jury account for “the royalty amount that gets paid up, and that royalty amount is ongoing”).) The record conclusively demonstrates that the jury considered, found, and imposed reasonable royalty rates for both Revance’s past and ongoing infringement.

**b. The Post-Verdict Economic Circumstances Confirm That the Jury-Determined Ongoing Royalty Rates Are Appropriate**

The post-verdict economic circumstances support the jury’s ongoing royalty rates, as reflected in Dr. Siegwarth’s post-verdict *Georgia-Pacific* analysis. *See XY*, 890 F.3d at 1297; *Arctic Cat*, 876 F.3d at 1370. The most relevant *Georgia-Pacific* factors are discussed below, while Dr. Siegwarth addresses all of the factors in her declaration. (*See* Ex. 1 (Siegwarth Decl., ¶¶ 16-56)).

**The Royalties Received by Allergan (*Georgia-Pacific* Factor 1):** The only existing royalty for the two unexpired patents-in-suit is the royalty awarded by the jury in this case: 15% for claim 6 of the ’878 patent, and 4% for claim 8 of the ’748 patent. These rates provide an “established royalty” that the Court may use as a basis to determine the ongoing royalty rates. (*See* Ex. 1 (Siegwarth Decl., ¶ 16-17); *see also* Section III.A.2.a, *supra*.)

---

[5] Direct “Ex.” citations herein refer to the exhibits attached to the supporting Declaration of Karthik R. Kasaraneni, dated September 12, 2025, and filed contemporaneously herewith.

**Allergan Does Not License Its Patents (*Georgia-Pacific* Factor 4):** Allergan does not license its patented botulinum toxin technology to competitors. (*See* Ex. 1 (Siegwarth Decl., ¶ 23).) Indeed, Dr. Siegwarth testified at trial that, at the original hypothetical negotiation, Allergan would be "a very reluctant licensor because they're letting a competitor into the market." (*See* Trial Tr. at 582:8-12, 593:6-10.) Allergan would be even more reluctant to license Daxxify to stay on the market at the post-verdict hypothetical negotiation, by when Daxxify had already established itself as a Botox® competitor. (*See* Ex. 1 (Siegwarth Decl., ¶ 23).) There is no longer anything speculative about the competitive threat. Moreover, and as noted above, Revance's continued infringement will cause ongoing harm to Allergan, further increasing Allergan's relative reluctance to license its patented technology to Revance. Thus, this factor supports awarding an ongoing royalty at least at the jury-determined rates. (*See id.*)

**Post-Verdict Commercial Relationship (*Georgia-Pacific* Factors 3 and 5):** As noted, Botox® and Daxxify compete in the neurotoxin market. (Ex. 1 (Siegwarth Decl., ¶ 26); *see also* Trial Tr. at 1068:19-24.) Indeed, although Allergan would have expected Daxxify to compete with Botox® during the pre-launch hypothetical negotiations, that competition is now a certainty. (*See* Ex. 1 (Siegwarth Decl., ¶ 27).) Further, as Allergan continues to develop its own next-generation long-acting injectable ("LAI") botulinum toxin product, competition between the parties will only intensify, as Allergan's LAI will be forced to compete with Daxxify—an infringing product based on Allergan's own patented inventions. (*See id.*; *see also* Trial Tr. at 237:4-10, 238:21-23; *cf. Douglas Dynamics, LLC v. Buyer Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."). Moreover, Daxxify already has a

significant first-to-market advantage over Allergan's LAI that Revance gained only by infringing Allergan's patents-in-suit. (*See* Ex. 1 (Siegwarth Decl., ¶ 27); Trial Tr. at 523:17-524:2; 537:8-538:14.)

The trial record and the parties' behavior both show that Allergan and Revance still view Botox® and Daxxify as competitors. At trial, Ms. Trexler referred to documents that post-date not just the pre-launch hypothetical negotiations considered by the jury, but also Daxxify's actual September 2022 launch, and show direct competition between Botox® and Daxxify. (Ex. 33 (JTX-211.0002); Ex. 17 (JTX-164.0008); Trial Tr. at 1034:21-1035:2, 1049:17-1052:11; D.I. 640, Ex. B at DDX-10.34-38.) Ms. Joanna Stebbins, Revance's Head of Commercial Marketing Strategy and Insights, confirmed this competition in September 2023, a year after Daxxify's launch. (Trial Tr. at 230:24-231:2 ("Q: And do you personally view AbbVie's BOTOX as the number one competitive threat to DAXXIFY? A: It's one of the competitors in the market that has the largest share. It's a competitor.").) Revance's final Form 10-K, filed on February 28, 2024, before Revance's acquisition by Crown Laboratories, also lists "BOTOX® and BOTOX® Cosmetic" as the first of Revance's "primary competitors for DAXXIFY®." (Ex. 20 (DTX-370.0026-27); Ex. 27 (PTX-987).) Revance also repeatedly states that, "in September 2023, [Revance] introduced new pricing for DAXXIFY®, which priced the product to be more competitive with BOTOX®." (*Id.* at .0013, .0024, .0040.) Thereafter, Revance reported increased sales and revenue, consistent with its expectation that "the new pricing strategy for DAXXIFY®" would "lead to additional product adoption." (*Id.* at .0024, .0040.)

In addition, Botox® is now facing the certainty of additional competition from Daxxify in markets outside the United States. For example, as discussed in more detail below, Revance has contracted with partners to distribute and sell Daxxify in at least China, Australia, and New

Zealand, and since the Trial Verdict, those partners have launched or soon will be launching Daxxify in these markets. (*See* Section III.A.3, *infra*; *see also* Ex. 1 (Siegwarth Decl., ¶ 20-21, 28).) Revance's continued foreign expansion, achieved using Allergan's patented technology to make Daxxify, will only intensify the parties' competition. (Ex. 1 (Siegwarth Decl., ¶ 28).)

Furthermore, concrete market research conducted by both parties after Daxxify's launch shows that roughly 50% of Revance's Daxxify customers switched from, or would have received, Botox®. (Ex. 17 (JTX-164.0008); Ex. 33 (JTX-211.0002); D.I. 349, Ex. 8 (Siegwarth Opening Report), ¶¶ 73-74.) Revance even publicly touted these results to its investors in September 2023, a year after Daxxify launched. (Ex. 15 (PTX-617.0025, -.0027).) This is hardly a surprise, as Revance still to this day targets Botox® customers via its "Break Up with Botox" social media marketing campaign for Daxxify. (Ex. 18 (PTX-661 (citing Ex. 36); Ex. 37 (two screenshots from the bottom-left post of Revance's Instagram campaign in Ex. 36); D.I. 349, Ex. 8 (Siegwarth Opening Report), ¶ 62; *see also* Ex. 38; Ex. 19 (PTX-638.0005-0006 ("[W]e initiated an unbranded breakup of BOTOX campaign, targeting experienced female uses between the age of 25 and 55. The campaign was designed to highlight . . . that existing customers now have a choice to try a new treatment option.")).) The heightened competitive relationship between the parties further supports maintaining the jury's ongoing royalty rates. (Ex. 1 (Siegwarth Decl., ¶¶ 26-29).)

**<u>The Established Profitability of Daxxify (*Georgia-Pacific* Factor 8):</u>** Revance has generated more than [redacted] in Daxxify sales even before Trial Verdict. (Ex. 1 (Siegwarth Decl., ¶¶ 35-36).) And Revance continues to add indications for Daxxify, including for cervical dystonia in May 2024. (*Id.*) Indeed, in September 2023, Revance publicly referred to Daxxify as the "[m]ost successful neuromodulator launch since Botox Cosmetic." (Ex. 15 (PTX-

617.0026); *see* Ex. 1 (Siegwarth Decl., ¶ 36).) Accordingly, this factor supports adopting at least the jury's ongoing royalty rates. (Ex. 1 (Siegwarth Decl., ¶ 35-38).)

**Importance and Value of Allergan's Inventions (*Georgia-Pacific* Factors 9 and 10):** There would be no Daxxify without Allergan's patented technology. (*See* Trial Tr. at 711:24-712:9 ("[W]e can't have those kind of proteins in our formulation, so we had to eliminate those and not rely on animal proteins, any proteins really, except for the neurotoxin.").) That remains true today. If anything, the value of Allergan's inventions to Revance is even greater now than at the pre-launch hypothetical negotiations, which explains why Revance used Allergan's technology in the first place and did not stop infringing after Allergan sued, after Revance stipulated to infringement, or even after the jury verdict. In short, the technology is so important to Daxxify that Revance continues to voluntarily infringe to this day.

Starting with the '878 patent, Revance would have viewed Daxxify's longer duration as its essential differentiator in the crowded neurotoxin market at the October 2021 hypothetical negotiation. (Trial Tr. at 537:18-538:14] (Dr. Siegwarth testifying that, in a crowded market like this one, "[y]ou want to have your own differentiation" to succeed, and that "differentiation . . . is long duration. . . . And it's this patent that would get the long duration, the '878 patent."). Trial testimony also confirmed that Daxxify's longer duration has retained significant value for Revance since Daxxify's September 2022 launch. For example, at his October 18, 2023 deposition, Mr. Bryan Bullock, Revance's Senior Director of Marketing for Aesthetics, explained how Revance still uses duration to differentiate Daxxify from its competition, including when publicly discussing the product with investors. (*See* Trial Tr. at 217:20-218:1; *see also* Trial Tr. at 538:15-539:2; 219:18-220:19; 223:4-12 ("We lead with duration."); D.I. 641, Ex. G at PDX17-10; Ex. 15 (PTX-617.0021, -.0025).) Revance also continued to praise

Daxxify's longer duration at trial. (*See, e.g.*, Trial Tr. at 1265:9-16 (Revance's counsel stating that "DAXXIFY comes on [the market] and has advantages" over Botox®, such as "[l]onger duration, it's important").)

Both parties' post-launch market research data emphasizes duration's continued importance. According to actual Daxxify prescribers, Daxxify's duration attribute contributes approximately 17 to 23 percent of its overall value. (Trial Tr. at 1049:17-1052:11; D.I. 640, Ex. B at DDX-10.35, 10.38; Ex. 33 (JTX-211.0005); Ex. 17 (JTX-164.0024); *see also* Trial Tr. at 19-590:15; Ex. 34 (PTX-596.0024)). The jury no doubt considered this duration testimony when it selected an ongoing royalty rate that would compensate Allergan for Revance's continued infringement of the '878 patent. Indeed, to this day, Revance's marketing materials still differentiate Daxxify by focusing on duration: "But here's the thing: conventional treatments only last 3-4 months. . . . In clinical trials, at least 50% of [Daxxify] patients showed results in frown lines at 6 months." (Ex. 32 at 7.) Moreover, by siding with Allergan, the jury implicitly found that Daxxify's duration is driven (at least mostly) by the '878 patent's invention. (*See* D.I. 639.) And by awarding Allergan a royalty for the '878 patent, the jury determined how to value that duration feature. (*Id.*) That value remains today. (*See* Ex. 1 (Siegwarth Decl., ¶¶ 40-41).)

Turning to the '748 patent, Allergan's patented animal-product-free ("APF") manufacturing method was likewise extremely valuable to Revance at the June 2019 hypothetical negotiation and remains so today. Indeed, Revance still has no choice but to infringe the '748 patent. Trial testimony confirms that not only has Revance never designed around Allergan's patents-in-suit (Trial Tr. at 1072:17-1073:13), but it cannot viably do so. For example, as noted above, Dr. Ruegg told the jury that Revance's peptide is incompatible with animal proteins. (*See* Trial Tr. at 711:24-712:9.) And Mr. Bullock's October 2023 deposition

was similarly revealing. As with duration, he explained that Revance has continued to publicly promote Daxxify as an APF product (*i.e.*, lacking human serum albumin, or HSA) to both prescribers and investors since Daxxify's launch. (Trial Tr. at 218:2-6; 223:4-12; *see id*. at 218:19-219:14; 219:18-220:11; 220:20-221:7; Ex. 15 (PTX-617.0022, -.0025).)

This aligns with the June 30, 2023 post-launch survey data Ms. Trexler presented at trial, which shows that actual Daxxify prescribers continue to value its APF attribute at about 8% of Daxxify's overall value. (*See* Trial Tr. at 1049:17-1052:11; D.I. 640, Ex. B at DDX-10.38; Ex. 17 (JTX-164.0024); *see also* Trial Tr. at 583:19-590:15; Ex. 34 (PTX-596.0024)). The jury's ongoing royalty rate for the '748 patent reflects this testimony. Even now, Revance's website continues to advertise that "DAXXIFY® is unique because it . . . does not contain human or animal byproducts." (Ex. 32 at 3.) This APF attribute remains important to Revance to this day. (*See* Ex. 1 (Siegwarth Decl., ¶¶ 40-41).) This factor also supports awarding an ongoing royalty at the jury-determined rates. (*See id.*)

**<u>No Viable Noninfringing Alternatives (*Georgia-Pacific* Factor 11):</u>** Revance would expect that any attempted design-around now, years after Daxxify's launch, would cost it substantially more than it would have expected to spend on such efforts at the pre-launch hypothetical negotiations. (*See* Ex. 1 (Siegwarth Decl., ¶ 43).) Revance has already sold [redacted] of dollars of Daxxify and sells well over [redacted] more each year. (*Id.*) Pulling Daxxify from the market to attempt to design around Allergan's patents would risk this established revenue stream and its associated profits. (*Id.*) Indeed, there is no certainty that Revance *could* successfully design around the '748 patent, and Revance has never suggested that a noninfringing alternative with the same attributes as the formulation of the '878 patent even exists. (Ex. 1 (Siegwarth Decl., ¶¶ 43, 46).) It would make no economic sense for Revance to

pull Daxxify off the market to try to design around Allergan' patents instead of paying the jury's ongoing royalty rates—particularly when those rates are lower than the relative values of the duration and APF attributes suggested by both parties' post-launch market research. (*See Georgia-Pacific* Factors 9-10, *supra*; (Ex. 1 (Siegwarth Decl., ¶¶ 43-46). For example, even a one-year absence until the'878 patent expires in 2026 would likely cost Revance more than the [redacted] in Daxxify sales it earned in the last 12 months. (Ex. 1 (Siegwarth Decl., ¶¶ 43); *id.*, ¶ 36 (noting Daxxify's [redacted] year-over-year growth).) And it is also by no means certain that a reformulated, noninfringing Daxxify would win back Revance's existing customers, who are familiar with the now nearly three-year-old product. (*Id.*, ¶ 43.)

Thus, if anything, Allergan's patents-in-suit are even more valuable to Revance today than they were in 2019, because Revance still has no economically acceptable alternative to Allergan's technology that would allow it to maintain, let alone grow, Daxxify's present revenue. (*Id.*) Accordingly, this factor also supports an ongoing royalty at least at the jury-awarded rates.

**The Overall Hypothetical Negotiation (*Georgia-Pacific* Factor 15):** The parties' relative bargaining positions at the post-verdict hypothetical negotiation support an ongoing royalty at least at the jury-determined rates. The jury's verdict itself "amounts to a 'substantial shift in the bargaining position of the parties.'" *XY*, 890 F.3d at 1297. Revance is now an adjudged infringer, bolstering Allergan's position. *See id.*[6] This "improved bargaining

---

[6] Allergan acknowledges that this Court has questioned whether a prevailing patentee would be in a stronger bargaining position by virtue of a jury's verdict. *See Vectura*, 2019 WL 4346502, at *7 n.10. But there is a "fundamental difference" between a hypothetical assumption and a real-world jury finding, with the Court's imprimatur, that a patent claim is, in fact, valid and infringed. *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008); *see Bos. Sci. Corp. v. Johnson & Johnson*, No. C 02-00790 SI, 2009 WL 975424, at *3-5 (N.D. Cal. Apr. 9, 2009) (a prevailing patentee has a stronger bargaining position because "[w]e must assume that the jury's finding means something"). In any event, as explained herein, the other post-verdict economic circumstances justify at least an ongoing royalty at the jury-determined rates.

position," *XY*, 890 F.3d at 1298, Daxxify's status as an established Botox® competitor with over [redacted] in sales, and Revance's continued expansion in the United States and abroad would only increase Allergan's relative reluctance to license in the post-verdict hypothetical negotiation. (Ex. 1 (Siegwarth Decl., ¶ 55).) By contrast, Revance would be a highly motivated licensee because designing around the '748 and '878 patents, even if possible, would put Revance's established Daxxify revenue stream at risk and be substantially more costly to it than paying an ongoing royalty at the jury-determined rates. (*Id.*) This balance of bargaining positions justifies at least maintaining the jury-determined ongoing royalty rates. (*See id.*, ¶ 56.)

**c. Revance's Willful Continuing Infringement Supports the Jury-Determined Ongoing Royalty Rates**

To the extent Revance argues that rates lower than those awarded by the jury should be adopted going forward, Revance's willful, post-verdict infringement justifies enhancing the ongoing royalty pursuant to 35 U.S.C. § 284 at least to return it to the jury-determined rates.[7] The Court has discretion to enhance post-verdict damages where a defendant acts "'egregious[ly] in continuing, and even increasing, sales in the face of an infringement verdict." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) (affirming an enhancement of damages based on "willful infringement for *post-verdict* sales"); *cf. Vectura*, 2019 WL 4346502, at *8 (refusing to enhance an ongoing royalty rate where, unlike here, "the plaintiff is a non-competitor who benefits from the defendant's ongoing infringement"). "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of

[7] Indeed, some post-verdict circumstances and several of the post-verdict *Georga-Pacific* factors support even higher royalty rates. *See* Section III.A.2.b, *supra*. But Allergan seeks only an ongoing royalty at the rates the jury already adopted for Revance's continuing infringement.

the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992) (establishing non-exclusive factors to guide the analysis).

Here, several *Read* factors support enhancing any Court-lowered ongoing royalty to at least the same level as the jury-determined rates. For example, in view of Revance's stipulation of infringement and the jury's finding of no invalidity, Revance cannot have a good-faith belief that the '748 and '878 patents are invalid or not infringed (factor 2), and the case cannot be close (factor 5). Revance's (and its new parent company, Crown Laboratories') size and financial condition demonstrate that "[a]n enhanced damages award will not jeopardize [their] financial well-being" (factor 4). *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 528 (D. Del. 2008); *cf.* (Ex. 20 (DTX-370.0013 (Revance's last 10-K stating that "[f]or the year ended December 31, 2023, [Revance] generated $224.9 million in revenue")); Ex. 39 at 2 (quoting Crown's CEO, Jeff Bedard, who stated that Crown's revenue in 2022 was "close to $400 million"). Revance also has infringed for years, despite Allergan's lawsuit and now the jury's verdict (factor 6), and without taking any remedial action to avoid infringement (factor 7). Accordingly, should the Court consider departing downward from the royalty rates adopted by the jury, these *Read* factors support an upward adjustment to an ongoing royalty at least at the jury-determined rates to compensate Allergan for Revance's ongoing willful infringement.

### 3. The Ongoing Royalty Should Cover Sales of U.S.-Made Daxxify to Revance's Foreign Partners

For avoidance of doubt, the ongoing royalty should include any Revance revenue associated with infringing Daxxify sales to Revance's foreign partners, such as, for example, Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. ("Fosun") and Teoxane SA ("Teoxane"). This would include Revance's transfer sales of Daxxify to its foreign partners,

Revance's royalties based on those partners' Daxxify sales, and Revance's sales-related milestones on those partners' Daxxify sales.

Revance has entered supply and distribution agreements with companies like Fosun and Teoxane to distribute and sell Daxxify in other countries, including China, Australia, and New Zealand. (*See, e.g.*, Ex. 4 (PTX-767.0207-.0273) ("Revance-Fosun License Agreement"); Ex. 8 ("Revance-Teoxane Distribution Agreement").) Allergan understands that Revance is the [redacted]. That manufacture and sale indisputably infringes the patents-in-suit.[8]

For example, the Revance-Fosun License Agreement states that Revance did not provide to Fosun "the right to manufacture or have manufactured the Product" (*i.e.*, Daxxify). (Ex. 4, § 2.01(a).) Instead, Daxxify for Fosun will be "manufactured and supplied by" Revance. (Ex. 4 (PTX-767.0214, 0216), §§ 1.52, 1.61.) Similarly, the Revance-Teoxane Distribution Agreement states that "Revance will Manufacture and supply to Teoxane" the Daxxify product and "Revance shall be solely responsible for the Manufacture and storage of all [Daxxify] Products and Product Samples until delivery thereof." (Ex. 8 at 15, § 5.01.) Revance also continues to prominently state that Daxxify is manufactured in the United States. (*E.g.*, Ex. 32 at 4.)

Allergan understands that only [redacted] Further, Daxxify has not yet launched in China (*see* Ex. 22 at 2), and as such, Revance is yet to receive any follow-on royalties or sales-related milestone payments based on

8 Revance appears to agree, because it included some such sales in its supplemental, post-verdict sales data production

[redacted] (Ex. 1 (Siegwarth Decl., ¶¶ 21, 28 & nn.25-26); Ex. 4 (PTX-767.0219, .0230-35), §§ 1.93, 5.01, 6.01-6.04.).). Similarly, Daxxify did not launch in Australia before the July 24, 2025 supplemental damages cutoff (*see, e.g.*, Ex. 23), and, as such, is yet to receive [redacted]. (Ex. 1 (Siegwarth Decl., ¶¶ 21, 28 & nn.25-26); Ex. 8 at 10 ("Transfer Price"), 19 (§ 7.02), 21 (§ 7.04).)

But once Revance begins making this additional revenue from its Daxxify sales to its foreign partners, that revenue should be subject to the ongoing royalty, at least because the sold Daxxify products will be manufactured in the United States. Moreover, Allergan understands [redacted]. For example, Revance's agreements with Fosun and Teoxane state that Revance will deliver the Daxxify product pursuant to FCA Incoterms 2010 and "Ex Works Revance's premises" Incoterms 2020, respectively. (Ex. 4 (PTX-767.0231), § 5.01(d); Ex. 8 at 16, § 5.04(a);[9] *cf. Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1369-71 (Fed. Cir. 2008) (holding that an infringing sale occurred in the United States because "the location of a 'sale' under section 271(a) is not necessarily where legal title passes").) Thus, Revance's transfer sales to its partners are and will be infringing, and they, together with related royalty, price-supplement, and milestone payments, must be subject to the awarded ongoing royalty.

[9] "FCA" and "Ex-Works" (or "EXW") are international commercial terms ('incoterms') defined by the International Chamber of Commerce. Both define where delivery of the purchased goods is complete and both typically require the seller to deliver the goods in the seller's country, here, the United States. Indeed, delivery pursuant to EXW incoterm typically occurs at the seller's premises. *See US Iron FLA, LLC v. GMA Garnett (USA) Corp.*, 660 F. Supp. 3d 1212, 1217 n.5 (N.D. Fla. 2023); *Armadillo Glass, Inc. v. Emmegi U.S.A., Inc.*, No. CIV.A.H-09-362, 2010 WL 1435159, at *1 (S.D. Tex. Apr. 7, 2010). According to the Revance-Teoxane Distribution Agreement, Revance is located in Nashville, TN. (Ex. 8 at 1.)

#### 4. The Ongoing Royalty Should Cover Revance Successors-in-Interest

In addition, any ongoing royalty should extend to any Revance successors-in-interest. *See Mondis Tech. Ltd. v. Chimei Innolux Corp.*, No. 2:11-CV-378-JRG, 2012 WL 1554645, at *6-*7 (E.D. Tex. Apr. 30, 2012) (extending an ongoing royalty to defendant's successors and assigns because to do otherwise "would in practice make [the ongoing royalty] a nullity"); 4 Robert A. Matthews, Jr, .Annotated Patent Digest § 30:90.80 (Aug. 2025 Update) (explaining that a court may use its equitable power to bind a successor-in-interest to an ongoing royalty obligation "[t]o avoid an easy way for nullifying [that ongoing] royalty obligation").

### B. The Court Should Award Allergan Supplemental Damages

Allergan should be awarded supplemental damages for infringing sales that occurred through July 24, 2025 (the date of the Trial Verdict (D.I. 639)), but were not presented to the jury. "When the damages are not found by a jury, the court shall assess them." 35 U.S.C. § 284; *see also Finjan*, 626 F.3d at 1212-13 (explaining that a patentee should be fully compensated). "The amount of supplemental damages following a jury verdict 'is a matter committed to the sound discretion of the district court.'" *SynQor*, 709 F.3d at 1384. "Typically, supplemental damages are calculated based on the jury's damages verdict." *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, 2017 WL 4004419, at *7 (D. Del. Sept. 12, 2017).

Here, the jury's verdict compensated Allergan only for Revance's infringing sales that Revance produced in time to be included in the parties' pre-trial expert reports. This sales data was incomplete in two respects, preventing Allergan from presenting to the jury a complete accounting of damages for Revance's infringement through the July 24, 2025 Trial Verdict.

*First*, by its very nature, the timing of Revance's production prevented Allergan from presenting any damages to the jury based on any Daxxify sales that occurred after May 31, 2025. (*See* Trial Tr. at 590:19-591:9 (Dr. Siegwarth testifying that she only received Daxxify sales data

"through May 31, 2025," and those sales formed the "royalty base in [her] analysis").) An award of supplemental damages is necessary to fully compensate Allergan for Revance's infringing Daxxify sales that occurred from June 1, 2025, through July 24, 2025.

*Second*, Revance did not produce complete data for its sales of Daxxify for therapeutic use in time for that data to be included in Dr. Siegwarth's expert report or presented to the jury. At trial, Dr. Siegwarth confirmed that damages should compensate Allergan for "both the cosmetic and therapeutic sales" of Daxxify. (*See* Trial Tr. at 515:3-21.) But Revance did not timely produce all Daxxify therapeutic sales through May 31, 2025, despite agreeing to do so in the lead-up to trial. (Ex. 40 at 3 (June 13, 2025 Email from S. Rao to K. Kasaraneni).) Instead, on June 16, 2025, Revance produced only therapeutic sales data from October 1, 2024, through May 31, 2025, even though Daxxify had been approved for therapeutic use since August 2023. (DTX-370.0018.) Dr. Siegwarth noted this May-to-October 2024 gap in her pre-trial supplemental report, produced June 19, 2025, per the parties' agreement. (D.I. 574, Ex. 8 (Siegwarth Second Supplemental Report), ¶ 6.)

Four days later, on June 23, 2025, Revance unilaterally produced additional data for therapeutic Daxxify sales that occurred before October 1, 2024. (PTX-986 at Tab "THX Life to Date".)[10] This production was untimely, however, because it occurred after Dr. Siegwarth had already submitted her final supplemental report on June 19, 2025, as agreed (and when Revance knew that Dr. Siegwarth would be unavailable to review the additional data). (Ex. 40 at 2-6 (June 10-16, 2025 Emails between K. Kasaraneni and S. Rao).) Revance itself did not include those belatedly produced therapeutic sales in Ms. Trexler's final supplemental report, which it

---

[10] Raw Daxxify sales data, including JTX-178, PTX-849, PTX-850, PTX-985, PTX-986, and REV_DAX-03348499, can be provided to the Court as native Excel files upon request.

served a few hours later. (*Compare* D.I. 574, Ex. 9 (Trexler Second Supplemental Report) ($273,433,220 in Daxxify sales), *with* D.I. 574, Ex. 8 (Siegwarth Second Supplemental Report) ($273,433,220 in Daxxify sales).) Allergan was thus unable to present the jury with a complete accounting of potential damages related to infringing sales of Daxxify for therapeutic use before October 1, 2024, nor did Revance attempt to do so.

Accordingly, Allergan respectfully asks the Court to award supplemental damages on all infringing Daxxify sales through July 24, 2025, that were not presented to the jury. Based on updated Daxxify revenue data produced by Revance on September 3, 2025, and the jury's $56 million past-damages award, these supplemental damages total [redacted], including [redacted] on all sales from June 1, 2025, through July 24, 2025, and [redacted] on all therapeutic sales before October 1, 2024. (Ex. 1 (Siegwarth Decl., ¶¶ 4-6).)[11]

### C. The Court Should Award Prejudgment Interest at the Prime Rate, Compounded Quarterly

"[P]rejudgment interest should be awarded under [35 U.S.C.] § 284 absent some justification for withholding such an award." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1313 (Fed. Cir. 2017) (quoting *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983)) (cleaned up); *accord Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-RGA, 2022 WL 3973499, at *4 (D. Del. Aug. 31, 2022); *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-CV-1122-RGA, 2019 WL 4016235, at *7 (D. Del. Aug. 26, 2019), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021). "The purpose of prejudgment

[11] In addition, Allergan is entitled to supplemental damages based on any revenue related to Revance's transfer sales of Daxxify to Revance's foreign partners, including any Daxxify royalty, price-supplement, and sales-related milestone payments from such partners, through July 24, 2025. *See* Section III.A.3, *supra*. Allergan reserves the right to seek an accounting to the extent necessary to account for all infringing Daxxify sales, including such revenue. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1380 (Fed. Cir. 2013).

interest is to place the patentee in as good a position as he would have been had the infringer paid a reasonable royalty rather than infringe." *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1094 (Fed. Cir. 2014); *accord Gen. Motors Corp.*, 461 U.S. at 655. The type of patent damages award is immaterial; the purpose of awarding prejudgment interest remains "to make the patent owner whole." *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556 (Fed. Cir. 1984). As such, prejudgment interest applies not only to the jury award, but also to compensatory supplemental damages. *See Sunoco*, 2022 WL 3973499, at *5 n.7 (citing *Hologic, Inc. v. Minerva Surgical, Inc.*, 957 F.3d 1256, 1274 (Fed. Cir. 2020), *vacated on other grounds*, 594 U.S. 559 (2021)). Similarly, in view of its compensatory purpose, prejudgment interest begins to accrue "from the earliest date of infringement." *Comcast*, 850 F.3d at 1315; *see Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020).

The interest rate and whether it should be compounded "are matters left largely to the discretion of the district court," *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986), and this Court has previously explained that "the prime rate, compounded quarterly, best compensates a patentee," *Sunoco* 2022 WL 3973499, at *4; *see Bayer*, 2019 WL 4016235, at *7 & n.9 (explaining that "the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is a better measure of the harm suffered as a result of the loss of the use of money over time" and collecting cases) (cleaned up). This is so even if there is no evidence that the patent holder borrowed at the prime rate. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). Moreover "[i]t has been recognized that an award of compound rather than simple interest assures that the patent owner is fully compensated." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) (en banc) (cleaned up). If there

are any doubts as to the amount of prejudgment interest, they "must be resolved against the infringer." *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 274 (Fed. Cir. 1988).

Allergan respectfully requests prejudgment interest at the prime rate, compounded quarterly, on the jury's damages award of $56 million for Revance's infringing Daxxify sales from December 1, 2022, through May 31, 2025, which amounts to [redacted]. (Ex. 1 (Siegwarth Decl., ¶ 7).) Allergan further requests prejudgment interest at the prime rate, compounded quarterly, on supplemental damages for infringing Daxxify sales from June 1, 2025, through July 24, 2025, and infringing Daxxify therapeutic sales before October 1, 2024 (*see* Section III.B, *supra*), which amount to [redacted] and [redacted], respectively, for a total of [redacted] in prejudgment interest. (Ex. 1 (Siegwarth Decl., ¶ 7 & n.12; *id.*, Exhibits 2A-2C).)

**D. Allergan Is Entitled to Post-Judgment Interest at the Statutory Rate**

Allergan is statutorily entitled to post-judgment interest. *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."). "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990). The "calendar week preceding" refers to the "week that is over before the day of the date of the judgment," *E.I. DuPont*, 2017 WL 4004419, at *8, meaning "the last complete Sunday-to-Saturday period before the relevant date," *ChromaDex, Inc. v. Elysium Health, Inc.*, No. 8:16-CV-02277-FWS-DFM, 2024 WL 4804998, at *5 (C.D. Cal. Oct. 8, 2024). Post-judgment interest accrues on all prejudgment damages, including the jury's award, all supplemental damages, and prejudgment interest on each of the foregoing. *See Sun Ship Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986).

The Court entered judgment on the jury verdict on Thursday, July 24, 2025 (D.I. 639), which is also the transition date between pre- and post-judgment interest (D.I. 644, ¶ 8). The "calendar week preceding" is the week ending Saturday, July 19, 2025. Thus, Allergan should be awarded post-judgment interest at an annual rate of 4.09% on the jury's $56 million damages award, all supplemental damages, and prejudgment interest. The post-judgment interest should accrue from July 25, 2025, through the date Revance pays Allergan the damages owed.

## IV. CONCLUSION

Allergan respectfully requests that the Court award Allergan an ongoing royalty, paid quarterly, at the rate of 15% for the '878 patent and 4% for the '748 patent, which the jury determined is proper compensation for Revance's continued infringement (i.e., 19% from July 25, 2025, through the September 21, 2026 expiration of the '878 patent, followed by 4% from September 22, 2026, through the July 13, 2029 expiration of the '748 patent). Allergan also respectfully requests that the Court order Revance to provide Allergan timely quarterly royalty reports, including an accounting of all Daxxify sales. Allergan also respectfully requests that the Court award supplemental damages for all Daxxify sales through July 24, 2025, prejudgment interest of [redacted] on all damages awarded through that date, and post-judgment interest of 4.09%, compounded annually.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Of Counsel*:

Eric W. Dittmann
Melanie R. Rupert
Isaac S. Ashkenazi
Krystina L. Ho, Ph.D.
Carl J. Minniti III
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
(312) 499-6000

Karthik R. Kasaraneni
Vladimir J. Semendyai
David M. Valente
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

*Attorneys for Plaintiff Allergan, Inc.*

Dated: September 12, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on September 12, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire *VIA ELECTRONIC MAIL*
Samantha G. Wilson, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

Dennies Varughese, Pharm. D. *VIA ELECTRONIC MAIL*
Eldora L. Ellison, Ph.D.
Adam C. LaRock, Esquire
Olga A. Partington, Ph.D.
Ryan E. Conkin, Esquire
Anna G. Phillips, Esquire
Sasha S. Rao, Esquire
Marsha Rose Gillentine, Ph.D.
Nirav N. Desai, Esquire
Christopher M. Gallo, Ph.D.
Tyler C. Liu, Esquire
Adil B. Moghal, Ph.D.
Louis P. Panzica, Jr., Esquire
Byron L. Pickard, Esquire
Deirdre M. Wells, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC 20005
*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

Peter J. Armenio, Esquire
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
*Attorneys for Defendants Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. d/b/a Ajinomoto Bio-Pharma Services*

*VIA ELECTRONIC MAIL*

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)