# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Revance Therapeutics, Inc. and<br>PCI San Diego, Inc.,<br><br>*Defendants*. | Civil Action No. 21-1411-RGA |

**DECLARATION OF CHRISTINE SIEGWARTH, PH.D. IN SUPPORT OF ALLERGAN'S MOTION FOR SUPPLEMENTAL DAMAGES, PREJUDGMENT AND POST-JUDGMENT INTEREST, AND ONGOING ROYALTY**

[redacted]

I, Christine Siegwarth, declare as follows:

1. I submitted expert reports in this matter on December 15, 2023, March 8, 2024, April 19, 2024, November 4, 2024, and June 19, 2025, on behalf of Allergan, Inc. ("Allergan"), Allergan Pharmaceuticals Ireland Unlimited Company, and Allergan USA, Inc.[1] I also testified at trial in this litigation as an expert in the field of economics and patent damages.[2] My qualifications and the terms of my retention were described in my trial testimony and submitted expert reports and are incorporated here by reference.[3]

2. I understand that on July 18, 2025, the jury decided that Allergan had proved by a preponderance of evidence that it was entitled to: (1) a royalty rate of 15 percent of Daxxify net sales for infringement of claim 6 of U.S. Patent No. 11,147,878 ("the '878 Patent") through the expiration of the '878 Patent; (2) a royalty rate of 12 percent of Daxxify net sales for infringement of claim 8 of U.S. Patent No. 7,354,740 ("the '740 Patent") and claim 8 of U.S. Patent No. 11,203,748 ("the '748 Patent") until the September 25, 2023 expiration of the '740 Patent; and (3) a royalty rate of 4 percent of Daxxify net sales for infringement of claim 8 of the '748 Patent from September 25, 2023 through the expiration of the '748 Patent.[4] I further understand that the jury determined that Allergan had proved by a preponderance of evidence that it was entitled to total reasonable royalty damages in the amount of $56,000,000 through May 31, 2025.[5] I also understand that the Court entered its judgment in favor of Allergan on July 24, 2025, affirming the verdict reached by the jury.[6]

3. I have been asked by counsel for Allergan to provide calculations of (a) supplemental

---

[1] I understand that, following my submission of these expert reports, the Court dismissed Allergan Pharmaceuticals Ireland Unlimited Company and Allergan USA, Inc. from the case, leaving only plaintiff Allergan.

[2] Transcript of Jury Trial, *Allergen, Inc., vs. Revance Therapeutics, Inc., et al.,* United States District Court for the District of Delaware, Case No. 24-CV-1411-RGA, August 5, 2025 proofread transcript ("Trial Tr."), July 15, 2025, 508:15-19.

[3] I have recently retired from NERA Economic Consulting. I am being compensated by AbbVie for the time I spend on this matter. In addition, NERA is being compensated for the time its employees spend to assist me with my work on this matter. Neither my compensation nor NERA's is dependent on the outcome of this litigation or the nature of my opinions.

[4] D.I. 636, p. 5.

[5] D.I. 636, p. 5.

[6] D.I. 639.



[redacted]

damages due for the period from June 1, 2025 through July 24, 2025 (*i.e.*, the date of judgment on the jury verdict); (b) prejudgment interest on the total damages through July 24, 2025; and (c) the appropriate post-judgment interest. I have also been asked by counsel for Allergan to provide an analysis of the economic circumstances at an approximately July 24, 2025 post-verdict hypothetical negotiation date, as compared to the pre-verdict hypothetical negotiation dates of June 2019 and October 2021 considered by the jury, to determine the appropriate ongoing royalty rate for Revance's continued infringement of the '878 Patent and the '748 Patent.[7]

## I. Supplemental Damages

4. The jury was presented during trial with a total sales amount of about $273 million for infringing Daxxify sales that Revance made in the United States from December 1, 2022 through May 31, 2025.[8] Because information on Daxxify sales in the United States from June 1, 2025 through July 24, 2025, was not available to be presented to the jury during trial, the jury's verdict did not include damages on these additional infringing sales. I understand that Revance subsequently provided this data on September 3, 2025.[9] I have been asked by counsel for Allergan to provide a calculation of supplemental damages based on Daxxify sales from June 1, 2025 through July 24, 2025. Revance generated [redacted] in Daxxify sales from June 1, 2025 through July 24, 2025. Applying the jury's royalty rates to these sales results in [redacted] in additional damages (*see* **Exhibit 1** to this declaration).

5. Likewise, I understand that on June 23, 2025, Revance provided Allergan with supplementary data on infringing Daxxify sales made by Revance for therapeutic use

---

7 D.I. 632 p. 17.

8 Trial Tr., July 16, 2025, 590:19-591:6; 593:11-595:14; Trial Tr., July 17, 2025, 1054:14-24. In the Siegwarth Second Supplemental Report, I calculated total Daxxify sales of $273,433,220 from December 1, 2022 through May 31, 2025 (*see* Expert Report of Christine Siegwarth, Ph.D., June 19, 2025 ("Siegwarth Second Supplemental Report"), Exhibit 26B). *See* D.I. 574, Exhibit 8. Ms. Trexler similarly calculated total Daxxify sales of $273,433,220 during the same period (*see* Second Supplemental Rebuttal Expert Report of Dana Trexler, CPA/CFF, June 23, 2025 ("Trexler Second Supplemental Report"), Second Supplemental Exhibit 3.0). *See* D.I. 574, Exhibit 9.

9 REV_DAX-03348499.



[redacted]

from October 2, 2023 through June 4, 2025.[10] These additional sales data were not available to me when I submitted my most recent report on June 19, 2025. The belatedly produced supplemental data on Daxxify sales for therapeutic use total [redacted] (*i.e.*, the additional Daxxify sales produced by Revance after removing potentially duplicative transactions in the belatedly produced supplemental data on Daxxify sales for therapeutic use). Applying the jury's royalty rates to these additional sales results in [redacted] in additional damages (*see* **Exhibit 1** to this declaration).

6. Adding these two sources of additional Daxxify sales to the $273,433,220 in infringing Daxxify sales I previously considered and presented to the jury, I have calculated total Daxxify sales of [redacted] from December 1, 2022 through July 24, 2025. Applying the jury's royalty rates to these sales results in supplemental damages of [redacted] (*see* **Exhibit 1** to this declaration).[11] Adding these supplemental damages to the jury's award of $56,000,000 results in total prejudgment damages of [redacted] through July 24, 2025.

## II. Prejudgment Interest

7. I have also been asked to provide a calculation of the prejudgment interest at the U.S. prime rate, compounded quarterly, on the total prejudgment damages (including the jury's verdict and the supplemental damages noted in **Section I** above) from December 1, 2022 through July 24, 2025.[12] Applying these prime rates to the total damages,

---

[10] PTX-986 (REV_DAX-03348498). These supplemental data contain many completed transactions which are potentially duplicative of observations included in data previously produced in this matter. When the same combination of "CC Order: Name" and "Order Date" appeared in multiple files, I exclude the potentially duplicative observation from the most recently produced file. Additionally, the supplemental data contain one transaction (where the "CC Order: Name" field is equal to "O-0000107035") for which the "Order Status" changed from "Completed" in PTX-986 to "Returned" in REV_DAX-03348499. I exclude this transaction and any potentially duplicative transactions from my damages calculations (*i.e.*, I include only incremental therapeutic sales of [redacted] from November 29, 2023 through September 30, 2024. *See* **Exhibit 1** to this declaration).

[11] [redacted]

[12] "Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)*, retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed on September 5, 2025. When applying the royalty rates deemed appropriate by the jury to actual Daxxify sales addressed in my Second Supplemental Report from December 2022 through May 2025, total reasonable royalty damages amount to [redacted] Accordingly, I adjust the royalty payment in each quarter by an amount proportional to the sales in a given quarter to reflect the jury's damages award of $56,000,000.



[redacted]

compounding quarterly, results in prejudgment interest of [redacted] through July 24, 2025 (*see* **Exhibit 2** to this declaration).[13]

## III. Post-Judgment Interest

8. I have also been asked to calculate the post-judgment interest that Allergan will be owed if it is awarded by the Court. I understand that post-judgment interest is calculated from the date of the judgment, at a rate equal to the weekly average one-year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment.[14] I also understand that the post-judgment interest shall be computed daily to the date of payment, unless certain statutory exceptions are met, and that the interest is compounded annually.[15]

9. Since judgment in this case was entered on July 24, 2025, the applicable post-judgment interest rate for the preceding week that ends on July 19, 2025 is 4.09 percent (*see* **Exhibit 3** to this declaration). If the Court awards Allergan post-judgment interest, Allergan is entitled to such interest at a rate of 4.09 percent, compounded annually, on the total unpaid damages, including the jury verdict, supplemental damages, prejudgment interest, and ongoing royalties. The post-judgment interest would accrue from July 25, 2025 through the date that Revance pays Allergan the damages owed.

## IV. Ongoing Reasonable Royalty

10. In determining an ongoing royalty, I understand that the Court may consider: (a) the change in bargaining position between the parties, and the resulting change in economic circumstances, resulting from the determination of liability; (b) any changed economic circumstances, such as changes related to the market for the patented products; and (c)

---

[13] **Exhibits 2A-2C** to this declaration present supplementary prejudgment interest calculations specific to: (1) the jury's $56,000,000 damages verdict (*see* **Exhibit 2A**); (2) the belatedly produced therapeutic sales (*see* **Exhibit 2B**); and (3) the additional Daxxify sales that Revance generated from June 1, 2025 through July 24, 2025 (*see* **Exhibit 2C**). The prejudgment interest amounts presented in **Exhibits 2A-2C** necessarily sum to the total prejudgment presented in **Exhibit 2** (subject to rounding) and can thus be considered independently or in any combination as needed.

[14] 28 U.S.C. § 1961(a).

[15] 28 U.S.C. § 1961(b).



[redacted]

any other post-verdict factors affecting a post-judgment hypothetical negotiation, as determined through a modified, post-verdict *Georgia-Pacific* analysis. I understand that the circumstances and factors that courts have considered for a post-judgment hypothetical negotiation include additional expert opinions based on, *e.g.*, changed market realities, the scope of the contemplated license, the commercial relationship between the parties, any reluctance of the patentee to license to a competitor, the commercial success of the infringing product, the nature, utility, and advantages of the patented invention, the extent of the infringer's use of the invention, and the availability of non-infringing alternatives. Below, I undertake this post-verdict *Georgia-Pacific* analysis, which reflects the post-judgment economic circumstances between the parties and supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

## A. The Date of the Post-Judgment Hypothetical Negotiation

11. I presented my damages opinions to the jury during trial assuming a hypothetical negotiation date of June 2019 for the '740 Patent and the '748 Patent, and a subsequent hypothetical negotiation date of October 2021 for the '878 Patent (collectively, the "pre-launch hypothetical negotiations").[16] I assume that the post-judgment hypothetical negotiation between Allergan and Revance for a future ongoing royalty would have taken place around July 24, 2025, *i.e.*, the date of the Court's judgment on the jury verdict.

## B. The Parties' Bargaining Positions at the Post-Judgment Hypothetical Negotiation

12. I understand that at the post-judgment hypothetical negotiation the parties would know that the '748 Patent and the '878 Patent are both valid and that Revance is an adjudicated infringer of these patents.[17]

13. In addition, I also understand that Revance's continued infringement of the '748 Patent

---

[16] Trial Tr., July 15, 2025, 515:22-516:4; 536:21-537: 3.

[17] I understand that the '740 Patent expired on September 25, 2023. It would therefore not be part of the post-judgment hypothetical negotiation between Allergan and Revance.



[redacted]

and the ’878 Patent is both voluntary and intentional, because Revance could instead either (a) stop selling Daxxify and/or (b) attempt to implement a non-infringing alternative that does not infringe the ’748 Patent and/or the ’878 Patent. As discussed more fully below, however, I do not believe that either of these options would be economically viable for Revance at the post-judgment hypothetical negotiation. For example, it [redacted] than at the June 2019 or October 2021 hypothetical negotiations. At the post-judgment hypothetical negotiation, Revance was already generating [redacted] in Daxxify sales each month, whereas Revance had not yet submitted Daxxify’s BLA to the FDA as of the June 2019 hypothetical negotiation, and still had not actually begun earning Daxxify sales as of the October 2021 hypothetical negotiation. In addition, there has been no suggested design-around for the ’878 Patent.

14. Revance would thus be in a relatively weaker bargaining position, and Allergan in a relatively stronger one, at the post-judgment hypothetical negotiation as compared to the pre-launch hypothetical negotiations that were considered by the jury.

## C. Analysis of the *Georgia-Pacific* Factors

15. In this section, I evaluate the *Georgia-Pacific* factors relevant to the parties’ approximately July 24, 2025 post-judgment hypothetical negotiation to determine an appropriate ongoing reasonable royalty. As explained in more detail below, it is my opinion that an appropriate, ongoing reasonable royalty should be no less than the royalty rates that the jury already decided for both past and future infringement by Revance.

### 1. The royalties received by the patentee for the licensing of the Patent(s)-in-Suit

16. Allergan has never licensed the ’748 Patent or the ’878 Patent to a third party.[18] However, one direct benchmark for royalty rates covering claim 6 of the ’748 Patent and

[18] Expert Report of Christine S. Meyer, Ph.D., December 15, 2023 (“Siegwarth Damages Report”), ¶ 95. *See* D.I. 349, Exhibit 8.



[redacted]

claim 8 of the ’878 Patent exists: the jury’s verdict finding that a royalty of 4 percent and 15 percent for infringing these two patents, respectively, would be reasonable and appropriate.

17. The jury’s determination establishes at least a baseline for what a reasonable royalty for the ’748 Patent and the ’878 Patent would be following the jury’s verdict. Accordingly, this post-judgment factor supports continuing to apply the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 2. The rates paid by licensee for the use of other patents comparable to the Patent(s)-in-Suit

18. As I explained at trial, I have not been provided with any agreement entered into by Revance that would be comparable to the hypothetical license.[19] Based on the information available to me, Revance has not subsequently entered into any licensing agreements that would be comparable to the hypothetical license that would result from the post-judgment hypothetical negotiation.

19. This factor is unchanged from the time of the pre-launch hypothetical negotiations. Accordingly, this post-judgment factor supports continuing to apply the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold

20. The hypothetical negotiation would be for a non-exclusive license to the ’748 Patent and the ’878 Patent for Revance to make and sell its Daxxify product in the United States. Between the pre-launch and post-judgment hypothetical negotiations, however, the parties would have come to understand not only that Revance planned to sell Daxxify made in the United States into foreign markets, but also that Revance had successfully been able to secure the regulatory authorizations and distribution partnerships required to do so. For example, on September 9, 2024, Revance announced that Daxxify had been

---

[19] *See*, *e.g.*, Trial Tr., July 16, 2025, 657:22-658:3; *see also* Siegwarth Damages Report, ¶¶ 98-105. *See* D.I. 349, Exhibit 8.



[redacted]

approved for cosmetic use in China.[20] Revance has partnered with Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. ("Fosun") to commercialize Daxxify in China, whereby Fosun will purchase Daxxify that Revance manufactures in the United States and resell it in China,[21] a market where Botox also competes.[22] Likewise, Daxxify was approved for cosmetic and therapeutic use in Australia in December 2024,[23] and Revance has partnered with Teoxane SA ("Teoxane") to commercialize Daxxify in Australia and New Zealand, whereby Teoxane will purchase Daxxify that Revance manufactures in the United and resell it in Australia and New Zealand through at least 2040,[24] markets where Botox also competes.[25]

---

[20] PTX-851.0002 (Revance Therapeutics, Inc. Form 8-K, September 9, 2024 ("Revance September 2024 8-K")). *See* Declaration of Karthik Kasaraneni, September 12, 2025 ("Kasaraneni Decl."), Exhibit 3.

[21] *See*, *e.g.*, PTX-767.0219, .0220, .0230-31 (Revance Therapeutics, Inc. Form 10-K for the Period Ended December 31, 2018 ("Revance 2018 10-K"), Exhibit 10.42, §§ 1.85 ("'Territory' means the People's Republic of China, Hong Kong Special Administrative Region, and Macao Special Administrative Region"), 5.01(a) ("(a) Revance shall supply Product to Fosun to allow Fosun to conduct its Development and Commercialization activities in the Territory under this Agreement"), 5.01(d) ("the product to be supplied FCA (Incoterms 2010)"), 2.01(a) ("For the avoidance of doubt, the license granted in this Section 2.01 does not include the right to manufacture or have manufactured the Product")). *See* Kasaraneni Decl., Exhibit 4.

[22] "Allergan Aesthetics Launches BOTOX® Cosmetic (onabotulinumtoxinA) for Masseter Muscle Prominence (MMP) in Adults in China," *AbbVie*, available at https://news.abbvie.com/2024-09-11-Allergan-Aesthetics-Launches-BOTOX-R-Cosmetic-onabotulinumtoxinA-for-Masseter-Muscle-Prominence-MMP-in-Adults-in-China, accessed on September 8, 2025 ("AbbVie Launches Botox for MMP in Adults in China"); "Botox," *Allergan Aesthetics (CN)*, available at https://qa-aa-site.allerganaesthetics.cn/our-brands/botox.html, accessed on September 8, 2025 ("Allergan Aesthetics China – Botox"). *See* Kasaraneni Decl., Exhibits 5-6.

[23] "Australian Public Assessment Report for Daxxify," *Therapeutic Goods Administration*, available at https://www.tga.gov.au/sites/default/files/2025-07/auspar-daxxify-250630.pdf, accessed on September 8, 2025, p. 8. *See* Kasaraneni Decl., Exhibit 7.

[24] *See*, *e.g.*, Revance Therapeutics, Inc. Form 8-K, October 24, 2024, Exhibit 10.2, §§ 1.01 ("'Territory' means Australia and New Zealand"), 5.01 ("Revance will Manufacture and supply to Teoxane or to any of its designated Affiliates, subject to the forecasting and ordering procedures in this Agreement, such quantities of each Product and Product Samples as required by Teoxane or its designated Affiliate."), 5.04(a) ("Delivery by Revance to Teoxane shall be made Ex Works Revance's premises or defined warehouse location (Incoterms 2020)."), 2(b) ("For the avoidance of doubt, nothing herein shall be construed as a license to manufacture or purify any Product or any component thereof."); PTX-852.0005 (Revance Therapeutics, Inc. Form 8-K, November 7, 2024, Exhibit 99.1) ("Teoxane will act as Revance's and Revance Australia's exclusive distributor and licensee in Australia and New Zealand of . . . DAXXIFY® . . . . The ANZ Distribution Agreement expires December 31, 2040."). *See* Kasaraneni Decl., Exhibits 8-9.

[25] "Australian Product Information – Botox® (Botulinum Toxin Type A) Powder for Injection," *Allergan Aesthetics (AU)*, available at https://www.allerganaesthetics.com.au/content/dam/aa-corporate/au/en/pdf/botox-pi-v22-ccds-v24-25-27jun25.pdf, accessed on September 8, 2025 ("Allergan Aesthetics AU Botox Product Information"); "Botox," *Allergan Aesthetics (AU)*, available at https://www.allerganaesthetics.com.au/our-products/botox, accessed on September 8, 2025 ("Allergan Aesthetics AU Botox Overview"); "New Zealand Data Sheet," *Allergan Aesthetics (NZ)*, available at https://allergan-web-cdn-prod.azureedge.net/allergan/allergannewzealand/media/allergannewzealand/products/botox-ds-v16-ccds-v22-18may23.pdf, accessed on September 8, 2025 ("Allergan Aesthetics NZ Botox Product Information"); "Botox," *Allergan Aesthetics (NZ)*, available at https://www.allergan.co.nz/en-nz/products/list/botox/, accessed on September 8, 2025 ("Allergan Aesthetics NZ Botox Overview"). *See* Kasaraneni Decl., Exhibits 10-13.

21. I understand that Daxxify product manufactured in the United States and transferred overseas for sale in international markets would be subject to a royalty given the jury's infringement finding. According to the supplemental sales data that Revance recently produced, Sisram Medical, a subsidiary of Fosun, had an order completed by Revance on July 14, 2025, for [redacted] vials of Daxxify corresponding to a total purchase amount of [redacted].[26] Similarly, Teoxane had an order completed on April 7, 2025, for [redacted] vials of Daxxify corresponding to a total purchase amount of [redacted].[27] I understand the ongoing royalty should be applied to any Revance revenue associated with infringing Daxxify sales to Revance's foreign partners, such as Fosun or Sisram Medical for China or Teoxane for Australia and New Zealand. This revenue would include at least Revance's transfer sales of Daxxify to its foreign partners, Revance's royalties and/or price supplements based on those partners' Daxxify sales, and Revance's sales-related milestones on those partners' Daxxify sales.[28]

22. Accordingly, this post-judgment factor supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

#### 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly

23. I am not aware of any marketing or licensing program at Allergan designed to generate revenue by licensing its patent rights.[29] To the contrary, as noted above, Allergan has

---

26 "Sirsram [sic] Medical announces NMPA approval for DAXXIFY® Marking the introduction of the world's first and only peptide-powered botulinum toxin product to Mainland China," *Sisram Medical*, available at https://sisram-medical.com/wp-content/uploads/2024/09/%E3%80%90ENG-Press-Release%E3%80%91Sirsram-Medical-announces-NMPA-approval-for-Daxxify.pdf, accessed on September 9, 2025. *See* Kasaraneni Decl., Exhibit 14. *See also* REV_DAX-03348499. Sisram paid Revance an apparent transfer price of [redacted] per unit for the product, whereas all other completed transactions in the sales data produced reflect prices per unit greater than [redacted] (excluding one order completed by Teoxane, as discussed below).

27 REV_DAX-03348499. Teoxane paid Revance an apparent transfer price of [redacted] per unit for the product, whereas all other completed transactions in the sales data reflect prices per unit greater than [redacted] (excluding one order completed by Sisram Medical, as discussed above).

28 PTX-767.0219, .0230-35, §§ 1.93, 5.01, 6.01-6.04; Revance Therapeutics, Inc. Form 8-K, October 24, 2024, Exhibit 10.2, §§ 1.01 ("Transfer Price"), 7.02, 7.04. *See* Kasaraneni Decl., Exhibits 4, 8.

29 Siegwarth Damages Report, ¶ 107. *See* D.I. 349, Exhibit 8.



[redacted]

never licensed the '748 Patent or the '878 Patent to any third party, let alone to a direct competitor. As I explained at trial, this would have contributed to Allergan being a relatively reluctant licensor at the time of the pre-verdict hypothetical negotiations,[30] and that relative reluctance would only increase by the time of the jury's verdict, as Daxxify had by then established itself as an actual competitor in the neurotoxin market, rather than just a prospective entrant.

24. Accordingly, this post-judgment factor supports increasing the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter

25. This factor accounts for the fact that royalty rates are generally higher when the negotiating parties are direct competitors as compared with an inventor-promoter relationship.

26. As I explained at trial, Allergan and Revance both recognize each other as competitors.[31] A key difference between the post-judgment hypothetical negotiation and the earlier negotiation dates is that Allergan and Revance are now actual competitors (and not just expected competitors), and Revance has been adjudicated to infringe Allergan's patents. By now, Revance has reached several notable commercial milestones. It has generated more than [redacted] in Daxxify sales in the United States and has touted itself as having the "[m]ost successful neuromodulator launch since Botox Cosmetic."[32] Moreover, Revance executives have continued to affirm Revance's aesthetic portfolio as having "blockbuster" potential.[33] Revance's actual sales gains are also largely the result

30 *See*, *e.g.*, Trial Tr., July 16, 2025, 582:8-12; 593:6-10.

31 *See*, *e.g.*, Trial Tr., July 15, 2025, 513:3-514:10; 517:22-518:6; 521:14-522:9; 524:10-525:20; 530:15-17; *see also* Trial Tr., July 16, 2025, 582:5-17; 615:10-15.

32 PTX-617.0026 (Revance September 2023 Investor Day Presentation, p. 26). *See* Kasaraneni Decl., Exhibit 15.

33 PTX-933.0004, .0008 (Revance Therapeutics, Inc. Q4 2023 Earnings Call, February 28, 2024, *S&P Global* ("Revance Q4 2023 Earnings Call Transcript"), pp. 4, 8). *See* Kasaraneni Decl., Exhibit 16.



[redacted]

of sales that Allergan has lost to Revance. Indeed, market research commissioned by Allergan in May and June 2023 shows that over 50 percent of the patients who switched to Daxxify were patients switching from Botox.[34] Revance's own market research corroborates this finding.[35] In addition, in 2023, Revance specifically targeted Allergan's customers with its "Break Up with Botox" campaign.[36] Moreover, about a year after launch, Revance lowered the price of Daxxify and explained that the reason was "to be more competitive with BOTOX®" and "lead to additional product adoption."[37]

27. Although Allergan expected Revance to be a competitor at the time of the earlier hypothetical negotiations, Allergan is now faced with the certainty of having to compete with Revance, which has already cut its price of Daxxify to take even more Botox sales away from Allergan. Moreover, the competition between Allergan and Revance is only expected to increase in the future given Allergan's plans to release its own animal-product-free ("APF") long-acting injectable botulinum toxin product, known as LAI.[38] In Daxxify, Allergan's LAI will have a direct, entrenched, and long-acting competitor that has already been on the market for several years, with first-to-market advantage as a longer-duration product.[39] The expected market entry of LAI will only intensify competition between Allergan and Revance, and provide Allergan with additional disincentive to license Revance the Allergan-patented technology that underpins Daxxify.

28. I also understand that Revance may seek to sell infringing Daxxify products manufactured in the United States in several international Botox markets. For example, Fosun, Revance's development partner for Daxxify in China, plans to begin selling

---

34 JTX-164.0008. *See* Kasaraneni Decl., Exhibit 17.

35 PTX-617.0027 (Revance September 2023 Investor Day Presentation, p. 27); JTX-211.0002. *See* Kasaraneni Decl., Exhibits 15, 33.

36 PTX-661; PTX-638.0005-06. *See* Kasaraneni Decl., Exhibits 18-19.

37 DTX-370.0013, .0024, .0040 (Revance 2023 Form 10-K at 1, 12, 28); Siegwarth Damages Report, ¶ 121. *See* D.I. 349, Exhibit 8. PTX-654.0009 ("Revance September 2023 Investor Day Transcript," *S&P Global*, p. 9 ("And so with all that information, we're continuing to evolve our strategy with the sole goal of taking meaningful share gain. I mean that's our long-term goal here. And so as of September 1, we kicked off a pricing strategy change where we're positioning the product to be competitively more in line with BOTOX.")). *See* Kasaraneni Decl., Exhibits 20-21.

38 Trial Tr., July 15, 2025, 523:17-19.

39 *See*, *e.g.*, Trial Tr., July 15, 2025, 537:8-538:14.



[redacted]

Daxxify products manufactured by Revance in the United States in China,[40] where Botox also competes.[41] And I understand that Teoxane, Revance's distribution partner for Daxxify in Australia and New Zealand, plans to begin doing the same in Australia and New Zealand through at least 2040,[42] which are likewise markets where Botox competes.[43] As compared to the pre-launch hypothetical negotiations, at a post-judgment hypothetical negotiation, Allergan would better understand that granting Revance's request for a license to practice its patents in the United States would also increase competition for Botox in at least these markets, and very likely others as Revance continues to expand Daxxify's global reach.

29. These enhanced competitive conditions would further Allergan's position as a reluctant licensor. Accordingly, this post-judgment factor supports increasing the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales

30. I am not aware of any convoyed sales that derive from the '748 Patent and/or the '878 Patent.

31. This factor is unchanged from the time of the pre-launch hypothetical negotiations. Accordingly, this post-judgment factor supports continuing to apply the rates determined

---

40 "Sisram Medical Reports First-Half 2025 Results Injectables Surge as AI-Powered EBD Strengthens Segment Positioning," *Sisram Medical*, available at https://sisram-medical.com/wp-content/uploads/2025/08/%E3%80%90PR-ENG%E3%80%91Sisram-Medical-H1-2025-financial-Results_final.pdf, accessed on September 8, 2025; *see also* PTX-851.0002 (Revance September 2024 8-K); Expert Report of Christine S. Meyer, Ph.D., November 4, 2024, ¶ 7; Siegwarth Second Supplemental Report, ¶ 8. *See* Kasaraneni Decl., Exhibits 3, 22; D.I. 500, Exhibit A; D.I. 574, Exhibit 8.

41 AbbVie Launches Botox for MMP in Adults in China; Allergan Aesthetics China – Botox. *See* Kasaraneni Decl., Exhibits 5-6.

42 PTX-852.0005 (Revance Therapeutics, Inc. Form 8-K, November 7, 2024, Exhibit 99.1); "Excited to be part of the Daxxify® launch with Teoxane. Thank you for the wonderful invite and such an inspiring event," *Instagram (via @dr.jennjenn)*, available at https://www.instagram.com/reel/DN7LxLbki18/, accessed September 11, 2025. *See* Kasaraneni Decl., Exhibits 9, 23.

43 Allergan Aesthetics AU Botox Product Information; Allergan Aesthetics AU Botox Overview; Allergan Aesthetics NZ Botox Product Information; Allergan Aesthetics NZ Botox Overview. *See* Kasaraneni Decl., Exhibits 10-13.



[redacted]

by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 7. The duration of the patent and term of the license

32. The term of the hypothetical license would begin on the date of the post-judgment hypothetical negotiation and would end on the date of expiration of the last-to-expire patent (*i.e.*, the ’748 Patent). At the post-judgment hypothetical negotiation, Revance would be negotiating for a license to the ’878 Patent and the ’748 Patent, which are set to expire on September 21, 2026 and July 13, 2029, respectively.[44] As compared to pre-launch hypothetical negotiations, the remaining term of the hypothetical license would be shorter at the post-judgment hypothetical negotiation. However, Revance would recognize that a license to the ’748 Patent and the ’878 Patent—even one with a shorter term—would be more valuable to Revance at the time of the post-judgment hypothetical negotiation, when it has reached more than [redacted] in actual Daxxify sales and just recorded its best quarterly sales result yet, with more than [redacted] in Daxxify sales in Q2 2025.[45] That is, Revance would be at least as motivated to obtain a license to practice the ’878 Patent and the ’748 Patent to continue to sell Daxxify and to further advance Daxxify in the marketplace at the time of the post-judgment hypothetical negotiation (*i.e.*, sales that Revance would otherwise stand to lose without a license) as it would have been at the pre-launch hypothetical negotiations.

33. Accordingly, this post-judgment factor supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 8. The established profitability of the product made under the patent; its commercial success; and its current popularity

34. I understand that Allergan does not currently sell a product that practices the ’748 Patent or the ’878 Patent and is thus not generating profits under these patents.

---

44 Siegwarth Damages Report, ¶¶ 40, 43. *See* D.I. 349, Exhibit 8.

45 *See* **Exhibit 1** to this declaration.



[redacted]

35. Revance has characterized Daxxify's early sales performance as successful. For example, in its 2023 Investor Day Presentation, Revance described Daxxify as the "[m]ost successful neuromodulator launch since Botox Cosmetic," despite Daxxify being the fifth BoNT injectable product to be approved for cosmetic use in the United States (*i.e.*, after Botox Cosmetic, Dysport, Xeomin, and Jeuveau).[46] Moreover, Revance continues to expand the use of Daxxify through the launch of its first therapeutic indication for the treatment of cervical dystonia in May 2024 and its recent expansion into international markets.[47]

36. Revance has generated more than [redacted] in Daxxify sales in the United States since the launch of Daxxify in 2022. Moreover, Revance recorded its best quarterly sales result in Q2 2025 with total Daxxify sales of more than [redacted], representing a year-over-year increase of about [redacted] percent relative to Daxxify sales in Q2 2024.[48] On September 1, 2023, Revance put into effect a lower price for Daxxify to be "competitively more in line with Botox."[49] At its 2023 Investor Day, Revance told investors that this pricing strategy was intended to attract more patients to Daxxify and improve Daxxify's performance with "the sole goal of taking meaningful share gain."[50] At the same event, Revance also stated an expectation of earning an adjusted gross margin of at least [redacted] percent on Daxxify sales in the long term despite its new pricing strategy for Daxxify.[51] Mr. Tobin C. Schilke, then Chief Financial Officer at Revance, also announced at the 2023 Investor Day that "we still feel that with the U.S. aesthetics business, our combination of DAXXIFY and RHA lead to that blockbuster or $1 billion opportunity."[52] On June 4, 2024, Mr. Schilke spoke at the William Blair 44th Annual Growth Stock Conference about Daxxify's market opportunities, noting that Daxxify is

---

46 PTX-617.0026 (Revance September 2023 Investor Day Presentation, p. 26). *See* Kasaraneni Decl., Exhibit 15.

47 Revance Therapeutics, Inc. Form 8-K, May 9, 2024, Exhibit 99.1, Exhibit 99.2. *See* Kasaraneni Decl., Exhibits 24-25.

48 $41,168,841 / 28,635,840 – 1 = 43.8 percent. *See* **Exhibit 1** to this declaration**.**

49 PTX-654.0009 (Revance September 2023 Investor Day Transcript, p. 9). *See* Kasaraneni Decl., Exhibit 21.

50 PTX-654.0009 (Revance September 2023 Investor Day Transcript, p. 9). *See* Kasaraneni Decl., Exhibit 21.

51 PTX-617.0102, .0108; *see also* PTX-617.0015. *See* Kasaraneni Decl., Exhibit 15.

52 PTX-654.0041 (Revance September 2023 Investor Day Transcript, p. 41). *See* Kasaraneni Decl., Exhibit 21.



[redacted]

not only competing in the aesthetic "Botox market" in the United States, but that "Daxxify is now approved and competes in the therapeutics market, which is surprisingly about the same size as the aesthetics market. So it's another about $2.5 billion [opportunity] in the US."[53] In addition, Mr. Schilke also told participants at the William Blair conference that "[t]here's an additional $2.5 billion of botulinum toxin sold outside of the US mainly in aesthetics indications."[54]

37. I understand that Crown Laboratories, Inc. ("Crown") completed its acquisition of Revance on February 6, 2025.[55] On March 31, 2025, Crown announced that the combined company "will operate under the name Revance, effectively immediately."[56] As part of this acquisition, Revance was delisted from the NASDAQ,[57] so more recent sales data and securities filings are not publicly available. Revance's most recent 10-Q filing with the SEC is from November 7, 2024.[58] According to the sales data produced by Revance, Daxxify sales have continued to grow during and after the acquisition by Crown.

38. Accordingly, this post-judgment factor supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

---

53 "William Blair 44th Annual Growth Stock Conference," *Bloomberg* ("William Blair Conference Transcript"), p. 1. *See* Kasaraneni Decl., Exhibit 26.

54 William Blair Conference Transcript, p. 1. *See* Kasaraneni Decl., Exhibit 26.

55 PTX-987.0001 ("Crown Laboratories Announces Completion of Acquisition of Revance Therapeutics," *Revance*, available at https://www.revance.com/revance-crown-merger/, accessed on June 25, 2025). *See* Kasaraneni Decl., Exhibit 27.

56 PTX-988.0001 ("Crown Laboratories Now Operates Under the Name Revance," *Revance*, available at https://www.revance.com/crown-revance-unite/, accessed on June 25, 2025). *See* Kasaraneni Decl., Exhibit 28.

57 Revance Therapeutics, Inc. Form 8-K, February 6, 2025, Item 3.01. *See* Kasaraneni Decl., Exhibit 29.

58 "Revance Therapeutics, Inc.," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/edgar/browse/?CIK=0001479290, accessed on September 12, 2025; PTX-853 (Revance Therapeutics, Inc. Form 10-Q for the Period Ended September 30, 2024). *See* Kasaraneni Decl., Exhibits 30-31.



[redacted]

### 9. The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results

### 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention

39. *Georgia-Pacific* factors 9 and 10 attribute the benefits granted by the ’748 Patent and the ’878 Patent over other means of accomplishing the same end. Revance continues to tout both the longer duration of effect and the human serum albumin (“HSA”)-free and APF attributes as key features of Daxxify that differentiate it from competing neurotoxins, including Allergan’s Botox.[59]

40. I testified at trial that longer duration is a product attribute that is in high demand by customers and healthcare providers (“HCPs”), as observed in surveys that were known to Allergan and Revance at the pre-launch hypothetical negotiation dates.[60] Later surveys that post-date Daxxify’s launch continue to confirm the relative contribution of longer duration to Daxxify’s value. For example, Kx Advisors conducted the “Daxxify Pulse Survey” on behalf of Revance in August 2023, which asked HCPs to rank how Daxxify performs across various attributes versus their first-choice short-acting toxin.[61] The normalized survey results showed that 17 percent of Daxxify’s value is due to its longer duration.[62] Likewise, in May and June 2023, Allergan conducted a survey as part of its “Daxxify Launch Tracker” that asked respondents, “Why did you switch away from other neurotoxins to Daxxify?”[63] The normalized survey results demonstrate that about 23 percent of the reason actual HCPs switched their patients to Daxxify was its longer

---

[59] *See*, *e.g.*, “Daxxify FAQs,” *Revance*, available at https://www.daxxify.com/faqs, accessed on September 3, 2025, p. 3 (“DAXXIFY® is unique because it is the only formulation that uses a novel peptide as a stabilizer and does not contain human or animal byproducts.”), p. 7 (“[C]onventional treatments only last 3–4 months. . . . In clinical trials, at least 50% of [Daxxify] patients showed results in frown lines at 6 months.”). *See* Kasaraneni Decl., Exhibit 32.

[60] Trial Tr., July 15, 2025, 541:15-544:13; 544:24-546:20; Trial Tr., July 16, 2025, 581:4-581:13; 616:9-12.

[61] JTX-211.0005. *See* Kasaraneni Decl., Exhibit 33.

[62] JTX-211.0005; 73 percent / 430 percent = 17.0 percent. *See* Kasaraneni Decl., Exhibit 33. *See also* D.I. 640, Exhibit B (DDX-10.35); Trial Tr., July 17, 2025, 1049:17-1052:11; Trial Tr., July 16, 2025, 583:19-590:15.

[63] JTX-164.0024. *See* Kasaraneni Decl., Exhibit 17.



[redacted]

duration, and about eight percent of the reason was because Daxxify is HSA free (*i.e.*, APF).[64] That is, these surveys demonstrate that, after Daxxify's launch, duration still has a relative contribution to Daxxify's value that exceeds the 15 percent determined by the jury for the '878 patent, and being APF still has a relative contribution to Daxxify's value that exceeds the 4 percent royalty determined by the jury for the '748 patent.

41. Because both Ms. Trexler's analysis of these surveys[65] and my response to her analysis[66] were presented to the jury at trial, they have already been considered by the jury. I am unaware of any change since these surveys that would suggest a decrease in the relative value of duration. Accordingly, these two post-judgment *Georgia-Pacific* factors support continuing to apply the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use

42. The jury determined that Revance uses the '748 Patent and the '878 Patent for each vial of Daxxify which is expected to continue to generate significant sales for Revance.

43. At trial, I testified that a reasonable royalty for the '748 Patent could be determined by calculating Revance's cost of delay had it attempted to develop and commercialize a non-infringing alternative to the '748 Patent starting at the time of a June 2019 hypothetical negotiation (or, stated differently, its profit boost had Revance chosen to take a license), when Revance had yet to submit its BLA for Daxxify to the FDA. At the post-judgment hypothetical negotiation, Revance would be highly unlikely to pull Daxxify from the market to avoid infringement by attempting to pursue a non-infringing alternative to the '748 Patent. First, I understand that Revance has still not identified or demonstrated that

---

64 JTX-164.0024; ((65 percent / 274) + (64 percent / 283)) / 2 = 23.2 percent; ((21 percent / 274) + (25 percent / 283)) / 2 = 8.2 percent *See* Kasaraneni Decl., Exhibit 17. *See also* D.I. 640, Exhibit B (DDX-10.38); Trial Tr., July 17, 2025, 1049:17-1052:11; Trial Tr., July 16, 2025, 583:19-590:15; PTX-596.0024. *See* Kasaraneni Decl., Exhibit 34. *See also* Siegwarth Second Supplemental Report, FN 20; Expert Reply Report of Christine S. Meyer, Ph.D., April 19, 2024, ¶ 100, FN 181. *See* D.I. 574, Exhibit 8; D.I. 349, Exhibit 9.

65 Trial Tr., July 17, 2025, 1049:17-1052:11.

66 Trial Tr., July 16, 2025, 583:19-590:15.



[redacted]

an acceptable workaround to the ’748 Patent even exists. That is, as before, I understand that Revance would face substantial uncertainty about whether it could develop and commercialize such a non-infringing alternative at all.[67] Second, the changed economic realities of the post-judgment hypothetical negotiation mean that Revance would be unlikely to accept forgoing its entire profits associated with the Daxxify sales that, in the absence of a license, it would stand to lose during the time it would be developing and implementing any potential non-infringing alternative. For example, Daxxify sold [redacted] from Q3 2024 through Q2 2025, its most recent 12-month period as of the post-judgment hypothetical negotiation, with a full [redacted] coming from Q2 2025 alone, the most recent complete quarter.[68] By contrast, at the June 2019 hypothetical negotiation, Revance would have expected substantially less immediate Daxxify revenue to be at risk had it sought to design around the ’748 Patent at that time, given the design-around would have delayed only the first 12 to 18 months of Daxxify sales right after launch.[69] Moreover, even a temporary withdrawal of Daxxify from the marketplace could generate long-lasting, detrimental effects on future Daxxify sales, which Revance would want to avoid (*e.g.*, Daxxify customers may be less willing to purchase Daxxify in the future due to the disruptions caused by the temporary withdrawal). In my opinion, Revance’s cost of pursuing a non-infringing alternative would be prohibitively high at the post-judgment hypothetical negotiation, including as compared to the earlier hypothetical negotiation in June 2019.

44. Instead, Revance would be a highly motivated to secure a license to the ’748 Patent at the post-judgment hypothetical negotiation that would allow it to continue to proceed with its commercial plans for Daxxify without interruption. In its verdict, the jury determined a reasonable royalty of 4 percent for the ’748 Patent, which Revance would likely use as the starting point for the post-judgment hypothetical negotiation. Both Allergan and

---

[67] Trial Tr., July 15, 2025, 482:18-483:15, 485:25-486:9, 487:18-490:1. *See also* Trial Tr., July 15, 2025, 496:14-497:17; 498:25-502:12; Trial Tr., July 16, 2025, 592:19-593:10; Siegwarth Damages Report, ¶¶ 127, 164, 166, 168, 173. *See* D.I. 349, Exhibit 8.

[68] *See* **Exhibit 1** to this declaration. $28,607,683 + $40,211,961 + $33,222,387 + $41,168,841 = $143,210,872.

[69] Trial Tr., July 15, 2025, 527:12-528:1, 529:6-530:2; Trial Tr., July 16, 2025, 591:17-593:3.

Revance would understand that Revance would be unlikely to have an economically viable non-infringing alternative readily available to it and that Allergan would be relatively reluctant to license the '748 Patent to a direct Botox competitor such as Revance. Allergan and Revance would also recognize the relative value assigned to Daxxify's APF product attribute. As discussed above, Allergan's post-launch "Daxxify Launch Tracker" surveys demonstrate that about 8 percent of the reason actual HCPs switched their patients to Daxxify was its APF attribute—a relative value that exceeds the jury's 4 percent rate.

45. Similarly, at the post-judgment hypothetical negotiation, Revance would have no choice but to take a license from Allergan to continue selling Daxxify with its longer-duration attribute to compete with (and differentiate itself from) Botox and the other competitors. Indeed, I am not aware of Revance identifying any non-infringing alternative that provides this attribute. Allergan and Revance would negotiate over the value of the duration attribute conferred by the '878 Patent. And, as discussed above, Revance's post-launch "Daxxify Pulse Survey" and Allergan's post-launch "Daxxify Launch Tracker" surveys demonstrate that the relative value of Daxxify's duration attribute was 17 percent and about 23 percent, respectively, both of which exceed the jury's 15 percent rate.

46. Revance's significant actual Daxxify sales at-risk and the lack of a design-around for the '748 Patent and '878 Patent mean that this post-judgment factor supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions

47. I am not aware of a customary royalty rate for patents in the pharmaceutical industry or specifically for BoNT injectable products. As such, Allergan would enter the post-judgment hypothetical negotiation with the intent of maximizing its business opportunity.

48. Since trial, I have been made aware of the license agreement between Revance and Fosun



[redacted]

that allows Fosun to commercialize Daxxify in China. While I am unaware of the specific payment terms therein, I understand that Revance has stated that, upon commercialization, it will begin receiving "tiered low-double-digit to high-teen royalty payments on future net sales," in addition to a set margin on transfer sales of Daxxify to Fosun and certain sales-related milestone payments.[70] Likewise, in connection with its co-development of a Botox biosimilar with Viatris, Revance has stated that it will receive "low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-US Viatris territories" in addition to "tiered sales milestones of up to $225 million."[71] These agreements are informative of the post-judgment hypothetical license. In particular, they suggest that the parties would recognize that the jury's rates are consistent with the low end of royalty rates that Revance has agreed to receive from third parties in exchange for the rights to intellectual property related to neurotoxin products.

49. Accordingly, this post-judgment factor supports continuing to apply at least the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements added by the infringer

50. In its verdict, the jury considered the relative contributions of the '748 Patent and the '878 Patent to the overall value of the infringing product, which are reflected in the jury's royalty rates.

51. Accordingly, this factor is unchanged from the time of the pre-launch hypothetical negotiations and supports continuing to apply the rates determined by the jury based on

[70] PTX-767.0265 (Revance 2018 10-K), Exhibit 10.42, Exhibit C ("Revance Announces China Market License Agreement with Fosun Pharma for RT002"). *See also* PTX-767.0219, .0230-35 (Revance 2018 10-K), Exhibit 10.42, §§ 1.93 (Transfer Price), 5.01(c) (Commercial Supply), 6.03 (Sales Related Milestones), 6.04 (Royalties). *See* Kasaraneni Decl., Exhibit 4.

[71] Revance Therapeutics, Inc. Form 10-Q for the Period Ended June 30, 2024, p. 11. *See* Kasaraneni Decl., Exhibit 35.



[redacted]

its consideration of the pre-launch hypothetical negotiations.

### 14. The opinion testimony of qualified experts

52. I am a qualified economist to opine on the damages appropriate to compensate Allergan for Revance's continued infringement. In addition, in my analysis of the pre-launch and post-judgment hypothetical negotiation using the *Georgia-Pacific* factors, and as set forth throughout my expert reports, testimony, and declaration, I have considered the opinions of Dr. Drago, Dr. Gessler, and Dr. Schöneich.[72]

53. This factor is unchanged from the time of the pre-launch hypothetical negotiations. Accordingly, this post-judgment factor supports continuing to apply the rates determined by the jury based on its consideration of the pre-launch hypothetical negotiations.

### 15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license

54. *Georgia-Pacific* factor 15 describes the overall hypothetical negotiation framework as one in which it is important to consider the parties to the negotiation and the considerations each would have faced in the negotiation, as outlined in my discussion of the factors above.

55. As discussed above, Allergan would approach the post-judgment hypothetical negotiation as a relatively reluctant licensor with the understanding that Revance continues to expand its sales operations in the U.S., has already generated more than [redacted] in Daxxify sales in the U.S., and has begun or is poised to begin receiving revenue for infringing

72 Trial Tr., July 25, 2025, 507:7-508:19; Siegwarth Damages Report, ¶ 160. *See* D.I. 349, Exhibit 8.



[redacted]

Daxxify that it manufactures in the U.S. and sells to third parties who resell it abroad. In contrast, Revance would be a highly motivated licensee given that there is likely no economically viable non-infringing alternative readily available to it.

56. On balance, the *Georgia-Pacific* factors suggest at least a slight upward impact on the jury-determined royalty rates. In particular, *Georgia-Pacific* factor 4 (the licensor's licensing policy) and *Georgia-Pacific* factor 5 (the competitive relationship) support higher ongoing royalty rates than those determined by the jury. No factor suggests applying lower ones. In my opinion, Allergan is entitled to ongoing royalty rates that are no less than the royalty rates already determined by the jury: 15 percent for the '878 Patent and four percent for the '748 Patent (*i.e.*, totaling 19 percent from July 25, 2025 through the September 21, 2026 expiration of the '878 Patent followed by 4 percent from September 22, 2025 through the July 13, 2029 expiration of the '748 Patent).

# V. Conclusion

57. Allergan is owed total damages through July 24, 2025, of [redacted] (*i.e.*, the jury's $56 million verdict and [redacted] in supplemental damages).[73] The prejudgment interest through July 24, 2025, on the jury verdict and supplemental damages is [redacted].[74] The appropriate post-judgment interest rate is 4.09 percent, compounded annually, on the total unpaid damages (*i.e.*, the jury verdict, supplemental damages, prejudgment interest, and ongoing royalties) from July 25, 2025, through the date of Revance's payment.[75] And based on my economic analysis of the post-judgment hypothetical negotiation, an appropriate, ongoing reasonable royalty should be no less than the royalty rates decided by the jury.

[73] *See* **Exhibit 1** to this declaration.

[74] *See* **Exhibit 2** to this declaration.

[75] *See* **Exhibit 3** to this declaration.



[redacted]

I declare under penalty of perjury that the forgoing is true and correct.

Signed this 12th day of September, 2025.

Christine Siegwarth, Ph.D.



[redacted]

## Exhibit 1
## Total Prejudgment Damages Due to Revance's Adjudicated Infringement of the '878 Patent, '740 Patent, and '748 Patent
## December 1, 2022 through July 24, 2025

| | | Supplemental Daxxify Sales Amount[1] | | | | Supplemental Damages | | |
|---|---|---|---|---|---|---|---|---|
| **Quarter** | **Past Daxxify Sales Amount** | **Jun 1, 2025 through Jul 24, 2025** | **Oct 2, 2023 through Jun 4, 2025** | **Total Daxxify Sales Amount** | **Past Damages[2]** | **Jun 1, 2025 through Jul 24, 2025** | **Oct 2, 2023 through Jun 4, 2025** | **Total Prejudgment Damages** |
| | ---(Dollars)--- | | | | | | | |
| **(a)** | **(b)** | **(c)** | **(d)** | **(e)** (b)+(c)+(d) | **(f)** | **(g)** | **(h)** | **(i)** (f)+(g)+(h) |
| 4Q22 | $ 10,507,270 | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 1Q23 | $ 15,512,745 | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 2Q23 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 3Q23 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 4Q23 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 1Q24 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 2Q24 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 3Q24 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 4Q24 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 1Q25 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 2Q25 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| 3Q25 | $ [redacted] | [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] | $ [redacted] |
| **Total:** | **$ [redacted]** | **$ [redacted]** | **$ [redacted]** | **$ [redacted]** | **$ 56,000,000** | **$ [redacted]** | **$ [redacted]** | **$ [redacted]** |

Notes: [1] Revance has produced supplemental Daxxify sales data spanning the period from June 1, 2025, through July 24, 2025 (REV_DAX-03348499). In addition, Revance has produced supplemental data on infringing sales of Daxxify for therapeutic uses spanning the period from October 2, 2023, through June 4, 2025 (PTX-986). The latter file (i.e., PTX-986) includes transactions that are potentially duplicative of transactions in other files previously produced by Revance. These potentially duplicative transactions amount to [redacted] and are excluded to avoid double-counting. In addition, one transaction in PTX-986 (for which the "CC Order: Name" field is equal to "O-0000107035") appears as "Completed" in PTX-986 and as "Returned" in REV_DEX-03348499 (with respect to the "Order Status" field). This transaction is excluded from the sales totals presented in this exhibit.

[2] The jury determined a reasonable royalty rate of 15 percent for the '878 Patent, 12 percent for the '740 Patent and the '748 Patent combined prior to September 25, 2023 (the expiration of the '740 Patent), and 4 percent for the '748 Patent after September 25, 2023. These royalty rates are applied to Daxxify sales from Q4 2022 through Q3 2025 to calculate damages. For Q3 2023, a combined rate of 27 percent is applied to sales through September 25, 2023, and a combined rate of 19 percent is applied to sales through the end of the quarter. Using the actual Daxxify sales addressed in my Second Supplemental Report from December 2022 through May 2025, total reasonable royalty damages amount to [redacted]. As such, the royalty payment in each quarter is adjusted by an amount proportional to the sales in each quarter respectively to reflect the jury's damages award of $56,000,000.

Sources: JTX-178, sheet "Daxxify Current Quarter Order D."
PTX-849, sheet "Revenue Details ITD-0930 AES."
PTX-985, sheet "All Data 10.1.24-5.31.25."
PTX-986, sheet "THX Life to Date."
REV_DAX-03348499, sheet "Gross Revenue Details."

# Exhibit 2
# Prejudgment Interest at the Bank Prime Loan Rate Compounded Quarterly
# Applied to Total Prejudgment Damages
# December 1, 2022 through July 24, 2025

| Quarter | Prejudgment Damages[1] | Interest Rate[2] | Quarterly Interest Rate[3] | Principal[4] | Earned Quarterly Interest |
|---|---|---|---|---|---|
| | -------(Dollars)------- | --------------(Percent)-------------- | | --------------------(Dollars)-------------------- | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| | | | (c)*0.25 | | (d)*(e) |
| 4Q22 | $ [redacted] | 7.26 % | 0.61 % | [redacted] | $ - |
| 1Q23 | $ | 7.69 % | 1.92 % | $ | $ [redacted] |
| 2Q23 | $ | 8.16 % | 2.04 % | $ | $ |
| 3Q23 | $ | 8.43 % | 2.11 % | $ | $ |
| 4Q23 | $ | 8.50 % | 2.13 % | $ | $ |
| 1Q24 | $ | 8.50 % | 2.13 % | $ | $ |
| 2Q24 | $ | 8.50 % | 2.13 % | $ | $ |
| 3Q24 | $ | 8.44 % | 2.11 % | $ | $ |
| 4Q24 | $ | 7.82 % | 1.96 % | $ | $ |
| 1Q25 | $ | 7.50 % | 1.88 % | $ | $ |
| 2Q25 | $ | 7.50 % | 1.88 % | $ | $ |
| 3Q25 | $ | 7.50 % | 0.49 % | $ | $ |
| **Total:** | **$** [redacted] | | | | **$** [redacted] |

Notes: [1] See **Exhibit 1**.

[2] The interest rate is equal to the average of the daily Bank Prime Loan Rates reported by the Federal Reserve Bank of St. Louis for the three months in the quarter or for the days in the quarter with available sales data through July 24, 2025 (i.e., December 1, 2022 through December 31, 2022 for Q4 2022 and July 1, 2025 through July 24, 2025, for Q3 2025).

[3] The Quarterly Interest Rates in Q4 2022 and Q3 2025 are adjusted based on the number of days in each quarter that falls within the scope of this exhibit. Specifically, an adjustment of 34 percent is applied to the Quarterly Interest Rate in Q2 2022, as the data only cover the last 31 days of the quarter, in which there 92 days in total (31 / 92 = 0.34). Similarly, an adjustment of 26 percent is applied in Q3 2025, as the date of judgment occurred on the 24th day of the quarter, in which there are 92 days in total (24 / 92 = 0.26).

[4] Each royalty payment is assumed to occur at the end of the quarter and accrue to the principal the first day of the following quarter. Interest is assumed to compound quarterly and accrue to the principal on the first day of the following quarter. Accordingly, the principal at the end of a quarter equals the accrued royalty payments and interest from the preceding quarter plus the existing principal from that prior quarter.

Sources: **Exhibit 1**.
JTX-178, sheet "Daxxify Current Quarter Order D."
PTX-849, sheet "Revenue Details ITD-0930 AES."
PTX-985, sheet "All Data 10.1.24-5.31.25."
PTX-986, sheet "THX Life to Date."
REV_DAX-03348499, sheet "Gross Revenue Details."
"Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)* , retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed September 5, 2025.

[redacted]

# Exhibit 2A
## Prejudgment Interest at the Bank Prime Loan Rate Compounded Quarterly
## Applied to Jury Verdict Damages
## December 1, 2022 through July 24, 2025

| Quarter | Prejudgment Damages[1] | Interest Rate[2] | Quarterly Interest Rate[3] | Principal[4] | Earned Quarterly Interest |
|---|---|---|---|---|---|
| | -------(Dollars)------- | --------------(Percent)-------------- | | --------------------(Dollars)-------------------- | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| | | | (c)*0.25 | | (d)*(e) |
| 4Q22 | $ [redacted] | 7.26 % | 0.61 % | [redacted] | $ [redacted] |
| 1Q23 | $ [redacted] | 7.69 % | 1.92 % | $ [redacted] | $ [redacted] |
| 2Q23 | $ [redacted] | 8.16 % | 2.04 % | $ [redacted] | $ [redacted] |
| 3Q23 | $ [redacted] | 8.43 % | 2.11 % | $ [redacted] | $ [redacted] |
| 4Q23 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | $ [redacted] |
| 1Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | $ [redacted] |
| 2Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | $ [redacted] |
| 3Q24 | $ [redacted] | 8.44 % | 2.11 % | $ [redacted] | $ [redacted] |
| 4Q24 | $ [redacted] | 7.82 % | 1.96 % | $ [redacted] | $ [redacted] |
| 1Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | $ [redacted] |
| 2Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | $ [redacted] |
| 3Q25 | $ [redacted] | 7.50 % | 0.49 % | $ [redacted] | $ [redacted] |
| **Total:** | **$ 56,000,000** | | | | **$ 5,758,948** |

Notes: [1] See **Exhibit 1**.

[2] The interest rate is equal to the average of the daily Bank Prime Loan Rates reported by the Federal Reserve Bank of St. Louis for the three months in the quarter or for the days in the quarter with available sales data through July 24, 2025 (i.e., December 1, 2022 through December 31, 2022 for Q4 2022 and July 1, 2025 through July 24, 2025, for Q3 2025).

[3] The Quarterly Interest Rates in Q4 2022 and Q3 2025 are adjusted based on the number of days in each quarter that falls within the scope of this exhibit. Specifically, an adjustment of 34 percent is applied to the Quarterly Interest Rate in Q2 2022, as the data only cover the last 31 days of the quarter, in which there 92 days in total (31 / 92 = 0.34). Similarly, an adjustment of 26 percent is applied in Q3 2025, as the date of judgment occurred on the 24th day of the quarter, in which there are 92 days in total (24 / 92 = 0.26).

[4] Each royalty payment is assumed to occur at the end of the quarter and accrue to the principal the first day of the following quarter. Interest is assumed to compound quarterly and accrue to the principal on the first day of the following quarter. Accordingly, the principal at the end of a quarter equals the accrued royalty payments and interest from the preceding quarter plus the existing principal from that prior quarter.

Sources: **Exhibit 1**.
JTX-178, sheet "Daxxify Current Quarter Order D."
PTX-849, sheet "Revenue Details ITD-0930 AES."
PTX-985, sheet "All Data 10.1.24-5.31.25."
PTX-986, sheet "THX Life to Date."
REV_DAX-03348499, sheet "Gross Revenue Details."
"Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)* , retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed September 5, 2025.

[redacted]

## Exhibit 2B
## Prejudgment Interest at the Bank Prime Loan Rate Compounded Quarterly
## Applied to Damages from October 2, 2023 through June 4, 2025 Supplemental Data
## December 1, 2022 through July 24, 2025

| Quarter | Prejudgment Damages[1] | Interest Rate[2] | Quarterly Interest Rate[3] | Principal[4] | Earned Quarterly Interest |
|---|---|---|---|---|---|
| | --------(Dollars)-------- | --------------(Percent) | -------------- | ------------------(Dollars) | ------------------ |
| (a) | (b) | (c) | (d) | (e) | (f) |
| | | | (c)*0.25 | | (d)*(e) |
| 4Q22 | $ [redacted] | 7.26 % | 0.61 % | [redacted] | [redacted] |
| 1Q23 | $ [redacted] | 7.69 % | 1.92 % | $ [redacted] | [redacted] |
| 2Q23 | $ [redacted] | 8.16 % | 2.04 % | $ [redacted] | [redacted] |
| 3Q23 | $ [redacted] | 8.43 % | 2.11 % | $ [redacted] | [redacted] |
| 4Q23 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 1Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 2Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 3Q24 | $ [redacted] | 8.44 % | 2.11 % | $ [redacted] | [redacted] |
| 4Q24 | $ [redacted] | 7.82 % | 1.96 % | $ [redacted] | [redacted] |
| 1Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | [redacted] |
| 2Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | [redacted] |
| 3Q25 | $ [redacted] | 7.50 % | 0.49 % | $ [redacted] | [redacted] |
| **Total:** | **$** [redacted] | | | | **$** [redacted] |

Notes: [1] See **Exhibit 1**.

[2] The interest rate is equal to the average of the daily Bank Prime Loan Rates reported by the Federal Reserve Bank of St. Louis for the three months in the quarter or for the days in the quarter with available sales data through July 24, 2025 (i.e., December 1, 2022 through December 31, 2022 for Q4 2022 and July 1, 2025 through July 24, 2025, for Q3 2025).

[3] The Quarterly Interest Rates in Q4 2022 and Q3 2025 are adjusted based on the number of days in each quarter that falls within the scope of this exhibit. Specifically, an adjustment of 34 percent is applied to the Quarterly Interest Rate in Q2 2022, as the data only cover the last 31 days of the quarter, in which there 92 days in total (31 / 92 = 0.34). Similarly, an adjustment of 26 percent is applied in Q3 2025, as the date of judgment occurred on the 24th day of the quarter, in which there are 92 days in total (24 / 92 = 0.26).

[4] Each royalty payment is assumed to occur at the end of the quarter and accrue to the principal the first day of the following quarter. Interest is assumed to compound quarterly and accrue to the principal on the first day of the following quarter. Accordingly, the principal at the end of a quarter equals the accrued royalty payments and interest from the preceding quarter plus the existing principal from that prior quarter.

Sources: **Exhibit 1**.
JTX-178, sheet "Daxxify Current Quarter Order D."
PTX-849, sheet "Revenue Details ITD-0930 AES."
PTX-985, sheet "All Data 10.1.24-5.31.25."
PTX-986, sheet "THX Life to Date."
REV_DAX-03348499, sheet "Gross Revenue Details."
"Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)* , retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed September 5, 2025.

[redacted]

# Exhibit 2C
## Prejudgment Interest at the Bank Prime Loan Rate Compounded Quarterly
## Applied to Damages from June 1, 2025 through July 24, 2025 Supplemental Data
## December 1, 2022 through July 24, 2025

| Quarter | Prejudgment Damages[1] | Interest Rate[2] | Quarterly Interest Rate[3] | Principal[4] | Earned Quarterly Interest |
|---|---|---|---|---|---|
| | -------(Dollars)------- | --------------(Percent)-------------- | | --------------------(Dollars)-------------------- | |
| (a) | (b) | (c) | (d) | (e) | (f) |
| | | | (c)*0.25 | | (d)*(e) |
| 4Q22 | $ [redacted] | 7.26 % | 0.61 % | [redacted] | [redacted] |
| 1Q23 | $ [redacted] | 7.69 % | 1.92 % | $ [redacted] | [redacted] |
| 2Q23 | $ [redacted] | 8.16 % | 2.04 % | $ [redacted] | [redacted] |
| 3Q23 | $ [redacted] | 8.43 % | 2.11 % | $ [redacted] | [redacted] |
| 4Q23 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 1Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 2Q24 | $ [redacted] | 8.50 % | 2.13 % | $ [redacted] | [redacted] |
| 3Q24 | $ [redacted] | 8.44 % | 2.11 % | $ [redacted] | [redacted] |
| 4Q24 | $ [redacted] | 7.82 % | 1.96 % | $ [redacted] | [redacted] |
| 1Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | [redacted] |
| 2Q25 | $ [redacted] | 7.50 % | 1.88 % | $ [redacted] | [redacted] |
| 3Q25 | $ [redacted] | 7.50 % | 0.49 % | $ [redacted] | [redacted] |
| **Total:** | **$** [redacted] | | | | **$** [redacted] |

Notes: [1] See **Exhibit 1**.

[2] The interest rate is equal to the average of the daily Bank Prime Loan Rates reported by the Federal Reserve Bank of St. Louis for the three months in the quarter or for the days in the quarter with available sales data through July 24, 2025 (i.e., December 1, 2022 through December 31, 2022 for Q4 2022 and July 1, 2025 through July 24, 2025, for Q3 2025).

[3] The Quarterly Interest Rates in Q4 2022 and Q3 2025 are adjusted based on the number of days in each quarter that falls within the scope of this exhibit. Specifically, an adjustment of 34 percent is applied to the Quarterly Interest Rate in Q2 2022, as the data only cover the last 31 days of the quarter, in which there 92 days in total (31 / 92 = 0.34). Similarly, an adjustment of 26 percent is applied in Q3 2025, as the date of judgment occurred on the 24th day of the quarter, in which there are 92 days in total (24 / 92 = 0.26).

[4] Each royalty payment is assumed to occur at the end of the quarter and accrue to the principal the first day of the following quarter. Interest is assumed to compound quarterly and accrue to the principal on the first day of the following quarter. Accordingly, the principal at the end of a quarter equals the accrued royalty payments and interest from the preceding quarter plus the existing principal from that prior quarter.

Sources: **Exhibit 1**.
JTX-178, sheet "Daxxify Current Quarter Order D."
PTX-849, sheet "Revenue Details ITD-0930 AES."
PTX-985, sheet "All Data 10.1.24-5.31.25."
PTX-986, sheet "THX Life to Date."
REV_DAX-03348499, sheet "Gross Revenue Details."
"Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)* , retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed September 5, 2025.

[redacted]

# Exhibit 3
## Post-Judgment Interest Rate
## Using the One-Year Constant Maturity Treasury Yield
## Published by the Board of Governors of the Federal Reserve System
## July 14, 2025 through July 18, 2025

| Date | One-Year Constant Maturity Treasury Yield |
|---|---|
| | ------------(Percent)------------ |
| (a) | (b) |
| 7/14/2025 | 4.08 % |
| 7/15/2025 | 4.12 % |
| 7/16/2025 | 4.08 % |
| 7/17/2025 | 4.10 % |
| 7/18/2025 | 4.08 % |
| **Weekly Average:** | **4.09 %** |

Source: "Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis (DGS1)," *Board of Governors of the Federal Reserve System (US)* , retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DGS1, accessed August 29, 2025.

[redacted]

# EXHIBIT 2

# Intentionally left blank

# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 9, 2024**

# Revance Therapeutics, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-36297** | **77-0551645** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File No.) | (I.R.S. Employer Identification No.) |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
(Address of principal executive offices and zip code)

**(615) 724-7755**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, $0.001 par value | RVNC | Nasdaq Global Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

C.A. No. 21-1411-RGA-LDH
**Plaintiffs' Trial Exhibit**
**PTX-851**

**Item 8.01 Other Events**

On September 9, 2024, Revance Therapeutics, Inc. (the “Company”) announced that China’s National Medical Products Administration approved Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd.’s, a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd., biologics license application for DaxinbotulinumtoxinA for Injection for the improvement of glabellar lines.

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

| | |
|---|---|
| Date: September 9, 2024 | Revance Therapeutics, Inc. |
| | By: /s/ Tobin C. Schilke |
| | **Tobin C. Schilke** |
| | **Chief Financial Officer** |

# EXHIBIT 4

C.A. No. 21-1411-RGA-LDH
Plaintiffs' Trial Exhibit
PTX-767

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

# FORM 10-K

( Mark One)

ý **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2018

or

¨ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ___ to ___

Commission File No. 001-36297

# Revance Therapeutics, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **77-0551645** |
|---|---|
| State or other jurisdiction of incorporation or organization | (I.R.S. Employer Identification No.) |

**7555 Gateway Boulevard**
**Newark, California 94560**
**(510) 742-3400**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Exchange on Which Registered |
|---|---|
| Common Stock, par value $0.001 per share | The Nasdaq Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ý No ¨

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ¨ No ý

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ý No ¨

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ý No ¨

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ý

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ý | Accelerated filer | ¨ |
| Non-accelerated filer | ¨ | Smaller reporting company | ¨ |
| | | Emerging growth company | ¨ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial statement accounting standards provide pursuance to Section 13(a) of the Exchange Act. ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ¨ No ý

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $1.0 billion, based on the closing price of the registrant's common stock on the Nasdaq Global Market of $27.45 per share for such date.

Number of shares outstanding of the registrant's common stock, par value $0.001 per share, as of February 22, 2019 : 44,028,590

## DOCUMENTS INCORPORATED BY REFERENCE

Certain portions of the registrant's definitive proxy statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A, not later than April 30, 2019, in connection with the registrant's 2019 Annual Meeting of the Stockholders are incorporated herein by reference into Part III of this Annual Report on Form 10-K.

## Table of Contents


| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 22 |
| Item 1B | Unresolved Staff Comments | 55 |
| Item 2 | Properties | 56 |
| Item 3 | Legal Proceedings | 57 |
| Item 4 | Mine Safety Disclosures | 58 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 59 |
| Item 6 | Selected Financial Data | 61 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 62 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 81 |
| Item 8 | Financial Statements and Supplementary Data | 82 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 83 |
| Item 9A | Controls and Procedures | 84 |
| Item 9B | Other Information | 85 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 86 |
| Item 11 | Executive Compensation | 87 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 88 |
| Item 13 | Certain Relationships and Related Party Transactions, and Director Independence | 89 |
| Item 14 | Principal Accounting Fees and Services | 90 |
| **PART IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 91 |
| Item 16 | Form 10-K Summary | 91 |
| Signatures | | |


"Revance Therapeutics," the Revance logos and other trademarks or service marks of Revance appearing in this annual report on Form 10-K are the property of Revance. This Form 10-K contains additional trade names, trademarks and service marks of others, which are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K, or Form 10-K, contains "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, or the Exchange Act, as amended, which are subject to the "safe harbor" created by that section. The forward-looking statements in this Form 10-K are contained principally under "Item 1. Business," "Item 1A. Risk Factors" and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations." In some cases, you can identify forward-looking statements by the following words: "may," "will," "could," "would," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," "continue," "ongoing" or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these words. These statements involve risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements. Although we believe that we have a reasonable basis for each forward-looking statement contained in this Form 10-K, we caution you that these statements are based on a combination of facts and factors currently known by us and our projections of the future, about which we cannot be certain. These forward-looking statements include, but are not limited to, statements concerning the following:

- our expectations regarding the results, timing and completion of our clinical trials and regulatory submissions needed for the approval of DAXI, including but not limited to, for the treatment of glabellar (frown) lines, forehead lines, lateral canthal lines, cervical dystonia, plantar fasciitis, and adult upper limb spasticity in the United States ("U.S."), Europe and other countries;
- our expectations regarding our future development of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates for other indications, including but not limited to, chronic migraine;
- our expectations regarding the development of future product candidates;
- the potential for commercialization by us of DAXI, if approved;
- our expectations regarding the potential market size, opportunity and growth potential for DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, if approved for commercial use;
- our belief that DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates can expand overall demand for botulinum toxin;
- our ability to build our own sales and marketing capabilities, or seek collaborative partners including distributors, to commercialize our product candidates, if approved;
- our ability to manufacture in our facility and to scale up our manufacturing capabilities and those of future third-party manufacturers if our product candidates are approved;
- estimates of our expenses, future revenue, capital requirements and our needs for additional financing;
- the timing or likelihood of regulatory filings and approvals;
- our ability to advance product candidates into, and successfully complete, clinical trials;
- the implementation of our business model, and strategic plans for our business, product candidates and technology;
- the initiation, timing, progress and results of future preclinical studies and clinical trials and our research and development programs;
- the scope of protection we are able to establish and maintain for intellectual property rights covering our product candidates and technology;
- our ability to establish collaborations or obtain additional funding;
- our financial performance, including future revenue targets; and
- developments and projections relating to our competitors and our industry.

In addition, you should refer to Item 1A. "Risk Factors" in this Form 10-K for a discussion of these and other important factors that may cause our actual results to differ materially from those expressed or implied by our forward-looking statements. As a result of these factors, we cannot assure you that the forward-looking statements in this Form 10-K will prove to be accurate. Furthermore, if our forward-looking statements prove to be inaccurate, the impact may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame, or at all. Also, forward-looking statements represent our estimates and assumptions only as of the date of this Form 10-K. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## PART I

### ITEM 1. BUSINESS

**Overview**

Revance Therapeutics, Inc. ("we" or "the Company") is a clinical-stage biotechnology company focused on the development, manufacturing and commercialization of novel neuromodulators for multiple aesthetic and therapeutic indications. We are leveraging our proprietary portfolio of botulinum toxin type A compounds, formulated with our patented and proprietary peptide technology, to address unmet needs in large and growing neuromodulator markets. Our initial focus is on developing daxibotulinumtoxinA, our highly purified botulinum toxin Type A, for a broad spectrum of aesthetic and therapeutic indications, including facial wrinkles, muscle disorders, and chronic migraine.

Our lead drug candidate is DaxibotulinumtoxinA for Injection ("DAXI"). We used our unique proprietary peptide excipient technology to formulate DAXI. The noncovalent bond formed between the proprietary peptide excipient technology and the botulinum toxin may enable longer residence time of botulinum toxin Type A, which could explain DAXI's long duration of effect. The process binds a highly purified botulinum toxin Type A with a unique proprietary stabilizing excipient peptide. We do not use human serum albumin ("HSA") and other animal-sourced ingredients, which carry the risk of transmission of pathogens, to stabilize our product.

We are currently studying DAXI for the treatment of facial wrinkles, cervical dystonia, plantar fasciitis, adult upper limb spasticity and chronic migraine. We believe DAXI has the potential to expand into additional aesthetic and therapeutic indications in the future. We also are developing a topically applied neuromodulator for aesthetic and therapeutic indications, DaxibotulinumtoxinA Topical, and have a collaboration and license agreement with Mylan Ireland Limited, a wholly-owned indirect subsidiary of Mylan N.V. ("Mylan"), to develop and commercialize a biosimilar to BOTOX®.

**Pipeline Summary**






ALGN-1364657
PTX-767.0005

**Our Product Candidates**

**DaxibotulinumtoxinA for Injection ("DAXI")**

We are developing an injectable formulation of botulinum toxin type A, which we refer to as DAXI, for indications where a long-lasting effect is desired. We believe, and our preclinical and clinical studies using DAXI indicate, that daxibotulinumtoxinA combined with our novel peptide may safely achieve enhanced clinical efficacy and duration without an increase in associated adverse events. We are currently focusing on developing DAXI for the treatment of both aesthetic and therapeutic indications.

***Glabellar Lines***

The glabella is the area between the eyebrows and above the nose. Glabellar lines, often called "frown lines," are vertical lines that develop between the eyebrows and may appear as a single vertical line or as two or more lines. When one frowns, the muscles of the glabella contract causing vertical creases to form between the eyebrows. Botulinum toxin is used to temporarily block the ability of nerves to trigger contraction of injected muscle, inhibiting movement of the muscles that cause the frown lines, giving the skin a smoother, more refreshed appearance. The most common cosmetic use of BOTOX® Cosmetic is for the treatment of glabellar lines. Consumers enjoy the benefits of currently available botulinum toxin injections and express a high rate of satisfaction. However, consumers are less satisfied with the duration and longevity of currently available botulinum toxin injections.

Botulinum toxin treatment of glabellar lines is the largest proportion of cosmetic neuromodulator sales in the U.S. and, according to the American Society for Aesthetic Plastic Surgery ("ASAPS"), botulinum toxin treatment is the number one nonsurgical cosmetic procedure in the U.S. According to our 2018 Harris Poll survey results, 86 percent of the physicians surveyed want a neuromodulator that offers longer-lasting results than is available today and 88 percent of the patients consider long lasting duration very important or absolutely essential. Our primary qualitative market research among aesthetic physicians, patients, and office practice managers indicated that DAXI's longer lasting duration than what is available today is a differentiating and desirable attribute. A majority of those physicians interviewed reported that if DAXI confirmed similar results in Phase 3 trials, the increased duration of effect would cause them to change their treatment or purchase habits from currently available botulinum toxins to include DAXI. Duration of effect was reported in the qualitative market research to be the greatest unmet need and the primary driver of adoption amongst physicians, patients, and office managers.

We believe that a product that shows increased persistence of effect over time, with a slower return to baseline and a meaningful consumer benefit up to six months would better fit the current treatment regimen and consumer habits. Quantitative market research shows that the majority of consumers only visit their physicians nearly twice per year for treatments and the longer duration would mean that they would enable patients to remain more satisfied between treatments.

*Development of DAXI for Treatment of Glabellar Lines*

*Phase 1 and 2 Clinical Trials.* DAXI has demonstrated long-lasting effect and appeared to provide safe administration of botulinum toxin in Phase 1 and 2 clinical trials, even with repeated doses. Long-lasting effect was first demonstrated in 2014 in the final cohort of a four-cohort Phase 1/2 dose escalation clinical trial conducted outside the U.S. for improvement of glabellar lines. In the trial, DAXI met its primary efficacy and safety endpoints. The open-label, dose escalating, Phase 1/2 trial enrolled 48 adults.

DAXI appeared to be generally safe and well-tolerated with minimal adverse events in our Phase 1/2 trial. Adverse events were generally mild, localized and transient. The most common adverse events observed were headache and injection site reactions. There was no evidence of spread beyond the treatment site at any dose. There were no serious adverse events or evidence of any systemic exposure based on clinical laboratory results and related evaluations. Adverse event rates did not change in frequency, severity, or type with increasing doses.

Based on the results of this study, in 2015 we conducted BELMONT, a Phase 2, randomized, double-blind, dose ranging, active and placebo controlled, multi-center study to evaluate the safety, efficacy, and duration of effect of DAXI to treat glabellar lines. The primary endpoints for the study were the investigator's assessment of glabellar line severity at maximum frown at Week 24 based upon the subject response definition of at least one-point improvement from baseline on the Investigator Global Assessment-Facial Wrinkle Severity ("IGA-FWS") scale and median duration of effect from the date of treatment back to baseline severity. The BELMONT trial evaluated treatment for glabellar lines in 268 subjects with moderate to severe glabellar lines at nine investigational sites in Canada. The trial compared the safety, efficacy and duration of three doses of DAXI, the labeled dose of BOTOX® Cosmetic/VISTABEL® and a placebo control in a randomized 1:1:1:1:1 trial design. In 2015, we reported positive 24-week results from the trial that showed DAXI achieved its primary efficacy measurement with high statistical significance. In addition, the 40 Unit dose of DAXI demonstrated a 23.6-week median duration, compared to BOTOX® Cosmetic with an 18.8-week median duration. Across all cohorts, DAXI appeared to be generally safe and well-tolerated.

*Phase 3 Clinical Trials.* The Phase 3 clinical program includes a) SAKURA 1 and SAKURA 2, two randomized, double-blind, placebo-controlled pivotal trials to evaluate the safety and efficacy of a single administration of DAXI for the treatment of moderate to severe glabellar lines in adults and b) SAKURA 3, a long-term, open-label safety trial designed to evaluate the long-term safety of DAXI for the treatment of moderate to severe glabellar lines in adults following both single and repeat treatment administration.

The SAKURA 1 and SAKURA 2 trials enrolled more than 600 subjects at 30 sites in the U.S. and Canada. In both trials, subjects were randomized in a 2:1 ratio to either the DAXI or placebo treatment groups, respectively. Post-treatment, subjects were followed for at least 24 weeks and up to 36 weeks. The primary efficacy endpoint of the pivotal trials was a composite of the proportion of subjects who achieve a score of 0 or 1 (none or mild) and a two-point improvement from baseline in glabellar line severity on the IGA-FWS and Patient Facial Wrinkle Severity ("PFWS") scales, at maximum contraction (frown), at Week 4. Duration of the reduction of severity of the glabellar lines was assessed as a secondary efficacy endpoint in the Phase 3 pivotal trials.

In December 2017, we announced top-line results for the SAKURA 1 and SAKURA 2 pivotal trials. Both SAKURA 1 and SAKURA 2 met the primary composite endpoint by delivering highly statistically significant improvement against placebo in reducing the severity of glabellar lines. The percentage of DAXI-treated patients who had none or mild wrinkles and achieved at least a two-point improvement from baseline on both validated physician and patient assessments was 73.6 percent in SAKURA 1 and 74.0 percent in SAKURA 2 compared to placebo ($p<0.0001$) at Week 4. Also, at that time point, 88 percent of DAXI-treated patients in SAKURA 1 and 91 percent of DAXI patients in SAKURA 2 said they were very satisfied or satisfied with their treatment experience.

There were several secondary endpoints used to evaluate duration of effect, including the proportion of patients achieving none or mild response on IGA-FWS compared to placebo, median duration for time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS, and median duration for time to return to baseline on both IGA-FWS and PFWS. The percentage of DAXI-treated patients who achieved a none or mild response on IGA-FWS was 35.3 percent in SAKURA 1 and 29.4 percent at SAKURA 2 compared to placebo ($p<0.0001$) at Week 24. The median duration for time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS for DAXI-treated patients was 24.0 weeks for SAKURA 1 and 23.9 weeks for SAKURA 2. The median duration for time to return to baseline wrinkle severity on both IGA-FWS and PFWS for DAXI-treated patients was 27.7 weeks for SAKURA 1 and 26.0 weeks for SAKURA 2. For comparison, an additional exploratory duration endpoint was evaluated, which mirrors the duration measure used in the BELMONT Phase 2 study. This endpoint, was the median duration of greater or equal to 1 point improvement from baseline on IGA-FWS for DAXI-treated patients, and the results were 24.1 weeks for both SAKURA 1 and SAKURA 2, and 23.6 weeks for BELMONT.

In December 2018, we announced top-line results for the SAKURA 3 open-label, long-term safety study. DAXI appeared to be generally well-tolerated, with no new tolerability or safety concerns reported. As was seen in the SAKURA 1 and SAKURA 2 pivotal trials, adverse events were mild, localized and transient. The rate of treatment-related adverse events decreased over successive treatments. The most common treatment-related adverse events per treatment of DAXI were headache (3.3 percent of treatments), injection site pain (2.7 percent), injection site erythema (2.5 percent), and injection site oedema (2.2 percent). There were no treatment-related serious adverse events. Eyelid ptosis was reported in 0.9 percent of treatments, decreased in frequency with successive treatments and was substantially lower than the rate observed in SAKURA 1 and SAKURA 2 (2.2 percent of treatments). The majority of ptosis events were characterized as mild in severity (85 percent) and transient. A high degree of efficacy was seen consistently across all three treatment cycles. Results were consistent with SAKURA 1 and SAKURA 2 based on the IGA-FWS and PFWS scales. As early as Week 1, over 90 percent of subjects across all three treatments had none or mild wrinkles on the IGA-FWS. At Week 4, the percentage of DAXI-treated patients who achieved a none or mild response on IGA-FWS was 95.8 percent, 96.6 percent, and 97.7 percent for first, second and third treatment for SAKURA 3, respectively, and 97.5 percent for SAKURA 2 and SAKURA 1. On the more stringent 2-point composite endpoint, which was the primary efficacy endpoint in SAKURA 1 and 2, efficacy improved with successive treatment cycles: 73.2 percent, 77.7 percent, and 79.6 percent for first, second and third treatment of SAKURA 3, respectively, and 73.6 percent and 74.0 percent for SAKURA 1 and 2, respectively.

As in the SAKURA 1 and SAKURA 2 pivotal trials, there were several secondary endpoints used to evaluate duration of effect, including median time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS, and median duration for time to return to baseline wrinkle severity on both IGA-FWS and PFWS. Duration was evaluated in the first two 36-week treatment cycles; the third treatment cycle was not evaluated for duration as the observation period ended at twelve weeks for the purpose of this study. Median time to return to baseline wrinkle severity on both IGA-FWS and PFWS is 28.0 weeks and 28.1 weeks for first and second treatment of SAKURA 3, respectively, 27.7 weeks for SAKURA 1, and 26.0 weeks for SAKURA 2. Median time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS is 24.0 weeks and 24.1 weeks for first and second treatment of SAKURA 3, respectively, 24.0 weeks for SAKURA 1, and 23.9 weeks for SAKURA 2. We held a pre-BLA meeting with U.S. Food and Drug Administration ("FDA") in December 2018, to agree upon the content and format of the BLA, which we plan to submit in first half of 2019. We plan to file marketing applications in the European Union, Canada, and certain Latin American and Asian countries after filing in the U.S.

*European Union Agency Interactions.* We requested scientific guidance from the European Medicines Agency ("EMA") on the development of DAXI for the treatment of glabellar lines and the proposed Phase 3 program in 2016. The EMA provided comments on Quality, Nonclinical and Clinical programs. Overall, the EMA agreed with the proposed programs and provided details and suggestions to be considered for our marketing application. We have taken the EMA comments into consideration in the Phase 3 program and plan to provide data to support the various requests in the marketing application.

***Forehead Lines***

Forehead lines are produced by the action of the frontalis muscle, a large, thin, vertically-oriented muscle which lifts the eyebrows. The frontalis muscle serves as an antagonist to the glabellar musculature, a natural depressor that is responsible for frowning and associated eyebrow movement. As the eyebrow is considered the aesthetic center of the upper face, forehead lines can significantly impact the aesthetic appearance of the face, contribute to increased signs of aging and convey unwanted social signals. However, both men and women have identified internal factors, such as wanting to look good for their age or having a more youthful appearance as very important and have prioritized forehead lines as bothersome areas for potential treatment regardless of age or available income.

Minimally-invasive injectable treatments have become the most common procedure worldwide with an increase in frequency over the last decade since the first approval of botulinum neurotoxin Type A (BOTOX® Cosmetic [onabotulinumtoxinA] UPSI, Allergan, Inc. 2013). This is largely the result of years of experience of patients and injectors, and a favorable risk-benefit profile. BOTOX® Cosmetic was approved to treat forehead lines in 2017, and is currently the only toxin approved for that use, though other toxins are used off-label.

We initiated a Phase 2 study in forehead lines in January 2019.



ALGN-1364660
PTX-767.0008

***Lateral Canthal Lines***

Lateral canthal lines ("LCL" or "crow's feet") are the spider-like fine lines around the outside corners of the eyes that become more obvious when someone smiles. These lines (also referred to as periorbital wrinkles, laugh lines or smile lines), fan out across the skin from the outer corner of each eye. Sometimes they extend down across the cheekbones to the lower cheeks. Repetitive motions, such as squinting and smiling, can lead to the increase of wrinkles and contribute to the severity and onset of crow's feet. Age and exposure to sun also play significant roles in development of these lines, which can deepen over time. Current treatments include anti-wrinkle eye creams and moisturizers, topical tretinoins, botulinum toxin injections, dermal fillers and laser treatments. BOTOX® Cosmetic was approved to treat LCL in 2013, and is currently the only toxin approved for that use, though other toxins are used off-label.

We plan to initiate a Phase 2 study in LCL in the first quarter of 2019.

***Muscle Movement Disorders***

Muscle movement disorders are neurological conditions that affect a person's ability to control muscle activity in one or more areas of the body. Muscle spasticity happens after the body's nervous system has been damaged, most commonly by a stroke, disease, or trauma. While not life-threatening, spasticity can be painful and may have a significant effect on a person's quality of life. Certain tasks, like getting dressed or bathing, become difficult, and a person's self-esteem may be affected by an abnormal posture. Common muscle movement disorders include cervical dystonia (excessive pulling of the muscles in the neck and shoulder), upper or lower limb spasticity (stiffness in muscles), and blepharospasm (involuntary closing of the eyelids). Botulinum toxin type A has been proven safe and effective for such uses, as the most common treatment for muscle movement disorders is to relax the muscle by injecting it with botulinum toxin. According to Global Industry Analytics, Inc. ("GIA"), the global opportunity for botulinum toxin for the treatment of muscle movement disorders, which includes cervical dystonia and upper limb spasticity, was estimated to be over $1.0 billion in 2017. We will continue to evaluate development for other therapeutic indications, such as neurological movement and other disorders, based on the results of our current preclinical studies and clinical trials.

*DAXI for Treatment of Cervical Dystonia*

In 2015, we initiated a Phase 2 dose-escalating, open-label clinical study of DAXI to evaluate safety, preliminary efficacy, and duration of effect of DAXI in subjects with moderate to severe isolated cervical dystonia symptoms of the neck. In December 2016, we announced positive interim results from the Phase 2 clinical trial. The interim data showed that DAXI appeared to be generally safe and well-tolerated, demonstrated a median duration of at least 24 weeks for the first cohort of the study, and displayed a clinically significant impact on cervical dystonia signs and symptoms. The trial enrolled 37 subjects and follows three sequential treatment cohorts for up to a total of 24 weeks after treatment for each cohort. The trial's first cohort of 12 subjects received a single dose of up to 200 units of DAXI, the second cohort of 12 subjects received between 200 and 300 units, and the third cohort of 13 subjects received from 300 to 450 units. In May 2017, we announced positive 24-week topline results in all three cohorts from the Phase 2 trial. The topline data demonstrated a median duration of at least 24 weeks for all three cohorts.

Key results of the cervical dystonia trial are as follows:

*Safety.* In all three cohorts, DAXI appeared to be generally safe and well-tolerated through Week 24. There were no serious adverse events and no dose-dependent increase in adverse events. The treatment-related adverse events were transient and mild to moderate in severity, except for one case of neck pain reported as severe, with a duration of 2 days. The most common adverse events were dysphagia, or difficulty in swallowing (14 percent), of which all cases were mild in severity, injection site redness (8 percent), bruising (5 percent), injection site pain (5 percent), muscle tightness (5 percent) and muscle weakness (5 percent). For reference, trials for botulinum type A products approved to treat cervical dystonia have reported adverse events for dysphagia ranging from 13 percent to 39 percent.

*Efficacy.* The trial's 4-week primary efficacy measurement was the improvement in dystonia symptoms as determined by reduction from baseline on the Toronto Western Spasmodic Torticollis Rating Scale ("TWSTRS") total score. DAXI showed a clinically significant mean reduction of 16.8 from baseline, or 38 percent, across all three cohorts at Week 4. This reduction continued to increase to 50 percent at Week 6 for all subjects, was 42 percent at Week 12 and was maintained at or above 30 percent through Week 24. Clinically meaningful mean reductions in the TWSTRS Severity, Disability and Pain subscales were consistent and observed at all follow-up visits across all subjects. For reference, placebo-controlled trials for botulinum toxin type A products approved to treat cervical dystonia had a reduction in the TWSTRS-Total score from baseline of 21 percent to

26 percent at Week 4 and 13 percent to 16 percent at Week 12.

*Duration of Effect.* The median duration of effect was at least 24 weeks for each of the three dose cohorts studied. Duration of effect was defined as the number of weeks from treatment until the return of signs and symptoms that warrant retreatment, based on subjects reaching their target TWSTRS score. For reference, treatment with currently approved neuromodulators for cervical dystonia calls for injection of botulinum toxin approximately every 3 months (12 weeks), or 4 times per year.

In November 2017, the FDA granted orphan drug status to DAXI for the treatment of cervical dystonia in adults. Additionally, in November 2017, we completed our End-of-Phase 2 meeting with the FDA and received scientific advice from the EMA regarding DAXI for the treatment of cervical dystonia.

In June 2018, we announced the initiation of patient dosing in our ASPEN Phase 3 clinical program based on the Phase 2 safety and efficacy results and guidance from the FDA and EMA. The ASPEN Phase 3 clinical program consists of two trials to evaluate the safety and efficacy of DAXI for the treatment of cervical dystonia in adults including: a randomized, double-blind, placebo-controlled, parallel group trial, and an open-label, long-term safety trial. The program is expected to enroll approximately 300 patients in the pivotal trial and 350 patients in the open-label trial at multiple sites in the U.S., Canada, and Europe.

The program is expected to complete enrollment by early 2020, and we expect to release topline results in the second half of 2020.

*DAXI for Treatment of Adult Upper Limb Spasticity*

We initiated a Phase 2 study (JUNIPER) in adult upper limb spasticity in December 2018. Our JUNIPER Phase 2 clinical trial of upper limb spasticity is a randomized, double-blind, placebo-controlled trial to evaluate the efficacy and safety of DAXI at three dose levels versus placebo in reducing muscle tone of adult patients with upper limb spasticity due to stroke or traumatic brain injury over 36 weeks. The program is expected to enroll a total of approximately 128 patients, 18-70 years of age, at 25 sites in the U.S..

Patients will be randomized to one of three active treatment groups of DAXI or placebo. Post-treatment, patients will be followed for a maximum of 36 weeks. The co-primary efficacy endpoints of the trial will be the mean change from baseline in muscle tone using the Modified Ashworth Score ("MAS") scale in the suprahypertonic muscle group (SMG - highest degree for muscle tone) of the elbow, wrist, or finger flexors at Week 6, and the mean score on the Physician Global Impression of Change ("PGIC") scale at Week 6.

The JUNIPER study is expected to be fully enrolled by the second half of 2019, and we expect to release topline results in the second half of 2020.

***Plantar Fasciitis***

Plantar fasciitis is a painful affliction caused by inflammation of the ligament running along the bottom of the foot and is the most common cause of heel pain. Heel pain is the most common complaint of patients who visit podiatrists and orthopedic foot and ankle surgeons. Eighty percent of reported heel pain complaints are due to plantar fasciitis. Plantar fasciitis is estimated to affect 20 million individuals in the U.S.. Risk factors include age, long distance running, excessive weight, abnormal foot posture, use of poor foot wear, and repetitive trauma.

Symptoms can last six months or more, sometimes requiring surgery. In the U.S. alone, more than two million patients undergo treatment for plantar fasciitis each year. Treatment options for less severe cases include leg and foot stretching exercises, nonsteroidal anti-inflammatory drugs, shoe inserts, heel pads, and night splints. More severe or refractory cases are currently treated with steroid injections, extracorporeal shock wave therapy, platelet rich plasma injections, and/or surgery. Preclinical and clinical research suggests a neuromodulator candidate such as DAXI may provide patients with sustained relief from chronic heel pain and support healing of the plantar fascia without the risks of plantar fascia rupture or atrophy of the fat pad that can occur with corticosteroid injections, a common treatment.

Botulinum toxin is not currently approved for treating plantar fasciitis; the clinical endpoints, however, are well established. Published estimates place the annual U.S. evaluation and treatment market for plantar fasciitis at more than $250 million, and we believe the market could grow significantly larger if patients had a compelling neuromodulator treatment option.

*DAXI for Treatment of Plantar Fasciitis*

In 2016, we initiated a Phase 2 prospective, randomized, double-blinded, placebo-controlled trial of DAXI in the therapeutic indication of plantar fasciitis. This study evaluated the safety and efficacy of a single administration of DAXI in reducing the signs and symptoms of plantar fasciitis. The study completed enrollment of 59 subjects in the U.S. in October 2017. The study's primary efficacy endpoint is the improvement in the American Orthopedic Foot and Ankle Score ("AOFAS").

In January 2018, we announced the interim 8-week Phase 2a results for the plantar fasciitis trial. The trial's primary endpoint, the reduction in the patient-reported visual analog scale ("VAS") for pain at Week 8, showed a robust impact on pain, with a greater than 50 percent reduction for patients treated with DAXI. In the intent-to-treat population, a mean reduction in the VAS score of 54.2 percent from baseline was achieved with DAXI, compared with a 42.6 percent reduction in the placebo group, which upon further subgroup analysis, was driven primarily by a strong placebo response in the control group at three of the five study sites. While the results are not statistically significant (p=0.39), DAXI provided patients with considerable pain relief. Similar numeric trends were seen in the secondary and exploratory endpoints. DAXI appeared to be generally safe and well-tolerated through Week 8. The majority of adverse events in both treatment groups were mild in severity. There were no treatment-related serious adverse events. The most common treatment-related adverse events for DAXI and placebo were injection site pain (10.0 percent and 10.3 percent) and muscle weakness (3.3 percent and 3.4 percent), both respectively, all of which were classified as mild in severity. We completed the 16-week trial which showed a 58 percent reduction of pain from baseline along with a strong placebo response, with the difference between the treatment groups not being statistically significant.

In September 2018, we completed a Type C meeting with FDA discussing the design of the Phase 2 dose-finding study. We initiated another Phase 2 trial in December 2018. The Phase 2 prospective, randomized, double-blind, multi-center, placebo-controlled study will evaluate the safety and efficacy of two doses of administration of our investigational drug candidate DAXI in reducing the signs and symptoms of plantar fasciitis. The study is expected to enroll approximately 150 adult patients with unilateral plantar fasciitis, from approximately 20 study centers in the U.S.. Patients will be randomized (1:1:1) to receive an injection of a low dose, high dose or placebo. The study's primary efficacy endpoint is the change from baseline in Numeric Pain Rating Scale ("NPRS") score at Week 8. Patients will be followed for up to 24 weeks post treatment to assess treatment response, tolerability and safety. We expect to complete enrollment in this Phase 2 trial during the second half of 2019 and release topline results in the second half of 2020.

***Chronic Migraine***

Migraine headache is a central nervous system disorder characterized as moderate to severe headache and often includes other symptoms such as nausea and vomiting. Migraine headache affects more than 38 million people in the U.S., of which more than 3 million of whom suffer from chronic migraine headache. Chronic migraine headache is both undertreated and underdiagnosed, and is defined as more than fifteen headache days per month over a three-month period of which more than eight are migrainous, in the absence of medication overuse. According to GIA, the global opportunity for botulinum toxin for the treatment of chronic migraine was estimated to be approximately $600 million in 2017.

We are in the process of finalizing our Chronic Migraine Clinical Development strategy. We plan to study DAXI for the treatment of chronic migraine in 2019 or 2020.



ALGN-1364665
PTX-767.0013

**OnabotulinumtoxinA Biosimilar**

In February 2018, we entered into a collaboration and license agreement with Mylan ("Mylan Collaboration") pursuant to which we will collaborate with Mylan exclusively, on a world-wide basis (excluding Japan) (the "ex-U.S. Mylan territories"), to develop, manufacture and commercialize a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®. As part of the Mylan Collaboration, Mylan agreed to pay a non-refundable upfront payment of $25 million with additional contingent payments of up to $100 million, in the aggregate, upon the achievement of specified clinical and regulatory (i.e. biosimilar biological pathway) milestones and of specified, tiered sales milestones of up to $225 million. In addition, Mylan would pay us low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-U.S. Mylan territories. However, we agreed to waive royalties for U.S. sales, up to a limit of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs.

In February 2019, we and Mylan recently had a Biosimilar Initial Advisory Meeting with the FDA on a proposed biosimilar to BOTOX®. In this meeting, the FDA provided guidance on their expectations for a development program to establish biosimilarity to BOTOX®. Based on the agency's feedback, we and Mylan believe that a 351(k) pathway for the development of a biosimilar to onabotulinumtoxinA is viable and provides the opportunity to develop and commercialize the first biosimilar product for all eleven currently approved indications of BOTOX® and BOTOX® Cosmetic.

**DaxibotulinumtoxinA Topical**

DaxibotulinumtoxinA Topical presents several potential advantages, including painless topical administration, no bruising, ease of use and limited dependence on administration technique by physicians and medical staff. We believe these potential advantages may improve the experience of patients undergoing botulinum toxin procedures and could make DaxibotulinumtoxinA Topical suitable for multiple indications in the future. We are planning to conduct additional preclinical work for DaxibotulinumtoxinA Topical in therapeutic and aesthetic applications where botulinum toxin has shown efficacy and is particularly well suited for injection-free treatments.

**Our Technology**

**Our Proprietary Peptide Excipient Technology**

Combining our proprietary peptide excipient technology with active drug macromolecules such as daxibotulinumtoxinA may help address currently unfulfilled needs in aesthetic medicine and therapeutic categories. Employing our proprietary peptide excipient technology may ensure overall formulation performance of the DAXI where the focus is on delivering the first potentially long-acting neuromodulator. Our daxibotulinumtoxinA compound is often referred to as "a pipeline within a product," as there are multiple indications that may potentially be treated by our daxibotulinumtoxinA compound.

**DAXI Delivery of Botulinum Toxin**

DAXI utilizes our proprietary botulinum toxin-peptide complex in a saline-based formulation. In DAXI, the peptide interacts with both extracellular structures and cell surface receptors in the targeted muscle. This interaction restricts the toxin molecule to the target site and potentially reduces unwanted spread to other neighboring muscles. We believe that by limiting the spread of DAXI to neighboring muscles, DAXI is likely to be better tolerated at higher doses than BOTOX® Cosmetic. Additionally, at doses where the spread of BOTOX® Cosmetic and DAXI were compared, DAXI appeared to be more targeted with longer duration in our preclinical studies. Nonclinical and clinical data taken together suggest that DAXI may provide long duration of effect at the target muscle and reduce spread to untargeted muscles.

**The Botulinum Toxin Opportunity**

Botulinum toxin is a protein and neuromodulator produced by *Clostridium botulinum*. Since 1989 botulinum toxin in an injectable dose form has been used to treat a variety of aesthetic and therapeutic indications in the U.S. and globally. Botulinum toxin has been approved for a variety of therapeutic indications including cervical dystonia, upper limb spasticity, blepharospasm, strabismus associated with neurological movement disorders, hyperhidrosis, migraine headache, overactive bladder and, most recently, lower limb spasticity. In the U.S., botulinum toxin has been approved to treat three aesthetic indications, glabellar lines, forehead lines and lateral canthal lines, although we believe botulinum toxin to be widely used for other aesthetic indications. Three products, Allergan's BOTOX® Cosmetic, Ipsen and Galderma's Dysport®, and Merz's Xeomin®, each of which is delivered in an injectable form, have been approved for the treatment of glabellar lines in the United States.

According to Millennium Research Group, Inc. ("MRG"), the global opportunity for botulinum toxin was estimated to be $4.3 billion in 2018 compared to $3.8 billion in 2017. The market is projected to reach approximately $9.0 billion by 2027, registering a compounded annual growth rate of approximately 9 percent over the analysis period of 2017 to 2027. We estimate the market opportunity split between therapeutics and aesthetics is approximately 60 percent and 40 percent, respectively. We expect continued growth to be driven by new indications and product launches in new geographies. According to clinicaltrials.gov, as of December 31, 2018, there were more than 125 active clinical trials for a wide range of uses of botulinum toxin, with approximately 24 percent of these identified as being in Phase 3 clinical development. We are unaware of any clinical trials for potentially competitive long-lasting products that may realistically achieve commercialization before DAXI, but it is possible that clinical trials for such potentially competitive products have occurred or are occurring.

**The Opportunity for Botulinum Toxins for Aesthetic Indications**

Today's culture places significant value on physical appearance, leading to widespread adoption of anti-aging and aesthetic treatments. Aesthetic treatments have grown dramatically in the U.S., driven by a large population of consumers who are looking to delay signs of aging and improve general appearance.

Injectable botulinum toxin treatments are the single largest cosmetic procedure in the U.S. and the rest of the world. According to the ASAPS, a strong consumer preference for non-surgical options and the increasing availability of effective alternatives have prompted adoption of non-surgical aesthetic procedures by a broader patient population. Non-surgical procedures account for approximately 68 percent of all procedures performed in 2017, according to the ASAPS 2017 annual statistics. Injectable botulinum toxin continued to be the most frequently performed non-surgical procedure in 2017, with 1.5 million procedures in the US, a 7.6 percent increase over 2016. Injectable treatments overall, botulinum toxins and dermal fillers, increased 5.1 percent in 2017, according to ASAPS. Injectable botulinum toxin treatments have been the number one nonsurgical procedure since 2000, according to ASAPS.

**The Opportunity for Botulinum Toxins for Therapeutic Indications**

While currently approved botulinum toxin products may be better known for their aesthetic applications, according to MRG, the fastest-growing segment for botulinum toxin treatments globally is for therapeutic indications. This growth has been driven largely by the approval of botulinum toxin products in new indications such as preventive treatment of chronic migraine headache and upper limb spasticity in 2010, urinary incontinence in 2011, overactive bladder in 2013, and lower limb spasticity in 2016. Botulinum toxin's ability to affect neuromuscular junctions, muscle activity or the release of neuropeptides, neurotransmitters and neuromediators in a controlled manner has enabled it to be developed and used in a wide range of therapeutic indications.

In addition to the approved therapeutic indications mentioned above, botulinum toxin products are being evaluated in clinical trials in multiple other therapeutic indications including acne, rosacea, skin and wound healing, scar reduction, hair loss treatments, plantar fasciitis and several musculoskeletal conditions.

We believe there is opportunity to improve injectable botulinum toxin use in neurological movement and other disorders. Muscle movement disorders are neurological conditions that affect a person's ability to control muscle activity in one or more areas of the body. Muscle spasticity happens after the body's nervous system has been damaged, most commonly by a stroke, disease, or trauma. Muscle spasticity can be painful and may have a significant effect on a person's quality of life. Certain tasks, like getting dressed or bathing, become difficult, and a person's self-esteem may be affected by an abnormal posture. Common muscle movement disorders include cervical dystonia (excessive pulling of the muscles in the neck and shoulder), and upper or lower limb spasticity (stiffness in arm or leg muscles). Botulinum toxin type A has been proved safe and effective for such uses, as the most common treatment for muscle movement disorders is to relax the muscle by injecting it with botulinum toxin. However, such injections must be repeated every 3-4 months and require large doses, typically more than 200 BOTOX® units each treatment. As a result of the discomfort associated with muscle movement disorders and the associated demand for treatment that currently requires up to four visits per year, we believe that there is a significant need for a long-lasting and targeted injectable botulinum toxin.



ALGN-1364668
PTX-767.0016

**Our Strategy**

Our objective is to be a leading provider of neuromodulator products across multiple aesthetic and therapeutic indications in both injectable and topical dose forms and to expand the opportunity for botulinum toxin products. To achieve this objective, we plan to develop and commercialize two proprietary, patent-protected product candidates, DAXI and DaxibotulinumtoxinA Topical, and participate in development and commercialization of biosimilar to BOTOX® with Mylan.

Key elements of our strategy are:

- *Complete DAXI clinical development and file for marketing approval in frown lines in the U.S. followed by Europe.* We announced positive top-line results for DAXI in alleviating moderate-to-severe glabellar lines in two randomized, double-blind, placebo-controlled pivotal Phase 3 trials that evaluated the safety and efficacy of a single administration of DAXI for the treatment of moderate-to-severe glabellar lines in adults. The SAKURA 1 and SAKURA 2 trials enrolled a total of 609 patients at 30 sites in the U.S. and Canada. We also completed our SAKURA Phase 3 open-label, long-term safety study program of DAXI for the treatment of glabellar lines in December of 2018, which enrolled a total of 2,691 patients at 66 sites in the U.S. and Canada. In the first half of 2019, we plan to submit a Biologics License Application ("BLA") in the U.S. to gain marketing approval, followed by filings in other countries in 2020. In addition, we plan to initiate Phase 2 study for forehead lines and lateral canthal lines in conjunction with treatment of the frown lines in the first quarter of 2019.

- *Advance DAXI clinical development for therapeutic indications.* We reported Phase 2 results for cervical dystonia in November 2017 and Phase 2a results for plantar fasciitis in January 2018. We initiated our Phase 3 program for the treatment of cervical dystonia in June 2018, and the Phase 3 program is expected to enroll approximately 300 patients in the pivotal trial and 350 patients in the open-label trial at multiple sites in the U.S., Canada, and Europe. We are evaluating future development of DAXI in other indications. As part of this strategy, we initiated a Phase 2 study for upper limb spasticity and another Phase 2 study for plantar fasciitis in December 2018.

- *Build our own sales and marketing capabilities to commercialize DAXI in North America.* We have expanded our pre-commercial activities in anticipation of approval of DAXI in glabellar lines. If DAXI is approved for the treatment of glabellar lines by the FDA, we intend to expand our own commercial organization in North America. Specifically, we plan to build a specialty sales force to target key physicians who perform the majority of aesthetic procedures, including dermatologists, plastic surgeons, facial plastic surgeons, and oculoplastic surgeons.

- *Expand the global opportunity for botulinum toxin products.* We believe DAXI has the ability to expand the botulinum toxin opportunity by appealing to patients who seek a long-lasting effect. We also believe DaxibotulinumtoxinA Topical and other possible dose forms can expand the overall botulinum toxin opportunity beyond the current patient base by bringing in new patients who would prefer a needle-free approach to treatment and a more tolerable procedure.

- *Establish selective strategic partnerships to maximize the commercial potential of our product candidates and our proprietary peptide excipient technology.* Outside of North America, we plan to evaluate whether to commercialize our product candidates on our own or in collaboration with potential partners and distributors. Specifically, assuming regulatory approval of DAXI outside of the U.S., we will evaluate whether to build in-house commercial capabilities in one or more countries outside of the U.S. and Canada or to seek commercialization partners to maximize the profitability of DAXI. As part of this strategy, in December 2018, we entered into a license agreement (the "Fosun License Agreement") with Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd ("Fosun"), whereby we have granted Fosun the exclusive rights to develop and commercialize our proprietary DAXI in mainland China, Hong Kong and Macau (the "Fosun Territory") and certain sublicense rights. Additionally, our proprietary peptide excipient technology can be used for molecules other than botulinum toxin. We plan to partner or license the peptide excipient technology opportunistically to monetize our technology platform.

- *Maximize the value of our botulinum toxin cell line and manufacturing assets.* We have developed an integrated manufacturing, analytics, research and development facility that is capable of producing proprietary forms of botulinum toxin for us and for potential future partners. As part of this strategy, in February 2018, we entered into the Mylan Collaboration, pursuant to which we will collaborate with Mylan exclusively, on a world-wide basis (excluding Japan), to develop, manufacture and commercialize the biosimilar to BOTOX®.

**Manufacturing and Operations**

We have established capabilities for the production of botulinum toxin type A, including bulk drug substance and injectable finished drug product. Botulinum toxin is regulated as a Tier 1 Select Agent under authority of the Centers for Disease Control and Prevention ("CDC"), and as such requires that we obtain a select agent registration and perform our operations in compliance with CDC regulations. We are in good standing under our select agent registration with the CDC. We have assembled a team of experienced individuals in the technical disciplines of chemistry, biology, biosafety, and engineering and have appropriately equipped laboratory space to support ongoing research and development efforts in our botulinum toxin product development platform. We have the ability to manufacture our own botulinum toxin bulk drug substance to support our clinical trial programs and eventually, our commercial production. We believe that having direct control over our manufacturing processes will enable us to develop additional pharmaceutical product configurations effectively and with a competitive cost structure. In March 2017, we entered into a Technology Transfer, Validation and Commercial Fill/Finish Services Agreement (the "Althea Services Agreement") with Ajinomoto Althea, Inc.("Althea"), a contract development and manufacturing organization, to provide us with expanded capacity and a second source for drug product manufacturing to support a global launch of DAXI. The Althea Services Agreement also mitigates supply chain risk by giving us a different manufacturing location for drug product manufacturing and reduces future capital and operating expenditures required in our primary manufacturing facility by outsourcing to an experienced partner.

We manufacture and perform testing for both bulk drug substance and finished dosage forms of drug product to support our DAXI candidate. The additional components required for our product lines and the peptide for DAXI are manufactured by third parties under contract with us. Refer to section entitled "Outsourced Components" below for additional information.

**Drug Substance**

Manufacture of the drug substance for DAXI is based on microbial fermentation followed by product recovery and purification steps. The process is entirely free of animal and human-derived materials and depends on standard raw materials available commercially. The process is already scaled to support all future commercial demands. Bulk drug substance is stable when stored for extended periods, which allows us to establish reserves of drug substance and allows periodic drug substance production to replenish inventories as needed.

**Drug Product**

Manufacture of dose forms to support the DAXI programs is currently performed at our fill-finish facility. The manufacturing process consists of bulk compounding, liquid fill and freeze-drying to support acceptable shelf-life duration. We plan to perform further scale-up of DAXI drug product manufacturing to meet anticipated commercial demand and may utilize internal capacity, a third-party manufacturer such as Althea or a combination of both.

**Outsourced Components**

We contract with third parties for the manufacture of our botulinum toxin and the additional components required for our products, which includes the manufacture of bulk peptide.

Our agreement with List Biological Laboratories, Inc. ("List Laboratories"), a developer of botulinum toxin, includes certain milestone payments related to the clinical development of our botulinum toxin products and the toxin manufacturing process. There is a royalty with an effective rate ranging from low-to-mid single-digit percentages of future sales of botulinum toxin. Our agreement with List Laboratories will remain in effect until expiration of our royalty obligations and may be terminated earlier on mutual agreement or because of a material breach by either party.

Our agreement with American Peptide Company, Inc. ("American Peptide"), which was acquired by Bachem, includes development, manufacture and supply of peptide in accordance with certain specifications. This agreement also includes certain quality control and inspection provisions through which we can ensure the satisfactory quality of our peptide. Our agreement with American Peptide will remain in effect until 2020 and may be terminated earlier by either party following advance notice or a material breach by either party.

Our agreement with Althea includes manufacture and supply of drug product in accordance with certain specifications. This agreement also includes certain quality control and inspection provisions through which we can ensure the satisfactory quality of our drug product. Our agreement with Althea will remain in effect for seven years and may be terminated earlier by either party following advance notice or a material breach by either party.

ALGN-1364672
PTX-767.0020

**Competition**

We expect to enter highly competitive pharmaceutical and medical device markets. Successful competitors in the pharmaceutical and medical device markets have the ability to effectively discover, develop, test and obtain regulatory approvals for products, as well as the ability to effectively commercialize, market and promote approved products, including communicating the effectiveness, safety and value of products to actual and prospective customers and medical staff. Numerous companies are engaged in the development, manufacture and marketing of healthcare products competitive with those that we are developing.

Many of our competitors have substantially greater manufacturing, financial, research and development, personnel and marketing resources than we do. Our competitors may also have more experience and expertise in obtaining marketing approvals from the FDA and other regulatory authorities. In addition to product development, testing, approval and promotion, other competitive factors in the pharmaceutical and medical device industries include product quality and price, product technology, reputation, customer service and access to technical information. Our competitors may be able to develop competing or superior technologies and processes, and compete more aggressively and sustain that competition over a longer period of time than we could. Our technologies and products may be rendered obsolete or uneconomical by technological advances or entirely different approaches developed by one or more of our competitors. As more companies develop new intellectual property in our markets, the possibility of a competitor acquiring patent or other rights that may limit our products or potential products increases, which could lead to litigation.

Upon marketing approval, the first expected uses of our products will be to treat glabellar lines, cervical dystonia, plantar fasciitis, and adult upper limb spasticity, followed by potential use to treat other aesthetic and therapeutic conditions. The technologies with which we expect to compete directly are injectable and topical neuromodulators.

**Injectable Neuromodulators**

Our primary competitors for DAXI in the pharmaceutical market are expected to be companies offering injectable dose forms of botulinum toxin, including:

- BOTOX® and BOTOX Cosmetic®, marketed by Allergan plc, since its original approval by the FDA in 1989, has been approved for multiple indications, including glabellar lines, forehead lines, crow's feet, axillary hyperhidrosis, upper and lower limb spasticity, cervical dystonia, strabismus, blepharospasm, chronic migraine, incontinence, and overactive bladder. Allergan is a leading global pharmaceutical company with significant research, discovery, and delivery capabilities.
- Dysport®, an injectable botulinum toxin for the treatment of cervical dystonia, glabellar lines and upper and lower limb spasticity, is marketed by Ipsen Ltd., or Ipsen, and Galderma, a Nestle company. Galderma has rights to market the product in the U.S. and Canada. Dysport® was approved by the FDA in 2009. Ipsen received marketing authorization for a cosmetic indication for Dysport® in Germany. Ipsen granted Galderma an exclusive development and marketing license for Dysport® for cosmetic indications in the European Union, Russia, Eastern Europe and the Middle East, and first rights of negotiation for other countries around the world, except the U.S., Canada and Japan. Galderma is Ipsen's sole distributor for Dysport® in Brazil, Argentina and Paraguay. The health authorities of 15 European Union countries have also approved Dysport® for glabellar lines under the trade name Azzalure®. Ipsen and Syntaxin are engaged in a research collaboration agreement to develop native and engineered formats of botulinum toxin.
- Myobloc® (rimabotulinumtoxinB) is currently marketed by US WorldMeds and approved by the FDA in 2000 for the treatment of cervical dystonia.
- Xeomin®, an injectable botulinum toxin for the treatment of cervical dystonia, glabellar lines, blepharospasm, and upper limb spasticity, is marketed by Merz Pharma, or Merz. Xeomin is approved by the FDA for cervical dystonia and blepharospasm in adults, glabellar lines, and the treatment of upper limb spasticity. Xeomin® is also currently approved for glabellar lines in Korea, Argentina and Mexico, and therapeutic indications in most countries in the European Union as well as Canada and certain countries in Latin America and Asia. Bocouture® (rebranded from Xeomin®), marketed by Merz, has approval for glabellar lines in Germany and the European Union.
- Jeuveau™, an injectable botulinum toxin manufactured by Daewoong Pharmaceutical Co., Ltd. in South Korea, was approved in 2019 by the FDA in the U.S. for the treatment of glabellar lines only. It is marketed in the U.S. by Evolus, Inc. Jeuveau is also known as NABOTA® in South Korea along with other geographic areas and was designated Nuceiva™ in Canada.

We are aware of competing botulinum toxins currently being developed or commercialized in the U.S., Asia, South America and other markets. Some of these markets may or may not require adherence to the FDA's cGMPs or the regulatory requirements of the EMA or other regulatory agencies in countries that are members of the Organization for Economic Cooperation and Development. While some of these products may not meet U.S. regulatory standards, the companies operating in these markets may be able to produce products at a lower cost than U.S. and European manufacturers. In addition to the injectable botulinum toxin dose forms, we are aware that other companies are developing topical botulinum toxins for cosmetic and therapeutics indications and are conducting clinical trials for acne, facial aesthetic and hyperhidrosis.

**Aesthetic Medicine**

Professional facial aesthetic medicine includes neuromodulators and dermal fillers, as well as polymer-based injectables. These and other products experience competition from procedures, such as laser treatments, face lifts, chemical peels, fat injections and cold therapy. In the U.S., dermal filler products, including Allergan's Juvéderm family of fillers including Juvéderm VOLUMA® XC, compete with Galderma's products Restylane ® and Perlane™. The FDA has approved Allergan's Juvéderm® Ultra XC and Ultra Plus XC products containing lidocaine as well as new formulations of Galderma's Restylane® and Perlane™, also containing lidocaine, and Restylane® without lidocaine for lips. Allergan also has FDA approval for Juvéderm Volbella® XC, created specifically for lips for and long-lasting results. Galderma has FDA approval for Restylane Refyne for the treatment of moderate to severe facial wrinkles and folds, and Restylane Defyne for the treatment of moderate to severe, deep facial wrinkles and folds. Additional competitors in the filler category include Radiesse®, a calcium hydroxylapatite from BioForm, acquired by Merz, Sculptra® from Galderma, and Belotero Balance® from Merz. Internationally, other competitive products include products from Bloomage BioTechnology, LG Life Sciences, Medytox, Laboratories TEOXANE, Sinclair Pharma, and a large number of other hyaluronic acid, bioceramic, protein and other polymer-based dermal fillers. All new generation fillers now last at least six months. We believe a neuromodulator with a six-month duration of effect would allow physicians to coordinate treatments with fillers.

**Sales and Marketing**

We currently have limited marketing capabilities and no sales organization. Assuming successful completion of clinical trials and receipt of marketing approval for DAXI for treatment of glabellar lines by the FDA, we plan to launch in North America with our own commercial organization. Specifically, we would access the North American market by hiring a focused, specialized sales force that targets the aesthetic physicians (dermatologists, plastic surgeons, facial plastic surgeons, oculo-plastic surgeons, and aesthetic practitioners) who perform the majority of the cosmetic procedures. Assuming approval to market in the U.S., we will focus our initial marketing of DAXI on these core specialties.

**Strategic Partnering**

We plan to focus our efforts on developing and commercializing DAXI in North America and we intend to market on our own. Outside of North America, we will seek collaborations to maximize the commercial potential of our product candidates and delivery technology. As part of this strategy, in December 2018, we announced a collaboration with Fosun to develop and commercialize DAXI in China.

We also plan to leverage our botulinum toxin cell line and manufacturing assistance by partnering with other companies. In February 2018, we entered into a collaboration with Mylan pursuant to which Mylan and us will collaborate exclusively, on a world-wide basis (excluding Japan), to develop, manufacture and commercialize the biosimilar to BOTOX®.

**Intellectual Property**

Our success depends in large part on our ability to obtain and maintain intellectual property protection for our drug candidates, novel biological discoveries, and drug development technology and other know-how, to operate without infringing on the proprietary or intellectual property rights of others and to prevent others from infringing our proprietary and intellectual property rights. We seek to protect our proprietary position by, among other methods, filing U.S. and foreign patent applications related to our proprietary technology, inventions and improvements that are important to the development and implementation of our business. We also rely on know-how, copyright, trademarks and trade secret laws, continuing technological innovation and potential in-licensing opportunities to develop and maintain our proprietary position. Such protection is also maintained using confidential disclosure agreements. Protection of our technologies is important for us to offer our customers proprietary services and products unavailable from our competitors, and to exclude our competitors from using technology that we have developed. If competitors in our industry have access to the same technology, our competitive position may be adversely affected.

It is possible that our current patents, or patents which we may later acquire or develop, may be successfully challenged or invalidated in whole or in part. It is also possible that we may not obtain issued patents from our pending patent applications or other inventions we seek to protect. Due to uncertainties inherent in prosecuting patent applications, sometimes patent applications are rejected and we subsequently abandon them. It is also possible that we may develop proprietary products or technologies in the future that are not patentable or that the patents of others will limit or altogether preclude our ability to do business. In addition, any patent issued to us, or any of our pending patent applications, may provide us with little or no competitive advantage, in which case we may abandon such patent, or patent applications, or license them to another entity. Please refer to Item 1A. "Risk Factors—Risks Related to our Intellectual Property." for more information.

In June 2016, we entered into an asset purchase agreement with Botulinum Toxin Research Associates, Inc.("BTRX") (the "BTRX Purchase Agreement"). Under the BTRX Purchase Agreement, we acquired all rights, title and interest in a portfolio of botulinum toxin-related patents and patent applications from BTRX and were granted the right of first negotiation and of right of first refusal with respect to other botulinum toxin-related patents owned or controlled by BTRX.

As of January 16, 2019, we held approximately 419 issued patents and approximately 106 pending patent applications, including foreign counterparts of U.S. patents and applications. 37 of our patents are issued in the U.S., with the rest issued in Australia, Canada, China, various countries in Europe, Hong Kong, Israel, Japan, Malaysia, Mexico, New Zealand, Singapore and South Africa. In addition, we have pending patent applications in the U.S. as well as in Australia, Brazil, Canada, China, Europe, Hong Kong, Israel, India, Japan, Korea, Mexico, and Singapore. The earliest that any of our U.S. patents will expire is December 10, 2019 for U.S. Patent No. 6429189, which is a patent acquired as part of the asset purchase from BTRX but does not disclose or claim our DAXI technology. The latest that any of our U.S. patents will expire is July 20, 2035. We will continue to pursue additional patent protection as well as take appropriate measures to obtain and maintain proprietary protection for our innovative technologies.

On May 2, 2018, Allergan plc filed an Opposition in the European Patent Office against our European Patent No. EP 2 661 276 titled "Topical composition comprising botulinum toxin and a dye." While the opposed patent is not material to RT002 injectable, we will continue to take appropriate measures to defend the patent.

Our registered and pending U.S. trademarks include REVANCE®, TransMTS®, MOTISTE®, "Remarkable Science Changes Everything®", MEYESMILE, Relastin®, "Remarkable Science. Enduring Performance®", and R Logo.

**Government Regulation**

**Product Approval Process in the U.S.**

In the U.S., the FDA regulates drugs and biologic products under the Federal Food, Drug and Cosmetic Act ("FDCA"), its implementing regulations, and other laws, including, in the case of biologics, the Public Health Service Act ("PHSA"). Our product candidates, DAXI and DaxibotulinumtoxinA Topical, are subject to regulation by the FDA as a biologic. Biologics require the submission of a BLA to the FDA and approval of the BLA by the FDA before marketing in the U.S.

The process of obtaining regulatory approvals for commercial sale and distribution and the subsequent compliance with applicable federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Failure to comply with the applicable U.S. requirements at any time during the product development process, approval process or after approval, may subject an applicant to administrative or judicial civil or criminal sanctions. These sanctions could include the FDA's refusal to approve pending applications, license suspension or revocation, withdrawal of an approval, imposition of a clinical hold on clinical trials, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, restitution, disgorgement or civil or criminal penalties. The process required by the FDA before a biologic may be marketed in the U.S. generally involves the following:



ALGN-1364677
PTX-767.0025

- completion of preclinical laboratory tests, animal studies and formulation studies performed in accordance with the FDA's current good laboratory practices ("GLPs");
- submission to the FDA of an Investigational New Drug Application ("IND") which must become effective before human clinical trials in the U.S. may begin;
- approval by an institutional review board ("IRB"), at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with the FDA's current good clinical practices ("GCP") regulations to establish the safety and efficacy of the product candidate for its intended use;
- submission to the FDA of a BLA;
- satisfactory completion of an FDA inspection, if the FDA deems it as a requirement, of the manufacturing facility or facilities where the product is produced to assess compliance with the FDA's current good manufacturing practice standards ("cGMP") regulations to assure that the facilities, methods and controls are adequate to preserve the product's identity, strength, potency, quality and purity, as well as compliance with applicable Quality System Regulations ("QSR"), for devices;
- potential inspections by the FDA of the nonclinical and clinical trial sites that generated the data in support of the BLA;
- potential review of the BLA by an external advisory committee to the FDA, whose recommendations are not binding on the FDA; and
- FDA review and approval of the BLA prior to any commercial marketing or sale.

***Preclinical Studies***

Before testing any compounds with potential therapeutic value in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, stability and formulation, as well as animal studies to assess the potential toxicity and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions about the conduct of the clinical trial, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a product candidate at any time before or during clinical trials due to safety concerns or non-compliance, or for other reasons.



**ALGN-1364678**
PTX-767.0026

***Clinical Trials***

Clinical trials involve the administration of the product candidate to human patients under the supervision of qualified investigators, generally physicians not employed by or under the clinical trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety and effectiveness. Each protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted in accordance with GCPs. Further, each clinical trial must be reviewed and approved by an IRB at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of clinical trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- *Phase 1.* The product candidate is initially introduced into a limited population of healthy human subjects and tested for safety, dosage tolerance, absorption, metabolism, distribution and excretion. In the case of some products for some diseases, or when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in patients with the disease or condition for which the product candidate is intended to gain an early indication of its effectiveness.
- *Phase 2.* The product candidate is evaluated in a limited patient population, but larger than in Phase 1, to identify possible adverse events and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted indications and to assess dosage tolerance, optimal dosage and dosing schedule.
- *Phase 3.* Clinical trials are undertaken to further evaluate dosage, and provide substantial evidence of clinical efficacy and safety in an expanded patient population, such as several hundred to several thousand, at geographically dispersed clinical trial sites. Phase 3 clinical trials are typically conducted when Phase 2 clinical trials demonstrate that a dose range of the product candidate is effective and has an acceptable safety profile. These trials typically have at least 2 groups of patients who, in a blinded fashion, receive either the product or a placebo. Phase 3 clinical trials are intended to establish the overall risk/benefit ratio of the product and provide an adequate basis for product labeling. Generally, two adequate and well-controlled Phase 3 clinical trials are required by the FDA for approval of a BLA.

Post-approval trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication to further assess the biologic's safety and effectiveness after BLA approval. Phase 4 trials can be initiated by the drug sponsor or as a condition of BLA approval by the FDA.

Annual progress reports detailing the results of the clinical trials must be submitted to the FDA and written IND safety reports must be promptly submitted to the FDA and the investigators for serious and unexpected adverse events or any finding from tests in laboratory animals that suggests a significant risk for human subjects.

Concurrent with clinical trials, companies usually complete additional animal studies and must also develop additional information about the chemistry and physical characteristics of the biologic and finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate and, among other things, must develop methods for testing the identity, strength, quality and purity of the final biologic product. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its shelf life.

***U.S. Review and Approval Processes***

The results of product development, preclinical studies and clinical trials, along with descriptions of the manufacturing process, analytical tests, proposed labeling and other relevant information are submitted to the FDA in the form of a BLA requesting approval to market the product for one or more specified indications. The submission of a BLA is subject to the payment of substantial user fees.

Once the FDA receives a BLA, it has 60 days to review the BLA to determine if it is substantially complete and the data are readable, before it accepts the BLA for filing. Once the submission is accepted for filing, the FDA begins an in-depth review of the BLA. Under the goals and policies agreed to by the FDA under the Prescription Drug User Fee Act ("PDUFA"), the FDA has twelve months from submission in which to complete its initial review of a standard BLA and make a decision on the application, and eight months from submission for a priority BLA, and such deadline is referred to as the PDUFA date. The FDA does not always meet its PDUFA dates for either standard or priority BLAs. The review process and the PDUFA date may be extended by three months if the FDA requests or the BLA sponsor otherwise provides additional information or clarification regarding information already provided in the submission within the last three months before the PDUFA date.

After the BLA submission is accepted for filing, the FDA reviews the BLA to determine, among other things, whether the proposed product is safe and effective for its intended use, and whether the product is being manufactured in accordance with cGMP to assure and preserve the product's identity, strength, potency, quality and purity. The FDA may refer applications for novel drug or biological products or drug or biological products which present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions. During the approval process, the FDA also will determine whether a Risk Evaluation and Mitigation Strategies ("REMS"), is necessary to assure the safe use of the product. If the FDA concludes a REMS is needed, the sponsor of the BLA must submit a proposed REMS; the FDA will not approve the BLA without an approved REMS, if required. A REMS can substantially increase the costs of obtaining approval and limit commercial opportunity.

Before approving a BLA, the FDA can inspect the facilities at which the product is manufactured. The FDA will not approve the BLA unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with GCP requirements. If the FDA determines that the application, manufacturing process or manufacturing facilities are not acceptable, it will outline the deficiencies in the submission and often will request additional clinical testing or information before a BLA can be approved.

The FDA will issue a complete response letter if the agency decides not to approve the BLA. The complete response letter describes all of the specific deficiencies in the BLA identified by the FDA during review. The deficiencies identified may be minor, for example, requiring labeling changes, or major, for example, requiring additional clinical trials. Additionally, the complete response letter may include recommended actions that the applicant might take to place the application in a condition for approval. If a complete response letter is issued, the applicant may either resubmit the BLA, addressing all of the deficiencies identified in the letter, or withdraw the application.

If a product receives regulatory approval, the approval may be significantly limited to specific diseases and dosages or the indications for use may otherwise be limited, which could restrict the commercial value of the product. Further, the FDA may require that certain contraindications, warnings or precautions be included in the product labeling. In addition, the FDA may require post marketing studies, sometimes referred to as Phase 4 testing, which involves clinical trials designed to further assess drug safety and effectiveness and may require testing and surveillance programs to monitor the safety of approved products that have been commercialized. After approval, certain changes to the approved biologic, such as adding new indications, manufacturing changes or additional labeling claims, are subject to further FDA review and approval. Depending on the nature of the change proposed, a BLA supplement must be submitted and approved before the change may be implemented. For many proposed post-approval changes to a BLA, the FDA has up to 180 days to review the supplement. As with new BLAs, the review process is often significantly extended by the FDA requests for additional information or clarification.

***Post-Approval Requirements***

Any biologic products for which we receive FDA approvals are subject to continuing regulation by the FDA, including, among other things, record-keeping requirements, reporting of adverse experiences with the product, providing the FDA with updated safety and efficacy information, product sampling and distribution requirements, complying with certain electronic records and signature requirements and complying with FDA promotion and advertising requirements, which include, among others, restrictions on direct-to-consumer advertising, promoting biologics for uses or in patient populations that are not described in the product's approved labeling, known as "off-label use," industry-sponsored scientific and educational activities, and promotional activities involving the internet. The FDA closely regulates the post-approval marketing and promotion of biologics, and although physicians may prescribe legally available drugs for off-label uses, manufacturers may not market or promote such off-label uses. Failure to comply with these or other FDA requirements can subject a manufacturer to possible legal or regulatory action, such as warning letters, suspension of manufacturing, seizure of product, injunctive action, mandated corrective advertising or communications with healthcare professionals, possible civil or criminal penalties or other negative consequences, including adverse publicity.

We currently manufacture clinical drug supplies using a combination of third-party manufacturers and our own manufacturing facility in order to support both of our product candidates and plan to do so on a commercial scale if our product candidates are approved. Our future collaborators may also utilize third parties for some or all of a product we are developing with such collaborator. We and our third-party manufacturers are required to comply with applicable FDA manufacturing requirements contained in the FDA's cGMP regulations. cGMP regulations require among other things, quality control and quality assurance as well as the corresponding maintenance of records and documentation. Drug manufacturers and other entities involved in the manufacture and distribution of approved biologics are required to register their establishments with the FDA and certain state agencies, and are subject to periodic inspections by the FDA and certain state agencies for compliance with cGMP and other laws. Accordingly, manufacturers must continue to expend time, money, and effort in the area of production and quality control to maintain cGMP compliance.

***U.S. Patent Term Restoration and Marketing Exclusivity***

Depending upon the timing, duration and specifics of the FDA approval of our biologic product candidate, some of our U.S. patents may be eligible for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments permit a patent restoration term of up to five years as compensation for patent term lost during product development and the FDA regulatory review process. However, patent term restoration cannot extend the remaining term of a patent beyond a total of 14 years from the product's approval date. The patent term restoration period is generally one-half the time between the effective date of an IND and the submission date of a BLA plus the time between the submission date of a BLA and the approval of that application. Only one patent applicable to an approved product is eligible for the extension and the application for the extension must be submitted prior to the expiration of the patent. The U.S. Patent and Trademark Office, in consultation with the FDA, reviews and approves the application for any patent term extension or restoration. In the future, we may intend to apply for restoration of patent term for one of our currently owned or licensed patents to add patent life beyond its current expiration date, depending on the expected length of the clinical trials and other factors involved in the filing of the relevant BLA.

Market exclusivity provisions under the FDCA can also delay the submission or the approval of certain applications of other companies seeking to reference another company's BLA. Specifically, the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"), established an abbreviated pathway for the approval of biosimilar and interchangeable biological products. Under the BPCIA, an application for a biosimilar product cannot be approved by the FDA until twelve years after the original branded product was approved under a BLA. However, an application may be submitted after four years, which initiates a process in which the innovator BLA holder and the biosimilar applicant identify patents that could be litigated and resolve patent disputes.

**Product Approval Process Outside the U.S.**

In addition to regulations in the U.S., we will be subject to a variety of foreign regulations governing manufacturing, clinical trials, commercial sales and distribution of our future products. Whether or not we obtain FDA approval for a product candidate, we must obtain approval of the product by the comparable regulatory authorities of foreign countries before commencing clinical trials or marketing in those countries. The approval process varies from country to country, and the time may be longer or shorter than that required for FDA approval. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country.

Under European Union regulatory systems, marketing authorizations may be submitted either under a centralized, decentralized or mutual recognition procedure. The centralized procedure provides for the grant of a single marketing authorization that is valid for all European Union member states. The decentralized procedure includes selecting one reference member state ("RMS"), and submitting to more than one member state at the same time. The RMS National Competent Authority conducts a detailed review and prepares an assessment report, to which concerned member states provide comment. The mutual recognition procedure provides for mutual recognition of national approval decisions. Under this procedure, the holder of a national marketing authorization may submit an application to the remaining member states post-initial approval. Within 90 days of receiving the applications and assessment report, each member state must decide whether to recognize approval.

**Federal and State Fraud and Abuse and Data Privacy and Security Laws and Regulations**

In addition to FDA restrictions on marketing of pharmaceutical products, federal and state fraud and abuse laws restrict certain business practices in the biotechnology industry. These laws include anti-kickback and false claims statutes. We will be subject to these laws and regulations once we begin to directly commercialize our products.

The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to induce, or in return for, purchasing, leasing, ordering or arranging for the purchase, lease or order of any item or service reimbursable under Medicare, Medicaid or other federal healthcare programs. The term "remuneration" has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payment, ownership interests and providing anything at less than its fair market value. The Anti-Kickback Statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on one hand prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and our practices may not in all cases meet all of the criteria for statutory exemptions or safe harbor protection. Practices that involve remuneration that may be alleged to be intended to induce prescribing, purchases or recommendations may be subject to scrutiny if they do not qualify for an exemption or safe harbor. Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated. The reach of the Anti-Kickback Statute was also broadened by the Patient Protection and Affordable Care Act as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, the ACA, which, among other things, amends the intent requirement of the federal Anti-Kickback Statute. Pursuant to the statutory amendment, a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it in order to have committed a violation. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the civil False Claims Act or the civil monetary penalties statute, which imposes penalties against any person who is determined to have presented or caused to be presented a claim to a federal health program that the person knows or should know is for an item or service that was not provided as claimed or is false or fraudulent. The federal transparency requirements under ACA require certain manufacturers of drugs, devices, biologics and medical supplies to annually report to the Department of Health and Human Services information related to payments and other transfers of value to physicians and teaching hospitals and physician ownership and investment interests.

The federal False Claims Act prohibits any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government or knowingly making, using or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. Pharmaceutical and other healthcare companies have been prosecuted under these laws for allegedly providing free product to customers with the expectation that the customers would bill federal programs for the product. Other companies have been prosecuted for causing false claims to be submitted because of the companies' marketing of the product for unapproved, and thus non-reimbursable, uses. Also, many states have similar fraud and abuse statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor.



**ALGN-1364683**
PTX-767.0031

In addition, we may be subject to data privacy and security regulation by both the federal government and the states in which we conduct our business. The Health Insurance Portability and Accountability Act ("HIPAA"), as amended by the Health Information Technology and Clinical Health Act ("HITECH"), and its implementing regulations, imposes certain requirements relating to the privacy, security and transmission of individually identifiable health information. Among other things, HITECH makes HIPAA's privacy and security standards directly applicable to "business associates," those independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity. HITECH also increased the civil and criminal penalties that may be imposed against covered entities, business associates and possibly other persons, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorney's fees and costs associated with pursuing federal civil actions. In addition, state laws govern the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and may not have the same effect, thus complicating compliance efforts.

Because of the breadth of these laws and the narrowness of available statutory and regulatory exemptions, it is possible that some of our business activities now and in the future could be subject to challenge under one or more of such laws. If our operations are found to be in violation of any of the federal and state laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including criminal and significant civil monetary penalties, damages, fines, imprisonment, exclusion of products from reimbursement under government programs and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. To the extent that any of our products are sold in a foreign country, we may be subject to similar foreign laws and regulations, which may include, for instance, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

**Environment, Health and Safety**

We are voluntarily assessing and publicly reporting our greenhouse gas emissions and water usage, and have begun to take action to reduce such emissions and usage. For example, we have established employee commuter programs, evaluated the energy efficiency of our buildings and installed low-flow water fixtures. Various laws and regulations have been implemented or are under consideration to mitigate the effects of climate change caused by greenhouse gas emissions. For example, the California Air Resources Board is in the process of drafting regulations to meet state emissions targets. Based on current information and subject to the finalization of the proposed regulations, we believe that our primary risk related to climate change is the risk of increased energy costs. However, because we are not an energy-intensive business, we do not anticipate being subject to a cap and trade system or any other mitigation measures that would likely be material to our capital expenditures, results of operations or competitive position.

We are also subject to other federal, state and local regulations regarding workplace safety and protection of the environment. We use hazardous materials, chemicals, and various compounds in our research and development activities and cannot eliminate the risk of accidental contamination or injury from these materials. Certain misuse or accidents involving these materials could lead to significant litigation, fines and penalties. We have implemented proactive programs to reduce and minimize the risk of hazardous materials incidents.

**Research and Development**

Conducting research and development is central to our business model. We have invested and expect to continue to invest significant time and capital in our research and development operations. We plan to maintain or increase our research and development expenses for the foreseeable future to initiate and complete additional clinical trials and associated programs related to DAXI for aesthetic indications in areas such as forehead lines and lateral canthal lines, and therapeutic indications in areas such as cervical dystonia, plantar fasciitis, adult upper limb spasticity, and chronic migraine.

**Customers**

For the year ended December 31 2018, revenue from Mylan represented 100 percent of our total revenue. For the years ended December 31, 2017 and 2016, all of our revenue was from Precision Dermatology, Inc. ("PDI"), which was subsequently acquired by Valeant Pharmaceuticals International, Inc.("Valeant").

**Employees**

As of December 31, 2018, we had 170 employees. Of these employees, 111 employees were engaged in research and development and 59 employees were engaged in finance, marketing, human resources, facilities, information technology, general management, and administrative activities. We plan to continue to expand our research, development, and commercial activities next year. None of our employees are represented by a labor union and we consider our employee relations to be good.

**Other Information**

We were incorporated in Delaware on August 10, 1999, under the name Essentia Biosystems, Inc. We commenced operations in June 2002 and, in April 2005, changed our name to Revance Therapeutics, Inc. Our principal executive offices are located at 7555 Gateway Boulevard, Newark, California 94560, and our telephone number is (510) 742-3400. Our website address is http://www.revance.com. The information contained in, or that can be accessed through, our website is not part of this Form 10-K.

We file electronically with the SEC, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act. We make available on our website at www.revance.com (under "Investors-Financials & Filings"), free of charge, copies of these reports as soon as reasonably practicable after filing these reports with, or furnishing them to, the SEC.



ALGN-1364685
PTX-767.0033

## ITEM 1A. RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as all other information included in this Form 10-K, including our Consolidated Financial Statements, the notes thereto and the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before you decide to purchase shares of our common stock. If any of the following risks actually occurs, our business, prospects, financial condition and operating results could be materially harmed. As a result, the trading price of our common stock could decline and you could lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations and stock price.*

### Risks Related to Our Business and Strategy

**We are substantially dependent on the clinical and commercial success of our product candidate DAXI.**

To date, we have invested substantial efforts and financial resources in the research and development of botulinum toxin-based product candidates. Our success as a company is substantially dependent on the clinical and commercial success of DAXI.

We are in Phase 3 clinical development for DAXI in North America for the treatment of glabellar lines. From 2016 to 2018, we conducted and announced results relating to multiple pivotal and safety trials in our SAKURA Phase 3 program. The SAKURA 1 and SAKURA 2 trials were designed to evaluate the safety and efficacy of a single administration of DAXI for the treatment of moderate-to-severe glabellar lines in adults. In addition to the two pivotal trials, the Phase 3 program includes a long-term open-label safety trial (SAKURA 3), which is designed to evaluate the long-term safety and duration of DAXI for the treatment of moderate to severe glabellar lines in adults following both single and repeat treatment administration. SAKURA 3 was designed to support a safety database adequate for both domestic and international marketing applications. We plan to file marketing applications for DAXI for the treatment of glabellar lines first in the U.S. in the first half of 2019, followed by the European Union, Canada, and certain Latin American and Asian countries.

In 2015, we initiated a Phase 2 dose-escalating, open-label clinical study of DAXI for the treatment of cervical dystonia. The Phase 2 study evaluated the safety, preliminary efficacy, and duration of effect of DAXI in subjects with moderate to severe isolated cervical dystonia. Based on the Phase 2 safety and efficacy results and subsequent guidance from the FDA and EMA, in June 2018 we announced the initiation of patient dosing in our ASPEN Phase 3 clinical program. The ASPEN Phase 3 clinical program consists of two trials to evaluate the safety and efficacy of DAXI for the treatment of cervical dystonia in adults including: a randomized, double-blind, placebo-controlled, parallel group trial and an open-label, long-term safety trial.

In 2016, we also initiated a Phase 2 prospective, randomized, double-blinded, placebo-controlled trial of DAXI in the therapeutic indication of plantar fasciitis. This study evaluated the safety and efficacy of a single administration of DAXI in reducing the signs and symptoms of plantar fasciitis. The study's primary efficacy endpoint is the improvement in the AOFAS. In January 2018, we announced interim 8-week results from this study. We completed the 16-week trial which showed a 58 percent reduction of pain from baseline along with a strong placebo response, with the difference between the treatment groups not being statistically significant. We initiated another Phase 2, double-blind, placebo-controlled trial utilizing two doses of DAXI in the fourth quarter of 2018.

In April 2018, we announced two new clinical programs for DAXI, including adult upper limb spasticity and chronic migraine. We initiated a Phase 2 study in adult upper limb spasticity in the fourth quarter of 2018 and we expect to have topline results in second half of 2020. In 2019, we plan to continue evaluating DAXI for the treatment of chronic migraine.

Our near-term prospects, including our ability to finance our company and generate revenue, will depend heavily on the successful development, regulatory approval and commercialization of DAXI. Our longer-term prospects will depend on the successful development, regulatory approval and commercialization of DAXI, as well as DaxibotulinumtoxinA Topical, biosimilar or any future product candidates. The preclinical, clinical and commercial success of our product candidates will depend on a number of factors, including the following:

- timely completion of, or need to conduct additional, clinical trials, including our clinical trials for DAXI, DaxibotulinumtoxinA Topical, biosimilar and any future product candidates, which may be significantly slower or cost more than we currently anticipate and will depend substantially upon the number and design of such trials and the accurate and satisfactory performance of third-party contractors;
- our ability to demonstrate the effectiveness and differentiation of our products on a consistent basis as compared to existing or future therapies;
- our ability to demonstrate to the satisfaction of the FDA, the safety and efficacy of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates through clinical trials;
- whether we are required by the FDA or other similar foreign regulatory agencies to conduct additional clinical trials to support the approval of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- our success in educating physicians and patients about the benefits, administration and use of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, if approved;
- the prevalence and severity of adverse events experienced with our product candidates or future approved products;
- the timely receipt of necessary marketing approvals from the FDA and similar foreign regulatory authorities;
- the ability to raise additional capital on acceptable terms and in the time frames necessary to achieve our goals;
- achieving and maintaining compliance with all regulatory requirements applicable to DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates or approved products;
- the availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative treatments;
- the effectiveness of our own or our current and any future potential strategic collaborators' marketing, sales and distribution strategy and operations;
- our ability to manufacture clinical trial supplies of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates and to develop, validate and maintain a commercially viable manufacturing process that is compliant with current good manufacturing practices, or cGMP;
- our ability to successfully commercialize DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, if approved for marketing and sale, whether alone or in collaboration with others;
- our ability to enforce our intellectual property rights in and to DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- our ability to avoid third-party patent interference or intellectual property infringement claims;
- acceptance of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, if approved, as safe and effective by patients and the medical community;
- the willingness of third-party payors to reimburse physicians or patients for DAXI and any future products we may commercialize for therapeutic indications;
- the willingness of patients to pay out of pocket for DAXI and any future products we may commercialize for aesthetic indications;
- the continued acceptable safety profile of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates following approval.

If we do not achieve one or more of these factors, many of which are beyond our control, in a timely manner or at all, we could experience significant delays or an inability to successfully commercialize our product candidates. Accordingly, we cannot assure you that we will be able to generate sufficient revenue through the sale of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidate to continue our business.

**We may be unable to obtain regulatory approval for DAXI, topical product candidate, biosimilar product candidate or future product candidates under applicable regulatory requirements. The denial or delay of any such approval would delay commercialization and have a material adverse effect on our potential to generate revenue, our business prospects, and our results of operations.**

To gain approval to market a biologic product such as DAXI, DaxibotulinumtoxinA Topical or biosimilar, we must provide the FDA and foreign regulatory authorities with data that adequately demonstrate the safety, efficacy and quality of the product for the intended indication applied for in the BLA or other respective marketing applications. The development of biologic products is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical trials. A number of companies in the pharmaceutical industry, including biotechnology companies, have suffered significant setbacks in clinical trials, including in Phase 3 development, even after promising results in earlier preclinical studies or clinical trials. These setbacks have been caused by, among other things, findings made while clinical trials were underway, safety or efficacy observations, including previously unreported adverse events; and the need to conduct further supportive or unanticipated studies, even after initiating Phase 3 trials. Success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful or that additional supportive studies will not be required, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct.

For example, we completed DaxibotulinumtoxinA Topical clinical trials for the treatment of lateral canthal lines ("crow's feet") and primary axillary hyperhidrosis, but discontinued further clinical development in 2016 following the results from our REALISE 1 Phase 3 clinical trial for crow's feet. In 2016, we also initiated a Phase 2 trial of DAXI for the treatment of plantar fasciitis. In January 2018, we announced interim 8-week results from this study and subsequently completed the 16-week trial, which showed a strong placebo response, with the difference between the treatment groups not being statistically significant.

Our business currently depends substantially on the successful development, regulatory approval and commercialization of our product candidates. Based on discussion with the FDA at a Pre-Phase 3 meeting in the second quarter of 2016 and the minutes received following the meeting, we submitted an IND in the U.S. and initiated subject dosing in Phase 3 clinical studies of DAXI for the treatment of glabellar lines in 2016. In the first quarter of 2017, we completed patient enrollment in the two pivotal trials of our SAKURA Phase 3 program and in October 2017, we completed enrollment of SAKURA 3. In December 2017, we announced positive top-line results from the two pivotal trials. In December 2018, we announced top-line results for the SAKURA 3 open-label, long-term safety study. We plan to move forward with studies required for submission of a BLA. In June 2018, we announced the initiation of patient dosing in our ASPEN Phase 3 clinical program for DAXI for the treatment of cervical dystonia. The program is expected to enroll approximately 300 patients in each of the two studies at multiple sites in the U.S., Canada, and Europe.

Such studies may increase the time, expense and uncertainty of our product development programs, including, for example, because results of such studies may indicate to us a further need to refine the related product candidate.

We currently have no drug or biologic products approved for sale, and we may never obtain regulatory approval to commercialize DAXI, DaxibotulinumtoxinA Topical or biosimilar. The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of drug and biologic products are subject to extensive regulation by the FDA and other regulatory authorities in the U.S. and other countries, and such regulations differ from country to country. We are not permitted to market our product candidates in the U.S. until we receive approval of a BLA from the FDA. We are also not permitted to market our product candidates in any foreign countries until we receive the requisite approval from the regulatory authorities of such countries.

The FDA or any foreign regulatory body can delay, limit or deny approval of our product candidates for many reasons, including:

- our inability to demonstrate to the satisfaction of the FDA or an applicable foreign regulatory body that DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates are safe and effective for the requested indication;
- our inability to demonstrate preclinical proof of concept of DaxibotulinumtoxinA Topical, biosimilar or other products in future, new indications;
- the FDA's or an applicable foreign regulatory agency's disagreement with the trial protocol or the interpretation of data from preclinical studies or clinical trials;
- our inability to demonstrate that clinical and other benefits of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates outweigh any safety or other perceived risks;
- the FDA's or an applicable foreign regulatory agency's requirement for additional preclinical or clinical studies;
- the FDA's or an applicable foreign regulatory agency's non-approval of the formulation, labeling or the specifications of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- the FDA's or an applicable foreign regulatory agency's failure to approve our manufacturing processes or facilities, or the manufacturing processes or facilities of third-party manufacturers with which we contract; or
- the potential for approval policies or regulations of the FDA or an applicable foreign regulatory agency to significantly change in a manner rendering our clinical data insufficient for approval.

Of the large number of drugs, including biologics, in development, only a small percentage successfully complete the FDA or other regulatory approval processes and are commercialized.

Even if we eventually complete clinical testing and receive approval of any regulatory filing for DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, the FDA or the applicable foreign regulatory agency may grant approval contingent on the performance of costly additional post-approval clinical trials. The FDA or the applicable foreign regulatory agency also may approve DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates for a more limited indication or a narrower patient population than we originally requested, and the FDA or applicable foreign regulatory agency may not approve the labeling that we believe is necessary or desirable for the successful commercialization of our product candidates. Any delay in obtaining, or inability to obtain, applicable regulatory approval for any of our product candidates, and DAXI in particular, would delay or prevent commercialization of DAXI and would materially adversely impact our business, results of operations and prospects.

**Even if we receive regulatory approval for our product candidates, we will be subject to ongoing FDA and foreign regulatory obligations and continued regulatory review.**

We and any third party contract development and manufacturers or suppliers are required to comply with applicable GMP regulations and other international regulatory requirements. The regulations require that our product candidates be manufactured and records maintained in a prescribed manner with respect to manufacturing, testing and quality control/quality assurance activities. Manufacturers and suppliers of materials must be named in a BLA submitted to the FDA for any product candidate for which we are seeking FDA approval. Additionally, third party manufacturers and suppliers and any manufacturing facility must undergo a pre-approval inspection before we can obtain marketing authorization for any of our product candidates. Even after a manufacturer has been qualified by the FDA, the manufacturer must continue to expend time, money and effort in the area of production and quality control to ensure full compliance with GMP. Manufacturers are subject to regular, periodic inspections by the FDA following initial approval. Further, to the extent that we contract with third parties for the manufacture of our products, our ability to control third-party compliance with FDA requirements will be limited to contractual remedies and rights of inspection.

If, as a result of the FDA's inspections, it determines that the equipment, facilities, laboratories or processes do not comply with applicable FDA regulations and conditions of product approval, the FDA may not approve the product or may suspend the manufacturing operations. If the manufacturing operations of any of the suppliers for our product candidates are suspended, we may be unable to generate sufficient quantities of commercial or clinical supplies of product to meet market demand, which would harm our business. In addition, if delivery of material from our suppliers were interrupted for any reason, we might be unable to ship our approved product for commercial supply or to supply our products in development for clinical trials. Significant and costly delays can occur if the qualification of a new supplier is required.

ALGN-1364690
PTX-767.0038

Failure to comply with regulatory requirements could prevent or delay marketing approval or require the expenditure of money or other resources to correct. Failure to comply with applicable requirements may also result in warning letters, fines, injunctions, civil penalties, recall or seizure of products, total or partial suspension of production, refusal of the government to renew marketing applications and criminal prosecution, any of which could be harmful to our ability to generate revenues and our stock price.

Any regulatory approvals that we receive for our product candidates are likely to contain requirements for post-marketing follow-up studies, which may be costly. Product approvals, once granted, may be modified based on data from subsequent studies or commercial use. As a result, limitations on labeling indications or marketing claims, or withdrawal from the market may be required if problems occur after approval and commercialization.

**We will require substantial additional financing to achieve our goals, and a failure to obtain this necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts.**

Since our inception, most of our resources have been dedicated to the research and preclinical and clinical development of our botulinum toxin product candidates, DAXI, DaxibotulinumtoxinA Topical or biosimilar. In particular, our clinical programs for DAXI, DaxibotulinumtoxinA Topical or biosimilar will require substantial additional funds to complete. We had an accumulated deficit through December 31, 2018 of $684.8 million and a working capital surplus of $176.0 million as of December 31, 2018, primarily as a result of our November 2015 and December 2017 follow-on public offerings, and at-the-market ("ATM") offerings in 2015 and 2017. Our recorded net losses were $142.6 million, $120.6 million and $89.3 million, for the years ended December 31, 2018, 2017, and 2016, respectively. We have funded our operations primarily through the sale and issuance of convertible preferred stock, common stock, notes payable and convertible notes. As of December 31, 2018, we had capital resources consisting of cash and cash equivalents and short-term investments of $175.8 million. We raised aggregate net proceeds of $126.2 million and $156.9 million in our follow-on public offerings in November 2015 and December 2017, respectively. In addition, we raised net proceeds of approximately $10.0 million by selling an aggregate of 352,544 shares of our common stock under the 2015 ATM agreement, which was effectively terminated on March 7, 2016, and raised net proceeds of approximately $38.2 million by selling an aggregate of 1,802,651 shares of our common stock under the 2016 ATM agreement. In March 2018, we terminated the 2016 ATM Agreement and entered into a Controlled Equity Offering sales agreement with Cantor Fitzgerald & Co., or Cantor Fitzgerald (the "2018 ATM Agreement"). Under the 2018 ATM Agreement, we may offer and sell common stock having aggregate proceeds of up to $125.0 million from time to time through Cantor Fitzgerald as our sales agent. No sales of our common stock have taken place under the 2018 ATM Agreement as of December 31, 2018. We believe that we will continue to expend substantial resources for the foreseeable future for the clinical development of DAXI, DaxibotulinumtoxinA Topical or biosimilar and development of any other indications and product candidates that we may choose to pursue. These expenditures will include costs associated with research and development, conducting preclinical studies and clinical trials, and manufacturing and supply as well as marketing and selling any products approved for sale. In addition, other unanticipated costs may arise. Because the outcome of any clinical trial is highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development and commercialization of DAXI and any future product candidates.

We believe that our existing cash, cash equivalents, and short-term investments including the net proceeds from our follow-on public offerings and ATM offerings will allow us to fund our operations for at least 12 months following the filing of this Form 10-K. However, our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional capital sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. Such financings may result in dilution to stockholders, imposition of debt covenants and repayment obligations or other restrictions that may affect our business. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe that we have sufficient funds for our current or future operating plans.

Our future capital requirements depend on many factors, including:

- the results of our clinical trials for DAXI and preclinical trials of DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- the timing of, and the costs involved in, obtaining regulatory approvals for DAXI, or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar;
- the number and characteristics of any additional product candidates we develop or acquire;
- the scope, progress, results and costs of researching and developing and conducting preclinical and clinical trials of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- the cost of commercialization activities if DAXI or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar are approved for sale, including marketing, sales and distribution costs;
- the cost of manufacturing DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates and any products we successfully commercialize and maintaining our related facilities;
- our ability to establish and maintain strategic collaborations, licensing or other arrangements including the Mylan collaboration, Fosun licensing, and the terms of and timing such arrangements;
- the degree and rate of market acceptance of any future approved products;
- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;
- any product liability or other lawsuits related to our products;
- the expenses needed to attract and retain skilled personnel;
- any litigation, including litigation costs and the outcome of such litigation;
- the costs associated with being a public company;
- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing patent claims, including litigation costs and the outcome of such litigation; and
- the timing, receipt and amount of sales of, or royalties on, future approved products, if any.

Additional capital may not be available when needed, on terms that are acceptable to us or at all. If adequate funds are not available to us on a timely basis, we may be required to delay, limit, reduce or terminate preclinical studies, clinical trials, research, development, manufacturing, sales, marketing or other commercial activities for DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidate.

If we raise additional capital through marketing and distribution arrangements or other collaborations, strategic alliances or licensing arrangements with third parties, we may have to relinquish certain valuable rights to our product candidates, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through public or private equity offerings, the ownership interest of our existing stockholders will be diluted and the terms of any new equity securities may have a preference over our common stock. If we raise additional capital through debt financing, we may be subject to covenants limiting or restricting our ability to take specific actions, such as incurring additional debt or making capital expenditures or specified financial ratios, any of which could restrict our ability to commercialize our product candidates or operate as a business.

**Even if our product candidates receive regulatory approval, they may fail to achieve the broad degree of physician adoption and use necessary for commercial success.**

The commercial success of DAXI, and any future product candidates including DaxibotulinumtoxinA Topical or biosimilar, if approved, will depend significantly on the broad adoption and use of the resulting product by physicians for approved indications. The degree and rate of physician adoption of DAXI and any future product candidates, if approved, will depend on a number of factors, including:

- the effectiveness and duration of effect of our product as compared to existing and future therapies;
- physician willingness to adopt a new therapy to treat glabellar lines, cervical dystonia, plantar fasciitis, adult upper limb spasticity, chronic migraine or other aesthetic or therapeutic indications;
- patient satisfaction with the results and administration of our product and overall treatment experience;
- patient demand for the treatment of glabellar lines, cervical dystonia, plantar fasciitis or other aesthetic or therapeutic indications;
- the willingness of third-party payors to reimburse physicians or patients for DAXI and any future products we may commercialize for therapeutic indications;
- the willingness of patients to pay out of pocket for DAXI and any future products we may commercialize for aesthetic indications; and
- the revenue and profitability that our product will offer a physician as compared to alternative therapies.

If DAXI or any future product candidates are approved for use but fail to achieve the broad degree of physician adoption necessary for commercial success, our operating results and financial condition will be adversely affected.

**Our product candidates, if approved, will face significant competition and our failure to effectively compete may prevent us from achieving significant market penetration and expansion.**

We expect to enter highly competitive pharmaceutical and medical device markets. Successful competitors in the pharmaceutical and medical device markets have the ability to effectively discover therapies, obtain patents, develop, test and obtain regulatory approvals for products, and have the ability to effectively commercialize, market and promote approved products, including communicating the effectiveness, safety and value of products to actual and prospective customers and medical staff. Numerous companies are engaged in the developing, patenting, manufacturing and marketing healthcare products which we expect will compete with those that we are developing. Many of these competitors are large, experienced companies that enjoy significant competitive advantages, such as substantially greater financial, research and development, manufacturing, personnel and marketing resources, greater brand recognition and more experience and expertise in obtaining marketing approvals from the FDA and other regulatory authorities.

Upon marketing approval, the first expected use of our products will be in aesthetic medicine. Competition in aesthetic products is significant and dynamic, and is characterized by rapid and substantial technological development and product innovations. Numerous competitors have obtained patents protecting what they consider to be their intellectual property.

In aesthetic medicine, we plan to seek regulatory approval of DAXI for the treatment of glabellar lines. We anticipate that DAXI, if approved, will face significant competition from existing injectable botulinum toxins as well as unapproved and off-label treatments. Further, if approved, in the future we may face competition for DAXI from biosimilar products and products based upon botulinum toxin. To compete successfully, we will have to demonstrate that the treatment of glabellar lines with DAXI is a worthwhile aesthetic treatment and has advantages over other therapies. Competition could result in reduced profit margins and limited sales, which would harm our business, financial condition and results of operations.

Due to less stringent regulatory requirements, there are many more aesthetic products and procedures available for use in a number of foreign countries than are approved for use in the U.S.. There are also fewer limitations on the claims that our competitors in certain countries can make about the effectiveness of their products and the manner in which they can market them.

**We currently make our DAXI clinical drug product exclusively in one internal manufacturing facility. We plan to utilize internal and external facilities, including through one or more third-party contractors, in the future to support commercial production if our product candidates are approved. If these or any future facility or our equipment were damaged or destroyed, or if we experience a significant disruption in our operations for any reason, our ability to continue to operate our business would be materially harmed.**

We currently manufacture our own clinical drug product to support DAXI development in one internal manufacturing facility. In March 2017, we entered into Althea Services Agreement. Under the Althea Services Agreement, Althea will provide us commercial fill/finish services and will serve as a second source of manufacturing for DAXI. We plan to utilize our internal and external Althea facility to support commercial production of DAXI, if approved. If these or any future facility were to be damaged, destroyed or otherwise unable to operate, whether due to earthquakes, fire, floods, hurricanes, storms, tornadoes, other natural disasters, employee malfeasance, terrorist acts, power outages or otherwise, or if performance of such manufacturing facilities is disrupted for any other reason, such an event could delay our clinical trials or, if our product candidates are approved, jeopardize our ability to manufacture our products as promptly as our customers expect or possibly at all. If we experience delays in achieving our development objectives, or if we are unable to manufacture an approved product within a timeframe that meets our customers' expectations, our business, prospects, financial results and reputation could be materially harmed.

Currently, we maintain insurance coverage totaling $22.8 million against damage to our property, equipment and tenant improvements, $2.0 million in general liability coverage, a $9.0 million umbrella policy, and an additional $70.0 million to cover business interruption and research and development restoration expenses, subject to deductibles and other limitations. If we have underestimated our insurance needs with respect to an interruption, or if an interruption is not subject to coverage under our insurance policies, we may not be able to cover our losses.

**Impairment in the carrying value of long-lived assets could negatively affect our operating results.**

We constructed a fill/finish line dedicated to the manufacture of DaxibotulinumtoxinA Topical and to support our regulatory license applications. We discontinued further clinical development of DaxibotulinumtoxinA Topical for the treatment of crow's feet and for the treatment of primary axillary hyperhidrosis in June 2016, following the results from our REALISE 1 Phase 3 clinical trial. During the year ended December 31, 2016, we recorded a loss on impairment of $9.1 million related to certain components of the DaxibotulinumtoxinA Topical fill/finish line and other long-lived assets. The Company assessed the DaxibotulinumtoxinA Topical fill/finish line and these other long-lived assets for impairment indicators and recorded a loss on impairment of $2.9 million for the year ended December 31, 2017. As of December 31, 2017, the fill/finish line and these other long-lived assets had net book values of $2.4 million and $0.1 million, respectively. There were no indicators of impairment for the year ended December 31, 2018. Under U.S. generally accepted accounting principles ("GAAP"), long-lived assets, such as our fill/finish line, are required to be reviewed for impairment whenever adverse events or changes in circumstances indicate a possible impairment. If business conditions or other factors indicate that the carrying value of the asset may not be recoverable, we may be required to record additional non-cash impairment charges. Additionally, if the carrying value of our capital equipment exceeds current fair value as determined based on the discounted future cash flows of the related product, the capital equipment would be considered impaired and would be reduced to fair value by a non-cash charge to earnings, which could negatively affect our operating results. Events and conditions that could result in impairment in the value of our long-lived assets include adverse clinical trial results, changes in operating plans, unfavorable changes in competitive landscape, adverse changes in the regulatory environment, or other factors leading to reduction in expected long-term sales or profitability. We will evaluate the recoverability and fair value of our long-lived assets, including those related to other components of the fill/finish line, each reporting period to determine the extent to which further non-cash charges to earnings are appropriate. Additional impairment in the value of our long-lived assets may materially and negatively impact our operating results.

**We have incurred significant losses since our inception and we anticipate that we will continue to incur losses for the foreseeable future. Currently, we have only one product candidate in clinical trials and no commercial sales, which make it difficult to assess our future viability.**

We are a clinical-stage biotechnology company. Biotechnology product development is a highly speculative undertaking and involves a substantial degree of risk. We are not profitable and have incurred losses in each year since we commenced operations in 2002. In addition, we have limited experience and have not yet demonstrated an ability to successfully overcome many of the risks and uncertainties frequently encountered by companies in new and rapidly evolving fields, particularly in the biotechnology industry. To date, we have not obtained any regulatory approvals for any of our product candidates or generated any revenue from product sales relating to DAXI, DaxibotulinumtoxinA Topical or biosimilar. We continue to incur significant research and development and other expenses related to our ongoing clinical trials and operations. We had an accumulated deficit through December 31, 2018 of $684.8 million and a working capital surplus of $176.0 million as of December 31, 2018, primarily as a result of our November 2015 and December 2017 follow-on public offerings, and ATM offerings in 2015 and 2017. Our recorded net losses were $142.6 million, $120.6 million and $89.3 million, for the year ended December 31, 2018, 2017, and 2016, respectively. We have funded our operations primarily through the sale and issuance of convertible preferred stock, common stock, notes payable and convertible notes. The net proceeds from the sale of the shares in our November 2015 and December 2017 follow-on public offerings and ATM offerings in 2015 and 2017, after deducting the underwriters' discount, commissions, and other offering expenses related to the respective offerings, were approximately $126.2 million and $156.9 million, $10.0 million and $38.2 million, respectively. Our capital requirements to implement our business strategy are substantial, including our capital requirements to develop and commercialize DAXI. We believe that our currently available capital is sufficient to fund our operations through at least the next 12 months following the filing of this Form 10-K.

We expect to continue to incur losses for the foreseeable future, and we anticipate that these losses will increase as we continue our development of, seek regulatory approval for and begin to commercialize DAXI. Our ability to achieve revenue and profitability is dependent on our ability to complete the development of our product candidates, obtain necessary regulatory approvals and manufacture, market and commercialize our products successfully. Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock and our ability to raise capital and continue operations.

**Even if DAXI, DaxibotulinumtoxinA Topical, biosimilar, or any future product candidates obtain regulatory approval, they may never achieve market acceptance or commercial success.**

Even if we obtain FDA or other regulatory approvals, DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates may not achieve market acceptance among physicians and patients, and may not be commercially successful.

The degree and rate of market acceptance of DAXI, DaxibotulinumtoxinA Topical, biosimilar, or any future product candidates for which we receive approval depends on a number of factors, including:

- the safety and efficacy of the product as demonstrated in clinical trials;
- the clinical indications for which the product is approved;
- acceptance by physicians, major operators of clinics and patients of the product as a safe and effective treatment;
- the proper training and administration of our products by physicians and medical staff;
- the potential and perceived advantages of our products over alternative treatments;
- the cost of treatment in relation to alternative treatments and willingness to pay for our products, if approved, on the part of payors and patients;
- the willingness of patients to pay for DAXI, DaxibotulinumtoxinA Topical, and other aesthetic treatments in general, relative to other discretionary items, especially during economically challenging times;
- the willingness of third-party payors to reimburse physicians or patients for DAXI and any future products we may commercialize for therapeutic indications;
- the willingness of patients to pay out of pocket for DAXI and any future products we may commercialize for aesthetic indications;
- the relative convenience and ease of administration;
- the prevalence and severity of adverse events; and
- the effectiveness of our sales and marketing efforts.

Any failure by our product candidates that obtain regulatory approval to achieve market acceptance or commercial success would materially adversely affect our results of operations and delay, prevent or limit our ability to generate revenue and continue our business.

**Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results.**

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Furthermore, we rely on contract research organizations, or CROs, and clinical trial sites to ensure the proper and timely conduct of our clinical trials. While we have agreements governing the committed activities of our CROs, we have limited influence over their actual performance. A failure of one or more of our clinical trials can occur at any time during the clinical trial process. The results of preclinical studies and clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. Furthermore, final results may differ from interim results. For example, any positive results generated to date in clinical trials for DAXI do not ensure that later clinical trials, including any DAXI clinical trials for the treatment of glabellar lines, will demonstrate similar results. Product candidates in later stages of clinical trials may fail to show the desired safety profile and efficacy despite having progressed through preclinical studies and initial clinical trials.

A number of companies in the biotechnology industry have suffered significant setbacks in advanced clinical trials due to a lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier clinical trials. We have suffered similar setbacks with the clinical development of DaxibotulinumtoxinA Topical and we cannot be certain that we will not face other similar setbacks in the future for DAXI or other clinical development programs. Even if our clinical trials are completed, the results may not be sufficient to obtain regulatory approval for our product candidates.

We have in the past and may in the future experience delays in our ongoing clinical trials, and we do not know whether future clinical trials, if any, will begin on time, need to be redesigned, enroll an adequate number of subjects on time or be completed on schedule, if at all. Clinical trials can be delayed or aborted for a variety of reasons, including delay or failure to:

- obtain regulatory approval to commence a trial;
- reach agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;
- obtain IRB, approval at each site;
- recruit suitable subjects to participate in a trial;
- have subjects complete a trial or return for post-treatment follow-up;
- ensure clinical sites observe trial protocol or continue to participate in a trial;
- address any patient safety concerns that arise during the course of a trial;
- address any conflicts with new or existing laws or regulations;
- add a sufficient number of clinical trial sites; or
- manufacture sufficient quantities of product candidate for use in clinical trials.

Subject enrollment is a significant factor in the timing of clinical trials and is affected by many factors, including the size and nature of the patient population, the proximity of patients to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs or treatments that may be approved for the indications we are investigating.

We could also encounter delays if a clinical trial is suspended or terminated by us, by the IRBs of the institutions in which such trials are being conducted, by the data safety monitoring board, for such trial or by the FDA or other regulatory authorities. Such authorities may suspend or terminate a clinical trial due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, failure of inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, discovery of unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial.



ALGN-1364697
PTX-767.0045

If we experience delays in the completion or termination of any clinical trial of our product candidates, the commercial prospects of our product candidates may be harmed, and our ability to generate product revenues from any of these product candidates will be delayed. In addition, any delays in completing our clinical trials will increase our costs, slow down our product candidate development and approval process and jeopardize our ability to commence product sales and generate revenues. Any of these occurrences may significantly harm our business, financial condition and prospects. In addition, many of the factors that cause or lead to a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates.

**We have no experience manufacturing our product candidates at full commercial scale. If our product candidates are approved, we will face certain risks associated with scaling up our manufacturing capabilities to support commercial production.**

We have developed an integrated manufacturing, research and development facility located at our corporate headquarters. We manufacture drug substance and finished dose forms of the drug product at this facility that we use for research and development purposes and clinical trials. We do not have experience in manufacturing our product candidates at commercial scale. If our product candidates are approved, we may need to expand our manufacturing facilities, add manufacturing personnel and ensure that validated processes are consistently implemented in our facilities and potentially enter into additional relationships with third-party manufacturers. The upgrade and expansion of our facilities will require additional regulatory approvals. In addition, it will be costly and time-consuming to expand our facilities and recruit necessary additional personnel. If we are unable to expand our manufacturing facilities in compliance with regulatory requirements or to hire additional necessary manufacturing personnel, we may encounter delays or additional costs in achieving our research, development and commercialization objectives, including obtaining regulatory approvals of our product candidates, which could materially damage our business and financial position.

**We currently contract with third-party manufacturers for certain components and services necessary to produce DAXI and expect to continue to do so to support further clinical trials and commercial scale production if DAXI is approved. This increases the risk that we will not have sufficient quantities of DAXI or be able to obtain such quantities at an acceptable cost, which could delay, prevent or impair our development or commercialization efforts.**

We currently rely on third-party manufacturers for certain components such as bulk peptide and services such as fill/finish services, necessary to produce DAXI for our clinical trials, and we expect to continue to rely on these or other manufacturers to support our commercial requirements if DAXI is approved. In particular, in March 2017, we entered into the Althea Services Agreement. We plan to utilize our internal and external Althea facility to support commercial production of DAXI, if approved. Some of our contracts with our manufacturers contain minimum order and pricing provisions and provide for early termination based on regulatory approval milestones.

Reliance on third-party manufacturers entails additional risks, including the reliance on the third party for regulatory compliance and quality assurance, the possible breach of the manufacturing agreement by the third party, and the possible termination or nonrenewal of the agreement by the third party at a time that is costly or inconvenient for us. In addition, third-party manufacturers may not be able to comply with cGMP or Quality System Regulation, or QSR, or similar regulatory requirements outside the U.S.. Our failure or the failure of our third-party manufacturers to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of products, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect supplies of DAXI, or any other product candidates or products that we may develop. Any failure or refusal to supply the components or services for DAXI or any other product candidates or products that we may develop could delay, prevent or impair our clinical development or commercialization efforts.

**We depend on single-source suppliers for the raw materials necessary to produce our product candidates. The loss of these suppliers, or their failure to supply us with these raw materials, would materially and adversely affect our business.**

We and our manufacturers purchase the materials necessary to produce DAXI for our clinical trials from single-source third-party suppliers. There are a limited number of suppliers for the raw materials that we use to manufacture our product candidates, and we may need to assess alternate suppliers to prevent a possible disruption of the manufacture of the materials necessary to produce our product candidates for our clinical trials and, if approved, ultimately for commercial sale. In particular, we outsource the manufacture of bulk peptide through American Peptide Company, Inc., or American Peptide, which was acquired by Bachem.

We do not have any control over the process or timing of the acquisition of raw materials by our manufacturers. Although we generally do not begin a clinical trial unless we believe that we have a sufficient supply of a product candidate to complete the clinical trial, any significant delay in the supply of DAXI or any future product candidates, or the raw material components thereof, for an ongoing clinical trial due to the need to replace a third-party supplier could considerably delay completion of our clinical trials, product testing and potential regulatory approval of DAXI or any future product candidates. If we or our manufacturers are unable to purchase these raw materials on acceptable terms and at sufficient quality levels or in adequate quantities if at all, the development of DAXI and any future product candidates, or the commercial launch of any approved products, would be delayed or there would be a shortage in supply, which would impair our ability to meet our development objectives for our product candidates or generate revenues from the sale of any approved products.

Furthermore, if there is a disruption to our or our third-party suppliers' relevant operations, we will have no other means of producing DAXI or any future product candidates until they restore the affected facilities or we or they procure alternative facilities. Additionally, any damage to or destruction of our or our third party or suppliers' facilities or equipment may significantly impair our ability to manufacture our product candidates on a timely basis.

**We currently have limited marketing and sales capabilities and no field sales organization. If we are unable to establish sales and marketing capabilities on our own or through third parties, we will be unable to successfully commercialize DAXI or any other future product candidates, if approved, or generate product revenue.**

We currently have limited marketing and sales capabilities and no field sales organization. To commercialize DAXI or any other future product candidates, if approved, in the U.S., Europe and other jurisdictions we seek to enter, we must build our marketing, sales, distribution, managerial and other non-technical capabilities or make arrangements with third parties to perform these services, and we may not be successful in doing so. If DAXI receives regulatory approval, we expect to market DAXI as applicable, through our own sales force in North America, and in Europe and other countries through either our own sales force or a combination of our internal sales force and distributors or partners, which may be expensive and time consuming. We have no prior experience in the marketing, sale and distribution of pharmaceutical products and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team. Any failure or delay in the development of our internal sales, marketing and distribution capabilities would adversely impact the commercialization of these products. We may choose to collaborate with third parties that have direct sales forces and established distribution systems, either to augment our own sales force and distribution systems or in lieu of our own sales force and distribution systems. If we are unable to enter into such arrangements on acceptable terms or at all, we may not be able to successfully commercialize DAXI or any future product candidates. If we are not successful in commercializing DAXI or any future product candidates, either on our own or through collaborations with one or more third parties, our future product revenue will suffer and we would incur significant additional losses.

**As we evolve from a company primarily involved in research and development to a company potentially involved in commercialization, we will need to increase the size of our organization and we may experience difficulties in managing this growth.**

If we are successful in advancing DAXI through the development stage towards commercialization, we will need to expand our organization, including adding marketing, managerial, operational and sales capabilities, or contracting with third parties to provide these capabilities for us to manage our operations and clinical trials, continue our development activities and commercialize DAXI or any other product candidates, if approved. Our management, personnel, systems and facilities currently in place may not be adequate to support this future growth. Our need to effectively execute our growth strategy requires that we:

- manage our clinical trials and manufacturing operations effectively;
- identify, recruit, retain, incentivize and integrate additional employees;
- manage our internal development efforts effectively while carrying out our contractual obligations to third parties; and
- continue to improve our operational, financial and management controls, reporting systems and procedures.

As our operations expand, we expect that we will also need to manage additional relationships with various collaborative partners, suppliers and other third parties. Future growth will impose significant added responsibilities on our organization, in particular on management. Our future financial performance and our ability to commercialize DAXI and to compete effectively will depend, in part, on our ability to manage any future growth effectively. Due to our limited financial resources and our limited experience in managing a company with such anticipated growth, we may not be able to effectively manage the expansion of our operations or recruit and train additional qualified personnel. The physical expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability to manage growth could delay the execution of our development and strategic objectives, or disrupt our operations.

**We or the third parties upon whom we depend may be adversely affected by earthquakes or other natural disasters and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.**

Our corporate headquarters and other facilities, including our internal manufacturing facility, are located in the San Francisco Bay Area, which has experienced severe earthquakes. We do not carry earthquake insurance. Earthquakes or other natural disasters could severely disrupt our operations, and have a material adverse effect on our business, results of operations, financial condition and prospects.

If a natural disaster, power outage or other event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our manufacturing facility, enterprise financial systems or manufacturing resource planning and enterprise quality systems, or that otherwise disrupted operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. In particular, because we manufacture botulinum toxin in our facilities, we would be required to obtain further clearance and approval by state, federal or other applicable authorities to continue or resume manufacturing activities. The disaster recovery and business continuity plans we have in place currently are limited and may not be adequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans, which, particularly when taken together with our lack of earthquake insurance, could have a material adverse effect on our business.

Furthermore, integral parties in our supply chain are geographically concentrated and operating from single sites, thereby increasing their vulnerability to natural disasters or other sudden, unforeseen and severe adverse events. If such an event were to affect our supply chain, it could have a material adverse effect on our business.

**We currently rely on third parties and consultants to conduct all our preclinical studies and clinical trials. If these third parties or consultants do not successfully carry out their contractual duties or meet expected deadlines, we may be unable to obtain regulatory approval for or commercialize DAXI or any future product candidates.**

We do not have the ability to independently conduct preclinical studies or clinical trials. We rely on medical institutions, clinical investigators, contract laboratories, collaborative partners and other third parties, such as CROs and clinical data management organizations, to conduct clinical trials on our product candidates. The third parties with whom we contract for execution of our clinical trials play a significant role in the conduct of these trials and the subsequent collection and analysis of data. However, these third parties are not our employees, and except for contractual duties and obligations, we have limited ability to control the amount or timing of resources that they devote to our programs. Although we rely on these third parties to conduct our preclinical studies and clinical trials, we remain responsible for ensuring that each of our preclinical studies and clinical trials is conducted in accordance with its investigational plan and protocol. Moreover, the FDA and foreign regulatory authorities require us to comply with regulations and standards, commonly referred to as GCPs and good laboratory practices or GLPs, for conducting, monitoring, recording and reporting the results of clinical and preclinical trials to ensure that the data and results are scientifically credible and accurate, and that the trial subjects are adequately informed of the potential risks of participating in clinical trials. We also rely on consultants to assist in the execution, including data collection and analysis, of our clinical trials.

In addition, the execution of preclinical studies and clinical trials, and the subsequent compilation and analysis of the data produced, requires coordination among various parties. In order for these functions to be carried out effectively and efficiently, it is imperative that these parties communicate and coordinate with one another. Moreover, these third parties may also have relationships with other commercial entities, some of which may compete with us. These third parties may terminate their agreements with us upon as little as 30 days' prior written notice of a material breach by us that is not cured within 30 days. Many of these agreements may also be terminated by such third parties under certain other circumstances, including our insolvency or our failure to comply with applicable laws. In general, these agreements require such third parties to reasonably cooperate with us at our expense for an orderly winding down of services of such third parties under the agreements. If the third parties or consultants conducting our clinical trials do not perform their contractual duties or obligations, experience work stoppages, do not meet expected deadlines, terminate their agreements with us or need to be replaced, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical trial protocols or GCP, or for any other reason, we may need to conduct additional clinical trials or enter into new arrangements, which could be difficult, costly or impossible, and our clinical trials may be extended, delayed or terminated or may need to be repeated. We may be unable to recover unused funds from these third-parties. If any of the foregoing were to occur, we may not be able to obtain, or may be delayed in obtaining, regulatory approval for, and will not be able to, or may be delayed in our efforts to, successfully commercialize the product candidate being tested in such trials.

**If any products we develop are not accepted by the market or if regulatory agencies limit our labeling indications, require labeling content that diminishes market uptake of our products or limits our marketing claims, we may be unable to generate significant revenues, if any.**

Even if we obtain regulatory approval for our product candidates and are able to commercialize them, our products may not gain market acceptance among physicians, patients, healthcare payors and the medical community.

The degree of market acceptance of any of our approved products will depend upon a number of factors, including:

- the indication for which the product is approved and its approved labeling;
- the presence of other competing approved treatments and therapies;
- the potential advantages of the product over existing and future treatment products;
- the relative convenience and ease of administration of the product;
- the strength of our sales, marketing and distribution support;
- the willingness of third-party payors to provide adequate reimbursement for our approved products, and the willingness of payments to pay for our approved products in the absence of third-party reimbursement; and
- the price and cost-effectiveness of the product.

The FDA or other regulatory agencies could limit the labeling indication for which our product candidates may be marketed or could otherwise limit marketing efforts for our products. If we are unable to achieve approval or successfully market any of our product candidates, or marketing efforts are restricted by regulatory limits, our ability to generate revenues could be significantly impaired.

**If DAXI is approved for marketing, and we are found to have improperly promoted off-label uses, or if physicians misuse our products or use our products off-label, we may become subject to prohibitions on the sale or marketing of our products, significant fines, penalties, and sanctions, product liability claims, and our image and reputation within the industry and marketplace could be harmed.**

The FDA and other regulatory agencies strictly regulate the marketing and promotional claims that are made about drug products, such as DAXI, if approved. In particular, a product may not be promoted for uses or indications that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. If we are found to have promoted such off-label uses, we may receive warning letters and become subject to significant liability, which would materially harm our business. The federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. If we become the target of such an investigation or prosecution based on our marketing and promotional practices, we could face similar sanctions, which would materially harm our business. In addition, management's attention could be diverted from our business operations, significant legal expenses could be incurred, and our reputation could be damaged. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed. If we are deemed by the FDA to have engaged in the promotion of our products for off-label use, we could be subject to FDA prohibitions on the sale or marketing of our products or significant fines and penalties, and the imposition of these sanctions could also affect our reputation and position

within the industry.

Physicians may also misuse our products or use improper techniques, potentially leading to adverse results, side effects or injury, which may lead to product liability claims. If our products are misused or used with improper technique, we may become subject to costly litigation by our customers or their patients. Product liability claims could divert management's attention from our core business, be expensive to defend, and result in sizable damage awards against us that may not be covered by insurance. Furthermore, the use of our products for indications other than those cleared by the FDA may not effectively treat such conditions, which could harm our reputation in the marketplace among physicians and patients.

Any of these events could harm our business and results of operations and cause our stock price to decline.

**Even if DAXI or any future product candidate is approved for commercialization, if there is not sufficient patient demand for such procedures, our financial results and future prospects will be harmed.**

Treatment of glabellar lines or other aesthetic indications with DAXI is an elective procedure, the cost of which must be borne by the patient, and we do not expect it to be reimbursable through government or private health insurance. The decision by a patient to elect to undergo the treatment of glabellar lines with DAXI or the treatment of other aesthetic indications we may pursue may be influenced by a number of factors, including:

- the success of any sales and marketing programs that we, or any third parties we engage, undertake, and as to which we have limited experience;
- the extent to which physicians recommend DAXI to their patients;
- the extent to which DAXI satisfies patient expectations;
- our ability to properly train physicians in the use of DAXI or such that their patients do not experience excessive discomfort during treatment or adverse side effects;
- the cost, safety and effectiveness of DAXI versus other treatments;
- consumer sentiment about the benefits and risks of aesthetic procedures generally and DAXI in particular;
- the success of any direct-to-consumer marketing efforts we may initiate; and
- general consumer confidence, which may be impacted by general economic and political conditions.

Our business, financial results and future prospects will be materially harmed if we cannot generate sufficient demand for DAXI or for any other future product candidate, once approved.

**We are subject to uncertainty relating to third-party reimbursement policies which, if not favorable for DAXI or any future product candidates, could hinder or prevent their commercial success.**

Our ability to commercialize DAXI or any future product candidates for therapeutic indications such as cervical dystonia or plantar fasciitis will depend in part on the coverage and reimbursement levels set by governmental authorities, private health insurers and other third-party payors. As a threshold for coverage and reimbursement, third-party payors generally require that drug products have been approved for marketing by the FDA. Third-party payors also are increasingly challenging the effectiveness of and prices charged for medical products and services. We may not obtain adequate third-party coverage or reimbursement for DAXI or any future product candidates for therapeutic indications, or we may be required to sell them at a discount.

We expect that third-party payors will consider the efficacy, cost effectiveness and safety of DAXI in determining whether to approve reimbursement for DAXI for therapeutic indications and at what level. Our business would be materially adversely affected if we do not receive coverage and adequate reimbursement of DAXI for therapeutic indications from private insurers on a timely or satisfactory basis. No uniform policy for coverage and reimbursement for products exists among third-party payors in the United States; therefore, coverage and reimbursement for products can differ significantly from payor to payor. Further, coverage under certain government programs, such as Medicare and Medicaid, may not be available for certain of our product candidates. As a result, the coverage determination process will likely be a time-consuming and costly process, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Our business could also be adversely affected if third-party payorslimit the indications for which DAXI will be reimbursed to a smaller patient set than we believe they are effective in treating.



ALGN-1364704
PTX-767.0052

In some foreign countries, particularly Canada and European countries, the pricing of prescription pharmaceuticals is subject to strict governmental control. In these countries, pricing negotiations with governmental authorities can take six to 12 months or longer after the receipt of regulatory approval and product launch. To obtain favorable reimbursement for the indications sought or pricing approval in some countries, we may be required to conduct a clinical trial that compares the cost-effectiveness of our products, including DAXI, to other available therapies. If reimbursement for our product is unavailable in any country in which reimbursement is sought, limited in scope or amount, or if pricing is set at unsatisfactory levels, our business could be materially harmed.

**If product liability lawsuits are brought against us, we may incur substantial liabilities and may be required to limit commercialization of any future products we develop.**

We face an inherent risk of product liability lawsuits as a result of the clinical testing of our product candidates and we will face an even greater risk if we commercialize any products. For example, we may be sued if any product we develop allegedly causes injury or is found to be otherwise unsuitable during product testing, manufacturing, marketing or sale. Any such product liability claims may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability and a breach of warranties. Claims could also be asserted under state consumer protection acts. If we cannot successfully defend ourselves against product liability claims, we may incur substantial liabilities or be required to limit commercialization of our products. Even a successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims may result in:

- decreased demand for DAXI or any future product candidates or products we develop;
- injury to our reputation and significant negative media attention;
- withdrawal of clinical trial participants or cancellation of clinical trials;
- costs to defend the related litigation;
- a diversion of management's time and our resources;
- substantial monetary awards to trial participants or patients;
- regulatory investigations, product recalls, withdrawals or labeling, marketing or promotional restrictions;
- loss of revenue; and
- the inability to commercialize any products we develop.

Our inability to obtain and maintain sufficient product liability insurance at an acceptable cost and scope of coverage to protect against potential product liability claims could prevent or inhibit the commercialization of DAXI or any future products we develop. We currently carry product liability insurance covering our clinical trials in the amount of $10.0 million in the aggregate. Although we maintain such insurance, any claim that may be brought against us could result in a court judgment or settlement in an amount that is not covered, in whole or in part, by our insurance or that is in excess of the limits of our insurance coverage. Our insurance policies also have various exclusions and deductibles, and we may be subject to a product liability claim for which we have no coverage. We will have to pay any amounts awarded by a court or negotiated in a settlement that exceed our coverage limitations or that are not covered by our insurance, and we may not have, or be able to obtain, sufficient capital to pay such amounts. Moreover, in the future, we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses. If and when we obtain approval for marketing DAXI we intend to expand our insurance coverage to include the sale of DAXI as applicable; however, we may be unable to obtain this liability insurance on commercially reasonable terms.

**We have been, and in the future may be, subject to securities class action and stockholder derivative actions. These, and potential similar or related litigation, could result in substantial damages and may divert management's time and attention from our business.**

We have been, and may in the future be, the target of securities class actions or stockholder derivative claims. On May 1, 2015, a securities class action complaint was filed on behalf of City of Warren Police and Fire Retirement System against us and certain of our directors and executive officers at the time of our follow-on public offering, and the investment banking firms that acted as the underwriters in our follow-on public offering. The Court granted final approval of the Settlement, as set forth in the Stipulation of Settlement, on July 28, 2017. While the litigation has ended, we may be subject to future securities class action and shareholder derivation actions, which may adversely impact our business, results of operations, financial position or cash flows and divert management's time and attention from the business.

**If we fail to attract and keep senior management and key scientific personnel, we may be unable to successfully develop DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, conduct our clinical trials and commercialize DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future products we develop.**

Our success depends in part on our continued ability to attract, retain and motivate highly qualified management, clinical and scientific personnel. We believe that our future success is highly dependent upon the contributions of our senior management, particularly L. Daniel Browne, our President and Chief Executive Officer, Abhay Joshi, Ph.D., our Chief Operating Officer, Caryn G. McDowell, our Senior Vice President, General Counsel & Corporate Secretary, and Tobin C. Schilke, our Chief Financial Officer and Principal Financial Officer, as well as our senior scientists and other members of our senior management team. The loss of services of any of these individuals could delay or prevent the successful development of our product pipeline, the completion of our planned clinical trials or the commercialization of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future products we develop.

For example, Lauren P. Silvernail resigned as our Chief Financial Officer and Chief Business Officer, effective as of May 29, 2018. In connection with the departure of Ms. Silvernail, our Board of Directors, on June 20, 2018 appointed Cyril Allouche, our current Head of Finance and Corporate Controller, to serve as our Principal Financial Officer and Principal Accounting Officer on an interim basis. On October 10, 2018, our Board of Directors appointed Tobin C. Schilke to serve as our Chief Financial Officer and Principal Financial Officer effective as of November 5, 2018, which was Mr. Schilke's employment start date. Mr. Allouche will continue to serve as the Company's Principal Accounting Officer. In addition, Todd Zavodnick resigned as our Chief Commercial Officer and President, Aesthetics and Therapeutics, effective November 2018. In connection with the departure of Mr. Zavodnick, Dustin Sjuts was promoted to head of Commercial effective as of November 5, 2018.

Leadership transitions can be inherently difficult to manage. Resignations of executive officers may cause disruption in our business, strategic and employee relationships, which may significantly delay or prevent the achievement of our business objectives. Leadership changes may also increase the likelihood of turnover in other key officers and employees and may cause declines in the productivity of existing employees. The search for a replacement officer may take many months or more, further exacerbating these factors. Identifying and hiring an experienced and qualified executive officer are typically difficult. Periods of transition in senior management leadership are often difficult as the new executives gain detailed knowledge of our operations and may result in cultural differences and friction due to changes in strategy and style. During the transition periods, there may be uncertainty among investors, employees, creditors and others concerning our future direction and performance.

We could experience problems attracting and retaining qualified employees. For example, competition for qualified personnel in the biotechnology and pharmaceuticals field is intense and the turnover rate can be high due to the limited number of individuals who possess the skills and experience required by our industry. We will need to hire additional personnel as we expand our clinical development and commercial activities. We may not be able to attract and retain quality personnel on acceptable terms, or at all. In addition, to the extent we hire personnel from competitors, we may be subject to allegations that they have been improperly solicited or that they have divulged proprietary or other confidential information, or that their former employers own their previous research output.

**If we are not successful in discovering, developing, acquiring and commercializing additional product candidates, our ability to expand our business and achieve our strategic objectives would be impaired.**

Although a substantial amount of our effort will focus on the continued clinical testing and potential approval of DAXI, a key element of our strategy is to discover, develop and commercialize a portfolio of botulinum toxin products for both aesthetic and therapeutic indications. We are seeking to do so through our internal research programs and may explore strategic collaborations for the development or acquisition of new products. While DAXI is in the clinical development stage, DaxibotulinumtoxinA Topical and all of our other potential product candidates remain in the discovery or preclinical stage. Research programs to identify product candidates require substantial technical, financial and human resources, whether or not any product candidates are ultimately identified. Our research programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development for many reasons, including the following:

- the research methodology used may not be successful in identifying potential product candidates;
- competitors may develop alternatives that render our product candidates obsolete or less attractive;
- product candidates we develop may nevertheless be covered by third parties' patents or other exclusive rights;
- a product candidate may on further study be shown to have harmful side effects or other characteristics that indicate it is unlikely to be effective or otherwise does not meet applicable regulatory criteria;
- a product candidate may not be capable of being produced in commercial quantities at an acceptable cost, or at all;
- a product candidate may not be accepted as safe and effective by patients, the medical community or third-party payors, if applicable; and
- intellectual property rights of third parties may potentially block our entry into certain geographies or make such entry economically impracticable.

If we fail to develop and successfully commercialize other product candidates, our business and future prospects may be harmed and our business will be more vulnerable to problems that we encounter in developing and commercializing DAXI.

**The requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain qualified members of our board of directors.**

We are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, the Dodd-Frank Act, the Nasdaq listing rules and other applicable securities rules and regulations. Compliance with these rules and regulations has increased and will continue to increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly, and increase demand on our systems and resources. The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and, if required, improve our disclosure controls and procedures and internal control over financial reporting to meet this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could harm our business and operating results. Although we have hired additional employees to comply with these requirements, we may need to hire more employees in the future, which will increase our costs and expenses.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time-consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to practice, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

As a public company that is subject to these rules and regulations we may find it is more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors could also make it more difficult for us to attract and retain qualified members of our board of directors and qualified executive officers.

**We need to maintain effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act, and the failure to do so could have a material adverse effect on our business and stock price.**

The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. We are required to perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, or Section 404. Beginning with the 2018 Annual Report on Form 10-K, our independent registered public accounting firm is required to attest to the effectiveness of our internal control over financial reporting. If we or our independent registered public accounting firm identifies deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our common stock could decline and we could be subject to actions or investigations by the SEC, or other regulatory authorities, which would require additional financial and management resources.

ALGN-1364708
PTX-767.0056

**We may experience difficulties implementing and maintaining our new enterprise resource planning system.**

We purchased a new enterprise resource planning ("ERP") system and are currently implementing the new system. ERP implementations are complex and time-consuming, and involve substantial expenditures on system software and implementation activities. The ERP system will be critical to our ability to provide important information to our management, obtain and deliver our products, provide services and customer support, send invoices and track payments, fulfill contractual obligations, accurately maintain books and records, provide accurate, timely and reliable reports on our financial and operating results or otherwise operate our business. ERP implementations also require transformation of business and financial processes in order to reap the benefits of the ERP system; any such transformation involves risks inherent in the conversion to a new computer system, including loss of information and potential disruption to our normal operations. The implementation and maintenance of the new ERP system has required, and will continue to require, the investment of significant financial and human resources and the implementation may be subject to delays and cost overruns. In addition, we may not be able to successfully complete the implementation of the new ERP system without experiencing difficulties. Any disruptions, delays or deficiencies in the design and implementation or the ongoing maintenance of the new ERP system could adversely affect our ability to process orders, ship products, provide services and customer support, send invoices and track payments, fulfill contractual obligations, accurately maintain books and records, provide accurate, timely and reliable reports on our financial and operating results, or otherwise operate our business. Additionally, if we do not effectively implement the ERP system as planned or the system does not operate as intended, the effectiveness of our internal control over financial reporting could be adversely affected or our ability to assess it adequately could be delayed.

**Our business involves the use of hazardous materials and we and our third-party manufacturers and suppliers must comply with environmental laws and regulations, which can be expensive and restrict how we do business.**

Our research and development and manufacturing activities and our third-party manufacturers' and suppliers' activities involve the controlled storage, use and disposal of hazardous materials owned by us, including botulinum toxin type A, a key component of our product candidates, and other hazardous compounds. We and our manufacturers and suppliers are subject to laws and regulations governing the use, manufacture, storage, handling and disposal of these hazardous materials. We are licensed with the CDC and with the California Department of Health, Food and Drug Branch for use of botulinum toxin and to manufacture both the active pharmaceutical ingredient, or API, and the finished product in topical and injectable dose forms. In some cases, these hazardous materials and various wastes resulting from their use are stored at our and our manufacturers' facilities pending their use and disposal. We cannot eliminate the risk of contamination, which could cause an interruption of our commercialization efforts, research and development efforts and business operations, environmental damage resulting in costly clean-up and liabilities under applicable laws and regulations governing the use, storage, handling and disposal of these materials and specified waste products. Although we believe that the safety procedures utilized by us and our third-party manufacturers for handling and disposing of these materials generally comply with the standards prescribed by these laws and regulations, we cannot guarantee that this is the case or eliminate the risk of accidental contamination or injury from these materials. In such an event, we may be held liable for any resulting damages and such liability could exceed our resources and state or federal or other applicable authorities may curtail our use of certain materials and interrupt our business operations. Furthermore, environmental laws and regulations are complex, change frequently and have tended to become more stringent. We cannot predict the impact of such changes and cannot be certain of our future compliance.

**We may use third-party collaborators to help us develop, validate or commercialize any new products, and our ability to commercialize such products could be impaired or delayed if these collaborations are unsuccessful.**

We may license or selectively pursue strategic collaborations for the development, validation and commercialization of DAXI, DaxibotulinumtoxinA Topical, biosimilar and any future product candidates. For instance, in February 2018, we and Mylan entered into the Mylan Collaboration, pursuant to which we and Mylan will collaborate exclusively, on a world-wide basis (excluding Japan), to develop, manufacture and commercialize our product candidates. In addition, in December 2018, we and Fosun entered into the Fosun License Agreement pursuant to which we have granted Fosun the exclusive rights to develop and commercialize DAXI in the Fosun Territory and certain sublicense rights. In any third-party collaboration, we would be dependent upon the success of the collaborators to perform their responsibilities with continued cooperation. Our collaborators may not cooperate with us or perform their obligations under our agreements with them. We cannot control the amount and timing of our collaborators' resources that will be devoted to performing their responsibilities under our agreements with them. Our collaborators may choose to pursue alternative technologies in preference to those being developed in collaboration with us. The development, validation and commercialization of our product candidates will be delayed if collaborators fail to conduct their responsibilities in a timely manner or in accordance with applicable regulatory requirements or if they breach or terminate their collaboration agreements with us. Disputes with our collaborators could also impair our reputation or result in development delays, decreased revenues and litigation expenses. Our collaboration with Mylan is for the development of a biosimilar product, which is subject to risks inherent with the relatively short history of biosimilar product approvals in the United States. The biosimilar product would be subject to similar commercial risks as our DAXI and Daxibotulinumtoxin A Topical product candidates. In February 2019, we and Mylan participated in a Biosimilar Initial Advisory Meeting ("BIAM") with the FDA to discuss the feasibility of a 351(k) biosimilar submission and the necessary development pathway for the biosimilar product candidate. While we believe that such a pathway is viable, the successful development and commercialization of a biosimilar product in any indications of BOTOX® or BOTOX Cosmetic® would be subject to FDA requirements that would need to be assessed by us and Mylan in determining the development of the biosimilar product candidate. Such requirements may also limit our ability to begin Phase 3 development of the biosimilar in 2020, as presently planned or at all. Even if successfully developed, the biosimilar product would be subject to similar commercial risks as our DAXI and Daxibotulinumtoxin A Topical product candidates.

**Unfavorable global economic conditions or trade relations could adversely affect our business, financial condition or results of operations.**

Our results of operations could be adversely affected by general conditions in the global economy and in the global financial markets. Furthermore, the demand for aesthetic or therapeutic medical procedures may be particularly vulnerable to unfavorable economic conditions. We do not expect sales of DAXI for the treatment of glabellar lines to be reimbursed by any government or third-party payor and, as a result, demand for the first indications of each of our product candidates will be tied to discretionary spending levels of our targeted patient population. Future global financial crises may cause extreme volatility and disruptions in capital and credit markets. A severe or prolonged economic downturn could result in a variety of risks to our business, including weakened demand for DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, if approved, and our ability to raise additional capital when needed on acceptable terms, if at all. A weak or declining economy could also strain our suppliers, possibly resulting in supply disruption, or cause our customers to delay making payments for our services.

In addition, changes in U.S. and foreign trade policies could trigger retaliatory actions by affected countries, resulting in "trade wars", which may reduce customer demand for goods exported out of the United States if the parties having to pay those tariffs increase their prices, or if trading partners limit their trade with the United States. If these consequences are realized, the price to the consumer of aesthetic or therapeutic medical procedures from products exported out of the United States may increase, resulting in a material reduction in the demand for our future product candidates. Such a reduction may materially and adversely affect our potential sales and our business. In particular, under our Fosun License Agreement, we are responsible for manufacturing DAXI and supplying it to Fosun, which would then develop commercialize, market and sell it in mainland China, Hong Kong and Macau. If this arrangement is restricted in any way due to the US-China trade relation, the contingent payments we are entitled to receive under the agreement, which are based on product sales, among other things, may be adversely affected.

Any of the foregoing could harm our business and we cannot anticipate all of the ways in which the current or future economic climate and financial market conditions could adversely impact our business.

**Adverse tax laws or regulations could be enacted or existing laws could be applied to us or our customers, which could increase the costs of our services and adversely impact our business.**

The application of federal, state, local and international tax laws to services provided electronically is evolving. New income, sales, use or other tax laws, statutes, rules, regulations or ordinances could be enacted at any time (possibly with retroactive effect), and could be applied solely or disproportionately to services provided over the internet. These enactments could adversely affect our sales activity due to the inherent cost increase the taxes would represent and ultimately result in a negative impact on our operating results and cash flows.

In addition, existing tax laws, statutes, rules, regulations or ordinances could be interpreted, changed, modified or applied adversely to us (possibly with retroactive effect), which could require us or our customers to pay additional tax amounts, as well as require us or our customers to pay fines or penalties and interest for past amounts. If we are unsuccessful in collecting such taxes from our customers, we could be held liable for such costs, thereby adversely impacting our operating results and cash flows.

Further, we have undertaken certain transactions to realize potential tax efficiencies in support of our expected global business expansion. These transactions are meant to align the global economic ownership of our intellectual property rights with our current and future business operations. We are uncertain as to whether the tax efficiencies sought by this alignment will materialize and may choose to unwind these transactions in the future.

On December 22, 2017, legislation that significantly revised the Internal Revenue Code of 1986, as amended, was signed into law. The legislation, among other things, contained significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35 percent to a flat rate of 21 percent, limitation of the tax deduction for interest expense to 30 percent of adjusted earnings (except for certain small businesses), limitation of the deduction for net operating losses to 80 percent of current year taxable income and elimination of net operating loss carrybacks, one time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, elimination of U.S. tax on foreign earnings (subject to certain important exceptions), immediate deductions for certain new investments instead of deductions for depreciation expense over time, and modifying or repealing many business deductions and credits. Notwithstanding the reduction in the corporate income tax rate, the overall impact of the federal tax law changes is uncertain and our business and financial condition could be adversely affected. In addition, it is uncertain if and to what extent various states will conform to the newly enacted federal tax law. The impact of this tax reform on holders of our common stock is also uncertain and could be adverse.

**Significant disruptions of information technology systems or breaches of data security could materially adversely affect our business, results of operations and financial condition.**

We collect and maintain information in digital form that is necessary to conduct our business, and we are increasingly dependent on information technology systems and infrastructure to operate our business. In the ordinary course of our business, we collect, store and transmit confidential information, including intellectual property, proprietary business information and personal information. It is critical that we do so in a secure manner to maintain the confidentiality and integrity of such confidential information. We have established physical, electronic and organizational measures to safeguard and secure our systems to prevent a data compromise, and rely on commercially available systems, software, tools, and monitoring to provide security for our information technology systems and the processing, transmission and storage of digital information. We have also outsourced elements of our information technology infrastructure, and as a result a number of third-party vendors may or could have access to our confidential information. Our internal information technology systems and infrastructure, and those of our current and any future collaborators, contractors and consultants and other third parties on which we rely, are vulnerable to damage from computer viruses, malware, natural disasters, terrorism, war, telecommunication and electrical failures, cyber-attacks or cyber-intrusions over the Internet, attachments to emails, persons inside our organization, or persons with access to systems inside our organization. For example, in January 2019, we discovered that our e-mail server suffered unauthorized intrusions in which proprietary business information was accessed. Although we do not believe that we have experienced any material losses related to security breaches, including recent cybersecurity incidents, there can be no assurance that we will not suffer such losses in the future. Breaches and other inappropriate access can be difficult to detect and any delay in identifying them could increase their harm. While we have implemented security measures to protect our data security and information technology systems, such measures may not prevent such events. Any such breaches of security and inappropriate access could disrupt our operations, harm our reputation or otherwise have a material adverse effect on our business, financial condition and results of operations.

The risk of a security breach or disruption, particularly through cyber-attacks or cyber intrusion, including by computer hackers, foreign governments and cyber terrorists, has generally increased as the number, intensity and sophistication of attempted attacks and intrusions from around the world have increased. In addition, the prevalent use of mobile devices that access confidential information increases the risk of data security breaches, which could lead to the loss of confidential information or other intellectual property. The costs to us to mitigate network security problems, bugs, viruses, worms, malicious software programs and security vulnerabilities could be significant, and while we have implemented security measures to protect our data security and information technology systems, our efforts to address these problems may not be successful, and these problems could result in unexpected interruptions, delays, cessation of service and other harm to our business and our competitive position. If such an event were to occur and cause interruptions in our operations, it could result in a material disruption of our product development programs. For example, the loss of clinical study data from completed or ongoing or planned clinical studies could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. Moreover, if a computer security breach affects our systems, corrupts our data or results in the unauthorized disclosure or release of personally identifiable information, our reputation could be materially damaged. In addition, such a breach may require notification to governmental agencies, supervisory bodies, credit reporting agencies, the media or individuals pursuant to various federal, state and foreign data protection, privacy and security laws, regulations and guidelines, if applicable. For example, these may include the Health Insurance Portability and Accountability Act of 1996, or HIPAA, as amended by the Health Information Technology for Clinical Health Act of 2009, and its implementing rules and regulations, U.S. state breach notification laws and the EU General Data Protection Regulation (EU) 2016/679, or GDPR. We would also be exposed to a risk of loss, enforcement measures, penalties, fines, indemnification claims or litigation and potential civil or criminal liability, which could materially adversely affect our business, results of operations and financial condition.

**Changes in and failures to comply with U.S. and foreign privacy and data protection laws, regulations and standards may adversely affect our business, operations and financial performance.**

We are subject to or affected by numerous federal, state and foreign laws and regulations, as well as regulatory guidance, governing the collection, use, disclosure, retention, and security of personal data, such as information that we collect about patients and healthcare providers in connection with clinical trials in the U.S. and abroad. The global data protection landscape is rapidly evolving, and implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future. This evolution may create uncertainty in our business, affect our or our vendors' ability to operate in certain jurisdictions or to collect, store, transfer use and share personal information, necessitate the acceptance of more onerous obligations in our contracts, result in liability or impose additional costs on us. The cost of compliance with these laws, regulations and standards is high and is likely to increase in the future. Any failure or perceived failure by us to comply with federal, state or foreign laws or regulation, our internal policies and procedures or our contracts governing our processing of personal information could result in negative publicity, diversion of management time and effort and proceedings against us by governmental entities or others. In many jurisdictions, enforcement actions and consequences for noncompliance are rising.

In the U.S., HIPAA imposes, among other things, certain standards relating to the privacy, security, transmission and breach reporting of individually identifiable health information. Certain states have also adopted comparable privacy and security laws and regulations, some of which may be more stringent than HIPAA. Such laws and regulations will be subject to interpretation by various courts and other governmental authorities, thus creating potentially complex compliance issues for us and our future customers and strategic partners. In the event that we are subject to HIPAA or other U.S. privacy and data protection laws, any liability from failure to comply with the requirements of these laws could adversely affect our financial condition. Our operations abroad may also be subject to increased scrutiny or attention from data protection authorities. Many countries in these regions have established or are in the process of establishing privacy and data security legal frameworks with which we, our customers, or our vendors must comply. For example, the EU has adopted the GDPR, which went into effect in May 2018 and introduces strict requirements for processing the personal information of EU subjects, including clinical trial data. The GDPR is likely to increase compliance burdens on us, including by mandating potentially burdensome documentation requirements and granting certain rights to individuals to control how we collect, use, disclose, retain and process information about them. The processing of sensitive personal data, such as physical health condition, may impose heightened compliance burdens under the GDPR and is a topic of active interest among foreign regulators. In addition, the GDPR provides for more robust regulatory enforcement and fines of up to €20 million or 4 percent of the annual global revenue of the noncompliant company, whichever is greater. As we continue to expand into other foreign countries and jurisdictions, we may be subject to additional laws and regulations that may affect how we conduct business.

## Risks Related to Our Intellectual Property

**If our efforts to protect our intellectual property related to DAXI, or any future product candidates, including DaxibotulinumtoxinA Topical and biosimilar, are not adequate, we may not be able to compete effectively.**

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to DAXI, DaxibotulinumtoxinA Topical, biosimilar, and our development programs. Any disclosure to or misappropriation by third parties of our confidential proprietary information could enable competitors to quickly duplicate or surpass our technological achievements, thereby eroding our competitive position.

The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. This uncertainty includes changes to the patent laws through either legislative action to change statutory patent law or court action that may reinterpret existing law in ways affecting the scope or validity of issued patents. The patent applications that we own or license may fail to result in issued patents in the U.S. or foreign countries. Competitors in the field of cosmetics, pharmaceuticals, and botulinum toxin have created a substantial amount of prior art, including scientific publications, patents and patent applications. Our ability to obtain and maintain valid and enforceable patents depends on whether the differences between our technology and the prior art allow our technology to be patentable over the prior art. Even if the patents do successfully issue, third parties may challenge the validity, enforceability or scope of such issued patents or any other issued patents we own or license, which may result in such patents being narrowed, invalidated or held unenforceable. For example, patents granted by the European Patent Office may be opposed by any person within nine months from the publication of their grant. Our European Patent EP 2 661 276 for "Topical composition comprising botulinum toxin and a dye" was opposed in the European Patent Office by Allergan plc on May 2, 2018, and although this patent is not material to RT002 injectable, we will continue to take appropriate measures to defend the patent. Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. In addition, recent changes to the patent laws of the U.S. provide additional procedures for third parties to challenge the validity of issued patents. Patents issued from applications filed after March 15, 2013 may be challenged by third parties using the post-grant review procedure which allows challenges for a number of reasons, including prior art, sufficiency of disclosure, and subject matter eligibility.

Under the inter partes review procedure, any third party may challenge the validity of any issued U.S. Patent in the U.S. Patent and Trademark Office, or USPTO, on the basis of prior art. Because of a lower evidentiary standard necessary to invalidate a patent claim in USPTO proceedings as compared to the evidentiary standard relied on in U.S. federal court, a third party could potentially provide evidence in a USPTO proceeding sufficient for the USPTO to hold a claim invalid even though the same evidence would be insufficient to invalidate the claim if first presented in a district court action. Accordingly, a third party may attempt to use the USPTO procedures to invalidate our patent claims that would not have been invalidated if first challenged by the third party as a defendant in a district court action. If the breadth or strength of protection provided by the patents and patent applications we hold or pursue with respect to DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates is challenged, then it could threaten our ability to commercialize DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates, and could threaten our ability to prevent competitive products from being marketed. Further, if we encounter delays in our clinical trials, the period of time during which we could market DAXI, or any future product candidates under patent protection would be reduced. The results of our REALISE 1 Phase 3 clinical trial may be relevant to our patent strategy for our DaxibotulinumtoxinA Topical program.

Since patent applications in the U.S. and most other countries are confidential for a period of time after filing, we cannot be certain that we were the first to either (i) file any patent application related to our product candidates or (ii) invent any of the inventions claimed in our patents or patent applications. Furthermore, for applications filed before March 16, 2013, or patents issuing from such applications, an interference proceeding can be provoked by a third party, or instituted by the USPTO to determine who was the first to invent any of the subject matter covered by the patent claims of our applications and patents. As of March 16, 2013, the U.S. transitioned to a "first-to-file" system for deciding which party should be granted a patent when two or more patent applications are filed by different parties claiming the same invention. A third party that files a patent application in the USPTO before us could therefore be awarded a patent covering an invention of ours even if we had made the invention before it was made by the third party. The change to "first-to-file" from "first-to-invent" is one of the changes to the patent laws of the United States resulting from the Leahy-Smith America Invents Act signed into law on September 16, 2011. Among some of the other changes to the patent laws are changes that limit where a patentee may file a patent infringement suit and providing opportunities for third parties to challenge any issued patent in the USPTO.

Even where laws provide protection, costly and time-consuming litigation could be necessary to enforce and determine the scope of our proprietary rights, and the outcome of such litigation would be uncertain. Moreover, any actions we may bring to enforce our intellectual property against our competitors could provoke them to bring counterclaims against us, and some of our competitors have substantially greater intellectual property portfolios and financial resources than we have.

We also rely on trade secret protection and confidentiality agreements to protect proprietary know-how that may not be patentable, processes for which patents may be difficult to obtain or enforce and any other elements of our product development processes that involve proprietary know-how, information or technology that is not covered by patents.

In an effort to protect our trade secrets and other confidential information, we require our employees, consultants, collaborators and advisors to execute confidentiality agreements upon the commencement of their relationships with us. These agreements require that all confidential information developed by the individual or made known to the individual by us during the course of the individual's relationship with us be kept confidential and not disclosed to third parties. These agreements, however, may not provide us with adequate protection against improper use or disclosure of confidential information, and these agreements may be breached. Adequate remedies may not exist in the event of unauthorized use or disclosure of our confidential information. A breach of confidentiality could significantly affect our competitive position. In addition, in some situations, these agreements may conflict with, or be subject to, the rights of third parties with whom our employees, consultants, collaborators or advisors have previous employment or consulting relationships. To the extent that our employees, consultants or contractors use any intellectual property owned by others in their work for us, disputes may arise as to the rights in any related or resulting know-how and inventions. Also, others may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets and other confidential information.

**If we infringe or are alleged to infringe intellectual property rights of third parties, our business could be harmed.**

Our research, development and commercialization activities may infringe or otherwise violate or be claimed to infringe or otherwise violate patents owned or controlled by other parties. Competitors in the field of cosmetics, pharmaceuticals and botulinum toxin have developed large portfolios of patents and patent applications in fields relating to our business. For example, there are patents held by third parties that relate to the treatment with botulinum toxin-based products for indications we are currently developing. There may also be patent applications that have been filed but not published that, when issued as patents, could be asserted against us. These third parties could bring claims against us that would cause us to incur substantial expenses and, if successful against us, could cause us to pay substantial damages. Further, if a patent infringement suit were brought against us, we could be forced to stop or delay research, development, manufacturing or sales of the product or product candidate that is the subject of the suit.

As a result of patent infringement claims, or to avoid potential claims, we may choose or be required to seek licenses from third parties. These licenses may not be available on acceptable terms, or at all. Even if we are able to obtain a license, the license would likely obligate us to pay license fees or royalties or both, and the rights granted to us might be nonexclusive, which could result in our competitors gaining access to the same intellectual property. Ultimately, we could be prevented from commercializing a product based on our current or future indications, or be forced to cease some aspect of our business operations, if, as a result of actual or threatened patent infringement claims, we are unable to enter into licenses on acceptable terms.

There has been substantial litigation and other proceedings regarding patent and other intellectual property rights in the pharmaceutical industry. In addition to infringement claims against us, we may become a party to other patent litigation and other proceedings, including interference, derivation or post-grant proceedings declared or granted by the USPTO and similar proceedings in foreign countries, regarding intellectual property rights with respect to our current or future products. The cost to us of any patent litigation or other proceeding, even if resolved in our favor, could be substantial. Some of our competitors may be able to sustain the costs of such litigation or proceedings more effectively than we can because of their substantially greater financial resources. Patent litigation and other proceedings may also absorb significant management time. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could impair our ability to compete in the marketplace. The occurrence of any of the foregoing could have a material adverse effect on our business, financial condition or results of operations.

**We may become involved in lawsuits to protect or enforce our patents or other intellectual property or the patents of our licensors, which could be expensive and time-consuming.**

Competitors may infringe upon our intellectual property, including our patents or the patents of our licensors. As a result, we may be required to file infringement claims to stop third-party infringement or unauthorized use. This can be expensive, particularly for a company of our size, and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patent claims do not cover its technology or that the factors necessary to grant an injunction against an infringer are not satisfied.

An adverse determination of any litigation or other proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not issuing.

Interference, derivation, inter partes review, post-grant review or other proceedings brought at the USPTO may be necessary to determine the priority or patentability of inventions with respect to our patents or patent applications or those of our licensors or collaborators. Litigation or USPTO proceedings brought by us may fail or may be invoked against us by third parties. Even if we are successful, domestic or foreign litigation or USPTO or foreign patent office proceedings may result in substantial costs and distraction to our management. We may not be able, either alone or with our licensors or collaborators, to prevent misappropriation of our proprietary rights, particularly in countries where the laws may not protect such rights as fully as in the U.S.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation or other proceedings, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation or proceedings. In addition, during the course of this kind of litigation or proceedings, there could be public announcements of the results of hearings, motions or other interim proceedings or developments or public access to related documents. If investors perceive these results to be negative, the market price for our common stock could be significantly harmed.

**We may not be able to protect our intellectual property rights throughout the world.**

Filing, prosecuting and defending patents on product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the U.S. can be less extensive than those in the U.S.. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the U.S. and in some cases may even force us to grant a compulsory license to competitors or other third parties. Consequently, we may not be able to prevent third parties from practicing our inventions in all countries outside the U.S., or from selling or importing products made using our inventions in and into the U.S. or other jurisdictions. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products and further, may export otherwise infringing products to territories where we have patent protection, but where enforcement is not as strong as that in the U.S. These products may compete with our products and our patents or other intellectual property rights may not be effective or sufficient to prevent them from competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biotechnology, which could make it difficult for us to stop the infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license.

In addition, our ability to protect and enforce our intellectual property rights may be adversely affected by unforeseen changes in domestic and foreign intellectual property laws.



ALGN-1364717
PTX-767.0065

## Risks Related to Government Regulation

**Our business and products are subject to extensive government regulation.**

We are subject to extensive, complex, costly and evolving regulation by federal and state governmental authorities in the U.S., principally by the FDA, the U.S. Drug Enforcement Administration, or DEA, the CDC, and foreign regulatory authorities. Failure to comply with all applicable regulatory requirements, including those promulgated under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), the PHSA, and Controlled Substances Act, may subject us to operating restrictions and criminal prosecution, monetary penalties and other disciplinary actions, including, sanctions, warning letters, product seizures, recalls, fines, injunctions, suspension, revocation of approvals, or exclusion from future participation in the Medicare and Medicaid programs.

After our products receive regulatory approval , we, and our direct and indirect suppliers, will remain subject to the periodic inspection of our plants and facilities, review of production processes, and testing of our products to confirm that we are in compliance with all applicable regulations. Adverse findings during regulatory inspections may result in the implementation of Risk Evaluation and Mitigation Strategies ("REMS") programs, completion of government mandated clinical trials, and government enforcement action relating to labeling, advertising, marketing and promotion, as well as regulations governing manufacturing controls noted above.

**The regulatory approval process is highly uncertain and we may not obtain regulatory approval for the commercialization of DAXI or any future product candidates.**

The research, testing, manufacturing, labeling, approval, selling, import, export, marketing and distribution of drug and biologic products are subject to extensive regulation by the FDA and other regulatory authorities in the U.S. and other countries, which regulations differ from country to country. Neither we nor any collaboration partner are permitted to market DAXI or any future product candidates in the U.S. until we receive approval of a BLA from the FDA. We have not submitted an application or obtained marketing approval for DAXI anywhere in the world. After we submit a BLA for DAXI, the FDA may refuse to file the application if it determines that the application is not sufficiently complete to permit substantive review. Even if filed by FDA, our BLA may receive a Complete Response Letter identifying deficiencies that must be addressed, rather than an approval. Obtaining regulatory approval of a BLA can be a lengthy, expensive and uncertain process.

In addition, failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject us to administrative or judicially imposed sanctions or other actions, including:

- warning letters;
- civil and criminal penalties;
- injunctions;
- withdrawal of approved products;
- product seizure or detention;
- product recalls;
- total or partial suspension of production; and
- refusal to approve pending BLAs or supplements to approved BLAs.

Prior to obtaining approval to commercialize a product candidate in the U.S. or abroad, we or our collaborators must demonstrate with substantial evidence from well controlled clinical trials, and to the satisfaction of the FDA or other foreign regulatory agencies, that such product candidates are safe and effective for their intended uses. Results from preclinical studies and clinical trials can be interpreted in different ways. Even if we believe the preclinical and clinical data for our product candidates are promising, such data may not be sufficient to support approval by the FDA and other regulatory authorities. Administering product candidates to humans may produce undesirable side effects, which could interrupt, delay or halt clinical trials and result in the FDA or other regulatory authorities denying approval of a product candidate for any or all targeted indications.



ALGN-1364718
PTX-767.0066

Regulatory approval of a BLA or BLA supplement is not guaranteed, and the approval process is expensive and may take several years. The FDA also has substantial discretion in the approval process. Despite the time and expense expended, failure can occur at any stage, and we could encounter problems that cause us to abandon or repeat clinical trials, or perform additional preclinical studies and clinical trials. The number of preclinical studies and clinical trials that will be required for FDA approval varies depending on the product candidate, the disease or the condition that the product candidate is designed to address and the regulations applicable to any particular product candidate. The FDA can delay, limit or deny approval of a product candidate for many reasons, including the following:

- a product candidate may not be deemed safe, effective, or of required quality;
- FDA officials may not find the data from preclinical studies and clinical trials sufficient;
- the FDA might not approve our third-party manufacturers' processes or facilities; or
- the FDA may change its approval policies or adopt new regulations.

If DAXI or any future product candidates fail to demonstrate safety and efficacy in clinical trials or do not gain approval, our business and results of operations will be materially and adversely harmed.

**Even if we receive regulatory approval for DAXI or any future product candidates, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense, may limit or delay regulatory approval and may subject us to penalties if we fail to comply with applicable regulatory requirements.**

Once regulatory approval has been granted, DAXI or any approved product will be subject to continual regulatory review by the FDA and/or non-U.S. regulatory authorities. Additionally, any product candidates, if approved, will be subject to extensive and ongoing regulatory requirements, including labeling and other restrictions and market withdrawal and we may be subject to penalties if we fail to comply with regulatory requirements or experience unanticipated problems with our products.

Any regulatory approvals that we or our collaborators receive for DAXI or any future product candidates may also be subject to limitations on the approved indications for which the product may be marketed or to the conditions of approval, or contain requirements for potentially costly post-marketing testing, including Phase 4 clinical trials, and surveillance to monitor the safety and efficacy of the product candidate. In addition, if the applicable regulatory agency approves DAXI or any future product candidates, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion and recordkeeping for the product will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMP and cGCP for any clinical trials that we conduct post-approval. Later discovery of previously unknown problems with DAXI or any future product candidates, including adverse events of unanticipated severity or frequency, or with our third-party manufacturers or manufacturing processes, or failure to comply with regulatory requirements, may result in, among other things:

- restrictions on the marketing or manufacturing of the product, withdrawal of the product from the market, or voluntary or mandatory product recalls;
- fines, warning letters or holds on clinical trials;
- refusal by the FDA to approve pending applications or supplements to approved applications submitted by us or our strategic collaborators, or suspension or revocation of product license approvals;
- product seizure or detention, or refusal to permit the import or export of products; and
- injunctions or the imposition of civil or criminal penalties.

Our ongoing regulatory requirements may also change from time to time, potentially harming or making costlier our commercialization efforts. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the U.S. or other countries. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained and we may not achieve or sustain profitability, which would adversely affect our business.

**If we fail to obtain regulatory approvals in foreign jurisdictions for DAXI, or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar, we will be unable to market our products outside of the U.S.**

In addition to regulations in the U.S., we will be subject to a variety of foreign regulations governing manufacturing, clinical trials, commercial sales and distribution of our future products. Whether or not we obtain FDA approval for a product candidate, we must obtain approval of the product by the comparable regulatory authorities of foreign countries before commencing clinical trials or marketing in those countries. The approval procedures vary among countries and can involve additional clinical testing, or the time required to obtain approval may differ from that required to obtain FDA approval. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries. Approval by the FDA does not ensure approval by regulatory authorities in other countries, and approval by one or more foreign regulatory authorities does not ensure approval by regulatory authorities in other foreign countries or by the FDA. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval. We may not be able to file for regulatory approvals or to do so on a timely basis, and even if we do file, we may not receive the necessary approvals to commercialize our products in geographies outside of the U.S..

**If approved, DAXI or any other products may cause or contribute to adverse medical events that we are required to report to regulatory agencies and if we fail to do so, we could be subject to sanctions that would materially harm our business.**

Some participants in our clinical trials have reported adverse events after being treated with DAXI. If we are successful in commercializing DAXI, or any other products including DaxibotulinumtoxinA Topical or biosimilar, the FDA and foreign regulatory agency regulations require that we report certain information about adverse medical events if those products may have caused or contributed to those adverse events. The timing of our obligation to report would be triggered by the date we become aware of the adverse event as well as the nature of the event. We may fail to report adverse events we become aware of within the prescribed timeframe. We may also fail to appreciate that we have become aware of a reportable adverse event, especially if it is not reported to us as an adverse event or if it is an adverse event that is unexpected or removed in time from the use of our products. If we fail to comply with our reporting obligations, the FDA or a foreign regulatory agency could take action including criminal prosecution, the imposition of civil monetary penalties, seizure of our products, or delay in approval or clearance of future products.

**We may in the future be subject to various U.S. federal and state laws pertaining to healthcare fraud and abuse, including anti-kickback, self-referral, false claims and fraud laws, and any violations by us of such laws could result in fines or other penalties.**

While we do not expect that DAXI, if approved for the treatment of glabellar lines, will subject us to all of the various U.S. federal and state laws intended to prevent healthcare fraud and abuse, we may in the future become subject to such laws for treatment of other indications. The federal anti-kickback statute prohibits the offer, receipt, or payment of remuneration in exchange for or to induce the referral of patients or the use of products or services that would be paid for in whole or part by Medicare, Medicaid or other federal healthcare programs. Remuneration has been broadly defined to include anything of value, including cash, improper discounts, and free or reduced price items and services. Many states have similar laws that apply to their state healthcare programs as well as private payors. Violations of the anti-kickback laws can result in exclusion from federal healthcare programs and the levying of substantial civil and criminal penalties.

The federal false claims and civil monetary penalties laws, including the civil False Claims Act, or FCA, imposes liability on persons who, among other things, present or cause to be presented false or fraudulent claims for payment by a federal healthcare program. The FCA has been used to prosecute persons submitting claims for payment that are inaccurate or fraudulent, for services not provided as claimed, or for services that are not medically necessary. The FCA includes a whistleblower provision that allows individuals to bring actions on behalf of the federal government and share a portion of the recovery of successful claims. If our marketing or other arrangements were determined to violate anti-kickback or related laws, including the FCA, then our revenues could be adversely affected, which would likely harm our business, financial condition, and results of operations.

HIPAA imposes criminal and civil liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false statement, in connection with the delivery of, or payment for, healthcare benefits, items or services. Similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

The federal Physician Payments Sunshine Act, and its implementing regulations, require certain manufacturers of drugs, devices, biologics and medical supplies that are reimbursable under Medicare, Medicaid, or the Children's Health Insurance Program to report annually to CMS information related to certain payments and other transfers of value to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by the physicians described above and their immediate family members.

We may also be subject to analogous state laws and regulations, including: state anti-kickback and false claims laws, state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the U.S. federal government, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources, state laws and regulations that require drug manufacturers to file reports relating to pricing and marketing information, which requires tracking gifts and other remuneration and items of value provided to healthcare professionals and entities, and state and local laws that require the registration of our pharmaceutical sales representatives

State and federal authorities have aggressively targeted pharmaceutical manufacturers for alleged violations of these anti-fraud statutes, based on improper research or consulting contracts with physicians and other healthcare professionals, certain marketing arrangements that rely on volume-based pricing, off-label marketing schemes, and other improper promotional practices. Companies targeted in such prosecutions have paid substantial fines in the hundreds of millions of dollars or more, have been forced to implement extensive corrective action plans, and have often become subject to consent decrees severely restricting the manner in which they conduct business. Further, defending against any such actions can be costly, time-consuming and may require significant financial and personnel resources. If we become the target of such an investigation or prosecution based on our contractual relationships with providers or institutions, or our marketing and promotional practices, we could face similar sanctions, which would materially harm our business. Even if we are successful in defending against any such actions that may be brought against us, our business may be impaired.

Also, the U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. We cannot assure you that our internal control policies and procedures will protect us from reckless or negligent acts committed by our employees, future distributors, partners, collaborators or agents. Violations of these laws, or allegations of such violations, could result in fines, penalties or prosecution and have a negative impact on our business, results of operations and reputation.

**Legislative or regulatory healthcare reforms in the U.S. may make it more difficult and costly for us to obtain regulatory clearance or approval of DAXI, topical, or any future product candidates and to produce, market, and distribute our products after clearance or approval is obtained.**

From time to time, legislation is drafted and introduced in Congress that could significantly change the statutory provisions governing the regulatory clearance or approval, manufacture, and marketing of regulated products or the reimbursement thereof. In addition, FDA regulations and guidance are often revised or reinterpreted by the FDA in ways that may significantly affect our business and our products. In addition, there have been several recent U.S. congressional inquiries and proposed and enacted state and federal legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, reduce the costs of drugs under Medicare and reform government program reimbursement methodologies for drug products. Any new regulations or revisions or reinterpretations of existing regulations may impose additional costs or lengthen review times of, or affect the price that we may charge for, DAXI, or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar. We cannot determine what effect changes in regulations, statutes, legal interpretation or policies, when and if promulgated, enacted or adopted may have on our business in the future. Such changes could require, among other things:

- changes to manufacturing methods;
- recall, replacement, or discontinuance of one or more of our products; and
- additional recordkeeping.

Each of these would likely entail substantial time and cost and could materially harm our business and our financial results. In addition, delays in receipt of or failure to receive regulatory clearances or approvals for any future products would harm our business, financial condition, and results of operations.

**Changes in funding for the FDA, the SEC and other government agencies could hinder their ability to hire and retain key leadership and other personnel, prevent new products and services from being developed or commercialized in a timely manner or otherwise prevent those agencies from performing normal functions on which the operation of our business may rely, which could negatively impact our business.**

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept payment of user fees, and statutory, regulatory, and policy changes. Average review times at the agency have fluctuated in recent years as a result. In addition, government funding of the SEC and other government agencies on which our operations may rely, including those that fund research and development activities is subject to the political process, which is inherently fluid and unpredictable.

Disruptions at the FDA and other agencies may also slow the time necessary for new drugs to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. For example, over the last several years, including beginning on December 22, 2018, the U.S. government has shut down several times and certain regulatory agencies, such as the FDA and the SEC, have had to furlough critical FDA, SEC and other government employees and stop critical activities. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process our regulatory submissions, which could have a material adverse effect on our business. Further, future government shutdowns could impact our ability to access the public markets and obtain necessary capital in order to properly capitalize and continue our operations.

**Risks Related to the Ownership of Our Common Stock**

**The trading price of our common stock is volatile, and purchasers of our common stock could incur substantial losses.**

The trading price of our common stock is highly volatile and could be subject to wide fluctuations in response to various factors, some of which are beyond our control. The stock markets in general and the markets for pharmaceutical biopharmaceutical and biotechnology stocks in particular have experienced extreme volatility that may have been for reasons that are related or unrelated to the operating performance of the issuer. The market price for our common stock may be influenced by many factors, including:

- regulatory or legal developments in the U.S. and foreign countries;
- results from or delays in clinical trials of our product candidates, including our ongoing SAKURA Phase 3 clinical program in glabellar lines our ongoing ASPEN Phase 3 clinical program in cervical dystonia and our Phase 2 program in plantar fasciitis all with DAXI;
- announcements of regulatory approval or disapproval of DAXI or any future product candidates;
- FDA or other U.S. or foreign regulatory actions or guidance affecting us or our industry;
- introductions and announcements of new products by us, any commercialization partners or our competitors, and the timing of these introductions and announcements;
- variations in our financial results or those of companies that are perceived to be similar to us;
- changes in the structure of healthcare payment systems;
- announcements by us or our competitors of significant acquisitions, licenses, strategic partnerships, joint ventures or capital commitments;
- market conditions in the pharmaceutical and biotechnology sectors and issuance of securities analysts' reports or recommendations;
- quarterly variations in our results of operations or those of our future competitors;
- changes in financial estimates or guidance, including our ability to meet our future revenue and operating profit or loss estimates or guidance;
- sales of substantial amounts of our stock by insiders and large stockholders, or the expectation that such sales might occur;
- general economic, industry and market conditions;
- additions or departures of key personnel;
- intellectual property, product liability or other litigation against us;
- expiration or termination of our potential relationships with customers and strategic partners;
- the occurrence of trade wars or barriers, or the perception that trade wars or barriers will occur; and

- other factors described in this "Risk Factors" section.

These broad market fluctuations may adversely affect the trading price or liquidity of our common stock. In addition, in the past, stockholders have initiated class actions against pharmaceutical companies, including us, following periods of volatility in their stock prices. Such litigation instituted against us could cause us to incur substantial costs and divert management's attention and resources.

**If securities or industry analysts do not publish research or publish unfavorable research about our business, our stock price and trading volume could decline.**

The trading market for our common stock depends, in part, on the research and reports that securities or industry analysts publish about us or our business. Securities and industry analysts may cease to publish research on our company at any time in their discretion. A lack of research coverage may adversely affect the liquidity and market price of our common stock. We will not have any control of the equity research analysts or the content and opinions included in their reports. The price of our stock could decline if one or more equity research analysts downgrade our stock or issue other unfavorable commentary or research. If one or more equity research analysts ceases coverage of our company, or fails to publish reports on us regularly, demand for our stock could decrease, which in turn could cause our stock price or trading volume to decline.

**Sales of substantial amounts of our common stock in the public markets, or the perception that such sales might occur, could cause the market price of our common stock to drop significantly, even if our business is doing well.**

Sales of a substantial number of shares of our common stock in the public market could occur at any time. We raised net proceeds of approximately $10.0 million by selling an aggregate of 352,544 shares of our common stock under the 2015 ATM agreement, which was effectively terminated on March 7, 2016, and raised net proceeds of approximately $38.2 million by selling an aggregate of 1,802,651 shares of our common stock under the 2016 ATM agreement. In March 2018, the Company terminated the 2016 ATM Agreement and entered into the 2018 ATM Agreement. Under the 2018 ATM Agreement, the Company may offer and sell common stock having aggregate proceeds of up to $125.0 million from time to time through Cantor Fitzgerald as our sales agent. No sales of our common stock have taken place under the 2018 ATM Agreement as of December 31, 2018.

If our stockholders sell, or the market perceives that our stockholders intend to sell, substantial amounts of our common stock in the public market, the market price of our common stock could decline significantly. Any sales of securities by stockholders could have a material adverse effect on the trading price of our common stock.

**Provisions in our corporate charter documents and under Delaware law could discourage takeover attempts and lead to management entrenchment, and the market price of our common stock may be lower as a result.**

Certain provisions in our amended and restated certificate of incorporation and amended and restated bylaws may make it difficult for a third party to acquire, or attempt to acquire, control of our company, even if a change in control was considered favorable by you and other stockholders. For example, our board of directors has the authority to issue up to 5,000,000 shares of preferred stock. Our board of directors can fix the price, rights, preferences, privileges, and restrictions of the preferred stock without any further vote or action by our stockholders. The issuance of shares of preferred stock may delay or prevent a change in control transaction. As a result, the market price of our common stock and the voting and other rights of our stockholders may be adversely affected. An issuance of shares of preferred stock may result in the loss of voting control to other stockholders.

Our charter documents also contain other provisions that could have an anti-takeover effect, including:

- only one of our three classes of directors will be elected each year;
- no cumulative voting in the election of directors;
- the ability of our board of directors to issues shares of preferred stock and determine the price and other terms of those shares, including preferences and voting rights, without stockholder approval;
- the exclusive right of our board of directors to elect a director to fill a vacancy or newly created directorship;
- stockholders will not be permitted to take actions by written consent;
- stockholders cannot call a special meeting of stockholders;
- stockholders must give advance notice to nominate directors or submit proposals for consideration at stockholder meetings;
- the ability of our board of directors, by a majority vote, to amend the bylaws; and
- the requirement for the affirmative vote of at least 66 2/3 percent or more of the outstanding common stock to amend many of the provisions described above.

In addition, we are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which regulates corporate acquisitions. These provisions could discourage potential acquisition proposals and could delay or prevent a change in control transaction. They could also have the effect of discouraging others from making tender offers for our common stock, including transactions that may be in your best interests. These provisions may also prevent changes in our management or limit the price that certain investors are willing to pay for our stock.

Our amended and restated certificate of incorporation also provides that the Court of Chancery of the State of Delaware will be the exclusive forum for substantially all disputes between us and our stockholders.

**A relatively small number of existing stockholders have substantial control over us, which could limit your ability to influence the outcome of key transactions, including a change of control.**

As of December 31, 2018, our directors, executive officers and each of our stockholders who own greater than 5 percent of our outstanding common stock and their affiliates, in the aggregate, beneficially owned approximately 54.0 percent of our common stock. As a result, these stockholders, if acting together, would be able to influence or control matters requiring approval by our stockholders, including the election of directors and the approval of mergers, acquisitions or other extraordinary transactions. They may have interests that differ from yours and may vote in a way with which you disagree and that may be adverse to your interests. This concentration of ownership may have the effect of delaying, preventing or deterring a change of control of our company, could deprive our stockholders of an opportunity to receive a premium for their common stock as part of a sale of our company and might affect the market price of our common stock.

**Claims for indemnification by our directors and officers may reduce our available funds to satisfy successful third-party claims against us and may reduce the amount of money available to us.**

Our amended and restated certificate of incorporation and amended and restated bylaws provide that we will indemnify our directors and officers, in each case to the fullest extent permitted by Delaware law.

In addition, as permitted by Section 145 of the Delaware General Corporation Law, our amended and restated bylaws and our indemnification agreements that we have entered into with our directors and officers provide that:

- We will indemnify our directors and officers for serving us in those capacities, or for serving other business enterprises at our request, to the fullest extent permitted by Delaware law. Delaware law provides that a corporation may indemnify such person if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the registrant and, with respect to any criminal proceeding, had no reasonable cause to believe such person's conduct was unlawful.
- We may, in our discretion, indemnify employees and agents in those circumstances where indemnification is permitted by applicable law.
- We are required to advance expenses, as incurred, to our directors and officers in connection with defending a proceeding, except that such directors or officers shall undertake to repay such advances if it is ultimately determined that such person is not entitled to indemnification.
- We will not be obligated pursuant to our amended and restated bylaws to indemnify a person with respect to proceedings initiated by that person against us or our other indemnitees, except with respect to proceedings authorized by our board of directors or brought to enforce a right to indemnification.
- The rights conferred in our amended and restated bylaws are not exclusive, and we are authorized to enter into indemnification agreements with our directors, officers, employees and agents and to obtain insurance to indemnify such persons.
- We may not retroactively amend our amended and restated bylaw provisions to reduce our indemnification obligations to directors, officers, employees and agents.

**Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be your sole source of gains.**

We have not declared or paid cash dividends on our common stock to date. We currently intend to retain our future earnings, if any, to fund the development and growth of our business. In addition, the terms of any existing or future debt agreements may preclude us from paying dividends. As a result, capital appreciation, if any, of our common stock will be your sole source of gain for the foreseeable future.

**We recognize revenue in accordance with complex accounting standards and changes in the interpretation or application of generally accepted accounting principles may materially affect our financial statements.**

In May 2014, the Financial Accounting Standards Board (the "FASB") issued an accounting standard for revenue recognition, Accounting Standards Update No. 2014-09, Revenue from Contracts with Customers ("ASC 606"). Further, in April 2016, the FASB amended ASC 606 to provide additional guidance on revenue recognition as it pertains to licenses of intellectual property. We adopted ASC 606 and its related amendments on January 1, 2018.

The nature of our business requires the application of complex revenue recognition rules. Significant judgment is required in the interpretation and application of complex accounting guidance such as ASC 606. Our judgments and assumptions are based on the facts and circumstances of the underlying revenue transactions. The SEC, the American Institute of Certified Public Accountants ("AICPA"), the FASB and various other regulatory or accounting bodies may issue new positions, interpretive views or updated accounting standards on the treatment of complex accounting matters such as revenue recognition that may materially affect our financial statements.

Table of Contents

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

None.



ALGN-1364730
PTX-767.0078

Table of Contents

**ITEM 2. PROPERTIES**

Our headquarters is located in Newark, California, where we occupy approximately 109,000 square feet of office, laboratory and manufacturing space. The current term of our lease expires in January 2027. We have an option to extend the lease for two additional terms of seven years, which would extend our lease through January 2041. We believe that our current facilities are adequate for our needs and for the immediate future and that, should it be needed, additional space can be leased to accommodate any future growth.



ALGN-1364731
PTX-767.0079

Table of Contents

**ITEM 3. LEGAL PROCEEDINGS**

From time to time, we may be involved in litigation relating to claims arising out of our operations. We are not currently involved in any known material legal proceedings. We may, however, be involved in material legal proceedings in the future. Such matters are subject to uncertainty and there can be no assurance that such legal proceedings will not have a material adverse effect on our business, results of operations, financial position or cash flows.



ALGN-1364732
PTX-767.0080

Table of Contents

## ITEM 4. MINE SAFETY DISCLOSURES

None.



ALGN-1364733
PTX-767.0081

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock has been trading on The Nasdaq Global Market under the symbol "RVNC" since our IPO on February 6, 2014. Prior to this date, there was no public market for our common stock.

### Holders of Record

As of February 22, 2019, there were approximately 25 holders of record of our common stock, one of which was Cede & Co., a nominee for Depository Trust Company ("DTC"). All of the shares of our common stock held by brokerage firms, banks and other financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC and are therefore considered to be held of record by Cede & Co. as one stockholder.

### Dividend Policy

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any determination to pay dividends in the future will be at the discretion of our board of directors and will be dependent on a number of factors, including our earnings, capital requirements, overall financial conditions, business prospects, contractual restrictions and other factors our board of directors may deem relevant.

### Stock Price Performance Graph

This performance graph shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or incorporated by reference into any of our filings under the Securities Act or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.






ALGN-1364734
PTX-767.0082

Table of Contents

This graph compares, for the period ended December 31, 2018, the cumulative total return on our common stock, the Nasdaq Biotechnology Index ("NBI") and the Nasdaq Composite Index ("CCMP"). The graph assumes $100 was invested on February 6, 2014, in our common stock, the NBI and CCMP, and assumes the reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.

| Company/Index | 2/6/2014 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|---|
| Revance Therapeutics, Inc. | $100.00 | $105.88 | $213.50 | $129.38 | $223.44 | $125.81 |
| Nasdaq Biotechnology Index | $100.00 | $128.67 | $143.81 | $113.11 | $137.58 | $125.39 |
| Nasdaq Composite Index | $100.00 | $117.98 | $126.20 | $137.39 | $178.11 | $173.05 |

**Recent Sales of Unregistered Securities**

During the year ended December 31, 2018, there were no sales of unregistered securities.

**Issuer Purchases of Equity Securities**

We have not and do not currently intend to retire or repurchase any of our shares other than providing our employees with the option to withhold shares to satisfy tax withholding amounts due from employees upon the vesting of restricted stock awards in connection with our 2014 Equity Incentive Plan ("2014 EIP") and 2014 Inducement Plan ("2014 IN").

| Period | Total Number of Shares Purchased (i) | Weighted-Average Price Paid per Share (ii) | Total Number of Share Purchased as Part of Publicly Announced Plan or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plan or Programs (in thousands) |
|---|---|---|---|---|
| October 1 through October 31, 2018 | 7,732 | $ 23.94 | — | — |
| November 1 through November 30, 2018 | 1,199 | 21.19 | — | — |
| December 1 through December 31, 2018 | 4,841 | 19.91 | — | — |
| Total | 13,772 | $ 22.40 | — | $ — |

(i) Consists solely of shares that were withheld to satisfy tax withholding amounts due from employees upon the vesting of previously issued restricted stock awards.

(ii) The weighted-average price paid per share is the weighted-average of the fair market prices at which we calculated the number of shares withheld to cover tax withholdings for the employees.

## ITEM 6. SELECTED FINANCIAL DATA

The information set forth below for the five years ended December 31, 2018 is not necessarily indicative of results of future operations, and should be read in conjunction with Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, and the Consolidated Financial Statements and related notes thereto included in Item 8, Consolidated Financial Statements and Supplementary Data, of this Form 10-K to fully understand the factors that may affect the comparability of the information presented below.

**SELECTED CONSOLIDATED FINANCIAL DATA**
**(In thousands, except share and per share data)**

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 3,729 | $ 262 | $ 300 | $ 300 | $ 383 |
| Total operating expenses | $ 146,363 | $ 120,686 | $ 88,515 | $ 72,617 | $ 52,433 |
| Loss from operations | $ (142,634) | $ (120,424) | $ (88,215) | $ (72,317) | $ (52,050) |
| Interest expense | $ (44) | $ (457) | $ (1,082) | $ (1,190) | $ (10,672) |
| Net loss | $ (142,568) | $ (120,587) | $ (89,270) | $ (73,476) | $ (62,917) |
| Basic and Diluted net loss attributable to common stockholders | $ (142,568) | $ (120,587) | $ (89,270) | $ (73,476) | $ (62,917) |
| Basic and Diluted net loss per share attributable to common stockholders | $ (3.94) | $ (4.01) | $ (3.18) | $ (3.02) | $ (3.24) |
| Basic and Diluted weighted-average number of shares used in computing net loss per share attributable to common stockholders | 36,171,582 | 30,101,125 | 28,114,784 | 24,340,466 | 19,391,523 |

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | $ 73,256 | $ 282,896 | $ 63,502 | $ 201,615 | $ 171,032 |
| Short-term investments | $ 102,556 | $ — | $ 122,026 | $ 52,439 | $ — |
| Working capital surplus | $ 175,952 | $ 264,309 | $ 173,048 | $ 241,926 | $ 162,495 |
| Total Assets | $ 226,348 | $ 295,699 | $ 204,360 | $ 275,822 | $ 192,469 |
| Financing obligation, net of current portion | $ — | $ — | $ 1,872 | $ 5,346 | $ 598 |
| Accumulated deficit | $ (684,775) | $ (542,167) | $ (421,543) | $ (332,273) | $ (258,797) |

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) is intended to help the reader understand our results of operations and financial condition. MD&A is provided as a supplement to, and should be read in conjunction with, our audited Consolidated Financial Statements and the accompanying notes to the Consolidated Financial Statements and other disclosures included in this Annual Report on this Form 10-K (including the disclosures under "Item 1A. Risk Factors"). Our Consolidated Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles and are presented in U.S. dollars.*

**Overview**

We are a clinical-stage biotechnology company focused on the development, manufacturing, and commercialization of novel neuromodulators for multiple aesthetic and therapeutic indications. We are leveraging our proprietary portfolio of botulinum toxin type A compounds, formulated with our patented and proprietary peptide excipient technology, to address unmet needs in large and growing neuromodular markets. Our initial focus is on developing daxibotulinumtoxinA, our highly purified botulinum toxin Type A, for a broad spectrum of aesthetic and therapeutic indications, including facial wrinkles, muscle disorders, and chronic migraine.

Our lead drug candidate is DAXI. We used our unique proprietary peptide excipient technology to formulate DAXI. The noncovalent bond formed between the proprietary peptide excipient technology and the botulinum toxin may enable longer residence time of botulinum toxin Type A, which could explain DAXI's long duration of effect. The process binds a highly purified botulinum toxin Type A with a unique proprietary stabilizing excipient peptide. We do not use human serum albumin and other animal-sourced ingredients, which carry the risk of transmission of pathogens, to stabilize our product.

We are currently studying DAXI for the treatment of facial wrinkles, cervical dystonia, plantar fasciitis, adult upper limb spasticity and chronic migraine. We believe DAXI has the potential to expand into additional aesthetic and therapeutic indications in the future. We also are developing a topically applied neuromodulator for aesthetic and therapeutic indications, DaxibotulinumtoxinA Topical, and have a collaboration and license agreement with Mylan to develop and commercialize a biosimilar to BOTOX®.

**DAXI**

We are developing an injectable formulation of botulinum toxin type A, which we refer to as DAXI, for indications where a long-lasting effect is desired. We believe, and our preclinical and clinical studies using DAXI indicate, that daxibotulinumtoxinA combined with our novel peptide may safely achieve enhanced clinical efficacy and duration without an increase in associated adverse events. We are currently focusing on developing DAXI for the treatment of both aesthetic and therapeutic indications.

***Glabellar Lines***

The glabella is the area between the eyebrows and above the nose. Glabellar lines, often called "frown lines," are vertical lines that develop between the eyebrows and may appear as a single vertical line or as two or more lines. When one frowns, the muscles of the glabella contract causing vertical creases to form between the eyebrows. Botulinum toxin is used to temporarily block the ability of nerves to trigger contraction of injected muscle, inhibiting movement of the muscles that cause the frown lines, giving the skin a smoother, more refreshed appearance.

In 2015, we reported results from BELMONT, a Phase 2 active comparator, placebo-controlled clinical trial for the treatment of glabellar lines against BOTOX® Cosmetic. The 24-week data showed that DAXI achieved its primary efficacy measurement for all doses of DAXI, and that such efficacy was highly statistically significant as compared to placebo. In addition, the 40 Unit dose of DAXI demonstrated a 23.6-week median duration versus BOTOX® Cosmetic with an 18.8-week median duration. Across all cohorts, DAXI appeared to be generally safe and well-tolerated.



ALGN-1364737
PTX-767.0085

The Phase 3 clinical program includes a) SAKURA 1 and SAKURA 2, two randomized, double-blind, placebo-controlled pivotal trials to evaluate the safety and efficacy of a single administration of DAXI for the treatment of moderate to severe glabellar lines in adults and b) SAKURA 3, a long-term, open-label safety trial designed to evaluate the long-term safety of DAXI for the treatment of moderate to severe glabellar lines in adults following both single and repeat treatment administration. In December 2017, we announced top-line results for the SAKURA 1 and SAKURA 2 pivotal trials. Both SAKURA 1 and SAKURA 2 met the primary composite endpoint by delivering highly statistically significant improvement against placebo in reducing the severity of glabellar lines. The percentage of DAXI-treated patients who had none or mild wrinkles and achieved at least a two-point improvement from baseline on both validated physician and patient assessments was 73.6 percent in SAKURA 1 and 74.0 percent in SAKURA 2 compared to placebo ($p<0.0001$) at Week 4. Also, at that time point, 88 percent of DAXI-treated patients in SAKURA 1 and 91 percent of DAXI patients in SAKURA 2 said they were very satisfied or satisfied with their treatment experience.

There were several secondary endpoints used to evaluate duration of effect, including the proportion of patients achieving none or mild response on IGA-FWS compared to placebo, median duration for time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS, and median duration for time to return to baseline on both IGA-FWS and PFWS. The percentage of DAXI-treated patients who achieved a none or mild response on IGA-FWS was 35.3 percent in SAKURA 1 and 29.4 percent at SAKURA 2 compared to placebo ($p<0.0001$) at Week 24. The median duration for time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS for DAXI-treated patients was 24.0 weeks for SAKURA 1 and 23.9 weeks for SAKURA 2. The median duration for time to return to baseline wrinkle severity on both IGA-FWS and PFWS for DAXI-treated patients was 27.7 weeks for SAKURA 1 and 26.0 weeks for SAKURA 2. For comparison, an additional exploratory duration endpoint was evaluated, which mirrors the duration measure used in the BELMONT Phase 2 study. This endpoint, was the median duration of greater or equal to 1 point improvement from baseline on IGA-FWS for DAXI-treated patients, and the results were 24.1 weeks for both SAKURA 1 and SAKURA 2, and 23.6 weeks for BELMONT.

In December 2018, we announced top-line results for the SAKURA 3 open-label, long-term safety study. DAXI appeared to be generally well-tolerated, with no new tolerability or safety concerns reported. As was seen in the SAKURA 1 and SAKURA 2 pivotal trials, adverse events were mild, localized and transient. The rate of treatment-related adverse events decreased over successive treatments. The most common treatment-related adverse events per treatment of DAXI were headache (3.3 percent of treatments), injection site pain (2.7 percent), injection site erythema (2.5 percent), and injection site oedema (2.2 percent). There were no treatment-related serious adverse events. Eyelid ptosis was reported in 0.9 percent of treatments, decreased in frequency with successive treatments and was substantially lower than the rate observed in SAKURA 1 and SAKURA 2 (2.2 percent of treatments). The majority of ptosis events were characterized as mild in severity (85 percent) and transient. A high degree of efficacy was seen consistently across all three treatment cycles. Results were consistent with SAKURA 1 and SAKURA 2 based on the IGA-FWS and PFWS scales. As early as Week 1, over 90 percent of subjects across all three treatments had none or mild wrinkles on the IGA-FWS. At Week 4, the percentage of DAXI-treated patients who achieved a none or mild response on IGA-FWS was 95.8 percent, 96.6 percent, and 97.7 percent for first, second and third treatment for SAKURA 3, respectively, and 97.5 percent for SAKURA 2 and SAKURA 1. On the more stringent 2-point composite endpoint, which was the primary efficacy endpoint in SAKURA 1 and 2, efficacy improved with successive treatment cycles: 73.2 percent, 77.7 percent, and 79.6 percent for first, second and third treatment of SAKURA 3, respectively, and 73.6 percent and 74.0 percent for SAKURA 1 and 2, respectively.

As in the SAKURA 1 and SAKURA 2 pivotal trials, there were several secondary endpoints used to evaluate duration of effect, including median time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS, and median duration for time to return to baseline wrinkle severity on both IGA-FWS and PFWS. Duration was evaluated in the first two 36-week treatment cycles; the third treatment cycle was not evaluated for duration as the observation period ended at twelve weeks for the purpose of this study. Median time to return to baseline wrinkle severity on both IGA-FWS and PFWS is 28.0 weeks and 28.1 weeks for first and second treatment of SAKURA 3, respectively, 27.7 weeks for SAKURA 1, and 26.0 weeks for SAKURA 2. Median time to loss of none or mild wrinkle severity on both IGA-FWS and PFWS is 24.0 weeks and 24.1 weeks for first and second treatment of SAKURA 3, respectively, 24.0 weeks for SAKURA 1, and 23.9 weeks for SAKURA 2. We held a pre-BLA meeting with U.S. Food and Drug Administration ("FDA") in December 2018, to agree upon the content and format of the BLA, which we plan to submit in first half of 2019. We plan to file marketing applications in the European Union, Canada, and certain Latin American and Asian countries after filing in the U.S.

We held a pre-BLA meeting with the FDA in December 2018, to agree upon the content and format of the BLA, which we plan to submit in first half of 2019.

***Forehead Lines***

Forehead lines are produced by the action of the frontalis muscle, a large, thin, vertically-oriented muscle which lifts the eyebrows. The frontalis muscle serves as an antagonist to the glabellar musculature, a natural depressor that is responsible for frowning and associated eyebrow movement. As the eyebrow is considered the aesthetic center of the upper face, forehead lines can significantly impact the aesthetic appearance of the face, contribute to increased signs of aging and convey unwanted social signals. However, both men and women have identified internal factors, such as wanting to look good for their age or having a more youthful appearance as very important and have prioritized forehead lines as bothersome areas for potential treatment regardless of age or available income. We initiated a Phase 2 study in forehead lines in January 2019.

***Lateral Canthal Lines***

LCL, or "crow's feet," are the spider-like fine lines around the outside corners of the eyes that become more obvious when someone smiles. These lines (also referred to as periorbital wrinkles, laugh lines or smile lines), fan out across the skin from the outer corner of each eye. Sometimes they extend down across the cheekbones to the lower cheeks. Repetitive motions, such as squinting and smiling, can lead to the increase of wrinkles and contribute to the severity and onset of crow's feet. Age and exposure to sun also play significant roles in development of these lines, which can deepen over time. Current treatments include anti-wrinkle eye creams and moisturizers, topical tretinoins, botulinum toxin injections, dermal fillers and laser treatments. BOTOX® Cosmetic was approved to treat LCL in 2013, and is currently the only toxin approved for that use, though other toxins are used off-label. We plan to initiate a Phase 2 study in LCL in the first quarter of 2019.

***Cervical Dystonia***

We have been developing DAXI for the treatment of cervical dystonia, a muscle movement disorder. Muscle movement disorders are neurological conditions that affect a person's ability to control muscle activity in one or more areas of the body. In 2015, we initiated a Phase 2 dose-escalating, open-label clinical study of DAXI to evaluate the safety, preliminary efficacy, and duration of effect of DAXI in subjects with moderate to severe isolated cervical dystonia.

In May 2017, we announced positive 24 week topline results in all three cohorts from the Phase 2 trial. The topline data demonstrated a median duration of at least 24 weeks for each of the three cohorts. The topline data also displayed a clinically significant impact on cervical dystonia signs and symptoms. At Week 4, DAXI showed a clinically significant mean reduction of 38% from baseline across all three cohorts. This reduction continued to increase to 50% at Week 6 for all subjects, was 42% at Week 12 and was maintained at or above 30% through Week 24. The topline data also showed that DAXI appeared to be generally safe and well-tolerated through Week 24 in all three cohorts. There were no serious adverse events and no dose-dependent increase in adverse events. The treatment-related adverse events were generally transient and mild to moderate in severity, with one case of neck pain reported as severe. The most common adverse events were dysphagia, or difficulty in swallowing (14 percent), of which all cases were mild in severity, injection site redness (8 percent), injection site bruising (5 percent), injection site pain (5 percent), muscle tightness (5 percent) and muscle weakness (5 percent).

In November 2017, the FDA granted orphan drug status to DAXI for the treatment of cervical dystonia in adults. Additionally, in November 2017, we completed our End-of-Phase 2 meeting with the FDA and received scientific advice from the EMA regarding DAXI for the treatment of cervical dystonia.

In June 2018, we announced the initiation of patient dosing in our ASPEN Phase 3 clinical program based on the Phase 2 safety and efficacy results and guidance from the FDA and EMA. The ASPEN Phase 3 clinical program consists of two trials to evaluate the safety and efficacy of DAXI for the treatment of cervical dystonia in adults including: a randomized, double-blind, placebo-controlled, parallel group trial, and an open-label, long-term safety trial. The program is expected to enroll approximately 300 patients in the pivotal trial and 350 patients in the open-label trial at multiple sites in the U.S., Canada, and Europe. The program is expected to complete enrollment by early 2020, and we expect to release topline results in the second half of 2020.

***Plantar Fasciitis***

In 2016, we initiated a Phase 2 prospective, randomized, double-blinded, placebo-controlled trial of DAXI in the therapeutic indication of plantar fasciitis. This study evaluated the safety and efficacy of a single administration of DAXI in reducing the signs and symptoms of plantar fasciitis. The study completed enrollment of 59 subjects in the U.S. in October 2017. The study's primary efficacy endpoint is the improvement in the AOFAS.

In January 2018, we announced the interim 8-week Phase 2a results for the plantar fasciitis trial. The trial's primary endpoint, the reduction in the patient-reported VAS for pain at Week 8, showed a robust impact on pain, with a greater than 50 percent reduction for patients treated with DAXI. In the intent-to-treat population, a mean reduction in the VAS score of 54.2 percent from baseline was achieved with DAXI, compared with a 42.6 percent reduction in the placebo group, which upon further subgroup analysis, was driven primarily by a strong placebo response in the control group at three of the five study sites. While the results are not statistically significant (p=0.39), DAXI provided patients with considerable pain relief. Similar numeric trends were seen in the secondary and exploratory endpoints. DAXI appeared to be generally safe and well-tolerated through Week 8. The majority of adverse events in both treatment groups were mild in severity. There were no treatment-related serious adverse events. The most common treatment-related adverse events for DAXI and placebo were injection site pain (10.0 percent and 10.3 percent) and muscle weakness (3.3 percent and 3.4 percent), both respectively, all of which were classified as mild in severity We completed the 16-week trial which showed a 58 percent reduction of pain from baseline along with a strong placebo response, with the difference between the treatment groups not being statistically significant.

In September 2018, we completed a Type C meeting with FDA discussing the design of the Phase 2 dose-finding study. We initiated another Phase 2 trial in December 2018. The Phase 2 prospective, randomized, double-blind, multi-center, placebo-controlled study will evaluate the safety and efficacy of two doses of administration of our investigational drug candidate DAXI in reducing the signs and symptoms of plantar fasciitis. The study is expected to enroll approximately 150 adult patients with unilateral plantar fasciitis, from approximately 20 study centers in the U.S.. Patients will be randomized (1:1:1) to receive an injection of a low dose, high dose or placebo. The study's primary efficacy endpoint is the change from baseline in NPRS score at Week 8. Patients will be followed for up to 24 weeks post treatment to assess treatment response, tolerability and safety. We expect to complete enrollment in this Phase 2 trial during the second half of 2019 and release topline results in the second half of 2020.

***Adult Upper Limb Spasticity***

Adult upper limb spasticity is a chronic movement disorder (an inability to produce and control bodily movements), that presents as increased tone or stiffness of the muscles. Spasticity results from neurological insults (e.g., stroke, multiple sclerosis, spinal cord injury and traumatic brain injury) to the brain that control voluntary movement of the body, arms and legs. According to GIA, the global opportunity for botulinum toxin for the treatment of muscle movement disorders, which includes cervical dystonia and upper limb spasticity, was estimated to be over $1.0 billion in 2017. We initiated a Phase 2b study (JUNIPER) in adult upper limb spasticity in December 2018, and we expect to release topline results in the second half of 2020.

***Chronic Migraine***

Migraine headache is a central nervous system disorder characterized as moderate to severe headache and often includes other symptoms such as nausea and vomiting. Migraine headache affects more than 38 million people in the U.S., of which more than 3 million of whom suffer from chronic migraine headache. Chronic migraine headache is both undertreated and underdiagnosed, and is defined as more than fifteen headache days per month over a three-month period of which more than eight are migrainous, in the absence of medication overuse. According to GIA, the global opportunity for botulinum toxin for the treatment of chronic migraine was estimated to be approximately $600 million in 2017. We are in the process of finalizing our Chronic Migraine Clinical Development strategy. We plan to study DAXI for the treatment of chronic migraine in 2019 or 2020.

**OnabotulinumtoxinA Biosimilar**

In February 2018, we entered into a collaboration and license agreement with Mylan, pursuant to which we will collaborate with Mylan exclusively, on a world-wide basis (excluding Japan), to develop, manufacture and commercialize a biosimilar to BOTOX®. As part of the agreement Mylan agreed to pay a non-refundable upfront payment of $25 million with additional contingent payments of up to $100 million, in the aggregate, upon the achievement of specified clinical and regulatory (i.e. biosimilar biological pathway) milestones and of specified, tiered sales milestones of up to $225 million. In addition, Mylan would pay us low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-U.S. Mylan territories. However, we agreed to waive royalties for U.S. sales, up to a limit of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs. In February 2019, we and Mylan recently had a Biosimilar Initial Advisory Meeting with the FDA on a proposed biosimilar to BOTOX®. In this meeting, the FDA provided guidance on their expectations for a development program to establish biosimilarity to BOTOX®. Based on the agency's feedback, we and Mylan believe that a 351(k) pathway for the development of a biosimilar to onabotulinumtoxinA is viable and provides the opportunity to develop and commercialize the first biosimilar product for all eleven currently approved indications of BOTOX® and BOTOX® Cosmetic.

**DaxibotulinumtoxinA Topical**

DaxibotulinumtoxinA Topical presents several potential advantages, including painless topical administration, no bruising, ease of use and limited dependence on administration technique by physicians and medical staff. We believe these potential advantages may improve the experience of patients undergoing botulinum toxin procedures and could make DaxibotulinumtoxinA Topical suitable for multiple indications in the future. We are planning to conduct additional preclinical work for DaxibotulinumtoxinA Topical in therapeutic and aesthetic applications where botulinum toxin has shown efficacy and is particularly well suited for injection-free treatments.

**Fosun License Agreement**

In December 2018, we and Fosun entered into the Fosun License Agreement, whereby we have granted Fosun the exclusive rights to develop and commercialize our proprietary DAXI in the Fosun Territory and certain sublicense rights. Additionally, our proprietary peptide excipient technology can be used for molecules other than botulinum toxin. We plan to partner or license the peptide excipient technology opportunistically to monetize our technology platform.

Under the Fosun License Agreement, we are eligible to receive a non-refundable upfront payment of $30.0 million within 30 business days of the date of the Fosun License Agreement, which was received in January 2019 net of foreign withholding tax of $3.0 million. We are also eligible to receive (i) additional contingent payments of up to $230.5 million upon the achievement of specified milestones based on (a) the submission and approval of BLAs for certain aesthetic and therapeutic indications and (b) first time calendar year net sales, and (ii) tiered royalty payments in low double digit to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) we do not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third parties to either avoid patent infringement or market the product in the Fosun Territory.



ALGN-1364742
PTX-767.0090

**Results of Operations**

**Revenue**

The following table presents our revenue for the periods indicated and related changes from the prior period:

| | Years Ended December 31, | | | 2018 vs. 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | % | % |
| | (In thousands, except percentages) | | | | |
| Milestone | $ 3,729 | $ — | $ — | —% | —% |
| Relastin Royalty | — | 262 | 300 | (100)% | (13)% |
| Total revenue | $ 3,729 | $ 262 | $ 300 | 1,323 % | (13)% |

Our total revenue for the year ended December 31, 2018 increased compared to the same period in 2017 and 2016, primarily due to revenue recognized from the collaboration and license agreement with Mylan.

In February 2018, we entered into the Mylan Collaboration, pursuant to which we will collaborate with Mylan exclusively, on a world-wide basis (excluding Japan) to develop, manufacture, and commercialize a biosimilar to BOTOX®. As part of the Mylan Collaboration, Mylan paid us a non-refundable upfront payment of $25 million with additional contingent payments of up to $100 million, in the aggregate, upon the achievement of specified clinical and regulatory (i.e., biosimilar biological pathway) milestones and of specified, tiered sales milestones of up to $225 million. We recognized revenue based on the estimated cost of services incurred over the estimated cost of services to be provided for the development period.

We recognized royalty revenue during the years ended December 31, 2017 and 2016 related to the Relastin asset purchase and royalty agreement. In August 2011, we entered into the Relastin asset purchase and royalty agreement to sell the business related to our Relastin product line to PDI. The Relastin asset purchase and royalty agreement provided for a minimum royalty payment of $0.3 million per year, to be paid quarterly for up to 15 years from the execution date. PDI was subsequently acquired by Valeant in July 2014. On April 23, 2015, we received notice from Valeant terminating the asset purchase and royalty agreement effective as of July 23, 2015. We were entitled to the minimum royalty payment until Valeant returned the Relastin® intellectual property rights to us. In November 2017, we and Valeant entered into an asset transfer agreement to finalize the termination of the asset purchase and royalty agreement and Valeant returned the Relastin® intellectual property rights to us. We do not have any current plans for future developments of Relastin® and our primary focus is on the development of DAXI.

**Operating Expenses**

Our operating expenses consist of research and development expenses and general and administrative expenses. The largest component of our operating expenses is our personnel costs including stock-based compensation. We expect our expenses to increase in the near term as we initiate and complete additional clinical trials and associated programs related to DAXI for the treatment of glabellar lines and indications in muscle movement and other disorders, such as cervical dystonia, plantar fasciitis, upper limb spasticity, chronic migraine, and our biosimilar product candidate.



ALGN-1364743
PTX-767.0091

***Research and Development Expenses***

We recognize research and development expenses as they are incurred. Since our inception, we have focused on our clinical development programs and the related research and development. We have been developing DAXI, DaxibotulinumtoxinA Topical, and our biosimilar product candidate since 2002 and we have typically shared our employees, consultants and infrastructure resources across both programs. Our research and development expenses consist primarily of:

- salaries and related expenses for personnel in research and development functions, including stock-based compensation;
- expenses related to the initiation and completion of clinical trials for DAXI and DaxibotulinumtoxinA Topical, including expenses related to production of clinical supplies;
- fees paid to clinical consultants, CROs and other vendors, including all related fees for investigator grants, patient screening fees, laboratory work and statistical compilation and analysis;
- other consulting fees paid to third parties;
- expenses related to establishment and maintenance of our own manufacturing facilities;
- expenses related to the manufacture of drug substance and drug product supplies for ongoing and future preclinical and clinical trials and other pre-commercial supplies;
- expenses to support our product development and establish manufacturing capabilities to support potential future commercialization of any products for which we may obtain regulatory approval;
- expenses related to license fees and milestone payments under in-licensing agreements;
- expenses related to compliance with drug development regulatory requirements in the U.S., the European Union and other foreign jurisdictions; and
- depreciation and other allocated expenses.

Our research and development expenditures are subject to numerous uncertainties primarily related to the timing and cost needed to complete our respective projects. Further, the development timelines, probability of success and development expenses can differ materially from expectations and the completion of clinical trials may take several years or more depending on the type, complexity, novelty and intended use of a product candidate. Accordingly, the cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development. We expect our research and development expenses to maintain or increase as we continue our clinical development of DAXI for the treatment of facial wrinkles and other neuroscience indications, such as cervical dystonia, plantar fasciitis, adult upper limb spasticity, and chronic migraine, any future new indications, and our biosimilar product candidate or if the FDA requires us to conduct additional clinical trials for approval.

Our research and development expenses fluctuate as projects transition from one development phase to the next. Depending on the stage of completion and level of effort related to each development phase undertaken, we may reflect variations in our research and development expense. We expense both internal and external research and development expenses as they are incurred. We typically share employees, consultants and infrastructure resources among the programs related to DAXI, our biosimilar product candidate, and DaxibotulinumtoxinA Topical. We believe that the strict allocation of costs by product candidate would not be meaningful. As such, we generally do not track these costs by product candidate.

Our research and development expenses are summarized as follows:

| | Year Ended December 31, | | | 2018 vs. 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | % | % |
| | (In thousands, except percentages) | | | | |
| Clinical and regulatory | $ 47,777 | $ 43,915 | $ 15,060 | 9% | 192 % |
| Manufacturing and quality efforts | 25,857 | 21,545 | 19,956 | 20% | 8 % |
| Stock-based compensation | 7,480 | 5,902 | 5,557 | 27% | 6 % |
| Other research and development expenses | 11,386 | 8,999 | 9,808 | 27% | (8)% |
| Total research and development expenses | $ 92,500 | $ 80,361 | $ 50,381 | 15% | 60 % |

ALGN-1364745
PTX-767.0093

*Clinical and regulatory*

Clinical expenses include personnel costs, and external clinical trial costs for clinical sites, clinical research organizations, central laboratories, data management, contractors and regulatory activities associated with the development of DAXI and DaxibotulinumtoxinA Topical, including clinical trials of DAXI for the improvement of glabellar lines, cervical dystonia and plantar fasciitis. For the years ended December 31, 2018, 2017, and 2016, clinical and regulatory costs totaled $47.8 million, or 52%, $43.9 million, or 55%, and $15.1 million, or 30% of the total research and development expenses in 2018, 2017, and 2016, respectively.

Clinical and regulatory costs for the year ended December 31, 2018 increased by 9%, compared to the same period in 2017, primarily due to increased costs related to hiring additional personnel and outside services to address compliance requirements and infrastructure build-out as well as studies related to cervical dystonia, adult upper limb spasticity, plantar fasciitis, forehead lines and lateral canthal lines, offset by a decrease in clinical trial costs related to glabellar lines as the SAKURA trials wind down. Clinical and regulatory costs for the year ended December 31, 2017 increased by 192%, compared to the same period in 2016, primarily due to the ongoing clinical trials for DAXI for the treatment of glabellar lines, cervical dystonia, and plantar fasciitis.

We expect to maintain or increase our clinical and regulatory costs in the near term as we initiate and complete clinical trials and other associated programs related to DAXI for the treatment of glabellar lines, forehead lines, lateral canthal lines, cervical dystonia, plantar fasciitis, adult upper limb spasticity, chronic migraine, and other indications, and our anticipated BLA submission upon the completion and success of the clinical trials for the DAXI glabellar lines indication.

*Manufacturing and quality efforts*

Manufacturing and quality efforts include personnel and occupancy expenses, external contract manufacturing costs and pre-approval manufacturing of drug product used in research and our development of DAXI. Manufacturing and quality efforts also include raw materials, lab supplies, and storage and shipment of our product to support quality control and assurance activities. These costs do not include clinical costs associated with the development of DAXI.

For the years ended December 31, 2018, 2017, and 2016, costs associated with our manufacturing and quality efforts for both DAXI and DaxibotulinumtoxinA Topical development totaled $25.9 million, or 28%, $21.5 million, or 27%, and $20.0 million, or 40% of the total research and development expenses in 2018, 2017, and 2016, respectively.

Manufacturing and quality efforts for the year ended December 31, 2018 increased by 20%, compared to the same period in 2017, primarily due to increased costs related to hiring additional personnel and outside services to address compliance requirements and infrastructure build-out. Manufacturing and quality efforts for the year ended December 31, 2017 increased by 8%, compared to the same period in 2016, primarily due to increased costs related to hiring additional personnel as well as an increase in outside services and consulting for compliance requirements. We expect our manufacturing and quality efforts to continue to increase as we approach commercialization.

*Stock-based compensation*

Stock-based compensation for research and development increased by $1.6 million for the year ended December 31, 2018 compared to the same period in 2017, and increased by $0.3 million for the year ended December 31, 2017 compared to the same period in 2016, primarily due to increased employee headcount and an average increase in fair value of stock option granted during those periods.

*Other research and development expenses*

Other research and development expenses include expenses for personnel, contract research organizations, consultants, raw materials, and lab supplies used to conduct preclinical research and development of DAXI, our DaxibotulinumtoxinA Topical, and biosimilar product candidates. Other research and development expenses represented $11.4 million, or 12%, $9.0 million, or 11%, and $9.8 million, or 19% for the years end on December 31, 2018, 2017, and 2016, respectively.

Other research and development expenses for the year ended December 31, 2018 increased by 27%, compared to the same period in 2017, primarily due to increased consulting costs on preclinical research and development of DAXI, our DaxibotulinumtoxinA Topical, and biosimilar product candidates. Other research and development expenses for the year ended December 31, 2017 decreased by 8%, compared to the same period in 2016, primarily due to a milestone payment of $2.0 million to BTRX to acquire a portfolio of patents.

ALGN-1364747
PTX-767.0095

***General and Administrative Expenses***

General and administrative expenses consist primarily the following:

- personnel and service costs in our finance, information technology, investor relations, legal, human resources, and other administrative functions;
- professional fees for accounting and legal services, including legal services associated with obtaining and maintaining patents and litigation; and
- pre-commercial activities including market research, public relations, promotion and advertising,

We expect that our general and administrative expenses will maintain or increase with the continued development of, and if approved, the commercialization of DAXI. The following table presents our general and administration expenses for the periods indicated and related changes from the prior period.

| | Year Ended December 31, | | | 2018 vs. 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | % | % |
| | (In thousands, except percentages) | | | | |
| General and administrative expenses before stock-based compensation | $ 45,070 | $ 30,070 | $ 22,679 | 50% | 33% |
| Stock-based compensation | 8,793 | 7,328 | 6,396 | 20% | 15% |
| Total general and administrative expenses | $ 53,863 | $ 37,398 | $ 29,075 | 44% | 29% |

*General and administrative expenses before stock-based compensation*

General and administrative expenses for the year ended December 31, 2018 increased by 50%, compared to the same period in 2017. General and administrative expenses for the year ended December 31, 2017 increased by 33%, compared to the same period in 2016. For both periods presented, the increases are primarily due to i) increased personnel in information technology, accounting, legal, and other administrative functions; ii) cost related to pre-commercial initiatives to support our future product launch following our anticipated BLA submission upon the completion and success of the clinical trials for the DAXI glabellar lines indication, iii) costs related to accounting and legal services, and iv) other costs related to infrastructure build-out.

*Stock-based compensation*

Stock-based compensation for general and administrative expenses increased for the periods presented primarily due to an increase in employee headcount and an average increase in the fair value of stock option granted during those periods.

**Loss on Impairment**

The following table presents our loss on impairment for the periods indicated and related changes from the prior period:

| | Year Ended December 31, | | | 2018 vs. 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | % | % |
| | (In thousands, except percentages) | | | | |
| Loss on impairment | $ — | $ 2,927 | $ 9,059 | (100)% | (68)% |

We constructed a large capacity fill/finish line dedicated to the manufacturing of DaxibotulinumtoxinA Topical and to support our regulatory license applications. In June 2016, we discontinued clinical development of DaxibotulinumtoxinA Topical for the treatment of crow's feet and axillary hyperhidrosis. As a result, we recorded a loss on impairment of $9.1 million and $2.9 million, respectively, related to our DaxibotulinumtoxinA Topical fill/finish line and certain other assets, during the years ended December 31, 2017, and 2016. No impairment loss was recorded during the year ended December 31, 2018.

**Net Non-Operating Income and Expense**

***Interest Income***

Interest income consists primarily of interest income earned on our deposit, money market fund, and short-term investment balances. We expect interest income to vary each reporting period depending on our average deposit, money market fund, and short-term investment balances during the period and market interest rates.

***Interest Expense***

Interest expense primarily consists of the interest charges associated with our financing obligations and capitalized interest. Interest expense includes cash and non-cash components with the non-cash components consisting of effective interest recognized on the financing obligations and interest capitalized for assets constructed for use in operations.

***Change in Fair Value of Derivative liability associated with the Medicis settlement***

The product approval payment associated with the Medicis settlement is classified as a liability on our Consolidated Balance Sheet. This liability is remeasured to fair value at each balance sheet date with the corresponding gain or loss from the adjustment recorded in the Consolidated Statements of Operations and Comprehensive Loss. We will continue to record adjustments to the fair value of the Medicis settlement derivative liability until the product approval payment has been paid. The decrease recorded during the year ended December 31, 2018 reflects an increase to the valuation of the derivative liability based on assumptions related to the development of DAXI for glabellar lines.

***Other Expense, net***

Other expense, net is comprised of miscellaneous tax and other expense items.

The following table presents our net non-operating income and expense for the periods indicated and related changes from the prior period:

| | Years Ended December 31, | | | 2018 vs. 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| | 2018 | 2017 | 2016 | % | % |
| | (In thousands, except percentages) | | | | |
| Interest income | $ 4,023 | $ 1,410 | $ 1,170 | 185% | 21% |
| Interest expense | (44) | (457) | (1,082) | (90)% | (58)% |
| Changes in fair value of derivative liability associated with the Medicis settlement | (140) | (591) | (608) | (76)% | (3)% |
| Other expense, net | (773) | (525) | (535) | 47 % | (2)% |
| Total net non-operating income (expenses) | $ 3,066 | $ (163) | $ (1,055) | N/M* | N/M* |

*NM - not meaningful

Our total net non-operating income for the year ended December 31, 2018 increased by $3.2 million, compared to the same period in 2017, primarily due to an increase in interest income from our short-term investments. Our total net non-operating expense for the year ended December 31, 2017 decreased by $0.9 million, compared to the same period in 2016, primarily due to lower interest expense resulting from the declining principal balance on the Essex Capital Lease offset by an increase in the interest income from a stronger investment portfolio.

**Income Taxes**

Since inception, we have incurred net losses and have not recorded any U.S. federal or state income tax and the tax benefits of our operating losses have been fully offset by valuation allowances.

Tax provision for the year ended December 31, 2018 is $3.0 million. The tax provision is related to foreign withholding taxes. There was no provision or benefit from income taxes during the years ended December 31, 2017 and 2016.

In December 2017, the U.S. government enacted the Tax Cuts and Jobs Act (the "Tax Reform Act"). The Tax Reform Act includes but is not limited to, reducing the U.S. federal corporate tax rate from 35 percent to 21 percent, allowing for federal net operating losses ("NOL") to be carried over indefinitely for NOL generated after December 31, 2017, and creating a new limitation on deductible interest expense.

In March 2018, the SEC staff issued SAB 118 which provides guidance on accounting for the tax effects of the Tax Reform Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Reform Act enactment date for companies to complete the accounting under *ASC 740, Income Taxes*. We completed our assessment of the accounting impact resulting from the Tax Reform Act in December 2018. The impact of the Tax Reform Act includes:

- a decrease in deferred tax assets resulting from the change in tax rate in the amount of $62.9 million;
- an increase of net operating loss of $43.5 million as a result of the reversal of the intra-entity transfer of certain intellectual properties, refer below for further information related to this transaction;
- a decrease in net operating loss of $3.8 million related to a research and development credit adjustment.

The aggregated impact resulting from the Tax Reform Act to deferred taxes is $68.1 million, which continues to be fully offset by a valuation allowance.

We follow the provisions of the FASB's guidance for accounting for uncertain tax positions. The guidance indicates a comprehensive model for the recognition, measurement, presentation and disclosure in financial statements of any uncertain tax positions that have been taken or expected to be taken on a tax return. No liability related to uncertain tax positions is recorded in the financial statements due to the fact that the liabilities have been netted against deferred attribute carryovers. It is our policy to include penalties and interest related to income tax matters in income tax expense.

**Liquidity and Capital Resources**

Our financial condition is summarized as follows:

| | Year Ended December 31, | | Increase |
|---|---|---|---|
| | 2018 | 2017 | (Decrease) |
| Cash, cash equivalents, and short-term investments | $ 175,812 | $ 282,896 | $ (107,084) |
| Financing obligations | — | 1,872 | (1,872) |
| Working Capital | 175,952 | 264,309 | (88,357) |
| Stockholders' Equity | 145,622 | 268,845 | (123,223) |

**Sources and Uses of Cash**

We hold our cash, cash equivalents, and short-term investments in a variety of non-interest bearing bank accounts and interest-bearing instruments subject to investment guidelines allowing for holdings in U.S. government and agency securities and money market accounts. Our investment portfolio is structured to provide for investment maturities and access to cash to fund our anticipated working capital needs.

Our cash, cash equivalents and short-term investments totaled $175.8 million at December 31, 2018 compared to $282.9 million at December 31, 2017, representing a decrease of $107.1 million, which was primarily due to cash used in operations, purchase of property and equipment of $7.0 million, and purchases of short-term investments of $314.9 million. These decreases were primarily offset by the proceeds from maturities of short-term investments of $146.0 million and the proceeds from sales of short-term investments of $67.4 million.

Through December 31, 2018, we have funded substantially all of our operations through the sale and issuance of our common stock, preferred stock, venture debt, and convertible debt. Due to our substantial research and development expenditures, we have generated significant operating losses since our inception. Our expenditures are primarily related to research and development activities. We expect to continue to incur net operating losses for at least the next several years as we advance DAXI through clinical development, seek regulatory approval, prepare for and, if approved, proceed to commercialization. As a result, we will need additional capital to fund our operations which we may obtain from additional financings, public offerings, or other sources. As of December 31, 2018, we had available cash and cash equivalents and short-term investments of $175.8 million.

We derived the following summary of our Consolidated Statement of Cash Flows for the periods indicated from our audited Consolidated Financial Statements included elsewhere in this Form 10-K:

| | Year Ended December 31, | | |
|---|---|---|---|
| **(in thousands)** | **2018** | **2017** | **2016** |
| Net cash provided by (used in): | | | |
| Operating activities | $ (104,246) | $ (95,342) | $ (59,827) |
| Investing activities | (107,026) | 118,792 | (75,499) |
| Financing activities | 1,782 | 195,944 | (2,642) |

***Cash Flows from Operating Activities***

Our cash used in operating activities is primarily driven by personnel, manufacturing costs, clinical development, and facility related expenditures. The changes in net cash used in operating activities are primarily related to our net loss, working capital fluctuations and changes in our non-cash expenses, all which are highly variable. Our cash flows from operating activities will continue to be affected principally by our working capital requirements and the extent to which we increase spending on personnel and research and development activities as our business grows.

Net cash used in operating activities for the year ended December 31, 2018 of $104.2 million was primarily due to clinical spend of approximately $38.5 million to advance our clinical programs toward commercialization; investing in our personnel and talent retention, which represents approximately $31.0 million; and professional services and consulting of approximately $32.0 million, offset by the $25.0 million upfront payment received from the Mylan Collaboration. The remaining balance of operating activities related primarily to rent, utilities, and other supplies.

Net cash used in operating activities for the year ended December 31, 2017 of $95.3 million was primarily due to clinical spend of more than $30 million to advance our clinical programs toward commercialization; investing in our personnel and talent retention, which represents approximately $25 million; and professional services and consulting of approximately $15 million. The remaining balance of operating activities related primarily to rent, utilities, and other supplies.

Net cash used in operating activities of $59.8 million in the year ended December 31, 2016 was largely due to ongoing clinical trial activities for our DAXI program and DaxibotulinumtoxinA Topical, including more than $10 million for payments to clinical trial vendors; investing in our personnel, including those that support the clinical programs, and talent retention, which represents more than $20 million; and professional services and consulting of approximately $10 million. The remaining balance of operating activities related primarily to rent, utilities, and other supplies.

***Cash Flows from Investing Activities***

Net cash provided by or used in investing activities for the years ended December 31, 2018, 2017 and 2016 was primarily due to purchases of property and equipment, proceeds from sale of assets, and fluctuations in the timing of purchases and maturities of short-term investments.

***Cash Flows from Financing Activities***

Net cash provided by or used in financing activities are primarily driven by proceeds from the issuance of our common stock in connection with follow-on offerings (as described below), ATM offerings (as described below), stock option exercises and employee stock plan purchases. Decreases in our cash flows from financing activities are primarily due to payments to settle

employee tax obligations resulting from net settlement of restricted stock awards.



ALGN-1364754
PTX-767.0102

***Follow-On Public Offerings***

In December 2017, we completed a follow-on public offering, or the 2017 follow-on offering, pursuant to which we issued 5,389,515 shares of common stock at $31.00 per share, including the exercise of the underwriters' over-allotment option to purchase 550,806 additional shares of common stock, for net proceeds of $156.9 million, after underwriting discounts, commissions and other offering expenses.

In January 2019, we completed a follow-on public offering, or the 2019 follow-on offering, pursuant to which we issued 6,764,705 shares of common stock at $17.00 per share, including the exercise of the underwriters' over-allotment option to purchase 882,352 additional shares of common stock, for net proceeds of $107.6 million, after underwriting discounts, commissions and other offering expenses.

***ATM Offering***

In March 2016, we entered into an At-the-market Issuance Sales Agreement with Cowen and Company, LLC ("Cowen") (the "2016 ATM agreement"). Under the 2016 ATM agreement, we may offer and sell common stock having aggregate proceeds of up to $75.0 million from time to time through Cowen as our sales agent. During the year ended December 31, 2017, we sold 1,802,651 shares of common stock under the 2016 ATM Agreement at a weighted average price of $22.17 per share resulting in gross proceeds of $40.0 million, and net proceeds of $38.2 million, after underwriting discounts, commissions, and offering expenses.

In March 2018, we terminated the 2016 ATM Agreement and entered into the 2018 ATM Agreement. Under 2018 ATM Agreement, we may offer and sell common stock having aggregate proceeds of up to $125.0 million from time to time through Cantor Fitzgerald as our sales agent. No sales of our common stock have taken place under the 2018 ATM Agreement as of December 31, 2018.

**Common Stock and Common Stock Equivalents**

As of February 22, 2019, the number of shares outstanding of our common stock is 44,028,590, which includes restricted stock awards. We had outstanding common stock options of 4,363,688, outstanding common stock warrants of 34,113, unvested restricted stock awards of 843,853, and shares expected to be purchased on June 30, 2019 under the 2014 ESPP of 10,405 as of February 22, 2019.

**Operating and Capital Expenditure Requirements**

We have not achieved profitability on a quarterly or annual basis since our inception and we expect to continue to incur net losses for the foreseeable future. We expect to make additional capital outlays to increase operating expenditures over the next several years to support the completion of the clinical trials and other associated programs relating to DAXI for the treatment of glabellar lines, cervical dystonia, plantar fasciitis, upper limb spasticity, migraine headache, and other indications, seek regulatory approval, prepare for and, if approved, proceed to commercialization. We believe that our existing capital resources will be sufficient to fund our operations for at least the next 12 months following the filing of this Form 10-K. However, we anticipate that we will need to raise substantial additional financing in the future to fund our operations. In order to meet these additional cash requirements, we may seek to sell additional equity or issue debt, convertible debt or other securities that may result in dilution to our stockholders. If we raise additional funds through the issuance of debt or convertible debt securities, these securities could have rights senior to those of our common stock and could contain covenants that restrict our operations. There can be no assurance that we will be able to obtain additional equity or debt financing on terms acceptable to us, if at all. Debt financing, if available, would result in increased fixed payment obligations and may involve agreements that include covenants limiting or restricting our ability to take specific actions such as incurring debt, making capital expenditures or declaring dividends. Our failure to obtain sufficient funds on acceptable terms when needed could have a material adverse effect on our business, results of operations, and financial condition.

If adequate funds are not available to us on a timely basis, or at all, we may be required to terminate or delay clinical trials or other development activities for DAXI, our biosimilar product candidate and DaxibotulinumtoxinA Topical, and any future product candidates, or delay our establishment of sales and marketing capabilities or other activities that may be necessary to commercialize our product candidates, if we obtain marketing approval. We may elect to raise additional funds even before we need them if the conditions for raising capital are favorable. Our future capital requirements depend on many factors, including:

- the results of our clinical trials for DAXI and preclinical trials of DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- the timing of, and the costs involved in, obtaining regulatory approvals for DAXI, or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar;
- the number and characteristics of any additional product candidates we develop or acquire;
- the scope, progress, results and costs of researching and developing and conducting preclinical and clinical trials of DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates;
- the cost of commercialization activities if DAXI or any future product candidates including DaxibotulinumtoxinA Topical or biosimilar are approved for sale, including marketing, sales and distribution costs;
- the cost of manufacturing DAXI, DaxibotulinumtoxinA Topical, biosimilar or any future product candidates and any products we successfully commercialize and maintaining our related facilities;
- our ability to establish and maintain strategic collaborations, licensing or other arrangements including the Mylan collaboration, Fosun licensing, and the terms of and timing such arrangements;
- the degree and rate of market acceptance of any future approved products;
- the emergence, approval, availability, perceived advantages, relative cost, relative safety and relative efficacy of alternative and competing products or treatments;
- any product liability or other lawsuits related to our products;
- the expenses needed to attract and retain skilled personnel;
- any litigation, including litigation costs and the outcome of such litigation;
- the costs associated with being a public company;
- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing patent claims, including litigation costs and the outcome of such litigation; and
- the timing, receipt and amount of sales of, or royalties on, future approved products, if any.

Please see Part I, Item 1A. "Risk Factors" in this Form 10-K for additional risks associated with our substantial capital requirements.

Since inception, we have devoted substantially all of our efforts to identifying and developing product candidates for the aesthetic and therapeutic pharmaceutical markets, recruiting personnel, raising capital, conducting preclinical and clinical development of, and manufacturing development for DAXI and DaxibotulinumtoxinA Topical. We have incurred losses and negative cash flows from operations. We have not yet commenced commercial operations, have not generated product revenue to date, and will continue to incur significant research and development and other expenses related to our ongoing operations. We have recorded net losses of $142.6 million, $120.6 million, and $89.3 million for the years ended December 31, 2018, 2017, and 2016, respectively. As of December 31, 2018, we had a working capital surplus of $176.0 million and an accumulated deficit of $684.8 million. We have funded our operations primarily through the sale and issuance of common stock, convertible preferred stock, notes payable, and convertible notes. As of December 31, 2018, we had capital resources consisting of cash, cash equivalents, and short-term investments of $175.8 million. In January 2019, we completed the 2019 follow-on offering for net proceeds of $107.6 million after underwriting discounts, commissions and other offering expenses. In January 2019, we received $27.0 million for an upfront payment net of foreign withholding tax from Fosun. We believe that our existing cash and cash equivalents will allow us to fund our operating plan through at least the next 12 months following the issuance of this Form 10-K, and may identify additional capital resources to fund our operations.

**Critical Accounting Policies and Estimates**

Our Consolidated Financial Statements are prepared in accordance with GAAP. The preparation of these Consolidated Financial Statements requires our management to make estimates, assumptions and judgments that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the Consolidated Financial Statements, and the reported amounts of revenue and expenses during the applicable periods. We base our estimates, assumptions and judgments on historical experience and on various other factors that we believe to be reasonable under the circumstances. Different assumptions and judgments would change the estimates used in the preparation of our Consolidated Financial Statements, which, in turn, could change the results from those reported. We evaluate our estimates, assumptions and judgments on an ongoing basis.

The critical accounting estimates, assumptions and judgments that we believe have the most significant impact on our Consolidated Financial Statements are described below.

**Revenue**

Effective January 1, 2018, we adopted Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers* (ASC 606), using the full retrospective transition method. We evaluated our prior contractual revenue arrangement with PDI, which was acquired by Valeant in 2014. After Valeant notified us that it intended to terminate the asset purchase and royalty agreement in 2015, we continued to receive royalties of $75,000 each quarter until November 2017 when Valeant and us entered into an asset transfer agreement to finalize the termination of the asset purchase and royalty agreement and Valeant returned the Relastin® intellectual property rights to us. Based on its evaluation, we determined that the new guidance had no impact to the revenue recognized prior to January 1, 2018 and, accordingly, had no impact on the accumulated deficit as of January 1, 2018.

We elected to use certain practical expedients permitted related to adoption (Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements—Note 3—Revenue" in this Form 10-K.) and the adoption ASC 606 had no impact on our financial position, results of operations or liquidity. This standard applies to all contracts with customers, except for contracts that are within the scope of other standards, such as leases, insurance, collaboration arrangements and financial instruments. Under ASC 606, we recognize revenue when our customer obtains control of promised goods or services, in an amount that reflects the consideration which we expect to receive in exchange for those goods or services.

To determine revenue recognition for arrangements that we determine are within the scope of ASC 606, we perform the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) we satisfied a performance obligation. We only apply the five-step model to contracts when it is probable that we will collect the consideration we are entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, we assess the goods or services promised within each contract and determine those that are performance obligations and assess whether each promised good or service is distinct. We then recognize as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied.

**Clinical Trial Accruals**

Clinical trial costs are charged to research and development expense as incurred. We accrue for expenses resulting from contracts with clinical research organizations ("CROs"), investigators and consultants, and under certain other agreements in connection with conducting clinical trials. The financial terms of these contracts are subject to negotiations, which vary from contract to contract and may result in payment flows that do not match the periods over which materials or services are provided. Our objective is to reflect the appropriate trial expense in the Consolidated Financial Statements by matching the appropriate expenses with the period in which services and efforts are expended. In the event advance payments are made to a CRO, the payments will be recorded as a prepaid asset, which will be amortized as services are rendered.

The CRO contracts generally include pass-through fees including, but not limited to, regulatory expenses, investigator fees, travel costs and other miscellaneous costs, including shipping and printing fees. We estimate our clinical accruals based on reports from and discussion with clinical personnel and outside services providers as to the progress or state of completion of trials, or the services completed. We estimate accrued expenses as of each balance sheet date based on the facts and circumstances known at that time. Our clinical trial accrual is dependent, in part, upon the receipt of timely and accurate reporting from the CROs and other third-party vendors. As of December 31, 2018, there have not been any material adjustments to our estimated accrued clinical expenses.

**Stock-Based Compensation**

We recognize compensation costs related to stock options granted to employees, non-employee consultants, and non-employee directors based on the estimated fair value of the awards on the date of grant, using the Black-Scholes option-pricing model. The grant date fair value of the stock-based awards is recognized over the requisite service period, which is generally the vesting period of the respective awards. Stock-based compensation expenses are classified in the Consolidated Statements of Operations and Comprehensive Loss based on the functional area to which the related recipients belong.

The estimated grant date fair values of the option awards granted to employees and non-employee directors during the years ended December 31, 2018, 2017, and 2016 were calculated using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected term (in years) | 6.0 | 6.0 | 6.0 |
| Expected volatility | 60.2% | 67.7% | 61.9% |
| Risk-free interest rate | 2.7% | 2.1% | 1.4% |
| Dividend rate | 0.0% | 0.0% | 0.0% |

The Black-Scholes option-pricing model requires the use of highly subjective and complex assumptions that determine the fair value of options. These assumptions are as follows:

- *Expected term* — The expected term represents the period that our options are expected to be outstanding and is calculated using the simplified method. We qualify for the simplified method as our stock options have the following characteristics: (i) granted at-the-money; (ii) exercisability is conditioned upon service through the vesting date; (iii) termination of service prior to vesting results in forfeiture; (iv) limited exercise period following termination of service; and (v) options are non-transferable and non-hedgeable, or "plain vanilla" options, and we have limited history of exercise data.
- *Expected volatility* — Beginning on January 1, 2017, the expected volatility is based on the historical volatility of a group of similar entities combined with the historical volatility of us, whereas prior to 2017, the expected volatility was based solely on the historical volatility of a group of similar entities. In evaluating similarity, we considered factors such as industry, stage of life cycle, capital structure, and size.
- *Risk-free interest rate* — The risk-free interest rate is based on the U.S. Treasury constant maturity rates with terms similar to the option's expected term.
- *Dividend rate* — The expected dividend was assumed to be zero as we have never paid dividends and have no current plans to do so.

As of January 1, 2017, we began accounting for forfeitures as they occur, which was an acceptable change in accordance with ASU 2016-09. In connection with changing the forfeiture rate methodology, we recorded a cumulative charge of less than $0.1 million to the Accumulated Deficit balance as of January 1, 2017.

As of July 1, 2018, we adopted ASU 2018-07 and began accounting for share-based payment transactions for acquiring goods and services from non-employees (excluding non-employee directors) using a retroactive approach. Under ASU 2018-07, equity-classified non-employee share-based payment awards are measured at the fair value on the grant date, and expense is recognized in the same period and in the same manner as if we had paid cash for the goods or services received. With the adoption of ASU 2018-07, we recorded a cumulative charge of less than $0.1 million to the Accumulated Deficit balance as of January 1, 2018.

We will continue to use judgment in evaluating the expected term and expected volatility related to our stock-based compensation calculations on a prospective basis. As we continue to accumulate additional data related to our common stock, we may make refinements to the estimates of our expected terms and expected volatility that could materially impact our future stock-based compensation.

ALGN-1364761
PTX-767.0109

***Derivative Liabilities***

We bifurcated and separately accounted for derivative instruments related to payment provisions underlying the Medicis settlement. This derivative is accounted for as a liability, which will be remeasured to fair value as of each balance sheet date, with changes in fair value recognized in the Consolidated Statements of Operations and Comprehensive Loss. We will continue to record adjustments to the fair value of the derivative liability associated with the Medicis settlement until the remaining settlement payment has been paid.

The fair value of the product approval payment derivative was determined by estimating the timing and probability of the related approval and multiplying the payment amount by this probability percentage then applying a discount factor. As of December 31, 2017, the fair value of the product approval payment derivative of $2.6 million was determined by updating the timing and probability estimate of the related approval and applying a discount factor assuming a term of 2.5 years, a risk-free rate of 2.0% and a credit risk adjustment of 6.5%. As of December 31, 2018, we determined the fair value of its liability for the product approval payment was $2.7 million, which was measured by assuming a term of 1.5 years, a risk-free rate of 2.6% and a credit risk adjustment of 8.0%. Our assumption for the expected term is based on an expected BLA approval in 2020. We did not make any payments under the product approval payment during the years ended December 31, 2018 and 2017. As a result of the fair value remeasurements during the years ended December 31, 2018, 2017, and 2016, we recognized aggregate losses of $0.1 million, $0.6 million, and $0.6 million, respectively.

***Impairment of Long-Lived Assets***

We evaluate long-lived assets, such as property and equipment subject to depreciation, for impairment whenever events or changes in circumstances indicate that the carrying value of long-lived assets may not be recoverable. Events and changes in circumstances considered important that could result in an impairment review of long-lived assets include (i) a significant decrease in the market price of a long-lived asset; (ii) a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition; (iii) a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, including an adverse action or assessment by a regulator; (iv) an accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset; (v) a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset; and (vi) a current expectation that, more likely than not (more than 50 percent), a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The impairment evaluation of long-lived assets includes an analysis of estimated future undiscounted net cash flows expected to be generated by the long-lived assets over their remaining estimated useful lives. If the estimate of future undiscounted net cash flows is insufficient to recover the carrying value of the long-lived assets over the remaining estimated useful lives, we record an impairment loss in the amount by which the carrying value of the long-lived assets exceeds the fair value. Fair value is generally measured based on discounted cash flow analysis.

We constructed a fill/finish line for the future commercial manufacturing of our DaxibotulinumtoxinA Topical and to support its clinical trials and regulatory license applications. In 2016, following the results of the REALISE 1 Phase 3 clinical trial for crow's feet, we discontinued our DaxibotulinumtoxinA Topical clinical development programs for the treatment of crow's feet and for the treatment of primary axillary hyperhidrosis. We performed an impairment analysis of the DaxibotulinumtoxinA Topical fill/finish line and other fixed assets to determine fair value based on highest and best use. We concluded that only certain equipment comprising the DaxibotulinumtoxinA Topical fill/finish line would be repurposed for commercial-scale manufacturing of DAXI. As a result, we determined fair value based on its highest and best use and that for certain components of the fill/finish line and other fixed assets, the carrying value of the assets was not entirely recoverable and the fair value, which was calculated using the market or cost approach depending on the specific asset, was lower than the carrying value. Accordingly, during the year ended December 31, 2017, we recorded a loss on impairment of $2.9 million.

During the year ended December 31, 2018, we sold certain component relating to the fill/finish line manufacturing equipment and recognized a gain of $1.5 million, which is included in Research and Development expenses in the Consolidated Statements of Operations and Comprehensive Loss. There was no impairment of long-lived assets during the year ended December 31, 2018.



ALGN-1364762
PTX-767.0110

***Income Taxes***

We account for income taxes under the asset and liability method. We estimate actual current tax exposure together with assessing temporary differences resulting from differences in accounting for reporting purposes and tax purposes for certain items, such as accruals and allowances not currently deductible for tax purposes. These temporary differences result in deferred tax assets and liabilities, which are included in the our Consolidated Balance Sheets. In general, deferred tax assets represent future tax benefits to be received when certain expenses previously recognized in our Consolidated Statements of Operations and comprehensive loss become deductible expenses under applicable income tax laws or when NOL or credit carryforwards are utilized. Accordingly, realization of our deferred tax assets is dependent on future taxable income against which these deductions, losses and credits can be utilized.

We must assess the likelihood that our deferred tax assets will be recovered from future taxable income, and to the extent we believe that recovery is not likely, we establish a valuation allowance. Based on the available evidence, we are unable, at this time, to support the determination that it is more likely than not that its deferred tax assets will be utilized in the future. Accordingly, we recorded a full valuation allowance as of December 31, 2018 and 2017. We intend to maintain valuation allowances until sufficient evidence exists to support its reversal.

As of December 31, 2018, we had NOL carryforwards available to reduce future taxable income, if any, for federal, California, and other states income tax purposes of $638.6 million, $179.1 million, and $703.9 million, respectively. The California NOL carryforwards began to expire in 2010. The federal NOL carryforwards will begin expiring in 2020, and the other states NOL carryforwards will begin expiring in 2030 if they are not utilized. As a result of the Tax Reform Act, the federal NOL generated after December 31, 2017 will carryover indefinitely with statutory limitations to the annual utilization.

As of December 31, 2018, we had research and development credit carryforwards of $7.3 million and $6.7 million available to reduce future taxable income, if any, for federal and California income tax purposes, respectively.
The federal research and development credit carryforwards will begin expiring in 2023 if they are not utilized, and the California research and development credit carryforwards have no expiration date.

In general, if we experience a greater than 50 percentage point aggregate change in ownership over a 3-year period (a Section 382 ownership change), utilization of its pre-change NOL carryforwards are subject to an annual limitation under Internal Revenue Code Section 382 (California and other states have similar laws). The annual limitation generally is determined by multiplying the value of our stock at the time of such ownership change (subject to certain adjustments) by the applicable long-term tax-exempt rate. Such limitations may result in expiration of a portion of the NOL carryforwards before utilization. We determined that an ownership change occurred on April 7, 2004 but that all carryforwards can be utilized prior to the expiration. We also determined that an ownership change occurred in February 2014, and as a result, we reduced the deferred tax assets and the corresponding valuation allowance to account for this limitation. Since the research and development credits for California carry over indefinitely, there was no change to the California research and development credits. We reviewed our Internal Revenue Code Section 382 limitation through December 31, 2018 and have not identified any ownership changes resulting in a limitation.

Our ability to use our remaining NOL carryforwards may be further limited if we experience a Section 382 ownership change as a result of future changes in its stock ownership.



ALGN-1364763
PTX-767.0111

**Contractual Obligations**

Our contractual commitments will have an impact on our future liquidity. The following table, which summarizes our contractual obligations as of December 31, 2018, represents material expected or contractually committed future obligations, with terms in excess of one year. We believe that we will be able to fund these obligations through cash generated funding activities and from our existing cash balances.

| | Payment due by period | | | | |
|---|---|---|---|---|---|
| **Contractual Obligations** | **Total** | **Less than 1 year** | **1-3 years** | **3-5 years** | **More than 5 years** |
| | | | ( In thousands) | | |
| Operating lease obligations | $ 48,995 | $ 6,339 | $ 13,677 | $ 11,021 | $ 17,958 |
| Total | $ 48,995 | $ 6,339 | $ 13,677 | $ 11,021 | $ 17,958 |

This table does not include any milestone or royalty payments, which may become payable to third parties under agreements, as the timing and likelihood of such payments are not known.

- We are obligated to pay milestone and royalties to List Laboratories on future sales of botulinum toxin products.
- We also have one remaining future milestone payment of $4.0 million due and payable to Valeant upon the achievement of regulatory approval for DAXI or DaxibotulinumtoxinA Topical.
- In June 2016, we entered into BTRX Purchase Agreement in which we agreed to pay up to an additional $16.0 million in aggregate upon the satisfaction of specified milestones relating to our sales revenue, intellectual property, and clinical and regulatory events. In exchange, we acquired all rights, title and interest in a portfolio of botulinum toxin-related patents and patent applications from BTRX and was granted the right of first negotiation and first refusal with respect to other botulinum toxin-related patents owned or controlled by BTRX.
- In April 2016, we entered into an agreement with BioSentinel, Inc. to in-license their technology and expertise for research and development and manufacturing purposes. In addition to minimum quarterly use fees, we are obligated to make a one-time future milestone payment of $0.3 million payable to BioSentinel, Inc. upon the achievement of regulatory approval.
- In March 2017, we entered into the Althea Services Agreement, under which Althea has agreed to provide us with a future source of commercial fill/finish services for our neuromodulator products. The Althea Services Agreement has an initial term that will expire in 2024, unless terminated sooner by either party. In accordance with the Althea Services Agreement, we will have minimum purchase obligations based on its production forecasts. As of December 31, 2018, we made non-refundable advanced payments of $1.9 million in accordance with the terms of the Althea Services Agreement. The remaining services are cancellable at any time, with the costs we are required to pay that incurred through the cancellation date.

This table does not include a liability for unrecognized tax benefits related to various federal and state income tax matters of $4.2 million at December 31, 2018. The timing of the settlement of these amounts was not reasonably estimable at December 31, 2018. We do not expect payment of amounts related to the unrecognized tax benefits within the next twelve months.

**Off-Balance Sheet Arrangements**

As of December 31, 2018, we did not have any off-balance sheet arrangements or any relationships with any entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities that would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Recent Accounting Pronouncements**

Refer to Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements—Note 2—Summary of Significant Accounting Policies" in this Form 10-K



ALGN-1364764
PTX-767.0112

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in foreign currency exchange rates and interest rates. We do not hold or issue financial instruments for trading purposes.

**Interest Rate Sensitivity**

Our exposure to market risk for changes in interest rates relates primarily to our cash, cash equivalents, and short-term investments. We had cash, cash equivalents, and short-term investments of $175.8 million and $282.9 million as of December 31, 2018 and 2017, respectively. As of December 31, 2018, our cash, cash equivalents, and short-term investments were held in deposit, money market funds, U.S. treasury securities and U.S. government agency obligations. Our primary exposure to market risk is interest income sensitivity, which is affected by changes in the general level of the interest rates in the U.S. A hypothetical 10% movement in interest rates would not be expected to have a material impact on our Consolidated Financial Statements. We mitigate market risk for changes in interest rates by holding our short-term investments in U.S. treasury and government agency obligations to maturity.

**Foreign Exchange**

Our operations are primarily conducted in the U.S. using the U.S. Dollar. However, we conduct limited operations in foreign countries, primarily for clinical and regulatory services, whereby settlement of our obligations are denominated in the local currency. Transactional exposure arises when transactions occur in currencies other than the U.S. Dollar. Transactions denominated in foreign currencies are recorded at the exchange rate prevailing at the date of the transaction with the resulting liabilities being translated into the U.S. Dollar at exchange rates prevailing at the balance sheet date. The resulting gains and losses, which were insignificant for the years ended December 31, 2018, 2017 and 2016, are included in other expense in the Consolidated Statements of Operations and Comprehensive Loss. We do not use currency forward exchange contracts to offset the related effect on the underlying transactions denominated in a foreign currency.

Table of Contents

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The financial statements required by this item are set forth beginning on page F-3 of this Annual Report on this Form 10-K and are incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

## ITEM 9A. CONTROLS AND PROCEDURES

(a) Evaluation of Disclosure Controls and Procedures

We are responsible for maintaining disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Disclosure controls and procedures are controls and other procedures designed to ensure that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer, our principal financial officer and our principal accounting officer, as appropriate to allow timely decisions regarding required disclosure.

Based on our management's evaluation (with the participation of our principal executive officer, our principal financial officer, and our principal accounting officer) of our disclosure controls and procedures as required by Rule 13a-15 under the Exchange Act, our principal executive officer, our principal financial officer, and our principal accounting officer have concluded that our disclosure controls and procedures were effective to achieve their stated purpose as of December 31, 2018, the end of the period covered by this report.

(b) Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our principal executive officer, principal financial officer, and principal accounting officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018 based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO. Based on our evaluation under the criteria set forth in *Internal Control - Integrated Framework (2013)* issued by the COSO, our management concluded our internal control over financial reporting was effective as of December 31, 2018.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report on page F-2 in Part IV, Item 15 of this Form 10-K and is incorporated herein by reference.

(c) Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## ITEM 9B. OTHER INFORMATION

None.



ALGN-1364769
PTX-767.0117

## PART III
## ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this Item will be included in the Company's proxy statement for the 2019 Annual Meeting of the Stockholders ("2019 Proxy Statement"), under the sections labeled "Proposal 1 - Election of Directors", "Section 16(a) Beneficial Ownership Reporting Compliance", "Information Regarding the Board of Directors and Corporate Governance" and "Executive Officers of the Company" and is incorporated by reference. The 2019 Proxy Statement will be filed with the SEC within 120 days after the end of the fiscal year to which this report relates.

*Code of Business Conduct.* Our board of directors adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers, including our principal executive officer, principal financial officer, and principal accounting officer or controller, or persons performing similar functions and agents and representatives, including directors and consultants. The full text of our Code of Business Conduct and Ethics is posted on our website at www.revance.com. We intend to disclose future amendments to certain provisions of our Code of Business Conduct and Ethics, or waivers of such provisions applicable to any principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and our directors, on our website identified above.

## ITEM 11. EXECUTIVE COMPENSATION

The information required by this Item will be included in the sections labeled "Executive Compensation", "Information Regarding the Board of Directors and Corporate Governance - Non-Employee Director Compensation", "Information Regarding the Board of Directors and Corporate Governance - Compensation Committee Interlocks and Insider Participation" and "Information Regarding the Board of Directors and Corporate Governance - Compensation Committee Report" appearing in our 2019 Proxy Statement, and is incorporated herein.



ALGN-1364771
PTX-767.0119

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this Item will be included in the sections labeled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" appearing in our 2019 Proxy Statement, and is incorporated by reference.



ALGN-1364772
PTX-767.0120

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item will be included in the sections labeled "Transactions with Related Persons" and "Information Regarding the Board of Directors and Corporate Governance" appearing in our 2019 Proxy Statement, and is incorporated by reference.



ALGN-1364773
PTX-767.0121

Table of Contents

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by this Item will be included in the section labeled "Proposal 2 - Ratification of Selection of Independent Registered Public Accounting Firm" appearing in our 2019 Proxy Statement, and is incorporated by reference.

## PART IV

### ITEM 15. EXHIBITS AND FINANCIALS STATEMENT SCHEDULES

(a) The following documents are filed as part of this Annual Report on this Form 10-K:

(1) Financial Statements. The financial statements required by this item are set forth beginning at F-1 of this Annual Report on this Form 10-K and are incorporated herein by reference.

(2) Financial Statement Schedules. None. Financial statement schedules have been omitted because they are not applicable.

(3) Exhibits: See Item 15(b) below.

(b) Exhibits. The following exhibits are included herein or incorporated herein by reference:

### EXHIBIT INDEX

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed Herewith |
| 3.1 | Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | February 11, 2014 | |
| 3.2 | Amended and Restated Bylaws | S-1 | 333-193154 | 3.4 | December 31, 2013 | |
| 4.2 | Form of Common Stock Certificate | S-1/A | 333-193154 | 4.4 | February 3, 2014 | |
| 10.1* | Revance Therapeutics, Inc. 2002 Equity Incentive Plan | S-1 | 333-193154 | 10.1 | December 31, 2013 | |
| 10.2* | Form of Stock Option Agreement and Option Grant Notice for Revance Therapeutics, Inc. 2002 Equity Incentive Plan | S-1 | 333-193154 | 10.2 | December 31, 2013 | |
| 10.3* | Revance Therapeutics, Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-193154 | 10.3 | December 31, 2013 | |
| 10.4* | Form of Stock Option Agreement and Option Grant Notice for Revance Therapeutics, Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-193154 | 10.4 | December 31, 2013 | |
| 10.5* | Revance Therapeutics, Inc. 2014 Equity Incentive Plan | S-1/A | 333-193154 | 10.5 | January 27, 2014 | |
| 10.6* | Form of Restricted Stock Unit Award Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | 10-K | 001-36297 | 10.6 | March 4, 2016 | |
| 10.7* | Form of Stock Option Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | 10-Q | 001-36297 | 10.3 | November 10, 2015 | |
| 10.8* | Form of Restricted Stock Bonus Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | 10-K | 001-36297 | 10.8 | March 4, 2016 | |
| 10.9* | Revance Therapeutics, Inc. 2014 Employee Stock Purchase Plan | S-1/A | 333-193154 | 10.7 | January 27, 2014 | |

| | | | | | |
|---|---|---|---|---|---|
| 10.10* | Form of Indemnity Agreement by and between Revance Therapeutics, Inc. and each of its officers and directors | S-1/A | 333-193154 | 10.8 | January 27, 2014 |
| 10.11 | Lease Agreement dated March 31, 2008 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.9 | December 31, 2013 |



ALGN-1364776
PTX-767.0124

| Exhibit Number | Exhibit Description | Incorporated by Reference Form | File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 10.12 | First Amendment to Office Lease dated April 7, 2008 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.10 | December 31, 2013 | |
| 10.13 | Second Amendment to Office Lease and Lease dated May 17, 2010 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.11 | December 31, 2013 | |
| 10.14 | Third Amendment to Lease, dated February 26, 2014 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | 8-K | 001-36297 | 10.35 | March 4, 2014 | |
| 10.15 | Fourth Amendment to Lease, dated May 10, 2018, by and between Revance Therapeutics, Inc. and BMR-Pacific Research Center LP. | 8-K | 001-36297 | 10.1 | May 11, 2018 | |
| 10.16+ | License and Service Agreement dated February 8, 2007 between Revance Therapeutics, Inc. and List Biological Laboratories, Inc. | S-1 | 333-193154 | 10.15 | December 31, 2013 | |
| 10.17+ | First Addendum to the License and Service Agreement dated April 21, 2009 between Revance Therapeutics, Inc. and List Biological Laboratories, Inc. | S-1 | 333-193154 | 10.16 | December 31, 2013 | |
| 10.18+ | Development and Supply Agreement dated December 11, 2009 between Revance Therapeutics, Inc. and Hospira Worldwide, Inc. | S-1 | 333-193154 | 10.18 | December 31, 2013 | |
| 10.19+ | First Amendment to Development and Supply Agreement dated May 29, 2013 between Revance Therapeutics, Inc. and Hospira Worldwide, Inc | S-1 | 333-193154 | 10.20 | December 31, 2013 | |
| 10.20+ | Second Amendment to Development and Supply Agreement dated August 31, 2015 between Revance Therapeutics, Inc. and Hospira Worldwide, Inc. | 10-Q | 001-36297 | 10.1 | November 10, 2015 | |
| 10.21+ | Manufacture and Development Agreement dated May 20, 2013 between Revance Therapeutics, Inc. and American Peptide Company, Inc. | S-1 | 333-193154 | 10.19 | December 31, 2013 | |
| 10.22 | First Amendment to Manufacture and Development Agreement dated April 13, 2018 between Revance Therapeutics, Inc. and Bachem Americas, Inc. | 10-Q | 001-36297 | 10.3 | August 3, 2018 | |
| 10.23 | Loan and Lease Agreement dated as of December 20, 2013 by and between Revance Therapeutics, Inc. and Essex | S-1 | 333-193154 | 10.21 | December 31, 2013 | |

| | | | | | |
|---|---|---|---|---|---|
| | Capital Corporation | | | | |
| 10.24 | First Amendment to Loan and Lease Agreement, dated December 17, 2014, by and between Revance Therapeutics, Inc. and Essex Capital Corporation | 8-K | 001-36297 | 10.1 | December 22, 2014 |
| 10.25 | Second Amendment to Loan and Lease Agreement, dated February 26, 2015, by and between Revance Therapeutics, Inc. and Essex Capital Corporation | 10-K | 001-36297 | 10.25 | March 4, 2015 |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.26* | Revance Therapeutics, Inc. Third Amended and Restated Executive Severance Benefit Plan | 10-K | 001-36297 | 10.24 | March 2, 2018 | |
| 10.27* | Revance Therapeutics, Inc. Amended and Restated Non-Employee Director Compensation Policy | — | — | — | — | X |
| 10.28* | Revance Therapeutics, Inc. 2019 Management Bonus Plan | — | — | — | — | X |
| 10.29* | Revance Therapeutics, Inc. Amended and Restated 2014 Inducement Plan | 8-K | 001-36297 | 99.1 | December 14, 2015 | |
| 10.30* | Form of Stock Option Agreement and Grant Notice under Amended and Restated Revance Therapeutics, Inc. 2014 Inducement Plan | 10-Q | 001-36297 | 10.5 | November 10, 2015 | |
| 10.31* | Form of Restricted Stock Agreement and Grant Notice under Amended and Restated Revance Therapeutics, Inc. 2014 Inducement Plan | 10-K | 001-36297 | 10.31 | March 4, 2016 | |
| 10.32* | Executive Employment Agreement dated December 30, 2013 by and between Revance Therapeutics, Inc. and L. Daniel Browne | S-1/A | 333-193154 | 10.25 | January 27, 2014 | |
| 10.33* | Executive Employment Agreement dated December 31, 2013 by and between Revance Therapeutics, Inc. and Lauren Silvernail | S-1/A | 333-193154 | 10.27 | January 27, 2014 | |
| 10.34* | Executive Employment Agreement dated December 14, 2015 by and between Revance Therapeutics, Inc. and Abhay Joshi. | 10-K | 001-36297 | 10.34 | March 4, 2016 | |
| 10.35* | Executive Employment Agreement dated September 18, 2017 by and between Revance Therapeutics, Inc. and Todd Zavodnick. | 10-Q | 001-36297 | 10.1 | November 3, 2017 | |
| 10.36* | Executive Employment Agreement dated May 1, 2018 by and between Company and Caryn G. McDowell | 10-Q | 001-36297 | 10.1 | August 3, 2018 | |
| 10.37* | Executive Employment Agreement dated November 5, 2018 by and between Revance Therapeutics, Inc. and Tobin Schilke | — | — | — | — | X |
| 10.38* | Employment Agreement dated November 7, 2018 by and between Revance Therapeutics, Inc. and Cyril Allouche | — | — | — | — | X |
| 10.39 | Technology Transfer, Validation and Commercial Fill/Finish Services | 10-Q | 001-36297 | 10.4 | May 9, 2017 | |

| | | | | | |
|---|---|---|---|---|---|
| | Agreement dated March 14, 2017 between Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. | | | | |
| 10.40 | Controlled Equity OfferingSM Sales Agreement, dated March 13, 2018, by and between Revance Therapeutics, Inc. and Cantor Fitzgerald & Co. | 8-K | 001-36297 | 99.1 | March 13, 2018 |
| 10.41+ | Collaboration and License Agreement, dated February 28, 2018, by and between Revance Therapeutics, Inc. and Mylan Ireland Ltd | 10-Q | 001-36297 | 10.1 | May 9, 2018 |

| Exhibit Number | Exhibit Description | Incorporated by Reference Form | File No. | Exhibit | Filing Date | Filed Herewith |
|---|---|---|---|---|---|---|
| 10.42++ | License Agreement, dated December 4, 2018, by and between Revance Therapeutics, Inc. and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. | — | — | — | — | X |
| 21.1 | List of Subsidiaries of the Registrant | — | — | — | — | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | — | — | — | — | X |
| 24.1 | Power of Attorney (contained in the signature page to this Annual Report on Form 10-K) | — | — | — | — | X |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 32.1† | Certification of the Chief Executive Officer pursuant to18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | — | — | — | — | X |
| 32.2† | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 101.INS | XBRL Instance Document | — | — | — | — | X |
| 101.SCH | XBRL Taxonomy Extension Schema Document | — | — | — | — | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | — | — | — | — | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | — | — | — | — | X |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document | — | — | — | — | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | — | — | — | — | X |

* Indicates a management contract or compensatory plan or arrangement.
+ Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.
++ Confidential treatment has been requested for certain portions of this exhibit.
† The certifications attached as Exhibit 32.1 and 32.2 that accompany this Annual Report on Form 10-K are not deemed filed with the Securities and Exchange Commission and are not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended,

whether made before or after the date of this Form 10-K, irrespective of any general incorporation language contained in such filing.

### ITEM 16. FORM 10-K SUMMARY

None.



ALGN-1364782
PTX-767.0130

Table of Contents

## REVANCE THERAPEUTICS, INC.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| **Consolidated Financial Statements:** | |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations and Comprehensive Loss | F-5 |
| Consolidated Statements of Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Revance Therapeutics, Inc.

### *Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of Revance Therapeutics, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations and comprehensive loss, of stockholders' equity and of cash flows for each of the three years in the period ended December 31, 2018, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

### *Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

### *Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

**ALGN-1364785**
PTX-767.0133

Table of Contents

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
San Jose, California
February 28, 2019

We have served as the Company's auditor since 2005.

**REVANCE THERAPEUTICS, INC.**

**Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**

| | As of December 31, | |
|---|---|---|
| | 2018 | 2017 |
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 73,256 | $ 282,896 |
| Short-term investments | 102,556 | — |
| Accounts and other receivables | 27,000 | 48 |
| Prepaid expenses and other current assets | 5,110 | 2,267 |
| Total current assets | 207,922 | 285,211 |
| Property and equipment, net | 14,449 | 9,250 |
| Restricted cash | 730 | 580 |
| Other non-current assets | 3,247 | 658 |
| TOTAL ASSETS | $ 226,348 | $ 295,699 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 8,434 | $ 6,805 |
| Accruals and other current liabilities | 14,948 | 12,225 |
| Deferred revenue, current portion | 8,588 | — |
| Financing obligations | — | 1,872 |
| Total current liabilities | 31,970 | 20,902 |
| Derivative liability associated with the Medicis settlement | 2,753 | 2,613 |
| Deferred revenue, net of current portion | 42,684 | — |
| Deferred rent | 3,319 | 3,339 |
| TOTAL LIABILITIES | 80,726 | 26,854 |
| Commitments and Contingencies (Note 10) | | |
| STOCKHOLDERS' EQUITY | | |
| Common stock, par value $0.001 per share — 95,000,000 shares authorized both as of December 31, 2018 and 2017; 36,975,203 and 36,516,075 shares issued and outstanding as of December 31, 2018 and 2017, respectively | 37 | 37 |
| Additional paid-in capital | 830,368 | 810,975 |
| Accumulated other comprehensive loss | (8) | — |
| Accumulated deficit | (684,775) | (542,167) |
| TOTAL STOCKHOLDERS' EQUITY | 145,622 | 268,845 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 226,348 | $ 295,699 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**REVANCE THERAPEUTICS, INC.**

**Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| Revenue | $ 3,729 | $ 262 | $ 300 |
| Operating expenses: | | | |
| Research and development | 92,500 | 80,361 | 50,381 |
| General and administrative | 53,863 | 37,398 | 29,075 |
| Loss on impairment | — | 2,927 | 9,059 |
| Total operating expenses | 146,363 | 120,686 | 88,515 |
| Loss from operations | (142,634) | (120,424) | (88,215) |
| Interest income | 4,023 | 1,410 | 1,170 |
| Interest expense | (44) | (457) | (1,082) |
| Changes in fair value of derivative liability associated with the Medicis settlement | (140) | (591) | (608) |
| Other expense, net | (773) | (525) | (535) |
| Loss before income taxes | (139,568) | (120,587) | (89,270) |
| Income tax provision | (3,000) | — | — |
| Net loss | (142,568) | (120,587) | (89,270) |
| Unrealized gain (loss) and adjustment on securities included in net loss | (8) | 45 | (5) |
| Comprehensive loss | $ (142,576) | $ (120,542) | $ (89,275) |
| Basic and Diluted net loss attributable to common stockholders | $ (142,568) | $ (120,587) | $ (89,270) |
| Basic and Diluted net loss per share attributable to common stockholders | $ (3.94) | $ (4.01) | $ (3.18) |
| Basic and Diluted weighted-average number of shares used in computing net loss per share attributable to common stockholders | 36,171,582 | 30,101,125 | 28,114,784 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**REVANCE THERAPEUTICS, INC.**

**Consolidated Statements of Stockholders' Equity**
**(In thousands, except share and per share amounts)**

| | Common Stock | | Additional Paid-In Capital | Other Accumulated Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance — December 31, 2015 | 28,288,464 | $ 28 | $ 585,537 | $ (40) | $ (332,273) | $ 253,252 |
| Issuance of common stock relating to employee stock purchase plan | 21,064 | — | 243 | — | — | 243 |
| Stock-based compensation expense | — | — | 11,953 | — | — | 11,953 |
| Issuance of common stock upon exercise of stock options | 131,752 | — | 1,405 | — | — | 1,405 |
| Issuance of restricted stock awards, net of cancellation | 234,567 | 1 | (1) | — | — | — |
| Net settlement of restricted stock awards for employee taxes | (26,893) | — | (507) | — | — | (507) |
| Unrealized loss and adjustment on securities included in net loss | — | — | — | (5) | — | (5) |
| Net loss | — | — | — | — | (89,270) | (89,270) |
| Balance — December 31, 2016 | 28,648,954 | 29 | 598,630 | (45) | (421,543) | 177,071 |
| Cumulative-effect adjustment from adoption of ASU 2016-09 | — | — | 37 | | (37) | — |
| Issuance of common stock relating to employee stock purchase plan | 28,135 | — | 583 | — | — | 583 |
| Stock-based compensation expense | — | — | 13,230 | — | — | 13,230 |
| Issuance of common stock in connection with at-the-market offering, net of issuance costs of $603 | 1,802,651 | 2 | 38,155 | — | — | 38,157 |
| Issuance of common stock in connection with the 2017 follow-on offering, net of issuance costs of $535 | 5,389,515 | 5 | 156,928 | — | — | 156,933 |
| Issuance of common stock upon net exercise of warrants | 9,878 | — | — | — | — | — |
| Issuance of common stock upon exercise of stock options | 309,341 | 1 | 3,985 | — | — | 3,986 |
| Issuance of restricted stock awards, net of cancellation | 353,620 | — | — | — | — | — |
| Net settlement of restricted stock awards for employee taxes | (26,019) | — | (573) | — | — | (573) |
| Unrealized gain and adjustment on securities included in net loss | — | — | — | 45 | — | 45 |
| Net loss | — | — | — | — | (120,587) | (120,587) |
| Balance — December 31, 2017 | 36,516,075 | 37 | 810,975 | — | (542,167) | 268,845 |
| Cumulative-effect adjustment from adoption of ASU 2018-07 | — | — | 40 | — | (40) | — |
| Issuance of common stock relating to employee stock purchase plan | 37,894 | — | 765 | — | — | 765 |
| Stock-based compensation expense | — | — | 16,273 | — | — | 16,273 |
| Issuance of common stock upon exercise of stock options | 293,100 | — | 4,527 | — | — | 4,527 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Issuance of restricted stock awards, net of cancellation | 201,032 | — | — | — | — | — |
| Net settlement of restricted stock awards for employee taxes | (72,898) | — | (2,212) | — | — | (2,212) |
| Unrealized loss and adjustment on securities included in net loss | — | — | — | (8) | — | (8) |
| Net loss | — | — | — | — | (142,568) | (142,568) |
| Balance — December 31, 2018 | 36,975,203 | $ 37 | $ 830,368 | $ (8) | $ (684,775) | $ 145,622 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**REVANCE THERAPEUTICS, INC.**

**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net loss | $ (142,568) | $ (120,587) | $ (89,270) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation | 1,726 | 1,468 | 1,445 |
| Amortization of premium (discount) on investments | (1,103) | 410 | 1,212 |
| Stock-based compensation expense | 16,273 | 13,230 | 11,953 |
| Gain on disposal of fixed assets | (1,466) | — | — |
| Impairment of long-lived assets | — | 2,927 | 9,059 |
| Acquisition of in-process research and development | — | — | 2,000 |
| Other non-cash operating activities | 175 | 767 | 1,013 |
| Changes in operating assets and liabilities: | | | |
| Accounts and other receivables | (26,952) | 80 | 30 |
| Prepaid expenses and other current assets | (2,911) | 4,849 | (5,621) |
| Other non-current assets | (1,871) | (403) | (151) |
| Accounts payable | 1,691 | 2,607 | 953 |
| Accruals and other liabilities | 1,609 | (565) | 7,502 |
| Deferred revenue | 51,272 | — | — |
| Deferred rent | (121) | (125) | 48 |
| **Net cash used in operating activities** | (104,246) | (95,342) | (59,827) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Purchases of property and equipment | (6,991) | (2,525) | (1,670) |
| Proceeds from sale of property and equipment | 1,541 | — | 2 |
| Purchases of short-term investments | (314,911) | (36,028) | (280,681) |
| Proceeds from maturity of short-term investments | 146,000 | 157,445 | 207,650 |
| Proceeds from sale of short-term investments | 67,435 | — | 1,000 |
| Purchase of in-process research and development | (100) | (100) | (1,800) |
| **Net cash provided by (used in) investing activities** | (107,026) | 118,792 | (75,499) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from issuance of common stock in connection with the 2017 follow-on offering, net of commissions and discount | — | 157,468 | — |
| Proceeds from issuance of common stock in connection with at-the-market offerings, net of commissions | — | 38,760 | — |
| Proceeds from the exercise of stock options and common stock warrants, and purchases under the employee stock purchase plan | 5,292 | 4,569 | 1,649 |
| Principal payments made on financing obligations | (932) | (3,636) | (3,541) |
| Net settlement of restricted stock awards for employee taxes | (2,212) | (573) | (507) |
| Payment of offering costs | (366) | (644) | (243) |
| **Net cash provided by (used in) financing activities** | 1,782 | 195,944 | (2,642) |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (209,490) | 219,394 | (137,968) |

| | | | |
|---|---|---|---|
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — Beginning of period | 283,476 | 64,082 | 202,050 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — End of period | $ 73,986 | $ 283,476 | $ 64,082 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | | |
| Cash paid for interest | $ 16 | $ 299 | $ 676 |
| **SUPPLEMENTAL DISCLOSURES OF NON-CASH INVESTING AND FINANCING INFORMATION:** | | | |
| Deferred offering costs | $ 354 | $ 251 | $ 134 |
| Property and equipment purchases included in accounts payable and accruals and other current liabilities | $ 642 | $ 718 | $ 200 |
| Holdback related to acquisition of in-process research and development | $ — | $ — | $ 200 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements

## 1. The Company and Basis of Presentation

Revance Therapeutics, Inc. ("the Company") is a clinical-stage biotechnology company focused on the development, manufacturing, and commercialization of novel neuromodulators for multiple aesthetic and therapeutic indications. The Company is leveraging its proprietary portfolio of botulinum toxin type A compounds, formulated with its patented and proprietary peptide excipient technology, to address unmet needs in large and growing neuromodular markets. The Company's initial focus is on developing daxibotulinumtoxinA, our highly purified botulinum toxin Type A, for a broad spectrum of aesthetic and therapeutic indications, including facial wrinkles, muscle disorders, and chronic migraine.

The Company's lead drug candidate is DaxibotulinumtoxinA for Injection ("DAXI"). The Company used its unique proprietary peptide excipient technology to formulate DAXI. The noncovalent bond formed between the proprietary peptide excipient technology and the botulinum toxin may enable longer residence time of botulinum toxin Type A, which could explain DAXI's long duration of effect. The process binds a highly purified botulinum toxin Type A with a unique proprietary stabilizing excipient peptide. The Company does not use human serum albumin ("HSA") and other animal-sourced ingredients, which carry the risk of transmission of pathogens, to stabilize our product.

The Company is currently studying DAXI for the treatment of facial wrinkles, cervical dystonia, plantar fasciitis, adult upper limb spasticity, and chronic migraine. The Company believes DAXI has the potential to expand into additional aesthetic and therapeutic indications. The Company also is developing a topically applied neuromodulator for aesthetic and therapeutic indications, DaxibotulinumtoxinA Topical, and have a collaboration and license agreement with Mylan Ireland Limited, a wholly-owned indirect subsidiary of Mylan N.V. ("Mylan"), to develop and commercialize a biosimilar to BOTOX®.

Since inception, the Company has devoted substantially all of its efforts to identifying and developing product candidates for the aesthetic and therapeutic pharmaceutical markets, recruiting personnel, raising capital, conducting preclinical and clinical development of, and manufacturing development for DAXI and DaxibotulinumtoxinA Topical. The Company has incurred losses and negative cash flows from operations. The Company has not yet commenced commercial operations, has not generated product revenue to date, and will continue to incur significant research and development and other expenses related to its ongoing operations. The Company has recorded net losses of $142.6 million, $120.6 million, and $89.3 million for the years ended December 31, 2018, 2017, and 2016, respectively. As of December 31, 2018, the Company had a working capital surplus of $176.0 million and an accumulated deficit of $684.8 million. The Company has funded its operations primarily through the sale and issuance of common stock, convertible preferred stock, notes payable, and convertible notes. As of December 31, 2018, the Company had capital resources consisting of cash, cash equivalents, and short-term investments of $175.8 million. In January 2019, the Company completed a follow-on public offering (the "2019 follow-on offering") for net proceeds of $107.6 million after underwriting discounts, commissions and other offering expenses (Note 11). In January 2019, the Company received $27.0 million for an upfront payment net of foreign withholding tax from Shanghai Fosun Pharmaceutical (Group) Co., Ltd ("Fosun") (Note 3). The Company believes that its existing cash and cash equivalents will allow the Company to fund its operating plan through at least the next 12 months following the issuance of this Form 10-K and may identify additional capital resources to fund its operations.

### Basis of Presentation

The Consolidated Financial Statements of the Company include the Company's accounts and those of its wholly-owned subsidiaries, Revance Therapeutics Limited and Revance International Limited, and have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP"). The Company operates in one segment.

## 2. Summary of Significant Accounting Policies

### Principles of consolidation

The Consolidated Financial Statements include the accounts of the company and its wholly-owned subsidiaries. All intercompany transactions have been eliminated.

**REVANCE THERAPEUTICS, INC.**

**Notes to Consolidated Financial Statements — (Continued)**

**Use of Estimates**

The preparation of Consolidated Financial Statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the Consolidated Financial Statements and accompanying notes. Such management estimates include revenue recognition, deferred revenue, accruals including clinical trial accruals, stock-based compensation, fair value of derivative liability, impairment of long-lived assets and the valuation of deferred tax assets. The Company bases its estimates on historical experience and also on assumptions that it believes are reasonable; however, actual results could significantly differ from those estimates.

**Risks and Uncertainties**

The product candidates developed by the Company require approvals from the U.S. Food and Drug Administration ("FDA") or foreign regulatory agencies prior to commercial sales. There can be no assurance that the Company's current and future product candidates will meet desired efficacy and safety requirements to obtain the necessary approvals. If approval is denied or delayed, it may have a material adverse impact on the Company's business and its Consolidated Financial Statements.

The Company is subject to risks common to companies in the development stage including, but not limited to, dependency on the clinical and commercial success of its product candidates, ability to obtain regulatory approval of its product candidates, the need for substantial additional financing to achieve its goals, uncertainty of broad adoption of its approved products, if any, by physicians and consumers, significant competition and untested manufacturing capabilities.

**Concentration of Credit Risk**

Financial instruments that potentially subject the Company to a concentration of credit risk consist of short-term investments. Under the Company's investment policy, the Company limits its credit exposure by investing in highly liquid funds and debt obligations of the United States ("U.S.") government and its agencies with high credit quality. The Company's cash, cash equivalents, and short-term investments are held in the U.S. Such deposits may, at times, exceed federally insured limits. The Company has not experienced any significant losses on its deposits of cash, cash equivalents, and short-term investments.

**Cash and Cash Equivalents**

The Company considers all highly liquid investment securities with remaining maturities at the date of purchase of three months or less to be cash equivalents. Cash and cash equivalents may include deposit, money market funds, and debt securities.

**Restricted Cash**

As of December 31, 2018 and 2017, a deposit totaling $0.7 million was restricted from withdrawal. The Company has a deposit balance of approximately $0.5 million that relates to securing the Company's facility lease and will remain until the end of the lease. The remaining $0.2 million deposit balance relates to a letter of credit. These balances are included in restricted cash on the accompanying Consolidated Balance Sheets and within the cash, cash equivalents, and restricted cash balance on the Consolidated Statement of Cash Flows.

**Investments**

Investments generally consist of securities with original maturities greater than three months and remaining maturities of less than one year, while long-term investments generally consist of securities with remaining maturities greater than one year. The Company determines the appropriate classification of its investments at the time of purchase and reevaluates such determination at each balance sheet date. All of its investments are classified as available-for-sale and carried at fair value, with the change in unrealized gains and losses reported as a separate component of other comprehensive income (loss) on the Consolidated Statements of Operations and Comprehensive Loss and accumulated as a separate component of stockholders' equity on the Consolidated Balance Sheets. Interest income, net includes interest, dividends, amortization of purchase premiums and discounts, realized gains and losses on sales of securities and other-than-temporary declines in the fair value of investments, if any. The cost of securities sold is based on the specific-identification method. The Company monitors its investment portfolio for potential impairment on a quarterly basis. If the carrying amount of an investment in debt securities

ALGN-1364797
PTX-767.0145

exceeds its fair value and the decline in value is determined to be other-than-temporary, the carrying amount of the security is reduced to fair value and a loss is recognized in operating results for the amount of such decline. In order to determine whether a decline in value is other-than-temporary, the Company evaluates, among other factors, the cause of the decline in value, including the creditworthiness of the security issuers, the number of securities in an unrealized loss position, the severity and duration of the unrealized losses, and its intent and ability to hold the security to maturity or forecast recovery. The Company mitigates its credit risk by investing in money market funds, U.S. treasury securities, and U.S. government agency obligations which limits the amount of investment exposure as to credit quality and maturity.

Of the Company's total cash, cash equivalents, and short-term investments of $175.8 million and $282.9 million as of December 31, 2018 and 2017, respectively, the Company held cash, cash equivalents, and short-term investments with a total fair value of $87.7 million and $150.7 million as of December 31, 2018 and 2017, respectively, in an investment account with a related party, J.P. Morgan Securities LLC. As of December 31, 2018 and 2017, JPMorgan Chase & Co. and its wholly owned subsidiaries JPMorgan Chase Bank, National Association (NA), J.P. Morgan Investment Management Inc., and JPMorgan Asset Management (UK) Limited held approximately 3.8 million shares and 3.6 million shares, respectively, of the Company's common stock, which represents approximately 10.30% and 9.75% of the Company's outstanding common stock, respectively. J.P. Morgan Securities LLC, who acts as a custodian and trustee for certain Company investments, is an affiliate of JPMorgan Chase Bank, NA.

**Fair Value of Financial Instruments**

The Company uses fair value measurements to record fair value adjustments to certain financial and non-financial assets and liabilities to determine fair value disclosures. The accounting standards define fair value, establish a framework for measuring fair value, and require disclosures about fair value measurements. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required to be recorded at fair value, the principal or most advantageous market in which the Company would transact are considered along with assumptions that market participants would use when pricing the asset or liability, such as inherent risk, transfer restrictions, and risk of nonperformance. The accounting standard for fair value establishes a fair value hierarchy based on three levels of inputs, the first two of which are considered observable and the last unobservable, that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

The three levels of inputs that may be used to measure fair value are as follows:

| | | |
|---|---|---|
| Level 1 | — | Observable inputs, such as quoted prices in active markets for identical assets or liabilities. |
| Level 2 | — | Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. |
| Level 3 | — | Valuations based on unobservable inputs to the valuation methodology and including data about assumptions market participants would use in pricing the asset or liability based on the best information available under the circumstances. |

**Property and Equipment**

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Computer equipment, lab equipment and furniture and fixtures, and manufacturing equipment is depreciated generally over 3, 5, and 7 years, respectively. Repairs and maintenance that do not extend the life or improve an asset are expensed in the period incurred.

Leasehold improvements are depreciated over the lesser of 15 years or the term of the lease. Repairs and maintenance

are charged to operations as incurred. When assets are retired or otherwise disposed of, the costs and accumulated depreciation are removed from the Consolidated Balance Sheets and any resulting gain or loss is reflected in the Consolidated Statements of Operations and Comprehensive Loss in the period realized.

**Impairment of Long-Lived Assets**

The Company evaluates long-lived assets, such as property and equipment subject to depreciation, for impairment whenever events or changes in circumstances indicate that the carrying value of long-lived assets may not be recoverable. Events and changes in circumstances considered important that could result in an impairment review of long-lived assets include (i) a significant decrease in the market price of a long-lived asset; (ii) a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition; (iii) a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, including an adverse action or assessment by a regulator; (iv) an accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset; (v) a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset; and (vi) a current expectation that, more likely than not (more than 50 percent), a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The impairment evaluation of long-lived assets includes an analysis of estimated future undiscounted net cash flows expected to be generated by the long-lived assets over their remaining estimated useful lives. If the estimate of future undiscounted net cash flows is insufficient to recover the carrying value of the long-lived assets over the remaining estimated useful lives, the Company records an impairment loss in the amount by which the carrying value of the long-lived assets exceeds the fair value. Fair value is generally measured based on discounted cash flow analysis.

**Clinical Trial Accruals**

Clinical trial costs are charged to research and development expense as incurred. The Company accrues for expenses resulting from contracts with clinical research organizations (CROs), consultants, and clinical site agreements in connection with conducting clinical trials. The financial terms of these contracts are subject to negotiations, which vary from contract to contract and may result in payment flows that do not match the periods over which materials or services are provided to the Company under such contracts. The Company's objective is to reflect the appropriate expense in the Consolidated Financial Statements by matching the appropriate expenses with the period in which services and efforts are expended. In the event advance payments are made to a CRO, the payments will be recorded as a prepaid expense, which will be amortized as services are rendered.

The CRO contracts generally include pass-through fees including, but not limited to, regulatory expenses, investigator fees, travel costs and other miscellaneous costs. The Company determines accrual estimates through reports from and discussion with clinical personnel and outside services providers as to the progress or state of completion of trials, or the services completed. The Company estimates accrued expenses as of each balance sheet date based on the facts and circumstances known to the Company at that time. The Company's clinical trial accrual is dependent, in part, upon the receipt of timely and accurate reporting from the CROs and other third-party vendors.

**Revenue**

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers* (ASC 606), using the full retrospective transition method. The Company evaluated its prior contractual revenue arrangement with Precision Dermatology, Inc., which was acquired by Valeant Pharmaceuticals International Inc. ("Valeant") in 2014. After Valeant notified the Company that it intended to terminate the asset purchase and royalty agreement in 2015, the Company continued to receive royalties of $75,000 each quarter until November 2017 when the Company and Valeant entered into an asset transfer agreement to finalize the termination of the asset purchase and royalty agreement and Valeant returned the Relastin® intellectual property rights to the Company. Based on its evaluation, the Company determined that the new guidance had no impact to the revenue recognized prior to January 1, 2018 and, accordingly, had no impact on the accumulated deficit as of January 1, 2018.

The Company elected to use certain practical expedients permitted related to adoption (Note 3) and the adoption of ASC 606 had no impact on the Company's financial position, results of operations or liquidity. This standard applies to all contracts with customers, except for contracts that are within the scope of other standards, such as leases, insurance, collaboration arrangements and financial instruments. Under ASC 606, the Company recognizes revenue when its customer obtains control of promised goods or services, in an amount that reflects the consideration which the Company expects to receive in exchange for those goods or services.

To determine revenue recognition for arrangements that the Company determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that Company will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied.

***Licenses of intellectual property***

If the license to the Company's intellectual property is determined to be distinct from the other performance obligations identified in the arrangement, the Company recognizes revenue from non-refundable, up-front fees allocated to the license when the license is transferred to the customer and the customer is able to use and benefit from the license. For licenses that are determined to not represent distinct performance obligations, the Company utilizes judgment to assess the nature of the combined performance obligation to determine whether the combined performance obligation is satisfied over time or at a point in time and, if over time, the appropriate method of measuring proportional performance for purposes of recognizing revenue from non-refundable, up-front fees. The Company evaluates the measure of proportional performance each reporting period and, if necessary, adjusts the measure of performance and related revenue recognition.

***Milestone payments***

At the inception of each arrangement that includes development, regulatory or commercial milestone payments, the Company evaluates whether the milestones are considered probable of being reached and estimates the amount to be included in the transaction price. ASC 606 provides two alternatives to use when estimating the amount of variable consideration: the expected value method and the most likely amount method. Under the expected value method, an entity considers the sum of probability-weighted amounts in a range of possible consideration amounts. Under the most likely amount method, an entity considers the single most likely amount in a range of possible consideration amounts. Whichever method is used should be consistently applied throughout the life of the contract; however, it is not necessary for the Company to use the same approach for all contracts. If it is probable that a significant revenue reversal would not occur, the associated milestone value is included in the transaction price. Milestone payments that are not within the control of the Company or the licensee, such as regulatory approvals, are not considered probable of being achieved until those approvals are received. The transaction price is then allocated to each performance obligation (as determined to be appropriate) on a relative stand-alone selling price basis. The Company recognizes revenue as or when the performance obligations under the contract are satisfied. At the end of each subsequent reporting period, the Company re-evaluates the probability of achievement of each such milestone and any related constraint, and if necessary, adjusts its estimates of the overall transaction price. Any such adjustments are recorded on a cumulative catch-up basis, which would affect revenues and earnings in the period of adjustment.

***Royalties***

For arrangements that include sales-based royalties, including milestone payments based on the level of sales, and the license is deemed to be the predominant item to which the royalties relate, the Company recognizes revenue at the later of (i) when the related sales occur, or (ii) when the performance obligation to which some or all of the royalty has been allocated has been satisfied (or partially satisfied).

Up-front payments and fees are recorded as deferred revenue upon receipt or when due, and may require deferral of revenue recognition to a future period until the Company performs its obligations under these arrangements. Amounts payable to the Company are recorded as accounts receivable when the Company's right to consideration is unconditional. As a practical expedient, the Company does not assess whether a contract has a significant financing component if the expectation at contract inception is such that the period between payment by the customer and the transfer of the promised goods or services to the customer will be one year or less.

**Research and Development Expenditures**

Research and development expenditures are charged to operations as incurred. Research and development expenditures include, but are not limited to, personnel expenses, clinical trial supplies, fees for clinical trial services, manufacturing costs, consulting costs and allocated overhead, including rent, equipment, depreciation, and utilities.

**Income Taxes**

The Company accounts for income taxes under the asset and liability method. The Company estimates actual current tax exposure together with assessing temporary differences resulting from differences in accounting for reporting purposes and tax purposes for certain items, such as accruals and allowances not currently deductible for tax purposes. These temporary differences result in deferred tax assets and liabilities, which are included in the Company's Consolidated Balance Sheets. In general, deferred tax assets represent future tax benefits to be received when certain expenses previously recognized in the Company's Consolidated Statements of Operations and comprehensive loss become deductible expenses under applicable income tax laws or when net operating loss or credit carryforwards are utilized. Accordingly, realization of the Company's deferred tax assets is dependent on future taxable income against which these deductions, losses and credits can be utilized.

The Company must assess the likelihood that the Company's deferred tax assets will be recovered from future taxable income, and to the extent the Company believes that recovery is not likely, the Company establishes a valuation allowance. Based on the available evidence, the Company is unable, at this time, to support the determination that it is more likely than not that its deferred tax assets will be utilized in the future. Accordingly, the Company recorded a full valuation allowance as of December 31, 2018 and 2017. The Company intends to maintain valuation allowances until sufficient evidence exists to support its reversal.

**Stock-Based Compensation**

The Company has equity incentive plans under which various types of equity-based awards including, but not limited to, incentive stock options, non-qualified stock options, and restricted stock awards, may be granted to employees, non-employee directors, and non-employee consultants. The Company also has an inducement plan under which various types of equity-based awards, including non-qualified stock options and restricted stock awards, may be granted to new employees.

For all equity-based awards granted to employees, non-employee directors, and non-employee consultants, the Company recognizes compensation expense based on the estimated grant-date fair values. The grant-date fair value of stock options is determined using the Black-Scholes option pricing model. The grant-date fair value of restricted stock awards is based on the closing price of the Company's common stock on the date of grant. As of January 1, 2017, the Company adopted the forfeiture rate methodology change in accordance with ASU 2016-09 to account for forfeitures as they occur. Prior to the adoption of ASU 2016-09, the Company was required to estimate forfeitures at the time of grant and revised those estimates in subsequent periods if actual forfeitures differed from those estimates. The Company used historical data to estimate pre-vesting option forfeitures and record stock-based compensation expense only for those awards that were expected to vest. To the extent actual forfeitures differed from the estimates, the difference was recorded as a cumulative adjustment in the period that the estimates were revised.

For employees and non-employee directors, the value of the portion of the equity-based award that is ultimately expected to vest is recognized as expense ratably over the requisite service period. The value of the portion of the equity-based award for non-employee consultants prior to July 1, 2018 that is ultimately expected to vest was recognized in the same period and in the same manner as if the Company had paid cash for the goods or services received, which is generally over the period the Company expects to receive services from the non-employee consultant. As of July 1, 2018, the Company adopted ASU 2018-07, under which the equity-classified share-based payment awards to non-employees are measured at fair value on the grant date.

**Warrants**

The Company has issued freestanding warrants to purchase shares of common stock in connection with certain debt and lease transactions. The warrants are recorded at fair value using the Black-Scholes option pricing model. Common stock warrants classified as equity at inception are recorded to additional paid-in capital at fair value upon issuance.

ALGN-1364805
PTX-767.0153

**Derivative Liability**

The Company bifurcated and separately accounted for derivative instruments related to payment provisions underlying the Medicis settlement. This derivative is accounted for as a liability, which will be remeasured to fair value as of each balance sheet date, with changes in fair value recognized in the Consolidated Statements of Operations and Comprehensive Loss. The Company will continue to record adjustments to the fair value of the derivative liability associated with the Medicis settlement until the remaining settlement payment has been paid.

**Contingencies**

From time to time, the Company may have certain contingent liabilities that arise in the ordinary course of business activities. The Company accrues a liability for such matters when it is probable that future expenditures will be made and such expenditures can be reasonably estimated. The Company expects that contingencies related to regulatory approval milestones will only become probable once such regulatory outcome is achieved. The Company is not subject to any known current pending legal matters or claims that would have a material adverse effect on its financial position, results of operations or cash flows.

**Comprehensive Loss**

Comprehensive loss is defined as a change in equity of a business enterprise during a period, resulting from transactions from non-owner sources. For the years ended December 31, 2018, 2017 and 2016, the other comprehensive gain or loss in the Consolidated Statements of Operations and Comprehensive Loss was the immaterial unrealized gain or loss on its short-term investments.

**Net Loss per Share Attributable to Common Stockholders**

The Company's basic net loss per share attributable to common stockholders is calculated by dividing the net loss by the weighted average number of shares of common stock outstanding for the period, which includes vested restricted stock awards. The diluted net loss per share attributable to common stockholders is computed by giving effect to all potential dilutive common stock equivalents outstanding for the period. The diluted net loss per share attributable to common stockholders also includes vested restricted stock awards and, if the effect is not anti-dilutive, unvested restricted stock awards. For purposes of this calculation, options to purchase common stock, unvested restricted stock, and common stock warrants are considered common stock equivalents.

The following common stock equivalents were excluded from the computation of diluted net loss per share for the periods presented because including them would have been antidilutive:

| | As of December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Outstanding common stock options | 3,605,333 | 3,210,400 | 2,790,646 |
| Outstanding common stock warrants | 34,113 | 34,113 | 61,595 |
| Unvested restricted stock awards | 605,012 | 639,287 | 416,229 |

**Interest Expense**

Interest expense includes cash and non-cash components with the non-cash components consisting of interest capitalized for assets constructed for use in operations and effective interest recognized on the financing obligation.



ALGN-1364806
PTX-767.0154

**Recently Adopted Accounting Pronouncements**

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers*, which sets forth a single, comprehensive revenue recognition model for all contracts with customers to improve comparability. Subsequently, the FASB issued several standards related to ASU 2014-09 (collectively, the "New Revenue Standard"), including the most recent ASU, ASU 2017-14, *Income Statement - Reporting Comprehensive Income (Topic 220), and Revenue Recognition (Topic 605), Revenue from Contracts with Customers (Topic 606),* which was issued in November 2017. Under the New Revenue Standard, revenue is recognized when a customer obtains control of promised goods or services in an amount that reflects the consideration that the entity expects to receive in exchange for those goods or services. In addition, the New Revenue Standard requires expanded disclosures. This New Revenue Standard permits the use of either the retrospective or cumulative effect transition method when adopted. As of January 1, 2018, the Company adopted the New Revenue Standard on a retrospective basis and determined there was no material impact to the Company's Consolidated Financial Statements.

In October 2016, the FASB issued ASU 2016-16, *Income Taxes - Intra-Entity Transfers of Assets Other Than Inventory*, which requires entities to recognize income tax consequences of intra-entity transfer of assets other than inventory when the transfer occurs. The amendments in ASU 2016-16 are effective for annual reporting periods beginning after December 15, 2017, including interim reporting periods within those annual reporting periods and require a modified retrospective method of adoption. As of January 1, 2018, the Company adopted ASU 2016-16 and determined that the adoption of this standard did not have a material impact on the Company's Consolidated Financial Statements as the Company has a full valuation allowance.

In May 2017, the FASB issued ASU 2017-09, *Scope of Modification Accounting (Topic 718)*, which amends the scope of modification accounting for share-based payment arrangements. The amendment provides guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting. ASU 2017-09 is effective for fiscal years beginning after December 15, 2017, with early adoption permitted. The adoption of this standard on January 1, 2018 had no material impact to the Company's Consolidated Financial Statements.

In March 2018, the FASB issued ASU 2018-05, *Income Taxes (Topic 740) - Amendments to SEC Paragraphs Pursuant to SEC Staff Accounting Bulletin No. 118 ("SAB 118").* This standard amends Accounting Standards Codification 740, Income Taxes (ASC 740) to provide guidance on accounting for the tax effects of the Tax Cuts and Jobs Act passed in December 2017 (the "Tax Reform Act") pursuant to SAB 118, which allows companies to complete the accounting under ASC 740 within a one-year measurement period from the Tax Reform Act enactment date. This standard is effective upon issuance. The Company has completed its assessment of the accounting impact resulting from the Tax Reform Act in December 2018. The impact of the Tax Reform Act includes:

- a decrease in deferred tax assets resulting from the change in tax rate in the amount of $62.9 million;
- an increase of net operating loss of $43.5 million as a result of the reversal of the intra-entity transfer of certain intellectual properties, refer to Note 12. Income Taxes for further information related to this transaction;
- a decrease in net operating loss of $3.8 million related to a research and development credit adjustment.

The aggregated impact resulting from the Tax Reform Act to deferred taxes is $68.1 million, which continues to be fully offset by a valuation allowance.

In June 2018, the FASB issued ASU 2018-07, *Compensation - Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, to expand the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from non-employees. Under ASU 2018-07, equity-classified share-based payment awards to non-employees are measured at fair value on the grant date and the probability of satisfying performance conditions must be considered for equity-classified non-employee share-based payment awards with such conditions. ASU 2018-07 does not specify the period(s) or manner of expense recognition for share-based payment awards to non-employees other than to require that recognition occur in the same period(s) and in the same manner as if the grantor had paid cash for the goods or services. ASU 2018-07 is effective for fiscal years beginning after December 15, 2018, with early adoption permitted. The Company early adopted ASU 2018-07 as of July 1, 2018, and remeasured all outstanding equity-classified non-employee share-based payment awards at fair value as of the adoption date, and also recognized a cumulative-effect increase to the Company's opening 2018 accumulated deficit balance of less than $0.1 million in connection with the adoption and remeasurement.

In July 2018, the FASB issued ASU 2018-09, *Codification Improvements*. The amendments in ASU 2018-09 affect a wide variety of Topics in the FASB Codification and apply to all reporting entities within the scope of the affected accounting guidance. The Company has evaluated ASU 2018-09 in its entirety and determined that the amendments related to Topic 718-740, *Compensation-Stock Compensation-Income Taxes*, are the only provisions that currently apply to the Company. The amendments in ASU 2018-09 related to Topic 718-740, *Compensation-Stock Compensation-Income Taxes*, clarify that an entity should recognize excess tax benefits related to stock compensation transactions in the period in which the amount of the deduction is determined. This is consistent with how the Company has historically reported and accounted for windfall/shortfall amounts. The amendments in ASU 2018-09 related to Topic 718-740 are effective for fiscal years beginning after December 15, 2018, with early adoption permitted. The Company adopted this standard and determined it has no impact to the Company's Consolidated Financial Statements.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurements (Topic 820): Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement*. ASU 2018-13 modifies the disclosure requirements for fair value measurements in Topic 820 based on the objectives of the FASB Concepts Statement, Conceptual Framework for Financial Reporting - Chapter 8: Notes to Financial Statements which aims to improve the effectiveness of notes to financial statements while allowing for the appropriate exercise of discretion by reporting entities based on materiality. The main provisions of ASU 2018-13 include the removal or modification of certain non-essential disclosure requirements and the addition of new disclosure requirements for public companies related to the changes in unrealized gains and losses for the period included in other comprehensive income for recurring Level 3 fair value measurements held at the end of the reporting period, and the range and weighted average of significant unobservable inputs used to develop Level 3 fair value measurements. ASU 2018-13 is effective for fiscal years beginning after December 15, 2019 with early adoption permitted. The Company adopted ASU 2018-13 and determined it has no material impact to the Company's Consolidated Financial Statements.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)* which requires an entity to recognize right-of-use asset and lease liabilities arising from a lease for both financing and operating leases with terms greater than 12 months. In July 2018, the FASB issued ASU 2018-10, *Leases (Topic 842), Codification Improvements* and ASU 2018-11, *Leases (Topic 842), Targeted Improvements, to provide additional guidance for the adoption of Topic 842*. ASU 2018-10 clarifies certain provisions and correct unintended applications of the guidance such as the application of implicit rate, lessee reassessment of lease classification, and certain transition adjustments that should be recognized to earnings rather than to stockholders' equity. ASU 2018-11 provides an alternative transition method to allow entities initially applying Topic 842 at the adoption date, rather than at the beginning of the earliest comparative period presented, and recognizing the cumulative effect of applying the new standard as an adjustment to beginning retained earnings in the year of adoption while continuing to present all prior periods under previous lease accounting guidance. ASU 2018-11 also provides a number of optional practical expedients in transition. ASU 2018-11, ASU 2018-10, and ASU 2016-02 (collectively, "the new lease standards") are effective for fiscal years beginning after December 15, 2018, with early adoption permitted. The Company has elected the transition method under ASU 2018-11 at the adoption date of January 1, 2019 on a modified retrospective basis and will not restate comparative periods. The Company has also elected all of the available practical expedients except the practical expedient allowing the use of hindsight in determining the lease term and assessing impairment of right-of-use assets based on all facts and circumstances through the effective date of the new standard. The Company currently estimates that approximately $25 million and $28 million would be recognized as total right-of-use assets and total lease liabilities, respectively, on its Consolidated Balance Sheet as of January 1, 2019 for its existing operating lease agreements for the office and manufacturing spaces in Newark, California. The existing deferred rent liabilities of $3.5 million associated with the same lease agreements will also be reversed as of January 1, 2019. Other than disclosed, the Company does not expect the new standards to have a material impact on its other consolidated financial statements.

In February 2019, the Additional Premises under the Amended Lease commenced operation (Note 10). Based on the new lease standards adopted as of January 1, 2019, the Additional Premises under the Amended Lease is an operating lease. Under the terms of the Amended Lease, the payments escalate over the term of the Amended Lease to January 2027. The Company currently estimates that approximately $4 million would be recognized as additional right-of-use assets and total lease liabilities on its consolidated balance sheet as of commencement date.



ALGN-1364809
PTX-767.0157

In August 2018, the FASB issued ASU 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40) Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract.* The amendments in ASU 2018-15 align the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). Accordingly, the amendments require an entity (customer) in a hosting arrangement that is a service contract to follow the guidance in Subtopic 350-40 to determine which implementation costs to capitalize as an asset related to the service contract and which costs to expense. ASU 2018-15 is effective for fiscal years beginning after December 15, 2019 with early adoption permitted. The Company is evaluating the impact of this standard on its Consolidated Financial Statements and disclosures.

**3. Revenue**

**Mylan Collaboration and License Agreement**

***Agreement Terms***

On February 28, 2018, the Company and Mylan Ireland Limited ("Mylan"), a wholly-owned indirect subsidiary of Mylan N.V., entered into a collaboration agreement or the Mylan Collaboration, pursuant to which the Company and Mylan will collaborate exclusively, on a world-wide basis (excluding Japan), to develop, manufacture, and commercialize a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®.

Under the Mylan Collaboration, the Company is responsible for conducting initial non-clinical development activities with the goal of preparing for and conducting a scientific advice meeting with the FDA to receive feedback as to whether a biosimilar biological pathway is feasible for BOTOX®. The Company is solely responsible for these initial activities and the related costs. Upon completion of the initial activities, Mylan will decide whether to continue the development of the biosimilar. If the development is continued, the Company will be primarily responsible for (a) non-clinical development activities, (b) clinical development activities in North America, and (c) manufacturing and supply of clinical drug substance and drug product; and Mylan will be primarily responsible for (a) clinical development activities outside of North America (excluding Japan) (the "ex-U.S. Mylan territories"), (b) regulatory activities, and (c) commercialization for any approved product. The Company will be solely responsible for an initial portion of non-clinical development costs. The remaining portion of any non-clinical development costs and clinical development costs for obtaining approval in the U.S. and Europe will be shared equally between the parties, and Mylan will be responsible for all other clinical development costs and commercialization expenses. The Company and Mylan will form a joint steering committee, consisting of an equal number of members from the Company and Mylan, to oversee and manage the development, manufacturing and commercialization of the biosimilar. The parties expect to enter into a separate agreement covering supply of drug substance and drug product. In addition, Mylan may elect to have the drug product manufactured by another party, including a third-party contract manufacturing organization or a Mylan affiliate; however, Mylan may not manufacture or have manufactured the drug substance, rights to which are retained by the Company.

Under the Mylan Collaboration, the Company granted Mylan an exclusive, world-wide license (excluding Japan) to the Company's intellectual property rights for the development and commercialization of the biosimilar. The Company retained all rights in Japan and has retained rights in the U.S. and ex-U.S. Mylan territories to develop and manufacture the biosimilar for Mylan to commercialize.

Mylan paid the Company a non-refundable upfront payment of $25 million with additional contingent payments of up to $100 million in the aggregate, upon the achievement of specified clinical and regulatory (i.e. biosimilar biological pathway) milestones and of specified, tiered sales milestones of up to $225 million. The upfront payment does not represent a financing component for the transfer of goods or services. The contingent payments would be payable following Mylan's decision to continue development services for Initial Phase and Phase 3 clinical trials and upon meeting certain milestones. In addition, Mylan would pay the Company low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-U.S. Mylan territories. However, the Company agreed to waive royalties for U.S. sales, up to a limit of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs.



ALGN-1364810
PTX-767.0158

The term of the collaboration will continue, on a country-by-country basis, in perpetuity until terminated by either party pursuant to the terms of the Mylan Collaboration. Either party may terminate the agreement for breach by, or bankruptcy of, the other party. Mylan may terminate the Mylan Collaboration if a biosimilar development pathway is not deemed viable, with such determination only occurring after an advisory meeting with the FDA. Further, Mylan may terminate the Collaboration in its entirety or on a region-by-region basis. All rights, including licenses, and obligations terminate in the country or countries for which termination applies, with limited exceptions for royalty-bearing licenses to certain intellectual property rights, and rights to certain data, for the continued development and sale of the biosimilar in the country or countries for which termination applies.

***Revenue Recognition***

The Company identified the following material promises within the Mylan Collaboration: (1) intellectual property ("IP") license for technology and know-how related to the biosimilar, (2) the performance of initial development services for the biosimilar prior to the FDA advisory meeting, (3) the performance of development services, during the Initial Phase and Phase 3 clinical trials for the biosimilar through the filing of an Investigational New Drug ("IND") application by the Company, and (4) manufacturing services to provide drug substance or drug product during the initial development, development, and commercialization periods.

The Company considered that the license has standalone functionality and is capable of being distinct. However, the Company determined that the license is not distinct from the development and manufacturing services within the context of the agreement because the development and manufacturing services significantly increase the utility of the intellectual property.

Specifically, the Company's development, manufacturing and commercialization license can only provide benefit to Mylan in combination with the Company's development services during initial development, the Initial Phase study, and the Phase 3 study. The IP related to the biosimilar platform, which is proprietary to the Company, is the foundation for the development activities related to the treatment for all indications. The manufacturing services are a necessary and integral part of the development services as they could only be conducted utilizing the outcomes of these services. Given the development services under the Mylan Collaboration are expected to involve significant further development of the initial IP, the Company has concluded that the development and compound supply services are not distinct from the license, and thus the license, development services and compound supply services are combined into a single performance obligation. The nature of the combined performance obligation is to provide development and manufacturing services to Mylan under the arrangement.

The Company, following an evaluation, determined that Mylan's option to decide whether to continue the development after the FDA feedback is received represents a material right, because it includes consideration for the IP license, and provides economic value for the duration of the entire development period, defined as the initial development through regulatory approval. Further, in accordance with ASC 606, the Company elected to use a practical alternative to estimate the standalone fair value selling price of the material right, which is based on the cost of expected services to be provided for the duration of the contract.

In accordance with ASC 606, transaction price is defined as the amount of consideration to which an entity expects to be entitled in exchange for promised goods or services to a customer. The Company estimated the transaction price for the Mylan Collaboration using the most likely amount method. In order to determine the transaction price, the Company evaluated all of the payments to be received during the duration of the contract, which included milestones and consideration payable by Mylan. Other than the upfront payment, all other milestones and consideration the Company may earn under the Mylan Collaboration are subject to uncertainties related to development achievements, Mylan's rights to terminate the agreement, and estimated effort for cost-sharing payments. Components of such estimated effort for cost-sharing payments include both internal and external costs. Consequently, the transaction price does not include any milestones and considerations that, if included, could result in a probable significant reversal of revenue when related uncertainties become resolved. Sales-based milestones and royalties are not included in the transaction price until the sales occur because as the underlying value relate to the license, the license is the predominant feature in the Mylan Collaboration. The initial estimated transaction price of $81.0 million included the $25.0 million upfront payment, $40.0 million of development milestones, and estimated variable consideration for cost-sharing payments from Mylan. The Company re-evaluates the transaction price at each reporting period. As of December 31, 2018, the transaction price allocated to the unfulfilled performance obligations is $76.7 million.



ALGN-1364811
PTX-767.0159

The Company recognizes revenue and estimates deferred revenue based on the cost of services incurred over the total estimated cost of services to be provided for the development period. For revenue recognition purposes, the development period is estimated to extend through 2022. However, it is possible that this period will change and is assessed at each reporting date.

For the year ended December 31, 2018, the Company recognized revenue related to development services rendered of $3.7 million. As of December 31, 2018, the Company estimated short-term and long-term deferred revenue of $8.6 million and $12.7 million, respectively. The Company estimates that, if the option is exercised, long-term deferred revenue will be recognized over the completion of the Initial Phase and Phase 3 study development period. Nonetheless, it is reasonably possible that our estimated cost of total services to be provided could change.

**Fosun License Agreement**

***Agreement Terms***

In December 2018, the Company and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd ("Fosun"), entered into a license agreement (the "Fosun License Agreement") whereby Revance has granted Fosun the exclusive rights to develop and commercialize the Company's proprietary DAXI in mainland China, Hong Kong and Macau (the "Fosun Territory") and certain sublicense rights.

Under the Fosun License Agreement, the Company is eligible to receive a non-refundable upfront payment of $30.0 million within 30 business days of the date of the Fosun License Agreement, which was received in January 2019 net of foreign withholding tax of $3.0 million. The Company is also eligible to receive (i) additional contingent payments of up to $230.5 million upon the achievement of specified milestones based on (a) the submission and approval of biologics license applications (BLAs) for certain aesthetic and therapeutic indications and (b) first calendar year net sales, and (ii) tiered royalty payments in low double digit to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) the Company does not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third parties to either avoid patent infringement or market the product in the Fosun Territory.

Under the Fosun License Agreement, Fosun will have the right to import, develop, commercialize, market and sell the product in the Fosun Territory or engage service providers for such activities, and the Company will be responsible for manufacturing the product and supplying it to Fosun for its clinical and commercial activities in the Fosun Territory, subject to the terms of a supply agreement and a quality assurance agreement, each to be entered into between the parties in the six months following the date of the Fosun License Agreement. Except as provided in the Fosun License Agreement, each party has retained all of its intellectual property rights.

During the term of the Fosun License Agreement and an additional two years from the termination date if Fosun terminates the Fosun License Agreement, Fosun will not engage in any research, development, manufacture or commercialization of any product competitive with the product; provided that such non-compete restrictions will expire if the Company fails to submit a BLA for the product in the U.S. by the end of 2020. Under the Fosun License Agreement, Fosun and the Company will also establish a joint development committee, which will oversee the development and commercialization of the product as well as all clinical and pre-clinical studies to be conducted by Fosun for the product in the Fosun Territory.

The term of the Fosun License Agreement will continue until Fosun's payment obligations have been performed or have expired, unless sooner terminated by either party pursuant to the terms of the Fosun License Agreement. Either party may terminate the Fosun License Agreement for material breach by, or bankruptcy of, the other party. In addition, the Company may terminate the Fosun License Agreement if Fosun challenges the Company's patents, and Fosun may terminate the Fosun License Agreement upon 120 days notice. In the event of a change of control of the Company, the Company's successor will have the option to terminate the Agreement by paying Fosun a variable payment that depends on the stage of development of the product.



ALGN-1364812
PTX-767.0160

***Revenue Recognition***

The Company identified the following material promises within the Fosun License Agreement: (1) license to certain intellectual property and know-how related to DAXI, (2) development supplies to achieve regulatory approvals in the Fosun Territory, and (3) future commercial product supplies. The Company retained all manufacturing rights and know-how due to complexities associated with the risks and management of toxins and transferability of the underlying technology. Since the manufacturing rights and know-how, which are highly specialized and complex, do not transfer, Fosun cannot benefit from the license on its own or together with other readily available resources without the supplies provided by Revance. Accordingly, the license is not distinct from the other material promises and are bundled into a single performance obligation.

In accordance with ASC 606, transaction price is defined as the amount of consideration to which an entity expects to be entitled in exchange for promised goods or services to a customer. The Company estimated the transaction price for the Fosun License Agreement using the most likely amount method. The Company evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered, and concluded only a certain milestone of $1.0 million was included in the transaction price. The Company will re-evaluate the transaction price at each reporting period and upon a change in circumstances. As of December 31, 2018, the transaction price allocated to unfulfilled performance obligation is $31.0 million.

The Company will recognize revenue on the single performance obligation as control of the manufactured product is supplied to Fosun. As of December 31, 2018, the full $31.0 million transaction price is deferred as no supply has been provided under the agreement. Upon commencement of the transfer of control, revenue will be recognized in a pattern consistent with estimated deliveries of the product through the term of the arrangement, which is estimated to extend through 2039. However, it is possible that this period will change and is assessed at each reporting date. The estimated contract term for revenue recognition purposes is not limited or impacted by Fosun's ability to terminate the agreement to due to a substantive significant termination penalty from non-refundable payments.

No revenue has been recognized from the Fosun License Agreement for the year ended December 31, 2018. The $30 million non-refundable upfront payment is included in long-term deferred revenue as of December 31, 2018.

**4. In-Process Research and Development**

In June 2016, the Company and Botulinum Toxin Research Associates, Inc. ("BTRX") entered into an asset purchase agreement (the "BTRX Purchase Agreement"). Under the BTRX Purchase Agreement, the Company acquired all rights, title and interest in a portfolio of botulinum toxin-related patents and patent applications from BTRX and was granted the right of first negotiation and first refusal with respect to other botulinum toxin-related patents owned or controlled by BTRX. In exchange, the Company agreed to an upfront expenditure of $2.0 million of which $1.8 million was paid immediately, $0.1 million was paid in June 2017, and the remaining $0.1 million was paid in May 2018. The Company also agreed to pay up to an additional $16.0 million in aggregate upon satisfaction of milestones relating to the Company's product revenue, intellectual property, and clinical and regulatory events. As of December 31, 2018, a one-time intellectual property development milestone liability of $1.0 million has been recorded in accruals and other current liabilities.

Pursuant to the guidance prescribed in Accounting Standards Codification Topic 805, *Business Combinations*, the Company concluded that the BTRX Purchase Agreement did not meet the criteria of a business combination. During 2016, the Company accounted for the initial $2.0 million expenditure as research and development expense, as future alternative use of the acquired assets was deemed contingent upon the successful outcome of existing research and development activities as of the transaction date.

**5. Medicis Settlement**

In July 2009, the Company and Medicis Pharmaceutical Corporation ("Medicis") entered into a license agreement granting Medicis worldwide aesthetic and dermatological rights to the Company's investigational, injectable botulinum toxin type A product candidate. In October 2012, the Company entered into a settlement and termination agreement with Medicis. The terms of the settlement provided for the reacquisition of the rights related to all territories of DAXI and DaxibotulinumtoxinA Topical from Medicis and for consideration payable by the Company to Medicis of up to $25.0 million, comprised of (i) an upfront payment of $7.0 million, which was paid in 2012, (ii) a proceeds sharing arrangement payment of $14.0 million due upon specified capital raising achievements by the Company, of which $6.9 million was paid in 2013 and $7.1 million in 2014, and (iii) a product approval payment of $4.0 million to be paid upon the achievement of regulatory approval for DAXI or DaxibotulinumtoxinA Topical by the Company. Medicis was subsequently acquired by Valeant in December 2012.

The Company determined that the settlement provisions related to the proceeds sharing arrangement payment in (ii) above and product approval payment in (iii) above were derivative instruments that require fair value accounting as a liability and periodic fair value remeasurements until settled.

The fair value of the product approval payment derivative was determined by estimating the timing and probability of the related approval and multiplying the payment amount by this probability percentage then applying a discount factor. As of December 31, 2017, the fair value of the product approval payment derivative of $2.6 million was determined by updating the timing and probability estimate of the related approval and applying a discount factor assuming a term of 2.5 years, a risk-free rate of 2.0% and a credit risk adjustment of 6.5%. As of December 31, 2018, the Company determined the fair value of its liability for the product approval payment was $2.7 million, which was measured by assuming a term of 1.5 years, a risk-free rate of 2.6% and a credit risk adjustment of 8.0%. The Company's assumption for the expected term is based on an expected BLA approval in 2020. The Company did not make any payments under the product approval payment during the years ended December 31, 2018 and 2017.

As a result of the fair value remeasurements during the years ended December 31, 2018, 2017, and 2016, the Company recognized aggregate losses of $0.1 million, $0.6 million, and $0.6 million, respectively.



ALGN-1364814
PTX-767.0162

### 6. Cash Equivalents and Short-term Investments

The Company's cash equivalents and short-term investments consist of money market funds, U.S. treasury securities, and U.S. government agency obligations, which are classified as available-for-sale securities.

The following table is a summary of amortized cost, unrealized gain and loss, and fair value:

| | December 31, 2018 | | | | December 31, 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | | Unrealized | | | | Unrealized | | |
| (in thousands) | Cost | Gains | Losses | Fair Value | Cost | Gains | Losses | Fair Value |
| Money market funds | $ 38,354 | $ — | $ — | $ 38,354 | $ 236,744 | $ — | $ — | $ 236,744 |
| U.S. treasury securities | 80,844 | 5 | (5) | 80,844 | — | — | — | — |
| U.S. government agency obligations | 52,586 | — | (8) | 52,578 | — | — | — | — |
| Total cash equivalents and available-for-sale securities | $ 171,784 | $ 5 | $ (13) | $ 171,776 | $ 236,744 | $ — | $ — | $ 236,744 |
| | | | | | | | | |
| Classified as: | | | | | | | | |
| Cash equivalents | | | | $ 69,220 | | | | $ 236,744 |
| Short-term investments | | | | 102,556 | | | | — |
| Total cash equivalents and available-for-sale securities | | | | $ 171,776 | | | | $ 236,744 |

There have been no significant realized gains or losses on available-for-sale securities for the periods presented. There were no significant available-for-sale securities held as of December 31, 2018 that have been in a continuous unrealized loss position for more than 12 months. The unrealized gains and losses are included in "accumulated other comprehensive loss" within stockholders' equity on the Consolidated Balance Sheets as of December 31, 2018. The unrealized losses on available-for-sale investments are not attributed to credit risk and are considered temporary. The Company believes that it is more-likely-than-not that investments in an unrealized loss position will be held until maturity or the cost basis of the investment is recovered. The Company believes it has no other-than-temporary impairments on its securities as it does not intend to sell these securities and does not believe it is more-likely-than not that it will be required to sell these securities before the recovery of their amortized cost basis. To date, the Company has not recorded any impairment charges on marketable securities related to other-than-temporary declines in fair value. The Company's cash equivalent and short-term investments are due within one year.



ALGN-1364815
PTX-767.0163

## 7. Fair Value Measurements

The carrying values of cash, prepaid expenses and other current assets, accounts payable, and accruals and other current liabilities approximate fair value due to the short maturities of these instruments.

The Company measures and reports certain financial instruments as assets and liabilities at fair value on a recurring basis. The fair value of these instruments was as follows:

| | As of December 31, 2018 | | | |
|---|---|---|---|---|
| (in thousands) | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| Money market funds | $ 38,354 | $ 38,354 | $ — | $ — |
| U.S. treasury securities | 80,844 | 80,844 | — | — |
| U.S. government agency obligations | 52,578 | — | 52,578 | $ — |
| Total assets measured at fair value | $ 171,776 | $ 119,198 | $ 52,578 | $ — |
| **Liabilities** | | | | |
| Derivative liability associated with the Medicis settlement | $ 2,753 | $ — | $ — | $ 2,753 |
| Total liabilities measured at fair value | $ 2,753 | $ — | $ — | $ 2,753 |

| | As of December 31, 2017 | | | |
|---|---|---|---|---|
| (in thousands) | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| Money market funds | $ 236,744 | $ 236,744 | $ — | $ — |
| Total assets measured at fair value | $ 236,744 | $ 236,744 | $ — | $ — |
| **Liabilities** | | | | |
| Derivative liability associated with the Medicis settlement | $ 2,613 | $ — | $ — | $ 2,613 |
| Total liabilities measured at fair value | $ 2,613 | $ — | $ — | $ 2,613 |

The fair value of the investments classified under U.S. government agency obligations is estimated by taking into consideration valuations obtained from third-party pricing services. The pricing services utilize industry standard valuation models, including both income and market-based approaches, for which all significant inputs are observable, either directly or indirectly, to estimate fair value. The primary inputs include reported trades of and broker/dealer quotes on the same or similar securities. Changes in the ability to observe valuation inputs may result in a reclassification of levels of certain securities within the fair value hierarchy. The Company did not transfer any assets or liabilities measured at fair value on a recurring basis to or from Level 1 and Level 2 during the years ended December 31, 2018 and 2017.



ALGN-1364816
PTX-767.0164

The following table sets forth a summary of the changes in the fair value of the Company's Level 3 financial instruments as follows:

| (in thousands) | Derivative liability associated with the Medicis settlement | |
|---|---|---|
| Fair value as of December 31, 2017 | $ | 2,613 |
| Change in fair value | | 140 |
| Fair value as of December 31, 2018 | $ | 2,753 |

The fair value of the derivative liability resulting from the Medicis litigation settlement was determined by estimating the timing and probability of the related regulatory approval and multiplying the payment amount by this probability percentage and a discount factor based primarily on the estimated timing of the payment and a credit risk adjustment (Note 5). Generally, increases or decreases in these unobservable inputs would result in a directionally similar impact to the fair value measurement of these derivative instruments. The significant unobservable inputs used in the fair value measurement of the product approval payment derivative are the expected timing and probability of the payments at the valuation date and the credit risk adjustment.

## 8. Balance Sheet Components

### Property and Equipment, net

Property and equipment, net consists of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| (in thousands) | 2018 | | 2017 | |
| Manufacturing equipment | $ | 11,307 | $ | 11,989 |
| Construction in progress | | 8,925 | | 4,335 |
| Leasehold improvements | | 4,752 | | 4,255 |
| Computer equipment and software | | 2,650 | | 1,567 |
| Furniture and fixtures | | 787 | | 635 |
| Total property and equipment | | 28,421 | | 22,781 |
| Less: Accumulated depreciation | | (13,972) | | (13,531) |
| Property and equipment, net | $ | 14,449 | $ | 9,250 |

### Loss on Impairment

The Company constructed a fill/finish line for the future commercial manufacturing of its DaxibotulinumtoxinA Topical product candidate and to support its clinical trials and regulatory license applications.

During the year ended December 31, 2016, following the results of the REALISE 1 Phase 3 clinical trial for crow's feet, the Company discontinued its DaxibotulinumtoxinA Topical clinical development programs for the treatment of crow's feet and for the treatment of primary axillary hyperhidrosis. The Company performed an impairment analysis of the DaxibotulinumtoxinA Topical fill/finish line and other fixed assets to determine fair value based on highest and best use. The Company concluded that only certain equipment comprising the DaxibotulinumtoxinA Topical fill/finish line would be repurposed for commercial-scale manufacturing of DAXI. As a result, the Company determined fair value based on its highest and best use and that for certain components of the fill/finish line and other fixed assets, the carrying value of the assets was not entirely recoverable and the fair

value, which was calculated using the market or cost approach depending on the specific asset, was lower than the carrying value. Accordingly, during the year ended December 31, 2016, the Company recorded a loss on impairment of $9.1 million. As of December 31, 2016, the fill/finish line and other fixed assets had net book values of $5.1 million and $0.2 million, respectively.



**ALGN-1364818**
PTX-767.0166

During the year ended December 31, 2017, the Company identified a subsequent indicator of impairment, an adverse change in the market value resulting from further negotiations with a potential buyer during the year, for the DaxibotulinumtoxinA Topical fill/finish line and other fixed assets. The Company continues to believe that certain equipment comprising the DaxibotulinumtoxinA Topical fill/finish line with a net book value of $2.4 million will be repurposed for commercial-scale manufacturing of DAXI. As a result, the Company determined fair value based on its highest and best use and that for certain components of the fill/finish line and other fixed assets, the carrying value of the assets was not entirely recoverable and the fair value, which was calculated using the market or cost approach depending on the specific asset, was lower than the carrying value. Accordingly, the Company recorded a loss on impairment of $2.9 million during the year ended December 31, 2017. Nonetheless, it is reasonably possible that our estimate of the recoverability of the equipment's carrying value could change, and may result in the need to further write down the assets to fair value.

During the year ended December 31, 2018, the Company sold certain components relating to the fill/finish line manufacturing equipment and recognized a gain of $1.5 million, which is recorded in research and development expenses in the Consolidated Statements of Operations and Comprehensive Loss. There was no impairment of long-lived assets during the year ended December 31, 2018.

**Accruals and Other Current Liabilities**

Accruals and other current liabilities consist of the following:

| | As of December 31, | |
|---|---|---|
| **(in thousands)** | **2018** | **2017** |
| Accruals related to: | | |
| Compensation [1] | $ 6,743 | $ 5,763 |
| Clinical trial expenses | 4,021 | 3,189 |
| Professional service fees | 2,272 | 1,773 |
| Nonrecurring milestone payment | 1,000 | — |
| Manufacturing and quality control costs | 260 | 488 |
| Fixed assets and construction-in-progress obligations | 111 | 302 |
| Other current liabilities | 541 | 710 |
| Total accruals and other current liabilities | $ 14,948 | $ 12,225 |

[1] The Company recorded $1.3 million and $0.9 million for vacation accruals as of December 31, 2018 and 2017, respectively.

## 9. Notes Payable

### Essex Capital Notes

On December 20, 2013, the Company signed a Loan and Lease Agreement ("Original Agreement") to borrow up to $10.8 million in the form of Secured Promissory Notes from Essex Capital, or the Essex Notes, to finance the completion and installation of the Company's DaxibotulinumtoxinA Topical commercial fill/finish line, or the Fill/Finish Line. In December 2013 and January 2014, the Company withdrew a total of $5.0 million under the terms of the Original Agreement. In May 2014, pursuant to the terms of the Original Agreement, the Company sold equipment to Essex Capital, resulting in partial settlement of the outstanding loan balance of $1.1 million, and leased the equipment back for fixed monthly payments to be paid over 3 years.

On December 17, 2014, the Company entered into the First Amendment to the Loan and Lease Agreement ("First Amendment") with Essex Capital. Under the terms of the First Amendment, the Company agreed to repay the outstanding debt balance of $3.9 million and issued a warrant to purchase 44,753 shares of common stock.

ALGN-1364820
PTX-767.0168

In February 2015, the Company executed the Second Amendment to the Loan and Lease Agreement, under which the term of the facility was extended to April 15, 2015 and the purchase price for the remainder of the equipment was increased by $0.1 million to approximately $9.8 million. Concurrently with this sale, the Company leased the equipment back from Essex Capital for a fixed monthly payment to be paid monthly over 3 years.

None of the leases qualified for sale-leaseback accounting due to the Company's continuing involvement in the equipment. Therefore, the Company accounted for these transactions as financing obligations using the effective interest rate method.

The leases provide for the option to purchase the leased equipment for 10% of the original purchase amount and, in June 2015, the Company exercised its option to purchase the remainder of the equipment sold and leased back from Essex Capital for 10% of the original purchase amount, or approximately $1.1 million, at the conclusion of the lease terms. In May 2017, the Company paid $0.1 million to purchase the equipment sold and leased back from Essex Capital in May 2014.

The Company paid principal and interest payments on the Essex Capital Lease of $0.9 million during the first quarter of 2018. In April 2018, the Company paid $1.0 million to purchase the remaining equipment sold and leased back, which excludes sales and use taxes paid, from Essex Capital and there are no remaining commitments or liabilities payable to Essex Capital.

## 10. Commitments and Contingencies

### Leases

In January 2010, the Company entered into a non-cancelable facility lease (the "Lease") that requires monthly payments through January 2022. We use this facility for research, manufacturing, commercial and administrative functions. In February 2014, the Company extended the term of the Lease by 36 months to January 2025. In May 2018, the Company further extended the term of the Lease for its existing facility by 24 months to January 2027 and amended the Lease to expand the existing premises by approximately 19,000 square feet ("Additional Premises"), commencing in February 2019 (the "Amended Lease"). The Lease is an operating lease. Under the terms of the amended lease agreements, the payments escalate over the term of the Lease with the exception of a decrease in payments at the beginning of 2022. The Company recognizes the expense on a straight-line basis over the life of the lease. Rent expense was $5.5 million for the year ended December 31, 2018 and $5.3 million for each of the years ended December 31, 2017 and 2016. The Company also has insignificant non-cancelable equipment operating leases.

As of December 31, 2018, the aggregate total future minimum lease payments under non-cancelable operating leases were as follows:

| Year Ending December 31, | | (in thousands) |
|---|---|---|
| 2019 | $ | 5,826 |
| 2020 | | 6,011 |
| 2021 | | 6,196 |
| 2022 | | 4,696 |
| 2023 and thereafter | | 20,173 |
| Total payments | $ | 42,902 |

The total future minimum lease payments for the Additional Premises are $6.1 million, of which $0.5 million, $0.7 million, $0.8 million, and $0.8 million is for the years ended December 31, 2019, 2020, 2021, and 2022, respectively, and $3.3 million is for the years ended December 31, 2023 and thereafter.

ALGN-1364822
PTX-767.0170

**Purchase Commitments**

In March 2017, the Company entered into a Technology Transfer, Validation and Commercial Fill/Finish Services Agreement (the "Althea Services Agreement") with Ajinomoto Althea, Inc.("Althea"), a contract development and manufacturing organization, to provide us with expanded capacity and a second source for drug product manufacturing to support a global launch of DAXI. The Althea Services Agreement has an initial term that will expire in 2024, unless terminated sooner by either party. In accordance with the Althea Services Agreement, the Company will have minimum purchase obligations based on its production forecasts. As of December 31, 2018, the Company made non-refundable advanced payments of $1.9 million in accordance with the terms of the Althea Services Agreement. The remaining services are cancellable at any time, with the Company required to pay costs incurred through the cancellation date.

**Contingencies**

The Company has one remaining future milestone payment to List Biological Laboratories, Inc. ("List Laboratories"), a developer of botulinum toxin, of $2.0 million due and payable on the achievement of a certain regulatory milestone. The milestone has not yet been achieved. The Company is also obligated to pay royalties to List Laboratories on future sales of botulinum toxin products.

The Company has obligations to pay BTRX up to a remaining $16.0 million in the aggregate upon the satisfaction of milestones relating to the Company's product revenue, intellectual property, and clinical and regulatory events (Note 4). As of December 31, 2018, a one-time intellectual property development milestone liability of $1.0 million has been recorded in accruals and other current liabilities.

In April 2016, the Company entered into an agreement with BioSentinel, Inc. to in-license their technology and expertise for research and development and manufacturing purposes. In addition to minimum quarterly use fees, the Company has a one-time future milestone payment of $0.3 million payable to BioSentinel, Inc. upon the achievement of regulatory approval. The milestone has not yet been achieved.

**Indemnification**

The Company enters into standard indemnification agreements in the ordinary course of business. Pursuant to these arrangements, the Company indemnifies, holds harmless, and agrees to reimburse the indemnified parties for losses suffered or incurred by the indemnified party, in connection with any trade secret, copyright, patent or other intellectual property infringement claim by any third party with respect to its technology. The term of these indemnification agreements is generally perpetual after the execution of the agreement. The maximum potential amount of future payments the Company could be required to make under these agreements is not determinable because it involves claims that may be made against the Company in the future, but have not yet been made. The Company has not incurred costs to defend lawsuits or settle claims related to these indemnification agreements.

The Company has entered into indemnification agreements with its directors and officers that may require the Company to indemnify them against liabilities that may arise by reason of their status or service as directors or officers, other than liabilities arising from willful misconduct of the individual.

No amounts associated with such indemnifications have been recorded for the year ended December 31, 2018.

**11. Stockholders' Equity**

**Convertible Preferred Stock**

The par value of convertible preferred stock is $0.001 per share. As of December 31, 2018 and 2017, the Company had 5,000,000 shares authorized and no preferred stock issued and outstanding.



ALGN-1364823
PTX-767.0171

**Warrants**

During the year ended December 31, 2016, no warrants were exercised. As of December 31, 2016, the Company had warrants to purchase 61,595 shares of common stock outstanding with a weighted average exercise price of $16.78 and with exercise prices ranging from $14.40 to $31.50. During the year ended in December 31, 2017, warrants to purchase 27,482 shares were net exercised for 9,878 shares of common stock with exercise price per share ranging from $14.95 to $31.50 in accordance with the terms of the warrant agreement. During the year ended December 31, 2018, no warrants were exercised. As of both December 31, 2018 and December 31, 2017, the Company had outstanding warrants to purchase 34,113 shares of common stock at weighted average exercise price per share of $14.95 and expire in 2020.

**Stock Option Plan**

***Equity Incentive Plans***

On January 23, 2014, the stockholders' approved the adoption of the 2014 Equity Incentive Plan ("2014 EIP"). The number of shares of common stock reserved for issuance under the Company's 2014 EIP will automatically increase on January 1 of each year, beginning on January 1, 2015, and continuing through and including January 1, 2024, by 4% of the total number of shares of the Company's capital stock outstanding on December 31 of the preceding calendar year or a lesser number of shares determined by the Company's Board of Directors. The maximum number of shares that may be issued upon the exercise of incentive stock options, or ISOs, under the Company's 2014 EIP is 2,000,000 shares. The 2014 EIP provides for the grant of ISOs, non-statutory stock options, or NSOs, stock appreciation rights, restricted stock awards, restricted stock unit awards, performance-based stock awards, and other forms of equity compensation, all of which may be granted to employees, including officers, non-employee directors and consultants of the Company and its affiliates. Additionally, the 2014 EIP provides for the grant of performance cash awards. ISOs may be granted only to employees. All other awards may be granted to employees, including officers, and to non-employee directors and consultants. Under the 2014 EIP, options may be granted with different vesting terms from time to time, but not to exceed 10 years from the date of grant. Upon the effectiveness of the 2014 EIP, the Company ceased granting any equity awards under the 2012 Equity Incentive Plan and any cancelled or forfeited shares under the 2012 and 2002 Equity Incentive Plans will be retired.

On January 1, 2018, the number of shares of common stock reserved for issuance under the 2014 EIP, automatically increased by 4% of the total number of shares of the Company's common stock outstanding on December 31, 2017, or 1,460,643 shares. During the year ended December 31, 2018, the Company granted stock options for 926,650 shares of common stock and 339,500 restricted stock awards under the 2014 EIP. These grants included non-employee directors' stock option grants for 36,000 shares and restricted stock award grants of 18,000 shares. As of December 31, 2018, there were 1,681,760 shares available for issuance under the 2014 EIP.

***2014 Inducement Plan***

On August 26, 2014, the Company's Board of Directors authorized the adoption of the 2014 Inducement Plan ("2014 IN"), which became effective immediately. Stockholder approval of the 2014 IN was not required pursuant to Rule 5635 (c)(4) of the Nasdaq Listing Rules. The 2014 IN reserves 325,000 shares of common stock and provides for the grant of NSOs that will be used exclusively for grants to individuals that were not previously employees or directors of the Company, as an inducement material to the individual's entry into employment with the Company. On December 14, 2015, the Company's Board of Directors authorized an additional 500,000 shares of common stock to be reserved for issuance under the 2014 IN. Under the 2014 IN, options may be granted with different vesting terms from time to time, but not to exceed 10 years from the date of grant. During the year ended December 31, 2018, the Company granted stock options for 210,000 shares of common stock and 34,000 restricted stock awards under the 2014 IN. As of December 31, 2018, there were 157,861 shares available for issuance under the 2014 IN.

Under the 2014 EIP and the 2014 IN plan, restricted stock awards typically vest annually over 1, 3, or 4 years, while options typically vest over four years, either with 25% of the total grant vesting on the first anniversary of the option grant date and 1/36th of the remaining grant vesting each month thereafter or 1/48th vesting monthly.

The following summary of stock option and restricted stock award activity, excluding 2014 IN, for the periods presented is as follows:

| | Number of Shares Available for Grant | Number of Shares Underlying Outstanding Options | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Life (in Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | | | | | (In thousands) |
| Balance as of December 31, 2015 | 273,948 | 2,381,486 | $ 18.36 | | |
| Additional shares reserved | 1,131,538 | — | — | | |
| Options granted | (839,800) | 839,800 | 16.72 | | |
| Restricted stock awards granted | (299,900) | 299,900 | — | | |
| Options exercised | — | (131,752) | 10.67 | | |
| Options cancelled/forfeited | 320,084 | (320,084) | 21.77 | | |
| Restricted stock awards forfeited | 80,333 | (80,333) | — | | |
| Restricted stock awards released | — | (124,344) | — | | |
| Shares cancelled/retired under 2002/2012 plans | — | (38,829) | 8.92 | | |
| Net settlement of restricted stock awards for employee taxes | 23,289 | — | — | | |
| Balance as of December 31, 2016 | 689,492 | 2,825,844 | 17.92 | | |
| Additional shares reserved | 1,145,958 | — | — | | |
| Options granted | (925,525) | 925,525 | 21.65 | | |
| Restricted stock awards granted | (340,525) | 340,525 | — | | |
| Options exercised | — | (309,341) | 12.88 | | |
| Options cancelled/forfeited | 230,734 | (230,734) | 22.81 | | |
| Restricted stock awards forfeited | 81,905 | (81,905) | — | | |
| Restricted stock awards released | — | (117,218) | — | | |
| Shares cancelled/retired under 2002/2012 plans | — | (696) | 8.94 | | |
| Net settlement of restricted stock awards for employee taxes | 21,010 | — | — | | |
| Balance as of December 31, 2017 | 903,049 | 3,352,000 | 19.29 | | |
| Additional shares reserved | 1,460,643 | — | — | | |
| Options granted | (926,650) | 926,650 | 28.67 | | |
| Restricted stock awards granted | (339,500) | 339,500 | — | | |
| Options exercised | — | (293,100) | 15.45 | | |
| Options cancelled/forfeited | 423,096 | (423,096) | 25.66 | | |
| Restricted stock awards forfeited | 101,218 | (101,218) | — | | |
| Restricted stock awards released | — | (198,213) | — | | |
| Net settlement of restricted stock awards for employee taxes | 59,904 | — | — | | |

| | | | | | |
|---|---|---|---|---|---|
| Balance as of December 31, 2018 | 1,681,760 | 3,602,523 | $ 21.63 | 7.13 | $ 8,071 |
| Exercisable as of December 31, 2018 | | 1,853,452 | $ 19.47 | 6.11 | $ 7,274 |

The intrinsic values of outstanding and exercisable options were determined by multiplying the number of shares by the difference in exercise price of the options and the fair value of the common stock as of December 31, 2018.

The total intrinsic values of options exercised as of December 31, 2018, 2017 and 2016 of $1.5 million, $7.1 million, and $1.3 million, respectively, were determined by multiplying the number of shares by the difference between exercise price of the options and the fair value of the common stock as of December 31, 2018, 2017, and 2016 of $20.13, $35.75 and $20.70 per share, respectively.

The following table summarizes the stock option activity for the 2014 IN is as follows:

| | Number of Shares Available for Grant | Number of Shares Underlying Outstanding Options and Awards | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Life (in Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| | | | | | (In thousands) |
| Balance as of December 31, 2015 | 449,889 | 354,219 | $ 31.46 | | |
| Options granted | (110,000) | 110,000 | 18.37 | | |
| Restricted stock awards granted | (15,000) | 15,000 | — | | |
| Option forfeitures | 88,594 | (88,594) | 22.97 | | |
| Restricted stock awards released | — | (9,594) | — | | |
| Net settlement of restricted stock awards for employee taxes | 3,604 | — | — | | |
| Balance as of December 31, 2016 | 417,087 | 381,031 | 29.43 | | |
| Options granted | (35,000) | 35,000 | 24.40 | | |
| Restricted stock awards granted | (95,000) | 95,000 | — | | |
| Restricted stock awards released | — | (13,344) | — | | |
| Net settlement of restricted stock awards for employee taxes | 5,009 | — | — | | |
| Balance as of December 31, 2017 | 292,096 | 497,687 | 28.96 | | |
| Options granted | (210,000) | 210,000 | 26.71 | | |
| Restricted stock awards granted | (34,000) | 34,000 | — | | |
| Option forfeitures | 25,521 | (25,521) | 24.40 | | |
| Restricted stock award forfeitures | 71,250 | (71,250) | — | | |
| Restricted stock awards released | — | (37,094) | — | | |
| Net settlement of restricted stock awards for employee taxes | 12,994 | — | — | | |
| Balance as of December 31, 2018 | 157,861 | 607,822 | $ 28.32 | 7.82 | $ 194 |
| Exercisable as of December 31, 2018 | | 261,791 | $ 29.34 | 6.67 | $ 133 |



ALGN-1364828
PTX-767.0176

The following table summarizes information with respect to stock options outstanding and currently exercisable as of December 31, 2018:

| | Options Outstanding | | |
|---|---|---|---|
| Exercise Price | Number of Options | Weighted-Average Remaining Contractual Life (In Years) | Options Exercisable |
| $0.45 - 9.15 | 430,333 | 4.41 | 430,333 |
| $13.35 - 16.23 | 406,389 | 6.44 | 335,718 |
| $16.3 - 18.37 | 423,042 | 7.16 | 298,893 |
| $18.7 - 19.7 | 391,547 | 8.09 | 180,069 |
| $19.91 - 24.96 | 442,443 | 8.48 | 167,039 |
| $25.3 - 29.15 | 656,654 | 8.52 | 176,065 |
| $29.4 - 32.22 | 587,175 | 6.88 | 360,415 |
| $32.25 - 34.08 | 51,000 | 8.53 | 9,399 |
| $35.95 - 35.95 | 10,500 | 8.94 | 2,625 |
| $36.32 - 36.32 | 206,250 | 6.95 | 154,687 |
| | 3,605,333 | | 2,115,243 |

The following table summarizes information with respect to restricted stock awards outstanding as of December 31, 2018:

| | Number of Awards Available for Grant | Weighted-Average Grant-Date Fair Value | Aggregate Intrinsic Value |
|---|---|---|---|
| | | | (In thousands) |
| Outstanding as of December 31, 2015 | 315,600 | $ 25.67 | — |
| Granted | 314,900 | 17.16 | — |
| Vested | (133,938) | 26.41 | — |
| Forfeited | (80,333) | 20.35 | — |
| Outstanding as of December 31, 2016 | 416,229 | 20.02 | — |
| Granted | 435,525 | 22.08 | — |
| Vested | (130,562) | 23.25 | — |
| Forfeited | (81,905) | 19.32 | — |
| Outstanding as of December 31, 2017 | 639,287 | 20.86 | — |
| Granted | 373,500 | 28.37 | — |
| Vested | (235,307) | 20.25 | — |
| Forfeited | (172,468) | 24.83 | — |
| Outstanding as of December 31, 2018 | 605,012 | $ 24.61 | $ 14,888 |

***Stock Options Granted to Employees and Non-employee Directors***

During the years ended December 31, 2018, 2017, and 2016, the Company granted stock options to employees and non-employee directors to purchase shares of common stock with a weighted-average grant date fair value of $16.35, $13.43 and

$16.91 per share, respectively. As of December 31, 2018, 2017, and 2016, there was total unrecognized compensation cost for outstanding stock options and restricted stock awards of $30.8 million, $26.5 million, and $19.6 million to be recognized over a period of approximately 2.6 years, 2.7 years, and 2.7 years, respectively.

The fair value of the employee and non-employee director stock options was estimated using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected term (in years) | 6.0 | 6.0 | 6.0 |
| Expected volatility | 60.2% | 67.7% | 61.9% |
| Risk-free interest rate | 2.7% | 2.1% | 1.4% |
| Expected dividend rate | —% | —% | —% |

*Fair Value of Common Stock*. The fair value of the shares of common stock is based on the Company's stock price as quoted by the Nasdaq.

*Expected Term*. The expected term for employees and non-employee directors is based on the simplified method, as the Company's stock options have the following characteristics: (i) granted at-the-money; (ii) exercisability is conditioned upon service through the vesting date; (iii) termination of service prior to vesting results in forfeiture; (iv) limited exercise period following termination of service; and (v) options are non-transferable and non-hedgeable, or "plain vanilla" options, and the Company has limited history of exercise data. The expected term for non-employees is based on the remaining contractual term.

*Expected Volatility*. Since January 1, 2017, the expected volatility is based on the historical volatility of a group of similar entities combined with the historical volatility of the Company, whereas prior to 2017, the expected volatility was based solely on the historical volatility of a group of similar entities. In evaluating similarity, the Company considered factors such as industry, stage of life cycle, capital structure, and size.

*Risk-Free Interest Rate*. The risk-free interest rate is based on U.S. Treasury constant maturity rates with remaining terms similar to the expected term of the options.

*Expected Dividend Rate*. The Company has never paid any dividends and does not plan to pay dividends in the foreseeable future, and, therefore, used an expected dividend rate of zero in the valuation model.

*Forfeitures*. Since January 1, 2017, the Company adopted the forfeiture rate methodology change in accordance with ASU 2016-09 to account for forfeitures as they occur. Prior to the adoption of ASU 2016-09, the Company was required to estimate forfeitures at the time of grant and revised those estimates in subsequent periods if actual forfeitures differed from those estimates. The Company used historical data to estimate pre-vesting option forfeitures and record stock-based compensation expense only for those awards that were expected to vest. To the extent actual forfeitures differed from the estimates, the difference was recorded as a cumulative adjustment in the period that the estimates were revised.

***Equity Awards Granted to Non-employee Consultants***

During the year ended December 31, 2018, the Company granted options to purchase 1,000 shares of common stock with an exercise price of $30.80 per share to a non-employee consultant. During the year ended December 31, 2017, the Company granted options to purchase 5,000 shares of common stock with a weighted-average exercise price of $25.45 per share and restricted stock awards of 4,000 shares to a non-employee consultant. Also in 2017, two employees converted to non-employee consultants and the individuals' options and awards continued to vest in accordance with the 2014 EIP. The Company did not grant options to purchase shares of common stock to non-employee consultants during the year ended December 31, 2016, however, the non-employee consultant options outstanding for the year then ended related to employees who had converted to non-employee consultants.

As of July 1, 2018, we began accounting for share-based payment transactions for acquiring goods and services from non-employees (excluding non-employee directors) in accordance with ASU 2018-07 (Note 2). Under ASU 2018-07, equity-

classified non-employee share-based payment awards are measured at the grant date fair value on the grant date, and expense is recognized in the same period and in the same manner as if the Company had paid cash for the goods or services received. In connection with the adoption of ASU 2018-07, we recorded a cumulative charge of less than $0.1 million to the Accumulated Deficit balance as of January 1, 2018.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected term (in years) | 5.5 | 8.9 | 7.3 |
| Expected volatility | 59.4% | 67.9% | 68.9% |
| Risk-free interest rate | 2.8% | 2.3% | 1.7% |
| Expected dividend rate | —% | —% | —% |

**2014 Employee Stock Purchase Plan**

On January 22, 2014, the Company's Board of Directors authorized the adoption of the 2014 Employee Stock Purchase Plan ("2014 ESPP"), which became effective after adoption and approval by the Company's stockholders on January 23, 2014. The maximum number of shares of common stock that may be issued under the Company's 2014 ESPP was initially 200,000 shares. The number of shares of common stock reserved for issuance under the Company's 2014 ESPP will automatically increase on January 1 of each year, beginning on January 1, 2015 and ending on and including January 1, 2024, by the lesser of (i) 1% of the total number of shares of common stock outstanding on December 31 of the preceding calendar year, (ii) 300,000 shares of common stock or (iii) such lesser number of shares of common stock as determined by the Company's Board of Directors. Shares subject to purchase rights granted under the Company's 2014 ESPP that terminate without having been exercised in full will return to the 2014 ESPP reserve and will not reduce the number of shares available for issuance under the Company's 2014 ESPP. The 2014 ESPP is intended to qualify as an "employee stock purchase plan," or ESPP, under Section 423 of the Internal Revenue Code of 1986 with the purpose of providing employees with an opportunity to purchase the Company's common stock through accumulated payroll deductions.

On January 1, 2018, the number of shares of common stock reserved for issuance under the Company's 2014 ESPP, automatically increased by 1% of the total number of shares of the Company's capital stock outstanding on December 31, 2017, or 300,000 shares. As of December 31, 2018, there were 1,178,940 shares available for issuance under the 2014 ESPP. For the year ended December 31, 2018, the Company recorded stock-based compensation expense of $0.3 million and issued 37,894 shares of common stock to employees under the 2014 ESPP. For the year ended December 31, 2017, the Company recorded stock-based compensation expense of $0.2 million and issued 28,135 shares of common stock to employees under the 2014 ESPP. For the year ended December 31, 2016, the Company recorded stock-based compensation expense of $0.1 million and issued 21,064 shares of common stock to employees under the 2014 ESPP.

The fair value of the option component of the shares purchased under the 2014 ESPP was estimated using the Black-Scholes option-pricing model with the following weighted-average assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected term (in years) | 0.5 | 0.5 | 0.5 |
| Expected volatility | 50.9% | 59.2% | 72.0% |
| Risk-free interest rate | 1.9% | 0.9% | 0.4% |
| Expected dividend rate | —% | —% | —% |

*Fair Value of Common Stock*. The fair value of the shares of common stock is based on the Company's stock price.

*Expected Term*. The expected term is based on the term of the purchase period under the 2014 ESPP.

*Expected Volatility*. Since of January 1, 2017 the expected volatility is based on the historical volatility of the Company's common stock. Prior to January 1, 2017, the expected volatility was based on volatility of a group of similar entities. In evaluating similarity, the Company considered factors such as industry, stage of life cycle, capital structure, and size.

*Risk-Free Interest Rate*. The risk-free interest rate is based on U.S. Treasury constant maturity rates with remaining terms similar to the expected term.

*Expected Dividend Rate*. The Company has never paid any dividends and does not plan to pay dividends in the foreseeable future, and, therefore, used an expected dividend rate of zero in the valuation model.

**Stock-Based Compensation**

Stock-based compensation expense related to options and awards for employees and non-employees and shares purchased under the 2014 ESPP by employees, was allocated as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2018 | 2017 | 2016 |
| Research and development | $ 7,480 | $ 5,902 | $ 5,557 |
| General and administrative | 8,793 | 7,328 | 6,396 |
| Total stock-based compensation expense | $ 16,273 | $ 13,230 | $ 11,953 |

There were no capitalized stock-based compensation costs or recognized stock-based compensation tax benefits during the years ended December 31, 2018, 2017, and 2016.

During 2017 and 2016, the Company modified certain equity awards, resulting in an acceleration of vesting for a portion of such awards as a result of termination of service. The acceleration in vesting of the unvested awards resulted in a Type III modification, which occurs when there is a change from an improbable to probable vesting condition. The Company recognized the incremental fair value, which was equal to the fair value of the awards on the modification date, and recognized the stock-based compensation over the remaining requisite service period. For the years ended December 31, 2017 and 2016, the Company recorded $0.1 million and $0.2 million, respectively, of stock-based compensation expense in connection with these modifications. There were no modifications for the year ended December 31, 2018.

**Common Stock**

As of December 31, 2018 and 2017, the Company was authorized to issue up to 95,000,000 shares of par value $0.001 per share common stock.

As of December 31, 2018 and 2017, the Company had no shares of common stock subject to repurchase. Common stockholders are entitled to dividends when and if declared by the Board of Directors subject to the prior rights of the preferred stockholders. The holder of each share of common stock is entitled to one vote. The common stockholders voting as a class are entitled to elect one member to the Company's Board of Directors. As of December 31, 2018, no dividends have been declared.

The Company had reserved shares of common stock, on an as if converted basis, for issuance as follows:

| | December 31, 2018 |
|---|---|
| Issuances under stock incentive plans | 1,681,760 |
| Issuances upon exercise of common stock warrants | 34,113 |
| Issuances under employee stock purchase plan | 1,178,940 |
| Issuances under inducement plan | 157,861 |
| Total | 3,052,674 |

**Follow-On Public Offerings**

In December 2017, the Company completed a follow-on public offering (the "2017 follow-on offering"), pursuant to which the Company issued 5,389,515 shares of common stock at $31.00 per share, including the exercise of the underwriters' over-allotment option to purchase 550,806 additional shares of common stock, for net proceeds of $156.9 million, after underwriting discounts, commissions and other offering expenses.

In January 2019, the Company completed a follow-on public offering (the “2019 follow-on offering”), pursuant to which the Company issued 6,764,705 shares of common stock at $17.00 per share, including the exercise of the underwriters' over-allotment option to purchase 882,352 additional shares of common stock, for net proceeds of $107.6 million, after underwriting discounts, commissions and other offering expenses.



ALGN-1364836
PTX-767.0184

**At-The-Market Offerings**

In March 2016, the Company entered into the 2016 At-The-Market ("ATM") agreement under which the Company may offer and sell common stock having aggregate proceeds of up to $75.0 million from time to time through Cowen, our sales agent. On March 25, 2016, the effective date of the registration statement on Form S-3 filed with the SEC on March 7, 2016, the 2015 ATM Agreement was effectively terminated and superseded by the 2016 ATM Agreement. Sales of common stock through Cowen under the 2016 ATM agreement will be made by means of ordinary brokers' transactions on the Nasdaq Global Market or otherwise at market prices prevailing at the time of sale, in block transactions, or as otherwise agreed upon by the Company and Cowen. Cowen will sell the common stock from time to time, based upon instructions from the Company (including any price, time or size limits or other customary parameters or conditions we may impose). The Company agreed to pay Cowen a commission of up to 3.0% of the gross sales proceeds of any common stock sold through Cowen under the ATM agreement. During the year ended December 31, 2017, the Company sold 1,802,651 shares of common stock under the 2016 ATM Agreement at a weighted average price of $22.17 per share resulting in net proceeds of $38.2 million, which was comprised of $38.8 million in proceeds after underwriting discounts and commissions and net of offering expenses of $0.6 million, of which $0.2 million was paid in 2016 and $0.4 million was paid in 2017.

In March 2018, the Company terminated the 2016 ATM Agreement and entered into the 2018 ATM Agreement. Under the 2018 ATM Agreement, the Company may offer and sell common stock having aggregate proceeds of up to $125.0 million from time to time through Cantor Fitzgerald as our sales agent. Sales of common stock through Cantor Fitzgerald under the 2018 ATM Agreement will be made by means of ordinary brokers' transactions on the NASDAQ Global Market or otherwise at market prices prevailing at the time of sale, in block transactions, or as otherwise agreed upon by the Company and Cantor Fitzgerald. Cantor Fitzgerald will sell the common stock from time to time, based upon instructions from the Company. The Company agreed to pay Cantor Fitzgerald a commission of up to 3.0% of the gross sales proceeds of any common stock sold through Cantor Fitzgerald under the 2018 ATM Agreement. No sales of common stock have taken place under the 2018 ATM Agreement as of December 31, 2018.

**12. Income Taxes**

From inception through 2018, the Company has only generated pretax losses in the U.S. and has not generated any pretax income or loss outside of the U.S. The Company recorded a current foreign income tax provision of $3.0 million for the year ended December 31, 2018. The tax provision is related to foreign withholding taxes. No provision (benefit) for income taxes was recorded for the years ended December 31 2017 and 2016.

The domestic and foreign components of loss before income taxes were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2018 | 2017 | 2016 |
| Domestic | $ (139,568) | $ (118,331) | $ (89,270) |
| Foreign | — | (2,256) | — |
| Loss before income taxes | $ (139,568) | $ (120,587) | $ (89,270) |



ALGN-1364837
PTX-767.0185

Significant components of the Company's deferred tax assets consist of the following:

| | Year Ended December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Deferred tax assets: | | |
| Net operating loss carryforward | $ 146,618 | $ 106,338 |
| Accruals and reserves | 2,191 | 2,591 |
| Stock based compensation | 5,173 | 5,400 |
| Tax credits | 12,230 | 6,779 |
| Fixed and intangible assets | 3,328 | 7,221 |
| Valuation Allowance | (169,540) | (128,329) |
| Net deferred tax assets | $ — | $ — |

Reconciliations of the statutory federal income tax (benefit) to the Company's effective tax are as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2018 | 2017 | 2016 |
| Tax benefit at statutory federal rate [1] | $ (29,309) | $ (40,999) | $ (30,352) |
| Sale of intellectual property [2] | (14,008) | 14,008 | — |
| Research and development credits | (4,064) | (1,858) | (544) |
| Foreign rate differential and withholding taxes | 2,370 | 767 | — |
| Nondeductible/nontaxable items | 108 | 738 | 832 |
| Impact of the Tax Reform Act | 5,154 | 62,903 | — |
| Other changes in valuation allowance | 42,902 | (35,783) | 30,053 |
| Other | (153) | 224 | 11 |
| Income tax provision | $ 3,000 | $ — | $ — |

[1] On December 22, 2017, the United States enacted tax reform legislation reduced the U.S federal tax rate from 35 percent to 21 percent.

[2] This represents the tax effect of an intra-entity sale between the Company and the Company's wholly owned subsidiary, Revance International Limited, which was eliminated for financial reporting purposes (discussed below).

The valuation allowance is determined using an assessment of both positive and negative evidence. Based on the available objective evidence and the Company's history of losses, the Company believes it is more likely than not that the net deferred tax assets will not be realized. The Company has established a valuation allowance to offset deferred tax assets as of December 31, 2018 and 2017 due to the uncertainty of realizing future tax benefits from its net operating loss carryforwards and other deferred tax assets. The valuation allowance for the year ended December 31, 2018 increased by $41.2 million, compared to the same period in 2017. The valuation allowance increased primarily due to net operating losses and credits generated during the taxable years.

As of December 31, 2018, the Company had net operating loss ("NOL") carryforwards available to reduce future taxable income, if any, for federal, California, and other states income tax purposes of $638.6 million, $179.1 million, and $703.9 million, respectively. The California NOL carryforwards began to expire in 2010. The federal NOL carryforwards will begin expiring in 2020, and the other states NOL carryforwards will begin expiring in 2030 if they are not utilized. As a result of the Tax Reform Act, the federal NOL generated after December 31, 2017 will carryover indefinitely with statutory limitations to the annual utilization.

As of December 31, 2018, the Company had research and development credit carryforwards of $7.3 million and $6.7 million available to reduce future taxable income, if any, for federal and California income tax purposes, respectively. The federal research and development credit carryforwards will begin expiring in 2023 if they are not utilized, and the California research and development credit carryforwards have no expiration date.



**ALGN-1364839**
PTX-767.0187

As of December 31, 2018, the Company had orphan drug credit carryforwards of $3.4 million available to reduce future taxable income, if any, for federal income tax purposes. The federal orphan drug credit carryforwards will begin expiring in 2038 if they are not utilized.

In general, if the Company experiences a greater than 50 percentage point aggregate change in ownership over a 3-year period (a Section 382 ownership change), utilization of its pre-change NOL carryforwards are subject to an annual limitation under Internal Revenue Code Section 382 (California and the other states have similar laws). The annual limitation generally is determined by multiplying the value of the Company's stock at the time of such ownership change (subject to certain adjustments) by the applicable long-term tax-exempt rate. Such limitations may result in expiration of a portion of the NOL carryforwards before utilization. The Company determined that an ownership change occurred on April 7, 2004 but that all carryforwards can be utilized prior to the expiration. The Company also determined that an ownership change occurred in February 2014, and as a result, the Company reduced the deferred tax assets and the corresponding valuation allowance to account for this limitation. Since the research and development credits for California carry over indefinitely, there was no change to the California research and development credits. The Company has reviewed its Internal Revenue Code Section 382 limitation through December 31, 2018 and has not identified any ownership changes resulting in a limitation.

The ability of the Company to use its remaining NOL carryforwards may be further limited if the Company experiences a Section 382 ownership change as a result of future changes in its stock ownership.

In December 2017, the U.S. government enacted Tax Cuts and Jobs Act (the "Tax Reform Act"). The Tax Reform Act includes but not limited to, reducing the U.S. federal corporate tax rate from 35 percent to 21 percent, allowing for federal net operating losses ("NOL") to be carried over indefinitely for NOL generated after December 31, 2017, and creating a new limitation on deductible interest expense.

In March 2018, the SEC staff issued SAB 118 which provides guidance on accounting for the tax effects of the Tax Reform Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Reform Act enactment date for companies to complete the accounting under *ASC 740, Income Taxes*. The Company has completed its assessment of the accounting impact resulting from the Tax Reform Act in December 2018. The impact of the Tax Reform Act includes:

- a decrease in deferred tax assets resulting from the change in tax rate in the amount of $62.9 million;
- an increase of net operating loss of $43.5 million as a result of the reversal of the intra-entity transfer of certain intellectual properties (further discussed below);
- a decrease in net operating loss of $3.8 million related to a research and development credit adjustment.

The aggregated impact resulting from the Tax Reform Act to deferred taxes is $68.1 million, which continues to be fully offset by a valuation allowance.

In October 2017, the Company created a wholly owned subsidiary, Revance International Limited, which was incorporated in the Cayman Islands, and transferred the economic rights to certain intellectual property for $41.2 million to the newly formed subsidiary. Under the tax laws prior to the Tax Reform Act in December 2017, the transaction had no financial statement impact to the Company other than to decrease the current net operating loss by the amount of the consideration. As a result of the Tax Reform Act in December 2017, the Company did not complete the accounting with regard to the tax effects associated with this intra-entity transfer as of December 31, 2017. In October 2018, the Company received notification that the Internal Revenue Service (IRS) had approved its request to disregard the Cayman subsidiary by treating it as a U.S. branch for federal income tax purposes, effectively eliminating any tax effects from the transaction. As a result of the finalization of our assessment of the Tax Reform Act, the Company has reversed the usage of the net operating losses from this transaction as of December 31, 2018.

The Company follows the provisions of the FASB's guidance for accounting for uncertain tax positions. The guidance indicates a comprehensive model for the recognition, measurement, presentation and disclosure in financial statements of any uncertain tax positions that have been taken or expected to be taken on a tax return. No liability related to uncertain tax positions is recorded in the financial statements due to the fact the liabilities have been netted against deferred attribute carryovers. It is the

Company's policy to include penalties and interest related to income tax matters in income tax expense.

As of December 31, 2018 and December 31, 2017, the unrecognized tax benefit was $4.2 million and $2.6 million, respectively. The Company does not expect that its uncertain tax positions will materially change in the next twelve months. No liability related to uncertain tax positions is recorded on the financial statements. During the year ending December 31, 2018, the amount of unrecognized tax benefits increased due to additional research and development credits generated. The additional uncertain tax benefits would not impact the Company's effective tax rate to the extent that the Company continues to maintain a full valuation allowance against its deferred tax assets.

The unrecognized tax benefit was as follows:

| (in thousands) | Unrecognized tax benefits |
|---|---|
| Balance as of December 31, 2015 | $ 1,537 |
| Additions for prior tax positions | 9 |
| Additions for current tax positions | 273 |
| Balance as of December 31, 2016 | 1,819 |
| Additions for prior tax positions | — |
| Additions for current tax positions | 758 |
| Balance as of December 31, 2017 | 2,577 |
| Additions for prior tax positions | 333 |
| Additions for current tax positions | 1,290 |
| Balance as of December 31, 2018 | $ 4,200 |

The Company files income tax returns in the U.S., California, and other states. The Company is not currently under examination by income tax authorities in federal, state or other jurisdictions. All tax returns will remain open for examination by the federal and state authorities for three and four years, respectively, from the date of utilization of any NOL or tax credits.

### 13. Defined Contribution Plan

The Company sponsors a defined contribution plan under Section 401(k) of the Internal Revenue Code covering substantially all employees. Contributions made by the Company are voluntary and are determined annually by the Board of Directors on an individual basis subject to the maximum allowable amount under federal tax regulations. During the year ended December 31, 2018 and December 31, 2017, the Company made contributions to the plan of approximately $0.6 million and $0.2 million, respectively. The Company made no contributions for the year ended December 31, 2016.

### 14. Subsequent Events

#### 2014 EIP Stock Option and Awards Grants

In January and February 2019 the Company granted 779,750 stock options and 316,200 restricted stock awards under the 2014 EIP to existing employees. The aggregate grant date fair value is estimated to be $19.1 million.

#### California State Apportionment

In 2018, the Company petitioned the California Franchise Tax Board for an alternative apportionment percentage due to the insignificant apportionment percentage derived from the single sales factor methodology for California. In January 2019, the California Franchise Tax Board approved the use of an alternative apportionment method. The Company is still assessing the accounting impact to its NOL in California and related tax effect from the change in apportionment model. Since the approval notification was received after December 31, 2018, the accounting impact resulting from the change in apportionment model will be recognized in 2019.

## 15. Quarterly Results of Operations (Unaudited)

The following tables presents the Company's unaudited consolidated quarterly financial data. This information has been prepared on a basis consistent with that of the audited consolidated financial statements. The Company believes that all necessary adjustments, consisting of normal recurring accruals and adjustments, have been included to present fairly the quarterly financial data. The Company's quarterly results of operations for these periods are not necessarily indicative of future results of operations. The following amounts are in thousands, except per share amounts:

| | For the Quarters Ended 2018 | | | |
|---|---|---|---|---|
| | December 31, | September 30, | June 30, | March 31, |
| Revenue | $ 487 | $ 2,362 | $ 686 | $ 193 |
| Net loss | $ (40,616) | $ (32,834) | $ (34,080) | $ (35,037) |
| Basic and Diluted net loss attributable to common stockholders | $ (40,616) | $ (32,834) | $ (34,080) | $ (35,037) |
| Basic and Diluted net loss per share attributable to common stockholders[(1)] | $ (1.12) | $ (0.91) | $ (0.94) | $ (0.97) |

| | For the Quarters Ended 2017 | | | |
|---|---|---|---|---|
| | December 31, | September 30, | June 30, | March 31, |
| Revenue | $ 37 | $ 75 | $ 75 | $ 75 |
| Loss on Impairment | $ (2,927) | $ — | $ — | $ — |
| Net loss | $ (40,616) | $ (30,651) | $ (26,874) | $ (27,156) |
| Basic and Diluted net loss attributable to common stockholders | $ (40,616) | $ (30,651) | $ (26,874) | $ (27,156) |
| Basic and Diluted net loss per share attributable to common stockholders [(1)] | $ (1.12) | $ (1.01) | $ (0.90) | $ (0.94) |

[(1)] Net loss per share amounts are calculated discretely and therefore may not add up to the total due to rounding.



ALGN-1364844
PTX-767.0192

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Newark, State of California on the 28th day of February, 2019.

REVANCE THERAPEUTICS, INC.

By: /s/ L. Daniel Browne

**L. Daniel Browne**

**President and Chief Executive Officer**

By: /s/ Tobin C. Schilke

**Tobin C. Schilke**

**Chief Financial Officer**

By: /s/ Cyril Allouche

**Cyril Allouche**

**Principal Accounting Officer, Head of Finance and Corporate Controller**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints L. Daniel Browne and Tobin C. Schilke, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution for him, and in his name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them, his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ L. Daniel Browne<br>**L. Daniel Browne** | President, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 28, 2019 |
| /s/ Tobin C. Schilke<br>**Tobin C. Schilke** | Chief Financial Officer<br>*(Principal Financial Officer)* | February 28, 2019 |
| /s/ Cyril Allouche<br>**Cyril Allouche** | Head of Finance and Corporate Controller<br>*(Principal Accounting Officer)* | February 28, 2019 |
| /s/ Angus C. Russell<br>**Angus C. Russell** | Director, Chairman | February 28, 2019 |
| /s/ Robert Byrnes<br>**Robert Byrnes** | Director | February 28, 2019 |
| /s/ Mark Foley<br>**Mark Foley** | Director | February 28, 2019 |
| /s/ Julian S. Gangolli<br>**Julian S. Gangolli** | Director | February 28, 2019 |
| /s/ Phyllis Gardner<br>**Phyllis Gardner, M.D.** | Director | February 28, 2019 |
| /s/ Philip J. Vickers | Director | February 28, 2019 |

**Philip J. Vickers, Ph.D.**

**Exhibit 10.27**

**REVANCE THERAPEUTICS, INC.**
**AMENDED AND RESTATED**
**NON-EMPLOYEE DIRECTOR COMPENSATION POLICY**

Each member of the Board of Directors (the ***"Board"***) who is not also serving as an employee of Revance Therapeutics, Inc. (the ***"Company"***) or any of its subsidiaries (each such member, an ***"Eligible Director"***) will receive the compensation described in this Amended and Restated Non-Employee Director Compensation Policy for his or her Board service. This policy is effective as of February 7, 2019 (the "***Effective Date***") and may be amended at any time in the sole discretion of the Board.

**Annual Cash Compensation**

The annual cash compensation amount set forth below is payable in equal quarterly installments, payable in arrears on the last day of each fiscal quarter in which the service occurred. If an Eligible Director joins the Board or a committee of the Board at a time other than effective as of the first day of a fiscal quarter, each annual retainer set forth below will be pro-rated based on days served in the applicable fiscal year, with the pro-rated amount paid for the first fiscal quarter in which the Eligible Director provides the service, and regular full quarterly payments thereafter. All annual cash fees are vested upon payment.

1. Annual Board Service Retainer:
   a. All Eligible Directors: $39,500
   b. Chairman of the Board Service Retainer (including Eligible Director Service Retainer): $74,000

2. Annual Committee Member Service Retainer:
   a. Member of the Audit Committee: $7,500
   b. Member of the Compensation Committee: $5,000
   c. Member of the Nominating & Governance Committee: $4,500
   d. Member of the Science & Technology Committee: $5,000

3. Annual Committee Chair Service Retainer (including Committee Member Service Retainer):
   a. Chairman of the Audit Committee: $20,000
   b. Chairman of the Compensation Committee: $12,250
   c. Chairman of the Nominating & Governance Committee: $8,000
   d. Chairman of the Science & Technology Committee: $12,250

**Equity Compensation**

The equity compensation set forth below will be granted under the Revance Therapeutics, Inc. 2014 Equity Incentive Plan (the ***"Plan"***), and will be documented on the applicable form of stock option agreement most recently approved for use by the Board (or a duly authorized committee thereof) for Eligible Directors. All stock options granted under this policy will be nonstatutory stock options, with an exercise price per share equal to 100% of the Fair Market Value (as defined in the Plan) of the underlying Common Stock on the date of grant, and a term of ten years from the date of grant (subject to earlier termination in connection with a termination of service as provided in the Plan).

1. Initial Option Grant: On the date of the Eligible Director's initial election to the Board, for each Eligible Director who is first elected to the Board following the Effective Date (or, if such date is not a market trading day, the first market trading day thereafter), the Eligible Director will be automatically, and without further action by the Board or Compensation Committee of the Board, granted a stock option for 18,000 shares (an "***Initial Option Grant***"). The shares subject to each Initial Option Grant will vest on the one year anniversary of the date of grant, subject to the Eligible Director's Continuous Service (as defined in the Plan) through each such vesting date.

2. Initial Restricted Stock Award: On the date of the Eligible Director's initial election to the Board, for each Eligible Director who is first elected to the Board following the Effective Date (or, if such date is not a market trading day, the first market trading day thereafter), the Eligible Director will be automatically, and without further action by the Board or Compensation Committee of the Board, granted a restricted stock award for 9,000 shares (an "***Initial RSA***"). The shares underlying the Initial RSA will vest on the one year anniversary of the date of grant, subject to the Eligible

Director's Continuous Service (as defined in the Plan) through such vesting date.

3. Annual Option Grant: On the date of each Company's annual stockholder meeting held after the Effective Date, each Eligible Director who continues to serve as a non-employee member of the Board will be automatically, and without further action by the Board or Compensation Committee of the Board, granted a stock option for 9,000 shares (an "***Annual Option Grant***"). The shares subject to the Annual Option Grant will vest on the one year anniversary of the date of grant, subject to the Eligible Director's Continuous Service (as defined in the Plan) through such vesting date.

4. Annual Restricted Stock Award: On the date of each Company's annual stockholder meeting held after the Effective Date, each Eligible Director who continues to serve as a non-employee member of the Board will be automatically, and without further action by the Board or Compensation Committee of the Board, granted a restricted stock award for 4,500 shares (an "***Annual RSA***"). The shares underlying the Annual RSA will vest on the one year anniversary of the date of grant, subject to the Eligible Director's Continuous Service (as defined in the Plan) through such vesting date.

**Exhibit 10.28**

**REVANCE THERAPEUTICS, INC.**

**2019 MANAGEMENT BONUS PROGRAM**

On January 24, 2019, the Compensation Committee of the Board of Directors of Revance Therapeutics, Inc. (the "Company") approved the Company's 2019 corporate objectives, weighted for purposes of determining bonuses, if any, for the Company's executive officers with respect to performance for fiscal year 2019 (the "2019 Bonus Program").

The 2019 Bonus Program is designed to reward, through the payment of annual cash bonuses, the Company's executive officers for the Company's performance in meeting key corporate objectives and for individual performance in meeting specified corporate goals for the year.

The Company's 2019 corporate goals include (i) achievement of specified milestones and activities relating to the Company's contemplated filing of a Biologics License Application ("BLA") with the U.S. Food and Drug Administration (50% weighting), (ii) achievement of specified milestones relating to the Company's clinical development programs (20% weighting), (iii) achievement of certain commercial readiness milestones (20% weighting), and (iv) completion of certain biosimilar development activities (10% weighting), as well as (v) the stretch goal of achieving specified financial milestones (up to 15% weighting).

The cash bonus for L. Daniel Browne will be based on the achievement of the 2019 corporate goals (100% weighting). The cash bonus for the other executive officers will be based on the achievement of the 2019 corporate goals (75% weighting) and his or her individual performance goals (25% weighting). The executive officers' actual bonuses for fiscal year 2019 may exceed 100% of his or her 2019 target bonus percentage in the event performance exceeds the predetermined goals and/or upon the achievement of other specified goals, including stretch goals.

Payment of bonuses to the Company's executive officers under the 2019 Bonus Program and the actual amount of such bonus, if any, are within the discretion of the Compensation Committee. The actual bonus awarded, if any, may be more or less than each executive's annual target bonus.

**Exhibit 10.37**

**EXECUTIVE EMPLOYMENT AGREEMENT**

**for**

**Tobin Schilke**

This Executive Employment Agreement (the "**Agreement**"), made between Revance Therapeutics, Inc. (the "**Company**") and Tobin Schilke ("**Executive**") (collectively, the "**Parties**"), is effective as of November 5, 2018 (the "**Start Date**").

**Whereas**, the Company desires for Executive to provide services to the Company; and

**Whereas**, Executive is willing to engage in employment by the Company on the terms and conditions set forth in this Agreement;

**Now, Therefore**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

**1. Employment by the Company.**

**1.1 Position.** Executive shall serve as the Company's Chief Financial Officer. During the term of Executive's employment with the Company, Executive will devote Executive's best efforts and substantially all of Executive's business time and attention to the business of the Company, except for approved vacation periods and reasonable periods of illness or other incapacities permitted by the Company's general employment policies.

**1.2 Duties and Location.** Executive shall perform such duties as are required by the Company's President and Chief Executive Officer, to whom Executive will report. Executive's primary office location will be the Company's office located in Newark, California. The Company reserves the right to reasonably require Executive to perform Executive's duties at places other than Executive's primary office location from time to time, and to require reasonable business travel. The Company may modify Executive's job title and duties as it deems necessary and appropriate in light of the Company's needs and interests from time to time.

**1.3 Policies and Procedures.** The employment relationship between the Parties shall be governed by the general employment policies and practices of the Company, except that when the terms of this Agreement differ from or are in conflict with the Company's general employment policies or practices, this Agreement shall control.

**2. Compensation.**

**2.1 Salary.** For services to be rendered hereunder, Executive shall receive a base salary at the rate of $405,000 per year (the "**Base Salary**"), subject to standard payroll deductions and withholdings and payable in accordance with the Company's regular payroll schedule. Executive's base salary shall be reviewed by the Board of Directors (the " **Board**") for possible adjustment annually. In addition, you will receive a signing bonus of $50,000.00 (the **"Signing Bonus")** to be paid in 2 increments.

The first increment of $25,000.00 is payable with your first regular paycheck and the second increment of $25,000.00 will be payable on July 1, 2019, subject to all applicable deductions and tax withholdings. By signing this Agreement to accept the employment, you agree to repay the full amount of this Signing Bonus if you resign your employment for any reason within one year after your start date. You further authorize Revance to deduct such Signing Bonus moneys you owe Revance from any moneys Revacne owes you (including your final paycheck). You understand and agree that you must repay Revance any unpaid balance of the Signing Bonus remaining after that deduction is made.

**2.2 Bonus.** Executive will be eligible for a discretionary annual bonus, with Executive's target bonus to be equal to 45% of Executive's Base Salary commencing with the 2020 bonus payouts for 2019 performance year.. Executive's target bonus shall be reviewed by the Board for possible adjustment annually. Whether Executive receives an annual bonus for any given year, and the amount of any such annual bonus, will be determined by the Board in its sole discretion based upon the Company's and Executive's achievement of objectives and milestones to be determined on an annual basis by the Board in consultation with Executive. Bonuses are generally paid by March 15 following the applicable bonus year, and Executive must be an active employee on the date any annual bonus is paid in order to earn any such annual bonus. Executive will not be eligible for, and will not earn, any annual bonus (including a prorated bonus) if Executive's employment terminates for any reason before the date annual bonuses are paid.

**2.3 Standard Company Benefits.** Executive shall be entitled to participate in all employee benefit programs for which Executive is eligible under the terms and conditions of the benefit plans that may be in effect from time to time and provided by the Company to its employees. Executive will receive up to twenty (20) days vacation per calendar year. The Company reserves the right to cancel or change the benefit plans or programs it offers to its employees at any time.

**2.4 Expenses.** The Company will reimburse Executive for reasonable travel, entertainment or other expenses incurred by Executive in furtherance or in connection with the performance of Executive's duties hereunder, in accordance with the Company's expense reimbursement policy and requirements of the Internal Revenue Service as in effect from time to time. The Company also agrees to pay for Executive's relocation expenses up to 12 months of hire date including (a) household goods move from San Francisco to South Peninula and (b) 3 months of temporary housing.

**2.5 Equity.** As a material inducement to Executive's acceptance of the Company's offer of employment, and subject to approval by the Board or Compensation Committee of the Board, the Company will grant Executive 18,000 shares of restricted stock and an option to purchase 100,000 shares of the Company's common stock with an exercise price equal to the closing sales price of such stock as qutoted on the NASDAQ on the date of grant. Subject to Executive's continuing service with the Company, the option will vest over a period of four years, with 25% vesting one year after the Start Date and 1/48th vesting each month thereafter over the remaining three years. Executive's stock option and restricted stock award will be governed in all respects by the terms of the Company's 2014 Inducement Plan, as amended, which is a non-shareholder

approved stock plan approved by the Board pursuant to the "inducement exception" provided under NASDAQ Listing Rule 5635(c)(4), and restricted stock award and stock option agreements thereunder, which Executive will be required to sign as a condition of receiving the awards.

3. **Termination of Employment; Severance.** Executive's employment relationship is at-will. Either Executive or the Company may terminate the employment relationship at any time, with or without cause or advance notice. The Executive will be eligible for severance under the Company's Executive Severance Benefit Plan, adopted by the Board, and amended from time to time (see attached).

4. **Proprietary Information Obligations.** As a condition of employment, Executive shall be required to execute the Company's standard form of Employee Proprietary Information and Inventions Agreement.

5. **Conflicts.** Executive represents that Executive has full authority to accept this position and perform the duties of the position without conflict with any other obligations and that Executive is not involved in any situation that might create, or appear to create, a conflict of interest with respect to Executive's loyalty to or duties for the Company. Executive specifically warrants that Executive is not subject to an employment agreement or restrictive covenant preventing full performance of Executive's duties for the Company. Executive agrees not to bring to the Company or use in the performance of Executive's responsibilities any materials or documents of a former employer that are not generally available to the public unless Executive has obtained express written authorization from the former employer. Executive further agrees to honor all obligations to former employers during the course of Executive's employment with the Company.

6. **Outside Activities During Employment.**

**6.1 Non-Company Business.** Except with the prior written consent of the Board, Executive will not during the term of Executive's employment with the Company undertake or engage in any other employment, occupation or business enterprise, other than ones in which Executive is a passive investor; *provided, however,* that Executive may (i) engage in activities that do not interfere with his duties and obligations under this Agreement or create an actual or potential conflict of interest with the Company as reasonably determined by the Board, and (ii) serve as a member of the Board of Directors on a maximum one (1) Board of other entities subject to the approval of the Board with such approval not to be unreasonably withheld. Executive may engage in civic and not-for-profit activities so long as such activities do not materially interfere with the performance of Executive's duties hereunder.

**6.2 No Adverse Interests.** Executive agrees not to acquire, assume or participate in, directly or indirectly, any position, investment or interest known to be adverse or antagonistic to the Company, its business or prospects, financial or otherwise.

7. **Dispute Resolution.** To ensure timely and economical resolution of any disputes that may arise in connection with Executive's employment with the Company, as a condition of Executive's employment, Executive and the Company hereby agree that any

and all claims, disputes or controversies of any nature whatsoever arising out of, or relating to, this letter, or its interpretation, enforcement, breach, performance or execution, Executive's employment with the Company, or the termination of such employment, shall be resolved, to the fullest extent permitted by law, by final, binding and confidential arbitration conducted before a single arbitrator by JAMS or its successor, under the then applicable JAMS arbitration rules (which can be found at http://www.jamsadr.com/rules-clauses/). The arbitration shall take place in San Jose, California; provided, however, that if the arbitrator determines there will be an undue hardship to Executive to have the arbitration in such location, the arbitrator will choose an alternative appropriate location. **Executive and the Company each acknowledge that by agreeing to this arbitration procedure, both Executive and the Company waive the right to resolve any such dispute, claim or demand through a trial by jury or judge or by administrative proceeding.** Executive will have the right to be represented by legal counsel at Executive's expense at any arbitration proceeding. The arbitrator shall: (i) have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be available under applicable law in a court proceeding; and (ii) issue a written statement signed by the arbitrator regarding the disposition of each claim and the relief, if any, awarded as to each claim, the reasons for the award, and the arbitrator's essential findings and conclusions on which the award is based. The arbitrator, and not a court, shall also be authorized to determine whether the provisions of this paragraph apply to a dispute, controversy, or claim sought to be resolved in accordance with these arbitration procedures. The Company shall pay all costs and fees in excess of the amount of court fees that Executive would be required to incur if the dispute were filed or decided in a court of law. Nothing in this Agreement is intended to prevent either Executive or the Company from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any arbitration.

**8. General Provisions.**

**8.1 Contingencies.** The Company reserves the right to conduct a background investigation and/or reference check on Executive. Executive may also be required to go through a Security Risk Assessment (SRA) via the CDC which includes a Bioterrorism Act background check and FBI fingerprinting. This job offer is contingent upon SRA approval (including FBI clearance) as well as a satisfactory background investigation and/or reference check. In accordance with federal immigration law, Executive will also be required to provide to the Company documentary evidence of Executive's identity and eligibility for employment in the United States. This employment offer is contingent upon such documentation being provided to the Company within three (3) business days after Executive's hire date.

**8.2 Notices.** Any notices provided must be in writing and will be deemed effective upon the earlier of personal delivery (including personal delivery by fax) or the next day after sending by overnight carrier, to the Company at its primary office location and to Executive at the address as listed on the Company payroll.

**8.3 Severability.** Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal

or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction to the extent possible in keeping with the intent of the parties.

**8.4 Waiver.** Any waiver of any breach of any provisions of this Agreement must be in writing to be effective, and it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.

**8.5 Complete Agreement.** This Agreement constitutes the entire agreement between Executive and the Company with regard to this subject matter and is the complete, final, and exclusive embodiment of the Parties' agreement with regard to this subject matter. This Agreement is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. It is entered into without reliance on any promise or representation other than those expressly contained herein, and it cannot be modified or amended except in a writing signed by a duly authorized officer of the Company.

**8.6 Counterparts.** This Agreement may be executed in separate counterparts, any one of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Agreement.

**8.7 Headings.** The headings of the paragraphs hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

**8.8 Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive and the Company, and their respective successors, assigns, heirs, executors and administrators, except that Executive may not assign any of his duties hereunder and he may not assign any of his rights hereunder without the written consent of the Company, which shall not be withheld unreasonably.

**8.9 Tax Withholding and Indemnification.** All payments and awards contemplated or made pursuant to this Agreement will be subject to withholdings of applicable taxes in compliance with all relevant laws and regulations of all appropriate government authorities. Executive acknowledges and agrees that the Company has neither made any assurances nor any guarantees concerning the tax treatment of any payments or awards contemplated by or made pursuant to this Agreement. Executive has had the opportunity to retain a tax and financial advisor and fully understands the tax and economic consequences of all payments and awards made pursuant to the Agreement.

**8.10 Choice of Law.** All questions concerning the construction, validity and interpretation of this Agreement will be governed by the laws of the State of California.



**ALGN-1364856**
PTX-767.0204

**In Witness Whereof**, the Parties have executed this Agreement on the day and year first written above.

**REVANCE THERAPEUTICS, INC.**

By: /s/ Dan Browne

**Dan Browne**

**President & Chief Executive Officer**

**EXCECUTIVE**

By: /s/ Tobin C. Schilke

**Tobin Schilke**

**Chief Financial Officer**

**Exhibit 10.38**

November 7, 2018

Cyril Allouche

Dear Cyril:

This memo will confirm your current title and compensation as an Executive Officer at Revance Therapeutics:

| | |
|---|---|
| Title: | Head of Finance, Corporate Controller & Principal Accounting Officer |
| Base Salary: | $265,000 |
| Bonus Target %: | 30% |

Sincerely,

Justin Ford

/s/ Justin Ford

**Justin Ford**

**Vice President, Human Resources and Head of People**

*EXECUTION COPY*

**[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.**

**Exhibit 10.42**

# LICENSE AGREEMENT

**BY AND BETWEEN**

**REVANCE THERAPEUTICS, INC.**

**AND**

**SHANGHAI FOSUN PHARMACEUTICAL INDUSTRIAL DEVELOPMENT CO., LTD.**

**DECEMBER 4, 2018**

## LICENSE AGREEMENT

This License Agreement (the "**Agreement**") is entered into as of December 4, 2018 (the "**Effective Date**") by and between Revance Therapeutics, Inc., a Delaware corporation with a place of business at 7555 Gateway Blvd., Newark, California, 94560 ("**Revance**") and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a Chinese corporation with a place of business at Building A, 1289 Yishan Road, Minhang District, Shanghai 200233, China ("**Fosun**"). Revance and Fosun are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

**WHEREAS**, Revance is a biotechnology company developing botulinum toxin products for use in aesthetic and therapeutic indications, including a certain proprietary biological product known as RT002;

**WHEREAS**, Fosun is a pharmaceutical company engaged in the research, development and commercialization of products for human use in the aesthetic and therapeutic settings;

**WHEREAS**, Revance and Fosun desire to establish a license agreement for the further development and commercialization of RT002, with the objective of providing pharmaceutical products in specified territories to patients.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I.
## DEFINITIONS AND CONSTRUCTION

The following terms shall have the following meanings as used in this Agreement:

**Section 1.01** **"Aesthetic Indication"** means the treatment, minimization, and/or eradication of, or the appearance of any lines or wrinkles on the body, including without limitation, glabellar lines and crow's feet on the face.

**Section 1.02** "**Affiliate**" means with respect to either Party, any Person controlling, controlled by or under common control with such Party, from time to time and for so long as such control exists. For purposes of this definition of Affiliate, "control" (and, with correlative meanings, the terms "controlled by" and "under common control with") means (a) direct or indirect ownership of fifty percent (50%) or more of the stock or shares having the right to vote for the election of directors of a Person or (b) the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.03** "**Alliance Manager**" shall have the meaning assigned in Section 3.01.

**Section 1.04** "**Annual Net Sales**" means the Net Sales made during any given Calendar Year.

**Section 1.05** "**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act, as amended, and any other applicable anti-corruption laws and laws for the prevention of fraud, bribery, racketeering, money laundering or terrorism in the Territory.

**Section 1.06** "**Applicable Laws**" means all applicable statutes, ordinances, codes, executive or governmental orders, laws, rules and regulations, including without limitation, any rules, regulations, guidelines or other requirements of Regulatory Health Authorities, that may be in effect from time to time.

**Section 1.07** "**Bankruptcy Code**" means Title 11, United States Code, as amended, or analogous provisions of Applicable Laws outside the United States.

**Section 1.08** **"Biosimilar"** means, with respect to the Product, any pharmaceutical product that: (a) has received all necessary approvals by the applicable Regulatory Authorities in such country to market and sell such product as a pharmaceutical product, including required pricing; (b) is marketed or sold by a Third Party that has not obtained the rights to market or sell such product as a licensee, sublicensee or distributor of Revance or Fosun or any of their respective Affiliates, licensees or sublicensees with respect to the Product; (c) is highly similar to the Product notwithstanding minor differences in clinically inactive components; (d) has no clinically meaningful differences from the Product in terms of safety, purity, and potency; and (e) is approved as (i) a "biosimilar" (in the United States) of the Product, or (ii) if not in the US, the foreign equivalent of a "biosimilar" of the Product in the Territory; in each case for use in such country pursuant to an expedited regulatory approval process governing approval of generic biologics based on the then-current standards for regulatory approval in such country (*e.g.*, the BPCIA Act or an equivalent under foreign law) and where such Regulatory Approval was based in significant part upon clinical data generated by Revance, Fosun or their respective Affiliates or Sublicensees with respect to the Product.

**Section 1.09** **"BLA"** means (a) in the US, a Biologics License Application, as defined in the BPCI Act, and applicable regulations promulgated thereunder by the FDA, or any equivalent application that replaces such application, (b) in the Territory, the relevant equivalent to the foregoing.

**Section 1.10** **"BPCI Act"** means the Biologics Price Competition and Innovation Act of 2009 within the Patient Protection and Affordable Care Act, as set forth in Section 351(k) of the United States Public Health Services Act (42 U.S.C. 262), which was signed into law in the United States in March 2010, as may be subsequently amended.

**Section 1.11** "**Breaching Party**" shall have the meaning assigned in Section 11.02(a).



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.12** "**Business Day**" means any day other than (a) a Saturday or a Sunday or (b) a day on which commercial banking institutions are authorized or required by Applicable Laws to be closed in New York City, New York or in Shanghai, People's Republic of China.

**Section 1.13** "**Calendar Quarter**" means each successive period of three (3) consecutive calendar months commencing on 1st January, 1st April, 1st July and 1st October.

**Section 1.14** "**Calendar Year**" means each successive period of twelve (12) consecutive calendar months commencing on 1st January.

**Section 1.15** **"Change of Control"** means, with respect to a Party, (a) a transaction or series of related transactions that results in the sale or other disposition of all or substantially all of such Party's assets; or (b) a merger or consolidation in which, whether or not such Party is the surviving corporation, the shareholders of such Party immediately prior to the consummation of such merger or consolidation do not, immediately after consummation of such merger or consolidation, possess, directly or indirectly through one or more intermediaries, a majority of the voting power of all of the surviving entity's outstanding stock and other securities and the power to elect a majority of the members of the surviving entity's board of directors; or (c) a transaction or series of related transactions (which may include a tender offer for such Party's stock or the issuance, sale, or exchange of stock of the Party) if a single Person or group of Persons who are Affiliates (including, without limitation, Affiliates that are venture capital or investment divisions of such Person) and who are engaged in the research, development, manufacturing and commercialization of pharmaceutical products acquire the Party's stock in such transaction or series of related transactions that possesses a majority of voting power of all of the Party's outstanding stock and other securities and the power to elect a majority of the members of the Party's board of directors.

**Section 1.16** "**Co-Chair**" shall have the meaning assigned in Section 3.04.

**Section 1.17** **"Combination Product"** means any combination of the Product and any other commercial product(s), including fillers, where such products are not formulated together but are sold together as a single product and invoiced as one product. For purposes of Section 1.54, the other commercial product(s) shall be referred to as the "**Other Product(s)**".

**Section 1.18** "**Commercialization**" means all activities undertaken relating to the marketing and sale of Product, advertising, education, planning, marketing, promotion, distribution, market and product support, and any post-approval clinical studies commenced after the First Commercial Sale of the Product in the Territory. **"Commercialize"** shall have a corresponding meaning.

**Section 1.19** **"Commercialization Plan"** shall have the meaning assigned in Section 4.09.

**Section 1.20** "**Commercially Reasonable Efforts**" shall mean, with respect to a Party's obligations under this Agreement, the efforts and resources typically used by pharmaceutical companies similar in size and scope to perform the obligations at issue, which efforts shall not be less than those efforts made by the performing Party with respect to other products at a similar stage



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

of development or in a similar market and commercial potential, taking into account the competitiveness of the market place, the proprietary position of the products, the regulatory structure involved and the profitability of the applicable products. Without limiting the foregoing, Commercially Reasonable Efforts requires, with respect to such obligations, that the Party apply efforts sufficient to carry out the given obligation in a diligent and sustained manner without undue interruption, pause, or delay. It is anticipated that the level of effort will change over time, reflecting changes in the status of the Product and the market involved.

**Section 1.21** "**Competitive Product**" means any pharmaceutical composition [*], regardless of formulation, dosage, or form, other than the Product.

**Section 1.22** "**Confidential Information**" means, subject to the exceptions listed at Section 7.02, any and all (a) Know-How relating to the Exploitation of the Product or relating to other aspects of this Agreement, and (b) Information and Materials, whether oral or in writing or in any other form, disclosed before, on or after the date of this Agreement by one Party to the other Party, including the terms of this Agreement.

**Section 1.23** "**Control**" means, with respect to an item of Know-How, Patent or other Intellectual Property Rights, the ability and authority of a Party or its Affiliates, whether arising by ownership, or pursuant to a license or sublicense, to grant licenses, sublicenses, or other rights to the other Party under or to such item of Know-How, Patent or Intellectual Property Rights as provided for in this Agreement without breaching the terms of any agreement between such Party and any Third Party.

**Section 1.24** "**Cost of Goods**", to be more specifically defined in the Supply Agreement, shall mean the fully burdened cost of manufacturing and supplying finished Product (as defined in Section 1.61), such costs to include the cost of direct materials and labor, conversion, packaging and labeling, associated freight expenses, and attributable portion of overhead. For clarity, Fosun's Cost of Goods will be consistent with internal and external reporting for Revance's Cost of Goods and associated Product gross margin calculations, as per U.S. GAAP. The Cost of Goods shall be subject to the condition defined at **Exhibit E** hereto.

**Section 1.25** "**CRO**" means a contract research organization, as defined in 21 C.F.R. 312 or in any Applicable Laws, that assumes, as an independent contractor with the sponsor of a clinical trial, one or more of the obligations of a sponsor, e.g., design of a protocol, selection or monitoring of investigations, evaluation or reports, and preparation of materials to be submitted to the applicable Regulatory Authority.

**Section 1.26** "**Development**" means all activities relating to obtaining Regulatory Approval of the Product and new Indications therefor, but excluding activities related to the manufacture of Product. Development activities includes, for example, (a) the conduct of all preclinical and clinical testing required for Regulatory Approval of the Product in the Territory, (b) the conduct of all regulatory activities directed to obtaining and maintaining Regulatory Approval of the Product in the Territory. "**Develop**" and "**Developing**" shall have a corresponding meaning.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.27** "**Drug Approval Application**" means an application for Regulatory Approval required before commercial sale or use of the Product as a drug in a regulatory jurisdiction.

**Section 1.28** "**Effective Date**" shall have the meaning assigned in the first paragraph of this Agreement.

**Section 1.29** "**Exploit**" means to import, use, sell or offer for sale, including to Develop and Commercialize, the Product in the Territory. **"Exploitation"** shall have a corresponding meaning.

**Section 1.30** "**FDA**" means the United States Food and Drug Administration or any successor thereto.

**Section 1.31** "**FFDCA**" means the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301, et seq., as amended from time to time.

**Section 1.32** "**Field**" means any and all uses of Product under an Aesthetic Indication or Therapeutic Indication.

**Section 1.33** "**Filing**" means, with respect to a submission to a Regulatory Health Authority, the date that such submission is confirmed to have been received by the relevant Regulatory Health Authority.

**Section 1.34** "**First Commercial Sale**" means, with respect to the Product, the first arm's length sale for monetary value by Fosun, its Affiliates, or its Sublicensees to a Third Party for end use or consumption by the general public of the Product in the Territory for any Indication.

**Section 1.35** "**Fosun Technology**" means all Patents and Know-How (i) Controlled by Fosun as of the Effective Date, or (ii) that thereafter comes into Fosun's Control independent of this Agreement, and in each case, that is not Product-related IPR. For clarity, Fosun Technology may include inventions that are broadly applicable to the Development or Commercialization of pharmaceutical products generally.

**Section 1.36** "**Fosun Triggered Termination**" shall have the meaning assigned in Section 11.03.

**Section 1.37** "**GCP**" or "**Good Clinical Practices**" means the current standards for clinical trials for pharmaceuticals, as set forth in China as well as in the United States Code of Federal Regulations, ICH guidelines and applicable regulations, laws or rules as promulgated thereunder, as amended from time to time, and such standards of good clinical practice as are required by other organizations and governmental agencies in the Territory.

**Section 1.38** "**GLP**" or "**Good Laboratory Practices**" means good laboratory practices required under the regulations set forth in 21 C.F.R. Part 58, as in effect during the Term, and the requirements thereunder imposed by the FDA and the NMPA, and the equivalent thereof in any jurisdiction.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.39** "**Government Official**" means any Person employed by or acting on behalf of a Governmental Body, government-controlled entity or public international organization.

**Section 1.40** "**Governmental Body**" means any: (a) nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, ministry, fund, foundation, center, organization, unit, body or entity and any court or other tribunal); or (d) self-regulatory organization (including the NASDAQ Global Market and the NASDAQ Global Select Market).

**Section 1.41** "**IFRS**" means the International Financial Reporting Standards, the set of accounting standards and interpretations and the framework in force on the Effective Date and adopted by the European Union as issued by the International Accounting Standards Board (IASB) and the International Financial Reporting Interpretations Committee (IFRIC), as such accounting standards may be amended from time to time.

**Section 1.42** "**IND**" means an Investigational New Drug application or the equivalent filed with or submitted to the relevant Regulatory Health Authority, including, for example, the FDA, for authorization to commence human clinical trials.

**Section 1.43** **"Indication"** means any distinct Aesthetic Indication or Therapeutic Indication.

**Section 1.44** "**Indirect Taxes**" means value added taxes, sales taxes, consumption taxes and other similar taxes.

**Section 1.45** "**Information**" means (a) techniques, information and data necessary or useful for the Development or Commercialization of the Product, including without limitation, Know-How, marketing, pricing, distribution, cost, sales, and manufacturing data or descriptions as well as (b) any information or data relating to Materials.

**Section 1.46** "**Intellectual Property Rights**" or "**IPR**" means Patents, Trademarks, service marks, Know-How, Trade Secrets (including patentable inventions), trade names, registered designs, design rights, copyrights (including rights in computer software), domain names, database rights and any rights or property similar to any of the foregoing in any part of the world, whether registered or not, together with the right to apply for the registration of any such rights.

**Section 1.47** **"I.U."** means with respect to a measure of Product, an international unit.

**Section 1.48** "**Know-How**" means all inventions, discoveries, data, information (including scientific, technical or regulatory information), Trade Secrets, processes, means, methods, practices, formulae, instructions, procedures, techniques, materials, technology, results, analyses, designs, drawings, computer programs, apparatuses, specifications, technical assistance, laboratory, pre-clinical and clinical data (including laboratory notes and notebooks), and other material or know-how, in written, electronic or any other form, whether or not confidential,



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

proprietary or patentable, including without limitation: development technology; biology, chemistry, pharmacology, toxicology, drug stability, Manufacturing and formulation, test procedures, synthesis, purification and isolation techniques, quality control data and information, methodologies and techniques; information regarding clinical and non-clinical safety and efficacy studies, including study designs and protocols, marketing studies, absorption, distribution, metabolism and excretion studies; assays and biological methodology.

**Section 1.49** "**Knowledge**" means the good faith understanding of the officers of the Party associated with the representation.

**Section 1.50** "**Losses**" means any and all direct and indirect liabilities, claims, actions, damages, losses or expenses, including interest, penalties, and reasonable lawyers' fees and disbursements. In calculating Losses, the legal duty to mitigate on the part of the Party suffering the Loss shall be taken into account.

**Section 1.51** "**Manufacture**" or "**Manufacturing**" means activities in connection with the manufacture, processing, formulating, testing (including, without limitation quality control, quality assurance and lot release testing), bulk packaging or storage and delivery of Product.

**Section 1.52** **"Manufacturer"** means Revance or such other Person as may be appointed to supply Product to Fosun pursuant to the Supply Agreement.

**Section 1.53** "**Materials**" means information, data or assays necessary or useful for the Development or Commercialization of Product in the Territory. Materials excludes any materials associated with Revance Manufacturing Know-How.

**Section 1.54** "**Net Sales**" means the gross amount invoiced by Fosun, its Affiliates or Sublicensees, for sales of Product to a Third Party (that is not an Affiliate or Sublicensee) less the following deductions from such gross amounts to the extent included in the gross amount invoiced for such Product or otherwise directly paid or incurred by Fosun, its Affiliates or Sublicencees:

(a) customary trade discounts, credits or allowances, not to exceed [*] of the gross amount invoiced;

(b) credits or allowances additionally granted upon returns, rejections or recalls (except where such recall arises out of the gross negligence, willful misconduct, or fraud by Fosun, its Affiliates or Sublicensees);

(c) taxes, duties or other governmental tariffs (other than income taxes); and

(d) government mandated rebates.

Notwithstanding the foregoing, such aggregated allowable deductions shall not exceed [*] of the gross amount invoiced.

For the avoidance of doubt, sales between or among Fosun and its Affiliates or Sublicensees will be excluded from the computation of Net Sales, but the subsequent final sales to a Third Party



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

by such Affiliate or Sublicensee will be included in the computation of Net Sales. For the further avoidance of doubt, gross amounts invoiced shall exclude value added taxes payable by Fosun as per Applicable Laws.

Net Sales for a Combination Product in the Territory shall be calculated as follows:

(i) If the Product and Other Product(s) in such Combination Product each are sold separately in the Territory, Net Sales will be calculated by multiplying the total Net Sales (as described above) of the Combination Product by the fraction A/(A+B), where A is the standard average sales price in the Territory of the Product separately in the same formulation and dosage, and B is the (sum of the) standard average sales price(s) in the Territory of the Other Product(s) sold separately in the same formulation and dosage, during the applicable Calendar Year.

(ii) If the Product is sold independently of the Other Product(s) in the Territory, but the standard average sales price of the Other Product(s) cannot be determined, Net Sales will be calculated by multiplying the total Net Sales (as described above) of such Combination Product by the fraction A/C, where A is the standard average sales price in the Territory of the Product sold separately in the same formulation and dosage and C is the standard average sales price in the Territory of the Combination Product, during the applicable Calendar Year.

(iii) If neither (i) nor (ii) above apply, the Parties will work together in good faith to determine the Net Sales of the Combination Product based on the relative values of the Product and the Other Product(s).

**Section 1.55** "**NMPA**" means the National Medical Products Administration under the People's Republic of China's State Administration for Market Regulation, or any successor thereto. For the avoidance of doubt, the NMPA shall refer to the agency formerly known as the People's Republic of China's Food and Drug Administration (CFDA).

**Section 1.56** "**Non-Breaching Party**" shall have the meaning assigned in Section 11.02(a).

**Section 1.57** "**Patent**" means (a) all national, regional and international patents and patent applications, including provisional patent applications, (b) all patent applications filed either from such patents, patent applications or provisional applications or from an application claiming priority from any of these, including divisionals, continuations, continuations-in-part, provisionals, converted provisionals, and continued prosecution applications, (c) any and all patents that have issued or in the future issue from the foregoing patent applications ((a) and (b)), including utility models, petty patents and design patents and certificates of invention, (d) any and all extensions or restorations by existing or future extension or restoration mechanisms, including revalidations, reissues, re-examinations and extensions (including any supplementary protection certificates and the like) of the foregoing patents or patent applications ((a), (b) and (c)), and (e) any similar rights, including so-called pipeline protection, or any importation, revalidation, confirmation or introduction patent or registration patent or patent of additions to any such foregoing patent applications and patents.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.58** "**Payments**" shall have the meaning assigned in Section 6.07(a).

**Section 1.59** "**Person**" means any individual, sole proprietorship, corporation, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other similar entity or organization, including a government or political subdivision, department or agency of a government.

**Section 1.60** "**Pharmacovigilance Agreement**" shall have the meaning assigned in Section 4.07(a).

**Section 1.61** **"Product"** means the finished form of the injectable pharmaceutical drug product containing daxibotulinumtoxinA, also referred to by Revance as RT002, that is manufactured and supplied by the Manufacturer in accordance with the Supply Agreement, and suitable for human administration.

**Section 1.62** **"Product-related IPR"** means all Intellectual Property Rights, including but not limited to rights to Patents and clinical data, not otherwise licensed by Revance to Fosun under this Agreement, that is discovered, invented, generated, collected, or obtained by Fosun, its Affiliates, or Sublicensees in the performance of activities conducted pursuant to this Agreement that relate to the Product and are necessary and/or useful to the Exploitation of the Product anywhere in the world.

**Section 1.63** "**Regulatory Approval**" means any and all approvals (including without limitation pricing and reimbursement approvals), product or establishment licenses, registrations, or authorizations of any regional, federal, state, or local Regulatory Health Authority, department, bureau, or other governmental entity, necessary to commercially distribute, sell or market the Product in a regulatory jurisdiction, including, where applicable, (a) pricing or reimbursement approval in such jurisdiction, (b) pre- and post-approval marketing authorizations, (c) labeling approval and (d) technical, medical and scientific licenses.

**Section 1.64** "**Regulatory Authority**" means any court or government body, whether national, supra-national, federal, state, local, foreign or provincial, including any political subdivision thereof, including any department, commission, board, bureau, agency, or other regulatory or administrative governmental authority or instrumentality, and further including any quasi-governmental Person or entity exercising the functions of any of these.

**Section 1.65** "**Regulatory Documentation**" means all applications, registrations, licenses, authorizations and approvals, all correspondence submitted to or received from Regulatory Health Authorities (including minutes and official contact reports relating to any communications with any Regulatory Health Authority) and all supporting documents, including documentation arising in the course of all clinical studies and tests, in each case relating to the Product, including all INDs, BLAs, Regulatory Approvals, regulatory drug lists, advertising and promotion documents, adverse event files and complaint files.

**Section 1.66** "**Regulatory Exclusivity**" means any exclusive marketing rights or data exclusivity rights conferred by any Regulatory Health Authority with respect to Product other than



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Patents, including, without limitation, rights conferred in the U.S. under the Hatch-Waxman Act or the FDA Modernization Act of 1997 (including pediatric exclusivity), orphan drug exclusivity, or rights similar thereto outside the U.S.

**Section 1.67** "**Regulatory Health Authority**" means any applicable national (for example, FDA or NMPA), supranational, regional, state, provincial or local regulatory health authority, department, bureau, commission, council, or other government entity regulating or otherwise exercising authority with respect to the Exploitation of Product in the Territory pursuant to the terms and conditions of this Agreement, including any such entity involved in the granting of Regulatory Approval for pharmaceutical products.

**Section 1.68** **"Revance"** shall have the meaning set forth in the preamble.

**Section 1.69** **"Revance Change of Control"** shall have the meaning set forth in Section 2.07.

**Section 1.70** **"Revance Corporate Trademarks"** shall have the meaning set forth in Section 1.75.

**Section 1.71** **"Revance Know-How"** means any and all know how, information, data (including, without limitation, pre-clinical data, toxicology information and clinical trial data), documents, materials, and software (including, but not limited to, marketing information, technical information, regulatory information, clinical information, processes, procedures, methods, formulae, protocols, and techniques) relating to Product and which is useful and necessary for Fosun to obtain Regulatory Approval of the Product in the Territory, or otherwise import, Develop, use, sell, offer for sale, or Commercialize the Product in the Territory, but not including Revance Manufacturing Information, which exists as of the Effective Date or during the Term and is Controlled by Revance or its Affiliates.

**Section 1.72** **"Revance Manufacturing Information"** means any and all confidential documents and information Controlled by Revance and/or its Affiliates and relating to the manufacture of Product.

**Section 1.73** **"Revance Patents"** means any and all patent applications and patents generically or specifically claiming or covering the use, sale, offer for sale and/or import of Product (including without limitation the active pharmaceutical ingredient in Product and its dosage forms and formulations), that are Controlled by Revance or its Affiliates as of the Effective Date or during the Term in the Territory, including without limitation the following: (a) patent applications and patents set forth in **Exhibit A**; (b) divisions, continuations, continuations-in-part, renewals, and substitute applications of any patent applications described in (a); (c) patents that may issue from any patent applications described in (a) or (b); (d) reissues, reexaminations, and extensions or restorations of patents described in (a) or (c) by existing or future extension or restoration mechanisms, including without limitation, patent restoration and supplementary protection certificates or the equivalent thereof; and (e) any other form of government-issued right in the Territory substantially similar to any of the foregoing. Notwithstanding anything to the contrary,



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Revance Patents will not include any patent applications or patents claiming or covering any processes for manufacture of Product.

**Section 1.74** **"Revance Product Trademarks"** shall have the meaning set forth in Section 1.75.

**Section 1.75** **"Revance Technology"** shall mean, for purposes of this Agreement, the Revance Know-How, Revance Patents, and Revance Trademarks.

**Section 1.76** **"Revance Trademarks"** means any trademarks, applications to register trademarks, intent-to-use applications, or other registrations or applications related to trademarks, common-law trademarks and rights, service marks, trade dress, logos, trade names, corporate names, all rights arising from the use of or existing in connection with domain names, and all goodwill associated with the foregoing and all registrations and applications for registration of any of the foregoing, currently pending or applied for in the future by Revance, all to the extent Controlled by Revance or its Affiliates in the Territory as of the Effective Date or during the Term that are (a) specific to and only used with Product(the "**Revance Product Trademarks**") or (b) used in connection with, but are not specific to or used exclusively with, Product (including, without limitation Housemarks of Revance)(the "**Revance Corporate Trademarks**").

**Section 1.77** "**Review Period**" shall have the meaning assigned in Section 7.07.

**Section 1.78** **"SAKURA 3 Trial"** means the clinical phase 3 trial investigating the long-term safety of the Product for the treatment of moderate to severe glabellar lines in adults.

**Section 1.79** "**Senior Executives**" means (a) the Chief Executive Officer of Revance and (b) the Chief Executive Officer of Fosun. A Party shall be entitled, effective upon written notice thereof to the other Party, to designate one of its other representatives having equivalent seniority and experience to replace such foregoing representative as that Party's Senior Executive for the purpose of this Agreement.

**Section 1.80** "**Sublicensee(s)**" shall have the meaning assigned in Section 2.02.

**Section 1.81** **"Supply Agreement"** means the agreement for the manufacture and supply of Product by the Manufacturer to Fosun or its designated agent for the purposes of this Agreement, which shall be executed by Fosun and Revance as soon as reasonably practicable after the Effective Date.

**Section 1.82** "**Tax**" means any form of tax or taxation, levy, duty, charge, social security charge, contribution or withholding of whatever nature (including any related fine, penalty, surcharge or interest) imposed by, or payable to, a Tax Authority.

**Section 1.83** "**Tax Authority**" means any government, state or municipality, or any local, state, federal or other fiscal, revenue, customs, or excise authority, body or official anywhere in the world, authorized to levy Tax.

**Section 1.84** "**Term**" shall have the meaning assigned in Section 11.01.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 1.85** "**Territory**" means the People's Republic of China, Hong Kong Special Administrative Region, and Macao Special Administrative Region (each of which for purposes of this Agreement shall each be deemed a region).

**Section 1.86** **"Therapeutic Indication"** means the treatment, prevention or palliation of any disease or non-aesthetic medical condition, including but not limited to, cervical dystonia, plantar fasciitis, chronic migraine, upper and lower limb spasticity, hyperhidrosis, urinary incontinence, overactive bladder, strabismus, facial spasm, blepharospasm, and focal dystonia.

**Section 1.87** "**Third Party**" means any Person other than Revance, Fosun, or their respective Affiliates.

**Section 1.88** "**Third Party Claims**" shall have the meaning assigned in Section 12.01(a).

**Section 1.89** "**Third Party Compensation**" shall have the meaning assigned in Section 6.04(f).

**Section 1.90** "**Trademark**" means any trademark, trade name, service mark, service name, brand, domain name, trade dress, logo, slogan or other indicia of origin or ownership, including the goodwill and activities associated with each of the foregoing.

**Section 1.91** "**Trademark License Agreement**" shall have the meaning assigned in Section 2.06(b).

**Section 1.92** "**Trade Secret**" means information, including but not limited to formulae, techniques, conditions, reagents, processes, or methods, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**Section 1.93** "**Transfer Price**" means with respect to the Product and placebo supplied by Revance, the Manufacturer's Cost of Goods plus [*], subject to [*] the Supply Agreement.

**Section 1.94** "**U.S. GAAP**" means United States Generally Accepted Accounting Principles, consistently applied.

**Section 1.95** "**Valid Claim**" means (a) a claim of an issued and unexpired Patent within the Revance Patents that has not been held unpatentable, invalid, or unenforceable by a court or other government agency of competent jurisdiction in an unappealable decision or has not been admitted to be invalid or unenforceable through disclaimer, or otherwise or (b) a claim of a pending patent application within the Revance Patents that has not been abandoned, finally rejected or expired without the possibility of appeal or re-filing.

**Section 1.96** "**Written Disclosure**" shall have the meaning assigned in Section 10.02.

**Section 1.97** **Construction.** Except where the context requires otherwise, whenever used in this Agreement, the singular includes the plural, the plural includes the singular, the use of any



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

gender is applicable to all genders and the word "**or**" has the inclusive meaning represented by the phrase "**and/or**". Whenever this Agreement refers to a number of days, unless otherwise specified, such number refers to calendar days. The term "**including**" or "**includes**" as used in this Agreement means including, without limiting the generality of any description preceding such term. The article, section, and subsection headings contained in this Agreement are for the purposes of convenience only and are not intended to define or limit the contents of such articles, sections, and subsections. The wording of this Agreement shall be deemed to be the wording mutually chosen by the Parties and no rule of strict construction shall be applied against any Party.

## ARTICLE II.
## GRANT OF RIGHTS AND LICENSES; EXCLUSIVITY

**Section 2.01 License to Fosun.**

(a) Subject to the terms of this Agreement, Revance hereby grants to Fosun an exclusive (including with regard to Revance and its Affiliates), royalty-bearing license, with the right to grant sublicenses solely in accordance with Section 2.02 below, under Revance Know-How and Revance Patents (but specifically excluding Revance Manufacturing Information and related Patents) to import, use, sell, offer for sale, Develop, and Commercialize, including without limitation package and have packaged the Product in the Field in the Territory. For the avoidance of doubt, the license granted in this Section 2.01 does not include the right to manufacture or have manufactured the Product.

(b) Fosun shall have the right to engage and appoint service providers at its own discretion:

(i) for the sole purpose of obtaining marketing authorisation or import authorisation, in each case, in relation to the Product in the Territory; provided such service providers [*], otherwise only upon prior written approval by Revance;

(ii) for the sole purpose of providing clinical development services in relation to the Product; provided that any CRO shall [*];

(iii) for the sole purpose of distributing Product in the Territory, upon prior written notice to Revance; provided such distributor [*]; and

(iv) for the sole purpose of marketing or promotion services in relation to the Product on behalf of Licensee in the Territory; provided that such service provider [*] with respect to the marketing, distribution or sale of the Product with respect to [*], otherwise upon prior written approval by Revance.

For avoidance of doubt, the Affiliates and the Sublicensee (as defined in Sections 2.02) of Licensee shall also have the right to engage and appoint service providers at its own discretion for the aforementioned purposes, subject to the same restrictions as indicated above, and provided such service providers are bound by obligations of confidentiality no less restrictive than those contained in this Agreement. Fosun shall remain liable for any action or failure to act



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

by any service provider if such action or failure to act by the service provider would have constituted a breach of this Agreement if such action or failure were committed by Fosun.

**Section 2.02 Sublicenses.** Fosun shall have the right to grant sublicenses, through multiple tiers of sublicenses, under the license granted to Fosun under Section 2.01 to: (i) its Affiliates upon [*] days prior written notice to Revance, unless such Affiliate is listed in **Exhibit B** hereto, in which case no prior written notice is necessary; (ii) a Third Party in the Territory for purposes [*]; and (iii) a Third Party for purposes [*]. Where Fosun or its Affiliates grants such sublicense to a Person that is not an Affiliate of Fosun, such Person shall be a "**Sublicensee**" for the purposes of this Agreement, and any Person to which a Sublicensee grants a further sublicense shall also be a Sublicensee; provided, however, that any Person that is engaged and appointed by Fosun, its Affiliates and/or Sublicensees as a service provider pursuant to Section 2.01(b) solely to enable such Person to provide such services shall not be a "**Sublicensee**" for purposes of this Agreement. Fosun, its Affiliates and its Sublicensees shall ensure that all Persons to which they grant sublicenses comply with all terms and conditions of this Agreement. Fosun shall remain liable for any action or failure to act by any Sublicensee, or any other Party that is granted a sublicense under the licenses granted in Section 2.01 by Fosun, its Affiliates or its Sublicensees, if such action or failure to act by the Sublicensee would have constituted a breach of this Agreement if such action or failure were committed by Fosun.

**Section 2.03 Rights Retained by Revance.** Notwithstanding the foregoing, Revance hereby expressly retains all rights to, and excludes from the license grant in Section 2.01, any Revance Know-How and Intellectual Property Rights, including the Revance Manufacturing Information, related to the Manufacture of the Product.

**Section 2.04 No Implied Rights.** This Agreement confers no right, license, or interest by implication, estoppel, or otherwise under any Patents, Know-How, or other Intellectual Property Rights of either Party except as expressly set forth in this Agreement. Each Party hereby expressly retains and reserves all rights and interests with respect to Patents, Know-How, or other Intellectual Property Rights not expressly granted to the other Party hereunder. Without limiting the generality of the foregoing, no license or other rights are granted to Fosun under this Agreement to any pharmaceutical compositions claimed or disclosed in any Revance Patents other than the Product.

**Section 2.05 Non-Compete.** Upon the Effective Date and throughout the Term, Fosun shall not, and shall ensure that its Affiliates do not, engage in, independently or for or with any Third Party, any research, development, manufacture or commercialization of any Competitive Product; provided, in the event Fosun terminates this Agreement under Section 11.02, the restrictions of this Section 2.05 shall extend for two (2) years following such termination by Fosun. Notwithstanding the foregoing, if Revance fails to submit a BLA for the Product in the US by the end of 2020, the non-compete restrictions under this Section 2.05 shall expire. Notwithstanding the above, in the event that an Affiliate of Fosun (a) [*], such Affiliate shall not be a violation of this Section 2.05; provided, that: (i) the Affiliate [*]; and (ii) the Affiliate [*], or [*] (except for [*]); or (b) [*], such Affiliate shall not be a violation of this Section 2.05; provided, that the Affiliate [*]. In the event that Fosun and/or any of its Affiliates' direct or indirect acquisition of or merger with a Third Party, which will become an Affiliate of Fosun immediately after closing of such acquisition



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

or merger transaction, when such Third Party is engaging in the commercialization of any Competitive Products, Fosun will notify Revance immediately after the closing of such acquisition or merger transaction to initiate a discussion with Revance and suspend the commercialization of such Competitive Products unless and until the Parties reach an agreement on this competitive business during or after such discussion with Fosun in good faith.

**Section 2.06 Trademark Rights.**

(a) Revance Trademarks. Revance hereby grants to Fosun a royalty-free exclusive license to use Revance Trademarks, including Revance Product Trademarks and Revance Corporate Trademarks, solely in connection with the Commercialization, including but not limited to use, sale, offering for sale, and import of Product in the Territory. All representations of Revance Trademarks that Fosun intends to use will first be submitted to Revance for approval, such approval not to be unreasonably withheld. Revance will have [*] days to review the representation of the Revance Trademarks. If Revance does not provide written notice of its approval or disapproval (together with its reasons for such disapproval) within such [*] day period, Revance will be deemed to have approved such representation.

(b) In connection with the license granted to Fosun under the Revance Trademarks as provided in Sections 2.06(a), Revance and Fosun agree that either they or their respective Affiliates will, within [*] calendar days after the Effective Date, cooperate to have an authorized representative execute a "**Trademark License Agreement**", which shall be filed with the appropriate governmental body in the Territory if necessary.

**Section 2.07 Revance Change of Control Option.**

(a) In the event of a Revance Change of Control ("**Revance CoC**") during the Term of this Agreement, Revance, or its successor entity in the event Revance does not exist after the Revance CoC transaction ("**CoC Successor**"), shall have the option ("**CoC Option**") to terminate this Agreement under Section 11.02(d) after the closing of Revance CoC, in exchange for economic compensation based on the stage of Development of the Product as set forth below, so as to re-acquire all licensed rights of the Product in the Territory transferred to Fosun under this Agreement:

| Stage of Development of Product Upon Termination Under CoC Option | Compensation (USD) |
|---|---|
| Prior to [*] | [*] |
| After [*] but prior to [*] | [*] |
| After [*] | [*] |

* In the event the Agreement is terminated pursuant to the CoC Option in this Section 2.07(a) prior to [*]: (1) the [*] shall be [*], and (2) the compensation shall [*].



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately

ALGN-1364874
PTX-767.0222

with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b) Revance or its CoC Successor shall (i) provide written notice to Fosun of the Revance CoC within [*] Business Days after closing of Revance CoC ("**CoC Notice**"), (ii) engage in a discussion in good faith with Fosun for a period of [*] days upon the receipt of CoC Notice to discuss the possibility to continue to perform under the Agreement ("**CoC Discussion Period**"); (iii) have a period of [*] days after the end of the CoC Discussion Period ("**CoC Option Exercise Period**") to provide written notice terminating the Agreement in accordance with the terms and obligations of Section 11.04(d); and (iv) fully pay Fosun the amount of economic compensation under Section 2.07(a) within such CoC Option Exercise Period; provided that, upon request by Revance or its CoC Successor, Fosun shall [*] during the CoC Discussion Period.

(c) For clarity, if Revance or its CoC Successor fails to exercise the CoC Option within the CoC Option Exercise Period, then such CoC Option shall expire and Revance or its CoC Successor shall no longer be able to exercise such CoC Option.

(d) To the extent this Agreement is terminated pursuant to Section 11.02(d), and in the event that (i) Revance then subsequently re-acquires the exclusive rights to the Product in the Territory, or (ii) the Revance CoC transaction has been terminated or amended in a way as if the Revance CoC has not occurred, within [*] from termination of this Agreement under Section 11.02(d), then Revance shall notify Fosun of such re-acquisition of rights, and Fosun shall have the option, at Fosun's own discretion, to re-acquire its rights to the Product in the Territory [*].

## ARTICLE III.
## GOVERNANCE

**Section 3.01 Alliance Manager**. Within thirty (30) days, of the Effective Date, each Party will identify (and notify the other Party of the identity of) a representative to act as its informal liaison under this Agreement ("**Alliance Manager**"). The Alliance Managers will serve as the primary contact points between the Parties regarding the activities contemplated by this Agreement. The Alliance Managers may facilitate the flow of information and otherwise promote communication, coordination and collaboration between the parties, providing single point communication for seeking consensus both internally within each Party's organization, including facilitating review of external corporate communications, and raising cross-Party and/or cross-functional disputes in a timely manner. Each Party may change its Alliance Manager by written notice to the other Party.

**Section 3.02 Joint Development Committee.** Within thirty (30) days of the Effective Date, the Parties shall establish a Joint Development Committee (the "**JDC**"). Each Party can designate three representatives as the members to the JDC, and such initial members to be nominated by the Parties and listed at **Exhibit D** herein. Such representatives shall be individuals suitable in seniority and experience and having delegated authority to make decisions of the JDC with respect to matters within the scope of the JDC's responsibilities. The JDC shall operate in accordance with the provisions of Sections 3.03 to 3.07, and shall have no authority to alter, amend or waive the terms and conditions of this Agreement, including any payment conditions or terms, periods of performance, or obligations of the Parties. A Party may change one or more of its representatives serving on the JDC at any time upon written notice to the other Party; provided that such replacement is of comparable authority and scope of functional responsibility within that Party's organization



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

as the person he or she is replacing. At its meetings, the JDC shall discuss the matters described below and such other matters as are reasonably requested by either Party's Alliance Manager. The JDC shall remain in effect as from its establishment through the Term. Each Party, in its sole discretion, can determine to terminate its membership in the JDC.

**Section 3.03 Responsibilities of JDC.** Subject to Section 3.07, the JDC shall perform the following functions:

(a) review and approve the Development and Commercialization strategy for the Product in the Territory, including the Development Plan and Commercialization Plan (defined below);

(b) ensure harmonization of the Product Development and regulatory strategy in the Territory with Revance's global development and commercialization strategy;

(c) approve all pre-clinical and/or clinical Development activities proposed to be conducted by or on behalf of Fosun with respect to the Product;

(d) review and approve the protocols for each clinical trial of Product proposed to be conducted by or on behalf of Fosun in the Territory;

(e) facilitate and approve the exchange of Product-related Data and information between the Parties as necessary;

(f) ensure that Fosun's Development and Commercialization activities are in compliance with the Development Plan, Pharmacoviligance Agreement, Commercialization Plan, and other relevant obligations under this Agreement, including but not limited to, obligations to keep Revance reasonably informed and updated regarding (i) the status of such Development and Commercialization activities, (ii) results from any clinical trials, (iii) any adverse events, and (iv) material correspondence with a Regulatory Authority; and

(g) perform such other functions as are specifically designated for the JDC in this Agreement.

**Section 3.04 Co-Chairs.** Each Party shall designate one of its representatives on the JDC to co-chair the meetings for the JDC (each, a "**Co-Chair**"). The Co-Chairs shall, through and with the assistance of the Alliance Managers, coordinate and prepare the agenda for, and ensure the orderly conduct of, the meetings of the JDC. The Co-Chairs shall, through and with the assistance of the Alliance Managers, solicit agenda items from the JDC members and provide an agenda, along with appropriate information for such agenda, reasonably in advance of any meeting. Such agenda shall include all items requested by either Co-Chair for inclusion therein. In the event the Co-Chairs or another JDC member from either Party is unable to attend or participate in a meeting of the JDC, the Party whose Co-Chair or member is unable to attend may designate a substitute co-chair or other representative for the meeting.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 3.05 Meetings.** The JDC shall meet at least quarterly, or more or less frequently if determined by the JDC, during the period in which Fosun is Developing the Product in the Territory, and JDC meetings can be called at other times by agreement between the Parties for any reason. JDC meetings may be conducted by telephone, videoconference or in person. Any in-person JDC meetings shall be held on an alternating basis between Revance's and Fosun's facilities, unless otherwise agreed by the Parties. Each Party shall be responsible for the cost of such Party's own personnel and for its own expenses in attending such meetings and carrying out the other activities contemplated under this Article III. As appropriate, the JDC may invite a reasonable number of non-voting employees, consultants and scientific advisors to attend its meetings as non-voting observers; provided, that such invitees are bound by confidentiality obligations at least as stringent as the provisions set forth herein. Each Party may also call for special meetings of the JDC to discuss particular matters requested by such Party. The Alliance Managers shall provide the members of the JDC with no less than ten (10) Business Days' notice of each regularly scheduled meeting and, to the extent reasonably practicable under the circumstances, no less than five (5) Business Days' notice of any special meetings called by either Party.

**Section 3.06 Minutes.** Minutes will be kept of all JDC meetings, with the minutes for each JDC meeting to be the responsibility of the Co-Chair (or his or her designees) of the Party that is hosting such meeting, unless otherwise agreed by the Parties. Draft meeting minutes shall be sent to all members of the JDC by e-mail for review and approval within thirty (30) days after each such meeting. The JDC shall formally accept the minutes of the previous meeting at or before the next meeting of the JDC. Minutes will be deemed approved unless any member of the JDC objects to the accuracy of such minutes by providing written notice to the other members of the JDC prior to the next meeting. Minutes shall list action items and shall designate any issues that need to be resolved by the JDC or applicable resolution process. In the event of any objection to the minutes that is not resolved by mutual agreement of the Parties, such minutes will be amended to reflect such unresolved dispute.

**Section 3.07 Decision Making of JDC.** Decisions of the JDC shall be made by unanimous vote, with each Party's representatives on the JDC collectively having one vote. Any matter which the JDC is unable to resolve unanimously shall be referred to the Parties' Alliance Managers, but the JDC shall continue to discuss over the matter in good faith. If the matter remains unresolved by the JDC after [*] days after referral to the Parties' Alliance Managers, final decision-making authority shall be determined as follows: (i) with respect to any issues related to [*], including [*], [*] shall have the final decision, provided that such decision shall [*]; and (ii) with respect to any issues related to [*], [*] shall have the final decision, provided that in no event shall either Party be permitted to use its decision making authority under this Section 3.07 to supersede its diligence obligations under this Agreement.

## ARTICLE IV.
## GENERAL PROVISIONS ON DEVELOPMENT AND COMMERCIALIZATION

**Section 4.01 Record Keeping.** Each Party shall maintain, or cause to be maintained, records of its activities under this Agreement in sufficient detail and in good scientific manner appropriate for patent and regulatory purposes related to the Product in the Territory, which shall



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

be complete and accurate and shall fully and properly reflect all work done and results achieved in the performance of its activities hereunder, which shall record only such activities and shall not include or be commingled with records of activities outside the scope of this Agreement, and which shall be retained by such Party for at least [*] after the termination of this Agreement, or for such longer period as may be required by Applicable Laws. Each Party shall have the right, during normal business hours and upon reasonable prior notice to the other Party, to inspect and copy any such records of such other party.

**Section 4.02 Development Plan.** Fosun shall be responsible for providing to the JDC for approval a reasonably detailed plan specifying the major Development activities, including clinical trials and regulatory submissions, planned for the Product in the Territory with respect to each Indication for which it is seeking Regulatory Approval, and the timelines for achieving such activities (the "**Development Plan**"). Fosun shall deliver an initial draft of the Development Plan to Revance for Revance's review within [*] of the Effective Date, Revance shall have the right to comment, such comments to be considered in good faith by Fosun, prior to the submission of the Development Plan to the JDC for approval. Thereafter, from time to time, but at least every [*], Fosun shall propose updates or amendments to the Development Plan in consultation with Revance to reflect changes in the plans, including timelines for activities therein. Fosun shall submit the proposed updated or amended Development Plan to the JDC for review and approval.

**Section 4.03 Conduct of Certain Development Activities.** Any clinical trial(s) and other Development studies that are commenced in the Territory after the Effective Date to support Regulatory Approval of the Product in the Territory will be conducted solely by Fosun at its sole expense; provided, however, Revance may sponsor or co-sponsor such clinical studies pursuant to the Applicable Law of the Regulatory Health Authority of the Territory, in which case Revance shall use Commercially Reasonable Efforts to cooperate with Fosun to conduct such clinical trials in the Territory. Fosun may support Revance's global development of Product by conducting certain Development activities in the Territory as reasonably requested by Revance. In the event Revance wishes Fosun to recruit patients and participate in a Product-related clinical trial outside of the Territory as part of Revance's global development of the Product, Revance shall notify Fosun in writing and the Parties shall negotiate in good faith with respect to Fosun's recruitment of patients and participation in such clinical trial and the compensation to Fosun for such activities. Any Fosun Development activities related to Revance's global development of the Product may be included in the Development Plan and approved by the JDC.

**Section 4.04 Diligence Obligations.**

(a) Fosun shall use Commercially Reasonable Efforts at its own cost and expense to carry out its activities under this Agreement to Develop and Commercialize the Product in the Territory for Aesthetic Indications and Therapeutic indications. For the avoidance of doubt, as of the Effective Date, Fosun shall act reasonably in preparing and conducting, and be reasonably responsible for all Development, regulatory, and Commercialization costs required for commercial success of the Product in the Territory, including but not limited to:

[*]



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b) Revance shall use Commercially Reasonable Efforts to carry out its activities under this Agreement to authorize Fosun and to cooperate with Fosun to Develop and Commercialize the Product for commercial success in the Territory.

**Section 4.05 Reports of Development Activities.** Fosun shall prepare and provide reports on the Development activities of the Product undertaken by it at each meeting of the JDC. The Development reports shall include a reasonably detailed summary of all results, data and material inventions, if any, obtained from such Development activities. In addition, Fosun shall, at its own expense, make appropriate scientific and regulatory personnel available to Revance, either by telephone or in person as the Parties may mutually agree, as reasonably required to keep Revance informed of Development activities conducted by Fosun.

**Section 4.06 Regulatory Matters.**

(a) Fosun shall use Commercially Reasonable Efforts to obtain Regulatory Approval for the Product in the Territory for all Indications specified in the Development Plan and approved by the JDC. The Product shall be registered through the Imported Drug pathway of the NMPA, and Revance or its designated agent, as the marketing authorization holder in the United States, shall be the marketing authorization or imported drug license holder of the Product in the Field in the Territory. Notwithstanding the foregoing sentence, however, Revance shall not have any right to Develop and/or Commercialize the Product in the Field in the Territory. In the event there is a change under Applicable Laws in the Territory that allow Fosun to be the marketing authorization holder, upon Fosun's request, the JDC shall decide whether it is appropriate and feasible to transfer marking authorization to Fosun, and if so, Revance shall promptly transfer the marketing authorization holder to Fosun and shall not require Fosun to make additional payment on such transfer of such holder. Fosun shall promptly reimburse Revance for any and all reasonable expenses (internal and external) that Revance may incur in being and transferring to Fosun the marketing authorization or imported drug license holder in the Territory.

(b) Fosun shall be solely responsible for preparing, translating, filing and submitting all Regulatory Documents related to the Product with the Regulatory Health Authority in the Territory, including all applications for Regulatory Approval, at its own cost. Revance shall own any and all applications for Regulatory Approvals, the Regulatory Approvals, and other regulatory filings related to the Product which will be held in the name of Revance. Fosun shall also be solely responsible for providing, in the format required by the applicable Regulatory Health Authorities, the data and information required to be submitted to such Regulatory Health Authorities for Regulatory Approval of the Product in the Territory, including without limitation data from all clinical trials. Revance shall transfer the original or provide a copy of the Regulatory Approvals and other necessary Regulatory Documents to Fosun for Regulatory Approval in the Territory.

(c) Revance shall cooperate with Fosun regarding its regulatory activities and shall provide, upon reasonable request by Fosun, all necessary data and other clinical development information Controlled by Revance for Fosun to obtain Regulatory Approval of the Product in the Territory.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(d) Upon request by Fosun, Revance shall share with Fosun a summary of publicly available information related to the status of each IND application or Drug Approval Application covering the Product outside the Territory. During the Term, Fosun shall report to Revance regarding the status of each pending or proposed BLA equivalent application or Drug Approval Application covering a Product in the Territory.

(e) Fosun shall promptly notify Revance of any request for information by any Regulatory Health Authority, and Fosun shall reasonably cooperate with Revance in providing such information. Fosun shall as soon as reasonably practicable furnish Revance with English language copies of all substantive correspondence Fosun has had with any Regulatory Health Authority, and contact reports concerning substantive conversations or substantive meetings with any Regulatory Health Authority, in each case relating to any such BLA equivalent or Drug Approval Application.

(f) Fosun shall be responsible for, at its own cost, any and all translations, including the accuracy and fidelity thereof, of documents to be provided, whether to the Regulatory Authority or to Revance, under Section 4.06.

**Section 4.07 Adverse Event Reporting and Product Recall.**

(a) Each Party agrees to provide the other Party with the necessary safety information required by Regulatory Health Authorities to comply with Applicable Laws. Revance will hold the safety database for the Product and Fosun will provide safety information as required by Applicable Laws, in a timely manner. As promptly as possible following the Effective Date, but no later than six (6) months after the Effective Date or otherwise agreed by both Parties, the Parties will enter into a detailed pharmacovigilance agreement (the "**Pharmacovigilance Agreement**"), governing, among other things, appropriate adverse event reporting procedures and pharmacovigilance responsibilities of the Parties relating to Product and reflecting the provisions set forth above in this Section 4.07(a).

(b) In the event that any government agency or authority issues or requests a recall or takes similar action in connection with the Product, or in the event either Party determines that an event, incident or circumstance has occurred that may result in the need for a recall or market withdrawal, the Party notified of or desiring such recall or market withdrawal shall promptly advise the other Party thereof. Fosun shall be responsible for any costs associated with a Product recall that is caused by damage during distribution, sales and marketing and related Commercialization activities in the Territory, while Revance shall be responsible for any costs associated with a Product recall that is caused by damage during manufacturing.

**Section 4.08 General Provisions Regarding Commercialization.** Fosun will control and perform, itself or through its Affiliates, or Sublicensees, the Commercialization of the Product throughout the Territory and, as a result, shall be obligated and responsible for using Commercially Reasonable Efforts to carry out such Commercialization in accordance with the Commercialization Plan (as defined below). Except to the extent otherwise described in this Agreement, Fosun will be solely responsible for, and will bear all costs relating to, the Commercialization of the Products in the Territory.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 4.09 Commercialization Plan.** Fosun shall be responsible for providing to the JDC for approval a reasonably detailed plan specifying the major Commercialization activities, including revenue targets and regional price strategy, planned for the Product in the Territory with respect to each Indication for which it is seeking Regulatory Approval, and the timelines for achieving such activities (the "**Commercialization Plan**"). Fosun shall deliver an initial draft of the Commercialization Plan to Revance for Revance's review no later than [*]. Revance shall have the right to comment where appropriate prior to the submission of the Commercialization Plan to the JDC for approval. Thereafter, from time to time, but at least every [*], Fosun shall propose updates or amendments to the Commercialization Plan in consultation with Revance to reflect changes in the plans, including those in response to changes in the marketplace, relative commercial success of the Product, and other relevant factors that may influence such plan and activities. Fosun shall submit the proposed updated or amended Commercialization Plan to the JDC for review and approval.

**Section 4.10 Reports of Commercialization Activities.** For each Calendar Year following the first Regulatory Approval of the Product in the Territory, Fosun shall provide to Revance annually within [*] after the end of such Calendar Year a written report that summarizes the Commercialization activities performed by or on behalf of Fosun, its Affiliates and Sublicensees in the Territory since the prior report by Fosun. Such report shall contain sufficient detail to enable Revance to assess Fosun's compliance with its Commercialization obligations in Section 4.08. Such reports shall be Confidential Information to Fosun pursuant to Article VII. Fosun shall provide updates to any such reports at JDC meetings, as necessary.

## ARTICLE V.
## SUPPLY

**Section 5.01 Supply.**

(a) Revance shall supply Product to Fosun to allow Fosun to conduct its Development and Commercialization activities in the Territory under this Agreement, as the Parties shall agree to in a separate supply agreement ("**Supply Agreement**"). Such Supply Agreement shall be entered into between the Parties within six (6) months of the Effective Date. The Supply Agreement shall provide specific terms and obligations concerning, among other things, forecasts, purchase orders, and supply of Product for the Territory, in accordance with Sections 5.01(b)-(e) below. The Parties shall also enter into a separate Quality Assurance Agreement ("**Quality Agreement**") within six (6) months upon the Effective Date. Such Quality Agreement shall define the manufacturing and supply quality responsibilities negotiated in good faith between the Parties.

(b) Development Supply. For supply of Product related to Fosun's Development activities (including all clinical or regulatory supplies necessary to obtain Regulatory Approval in the Territory), Revance shall supply the first [*] vials of Product for each Indication (the strength of each vial to meet one treatment per protocol) free of cost to Fosun, such free supply intended to be used by Fosun for all Development activities related to such indication, regardless of the number of clinical trials or other Development activities performed by Fosun or necessary for Regulatory Approval of such Indication. Any supply for Development purposes in excess of such [*] limit shall be supplied at the Transfer Price.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(c) Commercial Supply. For supply of Product for Commercialization purposes, Revance shall supply such Product to Fosun at the Transfer Price.

(d) The Supply Agreement shall specify, among other things: (i) a rolling forecast with binding periods (subject to mutually agreed upon variances); (ii) a binding purchase order requirement with a sufficient lead time for Revance to incorporate such orders under its then-current contract manufacturing orders with Third Party Manufacturers; and (iii) the Product to be supplied FCA (Incoterms 2010).

(e) In the event Revance is unable to supply Fosun's Product requirements pursuant to the Supply Agreement, the Parties shall agree upon mechanisms for safety stock and/or penalties to be specified in the Supply Agreement.

**Section 5.02 Restrictions on Manufacture and Supply.** Notwithstanding anything to the contrary herein, Fosun shall not (i) Manufacture or have Manufactured, itself or through an Affiliate or Sublicensee, nor authorize or license any Third Party to Manufacture or have Manufactured the Product; (ii) supply any Product it receives from Revance or its designated Manufacturer under this Agreement to any Third Party for any Third Party use, other than to Develop and Commercialize the Product in compliance with this Agreement; or (iii) purchase any Product from any party other than Revance or its designated Manufacturer pursuant to the Supply Agreement.

## ARTICLE VI.
## CONSIDERATION

**Section 6.01 Upfront.** As payment for the rights and licenses granted to Fosun by Revance under this Agreement, Fosun shall pay to Revance a nonrefundable payment of thirty million U.S. dollars (USD $30 million) within thirty (30) Business Days after the Effective Date. The upfront payment shall not be creditable against any other payments Fosun is obligated to make to Revance under this Agreement.

**Section 6.02 Milestone Payments.**

(a) Fosun shall make the following one-time, nonrefundable milestone payments to Revance within [*] Business Days following the first achievement of each of the following milestone events for a Product, subject to the limitations and additional provisions set forth below in this Section 6.02:



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

| Milestone Event for Product | Milestone Payment (USD) |
|---|---|
| 1a. Acceptance of Submission of BLA by FDA for 1st Aesthetic Indication | $[*] |
| 1b. Approval of BLA by FDA for 1st Aesthetic Indication | $[*] |
| 1c. Approval of BLA by NMPA for 1st Aesthetic Indication | $[*] |
| 2a. Approval of BLA by FDA for 1st Therapeutic Indication* | $[*] |
| 2b. Approval of BLA by NMPA for 1st Therapeutic Indication | $[*] |
| 3a. Approval of BLA by FDA for 2nd Therapeutic Indication | $[*] |
| 3b. Approval of BLA by NMPA for 2nd Therapeutic Indication | $[*] |
| 4a. Approval of BLA by FDA for 3rd Therapeutic Indication | $[*] |
| 4b. Approval of BLA by NMPA for 3rd Therapeutic Indication | $[*] |

* If the Therapeutic Indication approved by the FDA in Milestone Nos. 2-4 above is related to either of two preferred Therapeutic Indications to be defined in the Development Plan (each of which a "**Preferred Indication**"), then the "a" of such milestone payment shall be increased by USD $[*] and the "b" of such milestone payment shall be increased by USD $[*]. If either or both of the Preferred Indication is not among the above three (3) approved Therapeutic Indications by the FDA, then USD $[*] shall be paid within [*] Business Days upon the approval of BLA by NMPA for each Preferred Indication. However, [*] and [*] shall be the Preferred Indication if [*] the Preferred Indication in the Development Plan.

(b) Each of the milestones set forth in Section 6.02(a) is eligible to be earned individually.

(c) No payments pursuant to Section 6.02(a) shall be creditable against any other payments Fosun is obligated to make to Revance under this Agreement.

**Section 6.03 Sales Related Milestones.**

(a) Fosun shall make the following one-time, nonrefundable milestone payments to Revance within [*] Business Days following the first achievement of each of the following milestones, subject to the limitations and additional provisions set forth below in this Section 6.03.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

| First time Calendar Year Net Sales (USD) in Territory exceed the following amounts | Milestone Payment (USD) |
|---|---|
| [*] | $[*] |
| [*] | $[*] |
| [*] | $[*] |
| [*] | $[*] |
| [*] | $[*] |

(b) Sales between Fosun, its Affiliates and Sublicensees shall not be subject to sales milestones hereunder. Sales milestones shall be calculated on Fosun's, its Affiliates' and Sublicensees' sales of the Products to a Third Party.

(c) In the event that more than one of the sales milestones set forth in Section 6.03(a) are achieved in the same Calendar Year, the payment associated with each sales milestone achieved in such Calendar Year shall be due and payable by Fosun to Revance within [*] Business Days following the end of such Calendar Year.

(d) No payments pursuant to Section 6.03(a) shall be creditable against any other payments Fosun is obligated to make to Revance under this Agreement.

**Section 6.04 Royalties.**

(a) Subject to the provisions set forth below in Section 6.04(c) through Section 6.04(e), and Section 6.05, Fosun shall pay to Revance a royalty on aggregate Annual Net Sales of the Product in the Territory made by Fosun, its Affiliates, or its Sublicensees at the following rate:

| Range of Annual Net Sales (USD) | Royalty Rate |
|---|---|
| On that portion less than $[*] | [*]% |
| On that portion greater than or equal to $[*] but less than $[*] | [*]% |
| On that portion greater than or equal to $[*] but less than $[*] | [*]% |
| On that portion greater than or equal to $[*] | [*]% |

Each Royalty Rate set forth in the table above shall apply only to that portion of the Net Sales in the Territory

during a given Calendar Year that falls within the indicated range.

For illustration purposes only, if Net Sales resulting from the sale of a Product in the Territory during a Calendar Year total $[*] USD, then the aggregate royalties payable with respect



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

thereto will be $[*] USD, calculated as follows: (i) $[*] multiplied by [*]% = $[*], plus (ii) $[*] multiplied by [*]% = $[*], plus (iii) $[*] multiplied by [*]% = $[*].

(b) Sales between Fosun, its Affiliates and Sublicensees shall not be subject to royalties hereunder. Royalties shall be calculated on Fosun's, its Affiliates' and Sublicensees' sales of the Product to a Third Party.

(c) Royalty Term. The royalty payments payable under this Section 6.04 shall be payable on an aggregated Annual Net Sales basis from the First Commercial Sale of Product in the Territory until the latest of: (i) the expiration of the last Valid Claim (including any patent term adjustments or extensions) within the Revance Patents that covers the Product (including composition of matter, method of use or making) in the Territory; (ii) the expiration of all Regulatory Exclusivity for the Product in the Territory; (iii) the first commercial sale of a Biosimilar of the Product in the Territory; and (iv) [*] years after the First Commercial Sale of the Product in the Territory (the "***Royalty Term***").

(d) Patent Expiration Step-Down. The royalties that would otherwise be payable on Net Sales of the Product in the Territory shall be reduced by [*] during any period in which there exists no Valid Claim of a Revance Patent that covers the Product in the Territory.

(e) Biosimilar Step-Down. If a Product is generating Net Sales in the Territory during the applicable Royalty Term at a time when one or more Biosimilar(s) with respect to the Product is being sold in the Territory, then the royalties that would otherwise be payable on Net Sales of the Product in the Territory in such Calendar Quarter under Section 6.04(a) and, if applicable, Sections 6.04(d) and (f), shall be reduced by the following percentage for so long as the Biosimilar is being sold in the Territory during the Royalty Term: (i) [*] if [*]; (ii) [*] if [*]; or (iii) [*] if [*].

(f) Third Party Compensation. If (i) Fosun determines that it is necessary (x) to obtain a license from any Third Party in order to avoid infringement of such Third Party's Patent in the Territory, or (y) to make any payment of any kind in order to maintain the right to sell the Product in the Territory, and (ii) Fosun is required to pay to Third Party a royalty, milestone payments, or other monetary compensation in consideration for the grant of such license or maintenance of the right to Commercialization ("**Third Party Compensation**"), then, provided that (i) [*], or (ii) [*], for the period during which Fosun owes royalties to Revance hereunder, the royalties that would otherwise be payable on Net Sales of the Product in the Territory [*], shall be reduced by an amount of [*] of all Third Party Compensation payable by or on behalf of Fosun to such Third Party during the same period.

(g) Royalty Floor. Notwithstanding the foregoing, during any Calendar Quarter in the Royalty Term for a Product in the Territory, the operation of Sections 6.04(d), (e), and (f), individually or in combination shall not reduce the final royalty obligation by more than [*] of the royalties that would otherwise by payable on Net Sales of the Product in the Territory under Section 6.04(a).

**Section 6.05 Sales by Sublicensees.** In the event Fosun grants sublicenses to one or more Sublicensees to sell Product to the extent permitted hereunder, such sublicenses shall include without limitation an obligation for the Sublicensee to account for and report its Net Sales of such Product



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

on the same basis as if such sales were Net Sales by Fosun, and Fosun shall pay royalties and sales milestones to Revance as if the Net Sales of the Sublicensee were Net Sales of Fosun.

**Section 6.06 Royalty Payments and Reports.** The royalties payable under Section 6.04 shall be calculated quarterly as of the last day of March, June, September and December respectively for the Calendar Quarter ending on that date. Fosun shall deliver to Revance a report summarizing the Net Sales of Product during each Calendar Quarter following the First Commercial Sale of Product in the Territory. A draft of such report shall be provided within [*] Business Days following the end of each Calendar Quarter for which royalties are due from Fosun to allow Revance to estimate its royalty payments from Fosun. A final report, certified under IFRS, shall be delivered within [*] Business Days following the end of each Calendar Quarter. Any royalties payable to Revance or its designee under this Agreement shall be paid on the date that final report for the Calendar Quarter is delivered to Revance under this Section 6.06.

**Section 6.07 Taxes.**

(a) The royalties, milestones and other amounts payable by Fosun to Revance pursuant to this Agreement ("**Payments**") shall not be reduced on account of Taxes unless required by Applicable Laws. To the extent any payments made by Fosun pursuant to this Agreement become subject to withholding income Taxes under Applicable Laws, Fosun shall deduct and withhold the amount of such Taxes for the account of Revance to the extent required by Applicable Laws; such amounts payable to Revance shall be reduced by the amount of withholding income Taxes deducted and withheld; and Fosun shall pay the amounts of such Taxes to the proper governmental authority in a timely manner and transmit to Revance an official tax certificate or other evidence of such tax obligations together with proof of payment from the relevant governmental authority of all amounts deducted and withheld sufficient to enable Revance to claim such payment of Taxes. Any such withholding income Taxes required under Applicable Laws to be paid or withheld shall be an expense of, and borne solely by, Revance. Except as provided in this Section 6.07(a), all taxes or duties in connection with payments made by Fosun for Indirect Taxes, including any value added or similar tax or local tax or surcharge on value added taxes and any import duty or fees, shall be borne by Fosun. Notwithstanding the foregoing, if Revance is entitled (whether under any applicable tax treaty or otherwise under Applicable Laws) to a reduction in the rate of, or the elimination of, withholding income Tax, it may deliver to Fosun or the appropriate governmental authority (with the assistance of Fosun to the extent that this is reasonably required and is expressly requested in writing) the prescribed forms necessary to reduce the applicable rate of withholding or to relieve Fosun of its obligation to withhold Tax, and Fosun shall apply the reduced rate of withholding, or dispense with withholding, as the case may be. Fosun agrees to take reasonable and lawful efforts to minimize such withholding income Taxes that would otherwise be borne by Revance. Fosun shall cooperate with Revance as reasonably requested in any claim for refund or application to any Tax Authority. If Fosun intends to withhold income Tax from any Payment, Fosun shall inform Revance reasonably in advance of making such Payment to permit Revance an opportunity to provide any forms or information or obtain any Tax Authority approval as may be available to reduce or eliminate such withholding.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b) Tax Gross-up. Notwithstanding anything to the contrary herein, if (i) Fosun redomiciles or assigns its rights or obligations under this Agreement, (ii) as a result of such redomiciliation or assignment, Fosun (or its assignee) is required by Applicable Law to withhold taxes, or such redomiciliation or assignment results in the imposition of Indirect Taxes that were not otherwise applicable, from or in respect of any amount payable under this Agreement, and (iii) such withholding taxes or Indirect Taxes exceed the amount of withholding taxes or Indirect Taxes that would have been applicable but for such redomiciliation or assignment, then any such amount payable to Revance pursuant to this Agreement shall be increased to take into account such withholding taxes or Indirect Taxes as may be necessary so that, after making all required withholdings (including withholdings on the additional amounts payable) and/or paying such Indirect Taxes, as the case may be, Revance receives an amount equal to the sum it would have received had no such increased withholding been made and no such Indirect Taxes had been imposed. The obligation to pay additional amounts pursuant to the preceding sentence shall not apply, however, to the extent such increased withholding tax or Indirect Taxes would not have been imposed but for the assignment by Revance of its rights or obligations under this Agreement or the redomiciliation of Revance outside of the United States, to the extent such assignment or redomiciliation occurs after the redomiciliation or assignment by Fosun described in the first sentence of this Section 6.07(b). Solely for purposes of this Section 6.07(b), a Party's "**domicile**" shall include its jurisdiction of incorporation or tax residence and a "**redomiciliation**" shall include a reincorporation or other action resulting in a change in tax residence of the applicable Party or its assignee.

(c) Notwithstanding anything to the contrary contained in this Section 6.07 or elsewhere in this Agreement, the following shall apply with respect to Indirect Taxes. If any Indirect Taxes are chargeable in respect of any Payments, Fosun shall be responsible for such Indirect Taxes and shall not reduce any Payments due Revance hereunder as a result of such Indirect Taxes. Fosun shall pay such Indirect Taxes at the applicable rate in respect of any such Payments following the receipt, where applicable, of an Indirect Taxes invoice issued by Revance in respect of those Payments, such Indirect Taxes to be payable on the due date of the payment of the Payments to which such Indirect Taxes relate or at the time such Indirect Taxes are required to be collected by Revance, in the case of payment of Indirect Taxes to Revance. The sum of the net amount received by Revance and the withholding income Tax levied by China Tax Authority discussed in Section 6.07(a) above for each payment shall not be less than the amount of the Upfront and Milestone Payments set forth in Section 6.01, 6.02 and 6.03. The Parties shall issue invoices for all goods and services supplied under this Agreement consistent with Indirect Tax requirements, and to the extent any invoice is not initially issued in an appropriate form, Fosun shall promptly inform Revance and shall cooperate with Revance to provide such information or assistance as may be necessary to enable the issuance of such invoice consistent with Indirect Tax requirements.

**Section 6.08 Payments or Reports by Affiliates.** Any Payment required under any provision of this Agreement to be made to Revance or any report required to be made by Fosun shall be made by an Affiliate of Fosun if such Affiliate is designated by Fosun as the appropriate payer or reporting entity.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 6.09 Mode of Payment.** All payments set forth in this Article VI shall be remitted by wire transfer to the bank account of Revance as designated in writing to Fosun.

**Section 6.10 Payment Currency.** All amounts payable and calculations under this Agreement shall be in United States dollars. As applicable, Net Sales and any adjustments to payments under this Agreement shall be translated into United States dollars at an exchange rate determined by using the 30-day trailing average of the daily middle exchange rate for the renminbi of People's Bank of China (the central bank of the government of China) as published daily at http://www.safe.gov.cn/wps/portal/english/Home, as of the date of the applicable invoice.

**Section 6.11 Imports**. For the avoidance of doubt, the Parties acknowledge and agree that none of the milestones or royalties payable under this Agreement are related to the license (or right) to import or any import of Products. Fosun shall be responsible for any import clearance, including payment of any import duties and similar charges, in connection with the Product transferred to Fosun under this Agreement. The Parties shall co-operate in accordance with Applicable Laws to ensure where permissible that no import duties are paid on imported materials. Where import duties are payable, the Parties shall co-operate to ensure that the Party responsible for shipping values the materials in accordance with Applicable Laws and minimizes where permissible any such duties and any related import taxes that are not reclaimable from the relevant authorities.

**Section 6.12 Discounted Sales.** In the event that the Product is included as part of a package of products offered to customers of Fosun, and discounts on packages including Product are offered independently in the Territory, Fosun shall not discount the price of the Product sold as part of a package unreasonably compared to the discount Fosun offers on prices of the other products included in such package.

## ARTICLE VII.
## CONFIDENTIALITY

**Section 7.01 Confidentiality.** The Parties agree that the Party receiving Confidential Information disclosed by or on behalf of the other Party pursuant to this Agreement is entitled to disclose Confidential Information to its officers, directors, employees, agents, Affiliates and Sublicensees and other Persons to which a sublicense is granted, only for the purpose of the Agreement on a need-to-know basis, and shall cause the aforesaid persons to keep confidential and not publish or otherwise disclose or use for any purpose other than to conduct its activities under this Agreement or otherwise as expressly authorized by this Agreement any Confidential Information furnished to it by or on behalf of the other Party pursuant to this Agreement.

**Section 7.02 Exceptions.** Notwithstanding the foregoing, the obligations set forth in Section 7.01 shall not apply in respect of Confidential Information to the extent that it can be established by the receiving Party that such Confidential Information:

(a) was already known to the receiving Party, other than under an obligation of confidentiality, at the time of disclosure by or on behalf of the other Party;



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(b) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the receiving Party;

(c) was independently developed without use of the disclosing Party's information, as evidenced by contemporaneous written records;

(d) became generally available to the public or otherwise part of the public domain after its disclosure to the receiving Party and other than through any act or omission of the receiving Party in breach of this Agreement; or

(e) was disclosed to the receiving Party, other than under an obligation of confidentiality, by a Third Party who had no obligation to the disclosing Party not to disclose such information to others.

**Section 7.03 Receipt of Third Party Information.** Neither Party shall not knowingly receive documents relating to the Product under an obligation of confidentiality to Third Parties that requires the Party to withhold access to the other Party without such Party's written consent.

**Section 7.04 Authorized Disclosure.** The receiving Party may disclose Confidential Information of the disclosing Party to a Third Party only upon reasonable advanced notice to the disclosing Party and only to the extent that such disclosure is:

(a) required by law, order, or regulation of a government agency or a court of competent jurisdiction, or by the rules of a securities exchange, provided that the receiving Party required to make such disclosure shall, after providing reasonable advanced notice to the disclosing Party before the disclosure, (i) give the disclosing Party an opportunity to comment on any such required disclosure, (ii) if requested by the disclosing Party, use Commercially Reasonable Efforts to obtain protective orders or any available limitations on or exemptions from such disclosure requirement where applicable and practicable;

(b) made to a patent office for the purposes of filing or enforcing a Patent as permitted in this Agreement, provided, however, the receiving Party (i) receives written consent from the disclosing Party for such disclosure, and (ii) takes reasonable measures to assure confidential treatment of such information, to the extent such protection is available;

(c) made by a Party or its Affiliates, or Sublicensees to the Regulatory Health Authority for the purposes of any filing, application or request for Regulatory Approval for the Product as permitted in this Agreement;

(d) made to advisors, actual or potential Third Party partners, investors, licensees, sublicensees or acquirers of all or substantially all of the assets to which this Agreement relates; provided, however, the receiving Party (i) receives written consent from the disclosing Party for such disclosure, and (ii) takes reasonable measures to assure confidential treatment of such information, to the extent such protection is available;



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

(e) made by Fosun or its Affiliates, or Sublicensees to Third Parties as may be necessary or useful in connection with the Exploitation of the Product as contemplated by this Agreement, including subcontracting or sublicensing transactions in connection therewith;

provided that with respect to disclosures as per subsection (b), (d) and (e) of the following sentence, the Party making such disclosures shall ensure that each Third Party recipient is bound by obligations of confidentiality no less restrictive than those contained in this Agreement and shall be liable to the other Party for any breach of such confidentiality obligations by the relevant recipient.

**Section 7.05 Survival.** This Article VII (other than Section 7.03) shall survive for a period of [*] years following the termination or expiration of the Agreement, provided however, that all Trade Secret information shall be safeguarded by the receiving Party as required by this Agreement in perpetuity or for so long as such information remains a Trade Secret under Applicable Law.

**Section 7.06 Termination of Prior Agreements.** This Agreement supersedes the Confidentiality Agreement between Revance and Fosun dated as of [*], (the "**CDA**"). All Information and Materials exchanged between the Parties under the CDA shall be deemed Confidential Information and shall be subject to the terms of this Article VII.

**Section 7.07 Publications.** Except as required by law, Fosun agrees that it shall not publish or publicly present any scientific, technical, or academic information relating to the Product (a) without the opportunity for prior review by Revance and (b) other than in compliance with this Section 7.07. For the avoidance of doubt, advertising information shall not be subject to this Section 7.07. Fosun shall provide to Revance the opportunity to review any proposed publications or presentations (including without limitation information to be presented verbally) that relate to the Product as early as reasonably practical, but at least [*] days prior to their intended submission for publication or presentation, and Fosun agrees, upon written request from Revance within the Review Period (as defined below), not to submit such abstract or manuscript for publication or to make such presentation until Revance agrees, which agreement shall not be unreasonably withheld. Revance shall have [*] days after its receipt of any such publication or presentation (the "**Review Period**") to notify Fosun in writing of any specific objections to the intended publication or presentation. Fosun shall, in any such publication or presentation, delete from the proposed disclosure any Confidential Information of Revance. Additionally, if Revance notifies Fosun within the Review Period that it objects to such disclosure on the basis that a patent application claiming information contained in such disclosure should be filed prior to such disclosure, Fosun agrees to reasonably delay disclosure of the relevant information, for up to [*] days after Revance's timely notification of its objection as per the above, or until such application has been filed, if earlier. Once any such abstract or manuscript is accepted for publication, Fosun will provide Revance with a copy of the final version of the manuscript or abstract.

## ARTICLE VIII.
## OWNERSHIP OF INTELLECTUAL PROPERTY AND PATENT RIGHTS

**Section 8.01 Ownership.** Except as expressly provided in this Agreement, Revance shall retain sole and exclusive Control of the Revance Technology, including Revance Know-How, Revance Patents, and Revance Trademarks. Except as expressly provided herein, no right, title, or



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

interest is granted by Revance to Fosun in, to, or under any Revance Technology, and, except as expressly provided herein, Fosun shall have no right to assign to any Third Party any right or interest received under Revance Technology under the terms of this Agreement. Fosun shall retain sole and exclusive Control of any Fosun Technology.

**Section 8.02 Assignment of Product-related IPR.** Fosun hereby assigns to Revance all of Fosun's right, title, and interest to and in any Product-related IPR that it or its Affiliates or Sublicensees may acquire throughout the Term of this Agreement. Fosun shall be responsible for ensuring its employees, Affiliates, and Sublicensees are obligated to assign such rights and execute appropriate documents consistent with Fosun's obligations under this Section 8.02. Upon request, Fosun shall reasonably cooperate with Revance, including executing appropriate documentation, regarding: (i) the perfection of Revance's ownership rights in the Product-related IPR; (ii) the prosecution of any patent or trademark applications; and (iii) the enforcement or defense of any action related to the Product-related IPR. For the avoidance of doubt, Fosun's assignment of Product-related IPR to Revance under this Section 8.02 shall automatically convert such Product-related IPR into Revance Technology that is licensed to Fosun under Section 2.01.

**Section 8.03 Prosecution and Maintenance of Patent Rights.**

(a) Revance shall be primarily responsible for and control the preparation, filing, prosecution, and maintenance of the Revance Patents in the Territory. Revance shall, at its own cost, file, prosecute, and maintain all Revance Patents in the Territory after taking into account Fosun's reasonable interests and requests after reasonable consultation with Fosun. Revance shall provide Fosun with advance copies of, and a reasonable opportunity to comment upon, proposed patent filings, related prosecution strategies and proposed correspondence with patent officials, all to the extent in the Territory and relating to any Revance Patents, and will consider comments received from Fosun with respect to such proposed filings, strategies and correspondence in the Territory in good faith and will not unreasonably reject such comments. Revance agrees to discuss in good faith any changes reasonably requested by Fosun to such filings, strategies and correspondence in the Territory upon their being received. As relevant to the activities and interests of Fosun under this Agreement, Revance shall promptly inform Fosun in writing of any change in the status of the Revance Patents in the Territory.

(b) Each Party agrees to bring to the attention of the other Party any Third Party Patent it discovers, or has discovered, and which relates to the subject matter of this Agreement.

**Section 8.04 Enforcement Rights.**

(a) **Infringement by Third Parties in the Territory**. Revance shall have the initial right, but not the obligation, at its expense and in its own name or in the name of any of its Affiliates, to initiate, maintain, and control any legal action on account of any infringement within the Territory of any Revance Patent or Revance Trademark by a Third Party, by counsel of its own choice. Revance shall promptly notify Fosun in writing its intention to initiate legal action against a Third Party for such infringement within the Territory. If Revance exercises its first right, Fosun will, at Revance's expense, provide Revance cooperation as reasonably necessary, including being named as a party. With respect to actions, proceedings or settlements in the Territory, Fosun shall have the right, in



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Fosun's sole discretion and at Fosun's expense, to join or otherwise participate in such legal action in the Territory with legal counsel selected by Fosun. If Revance does not exercise its first right, Fosun will thereafter have the right, but not the obligation, at its expense and in its own name or in the name of any of its Affiliates, to initiate, maintain, and control such legal action on Revance's behalf by counsel of its choice. In the event that Fosun initiates and thereafter maintains such legal action against a Third Party for infringement of a Revance Patent or Revance Trademark in the, Revance, at Fosun's expense, will provide Fosun cooperation as reasonably necessary, including agreeing to be named as a party to such legal action.

(b) The Party first having Knowledge that any Revance Patent or Revance Trademark claiming or covering inventions that are necessary or useful to Exploit the Product in the Territory is infringed, or misappropriated by a Third Party, or suspected of being infringed or misappropriated by a Third Party in the Territory shall promptly notify the other Party thereof in writing. Such notice shall set forth the facts of that infringement, misappropriation, or suspected infringement or misappropriation in reasonable detail.

(c) **Third Party Infringement Claims Against Product in the Territory.** If a Third Party asserts that a Patent or other right owned or controlled by it is infringed by the Development or Commercialization of the Product in the Territory, Revance shall have the initial right, but not the obligation, at its expense and in its own name or in the name of any of its Affiliates, to defend, control and settle such legal action with counsel of its own choice, provided that any such settlement shall require Fosun's written consent. Revance shall notify Fosun in writing within ten (10) calendar days after receiving notice of such legal action. If Revance exercises its first right, Fosun shall, upon Revance's reasonable request, provide Revance cooperation as reasonably necessary; provided Revance shall reimburse for reasonable costs and expenses directly related to such cooperation. If Revance does not exercise its first right, Fosun will thereafter have the right, but not the obligation, at its expense and in its own name or in the name of any of its Affiliates, to defend and control such legal action on Revance's behalf, at its own expense and with counsel of its choice; provided that any settlement shall require Revance's written consent.

(d) **Allocation of Expenses and Recoveries.** Except as otherwise agreed by the Parties in writing, the Party controlling the legal action under Section 8.04 shall be solely responsible for any expenses incurred by such party as a result of such action. If the Parties are recovered monetary damages in such action, such amounts shall be allocated first to the reimbursement of any expenses incurred by the Parties in such action, and any remaining amounts shall be shared as follows: [*]. If such recovery is insufficient to reimburse the expenses of the Parties, then each Party shall receive a pro rata portion of the recovery based on [*]. If Fosun exercises its right, in its sole discretion and at its own expense, to join or otherwise participate in such legal action in the Territory with legal counsel selected by Fosun, any remaining amounts (after fully reimbursing the expenses of the Parties) shall be shared [*].

(e) **Settlement of Third Party Claims for Infringement in the Territory; Payment of Third Party Royalties.** If a Third Party asserts that a Patent or other right owned or controlled by it is infringed by the Development or Commercialization or other Exploitation of the Product in the Territory, and as a result of settlement procedures or litigation under Section 8.04 (c), Fosun is



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

required to pay the Third Party a royalty or make any payment of any kind for the right to sell the Product in the Territory, such expense shall be borne solely by Fosun provided that Fosun may deduct certain Third Party Compensation from its royalty or payment obligations to Revance in accordance with Section 6.04(f).

(f) **Oppositions by Parties.** If either Party desires to bring an opposition, action for declaratory judgment, nullity action, interference, reexamination, or other attack upon the validity, title, or enforceability of any Patents Controlled by a Third Party in the Territory that claim the use or sale or other Exploitation of the Product, such Party shall so notify the other Party in writing, and the Parties shall promptly confer to discuss whether to bring such action or the manner in which to settle such action; provided, if the Parties cannot reach agreement on whether to bring such action within thirty (30) days of such written notice, then such issue shall be subject to the dispute resolution procedures of Article XIII. The Party not bringing an action under this Section 8.04(f) shall be entitled to separate representation in such proceeding by counsel of its own choice and at its own expense, and shall otherwise cooperate fully with the Party bringing such action at the other Party's expense.

(g) **Oppositions by Third Parties.** If any Revance Patent in the Territory becomes the subject of any proceeding commenced by a Third Party in connection with an opposition, reexamination request, action for declaratory judgment, nullity action, third party observation interference, or other attack upon the validity, title, or enforceability thereof in the Territory, then the Party having the right to prosecute such Patent at such time pursuant to Section 8.03 shall control such defense, at its sole cost. The prosecuting Party shall permit the non-prosecuting Party to participate in the proceeding to the extent permissible under law, and to be represented by its own counsel in such proceeding, at the non-prosecuting Party's expense. The non-prosecuting Party shall reasonably cooperate with the prosecuting Party in such proceeding. If either Party decides that it does not wish to defend against such action, then the other Party shall have a backup right to assume defense of such Third Party action at its own expense. Any recoveries obtained in such action shall be shared, as set forth in Section 8.04(d).

(h) **Protective Order.** If, in any action brought pursuant to this Section 8.04 any information is the subject of a protective order that may be reviewed by counsel only, the Parties will endeavor to structure such protective order so as to enable their respective internal counsel to be included as permitted reviewers of such information.

## ARTICLE IX.
## REPRESENTATIONS, WARRANTIES, AND COVENANTS

### Section 9.01 Representations, Warranties, and Covenants.

(a) Each of the Parties hereby represents and warrants to the other Party that:

(i) this Agreement is a legal and valid obligation binding upon such Party and enforceable in accordance with its terms. The execution, delivery, and performance of the Agreement by such Party does not conflict with any company bylaw, agreement, instrument, or understanding, oral or written, to which it is a Party or by which it is bound, nor violate



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

any law or regulation of any court, Governmental Body, or administrative or other agency having jurisdiction over it;

(ii) such Party has not, and during the Term will not, grant any right to any Third Party relating to its respective Patents and Know-How which would conflict with the rights granted to the other Party hereunder; and

(iii) such Party will at all times and in all material respects comply with all Applicable Laws relating to its activities under this Agreement.

(iv) such Party shall implement appropriate processes and controls with respect to technology and work flow methodologies in connection with its activities under or in connection with this Agreement so as to protect the security and privacy of personally identifiable information in accordance with Applicable Laws.

(b) Revance represents, warrants and covenants as of the Effective Date (or as of such other/additional time as may be explicitly specified below) to Fosun that:

(i) Revance is the sole and exclusive owner, or exclusive licensee, of the entire right, title and interest in the Revance Patents existing as of the Effective Date and during the Term. Revance has all rights necessary to grant the licenses under the Revance Technology existing as of the Effective Date and during the Term that it grants to Fosun in this Agreement. The Revance Patents are not subject to any encumbrance, lien or claim of ownership by any Third Party. To Revance's Knowledge, the Revance Technology had not infringed and will not infringe any Intellectual Property Rights of any Third Party in the Territory.

(ii) To Revance's Knowledge, all applicable fees due to patent authorities with respect to the filing and prosecution of the Revance Patents existing as of the Effective Date have been paid on or before the due date for payment (as such due date may be extended in accordance with Applicable Law or patent authority rules and regulations) and will be paid in time during the Term.

(iii) As of the Effective Date, to Revance's Knowledge, there is no actual or threatened infringement or misappropriation of the Revance Technology by any Person.

(iv) Revance has not been debarred by the FDA, is not subject to any similar sanction of other Regulatory Health Authorities in the Territory, and is not subject to any such debarment or similar sanction by any such Regulatory Health Authority, and Revance has not used, and will not engage, in any capacity, in connection with this Agreement, any Person who either has been debarred by such a Regulatory Health Authority, or is the subject of a conviction described in Section 306 of the FFDCA (21 U.S.C. §335a). Revance shall inform Fosun in writing immediately if it or any Person engaged by Revance who is performing services under this Agreement is debarred or is the subject of a conviction described in Section 306 of the FFDCA (21 U.S.C. §335a) or if any action, suit, claim, investigation or legal or administrative proceeding is pending or, to Revance's Knowledge,



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

is threatened, relating to the debarment or conviction of Revance or any such Person performing services hereunder.

(c) Fosun represents, warrants and covenants as of the Effective Date (or as of such other/additional time as may be explicitly specified below) to Revance that:

(i) Fosun has not been debarred by the FDA (and is not subject to any similar sanction of other Regulatory Health Authorities in the Territory), and is not subject to any such debarment or similar sanction by any such Regulatory Health Authority, and Fosun has not used, and will not engage, in any capacity, in connection with this Agreement, any Person who either has been debarred by such a Regulatory Health Authority, or is the subject of a conviction described in Section 306 of the FFDCA (21 U.S.C. §335a). Fosun shall inform Revance in writing immediately if it or any Person engaged by Fosun who is performing services under this Agreement is debarred or is the subject of a conviction described in Section 306 of the FFDCA (21 U.S.C. §335a), or if any action, suit, claim, investigation or legal or administrative proceeding is pending or, to Fosun's Knowledge, is threatened, relating to the debarment or conviction of Fosun or any such Person performing services hereunder.

(ii) To the extent permissible under Applicable Laws, each employee and contractor of Fosun performing obligations under this Agreement shall, prior to conducting any such obligations hereunder, be obligated by Applicable Law, or written contract to (i) promptly disclose to Fosun of all inventions and Know-How conceived or reduced to practice by such employee or contractor during any performance under this Agreement, (ii) automatically assign to Fosun all right, title and interest in and to all such inventions and Know-How and all Intellectual Property Rights therein, including all Product-related Inventions and Product-related Data, and (iii) adhere to similar obligations of confidentiality as are set forth in this Agreement. Fosun shall not knowingly engage in any activities that use the inventions covered or claimed in the Revance Patents, or any Revance Know-How a manner that is outside the scope of the license rights expressly granted to it hereunder.

(d) Each of the Parties hereby covenants to the other Party that:

(i) Revance shall perform, or cause its Affiliates or other licensees or sublicensee to perform, its obligations and responsibilities under this Agreement in compliance with this Agreement, all Applicable Laws, applicable FDA (or foreign equivalent) requirements, including, without limitation, then-current GLP and GCP.

(ii) Fosun shall perform, or cause its Affiliates or Sublicensee to perform, its obligations and responsibilities under this Agreement in compliance with this Agreement, all Applicable Laws, applicable NMPA (or foreign equivalent) requirements, including, without limitation, then-current GLP and GCP.

**Section 9.02 No Debarment.** In the course of the Development of the Product in the Territory in accordance with this Agreement and during the term of this Agreement, neither Party will use, any employee or consultant that is debarred by any Regulatory Health Authority or, to the



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

best of such Party's Knowledge, is the subject of debarment proceedings by any Regulatory Health Authority. If either Party learns that its employee or consultant performing on behalf under this Agreement has been debarred by any Regulatory Health Authority, or has become the subject of debarment proceedings by any Regulatory Health Authority, such Party shall so promptly notify the other Party and shall prohibit such employee or consultant from performing on its behalf under this Agreement. The foregoing shall be without prejudice to the warranties stipulated in Section 9.01(b)(iv).

**Section 9.03 Privacy, Anti-Bribery, and Anti-Corruption Compliance.**

(a) Compliance with Privacy Laws. Each Party shall implement appropriate processes and controls with respect to technology and work flow methodologies in connection with its activities under or in connection with this Agreement so as to protect the security and privacy of personally identifiable information in accordance with Applicable Law.

(b) Compliance With Applicable Anti-Corruption Laws. Each party understands and agrees that it has complied and will continue to comply with all applicable Anti-Corruption Laws in connection with this Agreement.

(i) Each Party represents and warrants that no payments of money or anything of value have been or will be offered, promised, or paid, whether directly or indirectly, by any of its directors, officers, employees, Affiliates, or third party representatives to any Government Official in connection with this Agreement: (a) to influence any official act or decision of any Government Official; (b) to induce any Government Official to do or omit to do any act in violation of lawful duty; (c) to secure any improper business advantage; or (d) to obtain or retain business for, or otherwise direct business to, any Party in connection with this Agreement.

(ii) Each Party warrants and represents that, in connection with this Agreement, such Party, its directors, officers, employees, and third party representatives: (a) have not and will not request, accept, offer, promise, or give any bribe, kickback, or other corrupt payment to any person, including any representative of any commercial entity, in violation of any applicable Anti-Corruption Law; and (b) have not and will not request, offer, promise, or give any financial or other advantage to induce another person to perform a function or activity in order to obtain or retain an improper business advantage in any way relating to this Agreement.

(iii) Each Party warrants and represents that (a) it does not have any interest which directly or indirectly conflicts with its proper and ethical performance of the Agreement, and (b) it shall maintain arms-length relations with all Third Parties with which it deals for or on behalf of the other party in performance of the Agreement.

(c) Notification Of Investigations Into Potential Non-Compliance With Applicable Anti-Corruption Laws. Each Party warrants and represents that it will promptly inform the other party if such party, or any of its directors, officers, employees, Affiliates, third party representatives, or Sublicensees becomes subject to any investigation relating to any actual or potential violation of



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

any applicable Anti-Corruption Law in connection with this Agreement, including any meeting, interview, inspection, or audit requested by any Governmental Body.

(d) Cooperation With Due Diligence And Investigations. Each Party will provide reasonable cooperation in connection with any good faith investigation conducted by the other party into potential violations of applicable Anti-Corruption Laws in connection with this Agreement.

(e) Compliance Program. Each Party will adopt, implement, and/or update and, throughout the course of this Agreement, have, maintain, and enforce an appropriate and risk-based anti-corruption compliance program designed to reasonably ensure compliance with the representations contained in this Section 9.03 of the Agreement and all applicable Anti-Corruption Compliance Laws.

(f) Periodic Compliance Certifications. On an annual basis following the execution of this Agreement, or as reasonably requested in good faith by the other Party, each Party agrees to submit a compliance certificate to the other Party which restates the representations and warranties that are set forth in this Section 9.03 and provides certification by such Party that it has adhered, during the period covered by the compliance certificate, to the representations and warranties.

## ARTICLE X.
## RECORD RETENTION, AUDIT AND USE OF NAME

### Section 10.01 Records Retention; Audit.

(a) Each Party shall keep or cause to be kept accurate records of account in accordance with PRC GAAP, in the case of Fosun, and in accordance with U.S. GAAP, in the case of Revance, showing information that is necessary for the accurate determination of the Cost of Goods, the royalties and other payments due under Article VI, or any other payment due hereunder. Such records or books of account shall be kept until the [*] anniversary of December 31 of the Calendar Year in which the Product is relevant Product is sold (in the case of royalty or other payments due under Section 6.04) or in the period for which any other payment hereunder is required to be made. For clarity, Fosun shall cause its Affiliates to keep, and shall require pursuant to a written agreement that any Sublicensee or subcontractor performing activities hereunder keep accurate records or books of account in a manner that will permit such Party to comply with its obligations under the foregoing sentence.

(b) Upon the written request of the other Party, each Party shall permit a qualified accounting firm acceptable to both Parties to inspect during regular business hours and no more than once a year and once in any given Calendar Year, and going back no more than [*] years preceding the current Calendar Year, all or any part of the audited Party's records and books necessary to check the accuracy of any Cost of Goods calculated or payments made or required to be made hereunder. The accounting firm shall enter into appropriate obligations with the audited Party to treat all information it receives during its inspection in confidence. The accounting firm shall disclose to Revance and Fosun only whether Cost of Goods calculated or the payments made are correct and details concerning any discrepancies, but no other information shall be disclosed to the Party requesting the inspection. The charges of the accounting firm shall be paid by the Party



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

requesting the inspection, except that if the Cost of Goods being audited have been overcalculated, or the payments being audited have been underpaid or the costs being reimbursed have been overstated, in each case by more than [*], the charges will be paid by the Party whose records and books are being inspected. Any failure by a Party to exercise its rights under this Section 10.01 with respect to a Calendar Year within the [*] year period allotted therefor shall constitute a waiver by such Party of its right to later object to any payments made by the other Party under this Agreement during such Calendar Year.

**Section 10.02 Publicity Review.** Subject to the further provisions of this Section 10.02, no Party shall originate any written publicity, news release, or other announcement relating to this Agreement or to performance hereunder or the existence of an arrangement between the Parties (collectively, "**Written Disclosure**"), without the prior prompt review of a copy of the materials proposed to be disclosed and written approval of the other Party. This Section 10.02, shall not prohibit the disclosure under Section 7.04(a). Notwithstanding the foregoing provisions of this Section 10.02, each Party may make any public Written Disclosure it believes in good faith based upon the advice of counsel is required under the Securities Laws of the United States, Hong Kong SAR or P. R. China, or any listing or trading agreement concerning its publicly traded securities, or under any applicable securities laws, or any rule or order of stock exchange; provided that, prior to making such Written Disclosure, Revance or Fosun shall where reasonably practicable provide the other Party with a copy of the materials proposed to be disclosed and an opportunity to promptly review and comment on the proposed Written Disclosure. To the extent that Fosun reasonably requests that any information in the materials proposed to be disclosed be deleted, Revance shall use reasonable efforts to request confidential treatment of such information pursuant to Rule 406 of the Securities Act of 1933 or Rule 24b-2 of the Securities Exchange Act of 1934, as applicable (or any other applicable regulation relating to the confidential treatment of information) so that any information that Fosun reasonably requests to be deleted, to the extent permitted by the applicable government agency, are omitted from such materials. Notwithstanding the foregoing, each Party may issue an individual press release regarding the transaction contemplated by this Agreement; and the contents of such press release may, in each Party's discretion, be substantially similar to the press release attached at **Exhibit C** hereto. For clarity, Revance shall have the right to issue press releases and other public announcements regarding the Development or Commercialization of the Product outside of the Territory without the prior review or written approval of Fosun.

**Section 10.03 Use of Names.** Neither Party shall use the name, insignia, symbol, trademark, trade name or logotype of the other Party or its Affiliates in relation to this transaction or otherwise in any public announcement, press release, or other public document without the prior written consent of such other Party; provided, however, that either Party may use the name of the other Party in any document required to be filed with any government authority, including without limitation the FDA and the Securities and Exchange Commission, or foreign equivalent bodies, or otherwise as may be required by Applicable Law, provided that such disclosure shall be governed by Section 7.04. Further, the restrictions imposed on each Party under this Section 10.03 are not intended, and shall not be construed, to prohibit a Party from identifying the other Party in its internal business communications, provided that any Confidential Information in such communications remains subject to Article VII.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## ARTICLE XI.
## TERM AND TERMINATION

**Section 11.01 Term.** The term of this Agreement shall commence as of the Effective Date and, unless sooner terminated as provided herein, shall continue in effect until the date on which all of Fosun's payment obligations under Article VI have been performed or have expired (the "**Term**").

**Section 11.02 Termination Rights.**

(a) **Termination for Cause.** Subject to the provisions of this Section 11.02, if either Party (the "**Breaching Party**") shall have committed a material breach of any of its material obligations under this Agreement, and such material breach shall remain uncured and shall be continuing for a period of [*] days following the Breaching Party's receipt of notice of such breach from the other Party (the "**Non-Breaching Party**") stating the Non-Breaching Party's intent to terminate this Agreement in its entirety pursuant to this Section 11.02(a) if such breach remains uncured, then, in addition to any and all other rights and remedies that may be available, the Non-Breaching Party shall have the right to terminate this Agreement effective upon the expiration of such [*] day period (subject, however, to the provisions set forth below in this Section 11.02(a)). Notwithstanding the above, if (i) such material breach cannot reasonably be cured within such [*] day period, (ii) the Breaching Party provides, within such [*] day period, the Non-Breaching Party with a written detailed plan that contains measures that can be reasonably expected to cure such breach in a time frame reasonably acceptable to both Parties, which shall not extend beyond [*] from the date the plan is presented to the Non-Breaching Party, and (iii) the Breaching Party commences to perform such measures in accordance with such plan, and (iv) the Breaching Party thereafter diligently continues to perform such measures as detailed in such plan, then the Non-Breaching Party shall not be entitled to terminate this Agreement (and any notice of termination issued pursuant to the foregoing sentence shall not become effective) unless and until the earlier of (x) the Breaching Party ceases to diligently perform such measures despite then not having cured the breach, or (y) the Breaching Party fails to cure the breach in the time frame agreed to by the Non-Breaching Party in the plan, which shall not exceed [*] from the date the plan is presented to the Non-Breaching Party.

(b) **Termination for Challenge of Licensed Patents.** Prior to its expiration, Revance may terminate this Agreement in its entirety by written notice to Fosun if (i) Fosun or its Affiliates challenges the validity, scope or enforceability of or otherwise opposes any Revance Patent or corresponding Patents inside or outside the Territory and (ii) Fosun does not cause such measures to cease within [*] days after having received written notice thereof from Revance, requesting such measures to cease and stating Revance's intention to terminate this Agreement if such measures are not ceased within the prescribed time. If a Sublicensee of Fosun challenges the validity, scope or enforceability of or otherwise opposes any Revance Patent or corresponding Patents under which such Sublicensee is sublicensed or corresponding Patents inside or outside of the Territory, then Fosun shall, upon written notice from Revance terminate such sublicense or cause the Sublicensee to cease such measures within [*] days. Fosun shall include provisions in all agreements under which a Sublicensee obtains a sublicense under any Revance Patent providing that if the Sublicensee



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

challenges the validity or enforceability of or otherwise opposes any such Patent under which the Sublicensee is sublicensed, Fosun may terminate such sublicense.

(c) **Termination for Insolvency.** A Party may terminate this Agreement effective immediately upon written notice to the other Party if at any time during the Term, the other Party (the "**Debtor**") (i) becomes insolvent, (ii) has a case commenced by or against it under the Bankruptcy Code, (iii) files for or is subject to the institution of bankruptcy, liquidation or receivership proceedings, (iv) assigns all or a substantial portion of its assets for the benefit of creditors, (v) has a receiver or custodian appointed for the Debtor's business, or (vi) has a substantial part of its business being subject to attachment or similar process; provided, however, that in the event of any involuntary case under the Bankruptcy Code, the first Party shall not be entitled to terminate this Agreement pursuant to this subsection (d) if the case is dismissed within [*] days after the commencement thereof.

(d) **Termination for Revance Change of Control.** Pursuant to Section 2.07, the Revance, or its CoC Successor if applicable, shall have the right to terminate this Agreement based on Revance CoC in accordance with the terms of Section 2.07.

(e) **Termination for Convenience.** Prior to its expiration, this Agreement may be terminated in its entirety at any time by Fosun effective upon one hundred and twenty (120) days (or such longer period as Fosun may elect at its sole discretion) prior written notice to Revance.

**Section 11.03 Consequences of a Fosun Triggered Termination.** In the event (a) Revance terminates this Agreement pursuant to Section 11.02(a) for Fosun's material breach; (b) Revance terminates this Agreement pursuant to Section 11.02(b) for patent challenge by Fosun; (c) Revance terminates this Agreement pursuant to Section 11.02(c) for Fosun's insolvency; or (d) Fosun terminates this Agreement pursuant to Section 11.02(e) (a termination as per (a) through (d) being a "**Fosun Triggered Termination**"), both Revance and Fosun shall, subject to Section 11.03(a), continue to be obligated during the termination notice period (as applicable) to perform as far as reasonably practicable all of its obligations under this Agreement and any other agreements concluded between the Parties in accordance with this Agreement. If a Fosun Triggered Termination occurs after the first Regulatory Approval of the Product in the Territory, Fosun shall continue to use Commercially Reasonable Efforts to Commercialize such Product in the Territory until the earlier of (i), if applicable, the expiration of the fifteen (15) day notice period, in the event of a termination by Fosun pursuant to Section 11.02(d); (ii) receipt of Revance's written notice that Fosun may cease such Commercialization activities; or (iii), if applicable, the effective date of the termination notice issued pursuant to Section 11.02(a), Section 11.02(b), or Section 11.02(c). In addition, as a result of a Fosun Triggered Termination the following shall apply:

(a) All licenses and rights to the Revance Technology granted to Fosun hereunder shall terminate as of the effective date of such termination, except to the extent and for so long as is necessary to permit Fosun to finish work-in-progress, sell any inventory of Product that remains on hand as of the date of the termination and otherwise perform any responsibilities in connection with any then ongoing clinical trial or other activity that cannot be terminated as of such date under Applicable Laws, including GCP, it being agreed that all such activities and responsibilities shall be discontinued and ceased (unless otherwise agreed or required under Applicable Laws by



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

transitioning such activities and responsibilities to Revance) as promptly as possible, subject to Applicable Laws, including GCP. Fosun shall reasonably cooperate to transfer all responsibilities and activities related to its Development and Commercialization activities to Revance in an orderly fashion so as to not disrupt current Development and Commercialization efforts in the Territory.

(b) Each Party shall return all data, files, records and other Materials in its possession or Control containing or comprising the other Party's Confidential Information to which such first Party does not retain rights hereunder (except one copy thereof, which may be retained by the returning Party solely for legal archive purposes). For the avoidance of doubt, Fosun shall return all Revance Know-How and Product-related IPR (assigned under Section 8.02), including but not limited to all clinical trial data and records, regulatory submissions and correspondence, and marketing and sales information, all to the extent related to the Product.

(c) Fosun shall, where permitted under Applicable Laws, as promptly as reasonably practical transfer to Revance all INDs, BLAs, Drug Approval Applications, Regulatory Approvals, and any other Product-related IPR with respect to the Product in the Territory, and shall take such other actions and execute such other instruments, assignments, and documents as may be necessary to affect the transfer of rights hereunder to Revance. Without limiting the generality of the foregoing, Fosun agrees to submit to the NMPA and other Regulatory Authorities where reasonably appropriate and permitted under Applicable Laws in jurisdictions in which any regulatory filings have been made with respect to the Product, within ten (10) Business Days after the effective date of such termination, a letter (with copy to Revance) notifying the NMPA and such other Regulatory Authorities of the transfer of any regulatory filings for the Product in such jurisdictions from Fosun to Revance. Additionally, Fosun will provide Revance with copies of regulatory filings necessary to practice the rights granted to it under this Section 11.03(c).

(d) Fosun will assign (or cause its Affiliates to assign) to Revance, at Revance's request, all of Fosun's (or its Affiliates') rights and obligations under agreements with Third Parties with respect to (i) the conduct of clinical trials for the Product, including Agreements with CROs, clinical sites and investigators that relate to clinical trials in support of Regulatory Approvals in the Territory, and (ii) any other Third Party agreements involving the Development or Commercialization of the Product, unless in each of (i) or (ii), such agreement is not permitted to be assigned pursuant to its terms or relates to products other than the Product, in which case Fosun will cooperate with Revance in all reasonable respects to transfer as promptly as reasonably practical to Revance the benefit of such contract in another mutually acceptable manner and upon Revance's request facilitate discussions between Revance and such Third Parties to assist Revance in entering into a direct agreement with such Third Parties.

(e) To the extent they are assignable and as requested by Revance, Fosun shall execute any documents necessary to transfer to Revance rights under any Third Party licenses obtained by Fosun pursuant to and during the course of the term of this Agreement for the purpose of Exploiting the Product, and Revance shall thereafter be responsible for all costs, expenses and obligations associated with such Third Party licenses.

(f) Except where expressly provided for otherwise in this Agreement, termination of this Agreement shall not relieve the Parties of any liability, including without limitation any



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

obligation to make payments hereunder, which accrued hereunder prior to the effective date of such termination, nor preclude any Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement, nor prejudice any Party's right to obtain performance of any obligation. In the event of such termination, this Section 11.03 shall survive in addition to others specified in this Agreement to survive in such event.

(g) Fosun shall be entitled, during a period of [*] days following the Fosun Triggered Termination, to finish any work-in-progress, unless Revance requests the transfer thereof in accordance with the terms of Section 11.03, and to sell any inventory of Product that remains on hand as of the date of the termination, so long as Fosun pays to Revance the royalties applicable to said subsequent sales in accordance with the terms and conditions set forth in this Agreement; provided that if such termination is by Revance pursuant to Section 11.02(a), that Fosun's rights under this Section 11.03(g) shall be subject to Revance's prior written consent, which shall not be unreasonably withheld, delayed or conditioned.

(h) Notwithstanding anything else set forth in this Agreement, (i) Fosun shall not have any obligations to continue any Development or Commercialization with respect to particular doses of the Product if Fosun has terminated this Agreement pursuant to Section 11.02(e) with reference to any material safety concerns regarding such doses, as determined by the JDC; and (ii) should Revance elect to pursue any Development or Commercialization of Product following any such termination by Fosun, Revance shall - without prejudice to or limitation of any other or further obligations under this Agreement (including Section 12.01(b)) - indemnify Fosun for any Third Party claims arising from Revance's Development or Commercialization after the effective date of such termination as set forth in Section 12.01(b).

**Section 11.04 Consequences of Termination (or Right to Terminate) by Fosun for Revance's breach or insolvency.** If Fosun is entitled to terminate this Agreement pursuant to Section 11.02(a) as a result of a material breach by Revance or Section 11.02(c) for an insolvency or other transaction described therein affecting Revance. Fosun may elect to terminate this Agreement subject to the provisions set forth in Section 11.04(a), or to continue the Agreement subject to the provisions set forth in Section 11.04(b).

(a) If Fosun terminates the Agreement under Section 11.02(a) or under Section 11.02(c), the terms and obligations under Section 11.03 shall apply as if such termination were a Fosun Triggered Termination, except that (i) notwithstanding anything set forth to the contrary in Section 11.03, Revance shall [*] in connection with performing any of the activities [*], and (ii) [*] the transfer or assignment of data, files, records, Materials and, if applicable, INDs, BLAs, Drug Approval Applications, Regulatory Approvals, Product-related IPR and any other rights granted under the above provisions in Section 11.03, if this Agreement is terminated pursuant to Section 11.02(a) or Section 11.02(c) [*], Revance shall [*] as if [*] or [*]; provided, however, that the applicable [*] set forth in Section [*], subject to the remaining subsections included in Section [*], and the provisions of Section [*] and Section [*]; provided that [*] shall not [*] in connection with its activities pursuant to this Agreement. The foregoing shall be in addition and without prejudice to any other remedies that may be available to Fosun due to Revance's breach, including any money



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

damages that may be awarded to Fosun in connection with its termination pursuant to Section 11.02(a).

(b) If Fosun has the right to terminate this Agreement under Section 11.02(a) or Section 11.02(c), but elects to continue this Agreement, this Agreement shall continue in full force and effect, except that if Fosun is entitled to terminate this Agreement under Section 11.02(a) due to Revance breach (but not if Fosun's right to terminate is based solely on Revance's insolvency pursuant to Section 11.02(c)), [*] Revance shall [*], or [*].

(c) Except where expressly provided for otherwise in this Agreement, termination of this Agreement by either Party shall not relieve the Parties of any liability, including without limitation any obligation to make payments hereunder, which accrued hereunder prior to the effective date of such termination, nor preclude any Party from pursuing all rights and remedies it may have hereunder or at law or in equity with respect to any breach of this Agreement, nor prejudice any Party's right to obtain performance of any obligation. In the event of such termination, this Section 11.04 shall survive in addition to others specified in this Agreement to survive in such event.

(d) **Consequences of a Termination for Revance Change of Control**. In the event this Agreement is terminated pursuant to Section 2.07 and Section 11.02(d), the terms and obligations under Section 11.03 shall apply as if such termination were a Fosun Triggered Termination, and shall become effective upon payment to Fosun of the full amount of economic compensation provided in Section 2.07. Revance or its CoC Successor shall further fully compensate Fosun for any reasonable costs or expenses incurred by itself or its Affiliates in connection with performing any of the activities contemplated by termination under Section 11.03 and this Section 11.04(d).

**Section 11.05 Bankruptcy.** All rights and licenses granted under or pursuant to this Agreement by a Party are, and shall otherwise be deemed to be, for the purposes of Section 365(n) of the United States Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the United States Bankruptcy Code or equivalent provisions of applicable legislation in any other jurisdiction. The Parties agree that the Parties, as licensees of such rights under this Agreement, shall retain and may fully exercise all of their rights and elections under the United States Bankruptcy Code, or equivalent provisions of applicable legislation in any other jurisdiction. The Parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against either Party under the Unites States Bankruptcy Code or equivalent provisions of applicable legislation in any other jurisdiction, the Party that is not a party to such proceeding shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, which, if not already in the non-subject Party's possession, shall be promptly delivered to it (a) upon any such commencement of a bankruptcy proceeding upon the non-subject Party's written request therefor, unless the Party subject to such proceeding elects to continue to perform all of its obligations under this Agreement, or (b) if not delivered under subsection (a) above, following the rejection of this Agreement by or on behalf of the Party subject to such proceeding upon written request therefor by the non-subject Party.

**Section 11.06 Surviving Rights and Obligations.** The rights and obligations set forth in this Agreement shall extend beyond the expiration or termination of the Agreement only to the extent expressly provided for herein, or to the extent that the survival of such rights or obligations



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

are necessary to permit their complete fulfillment or discharge. Without limiting the foregoing, the Parties have identified various rights and obligations which are understood to survive, as follows: In the event of expiration or termination of this Agreement for any reason, the following provisions shall survive in addition to others specified in this Agreement to survive in such event: *Article I, Article VI (outstanding payment obligations accrued), Article VII (with the exception of Section 7.03), Article X, Article XI, Article XII (solely as to actions arising during the term of this Agreement, or as to activities conducted in the course of a Party's exercise of licenses surviving after the term of this Agreement), Article XIII and Article XIV, and Section 4.01.*

**Section 11.07 Accrued Rights.** Termination, relinquishment, or expiration of the Agreement for any reason shall be without prejudice to any rights that shall have accrued to the benefit of either Party prior to such termination, relinquishment, or expiration, including without limitation damages arising from any breach hereunder. Such termination, relinquishment, or expiration shall not relieve either Party from obligations that are expressly indicated to survive termination or expiration of the Agreement.

## ARTICLE XII.
## INDEMNIFICATION

**Section 12.01 Indemnification.**

(a) Fosun hereby agrees to indemnify, defend, and hold harmless Revance, its Affiliates, and each of its and their respective employees, officers, directors and agents from and against any and all Losses incurred by them resulting from or arising out of or in connection with any suits, claims, actions or demands made or brought by a Sublicensee or other Third Party (collectively, "**Third Party Claims**") against Revance, its Affiliates or their respective employees, officers, directors or agents, that result from or arise out of: (i) the importation, Development, or Commercialization of the Product in the Territory; (ii) any violation of Applicable Law by Fosun, its Affiliates or Sublicensees in performing Fosun's obligation under this Agreement; and (iii) any material breach by Fosun, its Affiliates or Sublicensees of Fosun's representations, warranties and/or obligations under this Agreement; except in any case, to the extent such Losses are Losses for which Revance has an obligation to indemnify Fosun, its Affiliates or their respective employees, officers, directors or agents pursuant to Section 12.01(b), as to which Losses each Party shall indemnify the other to the extent of their respective liability for such Losses.

(b) Revance hereby agrees to indemnify, defend and hold harmless Fosun, its Affiliates, and each of its and their respective employees, officers, directors and agents from and against any and all Losses incurred by them resulting from or arising out of or in connection with any Third Party Claims against Fosun, its Affiliates or their respective employees, officers, directors or agents, that result from or arise out of: (i) the Manufacture, Development or Commercialization of Product outside the Territory; (ii) any violation of Applicable Law by Revance or its Affiliates in performing Revance's obligations under this Agreement; and (iii) any material breach by Revance or its Affiliates of Revance's representations, warranties and/or obligations under this Agreement; except in any case, to the extent such Losses are Losses for which Fosun has an obligation to indemnify Revance, its Affiliates or their respective employees, officers, directors or agents pursuant to Section 12.01(a),



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

as to which Losses each Party shall indemnify the other to the extent of their respective liability for such Losses.

**Section 12.02 Mechanism.**

(a) In the event that a Party (the "**Indemnified Party**") is seeking indemnification under Section 12.01(a) or Section 12.01(b), it shall notify the other Party (the "**Indemnifying Party**") in writing of the relevant Third Party Claim and the relevant Loss for which indemnification is being sought as soon as reasonably practicable after it becomes aware of such claim. Each such notice shall contain a description of the Third Party Claim and the nature and amount of the Loss claimed (to the extent that the nature and amount of such Loss is known at such time). The Indemnified Party shall furnish promptly to the Indemnifying Party copies of all papers and official documents received in respect of any such Third Party Claim or Losses. For the avoidance of doubt, all indemnification claims in respect of a Party, its Affiliates, and each of its and their respective employees, officers, directors and agents shall be made solely by such Party to this Agreement. The Indemnified Party shall permit the Indemnifying Party to assume direction and control of the defense of the relevant Third Party Claim (including without limitation the right to settle the claim solely for monetary consideration), and shall cooperate as requested (at the expense of the Indemnifying Party) in the defense of the claim. The assumption of the defense of a Third Party Claim by the Indemnifying Party shall not be construed as an acknowledgement that the Indemnifying Party is liable to indemnify any Indemnified Party in respect of the Third Party Claim, nor shall it constitute a waiver by the Indemnifying Party of any defenses it may assert against any Indemnified Party's claim for indemnification.

(b) Notwithstanding Section 12.01, the failure to give timely notice to the Indemnifying Party shall not release the Indemnifying Party from any liability to the Indemnified Party to the extent the Indemnifying Party is not prejudiced thereby and, for the avoidance of doubt, the Indemnifying Party shall not be liable to the extent any Loss is caused by any delay by the Indemnified Party in providing such notice. Notwithstanding the provisions of Section 12.02(a) requiring the Indemnified Party to tender to the Indemnifying Party the exclusive ability to defend such claim, if the Indemnifying Party declines to or fails to timely assume control of the relevant Third Party Claim, the Indemnified Party shall be entitled to assume such control, conduct the defense of, and settle such claim, all at the sole costs and expense of the declining or failing Party; provided, however, that neither Party shall settle or dispose of any such claim in any manner that would adversely affect the rights or interests or admit fault, of the other Party without the prior written consent of such other Party, which shall not be unreasonably withheld, delayed or conditioned. Each Party, at the other Party's expense and reasonable request, shall cooperate with such other Party and its counsel in the course of the defense or settlement of any such claim, such cooperation to include without limitation using reasonable efforts to provide or make available documents, information, and witnesses.

**Section 12.03 Mitigation of Loss.** Each Indemnified Party shall take and shall ensure that its Affiliates take all such reasonable steps and action as are reasonably necessary or as the Indemnifying Party may reasonably require in order to mitigate any claims (or potential losses or



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

damages) under this Article XII. Nothing in this Agreement shall or shall be deemed to relieve any Party of any common law or other duty to mitigate any losses incurred by it.

**Section 12.04 Insurance.** Both Parties shall use Commercially Reasonable Efforts, at their own discretion, to procure and maintain insurance, including product liability insurance, with respect to its activities hereunder and which is consistent with normal and customary in the pharmaceutical industry generally for Persons similarly situated, and shall upon request provide the other Party with a copy of its policies of insurance in that regard, along with any amendments and revisions thereto. Each party shall still be responsible for its liability at its own risk whether it does or doesn't procure or maintain such insurance. Such insurance shall not be construed to create a limit of both Party's liability with respect to its indemnification obligations under this Article XII.

## ARTICLE XIII.
## DISPUTE RESOLUTION

**Section 13.01 Referral of Disputes to the Parties Senior Executives.** Subject to Section 3.05, in the event of any dispute between the Parties arising out of or in connection with this Agreement, either Party may, by written notice to the other, have such dispute referred to the Senior Executives for attempted resolution by good faith negotiations within [*] days after such notice is received.

**Section 13.02 Mechanism.**

(a) If (i) Revance at any time has a good faith belief that Fosun may be in material breach of its obligations [*], (ii) Revance has notified Fosun of its belief in writing and the Parties are not in agreement as to whether or not such breach [*] exists, and (iii) the Parties have not resolved the dispute through good faith negotiations pursuant to Section 13.01 within the prescribed time, then Revance shall have the right (but not the obligation) to request, through written notice to Fosun (a "**Mediation Notice**") within [*] days after the expiry of the time period set forth in Section 13.01, that the Parties shall attempt in good faith to settle such dispute by mediation administered by the [*] under its then-current [*] Mediation Rules, as such rules may be modified by this Section 13.02(a) or otherwise by subsequent written agreement of the Parties. For clarity, Revance shall not be obligated to exercise its right to initiate mediation pursuant to this Section 13.02(a) before initiating arbitration pursuant to Section 13.02(b), or before notifying Fosun that it is exercising its right of termination under Section 11.02(a). If Revance elects to exercise its right to initiate mediation within the prescribed time, then the following shall apply: If the Parties are unable to reach agreement on the selection of the mediator within [*] Business Days after Fosun's receipt of the Mediation Notice from Revance, then either or both Parties shall immediately request the [*] to select a mediator with the requisite background, experience and expertise in the biopharmaceutical industry to assist the Parties in resolving the dispute amicably. The place of mediation shall be [*], and all negotiations and communications shall be in English. The Parties shall have the right to be represented by counsel during the mediation. Each Party shall bear its own costs and expenses and attorneys' fees, and the Parties shall share equally all costs of engaging such mediator and using the [*] to mediate such matter. Any decisions or recommendations of the mediator shall be confidential and non-binding on the Parties. If the Parties are unable to resolve the dispute through mediation pursuant to this Section 13.02(a) within a period of [*] days following Fosun's receipt of the Mediation



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Notice from Revance, then Revance or Fosun shall thereafter have the right to refer the dispute to arbitration pursuant to Section 13.02(b) or notify Fosun that it is exercising its right of termination under Section 11.02(a).

(b) Subject to Section 13.01 and Section 13.01(a), any dispute, controversy or claim arising out of or relating to this Agreement, including the existence, negotiation, validity, formation, interpretation, breach, performance or application of this Agreement shall be settled by binding arbitration administered by the [*] in accordance with its then-current [*] Arbitration Rules, as such rules may be modified by this Section 13.02(b) or otherwise by subsequent written agreement of the Parties. The number of arbitrators shall be three (3), of whom the Parties shall select one (1) each. The two arbitrators so selected will select the third and final arbitrator. If the arbitrators selected by the Parties are unable or fail to agree upon the third arbitrator, the [*] shall select the third arbitrator. The place of arbitration shall be [*], and all proceedings and communications shall be in English. The Parties shall have the right to be represented by counsel. Any judgment or award rendered by the arbitrators shall be final and binding on the Parties. The Parties agree that such judgment or award may be enforced in any court of competent jurisdiction. The cost of the arbitration, including the fees of the arbitrators, shall be borne by the Party the arbitrators determine has not prevailed in the arbitration.

**Section 13.03 Preliminary Injunctions.** Notwithstanding anything to the contrary, a Party may seek a temporary restraining order or a preliminary injunction from any court of competent jurisdiction in order to prevent immediate and irreparable injury, loss, or damage on a provisional basis, pending the decision of the arbitrator(s) on the ultimate merits of any dispute.

**Section 13.04 Patent Disputes.** Notwithstanding anything to the contrary, any and all issues regarding the scope, inventorship, construction, validity, or enforceability of Patents shall be determined arbitration administered by the [*] Arbitration under the local patent laws of the jurisdictions having issued the Patents in question.

**Section 13.05 Confidentiality.** All proceedings and decisions of a mediator or arbitrator(s) in connection with proceedings pursuant to Section 13.02 shall be deemed Confidential Information of each of the Parties and shall be subject to Article VII.

## ARTICLE XIV.
## MISCELLANEOUS

**Section 14.01 Assignment; Performance by Affiliates.**

(a) Neither Party may assign any of its rights or obligations under this Agreement in any country in whole or in part without the prior written consent of the other Party, except that each Party shall have the right, without such consent, (i) to perform any of its obligations and exercise any of its rights under this Agreement through, and to assign all of its rights and obligations under this Agreement to, any of its Affiliates, provided that such performance or exercise by such Affiliate, or such assignment, as applicable, could not reasonably be expected to subject the other Party to any adverse Tax consequences with regard to any payments under this Agreement; and (ii) on written notice to the other party, to assign all of its rights and obligations under this Agreement to a non-



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Affiliate successor in interest, whether by Change of Control, merger, consolidation, reorganization, acquisition, stock purchase, asset purchase or other similar transaction, to all or substantially all of the business to which this Agreement relates; however, provided that both under (i) and (ii) the assignees shall have at least the same capability and capacity of such Party to perform any obligations and exercise any rights under this Agreement. In the event that a Party performs its obligations or exercises its rights under this Agreement through an Affiliate (without having assigned all of its rights and obligations to such Affiliate as permitted under this Section 14.01), doing so shall not relieve the relevant Party of its responsibilities for the performance of its obligations under this Agreement, and the relevant Party shall remain responsible for the performance by its Affiliates and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance).

(b) This Agreement shall survive any succession of interest permitted pursuant to Section 14.01(a)(ii), whether by Change of Control, merger, consolidation, reorganization, acquisition, stock purchase, asset purchase or other similar transaction, provided, that, in the event of such merger, consolidation, reorganization, acquisition, stock purchase, asset purchase or other similar transaction, no Intellectual Property Rights of the acquiring corporation shall be included in the technology licensed hereunder, unless such Intellectual Property Rights arise as a result of the performance of this Agreement by such corporation after such transaction becomes effective.

(c) This Agreement shall be binding upon and inure to the benefit of the successors, and permitted assigns of the Parties. Any assignment not in accordance with this Agreement shall be void.

**Section 14.02 Force Majeure.** In this Agreement, "**Force Majeure**" means an event which is beyond a non-performing Party's reasonable control, including an act of God, strike, lock-out or other industrial/labor disputes (whether involving the workforce of the Party so prevented or of any other Person), war, riot, civil commotion, terrorist act, epidemic, quarantine, fire, flood, storm, earthquake, natural disaster or compliance with any law or governmental order, rule, regulation or direction, whether or not it is later held to be invalid. A Party that is prevented or delayed in its performance under this Agreement by an event of Force Majeure (a "**Force Majeure Party**") shall, as soon as reasonably practical but no later than ten (10) days after the occurrence of a Force Majeure event, give notice in writing to the other Party specifying the nature and extent of the event of Force Majeure, its anticipated duration and any action being taken to avoid or minimize its effect. Subject to providing such notice and to this Section 14.02, the Force Majeure Party shall not be liable for delay in performance or for non-performance of its obligations under this Agreement, in whole or in part, except as otherwise provided in this Agreement, where non-performance or delay in performance has resulted from an event of Force Majeure. The suspension of performance allowed hereunder shall be of no greater scope and no longer duration than is reasonably required and the Force Majeure Party shall exert all reasonable efforts to avoid or remedy such Force Majeure.

**Section 14.03 Further Actions.** Each Party agrees to execute, acknowledge, and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Section 14.04 Notices.** All notices, requests, waivers and other communications made hereunder shall be in writing and shall be deemed given (a) upon delivery, if delivered personally; (b) upon confirmation of receipt, if by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next Business Day, (c) seven (7) Business Days after deposit in the mail as registered or certified mail (unless earlier return receipt requested), (d) three (3) Business Days after deposit with postage prepaid, or sent by internationally recognized overnight delivery service that maintains earlier records of delivery, to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice; provided, that notices of a change of address shall be effective only upon receipt thereof).

If to Revance, addressed to:

Revance Therapeutics, Inc.
7555 Gateway Boulevard
Newark, California 94560
Attention: Mukul Agarwal, VP Business Development
Email: magarwal@revance.com

With a copy to:

O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025
Attention: Portia Ku, Esq.
Email: pku@omm.com

If to Fosun, addressed to:

Strategic Product Development Center
Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd.
Building A, 1289 Yishan Road
Minhang District, Shanghai 200233
P.R.China
Attention: Ning Yuan, General Manager
Email: yuann@fosunpharma.com

**Section 14.05 Waiver.** Except as specifically provided for herein, the waiver from time to time by either of the Parties of any of their rights or their failure to exercise any remedy shall not operate or be construed as a waiver of any other of such Party's rights or remedies provided in this Agreement.

**Section 14.06 Severability.** If any term, covenant or condition of this Agreement or the application thereof to any Party or circumstance shall, to any extent, be held to be invalid or unenforceable, then (a) the remainder of this Agreement, or the application of such term, covenant, or condition to Parties or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant, or condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law, and (b) the Parties covenant



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

and agree to renegotiate any such term, covenant, or application thereof in good faith in order to provide a reasonably acceptable alternative to the term, covenant, or condition of this Agreement or the application thereof that is invalid or unenforceable, it being the intent of the Parties that the basic purposes of this Agreement are to be effectuated.

**Section 14.07 Governing Law.** This Agreement shall be governed by and interpreted under the laws of the State of New York, USA, without giving effect to any conflict of law principle that would otherwise result in the application of the laws of any State or jurisdiction other than the State of New York, USA.

**Section 14.08 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 14.09 Entire Agreement.** This Agreement, including without limitation all exhibits attached hereto, sets forth all the covenants, promises, agreements, warranties, representations, conditions, and understandings between the Parties and supersedes and terminates all prior and contemporaneous agreements and understanding between the Parties, including without limitation the agreements and amendments set forth in Section 7.06. There are no covenants, promises, agreements, warranties, representations, conditions, or understandings, either oral or written, between the Parties other than as set forth in this Agreement. No subsequent alteration, amendment, change, or addition to this Agreement shall be binding upon the Parties unless reduced to writing and signed by the respective authorized officers of the Parties.

**Section 14.10 Limitation of Liability.** EXCEPT IN CIRCUMSTANCES OF GROSS NEGLIGENCE OR INTENTIONAL MISCONDUCT BY A PARTY OR ITS AFFILIATES, OR WITH RESPECT TO THIRD PARTY CLAIMS UNDER Section 12.01, IN NO EVENT SHALL EITHER PARTY OR ITS RESPECTIVE AFFILIATES AND SUBLICENSEES BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, WHETHER IN CONTRACT, WARRANTY, TORT, STRICT LIABILITY, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS, REVENUE, MILESTONES OR ROYALTIES. This Section 14.10 shall not limit either Party's obligations under Article XII.

**Section 14.11 No Partnership.** It is expressly agreed that the relationship between Revance and Fosun shall not constitute a partnership, joint venture, or agency. Neither Revance nor Fosun shall have the authority to make any statements, representations, or commitments of any kind, or to take any action, which shall be binding on the other Party, without the prior consent of such other Party to do so.

*[SIGNATURE PAGE FOLLOWS]*



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

*[SIGNATURE PAGE]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in duplicate by their respective duly authorized officers or representatives.

**Revance Therapeutics Inc.**

By: /s L. Daniel Browne

Name: L. Daniel Browne

Title: President & Chief Executive Officer

**Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd.**

By: /s/ Yifang Wu

Name: Yifang Wu

Title: President



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## EXHIBIT A

*(Revance Patents)*

| Ref. No. Country | Title | Patent Application No. | Int'l Filing Date | Patent No. | Expiration Date | Status |
|---|---|---|---|---|---|---|
| [*] | [*] | [*] | [*] | [*] | [*] | [*] |

*[Exhibit A to License Agreement]*

[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT B**

*(Fosun Affiliates)*

*[*]*

*[Exhibit B to License Agreement]*

[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

## EXHIBIT C

*(Draft Press Release Attached)*



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

revance
REMARKABLE SCIENCE. ENDURING PERFORMANCE.

**Revance Announces China Market License Agreement with Fosun Pharma for RT002**

– Upfront payment of $30 million, plus potential milestone payment and tiered royalties on future sales –

NEWARK, Calif., December 4 - Revance Therapeutics, Inc. (NASDAQ:RVNC), a biotechnology company developing next-generation neuromodulators for use in treating aesthetic and therapeutic conditions, today announced that the company has entered into a license agreement with Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., (Fosun Pharma Industrial), a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd (Fosun Pharma), providing Fosun Pharma Industrial with the exclusive rights to develop and commercialize Revance's proprietary DaxibotulinumtoxinA for Injection (RT002) in mainland China, Hong Kong and Macau (the Territory). RT002 is a novel, long-lasting neuromodulator in development for the treatment of aesthetic conditions, including glabellar and upper facial lines, and neuroscience conditions including cervical dystonia, plantar fasciitis, adult upper limb spasticity and chronic migraine.

Under the terms of the agreement, Revance will receive an upfront payment of $30 million within 30 business days of entering into the license agreement and is eligible to receive additional potential development and sales milestone payments of up to $230.5 million, as well as tiered low-double-digit to high-teen royalty payments on future net sales. Fosun Pharma Industrial will be responsible for conducting necessary clinical studies, marketing and sales in the Territory, while Revance will be responsible for manufacturing drug substance and finished drug product for both the clinical and commercial activities in the Territory. There will be no transfer of intellectual property.

"Fosun Pharma is one of the leading healthcare companies in China, with the expertise and access to reach both the aesthetics and therapeutic markets. We see Fosun Pharma as an ideal partner to commercialize RT002 in the fast-growing Chinese market for neuromodulators, " said Dan Browne, president and chief executive officer at Revance. Fosun Pharma already has a growing portfolio of products in facial aesthetics where we plan to gain the first approval for RT002, backed by assets in a broad range of important therapeutics indications. We look forward to working with the Fosun Pharma team on the clinical, regulatory and commercial pathways to introduce RT002 in this important, developing geography."

"We are pleased to partner with Revance to bring a truly next generation neuromodulator to China," said Yifang Wu, president and chief executive officer of Fosun Pharma, the parent company of Fosun Pharma Industrial. "At Fosun Pharma, our values are based on the care for life, innovation, excellence and sustained partnership. Revance shares those values. The safety profile, high response rates and long duration of effect provides consumers and patients with an improved experience and gives us the confidence that RT002 will be a highly effective neuromodulator treatment."

**About RT002**

DaxibotulinumtoxinA for Injection (RT002) is an investigational product and the first neuromodulator with long-acting duration. It is a novel, next-generation neuromodulator in development for the treatment of aesthetic indications and a number of potential therapeutic conditions, including movement disorders, pain and other neuroscience-based targets. RT002 is the only neuromodulator using a Revance proprietary stabilizing excipient peptide technology in its formulation, which results in high efficacy, long duration and provides two-year product stability requiring no refrigeration. RT002 is the first and only botulinum toxin product sourced, processed and manufactured in the US and formulated without human blood- derived products or manufactured using animal-derived proteins.

*[Exhibit C to License Agreement]*

[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

Revance has four active clinical programs for RT002 injectable under way. The SAKURA 1, SAKURA 2 and SAKURA 3 trials to treat glabellar lines are complete. For cervical dystonia, the company was granted orphan drug designation from the FDA and initiated a Phase 3 program in mid-2018. The company plans to announce first patient dosing for Phase 2 trials for RT002 for the management of plantar fasciitis and for adult upper limb spasticity before year-end 2018.

**About Shanghai Fosun Pharmaceutical (Group) Co., Ltd.**

Established in 1994, Shanghai Fosun Pharmaceutical (Group) Co., Ltd. (stock code: 600196.SH, 02196.HK) is a leading healthcare group in the People's Republic of China. Adhering to the mission of improving human health, Fosun Pharma's business covers all key sectors of healthcare industry chain, including pharmaceutical manufacturing and R&D, healthcare services, medical devices and medical diagnosis, as well as pharmaceutical distribution and retail. Fosun Pharma always regards innovation as the driving force for its business growth. The company continuously optimized its pharmaceutical R&D system that integrates biosimilars and innovative drugs and has established international R&D teams in China, the United States, India, etc., forming a globally interactive R&D system. Fosun Pharma maintains a national recognized enterprise technology center and establishes innovative chemical drugs platform, biologics platform, high-value generic drugs platform and cell-therapy platform. At present, Fosun Pharma maintains the leading position with its core products in various therapeutic areas, including oncology, cardiovascular system, central nervous system, blood system, metabolism and alimentary system and anti-infection. All products occupy the leading position in each market segment.

**About Revance Therapeutics, Inc.**

Revance Therapeutics is an emerging Silicon Valley biotechnology leader developing neuromodulators for the treatment of aesthetic and therapeutic conditions. Revance uses a unique proprietary, stabilizing excipient peptide technology to create novel, differentiated therapies. The company's lead compound, DaxibotulinumtoxinA for Injection (RT002), is in clinical development for a broad range of aesthetic and therapeutic indications, including glabellar lines, cervical dystonia, plantar fasciitis, upper limb spasticity and chronic migraine. RT002 has the potential to be the first long-acting neuromodulator. The company is advancing a robust pipeline of injectable and topical formulations of daxibotulinumtoxinA. More information on Revance may be found at www.revance.com.

"Revance Therapeutics" and the Revance logo are registered trademarks of Revance Therapeutics, Inc.

**Forward-Looking Statements**

*This press release contains forward-looking statements, including statements related to the anticipated receipt of payments and potential receipt of development and sales milestones, as well as royalties on potential future sales of RT002 under the license with Fosun Pharma; the timing and conduct of regulatory, developmental and commercial activities to be conducted under the license with Fosun Pharma; the process and timing of, and ability to complete, current and anticipated future clinical development of our investigational drug product candidates, the initiation, design, timing and results of our clinical studies, and related results and reporting of such results, including the SAKURA 3 study of RT002; statements about our business strategy, timeline and other goals and market for our anticipated products, plans and prospects; including our pre- commercialization plans for RT002 to treat glabellar (frown) lines; and statements about our ability to obtain regulatory approval with respect to our drug; and potential benefits of our drug product candidates and our excipient peptide and other technologies.*

*Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from our expectations. These risks and uncertainties include, but are not limited to: the fact that we may not receive any milestone, royalty or other payments from Fosun Pharma, our dependence on Fosun Pharma to timely and successfully develop and commercialize RT002 in the China market, that we may not obtain the anticipated financial and other benefits of the license*

with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

*agreement with Fosun Pharma; the outcome, cost, and timing of our product development activities and clinical trials; the uncertain clinical development process, including the risk that clinical trials may not have an effective design or generate*

*positive results; our ability to obtain and maintain regulatory approval of our drug product candidates; our ability to obtain funding for our operations; our plans to research, develop, and commercialize our drug product candidates; unanticipated costs or delays in research, development, and commercialization efforts; the size and growth potential of the markets for our drug product candidates; our ability to successfully commercialize our drug product candidates and the timing of commercialization activities; our ability to develop sales and marketing capabilities; the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for financing; our ability to continue obtaining and maintaining intellectual property protection for our drug product candidates; and other risks. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release may be found in Revance's periodic filings with the Securities and Exchange Commission (the "SEC"), including factors described in the section entitled "Risk Factors" of our quarterly report on Form 10-Q filed November 2, 2018. These forward-looking statements speak only as of the date hereof. Revance disclaims any obligation to update these forward-looking statements.*

###

**Contacts for Revance**
INVESTORS
Revance Therapeutics, Inc.:
Jeanie Herbert (714) 325-3584
jherbert@revance.com

or

Burns McClellan, Inc.:
Ami Bavishi (212) 213-0006
abavishi@burnsmc.com

or

MEDIA
General Media:
TOGORUN:
Mariann Caprino (917) 242-1087
m.caprino@togorun.com

or

Trade Media: Nadine Tosk (504) 453-8344
nadinepr@gmail.com

**Contact for Fosun Pharma**
Anjiang Liu (646) 490-9833
liuanj@fosunpharma.com

Source: Revance Therapeutics, Inc.

**EXHIBIT D**

*(List of JDC Members)*

Revance Initial List of JDC Members:

- *Chief Operating Officer or SVP Clinical Development*
- *VP Business Development/Alliance Management*
- *General Counsel*

Fosun Initial List of JDC Members:

- *Chief Medical Officer*
- *Vice General Manager Business Development Department*
- *Head of Regulatory Affairs*



[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**EXHIBIT E**

*(Cost of Goods Condition)*

The Cost of Goods for a vial of Product supplied for Commercialization purposes [*], subject to [*], provided that [*].

*[Exhibit E to License Agreement]*

[*] = Certain confidential information contained in this document, marked by brackets, has been omitted and filed separately with the Securities and Exchange Commission pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended.

**Exhibit 21.1**

**REVANCE THERAPEUTICS, INC.**

**LIST OF SUBSIDIARIES**

1. Revance Therapeutics LTD, a wholly owned subsidiary incorporated in England and Wales.
2. Revance International Limited, a wholly owned subsidiary incorporated in the Cayman Islands.

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Forms S-8 (Nos. 333-223433, 333-216342, 333-209949, 333-208543, 333-203235, 333-198499, and 333-193963) and the Registration Statements on Forms S-3 (Nos. 333-210001, 333-207469 and 333-221911) of Revance Therapeutics Inc. of our report dated February 28, 2019 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
San Jose, California
February 28, 2019

**Exhibit 31.1**

## CERTIFICATIONS

I, L. Daniel Browne, certify that:

1. I have reviewed this annual report on Form 10-K of Revance Therapeutics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2019

/s/ L. Daniel Browne

**L. Daniel Browne**

**President and Chief Executive Officer**

**(Principal Executive Officer)**

**Exhibit 31.2**

## CERTIFICATIONS

I, Tobin C. Schilke, certify that:

1. I have reviewed this annual report on Form 10-K of Revance Therapeutics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2019

/s/ Tobin C. Schilke

**Tobin C. Schilke**

**Chief Financial Officer**

**(Principal Financial Officer)**

**Exhibit 32.1**

**CERTIFICATION**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), L. Daniel Browne, President and Chief Executive Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2018 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2. The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned has set his hand hereto as of the 28th day of February, 2019.

/s/ L. Daniel Browne

**L. Daniel Browne**

**President and Chief Executive Officer**

"This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing."

**Exhibit 32.2**

## CERTIFICATION

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Tobin C. Schilke, Chief Financial Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

**1.** The Company's Annual Report on Form 10-K for the period ended December 31, 2018 (the "Annual Report"), to which this Certification is attached as Exhibit 32.2, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

**2.** The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned has set his hand hereto as of the 28th day of February, 2019.

/s/ Tobin C. Schilke

**Tobin C. Schilke**

**Chief Financial Officer**

"This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing."

# EXHIBIT 5

AbbVie News Center

# Allergan Aesthetics Launches BOTOX® Cosmetic (onabotulinumtoxinA) for Masseter Muscle Prominence (MMP) in Adults in China

- *BOTOX® Cosmetic is the first neurotoxin approved in China for the treatment of masseter muscle prominence (MMP), the largest global market for MMP.*
- *Approval supported by well-established safety profile and robust clinical trials demonstrating BOTOX® Cosmetic is effective in reducing the prominence of the masseter muscle.*
- *Allergan Aesthetics intends to develop onabotulinumtoxinA treatment for MMP in additional global markets and expand the use of BOTOX® Cosmetic in the lower face.*

IRVINE, Calif., Sept. 11, 2024 /PRNewswire/ -- Allergan Aesthetics, an AbbVie company (NYSE: ABBV), today announced that BOTOX® Cosmetic (onabotulinumtoxinA) is now available for the treatment of masseter muscle prominence (MMP) in China. The masseter is one of the muscles in the lower face involved in chewing, and prominence of the masseter muscle can result in a wide and square lower face shape[1]. BOTOX® Cosmetic was recently approved for the temporary improvement in the appearance of marked to very marked MMP in adults by the China National Medical Product Administration (NMPA). BOTOX® Cosmetic is the first neurotoxin approved in China for MMP and offers the established dosing, robust clinical evidence and physician training that comes with on-label treatment.

"Masseter prominence is among the top aesthetics concerns for my patients and the broader Asian population, and there is a significant unmet need for minimally invasive treatment options for patients interested in addressing their lower face shape," said Professor Sun Jiaming, lead clinical study investigator and Director of the Plastic Surgery Department of Union Hospital Affiliated to Tongji Medical College of Huazhong University of Science and Technology. "The approval of BOTOX® Cosmetic offers an effective option delivered in a single treatment dosed every six months that relaxes masseter muscles and help patients achieve a slimmer and more defined jawline."

In a Phase 3 clinical trial, subjects treated with BOTOX® Cosmetic had 5.2mm greater average reduction of facial width as compared to subjects treated with placebo. Results typically lasted 6-9 months following BOTOX® Cosmetic treatment. Improvement was also seen in all secondary endpoints, as measured by multiple proprietary patient-reported outcome (PRO) instruments assessing psychosocial impact, treatment expectations and treatment satisfaction from the subject perspective. Subjects treated with BOTOX® Cosmetic had improved ratings in psychosocial impact (satisfaction with level of interaction in social situations), attractiveness, and confidence compared to subjects treated with placebo.

Treatment-emergent adverse events for BOTOX® Cosmetic were mild or moderate and consistent with known pharmacological effects of BOTOX® Cosmetic, which has a well-established safety profile throughout its 30-year history. No new safety signals were observed. The clinical study was conducted in multiple centers globally and nearly 90 percent (87.3%) of subjects identified as Asian.

"BOTOX® Cosmetic for masseter muscle prominence is a key focus for our global R&D pipeline," said Carrie Strom, President, Global Allergan Aesthetics and Senior Vice President, AbbVie. "We are excited to be approved and launch first in China, one of our most important markets."

With over 150 million vials of BOTOX® and BOTOX® Cosmetic distributed worldwide[2-6], the availability of BOTOX® Cosmetic for MMP in China marks another important milestone for the global aesthetic brand that medical providers and patients know and trust. Beyond China, reduction of MMP is a highly desirable, yet undertreated, indication for patients across all age ranges worldwide who may prefer a narrower lower face

shape.[7] Those bothered by marked or very marked MMP are typically unaware of potential treatment options and very few receive treatment[7]. Additional regulatory applications for onabotulinumtoxinA treatment for MMP are planned globally. BOTOX® Cosmetic is currently not approved by the U.S. Food and Drug Administration for MMP.

**About Masseter Muscle Prominence**

Masseter muscle prominence (MMP) is a benign condition where the masseter muscle along the jaw is enlarged and more noticeable[1]. This can cause the lower face to appear disproportionately wide and square, which may be an aesthetic concern for some people[1]. MMP can negatively impact self-perception of facial attractiveness and cause psychological distress[1]. MMP can be caused by heredity or overuse from activities like chewing gum, sports, clenching, or nocturnal bruxism[1]. It can be present in people of any age but adults between 20 and 40 are more likely to seek treatment[1]. Current treatment approaches are primarily surgical[1] and BOTOX® Cosmetic offers a minimally invasive option.

**BOTOX® Cosmetic (onabotulinumtoxinA) Important Information**

**Indications**

BOTOX® Cosmetic (onabotulinumtoxinA) is indicated in adult patients for the temporary improvement in the appearance of:

- Moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity
- Moderate to severe lateral canthal lines associated with orbicularis oculi activity
- Moderate to severe forehead lines associated with frontalis activity

**IMPORTANT SAFETY INFORMATION, INCLUDING BOXED WARNING**

**WARNING: DISTANT SPREAD OF TOXIN EFFECT**

**Postmarketing reports indicate that the effects of BOTOX® Cosmetic and all botulinum toxin products may spread from the area of injection to produce symptoms consistent with botulinum toxin effects. These may include asthenia, generalized muscle weakness, diplopia, ptosis, dysphagia, dysphonia, dysarthria, urinary incontinence, and breathing difficulties. These symptoms have been reported hours to weeks after injection. Swallowing and breathing difficulties can be life threatening and there have been reports of death. The risk of symptoms is probably greatest in children treated for spasticity, but symptoms can also occur in adults treated for spasticity and other conditions, particularly in those patients who have an underlying condition that would predispose them to these symptoms. In unapproved uses and approved indications, cases of spread of effect have been reported at doses comparable to those used to treat cervical dystonia and spasticity and at lower doses.**

**CONTRAINDICATIONS**

BOTOX® Cosmetic is contraindicated in the presence of infection at the proposed injection site(s) and in individuals with known hypersensitivity to any botulinum toxin preparation or to any of the components in the formulation.

**WARNINGS AND PRECAUTIONS**

**Lack of Interchangeability Between Botulinum Toxin Products**

**The potency units of BOTOX® Cosmetic are specific to the preparation and assay method utilized. They are not interchangeable with other preparations of botulinum toxin products and, therefore, units of biological activity of BOTOX® Cosmetic cannot be compared to nor converted into units of any other botulinum toxin products assessed with any other specific assay method.**

**Spread of Toxin Effect**
Please refer to Boxed Warning for Distant Spread of Toxin Effect.

No definitive serious adverse event reports of distant spread of toxin effect associated with dermatologic use of BOTOX® Cosmetic at the labeled dose of 20 Units (for glabellar lines), 24 Units (for lateral canthal lines), 40 Units (for forehead lines with glabellar lines), 44 Units (for simultaneous treatment of lateral canthal lines and glabellar lines), and 64 Units (for simultaneous treatment of lateral canthal lines, glabellar lines, and forehead lines) have been reported. Patients or caregivers should be advised to seek immediate medical care if swallowing, speech, or respiratory disorders occur.

**Serious Adverse Reactions With Unapproved Use**
Serious adverse reactions, including excessive weakness, dysphagia, and aspiration pneumonia, with some adverse reactions associated with fatal outcomes, have been reported in patients who received BOTOX® injections for unapproved uses. In these cases, the adverse reactions were not necessarily related to distant spread of toxin, but may have resulted from the administration of BOTOX® to the site of injection and/or adjacent structures. In several of the cases, patients had pre-existing dysphagia or other significant disabilities. There is insufficient information to identify factors associated with an increased risk for adverse reactions associated with the unapproved uses of BOTOX®. The safety and effectiveness of BOTOX® for unapproved uses have not been established.

**Hypersensitivity Reactions**
Serious and/or immediate hypersensitivity reactions have been reported. These reactions include anaphylaxis, serum sickness, urticaria, soft-tissue edema, and dyspnea. If such reactions occur, further injection of BOTOX® Cosmetic should be discontinued and appropriate medical therapy immediately instituted. One fatal case of anaphylaxis has been reported in which lidocaine was used as the diluent and, consequently, the causal agent cannot be reliably determined.

**Cardiovascular System**
There have been reports following administration of BOTOX® of adverse events involving the cardiovascular system, including arrhythmia and myocardial infarction, some with fatal outcomes. Some of these patients had risk factors including pre-existing cardiovascular disease. Use caution when administering to patients with pre-existing cardiovascular disease.

**Increased Risk of Clinically Significant Effects With Pre-existing Neuromuscular Disorders**
Individuals with peripheral motor neuropathic diseases, amyotrophic lateral sclerosis, or neuromuscular junction disorders (eg, myasthenia gravis or Lambert-Eaton syndrome) should be monitored when given botulinum toxin. Patients with neuromuscular disorders may be at increased risk of clinically significant effects including generalized muscle weakness, diplopia, ptosis, dysphonia, dysarthria, severe dysphagia, and respiratory compromise from onabotulinumtoxinA (see Warnings and Precautions).

**Dysphagia and Breathing Difficulties**
Treatment with BOTOX® and other botulinum toxin products can result in swallowing or breathing difficulties. Patients with pre-existing swallowing or breathing difficulties may be more susceptible to these complications. In most cases, this is a consequence of weakening of muscles in the area of injection that are involved in breathing or oropharyngeal muscles that control swallowing or breathing (see Boxed Warning).

**Pre-existing Conditions at the Injection Site**
Caution should be used when BOTOX® Cosmetic treatment is used in the presence of inflammation at the proposed injection site(s) or when excessive weakness or atrophy is present in the target muscle(s).

**Dry Eye in Patients Treated With BOTOX® Cosmetic**
There have been reports of dry eye associated with BOTOX® Cosmetic injection in or near the orbicularis oculi

muscle. If symptoms of dry eye (eg, eye irritation, photophobia, or visual changes) persist, consider referring patients to an ophthalmologist.

**Human Albumin and Transmission of Viral Diseases**
This product contains albumin, a derivative of human blood. Based on effective donor screening and product manufacturing processes, it carries an extremely remote risk for transmission of viral diseases and variant Creutzfeldt-Jakob disease (vCJD). There is a theoretical risk for transmission of Creutzfeldt-Jakob disease (CJD), but if that risk actually exists, the risk of transmission would also be considered extremely remote. No cases of transmission of viral diseases, CJD or vCJD have ever been identified for licensed albumin or albumin contained in other licensed products.

**ADVERSE REACTIONS**
The most frequently reported adverse reactions following injection of BOTOX® Cosmetic for glabellar lines were eyelid ptosis (3%), facial pain (1%), facial paresis (1%), and muscular weakness (1%).

The most frequently reported adverse reaction following injection of BOTOX® Cosmetic for lateral canthal lines was eyelid edema (1%).

The most frequently reported adverse reactions following injection of BOTOX® Cosmetic for forehead lines with glabellar lines were headache (9%), brow ptosis (2%), and eyelid ptosis (2%).

**DRUG INTERACTIONS**
Co-administration of BOTOX® Cosmetic and aminoglycosides or other agents interfering with neuromuscular transmission (eg, curare-like compounds) should only be performed with caution as the effect of the toxin may be potentiated. Use of anticholinergic drugs after administration of BOTOX® Cosmetic may potentiate systemic anticholinergic effects.

The effect of administering different botulinum neurotoxin products at the same time or within several months of each other is unknown. Excessive neuromuscular weakness may be exacerbated by administration of another botulinum toxin prior to the resolution of the effects of a previously administered botulinum toxin.

Excessive weakness may also be exaggerated by administration of a muscle relaxant before or after administration of BOTOX® Cosmetic.

**USE IN SPECIFIC POPULATIONS**
There are no studies or adequate data from postmarketing surveillance on the developmental risk associated with use of BOTOX® Cosmetic in pregnant women. There are no data on the presence of BOTOX® Cosmetic in human or animal milk, the effects on the breastfed child, or the effects on milk production.

**Please see BOTOX® Cosmetic full Prescribing Information including Boxed Warning and Medication Guide.**

**About Allergan Aesthetics**

At Allergan Aesthetics, an AbbVie company, we develop, manufacture, and market a portfolio of leading aesthetics brands and products. Our aesthetics portfolio includes facial injectables, body contouring, plastics, skin care, and more. Our goal is to consistently provide our customers with innovation, education, exceptional service, and a commitment to excellence, all with a personal touch. For more information, visit www.allerganaesthetics.com

**About AbbVie**

AbbVie's mission is to discover and deliver innovative medicines and solutions that solve serious health issues today and address the medical challenges of tomorrow. We strive to have a remarkable impact on people's lives

across several key therapeutic areas – immunology, oncology, neuroscience, and eye care – and products and services in our Allergan Aesthetics portfolio. For more information about AbbVie, please visit us at www.abbvie.com. Follow @abbvie on LinkedIn, Facebook, Instagram, X (formerly Twitter), and YouTube.

**Forward-Looking Statements**

*Some statements in this news release are, or may be considered, forward-looking statements for purposes of the Private Securities Litigation Reform Act of 1995. The words "believe," "expect," "anticipate," "project" and similar expressions and uses of future or conditional verbs, generally identify forward-looking statements. AbbVie cautions that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those expressed or implied in the forward-looking statements. Such risks and uncertainties include, but are not limited to, challenges to intellectual property, competition from other products, difficulties inherent in the research and development process, adverse litigation or government action, and changes to laws and regulations applicable to our industry. Additional information about the economic, competitive, governmental, technological and other factors that may affect AbbVie's operations is set forth in Item 1A, "Risk Factors," of AbbVie's 2023 Annual Report on Form 10-K, which has been filed with the Securities and Exchange Commission, as updated by its subsequent Quarterly Reports on Form 10-Q. AbbVie undertakes no obligation, and specifically declines, to release publicly any revisions to forward-looking statements as a result of subsequent events or developments, except as required by law.*

**References**


1. Almukhtar RM and Fabi S. *Plast Reconstr Surg.* 2019;143:39e-48e.
2. BOTOX® Cosmetic Prescribing Information, November 2023.
3. BOTOX® Prescribing Information, November 2023.
4. Data on file, Allergan Aesthetics, October 29, 2020; Westport Manufacturing Process.
5. Data on file, Allergan, December 5, 2022; Number of Total Vials Produced at Westport.
6. Data on file, Allergan Aesthetics, January 2023; Worldwide Marketing Authorization Status.
7. Masseter Global Assessment – Patient Assessment Quantitative Report May 2021. Allergan Aesthetics Primary Market Research performed by LRW.


SOURCE AbbVie

For further information: Media: Adelle Infante, Adelle.Infante@allergan.com; Investors: Liz Shea, liz.shea@abbvie.com

---

https://news.abbvie.com/2024-09-11-Allergan-Aesthetics-Launches-BOTOX-R-Cosmetic-onabotulinumtoxinA-for-Masseter-Muscle-Prominence-MMP-in-Adults-in-China

# EXHIBIT 6

菜单

Allergan Aesthetics
an AbbVie company





# 保妥适®

## 注射用A型肉毒毒素

**药品名称**

通用名称：注射用 A 型肉毒毒素

商品名称：BOTOX®/保妥适®

**适应症**

治疗12岁以上患者的眼睑痉挛、面肌痉挛及相关局灶性肌张力障碍。

暂时性改善65岁及65岁以下成人因皱眉肌和/或降眉间肌活动引起的中度至重度皱眉纹。

暂时性改善成人中度至重度的眼角侧皱纹（鱼尾纹）。

**规格**

50 单位/支。100 单位/支。

本品为处方药，详见完整版说明书。

BOTOX®及其中文商标保妥适®, 仅能用于艾尔建公司及其子公司或分支机构生产和/或销售的产品, 未经艾尔建公司特别授权, 任何单位或个人不得将此商标用于非艾尔建生产的产品。

保妥适验真介绍




Allergan
Aesthetics
an AbbVie company

隐私政策

职业发展

联系我们

合规

使用条款

网站地图

COOKIE 設定

# EXHIBIT 7

Australian Government
Department of Health, Disability and Ageing
Therapeutic Goods Administration

# Australian Public Assessment Report for Daxxify

## Active ingredient: DaxibotulinumtoxinA

## Sponsor: Revance Australia Pty Ltd

June 2025

## About the Therapeutic Goods Administration (TGA)

- The Therapeutic Goods Administration (TGA) is part of the Australian Government Department of Health, Disability and Ageing and is responsible for regulating therapeutic goods, including medicines, medical devices, and biologicals.
- The TGA administers the *Therapeutic Goods Act 1989* (the Act), applying a risk management approach designed to ensure therapeutic goods supplied in Australia meet acceptable standards of quality, safety, and efficacy.
- The work of the TGA is based on applying scientific and clinical expertise to decision-making, to ensure that the benefits to the Australian public outweigh any risks associated with the use of therapeutic goods.
- The TGA relies on the public, healthcare professionals and industry to report problems with therapeutic goods. The TGA investigates reports received to determine any necessary regulatory action.
- To report a problem with a therapeutic good, please see the information on the TGA website.

## About AusPARs

- The Australian Public Assessment Report (AusPAR) provides information about the evaluation of a prescription medicine and the considerations that led the TGA to approve or not approve a prescription medicine submission. Further information can be found in Australian Public Assessment Report (AusPAR) guidance.
- AusPARs are prepared and published by the TGA.
- AusPARs are static documents that provide information that relates to a submission at a particular point in time. The publication of an AusPAR is an important part of the transparency of the TGA's decision-making process.
- A new AusPAR may be provided to reflect changes to indications or major variations to a prescription medicine subject to evaluation by the TGA.

**Copyright**
© Commonwealth of Australia 2025
This work is copyright. You may reproduce the whole or part of this work in unaltered form for your own personal use or, if you are part of an organisation, for internal use within your organisation, but only if you or your organisation do not use the reproduction for any commercial purpose and retain this copyright notice and all disclaimer notices as part of that reproduction. Apart from rights to use as permitted by the *Copyright Act 1968* or allowed by this copyright notice, all other rights are reserved and you are not allowed to reproduce the whole or any part of this work in any way (electronic or otherwise) without first being given specific written permission from the Commonwealth to do so. Requests and inquiries concerning reproduction and rights are to be sent to the TGA Copyright Officer, Therapeutic Goods Administration, PO Box 100, Woden ACT 2606 or emailed to <tga.copyright@tga.gov.au>.

# Contents


List of abbreviations — 4

Daxxify (daxibotulinumtoxinA) submission — 5

Daxxify (daxibotulinumtoxinA) – proposed indication — 6

Glabellar lines — 6

Cervical dystonia — 6

Current treatment options for glabellar lines and cervical dystonia — 6

Clinical rationale for the use of Daxxify for glabellar lines and cervical dystonia — 7

Regulatory status — 7

Australian regulatory status — 7

International regulatory status — 7

Registration timeline — 8

Assessment overview — 8

Quality evaluation summary — 8

Nonclinical evaluation summary — 9

Clinical evaluation summary — 10

Pharmacology — 10

Efficacy — 12

Safety — 22

Risk management plan — 27

Risk-benefit analysis — 28

Efficacy — 28

Safety — 29

Uncertainties and limitations of the data — 30

Assessment outcome — 30

Specific conditions of registration — 30

Product Information and Consumer Medicines Information — 30

# List of abbreviations

| Abbreviation | Meaning |
| --- | --- |
| ACM | Advisory Committee on Medicines |
| AESI | Adverse event of special interest |
| ARTG | Australian Register of Therapeutic Goods |
| BoNT | Botulinum neurotoxin |
| CDIP-58 | Cervical Dystonia Impact Profile |
| CGIC | Clinical Global Impression of Change |
| CMI | Consumer Medicines Information |
| DAXI | daxibotulinumtoxinA |
| DP | drug product |
| DS | drug substance |
| GL | Glabellar lines |
| FDA | United States Food and Drug Administration |
| IGA-FWS | Investigator Global Assessment–Frown Wrinkle Severity |
| IM | Intramuscular |
| PFWS | Patient–Frown Wrinkle Severity |
| PI | Product Information |
| PGIC | Patient Global Impression of Change |
| PSUR | Periodic safety update report |
| RMP | Risk management plan |
| RT002 | daxibotulinumtoxinA |
| RTP004 | RTP004 peptide excipient |
| TEAEs | Treatment emergent adverse events |
| TGA | Therapeutic Goods Administration |
| TWSTRS | Toronto Western Spasmodic Torticollis Rating Scale |

# Daxxify (daxibotulinumtoxinA) submission

| | |
|---|---|
| *Type of submission:* | New biological entity |
| *Product name:* | Daxxify |
| *Active ingredient:* | DaxibotulinumtoxinA |
| *Decision:* | Approved |
| *Date of decision:* | 3 December 2024 |
| *Date of entry onto ARTG:* | 17 December 2024 |
| *ARTG number:* | 420430 |
| , *Black Triangle Scheme* | Yes |
| *Sponsor's name and address:* | Revance Australia Pty Ltd, Suite 1, Level 3, 62 Lygon Street, Carlton South VIC 3053, Australia |
| *Dose form:* | Powder for Injection |
| *Strength:* | 100 Units of daxibotulinumtoxinA per vial |
| *Container:* | single-dose vial |
| *Pack size:* | 1 vial per carton |
| *Approved therapeutic use for the current submission:* | • The temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients.<br>• The treatment of cervical dystonia in adult patients. |
| *Route of administration:* | intramuscular injection |

*Dosage:*

| Indication | Diluent * Added to 100 Unit Vials | Resulting dose in Units per 0. 1 mL |
|---|---|---|
| **Glabellar Lines, Adults** | 1. 2 mL | 8 Units |
| **Cervical Dystonia, Adults** | 1. 0 mL<br>2. 0 mL | 10 Units<br>5 Units |

* 0. 9% Sodium Chloride Injection, USP

For further information regarding dosage, refer to the Product Information.

*Pregnancy category:* Category B3

Drugs which have been taken by only a limited number of pregnant women and women of childbearing age, without an increase in the frequency of malformation or other direct or indirect harmful effects on the human fetus having been observed.

Studies in animals have shown evidence of an increased occurrence of fetal damage, the significance of which is considered uncertain in humans.

The use of any medicine during pregnancy requires careful consideration of both risks and benefits by the treating health professional. The pregnancy database must not be used as the sole basis of decision making in the use of medicines during pregnancy. The TGA does not provide advice on the use of medicines in pregnancy for specific cases. More information is available from obstetric drug information services in your state or territory.

# Daxxify (daxibotulinumtoxinA) – proposed indication

This AusPAR describes the submission by Revance Australia Pty Ltd to register Daxxify (daxibotulinumtoxinA) for the following proposed indication:[1]

> *The temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients.*
>
> *The treatment of cervical dystonia in adult patients*

DaxibotulinumtoxinA is a purified Clostridium botulinum type A neurotoxin derived from the Hall strain of *Clostridium botulinum.*

## Glabellar lines

Glabellar lines (GL) refer to the presence of one or more vertical lines that develop between the eyebrows upon frowning, and in some cases may be present at rest. Glabellar lines result from the contraction of the horizontally oriented corrugator muscles bilaterally and the vertically oriented central procerus muscle. [2]

## Cervical dystonia

Cervical dystonia (CD, also referred to as spasmodic torticollis) is a chronic neurologic disorder characterised by involuntary patterned contractions of cervical musculature resulting in abnormal movements or postural changes of the head, neck, and shoulders. In isolated CD, there is no evidence for any identifiable cause for the dystonic symptoms. The pattern of neck muscle involvement in patients with CD is variable, leading to clinically heterogeneous directional presentations, such as rotational torticollis, laterocollis, retrocollis, or anterocollis. Most cases of CD are idiopathic, though genetic susceptibility is presumed to play an important role. Rare cases are monogenetic. [3]

## Current treatment options for glabellar lines and cervical dystonia

Treatment of GL is performed for cosmetic reasons. Botulinum neurotoxin (BoNT) products registered in Australia for the treatment of GL include:

---

[1] This is the original indication proposed by the sponsor when the TGA commenced the evaluation of this submission. It may differ to the final indication approved by the TGA and registered in the Australian Register of Therapeutic Goods.

[2] Jean Carruthers, 'Overview of botulinum toxin for cosmetic indications', UpToDate, Feb 25, 2025.

[3] Andres Deik, 'Cervical dystonia: Etiology, clinical features, and diagnosis', UpToDate, Apr 23, 2024.

- Botox (botulinum toxin type A, onabotulinumtoxinA): for the temporary improvement in the appearance of upper facial rhytides (glabellar lines, crow's feet and forehead lines) in adults.
- Dysport (clostridium botulinum type A toxin - haemagglutinin complex): for the treatment of moderate to severe glabellar lines and/or lateral canthal lines (crow's feet) in adults.
- Xeomin (incobotulinumtoxinA): for the treatment of upper facial lines in adults (glabellar frown lines, lateral periorbital lines (crow's feet), horizontal forehead lines).
- Nuceiva (prabotulinumtoxinA): for the temporary improvement in the appearance of moderate to severe glabellar lines in adult patients.
- Letybo (letibotulinumtoxinA): indicated for the temporary improvement in the appearance of moderate to severe glabellar frown lines in adults.

Treatment of cervical dystonia is symptomatic, and can include BoNT injections, oral medications, and deep brain stimulation for refractory cases. BoNT products registered in Australia for the treatment of CD (or spasmodic torticollis) include Botox, Dysport, and Xeomin.

### Clinical rationale for the use of Daxxify for glabellar lines and cervical dystonia

BoNT cleaves a key protein of the neuroexocytosis apparatus on peripheral cholinergic nerve endings, preventing acetylcholine release, thereby inhibiting muscle contraction and wrinkle formation. [4,5,6]

## Regulatory status

### Australian regulatory status

This product is considered a new biological entity for Australian regulatory purposes.

### International regulatory status

At the time this submission was being evaluated by the TGA:

USA: The GL indication was submitted on 24 November 2019 and approved 7 September 2022. The CD indication was submitted on 19 October 2022 and approved 11 August 2023. The approved indications are:

> *Daxxify is indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients.*
>
> *Daxxify is indicated for the treatment of cervical dystonia in adult patients.*

[4] Morbiato, L.; Carli, L.; Johnson, E.A.; Montecucco, C.; Molgo, J.; Rossetto, O. Neuromuscular Paralysis and Recovery in Mice Injected with Botulinum Neurotoxins A and C. Eur. J. Neurosci. 2007, 25, 2697–2704.

[5] Pirazzini, M.; Rossetto, O.; Eleopra, R.; Montecucco, C. Botulinum Neurotoxins: Biology, Pharmacology, and Toxicology. Pharmacol Rev. 2017, 69, 200-235.

[6] Simpson, L. The Life History of a Botulinum Toxin Molecule. Toxicon. 2013, 68, 40–59

# Registration timeline

Table 1 captures the key steps and dates for this submission.

This submission was evaluated under the standard prescription medicines registration process.

**Table 1: Registration timeline for Daxxify (DaxibotulinumtoxinA) PM-2023-03624-1-1**

| Description | Date |
|---|---|
| Submission dossier accepted and evaluation commenced | 30 November 2023 |
| Evaluation completed | 22 July 2024 |
| Registration decision (Approved) | 3 December 2024 |
| Registration in the ARTG completed | 17 December 2024 |
| Number of working days from submission dossier acceptance to registration decision* | 256 days |

*Statutory timeframe for standard submissions is 255 working days

# Assessment overview

## Quality evaluation summary

DaxibotulinumtoxinA drug substance (DS) is a purified *Clostridium botulinum* type A neurotoxin derived from the Hall strain of *Clostridium botulinum*.

Daxxify is formulated as a lyophilised drug product (DP) with a novel peptide excipient, RTP004, which functions to stabilise daxibotulinumtoxinA. Daxxify is free of human albumin or animal-based components. Reconstitution of the DP is carried out with a commercially sourced sterile saline. The dosage form contains approximately 100 U of daxibotulinumtoxinA per 2 mL vial (borosilicate glass vial with butyl rubber stopper).

The physicochemical and biological properties of the DP relevant to the safety, clinical performance and manufacturability of the DP were identified and appropriately characterised or controlled in accordance with ICH guidelines.

The proposed drug DS and DP specifications are acceptable.

The compatibility of reconstituted DP with both the commercial vial and in-use syringe containers (polycarbonate and polypropylene) was demonstrated in in-use stability and in-use microbial studies.

Based on the submitted stability data, the recommended shelf life and storage conditions are:

- DS shelf life: 48 months; storage condition: ≤ -65°C.
- DP shelf life: 36 months; storage condition: 20 to 25°C or 2 to 8°C; protected from light.

The novel excipient, RTP004 acetate (RTP004), is a single-chain synthetic peptide consisting of 35 L-amino acids, which is used in the final DP formulation as a stabiliser of the active ingredient daxibotulinumtoxinA. Characterisation of the peptide's stabiliser properties has been adequately demonstrated and its manufacturing process has been successfully validated.

The Product Information (PI) and labels are acceptable from a quality perspective.

# Nonclinical evaluation summary

The submitted nonclinical data consisted of studies in rodents, rabbits, pigs, dogs and monkeys, with pivotal safety studies conducted in compliance with Good Laboratory Practice requirements, and generally conformed to relevant ICH guidelines. Non-clinical studies were conducted to establish the safety and toxicity profile of both daxibotulinumtoxinA and the new peptide excipient, RTP004. Possible differences in potency, safety, local or systemic spread and antigenicity (ability to generate neutralising antibodies) after intramuscular injections of daxibotulinumtoxinA was assessed compared to Botox.

Pharmacological studies in mouse hind limb paralysis models confirmed daxibotulinumtoxinA acts on the neuromuscular junction producing the desired (reversible) effect of muscle paralysis. Time course of onset (ca. 2-3 days) and maximum paralytic efficacy were comparable to Botox. DaxibotulinumtoxinA exhibited a greater duration of paralytic efficacy at a similar dose (up to 126%) with mice taking about twice as long (by 92%) to return to baseline cf. Botox. Investigations showed less local diffusion from the injection site cf. Botox (2. 5:1 dose ratio required for significant comparable paralysis of adjacent muscle).

Whilst no dedicated safety pharmacology studies were conducted with daxibotulinumtoxinA, no adverse effects on ECG parameters were seen in a repeat-dose toxicity study in monkeys. RTP004 also had no effect on ECG parameters in the repeat-dose toxicity study in monkeys and on CNS function in a single dedicated safety pharmacology study in rats. Given the low expected systemic exposures, no adverse effects on cardiovascular, central nervous system and respiratory function are expected in patients with the proposed clinical use.

No pharmacokinetic studies were conducted with daxibotulinumtoxinA and/or RTP004 given the low IM doses and the low systemic exposure in animals. However, distribution studies in rats following IM injections of $^{125}$I-daxibotulinumtoxinA ($^{125}$I-DAXI) showed no difference for $^{125}$I-DAXI (or related radioactivity) with or without RTP004 in the RT002 formulation in the local tissue distribution, area of distribution (within the injected thigh muscle) or on tissue distribution of radioactivity throughout the body of rats.

Toxicity findings in the repeat-dose toxicity studies with daxibotulinumtoxinA in rats and monkeys by IM injection and in mice by the SC route were expected for this type of product, and were mainly restricted to the injected muscle (i. e. , local muscle paralysis, resulting in reduced mobility and muscular tone, muscle atrophy, weakness, paralysis of the dosed hindlimb and at most dose levels, reductions in body weights). All of these findings are well known class effects of BoNT agents. There were no clinically relevant toxicity findings in the single and repeat-dose toxicity studies with RTP004.

No genotoxicity or carcinogenicity studies were conducted with Daxxify, which is consistent with the guideline for a product of this nature. RTP004 was not mutagenic in a bacterial mutation assay and was negative in both in vitro (lymphocytes) and in an in vivo chromosome aberration assay (bone marrow cells).

Fertility was reduced ≥10 U/kg and 30 U/kg in male and female rats, respectively, due to the poor clinical condition of animals (associated with limited use of the hindlimb, reductions in body weight gain and food intake). Adverse effects on embryofetal development in rats (but not rabbits) with daxibotulinumtoxinA were limited to decreased fetal body weight and skeletal ossification sites at 30 U/kg (24-times the maximum recommended human dose) and attributed to maternotoxicity. DaxibotulinumtoxinA was not teratogenic. In addition, it had no effect on pre- and postnatal development despite maternotoxicity at ≥3 U/kg. All findings were consistent with those reported for other BoNT agents as a class. Pregnancy Category B3 is considered appropriate. RTP004 resulted in no reproductive toxicity.

Nonclinical data submitted for RTP004 supports its use as a new (novel) excipient in Daxxify.

There are no non-clinical objections to the registration of Daxxify.

# Clinical evaluation summary

DaxibotulinumtoxinA was known as RT002 during clinical development and is also referred to as DAXI in this report. The clinical development program included:

- Dose-finding studies:
  - GL: RT002-CL001 (GL-Mexico) and RT002-CL002 (GL-Belmont).
  - CD: RT002-CL005.
- Pivotal efficacy/safety studies:
  - GL: Studies 1620301 (SAKURA-1) and 1620302 (SAKURA-2).
  - CD: Study 1720302 (ASPEN-1).
- Other efficacy/safety studies:
  - GL: Study 1620303 (SAKURA-OLS).
  - CD: Study 1720304 (ASPEN-OLS).

None of the main efficacy/safety studies evaluated an active comparator.

The evaluation of efficacy in the GL program was informed by FDA guidance,[7] research reported in the literature, and experience from other BoNT products approved for the treatment of GL. The main clinical studies evaluated Investigator Global Assessment–Frown Wrinkle Severity (IGA-FWS) and Patient–Frown Wrinkle Severity (PFWS). The IGA-FWS and PFWS are 4-point scales, where rating scores of 0, 1, 2, and 3 correspond to None, Mild, Moderate, and Severe, respectively. In the pivotal studies, success was defined as achievement of a score of 0 or 1 and a 2-grade improvement from the baseline, on both the investigator assessment and the subject self-assessment scales concurrently (2-point composite responder rate). In addition to the 2-point composite responder rate, efficacy analyses assessed the proportion of subjects with glabellar line severity rated as None or Mild, and time to return to a rating of Moderate or Severe.

The evaluation of efficacy in the CD program was based primarily on the Toronto Western Spasmodic Torticollis Rating Scale (TWSTRS). The TWSTRS is a composite assessment scale which covers different features of CD. The TWSTRS-Total score is the sum of the TWSTRS-Severity score (0-35, clinician-rated), the TWSTRS-Disability score (0–30, patient-rated), and the TWSTRS-Pain score (0–20, patient-rated), with a maximum score of 85 reflecting maximum severity.

## Pharmacology

No pharmacokinetic or pharmacodynamic studies were submitted. This is acceptable for a BoNT product given the local administration into the target muscle, low/undetectable systemic exposure, and well-established mechanism of action of BoNT.

[7] U.S. Food and Drug Administration, 'Guidance Document: Upper Facial Lines: Developing Botulinum Toxin Drug Products' August 2014.

## Dose selection

### Glabellar lines

*Study RT002-CL002 (GL-Belmont)*

This was a Phase 2, randomised, double-blind, placebo-controlled, dose-finding study that evaluated DAXI at single doses of 20, 40, and 60 U compared with placebo and Botox at dose of 20 U in 250 subjects with moderate to severe GL.

The primary efficacy outcome was a ≥1-point improvement from baseline on the IGA-FWS at maximum frown at Week 24 post-treatment. There was a statistically significant greater proportion of responders in each DAXI group compared with the placebo group, with a small increase in responders in the 60 U group compared with the 40 U group (Table 2). Considering the small difference in responders in the 60 U group compared with the 40 U group, the proportion of treatment-related adverse events in each group, and the number of eyelid ptosis cases, the 40 U dose was selected as the optimal dose to be evaluated in Phase 3 studies.

**Table 2: Study RT002-CL-002 (GL-Belmont). Results in support of DAXI dose selection**

| Treatment | N | Responder Rate[a] Week 4 (%) | Responder Rate[a] Week 24 (%) | Treatment-Related AEs (% subjects) | Eyelid Ptosis (n) |
|---|---|---|---|---|---|
| DAXI 60 U | 53 | 100 | 35. 7 | 30. 2 | 4 |
| DAXI 40 U | 53 | 100 | 32. 1 | 22. 7 | 0 |
| DAXI 20 U | 54 | 98. 1 | 16. 8 | 24. 1 | 0 |
| Placebo | 54 | 5. 9 | 2. 5 | 13. 1 | 0 |
| OnabotA 20 U | 54 | 96. 3 | 20. 4 | 27. 9 | 1 |

AE = adverse event; DAXI = daxibotulinumtoxinA; IGA-FWS = Investigator Global Assessment-Frown Wrinkle Severity; OnabotA = onabotulinumtoxinA.

a. Response rate was based on ≥ 1-point improvement from baseline on the IGA-FWS at maximum frown at the specified week.

### Cervical Dystonia

*Study RT002-CL005*

This was a Phase 2, multicentre, open-label, dose escalation study to evaluate the safety and preliminary efficacy of DAXI in adult subjects with moderate to severe isolated CD. The study enrolled 37 subjects in 3 treatment cohorts in a sequential, dose escalating fashion (Cohort 1 up to 200 U, Cohort 2 200 to 300 U, Cohort 3 300 to 450 U), with the actual dose administered to each patient based on the investigator's clinical judgement. 33 subjects completed the study: 12 in Cohort 1, 10 in Cohort 2, and 11 in Cohort 3.

The primary efficacy endpoint was the change from baseline in TWSTRS-total score at Week 4. At Week 4, the overall mean change from baseline in TWSTRS-total score was -16. 8 (-20. 2 in Cohort 1, -12. 4 in Cohort 2, and -17. 8 in Cohort 3). A dose response trend was not evident on the primary endpoint or other endpoints, including Cervical Dystonia Impact Profile (CDIP-58), Clinical Global Impression of Change (CGIC), or Patient Global Impression of Change (PGIC). The Sponsor postulated that a possible explanation for the lack of dose response was that the selection of dose for each patient was influenced by the investigator's clinical judgment.

The pivotal study, ASPEN-1, evaluated two doses of DAXI (125 U, 250 U) compared to placebo.

# Efficacy

## *Glabellar lines*

### *Study 1620301 (SAKURA-1)*

This was a Phase 3, randomised, double-blind, placebo-controlled, multicentre study conducted at 15 sites in the USA from December 2016 to November 2017. The primary objective was to evaluate the efficacy and safety of a single treatment of DAXI for the treatment of moderate to severe GL compared to placebo.

The study included healthy adults aged 18 to 75 years with moderate or severe GL during maximum frown based on the IGA-FWS and PFWS. Subjects were randomly assigned in a 2:1 ratio to DAXI for injection (40 U) or placebo, and were followed for a minimum of 24 weeks and up to a maximum of 36 weeks post-treatment. A trained physician administered a single dose of DAXI for injection (40 U) or placebo to subjects as five IM injections of 0. 1 mL each in the glabellar region: 2 injections into each corrugator muscle and 1 injection in the procerus muscle (Figure 1).

**Figure 1: Study 1620301 (SAKURA-1) Injection Sites**




The primary efficacy endpoint was the proportion of subjects who achieved a 2-point composite response at Week 4. In the final SAP, there were two hypothesis-tested secondary endpoints: proportion of subjects rated “none” or “mild” by the Investigator (IGA-FWS), and proportion of subjects rated “none” or “mild” by both the subject (PFWS) and the Investigator (IGA-FWS).

The primary endpoint was analysed using the Cochran-Mantel-Haenszel (CMH) test stratified by trial centre using a two-sided test with a Type I error rate of 0. 05. The two secondary endpoints were analysed sequentially (IGA-FWS first, then composite) at seven sequential study time points of Week 2, 4, 8, 12, 16, 20, and 24. All other efficacy endpoints were analysed descriptively.

303 subjects were randomised to treatment, 201 to DAXI and 102 to placebo. Overall, 275 (90. 8%) subjects completed the study. The majority of subjects were female (86. 5%), white (83. 8%), with a mean age of 50. 3 years. Approximately half of all subjects had been previously treated with BoNT with a mean time since last injection of 29. 1 months. At baseline, 62. 4% of subjects had moderate GL and 37. 6% had severe GL at maximum frown based on IGA-FWS. 60. 7% of subjects had moderate GL and 39. 3% had severe GL at maximum frown based on PFWS.

The primary endpoint was met (Table 3). The key secondary outcomes are presented in Figure 2 and Figure 3.

**Table 3: Study 1620301 (SAKURA-1) Proportion of subjects who achieved a 2-point Composite Response at Maximum Frown at Week 4 (Worst/Best Outcome Imputation; ITT Population)**

| | Placebo (N=102) | DAXI for Injection 40 U (N=201) | Difference[a] (95% CI)[b] |
|---|---|---|---|
| n (%) | 0 | 148 (73. 6%) | 74. 2% (68. 2%, 80. 2%) |
| p-value[c] | | | <0. 0001 |

CI = confidence interval; IGA-FWS = Investigator Global Assessment-Frown Wrinkle Severity; ITT = Intent-to treat; PFWS = Patient Frown Wrinkle Severity. Response was defined as achieving a score of 0 or 1 (none or mild) and an improvement of at least 2 points from baseline on both IGA-FWS and PFWS scales concurrently at the visit. Percentages were based on N.

a Difference was calculated as DAXI for injection 40 U minus placebo using the Mantel-Haenszel estimate of the common risk difference.

b The 95% CI was the stratified Newcombe confidence limits for the common risk difference.

c The p-value was based on the Cochran-Mantel-Haenszel test, stratifying by trial centre.

**Figure 2: Proportion of Subjects Who Achieved a Score of 0 or 1 (None or Mild) on IGA-FWS at Maximum Frown Over Time (Worst/Best Outcome Imputation; ITT Population). The 90% CI is displayed at each visit.**



**Figure 3: Proportion of Subjects Who Achieved a Score of 0 or 1 (None or Mild) on Both IGA-FWS and PFWS at Maximum Frown Over Time (Worst/Best Outcome Imputation; ITT Population). The 90% CI is displayed at each visit.**




The median time to return to moderate or severe GL on both IGA-FWS and PFWS was 24 weeks in all DAXI subjects, as well as for those who achieved a 2-point composite response at Week 4. The median time to return to baseline or worse than baseline on both IGA-FWS and PFWS was ~28 weeks in all DAXI subjects and 28 weeks in subjects who achieved a 2-point composite response at Week 4.

### *Study 1620302 (SAKURA-2)*

This was a Phase 3, randomised, double blind, placebo controlled, multicentre study conducted at 15 sites in the USA (9) and Canada (6) from November 2016 to November 2017. The study design was similar to SAKURA-1, including the dose and efficacy endpoints.

The primary efficacy outcome is shown in Table 4 and key secondary efficacy outcomes in Figure 4 and Figure 5.

The median time to return to moderate or severe GL on both IGA-FWS and PFWS was ~24 weeks in all DAXI subjects, as well as for those who achieved a 2-point composite response at Week 4. The median time to return to baseline or worse than baseline on both IGA-FWS and PFWS was ~26 weeks in all DAXI subjects and 28 weeks in subjects who achieved a 2-point composite response at Week 4.

**Table 4: Study 1620302 (SAKURA-2) Proportion of subjects who achieved a 2-point composite response at maximum frown at Week 4 (Worst/Best Outcome Imputation; ITT Population)**

| | Placebo (N=102) | DAXI for Injection 40 U (N=204) | Difference[a] (95% CI)[b] |
|---|---|---|---|
| n (%) | 1 (1. 0%) | 151 (74. 0%) | 72. 9% (66. 6%, 79. 1%) |
| p-value[c] | | | <0. 0001 |

Response was defined as achieving a score of 0 or 1 (none or mild) and an improvement of at least 2 points from baseline on both IGA-FWS and PFWS scales concurrently at the visit. Percentages were based on N.

a Difference was calculated as DAXI for injection 40 U minus placebo using the Mantel-Haenszel estimate of the common risk difference.

b The 95% CI was the stratified Newcombe confidence limits for the common risk difference.

c The p-value was based on the Cochran-Mantel-Haenszel test, stratifying by trial centre.

**Figure 4: Study 1620302 (SAKURA-2): Proportion of subjects who achieved a score of 0 or 1 (None or Mild) on IGA-FWS at maximum frown over time (Worst/Best Outcome Imputation; ITT Population)**




**Figure 5 Study 1620302 (SAKURA-2): Proportion of subjects who achieved a score of 0 or 1 (None or Mild) on both IGA-FWS and PFWS at maximum frown over time (Worst/Best Outcome Imputation; ITT Population)**



### *Study 1620303 (SAKURA-OLS)*

This was a Phase 3, open-label, multicentre study to assess the safety of single and repeat administration of DAXI in subjects with moderate to severe GL. It was conducted at 65 centres in the US and Canada from December 2016 to October 2018, and included subjects who completed SAKURA-1 and SAKURA-2 and also newly enrolled adult subjects (Figure 6).

**Figure 6: Study 1620303 (SAKURA-OLS) design**




All subjects received a single dose of 40 U DAXI into 5 injection sites (Figure 1) on Study Day 1. The criteria for re-treatment included a minimum period of 12 weeks between treatments, and return of IGA-FWS and PFWS to baseline. A subset of subjects received 3 treatments based on a pre-determined cut-off date of subject enrolment, including rollover subjects who received their first DAXI treatment in SAKURA-1 or SAKURA-2 and received 2 cycles of treatment in the OLS study, and de novo subjects who received all 3 treatment cycles in the OLS study.

2691 subjects were enrolled and treated in SAKURA-OLS, including 311 subjects (Group A) who received their first dose of DAXI in SAKURA-1 or SAKURA-2, and 2380 subjects (Group B) who received their first dose of DAXI in SAKURA-OLS. The majority of subjects were female (88. 6%), Caucasian/White (89. 4%), with a mean age of 49. 5 years. 39. 9% had been previously treated with BoNT with a mean time since last injection of 32. 06 months.

In SAKURA-OLS, 2380 subjects received treatment 1, 882 subjects received treatment 2, and 568 subjects received treatment 3.

The primary objective of the study was safety; efficacy outcomes were descriptive.

The proportion of subjects who achieved a 2-point composite response at maximum frown at each visit over time is shown in Table 5.

**Table 5: Study 1620303 (SAKURA-OLS): Proportion of subjects who achieved a 2-point composite response at maximum frown at each visit over time (Safety Evaluable Population) – First reference point (OLS baseline)**

| | Treatment 1 (N=2380) | | Treatment 2[a] (N=882) | | Treatment 3 (N=568) | |
|---|---|---|---|---|---|---|
| | N1 | n (%) | N1 | n (%) | N1 | n (%) |
| Week 1 | 2304 | | 1480 (62. 2%) | | 833 | |
| Week 2 | 2334 | | 1761 (74. 0%) | | 840 | |
| Week 4 | 2332 | | 1743 (73. 2%) | | 866 | |
| Week 8 | 2302 | | 1330 (55. 9%) | | 858 | |
| Week 12 | 2270 | | 786 (33. 0%) | | 853 | |
| Week 16 | 2142 | | 454 (19. 1%) | | 681 | |
| Week 20 | 1942 | | 218 (9. 2%) | | 634 | |
| Week 24 | 1614 | | 135 (5. 7%) | | 536 | |
| Week 28 | 1202 | | 66 (2. 8%) | | 415 | |
| Week 32 | 882 | | 34 (1. 4%) | | 286 | |
| Week 36 | 653 | | 13 (0. 5%) | | 194 | |

IGA-FWS = Investigator Global Assessment-Frown Wrinkle Severity; OLS = open-label safety; PFWS = Patient Frown Wrinkle Severity.

N was the number of evaluable subjects in the analysis population. N1 was the number of subjects with an IGA-FWS and PFWS score at maximum frown at the given visit. n was the number of subjects with a 2-point composite response at maximum frown at the given visit.

Percentages were based on the number in the population, N.

a Rollover subjects (n=134) were only followed through Week 12. The number in the population after Week 12 was 748 and was used for percentages starting at Week 16.

The median time to return to moderate or severe GL on IGA-FWS and PFWS from OLS baseline was ~24. 0 weeks after receiving the first and second administrations of DAXI. The median time to return to baseline, or worse than OLS baseline, on both IGA-FWS and PFWS was ~28. 0 weeks after receiving the first and second administrations of DAXI.

For Group B (received treatment 1 in SAKURA-OLS), the median time to re-treatment was ~24 weeks after treatment 1 and ~28 weeks after treatment 2. For Group A (received treatment 1 in SAKURA-1 or SAKURA-2), the median time to re-treatment after treatment 2 was ~26 weeks.

## Cervical Dystonia

### Study 1720302 (ASPEN-1)

This was a Phase 3, randomised, double-blind, placebo-controlled, parallel-group, multicentre study to evaluate the efficacy and safety of a single treatment of DAXI for injection in adults with isolated CD. It was conducted at 60 sites in 9 countries [Austria (1), Canada (1), Czech Republic (4), France (3), Germany (5), Poland (6), Spain (3), UK (1) and USA (36)] from June 2018 to June 2020.

The primary objective was to compare the efficacy of a high and low dose of DAXI for injection (250 U; 125 U) relative to placebo, and to each other, in adults with moderate to severe isolated

CD. All subjects received a single treatment at baseline and then had follow up visits at Weeks 2, 4, 6, 12, and then every 4 weeks thereafter up to Week 36.

The study included healthy adults aged 18 to 80 years who met the diagnostic criteria for isolated CD (idiopathic; dystonic symptoms localised to the head, neck, shoulder areas) with at least moderate severity at baseline, defined as a TWSTRS total score of at least 20, with at least 15 on the TWSTRS-Severity subscale, at least 3 on the TWSTRS-Disability subscale, and at least 1 on the TWSTRS-Pain subscale.

Subjects were allowed to be on a stable dose of medications (if any) used for focal dystonia treatment (e. g.  anticholinergics, muscle relaxants, benzodiazepines) for at least 4 weeks prior to baseline (Study Day 1) and continuing through end of study. Subjects previously treated with BoNT therapy were required to have a washout period of at least 14 weeks.

Subjects were randomised 3:3:1 to one of the following treatments:

- DAXI 250 U in 2. 5 mL
- DAXI 125 U in 2. 5 mL
- Placebo in 2. 5 mL

The investigator identified the involved muscles for injection based on the subject’s clinical presentation (e. g.  subject’s head, neck, and shoulder positions; localisation of pain; and muscle hypertrophy). The following muscles could be selected: sternocleidomastoid, levator scapulae, scalenus complex, splenius complex, splenius capitis, splenius cervices, trapezius, and longissimus. The entire 2. 5 mL solution of reconstituted study drug for each subject was to be divided and injected into the selected muscles. The volume injected into each involved muscle was restricted to a pre-defined range, which corresponded to a specific dose range per muscle for DAXI for injection 250 U, DAXI for injection 125 U, and placebo, respectively. Use of electromyography, ultrasonography, or other imaging modalities to guide injection of the investigational product was optional.

The primary efficacy endpoint was the average change from baseline in TWSTRS-Total Score at Week 4 and 6. The secondary efficacy endpoints included:

- Change from baseline in TWSTRS total score (all post-treatment time points).
- Duration of effect, defined as time (number of weeks) from treatment to loss of at least 80% of the peak treatment effect achieved at Weeks 4 and 6.
- Percentage of subjects with at least “moderate” (2-point) improvement on Clinical Global Impression of Change (CGIC) at Week 4 or 6.
- Percentage of subjects with at least “moderate” (2-point) improvement on Patient Global Impression of Change (PGIC) at Week 4 or 6.

301 subjects were randomised, 130 to DAXI 250 U, 125 to DAXI 125 U, and 46 to placebo. Overall, the mean age was 57. 7 years, with 74. 8% of subjects >50 years old. Over half of subjects were female (64. 8%) and postmenopausal (52. 5%). Most subjects were white (95. 3%). Most subjects (86. 4%) had received prior treatment with BoNT. The median duration of CD was 8. 6 years.

For the primary endpoint, a statistically significant improvement in the average change from baseline in TWSTRS-Total Score at Week 4 and 6 was demonstrated for both dose groups compared with placebo (Table 6). No dose-response relationship was demonstrated.

The duration of effect was defined as the time from treatment until loss of at least 80% of the peak treatment effect. The median (95% CI) duration of effect in the DAXI 125 U and DAXI 250 U groups was 24. 0 (20. 3, 29. 1) weeks and 20. 3 (16. 7, 24. 0) weeks, respectively (Figure 7).

60. 8% of subjects in the DAXI 125 U group and 56. 9% of subjects in the DAXI 250 U group had a CGIC response indicating improvement (moderately better or very much better at Week 4 or Week 6), compared with 28. 3% of subjects in the placebo group. 53. 6% of subjects in the DAXI 125 U group and 50. 8% of subjects in the DAXI 250 U group had a PGIC response indicating improvement (moderately better or very much better at Week 4 or Week 6), compared with 21. 7% of subjects in the placebo group.

**Table 6: Primary endpoint ASPEN-1. TWSTRS Total Score, ANCOVA of average change from baseline at Weeks 4 and 6 with multiple imputation (ITT Population)**

| Visit | Statistic | Placebo (N = 46) | DAXI 125 U (N = 125) | DAXI 250 U (N = 130) |
|---|---|---|---|---|
| Baseline | n | 46 | 125 | 130 |
| | Mean | 45.3 | 43.1 | 42.6 |
| | SE | 1.54 | 0.84 | 0.76 |
| Average of Weeks 4 and 6 | n | 46 | 125 | 130 |
| | Mean | 40.0 | 29.8 | 31.3 |
| | SE | 1.93 | 1.24 | 1.12 |
| Average change from baseline at Weeks 4 and 6 | n | 46 | 125 | 130 |
| | Mean | -5.3 | -13.3 | -11.3 |
| | SE | 1.46 | 1.07 | 0.98 |
| Percent change from baseline[a] | | -11.7% | -30.9% | -26.5% |
| LS mean (SE) change from baseline | | -4.3 (1.82) | -12.7 (1.30) | -10.9 (1.25) |
| | | | | |
| LS mean difference (SE) (versus placebo) | | | -8.5 (1.93) | -6.6 (1.92) |
| 95% CI of LS mean difference (versus placebo) | | | (-12.3, -4.7) | (-10.4, -2.9) |
| p-value (versus placebo)[b] | | | < 0.0001 | 0.0006 |
| | | | | |
| LS mean difference (SE) (versus DAXI 125 U) | | | | 1.8 (1.40) |
| 95% CI of LS mean difference (versus DAXI 125 U) | | | | (-0.9, 4.6) |
| p-value (versus DAXI 125 U)[b] | | | | 0.1902 |

ANCOVA = analysis of covariance; BoNT = botulinum neurotoxin; CI = confidence interval; DAXI = daxibotulinumtoxinA; ITT = intent-to-treat; LS = least squares; n = number of subjects in category; SE = standard error; TWSTRS = Toronto Western Spasmodic Torticollis Rating Scale. Notes: The average of subject's individual values at Week 4 and Week 6 was used to compute the summary statistics. LS mean, LS mean difference, 95% CI of LS mean difference, and p-value for average change from baseline at Weeks 4 and 6 were based on an ANCOVA model with terms for treatment, pooled study centre (region), prior BoNT treatment experience, and with baseline TWSTRS total score as a covariate. Multiple imputation was used for subjects missing both Week 4 and Week 6 TWSTRS data. Treatments presented in the table were based on planned treatment.

a The percent change in total TWSTRS score from baseline to the average of Weeks 4 and 6 was hand-calculated as follows: 100% × (mean change from baseline to the average of Weeks 4 and 6)/(mean baseline score).

b The test for DAXI 125 U versus placebo was done only if the test for DAXI 250 U versus placebo was statistically significant, and the test for DAXI 250 U versus DAXI 125 U was done only if the test for DAXI 125 U versus placebo was statistically significant.

**Figure 7: TWSTRS Total Score (Mean ± SE) by visit (ITT Population, ASPEN-1)**




## *Study 1720304 (ASPEN-OLS)*

This was a Phase 3 open-label, multicentre trial to evaluate the long-term safety and efficacy of repeat treatments of daxibotulinumtoxinA for injection in adults with isolated CD. ASPEN-OLS was an extension study for subjects completing ASPEN-1, but also enrolled de-novo subjects (Figure 8). The primary objectives were to evaluate the long-term safety of multiple continuous treatments of DAXI, and to assess immunogenicity after multiple treatments.

**Figure 8: Study 1720304 (ASPEN-OLS) design**




| Number of DAXI Treatments in OLS Study | Number of Subjects Receiving DAXI for Injection | | | | | Total (n=357) |
|---|---|---|---|---|---|---|
| One | -- | 20 | n/a | 2 | 6 | 28 |
| Two | -- | 59 | n/a | 18 | 18 | 95 |
| Three | -- | 111 | n/a | 15 | 43 | 169 |
| Four | -- | 40 | n/a | 6 | 19 | 65 |

ASPEN-OLS included healthy adults aged 18 to 80 years who met the diagnostic criteria for isolated CD (idiopathic; dystonic symptoms localised to the head, neck, shoulder areas) with at least moderate severity at baseline (Study Day 1), defined as a TWSTRS total score of at least 20, with at least 15 on the TWSTRS severity subscale, at least 3 on the TWSTRS disability subscale,

and at least 1 on the TWSTRS pain subscale (minimum TWSTRS subscale criteria were applicable only to subjects not previously enrolled in ASPEN-1. De-novo subjects could be BoNT treatment-naïve or have had past BoNT treatment.

The study was not randomised or blinded. At the Baseline Visit (Study Day 1) of Treatment Cycle 1 (Cycle 1), the investigator selected an open-label dose of DAXI for injection (125 U or 250 U) for the subject based on clinical factors, CD disease severity, and prior BoNT treatment history, using the following dose selection criteria.

To be eligible for the low dose (125 U) arm, a subject must have met 1 of the following criteria:

- Must have had a prior clinical experience with a BoNT dose that was <190 U of onabotulinumtoxinA (Botox) or incobotulinumtoxinA (Xeomin®) equivalent, OR
- Would qualify for a dose that was < 190 U of onabotulinumtoxinA or incobotulinumtoxinA equivalent, based on the clinical judgment of the investigator.

To be eligible for the high dose (250 U) arm, a subject must have met 1 of the following criteria:

- Must have had prior clinical experience with a BoNT dose that was ≥ 190 U of onabotulinumtoxinA or incobotulinumtoxinA equivalent, OR
- Would qualify for a BoNT dose that was ≥ 190 U of onabotulinumtoxinA or incobotulinumtoxinA equivalent, based on the clinical judgment of the investigator.

Subjects could receive up to 4 treatment cycles over the course of the study. Criteria for retreatment are described below. The study allowed investigators to adjust the DAXI dose by 50 U or 75 U in subsequent treatment cycles, such that the study evaluated doses of 125 U, 200 U, 250 U, and 300 U. The rationale for studying multiple doses of DAXI in this study was based on the consideration that the clinical application of BoNT for CD requires individualised treatment to achieve optimal outcome and minimise adverse events such as dysphagia.

The primary endpoints related to safety and immunogenicity. Secondary efficacy endpoints included average change in TWSTRS total score at Weeks 4 and 6 of each treatment cycle, inter-treatment time interval or duration of effect, percentage of subjects with at least moderate (2-point) improvement on CGIC at Week 4 or Week 6, percentage of subjects with at least moderate (2-point) improvement on PGIC at Week 4 or Week 6, and changes in quality of life measures based on CDIP-58.

The duration of effect was defined as the time in weeks after each treatment until loss of at least 80% of the peak treatment effect. The peak treatment effect was defined as the average change from baseline at Week 4 and Week 6 in the TWSTRS total score. The score that was consistent with the loss of at least 80% of the peak treatment effect was called the target TWSTRS score. When a subject's TWSTRS total score was the same or higher than his/her target TWSTRS score from Cycle 1, there was sufficient return of CD symptoms to warrant retreatment. Due to significant symptom recurrence (e. g. pain), some subjects may have requested retreatment before their TWSTRS total score reached/exceeded their target TWSTRS score. In this case, the investigator must have agreed that retreatment was clinically indicated for the subject to receive another treatment.

357 subjects received at least 1 treatment in ASPEN-OLS. 329 subjects received treatment 2, 234 received treatment 3, and 65 received treatment 4. Subjects were allowed to shift to higher or lower doses from treatment cycle to treatment cycle. Most shifts in dose levels were to higher dose groups over cycles (64 subjects from 125 U to 200 U, 31 subjects from 200 U to 250 U, and 131 subjects from 250 U to 300 U). There were some shifts to lower dose groups (9 subjects from 300 U to 250 U, 17 subjects from 250 U to 200 U, and 1 subject from 200 U to 125 U).

Overall, the mean age was 57. 6 years. The majority of subjects were female (66. 7%) and White (95. 8%).

The study showed a reduction (improvement) in the average change in TWSTRS total score from baseline at Weeks 4 and 6 for each treatment cycle, with a mean (percent) reduction of 15. 4 (35. 54%) in Cycle 1, 17. 7 (41. 22%) in Cycle 2, 17. 9 (39. 72%) in Cycle 3, and 19. 9 (41. 25%) in Cycle 4 (Figure 9).

**Figure 9: Mean Change in TWSTRS Total Score from Baseline for the Average of Weeks 4 and 6 for Each Treatment Cycle Overall (ASPEN-OLS, Safety Population)**




Note: The average of each subject's individual values at Week 4 and Week 6 was used to compute the summary statistics. The error bars represent the 95% CIs of the mean change from baseline in TWSTRS total score at Weeks 4 and 6.

The duration of effect was defined as the time in weeks after each treatment until loss of at least 80% of the peak treatment effect based on TWSTRS total score (loss of efficacy). Within each cycle the median duration of effect was similar at about 20 weeks, and was mostly similar across dose groups.

## Safety

Safety data for the treatment of GL and CD were presented separately, as the dosage regimens and injection sites differ substantially.

### *Glabellar lines*

The safety evaluation for GL included the following studies:

- Pooled pivotal studies – Study 1620301 (SAKURA-1) and Study 1620302 (SAKURA-2)
- Open label repeat-dose safety study – Study 1620303 (SAKURA-OLS)
- Supportive studies – Study RT002-CL001 (GL-Mexico) and Study RT002-CL002 (GL-Belmont)

A total of 3,139 subjects received at least 1 dose of study drug in the 5 GL clinical studies; of these, 2,994 subjects were exposed to DAXI at any dose, with a total of 4,444 treatments. A total of 2,839 subjects received the proposed dose of 40 U; of these, 1,957 received a single 40 U dose, 314 received 2 consecutive doses, and 568 subjects received 3 consecutive doses.

### Pooled pivotal studies (SAKURA-1, SAKURA-2)

Treatment emergent adverse events (TEAEs) in the pooled pivotal studies are summarised in Table 7 and Table 8. SAEs reported in DAXI-treated subjects (bone marrow failure, sepsis, uterine perforation, and uterine leiomyoma) were all assessed as unrelated to study treatment. Overall, 63 (15. 5%) subjects treated with DAXI and 10 (4. 9%) treated with placebo reported AESIs; of the 63 DAXI subjects, 40 (9. 9%) reported adverse event of special interest (AESIs) which were considered related to treatment (Table 9).

**Table 7: Overview of Subjects with TEAEs (SAKURA-1 and -2 Pooled Population)**

| | Placebo N = 203 n (%) [E] | DAXI 40 U N = 406 n (%) [E] |
|---|---|---|
| Total subjects with at least 1 TEAE | 49 (24.1) [74] | 166 (40.9) [294] |
| Total subjects with at least 1 related[a] TEAE | 18 (8.9) [25] | 78 (19.2) [104] |
| Total subjects with at least 1 serious TEAE | 2 (1.0) [2] | 4 (1.0) [4] |
| Total subjects with at least 1 related[a] serious TEAE | 0 | 0 |
| Total subjects with at least 1 TEAE of special interest[b] | 10 (4.9) [10] | 63 (15.5) [73] |
| Total subjects with at least 1 TEAE of special interest[c] | 0 [0] | 23 (5.7) [35] |
| Total subjects with at least 1 TEAE Leading to Study Discontinuation | 0 [0] | 0 [0] |
| Total subjects with at least 1 TEAE resulting in death | 0 [0] | 0 [0] |
| Total subjects with at least 1 Injection Site Reaction (ISR) | 3 (1.5) [3] | 6 (1.5) [6] |

n = number of subjects with adverse events. Percentages are based on the number in the analysis group, N. The Pooled Population includes all randomised subjects who received at least one dose of study treatment in SAKURA-1 or SAKURA-2 and had at least one post-treatment safety assessment. DAXI = daxibotulinumtoxinA for injection, [E] = number of events, MedDRA = Medical Dictionary for Regulatory Activities, PDSOT = potential distant spread of toxin, TEAE = treatment-emergent adverse event, U = units. a Related = possible, probable, or definite. b PDSOT events as determined by a pre-specified list of preferred terms and a system organ class. c PDSOT events as determined by the investigator.

**Table 8: TEAEs reported in ≥1% of subjects by MedDRA SOC and PT (SAKURA-1 and -2 Pooled Population)**

| MedDRA System Organ Class<br>Preferred Term | Placebo<br>N = 203<br>n (%) [E] | DAXI 40 U<br>N = 406<br>n (%) [E] |
|---|---|---|
| Any adverse event | 28 (13.8) [35] | 100 (24.6) [122] |
| Eye disorders | 0 [0] | 9 (2.2) [9] |
| Eyelid ptosis | 0 [0] | 9 (2.2) [9] |
| General disorders and administration site conditions | 12 (5.9) [15] | 22 (5.4) [25] |
| Injection site erythema | 4 (2.0) [4] | 5 (1.2) [5] |
| Injection site oedema | 3 (1.5) [3] | 5 (1.2) [5] |
| Injection site pain | 8 (3.9) [8] | 15 (3.7) [15] |
| Infections and infestations | 11 (5.4) [12] | 39 (9.6) [45] |
| Influenza | 2 (1.0) [2] | 6 (1.5) [6] |
| Nasopharyngitis | 6 (3.0) [7] | 17 (4.2) [21] |
| Upper respiratory tract infection | 3 (1.5) [3] | 11 (2.7) [13] |
| Urinary tract infection | 0 [0] | 5 (1.2) [5] |
| Investigations | 3 (1.5) [3] | 2 (0.5) [3] |
| Prothrombin time prolonged | 3 (1.5) [3] | 2 (0.5) [3] |
| Nervous system disorders | 5 (2.5) [5] | 37 (9.1) [40] |
| Headache | 5 (2.5) [5] | 37 (9.1) [40] |

MedDRA = Medical Dictionary for Regulatory Activities, n = number of subjects with adverse events, U = units. Percentages are based on the number in the analysis group, N. The Pooled Population includes all randomised subjects who received at least one dose of study treatment in SAKURA-1 or SAKURA-2 and had at least one post-treatment safety assessment. [E] = number of adverse events, regardless of causality.

**Table 9: Treatment-related AESIs – Potential Distant Spread of Toxin (SAKURA-1 and -2 Pooled Population)**

| Preferred Term[a] | Placebo N=203 | DAXI 40 U N=406 |
|---|---|---|
| Any adverse event, n (%) | 4 (2. 0) | 40 (9. 9) |
| Eyelid ptosis | 0 | 9 (2. 2) |
| Vision blurred | 0 | 1 (0. 2) |
| Facial paresis | 0 | 4 (1. 0) |
| Headache | 4 (2. 0) | 26 (6. 4) |
| Hemiparesis | 0 | 1 (0. 2) |
| Brow ptosis | 0 | 3 (0. 7) |

n = number of subjects with adverse events. Percentages are based on the number in the analysis group, N.

a Treatment-emergent adverse events are selected based upon a predetermined list of preferred terms.

### SAKURA-OLS

This was a large open-label study of 2,691 subjects who could receive up to 3 treatments of 40 U DAXI for moderate to severe GL. 2,380 subjects received Treatment 1, 882 subjects received Treatment 2, and 568 subjects received Treatment 3. Subjects were followed for up to 86 weeks.

Overall, 1,043 (38. 8%) subjects in SAKURA-OLS reported at least one TEAE, with similar profiles in Group A (received DAXI in SAKURA-1 or SAKURA-2) and Group B (received first dose of DAXI in SAKURA-OLS). TEAEs reported in >2% of subjects included headache (5. 9% of subjects), nasopharyngitis (4. 4%), injection site pain (3. 9%), injection site erythema (3. 3%), injection site oedema (2. 8%), erythema (2. 1%). Eyelid ptosis was reported in 35 (1. 3%) subjects. Most of the injection site reaction AEs were mild or moderate in severity. The rates of these AEs remained stable or decreased across successive treatment cycles.

There were 5 AEs which led to study discontinuation: optic neuritis, humerus fracture, brow spocking, basal cell carcinoma and bile duct cancer. Only brow spocking was considered related to treatment. 31 SAEs were reported. The most common SAE reported was breast cancer (2 [<0. 1%] subjects), while all other SAEs reported occurred in only one subject (<0. 1%). There was one death due to a homicide, considered unrelated to study drug.

There were 74 TEAEs that were deemed of special interest as potentially related to the distant spread of toxin in 65 (2. 4%) subjects, including eyelid ptosis (29 [1. 1%] subjects), headache (18 [0. 7%] subjects), brow ptosis (8 [0. 3%] subjects), and facial paresis (7 [0. 3%] subjects).

## Cervical Dystonia

The safety evaluation for CD included the following studies:

- Pivotal study – Study 1720302 (ASPEN-1)
- Open label repeat-dose safety study – Study 1720304 (ASPEN-OLS)
- Dose-finding study – Study RT002-CL005.

### ASPEN-1

This was a randomised, double-blind single-treatment study: 130 subjects received DAXI 250 U, 125 subjects received DAXI 125 U, and 46 subjects received placebo. TEAEs were reported more frequently with DAXI compared to placebo, but the profile was similar across the 2 DAXI dose groups (Table 10). The most commonly reported TEAEs in the DAXI groups were headache and injection site pain (Table 11). AEs related to distant spread of toxin reported in ≥2% of subjects in the All DAXI group were headache (4. 3% All DAXI, 5. 4% DAXI 250 U, 3. 2% DAXI 125 U), dysphagia (2. 7% All DAXI, 3. 8% DAXI 250 U, 1. 6% DAXI 125 U), and muscular weakness (2. 4% All DAXI, 0. 8% DAXI 250 U, 4. 0% DAXI 125 U).

Eight (3. 1%) DAXI-treated subjects reported SAEs, none of which were assessed as treatment-related. In the DAXI 125 U group, 5 (4. 0%) subjects reported SAEs of depression, urinary tract infection, cholelithiasis, renal tubular injury, and death (in 1 subject each). The death in the DAXI 125 U group occurred on Study Day 86, and the family declined to reveal the cause of death to the investigator. In the DAXI 250 U group, 3 (2. 3%) subjects reported SAEs of tachycardia and ventricular extrasystoles (both in 1 subject), abdominal pain (in 1 subject), and transient global amnesia (in 1 subject).

**Table 10: Overall Summary of TEAEs, ASPEN-1, Safety Population**

| Category | Placebo (N = 46) n (%) E | DAXI 125 U (N = 125) n (%) E | DAXI 250 U (N = 130) n (%) E | All DAXI (N = 255) n (%) E |
|---|---|---|---|---|
| Subjects with any TEAE | 18 (39.1) 34 | 74 (59.2) 148 | 64 (49.2) 134 | 138 (54.1) 282 |
| Subjects with any treatment-related TEAE | 8 (17.4) 11 | 37 (29.6) 54 | 31 (23.8) 49 | 68 (26.7) 103 |
| Subjects with any serious TEAE | 0 | 5 (4.0) 5 | 3 (2.3) 4 | 8 (3.1) 9 |
| Subjects with any treatment-related serious TEAE | 0 | 0 | 0 | 0 |
| Subjects with any TEAE of special interest as reported by the investigator[a] | 4 (8.7) 4 | 14 (11.2) 17 | 13 (10.0) 17 | 27 (10.6) 34 |
| Subjects with any TEAE related to distant spread of toxin[b] | 3 (6.5) 4 | 14 (11.2) 18 | 18 (13.8) 26 | 32 (12.5) 44 |
| Subjects with any potential distant spread of toxin TEAE[c] | 1 (2.2) 1 | 9 (7.2) 11 | 10 (7.7) 13 | 19 (7.5) 24 |
| Subjects with any TEAE related to potential anaphylactic reaction[d] | 0 | 7 (5.6) 10 | 4 (3.1) 4 | 11 (4.3) 14 |
| Death[e] | 0 | 1 (0.8) 1 | 0 | 1 (0.4) 1 |
| Subjects with any TEAE that led to study discontinuation[f] | 0 | 0 | 1 (0.8) 1 | 1 (0.4) 1 |

a These TEAEs of special interest were identified by the investigator in the AE eCRF. b These TEAEs related to distant spread of toxin were identified by the investigator on the AE eCRF. c Potential distant spread of toxin TEAEs were identified by SMQs. d TEAEs related to potential anaphylactic reaction were identified by SMQs. e The death was considered by the investigator as unrelated to study drug. f Subject 21418-03 in the DAXI 250 U group discontinued the study on Study Day 61 due to a TEAE of mild headache possibly related to study drug; this event began on Study Day 11 and resolved on Study Day 22.

**Table 11: TEAEs reported in ≥3% of subjects in the all DAXI group by SOC and PT ASPEN-1, Safety Population**

| System Organ Class<br>Preferred Term | Placebo (N = 46) n (%) | DAXI 125 U (N = 125) n (%) | DAXI 250 U (N = 130) n (%) | All DAXI (N = 255) n (%) |
|---|---|---|---|---|
| Subjects with any TEAE | 18 (39.1) | 74 (59.2) | 64 (49.2) | 138 (54.1) |
| Musculoskeletal and connective tissue disorders | 2 (4.3) | 15 (12.0) | 12 (9.2) | 27 (10.6) |
| Musculoskeletal pain | 0 | 5 (4.0) | 5 (3.8) | 10 (3.9) |
| Muscular weakness | 0 | 6 (4.8) | 3 (2.3) | 9 (3.5) |
| Neck pain | 2 (4.3) | 5 (4.0) | 4 (3.1) | 9 (3.5) |
| General disorders and administration site conditions | 3 (6.5) | 14 (11.2) | 9 (6.9) | 23 (9.0) |
| Injection site pain | 2 (4.3) | 10 (8.0) | 7 (5.4) | 17 (6.7) |
| Injection site erythema | 1 (2.2) | 6 (4.8) | 3 (2.3) | 9 (3.5) |
| Nervous system disorders | 1 (2.2) | 11 (8.8) | 9 (6.9) | 20 (7.8) |
| Headache | 1 (2.2) | 11 (8.8) | 9 (6.9) | 20 (7.8) |
| Infections and infestations | 2 (4.3) | 2 (1.6) | 7 (5.4) | 9 (3.5) |
| Upper respiratory tract infection | 2 (4.3) | 2 (1.6) | 7 (5.4) | 9 (3.5) |

### ASPEN-OLS

This was an open label study which was an extension study of ASPEN-1 (272 patients) and also enrolled de novo patients (86 patients). Subjects could receive up to 4 treatment cycles over the course of the study. 357 (99. 7%) subjects received treatment in Cycle 1, 329 (91. 9%) subjects received treatment in Cycle 2, 234 (65. 4%) subjects received treatment in Cycle 3, and 65 (18. 2%) subjects received treatment in Cycle 4.

The DAXI dose was selected by the investigator, with a dose of 125 U or 250 U in cycle 1. Doses in subsequent treatment cycles could be 125 U, 200 U, 250 U or 300 U. Subjects were allowed to shift to higher or lower doses from treatment cycle to treatment cycle. 44 subjects received a high dose (250 U or 300 U) for 4 treatments.

DAXI was generally well tolerated, with no clear pattern of increased TEAEs observed with higher doses. The most common AEs reported were dysphagia (10. 4%), muscular weakness (9. 5%), injection site pain (7. 6%), headache (5. 9%), neck pain (5. 3%), and upper respiratory tract infection (5. 0%). The incidence of AEs reflecting potential spread of toxin was 21. 9% in the high dose high frequency group, 17. 9% in the high dose low frequency group, 30. 6% in the low dose high frequency group, and 19. 6% in the low dose low frequency group.

### *Immunogenicity*

In the pivotal GL studies, ≤1. 5% of subjects developed treatment-related antibodies to DAXI and RT004. No subject developed neutralising antibodies and presence of ADAs had no demonstrable effect on efficacy. In SAKURA-OLS, a total of 19 (0. 7%) subjects developed treatment induced (n=18, 0. 7%) or treatment boosted (n=1, <0. 05%) anti-DAXI binding antibodies during the study. Treatment-related anti-DAXI antibody responses were reported in 10 (0. 4%), 4 (0. 5%), and 5 (0. 9%) subjects who received 1, 2, or 3 DAXI treatments, respectively.

In ASPEN-1, treatment-induced DAXI ADAs were reported in 6 (2. 7%) evaluable DAXI-treated subjects. In ASPEN-OLS, treatment-induced DAXI ADAs were reported in 2/346 (0. 6%) subjects. There was no trend observed with time in study or with higher DAXI dose in the percentage of subjects with post-baseline positive DAXI ADAs or neutralising antibodies.

## Risk management plan

The sponsor submitted Core RMP version 2. 0 (date 19 October 2023; data lock point 28 June 2021) and Australia specific annex version 1. 0 (date 19 October 2023) with the initial application.  The summary of safety concerns is presented in Table 12. The proposed pharmacovigilance plan and risk minimisation measures are acceptable.

**Table 12: Summary of safety concerns**

| Summary of safety concerns | | Pharmacovigilance | | Risk minimisation | |
|---|---|---|---|---|---|
| | | Routine | Additional | Routine | Additional |
| **Important identified risks** | Potential distant spread of toxins | P | - | | - |
| **Important potential risks** | Hypersensitivity | | - | | - |
| **Missing information** | Use in pregnancy or lactation | P* | - | | - |

*follow-up forms

The Daxxify Core Risk Management Plan (RMP) version 2. 0 (dated 11 June 2024; data lock point 28 June 2021), with Australian Specific Annex (version 1. 0, dated 11 June 2024), included with

submission PM-2023-03624-1-1, and any subsequent revisions, as agreed with the TGA will be implemented in Australia.

An obligatory component of risk management plans is routine pharmacovigilance. Routine pharmacovigilance includes the submission of periodic safety update reports (PSURs).

Unless agreed separately between the supplier who is the recipient of the approval and the TGA, the first report must be submitted to TGA no later than 15 calendar months after the date of the approval letter. The subsequent reports must be submitted no less frequently than annually from the date of the first submitted report until the period covered by such reports is not less than three years from the date of the approval letter. The annual submission may be made up of two PSURs each covering six months. If the sponsor wishes, the six-monthly reports may be submitted separately as they become available.

If the product is approved in the EU during the three years period, reports can be provided in line with the published list of EU reference dates no less frequently than annually from the date of the first submitted report until the period covered by such reports is not less than three years from the date of the approval letter.

The reports are to at least meet the requirements for PSURs as described in the European Medicines Agency's Guideline on good pharmacovigilance practices (GVP) Module VII-periodic safety update report (Rev 1), Part VII. B Structures and processes. Note that submission of a PSUR does not constitute an application to vary the registration. Each report must be submitted within ninety calendar days of the data lock point for that report.

Daxxify (daxibotulinumtoxinA) is to be included in the Black Triangle Scheme. The PI and CMI for Daxxify must include the black triangle symbol and mandatory accompanying text for five years, which starts from the date of first supply of the product.

# Risk-benefit analysis

## Efficacy

### *Glabellar lines*

The efficacy of DAXI 40 U for the treatment of moderate to severe GL was demonstrated in two pivotal randomised, double-blind, placebo-controlled, single treatment studies which shared similar design. Both studies demonstrated similar efficacy for DAXI 40 U compared to placebo. The primary efficacy endpoint was the proportion of subjects who achieved a 2-point composite response at Week 4, requiring both the subject and the investigator to record at least a 2-point response, in line with regulatory guidance published by the FDA. The difference in the proportion of subjects who reported a 2-point composite response at maximum frown at Week 4 between DAXI and placebo was 74. 2% in SAKURA-1 and 72. 9% in SAKURA-2. In both studies, the median time to return to moderate or severe GL on both IGA-FWS and PFWS was ~24 weeks for DAXI subjects.

The efficacy of single and repeat treatments with DAXI 40 U was evaluated in SAKURA-OLS, an open-label study which enrolled subjects from SAKURA-1 and SAKURA-2 plus 2,380 new subjects. Subjects enrolled from the pivotal studies could receive up to 2 treatments in SAKURA-OLS and new subjects could receive up to 3 treatments, subject to a pre-determined cut-off date. The criteria for re-treatment included a minimum period of 12 weeks between treatments, and return of IGA-FWS and PFWS to baseline. Efficacy as measured by 2-point composite response at maximum frown at 4 weeks post-treatment was consistent across treatments 1, 2, and 3. The

proportion of subjects achieving a 2-point composite response after each treatment in SAKURA-OLS was similar to SAKURA-1 and SAKURA-2.

In SAKURA-OLS, the median time to return to moderate or severe GL on IGA-FWS and PFWS from OLS baseline was ~24. 0 weeks after receiving the first and second administrations of DAXI. For Group B (received treatment 1 in SAKURA-OLS), the median time to retreatment was ~24 weeks after treatment 1 and ~28 weeks after treatment 2. For Group A (received treatment 1 in SAKURA-1 or SAKURA-2), the median time to re-treatment was ~26 weeks after treatment 2.

There was no active comparator study, which limited comparative conclusions regarding duration of effect and frequency of re-treatment relative to other BoNT products.

### Cervical Dystonia

In the pivotal study, a statistically significant improvement in the average change from baseline in TWSTRS-Total Score at Week 4 and 6 was demonstrated for both dose groups (125 U and 250 U) compared with placebo. No dose-response relationship was demonstrated. The Phase 3 open-label, multiple dose study evaluated doses of 125 U and 250 U for the first treatment cycle, based on prior BoNT experience or the clinical judgment of the investigator. The investigator could then adjust the dose by 50 U or 75 U for subsequent treatments, such that the study evaluated doses of 125 U, 200 U, 250 U, and 300 U. Most shifts in dose levels were to higher dose groups over cycles. The rationale for studying multiple doses of DAXI in this study was based on the consideration that the clinical application of BoNT for CD requires individualised treatment to achieve optimal outcome and minimise adverse events such as dysphagia. This approach is similar to that of other BoNT approved for the treatment of CD.

The evaluation concluded that the doses evaluated in the pivotal study have been adequately justified and that efficacy of the proposed doses (125 U to 250 U) have been satisfactorily demonstrated. The proposed dose range provides flexibility to individualise the treatment based on the muscles involved.

## Safety

### Glabellar lines

The safety database for the GL indication is large, with 2,839 subjects treated with the proposed dose of DAXI 40 U. The two pivotal studies evaluated a single treatment and the open-label study evaluated patients treated up to 3 times over ~1 year.

The DAXI safety profile was similar across the studies and consistent with the known safety profile of BoNT. Common AEs reported included headache, nasopharyngitis, injection site pain, and upper respiratory tract infection. Eyelid ptosis was reported in ~2% of subjects, comparable to rates reported for other BoNT products. AEs were generally mild and transient and resolved without treatment. There were no cases of anaphylaxis but ~3. 4% of DAXI patients were identified as having TEAEs potentially related to hypersensitivity.

### Cervical Dystonia

The dose of DAXI for CD (125 U to 250 U) is notably higher than the dose used for GL (40 U). The most commonly reported TEAEs in the All DAXI group were headache (7. 8%) and injection site pain (6. 7%). TEAEs related to distant spread of toxin reported in ≥2% of subjects in the All DAXI group were headache (4. 3% All DAXI, 5. 4% DAXI 250 U, 3. 2% DAXI 125 U), dysphagia (2. 7% All DAXI, 3. 8% DAXI 250 U, 1. 6% DAXI 125 U), and muscular weakness (2. 4% All DAXI, 0. 8% DAXI 250 U, 4. 0% DAXI 125 U).

In the open-label, multiple dose study ASPEN-OLS, the most common AEs reported were dysphagia (10. 4%), muscular weakness (9. 5%), injection site pain (7. 6%), headache (5. 9%), neck pain (5. 3%), and upper respiratory tract infection (5. 0%). There was no clear pattern of increased TEAEs observed with higher doses, but the variation in doses used over the course of ASPEN-OLS limits the assessment of the relative safety of the different doses evaluated in that study.

## Uncertainties and limitations of the data

The main GL and CD efficacy studies did not include an active comparator, so they do not directly inform comparative efficacy and duration of effect relative to other BoNT products.

Both DAXI doses evaluated in the pivotal CD study (125 U and 250 U) were superior to placebo, but a dose-response was not demonstrated. The open-label, multiple dose study evaluated doses of 125 U to 300 U. The proposed dose range of 125 U to 250 U is consistent with the established individualised treatment approach for BoNT for the treatment of CD.

No paediatric data were submitted. The proposed indications are only for adults.

# Assessment outcome

Based on a review of quality, safety, and efficacy, the TGA decided to register Daxxify (daxibotulinumtoxinA) for the following indications:

> *The temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients.*
>
> *The treatment of cervical dystonia in adult patients*

## Specific conditions of registration

Batch Release Testing and Compliance with the Certified Product Details Conditions of Registration for Daxxify

- All batches of Daxxify supplied in Australia must comply with the product details and specifications approved during evaluation and detailed in the Certified Product Details.
- When requested by the TGA, the Sponsor should be prepared to provide product samples, specified reference materials and documentary evidence to enable the TGA to conduct laboratory testing on the Product.

# Product Information and Consumer Medicines Information

For the most recent Product Information (PI) and Consumer Medicines Information (CMI), please refer to the TGA PI/CMI search facility.

**Therapeutic Goods Administration**

PO Box 100 Woden ACT 2606 Australia
Email: info@tga.gov.au Phone: 1800 020 653 Fax: 02 6203 1605
https://www.tga.gov.au

# EXHIBIT 8

EX-10.2 3 ef20037731_ex10-2.htm EXHIBIT 10.2

**Exhibit 10.2**

# EXCLUSIVE DISTRIBUTION AGREEMENT

This EXCLUSIVE DISTRIBUTION AGREEMENT (this "**Agreement**"), dated as of October 24, 2024 (the "**Effective Date**"), is entered into by and between Revance Therapeutics, Inc., a Delaware corporation with its principal place of business at 1222 Demonbreun St., 20th Floor, Nashville, TN 37203 and Revance Australia Pty. Ltd., an Australia proprietary company with its principal place of business at 1222 Demonbreun St., 20th Floor, Nashville, TN 37203 (collectively, "**Revance**"), on the one hand and Teoxane SA, a company organized under the laws of Switzerland with its principal place of business at rue du Lyon 105, CH-1203, Geneva, Switzerland ("**Teoxane**") on the other hand (each a "**Party**" and collectively, the "**Parties**").

**W I T N E S S E T H:**

WHEREAS, Revance owns or has the right to license certain Intellectual Property Rights relating to the Products; and

WHEREAS, Revance desires to appoint Teoxane, and Teoxane desires to become, Revance's exclusive distributor and licensee of the Products in the Field in the Territory upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.01. *Definitions.* For purposes of this Agreement, the following initially capitalized terms shall have the following meanings:

"**AAA**" has the meaning set forth in Section 13.06(a).

"**AASB**" means the accounting principles of the Australian Accounting Standards Board.

"**Accounting Standards**" means internationally recognized accounting principles, including U.S. generally accepted accounting principles ("**US GAAP**") and international financial reporting standards ("**IFRS**"), as generally and consistently applied by the applicable Party or Selling Party. "Accounting Standards" shall include AASB, provided there are no material differences compared to US GAAP or IFRS in the relevant accounting area, such as revenue recognition, to which AASB is applied.

"**Aesthetic Indications**" means (a) the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients and (b) any and all other Indications related to altering cosmetic appearance, including but not limited to the treatment, minimization and/or eradication of, or the appearance of, crow's feet, lines or wrinkles on the face, skin laxity, scars, skin discoloration, and liver spots.

"**Affiliate**" means, when used with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person, whether now or in the future. For the purpose of this definition, "**control**" (including, with correlative meanings, "controlled by" and "under common control with"), when used with respect to any specified Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract, agreement or otherwise.

"**Agreement**" has the meaning set forth in the Preamble.

"**Annual Net Sales**" means, with respect to a Calendar Year and any Product, the Net Sales of such Product in such Calendar Year.

"**Applicable Law**" means, with respect to any Person or Product, any transnational, domestic or foreign (including from Australia and New Zealand) federal, provincial, state or local law (statutory, common or otherwise), constitution, directive, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling, writ, stipulation, determination, award or other similar requirement enacted, adopted, promulgated, applied or entered by a Governmental Authority that is binding upon or applicable to such Person or Product.

"**Batch**" means, with respect to any Product, the specific amount of such Product that is intended to have a uniform character and quality within specified limits and is produced according to a single Manufacturing order during the same Manufacturing cycle.

"**Batch Record**" means a document that records the details required by cGMP and the Quality Agreement about the Manufacture of any Batch in the form prescribed by the Quality Agreement.

"**Binding Forecast**" has the meaning set forth in Section 5.02(a).

"**Brand Guidelines Agreement**" has the meaning set forth in Section 2.03.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banking institutions located in Geneva, Switzerland or Nashville, Tennessee are authorized or obligated by law or executive order to close.

"**Calendar Quarter**" means each successive period of three (3) calendar months commencing on January 1, April 1, July 1 and October 1; *provided, however*, that (a) the first Calendar Quarter of the Term shall commence on the Effective Date and end on the last day of the Calendar Quarter in which the Effective Date occurs; and (b) the last Calendar Quarter of the Term shall end upon the expiration or termination of this Agreement.

"**Calendar Quarter Report**" has the meaning set forth in Section 7.07.

"**Calendar Year**" means each respective period of twelve (12) consecutive months commencing on January 1 and ending on December 31; *provided, however*, that (a) the first Calendar Year of the Term shall commence on the Effective Date and end on December 31 of the same year; and (b) the last Calendar Year of the Term shall commence on January 1 of the Calendar Year in which this Agreement terminates or expires and end on the termination or expiration of this Agreement.

"**Certificate of Analysis**" means, with respect to any Product Manufactured and supplied hereunder, a certificate that meets all applicable requirements of cGMP and the Quality Agreement and is signed by a qualified person pursuant to the Quality Agreement confirming that such Product meets the applicable Product Specifications.

"**cGMP**" means all applicable current good manufacturing practices as adopted by the applicable Regulatory Authorities in the Territory, including standards relating to manufacturing practices for drugs, including biologics.

"**Change of Control**" means, with respect to any Person, (a) the sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of such Person or (b) a transaction or series of transactions (including by way of merger, consolidation, sale of stock or otherwise) the result of which is that any Person or "group" (as used in Section 13(d)(3) of the Securities Exchange Act of 1934) becomes the "beneficial owner" (as defined in Rule 13d-3 and Rule 13d-5 promulgated under the Securities Exchange Act of 1934), directly or indirectly, of more than fifty percent (50%) of the combined voting power of such Person's then outstanding voting securities with respect to matters submitted to a vote of the stockholders generally.

"**Commercial Success Milestone Event**" has the meaning set forth in Section 7.04.

"**Commercial Success Milestone Payment**" has the meaning set forth in Section 7.04.

"**Commercialize**" means, with respect to any product, any and all activities undertaken for such product relating to using, selling, offering for sale, marketing, promoting, distributing, importing, disposing of and otherwise commercializing such product. For the avoidance of doubt, "**Commercialize**" does not include research, development or Manufacturing. "**Commercialization**" has a correlative meaning.

"**Commercially Reasonable Efforts**" means, with respect to Teoxane's obligations under this Agreement, the reasonable and good faith efforts that are consistent with the exercise of prudent scientific and business judgment, as applied by companies in the pharmaceutical industry of similar size and resources under similar circumstances for a product (regardless of whether the product is owned by such company or such company has obtained rights to such product) having similar commercial potential and stage of development or lifecycle, taking into account the regulatory requirements involved, medical/scientific, technical and regulatory profile (including safety and efficacy), Intellectual Property Rights protection, anticipated and actual profitability and return on investment, the potential for additional Indications and the level of competition in the market.

"**Confidential Information**" means any non-public, proprietary or other confidential information disclosed by a Party or any of its Affiliates (the "**Disclosing Party**") to the other Party or any of its Affiliates (the "**Receiving Party**"), excluding any information that the Receiving Party can demonstrate with competent evidence that: (a) the Receiving Party independently develops without reference to the disclosed information; (b) the Receiving Party independently receives on a non-confidential and authorized basis from a source other than the Disclosing Party; (c) becomes public knowledge through no fault of the Receiving Party; or (d) is in the public domain at the time the Receiving Party receives the disclosed information.

"**Control**" means, with respect to any material, information or Intellectual Property Right, that a Party or one of its Affiliates possesses the right, whether directly or indirectly, and whether by ownership, license or otherwise (other than by a license, sublicense or other right granted (but not assignment) pursuant to this Agreement), to assign or grant a license, sublicense or other right to or under such material, information or Intellectual Property Right on the terms and conditions set forth herein without violating the terms of any agreement between such Party and any Third Party in existence as of the time such Party or its Affiliate would be required hereunder to assign or grant such license, sublicense or other right.

"**Cost of Manufacturing**" means, with respect to any Product Unit, Revance's and its Affiliates' fully burdened cost of manufacturing and supplying finished product, such costs to include the cost of direct materials and labor, conversion, packaging and labeling, associated freight expenses, cost of testing, stability and attributable portion of overhead (not to exceed [*]% of total costs pursuant to this Section less overhead), which cost shall be determined in accordance with Revance's internal managerial accounting calculations on a basis consistent with the table shown in Section A of Exhibit C, and following the structure and line items set forth in Section B of Exhibit C. For the avoidance of doubt, "Cost of Manufacturing" excludes Revance's and its Affiliates' general and administrative, regulatory, clinical, research and development and commercial costs, as well depreciation and amortization.

"**DAXXIFY**" means the product marketed as of the Effective Date by Revance and its Affiliates in the United States under the brand name DAXXIFY®.

"**Disclosing Party**" has the meaning set forth in the definition of "Confidential Information".

"**Effective Date**" has the meaning set forth in the Preamble.

"**Exploit**" means to develop, use, Manufacture, have Manufactured, Commercialize, keep (whether for disposal or otherwise) or otherwise exploit. "**Exploitation**" has a corresponding meaning.

"**Field**" means (a) any and all Aesthetic Indications and (b) the treatment of cervical dystonia ("**CD**").

"**First Commercial Sale**" means, with respect to any Product and any country in the Territory, the first bona fide, arm's length sale to a Third Party of such Product in such country after obtaining all Regulatory Approvals required for the sale of such Product in such country; *provided, however*, that First Commercial Sale shall not include any transfer of any Product (a) between or among Teoxane or any of its respective Selling Parties; or (b) for purposes of patient assistance, named patient sales, charitable or promotional purposes, for use in a clinical trial or for use in any other tests or studies (including pre-clinical studies) reasonably necessary to comply with any Applicable Law or request by a Regulatory Authority, or for warehousing or staging purposes in advance of release of such Product.

"**Forecast**" has the meaning set forth in Section 5.02(a).

"**Governmental Authority**" means any transnational, domestic or foreign federal, state or local, governmental authority, department, court, agency or official, including any political subdivision thereof.

"**Indemnified Claim**" has the meaning set forth in Section 12.04.

"**Indemnified Party**" has the meaning set forth in Section 12.04.

"**Indemnifying Party**" has the meaning set forth in Section 12.04.

"**Indication**" means any separate and distinct human disease, syndrome or medical condition that a product that is approved by a Regulatory Authority is intended to diagnose, treat, prevent or ameliorate.

“**Intellectual Property Rights**” means (a) in any jurisdiction, issued patents or pending patent applications, and any and all divisionals, continuations, continuations-in-part, reissues, renewals, reexaminations, and extensions thereof, any counterparts claiming priority therefrom, utility models, patents of importation/confirmation, supplementary protection certificates, certificates of invention, national and multinational statutory invention registrations and similar statutory rights (“**Patents**”); (b) in any jurisdiction, trademarks, service marks, certification marks, logos, trade names, trade dress, domain names, including all registrations and applications for registration of, and all goodwill associated with, the foregoing (“**Trademarks**”); (c) in any jurisdiction, copyrights and registrations and applications for registration thereof; (d) confidential and proprietary methods, processes, techniques, devices, technology, assays, materials, trade secrets, inventions, ideas, designs, compositions, formulae, know-how, data, specifications, technical information, safety information, instructions, and other similar types of confidential and proprietary documentation, materials and information (“**Know-How**”); (e) design rights, (f) data and database rights, and (g) any similar intellectual property or proprietary rights.

“**Latent Defect**” means, with respect to any Product Manufactured and supplied by Revance to Teoxane hereunder, any defect that is not readily determinable upon a reasonable inspection of such Product based on visual inspection (without the obligation to open the packaging) and review of the Certificate of Analysis and/or Batch Record for such Product (if applicable).

“**Losses**” has the meaning set forth in Section 12.01.

“**Manufacture**” and “**Manufacturing**” means, with respect to any product, any and all activities related to the planning, purchasing, production, manufacture, processing, filling, finishing, packaging, labeling, testing, serialization, shipping and holding of such product or any intermediate thereof, waste disposal, and leafleting, including process development, process qualification and validation, scale-up, commercial manufacture and analytic development, product characterization, stability and other testing, sample retention, quality assurance, QP release, and quality control.

“**Medsafe**” means the New Zealand Medicines and Medical Devices Safety Authority or any successor agency thereto.

“**Milestone Payments**” means the Regulatory Milestone Payments and the Commercial Success Milestone Payments.

“**Net Sales**” means, with respect to any Product during a stated period of time, the gross invoiced sales amounts for such Product sold by or on behalf of Teoxane or any of its Affiliates (each “a Selling Party”) in arm’s length transactions to a Third Party in the Territory, less the following deductions permitted under Applicable Law from such gross amounts to the extent actually incurred, allowed, paid, accrued or specifically allocated to such Product and to the extent that such amounts are deducted from gross invoiced sales amounts as reported by such Selling Party in its financial statements in accordance with Accounting Standards, consistently applied:

(a) credits or allowances actually granted for such Product if such Product is damaged, returns or rejections of such Product, price adjustments and billing errors;

(b) governmental and other rebates (or equivalents thereof) to national, state, provincial, local or other governments, their agencies and purchasers, and reimbursers, or to trade customers;

(c) normal and customary trade, cash and quantity discounts, allowances and credits actually given on such Product sold;

(d) transportation costs, including insurance, for outbound freight related to delivery of such Product to the extent included and separately itemized in the gross amount invoiced;

(e) sales, value added, purchase, turnover, or consumption taxes and other similar taxes directly linked to the sales of such Product to the extent included in the gross amount invoiced, in each case to the extent that each such tax is borne by the Selling Party without reimbursement (but excluding any tax imposed on or measured by the net income or profits); and

(f) any other items actually deducted from gross invoiced sales amounts as reported by such Selling Party in its financial statements in accordance with Accounting Standards, applied on a consistent basis, not set forth in (a)-(e) above.

Notwithstanding anything to the contrary, (i) sales of Products among Selling Parties for resale by the particular Selling Party to a Third Party shall not be deemed a sale for purposes of this definition of "Net Sales"; *provided* that the resale of such Products by such Selling Party to such Third Party shall be deemed a sale for the purposes of this definition of "Net Sales"; and (ii) transfers or dispositions of any Product for no monetary consideration (A) in connection with patient assistance programs, (B) for charitable or promotional purposes, (C) for preclinical, clinical, regulatory or governmental purposes or under so-called "named patient" or other limited access programs, (D) for use as reasonably necessary to comply with any Applicable Law or request by a Regulatory Authority, or (E) for warehousing or staging purposes in advance of release of such Product, in each case ((A) through (E)), shall not be deemed sales of such Product for purposes of this definition of "Net Sales". For clarity, Product Samples are excluded from Net Sales.

"**New Product**" means any product Manufactured by or on behalf of Revance or any of its Affiliates that is comprised of or contains the injectable formulation of DaxibotulinumtoxinA-lanm in any form, presentation, dosage or formulation (including as a combination product) approved for any Indication outside the Field in the Territory from time to time during the Term.

"**Parties**" has the meaning set forth in the Preamble.

"**Party**" has the meaning set forth in the Preamble.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Product**" means any injectable product in its fully packaged and labeled form that is Manufactured by or on behalf of Revance or any of its Affiliates and is comprised of or contains DaxibotulinumtoxinA-lanm in any form, presentation, dosage or formulation (including as a combination product) approved for any Indication in the Field in the Territory from time to time during the Term, but excluding, for clarity, the Viatris Biosimilar Product. The Product includes the product being marketed as of the Effective Date by Revance and its Affiliates in the United States under the brand name DAXXIFY®. Where the context requires, the definition of Product in any provision will be deemed to include Product Samples, except where Product Samples are specifically excluded in a provision.

"**Product Infringement**" has the meaning set forth in Section 8.02(a).

"**Product Samples**" means not-for-sale samples of Products labelled as such on their packaging and provided in the ordinary course of business solely for purposes of promoting the Product and consistent with general industry practice.

"**Product Specifications**" means, with respect to any Product, the specifications for the characteristics, quality and processing of such Product set forth in the Quality Agreement. The Product Specifications shall be the same for Product Samples except for the specific not for sale label, as will be further defined in the Quality Agreement.

"**Product Unit**" means, with respect to any Product, one (1) unit of such Product.

"**Quality Agreement**" has the meaning set forth in Section 6.01.

"**Receiving Party**" has the meaning set forth in the definition of "Confidential Information".

"**Regulatory Approvals**" means all approvals, licenses, registrations or authorizations necessary for the Exploitation of any Product for one (1) or more Indications in a country or regulatory jurisdiction in the Territory, including the satisfaction of all applicable regulatory and notification requirements.

"**Regulatory Authorities**" means the TGA and Medsafe, or any other national, transnational, regional, state or local regulatory agency, department, bureau, commission, council or other Governmental Authority with authority over the Exploitation of any Product in the Territory.

"**Regulatory Materials**" means all regulatory applications, submissions, notifications, registrations, and other filings made to or with a Regulatory Authority or other Governmental Authority in connection with the Exploitation of any Product in the Territory.

"**Regulatory Milestone Event**" has the meaning set forth in Section 7.03.

"**Regulatory Milestone Payment**" has the meaning set forth in Section 7.03.

"**Revance**" has the meaning set forth in the Preamble.

"**Revance Disclosure Schedule**" means the disclosure schedule set forth in Exhibit D.

"**Revance Indemnified Party**" has the meaning set forth in Section 12.02.

"**Revance Know-How**" means any and all Know-How that is Controlled by Revance or any of its Affiliates as of the Effective Date or at any time during the Term and is necessary or useful to Exploit any Products in the Territory, including any enhancement, modification, derivative or improvement to the foregoing.

"**Revance Licensed Technology**" means the Revance Know-How and the Revance Patents.

"**Revance Patents**" means any and all Patents that (a) are Controlled by Revance or any of its Affiliates as of the Effective Date or at any time during the Term and (b) (i) claim or cover any Revance Know-How, (ii) claim or cover any Product (or any element or component thereof) or (iii) are otherwise necessary or useful to Exploit any Product in the Territory, including the Patents set forth on Exhibit A.

"**Revance Trademarks**" means the Trademarks set forth on Exhibit B, as updated from time to time by Revance.

"**RHA Agreement**" means that certain Exclusive Distribution Agreement dated January 10, 2020 by and between Teoxane and Revance Therapeutics Inc. (as amended, amended and restated, supplemented or otherwise modified from time to time).

"**Right of First Negotiation**" has the meaning set forth in the RHA Agreement.

"**Selling Party**" has the meaning set forth in the definition of "Net Sales".

"**Shortfall**" means, with respect to any Product, the quantity of such Product actually delivered to Teoxane that is less than the quantity set out in the applicable purchase order for such Product.

"**Supply Price**" has the meaning set forth in Section 7.02(a).

"**Teoxane**" has the meaning set forth in the Preamble.

"**Teoxane Indemnified Party**" has the meaning set forth in Section 12.01.

"**Term**" has the meaning set forth in Section 11.01.

"**Termination Payment**" means the amount to be paid by Revance to Teoxane upon termination of this Agreement by Revance pursuant to Section 11.06(c), which amount shall be equal to: (a) if the notice of termination occurs on or before December 31, 2026, one hundred percent (100%) of the aggregate amount of the Upfront Payment and all Milestone Payments paid by Teoxane to Revance as of the date of such termination notice, or (b) if the such termination notice occurs between January 1, 2027 and December 31, 2031, a percentage of the aggregate amount of the Upfront Payment and all Milestone Payments paid by Teoxane to Revance as of the date of such termination notice, where such percentage equals one hundred percent (100%) *minus* the product of (i) ten percent (10%) *multiplied by* (ii) the number of Calendar Years completed in their entirety as of such date of termination notice.

"**Territory**" means Australia and New Zealand.

"**TGA**" means the Therapeutic Goods Administration or any successor agency thereto.

"**Third Party**" means any Person other than the Parties and their respective Affiliates.

"**Third Party Claims**" has the meaning set forth in Section 12.01.

"**Transfer Price**" means, with respect to any Product Unit, the Cost of Manufacturing for such Product Unit *plus* [*].

"**United States**" or "**U.S.**" means the United States of America, including its territories and possessions.

"**Upfront Payment**" has the meaning set forth in Section 7.01.

"**Viatris Biosimilar Product**" means that certain product being developed as of the Effective Date by Revance (or its Affiliate) and Viatris Inc. as a biosimilar to BOTOX®.

Section 1.02. *Other Definitional and Interpretative Provisions*. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections and Exhibits are to Articles, Sections and Exhibits of this Agreement unless otherwise specified. All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute, regulation or law shall be deemed also to include any and all Applicable Law.

## ARTICLE 2

### Appointment; Grant Of Rights

Section 2.01. *Appointment*; *Grant of Rights*. Subject to the terms and conditions of this Agreement:

(a) Revance (on behalf of itself and its Affiliates) hereby appoints Teoxane, and Teoxane accepts appointment, as the exclusive distributor of the Products in the Field in the Territory; and

(b) Revance (on behalf of itself and its Affiliates) hereby grants to Teoxane (i) an exclusive (even as to Revance and its Affiliates), non-transferable (except as provided in Section 13.01), license, with the right to grant sublicenses as provided in Section 2.02, under the Revance Licensed Technology, solely to register with Regulatory Authorities (for any purposes other than for the Regulatory Approval), keep and Commercialize the Products in the Field in the Territory and to use the Revance Trademarks in connection with the foregoing; and (ii) a non-exclusive, royalty-free, non-transferable (except as provided in Section 13.01), license, with the right to grant sublicenses as provided in Section 2.02, under the Revance Licensed Technology, solely to keep, use and import the Products outside of the Territory, but in each case solely for export to and Commercialization in the Field in the Territory and to use the Revance Trademarks in connection with the foregoing. For the avoidance of doubt, nothing herein shall be construed as a license to manufacture or purify any Product or any component thereof.

Section 2.02. *Sublicensing.* Teoxane shall have the right to grant sublicenses of any and all of its rights under this Agreement to (a) any of its Affiliates or (b) any Third Party, and any such Affiliate or Third Party may grant further sublicenses in accordance with the terms hereof; *provided* that any such sublicense requires such Affiliate or Third Party to comply with the applicable terms and conditions of this Agreement. Teoxane shall remain responsible and liable to Revance for the performance of each of its sublicensee's obligations under any sublicense granted under this Agreement and in the event that any such sublicensee takes any action that would be deemed to be a breach of this Agreement if such action were taken by Teoxane, then Teoxane shall be responsible and liable for such breach.

Section 2.03. *Branding.* Revance reserves the right to practice reasonable control with regard to the use of the Revance Trademarks by Teoxane and its sublicensees. Within sixty (60) days of Regulatory Approval for the Product in the Territory, the Parties shall execute an agreement setting forth the quality, appearance, distinctiveness and other standards with respect to the use of the Revance Trademarks for any Products (the "**Brand Guidelines Agreement**") and Teoxane shall, and shall cause its sublicensees to, comply with the Brand Guidelines Agreement. Any use of the Revance Trademarks by Teoxane or any of its sublicensees inures to the benefit of Revance.

Section 2.04. *No Other Licenses.* Except as expressly provided in this Agreement, no other licenses are granted by Revance to Teoxane under this Agreement.

Section 2.05. *Delivery of Revance Know-How; Cooperation.* As soon as reasonably practicable, but in no event later than thirty (30) days after the Effective Date, and at any time during the Term upon Teoxane's request, Revance shall, at its sole cost and expense, disclose and deliver to Teoxane such Revance Know-How which is required to Commercialize the Products in the Field in the Territory. Revance shall, at its sole cost and expense, provide Teoxane with all reasonably required assistance to enable Teoxane to understand and use such Revance Know-How and the Products, including providing to Teoxane personnel, Teoxane Key Opinion Leaders and aesthetics practitioners, as requested by Teoxane, in the Territory training in respect of the Products. Nothing herein shall create any obligation for Revance to disclose Know-How related to the Manufacture of any Product and/or purification of botulinum toxin, other than as may be required by a Regulatory Authority in the Territory.

Section 2.06. *Non Compete.* Except as provided expressly in this Agreement, during the Term or until an earlier termination of this Agreement, neither Teoxane nor its Affiliates may, without the prior written agreement of Revance: (a) Manufacture or Commercialize any botulinum toxin in the Territory other than the Products for use in the Field in the Territory; or (b) directly or indirectly research or develop a drug product before [*] containing botulinum toxin in the Field for purposes of seeking Regulatory Approval in the Territory (for clarity, any research or development by or on behalf of Teoxane or its Affiliates in the Territory (i) for approval of such product outside of the Territory; or (ii) for approval of such product within the Territory after [*] is permitted); or (c) enter into any partnership agreement in the Territory in respect of, acquire, conduct, engage directly or indirectly in or invest in, any activity (including white labelling) or business related to, or Person which activity relates to, any botulinum toxin in the Territory for use in the Field unless such activity would otherwise be permitted pursuant to the foregoing clause (b).

Section 2.07. *New Products.* The Parties acknowledge and agree that this Agreement does not exhaust the Right of First Negotiation provided in the RHA Agreement with respect to the Territory outside of the Field, and that any New Product, shall be subject to said Right of First Negotiation.

## ARTICLE 3

## Regulatory Activities

Section 3.01. *Regulatory Materials, Regulatory Approvals and Obligations.*

(a) As between the Parties, Revance shall solely and exclusively own all Regulatory Approvals for all Products in the Field in the Territory and shall have sole responsibility and decision making-authority for all regulatory activities, including communications and filings with any Regulatory Authorities, with respect to all Products in the Field in the Territory. Without limiting the foregoing, as between the Parties, (i) Revance shall, at its sole cost and expense, (A) have the exclusive right to file, maintain and update any and all Regulatory Materials and Regulatory Approvals for all Products in the Field in the Territory, and (B) be ultimately responsible for the regulatory structure required under such Regulatory Approvals for such Products in the Field in the Territory, including with respect to pharmacovigilance (as further described in Section 3.02), subject to Teoxane's obligations to cooperate as set forth in the Quality Agreement and/or Pharmacovigilance Agreement and (ii) Revance shall be solely responsible for all costs and fees of regulatory tasks externalized by Revance or any of its Affiliates to any Third Party consultants.

(b) Each Party shall inform the other Party in writing (in a manner compliant with Applicable Law) within [*] ([*]) of any information that such Party receives that (i) raises any material concerns regarding the safety or efficacy of any Product; (ii) indicates or suggests a potential material liability of either Party to Third Parties (including Governmental Authorities) in connection with any Product; (iii) is reasonably likely to lead to a recall or market withdrawal of any Product; or (iv) relates to any Product and is reasonably likely to have a material impact on a Regulatory Approval or the Commercialization of such Product.

(c) Notwithstanding Section 3.01(a), Teoxane shall reimburse [*] ([*]%) of all documented (i) external costs incurred by Revance related to submitting any applications for Regulatory Approvals to any applicable Regulatory Authority in the Territory for any Products indicated for the treatment of glabellar lines, including any fees charged by any such Regulatory Authorities for the submission of such applications, and (ii) external regulatory consulting costs incurred by Revance with respect to the aforementioned submissions to Regulatory Authorities. In the event that either Party opens a discussion to seek Regulatory Approval of a Product for additional Indications within the Field in the Territory, the Parties shall discuss in good faith the respective contributions of each Party to the external costs required to secure any such Regulatory Approvals.

Section 3.02. *Pharmacovigilance Agreement*. As soon as reasonably practicable after the Effective Date, but in any event prior to the First Commercial Sale of any Product by Teoxane, the Parties will negotiate and enter into a pharmacovigilance agreement (a "**Pharmacovigilance Agreement**") with the objective for a Teoxane Affiliate who is a Selling Party to enter the Pharmacovigilance Agreement with Revance or its designated Affiliate. The Pharmacovigilance Agreement shall define the respective responsibilities of the parties thereto with respect to pharmacovigilance for the Product throughout the product lifecycle, and which shall govern the adverse event reporting procedures and safety data exchange processes between the Parties, which may be amended or restated by the Parties independently of this Agreement.

## ARTICLE 4

## COMMERCIALIZATION

Section 4.01. *Product Commercialization*. Subject to the terms and conditions of this Agreement and the Brand Guidelines Agreement, Teoxane shall have the sole and exclusive right to keep and Commercialize the Products in the Field in the Territory at its sole cost and expense and Teoxane shall have sole and exclusive responsibility and decision making-authority for all activities in connection with any of the foregoing. Teoxane, itself or through its Affiliates or permitted sublicensees, shall use Commercially Reasonable Efforts to Commercialize each Product in each country in the Territory in which such Product obtains Regulatory Approval and is supplied to Teoxane by Revance under this Agreement. As reasonably required by Teoxane, Revance shall provide approved digital, print, and media assets and marketing, medical affairs and medical education best practices and learnings along with KOL / Trainer advocates (the latter at Teoxane's cost and expense) to support Teoxane's pre-launch and Commercialization efforts with respect to the Products in the Field in the Territory.

Section 4.02. *Cross-Territory Sales*. Teoxane shall not, and shall not authorize any Third Party to, Commercialize any Product outside of the Territory. Revance shall not, and shall not authorize any Third Party to, Commercialize any Product within the Territory. Except as authorized under this Agreement, Teoxane shall not directly or indirectly solicit, advertise, sell, distribute, ship, consign, or otherwise transfer any Product outside of the Territory. Except as authorized under this Agreement, Revance shall not directly or indirectly solicit, advertise, sell, distribute, ship, consign, or otherwise transfer any Product within the Territory.

Section 4.03. *DAXXIFY Steering Committee*. Within a reasonable time after the Effective Date, the Parties shall establish a steering committee for the purpose of sharing best practices, data, experiences and other information applicable to the Commercialization and sale of the Products.

## ARTICLE 5

### Manufacture, Supply and Delivery of Products

Section 5.01. *Supply by Revance*. Revance will Manufacture and supply to Teoxane or to any of its designated Affiliates, subject to the forecasting and ordering procedures in this Agreement, such quantities of each Product and Product Samples as required by Teoxane or its designated Affiliate. Revance shall be solely responsible for the Manufacture and storage of all Products and Product Samples until delivery thereof in accordance with Section 5.03. Revance shall have the right to subcontract the Manufacture of any Product and Product Samples to any of its cGMP-certified suppliers; *provided* that (a) such suppliers Manufacture such Product and Product Samples and otherwise perform their obligations in accordance with Applicable Law and (b) Revance shall remain responsible and liable to Teoxane for the performance of such supplier's obligations and, in the event that any such supplier takes any action that would be deemed to be a breach of this Agreement if such action were taken by Revance, then Revance shall be responsible for such breach.

Section 5.02. *Forecasts and Ordering.*

(a) Promptly following the Effective Date, Teoxane shall submit to Revance a rolling [*] ([*])-month forecast (the "**Forecast**") setting forth Teoxane's anticipated orders of each Product (excluding Product Samples) for each month of such Forecast. The Forecast shall be updated on or before the first day of each following Calendar Month during the Term. Until the later of (i) the date of the receipt of the Regulatory Approvals for the Product in the Field in the first country of the Territory and (ii) the first date of delivery of Products to such first country in the Territory communicated by Revance, the Forecast will be non-binding; from and after such date, the first [*] ([*]) months of each Forecast shall be binding on the Parties for each Product covered by such Forecast (the "**Binding Forecast**"). The remaining [*]([*]) months of each Forecast shall be a good faith estimate on the part of Teoxane as to its expected needs, but shall not be binding on either Party.

(b) Revance shall supply to Teoxane the quantities of each Product and Product Samples ordered by Teoxane pursuant to one (1) or more purchase orders. Teoxane shall submit one (1) purchase order to Revance per Calendar Quarter. Each purchase order shall be for at least the quantity of each Product and Product Samples equal to the then-current Binding Forecast; *provided* that if Teoxane submits a Purchase Order for a quantity of any Product and Product Samples that exceeds [*] ([*]%) of the quantity of such Product and Product Samples included in the then-current Binding Forecast, Revance shall not be obligated to supply such excess quantity to Teoxane.

(c) Each purchase order shall specify: (i) the purchase order number; (ii) the quantities of each Product and/or Product Sample to be purchased by, and supplied to, Teoxane; (iii) the delivery dates and shipping instructions with respect thereto; (iv) Teoxane's billing address for Revance's invoice; (v) the applicable Supply Price; and (vi) any other information necessary to ensure the timely production and delivery of each Product and/or Product Sample. The quantities of each Product and/or Product Samples specified in each purchase order shall be in full Batch increments. Revance shall confirm to Teoxane all purchase orders that are properly submitted (i.e., with no omissions or errors), including quantities, pricing, and delivery dates, within [*] ([*]) days after receipt. Any purchase orders not expressly accepted or rejected by Revance shall be deemed to have been accepted. The Parties hereby agree that the terms and conditions of this Agreement shall supersede any term or condition in any purchase order that is in any way inconsistent with these terms and conditions.

(d) Revance shall promptly notify Teoxane in writing of any event or circumstances that reasonably would be expected to materially adversely affect Revance's ability to timely supply Teoxane's requirements of any Product or Product Samples as reflected in Forecasts provided by Teoxane.

Section 5.03. *Minimum Purchase Commitment.* Beginning as of January 1, 2030, in each Calendar Year during the Term, Teoxane shall purchase a total value of Products corresponding to at least [*] of the purchases forecasted in the December Forecast for the following Calendar Year, the first time in December 2029.

Section 5.04. *Delivery.*

(a) Delivery by Revance to Teoxane shall be made Ex Works Revance's premises or defined warehouse location (Incoterms 2020). Revance shall make available each purchase order in the agreed quantity and on the agreed date pursuant to this Article 5.

(b) With respect to any Product or Product Sample supplied by Revance to Teoxane under this Agreement, Revance shall ensure that on the date on which such Product or Product Sample is delivered to Teoxane, and unless agreed otherwise in writing between the Parties, such Product shall have a remaining shelf life of at least [*] percent ([*]%) of such Product's or Product Sample's total shelf life.

Section 5.05. *Acceptance and Refusal.*

(a) Teoxane shall be entitled to reject any portion or all of any shipment of any Product or Product Sample that fails to meet the requirements for incoming inspection, quality documentation or any of the applicable Product Specifications by providing Revance with written notice of such rejection within thirty (30) days following receipt of such Product; *provided* that in the event that any Product is discovered to have a Latent Defect, Teoxane shall have fourteen (14) days (subject to Section 3.01(b)) from the date that such Latent Defect is discovered to notify Revance of such Latent Defect. If Teoxane wishes to reject any Product in accordance with this Section 5.05(a), Teoxane shall inform Revance of its rejection, reason therefor and the applicable Batch numbers.

(b) In the event that Teoxane rejects (or revokes the acceptance for) any Product Unit of any Product supplied to Teoxane hereunder, Revance, upon confirmation of the reasons given for the rejection and that the cause of the rejected state of the Product Unit was not attributed to Teoxane's actions or omissions (or revocation of the acceptance), at its sole cost and expense, shall either replace such defective Product Unit or refund the Transfer Price for such Product Unit as promptly as possible, as elected by Teoxane.

(c) If the Parties fail to agree on the reasons for the rejection (or revocation of the acceptance) of any Product, either Party may refer the matter for final analysis to a specialized laboratory of international reputation acceptable to both Parties for the purpose of determining the results. Any determination by such laboratory analysis shall be final and binding upon the Parties. The cost and expense of such laboratory shall be borne by Teoxane if the laboratory determines that such Product meets the requirements of this Agreement or by Revance if the laboratory determines that such Product does not meet the requirements of this Agreement.

Section 5.06. *Shortfalls*. Upon receipt of any Batch of any Product by Teoxane, Teoxane may inspect such Batch and confirm that the quantity of such Product received by Teoxane matches the quantity of such Product set forth in the applicable purchase order and, no later than five (5) days following the date of receipt of such Batch, Teoxane shall notify Revance if it becomes aware of any Shortfall. For each Shortfall, Revance shall, at Teoxane's option, (a) as promptly as practicable, and in any case without undue delay, use commercially reasonable efforts to deliver such Shortfall amount of such Product to Teoxane, or (b) credit Teoxane the proportion of the Supply Price paid by Teoxane for such Batch which equates to the amount of the Shortfall, or, if the invoice has not been paid, cancel the invoice and issue a new invoice for the actual amount of such Product delivered, and credit to a future invoice the applicable difference in the original invoice and new invoice. The rights and remedies set forth in this Section 5.06 shall be Teoxane's sole right and remedy in relation to any Shortfall.

Section 5.07. *Patent Marking*. Revance shall, and shall require its subcontractors to, mark all Products supplied to Teoxane for sale or distribution in the Territory (in a reasonable manner consistent with industry custom and practice) with appropriate Patent numbers or indicia to the extent permitted by Applicable Law or such notices would impact recoveries of damages or equitable remedies available with respect to infringements of Patents.

## ARTICLE 6

## Quality Assurance

Section 6.01. *Quality*. Revance shall, and shall cause its subcontractors to, Manufacture and warehouse the Products in conformity with Applicable Law. Within ninety (90) days following the Effective Date and, in any event, before the first supply by Revance to Teoxane of any Product, the Parties shall enter, or cause their relevant Affiliates to enter, into a quality agreement (the "**Quality Agreement**"), which shall include terms relating to the management of quality matters with respect to the Manufacture of any Product. The Parties shall perform their respective obligations under, and comply with all provisions of, the Quality Agreement, which may be amended or restated by the Parties independently of this Agreement.

Section 6.02. *Recall of Product*. With respect to any Product supplied to Teoxane pursuant to this Agreement, in the event that: (a) Revance determines and initiates a recall of the Product or any Regulatory Authority in the Territory issues a request, directive or order that such Product be recalled or retrieved; or (b) a court of competent jurisdiction orders that such Product be recalled or retrieved in the Territory, the Party first informed shall notify the other Party in writing within twenty-four (24) hours of learning of such event and both Parties shall conduct such activity and take appropriate corrective actions as will be agreed between them under the Quality Agreement and/or Pharmacovigilance Agreement. All Teoxane costs and expenses of such recall and corrective actions shall be reimbursed by Revance.

## ARTICLE 7

## Financial Provisions

Section 7.01. *Upfront Payment*. In partial consideration of the rights granted to Teoxane hereunder, within thirty (30) days from the Effective Date, Teoxane shall make a one-time, non-refundable and non-creditable upfront payment to Revance of [*] (the "**Upfront Payment**").

Section 7.02. *Supply Price.*

(a) *Transfer Price*. For each Product Unit and Product Samples supplied by Revance to Teoxane, Teoxane shall pay to Revance the Transfer Price for such Product Unit or Product Samples. With respect to each purchase order of any Product or Product Samples issued by Teoxane, Revance shall invoice Teoxane at the time of shipment of the Product or Product Samples in an amount equal to the applicable Transfer Price *multiplied by* the number of Product Units of such Product and Product Samples included in the shipment (the "**Supply Price**" for such Batch), and Teoxane shall pay such invoice within thirty (30) days after Teoxane's receipt of such invoice from Revance. For the avoidance of doubt, (i) the Transfer Price does not comprise any price supplement to be paid according to Section 7.02(b) and such price supplement shall additionally be paid and (ii) nothing in this Agreement restrains Teoxane's freedom to set the selling prices of the Products in the Territory; the non-binding recommended resale price of Revance to physicians is not below [*] per vial.

(b) *Price Supplement*. With respect to each Product in the Field in the Territory, Teoxane will pay Revance a price supplement on the aggregate Annual Net Sales of such Product sold by Teoxane or any of its Selling Parties in the Field in the Territory during a Calendar Year at the rates set forth in the immediately following table. For clarity, no price supplement is due on Product Samples.

| **Aggregate Annual Net Sales** | **Price Supplement Rate** |
|---|---|
| Portion of Annual Net Sales of such Product in a Calendar Year less than or equal to [*] | [*] |
| Portion of Annual Net Sales of such Product in a Calendar Year greater than [*] | [*] |

For clarity, Teoxane's obligation to pay to Revance the price supplement for any Product under this Section 7.02(b) is imposed only once in each Calendar Year during the Term with respect to the sale of the same Product Unit of such Product. Within sixty (60) days after the end of each Calendar Quarter during the Term, Teoxane shall deliver to Revance a report, on a Product-by-Product basis, summarizing the total amount payable for such Calendar Quarter, and on a Product-by-Product and country-by-country basis, the Net Sales and the calculation of the price supplement payable under this Section 7.02(b). Each such report shall be deemed Confidential Information of Teoxane subject to the obligations of Article 10. Teoxane shall pay to Revance the price supplement payable under this Section 7.02(b) with respect to a given Calendar Quarter within sixty (60) days following the end of such Calendar Quarter together with delivery of the applicable report.

Section 7.03. *Regulatory Milestones*. In partial consideration of the rights granted to Teoxane hereunder, following the first achievement of each milestone event for a Product in the immediately following table (each such milestone event, a "**Regulatory Milestone Event**") by Revance or Teoxane or any of their respective Affiliates, as applicable, Teoxane shall pay to Revance, in accordance with the terms in this Section 7.03, the one-time, non-refundable and non-creditable milestone payments set forth in the immediately following table that correspond to each such Regulatory Milestone Event (each such milestone payment, a "**Regulatory Milestone Payment**").

| **Regulatory Milestone Event** | **Regulatory Milestone Payment** |
|---|---|
| First Regulatory Approval by the TGA in Australia of the first Product in the Field | [*] |
| First Commercial Sale by Teoxane of the first Product in the Field in the Territory | [*] |
| First delivery by Revance to Teoxane of the first Batch of any Product Manufactured at a Fixed Price equal or less than [*] per Product Unit | [*] |
| **Total Regulatory Milestone Payments:** | [*] |

For clarity, and notwithstanding anything in this Agreement to the contrary, each Regulatory Milestone Payment shall be paid no more than one (1) time, regardless of how many Products achieve the corresponding Regulatory Milestone Event (it being understood that in no event will Teoxane be responsible for more than an aggregate of [*] in Regulatory Milestone Payments). Revance, as the Party responsible for achieving the Regulatory Milestone Events set forth in the first and third rows of the immediately preceding table, shall notify Teoxane within ten (10) Business Days following the first achievement of such Regulatory Milestone Events by Revance. Teoxane, as the Party responsible for achieving the Regulatory Milestone Event set forth in the second row of the immediately preceding table, shall notify Revance within ten (10) Business Days following the first achievement of such Regulatory Milestone Event by Teoxane. The Regulatory Milestone Payment for any Regulatory Milestone Event shall be due within thirty (30) days after Teoxane's receipt of an invoice from Revance for such Regulatory Milestone Payment.

Section 7.04. *Commercial Success Milestones*. In partial consideration of the rights granted to Teoxane hereunder, following the first achievement of each milestone event for a Product in the immediately following table (each such milestone event, a "**Commercial Success Milestone Event**") by Teoxane or any of its Affiliates, Teoxane shall pay to Revance, in accordance with the terms in this Section 7.04, the one-time, non-refundable and non-creditable milestone payments set forth in the immediately following table that correspond to each such Commercial Success Milestone Event (each such milestone payment, a "**Commercial Success Milestone Payment**").

| Commercial Success Milestone Event | Commercial Success Milestone Payment |
|---|---|
| The first time that the Annual Net Sales of a Product in the Territory in a Calendar Year are equal to or greater than [*] | [*] |
| The first time that the Annual Net Sales of a Product in the Territory in a Calendar Year are equal to or greater than [*] | [*] |
| The first time that the Annual Net Sales of a Product in the Territory in a Calendar Year are equal to or greater than [*] | [*] |
| **Total Commercial Success Milestone Payments:** | [*] |

For clarity, and notwithstanding anything in this Agreement to the contrary, each Commercial Success Milestone Payment shall be paid no more than one (1) time, regardless of how many Products achieve the corresponding Commercial Success Milestone Event or how many times each Commercial Success Milestone Event may be achieved (it being understood that in no event will Teoxane be responsible for more than an aggregate of [*] in Commercial Success Milestone Payments). Teoxane shall notify Revance within sixty (60) days following the end of the applicable Calendar Quarter during which a given Commercial Success Milestone Event is first achieved for any Product, and Teoxane shall pay to Revance the corresponding Commercial Success Milestone Payment within sixty (60) days from the date on which Teoxane receives an invoice from Revance for such Commercial Success Milestone Payment.

Section 7.05. *Method of Payment*. All payments due hereunder to Revance shall be paid to Revance in U.S. Dollars. In case of currency fluctuations between the Australian Dollar and the US Dollar in excess of [*] relative to the Effective Date, the currency gains or losses are shared equally between the Parties. All payments under this Agreement shall be made by bank wire transfer in immediately available funds to an account designated in writing by Revance or by other means as directed by Revance in writing.

Section 7.06. *Interest on Late Payments*. In the event that any payment due under this Agreement is not made when due, such payment shall accrue interest from the date due at a rate per annum equal to [*] *plus* the Secured Overnight Financing Rate for the date such payment was due, as published by The Federal Reserve Bank of New York on the date such payment was due (or, if unavailable on such date, the first date thereafter on which such rate is available), or the maximum rate allowable by Applicable Law, whichever is lower.

Section 7.07. *Quarterly Report*. During the Term, following the First Commercial Sale of a Product for use in the Field in the Territory, Teoxane shall furnish to Revance a written report within thirty (30) days after the end of each Calendar Quarter (each, a "**Calendar Quarter Report**") showing, on a Product-by-Product and country-by-country basis, for such Calendar Quarter (1) the number of units of Product sold, (2) the gross sales and Net Sales in United States dollars, including deductions from gross sales to determine Net Sales (itemized by deduction category), (3) the calculation of the applicable price supplement in accordance with Section 7.02(b) and the calculation of such payments payable in United States dollars, and (4) the exchange rates used in calculating any of the foregoing, in each case (with respect to the foregoing (1) through (4)), in reasonable detail to enable Revance to confirm the accuracy of the calculations. Each Calendar Quarter Report shall also include the total Net Sales of the Product for use in the Field in the Territory in United States dollars for the applicable Calendar Year for the purposes of determining whether a Commercial Success Milestone Payment is due and payable. Teoxane shall provide any information reasonably requested by Revance to verify the calculation of Net Sales and price supplements by Teoxane under this Agreement.

Section 7.08. *Audit Rights.*

(a) Upon Teoxane's reasonable request and with at least thirty (30) days' prior written notice provided by Teoxane to Revance, Revance shall permit an internationally recognized independent certified public accountant selected by Teoxane and reasonably acceptable to Revance to examine Revance's books and records during regular business hours for the purpose of verifying for Teoxane the accuracy of the Transfer Price per Product Unit for each Product required to be paid by Teoxane pursuant to this Agreement. Prior to each such audit, such independent certified public accountant shall execute a confidentiality agreement that is reasonably acceptable to Revance. The foregoing audit right shall survive and continue to apply for a period of three (3) Calendar Years from the end of the Calendar Year to which such records pertain, and Teoxane shall not be permitted to exercise such audit right more often than once each Calendar Year and no such record may be audited more than once. The independent certified public accountant shall disclose to Teoxane only whether the audited reports are correct or incorrect and the specific details concerning any discrepancies. Teoxane shall bear the full cost of such audit unless such audit reveals an overpayment by Teoxane of more than [*] of the amount actually due for any Calendar Year being audited, in which case Revance shall reimburse Teoxane for any and all reasonable costs of such audit. Revance shall issue a credit note to Teoxane for the amount of any overpayment discovered by such audit within thirty (30) days after the independent certified public accountant's report. Teoxane shall pay to Revance any underpayment discovered by such audit within thirty (30) days after the independent certified public accountant's report.

(b) Upon Revance's reasonable request and with at least thirty (30) days' prior written notice provided by Revance to Teoxane, Teoxane shall permit an internationally recognized independent certified public accountant selected by Revance and reasonably acceptable to Teoxane to examine Teoxane's books and records during regular business hours for the purpose of verifying for Revance the accuracy of the Net Sales of any Product reported by Teoxane under this Agreement for purposes of the price supplement pursuant to Section 7.02(b). Prior to each such audit, such independent certified public accountant shall execute a confidentiality agreement that is reasonably acceptable to Teoxane. The foregoing audit right shall survive and continue to apply for a period of three (3) Calendar Years from the end of the Calendar Year to which such records pertain, and Revance shall not be permitted to exercise such audit right more often than once each Calendar Year and no such record may be audited more than once. The independent certified public accountant shall disclose to Revance only whether the audited reports are correct or incorrect and the specific details concerning any discrepancies. Revance shall bear the full cost of such audit unless such audit reveals an underpayment by Teoxane of more than [*]% of the amount actually due for any Calendar Year being audited, in which case Teoxane shall reimburse Revance for any and all reasonable costs of such audit. Teoxane shall pay to Revance any underpayment discovered by such audit within thirty (30) days after the independent certified public accountant's report. If the audit reveals an overpayment by Teoxane, then Revance shall issue a credit note to Teoxane for the amount of such overpayment within thirty (30) days after the independent certified public accountant's report.

Section 7.09. *Taxes*. All payments due hereunder shall be net of any withholding for taxes, duties, levies, fees or other similar items required by Applicable Law. The Parties shall cooperate in good faith in order to minimize any such withholding as allowable under Applicable Law.

# ARTICLE 8

## Intellectual Property Rights

Section 8.01. *Prosecution of Revance Patents.*

(a) Revance shall have the sole responsibility, at its sole cost and expense, to prosecute and maintain the Revance Patents in the Territory. Revance shall (i) keep Teoxane reasonably informed of all steps to be taken in connection with such preparation, filing, prosecution and maintenance of the Revance Patents in the Territory, and (ii) consider in good faith and undertake to incorporate all reasonable comments and suggestions by Teoxane regarding such matters, including in respect of any actions, decisions, applications, amendments, submissions or correspondence related thereto.

(b) *Cooperation in Prosecution*. Teoxane shall provide Revance, at Revance's sole costs, all reasonable assistance and cooperation in the Patent prosecution efforts provided above in this Section 8.01, including providing any necessary powers of attorney and executing any other required documents or instruments for such prosecution.

Section 8.02. *Enforcement of Patents.*

(a) *Notification*. If a Party becomes aware of any infringement, threatened infringement, or alleged infringement of the Revance Patents in the Territory (in each case, a "**Product Infringement**"), then such Party shall promptly notify the other Party in writing of such Product Infringement, including any evidence in such Party's possession demonstrating such Product Infringement (it being understood that any claim that any Revance Patent in the Territory is invalid or unenforceable shall be deemed to be a Product Infringement hereunder).

(b) *Enforcement Rights*. Revance shall have the sole and exclusive right, and the obligation if so requested by Teoxane, at Revance's own expense and with legal counsel of its own choice, to institute, prosecute and control any action, suit, or proceeding (or take other appropriate legal action) to enforce the Revance Patents in the Territory against any Person engaged in any Product Infringement of the Revance Patents in the Territory, including the right to collect for past damages, and to control the defense of any declaratory judgment action filed in response to any action, suit or proceeding initiated under this Section 8.02(b). The Parties acknowledge and agree that it is the mutual intention of the Parties to enable Revance to have prudential and constitutional standing to enforce the Revance Patents in the Territory. In furtherance of the foregoing, and notwithstanding anything in this Agreement to the contrary, Teoxane shall cooperate fully with Revance, at Revance's expense, in taking all reasonable steps requested by Revance in connection with any such action

(c) *Settlement*. Notwithstanding anything in this Agreement to the contrary, in no event shall Revance have the right to settle, compromise or otherwise resolve any suit, action or proceeding initiated under Section 8.02(b) without Teoxane's approval, Teoxane shall in good faith consider all reasonable comments and suggestions of Revance in connection therewith.

(d) *Recoveries*. Any monetary awards or other amounts or recoveries resulting from any action brought by Revance under Section 8.02(b) (i) shall be applied first to reimburse the Parties for their respective out-of-pocket costs and expenses (including reasonable attorneys' fees and costs) incurred in prosecuting or assisting in such suit, proceeding or action, (ii) any amount of damages awarded to Revance will then be allocated to Teoxane in compensation for its damages, and (iii) any remaining balance shall be retained by Revance.

(e) *Enforcement of Teoxane Patents*. For the avoidance of doubt, Teoxane shall have the sole and exclusive right, but not the obligation, at its own expense and with legal counsel of its own choice, to institute, prosecute and control any action, suit, or proceeding (or take other appropriate legal action) to enforce the Teoxane Patents within or outside of the Territory against any Person.

Section 8.03. *Infringement of Third Party Intellectual Property Rights.* Each Party shall promptly notify the other Party in writing of any allegation, claim or suit that the Manufacture, use or Commercialization of any Product in the Territory infringes, misappropriates or otherwise violates any Third Party's Patent or other Intellectual Property Rights. Subject to Section 12.04, each Party shall have the sole right to control any defense of any such claim involving alleged infringement, misappropriation or other violation of Third Party rights by such Party's activities, at its own expense and by counsel of its own choice.

Section 8.04. *Ownership of Data and Information.* Revance shall be the sole owner of all data and information related to the use of DAXXIFY until the Effective Date, and Teoxane will be the sole owner of any data and information, including pre-clinical, clinical and post approval market surveillance data with respect to the Products generated after the Effective Date which result (i) from any activities reimbursed by Teoxane to Revance pursuant to Section 3.01(c), or (ii) from Teoxane's Commercialization of the Products in the Territory (collectively, "**Teoxane Product Data**"). Teoxane hereby grants Revance a non-exclusive, fully paid-up and royalty-free license and right of reference during the Term to Exploit the Teoxane Product Data to the extent required for Revance's regulatory obligations for the Products in and outside the Territory.

## ARTICLE 9

## Representations and Warranties

Section 9.01. *Mutual Representations and Warranties.* Each Party hereby represents, warrants, and covenants to the other Party that:

(a) such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated or formed;

(b) such Party has the requisite power and authority to execute and deliver this Agreement and to fully perform its obligations hereunder, and the individual executing this Agreement on behalf of such Party has the authority to do so;

(c) the execution, delivery and performance of this Agreement and the performance of such Party's obligations hereunder (i) has been duly authorized by all of its corporate actions necessary on the part of such Party; (ii) do not and will not conflict with or violate any requirement of Applicable Law, (iii) do not and will not conflict with or violate the certificate of incorporation, certificate of formation, bylaws, limited partnership agreement or other organizational documents of such Party, and (iv) do not and will not conflict with, violate, breach or constitute a default under any agreement, instrument or contractual obligations of such Party or any of its Affiliates;

(d) this Agreement is a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms and conditions, subject to the effects of bankruptcy, insolvency or other laws of general application affecting the enforcement of creditor rights, judicial principles affecting the availability of specific performance and general principles of equity (whether enforceability is considered a proceeding at law or equity); and

(e) such Party is not debarred or disqualified under the United States Federal Food, Drug and Cosmetic Act or any comparable Applicable Law in the Territory and it does not, and will not during the Term, employ or use the services of any Person who is debarred or disqualified, in connection with activities relating to any Product (it being understood that, in the event that such Party becomes aware of the debarment or disqualification or threatened debarment or disqualification of any Person providing services to such Party, including the Party itself, its Affiliates or sublicensees, which directly or indirectly relate to activities under this Agreement, such Party shall immediately notify the other Party in writing and such Party shall cease employing, contracting with, or retaining such Person to perform any services under this Agreement).

Section 9.02. *Representations and Warranties by Revance.* Revance hereby represents, warrants and covenants to Teoxane that:

(a) the Revance Licensed Technology and Revance Trademarks are Controlled by Revance in the Territory and Revance has the right to grant Teoxane the license granted to Teoxane under this Agreement;

(b) none of the Revance Licensed Technology or Revance Trademarks has been adjudged invalid or unenforceable in whole or in part, and all such Revance Licensed Technology and Revance Trademarks are valid and enforceable;

(c) neither Revance nor any of its Affiliates has granted, and during the Term Revance will not (and will cause its Affiliates to not) grant, any rights to any Third Party under any Revance Licensed Technology or Revance Trademarks in the Field in the Territory that conflict with the rights granted to Teoxane under Section 2.01;

(d) to the knowledge of Revance as of the Effective Date, the keeping and Commercialization of any Product in the Territory does not and will not infringe, misappropriate or otherwise violate any valid and enforceable Intellectual Property Right of any Third Party;

(e) the Revance Licensed Technology and Revance Trademarks constitute all of the Intellectual Property Rights necessary for the keeping and Commercialization of any and all Products in the Field in the Territory;

(f) except as set forth in the Revance Disclosure Schedule, as of the Effective Date, neither Revance nor any of its Affiliates has received any written notice from, and Revance is not otherwise aware of, any Third Party asserting or alleging that the, Manufacturing, keeping or Commercialization of any Product has infringed, misappropriated or otherwise violated any Intellectual Property Right of such Third Party;

(g) except as set forth in the Revance Disclosure Schedule, as of the Effective Date, there is no pending or threatened litigation, claim or proceeding against Revance or any of its Affiliates which could materially impact the ability of Revance or any of its Affiliates to perform their respective obligations under this Agreement;

(h) to the knowledge of Revance as of the Effective Date, no Third Party has infringed, misappropriated or otherwise violated any Revance Licensed Technology or any Revance Trademark;

(i) the development of each Product by Revance has been conducted in compliance with all Applicable Law;

(j) each Product supplied hereunder will (i) be Manufactured in all material respects in accordance with all applicable Regulatory Approvals, cGMPs and other Applicable Laws, (ii) conform to the Product Specifications for such Product at the time of delivery to Teoxane, (iii) not be adulterated or misbranded under Applicable Law, (iv) at the time of shipment to Teoxane, be free and clear of any lien or encumbrance, and (v) be supplied to Teoxane in accordance with the Quality Agreement;

(k) neither Revance nor any of its Affiliates has received or been subject to (i) any notices from any Regulatory Authority or other Governmental Authority of adverse findings or recalls relating to any Product, or (ii) any warning letters or other written correspondence from any Regulatory Authority or other Governmental Authority concerning any Product in which such Regulatory Authority or other Governmental Authority asserted that the operations of Revance or such Affiliate were not in compliance with Applicable Law with respect to such Product;

(l) during the Term, Revance shall comply with all licenses, permits and similar authorizations required by any Regulatory Authority for Revance to perform its obligations under this Agreement and the Quality Agreement; and

(m) the facilities and all equipment utilized in the Manufacture and supply of any Product to Teoxane hereunder by Revance shall be maintained in good operating condition.

Section 9.03. *Compliance with Law.* Each Party shall, and shall cause its Affiliates and sublicensees to, comply with all Applicable Law in exercising its rights and fulfilling its obligations under this Agreement.

Section 9.04. *Disclaimer; Limitation of Liability.* EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES IN THIS ARTICLE 9, THE RIGHTS GRANTED HEREIN ARE GRANTED ON AN "AS IS" BASIS, AND THE PARTIES EACH HEREBY DISCLAIM ANY EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES OF ANY KIND, INCLUDING WITHOUT LIMITATION, THOSE REGARDING MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OF NON-INFRINGEMENT. TO THE EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY WILL BE LIABLE UNDER ANY LEGAL OR EQUITABLE THEORY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; *PROVIDED* THAT THIS SECTION 9.04 SHALL NOT BE CONSTRUED TO LIMIT AN INDEMNIFIED PARTY'S RIGHT TO RECOVER FROM THE INDEMNIFYING PARTY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES PAID TO A THIRD PARTY AS PART OF A THIRD PARTY CLAIM FOR WHICH THE INDEMNIFYING PARTY PROVIDES INDEMNIFICATION UNDER ARTICLE 12.

# ARTICLE 10

## Confidentiality

Section 10.01. *Confidentiality.* (a) The Receiving Party shall keep confidential the Disclosing Party's Confidential Information, and shall not use any of the Disclosing Party's Confidential Information for any purpose other than the exercise of the Receiving Party's rights, or as otherwise permitted, hereunder. The Receiving Party shall preserve the confidentiality of the Disclosing Party's Confidential Information as it would preserve the confidentiality of its own similar type of confidential information and shall not disclose the Disclosing Party's Confidential Information to any Third Party without the prior written consent of the Disclosing Party, except as expressly permitted hereunder. The Receiving Party may disclose the Confidential Information of the Disclosing Party (i) to any of its employees, contractors, suppliers, agents and sublicensees who need it in connection with this Agreement and are directed by the Receiving Party to observe restrictions regarding disclosure and use of such Confidential Information on terms comparable to and no less restrictive than those set forth herein or (ii) in response to a valid order of a court or other Governmental Authority or to otherwise comply with Applicable Law; *provided* that, in the case of clause (ii), the Receiving Party shall first give prompt written notice to the Disclosing Party and, at the Disclosing Party's cost and expense, reasonably cooperate with the Disclosing Party to obtain a protective order or other measures preserving the confidential treatment of such Confidential Information and requiring that the information or documents so disclosed be used only for the purposes for which the order was issued or is otherwise required by Applicable Law.

(b) The terms and conditions of this Agreement and the existence of the transactions contemplated hereby shall be deemed Confidential Information for the purposes of this Agreement; *provided* that each Party may disclose the terms and conditions of this Agreement: (i) in confidence on terms no less restrictive than those set forth herein, to its accountants, banks and present and prospective financing sources, actual or potential acquirers, and their advisors; (ii) in connection with the enforcement of this Agreement or rights under this Agreement; (iii) in confidence on terms no less restrictive than those set forth herein, in connection with an actual or proposed merger, acquisition or similar transaction involving such Party; (iv) as required by applicable securities laws or the rules of any stock exchange on which securities of such Party are traded or any other Applicable Law; *provided* that prior to making any such disclosure, such Party shall provide written notice to the other Party regarding the nature and extent of the disclosure to enable the other Party to seek to obtain confidential treatment, to the extent available, for such Confidential Information; or (v) as mutually agreed upon by the Parties in writing.

(c) As of the Effective Date, the terms of this Article 10 shall supersede any prior non-disclosure, secrecy or confidentiality agreement between the Parties (or their Affiliates) with respect to the subject matter of this Agreement, including that certain Confidentiality Agreement, dated as of February 2, 2024, by and between the Parties.

# ARTICLE 11

## Term and Termination

Section 11.01. *Term.* This Agreement shall come into force on the Effective Date and, unless earlier terminated in accordance with this Article 11, shall continue in full force and effect until December 31, 2040 (the "**Term**").

Section 11.02. *Termination for Material Breach.*

(a) Either Party may, by written notice to the other Party, immediately terminate this Agreement if such other Party is in material breach of any provision of this Agreement and such breach has not been cured (if capable of cure) within sixty (60) days following receipt of written notice thereof from the non-breaching Party.

(b) In particular, but without limitation, the uncured (within the period set forth above) violation of any of the following causes or the following events shall be considered a material breach: (i) Section 2.01 (breach of exclusivity); (ii) Section 2.03 (failure to comply with the Brand Guidelines Agreement in any material respect); (iii) Section 2.06 (any breach of the non-compete undertaking), (iv) Section 5.03 (breach of the minimum purchase commitment due to reasons other than a breach by Revance of this Agreement); (v) failure to pay any due payments under Article 7; (vi) Section 7.07 (failure to deliver the Calendar Quarter Report); (vii) breach of Sections 9.01 9.02(a), (b), (i), (k), (l), or (m) or 9.03 (breach of representations and warranties); (viii) failure to comply with the Quality Agreement or Pharmacovigilance Agreement in any material respect; or (ix) Article 12 (failure to satisfy indemnification obligations).

Section 11.03. *Termination for Bankruptcy*. Either Party may, by written notice to the other Party, immediately terminate this Agreement upon (a) the bankruptcy, dissolution or winding up of such other Party; (b) the making of, or seeking to make or arrange for, an assignment for the benefit of creditors of such other Party; (c) the initiation of proceedings in voluntary or involuntary bankruptcy; or (d) the appointment of a receiver or trustee of such other Party's property that is not discharged within ninety (90) days.

Section 11.04. *Termination for Acquisition of Botulinum Toxin Rights*. Revance may terminate this Agreement in the event Teoxane acquires any right, title or interest (including any license rights) in or to any botulinum toxin Commercialized in the Territory from any Third Party by providing twelve (12) months' prior written notice to Teoxane.

Section 11.05. *Termination for Change of Control*. Revance may terminate this Agreement in the event of a Change of Control of Teoxane where the acquirer of Teoxane in such Change of Control transaction owns, develops, sells, distributes or otherwise Commercializes any product containing botulinum toxin for human use by providing eighteen (18) months' prior written notice to the other Party.

Section 11.06. *Effect of Expiration or Termination.*

(a) Except as provided in this Section 11.06, upon the expiration or any termination of this Agreement, all rights and obligations of the Parties hereunder shall automatically terminate.

(b) Except in the case of any termination of this Agreement by Revance pursuant to Section 11.02 or Section 11.03, to the extent that Teoxane and its Affiliates and sublicensees have any Product in inventory as of the effective date of the expiration or termination of this Agreement, Teoxane, its Affiliates and sublicensees shall have the right to sell such Product in the Territory for a period of three (3) months; *provided* that Teoxane shall be responsible for any payments to Revance that are payable as of the effective date of such expiration or termination. Teoxane shall destroy or return to Revance any Product in inventory upon expiration of such three (3)-month period (in Revance's sole discretion).

(c) Notwithstanding the limitation of liability set forth in Section 9.04, if Revance terminates this Agreement under Section 11.02 for an alleged material breach of this Agreement and where it is determined in an arbitration under Section 13.06 that there was no material breach (as the case may be, no more material breach after the end of cure period set forth in Section 11.02(a)) to justify an early termination of the Agreement, Revance shall, within thirty (30) days following the rendering of the final arbitral award, pay to Teoxane the Termination Payment. For illustrative purposes only, if the date of such termination notice is January 1, 2028 and as of such date, Teoxane has paid Revance an aggregate amount of [*] for the Upfront Payment and Milestone Payments and there have been three (3) Calendar Years completed in their entirety, the Termination Payment would be calculated as a [*].

(d) Upon the expiration or termination of this Agreement, the Receiving Party shall either, at the Disclosing Party's election, (i) promptly destroy all copies of the Disclosing Party's Confidential Information in the possession or control of the Receiving Party and confirm such destruction in writing to the Disclosing Party or (ii) promptly deliver to the Disclosing Party, at the Receiving Party's sole cost and expense, all copies of such Confidential Information in the possession or control of the Receiving Party. Notwithstanding the foregoing, the Receiving Party shall be permitted to retain (A) a reasonable number of copies of the Disclosing Party's Confidential Information for archival purposes and to ensure compliance with any legal or regulatory obligations on such Party or its Affiliates and (B) any computer records or files containing such Confidential Information that have been created solely by the Receiving Party's automatic archiving and back-up procedures, to the extent created and retained in a manner consistent with the Receiving Party's standard archiving and back-up procedures and any applicable regional record retention regulations, but not for any other uses or purposes. All Confidential Information so held shall continue to be subject to the terms and conditions of this Agreement.

(e) Upon the expiration or termination of this Agreement, Teoxane hereby assigns, and shall deliver to Revance, the Teoxane Product Data.

Section 11.07. *Accrued Liabilities; Other Remedies*. Termination or expiration of this Agreement for any reason shall not release either Party from any liability or obligation that already has accrued prior to such expiration or termination, nor affect the survival of any provision hereof to the extent it is expressly stated to survive such expiration or termination. Termination or expiration of this Agreement for any reason shall not constitute a waiver or release of, or otherwise be deemed to prejudice or adversely affect, any rights, remedies or claims, whether for damages or otherwise, that a Party may have hereunder or that may arise out of or in connection with such termination or expiration.

Section 11.08. *Rights in Bankruptcy*. All rights and licenses granted under or pursuant to this Agreement by Revance are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the United States Bankruptcy Code. The Parties agree that Teoxane, as licensee of certain rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the United States Bankruptcy Code. The Parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against Revance under the United States Bankruptcy Code, Teoxane shall be entitled to a complete duplicate of (or complete access to, as appropriate) any Intellectual Property Rights licensed to Teoxane and all embodiments of such Intellectual Property Rights, which, if not already in Teoxane's possession, shall be promptly delivered to it (a) upon any such commencement of a bankruptcy proceeding upon Teoxane's written request therefor, unless Revance elects to continue to perform all of its obligations under this Agreement; or (b) if not delivered under clause (a), following the rejection of this Agreement by Revance, upon written request therefor by the Teoxane.

Section 11.09. *Survival.* Notwithstanding anything in this Agreement to the contrary, Sections 2.04, 6.02 (with respect to any recall implemented as of the effective date of expiration or termination of this Agreement), 7.08, 9.04, 11.06, 11.07, 11.08 and this Section 11.09, and Articles 1, 10, 12 and 13 shall survive expiration or any termination of this Agreement.

# ARTICLE 12

## INDEMNIFICATION

Section 12.01. *Indemnification by Revance.* Revance shall defend, indemnify and hold harmless Teoxane and Teoxane's Affiliates and their respective officers, directors, employees, contractors, customers and agents (each a "**Teoxane Indemnified Party**") from and against any and all damages, liabilities, expenses, penalties, fines and other losses (including reasonable attorneys' fees and court costs) (collectively, "**Losses**") incurred in connection with any and all suits, investigations, claims or demands of Third Parties (collectively, "**Third Party Claims**") based on or arising from (a) Revance's material breach of this Agreement; (b) any breach of Applicable Law or grossly negligent or willful misconduct by or on behalf of Revance in connection with the Manufacturing or supply of Products; (c) infringement, misappropriation or other violation of any Person's Intellectual Property Rights in connection with the Manufacture or supply of the Products or the Commercialization of the Products by Teoxane as authorized under the Agreement; (d) the events disclosed in the Revance Disclosure Schedule; or (e) personal injury arising from the Manufacture of the Products, including any product liability claims relating to any Product.

Section 12.02. *Indemnification by Teoxane.* Teoxane shall defend, indemnify and hold harmless Revance and Revance's Affiliates and their respective officers, directors, employees, contractors, customers and agents (each a "**Revance Indemnified Party**") from and against any and all Losses incurred in connection with any and all Third Party Claims based on or arising from (a) Teoxane's material breach of this Agreement; (b) any breach of Applicable Law or grossly negligent or willful misconduct by or on behalf of Teoxane in connection with the Commercialization of Products; (c) infringement, misappropriation or other violation of any Person's Intellectual Property Rights in connection with the Commercialization of the Products in a manner not authorized under the Agreement; (d) personal injury arising from the Commercialization of the Products (other than any personal injury caused by the Manufacture of such Products).

Section 12.03. *Comparative Fault*. Where any Losses are the result of the concurrent acts of both Parties, each Party shall be liable under this Article 12 to the extent of its fault or liability therefor.

Section 12.04. *Third Party Indemnification Procedures*. The Party seeking indemnification (the "**Indemnified Party**") shall give written notice to the other Party (the "**Indemnifying Party**") promptly and in no event later than thirty (30) days after learning of a written claim that is covered or potentially covered by Section 12.01 or Section 12.02, as applicable (an "**Indemnified Claim**"). Failure by the Indemnified Party to give notice of an Indemnified Claim within thirty (30) days of receiving a writing reflecting such Indemnified Claim shall not relieve the Indemnifying Party of its indemnification obligations hereunder except and solely to the extent that the Indemnifying Party's ability to defend or settle the Indemnified Claim is actually and materially prejudiced as a result of such failure to give such notice. The Indemnifying Party may elect (but is not obligated) to assume control of and direct the defense of any Indemnified Claim; *provided* that the selection of counsel shall be subject to the Indemnified Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. The Indemnifying Party may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend, or settle any Indemnified Claim or take other remedial or corrective actions with respect thereto as may be necessary for the protection of the interests of the Indemnified Party; *provided, however*, that any settlement shall be subject to the Indemnified Party's prior written consent unless such settlement (a) is solely for monetary damages (for which the Indemnifying Party shall be solely responsible), (b) does not impose injunctive or other equitable relief against the Indemnified Party or any of its Affiliates or its and their respective directors, officers, employees and agents, or require any admission of guilt or fault, and (c) includes an unconditional release of the Indemnified Party and its Affiliates and its and their respective directors, officers, employees and agents from all liability on claims that are the subject matter of such Indemnified Claim. In each case where the Indemnifying Party assumes control of the defense, the Indemnified Party shall have the right to employ separate counsel and participate in the defense at its own expense.

Section 12.05. *Insurance*. Each Party, at its own cost and expense, shall, and shall cause its Affiliates to, maintain in full force and effect with an insurer having an A.M. Best rating of an "A-" or better, comprehensive commercial general liability insurance (including contractual liability) with limits not less than [*] per occurrence and in the aggregate and product liability insurance (including completed operations and contractual liability) with limits not less than [*] per occurrence and in the aggregate. On the Effective Date and upon request thereafter, but not more than once in any twelve (12)-month period, each Party shall provide proof of such insurance coverage to the other Party. Revance's insurance policies shall name Teoxane and its Affiliates, officers, directors and employees as additional insureds. Each Party's insurer shall waive all rights of subrogation against the other Party and such other Party's Affiliates, officers, directors and employees. Either Party may substitute a self-insurance program to satisfy in whole or in part its obligations under this Section 12.05. Revance's product liability insurance shall be primary with no contribution by Teoxane's insurance (or self-insurance). All deductibles or self-insured retentions are the responsibility of the respective insured. Each Party shall provide the other Party with at least thirty (30) days' advance written notice of any cancellation, termination, or material alteration of such Party's insurance policies or self-insurance program.

## ARTICLE 13

### Miscellaneous

Section 13.01. *Assignment.* Neither this Agreement nor any rights or obligations hereunder may be assigned or otherwise transferred by either Party, in whole or in part, whether voluntarily or by operation of Applicable Law, without the prior written consent of the other Party; *provided* that either Party may, without the consent of the other Party, assign this Agreement in its entirety to (a) any of its Affiliates or (b) any Third Party in connection with a Change of Control of such Party or the sale of all or substantially all of the business of such Party to which this Agreement relates, in each case, except to the extent such assignment would require an amount of taxes, duties, levies fees or other similar items to be withheld under Applicable Law from any amounts otherwise payable hereunder in excess of the amount of taxes, duties, levies fees or other similar items that would be required to be withheld absent such assignment. Any successor, transferee or assignee of a Party must agree in writing to be bound by the terms and conditions of this Agreement and no assignment or transfer of this Agreement by a Party shall relieve such Party of any of its obligations or liabilities to the other Party under this Agreement that are owing at the time of such assignment or transfer. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Any attempted assignment in contravention of this Section 13.01 shall be void ab initio.

Section 13.02. *Notices.* All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Revance to:

Revance Therapeutics Inc.
1222 Demonbreun Street
Suite 2000
Nashville, Tennessee 37203
USA
Attention: General Counsel

Email.: [*]

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
1 Manhattan West, New York, NY 10001
Attention: Demetrius Warrick
Email: [*]

if to Teoxane to:

[*]

with a copy (which shall not constitute notice) to:

[*]

or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other Party. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 13.03. *Amendments and Waivers*. (a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No failure or delay by either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

Section 13.04. *Expenses*. Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 13.05. *Governing Law*. This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflicts of law rules of such state.

Section 13.06. *Arbitration.* (a) Subject to Section 13.06(b), the Parties agree that arbitration shall be the exclusive means of resolving any dispute or claim between the Parties relating to or arising out of this Agreement, and neither Party may commence any action in any court except to enforce the obligation to arbitrate or to enforce any arbitration award. Any arbitration required by this Agreement shall be initiated under and governed by the American Arbitration Association (the "**AAA**") and any such arbitration shall be held in New York, New York. Within twenty (20) days after the commencement of any such arbitration, each Party shall select one (1) arbitrator. The two (2) arbitrators selected shall, in turn, select a third arbitrator. If the arbitrators selected by the Parties cannot agree on a third arbitrator, the third arbitrator shall be selected as provided by AAA rules. The arbitrators shall have the sole authority to permit the Parties to conduct discovery. The written decision of the arbitrators with respect to any dispute or controversy shall be final, binding and non-appealable, and the Parties shall be deemed to have consented to judgment upon the arbitration award being entered in any of the courts set forth below. The arbitrators shall be empowered to award such remedies (including equitable remedies and injunctive relief) as they shall consider appropriate based upon their findings of fact and conclusions of law and such other factors as they consider relevant. The Party which loses the arbitration proceedings shall indemnify and hold the prevailing Party harmless for any and all costs incurred or suffered in connection with the arbitration proceedings, including filing fees, hearing fees, reasonable attorneys' fees, arbitrator compensation and administrative fees, expenses of the arbitrators and witnesses. The Parties agree that the existence, conduct and content of any arbitration shall be kept confidential and neither Party shall disclose to any Third Party any information about such arbitration, except as may be required by Applicable Law or any Governmental Authority, including in any court proceedings to enforce the obligation to arbitrate or any arbitration award (it being understood that in such case, the Parties shall reasonably cooperate to obtain a protective order or other measure preserving the confidential treatment of such information and require that such information be used only for the purposes required by Applicable Law or such Governmental Authority). The Parties agree that any suit, action or proceeding seeking to enforce the obligation to arbitrate or to enforce any arbitration award shall be brought in the United States District Court for the Southern District of New York or any New York State court sitting in New York City and each of the Parties hereby irrevocably waives any and all right to trial by jury in any such legal proceeding.

(b) Notwithstanding anything in this Agreement to the contrary, any dispute, controversy or claim relating to (i) the scope, validity, enforceability or infringement of any Intellectual Property Right or (ii) a claim for specific performance or injunctive or other equitable relief as a remedy for a breach or threatened breach of Article 2 or Article 10, shall be submitted to the United States District Court for the Southern District of New York or any New York State court sitting in New York City so long as one of such courts shall have subject matter jurisdiction over such dispute, controversy or claim, and each Party hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on either Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 13.02 shall be deemed effective service of process on such Party. Each of the Parties hereby irrevocably waives any and all right to trial by jury in any such suit, action or proceeding.

Section 13.07. *Further Assurances*. Each Party, upon the request of the other Party, without further consideration, shall do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged or delivered all such further acts, deeds, documents, assignments, transfers, conveyances, powers of attorney, instruments and assurances as may be reasonably necessary to effect complete consummation of the transactions contemplated by this Agreement, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this Agreement.

Section 13.08. *Performance by Affiliates*. Each Party may discharge any obligations and exercise any rights hereunder through any of its Affiliates. Each Party hereby guarantees the performance by its Affiliates of such Party's obligations under this Agreement and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance. Any breach by a Party's Affiliate of any of such Party's obligations under this Agreement shall be deemed a breach by such Party, and the other Party may proceed directly against such Party without any obligation to first proceed against such Party's Affiliate.

Section 13.09. *Specific Performance.* Each Party acknowledges and agrees that irreparable damage would occur if any material provision of Article 2 or Article 10 of this Agreement was not performed in accordance with the terms thereof and that the other Party shall be entitled to an injunction or injunctions to prevent breaches of such Articles or to enforce specifically the performance of such terms and provisions of such Articles in addition to any other remedy to which such other Party is entitled at law or in equity in accordance with the terms set forth in this Agreement. The Parties further acknowledge and agree that no Party shall be required to post any bond, guaranty or other surety in order to obtain any such injunction or specific performance.

Section 13.10. *Independent Contractors*. The Parties' relationship with one another, as established by this Agreement, is solely that of independent contractors, with Teoxane acting as an independent distributor of Products in the Field in the Territory. This Agreement does not create any partnership, joint venture, agency or similar business relationship between the Parties, including for U.S. federal and state or foreign income tax purposes, and will not be treated as such by either Party or any of its respective Affiliates. Neither Party is a legal representative of the other Party. Neither Party can assume or create any obligation, representation, warranty or guarantee, express or implied, on behalf of the other Party for any purpose whatsoever.

Section 13.11. *Waiver of Rule of Construction*. Each Party has had the opportunity to consult with counsel in connection with the review, drafting and negotiation of this Agreement. Accordingly, the rule of construction that any ambiguity in this Agreement shall be construed against the drafting Party shall not apply.

Section 13.12. *English Language*. This Agreement is in the English language, and the English language shall control its interpretation. In addition, all notices required or permitted to be given under this Agreement, and all written, electronic, oral or other communications between the Parties regarding this Agreement shall be in the English language.

Section 13.13. *Counterparts; Effectiveness; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. Until and unless each Party has received a counterpart hereof signed by the other Party, this Agreement shall have no effect and neither Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns.

Section 13.14. *Entire Agreement*. This Agreement, the Brand Guidelines Agreement and the Quality Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 13.15. *Severability.* If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 13.16. *Conflict*. In the event of any conflict or inconsistency between:

(a) the Quality Agreement and this Agreement, the terms of the Quality Agreement shall govern solely in relation to quality-related matters, and this Agreement shall govern all other matters;

(b) the Pharmacovigilance Agreement and this Agreement, the terms of the Pharmacovigilance Agreement shall govern solely in relation to pharmacovigilance-related matters, and this Agreement shall govern all other matters;

(c) the Pharmacovigilance Agreement and the Quality Agreement, the terms of the Pharmacovigilance Agreement shall govern in relation to pharmacovigilance-related matters, and the Quality Agreement shall govern all other matters; and

(d) the Brand Guidelines Agreement and this Agreement, the Brand Guidelines Agreement shall govern solely in relation to branding and marketing-related matters, and this Agreement shall govern all other matters.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

REVANCE THERAPEUTICS, INC.

By: /s/ Mark J. Foley
Name: Mark Foley
Title: President and Chief Executive Officer

REVANCE AUSTRALIA PTY. LTD

By: /s/ Mark J. Foley
Name: Mark Foley
Title: President and Chief Executive Officer

TEOXANE SA

By: /s/ Valérie Taupin
Name: Valérie Taupin
Title: CEO

[*Signature Page to Exclusive Distribution Agreement*]

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): November 7, 2024**

# Revance Therapeutics, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-36297 | 77-0551645 |
| --- | --- | --- |
| (State or other jurisdiction of incorporation) | (Commission File No.) | (I.R.S. Employer Identification No.) |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
(Address of principal executive offices and zip code)

**(615) 724-7755**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
| --- | --- | --- |
| Common Stock, $0.001 par value | RVNC | Nasdaq Global Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

C.A. No. 21-1411-RGA-LDH
Plaintiffs' Trial Exhibit
PTX-852

**ITEM 2.02 RESULTS OF OPERATIONS AND FINANCIAL CONDITION.**

On November 7, 2024, Revance Therapeutics, Inc. (the "Company") issued a press release announcing its financial results for the quarter ended September 30, 2024. The press release also provided an update regarding the commercial performance of DAXXIFY® and the RHA® Collection of Dermal Fillers, the pending merger between the Company and Crown Laboratories, Inc. and China's National Medical Products Administration's approval of Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd.'s biologics license application for DaxinbotulinumtoxinA for Injection for the improvement of glabellar lines. A copy of the press release regarding the financial results is furnished as Exhibit 99.1 to this report.

The information in this Item 2.02 and in the press release furnished as Exhibit 99.1 to this report shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that Section or Sections 11 and 12(a)(2) of the Securities Act of 1933, as amended. The information contained in this Item 2.02 and in the press release furnished as Exhibit 99.1 to this report shall not be incorporated by reference into any filing with the U.S. Securities and Exchange Commission made by the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS.**

**(d) Exhibits**

| Number | Description |
| --- | --- |
| 99.1 | Press Release dated November 7, 2024 |
| 104 | Interactive Data File (embedded within the Inline XBRL document) |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

| | | | |
|---|---|---|---|
| Date: | November 7, 2024 | Revance Therapeutics, Inc. | |
| | | By: | /s/ Tobin C. Schilke |
| | | | **Tobin C. Schilke** |
| | | | **Chief Financial Officer** |

Exhibit 99.1

REVANCE®

## Revance Reports Third Quarter 2024 Financial Results, Provides Corporate Update

– On August 11, 2024, Revance and Crown Laboratories, Inc. entered into a merger agreement. As a result of discussions between the Revance and Teoxane, Crown and Revance agreed to extend the deadline upon which the tender offer must commence to November 12, 2024. The tender offer has not yet commenced.
– Revance entered into an amendment to the Exclusive Distribution Agreement with Teoxane for the distribution of the RHA® Collection of dermal fillers in the U.S. and an Exclusive Distribution Agreement with Teoxane for DAXXIFY® in Australia and New Zealand.
– Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. announced China's National Medical Products Association's approval of DAXXIFY in Mainland China for the temporary improvement of the appearance of moderate to severe glabellar lines.
– Revance is withdrawing the Company's 2024 financial guidance and will not be holding a conference call to accompany its 3Q'24 financial results.

**NASHVILLE, Tenn. --(BUSINESS WIRE)—November 7, 2024** - Revance Therapeutics, Inc. (NASDAQ: RVNC, www.revance.com) ("Revance," the "Company" or "our"), today reported financial results for the third quarter ended September 30, 2024 and provided a corporate update.

**Third Quarter Highlights and Subsequent Updates**

- **Crown Laboratories and Revance Announce Entry Into Merger Agreement and Delay of Tender Offer Commencement.** During the quarter, Revance and Crown Laboratories, Inc ("Crown") announced that they had entered into a merger agreement pursuant to which the companies would seek to merge the two complementary organizations. Under the terms of the agreement, which was unanimously approved by Revance's Board of Directors, Crown will commence a tender offer to purchase all of Revance's outstanding shares of common stock, at a price of $6.66 per share, in cash. As a result of discussions between the Company and Teoxane SA ("Teoxane") regarding an alleged breach of the Exclusive Distribution Agreement for the distribution of the RHA® Collection of dermal fillers in the U.S. (the "U.S. Distribution Agreement"), the parties extended the date by which the tender offer must be commenced.

Revance and Crown agreed to extend the tender offer commencement date to November 12, 2024 or another date mutually agreed to between the parties.

- **Revance and Teoxane Enter into Agreements to Further their Partnership.** Following a notice from Teoxane to remedy alleged material breaches of the U.S. Distribution Agreement and discussions between the parties, on October 24, 2024, Revance and Teoxane entered into a sixth amendment to the U.S. Distribution Agreement and an exclusive distribution agreement (the "ANZ Distribution Agreement") pursuant to which Teoxane will act as Revance's and Revance Australia's exclusive distributor and licensee in Australia and New Zealand of certain products containing DaxibotulinumtoxinA-lanm, including DAXXIFY®, for the treatment of (a) temporary improvements in the appearance of glabellar lines and other indications related to altering cosmetic appearance and (b) cervical dystonia. The ANZ Distribution Agreement expires December 31, 2040.

- **DAXXIFY Approved in Mainland China for Glabellar Lines.** On September 9, Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. ("Fosun") announced that the Biologics License Application for DAXXIFY had been recently approved by China's National Medical Products Administration for the temporary improvement in the appearance of moderate to severe glabellar lines.

**Financial Highlights**

- **Total net revenue** for the third quarter ended September 30, 2024 was $59.9 million compared to $54.1 million for the same period in 2023, representing an increase of 11%, due primarily to an overall increase in the sales volume of DAXXIFY and the RHA® Collection, partially offset by an overall reduction in the average selling prices for both product lines. Net revenue for the third quarter ended September 30, 2024 included $30.5 million of RHA® Collection revenue, $28.3 million of DAXXIFY revenue, and $1.1 million of collaboration revenue. Total net revenue for the nine months ended September 30, 2024 was $177.2 million compared to $154.3 million for the same period in 2023.

- **Selling, general and administrative (SG&A) expenses** for the three and nine months ended September 30, 2024 were $62.6 million and $197.3 million compared to $65.8 million and $202.5 million, respectively, for the same periods in 2023. The decrease was primarily due to lower stock-based compensation charges and sales and marketing expenses related to DAXXIFY

and the RHA® Collection, offset primarily by expenses related to the launch of DAXXIFY for cervical dystonia and $7.3 million of transaction costs related to the pending merger.

- **Research and development (R&D) expenses** for the three and nine months ended September 30, 2024 were $11.4 million and $41.7 million compared to $8.7 million and $43.8 million, respectively, for the same periods in 2023. The decrease was primarily due to the U.S. Food and Drug Administration's approval of our manufacturing partner's, Ajinomoto Bio-Pharma Services, site in late Q1 2023 which allowed the subsequent DAXXIFY manufacturing expenses to be capitalized as inventory.

- **Total operating expenses** for the three and nine months ended September 30, 2024 were $92.1 million and $290.8 million compared to $91.7 million and $294.9 million, respectively, for the same periods in 2023.

- **Net loss from continuing operations** for the three and nine months ended September 30, 2024 were $38.1 million and $125.1 million, respectively, compared to $39.4 million and $146.1 million for the same periods in 2023.

- **Cash, cash equivalents and short-term investments** as of September 30, 2024 were $184.1 million.

Note: In connection with the exit of the Fintech Platform business (HintMD and OPUL®), the results of the Fintech Platform business are reflected as discontinued operations in our financial statements as of September 30, 2024 and December 31, 2023 and for the periods ended September 30, 2024 and 2023. Therefore, the results discussed reflect our continuing operations and exclude results of the Fintech Platform, which was presented in our financial statements as the service segment.

**2024 Financial Outlook**

In light of the proposed merger with Crown and other recent developments, Revance will not be providing any forward-looking guidance and is withdrawing any previously provided guidance and outlook. In addition, Revance will not hold a conference call to discuss its third quarter 2024 earnings.

**About Revance**

Revance is a biotechnology company setting the new standard in healthcare with innovative aesthetic and therapeutic offerings that enhance patient outcomes and physician experiences. Revance's portfolio

includes DAXXIFY (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers, which RHA® technology is proprietary to and manufactured by Teoxane SA in Switzerland. Revance has partnered with Teoxane, SA to supply HA fillers for U.S. distribution. Revance has also partnered with Viatris Inc. to develop a biosimilar to onabotulinumtoxinA for injection and Shanghai Fosun Pharmaceutical to commercialize DAXXIFY in China.

Revance's global headquarters and experience center is located in Nashville, Tennessee. Learn more at Revance.com, RevanceAesthetics.com, DAXXIFY.com, HCP.DAXXIFYCervicalDystonia.com, or connect with us on LinkedIn(https://www.linkedin.com/company/revance).
"Revance", the Revance logo, and DAXXIFY® are registered trademarks of Revance Therapeutics, Inc. Resilient Hyaluronic Acid® and RHA® are trademarks of TEOXANE SA.

**Forward-Looking Statements**

Any statements in this press release that are not statements of historical fact, including statements related to expectations with respect to the tender offer and the merger, including the timing thereof and the likelihood of the tender offer being commenced on the same terms as previously announced, or at all; our and Crown's ability to successfully complete the merger; the impact to the Company if the merger is not completed; plans regarding 2024 guidance; the potential to set a new standard in healthcare; patient outcomes and physician experiences; commercialization of DAXXIFY in Australia and New Zealand with our partner, Teoxane; development of an onobotulinumtoxinA biosimilar with our partner, Viatris; and commercialization of DAXXIFY in China with our partner, Shanghai Fosun Pharmaceutical; constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future results, levels of activity, performance, events, circumstances or achievements reflected in the forward-looking statements will ever be achieved or occur.
Forward-looking statements are subject to risks and uncertainties that could cause actual results and the timing of events to differ materially from our expectations. These risks and uncertainties relate to, but are not limited to: the risks and uncertainties inherent in the tender offer and the merger, including, among other things, regarding how many of the Company stockholders will tender their shares in the offer, the possibility that competing offers will be made, the ability to satisfy the conditions to the closing of the tender offer and the merger, the expected timing of the tender offer and the merger, the

possibility that the merger will not be completed, difficulties or unanticipated expenses in connection with integrating the parties' operations, products and employees and the possibility that anticipated synergies and other anticipated benefits of the transaction will not be realized in the amounts expected, within the expected timeframe or at all, the effect of the announcement of the tender offer and the merger on the Company's and Crown's business relationships (including, without limitations, partners and customers), the occurrence of any event, change or other circumstances that could give rise to the termination of the Merger Agreement, the expected tax treatment of the transaction, and the impact of the transaction on the businesses of the Company and Crown, and other circumstances beyond the Company's and Crown's control; our ability to obtain funding for our operations; the timing of capital expenditures; the accuracy of our estimates regarding expenses, revenues, capital requirements, supply chain and operational efficiencies; our financial performance and the economics of DAXXIFY and the RHA® Collection of dermal fillers; our ability to comply with our debt obligations; the impact of macroeconomic factors on our manufacturing operations, supply chain, end user demand for our products, commercialization efforts, business operations, regulatory meetings, inspections and approvals, clinical trials and other aspects of our business and on the market; our ability to maintain approval of our products; our ability and the ability of our partners to manufacture supplies for DAXXIFY and our drug product candidates; our ability to acquire supplies of the RHA® Collection of dermal fillers; the uncertain clinical development process; our ability to obtain, and the timing relating to, regulatory submissions and approvals with respect to our drug product candidates and third-party manufacturers; the risk that clinical trials may not have an effective design or generate positive results or that positive results would assure regulatory approval or commercial success; the applicability of clinical study results to actual outcomes; the rate and degree of economic benefit, safety, efficacy, duration, commercial acceptance, market, competition and/or size and growth potential of DAXXIFY, the RHA® Collection of dermal fillers, and our drug product candidates, if approved; our ability to successfully commercialize DAXXIFY and to continue to successfully commercialize the RHA® Collection of dermal fillers; the timing and cost of commercialization activities; securing or maintaining adequate coverage or reimbursement by third-party payers for DAXXIFY; the proper training and administration of our products by physicians and medical staff; our ability to maintain and gain acceptance from injectors and physicians in the use of DAXXIFY for aesthetic and therapeutic indications; our ability to strengthen professional partnerships; our ability to expand sales and marketing capabilities; the status of commercial collaborations; changes in and failures to comply with laws and regulations; our ability to continue obtaining and maintaining intellectual property protection for our products; the cost and our ability to defend ourselves in product liability, intellectual property, class action or other lawsuits; our ability to limit or mitigate cybersecurity incidents; the volatility of our stock price; and other risks. Detailed information regarding factors that

may cause actual results to differ materially from the results expressed or implied by statements in this press release may be found in our periodic filings with the Securities and Exchange Commission (SEC), including factors described in the section entitled "Risk Factors" in our Form 10-K filed with the SEC on February 28, 2024, and including, without limitation, our Form 10-Q for the quarter ended September 30, 2024 expected to be filed with the SEC on November 7, 2024. The forward-looking statements in this press release speak only as of the date hereof. We disclaim any obligation to update these forward-looking statements.

---

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 58,585 | $ 137,329 |
| Restricted cash, current | 465 | 550 |
| Short-term investments | 125,491 | 116,586 |
| Accounts receivable, net | 48,263 | 27,660 |
| Inventories | 85,213 | 45,579 |
| Prepaid expenses and other current assets | 9,935 | 9,308 |
| Current assets of discontinued operations | 1,735 | 1,853 |
| Total current assets | 329,687 | 338,865 |
| Property and equipment, net | 15,897 | 17,225 |
| Intangible assets, net | 7,634 | 9,270 |
| Operating lease right-of-use assets | 47,996 | 53,167 |
| Finance lease right-of-use asset | 13,100 | 19,815 |
| Restricted cash, non-current | 5,564 | 5,995 |
| Finance lease prepaid expense | 41,514 | 32,383 |
| Other non-current assets | 172 | 321 |
| Non-current assets of discontinued operations | — | 1,413 |
| TOTAL ASSETS | $ 461,564 | $ 478,454 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 12,335 | $ 13,554 |
| Accruals and other current liabilities | 34,022 | 52,863 |
| Deferred revenue, current | 6,329 | 10,737 |
| Operating lease liabilities, current | 6,372 | 5,703 |
| Finance lease liability, current | 10,841 | 2,651 |
| Debt, current | 10,150 | 2,500 |
| Current liabilities of discontinued operations | — | 1,216 |
| Total current liabilities | 80,049 | 89,224 |
| Debt, non-current | 421,041 | 426,595 |
| Deferred revenue, non-current | 85,550 | 70,419 |
| Operating lease liabilities, non-current | 35,043 | 40,985 |
| Other non-current liabilities | 2,911 | 2,835 |
| TOTAL LIABILITIES | 624,594 | 630,058 |
| STOCKHOLDERS' DEFICIT | | |
| Preferred stock, par value $0.001 per share — 5,000,000 shares authorized, and no shares issued and outstanding as of September 30, 2024 and December 31, 2023 | — | — |
| Common stock, par value $0.001 per share — 190,000,000 shares authorized as of September 30, 2024 and December 31, 2023; 104,895,611 and 87,962,765 shares issued and outstanding as of September 30, 2024 and December 31, 2023, respectively | 105 | 88 |
| Additional paid-in capital | 2,043,893 | 1,926,654 |
| Accumulated other comprehensive gain | 72 | 14 |
| Accumulated deficit | (2,207,100) | (2,078,360) |
| TOTAL STOCKHOLDERS' DEFICIT | (163,030) | (151,604) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 461,564 | $ 478,454 |

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Revenue: | | | | |
| Product revenue, net | $ 58,827 | $ 54,109 | $ 175,874 | $ 154,160 |
| Collaboration revenue | 1,052 | 3 | 1,330 | 139 |
| Total revenue, net | 59,879 | 54,112 | 177,204 | 154,299 |
| Operating expenses: | | | | |
| Cost of product revenue (exclusive of amortization) | 17,633 | 16,821 | 50,179 | 46,915 |
| Selling, general and administrative | 62,578 | 65,791 | 197,314 | 202,523 |
| Research and development | 11,379 | 8,688 | 41,674 | 43,844 |
| Amortization | 545 | 374 | 1,636 | 1,636 |
| Total operating expenses | 92,135 | 91,674 | 290,803 | 294,918 |
| Loss from continuing operations | (32,256) | (37,562) | (113,599) | (140,619) |
| Interest income | 2,631 | 3,733 | 8,806 | 9,851 |
| Interest expense | (6,732) | (5,093) | (17,667) | (13,958) |
| Other expense, net | (258) | (223) | (1,149) | (1,056) |
| Loss from continuing operations before income taxes | (36,615) | (39,145) | (37,469) | (58,166) |
| Income tax provision | (1,500) | (300) | (1,500) | (300) |
| Net loss from continuing operations | (38,115) | (39,445) | (125,109) | (146,082) |
| Net loss from discontinued operations | — | (101,731) | (3,631) | (122,205) |
| Total net loss | (38,115) | (141,176) | (128,740) | (268,287) |
| Unrealized gain | 98 | 48 | 58 | 361 |
| Comprehensive loss | $ (38,017) | $ (141,128) | $ (128,682) | $ (267,926) |
| | | | | |
| Basic and diluted net loss per share: | | | | |
| Continuing operations | $ (0.37) | $ (0.46) | $ (1.25) | $ (1.74) |
| Discontinued operations | — | (1.17) | (0.04) | (1.46) |
| Total net loss per basic and diluted share | $ (0.37) | $ (1.63) | $ (1.29) | $ (3.20) |
| | | | | |
| Basic and diluted weighted-average number of shares used in computing net loss per share | 104,212,891 | 86,613,425 | 100,016,088 | 83,816,577 |

**REVANCE THERAPEUTICS, INC.**

**Product Revenue Breakdown (Unaudited)**

| (in thousands) | Three Months Ended September 30, 2024 | Three Months Ended September 30, 2023 | Nine Months Ended September 30, 2024 | Nine Months Ended September 30, 2023 |
|---|---|---|---|---|
| Product: | | | | |
| RHA® Collection of dermal fillers | $ 30,503 | $ 32,133 | $ 96,704 | $ 94,180 |
| DAXXIFY® | 28,324 | 21,976 | 79,170 | 59,980 |
| Total product revenue, net | $ 58,827 | $ 54,109 | $ 175,874 | $ 154,160 |


**Investors**

Laurence Watts,

New Street Investor Relations

laurence@newstreetir.com

**Media**

Revance@evolvemkd.com

# EXHIBIT 10

# AUSTRALIAN PRODUCT INFORMATION – BOTOX® (BOTULINUM TOXIN TYPE A) POWDER FOR INJECTION

## 1 NAME OF THE MEDICINE

Botulinum toxin type A purified neurotoxin complex

## 2 QUALITATIVE AND QUANTITATIVE COMPOSITION

Each vial of BOTOX® injection contains either 50 units (U), 100 units (U) or 200 units (U) of botulinum toxin type A as a haemagglutinin complex.

For the full list of excipients, see Section 6.1 List of excipients.

## 3 PHARMACEUTICAL FORM

Powder for injection

## 4 CLINICAL PARTICULARS

### 4.1 THERAPEUTIC INDICATIONS

BOTOX® (botulinum toxin type A) purified neurotoxin complex is indicated for the following therapeutic indications:

- treatment of overactive bladder with symptoms of urinary incontinence, urgency and frequency, in adult patients who have an inadequate response to or are intolerant of an anticholinergic medication
- treatment of urinary incontinence due to neurogenic detrusor overactivity resulting from a defined neurological illness (such as spinal cord injury or multiple sclerosis) in adult patients who have an inadequate response to or are intolerant of an anticholinergic medication
- prophylaxis of headaches in adults with chronic migraine (headaches on at least 15 days per month of which at least 8 days are with migraine)
- treatment of strabismus in patients twelve years and over
- treatment of blepharospasm associated with dystonia, including benign blepharospasm and VIIth nerve disorders (specifically hemifacial spasm) in patients twelve years and over
- treatment of cervical dystonia (spasmodic torticollis)
- treatment of focal spasticity of the upper and lower limbs, including dynamic equinus foot deformity, due to juvenile cerebral palsy in patients two years and older
- treatment of severe primary hyperhidrosis of the axillae
- treatment of focal spasticity in adults
- treatment of spasmodic dysphonia.

BOTOX® (botulinum toxin type A) purified neurotoxin complex is indicated for the

following cosmetic indications:

- temporary improvement in the appearance of upper facial rhytides (glabellar lines, crow's feet and forehead lines) in adults
- temporary improvement in the appearance of platysma continuous bands in healthy adults.

## 4.2 DOSE AND METHOD OF ADMINISTRATION

### Route of Administration

Intramuscular injection.
Reconstituted BOTOX® is injected with the purpose of reaching the motor endplate region of the muscle to be treated. May be subcutaneous for blepharospasm. Intradermal for primary hyperhidrosis of the axillae.

### General

**BOTOX® should only be given by physicians with the appropriate qualifications and experience in the treatment of patients and the use of required equipment.**
**The product is for single use in one patient during one session only because the product and diluent do not contain a preservative. Once opened and reconstituted, store in the refrigerator and use within twenty four hours. Discard any remaining solution. Do not freeze reconstituted BOTOX®.**

In general, dosing of BOTOX® should be individualised for each patient and always start with the minimal effective dose. The dosing interval should typically not be more frequent than every three months.

In treating paediatric patients, including when treating for multiple indications, the maximum cumulative dose in a 3-month interval should generally not exceed 8 Units/kg body weight or 300 Units, whichever is lower (refer to indication-specific maximum dosing recommendations).

If different vial sizes of BOTOX® are being used as part of one injection procedure, care should be taken to use the correct amount of diluent when reconstituting a particular number of units per 0.1 mL. The amount of diluent varies between BOTOX® 100 Allergan Units, BOTOX® 50 Allergan Units and BOTOX® 200 Allergan Units. Each syringe should be labelled accordingly.

### Bladder Dysfunction

The intradetrusor administration of BOTOX® is only to be conducted by a urologist/urogynaecologist who has been trained in this highly specialised technique or by a urologist/urogynaecologist under the direct supervision of a urologist/urogynaecologist who has been so trained.

Patients should not have a urinary tract infection at the time of treatment. Prophylactic antibiotics, except aminoglycosides, (see **4.5 Interactions with other medicines and other forms of interactions**) should be administered 1-3 days pre-treatment, on the treatment day and 1-3 days post-treatment.

It is recommended that patients discontinue anti-platelet therapy at least 3 days before the injection procedure. Patients on anti-coagulant therapy need to be managed appropriately to decrease the risk of bleeding.

**Overactive Bladder**

An intravesical instillation of diluted local anaesthetic with or without sedation may be used prior to injection, per local site practice. If a local anaesthetic instillation is performed, the bladder should be drained and irrigated with sterile saline before injection.

The recommended dose is 100 U of BOTOX®, as 0.5 mL (5 U) injections across 20 sites in the detrusor, which is also the maximum recommended dose.

The recommended dilution is 100 U/10 mL with 0.9% sterile non-preserved saline solution (see **Dilution Table**). Dispose of any unused saline.

Reconstituted BOTOX® (100 U/10 mL) is injected into the detrusor muscle via a flexible or rigid cystoscope, avoiding the trigone and bladder base. The bladder should be instilled with enough saline to achieve adequate visualisation for the injections, but over-distension should be avoided.

The injection needle should be filled (primed) with approximately 1 mL of reconstituted BOTOX® prior to the start of injections (depending on the needle length) to remove any air.

The needle should be inserted approximately 2 mm into the detrusor and 20 injections of 0.5 mL each (total volume of 10 mL) should be spaced approximately 1 cm apart (see figure below). For the final injection, approximately 1 mL of sterile non-preserved saline solution should be injected so the full dose is delivered. After the injections are given, the saline used for bladder wall visualisation should not be drained so that patients can demonstrate their ability to void prior to leaving the clinic. The patient should be observed for at least 30 minutes post-injection and until a spontaneous void has occurred.

Clinical improvement may occur within 2 weeks. Patients should be considered for re-injection when the clinical effect of the previous injection has diminished (median duration in Phase 3 clinical studies was 166 days [~24 weeks]) but no sooner than 3 months from the prior bladder injection.

**Figure 1: Dosing guide for overactive bladder treatment**



**Neurogenic Detrusor Overactivity**
An intravesical instillation of diluted local anaesthetic with or without sedation, or general anaesthesia, may be used prior to injection, per local site practice. If a local anaesthetic instillation is performed, the bladder should be drained and irrigated with sterile saline before injection.

The recommended dose is 200 U of BOTOX®.

Reconstitute a 200 U vial of BOTOX® with 6 mL of 0.9% sterile non-preserved saline solution and mix the vial gently. Draw 2 mL from the vial into each of three 10 mL syringes. Complete the reconstitution by adding 8 mL of 0.9% sterile non-preserved saline solution into each of the 10 mL syringes and mix gently. This will result in three 10 mL syringes each containing 10 mL (~67 U in each), for a total of 200 U of reconstituted BOTOX®. Use immediately after reconstitution in the syringe. Dispose of any unused saline.

Reconstitute two 100 U vials of BOTOX®, each with 6 mL of 0.9% sterile non-preserved saline solution and mix the vials gently. Draw 4 mL from each vial into each of two 10 mL syringes. Draw the remaining 2 mL from each vial into a third 10 mL syringe. Complete the reconstitution by adding 6 mL of 0.9% sterile non-preserved saline solution into each of the 10 mL syringes and mix gently. This will result in three 10 mL syringes each containing 10 mL (~67 U in each), for a total of 200 U of reconstituted BOTOX®. Use immediately after reconstitution in the syringe. Dispose of any unused saline.

Reconstituted BOTOX® (200 U/30 mL) is injected into the detrusor muscle via a flexible or rigid cystoscope, avoiding the trigone. The bladder should be instilled with enough saline to achieve adequate visualisation for the injections but over-distension should be avoided.

The injection needle should be filled (primed) with approximately 1 mL of reconstituted BOTOX® prior to the start of injections (depending on the needle length) to remove any air.

The needle should be inserted approximately 2 mm into the detrusor and 30 injections of 1 mL (~6.7 U) each (total volume of 30 mL) should be spaced approximately 1 cm apart (see figure above). For the final injection, approximately 1 mL of 0.9% sterile non-preserved saline solution should be injected so the full dose is delivered. After the injections are given, the saline used for bladder wall visualisation should be drained. The patient should be observed for at least 30 minutes post-injection.

Clinical improvement generally occurs within 2 weeks. It is not recommended that patients be retreated pre-emptively, at fixed intervals. Patients should be considered for re-injection when the clinical effect of the previous injection has diminished (median duration in Phase 3 clinical studies was 256-295 days (36-42 weeks) for BOTOX® 200 U) but no sooner than 3 months from the prior bladder injection.

Placebo-controlled data is limited to one cycle so the decision to perform a second treatment should be made only after considering the risks and benefits.

**Chronic Migraine**
The recommended dose for treating chronic migraine is 155 U to 195 U administered intramuscularly (IM) using a 30-gauge, 0.5 inch needle as 0.1 mL (5 U) injections per each site. Injections should be divided across 7 specific head/neck muscle areas as specified in

Table 1 below.  A 1-inch needle may be needed in the neck region for patients with extremely thick neck muscles.  With the exception of the procerus muscle, which should be injected at 1 site (midline), all muscles should be injected bilaterally with the minimum dose per muscle as indicated below, with half the number of injections sites administered to the left and half to the right side of the head and neck.  If there is a predominant pain location(s), additional injections to one or both sides may be administered in up to 3 specific muscle groups (occipitalis, temporalis and trapezius), up to the maximum dose per muscle as indicated in Table 1 below.

The recommended re-treatment schedule is every 12 weeks.

Due to the difficulties in establishing a diagnosis of chronic migraine, patients being considered for prophylaxis of headaches with BOTOX® should be evaluated by a neurologist or pain management specialist prior to receiving treatment with BOTOX®.  The use of BOTOX® for prophylaxis of headaches in adults with chronic migraine has been assessed for 3 cycles over 32 weeks.  No long-term safety or efficacy data for this indication are available.  Patients who do not have an adequate response after 2 treatment cycles should not continue treatment.  Patients should not receive more than 3 cycles of treatment prior to an assessment of the need for further treatment.

Recommended injection sites for chronic migraine:

**Figure 2: Dosing guide for chronic migraine treatment**




The following diagrams indicate recommended muscle groups for optional additional injections:

**Figure 3: Optional additional injections for chronic migraine treatment**




**Table 1: BOTOX® dosing by muscle for chronic migraine**

| **Head/Neck Area** | **Recommended Dose**<br>**Total Number of Units (U) (number of IM injection sites[a])** |
|---|---|
| Corrugator[b] | 10 U (2 sites) |
| Procerus | 5 U (1 site) |
| Frontalis[b] | 20 U (4 sites) |
| Temporalis[b] | 40 U (8 sites) up to 50 U (up to 10 sites) |
| Occipitalis[b] | 30 U (6 sites) up to 40 U (up to 8 sites) |
| Cervical Paraspinal Muscle Group[b] | 20 U (4 sites) |
| Trapezius[b] | 30 U (6 sites) up to 50 U (up to 10 sites) |
| **Total Dose Range:** | **155 U to 195 U** |

[a] 1 IM injection site = 0.1 mL = 5 U BOTOX®
[b] Dose distributed bilaterally for minimum dose

**Blepharospasm**
An injection of BOTOX® is prepared by drawing into a sterile 1.0 mL tuberculin syringe an amount of the properly diluted toxin (see **Dilution Table**) slightly greater than the intended dose. Air bubbles in the syringe barrel are expelled and the syringe is attached to the injection needle, preferably a 1½", 27–30-gauge needle. Injection volume in excess of the intended dose is expelled through the needle into an appropriate waste container to assure patency of the needle and to confirm that there is no syringe-needle leakage. A new, sterile needle and syringe should be used to enter the vial on each occasion for dilution or removal of BOTOX®.

For blepharospasm, diluted BOTOX® injection (see **Dilution Table**) is injected using a sterile, 27–30-gauge needle with or without electromyographic guidance. 1.25 U to 2.5 U (0.05 mL to 0.1 mL volume at each site) injected into the medial and lateral pre-tarsal orbicularis oculi of the upper lid and into the lateral pre-tarsal orbicularis oculi of the lower

lid is the initial recommended dose. Pre-tarsal injections are often appropriate and may vary based on the patient's presentation. In the upper lid, maximising the distance of the injection from the levator palpebrae superioris may reduce the complication of ptosis. Avoiding medial lower lid injections, and thereby reducing diffusion into the inferior oblique, may reduce the complication of diplopia. Ecchymosis may occur easily in the soft eyelid tissues. This may be reduced by applying light pressure at the injection site immediately after the injection.

In general, the initial effect of the injections is seen within three days and reaches a peak at one to two weeks post-treatment. Each treatment lasts approximately three months, following which the procedure can be repeated as needed. At repeat treatment sessions, the dose may be increased up to two-fold if the response from the initial treatment is considered insufficient – usually defined as an effect that does not last longer than two months. However there appears to be a minimal increase in benefit from injecting more than 5.0 U per site. Some tolerance may be found when BOTOX® is used in treating blepharospasm if treatments are given any more frequently than every three months. The effect is rarely permanent.

The cumulative dose of BOTOX® in a two-month period should not exceed 200 U.

**Strabismus**

BOTOX® is intended for injection into extraocular muscles utilising the electrical activity recorded from the tip of the injection needle as a guide to placement within the target muscle. Injection without surgical exposure or electromyographic guidance should not be attempted. Physicians should be familiar with electromyographic technique.

To prepare the eye for BOTOX® injection, it is recommended that several drops of a local anaesthetic and an ocular decongestant be given several minutes prior to injection.

Note: The volume of BOTOX® injected for treatment of strabismus should be between 0.05 – 0.15 mL per muscle.

The initial listed doses of the reconstituted BOTOX® (see **Dilution Table** below) typically create paralysis of injected muscles beginning one to two days after injection and increasing in intensity during the first week. The paralysis lasts for 2-6 weeks and gradually resolves over a similar time period. Overcorrections lasting over 6 months have been rare. About one half of patients will require subsequent doses because of inadequate paralytic response of the muscle to the initial dose or because of mechanical factors such as large deviations or restrictions or because of the lack of binocular motor fusion to stabilise the alignment.

I. Initial doses in units. Use the lower listed doses for treatment of small deviations. Use the larger doses only for large deviations.
   A. For vertical muscles and for horizontal strabismus of less than 20 prism dioptres: 1.25 – 2.5 U in any one muscle.
   B. For horizontal strabismus of 20 prism dioptres to 50 prism dioptres: 2.5 – 5.0 U in any one muscle.
   C. For persistent sixth nerve palsy of one month or longer duration: 1.25 – 2.5 U in the medial rectus muscle.

II. Subsequent doses for residual or recurrent strabismus.
   A. It is recommended that patients be re-examined 7-14 days after each injection to assess the effect of that dose.

B. Patients experiencing adequate paralysis of the target muscle that require subsequent injections should receive a dose comparable to the initial dose.
C. Subsequent doses for patients experiencing incomplete paralysis of the target muscle may be increased up to two-fold compared to the previously administered dose.
D. Subsequent injections should not be administered until the effects of the previous dose have dissipated as evidenced by substantial function in the injected and adjacent muscles.
E. The maximum recommended dose as a single injection for any one muscle is 25 U.

**VIIth Nerve Disorders (Hemifacial Spasm)**

Patients with hemifacial spasm or VIIth nerve disorder should be treated as for unilateral blepharospasm. Further injections may be necessary into the corrugator, zygomaticus major, orbicularis oris and/or other facial muscles according to the extent of the spasm. Electromyographical control may be useful to identify small circumoral muscles.

The cumulative dose of BOTOX® in a two-month period should not exceed 200 U.

**Treatment of Focal Spasticity of the Upper Limb and Lower Limbs, Including Dynamic Equinus Foot Deformity, Due to Juvenile Cerebral Palsy in Patients Two Years and Older**

The exact dose and number of injection sites should be tailored to the child's needs based on the size, number and location of muscles involved, the severity of spasticity, presence of local muscle weakness and the patient's response to previous treatment. In clinical trials, the dose per muscle ranged from 0.5-2.0 U/kg body weight in the upper limb and 2.0-4.0 U/kg/body weight in the lower limb, per treatment session. For the treatment of equinus foot deformity the total dose is up to 4 U/kg or 200 U (whichever is the lesser amount) divided into two sites in each medial and lateral head of the gastrocnemius muscle. In other muscles, the dose per muscle ranged from 3.0-8.0 U/kg body weight and did not exceed 300U divided among selected muscles at any treatment session. Following initial injection to the gastrocnemius muscle, further involvement of the anterior or posterior tibialis may need to be considered for additional improvement in the foot position at heel strike and during standing.

A 27- or 30-gauge needle should be used with an appropriate needle length to reach the targeted muscles. For focal spasticity, localisation techniques include electromyography, muscle ultrasound or electrical stimulation.

Clinical improvement generally occurs within the first two weeks after injection. Repeat doses should be administered when the clinical effect of a previous injection diminishes but typically not more frequently than every three months. The degree of muscle spasticity at the time of reinjection may necessitate alterations in the dose of BOTOX® and muscles to be injected.

Table 2 below is intended to give dosing guidelines for injection of BOTOX® in the treatment of focal spasticity in children aged 2 years and older. The maximum cumulative dose should generally not exceed 8.0 U/kg body weight and up to a maximum of 300 U divided among selected muscles at any treatment session or in a 3-month interval:

**Table 2: Dose guidelines for injection of BOTOX® in the treatment of focal spasticity in children aged 2 years and older**

| Muscles in upper limb | Dosage in U/kg/muscle |
|---|---|
| Biceps brachii | 0.5 - 2.0 U |
| Brachialis | 0.5 - 2.0 U |
| Brachioradialis | 0.5 - 2.0 U |
| Flexor carpi ulnaris | 0.5 - 2.0 U |
| Flexor carpi radialis | 0.5 - 2.0 U |
| Pronator teres | 0.5 - 2.0 U |
| Pronator quadratus | 0.5 - 2.0 U |
| Flexor digitorum profundus | 0.5 - 2.0 U |
| Flexor digitorum sublimis | 0.5 - 2.0 U |
| Flexor pollicis longus | 0.5 - 2.0 U |
| Flexor pollicis brevis | 0.5 - 2.0 U |
| Opponens pollicis | 0.5 - 2.0 U |
| Adductor pollicis | 0.5 - 2.0 U |

**Table 2 (cont): Dose guidelines for injection of BOTOX® in the treatment of focal spasticity in children aged 2 years and older**

| Muscles in lower limb | Dosage in U/kg/muscle |
|---|---|
| Hip adductor group (adductor longus, adductor brevis, adductor magnus, medial hamstrings) | 4.0 U |
| Gastrocnemius | 2.0 - 4.0 U |

**Focal Spasticity in Adults**

The exact dose and number of injection sites should be tailored to the individual based on the size, number and location of muscles involved, the severity of spasticity, presence of local muscle weakness and the patient response to previous treatment. Clinical trials support a maximum dose of 400 U divided among involved muscles for treating adult upper limb spasticity, and a maximum dose of 400 U divided among involved muscles for treating adult lower limb spasticity at any treatment session. Clinical improvement in muscle tone generally occurs within two weeks following treatment with the peak effect seen four to six weeks following treatment. In clinical studies, patients were reinjected at 12 to 16-week intervals. The degree of muscle spasticity at the time of reinjection may necessitate alterations in the dose of BOTOX® and muscles to be injected.

Table 3 below is intended to provide dosing guidelines for the injection of BOTOX® in selected muscles evaluated in supporting Clinical Trials.

**Table 3: Dosing guidelines for the injection of BOTOX® in the treatment of focal spasticity**

| Muscle | Total Dosage; Number of Sites |
|---|---|
| **Upper Limb** | |
| Shoulder* | |
| Pectoralis major | 75 – 125 Units; 3 sites |
| Teres major | 30 – 50 Units; 2 sites |

| | |
|---|---|
| Latissimus dorsi | 45 – 75 Units; 3 sites |
| Elbow | |
| Biceps brachii | 60 - 200 U; 2 to 4 sites |
| Brachioradialis | 45 – 75 Units; 1 to 2 sites |
| Brachialis | 30 - 50 Units; 1 to 2 sites |
| Forearm | |
| Pronator Quadratus | 10 -50 Units; 1 site |
| Pronator Teres | 15 - 25 Units; 1 site |
| Fingers/Hand | |
| Flexor digitorum profundus | 15 - 50 U; 1-2 sites |
| Flexor digitorum sublimis | 15 - 50 U; 1-2 sites |
| Lumbricals** | 5 – 10 Units;1 site |
| Interossei** | 5 – 10 Units;1 site |
| Wrist | |
| Flexor carpi radialis | 15 - 60 U; 1-2 sites |
| Flexor carpi ulnaris | 10 - 50 U; 1-2 sites |
| Thumb | |
| Adductor pollicis | 20 U; 1-2 sites |
| Flexor pollicis longus | 20 U; 1-2 sites |
| Flexor pollicis brevis | 5 - 25 Units; 1 site |
| Opponens pollicis | 5 - 25 Units;1 site |
| **Lower Limb** | |
| Posterior tibialis | 70 - 100 U; 1-2 sites |
| Soleus | 80 - 125 U; 1-2 sites |
| Flexor hallucis longus | 50 U; 2 sites |
| Flexor digitorum longus/brevis | 50 - 100 U; 2-4 sites |
| Gastrocnemius medial/lateral | 50 - 200 U; 2-4 sites |

*When injecting the shoulder muscles in combination, the recommended maximum dose is 250 U.

**When injecting both lumbricals and/or interossei, the recommended maximum dose is 50 U per hand.

A 27- or 30-gauge needle should be used with an appropriate needle length to reach the targeted muscles. For focal spasticity, localisation techniques include electromyography, muscle ultrasound or electrical stimulation.

Multiple injection sites may allow BOTOX® to have more uniform contact with the innervation areas of the muscle and may be especially useful in larger muscles.

**Cervical Dystonia (Spasmodic Torticollis)**

Dosing must be tailored to the individual patient based on the patient's head and neck position, localisation of pain, muscle hypertrophy, patient's body weight and patient response.

Multiple injection sites allow BOTOX® to have more uniform contact with the innervation areas of the dystonic muscle and are especially useful in larger muscles. The optimal number of injection sites is dependent upon the size of the muscle to be chemically denervated. The treatment of cervical dystonia typically may include, but is not limited to, injection of BOTOX® into the sternocleidomastoid, levator scapulae, scalene, splenius capitis and/or the trapezius muscle(s).

A 25-, 27- or 30-gauge needle should be used for superficial muscles and a needle of

appropriate length should be used for deeper musculature. For cervical dystonia, localisation of the involved muscles with electromyographic guidance may be useful.

Table 4 below is intended to provide dosing guidelines for injection of BOTOX® in the treatment of cervical dystonia.

**Table 4: Dosage guidelines for injection of BOTOX® in the treatment of cervical dystonia**

| Classification of Cervical Dystonia | Muscle Groupings | Total Dosage; Number of Sites |
|---|---|---|
| Type I<br>Head rotated toward side of shoulder elevation | Sternocleidomastoid<br>Levator scapulae<br>Scalene<br>Splenius capitis<br>Trapezius | 50-100 U; at least 2 sites<br>50 U; 1-2 sites<br>25-50 U; 1-2 sites<br>25-75 U; 1-3 sites<br>25-100 U; 1-8 sites |
| Type II<br>Head rotation only | Sternocleidomastoid | 25-100 U; at least 2 sites if >25 U given |
| Type III<br>Head tilted toward side of shoulder elevation | Sternocleidomastoid<br><br>Levator scapulae<br>Scalene<br>Trapezius | 25-100 U; at posterior border; at least 2 sites if >25 U given<br>25-100 U; at least 2 sites<br>25-75 U; at least 2 sites<br>25-100 U; 1-8 sites |
| Type IV<br>Bilateral posterior cervical muscle spasm with elevation of the face | Splenius capitis and cervicis | 50-200 U; 2-8 sites, treat bilaterally |

This information is provided as guidance for the initial injection. The extent of muscle hypertrophy and the muscle groups involved in the dystonic posture may change with time necessitating alterations in the dose of toxin and muscles to be injected. The exact dose and sites injected must be individualised for each patient.

Clinical improvement generally occurs within the first two weeks after injection. The maximum clinical benefit generally occurs approximately six weeks post-injection. Treatment intervals of less than two months are not recommended. The duration of therapeutic effect reported in clinical trials showed substantial variation (from 2 to 32 weeks), with a typical duration of approximately 12 to 16 weeks, depending on the patient's individual disease and response.

Table 5 below shows the median dose of BOTOX® injected per muscle in a clinical study in which dose was determined by the practitioner based on the presentation of the individual cervical dystonia patient.

**Table 5: Median dose of BOTOX® injected per muscle in a clinical study**

| Muscle(s) | Range of Medians* (U) | Minimum-Maximum Dose, U/muscle** |
|---|---|---|
| Sternocleidomastoid | 50 | 15-190 |
| Trapezius | 50-60 | 5-200 |
| Levator scapulae | 50 | 10-180 |
| Splenius capitis/cervicis | 90 | 10-240 |
| Scalene | 40 | 5-90 |

* Two medians were given: for those patients who received one injection cycle (n=121) and for those patients who received two injection cycles (n=90). When only one number is given, the medians were the same for both groups of patients.
** Limiting the dose injected into the sternocleidomastoid muscle to less than 100 U may decrease the occurrence of dysphagia (see **4.4 Special warnings and precautions for use**).

In initial controlled clinical trials to establish safety and efficacy for cervical dystonia, doses of BOTOX® ranged from 140 to 280 U. In more recent studies, the doses have ranged from 95 to 360 U (with an approximate mean of 240 U). As with any drug treatment, initial dosing should begin at the lowest effective dose.

In general, a total dose of 360 U every two months should not be exceeded for the treatment of cervical dystonia. The time-to-retreatment will vary between patients, however data from controlled clinical studies indicates that symptoms may start to re-emerge at approximately 8-10 weeks post-injection (see **Clinical Trials**).

Repeat doses should be administered when the clinical effect of a previous injection diminishes, though usually not more frequently than every two months. “Booster” injections are not recommended.

**Primary Hyperhidrosis of the Axillae**

For the treatment of hyperhidrosis, 100 U of BOTOX® should be reconstituted with 4.0 mL of 0.9% sterile non-preserved sodium chloride for injection. For each axilla, 50 U of BOTOX® (2.0 mL) should be injected intradermally and evenly distributed in 10-15 sites approximately 1-2 cm apart within the hyperhidrotic area. For the treatment of hyperhidrosis, a 30-gauge needle should be used. The hyperhidrotic area may be defined using standard staining techniques (e.g. Minor’s iodine starch test). Each dose is injected to a depth of approximately 2 mm and at a 45 degree angle to the skin surface with the bevel side up to minimise leakage and ensure the injections remain intradermal. Repeat injections for axillary hyperhidrosis should be administered when the effects from the previous injection subside. However, repeat injections at intervals of less than four months are not recommended.

**Spasmodic Dysphonia**

Patients with spasmodic dysphonia should be treated by physicians skilled in the anatomy and physiology of the larynx and have facilities with nasal endoscopy and also electromyographically guided injections. The procedure should be carried out in a facility equipped to manage potential acute complications such as reflex stridor. The treatment program should be individualised for each patient at each treatment session. Peak effect is generally seen within 7 days following an injection.

BOTOX® (100 U/vial) should be reconstituted with 4.0 to 5.0 mL of 0.9% sterile non-preserved saline solution, giving a final concentration of 2.0-2.5 U per 0.1 mL. It is usual to commence with a standard dose of 1.0-2.5 U in 0.1 mL of BOTOX® to each thyroarytenoid muscle in adductor spasmodic dysphonia and subsequently vary the dose by altering the concentration according to patient requirements and response to therapy. An occasional patient will require 3.0 U per vocal cord and many patients over the years have reduced their dose, down to even 0.2 U per vocal cord. Bilateral injections are generally recommended but an occasional patient will benefit from unilateral injections, sometimes alternating between sides with each subsequent treatment.

In abductor spasmodic dysphonia, 2.0-5.0 U of BOTOX® are usually injected unilaterally into one posterior cricoarytenoid muscle via a lateral retrocricoid, supracricoid or transcricoid approach.

The injection is usually performed in the supine position with a small pillow under the shoulders to improve laryngeal exposure. For adductor spasmodic dysphonia, the laryngeal surface landmarks are identified, including the thyroid and cricoid cartilage and in particular the small gap of the cricothyroid membrane. Identification of the landmarks is a critical part of this procedure and sometimes this can be difficult in individuals with thick necks.

In adductor spasmodic dysphonia the EMG recording needle is advanced in the midline through the cricothyroid membrane, directing the needle rostrally and approximately 30º laterally towards the intended thyroarytenoid muscle. For a bilateral procedure, the needle is redirected towards the corresponding contralateral muscle. Once within the muscle, EMG insertional activity is audible and placement can be confirmed by having the patient phonate an ”e”. Having confirmed needle placement, the desired amount of BOTOX® in 0.1 mL is injected.

In all cases of abductor spasmodic dysphonia, endoscopy should be performed prior to each treatment to assess the dynamic activity of each vocal cord and the size of the glottal airway. Typically, the posterior cricoarytenoid (PCA) muscle on the more active side is chosen for therapy. A retrocricoid approach should be used whereby the injection needle, containing 2.0-5.0 U of BOTOX® in 0.1 mL, is directed towards the PCA muscle in a curving fashion at the level of the cricoid cartilage to lie behind the larynx. The larynx may be rotated laterally on the appropriate side to improve access. To confirm needle placement, the patient sniffs sharply to activate the posterior cricoarytenoid muscle resulting in a characteristic EMG interference pattern. BOTOX® is then injected. Only unilateral injections are recommended at each treatment session. The determination of which PCA muscle to treat at any injection session is determined by endoscopic review. Treatment sessions are performed only when the non-injected cord has sufficient motion to protect from stridor in the event that the injected cord would become immobile. An occasional patient with abductor spasmodic dysphonia will have increased activity of the cricothyroid muscle, which can also be evaluated by EMG and may also benefit from supplemental injections into this muscle.

To date there has only been one report of a patient developing resistance to the injections, with the development of neutralising antibodies, probably because the doses used are very small compared to other indications.

**Upper Facial Lines (Glabellar Lines, Crow's Feet and Forehead Lines)**
As optimum dose levels and number of injection sites per muscle may vary among patients, individual dosing regimens should be drawn up. The recommended injection volume per injection site is 0.1 mL.

**Glabellar Lines**
BOTOX® should be reconstituted with 0.9% sterile non-preserved saline solution (100 U/2.5 mL) and injected using a sterile 30-gauge needle. A volume of 0.1 mL (4 U) is administered in each of 5 injection sites, 2 injections in each corrugator muscle and 1 injection in the procerus muscle for a total dose of 20 U.

In order to reduce the complication of ptosis, injection near the levator palpebrae superioris muscle should be avoided, particularly in patients with larger brow-depressor complexes. Medial corrugator injections should be placed at least 1 cm above the bony supraorbital ridge.

Improvement of severity of glabellar lines generally occurs within one week after treatment. The effect was demonstrated for up to 4 months.

**Crow's Feet**
BOTOX® should be injected bilaterally at 3 sites in the lateral aspect of the orbicularis oculi (i.e. total of 6 injections), where most lines are seen when a smile is forced. In general, 2-6 U is recommended per injection site at a 2-3 mm depth, for a total dose of 6-18 U per side.

Injections should be at least 1 cm outside the bony orbit, not medial to the vertical line through the lateral canthus and not close to the inferior margin of the zygoma.

**Forehead Lines**
BOTOX® should be injected intramuscularly at each of 4 injection sites in the frontalis muscle. In general, 2-6 U is recommended per injection site every 1-2 cm along either side of a deep forehead crease, for a total dose of 8-24 U.

Injections should be at least 2-3 cm above the eyebrow to reduce the risk of brow ptosis.

**Platysma Continuous Bands**
BOTOX® injection should be administered by an appropriately qualified and trained healthcare practitioner, who understands the relevant anatomy and associated neuromuscular structures and any alterations to the anatomy in a particular individual patient (e.g. due to prior surgical or aesthetic procedures).

Patients should be screened for other potential causes of amended anatomy (e.g. thyromegaly and cervical lymphadenopathy).

Use caution in patients who have had prior surgical or aesthetic treatment of the area. Changes in anatomy/landmarks or the presence of scar tissue may impact the ability to safely administer BOTOX® injection or to obtain the desired aesthetic result.

Each treatment can require up to 36 Units (up to 28 sites) (Table 6). The safe and effective use of BOTOX® injection depends on the use of the correct number and locations for

injections, proper needle placement and administration techniques.

Needle placement with respect to the mandible is very important as it reduces the potential for injury to the marginal mandibular nerve, a motor branch of the facial nerve. Injury to the nerve presents as an asymmetrical smile due to paresis of lip depressor muscles.

Using an appropriately sized sterile syringe, needle, and aseptic technique, inject 2 Units/0.05 mL of reconstituted BOTOX® into each of the 4 sites in the upper segment of platysma muscle, below the jawline on each side. In addition, inject 1 Unit/0.025 mL of reconstituted BOTOX® into each of the 5 sites along each vertical neck band, 1 to 2 continuous vertical neck bands per side. Depending on severity, the total dose may be 26 Units (1 band/side), 31 Units (1 band one side, 2 bands other side) or 36 Units (2 bands/side) (see Table 6 and Figures 4 and 5 below).

**Identify the treatment location:** For each side, the 4 jawline injections to the upper platysma muscle should be approximately 1.5 to 2 cm inferior and parallel to the lower mandibular border. The anterior injection site should be in line with the oral commissure, and the posterior injection site should be slightly anterior to the angle of the mandible. The remaining 2 injections should be equidistant (approximately 1 to 2 cm apart) between the anterior and posterior injection points (see Figures 4 and 5).

For each vertical neck band, 1 to 2 per side, distribute 5 injections vertically approximately 1 to 2 cm apart (see Figures 4 and 5). The most superior injection site should be approximately 1 to 2 cm inferior to the jawline injections.

**Figure 4: Injection Sites for 2 Platysma Continuous Bands**




**Figure 5: Injection Sites for 1 Platysma Continuous Band**




**Administration:** The platysma muscle is a thin muscle sheet just below the surface of the skin. Therefore, all platysma muscle injections should be administered superficially and intramuscularly with the needle perpendicular to the surface of the skin. For continuous vertical neck band injections, each band should be identified while the patient is contracting their platysma. Gently pinch the band to isolate the muscle from nearby anatomical structures during administration (see Table 6).

To reduce injection-related complications, injection should be at least 1.5 cm inferior to the lower mandibular border. Do not inject into structures deep to the platysma muscle, particularly in the anterior region of the neck.

The safety and effectiveness of dosing with BOTOX® more frequently than every 3 months

have not been evaluated.

**Table 6: Dosing for Platysma Continuous Bands**

| Jawline Injection (Inferior to the Lower Mandibular Border) | Continuous Vertical Neck Band Injection | | Total Dose (Number of Injection Sites) |
|---|---|---|---|
| 2 Units/0.05 mL into each of the 4 sites on each side (16 Units in 8 sites) | 1 Unit/0.025 mL into each of the 5 sites per band (1 to 2 bands/side) | 1 band on both sides (10 Units in 10 sites) | 26 Units (18 sites) |
| | | 1 band on one side, and 2 bands on the other side (15 Units in 15 sites) | 31 Units (23 sites) |
| | | 2 bands on both sides (20 Units in 20 sites) | 36 Units (28 sites) |

**Dilution Technique**

It is good practice to perform vial reconstitution and syringe preparation over plastic-lined paper towels to catch any spillage. To reconstitute vacuum-dried BOTOX® injection, use sterile normal saline without a preservative; 0.9% w/v Sodium Chloride Injection is the recommended diluent. Draw up the proper amount of diluent (as per Table 7) in the appropriate size syringe. Since BOTOX® is denatured by bubbling or similar violent agitation, inject the diluent into the vial gently. Discard the vial if a vacuum does not pull the diluent into the vial. Record the date and time of reconstitution on the space on the label. BOTOX® should be administered within 24 hours after reconstitution in the vial.

During this time period, reconstituted BOTOX® should be stored in a refrigerator (2°C to 8°C). Reconstituted BOTOX® should be clear, colourless to slightly yellow and free of particulate matter. Parenteral drug products should be inspected visually for particulate matter and discolouration prior to administration and whenever the solution and the container permit.

**Table 7: Dilution Table for 50 U, 100 U and 200 U vials**

| Diluent Added (0.9% Sodium Chloride Injection) | 50 U Vial | 100 U Vial | 200 U Vial |
|---|---|---|---|
| | Resulting dose (U/0.1 mL) | Resulting dose (U/0.1 mL) | Resulting dose (U/0.1 mL) |
| 0.5 mL | 10 | 20 | 40 |
| 1 mL | 5 | 10 | 20 |
| 2 mL | 2.5 | 5 | 10 |
| 4 mL | 1.25 | 2.5 | 5 |
| 5 mL | N/A | 2 | 4 |
| 8 mL | N/A | 1.25 | 2.5 |
| 10 mL | N/A | 1 | 2 |

*Note:* These dilutions are calculated for an injection volume of 0.1 mL. A decrease or increase in the BOTOX® dose is also possible by administering a smaller or larger injection volume from 0.05 mL (50% decrease in dose) to 0.15 mL (50% increase in dose).

For reconstitution technique for intradetrusor injections for neurogenic detrusor overactivity, please refer to section **4.2 Dose and method of administration**; sub-section **Neurogenic Detrusor Overactivity**.

**Lack of Response**
In the absence of the desired effect after the first treatment session, i.e. no significant clinical improvement from baseline by one month after injection, the following actions should be considered:

- Analysis of potential causes of lack of effect, e.g. inappropriate selection of muscles to be injected; insufficient dose; poor injection technique; muscles inaccessible to injection; underlying structural abnormalities, such as muscle contractures or bone disorders; relative weakness of antagonist muscles; change in pattern of muscle involvement; patient perception of benefit compared with initial results; inappropriate storage or reconstitution; and/or formation of toxin-neutralising antibodies.
- Re-evaluation of the appropriateness of treatment with botulinum toxin type A.

For the second treatment session, in the absence of any undesirable effects after the first treatment session, the physician should consider the following:

- adjust the dose, taking into account the analysis of the earlier treatment failure;
- use of EMG guidance as appropriate; and
- maintain a three-month interval between the two treatment sessions.

In the event of treatment failure or diminished effect following repeat injections, taking into account dose adjustments and targeting of injections, alternative treatment methods should be considered.

A neutralising antibody is defined as an antibody that inactivates the biological activity of the toxin. In general, the proportion of patients who lose their response to botulinum toxin therapy and have demonstrable levels of neutralising antibodies is less than 5%, though in a long-term juvenile cerebral palsy study, of 117 patients treated with BOTOX®, antibodies were detected in 33/117 (28%) at either 27 or 39 months. Thirty one of these 33 had been responders, 19/31 (6%) continued to respond, with 7/31 (2%) becoming non-responders and no data available for 5/31.

In the pivotal studies, none of the 615 overactive bladder (OAB) patients with analysed specimens developed the presence of neutralising antibodies to BOTOX®. Based on the two pivotal studies and one open-label extension study, specimens analysed from patients showed that no neutralising antibodies developed in any of the 954 patients (0.0%) who had received BOTOX® 100 U doses. Only 3 of 260 patients (1.2%) developed neutralising antibodies after subsequently receiving at least one BOTOX® 150 U dose (the BOTOX® dose of 150 U is not the recommended dose for the OAB indication), of which one of these three patients continued to experience clinical benefit (≥ 50% reduction from study baseline in urinary incontinence episodes).

In the pivotal studies (300 U and 200 U), none of the 475 neurogenic detrusor overactivity (NDO) patients with analysed specimens developed the presence of neutralising antibodies. In patients with analysed specimens in the drug development program (including the open-label extension study), neutralising antibodies developed in 3 of 300 patients (1.0%) after

receiving only BOTOX® 200 U doses and 5 of 258 patients (1.9%) after receiving at least one 300 U dose (the BOTOX® dose of 300 U is not the recommended dose for the NDO indication). Four of these eight patients continued to experience clinical benefit (~ 50% or greater reduction from study baseline in urinary incontinence episodes).

The critical factors for neutralising antibody production are the frequency and dose of injection. Tolerance may be observed in some patients treated more frequently than every three months. The potential for neutralising antibody formation may be minimised by injecting with the lowest effective dose given at the longest feasible intervals between injections (injection intervals should typically be no more frequent than three months). The maximum dose should not be exceeded in any two-month period for adult spasticity patients and patients with cervical dystonia.

More than one ineffective treatment course should occur before classification of a patient as a non-responder, because there are patients who continue to respond to therapy despite the presence of neutralising antibodies.

## 4.3 CONTRAINDICATIONS

BOTOX® (botulinum toxin type A) purified neurotoxin complex is contraindicated in individuals with known hypersensitivity to any ingredient in the formulation.

BOTOX® is contraindicated in patients with myasthenia gravis or Eaton Lambert Syndrome.

BOTOX® is contraindicated in the presence of infection at the proposed injection site(s).

### Bladder Dysfunction

Intradetrusor injection of BOTOX® is contraindicated in patients who have a urinary tract infection and in patients with acute urinary retention who are not routinely catheterising.

Due to the risk of urinary retention, intradetrusor injection of BOTOX® is also contraindicated in patients who are not willing and/or able to initiate catheterisation post-treatment, if required (see **Clinical Trials**).

## 4.4 SPECIAL WARNINGS AND PRECAUTIONS FOR USE

### Lack of interchangeability between botulinum toxin products

**DUE TO THE LACK OF AN INTERNATIONAL UNIT, BOTOX® IS NOT THERAPEUTICALLY EQUIVALENT TO ANY OTHER BOTULINUM TOXIN TYPE A PREPARATIONS. THE POTENCIES OF BOTOX® AND OTHER BOTULINUM TOXIN TYPE A PREPARATIONS ARE BASED ON DIFFERENT ASSAY METHODS. IN VIEW OF THIS LACK OF HARMONISATION OF UNIT SYSTEMS FOR BOTULINUM TOXIN TYPE A, EXTREME CAUTION IS REQUIRED IF IT SHOULD PROVE NECESSARY TO SUBSTITUTE THE BOTULINUM TYPE A TOXIN OF ONE PHARMACEUTICAL COMPANY BY ANOTHER. THE EFFECT OF ADMINISTERING DIFFERENT BOTULINUM NEUROTOXIN SEROTYPES AT THE SAME TIME OR WITHIN SEVERAL MONTHS OF EACH OTHER IS UNKNOWN. EXCESSIVE NEUROMUSCULAR WEAKNESS MAY BE**

**EXACERBATED BY ADMINISTRATION OF ANOTHER BOTULINUM TOXIN PRIOR TO THE RESOLUTION OF THE EFFECTS OF A PREVIOUSLY ADMINISTERED BOTULINUM TOXIN.**

**Spread of toxin effect**

Post-marketing safety data from BOTOX® and other approved botulinum toxins suggest that botulinum toxin effects may, in some cases, be observed beyond the site of local injection. The symptoms are consistent with the mechanism of action of botulinum toxin, have been reported hours to weeks after injection and may include muscular weakness, ptosis, diplopia, blurred vision, facial weakness, swallowing and speech disorders, constipation, aspiration pneumonia, difficulty breathing and respiratory depression. The risk of symptoms is probably greatest in children treated for spasticity but these symptoms can also occur in patients who have underlying conditions and co-morbidities that would predispose them to these symptoms including adults treated for spasticity and other conditions and are treated with high doses. Swallowing and breathing difficulties can be life threatening and there have been reports of death. Advise patients or caregivers to seek immediate medical attention if any of these symptoms occur.

**Pre-existing neuromuscular disorders**

Individuals with peripheral motor neuropathic diseases (e.g., amyotrophic lateral sclerosis or motor neuropathy) should only receive BOTOX® with extreme caution. Patients with neuromuscular junction disorders may be at increased risk of clinically significant systemic effects including severe dysphagia and respiratory compromise from typical doses of BOTOX®. Published medical literature has reported rare cases of administration of botulinum toxin to patients with known or unrecognised neuromuscular junction disorders where the patients have shown extreme sensitivity to the systemic effects of typical clinical doses. In some of these cases, dysphagia has lasted several months and required placement of a gastric feeding tube. When exposed to very high doses, patients with neurologic disorders, e.g. paediatric cerebral palsy or adult spasticity may also be at increased risk of clinically significant systemic effects.

**Hypersensitivity reactions**

Serious and/or immediate hypersensitivity reactions such as anaphylaxis and serum sickness have been rarely reported, as well as other manifestations of hypersensitivity including urticaria, soft tissue oedema and dyspnoea. Some of these reactions have been reported following the use of BOTOX® either alone or in conjunction with other products associated with similar reactions. If such a reaction occurs, further injection should be discontinued and appropriate medical therapy immediately instituted. One fatal case of anaphylaxis has been reported in which the patient died after being injected with BOTOX® inappropriately diluted with 5 mL of 1% lidocaine. The causal role of BOTOX®, lidocaine or both cannot be reliably determined.

The recommended dosages and frequencies of administration for BOTOX® should not be exceeded (see **4.2 Dose and method of administration**).

**Immunogenicity**

Formation of neutralising antibodies to botulinum toxin type A may reduce the effectiveness of BOTOX® treatment by inactivating the biological activity of the toxin. The critical factors

for neutralising antibody formation have not been well characterised. The potential for antibody formation may be minimised by injecting with the lowest effective dose given at the longest feasible intervals between injections.

**Cardiovascular System**

There have been reports of adverse events following administration of BOTOX® involving the cardiovascular system, including arrhythmia and myocardial infarction, some with fatal outcomes. Some of these patients had risk factors including pre-existing cardiovascular disease. The exact relationship of these events to BOTOX® has not been definitely established and will continue to be monitored by Abbvie Pty Ltd.

**General**

The safe and effective use of BOTOX® depends upon proper storage of the product, selection of the correct dose and proper reconstitution and administration techniques. Physicians administering BOTOX® should be familiar with the relevant anatomy of the area involved and any alterations to the anatomy due to prior surgical procedures. Care should be taken when injecting near vulnerable anatomic structures and direct injection into these structures must be avoided.

Serious adverse events including fatal outcomes have been reported in patients who had received BOTOX® injected directly into salivary glands, the oro-lingual-pharyngeal region, oesophagus and stomach. Some patients had pre-existing dysphagia or significant debility. Pneumothorax associated with injection procedure has been reported following the administration of BOTOX® near the thorax and therefore extreme caution is required when injecting in this area. Caution is warranted when injecting in proximity to the lung, particularly the apices. An understanding of standard electromyographical techniques may be useful for the treatment of hemifacial spasm, cervical dystonia (spasmodic torticollis) and for the treatment of dynamic equinus foot deformity due to spasticity in juvenile cerebral palsy patients.

Caution should be exercised when BOTOX® is used in the presence of inflammation at the proposed injection site(s) or when excessive weakness or atrophy is present in the target muscles.

As with any injection, procedure-related injury could occur. An injection could result in localised infection and pain, inflammation, paraesthesia, hypoaesthesia, tenderness, swelling/oedema, erythema and/or bleeding/bruising. Needle-related pain and/or anxiety have resulted in vasovagal responses, including transient symptomatic hypotension and syncope.

**Seizures**

New onset or recurrent seizures have been reported, typically in patients who are predisposed to experiencing these events. The exact relationship of these events to the BOTOX® injection has not been established. The reports in children were predominantly from cerebral palsy patients treated for spasticity.

**Human Albumin**

This product contains human serum albumin, a derivative of human blood. Based on effective donor screening and product manufacturing processes, it carries an extremely

remote risk for transmission of viral diseases. A theoretical risk for transmission of Creutzfeldt-Jakob disease (CJD) also is considered extremely remote. No cases of transmission of viral diseases or CJD have ever been identified for albumin.

**Bladder Dysfunction**

The intradetrusor administration of BOTOX® is only to be conducted by a urologist/urogynaecologist who has been trained in this highly specialised technique or by a urologist/urogynaecologist under the direct supervision of a urologist/urogynaecologist who has been so trained.

Appropriate medical caution should be exercised when performing a cystoscopy.

In patients who are not catheterising, BOTOX® may decrease their ability to fully empty the bladder due to the pharmacological mode of action on the detrusor contractions. Therefore, post-void residual urine volume should be assessed within 2 weeks post-treatment and periodically as medically appropriate up to 12 weeks in these patients. Patients should be instructed to contact their physician if they experience difficulties in voiding as catheterisation may be required. Patients who develop an increase in post-void residual urine and/or patients who start to catheterise may have an increased risk of developing urinary tract infections. Patients who are not catheterising need to be made aware of this prior to treatment.

Patients who are not catheterising and who subsequently develop a clinically relevant increase in post-void residual urine, may need to start to catheterise to achieve desired efficacy (See **Clinical Trials**).

**Overactive Bladder**

**Urinary Retention**

In double-blind, placebo-controlled trials in patients with overactive bladder (OAB), the proportion of subjects who initiated clean intermittent catheterisation (CIC) for urinary retention following treatment with BOTOX® or placebo is shown in Table 8 below. The duration of post-injection catheterisation for those who developed urinary retention is also shown.

**Table 8: Proportion of patients catheterising for urinary retention and duration of catheterisation following an injection in double-blind, placebo-controlled clinical trials in OAB**

| Timepoint | BOTOX® 100 U (N=552) | Placebo (N=542) |
|---|---|---|
| Proportion of Patients Catheterising for Urinary Retention | | |
| At any time during complete treatment cycle | 6.5% (n=36) | 0.4% (n=2) |
| Duration of Catheterisation for Urinary Retention (Days) | | |
| Median | 63 | 11 |
| Min, Max | 1, 214 | 3, 18 |

Patients with diabetes mellitus treated with BOTOX® were more likely to develop urinary

retention than those without diabetes, as shown in Table 9 below.

**Table 9: Proportion of patients experiencing urinary retention following an injection in double-blind, placebo-controlled clinical trials in OAB according to history of diabetes mellitus**

| | **Patients with Diabetes** | | **Patients without Diabetes** | |
|---|---|---|---|---|
| | BOTOX® 100 U (N=81) | Placebo (N=69) | BOTOX® 100 U (N=526) | Placebo (N=516) |
| Urinary retention | 12.3% (n=10) | 0 | 6.3% (n=33) | 0.6% (n=3) |

**Urinary Tract Infection**
BOTOX® increases the incidence of urinary tract infection (UTI) (see **4.8 Adverse Effects (Undesirable Effects)**). Clinical trials for overactive bladder excluded patients with more than 2 UTIs in the past 6 months and those taking antibiotics chronically due to recurrent UTIs. Use of BOTOX® for the treatment of overactive bladder in such patients and in patients with multiple recurrent UTIs during treatment should only be considered when the benefit is likely to outweigh the potential risk.

**Use in Males**
The pivotal studies in overactive bladder were not powered for a subgroup analysis based on gender, however a statistically significant treatment-by-gender interaction was demonstrated. No statistically significant benefit was demonstrated in males for incontinence frequency or on the Treatment Benefit Scale (see **Clinical Trials**). In men, 12.2% of the overall study population, mean incontinence was decreased by 0.42 episodes per day (by LS mean difference) relative to placebo (p=0.612) from a baseline of 5.6 episodes per day, whereas in women it was reduced by 2.0 episodes (p<0.001). The proportion of men who felt that treatment had led to improvement on the Treatment Benefit Scale was ~40% (p=0.060), with the attributable proportion being 15% (after subtracting the placebo response of 25%). Approximately 60% of men given BOTOX® for overactive bladder felt that their condition was unchanged or worsened after treatment. Men considering BOTOX® for overactive bladder should be made aware of the gender specific results, including potential risk of urinary tract infections (BOTOX® 9.5% vs placebo 2.6%) and urinary retention (BOTOX® 7.9% vs placebo 1.3%).

Men with overactive bladder and signs or symptoms of urinary obstruction should not be treated with BOTOX®.

Please refer to section **4.8 Adverse Effects (Undesirable Effects)**; sub-section **General** for local weakness or weakness of adjacent muscles.

**Neurogenic Detrusor Overactivity**

In these patients, autonomic dysreflexia associated with the procedure could occur which may require prompt medical therapy.

Placebo-controlled safety and efficacy data is limited to one cycle.

In patients who are not catheterising, BOTOX® may decrease their ability to fully empty the

bladder, therefore, post-void residual urine volume should be assessed within 2 weeks post-treatment and periodically as medically appropriate up to 12 weeks in these patients. Patients who are not catheterising and who subsequently develop a clinically relevant increase in post-void residual urine, may need to start to catheterise. Such patients may also have an increased risk of developing urinary tract infections. Patients who are not catheterising need to be made aware of this prior to treatment.

**Blepharospasm**

Reduced blinking following BOTOX® injection into the orbicularis muscle can lead to corneal exposure, persistent epithelial defect and corneal ulceration, especially in patients with cranial nerve VII disorders. One case of corneal perforation in an aphakic eye requiring corneal grafting has occurred because of this effect. Careful testing of corneal sensation in eyes previously operated upon, avoidance of injection into the lower medial lid area to avoid ectropion and vigorous treatment of any epithelial defect should be employed. This may require protective drops, ointment, therapeutic soft contact lenses or closure of the eye by patching or other means.

As a result of the anticholinergic activity of botulinum toxin, caution should be exercised when treating patients at risk for angle closure glaucoma, including patients with anatomically narrow angles. Acute angle closure glaucoma has been reported very rarely following periorbital injections of botulinum toxin.

**Strabismus**

BOTOX® is ineffective in chronic paralytic strabismus except to reduce antagonist contracture in conjunction with surgical repair. The efficacy of BOTOX® treatment in deviations over 50 prism dioptres, in restrictive strabismus, in Duane's syndrome with lateral rectus weakness and in secondary strabismus caused by prior surgical over-recession of the antagonist is doubtful. In order to enhance efficacy, multiple injections over time may be required.

During the administration of BOTOX® for the treatment of strabismus, retrobulbar haemorrhages sufficient to compromise retinal circulation have occurred from needle penetrations into the orbit. It is recommended that appropriate instruments to examine and decompress the orbit be accessible. Ocular (globe) penetrations by needles have also occurred. An ophthalmoscope to diagnose this condition should be available. Inducing paralysis in one or more extraocular muscles may produce spatial disorientation, double vision or past pointing. Covering the affected eye may alleviate these symptoms.

**Spasticity**

BOTOX® is a treatment of focal spasticity that has only been studied in association with usual standard of care regimens and is not intended as a replacement for these treatment modalities. BOTOX® treatment is not likely to be effective in improving range of motion at a joint affected by a known fixed contracture.

Identification of treatment goals and clinical examination to identify the specific muscles causing spasticity is necessary, and use of electromyography, muscle ultrasound or electrical

stimulation may facilitate the accuracy of the BOTOX® injections.

There have been rare spontaneous reports of death sometimes associated with aspiration pneumonia in children with severe cerebral palsy after treatment with botulinum toxin. Caution should be exercised when treating paediatric patients who have significant neurologic debility, dysphagia or have a recent history of aspiration pneumonia or lung disease.

BOTOX® should not be used for the treatment of focal lower limb spasticity in adult post-stroke patients if muscle tone reduction is not expected to result in improved function (e.g., improvement in gait) or improved symptoms (e.g., reduction in pain) or to facilitate care.

Caution should be exercised when treating adult patients with post-stroke spasticity who may be at increased risk of fall.

BOTOX® should be used with caution for the treatment of focal lower limb spasticity in elderly post-stroke patients with significant co-morbidity and treatment should only be initiated if the benefit of treatment is considered to outweigh the potential risk.

**Cervical Dystonia (Spasmodic Torticollis)**

**Dysphagia and breathing difficulties**

Treatment with BOTOX® and other botulinum toxin products can result in swallowing or breathing difficulties. Patients with pre-existing swallowing or breathing difficulties may be more susceptible to these complications. In most cases, this is a consequence of weakening of muscles in the area of injection that are involved in breathing or swallowing. When distant effects occur, additional respiratory muscles may be involved. Deaths as a complication of severe dysphagia have been reported after treatment with botulinum toxin. Dysphagia may persist for several months and require use of a feeding tube to maintain adequate nutrition and hydration. Aspiration may result from severe dysphagia and is a particular risk when treating patients in whom swallowing or respiratory function is already compromised.

Treatment of cervical dystonia with botulinum toxins may weaken neck muscles that serve as accessory muscles of ventilation. This may result in a critical loss of breathing capacity in patients with respiratory disorders who may have become dependent upon these accessory muscles. There have been post-marketing reports of serious breathing difficulties, including respiratory failure, in cervical dystonia patients. Patients with smaller neck muscle mass and patients who require bilateral injections into the sternocleidomastoid muscle have been reported to be at greater risk for dysphagia. Limiting the dose injected into the sternocleidomastoid muscle may reduce the occurrence of dysphagia. Injections into the levator scapulae may be associated with an increased risk of upper respiratory infection and dysphagia.

Patients treated with botulinum toxin may require immediate medical attention should they develop problems with swallowing, speech or respiratory disorders. These reactions can occur within hours to weeks after injection with botulinum toxin.

**Primary Hyperhidrosis of the Axillae**

Patients should be evaluated for potential causes of secondary hyperhidrosis (e.g. hyperthyroidism, phaeochromocytoma) to avoid symptomatic treatment of hyperhidrosis without the diagnosis and/or treatment of the underlying disease.

**Spasmodic Dysphonia**

The diagnosis of spasmodic dysphonia should also be established by a multidisciplinary approach including neurological, ENT and speech pathology assessment. Laryngoscopy (preferably by a nasendoscope) is mandatory during the diagnostic evaluation to exclude other structural disorders of the larynx causing any form of dysphonia and to observe the nature of the hyperadductive or hyperabductive movements.

In general, treatment of spasmodic dysphonia with BOTOX® injections should not be administered in pregnant or breastfeeding women. It should be avoided in patients who are due to have elective surgery requiring general anaesthetic as BOTOX® relaxes the vocal cords, potentially increasing the risk of peri-operative aspiration etc. It is recommended that this procedure be carried out by appropriately trained physicians in facilities prepared to manage reflex stridor should it occur in association with the procedure.

**Upper Facial Rhytides (Forehead Lines, Crow's Feet and Glabellar Lines)**

Reduced blinking from BOTOX® injection of the orbicularis oculi muscle can lead to corneal exposure, persistent epithelial defects and corneal ulceration, especially in patients with cranial nerve VII disorders. Caution should be used when BOTOX® treatment is used in patients who have an inflammation at the injection site, marked facial asymmetry, ptosis, excessive dermatochalasis, deep dermal scarring, thick sebaceous skin or the inability to substantially lessen glabellar lines by physically spreading them apart.

**Chronic Migraine**

Due to the difficulties in establishing a diagnosis of chronic migraine, patients being considered for prophylaxis of headaches with BOTOX® should be evaluated by a neurologist or pain management specialist prior to receiving treatment with BOTOX®. The use of BOTOX® for prophylaxis of headaches in adults with chronic migraine has been assessed for 3 cycles over 32 weeks. No long-term safety or efficacy data for this indication are available. Patients who do not have an adequate response after 2 treatment cycles should not continue treatment. Patients should not receive more than 3 cycles of treatment prior to an assessment of the need for further treatment.

The safety and effectiveness of BOTOX® have not been established for the prophylaxis of headaches in adults with episodic migraine (14 headache days or fewer per month) or tension-type headache.

**Use in the elderly**

The reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range.

**Overactive Bladder**

Of 1242 patients in placebo-controlled clinical studies of BOTOX®, 41.4% (n=514) were 65 years of age or older and 14.7% (n=l82) were 75 years of age or older. No overall difference in the safety profile following BOTOX® treatment was observed between patients aged 65 years and older compared to younger patients in these studies, with the exception of urinary tract infection. In the placebo group, the incidence of urinary tract infection was higher in patients 65 years of age or older compared to younger patients (15.2% vs. 6.6%, respectively). The incidence was also higher in patients 65 years and older who were given BOTOX® compared to younger patients (33.1% vs. 21.2%, respectively). No overall difference in effectiveness was observed between these age groups in placebo-controlled pivotal clinical studies.

**Table 10: Incidence of urinary tract infection and urinary retention according to age group during first placebo-controlled treatment, placebo-controlled clinical trials in patients with OAB**

| | <65 Years | | 65 to 74 Years | | ≥75 Years | |
|---|---|---|---|---|---|---|
| Adverse Reactions | BOTOX® 100 U (N=344) | Placebo (N=348) | BOTOX® 100 U (N=169) | Placebo (N=151) | BOTOX® 100 U (N=94) | Placebo (N=86) |
| Urinary tract infection | 73 (21%) | 23 (7%) | 51 (30%) | 20 (13%) | 36 (38%) | 16 (19%) |
| Urinary retention | 21 (6%) | 2 (0.6%) | 14 (8%) | 0 (0%) | 8 (9%) | 1 (1%) |

**Paediatric use**

The safety and effectiveness of BOTOX® in indications other than those described for the paediatric population in section 4.1 have not been established. No recommendation on posology can be made for indications other than focal spasticity associated with paediatric cerebral palsy. Currently available safety data per indication are described in sections 4.4 and 4.8 as shown in the table below.

**Table 11: Currently available safety data by indication**

| | |
|---|---|
| Strabismus | 12 years (see section 4.4 and 4.8) |
| Blepharospasm/Hemifacial spasm | 12 years (see section 4.4 and 4.8) |
| Cervical dystonia | 16 years (see section 4.4 and 4.8) |
| Spasmodic dysphonia | 12 years (see section 4.4 and 4.8) |
| Focal spasticity | 2 years (see section 4.2, 4.4 and 4.8) |
| Severe primary hyperhidrosis of the axillae | 12 years (see section 4.4 and 4.8) |

There have been rare spontaneous reports of death sometimes associated with aspiration pneumonia in children with severe cerebral palsy after treatment with botulinum toxin including following off-label use (e.g. neck area). Some of these patients had risk factors including significant neuromuscular debility, dysphagia, aspiration pneumonia, seizures and cardiovascular disease. Post-marketing reports of possible distant effects from the site of injection have been very rarely reported in paediatric patients with co-morbidities, predominately with cerebral palsy who received >8 U/kg. Extreme caution should be exercised when treating paediatric patients who have significant neurologic debility, dysphagia or have a recent history of aspiration pneumonia or lung disease.

New onset or recurrent seizures have also been reported, typically in children who are pre-disposed to experiencing these events. The exact relationship of these events to the BOTOX® injection has not been established.

**Effects on laboratory tests**
There were no significant differences in routine laboratory variables between the placebo and BOTOX® groups in patients receiving doses up to 360 U, for the treatment of cervical dystonia.

**Information for patients**
Patients should be informed that the BOTOX® Consumer Medicines Information leaflet is available and must be provided to them by prescribers.

If BOTOX® is used during pregnancy or if the patient becomes pregnant while being treated with BOTOX®, the patient should be apprised of the potential risks, including abortion, seen in animal studies.

Patients with cervical dystonia (spasmodic torticollis) should be informed of the possibility of experiencing dysphagia which may be very mild but could be severe. Consequent to the dysphagia, there is the potential for aspiration and/or dyspnoea. In rare cases, tube feeding, aspiration pneumonia and death have been reported. Dysphagia may persist for two to three weeks after injection but has been reported to last up to five months post-injection. Patients or caregivers should be advised to seek immediate medical consultation if swallowing, speech or respiratory disorders arise.

After bladder injections for urinary incontinence, patients should be instructed to contact their physician if they experience difficulties in voiding as catheterisation may be required. Patients not already catheterising prior to BOTOX® bladder injections, should be advised to attend a clinic visit approximately 2 weeks after the procedure for measurement of their post-void residual volume.

Patients who are not catheterising and who subsequently develop a clinically relevant increase in post-void residual urine, may need to start to catheterise to achieve desired efficacy (see **Clinical Trials**).

## 4.5 INTERACTIONS WITH OTHER MEDICINES AND OTHER FORMS OF INTERACTIONS

The effect of botulinum toxin may be potentiated by aminoglycoside antibiotics or spectinomycin or any other drugs that interfere with neuromuscular transmission (e.g. tubocurarine-type muscle relaxants). Caution should be exercised when BOTOX® is used with aminoglycosides (e.g. streptomycin, tobramycin, neomycin, gentamycin, netilmycin, kanamycin, amikacin), spectinomycin, polymyxins, tetracyclines, lincomycin or any other drugs which interfere with neuromuscular transmission.

No specific tests have been carried out to establish the possibility of clinical interaction with medicinal products. No drug interactions of clinical significance have been reported.

The effect of administering different botulinum neurotoxin serotypes at the same time or within several months of each other is unknown. Excessive weakness may be exacerbated by administration of another botulinum toxin prior to the resolution of the effects of a previously administered botulinum toxin.

## 4.6 FERTILITY, PREGNANCY AND LACTATION

**Effects on fertility**

Intramuscular BOTOX® doses of 4 U/kg (males) and 8 U/kg (females) did not affect rat fertility. Decreased fertility occurred with higher doses, which also resulted in signs of toxicity. The relevance of these findings to human fertility is not known.

**Use in pregnancy:** Pregnancy Category B3

There are no adequate data regarding the use of botulinum toxin type A in pregnant women. Studies in animals have shown reproductive toxicity. The potential risk for humans is unknown. BOTOX® should not be used during pregnancy unless the benefits clearly outweigh the potential risks. If the use of BOTOX® is determined to be warranted during pregnancy or if the patient becomes pregnant whilst being treated with BOTOX®, the patient should be apprised of the potential risks.

There was no evidence of teratogenicity in animal studies. Intramuscular administration of BOTOX® to mice and rats during the period of organogenesis reduced dam weight gain and foetal ossification (4 U/kg); higher doses (8 or 16 U/kg) were associated with reductions in foetal body weights and/or delayed ossification. Intramuscular administration to rabbits twice during the period of organogenesis resulted in abortions (2 U/kg) and maternal deaths (4 and 6 U/kg), while daily intramuscular administration during organogenesis resulted in reduced foetal weights (0.25 and 0.5 U/kg) and increased resorptions (0.5 U/kg); the no-effect dose was 0.125 U/kg, although all doses were maternotoxic. Intramuscular treatment of rats with a maternotoxic dose of BOTOX® (16 U/kg) twice during gestation and once during lactation resulted in increased post-implantation loss and reduced pup weights but post-weaning pup development was unaffected. The significance of the adverse findings in animals for clinical risk is uncertain.

**Use in lactation**

There is no information on whether BOTOX® is excreted in human milk. The use of BOTOX® during lactation is not recommended.

## 4.7 EFFECTS ON ABILITY TO DRIVE AND USE MACHINES

Asthenia, muscle weakness, dizziness and visual disturbance have been reported after treatment of BOTOX® and could make driving or using machines dangerous.

## 4.8 ADVERSE EFFECTS (UNDESIRABLE EFFECTS)

**General**

In general, adverse events occur within the first few days following injection of BOTOX® and while generally transient may have duration of several months or, in rare cases, longer. As is expected for any injection procedure, localised pain, inflammation, paraesthesia, hypoaesthesia, tenderness, swelling/oedema, erythema, localised infection, bleeding and/or

bruising have been associated with the injection. Needle-related pain and/or anxiety have resulted in vasovagal responses, including transient symptomatic hypotension and syncope.

Local weakness represents the expected pharmacological action of botulinum toxin in muscle tissue. However, weakness of adjacent muscles and/or muscles remote from the site of injection has been reported.

**Overactive Bladder**

Table 12 presents the most frequently reported adverse reactions in double-blind, placebo-controlled, pivotal Phase 3 studies within 12 weeks of injection for overactive bladder.

**Table 12: Adverse reactions reported by ≥1% of BOTOX®-treated patients and more frequent than in placebo-treated patients within the first 12 weeks, in double-blind, placebo-controlled, pivotal Phase 3 clinical trials**

| Adverse Reactions by System Organ Class | BOTOX® 100 U (N=552) | Placebo (N=542) |
|---|---|---|
| **Infections and infestations** | | |
| Urinary tract infection | 17.9% | 5.5% |
| Bacteriuria | 4.3% | 2.0% |
| **Renal and urinary disorders** | | |
| Dysuria | 9.1% | 6.6% |
| Urinary retention | 5.6% | 0.4% |
| **Investigations** | | |
| Residual urine volume* | 3.1% | 0.2% |

*Elevated PVR not requiring catheterisation

During the complete treatment cycle, the following adverse reactions with BOTOX® 100 U were reported: urinary tract infections (25.5%), dysuria (10.9%), bacteriuria (8.0%), urinary retention (5.8%), residual urine volume (3.4%) and pollakiuria (2.0%).

The following table presents the BOTOX®-treated patients and placebo-treated patients who initiated CIC at week 12 and anytime during treatment cycle 1.

**Table 13: Catheterisation rates at week 12 and anytime during treatment cycle 1**

| | BOTOX® 100 U | Placebo |
|---|---|---|
| At Week 12 | 4.0% (22/547) | 0.0% (0/535) |
| Anytime during Treatment cycle 1 | 6.5% (36/552) | 0.4% (2/542) |

Urinary tract infections were increased in patients who initiated CIC and those who had post void residual volumes ≥200 mL. The following table presents a summary of UTI rates by CIC status and post-void residual urine volume during the first 12 weeks.

**Table 14: Urinary tract infection rates by CIC status and post-void residual urine volume during the first 12 weeks of treatment cycle 1**

| | BOTOX® 100 U | Placebo |
|---|---|---|
| Initiated CIC | 39.6% (19/48) | 12.5% (1/8) |
| Did not initiate CIC | 15.9% (80/504) | 5.4% (29/534) |
| PVR urine ≥ 200 mL | 34.5% (20/58) | 0.0% (0/4) |
| PVR urine < 200 mL | 16.0% (79/494) | 5.6% (30/538) |

CIC = clean intermittent catheterisation; PVR = post-void residual

A higher incidence of urinary tract infection was observed in patients with diabetes mellitus treated with BOTOX® 100 U and placebo than in patients without diabetes, as shown in Table 15 below.

**Table 15: Proportion of patients experiencing urinary tract infection following an injection in double-blind, placebo-controlled clinical trials in OAB according to history of diabetes mellitus**

| | Patients with Diabetes | | Patients without Diabetes | |
|---|---|---|---|---|
| | BOTOX® 100 U (N=81) | Placebo (N=69) | BOTOX® 100 U (N=526) | Placebo (N=516) |
| Urinary tract infection (UTI) | 25 (31%) | 8 (12%) | 135 (26%) | 51 (10%) |

Events considered to be procedure-related by the investigator reported at any time following initial injection were dysuria (5.8%) and haematuria (2.2%).

Based on an ongoing open-label extension study, no change was observed in the overall safety profile with repeat dosing.

**Neurogenic Detrusor Overactivity**

Table 16 presents the most frequently reported adverse reactions in the double-blind, placebo-controlled clinical studies within 12 weeks of injection for neurogenic detrusor overactivity.

**Table 16: Adverse reactions reported by ≥1% of BOTOX®-treated patients and more frequent than in placebo-treated patients within the first 12 weeks, in double-blind, placebo-controlled clinical trials**

| Adverse Reactions by System Organ Class | BOTOX® 200 U (N=262) | Placebo (N=272) |
|---|---|---|
| **Infections and infestations** | | |
| Urinary tract infection | 24.4% | 17.3% |
| **Renal and urinary disorders** | | |
| Urinary retention | 17.2% | 2.9% |
| **General disorders and administration site conditions** | | |
| Fatigue | 3.8% | 1.1% |
| **Psychiatric disorders** | | |
| Insomnia | 1.5% | 0% |

The following rates with BOTOX® 200 U were reported during the complete treatment cycle (median duration of 44 weeks of exposure): urinary tract infections (49.2%), urinary retention (17.2%), fatigue (6.1%) and insomnia (3.1%).

In these neurogenic patients, the following additional adverse reactions were reported during the complete treatment cycle: constipation (4.2%), muscular weakness (3.8%), fall (3.1%), gait disturbance (2.7%), muscle spasm (2.3%) and bladder diverticulum (1.1%). Procedure-related events in the 200 U BOTOX® group included: haematuria (3.8%), dysuria (2.3%) and autonomic dysreflexia (1.5%).

No change was observed in the overall safety profile with repeat dosing.

In the multiple sclerosis (MS) patients enrolled in the pooled pivotal studies, the annualised MS exacerbation rate (i.e., number of MS exacerbation events per patient-year) was 0.23 for BOTOX® and 0.20 for placebo. The annualised MS exacerbation rates reported in the individual studies, showed differing trends between the two pivotal studies: 0.14 for BOTOX® and 0.22 for placebo for study 191622-515 and 0.36 for BOTOX® and 0.19 for placebo for study 191622-516.

Among patients who were not catheterising at baseline prior to treatment, catheterisation was initiated in 38.9% following treatment with BOTOX® 200 U versus 17.3% on placebo.

In the pivotal studies of neurogenic detrusor overactivity, in the subgroup not using catheterisation at baseline, only 10.1 % of placebo recipients had commenced catheterisation at Week 12, compared to 25.5% of the 200 U group. Urinary tract infections were increased in patients who developed elevated residual volumes, even if they did not commence catheterisation.

The following table presents a summary of UTI rates by pre- and post-treatment CIC status and post-void residual urine volume during the first 12 weeks.

**Table 17: Summary of UTI rates by pre- and post-treatment CIC status and post-void residual urine volume during the first 12 weeks**

| **CIC Status** | | **BOTOX® 200 U** | **Placebo** |
|---|---|---|---|
| **Pre-treatment** | **Post-treatment** | | |
| **Using CIC** | **Using CIC**[a] | 22.0% (29/132) | 20.7% (29/140) |
| **Not Using CIC** | **Using CIC** | 40.4% (19/47) | 11.9% (5/42) |
| | **Not Using CIC** | 21.3% (13/61) | 16.4% (10/61) |
| | **Not Using CIC and PVR urine ≥ 200 mL** | 32.0% (8/25) | 0.0% (0/5) |
| | **Not Using CIC and PVR urine < 200 mL** | 13.9% (5/36) | 17.9% (10/56) |

CIC = clean intermittent catheterisation; PVR = post-void residual
[a] Patients who were using CIC pre-treatment continued to use it post-treatment

**Chronic Migraine**
Safety data were compiled from two chronic migraine double-blind, placebo-controlled studies involving 687 patients treated with BOTOX®. The following adverse reactions were reported.

**Table 18: Adverse reactions reported by ≥1% of BOTOX®-treated patients and more frequent than in placebo-treated patients in two chronic migraine double-blind, placebo-controlled clinical trials**

| Adverse Reactions | BOTOX® N=687 | Placebo N=692 |
|---|---|---|
| **Nervous system disorders** | | |
| Headache | 32 (4.7%) | 22 (3.2%) |
| Migraine | 26 (3.8%) | 18 (2.6%) |
| Facial paresis | 15 (2.2%) | 0 (0.0%) |
| **Eye disorders** | | |
| Eyelid ptosis | 25 (3.6%) | 2 (0.3%) |
| **Musculoskeletal and connective tissue disorders** | | |
| Neck pain | 60 (8.7%) | 19 (2.7%) |
| Musculoskeletal stiffness | 25 (3.6%) | 6 (0.9%) |
| Muscular weakness | 24 (3.5%) | 2 (0.3%) |
| Myalgia | 21 (3.1%) | 6 (0.9%) |
| Musculoskeletal pain | 18 (2.6%) | 10 (1.4%) |
| Muscle spasms | 13 (1.9%) | 6 (0.9%) |
| Muscle tightness | 9 (1.3%) | 3 (0.4%) |
| **General disorders and administration site conditions** | | |
| Injection site pain | 23 (3.3%) | 14 (2.0%) |
| **Skin and subcutaneous tissue disorders** | | |
| Pruritus | 7 (1.0%) | 2 (0.3%) |
| Rash | 7 (1.0%) | 6 (0.9%) |

Migraine, including worsening migraine, was reported in 3.8% of BOTOX® and 2.6% of placebo (saline) patients, typically occurring within the first month after treatment. These reactions did not consistently reoccur with subsequent treatment cycles and the overall incidence decreased with repeated treatments.

Other adverse reactions reported more frequently in the BOTOX® group compared to the placebo group at a frequency less than 1% include: dysphagia, pain in jaw and pain of skin.

The discontinuation rate due to adverse events in these Phase 3 trials was 3.8% for BOTOX® vs. 1.2% for placebo (saline).

**Blepharospasm**
In clinical studies of 1684 patients who received 4258 treatments (involving multiple injections) for blepharospasm, the incidence rates of adverse reactions per treated eye are listed below:

**Table 19. Incidence rates incurred during the treatment for blepharospasm**

| | |
|---|---|
| Ptosis | 11.0% |
| Irritation/tearing (includes dry eye, lagophthalmos and photophobia) | 10.0% |
| Ectropion, keratitis, diplopia and entropion were reported rarely | <1.0% |

Ecchymosis occurs easily in the soft eyelid tissues. This can be prevented by applying pressure at the injection site immediately after the injection.

Diffuse skin rash and local swelling of the eyelid skin lasting for several days following eyelid injection were reported infrequently in clinical studies.

In two cases of VIIth nerve disorder (one case of an aphakic eye) reduced blinking from BOTOX® injection of the orbicularis muscle led to serious corneal exposure, persistent epithelial defect and corneal ulceration. Perforation requiring corneal grafting occurred in one case, an aphakic eye. Avoidance of injection into the lower lid area to avoid ectropion may reduce this hazard. Vigorous treatment of any corneal epithelial defect should be employed. This may require protective drops, ointment, therapeutic soft contact lenses or closure of the eye by patching or other means.

Two patients previously incapacitated by blepharospasm experienced cardiac collapse attributed to over-exertion within three weeks following BOTOX® therapy. Sedentary patients should be cautioned to resume activity slowly and carefully following the administration of BOTOX®.

Acute angle closure glaucoma has been reported very rarely following periorbital injections of botulinum toxin (see **4.4 Special warnings and precautions for use**).

**Strabismus**

In a clinical investigation of botulinum toxin use in strabismus over a 9-year period, the incidence rates (% injections) of adverse events from 8300 injections are reported. The total number of patients who received the injections is not reported.

Effects on adjacent muscles: the incidence of partial ptosis and vertical deviation were 16% and 17% respectively. Complete ptosis was rare. In one series, slight residual ptosis (0.16%) and induced vertical deviation of greater than two prism dioptres (2%) persisted for 6 months or longer.

Retrobulbar haemorrhage (0.2%) occurred without visual loss. Decompression of the orbit after five minutes was performed to restore retinal circulation in one case.

Scleral perforation (0.11%): these tended to occur in myopic eyes and at a prior surgical site. A vitreous haemorrhage occurred in one patient which reduced vision for several months before clearing. In another patient, a reduction in vision from 20/25 to 20/30 was reported.

Pupillary dilation (0.06%): at least two of these were consistent with ciliary ganglion damage (Adie's pupil).

Past pointing and spatial disorientation may result from inducing paralysis in one or more

extraocular muscles. Covering the affected eye may alleviate these symptoms.

Diplopia is common after treatment in patients with good vision in both eyes. Diplopia in adults can be managed by patching. In one case, diplopia appeared to be permanent due to loss of suppression.

No systemic paralytic effect has been seen or suspected in any patient treated with the small doses used for strabismus.

Variation in incidence rates of the most frequently observed effects, ptosis and vertical deviation per patient, have also been reported in other retrospective observational studies.

There is no obvious explanation for the substantial variation. In the literature, 3 different studies evaluating BOTOX® for the treatment of strabismus (n=266) indicated percent incidence of ptosis occurred in a range of 30% to 37% of injections or 37% of patients.

Vertical deviation was reported in 42% of injections or from 10% to 34% of patients. Other studies have shown side effects such as sub-conjunctival and conjunctival haemorrhages to be fairly common. There have also been infrequent reports of headache, cycloplegia, ocular vertigo and corneal irritation. In one study, 5/45 (11.1%) patients were shown to exhibit an increase in intra-ocular pressure which was reversible.

**VIIth Nerve Disorders (Hemifacial Spasm)**
Adverse effects reported after injection of BOTOX® have included blurring of vision, facial droop, dizziness and tiredness, in addition to those listed above.

**Focal Spasticity in Children Two Years and Older**
The safety of BOTOX® used for the treatment of focal spasticity was evaluated from clinical studies for the treatment of dynamic equinus foot deformity, upper limb spasticity and lower limb spasticity. As is expected for any intramuscular injection procedure, localised pain, discomfort, bruising and oedema was associated with the injection in these patients. All treatment-related adverse events were mild to moderate in severity and were self-limiting.

In children treated for upper limb spasticity, the most frequently reported treatment related adverse events included local and general weakness, trigger finger, clumsiness, hypokinesia, falling and increased frequency of micturition, joint dislocation and muscle spasms. The percent of patients who experienced these events at least once during the study are summarised below:

**Table 20: Adverse events reported in children treated for upper limb spasticity**

| | **BOTOX® (N=74)** |
|---|---|
| Muscular weakness, local | 5.4% |
| Muscular weakness, general | 2.7% |
| Trigger finger | 2.7% |
| Clumsiness | 1.4% |
| Falling | 1.4% |
| Hypokinesia | 1.4% |
| Increased frequency of micturition | 1.4% |

| | |
|---|---|
| Joint dislocation | 1.4% |
| Muscle spasms | 1.4% |

Other adverse events reported commonly or very commonly in these studies were convulsions, nasopharyngitis, influenza, pneumonia, vomiting, joint dislocation, contusion, injection site discomfort, injection site bruising and injection site pain.

In children treated for dynamic equinus foot deformity due to spasticity in juvenile cerebral palsy, the adverse events most frequently reported were treatment-related included falling, leg pain, leg (local) weakness and general weakness. The percent of patients who experienced these events at least once during the study are summarised below:

**Table 21: Most frequently reported adverse events reported in children treated for dynamic equinus foot deformity.**

| | **BOTOX® (N=215)** |
|---|---|
| Falling | 9.3% |
| Leg Pain | 2.3% |
| Weakness, local | 2.3% |
| Weakness, general | 2.3% |

Falling may be attributable to a change in ankle position and gait pattern and/or local weakness. Local weakness represents the expected pharmacological action of botulinum toxin.

Other treatment-related adverse reactions reported in 1% of patients were: leg cramps, fever, knee pain, ankle pain, pain at the injection site post-treatment and lethargy. Urinary incontinence has also been reported.

Viral infection and ear infection have very commonly been reported and rash, somnolence, gait disturbance, paraesthesia, myalgia and malaise have commonly been reported in children treated for focal spasticity with BOTOX® injection.

In children treated for spasticity of the hip adductor muscles, there were no adverse events reported in the studies evaluated.

**Focal Spasticity in Adults**

The safety of BOTOX® was evaluated in a total of 1330 unique patients who received treatment for upper limb spasticity in which 658 patients were from double-blind placebo-control studies. In general, the majority of adverse events reported were mild to moderate in severity and were typically self-limiting.

**Table 22: BOTOX® Adverse Drug Reactions: Upper Limb Spasticity Adult Patients**

| **System Organ Class** | **Preferred Term** | **Frequency** |
|---|---|---|
| Gastrointestinal disorders | Nausea | Common |
| Musculoskeletal and connective tissue disorders | Pain in extremity, muscular weakness | Common |

| | | |
|---|---|---|
| General disorders and administration site conditions | Fatigue, oedema peripheral | Common |

No change was observed in the overall safety profile with repeat dosing.
Injection of BOTOX® for spasticity of the upper limb in patients with decreased pulmonary function has been associated with small but statistically significant decreases in forced vital capacity (FVC) and/or forced expiratory volume 1 second (FEV1) that were subclinical and were not correlated with any adverse clinical pulmonary reactions.

The treatment of the shoulder should be guided by a specialist with consideration of the benefit-risk balance particularly for patients at risk for or with existing respiratory compromise or weakness.

The safety of BOTOX® was evaluated in 82 patients who received a single treatment for lower limb spasticity associated with stroke in either a double-blind or an open-label study. The following treatment-related adverse events were reported: accidental injury (1.2%), incoordination (1.2%) and paraesthesia (1.2%). Adverse events reported were mild to moderate in severity.

Of the 56 patients who received BOTOX® in the double-blind phase of the study, 44 went on to receive a second injection in the open-label study. Additional treatment-related adverse reactions reported were: hypertonia (4.5%), asthenia (2.3%), headache (2.3%) and hyperkinesia (2.3%).

The most frequently reported adverse reactions identified in additional studies for adult lower limb spasticity, including Study 191622-116, reported by >1% of BOTOX®-treated patients and more frequent than in placebo-treated patients in adult lower limb spasticity double-blind, placebo-controlled clinical trials are displayed below:

**Table 23: Adverse events identified in additional studies for adult lower limb spasticity treatment**

| **Adverse Reactions by System Organ Class** | **All BOTOX® (N=538)** | **Placebo (N=422)** |
|---|---|---|
| **General disorders and administration site conditions**<br>- Peripheral oedema | 13 (2.4%) | 5 (1.2%) |
| **Musculoskeletal and connective tissue disorders**<br>- Arthralgia | 19 (3.5%) | 5 (1.2%) |

**Cervical Dystonia (Spasmodic Torticollis)**
The following adverse events were reported following BOTOX® treatment for cervical dystonia. Patients received an average dose of 155 U (range 100-300 U).

**Table 24: Adverse events reported following BOTOX® treatment for cervical dystonia**

| Adverse Event | BOTOX® (N=131) |
|---|---|
| **Body as a whole** | |
| - neck pain | 5.3% |
| - asthenia | 3.1% |
| - headache | 1.5% |
| - pain at injection site | 1.5% |
| **Digestive system** | |
| - dysphagia | 12.2% |
| **Muscular system** | |
| - muscle weakness | 0.8% |

Dysphagia was the most commonly reported adverse event after treatment with BOTOX®. Dysphagia and symptomatic general weakness may be attributable to an extension of the pharmacology of BOTOX® resulting from the spread of the toxin outside the injected muscles. Dysphagia is usually reported as mild to moderate severity in most patients. However, in an occasional patient it may be associated with more severe problems. Limiting the dose injected into the sternocleidomastoid muscle to less than 100 U may decrease the occurrence of dysphagia (see **4.4 Special warnings and precautions for use**).

Neck pain due to BOTOX® injection may be due to a change in resting tone for the contralateral muscles or other muscles not previously affected by dystonia. In rare instances, neck pain has been severe. Dysphonia has also been reported in the literature for patients who have been treated for cervical dystonia. Rhinitis has also been reported.

Common adverse events reported in other clinical trials conducted for the treatment of cervical dystonia include: upper respiratory tract infection, dizziness, hypertonia, hypoaesthesia, somnolence, headache, dry mouth, nausea, musculoskeletal stiffness, asthenia, malaise and influenza-like illness.

Uncommon adverse events reported in other clinical trials conducted for the treatment of cervical dystonia include: diplopia, eyelid ptosis, dyspnoea and pyrexia.

**Primary Hyperhidrosis of the Axillae**

The safety of BOTOX® was evaluated in 287 patients who received at least 1 treatment exposure of primary hyperhidrosis of the axillae in double-blind and open-label studies. Adverse events reported as treatment related in greater than 1% of BOTOX®-treated patients are listed in decreasing order of incidence: perceived increase in non-axillary sweating (4.5%), injection site pain (1.7%), pain (1.4%) and vasodilation (hot flushes) (1.0%). Two of 207 subjects (1.0%) who received repeated injections of BOTOX® developed transient arm weakness. Body odour has also been reported.

Common adverse events reported in other clinical trials conducted for the treatment of primary hyperhidrosis of the axillae include: headache, paraesthesia, nausea, pruritus, subcutaneous nodule, alopecia, pain in extremity, injection site oedema, injection site haemorrhage, injection site hypersensitivity, injection site irritation and asthenia.

**Spasmodic Dysphonia**

In the largest series reported of BOTOX® treatment for this disorder common adverse events after treatment with BOTOX® were breathy dysphonia (47.6% of all treatment sessions), dysphagia (14.9%) and aspiration (5.9%) for adductor spasmodic dysphonia and dysphagia (11.2%) and stridor (6.9%) for abductor dysphonia.

In another large trial of 169 patients with spasmodic dysphonia, the following adverse events were recorded in ≥1 of 1093 BOTOX® treatments. Paralytic dysphonia (breathy dysphonia) in 338/1093 (31%) treatments (mild 139, moderate 114, severe 73, very severe 12), technical failure in 90/1093 (8%) treatments, dysphagia in 38/1093 (3%) treatments (mild 17, moderate 15, severe 4, very severe 2), pain in 13/1093 (1%) treatments (mild 5, moderate 6, severe 2), gagging in 6/1093 (0.5%) treatments (mild 3, moderate 3), diplophonia in 3/1093 treatments, flu-like symptoms in 2/1093 treatments of moderate severity and persistent cough in 2/1093 treatments.

**Glabellar Lines**

Safety of BOTOX® for the treatment of glabellar lines was evaluated in two multicentre, double-blind, placebo-controlled, parallel-group studies (n=535; 405 in the BOTOX®-treated group and 130 in the placebo-treated group). Most adverse events reported were of mild to moderate severity and all were transient. The most frequently reported treatment-related adverse events were headache (9.4% in the BOTOX® group and 12.3% in the placebo group) and blepharoptosis (3.2% in the BOTOX® group and 0% in the placebo group). Blepharoptosis is consistent with the pharmacologic action of BOTOX® and may be injection technique-related.

Adverse events reported as treatment related in 1-3% of BOTOX®-treated patients, listed in decreasing order of incidence were: injection site pain/burning/stinging (2.5%), face pain (2.2%), erythema (1.7%), local muscle weakness (1.7%), injection site oedema (1.5%), ecchymosis (1.0%), skin tightness (1.0%), paraesthesia (1.0%) and nausea (1.0%).

**Crow's Feet**

The safety of BOTOX® for the treatment of crow's feet was evaluated in two multicentre, double-blind, placebo-controlled, parallel group studies (246 in the BOTOX®-treated groups (6 U to 18 U/side) and 80 in the placebo-treated group). Most adverse events reported were of mild to moderate severity and all were transient. The most frequently reported treatment-related adverse events were injection site haemorrhage i.e. bruising at the injection site (8.1% in the BOTOX® 6 U to 18 U/side groups and 10.0% in the placebo group) and headache (3.7% in the BOTOX® 6 U to 18 U/side groups and 2.5% in the placebo group). Flu syndrome was reported in 1.6% of BOTOX®-treated patients (6 U to 18 U/side) and in none of the placebo-treated patients. All other adverse events reported as treatment-related in the BOTOX® groups were reported in less than 1% of patients.

Other studies have reported the incidence of injection site bruising to be between 4-25% of BOTOX®-treated patients, with similar rates noted for placebo. Other adverse events related to BOTOX® treatment included temporary droop of the lateral portion of the lower eyelid (5%), which is consistent with the pharmacologic action of BOTOX® and may be injection technique-related.

**Forehead Lines**
In a clinical study where BOTOX® was administered to 59 patients with horizontal forehead lines (8 U to 24 U into frontalis), the following treatment related adverse events were reported: headache (22.0%), bruising (10.2%), eyebrow ptosis (10.2%), eyelid swelling (20.3%), aching/itching forehead (5.1%), nausea (3.4%), feeling of tension (1.7%), flu-like symptoms/cold (1.7%) and other (6.8%). All adverse events were mild or moderate in severity and no serious adverse events were reported.

**Platysma Continuous Bands**
The safety of BOTOX® 26 Units, 31 Units, or 36 Units was evaluated in 466 BOTOX®-treated subjects and 481 placebo-treated subjects in double-blind, placebo-controlled clinical studies for the improvement of platysma continuous bands. There were no adverse reactions reported by ≥1% of BOTOX®-treated subjects and more frequent than in placebo-treated subjects.
The safety of up to 4 BOTOX® treatments for platysma continuous bands was assessed in a double-blind, placebo-controlled clinical study and its open-label extension study. Eligible subjects who received BOTOX® or placebo in the lead-in study received up to 3 additional BOTOX® treatments in the open-label extension study. Adverse reactions that occurred at <1% among 350 BOTOX®-treated subjects include 4 mild dysphagia events in 3 subjects (0.9%) (duration ranged from 2 days to 71 days) and mild facial paresis in 2 subjects (0.6%) (duration ranged from 50 days [ongoing at end of study] to 127 days). Injection site reactions were reported for 13 subjects (3.7%).

No change was observed in the overall safety profile with repeat dosing up to 4 treatments with BOTOX®.

**Post-marketing experience**
There have been rare spontaneous reports of death, sometimes associated with dysphagia, pneumonia, and/or other significant debility, after treatment with BOTOX®.

Serious and/or immediate hypersensitivity reactions such as anaphylaxis and serum sickness have been rarely reported, as well as other manifestations of hypersensitivity including skin rash, urticaria, soft tissue oedema and dyspnoea (see **4.4 Special warnings and precautions for use**).

There have also been reports of adverse events involving the cardiovascular system, including arrhythmia and myocardial infarction, some with fatal outcomes following BOTOX® treatment. Some of these patients had risk factors including cardiovascular disease.

New onset or recurrent seizures have also been reported following BOTOX® treatment, typically in patients who are predisposed to experiencing these events.

Angle closure glaucoma has been reported very rarely following BOTOX® treatment for blepharospasm.

Lagophthalmos has been reported following BOTOX® injection into the glabellar lines or crow's feet lines.

Eyelid oedema has been reported following periocular BOTOX® injection.

Mephisto sign (elevation of the lateral end of the eyebrow relative to the medial end) has been reported for chronic migraine and for glabellar lines indications following BOTOX® injection into or near the frontalis muscle.

The following list includes adverse drug reactions or other medically relevant adverse events that have been reported since the drug has been marketed, regardless of indication and may be in addition to those cited in sections **4.4 Special warnings and precautions for use** and **4.8 Adverse effects (Undesirable effect)**: denervation/muscle atrophy; respiratory depression and/or respiratory failure; dyspnoea; aspiration pneumonia; dysarthria; dysphonia, dry mouth; strabismus; peripheral neuropathy, abdominal pain; diarrhoea; nausea; vomiting; pyrexia; anorexia; vision blurred; visual disturbance, hypoacusis; tinnitus; vertigo; facial palsy, facial paresis; brachial plexopathy; radiculopathy; syncope; hypoaesthesia; malaise; myalgia; myasthenia gravis; paraesthesia; rash; erythema multiforme; pruritus; dermatitis psoriasiform; hyperhidrosis; alopecia including madarosis, dry eye and localised muscle twitching/involuntary muscle contractions.

**Reporting suspected adverse effects**

Reporting suspected adverse reactions after registration of the medicinal product is important. It allows continued monitoring of the benefit-risk balance of the medicinal product. Healthcare professionals are asked to report any suspected adverse reactions at www.tga.gov.au/reporting-problems.

## 4.9 OVERDOSE

Overdose of BOTOX® is a relative term and depends upon dose, site of injection and underlying tissue properties. Signs and symptoms of overdose are likely not to be apparent immediately post-injection. Excessive doses may produce local, or distant, generalised and profound neuromuscular paralysis. Local weakness is usually well tolerated and resolves spontaneously without intervention. However, dysphagia may result in loss of airway protection and aspiration pneumonia.

The entire contents of a vial is below the estimated dose (from primate studies) for toxicity in humans weighing 6 kg or greater.

Should symptoms (muscular weakness, ptosis, diplopia, blurred vision, facial weakness, swallowing and speech disorders, constipation, aspiration pneumonia, difficulty breathing or respiratory depression) occur post injection or oral ingestion, the person should be medically monitored for up to several weeks. These patients should be considered for further medical evaluation and appropriate medical therapy immediately instituted, which may include hospitalisation. Advise patients or caregivers to seek immediate medical attention if any of these symptoms occur. Specific anti-toxin to botulinum toxin is only likely to be effective if given within thirty minutes of the botulinum toxin injection.

For information on the management of overdose, contact the Poisons Information Centre on 13 11 26 (Australia).

# 5 PHARMACOLOGICAL PROPERTIES

## 5.1 PHARMACODYNAMIC PROPERTIES

**Therapeutic class:** Neuromuscular blocking agent.

### Mechanism of action

*Clostridium botulinum* type A neurotoxin blocks peripheral acetylcholine release at presynaptic cholinergic nerve terminals by cleaving SNAP-25, a protein integral to the docking and release of acetylcholine from vesicles located within the nerve terminals.

After injection, there is an initial high-affinity binding of toxin to specific cell surface receptors on cholinergic nerve terminals. Bound toxin is then internalised by endocytosis, and the catalytic light chain is translocated across the vesicular membrane into the cytosol where it cleaves SNAP-25. Progressive inhibition of acetylcholine release follows and clinical signs usually manifest within 2-3 days. In sensory neurons, BOTOX® inhibits the release of sensory neurotransmitters (e.g., Substance P, CGRP) and inhibits the delivery of receptors, such as TRPV1, to the cell surface. BOTOX® may also prevent and/or reverse sensitisation in some nociceptive sensory neurons.

Recovery after intramuscular injection takes place normally within 12 weeks. Pre-clinical studies have demonstrated that, new sprouts from the original preterminal axons allow for a temporary reconnection of the neuron with the endplates. These sprouts are only partially effective and subsequently regress while the original nerve terminal at the primary neuromuscular junction becomes functional again. The relevance of these pre-clinical observations to the clinical condition remains to be established.

**Bladder Dysfunction (Overactive Bladder and Neurogenic Detrusor Overactivity)**
Due to its pharmacological mechanism of action, it is expected that BOTOX® affects the efferent pathways of detrusor activity mainly via inhibition of acetylcholine release.

**Chronic Migraine**
Limited nonclinical data suggest that BOTOX® may reduce sensitisation processes but the actual mechanism of action for headache prophylaxis is not known.

**Blepharospasm**
The relaxing effect on muscles injected with BOTOX® is useful in reducing the excessive, abnormal contractions associated with blepharospasm. Following periocular injection of BOTOX®, distant muscles show electrophysiological changes but no clinical weakness or other clinical change for a period of several weeks or months, parallel to the duration of local clinical paralysis.

Typically, patients with blepharospasm show improvement lasting an average of 12.5 weeks prior to the need for re-treatment.

**Strabismus**
When used for the treatment of strabismus, it is postulated that the administration of BOTOX® affects muscle pairs by inducing an atrophic lengthening of the injected muscle and a corresponding shortening of the muscle's antagonist.

**Focal Spasticity in Adults and Children Two Years and Older**
BOTOX® treatment reduces both the objective signs and subjective symptoms of spasticity. Improvements include reduction in muscle tone, increase in range of motion, reduction in pain and a reduction of spasticity-related functional disability.

**Cervical Dystonia (Spasmodic Torticollis)**
When injected into neck muscles, BOTOX® reduces both objective signs and subjective symptoms of cervical dystonia (spasmodic torticollis). These improvements may include reduced pain/discomfort, reduced head rotation, reduced shoulder elevation, decreased size and strength of hypertrophic muscles and functional disability improvement. Based on the results of early publications in naïve patients, 40 to 58% of patients with cervical dystonia respond with a significant improvement in their symptoms after initial treatment with BOTOX®. Among patients who have previously benefited from BOTOX® injection for cervical dystonia, approximately 91% can expect improvement for any given treatment period based on patient withdrawal data in a recent trial.

**Primary Hyperhidrosis of the Axillae**
The proposed mechanism of action of BOTOX® in hyperhidrosis is the inhibition of cholinergically driven excessive sweating, by locally blocking the autonomic sympathetic cholinergic nerve fibres innervating sweat glands. This is achieved by injecting the toxin in the vicinity of the sweat glands, which are located within the dermis of the skin. Injections for this indication must therefore be given intradermally. Hyperhidrosis is typically treated by multiple intradermal injections given in a grid-like pattern over the affected area. The objective of treatment is to reduce sweating to a physiologically normal level which patients find tolerable. Anhidrosis is not the target.

When injected intradermally, BOTOX® produces temporary chemical denervation of the sweat gland resulting in local reduction of sweating.

**Spasmodic Dysphonia**
Spasmodic dysphonia is a focal laryngeal dystonia with task specific spasms of the vocal cords seriously interfering with communication. Approximately 90% of the patients have adductor spasmodic dysphonia with spasms of the adductor muscles including thyroarytenoid, lateral cricoarytenoid and interarytenoid muscles. About 10% of patients have abductor spasmodic dysphonia with spasms of the abductors of the vocal cords, in particular the posterior cricoarytenoid muscles. Many studies have shown that at least 90% of patients with adductor spasmodic dysphonia obtain a satisfactory or better result with BOTOX® injections. Treatment of abductor spasmodic dysphonia is more technically difficult and results are less satisfactory but with a tailored approach most patients still obtain satisfactory improvement with BOTOX® injections.

**Glabellar Lines**
Glabellar lines are secondary to relative overactivity (or hyperfunctioning) of the muscles associated with frowning. When injected into the corrugator and/or procerus muscles, BOTOX® weakens the overactive underlying muscle contraction, decreasing the severity of the glabellar lines and improving appearance. In controlled clinical trials, onset of action was rapid (effect of BOTOX® was apparent at the first assessment timepoint of 7 days) and lasted

at least 4 months for many subjects.

**Crow's Feet**
Crow's feet are well established, deep, radiating, horizontal and oblique furrows at the temporal aspect of each eye and are the direct result of the contraction of the lateral fibres of the orbicularis oculi muscles. In controlled clinical trials, injections of BOTOX® into the lateral orbital area resulted in rapid onset of action (effect of BOTOX® was apparent at the first assessment timepoint of 7 days) and reduced the severity of wrinkling in this area for up to 17 weeks.

**Forehead Lines**
Horizontal forehead lines are associated with chronic functional activity of the frontalis muscle. At two weeks post-injection, 84-95% of BOTOX®-treated patients were considered by investigators as treatment responders; 75-80% of patients felt they had improvement (16 or 24 U at four sites in the frontalis muscle). Higher doses of BOTOX® resulted in greater efficacy and longer duration of effect. Injections of BOTOX® reduced the severity of horizontal forehead lines for up to 24 weeks as determined by a trained observer.

**Clinical Trials - Therapeutic Indications**

**Overactive Bladder**
Two double-blind, placebo-controlled, randomised, multicentre, 24-week Phase 3 clinical studies were conducted in patients with OAB with symptoms of urinary incontinence, urgency and frequency. A total of 1105 patients, whose symptoms had not been adequately managed with anticholinergic therapy (inadequate response or intolerable side effects), were randomised to receive either 100 U of BOTOX® (n=557) or placebo (n=548). Patients had to have at least 3 urinary urgency incontinence episodes and at least 24 micturitions in 3 days, a negative urine dipstick at randomisation and to be willing to use Clean Intermittent Catheterisation (CIC) if deemed necessary by the investigator. Patients were excluded if they had other urological conditions that could confound the studies such as: OAB secondary to any known neurological reason, a predominance of stress incontinence, anticholinergic treatment or any other therapies for OAB within the 7 days prior to baseline, already using CIC or an in-dwelling catheter, previous botulinum toxin therapy within the previous 12 weeks or immunisation for any botulinum toxin serotype, significant pelvic or urological abnormalities other than OAB or post-void residual (PVR) urine volume > 100 mL at screening among others.

Baseline characteristics were similar between the treatment groups in both studies: pooled mean age 60 years, 87.8% female, 90.9% Caucasian, 13.7% diabetic patients, mean 5.4 daily episodes of urinary incontinence, mean 11.7 daily episodes of micturition and mean 8.6 daily average urgency episodes.

In both studies, significant improvements compared to placebo in the change from baseline in daily frequency of urinary incontinence episodes were observed for BOTOX® (100 U) at the primary time point of week 12, including the proportion of dry patients. Using the Treatment Benefit Scale, the proportion of patients reporting a positive treatment response (their condition has been 'greatly improved' or 'improved') was significantly greater in the BOTOX® group compared to the placebo group in both studies. Significant improvements compared to placebo were also observed for the daily frequency of micturition, urgency and nocturia episodes. Volume voided per micturition was also significantly higher. Significant improvements were observed in all OAB symptoms from week 2.

BOTOX® treatment was associated with significant improvements over placebo in health-related quality of life as measured by the Incontinence Quality of Life (I-QOL) questionnaire (including avoidance and limiting behaviour, psychosocial impact and social embarrassment) and the King's Health Questionnaire (KHQ) (including incontinence impact, role limitations, social limitations, physical limitations, personal relationships, emotions, sleep/energy and severity/coping measures).

Results from the pivotal studies are presented in Table 25 below:

### Table 25: Primary and secondary efficacy variables at baseline and change from baseline in Study 1 (191622-095) and Study 2 (191622-520)

| | Study 1 (191622-095) | | | Study 2 (191622-520) | | |
|---|---|---|---|---|---|---|
| **Endpoint**<br>Timepoint | **BOTOX® 100 U (N=280)** | **Placebo (N=277)** | **p-value; Absolute difference from placebo (95% CI)** | **BOTOX® 100 U (N=277)** | **Placebo (N=271)** | **p-value; Absolute difference from placebo (95% CI)** |
| **Daily Frequency of Urinary Incontinence Episodes*** | | | | | | |
| Mean Baseline | 5.47 | 5.09 | | 5.52 | 5.70 | |
| Mean Change at Week 2 | -2.85 | -1.09 | | -2.85 | -1.34 | |
| Mean Change at Week 6 | -3.05 | -1.07 | | -3.18 | -1.37 | |
| **Mean Change** at Week 12[a]** | **-2.65** | **-0.87** | **< 0.001; -1.65 (-2.13, -1.17)** | **-2.95** | **-1.03** | **< 0.001; -1.91 (-2.43, -1.39)** |
| **Proportion of Positive Treatment Response using Treatment Benefit Scale (%)** | | | | | | |
| Week 2 | 64.5 | 32.6 | | 64.2 | 36.8 | |
| Week 6 | 66.9 | 34.7 | | 69.3 | 30.9 | |
| **Week 12***[a]** | **60.8** | **29.2** | **< 0.001; 31.8 (23.9, 39.7)** | **62.8** | **26.8** | **< 0.001; 36.0 (28.2, 43.8)** |
| **Daily Frequency of Micturition Episodes** | | | | | | |
| Mean Baseline | 11.98 | 11.20 | | 12.01 | 11.77 | |
| Mean Change at Week 2 | -1.58 | -0.79 | | -1.48 | -0.77 | |
| Mean Change at Week 6 | -1.96 | -0.98 | | -2.40 | -0.97 | |
| **Mean Change† at Week 12[b]** | **-2.15** | **-0.91** | **< 0.001; -1.04 (-1.48, -0.59)** | **-2.56** | **-0.83** | **< 0.001; -1.72 (-2.19 -1.26)** |
| **Daily Frequency of Urgency Episodes** | | | | | | |
| Mean Baseline | 8.54 | 7.85 | | 9.11 | 8.78 | |
| Mean Change at Week 2 | -2.83 | -1.34 | | -2.95 | -1.36 | |
| Mean Change at Week 6 | -3.21 | -1.45 | | -3.91 | -1.35 | |
| **Mean Change† at Week 12[b]** | **-2.93** | **-1.21** | **< 0.001; -1.51 (-2.15, -0.87)** | **-3.67** | **-1.24** | **< 0.001; -2.44 (-3.09, -1.79)** |
| **Incontinence Quality of Life Total Score** | | | | | | |
| Mean Baseline | 36.5 | 37.3 | | 31.7 | 32.1 | |
| **Mean Change† at Week 12[bc]** | **+21.9** | **+6.8** | **< 0.001; 14.9 (11.1, 18.7)** | **+23.1** | **+6.3** | **< 0.001; 16.9 (13.2, 20.6)** |
| **King's Health Questionnaire: Role Limitation** | | | | | | |
| Mean Baseline | 61.2 | 56.2 | | 69.6 | 66.4 | |
| **Mean Change† at Week 12[bc]** | **-24.3** | **-2.4** | **< 0.001; -20.6 (-25.6, -15.7)** | **-26.5** | **-5.0** | **< 0.001; -19.8 (-24.8, -14.7)** |
| **King's Health Questionnaire: Social Limitation** | | | | | | |
| Mean Baseline | 40.5 | 39.4 | | 49.1 | 45.4 | |
| **Mean Change† at Week 12[bc]** | **-17.3** | **-3.8** | **< 0.001 -13.9 (-18.1, -9.7)** | **-16.2** | **-1.3** | **< 0.001; -13.2 (-17.8, -8.6)** |

* Percentage of patients who were dry (without incontinence) at week 12 was 22.9% for the BOTOX® group and 6.5% for placebo group in Study 1 and 31.4% for the BOTOX® group and 10.3% for placebo group in Study 2. The proportions achieving at least a 75% and 50% reduction from baseline in urinary incontinence episodes

were 44.6% and 57.5% in the BOTOX® group compared to 15.2% and 28.9% in the placebo group in Study 1 and 47.3% and 63.5% in the BOTOX® group compared to 20.3% and 33.2% in the placebo group in Study 2.

** p-value, absolute difference in Least Squares Mean (LS Mean) and its 95% CI for daily frequency of urinary incontinence episodes at Week 12 are based on an ANCOVA model using a LOCF method with baseline value as covariate and treatment group and site as factors.

*** p-value, absolute difference from placebo and its 95% CI for proportion of positive treatment response using TBS at Week 12 are based on Cochran-Mantel-Haenszel (CMH) test using a LOCF method with urinary urgency incontinence ≤9 or >9 episodes at baseline as a stratification factor.

† p-values, absolute differences from placebo in LS Mean and its 95% CI for the secondary efficacy endpoints are based on an ANCOVA model with baseline value as covariate and stratification factor, treatment group and site as factors.

[a] Co-primary endpoints
[b] Secondary endpoints
[c] Pre-defined minimally important change from baseline was +10 points for I-QOL and -5 points for KHQ

A total of 839 patients were evaluated in a long-term extension study. For all efficacy endpoints, patients experienced consistent response with re-treatments. In the subset of 829 patients, who had reached week 12 of treatment cycle 6, the mean reductions in daily frequency of urinary incontinence were -3.26 (n=829), -3.64 (n=608), -3.82 (n=388), -3.48 (n=273), -3.34 (n=185) and -3.05 (n=139) episodes at week 12 after the first through sixth BOTOX® 100 U treatments, respectively. The corresponding proportions of patients with a positive treatment response on the Treatment Benefit Scale (TBS) were 74.0%, 81.3%, 82.1%, 78.3%, 83.2% and 80.9% respectively.

Only a limited number of males (n=135, 12.2%) were studied in the two Phase 3 clinical studies and the results were not statistically significant for patients administered BOTOX® compared to placebo. Results for the co-primary endpoints in males are presented below and further details are located in section **4.4 Special warnings and precautions for use**; sub-section **Overactive Bladder**; **Use in Males**:

**Table 26: Co-primary efficacy endpoints at baseline and change from baseline in male patients (pooled pivotal studies, placebo-controlled ITT population)**

| | **BOTOX® 100 U (N=61)** | **Placebo (N=74)** | **p-value** | **Absolute difference from placebo (95% CI)** |
|---|---|---|---|---|
| **Daily Frequency of Urinary Incontinence Episodes** | | | | |
| Mean Baseline | 5.61 | 4.33 | | |
| Mean Change at Week 12 | -1.86 | -1.23 | 0.612 | -0.42 (-2.08, 1.23) |
| **Proportion with Positive Treatment Response using Treatment Benefit Scale (%)** | | | | |
| Week 12 | 40.7 | 25.4 | 0.060 | 15.2 (-0.8, 31.3) |

The median duration of response following BOTOX® treatment, based on patient request for re-treatment was 166 days (~24 weeks). To qualify for retreatment, at least 12 weeks must have passed since the prior treatment, post-void residual urine volume must have been less

than 200 mL and patients must have reported at least 2 urinary incontinence episodes over 3 days.

**Neurogenic Detrusor Overactivity**

Two double-blind, placebo-controlled, randomised, multicentre Phase 3 clinical studies were conducted in patients with urinary incontinence due to neurogenic detrusor overactivity who were either spontaneously voiding or using catheterisation (in-dwelling catheters were not allowed). A total of 691 spinal cord injury (lesion at T1 or below) or multiple sclerosis patients (EDSS at 6.5 or below), not adequately managed with at least one anticholinergic agent, were enrolled. These patients were randomised to receive either 200 U of BOTOX® (n=227), 300 U of BOTOX® (n=223) or placebo (n=241). Both pivotal trials (191622-515 and 191622-516) were superiority studies compared to placebo. The primary endpoint was the number of episodes of urinary incontinence as recorded by patient bladder diary. Analysis of covariance was used to assess differences in efficacy between BOTOX® and placebo, with baseline value as a covariate, and treatment arm, aetiology (MS or SCI), concurrent use/non-use of anticholinergics and investigator site as factors. Baseline demographics of the pooled pivotal trial population are shown in Table 27 below:

**Table 27: Baseline demographics per aetiology in Phase 3 studies**

| | MS | SCI |
|---|---|---|
| N (%) | 381 (55.1%) | 310 (44.9%) |
| Age, median years (range) | 50.0 (22-77) | 41.5 (18-77) |
| Male gender, N (%) | 70 (18.4%) | 221 (71.3%) |
| Using CIC, N (%) | 112 (29.4%) | 263 (84.8%) |
| Spontaneously voiding, N (%) | 265 (69.6%) | 42 (13.5%) |

In both Phase 3 studies, significant improvements compared to placebo in the primary efficacy variable of change from baseline in weekly frequency of incontinence episodes were observed favouring BOTOX® (200 U and 300 U) at the primary efficacy time point at Week 6, including the percentage of dry patients. Significant improvements in some urodynamic parameters were observed, including decreases in peak detrusor pressure during the first involuntary detrusor contraction. Increases in maximum cystometric capacity were observed but in patients who were spontaneously voiding these were offset by almost equivalent increases in post-void residual volume (please see last row of Table 28 below).

Significant improvements in patient-reported incontinence specific health-related quality of life scores as measured by the Incontinence Quality of Life questionnaire (I-QOL) (including avoidance limiting behaviour, psychosocial impact and social embarrassment) were also observed. No additional benefit of BOTOX® 300 U over 200 U was demonstrated.

Results from the pivotal studies are presented below:

**Table 28: Primary and secondary efficacy variables at baseline and change from baseline in Phase 3 studies (Pivotal trials)**

| | Study 1 (191622-515) | | | Study 2 (191622-516) | | |
|---|---|---|---|---|---|---|
| | **BOTOX® 200 U (N=135)** | **Placebo (N=149)** | **p-value** | **BOTOX® 200 U (N=92)** | **Placebo (N=92)** | **p-value** |
| **Weekly Frequency of Urinary Incontinence*** | | | | | | |
| Mean Baseline | 32.3 | 28.3 | | 32.5 | 36.7 | |
| Mean Change at Week 2 | -16.9 | -8.6 | p=0.008 | -18.8 | -9.7 | p<0.001 |
| **Mean Change at Week 6[a]** | **-21.0** | **-8.8** | **p<0.001** | **-21.8** | **-13.2** | **p=0.002** |
| Mean Change at Week 12 | -20.8 | -8.3 | p<0.001 | -20.5 | -12.2 | p=0.002 |
| **Maximum Cystometric Capacity (mL)** | | | | | | |
| Mean Baseline | 252.3 | 256.0 | | 247.3 | 249.4 | |
| **Mean Change at Week 6[b]** | **+151.2** | **+15.5** | **p<0.001** | **+157.0** | **+6.5** | **p<0.001** |
| **Maximum Detrusor Pressure during 1st Involuntary Detrusor Contraction (cmH$_2$0)** | | | | | | |
| Mean Baseline | | | | | | |
| **Mean Change at Week 6[b]** | 51.3 | 50.9 | | 51.7 | 41.5 | |
| | **-35.1** | **-2.4** | **p<0.001** | **-28.5** | **+6.4** | **p<0.001** |
| **Incontinence Quality of Life Total Score[c,d]** | | | | | | |
| Mean Baseline | 33.95 | 35.06 | | 37.46 | 35.72 | |
| **Mean Change at Week 6[b]** | **+26.90** | **+10.81** | **p<0.001** | **+24.43** | **+11.71** | **p<0.001** |
| Mean Change at Week 12 | +31.42 | +9.05 | p<0.001 | +25.08 | +8.56 | p<0.001 |
| **Maximum Cystometric Capacity minus Post Void Residual[e]** | | | | | | |
| N | 50 | 46 | | 40 | 37 | |
| Mean Baseline | 195.1 | 170.1 | | 151.2 | 160.0 | |
| Mean Change at Week 6 | +35.8 | -36.9 | - | +20.8 | +16.8 | - |

p-values are based on an LOCF analysis using an ANCOVA model with baseline weekly endpoint as covariate and treatment group, aetiology at study entry (spinal cord injury or multiple sclerosis), concurrent anticholinergic therapy at screening and investigator as factors.

* Percentage of dry patients (without incontinence) throughout week 6 was 36.3% (200 U BOTOX® group) and 10.1% (placebo) in Study 1 and 38.0% (200 U BOTOX® group) and 7.6% (placebo) in Study 2

[a] Primary endpoint

[b] Secondary endpoints

[c] I-QOL total score scale ranges from 0 (maximum problem) to 100 (no problem at all).

[d] In the Phase 3 studies, the pre-specified minimally important difference (MID) for I-QOL total score was 8 points based on MID estimates of 4-11 points reported in neurogenic detrusor overactivity patients.

[e] Maximum cystometric capacity (MCC) and post-void residual (PVR) may not have been measured on the same day but they were measured within the same visit window. Only patients who had MCC and PVR data at both baseline and Week 6 visits and not using CIC at baseline were analysed.

The median duration of response in the two Phase 3 studies, based on patient request for re-treatment, was 256-295 days (36-42 weeks) for the 200 U dose group compared to 92 days (13 weeks) with placebo.

Placebo recipients crossed over to active therapy for subsequent treatment cycles so there are no placebo-controlled data beyond the first treatment cycle. For all efficacy endpoints, patients experienced consistent response with re-treatment.

**Chronic Migraine**

BOTOX® was evaluated in two multi-national, multicentre 56-week studies that included a 24-week, 2 injection cycle, double-blind phase comparing BOTOX® to placebo (saline), followed by a 32-week, 3 injection cycle, open-label phase. A total of 1,384 chronic migraine adults who had either never received or were not using any concurrent headache prophylaxis during a 28-day baseline, had ≥ 15 headache days, with 50% being migraine/probable migraine and ≥ 4 headache episodes were studied in two Phase 3 clinical trials. These patients had a mean duration of chronic migraine for 19.2 ± 12.56 years and during the 28-day baseline 906 (65.5%) patients were and 478 (34.5%) patients were not overusing acute headache pain medications. These patients were randomised to placebo (saline) or to 155 U - 195 U BOTOX® injections every 12 weeks; maximum 5 injection cycles. During the trial, patients were allowed to use acute headache treatments. BOTOX® treatment demonstrated statistically significant (p<0.001) and clinically meaningful improvements from baseline compared to placebo (saline) for 50% reduction in headache days, mean frequency of moderate/severe headache days and total cumulative hours of headache on headache days. Results of the Headache Impact Test (HIT-6) and Migraine-Specific Quality of Life (MSQ) questionnaires indicated BOTOX® had a sustained duration of action and improved functioning, vitality, psychological distress and overall quality of life (refer to Tables 29, 30, 31 and 32).

**Table 29: Week 24 (primary timepoint) key efficacy variables for pooled Phase 3 studies**

| Efficacy per 28 days | Pooled Studies 191622-079 & 191622-080 | | |
|---|---|---|---|
| | BOTOX® (N=688) | Placebo (saline) (N=696) | p-value |
| Mean change from baseline in frequency of headache days[a] | -8.4 | -6.6 | <0.001 |
| Mean change from baseline in frequency of migraine/probable migraine days[a] | -8.2 | -6.2 | <0.001 |
| Mean change from baseline in number of moderate/severe headache days[a] | -7.7 | -5.8 | <0.001 |
| Mean change from baseline in total cumulative hours of headache on headache days[a] | -119.73 | -80.49 | <0.001 |
| Mean change from baseline in frequency of headache episodes[a] | -5.2 | -4.9 | 0.009 |
| Decrease from baseline in 50% or more headache days[a] | 47.1% | 35.1% | <0.001 |
| Proportion of patients with severe HIT-6 category scores[b] | 67.6% | 78.2% | <0.001 |
| Total HIT-6 scores[b] | -4.8 | -2.4 | <0.001 |
| Mean change from baseline in MSQ scores[b] | | | |
| Role function- Restrictive | -17.0 | -8.6 | <0.001 |
| Role function- Preventative | -13.1 | -6.4 | <0.001 |
| Role function- Emotional Function | -17.9 | -9.5 | <0.001 |

[a] Evaluated over a 28-day pre-randomisation baseline period and a 28-day period leading up to Week 24

[b] Administered once at baseline and once at Week 24 and designed to collect data based on patient's one month recall

**Table 30: Week 24 (primary timepoint) key efficacy variables for pooled Phase 3 studies in medication overuse subgroup**

| **Efficacy per 28 days** | **Pooled Studies 191622-079 & 191622-080** | | |
|---|---|---|---|
| | BOTOX® (N=445) | Placebo (saline) (N=459) | p-value |
| Mean change from baseline in frequency of headache days[a] | -8.2 | -6.2 | <0.001 |
| Mean change from baseline in frequency of migraine/probable migraine days[a] | -8.1 | -6.0 | <0.001 |
| Mean change from baseline in number of moderate/severe headache days[a] | -7.7 | -5.7 | <0.001 |
| Mean change from baseline in total cumulative hours of headache on headache days[a] | -111.91 | -73.26 | <0.001 |
| Mean change from baseline in frequency of headache episodes[a] | -5.6 | -4.9 | 0.028 |
| Proportion of patients with severe HIT-6[b] category scores | 71.0% | 81.9% | <0.001 |
| Total HIT-6 scores[b] | -4.7 | -2.2 | <0.001 |
| Mean change from baseline in MSQ scores[b] | | | |
| Role function- Restrictive | -16.9 | -7.6 | <0.001 |
| Role function- Preventative | -13.9 | -5.8 | <0.001 |
| Role function- Emotional Function | -18.3 | -8.7 | <0.001 |

[a] Evaluated over a 28-day pre-randomisation baseline period and a 28-day period leading up to Week 24
[b] Administered once at baseline and once at Week 24 and designed to collect data based on patient's one month recall

**Table 31: Week 24 (primary timepoint) key efficacy variables for pooled Phase 3 studies in no medication overuse subgroup**

| **Efficacy per 28 days** | **Pooled Studies 191622-079 & 191622-080** | | |
|---|---|---|---|
| | BOTOX® (N=445) | Placebo (saline) (N=459) | p-value |
| Mean change from baseline in frequency of headache days[a] | -8.8 | -7.3 | 0.013 |
| Mean change from baseline in frequency of migraine/probable migraine days[a] | -8.4 | -6.6 | 0.004 |
| Mean change from baseline in number of moderate/severe headache days[a] | -7.7 | -6.1 | 0.005 |
| Mean change from baseline in total cumulative hours of headache on headache days[a] | -128.75 | -99.73 | 0.023 |
| Mean change from baseline in frequency of headache episodes[a] | -5.1 | -4.5 | 0.146 |
| Proportion of patients with severe HIT-6[b] category scores | 61.3% | 70.9% | 0.027 |
| Total HIT-6 scores[b] | -5.1 | -2.7 | <0.001 |
| Mean change from baseline in MSQ scores[b] | | | |
| Role function- Restrictive | -17.2 | -10.6 | 0.001 |
| Role function- Preventative | -11.7 | -7.7 | 0.032 |
| Role function- Emotional Function | -17.4 | -11.0 | 0.017 |

[a] Evaluated over a 28-day pre-randomisation baseline period and a 28-day period leading up to Week 24
[b] Administered once at baseline and once at Week 24 and designed to collect data based on patient's one month recall

**Table 32: Week 24 (primary timepoint) key efficacy variables for Phase 3 studies**

| Efficacy per 28 days | Study 191622-079 | | | Study 191622-080 | | |
|---|---|---|---|---|---|---|
| | BOTOX® (N=341) | Placebo (saline) (N=338) | p-value | BOTOX® (N=347) | Placebo (saline) (N=358) | p-value |
| Mean change from baseline in frequency of headache days[a] | -7.8 | -6.4 | 0.006 | -9.0 | -6.7 | <0.001 |
| Mean change from baseline in frequency of migraine/probable migraine days[a] | -7.6 | -6.1 | 0.002 | -8.7 | -6.3 | <0.001 |
| Mean change from baseline in number of moderate/severe headache days[a] | -7.2 | -5.8 | 0.004 | -8.3 | -5.8 | <0.001 |
| Mean change from baseline in total cumulative hours of headache on headache days[a] | -106.70 | -70.40 | 0.003 | -132.41 | -90.01 | <0.001 |
| Mean change from baseline in frequency of headache episodes[a] | -5.2 | -5.3 | 0.344 | -5.3 | -4.6 | 0.003 |
| Proportion of patients with severe HIT-6 category scores[b] | 68.9% | 79.9% | 0.001 | 66.3% | 76.5% | 0.003 |
| Total HIT-6 scores[b] | -4.7 | -2.4 | <0.001 | -4.9 | -2.4 | <0.001 |
| Mean change from baseline in MSQ scores[b] | | | | | | |
| Role function- Restrictive | -16.8 | -8.8 | <0.001 | -17.2 | -8.4 | <0.001 |
| Role function- Preventative | -12.6 | -7.6 | 0.005 | -13.5 | -5.4 | <0.001 |
| Role function- Emotional Function | -16.9 | -10.0 | 0.001 | -19.0 | -9.1 | <0.001 |

[a] Evaluated over a 28-day pre-randomisation baseline period and a 28-day period leading up to Week 24
[b] Administered once at baseline and once at Week 24 and designed to collect data based on patient's one month recall

**Blepharospasm**
In one study, botulinum toxin was evaluated in 27 patients with essential blepharospasm. Twenty six of the patients had previously undergone drug treatment utilising benztropine mesylate, clonazepam and/or baclofen without adequate clinical results. Three of these patients then underwent muscle stripping surgery still without an adequate outcome. One patient of the 27 was previously untreated. Upon using botulinum toxin, 25 of the 27 patients reported improvement within 48 hours. One of the other patients was later controlled with a higher dosage. The remaining patient reported only mild improvement but remained functionally impaired.

In another study, 12 patients with blepharospasm were evaluated in a double-blind, placebo-controlled study. All patients receiving botulinum toxin (n=8) were improved compared with no improvements in the placebo group (n=4). The mean dystonia score improved by 72%, the self-assessment score rating improved by 61% and a videotape evaluation rating

improved by 39%. The effects of the treatment lasted a mean of 12.5 weeks.

In a separate study, blepharospasm patients received an average dose per eye of 33 U of BOTOX® injected at 3 to 15 sites. The most frequently reported treatment-related adverse events were ptosis (20.8%), superficial punctate keratitis and eye dryness (6.3% each).

**Strabismus**
Six hundred and seventy seven adult patients with strabismus treated with one or more injections of BOTOX® were evaluated in a large retrospective case review. Fifty five percent of these patients improved to an alignment of 10 prism diopters or less when evaluated six months or more following injection. Large strabismus angles tended to return to pre-injection position and required re-injection more frequently than smaller angles. Thirty five percent of adults with horizontal strabismus were corrected by one injection to within 10 prism diopters of orthoposition.

**Focal Spasticity in Children 2 Years and Older**

**Upper Limb Spasticity**
Two randomised, evaluator-blinded studies compared BOTOX® plus standard care with standard care alone in a total of 72 children with hemiplegic cerebral palsy and upper limb spasticity. In these studies, the muscles in the arm and hand that were injected included the biceps brachii, brachialis, brachioradialis, flexor carpi ulnaris and radialis, pronator teres, pronator quadratus, flexor digitorum profundus and sublimis, flexor pollicis longus and brevis, thumb adductor, short flexor of the thumb and interossei.

In the 6-month study (n=42; 2 to 8 years) spasticity as measured by the Modified Ashworth Scale (MAS) was significantly reduced in children treated with BOTOX® (1-2 U/kg/muscle, maximum dose 240 U, mean 137 U) at months 1 and 3, but returned to baseline values at month 6. Quality of upper limb movement as measured by the Quality of Upper Extremity Skills Test (QUEST) improved significantly from baseline in both groups but to a greater extent in BOTOX®-treated children at months 1 (61% vs. 19%, p=0.004) and 3 (71% vs 33%, p=0.03) but not at month 6 (p=1.0). Children treated with BOTOX® had a significantly greater improvement in function as measured by Goal Attainment Scaling (GAS). Children treated with BOTOX® improved more quickly than those treated with standard care alone. No treatment-related adverse effects were reported.

In the 3-month study (n=30, 5-15 years) upper limb function was measured using the Melbourne Assessment of Unilateral Upper Limb Function. Children in the BOTOX® group (0.5 to 2.0 U/kg/muscle) had a 14% improvement in function compared with no change in children in the control group at month 3 (p=0.002). In this study, there was no difference between treatment groups on the GAS. Three treatment-related adverse effects were reported, 2 localised weakness and one increased frequency of micturition.

**Lower Limb Spasticity - Equinus**
A 3-month, double-blind, placebo-controlled parallel study was conducted in cerebral palsy children aged 2 to 16 years with equinus ankle position. Seventy two were administered 4 U/kg body weight of BOTOX® into the medial and lateral heads of the gastrocnemius at baseline (2 U/kg/muscle), for hemiplegic patients and 1 U/kg/muscle for diplegic patients) and again at 4 weeks. The cumulative dose of BOTOX® over 4 weeks was 2-4 U/kg/muscle

and overall 8 U/kg body weight up to a maximum of 200 U during a 30-day period. BOTOX® was significantly more effective than placebo (as assessed by improvement of 3 or more grades on the composite score of Rating Scale (PRS) of dynamic gait (gait pattern, ankle position, hindfoot position during foot strike, knee position during gait, degree of crouch and speed of gait). Improvement was reported by 53%, 50%, 60% and 54% of BOTOX® patients versus 25%, 27%, 25% and 32% of placebo patients at weeks 2, 4, 8 and 12, respectively. Of the individual assessments included on the PRS, a significantly greater number of BOTOX® patients versus placebo patients had improvements in gait pattern (weeks 2, 8 and 12) and ankle position (weeks 2, 6 and 12).

In the 39-month long-term, open-label follow-up of these patients, the medial and lateral gastrocnemius muscles were injected at a dose of 2 U/kg/muscle with a maximum total dose of 200 U of BOTOX® into the medial and lateral heads of the gastrocnemius and then as needed thereafter. Of the 207 patients evaluated; 115 patients were followed for 12 months, 100 for 18 months, 45 for 2 years and 6 for up to 3 years. The percent of patients who showed an improvement based on the PRS ranged from 41% to 67% over the 3-year period. Of the individual assessments which were included in the PRS, significant improvements were seen at every visit over the 3-year period.

**Lower Limb Spasticity – Hip Adductor**

Published studies showed that BOTOX® is effective in reducing pain and spasticity and improving function. A double-blind placebo-controlled study (n=16) in children aged 2 to 10 years found that 4 U/kg body weight to each adductor muscle group (total dose 8 U/kg total body weight) administered 5-10 days before scheduled isolated adductor surgery significantly reduced mean pain scores (74% reduction, p=0.003), analgesic requirements (50% reduction, p=0.005) and length of hospital stay (33% reduction, p=0.003) compared with placebo.

A second study (n=43, mean age 8.2 ± 2.5 years) compared the efficacy of BOTOX® (300 U injected into the adductor and medial hamstring muscles) with a pressure splint against hip adductor muscle spasticity. Both groups improved during the study period, however, at the 3-month visit, BOTOX® was significantly more effective than pressure splints for spasticity and motor performance as measured by the MAS (p=0.002) and knee distance (p=0.02).

Adverse events were not reported in these studies.

**Focal Spasticity in Adults**

Three initial double-blind placebo-controlled studies involving 256 adult post-stroke patients with upper limb spasticity showed clinically and statistically significant improvements in wrist, elbow and finger flexor muscle tone. The Ashworth scale was used to measure clinically significant changes in muscle tone which was assessed from a score of zero (no increase in muscle tone) to 4 (limb rigid in flexion or extension).

In Study 1, 126 patients were treated with 200 U to 240 U of BOTOX® into the wrist, finger and thumb flexor muscles. A clinically and statistically significantly greater reduction in muscle tone was observed in BOTOX®-treated patients compared to placebo as measured on the Ashworth scale (p<0.001) at 1, 4, 6, 8, and 12 weeks post-treatment. The Physician Global Assessment also showed statistically significant improvements at all post-treatment

visits for these patients (p<0.001). Furthermore, patients treated with BOTOX® had significant improvement for a pre-determined, targeted disability item associated with upper limb spasticity at 4, 6, 8 and 12 weeks post-treatment (p≤0.05).

The primary efficacy endpoint was wrist flexors muscle tone at week 6, as measured by the Ashworth score. Key secondary endpoints included Physician Global Assessment, finger flexors muscle tone and thumb flexors tone at Week 6. Study 1 results on the primary endpoint and the key secondary endpoints are shown in the Table below.

**Table 33: Primary and Secondary Efficacy Endpoints Results at Week 6 in Study 1**

| | **BOTOX® 200 to 240 Units (N=64)** | **Placebo (N=62)** |
|---|---|---|
| Mean Change from Baseline in Wrist Flexor Muscle Tone on the Ashworth Scale [a] | -1.7* | -0.5 |
| Mean Physician Global Assessment of Response to Treatment[b] | 1.8* | 0.6 |
| Mean Change from Baseline in Finger Flexor Muscle Tone on the Ashworth Scale[a] | -1.3* | -0.5 |
| Mean Change from Baseline in Thumb Flexor Muscle Tone on the Ashworth Scale[a] | -1.66* | -0.48 |

* Significantly different from placebo (p≤0.05)

[a] The Ashworth Scale is a 5-point scale (0 [no increase in muscle tone], 1, 2, 3, and 4 [limb rigid in flexion or extension]) which measures the force required to move an extremity around a joint, with a reduction in score representing improvement in spasticity.

[b] The Physician Global Assessment evaluated the response to treatment in terms of how the patient was doing in his/her life using a scale from -4 = very marked worsening to +4 = very marked improvement.

In Study 2 and Study 3, patients treated with a total dose of either 300 U or 360 U of BOTOX® had significantly greater reduction in wrist and elbow flexor tone compared to placebo. Additionally, the Physician Global Assessment also showed significant benefit from BOTOX® at doses of 75, 180 and 360 U.

The efficacy and safety of BOTOX® for the treatment of adult upper limb spasticity was further evaluated in 3 randomised, multicentre, double-blind, placebo-controlled studies (Studies 4, 5 and 6).

Study 4 included 124 adult post-stroke patients with upper limb spasticity who received either 400 U BOTOX® (240 U in wrist, finger and thumb flexors and 160 U in the elbow flexors; n=61) or 240 U BOTOX® (wrist, finger and thumb flexors and placebo in the elbow flexors; n=63). See table below. EMG, nerve stimulation, or ultrasound techniques were recommended to assist in proper muscle localisation for injections. Patients were followed for 12 weeks and then entered the open label phase during which they could receive up to 3 additional treatments

of 400 U BOTOX®, at minimum 12-week intervals, distributed among finger, thumb, wrist, or elbow flexors, forearm pronators or shoulder adductors/internal rotators.

**Table 34: BOTOX® Dose and Injection Sites in Study 4**

| Joint | Muscles | BOTOX® 400 U Dose (Units) | BOTOX® 240 U / Placebo Dose (units) |
|---|---|---|---|
| Elbow | Biceps brachii | 70 | Placebo |
| | Brachialis | 45 | |
| | Brachioradialis | 45 | |
| Wrist | Flexor carpi radialis | 50 | 50 |
| | Flexor carpi ulnaris | 50 | 50 |
| Finger | Flexor digitorum profundus | 50 | 50 |
| | Flexor digitorum superficialis | 50 | 50 |
| Thumb | Flexor pollicis longus | 20 | 20 |
| | Adductor pollicis | 20 | 20 |

The responder rate based on the MAS-B score reduction in the elbow flexors at Week 6 after the first treatment (the primary endpoint) was significantly higher in the BOTOX® 400 U group (68.9%, 42/61 patients) than in the BOTOX® 240 U group (50.8%, 32/63 patients). Significant improvement in the change from baseline in MAS-B elbow score at Week 6 was also observed in the 400 U dose group. As all patients received BOTOX® treatment, global improvement as measured by the Clinical Global Impresssion (CGI) by Physician was observed in both dose groups with numerically greater improvement seen in the 400 U dose group for both the mean score and responder rate at Week 6. The mean CGI score by Patient were similar for both groups and on par with the results of the CGI by Physician. Improvements in pain in the elbow as measured by the Numeric Rating Scale (NRS) and limb position as measured by Disability Assessment Scale (DAS) were greater in the 400 U dose group compared to the 240 U group.

**Table 35: Efficacy Results for Elbow Flexors at Week 6 in Study 4**

| | BOTOX® 400 U (160 U elbow) (N=61) | BOTOX® 240 U (placebo elbow) (N=63) |
|---|---|---|
| **MAS Elbow Flexors Responder Rate[a]** | 68.9%* | 50.8% |
| **Mean Change from Baseline in Elbow Flexor Muscle Tone on the MAS[b]** | -1.09** | -0.71 |
| **Mean CGI score by Physician[c]** | 1.5 | 1.4 |
| **CGI by Physician Responder Rate[d]** | 82.0% | 79.4% |
| **Mean CGI score by Patient[c]** | 1.2 | 1.3 |

| | | |
|---|---|---|
| **Mean Change from Baseline NRS Pain score in Elbow[e]** | -0.9 | -0.6 |
| **Mean Change from Baseline DAS Limb Position[f]** | -0.6 | -0.2 |

* difference from 240 U=18.1%; 95% Confidence Interval 1.1 to 35.0.

**nominal p value <0.05

[a] Proportion of patients with MAS score ≥ 1-grade improvement.

[b] The MAS is a 6-point scale (0 [no increase in muscle tone], 1, 1+, 2, 3, and 4 [limb rigid in flexion or extension]) which measures the force required to move an extremity around a joint, with a reduction in score representing improvement in spasticity.

[c] CGI score evaluates global improvement from -4 (very much worsened) to +4 (very much improved).

[d] Proportion of patients with CGI score ≥+1.

[e] Pain severity in the elbow was rated on a scale from 0 to 10, with 0 being "no pain" and 10 being "pain as bad as you can imagine".

[f] The DAS is a 4-point scale of 0 to 3, where 0 indicates no disability and 3 indicates severe disability.

A total of 84 patients from Study 4 received open-label treatments of BOTOX® (no control group) in the shoulder adductors/internal rotators. The change in the MAS for the shoulder was an exploratory endpoint. The results achieved at week 6 for the MAS in the shoulder muscles are shown below:

**Table 36: Efficacy Results for Shoulder at Week 6 of Open-label Treatment Cycles in Study 4**

| | **OL Cycle 1 (N=72)** | **OL Cycle 2 (N=76)** | **OL Cycle 3 (N=56)** |
|---|---|---|---|
| Mean Baseline Shoulder Muscle Tone on the MAS | 3.4 | 3.3 | 3.2 |
| Mean Change from Baseline in Shoulder Muscle Tone on the MAS | -0.7 | -0.6 | -0.5 |

Study 5 enrolled 53 adult post-stroke patients with upper limb spasticity. Patients received a single fixed-dose, fixed-muscle treatment of either BOTOX® 300 U (150 U elbow; 150 U shoulder), BOTOX® 500 U (250 U elbow; 250 U shoulder), or placebo, divided across defined muscles of the elbow and shoulder in a single limb. See table below. EMG, nerve stimulation, or ultrasound techniques were recommended to assist in proper muscle localisation for injections. The duration of follow-up was 12 to 16 weeks.

**Table 37: BOTOX® Dose and Injection Sites in Study 5**

| Joint | Required Muscle | BOTOX® 300 U Dose | BOTOX® 500 U Dose |
|---|---|---|---|
| Elbow | Biceps brachii | 60 U | 100 U |
| | Brachialis | 30 U | 50 U |
| | Brachioradialis | 45 U | 75 U |
| | Pronator teres | 15 U | 25 U |
| | Total Elbow | 150 U | 250 U |
| Shoulder | Pectoralis major | 75 U | 125 U |
| | Teres major | 30 U | 50 U |
| | Latissimus dorsi | 45 U | 75 U |
| | Total Shoulder | 150 U | 250 U |

Statistically significant improvement in the MAS-B elbow flexor score change from baseline at Week 6 (primary endpoint) was observed for the 500 U BOTOX® group compared to placebo and numerical improvement was observed for the 300 U BOTOX® group. The proportion of responders on MAS-B for elbow was numerically higher for both BOTOX® dose groups. The MAS change from baseline for shoulder showed numerical improvement for the 500 U BOTOX® group compared to placebo. However, the difference was only nominally significant at Weeks 2 ($p = 0.015$) and 4 ($p = 0.0006$). Improvement in the shoulder joint as measured by the shoulder-specific CGI score was numerically higher for both BOTOX® groups compared to placebo, although not statistically significant. Additionally, the CGI score by physician and CGI responder rates were numerically greater in both BOTOX® groups compared to placebo indicating overall global improvement, but no significant between-group differences were observed.

The main efficacy results are shown below.

**Table 38: Efficacy Results for Elbow and Shoulder at Week 6 in Study 5**

| | BOTOX® 300 U (N=18) | BOTOX® 500 U (N=17) | Placebo (N=18) |
|---|---|---|---|
| Mean Change from Baseline in Elbow Flexor Muscle Tone on the MAS | -1.47 | -1.62* | -0.74 |
| MAS Elbow Flexors Responder Rate[a] | 72.2% | 75.0% | 47.1% |
| Mean Change from Baseline in Shoulder Muscle Tone on the MAS | -1.4 | -1.6 | -1.4 |
| Mean Shoulder-Specific CGI Score by Physician[b] | 1.22 | 1.21 | 1.04 |
| Mean CGI score by Physician[c] | 1.31 | 1.21 | 0.94 |

* Significantly different from placebo ($p \leq 0.05$)

[a] Proportion of patients with MAS score ≥ 1-grade improvement.

[b] The shoulder-specific CGI evaluates global improvement in the shoulder joint from -4 (very much worsened) to +4 (very much improved).
[c] CGI score evaluates global improvement from -4 (very much worsened) to +4 (very much improved).

Study 6 was a 52-week randomised, double-blind, controlled and open-label Phase 3 study which included a subgroup of 26 adult post-stroke patients who received up to 2 treatments of BOTOX® in up to 3 affected shoulder muscles (pectoralis major with or without teres major and latissimus dorsi). The results of the change from baseline in shoulder muscle tone measured by REsistance to PAssive movement Scale (REPAS) and Goal Attainment Scale (GAS) score by physician favoured BOTOX® but did not demonstrate statistically significant treatment effect and are presented in the table below.

**Table 39: Efficacy Results for Shoulder at Week 10 post-2nd injection or Week 24 in Study 6**

| | **BOTOX®** | **Placebo** |
|---|---|---|
| Mean Change from Baseline on REPAS[a] | (N=20) | (N=20) |
| Shoulder Muscle Tone | -0.6 | -0.2 |
| In Patients with baseline REPAS ≥ 2 | -0.7 | -0.2 |
| In Patients with baseline REPAS ≥ 3 | -1.1 | -0.5 |
| Mean GAS score by Physician[b] | (N=26) | (N=23) |
| Principal Goal | 0.0 | -0.8 |
| Secondary Goal | -0.2 | -0.9 |

[a] The REPAS scale quantifies resistance to passive movement for passive arm and leg motions and is scored on a scale of 0 (no increase in tone) to 4 (limb rigid in flexion or extension), with a higher score denoting greater resistance to movement. REPAS for shoulder extension is presented here.
[b] GAS is a 6-point scale in which the physician rates goal attainment from -3 (worse than start), -2 (equal to start), -1 (less than expected), 0 (expected goal), +1 (somewhat more than expected) or +2 (much more than expected).

Across 4 studies (Studies 1, 4, 5 and 6) in patients with adult upper limb spasticity, neutralising antibodies developed in 2 of 406 patients (0.49%) treated with BOTOX®. One patient was not a clinical responder following any treatment cycle. The second patient experienced inconsistent clinical response both before and after seroconversion.

In a double-blind, placebo-controlled study of 85 patients with moderate to severe lower limb spasticity, injections of up to 300 U of BOTOX® into the soleus, posterior tibialis and either gastrocnemius or flexor digitorum longus muscles resulted in a reduction of spasm frequency, a reduction in pain, an improvement in spasticity as rated by the physician and increase in range of motion of the ankle as measured by goniometry. All of these changes were clinically and statistically significant. In addition, treatment with BOTOX® in patients with severe spasticity (Ashworth score of 3) resulted in a clinically and statistically significant reduction in muscle tone. In an open-label follow-up to this study, a second injection of BOTOX® clinically and statistically significantly reduced muscle tone in both moderate and severe patients at 4, 8 and 12 weeks post-2nd injection.

The efficacy and safety of BOTOX® for the treatment of lower limb spasticity was also evaluated in a randomised, multicentre, double-blind, placebo-controlled study (Study 191622-116). This study included 468 post-stroke patients (233 BOTOX® and 235 placebo) with ankle spasticity (Modified Ashworth Scale [MAS] ankle score of at least 3) who were at least 3 months post-stroke. A total dose of 300 U of BOTOX® or placebo was injected intramuscularly and divided between the gastrocnemius, soleus and tibialis posterior, with optional injection of up to an additional 100 U divided among the flexor hallucis longus, flexor digitorum longus, flexor digitorum brevis, extensor hallucis and rectus femoris (400 U total dose). Electromyography, muscle ultrasound or electrical stimulation was employed to assist in proper muscle localisation. Patients were followed for 12 weeks.

The primary endpoint was the average change from baseline of weeks 4 and 6 MAS ankle score and a key secondary endpoint was the average CGI (Physician Global Assessment of Response) at weeks 4 and 6. The MAS uses a similar scoring system as the Ashworth Scale. The CGI evaluated the response to treatment in terms of how the patient was doing in his/her life using a 9-point scale from -4 = very marked worsening to +4 = very marked improvement.

Statistically and clinically significant between-group differences for BOTOX® over placebo were demonstrated for the primary efficacy measures of MAS and key secondary measure of CGI and are presented in Table 40.

**Table 40: Primary and key secondary efficacy endpoint**

| | **BOTOX® 300 to 400 U (ITT) (N=233)** | **Placebo (N=235)** |
|---|---|---|
| **Mean Changes from Baseline in Ankle Plantar Flexors in MAS Score** | | |
| Week 4 and 6 Average | -0.8* | -0.6 |
| **Mean Clinical Global Impression Score by Investigator** | | |
| Week 4 and 6 Average | 0.9* | 0.7 |

*Statistically significantly different from placebo ($p<0.05$)

Compared to placebo, statistically significant improvements in MAS change from baseline (Figure 6) and CGI by Physician (Figure 7) were observed at weeks 2,4 and 6, compared to placebo for patients treated with BOTOX®.

**Figure 6: Modified Ashworth Scale ankle score for Study 191622-116 – Mean change from baseline by visit**




**Figure 7: Clinical Global Impression by physician for Study 191622-116 – Mean scores by visit**




**Cervical Dystonia (Spasmodic Torticollis)**

In a multicentre study, 170 cervical dystonia patients who had responded to an open-label run-in period (out of 214 patients) were randomised to receive BOTOX® (n=88) or placebo (n=82) in a double-blind, parallel-group evaluation for 10 weeks. Physicians determined the muscles and doses injected for each patient and used a mean total body BOTOX® dose of 236 U (Range: 95 to 360 U). BOTOX® was significantly better compared with placebo by measures of improvement in the Cervical Dystonia Severity Scale (head position rating), physician global assessment, patient global assessment, frequency and intensity of pain and functional disability by week 6 with sustained benefit for up to 10 weeks. Improvement, as measured by physician global assessment, was 50.6% for the BOTOX® group and 31.1% for the placebo group, a difference of 19.5% (p=0.009), which was essentially the same as the pre-defined value of 20% set for a clinically meaningful difference.

In a separate multicentre study, a total of 135 patients were treated. Patients received a single 100-300 U injection of one formulation followed by the other, 8-16 weeks later. Physicians determined the muscles and doses to be injected for each patient and used a mean total body

BOTOX® dose of approximately 155 U for all treatment periods. Maximum clinical improvement was observed at 6 weeks, with over 80% of patients achieving a treatment success by week 6. In relation to time-to-retreatment, at week 6 (42 days) post-injection, 67% of the BOTOX® group had not yet worsened since baseline compared to 45% of the placebo group. At week 10 (70 days) post-injection, 60% of the BOTOX® group remained improved compared to 30% in the placebo group. These differences were statistically significant (p=0.0002).

**Primary Hyperhidrosis of the Axillae**

In a double-blind, parallel-group, multicentre study, 320 patients with bilateral axillary primary hyperhidrosis were randomised to receive BOTOX® (n=242) or placebo (n=78). Subjects were eligible for enrolment in the study if their baseline spontaneous axillary, as measured by gravimetric assessment over 5 minutes at room temperature and at rest, was ≥50 mg. Baseline axillary sweat production was similar in the two treatment groups (216 mg in the BOTOX® group and 236 mg in the placebo group). Treatment responders were defined as subjects showing at least a 50% reduction from baseline in axillary sweating measured by gravimetric assessment.

The incidence of responders among BOTOX®-treated patients was significantly higher (p<0.001) than placebo-treated patients at all post-treatment time points for up to 16 weeks. The incidence of responders among BOTOX®-treated patients ranged from 95% at week 1 to 82% at week 16 compared to 32% at week 1 to 21% at week 16 for placebo-treated patients. The mean percentage reduction in the BOTOX®-treated group ranged from 83% at week 1 to 69% at week 16 compared to 22% at week 1 to 4% at week 16 in the placebo-treated group. The corresponding mean amounts of sweat production at these timepoints were 29 mg and 54 mg in the BOTOX®-treated patients compared to 166 mg and 190 mg in the placebo-treated patients.

Subject's global assessment of treatment satisfaction was significantly higher (p<0.001) in BOTOX®-treated than placebo-treated patients at all post-treatment timepoints.

**Spasmodic Dysphonia**

In the largest series reported 639 patients with adductor spasmodic dysphonia and 108 patients with abductor spasmodic dysphonia were injected with a mean dose of 3.1 ± 3.1 U and 2.16 ± 1.07 U of BOTOX® respectively. The patients recorded the responses in a diary, including their percentage of normal function, on a global visual analogue scale where 100% was a normal voice and 0% was inability to phonate. For adductor spasmodic dysphonia the mean onset of effect was 2.4 ± 4.3 days with a mean peak effect of 9 ± 12.7 days. The mean duration of benefit was 15.1 ± 12.3 weeks, the percent of normal function rose from 52.4% ± 22% to 89.71% ± 13%. For abductor spasmodic dysphonia mean onset of effect was 4.1 ± 5.5 days with a mean peak effect of 10 ± 12.5 days. The mean duration of benefit was 10.5 ± 12.2 weeks. The percentage of normal function rose from 54.8% ± 21.9% to 66.7% ± 23.4% respectively.

In another large series of 169 patients (adductor spasmodic dysphonia 88.8%, abductor spasmodic dysphonia 1.8% and mixed spasmodic dysphonia 4.1%) the median treatment outcome score was excellent in 63.9% of patients, very good in 18%, satisfactory in 14.5% and unsatisfactory in 3.5%, as judged by a subjective self-rating scale which patients

recorded in a diary. Speech rate increased after BOTOX® therapy by approximately 12 syllables per minute. Nasendoscopy, before and after treatment in many patients, confirmed the weakening of the vocal cords and abolition of the spasms.

## Clinical Trials - Cosmetic Indications

### Glabellar Lines

In two multicentre, double-blind, placebo-controlled, parallel-group studies of identical design, patients with moderate to severe glabellar lines evaluated at maximum frown were randomised to receive BOTOX® (n=405) or placebo (n=132). In these studies, the severity of glabellar lines was significantly reduced for up to 120 days in the BOTOX® group compared to the placebo group as measured by investigator rating of glabellar line severity at maximum frown and at rest and by subjects global assessment of change in appearance of glabellar lines. Thirty days after injection, 80% of BOTOX®-treated patients were considered by investigators as treatment responders (glabellar line severity score of mild or none), and 89% of patients felt they had moderate or better improvement, compared to 3.0% and 6.8% of placebo-treated patients respectively.

A third, open-label study was also conducted to support the continued efficacy of repeat BOTOX® injections. At the completion of the double-blind studies, patients were able to enter this open-label phase with repeat treatments given at 120-day intervals. Therapeutic effect was maintained over the three injection cycles assessed with results showing increased efficacy following multiple injection sessions.

### Crow's Feet

Two multicentre, double-blind, placebo-controlled, parallel-group studies were performed to examine the safety and efficacy of BOTOX® for the treatment of crow's feet. In one study, patients with bilaterally symmetrical, moderate or severe crow's feet at maximum smile were randomised to receive BOTOX® (n=130) [age range 27 to 64 years (mean = 47 years)], injected bilaterally at three sites per side, for a dose of 3 U, 6 U, 12 U or 18 U per side or placebo (n=32). Treatment with BOTOX® showed a dose-related response up to 12 U; although the response was similar in the two highest dose groups, 12 U and 18 U. The duration of response was dose-related, with significant mean reductions from baseline in crow's feet severity to day 180 for the 12 U ($p \leq 0.032$) and 18 U ($p \leq 0.003$) groups, day 150 for the 6 U group ($p \leq 0.017$) and day 120 for the 3 U group ($p \leq 0.006$). No significant changes were seen within the placebo group at any post-treatment timepoint. Maximum responder rates were observed at day 30 for all treatment groups. The safety profile in the active treatment groups was similar to placebo.

The second study examined the safety and efficacy of treatment of crow's feet with 1 of 3 dosages of BOTOX® (n=148) or placebo (n=49) [age range 27 to 65 years (mean = 47 years)] and the effect on the severity of forehead lines and glabellar lines. In this study, patients with bilaterally symmetrical, moderate or severe crow's feet at maximum smile; forehead line severity of mild, moderate or severe at maximum eyebrow elevation and glabellar line severity of mild, moderate or severe at maximum frown were treated with BOTOX®, injected bilaterally at three sites per side, for a dose of 6 U, 12 U or 18 U per side or placebo. Although significant improvements in crow's feet were seen with all BOTOX® doses when compared to placebo, the treatment of crow's feet did not affect the severity of either horizontal forehead lines or glabellar lines. Thus, it appears that the treatment of crow's feet

at doses of 18 U, 12 U and 6 U does not affect adjacent areas and as such dose modification is not considered necessary. No safety concerns were seen at any dose of BOTOX® treatment.

The safety and efficacy of BOTOX® for the treatment of crow's feet has been described in published clinical studies. In one study, 60 patients were treated with 6 U, 12 U or 18 U of BOTOX® in the orbicularis oculi muscle on one side of the face and placebo contralaterally. At 16 weeks after injection, patients were treated with 12 U or 18 U of BOTOX® bilaterally. BOTOX® was associated with significantly higher success rates than placebo at all dose levels, as determined by both trained observers and patients. At 4 weeks post-injection, 89-95% of patients on the BOTOX®-treated side were considered by investigators as treatment responders and 60-80% of patients felt they had treatment success, compared to approximately 5-15% and 15-45%, respectively on the placebo-treated side. No clear dose response relationship was observed. Benefits of the second injection lasted longer than the first, with success rates for the second injection reaching 100% for the 12 U and 18 U groups at week 4. BOTOX® was well tolerated. No serious or severe adverse events were reported.

**Forehead Lines**

The safety and efficacy of BOTOX® for the treatment of horizontal forehead lines has been described in published clinical studies. In one study, BOTOX® was administered to 59 patients with horizontal forehead lines scoring 2 (moderate) or 3 (severe) on the facial wrinkle scale (FWS). Patients were randomly assigned to receive 8 U, 16 U and 24 U of BOTOX® injected into the frontalis muscle with additional brow depressor injections. Approximately 90% of subjects responded to treatment as rated by investigators and up to 75-80% by self-assessment at week four. There was a reduction in horizontal rhytide severity in all three BOTOX® treatment groups at both contraction and repose. There was a significant dose-response trend ($p \leq 0.019$) for sustained duration of improvement: 53% in the 24 U group versus 15% in the 8 U group at 16 weeks ($p \leq 0.023$ for difference between groups), by trained observer. There was a significant dose-response trend ($p \leq 0.011$) for rate of relapse to baseline: 35% in the 24 U group versus 75% in the 8 U group at 16 weeks ($p \leq 0.038$ for difference between groups), by trained observer. BOTOX® was well tolerated.
No serious adverse events were reported.

**Platysma Continuous Bands**

Two Phase 3 multicentre, randomised, double-blind, placebo-controlled studies evaluated BOTOX® (N=408 BOTOX® and N=426 placebo) to compare the safety and efficacy of BOTOX ® with placebo for the treatment of platysma continuous bands in adult subjects with moderate to severe platysma continuous bands at maximum contraction. Based on baseline severity, subjects were randomised to receive a single treatment of BOTOX® (26 Units, 31 Units, or 36 Units) or placebo. In pivotal studies, 3.6% (30/834) of subjects were 65 years of age or older.

The co-primary efficacy measures were the assessment of platysma continuous bands severity at maximum contraction using the 5-grade Clinician Allergan Platysma Prominence Scale (C-APPS) by the investigators, and the 5-grade Participant Allergan Platysma Prominence Scale (P-APPS) by the subjects. For both scales, the 5 grades are 1=Minimal, 2=Mild, 3=Moderate, 4=Severe, 5=Extreme. C-APPS and P-APPS assessments were performed independently. The primary timepoint was Day 14 after the first treatment.

The co-primary efficacy endpoints were defined as an achievement of at least a 2-grade improvement from baseline in platysma continuous bands severity at maximum contraction, as assessed by investigator and as assessed by subject at Day 14. The proportions of responders for both co-primary endpoints were greater in the BOTOX® group compared to placebo at Day 14 (p<0.0001 for Studies 1 [M21-309] and 2 [M21-310]) (Table 41 and Figure 8).

**Table 41: Studies 1 (M21-309) and 2 (M21-310): Number and Percentage of Subjects Achieving at Least 2-Grade Improvement from Baseline Based on Investigator and Subject Assessments of Platysma Continuous Bands Severity at Maximum Contraction at Day 14**

| | **Study 1 (M21-309)** | | **Study 2 (M21-310)** | |
|---|---|---|---|---|
| | **BOTOX® 26, 31, or 36 Units (N=181) n (%)** | **Placebo (N=186) n (%)** | **BOTOX® 26, 31, or 36 Units (N=186) n (%)** | **Placebo (N=195) n (%)** |
| **Co-primary Endpoints[a]** | | | | |
| ≥ 2-Grade Improvement based on C-APPS (Investigator Assessment) at Day 14* | 79 (43.8%) | 7 (3.9%) | 76 (41.0%) | 4 (2.2%) |
| ≥ 2-Grade Improvement based on P-APPS (Subject Assessment) at Day 14* | 83 (45.6%) | 7 (3.9%) | 76 (40.8%) | 8 (3.9%) |

a. Co-primary achievement of ≥ 2-grade improvement from baseline based on (1) investigator's assessment using C-APPS at maximum contraction at Day 14 and (2) subject's self-assessment using P-APPS at maximum contraction at Day 14.

* Model-estimated Responder rate; p-value < 0.0001 for both co-primary endpoints

**Figure 8: Studies 1 (M21-309) and 2 (M21-310): Percentages of Subjects Achieving at Least 2-Grade Improvement from Baseline Based on the Investigator and Subject Assessments of Platysma Continuous Bands Severity at Maximum Contraction Over Time**

**Study 1 (M21-309)**




**Study 2 (M21-310)**




The results for secondary efficacy endpoints are presented for Studies 1 and 2 in Table 42.

**Table 42: Secondary Efficacy Endpoint Results from Studies 1 (M21-309) and 2 (M21-310)**

| | **Study 1 (M21-309)** | | **Study 2 (M21-310)** | |
|---|---|---|---|---|
| | **BOTOX® 26, 31, or 36 Units (N=181) n (%)** | **Placebo (N=186) n (%)** | **BOTOX® 26, 31, or 36 Units (N=186) n (%)** | **Placebo (N=195) n (%)** |
| **Secondary Endpoints[a]** | | | | |
| Minimal or Mild based on P-APPS (Subject Assessment) at Day 14 n (%)[b] | 93 (51.4%) | 10 (5.2%) | 90 (48.1%) | 10 (5.2%) |
| Satisfied or Very Satisfied on ANLFQ: Satisfaction (Follow-up) Item 5 (effect of treatment) at Day 14 n (%)[b] | 115 (63.6%) | 22 (11.7%) | 114 (61.2%) | 23 (11.8%) |
| Not at all Bothered or A Little Bothered on BAS-PP Item 2 (Jawline) at Day 14 n (%)[b] | 93 (51.5%) | 21 (11.3%) | 92 (49.4%) | 40 (20.6%) |
| Not at all Bothered or A little Bothered on the BAS-PP Item 1 (Vertical Neck Bands) at Day 14 n (%)[b] | 92 (50.6%) | 10 (5.4%) | 89 (47.8%) | 23 (11.9%) |
| Change from Baseline on ANLFQ: Impacts Summary Score at Day 14 Least Squares Mean (SE)[c] | -7.8 (0.43) | -2.1 (0.44) | -7.7 (0.51) | -3.0 (0.50) |
| Change from Baseline on ANLFQ: Impacts Summary Score at Day 30 Least Squares Mean (SE)[c] | -8.4 (0.44) | -2.8 (0.45) | -8.8 (0.55) | -3.9 (0.54) |
| Change from Baseline on ANLFQ: Impacts Summary Score at Day 60 Least Squares Mean (SE)[c] | -7.7 (0.43) | -2.7 (0.43) | -8.2 (0.56) | -3.5 (0.56) |
| Change from Baseline on ANLFQ: Impacts Summary Score at Day 90 Least Squares Mean (SE)[c] | -6.3 (0.44) | -2.4 (0.45) | -7.4 (0.50) | -3.5 (0.50) |

[a] Secondary endpoints tested in order according to the prespecified gated hierarchical testing sequence. Multiple imputation for missing data used. For each endpoint, p-value <0.0001.
[b] P-value derived from CMH model stratified by investigator site and baseline C-APPS.
[c] Least squares mean with its standard error (SE) are estimated after using multiple imputation for missing data. P-value derived from ANCOVA model stratified by investigator site and baseline C-APPS with baseline value as a factor.

## 5.2 PHARMACOKINETIC PROPERTIES

Classical absorption, distribution, biotransformation and elimination studies on the active substance have not been performed due to the nature of this product.

### Distribution

Distribution in rats was studied following injection of $^{125}$I-botulinum neurotoxin A complex into the gastrocnemius muscle. Radioactivity associated with the toxin complex was mostly retained at the injection site, declining with a half-life of approximately 10 hours. Radioactivity detected in other locations (plasma, muscle, thyroid, skin) was mainly associated with probable breakdown products, indicating minimal systemic exposure to toxin.

### Metabolism

The toxin is probably metabolised by proteases and the molecular components cycled through normal metabolic pathways.

### Excretion

Within 24 hours of dosing, 60% of the radioactivity was excreted in the urine.

## 5.3 PRECLINICAL SAFETY DATA

### Genotoxicity

BOTOX® was inactive in *in vitro* tests for gene mutation and in *in vitro* and *in vivo* tests for clastogenicity.

### Carcinogenicity

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of BOTOX® injection. BOTOX® is not structurally related to any known carcinogens.

# 6 PHARMACEUTICAL PARTICULARS

## 6.1 LIST OF EXCIPIENTS

Human albumin: 0.25 mg for 50 U, 0.5 mg for 100 U or 1.0 mg for 200 U

Sodium chloride: 0.45 mg for 50 U, 0.9 mg for 100 U or 1.8 mg for 200 U

## 6.2 INCOMPATIBILITIES

Incompatibility studies were not assessed as part of the registration of BOTOX®. BOTOX® should therefore not be mixed with other medicinal products.

## 6.3 SHELF LIFE

36 months.

## 6.4 SPECIAL PRECAUTIONS FOR STORAGE

Store the vacuum-dried product in the refrigerator between 2° C to 8° C.

Administer BOTOX® within 24 hours after the vial is removed from the refrigerator and reconstituted. During these twenty four hours, reconstituted BOTOX® should be stored in a refrigerator (2° C to 8° C). If reconstituted BOTOX® is further diluted in a syringe for

intradetrusor injections, it should be used immediately. Reconstituted BOTOX® should be clear, colourless or slightly yellow and free of particulate matter.

The reconstituted product does not contain a preservative. It should be used for one patient only and any residue discarded.

### 6.5 NATURE AND CONTENTS OF CONTAINER

BOTOX® (botulinum toxin type A) purified neurotoxin complex is a sterile, vacuum-dried preparation. It is supplied in a clear glass vial with a rubber stopper and tamper-proof aluminium seal, containing a white powder for reconstitution. BOTOX® is available in 50 U, 100 U and 200 U of vacuum-dried *Clostridium botulinum* toxin, type A.

### 6.6 SPECIAL PRECAUTIONS FOR DISPOSAL

All vials, including expired vials, or equipment used with the drug should be disposed of carefully as is done with all medical waste. Unused vials should be reconstituted with a small amount of water and then autoclaved. Any unused vials or equipment (such as syringes) should be autoclaved (120° C for 30 minutes) or the residual BOTOX® inactivated using dilute hypochlorite solution (0.5% or 1%) for five minutes and then disposed of as medical waste.

### 6.7 PHYSICOCHEMICAL PROPERTIES

**Chemical structure**

BOTOX® (botulinum toxin type A) neurotoxin complex is produced from the fermentation of *Clostridium botulinum* type A (Hall strain) and is purified from the culture solution as an approximately 900 kD molecular weight complex consisting of the neurotoxin and several accessory proteins. The complex is dissolved in sterile sodium chloride solution containing human serum albumin and is sterile filtered (0.2 microns) prior to filling and vacuum-drying.

One unit (U) of BOTOX® corresponds to the calculated median intraperitoneal lethal dose ($LD_{50}$) in mice, performed in a mouse potency assay. This assay method is specific to Abbvie's product, BOTOX®. Due to specific method details such as the vehicle, dilution scheme and laboratory protocols for the various mouse $LD_{50}$ assays, units of biological activity of BOTOX® cannot be compared to or converted into units of any other botulinum toxin activity.

**CAS number**

93384-43-1

## 7 MEDICINE SCHEDULE (POISONS STANDARD)

S4: Prescription Only Medicine

BOTOX® 50 U - AUST R 195530
BOTOX® 100 U - AUST R 67311

BOTOX® 200 U - AUST R 172264

## 8 SPONSOR

AbbVie Pty Ltd
241 O'Riordan Street
Mascot NSW 2020
Australia

## 9 DATE OF FIRST APPROVAL

09 July 1999

## 10 DATE OF REVISION

27 June 2025

## SUMMARY TABLE OF CHANGES

| Section Changed | Summary of new information |
|---|---|
| **4.1** | Addition of extension of indication wording for Platysma Continuous Bands |
| **4.2** | Addition of Dose and Method of Administration guidance for Platysma Continuous Bands |
| **4.8** | Addition of Adverse Drug Reactions related to Platysma Continuous Bands |
| **5.1** | Addition of Clinical Trials information for Platysma Continuous Bands |
| **All** | Updated tables and figures numbering throughout the document |

BOTOX and its design are trademarks of Allergan, Inc., an AbbVie company.© 2025 AbbVie. All rights reserved.

# EXHIBIT 11

Menu

Allergan Aesthetics
an AbbVie company

# BOTOX®

(botulinum toxin type A) injection

With Prescription

**Active Ingredient Name:** botulinum toxin, type A

---

## Information for Healthcare Professionals

Product Information (PI)

---

## Consumer Information

Consumer Medicine Information (CMI)

AU-NON-2050102 V1 DoP: May 2021

Allergan Aesthetics
an AbbVie company

CONTACT

CAREERS

COMPLIANCE

PRIVACY

TERMS

SITEMAP

COOKIES SETTINGS

Copyright © 2025 AbbVie Inc.

# EXHIBIT 12

# NEW ZEALAND DATA SHEET

## 1. PRODUCT NAME

BOTOX® (botulinum toxin type A) purified neurotoxin complex 50 units (U), 100 units (U) or 200 units (U) powder for injection.

## 2. QUALITATIVE AND QUANTITATIVE COMPOSITION

Each vial of BOTOX® injection contains either 50 units (U), 100 units (U) or 200 units (U) of botulinum toxin type A as a haemagglutinin complex.

For the full list of excipients, see section 6.1.

## 3. PHARMACEUTICAL FORM

A sterile, vacuum-dried preparation. Powder for injection.

## 4. CLINICAL PARTICULARS

### 4.1 Therapeutic indications

BOTOX® (botulinum toxin type A) purified neurotoxin complex is indicated:

- for the treatment of overactive bladder with symptoms of urinary incontinence, urgency and frequency, in adults who have an inadequate response to or are intolerant of an anticholinergic medication
- for the treatment of urinary incontinence due to neurogenic detrusor overactivity (e.g. spinal cord injury or multiple sclerosis) in adults who have an inadequate response to or are intolerant of an anticholinergic medication
- for the prophylaxis of headaches in adults with chronic migraine (headaches on at least 15 days per month with headache lasting 4 hours a day or longer, of which at least 8 days are with migraine)
- for the treatment of strabismus and blepharospasm associated with dystonia, including benign essential blepharospasm or VIIth nerve disorders in patients 12 years of age and above
- to reduce the subjective symptoms and objective signs of spasmodic torticollis (cervical dystonia) in adults
- treatment of focal spasticity in children two years and older
- for the treatment of primary hyperhidrosis of the axillae
- for the treatment of focal spasticity in adults
- for the treatment of upper facial rhytides, including forehead, crow's feet and glabellar lines.

### 4.2 Dose and method of administration

**Route of Administration**

Intramuscular injection.

Reconstituted BOTOX® is injected with the purpose of reaching the motor endplate region of the muscle to be treated.

May be subcutaneous for blepharospasm.

Intradermal for hyperhidrosis of the axillae.

**General**

**BOTOX® should only be given by physicians with the appropriate qualifications and experience in the treatment of patients and the use of required equipment.**

**The use of one vial for more than one patient is not recommended because the product and diluent do not contain a preservative. Once opened and reconstituted, store in the refrigerator and use within twenty-four hours. Discard any remaining solution. Do not freeze reconstituted BOTOX®.**

Optimum dose levels and the number of injection sites per muscle have not been established for all indications. The exact dosage and number of injection sites should be tailored to the patient's needs based on the size, number and location of muscles involved, severity of the disease, presence of local muscle weakness, response to previous treatment and the patient's medical condition. In general, dosing of BOTOX® should be individualised for each patient and always start with the minimal effective dose. The dosing interval should typically not be more frequent than every three months.

***Bladder Dysfunction***

Patients should not have an urinary tract infection at the time of treatment. Prophylactic antibiotics should be administered 1 - 3 days pre-treatment, on the treatment day and 1 - 3 days post-treatment. It is recommended that patients discontinue anti-platelet therapy at least 3 days before the injection procedure. Patients on anti-coagulant therapy need to be managed appropriately to decrease the risk of bleeding.

***Overactive Bladder***

An intravesical instillation of diluted local anaesthetic with or without sedation may be used prior to injection, as per local site practice. If a local anaesthetic instillation is performed, the bladder should be drained and irrigated with sterile saline before injection.

The recommended dose is 100 U of BOTOX®.

The recommended dilution is 100 U/10 mL with 0.9% non-preserved sterile saline solution (see **DILUTION TABLE – Table 6**). Dispose of any unused saline.

Reconstituted BOTOX® (100 U/10 mL) is injected into the detrusor muscle via a flexible or rigid cystoscope, avoiding the trigone. The bladder should be instilled with enough saline to achieve adequate visualisation for the injections but over-distension should be avoided.

The injection needle should be filled (primed) with approximately 1 mL of reconstituted BOTOX® prior to the start of injections (depending on the needle length) to remove any air.

The needle should be inserted approximately 2 mm into the detrusor and 20 injections of 0.5 mL each (total volume of 10 mL) should be spaced approximately 1 cm apart (see figure 1 below). For the final

injection, approximately 1 mL of sterile normal saline should be injected so the full dose is delivered. After the injections are given, the saline used for bladder wall visualisation should not be drained so that patients can demonstrate their ability to void prior to leaving the clinic. The patient should be observed for at least 30 minutes post-injection and until a spontaneous void has occurred.

Clinical improvement may occur within 2 weeks. Patients should be considered for re-injection when the clinical effect of the previous injection has diminished (median duration in Phase 3 clinical trials was 166 days [~24 weeks]) but no sooner than 3 months from the prior bladder injection.

**Figure 1**




***Neurogenic Detrusor Overactivity***

An intravesical instillation of diluted local anaesthetic with or without sedation, or general anaesthesia, may be used prior to injection, as per local site practice. If a local anaesthetic instillation is performed, the bladder should be drained and irrigated with sterile saline before injection.

The recommended dose is 200 U of BOTOX®.

Reconstitute two 100 U vials of BOTOX®, each with 6 mL of 0.9% non-preserved sterile saline solution and mix the vials gently. Draw 4 mL from each vial into each of two 10 mL syringes. Draw the remaining 2 mL from each vial into a third 10 mL syringe. Complete the reconstitution by adding 6 mL of 0.9% non-preserved sterile saline solution into each of the 10 mL syringes and mix gently. This will result in three 10 mL syringes each containing 10 mL (~67 U in each), for a total of 200 U of reconstituted BOTOX®. Use immediately after reconstitution in the syringe. Dispose of any unused saline.

Reconstituted BOTOX® (200 U/30 mL) is injected into the detrusor muscle via a flexible or rigid cystoscope, avoiding the trigone. The bladder should be instilled with enough saline to achieve adequate visualisation for the injections but over-distension should be avoided.

The injection needle should be filled (primed) with approximately 1 mL of reconstituted BOTOX® prior to the start of injections (depending on the needle length) to remove any air.

The needle should be inserted approximately 2 mm into the detrusor and 30 injections of 1 mL (~6.7 U) each (total volume of 30 mL) should be spaced approximately 1 cm apart (see figure 1 above). For the final injection, approximately 1 mL of sterile normal saline should be injected so the full dose is delivered. After the injections are given, the saline used for bladder wall visualisation should be drained. The patient should be observed for at least 30 minutes post-injection.

Clinical improvement generally occurs within 2 weeks. Patients should be considered for re-injection when the clinical effect of the previous injection has diminished (median duration in Phase 3 clinical trials was 256 - 295 days (36 - 42 weeks) for BOTOX® 200 U) but no sooner than 3 months from the prior bladder injection.

***Chronic Migraine***

The recommended dose for treating chronic migraine is 155 U to 195 U administered intramuscularly (i.m.) using a 30-gauge, 0.5 inch needle as 0.1 mL (5 U) injections per each site. Injections should be divided across 7 specific head/neck muscle areas as specified in Table 1 below. A 1-inch needle may be needed in the neck region for patients with extremely thick neck muscles. With the exception of the procerus muscle, which should be injected at 1 site (midline), all muscles should be injected bilaterally with the minimum dose per muscle as indicated below, with half the number of injection sites administered to the left and half to the right side of the head and neck. If there is a predominant pain location(s), additional injections to one or both sides may be administered in up to 3 specific muscle groups (occipitalis, temporalis and trapezius), up to the maximum dose per muscle as indicated in Table 1 below.

The recommended re-treatment schedule is every 12 weeks.

**Table 1: BOTOX® Dosing by Muscle for Chronic Migraine**

| | **Recommended Dose** |
|---|---|
| **Head/Neck Area** | **Total Number of Units (U) (number of IM injection sites[a])** |
| Frontalis[b] | 20 U (4 sites) |
| Corrugator[b] | 10 U (2 sites) |
| Procerus | 5 U (1 site) |
| Occipitalis[b] | 30 U (6 sites) up to 40 U (up to 8 sites) |
| Temporalis[b] | 40 U (8 sites) up to 50 U (up to 10 sites) |
| Trapezius[b] | 30 U (6 sites) up to 50 U (up to 10 sites) |
| Cervical Paraspinal Muscle Group[b] | 20 U (4 sites) |
| **Total Dose Range:** | 155 U to 195 U |

*[a] 1 IM injection site = 0.1 mL = 5 U BOTOX®*

*[b] Dose distributed bilaterally for minimum dose*

***Cervical Dystonia (spasmodic torticollis)***

Dosing must be tailored to the individual patient based on the patient's head and neck position, localisation of pain, muscle hypertrophy, patient's body weight and patient response.

Multiple injection sites allow BOTOX® to have more uniform contact with the innervation areas of the dystonic muscle and are especially useful in larger muscles. The optimal number of injection sites is dependent upon the size of the muscle to be chemically denervated. The treatment of cervical dystonia typically may include, but is not limited to, injection of BOTOX® into the sternocleidomastoid, levator scapulae, scalene, splenius capitis and/or the trapezius muscle(s).

A 25-, 27- or 30-gauge needle should be used for superficial muscles and a needle of appropriate length may be used for deeper musculature. For cervical dystonia, localisation of the involved muscles with electromyographic guidance may be useful.

Table 2 below is intended to provide dosing guidelines for injection of BOTOX® in the treatment of cervical dystonia.

**Table 2: Dosage Guide**

| **Classification of Cervical Dystonia** | **Muscle Groupings** | **Total Dosage; Number of Sites** |
|---|---|---|
| Type I<br>Head rotated toward side of shoulder elevation | Sternocleidomastoid<br>Levator scapulae<br>Scalene<br>Splenius capitis<br>Trapezius | 50 - 100 U; at least 2 sites<br>50 U; 1 - 2 sites<br>25 - 50 U; 1 - 2 sites<br>25 - 75 U; 1 - 3 sites<br>25 - 100 U; 1 - 8 sites |
| Type II<br>Head rotation only | Sternocleidomastoid | 25 - 100 U; at least 2 sites if >25 U given |
| Type III<br>Head tilted toward side of shoulder elevation | Sternocleidomastoid<br><br>Levator scapulae<br>Scalene<br>Trapezius | 25 - 100 U; at posterior border; at least 2 sites if >25 U given<br>25 - 100 U; at least 2 sites<br>25 - 75 U; at least 2 sites<br>25 - 100 U; 1 - 8 sites |
| Type IV<br>Bilateral posterior cervical muscle spasm with elevation of the face | Splenius capitis and cervicis | 50 - 200 U; 2 - 8 sites, treat bilaterally |

This information is provided as guidance for initial injection. The extent of muscle hypertrophy and the muscle groups involved in the dystonic posture may change with time, necessitating alterations in the dose of toxin and muscles to be injected. The exact dose and sites injected must be individualised for each patient.

Table 3 below shows the median dose of BOTOX® injected per muscle in a clinical trial in which dose was determined by the practitioner based on the presentation of the individual cervical dystonia patient.

**Table 3: BOTOX® Dosing by Muscle for Cervical Dystonia**

| **Muscle(s)** | **Range of Medians* (U)** | **Minimum - Maximum Dose, U/muscle**** |
|---|---|---|
| Sternocleidomastoid | 50 | 15 - 190 |
| Trapezius | 50 - 60 | 5 - 200 |
| Levator scapulae | 50 | 10 - 180 |
| Splenius capitis/cervicis | 90 | 10 - 240 |
| Scalene | 40 | 5 - 90 |

* Two medians were given: for those patients who received one injection cycle (n = 121) and for those patients who received two injection cycles (n = 90). When only one number is given, the medians were the same for both groups of patients.

** Limiting the dose injected into the sternocleidomastoid muscle to less than 100 U may decrease the occurrence of dysphagia (see **SPECIAL WARNINGS AND PRECAUTIONS FOR USE**).

In initial controlled clinical trials to establish safety and efficacy for cervical dystonia, doses of BOTOX® ranged from 140 to 280 U. In more recent trials, the doses have ranged from 95 to 360 U (with an approximate mean of 240 U). As with any medicinal treatment, initial dosing should begin at the lowest effective dose.

In general, a total dose of 360 U every two months should not be exceeded for the treatment of cervical dystonia. The time-to-retreatment will vary between patients, however data from controlled clinical trials indicates that symptoms may start to re-emerge at approximately 8-10 weeks post-injection. Clinical improvement generally occurs within the first two weeks after injection. The maximum clinical benefit generally occurs approximately six weeks post-injection. The duration of therapeutic effect reported in clinical trials showed substantial variation (from 2 to 32 weeks), with a typical duration of approximately 12 to 16 weeks, depending on the patient's individual disease and response.

Repeat doses should be administered when the clinical effect of a previous injection diminishes, though usually not more frequently than every two months. “Booster” injections are not recommended.

***Strabismus***

BOTOX® is intended for injection into extraocular muscles utilising the electrical activity recorded from the tip of the injection needle as a guide to placement within the target muscle. Injection without surgical exposure or electromyographic guidance should not be attempted. Physicians should be familiar with electromyographic techniques.

An injection of BOTOX® is prepared by drawing into a sterile tuberculin syringe an amount of the properly diluted toxin (see **DILUTION TABLE – Table 6**) slightly greater than the intended dose. Air bubbles in the syringe barrel are expelled and the syringe is attached to the electromyographic injection needle, preferably a one and a half inch, 27-gauge needle. Injection volume in excess of the intended dose is expelled through the needle into an appropriate waste container to assure patency of the needle and to confirm that there is no syringe-needle leakage. A new, sterile needle and syringe should be used to enter the vial on each occasion for dilution or removal of BOTOX®.

To prepare the eye for BOTOX® injection, it is recommended that several drops of a local anaesthetic and an ocular decongestant be given several minutes prior to injection.

**NOTE**: The volume of BOTOX® injected for treatment of strabismus should be between 0.05 mL to 0.15 mL per muscle.

Strabismus dosage: The initial doses of the diluted BOTOX® (see **DILUTION TABLE – Table 6**) typically create paralysis of injected muscles beginning one to two days after injection and increases in intensity during the first week. Paralysis lasts for 2 - 6 weeks and gradually resolves over a similar time period.

Overcorrections lasting over 6 months have been rare. About one half of patients will require subsequent doses because of inadequate paralytic response of the muscle to the initial dose because of mechanical factors such as large deviations or restrictions or because of lack of binocular motor fusion to stabilise the alignment.

**1. Initial doses in units (abbreviated as U)**

Use the lower listed doses for treatment of small deviations. Use the larger doses only for large deviations.

A. For vertical muscles and for horizontal strabismus of less than 20 prism dioptres: 1.25 U to 2.5 U in any one muscle.

B. For horizontal strabismus of 20 prism dioptres to 50 prism dioptres: 2.5 U to 5.0 U in any one muscle.

C. For persistent VIth nerve palsy of one month or longer duration: 1.25 U to 2.5 U in the medial rectus muscle.

**2. Subsequent doses for residual or recurrent strabismus**

A. It is recommended that patients be re-examined 7 - 14 days after each injection to assess the effect of that dose.

B. Patients experiencing adequate paralysis of the target muscle that require subsequent injections should receive a dose comparable to the initial dose.

C. Subsequent doses for patients experiencing incomplete paralysis of the target muscle maybe increased up to twice the amount of the previously administered dose.

D. Subsequent injections should not be administered until the effects of the previous dose have dissipated as evidenced by substantial function in the injected and adjacent muscles.

E. The maximum recommended dose as a single injection for any one muscle is 25 U.

***Blepharospasm***

An injection of BOTOX® is prepared by drawing into a sterile 1.0 mL tuberculin syringe an amount of the properly diluted toxin (see **DILUTION TABLE – Table 6**) slightly greater than the intended dose. A new, sterile needle and syringe should be used to enter the vial on each occasion for dilution or removal of BOTOX®.

For blepharospasm, diluted BOTOX® (see **DILUTION TABLE – Table 6**) is injected using a sterile, 27 - 30-gauge needle with or without electromyographic guidance. 1.25 U to 2.5 U (0.05 mL to 0.1 mL volume at each site) injected into the medial and lateral pre-tarsal orbicularis oculi of the upper lid and into the lateral pre-tarsal orbicularis oculi of the lower lid is the initial recommended dose. Pre-tarsal injections are often appropriate and may vary based on the patient's presentation. In the upper lid, maximising the distance of the injection from the levator palpebrae superioris may reduce the complication of ptosis. Avoiding medial lower lid injections, and thereby reducing diffusion into the inferior oblique, may reduce the complication of diplopia. Ecchymosis may occur easily in the soft eyelid tissue. This may be reduced by applying light pressure at the injection site immediately after the injection.

In general, the initial effect of the injections is seen within three days and reaches a peak at one to two weeks post-treatment. Each treatment lasts approximately three months, following which the procedure can be repeated as needed.

At repeat treatment sessions, the dose may be increased up to two-fold if the response from the initial treatment is considered insufficient - usually defined as an effect that does not last longer than two months. However, there appears to be a minimal increase in benefit from injecting more than 5.0 U per site.

Some tolerance may be found when BOTOX® is used in treating blepharospasm if treatments are given any more frequently than every three months. The effect is rarely permanent.

The cumulative dose of BOTOX® in a two-month period should not exceed 200 U.

### *VIIth Nerve Disorders*

Patients with hemifacial spasm or VIIth nerve disorder should be treated as for unilateral blepharospasm. Further injections may be necessary into the corrugator, zygomaticus major, orbicularis oris and/or other facial muscles according to the extent of the spasm. Electromyographical control may be useful to identify small circumoral muscles.

The cumulative dose of BOTOX® in a two-month period should not exceed 200 U.

### *Focal Spasticity in Children two years and older*

The exact dose and number of injection sites should be tailored to the child's needs based on the size, number and location of muscles involved, the severity of spasticity, presence of local muscle weakness and the patient's response to previous treatment. In clinical trials, the dose per muscle ranged from 0.5 - 2.0 U/kg body weight in the upper limb and 2.0 - 4.0 U/kg body weight in the lower limb per treatment session. For the treatment of equinus foot deformity, the total dose is up to 4 U/kg or 200 U (whichever is the lesser amount) divided into two sites in each medial and lateral head of the gastrocnemius muscle. In other muscles, the dose per muscle ranged from 3.0 - 8.0 U/kg body weight and did not exceed 300 U divided among selected muscles at any treatment session. Following initial injection to the gastrocnemius muscle, further involvement of the anterior or posterior tibialis may need to be considered for additional improvement in the foot position at heel strike and during standing.

A 27- or 30-gauge needle should be used with an appropriate needle length to reach the targeted muscles. For focal spasticity, localisation techniques include electromyography, muscle ultrasound or electrical stimulation.

Clinical improvement generally occurs within the first two weeks after injection. Repeat doses should be administered when the clinical effect of a previous injection diminishes but typically not more frequently than every three months. The maximum degree of muscle spasticity at the time of re-injection may necessitate alterations in the dose of BOTOX® and muscles to be injected.
Table 4 below is intended to give dosing guidelines for injection of BOTOX® in the treatment of focal spasticity in children aged 2 years and older. The maximum cumulative dose should generally not exceed 8.0 U/kg body weight and up to a maximum of 300 U divided among selected muscles at any treatment session or in a 3-month interval.

**Table 4: BOTOX® Dosing by Muscle for Focal Spasticity in Children**

| **Muscles in upper limb** | **Dosage in U/kg/muscle** |
|---|---|
| Biceps brachii | 0.5 - 2.0 U |
| Brachialis | 0.5 - 2.0 U |
| Brachioradialis | 0.5 - 2.0 U |
| Flexor carpi ulnaris | 0.5 - 2.0 U |
| Flexor carpi radialis | 0.5 - 2.0 U |
| Pronator teres | 0.5 - 2.0 U |
| Pronator quadratus | 0.5 - 2.0 U |
| Flexor digitorum profundus | 0.5 - 2.0 U |
| Flexor digitorum sublimis | 0.5 - 2.0 U |
| Flexor pollicis longus | 0.5 - 2.0 U |
| Flexor pollicis brevis | 0.5 - 2.0 U |

| | |
|---|---|
| Opponens pollicis | 0.5 - 2.0 U |
| Adductor pollicis | 0.5 - 2.0 U |
| **Muscles in lower limb** | **Dosage in U/kg/muscle** |
| Hip adductor group (adductor longus, adductor brevis, adductor magnus, medial hamstrings) | 4.0 U |
| Gastrocnemius | 2.0 - 4.0 U |

***Focal Spasticity in Adults***

The exact dosage and number of injection sites should be tailored to the individual based on the size, number and location of muscles involved, the severity of spasticity, presence of local muscle weakness and the patient response to previous treatment. Clinical trials support a maximum dose of 360 U divided among selected muscles (typically in the flexor muscles of the elbow, wrist and fingers) for treating upper limb spasticity and a maximum dose of 400 U divided among selected muscle groups for treating adult lower limb spasticity at any treatment session. Clinical improvement in muscle tone generally occurs within two weeks following treatment with the peak effect seen four to six weeks following treatment. In clinical trials, patients were re-injected at 12-to-16-week intervals. The degree of muscle spasticity at the time of re-injection may necessitate alterations in the dose of BOTOX® and muscles to be injected.

Table 5 below is intended to provide dosing guidelines for injection of BOTOX® in the treatment of focal spasticity.

**Table 5: BOTOX® Dosing by Muscle for Focal Spasticity in Adults**

| Muscle | Total Dosage; Number of Sites |
|---|---|
| **Upper Limb** | |
| Biceps brachii | 100 - 200 U; up to 4 sites |
| Flexor digitorum profundus | 15 - 50 U; 1 - 2 sites |
| Flexor digitorum sublimis | 15 - 50 U; 1 - 2 sites |
| Flexor carpi radialis | 15 - 60 U; 1 - 2 sites |
| Flexor carpi ulnaris | 10 - 50 U; 1 - 2 sites |
| Adductor pollicis | 20 U; 1 - 2 sites |
| Flexor pollicis longus | 20 U; 1 - 2 sites |
| **Lower Limb** | |
| Posterior tibialis | 70 - 100 U; 1 - 2 sites |
| Soleus | 80 - 125 U; 1 - 2 sites |
| Flexor hallucis longus | 50 U; 2 sites |
| Flexor digitorum longus/brevis | 50 - 100 U; 2 - 4 sites |
| Gastrocnemius medial/lateral | 50 - 200 U; 2 - 4 sites |

A 25-, 27- or 30-gauge needle should be used with an appropriate needle length to reach the targeted muscles. For focal spasticity, localisation techniques include electromyography, muscle ultrasound or electrical stimulation.

Multiple injection sites may allow BOTOX® to have more uniform contact with the innervation areas of the muscle and may be especially useful in larger muscles.

***Primary Hyperhidrosis of the Axillae***

The hyperhidrotic area to be injected may be defined using standard staining techniques, e.g. Minor's iodine-starch test. BOTOX® is reconstituted with 0.9% non-preserved sterile saline solution (100 U/4.0 mL). Using a 30-gauge needle, 50 U of BOTOX® (2.0 mL) is injected intradermally, to each axilla evenly distributed in multiple sites approximately 1 - 2 cm apart. Each dose is injected to a depth of approximately 2 mm and at a 45-degree angle to the skin surface with the bevel side up to minimise leakage and ensure the injections remain intradermal.

At week 1, BOTOX®-treated patients demonstrated 95% treatment responder rate based on gravimetric assessment. At 16 weeks, 82% of BOTOX®-treated patients were responding to treatment. Approximately 40% of patients received only 1 treatment with BOTOX® and had a duration of effect for over 1 year (median time 68 weeks). When patients received at least 2 consecutive treatments with BOTOX®, the mean time to re-treatment following their first treatment was 33 weeks (range 15 to 51 weeks). Repeat injections for axillary hyperhidrosis should be administered when the effects from previous injections subside but usually not more frequently than every two months.

***Upper Facial Lines (Glabellar Lines, Crow's Feet and Forehead Lines)***

As optimum dose levels and number of injection sites per muscle may vary among patients, individual dosing regimens should be drawn up. The recommended injection volume per injection site is 0.1 mL.

***Glabellar Lines***

BOTOX® should be reconstituted with 0.9% non-preserved sterile saline solution (100 U/2.5 mL) and injected using a sterile 30-gauge needle. A volume of 0.1 mL (4 U) is administered in each of 5 injection sites, 2 injections in each corrugator muscle and 1 injection in the procerus muscle for a total dose of 20 U.

In order to reduce the complication of ptosis, injection near the levator palpebrae superioris muscle should be avoided, particularly in patients with larger brow-depressor complexes. Medial corrugator injections should be placed at least 1 cm above the bony supraorbital ridge.

Improvement of the severity of glabellar lines generally occurs within one week after treatment. The effect was demonstrated for up to 4 months.

***Crow's Feet***

BOTOX® should be injected bilaterally at 3 sites in the lateral aspect of the orbicularis oculi (i.e. total of 6 injections), where most lines are seen when a smile is forced. In general, 2 - 6 U is recommended per injection site at a 2 - 3 mm depth, for a total dose of 6 - 18 U per side.

Injections should be at least 1 cm outside the bony orbit, not medial to the vertical line through the lateral canthus and not close to the inferior margin of the zygoma.

***Forehead Lines***

BOTOX® should be injected intramuscularly at each of 4 injection sites in the frontalis muscle. In general, 2 - 6 U is recommended per injection site every 1 - 2 cm along either side of a deep forehead crease, for a total dose of 8 - 24 U.

Injections should be at least 2 - 3 cm above the eyebrow to reduce the risk of brow ptosis.

**Dilution Technique**

It is good practice to perform vial reconstitution and syringe preparation over plastic-lined paper towels to catch any spillage. To reconstitute vacuum-dried BOTOX® injection, use sterile normal saline without a preservative; 0.9% w/v non-preserved, sterile sodium chloride injection is the recommended diluent. Draw up the proper amount of diluent in the appropriate size syringe. Since BOTOX® is denatured by bubbling or similar violent agitation, inject the diluent into the vial gently. Discard the vial if a vacuum does not pull the diluent into the vial. Record the date and time of reconstitution on the space on the label. BOTOX® should be administered within 24 hours after reconstitution in the vial.

During this time period, reconstituted BOTOX® should be stored in a refrigerator (2°C to 8°C). Reconstituted BOTOX® should be clear, colourless to slightly yellow and free of particulate matter. Parenteral medicines should be inspected visually for particulate matter and discolouration prior to administration and whenever the solution and the container permit. The product and recommended diluent do not contain a preservative and are for single use only.

For reconstitution technique for intradetrusor injections for neurogenic detrusor overactivity, please refer to **DOSE AND METHOD OF ADMINISTRATION** under the sub-heading **NEUROGENIC DETRUSOR OVERACTIVITY**.

**Table 6: Dilution Table for 50 U, 100 U and 200 U**

| **Diluent Added (0.9% non-preserved sterile Sodium chloride Injection)** | | **50 U Vial** | **100 U Vial** | **200 U Vial** |
|---|---|---|---|---|
| | | **Resulting dose (U/0.1 mL)** | **Resulting dose (U/0.1 mL)** | **Resulting dose (U/0.1 mL)** |
| 0.5 mL | | 10 | 20 | 40 |
| 1 mL | | 5 | 10 | 20 |
| 2 mL | | 2.5 | 5 | 10 |
| 4 mL | | 1.25 | 2.5 | 5 |
| 5 mL | | N/A | 2 | 4 |
| 8 mL | | N/A | 1.25 | 2.5 |
| 10 mL | | N/A | 1 | 2 |

**NOTE:** These dilutions are calculated for an injection volume of 0.1 mL. A decrease or increase in the BOTOX® dose is also possible by administering a smaller or larger injection volume - from 0.05 mL (50% decrease in dose) to 0.15 mL (50% increase in dose).

**Lack of Response**

In the absence of the desired effect after the first treatment session, i.e. no significant clinical improvement from baseline by one month after injection, the following actions should be considered:

- Analysis of potential causes of lack of effect, e.g. inappropriate selection of muscles to be injected; insufficient dose; poor injection technique; muscles inaccessible to injection; underlying structural abnormalities such as muscle contractures or bone disorders; relative weakness of antagonist muscles; change in pattern of muscle involvement; patient perception of benefit compared with initial results; inappropriate storage or reconstitution and/or formation of toxin-neutralising antibodies.

- Re-evaluation of the appropriateness of treatment with botulinum toxin type A.

For the second treatment session, in the absence of any undesirable effects after the first treatment session, the physician should consider the following:

- adjust the dose, taking into account the analysis of the earlier treatment failure;
- use of EMG guidance as appropriate; and
- maintain a three-month interval between the two treatment sessions.

In the event of treatment failure or diminished effect following repeat injections, taking into account dose adjustments and targeting of injections, alternative treatment methods should be considered.

A neutralising antibody is defined as an antibody that inactivates the biological activity of the toxin. In general, the proportion of patients who lose their response to botulinum toxin and have demonstrable levels of neutralising antibodies is less than 5%, though in a long-term juvenile cerebral palsy trial, of 117 patients treated with BOTOX®, antibodies were detected in 33/117 (28%) at either 27 or 39 months. Thirty-one of these 33 had previously been responders; 19 continued to respond; 7 became clinical non-responders and no further data is available in 5 patients.

In the pivotal trials, none of the 615 overactive bladder patients with analysed specimens developed the presence of neutralising antibodies to BOTOX®. Following on from these pivotal and open-label extension trials, specimens analysed from patients showed that no neutralising antibodies developed in any of the 954 patients (0.0%) who had received BOTOX® 100 U doses. Only 3 of 260 patients (1.2%) developed neutralising antibodies after subsequently receiving at least one BOTOX® 150 U dose, of which one of these three patients continued to experience clinical benefit.

In the pivotal trials (300 U and 200 U), none of the 475 neurogenic detrusor overactivity patients with analysed specimens developed the presence of neutralising antibodies. In patients with analysed specimens in the drug development program (including the open-label extension trial), neutralising antibodies developed in 3 of 300 patients (1.0%) after receiving only BOTOX® 200 U doses and 5 of 258 patients (1.9%) after receiving at least one 300 U dose. Four of these eight patients continued to experience clinical benefit.

The critical factors for neutralising antibody production are the frequency and dose of injection. Tolerance may be observed in some patients treated more frequently than every three months. The potential for neutralising antibody formation may be minimised by injecting with the lowest effective dose given at the longest feasible intervals between injections (injection intervals should be no more frequent than every two months). The maximum dose should not be exceeded in any two-month period for adult spasticity patients and patients with cervical dystonia. In treating paediatric patients, the maximum cumulative dose should generally not exceed 8 U/kg up to a maximum of 300 U, in a 3-month interval. More than one ineffective treatment course should occur before classification of a patient as a non-responder, because there are patients who continue to respond to therapy despite the presence of neutralising antibodies.

**Paediatric Use**

The safety and effectiveness of BOTOX® in the treatment of urinary incontinence due to overactive bladder, urinary incontinence due to neurogenic detrusor overactivity and prophylaxis of headaches in adults with chronic migraine have not been established in patients below the age of 18 years.

Safety and effectiveness in children below the age of 12 years have not been established for the indications of blepharospasm, strabismus, VIIth nerve disorder, cervical dystonia, upper facial lines (forehead, crow's feet and glabellar lines) or primary hyperhidrosis of the axillae, nor in children below 2 years of age for cerebral palsy.

There have been rare spontaneous reports of death sometimes associated with aspiration pneumonia in children with severe cerebral palsy after treatment with botulinum toxin. A causal association to BOTOX® has not been established in these cases. Some of these patients had risk factors including significant neuromuscular debility, dysphagia, aspiration pneumonia, seizures and cardiovascular disease. Post-marketing reports of possible distant effects from the site of injection have been very rarely reported in paediatric patients with co-morbidities, predominantly with cerebral palsy who received >8 U/kg. Extreme caution should be exercised when treating paediatric patients who have significant neurologic debility, dysphagia or have a recent history of aspiration pneumonia or lung disease.

New onset or recurrent seizures have also been reported, typically in children who are predisposed to experiencing these events. The exact relationship of these events to the BOTOX® injection has not been established.

**Use in the Elderly**

Overall, with the exception of Overactive Bladder (see below), clinical trials of BOTOX® did not identify differences in responses between the elderly and younger patients. Dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range.

**Overactive Bladder**

Of 1242 patients in placebo-controlled clinical trials of BOTOX®, 41.4% (n = 514) were 65 years of age or older and 14.7% (n = 182) were 75 years of age or older. No overall difference in the safety profile following BOTOX® treatment was observed between patients aged 65 years and older compared to younger patients in these trials, with the exception of urinary tract infection where the incidence was higher in patients 65 years of age or older in both the placebo and BOTOX® groups compared to younger patients. Similarly, no overall difference in effectiveness was observed between these age groups in placebo-controlled pivotal clinical trials.

## 4.3 Contraindications

BOTOX® injection is contraindicated

- in individuals with known hypersensitivity to the active substance or to any of the excipients listed in section 6.1.
- in patients with myasthenia gravis or Eaton Lambert syndrome.
- in the presence of infection at the proposed injection site(s).

***Bladder Dysfunction***

Intradetrusor injection of BOTOX® is contraindicated in patients who have a urinary tract infection and in patients with acute urinary retention who are not routinely catheterising.

Due to the risk of urinary retention, intradetrusor injection of BOTOX® is also contraindicated in patients who are not willing and/or able to initiate catheterisation post-treatment, if required.

## 4.4 Special warnings and precautions for use

**General**

The recommended dosages and frequencies of administration for BOTOX® injection should not be exceeded.

Formation of neutralising antibodies to botulinum toxin type A may reduce the effectiveness of BOTOX® treatment by inactivating the biological activity of the toxin. The critical factors for neutralising antibody formation have not been well characterised. The potential for antibody formation may be minimised by injecting with the lowest effective dose given at the longest feasible intervals between injections.

Post-marketing safety data from BOTOX® and other approved botulinum toxins suggest that botulinum toxin effects may, in some cases, be observed beyond the site of local injection. The symptoms are consistent with the mechanism of action of botulinum toxin and have been reported hours to weeks after injection. Symptoms may include muscular weakness, ptosis, diplopia, blurred vision, facial weakness, swallowing and speech disorders, constipation, aspiration pneumonia, difficulty breathing and respiratory depression. The risk of symptoms is probably greatest in children treated for spasticity but these symptoms can also occur in patients who have underlying conditions and co-morbidities that would predispose them to these symptoms including adults treated for spasticity and other conditions and are treated with high doses. Swallowing and breathing difficulties can be life-threatening and there have been reports of death, although an exact relationship to BOTOX® has not been established. Advise patients or caregivers to seek immediate medical attention if any of these symptoms occur.

There have been reports of adverse events following administration of BOTOX® involving the cardiovascular system, including arrhythmia and myocardial infarction, some with fatal outcomes. Some of these patients had risk factors including pre-existing cardiovascular disease. The exact relationship of these events to BOTOX® is unknown.

Theoretically, the effect of botulinum toxin type A may be potentiated by aminoglycoside antibiotics or spectinomycin or any other medicines that interfere with neuromuscular transmission (e.g. tubocurarine-type muscle relaxants). Caution should be exercised when BOTOX® injection is used with aminoglycosides (e.g. streptomycin, tobramycin, neomycin, gentamycin, netilmycin, kanamycin, amikacin), spectinomycin, polymyxins, tetracyclines, lincomycin or any other medicines which interfere with neuromuscular transmission.

As with any treatment with the potential to allow previously sedentary patients to resume activities, the sedentary patient should be cautioned to resume activity gradually following the administration of BOTOX® injection.

Individuals with peripheral motor neuropathic diseases (e.g. amyotrophic lateral sclerosis or motor neuropathy) should only receive BOTOX® injection with extreme caution. Patients with neuromuscular junction disorders may be at an increased risk of clinically significant systemic effects including severe dysphagia and respiratory compromise from typical doses of BOTOX®. Published medical literature has reported rare cases of administration of botulinum toxin to patients with known or unrecognised neuromuscular junction disorders where the patients have shown extreme sensitivity to the systemic effects of typical clinical doses. In some of these cases, dysphagia has lasted several months and required placement of a gastric feeding tube. When exposed to very high doses, patients with

neurologic disorders, e.g. paediatric cerebral palsy or adult spasticity, may also be at increased risk of clinically significant systemic effects.

The safe and effective use of BOTOX® injection depends upon proper storage of the product, selection of the correct dose and proper reconstitution and administration techniques. Physicians administering BOTOX® injection should be familiar with the relevant anatomy of the area involved and any alterations to the anatomy due to prior surgical procedures. Care should be taken when injecting in or near vulnerable anatomic structures. Serious adverse events, including fatal outcomes, have been reported in patients who had received BOTOX® injected directly into salivary glands, the oro-lingual-pharyngeal region, oesophagus and stomach. Some patients had pre-existing dysphagia or significant debility. Pneumothorax associated with the injection procedure has been reported following the administration of BOTOX® near the thorax. Caution is warranted when injecting in proximity to the lung, particularly the apices. An understanding of standard electromyographic techniques may be useful for the treatment of hemifacial spasm, cervical dystonia (spasmodic torticollis) and for the treatment of dynamic equinus foot deformity due to spasticity in juvenile cerebral palsy patients.

Serious and/or immediate hypersensitivity reactions such as anaphylaxis and serum sickness have been rarely reported, as well as other manifestations of hypersensitivity including urticaria, soft tissue oedema and dyspnoea. As with all biological products, adrenaline and other precautions as necessary should be available should an anaphylactic reaction occur. Some of these reactions have been reported following the use of BOTOX® either alone or in conjunction with other products associated with similar reactions. If such a reaction occurs, further injection should be discontinued and appropriate medical therapy immediately instituted. One fatal case of anaphylaxis has been reported in which the patient died after being injected with BOTOX® inappropriately diluted with 5 mL of 1% lidocaine. The causal role of BOTOX®, lidocaine or both cannot be reliably determined.

Caution should be exercised when BOTOX® is used in the presence of inflammation at the proposed injection site(s) or when excessive weakness or atrophy is present in the target muscles.

As with any injection, procedure-related injury could occur. An injection could result in localised infection, pain, inflammation, paraesthesia, hypoaesthesia, tenderness, swelling/oedema, erythema and/or bleeding/bruising. Needle-related pain and/or anxiety resulted in vasovagal responses, including transient symptomatic hypotension and syncope.

New onset or recurrent seizures have been reported, typically in patients who are predisposed to experiencing these events. The exact relationship of these events to the BOTOX® injection has not been established. The reports in children were predominantly from cerebral palsy patients treated for spasticity.

**DUE TO THE LACK OF AN INTERNATIONAL UNIT, BOTOX® IS NOT THERAPEUTICALLY EQUIVALENT TO ANY OTHER BOTULINUM TOXIN TYPE A PREPARATIONS. THE POTENCIES OF BOTOX® AND OTHER BOTULINUM TOXIN TYPE A PREPARATIONS ARE BASED ON DIFFERENT ASSAY METHODS. IN VIEW OF THIS LACK OF HARMONISATION OF UNIT SYSTEMS FOR BOTULINUM TOXIN TYPE A, EXTREME CAUTION IS REQUIRED IF IT SHOULD PROVE NECESSARY TO SUBSTITUTE THE BOTULINUM TYPE A TOXIN OF ONE PHARMACEUTICAL COMPANY BY ANOTHER. THE EFFECT OF ADMINISTERING DIFFERENT BOTULINUM NEUROTOXIN SEROTYPES AT THE SAME TIME OR WITHIN SEVERAL MONTHS OF EACH OTHER IS UNKNOWN. EXCESSIVE NEUROMUSCULAR WEAKNESS MAY BE EXACERBATED BY ADMINISTRATION OF ANOTHER BOTULINUM TOXIN PRIOR TO THE RESOLUTION OF THE EFFECTS OF A PREVIOUSLY ADMINISTERED BOTULINUM TOXIN.**

This product contains human serum albumin, a derivative of human blood. Based on effective donor screening and product manufacturing processes, it carries an extremely remote risk for transmission of viral diseases. A theoretical risk for transmission of Creutzfeldt-Jakob disease (CJD) is also considered extremely remote. No cases of viral diseases or CJD have ever been identified for albumin.

***Bladder Dysfunction***

Appropriate medical caution should be exercised when performing a cystoscopy.

In patients who are not catheterising, post-void residual urine volume should be assessed within 2 weeks post-treatment and periodically as medically appropriate up to 12 weeks. Initiation of catheterisation should be considered if post-void residual urine volume exceeds 200 mL and discontinuation should be considered when post-void residual falls below 200 mL. Patients should be instructed to contact their physician if they experience difficulties in voiding as catheterisation may be required.

***Neurogenic Detrusor Overactivity***

In these patients, autonomic dysreflexia associated with the procedure could occur which may require prompt medical therapy. From clinical data, the incidence rate of autonomic dysreflexia was 1.5% in the BOTOX® group, compared with 0.4% in the placebo group.

***Chronic Migraine***

The safety and effectiveness of BOTOX® have not been established for the prophylaxis of headaches in adults with episodic migraine (14 headache days or fewer per month).

***Strabismus***

During the administration of BOTOX® for the treatment of strabismus, retrobulbar haemorrhages sufficient to compromise retinal circulation have occurred from needle penetrations into the orbit. It is recommended that appropriate instruments to examine and decompress the orbit be accessible. Ocular (globe) penetrations by needles have also occurred. An ophthalmoscope to diagnose this condition should be available. Inducing paralysis in one or more extraocular muscles may produce spatial disorientation, double vision or past pointing. Covering the affected eye may alleviate these symptoms.

BOTOX® is ineffective in chronic paralytic strabismus except to reduce antagonist contracture in conjunction with surgical repair. The efficacy of BOTOX® in deviations over 50 prism dioptres, in restrictive strabismus, in Duane's syndrome with lateral rectus weakness and in secondary strabismus caused by prior surgical over-recession of the antagonist is doubtful. In order to enhance efficacy, multiple injections over time may be required.

***Blepharospasm***

Reduced blinking following BOTOX® injection into the orbicularis muscle can lead to corneal exposure, persistent epithelial defect and corneal ulceration, especially in patients with cranial nerve VII disorders. One case of corneal perforation in an aphakic eye requiring corneal grafting has occurred because of this effect.

Careful testing of corneal sensation in eyes previously operated upon, avoidance of injection into the lower medial lid area to avoid ectropion and vigorous treatment of any epithelial defect should be employed. This may require protective drops, ointment, therapeutic soft contact lenses or closure of the eye by patching or other means.

As a result of the anticholinergic activity of botulinum toxin, caution should be exercised when treating patients at risk for angle closure glaucoma, including patients with anatomically narrow angles. Acute angle closure glaucoma has been reported very rarely following periorbital injections of botulinum toxin.

***Cervical Dystonia (spasmodic torticollis)***

The most frequently reported adverse event following treatment of cervical dystonia patients with all types of botulinum toxins is dysphagia. Patients with cervical dystonia should be informed of the possibility of experiencing dysphagia which may be mild but could be severe. Dysphagia may persist for two to three weeks after injection but has been reported to last up to five months post-injection. Consequent to the dysphagia, there is the potential for aspiration, dyspnoea and occasionally the need for tube feeding. In rare cases, dysphagia followed by aspiration pneumonia and death has been reported.

Dysphagia has contributed to decreased food and water intake resulting in weight loss and dehydration. Patients with subclinical dysphagia may be at an increased risk of experiencing more severe dysphagia following a BOTOX® injection.

Limiting the dose injected into the sternocleidomastoid muscle to less than 100 U may decrease the occurrence of dysphagia. Patients with smaller neck muscle mass, or patients who receive bilateral injections into the sternocleidomastoid muscle, have been reported to be at a greater risk of dysphagia. Injections into the levator scapulae may be associated with an increased risk of upper respiratory infection and dysphagia. Dysphagia is attributable to the localised diffusion of the toxin to the oesophageal musculature.

Patients or caregivers should be advised to seek immediate medical care if swallowing, speech or respiratory disorders arise.

***Spasticity***

BOTOX® is a treatment of focal spasticity that has only been studied in association with usual standard of care regimens and is not intended as a replacement for these treatment modalities.

BOTOX® treatment is not likely to be effective in improving range of motion at a joint affected by a known fixed contracture. Identification of the treatment goals and clinical examination to identify the specific muscles causing spasticity is necessary and use of electromyography, muscle ultrasound or electrical stimulation may facilitate the accuracy of the BOTOX® injections.

BOTOX® should not be used for the treatment of focal lower limb spasticity in adult post-stroke patients if muscle tone reduction is not expected to result in improved function (e.g. improvement in gait) or improved symptoms (e.g. reduction in pain) or to facilitate care.

Caution should be exercised when treating adult patients with post-stroke spasticity who may be at an increased risk of fall.

BOTOX® should be used with caution for the treatment of focal lower limb spasticity in elderly post-stroke patients with significant co-morbidity and treatment should only be initiated if the benefit of treatment is considered to outweigh the potential risk.

There have been rare spontaneous reports of death sometimes associated with aspiration pneumonia in children with severe cerebral palsy after treatment with botulinum toxin. Caution should be exercised when treating paediatric patients who have significant neurologic debility, dysphagia or have a recent history of aspiration pneumonia or lung disease.

***Primary Hyperhidrosis of the Axillae***

Patients should be evaluated for potential causes of secondary hyperhidrosis (e.g. hyperthyroidism, pheochromocytoma) to avoid symptomatic treatment of hyperhidrosis without the diagnosis and/or treatment of the underlying disease.

***Upper Facial Rhytides (forehead lines, crow's feet and glabellar lines)***

Reduced blinking from BOTOX® injection of the orbicularis oculi muscle can lead to corneal exposure, persistent epithelial defects and corneal ulceration, especially in patients with cranial nerve VII disorders. Caution should be used when BOTOX® treatment is used in patients who have inflammation at the injection site, marked facial asymmetry, ptosis, excessive dermatochalasis, deep dermal scarring, thick sebaceous skin or the inability to substantially lessen glabellar lines by physically spreading them apart.

## 4.5 Interactions with other medicines and other forms of interaction

Theoretically, the effect of botulinum toxin type A may be potentiated by aminoglycoside antibiotics or any other medicines that interfere with neuromuscular transmission (e.g. neuromuscular blocking agents). Caution should be exercised when BOTOX® injection is used in patients taking any of these medicines (see **SPECIAL WARNINGS AND PRECAUTIONS FOR USE**).

No specific tests have been carried out to establish the possibility of clinical interaction with other medicinal products. No drug interactions of clinical significance have been reported.

The effect of administering different botulinum neurotoxin serotypes at the same time or within several months of each other is unknown. Excessive weakness may be exacerbated by administration of another botulinum toxin prior to the resolution of the effects of a previously administered botulinum toxin.

## 4.6 Fertility, pregnancy and lactation

**Pregnancy:** Pregnancy Category B3

When pregnant mice and rats were injected intramuscularly during the period of organogenesis, at 4 U/kg there was reduced weight gain compared with controls and reduced foetal ossification at a single site. Higher doses (8 or 16 U/kg) were associated with reductions in foetal body weights and/or delayed ossification but there was no evidence for teratogenicity.

Pregnant rabbits were particularly sensitive to BOTOX® injection. In a range-finding study, intramuscular administration twice during the period of organogenesis resulted in abortions (2 U/kg) and maternal deaths (4 and 6 U/kg). Daily intramuscular administration during the period of organogenesis resulted in reduced foetal weights (0.25 and 0.5 U/kg), increased resorptions (0.5 U/kg); the No-Observed-Effect-Level (NOEL) was 0.125 U/kg, although all doses produced maternal toxicity.

Intramuscular treatment of rats with a maternotoxic dose of BOTOX® (16 U/kg) injection, twice during gestation and once during the lactation period, resulted in an increased post-implantation loss and reduced pup weights but post-weaning pup development was unaffected.

There are no adequate data regarding the use of botulinum toxin type A in pregnant women. Studies in animals have shown reproductive toxicity. The potential risk for humans is unknown. BOTOX® treatment should not be used during pregnancy unless the benefits clearly outweigh the potential risks. If the use of BOTOX® injection is determined to be warranted during pregnancy, or if the patient becomes pregnant whilst taking BOTOX®, the patient should be apprised of the potential risks.

**Use in Lactation**

There is no information on whether BOTOX® injection is excreted in human milk. The use of BOTOX® during lactation is not recommended.

## 4.7 Effects on ability to drive and use machines

Asthenia***,*** muscle weakness***,*** dizziness and visual disturbance have been reported after treatment with BOTOX® and could make driving or using machines dangerous.

## 4.8 Undesirable effects

In general, adverse reactions occur within the first few days following injection of BOTOX® and while generally transient, may have a duration of several months or, in rare cases, longer.

As is expected for any injection procedure, localised pain, inflammation, paraesthesia, hypoaesthesia, tenderness, swelling/oedema, erythema, localised infection, bleeding and/or bruising have been associated with the injection. Needle-related pain and/or anxiety have resulted in vasovagal responses, including transient symptomatic hypotension and syncope.

Local weakness represents the expected pharmacological action of botulinum toxin in muscle tissue. However, weakness of adjacent muscles and/or muscles remote from the site of injection has been reported.

***Overactive Bladder***

Table 7 presents the most frequently reported adverse reactions in double-blind, placebo-controlled, pivotal Phase 3 trials within 12 weeks of injection for overactive bladder.

**Table 7: Adverse Reactions Reported by ≥1% of BOTOX®-treated Patients and More Frequent than in Placebo-treated Patients Within the First 12 Weeks, in Double-blind, Placebo-controlled, Pivotal Phase 3 Clinical Trials**

| Adverse Reactions by System Organ Class | BOTOX® 100 U (N=552) | Placebo (N=542) |
|---|---|---|
| Infections and infestations | | |
| Urinary tract infection | 17.9% | 5.5% |
| Bacteriuria | 4.3% | 2.0% |
| Renal and urinary disorders | | |
| Dysuria | 9.1% | 6.6% |
| Urinary retention | 5.6% | 0.4% |
| Investigations | | |
| Residual urine volume* | 3.1% | 0.2% |

***Elevated PVR not requiring catheterisation

During the complete treatment cycle, the following adverse reactions with BOTOX® 100 U injection were reported: urinary tract infections (25.5%), dysuria (10.9%), bacteriuria (8.0%), urinary retention (5.8%), residual urine volume (3.4%) and pollakiuria (2.0%).

Events considered to be procedure-related by the investigator reported at any time following initial injection were dysuria (5.8%) and haematuria (2.2%).

Catheterisation was initiated in 6.5% of patients following treatment with BOTOX® 100 U versus 0.4% of patients in the placebo group. Median duration of CIC was 63 days with BOTOX® 100 U versus 11 days in the placebo group as detailed in Table 8 below:

**Table 8: Initiation of CIC Post-treatment for Any Reason and for Urinary Retention (Placebo-controlled Pivotal Trial Safety Population; Treatment Cycle 1)**

| Parameter | 100 U BOTOX® (N = 552) | Placebo (N = 542) |
|---|---|---|
| Initiation of CIC (for any reason) at any time during treatment cycle 1 | | |
| Proportion of patients | 36/552 (6.5%) | 2/542 (0.4%) |
| Initiation of catheterisation due to urinary retention at any time during treatment cycle 1[a] | | |
| Proportion of patients | 32/552 (5.8%) | 2/542 (0.4%) |
| Median duration (days) | 63 | 11 |

CIC = clean intermittent catheterisation
[a] Based upon reporting an AE of urinary retention which is defined as an elevation of PVR that requires catheterisation

No change was observed in the overall safety profile with repeat dosing.

***Neurogenic Detrusor Overactivity***

Table 9 presents the most frequently reported adverse reactions in double-blind trials within 12 weeks of injection for neurogenic detrusor overactivity.

**Table 9: Adverse Reactions Reported by ≥1% of BOTOX®-treated Patients and More Frequent than in Placebo-treated Patients Within the First 12 Weeks, in Double-blind, Placebo-controlled Clinical Trials**

| Adverse Reactions by System Organ Class | BOTOX® 200 U (N = 262) | Placebo (N = 272) |
|---|---|---|
| Infections and infestations<br>Urinary tract infection | 24.4% | 17.3% |
| Renal and urinary disorders<br>Urinary retention | 17.2% | 2.9% |
| General disorders and administration site conditions<br>Fatigue | 3.8% | 1.1% |
| Psychiatric disorders<br>Insomnia | 1.5% | 0% |

The following rates with BOTOX® 200 U were reported during the complete treatment cycle (median duration of 44 weeks of exposure): urinary tract infections (49.2%), urinary retention (17.2%), fatigue (6.1%) and insomnia (3.1%).

In these neurogenic patients, the following additional adverse reactions were reported during the complete treatment cycle: constipation (4.2%), muscular weakness (3.8%), fall (3.1%), gait disturbance (2.7%), muscle spasm (2.3%) and bladder diverticulum (1.1%).

Procedure-related events in the BOTOX® 200 U group included: haematuria (3.8%), dysuria (2.3%) and autonomic dysreflexia (1.5%).

No change was observed in the overall safety profile with repeat dosing.

No difference on the multiple sclerosis (MS) exacerbation annualised rate (i.e. number of MS exacerbation events per patient-year) was observed (BOTOX® = 0.23, placebo = 0.20) in the MS patients enrolled in the pivotal trials.

Among patients who were not catheterising at baseline prior to treatment, catheterisation for urinary retention was initiated in 30.6% following treatment with BOTOX® 200 U versus 6.7% following treatment with placebo (Table 10).

**Table 10: Initiation of CIC Post-treatment for Any Reason and for Urinary Retention (Placebo-controlled Trial Safety Population; Treatment Cycle 1)**

| Parameter | BOTOX® 200 U (N = 108) | Placebo (N = 104) |
|---|---|---|
| Initiation of CIC (for any reason) at any time during treatment cycle 1[a] | | |
| Proportion of patients | 42/108 (38.9%) | 18/104 (17.3%) |
| Initiation of catheterisation due to urinary retention at any time during treatment cycle 1[b] | | |
| Proportion of patients | 33/108 (30.6%) | 7/104 (6.7%) |
| Median duration (days) | 289.0 | 358.0 |

CIC = clean intermittent catheterisation
[a] Based on patient bladder diary data
[b] Based on investigator reporting "Catheterisation due to Urinary Retention"

A placebo-controlled, double-blind, post-approval trial with BOTOX® 100 U (Study 191622-117) was conducted in MS patients with urinary incontinence due to neurogenic detrusor overactivity. These patients were not adequately managed with at least one anticholinergic agent and not catheterising at baseline. Table 11 below presents the most frequently reported adverse reactions within 12 weeks of injection.

**Table 11: Adverse Reactions Reported by ≥1% of BOTOX®-treated Patients and More Frequent than in Placebo-treated Patients Within the First 12 Weeks (Study 191622-117)**

| Adverse Reactions by System Organ Class | BOTOX® 100 U (N=66) | Placebo (N=78) |
|---|---|---|
| Infections and infestations | | |
| Urinary tract infection | 17 (25.8%) | 5 (6.4%) |
| Bacteriuria | 6 (9.1%) | 4 (5.1%) |
| Renal and urinary disorders | | |
| Urinary retention | 10 (15.2%) | 1 (1.3%) |
| Dysuria | 3 (4.5%) | 1 (1.3%) |
| Investigations | | |
| Residual urine volume* | 11 (16.7%) | 1 (1.3%) |

* Elevated PVR not requiring catheterisation

During the complete treatment cycle (median duration of 51 weeks of exposure), the following adverse events were reported with BOTOX® 100 U: urinary tract infections (39.4%), bacteriuria (18.2%), urinary retention (16.7%), residual urine volume* (16.7%) and dysuria (9.1%).

Procedure-related events included: dysuria (4.5%) and haematuria (3.0%).

No difference on the MS exacerbation annualised rate (i.e. number of MS exacerbation events per patient-year) was observed (BOTOX® = 0, placebo = 0.07).

Catheterisation was initiated in 15.2% of patients following treatment with BOTOX® 100 U versus 2.6% on placebo.

The median duration of post-injection catheterisation for those who developed urinary retention was 64 days for BOTOX® 100 U and 2 days for placebo.

***Chronic Migraine***

Safety data were compiled from two chronic migraine double-blind, placebo-controlled trials involving 687 patients treated with BOTOX® injection. The following adverse reactions were reported.

The frequency is defined as follows: Very Common (≥ 1/10); Common (≥1/100 to <1/10); Uncommon (≥1/1,000 to <1/100); Rare (≥1/10,000 to <1/1,000); Very Rare (<1/10,000).

*Nervous system disorders*

| | |
|---|---|
| Common: | Headache, migraine, facial paresis |

*Eye disorders*

| | |
|---|---|
| Common: | Eyelid ptosis |

*Skin and subcutaneous tissue disorders*

| | |
|---|---|
| Common: | Pruritus, rash |
| Uncommon: | Pain of skin |

*Musculoskeletal and connective tissue disorders*

| | |
|---|---|
| Common: | Neck pain, musculoskeletal stiffness, muscular weakness, myalgia, musculoskeletal pain, muscle spasms, muscle tightness |
| Uncommon: | Pain in jaw |

*General disorders and administration site conditions*

| | |
|---|---|
| Common: | Injection site pain |

*Gastrointestinal disorders*

| | |
|---|---|
| Uncommon: | Dysphagia |

Migraine, including worsening migraine, was reported in 3.8% of BOTOX® and 2.6% of placebo (saline) patients, typically occurring within the first month after treatment. These reactions did not consistently re-occur with subsequent treatment cycles and the overall incidence decreased with repeated treatments.

The discontinuation rate due to adverse events in these Phase 3 trials was 3.8% for BOTOX® vs. 1.2% for placebo (saline).

***Strabismus***

Inducing paralysis in one or more extraocular muscles may produce spatial disorientation, double vision or past-pointing. Covering the affected eye may alleviate these symptoms. Extraocular muscles adjacent to the injection site are often affected, causing ptosis or vertical deviation, especially with higher doses of BOTOX® injection. The incidence rates of these side effects in 2058 adults who received 3650 injections for horizontal strabismus are listed below:

| | |
|---|---|
| Ptosis | 15.7% |
| Vertical deviation | 16.9% |

The incidence of ptosis was much less after inferior rectus injection (0.9%) and much greater after superior rectus injection (37.7%).

The incidence rates of these side effects persisting for over 6 months in an enlarged series of 5587 injections of horizontal muscles in 3104 patients are listed below:

| | |
|---|---|
| Ptosis lasting over 180 days | 0.3% |
| Vertical deviation greater than 2 prism dioptres lasting over 180 days | 2.1% |

In these patients, the injection procedure itself caused 9 scleral perforations. A vitreous haemorrhage occurred and later cleared in one case. No retinal detachment or visual loss occurred in any case. Sixteen retrobulbar haemorrhages occurred. Decompression of the orbit after 5 minutes was necessary to restore retinal circulation in one case. There was no visual loss from retrobulbar haemorrhage in any of these cases but in five eyes there was pupillary change consistent with ciliary ganglion damage (Adies pupil).

***Blepharospasm***

In clinical trials of 1684 patients who received 4258 treatments (involving multiple injections) for blepharospasm, the incidence rates of adverse reactions per treated eye are listed below:

| | |
|---|---|
| Ptosis | 11.0% |
| Irritation/Tearing (including dry eye, lagophthalmos and photophobia) | 10.0% |
| Ectropion, keratitis, diplopia reported rarely and entropion | incidence less than 1% |

Ecchymosis occurs easily in the soft eyelid tissue. This can be prevented by applying pressure at the injection site immediately after injection. Diffuse skin rash and local swelling of the eyelid skin lasting for several days following eyelid injection were reported infrequently in clinical trials.

In the two cases of VIIth nerve disorder (one case of an aphakic eye) reduced blinking from BOTOX® injection of the orbicularis muscle led to serious corneal exposure, persistent epithelial defect and corneal ulceration. Perforation requiring corneal grafting occurred in one case, an aphakic eye. Avoidance of injection into the lower lid area to avoid ectropion may reduce this hazard. Vigorous treatment of any corneal epithelial defect should be employed. This may require protective drops, ointment, therapeutic soft contact lenses or closure of the eye by patching or other means.

Two patients previously incapacitated by blepharospasm experienced cardiac collapse attributed to over-exertion within three weeks following BOTOX® treatment. Sedentary patients should be cautioned to resume activity slowly and carefully following the administration of BOTOX® injection.

Acute angle closure glaucoma has been reported very rarely following periorbital injections of botulinum toxin (see **SPECIAL WARNINGS AND PRECAUTIONS FOR USE**).

***VIIth Nerve Disorders (hemifacial spasm)***

Adverse effects reported after injection of BOTOX® have included blurring of vision, facial droop, dizziness and tiredness, in addition to those listed above for blepharospasm.

***Cervical Dystonia (spasmodic torticollis)***

The following adverse events were reported in BOTOX®-treated patients compared with placebo-treated patients and are listed in descending order of incidence: pain (32%), focal weakness (17%) and dysphagia (13%) being the most common. Soreness, malaise, general weakness, upper respiratory infection, nausea, headache, drowsiness, stiffness, dry mouth, dizziness, rhinitis, flu syndrome, numbness and hypertonia were all reported in 2 to 10% of patients. Other treatment-related adverse events reported during clinical trials with BOTOX® injection for cervical dystonia included diplopia, ptosis, dyspnoea and fever.

**Table 12: Safety Data from Placebo-controlled, Double-blind Clinical Trials ***

| **Adverse event** | **BOTOX®<br>(n = 231)** | **Placebo<br>(n = 224)** |
|---|---|---|
| Pain† | 32% | 21% |
| Weakness, focal | 17% | 4% |
| Dysphagia | 13% | 3% |
| Soreness | 9% | 3% |
| Malaise | 6% | 2% |
| Weakness, general | 6% | 1% |
| Upper respiratory infection | 5% | 3% |
| Nausea | 5% | 1% |
| Headache | 5% | 3% |
| Drowsiness | 4% | 1% |
| Stiffness | 3% | 0% |
| Dry mouth | 3% | 0.4% |
| Dizziness | 3% | 1% |
| Rhinitis | 3% | 0% |
| Hypertonia | 2% | 0% |
| Flu syndrome | 3% | 4% |
| Numbness | 2% | 1% |
| Diplopia | 1% | 0% |
| Fever | 1% | 0% |
| Ptosis | 0.4% | 0% |
| Dyspnoea | 0.4% | 0% |
| Voice alteration | 0.4% | 0% |

*This data was compiled from all reported adverse events in Allergan placebo-controlled, double-blind trials including the meta-analysis of five Oculinum trials completed prior to 1992.

†Pain mainly represents local pain at injection site, but also includes neck pain, back pain and general muscle ache.

In an open label trial, 18.6% (13/70) of patients reported dysphagia after treatment with a mean dose of 240.5 U BOTOX®. Dysphagia and symptomatic general weakness may be attributable to an extension of the pharmacology of BOTOX® resulting from the spread of the toxin outside the injected muscles. Dysphagia is usually reported as mild to moderate severity in most patients. However, in an occasional patient it may be associated with more severe problems (see **SPECIAL WARNINGS AND PRECAUTIONS FOR USE**).

Dysphonia has also been reported in the literature in patients who have been treated for cervical dystonia. Rhinitis has also been reported.

***Focal Spasticity in Children two years and older***

The safety of BOTOX® used for the treatment of focal spasticity was evaluated from clinical trials for the treatment of dynamic equinus foot deformity, upper limb spasticity and lower limb spasticity. As is expected for any intramuscular injection procedure, localised pain, discomfort, bruising and oedema was associated with the injection in these patients. All treatment-related adverse events were mild to moderate in severity and were self-limiting.

In children treated for upper limb spasticity, the most frequently reported treatment-related adverse events included local and general weakness, trigger finger, clumsiness, hypokinesia, falling, increased frequency of micturition, joint dislocation and muscle spasms. The percent of patients who experienced these events at least once during the trial are summarised below:

**Table 13: Adverse events reported in children treated for upper limb spasticity**

| | **BOTOX® (n = 74)** |
|---|---|
| Muscular weakness, local | 5.4% |
| Muscular weakness, general | 2.7% |
| Trigger finger | 2.7% |
| Clumsiness | 1.4% |
| Falling | 1.4% |
| Hypokinesia | 1.4% |
| Increased frequency of micturition | 1.4% |
| Joint dislocation | 1.4% |
| Muscle spasms | 1.4% |

Other adverse events reported commonly or very commonly in these trials were convulsions, nasopharyngitis, pneumonia, vomiting and contusion.

In children treated for dynamic equinus foot deformity due to spasticity in juvenile cerebral palsy, the adverse events most frequently reported as treatment-related included falling, leg pain, leg (local) weakness and general weakness. The percentage of patients who experienced these events at least once during the trial are summarised below:

**Table 14: Most frequently reported adverse events reported in children treated for dynamic equinus foot deformity**

| | **BOTOX® (n = 215)** |
|---|---|
| Falling | 9.3% |
| Leg pain | 2.3% |
| Weakness, local | 2.3% |
| Weakness, general | 2.3% |

Falling may be attributable to a change in ankle position and gait pattern and/or local weakness. Local weakness represents the expected pharmacological action of botulinum toxin.

Other treatment-related adverse reactions reported in 1% of patients were: leg cramps, fever, knee pain, ankle pain, pain at the injection site post-treatment and lethargy. Urinary incontinence has also been reported.

In children treated for spasticity of the hip adductor muscles, there were no adverse events reported in the trials evaluated.

***Focal Spasticity in Adults***

The safety of BOTOX® was evaluated in 339 unique patients who received treatment for upper limb spasticity associated with stroke in double-blind and open label trials. In general, the majority of adverse events reported were mild to moderate in severity and were typically self-limiting.

The following events were reported as treatment-related in 1 - 4% of patients and are listed in decreasing order of incidence: arm pain and hypertonia.

Fever and flu syndrome were also reported in approximately 1% of patients. The following events were reported as treatment-related in less than 1% of patients and are listed in decreasing order of incidence: hyperaesthesia, arthralgia, asthenia, bursitis, dermatitis, headache, injection site hypersensitivity, malaise, nausea, paraesthesia, postural hypotension and pruritus.

The safety of BOTOX® was evaluated in 82 patients who received a single treatment for lower limb spasticity associated with stroke in either a double-blind or an open label trial. The following treatment-related adverse events were reported: accidental injury (1.2%), incoordination (1.2%) and paraesthesia (1.2%). Adverse events reported were mild to moderate in severity.

Of the 56 patients who received BOTOX® in the double-blind phase of the trial, 44 went on to receive a second injection in the open-label trial. Additional treatment-related adverse reactions reported were: hypertonia (4.5%), asthenia (2.3%), headache (2.3%) and hyperkinesia (2.3%).

The most frequently reported adverse reactions identified in additional studies for adult lower limb spasticity, including Study 191622-116, reported by >1% of BOTOX®-treated patients and more frequent than in placebo-treated patients in adult lower limb spasticity double-blind, placebo-controlled clinical trials are displayed below:

**Table 15: Adverse events identified in additional studies for adult lower limb spasticity treatment**

| **Adverse Reactions by System Organ Class** | **All BOTOX® (N=538)** | **Placebo (N=422)** |
|---|---|---|
| General disorders and administration site conditions | | |
| Peripheral oedema | 13 (2.4%) | 5 (1.2%) |
| Musculoskeletal and connective tissue disorders | | |
| Arthralgia | 19 (3.5%) | 5 (1.2%) |

***Primary Hyperhidrosis of the Axillae***

The safety of BOTOX® was evaluated in 287 patients who received at least 1 treatment exposure for focal hyperhidrosis of the axilla in double-blind and open-label trials. Adverse events reported as treatment-related in greater than 1% of BOTOX®-treated patients are listed in decreasing order of incidence: perceived increase in non-axillary sweating (4.5%), injection site pain (1.7%), pain (1.4%) and vasodilation (hot flushes) (1.0%). Body odour has also been reported.

***Glabellar Lines***

Safety of BOTOX® for the treatment of glabellar lines was evaluated in two multicentre, double-blind, placebo-controlled, parallel group trials (n = 535; 405 in the BOTOX®-treated group and 130 in the placebo-treated group). Most adverse events reported were of mild to moderate severity and all were

transient. The most frequently reported treatment-related adverse events were headache (9.4% in the BOTOX® group and 15.4% in the placebo group) and blepharoptosis (3.2% in the BOTOX® group). Blepharoptosis is consistent with the pharmacological action of BOTOX® and may be injection-technique-related.

Adverse events reported as treatment-related in 1 - 3% of BOTOX®-treated patients, listed in decreasing order of incidence were: injection site pain/burning/stinging (2.5%), face pain (2.2%), erythema (1.7%), local muscle weakness (1.7%), injection site oedema (1.5%), ecchymosis (1.0%), skin tightness (1.0%), paraesthesia (1.0%) and nausea (1.0%).

***Crow's Feet***

The safety of BOTOX® for the treatment of crow's feet was evaluated in two multicentre, double-blind, placebo-controlled, parallel group trials (246 in the BOTOX®-treated groups (6 U to 18 U/side) and 80 in the placebo-treated group). Most adverse events reported were of mild to moderate severity and all were transient. The most frequently reported treatment-related adverse events were injection site haemorrhage i.e. bruising at the injection site (8.1% in the BOTOX® 6 U to 18 U/side groups and 10.0% in the placebo group) and headache (3.7% in the BOTOX® 6 U to 18 U/side groups and 2.5% in the placebo group). Flu syndrome was reported in 1.6% of BOTOX®-treated patients (6 U to 18 U/side) and in none of the placebo-treated patients. All other adverse events reported as treatment-related in the BOTOX® groups were reported in less than 1% of patients.

Other trials have reported the incidence of injection site bruising to be between 4 - 25% of BOTOX®-treated patients, with similar rates noted for placebo treated patients. Other adverse events related to BOTOX® treatment included temporary droop of the lateral portion of the lower eyelid (5%) which is consistent with the pharmacological action of BOTOX® and may be injection technique-related.

***Forehead Lines***

In a clinical trial where BOTOX® was administered to 59 patients with horizontal forehead lines (8 U to 24 U into the frontalis), the following treatment-related adverse events were reported: headache (22.0%), bruising (10.2%), eyebrow ptosis (10.2%), eyelid swelling (20.3%), aching/itching forehead (5.1%), nausea (3.4%), feeling of tension (1.7%), flu-like symptoms/cold (1.7%) and other (6.8%). All adverse events were mild or moderate in severity and no serious adverse events were reported.

**Post-marketing Experience**

There have been rare spontaneous reports of death, sometimes associated with dysphagia, pneumonia and/or other significant debility, after treatment with BOTOX®.

Serious and/or immediate hypersensitivity reactions such as anaphylaxis and serum sickness have been rarely reported, as well as other manifestations of hypersensitivity including skin rash, urticaria, soft tissue oedema and dyspnoea (see **SPECIAL WARNINGS AND PRECAUTIONS FOR USE**).

There have also been reports of adverse events involving the cardiovascular system, including arrhythmia and myocardial infarction, some with fatal outcomes following BOTOX® treatment. Some of these patients had risk factors including cardiovascular disease.

New onset or recurrent seizures have also been reported following BOTOX® treatment, typically in patients who are predisposed to experiencing these events.

Angle closure glaucoma has been reported very rarely following BOTOX® treatment for blepharospasm.

Lagophthalmos has been reported following BOTOX® injection into the glabellar lines or crow's feet lines.

Eyelid oedema has been reported following periocular BOTOX® injection.

Mephisto sign has been reported for chronic migraine and for glabellar lines indications following BOTOX® injection into or near the frontalis muscle.

The following list includes adverse drug reactions or other medically relevant adverse events that have been reported since the drug has been marketed, regardless of indication and may be in addition to those cited in the **SPECIAL WARNINGS AND PRECAUTIONS FOR USE** and **UNDESIRABLE EFFECTS** sections: denervation/muscle atrophy; respiratory depression and/or respiratory failure; dyspnoea; aspiration pneumonia; dysarthria; dysphonia; dry mouth; strabismus; peripheral neuropathy, abdominal pain; diarrhoea; nausea; vomiting; pyrexia; anorexia; vision blurred; visual disturbance; dry eye; hypoacusis; tinnitus; vertigo; facial palsy; facial paresis; brachial plexopathy; radiculopathy; syncope; hypoaesthesia; malaise; myalgia; myasthenia gravis; paraesthesia; localised muscle twitching/involuntary muscle contractions; rash; erythema multiforme; pruritus; dermatitis psoriasiform; hyperhidrosis and alopecia; including madarosis.

**Reporting of Suspected Adverse Reactions**

Reporting suspected adverse reactions after authorisation of the medicine is important. It allows continued monitoring of the benefit/risk balance of the medicine. Healthcare professionals are asked to report any suspected adverse reactions https://nzphvc.otago.ac.nz/reporting/.

## 4.9 Overdose

Overdose of BOTOX® is a relative term and depends upon dose, site of injection and underlying tissue properties. Signs and symptoms of overdose are likely not to be apparent immediately post-injection. Excessive doses may produce local, or distant, generalised and profound neuromuscular paralysis. Local weakness is usually well tolerated and resolves spontaneously without intervention. However, dysphagia may result in loss of airway protection and aspiration pneumonia.

The entire contents of a vial is below the estimated dose (from primate trials) for toxicity in humans weighing 6 kg or greater.

Should symptoms (muscular weakness, ptosis, diplopia, blurred vision, facial weakness, swallowing and speech disorders, constipation, aspiration pneumonia, difficulty breathing or respiratory depression) occur post-injection or oral ingestion, the person should be medically monitored for up to several weeks. These patients should be considered for further medical evaluation and appropriate medical therapy immediately instituted which may include hospitalisation. Advise patients or caregivers to seek immediate medical attention if any of these symptoms occur. Specific anti-toxin to botulinum toxin is only likely to be effective if given within thirty minutes of the botulinum toxin injection.

If the musculature of the oropharynx and oesophagus are affected, aspiration may occur which may lead to the development of aspiration pneumonia. If the respiratory muscles become paralysed or sufficiently weakened, intubation and assisted respiration may be necessary until recovery takes place. Supportive care could involve the need for a tracheostomy and/or prolonged mechanical ventilation, in addition to other general supportive care.

For advice on the management of overdose please contact the National Poisons Centre on 0800 POISON (0800 764766).

# 5. PHARMACOLOGICAL PROPERTIES

## 5.1 Pharmacodynamic properties

**Pharmacotherapeutic group:** Neuromuscular blocking agent**, ATC code:** M03AX01

BOTOX® (botulinum toxin type A) purified neurotoxin complex is produced from the fermentation of *Clostridium botulinum* type A (Hall strain) and is purified from the culture solution as an approximately 900 kD molecular weight complex consisting of the neurotoxin and several accessory proteins. The complex is dissolved in sterile sodium chloride solution containing human serum albumin and is sterile filtered (0.2 microns) prior to filling and vacuum-drying.

One Unit of BOTOX® corresponds to the calculated median intraperitoneal lethal dose ($LD_{50}$) in mice, performed in a mouse potency assay. This assay method is specific to Abbvie's product, BOTOX®. Due to specific method details such as the vehicle, dilution scheme and laboratory protocols for the various mouse $LD_{50}$ assays, units of biological activity of BOTOX® cannot be compared to or converted into units of any other botulinum toxin activity.

**Mechanism of action**

*Clostridium botulinum* type A neurotoxin complex blocks peripheral acetylcholine release at presynaptic cholinergic nerve terminals by cleaving SNAP-25, a protein integral to the successful docking and release of acetylcholine from vesicles situated within the nerve endings.

After injection, there is an initial rapid high-affinity binding of toxin to specific cell surface receptors. This is followed by transfer of the toxin across the plasma membrane by receptor mediated endocytosis. Finally, the light chain toxin is released into the cytosol where it cleaves SNAP-25. This latter process is accompanied by progressive inhibition of acetylcholine release; clinical signs usually manifest within 2 - 3 days. In sensory neurons, BOTOX® inhibits the release of sensory neurotransmitters (e.g. Substance P, CGRP) and downregulates the expression of cell surface receptors (e.g. TRPV1). BOTOX® also prevents and reverses sensitisation in nociceptive sensory neurons.

Recovery after intramuscular injection takes place normally within 12 weeks as new nerve terminals sprout and allow for reconnection of the neuron with the endplates. However, the sprouts are partially effective and subsequently regress while the primary neuromuscular junction reactivates.

***Bladder Dysfunction (Overactive Bladder and Neurogenic Detrusor Overactivity)***

Following intradetrusor injection, BOTOX® affects the efferent pathways of detrusor activity via inhibition of acetylcholine release. In addition, BOTOX® inhibits afferent neurotransmitters and sensory pathways.

***Overactive Bladder***

Two double-blind, placebo-controlled, randomised, multi-centre, 24-week Phase 3 clinical trials were conducted in patients with OAB with symptoms of urinary incontinence, urgency and frequency. A total of 1105 patients, whose symptoms had not been adequately managed with anticholinergic therapy (inadequate response or intolerable side effects), were randomised to receive either 100 U of BOTOX® (n = 557) or placebo (n = 548).

In both trials, significant improvements compared to placebo in the change from baseline in daily frequency of urinary incontinence episodes were observed for BOTOX® (100 U) at the primary time point of week 12, including the proportion of dry patients. Using the Treatment Benefit Scale, the proportion of patients reporting a positive treatment response (their condition has been ‘greatly improved’ or ‘improved’) was significantly greater in the BOTOX® group compared to the placebo group in both trials. Significant improvements compared to placebo were also observed for the daily frequency of micturition, urgency and nocturia episodes. Volume voided per micturition was also significantly higher. Significant improvements were observed in all OAB symptoms from week 2.

BOTOX® treatment was associated with significant improvements over placebo in health-related quality of life as measured by the Incontinence Quality of Life (I-QOL) questionnaire (including avoidance and limiting behaviour, psychosocial impact and social embarrassment) and the King’s Health Questionnaire (KHQ) (including incontinence impact, role limitations, social limitations, physical limitations, personal relationships, emotions, sleep/energy and severity/coping measures).

The median duration of response following BOTOX® treatment, based on patient request for re-treatment was 166 days (~24 weeks). Qualification for re-treatment required at least 2 urinary incontinence episodes in 3 days.

A total of 834 patients were evaluated in a long-term extension trial. For all efficacy endpoints, patients experienced consistent response with re-treatments.

***Neurogenic Detrusor Overactivity***

In two Phase 3 trials, significant improvements compared to placebo in the primary efficacy variable of change from baseline in weekly frequency of urinary incontinence episodes were observed for BOTOX® (200 U and 300 U) at the primary efficacy time point at week 6, including the percentage of dry patients. Significant improvements in urodynamic parameters including increase in maximum-cystometric capacity and decreases in peak detrusor pressure during the first involuntary detrusor contraction were observed. Significant improvements in patient-reported incontinence specific health-related quality of life scores as measured by the Incontinence Quality of Life questionnaire (including avoidance limiting behaviour, psychosocial impact and social embarrassment) were also observed. No additional benefit of BOTOX® 300 U over 200 U was demonstrated.

The efficacy and safety profile of BOTOX® was studied in 51 patients **≥** 65 years of age and is consistent with that observed in the overall trial population in the pivotal trials.

A placebo-controlled, double-blind, randomised post-approval 52-week trial (Study 191622-117) was conducted in MS patients with urinary incontinence due to neurogenic detrusor overactivity who were not adequately managed with at least one anticholinergic agent and not catheterising at baseline. These patients were randomised to receive either 100 U of BOTOX® (n = 66) or placebo (n = 78).

Significant improvements compared to placebo in the primary efficacy variable of change from baseline in daily frequency of incontinence episodes were observed for BOTOX® (100 U) at the primary efficacy time point at week 6. Significant improvements in urodynamic parameters were also observed.

***Chronic Migraine***

The presumed mechanism for headache prophylaxis is by blocking peripheral signals to the central nervous system, which inhibits central sensitisation, as confirmed by clinical trials. Limited nonclinical data also suggest that BOTOX® may reduce sensitisation processes but the actual mechanism of action for headache prophylaxis is not known.

***Blepharospasm***

The paralytic effect on muscles injected with BOTOX® is useful in reducing the excessive, abnormal contractions associated with blepharospasm. Typically, patients with blepharospasm show improvement lasting an average of 12.5 weeks prior to the need for re-treatment.

***Strabismus***

When used for the treatment of strabismus, it is postulated that the administration of BOTOX® affects muscle pairs by inducing an atrophic lengthening of the injected muscle and a corresponding shortening of the muscle's antagonist.

***Cervical Dystonia (spasmodic torticollis)***

When injected into neck muscles, BOTOX® acts to provide relief from both objective signs and subjective symptoms of cervical dystonia (spasmodic torticollis). These improvements may include reduced pain/discomfort, reduced head rotation, reduced shoulder elevation, decreased size and strength of hypertrophic muscles and functional disability improvement. Based on the results of early publications in naïve patients, 40 to 58% of patients with cervical dystonia respond with a significant

improvement in their symptoms after initial treatment with BOTOX®. Among patients who have previously benefited from BOTOX® injection for cervical dystonia, approximately 91% can expect improvement for any given treatment period based on patient withdrawal data in a recent trial.

***Focal Spasticity in Adults and Children two years and older***

BOTOX® treatment reduces both the objective signs and subjective symptoms of spasticity. Improvements include reduction in muscle tone, increase in range of motion, reduction in pain and a reduction of spasticity related functional disability.

The efficacy and safety of BOTOX® for the treatment of lower limb spasticity was also evaluated in a randomised, multi-centre, double-blind, placebo-controlled study (Study 191622-116). This study included 468 post-stroke patients (233 BOTOX® and 235 placebo) with ankle spasticity (Modified Ashworth Scale [MAS] ankle score of at least 3) who were at least 3 months post-stroke. A total dose of 300 U of BOTOX® or placebo was injected intramuscularly and divided between the gastrocnemius, soleus and tibialis posterior, with optional injection of up to an additional 100 U divided among the flexor hallucis longus, flexor digitorum longus, flexor digitorum brevis, extensor hallucis and rectus femoris (400 U total dose). Electromyography, muscle ultrasound or electrical stimulation was employed to assist in proper muscle localisation. Patients were followed for 12 weeks.

The primary endpoint was the average change from baseline of weeks 4 and 6 MAS ankle score and a key secondary endpoint was the average CGI (Physician Global Assessment of Response) at weeks 4 and 6. The MAS uses a similar scoring system as the Ashworth Scale. The CGI evaluated the response to treatment in terms of how the patient was doing in his/her life using a 9-point scale from -4 = very marked worsening to +4 = very marked improvement.

Statistically and clinically significant between-group differences for BOTOX® over placebo were demonstrated for the primary efficacy measures of MAS and key secondary measure of CGI and are presented in Table 16.

**Table 16: Primary and Key Secondary Efficacy Endpoints**

| | **BOTOX®<br>300 to 400 U (ITT)<br>(N=233)** | **Placebo<br><br>(N=235)** |
|---|---|---|
| **Mean Changes from Baseline in Ankle Plantar Flexors in MAS Score** | | |
| Week 4 and 6 Average | -0.8* | -0.6 |
| **Mean Clinical Global Impression Score by Investigator** | | |
| Week 4 and 6 Average | 0.9* | 0.7 |

*Statistically significantly different from placebo ($p<0.05$)

Statistically significant improvements in MAS change from baseline (Figure 2) and CGI by Physician (Figure 3) for BOTOX® were observed at weeks 2, 4 and 6, compared to placebo.

**Figure 2: Modified Ashworth Scale Ankle Score for Study 191622-116 – Mean Change from Baseline by Visit**




**Figure 3: Clinical Global Impression by Physician for Study 191622-116 – Mean Scores by Visit**




***Primary Hyperhidrosis of the Axillae***

The proposed mechanism of action of BOTOX® in hyperhidrosis is the inhibition of cholinergically driven excessive sweating, by locally blocking the autonomic sympathetic cholinergic nerve fibres innervating sweat glands. This is achieved by injecting the toxin in the vicinity of the sweat glands which are located within the dermis of the skin. Injections for this indication must therefore be given intradermally. Hyperhidrosis is typically treated by multiple intradermal injections given in a grid-like pattern over the affected area.

In a double-blind, placebo-controlled clinical trial of 320 patients, the responder rate was 95% at week 1 and 93.8% at the primary endpoint of week 4, as assessed by the objective gravimetric evaluations. The objective of treatment is to reduce sweating to a physiologically normal level which patients find tolerable. Anhidrosis is not the target.

### *Glabellar Lines*

When injected into the corrugator and/or procerus muscles, BOTOX® weakens the overactive underlying muscle contraction, decreasing the severity of the glabellar lines and improving appearance. In controlled clinical trials, onset of action was rapid and lasted at least 4 months for many subjects.

### *Crow's Feet*

Crow's feet are well established, deep, radiating, horizontal and oblique furrows at the temporal aspect of each eye and are the direct result of the contraction of the lateral fibres of the orbicularis oculi muscles. In controlled clinical trials, injections of BOTOX® into the lateral orbital area resulted in rapid onset of action (effect of BOTOX® was apparent at the first assessment timepoint of 7 days) and reduced the severity of wrinkling in this area for up to 17 weeks.

### *Forehead Lines*

Horizontal forehead lines are associated with chronic functional activity of the frontalis muscle. At two weeks post-injection, 84 - 95% of BOTOX®-treated patients were considered by investigators as treatment responders; 75 - 80% of patients felt they had improvement (16 or 24 U at four sites in the frontalis muscle). Higher doses of BOTOX® resulted in greater efficacy and longer duration of effect. Injections of BOTOX® reduced the severity of horizontal forehead lines for up to 24 weeks as determined by a trained observer.

## 5.2 Pharmacokinetic properties

Classical absorption, distribution, biotransformation and elimination studies on the active substance have not been performed due to the nature of this product.

Distribution studies in rats indicate minimal muscular diffusion of $^{125}$I-botulinum neurotoxin A complex in the gastrocnemius muscle after injection, followed by rapid systemic metabolism and urinary excretion. The amount of radiolabelled material in the muscle declined at a half-life of approximately 10 hours. At the injection site the radioactive material was mainly in the form of large macromolecules, whereas very little of the radioactivity reaching the systemic circulation was TCA-precipitable, suggesting a minimal systemic exposure of toxin following gastrocnemius muscle injection of $^{125}$I-botulinum neurotoxin A complex. Within 24 hours of dosing, 60% of the radioactivity was excreted in the urine. The toxin is probably metabolised by proteases and the molecular components cycled through normal metabolic pathways.

Auto-radiographic results after intramuscular injection of $^{125}$I-botulinum neurotoxin A complex into the proximal inner surface of the upper eyelids of rabbits also indicate slow muscular diffusion.

*In vitro* studies of isolated rat synaptosome fragments indicated that botulinum toxin has a high affinity for cholinergic terminals where it binds to the pre-synaptic membrane.

## 5.3 Preclinical safety data

### Carcinogenesis, Mutagenesis, Impairment of Fertility

Long-term studies in animals have not been performed to evaluate the carcinogenic potential of BOTOX® injection. BOTOX® is not structurally related to any known carcinogens. There has been no clinical evidence of cumulative adverse events following repeated injection of BOTOX®. BOTOX® was inactive in *in vitro* tests for gene mutation and in *in vitro* and *in vivo* tests for clastogenicity.

Intramuscular BOTOX® doses of 4 U/kg (males) and 8 U/kg (females) did not affect rat fertility. Decreased fertility occurred with higher doses but these also resulted in signs of toxicity.

# 6. PHARMACEUTICAL PARTICULARS

## 6.1 List of excipients

Human albumin: 0.25 mg for 50 U, 0.5 mg for 100 U or 1.0 mg for 200 U
Sodium chloride: 0.45 mg for 50 U, 0.9 mg for 100 U or 1.8 mg for 200 U

## 6.2 Incompatibilities

Incompatibility studies were not assessed as part of the registration of BOTOX®. BOTOX® should therefore not be mixed with other medicinal products.

## 6.3 Shelf-life

The shelf life of all strengths of the BOTOX® packaged product (50 U, 100 U and 200 U) is 36 months when stored at 2 °C to 8 °C.

Administer BOTOX® within 24 hours after the vial is removed from the refrigerator and reconstituted. During these 24 hours, reconstituted BOTOX® injection should be stored in a refrigerator. If reconstituted BOTOX® injection is further diluted in a syringe for intradetrusor injections, it should be used immediately. It should be clear, colourless or slightly yellow and free of particulate matter. It is for single use only.

## 6.4 Special precautions for storage

Store the vacuum-dried product in a refrigerator between 2 ºC – 8 °C.

For storage conditions after reconstitution of the medicine, see section 6.3.

## 6.5 Nature and contents of container

BOTOX® (botulinum toxin type A) purified neurotoxin complex is a sterile, vacuum-dried preparation. It is supplied in a clear glass vial with a rubber stopper and tamper-proof aluminium seal, containing a white powder for reconstitution. Each vial contains 50 U, 100 U or 200 U of vacuum-dried *Clostridium botulinum* toxin type A.

Each vial contains 50 U*, 100 U or 200 U* of botulinum toxin type A, packaged individually.

*- not marketed

## 6.6 Special precautions for disposal

All vials, including expired vials, or equipment used with the medicine should be disposed of carefully as is done with all medical waste. Unused vials should be reconstituted with a small amount of water and then autoclaved. Any unused vials or equipment (such as syringes) should be autoclaved (120ºC for 30 minutes) or the residual BOTOX® inactivated using dilute hypochlorite solution (0.5% or 1%) for 5 minutes.

## 7. MEDICINE SCHEDULE

Prescription Medicine

## 8. SPONSOR

AbbVie Limited
6th Floor, 156-158 Victoria St
Wellington, 6011
New Zealand
Toll free telephone: 0800 659 912

## 9. DATE OF FIRST APPROVAL

October 1991

## 10. DATE OF REVISION OF TEXT

18 May 2023

## SUMMARY TABLE OF CHANGES

| Sections changed | Summary of new information |
|---|---|
| All | Sponsor details updated |

© 2023 AbbVie. All rights reserved.

BOTOX® and its design are trademarks of Allergan, Inc., an AbbVie company.

# EXHIBIT 13

< PRODUCT SEARCH

**Product details**

# BOTOX®

**With Prescription**

**Data Sheets**
Data Sheet (DS)

**Active Ingredient**
botulinum toxin type A

**Consumer Information**
Consumer Medicine Information (CMI)


© COPYRIGHT © 2023 ABBVIE INC.

# EXHIBIT 14

# Sirsram Medical announces NMPA approval for DAXXIFY®
# Marking the introduction of the world's first and only peptide-powered botulinum toxin product to Mainland China

**Hong Kong, September 9, 2024** - Sisram Medical (1696.HK), a global leading innovator and provider of holistic medical aesthetic solutions announced today that the National Medical Products Administration has accepted the Biologics License Application ("BLA") for the Company's botulinum toxin, DAXXIFY® (Chinese trademark: 达希斐®), intended for the temporary improvement in the appearance of moderate to severe glabellar lines caused by movements associated with corrugator and/or procures muscle activity in adult patients. As the first innovation of its kind in over 20 years, DAXXIFY® brings together botulinum toxin and Revances's proprietary Peptide Exchange Technology™ (PXT) to deliver outstanding efficacy.

Results from DAXXIFY® can be seen as early as day following treatment for some people, and typically within 2 days[1]. The treatment is also considered long-lasting and keeps frown lines smoother with the convenience of as few as 2 treatments a year[2], and results slowly soften over a prolonged period of time[3]. Additionally, DAXXIFY® is known to result in a better look to skin texture after treatment[4], smoothing even the deepest lines.

Alongside its outstanding clinically proven results, the high-end injectable botulinum toxin offers high safety. Free of human albumin or animal-based components, it has a lower probability of neutralizing antibodies or allergic reactions occurring during treatment sessions. DAXXIFY® also provides practitioners with more convenient and controllable storage management, aligning with clinic day operations. It can be kept at room temperature below 25°C, and after reconstitution, it can be stored in a refrigerator at 2°C-8°C, protected from light for 72 hours.

The registration of DAXXIFY® in Mainland China is a landmark milestone for Sisram's injectable business block, which strengthens the Company's comprehensive wellness ecosystem and represents a solid foundation for future commercialization in these strategic territories.

Alongside a license agreement granting exclusive rights to import, sell, and commercialize DAXXIFY® in Mainland China, Hong Kong SAR, and Macao SAR, the Company's comprehensive injectables portfolio includes partnerships with IBSA for the dermal biostimulator Profhilo® in other APAC markets, and with Prollenium® for its renowned dermal filler collection, FDA & CE approved Revanesse®, in several key markets including Germany, Austria, Switzerland, Australia, New Zealand, and Japan, with potential expansion into other regions.

The market value of the injectable segment in China has significantly soared, reaching an estimated value of RMB33.3 billion in recent years. According to the Company, this pivotal achievement serves as a competitive advantage, creating a significant new driver for revenues and laying a new cornerstone for business development.

**Mr. Liu Yi, Sisram Chairman and Executive Director**, said, "China has always been a strategic market for Sisram, and the approval of DAXXIFY® serves as a key milestone for bringing Sisram's high-end injectables portfolio to Mainland China."

"From a business perspective, this achievement enhances the competitiveness of the Company's products, expanding its diversified offerings and delivering an innovative experience for beauty-seeking patients," he added.

"We are committed to building lasting Partner-Patient relationships by delivering clinical excellence and outstanding patient experiences. The recent approval of DAXXIFY® represents a significant advancement in our offerings, providing consumers with a longer-lasting and safer treatment option and aligning perfectly with practitioners' needs for greater flexibility and convenience in their management practices," said **Lior Dayan, CEO of Sisram and Alma.**

He continued, "Sisram will continue to enhance our diversified product portfolio, reinforcing our mission to improve patients' quality of life and prioritize the customer journey as a key driver of our long-term success."

*Note:*

*① Based on pooled patient diary data from SAKURA 1 and SAKURA 2*

*② At least 50% of patients in SAKURA 1 and SAKURA 2 had none or mild frown lines for 24 weeks (6 months) and 23.9 weeks (6 months) or longer, respectively, per both investigator's and patient's assessments.*

*③ Median time to return to baseline wrinkle severity was 27.7 weeks in SAKURA 1 and 26 weeks in SAKURA 2*

*④ 64% of patients achieved an improvement in the appearance of skin texture at week 2 from a post hoc analysis of a phase 2 study with 60 patients*

**About Sisram Medical Ltd**

Sisram Medical Ltd (1696.HK) is a global consumer wellness group, featuring a first-of-its-kind synergistic ecosystem of business building blocks and consumer-focused branding, ranging from Energy Based Devices, injectables, aesthetics and digital dentistry, personal care and more. The Company is majority-owned by Fosun Pharma, one of China's leading healthcare groups. Sisram Medical went public on the Main Board of the Hong Kong Exchange in September 2017.

**Sisram Medical – Enhancing Quality of Life**

http://www.sisram-medical.com

For media inquiries, please contact:

Ever Bloom (HK) Communications Consultants Group Limited
Yinmei He /Angel Qiu
+852 6437 5886
sisrammed.list@everbloom.com.cn

For Investor Relations inquiries, please contact:
IR@sisram-medical.com