# EXHIBIT 20

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ___ to ___

Commission File No. 001-36297

## Revance Therapeutics, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **77-0551645** |
|---|---|
| State or other jurisdiction of incorporation or organization | (I.R.S. Employer Identification No.) |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
(Address, including zip code, of principal executive offices)

**(615) 724-7755**
(Registrant's telephone number, including area code)

TRIAL EXHIBIT
DTX-370
C.A. No. 21-1411-RGA-LDH

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.001 per share | RVNC | The Nasdaq Global Market LLC |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Emerging growth company ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant as of June 30, 2023, the last business day of the

registrant's most recently completed second fiscal quarter, was $2.2 billion, based on the closing price of the registrant's common stock on the Nasdaq Global Market of $25.31 per share for such date.

Number of shares outstanding of the registrant's common stock, par value $0.001 per share, as of February 16, 2024: 88,214,054

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain portions of the registrant's definitive proxy statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A, not later than April 29, 2024, in connection with the registrant's 2024 Annual Meeting of the Stockholders are incorporated herein by reference into Part III of this Annual Report on Form 10-K.

**Table of Contents**


| | | |
|---|---|---|
| Defined Terms | | i |
| Special Note Regarding Forward-Looking Statements | | vii |
| **PART I** | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 28 |
| Item 1B | Unresolved Staff Comments | 66 |
| Item 1C | Cybersecurity | 66 |
| Item 2 | Properties | 68 |
| Item 3 | Legal Proceedings | 68 |
| Item 4 | Mine Safety Disclosures | 69 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 70 |
| Item 6 | [Reserved] | 71 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 72 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 89 |
| Item 8 | Financial Statements and Supplementary Data | 89 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 89 |
| Item 9A | Controls and Procedures | 89 |
| Item 9B | Other Information | 90 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions That Prevent Inspections | 90 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 91 |
| Item 11 | Executive Compensation | 91 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 91 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 91 |
| Item 14 | Principal Accountant Fees and Services | 91 |
| **PART IV** | | |
| Item 15 | Exhibits and Financial Statement Schedules | 92 |
| Item 16 | Form 10-K Summary | 98 |
| Signatures | | |

**DEFINED TERMS**

Unless expressly indicated or the context requires otherwise, the terms "Revance," "Company," "we," "us," and "our," in this Annual Report on Form 10-K (this "Report") refer to Revance Therapeutics, Inc., a Delaware corporation, and, where appropriate, its wholly-owned subsidiaries. We also have used several other terms in this Report, the consolidated financial statement and accompanying notes included herein, most of which are explained or defined below.

**"2014 EIP"** means the Company's 2014 Equity Incentive Plan.

**"2014 ESPP"** means the Company's 2014 Employee Stock Purchase Plan.

**"2014 IN"** means the Company's 2014 Inducement Plan.

**"2020 ATM Agreement"** means the Sales Agreement by and between Revance and Cowen, dated November 2020, and terminated on May 10, 2022.

**"2022 ATM Agreement"** means the Sales Agreement by and between Revance and Cowen, dated May 10, 2022.

**"2024 Proxy Statement"** means our proxy statement for the 2024 Annual Meeting of the Stockholders.

**"2027 Notes"** means Revance's 1.75% Convertible Senior Notes due 2027.

**"ABPS"** means Ajinomoto Althaea, Inc., doing business as Ajinomoto Bio-Pharma Services, a contract development and manufacturing organization.

**"ABPS Services Agreement"** means the Technology Transfer, Validation and Commercial Fill/Finish Services Agreement by and between the Company and ABPS, dated March 14, 2017, as amended on December 18, 2020 and February 26, 2024.

**"ACA"** means the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010.

**"Allergan"** means Allergan, Inc.

**"Amortization Trigger"** has the meaning set forth in the Note Purchase Agreement.

**"Athyrium"** means Athyrium Buffalo LP.

**"ATM"** means at-the-market offering program.

**"BIAM"** means a biosimilar initial advisory meeting.

**"BLA"** means a biologics license application.

**"BPCIA"** means the Biologics Price Competition and Innovation Act of 2009.

**"BTRX"** means Botulinum Toxin Research Associates, Inc.

**"Business Associates"** means companies that create, receive, maintain, or transmit PHI for or on behalf of a covered entity.

**"CCMP"** means the Nasdaq Composite Index.

**"CCPA"** means the California Consumer Privacy Act of 2018.

**"cGMPs"** means the current good manufacturing practices regulations enforced by the FDA.

**"CIS"** means the Center for Internet Security.

**"CMS"** means the Centers for Medicare & Medicaid Services.

**"CODM"** means the chief operating decision maker.

**"Consolidated Teoxane Distribution Net Product Sales"** has the meaning set forth in the Note Purchase Agreement.

**"consumers"** means the patients of our aesthetic practice customers.



REV_DAX-03338609
DTX-370.0004

**"Continuation Decision"** means Viatris' decision under the Viatris Agreement as to whether to continue the biosimilar development program beyond the initial development plan and the BIAM.

**"Cowen"** means Cowen and Company, LLC.

**"CPRA"** means the California Privacy Rights Act of 2020.

**"CRL"** means a complete response letter from the FDA.

**"CROs"** means contract research organizations.

**"DAXXIFY®"** means (DaxibotulinumtoxinA-lanm) for injection.

**"DAXXIFY® GL Approval"** means the FDA approval in September 2022 of DAXXIFY® in the United States for the temporary improvement of moderate to severe glabellar lines in adults.

**"DGCL"** means the Delaware General Corporation Law.

**"DRG"** means Clarivate Plc, formerly known as Decision Resources Group.

**"DTC"** means the Depository Trust Company.

**"EEA"** means the European Economic Area.

**"EMA"** means the European Medicines Agency.

**"ERC"** means employee retention credit.

**"ERM"** means enterprise risk management.

**"ESG"** means environmental, social and governance.

**"ESPP"** means the Company's Employee Stock Purchase Plan.

**"EU GDPR"** means the European Union General Data Protection Regulation.

**"Exchange Act"** means the U.S. Securities Exchange Act of 1934, as amended.

**"Expansion Premises"** means the additional 30,591 square feet added to the initial premises pursuant to the Nashville Lease.

**"FCA"** means the False Claims Act.

**"FDA"** means the United States Food and Drug Administration.

**"FDCA"** means the Federal Food, Drug and Cosmetic Act.

**"Fintech Platform"** means OPUL® and the HintMD Platform.

**"First Amendment"** means the first amendment to the Note Purchase Agreement by and among the Company, HintMD and Athyrium, dated August 8, 2023.

**"First Tranche"** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $100.0 million on March 18, 2022.

**"Fosun"** means Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd.

**"Fosun License Agreement"** means the License Agreement by and between Revance and Fosun, dated December 4, 2018, as amended on February 15, 2020.

**"Fosun Territory"** means mainland China, Hong Kong and Macau.

**"FTC Act"** means the Federal Trade Commission Act.

**"FY 2022 Annual Report"** means our Annual Report on Form 10-K for the year ended December 31, 2022, as filed with the SEC on February 28, 2023.

**"GAAP"** means U.S. generally accepted accounting principles.

**"GCP"** means good clinical practice.

**"GLPs"** means the FDA's good laboratory practices.

**"HCP"** means Health Care Provider.

**"HHS"** means the U.S. Department of Health and Human Services.

**"HintMD"** means Hint, Inc., our wholly owned subsidiary.

**"HintMD Acquisition"** means Revance's acquisition of HintMD, completed on June 23, 2020.

**"HintMD Plan"** means the Hint, Inc. 2017 Equity Incentive Plan.

**"HintMD Platform"** means the legacy HintMD fintech platform.

**"HIPAA"** means the Health Insurance Portability and Accountability Act, as amended by HITECH, and each other implementing regulation.

**"HIPAA Privacy Rule"** means the national standards to protect individuals' PHI imposed by HIPAA.

**"HITECH"** means the U.S. Health Information Technology for Economic and Clinical Health Act, which was enacted as part of the American Recovery and Reinvestment Act of 2009.

**"IND"** means an investigational new drug application.

**"Indenture"** means the indenture, by and between Revance and U.S. Bank National Association, as trustee, dated February 14, 2020.

**"injector"** means a professional licensed to inject our Products, including physicians.

**"IPR"** means inter partes review.

**"IRA"** means the Inflation Reduction Act of 2022.

**"IRB"** means the institutional review board.

**"IRC"** means the Internal revenue code.

**"LCL"** means lateral canthal lines or "crow's feet".

**"market-based PSAs"** means performance stock awards subject to market-based vesting conditions.

**"market-based PSUs"** means performance stock units subject to market-based vesting conditions.

**"MAS"** means the Modified Ashworth Score.

**"Maturity Date"** means September 18, 2026, the maturity date of the Notes Payable set forth in the Note Purchase Agreement.

**"Medy-Tox"** means Medy-Tox, Inc.

**"Merz"** means Merz Pharmaceuticals GmbH.

**"Minimum Cash Covenant"** means the financial covenant under the Note Purchase Agreement to maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times.

**"Nashville Lease"** means the office lease by and between Revance and 1222 Demonbreun, LP, dated November 19, 2020, as amended on January 4, 2021, July 1, 2021 and January 13, 2023.

**"NBI"** means the Nasdaq Biotechnology Index.

**"neuromodulator"** means injectable botulinum toxins and neurotoxins.

**"NMPA"** means China's National Medical Products Association.

**"NOL"** means net operating loss.

**"Note Purchase Agreement"** means the note purchase agreement by and between Revance; Athyrium, as administrative agent; the Purchasers, including Athyrium; and HintMD, as a guarantor, dated March 18, 2022.

**"Notes Payable"** means notes payable by Revance pursuant to the Note Purchase Agreement.

**"NPA Effective Date"** means the effective date of the Note Purchase Agreement, March 18, 2022.

**"OCR"** means the U.S. Department of Health and Human Services Office for Civil Rights.

**"onabotulinumtoxinA biosimilar"** means a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®.

**"OPUL®"** means the OPUL® Relational Commerce Platform.

**"PAS"** means prior approval supplement.

**"PCI"** means PCI Pharma Services, which acquired Lyophilization Services of New England, Inc. in December 2021. References to PCI throughout this Report includes Lyophilization Services of New England, Inc., as applicable.

**"PCI Supply Agreement"** means the Commercial Supply Agreement by and between Revance and PCI (as successor in interest to Lyophilization Services of New England, Inc.), dated April 6, 2021.

**"PDUFA"** means Prescription Drug User Fee Act.

**"performance-based PSAs"** means performance stock awards subject to performance-based vesting conditions.

**"performance-based PSUs"** means performance stock units subject to performance-based vesting conditions.

**"PGIC"** means the Physician Global Impression of Change.

**"PHI"** means protected health information, as defined by HIPAA.

**"PMA"** means premarket approval by the FDA.

**"PNT"** means preserved network technology.

**"PrevU"** means the early experience program for DAXXIFY®.

**"Products"** means DAXXIFY® and the RHA Collection® of dermal fillers.

**"Product Segment"** means the business that includes the research, development and commercialization of our Products and product candidates.

**"PSA"** means a performance stock award.

**"PSU"** means a performance stock unit.

**"Public Health Service Act"** means the U.S. Public Health Services Act of 1944, as amended, including the Patient Protection and Affordable Care Act.

**"Purchasers"** means Athyrium and its successors and assigns.

**"QSR"** means the Quality System Regulations.

**"REMS"** means a Risk Evaluation Mitigation Strategy.

**"RHA® Collection of dermal fillers"** means RHA® 2, RHA® 3 and RHA® 4, which have been approved by the FDA for the correction of moderate to severe dynamic facial wrinkles and folds; and RHA® Redensity.

**"RHA® Pipeline Products"** means future hyaluronic acid filler advancements and products by Teoxane.

**"RHA® Redensity"** means a dermal filler, which has been approved by the FDA for the treatment of moderate to severe dynamic perioral rhytids (lip lines).

**"RSAs"** means restricted stock awards.

**"RSUs"** means restricted stock units.

**"SASB"** means the Sustainability Accounting Standards Board.

**"SEC"** means the U.S. Securities and Exchange Commission.

**"Securities Act"** means the U.S. Securities Act of 1933, as amended.

**"Second Expansion Premises"** means the additional 17,248 square feet added to the current premises pursuant to the Nashville Lease.

**"Second Tranche"** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $50.0 million on August 28, 2023.

**"Services"** means the Fintech Platform business.

**"Service Segment"** means the business that includes the development and commercialization of the Fintech Platform.

**"SMG"** means the suprahypertonic muscle group.

**"Stock Awards"** means RSAs, PSAs, RSUs and PSUs.

**"TCPA"** means the Telephone Consumer Protection Act.

**"Third Tranche"** means the uncommitted tranche of additional Notes Payable in an aggregate amount of up to $150.0 million, available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement.

**"Teoxane"** means Teoxane SA.

**"Teoxane Agreement"** means the exclusive distribution agreement by and between Revance and Teoxane, dated January 10, 2020, as amended on September 30, 2020, December 22, 2020 and December 22, 2022.

**"UFLs"** means upper facial lines.

**"UK GDPR"** means the United Kingdom General Data Protection Regulation.

**"USPTO"** means U.S. Patent and Trademark Office.

**"Viatris"** means Viatris Inc., formerly known as Mylan Ireland Ltd.

**"Viatris Agreement"** means the Collaboration and License Agreement by Revance and Viatris, dated February 28, 2018, as amended by the Viatris Amendment.

**"Viatris Amendment"** means Amendment #1 to the Viatris Agreement by Revance and Viatris, dated August 22, 2019.

**"Zero-cost Inventory"** means DAXXIFY® inventory produced prior to the DAXXIFY® GL Approval for the temporary improvement of glabellar lines in early September 2022, for which the related manufacturing costs were incurred and expensed to research and development expense prior to the FDA approval.

Revance®, the Revance logos, DAXXIFY®, OPUL® and other trademarks or service marks of Revance appearing in this Report are the property of Revance. This Report contains additional trade names, trademarks and service marks of others.

which are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Report, including the documents incorporated by reference herein, contains forward-looking statements within the meaning of Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act, and Section 21E of the Exchange Act. All statements other than statements of historical facts contained in this Report and the documents incorporated by reference herein, including statements regarding our future financial condition, regulatory approvals, business strategy and plans and objectives of management for future operations, are forward-looking statements. The words "may," "will," "could," "would," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," "continue," "ongoing" and similar expressions that convey uncertainty of future events or outcomes are intended to identify forward-looking statements. In addition, any statements that refer to our financial outlook or projected performance, profitability expectations, anticipated growth, milestone expectations, future expenses and cash flows, anticipated working capital requirements, market forecasts, capital expenditures, cash preservation plans, liquidity and financing requirements and the impact of inflationary pressures on our business; our ability to implement our operating plan; the impact of the DAXXIFY® pricing strategy on adoption and our sales; our ability to comply with our debt obligations; our ability to draw on the Third Tranche; our future financing plans and strategies; our future responses to macroeconomic and geopolitical factors; our ability to successfully commercialize and maintain regulatory approvals for DAXXIFY®; our ability to obtain, and the timing relating to, regulatory submissions and approvals with respect to our drug product candidates and third-party manufacturers, including with respect to the PAS for the PCI manufacturing facility, DAXXIFY® for indications other than glabellar lines and cervical dystonia, and the RHA® Pipeline Products; our opportunity in therapeutics; our ability to secure and maintain favorable third party reimbursement for our Products; the process and timing of, and ability to complete, the current and anticipated future pre-clinical and clinical development of our product candidates including the outcome of such clinical studies and trials; development of an onabotulinumtoxinA biosimilar, which would compete in the existing short-acting neuromodulator marketplace; the process and our ability to effectively and reliably manufacture supplies of DAXXIFY®; our ability to manufacture or receive sufficient supply of our Products in order to meet commercial demand; expectations regarding DAXXIFY® Zero-cost Inventory and the ERC; our ability to successfully compete in the dermal filler and neuromodulator markets; the design of our clinical studies; the markets for our current and future products and services; our business strategy, plans and prospects, including our commercialization plans related to DAXXIFY® and the RHA® Collection of dermal fillers, including the timing for the launch of DAXXIFY® for the treatment of cervical dystonia and the new RHA® 3 indication; the potential benefits of DAXXIFY®, the RHA® Collection of dermal fillers and our drug product candidates; the potential safety, efficacy and duration of DAXXIFY® for consumers and patients; our ability to maintain and seek out new strategic third-party collaborations to support our goals; the extent to which our Products are considered innovative or differentiated; consumer preferences related to our Products; the rate and degree of economic benefit, commercial acceptance, market, competition and/or size and growth potential of DAXXIFY®, the RHA® Collection of dermal fillers and our other drug product candidates, if approved; our ability to set a new standard in healthcare; our ability to build and expand valuable aesthetic and therapeutic franchises; the wind down of all activities related to the Fintech Platform; patent defensive measures; timing related to our ongoing litigation matters; our ability to defend ourselves in ongoing litigation; international expansion, including with respect to NMPA approval of DAXXIFY® for cervical dystonia and glabellar lines; anticipated milestone payments; our human capital, social and environmental performance and goals; our ability to expand our operations to support the commercialization of our Products and attract and retain qualified personnel to support our business; our ability to comply with applicable laws and regulations; our ability to protect the Company from cybersecurity threats, including the impact of security failures and/or breaches; and our ability to enhance our competitive position through strategic collaborations are forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements are subject to a number of known and unknown risks, uncertainties and assumptions, including risks described in Part I, Item 1A, "Risk Factors" and elsewhere in this Report.

You should not rely upon forward-looking statements as predictions of future events. These forward-looking statements represent our estimates and assumptions only as of the date of this Report. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason to conform these statements to actual results or to changes in our expectations. You should read this Report, together with the information incorporated herein by reference, with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

**Summary of Risk Factors**

Investing in our common stock involves risks. See Part I, Item 1A. "Risk Factors" in this Report for a discussion of the following principal risks and other risks that make an investment in Revance speculative or risky.

- Our success as a company, including our ability to finance our business and generate revenue, and our future growth is substantially dependent on the clinical and commercial success of our Products. If we are unable to successfully commercialize our Products, complete the development and regulatory approval process of our product candidates, and maintain regulatory approval of our Products we may not be able to generate sufficient revenue to continue our business.

- DAXXIFY® and any future product candidates, if approved, may not achieve market acceptance among injectors, HCPs, consumers and patients, and may not be commercially successful, which would adversely affect our operating results and financial condition.

- We have incurred significant losses since our inception and we anticipate that we will continue to incur GAAP operating losses for the foreseeable future and may not achieve or maintain profitability in the future. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock, our ability to raise capital and our ability to maintain compliance with our debt covenants. We may require substantial additional funding to continue to operate our business and achieve our goals and a failure to obtain the necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts.

- If we are not able to effectively and reliably manufacture DAXXIFY® or any future product candidates at sufficient scale and appropriate cost, including through any third-party manufacturers, as well as acquire supplies of the RHA® Collection of dermal fillers from Teoxane, our product development, regulatory approval, commercialization and sales efforts and our ability to generate revenue may be adversely affected.

- DAXXIFY®, the RHA® Collection of dermal fillers and any future product candidates will face significant competition, including from companies that enjoy significant competitive advantages, such as substantially greater financial, research and development, regulatory, manufacturing, marketing resources and expertise, greater brand recognition and more established relationships. Our failure to effectively compete may prevent us from achieving significant market penetration and expansion.

- We use third-party collaborators, including Teoxane, Viatris, Fosun, ABPS and PCI to help us develop, validate, manufacture and/or commercialize our products. Our ability to commercialize our products could be impaired or delayed if these collaborations are unsuccessful.

- Macroeconomic and geopolitical factors and a public health crisis, such as the COVID-19 pandemic, have and may continue to adversely affect our business, as well as those of third-parties on which we rely for significant manufacturing, clinical or other business operations. They may also impact disposable income levels, which could reduce consumer spending and lower demand for our products.

- We are subject to uncertainty relating to pricing and reimbursement. Failure to obtain or maintain adequate coverage, pricing and reimbursement for DAXXIFY® for therapeutics uses, or our other future approved products, if any, could have a material adverse impact on our ability to commercialize such products. Even if coverage and reimbursement is provided, acceptance of any approved product may vary among HCPs, healthcare organizations and administrators and others in the healthcare community, which could impact our ability to realize a return on our investment and reduce demand for our products.

- Reports of adverse events or safety concerns involving our Products could delay or prevent the Company or Teoxane from maintaining regulatory approval for such Products, or obtaining additional regulatory approval for additional indications or future product candidates. The denial, delay or withdrawal of any such approval

would negatively impact commercialization and could have a material adverse effect on our ability to generate revenue, business prospects, and results of operations.

- Unfavorable publicity relating to one or more of our Products, whether related to aesthetic or therapeutic indications, may affect the public perception of our entire portfolio of Products.
- Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results or actual consumer outcomes.
- If our efforts to protect our intellectual property related to DAXXIFY®, the RHA® Collection of dermal fillers or any future product candidates are not adequate, we may not be able to compete effectively. Additionally, we are currently and in the future may become involved in lawsuits or administrative proceedings to defend against claims that we infringe the intellectual property of others and to protect or enforce our patents or other intellectual property or the patents of our licensors, which could be expensive and time-consuming and would have a material adverse effect on our ability to generate revenue if we are unsuccessful.
- Servicing our debt, including the 2027 Notes and Notes Payable, requires a significant amount of cash to pay our substantial debt. If we are unable to generate sufficient cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive.
- We are currently, and in the future may be, subject to securities class action and stockholder derivative actions. If other stockholder derivative actions, additional securities class actions or other lawsuits are brought against us, including product liability actions, and we cannot successfully defend ourselves, we may incur substantial liabilities or be required to limit commercialization of our products. Even a successful defense would require significant financial and management resources.
- As our business and operations continue to grow, we may need to expand our development, manufacturing, regulatory, sales, marketing and distribution capabilities. If and when we expand such capabilities, we may encounter difficulties in managing our growth, which could disrupt our operations.
- We have undertaken, and may in the future undertake, restructuring plans to adjust our investment priorities and manage our operating expenses, which plans may not result in the savings or operational efficiencies anticipated and could result in total costs and expenses that are greater than expected.
- If we are not successful in discovering, developing, acquiring and commercializing additional product candidates other than our current Products, our ability to expand our business and achieve our strategic objectives may be impaired.
- We have experienced and may experience in the future compromises or failures of our information technology systems or data, or those of third parties upon which we rely, which could adversely affect our business. Despite significant efforts to secure against such threats, it is impossible to entirely mitigate these risks.
- Changes in and failures to comply with applicable laws, regulations and standards may adversely affect our business, operations and financial performance.
- If we fail to attract and retain qualified personnel at all levels and functions, we may be unable to successfully execute our objectives.

## PART I

## ITEM 1. BUSINESS

### Overview

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

### Key 2023 Developments

### Revance Aesthetics

For the year ended December 31, 2023, we generated $224.9 million in revenue from the sale of our Products and our Services. As of December 31, 2023, we had over 7,000 aesthetic accounts across our Products business, and of those accounts, over 3,000 accounts ordered DAXXIFY®.

#### *DAXXIFY®*

In September 2022, we received DAXXIFY® GL Approval. DAXXIFY® is an acetylcholine release inhibitor and neuromuscular blocking agent indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients.

Following DAXXIFY® GL Approval, we trained a group of faculty members on DAXXIFY® as part of PrevU, our early experience program for the product, which we initiated in December 2022. PrevU focused on providing practices with product education, tools for practice integration, and the opportunity to gain real-world clinical insights for DAXXIFY® with the goal of optimizing aesthetic outcomes. We completed the PrevU program in March 2023, which was followed by the targeted commercial launch of DAXXIFY®. Based on real-world learnings and customer feedback, in September 2023, we introduced new pricing for DAXXIFY®, which priced the product to be more competitive with BOTOX®. For the year ended December 31, 2023, we recognized $84.0 million in product revenue from the sale of DAXXIFY®.

#### *RHA® Collection of Dermal Fillers*

In July 2023, the FDA approved the expansion of RHA® 4's label to include cannula use. In October, the FDA approved Teoxane's PMA to expand the indication for RHA 3® to include injection into the vermillion body, vermillion border and oral commissure for lip augmentation and lip fullness in adults aged 22 years and older. RHA® 3 was previously approved for the correction of moderate to severe dynamic wrinkles and folds, such as nasolabial folds. The Company anticipates launching the new indication in mid-year 2024.

For the year ended December 31, 2023, we recognized $128.6 million in product revenue from the sale of the RHA® Collection of dermal fillers.

### Revance Therapeutics

In August 2023, the FDA approved DAXXIFY® for the treatment of cervical dystonia in adults, and in September 2023, we initiated PrevU, our early experience program for the product. As with our early experience program for aesthetics, PrevU focuses on providing practices with product education, tools for practice integration, and the opportunity to gain real-world clinical insights for DAXXIFY® with the goal of optimizing therapeutic outcomes. As of the date of this Report, coverage for DAXXIFY® for the treatment of cervical dystonia has been secured for more than 140 million commercial lives, which includes 25 of the top 30 payors in the country, representing over 50% of commercial lives covered. In January 2024, the Company received a permanent J-Code for DAXXIFY®. We expect the commercial launch to begin in mid-year 2024.



REV_DAX-03338618
DTX-370.0013

**CMO Partnerships**

In March 2023, the FDA approved our PAS submission for the ABPS manufacturing facility. Following approval, the ABPS manufacturing facility began serving as our primary commercial drug product supply source for DAXXIFY®. In February 2024, we entered into an amendment to the ABPS Services Agreement, which extended the term of the ABPS Services Agreement through December 31, 2027.

**Fosun Partnership**

In April and July 2023, the NMPA accepted Fosun's BLA for DaxibotulinumtoxinA for Injection for the improvement of glabellar lines and treatment of cervical dystonia, respectively. The anticipated approvals for both indications are expected in 2024.

**Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business because the significant costs and resources required to support OPUL® no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities predominantly included a reduction in OPUL® personnel headcount, the termination of OPUL® research and development activities and a reduction of outside services expenses related to OPUL®. Substantially all payment processing activities for OPUL® customers ended on January 31, 2024. We are currently in the process of completing activities to wind-down the remaining OPUL® platform operations, which we expect to be complete by March 31, 2024.

**Disciplined Capital Allocation**

In 2023, our capital resources were focused on supporting our strategic priorities, which included: (i) continuing to drive revenue growth by increasing adoption of DAXXIFY® and the RHA® Collection of dermal fillers; (ii) initiating DAXXIFY® cervical dystonia PrevU program and pre-launch activities; and (iii) maximizing supply chain efficiencies by leveraging and scaling commercial production of DAXXIFY® through ABPS. To align our operations with our capital allocation priorities, the Company made the decision to exit its Fintech Platform business. We will continue to assess expense management and the timing of capital allocation measures as it relates to our therapeutics pipeline activities and international regulatory investments for DAXXIFY®.

For additional information, see Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

**Our Strategy**

Our objective is to set a new standard in healthcare by elevating patient and physician experiences through the development, acquisition and commercialization of innovative aesthetic and therapeutic offerings, including DAXXIFY® and the RHA® Collection of dermal fillers.

***Key elements of our strategy are:***

- We aim to leverage the unique formulation and clinical profile of DAXXIFY® to build valuable aesthetic and therapeutic franchises.
- We aim to grow market share by utilizing our innovative and differentiated portfolio of Products to appeal to consumers seeking elevated aesthetic outcomes.
- We aim to leverage DAXXIFY® to pursue a therapeutics program that will advance the treatment of multiple indications, with a current focus on muscle movement disorders, including cervical dystonia and upper limb spasticity. We also plan to evaluate our pipeline for other indications, such as migraine.

- We have and will continue to selectively evaluate partnerships, distribution opportunities, joint development agreements and acquisitions to expand our aesthetic and therapeutic franchises and enhance our competitive position:
  - Our Teoxane partnership enabled us to enter the U.S. dermal filler market and has provided the foundation for DAXXIFY® and potential future product commercialization.
  - We have the potential to enter the second largest neuromodulator market, China, as a result of our Fosun License Agreement.
  - We have entered into the Viatris Agreement, which provides us with the potential to participate in the short-acting neuromodulator market.

**The Botulinum Toxin Opportunity**

Botulinum toxin is a protein and neurotoxin produced by clostridium botulinum. Since 1989, botulinum toxin has been used to treat a variety of aesthetic and therapeutic indications in the U.S. and globally. Botulinum toxin blocks neuromuscular transmission by binding to receptor sites on motor or sympathetic nerve terminals, entering the nerve terminals, and inhibiting the release of acetylcholine. This inhibition occurs as the neurotoxin cleaves SNAP-25, a protein integral to the successful docking and release of acetylcholine from vesicles situated within nerve endings. When injected intramuscularly at therapeutic doses, botulinum toxin produces partial chemical denervation of the muscle resulting in a localized reduction in muscle activity. Throughout this Report, we use neuromodulators to refer to botulinum toxins and neurotoxins.

According to DRG, the global market opportunity for neuromodulators was estimated to be $8.1 billion in 2023 compared to $7.4 billion in 2022 and is projected to reach approximately $12.0 billion by 2028, registering a compounded annual growth rate of approximately 8.1% from 2023 to 2028. DRG estimates that the market opportunity for aesthetic indications and therapeutic indications in 2023 is approximately 60% and 40%, respectively. We expect continued growth to be driven by demographics, changing lifestyle, new indications and product launches in new geographies.

For information on competition we face in these markets, please see "—Product Competition" below.

***The Opportunity for Neuromodulators for Aesthetic Indications***

Injectable neuromodulator treatments are the single largest cosmetic procedure in the U.S. and globally. In the U.S., neuromodulators have been approved to treat three aesthetic indications, glabellar lines, forehead lines and LCLs. According to DRG, in 2023, 16.1 million neuromodulator aesthetic procedures were performed in the U.S. and 49 million neuromodulator aesthetic procedures were performed globally, which represents an increase of 8.2% and 8.65%, respectively, over 2022. Also, according to DRG, the aesthetic neuromodulator market opportunity was estimated to be $2.8 billion in the U.S. and $4.9 billion globally in 2023, compared to $2.5 billion and $4.5 billion, respectively, in 2022. The aesthetic neuromodulator market is projected to reach approximately $4.4 billion in the U.S. and $7.3 billion globally by 2028, registering five-year compounded annual growth rates of approximately 9.2% and 8.3%, respectively, from 2023 to 2028.

We believe that we are positioned to take advantage of this growing market opportunity due to the performance profile of DAXXIFY®, which has been shown to include long duration, fast-onset and the appearance of improved skin quality. In our SAKURA Phase 3 clinical program for the treatment of glabellar lines, DAXXIFY® demonstrated a median time to the loss of none or mild wrinkle severity of 24 weeks (6 months) and a median time to return to baseline wrinkle severity of approximately 28 weeks (7 months), as documented on the prescribing information. According to the prescribing information from other neuromodulators on the market, median duration of effect of these products ranges between three to four months. We believe that DAXXIFY®'s attributes will provide more satisfaction and value to consumers, and ultimately drive increased adoption of DAXXIFY®.

***The Opportunity for Neuromodulators for Therapeutic Indications***

In the U.S., neuromodulators have been approved for the treatment of cervical dystonia, upper limb spasticity (adult and pediatric), lower limb spasticity, chronic migraine headache, urinary incontinence, overactive bladder, blepharospasm, strabismus, hyperhidrosis and neurogenic detrusor overactivity (adult and pediatric). In addition, neuromodulator products are being evaluated in clinical trials for other therapeutic indications, including acne, rosacea, skin and wound healing, scar reduction, hair loss, major depressive disorder, atrial fibrillation and several musculoskeletal and neurological conditions.

We are currently pursuing the commercialization of DAXXIFY® for the treatment of cervical dystonia and the development of DAXXIFY® for upper limb spasticity because we believe there is opportunity to improve injectable neuromodulator outcomes and overall health system costs in muscle movement disorders. Muscle movement disorders are neurological conditions that affect a person's ability to control muscle activity in one or more areas of the body. Cervical dystonia is a painful and disabling chronic condition in which the neck muscles contract involuntarily, causing abnormal movements and awkward posture of the head and neck. Cervical dystonia affected approximately 60,000 people in the U.S. According to DRG, the U.S. market opportunity for cervical dystonia in 2023 was approximately $372.8 million and is expected to grow to approximately $521.2 million by 2028, registering a five-year compounded annual growth rate of approximately 6.93% from 2023 to 2028.

Muscle spasticity happens after the body's nervous system has been damaged, most commonly by a stroke, trauma or disease. Muscle spasticity can be painful and may have a significant effect on a person's quality of life. Certain tasks, like getting dressed or bathing, become difficult, and a person's self-esteem may be affected by an abnormal posture. Spasticity affected approximately 500,000 people in the U.S. and approximately 12 million people globally. According to DRG, the global spasticity market in 2023 was approximately $906 million and is expected to grow to $1.4 billion by 2028.

Although currently approved neuromodulators have demonstrated safety and efficacy in clinical trials for the treatment of muscle movement disorders, such neuromodulator injections must be repeated every three to four months. According to the peer-reviewed article *Patient Perspectives on the Therapeutic Profile of Botulinum Neurotoxin Type A in Cervical Dystonia*, published in the Journal of Neurology in 2020, out of cervical dystonia patients surveyed, 88% of patients treated with botulinum neurotoxin type A products experienced symptom reemergence between treatment sessions, with a mean time to reemergence of approximately 10.5 weeks. In addition, most botulinum neurotoxin type A labels recommend waiting at least 12 weeks prior to re-treatment. We believe there is a significant need for a long-lasting injectable neuromodulator, which has the potential to offer consumers and payors more value by reducing the frequency of visits while also allowing consumers to achieve more durable symptom relief between injection cycles. We believe that DAXXIFY® has the potential to provide these benefits. In 2021, we completed the ASPEN-1 Phase 3 clinical program for the treatment of cervical dystonia and the JUNIPER Phase 2 clinical trial for the treatment of upper limb spasticity. In the ASPEN-1 Phase 3 clinical trial, DAXXIFY® demonstrated a median duration of effect of 24.0 weeks in one treatment group and 20.3 weeks in another treatment group. In the JUNIPER Phase 2 clinical trial, DAXXIFY® demonstrated a median duration of at least 24 weeks across all three doses. See "—Our Product — DAXXIFY for Therapeutic Indications."

**The Hyaluronic Acid Dermal Filler Opportunity**

Dermal fillers are injected into the superficial and deep layers of the skin to restore volume, smooth lines, provide facial lift and contour, plump the lips or improve the appearance of facial scars commonly caused by acne. Hyaluronic acid dermal fillers represent approximately 91% of the total U.S. dermal filler market, and according to the 2022 ASPS, hyaluronic acid dermal fillers were the second most common aesthetic injectable procedure in United States in 2022. Hyaluronic acid is naturally found in the body, primarily in the skin, joints and connective tissue. With age, human skin loses its ability to produce hyaluronic acid, resulting in the loss of volume, firmness and elasticity. Hyaluronic acid dermal fillers are manufactured from synthesized hyaluronic acid cross-linked to significantly enhance durability in the skin. These products can restore lost volume for six to 12 months or longer before the body gradually and naturally absorbs the hyaluronic acid. Most hyaluronic acid dermal fillers also contain lidocaine to help minimize discomfort during and after treatment.

DRG estimated that 3.3 million dermal filler procedures were performed in the U.S. in 2023. According to DRG, the U.S. market opportunity for hyaluronic acid dermal fillers was estimated to be $1.5 billion in 2023 and is projected to reach approximately $2.1 billion by 2028, registering a compounded annual growth rate of approximately 7.5% from 2023 to 2028.

Table of Contents

Access to the RHA® Collection of dermal fillers not only enables us to compete in the U.S. dermal filler market, but also supports the launch of DAXXIFY® and provides a foundation for other potential aesthetic product offerings. We believe there are long term revenue and cost synergy opportunities with neuromodulators and hyaluronic acid dermal fillers. We believe our ability to offer a comprehensive aesthetics portfolio, including DAXXIFY® and the RHA® Collection of dermal fillers, positions us to compete with established competitors.

For information on competition we face in this market, please see "—Product Competition" below.

Table of Contents

**Product Pipeline Summary**

| Product/Product Candidate | Indication | Phase |
|---|---|---|
| DAXXIFY® | Glabellar lines | FDA approved September 2022 |
| DAXXIFY® | Cervical dystonia | FDA approved August 2023 |
| RHA® Redensity | Perioral rhytids | FDA approved December 2021 |
| RHA® 2 | Facial wrinkles and folds (such as nasolabial folds) | FDA approved October 2017 |
| RHA® 3 | Facial wrinkles and folds (such as nasolabial folds<br>Vermillion body, vermillion border and oral commissure | FDA approved October 2017<br>FDA approved January 2024 |
| RHA® 4 | Facial wrinkles and folds (such as nasolabial folds) | FDA approved October 2017 |
| DAXXIFY® | Forehead lines, lateral canthal lines, upper facial lines | Phase 2 completed |
| DAXXIFY® | Upper limb spasticity | End of Phase 2 meeting with FDA completed Q4 2021 |
| onabotulinumtoxinA biosimilar | N/A | Pre-clinical |

**Our Products**

*DAXXIFY®*

DAXXIFY®, our first commercially approved product, is an acetylcholine release inhibitor and neuromuscular blocking agent indicated for the (i) temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients and (ii) treatment of cervical dystonia in adult patients. DAXXIFY® GL Approval was granted in the U.S. based on the results of the SAKURA Phase 3 clinical program in glabellar lines where DAXXIFY® demonstrated high response rates, long duration of effect and a safety profile consistent with other approved neuromodulator products. DAXXIFY® was also evaluated in Phase 2 clinical trials for the treatment of UFLs, forehead lines and LCLs. DAXXIFY® CD Approval was granted in the U.S. based on the results of the ASPEN-1 and ASPEN OLS Phase 3 clinical program for the treatment of cervical dystonia where DAXXIFY® demonstrated durable symptom relief, long duration of effect and a safety profile consistent with other approved neuromodulator products. DAXXIFY® was also evaluated in Phase 2 clinical trials for the treatment of additional therapeutic indications, including upper limb spasticity.

The DAXXIFY® formulation incorporates our proprietary stabilizing peptide excipient along with the other excipients: polysorbate-20, buffers and a sugar. DAXXIFY® is supplied as a lyophilized powder, which requires reconstitution with saline prior to injection. The highly positively charged peptide excipient has been shown to bind non-covalently to the daxibotulinumtoxinA molecule. The unique formulation of DAXXIFY® has enabled us to create a drug product without human serum albumin or animal-derived components, which are contained in all other FDA approved neuromodulator products.

Please see www.revance.com for the Full Prescribing Information including the Boxed Warning and Medication Guide for DAXXIFY®.

***DAXXIFY® for the Treatment of Aesthetic Indications***

DAXXIFY® has been studied in Phase 3 clinical trials for the treatment of glabellar lines and in Phase 2 clinical trials for the treatment of UFL, forehead lines and LCL. For a summary of the DAXXIFY® aesthetics clinical program, please see our Annual Reports on Form 10-K for the years ended December 31, 2021 and 2020.

*DAXXIFY® for the Treatment of Glabellar Lines*

Glabellar Lines, often called "frown lines," are vertical lines that develop between the eyebrows and may appear as a single vertical line or as two or more lines. When one frowns, the muscles of the glabella contract causing vertical creases to form between the eyebrows. Neuromodulators are used to temporarily block the ability of nerves to trigger contraction of the injected muscle, inhibiting movement of the muscles that cause the frown lines, resulting in a smoother, more refreshed appearance. Current treatments include neuromodulator injections, dermal fillers, laser treatments and topical creams.

In December 2018, we completed a Phase 3 clinical program for glabellar lines, which included three studies: two 36-week, randomized, double-blind, placebo controlled pivotal trials to evaluate the safety and efficacy of a single administration of DAXXIFY® for the treatment of moderate to severe glabellar lines in adults (SAKURA Phase 1 and SAKURA Phase 2) and an 84-week, open-label safety trial designed to evaluate the long term safety of DAXXIFY® for the treatment of moderate to severe glabellar lines in adults following both single and repeat treatment administration (SAKURA Phase 3). Based on the results of the SAKURA clinical program, DAXXIFY® was approved for the temporary improvement of glabellar lines.

*DAXXIFY® for the Treatment of Upper Facial Lines*

UFL is the name commonly given to the combination of the three most commonly treated facial areas with neuromodulators; specifically, glabellar lines, LCLs and forehead lines. In clinical practice, a large proportion of patients seek treatment in all three areas to address signs of aging.



REV_DAX-03338624
DTX-370.0019

In December 2020, we completed a multicenter, open-label Phase 2 trial for the treatment of the UFL to understand the safety and efficacy, including potential dosing and injection patterns, of DAXXIFY®, covering the UFL.

*DAXXIFY® for the Treatment of Forehead Lines*

Forehead lines are produced by the action of the frontalis muscle, a large, thin, vertically-oriented muscle which lifts the eyebrows. The frontalis muscle serves as an antagonist to the glabellar musculature, a natural depressor that is responsible for frowning and associated eyebrow movement. As the eyebrow is considered the aesthetic center of the upper face, forehead lines can significantly impact the aesthetic appearance of the face, contribute to increased signs of aging and convey unwanted social signals. Current treatments include neuromodulator injections, dermal fillers, laser treatments and topical creams.

In June 2020, we completed a Phase 2 multicenter, open-label, dose-escalation study to evaluate the treatment of moderate or severe dynamic forehead lines in conjunction with treatment of the glabellar complex. The objective was to understand the potential dosing and injection patterns of DAXXIFY® in other areas of the upper face.

*DAXXIFY® for the Treatment of Lateral Canthal Lines*

Crow's feet or LCLs are the spider-like fine lines around the outside corners of the eyes that become more obvious when someone smiles. These lines (also referred to as periorbital wrinkles, laugh lines or smile lines), fan out across the skin from the outer corner of each eye. Repetitive motions, such as squinting and smiling, can lead to the increase of wrinkles and contribute to the severity and onset of crow's feet. Age and exposure to sun also play significant roles in development of these lines, which can deepen over time. Current treatments include eye creams and moisturizers, topical tretinoins, neuromodulator injections, dermal fillers and laser treatments.

In June 2020, we completed a Phase 2 multicenter, open-label, dose-escalation study to evaluate the treatment of moderate or severe LCLs. The objective was to understand the potential dosing of DAXXIFY® in the lateral canthal area.

***DAXXIFY® for the Treatment of Therapeutic Indications***

DAXXIFY® has been studied in Phase 3 clinical trials for the treatment of cervical dystonia and Phase 2 studies for upper limb spasticity and plantar fasciitis. Although we previously evaluated DAXXIFY® for the treatment of plantar fasciitis, we are not currently pursuing the plantar fasciitis indication due to the results of the Phase 2 study. We will continue to evaluate development for other therapeutic indications, such as migraine, informed by the results of the commercialization of DAXXIFY® for the treatment of cervical dystonia and preclinical studies and clinical trials conducted by Revance and competitors.

*DAXXIFY® for the Treatment of Cervical Dystonia*

Cervical dystonia is a chronic neurologic disorder characterized by involuntary muscle contractions of the head, neck, and shoulders, resulting in pain, abnormal movements and/or postural changes. While not life-threatening, cervical dystonia can be painful and may have a significant effect on a person's quality of life. The cause of cervical dystonia is often unknown, and treatment with a neuromodulator is the current standard of care.

In November 2021, we completed the ASPEN Phase 3 clinical program for the treatment of cervical dystonia. The ASPEN Phase 3 program included a randomized, double-blind, placebo-controlled trial comparing two doses of DAXXIFY® (125 units and 250 units) to placebo designed to evaluate the safety and efficacy of a single treatment of either 125 units or 250 units of DAXXIFY® for the treatment of cervical dystonia (ASPEN-1) and a Phase 3, open-label, multi-center trial to evaluate the long-term safety and efficacy of repeat treatments of DAXXIFY® in adults with cervical dystonia (ASPEN-OLS). Based on the results of the ASPEN Phase 3 clinical program, DAXXIFY® was approved for the treatment of cervical dystonia in adults in August 2023. For a summary of the DAXXIFY® ASPEN clinical program, please see our Annual Report on Form 10-K for the year ended December 31, 2021.

*DAXXIFY® for the Treatment of Adult Upper Limb Spasticity*

Spasticity is a motor symptom characterized by rigidity, muscle tightness, joint stiffness, involuntary jerky movements, exaggeration of reflexes, unusual posture, abnormal positioning and muscle spasms and can affect the hands, fingers, wrists, arms, elbows or shoulders. Muscle spasticity happens after the body's nervous system has been damaged, most commonly by a stroke or brain injury. While not life-threatening, spasticity can be painful and may have a significant effect on a person's quality of life. Neuromodulators are one of several approved therapies for the treatment of adult upper limb spasticity. Other treatments include oral and intrathecal muscle relaxants, physical therapy, splints, casts & braces, electrical stimulation, and surgery.

In December 2018, we initiated the JUNIPER Phase 2 randomized, double-blind, placebo-controlled, multi-center clinical trial to evaluate the efficacy and safety of DAXXIFY® for adults with moderate to severe upper limb spasticity due to stroke or traumatic brain injury. In February 2021, we announced topline data from the JUNIPER Phase 2 trial. Subjects were assigned to one of three doses of DAXXIFY® (250 units, 375 units, or 500 units) or to placebo. The trial was originally designed to enroll 128 subjects. Due to COVID-19 challenges related to continued subject enrollment and the scheduling of in-person study visits, we made the decision in June 2020 to complete study enrollment at 83 subjects.

The study's co-primary endpoints were improvement from baseline in the MAS and the PGIC score at Week 6. One co-primary endpoint was achieved in the 500-unit treatment group, which evaluated the change in the MAS score from baseline, with demonstration of a clinically meaningful and statistically significant reduction from baseline in muscle tone versus placebo ($p=0.0488$). Proof of concept was demonstrated with all three doses being numerically higher than placebo for the improvement in the MAS score. Statistical significance was not achieved on the second co-primary endpoint, however numerical improvement compared with placebo in all three doses on the PGIC assessment was achieved.

The study was designed to run for up to 36 weeks, with the co-primary measures: mean change from baseline in muscle tone measured with the MAS in the SMG of the elbow, wrist, or finger flexors at Week 6; and mean score of the PGIC at Week 6. The first 73 subjects, who were dosed before enrollment was paused in March due to the COVID-19 pandemic, were followed for up to 36 weeks, and the succeeding 10 subjects were followed up to Week 12.

On a key secondary endpoint, DAXXIFY® delivered a median duration of at least 24 weeks across all three doses. Duration of effect was defined as the time from injection (in weeks) until the loss of improvement as measured by the MAS (for the SMG) and the PGIC, or a request for retreatment by the subject.

All three doses of DAXXIFY® were generally safe and well tolerated with no increase in the incidence of adverse events observed in the higher dose treatment groups. The majority of treatment-related adverse events were mild or moderate in severity.

The JUNIPER Phase 2 trial generated sufficient data for progression to a Phase 3 study and to inform our dosing strategy and design for our Phase 3 program. In October 2021, we concluded our end-of-Phase 2 meeting with the FDA, which informed the study design for our JUNIPER Phase 3 program in upper limb spasticity.

*DAXXIFY® for the Treatment of Migraine*

Migraine headache is a central nervous system disorder characterized as moderate to severe headache and often includes other symptoms such as nausea and vomiting. In 2019, migraine headache affected more than 37 million people in the U.S., of which, it is estimated that more than 3 million suffered from chronic migraine headache. Chronic migraine headache is both under treated and under diagnosed and is defined as more than fifteen headache days per month over a three-month period of which more than eight are migrainous, in the absence of medication overuse.

We continue to evaluate the timing of the initiation of migraine clinical trials.

***Topical***

We previously evaluated preclinically and clinically a topical program for indications currently served by neuromodulator treatments. A topical product presents several potential advantages over injectable treatments, including

painless topical administration, no bruising, ease of use and limited dependence on administration technique by injectors and other medical staff. We believe these potential advantages may improve the experience of consumers undergoing neuromodulator procedures and could make a topical product candidate suitable for multiple indications in the future. We may conduct additional preclinical work for a topical product candidate in therapeutic and aesthetic applications where neuromodulators have shown efficacy and are particularly well suited for injection-free treatments.

**Our Strategic Collaborations**

***The RHA® Collection of Dermal Fillers***

In January 2020, we entered into the Teoxane Agreement, as amended on September 2020, January 2021 and December 2022, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) the RHA® Collection of dermal fillers and (ii) the RHA® Pipeline Products in the U.S., U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us.

In September 2020, we launched the RHA® Collection of dermal fillers, which initially included RHA® 2, RHA® 3 and RHA® 4. In July 2022, we added RHA® Redensity to the portfolio of the RHA® Collection of dermal fillers. In July 2023, the FDA approved the expansion of RHA 4's label to include cannula use.

The RHA® Collection of dermal fillers represents the latest advancements in hyaluronic acid filler technology. The dermal filler collection is created using a novel and gentle manufacturing process called preserved network technology that has few chemical modifications. The PNT process helps preserve the natural structure of the hyaluronic acid, allowing it to more closely mimic the natural hyaluronic acid found in the skin. The result is a hyaluronic acid dermal filler that is easy to inject and gives consumers a natural look.

The Teoxane Agreement is effective for a term of ten years from product launch and may be extended for a two-year period upon the mutual agreement of the parties. In September 2020, we amended the Teoxane Agreement to memorialize a revised launch date from April to September as a result of delays related to the COVID-19 pandemic. In January 2021 and December 2022, we amended the Teoxane Agreement by amending the innovation plan annex and quality agreement annex, respectively. Pursuant to the Teoxane Agreement, we are required to meet certain minimum purchase obligations and certain minimum expenditure requirements, which are discussed in Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to consolidated financial statements— Note 15—Commitments and Contingencies." If Teoxane pursues regulatory approval for certain new indications or filler technologies, including innovations with respect to existing products in the U.S., we will be subject to certain specified cost-sharing arrangements for third party expenses incurred in achieving regulatory approval for such products. We also have a right of first negotiation with respect to any cosmeceutical products that Teoxane wishes to distribute in the U.S. and Teoxane will have a right of first negotiation in connection with the distribution of DAXXIFY® for aesthetic use outside the U.S. and U.S. territories where Teoxane has an affiliate.

***OnabotulinumtoxinA Biosimilar***

We entered into the Viatris Agreement in February 2018, under which Revance and Viatris are collaborating exclusively, on a worldwide basis (excluding Japan), to develop, manufacture, and commercialize a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®. In February 2019, we had a BIAM with the FDA and Viatris on a proposed onabotulinumtoxinA biosimilar product candidate. Based on the FDA's feedback, Revance and Viatris believe that a 351(k) pathway for the development of an onabotulinumtoxinA biosimilar is viable.

In August 2019, we entered into the Viatris Amendment which, among other things, extended the period of time for Viatris to make the Continuation Decision as to whether to continue the biosimilar development program beyond the initial development plan and the BIAM. In accordance with the Viatris Amendment, Viatris was required to notify us of the Continuation Decision on or before the later of (i) April 30, 2020 or (ii) 30 calendar days from the date that we provide Viatris with certain deliverables. Pursuant to the Viatris Amendment, Viatris agreed to pay us an additional $5.0 million above the previously agreed non-refundable upfront payment of $25.0 million with contingent payments of up to $100.0 million, in the aggregate, upon the achievement of specified clinical and regulatory milestones, tiered sales milestones of up to $225.0 million, and royalties on sales of the biosimilar in the Viatris territories previously disclosed from the Viatris

Agreement. In June 2020, we announced that Viatris provided us its written notice of its Continuation Decision and paid us a $30 million milestone payment in connection with the Continuation Decision. We began the continuation phase of the onabotulinumtoxinA biosimilar program and are moving forward with characterization and product development work, followed by an anticipated filing of an IND with the FDA. Viatris has paid us an aggregate of $60 million in non-refundable fees as of December 31, 2023.

***Fosun License Agreement***

In December 2018, we entered into the Fosun License Agreement with Fosun, whereby we granted Fosun the exclusive rights to develop and commercialize DAXXIFY® in the Fosun Territory and certain sublicense rights. Fosun has paid us non-refundable fees upfront and other payments totaling $41.0 million before foreign withholding taxes as of December 31, 2023. We are also eligible to receive (i) additional remaining contingent payments of up toS219.5 million upon the achievement of certain milestones based on first calendar year net sales and tiered royalty payments in low double digits to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) we do not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third parties to either avoid patent infringement or market the product in the Fosun Territory.

In April and July 2023, the NMPA accepted Fosun's BLA for DaxibotulinumtoxinA for Injection for the improvement of glabellar lines and treatment of cervical dystonia, respectively. The anticipated approvals for both indications are expected in 2024. We are entitled to receive additional milestone payments from Fosun upon approval of DaxibotulinumtoxinA for Injection in China, as well as milestones based on future commercial sales in Fosun territories.

**Manufacturing and Supply Chain**

***DAXXIFY® Manufacturing***

*Drug Substance*

In our northern California manufacturing facility, we manufacture and perform testing for the botulinum toxin, the active pharmaceutical ingredient in our bulk drug substance. Manufacture of the drug substance for DAXXIFY® is based on microbial fermentation followed by product recovery and purification steps. The process is entirely free of animal and human-derived materials and depends on standard raw materials available commercially. The process is scaled to support expected future commercial demand. Bulk drug substance is stable when stored under required conditions, which allows us to manage risk with reserves of drug substance and allows periodic drug substance production to replenish inventories as needed.

*Drug Product*

In March 2023, the FDA approved our PAS submission for the ABPS manufacturing facility. Following approval, the ABPS manufacturing facility began serving as our primary commercial drug product supply source for DAXXIFY®. Our northern California aseptic fill-and-finish manufacturing facility is available for commercial and clinical production of DAXXIFY® to support the development and commercialization of DAXXIFY® for the Fosun partnership. The manufacturing process consists of bulk compounding, liquid fill and freeze-drying to support acceptable shelf-life duration. We also perform testing for DAXXIFY® in our northern California facility and at the ABPS facility.

In March 2017, we entered into the ABPS Services Agreement, pursuant to which ABPS would serve as a supply source and provide drug product manufacturing services for us at its aseptic manufacturing facility in San Diego, California. Under the ABPS Services Agreement, until May 2022, we were subject to minimum purchase obligations of up to $30.0 million for each of the years ending December 31, 2022, 2023 and 2024. In May 2022, we amended a statement of work under the ABPS Services Agreement pursuant to which the minimum purchase obligations of $30.0 million per year were eliminated, and instead the minimum purchase obligations would be based on available manufacturing weeks and negotiated prior to the beginning of each year over the term of the agreement. In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Services Agreement through December 31, 2027



REV_DAX-03338628
DTX-370.0023

and modified our remedies with respect to non-conforming products and delays. The minimum payments for the year ending December 31, 2024 have not been established.

In order to support the anticipated commercial demand and manage potential supply chain risks, we have also entered into an agreement with PCI, another third-party manufacturer. In April 2021, we entered into the PCI Supply Agreement, pursuant to which PCI would serve as a non-exclusive manufacturer and supplier of our products and product candidates. Pursuant to the PCI Supply Agreement, we will be responsible for an estimated $28 million in costs associated with the design, equipment procurement and validation and facilities-related costs, which are paid in accordance with a payment schedule based on the completion of specified milestones.

The initial term of the obligations underlying the PCI Supply Agreement is dependent upon the date of regulatory submission for the applicable product and may be sooner terminated by either party in accordance with the terms of the PCI Supply Agreement. The term of the PCI Supply Agreement may also be extended by mutual agreement of the parties. The PCI Supply Agreement also sets forth, among other things, the Company's purchase requirements, pricing and payment information, deliverables, timelines, milestones, payment schedules, manufacturing facility obligations and development of a drug manufacturing process. The parties would also enter into quality agreements and other supplements which detail the process and product specifications for the applicable Product. The PCI Supply Agreement also contains provisions relating to compliance with cGMPs and applicable laws and regulations, and to intellectual property, indemnification, confidentiality, representations and warranties, dispute resolution and other customary matters for an agreement of this kind.

We anticipate the potential approval of the PAS for the PCI manufacturing site in 2025.

*Outsourced Components of Drug Product*

We also contract with third parties for the manufacture of the additional components required for DAXXIFY®, including the manufacture of bulk peptide. We currently rely on a single source supplier for the development, manufacture and supply of peptide. To decrease the risk of an interruption to our drug supply, we maintain an inventory of peptide.

***Supply of the RHA® Collection of Dermal Fillers***

We are a distributor of the RHA® Collection of dermal fillers and are not involved in the manufacturing process. We rely on Teoxane to supply us with the RHA® Collection of dermal fillers.

**Sales, Marketing and Distribution**

***Sales and Marketing of our Aesthetics Portfolio***

In August 2020, we became a commercial company with the launch of the RHA® Collection of dermal fillers in the U.S., which included RHA® 2, RHA® 3 and RHA® 4. Since the initial launch of the RHA® Collection of dermal fillers, we have added RHA® Redensity to our portfolio offering as a part of the RHA® Collection of dermal fillers. In September 2022, we expanded our aesthetic Product portfolio to include DAXXIFY®.

We initiated the launch of DAXXIFY® in the U.S. in December 2022 by training a group of faculty members on the product as a part of PrevU, our early experience program for the product. PrevU focused on providing practices with product education, tools for practice integration, and the opportunity to gain real-world clinical insights with the goal of optimizing aesthetic outcomes. We completed the PrevU program in March 2023, which was followed by the targeted commercial launch of DAXXIFY®.

Based on real-world learnings and customer feedback, in September 2023, we introduced a new pricing strategy for DAXXIFY® that allows the product to be priced more competitively to BOTOX®. Revenue increased from $22.0 million for the three months ended September 30, 2023 to $24.0 million for the three months ended December 31, 2023, and the volume sold during the three months ended December 31, 2023 increased by 22% compared to the three months ended September 30, 2023. Further, the majority of total DAXXIFY® sales revenue for the three months ended September 30 and December 31, 2023 were attributable to reordering accounts.

We acquired HintMD in July of 2020, pursuant to which we commercialized the Fintech Platform. In September 2023, we commenced a plan to exit the Fintech Platform business and halted any additional commercialization activities for the Fintech Platform because the significant costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. As of January 31, 2024, we ceased substantially all payment processing activity.

***Sales and Marketing of our Therapeutics Portfolio***

In August 2023, the FDA approved DAXXIFY® for the treatment of cervical dystonia in adults, which was followed by PrevU, our early experience program for the product. We have also begun to establish our commercial sales and marketing organization to support the launch of DAXXIFY® for the treatment of cervical dystonia, with commercial launch expected to begin in mid-year 2024. Our therapeutics sales team will be supported by our marketing, market access and medical affairs teams. Our therapeutics sales and national account teams will initially target high volume cervical dystonia injectors in private practice, targeted academic medical centers, integrated delivery networks, and government accounts. As of the date of this Report, coverage for DAXXIFY® for the treatment of cervical dystonia has been secured for more than 140 million commercial lives, which includes 25 of the top 30 payors in the country, representing over 50% of commercial lives covered.

***Distribution***

We rely on one or more third-party service providers to perform a variety of functions related to the packaging, storage and distribution of DAXXIFY® and the storage and distribution of the RHA® Collection of dermal fillers. We recognize revenue from the sales of our Products once they are delivered to our customers. We rely on one third-party service provider to distribute our Products to our customers, which could expose us to shipping delays and delays in revenue recognition to the extent we experience a sudden loss of that third-party service provider or that third-party service provider's operations are disrupted or impacted. See Part I, Item 1A. "Risk Factors—We generally rely on one third-party service provider for the distribution of our Products to our customers. If we experienced a sudden loss of our third-party distributor or such distributor experiences a disruption in its operations, it would affect the delivery of our Products to our customers, which could negatively impact our business, consolidated financial condition and results of operations."

***Seasonality***

Sales of DAXXIFY® and the RHA® Collection of dermal fillers have been subject to the impact of traditional seasonality in the aesthetic facial injectables market, which historically has experienced higher sales in the second and fourth calendar quarters as compared to the first and third calendar quarters.

**Intellectual Property**

Our success depends in large part on our ability to obtain and maintain intellectual property protection for our drug candidates, novel biological discoveries, drug development technology and other know-how, to operate without infringing on the proprietary or intellectual property rights of others and to prevent others from infringing our proprietary and intellectual property rights. We seek to protect our proprietary position by, among other methods, filing U.S. and foreign patent applications related to our proprietary technology, inventions and improvements that are important to the development and implementation of our business. We also rely on know-how, copyright, trademarks and trade secret laws, continuing technological innovation and potential in-licensing opportunities to develop and maintain our proprietary position. Such protection is also maintained using confidential non-disclosure agreements. Protection of our technologies is important for us to offer our customers proprietary products unavailable from our competitors, and to exclude our competitors from using technology that we have developed. If competitors in our industry have access to the same technology, our competitive position may be adversely affected.

As of December 31, 2023, Revance and its subsidiaries held approximately 305 issued patents and approximately 124 pending patent applications, including foreign counterparts of U.S. patents and applications. 57 of our patents are issued in the U.S., with the rest issued in Australia, Brazil, Canada, China, various countries in Europe, Hong Kong, Israel, Japan, Mexico, New Zealand, Singapore, and South Korea. In addition, we have pending patent applications in the U.S. as well as in Australia, Brazil, Canada, China, Colombia, Europe, Hong Kong, India, Israel, Japan, Mexico, New Zealand, Philippines,

Singapore and South Korea. We will continue to pursue additional patent protection as well as take appropriate measures to obtain and maintain proprietary protection for our innovative technologies.

It is possible that our current patents, or patents which we may later acquire or develop, may be successfully challenged or invalidated in whole or in part. For example, in May 2019, our European Patent No. EP 2 490 986 B1 for "Methods and Systems For Purifying Non-Complexed Botulinum Neurotoxin" was opposed. At a hearing in June 2021, the Opposition Division granted amended claims in our patent. The opponent appealed our successful opposition defense to the Board of Appeal of the European Patent Office. We subsequently filed an appeal to preserve our ability to use all arguments throughout the appeal process. Following an Appeal Hearing in December 2023, the patent was upheld with the claims, as amended during the opposition, and the appeals were dismissed. In November 2022, Ipsen Biopharm Limited filed an Opposition in the European Patent Office against our European Patent No. EP 3 368 071 titled "Injectable botulinum toxin formulations and methods of use thereof having long duration of therapeutic or cosmetic effect." We will vigorously defend this patent in the European Patent Office.

It is also possible that we may not obtain issued patents from our pending patent applications or for other inventions we seek to protect. Due to uncertainties inherent in prosecuting patent applications, sometimes patent applications are rejected and we subsequently abandon them. It is also possible that we may develop proprietary products or technologies in the future that are not patentable or that the patents of others will limit or altogether preclude our ability to do business. In addition, any patent issued to us, or any of our pending patent applications, may provide us with little or no competitive advantage, in which case we may abandon such patent, or patent applications, or license them to another entity. Please refer to Item 1A. "Risk Factors—Risks Related to our Intellectual Property" for more information.

Our registered U.S. trademarks include REVANCE®, DAXXIFY® and the Revance logo.

**Product Competition**

The pharmaceutical and medical device markets are highly competitive. Our competitors are engaged in the development, research, manufacture and marketing of healthcare products. While we believe that our innovative Products provide us with a competitive advantage, possible competitors may also have an ability to discover, develop, test and obtain regulatory approvals for products, as well as the ability to commercialize, market and promote approved products more effectively than us. Our competitors may be able to develop competing technologies and processes that compete more aggressively and sustain that competition over a longer period of time. Our technologies and Products may be rendered obsolete or uneconomical by technological advances, products with longer duration or entirely different approaches developed by one or more of our competitors. Additionally, our competitors have greater existing market share in the aesthetic market and long-standing consumer loyalty programs and sales contracts with large customers and further established business and financial relationships with customers. Competitors may also try to compete with us on price both directly, through rebates and promotional programs to high volume injectors and coupons to consumers, and indirectly, through attractive product bundling with complementary products, such as dermal fillers, that offer convenience and an effectively lower price compared to the total price of purchasing each product separately. In addition, as more companies develop new intellectual property in our markets, the possibility of a competitor acquiring patent or other rights that may limit our Products or potential indications for our products increases, which could lead to litigation. Current competitors have asserted and competitors in the future could assert patent infringement claims against us, which could require us to pay damages, halt or delay commercialization, suspend the manufacture of our Products or reengineer or rebrand our Products. See "Part I. Item 1A. Risk Factors— Risks Related to Our Intellectual Property."

We expect to compete directly with competitors that sell injectable neuromodulator products or dermal fillers in the markets where we have a labeled indication and/or regulatory clearance. We may also indirectly compete with approved neuromodulators in other markets which are able to offer neuromodulator products and dermal fillers at lower costs.

***Injectable Botulinum Toxin Neuromodulators***

Our primary competitors for DAXXIFY® globally are companies offering injectable dose forms of neuromodulators. DAXXIFY® is currently competing in the U.S. aesthetics market and has begun to compete in the therapeutics market. Current and potential future competitors include:

- BOTOX® and BOTOX® Cosmetic, which are marketed by AbbVie. BOTOX® and BOTOX® Cosmetic have been approved for multiple indications, including glabellar lines, forehead lines, crow's feet, spasticity, cervical dystonia and chronic migraine in the U.S. and globally.
- Dysport®, which is marketed by Ipsen Ltd. and Galderma. Dysport® has been approved for multiple indications, including glabellar lines, cervical dystonia and upper and lower limb spasticity in the U.S. and certain other countries. Dysport® is also marketed as Azzalure® for glabellar lines in certain European countries.
- Xeomin®, which is marketed by Merz. Xeomin® has been approved for multiple indications, including glabellar lines, cervical dystonia and upper limb spasticity in the U.S. and certain other countries. Xeomin® is also marketed as Bocouture® for glabellar lines in certain European countries.
- Jeuveau®, which is marketed by Evolus, Inc. Jeuveau® has only been approved for the treatment of glabellar lines in the U.S. Jeuveau® is also known as NABOTA® or Nuceiva™ in certain other countries.
- Myobloc® (rimabotulinumtoxinB), which is marketed by US Supernus Pharmaceuticals, Inc. Myobloc® has been approved for multiple indications, including the treatment of cervical dystonia in the U.S. and in certain other countries.

In addition, there are other competing neuromodulators currently being developed, going through the regulatory approval process and to be commercialized in the U.S. and other markets, including neuromodulators with extended duration claims. If other neuromodulators are approved, especially with extended duration claims, it would increase competition for DAXXIFY® and potentially limit adoption of DAXXIFY®. In addition, markets outside of the U.S. may or may not require adherence to cGMPs or the regulatory requirements of the EMA or other regulatory agencies in countries that are members of the Organization for Economic Cooperation and Development. While some of these products may not meet U.S. regulatory standards, the companies operating in these markets may be able to produce products at a lower cost than U.S. and European manufacturers.

***Dermal Fillers***

Our primary competitors for the RHA® Collection of dermal fillers in the U.S. include:

- the Juvéderm® family of fillers, which are marketed by AbbVie. The Juvéderm® family of fillers have been approved for the treatment of moderate to severe loss of jawline definition, augmentation of the chin region, moderate to severe, facial wrinkles and folds such as nasolabial folds, lip augmentation and perioral lines.
- the Restylane® family of fillers, which are marketed by Galderma. The Restylane® family of fillers have been approved for the treatment of moderate to severe facial wrinkles and folds such as nasolabial folds, age-related midface contour deficiencies, volume loss of the dorsal hand, upper perioral wrinkles, and for cheek and chin augmentation.
- RADIESSE® and RADIESSE® (+), which are marketed by Merz. RADIESSE® and RADIESSE® (+) have been approved for the treatment of moderate to severe facial wrinkles and folds, such as nasolabial folds, and for volume loss of the hand.
- Sculptra® Aesthetic, which is marketed by Galderma. Sculptra® Aesthetic is approved for the treatment of shallow to deep nasolabial folds and facial fat loss.
- Belotero Balance® and Belotero Balance® (+), which is marketed by Merz. Belotero Balance® and Belotero Balance® (+) are approved for the treatment of moderate to severe facial wrinkles and folds such as nasolabial folds.

We are aware of competing dermal fillers currently commercialized or under development in the U.S. and are monitoring the competitive pipeline environment.

**Government Regulations**

***Product Approval Process in the U.S.***

In the U.S., the FDA regulates drugs and biologic products under the FDCA, its implementing regulations, and other laws, including, in the case of biologics, the Public Health Service Act. Our products and product candidates, including DAXXIFY® and an onabotulinumtoxinA biosimilar, are subject to regulation by the FDA as biologics. Biologics require the submission of a BLA to the FDA and approval of the BLA by the FDA before marketing in the U.S.

The process of obtaining regulatory approvals for commercial sale and distribution and the subsequent compliance with applicable federal, state, local and foreign statutes and regulations requires the expenditure of substantial time and financial resources. Failure to comply with the applicable U.S. requirements at any time during the product development process, approval process or after approval, may subject an applicant to administrative or judicial civil or criminal sanctions. These sanctions could include the FDA's refusal to approve pending applications, license suspension or revocation, withdrawal of an approval, imposition of a clinical hold on clinical trials, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, refusals of government contracts, debarment, restitution, disgorgement or civil or criminal penalties. The process required by the FDA before a biologic may be marketed in the U.S. generally involves the following:

- completion of preclinical laboratory tests, animal studies and formulation studies performed in accordance with the GLPs;
- submission to the FDA of an IND which must become effective before human clinical trials in the U.S. may begin;
- approval by an IRB, at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with the GCP regulations to establish the safety and efficacy of the product candidate for its intended use;
- submission to the FDA of a BLA;
- satisfactory completion of an FDA inspection, if the FDA deems it as a requirement, of the manufacturing facility or facilities where the product is produced to assess compliance with cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the product's identity, strength, potency, quality and purity, as well as compliance with applicable QSR for devices;
- potential inspections by the FDA of the nonclinical and clinical trial sites that generated the data in support of the BLA;
- potential review of the BLA by an external advisory committee to the FDA, whose recommendations are not binding on the FDA; and
- FDA review and approval of the BLA prior to any commercial marketing or sale.

*Preclinical Studies*

Before testing any compounds with potential therapeutic value in humans, the product candidate enters the preclinical testing stage. Preclinical tests include laboratory evaluations of product chemistry, stability and formulation, as well as animal studies to assess the potential toxicity and activity of the product candidate. The conduct of the preclinical tests must comply with federal regulations and requirements including GLPs. The sponsor must submit the results of the preclinical tests, together with manufacturing information, analytical data, any available clinical data or literature and a proposed clinical protocol, to the FDA as part of the IND. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions about the conduct of the clinical trial, including concerns that human research subjects will be exposed to unreasonable health risks. In such cases, the IND sponsor and the FDA must resolve any

outstanding concerns before the clinical trial can begin. The FDA may also impose clinical holds on a product candidate at any time before or during clinical trials due to safety concerns or non-compliance, or for other reasons.

*Clinical Trials*

Clinical trials involve the administration of the product candidate to human patients under the supervision of qualified investigators, generally physicians not employed by or under the clinical trial sponsor's control. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, dosing procedures, subject selection and exclusion criteria, and the parameters to be used to monitor subject safety and effectiveness. Each protocol must be submitted to the FDA as part of the IND. Clinical trials must be conducted in accordance with GCPs. Further, each clinical trial must be reviewed and approved by an IRB at or servicing each institution at which the clinical trial will be conducted. An IRB is charged with protecting the welfare and rights of clinical trial participants and considers such items as whether the risks to individuals participating in the clinical trials are minimized and are reasonable in relation to anticipated benefits. The IRB also approves the form and content of the informed consent that must be signed by each clinical trial subject or his or her legal representative and must monitor the clinical trial until completed. Human clinical trials are typically conducted in three sequential phases that may overlap or be combined:

- *Phase 1.* The product candidate is initially introduced into a limited population of healthy human subjects and tested for safety, dosage tolerance, absorption, metabolism, distribution and excretion. In the case of some products for some diseases, or when the product may be too inherently toxic to ethically administer to healthy volunteers, the initial human testing is often conducted in patients with the disease or condition for which the product candidate is intended to gain an early indication of its effectiveness.

- *Phase 2.* The product candidate is evaluated in a limited patient population, but larger than in Phase 1, to identify possible adverse events and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted indications and to assess dosage tolerance, optimal dosage and dosing schedule.

- *Phase 3.* Clinical trials are undertaken to further evaluate dosage, and provide substantial evidence of clinical efficacy and safety in an expanded patient population, such as several hundred to several thousand, at geographically dispersed clinical trial sites. Phase 3 clinical trials are typically conducted when Phase 2 clinical trials demonstrate that a dose range of the product candidate is effective and has an acceptable safety profile. These trials typically have at least 2 groups of patients who, in a blinded fashion, receive either the product or a placebo. Phase 3 clinical trials are intended to establish the overall risk/benefit ratio of the product and provide an adequate basis for product labeling. Generally, two adequate and well-controlled Phase 3 clinical trials are required by the FDA for approval of a BLA.

Post-approval trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication to further assess the biologic's safety and effectiveness after BLA approval. Phase 4 trials can be initiated by the drug sponsor or as a condition of BLA approval by the FDA.

Annual progress reports detailing the results of the clinical trials must be submitted to the FDA and written IND safety reports must be promptly submitted to the FDA and the investigators for serious and unexpected adverse events or any finding from tests in laboratory animals that suggests a significant risk for human subjects.

Concurrent with clinical trials, companies usually complete additional animal studies and must also develop additional information about the chemistry and physical characteristics of the biologic and finalize a process for manufacturing the product in commercial quantities in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate and, among other things, must develop methods for testing the identity, strength, quality and purity of the final biologic product. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its shelf life.

*U.S. Review and Approval Processes*

The results of product development, preclinical studies and clinical trials, along with descriptions of the manufacturing process, analytical tests, proposed labeling and other relevant information are submitted to the FDA in the form of a BLA requesting approval to market the product for one or more specified indications. The submission of a BLA is subject to the payment of substantial user fees.

Once the FDA receives a BLA, it has 60 days to review the BLA to determine if it is substantially complete and the data are readable, before it accepts the BLA for filing. Once the submission is accepted for filing, the FDA begins an in-depth review of the BLA. Under the goals and policies agreed to by the FDA under the PDUFA, the FDA has twelve months from submission in which to complete its initial review of a standard BLA and make a decision on the application, and eight months from submission for a priority BLA, and such deadline is referred to as the PDUFA date. The FDA does not always meet its PDUFA dates for either standard or priority BLAs. The review process and the PDUFA date may be extended by three months if the FDA requests or the BLA sponsor otherwise provides major additional information or clarification regarding information already provided in the submission at any time before the PDUFA date.

After the BLA submission is accepted for filing, the FDA reviews the BLA to determine, among other things, whether the proposed product is safe and effective for its intended use, and whether the product is being manufactured in accordance with cGMP to assure and preserve the product's identity, strength, potency, quality and purity. The FDA may refer applications for novel drug or biological products or drug or biological products which present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions. During the approval process, the FDA also will determine whether a REMS is necessary to assure the safe use of the product. If the FDA concludes a REMS is needed, the sponsor of the BLA must submit a proposed REMS; in such cases, the FDA will not approve the BLA without an approved REMS. A REMS can substantially increase the costs of obtaining approval and limit commercial opportunity.

Before approving a BLA, the FDA can inspect the facilities at which the product is manufactured. The FDA will not approve the BLA unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving a BLA, the FDA will typically inspect one or more clinical sites to assure that the clinical trials were conducted in compliance with GCP requirements. If the FDA determines that the application, manufacturing process or manufacturing facilities are not acceptable, it will outline the deficiencies in the submission and often will request additional clinical testing or information before a BLA can be approved.

The FDA will issue a complete response letter if the agency decides not to approve the BLA. The complete response letter describes all of the specific deficiencies in the BLA identified by the FDA during review. The deficiencies identified may be minor, for example, requiring labeling changes, or major, for example, requiring additional clinical trials. Additionally, the complete response letter may include recommended actions that the applicant might take to place the application in a condition for approval. If a complete response letter is issued, the applicant may either resubmit the BLA, addressing all of the deficiencies identified in the letter, or withdraw the application.

If a product receives regulatory approval, the approval may be significantly limited to specific diseases and dosages or the indications for use may otherwise be limited, which could restrict the commercial value of the product. Further, the FDA may require that certain contraindications, warnings or precautions be included in the product labeling. In addition, the FDA may require post marketing studies, sometimes referred to as Phase 4 testing, which involves clinical trials designed to further assess drug safety and effectiveness and may require testing and surveillance programs to monitor the safety of approved products that have been commercialized. After approval, certain changes to the approved biologic, such as adding new indications, manufacturing changes or additional labeling claims, are subject to further FDA review and approval. Depending on the nature of the change proposed, a BLA supplement must be submitted and approved before the change may be implemented and may require the development of additional data, including preclinical studies, clinical trials or other studies. For certain proposed post-approval changes to a BLA, the FDA has up to 10 months to review the supplement. As with new BLAs, the review process is often significantly extended by the FDA requests for additional information or clarification.

*Post-Approval Requirements*

Any biologic products for which we receive FDA approvals are subject to continuing regulation by the FDA, including, among other things, record-keeping requirements, reporting of adverse experiences with the product, providing the FDA with updated safety and efficacy information, product sampling and distribution requirements, complying with certain electronic records and signature requirements and complying with FDA promotion and advertising requirements, which include, among others, restrictions on direct-to-consumer advertising, promoting biologics for uses or in patient populations that are not described in the product's approved labeling, known as "off-label use," industry-sponsored scientific and educational activities, and promotional activities involving the internet. The FDA and other agencies closely regulate the post-approval marketing and promotion of biologics, and although physicians may prescribe legally available drugs for off-label uses, manufacturers may not market or promote such off-label uses. The FDA does not regulate the behavior of physicians in their choice of treatments but the FDA does restrict manufacturers' communications on the subject of off-label use of their products. Failure to comply with these or other FDA requirements can subject a manufacturer to possible legal or regulatory action, such as warning letters, suspension of manufacturing, seizure of product, injunctive action, mandated corrective advertising or communications with healthcare professionals, possible civil or criminal penalties or other negative consequences, including adverse publicity.

We currently manufacture drug supplies using a combination of third-party manufacturers and our own manufacturing facility. Our future collaborators may also utilize third parties for some or all of a product we are developing with such collaborator. We and our third-party manufacturers are required to comply with applicable FDA manufacturing requirements contained in the cGMP regulations. cGMP regulations require among other things, quality control and quality assurance as well as the corresponding maintenance of records and documentation. Drug manufacturers and other entities involved in the manufacture and distribution of approved biologics are required to register their establishments with the FDA and certain state agencies, and are subject to periodic inspections by the FDA and certain state agencies for compliance with cGMP and other laws. Accordingly, manufacturers must continue to expend time, money, and effort in the area of production and quality control to maintain cGMP compliance.

*U.S. Patent Term Restoration and Marketing Exclusivity*

Depending upon the timing, duration and specifics of the FDA approval of our biologic product candidate, one or more of our U.S. patents may be eligible to be the basis for an application for limited patent term extension under the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the Hatch-Waxman Amendments. Such Hatch-Waxman Amendments permit a patent restoration term of up to five years as compensation for patent term lost during the FDA regulatory review process, which coincides with the period of product development and regulatory review. However, patent term restoration cannot extend the remaining term of a patent beyond a total of 14 years from the product's approval date. The patent term restoration period is generally one-half the time between the effective date of an IND and the submission date of a BLA plus the time between the submission date of a BLA and the approval of that application. Each phase of the patent term restoration period is reduced by any time that the applicant did not act with due diligence during that phase. Only one patent applicable to an approved product may be extended, and the application for the extension must be submitted prior to the expiration of the patent and within 60 days after drug approval. The U.S. Patent and Trademark Office, in consultation with the FDA, reviews and approves the application for any patent term extension. We have applied for extension of patent term for three of our currently owned or licensed patents to add patent term beyond the current expiration date of one of the patents.

Market exclusivity provisions under the FDCA can also delay the submission or the approval of certain applications of other companies seeking to reference another company's BLA. Specifically, the BPCIA established an abbreviated pathway for the approval of biosimilar and interchangeable biological products. Under the BPCIA, an application for a biosimilar product cannot be approved by the FDA until twelve years after the original branded product was approved under a BLA. However, an application may be submitted after four years, which initiates a process in which the innovator BLA holder and the biosimilar applicant identify patents that could be litigated and resolve patent disputes.

***Product Approval Process Outside the U.S.***

In addition to regulations in the U.S., we will be subject to a variety of foreign regulations governing manufacturing, clinical trials, commercial sales and distribution of our future products. Whether or not we obtain FDA approval for a product



REV_DAX-03338636

DTX-370.0031

candidate, we must obtain approval of the product by the comparable regulatory authorities of foreign countries before commencing clinical trials or marketing in those countries. The approval process varies from country to country, and the time may be longer or shorter than that required for FDA approval. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country.

***Federal and State Fraud and Abuse and Data Privacy and Security Laws and Regulations***

There are also healthcare fraud and abuse laws and regulations that extensively govern how pharmaceutical companies, like Revance, operate. Applicable federal and state healthcare fraud and abuse laws include:

- The federal Anti-Kickback Statute, which prohibits, among other things, persons and entities from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in cash or in kind, to induce or reward either the referral of an individual for, or the purchase, order or recommendation of, any good or service, for which payment may be made, in whole or in part, under a federal healthcare program such as Medicare and Medicaid;

- The federal civil and criminal false claims laws, including the civil False Claims Act, and civil monetary penalties laws, which prohibit individuals or entities from, among other things, knowingly presenting, or causing to be presented, to the federal government, claims for payment that are false or fraudulent or making a false statement to avoid, decrease or conceal an obligation to pay money to the federal government;

- The federal Physician Payments Sunshine Act (part of the ACA), commonly known as the Sunshine Act or Open Payments, requires certain manufacturers of drugs, devices, biologics and medical supplies to disclose certain payments and financial relationships with healthcare providers directly to CMS. Failure to comply with these laws can result in significant civil monetary penalties;

- HIPAA mandates, among other things, the adoption of uniform standards for the electronic exchange of information in common health care transactions as well as standards relating to the privacy and security of individually identifiable health information. These standards require the adoption of administrative, physical and technical safeguards to protect such information. In addition, many states have enacted comparable laws addressing the privacy and security of health information, some of which are more stringent than HIPAA. Failure to comply with these laws can result in the imposition of significant civil and criminal penalties;

- Other analogous state and foreign laws and regulations, such as state anti-kickback and false claims laws, may apply to healthcare related items or services that are reimbursed by non-governmental third-party payors, including private insurers.

***In General***

The process of obtaining regulatory approvals and the compliance with appropriate federal, state, local and foreign statutes and regulations require the expenditure of substantial time and financial resources. Because of the breadth of these laws and the narrowness of available statutory and regulatory exemptions, it is possible that some of our business activities now and in the future could be subject to challenge under one or more of these laws. If our operations are found to be in violation of any of the federal and state laws described above or any other governmental regulations that apply to us, we may be subject to legal or administrative actions, which may include orders to cease any con-compliant activities, warning letters, investigations, product recalls or seizures, delays in product approvals and significant penalties, including criminal and civil monetary penalties, damages, charges, fines, imprisonment, exclusion of products from reimbursement under government healthcare programs, integrity oversight, limitations on conducting business in applicable jurisdictions and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. To the extent that any of our products are sold in a foreign country, we may be subject to similar foreign laws and regulations, which may include, for instance, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

***U.S. and Foreign Privacy and Security Laws and Regulations***

In the ordinary course of our business, we may process personal data. Accordingly, we are, or may become, subject to numerous data privacy and security obligations, including federal, state and local laws, regulations, guidance, and industry standards related to data privacy, security, and protection.

*HIPAA Privacy and Security Requirements*

HIPAA imposes strict privacy, security, and breach notification obligations and standards on "covered entities" related to their use and disclosure of individually identifiable health information, defined by HIPAA as PHI. Covered entities are defined under HIPAA to include healthcare providers that undertake certain electronic transmissions of PHI, such as submitting electronic claims for reimbursement for the treatment of patients. Many of our healthcare provider customers are considered to be covered entities. HIPAA also applies to Business Associates, which are entities that perform certain functions or activities that involve the use or disclosure of PHI on behalf of a covered entity or entities that provide services to a covered entity. Even though we are generally not a covered entity or a Business Associate in our product-related activities, HIPAA limits the amount of data including PHI that can be shared between our business and our healthcare provider customers. In certain of our activities, including our Services-related activities, which we are in the final stages of winding down, Revance or OPUL® may be considered a Business Associate of OPUL®'s aesthetic practice customers and directly subject to HIPAA. For instance we have entered into Business Associate agreements with covered entities related to OPUL®, as discussed more below. We also may be subject to certain of HIPAA's provisions as a covered entity related to our Company health plan. HIPAA is generally enforced by the OCR, which can bring enforcement actions against companies that violate HIPAA's privacy, security or breach notification rules and levy significant civil fines and/or require changes to the manner in which PHI is used and disclosed. The U.S. Department of Justice has authority under HIPAA to bring criminal enforcement actions against covered entities, Business Associates and other entities for certain misuses of PHI and other criminal acts. Further, HIPAA authorizes state attorneys general to file civil actions for damages or injunctions in federal courts to enforce HIPAA and seek attorney's fees and costs associated with pursuing federal civil actions. If we are in possession of PHI as a Business Associate or in connection with our employee health plan covered entity and we have an unauthorized use or disclosure of the PHI, we may be required pursuant to the HIPAA breach notification rule, to notify our covered entity customer(s), impacted individuals, and/or OCR.

Our aesthetic practice customers have used OPUL® to process personal data and PHI. Where we are determined to be a Business Associate of our aesthetic practice customers who are covered entities pursuant to HIPAA, the HIPAA Security and Breach Notification Rules may apply directly to our Business Associate activities. Further, the terms of the Business Associate agreements we entered into with covered entities also generally obligate Revance to comply with the HIPAA Privacy Rule.

*Other Privacy and Security Requirements*

In addition to HIPAA, we may be subject to other federal and state laws that govern the collection, use, and disclosure of personal data.

Section 5 of the FTC Act prohibits unfair or deceptive acts or practices directed toward consumers. The FTC has brought aggressive enforcement actions against companies they believe have made material misrepresentations on their website or mobile app privacy statements with respect to their processing of personal data of consumers. In addition, state privacy laws include consumer protection laws that are very similar to the FTC Act and that are enforced by state attorneys general.

Additionally, the TCPA governs the manner in which we send mobile phone marketing and commercial messages to consumers. The U.S. Federal Communication Commission enforces the TCPA, however, the TCPA includes a private right of action with statutory damages and there have been lawsuits brought by private plaintiffs against biopharmaceutical and medical device companies. While a 2021 Supreme Court decision narrowed the applicability of the TCPA's restrictions, plaintiffs continue to test the boundaries of the decision, and a few states, including Florida and Oklahoma, have adopted TCPA-like laws that similarly provide for statutory damages and a private right of action. Additional states may follow suit.

Several states, including, but not limited to, California, Colorado, Connecticut, Utah and Virginia, have adopted generally applicable and comprehensive privacy laws, although most have an exception for information regulated by HIPAA. These new and developing state laws provide a number of new privacy rights for residents of these states and impose

corresponding obligations on organizations doing business in these states. For example, the CCPA imposes obligations on covered businesses to provide specific disclosures related to a business's collection, use, sale, and disclosure of personal data and to respond to certain requests from California residents related to their personal data (for example, requests to know of the business's personal data processing activities, to delete the individual's personal data, and to opt out of certain personal data disclosures). The CCPA provides for civil penalties and a private right of action for data breaches which may include an award of statutory damages. In addition, the CPRA, which took effect January 1, 2023, expanded the CCPA, giving California residents the ability to limit use of certain sensitive personal data, established restrictions on personal data retention, expanded the types of data breaches that are subject to the CCPA's private right of action, and established a new California Privacy Protection Agency to implement and enforce the CCPA, among other things. Revance may be required to comply with other states' privacy and data protection laws as they come into effect during 2024.

Our operations abroad may also be subject to increased scrutiny or attention from data protection authorities. Many countries in the regions where we operate have established or are in the process of establishing privacy laws with which we, our customers, and our vendors must comply. For example, while not currently applicable to Revance, European data privacy and security laws (including the EU GDPR and the UK GDPR) impose significant and complex compliance obligations on entities that are subject to those laws. For example, the EU GDPR applies to any company established in the EEA and to companies established outside the EEA that process personal data in connection with the offering of goods or services to data subjects in the EEA or the monitoring of the behavior of data subjects in the EEA. These obligations may include limiting personal data processing to only what is necessary for specified, explicit, and legitimate purposes; requiring a legal basis for personal data processing; requiring the appointment of a data protection officer in certain circumstances; increasing transparency obligations to data subjects; requiring data protection impact assessments in certain circumstances; limiting the collection and retention of personal data; increasing rights for data subjects; formalizing a heightened and codified standard of data subject consents; requiring the implementation and maintenance of technical and organizational safeguards for personal data; mandating notice of certain personal data breaches to the relevant supervisory authority(ies) and affected individuals; and mandating the appointment of representatives in the United Kingdom and/or the European Union in certain circumstances. The processing of 'special categories of personal data' (such as data concerning health, biometric data used for unique identification purposes and genetic information) imposes further heightened compliance burdens under the UK GDPR and EU GDPR and is a topic of active interest among foreign regulators.

Compliance with HIPAA, federal and state privacy laws and breach notification laws, the GDPR and other foreign privacy laws, and other non-harmonized laws can be costly and time consuming and failure to comply may result in significant fines, penalties, or other liabilities. Moreover, if our employees fail to adhere to the Company's processes and practices for the protection and/or appropriate use of personal data or PHI, or in other ways violate privacy laws or breach notification laws, it may damage our reputation and brand. Finally, any failure by our vendors to comply with the terms of our contractual provisions or the applicable privacy laws or breach notification laws, could result in proceedings against us by governmental entities or others.

As our business continues to expand in the U.S. and other jurisdictions, and as laws and regulations continue to be passed and their interpretations continue to evolve in numerous jurisdictions, additional laws and regulations may become relevant to us. See the section titled "Risk Factors - Risks Related to Government and Industry Regulation" for additional information about the laws and regulations to which we are or may become subject and about the risks to our business associated with such laws and regulations.

*Security Failures and Breach Notification Laws*

Our information technology systems, cloud-based computing services and those of our current and any future vendors, collaborators, contractors, or consultants may be subject to interruption and compromise. We and the third parties upon which we rely may be subject to a variety of evolving threats, including but not limited to social-engineering attacks (including through phishing attacks), malicious code (such as viruses and worms), malware (including as a result of advanced persistent threat intrusions), denial-of-service attacks, personnel misconduct or error, ransomware attacks, supply-chain attacks, software bugs, server malfunctions, software or hardware failures, loss of data or other information technology assets, adware, telecommunications failures, earthquakes, fires, floods, and other similar threats.

We are required to comply with laws, rules and regulations that require us to maintain the security of personal data. In the event of a security incident, we may have contractual and other legal obligations to notify relevant stakeholders. In

addition to the breach notification obligations under HIPAA, every state in the U.S. now has similar breach notification laws. Breach notification laws vary from state to state but upon an unauthorized access or disclosure of certain sensitive personal data, generally require notification to data subjects as well as notification in some circumstances to state agencies, such as the state attorneys general or the consumer protection bureau, and in some circumstances, notification to media.

See the section titled "Risk Factors – Risks Related to Our Business and Strategy" for additional information about our use of information technology systems and about the risks to our business associated with such information technology systems.

***Medical Device Distribution***

As the distributor of Teoxane's RHA® Collection of dermal fillers, we are required to maintain certain licenses, registrations, permits, authorizations, approvals or other types of state and local permissions in order to comply with various regulations regarding the distribution of medical devices, and we are contractually obligated to cooperate with Teoxane in the event of any medical device reports (adverse events) or product recalls. Satisfaction of regulatory requirements may take many months, and may require the expenditure of substantial resources. Failure to comply with such regulatory requirements can result in enforcement actions, including the revocation or suspension of licenses, registrations or accreditations, and can also subject us to plans of correction, monitoring, civil monetary penalties, civil injunctive relief and/or criminal penalties. Failure to obtain state regulatory approval will also prevent distribution of products where such approval is necessary and will limit our ability to generate revenue. Maintaining the necessary compliance infrastructure to support these activities will result in increased expense.

***Coverage and Reimbursement***

Patients in the United States and elsewhere generally rely on third-party payors to reimburse part or all of the costs associated with their prescription drugs. Accordingly, our ability to commercialize DAXXIFY® or any future product candidates for therapeutic indications such as cervical dystonia and adult upper limb spasticity will depend in part on the coverage and reimbursement levels set by governmental authorities, private health insurers and other third-party payors. As a threshold for coverage and reimbursement, third-party payors generally require that drug products have been approved for marketing by the FDA. Third-party payors also are increasingly challenging the effectiveness of and prices charged for medical products and services. We may not obtain adequate third-party coverage or reimbursement for DAXXIFY® or any future product candidates for therapeutic indications, or we may be required to sell them at a discount.

We expect that third-party payors will consider the efficacy, cost effectiveness and safety of DAXXIFY® in determining whether to approve reimbursement for DAXXIFY® for therapeutic indications and at what level. Our business would be materially adversely affected if we do not receive coverage and adequate reimbursement of DAXXIFY® for therapeutic indications from private insurers on a timely or satisfactory basis. No uniform policy for coverage and reimbursement for products exists among third-party payors in the U.S.; therefore, coverage and reimbursement for products can differ significantly from payor to payor. Further, coverage under certain government programs, such as Medicare and Medicaid, may not be available for certain of our product candidates. CMS decides whether and to what extent a new product will be covered and reimbursed under Medicare, and private third-party payors often follow CMS's decisions regarding coverage and reimbursement to a substantial degree. However, one third-party payor's determination to provide coverage for a product candidate does not assure that other payors will also provide coverage for the product candidate. As a result, the coverage determination process will likely be a time-consuming and costly process, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Further, coverage policies and third-party reimbursement rates may change at any time. Even if favorable coverage and reimbursement status is attained for one or more products for which the Company receives regulatory approval, less favorable coverage policies and reimbursement rates may be implemented in the future.

In some foreign countries, particularly Canada and European countries, the pricing of prescription pharmaceuticals is subject to strict governmental control. In the European Union, pricing and reimbursement schemes vary widely from country to country. Some countries provide that products may be marketed only after a reimbursement price has been agreed. Some countries may require the completion of additional studies that compare the cost-effectiveness of a particular product candidate to currently available therapies, and so we may be required to conduct a clinical trial that compares the cost-effectiveness of our products, including DAXXIFY®, to other available therapies. European Union member states may

approve a specific price for a product or it may instead adopt a system of direct or indirect controls on the profitability of the Company placing the product on the market. Other member states allow companies to fix their own prices for products, but monitor and control Company profits.

***U.S. Healthcare Reform***

The ACA was passed in March 2010, and substantially changed the way healthcare is financed by both governmental and private insurers and continues to significantly impact the U.S. biotechnology industry. There have been challenges by the executive, judicial and legislative branches of government to certain aspects of the ACA. The U.S. Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While the U.S. Congress has not passed comprehensive repeal legislation, it has enacted laws that modify certain provisions of the ACA such as removing penalties, which began January 1, 2019, for not complying with the ACA's individual mandate to carry health insurance. On June 17, 2021, the U.S. Supreme Court dismissed a challenge on procedural grounds that argued the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by the U.S. Congress. Prior to the U.S. Supreme Court ruling, on January 28, 2021, the current administration issued an executive order that initiated a special enrollment period for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. In addition, on August 16, 2022, the IRA was signed into law, which among other things, extends enhanced subsidies for individuals purchasing health insurance coverage in ACA marketplaces through plan year 2025. The IRA also eliminates the "donut hole" under the Medicare Part D program beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost through a newly established manufacturer discount program. It is possible that the ACA will be subject to judicial or Congressional challenges in the future. It is unclear how such challenges and the healthcare reform measures of the current administration will impact the ACA and our business.

In addition, there have been several recent U.S. congressional inquiries and proposed and enacted state and federal legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, reduce the costs of drugs under Medicare and reform government program reimbursement methodologies for drug products. In July 2021, the current administration released an executive order, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response to the executive order, on September 9, 2021, HHS released a Comprehensive Plan for Addressing High Drug Prices that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that the U.S. Congress could pursue as well as potential administrative actions HHS can take to advance these principles. In addition, the IRA, among other things, (i) directs HHS to negotiate the price of certain single-source drugs and biologics covered under Medicare and (ii) imposes rebates under Medicare Part B and Medicare Part D to penalize price increases that outpace inflation. These provisions will take effect progressively starting in fiscal year 2023, although they may be subject to legal challenges. Further, the current administration released an additional executive order on October 14, 2022, directing HHS to submit a report within ninety (90) days on how the Center for Medicare and Medicaid Innovation can be further leveraged to test new models for lowering drug costs for Medicare and Medicaid beneficiaries. As of August 29, 2023, CMS announced its selection of the first 10 drugs covered under Medicare Part D set for negotiation. CMS will publish any agreed-upon negotiated prices for the selected drugs by September 1, 2024; those prices will come into effect starting January 1, 2026. In future years, CMS will select for negotiation up to 15 more drugs covered under Part D for 2027, up to 15 more drugs for 2028 (including drugs covered under Part B and Part D), and up to 20 more drugs for each year after that, as outlined in the IRA.

At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

*Environment, Health and Safety*

We are also subject to other federal, state and local regulations regarding workplace safety and protection of the environment. We use hazardous materials, chemicals, and various compounds in our research and development activities and cannot eliminate the risk of accidental contamination or injury from these materials. Certain misuse or accidents involving these materials could lead to significant litigation, fines and penalties. We have implemented proactive programs to reduce and minimize the risk of hazardous materials incidents.

**Human Capital Management**

As of December 31, 2023, we had approximately 597 employees, all of which are located in the U.S. Our employee base grew from 534 as of December 31, 2022. As of December 31, 2023, there were no unions represented within our employee base. We may need to expand our workforce as our company grows.

We believe that empowered employees make a difference in our ability to execute our strategy. As such, we strive to provide an inclusive, rewarding and engaging environment for employees to develop professionally and contribute to our success.

*Diversity, Equity and Inclusion*

We believe in equal opportunity employment and do not tolerate discrimination based on race, color, religion, gender, sexual orientation, gender identity, national origin/ancestry, age, disability, marital or veteran status. In addition, because we believe that a diverse workforce is critical to our success, in mid-2020, we formed a Diversity and Inclusion Committee, comprised of employees and led by our Senior Vice President, General Counsel & Corporate Secretary. This committee had a mission to foster inclusivity, diversity and equity by actively educating and empowering employees to help dismantle systems of oppression, which include racism and other explicit or implicit bias at the Company and within our communities. As a reflection of this commitment, for the past three years we established Company performance goals, which are also included as performance measures in the 2023 bonus program for our executive officers, tied to the achievement of specified diversity and inclusion initiatives. In 2023, we formed the Revance Inclusion, Support and Empowerment (RISE) team, comprised of various employee resource groups and led by our Chief People Officer, which replaced the Diversity and Inclusion Committee, in order to enhance the Company's diversity, equity and inclusion programming.

As of December 31, 2023, women represented 58% of our workforce and 46% of our leadership team (defined as our management team and executive employees), and ethnic minorities represented 41% of our workforce and 43% of our leadership team.

*Training and Talent Development*

We believe that our employees are the key to our success, and we believe their development is what supports our growth and prosperity as a company. To support employee development and growth, we offer development training and workshops to all full-time employees. In addition, personal development plans for full-time employees are discussed and reviewed each year with their supervisor. We also offer an education tuition reimbursement program.

Upon joining the Company, all new employees are required to become familiar with our policies and complete compliance training, and existing employees are required to acknowledge certain policies annually.

*Compensation and Benefits*

Our objective is to provide our employees with a choice in quality benefits that are competitive and cost-efficient with the flexibility to meet employees' life needs. Our compensation package includes market-competitive pay, an annual bonus program, an employee stock purchase plan, long-term incentive awards, rewards and recognition opportunities, an education assistance program, health care and retirement benefits, paid time off and family leave, among others. We grant equity as part of our new hire and annual compensation programs. We are committed to fair wages and benefits for employees at all locations and use appropriate national and local external surveys to provide highly competitive wages and benefits to attract high quality talent.

*Health and Safety*

We are committed to the safety of our employees and communities. We provide regular health and safety training programs for employees, which includes, upon on-boarding, an overview during new hire orientation, personal protective equipment training, ergonomics evaluation procedures and first aid training. All employees are trained on workplace safety, including security and inspection, work related injuries and emergency protocols. We also conduct special additional training for laboratory staff.

*ESG*

As our business continues to grow and develop, we are focused on building a sustainable enterprise for all of our stakeholders while driving a positive impact on the communities in which we serve. In 2020, we made a formal commitment to ESG and published our inaugural ESG report in January 2021, which was guided by the SASB framework for our sector. The Nominating and Corporate Governance Committee oversees Revance's ESG strategy and initiatives. In addition, the Company's ESG Steering Committee, which is comprised of leadership across key business units including investor relations, communications, legal, finance and accounting, manufacturing and supply chain, human resources, enterprise risk management and compliance, leads the planning and execution of the company's ESG program.

Building on our long-term commitment to ESG, we have continued to advance our program and further refined our ESG framework to better align with our corporate strategy and values. Our ESG strategy is centered on three pillars, which we believe are essential to creating long-term value for all our stakeholders:

- **Innovation and Access:** We are committed to setting new standards for patient care and physician experience, while simultaneously helping optimize the overall healthcare system. The cornerstone of this effort is delivering innovation to address unmet consumer, patient, injector and HCP needs through our portfolio of Products.

- **Strong Workplace Culture:** We aspire to attract and retain a diverse and highly skilled workforce to foster a culture of innovation. Through efforts to ensure diversity, equality and inclusivity, we hope to unlock the tremendous potential of our team and its impact on the communities in which we serve.

- **Responsible Business:** We seek to build trust with our stakeholders and identify and mitigate risks to the Company by implementing strong corporate governance practices and utilizing clear and actionable policies to support product quality and safety and minimize our environmental footprint where possible.

Our 2022 ESG report, published in March 2023, reflects our focus on these pillars. It also detailed the results of our first materiality assessment and progress across the environmental, social, and governance issues it identified. The materiality assessment was developed in response to stockholder feedback, and was led by our ESG Steering Committee, with oversight from the Nominating and Corporate Governance Committee and the ESG Steering Committee. The assessment enabled us to understand the importance level of various ESG matters to Revance and our stakeholders.

Our ESG initiatives going forward will continue to be guided by our three pillars of innovation, in addition to our materiality assessment. For additional information, please refer to our 2022 ESG Report, which is found on the Corporate Governance page of our company website at www.revance.com.

**Corporate Information**

We were incorporated in Delaware in August 1999, under the name Essentia Biosystems, Inc. We commenced operations in June 2002 and, in April 2005, changed our name to Revance Therapeutics, Inc. Our principal executive offices are located at 1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203, and our telephone number is (615) 724-7755.

**Available Information**

We make available, free of charge through our website, our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements, and any amendments to those reports, filed or furnished pursuant to

Sections 13(a) or Section 15(d) of the Exchange Act, as soon as reasonably practicable after they have been electronically filed with or furnished to the SEC at www.sec.gov. Our website address is www.revance.com. Information contained on or accessible through these websites is not incorporated by reference nor otherwise included in this Report, and any references to these websites are intended to be inactive textual references only.

## ITEM 1A. RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as all other information included in this Report, including our consolidated financial statements, the notes thereto and the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before you decide to purchase shares of our common stock. If any of the following risks actually occurs, our business, prospects, financial condition and operating results could be materially harmed. As a result, the trading price of our common stock could decline and you could lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations and stock price.*

### Risks Related to Our Business and Strategy

**We are substantially dependent on the clinical and commercial success of our Products.**

Our near-term prospects and our future growth, including our ability to finance our business and generate revenue, is substantially dependent on the clinical and commercial success of DAXXIFY® and our ability to continue to generate revenue from the sales of the RHA® Collection of dermal fillers.

In September 2022, we announced the DAXXIFY® GL Approval. In addition, in September 2023, we introduced new pricing for DAXXIFY®, which priced the product more competitively with BOTOX®. As of December 31, 2023, we have generated $95.0 million in revenue from the commercial sale of DAXXIFY® since the DAXXIFY® GL Approval in September 2022. If our aesthetics strategy, including the new pricing for DAXXIFY®, does not lead to additional product adoption as expected or we are unable to continue or increase the commercial success of DAXXIFY® as expected, our revenues may not be sufficient to support our existing operating plan, which may require us to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses. In August 2023, we announced the approval of DAXXIFY® for the treatment of cervical dystonia, which is our first therapeutics indication. We have limited experience in commercializing products in the therapeutics space and have not yet demonstrated that DAXXIFY® for the treatment of cervical dystonia will be commercially successful. In addition we have not received regulatory approval for or completed the clinical development process for DAXXIFY® for indications other than glabellar lines and cervical dystonia. Although the commercialization of our Products has generated significant revenue to date, we cannot predict the extent to which they will continue to generate revenue.

The success of our Products will depend on a number of factors, including the risks identified in this "Item 1A. Risk Factors." These factors include, among other things:

- the rate and degree of commercial acceptance, potential market size, opportunity and growth potential of our Products;
- our ability to effectively and reliably manufacture or obtain adequate and timely supplies of DAXXIFY® and obtain adequate and timely supply of the RHA® Collection of dermal fillers to meet commercial demand;
- the timing, success, and cost of commercialization activities and other activities needed to operate our business;
- our ability to demonstrate in the medical community the safety, efficacy and duration of our Products and their potential advantages over and side effects compared to competing Products;
- our ability to establish and maintain relationships with injectors and HCPs who will be treating the consumers and patients who may receive our products;
- our ability to obtain adequate pricing and reimbursement for DAXXIFY® in therapeutics;
- our ability to continue to expand our own sales, marketing and other capabilities and infrastructure, or seek collaborative partners, to commercialize our Products as needed, including with respect to therapeutics;

- reports of adverse events or safety concerns involving our Products and the impact of any such reports on their commercialization;
- enforcing our intellectual property rights in and to our Products;
- avoiding third-party patent interference or intellectual property infringement claims;
- our ability to comply with the terms of the Teoxane Agreement, including our obligations with respect to purchase quantities and marketing efforts, which noncompliance could result in termination of the Teoxane Agreement;
- our ability to collaborate with Teoxane to research, develop and obtain necessary approvals from the FDA and similar regulatory authorities for the RHA® Pipeline Products;
- our ability to comply with the legal and regulatory requirements for our Products, including regarding the sales, marketing, manufacturing, price reporting, registration and permitting of our Products, as applicable;
- our ability to adapt to any changes to the labels for our Products that could place restrictions on how we market and sell the Products; and
- maintaining or establishing arrangements with third party logistics providers to distribute our Products to customers.

One or more of these factors, or other factors identified in this "Item 1A. Risk Factors", many of which are beyond our control, could impact the commercialization of and our ability to generate revenue from the sales of our Products, and any future products we may develop or acquire, which would materially impact the success of our business.

**We have incurred significant losses since our inception and we anticipate that we will continue to incur GAAP operating losses for the foreseeable future and may not achieve or maintain profitability in the future.**

We are not profitable and have incurred losses each year since we commenced operations in 2002. We cannot guarantee that we will be able to increase our revenue to offset our operating expenses. Our revenue may not increase or could decline for a number of other reasons, including reduced demand for our Products, increased competition, a decrease in the growth or reduction in size of the overall market for our Products, or if we cannot maintain our strategic partnerships, including with Teoxane, ABPS, PCI, Viatris and Fosun. In addition, we may not receive or generate anticipated revenue on the timeframe expected. If we cannot generate sufficient revenue from the sale of our Products to fulfill our existing operating plan, we may be required to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses.

In addition, our operating expenses may increase in the future as we optimize and grow our business, including as a result of our commercialization efforts across aesthetics and therapeutics and continuing to invest in research, development, regulatory approvals and the manufacturing and supply of DAXXIFY® for commercialization. Further, our estimates regarding the amounts necessary to accomplish our business objectives may be inaccurate; other unanticipated costs may arise; and, our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional capital sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe that we have sufficient funds for our current or future operating plans.

Additional capital may not be available when needed, on terms that are acceptable to us or at all. If adequate funds are not available to us on a timely basis, or at all, we may be required to take capital preservation measures, including to reduce operating expense and delay, reduce the scope of, discontinue or alter our research and development activities; our sales and marketing capabilities or other activities that may be necessary to continue to commercialize our Products and other aspects of our business plan. If we are unable to generate sufficient revenue to fulfill our operating plan or we are unable to secure additional capital when needed or sufficiently reduce our operating expenses, we may be unable to comply with the Minimum Cash Covenant, which would raise substantial doubt about our ability to continue as a going concern. Our inability to secure additional financing or sufficiently reduce our operating expenses may otherwise limit our ability to capitalize on business opportunities or compete effectively, and our business may be harmed.

If we raise additional capital through marketing and distribution arrangements, royalty financings or other collaborations, strategic alliances or licensing arrangements with third parties, we may need to relinquish certain valuable rights to our product candidates, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through public or private equity offerings, the ownership interest of our existing stockholders will be diluted and the terms of any new equity securities may have a preference over our common stock. If we raise additional capital through debt financing, we may be subject to specified financial covenants or covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or pursuing certain transactions, any of which could restrict our ability to commercialize our product candidates or operate as a business; and our assets may be subject to liens. In addition, our ability to raise capital may be limited by restrictions under the Note Purchase Agreement, including our ability to sell or license intellectual property, and other reasons like the global economy, inflation or other macroeconomic factors.

Even if we achieve profitability in the future, we may not be able to sustain profitability in subsequent periods. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock and our ability to raise capital and continue operations.

**If we fail to maintain FDA approval to market and sell DAXXIFY® or if we or Teoxane fail to maintain the approval of the RHA® Collection of dermal fillers, we would be unable to continue to commercially distribute and market such Product. Further, our ability to market our Products are limited to approved indications, which may restrict how we market our Products.**

Our Products are subject to extensive regulation by the FDA. While we received DAXXIFY® GL and DAXXIFY® CD Approval and Teoxane has received approval of the RHA® Collection of dermal fillers for certain indications, there can be no assurance that such approvals will be maintained. For example:

- we or Teoxane may not be able to maintain to the FDA's satisfaction that the applicable Product is safe and effective for its intended use;
- we or Teoxane may fail to comply with applicable laws and regulations to maintain approval; and
- the manufacturing processes and facilities we and our vendors use may not meet applicable requirements to maintain approval.

Failing to maintain FDA approval could result in unexpected and significant costs for us and consume management's time and other resources. The FDA could ask us to improve or augment manufacturing processes, collect and provide data on the quality or safety of a Product or issue us warning letters relating to matters that may result in removal of a Product from the market.

Further, we have received approval for DAXXIFY® solely for the glabellar line and cervical dystonia indications. Many of our competitors have received approval of multiple aesthetic and therapeutic indications for their neuromodulator products and are able to market such products for use in a way that we cannot. The restrictions on how we can market DAXXIFY® in comparison to competitors could limit injector, HCP and consumer adoption.

**We may use third-party collaborators to help us develop, validate and commercialize our Products and product candidates, and our ability to commercialize such Products and product candidates could be impaired or delayed if these collaborations are unsuccessful.**

We may continue to license or selectively pursue strategic collaborations for the development, validation and commercialization of DAXXIFY®, an onabotulinumtoxinA biosimilar, hyaluronic acid filler products, and any future product candidates. Examples of such strategic collaborations include the ABPS Services Agreement, PCI Supply Agreement, Viatris Agreement, Fosun License Agreement and Teoxane Agreement. In any third-party collaboration, we are dependent upon the success of the collaborators to perform their responsibilities with continued cooperation. Our collaborators may not cooperate with us or perform their obligations under our agreements with them. We cannot control the amount and timing of our collaborators' resources that will be devoted to performing their responsibilities under our agreements with them. Our collaborators may choose to pursue alternative technologies in preference to those being developed in collaboration with us. The development, validation and commercialization of our product candidates will be delayed if collaborators fail to conduct

their responsibilities in a timely manner or in accordance with applicable regulatory requirements or if they breach, terminate or choose not to renew their collaboration agreements with us. The breach, termination or non-renewal of any of our collaboration agreements could materially and adversely impact our financial and operating results. Disputes with our collaborators could also impair our reputation or result in development delays, decreased revenues and litigation expenses.

**The Teoxane Agreement requires us to make specified annual minimum purchases of the RHA® Collection of dermal fillers and to meet specified expenditure levels in connection with our marketing of the RHA® Collection of dermal fillers in furtherance of the commercialization of the RHA® Collection of dermal fillers, regardless of whether our commercialization efforts are successful. Such expenditure requirements may adversely affect our cash flow and our ability to operate our business and our prospects for future growth, or may result in the termination of the Teoxane Agreement.**

If we fail to meet the annual minimum purchase amount or the annual minimum marketing spending requirements specified in the Teoxane Agreement, Teoxane has the right to terminate the Teoxane Agreement. Termination of the Teoxane Agreement could materially impact our financial and operating results.

If our commercialization efforts of our Products are unsuccessful, there can be no assurance that we will have sufficient cash flow to comply with such minimum purchase and expenditure requirements. Our obligation to Teoxane to meet such requirements could:

- make it more difficult for us to satisfy obligations with respect to our indebtedness, including the 2027 Notes and the Notes Payable, and any failure to comply with the obligations of any of our debt instruments, including financial and other restrictive covenants, could result in an event of default under the agreements governing such indebtedness;
- require us to dedicate a substantial portion of available cash flow to meet the minimum expenditure requirements, which will reduce the funds available for working capital, capital expenditures, acquisitions and other general corporate purposes;
- limit flexibility in planning for and reacting to changes in our business and in the industry in which we operate;
- limit our ability to engage in strategic transactions or implement our business strategies;
- limit our ability to borrow additional funds; and
- place us at a disadvantage compared to our competitors.

Any of the factors listed above could materially and adversely affect our business and our results of operations.

**Worldwide economic and market conditions, an unstable economy, a decline in consumer-spending levels and other adverse developments, including inflation, could adversely affect our business, results of operations and liquidity, and stock price.**

As widely reported, in recent years, global credit and financial markets have experienced volatility and disruptions, including declines in consumer confidence, concerns about declines in economic growth and unemployment, increases in the rate of inflation, increases in borrowing rates and changes in liquidity and credit availability, and uncertainty about geopolitical events and other challenges affecting the global economy, including most recently in connection with actions undertaken by the U.S. Federal Reserve Board to address inflation, the Ukraine-Russia and Israel-Hamas conflicts, the continuing effects of the COVID-19 pandemic and supply chain disruptions. These factors could lead to further disruption, instability, and volatility in global markets, continue to increase inflation, disrupt supply chains, adversely affect consumer confidence and disposable income levels and have other impacts on our business. For example, inflation has impacted the cost of supplies to manufacture DAXXIFY® and other aspects of our business. In addition, if the current equity and credit markets deteriorate, or do not improve, it may make any necessary debt or equity financing more difficult, more costly, and more dilutive. Furthermore, our stock price may decline due in part to the volatility of the stock market and the general economic downturn.

The discretionary nature of aesthetic medical procedures may be vulnerable to unfavorable economic conditions. Due to the cash pay market for aesthetic procedures, demand for our aesthetic Products is tied to discretionary spending levels of our target consumers. Although the facial injectable market has been generally resilient and recovered relatively quickly during past economically challenging times, a severe or prolonged economic downturn could result in a variety of risks to our business, including a decline in the discretionary spending of our target consumers and financial hardships for injectors which may reduce demand for our aesthetic Products and adversely affect distribution channels for our aesthetic Products. Our business strategy relies on projections related to demand, which projections are inherently uncertain and could be more significantly impacted by an economic downturn.

Changes in U.S. and foreign trade policies or border closures, including as a result of geopolitical crises or the COVID-19 pandemic, could delay or prevent the export of Products internationally or trigger retaliatory actions by affected countries, resulting in "trade wars", which may reduce consumer demand for goods exported out of the U.S. if the parties having to pay those retaliatory tariffs increase their prices, or if trading partners limit their trade with the U.S. If these consequences are realized, the price to the consumer of aesthetic or therapeutic medical procedures from products exported out of the U.S. may increase, resulting in a material reduction in the demand for those products. In particular, under our Fosun License Agreement, we are responsible for manufacturing DAXXIFY® and supplying it to Fosun, which would then develop, commercialize, market and sell it in the Fosun Territory. If this arrangement is restricted in any way due to the U.S.–China trade relationship or border closures, the contingent payments we are entitled to receive under the agreement, which are based on product sales, among other things, may be adversely affected.

More recently, the closure of Silicon Valley Bank (SVB) and other financial institutions and their placement into receivership with the Federal Deposit Insurance Corporation (FDIC) created bank-specific and broader financial institution liquidity risk and concerns. Although the Department of the Treasury, the Federal Reserve, and the FDIC jointly released a statement that depositors at SVB would have access to their funds, even those in excess of the standard FDIC insurance limits, under a systemic risk exception, future adverse developments with respect to specific financial institutions or the broader financial services industry may lead to market-wide liquidity shortages, impair the ability of companies to access near-term working capital needs, and create additional market and economic uncertainty. Promptly following the collapse of SVB, we consolidated substantially all of our operating cash activities to our existing Bank of America (BofA) accounts and with the exception of the cash collateral associated with our existing letters of credit, we have transferred substantially all of our cash held at SVB to BofA without any loss. We also transferred our short-term investments managed by SVB to J.P. Morgan Chase & Co. (JPM), which was completed without any loss. While we did not hold a material amount of cash at SVB and, as a result, the closure of SVB did not have a material direct impact on our business, continued instability in the global banking system may result in additional bank failures, as well as volatility of global financial markets, either of which may adversely impact our business and financial condition.

These factors could have a negative impact on our potential sales and operating results.

**The COVID-19 pandemic has and may continue to, and other actual or threatened epidemics, pandemics, outbreaks, or public health crises may, adversely affect our financial condition and our business.**

Our business has been and could in the future be materially and adversely affected by the risks, or the public perception of the risks, related to an epidemic, pandemic, outbreak, or other public health crisis, such as the COVID-19 pandemic. The extent to which the COVID-19 pandemic will further directly or indirectly impact our business, results of operations, financial condition, liquidity and global economic activity and consumer behavior will depend on future developments that are highly uncertain, including variant strains of the virus and the degree of their vaccine resistance, a rise in infection rates and as a result of new information that may emerge concerning COVID-19, the actions taken to contain or treat it, and the duration and intensity of the related effects.

An epidemic, pandemic, outbreak or other public health crisis such as the COVID-19 pandemic, or the public perception of such a risk, could:

- cause delays in the regulatory approval process or interfere with enrollment and our ability to complete ongoing clinical trials on schedule or at all;

- cause consumers to cancel or defer aesthetic and elective procedures, and cause consumers and patients to avoid public places, including hospitals and injector and HCP offices;
- cause temporary or long-term disruptions in our supply chain, manufacturing and/or delays in the delivery of our inventory; and
- cause a complete or partial closure of one or more of our facilities and offices, or cause employees to avoid our properties, which could adversely affect our ability to adequately staff and manage our businesses.

Risks related to an epidemic, pandemic or other health crisis, such as the COVID-19 pandemic, could also negatively impact the business or operations of our sourcing or manufacturing partners, CROs, customers or other third parties with whom we conduct business. These and other potential impacts of an epidemic, pandemic or other health crisis, such as the COVID-19 pandemic, has and could in the future materially and adversely affect our business, financial condition and results of operations.

**Reports of adverse events or safety concerns involving our Products could result in a loss of regulatory approval for such Products and delay or prevent us or Teoxane from obtaining additional regulatory approvals.**

Reports of adverse events or safety concerns involving our Products could result in the FDA or other regulatory authorities withdrawing approval of those Products for any or all indications that have approval, and delay or prevent us or Teoxane from obtaining additional regulatory approvals. We cannot assure you that consumers receiving our Products will not experience serious adverse events that require submission of post-marketing safety or medical device reports to the FDA or other regulatory authorities. Adverse events, including with respect to neurotoxin products and dermal fillers generally, may also negatively impact demand for our Products, which could result in reduced sales. We or Teoxane may also be required to update package inserts and consumer information brochures for our Products based on reports of adverse events or safety concerns, which could adversely affect acceptance of these Products in the market, make them less competitive or make commercialization of these Products more difficult or expensive.

**We are currently, and in the future may be, subject to securities class action and stockholder derivative actions. These, and potential similar or related litigation, could result in substantial damages and may divert management's time and attention from our business.**

We are currently, and may in the future be, the target of securities class actions or stockholder derivative claims. On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021. The complaint alleges that the Company and certain of its officers violated sections 10(b) and 20(a) of the Exchange Act by making false or misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. On January 23, 2023, we filed a motion to dismiss, but we cannot be certain of whether that motion to dismiss will be granted. We maintain director and officer's insurance coverage and continue to engage in vigorous defense of the complaint. If we are not successful in our defense of the complaint, we could be forced to make significant payments to or other settlements with our stockholders and their lawyers outside of our insurance coverage, and such payments or settlement arrangements could have a material adverse effect on our business, operating results or financial condition. This and any such other actions or claims could result in substantial damages and may divert management's time and attention from our business and otherwise harm our business.

**If product liability lawsuits are brought against us, we may incur substantial liabilities and may be required to limit commercialization of our Products and any future products we develop.**

We face an inherent risk of product liability lawsuits as a result of commercializing our Products and the clinical testing of our Products, an onabotulinumtoxinA biosimilar, or any other product candidates. For example, we may be sued if any product we develop allegedly causes injury or is found to be otherwise unsuitable during product testing, manufacturing, marketing or sale. Any such product liability claims may include allegations of defects in manufacturing, defects in design, a failure to warn of dangers inherent in the product, negligence, strict liability and a breach of warranties. Claims could also be asserted under state consumer protection acts. If we cannot successfully defend ourselves against product liability claims, we

may incur substantial liabilities or be required to limit commercialization of our products. Even a successful defense would require significant financial and management resources. Regardless of the merits or eventual outcome, liability claims would require significant financial and management resources and may result in decreased demand for our Products or any future products we may develop and a loss of revenue; regulatory investigations, product recalls, withdrawals or labeling, marketing or promotional restrictions; termination of clinical trial sites or entire trial programs; injury to our reputation and significant negative media attention; withdrawal of clinical trial participants or cancellation of clinical trials; and significant costs and diversion of management's time to defend the related litigation.

Our inability to obtain and maintain sufficient product liability insurance at an acceptable cost and scope of coverage to protect against potential product liability claims could halt or inhibit the commercialization of our Products or any future products we develop. Although we maintain product liability insurance, any claim that may be brought against us could result in a court judgment or settlement in an amount that is not covered, in whole or in part, by our insurance or that is in excess of the limits of our insurance coverage. Our insurance policies also have various exclusions and deductibles, and we may be subject to a product liability claim for which we have no coverage. We will have to pay any amounts awarded by a court or negotiated in a settlement that exceed our coverage limitations or that are not covered by our insurance, and we may not have, or be able to obtain, sufficient capital to pay such amounts. Moreover, in the future, we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses.

**As our business and operations continue to grow, we may need to expand our development, manufacturing, regulatory, sales, marketing and distribution capabilities. If and when we expand such capabilities, we may encounter difficulties in managing our growth, which could disrupt our operations.**

In the future we may need to grow the number of employees and the scope of our operations, particularly in the areas of manufacturing, sales, marketing, distribution and other departments integral to growing our commercial infrastructure, including for potential expansion into the therapeutics market and internationally. If and when we experience such growth, we may be required to implement and improve our managerial, operational and financial systems, expand our facilities and continue to recruit and train additional qualified personnel. Due to our limited financial resources and the limited experience of our management team in managing a company with such growth, if and when we determine to grow the number of our employees and the scope of our operations, we may not be able to effectively manage the expansion of our operations or recruit and train additional qualified personnel. Any such expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability to manage growth could delay the execution of our business plans or disrupt our operations.

As our operations expand, we will also need to manage additional relationships with various strategic partners, suppliers and other third parties. Our future financial performance and our ability to commercialize our Products and to compete effectively will depend, in part, on our ability to manage any future growth effectively. Our failure to do so could prevent us from successfully growing our company.

**We have, and may in the future, undertake restructuring plans to adjust our investment priorities and manage our operating expenses, which plans may not result in the savings or operational efficiencies anticipated and could result in total costs and expenses that are greater than expected.**

In September 2023, we announced a plan to exit the Fintech Platform business. This plan was adopted because the significant costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. We announced that this plan would free up capital for reinvestment in other areas of our business. We may not realize, in full or in part, the anticipated benefits and savings from the exit of the Fintech Platform business due to unforeseen difficulties, delays or unexpected costs.

Our restructuring plans, including the exit of the Fintech Platform business, may adversely affect our ability to recruit and retain skilled and motivated personnel, may result in a loss of continuity, loss of accumulated knowledge, or inefficiency during transitional periods, may require a significant amount of employees' time and focus, and may be distracting to employees, which may divert attention from operating and growing our business. The exit of the Fintech Platform business may also negatively impact relationships with our customers.

If we fail to achieve some or all of the expected benefits of any restructuring plans, including the exit of the Fintech Platform, if such activities negatively impact relationships with our customers or other stakeholders, or we are unable to

manage the related transition effectively, which may be impacted by factors outside of our control, our business, operating results, and financial condition could be adversely affected.

**If we are not successful in discovering, developing, acquiring and commercializing additional product candidates other than our Products, our ability to expand our business and achieve our strategic objectives may be impaired.**

Although a substantial amount of our effort has focused on the commercialization of the RHA® Collection of dermal fillers, and the continued clinical testing, regulatory approval and commercialization for DAXXIFY®, our strategy also includes the discovery, development and commercialization of other neuromodulator products for both aesthetic and therapeutic indications, including the onabotulinumtoxinA biosimilar. We may seek to do so through our internal research programs, strategic collaborations and product acquisitions.

Even if we identify an appropriate collaboration or product acquisition, we may not be successful in negotiating the terms of the collaboration or acquisition, or effectively integrating the collaboration or acquired product into our existing business and operations. Moreover, we may not be able to pursue such opportunities if they fall within the non-compete provision of the Teoxane Agreement, which prohibits us from developing, manufacturing, marketing, selling, detailing or promoting any hyaluronic acid dermal filler (other than the RHA® Collection of dermal fillers) in the U.S. during the term of the Teoxane Agreement. We have limited experience in successfully acquiring and integrating products and technologies into our business and operations, and even if we are able to consummate an acquisition or other investment, we may not realize the anticipated benefits of such acquisitions or investments. We may face risks, uncertainties and disruptions, including difficulties in the integration of the operations and services of these acquisitions. If we fail to successfully integrate collaborations, assets, products or technologies that we enter into or acquire, or if we fail to successfully exploit acquired product distribution rights and maintain acquired relationships with customers, our business could be harmed. In addition, in any collaboration, we would be dependent upon the success of the collaborators in performing their responsibilities and their continued cooperation. Our collaborators may not cooperate with us or perform their obligations under our agreements with them. Our collaborators may choose to pursue alternative technologies in preference to those being developed in collaboration with us. Furthermore, we may have to incur debt or issue equity securities in connection with proposed collaborations or to pay for any product acquisitions or investments, the issuance of which could be dilutive to our existing stockholders. Identifying, contemplating, negotiating or completing a collaboration or product acquisition and integrating an acquired product or technology could significantly divert management and employee time and resources.

Our onabotulinumtoxinA biosimilar program is still in the preclinical stage and our other programs are in the discovery or preclinical state. Research programs to identify product candidates require substantial technical, financial and human resources, whether or not any product candidates are ultimately identified. Our research and preclinical programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development for many reasons, including the following:

- the research methodology used may not be successful in identifying potential product candidates;
- competitors may develop alternatives that render our product candidates obsolete or less attractive;
- product candidates we develop may nevertheless be covered by third parties' patents or other exclusive rights;
- a product candidate may on further study be shown to have harmful side effects or other characteristics that indicate it is unlikely to be effective or otherwise does not meet applicable regulatory criteria;
- a product candidate may not be capable of being produced in commercial quantities at an acceptable cost, or at all;
- a product candidate may not be accepted as safe and effective by consumers, the medical community or third-party payors, if applicable; and
- intellectual property rights of third parties may potentially block our entry into certain geographies or make such entry economically impracticable.

If we fail to develop and successfully commercialize products other than our Products, our future growth prospects may be harmed and our business will be more vulnerable to problems that we encounter in commercializing our Products, and in the continuing development of DAXXIFY®.

**We have experienced and may experience in the future compromises or failures of our information technology systems or data, or those of third parties upon which we rely, which could adversely affect our business, including but not limited to regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; loss of customers or sales; and other adverse consequences.**

In the ordinary course of our business, we may collect, receive store, process, generate, use, disclose, make accessible, protect, secure, dispose of, transmit, share or otherwise process (collectively, "process") proprietary, confidential, and sensitive data, including personal data (such as health-related data), intellectual property, and trade secrets (collectively, "sensitive information").

We may rely upon and may share or receive sensitive data with or from third party service providers and technologies to operate critical business systems to process sensitive information in a variety of contexts, including, without limitation, third-party providers of cloud-based infrastructure, encryption and authentication technology, employee email and other functions. We may also rely on third-party service providers to provide other products, services, parts, or otherwise to operate our business. Our ability to monitor these third parties' cybersecurity practices is limited, and these third parties may not have adequate information security measures in place.

Our information technology systems could be damaged or interrupted by earthquakes, fires, floods and other natural disasters, terrorist attacks, power losses, computer system or data network failures, data corruption and security breaches or other cyber-based incidents, which we monitor and for which we maintain disaster recovery plans. Cyber incidents can include ransomware, and extortion, denial-of-service attacks, worms, and other malicious software programs introduced to our computers and networks, including intrusions that are disguised and evade detection for an extended period of time, phishing attacks, impersonation of authorized users, and efforts to discover and exploit any design flaws, bugs, security vulnerabilities or security weaknesses, as well as intentional or unintentional acts by employees or other insiders with access privileges, intentional acts of vandalism or fraud by third parties and sabotage. In addition, a variety of our software systems are cloud-based data management applications, hosted by third-party service providers whose security and information technology systems are subject to similar risks. Despite significant efforts to secure against such threats, it is impossible to entirely mitigate these risks. In the normal course of our business, we have experienced cyber-based incidents and expect we will experience them in the future. While to date, we do not believe such identified security events have been material to us, including to our reputation or business operations, or had a material financial impact, we cannot be certain that such incidents or future cyber incidents will not expose us to material costs and liability. These incidents and the failure to protect either our or our service providers' information technology infrastructure could disrupt our operations or result in the loss or misuse of proprietary or confidential information, intellectual property or sensitive or personal information, harm to our employees, decreased sales, increased overhead costs, and product shortages, all of which could have a material adverse effect on our reputation, business, financial condition and operating results.

We may expend significant resources or modify our business activities in an effort to protect against security incidents. Certain data privacy and security obligations may require us to implement and maintain specific security measures, industry-standard or reasonable security measures to protect our information technology systems and sensitive information. While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective. We may be unable to detect vulnerabilities in our information technology systems because such threats and techniques change frequently, are often sophisticated in nature, and may not be detected until after a security incident has occurred. Despite our efforts to identify and remediate vulnerabilities, if any, in our information technology systems, our efforts may not be successful. Further, we may experience delays in developing and deploying remedial measures designed to address any such identified vulnerabilities.

Applicable data privacy and security obligations may require us to notify relevant stakeholders of security incidents. Such notifications are costly, and the notifications or the failure to comply with such requirements could lead to adverse consequences. If we (or a third party upon whom we rely) experience a security incident or are perceived to have experienced a security incident, we may experience adverse consequences. These consequences may include: government enforcement actions (for example, investigations, fines, penalties, audits, and inspections); additional reporting requirements and/or

oversight; restrictions on processing data (including personal data); litigation (including class action claims); indemnification obligations; negative publicity; reputational harm; monetary expenditures; interruptions in our operations (including availability of data); financial loss; and other similar harms. Security incidents and attendant consequences may cause delays in the development of our product candidates, cause customers to stop using our Products, deter new customers from using our Products, and negatively impact our ability to grow and operate our business.

**If we fail to attract and retain qualified management, clinical, scientific, technical and sales personnel, we may be unable to successfully execute our objectives.**

Our success depends in part on our continued ability to attract, retain and motivate highly qualified management, clinical, scientific, technical and sales personnel. There is intense competition for qualified personnel in the pharmaceutical and biotechnology industries, and we cannot be sure that we will be able to continue to attract and retain the qualified personnel necessary, particularly as business prospects change. The inability to recruit or loss of the services of key employees might impede the progress of our research, development and commercialization objectives.

Leadership transitions can be inherently difficult to manage. Resignations of executive officers may cause disruption in our business, strategic and employee relationships, which may significantly delay or prevent the achievement of our business objectives. Leadership changes may also increase the likelihood of turnover of other key officers and employees and may cause declines in the productivity of existing employees. The search for a replacement officer may take time, further exacerbating these factors. Identifying and hiring an experienced and qualified executive officer are typically difficult. Periods of transition in senior management leadership are often difficult as the new executives gain detailed knowledge of our operations and may result in cultural differences and friction due to changes in strategy and style. During the transition periods, there may be uncertainty among investors, employees, creditors and others concerning our future direction and performance.

**Risks Related to Marketing and Commercialization**

**Our Products may never achieve market acceptance or long-term commercial success.**

Our Products may not continue to be commercially successful, which could harm our financial results and future prospects. The degree and rate of market acceptance of our Products depends on a number of factors, including:

- the safety, efficacy and duration of the product as compared to existing and future therapies;
- the clinical indications for which the product is approved and consumer demand or need for the treatment of those indications;
- our ability to establish or maintain a sufficient supply of approved products;
- acceptance by injectors, HCPs, major operators of clinics and consumers of the product as a safe and effective treatment;
- the extent to which injectors recommend the products to their consumers;
- the willingness of third-party payors to reimburse HCPs or patients for DAXXIFY® and any future products we may commercialize for therapeutic indications;
- the proper training and administration of the products by injectors, HCPs and medical staff such that consumers and patients do not experience excessive discomfort during treatment or adverse side effects;
- consumer and patient satisfaction with the results and administration of the product and overall treatment experience;
- the potential and perceived advantages and cost of the product over alternative treatments;

- the willingness of consumers to pay for the product and other aesthetic treatments in general, relative to other discretionary items, especially during economically challenging times;
- the revenue and profitability that the product will offer an injector and HCP as compared to alternative therapies;
- the relative convenience and ease of administration;
- the prevalence and severity of adverse events;
- the effectiveness of our sales and marketing efforts, including efforts by any third parties we engage;
- consumer sentiment about the benefits and risks of aesthetic procedures generally and our products in particular; and
- general consumer, patient, injector and HCP confidence with respect to our Products; and
- availability of practicing injectors for administration of our Products for aesthetic indications, which may be impacted by general economic and political conditions, including challenges affecting the global economy.

In addition, DAXXIFY®'s duration, safety and efficacy profile, as well as prescribing information, are based on the results achieved during clinical trials. Clinical trials are conducted in representative samples of the potential patient population and we have only conducted Phase 3 clinical trials for glabellar lines and cervical dystonia and Phase 2 trials for UFL, LCL, adult upper limb spasticity and plantar fasciitis. Therefore, the commercial experiences may yield different outcomes or consumer and patient experiences due to variations in injection techniques, dilution approaches and dosing levels employed by different injectors and HCPs or for other reasons. As a result, consumers and patients treated with DAXXIFY® may experience different duration, efficacy and safety results from what was experienced during clinical trials, which could negatively impact adoption.

Any failure by DAXXIFY® or any approved products to achieve and maintain market acceptance or commercial success would materially adversely affect our results of operations and delay, prevent or limit our ability to generate revenue and continue our business.

**Our Products will face significant competition, and our failure to effectively compete may prevent us from achieving significant market penetration and expansion. In addition, our competitors may develop products that are safer, more effective, more convenient or less expensive than our Products, which could reduce or eliminate our commercial opportunity.**

Successful competitors in the pharmaceutical and medical device markets have the ability to efficiently and effectively discover therapies, obtain patents, develop, test and obtain regulatory approvals for products, and effectively commercialize, market and promote approved products, including communicating the effectiveness, safety and value of products to actual and prospective customers and medical staff. Numerous companies are engaged in developing, patenting, manufacturing and marketing healthcare products which we expect will compete with our Products. Many of these competitors are large, experienced companies that enjoy significant competitive advantages, such as substantially greater financial, research and development, manufacturing, testing, personnel and marketing resources, greater brand recognition and more experience and expertise in obtaining marketing approvals from the FDA and other regulatory authorities. It is possible that competitors will succeed in developing technologies that are safer, more effective, more convenient, longer-lasting or that have a lower cost of goods and price than our Products, or that would render our technology obsolete or noncompetitive. Additionally, our competitors have greater existing market share in the aesthetics and therapeutics markets and long-standing practice and consumer loyalty and sales contracts with large practices which furthers their established business and financial relationships with practices, consumers and patients.

In the aesthetics market, competition is significant and dynamic and is characterized by substantial technological development and product innovations, and our competitors include large, fully-integrated pharmaceutical companies and more established biotechnology and medical device companies. We anticipate that DAXXIFY® will face significant competition from existing injectable neuromodulators as well as unapproved and off-label treatments in the U.S. and abroad. Further, in the future we may face competition for DAXXIFY® from biosimilar products and products based upon botulinum

toxin. The RHA® Collection of dermal fillers also competes with other approved dermal filler products in a marketplace characterized by the continuous introduction of products with new intended uses and expanded labels. Competitors may also try to compete with us on price both directly, through rebates and promotional programs to high volume injectors and coupons or loyalty programs to consumers, and indirectly, through attractive product bundling with complementary products, such as dermal fillers that offer convenience and an effectively lower price compared to the total price of purchasing each product separately. For a variety of reasons, including less stringent regulatory requirements, there are significantly more aesthetic products and procedures available for use in a number of foreign countries than are approved for use in the U.S. There are also fewer limitations on the claims that our competitors in certain countries can make about the effectiveness of their products and the manner in which they can market them. As a result, it may be more difficult for us to compete with aesthetic products available in these markets.

In the therapeutics market, the key competitive factors affecting the success of DAXXIFY®, are likely to include efficacy, duration of effect, safety, convenience, availability, price and the availability of reimbursement from government and other third-party payors.

If we are unable to compete effectively, our future sales growth may be affected, which would harm our business, financial condition and results of operations.

**We may not be successful in executing our sales and marketing strategy for the commercialization of our Products.**

We have limited prior experience in the marketing, sale and distribution of aesthetic products and no experience with the marketing, sale and distribution of therapeutic products or any products internationally. Establishing and maintaining sales, marketing, and distribution capabilities involve significant risks, including our ability to retain and incentivize qualified individuals, provide adequate training to sales and marketing personnel, generate sufficient sales leads, effectively manage a geographically dispersed sales and marketing team, and handle any unforeseen costs and expenses.

We have established and scaled a commercial sales and marketing organization to support the commercialization of our Products for aesthetics. We are also expanding our commercial team to support the commercialization of DAXXIFY® for the treatment of cervical dystonia. Any failure or delay in or complications from the expansion of our internal sales, marketing and distribution capabilities could adversely impact the commercialization of our Products and to the extent such failure, delay or complications impact the commercialization of the RHA® Collection of dermal fillers may result in a breach of our obligations to Teoxane under the Teoxane Agreement.

We also have to compete with other pharmaceutical and life sciences companies to recruit, hire, train and retain sales and marketing personnel, and turnover in our sales force and marketing personnel could negatively affect the commercialization of our Products. We may not be able to attract and retain quality personnel on acceptable terms, or at all. Also, to the extent we hire personnel from our competitors, such personnel will usually be subject to restrictive covenants with their former employers, including non-competition, non-solicitation and/or confidentiality provisions. As a result, we may have to wait until applicable non-competition provisions have expired before deploying such personnel in restricted territories or incur costs to relocate personnel outside of such territories. We may be subject to allegations and litigation that these personnel have violated the non-competition clauses, been improperly solicited or divulged to us proprietary or other confidential information of their former employers. Any of these risks may adversely affect our business.

We will also need to increase our commercial team or contract with distributors and partners to expand internationally. If we are unable to effectively expand our commercial team or enter into such arrangements on acceptable terms or at all, we may not be able to successfully commercialize DAXXIFY® internationally.

Establishing and maintaining sales, marketing and distribution capabilities may be expensive and time consuming. Such expenses may be disproportionate compared to the revenues we may be able to generate on sales of our Products, which could cause our commercialization efforts to be unprofitable or less profitable than expected.

**We are subject to uncertainty relating to pricing and reimbursement. Failure to obtain or maintain adequate coverage, pricing and reimbursement for DAXXIFY for therapeutics uses, or our other future approved products, if any, could have a material adverse impact on our ability to commercialize such products.**

The availability and extent of coverage and reimbursement from governmental and private healthcare payors for DAXXIFY® for therapeutic uses or any future approved product for therapeutic indications, and our ability to obtain adequate pricing for such products are key factors that will affect our future commercial prospects. Government authorities and third-party payors, such as private health insurers and health maintenance organizations, decide which drugs they will cover and establish payment levels. Sales of our products depend and will depend substantially on the extent to which their cost will be paid by health maintenance, managed care, pharmacy benefit and similar healthcare management organizations or reimbursed by government health administration authorities, private health coverage insurers and other third-party payors. Accordingly, the coverage and reimbursement decisions of such governmental and private healthcare payors could reduce the demand for, or the price paid for, our products. If these payors do not consider our products to be cost-effective alone, or relative to other approved therapies, they may not cover our products or, if they do, they may apply utilization management restrictions, high patient cost-sharing obligations, or restrict the level of reimbursement. The approved reimbursement amount may be insufficient to establish or maintain pricing sufficient to realize a return on our investment.

Third-party payors are increasingly challenging the prices charged for pharmaceuticals products, and many also limit reimbursement for newly-approved products and indications. Third-party payors often attempt to contain healthcare costs by demanding price discounts or rebates and limiting both the types and variety of drugs that they will cover and the amounts that they will pay for drugs. As a result, they may not provide adequate payment for our products. Similarly, the containment of healthcare costs has become a priority for federal and state governments and the pricing of pharmaceutical products has been a focus in this effort. The U.S. government and state legislatures have shown significant interest in implementing cost-containment programs, including price controls, restrictions on reimbursement, requirements for substitution of generic products and requirements to demonstrate a specific degree of improvement in terms of medical benefit compared to existing therapies. Adoption of price controls and cost-containment measures could adversely affect our ability to successfully commercialize our products. In addition, we may be required to conduct post-marketing studies in order to demonstrate the cost-effectiveness of our products to payors' satisfaction. Such studies might require us to commit a significant amount of management's time and our financial and other resources and our products might not ultimately be considered cost-effective.

The IRA makes significant changes to how drugs are covered and paid for under the Medicare program, including the creation of financial penalties for drugs whose prices rise faster than the rate of inflation, redesign of the Medicare Part D program to require manufacturers to bear more of the liability for certain drug benefits, and government price-setting for certain Medicare Part D drugs, starting in 2026, and Medicare Part B drugs starting in 2028. We have evaluated, and will continue to evaluate, the effect of the IRA on our business. At this time, we do not expect the IRA to have a material effect.

We do not know if DAXXIFY® for therapeutic purposes will obtain and maintain broad acceptance from third-party payors. The coverage determination process is a time-consuming and costly process that requires us to provide scientific and clinical support for the use of DAXXIFY® to each payor separately, with no assurance that coverage will be obtained or maintained. The market for a drug depends significantly on access to third party payors' drug formularies, or lists of medications for which third-party payors provide coverage and reimbursement. Third-party payors may refuse to include a particular drug in their formularies or restrict patient access to a branded drug when a less costly generic equivalent or other alternative is available, even if not approved for the indication for which the branded drug is approved. Due to there being no uniform policy of coverage and reimbursement in the U.S. among commercial payors, coverage and reimbursement for pharmaceutical products may differ significantly from payor to payor. If we are unable to obtain and maintain adequate coverage from third-party payors, the adoption of DAXXIFY® by HCPs and patients may be limited. This in turn could affect our ability to successfully commercialize DAXXIFY® and have a material adverse impact on our profitability, results of operations, financial condition and future success.

We cannot be certain that we will be able to obtain and maintain adequate coverage, pricing and reimbursement for DAXXIFY®, or our other future approved products, if any. If coverage or reimbursement is not available or is available on a limited basis, or if we are unable to obtain and maintain adequate pricing, we may not be able to successfully commercialize DAXXIFY® or our other future approved products, if any.

**Even if coverage and reimbursement from governmental and private healthcare payors for therapeutic uses of DAXXIFY® or any future approved product for therapeutic indications is provided, acceptance of any approved product may vary among HCPs, healthcare organizations and administrators and others in the healthcare**

**community, which could impact our ability to realize a return on our investment and reduce demand for our products.**

The market acceptance of any approved product, including DAXXIFY®, may vary among HCPs, patients, administrators, or others in the healthcare community. In addition, regional hospitals and healthcare organizations are increasingly using bidding procedures to determine which suppliers as well as which pharmaceutical and therapeutic products will be included in their drug formularies or lists of medications approved for use in their facility. The administration of regional hospitals and healthcare organizations may refuse to include a particular drug in their formularies or restrict patient access to a branded drug when a less costly generic equivalent or other alternative is available. These measures could reduce the ultimate demand for our products or put pressure on our product pricing.

HCPs play a significant role in determining the course of a patient's treatment and the type of pharmaceutical and therapeutic products that are included on drug formularies and lists of medications approved for use within their healthcare organizations. An important part of our commercialization process includes the education of HCPs on the safe and effective use of any approved product, including DAXXIFY®, as applicable. Acceptance of any approved product, including DAXXIFY®, depends on educating HCPs regarding the distinctive characteristics, perceived benefits, safety, ease of use, and cost-effectiveness of the product as compared to our competitors' products. If an HCP experiences difficulties during an initial procedure or otherwise, that HCP may be less likely to continue to use our product or to recommend it to other HCPs and healthcare administrators. Our efforts to educate HCPs, patients, administrators, and others in the healthcare community on the proper use of any approved product, including DAXXIFY®, have required, and will continue to require, significant resources, and these efforts may never be successful. If we are not successful in educating HCPs, we may be unable to increase sales, sustain growth, or achieve profitability.

**Unfavorable publicity relating to one or more of our product offerings, whether related to aesthetic or therapeutic indications, may affect the public perception of our entire portfolio of Products.**

DAXXIFY® has been approved for both aesthetic and therapeutic indications. Concerns about product safety, efficacy or duration for any DAXXIFY® indication or the RHA® Collection of dermal fillers, whether raised by an injector, HCP, consumer, patient, litigant, regulator or consumer advocate, can result in safety alerts, product recalls, governmental investigations, regulatory action, private claims and lawsuits, payment of fines and settlements, declining sales and reputational damage for the entire portfolio of our Products, potentially impacting any approved DAXXIFY® indications and the RHA® Collection of dermal fillers. If any such events occur, the negative publicity could negatively impact our brand and results of operations.

**If we are found to have improperly promoted off-label uses for our Products that are approved for marketing, or if HCPs or injectors misuse our Products or use our Products off-label, we may become subject to prohibitions on the sale or marketing of our Products, significant fines, penalties, and sanctions, product liability claims, and our image and reputation within the industry and marketplace could be harmed.**

The FDA and other regulatory agencies strictly regulate the marketing and promotional claims that are made about regulated products. In particular, a product may not be promoted for uses or indications that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. We train our sales and marketing personnel against improperly promoting off-label uses for our Products. However, if we are found to have promoted such off-label uses, we may receive warning letters, become subject to significant liability and be subject to FDA prohibitions on the sale or marketing of our Products, which could affect our reputation within the industry and materially harm our business. The federal government has levied large civil and criminal fines against companies for alleged improper promotion and has enjoined several companies from engaging in off-label promotion. If we become the target of such an investigation or prosecution based on our marketing and promotional practices, we could face similar sanctions, which would materially harm our business. In addition, management's attention could be diverted from our business operations, significant legal expenses could be incurred, and our reputation could be damaged. The FDA has also requested that companies enter into consent decrees or permanent injunctions under which specified promotional conduct is changed or curtailed.

Injectors and HCPs may, in their independent professional judgment, use legally available products for off-label uses. However, injectors and HCPs may also misuse our Products, or use improper techniques, potentially leading to adverse results, side effects or injury, which may lead to product liability claims. If our Products are misused or used with improper

technique, we may become subject to costly litigation by our customers, consumers or patients. Product liability claims could divert management's attention from our core business, be expensive to defend, and result in sizable damage awards against us that may not be covered by insurance. Furthermore, the use of these products for indications other than those cleared by the FDA may not effectively treat such conditions, which could harm our reputation in the marketplace among injectors, HCPs and consumers.

Any of these events could harm our business and results of operations and cause our stock price to decline.

**We generally rely on one third-party service provider for the distribution of our Products to our customers. If we experienced a sudden loss of our third-party distributor or such distributor experiences a disruption in its operations, it would affect the delivery of our Products to our customers, which could negatively impact our business, consolidated financial condition and results of operations.**

We currently rely on third-party service providers to perform a variety of functions related to the packaging, storage and distribution of DAXXIFY® and the storage and distribution of the RHA® Collection of dermal fillers. Traditionally, we have relied on one third-party service provider for inventory and shipment of Product to our customers, and we generally expect the sole service provider arrangement to continue in the near term. We cannot guarantee that any existing relationship will be maintained or that the third-party service provider will continue to be available to us. The sudden loss of our third-party service provider or disruptions in their operations, could impact our business, financial condition and results of operations. Moreover, we may not be able to find a replacement third-party service provider in a timely fashion or on commercially reasonably terms.

A significant disruption to the business of our third-party service provider or interruption in the operation of their facility used for our Products due to public health crises, changes to existing systems, use of other facilities, natural disasters, severe weather, accidents, system failures, cybersecurity incidents, capacity constraints or other unforeseen causes could delay, impair or prevent our third-party service provider from delivering our Products to our customers. The delay could negatively impact customer satisfaction and the extent to which customers use our Products, which could impact our commercial success.

Additionally, we recognize revenue from the sale of our Products once they are delivered to our customers. Any delay in the delivery of our Products could push the revenue recognition for those Products to the following quarter, impacting the financial results of the current quarter. Further, due to seasonality trends, a significant portion of our revenue is received in the fourth quarter of the year. Any disruption or delay in the delivery of our Products during the fourth quarter could impact our year end results in addition to quarterly performance.

## Risks Related to the Manufacturing and Supply Chain

**We face certain risks associated with manufacturing DAXXIFY® to support commercial production for any approved indications.**

Our success depends in part on our ability to effectively and reliably forecast the demand and manufacture or source supplies of DAXXIFY® to meet commercial demand, and for us and our third-party manufacturers to maintain a commercially viable manufacturing process. We have developed an integrated manufacturing, research and development facility located at our Newark, California office, which is available for commercial and clinical production of DAXXIFY®, to support the development and commercialization of DAXXIFY®, for the Fosun partnership. We also manufacture drug substance at this facility, which is used for research and development purposes, clinical trials and/or commercial production.

In support of the commercialization of DAXXIFY®, we are outsourcing some manufacturing responsibilities to our third-party manufacturers. In April 2023, the FDA approved our PAS submission for the ABPS manufacturing facility. Following approval, the ABPS manufacturing facility began serving as our primary commercial drug product supply source for DAXXIFY®. In addition, the PCI manufacturing facility will need regulatory approval before it can be used to support commercialization. There are no assurances that the PCI manufacturing facility will get approved on a timely basis, or at all, or that either or both ABPS and PCI will continue to be available to us at the required commercial scale, or at all. In addition, there are risks associated with commercial manufacturing including, among others, cost overruns, process reproducibility, stability issues, lot consistency and timely availability of raw materials. If these or other risks materialize or we are unable to utilize our third-party manufacturers, we may encounter delays or additional costs in achieving our commercialization objectives, which could materially damage our business and financial position.

**We use our internal manufacturing facility and an external manufacturing facility to make our DAXXIFY® drug substance and drug product. We plan to utilize these facilities and potentially additional external facilities to support clinical and commercial production of DAXXIFY® and any product candidates. If we experience a significant disruption in our manufacturing operations or our third-party manufacturers experience a significant disruption in their operations for any reason, our ability to continue to operate our business would be materially harmed.**

We use our internal manufacturing facility and the ABPS manufacturing facility to manufacture DAXXIFY® drug substance and drug product. We plan to utilize our internal and the external ABPS facility, as well as PCI facility, if approved for the clinical and commercial production of DAXXIFY® and any product candidates. If these or any future facility were to be damaged, destroyed or otherwise unable to operate, whether due to earthquakes, fire, floods, hurricanes, storms, tornadoes, other natural disasters, employee malfeasance, terrorist acts, power outages, actual or threatened epidemics, pandemics (including the COVID-19 pandemic), outbreaks, or public health crises, equipment failures or otherwise, or if performance of such manufacturing facilities is disrupted for any other reason, such an event could make it difficult or, in certain cases, impossible for us or our third-party manufacturers to continue to manufacture our drug product and/or drug substance for a substantial period of time. In particular, because we manufacture botulinum toxin in our facilities, we would be required to obtain further clearance and approval by state, federal or other applicable authorities to continue or resume manufacturing activities. Although we have disaster recovery and business continuity plans in place, they may not be adequate in the event of a serious disaster or similar event. We may incur substantial expenses as a result of the limited nature of our disaster recovery and business continuity plans, which, particularly when taken together with our lack of earthquake insurance, could have a material adverse effect on our business. We may also need to halt manufacturing operations, which could impact FDA inspections, halt or delay our clinical trials or prevent the manufacture of DAXXIFY® for commercialization. If we experience delays in achieving our development or regulatory objectives, or if we are unable to manufacture an approved product within a timeframe that meets market demands, our business, prospects, financial results and reputation could be materially harmed.

**We currently contract with third-party manufacturers for certain components and services necessary to produce our products and expect to continue to do so to support further clinical trials and commercial scale production. This increases the risk that we will not have sufficient quantities of our products or be able to obtain such quantities or services at an acceptable cost, which could delay, prevent or impair our development or commercialization efforts.**

We plan to utilize our internal and the external ABPS and PCI manufacturing facilities for drug product and drug substance production and testing, and we use other service providers for testing and the production of raw materials and

excipients to support the clinical and commercial production of our products. For example, we and our manufacturers purchase the materials necessary to produce DAXXIFY® from single-source third-party suppliers, which includes the development, manufacture and supply of bulk peptide. There are no assurances that the bulk peptide manufacturer will continue to be available to us or be able to continue to supply us at the required commercial scale, or at all. There are a limited number of suppliers for the bulk peptide and raw materials that we use to manufacture our products. Any significant delay in the supply of such components or the inability to purchase these components on acceptable terms and at sufficient quality levels or in adequate quantities could delay or halt commercial activities, clinical trials, product testing and potential regulatory approval. We may need to assess alternate suppliers to prevent a possible disruption of the manufacture of the materials necessary to produce a product for commercial sale or clinical trials.

There is no guarantee as to if or when we may establish or rely on new and additional suppliers or service providers to support clinical development or commercialization of our products, or whether they will be adequate in all circumstances we may encounter. Even where alternative sources of supply or other service providers are available, qualifying alternate suppliers and service providers and establishing reliable supplies could cost more or could result in delays and a loss of revenues. For instance, we outsource the manufacture of bulk peptide through an agreement with a single supplier. Although we have multiple years of released inventory on hand, we do not know whether such stock will be sufficient to meet projected demand and may need to identify a second source of supply. Even if we are able to identify and qualify a suitable second source to replace the peptide supplier, if necessary, that replacement supplier would not have access to our previous supplier's proprietary processes and would therefore be required to develop its own, which could result in further delay. As a result, we are dependent on a limited number of suppliers and service providers for our products and the loss of one of our suppliers or service providers could have a material adverse effect on our business, results of operations and financial condition.

Reliance on third-party manufacturers entails other additional risks, including the reliance on the third party for regulatory compliance and quality assurance, the possible breach of the manufacturing agreement by the third party, and the possible termination or nonrenewal of the agreement by the third party at a time that is costly or inconvenient for us. In addition, third-party manufacturers may not be able to comply with cGMP or QSR, or similar regulatory requirements outside the U.S. Our failure or the failure of our third-party manufacturers to comply with applicable regulations could result in sanctions being imposed on us, including fines, injunctions, civil penalties, delays, suspension or withdrawal of approvals, license revocation, seizures or recalls of products, operating restrictions and criminal prosecutions, any of which could significantly and adversely affect supplies of our product candidates or products that we may develop. Any failure or refusal to supply the components or services for our product candidates or products that we may develop could delay, prevent or impair our clinical development, regulatory approval or commercialization efforts.

**We rely on Teoxane for the manufacture and supply of the RHA® Collection of dermal fillers, and our dependence on Teoxane may impair our ability to commercialize the RHA® Collection of dermal fillers.**

Pursuant to the Teoxane Agreement, we are not entitled to manufacture the RHA® Collection of dermal fillers. Instead, Teoxane is responsible for supplying our entire supply of the RHA® Collection of dermal fillers. If Teoxane were to cease production or otherwise fail to timely supply us with an adequate supply of the RHA® Collection of dermal fillers, our ability to continue to commercialize the RHA® Collection of dermal fillers would be adversely affected.

Teoxane is required to produce the RHA® Collection of dermal fillers under QSR in order to meet acceptable standards for commercial sale. Teoxane is subject to pre-approval inspections and periodic unannounced inspections by the FDA and corresponding state and foreign authorities to ensure strict compliance with QSR and other applicable government regulations and corresponding foreign standards. We do not have control over Teoxane's compliance with these regulations and standards. Any difficulties or delays in Teoxane's manufacturing and supply of the RHA® Collection of dermal fillers or any failure of Teoxane to maintain compliance with the applicable regulations and standards could increase our costs, cause us to lose revenue, prevent the import and/or export of the RHA® Collection of dermal fillers, impair Teoxane's ability to produce the RHA® Collection of dermal fillers on the schedule we require to meet commercialization goals, or cause the RHA® Collection of dermal fillers to be the subject of field alerts, recalls or market withdrawals.

**Our business involves the use of hazardous materials and we and our third-party manufacturers and suppliers must comply with environmental laws and regulations, which can be expensive and restrict how we do business.**

Our sales, marketing, research and development and manufacturing activities and our third-party manufacturers' and suppliers' activities involve the controlled storage, use and disposal of hazardous materials owned by us, including botulinum toxin type A, a key component of our product candidates, and other hazardous compounds. In some cases, these hazardous materials and various wastes resulting from their use are stored at our facilities and our manufacturers' facilities pending their use and disposal. We and our manufacturers and suppliers are subject to laws and regulations governing the use, manufacture, storage, handling and disposal of these hazardous materials. We are licensed with the Centers for Disease Control and Prevention and with the California Department of Health, Food and Drug Branch for use of botulinum toxin and to manufacture both the active pharmaceutical ingredient and the finished product in topical and injectable dose forms.

Although we believe that our safety procedures are sufficient and comply with the standards prescribed by applicable laws and regulations, we cannot eliminate the risk of accidental contamination or injury, which may cause an interruption of our commercialization efforts, research and development efforts or business operations, as well as environmental damage resulting in costly clean-up and liabilities. Such damages and liability could exceed our resources and federal or state, local or other applicable authorities may curtail our use of certain materials and interrupt our business operations.

Furthermore, environmental, health and safety laws and regulations are complex, change frequently and have tended to become more stringent. We cannot predict the impact of such changes and cannot be certain of our future compliance.

**Risks Related to Research and Development**

**Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results.**

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Furthermore, we rely on CROs, and clinical trial sites to ensure the proper and timely conduct of our clinical trials. While we have agreements governing the committed activities of our CROs, we have limited influence over their actual performance. A failure of one or more of our clinical trials can occur at any time during the clinical trial process. The results of preclinical studies and clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. Furthermore, final results may differ from interim results.

Clinical trials can be prevented, delayed or aborted for a variety of reasons, including delay or failure to:

- obtain regulatory approval to commence a trial;
- reach agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;
- obtain IRB approval at each site;
- recruit suitable subjects to participate in a trial;
- have subjects complete a trial or return for post-treatment follow-up;
- ensure clinical sites observe trial protocol or continue to participate in a trial;
- address any patient safety concerns that arise during the course of a trial;
- address any conflicts with new or existing laws or regulations;
- add a sufficient number of clinical trial sites;
- manufacture sufficient quantities of a product candidate for use in clinical trials; or
- lack of adequate funding to continue the clinical trial.

We have and may again experience delays in our clinical trials, and we do not know whether future clinical trials, if any, will begin on time, need to be redesigned, enroll an adequate number of subjects on time or be completed on schedule, if at all. Subject enrollment is a significant factor in the timing of clinical trials and is affected by many factors, including the size and nature of the patient population, the proximity of patients to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drug being studied in relation to other available therapies, including any new drugs or treatments that may be approved for the indications we are investigating. There is no guarantee that we can identify, recruit and maintain subjects as participants in a clinical trial in order for the trial to be completed.

We could also encounter delays if a clinical trial is suspended or terminated by us, by the IRBs of the institutions in which such trials are being conducted, by the data safety monitoring board for such trial or by the FDA or other regulatory authorities. Such authorities may suspend or terminate a clinical trial due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, failure of inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, discovery of unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions, risks related to conducting clinical trials during the COVID-19 pandemic, or lack of adequate funding to continue the clinical trial.

Delays in the completion or termination of any clinical trial of our product candidates will increase our costs, slow down our product candidate development and approval process and jeopardize our ability to commence product sales and generate revenues. In addition, many of the factors that cause or lead to a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates. Any of these occurrences may significantly harm our business, financial condition and prospects.

**We have historically relied on third parties and consultants to conduct our preclinical studies and clinical trials. If these third parties or consultants do not successfully carry out their contractual duties or meet expected deadlines, we may be unable to obtain regulatory approval for or commercialize DAXXIFY® for additional indications or any future product candidates, on a timely basis, or at all.**

We rely on medical institutions, clinical investigators, contract laboratories, collaborative partners and other third parties, such as CROs and clinical data management organizations, to conduct clinical trials on our product candidates. The third parties with whom we contract for execution of our clinical trials play a significant role in the conduct of these trials and the subsequent collection and analysis of data. However, these third parties are not our employees, and except for contractual duties and obligations, we have limited ability to control the amount or timing of resources that they devote to our programs. Although we typically rely on these third parties to conduct our preclinical studies and clinical trials, we remain responsible for ensuring that each of our preclinical studies and clinical trials is conducted in accordance with its investigational plan and protocol. Moreover, the FDA and foreign regulatory authorities require us to comply with GCPs and good laboratory practices for conducting, monitoring, recording and reporting the results of clinical and preclinical trials to ensure that the data and results are scientifically credible and accurate, and that the trial subjects are adequately informed of the potential risks of participating in clinical trials. We also rely on consultants to assist in the execution, including data collection and analysis, of our clinical trials.

In addition, the execution of preclinical studies and clinical trials, and the subsequent compilation and analysis of the data produced, requires coordination among various parties. In order for these functions to be carried out effectively and efficiently, it is imperative that these parties communicate and coordinate with one another. Moreover, these third parties may also have relationships with other commercial entities, some of which may compete with us. These third parties may terminate their agreements with us upon as little as 30 days' prior written notice of a material breach by us that is not cured within 30 days. Many of these agreements may also be terminated by such third parties under certain other circumstances, including our insolvency or our failure to comply with applicable laws. In general, these agreements require such third parties to reasonably cooperate with us at our expense for an orderly winding down of services of such third parties under the agreements. If the third parties or consultants conducting our clinical trials do not perform their contractual duties or obligations, experience work stoppages, do not meet expected deadlines, terminate their agreements with us or need to be replaced, or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical trial protocols or GCPs, or for any other reason, we may need to conduct additional clinical trials or enter into new arrangements, which could be difficult, costly or impossible, and our clinical trials may be extended, delayed or terminated or

may need to be repeated. We may be unable to recover unused funds from these third-parties. If any of the foregoing were to occur, we may not be able to obtain, or may be delayed in obtaining, regulatory approval for, and will not be able to, or may be delayed in our efforts to, successfully commercialize the product candidate being tested in such trials.

## Risks Related to Our Intellectual Property

**If our efforts to protect our intellectual property related to our Products or any future products are not adequate, we may not be able to compete effectively.**

Our success and ability to compete depends significantly upon our ability to obtain, maintain and protect our proprietary rights and licensed intellectual property rights to the technologies and inventions used in or embodied by our Products. We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to DAXXIFY® and the RHA® Collection of dermal fillers, our onabotulinumtoxinA biosimilar, and our development programs. We also have not pursued or maintained, and may not pursue or maintain in the future, patent protection for our products in every country or territory in which we sell or will in the future sell our products. Any disclosure to or misappropriation by third parties of our confidential proprietary information could enable competitors to quickly duplicate or surpass our technological achievements, thereby eroding our competitive position.

The strength of patents in the biotechnology field involves complex legal and scientific questions and can be uncertain. This uncertainty includes changes to the patent laws through either legislative or court action that may reinterpret existing law in ways affecting the scope or validity of issued patents. The evolving law relating to patent eligibility for patents related to our business may be relevant to the scope of protection available to us. The patent applications that we own or license may fail to result in issued patents in the U.S. or foreign countries. Competitors and academic scientists in the field of cosmetics, pharmaceuticals and neuromodulators, for example, have created a substantial amount of prior art, including scientific publications, patents and patent applications. Our ability to obtain and maintain valid and enforceable patents depends on whether the differences between our technology and the prior art allow our technology to be patentable over the prior art. Even if the patents do successfully issue, third parties are currently challenging and may again challenge the validity, enforceability or scope of such issued patents or any other issued patents we own or license, which may result in such patents being narrowed, invalidated or held unenforceable. For example, in November 2022, Ipsen Biopharmaceuticals, Inc. opposed our European Patent No. EP 3 368 071 for "Injectable botulinum toxin formulations and methods of use thereof having long duration of therapeutic or cosmetic effect." We responded to their opposition in March 2023.We will vigorously defend this patent in the European Patent Office; however, we cannot guarantee that it will be upheld.

Third parties may challenge the validity of any issued U.S. Patent in the USPTO through the post-grant review process on the basis of prior art patents or printed publications. Because of a lower evidentiary standard in the USPTO compared to district courts, third parties may attempt to use the USPTO procedures to invalidate our patent claims that would not have been invalidated if first challenged by the third party as a defendant in a district court action. If the breadth or strength of protection provided by the patents and patent applications we hold or pursue with respect to DAXXIFY®, an onabotulinumtoxinA biosimilar or any future product candidates is challenged, then it could threaten our ability to prevent competitive products from being marketed.

Even where laws provide protection, costly and time-consuming litigation could be necessary to enforce, defend and determine the scope of our proprietary rights, and the outcome of such litigation would be uncertain. Moreover, any actions we may bring to enforce our intellectual property against our competitors could provoke them to bring counterclaims against us. Some of our competitors have substantially greater intellectual property portfolios and financial resources than we have. See Item 1A. "Risk Factors—If we infringe or are alleged to infringe intellectual property rights of third parties, our business could be harmed" for more information. Furthermore, even if our patents and applications are unchallenged, they may not adequately protect our intellectual property or prevent others from designing around our claims.

We also rely on trade secret protection and confidentiality agreements to protect proprietary know-how that may not be patentable, processes for which patents may be difficult to obtain or enforce and any other elements of our product development and manufacturing processes that involve proprietary know-how, information or technology that is not covered by patents.

In an effort to protect our trade secrets and other confidential information, we require our employees, consultants, collaborators and advisers to execute confidentiality agreements upon the commencement of their relationships with us. These agreements require that all confidential information developed by the individual or made known to the individual by us during the course of the individual's relationship with us be kept confidential and not be disclosed to third parties. These agreements, however, may not provide us with adequate protection against improper use or disclosure of confidential information, and these agreements may be breached. Adequate remedies may not exist in the event of unauthorized use or disclosure of our confidential information. A breach of confidentiality could significantly affect our competitive position. In addition, in some situations, these agreements may conflict with, or be subject to, the rights of third parties with whom our employees, consultants, collaborators or advisers have previous employment or consulting relationships. To the extent that our employees, consultants or contractors use any intellectual property owned by others in their work for us, disputes may arise as to the rights in any related or resulting know-how and inventions. Also, others may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets and other confidential information.

**If we infringe or are alleged to infringe intellectual property rights of third parties, our business could be harmed.**

Our research, development, manufacturing and commercialization activities may infringe or otherwise violate or be claimed to infringe or otherwise violate patents owned or controlled by other parties. Competitors in the field of cosmetics, pharmaceuticals and botulinum toxin have developed large portfolios of patents and patent applications in fields relating to our business. For example, there are patents held by third parties that relate to the treatment with botulinum toxin-based products for indications we are currently developing. There may also be patent applications that have been filed but not published that, when issued as patents, could be asserted against us. These third parties could bring claims against us that would cause us to incur substantial expenses and, if successful against us, could cause us to pay substantial damages. Further, if a patent infringement suit were brought against us, we could be forced to stop or delay research, development, manufacturing or sales of the product or product candidate that is the subject of the suit.

For example, in October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan later amended its complaint alleging infringement of four additional patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,147,878; 11,203,748; 11,326,155; and 11,285,216. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case. See Item 3. "Legal Proceedings" for more information. Allergan claims that our formulation for DaxibotulinumtoxinA for Injection and our and ABPS's manufacturing process used to produce DaxibotulinumtoxinA for Injection infringes its patents. We dispute the claims in this lawsuit and intend to defend the matter vigorously. However, there can be no assurance that the court will not rule against us in these proceedings. Even if we are successful in defending against such claim, this litigation could divert management's attention, as well as our resources, from our business and any claims paid out of our cash reserves would harm our financial condition and operating results.

As a result of patent infringement claims, or to avoid potential claims, we may choose or be required to seek licenses from third parties. These licenses may not be available on acceptable terms, or at all. Even if we are able to obtain a license, the license would likely obligate us to pay license fees or royalties or both, and the rights granted to us might be nonexclusive, which could result in our competitors gaining access to the same intellectual property. Ultimately, we could be prevented from commercializing a product based on our current or future indications, or be forced to cease some aspect of our business operations, if, as a result of actual or threatened patent infringement claims, we are unable to enter into licenses on acceptable terms.

There has been substantial litigation and other proceedings regarding patent and other intellectual property rights in the pharmaceutical industry. In addition to infringement claims against us, we may become a party to other patent litigation and other proceedings, including interference, derivation or post-grant proceedings declared or granted by the USPTO and similar proceedings in foreign countries, regarding intellectual property rights with respect to our current or future products. The cost to us of any patent litigation or other proceeding, even if resolved in our favor, could be substantial. Some of our competitors may be able to sustain the costs of such litigation or proceedings more effectively than we can because of their substantially greater financial resources. Patent litigation and other proceedings may also absorb significant management time. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could impair our

ability to compete in the marketplace. The occurrence of any of the foregoing could have a material adverse effect on our business, financial condition or results of operations.

**If Teoxane fails to obtain and maintain patents, licensing arrangements or other protection for the proprietary intellectual property that we have exclusive distribution rights to in the U.S., we could lose our rights related to the RHA® Collection of dermal fillers, which would have a material adverse effect on our potential to generate revenue, our business prospects, and our results of operations.**

If Teoxane fails to obtain and maintain patent, licensing arrangements or other protection for the proprietary intellectual property that we have exclusive distribution rights to in the U.S., we could lose our rights to the intellectual property or our exclusivity with respect to those rights, and our competitors could market competing products using the intellectual property. The intellectual property underlying the RHA® Collection of dermal fillers is of critical importance to our business and involves complex legal, business and scientific issues and is complicated by the rapid pace of scientific discovery in our industry. Disputes may arise regarding intellectual property subject to the Teoxane Agreement, including:

- the scope of rights granted under the Teoxane Agreement and other interpretation-related issues;
- the extent to which our technology and processes infringe on intellectual property of Teoxane that is not subject to the Teoxane Agreement;
- the sublicensing of patent and other rights under our collaborative development relationships; and
- the ownership of inventions and know-how resulting from the development of intellectual property under the Teoxane Agreement.

If disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, we may be unable to successfully develop and commercialize the affected products or product candidates.

**We may become involved in lawsuits or administrative proceedings to protect or enforce our patents or other intellectual property or the patents of our licensors, or to challenge patent claims of third party patents which could be expensive and time-consuming.**

Competitors may infringe upon our intellectual property, including our patents or the patents of our licensors. As a result, we may in the future be required to file infringement claims to stop third-party infringement or unauthorized use of our own or licensed intellectual property. This can be expensive, particularly for a company of our size, and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patent claims do not cover its technology or that the factors necessary to grant an injunction against an infringer are not satisfied.

An adverse determination of any litigation or other proceeding could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not issuing.

Interference, derivation, inter partes review, post-grant review or other proceedings brought at the USPTO may be necessary to determine the priority or patentability of inventions with respect to our patents or patent applications or those of our licensors or collaborators, or those of our competitors. However, we cannot guarantee that those proceedings will be successful. For example, we filed two petitions (IPR2021-01203 and IPR2021-01204) requesting IPR of Medy-Tox's U.S. Patent No. 9,480,731, titled "Long Lasting Effect of New Botulinum Toxin Formulations" and the USPTO Trial and Appeal Board denied institution of the IPRs. Although the IPR proceedings were not successful, we continue to take appropriate measures to defend our patent position, which may include future IPR proceedings, litigation or other USPTO proceedings, any of which may fail or may be invoked against us by third parties.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation or other proceedings, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation or proceeding. In addition, during the course of this kind of litigation or proceeding, there could

be public announcements of the results of hearings, motions or other interim proceedings or developments or public access to related documents. If investors perceive these results to be negative, the market price for our common stock could be significantly harmed.

**We may not be able to protect our intellectual property rights throughout the world.**

We do not have intellectual property rights in all foreign countries in which a market may exist. Filing, prosecuting and defending patents on product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the U.S. can be less extensive than those in the U.S. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the U.S. and in some cases may even force us to grant a compulsory license to competitors or other third parties. Consequently, we may not be able to prevent third parties from practicing our inventions in all countries outside the U.S., or from selling or importing products made using our inventions in and into the U.S. or other jurisdictions. Competitors may use our technologies to develop their own products in jurisdictions where we have not obtained patent protection and further, may export otherwise infringing products to territories where we have patent protection, but where enforcement is not as strong as that in the U.S. These products may compete with our products and our patents or other intellectual property rights may not be effective or sufficient to prevent them from competing. Periodically, we may review the patents and patent applications we have pending throughout the world and decide to abandon one or more of them if we determine such patents or applications would not make a strategic contribution to our business.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biotechnology, which could make it difficult for us to stop the infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate and the damages or other remedies awarded, if any, may not be commercially meaningful.

Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license.

In addition, our ability to protect and enforce our intellectual property rights may be adversely affected by unforeseen changes in domestic and foreign intellectual property laws.

## Risks Related to Government and Industry Regulation

**Our business and Products are subject to extensive government regulation.**

We are subject to extensive, complex, costly and evolving regulation by federal, state, and local governmental authorities in the U.S., principally the FDA, the U.S. Drug Enforcement Administration, and the Centers for Disease Control and Prevention, as well as foreign regulatory authorities. Compliance with laws affecting the manufacture, promotion, and sale of current Products and the discovery, development, and introduction of new products or new Product uses requires substantial ongoing effort and expense. Failure to comply with applicable requirements, including those promulgated under the FDCA, the Public Health Service Act, and the Controlled Substances Act in the U.S., and similar laws that vary by country, may subject us to delay, remediation costs, adverse publicity, operating or distribution restrictions, disciplinary actions including warning letters or similar communications of admonition, Product seizures, recalls, monetary penalties, injunctions, suspension or revocation of approvals, criminal prosecution, or exclusion from future participation in federal healthcare programs.

**The regulatory approval process is highly uncertain and we or any collaboration partner may be unable to obtain regulatory approval for the manufacture or commercialization of DAXXIFY® for new indications, the RHA® Pipeline Products or any future product candidates, or to obtain regulatory approval on our desired timelines.**

The research, development, testing, regulatory review, and approval of new products and new product uses are subject to extensive regulation. In addition to the regulatory authorities described above, product development may be subject to requirements for authorization and continuing oversight by institutional review boards/ethics committees and other local boards. Generally, relevant regulatory and institutional authorities must approve a nonclinical study or clinical research before it may commence. Then a regulatory authority must authorize a product for proposed conditions of use before it may be commercialized. Obtaining regulatory approvals can be a lengthy, expensive and uncertain process, requirements can change over time, and delay or failure can occur at any stage of the process.

Failure to comply with FDA and other applicable U.S. and foreign regulatory requirements may subject us to the range of administrative or judicially imposed sanctions or other actions. See the section titled "Risk Factors – Risks Related to Government and Industry Regulation – Our business and Products are subject to extensive government regulation" for additional information about consequences of non-compliance.

Prior to obtaining approval to commercialize a product in the U.S. or abroad, we or our collaborators must demonstrate with substantial evidence from well controlled clinical trials, and to the satisfaction of the FDA or applicable foreign regulatory agencies, that such product candidates are safe and effective, or safe, pure and potent, for their intended uses. Results from nonclinical studies and clinical trials can be interpreted in different ways. Deficiencies can occur in the conduct of nonclinical studies and clinical trials. Even if we believe the data for our product candidates are reliable and promising, such data may not be sufficient to support approval by the FDA or other regulatory authorities, or approval to the extent desired. Furthermore, administering product candidates to humans may produce unexpected results or undesirable side effects, which could interrupt, delay or halt clinical trials or result in the FDA or other regulatory authorities denying approval of a product candidate for any or all targeted indications.

Even with positive clinical trial results, there is risk that the FDA or other regulatory authority identifies deficiencies or questions related to the manufacturing process of our products. For example, in 2021, the FDA delayed DAXXIFY® GL Approval following its identification of observations at its onsite inspection at our manufacturing facility. Although we were subsequently granted DAXXIFY® GL Approval, in order to meet future commercial demand, we will need to rely on one or more third-party manufacturing partners, which requires their successful completion of an inspection and FDA prior approval of a supplemental filing to our BLA. Although the ABPS facility has received FDA approval, we cannot be certain of how quickly or successfully the regulatory approval process will proceed for additional manufacturing sites.

In addition, we could experience issues during manufacturing inspections that could cause us or our manufacturing partners to undergo reinspections, as was the case with the process for the DAXXIFY® GL Approval. Depending on the circumstances, the timing to complete remediation of issues identified and then a reinspection can be lengthy. Even upon reinspection, it is not guaranteed that a facility or its systems and processes will be found adequate.



REV_DAX-03338668
DTX-370.0063

Table of Contents

Regulators can delay, limit or deny approval of a product candidate for many reasons, including the following:

- our inability to demonstrate to the satisfaction of the FDA or applicable foreign regulatory body that the product candidate is safe and effective, or safe, pure and potent, for the requested conditions of use;
- our inability to establish that our data, including data collected for us by third parties, are properly collected, reliable, and reproducible;
- our inability to remedy identified deficiencies or demonstrate viable manufacturing processes, or similar issues affecting third-party manufacturers with which we contract;
- the FDA's or foreign regulatory agency's disagreement with the trial protocol or the interpretation of data from nonclinical studies or clinical trials;
- our inability to demonstrate that clinical and other benefits of the product candidate outweigh any safety or other perceived risks;
- the FDA's or applicable foreign regulatory agency's requirement for additional preclinical or clinical studies;
- the FDA's or applicable foreign regulatory agency's non-approval of the formulation, quality control, labeling, or the specifications of the product candidate;
- the inability of the FDA to audit key clinical sites used in the development of the product for unapproved indications;
- competitor products may secure data or marketing exclusivity that delays our product approval or market entry; or
- the approval policies or regulations of the FDA or applicable foreign regulatory agency significantly change in a manner rendering our data insufficient for approval.

The RHA® Collection of dermal fillers are Class III medical devices that require PMA approval before they may be commercialized in the U.S. Although our partner Teoxane has received PMA approval for the RHA® Collection of dermal fillers, any future development of RHA® Pipeline Products will require approval.

If we are unable to gain approval of DAXXIFY® for additional indications or any future product candidates on a timely basis or at all, or if our prior approval supplement filing for our third-party manufacturing partner is not approved on a timely basis or at all, our business and results of operations could be materially and adversely harmed.

**Our Products remain subject to ongoing regulatory obligations and continued regulatory oversight even though approved, which may result in significant additional expense, may limit or delay additional regulatory approvals, may subject us to penalties, and may result in withdrawal of regulatory approval if we fail to comply with applicable regulatory requirements.**

After our products receive regulatory approval, we, Teoxane and our manufacturing partners, remain subject to the applicable laws as well as post-marketing surveillance. We must perform periodic inspection of facilities, continuing review of production processes, testing of products, and monitoring and reporting obligations to confirm that we are in compliance with all applicable requirements, including product specifications. New information is expected to be developed post-approval, following more diverse consumer exposures and longer time in use, as well as due to changes in manufacturing and production experience over time. Adverse findings may result in quality or other investigations, labeling revisions, the implementation of REMS or other control programs, completion of government mandated clinical trials or other assessments, specification revisions, and government enforcement action relating to labeling, advertising, marketing and promotion, as well as regulations governing manufacturing controls noted above. If supplies or products are imported or exported, detention or other restrictions may be imposed if there appears to be a violation, potentially disrupting supply chains. New suppliers must be tested and authorized prior to use.

The FDA may withdraw approval of a product if compliance with regulatory requirements is not maintained or if problems occur after a product reaches the market. The FDA strictly regulates marketing, labeling, advertising, and promotion of products that are placed on the market. Pharmaceutical products may be promoted only for the approved indications and consistent with the provisions of the approved label. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.

Our Products and any future products will be subject to continual regulatory review by the FDA and/or (if applicable) non-U.S. regulatory authorities. Conditions may be imposed for continuing approval, potentially including costly post-marketing testing, including Phase 4 clinical trials, surveillance to monitor the safety and efficacy of the product candidate and requirements related to manufacturing and testing. For example, in connection with the DAXXIFY® GL Approval, the FDA required us to transition to a cell-based potency assay as a part of our quality control testing process to align with evolving industry standards. If we are unable to meet our post approval commitments, we may be subject to citations from the FDA, and as a result, negative publicity. In addition, the manufacturing processes, labeling, packaging, distribution, adverse event reporting, storage, advertising, promotion and recordkeeping for our Products and any future products will be subject to extensive and ongoing regulatory requirements. These requirements include submissions of safety and other post-marketing information and reports, registration, as well as continued compliance with cGMP and GCPs for any clinical trials conducted post-approval. Later discovery of previously unknown problems with such Products and any future products, including adverse events of unanticipated severity or frequency, or with our third-party manufacturers or manufacturing processes, or failure to comply with regulatory requirements, including conditions of approval, may result in, among other things:

- restrictions on the marketing or manufacturing of the product, withdrawal of the product from the market, or voluntary or mandatory product recalls;
- holds or other adverse impacts on ongoing or future clinical trials;
- refusal by the FDA to approve pending applications or supplements to approved applications submitted by us or our strategic collaborators, or suspension or revocation of product license approvals;
- product seizure or detention, or refusal to permit the import or export of products; and
- injunctions or the imposition of civil or criminal penalties;

any of which could be harmful to our ability to generate revenues and our stock price.

In addition, we and Teoxane are subject to ongoing regulatory requirements governing, among other things, the manufacture, marketing, advertising, medical device reporting, sale, promotion, registration, and listing of Class III medical devices. The medical device regulations to which we and Teoxane are subject are complex and have become more stringent over time. Any failure by us or Teoxane to maintain compliance with the applicable regulations and standards for the RHA® Collection of dermal fillers and reports of adverse events or safety concerns could increase our costs, cause us to lose revenue, prevent the import and/or export of the RHA® Collection of dermal fillers, result in enforcement action by regulatory agencies, cause the RHA® Collection of dermal fillers to be recalled or withdrawn, result in negative publicity and prevent us from successfully commercializing the RHA® Collection of dermal fillers.

Further, as the manufacturer of DAXXIFY® and the distributor of the RHA® Collection of dermal fillers, we are required to maintain certain licenses, registrations, permits, authorizations, approvals or other types of state and local permissions in order to comply with various regulations regarding the distribution of drugs and medical devices. Failure to maintain such licenses and approvals will also prevent distribution of Products, which would limit our ability to generate revenue.

Our ongoing regulatory requirements may also change from time to time, potentially harming or making costlier our commercialization efforts. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the U.S. or other countries. If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies, or if we are not able to maintain regulatory

compliance, we may lose any marketing approval that we may have obtained and we may not achieve or sustain profitability, which would adversely affect our business.

**Our Products and product candidates are subject to ongoing FDA and foreign regulatory obligations and continued regulatory review with respect to manufacturing.**

We and any third-party contract development and manufacturers or suppliers are required to comply with applicable cGMP regulations and other international regulatory requirements. The regulations require that our Products and product candidates be manufactured and records maintained in a prescribed manner with respect to manufacturing, testing and quality control/quality assurance activities. The RHA® Collection of dermal fillers are subject to the FDA's QSR for medical devices. Additionally, third party manufacturers and suppliers and any manufacturing facility typically must undergo a pre-approval inspection before we can obtain marketing authorization for any of our Products or product candidates. Even after a manufacturer has been qualified by the FDA, the manufacturer must continue to expend time, money and effort in the area of production and quality control to ensure full compliance with cGMP and QSR, as applicable. Manufacturers are subject to regular, periodic inspections by the FDA following initial approval. Further, to the extent that we contract with third parties for the supply and/or manufacture of our Products (for example, Teoxane with respect to the RHA® Collection of dermal fillers and ABPS and PCI with respect to DAXXIFY®), our ability to control third party compliance with FDA requirements will be limited to contractual remedies and rights of inspection.

If, as a result of the FDA's inspections, it determines that the equipment, facilities, laboratories or processes do not comply with applicable FDA regulations and conditions of Product approval, the FDA may require remediation, not approve subsequent supplements, may withdraw approval or may suspend the manufacturing operations. If the manufacturing operations of any of the suppliers for our Products or product candidates are suspended, we may be unable to generate sufficient quantities of commercial or clinical supplies of such products to meet market demand or satisfy clinical trial needs, which would harm our business. In addition, if delivery of material from our suppliers were interrupted for any reason, we might be unable to ship our Products for commercial supply or to supply our products in development for clinical trials. Significant and costly delays can occur if the qualification of a new supplier is required.

We are also subject to a variety of federal, state, local, and foreign environmental, health and safety, and other laws and regulations that may affect our research, development and production efforts.

**We are subject to stringent and changing obligations related to data privacy and security. Our actual or perceived failure to comply with such obligations could lead to regulatory investigations or actions, litigation, fines and penalties, disruptions of our business operations, reputational harm, loss of revenue or profits, loss of customers or sales and other adverse business consequences.**

We process personal data and other sensitive data; proprietary and confidential business data; trade secrets; intellectual property; and sensitive third-party data. Our data processing activities subject us to numerous data privacy and security obligations, such as various laws, regulations, guidance, industry standards, external and internal privacy and security policies, contractual requirements, and other obligations that govern the processing of personal data by us and on our behalf.

We are subject to state, federal and foreign laws relating to data privacy and security in the conduct of our business, including state breach notification laws, HIPAA, as amended by HITECH, CCPA, and the TCPA, among others. These laws affect how we collect, use and otherwise process data of our employees, consultants, customers, consumers and other parties. These laws, as well as similar laws being enacted by other states and countries, impose substantial requirements that involve the expenditure of significant resources and the investment of significant time and effort to comply. Our failure to comply with these laws or prevent security breaches of such data could result in significant liability under applicable laws, cause disruption to our business, harm our reputation and have a material adverse effect on our business. We also rely on third parties to host or otherwise process some of this data. In some instances, these third parties have experienced failures to protect data privacy. Any failure by a third party to prevent security breaches could have adverse consequences for us.

We may also be bound by contractual obligations related to data privacy and security, which limit our ability to use and disclose information provided to us, and our efforts to comply with such obligations may not be successful. For example, certain privacy laws, such as the CCPA, require our customers to impose specific contractual restrictions on their service

providers. Additionally, some of our customer contracts may require us to host personal data locally. We may publish privacy policies, marketing materials and other statements, such as compliance with certain certifications or self-regulatory principles, regarding data privacy and security. If these policies, materials or statements are found to be deficient, lacking in transparency, deceptive, unfair, or misrepresentative of our practices, we may be subject to investigation, enforcement actions by regulators or other adverse consequences.

Our obligations related to data privacy and security are quickly changing, becoming increasingly stringent, and creating uncertainty as to the applicable future legal frameworks. Additionally, these obligations may be subject to differing applications and interpretations, which may be inconsistent or in conflict among jurisdictions. Preparing for and complying with these obligations requires us to devote significant resources (including, without limitation, financial and time-related resources). These obligations may necessitate changes to our information technologies, systems, and practices and to those of any third parties that process personal data on our behalf. In addition, these obligations may require us to change our business model.

Although we endeavor to comply with all applicable data privacy and security obligations, we may at times fail (or be perceived to have failed) to do so. In addition, despite our efforts, our personnel or third parties upon whom we rely may fail to comply with such obligations.

If we or the third parties on which we rely fail, or are perceived to have failed, to address or comply with data privacy and security obligations, we could face significant consequences, including, but not limited to, government enforcement actions (e.g., investigations, fines, penalties, audits, inspections, and similar); litigation (including class action-related claims); additional reporting requirements and/or oversight; bans on processing personal data; and orders to destroy or not use personal data. Any of these events could have a material adverse effect on our reputation, business, or financial condition, including but not limited to: loss of customers; interruptions or stoppages in our business operations; inability to process personal data or to operate in certain jurisdictions; limited ability to develop or commercialize our product candidates; expenditure of time and resources to defend any claim or inquiry; adverse publicity; or revision or restructuring of our operations.

**If we fail to obtain regulatory approvals in foreign jurisdictions for DAXXIFY®, or any future product candidates, including an onabotulinumtoxinA biosimilar, we will be unable to market our products outside of the U.S.**

In addition to regulations in the U.S., we will be subject to a variety of foreign regulations governing manufacturing, clinical trials, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product candidate, we must obtain approval of the product by the comparable regulatory authorities of foreign countries before commencing clinical trials or marketing in those countries. The approval procedures vary among countries and can involve additional clinical testing, or the time required to obtain approval may differ from that required to obtain FDA approval. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries. Approval by the FDA does not ensure approval by regulatory authorities in other countries, and approval by one or more foreign regulatory authorities does not ensure approval by regulatory authorities in other foreign countries or by the FDA. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval. We may not be able to file for regulatory approvals or to do so on a timely basis, and even if we do file, we may not receive the necessary approvals to commercialize our products in geographies outside of the U.S.

Further, interruption or delays in the operations of applicable foreign regulatory agencies may affect the review and approval timelines of such agencies for DAXXIFY®, an onabotulinumtoxinA biosimilar, or the RHA® Pipeline Products or any future product candidates.

**Legislative and regulatory healthcare reform may adversely affect our business.**

From time to time, legislation is drafted that could significantly change the statutory provisions governing the regulatory clearance or approval, manufacture, and marketing of regulated products or the reimbursement thereof. In the United States, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA") changed the way Medicare covers and pays for pharmaceutical products. The legislation established Medicare Part D, which expanded Medicare coverage for outpatient prescription drug purchases by the elderly but provided authority for limiting the number of drugs that will be covered in any therapeutic class. The MMA also introduced a new reimbursement methodology based on

average sales prices for physician-administered drugs. Any negotiated prices for our products covered by a Part D prescription drug plan will likely be lower than the prices we might otherwise obtain. Moreover, while the MMA applies only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own payment rates. Any reduction in payment that results from the MMA may result in a similar reduction in payments from non-governmental payors.

In March 2010, the ACA became law in the United States. Among other things, the purpose of the ACA was to reduce the cost of healthcare and substantially change the way healthcare is financed by both governmental and private insurers. The ACA requires discounts under the Medicare drug benefit program and increased the rebates paid by pharmaceutical companies on drugs covered by Medicaid. The ACA also imposes an annual fee, which increases each year, on sales by branded pharmaceutical manufacturers. The ACA has been challenged repeatedly in court, and its future may be uncertain. If the ACA is ultimately overturned or repealed, the effect on our business could be material.

In August 2022, the current administration signed the IRA into law, which among other things, (1) directs U.S. Department of Health and Human Services to negotiate the price of certain single-source drugs and biologics covered under Medicare, and (2) imposes rebates under Medicare Part B and Medicare Part D to penalize price increases that outpace inflation. These provisions will take effect progressively starting in fiscal year 2023, although they may be subject to legal challenges. As of August 29, 2023, CMS announced its selection of the first 10 drugs covered under Medicare Part D set for negotiation. CMS will publish any agreed-upon negotiated prices for the selected drugs by September 1, 2024; those prices will come into effect starting January 1, 2026. In future years, CMS will select for negotiation up to 15 more drugs covered under Part D for 2027, up to 15 more drugs for 2028 (including drugs covered under Part B and Part D), and up to 20 more drugs for each year after that, as outlined in the IRA.

The United States and several other jurisdictions are considering, or have already enacted, a number of legislative and regulatory proposals to change their healthcare systems in ways that could affect our ability to sell our products profitably. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and/or expanding access to healthcare. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives. We expect to experience pricing pressures in connection with the sale of DAXXIFY® and our other future approved products, if any, due to the trend toward managed healthcare, the increasing influence of health maintenance organizations and additional legislative proposals. Pricing pressures recently experienced by the pharmaceutical industry may be further exacerbated by legislative and policy changes proposed or considered by the executive branch and the United States Congress. We cannot predict the success or impact of any such current or future federal or state legislative efforts.

In addition, regulations and guidance are often revised or reinterpreted by the FDA and other regulatory authorities in ways that may significantly affect our business and our products. Any new regulations or revisions or reinterpretations of existing regulations may impose additional costs or lengthen review times of any future product candidates. Such changes could, among other things, require changes to manufacturing or marketing methods, changes to product labeling or promotional materials, recall, replacement, or discontinuance of one or more of our products; and additional recordkeeping. Each of these would likely entail substantial time and cost and could materially harm our business and our financial results.

**If we market products in a manner that violates healthcare fraud and abuse laws, or if we violate government price reporting or physician payment disclosure laws, we may be subject to civil or criminal penalties.**

In addition to FDA restrictions on the marketing of pharmaceutical products, several other types of state and federal healthcare laws, commonly referred to as "fraud and abuse" laws, have been applied in recent years to restrict certain marketing practices in the pharmaceutical industry. These laws include false claims and anti-kickback statutes. It is possible that some of our business activities could be subject to challenge under one or more of these laws.

Federal false claims laws generally prohibit anyone from knowingly and willingly presenting, or causing to be presented, any claims for the payment for goods (including drugs) or services to third-party payors (including Medicare and Medicaid) that are false or fraudulent. The federal civil monetary penalties statute, likewise, imposes penalties against any person or entity that, among other things, is determined to have presented or caused to be presented a claim to a federal health program that the person knows or should know is for an item or service that was not provided as claimed or is false or

fraudulent. The FCA has been used to prosecute persons submitting claims for payment that are inaccurate or fraudulent, for services not provided as claimed, or for services that are not medically necessary. The FCA includes a whistleblower provision that allows individuals to bring actions on behalf of the federal government and share a portion of the recovery of successful claims.

The federal healthcare program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to generate business, including the purchase or prescription of a particular product covered by Medicare, Medicaid or other federally financed healthcare programs. This statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers or formulary managers on the other. Although there are several statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration intended to induce prescribing, purchasing or recommending may be subject to scrutiny if they do not qualify for an exemption or safe harbor. In addition, such exemptions and safe harbors are subject to change from time to time. Additionally, the intent standard under the federal Anti-Kickback Statute does not require that a person or entity have actual knowledge of the statute or a specific intent to violate it in order to have committed a violation. Further, the ACA codified case law that a claim submitted for reimbursement that includes items or services resulting from an arrangement that violates the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the FCA. Many states have similar laws that apply to their state healthcare programs as well as private payors.

HIPAA created additional federal criminal statutes that prohibit, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or obtain, by means of false or fraudulent pretenses, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statement, in connection with the delivery of, or payment for, healthcare benefits, items or services.

In addition, the federal transparency requirements under the Physician Payments Sunshine Act require certain manufacturers of drugs, including us, for which payment is available under certain federal healthcare programs annually to report information related to payments and other transfers of value to physicians and teaching hospitals, and physician ownership and investment interests. In addition, several states now require prescription drug companies to report expenses relating to the marketing and promotion of drug products.

Further, the U.S. Foreign Corrupt Practices Act and similar worldwide anti-bribery laws generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. We cannot assure you that our internal control policies and procedures will protect us from reckless or negligent acts committed by our employees, future distributors, partners, collaborators or agents. Violations of these laws, or allegations of such violations, could result in fines, penalties or prosecution and have a negative impact on our business, results of operations and reputation.

Finally, we may offer discounted pricing or rebates on DAXXIFY® and our future approved products, if any, under various federal and state healthcare programs, and report specific prices to government agencies under healthcare programs. The calculations necessary to determine the prices reported are complex and the failure to report prices accurately may expose us to significant penalties.

There are state law equivalents of these laws and regulations, such as anti-kickback, false claims and transparency laws, to which we are currently and/or may in the future be subject. We may also be subject to state laws that require manufacturers to report information related to payments and other transfers of value to physicians and other healthcare providers or marketing expenditures. Many of these laws differ from each other in significant ways, thus increasing the cost and complexity of our compliance efforts.

State and federal authorities, in addition to whistleblowers, have aggressively targeted pharmaceutical manufacturers for alleged violations of these anti-fraud statutes for a range of activities, such as those based on improper research or consulting contracts with physicians and other healthcare professionals, certain marketing arrangements that rely on volume-based pricing, off-label marketing schemes, inappropriate billing and other improper promotional practices. A number of pharmaceutical and other healthcare companies have been prosecuted under these laws for a variety of promotional and

marketing activities, including providing free trips, free goods, sham consulting fees and grants and other monetary benefits to prescribers; reporting inflated average wholesale prices that were then used by federal programs to set reimbursement rates; engaging in improper promotional activities; and submitting inflated best price information to the Medicaid Drug Rebate Program to reduce liability for Medicaid rebates. Companies targeted in such prosecutions have paid substantial fines in the hundreds of millions of dollars or more, have been forced to implement extensive corrective action plans, and have often become subject to consent decrees severely restricting the manner in which they conduct business. Further, defending against any such actions can be costly, time-consuming and may require significant financial and personnel resources.

If we or our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including criminal and significant civil penalties, damages, fines, imprisonment, exclusion of products from reimbursement under United States federal or state healthcare programs, and the curtailment or restructuring of our operations. Any penalties, damages, fines, curtailment or restructuring of our operations could materially and adversely affect our ability to operate our business and our financial results. Although compliance programs can mitigate the risk of investigation and prosecution for violations of these laws, the risks cannot be entirely eliminated. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Moreover, achieving and sustaining compliance with these laws may prove costly.

**Our Products and any future approved products may cause or contribute to adverse medical events that we are required to report to regulatory agencies and if we fail to do so, we could be subject to sanctions that would materially harm our business.**

As we continue commercialization of the RHA® Collection of dermal fillers and DAXXIFY®, or if we commercialize any future approved products, including an onabotulinumtoxinA biosimilar, the FDA and foreign regulatory agency regulations require that we report certain information about adverse medical events if those products may not have caused or contributed to those adverse events. The timing of our obligation to report would be triggered by the date we become aware of the adverse event as well as the nature of the event. We may fail to report adverse events we become aware of within the prescribed timeframe. We may also fail to appreciate that we have become aware of a reportable adverse event, especially if it is not reported to us as an adverse event or if it is an adverse event that is unexpected or removed in time from the use of our products. If we fail to comply with our reporting obligations, we may be subjected to various sanctions or other actions or outcomes described above. Failure to properly consider adverse event information may also lead us to delay use evaluations and potential labeling updates, which could lead to the initiation of tort litigation for failure to warn.

### Risks Related to Our Indebtedness

**Our level of indebtedness and debt service obligations could adversely affect our financial condition, and may make it more difficult for us to fund our operations.**

Under the Note Purchase Agreement, drawdowns are available in three tranches, subject to certain terms and conditions, including, with respect to the Third Tranche, the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche and prior approval from Athyrium. To date, we have borrowed the full $100.0 million of the First Tranche and the full $50.0 million of the Second Tranche. However, if we do not achieve the specified conditions and milestones, we will not be eligible to draw funds under the Third Tranche of the Note Purchase Agreement, and we may need to obtain additional or alternative financing to advance our research and development efforts, our regulatory approvals, our commercialization efforts and other aspects of our business plan. Such additional or alternative financing may not be available on attractive terms, if at all, and could be more costly for us to obtain. The Note Purchase Agreement may also limit our ability to raise capital, including our ability to sell or license intellectual property. In addition, before we can draw down the Third Tranche of the Note Purchase Agreement, if available, we must first satisfy ourselves that we will have access to sufficient cash flow from operations and/or future alternate sources of capital, in order to repay any additional principal borrowed, which we may be unable to do, in which case, our liquidity and ability to fund our operations may be substantially impaired.

All obligations under the Note Purchase Agreement are secured by substantially all of our existing property and assets. This indebtedness may create additional financing risk for us, particularly if our business or prevailing financial market conditions are not conducive to paying off or refinancing the outstanding debt obligations at maturity. If we are able

to drawdown any of the Third Tranche, our indebtedness will increase, which would further increase our risk of being unable to pay off or refinance our outstanding debt obligations at maturity. Our indebtedness could also have important negative consequences, including:

- we will need to repay the indebtedness by making payments of interest and principal, which will reduce the amount of cash available to finance our operations, our research and development efforts, our regulatory approvals, our commercialization efforts and other aspects of our business plan;
- our failure to comply with the obligations of our affirmative and restrictive covenants in the Note Purchase Agreement could result in an event of default that, if not cured or waived, would accelerate our obligation to repay this indebtedness, and Athyrium could seek to enforce its security interest in the assets securing such indebtedness;
- limit our flexibility to plan for, or react to, changes in our business and industry, or our ability to take specified actions to take advantage of certain business opportunities that may be presented to us;
- expose us to the risk of increased interest rates, as our obligations under the Note Purchase Agreement are at variable rates of interest;
- place us at a competitive disadvantage; and
- increase our vulnerability to the impact of adverse economic and industry conditions.

To the extent additional debt is added to our current debt levels, the risks described above could increase.

**The terms of the Note Purchase Agreement place restrictions on our operating and financial flexibility, and if we fail to comply with these restrictions, our business, business prospects, results of operations and financial condition may be adversely affected.**

The Note Purchase Agreement imposes operating and other restrictions on us. Such restrictions will affect, and in many respects limit or prohibit, our ability and the ability of any future subsidiaries to, among other things:

- dispose of certain assets;
- sell, transfer or exclusively license certain assets, including material intellectual property and capital stock of certain subsidiaries;
- change our line of business;
- engage in mergers, acquisitions or consolidations;
- incur additional indebtedness;
- prepay, redeem or repurchase certain debt;
- create liens on assets;
- engage in certain transactions with affiliates;
- pay dividends and make contributions or repurchase our capital stock; and
- make certain loans and investments.

The Note Purchase Agreement also contains financial covenants requiring us to (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times and (ii)

upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve months basis.

As a result of these restrictions, we may be limited in how we conduct our business; unable to raise additional debt or equity financing to operate as needed; or unable to compete effectively, take advantage of new business opportunities or grow in accordance with our plans.

The breach of any of these restrictive covenants or any other terms of the Note Purchase Agreement could result in a default under the Note Purchase Agreement, which would allow Athyrium to accelerate our obligation to repay our indebtedness under the Note Purchase Agreement, and result in a cross-acceleration or cross-default with our convertible notes or other indebtedness. In addition, an event of default may prevent us from drawing funds under the Third Tranche of the Note Purchase Agreement and may result in an increased interest rate for all amounts outstanding under the Note Purchase Agreement.

Furthermore, if we are unable to repay the amounts due and payable under the Note Purchase Agreement, Athyrium could also exercise its rights to take possession and dispose of the collateral securing the Note Purchase Agreement, which collateral includes substantially all of our property. The occurrence of any of the aforementioned events could have a material adverse effect on our business, business prospects, results of operations and financial condition.

**We may not have cash available in an amount sufficient to enable us to make interest or principal payments on our indebtedness when due.**

All principal under the Note Purchase Agreement is repayable upon the Maturity Date. And, pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes based on a principal amortization schedule. In addition, upon the occurrence of an Amortization Trigger, we are required to repay the principal of the Third Tranche in equal monthly installments beginning on the last day of the month in which the Amortization Trigger occurred and continuing through the Maturity Date. Our ability to make scheduled payments on or to refinance our indebtedness depends on our future performance and ability to raise additional sources of cash, which is subject to economic, financial, market, competitive, regulatory and other factors beyond our control. If we are unable to generate sufficient cash to service our debt, we may be required to adopt one or more alternatives, such as selling assets, restructuring our debt or obtaining additional equity capital on terms that may be onerous or highly dilutive, to the extent permitted by the Note Purchase Agreement. If we desire to refinance our indebtedness, our ability to do so will depend on the capital and lending markets and our financial condition at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations.

Failure to satisfy our current and future obligations under the Note Purchase Agreement could result in an event of default. In addition, the Note Purchase Agreement includes customary affirmative and negative covenants and other events of default, the occurrence and continuance of which provide Athyrium with the right to demand immediate repayment of all principal and unpaid interest under the Note Purchase Agreement, and to exercise remedies against us and the collateral securing the Note Purchase Agreement. These events of default include, among other things:

- insolvency, liquidation, bankruptcy or similar events;
- failure to observe any covenant or secured obligation under the Note Purchase Agreement, subject to a cure period for some covenants and obligations;
- occurrence of an event that could reasonably be expected to have a material adverse effect;
- material misrepresentations;
- occurrence of any default under any other agreement involving indebtedness in excess of specified amounts, or the occurrence of a default under any agreement that could reasonably be expected to have a material adverse effect on us;
- certain judgments being entered against us or any portion of our assets are attached or seized; and



REV_DAX-03338677
DTX-370.0072

- certain governmental and regulatory actions.

In the event of default, Athyrium could accelerate all of the amounts due under the Note Purchase Agreement. Under such circumstances, we may not have enough available cash or be able to raise additional funds through equity or debt financings or other strategic transactions to repay such indebtedness at the time of such acceleration, which would adversely affect the market price of our common stock and our ability to continue operations. Athyrium could also exercise other rights as discussed above in "—We may not have cash available in an amount sufficient to enable us to make interest or principal payments on our indebtedness when due." Our business, business prospects, results of operations and financial condition could be materially adversely affected as a result of any of these events.

**Servicing our debt requires a significant amount of cash, and we may not have sufficient cash flow from our business to pay our substantial debt.**

Our ability to make scheduled payments of the principal of, to pay interest on or to refinance our indebtedness, including the 2027 Notes and Notes Payable, depends on our future performance, which is subject to economic, financial, competitive and other factors beyond our control, including global macroeconomic effects of the COVID-19 pandemic. Our business may not continue to generate cash flow from operations in the future sufficient to service our debt and make necessary capital expenditures. If we are unable to generate such cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive. Our ability to refinance our indebtedness will depend on the capital markets and our financial condition at such time. We may not be able to engage in any of these activities or engage in these activities on desirable terms, which could result in a default on our debt obligations.

**We may not have the ability to raise the funds necessary to settle conversions of the 2027 Notes in cash or to repurchase the 2027 Notes upon a fundamental change, and our future debt may contain limitations on our ability to pay cash upon conversion or repurchase of the 2027 Notes.**

Holders of the 2027 Notes will have the right to require us to repurchase all or a portion of their 2027 Notes upon the occurrence of a fundamental change (as defined in the Indenture for the 2027 Notes) at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus accrued and unpaid interest, if any. In addition, upon conversion of the 2027 Notes, unless we elect to deliver solely shares of our common stock to settle such conversion (other than paying cash in lieu of delivering any fractional share), we will be required to make cash payments in respect of the 2027 Notes being converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make repurchases of the 2027 Notes surrendered therefor or notes being converted. In addition, our ability to repurchase the 2027 Notes or to pay cash upon conversions of the 2027 Notes may be limited by law, by regulatory authority, by the Note Purchase Agreement or by agreements governing our future indebtedness. Our failure to repurchase the 2027 Notes at a time when the repurchase is required by the Indenture or to pay any cash payable on future conversions of the 2027 Notes as required by the Indenture would constitute a default under the Indenture. A default under the Indenture or the fundamental change itself could also lead to a default under agreements governing our future indebtedness. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and repurchase the 2027 Notes or make cash payments upon conversions thereof.

**The conditional conversion feature of the 2027 Notes, if triggered, may adversely affect our financial condition and operating results.**

In the event the conditional conversion feature of the 2027 Notes is triggered, holders of 2027 Notes will be entitled to convert the 2027 Notes at any time during specified periods at their option. If one or more holders elect to convert their 2027 Notes, unless we elect to satisfy our conversion obligation by delivering solely shares of our common stock (other than paying cash in lieu of delivering any fractional share), we would be required to settle a portion or all of our conversion obligation through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their 2027 Notes, we could be required under applicable accounting rules to reclassify all or a portion of the outstanding principal of the 2027 Notes as a current rather than long-term liability, which would result in a material reduction of our net working capital.

**Conversion of the 2027 Notes may dilute the ownership interest of our stockholders or may otherwise depress the price of our common stock.**

The conversion of some or all of the 2027 Notes may dilute the ownership interests of our stockholders. Upon conversion of the 2027 Notes, we have the option to pay or deliver, as the case may be, cash, shares of our common stock, or a combination of cash and shares of our common stock. If we elect to settle our conversion obligation in shares of our common stock or a combination of cash and shares of our common stock, any sales in the public market of our common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock. In addition, the existence of the 2027 Notes may encourage short selling by market participants because the conversion of the 2027 Notes could be used to satisfy short positions, or anticipated conversion of the 2027 Notes into shares of our common stock could depress the price of our common stock.

## General Risk Factors

**The trading price of our common stock is volatile, and purchasers of our common stock could incur substantial losses.**

The trading price of our common stock is highly volatile and could be subject to wide fluctuations in response to various factors, some of which are beyond our control. For example, the closing price of our common stock from December 31, 2022 to December 31, 2023 has ranged from a low of $5.81 to a high of $37.61. The stock markets in general and the markets for pharmaceutical biopharmaceutical and biotechnology stocks in particular have experienced extreme volatility that may have been for reasons that are related or unrelated to the operating performance of the issuer. The market price for our common stock may be influenced by many factors, including:

- announcements of regulatory approval or disapproval of DAXXIFY® in additional indications, the RHA® Pipeline Products or any future product candidates;
- regulatory or legal actions, developments and guidance in the U.S. and foreign countries, such as the receipt of the CRL related to the BLA for DAXXIFY® GL Approval;
- our success or lack of success in commercializing our Products;
- pricing and reimbursement decisions with respect to our Products;
- results from or delays in clinical trials of our product candidates;
- introductions and announcements of new products by us, any commercialization partners or our competitors, and the timing of these introductions and announcements;
- variations in our financial results or those of companies that are perceived to be similar to us;
- changes in the structure of healthcare payment systems;
- announcements by us or our competitors of significant acquisitions, restructuring activities, licenses, strategic partnerships, joint ventures or capital commitments;
- the occurrence of adverse consequences pursuant to our financing arrangements;
- market conditions in the pharmaceutical and biotechnology sectors and issuance of securities analysts' reports or recommendations;
- quarterly variations in our results of operations or those of our future competitors;
- changes in financial estimates or guidance, including our ability to meet our future revenue, operating profit or loss and operating expenses estimates or guidance;

- sales of substantial amounts of our stock by insiders and large stockholders, or the expectation that such sales might occur;
- general economic, industry and market conditions;
- adverse tax laws or regulations enacted or existing laws applied to us or our customers;
- additions or departures of key personnel;
- intellectual property, product liability or other litigation against us;
- unanticipated safety concerns related to the use of our Products or any of our future products;
- expiration or termination of our potential relationships with customers and strategic partners;
- the occurrence of trade wars or barriers, or the perception that trade wars or barriers will occur;
- any buying or selling of shares of our common stock or other hedging transactions in our common stock in connection with the 2027 Notes or the capped call transactions;
- widespread public health crises such as the COVID-19 pandemic; and
- other factors described in this "Risk Factors" section.

These broad market fluctuations may adversely affect the trading price or liquidity of our common stock, regardless of our actual operating performance. In addition, in the past, stockholders have initiated class actions against pharmaceutical companies, including us, following periods of volatility in their stock prices. Such litigation instituted against us could cause us to incur substantial costs and divert management's attention and resources.

**If securities or industry analysts do not publish research or publish unfavorable research about our business, our stock price and trading volume could decline.**

The trading market for our common stock depends, in part, on the research and reports that securities or industry analysts publish about us or our business. Securities and industry analysts may cease to publish research on our company at any time in their discretion. A lack of research coverage may adversely affect the liquidity and market price of our common stock. We will not have any control of the equity research analysts or the content and opinions included in their reports. The price of our stock could decline if one or more equity research analysts downgrade our stock or issue other unfavorable commentary or research. If one or more equity research analysts ceases coverage of our company, or fails to publish reports on us regularly, demand for our stock could decrease, which in turn could cause our stock price or trading volume to decline.

**Sales of substantial amounts of our common stock in the public markets, or the perception that such sales might occur, could cause the market price of our common stock to drop significantly, even if our business is doing well.**

Sales of a substantial number of shares of our common stock in the public market could occur at any time. From January 1, 2022 through May 10, 2022, we sold 1.7 million shares of common stock under the 2020 ATM Agreement at a weighted average price of $18.71 per share resulting in net proceeds of $31.6 million after sales agent commissions and offering costs. The 2020 ATM Agreement was terminated on May 10, 2022. On May 10, 2022, we entered into the 2022 ATM Agreement with Cowen. Under the 2022 ATM Agreement, we may sell up to $150.0 million of our common stock. As of both December 31, 2023 and the filing date of this Report, we have sold 3.2 million of shares of common stock under the 2022 ATM Agreement.

On September 15, 2022, we completed an underwritten follow-on offering, pursuant to which we issued 9.2 million shares of common stock at an offering price of $25.00 per share, including the exercise of the underwriters' over-allotment option to purchase 1.2 million additional shares of common stock, for aggregate net proceeds of $215.9 million, after deducting underwriting discounts, commissions and other offering expenses.

If our stockholders sell, or the market perceives that our stockholders intend to sell, substantial amounts of our common stock in the public market, the market price of our common stock could decline significantly.

**Provisions in our corporate charter documents and under Delaware law could discourage takeover attempts and lead to management entrenchment, and the market price of our common stock may be lower as a result.**

Certain provisions in our amended and restated certificate of incorporation and amended and restated bylaws may make it difficult for a third party to acquire, or attempt to acquire, control of the Company, even if a change in control was considered favorable by you and other stockholders. For example, our board of directors has the authority to issue up to 5,000,000 shares of preferred stock. Our board of directors can fix the price, rights, preferences, privileges, and restrictions of the preferred stock without any further vote or action by our stockholders. The issuance of shares of preferred stock may delay or prevent a change in control transaction. As a result, the market price of our common stock and the voting and other rights of our stockholders may be adversely affected. An issuance of shares of preferred stock may result in the loss of voting control to other stockholders.

Our charter documents also contain other provisions that could have an anti-takeover effect, including:

- only one of our three classes of directors will be elected each year;
- no cumulative voting in the election of directors;
- the ability of our board of directors to issues shares of preferred stock and determine the price and other terms of those shares, including preferences and voting rights, without stockholder approval;
- the exclusive right of our board of directors to elect a director to fill a vacancy or newly created directorship;
- stockholders will not be permitted to take actions by written consent;
- stockholders cannot call a special meeting of stockholders;
- stockholders must give advance notice to nominate directors or submit proposals for consideration at stockholder meetings;
- the ability of our board of directors, by a majority vote, to amend the bylaws; and
- the requirement for the affirmative vote of at least 66 2/3 percent or more of the outstanding common stock to amend many of the provisions described above.

Also, our amended and restated bylaws provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders or to nominate candidates for election as directors at our annual meeting of stockholders. Our amended and restated bylaws also specify certain requirements regarding the form and content of a stockholder's notice. In addition, any stockholder nomination must meet the requirements of Rule 14a-19(b) under the Exchange Act. These provisions might preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders if the proper procedures are not followed. We expect that these provisions might also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

In addition, we are subject to the anti-takeover provisions of Section 203 of the DGCL, which regulates corporate acquisitions. These provisions could discourage potential acquisition proposals and could delay or prevent a change in control transaction. They could also have the effect of discouraging others from making tender offers for our common stock, including transactions that may be in your best interests. These provisions may also prevent changes in our management or limit the price that certain investors are willing to pay for our stock.

Our amended and restated bylaws and amended and restated certificate of incorporation also provide that the Delaware Court of Chancery (or, if the Delaware Court of Chancery does not have jurisdiction, any state court located in

Delaware or if all the state courts lack jurisdiction, the federal district court for the District of Delaware) and any appellate court therefrom will be the exclusive forum for the following types of actions or proceedings under Delaware statutory or common law:

- any derivative action, suit or proceeding brought on behalf of the Company;
- any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Company to the Company or the Company's stockholders or any action asserting a claim for aiding and abetting any such breach of fiduciary duty;
- any action, suit or proceeding asserting a claim against the Company or any current or former director, officer, or other employee of the Company arising out of or pursuant to, or seeking to enforce any right, obligation or remedy under, or to interpret, apply, or determine the validity of, any provision of the DGCL, the amended and restated certificate of incorporation, or the amended and restated bylaws (as each may be amended from time to time);
- any action, suit, or proceeding as to which the DGCL confers jurisdiction on the Delaware Court of Chancery, and
- any action, suit or proceeding asserting a claim against the Company or any current or former director, officer, or other employee of the Company governed by the internal-affairs doctrine.

This provision would not apply to actions, suits or proceedings brought to enforce a duty or liability created by the Exchange Act, or any other claim for which the federal courts have exclusive jurisdiction. In addition, our amended and restated bylaws provide that, unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any claims arising under the Securities Act. The exclusive forum provisions contained in our amended and restated certificate of incorporation and amended and restated bylaws may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find the exclusive-forum provision in our amended and restated certificate of incorporation or amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could harm our business.

**Claims for indemnification by our directors and officers may reduce our available funds to satisfy successful third-party claims against us and may reduce the amount of money available to us.**

Our amended and restated certificate of incorporation and amended and restated bylaws provide that we will indemnify our directors and officers, in each case to the fullest extent permitted by Delaware law.

In addition, as permitted by Section 145 of the DGCL, our amended and restated bylaws and our indemnification agreements that we have entered into with our directors and officers provide that:

- We will indemnify our directors and officers for serving us in those capacities, or for serving other business enterprises at our request, to the fullest extent permitted by Delaware law. Delaware law provides that a corporation may indemnify such person if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the registrant and, with respect to any criminal proceeding, had no reasonable cause to believe such person's conduct was unlawful.
- We may, in our discretion, indemnify employees and agents in those circumstances where indemnification is permitted by applicable law.
- We are required to advance expenses, as incurred, to our directors and officers in connection with defending a proceeding, except that such directors or officers shall undertake to repay such advances if it is ultimately determined that such person is not entitled to indemnification.

- We will not be obligated pursuant to our amended and restated bylaws to indemnify a person with respect to proceedings initiated by that person against us or our other indemnitees, except with respect to proceedings authorized by our board of directors or brought to enforce a right to indemnification.
- The rights conferred in our amended and restated bylaws are not exclusive, and we are authorized to enter into indemnification agreements with our directors, officers, employees and agents and to obtain insurance to indemnify such persons.
- We may not retroactively amend our amended and restated bylaw provisions to reduce our indemnification obligations to directors, officers, employees and agents.

As a result, claims for indemnification by our directors and officers may reduce our available funds to satisfy successful third-party claims against us and may reduce the amount of money available to us.

**Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be your sole source of gains.**

We have not declared or paid cash dividends on our common stock to date. We currently intend to retain our future earnings, if any, to fund the development and growth of our business. In addition, the terms of the Note Purchase Agreement and any future debt agreements may contain similar restrictions. As a result, capital appreciation, if any, of our common stock will be your sole source of gain for the foreseeable future. There is no guarantee that our common stock will appreciate or even maintain the price at which our stockholders have purchased it and it is possible that you may never receive a return on your investment.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

None.

**ITEM 1C. CYBERSECURITY**

Cybersecurity represents a critical component of the Company's overall approach to risk management. The Company's cybersecurity standards and practices are guided by CIS's Critical Security Controls, which provides a framework for prioritizing best practices to improve the Company's cyber security measures.

The Company, using CIS's guidance, approaches cybersecurity threats, through a cross-functional, multilayered approach, for purposes of: (i) identifying, preventing and mitigating cybersecurity threats to the Company; (ii) preserving the confidentiality, integrity and availability of the information that we collect and store to use in our business; (iii) protecting the Company's intellectual property; (iv) maintaining the confidence of our customers, consumers, patients and business partners; and (v) providing appropriate public disclosure of cybersecurity risks and incidents when required.

***Risk Management and Strategy***

The Company's cybersecurity program focuses on the following areas:

**Vigilance**: The Company's endpoints and networks are monitored 24/7 by its security operations center and the Company conducts periodic reviews and testing to prevent and mitigate cybersecurity threats and respond to cybersecurity incidents.

**Systems Safeguards**: The Company deploys systems safeguards that are designed to protect the Company's information systems from cybersecurity threats, including firewalls, intrusion prevention and detection systems, anti-malware functionality and access controls, which are evaluated and improved through vulnerability assessments and cybersecurity threat intelligence.

**Collaboration**: The Company collaborates with public and private entities, including intelligence and law enforcement agencies, industry groups and third-party service providers, to identify, assess and respond to cybersecurity risks.

**Training**: The Company provides periodic training for personnel regarding cybersecurity threats, which reinforces the Company's information security policies, standards and practices.

**Incident Response and Recovery Planning**: The Company has established and maintains incident response and recovery plans that address the Company's response to a cybersecurity incident and the recovery from a cybersecurity incident, and such plans are evaluated annually.

**Communication, Coordination and Disclosure**: The Company utilizes a cross-functional approach to address the risk from cybersecurity threats, involving management personnel from the Company's IT, legal, enterprise risk and compliance, internal audit and other key business functions, as well as the members of the Board and the Audit Committee in an ongoing dialogue regarding cybersecurity threats and incidents, while also implementing controls and procedures for the escalation of cybersecurity incidents pursuant to established thresholds so that decisions regarding the disclosure and reporting of such incidents can be made by management in a timely manner.

**Governance**: The Board's oversight of cybersecurity risk management is supported by the Audit Committee, which regularly interacts with the company's Chief Financial Officer, the Company's VP of Information Technology, other members of management and the Company's external Chief Information Security Officer.

A key part of the Company's strategy, informed by CIS's guidance, for managing risks from cybersecurity threats is the regular evaluation, ongoing assessment and testing of the Company's processes and practices through assessments, tabletop exercises, threat modeling, penetration testing, employee training and testing (including on phishing scams), and other exercises focused on evaluating the effectiveness of our cybersecurity measures. The Company engages third parties to perform assessments of our cybersecurity measures, including information security maturity assessments and independent reviews of our information security control environment and operating effectiveness. The results of such assessments and reviews are reported to the Audit Committee and the Board, and the Company adjusts its cybersecurity policies, standards, processes and practices as necessary based on the information provided by the assessments, audits and reviews.

***Governance***

The Board, in coordination with the Audit Committee, oversees the management of risks from cybersecurity threats, including the policies, standards, processes and practices that the Company's management implements to address risks from cybersecurity threats. The Board and the Audit Committee each receive regular presentations and reports on cybersecurity risks, which address a wide range of topics including, for example, recent developments, evolving standards, vulnerability assessments, third-party and independent reviews, the threat environment, technological trends and information security considerations arising with respect to the Company's peers and third parties. The Audit Committee also receives prompt and timely information regarding any cybersecurity incident that meets preestablished factors, as well as ongoing updates regarding such incident until it has been resolved. Cybersecurity events that meet specified criteria are also escalated to the Disclosure Committee. At least once each year, the Audit Committee holds a meeting dedicated to cybersecurity matters, in addition to receiving quarterly updates on cybersecurity matters at regularly scheduled Audit Committee meetings. On an annual basis, Company management presents to the Board on the Company's approach to cybersecurity risk management.

The Company's VP of Information Technology is the member of the Company's management that is principally responsible for overseeing the Company's cybersecurity risk management program, in partnership with the Company's Chief Financial Officer and other business leaders across the Company, including in cybersecurity and legal and enterprise risk & commercial compliance. The VP of Information Technology has over twenty years of technology experience, during which his responsibilities have included technology operations, third-party assessments and risk management.

The Company has established a Core Incident Response Team, which is comprised of the VP of Information Technology and members of the cybersecurity, legal and enterprise risk & commercial compliance teams. The Core Incident Response Team works with other members of the Company's management and collaboratively across the Company to promptly respond to cybersecurity incidents in accordance with the Company's incident response and recovery plans. Through the ongoing communications from these teams, the Core Incident Response Team, along with the Chief Financial Officer, monitors the prevention, detection, mitigation and remediation of cybersecurity incidents in real time. Cybersecurity events that meet specified criteria are escalated for further review by the Audit Committee and/or the Disclosure Committee.

The Disclosure Committee assesses and determines materiality based on the information provided by the Incident Response Team and makes recommendations to the Chief Financial Officer regarding disclosure.

In addition, the Company's VP of Information Technology works closely with an external Chief Information Security Officer to provide valuable perspectives and industry insights into evaluating cybersecurity threats. The Chief Information Security Officer has over twenty-five years of experience in cross-vertical security, software, and systems engineering.

To date, no risks from cybersecurity threats, including as a result of any previous cybersecurity incidents, have materially affected or are reasonably likely to materially affect the Company, including our business strategy, results of operations or financial condition.

**ITEM 2. PROPERTIES**

Our headquarters is located in Nashville, Tennessee, where we lease 80,500 square feet of space. The space adequately serves as our headquarters and experience center, which includes office space, education and training facilities and a live injection training center. We also lease 109,318 square feet of office, laboratory and manufacturing space in Newark, California, which supports our regulatory, pre-commercial and research and development manufacturing activities. Operations across the Product Segment and Services Segment are conducted in each facility except for the Newark facility, which supports Product Segment operations.

**ITEM 3. LEGAL PROCEEDINGS**

From time to time, we may be involved in litigation relating to claims arising out of our operations. Such matters are subject to uncertainty and there can be no assurance that such legal proceedings will not have a material adverse effect on our business, results of operations, financial position or cash flows.

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and our and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan, U.S. Patent No. 11,147,878. On December 17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021 in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss. On March 8, 2023, the lead plaintiff filed an opposition to our motion to dismiss. On April 7, 2023, we filed a reply in support of our motion to dismiss. A hearing on our motion to dismiss took place on August 10, 2023, and we are awaiting a decision from the court. We cannot be certain of whether that motion to dismiss will be granted.

We dispute the claims in these lawsuits and intend to defend the matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcome of the lawsuits is necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

## PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock has been trading on the Nasdaq Global Market under the symbol "RVNC" since our initial public offering on February 6, 2014. Prior to this date, there was no public market for our common stock.

**Holders of Record**

As of February 16, 2024, there were approximately 155 holders of record of our common stock, one of which was Cede & Co., a nominee for DTC. All of the shares of our common stock held by brokerage firms, banks and other financial institutions as nominees for beneficial owners are deposited into participant accounts at DTC and are therefore considered to be held of record by Cede & Co. as one stockholder.

**Dividend Policy**

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any determination to pay dividends in the future will be at the discretion of our board of directors and will be dependent on a number of factors, including our earnings, capital requirements, overall financial conditions, business prospects, contractual restrictions and other factors our board of directors may deem relevant.

**Stock Price Performance Graph**

This performance graph shall not be deemed "soliciting material" or "filed" with the SEC for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities under that Section, and shall not be deemed incorporated by reference into any of our filings under the Securities Act or Exchange Act, except as shall be expressly set forth by specific reference in such filing.




This graph shows a comparison of the cumulative total return on our common stock, NBI, and the CCMP for the five years ended December 31, 2023. The graph assumes that $100 was invested at the market close on the last trading day for the year ended December 31, 2018 in our common stock, the NBI, and CCMP, and assumes the reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.

| Company/Index | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 |
|---|---|---|---|---|---|---|
| Revance Therapeutics, Inc. | $ 100.00 | $ 80.63 | $ 140.78 | $ 81.07 | $ 91.70 | $ 43.67 |
| Nasdaq Biotechnology Index | $ 100.00 | $ 125.11 | $ 158.17 | $ 158.20 | $ 142.19 | $ 148.72 |
| Nasdaq Composite Index | $ 100.00 | $ 136.69 | $ 198.10 | $ 242.03 | $ 163.28 | $ 236.17 |

**Recent Sales of Unregistered Securities**

None.

**Issuer Purchases of Equity Securities**

We have not and do not currently intend to retire or repurchase any of our shares of common stock other than providing our employees with the option to withhold shares to satisfy tax withholding amounts due from employees upon the vesting of RSAs/PSAs in connection with our 2014 EIP, 2014 IN and the HintMD Plan.

**ITEM 6. [RESERVED]**

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to help the reader understand our results of operations and financial condition. MD&A is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements and the accompanying notes to the consolidated financial statements and other disclosures included in this Report. In addition to our historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates, and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this Report, particularly in Part I, Item 1A, "Risk Factors." Our audited consolidated financial statements have been prepared in accordance with GAAP and are presented in U.S. dollars.*

### Overview

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

### Impact of the Macroeconomic Environment on Our Operations

The U.S. and global financial markets have experienced significant volatility in recent years, which has led to disruptions to commerce and pricing stability, impacts to foreign exchange rates, labor shortages, global inflation, higher interest rates and supply chain disruptions. Due to current inflationary pressures, we have experienced higher costs throughout our business, which we expect may continue during 2024.

The ultimate impact of the current and anticipated global economic conditions is highly uncertain and we do not yet know the full extent of potential delays or impacts on our regulatory process, our manufacturing operations, supply chain, end user demand for our Products, commercialization efforts, business operations, clinical trials and other aspects of our business and the aesthetics industry, the healthcare systems or the global economy as a whole.

See Part I, Item 1A, "Risk Factors — Worldwide economic and market conditions, an unstable economy, a decline in consumer-spending levels and other adverse developments, including inflation, could adversely affect our business, results of operations and liquidity, and stock price."

### Key 2023 Developments

### Revance Aesthetics

For the year ended December 31, 2023, we generated $224.9 million in revenue from the sale of our Products and our Services. As of December 31, 2023, we had over 7,000 aesthetic accounts across our Products business, and of those accounts, over 3,000 accounts ordered DAXXIFY®.

#### *DAXXIFY®*

Following the completion of our PrevU program in March 2023, we initiated the targeted commercial launch of DAXXIFY®. Based on real-world learnings and customer feedback, in September 2023, we introduced new pricing for DAXXIFY® to further encourage adoption and market penetration. Revenue increased from $22.0 million for the three months ended September 30, 2023 to $24.0 million for the three months ended December 31, 2023, and the volume sold during the three months ended December 31, 2023 increased by 22% compared to the three months ended September 30, 2023. For the years ended December 31, 2023 and 2022, we recognized $84.0 million and $11.0 million in product revenue from the sale of DAXXIFY®, respectively.

***RHA® Collection of Dermal Fillers***

For the years ended December 31, 2023 and 2022, we recognized $128.6 million and $107.2 million in Product revenue from the sale of the RHA® Collection of dermal fillers, respectively, which represented an increase of $21.5 million, or 20%, period over period, due to increased units sold.

**Revance Therapeutics**

In August 2023, the FDA approved DAXXIFY® for the treatment of cervical dystonia in adults, and in September 2023, we initiated PrevU, our early experience program for the product. As with our early experience program for aesthetics, PrevU focuses on providing practices with product education, tools for practice integration, and the opportunity to gain real-world clinical insights for DAXXIFY® with the goal of optimizing therapeutic outcomes. As of the date of this Report, coverage for DAXXIFY® for the treatment of cervical dystonia has been secured for more than 140 million commercial lives, which includes 25 of the top 30 payors in the country, representing over 50% of commercial lives covered. In January 2024, the Company received a permanent J-Code for DAXXIFY®. We expect the commercial launch to begin in mid-year 2024.

**CMO Partnerships**

In March 2023, the FDA approved our PAS submission for the ABPS manufacturing facility. Following approval, the ABPS manufacturing facility began serving as our primary commercial drug product supply source for DAXXIFY®. In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Services Agreement through December 31, 2027 and modified our remedies with respect to non-conforming products and delays. The minimum payments for the year ending December 31, 2024 have not been established.

**Fosun Partnership**

In April and July 2023, the NMPA accepted Fosun's BLA for DaxibotulinumtoxinA for Injection for the improvement of glabellar lines and treatment of cervical dystonia, respectively. The anticipated approvals for both indications are expected in 2024. We are entitled to receive additional milestone payments from Fosun upon approval of DaxibotulinumtoxinA for Injection in China, as well as milestones based on future commercial sales in Fosun territories.

**Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business because the significant costs and resources required to support OPUL® no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities predominantly included a reduction in OPUL® personnel headcount, the termination of OPUL® research and development activities and a reduction of outside services expenses related to OPUL®. Substantially all payment processing activities for OPUL® customers ended on January 31, 2024. We are currently in the process of completing activities to wind-down the remaining OPUL® platform operations, which we expect to be complete by March 31, 2024. In the first quarter of 2024, the Service Segment will be presented as a discontinued operation with certain prior period amounts retrospectively revised to reflect this change.

In connection with the exit of the Fintech Platform business, for the year ended December 31, 2023, we recorded a restructuring charge, primarily consisting of non-cash impairment charges from goodwill and intangible assets of $93.2 million and severance and related costs of $2.9 million. We expect to incur estimated additional restructuring charges of up to $2 million, and such restructuring charges will be incurred through, on or around, March 31, 2024. See Part IV, Item 15. "Notes to Consolidated Financial Statements — Note 4 — Restructuring" in this Report for additional information regarding restructuring charges.

**Disciplined Capital Allocation**

In 2023, our capital resources were focused on supporting our strategic priorities, which included: (i) continuing to drive revenue growth by increasing adoption of DAXXIFY® and the RHA® Collection of dermal fillers; (ii) initiating DAXXIFY® cervical dystonia PrevU program and pre-launch activities; and (iii) maximizing supply chain efficiencies by leveraging and scaling commercial production of DAXXIFY® through ABPS. To align our operations with our capital

allocation priorities, the Company made the decision to exit its Fintech Platform business. We will continue to assess expense management and the timing of capital allocation measures as it relates to our therapeutics pipeline activities and international regulatory investments for DAXXIFY®. See—"Liquidity and Capital Resources" for additional information.

**Results of Operations**

A discussion regarding our financial condition and results of operations for the year ended December 31, 2023 compared to the same period in 2022 is presented below. For a discussion regarding our financial condition and results of operations for the year ended December 31, 2022 compared to the same period in 2021, see Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations" of our FY 2022 Annual Report.

***Revenue***

| | Years Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands, except percentages)** | **2023** | **2022** | **Change** | **% Change** |
| Product revenue | $ 212,658 | $ 118,131 | $ 94,527 | 80 % |
| Service revenue | 12,249 | 6,990 | $ 5,259 | 75 % |
| Collaboration revenue | 9,133 | 7,444 | $ 1,689 | 23 % |
| Total revenue | $ 234,040 | $ 132,565 | $ 101,475 | 77 % |

*Product Revenue*

Our breakdown of revenue by Product is summarized below:

| | Years Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands)** | **2023** | **2022** | **Change** | **% Change** |
| Product: | | | | |
| RHA® Collection of dermal fillers | $ 128,647 | $ 107,156 | $ 21,491 | 20 % |
| DAXXIFY® | 84,011 | 10,975 | $ 73,036 | 665 % |
| Total product revenue | $ 212,658 | $ 118,131 | $ 94,527 | 80 % |

We started to generate product revenue from DAXXIFY® in the fourth quarter of 2022 from the pre-launch promotional PrevU program for select practice partners. We completed the PrevU program in March 2023, which was followed by the targeted commercial launch of DAXXIFY®. Based on real-world learnings and customer feedback, in September 2023 we introduced a new pricing for DAXXIFY® which reduced our average selling price. During the three months ended December 31, 2023, product revenue from DAXXIFY® increased by 9% as volume sold increased by 22% compared to the three months ended September 30, 2023, offset by a lower average selling price resulting from the new pricing strategy discussed above.

For the year ended December 31, 2023, our product revenue from the sale of DAXXIFY® increased compared to the same period in 2022 primarily due to the full year of DAXXIFY® sales in 2023 compared to a partial year of DAXXIFY® sales in 2022. For the year ended December 31, 2023, our product revenue from the sale of the RHA® Collection of dermal fillers increased compared to the same period in 2022 primarily due to an increase in units of the RHA® Collection of dermal fillers sold.

*Service Revenue*

Service revenue is generated from the Fintech Platform, which earned revenues through payment processing fees and certain value-added services. Although we have substantially exited the Fintech Platform business, we continued to recognize service revenue from the Fintech Platform until the completion of the wind down of the payment operations on or around January 31, 2024. In our HintMD Platform service offerings, which substantially ceased during the second quarter of

2023, we recognized service revenue net of costs as an accounting agent. In our OPUL® service offerings, we recognized service revenue on a gross basis as the accounting principal because we maintained control of the service offerings to our customers. For the year ended December 31, 2023, our service revenue increased compared to the same period in 2022, primarily due to the presentation difference in the revenue accounting method used for the HintMD Platform and OPUL® Platform.

*Collaboration Revenue*

We are actively developing an onabotulinumtoxinA biosimilar in collaboration with Viatris. As described in Part IV, Item 15. "Notes to Consolidated Financial Statements —Note 3—Revenue," we generally recognize collaboration revenue for the onabotulinumtoxinA biosimilar program based on the determined transactions price of the contract multiplied by the quotient of the cost of development services incurred over the total estimated cost of development services for the expected duration of our performance obligations. ASC Topic 606, Revenue from Contracts with Customers (ASC 606) requires that an entity include a constraint on the amount of variable consideration included in the transaction price. Variable consideration is considered "constrained" if there is a potential for significant reversal of cumulative revenue recognized. As part of the constraint evaluation, we considered numerous factors, including a shift in certain responsibilities between the two parties which would result in changes to the net cost sharing payments and the total project budget, for which outcomes are difficult to predict as of the date of this Report. We will continue to evaluate the variable transaction price and related revenue recognition in each reporting period and as the above uncertainties are resolved or other changes in circumstances occur. For the years ended December 31, 2023 and 2022, we recognized $9.0 million and $7.1 million related to the development services under the Viatris Agreement, respectively. For the year ended December 31, 2023, our collaboration revenue increased compared to the same period in 2022, primarily due to increased development activities of the onabotulinumtoxinA biosimilar program.

We are also working with Fosun to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory under the Fosun License Agreement. As described in Part IV, Item 15. "Notes to Consolidated Financial Statements —Note 3—Revenue," we evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. For the years ended December 31, 2023 and 2022, revenue of $0.2 million and $0.3 million was recognized from the Fosun License Agreement, respectively.

***Operating Expenses***

| | Years Ended December 31, | | 2023 vs. 2022 | | |
|---|---|---|---|---|---|
| **(in thousands)** | **2023** | **2022** | | **Change** | **% Change** |
| Operating expenses: | | | | | |
| Cost of product revenue (exclusive of amortization) | 62,335 | 44,414 | $ | 17,921 | 40 % |
| Cost of service revenue (exclusive of amortization) | 12,028 | 7,253 | $ | 4,775 | 66 % |
| Selling, general and administrative | 297,732 | 223,934 | $ | 73,798 | 33 % |
| Research and development | 79,410 | 101,286 | $ | (21,876) | (22)% |
| Goodwill impairment | 77,175 | 69,789 | $ | 7,386 | 11 % |
| Intangible asset impairment | 16,007 | — | $ | 16,007 | N/M |
| Amortization | 6,130 | 27,847 | $ | (21,717) | (78)% |
| Total operating expenses | 550,817 | 474,523 | $ | 76,294 | 16 % |

N/M - Percentage not meaningful



REV_DAX-03338692
DTX-370.0087

***Cost of Product Revenue (exclusive of amortization)***

| | Years Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands, except percentages)** | **2023** | **2022** | **Change** | **% Change** |
| Cost of product revenue (exclusive of amortization) | | | | |
| Purchasing and manufacturing costs | $ 54,221 | $ 41,635 | $ 12,586 | 30 % |
| Distribution, royalty and other fulfillment charges | 6,740 | 2,779 | $ 3,961 | 143 % |
| Stock-based compensation | 1,374 | — | $ 1,374 | N/M |
| Total cost of product revenue (exclusive of amortization) | $ 62,335 | $ 44,414 | $ 17,921 | 40 % |

N/M - Percentage not meaningful

Cost of product revenue (exclusive of amortization) primarily consists of the purchasing cost of the RHA® Collection of dermal fillers and manufacturing costs of DAXXIFY®, distribution expenses, royalty, other fulfillment costs related to the RHA® Collection of dermal fillers and DAXXIFY®, and stock-based compensation expenses related to manufacturing efforts.

We obtained DAXXIFY® GL Approval in September 2022, and the first delivery of DAXXIFY® to a customer took place in the fourth quarter of 2022. Cost of product revenue (exclusive of amortization) related to DAXXIFY® is generally incurred when delivered. Substantially all of DAXXIFY® manufacturing expenses incurred prior to DAXXIFY® GL Approval were classified as research and development expenses, resulting in Zero-cost Inventory.

Our cost of product revenue (exclusive of amortization) for the year ended December 31, 2023 increased compared to the same period in 2022, which was primarily due to higher sales volumes of the RHA® Collection of dermal fillers and DAXXIFY® and costs related to manufacturing delays resulting from unplanned equipment repairs during the year ended December 31, 2023. When Zero-cost Inventory, which is further discussed below, is depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase. We also anticipate that our cost of product revenue (exclusive of amortization) associated with the RHA® Collection of dermal fillers to increase if sales volume increases.

*Purchasing and manufacturing costs*

For the year ended December 31, 2023, purchasing and manufacturing costs related to the RHA® Collection of dermal fillers and DAXXIFY® increased compared to the same period in 2022 primarily due to higher sales volumes of our Products.

*Distribution, royalty and other fulfillment charges*

For the year ended December 31, 2023, distribution, royalty and other fulfillment charges related to the RHA® Collection of dermal fillers and DAXXIFY® increased compared to the same period in 2022 due to higher sales volumes of the RHA® Collection of dermal fillers and DAXXIFY®.

*Stock-based compensation*

Stock-based compensation expense in cost of product revenue (exclusive of amortization) is related to equity grants to employees in departments involved in the manufacturing of DAXXIFY®. Stock-based compensation expense in cost of product revenue (exclusive of amortization) is a period cost which is not absorbed into our inventory cost. DAXXIFY®

Table of Contents

manufacturing related stock-based compensation expense incurred prior to DAXXIFY® GL Approval was classified as research and development expenses.

*Impact of Zero-cost Inventory for DAXXIFY®*

If cost of product revenue included previously expensed inventories, the cost of product revenue (exclusive of amortization) for the years ended December 31, 2023 and 2022 would have increased by approximately $14 million and $3 million, respectively. We expect to utilize Zero-cost Inventory in the near-term until depleted. Once depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase.

***Cost of Service Revenue (exclusive of amortization)***

Costs of service revenue (exclusive of amortization) primarily consists of payment processing costs and the cost of POS devices.

For the year ended December 31, 2023, cost of service revenue (exclusive of amortization) increased compared to the same period in 2022 due to the change to the gross accounting presentation of revenue as described in the Service Revenue section above.

Our cost of service revenue associated with the Fintech Platform was eliminated following the end of payment processing activity on January 31, 2024.

***Selling, General and Administrative Expenses***

| | Years Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands, except percentages)** | **2023** | **2022** | **Change** | **% Change** |
| Selling, general and administrative | $ 253,424 | $ 183,101 | $ 70,323 | 38 % |
| Stock-based compensation | 38,814 | 36,595 | $ 2,219 | 6 % |
| Depreciation and amortization | 4,234 | 4,238 | $ (4) | — % |
| Restructuring charges | 1,260 | — | $ 1,260 | N/M |
| Total selling, general and administrative expenses | $ 297,732 | $ 223,934 | $ 73,798 | 33 % |

N/M - Percentage not meaningful

*Selling, general and administrative expenses (before stock-based compensation, restructuring charges and depreciation and amortization)*

Selling, general and administrative expenses (before stock-based compensation, restructuring charges and depreciation and amortization) consist primarily of the following:

- Costs of sales and marketing activities and sales force compensation related to DAXXIFY®, the RHA® Collection of dermal fillers and OPUL®; and
- Personnel and professional service costs in our finance, information technology, investor relations, legal, human resources, and other administrative departments;

For the year ended December 31, 2023, selling, general and administrative expenses increased compared to the same period in 2022, primarily due to an increase in sales and marketing expenses in connection with the DAXXIFY® sales expansion and increased legal costs, partially offset by an employee retention credit claim recognized in 2023. We expect selling, general and administrative expenses to increase over the next year in connection with the expansion of our commercial sales team related to therapeutics and incremental administrative and infrastructure support, partially offset by the decrease in OPUL® selling, general and administrative expenses and other areas of cost efficiencies identified.

*Stock-based compensation*

For the year ended December 31, 2023, stock-based compensation included in selling, general and administrative expenses increased compared to the same period in 2022, primarily due to (i) increased headcount in selling, general and administrative functions; (ii) the stock-based compensation expense recognized for the vesting of certain market-based PSUs in May 2023. This increase was partially offset by the completion of recognizing stock-based compensation expense for the DAXXIFY® GL Approval PSUs in March 2023, which was initiated in September 2022.

*Restructuring Charges*

For the year ended December 31, 2023, restructuring charges in selling, general and administrative expenses was $1.3 million associated with the severance and other related costs in the OPUL® selling, general and administrative function. See Part IV, Item 15. "Exhibits and Financial Statement Schedules —Notes to Consolidated Financial Statements —Note 4— Restructuring" in this Report for additional information regarding restructuring charges.

***Research and Development Expenses***

| | Year Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands, except percentages)** | **2023** | **2022** | **Change** | **% Change** |
| Research and development | $ 65,472 | $ 83,894 | $ (18,422) | (22)% |
| Stock-based compensation | 8,999 | 15,745 | $ (6,746) | (43)% |
| Depreciation and amortization | 3,329 | 1,647 | $ 1,682 | 102 % |
| Restructuring charges | 1,610 | — | $ 1,610 | N/M |
| Total research and development expenses | $ 79,410 | $ 101,286 | $ (21,876) | (22)% |

N/M - Percentage not meaningful

*Research and development expenses (before stock-based compensation, restructuring charges and depreciation and amortization)*

In the Product Segment, we generally do not allocate costs by product candidates unless contractually required by our business partners. In the Service Segment, our research and development expenses relate to the development and introduction of new functionalities and features of OPUL® that are not subject to capitalization. All Service Segment related research and development activities ceased in September 2023 when we commenced a restructuring plan to exit the Fintech Platform business. We expect all Fintech Platform payment operations to be discontinued by or around March 31, 2024.

Research and development expenses (before stock-based compensation, restructuring charges and depreciation and amortization) consist primarily of:

- salaries and related expenses for personnel in research and development functions;
- expenses related to the initiation and completion of clinical trials and studies for DAXXIFY®, the RHA® Pipeline Products and an onabotulinumtoxinA biosimilar, including expenses related to the production of clinical supplies;
- expenses related to the manufacturing of supplies for clinical activities, regulatory approvals, and pre-commercial inventory;
- certain expenses related to the establishment and maintenance of our manufacturing facilities;
- expenses related to medical affairs, medical information, publications and pharmacovigilance oversight;
- expenses related to license fees, milestone payments, and development efforts under in-licensing agreements;

- expenses related to compliance with drug development regulatory requirements in the U.S. and other foreign jurisdictions;
- fees paid to clinical consultants, CROs and other vendors, including all related fees for investigator grants, patient screening fees, laboratory work and statistical compilation and analysis;
- expenses related to the development of new features and functionalities of OPUL® and services that are not eligible for capitalization; and
- other consulting fees paid to third parties;

For the year ended December 31, 2023, research and development expenses (before stock-based compensation, restructuring charges and depreciation and amortization) decreased compared to the same period in 2022, primarily due to the effects of capitalizing certain manufacturing related expenses for DAXXIFY® since the third quarter of 2022 and an employee retention credit claim recognized in 2023.

Our research and development expenses (before stock-based compensation, restructuring charges and depreciation and amortization) are subject to numerous uncertainties, primarily related to the timing and cost needed to complete our respective projects. In our Product Segment, the development timelines, probability of success and development expenses can differ materially from expectations, and the completion of clinical trials may take several years or more depending on the type, complexity, novelty and intended use of a product candidate. Accordingly, the cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development. We expect our research and development cost (before stock-based compensation, restructuring charges and depreciation and amortization) to be relatively consistent in the near term, primarily due to deferring the Phase 3 clinical program for upper limb spasticity and other therapeutics pipeline activities. However, we will continue sharing certain development costs with Teoxane related to the RHA® Pipeline Products, and other activities related to the pursuit of approval for the PCI manufacturing facility.

When we conduct additional clinical trials, such as for our biosimilar program or additional DAXXIFY® therapeutic indications, we expect our research and development expenses (before stock-based compensation, restructuring charges and depreciation and amortization) to increase. Depending on the stage of completion and level of effort related to each development phase undertaken, we may reflect variations in our research and development expenses. We expense both internal and external research and development expenses as they are incurred.

*Stock-based compensation*

For the year ended December 31, 2023, stock-based compensation included in research and development expenses decreased compared to the same period in 2022, primarily due to (i) a stock modification accounting adjustment related to the separation of an executive officer from the Company in the first quarter of 2022; (ii) the capitalized stock-based compensation for 2023; and (iii) the completion of recognizing stock-based compensation expense for the DAXXIFY® GL Approval PSUs in March 2023, which was initiated in September 2022. These decreases were partially offset by a change in estimate in stock compensation accounting related to achievement of certain performance-based PSUs in May 2023.

*Restructuring Charges*

For the year ended December 31, 2023, restructuring charges in research and development expenses was $1.6 million related to severance and other related costs in the OPUL® research and development function. See Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements —Note 4— Restructuring" in this Report for additional information regarding restructuring charges.

***Goodwill Impairment and Intangible Asset Impairment***

For the year ended December 31, 2022, we recorded goodwill impairment of $69.8 million and no intangible asset impairment. For the year ended December 31, 2023, we recorded goodwill impairment of $77.2 million and intangible asset impairment of $16.0 million based on our plan to exit the Fintech Platform business. See Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements —Note 6 — Goodwill and intangible Assets, net " in this Report for impairment discussion.

***Amortization***

Amortization presented separately on the consolidated statements of operations and comprehensive loss represents the amortization for the intangible assets within the functional area of costs of revenue.

For the year ended December 31, 2023, amortization decreased compared to the same period in 2022, primarily due to the decrease of amortization expense as a result of the Fintech Platform intangible assets impairment, the extension of the useful life of Teoxane distribution rights, as well as the completion of amortization for developed technology related to HintMD in 2022.

***Net Non-Operating Income and Expense***

| | Years Ended December 31, | | 2023 vs. 2022 | |
|---|---|---|---|---|
| **(in thousands, except percentages)** | **2023** | **2022** | **Change** | **% Change** |
| Interest income | $ 13,285 | $ 4,891 | $ 8,394 | 172 % |
| Interest expense | (19,356) | (16,474) | $ (2,882) | 17 % |
| Other expense, net | (838) | (2,181) | $ 1,343 | (62)% |
| Total net non-operating expense | $ (6,909) | $ (13,764) | $ 6,855 | (50)% |

*Interest Income*

Interest income primarily consists of interest income earned on our deposit, money market fund, and investment balances. We expect interest income to vary each reporting period depending on our average deposit, money market fund, and investment balances during the period and market interest rates. For the year ended December 31, 2023, interest income increased compared to the same period in 2022, primarily due to higher interest rates and higher average investment balances.

*Interest Expense*

Interest expense includes cash and non-cash components. The cash component of the interest expense primarily consists of the contractual interest charges for our 2027 Notes and Notes Payable, as well as our finance lease liability interest expense. The non-cash component of the interest expense primarily consists of the amortization of debt issuance costs for our 2027 Notes and the amortization of debt insurance cost and debt discount for the Notes Payable.

For the year ended December 31, 2023, interest expense increased compared to the same period in 2022 due to the contractual interest on the Notes Payable, which began to accrue in late March 2022, and the issuance of the Second Tranche of the Notes Payable in August 2023, offset by a decrease in interest expense for our finance lease liability.

*Other Expense, net*

Other expense, net primarily consists of miscellaneous tax and other expense items.

***Income Taxes***

We have only generated domestic pretax losses for the periods presented. For the year ended December 31, 2023 and 2022, tax provision was $0.3 million and $0.7 million, respectively, related to foreign withholding taxes.

**Liquidity and Capital Resources**

Our financial condition is summarized as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 | Decrease |
|---|---|---|---|
| Cash, cash equivalents, and short-term investments | $ 253,915 | $ 340,707 | $ (86,792) |
| Working capital | $ 249,641 | $ 299,045 | $ (49,404) |
| Stockholders' equity (deficit) | $ (151,604) | $ 12,600 | $ (164,204) |

***Sources and Uses of Cash***

We hold our cash, cash equivalents, and short-term investments in bank accounts and interest-bearing instruments subject to investment guidelines for high credit quality. Our investment portfolio is structured to provide for investment maturities and access to cash to fund our anticipated working capital needs.

As of December 31, 2023 and 2022, we had cash, cash equivalents, and short-term investments of $253.9 million and $340.7 million, respectively, which reflected a decrease between these periods of $86.8 million. The decrease was primarily due to cash used in operating activities of $211.4 million, principal payments on a finance lease of $18.3 million, taxes paid related to net settlement of Stock Awards of $8.2 million, the purchase of property and equipment of $6.9 million, and finance lease prepayments of $4.9 million. The decrease was primarily offset by proceeds from the ATM of $100.2 million, net of commissions and offerings costs, issuance of the Notes Payable, net of debt discount and issuance costs of $47.6 million, and the proceeds from stock option exercises and ESPP purchases of $15.3 million.

We derived the following summary of our consolidated statement of cash flows for the periods indicated from our audited consolidated financial statements included elsewhere in this Report:

| (in thousands) | Year Ended December 31, 2023 | Year Ended December 31, 2022 |
|---|---|---|
| Net cash provided by (used in): | | |
| Operating activities | $ (216,575) | $ (193,548) |
| Investing activities | $ 109,740 | $ (138,798) |
| Financing activities | $ 136,567 | $ 331,694 |

*Cash Flows from Operating Activities*

Our cash used in operating activities is primarily driven by personnel costs, manufacturing and facility costs, sales and marketing activities, and general and administrative support, offset by revenue generated from the sale of our Products. Our cash flows from operating activities will continue to be affected principally by the revenue generated from our Products and our working capital requirements, with a primary focus on commercial operations.

Cash used in operating activities for the year ended December 31, 2023 consisted of approximately $425 million in expenditures related to overall operations, offset by over $210 million in cash receipts from our revenue. The increase in net cash used in operating activities for the year ended December 31, 2023, compared to 2022 is primarily driven by expenditures related to supporting the Company's commercial growth, and partially offset by an increase in cash receipt from Product sales.

Cash used in operating activities during the year ended December 31, 2022 primarily consisted of approximately $265 million in expenditures related to overall operations, offset by over $100 million in net cash receipts from our product and service sales, working capital adjustments, and other non-cash adjustments.

*Cash Flows from Investing Activities*

For the years ended December 31, 2023 and 2022, net cash provided by or used in investing activities was primarily driven by fluctuations in the timing of purchases and maturities of investments, purchase of property and equipment and prepayments for a finance lease.

*Cash Flows from Financing Activities*

For the year ended December 31, 2023, net cash provided by financing activities was driven by the proceeds from the ATM, net of commissions, the issuance of the Notes Payable pursuant to the Note Purchase Agreement, net of debt discount and the exercise of stock options and purchases of our common stock through the ESPP. The inflows were offset by the net settlement of Stock Awards for employee taxes, and principal payments on finance lease obligations.

For the year ended December 31, 2022, net cash provided by financing activities was driven by the proceeds from issuance of common stock in connection with follow-on offering, net of discounts and commissions, the issuance of the Notes Payable, net of debt discount, the ATM, net of commissions, and proceeds from the exercise of stock options and the purchase of shares of our common stock under the 2014 ESPP. The inflows were offset by the principal payments on finance lease obligations, net settlement of RSAs for employee taxes and payments of debt issuance costs and offering costs.

***Note Purchase Agreement***

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche is available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. The First Amendment modified the variable interest rate adjustment for the Third Tranche from Adjusted Three-Month LIBOR to Adjusted Three-Month Term SOFR. If the Third Tranche of Notes Payable becomes committed, the Notes Payable will then bear interest at an annual rate equal to the sum of (a) 7.0% and (b) Adjusted Three-Month Term SOFR for such interest period (subject to a floor of 1.50% and a cap of 2.50%). We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. If any Third Tranche notes are issued, upon the occurrence of an Amortization Trigger (as defined in the Note Purchase Agreement), we are required to repay the principal of the Third Tranche in equal monthly installments beginning on the last day of the month in which the Amortization Trigger occurred and continuing through the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon

prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

***Convertible Senior Notes***

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers' discount, commissions, and other issuance costs.

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the measurement period in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

Contractually, we may not redeem the 2027 Notes prior to February 20, 2024. We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

We used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027 Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

***ATM Offering Programs***

From January 1, 2022 through May 10, 2022, under the 2020 ATM Agreement, we sold 1.7 million shares of common stock at a weighted average price of $18.71 per share resulting in net proceeds of $31.6 million after sales agent commissions and offering costs. We terminated the 2020 ATM Agreement on May 10, 2022.

On May 10, 2022, we entered into the 2022 ATM Agreement with Cowen. Under the 2022 ATM Agreement, we may sell up to $150.0 million of our common stock. No shares of common stock had been sold under the 2022 ATM Agreement for the year ended December 31, 2022.

In the second quarter of 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the year ended December 31, 2023 from the 2022 ATM Agreement, outside of the second quarter of 2023.

***Follow-On Offering***

In September 2022, we completed the 2022 follow-on offering, pursuant to which we issued 9.2 million shares of common stock at an offering price of $25.00 per share, including the exercise of the underwriters' over-allotment option to purchase 1.2 million additional shares of common stock, for net proceeds of $215.9 million, after underwriting discounts, commission and other offering expenses. We did not conduct any offerings of our common stock in 2023.

***Common Stock and Common Stock Equivalents***

As of February 16, 2024, outstanding shares of common stock were 88.2 million, unvested RSUs and PSUs were 5.7 million, outstanding stock options were 3.8 million, unvested RSAs and PSAs were 0.8 million, and the number of underlying shares from the 2027 Notes at the initial conversion price is 8.9 million, based upon the initial conversion price.

***Operating and Capital Expenditure Requirements - Going Concern***

We expect to continue to incur GAAP operating losses for the foreseeable future as we continue to devote resources to the commercialization, research and development, manufacturing development and regulatory approval of our products.

Disciplined capital allocation continues to be a priority; however, we expect that we will continue to expend substantial resources for the foreseeable future and in the long-term to support the growth of the aesthetics portfolio of Products and DAXXIFY® for the treatment of cervical dystonia and to support our ongoing operations. In particular, we anticipate that we will continue to invest substantial resources in our commercialization efforts across aesthetics and therapeutics and the manufacturing and supply of DAXXIFY® for commercialization. In addition, in connection with the Teoxane Agreement, we must continue to make specified annual minimum purchases of the RHA® Collection of dermal fillers and meet annual minimum investments in connection with the commercialization of the RHA® Collection of dermal fillers. In addition, we have dedicated manufacturing capacity, buyback obligations, cost sharing arrangements and related minimum purchase obligations under our manufacturing and supply agreements in connection with the manufacture and supply of DAXXIFY® and any product candidate. We also anticipate expending resources to continue to support the onabotulinumtoxinA biosimilar and Fosun partnerships. In the long term, in addition to the aforementioned expenditures, we anticipate our expenditures will include clinical programs for DAXXIFY® in other potential indications and international regulatory investments.

As of December 31, 2023, we had capital resources of $253.9 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement and payments received from collaboration arrangements. We also have remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of December 31, 2023.

In accordance with ASC 205-40, *Presentation of Financial Statements – Going Concern*, we are required to evaluate whether there are conditions and events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern for at least 12 months from the issuance date of our financial statements. We are required to maintain compliance with the Minimum Cash Covenant in accordance with the terms of the Note Purchase Agreement (see Note 10 to our consolidated financial statements). Our forecasted liquidity is based on our approved operating plan which forecasts the receipt of milestone payments expected from Fosun upon the NMPA's potential approvals of Fosun's BLAs for DaxibotulinumtoxinA for Injection for the improvement of glabellar lines and treatment of cervical dystonia, which are anticipated in 2024 and early 2025, respectively, and a payment from the IRS resulting from our ERC claim filed in July 2023. As the timing of receipt of those payments are subject to regulatory/governmental approvals of which there are inherent uncertainties outside of our control, for purposes of the evaluation under ASC 205-40, those payments have been excluded from our forecasted liquidity, which initially resulted in a risk condition that the Minimum Cash Covenant would not be met sometime in the first half of 2025 and would put the Company in default under the terms of the Note Purchase Agreement. As a result, substantial doubt about our ability to continue as a going concern was raised.

The Company finalized and approved a plan to alleviate the substantial doubt, which includes a refined operating plan, which aligns with our capital allocation priorities and is designed to streamline our operations and drive revenue growth. The operating plan includes delaying or eliminating certain non-essential projects and capital expenditure spending, deferring certain hiring and reducing costs associated with non-revenue generating commercial and marketing functions. Management believes the refined operating plan is probable of being implemented on a timely basis.

Because the refined operating plan provides the Company with sufficient liquidity and working capital to meet its cash flow requirements for at least 12 months from the issuance date of our financial statements and would not result in violation of the Minimum Cash Covenant, the substantial doubt about our ability to continue as a going concern has been alleviated. Although the refined operating plan provides the Company with sufficient liquidity and working capital to alleviate the going concern, if the Company were unable to successfully execute the refined operating plan, its estimates regarding the amounts necessary to accomplish its business objectives are inaccurate, other unanticipated costs arise or the Company changes its operating plan as a result of factors currently unknown, the Company may need to seek additional capital sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations, although adequate funds may not be available to us on a timely basis or at all.

We may also seek additional capital due to favorable market conditions or strategic considerations even if we believe that we have sufficient funds for our current or future operating plans. See "Part I, Item 1A. Risk Factors – We have incurred significant losses since our inception and we anticipate that we will continue to incur GAAP operating losses for the foreseeable future and may not achieve or maintain profitability in the future."

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with GAAP. The preparation of these consolidated financial statements requires our management to make estimates, assumptions and judgments that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and the reported amounts of revenue and expenses during the applicable periods. We base our estimates, assumptions and judgments on historical experience and on various other factors that we believe to be reasonable under the circumstances. Different assumptions and judgments would change the estimates used in the preparation of our consolidated financial statements, which, in turn, could change the results from those reported. We evaluate our estimates, assumptions and judgments on an ongoing basis.

The critical accounting estimates, assumptions and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

***Goodwill Impairment***

Goodwill represents the excess of the purchase price of the acquired business over the estimated fair value of the identifiable net assets acquired. All of the Company's goodwill balance is associated with the Service reporting unit. Goodwill is not amortized but is tested for impairment at least annually at the reporting unit level in the fourth quarter of each calendar year, or more frequently if events or changes in circumstances indicate that the reporting unit might be impaired. Impairment loss, if any, is recognized based on a comparison of the fair value of the reporting unit to its carrying value, without consideration of any recoverability. In assessing goodwill for impairment, we first assess qualitative factors to determine whether it is more likely than not that the fair value is less than its carrying amount. If we conclude it is more likely than not that the fair value of a reporting unit is less than its carrying amount, a quantitative impairment test is performed. If we conclude that goodwill is impaired, an impairment charge is recorded to the extent that the reporting unit's carrying value exceeds its fair value.

In December 2022, based on performance results and the valuation of the broader payment sector, we concluded that it was more likely than not that the fair value of our Service reporting unit was less than its carrying amount; therefore, a quantitative goodwill impairment test was performed during the fourth quarter. This quantitative goodwill impairment test was performed by estimating the fair value of the reporting unit using the income approach, which was based on a discounted cash flow model and required the use of significant assumptions, including estimates of the revenue growth rates and discount rate. Based on the goodwill impairment test, we determined that the estimated fair value of the Service reporting unit was below the carrying value and, accordingly, we recognized a goodwill impairment charge of $69.8 million in our Service reporting unit for the year ended December 31, 2022 and was presented in impairment loss on the consolidated statement of operations and comprehensive loss.

In September 2023, based on our plan to exit the Fintech Platform business, we concluded that it was more likely than not that goodwill is further impaired. A quantitative goodwill impairment test was performed by estimating the fair value of the reporting unit using the income approach, which required the use of significant judgement, including the planned exit of the Fintech Platform business. Due to our decision to exit the Fintech Platform business, our projected negative future cash flows from the Service Segment resulted in an estimated fair value of zero and full impairment of the related goodwill carrying value. We therefore recognized an impairment charge of $77.2 million in our Service Segment in September 2023 classified as goodwill impairment on the consolidated statement of operations and comprehensive loss for the year ended December 31, 2023.

***Collaboration Revenue***

Upon adoption of ASC 606 in 2018, we recognize revenue when our customer obtains control of promised goods or services, in an amount that reflects the consideration which we expect to receive in exchange for those goods or services.

To determine revenue recognition for arrangements that we determine are within the scope of ASC 606, we perform the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v)

recognize revenue when (or as) we satisfy a performance obligation. We only apply the five-step model to contracts when it is probable that we will collect the consideration we are entitled to in exchange for the goods or services we transfer to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, we assess the goods or services promised within the contract and determine those that are performance obligations and assess whether each promised good or service is distinct. We then recognize as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied.

At the inception of each arrangement that includes development, regulatory or commercial milestone payments, we evaluate whether the milestones are considered more likely than not of being reached and estimate the amount to be included in the transaction price. ASC 606 provides two alternatives to use when estimating the amount of variable consideration: the expected value method and the most likely amount method. Under the expected value method, an entity considers the sum of probability-weighted amounts in a range of possible consideration amounts. Under the most likely amount method, an entity considers the single most likely amount in a range of possible consideration amounts. Whichever method is used should be consistently applied throughout the life of the contract; however, it is not necessary for us to use the same approach for all contracts. If it is probable that a significant revenue reversal would not occur, the associated milestone value is included in the transaction price. Milestone payments that are not within the control of us or the licensee, such as regulatory approvals, are not considered probable of being achieved until those approvals are received. The transaction price is then allocated to each performance obligation (as determined to be appropriate) on a relative stand-alone selling price basis. We recognize revenue as or when the performance obligations under the contract are satisfied. At the end of each subsequent reporting period, we re-evaluate the probability of achievement of each such milestone and any related constraint, and if necessary, adjusts our estimates of the overall transaction price. Any such adjustments are recorded on a cumulative catch-up basis, which would affect revenues and earnings in the period of adjustment.

**Contractual Obligations**

***Lease Obligations***

*Operating Lease Obligations*

As of December 31, 2023, we had operating lease obligations for real estate totaling $65.3 million, of which $10.2 million was attributed to short-term obligations, and the remainder was attributed to long-term obligations.

*Finance Lease Obligations*

Under the ABPS Services Agreement, we have a finance lease related to dedicated fill-and-finish-line of DAXXIFY®, which has minimum purchase obligation negotiated at the beginning of each year. As of December 31, 2023, we had short-term obligations of $4.9 million associated with our 2023 minimum purchase obligation under the ABPS Services Agreement. In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Services Agreement through December 31, 2027 and modified our remedies with respect to non-conforming products and delays. The minimum payments for the year ending December 31, 2024 have not been established.

In April 2021, we entered into the PCI Supply Agreement which contains a lease related to a dedicated fill-and-finish line and closely related assets for the manufacturing of DAXXIFY® under ASC 842. The embedded lease had not yet commenced as of December 31, 2023. The accounting commencement and recognition of the right-of-use lease assets and lease liabilities related to the embedded lease will take place when we have substantively obtained the right of control. The embedded lease is preliminarily classified as a finance lease. Pursuant to the PCI Supply Agreement, we are responsible for certain costs associated with the design, equipment procurement and validation, and facilities-related costs, monthly payments and minimum purchase obligations throughout the initial term of the PCI Supply Agreement. Based on our best estimate as of December 31, 2023, we had a remaining commitment under the PCI Supply Agreement of $227.4 million until 2031, of which $18.4 million was attributed to short-term obligations, and the remainder was attributed to long-term obligations. For details of the PCI Supply Agreement as of December 31, 2023, refer to Part IV, Item 15, "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements—Note 9—Leases."



REV_DAX-03338704
DTX-370.0099

*Convertible Senior Notes*

In February 2020, we issued the 2027 Notes with an aggregate principal balance of $287.5 million, pursuant to the Indenture. The 2027 Notes are convertible into cash, shares of our common stock, or a combination of cash and shares of our common stock, at our election. Contractually, we may not redeem the 2027 Notes prior to February 20, 2024, and no sinking fund is provided for the 2027 Notes. As of December 31, 2023, our total obligation for the principal and interest of the 2027 Notes was $303.2 million over four years, of which $5.0 million was attributed to short-term obligations, and the remainder was attributed to long-term obligations. Refer to Part IV, Item 15. "Notes to Consolidated Financial Statements—Note 10—Debt — Convertible Senior Notes" for details of the convertible senior notes.

*Note Purchase Agreement*

In March 2022 and August 2023, we issued $100 million and $50 million of the First Tranche and Second Tranche under the Note Purchase Agreement, respectively. As of December 31, 2023, our total obligation for the principal and interest of the Notes Payable was $183.2 million over three years, of which $15.4 million was attributed to short-term obligations, and the remainder was attributed to long-term obligations. Refer to Part IV, Item 15. "Exhibits and Financial Statement Schedules Notes to Consolidated Financial Statements Note 10 Debt" for details of the Notes Payable.

*Purchase Commitments*

Under the Teoxane Agreement, as amended in September 2020, November 2020 and December 2022, we are required to meet certain minimum purchase obligations during each year of the term and are required to meet certain minimum expenditure requirements in connection with commercialization efforts. Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

Our minimum purchase obligation for the year ended December 31, 2024 is $52 million. Our minimum purchase obligations after December 31, 2024 will be determined based on projected market growth rate. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date. Refer to Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to Consolidated Financial Statements —Note 15—Commitments and Contingencies" for details of the Teoxane Agreement.

*Contingencies*

As of December 31, 2023, we have remaining contingent payments upon the satisfaction of milestones relating to our product revenue, intellectual property, and clinical and regulatory events of $15.5 million to BTRX.

**Recent Accounting Pronouncements**

Please refer to Part IV, Item 15. "Exhibits and Financial Statement Schedules—Notes to consolidated financial statements—Note 2—Summary of Significant Accounting Policies" in this Report.



REV_DAX-03338705
DTX-370.0100

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest Rate Risk

Our exposure to market risk for changes in interest rates relates primarily to our cash, cash equivalents, and short-term investments, which had balances of $253.9 million and $340.7 million as of December 31, 2023 and 2022, respectively. We do not hold or issue financial instruments for trading purposes. Our investments carry a degree of interest rate risk, but this risk is limited due to the duration of our short-term investments. We have not been exposed to, nor do we anticipate being exposed to, material risks due to changes in interest rates. A hypothetical 10% relative change in interest rates would not have a material impact on our consolidated financial statements.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The financial statements are set forth beginning on page F-5 in this Report and are incorporated herein by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We are responsible for maintaining disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act. Disclosure controls and procedures are controls and other procedures designed to ensure that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and our principal financial and accounting officer, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our principal executive officer and our principal financial and accounting officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of December 31, 2023, the end of the period covered by this Report. Based on such evaluation, our principal executive officer and principal financial and accounting officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2023, the end of the period covered by this Report.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our consolidated financial statements.

Under the supervision and with the participation of our management, including our principal executive officer and principal financial and accounting officer, we conducted an evaluation of the effectiveness of our internal control over

financial reporting as of December 31, 2023 based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation, our management concluded our internal control over financial reporting was effective as of December 31, 2023.

The effectiveness of our internal control over financial reporting as of December 31, 2023 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report on pages F2-F4 in Part IV, Item 15. in this Report.

**Changes in Internal Control Over Financial Reporting**

For the three months ended December 31, 2023, there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

In designing and evaluating the disclosure controls and procedures and internal control over financial reporting, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures and internal control over financial reporting must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

## ITEM 9B. OTHER INFORMATION

During the three months ended December 31, 2023, none of our Section 16 officers or directors adopted, modified or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement, as defined in Item 408 of Regulation S-K.

## ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.

Not applicable.

## PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

Incorporated herein by reference are "Directors," "Executive Officers," "Delinquent Section 16(a) Reports," "Board Matters – Information Regarding Committees of the Board" and "Board Matters – Audit Committee" to be included in our 2024 Proxy Statement, which will be filed with the SEC within 120 days after the end of the fiscal year to which this Report relates.

**Code of Business Conduct.**

Our Board of Directors adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers, including our principal executive officer and principal financial and accounting officer, or persons performing similar functions and agents and representatives, including directors and consultants. The full text of our Code of Business Conduct and Ethics is posted on our website at www.revance.com. We intend to disclose future amendments to certain provisions of our Code of Business Conduct and Ethics, or waivers of such provisions applicable to any principal executive officer and principal financial and accounting officer, or persons performing similar functions, and our directors, on our website identified above.

### ITEM 11. EXECUTIVE COMPENSATION

Incorporated herein by reference are "Executive Compensation" (excluding the information under the subheading "Item 402(v) Pay versus Performance") and "Non-Employee Director Compensation" to be included in our 2024 Proxy Statement, which will be filed with the SEC within 120 days after the end of the fiscal year to which this Report relates.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Incorporated herein by reference are "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information" to be included in our 2024 Proxy Statement, which will be filed with the SEC within 120 days after the end of the fiscal year to which this Report relates, and is incorporated by reference.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

Incorporated herein by reference are "Transactions with Related Persons," "Board Matters – Independence of the Board," "Board Matters – Audit Committee," "Board Matters – Compensation Committee," and "Board Matters – Nominating and Corporate Governance Committee" to be included in our 2024 Proxy Statement, which will be filed with the SEC within 120 days after the end of the fiscal year to which this Report relates.

### ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

Incorporated herein by reference is "Proposal 2 – Ratification of Selection of Independent Registered Public Accounting Firm" to be included in our 2024 Proxy Statement, which will be filed with the SEC within 120 days after the end of the fiscal year to which this Report relates.

## PART IV

### ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following documents are filed as part of this Annual Report on Form 10-K:

(1) Financial Statements. The financial statements required by this item are set forth beginning at F-1 in this Report and are incorporated herein by reference.

(2) Financial Statement Schedules. None. Financial statement schedules have been omitted because they are not applicable, not material, or the required information is shown in the consolidated financial statements or the notes thereto.

(3) Exhibits: See Item 15(b) below.

(b) Exhibits. The following exhibits are included herein or incorporated herein by reference:

## EXHIBIT INDEX

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 2.1 | Agreement and Plan of Merger, dated May 18, 2020, by and among Revance Therapeutics, Inc., Heart Merger Sub, Inc., Hint, Inc. and Fortis Advisors LLC, as the Securityholders' Representative (included as Annex A to the prospectus/information statement) | S-4 | 333-239059 | 2.1 | June 10, 2020 | — |
| 3.1 | Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | February 11, 2014 | — |
| 3.2 | Certificate of Amendment to Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | May 7, 2021 | — |
| 3.3 | Amended and Restated Bylaws | 8-K | 001-36297 | 3.1 | December 15, 2023 | — |
| 4.1 | Form of Common Stock Certificate | S-1/A | 333-193154 | 4.4 | February 3, 2014 | — |
| 4.2 | Indenture, dated as of February 14, 2020, by and between Revance Therapeutics, Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-36297 | 4.1 | February 14, 2020 | — |
| 4.3 | Form of Global Note, representing Revance Therapeutics, Inc.'s 1.75% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.2) | 8-K | 001-36297 | 4.2 | February 14, 2020 | — |
| 4.4 | Description of Registrant's Securities | — | — | — | — | X |
| 4.5 | Form of Indenture | S-3ASR | 333-250998 | 4.5 | November 27, 2020 | — |
| 4.6 | Form of Common Stock Warrant Agreement and Warrant Certificate | S-3ASR | 333-275548 | 4.6 | November 14, 2023 | — |
| 4.7 | Form of Preferred Stock Warrant Agreement and Warrant Certificate | S-3ASR | 333-275548 | 4.7 | November 14, 2023 | — |
| 4.8 | Form of Debt Securities Warrant Agreement and Warrant Certificate | S-3ASR | 333-275548 | 4.8 | November 14, 2023 | |
| 10.1* | Revance Therapeutics, Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-193154 | 10.3 | December 31, 2013 | — |
| 10.2* | Form of Stock Option Agreement and Option Grant Notice for Revance Therapeutics, Inc. Amended and Restated 2012 Equity Incentive Plan | S-1 | 333-193154 | 10.4 | December 31, 2013 | — |
| 10.3* | Revance Therapeutics, Inc. 2014 Equity Incentive Plan | S-1/A | 333-193154 | 10.5 | January 27, 2014 | — |
| 10.4* | Form of Restricted Stock Unit Award Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | S-8 | 333-263099 | 99.2 | February 28, 2022 | — |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.5* | Form of Stock Option Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | 10-Q | 001-36297 | 10.3 | November 10, 2015 | — |
| 10.6* | Form of Restricted Stock Bonus Agreement and Grant Notice for Revance Therapeutics, Inc. 2014 Equity Incentive Plan | 10-K | 001-36297 | 10.6 | February 25, 2021 | — |
| 10.7* | Revance Therapeutics, Inc. 2014 Employee Stock Purchase Plan | S-1/A | 333-193154 | 10.7 | January 27, 2014 | — |
| 10.8* | Form of Indemnity Agreement by and between Revance Therapeutics, Inc. and each of its officers and directors | S-1/A | 333-193154 | 10.8 | January 27, 2014 | — |
| 10.9* | Revance Therapeutics, Inc. Amended and Restated 2014 Inducement Plan | 10-Q | 001-36297 | 10.2 | November 9, 2020 | — |
| 10.10* | Form of Stock Option Agreement and Grant Notice under Amended and Restated Revance Therapeutics, Inc. 2014 Inducement Plan | 10-Q | 001-36297 | 10.5 | November 10, 2015 | — |
| 10.11* | Form of Restricted Stock Agreement and Grant Notice under Amended and Restated Revance Therapeutics, Inc. 2014 Inducement Plan | 10-K | 001-36297 | 10.11 | February 25, 2021 | |
| 10.12* | Form of Restricted Stock Unit Agreement and Grant Notice under Amended and Restated Revance Therapeutics, Inc. 2014 Inducement Plan | 10-K | 001-36297 | 10.12 | February 28, 2023 | — |
| 10.13* | Hint, Inc. 2017 Equity Incentive Plan | S-8 | 333-240061 | 99.2 | July 24, 2020 | — |
| 10.14 | Lease Agreement dated March 31, 2008 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.9 | December 31, 2013 | — |
| 10.15 | First Amendment to Office Lease dated April 7, 2008 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.10 | December 31, 2013 | — |
| 10.16 | Second Amendment to Office Lease and Lease dated May 17, 2010 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | S-1 | 333-193154 | 10.11 | December 31, 2013 | — |
| 10.17 | Third Amendment to Lease dated February 26, 2014 by and between Revance Therapeutics, Inc. and BMR-Gateway Boulevard LLC | 8-K | 001-36297 | 10.35 | March 4, 2014 | — |
| 10.18 | Fourth Amendment to Lease dated May 10, 2018, by and between Revance Therapeutics, Inc. and BMR-Pacific Research Center LP. | 8-K | 001-36297 | 10.1 | May 11, 2018 | — |
| 10.19 | Fifth Amendment to Lease dated July 1, 2020, by and between Revance Therapeutics, Inc. and BMR-Pacific Research Center LP. | 10-Q | 001-36297 | 10.1 | August 6, 2020 | — |
| 10.20 | Office Lease dated November 19, 2020, by and between Revance Therapeutics, Inc. and 1222 Demonbreun, LP | 8-K | 001-36297 | 10.1 | November 20, 2020 | — |
| 10.21 | Amendment to Lease dated January 4, 2021, by and between Revance Therapeutics, Inc. and 1222 Demonbreun, LP | 10-K | 001-36297 | 10.20 | February 25, 2021 | — |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.22+—+ | Second Amendment to Lease dated July 1, 2021 by and between Revance Therapeutics, Inc. and 1222 Demonbreun, LP | 10-Q | 001-36297 | 10.1 | November 9, 2021 | — |
| 10.23+—+ | Third Amendment to Lease dated January 13, 2023, by and between Revance Therapeutics, Inc. and 1222 Demonbreun, LP | 10-Q | 001-36297 | 10.3 | May 9, 2023 | — |
| 10.24+— | License and Service Agreement dated February 8, 2007, by and between Revance Therapeutics, Inc. and List Biological Laboratories, Inc. | 10-Q | 001-36297 | 10.1 | May 9, 2023 | — |
| 10.25+— | First Addendum to the License and Service Agreement dated April 21, 2009, by and between Revance Therapeutics, Inc. and List Biological Laboratories, Inc. | 10-Q | 001-36297 | 10.2 | May 9, 2023 | — |
| 10.26+— | Second Addendum to License and Service Agreement dated March 2, 2021, by and between Revance Therapeutics, Inc. and List Biological Laboratories, Inc. | 10-Q | 001-36297 | 10.2 | May 10, 2021 | — |
| 10.27+— | Third Addendum to License and Service Agreement dated December 9, 2021, by and between Revance Therapeutics, Inc. and List E, LLC | 10-Q | 001-36297 | 10.3 | May 10, 2022 | — |
| 10.28+ | Development and Supply Agreement dated December 11, 2009, by and between Revance Therapeutics, Inc. and Hospira Worldwide, Inc. | S-1 | 333-193154 | 10.18 | December 31, 2013 | — |
| 10.29+ | First Amendment to Development and Supply Agreement dated May 29, 2013 by and between Revance Therapeutics, Inc. and Hospira Worldwide, Inc. | S-1 | 333-193154 | 10.20 | December 31, 2013 | — |
| 10.30+ | Second Amendment to Development and Supply Agreement dated August 31, 2015, by and between Revance Therapeutics, Inc. and Hospira Worldwide, Inc. | 10-Q | 001-36297 | 10.1 | November 10, 2015 | — |
| 10.31* | Revance Therapeutics, Inc. Executive Severance Benefit Plan, Amended and Restated effective February 7, 2024 | 8-K | 001-36297 | 10.1 | February 13, 2024 | — |
| 10.32* | Revance Therapeutics, Inc. 2024 Management Bonus Plan | — | — | — | — | X |
| 10.33* | Executive Employment Agreement dated November 5, 2018 by and between Revance Therapeutics, Inc. and Tobin Schilke | 10-K | 001-36291 | 10.37 | February 28, 2019 | — |
| 10.34+# | Technology Transfer, Validation and Commercial Fill/Finish Services Agreement dated March 14, 2017, by and between Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. | 10-Q | 001-36297 | 10.4 | May 9, 2017 | — |
| 10.35+— | Amendment No. 1 to the Technology Transfer, Validation and Commercial Fill/Finish Services Agreement dated December 18, 2020, by and between Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. | 10-K | 001-36297 | 10.31 | February 25, 2021 | — |
| 10.36+— | Amendment No. 2 to the Technology Transfer, Validation and Commercial Fill/Finish Services Agreement dated February 26, 2024, by and between Revance Therapeutics, Inc. and Ajinomoto Althea, Inc. | 8-K | 001-36297 | 10.1 | February 28, 2024 | — |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.37+ | Collaboration and License Agreement dated February 28, 2018 by and between Revance Therapeutics, Inc. and Mylan Ireland Ltd. | 10-Q | 001-36297 | 10.1 | May 9, 2018 | — |
| 10.38+— | Amendment #1 to the Collaboration and License Agreement dated August 22, 2019, by and between Revance Therapeutics, Inc. and Mylan Ireland Ltd. | 10-Q | 001-36297 | 10.1 | November 4, 2019 | — |
| 10.39+ | License Agreement dated December 4, 2018, by and between Revance Therapeutics, Inc. and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. | 10-K | 001-36291 | 10.42 | February 28, 2019 | — |
| 10.40 | Letter Amendment to the License Agreement dated January 8, 2020, by and between Revance Therapeutics, Inc. and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. | 10-K | 001-36291 | 10.35 | February 25, 2021 | — |
| 10.41+—+ | Second Letter Amendment to License Agreement dated March 23, 2023, by and between Revance Therapeutics, Inc. and Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd. | 10-Q | 001-36297 | 10.4 | May 9, 2023 | — |
| 10.42* | Executive Employment Agreement dated October 13, 2019, by and between Revance Therapeutics, Inc. and Mark J. Foley | 10-Q | 001-36297 | 10.4 | November 4, 2019 | — |
| 10.43* | Executive Employment Agreement dated December 1, 2019, by and between Revance Therapeutics, Inc. and Dustin Sjuts | 10-K | 001-36297 | 10.40 | February 26, 2020 | — |
| 10.44 | Separation Agreement, dated February 23, 2024, by and between Revance Therapeutics, Inc. and Dustin Sjuts | 8-K | 001-36297 | 10.2 | February 28, 2024 | — |
| 10.45* | Executive Employment Agreement dated February 17, 2020, by and between Revance Therapeutics, Inc. and Dwight Moxie | 10-K | 001-36297 | 10.42 | February 26, 2020 | — |
| 10.46+— | Exclusive Distribution Agreement dated January 10, 2020, by and between Revance Therapeutics, Inc. and Teoxane SA | 10-K | 001-36297 | 10.43 | February 26, 2020 | — |
| 10.47+— | First Amendment to Exclusive Distribution Agreement dated September 1, 2020, by and between Revance Therapeutics, Inc. and Teoxane SA | 10-Q | 001-36297 | 10.5 | November 9, 2020 | — |
| 10.48+—+ | Second Amendment to Exclusive Distribution Agreement dated November 18, 2020, by and between Revance Therapeutics, Inc. and Teoxane SA | 10-Q | 001-36297 | 10.1 | November 8, 2022 | — |
| 10.49+—+ | Third Amendment to Exclusive Distribution Agreement dated December 22, 2022, by and between Revance Therapeutics, Inc. and Teoxane SA | 10-K | 001-36297 | 10.46 | February 28, 2023 | — |
| 10.50* | Revance Therapeutics, Inc. Amended and Restated Non-Employee Director Compensation Policy | 10-Q | 001-36297 | 10.1 | May 10, 2021 | — |
| 10.51+—+ | Commercial Supply Agreement dated April 6, 2021, by and between Revance Therapeutics, Inc. and Lyophilization Services of New England, Inc. | 10-Q | 001-36297 | 10.1 | August 5, 2021 | — |
| 10.52+—+ | Note Purchase Agreement dated March 18, 2022 among Revance Therapeutics, Inc., certain subsidiaries of Revance Therapeutics, Inc., Athyrium Buffalo LP and the purchasers from time to time party thereto | 10-Q | 001-36297 | 10.4 | May 10, 2022 | — |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.53++ | First Amendment to the Note Purchase Agreement, dated August 8, 2023 among Revance Therapeutics, Inc., certain subsidiaries of Revance Therapeutics, Inc., Athyrium Buffalo LP and the purchasers from time to time party thereto | 10-Q | 001-36297 | 10.1 | November 8, 2023 | — |
| 21.1 | List of Subsidiaries of the Registrant | — | — | — | — | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | — | — | — | — | X |
| 24.1 | Power of Attorney (contained in the signature page to this Annual Report on Form 10-K) | — | — | — | — | X |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 32.1† | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 32.2† | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 97.1 | Revance Therapeutics, Inc. Incentive Compensation Recoupment Policy | — | — | — | — | X |
| 101.INS | Inline XBRL Instance Document | — | — | — | — | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | — | — | — | — | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | — | — | — | — | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | — | — | — | — | X |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document | — | — | — | — | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | — | — | — | — | X |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibits 101) | — | — | — | — | X |

* Indicates a management contract or compensatory plan or arrangement.

\+ Confidential treatment has been granted for portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

++ Portions of this exhibit (indicated by asterisks) have been omitted as the registrant has determined that (i) the omitted information is not material and (ii) the omitted information would likely cause competitive harm to the registrant if publicly disclosed.

+++ Portions of this exhibit (indicated by asterisks) have been omitted as the registrant has determined that (i) the omitted information is not material and (ii) the omitted information is of the type that the registrant treats as private or confidential.

\# Confidential treatment was previously granted for portions of this exhibit which was originally filed as Exhibit 10.4 to the registrant's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on May 9, 2017.

† The certifications attached as Exhibit 32.1 and 32.2 that accompany this Report are not deemed filed with the SEC and are not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act or the Exchange Act, whether made before or after the date of this Report, irrespective of any general incorporation language contained in such filing.

**ITEM 16. FORM 10-K SUMMARY**

None.

**REVANCE THERAPEUTICS, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | F-2 |
| **Consolidated Financial Statements:** | |
| Consolidated Balance Sheets | F-5 |
| Consolidated Statements of Operations and Comprehensive Loss | F-6 |
| Consolidated Statements of Stockholders' Equity | F-7 |
| Consolidated Statements of Cash Flows | F-9 |
| Notes to Consolidated Financial Statements | F-11 |

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Revance Therapeutics, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Revance Therapeutics, Inc. and its subsidiaries (the "Company") as of December 31, 2023 and 2022, and the related consolidated statements of operations and comprehensive loss, of stockholders' equity (deficit) and of cash flows for each of the three years in the period ended December 31, 2023, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

**Basis for Opinions**

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

**Emphasis of Matter**

As disclosed in Note 1 to the consolidated financial statements, the Company is required to comply with a cash covenant under the terms of its Note Purchase Agreement. Management's evaluation of events and conditions related to its covenant compliance in 2025, including management's plans to alleviate those conditions are also described in Note 1.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Goodwill and Intangible Asset Impairment Assessments Related to the Planned Exit of the Fintech Platform Business*

As described in Notes 2, 4 and 6 to the consolidated financial statements, the Company recorded goodwill and intangible asset impairment charges of $77.2 million and $16.0 million, respectively, for the year ended December 31, 2023, due to the planned exit of the Fintech Platform business. Management assesses goodwill for impairment at least annually at the reporting unit level in the fourth quarter of each calendar year, or more frequently if events or changes in circumstances indicate that the reporting unit might be impaired and evaluates long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of long-lived assets may not be recoverable. Impairment loss for goodwill and long-lived assets, if any, is recognized based on a comparison of the respective fair value to its respective carrying value. In September 2023, based on management's plan to exit the Fintech Platform business, management concluded that it was more likely than not that the goodwill and asset group for OPUL were impaired. Due to management's decision to exit the Fintech Platform business, the Company's negative future cash flows from the Services Segment resulted in estimated fair values of zero for the related goodwill and OPUL asset group and full impairment of the related goodwill and intangible asset carrying values. Management performed quantitative impairment assessments over the reporting unit and OPUL asset group using the income approach. The performance of the impairment assessments required the use of significant judgment by management related to the planned exit of the Fintech Platform business.

The principal considerations for our determination that performing procedures relating to the goodwill and intangible asset impairment assessments related to the planned exit of the Fintech Platform business is a critical audit matter are (i) the significant judgment by management when evaluating the impact of the planned exit of the Fintech Platform business on the related goodwill and intangible asset and when developing the fair value estimates of the related reporting unit and OPUL asset group and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's judgments related to whether the planned exit of the Fintech Platform business indicated that the related goodwill may be impaired or the carrying value of the related intangible asset may not be recoverable.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls

relating to management's planned exit of the Fintech Platform business, including controls over the goodwill and intangible asset impairment assessments. These procedures also included, among others, testing management's process for (i) evaluating the impact of the planned exit of the Fintech Platform business on the related goodwill and intangible asset; (ii) evaluating whether the planned exit of the Fintech Platform business indicate that the related goodwill may be impaired or the carrying value of the related intangible asset may not be recoverable; and (iii) developing the fair value estimates of the related reporting unit and OPUL asset group. These procedures also included (i) evaluating the appropriateness of the income approach used by management; (ii) testing certain of the data used by management in the income approach; and (iii) evaluating management's judgments related to whether the planned exit of the Fintech Platform business indicated that the related goodwill may be impaired or the carrying value of the related intangible asset may not be recoverable. Evaluating management's judgment involved evaluating whether the judgments were reasonable by considering (i) the current and past performance of the Fintech Platform business; (ii) whether the judgments were consistent with management's plan to exit the Fintech Platform business; and (iii) whether the judgments were consistent with evidence obtained in other areas of the audit.

/s/ PricewaterhouseCoopers LLP
San Jose, California
February 28, 2024

We have served as the Company's auditor since 2005.

Table of Contents

**REVANCE THERAPEUTICS, INC.**
**Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**

| | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 137,329 | $ 108,965 |
| Restricted cash, current | 550 | — |
| Short-term investments | 116,586 | 231,742 |
| Accounts receivable, net | 27,676 | 11,339 |
| Inventories | 45,579 | 18,325 |
| Prepaid expenses and other current assets | 11,145 | 4,356 |
| Total current assets | 338,865 | 374,727 |
| Property and equipment, net | 17,225 | 13,799 |
| Goodwill | — | 77,175 |
| Intangible assets, net | 9,808 | 35,344 |
| Operating lease right-of-use assets | 53,167 | 39,223 |
| Finance lease right-of-use asset | 19,815 | 6,393 |
| Restricted cash, non-current | 6,870 | 6,052 |
| Finance lease prepaid expense | 32,383 | 27,500 |
| Other non-current assets | 321 | 1,687 |
| TOTAL ASSETS | $ 478,454 | $ 581,900 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 13,809 | $ 4,546 |
| Accruals and other current liabilities | 53,824 | 59,357 |
| Deferred revenue, current | 10,737 | 6,867 |
| Finance lease liability, current | 2,651 | 669 |
| Operating lease liabilities, current | 5,703 | 4,243 |
| Debt, current | 2,500 | — |
| Total current liabilities | 89,224 | 75,682 |
| Debt, non-current | 426,595 | 379,374 |
| Deferred revenue, non-current | 70,419 | 78,577 |
| Operating lease liabilities, non-current | 40,985 | 34,182 |
| Other non-current liabilities | 2,835 | 1,485 |
| TOTAL LIABILITIES | 630,058 | 569,300 |
| Commitments and Contingencies (Note 15) | | |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Preferred stock, par value $0.001 per share — 5,000,000 shares authorized, and no shares issued and outstanding as of December 31, 2023 and 2022 | — | — |
| Common stock, par value $0.001 per share — 190,000,000 shares authorized as of December 31, 2023 and 2022; 87,962,765 and 82,385,810 shares issued and outstanding as of December 31, 2023 and 2022, respectively | 88 | 82 |
| Additional paid-in capital | 1,926,654 | 1,767,266 |
| Accumulated other comprehensive gain (loss) | 14 | (374) |
| Accumulated deficit | (2,078,360) | (1,754,374) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | (151,604) | 12,600 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT) | $ 478,454 | $ 581,900 |

The accompanying notes are an integral part of these consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**

| | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Revenue: | | | |
| Product revenue | $ 212,658 | $ 118,131 | $ 70,820 |
| Service revenue | 12,249 | 6,990 | 1,323 |
| Collaboration revenue | 9,133 | 7,444 | 5,655 |
| Total revenue | 234,040 | 132,565 | 77,798 |
| Operating expenses: | | | |
| Cost of product revenue (exclusive of amortization) | 62,335 | 44,414 | 23,125 |
| Cost of service revenue (exclusive of amortization) | 12,028 | 7,253 | 285 |
| Selling, general and administrative | 297,732 | 223,934 | 198,821 |
| Research and development | 79,410 | 101,286 | 116,255 |
| Goodwill impairment | 77,175 | 69,789 | — |
| Intangible asset impairment | 16,007 | — | — |
| Amortization | 6,130 | 27,847 | 13,988 |
| Total operating expenses | 550,817 | 474,523 | 352,474 |
| Loss from operations | (316,777) | (341,958) | (274,676) |
| Interest income | 13,285 | 4,891 | 337 |
| Interest expense | (19,356) | (16,474) | (6,273) |
| Other expense, net | (838) | (2,181) | (698) |
| Loss before income taxes | (323,686) | (355,722) | (281,310) |
| Income tax provision | (300) | (700) | — |
| Net loss | (323,986) | (356,422) | (281,310) |
| Unrealized gain (loss) | 388 | (356) | (18) |
| Comprehensive loss | $ (323,598) | $ (356,778) | $ (281,328) |
| Basic and diluted net loss | $ (323,986) | $ (356,422) | $ (281,310) |
| Basic and diluted net loss per share | $ (3.83) | $ (4.90) | $ (4.17) |
| Basic and diluted weighted-average number of shares used in computing net loss per share | 84,599,409 | 72,713,340 | 67,507,818 |

The accompanying notes are an integral part of these consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Consolidated Statements of Stockholders' Equity (Deficit)**
**(In thousands, except share amounts)**

| | Common Stock | | Additional Paid-In Capital | Other Accumulated Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance — December 31, 2020 | 69,178,666 | $ 69 | $ 1,500,514 | $ — | $ (1,126,293) | $ 374,290 |
| Cumulative-effect adjustment from adoption of ASU 2020-06 | — | — | (108,509) | — | 9,651 | (98,858) |
| Issuance of common stock upon exercise of stock options | 965,462 | 1 | 12,922 | — | — | 12,923 |
| Issuance of common stock related to stock awards, net of cancellation | 781,720 | 1 | (1) | — | — | — |
| Issuance of common stock related to ATM, net of commissions and issuance costs | 761,526 | 1 | 21,553 | — | — | 21,554 |
| Issuance of common stock related to 2014 ESPP | 204,004 | — | 3,765 | — | — | 3,765 |
| Shares withheld related to net settlement of stock awards | (307,321) | — | (8,185) | — | — | (8,185) |
| Stock-based compensation | — | — | 44,310 | — | — | 44,310 |
| Unrealized loss | — | — | — | (18) | — | (18) |
| Net loss | — | — | — | — | (281,310) | (281,310) |
| Balance — December 31, 2021 | 71,584,057 | 72 | 1,466,369 | (18) | (1,397,952) | 68,471 |
| Issuance of common stock in connection with follow-on offering, net of underwriting discounts, commissions, and offering costs | 9,200,000 | 9 | 215,852 | — | — | 215,861 |
| Issuance of common stock related to ATM, net of commissions and issuance costs | 1,734,853 | 1 | 31,585 | — | — | 31,586 |
| Issuance of common stock related to 2014 ESPP | 322,727 | | 3,856 | | | 3,856 |
| Issuance of common stock upon exercise of stock options | 181,902 | — | 964 | — | — | 964 |
| Shares withheld related to net settlement of stock awards | (341,799) | — | (6,496) | — | — | (6,496) |
| Cancellation of common stock related to stock awards, net of issuance | (295,930) | — | — | — | — | — |
| Stock-based compensation | — | — | 54,788 | — | — | 54,788 |
| Unrealized loss | — | — | — | (356) | — | (356) |
| Other | — | — | 348 | — | — | 348 |
| Net loss | — | — | — | — | (356,422) | (356,422) |
| Balance — December 31, 2022 | 82,385,810 | 82 | 1,767,266 | (374) | (1,754,374) | 12,600 |

The accompanying notes are an integral part of these consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Consolidated Statements of Stockholders' Equity (Deficit) — (Continued)**
**(In thousands, except share amounts)**

| | Common Stock | | Additional Paid-In Capital | Other Accumulated Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Issuance of common stock related to ATM, net of commissions and issuance costs | 3,223,767 | 3 | 99,956 | — | — | 99,959 |
| Issuance of common stock related to stock awards, net of cancellation | 1,679,683 | 2 | (2) | — | — | — |
| Issuance of common stock upon exercise of stock options | 708,084 | 1 | 11,608 | — | — | 11,609 |
| Issuance of common stock related to 2014 ESPP | 321,345 | — | 3,681 | — | — | 3,681 |
| Shares withheld related to net settlement of stock awards | (355,924) | — | (8,216) | — | — | (8,216) |
| Stock-based compensation | — | — | 52,331 | — | — | 52,331 |
| Unrealized gain | — | — | — | 388 | — | 388 |
| Other | — | — | 30 | — | — | 30 |
| Net loss | — | — | — | — | (323,986) | (323,986) |
| Balance — December 31, 2023 | 87,962,765 | $ 88 | $ 1,926,654 | $ 14 | $ (2,078,360) | $ (151,604) |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**REVANCE THERAPEUTICS, INC.**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net loss | $ (323,986) | $ (356,422) | $ (281,310) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Goodwill and intangible asset impairment | 93,182 | 69,789 | — |
| Stock-based compensation | 47,813 | 52,340 | 43,434 |
| Depreciation and amortization | 11,375 | 33,732 | 19,853 |
| Amortization of debt discount and debt issuance costs | 2,397 | 1,880 | 1,250 |
| Amortization of finance lease right-of-use asset | 2,318 | 5,414 | — |
| Amortization of premium (discount) on investments | (6,438) | (2,176) | 89 |
| Other non-cash operating activities | 646 | 1,230 | (80) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (16,338) | (7,990) | (1,519) |
| Inventories | (14,910) | (6,008) | (4,278) |
| Prepaid expenses and other current assets | (6,789) | 3,596 | (1,751) |
| Lease right-of-use assets | (36,399) | (6,691) | (14,708) |
| Other non-current assets | 900 | (602) | 333 |
| Accounts payable | 6,900 | (5,448) | (1,824) |
| Accruals and other liabilities | (5,025) | 15,564 | 6,825 |
| Deferred revenue | (4,288) | 1,930 | (1,631) |
| Lease liabilities | 30,717 | 6,314 | 12,294 |
| Other non-current liabilities | 1,350 | — | 1,485 |
| **Net cash used in operating activities** | (216,575) | (193,548) | (221,538) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Proceeds from maturities of investments | 385,432 | 232,178 | 172,000 |
| Purchases of investments | (263,923) | (347,966) | (183,590) |
| Purchases of property and equipment | (6,886) | (3,210) | (10,375) |
| Finance lease prepayments | (4,883) | (19,800) | (7,700) |
| **Net cash provided by (used in) investing activities** | 109,740 | (138,798) | (29,665) |

The accompanying notes are an integral part of these consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Consolidated Statements of Cash Flows — (Continued)**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from issuance of common stock related with ATM, net of commissions | 100,183 | 31,814 | 21,706 |
| Proceeds from issuance of notes payable, net of debt discount | 48,415 | 98,150 | — |
| Proceeds from the exercise of stock options and employee stock purchase plan | 15,289 | 4,820 | 16,688 |
| Principal payments on finance lease obligations | (18,255) | (11,097) | — |
| Taxes paid related to net settlement of stock awards | (8,216) | (6,496) | (8,185) |
| Payment of debt issuance costs and offering costs | (849) | (2,045) | (340) |
| Proceeds from issuance of common stock in connection with follow-on offering, net of discounts and commissions | — | 216,200 | — |
| Other financing activities | — | 348 | — |
| **Net cash provided by financing activities** | 136,567 | 331,694 | 29,869 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | 29,732 | (652) | (221,334) |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — Beginning of period | 115,017 | 115,669 | 337,003 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — End of period | $ 144,749 | $ 115,017 | $ 115,669 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | | |
| Cash paid for interest | $ 15,090 | $ 12,231 | $ 5,031 |
| Cash paid for income taxes | $ 300 | $ 700 | $ — |

The accompanying notes are an integral part of these consolidated financial statements.



REV_DAX-03338725

DTX-370.0120

**REVANCE THERAPEUTICS, INC.**

**Notes to Consolidated Financial Statements**

**1. The Company**

**Overview**

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

**Liquidity and Going Concern**

We are not profitable and have incurred losses in each year since our inception. For the year ended December 31, 2023, we had a net loss of $324.0 million and an accumulated deficit of $2.1 billion. Although we began generating revenue from the sale of our Products and Services during the three months ended September 30, 2020, we expect to continue to incur GAAP operating losses for the foreseeable future. As of December 31, 2023, we had a working capital surplus of $249.6 million and capital resources of $253.9 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement, and payments received from collaboration arrangements. We also have a remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of December 31, 2023.

In accordance with ASC 205-40, *Presentation of Financial Statements – Going Concern*, we are required to evaluate whether there are conditions and events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern for at least 12 months from the issuance date of our financial statements. We are required to maintain compliance with the Minimum Cash Covenant in accordance with the terms of the Note Purchase Agreement (see Note 10). Our forecasted liquidity is based on our approved operating plan which forecasts the receipt of milestone payments expected from Fosun upon the NMPA's potential approvals of Fosun's BLAs for DaxibotulinumtoxinA for Injection for the improvement of glabellar lines and treatment of cervical dystonia, which are anticipated in 2024 and early 2025, respectively, and a payment from the IRS resulting from our ERC claim filed in July 2023. As the timing of receipt of those payments are subject to regulatory/governmental approvals of which there are inherent uncertainties outside of our control, for purposes of the evaluation under ASC 205-40, those payments have been excluded from our forecasted liquidity, which initially resulted in a risk condition that the Minimum Cash Covenant would not be met sometime in the first half of 2025 and would put the Company in default under the terms of the Note Purchase Agreement. As a result, substantial doubt about our ability to continue as a going concern was raised.

The Company finalized and approved a plan to alleviate the substantial doubt, which includes a refined operating plan, which aligns with our capital allocation priorities and is designed to streamline our operations and drive revenue growth. The operating plan includes delaying or eliminating certain non-essential projects and capital expenditure spending, deferring certain hiring and reducing costs associated with non-revenue generating commercial and marketing functions. Management believes the refined operating plan is probable of being implemented on a timely basis.

Because the refined operating plan provides the Company with sufficient liquidity and working capital to meet its cash flow requirements for at least 12 months from the issuance date of our financial statements and would not result in violation of the Minimum Cash Covenant, the substantial doubt about our ability to continue as a going concern has been alleviated. Although the refined operating plan provides the Company with sufficient liquidity and working capital to alleviate the going concern, if the Company were unable to successfully execute the refined operating plan, its estimates regarding the amounts necessary to accomplish its business objectives are inaccurate, other unanticipated costs arise or the Company changes its operating plan as a result of factors currently unknown, the Company may need to seek additional capital sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations, although adequate funds may not be available to us on a timely basis or at all.

## 2. Summary of Significant Accounting Policies

### Basis of Presentation and Principles of Consolidation

Our consolidated financial statements include our accounts and those of our wholly-owned subsidiaries, and have been prepared in conformity with GAAP. All intercompany transactions have been eliminated.

### Reclassification

At the beginning of 2023, we changed our presentation of internal-use software where approximately $8.3 million has been reclassified from property and equipment, net into intangible assets, net. This reclassification has no impact on net loss or cash flows. The table below presents the impact of the reclassification:

| | As of December 31, 2022 | | |
|---|---|---|---|
| | Balance As Previously Reported [(1)] | Reclassification | Balance As Reclassified |
| Property and equipment, net | $ 22,139 | $ (8,340) | $ 13,799 |
| Intangible assets, net | $ 27,004 | $ 8,340 | $ 35,344 |

(1) Amount as filed with our Annual Report on Form 10-K for the year ended December 31, 2022 on the consolidated balance sheets, as filed with the SEC on February 28, 2023.

### Use of Estimates

The preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities in the consolidated financial statements and accompanying notes. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical information and on various other assumptions that we believe are reasonable under the circumstances. GAAP requires us to make estimates and judgments in several areas, including, but not limited to, the incremental borrowing rate used to measure lease liabilities, the recoverability of goodwill and long-lived assets, useful lives associated with property and equipment and intangible assets, the period of benefit associated with deferred costs, revenue recognition (including the timing of satisfaction of performance obligations, estimating variable consideration, estimating stand-alone selling prices of promised goods and services, and allocation of transaction price to performance obligations), deferred revenue classification, valuation and assumptions underlying stock-based compensation and income taxes.

As of the date of issuance of these consolidated financial statements, we are not aware of any specific event or circumstance that would require us to update our estimates, judgments or revise the carrying value of our assets or liabilities. These estimates may change as new events occur and additional information is obtained, and are recognized in the consolidated financial statements as soon as they become known. Actual results could differ from those estimates and any such differences may be material to our consolidated financial statements.

### Risks and Uncertainties

***Impact of the Macroeconomic Environment on our Business***

The U.S. and global financial markets have experienced significant volatility in recent years, which has led to disruptions to commerce and pricing stability, impacts to foreign exchange rates, labor shortages, global inflation, higher interest rates and supply chain disruptions. Due to current inflationary pressures, we have experienced higher costs throughout our business, which we expect may continue during 2024.

The ultimate impact of the current and anticipated global economic conditions is highly uncertain and we do not yet know the full extent of potential delays or impacts on our regulatory process, our manufacturing operations, supply chain, end user demand for our Products, commercialization efforts, business operations, clinical trials and other aspects of our business and the aesthetics industry, the healthcare systems or the global economy as a whole.

*Concentration of Business Risk*

We rely on a limited number of third-party suppliers for the manufacturing of DAXXIFY®. In particular, we outsource the manufacture of bulk peptide through an agreement with a single supplier, and we currently primarily manufacture DAXXIFY® commercial drug product supply through ABPS. To decrease the risk of an interruption to our drug supply, we maintain an inventory of peptide. In addition, we plan to utilize the PCI facility, if approved, for the clinical and commercial production of DAXXIFY® drug product. However, if and until the PCI facility is approved, we are dependent on the ABPS facility. If ABPS or the bulk peptide supplier is unable to fulfill its manufacturing obligations for any reason, such an event could make it difficult or, in certain cases, impossible for us to continue to manufacture our drug product and/or drug substance for a substantial period of time.

Our product revenue relies on one third-party distributor for our products.

*Concentration of Credit Risk*

Financial instruments that potentially subject us to a concentration of credit risk consist of short-term investments. Under our investment policy, we limit our credit exposure by investing in highly liquid funds and debt obligations of the U.S. government and its agencies with high credit quality. Our cash, cash equivalents, and short-term investments are held in the U.S. Such deposits may, at times, exceed federally insured limits. We have not experienced any significant losses on our deposits of cash, cash equivalents, and short-term investments.

**Cash and Cash Equivalents**

We consider all highly liquid investment securities with remaining maturities at the date of purchase of three months or less to be cash equivalents.

**Restricted Cash**

As of December 31, 2023, our restricted cash balance was $7.4 million, which consisted of $6.6 million of deposits related to letters of credit and $0.8 million related to securing our facility leases that will remain until the end of the leases. As of December 31, 2022, our restricted cash balance was $6.1 million, which consisted of $5.4 million of deposits related to letters of credit and $0.7 million related to securing our facility leases that will remain until the end of the leases. These balances were included in restricted cash on the accompanying consolidated balance sheets and within the cash, cash equivalents, and restricted cash balance on the consolidated statement of cash flows.

**Accounts receivable, net**

Trade accounts receivable are recorded at the invoiced amount and do not bear interest. Such accounts receivable have been reduced by an allowance for doubtful accounts, which is our best estimate of the amount of probable credit losses in our existing accounts receivable. We determine the allowance based on customer specific experience and the aging of such receivables, among other factors. The allowance for doubtful accounts as of December 31, 2023 and 2022 was $1.0 million and $0.1 million, respectively. We do not have any off-balance-sheet credit exposure related to our customers. Accounts receivable are also recorded net of estimated product returns which are not material.

**Investments**

Investments generally consist of securities with original maturities greater than three months and remaining maturities of less than one year. We do not have long-term investments with remaining maturities greater than one year. We determine the appropriate classification of our investments at the time of purchase and reevaluate such determination at each balance sheet date. All of our investments are classified as available-for-sale and carried at fair value, with the change in unrealized gains and losses reported as a separate component of other comprehensive income (loss) on the consolidated statements of operations and comprehensive loss and accumulated as a separate component of stockholders' equity (deficit) on the consolidated balance sheets. Interest income includes interest, amortization of purchase premiums and discounts, realized gains and losses on sales of securities and other-than-temporary declines in the fair value of investments, if any. The cost of securities sold is based on the specific-identification method. We monitor our investment portfolio for potential impairment on a quarterly basis. If the carrying amount of an investment in debt securities exceeds its fair value and the decline in value is determined to be other-than-temporary, the carrying amount of the security is reduced to fair value and a loss is recognized in operating results for the amount of such decline. In order to determine whether a decline in value is other-than-temporary, we evaluate, among other factors, the cause of the decline in value, including the creditworthiness of the security issuers, the number of securities in an unrealized loss position, the severity and duration of the unrealized losses, and our intent and ability to hold the security to maturity or forecast recovery.

**Inventories**

Inventories consist of raw materials, work in process, and finished goods held for sale to customers. Cost is determined using the first-in-first-out method. Inventory costs include raw materials, labor, quality control, and overhead associated with the cost of production and right-of-use amortization associated with the embedded finance lease. Inventory valuation reserves are established based on a number of factors including, but not limited to, inventory not conforming to product specifications, excess and obsolescence, or application of the lower of cost or net realizable value concepts. The determination of events requiring the establishment of inventory valuation reserves, together with the calculation of the amount of such reserves, may require judgment.

Products manufactured at a third-party contract manufacturer site prior to that site's regulatory approval may be capitalized as inventory when the future economic benefit is deemed probable. A number of factors are considered in determining probability, including the historical experience of achieving regulatory approvals for the manufacturing process, the progress along the approval process, the shelf life of the product, and any other impediments identified. If the criteria for capitalizing inventory are not met, the pre-approval manufacturing costs of products are recognized as research and development expense in the period incurred.

**Fair Value of Financial Instruments**

We use fair value measurements to record fair value adjustments to certain financial and non-financial assets and liabilities to determine fair value disclosures. The accounting standards define fair value, establish a framework for measuring fair value, and require disclosures about fair value measurements. Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required to be recorded at fair value, the principal or most advantageous market in which we would transact are considered along with assumptions that market participants would use when pricing the asset or liability, such as inherent risk, transfer restrictions, and risk of nonperformance. The accounting standard for fair value establishes a fair value hierarchy based on three levels of inputs, the first two of which are considered observable and the last unobservable, that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

The three levels of inputs that may be used to measure fair value are as follows:

- Level 1 — Observable inputs, such as quoted prices in active markets for identical assets or liabilities;
- Level 2 — Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities; and
- Level 3 — Valuations based on unobservable inputs to the valuation methodology and including data about assumptions market participants would use in pricing the asset or liability based on the best information available under the circumstances.

**Property and Equipment, net**

Property and equipment are stated at cost, net of accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Computer equipment and vehicles are generally depreciated over three years. Lab equipment, furniture and fixtures are generally depreciated over five years. Manufacturing machinery and equipment are generally depreciated over seven years. Leasehold improvements are depreciated over the lesser of fifteen years or the term of the lease. The cost of maintenance and repairs is expensed as incurred. As of December 31, 2023 and 2022, we had gross manufacturing machinery and equipment of $19.2 million and $21.9 million, which had net balances of $7.6 million and $8.4 million within property and equipment, net, respectively.

When property and equipment are retired or otherwise disposed of, the costs and accumulated depreciation are removed from the consolidated balance sheets and any resulting gain or loss is reflected in the consolidated statements of operations and comprehensive loss in the period realized.

**Leases**

We account for a contract as a lease when it has an identified asset that is physically distinct and we have the right to control the asset for a period of time while obtaining substantially all of the asset's economic benefits. We determine if an arrangement is a lease or contains a lease at inception. For arrangements that meet the definition of a lease, we determine the initial classification and measurement of our right-of-use asset and lease liability at the lease commencement date and thereafter if modified. We do not recognize right-of-use assets or lease liabilities for those leases that qualify as a short-term lease.

The lease term includes any renewal options that we are reasonably assured to exercise. The present value of lease payments is determined by using the interest rate implicit in the lease, if that rate is readily determinable; otherwise, we use our estimated secured incremental borrowing rate for that lease term.

For our real estate operating leases, rent expense is recognized on a straight-line basis over the reasonably assured lease term based on the total lease payments and is included in operating expenses in the consolidated statements of operations and comprehensive loss. In addition to rent, the real estate operating leases may require us to pay additional amounts for variable lease costs which includes taxes, insurance, maintenance, and other expenses, and the variable lease costs are generally referred to as non-lease components. Variable lease cost related to our operating leases are expensed as incurred. For real estate operating leases, we have elected to apply the practical expedient and account for the lease and non-lease components as a single lease component.

For our finance lease for a manufacturing fill-and-finish line, interest expense is recognized using the effective interest method. For finance leases, the interest expense on the lease liability and the amortization of the right-of-use asset is presented in a manner consistent with how we present other interest expense and depreciation and amortization of similar assets. For our manufacturing fill-and-finish line asset group, we have elected to apply the practical expedient and account for the lease and non-lease components as a single lease component. Variable lease costs related to our finance lease are expensed as incurred.

**Impairment of Long-lived Assets**

We evaluate long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of long-lived assets may not be recoverable. Events and changes in circumstances considered important that could result in an impairment review of long-lived assets include (i) a significant decrease in the market price of a long-lived asset; (ii) a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition; (iii) a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, including an adverse action or assessment by a regulator; (iv) an accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset; (v) a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset; and (vi) a current expectation that, more likely than not (more than 50%), a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The impairment evaluation of long-lived assets includes an analysis of estimated future undiscounted net cash flows expected from the use and eventual disposition of the long-lived assets over their remaining estimated useful lives. If the estimate of future undiscounted net cash flows is insufficient to recover the carrying value of the long-lived assets over the remaining estimated useful lives, we record an impairment loss in the amount by which the carrying value of the long-lived assets exceeds the fair value. Fair value is generally measured based on discounted cash flow analysis.

For the year ended December 31, 2023, we recorded $16.0 million of impairment related to intangible assets. For further information on quantitative intangible asset impairment tests and related impairment amounts, refer to Note 6.

**Goodwill and Impairment**

Goodwill represents the excess of the purchase price of the acquired business over the estimated fair value of the identifiable net assets acquired. All of the Company's goodwill balance is associated with the Service reporting unit. Goodwill is not amortized but is tested for impairment at least annually at the reporting unit level in the fourth quarter of each calendar year, or more frequently if events or changes in circumstances indicate that the reporting unit might be impaired. Impairment loss, if any, is recognized based on a comparison of the fair value of the reporting unit to its carrying value, without consideration of any recoverability. In assessing goodwill for impairment, we first assess qualitative factors to determine whether it is more likely than not that the fair value is less than its carrying amount. If we conclude it is more likely than not that the fair value of a reporting unit is less than its carrying amount, a quantitative impairment test is performed. If we conclude that goodwill is impaired, an impairment charge is recorded to the extent that the reporting unit's carrying value exceeds its fair value.

For the years ended December 31, 2023 and 2022, we recorded $77.2 million and $69.8 million of goodwill impairment, respectively. For further information on quantitative goodwill impairment tests and related impairment amounts, refer to Note 6.



REV_DAX-03338731
DTX-370.0126

**Intangible Assets, net**

Intangible assets consist of distribution rights acquired from the filler distribution agreement with Teoxane, intangible assets acquired from the HintMD Acquisition, internally developed technology, and other purchased software. Finite-lived intangible assets are carried at cost, less accumulated amortization on the consolidated balance sheets, and are amortized on a ratable basis over their estimated useful life.

Internal-use software, whether purchased or developed, is capitalized at cost and amortized using the straight-line method over its estimated useful life, which is generally three years. Costs associated with internally developed software are expensed until the point at which the project has reached the development stage. Subsequent additions, modifications or upgrades to internal-use software are capitalized only to the extent that they provide additional functionality. Software maintenance and training costs are expensed in the period in which they are incurred. The capitalization of internal-use software requires judgment in determining when a project has reached the development stage and the period over which we expect to benefit from the use of that software.

**Revenue**

Revenue is measured according to Accounting Standards Codification Topic 606, Revenue from Contracts with Customers (ASC 606). To determine revenue recognition for arrangements that we determine are within the scope of ASC 606, Revenue from Contracts with Customers, we perform the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) we satisfy a performance obligation. We only apply the five-step model to contracts when it is probable that we will collect the consideration we are entitled to in exchange for the goods or services we transfer to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, we assess the goods or services promised within the contract and determine those that are performance obligations and assess whether the promised good or service, or a bundle of goods and services is distinct. We then recognize as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied.

In revenue arrangements involving third parties, we recognize revenue as the principal when we maintain control of the product or service until it is transferred to our customer; under other circumstances, we recognize revenue as an agent in the sales transaction. Determining whether we have control requires judgment over certain considerations, which generally include whether we are primarily responsible for the fulfillment of the underlying products or services, whether we have inventory risk before fulfillment is completed, and if we have discretion to establish prices over the products or services. We evaluate whether we are the principal or the agent in our revenue arrangements involving third parties should there be changes impacting control in transferring related goods or services to our customers.

Taxes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction, that are collected by us from a customer, are excluded from revenue.

We currently generate product revenue from the sale of our Products, service revenue from payment processing and subscriptions to the platform, and collaboration revenue from an onabotulinumtoxinA biosimilar program with Viatris and Fosun.

***Product Revenue***

Our product revenue is recognized from the sale of our Products to our customers. We sell our Products to our customers through our third-party distributor and maintain control throughout the sales transactions as the principal. We recognize revenue from product sales when control of the product transfers, generally upon delivery, to the customers in an amount that reflects the consideration we received or expect to receive in exchange for those goods as specified in the customer contract. We accept product returns under limited circumstances which generally include damages in transit or ineffective product. Third-party distributor fees associated with product logistics are accounted for as fulfillment costs and are included in cost of product revenue in the accompanying statements of operations and comprehensive loss.

*Service Revenue*

Our service revenue is related to payment processing services. Payment processing services are charged on a rate per transaction basis (usage-based fees), with no minimum usage commitments. For revenue related to the HintMD Platform, which was discontinued during the second quarter of 2023, we were the accounting agent for arrangement and we recognized revenue generated from these transactions on a net basis. Conversely, we are the payment facilitator for the arrangements under the OPUL® platform and are considered the accounting principal, and the associated service revenue generated from the same transactions are recognized on a gross basis. In September 2023, we commenced a plan to exit the Fintech Platform business, discussed below in Note 4.

*Costs to Obtain Contracts with Customers*

Certain costs to obtain a contract with a customer should be capitalized, to the extent recoverable from the associated contract margin, and subsequently amortized as the products or services are delivered to the customer inclusive of expected renewals. We expect such costs to generally include sales commissions and related fringe benefits. For similar contracts with which the expected delivery period is one year or less, we apply the practical expedient to expense such costs as incurred in the consolidated statements of operations and comprehensive loss. Otherwise, such costs are capitalized on the consolidated balance sheets, and are amortized over the expected period of benefit to the customer. The determined period of benefit for payment processing and subscription services is subject to re-evaluation periodically.

*Collaboration Revenue*

We generate revenue from collaboration agreements, which are generally within the scope of ASC 606, where we license rights to certain intellectual property or certain product candidates and perform research and development services for third parties. The terms of these arrangements may include payment of one or more of the following: non-refundable upfront fees, milestone payments, and royalties on future net sales of licensed products.

Performance obligations are promises to transfer distinct goods or services to a customer. Promised goods or services are considered distinct when (i) the customer can benefit from the good or service on its own or together with other readily available resources and (ii) the promised good or service is separately identifiable from other promises in the contract. We utilize judgment to assess whether the collaboration agreements include multiple distinct performance obligations or a single combined performance obligation. In assessing whether a promised good or service is distinct in the evaluation of a collaboration arrangement subject to ASC 606, we consider various promised goods or services within the arrangement including but not limited to intellectual property license granting, research, manufacturing and commercialization, along with the intended benefit of the contract in assessing whether one promise is separately identifiable from other promises in the contract. We also consider the capabilities of the collaboration partner regarding these promised goods or services and the availability of the associated expertise in the general marketplace. If a promised good or service is not distinct, we are required to combine that good or service with other promised goods or services until we identify a bundle of goods or services that is distinct.

To estimate the transaction price, which could include fixed considerations or variable considerations, ASC 606 provides two alternatives to use when estimating the amount of variable considerations: the expected value method and the most likely amount method. Under the expected value method, an entity considers the sum of probability-weighted amounts in a range of possible consideration amounts. Under the most likely amount method, an entity considers the single most likely amount in a range of possible consideration amounts. The method selected can vary between contracts and is not a policy election; however, once determined, the method should be consistently applied throughout the life of the contract.

For collaboration arrangements that include variable considerations such as development, regulatory or commercial milestone payments, the associated milestone value is included in the transaction price if it is probable that a significant revenue reversal would not occur. Milestone payments that are not within the control of us or the licensee, such as regulatory approvals, are not considered probable of being achieved until those approvals are received.

For arrangements that include sales-based royalties, including milestone payments based on the level of sales, and the license is deemed to be the predominant item to which the royalties relate, we recognize revenue at the later of (i) when

the related sales occur, or (ii) when the performance obligation to which some or all of the royalty has been allocated has been satisfied (or partially satisfied).

For arrangements with multiple performance obligations, the transaction price is then allocated to each performance obligation on a relative stand-alone selling price basis.

We assess the nature of the respective performance obligation to determine whether it is satisfied over time or at a point in time and, if over time, the appropriate method of measuring proportional performance for purposes of recognizing revenue. We evaluate the measure of proportional performance each reporting period and, if necessary, adjust the measure of performance and related revenue recognition.

At the end of each subsequent reporting period, we re-evaluate the probability of achievement of each such milestone and any related constraint, and if necessary, adjust our estimates of the overall transaction price. Any such adjustments are recorded on a cumulative catch-up basis, which would affect revenues and earnings in the period of adjustment.

**Research and Development Expense**

Research and development expense are charged to operations as incurred. Research and development expense include, but are not limited to, personnel expenses, clinical trial supplies, fees for clinical trial services, manufacturing costs incurred before FDA approval becomes probable, consulting costs and allocated overhead, including rent, equipment, depreciation, and utilities. Assets acquired that are utilized in research and development that have no alternative future use are also expensed as incurred.

**Advertising Expense**

Cost related to advertising are expensed as incurred and included within selling, general and administrative expenses in the consolidated statement of operations and comprehensive loss. Advertising expense was $8.4 million, $5.1 million and $6.2 million for the years ended December 31, 2023, 2022 and 2021, respectively.

**Income Taxes**

We account for current and deferred income taxes by assessing and reporting tax assets and liabilities in our consolidated balance sheet and our statement of operations and comprehensive loss. We estimate current income tax exposure and temporary differences which result from differences in accounting under GAAP and tax purposes for certain items, such as accruals and allowances not currently deductible for tax purposes. These temporary differences result in deferred tax assets or liabilities. In general, deferred tax assets represent future tax benefits to be received when certain expenses previously recognized in the consolidated statements of operations and comprehensive loss become deductible expenses under applicable income tax laws or when net operating loss or credit carryforwards are utilized. Accordingly, realization of deferred tax assets is dependent on future taxable income against which these deductions, losses and credits can be utilized. Likewise, deferred tax liabilities represent future tax liabilities to be settled when certain amounts of income previously reported in the consolidated statements of operations and comprehensive loss become realizable income under applicable income tax laws.

We measure deferred tax assets and liabilities using tax rates applicable to taxable income in effect for the years in which those tax assets are expected to be realized or settled and provide a valuation allowance against deferred tax assets when we cannot conclude that it is more likely than not that some or all deferred tax assets will be realized. Based on the available evidence, we are unable, at this time, to support the determination that it is more likely than not that its net deferred tax assets will be utilized in the future. Accordingly, we recorded a full valuation allowance against the net deferred tax assets as of December 31, 2023 and 2022. We intend to maintain such a valuation allowance until sufficient evidence exists to support its reversal.

When foreign income is received in which a foreign withholding tax is required, we treat the withheld amount as a current income tax expense in the period in which the funds are received.

We recognize tax benefits from uncertain tax positions only if it expects that its tax positions are more likely than not that they will be sustained, based on the technical merits of the positions, on examination by the jurisdictional tax authority. We recognize any accrued interest and penalties to unrecognized tax benefits as interest expense and income tax expense, respectively.

**Stock-based Compensation**

Under our equity compensation plans, we have issued stock options, RSAs, RSUs, performance-based PSAs, performance-based PSUs, market-based PSAs, market-based PSUs, and issue shares of common stock to our employees under the 2014 ESPP.

We measure our stock-based awards using the estimated grant-date fair values. For stock options issued and shares purchased under the 2014 ESPP, fair values are determined using the Black-Scholes option pricing model. For RSAs, RSUs, performance-based PSAs, and performance-based PSUs, the grant-date fair values are the closing prices of our common stocks on the grant dates. For market-based PSAs and market-based PSUs, fair values are determined using the Monte-Carlo simulation model.

For stock options, RSAs, RSUs, market-based PSAs and market-based PSUs, the fair value is recognized as compensation expense over the requisite service period (generally the vesting period). For performance-based PSAs, and performance-based PSUs, the fair value is recognized as compensation expense when the performance condition is probable of achievement.

Stock-based compensation expenses are classified in the consolidated statements of operations and comprehensive loss based on the functional area to which the related recipients belong. Forfeitures are recognized as incurred.

**Contingencies**

From time to time, we may have certain contingent liabilities that arise in the ordinary course of business activities. We accrue a liability for such matters when it is probable that future expenditures will be made and can be reasonably estimated. Contingencies related to regulatory approval milestones will only become probable once such regulatory outcome is achieved. We are not subject to any known current pending legal matters or claims that would have a material adverse effect on our financial position, results of operations or cash flows.

**Recent Accounting Pronouncements**

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*. This standard requires public entities to disclose information about their reportable segments' significant expenses and other segment items on an interim and annual basis. Public entities with a single reportable segment are required to apply the disclosure requirements in ASU 2023-07, as well as all existing segment disclosures and reconciliation requirements in ASC 280, on an interim and annual basis. ASU 2023-07 is effective for fiscal years beginning after December 15, 2023 and for interim periods beginning after December 15, 2024, with early adoptions permitted. We are currently evaluating the impact of adopting ASU 2023-07.

**3. Revenue**

Our revenue is primarily generated from U.S. customers. Our product and collaboration revenues are generated from the Product Segment, and our service revenue is generated from the Service Segment (Note 16). The following table presents our revenue disaggregated by timing of transfer of goods or service:

Table of Contents



| (in thousands) | Year Ended December 31, 2023 Transferred at a point in time | over time | Total | Year Ended December 31, 2022 Transferred at a point in time | over time | Total | Year Ended December 31, 2021 Transferred at a point in time | over time | Total |
|---|---|---|---|---|---|---|---|---|---|
| Product revenue | $ 212,658 | $ — | $ 212,658 | $ 118,131 | $ — | $ 118,131 | $ 70,820 | $ — | $ 70,820 |
| Service revenue | 59 | 12,190 | 12,249 | 401 | 6,589 | 6,990 | 567 | 756 | 1,323 |
| Collaboration revenue | — | 9,133 | 9,133 | — | 7,444 | 7,444 | — | 5,655 | 5,655 |
| Total | $ 212,717 | $ 21,323 | $ 234,040 | $ 118,532 | $ 14,033 | $ 132,565 | $ 71,387 | $ 6,411 | $ 77,798 |

**Product Revenue**

Our product revenue breakdown is summarized below:

| (in thousands) | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Product: | | | |
| RHA® Collection of dermal fillers | $ 128,647 | $ 107,156 | $ 70,820 |
| DAXXIFY® | 84,011 | 10,975 | — |
| Total product revenue | $ 212,658 | $ 118,131 | $ 70,820 |

Accounts receivable and contract liabilities from contracts with our product customers are as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, net | $ 27,025 | $ 10,966 |
| Total accounts receivable, net | $ 27,025 | $ 10,966 |
| Contract liabilities: | | |
| Deferred revenue, current | $ 884 | $ 705 |
| Total contract liabilities | $ 884 | $ 705 |

**Service Revenue**

Through January 31, 2024, we offered payment processing and certain value-added services to aesthetic practices through the Fintech Platform. Generally, revenue related to the HintMD Platform payment processing service, which was discontinued in the second quarter of 2023, was recognized at a point in time and revenue related to the OPUL® payment processing service is recognized over time. For the Fintech Platform, revenue related to the value-added services component is recognized over time. In September 2023, we commenced a plan to exit the Fintech Platform business as discussed in Note 4.

Accounts receivable from contracts with our service customers are as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, net | $ 16 | $ 59 |
| Total accounts receivable, net | $ 16 | $ 59 |

**Collaboration Revenue**

*Viatris Agreement*

*Agreement Terms*

We entered into the Viatris Agreement in February 2018, pursuant to which we are collaborating with Viatris exclusively, in the Viatris Territory, to develop, manufacture, and commercialize an onabotulinumtoxinA biosimilar.

Viatris has paid us an aggregate of $60 million in non-refundable upfront and milestone fees as of December 31, 2023, and the agreement provides for additional remaining contingent payments of up to $70 million in the aggregate, upon the achievement of certain clinical and regulatory milestones and of specified, tiered sales milestones of up to $225 million. The payments do not represent a financing component for the transfer of goods or services. In addition, Viatris is required to pay us low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-U.S. Viatris territories. However, we have agreed to waive royalties for U.S. sales, up to a maximum of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs.

*Revenue Recognition*

We estimated the transaction price for the Viatris Agreement using the most likely amount method within the scope of ASC 606. In order to determine the transaction price, we evaluated all of the payments to be received during the duration of the contract, which included milestones and consideration payable by Viatris. Other than the upfront payment, all other milestones and consideration we may earn under the Viatris Agreement are subject to uncertainties related to development achievements, Viatris' rights to terminate the agreement, and estimated effort for cost-sharing payments. Components of such estimated effort for cost-sharing payments include both internal and external costs. Consequently, the transaction price does not include any milestones and considerations that, if included, could result in a probable significant reversal of revenue when related uncertainties become resolved. At the end of each reporting period, we re-evaluate the probability of achievement of each such milestone and any related constraint, and if necessary, adjust our estimates of the overall transaction price. Sales-based milestones and royalties are not included in the transaction price until the sales occur because the underlying value relates to the license and the license is the predominant feature in the Viatris Agreement. As of December 31, 2023, the transaction price allocated to the unfulfilled performance obligations was $33.9 million.

We recognize revenue and estimate deferred revenue based on the cost of development service incurred over the total estimated cost of development services to be provided for the development period. For revenue recognition purposes, the development period has an estimated accounting program end date of 2026. It is possible that this period will change and is assessed at each reporting date. ASC Topic 606, Revenue from Contracts with Customers (ASC 606) requires that an entity include a constraint on the amount of variable consideration included in the transaction price. Variable consideration is considered "constrained" if there is a potential for significant reversal of cumulative revenue recognized. As part of the constraint evaluation, we considered numerous factors, including a shift in certain responsibilities between the two parties which would result in changes to the net cost sharing payments and the total project budget, for which outcomes are difficult to predict as of the date of this Report. We will continue to evaluate the variable transaction price and related revenue recognition in each reporting period and as the above uncertainties are resolved or other changes in circumstances occur. For the years ended December 31, 2023, 2022, and 2021, we recognized revenue related to development services under the Viatris Agreement of $9.0 million, $7.1 million and $5.7 million, respectively.

**Fosun License Agreement**

*Agreement Terms*

In December 2018, we entered into the Fosun License Agreement with Fosun, whereby we granted Fosun the exclusive rights to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory and certain sublicense rights.



REV_DAX-03338737
DTX-370.0132

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

As of December 31, 2023, Fosun has paid us non-refundable upfront and other payments totaling $41.0 million before foreign withholding taxes. We are also eligible to receive (i) additional remaining contingent payments of up to $219.5 million upon the achievement of certain milestones, and (ii) tiered royalty payments in low double digits to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) we do not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third parties to either avoid patent infringement or market the product in the Fosun Territory.

***Revenue Recognition***

We estimated the transaction price for the Fosun License Agreement using the most likely amount method. We evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. We will re-evaluate the transaction price at each reporting period and upon a change in circumstances. As of December 31, 2023, the transaction price allocated to unfulfilled performance obligation is $41.0 million.

For the years ended December 31, 2023 and 2022, we recognized revenue from the Fosun License Agreement of $0.2 million and $0.3 million, respectively. No revenue was recognized from the Fosun License Agreement for the years ended December 31, 2021.

Accounts receivable and contract liabilities from contracts with our collaboration customers are as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, net — Viatris | $ 631 | $ — |
| Accounts receivable, net — Fosun | 4 | 315 |
| Total accounts receivable, net | $ 635 | $ 315 |
| | | |
| Contract liabilities: | | |
| Deferred revenue, current — Viatris | $ 9,853 | $ 6,162 |
| Total contract liabilities, current | $ 9,853 | $ 6,162 |
| | | |
| Deferred revenue, non-current — Viatris | $ 29,444 | $ 40,600 |
| Deferred revenue, non-current — Fosun | 40,975 | 37,977 |
| Total contract liabilities, non-current | $ 70,419 | $ 78,577 |

Changes in our contract liabilities from contracts with our collaboration revenue customers for the year ended December 31, 2023 are as follows:

| | (in thousands) |
|---|---|
| Balance on December 31, 2022 | $ 84,739 |
| Revenue recognized | (9,133) |
| Billings and adjustments, net | 4,666 |
| Balance on December 31, 2023 | $ 80,272 |

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

**4. Restructuring**

In September 2023, we commenced a plan to exit the Fintech Platform business as the costs and resources required to support OPUL® no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities predominantly included a reduction in OPUL® personnel headcount, the termination of OPUL® research and development activities and a reduction of outside services expenses related to OPUL®. Substantially all payment processing activities for OPUL® customers ended on January 31, 2024. We are currently in the process of completing activities to wind-down the remaining OPUL® platform operations, which we expect to be complete by March 31, 2024.

All of our restructuring charges in connection with the exit of the Fintech Platform business are recorded under our Service Segment. As of December 31, 2023, we recorded restructuring charges of $96.1 million as shown in the table below. We expect to incur estimated additional restructuring charges of up to $2 million, and such restructuring charges will be incurred over time through March 31, 2024.

A summary of our restructuring charges included within our consolidated statement of operations for the year ended December 31, 2023 were as follows:

| | | (in thousands) |
|---|---|---|
| Goodwill impairment | $ | 77,175 |
| Intangible asset impairment | | 16,007 |
| Research and development | | 1,610 |
| Selling, general and administrative | | 1,260 |
| Total restructuring charges | $ | 96,052 |

A summary of severance and personnel liabilities related to the exit of the Fintech Platform, included within accruals and other current liabilities on the consolidated balance sheet, is as follows:

| | | (in thousands) |
|---|---|---|
| Balance on December 31, 2022 | $ | — |
| Severance and other personnel costs | | 2,317 |
| Cash payments during the period | | (1,400) |
| Balance on December 31, 2023 | $ | 917 |

(1) We anticipate that the completion of the restructuring activities, including the implementation of the workforce reduction will be substantially complete by or around March 31, 2024, and the remaining related cash payments are expected though the second quarter of 2024.

**5. Cash Equivalents and Short-Term Investments**

The following table is a summary our cash equivalents and short-term investments:

| | December 31, 2023 | | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|---|
| (in thousands) | Adjusted Cost | Unrealized Gain | Unrealized Loss | Fair Value | Adjusted Cost | Unrealized Loss | Fair Value |
| U.S. treasury securities | $ 133,168 | $ 30 | $ — | $ 133,198 | $ 109,984 | $ (228) | $ 109,756 |
| Commercial paper | 49,433 | — | (15) | 49,418 | 80,946 | — | 80,946 |
| Money market funds | 39,280 | — | — | 39,280 | 85,206 | — | 85,206 |
| U.S. government agency obligations | 3,961 | — | (1) | 3,960 | 4,480 | — | 4,480 |
| Corporate bonds | — | — | — | — | 41,186 | (146) | 41,040 |
| Total cash equivalents and available-for-sale securities | $ 225,842 | $ 30 | $ (16) | $ 225,856 | $ 321,802 | $ (374) | $ 321,428 |
| Classified as: | | | | | | | |
| Cash equivalents | | | | $ 109,270 | | | $ 89,686 |
| Short-term investments | | | | 116,586 | | | 231,742 |
| Total cash equivalents and available-for-sale securities | | | | $ 225,856 | | | $ 321,428 |

As of December 31, 2023 and 2022, all of our cash equivalents and short-term investments were available-for-sale and had contractual maturities of less than one-year. There were no other-than-temporary impairments on such securities.

**6. Goodwill and Intangible Assets, net**

**Goodwill**

All of our goodwill was acquired in 2020 as part of the HintMD Acquisition and was assigned to the Service Segment.

***2022 Goodwill Impairment***

In December 2022, based on performance results and the valuation of the broader payment sector, we concluded that it was more likely than not that the fair value of our Service reporting unit was less than its carrying amount; therefore, a quantitative goodwill impairment test was performed during the fourth quarter. This quantitative goodwill impairment test was performed by estimating the fair value of the reporting unit using the income approach, which was based on a discounted cash flow model and required the use of significant assumptions, including estimates of the revenue growth rates and discount rate. The discount rate used was based on the historical internal rate of return of the acquisition and business-specific characteristics related to our ability to execute on the projected cash flows. The discount rate selected was 20%. Our Service reporting unit fair value measurements are classified as Level 3 in the fair value hierarchy because they involve significant unobservable inputs. Based on the goodwill impairment test, we determined that the estimated fair value of the Service reporting unit was below the carrying value and, accordingly, we recognized a goodwill impairment charge of $69.8 million in our Service reporting unit for the year ended December 31, 2022 and was presented in impairment loss on the consolidated

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

statement of operations and comprehensive loss. The aggregate amount of accumulated impairment as of December 31, 2022 was $69.8 million.

***2023 Goodwill Impairment***

In September 2023, based on our plan to exit the Fintech Platform business (Note 4), we concluded that it was more likely than not that goodwill is further impaired. A quantitative goodwill impairment test was performed by estimating the fair value of the reporting unit using the income approach, which required the use of significant judgement, including the planned exit of the Fintech Platform business. Due to our decision to exit the Fintech Platform business, our projected negative future cash flows from the Service Segment resulted in an estimated fair value of zero and full impairment of the related goodwill carrying value. We therefore recognized an impairment charge of $77.2 million in our Service Segment in September 2023 classified as goodwill impairment on the consolidated statement of operations and comprehensive loss for the year ended December 31, 2023. The aggregate amount of accumulated impairment as of December 31, 2023 was $147.0 million.

The changes in the carrying amount of goodwill by reporting unit during the years ended December 31, 2023 and 2022 was as follows:

| (in thousands) | Product | Service | Total |
|---|---|---|---|
| Balance at December 31, 2021 | $ — | $ 146,964 | $ 146,964 |
| Goodwill impairment | — | (69,789) | (69,789) |
| Balance at December 31, 2022 | — | 77,175 | 77,175 |
| Goodwill impairment | — | (77,175) | (77,175) |
| Balance at December 31, 2023 | $ — | $ — | $ — |

**Intangible Assets, net**

Intangible assets consist of distribution rights acquired from the filler distribution agreement with Teoxane, intangible assets acquired from the HintMD Acquisition, internally developed technology, and other purchased software. The following table sets forth the major categories of intangible assets and the weighted-average remaining useful lives for those assets that are not already fully amortized:

| | December 31, 2023 | | | | |
|---|---|---|---|---|---|
| (in thousands, except for in years) | Weighted Average Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment | Net Carrying Amount |
| Distribution rights | 4.3 | $ 32,334 | $ (23,064) | $ — | $ 9,270 |
| Internally developed technology | 1.5 | 8,918 | (4,408) | (3,972) | 538 |
| Acquired developed technology | 0.0 | 16,200 | (6,525) | (9,675) | — |
| Customer relationships | 0.0 | 10,300 | (7,940) | (2,360) | — |
| Total intangible assets | | $ 67,752 | $ (41,937) | $ (16,007) | $ 9,808 |



REV_DAX-03338741
DTX-370.0136

Table of Contents



| (in thousands, except for in years) | December 31, 2022[1] Weighted Average Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|
| Acquired developed technology | 4.2 | $ 35,800 | $ (24,325) | $ 11,475 |
| Distribution rights | 1.4 | 32,334 | (20,882) | 11,452 |
| Internally developed technology | 2.4 | 8,062 | (2,271) | 5,791 |
| Customer relationships | 1.6 | 10,300 | (6,223) | 4,077 |
| Other software | 1.8 | 3,166 | (1,592) | 1,574 |
| Development in progress | N/A | 975 | — | 975 |
| Total intangible assets | | $ 90,637 | $ (55,293) | $ 35,344 |

N/A - Not applicable

(1) The amount was different from the amounts filed with our Annual Report on Form 10-K for the year ended December 31, 2022 on the consolidated balance sheets, as filed with the SEC on February 28, 2023 due to a reclassification discussed in Note 2 - Reclassification.

***2023 Intangible Asset Impairment***

As discussed in Note 4, in September 2023, we commenced a plan to exit the Fintech Platform business and as a result, we concluded that it was more likely than not that the asset group for OPUL® was impaired. A quantitative impairment test was performed by estimating the fair value of the asset group using the income approach, which required the use of significant judgment, including the planned exit of the Fintech Platform business. We estimated that the fair value of the asset group was effectively zero and recorded a full impairment charge of the related intangible assets carrying values of $16.0 million in September 2023, which was presented as intangible asset impairment on the consolidated statement of operations and comprehensive loss.

***2022 Intangible Assets Amortization***

In late 2022, we sunsetted and substantially discontinued the HintMD Platform's general availability. As a result, we accelerated the amortization of the remaining net carrying amount of the developed technology asset associated with the HintMD Platform and recognized $11.7 million in additional amortization on the consolidated statement of operations and comprehensive loss. This is a change in accounting estimate and has no impact to prior period consolidated financial statements.

Amortization expense of the intangible assets in the table above were recorded on the consolidated statements of operations and comprehensive loss based on the function of the associated asset. The detail breakdown of the amortization expenses on the consolidated statements of operations and comprehensive loss were summarized as below:

| (in thousands) | Year Ended December 31, 2023 | 2022 [1] |
|---|---|---|
| Intangible asset amortization | $ 6,130 | $ 25,756 |
| Selling, general and administrative | 2,998 | 3,640 |
| Research and development | 283 | 311 |
| Total amortization expense | $ 9,411 | $ 29,707 |

(1) At the beginning of 2023, we made a reclassification between the property and equipment and intangible assets on the consolidated balance sheets (detail discussed in Note 2 - Reclassification), and we adjusted the presentation of the associated amortization expense related to those assets. Net impact was an increase of $1.1 million for selling, general and administrative expense and an increase of $0.3 million for research and development expense compare to expenses presented on our Annual Report on Form 10-K for the year ended December 31, 2022 as filed with the SEC on February 28, 2023.

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

Based on the amount of intangible assets as of December 31, 2023, the expected amortization expense for each of the next five fiscal years is as follows:

| Year Ending December 31, | | (in thousands) |
|---|---|---|
| 2024 | $ | 2,569 |
| 2025 | | 2,332 |
| 2026 | | 2,181 |
| 2027 | | 2,181 |
| 2028 | | 545 |
| Total | $ | 9,808 |

**7. Inventories**

Inventories consist of the following:

| | December 31, | | | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Raw materials | $ | 3,938 | $ | 505 |
| Work in process | | 17,418 | | 4,933 |
| Finished goods | | 24,223 | | 12,887 |
| Total inventories | $ | 45,579 | $ | 18,325 |

**8. Accruals and other current liabilities**

Accruals and other current liabilities consist of the following:

| | December 31, | | | |
|---|---|---|---|---|
| (in thousands) | | 2023 | | 2022 |
| Accruals related to: | | | | |
| Compensation[(1)] | $ | 31,132 | $ | 28,014 |
| Selling, general and administrative | | 9,019 | | 9,681 |
| Research and development | | 5,173 | | 9,012 |
| Royalties[(2)] | | 1,919 | | 5,113 |
| Interest expense | | 1,919 | | 1,912 |
| Inventories | | 1,478 | | 2,312 |
| Other current liabilities[(2)] | | 3,184 | | 3,313 |
| Total accruals and other current liabilities | $ | 53,824 | $ | 59,357 |

(1) In connection with our restructuring (Note 4), severance and personnel liabilities were included within accruals and other current liabilities on the consolidated balance sheet as of December 31, 2023.

(2) Certain prior period amounts have been reclassified to conform with current period presentation.

**9. Leases**

**Operating Leases**

Our operating leases primarily consist of non-cancellable facilities leases for research, manufacturing, and administrative functions. Our non-cancellable facilities operating leases have original lease periods expiring between 2027

and 2034, and include one or more options to renew for seven years to fourteen years. The monthly payments for our operating leases escalate over the remaining lease term. Our lease contracts do not contain termination options, residual value guarantees or restrictive covenants.

**Finance Lease**

Our finance lease represents a dedicated fill-and-finish line for the manufacturing of DAXXIFY®. In March 2017, we entered into the ABPS Services Agreement. The ABPS Services Agreement contains a lease, which commenced in January 2022, related to a dedicated fill-and-finish line for the manufacturing of DAXXIFY® because it has an identified asset that is physically distinct for which we have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease provides us with both (i) the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the exclusivity of the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line through our purchase orders to ABPS. Each party has the right to terminate the ABPS Services Agreement without cause, with an 18 months written notice to the other party. The lease is classified as a finance lease in the consolidated balance sheets.

Under the ABPS Services Agreement, until May 2022, we were subject to minimum purchase obligations of up to $30.0 million for each of the years ending December 31, 2022, 2023 and 2024. In May 2022, we amended a statement of work under the ABPS Services Agreement pursuant to which the minimum purchase obligations of $30.0 million per year were eliminated, and instead the minimum purchase obligations would be negotiated prior to the beginning of each year over the term of the agreement. As a result of the amended statement of work, the finance lease was modified. The primary change was that the modification reflects payments in 2023 and 2024 as variable lease payments, contingent on negotiation at the beginning of each period and excludes such payments in the present value calculation in arriving at the remaining finance lease liabilities with a corresponding adjustment to the related right-of-use asset, among other considerations and changes.

In January 2023, we amended the above mentioned statement of work under the ABPS Services Agreement. The second amendment established a minimum purchase obligation for the year ending December 31, 2023 of $23.9 million, which represents ABPS' practical manufacturing capability based on experience. The minimum purchase obligation for the year ending December 31, 2023 was determined to be fixed lease payments and such payments increased the present value calculation in arriving at the remaining finance lease liabilities with a corresponding adjustment to the related finance lease right-of-use asset. In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Services Agreement through December 31, 2027 and modified our remedies with respect to non-conforming products and delays. The minimum payments for the year ending December 31, 2024 have not been established.

The operating and finance lease costs are summarized as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2023 | 2022 | 2021 |
| Finance lease: | | | |
| Amortization of finance lease right-of-use asset(1) | $ 9,034 | $ 5,414 | $ — |
| Interest on finance lease liability | 1,402 | 2,687 | — |
| Variable lease cost(2) | 682 | 2,182 | — |
| Total finance lease costs | 11,118 | 10,283 | — |
| Operating leases: | | | |
| Operating lease cost | 12,434 | 8,881 | 8,026 |
| Variable lease cost (3) | 2,225 | 1,628 | 1,490 |
| Total operating lease costs | 14,659 | 10,509 | 9,516 |
| Total lease costs | $ 25,777 | $ 20,792 | $ 9,516 |

(1) Amortization of the finance lease right-of-use asset started to be capitalized into inventories on the consolidated balance sheets in the second quarter of 2023, as a result of the FDA approval of the PAS of the ABPS manufacturing facility.

(2) Variable finance lease cost includes validation, qualification, materials, and other related services which are not included in the lease liabilities and are expensed as incurred.

(3) Variable operating lease cost includes management fees, common area maintenance, property taxes, insurance and parking fees, which are not included in the lease liabilities and are expensed as incurred.

As of December 31, 2023, we have $2.2 million of accounts payable related to the finance lease under the ABPS Service Agreement. Additionally, we have maturities of our lease liabilities as follows:

| (in thousands) | Finance Lease | Operating Leases | Total |
|---|---|---|---|
| Year Ending December 31, | | | |
| 2024 | $ 2,659 | $ 10,172 | $ 12,831 |
| 2025 | — | 10,854 | 10,854 |
| 2026 | — | 11,185 | 11,185 |
| 2027 | — | 4,536 | 4,536 |
| 2028 | — | 4,021 | 4,021 |
| 2028 and thereafter | — | 24,565 | 24,565 |
| Total lease payments | 2,659 | 65,333 | 67,992 |
| Less imputed interest | (8) | (18,645) | (18,653) |
| Present value of lease payments | $ 2,651 | $ 46,688 | $ 49,339 |

Our lease contracts do not provide readily determinable implicit rates, as such, we used the estimated incremental borrowing rate based on the information available at the adoption, commencement, or remeasurement date. As of December 31, 2023, weighted-average remaining lease terms and discount rates are as follows:

| | Finance Lease | Operating Leases |
|---|---|---|
| Weighted-average remaining lease term (years) | 2.2 | 8.1 |
| Weighted-average discount rate | 10.7 % | 10.0 % |

Supplemental cash flow information related to the leases was as follows:

| (in thousands) | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities | | | |
| Operating cash flows from operating leases | $ 12,078 | $ 8,320 | $ 10,405 |
| Operating cash flows from finance lease | $ 1,404 | $ 2,687 | $ — |
| Financing cash flows from finance lease | $ 18,255 | $ 11,097 | $ — |
| Right-of-use assets obtained in exchange for lease liabilities | | | |
| Operating leases[(1)] | $ 22,694 | $ | $ 18,854 |
| Finance lease | $ 22,456 | $ 11,808 | $ — |

(1) In September 2023, the Expansion Premises and Second Expansion Premises commenced resulting in recognition of $22.7 million right-of-use asset and $16.2 million lease liability.

**Lease Not Yet Commenced**

***PCI Supply Agreement***

In April 2021, we entered into the PCI Supply Agreement pursuant to which PCI would serve as a non-exclusive manufacturer and supplier of DAXXIFY®. The initial term of the PCI Supply Agreement is dependent upon the date of regulatory submission for the manufacturing of DAXXIFY® and may be terminated by either party in accordance with the terms of the PCI Supply Agreement. The term of the PCI Supply Agreement may also be extended for one additional three-year term upon mutual agreement of the parties.

The PCI Supply Agreement contains a lease related to a dedicated fill-and-finish line and closely related assets for the manufacturing of DAXXIFY® because it has identified assets that are physically distinct for which we will have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease will provide us with both (i) the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the exclusivity implied from the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line.

The embedded lease had not yet commenced as of December 31, 2023. The accounting commencement and recognition of the right-of-use lease assets and lease liabilities related to the embedded lease will take place when we have substantively obtained the right of control. The embedded lease is preliminarily classified as a finance lease.

Pursuant to the PCI Supply Agreement, we are responsible for certain costs associated with the design, equipment procurement and validation, and facilities-related costs, monthly payments and minimum purchase obligations throughout the initial term of the PCI Supply Agreement. As of December 31, 2023, we have made prepayments of $32.4 million to PCI which is recorded within "Finance lease prepaid expense" in the consolidated balance sheets. Based on our best estimate as of December 31, 2023, our remaining minimum commitment under the PCI Supply Agreement will be $18.4 million for 2024, $19.7 million for 2025, $25.3 million for 2026, $29.5 million for 2027, $29.5 million for 2028 and $105.0 million for 2029 and thereafter in the aggregate.

## 10. Debt

The following table provides information regarding our debt:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| 2027 Notes, non-current | $ 287,500 | $ 287,500 |
| Less: Unamortized debt issuance costs | (4,279) | (5,587) |
| Carrying amount of the 2027 Notes | 283,221 | 281,913 |
| | | |
| Notes Payable, current | 2,500 | — |
| Notes Payable, non-current | 147,500 | 100,000 |
| Less: Unamortized debt discount | (2,700) | (1,347) |
| Less: Unamortized debt issuance costs | (1,426) | (1,192) |
| Carrying amount of Notes Payable | 145,874 | 97,461 |
| Total debt | $ 429,095 | $ 379,374 |

Interest expense relating to our debt in the consolidated statements of operations and comprehensive loss are summarized as follows:

| (in thousands) | Year Ended December 31, 2023 | Year Ended December 31, 2022 |
|---|---|---|
| Contractual interest expense | $ 15,137 | $ 11,855 |
| Amortization of debt issuance costs | 1,791 | 1,662 |
| Amortization of debt discount | 606 | 270 |
| Total interest expense | $ 17,534 | $ 13,787 |

### Convertible Senior Notes

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers' discount, commissions, and other issuance costs.

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the five business day period after any ten consecutive trading day period (the "measurement period") in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

Contractually, we may not redeem the 2027 Notes prior to February 20, 2024. We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

**Capped Call Transactions**

Concurrently with the 2027 Notes, we entered into capped call transactions with the option counterparties and used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027 Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

The capped call transactions are separate transactions that we entered into with the option counterparties and are not part of the terms of the 2027 Notes. As the capped call transactions meet certain accounting criteria, the premium paid of $28.9 million was recorded as a reduction in additional paid-in capital in the consolidated balance sheets, and will not be remeasured to fair value as long as the accounting criteria continue to be met. As of December 31, 2023 and 2022, we had not purchased any shares under the capped call transactions.

**Note Purchase Agreement**

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche is available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. The First Amendment modified the variable interest rate adjustment for the Third Tranche from Adjusted Three-Month LIBOR to Adjusted Three-Month Term SOFR. If the Third Tranche of Notes Payable becomes committed, the Notes Payable will then bear interest at an annual rate equal to the sum of (a) 7.0% and (b) Adjusted Three-Month Term SOFR for such interest period (subject to a floor of 1.50% and a cap of 2.50%). We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. If any Third Tranche notes are issued, upon the occurrence of an Amortization Trigger (as defined in the Note Purchase Agreement), we are required to repay the principal of the Third Tranche in equal monthly installments beginning on the last day of the month in which the Amortization Trigger occurred and continuing through the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of

certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

**11. Stock-based Compensation**

**Equity Compensation Plans**

We maintain four equity compensation plans: the 2014 EIP, the 2014 IN, the HintMD Plan, and the 2014 ESPP. Under the 2014 EIP, 2014 IN and the HintMD Plan, stock options may be granted with different vesting terms with maximum contractual term of 10 years from the grant dates. Under the 2014 EIP, the 2014 IN and the HintMD Plan, stock options typically vest over four years, either with (i) 25% of the total grant vesting on the first anniversary of the grant date and 1/48th of the remaining grant vesting each month thereafter or (ii) 1/48th vesting monthly. RSAs and RSUs typically vest annually over 1, 3, or 4 years.

***2014 EIP***

The 2014 EIP was effective on February 5, 2014, and the plan provides for the issuance of stock options, stock appreciation rights, RSAs, RSUs, PSAs, PSUs, and other forms of equity compensation to qualified employees, directors and consultants. The common stock shares reserved for issuance under the 2014 EIP will automatically increase each year on January 1st from January 1, 2015 to January 1, 2024 by 4% of our total common stock shares outstanding on December 31st of the preceding calendar year or a lesser number of shares determined by our Board of Directors. On January 1, 2023, the common stock shares reserved for issuance under the 2014 EIP increased by 3,295,432 shares. For the year ended December 31, 2023, 213,948 stock options and 2,778,413 Stock Awards were granted under the 2014 EIP. As of December 31, 2023, 4,457,206 common stock shares were available for issuance under the 2014 EIP.

***2014 IN***

The 2014 IN was effective on August 29, 2014, and the plan provides for the issuance of stock options, stock appreciation rights, RSAs, RSUs, PSAs, and other forms of equity compensation exclusively to individuals that were not previously employees or directors of the Company, as an inducement material to the individual's entry into employment with us. Stockholder approval of the 2014 IN was not required pursuant to Rule 5635 (c)(4) of the Nasdaq Listing Rules. On July 23, 2020, the 2014 IN was amended and restated to increase the number of common stock shares reserved for issuance by 1,089,400 shares. For the year ended December 31, 2023, no equity awards were granted under the 2014 IN. As of December 31, 2023, 1,080,457 common stock shares were available for issuance under the 2014 IN.

***HintMD Plan***

On July 23, 2020, we registered 1,260,946 shares of common stock under the HintMD Plan, which was assumed by the Company in connection with the HintMD Acquisition. For the year ended December 31, 2023, no equity awards were granted under the HintMD Plan. As of December 31, 2023, 85,672 shares of common stock were available for issuance under the HintMD Plan.

***2014 ESPP***

The 2014 ESPP was effective on February 5, 2014, and the plan provides employees with an opportunity to purchase our common stock through accumulated payroll deductions. The common stock shares reserved for issuance under the 2014 ESPP will automatically increase each year on January 1st from January 1, 2015 to January 1, 2024 by the lesser of (i) 1% of the total shares of common stock outstanding on December 31st of the preceding calendar year, (ii) 300,000 shares of common stock or (iii) a lesser number of shares of common stock determined by our Board of Directors. On January 1, 2023, the number of shares of common stock reserved for issuance under the 2014 ESPP increased by 300,000 shares. For the year ended December 31, 2023, 321,345 shares of common stock were issued to employees under the 2014 ESPP. As of December 31, 2023, 1,661,724 shares of common stock were available for issuance under the 2014 ESPP.

**Stock Options**

The following table summarizes our stock option activities:

| | Shares | | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Term (in Years) | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Balance as of December 31, 2022 | 4,929,097 | $ | 19.78 | | | |
| Granted | 213,948 | $ | 33.49 | | | |
| Exercised | (708,084) | $ | 16.39 | | $ | 668 |
| Forfeited or expired | (601,611) | $ | 28.87 | | | |
| Balance as of December 31, 2023 | 3,833,350 | $ | 19.75 | 5.5 | $ | 732 |
| Exercisable as of December 31, 2023 | 3,231,263 | $ | 19.08 | 5.1 | $ | 717 |

The intrinsic values of outstanding and exercisable options were determined by multiplying the number of shares by the difference in exercise price of the options and the fair value of the common stock as of December 31, 2023. The total intrinsic value of the options exercised during the years ended December 31, 2022 and 2021 was $2.4 million and $3.6 million, respectively.

The weighted-average grant-date fair value of options granted during the years ended December 31, 2023, 2022 and 2021 was $20.40, $8.64 and $15.38, respectively.

**RSAs and RSUs**

The following table summarizes our RSA and RSU share activities:

| | Shares | | Weighted-Average Grant-Date Fair Value Per Share |
|---|---|---|---|
| Unvested balance as of December 31, 2022 | 2,806,321 | $ | 20.62 |
| Granted | 1,877,457 | $ | 29.14 |
| Vested | (1,289,885) | $ | 21.41 |
| Forfeited | (700,231) | $ | 25.06 |
| Unvested balance as of December 31, 2023 | 2,693,662 | $ | 25.02 |

The weighted-average grant date fair value of RSAs and RSUs granted in the years ended December 31, 2022 and 2021 was $16.60 and $26.41, respectively. The total fair value as of the respective vesting dates of RSAs and RSUs that vested during the years ended December 31, 2023, 2022, and 2021 was $32.5 million, $19.8 million, and $24.4 million, respectively.



REV_DAX-03338751

DTX-370.0146

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

**PSAs and PSUs**

We have granted PSAs and PSUs which vests based on certain market and performance conditions. The following table summarizes our PSA and PSU share activities:

| | Shares | Weighted-Average Grant-Date Fair Value Per Share |
|---|---|---|
| Unvested balance as of December 31, 2022 | 2,071,559 | $ 12.61 |
| Granted | 900,956 | $ 34.68 |
| Vested | (1,636,973) | $ 12.76 |
| Forfeited | (24,586) | $ 19.26 |
| Unvested balance as of December 31, 2023 | 1,310,956 | $ 27.46 |

The weighted-average grant date fair value of PSAs granted in the years ended December 31, 2022 and 2021 was $12.79 and $28.01, respectively. No PSAs vested during the years ended December 31, 2022 and 2021.

**Stock-based Awards Valuation**

***Stock Option and 2014 ESPP Shares***

The fair value of both stock options and the option component of shares purchased under our 2014 ESPP was estimated using the Black-Scholes option pricing model. The description of the significant assumptions used in the model are as follows:

- *Fair Value of Common Stock.* The fair value of the common stock shares is based on our stock price as quoted by the Nasdaq.
- *Expected Term.* For stock options, the expected term is based on the simplified method, as our stock options have the following characteristics: (i) granted at-the-money; (ii) exercisability is conditioned upon service through the vesting date; (iii) termination of service prior to vesting results in forfeiture; (iv) limited exercise period following termination of service; and (v) options are non-transferable and non-hedgeable, or "plain vanilla" options, and we have limited history of exercise data. For ESPP, the expected term is based on the term of the purchase period under the 2014 ESPP.
- *Expected Volatility.* The expected volatility was calculated based on our historical stock prices.
- *Risk-Free Interest Rate.* The risk-free interest rate is based on U.S. Treasury constant maturity rates with remaining terms similar to the expected term of the stock options.
- *Expected Dividend Rate.* We use an expected dividend rate of zero because we have never paid any dividends and do not plan to pay dividends in the foreseeable future.
- *Forfeitures.* We account for forfeitures as they occur.

The fair values of stock options were estimated using the Black-Scholes option pricing model with the following weighted-average assumptions:

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Expected term (in years) | 5.9 | 6.0 | 6.0 |
| Expected volatility | 64.1 % | 62.7 % | 60.7 % |
| Risk-free interest rate | 3.6 % | 2.1 % | 0.7 % |
| Expected dividend rate | — % | — % | — % |

The fair values of the option component of the shares purchased under the 2014 ESPP were estimated using the Black-Scholes option pricing model with the following weighted-average assumptions for years presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Expected term (in years) | 0.5 | 0.5 | 0.5 |
| Expected volatility | 72.8 % | 80.5 % | 47.4 % |
| Risk-free interest rate | 5.1 % | 1.3 % | 0.1 % |
| Expected dividend rate | — % | — % | — % |

***Market-based PSUs***

Our market-based PSUs include market-based vesting conditions, which will vest upon the earlier of (i) the date that the closing share price of our common stock meets certain minimum share prices on a volume-weighted basis for a specified period of time or (ii) upon a change in control in which the purchase price of our common stock is at or above the same minimum share prices as determined in the award agreement. We determined the fair values of market-based PSUs using the Monte Carlo simulation model. The description of the significant assumptions used in the model are as follows:

- *Expected term:* For market-based PSUs granted in the year ended December 31, 2022, the expected term of 3.5 years was based on a derived service period using a simulated share price model.
- *Expected volatility:* For market-based PSUs granted in the year ended December 31, 2022, expected volatility of 60.0% was estimated separately using a Monte-Carlo framework.
- *Risk-free interest rate:* For market-based PSUs granted in the year ended December 31, 2022, the risk-free interest rate of 1.8% was based U.S. Treasury constant maturity rates for the terms of respective awards.
- *Expected dividend rate:* We use an expected dividend rate of zero because we have never paid any dividends and do not plan to pay dividends in the foreseeable future.

**Stock-based Compensation Expense**

The following table summarizes our stock-based compensation expense by line item in our consolidated statements of operations and comprehensive loss:

| (in thousands) | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Selling, general and administrative | $ 38,814 | $ 36,595 | $ 28,307 |
| Research and development | 8,999 | 15,745 | 15,127 |
| Cost of product revenue (exclusive of amortization) | 1,374 | — | — |
| Total stock-based compensation expense (exclusive of capitalized stock-based compensation expense) | 49,187 | 52,340 | 43,434 |
| Capitalized stock-based compensation expense | 3,144 | 2,448 | 876 |
| Total stock-based compensation expense | $ 52,331 | $ 54,788 | $ 44,310 |

**Unrecognized Compensation Cost**

| | December 31, 2023 | |
|---|---|---|
| | Unrecognized Compensation Cost (in thousands) | Weighted Average Expected Recognition Period (in years) |
| RSAs and RSUs | $ 47,276 | 2.4 |
| Stock options | 6,519 | 2.2 |
| PSUs[(1)] | 2,146 | 0.9 |
| Total unrecognized compensation cost | $ 55,941 | 2.3 |

(1) As of December 31, 2023, we only presented the unrecognized compensation costs for the PSUs with probable performance conditions in the table. Additionally, as of December 31, 2023, the unrecognized compensation costs for the PSUs with non-probable performance conditions are $23.8 million, which may be recognized from January 2024 through the first quarter of 2026 if their performance conditions become probable, including a catch up expense in the period which probability is determined.

## 12. Stockholders' Equity

**Follow-On Offering**

In September 2022, we completed a follow-on offering, pursuant to which we issued 9.2 million shares of common stock at an offering price of $25.00 per share, which included the exercise of the underwriters' over-allotment option to purchase 1.2 million additional shares of common stock, for net proceeds of $215.9 million, after underwriting discounts, commission and other offering expenses.

**ATM Offering Programs**

In November 2020, we entered into the 2020 ATM Agreement with Cowen. Under the 2020 ATM Agreement, we could offer and sell, from time to time, through Cowen, shares of our common stock having an aggregate offering price of up to $125.0 million. We were not obligated to sell any shares under the 2020 ATM Agreement. Subject to the terms and conditions of the 2020 ATM Agreement, Cowen was required to use commercially reasonable efforts, consistent with its normal trading and sales practices, applicable state and federal law, rules and regulations and the rules of The Nasdaq Global Market, to sell shares from time to time based upon our instructions, including any price, time or size limits specified by us. We paid Cowen a commission of up to 3.0% of the aggregate gross proceeds from each sale of shares, reimbursed legal fees

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

and disbursements and provided Cowen with customary indemnification and contribution rights. From January 1, 2022 through May 10, 2022, we sold 1.7 million shares of common stock under the 2020 ATM Agreement at a weighted average price of $18.71 per share resulting in net proceeds of $31.6 million after sales agent commissions and offering costs. The 2020 ATM Agreement was terminated on May 10, 2022.

On May 10, 2022, we entered into the 2022 ATM Agreement with Cowen. Under the 2022 ATM Agreement, we may sell up to $150.0 million of our common stock. We are not obligated to sell any shares under the 2022 ATM Agreement. Subject to the terms and conditions of the 2022 ATM Agreement, Cowen will use commercially reasonable efforts, consistent with its normal trading and sales practices, applicable state and federal law, rules and regulations and the rules of The Nasdaq Global Market, to sell shares from time to time based upon our instructions, including any price, time or size limits specified by us. We pay Cowen a commission of up to 3.0% of the aggregate gross proceeds from each sale of shares, reimburse legal fees and disbursements and provide Cowen with customary indemnification and contribution rights.

In the second quarter of 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the year ended December 31, 2023 from the 2022 ATM Agreement, outside of the second quarter of 2023.

**Net Loss per Share**

Our basic net loss per share is calculated by dividing the net loss by the weighted average number of shares of common stock outstanding for the period. The diluted net loss per share is calculated by giving effect to all potential dilutive common stock equivalents outstanding for the period. For purposes of this calculation, shares of common stock underlying the 2027 Notes at the initial conversion price, outstanding stock options, and unvested Stock Awards, are considered common stock equivalents, which were excluded from the computation of diluted net loss per share because including them would have been antidilutive.

Common stock equivalents that were excluded from the computation of diluted net loss per share are presented as below:

| | December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Convertible senior notes | 8,878,938 | 8,878,938 | 8,878,938 |
| Outstanding common stock options | 3,833,350 | 4,929,097 | 4,808,286 |
| Unvested RSUs and PSUs | 3,167,860 | 2,793,947 | — |
| Unvested RSAs and PSAs | 836,758 | 2,083,933 | 3,410,636 |



REV_DAX-03338755

DTX-370.0150

### 13. Fair Value Measurements

The following table summarizes, for assets and liabilities measured at fair value, the respective fair value and the classification by level of input within the fair value hierarchy:

| | December 31, 2023 | | | |
|---|---|---|---|---|
| (in thousands) | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 133,198 | $ 133,198 | $ — | $ — |
| Money market funds | 39,280 | 39,280 | — | — |
| U.S. government agency obligations | 3,960 | 3,960 | — | — |
| Commercial paper | 49,418 | — | 49,418 | — |
| Total assets measured at fair value | $ 225,856 | $ 176,438 | $ 49,418 | $ — |

| | December 31, 2022 | | | |
|---|---|---|---|---|
| (in thousands) | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 109,756 | $ 109,756 | $ — | $ — |
| Money market funds | 85,206 | 85,206 | — | — |
| U.S. government agency obligations | 4,480 | 4,480 | — | — |
| Commercial paper | 80,946 | — | 80,946 | — |
| Corporate bonds | 41,040 | — | 41,040 | — |
| Total assets measured at fair value | $ 321,428 | $ 199,442 | $ 121,986 | $ — |

For Level 1 investments, we use quoted prices in active markets for identical assets to determine the fair value. For Level 2 investments, we use quoted prices for similar assets sourced from certain third-party pricing services. The third-party pricing services generally utilize industry standard valuation models for which all significant inputs are observable, either directly or indirectly, to estimate the price or fair value of the securities. The primary input generally includes reported trades of or quotes on the same or similar securities. We do not make additional judgments or assumptions made to the pricing data sourced from the third-party pricing services.

The fair value of the 2027 Notes and the Notes Payable (Note 10) was determined on the basis of market prices observable for similar instruments and is considered Level 2 in the fair value hierarchy. We present the fair value of the 2027 Notes and Notes Payable for disclosure purposes only. As of December 31, 2023 and 2022 the fair value of the 2027 Notes was $219.2 million and $288.2 million, respectively. As of December 31, 2023, the fair value of the Notes payable was approximately the same as its unamortized carrying value.

### 14. Income Taxes

From inception through December 31, 2023, we have only generated domestic pretax losses.

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

For the years ended December 31, 2023, 2022 and 2021, there were no deferred tax benefits. The income tax provision is as follows:

| (in thousands) | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Current: | | | |
| Federal | $ — | $ — | $ — |
| State | — | — | — |
| Foreign [(1)] | 300 | 700 | — |
| Total income tax provision | 300 | 700 | — |

(1) The foreign tax provision amounts represent withholding taxes on cash payments received in connection with the Fosun License Agreement.

**Statutory Federal Income Tax Benefit**

Reconciliations of the statutory federal income tax benefit to our effective taxes are as follows:

| (in thousands) | Year Ended December 31, 2023 | 2022 | 2021 |
|---|---|---|---|
| Tax benefit at statutory federal rate | $ (68,037) | $ (74,849) | $ (59,075) |
| Stock-based compensation[(1)] | (9,467) | 1,678 | 1,489 |
| Research and development credits | (2,862) | (1,863) | (1,534) |
| ERC | (1,555) | — | — |
| Other changes in valuation allowance | 57,902 | 57,582 | 57,086 |
| Goodwill impairment | 16,207 | 14,656 | — |
| Section 162(m) | 9,225 | 4,155 | 2,352 |
| Nondeductible/nontaxable items[(1)] | 800 | 591 | 233 |
| Foreign rate differential and withholding taxes | 300 | 553 | — |
| Other[(1)] | (2,213) | (1,803) | (551) |
| Income tax provision | $ 300 | $ 700 | $ — |

(1) Certain prior period amounts have been reclassified to conform with current period presentation.

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

**Deferred Tax Assets, net**

Components of our deferred tax assets, net were as follows:

| (in thousands) | December 31, 2023 | December 31, 2022 |
|---|---|---|
| Deferred tax assets | | |
| NOL carryforward | $ 377,138 | $ 333,638 |
| Tax credits | 38,600 | 29,195 |
| Capitalized research and development expenditures | 29,849 | 18,690 |
| Deferred revenue | 19,220 | 19,051 |
| Intangible assets | 14,553 | 6,510 |
| Lease liabilities | 12,543 | 9,979 |
| Stock-based compensation | 10,126 | 12,655 |
| Accruals and reserves | 4,607 | 4,750 |
| Interest limitation | 3,918 | 3,486 |
| Property and equipment, net | 3,629 | 1,171 |
| Other | 24 | 26 |
| Total deferred tax assets | 514,207 | 439,151 |
| Less: valuation allowance | (495,654) | (427,507) |
| Deferred tax assets, net of valuation allowance | 18,553 | 11,644 |
| Deferred tax liabilities | | |
| Lease right-of-use assets | (18,553) | (11,644) |
| Total deferred tax liabilities | (18,553) | (11,644) |
| Net deferred tax assets | $ — | $ — |

***Valuation Allowance***

We have evaluated the positive and negative evidence bearing upon our ability to realize the deferred tax assets. We have considered our history of cumulative net loss incurred since our inception and have concluded that it is more likely than not that we will not realize the benefits of the deferred tax assets. Accordingly, a full valuation allowance has been established against the deferred tax assets due to the uncertainty of realizing future tax benefits from our NOL carryforwards and other deferred tax assets as of December 31, 2023 and 2022. We reevaluate the positive and negative evidence at each reporting period. The valuation allowance increased by $68.1 million and $71.9 million during the years ended December 31, 2023 and 2022, respectively. The valuation allowance increased primarily due to net loss incurred during the taxable years.

***NOL and Tax Credit Carryforwards***

As of December 31, 2023, we had NOL carryforwards available to reduce future taxable income, if any, for federal, California, and other states income tax purposes of $1.5 billion, $521.7 million, and $379.5 million, respectively. Of the total federal NOL carryforward of $1.5 billion, approximately $1.0 billion was generated after tax year 2017 and has an indefinite carryover period; the utilization of these NOLs will be limited to 80% of the taxable income in the years in which these NOLs are utilized. The California NOL carryforwards will begin to expire in 2028. If not utilized, the remaining federal and the other states NOL carryforwards will begin expiring in 2024 and 2030, respectively.

As of December 31, 2023, we had research and development credit carryforwards of $17.3 million and $13.4 million available to reduce future taxable income, if any, for federal and California income tax purposes, respectively. The federal



REV_DAX-03338758
DTX-370.0153

research and development credit carryforwards will begin expiring in 2024 if they are not utilized, and the California research and development credit carryforwards have no expiration date.

As of December 31, 2023, we had orphan drug credit carryforwards of $10.0 million available to reduce future taxable income, if any, for federal income tax purposes. The federal orphan drug credit carryforwards will begin expiring in 2038 if they are not utilized.

In general, if we experience a greater than 50% aggregate change in ownership over a 3-year period (a Section 382 ownership change), utilization of our pre-change NOL carryforwards are subject to an annual limitation under IRC Section 382 (California and the other states have similar laws). The annual limitation generally is determined by multiplying the value of our common stock at the time of such ownership change (subject to certain adjustments) by the applicable long-term tax-exempt rate. Such limitations may result in expiration of a portion of the NOL carryforwards before utilization. As a result of performing a 382 limitation analysis for us through December 31, 2023, we determined that ownership changes occurred in prior years and the carryforwards currently reflected in the deferred table show federal and California NOL reductions of $4.0 million and $2.5 million and the remaining carryforwards currently reflected can be utilized prior to the expiration. Our ability to use our remaining NOL carryforwards may be further limited if we experience a Section 382 ownership change as a result of future changes in our common stock ownership.

**Unrecognized Tax Benefits**

We follow the provisions of the FASB's guidance for accounting for uncertain tax positions. The guidance indicates a comprehensive model for the recognition, measurement, presentation and disclosure in financial statements of any uncertain tax positions that have been taken or expected to be taken on a tax return. No liability related to uncertain tax positions is recorded in the consolidated financial statements due to the fact the liabilities have been netted against deferred attribute carryovers. It is our policy to include penalties and interest related to income tax matters in income tax expense.

We do not expect that our uncertain tax positions will materially change in the next twelve months. For the year ended December 31, 2023, the amount of unrecognized tax benefits increased due to additional research and development credits generated. The additional uncertain tax benefits would not impact our effective tax rate to the extent that we continue to maintain a full valuation allowance against our deferred tax assets.

The unrecognized tax benefit was as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| **(in thousands)** | **2023** | **2022** | **2021** |
| Balance at the beginning of the period | $ 9,709 | $ 7,754 | $ 7,166 |
| Additions for prior years positions | 1,598 | 916 | — |
| Additions for current year positions | 1,590 | 1,039 | 588 |
| Balance at the end of the period | $ 12,897 | $ 9,709 | $ 7,754 |

We file income tax returns in the United States, Canada, California, and other states. We are not currently under examination by income tax authorities in any federal, state or other jurisdictions. All United States tax returns will remain open for examination by the federal and state authorities for three and four years, respectively, from the date of utilization of any NOL or tax credits.



REV_DAX-03338759
DTX-370.0154

### 15. Commitments and Contingencies

#### Teoxane Agreement

In January 2020, we entered into the Teoxane Agreement, as amended, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) RHA® Collection of dermal fillers, and (ii) the RHA® Pipeline Products in the U.S. and U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us. The Teoxane Agreement is effective for a term of ten years from product launch in September 2020 and may be extended for a two-year period upon the mutual agreement of the parties. We are required to meet certain minimum purchase obligations during each year of the term. Our minimum purchase obligation for the year ended December 31, 2024 is $52 million. Our minimum purchase obligations after December 31, 2024 will be determined based on projected market growth rate. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date.

Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

#### Other Contingencies

As of December 31, 2023, we are obligated to pay BTRX up to a remaining $15.5 million upon the satisfaction of certain milestones relating to our product revenue, intellectual property, and clinical and regulatory events.

#### Indemnification

We have standard indemnification agreements in the ordinary course of business. Under these indemnification agreements, we indemnify, hold harmless, and agree to reimburse the indemnified parties for losses suffered or incurred by the indemnified party, in connection with any trade secret, copyright, patent or other intellectual property infringement claim by any third party with respect to our technology. The term of these indemnification agreements is generally perpetual after the execution of the agreements. The maximum potential amount of future payments we are obligated to pay under other indemnification agreements is not determinable because it involves claims for indemnification that may be made against us in the future but have not been made. We have not yet incurred material costs to defend lawsuits or settle claims related to indemnification agreements.

We have indemnification agreements with our directors and officers that may require us to indemnify them against liabilities that may arise by reason of their status or service as directors or officers, other than liabilities arising from willful misconduct of the individual.

For the years ended December 31, 2023 and 2022, no material amounts associated with the indemnification agreements have been recorded.

#### Litigation

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and our and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan, U.S. Patent No. 11,147,878. On December

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan, U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021 in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss. On March 8, 2023, the lead plaintiff filed an opposition to our motion to dismiss. On April 7, 2023, we filed a reply in support of our motion to dismiss. A hearing on our motion to dismiss took place on August 10, 2023, and we are awaiting a decision from the court. We cannot be certain of whether that motion to dismiss will be granted.

We dispute the claims in these lawsuits and intend to defend the matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcome of the lawsuits is necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

We record a provision for a liability when we believe that it is both probable that a liability has incurred, and the amount can be reasonably estimated. As of both December 31, 2023 and December 31, 2022, no such provision for liabilities related to the above litigation matters were recorded on the consolidated balance sheets.

## 16. Segment Information

### Reportable Segments

We report segment information based on the management approach. The management approach designates the internal reporting used by the CODM for making decisions and assessing performance as the source of our reportable segments.

We have two reportable segments: the Product Segment and the Service Segment. Each reportable segment represents a component, or an operating segment, for which separate financial information is available that is utilized on a regular basis by our CODM in determining resource allocations and performance evaluation. We also considered whether the identified operating segments should be further aggregated based on factors including economic characteristics, the nature of products and services, production processes, customer base, distribution methods, and regulatory environment; however, no such aggregation was made due to dissimilarity of the operating segments.

*Product Segment*

Our Product Segment refers to the business that includes the research, development and commercialization of our approved products and product candidates, including DAXXIFY®, the onabotulinumtoxinA biosimilar and the RHA® Collection of dermal fillers.

REVANCE THERAPEUTICS, INC.

Notes to Consolidated Financial Statements — (Continued)

*Service Segment*

Our Service Segment refers to the business that includes the development and commercialization of the Fintech Platform. In September 2023, we commenced a restructuring plan to exit the Fintech Platform business (Note 4), and we continued to provide payment processing services to our existing customers for the period from September 2023 to December 31, 2023.

On January 31, 2024, substantially all payment processing activities related to OPUL® ended in connection with the Company's plan to exit the Fintech Platform business. In the first quarter of 2024, the Service Segment will be presented as a discontinued operation with certain prior period amounts retrospectively revised to reflect this change, and we will operate under a single reportable segment.

*Corporate and Other Expenses*

Corporate and other expenses include operating expenses related to general and administrative expenses, depreciation and amortization, stock-based compensation, in-process research and development and intersegment elimination that are not used in evaluating the results of, or in allocating resources to, our segments. Intersegment revenue represents the revenue generated between the two segments. Intersegment revenue for years ended December 31, 2023, 2022, and 2021 was $2.7 million, $1.5 million and $1.2 million, respectively.

**Reconciliation of Segment Revenue to Consolidated Revenue**

| | Year Ended December 31, | | |
|---|---|---|---|
| **(in thousands)** | **2023** | **2022** | **2021** |
| **Revenue:** | | | |
| Product Segment | $ 221,791 | $ 125,575 | $ 76,475 |
| Service Segment | 12,249 | 6,990 | 1,323 |
| Total revenue | $ 234,040 | $ 132,565 | $ 77,798 |

**Reconciliation of Segment Loss from Operations to Consolidated Loss from Operations**

| | Year Ended December 31, | | |
|---|---|---|---|
| **(in thousands)** | **2023** | **2022** | **2021** |
| **Loss from operations:** | | | |
| Product Segment | $ (57,208) | $ (103,989) | $ (135,950) |
| Service Segment [(1)] | (115,245) | (92,186) | (16,764) |
| Corporate and other expenses | (144,324) | (145,783) | (121,962) |
| Total loss from operations | $ (316,777) | $ (341,958) | $ (274,676) |

(1) For the years ended December 31, 2023 and 2022, loss from operations for the Service Segment included an impairment loss of $93.2 million and $69.8 million, respectively. Refer to Note 6 for details.

We do not evaluate performance or allocate resources based on segment asset data, and therefore such information is not presented.

**17. Subsequent Event**

**Equity Grants under the 2014 EIP**

In the first quarter of 2024, we granted 1.2 million RSUs and 1.7 million PSUs, under the 2014 EIP to existing employees.



REV_DAX-03338762
DTX-370.0157

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Exchange Act, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on the 28th day of February, 2024.

REVANCE THERAPEUTICS, INC.

By: /s/ Mark J. Foley
**Mark J. Foley**
**Chief Executive Officer**
***(Duly Authorized Principal Executive Officer)***

By: /s/ Tobin C. Schilke
**Tobin C. Schilke**
**Chief Financial Officer**
***(Duly Authorized Principal Financial Officer and Principal Accounting Officer)***

Table of Contents

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Mark J. Foley, Tobin C. Schilke, and Dwight Moxie, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution for him, and in his name in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, and any of them, his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ Mark J. Foley<br>**Mark J. Foley** | Chief Executive Officer and Director<br>*(Principal Executive Officer)* | February 28, 2024 |
| /s/ Tobin C. Schilke<br>**Tobin C. Schilke** | Chief Financial Officer<br>*(Principal Financial and Accounting Officer)* | February 28, 2024 |
| /s/ Angus C. Russell<br>**Angus C. Russell** | Director, Chairman | February 28, 2024 |
| /s/ Jill Beraud<br>**Jill Beraud** | Director | February 28, 2024 |
| /s/ Vlad Coric<br>**Vlad Coric** | Director | February 28, 2024 |
| /s/ Julian S. Gangolli<br>**Julian S. Gangolli** | Director | February 28, 2024 |
| /s/ Carey O'Connor Kolaja<br>**Carey O'Connor Kolaja** | Director | February 28, 2024 |
| /s/ Chris Nolet<br>**Chris Nolet** | Director | February 28, 2024 |
| /s/ Olivia C. Ware<br>**Olivia C. Ware** | Director | February 28, 2024 |

**Exhibit 4.4**

**DESCRIPTION OF REVANCE THERAPEUTICS, INC. SECURITIES**

The following is a description of the common stock, $0.001 par value (the "Common Stock"), of Revance Therapeutics, Inc. ("we" or the "Company"), which is the only security of the Company registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**General**

Our Amended and Restated Certificate of Incorporation as currently in effect (the "Certificate of Incorporation") authorizes us to issue up to 190,000,000 shares of Common Stock and up to and 5,000,000 shares of preferred stock, $0.001 par value per share (the "Preferred Stock"). The following description summarizes selected information regarding the Common Stock, as well as relevant provisions of (i) the Certificate of Incorporation, (ii) the Company's Amended and Restated Bylaws, as currently in effect (the "Bylaws"), and (iii) the Delaware General Corporation Law (the "DGCL"). The following summary description of the Common Stock of the Company is qualified in its entirety by reference to the provisions of the Certificate of Incorporation and Bylaws, copies of which have been filed as exhibits to the Company's periodic reports under the Exchange Act, and the applicable provisions of the DGCL.

**Common Stock**

**Voting rights.** Each holder of Common Stock is entitled to one vote for each share on all matters submitted to a vote of the stockholders, including the election of directors.

At all meetings of stockholders, except where otherwise provided by statute or by the Certificate of Incorporation, or by the Bylaws, the presence of the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business. Except as otherwise provided by statute or by applicable stock exchange rules, or by the Certificate of Incorporation or the Bylaws, in all matters other than the election of directors, the affirmative vote of the majority of shares present at the meeting and entitled to vote generally on the subject matter shall be the act of the stockholders.

Our board of directors is divided into three classes, with each class having a three-year term. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors standing for election shall be elected by a plurality of the votes of the shares present at the meeting and entitled to vote generally on the election of directors. The Company's stockholders do not have cumulative voting rights in the election of directors. As a result, the holders of a majority of the shares of Common Stock entitled to vote in any election of directors can elect all of the directors standing for election, if they should so choose.

**Dividends.** Subject to preferences that may be applicable to any then-outstanding Preferred Stock, holders of Common Stock are entitled to receive ratably those dividends, if any, as may be declared from time to time by our board of directors out of legally available funds.

**Liquidation.** In the event of our liquidation, dissolution or winding up of the Company, holders of Common Stock are entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities and the satisfaction of any liquidation preference granted to the holders of any then-outstanding shares of Preferred Stock.

**Rights and preferences.** Holders of Common Stock have no preemptive, conversion or subscription rights and there are no redemption or sinking fund provisions applicable to the Common Stock. The rights, preferences and privileges of the holders of Common Stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of Preferred Stock that we may designate in the future.

**Fully paid and nonassessable.** All of our outstanding shares of Common Stock are fully paid and nonassessable.

**Preferred Stock**

Under our Certificate of Incorporation, our board of directors has the authority, without further action by the stockholders (unless such stockholder action is required by applicable law or the rules of any stock exchange or market on which our securities are then traded), to designate and issue up to 5,000,000 shares of Preferred Stock in one or more series, to establish from time to time the number of shares to be included in each such series, to fix the designations, voting powers, preferences and rights of the shares of each wholly unissued series, and any qualifications, limitations or restrictions thereof, and to increase or decrease the number of shares of any such series, but not below the number of shares of such series then outstanding. The, rights, preferences, privileges and restrictions granted to or imposed upon any unissued series of Preferred Stock may be greater than the rights of the Common Stock. The issuance of Preferred Stock may have the effect of delaying, deferring or preventing a change of control of the Company without further action by the stockholders, and may have the effect of delaying or preventing changes in management of the Company. In addition, the issuance of Preferred Stock may have the effect of decreasing the market price of the Common Stock and may adversely affect the voting power of holders of Common Stock and reduce the likelihood that holders of Common Stock will receive dividend payments and payments upon liquidation.

**Anti-Takeover Effects of Provisions of Our Amended and Restated Certificate of Incorporation and Bylaws**

Our Certificate of Incorporation and Bylaws provide for our board of directors to be divided into three classes, with staggered three-year terms. Only one class of directors is elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Because our stockholders do not have cumulative voting rights, our stockholders representing a majority of the shares of Common Stock outstanding will be able to elect all of our directors due to be elected at each annual meeting of our stockholders. In addition, our Certificate of Incorporation provides that vacancies on our board of directors resulting from death, resignation, disqualification, removal or other causes may be filled by the affirmative vote of a majority of the remaining directors in office, even if less than a quorum, and that newly created directorships shall be filled by the affirmative vote of a majority of the directors then in office, even if less than a quorum, unless our board of directors determines otherwise. Our Bylaws provide that all stockholder action must be effected at a duly called meeting of stockholders and not by consent in writing, and that only the chairman of our board, our president, our secretary or a majority of the authorized number of directors may call a special meeting of stockholders. Our Certificate of Incorporation requires a 66-2/3% stockholder vote for the amendment, repeal or modification of certain provisions of our Certificate of Incorporation relating to, among other things, the classification of our board of directors and filling of vacancies on our board of directors. Our Bylaws provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at any meeting of stockholders. Our Bylaws also specify certain requirements regarding the form and content of a stockholder's notice. In addition, any stockholder nomination must meet the requirements of Rule 14a-19 under the Exchange Act. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our meetings of stockholders if the proper procedures are not followed. Our Certificate of Incorporation and Bylaws also require a 66-2/3% stockholder vote for the stockholders to adopt, amend or repeal certain provisions of our Bylaws relating to stockholder proposals at annual meetings, director nominees and the number and term of office of directors.

The combination of the classification of our board of directors, the lack of cumulative voting and the 66-2/3% stockholder voting requirements will make it more difficult for our existing stockholders to replace our board of directors as well as for another party to obtain control of us by replacing our board of directors. We expect that these provisions might also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company. Since our board of directors has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management. In addition, the authorization of undesignated Preferred Stock makes it possible for our board of directors to issue Preferred Stock with voting or other rights or preferences that could impede the success of any attempt to effect a change of our control.

These provisions may have the effect of deterring hostile takeovers or delaying changes in our control or in our management. These provisions are intended to enhance the likelihood of continued stability in the composition of our board of directors and in the policies they implement, and to discourage certain types of transactions that may involve an actual or threatened change of our control. These provisions are designed to reduce our vulnerability to an unsolicited acquisition proposal. The provisions also are intended to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for our shares and, as a consequence, they also may inhibit fluctuations in the market price of our shares that could result from actual or rumored takeover attempts.

**Exclusive Forum**

Our Certificate of Incorporation and Bylaws provide that the Delaware Court of Chancery (or, if the Delaware Court of Chancery does not have jurisdiction, any state court located in Delaware or if all the state courts lack jurisdiction, the federal district court for the District of Delaware) and any appellate court therefrom will be the exclusive forum for the following types of actions or proceedings under Delaware statutory or common law:

- any derivative action, suit or proceeding brought on behalf of the Company;
- any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Company to the Company or the Company's stockholders or any action asserting a claim for aiding and abetting any such breach of fiduciary duty;
- any action, suit or proceeding asserting a claim against the Company or any current or former director, officer, or other employee of the Company arising out of or pursuant to, or seeking to enforce any right, obligation or remedy under, or to interpret, apply, or determine the validity of, any provision of the DGCL, the amended and restated certificate of incorporation, or the amended and restated bylaws (as each may be amended from time to time);
- any action, suit, or proceeding as to which the DGCL confers jurisdiction on the Delaware Court of Chancery; and
- any action, suit or proceeding asserting a claim against the Company or any current or former director, officer, or other employee of the Company governed by the internal-affairs doctrine.

This provision would not apply to actions, suits or proceedings brought to enforce a duty or liability created by the Securities Exchange Act of 1934, as amended, or any other claim for which the federal courts have exclusive jurisdiction. In addition, our Bylaws provide that, unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any claims arising under the Securities Act of 1933, as amended.

**Section 203 of Delaware Law**

We are subject to Section 203 of the Delaware General Corporation Law ("Section 203"), which prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years after the date that such stockholder became an interested stockholder, with the following exceptions:

- before such date, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- upon completion of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction began, excluding for purposes of determining the voting stock outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned (i) by persons who are directors and also officers and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or
- on or after such date, the business combination is approved by the board of directors and authorized at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of at least 66-2/3% of the outstanding voting stock that is not owned by the interested stockholder.

In general, Section 203 defines business combination to include the following:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, lease, transfer, pledge or other disposition of 10% or more of the assets of the corporation to or with the interested stockholder;
- subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;
- any transaction involving the corporation that has the effect of increasing the proportionate share of the stock or any class or series of the corporation beneficially owned by the interested stockholder; or
- the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits by or through the corporation.

In general, Section 203 defines interested stockholder as an entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation or any entity or person affiliated with or controlling or controlled by such entity or person.

A Delaware corporation may "opt out" of these provisions with an express provision in its original certificate of incorporation or an express provision in its certificate of incorporation or bylaws resulting from a stockholders' amendment approved by at least a majority of the outstanding voting shares. We have not opted out of these provisions. As a result, mergers, or other takeover or change in control attempts of us may be discouraged or prevented.

**REVANCE THERAPEUTICS, INC.**
**2024 MANAGEMENT BONUS PROGRAM**

On February 7, 2024, upon recommendation of the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Revance Therapeutics, Inc. (the "Company"), the Board approved the Company's 2024 corporate objectives, weighted for purposes of determining bonuses, if any, for the Company's executive officers with respect to 2024 performance.

The 2024 Bonus Program is designed to reward, through the payment of annual cash bonuses, the Company's executive officers for the Company's performance in meeting key corporate objectives and for individual performance in meeting specified corporate goals for the year.

The Company's 2024 corporate goals include (i) achievement of specified total revenue targets for DAXXIFY® and the RHA® Collection of dermal fillers combined (80% weighting); (ii) achievement of DAXXIFY® for cervical dystonia payor coverage (10% weighting); (iii) achievement of a regulatory milestone related to DAXXIFY® (10%); and (vi) additional stretch goals (up to 15%) relating to financial and strategic milestones.

The cash bonus for Mr. Foley will be based on the achievement of the 2024 corporate goals (100% weighting). For each of the other executive officers, the bonus will be based on achievement of corporate goals, subject to a modifier for individual performance that may increase or decrease the total bonus payout. The executive officers' actual bonuses for fiscal year 2024 are capped at 155% of each executive officer's 2024 target bonus percentage in the event performance exceeds the predetermined goals and/or upon the achievement of other specified goals, including stretch goals. Payment of bonuses to the Company's executive officers under the 2024 Bonus Program and the actual amount of such bonus, if any, are at the discretion of the Committee. All bonuses under the 2024 Bonus Program are subject to recoupment in accordance with (i) the Company's Incentive Compensation Recoupment Policy adopted as required by the Dodd-Frank Wall Street Reform and Consumer Protection Act, (ii) applicable law and (iii) any policy the Company otherwise voluntarily adopts, to the extent applicable and permissible under applicable law.

Exhibit 21.1

**REVANCE THERAPEUTICS, INC.**

**LIST OF SUBSIDIARIES**

1. Hint, Inc. (d/b/a HintMD), incorporated in Delaware.

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Forms S-8 (Nos. 333-270130, 333-263099, 333-252526, 333-240061, 333-235994, 333-229977, 333-223433, 333-216342, 333-209949, 333-208543, 333-203235, 333-198499, and 333-193963) and S-3 (No. 333-275548 of Revance Therapeutics, Inc. of our report dated February 28, 2024 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

San Jose, California
February 28, 2024

**Exhibit 31.1**

**CERTIFICATIONS**

I, Mark J. Foley, certify that:

1. I have reviewed this annual report on Form 10-K of Revance Therapeutics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2024

/s/ Mark J. Foley
**Mark J. Foley**
**Chief Executive Officer**
**(Principal Executive Officer)**

**Exhibit 31.2**

**CERTIFICATIONS**

I, Tobin C. Schilke, certify that:

1. I have reviewed this annual report on Form 10-K of Revance Therapeutics, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2024

/s/ Tobin C. Schilke

**Tobin C. Schilke**
**Chief Financial Officer**
**(Principal Financial Officer and Principal Accounting Officer)**

**Exhibit 32.1**

**CERTIFICATION**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Mark J. Foley, Chief Executive Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

**1.** The Company's Annual Report on Form 10-K for the period ended December 31, 2023 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

**2.** The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned has set his hand hereto as of the 28th day of February, 2024.

/s/ Mark J. Foley

**Mark J. Foley**
**Chief Executive Officer**
**(Principal Executive Officer)**

"This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing."

**Exhibit 32.2**

**CERTIFICATION**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Tobin C. Schilke, Chief Financial Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

**1.** The Company's Annual Report on Form 10-K for the period ended December 31, 2023 (the "Annual Report"), to which this Certification is attached as Exhibit 32.2, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

**2.** The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned has set his hand hereto as of the 28th day of February, 2024.

/s/ Tobin C. Schilke
**Tobin C. Schilke**
**Chief Financial Officer**
**(Principal Financial Officer and Principal Accounting Officer)**

"This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing."

**Revance Therapeutics, Inc.**

**Incentive Compensation Recoupment Policy**

## 1. Introduction

The Compensation Committee (the "***Compensation Committee***") of the Board of Directors (the "***Board***") of Revance Therapeutics, Inc., a Delaware corporation (the "***Company***"), has determined that it is in the best interests of the Company and its stockholders to adopt this Incentive Compensation Recoupment Policy (this "***Policy***") providing for the Company's recoupment of Recoverable Incentive Compensation that is received by Covered Officers of the Company under certain circumstances. Certain capitalized terms used in this Policy have the meanings given to such terms in Section 3 below.

This Policy is designed to comply with, and shall be interpreted to be consistent with, Section 10D of the Exchange Act, Rule 10D-1 promulgated thereunder ("***Rule 10D-1***") and Nasdaq Listing Rule 5608 (the "***Listing Standards***").

## 2. Effective Date

This Policy shall apply to all Incentive Compensation that is received by a Covered Officer on or after October 2, 2023 (the "***Effective Date***"). Incentive Compensation is deemed "***received***" in the Company's fiscal period in which the Financial Reporting Measure specified in the Incentive Compensation award is attained, even if the payment or grant of such Incentive Compensation occurs after the end of that period.

## 3. Definitions

"***Accounting Restatement***" means an accounting restatement that the Company is required to prepare due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

"***Accounting Restatement Date***" means the earlier to occur of (a) the date that the Board, a committee of the Board authorized to take such action, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an Accounting Restatement, or (b) the date that a court, regulator or other legally authorized body directs the Company to prepare an Accounting Restatement.

"***Administrator***" means the Compensation Committee or, in the absence of such committee, the Board.

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"***Covered Officer***" means each current and former Executive Officer.

"***Exchange***" means the Nasdaq Stock Market.

"***Exchange Act***" means the U.S. Securities Exchange Act of 1934, as amended.

"***Executive Officer***" means a current or former officer of the Company as defined under Section 16 of the Exchange Act. For the avoidance of doubt, this definition of "Executive Officer" is intended, and shall be interpreted, to reflect a current or former "executive officer," as such term is defined in Section 10D and Rule 10D-1(d) of the Exchange Act and Nasdaq Listing Rule 5608.

"***Financial Reporting Measures***" means measures that are determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures derived wholly or in part from such measures, including Company stock price and total stockholder return ("***TSR***"). A measure need not be presented in the Company's financial statements or included in a filing with the SEC in order to be a Financial Reporting Measure.

"***Incentive Compensation***" means any compensation that is granted, earned or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

"***Lookback Period***" means the three completed fiscal years immediately preceding the Accounting Restatement Date, as well as any transition period (resulting from a change in the Company's fiscal year) within or immediately following those three completed fiscal years (except that a transition period of at least nine months shall count as a completed fiscal year). Notwithstanding the foregoing, the Lookback Period shall not include fiscal years completed prior to the Effective Date.

"***Recoverable Incentive Compensation***" means Incentive Compensation received by a Covered Officer during the Lookback Period that exceeds the amount of Incentive Compensation that would have been received had such amount been determined based on the Accounting Restatement, computed without regard to any taxes paid (*i.e.*, on a gross basis without regard to tax withholdings and other deductions). For any compensation plans or programs that take into account Incentive Compensation, the amount of Recoverable Incentive Compensation for purposes of this Policy shall include, without limitation, the amount contributed to any notional account based on Recoverable Incentive Compensation and any earnings to date on that notional amount. For any Incentive Compensation that is based on stock price or TSR, where the Recoverable Incentive Compensation is not subject to mathematical recalculation directly from the information in an Accounting Restatement, the Administrator will determine the amount of Recoverable Incentive Compensation based on a reasonable estimate of the effect of the Accounting Restatement on the stock price or TSR upon which the Incentive Compensation was received. The Company shall maintain documentation of the determination of that reasonable estimate and provide such documentation to the Exchange in accordance with the Listing Standards.

"***SEC***" means the U.S. Securities and Exchange Commission.

**4. Recoupment**

**(a) Applicability of Policy.** This Policy applies to Incentive Compensation received by a Covered Officer (i) after beginning services as an Executive Officer, (ii) who served as an Executive Officer at any time during the performance period for such Incentive Compensation, (iii) while the Company had a class of securities listed on a national securities exchange or a national securities association, and (iv) during the Lookback Period.

**(b) Recoupment Generally.** Pursuant to the provisions of this Policy, if there is an Accounting Restatement, the Company must reasonably promptly recoup the full amount of the Recoverable Incentive Compensation, unless the conditions of one or more subsections of Section 4(c) of this Policy are met and the Compensation Committee, or, if such committee does not consist solely of independent directors, a majority of the independent directors serving on the Board, has made a determination that recoupment would be impracticable. Recoupment is required regardless of whether the Covered Officer engaged in any misconduct and regardless of fault, and the Company's obligation to recoup Recoverable Incentive Compensation is not dependent on whether or when any restated financial statements are filed.

**(c) Impracticability of Recovery.** Recoupment may be determined to be impracticable if, and only if:

i. the direct expense paid to a third party to assist in enforcing this Policy would exceed the amount of the applicable Recoverable Incentive Compensation; provided that, before concluding that it would be impracticable to recover any amount of Recoverable Incentive Compensation based on expense of enforcement, the Company shall make a reasonable attempt to recover such Recoverable Incentive Compensation, document such reasonable attempt(s) to

recover, and provide that documentation to the Exchange in accordance with the Listing Standards; or

ii. recoupment of the applicable Recoverable Incentive Compensation would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of Code Section 401(a)(13) or Code Section 411(a) and regulations thereunder.

**(d) Sources of Recoupment.** To the extent permitted by applicable law, the Administrator shall, in its sole discretion, determine the timing and method for recouping Recoverable Incentive Compensation hereunder, provided that such recoupment is undertaken reasonably promptly. The Administrator may, in its discretion, seek recoupment from a Covered Officer from any of the following sources or a combination thereof, whether the applicable compensation was approved, awarded, granted, payable or paid to the Covered Officer prior to, on or after the Effective Date: (i) direct repayment of Recoverable Incentive Compensation previously paid to the Covered Officer; (ii) cancelling prior cash or equity-based awards (whether vested or unvested and whether paid or unpaid); (iii) cancelling or offsetting against any planned future cash or equity-based awards; (iv) forfeiture of deferred compensation, subject to compliance with Code Section 409A; and (v) any other method authorized by applicable law or contract. Subject to compliance with any applicable law, the Administrator may effectuate recoupment under this Policy from any amount otherwise payable to the Covered Officer, including amounts payable to such individual under any otherwise applicable Company plan or program, *e.g.*, base salary, bonuses or commissions and compensation previously deferred by the Covered Officer. The Administrator need not utilize the same method of recovery for all Covered Officers or with respect to all types of Recoverable Incentive Compensation.

**(e) No Indemnification of Covered Officers.** Notwithstanding any indemnification agreement, applicable insurance policy or any other agreement or provision of the Company's certificate of incorporation or bylaws to the contrary, no Covered Officer shall be entitled to indemnification or advancement of expenses in connection with any enforcement of this Policy by the Company, including paying or reimbursing such Covered Officer for insurance premiums to cover potential obligations to the Company under this Policy.

**(f) Indemnification of Administrator.** Any members of the Administrator, and any other members of the Board who assist in the administration of this Policy, shall not be personally liable for any action, determination or interpretation made with respect to this Policy and shall be indemnified by the Company to the fullest extent under applicable law and Company policy with respect to any such action, determination or interpretation. The foregoing sentence shall not limit any other rights to indemnification of the members of the Board under applicable law or Company policy.

**(g) No "Good Reason" for Covered Officers.** Any action by the Company to recoup or any recoupment of Recoverable Incentive Compensation under this Policy from a Covered Officer shall not be deemed (i) "good reason" for resignation or to serve as a basis for a claim of constructive termination under any benefits or compensation arrangement applicable to such Covered Officer, or (ii) to constitute a breach of a contract or other arrangement to which such Covered Officer is party.

**5. Administration**

Except as specifically set forth herein, this Policy shall be administered by the Administrator. The Administrator shall have full and final authority to make any and all determinations required under this Policy. Any determination by the Administrator with respect to this Policy shall be final, conclusive and binding on all interested parties and need not be uniform with respect to each individual covered by this Policy. In carrying out the administration of this Policy, the Administrator is authorized and directed to consult with the full Board or such other committees of the Board as may be necessary or appropriate as to matters within the scope of such other committee's responsibility and authority. Subject to applicable law, the Administrator may authorize and empower any officer or employee of the Company to take any and all actions that the Administrator, in its sole discretion, deems necessary or appropriate to carry out the purpose and intent of this Policy (other than with respect to any recovery under this Policy involving such officer or employee).

**6. Severability**

If any provision of this Policy or the application of any such provision to a Covered Officer shall be adjudicated to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Policy, and the invalid, illegal or unenforceable provisions shall be deemed amended to the minimum extent necessary to render any such provision or application enforceable.

**7. No Impairment of Other Remedies**

Nothing contained in this Policy, and no recoupment or recovery as contemplated herein, shall limit any claims, damages or other legal remedies the Company or any of its affiliates may have against a Covered Officer arising out of or resulting from any actions or omissions by the Covered Officer. This Policy does not preclude the Company from taking any other action to enforce a Covered Officer's obligations to the Company, including, without limitation, termination of employment and/or institution of civil proceedings. This Policy is in addition to the requirements of Section 304 of the Sarbanes-Oxley Act of 2002 ("***SOX 304***") that are applicable to the Company's Chief Executive Officer and Chief Financial Officer and to any other compensation recoupment policy and/or similar provisions in any employment, equity plan, equity award, or other individual agreement, to which the Company is a party or which the Company has adopted or may adopt and maintain from time to time; provided, however, that compensation recouped pursuant to this Policy shall not be duplicative of compensation recouped pursuant to SOX 304 or any such compensation recoupment policy and/or similar provisions in any such employment, equity plan, equity award, or other individual agreement except as may be required by law.

**8. Amendment; Termination**

The Administrator may amend, terminate or replace this Policy or any portion of this Policy at any time and from time to time in its sole discretion. The Administrator shall amend this Policy as it deems necessary to comply with applicable law or any Listing Standard.

**9. Successors**

This Policy shall be binding and enforceable against all Covered Officers and, to the extent required by Rule 10D-1 and/or the applicable Listing Standards, their beneficiaries, heirs, executors, administrators or other legal representatives.

**10. Required Filings**

The Company shall make any disclosures and filings with respect to this Policy that are required by law, including as required by the SEC.

* * * * *

**Revance Therapeutics, Inc.**

**Incentive Compensation Recoupment Policy**

**Form of Executive Acknowledgment**

I, the undersigned, agree and acknowledge that I am bound by, and subject to, the Revance Therapeutics, Inc. Incentive Compensation Recoupment Policy, as may be amended, restated, supplemented or otherwise modified from time to time (the "***Policy***"). In the event of any inconsistency between the Policy and the terms of any employment agreement, offer letter or other individual agreement with Revance Therapeutics, Inc. (the "***Company***") to which I am a party, or the terms of any compensation plan, program or agreement, whether or not written, under which any compensation has been granted, awarded, earned or paid to me, the terms of the Policy shall govern.

In the event that the Administrator (as defined in the Policy) determines that any compensation granted, awarded, earned or paid to me must be forfeited or reimbursed to the Company pursuant to the Policy, I will promptly take any action necessary to effectuate such forfeiture and/or reimbursement. I further agree and acknowledge that I am not entitled to indemnification, and hereby waive any right to advancement of expenses, in connection with any enforcement of the Policy by the Company.

**Agreed and Acknowledged:**

__

Name: __

Title: __

Date: __