# EXHIBIT 21

S&P Global
Market Intelligence

# Revance Therapeutics, Inc.

## NasdaqGM:RVNC

# Analyst/Investor Day

Tuesday, September 19, 2023 2:30 PM GMT

C.A. No. 21-1411-RGA-LDH
Plaintiffs' Trial Exhibit
PTX-654

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ........ | 3 |
| Presentation | ........ | 4 |
| Question and Answer | ........ | 12 |

COPYRIGHT © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Call Participants

**EXECUTIVES**

**Dustin S. Sjuts**
*President*

**Jessica Serra**
*Head of Investor Relations & ESG*

**Mark J. Foley**
*CEO & Director*

**Rob E. Bancroft**

**Taryn Conway**
*Vice President of Marketing*

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

**Unknown Executive**

**ANALYSTS**

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**Balaji V. Prasad**
*Barclays Bank PLC, Research Division*

**Chris Shibutani**
*Goldman Sachs Group, Inc., Research Division*

**David A. Amsellem**
*Piper Sandler & Co., Research Division*

**Navann Ty Dietschi**
*BNP Paribas Exane, Research Division*

**Serge D. Belanger**
*Needham & Company, LLC, Research Division*

**Stacy Ku**
*TD Cowen, Research Division*

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

**Unknown Analyst**

**ATTENDEES**

**Ruth E. Tedaldi**
*RegimenMD, LLC*

**Unknown Attendee**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Please welcome Chief Executive Officer, Mark Foley.

**Mark J. Foley**
*CEO & Director*

Great. Thanks, everyone, and welcome to our Investor Day. This is the first time we've hosted one of these Investor Days in 5 years. So we thought it was particularly timely for us to do it given the recent approval of DAXXIFY in Aesthetics and more recently in Therapeutics and where we are in our commercial journey. So we're really excited today to share with you where we are in the journey, why we have conviction and confidence in both our strategy and opportunity for success that we have going forward. Before I jump into the agenda and everything, I'd also like to welcome Valerie Toppan or -- the CEO and Founder of Teoxane and we're very fortunate to be in partnership with Valerie and the RHA line of fillers. So thanks, Valerie for making the trip from Europe over here and for being such a supportive shareholder as well.

In terms of the program that we're going to cover, we'll start out with the overall aesthetics market. We have an opportunity to have an esteemed group of clinicians here who are going to go through Q&A session, so you can ask them questions along the way. Then we'll take a brief break. We'll then go into the therapeutics opportunity and map for you, how we see the therapeutics opportunity unfolding, talk about some of our future growth opportunities, financial overview and then ultimately closing.

Before we get into the meat of the presentation, I need to put up our forward-looking statements as we're going to make some comments about the future that may or may not ultimately line up exactly as we see it today, and so I wanted to put that forward.

So let me start with a little bit of a high-level overview. So we set out to disrupt large established and growing markets in aesthetics and therapeutics with our innovative approach on the product side. And if you look at really what anchors that, it's DAXXIFY. We believe that, that really is the primary pillar that we're going to build on, along with RHA and some of the other assets that we'll continue to bring into play over time. But we're competing in the U.S. marketplace, both in aesthetics and therapeutics with $5 billion of market opportunity that we believe creates a really unique opportunity for us.

If you look at the journey of Revance, often in the case of breakthrough innovation, it doesn't start in an obvious form or fashion. And so the company started back in 2002, trying to leverage what at the time were sort of novel peptide technologies and trying to marry those with biologics, all with the goal of trying to figure out a more efficient and effective way to deliver things into the body. And after trying a different variety of candidates that ultimately settled on peptide formulation and a toxin fearing that, that was going to be the best way to enter the market.

The company then started working initially on a topical formulation. And so as you can imagine, trying to get things through the skin is even more challenging when you inject something into the body. And so that really allowed the company to refine the peptide approach and sort of how to partner with the toxin. That journey, while it would yield a lot of learnings along the way, ended up being a little bit more challenging than expected from a regulatory standpoint and from a clinical outcome in terms of what the FDA was going to require to see and the company then made the step to actually go to an injectable toxin. And the innovative efforts and the peptide and the uniqueness of the peptide ultimately is what's allowed us to deliver on this very differentiated clinical profile.

With now sort of line of sight of DAXI coming into the marketplace, we focused on some strategic partnerships. The partnership with Teoxane to procure the rights to the RHA line of fillers here in the U.S., along with the partnership with Viatris and Fosun for the rights to China. We then kicked off and commercialized the RHA line of fillers in September of 2020, which began our commercial journey,

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

and then that has been sort of further buttress now with the approval of DAXI in both aesthetics and therapeutics.

The clip is not working? There we go -- so with all that in place, we have a real clear vision for our strategy, and it's really underpinned by three things: innovative products. So we're coming into the market really with a commitment to bringing innovation versus just trying to compete in a similar fashion to the others. Our strategy also relies on putting the provider at the center of everything that we think about and that we do. So from a no advertised pricing policy to some of the different initiatives, how can we be a better partner and work with the practices to try and either enhance profitability, patient outcomes, experience. And if you look at the investment that we've made here in Nashville in terms of training and education, we're very committed to making sure that we're surrounding our products with the right training and education as well.

And then we feel great about the pipeline that we have in terms of not just what we have in front of us today in the form of DAXI in aesthetics and therapeutics. But if we look at the growth opportunities that we have going forward in terms of therapeutics international expansion, unlocking the partnerships that we have. And as we continue to evolve and grow the build-out of our supply chain, which will give us more financial flexibility.

So with all of that, let me talk a little bit about our opportunity in terms of the pathway to unlocking the blockbuster opportunity in the U.S. market and beyond. So '23 was really a pivotal year for us from a commercialization standpoint with the approval of DAXXIFY for aesthetics. This is our first full year of commercialization. We've continued to grow and feel very pleased about how we're doing in the marketplace with RHA line of fillers, which I'll talk about a little bit later. We also received our approval in cervical dystonia, which marks our entrance into the overall therapeutics category. We've expanded our contract manufacturing relationships -- will give us more flexibility from an overall volume standpoint. We expanded our sales force by almost 50% in the U.S. going from 100 to 150. And then we also fortified our balance sheet, raising about $100 million in ATM proceeds and added another $50 million in debt from our partnership with Ethereum. So we feel very well positioned from a capital standpoint to execute on all of our different initiatives.

And Toby will talk a little bit later about the financial forecast and the impact and sort of what we feel from an achievement standpoint we can do based on how we're positioned.

In '24, we expect to have a full commercial launch with cervical dystonia and learn a little bit more about the overall performance of our product in that broader therapeutics category. We anticipate through a partner, Fosun, that will receive approvals in both aesthetics and therapeutics in China, and we will start our journey down the international expansion pathway as well.

And then as we move over time, we'll continue to expand internationally. We'll continue to build out sort of the therapeutic pipeline. We'll also continue to expand our contract manufacturing relationship -- and through our partnership with Viatris. we would expect our biosimilar to BOTOX program to come online in the future as well.

So let me talk more specifically about the U.S. aesthetics market, where we are in that journey and particularly on the revamped side of it. So from an overall landscape standpoint, we really like how we're positioned in the U.S. facial injectables market. It's a $3.9 billion market, and it's got some very attractive characteristics about it. It's still thinly penetrated from a true potential opportunity, market penetration, and there's a lot of tailwinds there in terms of younger people engaging in treatments. People that, as they live longer, want to retain the best versions of themselves, want things that are noninvasive and that they don't look done. So the #1 and #2 most performed minimally invasive procedures. They've had strong historic growth CAGRs and are projected to continue to grow nicely if you look forward.

We also like it from a manufacturing perspective because there's high barriers to entry to get into these categories due to the regulatory side of things and historically been very resilient to macroeconomic factors.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Let me talk a little bit about that. So this is a survey that was done this summer by Beauty Engine that looked at asking consumers, if you had to cut back on spend, where would you cut back first? And what you'll find is that only 25% of consumers would actually cut back on some of their aesthetic treatments. And I think this is borne out in prior economic downturns where aesthetics, and particularly these recurring procedures that people get used to, end up being very highly desirable and things that consumers are willing to make trade-offs in their budget to continue to pursue them.

When we're going down the journey of getting the approval for DAXXIFY and looking at how we were going to compete effectively in the U.S. facial injectables market, we felt very strongly that for us to achieve the sort of growth that we wanted, that we needed really three key elements to enter the market successfully. One is a toxin, one is a filler and one is an engagement strategy that would allow us to offer loyalty and practice partnership. And so we feel like we've come into the market with really leading offerings across all of these. And so I'll go into those a little bit more deeply.

So first, on the neurotoxin side, let me talk a little bit about where we are in the launch and ultimately, the DAXXIFY difference. So I talked a little bit about the journey where we started is kind of really a peptide company and how we wanted to deliver different biologics, but a little bit more about the actual formulation of DAXXIFY itself. So it's really stabilized by proprietary 35 amino acid stabilizing peptide, which is the backbone of what we do. And based on a lot of the bench work that we've done and the clinical work that we've done, this ultimately yields a much more efficient way to deliver toxin into the body. And we've seen that in terms of more affinity to the cell membranes, we SNAP-25 cleaved, which ultimately drives efficacy and duration, and we're able to really target it into the tissues.

And in terms of the performance profile, all of the work that we did early on around the performance of the product, what we continue to hear from consumers is that duration was the #1 unmet need. And this is just another refresh survey that was done this summer as well that continue to say that for consumers, duration continues to be the #1 thing that they look for. So we feel great about how we're positioned the uniqueness of the peptide and ultimately, how it delivers in the real world.

If you drill down a little bit deeper and you look at sort of how does this compare with other competitor toxins, First off, if you look at it, we take this 900-kilodalton complex. We strip away the accessory proteins, and we end up with 150 kilodalton starting point. We then stabilize that with our peptide. And what's interesting is that our 40 units, we still deliver the same amount of core active ingredient as BOTOX with their 20 units. And so with the same amount of core active ingredient, we're able to get a lot of the benefits that I'll talk a little bit more about as I move forward.

Interestingly, we're the only ones that have a peptide formulation. We don't use any human serum albumin. We don't use any animal proteins or components, and we're also manufactured here in the U.S.

When you look at the performance profile of the product, we sometimes get questions around with aesthetics, sometimes endpoints can be a little more squishy. Does the duration? Is it replicated in other areas? And we feel great that we're not only seeing this duration profile play out in our aesthetics trials but also in the therapeutic trials. And in like cervical dystonia, when you're injecting seven different muscles, the fact that we're able to see this consistency of duration and performance, gives us conviction and confidence in terms of the overall performance profile of the product.

So let me take a step back now and talk a little bit about the launch of DAXXIFY, how it's gone, what's the feedback and our strategy overall. So if you look at the timeline, we received approval roughly about a year ago. And as we articulated to the street, our plan was to go in a very sort of measured and controlled fashion. So on approval, we trained a group of faculty members that we're going to work with the preview early launch group in order to generate experience. We knew coming into a very established category with a product with a different performance profile and frankly, only clinical trial data that we were going to learn some things that were going to help us optimize the launch, all with the goal of driving long-term success.

So we set out with this very measured and thoughtful rollout strategy, where in the preview program in December, we trained roughly 400 injectors or so that went out and started using the product more broadly. And based on the duration profile of the product with median duration around 6 months, we

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

heard from a lot of them that I'm going to use it early and then I'm going to want to wait to see what that duration signal looks like. So through that experience, we got a lot of really good feedback that we incorporated into our messaging and our positioning, armed our sales force with it. And then we went into the full commercial launch in March of this year.

And so in March of this year, we rolled it out and that group went through a similar process where they had early experience with it and then looking for that duration signal. And so through that whole journey and that process, we were gathering real-world feedback. And now that we're about a year into launch, we feel we've got a pretty good body of feedback that is allowing us to sort of make modifications and tweaks to our strategy.

But the one thing I want to point out is despite what was a very measured strategy and controlled rollout, this has still been the most successful neuromodulator launch since BOTOX cosmetic. And so if you look at how we're performing, even with a very targeted strategy and a measured approach, this has been the most successful launch.

What's also interesting, if you look at kind of where we're taking share from and how our practice is incorporating and using it, what we have found, and this is a survey that we did in August through Kx Advisors. They surveyed about 225 injectors and ask them in the last 3 months, what's been your usage prior to DAXXIFY and then since DAXXIFY. And what we're seeing is that it's interesting, we're taking share from all of the different players. And so we feel really good that this product resonates in all the different practices based on whatever they're using.

So what else did we learn from some of these real-world findings and what are our customers telling us? First off, they're very happy with the performance of the product. And this is a critical one for us because when you come into the market, and you only have clinical trial data, you want to make sure that actually people are really happy with the product. And we've heard that over 80% of both the injectors and the patients are very happy with the performance of the product. And so for us, we know the product works. We know that it's delivering incremental value, and we continue to feel really good about that.

The second thing is that we've heard from folks is, listen, we're seeing a duration profile that's very consistent with the clinical trial data that's been put out there, meaning duration of 6 months, some get less, some get more. Just like with conventional toxins, you'll find patients that have different duration responses to existing products that are also in the market. And so they're saying we're seeing very much similar real-world feedback in terms of the performance of the product.

Also, since we only have a glabellar lines indication and we're coming into the market, we weren't sure and the fact that we can't promote it outside of glabellar lines, where these injectors going to use the product more broadly or are they going to stick with global lines? And we're very encouraged to hear in the survey as well that injectors have really kind of embraced this and figured out and they have become comfortable using the product broadly the same way that they do with all of the other toxins that are out there.

There were two sort of, I would say, really pleasant findings as well that have come through pretty clearly from the discussions that we've had. One is what appears to be a faster and early onset of action. And I know that when we bring our panel of clinicians up, they can speak to this as well. But the fact that it kicks in quickly, is perceived to be a big benefit. When you look at sort of the overall duration profile of a product, what sometimes get lost a little bit is that early part, which speaks also to duration and frankly, them getting the results that they want.

And the second one is this comment around skin smoothness, skin texture, blow a really good look. And so we did a quantitative image analysis where we found that 90% of patients achieved improvement in their skin texture. And so we feel like these were two aspects of the product that we didn't fully appreciate in the clinical trials.

As a matter of fact, when we actually did the market research and ask the injectors, what are the top three reasons that they prefer, DAXXIFY, we heard duration still at the top, but not too far behind was

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

about this sort of onset of effect in the skin quality. And we put a quote up there that from one of the partners was that, hey, listen, DAXXIFY, works faster, lasts longer and skin looks better.

We're also very focused on a few other practice integration pieces. Was the reconstitution going to be a barrier? And what we've heard pretty universally is that the communities experienced enough, they figured it out. And so that hasn't really been a big impediment. We do find that just like with other products where injectors differ a little bit from what's on label that they figure out what works for them, but this has been fairly straightforward and people figured this out.

Number two, on glabellar lines that the injection for glabellar lines is very consistent with what they do. Some have figured out ways to we can optimize just like they do with all products, but that also has not been a huge barrier.

Another one that's come up is the importance of proper dosing, what's often the case with new products is clinicians will go a little bit more conservatively. They might start a little bit lower in order to make sure that they have confidence in the product. And since our dosing for glabellar lines, compared to BOTOX is 2:1, it's not uncommon for injectors to start with maybe a little less dosing and then work their way up. And obviously, there's a strong correlation between the dose and the performance of the product. And so we have good discussions with them about patient expectations, based on how they dose and where they go from there.

And then we have heard -- well, I don't think this is a major driver that patients certainly like the kind of the vegan tox or whatever the fact that we don't have any animal proteins or human serum albumin in our product and that it's made in the U.S. And so at a high level, we feel very good that -- the products -- is a great product, it works and most of the people we talk to say, listen, I think it's a better product and we think that, that's really anchored by the formulation, which delivers extended duration of effects, early onset of action, really good skin quality and it does so with really good efficacy and a really good safety profile.

So let me talk about some of the other feedback that we've received that we've incorporated into our launch strategy, all with the goal of taking more meaningful share. And that really comes down to this alignment between price and the product expectations and the importance of that interplay to unlocking meaningful adoption.

So in practices where we find there's good alignment between the price and the expectations, DAXXIFY has become the top share of wallet. And some of the success factors are setting the right expectations, making sure that there's alignment between price and ultimately, the outcome and then favorable economics so that the practice feels like they're getting rewarded on the economic side, the patient feels like they're getting value for the performance of the product relative to the price.

When there's misalignment, hurdles to deeper adoption exists. And that comes when the price starts to elevate beyond a certain level, consumer expectations start to go up, and that directly aligns with sort of the no movement. So in a consumer's mind, if I'm paying that much more, and it's a better product, then I don't want to see movement. So expectations get a little bit uncorrelated from the normal performance of the product and particularly one with longer duration. It also leads to a more involved switch discussion.

And so I talked about our provider-centric strategy, we're engaging these practices and arming them with the right information often leads to a discussion between the injector and the patient about, "hey, this new product, it lasts longer", and with elevated price that discussion can take longer and can create sort of challenges from the broader adoption.

And then ultimately, consumer price sensitivity. For some consumers, there's limits to how much they can ultimately pay. And so now we've got the benefit of real-world experience whereas in the past, when we launched, we had clinical trial data. And we've been hearing that the product is a great product. It delivers, it works. It lasts longer. It's skin quality, early onset. And we feel that, that helps reinforce our conviction and some of the strategy changes that we're making to go to broad-based adoption.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And I was talking with a plastic surgeon recently, who now has a lot of experience with the product who's saying, listen, patients love it, staff loves it, if you could price it more competitively BOTOX, I believe I could switch over at 50% of my patients.

And so with all that information, we're continuing to evolve our strategy with the sole goal of taking meaningful share gain. I mean that's our long-term goal here. And so as of September 1, we kicked off a pricing strategy change where we're positioning the product to be competitively more in line with BOTOX. And what that means is you know we have different tiers of pricing. At the lower end of our tier, which we still have these tiers, a little less than a 20% discount at that end of the tier. And all this is designed to make switching to DAXXIFY easier for both patients and for the injectors. So that they can align patients can experience the benefit of the product where price doesn't become a major determinant in that. And then it provides ultimately for the practices, the flexibility to figure out what economics work best for them.

Do they want to price it at parity and let the patients ultimately get the benefit? Do they want to charge a premium? And how does that ultimately work? And again, we'll get into some more in pricing discussions as we go a little bit further into this.

And then ultimately, like I said before, it's a way for the performance profile of the product to be fully realized without being encumbered by price.

So where are we at? And what's been the execution on the strategy. And so we rolled this out September 1. And part of that strategy is we are currently reengaging those accounts that we already onboarded with the product. Why are we doing that? Well, we're doing that because these are practices that have been trained, they've seen the benefits of the products, have happy patients and who have given us feedback that this is a strategy. And so our focus right now is really on going back and reengaging with these accounts versus going out and yet opening more and more. Now we will certainly open some new accounts. That's our primary focus. And we're partnering with those practices to talk about, okay, now with this adjusted pricing strategy, what is that path now to treat a large number of patients and become a more meaningful share player in those accounts. And so those discussions are taking place, and we're working our way through that.

In terms of the early insights, what I would say is based on all the discussions that we had with the clinical community and the feedback that we've received, universally, we're hearing this is a great strategy. We think it makes a ton of sense. We would love to offer it to more of our patients, and this removes kind of one of those hurdles and the barriers. And while it's really early, if we look at the first week of September versus the first week of June, so both the third months in the quarter, we've seen an increase of orders the first week versus the first week of over 50% and we've also seen in this first week an increase of over 60% of reorders. So accounts that have already ordered more than 2x, those accounts reorder. So I know these are very early numbers, but they continue to be directionally in line with what we would have expected based on the patient -- practice feedback that we've received about ultimately the pricing. And so this early confidence is what gives us the conviction that we can really go after a meaningful shared adoption going forward.

Based on the recent rollout of the pricing and our focus on going back around to these accounts and reengaging them and making sure that we've got the right strategy to convert a large number of patients, combined with seasonality. We expect our Q3 revenue -- product revenue to be around Q2 '23 levels.

So in summary, we feel really good about the launch strategy. It's provided us with the real-world learnings that we were looking to get in the marketplace. And based on all of that, we're really pleased with a lot of the things that we weren't sure whether or not we're going to be issues from a reconstitution, where they're going to use the product. We've been very encouraged with the early onset of action and the skin quality that we're seeing. And with some of the recent pricing adjustments that we made, we feel really good about our ability to drive meaningful long-term growth over time. And so we feel great about our foundation for long-term success.

Let me now shift over to the RHA Collection and talk a little bit about where we are with RHA Collection of fillers overview and the progress. Again, currently, we have four different SKUs in the marketplace.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The RHA line of fillers is the first and only FDA-approved line of fillers that has a claim around treatment of dynamic wrinkles and folds, and that's important because it really speaks to the construction and the differentiation of the product. And so if you look at the sort of the lightest of the gels, the RHA Redensity allows for really good smoothing around the lip area, the perioral rhytids. Two and three are sort of very balanced pillars that can treat a variety of different things, and then RHA 4 on the other side provides more lift.

But really what underpins the technology is the way that it's manufactured. And so if you look at natural HA, they have these long strands. And the way that ultimately, Theoxane has engineered the product, it's designed to mimic the natural expressions and facial movement of the face. And it's also designed to be long-lasting.

So if I go into that, really what that speaks to is the fact that they're able to preserve a much longer HA chain than all the competitors and almost up to 5x longer than the HA chain. It's kind of think of like the Golden Gate Bridge, as long span that can move versus the Bay Bridge, which is very rigid. And so that these natural long chains, move more naturally with facial expression, the long chains as well provide the duration side of it. And so we really continue to hear from the market how great these products are and how happy they are with them.

And so if you look at how we're doing in the marketplace, again, we've had a very measured and thoughtful approach. But within 3 years of market launch and we launched in the middle of the pandemic, and we launched also without the benefit of a neurotoxin. But in 3 years, we've been able to garner about 9% share in the U.S. market based on revenue. Cumulatively, we've delivered over $250 million of revenue. And if you look at a guide point survey, it's the #1 brand in terms of year-over-year growth, #1, in terms of profitability for the practice and #1 relationship with the sales rep. And we think that speaks to the fact that when we're coming into these accounts, we're not just coming in with a product and price, we're coming in with innovation and talking to them about how this might be able to add and help sort of further give them optionality with their patients to get the best outcomes.

On the commercial execution side of it, historically, we've added roughly 500 new accounts per quarter when we only have the RHA line of fillers in there. But I think that speaks to the commercial strategy that we put in place, our ability to execute. We now have over 6,000 accounts that we have relationships with. And again, I come back to the success that we've been able to drive still in dealing with a targeted number of overall aesthetic accounts that are in the marketplace. So we feel great about the RHA line of filler as we now get deeper into the market with DAXXIFY, our ability to pair these brands and to continue to be a valued partner, we think will continue to increase.

So with that, I'm going to ask Dustin to come up and talk about loyalty and practice partnership.

**Dustin S. Sjuts**
*President*

Thanks, Mark, and good morning. As Mark was talking about so much of our strategy is built on the innovation of our products, and we've got amazing products. But in our space, you've got to do more than just have great products. We've got to partner with our customers and develop value adds and allow them to continue to grow with us.

Our loyalty and practice partnership principles and priorities are fairly simple. Number one, we want to enhance the customer experience at every single touch point. We've got to be easy to do business with. Number two, we're going to deliver a loyalty program to customers and consumers in addition to portfolio pricing.

The word loyalty often is synonymous with coupons. And while that can be a strategy and is part of a strategy, it's really more about how do you deliver the overall value that drives market share growth and also stickiness when competitors try new things and new coupons and other activities.

And then lastly, we'll continue to leverage our data and digital capabilities to enhance engagement and engagements with our customers, with our sales force, and the entire organization, how do we be more nimble, more efficient than the others to continue to accomplish more.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Our loyalty and customer engagement initiatives include a wide range of offerings. This will continue to ebb and flow over the next few years. As you'll hear later on today, each practice is quite different. We've got to explore different ideas on how do we partner with them to drive the growth that they need, that's important to their practice and also helps continue to drive our portfolio.

As part of our current offering, we have payment processing. Why do we have payment processes? Well, first, loyalty programs in a sense are really complicated to build and expensive. And in 2022, we had an opportunity to purchase HintMD as a foundation for how we look at loyalty, digital and overall engagement. And HintMD platform had payments. With payments, it gave us a variety of options. It gave us in-market data directly at the transactional level. It gave us an opportunity to take advantage of revenue in the practice as it relates to credit card processing fees. It built our tech talent in our digital capabilities and ultimately allowed us to try memberships, which we know helps continue to drive stickiness and practices. And overall, helped us accelerate our digital capabilities and better understand the practice and how it works beyond just product engagement.

Despite our success with OPUL and our significant progress, the cost and operational resources required for a payments business no longer align with our capital allocation priorities. What that means is today, we'll be exiting the OPUL payments business by the end of Q1 of 2024. We'll cease all related R&D spend while exploring strategic alternatives for that business. The 2023 projected loss from our Services segment is approximately $25 million. Preliminary and estimated noncash impairment charges from goodwill and other assets will be between $80 million and $100 million, which will increase our 2023 GAAP operating expense. And Toby will go into a bit details of that in a little bit. And we'll have a reduction in our 2023 non-GAAP operation expense guidance by $5 million.

What we are going to do is continue to leverage our technical architecture, our digital capabilities, execute on our loyalty and practice partnership initiatives.

Overall, we feel really confident of our continued ability to grow the aesthetics portfolio. Mark reviewed our learnings to date that validate the innovation of DAXXIFY and our continued launch strategy. It's clear launch optimizations are underway for us to maximize share take over time. We have competitive products and are supported by the continued success of our entire organization and our future innovations to come.

Our growing loyalty and partnership capabilities will help support long-term success, growth of market share and overall stickiness as new competitive entrants coming to the market. But it's now time to hear from our customers and the voice of the customer. Please play the video.

[Presentation]

**Operator**
Please welcome our esteemed faculty and General Manager of Aesthetics, Taryn Conway, for a question-and-answer session.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Taryn Conway**
*Vice President of Marketing*

All right. Good morning. I know we've been eagerly waiting for this. So we're going to kick off the DAXXIFY panel today, and we're going to be discussing this with our faculty who's been using it over the last year. We've divided this into three different sections. We're going to talk about product performance, practice integration and then pricing and profitability. As this is intended for an investor audience, our clinicians are allowed to use the product in any way they see -- deem fit for their consumers than the providers. So we'll be discussing some real-world scenarios where DAXXIFY is used today.

So let's kick it off. I have some questions that are prepared, and then we'll open it up for the audience. So let's just start. We'll go down the line, introduce yourself. What toxins you've been predominantly using in your practice? And how long you've been using DAXXIFY?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

I'm Ruth Tedaldi, I met you all yesterday. I was a pediatrician. And then I did a second residency in dermatology, started doing pediatric dermatology. And then about 15 years ago, converted my practice to completely cosmetic dermatology except for a lot of the 70-year olds who still come and have me do their skin check. So I used -- I was an Allergan person for a long time, and I use a lot of Xeomin. I also did the Dysport clinical trials. I did Xeomin clinical trials. I've done a lot of clinical trials. And I was part of the December launch, and I didn't, as I said last night, didn't expect to be as gung-ho because I've actually been turned off by a lot of the aesthetic launches recently. They're a little too glitzy for me, but this one really spoke to me on so many levels. And in my practice, it's been definite game changer.

**Taryn Conway**
*Vice President of Marketing*

Great. Dr. Lafkas?

**Unknown Attendee**

Michael Lafkas, Southern California. I'm an injection physician for 19 years now. It was predominantly -- I've been an entirely BOTOX only account for 19 years. This is the first toxin that has passed the cost performance benefits needed to surpass BOTOX performance. And I've probably now at around 20% to 25% integration in my practice, and it continues to grow. We've been very happy with its performance. I launched with the preview in December, and it continues to generate momentum and market share.

**Unknown Attendee**

Haley Wood, nurse practitioner. I have a practice about 20 miles south of Nashville and Franklin, Tennessee. I was here last night, you saw we inject those beautiful lips last night. I was one of the first ones to use DAXI. I have -- also probably one of the first ones to integrate RHA into my practice fully and it's been a 3-year process, but I've been really -- it's been a journey, but it's been a worthwhile journey from a profit point of view. I also intimately involved with training across the country. I've trained for every major company in the business and I exclusively train for Revance right now.

**Unknown Attendee**

I'm Adair Blackledge, [indiscernible] -- facial plastic surgeon in Jackson, Mississippi. And I have been predominantly Allergan and Evolus provider in the past. And I would say I started using DAXXIFY in the initial rollout. And I would say that our experience has been that of all the new toxins I've added to our center over the past 23 years, this has, without a doubt, been the most positive experience from a patient standpoint. Our patients have appreciated. It's funny. Initially, I thought the duration of the product would be what patients would like, but it's actually been the onset because we forget that when Amazon can

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

deliver something to your house in less than 24 hours. Guess what? People expect now toxins to kick in, in 24 to 48 hours. And this is the first toxin that I've seen that we can -- that starts taking effect in less than 2 days in the majority of our patients. That's been the game changer. It hasn't been there in 6 month. It's been the fact that patients are walking in and saying, "I want the toxin that kicks in really fast," and I know immediately what they're talking about.

**Taryn Conway**
*Vice President of Marketing*

Great. So Dr. Tedaldi, I'm going to ask you the first question. What makes DAXXIFY as significant or exciting addition to the toxin category?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

As I said last night, it's all about patient relationship for me. It's about my ability to bring to my patient what they're asking for. I feel very confident they trust my confidence in the product. I'm all about skin care. I have talked to Mark and Dustin many times because I actually developed a skincare company called RegimenPro, where we try to teach other physicians, mostly dermatologists how to dispense. And with DAXXIFY, and that has been 7 years of a lot of work and doctors, as you know, are really difficult to jump ship and do something a little differently. But it's all about skin care for me. And so that's the entry point in terms of my relationship and DAXXIFY combines the effects of a neuromodulator with enhanced skin quality. And so for me, why would I do or have anything else if I'm going to get an injection, and that's something I convey to my patients, and they're really thrilled with it.

**Taryn Conway**
*Vice President of Marketing*

Dr. Lafkas any additional comments on that?

**Unknown Attendee**

Definitely safety profile goes without saying but outcomes and the nuances we've talked about, risks, brow ptosis are low. We were very surprised about that when we tested it, a more natural look to the brows, more natural look around the lateral canthal lines were very surprising additional benefits, but the duration for me is extremely important. If I can take just -- we're seeing typically 60% to 70% average longer duration for our clients. The product overall for my patients right now is actually, on an annualized basis, probably 5% cheaper, but they visit me 2.4 times a year rather than 4 times a year. So that frees up 40% of my time. And on average, I make twice the profit in 15 minutes compared to BOTOX injection. So the financial metrics are there, since the incentive's there for the patient, the incentive's there for the doctor. And that's what's really exciting for us.

**Taryn Conway**
*Vice President of Marketing*

Great.

So [Haley], you've had the product just about a year. What has been your clinical experience with duration of DAXXIFY?

**Unknown Attendee**

Yes. So for a year, we've had to play and it's been a journey playing with dosage, reconstitution, and then every patient is different. So it's been a learning curve for sure, along with pricing. But it's -- when we talked about stickiness in the practice, this provides another stickiness to our practice because patients they love it. And so I always want to give patients something that they love. They want to keep come and go back for. And like you said, I love the opportunity that it opens up more openings in my practice so that I can see more new patients, increase my revenue numbers. And yes, I mean, we haven't had a new tox in the market for almost -- I mean, a great toxin for -- I mean, BOTOX came out with 20 years ago. So this is just another new talk and that patients are like, "Yes, I want to try that new toxin. I've heard great

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

things about it." We've done a lot on social media around it to promote it, talk about the duration and the quality of skin and patients are coming to us because of that.

And so yes, it's been exciting. And the delivery that you guys gave in the beginning, like it was science-based. It wasn't about the glitz and the glamor that we see on stage all the time. It wasn't about a shiny new box. It was like science-based, and there's not very many companies who were doing that. So I thought really secure about the science going into this, like bringing this into my practice.

**Taryn Conway**
*Vice President of Marketing*

Great. So Dr. Blackledge, just start with you. How do you align patient expectations with DAXI?

**Unknown Attendee**

I think that I talk a lot about a longer-lasting toxin. I've actually gotten away from specific numbers for the exact same reason that I don't talk to patients about how long a face lift is going to last. There's absolutely no way that I can predict how long one of my face lift is going to last. And I don't know of another plastic surgeon in the country that goes into consultation and says, your face lift is going to the last 10 years. Because I have no idea of what kind of stressors, what kind of aging factors in Mississippi, I have no idea if they're even sleeping in a tanning bed. I mean it's -- you don't know. And so I don't talk about specific numbers, this toxin is going to last this long. What I've done that has worked just beautifully is I give the patients the option of a long-lasting toxin or short-acting toxin. And so that's what I do. And so I'm a long-lasting toxin, I say, "You know what, if you would like to do a long-lasting toxin, we'll do that. If you want to do a short-acting toxin, we will do that." and that way, it gives the patient the option of deciding how they want to spend their money. And we're not talking to them about long-lasting toxin and I say, you know what, in my hands right now, this talks in last twice as long as anything else that I have in my center.

**Taryn Conway**
*Vice President of Marketing*

What about you, Dr. Tedaldi?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

Well, I'm sitting here thinking, I never try to figure out how much my patients are going to spend in terms of their budget. Because as soon as I think I figured that out, I'm wrong. We're not talking about thousands of dollars. We're talking about hundreds of dollars. And most women and now men, as you can see, especially the [indiscernible] guys, are willing to spend more money for a better outcome. There's no question about that. And so when we're talking about better outcome, we're talking about all of these soft things, that we talk about movement with no lines, but some movement, better skin quality. We're talking about all of these things that have become much more important to our patients who are now consumers. They come in and Dr. Google told them to do this. And so we spend the first 2 minutes saying that Dr. Google doesn't really understand what DAXXIFY is. So we explain a bit to them. It takes a little bit more time and that is a turn off to any physician, anything that's going to take more time is a negative, but what they don't realize is that the positive of the stick and the positive of the relationship and the positive, of course, on the benefit to the patient, which is first and foremost, is definitely there.

**Taryn Conway**
*Vice President of Marketing*

Great. So Haley, I have a question for you. There's always a product adoption curve when it comes to a new product and a launch. What have been those key learnings since using and some key points of differentiation?

**Unknown Attendee**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Well, for sure, the frontalis. I mean the glabella stick. We know that for sure. But I always say because I do a ton of trainings. And I say the first 4 months, you adopt DAXI in your practice, it's a bear, it can't be. And so it's a bear because we know that there are some patients who aren't going to last as long. And so those are the ones you're hearing from. It's just like surgeons or dermatologist is really difficult. They're the ones you're going to hear from first.

And then -- but the people -- they're super happy. They're sleeping for the first 4 months because they're happy. They're not calling the practice complaining about it. You're going to hear from them about 5 to 5.5 months. So that's the curve. That's what we've learned this first year is that the first 4 months you adopt this product don't give up, there's a learning curve behind the dosing, you've got to learn the reconstitution, you got to learn the pricing point behind it. Once you get past that, and you get to that 5, 5.5 month mark, then you hear from the patients who are super happy with it.

So that's been the journey for me is knowing that you're going to have some patients who -- they may want to go back to botox, but you got to take the photography, you've got to go back, you got to prove, like is it actually not lasting as they say. They're comparing it all in the frontalis. And that's where I think this toxin has had a really hard way to go. As all foreheads are going to wear off faster than the frown. There's no doubt about it with any toxin you use. And so I think this toxin has had an unfair -- just it's been -- it's been unfair for you guys. It's been a hard row.

**Taryn Conway**
*Vice President of Marketing*

Thank you for acknowledging that.

**Unknown Attendee**

Yes. It's been super hard for you guys. I have been on the front end to like trying to like go to back for you guys.

**Taryn Conway**
*Vice President of Marketing*

I don't even know if you were breathing when BOTOX was first launched. However, we launched it with a glabellar indication only. And that's all we did because we were afraid to put it anywhere else. And our patients certainly weren't going to let us put it anywhere else. And that's the easiest place to treat. So for years and years, everybody thought, okay, BOTOX is great because this is what happens. We all know that the harder parts to treat are everywhere else. So it's not really -- it's a learning curve. It's the same learning curve that we go through with the other toxins. It's just that we're seeing those patients back earlier. If we photograph them, and see them at 3 months and then photograph our DAXI patients and see them at 3 months, they look much better. Every period.

**Unknown Attendee**

Actually this with RHA 2, it's taken us like 2 to 3 years to get RHA where it is today. So it just takes a while.

**Taryn Conway**
*Vice President of Marketing*

Yes. And actually, Dr. Blackledge and I have had extensive conversations about the frontalis area. How do you optimize?

**Unknown Attendee**

You know what -- I think the first thing you do is you set expectations I think second of all, you're confident in your approach to the frontalis. And it's about not being scared to inject the frontalis. I think the last thing is to realize that you know what, every toxin that's come out has had problems with the frontalis. This is absolutely nothing new. And we've seen it with every toxin.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I compare it with my son. He wanted to be a major league baseball player. And you don't start out by trying to teach him how to hit a curveball. We start with just a fastball, something simple. And so A lot of -- I feel like a lot of newer injectors are starting with the frontalis. I feel the injectors, hey, start with the gaming, start with T-ball and start with the glabella. We know it's going to work. We know we're going to get 6 months.

And then as you get more confident in your technique and your approach, then use -- then branch off into the frontalis. I'm at a point now where I'm using anywhere from 30 to 35 units in 7 to 8 injection points in the frontalis and -- and right now, I'm getting on average -- I do all my own injections. I don't have injectors. So I know what my patients are saying and -- and right now, I'm getting on average about 5 months duration in the frontalis, which is brand new to me because I'm never with any other product gotten more than 3 months in the frontalis.

**Taryn Conway**
*Vice President of Marketing*

Great. So Dr. Lafkas, why switch a patient to DAXXIFY? You've been a BOTOX only account for 19 years. Why do you do?

**Unknown Attendee**

And just to be clear, BOTOX has gotten phenomenal results all these years. It's an amazing product with high satisfaction rates and now we don't take switching toxins lightly. I've tested all the other ones I said, none of them had the satisfaction rates of DAXXIFY. And on the cost performance, if I don't move them to this product, and I delay this launch, I worry that as my competitors get a hold a bit, they'll slowly steal my clients. And this is one of those products that I suspect that in the next 2 years, if you do not move to it, you will lose clients to practices that do offer it. Feel very strongly about it.

**Taryn Conway**
*Vice President of Marketing*

What about you?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

Pretty much the same. I think it's -- I have nothing bad to say about any of the products. I feel like I can create whatever I need to, but I think that the 360 of what my patient feels, having DAXXIFY and a lot of skin care and a lot of injectables done in a very metered way for a super natural look is really right up the DAXXIFY line of what we're providing.

**Taryn Conway**
*Vice President of Marketing*

Yes. I love that you said last night, you have 25 women that work for you, and they all choose. DAXI when they could use any other toxin. It's true.

**Ruth E. Tedaldi**
*RegimenMD, LLC*

Yes.

**Taryn Conway**
*Vice President of Marketing*

So [Haley], how do you typically introduce new products to patients in your practice? How do they get integrated?

**Unknown Attendee**

We do a lot of social media presence. We do a lot of education on videos. But typically, when we bring a new product into our practice, we'll start with like, it depends if it's a filler, we'll do 10 patients, if it's a

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

toxin, we'll do 20 patients or more. And we just see how it goes. We just kind of give it like use those few patients to see how the first few months go. But we didn't have to do that with DAXI. I mean, as soon as we did the first 10 patients, because there's a waiting curve. You have to wait to see, okay, you're going to inject it today, but filler, you see the results immediately, right?

Toxin, it takes a while to see the result. So we had to wait for the kick in, but the kick in was, like you said, it's so fast. Like if I get mine on Friday, by Sunday night, I'm golden. And the patients love that. Their skin quality was amazing. So it was really a really fast onboarding because I don't change my technique at all with the toxin. So that was really easy. We learned the reconstitution very easily. So it was really quick adoption. It's just learning the dosing curve. But typically, we do 20 patients in watch, but this one, we just flew out with, it was super easy to integrate.

**Taryn Conway**
*Vice President of Marketing*

What about you, Dr. Blackledge?

**Unknown Attendee**

We -- the first thing I did was I injected all of our employees and we -- I have 32 ladies that work with me. And my average employee has been with me for 18 years, we don't have a lot of turnover. It's more of a family. And so I didn't -- obviously, I didn't wait 6 months to see if they liked it. What happened was it kicked in so fast that about 32 employees now, 31 of the 32 chose DAXXIFY. The only reason that the other one, the one does not is because he's related to the BOTOX [realm]. And so that's kind of unfair -- that's kind of an unfair advantage at this point.

But anyway, so as soon as it started kicking in, that's how when I would go in to see a new patient and talk to them about our product, the first thing that I would do is I would just tell them what my own employees were choosing. And that made it easy because my patients know when you have employees that have been with you for an average of 18 years, those patients have seen the same faces plus the fact that they know them and my employees with an average duration of 18 years have seen a lot of toxins come and go, and they know their toxins, they're professional toxin patients.

And so when they choose a toxin, they're basing it off from not just how they look, but how they feel. I think that's one thing that we haven't talked about quite yet here today, and that's the lightness that you feel with DAXXIFY. Some of these toxins make you feel really heavy. And DAXI, I don't know if you guys, but it's a very light feeling. It's indescribable, but your brows don't feel heavy. You feel it's very much of a lighter feeling toxin.

**Taryn Conway**
*Vice President of Marketing*

I think you could basically go into every office and have the injectors treat the members of their staff and their family members, and that would be your launch. That's what we to do basically.

**Unknown Attendee**

It sounds like we're the #1 staff.

**Taryn Conway**
*Vice President of Marketing*

So Dr. Tedaldi, have you found an ideal candidate to treat with DAXXIFY? Has there been a certain patient type?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

So my least favorite patient is the 53-year-old female. The 53-year-old female is the most difficult patient to treat because she still feels like she's 30 and she's looking at lines and she wants every single one removed. So that's a lot of psychology, a lot of talking. I have a lot of 20-year-olds and who have a crease

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

that's ideal. That's the ideal patient. It bothers them. As a pediatrician, I was horrified that I was treating them. But really just like Accutane, it made a huge difference in their life. I have 90-year-old women who come to look better because they feel good. So I don't think there is a perfect patient, I think the 53-year-old is the least perfect patient.

**Taryn Conway**
*Vice President of Marketing*

Something to look forward to. Anybody else have an ideal candidate?

**Unknown Attendee**

Our ideal or low-hanging fruit and the clients that I started with when we started injecting where the clients that were not getting more than 3 months duration out of BOTOX. So anyone who's starting to wear off by 2.5 months were the ones that we hand selected and those are the ones we launched with. And they were an easy sell because they were already asking for a longer duration. They'd asked me to do more units. I'd up'd their units. So we were still not getting -- we have got to the point where doing more units was getting an aesthetic we didn't like. And so they were an easy transition, and they were all extremely satisfied with the duration of the DAXXIFY, especially in the glabellar area.

**Taryn Conway**
*Vice President of Marketing*

Great.

**Unknown Attendee**

Yes, that is a low hanging fruit, it is super easy. I'm all new patients. All new patients, All start on DAXI, they get every 6 months, it's just easier. It opens up my schedule. The expectations are set. So a new patient for me is always on DAXI.

**Unknown Attendee**

I think also that younger generation, the 20s. That to me has been my favorite patient as it relates to DAXXIFY. The best part of that is that's the fastest growing group of toxin patients as well. The reason I love that patient is because they come in and they get results -- quicker results. And that group, that 23, that 24-year-old patient, they don't wait for anything. I mean they don't -- they're used to sub checkouts and Amazon delivery in 24 hours. And so when they get a toxin that kicks in -- in 48 hours, they're the happiest patients. My 50-year-olds are used to waiting 5 to 7 days. But this younger age group, I mean, they're the easiest patients in the world to convert to DAXXIFY. And the best part about it is it's the fastest-growing group.

**Unknown Attendee**

And men because men are so needle-phobic. Men are great patients for Doc. They do it less, they do it less.

**Unknown Attendee**

I wouldn't say that all men are needle phobic.

**Unknown Attendee**

And to find there's a lot of plastic surgeons who not do toxins and fillers. But we know this one does.

**Taryn Conway**
*Vice President of Marketing*

So Dr. Lafkas, any challenges to adopting DAXXIFY in your practice? Have you done anything different with dose ranging?

**Unknown Attendee**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

The frontalis has been the one where we have to kind of make little adjustments, but it took us probably about 4 to 5 months to perfect the frontals pattern. And now I've modified my pattern. 20% of my clients got remapped, 20% to 25%, getting a slight different recipe in the injection pattern. But once you get it, the satisfaction rates are there, we didn't give up on any of them. And right now, I'm at about a 90% satisfaction rate. So 1 out of 10 chooses to stick to BOTOX, but 90% of them are moving to DAXXIFY.

And so this is a 4- to 6-month learning curve. And so you're going to see like little sweeps of new entrants, and it's going to have I think they all are going to have to go through that 6-month adoption cycle.

**Taryn Conway**
*Vice President of Marketing*

Yes. And then Dr. Tedaldi, how do you optimize outcomes with the new product? And why ongoing education and training is so important. It's something that we launched with for DAXXIFY?

It was really important to us to get the science as Haley talked about education and training before they got the product. So what do you do for your product launches in your practice?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

Well, I think the most important thing is seeing the patient back and letting the patient know that you're in this together, and you are going to make them happy with their injection, whether it means coming back once or twice. And we had in the beginning, patients come back twice as you were saying, in terms of really getting the method. And I think -- I don't think that's new to DAXXIFY. It's just that it's lasting longer. And so you want to look great longer. I mean we all have patients their child is getting married. They have a wedding. They have a [indiscernible] that they have something that's happening, and you want them to look perfect. So those photos that they have forever are perfect as well.

And so what that does, though, and what most physicians and providers are not as cognizant of is it solidifies your relationship. You care enough to have them come back, you care enough to make it perfect. That's my name on that patient. And then nothing that makes me feel better than the patient is really happy and looks great.

**Taryn Conway**
*Vice President of Marketing*

Haley, we've done a ton of training for us. Why do you think that's so important to continue?

**Unknown Attendee**

Because you have to -- because you have to meet them where they are. And that's where like the Zumba gurus, which are a brilliant platform, it's 30 minutes with an expert. And so I can be after work in clinic, and I have a 30-minute call with someone in L.A. or someone who doesn't get a train, like, let's say, someone that's in Idaho who can't get anywhere for a train. They're going to have a conversation with the guru say, "what's working in your practice?" And so that's where education and communication is so critical because you don't want them to give up. You want to say, "Hey, I want to meet you where you are, you're having issues with this. I've had issues with us, too. I'm working through it. Let's talk about your pricing " So yes, you -- that platform, I think your launches have gone really well as far as like what you did here, what you're doing on Zumba gurus, those DAXI brown table conversations. From that sparks a lot of DMs in my Instagram saying, what are you doing for pricing? Because they want -- they need that. So it's important to have that ongoing.

**Taryn Conway**
*Vice President of Marketing*

Great. And so we've talked a lot about upper facial lines. I'll start with you, Dr. Blackledge. What are other treatment areas where DAXXIFY has delivered improved efficacy? Have you used it in other areas besides the upper face?

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Unknown Attendee**

Sure. Once I get comfortable with the upper face, I've moved into the neck. I think that the neck is obviously one of the more underutilized areas because there are very few patients. It's the one area that in 20-somethings they have tech neck. In 50-something, they have sagging neck. And so it covers everything from 20 to 80. And so that's where I'm using DAXXIFY probably as much now as I am in the upper face because every patient that walks in that 20-something may not have forehead wrinkles, but they're going to have tech neck. Every one of them are constantly looking down. And so they had the horizontal lines. And then the 60-year old comes in with the vertical bands. And so I'm using DAXXIFY and that's probably as much as I'm using it in the forehead now. And it's been -- it has worked in my hands as well or even better than in the forehead. The reason being is because patients are a little more forgiving in the neck. If they even get 50% improvement in their neck they're so pleased, whereas across the glabella and the frontalis if they see any little movement, a lot of patients are quick to come back in. But if they see any improvement in the neck, they're really, really happy.

**Taryn Conway**
*Vice President of Marketing*

What about you, Haley?

**Unknown Attendee**

Lip flip all day long. So lip flip for me, it's lower face. I thought about this last night, we should get a mobile unit and go to all like University of Alabama on [indiscernible] and it's due like Saturday before Game Day. We can knock it out. But lip flip for me because younger patients are coming in, they may not want to do a filler, but they want that inverted lip look. And BOTOX originally -- will last -- usually, it's gone by the time they check out. But it's -- so the result last maybe 4 to 6 weeks, but with DAXI is a hands down all-time 3 months.

And so that's been a great intro for me on new patients. Like, I don't know if I want to do something a little bit more expensive and like, let's just start with lip flip. It's $150, they'll get a 3-month longevity out of it. It literally takes 5 minutes to do. And then they're converted on to DAXI because it's lasting in their upper lip area. So that's been a really great new opportunity for me.

**Taryn Conway**
*Vice President of Marketing*

What about you Dr. Lafkas?

**Unknown Attendee**

I'm injecting the entire face. So it hasn't. I have not been deterred from injecting any parts of the face, forehead and neck.

**Taryn Conway**
*Vice President of Marketing*

What about you?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

I also am but I also think my college kids that came back for hyperhidrosis this spring and got through the entire summer was really impressive.

**Taryn Conway**
*Vice President of Marketing*

Yes. All right. Let's move on to pricing and profitability. So Dr. Lafkas, I'm going to start with you. How do you price DAXXIFY to make it profitable for your practice? And how does that compared to BOTOX?

**Unknown Attendee**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Okay. So I'm not sure how verse I assume the audience here is verse on BOTOX. My price for BOTOX was $12 a unit. We're right around that price point, and we priced DAXXIFY as Revance recommended, which is 25% less per unit. So $9 per unit, but remember, we're doubling the unit count. So the price comes out if you take 9 x 2, you're about $18 a unit equivalent, so 50% more than BOTOX treatments and I'm getting typically 60% to 70% more duration So that's where the value proposition comes to the patient. They're paying 50% more, but getting 60% to 70% more duration. And at that profit point, with the new pricing of DAXXIFY that was announced recently at [ $2.75 ] a unit. That's a significant profit share increase for the injector in the practice.

**Taryn Conway**
*Vice President of Marketing*

Great. What about you, Dr. Blackledge?

**Unknown Attendee**

I'm doing the exact thing. That's funny because our units are priced the exact same, which I kind of consider that Mississippi would be a little bit cheaper. But we're doing the exact same and with the new pricing that came out, in fact, I met with our local rep a couple of weeks ago, and she told me about the new pricing. And we -- we in Mississippi have never been accused to being real smart, but we have tons of common sense. And when you look at that pricing, and I have my CFO come in and look at it, it's a no-brainer. It is an absolute no-brainer because when I looked at our projections as far as how many units we order over the course of a year, it's going to be a significant change in our overall numbers. I will tell you something else. You know that DAXXIFY is doing something right, when you start getting text from competitors wanting to know how to get in touch with the local rep. And that's something that you -- because I appreciated how you guys rolled it out, you found certain injectors that you felt confident in and found just a select group because you want a toxin, you want it to get a good response because of its -- the product and not because it's being used by an experienced injectors.

So I appreciated that. So not everyone in my area had exposure to it. And as soon as you guys rolled out the new pricing, that very day, I got at least 10 texts from my competitors because we have all good relationships, saying, hey, how do you get in touch with Laurie? -- but -- and I knew what they were doing. They had heard about the new pricing. They knew that it was a product that worked and all of a sudden, they want to get in touch with the reps. So at that point, I know you know what this is going to be a game changer for this company.

**Taryn Conway**
*Vice President of Marketing*

Haley, I know you've had a lot of experience with pricing over the year.

**Unknown Attendee**

Yeah, I've changed my pricing 3 times. And I don't do that -- I mean I don't change pricing on fillers. I mean we go up on filler over the years. But yes, in the very beginning when we launched this in September, we went with really high pricing and I went -- and I changed it. So historically, toxins are a unit repriced by the unit. So we're $1,350 a unit. And I want to do this difference. I wanted to make DAXI in a different category. So I did it by area. And I love the notion of area-based pricing. I still love that, but I think I priced it too high than it was the holiday season. Patients weren't prepared for a $1,300 bill that they weren't sure their talk is going to last longer. So had a hard time in the beginning, converting that. So then I went over to intra-pricing. I thought Brian Bullock on intro pricing and when I adopted intro pricing, so I dropped the price down a little bit, and that was easier to adopt but now I know my sweet spot. My sweet spot is $1,000. And so now I'm looking at more of a unit-based pricing in my mind, but still communicating with the patient area-based. So I tell a patient for about $1,000 we're going to do your entire upper face, and that's $8 a unit. So that 20% to 25% premium versus the 65% that I did in the beginning.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And I'm happy with this. So now with the new pricing, our profit is going to be about -- my return on investment is going to be about 300%. This past year, it's been about 230%, but that's the learning curve. That was my learning curve. That still made great [indiscernible].

**Taryn Conway**
*Vice President of Marketing*

What about you, Dr. Tedaldi?

**Ruth E. Tedaldi**
*RegimenMD, LLC*

I'm not a unit pricer because I guess I'm a closet marxist. So I want to be able to charge the people that can afford it more and the people that can't afford it less. And that's basically what I do.

**Taryn Conway**
*Vice President of Marketing*

Love it. Okay. So Dr. Blackledge, have -- with the new pricing, have any adjustments or strategy changes been made as it relates to the patient or how you see the patient walking in?

**Unknown Attendee**

I don't -- the only thing that I would say that I'm actually doing with new pricing is I'm actually using DAXXIFY in-- to make it economically friendly for every patient. I'm actually using it in place of some of our shorter-acting toxins as well.

In other words, let's say, we use 40 -- it takes 40 units for the glabella to get a true 6-month duration. I'm using it also as a 20-unit and giving patients a 3-month duration. And so that way, patients are being able to choose the product that -- they are being able to choose what kind of duration they're wanting because in my mind, -- you know what, if I give them 20 units, they're going to get the exact same duration that they've gotten with everything -- with what they've used in the past.

But here's the perk. They get the skin care change. They get the glow, they may not be paying for the duration. If they want the duration, then we go up in the number of units. But even at going down on the number of units so that they just get what they've been getting with previous toxins, they're still getting a part of a skin glow that they have not gotten with toxins in the past.

So that's really -- that's what I've done in the past. I would say 2 to 3 months, it's been really, really popular is backing it down as well and making it so that the patient gets to decide how long they want their toxin to last.

**Taryn Conway**
*Vice President of Marketing*

Great. Dr. Lafkas, have you had any experience there?

**Unknown Attendee**

Yes. We've recently launched a lower dose of DAXXIFY, just to -- for clients who are perfectly happy with their BOTOX and who get longer duration with BOTOX is to trial it with the pricing -- with the lower units because equivalent to BOTOX is usually saving about 5%, 10%. Our goal with that, but those patients is maybe a 5% to 10% lower price point, that lasts the same or maybe even 10% longer duration, not the 60% to 70% longer duration, but now you get slightly longer duration at a lower price point.

**Taryn Conway**
*Vice President of Marketing*

Great. And so a question for all of you. With DAXXIFY priced more competitively with other toxins, do you think that will help convert more patients or those who might have been hesitant prior, do you think that will convince them to try to DAXXIFY today?

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ruth E. Tedaldi**
*RegimenMD, LLC*

100%. I mean, I remember having that conversation with you back in December that there is no question that not only the patients, but the doctors and people that are buying the product because they have this sense about how much what their actual profitability is. And I think very few of them know the actual number of their profitability, but because they're either in buying groups or because someone's telling them, this is how profitable this is for you that they listen to those people. But I think once they try it, once they have it in their hands, once they see the result, it's a combination of the doctor and the patient being happier.

**Taryn Conway**
*Vice President of Marketing*

Yes. What about you?

**Unknown Attendee**

The cost performance is there. So I don't get a lot of pushback. If I recommend it, if I tell them, I'm using it, our split-face trial results kind of spoke for themselves. So we don't get pushback. There's no hesitation. They might be fairly quick when we recommend it.

**Unknown Attendee**

Loot at his forehead.

**Unknown Attendee**

This was just on Friday actually.

**Taryn Conway**
*Vice President of Marketing*

[indiscernible]. What about you, Haley?

**Unknown Attendee**

Well, now I'm allowing your new patients to try it for the same price they would try BOTOX. So there's nothing lost. There -- if they've been a BOTOX patient for years, they can do -- try this for the same price, and they love that. I know my profit margins will be great. They were great before the price change, but now they'll be even better. So the conversion should be a lot easier now that they don't have -- they're not losing any money by trying it.

**Taryn Conway**
*Vice President of Marketing*

And Dr. Blackledge?

**Unknown Attendee**

Thank you. you've removed the only roadblock. That's -- it's -- in my opinion, it's that simple because the economics of it, we're the only thing -- that was the only thing that you guys were getting from competitors. That was the only thing that they were hammering you guys on. And so now you've removed the roadblock, in my opinion. I think it's going to be -- I think it's going to be a real game changer.

**Unknown Attendee**

I don't know if your investors are aware of how complicated the relationship is for the for the offices, buying product when they can buy toxin alone versus toxin in filler. It is the most complicated equation and if you think you can figure it out, I promise, even you can't figure it out. Because if you're on a tier and you have no idea which products go into that tier, if you buy it on a Tuesday after 4:00 versus Monday, it is the most complicated thing to have a -- and there are a lot of problems with the Allergan

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

fillers now, which people are not emphasizing, which I have basically been on many, many committees to discuss with Vycross, which is one of the platforms of the Allergan fillers. And there have been a lot of, what we call late onset nodules. And so a lot of doctors are now looking for fillers that do not have Vycross technology.

And so I think that like Haley, who completely converted I'm almost there. I'm getting there.

**Taryn Conway**
*Vice President of Marketing*

We'll get you there.

**Unknown Attendee**

Yes, you will get there, it's definitely something that you have now a filler with a toxin that makes a huge difference because a lot of us could not just buy a toxin without buying our filler and getting the discount on both. It was just too expensive. Yes.

**Taryn Conway**
*Vice President of Marketing*

So my last question before we open it up to the audience is, just talking about consumer loyalty programs. There's Alle, it's obviously very popular. How much of an impact did they have on switching patients? And do you think it's a barrier for us or we should start to go down that path to have more consumers?

**Unknown Attendee**

I'm sorry to be so vocal about this but I was person in the back row who basically said, "Are you kidding me? Is that like a Dunkin' Donuts card that you're giving when they introduced Alle. And my husband has lots of Dunkin' Donuts cards.

So he looked at me saying, "Are you kidding me? Why would you not?" Because he thinks I always choose the most expensive thing, which is probably true. But Alle made a monster difference. And so I think in my practice and I may not have been wanting to be involved with it, but all of my patients were coming in because they could do skin care, they could do filler, they could do their toxin all together and they watch those points.

I mean the wealthiest women come in with little bags of cash, you don't realize how private they are about what they're spending. And so to have a program where you are getting points and it allows you some freedom of spending is really important.

**Taryn Conway**
*Vice President of Marketing*

What about you?

**Unknown Attendee**

There's no doubt that the Alle program was a significant boost to our industry and what Jason Gilmore and the Allergan guys have done a DataLabs was phenomenal. So we're hoping that Revance kind of falls in that space.

**Taryn Conway**
*Vice President of Marketing*

As long as there's no administrative burden on your [indiscernible].

**Unknown Attendee**

Yes.

**Taryn Conway**
*Vice President of Marketing*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

What about you, Haley?

**Unknown Attendee**

That's a double-edged sword. I mean, for patients, they love it. For providers, we - I think we hate it. From a practice owner position, I hate it. Only because you got to check -- you've got your front desk stack or looking at their points, applying it to the account, applying it to or whatever -- it's a mess.

And so honestly, like it's -- we do it because the patients ask for it. They've been accustomed because Allergan started it. Patients are used to ads called Brilliant Distinctions. Now it's called Alle and Galderma has one called Aspire. it's just a lot to deal with. So -- and then when they do like a JUVEDERM day, then they buy these gift cards through their app and then we have to talk the patients out of using that product.

So it's -- it's consumer wonderful because the patients love it. But from a provider point of view, it's not the easiest to deal with.

**Taryn Conway**
*Vice President of Marketing*

Dr. Blackledge?

**Unknown Attendee**

I think the thing about it is the loyalty programs only create patients, they're loyal to the product and not to the practice. And so in other words, Alle gives patients loyalty points to go get their BOTOX anywhere that they want, yet I'm the one that has to provide -- had to hire someone extra just to provide -- just to work through the Alle points. And so what we did is we made a loyalty specific program to Blackledge Face Center. So that's why Alle has really not even faced our practice.

Looking at growth of practices, it has not -- compared to national averages. It's never hurt us. We -- we still carry SkinMedica because what I do is when patients come in that have Alley points allow that we do something where they will get an RHA and yet they're able to apply their Alle points toward a SkinMedica product.

And that way, they consider that they're like, "Oh my god, I'm getting something for free with my injectable plus, I'm getting my Blackledge Face Center points. And that's what I think we all underestimate is that all of these loyalty programs, they just drive patients to get the product. They don't drive us -- drive them into our specific practice.

And so that's why I feel so strongly about loyalty programs that are practice-specific, Granted it creates a little more work for the physician themselves, but that's part of it.

**Unknown Attendee**

Yes. There are two sides to that story because the loyalty programs where the company has what was the JUVEDERM card that they sold, I didn't even know about it. Nobody in my office knew about it. And patients who are loyal to you and that's what the stick value is of the way you approach the patient and treat the patient. Those patients are all buying cards and coming in and you have nothing to do with it.

So it's about having the right person answering the phone. It's about having the right face in your office. It's about from the second, you announced who your practice is without it being you so that you don't have to do it, having someone represent you who can do it well.

**Taryn Conway**
*Vice President of Marketing*

Great. So let's open it up for questions. Anybody have? Yes, first question.

**Navann Ty Dietschi**
*BNP Paribas Exane, Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Thank you very much. At least some of you, seems that some of you have changed your pricing to your patients since the DAXXIFY launch. Do you intend to change that pricing against once you reach higher adoption? And this is Navann from BNP Pariba.

**Unknown Attendee**

I'd like to take it. I did what Haley did and I went down and then I went right back up. So Yes.

**Unknown Attendee**

I don't see. I mean if anything, I'll go up. I mean we go up on fillers, we go up on our prices. haven't gone up in my prices in a long time. I don't see after three changes. I think I'm done.

**Taryn Conway**
*Vice President of Marketing*

Anybody else?

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Annabel Simimy from Stifel. So Dr. Blackledge, you mentioned that you don't mention duration to your patients. It's not 6 months, it could be 5 months, it would be 10 months. So you don't mention it.

So when you approach patients, how do you make that pharmacoeconomic argument or that value argument to your patient if you're not giving them a duration?

Dr. Lafkus you seem to have a formula set up and you know exactly what your numbers are. But how -- are all of these -- first of all, how do you set that price for the patient so they can really realize in hard numbers what that value is?

And then, I guess, going back on the prior question, are all these numbers that you've put out there and savings and calculations that you made prior to this recent price change? Or does that incorporate the new price change?

**Unknown Attendee**

The way that I approach it is, I just -- literally, I just -- and this isn't something that I just done with DAXXIFY. I did it with Jeauveau, I did it with this Dysport. I've just never been one of those that say this is a toxin that's going to last 3 months or 6 months. Because I think that once you've been doing it maybe as long as some of us have, you realize what happens when you make promises of exact duration.

And so what I do right now is, I'll say, you know what, this is -- this product lasts twice as long as anything else that I have in my practice. And so you're getting -- you're getting a product that lasts 100% longer, but it's only 50% more. And so that's the economics behind how I explain it to patients.

I think that because of there are also areas specifics of this product that you can't put a price tag on or that we haven't been able to, the skin change is -- the only way I know to describe this is to have an existing patient tell you about it, but the feeling of the toxin.

I think every one of us on this stage would tell you how discouraging it is when a patient comes in and they look amazing, yet they say my brows feel heavy. And you're like, but they look great. And with this toxin, there's not a heavy feeling, it's a light feeling, almost to the point, it's almost like a facelift that doesn't look like they've had a facelift. That's the look that we're all going for now. It's not the toxin of 10 years ago.

And so that's how I explain it to patients is that you're paying for increased duration, shorter onset, skin change and the feeling. So you're getting 4 for the price of 1.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And as to your second question about the pricing that -- it was a 75%, 80% profit increase based on previous pricing, it's now up to 100% profit increase for me.

**Serge D. Belanger**
*Needham & Company, LLC, Research Division*

Good morning. Thanks for the great panel. It doesn't sound like you've been countering much pricing sensitivity with the premium pricing of DAXXIFY. But curious, I think you've all said you're seeing younger patients now if that cohort has more price sensitivity?

And then secondly, have any of you used the OPUL platform? And what was your experience with it?

**Unknown Attendee**

The younger patients, mostly in my practice, their parents are paying for it. So it's not something of an issue, but I think it is an issue for the 30-something who are a little more independent.

But I think when they realize it's going to last that much longer. And I haven't seen the literature. I haven't seen the data, but my guess is that the younger you are, and I'm just taking this from my other neuromodulators, the younger you are, the more the longer lasting the product will be as well. And that just has to do with muscle kinetics.

I did not use OPUL. I was very interested in OPUL, but I also was somewhat critical of the fact that most of my patients don't want the shock value of I'm going to spend $10,000 this year on my face. So that was something in terms of doing paying upfront for it. But I do think the credit card savings was something very significant to a lot of practices.

**Unknown Attendee**

I'll take it at that. I did not use the OPUL platform. And as far as younger patients, they typically need fewer units. So my younger clients typically would use 30% to 40% fewer units than my mean number of units and my older clients can use 20% to 30% more units than my mean. So for them, that's not much pushback, especially if I get in the longer duration. And they will save money over the course of the year.

**Unknown Attendee**

I definitely see a lot of young patients in my practice. And on average, we knew most of our patients are spending $2,000 a year on toxins. So the ones I showed you yesterday, they're getting like the 6-, 7-, 8-month duration. So they're spending less than $2,000 a year. They're super happy about it. They're busy. They just like the fact that they're getting something new. They're getting toxin and that they're just coming in like maybe 1, 1.5 times a year. So it's worked out really well for the young patients.

I do use OPUL, and we use it for credit card processing, and we've had success with it. I'll tell you, I'm like entrenched on the back end. So it's a double check for me. So every day, I check my OPUL transactions against my transactions and patient [and] my EMR to make sure they line up. So it's a double check for me, which I love.

**Unknown Attendee**

I think the younger patients, simply because they're not getting as many units. Price just hasn't been a factor for them. But I actually never -- I've never changed my DAXXIFY by pricing since it launched for whatever reason, our patients have just valued the duration. And so I never had to go down to encourage them to jump on board. And I think that younger patient has never known the price of BOTOX or Jeauveau and so they actually expect to pay this. It's what they've always paid.

**Unknown Attendee**

And it's the novel part of using a product that's new really appeals to younger generation. I mean, right? Kids said to me, are you really using AOL still? I mean, it's like let's try something new, and there's something that's very appealing about that, especially in the field of aesthetics.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Taryn Conway**
*Vice President of Marketing*

Question over there?

**Stacy Ku**
*TD Cowen, Research Division*

Stacy Ku from TD Cowen. So with the pricing update, how should we think about potential patient adoption and how it might change now in a few years? So stated differently, what percentage of your DAXXIFY-treated patients are happy with the DAXXIFY profile and duration, as we think about a target population. So who can you capture?

**Unknown Attendee**

I don't -- I think that -- I don't think it's going to change the patient capture rate because the patients are happy. The numbers are there. I mean when you've got over 90% of your patients are already pleased with it. I think what you're going to capture is you're going to capture the providers. That's what they're about to capture. Is because when you see this new pricing, it's going to be really hard for providers now to find a reason not to use DAXXIFY.

**Unknown Attendee**

That's 100%. It was not the patient. We all at and -- that had it bought it and used it. We're very happy, but the providers that were not buying it, that was the kind of conundrum for me, why -- why were they not trying it?

**Unknown Attendee**

I'll give you some more numbers really quick because I know you guys like numbers, I typically go through 10,000 units of BOTOX a month, right? And now with this product, if I transition all those 10,000, let's just say I do a 1.7:1 ratio. Now you're at $17,000. They just draw my price by 50 -- a little over $0.55 a unit off of a previously really good value proposition. So $0.55 additional profit on 17,000 units, it's $9,000 more profit for me at $100,000 a year to just spell it out nice and clear.

**David A. Amsellem**
*Piper Sandler & Co., Research Division*

David Amsellem from Piper Sandler. So -- this is sort of a high-level question. BOTOX is such a big part of our cultural lexicon. And with that in mind, when you talk to your patients, what is the extent to which they -- I guess, for lack of a better term, are, I guess, demand BOTOX or loyal to BOTOX and have a bias towards all things BOTOX. And is that something you find yourself pushing up against when you talk about DAXXIFY?

**Unknown Attendee**

Once in a while, I have a patient who wants to see the hologram on the bottle. They want to see that it's BOTOX, and then they look for it, but that's very rare in my office. My patients are much more interested in what my medical assistant says, which is do you want to try the new BOTOX. And yes, it's become a staple word in our vocabulary, but I think that's why Revance called it DAXXIFY because we can say, were you BOTOX, we can say you were you DAXXIFY'd, -- you can't say it for the other one. So I think that it's becoming much more -- our patient population is becoming much more aware of the rising gold standard.

**Unknown Attendee**

I don't see much of a pushback in that regard, right? When a new filler comes out, that's superior, they don't stay loyal to old-generation fillers. So remember when the collagens first were around, and then we got the first HAs. They didn't have any loyalty. They just want to give me the product with the 1-year duration, right? That was a rapid shift back in the 2005 time frame.

**Unknown Attendee**

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I've had a little bit of it, patients and we have had them for 17 years. They've had -- they've had more exposure to BOTOX, they have had fillers because they're getting the BOTOX every 3 or 4 times a year. So they hear it over and over again. That's what they're accustomed to is what they love.

Patients who are early adopters, they take on DAXI hands on, not hard at all to switch them over. But there -- yes, there are some patients who just don't want to switch to something that they love and they're familiar with, especially your older patients. They don't really want to change. Newer patients will.

**Unknown Attendee**

I think it's also -- I think it's one of those things where it all has to do with how you present it. I talked about our long-lasting BOTOX then the shorter acting BOTOX and so -- so many times now, I feel like providers use BOTOX almost as a generic term versus a specific term. It's kind of like in the south. When we say we want to coke, we may mean Pepsi, we may mean [indiscernible] , but we all know what we're talking about. And so I feel like I can't even remember the last time that a patient actually looked at me and said now is this actually BOTOX because they actually -- I think they trust their provider more so than they trust the product. If your injectors that have been doing it long enough that you have a patient base that's loyal to you.

**David A. Amsellem**
*Piper Sandler & Co., Research Division*

Great.

**Chris Shibutani**
*Goldman Sachs Group, Inc., Research Division*

Chris Shibutani from Goldman Sachs. Two questions, if I may. A lot of us are in the job of trying to predict the future. So I'm going to ask you with perhaps speculating a bit on this.

The first question, obviously, since the pricing move that was made by Revance, to the providers, what have you seen and what do you expect the competitors in particular, BOTOX to do, perhaps speaking from your past experience. Would they try to match or diminish or blunt this relative opportunity going forward?

And the second question, as we think about the future a couple of years out, there's potential for biosimilars that Revance will have.

And it's been interesting to hear the dialogue about BOTOX as a brand sort of generic is kind of used in its many interpretations and definitions. But when a biosimilar comes along, what impact do you think that will have on the market in terms of your expectations for what the price might be and what you think the consumers will think about using a biosimilar?

**Taryn Conway**
*Vice President of Marketing*

Well, our colleagues are definitely going to buy more product. There's no question. They're going to try it. I think the blockade for them was that it was so expensive. And once they try it, they will have a different experience. So in terms of trying to predict any future. There's no question in my mind that more people will be using it. And that's not necessarily great news for us because we have become the people in our community that have used it first, and we'll probably bank on that a little bit.

The biosimilars, I mean, we have a lot of biosimilars already. And in my head, I can put the other four toxins very similarly in one category, and I separate DAXXIFY. So I'm sure it will come, and I'm sure there will be something and then they will go through the same learning curve switching from BOTOX to the others. It still got the lion's share of the market. So my guess is that DAXXIFY will have the lion's share of the longer-acting market.

**Chris Shibutani**
*Goldman Sachs Group, Inc., Research Division*

Sorry, you expect Allergan to counter based upon this pricing?

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Taryn Conway**
*Vice President of Marketing*

No, they are too smug, I don't think they'll counter, that does help us to use a higher dose, which is not the same. That's clearly not the same.

**Unknown Attendee**

The studies have been done. And they can't prove that they have a longer lasting, something that's going to last as long -- and so I don't think that they can counter off from that standpoint, they're going to attack because they've already attacked. And it's like we talked about last night. I mean the number of attacks on this company for somebody that's been in this 23 years, I've watched, it's been unprecedented. And that's how I knew initially that I wanted this toxin in my hands, is because I so much attack from the other companies.

I mean, typically, you just don't see these kind of attacks from other companies in this field until something comes along that is a game changer. I think with the new pricing, I will -- I can't imagine that this will -- this toxin will -- I think it's going to be amazing how much the share of the market that this toxin is about to take. And I think somewhere as small as where I'm from, the number of techs that I'm already getting from competitors asking about it, wanting in on it. Because that's the only thing that held it back.

**Unknown Attendee**

As far as biosimilars, once you get someone with 5 to 6 months duration, and now you're telling them to go back to 3 months duration, it's not going to happen. That's once again, go back to the days of the collagens that lasted 3 to 4 months, maybe 5 months in the nasal labial folds. And then we have HAs that took us to 1 year, trying to convert people back to getting a collagen filler and get half the duration. They're -- You're not going to get that.

**Unknown Executive**

Also the slide that Mark showed about the actual number of units that were active units of the neuromodulators, where you compare them. I don't know if it was as obvious to all of you because that science is not your 4K, maybe for some, but the actual number of active units was the same between BOTOX and DAXXIFY.

**Unknown Attendee**

Yes. So it's the cost per unit results, and it's going to be, I think, very difficult for Allergan on counter the advantage that DAXXIFY has.

**Unknown Executive**

I think this is our last question.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Last question. Tim Lugo from William Blair. I think all of you mentioned your colleagues who haven't yet tried it or incorporated into the practice. And it sounds like price was the main barrier. Can you dig into that? And when we talk about price, I assume that just refers to practice economics and how the parity pricing really changes your individual practice economics because it sounds like you've all been making it work so far.

Is this new price only going to enhance your personal practice economics and then those of your colleagues?

**Taryn Conway**
*Vice President of Marketing*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I think it's price matched with the patient expectations.

**Unknown Attendee**

I'll say from a nursing point of view. Most nurses, I would say most of my colleagues who have not adopted DAXI, have not adopted DAXI because they are Allergan loyal, either they are trainers for Allergan and they are like contract-based. So they don't -- and Allergan can be a bully. And so they don't want to lose their training opportunity. But now that the price is different, they may have a different opportunity to say, "Okay, I've got some money to make here " And so they may be more willing to take this on and learn it from that point of view.

**Unknown Attendee**

It was price that was a blockade for our colleagues to try it, but also a lot of them participate -- have been bought by private equity or participate in buying groups. And so they don't really have the control anymore. And I think that that's become a real factor because I think their patients will search the better product.

**Unknown Executive**

I think this is our last question?

**Balaji V. Prasad**
*Barclays Bank PLC, Research Division*

This is Balaji from Barclays. So I heard with interest your comment that it was -- providers are reluctant until now. And I had done a similar survey around a couple of months ago to a large number of [acetations] and there got the feedback that cost obviously was the biggest pushback, and that was the patient pushback.

So if you can just connect these two statements and maybe qualify a bit more about how many providers were you seeing amongst your colleagues that are not buying it because of the price?

Secondly, can you think of any other concerns that can prevent wider adoption of DAXXIFY now apart from now that the pricing equation is resolved and sorted out.

**Mark J. Foley**
*CEO & Director*

You want to take that? You guys are aware of that there was -- the highest pricing for DAXXIFY was $420 a vial. It's now $275 a vial, but you have to buy a certain volume. So if you're at practice that's going to only buy 10, 20 vials you're going to pay that $420 price point, does not make you that cost competitive and the economics changed significantly there. So -- but once they get down to $275 a vial, the metrics dramatically shift in the favor of the injector, right?

And so hopefully, you guys have -- I know you guys got a lot of spreadsheets, and I have some that I can share with you that will make it plainly obvious. But yes, if you're buying at $420 a vial and you're not going to go all in and embrace this product. You will not be as competitive. And so it doesn't make the -- the economic sense is not as obvious right? The incentive is not there. But at $275 or $295 a vial or below, the economic incentive is strongly there for the injector and the patient. You're saving the patient money and you're making more profit and working less, all three.

**Unknown Attendee**

And in terms of barriers, it was the largest clinical trial of all of the toxins. The safety profile is absolutely equal. So they're really -- I mean, far as what we feel in terms of how we inject is safety first and then going into the -- all the other areas we've all, I think, feel facile enough with the fact that we have a long history with neuromodulators that we don't feel uncomfortable with that.

**Taryn Conway**
*Vice President of Marketing*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Great. So I think that wraps up our panel. Thank you to everybody, and we are going to take a short break.-- please take your seat.
[Break]

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Ladies and gentlemen, the program is about to begin. Please take your seat. Welcome, President of Revance, Dustin Sjuts.

**Dustin S. Sjuts**
*President*

Well, thanks, and thanks again to the amazing panel. That was such a great insights in the real world and get some clinician experience. So now I get the opportunity to -- to pivot a bit into Revance Therapeutics. And we're in a very unique opportunity because in the last 1 year, we've had two FDA approval -- two FDA approvals, one, obviously, with our glabellar lines and one with cervical dystonia and they couldn't be more distinct business units in terms of how the customers interact and the dynamics.

So we look forward to explaining a little bit about our strategy here. And today, we're going to go a bit into the market landscape, specifically with therapeutics as well as cervical dystonia, we're going to talk about the unmet need, very different than aesthetics, how these patients are seeking something different. And then overall, we'll bring it home with the commercial launch strategy with Rob and the team.

So if we take a look at the therapeutic landscape, more than $2.9 billion of value here globally with around 84% of that value being in the United States. In the United States, it breaks down to these key categories on the right, with the majority, actually, more than 50% being in movement disorders, broken down by cervical dystonia, spasticity and together, more than 50%. And then you've got migraine and then overactive bladder and then all other below there.

So specifically for cervical dystonia, this is a very unique opportunity for us to enter into this very large market in the United States. It's the first two innovation in 30 years, and there has not been a new botulinum toxin introduced in the therapeutic market in more than 12 years.

If we take a double-click into cervical dystonia specifically, this is a very painful and disabling chronic condition that causes next muscle movements for involuntary contractor. You've got more than 60,000 patients that have been diagnosed with this disease. It affects women 2 times more often than men. The age typically, the onset of this disease is between 40% and 60% and 85% of these patients are treated by [indiscernible].

This market really hasn't been challenged by new entrants. Just like we talked about earlier, all products in this space haven't provided a value to the patient, the provider or the payer. And so they've seen very minimal impact in taking share in this market, which is largely owned by BOTOX at more than 80%, having been approved since 1989.

The CD community is extremely conservative and concentrated. 70% of the CD patients are treated by 1,000 injectors. 90% of these patients, because of this disease come back every 3 months like clockwork. The practice mindset here is -- starts slow. They start with a low dose of neuromodulator. They adjust that patient experience. And then over time, they titrate the dose depending on the disease over a multitude of cycles.

But it's clearly an understood here. This is not a cure. This is how do we make those patients have a better life. And for these patients, the conventional bonds today do not provide that symptom relief even at the 12-week mark, when they're allowed to be retreated. These patients are left to struggle across a ton of issues with this disease. The embarrassment, the shame, the disability, the pain, this is multifactorial in terms of the impact this disease has on their life.

And let's hear from a patient to tell us about what that feels like.

[Presentation]

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

Please welcome Chief Medical Officer, Dr. David Hollander.

**Unknown Executive**

Thank you. First, I want to express our sincere appreciation for this patient who is brave enough to share her experiences with cervical dystonia, experiences which underscore the challenges facing thousands of individuals living with this debilitating disease each and every day.

The roller coaster of symptoms she describes and the despair, you can hear in her voice as she waits for that neurotoxin treatment is the result of a simple reality. And that reality is that product labeling across the category, limits re-treatments earlier than every 12 weeks and for a vast number of patients that is simply not adequate to bring relief throughout that treatment interval. It's patients not alone.

After surveying more than 200 CD patients, Camilla and colleagues created this graph. And it shows the wide fluctuations patients experience in their symptoms between treatments marked by the arrows. Usually, there's limited improvement over the first couple of weeks with some peak improvement in symptoms around week 4. And -- but by around week 10 on average, as that talks and fades, the patients begin to feel more debilitation, are in greater pain and then they're waiting a number of weeks for that next treatment and even a number of more weeks for that next treatment to kick in. And the cycle repeats over and over and over again.

The need for a longer-acting neuromodulator is highlighted by the numbers behind me where you see that 45% of CD patients would want to retreatment 10 weeks or sooner. In fact, 1/4 of the patients would want to be retreated every 8 weeks, simply to bring them relief, which is not satisfied during this 12-week or more treatment interval.

The unmet need is clear for a longer-acting neuromodulator, one that will deliver relief for these patients throughout that treatment interval or quite simply, simply deliver more good days to these patients.

The Aspen Cervical Dystonia Study consisted of two pivotal studies. One was a placebo-controlled trial where we evaluated 2 doses of DAXXIFY, 125 units and 250 units relative to placebo. The primary endpoint was at week 4 and 6, looking at mean change in TWSTRS score. What is TWSTR? TWSTRS is an acronym for the Toronto Western Spasmodic Torticollis Rating Scale. It's the rating scale used for OCD registration trials in recent years. It consists of three domains consistent with cervical dystonia. And overall severity of neck position as rated by the clinician as well as scales on disability and pain as rated by the patients.

And at the primary endpoint, both 125 units and 250 units of DAXXIFY proved effective in relieving the symptoms of patients with cervical dystonia. And the long duration we've talked about with DAXXIFY all day we've seen looking at the change in mean TWSTRS score over time, where at the end of the day, the mean duration of effect was 20 to 24 weeks for these patients with cervical dystonia.

Now a second pivotal trial was done looking at up to 4 doses of DAXXIFY over the course of 1 year. Patients were initiated on either 125 or 250 units of DAXXIFY based on the overall clinical severity or prior toxin use and the physicians could then titrate these doses as needed for the individual patients. With repeated dosing, using an individualized treatment plan, there continue to be improvement in the patient symptoms over the course of the study.

Now as I said, all patients were started on either 125 or 250 units, roughly 2/3 were started on 250 units. And as Dustin shared with you, in this patient base, you often titrate to optimize the dose over 2 to 4 cycles. Over the course of this study, roughly 1/3 ended up being titrated up to 300 units of DAXXIFY to either achieve better symptom relief or increase the duration of effect. By the numbers you see here, you see over the course of the 1 year, most of the patients received either 2 or 3 treatments of DAXXIFY.

Now the excellent safety profile we've heard about with DAXXIFY all years highlighted by the table you see behind me. Overall, looking at treatment-related AEs from each cycle 1, 2, 3 and 4, you see all of these

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

numbers remain low. The overall treatment-related AEs remained low, even with repeat dosing and even as the doses were titrated over the course of the study.

Now I highlight dysphasia and muscle weakness because those are the areas that these physicians worry about most. -- cervical's -- it's in the cervical dystonia patients that you do not want to cause dysphagia or added muscle weakness.

Now to put in context how low these rates are, we've graphed on the x-axis the rates of dysphagia of DAXXIFY in these studies relative to the reported rates of some of the other neurotoxins on the market. And you see the remarkably low rates of DAXXIFY all the way on the left.

Now we've also heard about the formulation of DAXXIFY, which delivers more neurotoxin into the neurons. And so you see on the Y axis graph, the overall low total amount of core neurotoxin. But these low numbers alone do not lead to the great safety margin we see here because as you see, there's essentially a linear relationship with all the other neurotoxins in terms of as the amount of neurotoxin goes up, so do the AE rates. But DAXXIFY again, remains towards the left. And we believe that this is likely due to the peptide as well, which anchors DAXXIFY in the neurons in the target tissue and does not allow spread to unwanted tissues.

Now why is any of this important? It's important because it gives the physicians confidence to titrate the doses as needed to deliver better duration of effect or better symptom control. Again, I show here TWSTRS score, and this is over time, each color represents a new cycle of DAXXIFY with the ultimate dose used in the red line down below. And I highlight these to show different ways physicians could approach titration.

In the first patient study, you see a very nice actually benefit going from 50 to the high 20s in overall TWSTRS score with just the first dose of 125 units of DAXXIFY. However, when titrated 250 and 300, you see continued dramatic improvement in the overall symptoms as the physician optimizes the patient dose.

Looking at a separate patient, again, you see an increase from 125 to 250. And in this case, it was done for duration, whereas the first dose basically achieved about 12 weeks of duration, you achieved more than 20 weeks of duration with that titration up to 200 units.

So I've talked about the flexibility in the dose. We also have flexibility in the interval of dosing. And this is on the label. The label includes the number of treatments patients received during the course of the 1-year study. As I said, most of the patients received 2 or 3 doses, just under half ended up receiving 3 doses, about 1/4 received 2 doses and a little over 18% receive 4 doses. This gives important information to both the payer and the physician in terms of how to estimate the dose interval.

Another way of looking at the dose interval is to simply look at the first time of retreatment in OLS when the patients could choose to be retreated. What you see behind me is essentially 1/3 of patients elected to be treated at around week 16 with another 20-some percent electing to be treated at week 20. Again, in this particular study, patients could choose to be retreated early before their symptoms had come all the way back to baseline.

And that actually is the beauty of what DAXXIFY will bring. At the end of the day, we know that the long duration of DAXXIFY will allow for many patients to experience fewer treatments over the year. But that is really not our only goal. Our goal at the end of the day is to bring better symptomatic control over the course of the year to minimize that roller coaster ride they're on -- their symptoms going up and their symptoms going down.

In the ASPEN study, we determined that patients actually want to be retreated with about 40% to 50% of their peak effect still on board just as their symptoms reemerge. And the key to DAXXIFY is that we know patients aren't coming in at week 8 or week 10 for that retreatment. So whether patients come in at week 12 or week 20, physicians can now treat as those symptoms reemerge and not have to wait for those symptoms to go all the way back to baseline.

Here, I show one more patient example, just to get a sense of what I'm talking about, again, the different cycles are in the different colors. And you can get a sense that with the first treatment, again, a very long

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

duration of effect, 24-plus weeks, but the physician did not wait for the patient to go all the way back to baseline in this blue horizontal line. The patient was retreated at the end of the blue cycle to red and at the end of the red cycle to green, just as there was an uptick in symptoms. This is really the magic of what DAXXIFY can offer the market. The ability to treat as the symptoms reemerge and not wait for those symptoms to go all the way back to baseline.

So we believe that the strong excellent safety profile of DAXXIFY will really give the physicians confidence to titrate their patients optimally. And we believe that with the long duration patients will no longer have to wait for their symptoms to go back to baseline and physicians will be able to retreat their patients, whether it's at week 12 or beyond, and really provide that long-lasting symptomatic relief and truly more good days for these patients.

And now I'd like to hand you over to Rob Bancroft, who is our General Manager of Therapeutics, to take us through the CD launch.

**Rob E. Bancroft**

Thank you, David, and thank you all for joining us today. The clinical profile that David described sets DAXXIFY up to deliver some very important benefits that all 3 of our customer groups are really, really value. For physicians, it starts with delivering great clinical outcomes. This by nature, physicians are healers, and Dustin already mentioned that there's no cure for cervical dystonia. So their focus is about how do I deliver the best quality of life that I can for this patient population. And we're going to lean into in our launch, that desire and that need with skill building, education, knowledge and giving them the confidence that with the clinical profile of DAXXIFY, they can deliver the durable symptom relief, injection to injection that this patient population really needs, right?

Payers also value outcomes. They don't want to know that their members, their beneficiaries are being well taken care of. And so we've been surprised at the degree to which payers have been tracking DAXXIFY. They know the profile. They understand the product. They've really been leaning in with our national account team and understanding our innovative formulation and the clinical performance, but we also know that the payers really value another factor, and that is they want those great outcomes to come at a compelling economic value. And what we're going to show you is how we priced DAXXIFY in the therapeutic space and how that, in combination with the clinical value, how's the payers now very excited about the opportunity they have to manage the cost of this category in a very different way with DAXXIFY than they've been able to do before, right? And then the patients.

The video speaks volumes about the experience that these patients are currently having, what their day-to-day life is like. Dystonia is a very difficult disease, difficult to live with physically, functionally, mentally, emotionally, all of those factors come into play. They want to get off the roller coaster. They're very excited about the prospects of a longer duration toxin delivering to them, as David very well said, more good days, right? So we're going to unpack for you how we're going to educate those patients and some of the other factors that are important to them in terms of thinking about DAXXIFY as an alternative.

So let's talk about how we're going to go to market. Unless we're going to start with the gatekeeper, which is the physician. And the headline is, we're going to pursue a strategy of taking a very measured approach to the launch with physicians. And there's a very straightforward reason why that's the case. We want the first experience that the broader market has with DAXXIFY, to be consistently positive and successful. And so the way that we're going to do that, very similar to what you've seen in aesthetics, very similar to the approach that we took there, we're going to start with a group of expert physicians. We're calling it the PrevU early experience program. These are handpicked, hand-selected physicians, and we're going to focus with them on 2 objectives.

The first one is to translate the clinical results from our pivotal trials into real-world use of the product to optimize clinical outcomes for patients. And that involves a number of different things. Through a series of 2 or 3 injection cycles for each of these physicians, we're going to ask them to translate that clinical trial work into how do you select the right patients right? In clinical trials, that decision is made for you. The real world is different. How do you select the right patients? How do you have the right conversation with those patients about a new alternative, and you heard that in the aesthetic panel, that's an important

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

aspect of managing patients' interest in a new product is how you have that conversation with them. How do you think about that starting dose in the clinical trial? That decision is made for you. In the real world, you have a lot of choice to make there. How do you assess the response to the product? When do you bring the patient back? How do you titrate the dose and then how do you get them on to a retreatment cadence?

So the translation of our clinical trial to the real world involves a lot of different steps and aspects, and we're going to work with the PrevU experts to help us figure out how to package all of that. So by the time we go to the broader market in the middle of 2024. We have dispelled the ambiguities and some of the mysteries and we've got that well packaged for these physicians to pick up the needle and be successful right from the get-go. We started that process, as you can see. In just a couple of weeks, we've had, as of last Friday, 11 physicians have now injected more than 30 patients. The dose range is highly variable in cervical dystonia because the presentation of the disease and severity and muscle pattern are also very variable.

It's one of the key reasons why we want to engage these experts to help define what the appropriate dosing strategy is from patient to patient. And so we'll have all of that information packaged by the time we go to commercial launch. There is a chapter 2 to this story as well and has to do with smooth practice integration. On the slide that Dustin showed it mentioned 85% buy and bill, which means these practices purchase the product, they take financial possession, they take physical possession. So somebody is ordering, somebody's inventorying, somebody's reconstituting, physician injects and then somebody is billing and coding that as well for the payer.

So there are a lot of different hands in the practice to touch these products. A lot of the different personnel in the practice are responsible for the successful use of these products. And we're going to work with these physicians and their practice administrators to determine what all those best practices are so that by the time we get to this community of physicians that part of managing DAXXIFY and incorporating it into your practice is also well elucidated.

Now not mentioned on the slide, but also an important part of what's going on during this period, is the work that our national account team and our medical affairs team are doing with payers to unlock the payer channel. So we are educating payers on the clinical profile, the economic profile, filing for our J code, sending our clinical dossiers to the Medicare Administrative Contractors and getting all of those payment policies in place so that these physicians can be successful from day 1.

Okay. So in terms of the payer community, I know there have been a lot of questions about how are they perceiving DAXXIFY? How are they processing their way through determining coverage policy determinations for DAXXIFY? And to get into that conversation, I want to first lay some groundwork and some foundations. On the left panel, you can see how cervical dystonia patients flow through the different payer channels. Most prominent is the commercial payer, 60% of lives flow through that channel. The other 40% flow through government reimbursed channels, Medicare, Federal and also Medicaid.

And then in the middle and the right-hand panel, we're focusing just on how commercial payers think about and manage this category, a couple of key aspects that I want everybody to be aware of. The first is that about 2/3 of commercial lives sit under a toxin policy that is category based, meaning that those payers, anything they cover a BoNT for, they cover all of the BoNTs for, right? And so they've made a determination that these products are essentially functionally equivalent and similarly have a similar safety profile. And so they're covering all of them in a very similar way. The other 35%, you can see covered by brand, and that can mean specific to that brand's label, could also be extended to include what that brand has shown as evidenced in the literature. So it may be somewhat beyond the label, but it is more restrictive.

And so there was a question about last night in the reception about what is the off-label potential for DAXXIFY. And the reality is, we know that in this category, physicians for years and years have used these products for a wide variety of indications. Some of them are labeled and some of them are not. And this payer community, 2/3 of the lives are covered under a policy that would support that use of DAXXIFY beyond the label, so that potential certainly exists. We haven't seen it yet, but based on the history

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

and the way that physicians use the products and the way payers cover it, that potential for DAXXIFY is certainly there.

Then the last aspect of how commercial payers approach coverage of these products that I want to speak to has to do with utilization management. And today, about 30% of the commercial lives live under policy where the payer is exercising some sort of control, some sort of influence over which product providers are using. And it comes in a variety of different flavors.

The strongest is the step edit where the payer requires a patient who have failed on the preferred toxin before they move on to another one, but it comes in a couple of other different flavors as well. It could be removal of the prior off, could be a financial incentive where they pay ASP plus a higher percentage to give a direct financial incentive to the physician to use a preferred toxin. And this is, as you can see, a growing trend as this payer community tries to get their arms around this growing medical benefit drug spend that they're facing as they think about oncology drugs, rare disease, cell and gene, and also this category as well. BoNTs according to the 2022 Magellan trend report, now #12 medical benefit drug spend.

So this is very much on the radar screen and important to them. And we think that long term, that's going to be a benefit to DAXXIFY. Because our economic comparison or economic profile compared to the market leader is very favorable. We've made a decision to price our 100-unit vial in therapeutics at $420. And compared to the market leader, that's about a 34% discount. BOTOX is $634. On a per injection session when we bring the dose into the economic comparison, you can see that BOTOX, most commonly, when you look at all the data sources on their label, the mean doses about 235 units. Look at other data sources, it's always in the low 2 to mid-200 range. That implies 3 vials of BOTOX, which translates to about $1,900 per injection session.

The doses that we studied for DAXXIFY 125 units and 250 units imply either 2 vials or 3 vials. And you can see with -- on a per injection session, what that discount that implied discount is relative to the market leader. Then when we annualize those costs, we bring into play the reinjection frequency, which is another aspect, obviously, of the DAXXIFY profile. If we were to treat at 4 times a year, you can see what the relative economic comparison is versus BOTOX.

What you saw in the data from David, we don't expect that to be the norm when DAXXIFY is in the market. We expect it to look more like what you're seeing here in the middle, closer to 3 injection cycles per year relative to the average BOTOX, which is most commonly 4 injection cycles a year. You can see the differences start to get into the multiple thousands of dollars. This has been a very key part of the education process that our national account team has been involved in with payers so far. And I can tell you, the response has been very enthusiastic. When we're showing them savings per year that are up to and perhaps even beyond 50% per year, this is representative of the type of response that we're getting across the payer spectrum. And it's important, I think, to look at some of these quotes because they imply a variety of different reactions.

Here's a top regional plan that for years has had a step edit in place. So they've had very strong utilization management, controlling physicians use of these toxins. But in light of what they're seeing in DAXXIFY, both in terms of clinical performance and an economic profile, they're signaling to us that they're going to reconsider that, which is exactly what we're looking for. This response from a larger regional plan is very representative of what we've been getting from payers. They're looking at the combination of the clinical performance and the economic package. They just don't see that today in this category. And so they're very, very interested in DAXXIFY from that perspective. And then this is a large national plan, one of the largest we've spoken to. They've characterized our pricing as responsible, and they're interested in having a larger discussion, a larger strategy about how they were going to cover DAXXIFY.

So that is characteristic of the kind of response that we're getting from the payer community. It does take time for them to work through their clinical teams and update their policies. And so that process is in place right now, but we think we've got good momentum, given the profile that we've shown them and the responses that we've been giving.

And then finally, the constituency that has the most to gain is the patient. As we said, dystonia is a difficult disease for them and this up and down response they're getting on conventional toxins is

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

something that they would really like to get away from. And so the opportunity to translate durable symptom relief, injection to injection to give them the opportunity for more good days is very, very enticing to this population. But there are a couple of other benefits that specific subsegments of this group are also very interested in.

One is the read-through on the economics of DAXXIFY. The majority of this population is responsible for a co-pay 20%. And so you look at the thousands of dollar difference on the annual cost of DAXXIFY versus the market leader, that can translate into $500, $600, $800 of difference on an annual basis for this population. And for many of them, that's in a very big number and very important to them.

The other is that long duration is not just more good days, it's also about potentially fewer injections. And with the very concentrated physician community that treats this population, there's only about 1,000 physicians who are heavily engaged in managing cervical dystonia. A lot of these patients have to travel long distances to get to an injector. They're not just around the corner. Some of them are taking flights. It's taking all day. And so the prospect of fewer injections is something that's really important to that cohort of patients as well. So this is a group that's very excited about DAXXIFY. They want to learn more. They want to know more. They're asking questions and part of our go-to-market strategy will be to communicate and educate this constituency.

So when we pull it all together and think about the clinical profile, the economic profile, the benefits that DAXXIFY offers across these 3 stakeholder audiences, we believe that an appropriate ambition for us to have in this category is to ultimately be the BoNT of choice for cervical dystonia. And the strategy that we're going to take this product to market starts with those PrevU physicians and distilling the clinical and practice integration pearls of wisdom and package that into a scalable adoption journey, an optimized adoption journey, for their colleagues and for those patients to give them the confidence, the knowledge and the skill on how to utilize DAXXIFY, to deliver durable symptom relief, injection to injection and thereby address that patient need and to do so in a way that they're comfortable and confident that they're going to get reimbursed for that service.

We don't have to go to very many physicians. It's a concentrated market, as Dustin said, only about 1,000 that we need to get to, and our ask of them is going to be very straightforward, to take those patients who are having symptom breakthrough before that next injection cycle. And David mentioned the [indiscernible] study. In that study, 88% of the patients reported that they had symptom breakthrough. Our ask of this 1,000 physicians that take those patients and to put them on DAXXIFY and give them the potential and the opportunity for more good days. And we're confident that we can reach those 1,000 physicians with a relatively concentrated field organization of about 30 individuals.

You can see the different functional areas that we believe comprise that organization. And our key milestones are both PrevU related. They're also unlocking payer channel related in terms of the J-code. And also commercial coverage, we feel very confident based on the responses we've been getting about 50% or even better commercial coverage by the middle of next year when we plan to launch and we anticipate our launch.

Okay. I'm going to conclude my comments there, and I'll hand it back over to Dustin for future growth opportunities.

**Dustin S. Sjuts**
*President*

Well, thanks, Rob. Most of the time is spent today on what we have in front of us right now. How do we execute against the strategy for the growth in aesthetics and our launch in the therapeutics. I'm going to focus a few minutes on what's out in front of us? What are our future growth opportunities. Those are underpinned in 3 key areas: DAXXIFY international expansion, our strategic partnerships and therapeutics pipeline expansion. So if we look at how we unlock the international markets, we had to look at our overall supply chain network. And supply has been -- on supply constraints, you've got regulatory needs in terms of when you can apply and then you also have the cost of goods that Toby will talk about in terms of what's that strategy that allows you to unlock through an appropriate time line of those international

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

markets. We obviously started in 2010 with our wholly owned subsidy -- wholly owned manufacturing facility in Newark, California.

That was designed to execute the clinical trial programs for DAXXIFY as well as supplying launch. Then we signed in 2017, we signed an agreement with Ajinimoto as our CMO, our first CMO. They were approved, as you know, in 2023 that unlocks the continued growth of our aesthetics launch as well as our initial therapeutics launch. And we also have a relationship with LSNE or PCI that was signed in 2021 that then unlocks in 2025, allow us to continue to expand, giving us the supply and cost of goods that we need to enter markets that don't have the pricing that the U.S. has. Obviously, the U.S. pricing is the highest priced neurotoxin market in the world, followed by China. Those 2 markets will be unlocked in these areas. And then as we get into broader markets, we'll need to continue to evaluate how that goes and 2025 helps us with those solutions.

But if you look at that international market, I just mentioned the 2 largest ones we've got taken care of with the United States, both on the aesthetic side and therapeutic side. China, which we'll talk about in a minute, our partnership with Fosun. And in these markets here are representative of those that have volumes in combination with pricing and how we look at unlocking those as a priority first as we go onto this next phase.

Taking a look at China. China is the #1 -- #2 market in the world for neuromodulators, more than $740 million across therapeutics and aesthetics. We picked an established partner there with Fosun Pharma that will allow us to enter our first international market. We've completed our submission for Glabellar lines. It was accepted in April 2023. Also submitted cervical dystonia, it was accepted in July of '23. So you look for anticipated approval through our partnership with Fosun in 2024 in China and going to the next phase of unlocking that opportunity across both aesthetics and therapeutics.

Viatris. With Viatris, we as well have a partnership on the first-ever Biosimilar to BOTOX which would provide access to the current 15 indications across all aesthetics and therapeutics and also all future indications for BOTOX therapeutic or BOTOX Cosmetic would be unlocked with small clinical program designed around Biosimilar. We've made significant progress there. We obviously secured agreement with the FDA on what that path looked like. We've done analytical characterization of BOTOX to confirm its similarities.

We are currently producing in the Biosimilar drug substance that allows us to move into clinical program. And through a partner, they've talked about potential IND filing by the end of this year.

Next, on the therapeutic side. We've got a unique opportunity to get into this market today with our first indication with cervical dystonia, which represents $345 million of market opportunity. We also have our Phase II program. We've met with the FDA. We've had that meeting complete. And so we've got opportunities to decide what's the right time to move forward with that program, and also have had significant inbound interest in data generation activities such as IITs and others in a variety of other areas.

And so throughout 2024, we'll leverage the experience that we get with cervical dystonia, our understanding of the data generation opportunities and evaluate what is next in unlocking that true potential. So with that, I'll turn it over to Tobin Schilke, who -- our Chief Financial Officer. Toby.

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

Thank you, Dustin. Before I begin, I'd like to take a little bit of a pause and appreciation for an individual. It takes a village to pull off in a day like today. And our panelists who have taken their time out of their busy practices, the front of house staff, the back of house staff that make the magic happen in front of here. But one person, in particular, who's architected this day, I have a special appreciation to Jessica Serra, our Head of IR and Corporate Communications. Thank you, Jess. It's just a treasure to work with you. You've been a great addition to the Revance family.

So it's my pleasure to take us through the financial picture of Revance. Our story is underpinned by revenue growth, and that is the underpinning that we have delivered to shareholders over the past several years. If you can harken back to 2020, it was a suboptimal time to launch an injectable filler project. This

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

was a time where we were in deep pandemic experience. And over that time, through the course of a great product, coupled by a gritty marketing and sales team, we've been able to deliver steady growth, strong steady growth of that injectable product.

That has -- that product still has room to run. We still are finding new opportunities and unlocking new doors on a day-by-day basis with that filler and the profile that we've talked about today. Further, we start to compound that growth with the addition of DAXXIFY to our portfolio. So you see DAXXIFY adding on to the growth characteristics of RHA in aesthetic medicine. Not only is there cost synergies because you have one field force promoting 2 products, a marketing team that's aligned and working together for a common objective in facial injectables. But there is revenue synergies across having a product that goes for both products. And so we're excited for that. And we're excited that we still feel that with the U.S. aesthetics business, our combination of DAXXIFY and RHA lead to that blockbuster or $1 billion opportunity.

Further areas that Dustin touched on to compound our growth are in 2024, the launch of cervical dystonia and layered through the course of the longer-term business plan, other opportunities in therapeutics and then our partnership programs with Viatris and Fosun. So we're excited to unlock this revenue opportunity for Revance.

I'd like to provide some thinking about our revenue guidance plan over the next few years. And to do that, I have to step back to go forward. So if we go back to 2021, that was our first full year of RHA in the market. We got experience there. The world was still locked down from pandemic-related shutdowns. But in 2022, last year in 2022, we're able to get DAXXIFY approved. We started our PrevU program, and we started to make progress. And so we got more and more information about RHA. We've got more information about DAXXIFY. This year, we have done a significant expansion of our field force for aesthetics by 50%, and we brought DAXXIFY to full commercialization out of the PrevU phase.

So we feel that we'll be well positioned to provide revenue guidance in the first half of 2024 with the full year of DAXXIFY launch and with additional experience on RHA and the impact that we've had with the addition of our field force. Secondly, we've touched on sort of changes we've made on our pricing for DAXXIFY. We still feel that when we do the math and with the supply chain that Dustin has talked about with Ajinomoto and with LSNE PCI Pharma, we'll be in a position to offer U.S. adjusted gross margins of over 80%. That is utilizing sort of that blended hybrid strategy where we make drug substance in Newark and continue to make that there, and then leverage CMOs to expand and scale our fill/finish ability.

The unlocking of LSNE also supports international expansion with improved cost of goods that we are allowed to do for DAXXIFY. So as we work further down our P&L, we're going to move into OpEx guidance. So as Dustin touched on, we made a hard decision on these last several days to move out of our payment facilitation business in the OPUL business. With that, we have to increase our OpEx or GAAP OpEx by $85 million to $105 million. This is primarily due to onetime impairment charges and severance costs for the people. Next, that translates though into non-GAAP savings of $5 million as we're stopping our research and development efforts related to OPUL.

So -- our R&D from a non-GAAP, which translates to our total OpEx is saved by $5 million this year in 2023. With that, with that decision about OPUL, our capital allocation priorities have come clear into focus. Priority 1 is to continue the expansion of our aesthetics growth in the engine that drives near-term revenue growth. Priority 2 is to build upon what Rob and David had talked about in launching cervical dystonia and furthering our therapeutics franchise. Priority 3 is to continue to find the efficiencies and scale within our supply chain.

As a consequence of doing that, we're able to grow our operating leverage. Consistently, if you look on the right-hand side, our non-GAAP OpEx as a percentage of revenue has continued to decrease and showing that with increased revenue growth from RHA, increased growth from the DAXXIFY launch, finding and focusing our investments like we are doing right now, we'll continue to improve that trend. That also implies supply chain efficiencies.

Lastly, before I turn the slide over, I'd like to -- we're going to double click on an experience and sort of the experience center that you've seen and demonstrated in the last several days here in Nashville. This is one of the areas that we've taken hard business decisions to actually invest as a platform for growth in

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

the future. So today, what you see is this lovely facility here in Nashville. It hosts 50 to 60 events on an annual basis, whether that's sales force training, whether that's customer events or Investor Days like you see today. That -- when you compare the cost of running a Nashville facility and the savings you get from catering, AV, the food and the rental space that you have to be locked in that saves $5 million to $7 million a year.

And so when you correlate that to the payback that was associated to build this facility and the ongoing rent that's required to maintain this facility, that's a 1-year payback. It's a pretty amazing thing for what you see here and the ability that we're able to showcase to our customers. So with that, coupled with our strong balance sheet, we had $320 million at the end of Q2 this year.

In August, we added an additional $50 million from our note purchase agreement with our partners at Ethereum. And coupled with our revenue trends, the levers we had on OpEx, we expect to be positive EBITDA adjusted in 2025. And so we are excited to execute our business from a position of financial strength. As Mark talked about, we've had -- we've introduced a new pricing program to unlock additional offices to open the experience for DAXXIFY. We feel that our Q3 revenue potential has the potential to be about the same levels of Q2 for our products because of the recent rollout of the pricing and because of traditional seasonality.

We expect to provide guidance for our revenue in the first half of 2024, and we continue this journey of disciplined capital allocation. We've taken hard decisions about streamlining our OPUL payments business. That's freed up over $20 million of OpEx to reinvest in other areas of growth for our business and reduced our non-GAAP financial guidance for 2023. When you couple that into our long-term potential, again, it's built on the strength of DAXXIFY and our blockbuster potential for our U.S. aesthetics portfolio. When we leverage that with our improving gross margins and sort of our balance sheet strength, we feel like we're in a really strong position to execute the opportunity we have. When you layer on those growth opportunities that Dustin alluded to, we feel like we can generate real shareholder returns. And with that,

I'll turn the presentation back over to Mark to close.

**Mark J. Foley**
*CEO & Director*

Great. Thanks, Toby. Before we go into the Q&A session, I just wanted to wrap everything up and kind of touch on some of the key points here. So we feel really good about where we're positioned in the market. As I open, we're in large, growing markets that are very sizable, and we're coming at it from a very differentiated place with innovation. We believe we've got the right strategy in place as demonstrated with how we've succeeded in the RHA filler launch. We've taken a very measured approach introducing DAXXIFY for the very first time into the market, and we think that we've been able to take all those learnings to optimize our strategy to position us for long-term meaningful share growth and gain.

We're also super excited as we move now into the therapeutics category to be able to start unlocking that. And as Toby mentioned, we're in a very strong financial position to put our heads down and go out and execute. I also feel like we've really assembled a fantastic team and that we're going to be able to leverage a lot of the innovative products that we have and the partnership that we're forging with practices to look at ways to better get leverage across both products as we roll out some of our additional engagement and loyalty strategies that we're going to put forward. So where we sit today, we feel we're incredibly well positioned for the future. We have a very strong foundation, and we look forward to keeping all of you posted along the way.
So thank you for your time, and we'll now go into the Q&A session.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

We want to welcome back our presenters for a question-and-answer session.

**David A. Amsellem**
*Piper Sandler & Co., Research Division*

Okay. Thanks, Jessica. David Amsellem at Piper Sandler. So 2 questions. First, with the revised pricing structure on DAXXIFY, does that change how you're thinking about practitioner targeting? In other words, do you target a wider audience of injectors, and that's in the aesthetic setting, do you pivot away from the prestige strategy that you outlined at the outset of the launch? So that's number one.

And then number two, a therapeutics question. You mentioned how some payers cover neuro-modulators as a category. So how do you think about what that means regarding the potential for off-label uses of DAXXIFY outside of cervical dystonia and what that might mean for how you're thinking about clinical trials, whether they are ones that you run or working with investigators on investigator-initiated trials? So I know that's a lot to unpack, but I wanted to get your general thoughts there?

**Mark J. Foley**
*CEO & Director*

Great. Thanks for the question. So I'll take the first one and then hand it over to the Therapeutics group to hit the second one. So on the targeting side of it, as we mentioned, our first priority is to double back with those accounts that we've already trained, that we've already onboarded who have experience with DAXXIFY because we think they're the best ones to build the foundation and strength going forward. If we look at our original launch strategy and the targeting that we had, what really underpinned what we called at the time, the Prestige strategy, but was really designed to say, we want to be a good practice partner. And what that means is we're not going to allow advertising of price because in the market today, the ability for some practices to advertise price only creates an environment for customers to shop just price.

And so we're trying to partner with practices to say we're not going to allow anybody to advertise price so that the discussion around pricing and what product to use can really take place within the practice itself. And so to your question, does that change our strategy over time? Listen, we would love as many people to experience DAXXI and RHA fillers as makes sense, provided that they're comfortable with the no advertising pricing strategy. And given how that has resonated, certainly, I would expect that as we go forward, we will have an ability to participate in a majority of the overall injector provider market. Having said that, if you look at how we've done with the RHA line of fillers, we're only in -- we said a little over 6,000 accounts, we're 9% shareholders.

So we still think that being measured and thoughtful, particularly when you have differentiated products and building from a place of strength is really important to getting to long-term adoption. So near term, focus on those, we have a relationship with going forward, continue to leverage the no advertising price. And then continue to engage whatever practices are comfortable with that strategy on the therapeutic side.

**Dustin S. Sjuts**
*President*

Yes, maybe I'll start and I'll kick it over to David and then talk about the IoTs. But I think first, the good thing is we know BoNTs work. BoNTs are used for a variety of things in the therapeutic space for 20, 30 different indications across and only approved for 15, as we know, are roughly that. And so we believe we have a better BoNT. We think that providers will be able to do what they seem appropriate for their patients with our products, and we'll evaluate that over time. In terms of what we'll be able to promote

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

and we'll be able to promote what we have as our indication and then be able to provide medical affair support around the data that exists that we generate and that is out there.

And so it's a time will tell in terms of what they do. But in this space, there's certainly utilization beyond what is within that specific indication. I'll take it to David to talk about kind of the IITs and how we evaluate those and Rob as well.

**David A. Amsellem**
*Piper Sandler & Co., Research Division*

Yes. So we've already had a number of interests in some of the off-label use of DAXXI. There's still a lot to learn. So we will probably be supporting some of these IITs. And when I say a lot to learn in terms of dose in terms of treatment algorithm, so we probably would begin in an IIT realm before necessarily embarking on our own studies. But the interest already existed pre cervical dystonia approval, it's only ramped up since that approval.

**Stacy Ku**
*TD Cowen, Research Division*

Stacy Ku at TD Cowen. So first, wondering if you're willing to disclose some metrics. So within the 6,000 accounts, what has already been trained on DAXXIFY? So might be the penetration of practices where you are right now? And in terms of how we think about the lower hanging fruit with the updated pricing? That's the first question, potential penetration rates.

And then second, as we think about some of the KO commentary, how long does it take for practices to really integrate DAXXIFY optimize outcomes? So what time frame do you think we'll see a potential acceleration of account adoption realized in sales numbers? So could this happen this year in Q4? Are we thinking more of 2025 for potential acceleration? And I'll stop there.

**Mark J. Foley**
*CEO & Director*

Sure. So the first one, in terms of the numbers, we haven't put that information out there. But what I can say is, it's in terms of the number of accounts for Q2 that have ordered, it's well less than half of the number of accounts that we currently have on the DAXXIFY side. So still a very manageable, thoughtful, targeted amount. And so now it's going back and circling back up with those accounts.

In terms of what does that sort of reengagement and cycle look like to get back to the kind of share gains that we would like, I think it's a TBD. I think the question will be for those accounts that have experienced, do they have enough comfort and familiarity with the duration profile where the price being what was communicated to be the major hurdle. Does that accelerate that? Or do they need with this new approach to say, "Hey, let us now treat 50 patients, not just those that said duration was an issue or whatever and want to see how it works in a broader base." And so I think there's a little bit of a TBD.

Again, all of the different sort of feedback points that we're getting since we've rolled it out, the early trends that we're seeing just in the early September, which you're hearing from the clinician panel here, we feel really good about it. And so we'll continue to keep investors posted as we have more information along that journey. But I think it's too early to say we know what that time frame is going to be.

**Timothy Francis Lugo**
*William Blair & Company L.L.C., Research Division*

Tim Lugo, William Blair. Can you dig more into the overall trend of these large buying groups within the industry? It sounds like that might have been one of the levers that also pointed to the price action that was announced. And just give us a sense of the volumes that are unlocked with now parity pricing? And also, are these groups bulkier buyers? Should we expect some lumpiness when these groups do come online and do adopt DAXXIFY?

**Mark J. Foley**
*CEO & Director*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So there's no doubt that there's a growing trend for some of these roll-ups in private equity across a variety of different verticals. Some are med spas, some are more plastic surgeons, some are more dermatology, which historically saw more in the med derm space, but less so in the pure aesthetic space. So you're definitely starting to see that. And since our strategy was a very targeted and measured strategy, a lot of these groups in order to get access, you start with price as being kind of the offer to get in the door. And for where we were at, we were more focused with the PrevU launch to say we're not ready right now to try and go after large share. We're trying to get clinical experience and feedback.

So it's hard to have that engagement dialogue to say, let's start with price when our whole value proposition was, duration and other things like that. And so we were a little bit more reluctant at that phase to engage with them. But the reality is they're an important part of this evolving market and in some cases, have also a lot of thought leaders and influencers. And so we're trying to be very thoughtful around. We need to be engaging our customers where they are, and we need to make sure that we've got an offering that works for everybody. And so we will start to engage with some of those folks. I think the chicken and the egg thing that we have is, as you've heard from clinicians that have experience with the product and have a lot of patients on it, it's the kind of thing where they've now seen the light, they've had the experience and that gives confidence all the way through.

Patients are now asking for practices to more confident. Our pricing strategy thus far has just been whenever you buy, you can buy at whatever price you're most comfortable with based on volumes. And it's very simple, clear and transparent. The market as a whole tends to be more structured on if you want best price, you have to make bigger commitments over the course of the year. And it's really hard for us to go into practice at the beginning and say, if you want our best price, we need 50% of your business because it would be disingenuous. They don't have enough experience to really inform, which was why it was so important that we went out and we did the launch strategy that we did. We got the feedback, so now we have more of that. So yes, we're going to start to engage with some of these practices. We now have enough data that were strategy made sense there, and we're going to try and find that right balance where everybody can win.

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

And to your point on sort of lumpiness of revenue when you enter into large agreements, typically, revenue is recognized when the DAXXIFY or RHA is received by the practice. And if they're ordering or if they have a contract, for instance, that wouldn't be super lumpy when you start to think about that over the nation.

**Annabel Eva Samimy**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Anabelle Samimy at Stifel. Can you just confirm the $420 per vial that you noted, was that pre or post the price change? And how are you going to handle some of the bulk purchasing from physicians where they get a lower price without therapeutics? I just want to know if you're going to do anything differently than what we are familiar with in the marketplace? And then second question with the payers. I can't remember specifically from the label. But clearly, the other neurotoxins are in a very set schedule every 12 weeks. Is there anything your label that might cause a payer to restrict to a certain timetable in the administration?

**Dustin S. Sjuts**
*President*

Thanks, Annabel. I'll start. So that $420 million that we announced was after. That is our WAC price, that will be our list price. Obviously, as you know, 2 quarters into launch, we'll then have a calculated ASP that will be across all volumes both in the aesthetic space as well as the therapeutic space. So we'll have a blended ASP, which is typical for a product that has 1 BLA with SBLAs to come. And so there will be an ASP that's obviously lower than $420, and we'll evaluate what that is as it continues to kind of progress, and then it will be updated each quarter around the historical ASP across both businesses.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So you'll see, that's why Robin talked about kind of a varying degree of discount depending on how that ASP shakes out over time. We were thoughtful on the label and I'll pass over to David in terms of not having something that would restrict us to a longer retreatment interval cycle because as you saw patients want to be retreated before 12 weeks and now can't. So one of the things we wanted to avoid is like, hey, you can only get retreated with DAXXIFY every 15 or what have you. So I don't know, David, if you want to add any details to that?

**Unknown Executive**

That's exactly it. The way we designed the open-label study, there wasn't a fixed treatment pattern. There wasn't every 16 or every 20. So the label actually shows you the range of 2, 3, 4 injections. Payers understand that it will be a range. Physicians understand that it's a range, but there's nothing preset or that was one question we actually heard from physicians, am I now going to be restricted to only dosing under certain interval? Absolutely not. Beyond 12 weeks, they are free rein, however the patient needs.

**Dustin S. Sjuts**
*President*

Maybe, Rob, on the specifics in terms of bulk buying on the therapeutic side?

**Rob E. Bancroft**

Yes. The -- our strategy is to keep our price at $420 out of the gate. We believe we're at such a significant cost savings and cost effectiveness relative to the market leaders today. Something that we'll contemplate longer term in the future. On the immediate basis, I think we'll stay in the $420 range.

**Navann Ty Dietschi**
*BNP Paribas Exane, Research Division*

This is Navann Ty from BNP Paribas. I have 2 questions, please. So maybe I'll start with the aesthetic one. So do you consider changing the competitive pricing versus BOTOX to provide us later on? Is that a possibility? And do you still recommend 1.5x as a price to the end patient. And then on the therapeutic side, I'm interested to know about how you will approach the PrevU program differently to take into account that providers might be more conservative in switching compared to the aesthetic side?

**Mark J. Foley**
*CEO & Director*

Sure. So on the aesthetic side, with regards to pricing. I mean, our goal right now as we reengage these accounts is to allow them to get a lot of experience in treating their patients. And so the preference would be given the price concession that we have made for these accounts that have not broadly adopted DAXXIFY is to offer the product to their patients at parity with the market leader so that they can get a lot of experience.

And then from there, they can decide going forward, based on that experience and the product performance profile, do they keep it at parity? Do they charge a small markup? Or do they charge a more meaningful markup? But will then be that experience that will give them the confidence in terms of expectation setting, how to position with the patients and what expectations set. And as you've seen with the group of clinicians up here, they've all had that experience. So they now have that opportunity to tinker with the product, to see the patients come back to set that right expectation.

So that will be the near term. And that was the big driver is to allow price to be roughly in line so that they're not having to spend a lot of time convincing somebody that it's worth more money and then they can get into that discussion on the next time.

In terms of the future, we think this is a very thoughtful move on the pricing side. That's why we say competitive. It's not parity, it's competitive. And again, given the performance profile of the product and the ability for clinicians to charge something more than what they get today, we think there's a lot of ways that they can win. So that's our strategy in aesthetics.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Unknown Executive**

Rob, do you want to take the PrevU?

**Rob E. Bancroft**

Yes, it's a very good question. There are a number of factors that are going to influence physicians' thoughts around switching patients from conventional BoNTs that they may have been on years or decades over to DAXXIFY. And we believe we're going to be addressing a number of those in our prevU programs. Some of them will be around their clinical confidence on how do they use the product to pull through those differentiated durable symptom relief injection to injection. And one of the key reasons we're working with these PrevU physicians is to really nail down the best practices, the pearls of wisdom that will come out of that real-world experience on how you do that.

Another is going to be having a discussion with physicians about where their patients are in their current experience with conventional toxins. I will say we have been pleasantly surprised that the vast majority of physicians proactively without us prompting, are communicating to us that the majority of their patients are not getting to 12 weeks. They recognize the shortcomings in the conventional toxins against that FDA mandated 12-week reinjection cycle.

So we think that part of our communication with the physicians is also to bring the voice of the patient into that equation as well. So one of the things we're going to do in our PrevU program is identify patient ambassadors who have a great story to tell about what their life was like when they were treated with conventional toxin and how that's changed once they've been converted to DAXXIFY. And for that story to not only get into the patient community, which is also key, but to get that into the physician community as well so that they really understand what that patient journey is like.

I think today, they recognize it, but I don't know that they sense the depth and the scope of the suffering that these patients are really going through as that patient said, by the time she's ready for her next injection, she's desperate for that injection. And as David said, we think we could remove that desperation. So those factors together, we think, will be a pretty strong package for physicians to consider when it comes to switching patients over to DAXXIFY giving that a try and see if they can improve the lives of their patients.

**Chris Shibutani**
*Goldman Sachs Group, Inc., Research Division*

Chris Shibutani from Goldman Sachs. Two questions maybe on the profitability profile. As you think about the puts and takes as far as the cost of goods and you talk about it ultimately achieving the 80% plus gross margin there. Obviously, one of the inputs that you have made an adjustment is in terms of the revenues that you get for sale of the product. Are there any commensurate toggles within the ultimate COGS calculation in terms of relationship with your manufacturers that can help offset and generate the achievement of that kind of COGS.

And then you also meet an adjustment in the R&D level of spend. And so if I think about what it is you'd be spending on R&D, go to your website, you have your pipeline efforts in aesthetics and in therapeutics. In aesthetics, there are a bunch of studies that have listed as Phase II positive in other parts of the anatomy of the face.

But clearly, from the discussion we've had from the KOLs here that is not holding back their ability to practice medicine. So is further investment in these aesthetic indications part of the expense assumption? And if so, is that really necessary? And then on the therapeutic side, it looks we have cervical dystonia, but there's an additional indication. How relevant and important is that towards achieving competitive relevance in the therapeutic space.

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

Yes. So to your first point about R&D expenses, the technology investment that we make in the OPUL platform in terms of the developed technologies expensed through R&D and capitalized -- partially

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

capitalized and partially expensed. So with the stoppage of the investment in OPUL, we'll be stopping the R&D. So that's the 2023 effect that you see. So there's a fair amount. If you were to look at that $20 million that we talked about in the -- about more than half of that was related to R&D investment in the OPUL platform that flows through the income statement. When you look going forward, towards our strategy right now, we feel that there is a lot of utilization of DAXXIFY anesthetics outside of Glabellar lines. The vast majority of products, Dysport, Xeomin, and Jeuveau only have an indication in Glabellar lines and are broadly utilized across the phase, and that was the data that we presented today for DAXXIFY as well.

So obviously, there's a benefit cost associated with that, but probably in the near term, investments in registrational paths for aesthetic indications are not on the table right now. And to David's earlier question, I think that the start for the therapeutics profile for DAXXIFY starts with IITs and data we can generate there. And then we'll continue to build and leverage as we gain more experience in the marketplace for uptake in cervical dystonia, spontaneous use patterns and sort of the feedback we get with the IITs to design a thoughtful registration strategy.

**Chris Shibutani**
*Goldman Sachs Group, Inc., Research Division*

Do you want to maybe just hit what's in R&D then?

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

Yes. Currently, the most of the R&D actually is towards our supply chain. And a fair amount of that is the investment in the LSNE PCI strategy and the build-out of those pipelines. As you know, until facility is approved, those costs are actually expensed rather than capitalized in terms of an inventory. So as LSNE builds up, and starts to make that and moves towards approval, we'll continue to have those, and then those will decline as they become capitalized and then ultimately flown through the income statement as cost of goods.

**Mark J. Foley**
*CEO & Director*

And just to build on that, I mean, we're taking obviously a critical look given where we are in our journey and the commercialization side to say we're, can we best deploy our capital? Obviously, we made a difficult decision with the OPUL payments business. We're continuing to look to say, how do we make sure that every dollar that we have to spend is going to generate the best return?

As you pointed out, Chris, on the clinical side of it, we really don't have much right now on the clinical side other than some dollars to do some IITs for the reasons you mentioned. We've done some Phase II work in upper facial lines. We've got a lot of real-world experience where -- most of our competitors only have a Glabellar line indication and most of these clinicians know how to inject these. And so that's probably not a great use of our resources today.

Therapeutics. We're going to learn a lot through cervical dystonia. We talked about the landscape there. We're dealing with a very concentrated base. We'll have some IT. We'll wait and see there. So we're going to be very measured in terms of that strategy. To your first question about the supply chain and what are the other things that we might be able to do and sort of what's our confidence in our conviction.

This is really at this point based on some of the supply chain investments that we've made. It's really -- it's a volume game. And most of that is the U.S. aesthetics volume that's going to drive it. We've got a fixed cost related to our drug substance manufacturing. So obviously, that overhead, the more volume that we sell gets absorbed. And then same thing from our supplier, we have price breaks at certain volume levels. So as our volume goes up, our costs come down. And that's going to be the biggest way that we can drive it.

The great thing about it, there's certainly some of our competitors who are distributors in the market. So they get their product via a transfer price, and there's a middle man that plays in it. So two of our

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

competitors have that. We don't. And so over time, as we build scale and size, we should have more margin flexibility as it relates to our profitability profile.

**Balaji V. Prasad**
*Barclays Bank PLC, Research Division*

Mark, this is Balaji from Barclays. A couple of questions actually for each of you. Firstly, on the gross margin side, I mean, Street really has its work cut out, were allowed to go back to the drawing table sitting at around 82% gross margin for next year. So on your renewed pricing, although you said pricing, when do you think you'll reach this 80% adjusted gross margin? And are there any particular inflection points that you're looking for that's going to take you there? And insight, what is the cover going to look like? That's one. .

Two on OPUL, we had always discussed that this provides you enormous insight into customer behavior. At what point do you think that this was worth divesting and let go of that insight into customer behavior?

And maybe last one on the step edit. So can you help us understand how step edit it works as related -- as it relates to duration and where you still have comparable efficacy, but the duration is of a greater benefit. So how does the step edit work in that case?

**Mark J. Foley**
*CEO & Director*

Do you want to take the first one? .

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

Yes, sure. We've consistently said on our gross margin that when you model out the experience that we've previously stated for our RHA collection of fillers, that gross margin profile of those products is dictated by the transfer price that we get from TEOXANE SA which has hovered between 63% to 68% from a gross margin profile with the RHA Collection. .

With DAXXIFY, the key to unlock the next step in the leg down in gross margin is the approval of the LSNE or PCI facility. That provides the scale that we need from a fill/finish, which is the sort of the bottleneck to unlock additional sort of cost savings across the supply chain.

**Mark J. Foley**
*CEO & Director*

And as you know, we've been on a little bit of this kind of unusual stage where a lot of the product that we've been selling was expensed as R&D. So we've already expensed the cost and 0 cost inventory, so we've had a little bit of that when we get to steady state. Certainly, PCI and the volumes will get us there. .

And your second question about OPUL in terms of the data insights. If we walk you back through the journey, again, when we launched this, in the middle of the pandemic, we had to cut back a little bit on some of the spend. So a lot of the different initiatives we pull back. Part of the reason that we were providing OPUL with discounted rates was that we were trying to build out the payback capability. And until we have the payback capability, we didn't have enough other value levers to convince practices to join. So it was really a price play.

Now that we've turned on the PayFac side of it, we are able to sort of extract some of that data. And so we were just looking at -- so maybe the other day across 200 practices that have the catalog and we can look at those, and we have some really good data insights there.

So that strategy continues to make sense. The challenge that we have is, given the time that it's taking it to get it to this point and the fact that getting accounts to adopt this, oftentimes, it's a little bit of a higher hurdle if somebody has an EMR system. And so that journey to converting accounts is going to take yet another additional sales and marketing effort for that to happen. And we just had to take the pragmatic

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

approach that as much as we like the strategy, and we think it makes sense, and hopefully, we'll find a good home for it, and maybe that home would allow for some data sharing going forward, and we'll see. We're heading down that journey.

We just felt like we're at a stage where we have to make some priority decisions. And as much as we really like that and that strategy, we think we can better use that $20 million plus to go directly towards the DAXXI and the RHA side of things to drive better adoption.

**Unknown Executive**

Rob, [indiscernible].

**Rob E. Bancroft**

Yes, I'd love to. In a world where payers perceive conventional toxins to all be interchangeable and the same, they're going to be looking for implementing mechanisms to save dollars. One of those is the step edit as the Northeast regional plan that we discussed. Our discussion with them about DAXXIFY is about leveraging this different clinical performance and a different economic profile to break that step edit.

So it remains to be seen whether that will be the case, but you saw the response from that particular payer that it is giving them reason to reconsider what has been a long-held practice there to put a step edit in place. So our thought about the duration relationship to step edit is it's a way for us to get DAXXIFY carved out of that step edit, so it sits outside of that limitation. So that we're not subject to that because we have a different clinical profile.

**Serge D. Belanger**
*Needham & Company, LLC, Research Division*

Serge Belanger from Needham. A couple of questions on the PrevU program that just got underway in cervical dystonia. I guess, first, how many docs do you intend to be trained by the time you launch in mid-2024? And secondly, should we see something similar to what happened with the aesthetics PrevU program where the initial cohort of trained docs are using the product ahead of the launch? And then second question regarding the international expansion opportunities. Should we view these as potential partnering opportunities? Or these are additional investments you'll be taking on over the next few years?

**Unknown Executive**

Rob, do you want to start with the PrevU?

**Rob E. Bancroft**

.

Yes. Let me start with PrevU. The total number of practices that we're planning to work with up to the time we launch to the broader market is 30 to 35 practices, and they will be using the product between now and the time that happens. And so that group will be ordering the product beginning in October all the way through the time that we launched the product. They'll also, as I indicated, service our faculty, when we go to the broader market. They'll be our trainers and our educators, but they will be using the product between now and then, it's about 3 dozen.

**Mark J. Foley**
*CEO & Director*

Do you want to comment on the other part of that question, where it was -- will we see that same sort of bump that we saw with this preview group when we kicked off preview? Rob.

**Rob E. Bancroft**

Yes, yes, we definitely expect that this -- I would tell you that the initial feedback in this group is a lot of excitement about this product. They're similar to our aesthetic panel. They are very excited about being out in front and being the first to get their hands on this product commercially. And so we do expect there

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to be significant utilization from them prior to launch. I don't think it's going to be on the same order as it was in aesthetics. It's a different size market, things of that nature. But we do expect that they will be ramping significantly by the time we get to launch midyear next year.

**Dustin S. Sjuts**
*President*

I think if you look at aesthetics, we started with something called Prelude, which was around 20 or so informed KOLs that are going to drive PrevU, this PrevU is 30. So it's not that 400 that you saw with that December PrevU program. So just to understand this 30 is what's going to carry us into that mid-part of 2024. And so yes, their utilization will be larger than anyone else's, but that's really going to be more of a muted scenario in terms of that in terms of obviously, with how they buy and build these patients. It's also going to pin on patient flow and what practices they're in.

So it's pretty dynamically different, as you know, in terms of the order patterns there. And on the international side, we've long talked about our focus is here in the United States. How do we maximize the most amount of value we can out of both aesthetics and therapeutics here in North America? We've got the second largest market unlocked with Fosun partnership.

And then we mentioned that supply chain kind of allowing us to unlock the next level of international opportunities based off of the right pricing for us in terms of cost of goods and then also the right price in market. And so we'll evaluate what are the right markets, if any, to go direct or partnership. But right now, our focus is purely on the U.S. We also remain very focused on our partnership with TEOXANE who obviously has a significant organizational infrastructure outside the United States, and we can evaluate what's the right thing there from a partnership perspective.

**Unknown Analyst**

This is [indiscernible] from [indiscernible]. So on your guidance, your previous financial guidance was to reach cash flow breakeven and now it's sort of changed to 2025 positive adjusted EBITDA. So I guess what we like to know is what has changed in terms of your internal assumptions, particularly for the revenues between now, then and now -- are you expecting significantly more revenues from either DAXXIFY? Because we know that, I guess, a small amount of revenues from OPUL were gone away?

**Mark J. Foley**
*CEO & Director*

I could hit that first and then give it to you. So we just kind of -- the chronology of the guidance things around the financial side of it started when we said with the -- and this is back at our Q1 earnings call when we said that with the additional $100 million that we had available via Ethereum in our second tranche, should we take that down, that combined with our cash balance in that $100 million that we could fund the U.S. aesthetics business to cash flow positive. .

We then actually ran the ATM in Q2 and took $100 million of equity and worked with Ethereum to reduce that second tranche of $100 million down to $50 million. And so when we took the $100 million in the ATM that sort of traded out what we were saying about the $100 million in Ethereum debt. And then we added $50 million in debt, we said now we're no longer just funded to break even in the U.S. aesthetics business, but for the full business. And now we're putting a stake in the ground saying when we expect that to happen. So there really hasn't been a change necessarily in what we're guiding. The only thing we've done now is created more clarity about when we expect that to happen. I don't know if you want to add.

**Tobin C. Schilke**
*CFO & Principal Accounting Officer*

I think you covered it well.

**Jessica Serra**
*Head of Investor Relations & ESG*

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

That was our last question.

**Mark J. Foley**
*CEO & Director*
All right. Listen, thank you all so much for coming all the way out to Nashville. We're very proud to show up our facility, and we know that you all have busy schedules. So thanks for the time. We have to go, lunch is out there and food out there. Anybody who hasn't had a chance to do a tour that would like, we would be happy to do that and would like to say special thanks to our esteemed panel of clinicians too, that came all the way out here to be part of this as well. So thank you so much.

Copyright © 2023 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2023 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2023 S&P Global Market Intelligence.

# EXHIBIT 22

sisram medical

SISRAM MED
(1696.HK)

# Sisram Medical Reports First-Half 2025 Results
## Injectables Surge as AI-Powered EBD Strengthens Segment Positioning

**Hong Kong, August 20, 2025** -- Sisram Medical Ltd (the "**Company"** or "**Sisram"**, 1696.HK; referred to collectively with its subsidiaries as the "**Group"**), a global consumer wellness group, featuring a distinguished synergistic ecosystem of business building blocks and consumer-focused approaches including Energy-Based Devices (EBD), and Injectables, alongside other complementary offerings, today announced its unaudited consolidated interim results for the six months ended June 30, 2025 (the "**Reporting Period**").

**FINANCIAL HIGHLIGHTS**

- Revenue was US$165.5 million, representing a decrease of 1.9% YoY
- Revenue of Injectables line achieved US$14.4 million, representing a significant increase of 218.1% YoY
- Revenue in the international market① was US$108.9 million, up 7.1% YoY. In APAC, revenue achieved a 17.6% increase YoY
- Gross margin decreased from 62.4% to 60.0%, mainly due to a shift toward higher-cost core-professionals and sophisticated products with premium materials, along with lower North America revenue share
- Adjusted net profit was US$12.0 million, down 28.1% YoY

***Advancing EBD Market Potential with AI powered Innovations for an Intelligent, Integrated Approach to Aesthetic Care***

During the Reporting Period, Sisram reinforced its leadership in non-invasive body contouring with peer-reviewed validation of the Alma Accent Prime platform in the Nature Scientific Reports, creating new commercial opportunities globally. Alma Harmony also exceeded expectations, further strengthening the Company's position in advanced aesthetic solutions.

Expanding beyond energy-based technologies, Sisram introduced innovations that build an intelligent, integrated infrastructure across the patient journey. In North America, Universkin by Alma marked a milestone in AI-assisted skincare, gaining rapid adoption and positive feedback. The Alma IQ intelligent skin analysis platform was introduced globally to enhanced diagnostic precision, treatment planning, and patient engagement.

By harnessing AI, Sisram is moving from standalone treatments to comprehensive solutions, unlocking new potential through combined therapies and advancing its strategic leadership in medical aesthetics.

***Expanding Dermal Injectables Global Footprint with Successful Market Entry and Scaling in Key Markets***

Sisram's injectables business continued to strengthen as the Company's second growth engine, delivering robust growth of 218.1% during the Reporting Period. This marks a strategic evolution from technology development to global commercialization, signaling the entry of this line of business into a growth harvest phase.

The Company accelerated penetration of Profhilo, its next-generation hyaluronic acid–based bioremodeling product, in Thailand, establishing it as a category benchmark and driving strong sales and profitability. Preparations progressed for the mainland China launch of DAXXIFY, a long-lasting botulinum toxin type A product which is expected to take place in the coming months.

Sisram also enhanced commercialization of the Revanesse filler series, building specialized teams in the UK, DACH, Australia and New Zealand with the aim of strengthening regional operations. In addition, the Company continued to advance the commercialization in strategic regions of its partner Hallura and it first-of-its-kind hyaluronic acid biostimulator combination.

Leveraging its commercial infrastructure and expanding penetration in key markets, Sisram is laying a solid foundation for scalable growth in dermal injectables, further reinforcing its ecosystem advantage in global medical aesthetics.

***Accelerating High-Quality Growth Through a Glocalized Model***

Sisram has transitioned from global direct sales to a "glocalization" model, shifting its focus from rapid expansion to deeply rooted local operations. By combining global resources with local insights, the Company is building end-to-end value chain capabilities that drive sustainable, high-quality growth.

APAC remained a strong growth engine with a 17.6% revenue increase YoY, led by outstanding performances in Thailand and South Korea. In China, Sisram is accelerating the integration of R&D, manufacturing, and commercialization to create a local closed-loop ecosystem. This not only strengthens margins and supply chain resilience, but also transforms the direct sales business into a regional innovation hub.

With "global standards and local innovation" at its core, Sisram is reinforcing its position in strategic markets and unlocking new growth momentum worldwide.

**Outlook**

Looking ahead to H2 2025, Sisram forecasts a stronger performance both in revenue and net profit.

The Company will strategically focus on strengthening corporate leadership in APAC and North America, its key growth engines. Through regional innovation and wellness ecosystem synergy, Sisram will build differentiated competitive advantages while enhancing operational excellence and market share.

In North America, the Company will build on the successful launch of Universkin by Alma and Alma IQ, alongside continued strong demand for Sisram's energy-based medical device solutions, advancing an innovative, integrated approach to aesthetic care.

In the APAC region, the Company will expedite the launch of its long-lasting botulinum toxin product DAXXIFY in mainland China, while driving the commercial expansion of core injectables such as Revanesse and Profhilo in key markets. Concurrently, it will advance the launch and market ramp-up of the "钛提升" and "普娜提" energy-based devices in China, reinforcing the competitive edge in premium aesthetic solutions.

By building a synergistic ecosystem of product portfolio, technological innovation, and market strategy, the Company aims to fuel high-quality, sustainable growth with forward-looking vision and strategic execution.

**Mr. Liu Yi, Chairman and Executive Director of Sisram**, commented: "Sisram is accelerating the development of an integrated growth model built on technology innovation, ecosystem expansion, and glocalization. The upcoming launch of DAXXIFY in mainland China will serve as a key milestone, working in synergy with our global injectables portfolio to establish a strong second growth engine. By combining AI integration with material innovations, we are expanding the frontiers of medical aesthetics, while strengthening supply chain resilience through localized end-to-end capabilities and a multi-center manufacturing network. Looking ahead, we remain committed to optimizing resources, unlocking ecosystem synergies, and building a more competitive, future-ready medical aesthetics platform."

**Mr. Lior Dayan, CEO of Sisram and Alma**, said: "In the first half of 2025, Sisram advanced its position as a holistic wellness ecosystem leader in medical aesthetics. Leveraging AI-powered innovation and continuous technological advancement, we introduced major advancements. We also strengthened our intelligent infrastructure to deliver greater value for customers and elevate patient experience. Combined with accelerated commercialization, localized market strategies, and a reinforced supply chain, these capabilities have driven strong performance across our core markets. Our global presence enabled us to navigate regional challenges, invest confidently in growth initiatives, and lay a solid foundation for sustainable leadership in the years ahead."

① The term "international market" refers to the global market excluding North America.

**About Sisram Medical Ltd**

Sisram Medical Ltd (1696.HK) is a global leader in medical aesthetic solutions with over 25 years of expertise in energy-based devices (EBD). Built on a legacy of innovation and clinical excellence, the Company's synergistic ecosystem spans EBD technologies, injectables, diagnostics, and complementary solutions.

Sisram serves customers in over 110 countries and regions, delivering award-winning products that set new standards in safety, efficacy, and personalized aesthetic care for millions of patients worldwide.

The Company is majority-owned by Fosun Pharma, one of China's leading healthcare groups, and was listed on the Main Board of the Hong Kong Stock Exchange in September 2017.

**Sisram Medical – Enhancing Quality of Life**

http://www.sisram-medical.com

**For media inquiries, please contact:**

Arina He / Gloria Yu
Ever Bloom (HK) Communications Consultants Group Limited
+852 3468 8650
sisrammed.list@everbloom.com.cn

**For Investor Relations inquiries, please contact:**

IR@sisram-medical.com

# EXHIBIT 23

Instagram

Log In Sign Up




dr.jennjenn • Follow
Marshmello, Jonas Brothers • Leave Befo...

dr.jennjenn 1w
✨ Excited to be part of the Daxxify® launch with Teoxane ✨ Thank you for the wonderful invite and such an inspiring event 🤍
#daxxify®

smartiewtm 1w
加油呀，美女醫師，好靚女，好專業呀！！！ 👍👍😍😍😍
Like Reply

ly.sammi 1w
速度太快，看不到你，要看很多次
Like Reply

100 likes
August 29

Log in to like or comment.

More posts from dr.jennjenn

Instagram

Log In Sign Up



















Instagram

Log In Sign Up

# EXHIBIT 24

EX-99.1 2 rvncq124er8-k_exhibit991.htm EX-99.1

**Exhibit 99.1**

REVANCE®

**Revance Reports First Quarter 2024 Financial Results, Provides Corporate Update**

- Total net product revenue (DAXXIFY® and RHA® Collection) of $51.7 million, a YoY increase of 13%.
- DAXXIFY® net revenue of $22.1 million, after a reduction of $2.0 million related to a consumer coupon program.
  - Toxin market share increased from 3.0% in Q4’23 to 3.7% in Q1’24.
  - Aesthetic units sold increased 105% YoY and 7% QoQ, despite traditional seasonality.
- RHA® Collection net revenue of $29.6 million; filler market share increased from 9.1% in Q4’23 to 9.8% in Q1’24.
- Revance launches DAXXIFY for Cervical Dystonia, with coverage for 78% of commercial lives and continued positive real-world physician feedback from PrevU program.
- Revance continues to expect 2024 total net product revenue, which includes sales of DAXXIFY and the RHA Collection, to be at least $280 million.
- Conference call and webcast today at 4:30 p.m. ET.

**NASHVILLE, Tenn. --(BUSINESS WIRE)-- May 9, 2024** - Revance Therapeutics, Inc. (RVNC, www.revance.com), today reported financial results for the first quarter ended March 31, 2024 and provided a corporate update.

**Financial Highlights**

In connection with the exit of the Fintech Platform business, the results of the Fintech Platform business are reflected as discontinued operations in our financial statements as of March 31, 2024 and December 31, 2023 and for the periods ended March 31, 2024 and 2023. Therefore, the GAAP and non-GAAP results discussed below reflect our continuing operations and exclude results of the Fintech Platform, which was presented in our financial statements as the service segment.

- **Total net revenue** for the first quarter ended March 31, 2024 was $51.9 million compared to $45.8 million for the same period last year, representing an increase of 13%, due to an increase in DAXXIFY sales volume. Net revenue for the first quarter ended March 31, 2024 included $29.6 million of RHA Collection revenue, $22.1 million of DAXXIFY revenue, and $0.2 million of collaboration revenue.
- **Selling, general and administrative (SG&A) expenses** for the first quarter ended March 31, 2024 were $68.9 million compared to $61.9 million for the same period in 2023, presented in

accordance with U.S. generally accepted accounting principles ("GAAP"). The increase was primarily due to higher sales and marketing expenses related to DAXXIFY and the RHA Collection. Excluding stock-based compensation, depreciation and amortization, non-GAAP SG&A expenses were $61.0 million for the first quarter ended March 31, 2024, compared to $50.9 million for the same period in 2023.

- **Research and development (R&D) expenses** for the first quarter ended March 31, 2024 were $14.4 million compared to $17.5 million for the same period in 2023. The decrease was primarily due to lower clinical trial and regulatory activity. Excluding stock-based compensation, depreciation and amortization, non-GAAP R&D expenses were $12.7 million for the first quarter ended March 31, 2024, compared to $13.7 million for the same period in 2023.
- **Total operating expenses** for the first quarter ended March 31, 2024 were $98.8 million compared to $92.5 million for the same period in 2023. Excluding cost of product revenue (exclusive of amortization), stock-based compensation, depreciation and amortization, non-GAAP operating expenses for the first quarter ended March 31, 2024 were $73.6 million, compared to $64.5 million for the same period in 2023.
- **Net loss from continuing operations** for the first quarter ended March 31, 2024 was $49.5 million compared to $48.5 million for the same period in 2023.
- **Cash, cash equivalents and short-term investments** as of March 31, 2024 were $277.1 million.

"We are very pleased to see the DAXXIFY strategy change continue to drive the desired momentum and market share gains. Notably, we saw a healthy uptick in volume both on a year-on-year basis, where aesthetic units sold increased by 105%, and on a sequential quarterly basis where aesthetic units sold increased by 7% despite traditional Q4 to Q1 seasonality. The positive impact of our strategy change was further reflected in our market share gains where DAXXIFY's share increased from 3.0% in Q4'23 to 3.7% in Q1'24.[1] DAXXIFY's net revenue was $22.1 million for the quarter, after a reduction of $2.0 million related to a consumer coupon program. In addition, the RHA Collection continued to outpace the market growing share from 9.1% in Q4'23 to 9.8%[1] in Q1'24, against the backdrop of a soft filler market," said Mark J. Foley, President and Chief Executive Officer. "Moving forward, our aesthetics business will be focused on expanding our DAXXIFY and RHA customer base while also driving deeper account penetration. Overall, we are pleased with the traction we are seeing with DAXXIFY and are encouraged by our ability to continue to take filler share, particularly as we kick-off a number of important initiatives designed to drive further growth. Additionally, today, we announced the commercial launch of DAXXIFY in cervical dystonia, which we believe will be an important driver of top line growth for us over time. We continue to be encouraged by the results of our CD PrevU Program, as

well as the progress we have made on reimbursement. Currently, DAXXIFY is covered by approximately 78% of commercial payors which, when combined with our government coverage, represents over 200 million lives. In sum, we remain on track to generate combined sales of DAXXIFY and the RHA Collection of at least $280 million in 2024."

**First Quarter Highlights and Subsequent Updates**

- DAXXIFY continued to take share, with aesthetic units sold up 105% YoY and 7% QoQ, despite typical first quarter seasonality; DAXXIFY net product revenue was $22.1 million, after a $2.0 million reduction related to a consumer coupon program during the quarter that functioned like a rebate.
- RHA Collection also took share against the backdrop of a soft filler market and an ongoing focus on DAXXIFY; RHA Collection net product revenue was $29.6 million, representing a YoY decrease of 2%. In April, we launched RHA 3 for lip augmentation and fullness – the #1 performed filler procedure in the U.S.
- Accounts across Revance's aesthetic portfolio totaled over 7,500 at the end of the first quarter 2024. The company ended the quarter with over 3,500 accounts that have ordered DAXXIFY.
- Expanded into the U.S. therapeutics market in May 2024 with the launch of DAXXIFY for the treatment of cervical dystonia. DAXXIFY for the treatment of cervical dystonia is the first and only peptide-formulated, long-lasting neurotoxin that offers the potential to improve duration of symptom control. Today's launch enables the company to enter the $2.7 billion U.S. therapeutic neurotoxin market with a new and compelling treatment option.
- In February 2024, Revance received a permanent J-Code for DAXXIFY and announced the publication of DAXXIFY's pivotal study (ASPEN-1) results in Neurology®. The assignment of a J-Code by the U.S. Centers for Medicare and Medicaid Services streamlines future reimbursement for DAXXIFY. The peer-reviewed publication in Neurology of DAXXIFY's pivotal data in therapeutics reinforced the product's long duration of effect and favorable safety profile.
- In March, the company successfully completed an offering of common stock for gross proceeds of $100.0 million, which further bolstered the company's financial standing, and provides balance sheet optionality.

**2024 Financial Outlook**

Revance continues to expect 2024 total net product revenue, which includes sales of DAXXIFY and the RHA Collection, to be at least $280 million. Revance continues to expect 2024 GAAP operating expenses from continuing operations to be between $460 million to $490 million and non-GAAP operating expenses from continuing operations to be between $290 million to $310 million. Revance continues to expect non-GAAP SG&A expenses from continuing operations to be between $240 million to $255 million.

With cash, cash equivalents, and short-term investments of $277.1 million as of March 31, 2024, and anticipated revenues and expenditures, management projects that the company will be funded to cash flow break-even and reach positive Adjusted EBITDA in 2025.

**Conference Call**

Revance will host a corresponding conference call and a live webcast at 1:30 p.m. PT / 4:30 p.m. ET on May 9, 2024 to discuss its financial results and provide a corporate update. Individuals interested in listening to the conference call may do so by dialing (833) 470-1428 and reference conference ID: 663066, or from the webcast link in the investor relations section of the company's website at: www.revance.com.

A webcast replay will be available beginning May 9, 2024, at 4:30 p.m. PT / 7:30 p.m. ET to August 9, 2024, at 4:30 p.m. PT / 7:30 p.m. ET. To access the replay, please register via the webcast link on the events page. The webcast will be available in the investor relations section on the company's website for 90 days following the completion of the call.

**About Revance**

Revance is a biotechnology company setting the new standard in healthcare with innovative aesthetic and therapeutic offerings that enhance patient outcomes and physician experiences. Revance's portfolio includes DAXXIFY (DaxibotulinumtoxinA-lanm) for injection and the RHA Collection of dermal fillers in the U.S. Revance has also partnered with Viatris Inc. to develop a biosimilar to onabotulinumtoxinA for injection and Shanghai Fosun Pharmaceutical to commercialize DAXXIFY in China.

Revance's global headquarters and experience center is located in Nashville, Tennessee. Learn more at Revance.com, RevanceAesthetics.com, DAXXIFY.com, HCP.DAXXIFYCervicalDystonia.com, or connect with us on LinkedIn(https://www.linkedin.com/company/revance).

"Revance", the Revance logo, and DAXXIFY are registered trademarks of Revance Therapeutics, Inc. Resilient Hyaluronic Acid® and RHA are trademarks of TEOXANE SA.

**Forward-Looking Statements**

Any statements in this press release that are not statements of historical fact, including statements related to 2024 guidance, our expected cash flow breakeven and our ability and timing related to achieving positive Adjusted EBITDA; the potential benefits, safety, efficacy and duration (including while titrating doses) of DAXXIFY® for patients, physicians and payers; our opportunity in aesthetics and therapeutics; our growth potential and our ability to take share; the potential to set a new standard in healthcare; patient outcomes and physician experiences; development of an onobotulinumtoxinA biosimilar with our partner, Viatris; and commercialization of DAXXIFY® in China with our partner, Shanghai Fosun Pharmaceutical; constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future results, levels of activity, performance, events, circumstances or achievements reflected in the forward-looking statements will ever be achieved or occur.

Forward-looking statements are subject to risks and uncertainties that could cause actual results and the timing of events to differ materially from our expectations. These risks and uncertainties relate to, but are not limited to: our ability to obtain funding for our operations; the timing of capital expenditures; the accuracy of our estimates regarding expenses, revenues, capital requirements, supply chain and operational efficiencies; our financial performance and the economics of DAXXIFY and the RHA Collection of dermal fillers; our ability to comply with our debt obligations; the impact of macroeconomic factors on our manufacturing operations, supply chain, end user demand for our products, commercialization efforts, business operations, regulatory meetings, inspections and approvals, clinical trials and other aspects of our business and on the market; our ability to maintain approval of our products; our ability and the ability of our partners to manufacture supplies for DAXXIFY and our drug product candidates; our ability to acquire supplies of the RHA Collection of dermal fillers; the uncertain clinical development process; our ability to obtain, and the timing relating to, regulatory

submissions and approvals with respect to our drug product candidates and third-party manufacturers; the risk that clinical trials may not have an effective design or generate positive results or that positive results would assure regulatory approval or commercial success; the applicability of clinical study results to actual outcomes; the rate and degree of economic benefit, safety, efficacy, duration, commercial acceptance, market, competition and/or size and growth potential of DAXXIFY, the RHA Collection of dermal fillers, and our drug product candidates, if approved; our ability to successfully commercialize DAXXIFY and to continue to successfully commercialize the RHA Collection of dermal fillers; the timing and cost of commercialization activities; securing or maintaining adequate coverage or reimbursement by third-party payers for DAXXIFY; the proper training and administration of our products by physicians and medical staff; our ability to maintain and gain acceptance from injectors and physicians in the use of DAXXIFY for aesthetic and therapeutic indications; our ability to strengthen professional partnerships; our ability to expand sales and marketing capabilities; the status of commercial collaborations; changes in and failures to comply with laws and regulations; our ability to continue obtaining and maintaining intellectual property protection for our products; the cost and our ability to defend ourselves in product liability, intellectual property, class action or other lawsuits; our ability to limit or mitigate cybersecurity incidents; the volatility of our stock price; and other risks. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release may be found in our periodic filings with the Securities and Exchange Commission (SEC), including factors described in the section entitled "Risk Factors" in our Form 10-K filed with the SEC on February 28, 2024, and including, without limitation, our Form 10-Q for the quarter ended March 31, 2024 expected to be filed with the SEC on May 9, 2024. The forward-looking statements in this press release speak only as of the date hereof. We disclaim any obligation to update these forward-looking statements.

**Use of Non-GAAP Financial Measures**

Revance has presented certain preliminary and unaudited non-GAAP financial measures and forward-looking non-GAAP financial measures in this release, including non-GAAP SG&A expenses, non-GAAP R&D expenses, non-GAAP OPEX; and Adjusted EBITDA. As discussed above, the non-GAAP results discussed below reflect our continuing operations and exclude results of the service segment. Non-GAAP SG&A expense and non-GAAP R&D expense exclude depreciation, amortization and stock-based compensation; and non-GAAP OPEX excludes cost of product revenue (exclusive of amortization), depreciation, amortization and stock-based compensation. Adjusted EBITDA is defined as earnings before interest, taxes, depreciation and amortization and stock-based compensation. The company excludes cost of product revenue (exclusive of amortization), depreciation, amortization and stock-

based compensation because management believes the exclusion of these items is helpful to investors to evaluate the company's recurring operational performance. Company management uses these non-GAAP financial measures to monitor and evaluate its operating results and trends on an ongoing basis, and internally for operating, budgeting and financial planning purposes. The non-GAAP financial measures should be considered in addition to results prepared in accordance with GAAP but should not be considered a substitute for or superior to GAAP results.

Revance is unable to reconcile forward-looking non-GAAP OPEX, non-GAAP SG&A expenses or Adjusted EBITDA to the most directly comparable GAAP measure because the items that are being excluded from the non-GAAP financial measure are difficult to predict and a reconciliation or a range of results could lead to disclosure that would be imprecise or potentially misleading. Material changes to any one of the exclusions could have a significant effect on our forward-looking estimates and GAAP results. Such items include costs of revenue (exclusive of amortization), depreciation, amortization and stock-based compensation.

**Sources**

**1.** Guidepoint Qsight® Aesthetics Sales Measurement data

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | March 31, 2024 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 132,609 | $ 137,329 |
| Restricted cash, current | 550 | 550 |
| Short-term investments | 144,463 | 116,586 |
| Accounts receivable, net | 29,887 | 27,660 |
| Inventories | 50,280 | 45,579 |
| Prepaid expenses and other current assets | 9,287 | 9,308 |
| Current assets of discontinued operations | 2,610 | 1,853 |
| Total current assets | 369,686 | 338,865 |
| Property and equipment, net | 17,505 | 17,225 |
| Intangible assets, net | 8,725 | 9,270 |
| Operating lease right-of-use assets | 70,245 | 53,167 |
| Finance lease right-of-use asset | — | 19,815 |
| Restricted cash, non-current | 5,895 | 5,995 |
| Finance lease prepaid expense | 35,846 | 32,383 |
| Other non-current assets | 217 | 321 |
| Non-current assets of discontinued operations | — | 1,413 |
| TOTAL ASSETS | $ 508,119 | $ 478,454 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 5,276 | $ 13,554 |
| Accruals and other current liabilities | 40,311 | 52,863 |
| Deferred revenue, current | 9,784 | 10,737 |
| Operating lease liabilities, current | 7,126 | 5,703 |
| Finance lease liability, current | — | 2,651 |
| Debt, current | 5,000 | 2,500 |
| Current liabilities of discontinued operations | 1,406 | 1,216 |
| Total current liabilities | 68,903 | 89,224 |
| Debt, non-current | 424,838 | 426,595 |
| Deferred revenue, non-current | 71,403 | 70,419 |
| Operating lease liabilities, non-current | 38,813 | 40,985 |
| Other non-current liabilities | 2,835 | 2,835 |
| TOTAL LIABILITIES | 606,792 | 630,058 |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Preferred stock, par value $0.001 per share — 5,000,000 shares authorized, and no shares issued and outstanding as of March 31, 2024 and December 31, 2023 | — | — |
| Common stock, par value $0.001 per share — 190,000,000 shares authorized as of March 31, 2024 and December 31, 2023; 104,409,798 and 87,962,765 shares issued and outstanding as of March 31, 2024 and December 31, 2023, respectively | 104 | 88 |
| Additional paid-in capital | 2,032,760 | 1,926,654 |
| Accumulated other comprehensive gain (loss) | (25) | 14 |
| Accumulated deficit | (2,131,512) | (2,078,360) |
| TOTAL STOCKHOLDERS' DEFICIT | (98,673) | (151,604) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 508,119 | $ 478,454 |

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| Revenue: | | |
| Product revenue, net | $ 51,719 | $ 45,658 |
| Collaboration revenue | 217 | 116 |
| Total revenue, net | 51,936 | 45,774 |
| Operating expenses: | | |
| Cost of product revenue (exclusive of amortization) | 14,911 | 12,487 |
| Selling, general and administrative | 68,914 | 61,920 |
| Research and development | 14,393 | 17,532 |
| Amortization | 545 | 545 |
| Total operating expenses | 98,763 | 92,484 |
| Loss from continuing operations | (46,827) | (46,710) |
| Interest income | 2,996 | 2,970 |
| Interest expense | (5,256) | (4,497) |
| Other expense, net | (438) | (234) |
| Net loss from continuing operations | (49,525) | (48,471) |
| Net loss from discontinued operations | (3,627) | (11,322) |
| Total net loss | (53,152) | (59,793) |
| Unrealized gain (loss) | (39) | 249 |
| Comprehensive loss | $ (53,191) | $ (59,544) |
| | | |
| Basic and diluted net loss per share: | | |
| Continuing operations | $ (0.54) | $ (0.60) |
| Discontinued operations | (0.04) | (0.14) |
| Total net loss per basic and diluted share | $ (0.58) | $ (0.74) |
| | | |
| Basic and diluted weighted-average number of shares used in computing net loss per share | 91,919,018 | 81,134,111 |

**REVANCE THERAPEUTICS, INC.**

**Product Revenue Breakdown (Unaudited)**

| (in thousands) | Three Months Ended March 31, 2024 | 2023 |
|---|---|---|
| **Product:** | | |
| RHA Collection of dermal fillers | $ 29,570 | $ 30,280 |
| DAXXIFY | 22,149 | 15,378 |
| **Total product revenue, net** | $ 51,719 | $ 45,658 |

**Reconciliation of GAAP SG&A Expense from Continuing Operations to Non-GAAP SG&A Expense from Continuing Operations (Unaudited)**

| (in thousands) | Three Months Ended March 31, 2024 | 2023 |
|---|---|---|
| SG&A expense from continuing operations | $ 68,914 | $ 61,920 |
| **Adjustments:** | | |
| Stock-based compensation | (7,384) | (9,555) |
| Depreciation and amortization | (554) | (1,498) |
| **Non-GAAP SG&A expense from continuing operations** | $ 60,976 | $ 50,867 |

**Reconciliation of GAAP R&D Expense from Continuing Operations to Non-GAAP R&D Expense from Continuing Operations (Unaudited)**

| (in thousands) | Three Months Ended March 31, 2024 | 2023 |
|---|---|---|
| R&D expense from continuing operations | $ 14,393 | $ 17,532 |
| **Adjustments:** | | |
| Stock-based compensation | (1,379) | (1,397) |
| Depreciation and amortization | (344) | (2,473) |
| **Non-GAAP R&D expense from continuing operations** | $ 12,670 | $ 13,662 |

**Reconciliation of GAAP Operating Expenses from Continuing Operations to Non-GAAP Operating Expenses from Continuing Operations (Unaudited)**

| (in thousands) | Three Months Ended March 31, 2024 | 2023 |
|---|---|---|
| Total operating expenses from continuing operations | $ 98,763 | $ 92,484 |
| **Adjustments:** | | |
| Cost of product revenue (exclusive of amortization) | (14,911) | (12,487) |
| Stock-based compensation | (8,763) | (10,952) |
| Depreciation and amortization | (1,443) | (4,516) |
| **Non-GAAP operating expenses from continuing operations** | $ 73,646 | $ 64,529 |

**Investors**

Laurence Watts, 619-916-7620

laurence@newstreetir.com

**Media**

Revance@evolvemkd.com

# EXHIBIT 25

EX-99.2 3 rvncq124er8-k_exhibit992.htm EX-99.2

**Exhibit 99.2**

REVANCE

# Revance Expands into the U.S. Therapeutics Market with the Launch of DAXXIFY® for the Treatment of Cervical Dystonia

– *DAXXIFY® for the treatment of cervical dystonia is the first and only peptide-formulated, long-lasting neurotoxin that offers the potential to improve duration of symptom control*[1]

– *Revance has received a Permanent J-Code and has already secured coverage for 78% of commercial lives with top health plans, while also launching patient affordability programs*

– *Today's launch provides first entry into the $2.7 billion U.S. therapeutic neurotoxin market with a new and compelling treatment option*[2]

**NASHVILLE, Tenn. — (BUSINESS WIRE) — May 9, 2024** - (NASDAQ: RVNC), today announced the commercial launch of DAXXIFY (DaxibotulinumtoxinA-lanm) for injection for the treatment of cervical dystonia, providing patients and physicians with a compelling new treatment option for a painful and disabling chronic condition. The launch marks Revance's entry into the large and growing U.S. therapeutics neurotoxin market.

"DAXXIFY provides a significant opportunity for Revance and marks the culmination of our decades-long mission to bring true innovation to the therapeutics market. Between DAXXIFY's differentiated clinical profile, compelling value proposition and safety profile, DAXXIFY has the potential to address the unmet needs of all stakeholders, including patients, physicians and payers," said President and Chief Executive Officer, Mark J. Foley.

Following the FDA's approval of DAXXIFY for cervical dystonia in August 2023, Revance launched the DAXXIFY cervical dystonia PrevU early experience program with the objective of optimizing treatment outcomes for patients and ensuring smooth practice integration. Revance subsequently established its commercial infrastructure in preparation for launch, received a permanent J-Code for DAXXIFY from the U.S. Centers for Medicare & Medicaid Services (CMS) (which streamlines the reimbursement pathway for providers), operationalized reimbursement support services to minimize potential hurdles to adoption, and launched patient affordability programs to support patients with out-of-pocket costs.

"One of our primary goals has been to minimize barriers and ensure access to DAXXIFY for the large number of CD patients who have early symptom re-emergence and are not adequately controlled on current toxin treatments," said David. A. Hollander, M.D., MBA, Chief Medical Officer and Global Therapeutics Franchise Lead.

Peter McAllister, M.D., co-founder and medical director of the New England Institute for Neurology and Headache, added: "As an investigator in the ASPEN program, and a participating physician in PrevU, I have seen firsthand the potential for DAXXIFY to address a significant unmet need in the treatment of cervical dystonia. Many patients struggle with pain and discomfort coming back between injections with current treatment options, but with DAXXIFY my patients have experienced long lasting symptom relief. Further, DAXXIFY's safety profile continues to be encouraging over a broad range of doses. As patients

can currently only access treatment every 12 weeks based on product labeling and reimbursement guidelines, I'm excited to offer my patients a new therapy that offers sustained symptom control."

For more information on DAXXIFY® access and availability, visit HCP.DAXXIFYCervicalDystonia.com

**DAXXIFY® (daxibotulinumtoxinA-lanm) injection IMPORTANT SAFETY INFORMATION INDICATIONS**

DAXXIFY® (daxibotulinumtoxinA-lanm) injection is an acetylcholine release inhibitor and neuromuscular blocking agent indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients and for the treatment of cervical dystonia in adults.

**WARNING: DISTANT SPREAD OF TOXIN EFFECT**
**The effects of DAXXIFY® and all botulinum toxin products may spread from the area of injection to produce symptoms consistent with botulinum toxin effects. These symptoms have been reported hours to weeks after injection. Swallowing and breathing difficulties can be life threatening and there have been reports of death. DAXXIFY® is not approved for the treatment of spasticity or any conditions other than cervical dystonia and glabellar lines.**

**IMPORTANT SAFETY INFORMATION**

**Contraindications**
DAXXIFY® contraindications include hypersensitivity to any botulinum toxin preparation or any of the components in the formulation and infection at the injection site(s).

**Warnings and Precautions**
Please refer to Boxed Warning for Distant Spread of Toxin Effect.

The potency units of DAXXIFY® are not interchangeable with preparations of other botulinum toxin products. Recommended dose and frequency of administration should not be exceeded. Patients should seek immediate medical attention if respiratory, speech or swallowing difficulties occur. Use caution when administering to patients with pre-existing cardiovascular disease. Concomitant neuromuscular disorders may exacerbate clinical effects of treatment.

**Adverse Reactions**
The most commonly observed adverse reactions are:

Glabellar lines (≥1%): headache (6%), eyelid ptosis (2%) and facial paresis (1%).

Cervical dystonia (≥5%): headache (9%), injection site pain (8%), injection site erythema (5%), muscular weakness (5%), and upper respiratory tract infection (5%).

**Drug Interactions**
Co-administration of DAXXIFY® and aminoglycoside antibiotics, anticholinergic agents or any other agents interfering with neuromuscular transmission or muscle relaxants should only be performed with caution as the effect of DAXXIFY® may be potentiated. The effect of administering different botulinum neurotoxins during course of treatment with DAXXIFY® is unknown.

**Use in Specific Populations**
DAXXIFY® is not recommended for use in children or pregnant women.

**Please see DAXXIFY® full Prescribing Information** (https://www.revance.com/wp-content/uploads/2023/08/daxi-pi-and-med-guide.pdf)**, including Boxed Warning and Medication Guide** (https://www.revance.com/wp-content/uploads/2023/08/daxi-pi-and-med-guide.pdf)**.**

**To report side effects associated with DAXXIFY®, please visit safety.revance.com, or call 1-877-373-8669. You may also report side effects to the FDA at 1-800-FDA-1088 or visit www.fda.gov/medwatch .**

**About DAXXIFY**
DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection is the first and only FDA approved long-lasting, peptide formulated neuromodulator product with approved indications in the U.S. for the temporary improvement of glabellar lines (frown lines) and for the treatment of cervical dystonia in adults. DAXXIFY is powered by Peptide Exchange Technology™, Revance's proprietary, synthetic, 35-amino-acid stabilizing excipient, and is developed free of human serum albumin or animal-based components. Manufactured in the U.S., DAXXIFY is the first true innovation in neuromodulator product formulation in over 30 years.

Please see DAXXIFY important safety information below and full Prescribing Information, including Boxed Warning and Medication Guide (https://revance.com/wp-content/themes/allen-larson-theme/files/daxi-pi-and-med-guide.pdf).

**About Cervical Dystonia**
According to the Dystonia Medical Research Foundation, cervical dystonia is a painful condition in which the neck muscles contract involuntarily, causing abnormal movements and awkward posture of the head and neck. The movements may be sustained (tonic), jerky (clonic), or a combination. Cervical dystonia (also referred to as spasmodic torticollis) may be primary (meaning that it is the only apparent neurological disorder, with or without a family history) or may be the result of secondary causes (such as physical trauma).

First-line treatment for cervical dystonia is usually neuromodulator (botulinum toxin) injections, but additional treatments can include oral medications, surgery, and complementary therapies. Neuromodulators block the communication between the nerve and the muscle, relaxing the muscle, which alleviates abnormal involuntary movements and postures. Cervical dystonia can occur at any age, although most individuals first experience symptoms in middle age. The condition affects roughly 60,000 people in the United States.

**About Revance**
Revance is a biotechnology company setting the new standard in healthcare with innovative aesthetic and therapeutic offerings that enhance patient outcomes and physician experiences. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris Inc. to develop a biosimilar to onabotulinumtoxinA for injection and Shanghai Fosun Pharmaceutical to commercialize DAXXIFY® in China.

Revance's global headquarters and experience center is located in Nashville, Tennessee. Learn more at Revance.com, RevanceAesthetics.com, DAXXIFY.com, HCP.DAXXIFYCervicalDystonia.com, or connect with us on LinkedIn(https://www.linkedin.com/company/revance).

"Revance", the Revance logo, and DAXXIFY are registered trademarks of Revance Therapeutics, Inc. Resilient Hyaluronic Acid® and RHA are trademarks of TEOXANE SA.

**Forward-Looking Statements**

Any statements in this press release that are not statements of historical fact, including statements related to the potential benefits, safety, efficacy and duration of DAXXIFY® for the treatment of Cervical Dystonia; our opportunity in therapeutics; the U.S. therapeutics neurotoxin market; patient, physician and payor outcomes and experiences; our ability to set a new standard in healthcare; development of an onobotulinumtoxinA biosimilar with our partner, Viatris; and commercialization of DAXXIFY® in China with our partner, Shanghai Fosun Pharmaceutical; constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future results, levels of activity, performance, events, circumstances or achievements reflected in the forward-looking statements will ever be achieved or occur.

Forward-looking statements are subject to risks and uncertainties that could cause actual results and the timing of events to differ materially from our expectations. These risks and uncertainties relate to, but are not limited to: our ability to obtain funding for our operations; the timing of capital expenditures; the accuracy of our estimates regarding expenses, revenues, capital requirements, cost savings related to the divestiture of the OPUL payments business and supply chain and operational efficiencies; our financial performance and the economics of DAXXIFY and the RHA Collection of dermal fillers; the extent of future impairment charges; our ability to comply with our debt obligations; the impact of macroeconomic factors on our manufacturing operations, supply chain, end user demand for our products, commercialization efforts, business operations, regulatory meetings, inspections and approvals, clinical trials and other aspects of our business and on the market; our ability to maintain approval of our products; our ability and the ability of our partners to manufacture supplies for DAXXIFY and our drug product candidates; our ability to acquire supplies of the RHA Collection of dermal fillers; the uncertain clinical development process; our ability to obtain, and the timing relating to, regulatory submissions and approvals with respect to our drug product candidates and third-party manufacturers; the risk that clinical trials may not have an effective design or generate positive results or that positive results would assure regulatory approval or commercial success; the applicability of clinical study results to actual outcomes; the rate and degree of economic benefit, safety, efficacy, duration, commercial acceptance, market, competition and/or size and growth potential of DAXXIFY, the RHA Collection of dermal fillers, and our drug product candidates, if approved; our ability to successfully commercialize DAXXIFY and to continue to successfully commercialize the RHA Collection of dermal fillers; the timing and cost of commercialization activities; securing or maintaining adequate coverage or reimbursement by third-party payers for DAXXIFY; the proper training and administration of our products by physicians and medical staff; our ability to maintain and gain acceptance from injectors and physicians in the use of DAXXIFY for aesthetic and therapeutic indications; our ability to strengthen professional partnerships; our ability to expand sales and marketing capabilities; the status of commercial collaborations; our ability to effectively manage the exit of the OPUL payments business; changes in and failures to comply with laws and regulations; our ability to continue obtaining and maintaining intellectual property protection for our products; the cost and our ability to defend ourselves in product liability, intellectual property, class action or other lawsuits; our ability to limit or mitigate cybersecurity incidents; the volatility of our stock price; and other risks. Detailed information regarding factors that may cause actual results to differ materially from the results expressed or implied by statements in this press release may be found in our periodic filings with the Securities and Exchange Commission (SEC), including factors described in the section entitled "Risk Factors" in our Form 10-K filed with the SEC on February 28, 2024,

and including, without limitation, our Form 10-Q for the quarter ended March 31, 2024, expected to be filed with the SEC on May 9, 2024. The forward-looking statements in this press release speak only as of the date hereof. We disclaim any obligation to update these forward-looking statements.

**SOURCES**

1. Data on File. ASPEN-1 Rollover and ASPEN OLS TWSTRS. Newark, CA: Revance Therapeutics, Inc.
2. Market size as of 2023. CAGRs represent projected estimates. Decision Resources Group Therapeutic Botulinum Toxin Market Analysis Global 2024.

**Investors**
Laurence Watts, 619-916-7620
laurence@newstreetir.com

**Media**
Revance@evolvemkd.com

# EXHIBIT 26

# William Blair 44th Annual Growth Stock Conference

## Company Participants

- Tobin Schilke, Chief Financial Officer

## Other Participants

- Tim Lugo, Analyst, William Blair

## Presentation

### Tim Lugo {BIO 17258551 <GO>}

All right. I think we're at time, so we should get going. Thank you for joining us. For those who have not met, I'm Tim Lugo, the head of biotech and pharma research here at William Blair and it's my pleasure to welcome Tobin Schilke, CFO Revance Therapeutics, a leading company in the aesthetics and a soon-to-be a therapeutic space. It's my pleasure to welcome Toby to our conference. I believe this is the first time you might be presenting. I think Mark has presented in the past, so it's great to have you.

We're going to have a very conversational presentation. So even if you would like to ask questions from the audience, feel free. I do have a list of questions though. But I do also -- I should note that our compliance officer would probably have a heart attack if I didn't mention gotowilliamblair.com to check for any disclosures related to our two firms. And with that, it's my pleasure to welcome Toby who maybe you could just start with a bit of an overview for the generalists in the audience of what is Revance and what does Revance do. And thank you for coming to our conference.

### Tobin Schilke {BIO 15988199 <GO>}

Thanks for having us. Thanks for all the coverage over the years, Tim, and just appreciate the advice that the platform has given. So it's great to be here. Revance is anchored by our key lead asset, DAXXIFY, which is proven to be in many clinical studies to be a longer-lasting botulinum toxin and botulinum toxins is used in two major fields for therapeutic and aesthetic indications. Most people are well known of the botox market and in the US that TAM total addressable market is about $2.5 billion and has historically grown high single-digits, low double-digits over the last several decades.

Also, DAXXIFY is now approved and competes in the therapeutics market, which is surprisingly about the same size as the aesthetics market. So it's another about $2.5 billion in the US. There's an additional $2.5 billion of botulinum toxin sold outside of the US mainly in aesthetics indications. We also have a line of hyaluronic acid fillers, which are sort of the peanut butter and jelly of facial injectable medicine for practices. Those have been on the market since the pandemic in 2020 and last year did over $128 million of revenue.

And so typically in the facial injectable markets, toxins or botulinum toxins are treated for wrinkles and motion, usually the upper third of your face and for wrinkles at rest usually the lower two-thirds of your face are treated by hyaluronic acid injections. Hyaluronic acid in the US is about a $1.5 billion market and historically grown in the low single-digits. The last couple of years, the

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

market has flatlined, probably because of some sort of macroeconomic effect related to the pandemic and we're starting to see that bottom out and return back to growth.

## Questions And Answers

### Q - Tim Lugo {BIO 17258551 <GO>}

And maybe we can talk a bit about your most recent quarter and just what's the state of the DAXXIFY launch as we sit here today?

### A - Tobin Schilke {BIO 15988199 <GO>}

That's terrific and maybe we take a step back and go forward if you don't mind. So we launched -- DAXXIFY was approved in September of 2022 and we had a gradual rollout that we called the PrevU program, if you remember, Tim. And in that process, we used about 400 clinicians to practice DAXXIFY and to make sure that what we were seeing in the clinical trials resonated in medical practice. So that went on from September until the end of March basically with these practices. And during that time, DAXXIFY did really, really well commercially and exceeded our expectations as these PrevU doctors started ordering commercial products.

As we got further and penetrated the market more in a deep fashion in the May, June, July time frame, what we saw is the value proposition that was being realized by clinicians and their patients in terms of what our price was for DAXXIFY, wasn't matching their expectations in the real world. So we made a strategic pivot in September and we reduced the price of DAXXIFY on September 1 last year 2023 by about 20% to be in line with other competitor toxins at that point in time. And in doing so, we went back to practices and over the past two quarters have been relaunching DAXXIFY, talking about DAXXIFY as a product that not only lasts longer, but has a better onset of action and has improved skin quality attributes. So that relaunch phase has been going on since Q3, Q4 and into Q1 and now we're sort of regrowing from that base of our aesthetic accounts.

So in Q1, we were pleased to see that the volume of DAXXIFY grew significantly year-on-year and then also sequentially quarter-on-quarter. So we're starting to see DAXXIFY returning to growth. And one other thing to note is that Q1 is typically the weakest quarter on a calendar year for the aesthetic market. Usually, there's a large consumer seasonality that happens ahead of the Christmas end of the year holiday season and then also there's a pickup then in the springtime ahead of graduation's wedding season and things like that. So you'll see these spring and Q2 and Q4 are typically high quarters. Q3 and Q1 are a little bit slower and Q3 is usually diminished because of vacation patterns.

### Q - Tim Lugo {BIO 17258551 <GO>}

And it sounds like the normal seasonality is kind of holding true even despite kind of the relaunch. Is that fair enough to say?

### A - Tobin Schilke {BIO 15988199 <GO>}

That's fair to say.

### Q - Tim Lugo {BIO 17258551 <GO>}

Okay. And the current state of the new pricing strategy, is it anecdotally? How is it sitting with the market?

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So what you see here and again, just to reorient folks, this is a B2B2C sell. So Revance sells our products to plastic surgeons, dermatologists, med spas and they in turn sell their services and the injection to their consumer, their end consumer. So any price that we have, there's a lag between when we set a new price and when it's effective with the consumer. So what we're seeing from GuidePoint data which is also known as QSite which is sort of the industry-leading practice to determine end consumer prices is we're starting to see DAXXIFY price to the end consumer come in line with the competition. Now there's mixed practices out there. Some practices we're still trying to adjust to bring them down that their end consumer price is closer to the competitive toxin price. But for the -- by and large, what we're seeing from that QSite data is coming in line with our competitors.

## Q - Tim Lugo {BIO 17258551 <GO>}

And the growth that you've been seeing over the past two quarters since the new pricing has been announced, is this coming from new to kind of brand physicians or is this kind of a deeper penetration into the original cohort of physicians?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So what we saw was we saw a growth of our market share from Q4 to Q1 of 3% to 3.8% of the toxin marketplace and what we've also said publicly is that about two-thirds of that was from recurring accounts and we added about 500 DAXXIFY accounts on the quarter. So we feel pretty good about that, that when we're establishing DAXXIFY in a practice, it's tending to be sticky and there's less churn and we're starting to add account as well.

## Q - Tim Lugo {BIO 17258551 <GO>}

And I guess before we talk a little bit about therapeutics, there is some competition coming in the aesthetics market. We've had I think another Korean toxins been approved recently. There might be a longer acting product coming to the market as well from an established competitor. Can you just describe what you -- you're in the still very much the growth phase, but you do have some competition coming. Can you kind of weigh those two?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. Well, let's kind of break it all down. So generally speaking, there are five approved competitors right now that are on the marketplace. The first one is Botox that has the largest market share and it's about 60% market share there or thereabouts. The second competitor is Dysport by Galderma, which is about there, thereabouts its about 20% market share and then you've got about 10-ish market share or a little sub 10-ish market share to Xeomin which is sold by Mers and Jeuveau which is sold by Evolis. And so DAXXIFY was the fifth product to market and as we said in Q1, we achieved about 3.8% market share in growing.

There is competitive another toxin that was approved, Ledibo [ph] by Hugel, as Tim pointed out that has not been introduced commercially to the US at this point in time and there's not commercial infrastructure that's been fielded to launch Ledibo. What we're seeing is this is a relatively mature market and Revance is taking a classical market segmentation approach to this and trying to find a position for DAXXIFY that's not solely dependent on pricing and discounts where we're trying to let the clinical profile of our toxins stand out compared to all of the other competitors. And so that's our differentiated process to garner market share and to do that in a

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

Bloomberg

way that benefits our businesses who buy our practice so that they can achieve better profits by using DAXXIFY, which encourages them to grow their market share of DAXXIFY.

The second competitor that's potentially going to be approved is from Galderma. It's a product known as QM114. That's a pre-filled syringe of toxin. So basically all of the other toxin products come in a vial that has to be reconstituted at the practice on a daily basis. The practice draws up a small insulin like syringes and injects those. This is a little bit different because it comes in a prefilled syringe. What we've seen over multiple decades of medical practice in that is that doctors have different patterns of reconstituting their toxin depending on the look that they're trying to achieve and sort of the local look that's considered appropriate in their given local geographies.

And so it'll be interesting to see how a prefilled syringe which won't have that ability to do the dilution parameters work and also be interesting to see the data on injection site pain, which has been managed by various buffers and saline solutions that practices put in when they draw up their toxin over time. And so they've learned to kind of compensate for the short-term injection pain with different sorts of dilution criteria. So be interesting to see that when that's approved and that's by Galderma.

## Q - Tim Lugo {BIO 17258551 <GO>}

And this is probably something interesting for the audience. It's not a very typical pharma biotech market. These aesthetic physicians and practicing physicians do like a lot of flexibility in their injection site patterns or not just injection site patterns, but just flexibility in achieving the look on a per patient kind of level.

## A - Tobin Schilke {BIO 15988199 <GO>}

You'll find that there's even different geographic looks. For instance, you'll find in the Northeast, there's more of a little bit more natural looks and a less firm look and in the south people want more effective toxin and you'll see a more setup look.

## Q - Tim Lugo {BIO 17258551 <GO>}

And that flexibility is hindered when you have a prefilled syringe. So that's kind of the importance of that. So we also have obviously Botox is the brand leader. AbbVie has been discussing inventory levels in Q1. Can you talk -- and also kind of increased promotional activities. Can you maybe speak a bit to what the leader is doing into the market? And you're still at a sub 5% penetration. How you are kind of gaining share?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So we felt pretty good about, like you said that we're not just selling into the practice and the practice is stocking and keeping our files of DAXXIFY and not injecting them. We feel with the lower price and lowering that acquisition cost that they're actually pulling it through. And one thing that we did an experiment on that we talked about in Q1 is we ran a consumer coupon program and it was a little bit different, Tim, than the traditional ones where a practice had to buy for one month, the month of February over a set quantity of DAXXIFY vials in a given order and they were given a set of QR codes that had an expiry date. Those QR codes could only be used in the month of February, March and April. And so we could monitor the activity and make sure that a fair amount of those QR codes were being used, which to us means that the practice is actually injecting DAXXIFY at that point in time. And so we saw really good utilization of those QR codes

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

and so that means that feeling like folks aren't leaving DAXXIFY on inventory even when they're buying large quantities of DAXXIFY.

## Q - Tim Lugo {BIO 17258551 <GO>}

That's interesting. In some of the reordering patterns, can you discuss the strength of those areas? And have you seen any kind of geographic footholds that have really embraced DAXXIFY?

## A - Tobin Schilke {BIO 15988199 <GO>}

I think there are certain geographies that we think are ahead or behind what we envision for DAXXIFY, but it really comes down to an account by account basis and there's certain areas. If you take, again, a big step back, there's roughly 30,000 to 40,000 accounts or injectors in the US for aesthetic medicine. And right now, we said that we're in about 7,500 accounts for all of our aesthetic products, RHA and DAXXIFY and we're in over 2,500 DAXXIFY accounts too. So what we're seeing then is we've got a foothold. We've got a large area to continue to expand, to build account volume and to establish DAXXIFY in those accounts over time and you'll see that it's correlated by making sure that you have really good sales presence in those given geographies and that correlates quite well.

## Q - Tim Lugo {BIO 17258551 <GO>}

And I've heard from kind of some of the tonal checks I've done with larger users of DAXXIFY, there is this at least feeling that the skin quality benefits are different with DAXXIFY than some of the other neurotoxins. Can you just speak to kind of the feedback you're hearing from the field as well as how does this kind of gain traction in the marketplace?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So I think that, that right now, we're generating data both from an animal and a human study perspective that will be through a publication strategy will compliantly disseminate that over time. The data that we're seeing about improved skin quality, we believe it comes from the differentiated formulation of DAXXIFY and that it's combined with a peptide and that's what people are seeing and saying. And so typically whenever you're giving a toxin, you'll see that when you relax the wrinkles, your natural pore structure will improve and the luminosity of your skin will improve no matter what kind of toxin. They're seeing an improved effect with DAXXIFY and perhaps it's related to the peptide that we're using, and perhaps it's related to the faster onset and sort of the longer duration that you're seeing that benefit of improved skin quality.

## Q - Tim Lugo {BIO 17258551 <GO>}

Well, with the aggressive lighting up here, I feel like the luminosity of our skin is...

## A - Tobin Schilke {BIO 15988199 <GO>}

Skin is really shiny.

## Q - Tim Lugo {BIO 17258551 <GO>}

Really shiny.

## A - Tobin Schilke {BIO 15988199 <GO>}

Exactly.

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

## Q - Tim Lugo {BIO 17258551 <GO>}

Maybe for the next few minutes, I'd love to pivot into talking about the therapeutic space. There was a lot of controversy in the aesthetic space around the launch. Do physicians really want to see their patients less six months versus three months? It doesn't -- I mean, in the therapeutic space, I think everyone can widely agree longer is better for duration. Could you talk about how you're launching in the therapeutic space especially in cervical dystonia whereas the first label?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So DAXXIFY is approved in cervical dystonia of the call it $2.5 billion TAM of therapeutics in the US. Cervical dystonia most folks agree is around $300 million to $400 million of that $2.5 billion TAM, call it about $350 million. The product has a really interesting profile there. And what we're trying to do with the duration of DAXXIFY is avoid a roller coaster ride of what patients experience with other approved toxins that are on the marketplace. There's interesting literature published by Camilla at all [ph] that describes patients that have sort of an onset of action that takes few weeks for the toxin to click in to shut down some of the muscles in the shoulder and the base of the spine and the neck.

And so they're still feeling the pain and discomfort and the disability associated with cervical dystonia for a few weeks. Then what they're seeing is the typical toxin wears off. Over thousands of patients have realized, it wears off after eight to 10 weeks. However, they're stuck in a quandary because you can't reinject a toxin until 12 weeks. That's a label on every toxin and it's also controlled by payers. So you're stuck with these sort of roller coaster of effect where folks have to plan their life around. These are the days I can work, these are the days I can drive. These are the days that I cannot.

And what we're trying to do is modulate that with DAXXIFY, have it kick in and then have the patients come back, even if they're experiencing not a return to baseline, but a treatment with DAXXIFY at that 12 to 16 weeks so that they never return to baseline. And so what we've shown is in sort of our published data on cervical dystonia and then also what we're experiencing through 30 clinical sites is that the doctors are managing that first dose of DAXXIFY and then the second dose of DAXXIFY so that there's no return to baseline and they have more better days. It's also a huge value perspective from a payer because there's less disability.

A lot of cervical dystonia patients have to go on disability during those times where their toxin has worn off and so they're unable to work, unable to drive, unable to do activities of daily living. So we're really proud to introduce this product right now. It's gotten great traction from payers. We've achieved our stated corporate goal of having payer coverage at this point in time. So we feel confident and ready to introduce that into the marketplace, which we've done in May.

## Q - Tim Lugo {BIO 17258551 <GO>}

It's a smaller physician footprint.

## A - Tobin Schilke {BIO 15988199 <GO>}

That's right. Very different than aesthetics.

## Q - Tim Lugo {BIO 17258551 <GO>}

Very different than aesthetics. I think you have 7,500 aesthetic accounts. 3,500 of those are DAXXIFY. Can you talk about what is the footprint in cervical dystonia and the kind of how many

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

treating physicians are there and how are you attacking that market?

## A - Tobin Schilke {BIO 15988199 <GO>}

So these are neurologists and injecting physiatrists. So very different than dermatologists, plastic surgeons and med spas, completely different channel. We believe that less than a 1,000 of those injectors on this space treat muscle movement disorders, broadly cervical dystonia, upper limb spasticity, lower limb spasticity. And so less than a 1000 are doing about 80% of the volume for muscle movement disorders. And with that, we feel that our field team that we've assembled of about 20 folks targeting these areas from a payer, from a medical affairs perspective and a on-label sales rep are able to target that effectively.

## Q - Tim Lugo {BIO 17258551 <GO>}

And you mentioned that upon launch, you already had a permanent J code. You've already secured coverage for about 78% commercial lives. That sounds like you should be able to hit the ground running in CD. When do we kind of start to see that flow through the results in Q3, Q4? Is that kind of the timeframe?

## A - Tobin Schilke {BIO 15988199 <GO>}

That's right. And we've guided a modest uptake because what you see is that when you start to establish DAXXIFY in a given account usually that account is working with a set number of local payers that they have to go through. And so you have to uncover those payers from both the account level to get DAXXIFY onto their formula -- formulary and then to allow them to switch over their patients. You're not going to introduce new patients to cervical dystonia. People who have cervical dystonia are diagnosed. So you're about switching an existing toxin patient to DAXXIFY. Usually that's 90 days to a quarter because you're going to -- the patient is going to come in, they'll probably be injected with their existing toxin.

The doctor will have a conversation about switching them so that the next injection cycle they can get the benefits of DAXXIFY and you'll probably have sort of your first patients be sort of more resistant patients or your more difficult patients that they're seeing. And so they'll probably start there and they'll start titrating at lower doses and move up that titration curve because they want to make sure patient safety is also paramount when dealing with toxins. So that's why we guided a modest contribution in 2024, but feel like we'll continue to garner market share and use through the next couple years.

## Q - Tim Lugo {BIO 17258551 <GO>}

And so given guidance, you've mentioned $280 million, can you talk a bit about the split amongst DAXXIFY versus the filler line and then also how much therapeutic is in that DAXXIFY line? You mentioned modest.

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. So maybe we deconstruct it a little bit and start with the fillers. Last year we did over $128 million of revenue from our line of HA fillers. We're aiming to grow that by double digits this year. We're launching this quarter our filler, our RHA3 in lips. We believe that the market for HA fillers has sort of bottomed out and will start to return to historical growth. So we feel like that will make up more than 50% of that $280 million contribution. So that's call it around $150 million. That $280 million is what most folks have out there for the filler line. Also feel that analysts right now have our DAXXIFY for therapeutics in sub $10 million given sort of the later launch in the time frame for

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

the calendar year and then also sort of those payer hurdles that we're knocking down on an account by account basis.

So that leaves call it about $120 million to $130 million of DAXXIFY for aesthetics. If you recall, Tim, we sold over $80 million of DAXXIFY last year in aesthetics. It's a significant growth step up. But we're introducing a new toxin and we're also having to lap about a 20% price increase. So if you take those two factors, we think that you're going to have to grow your volumes about 80% to 90% of DAXXIFY on a unit by unit basis on a year-on-year. And we were pleased to see in Q1 that we grew nearly 100% of DAXXIFY units compared to Q1 of last year. So again, we'll require continued growth of DAXXIFY. But it's a great product and our RHA line continues to resonate and garner market share as well.

## Q - Tim Lugo {BIO 17258551 <GO>}

And again, Q1 is seasonally a weak quarter for the aesthetic sector. So it's still impressive to see that growth sequentially and yearly. So maybe the last question since you are the CFO, can you talk about your cash position and I know you've had some debt kind of reshuffling recently? So can you just speak broadly about your balance sheet?

## A - Tobin Schilke {BIO 15988199 <GO>}

Yeah. Thanks. So we closed Q1 with over $277 million of cash. We did a raise in early Q1 of $100 million. Right now, we feel like with the trajectory that DAXXIFY and RHA are on, we're going to be in a position to be EBITDA positive in 2025 and that's our guidance. So then what we have is we have a $150 million of term debt with Ethereum and senior secured. It's due in September of 2026 and then we have a $287 million convert that's due in Q1 of 2027. Feel like most companies have a certain level of debt and we feel like we're in a good position to maintain our commitment to Ethereum and pay that when it's due and we have optionality. If we can choose to extend the Ethereum debt, if we refinance the convertible debt first. So we're sort of balancing the equity link convert versus the straight term debt that's at a fixed coupon of 8.5%. And so that's what we're thinking through these days and it really depends on sort of the trajectory of the business and the interest rates on a go forward basis.

## Q - Tim Lugo {BIO 17258551 <GO>}

Understood. Well, with that, thank you so much for joining us and the breakout. If you have some additional questions, Art is upstairs at Janie A. Thank you for joining us Toby.

## A - Tobin Schilke {BIO 15988199 <GO>}

Thanks Tim.

---

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP. © COPYRIGHT 2025, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

© COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.

# EXHIBIT 27

Company
Portfolio
Careers
News
Contact Us

C.A. No. 21-1411-RGA-LDH
**Plaintiffs' Trial Exhibit**
**PTX-987**

# Crown Laboratories Announces Completion of Acquisition of Revance Therapeutics

News provided by

**Crown Laboratories, Inc.**

Feb 06, 2025, 08:39 ET

*The business combination reinforces Crown's position as a leading, innovative, high-growth aesthetics and skincare company*

JOHNSON CITY, Tenn., Feb. 6, 2025 /PRNewswire/ — Crown Laboratories, Inc. ("Crown"), a privately held, global innovative leader in the skincare industry, today announced the successful closing of its acquisition of Revance Therapeutics, Inc. ("Revance") (NASDAQ: **RVNC**), a biotechnology company aimed at setting the new standard in healthcare with innovative aesthetic and therapeutic offerings.

**The Offer and the Merger**

Crown's tender offer to acquire all of the issued and outstanding shares of common stock, par value $0.001 per share (each, a "Share") of Revance at a purchase price of $3.65 per Share, net to the

stockholder in cash, without interest and less any applicable tax withholding (the "Offer"), expired as scheduled at one minute past 11:59 p.m., Eastern Time, on February 4, 2025, and was not further extended (such date and time, the "Expiration Time"). Crown previously announced that Computershare Trust Company, N.A., the depositary and paying agent for the tender offer, advised Crown that, as of the Expiration Time, 86,197,893 Shares were validly tendered and not properly withdrawn in the Offer, representing approximately 82.0% of the issued and outstanding Shares as of the Expiration Time. In accordance with the terms of the Offer, Crown and its affiliate, Reba Merger Sub, Inc. ("Merger Sub"), accepted for payment all such Shares that were validly tendered and not properly withdrawn pursuant to the Offer. Following completion of the Offer, Crown completed the acquisition of Revance through the previously-planned and announced second-step merger. Revance's common stock will be delisted from the NASDAQ Global Select Market and deregistered under the Securities Exchange Act of 1934, as amended.

**Advisors**

Leerink Partners and PJT Partners served as financial advisors to Crown; Kirkland & Ellis LLP and Lowenstein Sandler LLP served as legal advisors to Crown.

**About Crown**

Crown, a privately held, fully integrated global skincare company, is committed to developing and providing a diverse portfolio of aesthetic, premium and therapeutic skincare products that improve the quality of life for its consumers throughout their skincare journey. An innovative company focused on skin science for life, Crown's unyielding pursuit of delivering therapeutic excellence and enhanced patient outcomes is why it has become a leader in Dermatology and Aesthetics. Crown has been listed on the Inc. 5000 Fastest Growing Privately Held Companies List for eleven years and has expanded its distribution to over 50 countries. For more information, visit **www.crownlaboratories.com**.

The "Crown" logo, PanOxyl and Blue Lizard are registered trademarks of Crown Laboratories, Inc. SkinPen and StriVectin are registered trademarks of Bellus Medical, LLC and StriVectin Operating Company, Inc., respectively.

**Forward-Looking Statements**

Certain statements contained in this press release are "forward-looking statements." The use of words such as "anticipates," "hopes," "may," "should," "intends," "projects," "estimates," "expects," "plans" and "believes," among others, generally identify forward-looking statements. All statements, other than statements of historical fact, are forward-looking statements. These forward-looking statements include, among others, statements relating to Revance's and Crown's future financial performance, business prospects and strategy, expectations with respect to the integration following the merger, including the timing thereof and Revance's and Crown's ability to successfully complete such transactions and realize the anticipated benefits. Actual results could differ materially from those contained in these forward-looking statements for a variety of reasons, including, among others, difficulties or unanticipated expenses in connection with integrating the parties' operations, products and employees and the possibility that anticipated synergies and other anticipated benefits of the transaction will not be realized in the amounts expected, within the expected timeframe or at all, the effect of the merger on Revance's and Crown's business relationships (including, without limitations, partners and customers), and other circumstances beyond Revance's and Crown's control. You should not place undue reliance on these forward-looking statements. All forward-looking statements in this communication are based on information available as of the date of this communication, and except as required by law, neither Revance nor Crown undertakes any duty to update forward-looking statements to reflect events after the date of this press release.

**Contacts**

**Media:**

Alecia Pulman

ICR

**Crown@icrinc.com**

SOURCE Crown Laboratories, Inc.

Company +

Portfolio +

Careers +

News +

FOR CUSTOMER SERVICE, PRODUCT INFORMATION, NEW ACCOUNTS OR ADVERSE EVENTS CALL: 877-3REV-NOW

1222 DEMONBREUN ST
20TH FLOOR
NASHVILLE, TN 37203

©2025 REVANCE.
RHA® AND RHA REDENSITY® ARE REGISTERED TRADEMARKS OF TEOXANE SA, MANUFACTURED IN SWITZERLAND. THE TEOXANE RHA® COLLECTION IS EXCLUSIVELY DISTRIBUTED BY REVANCE®. ALL OTHER TRADEMARKS ARE THE PROPERTY OF THEIR RESPECTIVE OWNERS.
CORP-00147

Case 1:21-cv-01411-RGA-LDH Document 684-3 Filed 10/03/25 Page 100 of 344 PageID #: 63168

SOCIAL MEDIA COMMUNITY GUIDELINES

PRIVACY POLICY

TERMS OF USE


PTX-987.0005

# EXHIBIT 28

C.A. No. 21-1411-RGA-LDH
Plaintiffs' Trial Exhibit
PTX-988

Company
Portfolio
Careers
News
Contact Us

# Crown Laboratories Now Operates Under the Name Revance

REVANCE®

**Nashville, TN, March 31, 2025 – Crown Laboratories** ("Crown"), a fast-growing global aesthetics and skincare company, announced today that it will operate under the name Revance, effective immediately.

This change marks a significant milestone in the company's strategic transformation following its recent acquisition of Revance Therapeutics, Inc., a biotechnology company known for its cutting edge innovation in aesthetics and therapeutics, which joins Crown's deep roots in science-driven brands for skin health and rejuvenation.

"The transition to the Revance name marks an exciting new chapter for our company, representing the future of our combined portfolio of advanced, science-driven brands that are designed to address the ever-changing needs of patients, clinicians, and consumers worldwide," said Jeff Bedard, CEO of Revance.

Revance was chosen as the name that best represents the newly combined company mission to revolutionize the aesthetics and skincare industry through science-based, innovative products.

Bedard continued, “By uniting our complementary market-leading products and incredibly talented teams under one powerful brand, we are strengthening our unique position in the marketplace and unlocking exciting new opportunities for growth. Importantly, our dedication to excellence, innovation, and serving our customers remains unchanged. We look forward to continuing to execute on our successful integration and go-forward strategy, as we aim to become a global leader in injectables, skin quality and skincare solutions.”

**About Revance**

Revance is a fast-growing global aesthetics and skincare company focused on providing innovative aesthetics and market-leading skincare offerings throughout every stage of life. With a differentiated portfolio of products spanning 60 countries, Revance meets the evolving needs of patients and consumers worldwide through continued innovation and commercialization of new products and treatments.

Learn more at Revance.com, RevanceAesthetics.com, CrownLaboratories.com, and CrownAesthetics.com.

**Media Contact:**

ICR

Crown@icrinc.com

Company

Portfolio

Careers

News

FOR CUSTOMER SERVICE, PRODUCT INFORMATION, NEW ACCOUNTS OR ADVERSE EVENTS CALL: 877-3REV-NOW

1222 DEMONBREUN ST
20TH FLOOR
NASHVILLE, TN 37203

©2025 REVANCE.
RHA® AND RHA REDENSITY® ARE REGISTERED TRADEMARKS OF TEOXANE SA, MANUFACTURED IN SWITZERLAND. THE TEOXANE RHA® COLLECTION IS EXCLUSIVELY DISTRIBUTED BY REVANCE®. ALL OTHER TRADEMARKS ARE THE PROPERTY OF THEIR RESPECTIVE OWNERS.
CORP-00147

SOCIAL MEDIA COMMUNITY GUIDELINES

PRIVACY POLICY

TERMS OF USE

# EXHIBIT 29

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): February 6, 2025**

# Revance Therapeutics, Inc.
**(Exact name of registrant as specified in charter)**

| **Delaware** | **001-36297** | **77-0551645** |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
**(Address of principal executive offices and zip code)**

**(615) 724-7755**
**(Registrant's telephone number, including area code)**

**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | RVNC | Nasdaq Global Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Introductory Note**

As previously disclosed in the Current Report on Form 8-K filed with the Securities and Exchange Commission (the "***SEC***") on January 21, 2025, Revance Therapeutics, Inc., a Delaware corporation ("***Revance***" or the "***Company***"), entered into a second amendment to the Amended and Restated Agreement and Plan of Merger, dated December 7, 2024 (previously amended as of December 11, 2024, and as amended, the "***A&R Merger Agreement***"), by and among the Company, Crown Laboratories, Inc. a Delaware corporation ("***Parent***") and Reba Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("***Merger Sub***," and together with Parent, the "***Buyer Parties***"). The A&R Merger Agreement amends and restates the Agreement and Plan of Merger (the "***Original Agreement***"), dated as of August 11, 2024, by and among the Company and the Buyer Parties. Capitalized terms used herein but not otherwise defined have the meaning set forth in the A&R Merger Agreement.

**Item 1.01 Entry into a Material Definitive Agreement.**

On February 6, 2025, the Company and U.S. Bank Trust Company, National Association (as successor in interest to U.S. Bank National Association), as trustee (the "***Trustee***"), entered into the first supplemental indenture, dated as of February 6, 2025 (the "***First Supplemental Indenture***"), to the base indenture, dated as of February 14, 2020 (the base indenture as so supplemented, the "***Indenture***"), relating to the Company's 1.75% Convertible Senior Notes due 2027 (the "***2027 Convertible Notes***").

As a result of the Merger, and pursuant to the First Supplemental Indenture, from and after the Effective Time, the 2027 Convertible Notes are no longer convertible into shares of the Company's common stock. Rather, a holder's right to convert each $1,000 principal amount of the 2027 Convertible Notes into shares of the Company's common stock has been changed to the right to convert such principal amount solely into a number of units of Reference Property (as defined in the Indenture) in an aggregate amount equal to the conversion rate of the 2027 Convertible Notes, in effect on the applicable conversion date (subject to any adjustments pursuant to the terms of the Indenture), with each unit of Reference Property consisting of $3.65 in cash. The foregoing descriptions of the Indenture and the transactions contemplated thereby are subject to and qualified in their entirety by reference to the full text of the Indenture as incorporated by reference in Exhibit 4.2 of Revance's most recent Annual Report on Form 10-K. A copy of the First Supplemental Indenture is filed as Exhibit 4.1 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 2.01 Completion of Acquisition or Disposition of Assets**

Pursuant to the A&R Merger Agreement, and upon the terms and subject to the conditions thereof, on December 12, 2024, Merger Sub commenced a tender offer (as amended and/or supplemented from time to time as permitted by the A&R Merger Agreement, the "***Offer***") to purchase all of the outstanding shares of common stock, par value $0.001 per share, of the Company (the "***Company Common Stock***," each a "***Share***" and collectively, the "***Shares***"), other than Shares held by Parent, Merger Sub or their affiliates (as defined in Section 251(h) of the DGCL) and Dissenting Shares, at a price of $3.65 per Share (such amount per Share, the "***Offer Price***"), in cash, without interest and less any applicable tax withholding.

The Offer expired as scheduled at one (1) minute after 11:59 p.m., Eastern Time, on February 4, 2025. Computershare Trust Company, N.A., in its capacity as depositary and paying agent for the Offer, advised that, as of the expiration of the Offer, a total of 86,197,893 Shares were validly tendered and not validly withdrawn pursuant to the Offer, representing approximately 82% of the outstanding Shares other than the Excluded Shares. On February 6, 2025, Merger Sub irrevocably accepted for payment all Shares that were validly tendered and not validly withdrawn.

The number of Shares validly tendered and not validly withdrawn pursuant to the Offer satisfied the Minimum Condition. As all the remaining conditions to the Merger set forth in the A&R Merger Agreement were satisfied or waived, and on February 6, 2025, Merger Sub merged with and into Revance pursuant to Section 251(h) of the Delaware General Corporation Law, as amended (the "***DGCL***"), with Revance being the surviving corporation (the "***Merger***," and together with the Offer, the "***Transaction***"). At the effective time of the Merger (the "***Effective Time***"), each Share (other than the Excluded Shares) converted into the right to receive an amount in cash equal to the Offer Price, net to the holder of such Share in cash, without interest and subject to any required withholding of taxes.

In addition, at the Effective Time, (i) each Vested Company RSU and Vested Company RSA that is subject to service-based vesting conditions and outstanding or that vests in accordance with its terms as a result of the consummation of the Merger, and each Director RSA was canceled and converted into the right to receive a lump sum payment, without interest thereon and subject to applicable withholding taxes, equal to, (a) with respect to each Vested Company RSU, the product of

the Per Share Price and the total number of Shares of Company Common Stock subject to such Vested Company RSU as of immediately prior to the Effective Time and (b) with respect to each Vested Company RSA and Director RSA, the Per Share Price, (ii) each Vested Company Option and Director Option, in each case, granted under any Company Equity Plan, was canceled and converted into the right to receive a lump sum cash payment, without interest thereon and subject to applicable withholding taxes, equal to the product of (a) the excess, if any, of the Per Share Price over the applicable exercise price per share of Company Common Stock subject to such Vested Company Option and Director Option, as applicable, and (b) the number of Shares of Company Common Stock subject to such Vested Company Option and Director Option, as applicable, and (iii) each Company equity award that vests based on the achievement of performance-based conditions ("***Company Performance Awards***") vested in accordance with its terms, resulting in the forfeiture of all Company Performance Awards other than the performance stock unit awards granted in 2023.

At the Effective Time, (i) each Unvested Company RSU and Unvested Company RSA that is subject to service-based vesting conditions and outstanding was canceled and converted into the right to receive an amount in cash, without interest thereon and subject to applicable withholding taxes, equal to (a) with respect to each Unvested Company RSU, the product of the Per Share Price and the total number of Shares of Company Common Stock subject to such Unvested Company RSU as of immediately prior to the Effective Time ("***Cash Replacement Company RSU Amount***") and (b) with respect to each Unvested Company RSA, the Per Share Price ("***Cash Replacement Company RSA Amount***") and (ii) each Unvested Company Option was canceled and converted into the right to receive an amount in cash, without interest thereon and subject to applicable withholding taxes, equal to the product of (a) the excess, if any, of the Per Share Price over the applicable exercise price per share of Company Common Stock subject to such Unvested Company Option and (b) the number of Shares of Company Common Stock subject to such Unvested Company Option ("***Cash Replacement Option Amount***" and, together with the Cash Replacement Company RSU Amount, and Cash Replacement Company RSA Amount, the "***Cash Replacement Amount***"). Each Vested Company Option and Unvested Company Option that has a per share exercise price that is equal to or greater than the Per Share Price was canceled as of the Effective Time without any cash payment or other consideration being paid in respect thereof. Each Cash Replacement Amount will, subject to the holder's continued service with Parent or its affiliates (including the Company or its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the underlying equity award for which such Cash Replacement Amount was exchanged would have vested and been payable pursuant to its terms. If a holder of such Cash Replacement Amount incurs a Qualifying Termination, the unpaid portion of the Cash Replacement Amount will vest and become payable.

The description of the Offer and the Merger does not purport to be complete and is qualified in its entirety by reference to (i) the A&R Merger Agreement, which was filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed on December 9, 2024, (ii) the Amendment to the A&R Merger Agreement, which was filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed on December 12, 2024 and (iii) Amendment No. 2 to the A&R Merger Agreement, which was filed as Exhibit 2.1 to the Company's Current Report on Form 8-K filed on January 21, 2025 (each, respectively, is incorporated herein by reference). The information set forth in the Introductory Note of this Current Report on Form 8-K is also incorporated herein by reference.

**Item 2.04 Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

The consummation of the Transaction constitutes a Share Exchange Event, a Fundamental Change and a Make-Whole Fundamental Change (each as defined in the Indenture) under the Indenture. The effective date of each of the Fundamental Change and the Make-Whole Fundamental Change is February 6, 2025, the date of the consummation of the Transaction. As a result of the Fundamental Change, each holder of 2027 Convertible Notes will have the right to require the Company to repurchase its 2027 Convertible Notes.

In addition, as a result of the Make-Whole Fundamental Change and in accordance with the Indenture and Section 2.01 of the First Supplemental Indenture, holders who surrender their 2027 Convertible Notes for conversion from and after the Effective Time at any time when the 2027 Convertible Notes are convertible will receive cash in an amount equal to the Conversion Rate in effect on the Conversion Date (each as defined in the Indenture), multiplied by the Offer Price of $3.65, and will not receive any Shares.

**Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

In connection with the consummation of the Transaction described in Item 2.01 of this Current Report on Form 8-K, which is incorporated by reference herein, Revance notified The Nasdaq Global Select Market ("***Nasdaq***") of the consummation of the Merger and requested that Nasdaq (i) halt trading in the Shares, (ii) suspend trading of and delist the Shares and (iii) file with the SEC a notification of removal from listing and/or registration on Form 25 to effect the delisting of all Shares from

Nasdaq and the deregistration of such Shares under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"). The trading of the Shares was halted following after-hours trading on the evening of February 5, 2025, and Nasdaq will file the Form 25 with the SEC on February 6, 2025. In addition, Revance intends to file a certification and notice of termination of registration on Form 15 with the SEC requesting the termination of registration of the Shares under Section 12(g) of the Exchange Act and the suspension of reporting obligations under Sections 13 and 15(d) of the Exchange Act with respect to the Shares.

The information set forth in the Introductory Note and Item 2.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 3.03. Material Modification to Rights of Security Holders.**

The information set forth in the Introductory Note, Item 2.01, Item 3.01 and Item 5.03 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 5.01. Changes in Control of Registrant.**

The information set forth in the Introductory Note, Item 2.01, Item 5.02 and Item 5.03 of this Current Report on Form 8-K is incorporated herein by reference.

As a result of the Merger, at the Effective Time, a change in control of the Company occurred, and the Company became a wholly-owned subsidiary of Parent. Parent funded the consideration payable in connection with the Merger and paid the fees and expenses required to be paid at the Closing Date of the Merger by Parent and Merger Sub under the A&R Merger Agreement, with debt and equity financing.

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

Pursuant to the terms of the A&R Merger Agreement, at the Effective Time, each of the directors of the Company (Angus C. Russell, Chris Nolet, Jill Beraud, Vlad Coric, Mark J. Foley, Julian S. Gangolli, Carey O'Connor Kolaja and Olivia C. Ware) resigned as directors of the Company. These resignations were in connection with the Merger and not as a result of any disagreements between the Company and the resigning individuals or any matters related to the Company's operations, policies or practices.

As of the Effective Time, in accordance with the A&R Merger Agreement, Jeffery A Bedard became the sole director of the Company.

Pursuant to the terms of the A&R Merger Agreement, the officers of Merger Sub immediately prior to the Effective Time became the officers of the surviving corporation, effective as of the Effective Time. The officers of Merger Sub immediately prior to the Effective Time were Jeffery A Bedard as Chief Executive Officer, Nadeem Moiz as President, Chief Financial Officer and Chief Operating Officer, and Shellie L. Hammock as Executive Vice President, General Counsel and Secretary. Following completion of the Merger, all of the incumbent officers of the Company, as of immediately prior to the effectiveness of the Merger, were removed as officers of the Company.

Biographical and other information with respect to Jeffery A Bedard, Nadeem Moiz, and Shellie L. Hammock is set forth in Schedule I to the Offer to Purchase, a copy of which is attached as Exhibit (a)(1)(A) to the Tender Offer Statement on Schedule TO filed with the SEC by Parent on December 12, 2024 and is incorporated herein by reference.

The information set forth in the Introductory Note of this Current Report on Form 8-K is incorporated herein by reference.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

Pursuant to the terms of the A&R Merger Agreement, at the Effective Time, Revance's certificate of incorporation and bylaws were each amended and restated in their entirety. Copies of the amended and restated certificate of incorporation and amended and restated bylaws are attached as Exhibit 3.1 and Exhibit 3.2, respectively, to this Current Report on Form 8-K, and are incorporated herein by reference.

**Item 7.01. Regulation FD Disclosure.**

On February 6, 2025, the Parent issued a press release announcing the completion of the Merger. A copy of the press release is attached as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1 | Amended and Restated Agreement and Plan of Merger, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc., dated as of December 7, 2024 (incorporated by reference to Exhibit 2.1 to the Form 8-K filed by Revance with the SEC on December 9, 2024). |
| 2.2 | Amendment to the Amended and Restated Agreement and Plan of Merger, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc., dated as of December 11, 2024 (incorporated by reference to Exhibit 2.1 to the Form 8-K filed by Revance with the SEC on December 12, 2024). |
| 2.3 | Amendment No. 2 to the Amended and Restated Agreement and Plan of Merger, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc., dated as of January 17, 2025 (incorporated by reference to Exhibit 2.1 to the Form 8-K filed by Revance with the SEC on January 21, 2025). |
| 3.1 | Amended and Restated Certificate of Incorporation of Revance Therapeutics, Inc. |
| 3.2 | Amended and Restated By-Laws of Revance Therapeutics, Inc. |
| 4.1 | First Supplemental Indenture, by and among Revance Therapeutics, Inc. and U.S. Bank Trust Company, National Association, dated as of February 6, 2025. |
| 99.1 | Press Release issued by Crown Laboratories, Inc., dated February 6, 2025. |
| 99.2 | Schedule I: Directors and Executive Officers of Crown, Merger Sub and Certain Related Parties (incorporated by reference to Exhibit (a)(1)(A) to the Tender Offer Statement on Schedule TO filed by Crown with the SEC on December 12, 2024). |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Revance Therapeutics, Inc.

By: /s/ Jeffery A. Bedard
Name: Jeffery A. Bedard
Title: Chief Executive Officer

Date: February 6, 2025

# EXHIBIT 30

Home » Company Search

# Revance Therapeutics, Inc.

Investor Toolkit: On

## [+] Company Information

## Latest Filings (excluding insider transactions)

- May 15, 2025 - SCHEDULE 13G/A: Schedule filed by certain investors to report beneficial ownership of more than 5% of a class of equity securities - *amendment* Filing
- May 15, 2025 - SCHEDULE 13G/A: Schedule filed by certain investors to report beneficial ownership of more than 5% of a class of equity securities - *amendment* Filing
- March 6, 2025 - SCHEDULE 13G/A: Schedule filed by certain investors to report beneficial ownership of more than 5% of a class of equity securities - *amendment* Filing
- February 18, 2025 - 15-12G: Securities registration termination [Section 12(g)] Filing
- February 13, 2025 - SCHEDULE 13G/A: Schedule filed by certain investors to report beneficial ownership of more than 5% of a class of equity securities - *amendment* Filing

Hide filings

## Selected Filings

### [+] 8-K (current reports)

### [+] 10-K (annual reports) and 10-Q (quarterly reports)

### [+] Proxy (annual meeting) and information statements

### [+] Ownership disclosures

## Filings

Annual & quarterly reports | Search table | From Date (yyyy-mm-dd) | To Date (yyyy-mm-dd) | Clear

How to read a 10-K/10-Q

Keywords | Search text in documents

Show columns:

☑ Form type ☑ Form description ☑ Filing date ☑ Reporting date ☐ Act ☐ Film number ☐ File number ☐ Accession number ☐ Size

Copy to clipboard | CSV | Excel | Print | RSS feed

| Form type | Form description | Filing date | |
|---|---|---|---|
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2024-11-07 | 2024-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2024-08-08 | 2024-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2024-05-09 | 2024-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2024-02-28 | 2023-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2023-11-08 | 2023-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2023-08-08 | 2023-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2023-05-09 | 2023-03-31 |

| | | | |
|---|---|---|---|
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2023-02-28 | 2022-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2022-11-08 | 2022-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2022-08-09 | 2022-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2022-05-10 | 2022-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2022-02-28 | 2021-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2021-11-09 | 2021-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2021-08-05 | 2021-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2021-05-10 | 2021-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2021-02-25 | 2020-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2020-11-09 | 2020-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2020-08-06 | 2020-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2020-05-07 | 2020-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2020-02-26 | 2019-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2019-11-04 | 2019-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2019-08-06 | 2019-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2019-05-09 | 2019-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2019-02-28 | 2018-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2018-11-02 | 2018-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2018-08-03 | 2018-06-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2018-05-09 | 2018-03-31 |
| 10-K | Annual report [Section 13 and 15(d), not S-K Item 405] Filing | 2018-03-02 | 2017-12-31 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2017-11-03 | 2017-09-30 |
| 10-Q | Quarterly report [Sections 13 or 15(d)] Filing | 2017-08-04 | 2017-06-30 |

Showing 1 to 34 of 44 entries
Data source: CIK0001479290.json

## Investor Resources

### How to Use EDGAR

Learn how to use EDGAR to research public filings by public companies, mutual funds, ETFs, some annuities, and more.

### Before you Invest, Investor.gov

Get answers to your investing questions from the SEC's website dedicated to retail investors

# EXHIBIT 31

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2024

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ___ to ___

Commission File No. 001-36297

# Revance Therapeutics, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0551645** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
(Address, including zip code, of principal executive offices)

**(615) 724-7755**
(Registrant's telephone number, including area code)

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | RVNC | Nasdaq Global Market |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ | Emerging growth company | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares outstanding of the registrant's common stock, par value $0.001 per share, as of October 31, 2024: 104,902,388

C.A. No. 21-1411-RGA-LDH
**Plaintiffs' Trial Exhibit**
**PTX-853**

**Table of Contents**


| | | Page |
|---|---|---|
| Defined Terms | | i |
| PART I. FINANCIAL INFORMATION | | |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 1 |
| | Condensed Consolidated Balance Sheets | 2 |
| | Condensed Consolidated Statements of Operations and Comprehensive Loss | 3 |
| | Condensed Consolidated Statements of Stockholders' Deficit | 4 |
| | Condensed Consolidated Statements of Cash Flows | 6 |
| | Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 45 |
| Item 4. | Controls and Procedures | 46 |
| PART II. OTHER INFORMATION | | |
| Item 1. | Legal Proceedings | 47 |
| Item 1A. | Risk Factors | 47 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 51 |
| Item 3. | Defaults Upon Senior Securities | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| Item 5. | Other Information | 51 |
| Item 6. | Exhibits | 52 |
| Signatures | | |

**DEFINED TERMS**

Unless expressly indicated or the context requires otherwise, the terms "Revance," "Company," "we," "us," and "our," in this Quarterly Report on Form 10-Q (this "Report") refer to Revance Therapeutics, Inc., a Delaware corporation, and, where appropriate, its wholly-owned subsidiaries. We also have used several other terms in this Report, the condensed consolidated financial statements and accompanying notes included herein, most of which are explained or defined below.

**"2014 EIP"** means the Company's 2014 Equity Incentive Plan.

**"2014 ESPP"** means the Company's 2014 Employee Stock Purchase Plan.

**"2014 IN"** means the Company's 2014 Inducement Plan.

**"2022 ATM Agreement"** means the Sales Agreement by and between Revance and Cowen, dated May 10, 2022.

**"2027 Notes"** means Revance's 1.75% Convertible Senior Notes due 2027.

**"ABPS"** means Ajinomoto Althea, Inc., doing business as Ajinomoto Bio-Pharma Services, a contract development and manufacturing organization.

**"ABPS Services Agreement"** means the Technology Transfer, Validation and Commercial Fill/Finish Services Agreement by and between the Company and ABPS, dated March 14, 2017, as amended on December 18, 2020.

**"Allergan"** means Allergan, Inc.

**"ANZ Distribution Agreement"** means the Exclusive Distribution Agreement by and among the Company, Teoxane, and Revance Australia Pty. Ltd., dated as of October 24, 2024.

**"ASC"** means the Accounting Standards Codification as set forth by the Financial Accounting Standards Board.

**"ASU"** means Accounting Standards Update issued by the FASB.

**"Athyrium"** means Athyrium Buffalo LP.

**"ATM"** means at-the-market offering program.

**"BTRX"** means Botulinum Toxin Research Associates, Inc.

**"Buyer Parties"** means Crown and Merger Sub.

**"Consolidated Teoxane Distribution Net Product Sales"** has the meaning set forth in the Note Purchase Agreement.

**"consumers"** means the patients of our aesthetic practice customers.

**"Cowen"** means Cowen and Company, LLC.

**"CROs"** means contract research organizations.

**"Crown"** means Crown Laboratories, Inc., a Delaware corporation.

**"DAXXIFY®"** means (DaxibotulinumtoxinA-lanm) for injection.

**"DAXXIFY® GL Approval"** means the FDA approval in September 2022, of DAXXIFY® in the United States for the temporary improvement of moderate to severe glabellar lines in adults.

**"DAXXIFY® GL Approval PSUs"** means performance stock units that vested on the 6-month anniversary of the date of DAXXIFY® GL Approval.

**"Exchange Act"** means the U.S. Securities Exchange Act of 1934, as amended.

**"FASB"** means the Financial Accounting Standards Board.

**"FDA"** means the United States Food and Drug Administration.

**"Fintech Platform"** means OPUL® and the HintMD Platform.

**"First Amendment"** means the first amendment to the Note Purchase Agreement, by and among the Company, HintMD and Athyrium, dated August 8, 2023.

**"First Tranche"** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $100.0 million on March 18, 2022.

**"Fosun"** means Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd.

**"Fosun License Agreement"** means the License Agreement by and between Revance and Fosun, dated December 4, 2018, as amended on February 15, 2020.

**"Fosun Territory"** means mainland China, Hong Kong and Macau.

**"FY2023 Form 10-K"** means our Annual Report on Form 10-K for the year ended December 31, 2023, which was filed with the SEC on February 28, 2024.

**"HintMD"** means Hint, Inc., our wholly owned subsidiary.

**"HintMD Plan"** means the Hint, Inc. 2017 Equity Incentive Plan.

**"HintMD Platform"** means the legacy HintMD fintech platform.

**"Indenture"** means the indenture, by and between Revance and U.S. Bank National Association, as trustee, dated February 14, 2020.

**"injector"** means a professional licensed to inject our Products, including physicians.

**"Maturity Date"** means September 18, 2026, the maturity date of the Notes Payable set forth in the Note Purchase Agreement.

**"Merger"** means the pending merger by and between Crown, Merger Sub and the Company pursuant to the Merger Agreement, whereby Merger Sub will be merged with and into the Company, with the Company surviving as a wholly owned subsidiary of Crown.

**"Merger Agreement"** means the Agreement and Plan of Merger entered into by and between Crown, Merger Sub and the Company as of August 11, 2024, as amended from time to time.

**"Merger Sub"** means Reba Merger Sub, Inc., a Delaware corporation.

**"Minimum Cash Covenant"** means the financial covenant under the Note Purchase Agreement to maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times.

**"Minimum Condition"** means the closing condition that a majority of the voting power of the Company common stock be validly tendered as of the expiration of the Offer.

**"NMPA"** means China's National Medical Products Administration.

**"Note Purchase Agreement"** means the note purchase agreement by and between Revance; Athyrium, as administrative agent; the Purchasers, including Athyrium; and HintMD, as a guarantor, dated March 18, 2022.

**"Notes Payable"** means notes payable by Revance pursuant to the Note Purchase Agreement.

**"NPA Effective Date"** means the effective date of the Note Purchase Agreement, March 18, 2022.

**"Offer"** means the tender offer to be commenced by Crown to purchase all of the outstanding shares of common stock of the Company, pursuant to the Merger Agreement.

**"onabotulinumtoxinA biosimilar"** means a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®.

**"option counterparties"** means capped call transactions with a purchaser and another financial institution.

**"OPUL®"** means the OPUL® Relational Commerce Platform.

**"PAS"** means prior approval supplement.

**"PCI"** means PCI Pharma Services, formerly known as Lyophilization Services of New England, Inc., which was acquired by PCI in December 2021.

**"PCI Supply Agreement"** means the Commercial Supply Agreement by and between Revance and PCI, dated April 6, 2021.

**"Products"** means DAXXIFY® and the RHA® Collection of dermal fillers.

**"PSAs"** means a performance stock award.

**"PSUs"** means a performance stock unit.

**"Purchasers"** means Athyrium and its successors and assigns.

**"Revance Australia"** means Revance Australia Pty. Ltd., a wholly owned subsidiary of the Company.

**"RHA® Collection of dermal fillers"** means RHA® 2, RHA® 3 and RHA® 4, which have been approved by the FDA for the correction of moderate to severe dynamic facial wrinkles and folds; and RHA® Redensity. The RHA® Collection of dermal fillers is manufactured in Switzerland by Teoxane.

**"RHA® Pipeline Products"** means future hyaluronic acid filler advancements and products by Teoxane.

**"RHA® Redensity"** means a dermal filler, which has been approved by the FDA for the treatment of moderate to severe dynamic perioral rhytids (lip lines).

**"RSAs"** means restricted stock awards.

**"RSUs"** means restricted stock units.

**"SEC"** means the U.S. Securities and Exchange Commission.

**"Second Tranche"** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $50.0 million on August 28, 2023.

**"Securities Act"** means the U.S. Securities Act of 1933, as amended.

**"Services"** means the Fintech Platform business.

**"Service Segment"** means the business that includes the development and commercialization of the Fintech Platform.

**"Settlement Agreement"** means the Settlement and Release Agreement by and between the Company and Teoxane, dated as of October 24, 2024.

**"Sixth Amendment"** means the Sixth Amendment to the Teoxane Agreement, dated as of October 24, 2024.

**"Superior Proposal"** means any bona fide written offer for at least 50% of the Company that is reasonably likely to be consummated and, if consummated, would be more favorable from a financial point of view to the Company's stockholders than the transactions contemplated by the Merger Agreement, taking into account any factors the Board deems appropriate and after considering revisions to the Merger Agreement committed to in writing by Crown in response to such acquisition proposal.

**"TGA"** means the Australian Therapeutics Goods Administration.

**"Third Tranche"** means the uncommitted tranche of additional Notes Payable in an aggregate amount of up to $150.0 million, which was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement.

**"Teoxane"** means Teoxane SA.

**"Teoxane Agreement"** means the exclusive distribution agreement by and between Revance and Teoxane, dated January 10, 2020, as amended on September 30, 2020, December 22, 2020, December 22, 2022, June 13, 2024, July 29, 2024 and October 24, 2024.

**"U.S. GAAP"** means U.S. generally accepted accounting principles.

**"Viatris"** means Viatris Inc., formerly known as Mylan Ireland Ltd.

**"Viatris Agreement"** means the Collaboration and License Agreement by Revance and Viatris, dated February 28, 2018, as amended on August 22, 2019.

**"Viatris Territory"** means world-wide (excluding Japan).

**"Zero-cost Inventory"** means DAXXIFY® inventory produced prior to the DAXXIFY® GL Approval in early September 2022, for which the related manufacturing costs were incurred and expensed to research and development expense prior to the FDA approval.

Revance®, the Revance logos, DAXXIFY®, OPUL® and other trademarks or service marks of Revance appearing in this Report are the property of Revance. This Report contains additional trade names, trademarks and service marks of others, which are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

**PART I. FINANCIAL INFORMATION**

**ITEM 1. Condensed Consolidated Financial Statements (Unaudited)**

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 58,585 | $ 137,329 |
| Restricted cash, current | 465 | 550 |
| Short-term investments | 125,491 | 116,586 |
| Accounts receivable, net | 48,263 | 27,660 |
| Inventories | 85,213 | 45,579 |
| Prepaid expenses and other current assets | 9,935 | 9,308 |
| Current assets of discontinued operations | 1,735 | 1,853 |
| Total current assets | 329,687 | 338,865 |
| Property and equipment, net | 15,897 | 17,225 |
| Intangible assets, net | 7,634 | 9,270 |
| Operating lease right-of-use assets | 47,996 | 53,167 |
| Finance lease right-of-use asset | 13,100 | 19,815 |
| Restricted cash, non-current | 5,564 | 5,995 |
| Finance lease prepaid expense | 41,514 | 32,383 |
| Other non-current assets | 172 | 321 |
| Non-current assets of discontinued operations | — | 1,413 |
| TOTAL ASSETS | $ 461,564 | $ 478,454 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 12,335 | $ 13,554 |
| Accruals and other current liabilities | 34,022 | 52,863 |
| Deferred revenue, current | 6,329 | 10,737 |
| Operating lease liabilities, current | 6,372 | 5,703 |
| Finance lease liability, current | 10,841 | 2,651 |
| Debt, current | 10,150 | 2,500 |
| Current liabilities of discontinued operations | — | 1,216 |
| Total current liabilities | 80,049 | 89,224 |
| Debt, non-current | 421,041 | 426,595 |
| Deferred revenue, non-current | 85,550 | 70,419 |
| Operating lease liabilities, non-current | 35,043 | 40,985 |
| Other non-current liabilities | 2,911 | 2,835 |
| TOTAL LIABILITIES | 624,594 | 630,058 |
| Commitments and Contingencies (Note 13) | | |
| STOCKHOLDERS' DEFICIT | | |
| Preferred stock, par value $0.001 per share — 5,000,000 shares authorized, and no shares issued and outstanding as of September 30, 2024 and December 31, 2023 | — | — |
| Common stock, par value $0.001 per share — 190,000,000 shares authorized as of September 30, 2024 and December 31, 2023; 104,895,611 and 87,962,765 shares issued and outstanding as of September 30, 2024 and December 31, 2023, respectively | 105 | 88 |
| Additional paid-in capital | 2,043,893 | 1,926,654 |
| Accumulated other comprehensive gain | 72 | 14 |
| Accumulated deficit | (2,207,100) | (2,078,360) |
| TOTAL STOCKHOLDERS' DEFICIT | (163,030) | (151,604) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 461,564 | $ 478,454 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended September 30, 2024 | Three Months Ended September 30, 2023 | Nine Months Ended September 30, 2024 | Nine Months Ended September 30, 2023 |
|---|---|---|---|---|
| Revenue: | | | | |
| Product revenue, net | $ 58,827 | $ 54,109 | $ 175,874 | $ 154,160 |
| Collaboration revenue | 1,052 | 3 | 1,330 | 139 |
| Total revenue, net | 59,879 | 54,112 | 177,204 | 154,299 |
| Operating expenses: | | | | |
| Cost of product revenue (exclusive of amortization) | 17,633 | 16,821 | 50,179 | 46,915 |
| Selling, general and administrative | 62,578 | 65,791 | 197,314 | 202,523 |
| Research and development | 11,379 | 8,688 | 41,674 | 43,844 |
| Amortization | 545 | 374 | 1,636 | 1,636 |
| Total operating expenses | 92,135 | 91,674 | 290,803 | 294,918 |
| Loss from continuing operations | (32,256) | (37,562) | (113,599) | (140,619) |
| Interest income | 2,631 | 3,733 | 8,806 | 9,851 |
| Interest expense | (6,732) | (5,093) | (17,667) | (13,958) |
| Other expense, net | (258) | (223) | (1,149) | (1,056) |
| Loss from continuing operations before income taxes | (36,615) | (39,145) | (123,609) | (145,782) |
| Income tax provision | (1,500) | (300) | (1,500) | (300) |
| Net loss from continuing operations | (38,115) | (39,445) | (125,109) | (146,082) |
| Net loss from discontinued operations | — | (101,731) | (3,631) | (122,205) |
| Total net loss | (38,115) | (141,176) | (128,740) | (268,287) |
| Unrealized gain | 98 | 48 | 58 | 361 |
| Comprehensive loss | $ (38,017) | $ (141,128) | $ (128,682) | $ (267,926) |
| | | | | |
| Basic and diluted net loss per share: | | | | |
| Continuing operations | $ (0.37) | $ (0.46) | $ (1.25) | $ (1.74) |
| Discontinued operations | — | (1.17) | (0.04) | (1.46) |
| Total net loss per basic and diluted share | $ (0.37) | $ (1.63) | $ (1.29) | $ (3.20) |
| | | | | |
| Basic and diluted weighted-average number of shares used in computing net loss per share | 104,212,891 | 86,613,425 | 100,016,088 | 83,816,577 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.



PTX-853.0009

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Stockholders' Equity (Deficit)**
**(In thousands, except share amounts)**
**(Unaudited)**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Preferred Stock** | — | $ — | — | $ — | — | $ — | — | $ — |
| **Common Stock** | | | | | | | | |
| Balance — Beginning of period | 104,810,881 | 105 | 87,949,987 | 88 | 87,962,765 | 88 | 82,385,810 | 82 |
| Issuance of common stock in connection with follow-on offering | — | — | — | — | 16,000,000 | 16 | — | — |
| Issuance of common stock related to stock awards, net of cancellation | 98,306 | — | 40,639 | — | 755,906 | 1 | 1,689,456 | 2 |
| Issuance of common stock relating to employee stock purchase plan | — | — | — | — | 240,272 | — | 157,313 | — |
| Issuance of common stock upon exercise of stock options | 1,769 | — | 23,076 | — | 22,292 | — | 694,300 | 1 |
| Shares withheld related to net settlement of stock awards | (15,345) | — | (200,387) | — | (85,624) | — | (337,331) | — |
| Issuance of common stock related to ATM | — | — | — | — | — | — | 3,223,767 | 3 |
| Balance — End of period | 104,895,611 | 105 | 87,813,315 | 88 | 104,895,611 | 105 | 87,813,315 | 88 |
| **Additional Paid-In Capital** | | | | | | | | |
| Balance — Beginning of period | — | 2,039,168 | — | 1,908,244 | — | 1,926,654 | — | 1,767,266 |
| Issuance of common stock in connection with follow-on offering, net of underwriting discounts and offering costs | — | — | — | — | — | 97,103 | — | — |
| Issuance of common stock relating to employee stock purchase plan | — | — | — | — | — | 525 | — | 2,455 |
| Issuance of common stock upon exercise of stock options | — | 5 | — | 58 | — | 57 | — | 11,573 |
| Shares withheld related to net settlement of stock awards | — | (92) | — | (3,774) | — | (534) | — | (8,068) |
| Issuance of common stock related to stock awards, net of cancellation | — | — | — | — | — | (1) | — | (2) |
| Issuance of common stock related to ATM, net of commissions and issuance costs | — | — | — | — | — | — | — | 99,956 |
| Stock-based compensation | — | 4,812 | — | 11,857 | — | 20,089 | — | 43,175 |
| Other | — | — | — | — | — | — | — | 30 |
| Balance — End of period | — | 2,043,893 | — | 1,916,385 | — | 2,043,893 | — | 1,916,385 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

Table of Contents

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Stockholders' Equity (Deficit) — (Continued)**
**(In thousands, except share amounts)**
**(Unaudited)**

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Other Accumulated Comprehensive Gain (Loss)** | | | | | | | | |
| Balance — Beginning of period | — | (26) | — | (61) | — | 14 | — | (374) |
| Unrealized gain | — | 98 | — | 48 | — | 58 | — | 361 |
| Balance — End of period | — | 72 | — | (13) | — | 72 | — | (13) |
| **Accumulated Deficit** | | | | | | | | |
| Balance — Beginning of period | — | (2,168,985) | — | (1,881,485) | — | (2,078,360) | — | (1,754,374) |
| Total net loss | — | (38,115) | — | (141,176) | — | (128,740) | — | (268,287) |
| Balance — End of period | — | (2,207,100) | — | (2,022,661) | — | (2,207,100) | — | (2,022,661) |
| **Total Stockholders' Equity (Deficit)** | 104,895,611 | $ (163,030) | 87,813,315 | $ (106,201) | 104,895,611 | $ (163,030) | 87,813,315 | $ (106,201) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Cash Flows**
**(In thousands)**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2024 | 2023 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Total net loss | $ (128,740) | $ (268,287) |
| Adjustments to reconcile total net loss to net cash used in operating activities: | | |
| Stock-based compensation | 19,367 | 38,968 |
| Depreciation and amortization | 4,662 | 9,956 |
| Amortization of debt discount, issuance costs, and exit fee | 3,516 | 1,639 |
| Amortization of discount on investments | (5,000) | (5,134) |
| Amortization of finance lease right-of-use asset | — | 2,318 |
| Goodwill and intangible asset impairment | — | 93,182 |
| Other non-cash operating activities | 1,004 | 572 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (20,586) | (14,075) |
| Inventories | (10,297) | (18,068) |
| Prepaid expenses and other current assets | (526) | (12,015) |
| Lease right-of-use assets | (16,429) | (39,368) |
| Other non-current assets | (2) | 1,000 |
| Accounts payable | (2,283) | (127) |
| Accruals and other liabilities | (20,110) | (6,289) |
| Deferred revenue | 10,723 | 4,242 |
| Lease liabilities | 16,468 | 36,292 |
| Other non-current liabilities | 76 | 1,350 |
| **Net cash used in operating activities** | (148,157) | (173,844) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of investments | (227,022) | (179,922) |
| Finance lease prepayments | (9,131) | (3,383) |
| Purchases of property and equipment | (2,243) | (5,107) |
| Proceeds from maturities of investments | 223,091 | 295,782 |
| **Net cash provided by (used in) investing activities** | (15,305) | 107,370 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from issuance of common stock in connection with follow-on offering, net of underwriting discounts | 97,626 | — |
| Proceeds from the exercise of stock options and employee stock purchase plan | 582 | 14,028 |
| Principal payments on finance lease obligations | (12,572) | (15,513) |
| Payment of debt principal and exit fee | (1,269) | — |
| Taxes paid related to net settlement of stock awards | (534) | (8,068) |
| Payment of offering costs | (506) | (849) |
| Proceeds from issuance of common stock in connection with ATM, net of commissions | — | 100,183 |
| Proceeds from issuance of notes payable, net of debt discount | — | 48,415 |
| **Net cash provided by financing activities** | 83,327 | 138,196 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (80,135) | 71,722 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — Beginning of period[(1)] | 144,749 | 115,017 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — End of period[(1)] | $ 64,614 | $ 186,739 |

(1) Cash, cash equivalents, and restricted cash included $0.9 million of restricted cash classified as non-current assets of discontinued operations as of December 31, 2023 on condensed consolidated balance sheets.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements**

**(Unaudited)**

## 1. The Company and Summary of Significant Accounting Policies

### Overview

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

### Liquidity and Going Concern

We are not profitable and have incurred losses in each year since our inception. For the three and nine months ended September 30, 2024, we had a total net loss of $38.1 million and $128.7 million, respectively. As of September 30, 2024, we had an accumulated deficit of $2.2 billion. Although we generate revenue from the sale of our Products, we expect to continue to incur operating losses for the foreseeable future.

As of September 30, 2024, we had a working capital surplus of $249.6 million and capital resources of $184.1 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement, and payments received from collaboration arrangements. We also have a remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of September 30, 2024.

In accordance with ASC 205-40, *Presentation of Financial Statements – Going Concern*, we are required to evaluate whether there are conditions and events, considered in the aggregate, that raise substantial doubt about our ability to continue as a going concern for at least 12 months from the issuance date of our financial statements. Our forecasted liquidity is based on our current operating plan and excludes any impact from the pending consummation of the Merger. Based on that plan and excluding any impact of the pending consummation of the Merger, our existing cash, cash equivalents, and short-term investments will not allow us to fund our operations for at least 12 months following the filing of this Report. Also, we are required to maintain compliance with the Minimum Cash Covenant in accordance with the terms of the Note Purchase Agreement (see Note 10). As a result, management has concluded that there is substantial doubt about our ability to continue as a going concern.

In order to mitigate the substantial doubt to continue as a going concern, we may be required to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses. If we are unable to generate sufficient revenue to fulfill our operating plan, secure additional capital when needed or sufficiently reduce our operating expenses, we may be unable to comply with the Minimum Cash Covenant or continue to operate our business.

The accompanying condensed consolidated financial statements are prepared assuming the Company will continue as a going concern, which contemplates the realization of assets and satisfaction of liabilities in the normal course of the business. The condensed consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might result from the outcome of this uncertainty.

### Basis of Presentation and Principles of Consolidation

The accompanying condensed consolidated financial statements are unaudited, and reflect all adjustments which are, in the opinion of management, of a normal recurring nature and necessary for a fair statement of the results for the interim periods presented.

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

Our condensed consolidated balance sheet for the year ended December 31, 2023 was derived from audited consolidated financial statements, but does not include all disclosures required by U.S. GAAP. The interim results presented herein are not necessarily indicative of the results of operations that may be expected for the full fiscal year ending December 31, 2024, or any other future period. Our condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements contained in our FY2023 Form 10-K.

Our condensed consolidated financial statements include our accounts and those of our wholly-owned subsidiaries, and have been prepared in conformity with U.S. GAAP. All intercompany transactions have been eliminated.

The requirements for reporting the exit of the Fintech Platform business (Note 3) as a discontinued operation were met in the first quarter of 2024. As a result, the Fintech Platform business is presented in the condensed consolidated statement of operations and condensed consolidated balance sheet as discontinued operations for all periods presented. Unless indicated otherwise, the information in the notes to the condensed consolidated financial statements relates to continuing operations. The Company operates under one reportable segment as a result of discontinuing the Service Segment.

**Use of Estimates & Risks and Uncertainties**

The preparation of the condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities in the condensed consolidated financial statements and accompanying notes. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical information and on various other assumptions that we believe are reasonable under the circumstances. U.S. GAAP requires us to make estimates and judgments in several areas, including, but not limited to, the incremental borrowing rate used to measure lease liabilities, the recoverability of long-lived assets, useful lives associated with property and equipment and intangible assets, the period of benefit associated with deferred costs, revenue recognition (including the timing of satisfaction of performance obligations, estimating variable consideration, estimating stand-alone selling prices of promised goods and services, and allocation of transaction price to performance obligations), deferred revenue classification, valuation and assumptions underlying stock-based compensation and other equity instruments, and income taxes.

As of the date of issuance of these condensed consolidated financial statements, we are not aware of any specific event or circumstance that would require us to update our estimates, judgments or revise the carrying value of our assets or liabilities. These estimates may change as new events occur and additional information is obtained, and are recognized in the condensed consolidated financial statements as soon as they become known. Actual results could differ from those estimates and any such differences may be material to our condensed consolidated financial statements.

**Significant Accounting Policies**

There have been no material changes to our significant accounting policies from our FY2023 Form 10-K.

**Recent Accounting Pronouncements**

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*. This standard requires public entities to disclose information about their reportable segments' significant expenses and other segment items on an interim and annual basis. Public entities with a single reportable segment are required to apply the disclosure requirements in ASU 2023-07, as well as all existing segment disclosures and reconciliation requirements in ASC 280, on an interim and annual basis. ASU 2023-07 is effective for fiscal years beginning after December 15, 2023 and for interim periods beginning after December 15, 2024, with early adoptions permitted. We are currently evaluating the impact of adopting ASU 2023-07.

In December 2023, the FASB issued ASU 2023-09, *Income Taxes (Topic 740)*. ASU 2023-09 improves reporting for income taxes, primarily by requiring disclosure of specific categories in the tax rate reconciliation and providing additional annual information for reconciling items that meet a quantitative threshold. The amendments in ASU 2023-09 also require additional annual information regarding income taxes paid, as well as other additional disclosures. The amendments

in ASU 2023-09 are effective for fiscal years beginning after December 15, 2024, early adoption is permitted. We are currently evaluating the effect the amendments in ASU 2023-09 will have on our tax disclosures.

In November 2024, the FASB issued ASU 2024-03, *Disaggregation of Income Statement Expense.* This update requires entities to disaggregate operating expenses into specific categories, such as salaries and wages, depreciation, and amortization, to provide enhanced transparency into the nature and function of expenses. ASU 2024-03 is effective for fiscal years beginning after December 15, 2026, with early adoption permitted. ASU 2024-03 may be applied retrospectively or prospectively. We are currently evaluating the impact of ASU 2024-03 on our financial statement presentation and disclosures.

**2. Pending Merger**

On August 11, 2024, the Company and the Buyer Parties entered into the Merger Agreement, pursuant to which Crown will cause Merger Sub to commence the Offer as promptly as practicable, but in no event later than fifteen business days after the date of the Merger Agreement or such other date as may be agreed to between the Company and Crown, to purchase all of our outstanding shares of common stock, par value $0.001 per share (each a "Share" and collectively, the "Shares") at a price of $6.66 per Share, in cash, without interest and less any required tax withholding. As a result of discussions between the Company and Teoxane regarding an alleged breach of the Teoxane Agreement, the Buyer Parties extended the date by which Merger Sub was obligated to commence the tender offer for all of the Shares pursuant to the Merger Agreement. The Company and Crown agreed to extend the Offer commencement date to November 12, 2024. The Merger Agreement contemplates that, as soon as practicable following the consummation of the Offer, on the terms and subject to the conditions set forth in the Merger Agreement, Merger Sub will be merged with and into the Company, with the Company surviving as a wholly owned subsidiary of Crown. The Offer has not commenced. If the Offer commences, consummation of the Offer and closing of the Merger will remain subject to customary closing conditions, including (i) the Minimum Condition; (ii) the absence of any order, injunction or law prohibiting the Offer or the closing of the Merger; (iii) obtaining applicable approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which approval has already been received; and (iv) the accuracy of the representations and warranties contained in the Merger Agreement, subject to customary materiality qualifications, and compliance with the covenants and agreements contained in the Merger Agreement as of the closing of the Merger.

***Impact on Debt Commitments***

*2027 Notes and Capped Call Transactions*

Pursuant to the 2027 Notes, if we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date. See Note 10 for additional information. Within the time periods required by the terms of the Indenture, we have agreed to deliver any notices (including with respect to holders' rights to require repurchase or conversion of the convertible notes), certificates, supplemental indentures and other documents that might be required under the Indenture and take all other actions that are required under the terms of the 2027 Notes, the Indenture or under applicable law, including as a result of the transactions contemplated by the Merger Agreement, to the extent constituting a "Fundamental Change" or "Make-Whole Fundamental Change" (as such terms are defined in the Indenture).

Concurrently with the 2027 Notes, we entered into capped call transactions with the option counterparties and used the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. See Note 10 for additional information. Prior to the effective time of the pending Merger, we have agreed to cooperate with, and assist Crown, upon Crown's request, in terminating our outstanding capped call confirmations (collectively, the "capped calls") at, or as promptly as practicable following, the effective time. Prior to the effective time of the Merger, we have also agreed to reasonably cooperate with and assist Crown in connection with discussions, negotiations or agreements with the counterparties to the capped calls with respect to any determination, adjustment, cancellation, termination, exercise, settlement or computation in connection with the capped calls, including with respect to any cash amounts or shares of our common stock that may be receivable by us pursuant to the capped calls. We have further agreed to not (i) enter into any binding agreements in respect of the capped calls, (ii) agree to any amendments, modifications or other changes to the terms of the capped calls, or (iii) exercise any right

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

we may have to terminate, or to trigger an early settlement of, any of the capped calls (other than in connection with an early conversion of any convertible notes or the occurrence of an event of default with respect to a counterparty to the capped call), in each case without the prior written consent of Crown, which shall not be unreasonably withheld or delayed.

*Note Purchase Agreement*

Pursuant to the Merger Agreement, upon the closing of the pending Merger, the Buyer Parties agreed to discharge the indebtedness under the Note Purchase Agreement.

**3. Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business as the costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities included elimination of Fintech Platform personnel, the termination of Fintech Platform research and development activities and an elimination of outside services expenses related to the Fintech Platform. Based on such plan, substantially all payment processing activities for Fintech Platform customers ended on January 31, 2024 and we substantially completed the remaining activities to wind-down the Fintech Platform operations as of March 31, 2024.

In accordance with ASC 205-20, *Presentation of Financial Statements - Discontinued Operations*, the substantial completion of exit of the Fintech Platform business represents a strategic shift that has a major effect on the Company's operations and financial results. The Fintech Platform business was historically reported as the Service Segment. As a result, the results of our Fintech Platform business have been reflected as discontinued operations in our condensed consolidated financial statements. Our condensed consolidated balance sheet and condensed consolidated statement of operations and comprehensive loss includes reclassification of certain prior year figures to conform to the current period presentation.

Details of assets and liabilities from discontinued operations are as follows:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Accounts receivable, net | $ — | $ 16 |
| Prepaid expenses and other current assets | 1,735 | 1,837 |
| Total current assets of discontinued operations | $ 1,735 | $ 1,853 |
| | | |
| Intangible assets, net | $ — | $ 538 |
| Restricted cash, non-current | — | 875 |
| Total non-currents assets of discontinued operations | $ — | $ 1,413 |
| | | |
| Accounts payable | $ — | $ 255 |
| Accruals and other current liabilities | — | 961 |
| Total current liabilities of discontinued operations [1] | $ — | $ 1,216 |

(1) Amount represents severance and personnel liabilities related to the exit of the Fintech Platform business. We substantially completed the restructuring activities as of March 31, 2024. A summary of severance and personnel liabilities related to the exit of the Fintech Platform business, included within current liabilities of discontinued operations on the condensed consolidated balance sheet, is as follows:

| | (in thousands) |
|---|---|
| Balance on December 31, 2023 | $ 917 |
| Severance and other personnel costs | 707 |
| Cash payments during the period | (1,624) |
| Balance on September 30, 2024 | $ — |

Details of loss from discontinued operations are as follows:

| (in thousands) | Three Months Ended September 30, 2024 | Three Months Ended September 30, 2023 | Nine Months Ended September 30, 2024 | Nine Months Ended September 30, 2023 |
|---|---|---|---|---|
| Service revenue | $ — | $ 2,664 | $ 426 | $ 9,942 |
| Operating expenses: | | | | |
| Cost of service revenue (exclusive of amortization) | — | 2,592 | 350 | 9,976 |
| Selling, general and administrative [1] | — | 3,303 | 1,950 | 9,966 |
| Research and development [1] | — | 4,372 | 1,757 | 15,200 |
| Goodwill impairment | — | 77,175 | — | 77,175 |
| Intangible asset impairment | — | 16,007 | — | 16,007 |
| Amortization | — | 946 | — | 3,823 |
| Net loss from discontinued operations | $ — | $ (101,731) | $ (3,631) | $ (122,205) |

(1) The restructuring charges are included in the results of discontinued operations for the periods of our condensed consolidated financial statements presented in this Report. A summary of our restructuring charges included within our consolidated statement of operations for the three and nine months ended September 30, 2024 were as follows:

| (in thousands) | Three Months Ended September 30, 2024 | Nine Months Ended September 30, 2024 |
|---|---|---|
| Research and development | $ — | $ 336 |
| Selling, general and administrative | — | 371 |
| Total restructuring charges | $ — | $ 707 |

As of September 30, 2024, we have recorded total restructuring charges of $3.6 million and impairment charges of $93.2 million in connection with the exit of the Fintech Platform business.

The cash flows related to discontinued operations have not been segregated and are included in the condensed consolidated statements of cash flows. Significant non-cash activities related to discontinued operations are as follows:

| (in thousands) | Nine Months Ended September 30, 2024 | Nine Months Ended September 30, 2023 |
|---|---|---|
| Operating activities: | | |
| Stock-based compensation | $ (10) | $ 5,620 |
| Depreciation and amortization | $ 538 | $ 3,823 |

**4. Revenue**

Our revenue is primarily generated from U.S. customers. Our product revenue is generated by transferring goods at a point in time and our collaboration revenue is generated over time.

**Product Revenue, net**

Our product revenue, net breakdown is summarized below:

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

| (in thousands) | Three Months Ended September 30, 2024 | Three Months Ended September 30, 2023 | Nine Months Ended September 30, 2024 | Nine Months Ended September 30, 2023 |
|---|---|---|---|---|
| Product: | | | | |
| RHA® Collection of dermal fillers | $ 30,503 | $ 32,133 | $ 96,704 | $ 94,180 |
| DAXXIFY® | 28,324 | 21,976 | 79,170 | 59,980 |
| Total product revenue, net | $ 58,827 | $ 54,109 | $ 175,874 | $ 154,160 |

Accounts receivable and contract liabilities from contracts with our product customers are as follows:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, gross | $ 35,961 | $ 27,975 |
| Allowance for doubtful accounts | (1,544) | (950) |
| Total accounts receivable, net | $ 34,417 | $ 27,025 |
| | | |
| Contract liabilities: | | |
| Deferred revenue, current | $ 383 | $ 884 |
| Total contract liabilities, current | $ 383 | $ 884 |

**Collaboration Revenue**

***Viatris Agreement***

*Agreement Terms*

We entered into the Viatris Agreement in February 2018, pursuant to which we are collaborating with Viatris exclusively, in the Viatris Territory, to develop, manufacture, and commercialize an onabotulinumtoxinA biosimilar.

Viatris has paid us an aggregate of $60 million in non-refundable upfront and milestone fees as of September 30, 2024, and the agreement provides for additional remaining contingent payments of up to $70 million in the aggregate, upon the achievement of certain clinical and regulatory milestones and of specified, tiered sales milestones of up to $225 million. The payments do not represent a financing component for the transfer of goods or services. In addition, Viatris is required to pay us low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single-digit royalties on any sales in other ex-U.S. Viatris territories. However, we have agreed to waive royalties for U.S. sales, up to a maximum of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs.

*Revenue Recognition*

We estimated the transaction price for the Viatris Agreement using the most likely amount method within the scope of ASC 606. In order to determine the transaction price, we evaluated all of the payments to be received during the duration of the contract, which included milestones and consideration payable by Viatris. Other than the upfront payment, all other milestones and consideration we may earn under the Viatris Agreement are subject to uncertainties related to development achievements, Viatris' rights to terminate the agreement, and estimated effort for cost-sharing payments. Components of such estimated effort for cost-sharing payments include both internal and external costs. Consequently, the transaction price does not include any milestones and considerations that, if included, could result in a probable significant reversal of revenue when related uncertainties become resolved. At the end of each reporting period, we re-evaluate the probability of achievement of each such milestone and any related constraint, and if necessary, adjust our estimates of the overall transaction price. Sales-based milestones and royalties are not included in the transaction price until the sales occur because the underlying value



PTX-853.0018

relates to the license and the license is the predominant feature in the Viatris Agreement. As of September 30, 2024, the transaction price allocated to the unfulfilled performance obligations was $30.0 million.

We recognize revenue and estimate deferred revenue based on the cost of development service incurred over the total estimated cost of development services to be provided for the development period. For revenue recognition purposes, the development period has an estimated accounting program end date of 2030. It is possible that this period will change and is assessed at each reporting date. ASC Topic 606, Revenue from Contracts with Customers (ASC 606) requires that an entity include a constraint on the amount of variable consideration included in the transaction price. Variable consideration is considered "constrained" if there is a potential for significant reversal of cumulative revenue recognized. As part of the constraint evaluation, we considered numerous factors, including a shift in certain responsibilities between the two parties which would result in changes to the net cost sharing payments and the total project budget, for which outcomes are difficult to predict as of the date of this Report. We will continue to evaluate the variable transaction price and related revenue recognition in each reporting period and as the above uncertainties are resolved or other changes in circumstances occur. For the three and nine months ended September 30, 2024, we recognized revenue related to development services under the Viatris Agreement of $1.0 million and $1.3 million, respectively. For the three and nine months ended September 30, 2023, no collaboration revenue is recognized from the biosimilar program.

***Fosun License Agreement***

*Agreement Terms*

In December 2018, we entered into the Fosun License Agreement with Fosun, whereby we granted Fosun the exclusive rights to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory and certain sublicense rights.

As of September 30, 2024, Fosun has paid us non-refundable upfront and other payments totaling $41.0 million before foreign withholding taxes. Upon China's NMPA approval of DAXXIFY® for the improvement of glabellar lines in September 2024, Fosun was obligated to pay us a milestone payment of $13.5 million, net of $1.5 million foreign withholding taxes, which we received in October 2024. We are also eligible to receive (i) additional remaining contingent payments of up to $204.5 million upon the achievement of certain milestones, and (ii) tiered royalty payments in low double digits to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) we do not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third-parties to either avoid patent infringement or market the product in the Fosun Territory.

*Revenue Recognition*

We estimated the transaction price for the Fosun License Agreement using the most likely amount method. We evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. We will re-evaluate the transaction price at each reporting period and upon a change in circumstances. As of September 30, 2024, the transaction price allocated to unfulfilled performance obligation is $56.0 million. For the three and nine months ended September 30, 2024, no revenue was recognized from the Fosun License Agreement. For the three and nine months ended September 30, 2023, we recognized revenue of less than $0.1 million and $0.1 million, respectively, related to the Fosun License Agreement.

We will recognize revenue on the single performance obligation as control of DAXXIFY® is supplied to Fosun. Upon commencement of the transfer of control, revenue will be recognized in a pattern consistent with estimated deliveries of DAXXIFY® through the term of the arrangement, which is estimated to extend through 2040. It is possible that this period will change and is assessed at each reporting date.

Table of Contents



Accounts receivable and contract liabilities from contracts with our collaboration customers are as follows:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, net — Viatris | $ 346 | $ 631 |
| Accounts receivable, net — Fosun | 13,500 | 4 |
| Total accounts receivable, net | $ 13,846 | $ 635 |
| | | |
| Contract liabilities: | | |
| Deferred revenue, current — Viatris | $ 5,723 | $ 9,853 |
| Deferred revenue, current — Fosun | 223 | — |
| Total contract liabilities, current | $ 5,946 | $ 9,853 |
| | | |
| Deferred revenue, non-current — Viatris | $ 29,798 | $ 29,444 |
| Deferred revenue, non-current — Fosun | 55,752 | 40,975 |
| Total contract liabilities, non-current | $ 85,550 | $ 70,419 |

Changes in our contract liabilities from contracts with our collaboration revenue customers for the nine months ended September 30, 2024 are as follows:

| | (in thousands) |
|---|---|
| Balance on December 31, 2023 | $ 80,272 |
| Revenue recognized | (1,330) |
| Billings and adjustments, net | 12,554 |
| Balance on September 30, 2024 | $ 91,496 |

Table of Contents



### 5. Cash Equivalents and Short-Term Investments

The following table is a summary of our cash equivalents and short-term investments:

| | September 30, 2024 | | | December 31, 2023 | | | |
|---|---|---|---|---|---|---|---|
| in thousands | Adjusted Cost | Unrealized Gain | Fair Value | Adjusted Cost | Unrealized Gain | Unrealized Loss | Fair Value |
| U.S. treasury securities | $ 70,872 | $ 54 | $ 70,926 | $ 133,168 | $ 30 | $ — | $ 133,198 |
| Commercial paper | 44,790 | 5 | 44,795 | 49,433 | — | (15) | 49,418 |
| Money market funds | 45,251 | — | 45,251 | 39,280 | — | — | 39,280 |
| U.S. government agency obligations | 13,744 | 13 | 13,757 | 3,961 | — | (1) | 3,960 |
| Total cash equivalents and available-for-sale securities | $ 174,657 | $ 72 | $ 174,729 | $ 225,842 | $ 30 | $ (16) | $ 225,856 |
| | | | | | | | |
| Classified as: | | | | | | | |
| Cash equivalents | | | $ 49,238 | | | | $ 109,270 |
| Short-term investments | | | 125,491 | | | | 116,586 |
| Total cash equivalents and available-for-sale securities | | | $ 174,729 | | | | $ 225,856 |

As of September 30, 2024 and December 31, 2023, all of our cash equivalents and short-term investments were available-for-sale and had contractual maturities of less than one-year. There were no other-than-temporary impairments on such securities.

### 6. Intangible Assets, net

The following table sets forth the major categories of intangible assets and the weighted-average remaining useful lives for those assets that are not already fully amortized or impaired:

| | September 30, 2024 | | | |
|---|---|---|---|---|
| (in thousands, except for in years) | Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Distribution rights | 3.5 | $ 32,334 | $ (24,700) | $ 7,634 |
| Total intangible assets | | $ 32,334 | $ (24,700) | $ 7,634 |

| | December 31, 2023 | | | | |
|---|---|---|---|---|---|
| (in thousands, except for in years) | Weighted-average Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment | Net Carrying Amount |
| Distribution rights | 4.3 | $ 32,334 | $ (23,064) | $ — | $ 9,270 |
| Internally developed technology[(1)] | 1.5 | 8,918 | (4,408) | (3,972) | 538 (1) |
| Acquired developed technology | 0.0 | 16,200 | (6,525) | (9,675) | — |
| Customer relationships | 0.0 | 10,300 | (7,940) | (2,360) | — |
| Total intangible assets | | $ 67,752 | $ (41,937) | $ (16,007) | $ 9,808 |



PTX-853.0021

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

(1) During the three months ended March 31, 2024, we reclassified the $0.5 million net carrying amount of internally developed technology to "Non-current assets of discontinued operations" in connection with the discontinued operations presentation.

Amortization expense of the intangible assets in the table above were recorded on the condensed consolidated statements of operations and comprehensive loss based on the function of the associated asset. The detail breakdown of the amortization expenses on the condensed consolidated statements of operations and comprehensive loss were summarized as below:

| | Three Months Ended September 30, 2024 | | | Nine Months Ended September 30, 2024 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations |
| Amortization | $ 545 | $ — | $ 545 | $ 1,636 | $ — | $ 1,636 |
| Selling, general and administrative | — | — | — | 528 | (528) | — |
| Research and development | — | — | — | 10 | (10) | — |
| Total amortization expense | $ 545 | $ — | $ 545 | $ 2,174 | $ (538) | $ 1,636 |

| | Three Months Ended September 30, 2023 | | | Nine Months Ended September 30, 2023 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations |
| Amortization | $ 1,491 | $ (946) | $ 545 | $ 5,459 | $ (3,823) | $ 1,636 |
| Selling, general and administrative | 464 | (430) | 34 | 2,998 | (1,717) | 1,281 |
| Total amortization expense | $ 1,955 | $ (1,376) | $ 579 | $ 8,457 | $ (5,540) | $ 2,917 |

(1) Amount represents the amortization expense before the impact of reclassification for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

(2) Amount represents the reclassification for the current and prior periods for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

Based on the amount of intangible assets as of September 30, 2024, the expected amortization expense for each of the next five fiscal years was as follows:

| Year Ending December 31, | (in thousands) |
|---|---|
| 2024 remaining three months | $ 546 |
| 2025 | 2,181 |
| 2026 | 2,181 |
| 2027 | 2,181 |
| 2028 | 545 |
| 2029 and thereafter | — |
| Total | $ 7,634 |



PTX-853.0022

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

**7. Inventories**

Inventories consist of the following:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Raw materials | $ 3,725 | $ 3,938 |
| Work in process | 44,077 | 17,418 |
| Finished goods | 37,411 | 24,223 |
| Total inventories | $ 85,213 | $ 45,579 |

**8. Accruals and other current liabilities**

Accruals and other current liabilities consists of the following:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| Accruals related to: | | |
| Compensation[(1)] | $ 10,372 | $ 30,267 |
| Selling, general and administrative | 9,546 | 9,019 |
| Research and development | 5,916 | 5,173 |
| Inventories | 5,056 | 1,478 |
| Royalty | 1,319 | 1,919 |
| Interest expense | 590 | 1,919 |
| Other current liabilities[(1)] | 1,223 | 3,088 |
| Total accruals and other current liabilities | $ 34,022 | $ 52,863 |

(1) Amounts related to current liabilities of discontinued operations have been reclassified to conform to current period presentation.

**9. Leases**

***Finance Lease***

The ABPS Services Agreement contains a lease, which commenced in January 2022, related to a dedicated fill-and-finish line for the manufacturing of DAXXIFY® because it has an identified asset that is physically distinct for which we have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease provides us with both (i) the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the exclusivity of the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line through our purchase orders to ABPS. Each party has the right to terminate the ABPS Services Agreement without cause, with an 18 month written notice to the other party. The lease is classified as a finance lease in the condensed consolidated balance sheets.

In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Service Agreement through December 31, 2027, and modified our remedies with respect to conforming products and delays. In April 2024, we entered into a statement of work under the ABPS Service Agreement, and our minimum purchase obligation was established as $25.1 million for the year ending December 31, 2024 with lease term through December 31, 2024. The minimum purchase obligation is subject to reduction based on ABPS' actual manufacturing output.



PTX-853.0023

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

***Operating Leases***

Our operating leases primarily consist of non-cancellable facilities leases for research, manufacturing, and administrative functions. Our non-cancellable facilities operating leases have original lease periods expiring between 2027 and 2034, and include one or more options to renew for seven years to fourteen years. The monthly payments for our operating leases escalate over the remaining lease terms. Our lease contracts do not contain termination options, residual value guarantees or restrictive covenants.

*Operating Lease Sublease Income*

In May 2024, we entered into a sublease agreement pursuant to which we subleased a portion of our office space in Nashville, TN. The term of the sublease is from June 2024 to December 2034, with no options to extend. The total undiscounted payments to be received under the sublease total $5.2 million, excluding variable lease income. The sublease is accounted for as an operating lease with the corresponding income classified within "Other expense, net" on our condensed consolidated statement of operations and comprehensive loss.

Our finance and operating lease costs are summarized as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **(in thousands)** | **2024** | **2023** | **2024** | **2023** |
| Finance lease: | | | | |
| Amortization of finance lease right-of-use asset (1) | $ 13,100 | $ 3,297 | $ 28,315 | $ 6,965 |
| Interest on finance lease liability | 219 | 270 | 673 | 1,278 |
| Variable lease cost (2) | 12 | 62 | 173 | 436 |
| Total finance lease costs | 13,331 | 3,629 | 29,161 | 8,679 |
| Operating leases: | | | | |
| Operating lease cost | 2,766 | 3,138 | 8,308 | 9,657 |
| Variable lease cost (3) | 668 | 534 | 2,031 | 1,589 |
| Sublease income | (124) | — | (165) | — |
| Total operating lease costs | 3,310 | 3,672 | 10,174 | 11,246 |
| Total lease cost | $ 16,641 | $ 7,301 | $ 39,335 | $ 19,925 |

(1) Amortization of the finance lease right-of-use asset started to be capitalized into inventories on the condensed consolidated balance sheets in the second quarter of 2023, as a result of the FDA approval of the PAS of the ABPS manufacturing facility.

(2) Variable finance lease cost includes validation, qualification, materials, and other related services which are not included in the lease liabilities and are expensed as incurred.

(3) Variable operating lease cost includes management fees, common area maintenance, property taxes, insurance and parking fees, which are not included in the lease liabilities and are expensed as incurred.

Table of Contents

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

As of September 30, 2024, we have $3.2 million of accounts payable related to the fill-and-finish line lease under the ABPS Service Agreement. Additionally, we have maturities of our lease liabilities as follows:

| (in thousands) | Finance Lease | Operating Leases |
|---|---|---|
| Year Ending December 31, | | |
| 2024 remaining three months | $ 7,799 | $ 1,780 |
| 2025 | 3,178 | 10,854 |
| 2026 | — | 11,185 |
| 2027 | — | 4,536 |
| 2028 | — | 4,021 |
| 2029 and thereafter | — | 24,565 |
| Total lease payments | 10,977 | 56,941 |
| Less imputed interest | (136) | (15,526) |
| Present value of lease payments | $ 10,841 | $ 41,415 |

Our lease contracts do not provide readily determinable implicit rates, as such, we used the estimated incremental borrowing rate based on the information available at the adoption, commencement, or remeasurement date. As of September 30, 2024, weighted-average remaining lease terms and discount rates are as follows:

| | Finance Lease | Operating Leases |
|---|---|---|
| Weighted-average remaining lease term (years) | 0.3 | 7.7 |
| Weighted-average discount rate | 10.0 % | 10.0 % |

Supplemental cash flow information related to the leases was as follows:

| | Nine Months Ended September 30, | |
|---|---|---|
| (in thousands) | 2024 | 2023 |
| Cash paid for amounts included in the measurement of lease liabilities | | |
| Operating cash flows from operating leases | $ 7,851 | $ 6,264 |
| Operating cash flows from finance lease | $ 532 | $ 1,280 |
| Financing cash flows from finance lease | $ 12,572 | $ 15,513 |
| Right-of-use assets obtained in exchange for lease liabilities | | |
| Finance lease | $ 21,600 | $ 23,781 |
| Operating leases | $ — | $ 22,694 |

**Lease Not Yet Commenced**

***PCI Supply Agreement***

In April 2021, we entered into the PCI Supply Agreement pursuant to which PCI would serve as a non-exclusive manufacturer and supplier of DAXXIFY®. The initial term of the PCI Supply Agreement is dependent upon the date of regulatory submission for the manufacturing of DAXXIFY® and may be terminated by either party in accordance with the terms of the PCI Supply Agreement. The term of the PCI Supply Agreement may also be extended for one additional three-year term upon mutual agreement of the parties.

The PCI Supply Agreement contains a lease related to a dedicated fill-and-finish line and closely related assets for manufacturing of products because it has identified assets that are physically distinct for which we will have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease will provide us with both (i)



PTX-853.0025

the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the exclusivity implied from the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line.

The embedded lease had not yet commenced as of September 30, 2024. The accounting commencement and recognition of the right-of-use lease assets and lease liabilities related to the embedded lease will take place when we have substantively obtained the right of control. The embedded lease is preliminarily classified as a finance lease.

Pursuant to the PCI Supply Agreement, we are responsible for certain costs associated with the design, equipment procurement and validation, and facilities-related costs, monthly payments and minimum purchase obligations throughout the initial term of the PCI Supply Agreement. As of September 30, 2024, we have made prepayments of $41.5 million to PCI which is recorded within "Finance lease prepaid expense" in the condensed consolidated balance sheets. Based on our best estimate as of September 30, 2024, our remaining minimum commitment under the PCI Supply Agreement is $10.0 million for 2024, $14.4 million for 2025, $19.2 million for 2026, $25.8 million for 2027, $29.5 million for 2028, and $134.5 million for 2029 and thereafter in aggregate.

**10. Debt**

The following table provides information regarding our debt:

| (in thousands) | September 30, 2024 | December 31, 2023 |
|---|---|---|
| 2027 Notes, non-current | $ 287,500 | $ 287,500 |
| Less: Unamortized debt issuance costs | (3,279) | (4,279) |
| Carrying amount of the 2027 Notes | 284,221 | 283,221 |
| | | |
| Notes payable principal and exit fee, current | 10,150 | 2,500 |
| Notes payable principal and exit fee, non-current | 140,831 | 147,500 |
| Less: Unamortized debt discount and exit fee | (3,000) | (2,700) |
| Less: Unamortized debt issuance costs | (1,011) | (1,426) |
| Carrying amount of Notes Payable | 146,970 | 145,874 |
| Total debt | $ 431,191 | $ 429,095 |

Interest expense relating to our debt in the condensed consolidated statements of operations and comprehensive loss are summarized as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (in thousands) | 2024 | 2023 | 2024 | 2023 |
| Contractual interest expense | $ 4,517 | $ 3,830 | $ 13,478 | $ 10,620 |
| Amortization of debt discount and exit fee | 1,400 | 157 | 1,951 | 329 |
| Amortization of debt issuance costs | 596 | 447 | 1,565 | 1,310 |
| Total interest expense | $ 6,513 | $ 4,434 | $ 16,994 | $ 12,259 |

**Convertible Senior Notes**

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers' discount, commissions, and other issuance costs.

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the five business day period after any ten consecutive trading day period (the "measurement period") in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. The threshold to redeem has not been met as of September 30, 2024. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

**Capped Call Transactions**

Concurrently with the 2027 Notes, we entered into capped call transactions with the option counterparties and used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027

Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

The capped call transactions are separate transactions that we entered into with the option counterparties and are not part of the terms of the 2027 Notes. As the capped call transactions meet certain accounting criteria, the premium paid of $28.9 million was recorded as a reduction in additional paid-in capital in the condensed consolidated balance sheets, and will not be remeasured to fair value as long as the accounting criteria continue to be met. As of September 30, 2024 and December 31, 2023, we had not purchased any shares under the capped call transactions.

**Note Purchase Agreement**

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the Purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium, which we did not draw on.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

**11. Stockholders' Deficit and Stock-Based Compensation**

***2014 EIP***

On January 1, 2024, the number of shares of common stock reserved for issuance under the 2014 EIP increased by 3.5 million shares. For the nine months ended September 30, 2024, 3.3 million shares of stock awards were granted under the 2014 EIP. As of September 30, 2024, 5.7 million shares were available for issuance under the 2014 EIP.

***2014 IN***

In 2024, 0.3 million shares of stock awards were granted under the 2014 IN before the plan's expiration date of August 25, 2024. No shares were available for issuance as of September 30, 2024.

***HintMD Plan***

For the nine months ended September 30, 2024, no stock options or awards were granted under the HintMD Plan. As of September 30, 2024, 0.1 million shares were available for issuance under the HintMD Plan.

***2014 ESPP***

On January 1, 2024, the number of shares of common stock reserved for issuance under the 2014 ESPP increased by 0.3 million shares. As of September 30, 2024, 1.7 million shares were available for issuance under the 2014 ESPP.

**Net Loss per Share**

Our basic net loss per share from continuing operations is calculated by dividing the net loss from continuing operations by the weighted average number of shares of common stock outstanding for the period. Our basic net loss per share from discontinued operations is calculated by dividing the net loss from discontinued operations by the weighted average number of shares of common stock outstanding for the period. The diluted net loss per share from both continuing and discontinued operations are calculated by giving effect to all potential dilutive common stock equivalents outstanding for the period. For purposes of this calculation, shares of common stock underlying the 2027 Notes at the initial conversion price, outstanding stock options, unvested stock awards, and shares of common stock expected to be purchased under the 2014 ESPP, are considered common stock equivalents, which were excluded from the computation of diluted net loss per share because including them would have been antidilutive.

Common stock equivalents that were excluded from the computation of diluted net loss per share for both continuing and discontinued operations are presented below:

| | September 30, | |
|---|---|---|
| | 2024 | 2023 |
| Convertible senior notes | 8,878,938 | 8,878,938 |
| Unvested RSUs and PSUs | 5,269,902 | 3,266,886 |
| Outstanding stock options | 3,540,819 | 3,886,868 |
| Unvested RSAs and PSAs | 588,152 | 949,059 |
| Shares of common stock expected to be purchased under the 2014 ESPP | 138,642 | 118,258 |

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

**Follow-On Offering**

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares sold and issued to Mark Foley, our president, chief executive officer, and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and offering costs.

**ATM Offering Programs**

On May 10, 2022, we entered into the 2022 ATM Agreement with Cowen. Under the 2022 ATM Agreement, we may sell up to $150.0 million of our common stock. We are not obligated to sell any shares under the 2022 ATM Agreement. Subject to the terms and conditions of the 2022 ATM Agreement, Cowen will use commercially reasonable efforts, consistent with its normal trading and sales practices, applicable state and federal law, rules and regulations and the rules of The Nasdaq Global Market, to sell shares from time to time based upon our instructions, including any price, time or size limits specified by us. We pay Cowen a commission of up to 3.0% of the aggregate gross proceeds from each sale of shares, reimburse legal fees and disbursements and provide Cowen with customary indemnification and contribution rights.

In 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the nine months ended September 30, 2024 from the 2022 ATM Agreement.

**Stock-based Compensation Expense**

The following table summarizes our stock-based compensation expense by line item in our condensed consolidated statements of operations and comprehensive loss:

| | Three Months Ended September 30, 2024 | | | Nine Months Ended September 30, 2024 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Stock-based Compensation before Discontinued Operation Adjustments(1) | Classified as Discontinued Operations(2) | Classified as Continuing Operations | Stock-based Compensation before Discontinued Operation Adjustments(1) | Classified as Discontinued Operations(2) | Classified as Continuing Operations |
| Selling, general and administrative | $ 3,491 | $ — | $ 3,491 | $ 15,631 | $ (73) | $ 15,558 |
| Research and development | 1,091 | — | 1,091 | 3,736 | 83 | 3,819 |
| Total stock-based compensation expense (exclusive of capitalized stock-based compensation expense) | 4,582 | — | 4,582 | 19,367 | 10 | 19,377 |
| Capitalized stock-based compensation expense | 230 | — | 230 | 722 | — | 722 |
| Total stock-based compensation expense | $ 4,812 | $ — | $ 4,812 | $ 20,089 | $ 10 | $ 20,099 |

Table of Contents



| (in thousands) | Three Months Ended September 30, 2023 | | | Nine Months Ended September 30, 2023 | | |
|---|---|---|---|---|---|---|
| | Stock-based Compensation before Discontinued Operation Adjustments[1] | Classified as Discontinued Operations [2] | Classified as Continuing Operations | Stock-based Compensation before Discontinued Operation Adjustments[1] | Classified as Discontinued Operations [2] | Classified as Continuing Operations |
| Selling, general and administrative | $ 8,599 | $ (730) | $ 7,869 | $ 31,042 | $ (2,204) | $ 28,838 |
| Research and development | 1,688 | (647) | 1,041 | 7,926 | (3,416) | 4,510 |
| Total stock-based compensation expense (exclusive of capitalized stock-based compensation expense) | 10,287 | (1,377) | 8,910 | 38,968 | (5,620) | 33,348 |
| Capitalized stock-based compensation expense | 1,570 | — | 1,570 | 4,207 | — | 4,207 |
| Total stock-based compensation expense | $ 11,857 | $ (1,377) | $ 10,480 | $ 43,175 | $ (5,620) | $ 37,555 |

(1) Amount represents the stock-based compensation expense before the impact of reclassification for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

(2) Amount represents the reclassification for the current and prior periods for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

## 12. Fair Value Measurements

The following table summarizes, for assets and liabilities measured at fair value, the respective fair value and the classification by level of input within the fair value hierarchy:

| (in thousands) | September 30, 2024 | | | |
|---|---|---|---|---|
| | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 70,926 | $ 70,926 | $ — | $ — |
| Money market funds | 45,251 | 45,251 | — | — |
| U.S. government agency obligations | 13,757 | 13,757 | — | — |
| Commercial paper | 44,795 | — | 44,795 | — |
| Total assets measured at fair value | $ 174,729 | $ 129,934 | $ 44,795 | $ — |

| (in thousands) | December 31, 2023 | | | |
|---|---|---|---|---|
| | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 133,198 | $ 133,198 | $ — | $ — |
| Money market funds | 39,280 | 39,280 | — | — |
| U.S. government agency obligations | 3,960 | 3,960 | — | — |
| Commercial paper | 49,418 | — | 49,418 | — |
| Total assets measured at fair value | $ 225,856 | $ 176,438 | $ 49,418 | $ — |

For Level 1 investments, we use quoted prices in active markets for identical assets to determine the fair value. For Level 2 investments, we use quoted prices for similar assets sourced from certain third-party pricing services. The third-party pricing services generally utilize industry standard valuation models for which all significant inputs are observable, either directly or indirectly, to estimate the price or fair value of the securities. The primary input generally includes reported trades of or quotes on the same or similar securities. We do not make additional judgments or assumptions made to the pricing data sourced from the third-party pricing services.

The fair value of the 2027 Notes and the Notes Payable (Note 10) was determined on the basis of market prices observable for similar instruments and is considered Level 2 in the fair value hierarchy. We present the fair value of the 2027 Notes and the Notes payable for disclosure purposes only. As of September 30, 2024, and December 31, 2023, the fair value of the 2027 Notes was $246.1 million and $219.2 million, respectively. As of September 30, 2024 the fair value of the Notes Payable was approximately the same as its unamortized carrying value.

**13. Commitments and Contingencies**

**Teoxane Agreement**

In January 2020, we entered into the Teoxane Agreement, as amended, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) RHA® Collection of dermal fillers, and (ii) the RHA® Pipeline Products in the U.S. and U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us. The Teoxane Agreement continues to be effective for a term of 10 years. The term ends on December 31, 2029 and may be extended for a two-year period ending December 31, 2031 upon the mutual agreement of the parties. We are required to meet certain minimum purchase obligations during each year of the term. Our minimum purchase obligation for the year ending December 31, 2024 is $52 million. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date.

On October 24, 2024, we entered the Sixth Amendment, under which our minimum purchase commitments are as follows: (i) $60 million for 2025; (ii) $67.8 million for 2026; (iii) $76.7 million for 2027; (iv) $86.6 million for 2028; and (v) $97.8 million for 2029. Additionally, the Sixth Amendment (a) updates and clarifies certain branding guidelines, (b) establishes a marketing task force to review promotional materials, (c) establishes a medical education task force to promote the exchange of best practices, (d) deems the breach of certain provisions under the Teoxane Agreement to be material breaches for purposes of early termination, including the failure to adhere to branding guidelines and timely deliver certain reports and (e) increases our minimum and maximum buffer stock requirements to align with our new purchase commitments.

Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that provide Teoxane the right to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, our failure to adhere to the branding guidelines or timely deliver certain reports or for our breach of the exclusivity obligations under the Teoxane Agreement.

**Other Contingencies**

As of September 30, 2024, we are obligated to pay BTRX up to a remaining $15.5 million upon the satisfaction of certain milestones relating to our product revenue, intellectual property, and clinical and regulatory events.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

**Indemnification**

We have standard indemnification agreements in the ordinary course of business. Under these indemnification agreements, we indemnify, hold harmless, and agree to reimburse the indemnified parties for losses suffered or incurred by the indemnified party, in connection with any trade secret, copyright, patent or other intellectual property infringement claim by any third-party with respect to our technology. The term of these indemnification agreements is generally perpetual after the execution of the agreements. The maximum potential amount of future payments we are obligated to pay under other indemnification agreements is not determinable because it involves claims for indemnification that may be made against us in the future but have not been made. We have not yet incurred material costs to defend lawsuits or settle claims related to indemnification agreements.

We have indemnification agreements with our directors and officers that may require us to indemnify them against liabilities that may arise by reason of their status or service as directors or officers, other than liabilities arising from willful misconduct of the individual.

For the nine months ended September 30, 2024 and 2023, no material amounts associated with the indemnification agreements have been recorded.

**Litigation**

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan: U.S. Patent No. 11,147,878. On December 17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our second motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice. Allergan reduced the asserted claims to claim 8 of U.S. Patent No. 7,354,740, claims 5 and 8 of U.S. Patent No. 11,203,748, claim 10 of U.S. Patent No. 11,033,625, claims 1, 4, 6, and 20 of U.S. Patent No. 11,147,878, and claim 1 of U.S. Patent No. 11,285,216 via a Stipulation and Order dated June 21, 2024. The jury trial is scheduled to begin in December 2024.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021, in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss, and on March 30, 2024, the Court granted the motion with leave for the plaintiff to amend the complaint. On May 1, 2024, the plaintiff filed an amended complaint, which asserted similar claims to those in the prior complaint. On June 25, 2024, the Company filed a motion to dismiss the amended complaint.

We dispute the claims in these lawsuits and intend to defend these matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcomes of the lawsuits are necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

REVANCE THERAPEUTICS, INC.

Notes to Condensed Consolidated Financial Statements — (Continued)

(Unaudited)

We record a provision for a liability when we believe that it is both probable that a liability has incurred, and the amount can be reasonably estimated. As of both September 30, 2024 and December 31, 2023, no such provision for liabilities related to the above litigation matters were recorded on the condensed consolidated balance sheets.

**14. Subsequent Event**

**Sixth Amendment & ANZ Distribution Agreement**

On October 24, 2024, the Company and Teoxane entered into (i) the Sixth Amendment which, among other things, (a) establishes minimum purchase commitments through 2029, (b) updates and clarifies certain branding guidelines, (c) establishes a marketing task force to review product promotional materials, (d) establishes a medical education task force to promote the exchange of best practices, (e) deems breach of certain provisions under the Teoxane Agreement material breaches for purposes of early termination, including the failure to adhere to branding guidelines and timely deliver certain reports and (f) amends our minimum and maximum buffer stock requirements to align with our new purchase commitments (as discussed in Note 13); and (ii) the ANZ Distribution Agreement, pursuant to which Teoxane will act as the Company's and Revance Australia's, exclusive distributor and licensee in Australia and New Zealand of certain products containing DaxibotulinumtoxinA-lanm, including DAXXIFY®, for the treatment of (a) temporary improvements in the appearance of glabellar lines and other indications related to altering cosmetic appearance and (b) cervical dystonia. The ANZ Distribution Agreement will continue in full force and effect until December 31, 2040. Pursuant to the ANZ Distribution Agreement, Teoxane will make certain payments to the Company, including an upfront payment, certain regulatory and commercial milestone payments and high single-digit to mid-teen royalty payments for the sale of products in Australia and New Zealand. Teoxane will be required to purchase a minimum volume of products per year beginning in 2030. We are evaluating the accounting impact of the Sixth Amendment and ANZ Distribution Agreement.

Table of Contents

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and the accompanying notes appearing elsewhere in this Report and in conjunction with our other SEC filings, including our FY2023 Form 10-K.

This Report, including the documents incorporated by reference herein, contains forward-looking statements within the meaning of Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act, and Section 21E of the Exchange Act. All statements other than statements of historical facts contained in this Report and the documents incorporated by reference herein, including statements regarding our future financial condition, regulatory approvals, business strategy and plans and objectives of management for future operations, are forward-looking statements. The words "may," "will," "could," "would," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," "continue," "ongoing" and similar expressions that convey uncertainty of future events or outcomes are intended to identify forward-looking statements. In addition, any statements that refer to our financial outlook or projected performance, profitability expectations, amortization expectations, anticipated growth, milestone expectations, future expenses and cash flows, anticipated working capital requirements, market forecasts, capital expenditures, cash preservation plans, liquidity and financing requirements; our ability to fund our operations, including our ability to alleviate any substantial doubt regarding the same; expectations with respect to the Offer and the Merger, including the timing thereof and the likelihood of the Offer being commenced on the same terms as previously announced, or at all; our and Crown's ability to successfully complete the Merger; the impact to the Company if the Merger is not completed; our ability to comply with our debt obligations, including with respect to the Minimum Cash Covenant; repayment of our indebtedness under the Note Purchase Agreement upon the closing of the Merger; our future financing plans and strategies; our ability to raise additional capital; our ability to develop and commercialize innovative aesthetic and therapeutic offerings; our ability to obtain, and the timing relating to, regulatory submissions and approvals with respect to our drug product candidates and third-party manufacturers, including with respect to the PAS for the PCI manufacturing facility; our opportunity in therapeutics; development of an onabotulinumtoxinA biosimilar; the process and our ability to effectively and reliably manufacture supplies of DAXXIFY®; our ability to manufacture or receive sufficient supply of our Products in order to meet commercial demand; expectations regarding DAXXIFY® Zero-cost Inventory; our ability to maintain and seek out new strategic third-party collaborations to support our goals; research and development expenses and expectations; patent defensive measures; timing and expenses related to our ongoing litigation matters; the possibility of stockholder litigation in connection with the Offer and Merger, and the impacts thereof; our ability to defend ourselves in ongoing litigation; international expansion, including with respect to the approval of DAXXIFY® for cervical dystonia and glabellar lines by the TGA and other regulatory bodies; and our ability to comply with applicable laws and regulations; are forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements are subject to a number of known and unknown risks, uncertainties and assumptions, including risks described in Item 1A. "Risk Factors" and elsewhere in this Report and our FY2023 Form 10-K.

You should not rely upon forward-looking statements as predictions of future events. These forward-looking statements represent our estimates and assumptions only as of the date of this Report. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason to conform these statements to actual results or to changes in our expectations. You should read this Report, together with the information incorporated herein by reference, with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

**Summary of Risk Factors**

Investing in our common stock involves risks. See Item 1A. "Risk Factors" in this Report and in our FY2023 Form 10-K for a discussion of the following principal risks and other risks that make an investment in Revance speculative or risky.

- There are significant risks and uncertainties associated with the pending Offer and Merger, including the risk that the Offer or the Merger may not be completed in a timely manner or at all, or may be completed on modified terms. The

Offer has not yet commenced. If the Offer does commence, closing of the Merger will remain subject to certain closing conditions that could adversely affect us or cause the Merger to be abandoned.

- Management has concluded there is substantial doubt about our ability to continue as a going concern. In order to mitigate the substantial doubt to continue as a going concern, we may be required to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses. We have incurred significant losses since our inception and we anticipate that we will continue to incur operating losses for the foreseeable future and may not achieve or maintain profitability in the future. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock, our ability to raise capital and our ability to maintain compliance with our debt covenants.

- Our success as a company, including our ability to finance our business and generate revenue, and our future growth is substantially dependent on the clinical and commercial success of our Products. If we are unable to successfully commercialize our Products, complete the development and regulatory approval process of our product candidates, and maintain regulatory approval of our Products we may not be able to generate sufficient revenue to continue our business.

- We use third-party collaborators, including Teoxane, Viatris, Fosun, ABPS and PCI to help us develop, validate, manufacture and/or commercialize our products. Our ability to commercialize our products could be impaired or delayed if these collaborations are unsuccessful.

- DAXXIFY® and any future product candidates, if approved, may not achieve market acceptance among injectors, HCPs, healthcare organizations and administrators, others in the healthcare community and consumers and patients, and may not be commercially successful, which would adversely affect our operating results and financial condition.

- DAXXIFY®, the RHA® Collection of dermal fillers and any future product candidates will face significant competition, including from companies that enjoy significant competitive advantages, such as substantially greater financial, research and development, regulatory, manufacturing, marketing resources and expertise, greater brand recognition and more established relationships. Our failure to effectively compete may prevent us from achieving significant market penetration and expansion.

- If we are not able to effectively and reliably manufacture DAXXIFY® or any future product candidates at sufficient scale and appropriate cost, including through any third-party manufacturers, as well as acquire supplies of the RHA® Collection of dermal fillers from Teoxane, our product development, regulatory approval, commercialization and sales efforts and our ability to generate revenue may be adversely affected.

- Servicing our debt, including the 2027 Notes and Notes Payable, requires a significant amount of cash to pay our substantial debt. If we are unable to generate sufficient cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive.

- Macroeconomic and geopolitical factors and a public health crisis, such as the COVID-19 pandemic, have and may continue to adversely affect our business, as well as those of third-parties on which we rely for significant manufacturing, clinical or other business operations. They may also impact disposable income levels, which could reduce consumer spending and lower demand for our Products.

- We are subject to uncertainty relating to pricing and reimbursement. Failure to obtain or maintain adequate coverage, pricing and reimbursement for DAXXIFY® for therapeutics uses, or our other future approved products, if any, could have a material adverse impact on our ability to commercialize such products.

- Reports of adverse events or safety concerns involving our Products could delay or prevent the Company or Teoxane from maintaining regulatory approval for such Products, or obtaining additional regulatory approval for additional indications or future product candidates. The denial, delay or withdrawal of any such approval would

negatively impact commercialization and could have a material adverse effect on our ability to generate revenue, business prospects, and results of operations.

- Unfavorable publicity relating to one or more of our Products, whether related to aesthetic or therapeutic indications, may affect the public perception of our entire portfolio of Products.

- Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results or actual consumer outcomes.

- If our efforts to protect our intellectual property related to DAXXIFY®, the RHA® Collection of dermal fillers or any future product candidates are not adequate, we may not be able to compete effectively. Additionally, we are currently and in the future may become involved in lawsuits or administrative proceedings to defend against claims that we infringe the intellectual property of others and to protect or enforce our patents or other intellectual property or the patents of our licensors, which could be expensive and time-consuming and would have a material adverse effect on our ability to generate revenue if we are unsuccessful.

- We are currently, and in the future may be, subject to securities class action and stockholder derivative actions. If other stockholder derivative actions, additional securities class actions or other lawsuits are brought against us, including product liability actions, and we cannot successfully defend ourselves, we may incur substantial liabilities or be required to limit commercialization of our products. Even a successful defense would require significant financial and management resources.

- As our business and operations continue to grow, we may need to expand our development, manufacturing, regulatory, sales, marketing and distribution capabilities. If and when we expand such capabilities, we may encounter difficulties in managing our growth, which could disrupt our operations.

- We have undertaken, and may in the future undertake, restructuring plans to adjust our investment priorities and manage our operating expenses, which plans may not result in the savings or operational efficiencies anticipated and could result in total costs and expenses that are greater than expected.

- If we are not successful in discovering, developing, acquiring and commercializing additional product candidates other than our current Products, our ability to expand our business and achieve our strategic objectives may be impaired.

- We have experienced and may experience in the future compromises or failures of our information technology systems or data, or those of third-parties upon which we rely, which could adversely affect our business. Despite significant efforts to secure against such threats, it is impossible to entirely mitigate these risks.

- Changes in and failures to comply with applicable laws, regulations and standards may adversely affect our business, operations and financial performance.

- If we fail to attract and retain qualified personnel at all levels and functions, we may be unable to successfully execute our objectives.

Table of Contents

**Overview**

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

**Recent Developments**

**Pending Merger**

On August 11, 2024, the Company and the Buyer Parties entered into the Merger Agreement, pursuant to which Crown will cause Merger Sub to commence the Offer as promptly as practicable, but in no event later than fifteen business days after the date of the Merger Agreement or such other date as may be agreed to between the Company and Crown, to purchase all of our outstanding Shares of common stock, par value $0.001 per Share, of the Company at a price of $6.66 per Share, in cash, without interest and less any required tax withholding. As a result of discussions between the Company and Teoxane regarding an alleged breach of the Teoxane Agreement, the Buyer Parties extended the date by which Merger Sub was obligated to commence the tender offer for all of the Shares pursuant to the Merger Agreement. The Company and Crown agreed to extend the Offer commencement date to November 12, 2024. The Merger Agreement contemplates that, as soon as practicable following the consummation of the Offer, on the terms and subject to the conditions set forth in the Merger Agreement, Merger Sub will be merged with and into the Company, with the Company surviving as a wholly owned subsidiary of Crown. The Offer has not commenced. If the Offer commences, consummation of the Offer and closing of the Merger will remain subject to customary closing conditions, including (i) the Minimum Condition; (ii) the absence of any order, injunction or law prohibiting the Offer or the closing of the Merger; (iii) obtaining applicable approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which approval has already been received; and (iv) the accuracy of the representations and warranties contained in the Merger Agreement, subject to customary materiality qualifications, and compliance with the covenants and agreements contained in the Merger Agreement as of the closing of the Merger. If the Merger is completed, it is expected that our common stock will thereafter be removed from listing on the Nasdaq Global Market and from registration under Section 12(b) of the Securities Exchange Act of 1934, as amended.

Both parties have termination rights under certain circumstances. If the Merger Agreement is terminated under certain circumstances, the Company may be required to pay a $28.8 million termination fee to Crown, including if the Company accepts a Superior Proposal.

The description of the Merger Agreement throughout this Report does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which was filed as Exhibit 2.1 to our Current Report on Form 8-K filed on August 12, 2024 and incorporated by reference as Exhibit 2.1 hereto. In addition, refer to "Item 1A. Risk Factors" in this Report for a discussion of the relevant risks regarding the pending Merger with Crown.

Table of Contents

**Teoxane Agreement**

On August 16, 2024, the Company received a notice to remedy alleged material breaches, including breaches of the maximum levels of buffer stock and required efforts to promote and sell the RHA® Collection of dermal fillers, under the Teoxane Agreement. Following discussions between the Company and Teoxane, the parties entered into the Settlement Agreement, pursuant to which Teoxane (i) waived any right to terminate the Teoxane Agreement with respect to any breaches that may have occurred, existed or arose on or prior to the date of the Settlement Agreement; and (ii) expressly acknowledged that there are no items currently in dispute between Teoxane and the Company.

On October 24, 2024, the Company and Teoxane entered into the Sixth Amendment which, among other things, (a) establishes minimum purchase commitments through 2029, (b) updates and clarifies certain branding guidelines, (c) establishes a marketing task force to review promotional materials, (d) establishes a medical education task force to promote the exchange of best practices, (e) deems breach of certain provisions under the Teoxane Agreement material breaches for purposes of early termination, including the failure to adhere to branding guidelines and timely deliver certain reports and (f) amends our minimum and maximum buffer stock requirements to align with our new purchase commitments (as discussed in Note 13). Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, our failure to adhere to the branding guidelines or timely deliver certain reports or for our breach of the exclusivity obligations under the Teoxane Agreement.

On October 24, 2024, the Company and Teoxane also entered into the ANZ Distribution Agreement, pursuant to which Teoxane will act as the Company's and Revance Australia's, exclusive distributor and licensee in Australia and New Zealand of certain products containing DaxibotulinumtoxinA-lanm, including DAXXIFY®, for the treatment of (a) temporary improvements in appearance of glabellar lines and other indications related to altering cosmetic appearance and (b) cervical dystonia. The ANZ Distribution Agreement will continue in full force and effect until December 31, 2040. Pursuant to the ANZ Distribution Agreement, Teoxane will make certain payments to the Company, including an upfront payment, certain regulatory and commercial milestone payments and high single-digit to mid-teen royalty payments. Teoxane will be required to purchase a minimum volume of products per year beginning in 2030.

The Company is currently seeking the approval of its DaxibotulinumtoxinA for Injection Category 1 registration application with the TGA for the temporary improvement of glabellar lines and treatment of cervical dystonia in adult patients, which was filed on November 2, 2023.

**Revance Aesthetics**

For the three and nine months ended September 30, 2024, we generated $58.8 million and $175.9 million in revenue from the sale of our Products. For the three and nine months ended September 30, 2023, we generated $54.1 million and $154.2 million, respectively, in revenue from the sale of our Products.

***DAXXIFY®***

For the three and nine months ended September 30, 2024, we recognized $28.3 million and $79.2 million in net product revenue from the sale of DAXXIFY®, respectively. For the three and nine months ended September 30, 2023, we recognized $22.0 million and $60.0 million in product revenue from the sale of DAXXIFY®, respectively.

***RHA® Collection of Dermal Fillers***

For the three and nine months ended September 30, 2024, we recognized $30.5 million and $96.7 million in product revenue from the sale of the RHA® Collection of dermal fillers, respectively. For the three and nine months ended September 30, 2023, we recognized $32.1 million and $94.2 million in product revenue from the sale of the RHA® Collection of dermal fillers, respectively.

In April 2024, the Company launched RHA® 3 for injection into the vermillion body, vermillion border and oral commissure for lip augmentation and lip fullness in adults aged 22 years and older.

***Fosun Partnership***

On September 9, 2024, we announced that China's NMPA approved Fosun's biologics license application for DaxinbotulinumtoxinA for Injection for the improvement of glabellar lines. In October 2024, we received the milestone payment of $13.5 million, net of $1.5 million of foreign withholding taxes.

**Revance Therapeutics**

In May 2024, the Company expanded into the U.S. therapeutics market with the commercial launch of DAXXIFY® for the treatment of cervical dystonia. As of September 30, 2024, DAXXIFY for the treatment of cervical dystonia had coverage for over 80% of commercial lives.

**Follow-On Offering**

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares which were sold and issued to Mark Foley, our chief executive officer and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and estimated offering costs.

**Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business as the costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities included elimination of Fintech Platform personnel, the termination of Fintech Platform research and development activities and an elimination of outside services expenses related to the Fintech Platform. Based on such plan, substantially all payment processing activities for Fintech Platform customers ended on January 31, 2024 and we substantially completed the activities related to winding down the remaining Fintech Platform operations as of March 31, 2024. Beginning as of March 31, 2024, the Service Segment is presented as a discontinued operation in our condensed consolidated financial statements with certain prior period amounts retrospectively revised to reflect this change. Although we discontinued the Service Segment, we do not expect the discontinuation of the Service Segment to have a material effect on our liquidity going forward. See Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 3 — Exit of the Fintech Platform Business" in this Report for additional information.

**Results of Operations**

In connection with the completion of the exit of the Fintech Platform business discussed above, the results of our Fintech Platform business have been reflected as discontinued operations in our condensed consolidated financial statements as of and for the period ended September 30, 2024. Certain prior year figures were reclassified to conform to the current period presentation. Additionally, we began operating under a single reportable segment as of March 31, 2024. See Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 3 — Exit of the Fintech Platform Business" in this Report for additional information. Accordingly, the results of operations discussed below no longer include a discussion of the Service Segment and the effect of the Service Segment on prior period amounts have been retrospectively revised for comparative purposes to more accurately reflect the period over period changes in our continuing operations.

**Revenue**

We generate product revenue from the sale of our Products. We generate collaboration revenue from an onabotulinumtoxinA biosimilar program with Viatris as well as the collaboration with Fosun for the development and commercialization of DaxibotulinumtoxinA for Injection. The service revenue generated from the Fintech Platform is classified as discontinued operations as discussed in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 3—Exit of the Fintech Platform Business".

Table of Contents

***Product Revenue***

Our breakdown of revenue by Product is summarized below:

| (in thousands, except percentages) | Three Months Ended September 30, 2024 | 2023 | Change | % Change | Nine Months Ended September 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Product: | | | | | | | | |
| RHA® Collection of dermal fillers | $ 30,503 | $ 32,133 | $ (1,630) | (5)% | $ 96,704 | $ 94,180 | $ 2,524 | 3 % |
| DAXXIFY® | 28,324 | 21,976 | $ 6,348 | 29 % | 79,170 | 59,980 | $ 19,190 | 32 % |
| Total product revenue, net | $ 58,827 | $ 54,109 | $ 4,718 | 9 % | $ 175,874 | $ 154,160 | $ 21,714 | 14 % |

For both the three and nine months ended September 30, 2024, our net total product revenue increased compared to the same periods in 2023 primarily due to an increase in sales volume across both product lines, and partially offset by an overall reduction in average selling prices for both product lines.

***Collaboration Revenue***

We are actively developing an onabotulinumtoxinA biosimilar in collaboration with Viatris. As described in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 4—Revenue," we generally recognize collaboration revenue for the onabotulinumtoxinA biosimilar program based on the determined transactions price of the contract multiplied by the quotient of the cost of development services incurred over the total estimated cost of development services for the expected duration of our performance obligations. For the three and nine months ended September 30, 2024, we recognized revenue related to development services under the Viatris Agreement of $1.0 million and $1.3 million, respectively. For the three and nine months ended September 30, 2023, we recognized no revenue related to development services under the Viatris Agreement.

We are also working with Fosun to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory under the Fosun License Agreement. As described in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 4—Revenue," we evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. Upon China's NMPA approval of DAXXIFY® for the improvement of glabellar lines in September 2024, Fosun was obligated to pay us a milestone payment of $13.5 million, net of $1.5 million foreign withholding taxes, which we received in October 2024. The milestone payment was included as "Deferred revenue" on the condensed consolidated balance sheets. For the three and nine months ended September 30, 2024, no collaboration revenue is recognized from the Fosun License Agreement. For the three and nine months ended September 30, 2023, revenue of less than $0.1 million and $0.1 million, respectively, was recognized from the Fosun License Agreement, respectively.

**Operating Expenses**

Operating expenses associated with the Fintech Platform business were classified as discontinued operations as discussed in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 3—Exit of the Fintech Platform Business".

| (in thousands, except percentages) | Three Months Ended September 30, 2024 | 2023 | Change | % Change | Nine Months Ended September 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Operating expenses: | | | | | | | | |
| Cost of product revenue (exclusive of amortization) | $ 17,633 | $ 16,821 | $ 812 | 5 % | $ 50,179 | $ 46,915 | $ 3,264 | 7 % |
| Selling, general and administrative | 62,578 | 65,791 | $ (3,213) | (5)% | 197,314 | 202,523 | $ (5,209) | (3)% |
| Research and development | 11,379 | 8,688 | $ 2,691 | 31 % | 41,674 | 43,844 | $ (2,170) | (5)% |
| Amortization | 545 | 374 | $ 171 | 46 % | 1,636 | 1,636 | $ — | — % |
| Total operating expenses | $ 92,135 | $ 91,674 | $ 461 | 1 % | $ 290,803 | $ 294,918 | $ (4,115) | (1)% |

***Cost of product revenue (exclusive of amortization)***

| (in thousands, except percentages) | Three Months Ended September 30, 2024 | 2023 | Change | % Change | Nine Months Ended September 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Cost of product revenue (exclusive of amortization) | | | | | | | | |
| Purchasing and manufacturing costs | $ 15,835 | $ 15,413 | $ 422 | 3 % | $ 45,044 | $ 41,974 | $ 3,070 | 7 % |
| Distribution, royalty and other fulfillment charges | 1,798 | 1,408 | $ 390 | 28 % | 5,135 | 4,941 | $ 194 | 4 % |
| Total cost of product revenue (exclusive of amortization) | $ 17,633 | $ 16,821 | $ 812 | 5 % | $ 50,179 | $ 46,915 | $ 3,264 | 7 % |

Cost of product revenue (exclusive of amortization) is generally incurred when our Products are delivered and primarily consists of the purchasing cost of the RHA® Collection of dermal fillers and manufacturing costs of DAXXIFY® and distribution expenses, royalty, other fulfillment costs related to the RHA® Collection of dermal fillers and DAXXIFY®. Substantially all of DAXXIFY® manufacturing expenses incurred prior to DAXXIFY® GL Approval were classified as research and development expenses, resulting in Zero-cost Inventory.

Our cost of product revenue (exclusive of amortization) for the three and nine months ended September 30, 2024 increased compared to the same periods in 2023, primarily due to higher sales volume of our Products. When Zero-cost Inventory, which is further discussed below, is depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase. We also anticipate that our cost of product revenue (exclusive of amortization) associated with the RHA® Collection of dermal fillers to increase as sales volume increases.

*Purchasing and manufacturing costs*

For the three and nine months ended September 30, 2024, purchasing and manufacturing costs increased compared to the same periods in 2023, primarily due to the higher sales volume of our Products.

*Distribution, royalty and other fulfillment charges*

For the three and nine months ended September 30, 2024, distribution, royalty, and other fulfillment costs increased compared to the same periods in 2023, primarily due to higher sales volume of our Products.

Table of Contents

*Impact of Zero-cost Inventory for DAXXIFY®*

For the three and nine months ended September 30, 2024, the cost of product revenue (exclusive of amortization) would have increased by approximately $5 million and $18 million, respectively, if cost of product revenue (exclusive of amortization) included previously expensed inventories. For the three and nine months ended September 30, 2023, the cost of product revenue (exclusive of amortization) would have increased by approximately $3 million and $11 million, respectively, if cost of product revenue (exclusive of amortization) included previously expensed inventories. We expect to utilize existing Zero-cost Inventory until depleted in the near-term. Once depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase.

***Selling, General and Administrative Expenses***

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **(in thousands, except percentages)** | **2024** | **2023** | **Change** | **% Change** | **2024** | **2023** | **Change** | **% Change** |
| Selling, general and administrative | $ 58,727 | $ 59,862 | $ (1,135) | (2)% | $ 181,709 | $ 177,632 | $ 4,077 | 2 % |
| Stock-based compensation | 3,491 | 8,599 | $ (5,108) | (59)% | 15,631 | 31,042 | $ (15,411) | (50)% |
| Depreciation and amortization | 360 | 633 | $ (273) | (43)% | 1,924 | 3,815 | $ (1,891) | (50)% |
| Less: selling, general, and administrative expenses classified as discontinued operations | — | (3,303) | $ 3,303 | (100)% | (1,950) | (9,966) | $ 8,016 | (80)% |
| Total selling, general and administrative expenses | $ 62,578 | $ 65,791 | $ (3,213) | (5)% | $ 197,314 | $ 202,523 | $ (5,209) | (3)% |

*Selling, general and administrative expenses (before stock-based compensation and depreciation and amortization)*

Selling, general and administrative expenses (before stock-based compensation and depreciation and amortization) consist primarily of the following:

- Costs of sales and marketing activities and sales force compensation related to our Products; and
- Personnel and professional service costs in our finance, information technology, investor relations, legal, human resources, and other administrative departments;

For the three months ended September 30, 2024, selling, general and administrative expenses decreased compared to the same period in 2023, primarily due to the implementation of cost efficiency measures during the current year, partially offset by increased sales and marketing expense for therapeutics, increased legal costs, and transaction costs related to the pending Merger. For the nine months ended September 30, 2024, selling, general and administrative expenses increased compared to the same period in 2023, primarily due to $7.3 million of transaction costs related to the pending Merger, an increase in sales and marketing activities in preparation for our DAXXIFY® therapeutics launch, and certain litigation matters, partially offset by cost efficiency measures realized during the period.

*Stock-based compensation*

For the three and nine months ended September 30, 2024, stock-based compensation included in selling, general and administrative expenses decreased $5.1 million and $15.4 million, respectively, compared to the same periods in 2023, primarily due to the (i) stock-based compensation expense recognized for the vesting of the DAXXIFY® GL Approval PSU in March 2023, (ii) the impact of the exit of the Fintech Platform business, (iii) the stock-based compensation expense recognized for the vesting of certain market-based PSUs in May 2023, and (iv) lower grant-date fair value of stock awards granted in 2024 compared to 2023, partially offset by expenses associated with certain equity award modifications in selling, general and administrative functions.

***Research and Development Expenses***

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| (in thousands, except percentages) | 2024 | 2023 | Change | % Change | 2024 | 2023 | Change | % Change |
| Research and development | $ 9,953 | $ 11,200 | $ (1,247) | (11)% | $ 38,605 | $ 48,118 | $ (9,513) | (20)% |
| Stock-based compensation | 1,091 | 1,688 | $ (597) | (35)% | 3,736 | 7,926 | $ (4,190) | (53)% |
| Depreciation and amortization | 335 | 172 | $ 163 | 95 % | 1,090 | 3,000 | $ (1,910) | (64)% |
| Less: research and development expenses classified as discontinued operations | — | (4,372) | $ 4,372 | (100)% | (1,757) | (15,200) | $ 13,443 | (88)% |
| Total research and development expenses | $ 11,379 | $ 8,688 | $ 2,691 | 31 % | $ 41,674 | $ 43,844 | $ (2,170) | (5)% |

*Research and development expenses (before stock-based compensation and depreciation and amortization)*

We generally do not allocate costs by product candidates unless contractually required by our business partners. Research and development expenses (before stock-based compensation and depreciation and amortization) consist primarily of:

- Personnel costs in our research and development functions;
- expenses related to the initiation and completion of clinical trials and studies for the RHA® Pipeline Products and an onabotulinumtoxinA biosimilar, including expenses related to the production of clinical supplies;
- expenses related to the manufacturing of supplies for clinical activities, regulatory approvals, and pre-commercial inventory;
- certain expenses related to the establishment and maintenance of our manufacturing facilities;
- expenses related to medical affairs, medical information, publications and pharmacovigilance oversight;
- expenses related to license fees, milestone payments, and development efforts under in-licensing agreements;
- expenses related to compliance with drug development regulatory requirements in the U.S. and other foreign jurisdictions;
- fees paid to clinical consultants, CROs and other vendors, including all related fees for investigator grants, patient screening fees, laboratory work and statistical compilation and analysis; and
- other consulting fees paid to third-parties;

For the three and nine months ended September 30, 2024, research and development expenses (before stock-based compensation and depreciation and amortization) decreased compared to the same periods in 2023, primarily due to the FDA approval of our PAS submission for the ABPS manufacturing facility in late March 2023 which allowed manufacturing related expenses for DAXXIFY® to be capitalized on the condensed consolidated balance sheet. Prior to the approval, such manufacturing related expenses were classified as research and development expense in the condensed consolidated statements of operations and comprehensive loss.

Our research and development expenses (before stock-based compensation and depreciation and amortization) are subject to numerous uncertainties, primarily related to the timing and cost needed to complete our respective projects. The development timelines, probability of success and development expenses can differ materially from expectations, and the completion of clinical trials may take several years or more depending on the type, complexity, novelty and intended use of a product candidate. Accordingly, the cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development. We expect our research and development expenses (before stock-based compensation and depreciation and amortization) to be relatively consistent in the near term, primarily due to deferring the Phase 3 clinical program for upper limb spasticity and other therapeutics pipeline activities. However, we will continue sharing certain development costs with Teoxane related to the RHA® Pipeline Products, and other activities related to the pursuit of approval for the PCI manufacturing facility.

When we conduct additional clinical trials, such as for our biosimilar program or additional DAXXIFY® therapeutic indications, we expect our research and development expenses (before stock-based compensation and depreciation and amortization) to increase. Depending on the stage of completion and level of effort related to each development phase undertaken, we may reflect variations in our research and development expenses. We expense both internal and external research and development expenses as they are incurred.

*Stock-based compensation*

For the three and nine months ended September 30, 2024, stock-based compensation included in research and development expenses decreased compared to the same periods in 2023, primarily due to the (i) stock-based compensation expense recognized from the vesting of the DAXXIFY® GL Approval PSU in March 2023, (ii) impact of the exit of the Fintech Platform business, (iii) the stock-based compensation expense recognized for the vesting of certain market-based PSUs in May 2023; and (iv) lower grant-date fair value from stock awards granted in 2024 in comparison to 2023, offset by lower capitalized stock-based compensation in 2024.

***Amortization***

Amortization presented separately on the condensed consolidated statements of operations and comprehensive loss represents the amortization for the distribution rights, which is within the functional area of cost of product revenue. Refer to Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 3—Exit of the Fintech Platform Business" for the amortization expense classified as discontinued operations.

***Net Non-Operating Income and Expense***

| (in thousands, except percentages) | Three Months Ended September 30, 2024 | 2023 | Change | % Change | Nine Months Ended September 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Interest income | $ 2,631 | $ 3,733 | $ (1,102) | (30)% | $ 8,806 | $ 9,851 | $ (1,045) | (11)% |
| Interest expense | (6,732) | (5,093) | $ (1,639) | 32 % | (17,667) | (13,958) | $ (3,709) | 27 % |
| Other expense, net | (258) | (223) | $ (35) | 16 % | (1,149) | (1,056) | $ (93) | 9 % |
| Total net non-operating expense | $ (4,359) | $ (1,583) | $ (2,776) | 175 % | $ (10,010) | $ (5,163) | $ (4,847) | 94 % |

*Interest Income*

Interest income primarily consists of interest income earned on our deposit, money market fund, and investment balances. We expect interest income to vary each reporting period depending on our average deposit, money market fund, and investment balances during the period and market interest rates.

*Interest Expense*

Interest expense includes cash and non-cash components. The cash component of the interest expense primarily consists of the contractual interest charges for our 2027 Notes and Notes Payable, as well as our finance lease liability interest expense. The non-cash component of the interest expense primarily consists of the amortization of debt issuance costs for our 2027 Notes and the amortization of debt insurance cost, debt discount, and exit fee for the Notes Payable.

For the three and nine months ended September 30, 2024, interest expense increased compared to the same periods in 2023 due to interest associated with the issuance of the Second Tranche of the Notes payable in August 2023, and partially offset by a decrease in interest expense for our finance lease liability.

*Other Expense, net*

Other expense, net primarily consists of miscellaneous tax and other expense items partially offset by office lease sublease income.

**Liquidity and Capital Resources**

Our financial condition is summarized as follows:

| (in thousands) | September 30, | December 31, 2023 | Increase/(Decrease) |
|---|---|---|---|
| Cash, cash equivalents, and short-term investments | $ 184,076 | $ 253,915 | $ (69,839) |
| Working capital | $ 249,638 | $ 249,641 | $ (3) |
| Stockholders' deficit | $ (163,030) | $ (151,604) | $ 11,426 |

***Sources and Uses of Cash***

We hold our cash, cash equivalents, and short-term investments in bank accounts and interest-bearing instruments subject to investment guidelines for high credit quality. Our investment portfolio is structured to provide for investment maturities and access to cash to fund our anticipated working capital needs.

As of September 30, 2024 and December 31, 2023, we had cash, cash equivalents and short-term investments of $184.1 million and $253.9 million, respectively, which reflected a decrease between these periods of $69.8 million. The decrease was primarily due to cash used in operating activities of $148.2 million, principal payments on a finance lease of $12.6 million, finance lease prepayment of $9.1 million, purchases of property and equipment of $2.2 million, and payment

of debt principal and an exit fee of $1.3 million. The decrease was primarily offset by proceeds from a follow-on public offering, net of underwriting discount of $97.6 million and other cash inflows of $6.0 million.

We derived the following summary of our condensed consolidated cash flows for the periods indicated from Part I, Item 1, "Financial Information—Condensed Consolidated Financial Statements (Unaudited)" in this Report:

| | Nine Months Ended September 30, | |
|---|---|---|
| **(in thousands)** | **2024** | **2023** |
| Net cash provided by (used in): | | |
| Operating activities | $ (148,157) | $ (173,844) |
| Investing activities | $ (15,305) | $ 107,370 |
| Financing activities | $ 83,327 | $ 138,196 |

*Cash Flows from Operating Activities*

Our cash used in operating activities is primarily driven by personnel costs, manufacturing and facility costs, sales and marketing activities, and general and administrative support, offset by revenue generated from the sale of our Products. Our cash flows from operating activities will continue to be affected principally by the revenue generated from our Products and our working capital requirements, with a primary focus on commercial operations.

Cash used in operating activities for nine months ended September 30, 2024 consisted of approximately $314 million in expenditures related to overall operations, partially offset by approximately $166 million in cash receipts from our revenue. The increase in net cash used in operating activities for the nine months ended September 30, 2024, compared to 2023 is primarily driven by expenditures related to supporting the Company's commercial growth, and partially offset by an increase in cash receipt from Product sales.

Cash used in operating activities for the nine months ended September 30, 2023 consisted of approximately $326 million in expenditures related to overall operations, partially offset by approximately $152 million in cash receipts from our revenue.

*Cash Flows from Investing Activities*

For the nine months ended September 30, 2024 and 2023, net cash provided by or used in investing activities was primarily due to fluctuations in the timing of purchases and maturities of investments, prepayment on a finance lease, and purchases of property and equipment.

*Cash Flows from Financing Activities*

For the nine months ended September 30, 2024, net cash provided by financing activities was driven by proceeds from follow-on public offering, net of underwriting discount, and proceeds from the exercise of stock options and employee stock purchase plan, which was offset by the principal payments on finance lease obligations, payment of debt principal and exit fee, net settlement of stock awards for employee taxes, and payments of offering costs.

For the nine months ended September 30, 2023, net cash provided by financing activities was driven by the proceeds from the ATM, net of commissions, the issuance of the Notes Payable pursuant to the Note Purchase Agreement, net of debt discount and the exercise of stock options and purchases of our common stock through the 2014 ESPP. The inflows were offset by the net settlement of stock awards for employee taxes, and principal payments on finance lease obligations.

***Convertible Senior Notes***

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature

on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers' discount, commissions, and other issuance costs.

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the measurement period in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. The threshold to redeem has not been met as of September 30, 2024. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

Within the time periods required by the terms of the Indenture, we have agreed to deliver any notices (including with respect to holders' rights to require repurchase or conversion of the convertible notes), certificates, supplemental indentures and other documents that might be required under the convertible notes indenture and take all other actions that are required under the terms of the 2027 Notes, the Indenture or under applicable law, including as a result of the transactions contemplated by the Merger Agreement, to the extent constituting a "Fundamental Change" or "Make-Whole Fundamental Change" (as such terms are defined in the Indenture).

We used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027 Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

***Note Purchase Agreement***

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the Purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium, which we did not draw on.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

***Follow-On Offering***

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares to be sold and issued to Mark Foley, our president, chief executive officer, and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and offering costs.

***ATM Offering Program***

In 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the three and nine months ended September 30, 2024 from the 2022 ATM Agreement.

***Common Stock and Common Stock Equivalents***

As of October 31, 2024, outstanding shares of common stock were 104.9 million, unvested RSUs and PSUs were 5.1 million, outstanding stock options were 3.5 million, unvested RSAs and PSAs were 0.6 million, shares expected to be purchased under the 2014 ESPP were 0.1 million and shares of common stock underlying the 2027 Notes was 8.9 million, based upon the initial conversion price.

***Operating and Capital Expenditure Requirements - Going Concern***

We expect to continue to incur operating losses for the foreseeable future as we continue to devote resources to the commercialization, research and development, manufacturing development and regulatory approval of our products. However, there are numerous risks and uncertainties regarding our planned activities, and as a result our funding requirements.

Disciplined capital allocation continues to be a priority; however, we have spent and expect to continue to spend significant resources towards the costs of completing the pending Merger, including legal and financial advisory fees and other transaction costs, certain of which are payable by the Company whether or not the Merger is completed. Also, in addition to quarterly interest payments and exit fees, beginning in September 2024, the Company started repaying to Athyrium the outstanding principal amount of the Second Tranche Notes, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026.

In addition, we expect that we will continue to expend substantial resources for the foreseeable future and in the long-term to support the growth of the aesthetics portfolio of Products and DAXXIFY® for the treatment of cervical dystonia and to support our ongoing operations. In particular, we anticipate that we will continue to invest substantial resources in our commercialization efforts and the manufacturing and supply of DAXXIFY® for commercialization. In addition, in connection with the Teoxane Agreement, we must continue to make specified annual minimum purchases of the RHA® Collection of dermal fillers, which amounts have increased following our entry into the Sixth Amendment (see Note 13 for additional information), and meet annual minimum investments in connection with the commercialization of the RHA® Collection of dermal fillers. In addition, we have dedicated manufacturing capacity, buyback obligations, cost sharing arrangements and related minimum purchase obligations under our manufacturing and supply agreements in connection with the manufacture and supply of DAXXIFY® and any product candidate. We also anticipate expending resources to continue to support the onabotulinumtoxinA biosimilar and Fosun partnerships. In the long term, in addition to the aforementioned expenditures, we anticipate our expenditures will include clinical programs for DAXXIFY® in other potential indications and international regulatory investments.

As of September 30, 2024, we had capital resources of $184.1 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement and payments received from collaboration arrangements. We also have remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of September 30, 2024. Our forecasted liquidity is based on our current operating plan and

excludes any impact from the pending consummation of the Merger. Based on that plan and excluding any impact of the pending consummation of the Merger, our existing cash, cash equivalents, and short-term investments will not allow us to fund our operations for at least 12 months following the filing of this Report. Also, we are required to maintain compliance with the Minimum Cash Covenant in accordance with the terms of the Note Purchase Agreement (see Note 10). As a result, management has concluded that there is substantial doubt about our ability to continue as a going concern. In order to mitigate the substantial doubt to continue as a going concern, we may be required to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses. If we are unable to generate sufficient revenue to fulfill our operating plan, secure additional capital when needed or sufficiently reduce our operating expenses, we may be unable to comply with the Minimum Cash Covenant or continue to operate our business.

See "Part II. Item 1A. Risk Factors—Management has concluded there is substantial doubt about our ability to continue as a going concern" in this Report and "Part I. Item 1A. Risk Factors—We have incurred significant losses since our inception and we anticipate that we will continue to incur operating losses for the foreseeable future and may not achieve or maintain profitability in the future" in our FY2023 Form 10-K for additional information.

**Critical Accounting Policies and Estimates**

For the nine months ended September 30, 2024, there have been no material changes in our critical accounting policies compared to those disclosed in Item 7 in our FY2023 Form 10-K.

**Contractual Obligations**

Except for the minimum purchase obligation under the Sixth Amendment discussed in Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 13—Commitments and Contingencies", there were no material changes outside of the ordinary course of business in our contractual obligations as of September 30, 2024, from those as of December 31, 2023 as reported in our FY2023 Form 10-K.

**Recent Accounting Pronouncements**

Refer to "Recent Accounting Pronouncements" in Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 1—The Company and Summary of Significant Accounting Policies" in this Report.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in interest rates. We do not hold or issue financial instruments for trading purposes. For the nine months ended September 30, 2024, our exposure to market risk did not change materially from what was disclosed in Item 7A in our FY2023 Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Management, with the participation of our principal executive officer and our principal financial officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Report. The term "disclosure controls and procedures" as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

For the three months ended September 30, 2024, there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

We are currently involved in litigation relating to claims arising out of our operations and may be involved in such litigation in the future. Such matters are subject to uncertainty and there can be no assurance that such legal proceedings will not have a material adverse effect on our business, results of operations, financial position or cash flows.

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan: U.S. Patent No. 11,147,878. On December 17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our second motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice. Allergan reduced the asserted claims to claim 8 of U.S. Patent No. 7,354,740, claims 5 and 8 of U.S. Patent No. 11,203,748, claim 10 of U.S. Patent No. 11,033,625, claims 1, 4, 6, and 20 of U.S. Patent No. 11,147,878, and claim 1 of U.S. Patent No. 11,285,216 via a Stipulation and Order dated June 21, 2024. The jury trial is scheduled to begin in December 2024.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021, in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss, and on March 30, 2024, the Court granted the motion with leave for the plaintiff to amend the complaint. On May 1, 2024, the plaintiff filed an amended complaint, which asserted similar claims to those in the prior complaint. On June 25, 2024, the Company filed a motion to dismiss the amended complaint.

We dispute the claims in these lawsuits and intend to defend these matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcomes of the lawsuits are necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

**ITEM 1A. RISK FACTORS**

Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as all other information included in this Report, including our consolidated financial statements, the notes thereto and the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," and Part I, Item IA of our FY2023 10-K before you decide to purchase shares of our common stock. If any of those risks actually occurs, our business, prospects, financial condition and operating results could be materially harmed. As a result, the trading price of our common stock could decline and you could lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations and stock price.

Below we are providing, in supplemental form, new risk factors as well as material changes to our risk factors from those previously disclosed in Part I, Item 1A in our FY2023 10-K. Our risk factors disclosed in Part I, Item 1A of the FY2023 10-K provide additional discussion about these supplemental risks.

**There are uncertainties as to the timing of the Offer and the Merger, including the risk that the Offer or the Merger may not be completed in a timely manner or at all, or may be completed on modified terms that are less favorable.**

On August 11, 2024, we entered into the Merger Agreement with Crown and Merger Sub, pursuant to which Crown will cause Merger Sub to commence a tender offer as promptly as practicable for all of our outstanding common stock. The commencement date for the tender offer was extended via mutual waiver to November 12, 2024, or such other date as may be mutually agreed to among the Buyer Parties and the Company. There can be no assurance that the Offer and the Merger will be completed in the currently contemplated timeframe, or at all, or on the same terms as originally contemplated by the parties, including at the original Offer Price. While the parties previously contemplated closing the Offer and the Merger during the fourth quarter of 2024, there can be no assurance that all closing conditions will be satisfied (or waived, if applicable) by year-end. The obligation of Merger Sub to accept for payment Shares validly tendered pursuant to the Offer is subject to customary closing conditions, including: (i) the Minimum Condition; (ii) the absence of any order, injunction or law prohibiting the Offer or the closing of the Merger; (iii) obtaining applicable approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, which approval has already been received; and (iv) the accuracy of the representations and warranties contained in the Merger Agreement, subject to customary materiality qualifications, and compliance with the covenants and agreements contained in the Merger Agreement as of the closing of the Merger.

The Merger Agreement contains certain termination rights for both the Company and Crown, which could prevent the consummation of the Offer and the Merger. Due to the ongoing discussions between the Company and Crown, in light of the Company's entry into the Teoxane Agreements, the Buyer Parties agreed to further extend the date by which Merger Sub is obligated to commence the tender offer to November 12, 2024 or such other date as may be mutually agreed to between the Company and the Buyer Parties. Crown has expressed dissatisfaction with our entry into the Teoxane Agreements and the terms of such agreements. While the parties continue their discussions, Crown may assert claims related to the Merger Agreement or take other action in connection with the Company's entry into the Teoxane Agreements, including by seeking to unilaterally terminate the Merger Agreement or to otherwise reach a settlement. For these and other reasons, termination of the Merger Agreement could materially and adversely affect our business operations and financial condition, which in turn would materially and adversely affect the price of our common stock. There could also be further delays to the commencement or consummation of the Offer, or in the Company or the Buyer Parties seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including Offer Price.

If the Offer and the Merger are not completed within the expected timeframe or at all, or on modified terms, we will be subject to a number of material risks that could adversely impact our business, financial conditions and results of operations, including the following:

- the trading price of our Shares may significantly decline to the extent that the market price of the Shares reflect positive market assumptions that the Offer and the Merger will be completed at the current Offer Price, and the related benefits will be realized;
- if the Merger Agreement is terminated under certain specified circumstances, including by Revance to accept a Superior Proposal, we may be required to pay Crown a termination fee of $28.8 million;
- the obligation to pay significant transaction costs, such as legal, accounting and financial advisory costs that are not contingent on closing of the Offer and the Merger;
- the diversion of management's attention from our ongoing business operations towards the Offer and the Merger, for which we will have received little or no benefit if completion of the Offer and the Merger does not occur;
- negative reactions from employees, resulting in low productivity, employees leaving the Company or possible layoffs; and

- reputational harm including to relationships with customers, service providers, investors, lenders and business partners due to the adverse perception of any failure to successfully complete the Offer and the Merger.

Failure to timely complete the Offer and the Merger could adversely impact our business, financial condition and results of operations and the trading price of our Shares could significantly decline.

**The announcement and pendency of the Offer and the Merger has resulted and may continue to result in disruptions to our business, divert management's attention and/or disrupt our relationships with third parties and employees, any of which could negatively impact our operating results and ongoing business.**

The Merger Agreement generally requires us to conduct our business in the ordinary course, subject to certain exceptions, including as required by applicable law, pending consummation of the Merger, and subjects us to interim operating covenants that restrict us, without Crown's approval from taking certain specified actions until the Offer and Merger are consummated or the Merger Agreement is terminated in accordance with its terms. These restrictions could prevent us from pursuing certain business opportunities that may arise prior to the consummation of the Offer and the Merger and may affect our ability to execute our business strategies and attain financial and other goals and may impact our financial condition, results of operations and cash flows.

Our current and prospective employees may experience uncertainty about their future roles with us following the consummation of the Merger, which may materially adversely affect our ability to retain and hire key personnel and other employees while the Offer and Merger are pending. The pending Offer and Merger could cause disruptions to our business or business relationships with our existing and potential customers, service providers, investors, lenders and others with whom we do business, and this could have an adverse impact on our operating results and business generally. Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties, or seek to negotiate changes or alter their present business relationships with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

The pursuit of the Offer and Merger has placed and may continue to place a significant burden on management and internal resources, which may have a negative impact on our ongoing business operations. It has also diverted management's time and attention from the day-to-day operation of our businesses and the execution of our other strategic initiatives. This could adversely affect our business, financial condition and results of operations, despite management's efforts to continue to operate in the ordinary course.

The adverse consequence of the pendency of the Merger could be exacerbated by any delays in completion of the Merger or termination of the Merger Agreement. In addition, we have incurred, and will continue to incur, significant costs, expenses and fees for professional services and other transaction costs in connection with the Merger, for which we will have received little or no benefit if the Merger is not completed. Many of these fees and costs will be payable by us even if the Merger is not completed and may relate to activities that we would not have undertaken other than to complete the Merger, which could materially and adversely affect our business, financial condition, results of operations and cash flows.

**Stockholder litigation in connection with the Offer and Merger may result in significant costs of defense, indemnification and liability, and could impact the timing of or our ability to complete the Merger.**

The Company may be subject to stockholder lawsuits challenging the Offer and Merger. No assurance can be made as to the outcome of these and other similar lawsuits, including the amount of costs associated with defending such claims or any other liabilities that may be incurred in connection with the litigation of such claims. If plaintiffs are successful in obtaining an injunction prohibiting completion of the Offer and Merger on the agreed-upon terms, such an injunction may delay the completion of the Offer and Merger in the expected timeframe or may prevent the Offer and Merger from being completed altogether. Whether or not any plaintiff's claim is successful, such litigation may result in significant costs of defense, indemnification and liability, and diverts management's attention and resources, which could adversely affect our business, financial condition and results of operations.

**In certain instances, the Merger Agreement requires us to pay a termination fee to Crown, which could require us to use available cash that would have otherwise been available for general corporate purposes.**

Under the terms of the Merger Agreement, we may be required to pay Crown a termination fee of $28.8 million if the Merger Agreement is terminated under certain circumstances described in the Merger Agreement, including by Revance to accept a Superior Proposal. If the Merger Agreement is terminated under such circumstances, the termination fee we may be required to pay under the Merger Agreement may require us to use available cash that would have otherwise been available for general corporate purposes and other uses. For these and other reasons, termination of the Merger Agreement could materially and adversely affect our business operations and financial condition, which in turn would materially and adversely affect the price of our common stock.

**The Merger Agreement contains provisions that could discourage a potential competing acquirer of the Company or could result in a competing acquisition proposal being at a lower price than it might otherwise be.**

The Merger Agreement contains provisions that, subject to certain exceptions, restrict our ability to solicit or negotiate any alternative acquisition proposal. For example, the Merger Agreement contains certain termination rights for both the Company and Crown. Either party may terminate for the following events: (i) issuance of a final and non-appealable order by a court of competent jurisdiction that prevents or makes illegal the Offer or the Merger; and (ii) the termination or expiration of the Offer with Merger Sub being required to accept Shares for payment and the failure of the Merger to close by the Outside Date (as defined in the Merger Agreement). The Company may terminate, (i) if Crown fails to commence the Offer on or prior to the expiration date, unless due primarily to the Company's material breach of the agreement; (ii) to enter into a definitive agreement for a Superior Proposal; (iii) Crown leaves a material breach uncured, which breach would reasonably be expected to have a material adverse effect on the ability of Crown or Merger Sub to consummate the Merger; and (iv) if the conditions to closing are satisfied, the Company is prepared to close, and the Buyer Parties fail to close. These provisions could discourage a potential competing acquirer that might have an interest in acquiring all or a significant part of our business from considering or making a competing acquisition proposal, even if the potential competing acquirer was prepared to pay consideration with a higher per share cash value than the market value proposed to be received or realized in the Offer and the Merger, or might cause a potential competing acquirer to propose to pay a lower price than it might otherwise have proposed to pay because of the added expense of the termination fee and other costs that may become payable in certain circumstances under the Merger Agreement.

**Management has concluded there is substantial doubt about our ability to continue as a going concern.**

We are not profitable and have incurred losses each year since we commenced operations in 2002. As of September 30, 2024, we had capital resources of $184.1 million consisting of cash, cash equivalents, and short-term investments. Based on our current operating plan, excluding any impact from the pending consummation of the Merger, our existing cash, cash equivalents, and short-term investments will not allow us to fund our operations for at least 12 months following the filing of this Report. Also, we are required to maintain compliance with the Minimum Cash Covenant in accordance with the terms of the Note Purchase Agreement. As a result, management has concluded that there is substantial doubt about our ability to continue as a going concern. In order to mitigate the substantial doubt to continue as a going concern, we may be required to refinance our debt, conduct additional financings, restructure operations, sell assets or reduce our operating expenses.

Additional capital may not be available when needed, on terms that are acceptable to us or at all. If adequate funds are not available to us on a timely basis, or at all, we may be required to take capital preservation measures, including to reduce operating expense and delay, reduce the scope of, discontinue or alter our sales and marketing capabilities; research and development activities; or other activities that may be necessary to continue to commercialize our Products and other aspects of our business plan. If we are unable to generate sufficient revenue to fulfill our operating plan, secure additional capital when needed or sufficiently reduce our operating expenses, we may be unable to comply with the Minimum Cash Covenant or continue to operate our business. For more information on consequences under the Note Purchase Agreement, see our FY2023 Form 10-K, Item 1A - "We may not have cash available in an amount sufficient to enable us to make interest or principal payments on our indebtedness when due."

If we raise additional capital through marketing and distribution arrangements, royalty financings or other collaborations, strategic alliances or licensing arrangements with third parties, we may need to relinquish certain valuable rights to our product candidates, technologies, future revenue streams or research programs or grant licenses on terms that may not be favorable to us. If we raise additional capital through debt financing, we may be subject to specified financial covenants or covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making capital expenditures or pursuing certain transactions, any of which could restrict our ability to commercialize our product candidates or operate as a business; and our assets may be subject to liens. In addition, our ability to raise capital may be limited by restrictions under the Note Purchase Agreement, including our ability to sell or license intellectual property, and other reasons like the global economy, inflation or other macroeconomic factors.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None.

## ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## ITEM 5. OTHER INFORMATION

None.

### Rule 10b5-1 Trading Arrangements

During the three months ended September 30, 2024, none of our Section 16 officers or directors adopted, modified or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement, as defined in Item 408 of Regulation S-K.

**ITEM 6. EXHIBITS**

The following exhibits are included herein or incorporated herein by reference:

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed Herewith |
| 2.1 | Agreement and Plan of Merger by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. dated as of August 11, 2024 | 8-K | 001-36297 | 2.1 | August 12, 2024 | — |
| 3.1 | Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | February 11, 2014 | — |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | May 7, 2021 | — |
| 3.3 | Amended and Restated Bylaws | 8-K | 001-36297 | 3.1 | December 15, 2023 | — |
| 4.1 | Form of Common Stock Certificate | S-1/A | 333-193154 | 4.4 | February 3, 2014 | — |
| 4.2 | Indenture, dated as of February 14, 2020, by and between Revance Therapeutics, Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-36297 | 4.1 | February 14, 2020 | — |
| 4.3 | Form of Global Note, representing Revance Therapeutics, Inc.'s 1.75% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.2) | 8-K | 001-36297 | 4.2 | February 14, 2020 | — |
| 10.1+ | Fourth Amendment to Exclusive Distribution Agreement dated June 13, 2024 by and between Revance Therapeutics, Inc. and Teoxane SA | — | — | — | — | X |
| 10.2 | Fifth Amendment to Exclusive Distribution Agreement dated July 29, 2024 by and between Revance Therapeutics, Inc. and Teoxane SA | — | — | — | — | X |
| 10.3+ | Sixth Amendment to Exclusive Distribution Agreement dated October 24, 2024 by and between Revance Therapeutics, Inc. and Teoxane SA | 8-K | 001-36297 | 10.1 | October 28, 2024 | — |
| 10.4+ | Exclusive Distribution Agreement, dated October 24, 2024, by and among Teoxane SA, Revance Therapeutics, Inc. and Revance Australia Pty. Ltd. | 8-K | 001-36297 | 10.2 | October 28, 2024 | — |
| 10.5 | Support Agreement, dated as of August 11, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and the parties named on Schedule A thereto (included as Exhibit C in the Merger Agreement and incorporated herein by reference) | 8-K | 001-36297 | 10.1 | August 12, 2024 | — |
| 10.6 | Waiver to Agreement and Plan of Merger, dated as of August 27, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | August 28, 2024 | — |
| 10.7 | Waiver to Agreement and Plan of Merger, dated as of September 19, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | September 23, 2024 | — |
| 10.8 | Waiver to Agreement and Plan of Merger, dated as of October 3, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | October 4, 2024 | — |
| 10.9 | Waiver to Agreement and Plan of Merger, dated as of October 18, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | October 18, 2024 | — |
| 10.10 | Waiver to Agreement and Plan of Merger, dated as of October 25, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | October 28, 2024 | — |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filling Date | |
| 10.11 | Waiver to Agreement and Plan of Merger, dated as of November 1, 2024, by and among Crown Laboratories, Inc., Reba Merger Sub, Inc. and Revance Therapeutics, Inc. | 8-K | 001-36297 | 99.1 | November 1, 2024 | — |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 32.1† | Certification of the Principal Executive Officer pursuant to18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 32.2† | Certification of the Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | — | — | — | — | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | — | — | — | — | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | — | — | — | — | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | — | — | — | — | X |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document | — | — | — | — | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | — | — | — | — | X |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibits 101) | — | — | — | — | X |

\+ Portions of this exhibit (indicated by asterisks) have been omitted as the registrant has determined that (i) the omitted information is not material and (ii) the omitted information is of the type that the registrant treats as private or confidential.

† The certifications attached as Exhibit 32.1 and 32.2 that accompany this Report pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, shall not be deemed filed with the Securities and Exchange Commission for purposes of Section 18 of the Exchange Act. Such certifications shall not be deemed incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act, or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

**REVANCE THERAPEUTICS, INC.**

Date: November 7, 2024

By: /s/ Mark J. Foley
**Mark J. Foley**
**President and Chief Executive Officer**
***(Duly Authorized Principal Executive Officer)***

By: /s/ Tobin C. Schilke
**Tobin C. Schilke**
**Chief Financial Officer**
***(Duly Authorized Principal Financial Officer and Principal Accounting Officer)***

**Fourth Amendment to the Exclusive Distribution Agreement dated January 10, 2020**

dated June 13, 2024 by and among

**Teoxane SA** (the **Supplier**)
Rue de Lyon 105, CH-1203 Geneva, Switzerland
and

**Revance Therapeutics Inc.** (the **Distributor**)
7555 Gateway Boulevard Newark, California, USA
(the Supplier and the Distributor, together the **Parties**, and each a **Party**)

**CERTAIN CONFIDENTIAL INFORMATION**
**CONTAINED IN THIS DOCUMENT, MARKED BY [*], HAS BEEN OMITTED BECAUSE REVANCE THERAPEUTICS, INC., HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) IS THE TYPE THAT REVANCE THERAPEUTICS, INC. TREATS AS PRIVATE AND CONFIDENTIAL.**

**Preamble**

A. On January 10, 2020, the Parties entered into an Exclusive Distribution Agreement (the **Original Exclusive Distribution Agreement**) to distribute certain products in the Territory.

B. On September 1, 2020, the Parties entered into a First Amendment Agreement to postpone the Launch Date (the **First Amendment Agreement**).

C. On November 18, 2020, the Parties entered into a Second Amendment Agreement to update the Innovation Plan (the **Second Amendment Agreement**).

D. On December 16, 2022, the parties entered into a Third Amendment Agreement to update the Annex 6.3 – Quality Agreement and replace it by the Annex 6.3 – First Restated and Amended Quality Agreement (The **Third Amendment Agreement**).

E. The Original Exclusive Distribution Agreement, the First Amendment Agreement, the Second Amendment Agreement, and the Third Amendment Agreement together are referred to as the **Exclusive Distribution Agreement**. Unless otherwise defined herein, capitalized terms used in this preamble and in this fourth amendment agreement to the exclusive distribution agreement dated January 10, 2020 (this **Fourth Amendment Agreement**) shall have the meaning assigned to them in the Exclusive Distribution Agreement.

F. The parties wish to update the **Annex 6.3 - First Restated and Amended Quality Agreement** of the Exclusive Distribution Agreement

G. The purpose of this Fourth Amendment Agreement is to formally amend the Exclusive Distribution Agreement in accordance with its Clause 19.7 in order to reflect the Parties new agreements regarding the above.

**Now therefore the Parties agree to modify the Exclusive Distribution Agreement as follows:**

**1. Amendments**

As of the effective date of this Fourth Amendment Agreement, as set forth in Section 3 below, Annex 6.3 – First Restated and Amended Quality Agreement of the Exclusive Distribution Agreement shall be replaced by Annex 6.3 – Second Restated and Amended Quality Agreement attached to this Fourth Amendment Agreement.

**2. No Other Amendments**

Other than as set for in this Fourth Amendment Agreement, the Exclusive Distribution Agreement and its Annexes shall not be amended, changed, modified or varied in any way.

**CERTAIN CONFIDENTIAL INFORMATION**
**CONTAINED IN THIS DOCUMENT, MARKED BY [*], HAS BEEN OMITTED BECAUSE REVANCE THERAPEUTICS, INC., HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) IS THE TYPE THAT REVANCE THERAPEUTICS, INC. TREATS AS PRIVATE AND CONFIDENTIAL.**

**3. Effective Date**

The amendments set forth in this Fourth Amendment Agreement shall become effective upon the date of its execution by both Parties.

**4. One Agreement**

This Fourth Amendment Agreement and the Exclusive Distribution Agreement including its Annexes, taken together, shall constitute one and the same agreement for all purposes to be designated as the Exclusive Distribution Agreement.

**5. Expenses**

Each Party shall bear its own taxes, costs and expenses related to the preparation, execution and performance of this Fourth Amendment Agreement.

**6. Applicable Law and Dispute Resolution**

a. This Fourth Amendment Agreement shall for all purposes be governed by and interpreted in accordance with the laws of [*], without giving effect to conflicts of laws principles. The Parties agree that the United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to this Fourth Amendment Agreement.

b. Any dispute arising from or relating to this Fourth Amendment Agreement shall be submitted to final and binding arbitration in accordance with Clause 19.10(b) to Clause 19.10(e) of the Exclusive Distribution Agreement.

**7. Counterparts**

This Third Amendment Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Third Amendment Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement, including counterparts transmitted via facsimile or by PDF file (portable document format file).

**CERTAIN CONFIDENTIAL INFORMATION**
**CONTAINED IN THIS DOCUMENT, MARKED BY [*], HAS BEEN OMITTED BECAUSE REVANCE THERAPEUTICS, INC., HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) IS THE TYPE THAT REVANCE THERAPEUTICS, INC. TREATS AS PRIVATE AND CONFIDENTIAL.**

**Signature — Fourth Amendment to the Exclusive Distribution Agreement**

| **The Supplier** | **Teoxane SA** |
|---|---|
| Place, date | /s/ Pascal Brice<br>By: Pascal Brice<br>Title: Chief Technical Officer |
| Place, date | /s/ Teny Nicoghossian<br>By: Teny Nicoghossian<br>Title: Head of Legal |

| **The Distributor** | **Revance Therapeutics Inc.** |
|---|---|
| Place, date | /s/ Mike Kawano<br>By: Mike Kawano<br>Title: Sr. Dir., Quality Assurance |

CERTAIN CONFIDENTIAL INFORMATION
CONTAINED IN THIS DOCUMENT, MARKED BY [*], HAS BEEN OMITTED BECAUSE REVANCE THERAPEUTICS, INC., HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) IS THE TYPE THAT REVANCE THERAPEUTICS, INC. TREATS AS PRIVATE AND CONFIDENTIAL.

**Annex 6.3 – Second Restated and Amended Quality Agreement**

**[*]**

**CERTAIN CONFIDENTIAL INFORMATION**
**CONTAINED IN THIS DOCUMENT, MARKED BY [*], HAS BEEN OMITTED BECAUSE REVANCE THERAPEUTICS, INC., HAS DETERMINED THE INFORMATION (I) IS NOT MATERIAL AND (II) IS THE TYPE THAT REVANCE THERAPEUTICS, INC. TREATS AS PRIVATE AND CONFIDENTIAL.**

# Fifth Amendment to the Exclusive Distribution Agreement dated January 10, 2020

dated July 29th, 2024

by and among

**Teoxane SA** (the **Supplier**)
Rue de Lyon 105, CH-1203 Geneva, Switzerland

and

**Revance Therapeutics Inc.** (the **Distributor**)
7555 Gateway Boulevard Newark, California, USA

(the Supplier and the Distributor, together the **Parties**, and each a **Party**)

**Preamble**

A. On January 10, 2020, the Parties entered into an Exclusive Distribution Agreement (the **Original Exclusive Distribution Agreement**) to distribute certain products in the Territory.

B. On September 1, 2020, the Parties entered into a First Amendment Agreement to postpone the Launch Date (the **First Amendment Agreement**).

C. On November 18, 2020, the Parties entered into a Second Amendment Agreement to update the Innovation Plan (the **Second Amendment Agreement**).

D. On December 16, 2022, the parties entered into a Third Amendment Agreement to update the Annex 6.3 — Quality Agreement and replace it by the Annex 6.3 — First Restated and Amended Quality Agreement (The **Third Amendment Agreement**).

E. On June 13, 2024, the parties entered into a Fourth Amendment Agreement to update the Annex 6.3 — Quality Agreement and replace it by the Annex 6.3 — Second Restated and Amended Quality Agreement (The **Fourth Amendment Agreement**).

F. The Original Exclusive Distribution Agreement, the First Amendment Agreement, the Second Amendment Agreement, the Third Amendment Agreement and the Fourth Amendment Agreement together are referred to as the **Exclusive Distribution Agreement**. Unless otherwise defined herein, capitalized terms used in this preamble and in this fifth amendment agreement to the exclusive distribution agreement dated January 10, 2020 (this **Fifth Amendment Agreement**) shall have the meaning assigned to them in the Exclusive Distribution Agreement.

G. The parties wish to amend the "Cure" period in Section 16.2(a)(i) (**Termination for Breach**) from ninety (90) days to sixty (60) days.

H. The purpose of this Fifth Amendment Agreement is to formally amend the Exclusive Distribution Agreement in accordance with its Clause 19.7 in order to reflect the Parties new agreements regarding the above.

**Now therefore the Parties agree to modify the Exclusive Distribution Agreement as follows:**

**1. Amendment:**

**<u>Early Termination for Breach</u>**

Clause 16.2(a)(i) of the Exclusive Distribution Agreement is deleted in its entirety and is replaced by the following new Clause 16.2(a) as follows:

(a) Without prejudice to any other rights or remedies provided under this Agreement, either Party has the right, but not the obligation, to terminate this Agreement immediately upon written notice served to the other Party in writing if the other Party (the **Breaching Party**) has materially breached its obligations under this Agreement, and the Breaching Party has not cured such material breach within **(i) sixty (60) calendar days of receipt of a written notice of such breach by the nonbreaching Party to remedy such breach or** (ii) in the case of any

nonpayment due under this Agreement, thirty (30) calendar days of receipt of a written notice requesting payment of such due amount.

**2. No Other Amendments**

Other than as set for in this Fifth Amendment Agreement, the Exclusive Distribution Agreement and its Annexes shall not be amended, changed, modified or varied in any way, and each Party retains its rights and obligations under the Exclusive Distribution Agreement in its version prior to the Amendment Effective Date up until the Amendment Effective Date.

**3. Effective Date**

The amendments set forth in this Fifth Amendment Agreement shall be effective as of July 29, 2024 ("**Amendment Effective Date**").

**4. One Agreement**

This Fifth Amendment Agreement and the Exclusive Distribution Agreement including its Annexes, taken together, shall constitute one and the same agreement for all purposes to be designated as the Exclusive Distribution Agreement.

**5. Expenses**

Each Party shall bear its own taxes, costs and expenses related to the preparation, execution and performance of this Fifth Amendment Agreement.

**6. Counterparts**

This Fifth Amendment Agreement may be executed in one or more counterparts each of which will be deemed to be an original copy of this Fifth Amendment Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement, including counterparts transmitted via facsimile or by PDF file (portable document format file).

**Signature — Fourth Amendment to the Exclusive Distribution Agreement**

| **The Supplier** | **Teoxane SA** |
|---|---|
| Geneva, 29 July 2024 | /s/ Pierre Alain Guillaume |
| Place, date | By: Pierre Alain Guillaume<br>Title: Member of the Board of directors |

| **The Distributor** | **Revance Therapeutics Inc.** |
|---|---|
| Nashville, 29 July 2024 | /s/ Mark Foley |
| Place, date | By: Mark Foley<br>Title: CEO |

**Exhibit 31.1**

**CERTIFICATIONS**

I, Mark J. Foley, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Revance Therapeutics, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2024

/s/ Mark J. Foley
**Mark J. Foley**
**President and Chief Executive Officer**
***(Duly Authorized Principal Executive Officer)***

**Exhibit 31.2**

**CERTIFICATIONS**

I, Tobin C. Schilke, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Revance Therapeutics, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2024

/s/ Tobin C. Schilke

**Tobin C. Schilke**
**Chief Financial Officer**
***(Duly Authorized Principal Financial Officer and Principal Accounting Officer)***

**Exhibit 32.1**

**CERTIFICATION**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Mark J. Foley, Chief Executive Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

**1.** The Company's Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "Periodic Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

**2.** The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 7, 2024

/s/ Mark J. Foley

**Mark J. Foley**
**President and Chief Executive Officer**
***(Duly Authorized Principal Executive Officer)***

This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

**Exhibit 32.2**

# CERTIFICATION

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Tobin C. Schilke, Chief Financial Officer of Revance Therapeutics, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

1. The Company's Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "Periodic Report"), to which this Certification is attached as Exhibit 32.2, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and
2. The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 7, 2024

/s/ Tobin C. Schilke

**Tobin C. Schilke**
**Chief Financial Officer**
***(Duly Authorized Principal Financial Officer and Principal Accounting Officer)***

This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

# EXHIBIT 32

Case 1:21-cv-01411-RGA-LDH Document 684-3 Filed 10/03/25 Page 190 of 344 PageID #: 63258

DAXXIFY®
daxibotulinumtoxinA-lanm injection

MENU



FAQS

# Questions? We've got answers.

JUMP TO A SECTION


About DAXXIFY®

Safety

Preparing for Your Treatment

About Wrinkles & Injectable Treatments


## About DAXXIFY®

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection. **Expand to Read More**

### What is DAXXIFY®?

DAXXIFY® is FDA approved to smooth moderate to severe lines between the brows. It is the only frown line treatment powered by a peptide.

The active ingredient in DAXXIFY® is a purified protein called botulinum toxin type A.

### Is DAXXIFY® for me?

DAXXIFY® could be for you if you would like to improve the look of your frown lines with a product that's fast acting, long lasting and delivers a better look.*

Find a DAXXIFY® provider in your area.

*Results as early as the next day and typically within 2 days. At least 50% of patients in clinical studies had no or minor frown lines 6 months after treatment. Improves the appearance of skin texture versus before treatment.

### How can I get treated with DAXXIFY®?

Find a provider near you who offers DAXXIFY®.

### Why does DAXXIFY® have a peptide?

All frown line treatments require a special ingredient to stabilize botulinum toxin A, the protein responsible for helping smooth moderate to severe frown lines. For instance, Botox® Cosmetic uses human serum albumin (HSA), a blood product, as its stabilizer. Dysport®, another frown line treatment, uses HSA as a stabilizer and cow's milk protein as a protectant.

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

DAXXIFY® is unique because it is the only formulation that uses a novel peptide as a stabilizer and does not contain human or animal byproducts.

---

**How is DAXXIFY® different from other frown line treatments?** —

DAXXIFY® is unique because it's the only frown line treatment formulated with a peptide. The peptide helps eliminate the need for human or animal products to stabilize the active ingredient, botulinum toxin A. The peptide also enhances attachment of the active ingredient, acting like a magnet and making more toxin available to enter nerve cells. The peptide formulation delivers outstanding results that are fast, last, and give a better look to the skin's texture after treatment.*

*Results as early as the next day and typically within 2 days. At least 50% of patients in clinical studies had no or minor frown lines 6 months after treatment.

---

**Will I need the same number of Units as my current frown line treatment?** —

In short, no, and here's why. Units are like fingerprints—they are a proprietary measurement of a treatment's unique potency.

Because of the differences in how treatments are formulated and tested, you cannot compare or convert Units between them, just like you cannot compare 2 fingerprints.

A clearer way to understand dosing is to look at how many nanograms of active ingredient (botulinum toxin type A) a product has.

**Double the Units does not mean double the dose.**

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

Approved frown line dose: 40 Units Amount of active ingredient: 0.18 nanograms

**Botox® Cosmetic**

Approved frown line dose: 20 Units Amount of active ingredient: 0.18 nanograms

**Dysport®**

Approved frown line dose: 50 Units Amount of active ingredient: 0.27 nanograms As you can see, despite the number of Units, DAXXIFY® isn't 2x the dose of Botox® Cosmetic and Dypsort® isn't 2.5x the dose of Botox® Cosmetic. Each product is unique. Talk to your provider about DAXXIFY® and your aesthetic goals.

**The potency Units of DAXXIFY® are not interchangeable with other preparations of other botulinum toxin products.**

---

**Where is DAXXIFY® made?** —

DAXXIFY® is manufactured in California, and the only prescription frown line treatment made in the United States. Conventional frown line treatments are manufactured in other countries, then imported into the United States.

---

**How was DAXXIFY® created?** —

In 2002, physicians and entrepreneurs founded a start-up in Silicon Valley, California to explore the use of peptides in biologics for different therapeutic uses. Their goal was to utilize peptides to transport biologics, typically large molecules, through the skin.

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

The initial idea was to formulate botulinum toxin type A, the active ingredient in DAXXIFY®, with a peptide to see if it could be applied topically to the skin to treat crow's feet wrinkles. Through this process, scientists discovered that the formulation was optimally administered through injection. Several clinical studies were created to determine the correct dose for an injectable product that would treat frown lines.

# Safety

### Is DAXXIFY® safe?

DAXXIFY® was studied in the largest-ever clinical study for a frown line treatment and included more than 2,800 people across different ages and skin types. Here are some things you should know about DAXXIFY®:

- There were no serious treatment-related side effects
- The active ingredient in DAXXIFY® is botulinum toxin type A, an ingredient that has been used in frown line treatments for more than 20 years

DAXXIFY® may cause serious side effects that can be life threatening. Please talk to your aesthetic provider about possible side effects and consult with the Prescribing Information and Medication Guide.

### Does DAXXIFY® work on all skin types?

The safety and efficacy of DAXXIFY® is well established, with more than 20 years of research. In fact, DAXXIFY® has been studied in the largest-ever phase 3 clinical trial conducted for a frown line treatment and included more than 2,800 people across different ages and with

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

different skin types. DAXXIFY® was studied in patients with varying skin types.

**Do long-lasting results mean potentially long-lasting side effects?** —

No, not necessarily. The most common side effects observed in clinical trials occurred within one to two weeks after injection and lasted only a short while. This is consistent with other frown line treatments.

DAXXIFY® is well studied, with no serious treatment-related side effects seen in large-scale clinical trials.

# Preparing for your treatment

**How should I prepare for my DAXXIFY® treatment?** —

Ask your aesthetic provider for pre-treatment instructions prior to your DAXXIFY® appointment.

A list of common avoidances before treatment include, but are not limited to:

- Retin-A
- Blood thinners
- Muscle relaxants
- Fish or oils rich in omega 3
- Allergy medication
- Topical steroids
- Sleep medications and supplements
- Aspirin
- St. John's Wort

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

- Supplements containing Vitamin E

### What can I expect with DAXXIFY® treatment? Does it hurt?

DAXXIFY® injections are typically performed with a small needle and people treated with frown line treatments say the injection feels like a pinch.

If you are concerned about discomfort, talk to your injector about options for minimizing pain, such as icing the area or applying a topical numbing cream. Treatment with DAXXIFY® requires minimal downtime, and you can return to your daily routine immediately after your appointment.

There is a possibility that the area around the injection site will swell, turn red, and cause pain or tenderness from the injection itself; however, these side effects are typically very minor and go away after a few hours or days.

### How often will I need to get DAXXIFY®?

If you're like most people, you probably get a frown line treatment around twice a year. But here's the thing: conventional treatments only last 3–4 months. If you are not able to get treated every 3-4 months, that means you may spend the next 2-3 months of the year with those frown lines staring back at you between treatments. That's up to 4-6 months of total wear off time per year!

In clinical trials, at least 50% of patients showed results in frown lines at 6 months.

### Will I see results quickly?

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

You may see results with DAXXIFY® as early as the next day after treatment, and typically within two days.

**I have an event coming up in two weeks and want to try DAXXIFY® for the first time. Is now the best time to get DAXXIFY®?**

You may see results with DAXXIFY® as early as the next day after treatment, and typically within two days. You should see noticeable results within a two-week time frame. You may experience mild injection-related bruising. In most cases, bruising heals within a few days after injection.

# About wrinkles & injectable treatments

**How do frown lines form?**

Several factors contribute to the formation of facial lines. Decreased collagen production, cellular changes, genetics, environmental damage, and sun damage may all play a role.

Facial lines are also formed by repeated muscle contractions such as frowning, squinting, or raising the eyebrows. These facial expressions cause the skin to furrow and fold, which eventually leads to the formation of wrinkles.

DAXXIFY® works below the skin's surface to temporarily reduce the underlying muscle activity responsible for moderate to severe frown lines.

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

### How do botulinum toxins work?

—

Botulinum toxins are biologics, produced from a bacterium called Clostridium botulinum. They are used to inhibit the transmission of specific chemical signals from nerves, primarily those signals that cause muscular contractions. Botulinum toxin type A injections temporarily relax the facial muscles that cause wrinkles between the brows, reducing their appearance.

DAXXIFY® is the only FDA-approved peptide-powered treatment (neuromodulator) that smooths moderate to severe lines between the brows.

Injections of specific botulinum toxin formulations are also utilized in the treatment of medical conditions.

---

### How long has botulinum toxin type A been used in facial aesthetics?

—

Injectable wrinkle treatments containing botulinum toxin type A have been used to improve the look of moderate to severe frown lines for more than 20 years. The first FDA-approved treatment was Botox® Cosmetic, followed by Dysport®, Xeomin®, and Jeuveau®.

Although today's wrinkle reducers all contain botulinum toxin type A, it's important to know that no 2 treatments are alike and cannot be interchanged with each other.

---

### How is DAXXIFY® different from facial fillers, also known as dermal fillers?

—

DAXXIFY® minimizes the appearance of moderate to severe frown lines by temporarily relaxing the underlying muscles that cause these wrinkles. DAXXIFY® is a long-lasting botulinum type A treatment with a novel peptide.

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

Facial fillers, also known as dermal fillers, are typically made of hyaluronic acid and are used to add volume, fullness, and structure to areas of the face. They can help contour cheekbones, soften lines around the nose and mouth, and volumize lips. Dermal fillers target volume loss rather than muscle-related wrinkles.



## Experience the DAXXIFY® Difference

FIND DAXXIFY®

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.



What makes
DAXXIFY® different?

LEARN MORE →

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

Case 1:21-cv-01411-RGA-LDH Document 684-3 Filed 10/03/25 Page 201 of 344 PageID #: 63269




## Have questions about DAXXIFY®?

GET ANSWERS →

IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection

**DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®:**

- **Problems swallowing, speaking, or breathing** due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection. Swallowing problems may last for several months.
- **Spread of toxin effects:** The effect of botulinum toxin may affect areas away from the injection site and cause serious symptoms that include loss of strength and all-over muscle weakness, double vision, blurred vision and drooping eyelids, hoarseness or change or loss of

IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

voice, trouble saying words clearly, loss of bladder control, trouble breathing, and trouble swallowing.

**Do not receive DAXXIFY® if you are allergic** to any of the ingredients in DAXXIFY® (see Medication Guide for ingredients); had an allergic reaction to any other botulinum toxin product such as rimabotulinumtoxinB (MYOBLOC®), onabotulinumtoxinA (BOTOX®/BOTOX® Cosmetic), abobotulinumtoxinA (DYSPORT®), incobotulinumtoxinA (XEOMIN®) or prabotulinumtoxinA-xvfs (JEUVEAU®), or have a skin infection at the planned injection site.

**DAXXIFY® dosing units are not the same as, or comparable to, any other botulinum toxin product.**

**Tell your healthcare provider about all your medical conditions,** including any side effects from botulinum toxin products, including dry eye; breathing, swallowing, bleeding, or heart problems; plans to have surgery; weakness of forehead muscles; drooping eyelids; have had surgery on your face; are pregnant or breastfeeding or plan to become pregnant or breastfeed.

**Tell your healthcare provider about all the medicines you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. Using DAXXIFY® with certain other medicines may cause serious side effects. **Do not start any new medicines until you have told your healthcare provider that you have received DAXXIFY® in the past.**

**Especially tell your healthcare provider if you** have received any other botulinum toxin product in the last 4 months or any in the past, and exactly which product you received (such as BOTOX®, BOTOX® Cosmetic, MYOBLOC®, DYSPORT®, XEOMIN®, or JEUVEAU®). **DAXXIFY® may cause serious side effects, including allergic reactions** (such as itching, rash, redness, swelling, wheezing, trouble breathing, or dizziness or feeling faint), **heart problems** (such as irregular heartbeat and heart attack), and **eye problems** (including dry eye, reduced blinking, and corneal problems). Tell your healthcare provider or get medical help right away if you experience a serious side effect. No serious adverse events of distant spread of toxin effect associated with dermatologic use of DAXXIFY® have been reported in clinical studies at the dose of 40 Units for glabellar lines. The most common side effects of DAXXIFY® include headache, eyelid drooping, and loss of ability to move the muscles in your face.

These are not all the possible side effects of DAXXIFY®. For more information, see the full Prescribing Information including Boxed Warning, and refer to the Medication Guide or talk with your doctor. **To report side effects associated with DAXXIFY®, please call 1-877-373-8669. You may also report side effects to the FDA at 1-800-FDA-1088 or visit www.fda.gov/medwatch.**

APPROVED USE

DAXXIFY® is a prescription medicine that is injected into muscles and used in adults to temporarily improve the look of moderate to severe frown lines between the eyebrows.

DAXI-001723.2

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

DAXXIFY®
daxibotulinumtoxinA-lanm injection

©2025 REVANCE AESTHETICS. DAXXIFY, Revance Therapeutics and the Revance logo are registered trademarks of Revance Therapeutics, Inc. RHA is a registered trademark of TEOXANE SA. All other trademarks are the property of their respective owners.

ADDRESS

Revance Therapeutics Inc.
1222 Demonbreun Street, 20th floor
Nashville, TN 37203

DISCOVER

TEOXANE RHA® COLLECTION OF FILLERS

MENU

HOME

THE DAXXIFY® DIFFERENCE

SEE RESULTS

FAQS

DAXXIFY® NEAR ME

SOCIAL

INSTAGRAM

FACEBOOK

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**
DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

PRIVACY POLICY

TERMS AND CONDITIONS

REVANCE THERAPEUTICS

DAXI-00338

From TIME. © 2023 TIME USA LLC. All rights reserved. Used under license.
2024 Shape® Skin Award logo ©2024 Meredith Operations Corporation, a Dotdash Meredith company. Used under license.

**IMPORTANT SAFETY INFORMATION for DAXXIFY® (daxibotulinumtoxinA-lanm) for injection**

DAXXIFY® may cause serious side effects that can be life threatening. Get medical help right away if you have any of these problems any time (hours to weeks) after injection of DAXXIFY®: • Problems swallowing, speaking, or breathing due to weakening of associated muscles can be severe and result in loss of life. You are at the highest risk if these problems are pre-existing before injection.

# EXHIBIT 33




[redacted]

C.A. No. 21-1411-RGA-LDH
Joint Trial Exhibit
JTX-211

EXHIBIT 9
Bullock
10/18/2023

[redacted]

[redacted]

*NTX patient breakdown by brand in past 3 months*[1,2,3,4]

[redacted]

[1] To date, what percentage of your Daxxify patients switched from each of the following toxin brands? (N=225)
[2] Before Daxxify's launch, what percentage of your aesthetic neurotoxin patients were injected with each of the following neurotoxin brands? (N=225)
[3] Over the past 3 months, what percentage of your total aesthetic neurotoxin patients have you injected with Daxxify? (N=225)
[4] Note that data has been normalized to represent conversion of patients previously receiving another neurotoxin brand and does not account for changes in share or share gains from naïve patients

# >4/5 HCPs and patients are satisfied or very satisfied with Daxxify's results

**82%** of HCPs are satisfied or very satisfied with their Daxxify experience[1]

*"Clinical results are excellent, the duration is longer than Botox, and profit is favorable"*
*- Aesthetic Physician, Med Spa*

**84%** of Daxxify patients are satisfied or very satisfied with their results[2]

*Based on HCP perception*

*"Patients love Daxxify's natural look and very long duration"*
*- Plastic Surgeon, Private Practice*

[1] Do you feel very satisfied, satisfied, or not satisfied with the results of Daxxify in your aesthetic toxin patients? (N=225)
[2] What percentage of your Daxxify patients are very satisfied, satisfied, or not satisfied with the results of Daxxify? Answers must sum to 100% (N=225)

# 95%+ HCPs inject Daxxify for glabellar lines, forehead lines, and lateral canthal lines

[redacted]

[1] Over the past 3 months, what percentage of your Daxxify patients were injected in the following treatment areas? (N=225)

# >50% of HCPs see Daxxify as superior in duration, onset, muscle relaxation, skin quality and aesthetic look vs. first-choice short-acting toxin

*% of HCPs who rank Daxxify "Superior" to first-choice short-acting toxin*[1]




Daxxify's value proposition extends far beyond duration alone

[1] On a scale of 1 to 7, with 1 being highly inferior performance vs. your first-choice short-acting toxin and 7 being highly superior vs. your first-choice short-acting toxin, how does Daxxify perform across each of the following attributes? (N=225)

# EXHIBIT 34

Allergan Aesthetics
an AbbVie company

# Daxxify® Launch Tracker
## Main Quant Study Report

*May and June Waves w/ HCPs*



*June 30, 2023*
***Wave 2***

Source: 2023-PR-BTXC-Daxxify® Launch Tracker JUNE Report - HCP

C.A. No. 21-1411-RGA-LDH
**Plaintiffs' Trial Exhibit**
**PTX-596**

**EXHIBIT**
6
exhibitsticker.com

[redacted]

## Table of Contents


| | Page |
|---|---|
| Objectives and Methodology | 3 |
| Executive Summary | 4 |
| Summary of Findings | |
| [redacted] | |
| Appendix | 48 |


Source: 2023-PR-B1XC-Dazzly® Launch Tracker JUNE Report - HCP

## Objectives & Methodology



**Objectives:** [redacted]

**Quantitative Sample:** [redacted]

**Quantitative:** [redacted]

Fielding was conducted: [redacted]

© Allergan Aesthetics

Source: 2023-PR-BTXC-Daxxify® Launch Tracker JUNE Report - HCP

## Executive Summary

*Daxxify® Launch Tracker - HCPs*
(Wave 2: June 2023)



1. Key Aspects of Daxxify® Use: [redacted]
2. [redacted]
3. [redacted]
4. [redacted]

[redacted]

[redacted]

# Neurotoxin Usage Behaviors

© Allergan Aesthetics

Among Daxxify® injectors, [redacted]

[redacted]

[redacted]

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

The adoption of Daxxify® had [redacted] 7

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]

8

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]

Daxxify® use is being driven by patient requests (increased in June) and to a lesser extent HCP recommendations.

9

**Who Recommended / Requested Daxxify®**

- % among Daxxify® Injectors -

[redacted]

**Qual Results**

- Daxxify® is being recommended to…

[redacted]

- Of the patients HCPs offer Daxxify®, half or less go forward with it. Main patient barriers to adoption are:

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

Most patients receiving Daxxify® are existing NTX patients. 10

**% of New vs. Existing Patients Receiving**
- % among users of each NTX -

Botox® Cosmetic | Daxxify® | Dysport®

[redacted]

**Key reasons NEW patients are receiving Daxxify® (unaided):**

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

Although glabellar lines are the main area HCPs are injecting Daxxify®, use in all three areas has increased with greater use in FHL and LCL.



**% of Patients Receiving Daxxify® in the Following Areas**
- % among Daxxify® Injectors -

Glabellar lines

Forehead lines

Lateral canthal lines

[redacted]

**# of Areas Being Treated with Daxxify® per Patient**
- % among Daxxify® Injectors (n=117) -

[redacted]

| | WV1 (n=50) |
|---|---|
| All 3 Areas | [redacted] |
| 2 Areas | [redacted] |
| GL Only | [redacted] |
| FL or LCL Only | [redacted] |

© Allergan Aesthetics

[redacted]

Most HCPs are dosing Daxxify® at less than 40 units for GL, and even fewer units in FHL and LCL. 12

**Average Units of Daxxify® Used to Treat Following Areas**

- % among Daxxify® Injectors dosing the following amounts -

[redacted]

| Glabellar | Forehead Lines | Crow's Feet |
| --- | --- | --- |
| DAXXIFY Avg | DAXXIFY Avg | DAXXIFY Avg |

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

## Qual Results



[redacted]

[redacted]

[redacted]

© Allergan Aesthetics [redacted]

Although BTXC is the preferred NTX across all patient types, [redacted]

14

**Main NTX of Choice for Each Patient Type**

[redacted]

| [redacted] | Botox® Cosmetic | Daxxify® | Dysport® |
|---|---|---|---|
| [redacted] | | | |

© Allergan Aesthetics [redacted]

[redacted]

BTXC is the preferred NTX regardless of filler used, [redacted]

15

[redacted]

| Juvéderm® | Restylane® | RHA® |
|---|---|---|
| [redacted] | | |

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]



**Anticipated Neurotoxins to be Offered 12 Months from Now**
- % among those that currently offer. June (W2) -

[redacted]

Botox® Cosmetic | Daxxify® | Dysport® | Jeuveau® | Xeomin®

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

## HCPs anticipate their use of Daxxify® to [redacted]

**Anticipated Neurotoxins Share 12 Months from Now**
- % indicating June (W2) n=117 -

Current | 12 Months From Now

Botox® Cosmetic
Daxxify®
Dysport®
Jeuveau®
Xeomin®

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

# Perceptions of Daxxify® Relative to Other NTXs

© Allergan Aesthetics

[redacted]



**Likelihood to Recommend - NPS**

- % among those using each NTX -

NPS

[redacted]

Botox® Cosmetic | Daxxify® | Dysport®

© Allergan Aesthetics

[redacted]

[redacted]

[redacted] 20

Performance on the Following Attributes – June (W2)

[redacted]

| Botox® Cosmetic | Daxxify® | Dysport® |
| --- | --- | --- |

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]



Performance on the Following Attributes - Daxxify®

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

## Qualitative Results: HCP Perceptions of Daxxify® on Following Characteristics



- Duration
- Predictability
- Minimal SE Potential
- Quick Onset
- Achieves Natural Looking Results
- Profitable

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]



**Mean # of Months Before Starts to Wear Off**
- % among HCPs who have used each NTX -

[redacted]

Botox® Cosmetic | Daxxify® | Dysport®

**Duration: Mean # of Months When Completely Wears Off / Need Retreatment**
- % among HCPs who have used each NTX -

*Unsure of Daxxify® Duration: 21% (WV1: 38%)*

[redacted]

Botox® Cosmetic | Daxxify® | Dysport®

**Onset: Mean # of Days When Patients Notice Visible Result**
- % among users of each NTX-

[redacted]

Botox® Cosmetic | Daxxify® | Dysport®

© Allergan Aesthetics

[redacted]

[redacted]

Longer duration is the primary reason HCPs switch to Daxxify®, but patient requests and wanting to offer the newest treatments are also drivers. 24

**Reasons for Switching from Other NTXs to Daxxify®**
- % indicating Daxxify® Injectors -




© Allergan Aesthetics

Source: 2023-PR-BTXC-Daxxify® Launch Tracker JUNE Report - HCP

N11. Why did you switch away from other neurotoxins to Daxxify®?

[redacted]

[redacted]



## Impact of Longer Duration of Daxxify® Due to Peptide vs. Increase in Units

[redacted]

Mainly Peptide ([illegible]+ due to peptide) | Equal | Mainly Increase in Units ([illegible]+ due to unit increase) | Unsure

[redacted]

**Qual Results:**

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

[redacted]



**If Dose Other NTXs at Same Number of Units as Daxxify® Do you Perceive it will Last as Long as Daxxify®**
- % indicating Yes -

[redacted]

**Considered Using Other NTXs Similar to Daxxify® Units**
- % indicating -

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

[redacted]



**Daxxify® Concerns**

- % Very Concerned (6 – 7 on 1 – 7 scale) -

[redacted]

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]




[redacted]

[redacted]

Training on Daxxify® is mainly coming via webinars or training at the practice.

**Received Training on How to Inject Daxxify®**
- % among users Daxxify® Injectors -

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]

# Price and Free Good Evaluation

© Allergan Aesthetics

Most of the Daxxify® vials used were purchased – but only a minority have reordered it again. 31

**Percentage of Daxxify® Vials Used in P1M were Free or Purchased**
- % among those received free goods/samples -

[redacted]

**Likely to Reorder Daxxify®**
- % indicating -

[redacted]

[redacted]

[redacted]

[redacted]



## Typically Charge Patients for NTXs

- % indicating -

■ Per unit

■ Per area injected

[redacted]

Botox® Cosmetic | Daxxify® | Dysport®

Avg price per unit charged to patients

[redacted]

Avg price per area injected charged to patients

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

Revance is recommending how to price Daxxify® for about half the HCPs, generally at 1½ times the total treatment cost of BTXC.



**Revance Provided Recommendations on How to Price Daxxify® to Patients**
- % among users Yes -

[redacted]

**Revance Conveyed About How to Price Daxxify®**
- % among users that received recommendations -

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

[redacted] 34

[redacted]

[redacted]

**Price Per Vial Practice Pays for 100U Vial**
- % using Daxxify®, n=38 -

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

Half of HCPs are aware of Revance offering some type of promotion to patients receiving Daxxify®.

**Discounts and Rebates Offered by Revance for Patients Receiving Daxxify®**

- % indicating -

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

36

# Daxxify® Promotion / Communications

© Allergan Aesthetics

Most practices offering Daxxify® are doing some type of promotion to consumers about it, mainly on social media or their practice website. 37

**Activities Done to Promote Daxxify® in Practice**

- % indicating -

[redacted]

[redacted]

Qual Results: [redacted]

© Allergan Aesthetics [redacted]

[redacted]

The key message HCPs convey to patients about Daxxify® is it is a new type of NTX that can last 6 months and will need fewer treatments, but often caveat it that duration may vary.

38

**What HCP Conveys to Patients about Daxxify®**
- % indicating Daxxify® Injectors -

[redacted]

[redacted]



[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

# Sale Rep Detailing and Counter Messaging Assessment

© Allergan Aesthetics

[redacted]



**HCP has Personally Seen a Sales Rep in Past 3 Months**
- n=143 -

[redacted]

BOTOX COSMETIC | DAXXIFY | Dysport

% Very Satisfied w/ Rep

[redacted]

© Allergan Aesthetics

Source: 2023-PR-BTXC-Daxxify® Launch Tracker JUNE Report - HCP

[redacted]

[redacted]

The main messages recalled from Revance about Daxxify® are last 6 months / twice as long and is peptide-powered. 41

**Recall of Daxxify® Messages**

- % indicating Detailed on Daxxify® / Seeing Promotions-

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

The longer duration / 6-month message though is the key motivator for using Daxxify®.



**Motivation of Daxxify® Messages**

- % Very Motivating (6 – 7 on 1 – 7 scale) -

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

While this duration is motivating, many HCPs are unsure of the credibility of this message.



**Credibility of Daxxify® Messages**

- % Very Credible (6 – 7 on 1 – 7 scale) -

[redacted]

© Allergan Aesthetics [redacted]

[redacted]

[redacted]

One-fifth of HCPs using and/or being detailed on Daxxify® have also been counter-detailed on Daxxify®, mainly by A/A.

44

**% of Competitive NTX Manufacturers Conveying Information about Daxxify®**
- % indicating, June (W2): n=143 / May (W1): n=96 -

[redacted]

**Messages Being Conveyed by Competitive Manufacturers**
(aided, Who Have Had Competitive Details.)

May/June (W1/2)
(n=61)

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]



**Top Messages Influencing HCPs NOT to Use Daxxify®**

HCPs with Daxxify® Available at their Practice

[redacted]

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

# RHA Assessment

© Allergan Aesthetics

[redacted]



Filler Brand Share Among Daxxify® Injectors

[redacted]

3-Month Rolling Average

Overall Filler Share (AMT)

RHA Collection

JUVÉDERM

Restylane

Other Fillers

[redacted]

Use of Daxxify® Caused an Increase in RHA

[redacted]

[redacted]

Anticipated Growth of RHA Over N12M

- % of Filler Patients -

[redacted]

Qual Results:

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

[redacted]

# Appendix –Practice Demographics

© Allergan Aesthetics

## Practice Demographics



Specialty
(% indicating)

[redacted]

Organizational Structure (% indicating)

[redacted]

Who Owns Group (% indicating)

[redacted]

Region (% indicating)

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

## Practice Demographics



[redacted]

**Patients Purchasing Professional-Grade Skin Care – Seen for Each Reason** (mean # of patients)

For Cosmetic reasons

For General Medical reasons

**Mean # of years in Practice**

[redacted]

[redacted]

**Own, Manage or Work at MediSpa** (% indicating)

[redacted]

**Avg # of HCP performing NTX injections** (mean # of patients)

[redacted]

© Allergan Aesthetics

Source: [illegible] Launch Tracker [illegible] - HCP

[redacted]

## Practice Demographics



[redacted]

**Loyalty Membership** (% indicating)

[redacted]

**Member of Loyalty Programs** (% indicating)

[redacted]

© Allergan Aesthetics

[redacted]

[redacted]

# EXHIBIT 35

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
# Washington, D.C. 20549

# FORM 10-Q

(Mark One)
☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2024
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from ___ to ___

Commission File No. 001-36297

# Revance Therapeutics, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 77-0551645 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203**
(Address, including zip code, of principal executive offices)

**(615) 724-7755**
(Registrant's telephone number, including area code)

**Securities Registered Pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which regis |
|---|---|---|
| Common Stock, par value $0.001 per share | RVNC | Nasdaq Global Market |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ | Emerging growth company | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares outstanding of the registrant's common stock, par value $0.001 per share, as of July 31, 2024: 104,823,331

## Table of Contents


| | | Page |
|---|---|---|
| Defined Terms | | i |
| PART I. FINANCIAL INFORMATION | | |
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 1 |
| | Condensed Consolidated Balance Sheets | 2 |
| | Condensed Consolidated Statements of Operations and Comprehensive Loss | 3 |
| | Condensed Consolidated Statements of Stockholders' Deficit | 4 |
| | Condensed Consolidated Statements of Cash Flows | 6 |
| | Notes to Condensed Consolidated Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 41 |
| Item 4. | Controls and Procedures | 42 |
| PART II. OTHER INFORMATION | | |
| Item 1. | Legal Proceedings | 43 |
| Item 1A. | Risk Factors | 43 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 44 |
| Item 3. | Defaults Upon Senior Securities | 44 |
| Item 4. | Mine Safety Disclosures | 44 |
| Item 5. | Other Information | 44 |
| Item 6. | Exhibits | 45 |
| Signatures | | |

**DEFINED TERMS**

Unless expressly indicated or the context requires otherwise, the terms "Revance," "Company," "we," "us," and "our," in this Quarterly Report on Form 10-Q (this "Report") refer to Revance Therapeutics, Inc., a Delaware corporation, and, where appropriate, its wholly-owned subsidiaries. We also have used several other terms in this Report, the condensed consolidated financial statements and accompanying notes included herein, most of which are explained or defined below.

**"2014 EIP"** means the Company's 2014 Equity Incentive Plan.

**"2014 ESPP**" means the Company's 2014 Employee Stock Purchase Plan.

**"2014 IN"** means the Company's 2014 Inducement Plan.

**"2022 ATM Agreement"** means the Sales Agreement by and between Revance and Cowen, dated May 10, 2022.

**"2027 Notes"** means Revance's 1.75% Convertible Senior Notes due 2027.

**"ABPS"** means Ajinomoto Althea, Inc., doing business as Ajinomoto Bio-Pharma Services, a contract development and manufacturing organization.

**"ABPS Services Agreement"** means the Technology Transfer, Validation and Commercial Fill/Finish Services Agreement by and between the Company and ABPS, dated March 14, 2017, as amended on December 18, 2020.

**"Allergan"** means Allergan, Inc.

**"ASC"** means the Accounting Standards Codification as set forth by the Financial Accounting Standards Board.

**"ASU"** means Accounting Standards Update issued by the FASB.

**"Athyrium"** means Athyrium Buffalo LP.

**"ATM"** means at-the-market offering program.

**"BTRX"** means Botulinum Toxin Research Associates, Inc.

**"Consolidated Teoxane Distribution Net Product Sales"** has the meaning set forth in the Note Purchase Agreement.

**"consumers"** means the patients of our aesthetic practice customers.

**"Cowen"** means Cowen and Company, LLC.

**"CROs"** means contract research organizations.

**"DAXXIFY®"** means (DaxibotulinumtoxinA-lanm) for injection.

**"DAXXIFY® GL Approval"** means the FDA approval in September 2022, of DAXXIFY® in the United States for the temporary improvement of moderate to severe glabellar lines in adults.

**"DAXXIFY® GL Approval PSUs"** means performance stock units that vested on the 6-month anniversary of the date of DAXXIFY® GL Approval.

**"Exchange Act"** means the U.S. Securities Exchange Act of 1934, as amended.

**"FASB"** means the Financial Accounting Standards Board.

**"FDA"** means the United States Food and Drug Administration.

**"Fintech Platform"** means OPUL® and the HintMD Platform.

**"First Amendment"** means the first amendment to the Note Purchase Agreement, by and among the Company, HintMD and Athyrium, dated August 8, 2023.

**“First Tranche”** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $100.0 million on March 18, 2022.

**“Fosun”** means Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., a wholly-owned subsidiary of Shanghai Fosun Pharmaceutical (Group) Co., Ltd.

**“Fosun License Agreement”** means the License Agreement by and between Revance and Fosun, dated December 4, 2018, as amended on February 15, 2020.

**“Fosun Territory”** means mainland China, Hong Kong and Macau.

**“FY2023 Form 10-K”** means our Annual Report on Form 10-K for the year ended December 31, 2023, which was filed with the SEC on February 28, 2024.

**“HintMD”** means Hint, Inc., our wholly owned subsidiary.

**“HintMD Plan”** means the Hint, Inc. 2017 Equity Incentive Plan.

**“HintMD Platform”** means the legacy HintMD fintech platform.

**“Indenture”** means the indenture, by and between Revance and U.S. Bank National Association, as trustee, dated February 14, 2020.

**“injector”** means a professional licensed to inject our Products, including physicians.

**“Maturity Date”** means September 18, 2026, the maturity date of the Notes Payable set forth in the Note Purchase Agreement.

**“neuromodulator”** means injectable botulinum toxins and neurotoxins.

**“NMPA”** means China's National Medical Products Administration.

**“Note Purchase Agreement”** means the note purchase agreement by and between Revance; Athyrium, as administrative agent; the Purchasers, including Athyrium; and HintMD, as a guarantor, dated March 18, 2022.

**“Notes Payable”** means notes payable by Revance pursuant to the Note Purchase Agreement.

**“NPA Effective Date”** means the effective date of the Note Purchase Agreement, March 18, 2022.

**“onabotulinumtoxinA biosimilar”** means a biosimilar to the branded biologic product (onabotulinumtoxinA) marketed as BOTOX®.

**“option counterparties”** means capped call transactions with a purchaser and another financial institution.

**“OPUL®”** means the OPUL® Relational Commerce Platform.

**“PAS”** means prior approval supplement.

**“PCI”** means PCI Pharma Services, formerly known as Lyophilization Services of New England, Inc., which was acquired by PCI in December 2021.

**“PCI Supply Agreement”** means the Commercial Supply Agreement by and between Revance and PCI, dated April 6, 2021.

**“Products”** means DAXXIFY® and the RHA® Collection of dermal fillers.

**“PSAs”** means a performance stock award.

**“PSUs”** means a performance stock unit.

**“Purchasers”** means Athyrium and its successors and assigns.

**“RHA® Collection of dermal fillers”** means RHA® 2, RHA® 3 and RHA® 4, which have been approved by the FDA for the correction of moderate to severe dynamic facial wrinkles and folds; and RHA® Redensity.

**"RHA® Pipeline Products"** means future hyaluronic acid filler advancements and products by Teoxane.

**"RHA® Redensity"** means a dermal filler, which has been approved by the FDA for the treatment of moderate to severe dynamic perioral rhytids (lip lines).

**"RSAs"** means restricted stock awards.

**"RSUs"** means restricted stock units.

**"SEC"** means the U.S. Securities and Exchange Commission.

**"Second Tranche"** means the Notes Payable issued to the Purchasers in an aggregate principal amount of $50.0 million on August 28, 2023.

**"Securities Act"** means the U.S. Securities Act of 1933, as amended.

**"Services"** means the Fintech Platform business.

**"Service Segment"** means the business that includes the development and commercialization of the Fintech Platform.

**"Third Tranche"** means the uncommitted tranche of additional Notes Payable in an aggregate amount of up to $150.0 million, which was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement.

**"Teoxane"** means Teoxane SA.

**"Teoxane Agreement"** means the exclusive distribution agreement by and between Revance and Teoxane, dated January 10, 2020, as amended on September 30, 2020, December 22, 2020 and December 22, 2022.

**"U.S. GAAP"** means U.S. generally accepted accounting principles.

**"Viatris"** means Viatris Inc., formerly known as Mylan Ireland Ltd.

**"Viatris Agreement"** means the Collaboration and License Agreement by Revance and Viatris, dated February 28, 2018, as amended on August 22, 2019.

**"Viatris Territory"** means world-wide (excluding Japan).

**"Zero-cost Inventory"** means DAXXIFY® inventory produced prior to the DAXXIFY® GL Approval in early September 2022, for which the related manufacturing costs were incurred and expensed to research and development expense prior to the FDA approval.

Revance®, the Revance logos, DAXXIFY®, OPUL® and other trademarks or service marks of Revance appearing in this Report are the property of Revance. This Report contains additional trade names, trademarks and service marks of others, which are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

Table of Contents

**PART I. FINANCIAL INFORMATION**

**ITEM 1. Condensed Consolidated Financial Statements (Unaudited)**

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Balance Sheets**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 81,453 | $ 137,329 |
| Restricted cash, current | 275 | 550 |
| Short-term investments | 150,791 | 116,586 |
| Accounts receivable, net | 36,088 | 27,660 |
| Inventories | 68,287 | 45,579 |
| Prepaid expenses and other current assets | 10,668 | 9,308 |
| Current assets of discontinued operations | 2,610 | 1,853 |
| Total current assets | 350,172 | 338,865 |
| Property and equipment, net | 16,665 | 17,225 |
| Intangible assets, net | 8,180 | 9,270 |
| Operating lease right-of-use assets | 49,746 | 53,167 |
| Finance lease right-of-use asset | 26,200 | 19,815 |
| Restricted cash, non-current | 5,895 | 5,995 |
| Finance lease prepaid expense | 37,645 | 32,383 |
| Other non-current assets | 296 | 321 |
| Non-current assets of discontinued operations | — | 1,413 |
| TOTAL ASSETS | $ 494,799 | $ 478,454 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| CURRENT LIABILITIES | | |
| Accounts payable | $ 4,985 | $ 13,554 |
| Accruals and other current liabilities | 47,172 | 52,863 |
| Deferred revenue, current | 9,610 | 10,737 |
| Operating lease liabilities, current | 6,393 | 5,703 |
| Finance lease liability, current | 17,717 | 2,651 |
| Debt, current | 7,500 | 2,500 |
| Current liabilities of discontinued operations | 255 | 1,216 |
| Total current liabilities | 93,632 | 89,224 |
| Debt, non-current | 423,086 | 426,595 |
| Deferred revenue, non-current | 67,968 | 70,419 |
| Operating lease liabilities, non-current | 36,940 | 40,985 |
| Other non-current liabilities | 2,911 | 2,835 |
| TOTAL LIABILITIES | 624,537 | 630,058 |
| Commitments and Contingencies (Note 12) | | |
| STOCKHOLDERS' EQUITY (DEFICIT) | | |
| Preferred stock, par value $0.001 per share — 5,000,000 shares authorized, and no shares issued and outstanding as of June 30, 2024 and December 31, 2023 | — | — |
| Common stock, par value $0.001 per share — 190,000,000 shares authorized as of June 30, 2024 and December 31, 2023; 104,810,881 and 87,962,765 shares issued and outstanding as of June 30, 2024 and December 31, 2023, respectively | 105 | 88 |
| Additional paid-in capital | 2,039,168 | 1,926,654 |
| Accumulated other comprehensive gain (loss) | (26) | 14 |
| Accumulated deficit | (2,168,985) | (2,078,360) |
| TOTAL STOCKHOLDERS' DEFICIT | (129,738) | (151,604) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $ 494,799 | $ 478,454 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Operations and Comprehensive Loss**
**(In thousands, except share and per share amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Revenue: | | | | |
| Product revenue, net | $ 65,328 | $ 54,393 | $ 117,047 | $ 100,051 |
| Collaboration revenue | 61 | 20 | 278 | 136 |
| Total revenue, net | 65,389 | 54,413 | 117,325 | 100,187 |
| Operating expenses: | | | | |
| Cost of product revenue (exclusive of amortization) | 17,635 | 17,607 | 32,546 | 30,094 |
| Selling, general and administrative | 65,822 | 74,812 | 134,736 | 136,732 |
| Research and development | 15,902 | 17,624 | 30,295 | 35,156 |
| Amortization | 546 | 717 | 1,091 | 1,262 |
| Total operating expenses | 99,905 | 110,760 | 198,668 | 203,244 |
| Loss from continuing operations | (34,516) | (56,347) | (81,343) | (103,057) |
| Interest income | 3,179 | 3,148 | 6,175 | 6,118 |
| Interest expense | (5,679) | (4,368) | (10,935) | (8,865) |
| Other expense, net | (453) | (599) | (891) | (833) |
| Net loss from continuing operations | (37,469) | (58,166) | (86,994) | (106,637) |
| Net loss from discontinued operations | (4) | (9,152) | (3,631) | (20,474) |
| Total net loss | (37,473) | (67,318) | (90,625) | (127,111) |
| Unrealized gain (loss) | (1) | 64 | (40) | 313 |
| Comprehensive loss | $ (37,474) | $ (67,254) | $ (90,665) | $ (126,798) |
| | | | | |
| Basic and diluted net loss per share: | | | | |
| Continuing operations | $ (0.36) | $ (0.70) | $ (0.89) | $ (1.29) |
| Discontinued operations | — | (0.10) | (0.04) | (0.25) |
| Total net loss per basic and diluted share | $ (0.36) | $ (0.80) | $ (0.93) | $ (1.54) |
| | | | | |
| Basic and diluted weighted-average number of shares used in computing net loss per share | 103,870,235 | 83,685,919 | 97,894,625 | 82,417,064 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Stockholders' Equity (Deficit)**
**(In thousands, except share amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Preferred Stock** | — | $ — | — | $ — | — | $ — | — | $ — |
| **Common Stock** | | | | | | | | |
| Balance — Beginning of period | 104,409,798 | 104 | 84,017,208 | 84 | 87,962,765 | 88 | 82,385,810 | 82 |
| Issuance of common stock in connection with follow-on offering | — | — | — | — | 16,000,000 | 16 | — | — |
| Issuance of common stock related to stock awards, net of cancellation | 159,756 | 1 | 460,569 | 1 | 657,600 | 1 | 1,648,817 | 2 |
| Issuance of common stock relating to employee stock purchase plan | 240,272 | — | 157,313 | — | 240,272 | — | 157,313 | — |
| Issuance of common stock upon exercise of stock options | 12,801 | — | 109,185 | — | 20,523 | — | 671,224 | 1 |
| Shares withheld related to net settlement of stock awards | (11,746) | — | (18,055) | — | (70,279) | — | (136,944) | — |
| Issuance of common stock related to ATM | — | — | 3,223,767 | 3 | — | — | 3,223,767 | 3 |
| Balance — End of period | 104,810,881 | 105 | 87,949,987 | 88 | 104,810,881 | 105 | 87,949,987 | 88 |
| **Additional Paid-In Capital** | | | | | | | | |
| Balance — Beginning of period | — | 2,032,760 | — | 1,787,535 | — | 1,926,654 | — | 1,767,266 |
| Issuance of common stock in connection with follow-on offering, net of underwriting discounts and offering costs | — | (7) | — | — | — | 97,103 | — | — |
| Issuance of common stock relating to employee stock purchase plan | — | 525 | — | 2,455 | — | 525 | — | 2,455 |
| Issuance of common stock upon exercise of stock options | — | 32 | — | 2,034 | — | 52 | — | 11,515 |
| Shares withheld related to net settlement of stock awards | — | (40) | — | (564) | — | (442) | — | (4,294) |
| Issuance of common stock related to stock awards, net of cancellation | — | (1) | — | (1) | — | (1) | — | (2) |
| Issuance of common stock related to ATM, net of commissions and issuance costs | — | — | — | 99,956 | — | — | — | 99,956 |
| Stock-based compensation | — | 5,899 | — | 16,829 | — | 15,277 | — | 31,318 |
| Other | — | — | — | — | — | — | — | 30 |
| Balance — End of period | — | 2,039,168 | — | 1,908,244 | — | 2,039,168 | — | 1,908,244 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Stockholders' Equity (Deficit) — (Continued)**
**(In thousands, except share amounts)**
**(Unaudited)**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | 2024 | | 2023 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Other Accumulated Comprehensive Gain (Loss)** | | | | | | | | |
| Balance — Beginning of period | — | (25) | — | (125) | — | 14 | — | (374) |
| Unrealized gain (loss) | — | (1) | — | 64 | — | (40) | — | 313 |
| Balance — End of period | — | (26) | — | (61) | — | (26) | — | (61) |
| **Accumulated Deficit** | | | | | | | | |
| Balance — Beginning of period | — | (2,131,512) | — | (1,814,167) | — | (2,078,360) | — | (1,754,374) |
| Total net loss | — | (37,473) | — | (67,318) | — | (90,625) | — | (127,111) |
| Balance — End of period | — | (2,168,985) | — | (1,881,485) | — | (2,168,985) | — | (1,881,485) |
| **Total Stockholders' Equity (Deficit)** | 104,810,881 | $ (129,738) | 87,949,987 | $ 26,786 | 104,810,881 | $ (129,738) | 87,949,987 | $ 26,786 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**
**Condensed Consolidated Statements of Cash Flows**
**(In thousands)**
**(Unaudited)**

| | Six Months Ended June 30, | |
|---|---|---|
| | **2024** | **2023** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Total net loss | $ (90,625) | $ (127,111) |
| Adjustments to reconcile total net loss to net cash used in operating activities: | | |
| Stock-based compensation | 14,785 | 28,681 |
| Depreciation and amortization | 3,410 | 7,831 |
| Amortization of debt discount and debt issuance costs | 1,520 | 1,035 |
| Amortization of discount on investments | (3,205) | (3,197) |
| Amortization of finance lease right-of-use asset | — | 2,318 |
| Other non-cash operating activities | 1,033 | 498 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (8,411) | (5,704) |
| Inventories | (6,823) | (11,652) |
| Prepaid expenses and other current assets | (1,257) | (3,102) |
| Lease right-of-use assets | (18,179) | (18,949) |
| Other non-current assets | (3) | (3,093) |
| Accounts payable | (7,206) | 3,703 |
| Accruals and other liabilities | (6,989) | (19,536) |
| Deferred revenue | (3,578) | 2,202 |
| Lease liabilities | 18,385 | 21,844 |
| Other non-current liabilities | 76 | 1,350 |
| **Net cash used in operating activities** | (107,067) | (122,882) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchases of investments | (164,810) | (128,859) |
| Finance lease prepayments | (5,262) | — |
| Purchases of property and equipment | (2,182) | (604) |
| Proceeds from maturities of investments | 133,656 | 185,247 |
| **Net cash provided by (used in) investing activities** | (38,598) | 55,784 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from issuance of common stock in connection with follow-on offering, net of underwriting discounts | 97,626 | — |
| Proceeds from the exercise of stock options and employee stock purchase plan | 577 | 13,970 |
| Principal payments on finance lease obligations | (8,123) | (8,899) |
| Taxes paid related to net settlement of stock awards | (442) | (4,294) |
| Payment of offering costs | (224) | (224) |
| Proceeds from issuance of common stock in connection with ATM, net of commissions | — | 100,183 |
| **Net cash provided by financing activities** | 89,414 | 100,736 |
| NET INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS, AND RESTRICTED CASH | (56,251) | 33,638 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — Beginning of period[1] | 144,749 | 115,017 |
| CASH, CASH EQUIVALENTS, AND RESTRICTED CASH — End of period[1] | $ 88,498 | $ 148,655 |

(1) Cash, cash equivalents, and restricted cash included $0.9 million of restricted cash classified as current assets of discontinued operations as of June 30, 2024, and non-current assets of discontinued operations as of December 31, 2023 on condensed consolidated balance sheets.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements**

**(Unaudited)**

## 1. The Company and Summary of Significant Accounting Policies

### Overview

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

### Liquidity and Financial Condition

We are not profitable and have incurred losses in each year since our inception. For the three and six months ended June 30, 2024, we had a total net loss of $37.5 million and $90.6 million, respectively. As of June 30, 2024, we had an accumulated deficit of $2.2 billion. Although we generate revenue from the sale of our Products, we expect to continue to incur U.S. GAAP operating losses for the foreseeable future.

As of June 30, 2024, we had a working capital surplus of $256.5 million and capital resources of $232.2 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement, and payments received from collaboration arrangements. We also have a remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of June 30, 2024. We believe that our existing capital resources will be sufficient to fund the operating plan through at least the next 12 months following the issuance of the condensed consolidated financial statements in this Report.

### Basis of Presentation and Principles of Consolidation

The accompanying condensed consolidated financial statements are unaudited, and reflect all adjustments which are, in the opinion of management, of a normal recurring nature and necessary for a fair statement of the results for the interim periods presented.

Our condensed consolidated balance sheet for the year ended December 31, 2023 was derived from audited consolidated financial statements, but does not include all disclosures required by U.S. GAAP. The interim results presented herein are not necessarily indicative of the results of operations that may be expected for the full fiscal year ending December 31, 2024, or any other future period. Our condensed consolidated financial statements should be read in conjunction with our audited consolidated financial statements contained in our FY2023 Form 10-K.

Our condensed consolidated financial statements include our accounts and those of our wholly-owned subsidiaries, and have been prepared in conformity with U.S. GAAP. All intercompany transactions have been eliminated.

The requirements for reporting the exit of the Fintech Platform business (Note 2) as a discontinued operation were met in the first quarter of 2024. As a result, the Fintech Platform business is presented in the condensed consolidated statement of operations and condensed consolidated balance sheet as discontinued operations for all periods presented. Unless indicated otherwise, the information in the notes to the condensed consolidated financial statements relates to continuing operations. The Company operates under one reportable segment as a result of discontinuing the Service Segment.

### Use of Estimates & Risks and Uncertainties

The preparation of the condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities in the condensed

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

consolidated financial statements and accompanying notes. These estimates form the basis for judgments we make about the carrying values of our assets and liabilities, which are not readily apparent from other sources. We base our estimates and judgments on historical information and on various other assumptions that we believe are reasonable under the circumstances. U.S. GAAP requires us to make estimates and judgments in several areas, including, but not limited to, the incremental borrowing rate used to measure lease liabilities, the recoverability of long-lived assets, useful lives associated with property and equipment and intangible assets, the period of benefit associated with deferred costs, revenue recognition (including the timing of satisfaction of performance obligations, estimating variable consideration, estimating stand-alone selling prices of promised goods and services, and allocation of transaction price to performance obligations), deferred revenue classification, valuation and assumptions underlying stock-based compensation and other equity instruments, and income taxes.

As of the date of issuance of these condensed consolidated financial statements, we are not aware of any specific event or circumstance that would require us to update our estimates, judgments or revise the carrying value of our assets or liabilities. These estimates may change as new events occur and additional information is obtained, and are recognized in the condensed consolidated financial statements as soon as they become known. Actual results could differ from those estimates and any such differences may be material to our condensed consolidated financial statements.

**Significant Accounting Policies**

There have been no material changes to our significant accounting policies from our FY2023 Form 10-K.

**Recent Accounting Pronouncements**

In November 2023, the FASB issued ASU 2023-07, *Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures*. This standard requires public entities to disclose information about their reportable segments' significant expenses and other segment items on an interim and annual basis. Public entities with a single reportable segment are required to apply the disclosure requirements in ASU 2023-07, as well as all existing segment disclosures and reconciliation requirements in ASC 280, on an interim and annual basis. ASU 2023-07 is effective for fiscal years beginning after December 15, 2023 and for interim periods beginning after December 15, 2024, with early adoptions permitted. We are currently evaluating the impact of adopting ASU 2023-07.

In December 2023, the FASB issued ASU 2023-09, *Income Taxes (Topic 740)*. ASU 2023-09 improves reporting for income taxes, primarily by requiring disclosure of specific categories in the tax rate reconciliation and providing additional annual information for reconciling items that meet a quantitative threshold. The amendments in ASU 2023-09 also require additional annual information regarding income taxes paid, as well as other additional disclosures. The amendments in ASU 2023-09 are effective for fiscal years beginning after December 15, 2024, early adoption is permitted. We are currently evaluating the effect the amendments in ASU 2023-09 will have on our tax disclosures.

**2. Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business as the costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities included elimination of Fintech Platform personnel, the termination of Fintech Platform research and development activities and an elimination of outside services expenses related to the Fintech Platform. Based on such plan, substantially all payment processing activities for Fintech Platform customers ended on January 31, 2024 and we substantially completed the remaining activities to wind-down the Fintech Platform operations as of March 31, 2024.

In accordance with ASC 205-20, *Presentation of Financial Statements - Discontinued Operations*, the substantial completion of exit of the Fintech Platform business represents a strategic shift that has a major effect on the Company's operations and financial results. The Fintech Platform business was historically reported as the Service Segment. As a result, the results of our Fintech Platform business have been reflected as discontinued operations in our condensed consolidated financial statements. Our condensed consolidated balance sheet and condensed consolidated statement of operations and comprehensive loss includes reclassification of certain prior year figures to conform to the current period presentation.

Table of Contents

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

Details of assets and liabilities from discontinued operations are as follows:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Restricted cash, current | $ 875 | $ — |
| Accounts receivable, net | — | 16 |
| Prepaid expenses and other current assets | 1,735 | 1,837 |
| Total current assets of discontinued operations | $ 2,610 | $ 1,853 |
| | | |
| Intangible assets, net | $ — | $ 538 |
| Restricted cash, non-current | — | 875 |
| Total non-currents assets of discontinued operations | $ — | $ 1,413 |
| | | |
| Accounts payable | $ — | $ 255 |
| Accruals and other current liabilities | 255 | 961 |
| Total current liabilities of discontinued operations [1] | $ 255 | $ 1,216 |

(1) Amount represents severance and personnel liabilities related to the exit of the Fintech Platform business. We substantially completed the restructuring activities as of March 31, 2024. Prior to the issuance of the condensed consolidated financial statements in this Report, $1.1 million was paid and the remaining $0.3 million will be paid over time through the third quarter of 2024. A summary of severance and personnel liabilities related to the exit of the Fintech Platform business, included within current liabilities of discontinued operations on the consolidated balance sheet, is as follows:

| | (in thousands) |
|---|---|
| Balance on December 31, 2023 | $ 917 |
| Severance and other personnel costs | 707 |
| Cash payments during the period | (1,369) |
| Balance on June 30, 2024 | $ 255 |

Details of loss from discontinued operations are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2024 | 2023 | 2024 | 2023 |
| Service revenue | $ — | $ 3,721 | $ 426 | $ 7,278 |
| Operating expenses: | | | | |
| Cost of service revenue (exclusive of amortization) | 34 | 3,700 | 350 | 7,384 |
| Selling, general and administrative [1] | (123) | 2,572 | 1,950 | 6,663 |
| Research and development [1] | 93 | 5,183 | 1,757 | 10,828 |
| Amortization | — | 1,418 | — | 2,877 |
| Net loss from discontinued operations | $ (4) | $ (9,152) | $ (3,631) | $ (20,474) |

(1) The restructuring charges are included in the results of discontinued operations for the periods of our condensed consolidated financial statements presented in this Report. A summary of our restructuring charges included within our consolidated statement of operations for the three and six months ended June 30, 2024 were as follows:

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

| (in thousands) | Three Months Ended June 30, 2024 | Six Months Ended June 30, 2024 |
|---|---|---|
| Research and development | $ (76) | $ 336 |
| Selling, general and administrative | 17 | 371 |
| Total restructuring charges (benefit) | $ (59) | $ 707 |

As of June 30, 2024, we have recorded total restructuring charges of $3.6 million and impairment charges of $93.2 million in connection with the exit of the Fintech Platform business.

The cash flows related to discontinued operations have not been segregated and are included in the condensed consolidated statements of cash flows. Significant non-cash activities related to discontinued operations are as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| (in thousands) | 2024 | 2023 |
| Operating activities: | | |
| Stock-based compensation | $ (10) | $ 4,243 |
| Depreciation and amortization | $ 538 | $ 4,164 |

**3. Revenue**

Our revenue is primarily generated from U.S. customers. Our product revenue is generated by transferring goods at a point in time and our collaboration revenue is generated over time.

**Product Revenue, net**

Our product revenue, net breakdown is summarized below:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2024 | 2023 | 2024 | 2023 |
| Product: | | | | |
| RHA® Collection of dermal fillers | $ 36,631 | $ 31,767 | $ 66,201 | $ 62,047 |
| DAXXIFY® | 28,697 | 22,626 | 50,846 | 38,004 |
| Total product revenue, net | $ 65,328 | $ 54,393 | $ 117,047 | $ 100,051 |

Accounts receivable and contract liabilities from contracts with our product customers are as follows:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable, gross | $ 37,412 | $ 27,975 |
| Allowance for doubtful accounts | (1,325) | (950) |
| Total accounts receivable, net | $ 36,087 | $ 27,025 |
| | | |
| Contract liabilities: | | |
| Deferred revenue, current | $ 375 | $ 884 |
| Total contract liabilities, current | $ 375 | $ 884 |

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

**Collaboration Revenue**

***Viatris Agreement***

*Agreement Terms*

We entered into the Viatris Agreement in February 2018, pursuant to which we are collaborating with Viatris exclusively, in the Viatris Territory, to develop, manufacture, and commercialize an onabotulinumtoxinA biosimilar.

Viatris has paid us an aggregate of $60 million in non-refundable upfront and milestone fees as of June 30, 2024, and the agreement provides for additional remaining contingent payments of up to $70 million in the aggregate, upon the achievement of certain clinical and regulatory milestones and of specified, tiered sales milestones of up to $225 million. The payments do not represent a financing component for the transfer of goods or services. In addition, Viatris is required to pay us low to mid-double digit royalties on any sales of the biosimilar in the U.S., mid-double digit royalties on any sales in Europe, and high single digit royalties on any sales in other ex-U.S. Viatris territories. However, we have agreed to waive royalties for U.S. sales, up to a maximum of $50 million in annual sales, during the first approximately four years after commercialization to defray launch costs.

*Revenue Recognition*

We estimated the transaction price for the Viatris Agreement using the most likely amount method within the scope of ASC 606. In order to determine the transaction price, we evaluated all of the payments to be received during the duration of the contract, which included milestones and consideration payable by Viatris. Other than the upfront payment, all other milestones and consideration we may earn under the Viatris Agreement are subject to uncertainties related to development achievements, Viatris' rights to terminate the agreement, and estimated effort for cost-sharing payments. Components of such estimated effort for cost-sharing payments include both internal and external costs. Consequently, the transaction price does not include any milestones and considerations that, if included, could result in a probable significant reversal of revenue when related uncertainties become resolved. At the end of each reporting period, we re-evaluate the probability of achievement of each such milestone and any related constraint, and if necessary, adjust our estimates of the overall transaction price. Sales-based milestones and royalties are not included in the transaction price until the sales occur because the underlying value relates to the license and the license is the predominant feature in the Viatris Agreement. As of June 30, 2024, the transaction price allocated to the unfulfilled performance obligations was $30.9 million.

We recognize revenue and estimate deferred revenue based on the cost of development service incurred over the total estimated cost of development services to be provided for the development period. For revenue recognition purposes, the development period has an estimated accounting program end date of 2030. It is possible that this period will change and is assessed at each reporting date. ASC Topic 606, Revenue from Contracts with Customers (ASC 606) requires that an entity include a constraint on the amount of variable consideration included in the transaction price. Variable consideration is considered "constrained" if there is a potential for significant reversal of cumulative revenue recognized. As part of the constraint evaluation, we considered numerous factors, including a shift in certain responsibilities between the two parties which would result in changes to the net cost sharing payments and the total project budget, for which outcomes are difficult to predict as of the date of this Report. We will continue to evaluate the variable transaction price and related revenue recognition in each reporting period and as the above uncertainties are resolved or other changes in circumstances occur. For the three and six months ended June 30, 2024, we recognized revenue related to development services under the Viatris Agreement of $0.1 million and $0.3 million, respectively. For the three and six months ended June 30, 2023, no collaboration revenue is recognized from the biosimilar program.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

***Fosun License Agreement***

*Agreement Terms*

In December 2018, we entered into the Fosun License Agreement with Fosun, whereby we granted Fosun the exclusive rights to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory and certain sublicense rights.

As of June 30, 2024, Fosun has paid us non-refundable upfront and other payments totaling $41.0 million before foreign withholding taxes. We are also eligible to receive (i) additional remaining contingent payments of up to $219.5 million upon the achievement of certain milestones, and (ii) tiered royalty payments in low double digits to high teen percentages on annual net sales. The royalty percentages are subject to reduction in the event that (i) we do not have any valid and unexpired patent claims that cover the product in the Fosun Territory, (ii) biosimilars of the product are sold in the Fosun Territory or (iii) Fosun needs to pay compensation to third-parties to either avoid patent infringement or market the product in the Fosun Territory.

*Revenue Recognition*

We estimated the transaction price for the Fosun License Agreement using the most likely amount method. We evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. We will re-evaluate the transaction price at each reporting period and upon a change in circumstances. As of June 30, 2024, the transaction price allocated to unfulfilled performance obligation is $41.0 million. For the three and six months ended June 30, 2024, no revenue was recognized from the Fosun License Agreement. For the three and six months ended June 30, 2023, we recognized revenue of less than $0.1 million and $0.1 million, respectively, related to the Fosun License Agreement.

We will recognize revenue on the single performance obligation as control of DAXXIFY® is supplied to Fosun. Upon commencement of the transfer of control, revenue will be recognized in a pattern consistent with estimated deliveries of DAXXIFY® through the term of the arrangement, which is estimated to extend through 2040. It is possible that this period will change and is assessed at each reporting date.

Accounts receivable and contract liabilities from contracts with our collaboration customers are as follows:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Accounts receivable: | | |
| Accounts receivable — Viatris | $ — | $ 631 |
| Accounts receivable — Fosun | — | 4 |
| Total accounts receivable | $ — | $ 635 |
| | | |
| Contract liabilities: | | |
| Deferred revenue, current — Viatris | $ 9,235 | $ 9,853 |
| Total contract liabilities, current | $ 9,235 | $ 9,853 |
| | | |
| Deferred revenue, non-current — Viatris | $ 26,993 | $ 29,444 |
| Deferred revenue, non-current — Fosun | 40,975 | 40,975 |
| Total contract liabilities, non-current | $ 67,968 | $ 70,419 |

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

Changes in our contract liabilities from contracts with our collaboration revenue customers for the six months ended June 30, 2024 are as follows:

| | (in thousands) |
|---|---|
| Balance on December 31, 2023 | $ 80,272 |
| Revenue recognized | (278) |
| Billings and adjustments, net | (2,791) |
| Balance on June 30, 2024 | $ 77,203 |

### 4. Cash Equivalents and Short-Term Investments

The following table is a summary of our cash equivalents and short-term investments:

| | June 30, 2024 | | | December 31, 2023 | | | |
|---|---|---|---|---|---|---|---|
| in thousands | Adjusted Cost | Unrealized Loss | Fair Value | Adjusted Cost | Unrealized Gain | Unrealized Loss | Fair Value |
| U.S. treasury securities | $ 115,120 | $ (9) | $ 115,111 | $ 133,168 | $ 30 | $ — | $ 133,198 |
| Commercial paper | 50,981 | (10) | 50,971 | 49,433 | — | (15) | 49,418 |
| Money market funds | 42,458 | — | 42,458 | 39,280 | — | — | 39,280 |
| U.S. government agency obligations | 16,083 | (7) | 16,076 | 3,961 | — | (1) | 3,960 |
| Total cash equivalents and available-for-sale securities | $ 224,642 | $ (26) | $ 224,616 | $ 225,842 | $ 30 | $ (16) | $ 225,856 |

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Classified as: | | |
| Cash equivalents | $ 73,825 | $ 109,270 |
| Short-term investments | 150,791 | 116,586 |
| Total cash equivalents and available-for-sale securities | $ 224,616 | $ 225,856 |

As of June 30, 2024 and December 31, 2023, all of our cash equivalents and short-term investments were available-for-sale and had contractual maturities of less than one-year. There were no other-than-temporary impairments on such securities.

### 5. Intangible Assets, net

The following table sets forth the major categories of intangible assets and the weighted-average remaining useful lives for those assets that are not already fully amortized or impaired:

| | June 30, 2024 | | | |
|---|---|---|---|---|
| (in thousands, except for in years) | Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Distribution rights | 3.8 | $ 32,334 | $ (24,154) | $ 8,180 |
| Total intangible assets | | $ 32,334 | $ (24,154) | $ 8,180 |

Table of Contents

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

| | December 31, 2023 | | | | |
|---|---|---|---|---|---|
| (in thousands, except for in years) | Weighted-average Remaining Useful Lives (in years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment | Net Carrying Amount |
| Distribution rights | 4.3 | $ 32,334 | $ (23,064) | $ — | $ 9,270 |
| Internally developed technology[1] | 1.5 | 8,918 | (4,408) | (3,972) | 538 (1) |
| Acquired developed technology | 0.0 | 16,200 | (6,525) | (9,675) | — |
| Customer relationships | 0.0 | 10,300 | (7,940) | (2,360) | — |
| Total intangible assets | | $ 67,752 | $ (41,937) | $ (16,007) | $ 9,808 |

(1) During the three months ended March 31, 2024, we reclassified the $0.5 million net carrying amount of internally developed technology to "Non-current assets of discontinued operations" in connection with the discontinued operations presentation.

Amortization expense of the intangible assets in the table above were recorded on the condensed consolidated statements of operations and comprehensive loss based on the function of the associated asset. The detail breakdown of the amortization expenses on the condensed consolidated statements of operations and comprehensive loss were summarized as below:

| | Three Months Ended June 30, 2024 | | | Six Months Ended June 30, 2024 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations |
| Amortization | $ 546 | $ — | $ 546 | $ 1,091 | $ — | $ 1,091 |
| Selling, general and administrative | — | — | — | 528 | (528) | — |
| Research and development | — | — | — | 10 | (10) | — |
| Total amortization expense | $ 546 | $ — | $ 546 | $ 1,629 | $ (538) | $ 1,091 |

| | Three Months Ended June 30, 2023 | | | Six Months Ended June 30, 2023 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations | Amortization of Intangible Assets (1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations |
| Amortization | $ 1,964 | $ (1,418) | $ 546 | $ 3,968 | $ (2,877) | $ 1,091 |
| Selling, general and administrative | 797 | (643) | 154 | 2,534 | (1,287) | 1,247 |
| Research and development | — | — | — | 261 | — | 261 |
| Total amortization expense | $ 2,761 | $ (2,061) | $ 700 | $ 6,763 | $ (4,164) | $ 2,599 |

(1) Amount represents the amortization expense before the impact of reclassification for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

(2) Amount represents the reclassification for the current and prior periods for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

Based on the amount of intangible assets as of June 30, 2024, the expected amortization expense for each of the next five fiscal years was as follows:

| Year Ending December 31, | (in thousands) |
|---|---|
| 2024 remaining six months | $ 1,092 |
| 2025 | 2,181 |
| 2026 | 2,181 |
| 2027 | 2,181 |
| 2028 | 545 |
| 2029 and thereafter | — |
| Total | $ 8,180 |

## 6. Inventories

Inventories consist of the following:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Raw materials | $ 4,100 | $ 3,938 |
| Work in process | 34,050 | 17,418 |
| Finished goods | 30,137 | 24,223 |
| Total inventories | $ 68,287 | $ 45,579 |

## 7. Accruals and other current liabilities

Accruals and other current liabilities consists of the following:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Accruals related to: | | |
| Compensation[(1)] | $ 21,232 | $ 30,267 |
| Selling, general and administrative | 8,029 | 9,019 |
| Research and development | 6,440 | 5,173 |
| Inventories | 5,825 | 1,478 |
| Royalty | 2,242 | 1,919 |
| Interest expense | 1,919 | 1,919 |
| Other current liabilities[(1)] | 1,485 | 3,088 |
| Total accruals and other current liabilities | $ 47,172 | $ 52,863 |

(1) Amounts related to current liabilities of discontinued operations have been reclassified to conform to current period presentation.

## 8. Leases

***Finance Lease***

The ABPS Services Agreement contains a lease, which commenced in January 2022, related to a dedicated fill-and-finish line for the manufacturing of DAXXIFY® because it has an identified asset that is physically distinct for which we have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease provides us with both (i) the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

exclusivity of the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line through our purchase orders to ABPS. Each party has the right to terminate the ABPS Services Agreement without cause, with an 18 month written notice to the other party. The lease is classified as a finance lease in the condensed consolidated balance sheets.

In February 2024, we entered into the second amendment to the ABPS Services Agreement, which extended the term of the ABPS Service Agreement through December 31, 2027, and modified our remedies with respect to conforming products and delays. In April 2024, we entered into a statement of work under the ABPS Service Agreement, and our minimum purchase obligation was established as $25.1 million for the year ending December 31, 2024 with lease term through December 31, 2024. The minimum purchase obligation is subject to reduction based on ABPS' actual manufacturing output.

***Operating Leases***

Our operating leases primarily consist of non-cancellable facilities leases for research, manufacturing, and administrative functions. Our non-cancellable facilities operating leases have original lease periods expiring between 2027 and 2034, and include one or more options to renew for seven years to fourteen years. The monthly payments for our operating leases escalate over the remaining lease terms. Our lease contracts do not contain termination options, residual value guarantees or restrictive covenants.

*Operating Lease Sublease Income*

In May 2024, we entered into a sublease agreement pursuant to which we subleased a portion of our office space in Nashville, TN. The term of the sublease is from June 2024 to December 2034, with no options to extend. The total undiscounted payments to be received under the sublease total $5.2 million, excluding variable lease income. The sublease is accounted for as an operating lease with the corresponding income classified within "Other expense, net" on our condensed consolidated statement of operations and comprehensive loss.

Our finance and operating lease costs are summarized as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| **(in thousands)** | **2024** | **2023** | **2024** | **2023** |
| Finance lease: | | | | |
| Amortization of finance lease right-of-use asset (1) | $ 13,099 | $ 1,350 | $ 15,215 | $ 3,668 |
| Interest on finance lease liability | 424 | 442 | 454 | 1,008 |
| Variable lease cost (2) | 142 | — | 161 | 374 |
| Total finance lease costs | 13,665 | 1,792 | 15,830 | 5,050 |
| Operating leases: | | | | |
| Operating lease cost | 2,769 | 4,312 | 5,542 | 6,519 |
| Variable lease cost (3) | 717 | 548 | 1,363 | 1,055 |
| Sublease income | (41) | — | (41) | — |
| Total operating lease costs | 3,445 | 4,860 | 6,864 | 7,574 |
| Total lease cost | $ 17,110 | $ 6,652 | $ 22,694 | $ 12,624 |

(1) Amortization of the finance lease right-of-use asset started to be capitalized into inventories on the condensed consolidated balance sheets in the second quarter of 2023, as a result of the FDA approval of the PAS of the ABPS manufacturing facility.

(2) Variable finance lease cost includes validation, qualification, materials, and other related services which are not included in the lease liabilities and are expensed as incurred.

(3) Variable operating lease cost includes management fees, common area maintenance, property taxes, insurance and parking fees, which are not included in the lease liabilities and are expensed as incurred.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

As of June 30, 2024, we have $0.8 million of accounts payable related to the fill-and-finish line lease under the ABPS Service Agreement. Additionally, we have maturities of our lease liabilities as follows:

| (in thousands) | Finance Lease | Operating Leases |
|---|---|---|
| Year Ending December 31, | | |
| 2024 remaining six months | $ 14,894 | $ 4,696 |
| 2025 | 3,178 | 10,854 |
| 2026 | — | 11,185 |
| 2027 | — | 4,536 |
| 2028 | — | 4,021 |
| 2029 and thereafter | — | 24,565 |
| Total lease payments | 18,072 | 59,857 |
| Less imputed interest | (355) | (16,524) |
| Present value of lease payments | $ 17,717 | $ 43,333 |

Our lease contracts do not provide readily determinable implicit rates, as such, we used the estimated incremental borrowing rate based on the information available at the adoption, commencement, or remeasurement date. As of June 30, 2024, weighted-average remaining lease terms and discount rates are as follows:

| | Finance Lease | Operating Leases |
|---|---|---|
| Weighted-average remaining lease term (years) | 0.5 | 7.8 |
| Weighted-average discount rate | 10.0 % | 10.0 % |

Supplemental cash flow information related to the leases was as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| (in thousands) | 2024 | 2023 |
| Cash paid for amounts included in the measurement of lease liabilities | | |
| Operating cash flows from operating leases | $ 5,220 | $ 4,188 |
| Operating cash flows from finance lease | $ 313 | $ 1,008 |
| Financing cash flows from finance lease | $ 8,123 | $ 8,899 |
| Right-of-use assets obtained in exchange for lease liabilities | | |
| Finance lease | $ 21,600 | $ 23,735 |

**Lease Not Yet Commenced**

***PCI Supply Agreement***

In April 2021, we entered into the PCI Supply Agreement pursuant to which PCI would serve as a non-exclusive manufacturer and supplier of DAXXIFY®. The initial term of the PCI Supply Agreement is dependent upon the date of regulatory submission for the manufacturing of DAXXIFY® and may be terminated by either party in accordance with the terms of the PCI Supply Agreement. The term of the PCI Supply Agreement may also be extended for one additional three-year term upon mutual agreement of the parties.

The PCI Supply Agreement contains a lease related to a dedicated fill-and-finish line and closely related assets for manufacturing of products because it has identified assets that are physically distinct for which we will have the right of control as defined under ASC 842. The right of control is conveyed because the embedded lease will provide us with both (i) the right to obtain substantially all of the economic benefit from the fill-and-finish line resulting from the exclusivity implied from the dedicated manufacturing capacity and (ii) the right to direct the use of the fill-and-finish line.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

The embedded lease had not yet commenced as of June 30, 2024. The accounting commencement and recognition of the right-of-use lease assets and lease liabilities related to the embedded lease will take place when we have substantively obtained the right of control. The embedded lease is preliminarily classified as a finance lease.

Pursuant to the PCI Supply Agreement, we are responsible for certain costs associated with the design, equipment procurement and validation, and facilities-related costs, monthly payments and minimum purchase obligations throughout the initial term of the PCI Supply Agreement. As of June 30, 2024, we have made prepayments of $37.6 million to PCI which is recorded within “Finance lease prepaid expense” in the condensed consolidated balance sheets. Based on our best estimate as of June 30, 2024, our remaining minimum commitment under the PCI Supply Agreement is $12.7 million for 2024, $14.4 million for 2025, $19.2 million for 2026, $25.8 million for 2027, $29.5 million for 2028, and $134.5 million for 2029 and thereafter in aggregate.

## 9. Debt

The following table provides information regarding our debt:

| (in thousands) | June 30, 2024 | December 31, 2023 |
|---|---|---|
| 2027 Notes, non-current | $ 287,500 | $ 287,500 |
| Less: Unamortized debt issuance costs | (3,614) | (4,279) |
| Carrying amount of the 2027 Notes | 283,886 | 283,221 |
| | | |
| Notes Payable, current | 7,500 | 2,500 |
| Notes Payable, non-current | 142,500 | 147,500 |
| Less: Unamortized debt discount | (2,149) | (2,700) |
| Less: Unamortized debt issuance costs | (1,151) | (1,426) |
| Carrying amount of Notes Payable | 146,700 | 145,874 |
| Total debt | $ 430,586 | $ 429,095 |

Interest expense relating to our debt in the condensed consolidated statements of operations and comprehensive loss are summarized as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| (in thousands) | 2024 | 2023 | 2024 | 2023 |
| Contractual interest expense | $ 4,492 | $ 3,407 | $ 8,961 | $ 6,790 |
| Amortization of debt issuance costs | 486 | 431 | 969 | 863 |
| Amortization of debt discount | 277 | 87 | 551 | 172 |
| Total interest expense | $ 5,255 | $ 3,925 | $ 10,481 | $ 7,825 |

### Convertible Senior Notes

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers’ discount, commissions, and other issuance costs.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the five business day period after any ten consecutive trading day period (the "measurement period") in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. The threshold to redeem has not been met as of June 30, 2024. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

**Capped Call Transactions**

Concurrently with the 2027 Notes, we entered into capped call transactions with the option counterparties and used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027 Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

The capped call transactions are separate transactions that we entered into with the option counterparties and are not part of the terms of the 2027 Notes. As the capped call transactions meet certain accounting criteria, the premium paid of $28.9 million was recorded as a reduction in additional paid-in capital in the condensed consolidated balance sheets, and will not be remeasured to fair value as long as the accounting criteria continue to be met. As of June 30, 2024 and December 31, 2023, we had not purchased any shares under the capped call transactions.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

**Note Purchase Agreement**

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the Purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium, which we did not draw on.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

**10. Stockholders' Deficit and Stock-Based Compensation**

***2014 EIP***

On January 1, 2024, the number of shares of common stock reserved for issuance under the 2014 EIP increased by 3.5 million shares. For the six months ended June 30, 2024, 3.1 million shares of stock awards were granted under the 2014 EIP. As of June 30, 2024, 5.7 million shares were available for issuance under the 2014 EIP.

***2014 IN***

For the six months ended June 30, 2024, 0.3 million shares of stock awards were granted under the 2014 IN. As of June 30, 2024, 0.8 million shares were available for issuance under the 2014 IN.

***HintMD Plan***

For the six months ended June 30, 2024, no stock options or awards were granted under the HintMD Plan. As of June 30, 2024, 0.1 million shares were available for issuance under the HintMD Plan.

***2014 ESPP***

On January 1, 2024, the number of shares of common stock reserved for issuance under the 2014 ESPP increased by 0.3 million shares. As of June 30, 2024, 1.7 million shares were available for issuance under the 2014 ESPP.

**Net Loss per Share**

Our basic net loss per share from continuing operations is calculated by dividing the net loss from continuing operations by the weighted average number of shares of common stock outstanding for the period. Our basic net loss per share from discontinued operations is calculated by dividing the net loss from discontinued operations by the weighted average number of shares of common stock outstanding for the period. The diluted net loss per share from both continuing and discontinued operations are calculated by giving effect to all potential dilutive common stock equivalents outstanding for the period. For purposes of this calculation, shares of common stock underlying the 2027 Notes at the initial conversion price, outstanding stock options, unvested stock awards, and shares of common stock expected to be purchased under the 2014 ESPP, are considered common stock equivalents, which were excluded from the computation of diluted net loss per share because including them would have been antidilutive.

Common stock equivalents that were excluded from the computation of diluted net loss per share for both continuing and discontinued operations are presented below:

| | June 30, | |
|---|---|---|
| | 2024 | 2023 |
| Convertible senior notes | 8,878,938 | 8,878,938 |
| Unvested RSUs and PSUs | 5,295,898 | 3,281,382 |
| Outstanding stock options | 3,693,037 | 4,391,679 |
| Unvested RSAs and PSAs | 652,364 | 1,577,981 |

**Follow-On Offering**

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares sold and issued to Mark Foley, our president, chief executive officer, and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and offering costs.

Table of Contents

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

### ATM Offering Programs

On May 10, 2022, we entered into the 2022 ATM Agreement with Cowen. Under the 2022 ATM Agreement, we may sell up to $150.0 million of our common stock. We are not obligated to sell any shares under the 2022 ATM Agreement. Subject to the terms and conditions of the 2022 ATM Agreement, Cowen will use commercially reasonable efforts, consistent with its normal trading and sales practices, applicable state and federal law, rules and regulations and the rules of The Nasdaq Global Market, to sell shares from time to time based upon our instructions, including any price, time or size limits specified by us. We pay Cowen a commission of up to 3.0% of the aggregate gross proceeds from each sale of shares, reimburse legal fees and disbursements and provide Cowen with customary indemnification and contribution rights.

In 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the six months ended June 30, 2024 from the 2022 ATM Agreement.

### Stock-based Compensation Expense

The following table summarizes our stock-based compensation expense by line item in our condensed consolidated statements of operations and comprehensive loss:

| | Three Months Ended June 30, 2024 | | | Six Months Ended June 30, 2024 | | |
|---|---|---|---|---|---|---|
| (in thousands) | Stock-based Compensation before Discontinued Operation Adjustments[(1)] | Classified as Discontinued Operations [(2)] | Classified as Continuing Operations | Stock-based Compensation before Discontinued Operation Adjustments[(1)] | Classified as Discontinued Operations [(2)] | Classified as Continuing Operations |
| Selling, general and administrative | $ 4,516 | $ 167 | $ 4,683 | $ 12,140 | $ (73) | $ 12,067 |
| Research and development | 1,279 | 70 | 1,349 | 2,645 | 83 | 2,728 |
| Total stock-based compensation expense (exclusive of capitalized stock-based compensation expense) | 5,795 | 237 | 6,032 | 14,785 | 10 | 14,795 |
| Capitalized stock-based compensation expense | 104 | — | 104 | 492 | — | 492 |
| Total stock-based compensation expense | $ 5,899 | $ 237 | $ 6,136 | $ 15,277 | $ 10 | $ 15,287 |

Table of Contents



| (in thousands) | Three Months Ended June 30, 2023 | | | Six Months Ended June 30, 2023 | | |
|---|---|---|---|---|---|---|
| | Stock-based Compensation before Discontinued Operation Adjustments(1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations | Stock-based Compensation before Discontinued Operation Adjustments(1) | Classified as Discontinued Operations (2) | Classified as Continuing Operations |
| Selling, general and administrative | $ 12,178 | $ (764) | $ 11,414 | $ 22,443 | $ (1,474) | $ 20,969 |
| Research and development | 3,421 | (1,349) | 2,072 | 6,238 | (2,769) | 3,469 |
| Total stock-based compensation expense (exclusive of capitalized stock-based compensation expense) | 15,599 | (2,113) | 13,486 | 28,681 | (4,243) | 24,438 |
| Capitalized stock-based compensation expense | 1,230 | — | 1,230 | 2,637 | — | 2,637 |
| Total stock-based compensation expense | $ 16,829 | $ (2,113) | $ 14,716 | $ 31,318 | $ (4,243) | $ 27,075 |

(1) Amount represents the stock-based compensation expense before the impact of reclassification for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

(2) Amount represents the reclassification for the current and prior periods for the discontinued operation presentation in the condensed consolidated statements of operations and comprehensive loss.

## 11. Fair Value Measurements

The following table summarizes, for assets and liabilities measured at fair value, the respective fair value and the classification by level of input within the fair value hierarchy:

| (in thousands) | June 30, 2024 | | | |
|---|---|---|---|---|
| | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 115,111 | $ 115,111 | $ — | $ — |
| Money market funds | 42,458 | 42,458 | — | — |
| U.S. government agency obligations | 16,076 | 16,076 | — | — |
| Commercial paper | 50,971 | — | 50,971 | — |
| Total assets measured at fair value | $ 224,616 | $ 173,645 | $ 50,971 | $ — |

| (in thousands) | December 31, 2023 | | | |
|---|---|---|---|---|
| | Fair Value | Level 1 | Level 2 | Level 3 |
| **Assets** | | | | |
| U.S. treasury securities | $ 133,198 | $ 133,198 | $ — | $ — |
| Money market funds | 39,280 | 39,280 | — | — |
| U.S. government agency obligations | 3,960 | 3,960 | — | — |
| Commercial paper | 49,418 | — | 49,418 | — |
| Total assets measured at fair value | $ 225,856 | $ 176,438 | $ 49,418 | $ — |

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

For Level 1 investments, we use quoted prices in active markets for identical assets to determine the fair value. For Level 2 investments, we use quoted prices for similar assets sourced from certain third-party pricing services. The third-party pricing services generally utilize industry standard valuation models for which all significant inputs are observable, either directly or indirectly, to estimate the price or fair value of the securities. The primary input generally includes reported trades of or quotes on the same or similar securities. We do not make additional judgments or assumptions made to the pricing data sourced from the third-party pricing services.

The fair value of the 2027 Notes and the Notes Payable (Note 9) was determined on the basis of market prices observable for similar instruments and is considered Level 2 in the fair value hierarchy. We present the fair value of the 2027 Notes and the Notes payable for disclosure purposes only. As of June 30, 2024, and December 31, 2023, the fair value of the 2027 Notes was $189.6 million and $219.2 million, respectively. As of June 30, 2024 the fair value of the Notes Payable was approximately the same as its unamortized carrying value.

**12. Commitments and Contingencies**

**Teoxane Agreement**

In January 2020, we entered into the Teoxane Agreement, as amended, pursuant to which Teoxane granted us the exclusive right to import, market, promote, sell and distribute Teoxane's line of Resilient Hyaluronic Acid® dermal fillers, which include: (i) RHA® Collection of dermal fillers, and (ii) the RHA® Pipeline Products in the U.S. and U.S. territories and possessions, in exchange for 2,500,000 shares of our common stock and certain other commitments by us. The Teoxane Agreement is effective for a term of ten years from product launch in September 2020 and may be extended for a two-year period upon the mutual agreement of the parties. We are required to meet certain minimum purchase obligations during each year of the term. Our minimum purchase obligation for the year ending December 31, 2024 is $52 million. Our minimum purchase obligations after December 31, 2024 will be determined based on projected market growth rate. We are also required to meet certain minimum expenditure requirements in connection with commercialization and promotion of RHA® Collection of dermal fillers and RHA® Pipeline Products, which is $36 million for the year ending December 31, 2024. Minimum expenditures related to the commercialization and promotion of the RHA® Collection of dermal fillers and RHA® Pipeline Products after December 31, 2024 will be determined at a later date.

Either party may terminate the Teoxane Agreement in the event of the insolvency of, or a material breach by, the other party, including certain specified breaches that include the right for Teoxane to terminate the Teoxane Agreement for our failure to meet the minimum purchase requirements or commercialization expenditure during specified periods, or for our breach of the exclusivity obligations under the Teoxane Agreement.

**Other Contingencies**

As of June 30, 2024, we are obligated to pay BTRX up to a remaining $15.5 million upon the satisfaction of certain milestones relating to our product revenue, intellectual property, and clinical and regulatory events.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

**Indemnification**

We have standard indemnification agreements in the ordinary course of business. Under these indemnification agreements, we indemnify, hold harmless, and agree to reimburse the indemnified parties for losses suffered or incurred by the indemnified party, in connection with any trade secret, copyright, patent or other intellectual property infringement claim by any third-party with respect to our technology. The term of these indemnification agreements is generally perpetual after the execution of the agreements. The maximum potential amount of future payments we are obligated to pay under other indemnification agreements is not determinable because it involves claims for indemnification that may be made against us in the future but have not been made. We have not yet incurred material costs to defend lawsuits or settle claims related to indemnification agreements.

We have indemnification agreements with our directors and officers that may require us to indemnify them against liabilities that may arise by reason of their status or service as directors or officers, other than liabilities arising from willful misconduct of the individual.

For the six months ended June 30, 2024 and 2023, no material amounts associated with the indemnification agreements have been recorded.

**Litigation**

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan: U.S. Patent No. 11,147,878. On December 17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our second motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice. Allergan reduced the asserted claims to claim 8 of U.S. Patent No. 7,354,740, claims 5 and 8 of U.S. Patent No. 11,203,748, claim 10 of U.S. Patent No. 11,033,625, claims 1, 4, 6, and 20 of U.S. Patent No. 11,147,878, and claim 1 of U.S. Patent No. 11,285,216 via a Stipulation and Order dated June 21, 2024.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021, in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss, and on March 30, 2024, the Court granted the motion with leave for the plaintiff to amend the complaint. On May 1, 2024, the plaintiff filed an amended complaint, which asserted similar claims to those in the prior complaint. On June 25, 2024, the Company filed a motion to dismiss the amended complaint.

We dispute the claims in these lawsuits and intend to defend these matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcomes of the lawsuits are necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

**REVANCE THERAPEUTICS, INC.**

**Notes to Condensed Consolidated Financial Statements — (Continued)**

**(Unaudited)**

We record a provision for a liability when we believe that it is both probable that a liability has incurred, and the amount can be reasonably estimated. As of both June 30, 2024 and December 31, 2023, no such provision for liabilities related to the above litigation matters were recorded on the condensed consolidated balance sheets.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and the accompanying notes appearing elsewhere in this Report and in conjunction with our other SEC filings, including our FY2023 Form 10-K.

This Report, including the documents incorporated by reference herein, contains forward-looking statements within the meaning of Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act, and Section 21E of the Exchange Act. All statements other than statements of historical facts contained in this Report and the documents incorporated by reference herein, including statements regarding our future financial condition, regulatory approvals, business strategy and plans and objectives of management for future operations, are forward-looking statements. The words "may," "will," "could," "would," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," "continue," "ongoing" and similar expressions that convey uncertainty of future events or outcomes are intended to identify forward-looking statements. In addition, any statements that refer to our financial outlook or projected performance, profitability expectations, amortization expectations, anticipated growth, milestone expectations, future expenses and cash flows, anticipated working capital requirements, market forecasts, capital expenditures, cash preservation plans, liquidity and financing requirements; our ability to comply with our debt obligations; our future financing plans and strategies; our ability to raise additional capital; our ability to develop and commercialize innovative aesthetic and therapeutic offerings; our ability to obtain, and the timing relating to, regulatory submissions and approvals with respect to our drug product candidates and third-party manufacturers, including with respect to the PAS for the PCI manufacturing facility; our opportunity in therapeutics; development of an onabotulinumtoxinA biosimilar; the process and our ability to effectively and reliably manufacture supplies of DAXXIFY®; our ability to manufacture or receive sufficient supply of our Products in order to meet commercial demand; expectations regarding DAXXIFY® Zero-cost Inventory; our ability to maintain and seek out new strategic third-party collaborations to support our goals; research and development expenses and expectations; patent defensive measures; timing and expenses related to our ongoing litigation matters; our ability to defend ourselves in ongoing litigation; international expansion, including with respect to NMPA approval of DAXXIFY® for cervical dystonia and glabellar lines; and our ability to comply with applicable laws and regulations; are forward-looking statements. We have based these forward-looking statements on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements are subject to a number of known and unknown risks, uncertainties and assumptions, including risks described in Item 1A. "Risk Factors" and elsewhere in this Report and our FY2023 Form 10-K.

You should not rely upon forward-looking statements as predictions of future events. These forward-looking statements represent our estimates and assumptions only as of the date of this Report. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason to conform these statements to actual results or to changes in our expectations. You should read this Report, together with the information incorporated herein by reference, with the understanding that our actual future results, levels of activity, performance and achievements may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

**Summary of Risk Factors**

Investing in our common stock involves risks. See Item 1A. "Risk Factors" in this Report and in our FY2023 Form 10-K for a discussion of the following principal risks and other risks that make an investment in Revance speculative or risky.

- Our success as a company, including our ability to finance our business and generate revenue, and our future growth is substantially dependent on the clinical and commercial success of our Products. If we are unable to successfully commercialize our Products, complete the development and regulatory approval process of our product candidates, and maintain regulatory approval of our Products we may not be able to generate sufficient revenue to continue our business.

- DAXXIFY® and any future product candidates, if approved, may not achieve market acceptance among injectors, HCPs, consumers and patients, and may not be commercially successful, which would adversely affect our operating results and financial condition.

- We have incurred significant losses since our inception and we anticipate that we will continue to incur U.S. GAAP operating losses for the foreseeable future and may not achieve or maintain profitability in the future. Our prior losses, combined with expected future losses, may adversely affect the market price of our common stock, our ability to raise capital and our ability to maintain compliance with our debt covenants. We may require substantial additional funding to continue to operate our business and achieve our goals and a failure to obtain the necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development, other operations or commercialization efforts.

- DAXXIFY®, the RHA® Collection of dermal fillers and any future product candidates will face significant competition, including from companies that enjoy significant competitive advantages, such as substantially greater financial, research and development, regulatory, manufacturing, marketing resources and expertise, greater brand recognition and more established relationships. Our failure to effectively compete may prevent us from achieving significant market penetration and expansion.

- If we are not able to effectively and reliably manufacture DAXXIFY® or any future product candidates at sufficient scale and appropriate cost, including through any third-party manufacturers, as well as acquire supplies of the RHA® Collection of dermal fillers from Teoxane, our product development, regulatory approval, commercialization and sales efforts and our ability to generate revenue may be adversely affected.

- We use third-party collaborators, including Teoxane, Viatris, Fosun, ABPS and PCI to help us develop, validate, manufacture and/or commercialize our products. Our ability to commercialize our products could be impaired or delayed if these collaborations are unsuccessful.

- Servicing our debt, including the 2027 Notes and Notes Payable, requires a significant amount of cash to pay our substantial debt. If we are unable to generate sufficient cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive.

- Macroeconomic and geopolitical factors and a public health crisis, such as the COVID-19 pandemic, have and may continue to adversely affect our business, as well as those of third-parties on which we rely for significant manufacturing, clinical or other business operations. They may also impact disposable income levels, which could reduce consumer spending and lower demand for our Products.

- We are subject to uncertainty relating to pricing and reimbursement. Failure to obtain or maintain adequate coverage, pricing and reimbursement for DAXXIFY® for therapeutics uses, or our other future approved products, if any, could have a material adverse impact on our ability to commercialize such products. Even if coverage and reimbursement is provided, acceptance of any approved product may vary among HCPs, healthcare organizations and administrators and others in the healthcare community, which could impact our ability to realize a return on our investment and reduce demand for our products.

- Reports of adverse events or safety concerns involving our Products could delay or prevent the Company or Teoxane from maintaining regulatory approval for such Products, or obtaining additional regulatory approval for additional indications or future product candidates. The denial, delay or withdrawal of any such approval would negatively impact commercialization and could have a material adverse effect on our ability to generate revenue, business prospects, and results of operations.

- Unfavorable publicity relating to one or more of our Products, whether related to aesthetic or therapeutic indications, may affect the public perception of our entire portfolio of Products.

- Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results or actual consumer outcomes.

- If our efforts to protect our intellectual property related to DAXXIFY®, the RHA® Collection of dermal fillers or any future product candidates are not adequate, we may not be able to compete effectively. Additionally, we are currently and in the future may become involved in lawsuits or administrative proceedings to defend against claims that we infringe the intellectual property of others and to protect or enforce our patents or other intellectual property or the patents of our licensors, which could be expensive and time-consuming and would have a material adverse effect on our ability to generate revenue if we are unsuccessful.

- We are currently, and in the future may be, subject to securities class action and stockholder derivative actions. If other stockholder derivative actions, additional securities class actions or other lawsuits are brought against us, including product liability actions, and we cannot successfully defend ourselves, we may incur substantial liabilities or be required to limit commercialization of our products. Even a successful defense would require significant financial and management resources.

- As our business and operations continue to grow, we may need to expand our development, manufacturing, regulatory, sales, marketing and distribution capabilities. If and when we expand such capabilities, we may encounter difficulties in managing our growth, which could disrupt our operations.

- We have undertaken, and may in the future undertake, restructuring plans to adjust our investment priorities and manage our operating expenses, which plans may not result in the savings or operational efficiencies anticipated and could result in total costs and expenses that are greater than expected.

- If we are not successful in discovering, developing, acquiring and commercializing additional product candidates other than our current Products, our ability to expand our business and achieve our strategic objectives may be impaired.

- We have experienced and may experience in the future compromises or failures of our information technology systems or data, or those of third-parties upon which we rely, which could adversely affect our business. Despite significant efforts to secure against such threats, it is impossible to entirely mitigate these risks.

- Changes in and failures to comply with applicable laws, regulations and standards may adversely affect our business, operations and financial performance.

- If we fail to attract and retain qualified personnel at all levels and functions, we may be unable to successfully execute our objectives.

**Overview**

Revance is a biotechnology company focused on developing and commercializing innovative aesthetic and therapeutic offerings. Revance's portfolio includes DAXXIFY® (DaxibotulinumtoxinA-lanm) for injection and the RHA® Collection of dermal fillers in the U.S. Revance has also partnered with Viatris to develop a biosimilar to onabotulinumtoxinA for injection and Fosun to commercialize DAXXIFY® in China.

**Recent Developments**

**Revance Aesthetics**

For the three and six months ended June 30, 2024, we generated $65.3 million and $117.0 million in revenue from the sale of our Products. As of June 30, 2024, we had over 7,500 aesthetic accounts and over 3,700 accounts have ordered DAXXIFY®.

***DAXXIFY®***

For the three and six months ended June 30, 2024, we recognized $28.7 million and $50.8 million in net product revenue from the sale of DAXXIFY®, respectively. For the three and six months ended June 30, 2023, we recognized $22.6 million and $38.0 million in product revenue from the sale of DAXXIFY®, respectively. For the three months ended June 30, 2024, the DAXXIFY® aesthetic units sold increased by 65% and 15%, compared to the three months ended June 30, 2023 and March 31, 2024, respectively.

***RHA® Collection of Dermal Fillers***

For the three and six months ended June 30, 2024, we recognized $36.6 million and $66.2 million in product revenue from the sale of the RHA® Collection of dermal fillers, respectively. For the three and six months ended June 30, 2023, we recognized $31.8 million and $62.0 million in product revenue from the sale of the RHA® Collection of dermal fillers, respectively.

In April 2024, the Company launched RHA® 3 for injection into the vermillion body, vermillion border and oral commissure for lip augmentation and lip fullness in adults aged 22 years and older.

**Revance Therapeutics**

In May 2024, the Company expanded into the U.S. therapeutics market with the commercial launch of DAXXIFY® for the treatment of cervical dystonia. As of June 30, 2024, DAXXIFY® for the treatment of cervical dystonia had coverage for over 80% of commercial lives.

**Follow-On Offering**

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares which were sold and issued to Mark Foley, our chief executive officer and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and estimated offering costs.

**Exit of the Fintech Platform Business**

In September 2023, we commenced a plan to exit the Fintech Platform business as the costs and resources required to support the Fintech Platform no longer aligned with the Company's capital allocation priorities. The exit and restructuring activities included elimination of Fintech Platform personnel, the termination of Fintech Platform research and development activities and an elimination of outside services expenses related to the Fintech Platform. Based on such plan, substantially all payment processing activities for Fintech Platform customers ended on January 31, 2024 and we substantially completed the activities related to winding down the remaining Fintech Platform operations as of March 31, 2024. Beginning as of March

31, 2024, the Service Segment is presented as a discontinued operation in our condensed consolidated financial statements with certain prior period amounts retrospectively revised to reflect this change. Although we discontinued the Service Segment, we do not expect the discontinuation of the Service Segment to have a material effect on our liquidity going forward. See Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 2 — Exit of the Fintech Platform Business" in this Report for additional information.

**Results of Operations**

In connection with the completion of the exit of the Fintech Platform business discussed above, the results of our Fintech Platform business have been reflected as discontinued operations in our condensed consolidated financial statements as of and for the period ended June 30, 2024. Certain prior year figures were reclassified to conform to the current period presentation. Additionally, we began operating under a single reportable segment as of March 31, 2024. See Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 2 — Exit of the Fintech Platform Business" in this Report for additional information. Accordingly, the results of operations discussed below no longer include a discussion of the Service Segment and the effect of the Service Segment on prior period amounts have been retrospectively revised for comparative purposes to more accurately reflect the period over period changes in our continuing operations.

**Revenue**

We generate product revenue from the sale of our Products. We generate collaboration revenue from an onabotulinumtoxinA biosimilar program with Viatris as well as the collaboration with Fosun for the development and commercialization of DaxibotulinumtoxinA for Injection. The service revenue generated from the Fintech Platform is classified as discontinued operations as discussed in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 2— Exit of the Fintech Platform Business".

***Product Revenue***

Our breakdown of revenue by Product is summarized below:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **(in thousands, except percentages)** | **2024** | **2023** | **Change** | **% Change** | **2024** | **2023** | **Change** | **% Change** |
| Product: | | | | | | | | |
| RHA® Collection of dermal fillers | $ 36,631 | $ 31,767 | $ 4,864 | 15 % | $ 66,201 | $ 62,047 | $ 4,154 | 7 % |
| DAXXIFY® | 28,697 | 22,626 | $ 6,071 | 27 % | 50,846 | 38,004 | $ 12,842 | 34 % |
| Total product revenue, net | $ 65,328 | $ 54,393 | $ 10,935 | 20 % | $ 117,047 | $ 100,051 | $ 16,996 | 17 % |

For the three and six months ended June 30, 2024, our product revenue from the sale of the RHA® Collection of dermal fillers increased compared to the same periods in 2023 primarily due to an increase in units sold.

For the three and six months ended June 30, 2024, our product revenue from the sale of DAXXIFY® increased compared to the same periods in 2023 primarily due to an increase in units sold, partially offset by a reduction in average selling price as a result of the new pricing introduced in September 2023 and approximately $2 million of rebates recorded from the non-recurring DAXXIFY® consumer coupon program during the three months ended March 31, 2024.

***Collaboration Revenue***

We are actively developing an onabotulinumtoxinA biosimilar in collaboration with Viatris. As described in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements

(Unaudited) —Note 3—Revenue," we generally recognize collaboration revenue for the onabotulinumtoxinA biosimilar program based on the determined transactions price of the contract multiplied by the quotient of the cost of development services incurred over the total estimated cost of development services for the expected duration of our performance obligations. For the three and six months ended June 30, 2024, we recognized revenue related to development services under the Viatris Agreement of $0.1 million and $0.3 million, respectively. For the three and six months ended June 30, 2023, no collaboration revenue was recognized from the biosimilar program.

We are also working with Fosun to develop and commercialize DaxibotulinumtoxinA for Injection in the Fosun Territory under the Fosun License Agreement. As described in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 3—Revenue," we evaluated all of the variable payments to be received during the duration of the contract, which included payments from specified milestones, royalties, and estimated supplies to be delivered. For the three and six months ended June 30, 2024, no collaboration revenue is recognized from the Fosun License Agreement. For the three and six months ended June 30, 2023, revenue of less than $0.1 million and $0.1 million, respectively, was recognized from the Fosun License Agreement, respectively.

**Operating Expenses**

Operating expenses associated with the Fintech Platform business were classified as discontinued operations as discussed in Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) — Note 2—Exit of the Fintech Platform Business".

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **(in thousands, except percentages)** | **2024** | **2023** | **Change** | **% Change** | **2024** | **2023** | **Change** | **% Change** |
| Operating expenses: | | | | | | | | |
| Cost of product revenue (exclusive of amortization) | $ 17,635 | $ 17,607 | $ 28 | — % | $ 32,546 | $ 30,094 | $ 2,452 | 8 % |
| Selling, general and administrative | 65,822 | 74,812 | $ (8,990) | (12)% | 134,736 | 136,732 | $ (1,996) | (1)% |
| Research and development | 15,902 | 17,624 | $ (1,722) | (10)% | 30,295 | 35,156 | $ (4,861) | (14)% |
| Amortization | 546 | 717 | $ (171) | (24)% | 1,091 | 1,262 | $ (171) | (14)% |
| Total operating expenses | $ 99,905 | $ 110,760 | $ (10,855) | (10)% | $ 198,668 | $ 203,244 | $ (4,576) | (2)% |

***Cost of product revenue (exclusive of amortization)***

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| **(in thousands, except percentages)** | **2024** | **2023** | **Change** | **% Change** | **2024** | **2023** | **Change** | **% Change** |
| Cost of product revenue (exclusive of amortization) | | | | | | | | |
| Purchasing and manufacturing costs | $ 15,748 | $ 16,140 | $ (392) | (2)% | $ 29,209 | $ 26,561 | $ 2,648 | 10 % |
| Distribution, royalty and other fulfillment charges | 1,887 | 1,467 | $ 420 | 29 % | 3,337 | 3,533 | $ (196) | (6)% |
| Total cost of product revenue (exclusive of amortization) | $ 17,635 | $ 17,607 | $ 28 | — % | $ 32,546 | $ 30,094 | $ 2,452 | 8 % |

Cost of product revenue (exclusive of amortization) is generally incurred when our Products are delivered and primarily consists of the purchasing cost of the RHA® Collection of dermal fillers and manufacturing costs of DAXXIFY® and distribution expenses, royalty, other fulfillment costs related to the RHA® Collection of dermal fillers and DAXXIFY®.

Substantially all of DAXXIFY® manufacturing expenses incurred prior to DAXXIFY® GL Approval were classified as research and development expenses, resulting in Zero-cost Inventory.

Our cost of product revenue (exclusive of amortization) for the three and six months ended June 30, 2024 increased compared to the same periods in 2023, primarily due to higher sales volume of our Products. When Zero-cost Inventory, which is further discussed below, is depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase. We also anticipate that our cost of product revenue (exclusive of amortization) associated with the RHA® Collection of dermal fillers to increase as sales volume increases.

*Purchasing and manufacturing costs*

For the three months ended June 30, 2024, purchasing and manufacturing costs decreased compared to the same period in 2023, primarily due to an increase in manufacturing efficiencies for DAXXIFY® in 2024, offset by higher sales volume. For the six months ended June 30, 2024, purchasing and manufacturing costs related to our Products increased compared to the same period in 2023, primarily due to the higher sales volume of our Products in 2024, partially offset by an increase in manufacturing efficiencies for DAXXIFY® in 2024.

*Distribution, royalty and other fulfillment charges*

For the three months ended June 30, 2024, distribution, royalty, and other fulfillment costs increased compared to the same period in 2023, primarily due to higher sales volume of our Products. For the six months ended June 30, 2024, distribution, royalty and other fulfillment charges related to the RHA® Collection of dermal fillers and DAXXIFY® decreased compared to the same period in 2023 primarily due to non-recurring costs in 2023 attributable to the DAXXIFY® launch, partially offset by higher sales volume of our Products.

*Impact of Zero-cost Inventory for DAXXIFY®*

For the three and six months ended June 30, 2024, the cost of product revenue (exclusive of amortization) would have increased by approximately $7 million and $13 million, respectively, if cost of product revenue (exclusive of amortization) included previously expensed inventories. For the three and six months ended June 30, 2023, the cost of product revenue (exclusive of amortization) would have increased by approximately $4 million and $8 million, respectively, if cost of product revenue (exclusive of amortization) included previously expensed inventories. We expect to utilize existing Zero-cost Inventory until depleted in the near-term. Once depleted, we expect our cost of product revenue (exclusive of amortization) associated with DAXXIFY® to increase.

***Selling, General and Administrative Expenses***

| (in thousands, except percentages) | Three Months Ended June 30, 2024 | 2023 | Change | % Change | Six Months Ended June 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Selling, general and administrative | $ 60,701 | $ 64,166 | $ (3,465) | (5)% | $ 122,982 | $ 117,770 | $ 5,212 | 4 % |
| Stock-based compensation | 4,516 | 12,178 | $ (7,662) | (63)% | 12,140 | 22,443 | $ (10,303) | (46)% |
| Depreciation and amortization | 482 | 1,040 | $ (558) | (54)% | 1,564 | 3,182 | $ (1,618) | (51)% |
| Less: selling, general, and administrative expenses classified as discontinued operations | 123 | (2,572) | $ 2,695 | (105)% | (1,950) | (6,663) | $ 4,713 | (71)% |
| Total selling, general and administrative expenses | $ 65,822 | $ 74,812 | $ (8,990) | (12)% | $ 134,736 | $ 136,732 | $ (1,996) | (1)% |

*Selling, general and administrative expenses (before stock-based compensation and depreciation and amortization)*

Selling, general and administrative expenses (before stock-based compensation and depreciation and amortization) consist primarily of the following:

- Costs of sales and marketing activities and sales force compensation related to our Products; and
- Personnel and professional service costs in our finance, information technology, investor relations, legal, human resources, and other administrative departments;

For the three months ended June 30, 2024, selling, general and administrative expenses decreased compared to the same period in 2023, primarily due to the implementation of cost efficiency measures during the current year, partially offset by increased sales and marketing expense for therapeutics and increased legal costs. For the six months ended June 30, 2024, selling, general and administrative expenses increased compared to the same period in 2023, primarily due to increases in sales and marketing activities in preparation for our DAXXIFY® therapeutics launch as well as certain litigation matters.

*Stock-based compensation*

For the three and six months ended June 30, 2024, stock-based compensation included in selling, general and administrative expenses decreased $7.7 million and $10.3 million, respectively, compared to the same periods in 2023, primarily due to the (i) stock-based compensation expense recognized for the vesting of the DAXXIFY® GL Approval PSU in March 2023, (ii) impact of the exit of the Fintech Platform business, (iii) the stock-based compensation expense recognized for the vesting of certain market-based PSUs in May 2023, and (iv) lower grant-date fair value of stock awards granted in 2024 compared to 2023, partially offset by expenses associated with certain equity award modifications in selling, general and administrative functions.

***Research and Development Expenses***

| (in thousands, except percentages) | Three Months Ended June 30, 2024 | 2023 | Change | % Change | Six Months Ended June 30, 2024 | 2023 | Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Research and development | $ 14,315 | $ 19,031 | $ (4,716) | (25)% | $ 28,652 | $ 36,918 | $ (8,266) | (22)% |
| Stock-based compensation | 1,279 | 3,421 | $ (2,142) | (63)% | 2,645 | 6,238 | $ (3,593) | (58)% |
| Depreciation and amortization | 401 | 355 | $ 46 | 13 % | 755 | 2,828 | $ (2,073) | (73)% |
| Less: research and development expenses classified as discontinued operations | (93) | (5,183) | $ 5,090 | (98)% | (1,757) | (10,828) | $ 9,071 | (84)% |
| Total research and development expenses | $ 15,902 | $ 17,624 | $ (1,722) | (10)% | $ 30,295 | $ 35,156 | $ (4,861) | (14)% |

*Research and development expenses (before stock-based compensation and depreciation and amortization)*

We generally do not allocate costs by product candidates unless contractually required by our business partners. Research and development expenses (before stock-based compensation and depreciation and amortization) consist primarily of:

- Personnel costs in our research and development functions;
- expenses related to the initiation and completion of clinical trials and studies for the RHA® Pipeline Products and an onabotulinumtoxinA biosimilar, including expenses related to the production of clinical supplies;
- expenses related to the manufacturing of supplies for clinical activities, regulatory approvals, and pre-commercial inventory;
- certain expenses related to the establishment and maintenance of our manufacturing facilities;
- expenses related to medical affairs, medical information, publications and pharmacovigilance oversight;
- expenses related to license fees, milestone payments, and development efforts under in-licensing agreements;
- expenses related to compliance with drug development regulatory requirements in the U.S. and other foreign jurisdictions;
- fees paid to clinical consultants, CROs and other vendors, including all related fees for investigator grants, patient screening fees, laboratory work and statistical compilation and analysis; and
- other consulting fees paid to third-parties;

For the three and six months ended June 30, 2024, research and development expenses (before stock-based compensation and depreciation and amortization) decreased compared to the same periods in 2023, primarily due to the FDA approval of our PAS submission for the ABPS manufacturing facility in late March 2023 which allowed manufacturing related expenses for DAXXIFY® to be capitalized on the condensed consolidated balance sheet. Prior to the approval, such manufacturing related expenses were classified as research and development expense in the condensed consolidated statements of operations and comprehensive loss.

Our research and development expenses (before stock-based compensation and depreciation and amortization) are subject to numerous uncertainties, primarily related to the timing and cost needed to complete our respective projects. The development timelines, probability of success and development expenses can differ materially from expectations, and the

completion of clinical trials may take several years or more depending on the type, complexity, novelty and intended use of a product candidate. Accordingly, the cost of clinical trials may vary significantly over the life of a project as a result of differences arising during clinical development. We expect our research and development expenses (before stock-based compensation and depreciation and amortization) to be relatively consistent in the near term, primarily due to deferring the Phase 3 clinical program for upper limb spasticity and other therapeutics pipeline activities. However, we will continue sharing certain development costs with Teoxane related to the RHA® Pipeline Products, and other activities related to the pursuit of approval for the PCI manufacturing facility.

When we conduct additional clinical trials, such as for our biosimilar program or additional DAXXIFY® therapeutic indications, we expect our research and development expenses (before stock-based compensation and depreciation and amortization) to increase. Depending on the stage of completion and level of effort related to each development phase undertaken, we may reflect variations in our research and development expenses. We expense both internal and external research and development expenses as they are incurred.

*Stock-based compensation*

For the three and six months ended June 30, 2024, stock-based compensation included in research and development expenses decreased compared to the same periods in 2023, primarily due to the (i) stock-based compensation expense recognized from the vesting of the DAXXIFY® GL Approval PSU in March 2023, (ii) impact of the exit of the Fintech Platform business, (iii) the stock-based compensation expense recognized for the vesting of certain market-based PSUs in May 2023; and (iv) lower grant-date fair value from stock awards granted in 2024 in comparison to 2023, offset by lower capitalized stock-based compensation in 2024.

***Amortization***

Amortization presented separately on the condensed consolidated statements of operations and comprehensive loss represents the amortization for the distribution rights, which is within the functional area of cost of product revenue. Refer to Part I, Item 1. "Condensed Consolidated Financial Statements (Unaudited)—Notes to Condensed Consolidated Financial Statements (Unaudited) —Note 2—Exit of the Fintech Platform Business" for the amortization expense classified as discontinued operations.

***Net Non-Operating Income and Expense***

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| (in thousands, except percentages) | 2024 | 2023 | Change | % Change | 2024 | 2023 | Change | % Change |
| Interest income | $ 3,179 | $ 3,148 | $ 31 | 1 % | $ 6,175 | $ 6,118 | $ 57 | 1 % |
| Interest expense | (5,679) | (4,368) | $ (1,311) | 30 % | (10,935) | (8,865) | $ (2,070) | 23 % |
| Other expense, net | (453) | (599) | $ 146 | (24)% | (891) | (833) | $ (58) | 7 % |
| Total net non-operating expense | $ (2,953) | $ (1,819) | $ (1,134) | 62 % | $ (5,651) | $ (3,580) | $ (2,071) | 58 % |

*Interest Income*

Interest income primarily consists of interest income earned on our deposit, money market fund, and investment balances. We expect interest income to vary each reporting period depending on our average deposit, money market fund, and investment balances during the period and market interest rates.

*Interest Expense*

Interest expense includes cash and non-cash components. The cash component of the interest expense primarily consists of the contractual interest charges for our 2027 Notes and Notes Payable, as well as our finance lease liability interest

expense. The non-cash component of the interest expense primarily consists of the amortization of debt issuance costs for our 2027 Notes and the amortization of debt insurance cost and debt discount for the Notes Payable.

For the three and six months ended June 30, 2024, interest expense increased compared to the same periods in 2023 due to interest associated with the issuance of the Second Tranche of the Notes payable in August 2023, and partially offset by a decrease in interest expense for our finance lease liability.

*Other Expense, net*

Other expense, net primarily consists of miscellaneous tax and other expense items partially offset by office lease sublease income.

**Liquidity and Capital Resources**

Our financial condition is summarized as follows:

| (in thousands) | June 30, | December 31, 2023 | Increase/(Decrease) |
|---|---|---|---|
| Cash, cash equivalents, and short-term investments | $ 232,244 | $ 253,915 | $ (21,671) |
| Working capital | $ 256,540 | $ 249,641 | $ 6,899 |
| Stockholders' deficit | $ (129,738) | $ (151,604) | $ (21,866) |

***Sources and Uses of Cash***

We hold our cash, cash equivalents, and short-term investments in bank accounts and interest-bearing instruments subject to investment guidelines for high credit quality. Our investment portfolio is structured to provide for investment maturities and access to cash to fund our anticipated working capital needs.

As of June 30, 2024 and December 31, 2023, we had cash, cash equivalents and short-term investments of $232.2 million and $253.9 million, respectively, which reflected a decrease between these periods of $21.7 million. The decrease was primarily due to cash used in operating activities of $107.1 million, finance lease prepayment of $5.3 million, principal payments on a finance lease of $8.1 million, and purchases of property and equipment of $2.2 million. The decrease was primarily offset by proceeds from a follow-on public offering, net of underwriting discount of $97.6 million and other cash inflows of $3.4 million.

We derived the following summary of our condensed consolidated cash flows for the periods indicated from Part I, Item 1, "Financial Information—Condensed Consolidated Financial Statements (Unaudited)" in this Report:

| | Six Months Ended June 30, | |
|---|---|---|
| (in thousands) | 2024 | 2023 |
| Net cash provided by (used in): | | |
| Operating activities | $ (107,067) | $ (122,882) |
| Investing activities | $ (38,598) | $ 55,784 |
| Financing activities | $ 89,414 | $ 100,736 |

*Cash Flows from Operating Activities*

Our cash used in operating activities is primarily driven by personnel costs, manufacturing and facility costs, sales and marketing activities, and general and administrative support, offset by revenue generated from the sale of our Products. Our cash flows from operating activities will continue to be affected principally by the revenue generated from our Products and our working capital requirements, with a primary focus on commercial operations.

Cash used in operating activities for six months ended June 30, 2024 consisted of approximately $212 million in expenditures related to overall operations, offset by approximately $105 million in cash receipts from our revenue. The increase in net cash used in operating activities for the six months ended June 30, 2024, compared to 2023 is primarily driven by expenditures related to supporting the Company's commercial growth, and partially offset by an increase in cash receipt from Product sales.

Cash used in operating activities for the six months ended June 30, 2023, primarily consisted of approximately $197 million in expenditures related to overall operations and other working capital adjustments of $28 million, partially offset by approximately $102 million in net cash receipts from our Products and Services sales and other non-cash adjustments.

*Cash Flows from Investing Activities*

For the six months ended June 30, 2024 and 2023, net cash provided by or used in investing activities was primarily due to fluctuations in the timing of purchases and maturities of investments, purchases of property and equipment and prepayments for a finance lease.

*Cash Flows from Financing Activities*

For the six months ended June 30, 2024, net cash provided by financing activities was driven by proceeds from follow-on public offering, net of underwriting discount, and proceeds from the exercise of stock options and employee stock purchase plan, which was offset by the principal payments on finance lease obligations, net settlement of stock awards for employee taxes, and payments of offering costs.

For the six months ended June 30, 2023, net cash provided by financing activities was driven by the proceeds from the ATM offering program, net of commissions, and the exercise of stock options and purchases of our common stock through the employee stock purchase program. The inflows were offset by the net settlement of stock awards for employee taxes, and principal payments on finance lease obligations.

***Convertible Senior Notes***

In February 2020, we issued the 2027 Notes, in the aggregate principal amount of $287.5 million, pursuant to the Indenture. The 2027 Notes are senior unsecured obligations and bear interest at a rate of 1.75% per year, payable semiannually in arrears on February 15 and August 15 of each year, began on August 15, 2020. The 2027 Notes will mature on February 15, 2027, unless earlier converted, redeemed or repurchased. In connection with issuing the 2027 Notes, we received $278.3 million in net proceeds, after deducting the initial purchasers' discount, commissions, and other issuance costs.

The 2027 Notes may be converted at any time by the holders prior to the close of business on the business day immediately preceding November 15, 2026 only under the following circumstances: (i) during any fiscal quarter commencing after the fiscal quarter ending on June 30, 2020 (and only during such fiscal quarter), if the last reported sale price of our common stock for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (ii) during the measurement period in which the trading price (as defined in the Indenture) per $1,000 principal amount of the 2027 Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of our common stock and the conversion rate on each such trading day; (iii) if we call any or all of the 2027 Notes for redemption, at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (iv) upon the occurrence of specified corporate events. On or after November 15, 2026 until the close of business on the second scheduled trading day immediately preceding the Maturity Date, holders may convert all or any portion of their 2027 Notes at any time, regardless of the foregoing circumstances. Upon conversion, we will pay or deliver, as the case may be, cash, shares of our common stock or a combination of cash and shares of our common stock, at our election.

The conversion rate will initially be 30.8804 shares of our common stock per $1,000 principal amount of the 2027 Notes (equivalent to an initial conversion price of approximately $32.38 per share of our common stock). The conversion rate is subject to adjustment in some events but will not be adjusted for any accrued and unpaid interest. In addition, following certain corporate events that occur prior to the Maturity Date or if we deliver a notice of redemption, we will, in certain circumstances, increase the conversion rate for a holder who elects to convert its 2027 Notes in connection with such a corporate event or notice of redemption, as the case may be.

We may redeem for cash all or any portion of the 2027 Notes, at our option, on or after February 20, 2024 if the last reported sale price of our common stock has been at least 130% of the conversion price then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which we provide notice of redemption at a redemption price equal to 100% of the principal amount of the 2027 Notes to be redeemed, plus any accrued and unpaid interest to, but excluding, the redemption date. The threshold to redeem has not been met as of June 30, 2024. No sinking fund is provided for the 2027 Notes.

If we undergo a fundamental change (as defined in the Indenture), holders may require us to repurchase for cash all or any portion of their 2027 Notes at a fundamental change repurchase price equal to 100% of the principal amount of the 2027 Notes to be repurchased, plus any accrued and unpaid interest to, but excluding, the fundamental change repurchase date.

We used $28.9 million of the net proceeds from the 2027 Notes to pay the cost of the capped call transactions. The capped call transactions are expected generally to reduce the potential dilutive effect upon conversion of the 2027 Notes and/or offset any cash payments we are required to make in excess of the principal amount of converted 2027 Notes, as the case may be, with such reduction and/or offset subject to a price cap of $48.88 of our common stock per share, which represents a premium of 100% over the last reported sale price of our common stock on February 10, 2020. The capped calls have an initial strike price of $32.38 per share, subject to certain adjustments, which corresponds to the conversion option strike price in the 2027 Notes. The capped call transactions cover, subject to anti-dilution adjustments, approximately 8.9 million shares of our common stock.

***Note Purchase Agreement***

In March 2022, we entered into the Note Purchase Agreement and issued the First Tranche in an aggregate principal amount for all such Notes of $100 million. In August 2023, we entered into the First Amendment to reduce the Second Tranche from $100 million to $50 million, and we subsequently issued $50 million to the Purchasers. Additionally, the First Amendment increased the uncommitted Third Tranche from $100 million to $150 million. The uncommitted Third Tranche was available until March 31, 2024, subject to the satisfaction of certain conditions set forth in the Note Purchase Agreement, including the achievement of greater than or equal to $50 million in trailing twelve months revenue for DAXXIFY® preceding the date of the draw request for the Third Tranche, and approval by Athyrium, which we did not draw on.

Our obligations under the Note Purchase Agreement are secured by substantially all of our assets and the assets of our wholly owned domestic subsidiaries, including their respective intellectual property.

The notes issued pursuant to the First Tranche and Second Tranche bear interest at an annual fixed interest rate equal to 8.50%. We are required to make quarterly interest payments on each Notes Payable commencing on the last business day of the calendar month following the funding date thereof, and continuing until the Maturity Date. Pursuant to the First Amendment, the Company is required to repay Athyrium the outstanding principal amount of the Second Tranche notes in installments on the last business day of each March, June, September and December (commencing in September 2024), in each case, based on the following principal amortization payment schedule: 2.5% in September and December 2024; 5.0% in March and June 2025; 7.5% in September and December 2025; and 10.0% in March and June 2026; followed by repayment of the Second Tranche in full on September 18, 2026. The Maturity Date may be extended to March 18, 2028 if, as of September 18, 2026, less than $90 million principal amount of our existing 2027 Notes remain outstanding and with the consent of the Purchasers. Initially, all principal for each tranche is due and payable on the Maturity Date. At our option, we may prepay the outstanding principal balance of all or any portion of the principal amount of the Notes Payable, subject to a prepayment fee equal to (i) a make-whole amount if the prepayment occurs on or prior to the first anniversary of the NPA

Effective Date and (ii) 2.0% of the amount prepaid if the prepayment occurs after the first anniversary of the NPA Effective Date but on or prior to the second anniversary of the NPA Effective Date. Upon prepayment or repayment of all or any portion of the principal amount of the Notes Payable (whether on the Maturity Date or otherwise), we are also required to pay an exit fee to the Purchasers.

The Note Purchase Agreement includes affirmative and negative covenants applicable to us, our current subsidiaries and any subsidiaries we create in the future. The affirmative covenants include, among others, covenants requiring us to maintain our legal existence and governmental approvals, deliver certain financial reports, maintain insurance coverage and satisfy certain requirements regarding deposit accounts. We must also (i) maintain at least $30.0 million of unrestricted cash and cash equivalents in accounts subject to a control agreement in favor of Athyrium at all times (the Minimum Cash Covenant) and (ii) upon the occurrence of certain specified events set forth in the Note Purchase Agreement, achieve at least $70.0 million of Consolidated Teoxane Distribution Net Product Sales on a trailing twelve-months basis. The negative covenants include, among others, restrictions on our transferring collateral, incurring additional indebtedness, engaging in mergers or acquisitions, paying dividends or making other distributions, making investments, creating liens, selling assets and undergoing a change in control, in each case subject to certain exceptions.

If we do not comply with the affirmative and negative covenants, such non-compliance may be an event of default under the Note Purchase Agreement. The Note Purchase Agreement also includes events of default, the occurrence and continuation of which could cause interest to be charged at the rate that is otherwise applicable plus 2.0% and would provide Athyrium, as administrative agent, with the right to exercise remedies against us and the collateral, including foreclosure against our property securing the obligations under the Note Purchase Agreement, including our cash. These events of default include, among other things, our failure to pay principal or interest due under the Note Purchase Agreement, a breach of certain covenants under the Note Purchase Agreement, our insolvency, the occurrence of a circumstance which could have a material adverse effect and the occurrence of any default under certain other indebtedness.

***Follow-On Offering***

In March 2024, we completed a follow-on offering, pursuant to which we issued 16.0 million shares of common stock at a price to the public of $6.25 per share (except with respect to 30,000 shares to be sold and issued to Mark Foley, our president, chief executive officer, and director, at $6.98 per share), for net proceeds of $97.1 million, after underwriting discounts and offering costs.

***ATM Offering Programs***

In 2023, we sold 3.2 million shares of common stock under the 2022 ATM Agreement at a weighted average price of $31.90 per share, resulting in net proceeds of $100.0 million after sales agent commissions and offering costs. No shares of common stock were sold during the three and six months ended June 30, 2024 from the 2022 ATM Agreement.

***Common Stock and Common Stock Equivalents***

As of July 31, 2024, outstanding shares of common stock were 104.8 million, unvested RSUs and PSUs were 5.4 million, outstanding stock options were 3.6 million, unvested RSAs and PSAs were 0.6 million and shares of common stock underlying the 2027 Notes was 8.9 million, based upon the initial conversion price.

***Operating and Capital Expenditure Requirements***

We expect to continue to incur U.S. GAAP operating losses for the foreseeable future as we continue to devote resources to the commercialization, research and development, manufacturing development and regulatory approval of our products.

Disciplined capital allocation continues to be a priority; however, we expect that we will continue to expend substantial resources for the foreseeable future and in the long-term to support the growth of the aesthetics portfolio of Products and DAXXIFY® for the treatment of cervical dystonia and to support our ongoing operations. In particular, we anticipate that we will continue to invest substantial resources in our commercialization efforts across aesthetics and

therapeutics and the manufacturing and supply of DAXXIFY® for commercialization. In addition, in connection with the Teoxane Agreement, we must continue to make specified annual minimum purchases of the RHA® Collection of dermal fillers and meet annual minimum investments in connection with the commercialization of the RHA® Collection of dermal fillers. In addition, we have dedicated manufacturing capacity, buyback obligations, cost sharing arrangements and related minimum purchase obligations under our manufacturing and supply agreements in connection with the manufacture and supply of DAXXIFY® and any product candidate. We also anticipate expending resources to continue to support the onabotulinumtoxinA biosimilar and Fosun partnerships. In the long term, in addition to the aforementioned expenditures, we anticipate our expenditures will include clinical programs for DAXXIFY® in other potential indications and international regulatory investments.

As of June 30, 2024, we had capital resources of $232.2 million consisting of cash, cash equivalents, and short-term investments. To date, we have funded our operations primarily through the sale of common stock, convertible senior notes, sales of Products, proceeds from notes issued pursuant to the Note Purchase Agreement and payments received from collaboration arrangements. We also have remaining capacity to sell up to $47.2 million of our common stock under the 2022 ATM Agreement as of June 30, 2024. We believe that our existing capital resources will be sufficient to fund the operating plan through at least the next 12 months following the issuance of this Report.

However, we may need to raise substantial additional financing in the future to fund our operations. In addition, our estimates regarding the amounts necessary to accomplish our business objectives may be inaccurate, other unanticipated costs may arise and our operating plan may change as a result of many factors currently unknown to us, and we may need to seek additional capital sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe that we have sufficient funds for our current or future operating plans.

See "Part 1. Item 1A. Risk Factors—We have incurred significant losses since our inception and we anticipate that we will continue to incur U.S. GAAP operating losses for the foreseeable future and may not achieve or maintain profitability in the future" in our FY2023 Form 10-K for additional information.

**Critical Accounting Policies and Estimates**

For the six months ended June 30, 2024, there have been no material changes in our critical accounting policies compared to those disclosed in Item 7 in our FY2023 Form 10-K.

**Contractual Obligations**

There were no material changes outside of the ordinary course of business in our contractual obligations as of June 30, 2024, from those as of December 31, 2023 as reported in our FY2023 Form 10-K.

**Recent Accounting Pronouncements**

Refer to "Recent Accounting Pronouncements" in Part I, Item 1, "Financial Information—Notes to Condensed Consolidated Financial Statements (Unaudited)—Note 1—The Company and Summary of Significant Accounting Policies" in this Report.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in interest rates. We do not hold or issue financial instruments for trading purposes. For the six months ended June 30, 2024, our exposure to market risk did not change materially from what was disclosed in Item 7A in our FY2023 Form 10-K.

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Management, with the participation of our principal executive officer and our principal financial officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Report. The term "disclosure controls and procedures" as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our principal executive officer and principal financial officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.

### Changes in Internal Control over Financial Reporting

For the three months ended June 30, 2024, there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

We are currently involved in litigation relating to claims arising out of our operations and may be involved in such litigation in the future. Such matters are subject to uncertainty and there can be no assurance that such legal proceedings will not have a material adverse effect on our business, results of operations, financial position or cash flows.

In October 2021, Allergan filed a complaint against us and ABPS, one of our manufacturing sources of DAXXIFY®, in the U.S. District Court for the District of Delaware, alleging infringement of the following patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,033,625; 7,354,740; 8,409,828; 11,124,786; and 7,332,567. Allergan claims that our formulation for DAXXIFY® and ABPS's manufacturing process used to produce DAXXIFY® infringes its patents. Allergan also asserted a patent with claims related to a substrate for use in a botulinum toxin detection assay. On November 3, 2021, we filed a motion to dismiss. On November 24, 2021, Allergan filed an amended complaint against us and ABPS, alleging infringement of an additional patent assigned and/or licensed to Allergan: U.S. Patent No. 11,147,878. On December 17, 2021, we filed a second motion to dismiss, and on January 14, 2022, Allergan filed an opposition to that motion. We filed a reply to Allergan's opposition on January 21, 2022, and on August 19, 2022, the court denied our second motion to dismiss. On September 2, 2022, we filed an answer and counterclaims to Allergan's amended complaint. On December 30, 2022, Allergan filed a second amended complaint against us and ABPS, alleging infringement of three additional patents assigned and/or licensed to Allergan: U.S. Patent Nos. 11,203,748; 11,326,155; and 11,285,216. On January 20, 2023, we filed an answer and counterclaims to Allergan's second amended complaint. On March 3, 2023, we filed invalidity contentions, which challenge Allergan's asserted patents. A Markman hearing was held on June 28, 2023, and a decision was issued on August 29, 2023. On September 15, 2023, U.S. Patent No. 7,332,567 was dismissed from the case with prejudice. Allergan reduced the asserted claims to claim 8 of U.S. Patent No. 7,354,740, claims 5 and 8 of U.S. Patent No. 11,203,748, claim 10 of U.S. Patent No. 11,033,625, claims 1, 4, 6, and 20 of U.S. Patent No. 11,147,878, and claim 1 of U.S. Patent No. 11,285,216 via a Stipulation and Order dated June 21, 2024.

On December 10, 2021, a putative securities class action complaint was filed against the Company and certain of its officers on behalf of a class of stockholders who acquired the Company's securities from November 25, 2019 to October 11, 2021, in the U.S. District Court for the Northern District of California. The complaint alleges that the Company and certain of its officers violated Sections 10(b) and 20(a) of Exchange Act by making false and misleading statements regarding the manufacturing of DAXXIFY® and the timing and likelihood of regulatory approval and seeks unspecified monetary damages on behalf of the putative class and an award of costs and expenses, including reasonable attorneys' fees. The court appointed the lead plaintiff and lead counsel on September 7, 2022. The lead plaintiff filed an amended complaint on November 7, 2022. On January 23, 2023, we filed a motion to dismiss, and on March 30, 2024, the Court granted the motion with leave for the plaintiff to amend the complaint. On May 1, 2024, the plaintiff filed an amended complaint, which asserted similar claims to those in the prior complaint. On June 25, 2024, the Company filed a motion to dismiss the amended complaint.

We dispute the claims in these lawsuits and intend to defend these matters vigorously. These lawsuits are subject to inherent uncertainties, and the actual defense and disposition costs will depend upon many unknown factors. The outcomes of the lawsuits are necessarily uncertain. We could be forced to expend significant resources in the defense of either lawsuit, and we may not prevail. In addition, we may incur substantial legal fees and costs in connection with each lawsuit.

**ITEM 1A. RISK FACTORS**

Investing in our common stock involves a high degree of risk. You should carefully read and consider the risks we describe in Part I, Item 1A of our FY2023 Form 10-K, as well as all other information included in this Report, including our condensed consolidated financial statements, the notes thereto and the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," before you decide to purchase shares of our common stock. If any of the those risks actually occurs, our business, prospects, financial condition and operating results could be materially harmed. As a result, the trading price of our common stock could decline and you could lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations and stock price.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**Rule 10b5-1 Trading Arrangements**

During the three months ended June 30, 2024, none of our Section 16 officers or directors adopted, modified or terminated a Rule 10b5-1 trading arrangement or a non-Rule 10b5-1 trading arrangement, as defined in Item 408 of Regulation S-K.

**ITEM 6. EXHIBITS**

The following exhibits are included herein or incorporated herein by reference:

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filling Date | Filed Herewith |
| 3.1 | Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | February 11, 2014 | — |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation | 8-K | 001-36297 | 3.1 | May 7, 2021 | — |
| 3.3 | Amended and Restated Bylaws | 8-K | 001-36297 | 3.1 | December 15, 2023 | — |
| 4.1 | Form of Common Stock Certificate | S-1/A | 333-193154 | 4.4 | February 3, 2014 | — |
| 4.2 | Indenture, dated as of February 14, 2020, by and between Revance Therapeutics, Inc. and U.S. Bank National Association, as Trustee | 8-K | 001-36297 | 4.1 | February 14, 2020 | — |
| 4.3 | Form of Global Note, representing Revance Therapeutics, Inc.'s 1.75% Convertible Senior Notes due 2027 (included as Exhibit A to the Indenture filed as Exhibit 4.2) | 8-K | 001-36297 | 4.2 | February 14, 2020 | — |
| 31.1 | Certification of Principal Executive Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 31.2 | Certification of Principal Financial Officer pursuant to Rule 13a-14(a) and 15d-14(a) promulgated under the Exchange Act | — | — | — | — | X |
| 32.1† | Certification of the Principal Executive Officer pursuant to18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 32.2† | Certification of the Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | — | — | — | — | X |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | — | — | — | — | X |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | — | — | — | — | X |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | — | — | — | — | X |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | — | — | — | — | X |
| 101.LAB | Inline XBRL Taxonomy Extension Labels Linkbase Document | — | — | — | — | X |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | — | — | — | — | X |
| 104 | Cover Page Interactive Data File (formatted as inline XBRL and contained in Exhibits 101) | — | — | — | — | X |

† The certifications attached as Exhibit 32.1 and 32.2 that accompany this Report pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002, shall not be deemed filed with the Securities and Exchange Commission for purposes of Section 18 of the Exchange Act. Such certifications shall not be deemed incorporated by reference into any filing of Revance Therapeutics, Inc. under the Securities Act, or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

**REVANCE THERAPEUTICS, INC.**

Date: August 8, 2024

By: /s/ Mark J. Foley
**Mark J. Foley**
**President and Chief Executive Officer**
***(Duly Authorized Principal Executive Officer)***

By: /s/ Tobin C. Schilke
**Tobin C. Schilke**
**Chief Financial Officer**
***(Duly Authorized Principal Financial Officer and Principal Accounting Officer)***

# EXHIBIT 36

Instagram Log In Sign Up

# Audio

## Breakup With Botox

32 reels

Save audio

0:00



Instagram

Log In

Sign Up


















# EXHIBIT 37

Breakup With Botox | Breakup With Botox on Instagram




your.wellness.angel • Follow
breakupwithbotox • Breakup With Botox

your.wellness.angel Want to find a friend who can outlast the old one??? Maybe give @daxxify a try! #daxxify #innovation #makeitlastforver #resistance #aestheticposts

115w

laurissa_barlow 💙 your necklaces

115w 1 like Reply

View replies (3)

34 likes

June 27, 2023

Add a comment... Post

Breakup With Botox | Breakup With Botox on Instagram




**your.wellness.angel** • Follow
breakupwithbotox • Breakup With Botox

**your.wellness.angel** Want to find a friend who can outlast the old one??? Maybe give @daxxify a try! #daxxify #innovation #makeitlastforver #resistance #aestheticposts
115w

**laurissa_barlow** 💙 your necklaces
115w 1 like Reply

View replies (3)

34 likes
June 27, 2023

Add a comment... Post

# EXHIBIT 38

breakupwithbotox

breakupwithbotox •••

Follow

**Breakup With Botox**

breakupwithbotox

Hi Babe, time to move on.
Check us out👇if you want
a long-lasting relationship 💋
#breakupwithbotox
bit.ly/breakupwithbotox_IG

Sofia Kelley Ian Caroline

| 9 | 315 | 0 |
| --- | --- | --- |
| posts | followers | following |



breakupwithbotox



# EXHIBIT 39

Local

# Crown Labs makes list of fastest-growing companies

by: Jeff Keeling

Posted: Aug 17, 2022 / 04:51 PM EDT

Updated: Aug 17, 2022 / 05:48 PM EDT

by: Jeff Keeling

Posted: Aug 17, 2022 / 04:51 PM EDT

Updated: Aug 17, 2022 / 05:48 PM EDT

JOHNSON CITY, Tenn. (WJHL) — Johnson City's Crown Laboratories has joined just a handful of companies that have ever appeared nine straight times in the *Inc. 5000* list of America's fastest-growing private companies.

With 498% revenue growth from 2019 through 2021, Crown came in at #1,305 on this year's list. The Inc. 5,000 list measures revenue growth for companies' most recent three years.
Crown Laboratories breaks ground on new warehouse expansion

CEO Jeff Bedard said the skincare company – best known for its Blue Lizard sunscreen brand – had revenues in the $80 million range three years ago and hit $400 million last year. Crown won a large contract to produce hand sanitizer for a major name brand in 2020 when COVID-19 struck, which boosted its revenues that year.




***Jeff Bedard (WJHL photo)***

It has also continued growing through the introduction of its own branded products and through mergers and acquisitions.

"When we started with *Inc. 5000*, it was roughly $40 million in revenue; this year we'll do close to $400 million, so if you look at it that way we should be on track to continue to grow and be in the award range," Bedard said.

The honor, which is based purely on companies' audited financials, remains "surprising every year and very rewarding," Bedard said. "You can't fudge your numbers. These are the real things.

"It just goes to show A, the team that we have in place, and B, the runway we have in growing as a global skincare company."

Crown, which employs more than 350 people in Johnson City, has expanded its reach from just a couple of countries a decade ago to 39 countries today. That international expansion has combined with acquisitions and organic growth in the domestic market to keep the company on a steady growth trajectory.

Crown Labs to build 60K SF warehouse as production growth continues at quick pace

“The fact that we were able to do it nine years in a row and not fall off at any time when the economy has had some headwinds just speaks to the quality of our products and our sales organization, commercial teams and everybody that is part of Crown,” he said.

He also said many companies on the list each year are much smaller than Crown is now. “There are a couple of companies that are approaching a billion in revenue, but certainly we’re on the higher side,” Bedard said.

Speaking of that figure, Bedard said Crown’s goal is to reach another big revenue milestone by 2026 which would represent another 150% growth over the next four years.

“Our goal, and I’ve said it all along, by 2026, we’d like to be a billion in revenue. So we’ve got basically this year ’22 through ’26 to go from roughly $400 million to $1 billion. We think we’ve got both an organic and M and A (merger/acquisition) opportunity to bring us to that number so we feel really good about that growth trajectory and I think we’ll accomplish it.”

Crown Labs was the only Northeast Tennessee company featured on the 2022 Inc. 5000 list.

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# EXHIBIT 40

## Kasaraneni, Karthik

| | |
|---|---|
| **From:** | Sasha Rao <SRao@sternekessler.com> |
| **Sent:** | Monday, June 16, 2025 11:42 AM |
| **To:** | Kasaraneni, Karthik; Minniti, Carl; Dittmann, Eric W.; Rupert, Melanie R.; Ashkenazi, Isaac S.; Allergan-BoNT-PH; Blumenfeld, Jack; 'Tigan, Jeremy A.'; Raucci, Anthony D. |
| **Cc:** | Revance-DAXI; Dennies Varughese; Byron Pickard; Adam LaRock; Anna Phillips; Peter J. Armenio; Andrew Solomon; ycst_revance_daxi@ycst.com; Gaza, Anne Shea; Wilson, Samantha |
| **Subject:** | [EXT] RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data |

**--- External Email ---** Report Suspicious

Karthik,

Thank you for finally clarifying Allergan's intended scope of supplementation. We disagree that lost profits are currently in the case or that the parties should make presumptions about the outcome of Plaintiff's motion for reconsideration. But in the interest of compromise and to avoid delay, we do not oppose the supplementation of both damages numbers. To be clear, the parties will update only the ultimate damages numbers and underlying sales numbers for their respective Nov. 4, 2024 and Nov. 6, 2024 damages expert reports. We reserve the right to object and seek relief for any supplementation beyond that.

With that shared understanding, Revance is prepared to exchange sales data today.

Best,

Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

---

**From:** Kasaraneni, Karthik <karthikkasaraneni@paulhastings.com>
**Sent:** Monday, June 16, 2025 9:46 AM
**To:** Sasha Rao <SRao@sternekessler.com>; Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>;

ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha,

We can agree to your proposed dates, but you are aware that Allergan has filed a motion for reconsideration of the Court's May 30 opinion and order. Accordingly, Dr. Meyer intends to update both her lost profits numbers and her reasonable royalty numbers on Thursday. Consistent with her opening and November 2024 reports, she expects to update each of her alternative scenarios to account for the possibility that lost profits will or will not be in the case. We will proceed accordingly after the Court's pending decision.

We do not understand Revance's objection. You highlight the limited burden of the previous update below, which included both scenarios, and there are clear efficiencies in once again updating both damages figures now instead of potentially needing to revisit this again on the immediate eve of trial. We also note that Dr. Meyer is not available again until the week of July 7, so any dedicated lost-profits-only supplementation could not occur until then, creating unnecessary difficulties for both parties and their experts.

Please confirm that Revance will be proceeding with the sales data exchange today.

Regards,
Karthik

---

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Friday, June 13, 2025 6:53 PM
**To:** Kasaraneni, Karthik <karthikkasaraneni@paulhastings.com>; Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Karthik,

As an initial matter, it is troubling that Allergan has repeatedly ignored Revance's requests that Allergan confirm that the parties have a shared understanding of the scope of this supplementation. The particulars of the schedule matter little if the parties cannot agree on the substance. From today's meet and confer, we understand that Allergan intends to disclose, through the pre-trial order exchange, whether it will depart from the representation that it made to the Court that lost profits would be out of the case in the current posture. But waiting for the pretrial exchange for clarification is too late for either parties' proposed exchange schedule. We maintain that lost profits are out and supplementation should proceed accordingly. Thus, please confirm that: (1) this supplementation will be limited to updating only the

ultimate damages numbers and underlying sales numbers of Dr. Meyer's Nov. 4, 2024 and Ms. Trexler's Nov. 6, 2024 damages expert reports, and (2) only reasonable royalty damages numbers will be supplemented.

Second, we disagree with your characterization of the correspondence between the parties. It is unclear why Allergan disregards the potential for the court's decisions to impact the scope of the parties supplementation. With that said, Allergan's protest of a conditional deadline is moot as Revance has agreed to a concrete schedule while giving the Court additional time for a decision to be issued.

Given the very narrow scope of supplementation, it is unclear why Allergan demands that the parties have significantly more time to supplement in this iteration than in November 2024. Last year, the parties completed their exchange of updated account-level sales data on Friday, November 1, 2024. Dr. Meyer supplemented her report within 3 days on Monday, Nov. 4. Ms. Trexler then supplemented her report within 2 days on Wed., Nov. 6. Revance's proposal was in line with this, accounting for the weekend and certain unavailability. Indeed, given the narrower scope of the damages case, less time would be needed. We are not trying to "manufacture a time crunch" or "prejudice Dr. Meyer's ability to accurately process the data and supplement her report." Rather, we are being consistent with the parties' prior agreement while trying to accommodate Dr. Meyer's schedule and to give the court the most time possible to issue its decision(s) prior to supplementation.

Nevertheless, in the interest of compromise, and consistent with the parties' prior agreements and Dr. Meyer's new additional dates of unavailability, Revance proposes the following schedule: (1) a data exchange of Cx and Tx account-level sales data through May 31 on Monday, June 16, (2) Allergan's supplementation of its reasonable royalty numbers on Thursday, June 19, and (3) Revance's supplementation of its reasonable royalty numbers on Monday, June 23. Of course, as a threshold matter, Allergan must confirm the scope of the supplementation prior to the parties' exchange of data.

Best,
Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

**From:** Kasaraneni, Karthik <karthikkasaraneni@paulhastings.com>
**Sent:** Friday, June 13, 2025 12:01 AM
**To:** Sasha Rao <SRao@sternekessler.com>; Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha,

The record below is clear that we have been proactive about trying to agree on a concrete schedule for this straightforward supplementation only to be met with conditional dates. There is no reason why damages figures cannot be updated while motions are pending, which the parties did last time in November 2024. The June 6 date certain for the data exchange and June 13 date certain for Dr. Meyer's supplemental report that we proposed on April 15 and again on May 20 did not pose any scheduling issues. It is not clear to us why Revance declined to respond to our May 20 proposal or our follow-up on June 6 until June 10, four days after the contemplated data exchange. Or why you still have not responded to several of the question in our May 20 email that were designed to facilitate the exchange.

Dr. Meyer is not available on Friday, June 20. That is why we proposed providing her supplement on Thursday, June 19. Accordingly, your newly proposed data exchange on Wednesday, June 18 is too compressed. There is no reason for either party to manufacture a time crunch here by delaying the productions until next week—particularly while we will also be working together on the PTO at the same time.

Is your position that Revance is unable to make its production tomorrow, or are you just trying to prejudice Dr. Meyer's ability to accurately process the data and supplement her report by giving her just two days (if she were available on the 20th, which she's not)? That's not particularly fair when you're proposing that Ms. Trexler gets six days with the data, *i.e.*, three times as long to carefully update her report.

We think our last proposal is the most reasonable solution, with equal spacing between the data exchange (6/13), Dr. Meyer's supplement (6/19), Ms. Trexler's supplement (6/25), and the pretrial conference (7/1). Please confirm that you and Ms. Trexler can make this work.

Thanks,
Karthik

---

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Thursday, June 12, 2025 6:21 PM
**To:** Kasaraneni, Karthik <karthikkasaraneni@paulhastings.com>; Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Karthik,

To clarify the ambiguity in your email, we reiterate that this supplementation is limited to updating only the ultimate damages numbers and underlying sales numbers of Dr. Meyer's Nov. 4, 2024 and Ms. Trexler's Nov. 6, 2024 damages

expert reports. This has been the parties' understanding for any supplementation since at least October 2024. As a threshold issue, please confirm that Allergan does not intend to further supplement Dr. Meyer's report.

Second, the parties' supplementation is further limited by the Court's May 30 order. Specifically, we understand that only the ultimate damages numbers for reasonable royalties will be updated, consistent with Allergan's counsel's representation at the Pretrial Conference at "[i]f both of the parties [(i.e., Allergan USA and Allergan Ireland)] were not in the case, if [the Court] were to grant that motion, then the lost profits portion of the case would not be presented." Nov. 15, 2024 Hearing Tr. at 5:13-15. Please confirm the parties have a mutual understanding that only reasonable royalty damages numbers will be supplemented.

With respect to the schedule, this is the first we're hearing of Dr. Meyer's surprising unavailability shortly before trial. Coincidentally, Allergan injected the same issue when coordinating the last supplementation shortly before the November trial. *See* Oct. 4, 2024 C. Minniti email. Nevertheless, to accommodate Dr. Meyer's schedule, we propose (1) a data exchange of Cx and Tx account-level sales data through May 31 on Wednesday, June 18, (2) Allergan's supplementation of its reasonable royalty numbers on Friday, June 20, and (3) Revance's supplementation of its reasonable royalty numbers on Tuesday, June 24. This timing is consistent with the schedule the parties followed in November 2024. *See* Oct. 31, 2024 C. Minniti email.

Kind regards,

Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

**From:** Kasaraneni, Karthik <karthikkasaraneni@paulhastings.com>
**Sent:** Thursday, June 12, 2025 5:20 AM
**To:** Sasha Rao <SRao@sternekessler.com>; Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha,

Dr. Meyer is not available that week. We propose (1) exchanging Cx and Tx account-level sales data through May 31 on Friday, June 13, (2) Dr. Meyer's supplementation on Thursday, June 19, and (3) Ms. Trexler's supplementation on Wednesday, June 25, ahead of the pretrial conference on Tuesday, July 1. Please confirm.

Thank you,
Karthik

---

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Tuesday, June 10, 2025 9:40 PM
**To:** Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Carl,

It remains judicious for the parties to defer supplementation until after the Court makes a further ruling that could impact the parties' damages positions. But, in the interest of certainty and respect for the schedules of our experts, if the Court has not made such a decision by Monday, June 23, Defendants are amenable to an exchange of supplemental expert reports that update the parties' reasonable royalty numbers with Cx and Tx account-level sales data through May 31.

The data exchange can occur the week before the pre-trial conference on July 1. We envision (1) a data exchange on Monday, June 23, (2) Allergan's supplementation of its reasonable royalty numbers on Wednesday, June 25, and (3) Revance's supplementation of its reasonable royalty numbers on Friday, June 27. Please confirm that Allergan is amenable to this proposal.

Best,

Sasha

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

---

**From:** Minniti, Carl <carlminniti@paulhastings.com>
**Sent:** Friday, June 6, 2025 11:03 AM
**To:** Sasha Rao <SRao@sternekessler.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips

<aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Sasha,

Revance has not responded to Allergan's email below. Please let us know Revance's position.

Regards,
Carl

PAUL HASTINGS

**Carl J. Minniti III | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6866 | Main: +1.212.318.6000 | Fax: +1.212.319.4090 | carlminniti@paulhastings.com | www.paulhastings.com

**From:** Minniti, Carl
**Sent:** Tuesday, May 20, 2025 11:47 AM
**To:** 'Sasha Rao' <SRao@sternekessler.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Sasha,

Allergan writes further to the below concerning supplementation of damages reports ahead of trial.

***Supplemental Damages Reports***: Allergan does not agree that the parties' agreement on supplementation should depend on the pending damages-related motions before the Court. The parties' previous agreement to supplement was also made while motions were pending ahead of trial. There is no need to change course now.

Nevertheless, Allergan is interested to reach a mutual understanding on timing of supplementation. *First*, regardless of the pending motions, the parties should produce updated account-level sales by June 6, 2025 applying a May 31, 2025 cut-off. These underlying facts are relevant regardless of the outcome of the pending motions. *Second*, if the Court has not issued a written opinion on all pending damages-related motions by 5:30pm ET on June 13, 2025, then Allergan will serve Dr. Meyer's supplemental report at that time. *Third*, to the extent the Court issues written opinions on all pending damages-related motions before 5:30pm ET on June 13, 2025, then the parties will promptly meet and confer to align on the appropriate deadline for Dr. Meyer's supplemental report. Allergan cannot agree to Revance's proposal in the abstract to serve Dr. Meyer's report within three business days of receiving all of the Court's decisions, as this may be insufficient time to assess the Court's ruling and may conflict with Dr. Meyer's availability. *Fourth*, with respect to the timing of Ms. Trexler's responsive expert report, we do not oppose Revance's proposal to have that deadline occur three business days after whenever Dr. Meyer serves her supplemental report.

***Account-Level Sales***: Please provide us, as noted in your email below, confirmation that Revance will provide updated account-level sales data on June 6, 2025 that incorporates sales data through May 31, 2025. If Revance cannot provide us that confirmation, please let us know what data would be anticipated to be included if May 31, 2025 were applied as the date-cut-off filter for the export on June 6, 2025. Additionally, to the extent Revance's account-level sales system has changed following its acquisition by Crown, please let us know that fact and whether this impacts the extent and fulsomeness of complete Daxxify sales data that had been received to date. That is, Allergan seeks confirmation that all Daxxify sales regardless of the seller will be captured in the forthcoming supplemental production. Additionally, please confirm whether Revance's account-level export will include data concerning sales of Daxxify for its cervical dystonia indication.

To the extent Revance does not agree to any of Allergan's points above, please identify those disagreements and provide us your availability to meet and confer on Thursday, May 22, 2025.

Regards,
Carl

**Carl J. Minniti III | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6866 | Main: +1.212.318.6000 | Fax: +1.212.319.4090 | carlminniti@paulhastings.com | www.paulhastings.com

**From:** Sasha Rao <SRao@sternekessler.com>
**Sent:** Monday, May 5, 2025 6:29 PM
**To:** Minniti, Carl <carlminniti@paulhastings.com>; Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Cc:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Subject:** [EXT] RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Carl,

The Court's decisions on the parties' pending motions could have a significant impact on the scope of any damages report supplementation. Accordingly, we can agree to a mutual exchange of updated account-level sales information, pending confirmation from our client regarding their ability to provide updated account-level sales data through May 31 by June 6. That said, any expert report supplementation should occur after a ruling on the parties' pending summary judgment, *Daubert*, and standing motions. Further, a full week each for the surgical supplementation of these reports is excessive. We've shortened this to three days. Please let us know if Allergan agrees.

| Date | ~~Event~~ Schedule assuming Court's order |
|---|---|
| 2025.06.06 (F) | Parties produce updated account-level sales applying a date filter of no earlier than June 1, 2025 (*i.e.*, capturing sales from the latest production in October 2024 through May 2025) |
| 2025.06.13 (F), *unless* the Court's ruling on the pending summary | Allergan serves supplemental expert report from Dr. Meyer, updating only the ultimate damages numbers and underlying sales numbers of her Nov. 4, 2024 damages expert reports. |

| | |
|---|---|
| judgment, *Daubert*, and standing motions remains outstanding, in which case, supplementation will occur *three business dates after* the Court's ruling on summary judgment, *Daubert*, and standing motions | |
| ~~2025.06.20 (F)~~ Three business days after receipt of Allergan's supplemental damages report | Revance serves supplemental expert report from Ms. Trexler, updating only the ultimate damages numbers and underlying sales numbers of her November 6, 2024 damages expert reports. |

**Sasha Rao**
Counsel
**Sterne, Kessler, Goldstein & Fox P.L.L.C.**
**Email:** srao@sternekessler.com
**Direct:** 202.772.8733 **Main:** 202.371.2600

**IP Assistant-TAG:** Renee Moore
**Direct:** 202.772.8820

---

**From:** Minniti, Carl <carlminniti@paulhastings.com>
**Sent:** Wednesday, April 23, 2025 4:19 PM
**To:** Revance-DAXI <Revance-DAXI@sternekessler.com>; Dennies Varughese <dvarughese@sternekessler.com>; Byron Pickard <BPICKARD@sternekessler.com>; Adam LaRock <ALAROCK@sternekessler.com>; Anna Phillips <aphillips@sternekessler.com>; Sasha Rao <SRao@sternekessler.com>; Peter J. Armenio <PArmenio@cahill.com>; Andrew Solomon <ASolomon@cahill.com>; ycst_revance_daxi@ycst.com; Gaza, Anne Shea <agaza@ycst.com>; Wilson, Samantha <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; Blumenfeld, Jack <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; Raucci, Anthony D. <araucci@morrisnichols.com>
**Subject:** RE: Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

**EXTERNAL EMAIL:** Use caution before clicking links or attachments.

Counsel — Allergan is following up on the below. Please let us know Revance's position on the proposed exchange schedule.

Regards,

Carl

PAUL HASTINGS

**Carl J. Minniti III | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6866 | Main: +1.212.318.6000 | Fax: +1.212.319.4090 | carlminniti@paulhastings.com | www.paulhastings.com

**From:** Minniti, Carl
**Sent:** Tuesday, April 15, 2025 2:06 PM
**To:** 'Revance-DAXI' <Revance-DAXI@sternekessler.com>; 'Dennies Varughese' <DVARUGHE@sternekessler.com>; 'Byron L. Pickard (bpickard@sternekessler.com)' <bpickard@sternekessler.com>; 'Adam LaRock' <ALAROCK@sternekessler.com>; 'Anna Phillips' <aphillips@sternekessler.com>; 'Sasha Rao' <SRao@sternekessler.com>; 'Peter J. Armenio' <PArmenio@cahill.com>; 'Andrew Solomon' <ASolomon@cahill.com>; 'ycst_revance_daxi@ycst.com' <ycst_revance_daxi@ycst.com>; 'Gaza, Anne Shea' <agaza@ycst.com>; 'Wilson, Samantha' <SWilson@ycst.com>
**Cc:** Dittmann, Eric W. <ericdittmann@paulhastings.com>; Rupert, Melanie R. <melanierupert@paulhastings.com>; Ashkenazi, Isaac S. <isaacashkenazi@paulhastings.com>; Allergan-BoNT-PH <Allergan-BoNT-PH@paulhastings.com>; 'Blumenfeld, Jack' <JBlumenfeld@morrisnichols.com>; 'Tigan, Jeremy A.' <JTigan@morrisnichols.com>; 'Raucci, Anthony D.' <araucci@morrisnichols.com>
**Subject:** Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al., Case No. 21-1411-RGA (D. Del.) – Sales Data

Counsel,

We write further to the parties' agreement to produce updated account-level sales data and serve supplemental damages expert reports ahead of trial. (*See, e.g.*, Minniti Email to Rao (Oct. 23, 2024).) Please confirm by Monday, April 21, 2025 whether Revance agrees to the following:

| Date | Event |
|---|---|
| 2025.06.06 (F) | Parties produce updated account-level sales applying a date filter of no earlier than June 1, 2025 (*i.e.*, capturing sales from the latest production in October 2024 through May 2025) |
| 2025.06.13 (F) | Allergan serves supplemental expert report from Dr. Meyer |
| 2025.06.20 (F) | Revance serves supplemental expert report from Ms. Trexler |

Regards,
Carl

PAUL HASTINGS

**Carl J. Minniti III | Associate, Litigation Department**
Paul Hastings LLP | 200 Park Avenue, New York, NY 10166 | Direct: +1.212.318.6866 | Main: +1.212.318.6000 | Fax: +1.212.319.4090 | carlminniti@paulhastings.com | www.paulhastings.com

*****************************************************************************************

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.