IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., )
)
--------------------Plaintiff, )
) Case No.
vs. ) 24-CV-1411-RGA
)
REVANCE THERAPEUTICS, et al., )
) Volume I
--------------------Defendant. )

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Richard G. Andrews, U.S.D.C.J., in Courtroom 6A on the 14th of July, 2025.

APPEARANCES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JEREMY TIGAN, ESQ.

-and-

PAUL HASTINGS LLP
BY: ERIC DITTMANN, ESQ.
ISAAC ASHKENAZI, ESQ.
MELANIE RUPERT, ESQ.
CARL MINNITI, ESQ.
KRYS HO, ESQ.
ROBERT UNIKEL, ESQ.
DAVID VALENTE, ESQ.
VLADIMIR SEMENDYAI, ESQ.

Counsel for Plaintiff

(Appearances continued.)

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: ANNE GAZA, ESQ.
SAMANTHA WILSON, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: DENNIES VARUGHESE, ESQ.
ADAM LAROCK, ESQ.
BYRON PICKARD, ESQ.
NIRAV DESAI, ESQ.
DEIRDRE WELLS, ESQ.

-and-

CAHILL GORDON
BY: PETER ARMENIO, ESQ.

Counsel for Defendant

THE COURT: All right. So I got the Docket Items 613, 614, 615, and 616. And what I'd like is for whoever is controlling the video to be prepared to put these things up on the slides. I did look at most of the exhibits, but I want to make sure I don't get them confused.

So let's start with the first one, Docket Item 613. And so the first thing there is the "omnibus objection" to various opening statement exhibits about using the moniker "Allergan." I think from looking at them, those ones I wasn't particularly concerned about. As you'll hear when we get to one of the later ones, whenever we're talking about the patent that actually issued in this case, at least the slides ought to identify it as Allergan, Inc.

But when we're talking about, for example, buying Oculinum or whatever the name of the company is in 1991, that doesn't matter, I don't think, who actually bought them, who scientists worked for at particular time, or if there were inventors. That doesn't matter.

So I think based on what I'm going to rule on the rest of these things, if there's anything that is -- falls within those sort of categories, particularly related to the patent in these PDX exhibits, then I'm going to want plaintiff to change what they have.

The second objection is to PDX 10-5, which supposedly relied on -- I looked at this picture listing

Oculinum, Inc. as the manufacturer and Allergan, Inc. as the distributor. Revance says this photo and information is new, undisclosed information.

Was this photo disclosed previously?

MR. DITTMANN: Your Honor, Eric Dittman on behalf of plaintiff. It was. For example, Dr. Siegwarth, in her expert reports, goes through the whole history of Allergan, Inc., acquiring botulinum toxin, history of indications and, by the way, all of which was done by Allergan, Inc., on this case. So it's 100 percent disclosed.

THE COURT: So apparently, it has been disclosed.

MR. PICKARD: Byron Pickard on behalf of Revance. I don't think he answered your question correctly about the photo itself. And although Dr. Siegwarth does go through the timeline, I don't know. It's not clear to me she ties that to Allergan, Inc., itself as the distinct entity. That was our point.

THE COURT: I'm not going to be able to resolve this right now, so take it out of your slide deck for the opening. If it turns out Dr. Siegwarth wants to use it in her expert report or during her expert testimony and she actually used it before, then I'll allow it then.

MR. DITTMANN: Your Honor, I'm sorry. Would it

be okay if their objection is just to Allergan, Inc., on the file? We just made the graphic. It's not that important. It's just for background.

THE COURT: It's not that important. You answered it yourself.

MR. DITTMANN: It's important, Your Honor, to tell the story --

THE COURT: You can tell a story without a picture. You just need a thousand words.

PDX 10-25. So, again, plaintiff, according to defendant, is using images of its initial FDA submission in 2017 without any support. It says these were not identified as trial exhibits; is that right, Mr. Dittmann?

MR. DITTMANN: It's not correct, Your Honor. We explained last night this initial FDA submission is identified in Allergan's November 3, 2013 interrogatory response. It's PDX 727. We gave a range of documents and they had these documents before fact depositions and, in fact, asked Dr. Broide about one of the FDA submissions. So they've been on notice of this 2007 submission.

THE COURT: All right. Your side, Mr. Pickard.

MR. PICKARD: Your Honor, Mr. Dittmann is right in terms of the disclosure of the fact itself. I think where we are on this issue is the images there, those are not in this case. I don't know where they come from on the

slide. Those are not trial exhibits you see between the two arrows.

THE COURT: Can someone put it up on the screen for me because I'm not recalling what exactly this was.

Those -- that's just generic. Nobody can possibly read anything that's in there. So I don't know how it fits into the story of what's going on here, but I'm going to overrule the objection.

All right. PDX 10-30. So I don't have a problem with the question being put on a slide was a fair amount to compensate Allergan for Revance's patent infringement. They're saying the evidence they expect to have they expect to rebut your invalidity case. I think that's a fair thing to put up in opening statement, so I'm going to overrule that objection.

Then on -- the next one is PDX 10-30 to PDX 10-32. I agree that the titles are argumentative and so if -- so you need to redo the titles. But the presupposition that Revance has committed infringement, you don't need to get rid of that okay, Mr. Dittmann?

MR. DITTMANN: Yes, Your Honor. No problem.

THE COURT: All right. Then the last thing is this 15 percent royalty, which is in PDX 10-32. Revance says she always had a range before on the manufacturing patents, and so now having a bullet with 15 percent is not

something she previously disclosed. You know, based on what I know about this, that sounds to me like that's probably right. But --

MR. DITTMANN: Thank you, Your Honor. This is really just basically when the jury is going to be asked in the verdict what royalty percent to assign. This is essentially us saying we'd be conservative, split it in the middle, 12 and a half percent, 15 and a half, go with 15.

THE COURT: Maybe when we get to the closing argument, you can do that. But right now it is just an argument because what she has -- I think based on what you're saying, she's always had a range. And, you know, what -- so I think it's not proper to be picking something that she's never actually disclosed. I'm assuming that the way this looks like in the slide is it's coming from her.

MR. DITTMANN: This is more or less just a preview of what we're going to ask. But we wanted to be clear and upfront. To make it simple, this is what we're going to ask for, and we want to say it from the beginning and that's what we're going to say. Very simple.

THE COURT: Well, I think that --

MR. DITTMANN: I think it would make it easier for the jurors --

THE COURT: All right. So in other words, she's not going to say 15 percent. She's going to stick with her

range when she testifies?

MR. DITTMANN: She's going to talk about her range, yes.

THE COURT: All right. I'll let you do that. So that, I believe, resolves Docket Item 613.

MR. PICKARD: Your Honor, one quick question about our coverage on PDX 30. That was the slide with some reference to -- one of our issues was the title, Revance Must Be Held Accountable --

THE COURT: That sounds argumentative.

MR. PICKARD: I didn't know -- I wasn't sure if I caught that. If they're changing that, great.

THE COURT: All right. Thank you.

So the DI 614 was an exhibit which I looked at, though at this point I can't remember what it was. But in any event, I think it went with the one I just did.

So DX 615, the first objection is to the number of slides that have large quotes from Judge Fogel. Remove all reference to Judge Fogel and his quotes. That's a sort of the -- (A), it's pretty argumentative for opening, but as I've -- the exhibits that, I guess, Allergan attached, it's not good for the jury to think that Judge Fogel is an alternate basis for instructions in this case. It's supposed to be just general background. And certainly, when you get around to argument, you can argue, essentially, the

things that he says. But, again, you can't rely on him for it. All right?

MR. VARUGHESE: Yes, Your Honor. Can I ask a question?

THE COURT: Yes.

MR. VARUGHESE: We'll do that. I want to make sure I follow Your Honor's instructions. Can I discuss what he says in the video to the jury about patent examiners overlooking things sometimes and then being able to render a patent invalid? I need to explain to the jury what we're doing in this case. I can say Your Honor is going to instruct you, but I want to give you some context.

THE COURT: All right. If you speak in general and you don't act like you're quoting what Judge Fogel says and it weaves into here's the evidence we're going to show, that this is one of the cases where something happened and the Patent Office didn't get it right, you can do that.

MR. VARUGHESE: Can I say "as you saw in the video"?

THE COURT: No. Don't refer to the video.

MR. VARUGHESE: Thank you, Your Honor.

THE COURT: Okay. Revance's opening slide 21 and JTX 154, which is a *Time* article, and there was attached to the exhibit a two-page thing, JTX 154, praising, I guess, DAXXIFY. What is the relevance of this to anything?

MR. PICKARD: Your Honor, I think that the role of the peptide and the duration of the DAXXIFY play a very big role. The Time magazine article, in particular, is an item that was sponsored by Allergan's expert. And we think it tends to cut against their theory that it is not the peptide.

THE COURT: Well, so that does sound to me just like hearsay. And what does *Time* magazine know about what DAXXIFY does? And what's more is maybe the -- whatever it is that is in their expert report is something that shouldn't be coming in either, but I'm going to strike that slide.

I'll reserve judgment on the admissibility of the exhibit until some later time when I've got more context, but I think there's a pretty good chance that I'm not going to let JTX 154 into the record. So I don't want it to be presented in the opening statement. All right?

MR. PICKARD: Sure, Your Honor. I do think we have a good exception to the hearsay, but thank you.

THE COURT: All right. Well, we can debate that at another time.

Okay. Opening slide 23, can I see that for a minute, please.

Well, this is a pretty busy slide. Hold on a minute.

Is this basically just the timeline?

MR. PICKARD: That's right, Your Honor.

THE COURT: Okay. What's the problem with this?

MR. ASHKENAZI: Your Honor, this is implying that somehow there was something nefarious being done at the patent phase. Let's be clear. The fact that Revance filed their BLA in between while the patent -- in between their filing date of the patent and when it issued is irrelevant to this case. It's not relevant to validity.

It implies, for example, maybe there's a latches defense or something was done nefariously --

THE COURT: Well, the jury is not going to think of a latches defense on its own.

MR. ASHKENAZI: That's my point, Your Honor, is it implies something nefarious was being done by putting the BLA in between the middle of our activities. If they want to reference the fact that they had a BLA in another slide not with pointing out that it's in between the filing of the patents --

THE COURT: All right. Well, you know, the fact is that it's possible to infer something nefarious. I don't think that's a good enough reason. It does have the --

MR. VARUGHESE: So one of the issues they had was they thought that the prior title was argumentative. And so in an effort to resolve the dispute, we sent them an

updated slide where it's much more generic. It just says Allergan, Inc. Before it said, you know, they got new patents.

So we thought we removed any --

THE COURT: All right. Well --

MR. ASHKENAZI: Your Honor, if I may.

THE COURT: Yes.

MR. ASHKENAZI: Now the slide says Allergan, Inc., key dates and then there's reference to Revance's BLA in between.

THE COURT: Well, the fact that, you know, you can't summarize something in four words and catch every nuance in the body, so I reject that argument.

All right. So I'm going to allow that.

It should be said that there is no issue about any nefariousness, and I certainly expect there's not going to be any hints of that from Revance.

MR. VARUGHESE: No nefariousness, Your Honor. This goes to kind of show the value of the patents alone. It really goes to that.

THE COURT: All right.

MR. ASHKENAZI: Your Honor, if that's the point, they've never disclosed that. How could the value of the patents be low? The fact that Revance filed their application after the filing of the priority date before the

patent issued --

THE COURT: All right. Well, we'll see how that plays out. I'm going to let them use that in opening statement.

And then there's the opening slide 46, which I believe I did not actually look at. So can we put that up on the screen. Is that what that is? Yes. All right. Hold on a minute.

This is the -- what is the point of this from the Revance perspective?

MR. PICKARD: Your Honor, what I think we're going to see from the other side -- I mean, we saw that last week with Dr. Siegwarth -- is this notion that at the hypothetical negotiation, Allergan, Inc., would have been a much harder bargainer because just over the hill was this new product, the long-acting injectable that we talked about.

We think it's appropriate to put that into context, that their existing product was not being harmed by the DAXXIFY sales that were actually going on in that period. We also see in the opening that they're sort of wrapping themselves in the halo of all of the BOTOX efforts.

It's important for the jury to understand the interplay of the DAXXIFY product to the BOTOX product. And here we have an example of their CEOs their executives

saying --

THE COURT: And, Mr. Pickard, this is being introduced relevant to?

MR. PICKARD: Hypothetical negotiation.

THE COURT: And how -- considering that the hypothetical negotiation is supposed to be looking forward and -- how are these -- and I believe the hypothetical negotiation is in 2022 or possibly earlier; right?

MR. PICKARD: Right. We believe the book of wisdom allows us to --

THE COURT: No, I don't think the book of wisdom -- I tend to agree that I don't think this is relevant to what they expected in 2022.

I think, though, it could be relevant to your argument, which actually I think I heard you making, of what was going to happen was not as certain as what Dr. Siegwarth thought or says. And to show that in -- so that would undercut her theory -- or at least partly undercut it.

So I'm inclined to allow this.

Mr. Ashkenazi.

MR. ASHKENAZI: Yeah. Your Honor, first of all, the fact of the matter is that at the time of the hypothetical negotiation, both experts agree that the parties would be competitors and that there was an expectation that there would be competition. Whether or not

something did or did not happen is actually relevant to the lost profits case. We'd be reintroducing that whole element to the case, which is not here, Your Honor.

And to imply that whether or not they lost sales, we're going to now have to introduce evidence about what the sales would have been. We have evidence. It's going to completely confuse things and it's not relevant to the hypothetical negotiation. Because to say whether or not something -- they have no proof that at the time of the hypothetical negotiation, there would be an expectation that there would not be lost sales.

And all the evidence that's here in the case is to prove -- to use the book of wisdom otherwise is to completely subvert the rule itself, which requires the parties to understand what would be the expectations at that time.

THE COURT: All right. So here's what I'm going to do. I think Revance has the better of the argument here, but I think it might be better for me to see how this actually plays out, what Dr. Siegwarth says, because this is clearly just rebuttal to whatever it is that Dr. Siegwarth does.

And so after we've heard her testimony, we'll bring this up again. But in the meantime, I want you not to use this slide in opening. All right?

MR. PICKARD: Yes, Your Honor.

THE COURT: Okay, thank you.

All right. That takes care of Docket Item 615.

Docket Item 616. So I looked at the deposition of Mr. Gallagher.

Am I right that it's exactly --

MR. ASHKENAZI: Your Honor, if I may, I think that's no longer an issue between the parties.

THE COURT: Okay. And did you resolve that by getting rid of it?

MR. PICKARD: We just made some edits that are acceptable to the other parties.

THE COURT: Okay. Is the DS2 project something that we're going to be hearing about later on in the trial?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: Okay. All right. Well, thank you for resolving that.

And then we've got the Broide demonstratives and Bates demonstratives. And -- oh, yeah. So what I said earlier, like -- actually, can you just put up PDX 13 dash -- and unfortunately, I Xeroxed it and it cut off what the individual item was.

This is the one that had the ventures listed.

MR. ASHKENAZI: Your Honor, which slide is that?

THE COURT: Well, I can't tell you because --

it's somewhere in the PDX 13 series -- okay.

MR. ASHKENAZI: (Indiscernible.)

THE COURT: Ah, okay. I was just wondering. You know, I noticed when I look at this that it all had privileged and confidential at the bottom, but I assume that all of those, everywhere they appear, is being -- has been removed or won't be seen by the jury, right?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: Thank you. All right.

So on this one, I think when you're talking about the patent -- and this is what I was talking about earlier -- this ought to say Allergan, Inc.'s, '740 animal-free process.

And so that would apply to this slide and the next one in the exhibits and the one after that in the exhibit and after that. I think, in fact, all the way through. You know, as I've said at the pretrial conference, sometimes I think it's going to be perfectly fine to refer to Allergan as an entity.

But I think at least in terms of ownership of the patents and who's at, for example, the bargaining table for the hypothetical negotiation, you've got to say Allergan, Inc. Okay?

All right. I think that resolves everything or at least puts it off till another day. Is that right?

MR. DITTMANN: There's one item, Your Honor, that could come up today, which is why I wanted to raise it. It may be that there's no issue, but we saw the stipulation that went in where we simplified the case. We're down to one formulation patent.

And as part of that stipulation, there was a commitment by Revance that it will not use the Frevert and Webb references --

THE COURT: Yes.

MR. DITTMANN: -- these are now no longer prior art, in connection with its invalidity case.

We sought to remove them from the exhibit list. Revance wouldn't remove it and they wouldn't tell us whether they're planning to use, revamp, or whatever. We can't conceive of how it possibly could be relevant since they can't use it for invalidity.

And so we want to just make sure that it's clear that those references aren't to come in, period, in this case.

THE COURT: Mr. Pickard.

MR. PICKARD: Your Honor, I'll tell you that we're not intending to introduce them as part of our affirmative invalidity case as a ground or even background art.

But it may be the case, depending on how the

evidence comes in, that Frevert and Webb are fair game for cross-examination of the fact and expert witnesses, and we simply are not prepared to agree that they are out of the case for all purposes, which was not what we stipulated to.

THE COURT: All right. Well, so let's operate under this principle. They're out of the case for all purposes unless you bring it to my attention that you want to put them into the case, in which case I'll hear where we stand at the time. All right?

Hold on just a minute. Let me just look at -- I don't have too much paper with me, but that stipulation is one of the things I do have with me.

So this is what the stipulation says: "For the avoidance of doubt, defendants will not use the Frevert and Webb references at trial in their invalidity case with respect to Claim 6 of the '878 patent."

I would be inclined to interpret that as your invalidity case includes the cross-examination of plaintiff's witnesses. So you'll have a hurdle bringing that in. But if it gets to the point where you think it's -- that it's relevant to something and we can revisit this, but I wouldn't count on, at least based on what I just read, that you would win the argument that you can even use it. Okay.

MR. PICKARD: I understand, Your Honor, and this

may ultimately be academic, so.

THE COURT: Well, you know, that's what I'm hoping. All right.

Anything else? All right. Okay. All right. So apparently we've got 41 jurors, so we have plenty of jurors. You all understand how we're going to do this, the jury selection?

MR. DITTMANN: Yes, Your Honor.

MR. VARUGHESE: Yes, Your Honor.

THE COURT: All right. And just to be clear, once I've done the general voir dire out here, we'll return to my conference room and we will bring them in one by one until we, essentially, have 14 qualified jurors. Once we have the 14 qualified jurors, we will stop doing the one-on-one because those are the 14 that will be seated and then I'll give you, like, 15 minutes to caucus to decide which of the -- you each have three strikes -- which ones you want to exercise them against so when we come out back in front of the jury, the exercise of the peremptories should be fairly quick because you've figured out what you want to do.

The other thing is when I go back to the jury room to do the individual questioning, I want each side to be limited to three people. So you can decide which three that is. All right.

Usually, even though we like to say the jury will be here at 9:30, we can't count on that.

The people who are behind the Revance side are going to need to move because that's where we put the jury.

Is there anything else we need to do right now? No. Okay. So I'll see you again whenever it is that the jury is actually up here.

(A recess was taken, after which the following proceedings were had:)

THE COURT: So my name is Richard Andrews. I'm a judge of the court here. And what we're -- what you all have come in for is for the selection of a jury in a civil case that's called *Allergan, Inc., versus Revance Therapeutics.* I'm going to ask you a series of questions that's going to help me and the attorneys in the jury selection process.

But before I ask any questions, I'm going to ask the deputy clerk to swear the jury panel to answer all of the questions truthfully.

Could we do that, please.

(The venire panel was sworn.)

THE COURT: All right. Be seated.

So I believe that each of you has a card with your jury number on it. And so what's going to happen is I'm going to ask about 20 questions or so, and after each

question, I'm going to give a chance for those of you who answer the question yes to raise your card, signalling that your answer is yes. If your answer is no, don't do anything.

At the end of the questions, I'm going to go back to my conference room, and some of you will come in to talk to me and the lawyers one at a time to follow up on some of the answers to your questions.

Actually, one other thing I should say before we get started, those of you who have electronic devices that allow you to access the internet, don't access the internet to find out anything about the case that you are -- you will soon start hearing about.

One of the things that I'm going to tell whoever ends up on the jury is you have to make sure that everything you learn about this case is something that you learned sitting here in the courtroom from the testimony in the case. So if you're somebody who whenever you hear something new starts to Google it, don't do that.

All right. So this case, the presentation of evidence is expected to occur over the next five days, that is through Friday morning, and I expect to have closing arguments on Friday. But then your jury deliberations could extend into Monday of next week.

So basically when I'm picking a jury, I need to

make sure that you're available not only this week but also Monday or next week. Each day of trial, basically, we're going to start at 9:30. We try to start at 9:30 sharp and we'll go to about 5:00.

There will be a lunch break of at least a half an hour in the middle of that, maybe 45 minutes. Those of you who are on the jury, you'll be able to order sandwiches and lunches that will be brought in, if that's what you want. There will also be a 15-minute break in the middle of the morning and a 15-minute break in the middle of the afternoon.

So that's the schedule that I expect to keep for the trial, and that leads to my first question, which is: Does the schedule, including the six days possible and the time each day, does that present a special hardship for any of you? If so, raise your hand, okay, with your card in it. And okay.

So I'm going to try to read off cards to indicate that I've got you down. When I read your number, then you can lower your hand. So I see 2, 3, 4, 7, 8, 9, 10, 12 , 14, 15, 18, 20, 21, 32, 33, 34, 37, 38, 41, 43, and 44. Did I miss anyone? Apparently not.

Okay. So here's the second question, but if -- there's a bit of a lead-up. So I'm going to give you a brief description of the case.

This is a patent lawsuit involving biologic drug products, specifically botulinum neurotoxin technologies and products for injection.

The plaintiff in this case is Allergan, Inc., which I will refer to as Allergan when I'm talking to you. Allergan, Inc., owns a number of patents relating to botulinum neurotoxin technologies. It has wholly owned subsidiaries that manufacture and sell a botulinum neurotoxin product which is called BOTOX. Allergan has sued the defendant, Revance Therapeutics, for patent infringement.

Revance manufactures and sells a botulinum neurotoxin product that's called DAXXIFY. Allergan says that Revance's DAXXIFY product infringes Allergan's patents. Revance says that does not matter because the patents are invalid.

The jury in this case will be asked to decide whether Allergan's patents are invalid.

For those of you who end up being on the jury, I will give you more detailed instructions on the law later in the case. The question after all that is this: Have any of you heard or read anything about this case?

No response.

So I'm going to ask the lawyers to introduce themselves and their firms. When you've heard whoever it is

they introduce, my question is going to be, do you or any member of your immediate family -- and "by immediate family," I mean parents, children, spouse, siblings -- do any members of your immediate family or do you know any of these attorneys or law firms that have just been mentioned?

We'll start with the plaintiff, Mr. Dittmann.

MR. DITTMANN: Yes. Hello. My name is Eric Dittman. I'm with the law firm Paul Hastings, LLP. I have some of my colleagues, Isaac Ashkenazi, Melanie Rupert, Carl Minniti, Robert Unikel. And Jeremy Tigan is with us from the law firm of Morris Nichols.

THE COURT: All right. Thank you, Mr. Dittmann.

Mr. Varughese.

MR. VARUGHESE: Good morning, everyone. My name is Dennies Varughese and I'm from the law firm Sterne Kessler Goldstein & Fox. These are some of my colleagues: Byron Pickard, Deirdre Wells, Nirav Desai, Adam Larock. From the Cahill Gordon firm, this is Peter Armenio. From the Young Conway firm, this is Anne Gaza and Samantha Wilson.

THE COURT: Thank you, Mr. Varughese.

Do you or any members of your immediate family, to your knowledge, know any of these attorneys or law firms you have just been introduced?

No response, so probably I can guess the answer

to this question.

But have you or any member of your immediate family had any business dealings with or been employed by any of these attorneys or law firms?

No response.

Now I'm going to ask about some companies. Have you or any member of your immediate family ever worked for or done business with Allergan, AbbVie Inc., Revance Therapeutics, or PCI San Diego, which was formerly known as Ajinomoto Althea?

No response.

Do you or any member of your immediate family own any stock in Allergan, AbbVie Inc., Revance, or PCI San Diego, formerly known as Ajinomoto Althea?

No response.

Do you have any strong positive or negative opinions about any of these companies that I just mentioned twice?

No response.

So I'm going to ask the attorneys to now identify the potential witnesses in the case, and then I'm going to ask when they're done whether you know or recognize the name of any of these possible witnesses. Just because a name is mentioned doesn't necessarily mean the person will actually appear as a witness.

So, Mr. Dittmann.

MR. DITTMANN: Yes. Some of the witnesses' names are: Terrence Hunt, Ronald Bates, Christian Schöneich, Frank Gessler, Christine Siegwarth, Daniela Drago.

THE COURT: All right. And Mr. Varughese.

MR. VARUGHESE: Good morning again, everyone. The witnesses are Curtis Ruegg, Raj Suryanarayanan, Dana Trexler, Michael Goodnough, Joshia Ramsey, Jeffrey Dover, Atul Patel, Michael Meagher, Akhilesh Nagaich.

THE COURT: All right. Thank you.

Do you know or recognize the name of any of these possible witnesses?

And I see no response.

Do you have any strong positive or negative opinions about pharmaceutical or biotechnology companies?

All right. I see some response there, 39 and 41.

Anyone else? No further response.

Have you ever worked in the field of cosmetic or therapeutic botulinum toxin products?

I see no response.

Do you have any particular expertise or knowledge about cosmetic or therapeutic botulinum toxin products such as Dysport, Jeuveau, Xeomin, BOTOX or DAXXIFY?

I see no response.

Do you have any strong positive or negative opinions about a drug product called BOTOX?

All right. I see no response.

Do you have any strong positive or negative opinions about a drug product called DAXXIFY?

I see no response.

All right. So shifting topics here, have you or any member of your immediate family ever been employed by the United States Patent and Trademark Office?

No response.

Do you have any strong positive or negative opinions about the United States Patent and Trademark Office, patents or the patent system?

All right. I see Number 9 there.

Anybody else? I see no further response.

Have you or any member of your immediate family ever applied for or obtained a United States or foreign patent?

No response.

Have you ever been involved in a dispute about patent rights?

No response.

Have you served on a jury in a civil case within the past 15 years or so?

Okay. No. Don't lower your hands yet. So I see 16, 22, 34, and 35.

Anyone else? No one else. All right.

Based on what you heard so far, do you think you would have difficulty in being a fair and impartial juror in this case?

No response.

Is there anything such as poor vision, difficulty hearing, or difficulty understanding spoken or written English that would make it difficult for you to serve on this jury?

All right. I see Number 39 there.

Anybody else? No further response.

Is there anything else that I haven't asked about that you think the parties and I ought to know about your possible service as a juror in this case?

All right. I got 43 over there. Anyone else? And I got 5 and 39, and I don't see any other cards.

So here's the last question, and I ask this because sometimes you remember things or things occur to you that you didn't think about when I asked you a question just because sometimes answers don't pop into your head in five seconds. So is there anything that you now remember about a question that I asked earlier that you would like to bring to my attention?

And I see no response.

Okay. So thank you. We're going to go back to the conference room and I'll start talking to you one at a time.

We'll be in recess.

(A recess was taken, after which the following proceedings were had in chambers:)

THE COURT: If anyone is going to be asking questions, who is it for each side?

MS. GAZA: Me, your Honor, Anne Gaza.

THE COURT: Okay. All right. Well, let's get Juror Number 1.

Off the record.

(Discussion off the record.)

THE COURT: Good morning. You are Mr. Thompson?

PROSPECTIVE JUROR: Yes.

THE COURT: So you didn't answer any questions yes, so I really just wanted to make sure if you're selected to serve on this jury, are you good with that?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Well, thank you very much. You may retake your seat.

Good morning, ma'am.

PROSPECTIVE JUROR: Good morning.

THE COURT: Your name is Ms. Yolain?

PROSPECTIVE JUROR: Yes.

THE COURT: And I believe you answered that it would be a hardship to serve on this jury. Can you tell me about that?

PROSPECTIVE JUROR: Yeah, because I have three kids who stay at home and child care going to be kind of tough for me.

THE COURT: And the three children, their ages are?

PROSPECTIVE JUROR: One is -- he's 11. The other one, she's 9, and the last one is -- he just turned 4.

THE COURT: Four?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Okay. So who's taking care of them right now?

PROSPECTIVE JUROR: Right now I left my neighbor. But they go to work so, you know, I just try to remember that and they said, okay, you can go. That's how I came today.

THE COURT: All right. But this is going to be a big problem for you if you have to do this multiple days?

PROSPECTIVE JUROR: Yes.

THE COURT: Okay. Do you have any questions?

MR. DITTMANN: I just have a question.

How do you feel about products or medicines that

contain botulinum toxin?

PROSPECTIVE JUROR: To be honest, I really don't pay attention to most of the stuff, so.

MS. GAZA: No questions, Your Honor.

Sounds like you have a handful at home.

THE COURT: Ma'am, why don't you step outside for a minute. Okay?

PROSPECTIVE JUROR: Sure.

THE COURT: So I'm going to excuse her. And I see that nobody objects.

All right. Oh, and actually -- off the record.

(Thereupon, a discussion was held off the record.)

THE COURT: Back on the record. Let's get her back in.

I just have one more question.

PROSPECTIVE JUROR: Sure.

THE COURT: It says here that you are a direct support professional.

I take it that means you have a job; right?

PROSPECTIVE JUROR: Yes, I do.

THE COURT: And what are the hours of the job?

PROSPECTIVE JUROR: 1:00 to 9:00.

THE COURT: So what do you do during the 1:00 to 9:00 period?

PROSPECTIVE JUROR: I work in a group home.

THE COURT: Oh, I'm sorry. I meant what do you do with your children?

PROSPECTIVE JUROR: With the children, by then my husband, he's home at 12:00, 12:30.

THE COURT: Okay. All right. So I'm going to excuse you because I think you have a real issue of taking care of -- particularly of a four-year-old, even though they're all young enough to need somebody to take care of them. So I'm going to excuse you.

I'm going to ask that you go back and sit down. Don't tell anyone about our conversation here. Okay?

PROSPECTIVE JUROR: Sure, I won't.

THE COURT: And we will have a jury in another hour or so and then you'll be free to go. All right?

PROSPECTIVE JUROR: Okay. Thank you so much. I appreciate it. Thank you.

THE COURT: Thank you.

Good morning, ma'am. Is your name Ms. Abellard?

PROSPECTIVE JUROR: Yes.

THE COURT: So you answered one question that it would be a hardship for you to serve.

Can you tell me about that.

PROSPECTIVE JUROR: I work in healthcare. I'm scheduled for the home health aid to go to a client home and

I'm covering some shift for other coworker in the -- in my office this week, Thursday, Friday, so it's really hard for me to be here.

THE COURT: So who is it that employs you?

PROSPECTIVE JUROR: Bayada.

THE COURT: Okay. And they're a pretty big operation; right?

PROSPECTIVE JUROR: Yes. The office -- there's, like, six different office I work in. The DSB office. Each office have their own name.

THE COURT: Okay. So if you were -- came down with an illness, they'd find someone else to do the scheduling for Thursday and Friday; right?

PROSPECTIVE JUROR: There's two of us in the office who do schedule. We usually cover for each other. And I cover for her this Thursday, Friday. And she covered for me last Friday. So usually we cover for each other.

THE COURT: Well, so you mean, like, she's -- if you didn't do it, she would have to come in and do it herself?

PROSPECTIVE JUROR: Yeah. She already request that day off. I already say I will cover her client for her, all her client for her. So that means she have to -- her day off have to be cancel if I end up...

THE COURT: Well, so do you know if she's taking

the day off, is she like going on vacation somewhere or is she just basically -- I guess what I'm wondering is, would it be a hardship for her not to take the day off?

PROSPECTIVE JUROR: Oh, she have personal stuff. So she request like couple weeks ago. It's not something that she needs to do.

THE COURT: So the Bayada has given her the day off. And if something happened to you, presumably, they have other people that they can find to do the same job?

PROSPECTIVE JUROR: Not in the office I am. Each office operates separately. So the office I work is the DSB office. It's two of us -- there's two nurse and two scheduler. I'm one of the schedule. She's going to schedule the other nurse. They don't do the schedule. They go out with the client.

THE COURT: Mr. Dittmann, any questions?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: So just to be clear, if you're not in the office, then no one would be able to handle the scheduling currently?

PROSPECTIVE JUROR: If -- yeah. Since I'm covering for her, it's between both of us. If I'm not here, she's not there, there's nobody else.

MS. GAZA: Okay. And that would impact the

patients and nurses that are providing the care as well?

PROSPECTIVE JUROR: The nurse just call -- we schedule the home health aid. The nurse just go out visit the client with the aid. So they don't do any of the scheduling.

MS. GAZA: Okay. Thank you.

THE COURT: All right. Do you mind stepping outside for a minute?

PROSPECTIVE JUROR: Sure.

THE COURT: Do you have any views?

MR. DITTMANN: It's a closer one, but it does sound like she legitimately doesn't have coverage on the one day.

MS. GAZA: I agree, Your Honor.

THE COURT: All right. Well, then I will excuse her.

You know, as a general matter, I don't like to excuse people who claim work hardships and they work for a large organization, but it is a close one.

All right. Can we bring her back in.

All right. Ms. Abellard, I'm going to excuse you from service, but I want you to go back out and sit with the other jurors. We'll finish here in, you know, an hour or so or maybe -- somewhere in that ballpark.

PROSPECTIVE JUROR: Okay.

THE COURT: And so don't talk to anyone out there about what we've talked about in here. Okay?

PROSPECTIVE JUROR: Okay. No problem.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Good afternoon -- or morning. You are Ms. Middleton?

PROSPECTIVE JUROR: Yes.

THE COURT: And so you said that it would be a hardship for you to serve.

Can you tell me about that?

PROSPECTIVE JUROR: I work in health care, so my schedule is already done a month in advance, and I work tonight and I work tomorrow 11:00 to 7:00.

THE COURT: What do you do?

PROSPECTIVE JUROR: Caregiver.

THE COURT: And is that at a particular -- who employs you?

PROSPECTIVE JUROR: Brandywine Senior Living in Fenwick Island.

THE COURT: And Brandywine Senior Living, do they have multiple places of business or is --

PROSPECTIVE JUROR: No. Well, they do in different locations. But I live in Seaford and I work over there.

THE COURT: Okay. And if you were -- got food poisoning and couldn't work, what would they do to fill your slots?

PROSPECTIVE JUROR: They would probably try to find coverage. I had to find coverage last night because I work 11:00 to 7:00, but I don't have coverage for tonight or tomorrow, and Friday I won't be in the state, Friday through Sunday.

THE COURT: And Friday, you won't be in the state because you are --

PROSPECTIVE JUROR: -- on vacation from work.

THE COURT: And you're going somewhere?

PROSPECTIVE JUROR: Over the bridge in Hanover.

THE COURT: Is this a vacation that's not just you but other family members?

PROSPECTIVE JUROR: Just me. It's a solo vacation.

THE COURT: Okay. Have you paid any money towards this vacation?

PROSPECTIVE JUROR: I pay at the hotel when I get there. It's already booked, but I pay at the hotel.

THE COURT: Booked, that's the word I should have been asking about. I'm going to -- I think I'm going to excuse you because you're booked for a vacation on Friday. You may go back to your seat. Please don't tell

anyone what we talked about here. Okay?

PROSPECTIVE JUROR: No. Thank you.

THE COURT: You are Mr. Bruce?

PROSPECTIVE JUROR: I am.

THE COURT: And you answered the question that suggested maybe you thought of something you hadn't thought of before.

PROSPECTIVE JUROR: I erred on the side of caution. I have no problem being impartial, but I do want to let everybody know that I work for a large pharmaceutical company, have for the last 23 years. No idea -- none of our product lines are cosmetic. It's all oncology, gastrointestinal, but I thought maybe that was relevant.

THE COURT: That's a good thing to bring up. It says on my thing here associate director of Medicaid, which I assumed meant you were a government employee, but that's a title in a pharmaceutical company. Does that mean you're mostly interested in financial transactions?

PROSPECTIVE JUROR: So, yeah. The way that Medicaid reimbursement works is that we pay a certain percent back to the states for use of our product. I'm in charge of that department.

THE COURT: Which pharmaceutical company do you work for?

PROSPECTIVE JUROR: AstraZeneca.

THE COURT: Okay. All right. Mr. Dittmann, do you have any questions?

MR. DITTMANN: Do you have any strong feelings about patents in the pharmaceutical space?

PROSPECTIVE JUROR: I do not, no.

THE COURT: Ms. Gaza?

MS. GAZA: No questions, Your Honor. Thank you.

THE COURT: Well, you may retake your seat.

PROSPECTIVE JUROR: Thank you.

THE COURT: Good morning. You are Mr. Daros?

PROSPECTIVE JUROR: Yes.

THE COURT: And I believe you did not answer any question yes; correct?

PROSPECTIVE JUROR: Not yet.

THE COURT: Trick question. Does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: I'm fine. I'm retired, so I have all the time in the world.

THE COURT: Thank you. You may retake your seat.

Good morning. You are Mr. Patel?

PROSPECTIVE JUROR: Yes.

THE COURT: So you answered serving on the jury would be a hardship. Can you tell me about that.

PROSPECTIVE JUROR: Yes. I'm hosting a religious event at my house on Monday, and I got prior approval from the Court already to be excused on 7/21.

THE COURT: You're good for this week. But if it spilled over to next Monday, you are already excused for that day?

PROSPECTIVE JUROR: Correct, yes.

THE COURT: Well, I don't think I can guarantee that it won't spill over to next week. And I don't think we want to have a jury where we give the Monday off, do we? I don't think we do.

MS. GAZA: At that point, Your Honor.

THE COURT: Mr. Patel, I'm going to excuse you. Hopefully -- when you go out there, don't tell anyone else what we're talking about. Okay? And good luck.

Mr. Patel, good morning. Have a seat.

PROSPECTIVE JUROR: Thank you.

THE COURT: So you answered one of the questions which was it would be a hardship for you to serve on this jury. Can you tell me about that.

PROSPECTIVE JUROR: I have business, so I have to get somebody else to work seven days a week.

THE COURT: You have to work seven days a week?

PROSPECTIVE JUROR: Yeah.

THE COURT: And I see here you're involved in a

liquor store. Are you the owner?

PROSPECTIVE JUROR: Yes.

THE COURT: That's in Dover or somewhere in Kent County?

PROSPECTIVE JUROR: Dover.

THE COURT: Who's working there right now?

PROSPECTIVE JUROR: My son. He take off and he works.

THE COURT: But your son has some other job and doesn't normally work in the store?

PROSPECTIVE JUROR: No. He work IT engineer, so he take off.

THE COURT: He's an engineer?

PROSPECTIVE JUROR: IT engineer, cyber security.

THE COURT: Do you run the store other than when your son fills in? I mean, you're the only person who works there?

PROSPECTIVE JUROR: Yes.

THE COURT: What are the normal hours that you have?

PROSPECTIVE JUROR: 9:00 to 9:00.

THE COURT: You are there 12 hours a day, seven days of the week?

PROSPECTIVE JUROR: Yes. One of them coming nighttime.

THE COURT: You have some other person help you in the evening? So basically, your son can cover one day but can't cover six days?

PROSPECTIVE JUROR: No.

THE COURT: Any questions?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor.

THE COURT: Mr. Patel, I'm going excuse you.

PROSPECTIVE JUROR: Thank you.

THE COURT: I'm going to ask that you go back and sit down in your seat and don't talk with anyone else what we talked about here. And we'll be done soon enough, and then you can go and start working.

PROSPECTIVE JUROR: Okay. Thank you. I appreciate it.

THE COURT: Mr. Walker, have a seat. So you answered two questions yes. One of them was about a hardship, the other was about opinions about the Patent and Trademark Office, I think. Did I get that right?

PROSPECTIVE JUROR: No. I didn't mention anything about a hardship, but I mentioned something about the patent.

THE COURT: Okay. So in any event, tell me about the patent.

PROSPECTIVE JUROR: I don't trust the patent company process. I have a friend many years ago in church and he developed something. He went through the processes. I was happy for him. And all of a sudden, the very thing that he created a patent for came out and I told him -- I said, "Hey, congratulations. You did it."

He said, "I did what?"

And I was like, "Didn't you get your product patent?"

He said, "No."

I said -- well, I seen this description of what he had. And he said, "How?"

I said, "I don't know how, but go look in some stores."

And he was broken. So from that point on, I'm like -- you know, just have a bias with them.

THE COURT: How long ago was this?

PROSPECTIVE JUROR: This was somewhere around in the '80s or '90s. That just stays in my mind.

THE COURT: Okay. So the impression I get is that you think your friend was treated badly; right?

PROSPECTIVE JUROR: Yeah.

THE COURT: How would that impact your view of a dispute between these two companies that -- what we're talking about here today?

PROSPECTIVE JUROR: I don't know how to decide who would be right, who would be wrong, to be partial, because of what I went through.

THE COURT: And so you wouldn't decide who has a better case based on the evidence you hear but based on this experience that your friend had?

PROSPECTIVE JUROR: Based on the experience and I don't know too much about the chemical aspect and different things like that. So it just makes it hard for me to make a decision either way.

THE COURT: The technical aspects, that's something that's up to the parties to teach to the jury. Nobody is going to know anything about the technical aspects before the case starts except for relatively few people in the world. But you think you would not be fair to both sides if you were asked to resolve this dispute?

PROSPECTIVE JUROR: I don't think I would be fair to both sides.

THE COURT: Any questions, Mr. Dittmann?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor.

THE COURT: All right. Mr. Walker, I'm going to excuse you because it is a premise that we need jurors who at least start off planning to be fair to both sides, and I

understand what you've said. So I'm going to ask you to retake your seat, but please don't talk to anyone out there about what we talked about and keep your opinions to yourself. All right.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you.

You are Mr. Amos?

PROSPECTIVE JUROR: Yes.

THE COURT: So you answered that it would be a hardship for you to serve on this jury. Can you tell me about that?

PROSPECTIVE JUROR: I'm a truck driver and sole provider in my home.

THE COURT: Do you drive trucks on your own behalf? Are you employed by a company?

PROSPECTIVE JUROR: Employed by a company Owen Steel.

THE COURT: Do they -- is that a big company? I've never heard of them.

PROSPECTIVE JUROR: It's not a huge company. It's a fabrication company here in Wilmington. They also have one in South Carolina as well.

THE COURT: And if you serve on a jury, do they continue to pay you?

PROSPECTIVE JUROR: No, I don't get paid for

this. I get excused as far as work, but I don't get paid. So as of now, I'm not getting paid.

THE COURT: All right.

PROSPECTIVE JUROR: They just excuse you for it.

THE COURT: So if this case took six days, you'd lose six days of pay?

PROSPECTIVE JUROR: Yes. That's correct.

THE COURT: And that would be a hardship for you and your family?

PROSPECTIVE JUROR: Yes, in terms as far as financial. Another point you raised I should have raised my arm up when you said will this case be -- will you feel that you have difficulty serving as a juror in this case, I should have raised mine because I'm dealing with some form of depression from -- my mom passed away.

THE COURT: I'm sorry to hear that. All right. I don't think -- let's keep that thought and let's not talk about that anymore.

Any questions, Mr. Dittmann?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No.

THE COURT: Mr. Amos, I'm going to excuse you on the basis of what you said. So I'm going to ask you to go back out there. Don't talk to anyone about what we've

talked about, and we'll be through this process soon enough and then you can leave. Okay?

PROSPECTIVE JUROR: Okay.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: So I'll go back to my seat?

THE COURT: Yes.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: Hello. Have a seat. Is it Mr. Zborovsky?

PROSPECTIVE JUROR: Zborovsky, yeah.

THE COURT: Okay. So I think you didn't answer any question yes. Am I correct?

PROSPECTIVE JUROR: Yes.

THE COURT: And does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Mm-hmm.

THE COURT: Okay. Well, thank you very much. Can you retake your seat?

PROSPECTIVE JUROR: Yeah.

THE COURT: Good morning. Is it Mr. Sincock?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: So I believe you answered one question yes, which was that it would be a hardship for you to serve on this jury.

Can you tell me about that?

PROSPECTIVE JUROR: Last Thursday I was laid off from work and I would like to begin my job search as soon as possible to find employment, if given the option.

THE COURT: I'm sorry to hear about being laid off. I see you're an electrician; right?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Is the way you start a job search by -- I'm just curious how you go about --

PROSPECTIVE JUROR: The current method I'm using is online. I have accounts on Indeed and other such job placement boards. And during normal business hours is when everyone is available for communication and interviews and phone calls and that sort.

THE COURT: Do -- I'm sure -- was it a shock to be laid off?

PROSPECTIVE JUROR: Yes. I had no warning whatsoever that this was going to happen.

THE COURT: All right. Do you -- just kind of a prospective question because I imagine Friday you were probably too upset to do anything about this.

How much -- to apply for jobs, do you expect to actually be having discussions with people this week or is it pretty much just sending in e-mails and resumés and that sort of thing?

PROSPECTIVE JUROR: Well, Friday afternoon I

actually received a phone call from a potential employer, and they're waiting -- I told them I had all this pending. So they said, okay, get back to me when you can, either after jury selection or the trial or what have you or whenever I'm available.

THE COURT: All right. But --

PROSPECTIVE JUROR: I do have, like, another phone interview for this Friday and, of course, if I need to reschedule, I will.

THE COURT: All right. Well, I think I don't want to be interfering with your possibility of becoming reemployed, so I'm going to excuse you.

PROSPECTIVE JUROR: Thank you very much.

THE COURT: All right. You may retake your seat.

Good morning. You are Ms. O'Brien?

PROSPECTIVE JUROR: Yes.

THE COURT: And I believe you did not answer any question yes. Is that right?

PROSPECTIVE JUROR: Correct.

THE COURT: And so does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Mm-hmm.

THE COURT: Okay. Thank you very much. You may retake your seat.

Have a seat, sir. You are Mr. Marciano?

PROSPECTIVE JUROR: Yes.

THE COURT: And I believe that you answered one question yes, which was it would be a hardship for you to serve on this jury.

Can you tell me about that?

PROSPECTIVE JUROR: So I leave for Florida on Sunday morning.

THE COURT: Okay. That's for a vacation of some sort?

PROSPECTIVE JUROR: Yeah.

THE COURT: Okay. Well, I cannot guarantee -- this is a vacation that you've already booked?

PROSPECTIVE JUROR: Yeah. It's a B&B.

THE COURT: Okay. Well, I'm going to excuse you because I can't really guarantee that the trial will be over on Friday.

PROSPECTIVE JUROR: If it stopped on Friday, I'd be good.

THE COURT: All right. Well, thank you very much. You may retake your seat.

PROSPECTIVE JUROR: Thank you.

THE COURT: Off the record.

(Discussion off the record.)

MS. GAZA: Your Honor, would it be okay for -- I

saw there are some people on the list who are retired, to ask them what their job was before they were retired?

THE COURT: Sure.

Have a seat, ma'am. You are Mr. Herbein and I believe you answered that it would be a hardship to serve on the jury.

Can you tell me about that?

PROSPECTIVE JUROR: Yes. My father passed away June 3rd. We have an appointment -- my brothers -- my two brothers and I have an appointment tomorrow morning with a lawyer to start the probate process. All three of us have to be there. That was my reason.

THE COURT: Okay. All right.

Any questions, Mr. Dittmann?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor.

THE COURT: All right. Obviously, I'm sorry your father died.

PROSPECTIVE JUROR: Thank you.

THE COURT: And I am going to excuse you because I can't really say that it's good to postpone this appointment for a week, and who knows how soon you'd actually get there.

I take it your two brothers are -- are they

local?

PROSPECTIVE JUROR: Yes.

THE COURT: How hard was it to get this appointment?

PROSPECTIVE JUROR: A month.

THE COURT: Okay. I'm going to excuse you. Thank you very much.

PROSPECTIVE JUROR: Thank you.

THE COURT: Good morning. You are Mr. Glenn?

PROSPECTIVE JUROR: Yes.

THE COURT: And I believe that you answered the question that you've served on a jury before.

PROSPECTIVE JUROR: Two, yeah.

THE COURT: Tell me about those two cases just in a sentence or two.

PROSPECTIVE JUROR: I think they were, like, 2014 and 2017 I was in them. The one case -- they were both Delaware state. The one case they assembled the jury but then threw out the case for some reason. We never actually deliberated. The second case was a civil case where we deliberated.

THE COURT: And what was the civil case about?

PROSPECTIVE JUROR: It was a man suing Home Depot because he fell on, like, a plastic bench or something.

THE COURT: Does your experience on these two cases impact your ability at all to be a fair and impartial juror in this case?

PROSPECTIVE JUROR: No.

THE COURT: All right. Any questions, Mr. Dittmann?

MR. DITTMANN: No, Your Honor.

MS. GAZA: No, Your Honor.

THE COURT: Hold on a second.

MR. DITTMANN: Did you happen to be the foreman in that particular jury, the one that you went to deliberations?

PROSPECTIVE JUROR: No.

THE COURT: So, Mr. Glenn, if you'd retake your seat.

PROSPECTIVE JUROR: All right. Thank you.

THE COURT: Good morning. Have a seat. Is it Ms. Majewski?

PROSPECTIVE JUROR: Majewski.

THE COURT: Majewski, okay. Thank you.

So I believe you didn't answer any question yes. Is that right?

PROSPECTIVE JUROR: That is correct.

THE COURT: And does that mean that if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Yes.

THE COURT: And can I ask, you're retired, what was your main line of work before you retired?

PROSPECTIVE JUROR: Educational program management.

THE COURT: So is that like a state job or --

PROSPECTIVE JUROR: No. I worked for different groups. I worked for Osher Lifelong Learning was the last place I worked being a program manager.

THE COURT: Okay. I'm familiar with that.

All right. Any questions, Mr. Dittmann?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: Did you have other jobs before that? You said that was the most recent, so I was just curious about your --

PROSPECTIVE JUROR: Yes. I worked for the Delaware Historical Society at the Read House & Gardens. Then I worked for the Delaware Business, Industry, Educational Alliance with children's programming. Then I worked at Delaware Tech with energy and sustainability. And then I moved to Osher Lifelong Learning.

MS. GAZA: Okay. Were those all your jobs in the past 10, 15 years?

PROSPECTIVE JUROR: That's since 1996.

MS. GAZA: Okay.

THE COURT: Okay. Thank you, Ms. Majewski. You can retake your seat.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: Good morning. Ms. Evans, is it?

PROSPECTIVE JUROR: Yes.

THE COURT: So I believe you answered that it would be a hardship for you to serve. And you're handing me a letter from Delaware State University.

PROSPECTIVE JUROR: Yes. Our payroll is due this week so we have to have it done by Thursday.

THE COURT: So I take it this is a hardship for Delaware State University, not a hardship for you personally.

PROSPECTIVE JUROR: Well, yeah.

THE COURT: So I'm not real inclined to excuse it when it's a hardship for what's essentially a state institution.

Would you be upset if you were selected to serve on this jury?

PROSPECTIVE JUROR: I'm the only one that can do some of those jobs that needs to be done.

THE COURT: Well, so does that mean that you would be holding it against the parties that you're here rather than doing this?

PROSPECTIVE JUROR: Not necessarily holding it against, but would feel really awful that I'm not going to be able to do my job.

THE COURT: Okay. So the -- so you'd be as fair as you can be to these parties, but you'd feel bad that you weren't doing your job?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. And do you think this feeling bad about not doing your job would spill over into your ability to pay attention or anything like that?

PROSPECTIVE JUROR: Possibly.

THE COURT: All right. Mr. Dittmann, any questions?

MR. DITTMANN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor.

THE COURT: And you said you're the only person who can do some of this data inputting.

What would happen if you were in a traffic accident and you couldn't be there for the next week?

PROSPECTIVE JUROR: They would figure it out, but it's -- I guess it's more weight on me, myself, than -- my boss is out right now, and she's the other person that would know how to do it.

THE COURT: I'm going to excuse you.

PROSPECTIVE JUROR: Thank you.

THE COURT: Don't talk to anyone out there about what we talked about. Okay? And you can have your letter.

Good morning, Mr. Banerjee. So I believe you answered no questions, with a yes. Am I correct?

PROSPECTIVE JUROR: Yes.

THE COURT: And does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you very much. You may -- actually, it lists your occupation here as an engineer which, of course, is a very broad category. More specifically, what do you do?

PROSPECTIVE JUROR: Manufacturing, chemical engineering.

THE COURT: Does that mean you have an advanced degree in chemistry or chemical engineering?

PROSPECTIVE JUROR: Yeah.

THE COURT: Any questions?

MR. DITTMANN: Do you have any strong opinions about patents in the biotechnology space?

PROSPECTIVE JUROR: No.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor. Thank you.

THE COURT: If you would retake your seat.

Thank you.

Good morning. Is it Mr. Bogush?

PROSPECTIVE JUROR: That's correct.

THE COURT: So I believe you answered that you have a hardship in serving as a juror. Can you tell me about that.

PROSPECTIVE JUROR: Yeah. I start vacation tomorrow.

THE COURT: This is a vacation with your family?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Not sure how you made it this far, but I'm going to excuse you.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you.

Good morning. Mr. Byler, is it?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: So I believe you answered that it would be a hardship to serve on this jury. Can you tell me about that.

PROSPECTIVE JUROR: Yeah. Scheduled to close my property in the next week and I'm moving to Montana, so I have quite a bit to accomplish between now and the end of next week.

THE COURT: And moving to Montana, that's quite a change.

PROSPECTIVE JUROR: Yes.

THE COURT: Do you already have a place in Montana you're going to?

PROSPECTIVE JUROR: Working on that right now. I close on a property, but I have to rent a house while I build out there.

THE COURT: Of course, if you'd actually moved to Montana, you wouldn't be eligible to sit on a Delaware jury. But I think based on what you're telling me -- you said you're closing on your house. When do you have to be out of it?

PROSPECTIVE JUROR: The day I close, which will be the 25th.

THE COURT: Are you planning on getting in a vehicle and driving to Montana on the 26th?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Good luck in Montana. I'm going to excuse you. You can retake your seat.

I think we're going to have fairly smooth sailing now to get the rest of the jurors because basically nobody has claimed a hardship until Juror 32, and so I think we should be wrapping this up pretty soon.

Good morning. Why don't you tell me how you pronounce your last name.

PROSPECTIVE JUROR: Siaweleski.

THE COURT: So I believe -- first off, you're retired. What did you do before you retired?

PROSPECTIVE JUROR: I worked in an oil refinery in Delaware City for 34 years.

THE COURT: What kind of job did you do there?

PROSPECTIVE JUROR: I worked as a process operator when I first started and moved into a control board operator and eventually safety class instructor.

THE COURT: Did you enjoy that?

PROSPECTIVE JUROR: Very much so, yes.

THE COURT: So you've served on a civil jury before; is that right?

PROSPECTIVE JUROR: I believe -- I wanted to verify because I'm not sure. It was a constitutional law case. A former inmate in a federal institution was suing the federal government saying that his constitutional rights were violated because he was beaten up in prison and wasn't protected.

THE COURT: Okay. Yes. That's a civil case. How long ago was that?

PROSPECTIVE JUROR: And that's another thing. I'm not --

THE COURT: Roughly.

PROSPECTIVE JUROR: Probably about 15 years ago. I was still working at the time and I've been retired now

for ten years.

THE COURT: That was in this court?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you remember who the judge was?

PROSPECTIVE JUROR: I do not.

THE COURT: Do you remember if it was a man or a woman?

PROSPECTIVE JUROR: No, I don't. I believe it was a man, but I'm not sure. I couldn't swear to that.

THE COURT: Was there anything about that experience that would impact your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR: I don't believe so, no.

THE COURT: Did you enjoy that experience?

PROSPECTIVE JUROR: Yeah, except for the interruption to your daily life that it provides. Other than that, it was fine.

THE COURT: Any questions, Mr. Dittmann?

MR. TIGAN: No, Your Honor.

THE COURT: Ms. Gaza?

MS. GAZA: No, Your Honor.

THE COURT: All right. If you would take your seat.

Good morning, sir. You are Mr. Bahr?

PROSPECTIVE JUROR: Correct.

THE COURT: Have a seat. Basically, I just wanted to make sure since you didn't answer any question yes, if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: I think so.

THE COURT: Why don't you retake your seat. Thank you.

(Thereupon, a discussion was held off the record.)

THE COURT: Good morning, ma'am. You are Ms. Withrow?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And I believe you didn't answer any question yes; is that right?

PROSPECTIVE JUROR: Correct.

THE COURT: Does that mean if you're selected to serve on the jury, you're good with that?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: I'm curious. Talent acquisition coordinator. What kind of talent are you trying to acquire?

PROSPECTIVE JUROR: I work in recruitment for the hospital.

THE COURT: It's HR, sort of?

PROSPECTIVE JUROR: Yes.

THE COURT: Thank you very much. You may return

to your seat.

Good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: You are Mr. Williams?

PROSPECTIVE JUROR: Yes.

THE COURT: It says you're retired here. What did you do before you retired?

PROSPECTIVE JUROR: I worked at nuclear power plants, refineries, chemical plants. I was in electrical engineering.

THE COURT: Did you enjoy that work?

PROSPECTIVE JUROR: Yeah. Yeah, I did.

THE COURT: That's good. In any event, so I believe it's the case you didn't answer any question yes. Does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Yeah.

THE COURT: All right. Why don't you retake your seat.

PROSPECTIVE JUROR: Okay. That was quick. Thank you.

THE COURT: Good morning, sir. Have a seat. You are Mr. Harris?

PROSPECTIVE JUROR: Correct.

THE COURT: And I believe it's the case you

didn't answer any question yes; is that right?

PROSPECTIVE JUROR: Yes.

THE COURT: Does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: Mm-hmm.

THE COURT: I take it that was a yes?

PROSPECTIVE JUROR: Yes. I apologize.

THE COURT: That's all right. That's the reason why I followed up.

It says here you're a remote engineer. I take it that means you're an engineer, but you're not on site to whatever it is you're engineering.

PROSPECTIVE JUROR: That's correct.

THE COURT: What kind of engineering are you or do you do?

PROSPECTIVE JUROR: I work for Agilent Technologies. I repair various laboratory instruments. The remote part is I will either remotely troubleshoot through e-mail or over the phone or if they mail the instruments in to us to do, we call it bench repair.

THE COURT: Okay. All right. Any questions?

MR. DITTMANN: What kind of lab equipment is that you're involved with?

PROSPECTIVE JUROR: I repair FTIR, Fourier transform infrared. I repair two different kinds of Raman

spectroscopy instruments. They resolve on the via. I also repair gas chromatography-mass spec. And I also repair the Agilent sulfur and nitrogen chemiluminescence detectors.

MR. DITTMANN: Very helpful. Thank you.

THE COURT: Ms. Gaza?

MS. GAZA: No questions. Thank you.

THE COURT: Mr. Harris, if you could retake your seat. Thank you.

Good morning. You are Mr. Emery?

PROSPECTIVE JUROR: Yes.

THE COURT: And what is it, when you're employed, that you do?

PROSPECTIVE JUROR: I'm a retired architect.

THE COURT: So when it says "unemployed" here, it would be more correct to say retired?

PROSPECTIVE JUROR: Yes.

THE COURT: Sounds more prestigious. So you were an architect, basically, your whole working life?

PROSPECTIVE JUROR: For most of it. I was a defense intelligence analyst earlier before I became an architect.

THE COURT: I believe you didn't answer any question yes. Does that mean if you're selected to serve on this jury, you're good with that?

PROSPECTIVE JUROR: One issue, I'm experiencing

symptoms of Lyme disease. We were on vacation for two weeks in a high-risk area.

THE COURT: So I don't know too much about Lyme disease. I take it it's only transmitted by a particular insect?

PROSPECTIVE JUROR: Ticks. If you have an infestation of ticks here, you would be in trouble.

THE COURT: Are those symptoms causing you any desire to go see a medical professional or --

PROSPECTIVE JUROR: They are. It's muscle pain, chills, and things like that.

THE COURT: Okay. So do you want to be excused from serving on this jury?

PROSPECTIVE JUROR: I would like to be unless you have a shortage of personnel.

THE COURT: I don't know what the normal incubation stage -- is Lyme disease the one where there's kind of a little spot shows up and then --

PROSPECTIVE JUROR: Yeah, I didn't have the spot, but I have all the other symptoms.

THE COURT: Okay. Well, I'm not a doctor so I'm not going to go any further on that.

PROSPECTIVE JUROR: It's usually knocked out pretty easily with antibiotics.

THE COURT: All right. Can you step outside for

a second.

I'm inclined to excuse him, but I wanted to just get your views.

MR. DITTMANN: Yeah, it seems like, especially if he's not feeling well --

MS. GAZA: I think so, Your Honor, so he can get treatment.

THE COURT: Okay. All right.

Mr. Emery, I'm going to excuse you and I'd go see a doctor if I were you.

PROSPECTIVE JUROR: All right. Thank you.

THE COURT: But if you could go and just sit back with the group.

PROSPECTIVE JUROR: Yes.

THE COURT: We're getting close to finished here and when we're done, you'll be excused. Okay?

PROSPECTIVE JUROR: Thank you very much.

THE COURT: Thank you.

Good morning, sir.

PROSPECTIVE JUROR: Good morning.

THE COURT: You are, Mr. Furbush?

PROSPECTIVE JUROR: That's correct.

THE COURT: And my notes are that you did not answer any of the questions with a yes. Is that right?

PROSPECTIVE JUROR: That is correct.

THE COURT: And it says here that your employment is technology, which seems to be kind of a broad description. Can you be a little more specific?

PROSPECTIVE JUROR: I'm a Jack of all trades. I've done app development, project management. Right now I'm director of financial payment systems. But it's all been within banking and financial services.

THE COURT: Oh, okay. So -- all right. So if you're selected for this jury, you're good with that?

PROSPECTIVE JUROR: Yeah. Trust me, I know nothing about pharmacy. Don't want to either, but...

THE COURT: All right. Well, you will learn something in the coming week if you're selected. All right. So that's good. If you could retake your seat, please.

All right. So we've got 14 qualified jurors. Usually what I do is leave the people who are sitting on this side in here to talk about it amongst themselves and my staff finds someplace for this side to have a little privacy and to talk about what you want.

And so it's seven minutes after 11:00, according to this clock, so basically 11:22 or so I'll hope that you're done talking and we'll come back into court and finish the selection process. Okay?

(A recess was taken, after which the following proceedings were had in open court:)

THE COURT: So members of the jury panel, at this point there is going to be a sheet passed back and forth between the parties because some of the jurors that I talked to, they -- the parties have an opportunity to remove them from consideration. And this is a law -- a requirement of law. So it will take just a little while, I think, for that to happen, and then we'll be ready to seat a jury.

THE CLERK: So when I call your number and I seat you in the box, that means you got this.

So Juror Number 1, seat number one, row number one of the jury box.

Juror Number 6, you're going to be in seat number three of row number one of the jury box.

Juror Number 11, you are going to be fifth seat in the first row of the jury box.

Juror Number 16, you are going to be the seventh seat in the first row of the jury box.

Juror Number 22, you are going to be the third seat -- oh, sorry, first seat, second row of the jury box.

Juror Number 23, can you go to the third seat. Yeah, there's going to be a, like, space buffer between you all just to give you all a little room and comfort.

Juror Number 25, you're going to be the fifth seat in the second row of the jury box.

And then Juror Number 28, you're going to be the

seventh seat in the second row of the jury box. You're going to be the last seat in the jury box, second row, sir.

THE COURT: All right. Can we swear the jury.

(The jury panel was sworn.)

THE COURT: All right. Have a seat.

So the rest of the members of the jury panel, we've now got our jury for this case, and I want to thank you all for being here.

We did go through a lot of jurors who had reasons why they needed to be excused, though we didn't, obviously, go through all the jurors. It's kind of a -- you know, we'd always prefer to have more people here because if we don't have enough jurors, that's a problem.

But in any event, so even if you didn't get called on, you helped the process this morning, and I want to thank you all for being here. But now if there is someone who can take the members of the panel away, that would be good. So thank you. You're free to go.

(The potential jurors were dismissed.)

THE COURT: Mr. Dittmann and Mr. Varughese, can I see you at sidebar. I don't need the court reporter.

(Thereupon, a discussion was held off the record.)

THE COURT: So members of the jury, I think we're going to hand out some jury instructions while we're

getting the -- while people are getting settled.

All right. So we're not going to be handing out copies of the jury instructions. When we start, I'm going to read some jury instructions to you. We will give them in writing to you at some point, but for the time being, you're just going to have to try to listen to me.

There's only so much you can do to make reading jury instructions exciting, so try your best to listen as we go.

So members of the jury, now that you've been sworn, I'm going to give you some preliminary instructions to guide you in your role as jurors in this case.

It will be your duty as jurors to hear the evidence, decide what the facts are, and then apply those facts to the law that I will give you.

You and only you will be the judges of the facts. You will have to apply those facts to the law as I will instruct you, both during these preliminary instructions and at the close of evidence when I will give you more instructions.

You must follow the law whether you agree with it or not.

It is important that you perform your duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your

decision in any way.

I play no part in judging the facts. You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

My role is to be the judge of the law. I make whatever legal decisions have to be made during the course of the trial, and I will explain to you the legal principles that must guide you in your decision.

So the plaintiff in this case is Allergan, Inc. Allergan, Inc., owns the three patents that are at issue. Its wholly owned subsidiaries manufacture and sell a botulinum toxin injectable product known as BOTOX.

The defendant in this case is Revance Therapeutics. Revance is a company that manufactures and sells a botulinum toxin injectable product called DAXXIFY.

During the trial, the parties will offer testimony and evidence to familiarize you with these products.

Allergan, Inc., as I said, owns the three patents-at-issue in this case. Those patents are U.S. Patent Number 7,354,740, 11,203,748, and 11,147,878.

As you might appreciate, that's a mouthful of numbers. So for convenience, the parties and I will -- and the witnesses, I think -- will refer to these patents by

their last three digits. So you'll hear about the '740 patent, the '748 patent, and the '878 patent.

The parties and I may refer to these patents collectively as the "Asserted Patents." All three patents relate to botulinum toxin injectable products.

And also during the trial, the parties will offer testimony and evidence to familiarize you with the relevant technology. I don't believe you yet have your juror notebooks, but there should be copies of the three patents in the juror notebooks.

Did somebody bring them? Oh, okay. We have the juror notebooks. We'll hand them out when we're done.

Before I describe the parties' positions further, at this time, we're going to show you a 17-minute video that will provide background information about patents. This video is prepared by the United States government, not the parties to the case, so it's supposed to be a neutral presentation, and it's designed to help introduce you to the patent system.

Actually, I guess we should hand out the notebooks because the video references a sample patent that you will find in your notebooks. And there are also some terms that are going to be used in the video that are contained in a glossary of patent terms found in these notebooks. And you can refer to the glossary and other

materials in your binder throughout the trial.

So as soon as we finish handing out these notebooks and also copies of the jury instructions, which you won't need until after the video, and even then you might not need them.

All right. Are we prepared to play the video? And maybe we can dim the lights a little for ease of viewing.

(A video was played.)

JUDGE FOGEL: Hello. I'm Jeremy Fogel. I've been a United States District Judge since 1998, and I am now the director of the Federal Judicial Center.

As you probably know by now, this is a patent case. So you may be wondering, how can I sit in judgment on a case like this when I'm not entirely sure what a patent is? We hope to answer that concern with this brief video, which will give you some of the background needed to do your job.

This case will involve some special issues that the judge and lawyers will explain to you, but all patent cases involve some basics that you will learn about. This video will discuss what patents are, why we have them, how people get them, and why there are disputes that require us to call in a jury like you. We'll also show you what patents look like.

The United States Constitution gives Congress the power to pass laws relating to patents. Article I, Section 8, Clause 8 allows Congress to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

A patent, then, is an official grant by the United States government that gives its owner certain rights to an invention. Those include the right to stop others from making, using, selling, or offering for sale the invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor. But because it takes an average of three years for the Patent and Trademark Office to act on the application, the effective life of the patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor. In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge of what we sometimes call the state of the art by adding something new and useful to it. A famous example is Thomas Edison's invention of the light bulb. Harnessing electrical power for illumination transformed society and led to many other important

breakthroughs.

During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use. It is this combination of something new and valuable to the public that justifies granting time-limited patent protection to the inventor.

A patent is in many ways like a deed to a piece of property. It grants the owner the right to keep people off the property or to charge them a fee like rent for using it. And just as a deed indicates boundaries defining a landowner's property, a patent claim defines the patentee's domain. The patent system works because the inventor is required to describe the invention in clear and specific terms so that the public knows what the boundaries of the invention are.

Once a patent is issued by the government, it becomes available for public inspection. In that way, anyone who learns of the patent can read it and understand exactly what the inventor invented and the limits of the patent set forth in the claims.

Now that we understand what a patent is, let's take a closer look at the term "invention." An invention is a new way of solving a problem or a useful new machine, manufacture, or composition of matter. The patent process

begins in the mind of the inventor, and in particular when the invention is formulated in the mind of the inventor. Patent lawyers call this conception. This is when the idea occurs to the inventor clearly enough that he or she can write it down and explain it to someone.

To qualify for a patent, the invention needs to be new and useful. Also, it must not be obvious to one of ordinary skill in the field. If the inventor believes these requirements are met, he or she will prepare an application for filing with the Patent and Trademark Office whose headquarters are in Alexandria, Virginia, just outside of Washington, D.C. The Patent and Trademark Office, often called the PTO, is the agency of the federal government whose job it is to examine patent applications to make sure they are in proper form and comply with the requirements of the law.

The inventor can prepare an application for filing with the PTO, but usually it is drafted by a patent attorney or a patent agent who specializes in what is called prosecuting patent applications. That is the process by which they are evaluated. The attorney or agent works with the inventor to be sure the invention is described and claimed in a way that complies with the law and the regulations of the PTO. 98 percent of patent applications are made online using the PTO's electronic filing system,

although a few paper applications are still made.

When the PTO receives the inventor's application, it is first checked to see if it is complete and complies with all the PTO's application requirements. It then assigns the submission to a patent examiner, a staff person with a background in the field or art the invention falls within, to evaluate the application and decide whether a patent can be granted.

You've been given a sample patent to refer to as you watch this video, so you already have a sense of what a patent looks like. But now let's take a closer look at the three main parts of a patent.

To begin with, there are some basic identifying information on the first page. This material is highlighted in your handout. On the upper right side of the page is the number assigned to the patent by the PTO, and on the left side is a title that describes the invention and the names of the inventors and sometimes the company to whom they've assigned the patent. Also on the left is the date when the patent application was filed and back on the right, the date when the patent was issued.

There also is more detailed information on the first page, including a list of numbers following the caption field of search. These numbers identify previously issued patents the examiner looked at or searched to make

sure the applicant's claimed invention really is something new, not obvious, and thus patentable. Also listed on the first page are what we call references, that is, previous patents or articles that describe the technology or prior art known at the time the application was filed.

It may seem strange to you that we call this preexisting technology "prior art," even though it has nothing to do with artists. We use the word "art" in its historical sense to include inventions and other subject matter reasonably related to the claimed invention. We also refer to the latest technology as state of the art, and we say of someone who can understand and apply the technology that he or she is skilled in the art.

The second major part of the patent is what we call the specification or written description. As is the case in your sample, it is usually the longest part of the patent. It includes an abstract, which is a brief summary of the invention, a background section that describes the nature of the problem the invention is supposed to solve, one or more drawings called figures that illustrate various aspects of the application, and a detailed description of one or more embodiments of the invention. An embodiment is a specific device or method that uses the invention, such as a particular form of light bulb.

The third and most important part of the patent

is the claims. These are the numbered paragraphs that appear at the end. The claims are what give the public notice of the boundaries of the invention. They are similar to the description of property you may have seen in a deed referring to precise measurements taken on the ground. The judge will instruct you further on how any technical or ambiguous terms in the patent claims should be understood.

Now that we've discussed the main parts of a patent, let's look at how the PTO processes patent applications, what we referred to earlier as prosecution of the patent application. This process begins when the inventor's application arrives at the PTO. There, it receives a filing date. Under the America Invents Act of 2011, filing dates will determine who is awarded the patent if there are competing valid applications.

In 2012, the PTO received nearly 600,000 patent applications and issued more than 270,000 patents. After determining that the application is complete, the receiving branch also decides what field of technology an application relates to and assigns it to the appropriate examining group. In order to make that decision, the patent examiner usually looks at patents that have been issued previously in the same or closely related fields of art. The examiner has computer databases that contain information used to accomplish this task.

Another part of the job is to decide if the inventor's description of the invention is complete and clear enough to meet the requirements for a patent, including the requirement that the description enable someone of ordinary skill in the field to actually make and use it.

However, because the job of examining so many applications is challenging, the law requires the applicant to tell the examiner whatever he or she knows about the prior art that might be important to the examiner's decision on whether to allow the patent. We call this the applicant's duty of candor.

One way the applicant can satisfy this duty is by bringing pertinent prior art to the attention of the examiner, either in the original application or in other submissions called information disclosure statements. In this way, the decisions of the examiner are based on both the information provided by the applicant and on the information the examiner finds during his or her prior art search.

Sometimes the examiner concludes that the application meets all the requirements we discussed and allows the patent to issue at this first stage. But more frequently, the examiner will reject the application as deficient in some respect. This decision will be

communicated by the examiner in what is called an Office Action, which is a preliminary notice to the applicant of what the examiner finds insufficient or unpatentable.

For example, the examiner may reject certain claims as being unpatentable because a journal article written and published by another person prior to the effective filing date of the patent application disclosed what the applicant is currently claiming. At that point, the applicant prepares a written response either agreeing or disagreeing with the examiner.

An applicant who agrees with the examiner can suggest amendments to the application designed to overcome the examiner's rejection. Alternatively, an applicant who disagrees with the examiner's Office Action can explain the reasons for the disagreement. This exchange of Office Actions and responses goes on until the examiner issues a Final Office Action which may reject or allow some or all of the applicant's claims.

The overall process is referred to as the prosecution history of the application. The written incoming and outgoing correspondence between the PTO examiner and the applicant is also called the file wrapper. In the past, these file wrappers were all in paper form, as were the submitted applications. Now they are most often electronic and may occasionally be paper as well.

Most patent applications filed on or after November 29, 2000, are published by the PTO 18 months after the inventor has filed his or her application so that the public may inspect it.

Once a final PTO Office Action has occurred and one or more claims have been allowed, the applicant is required to pay an issuance fee and the patent is printed. Then on the date shown in the upper right-hand corner of the first page of the patent, it is issued by the PTO, and the inventor receives all the rights of the patent. That date is highlighted on your sample.

Once a patent has issued, the inventor or the person or company the inventor has assigned a patent to can enforce the patent against anyone who uses the invention without permission. We call such unlawful use infringement. But the PTO and its examiners have no jurisdiction over questions relating to infringement of patents. If there is a dispute about infringement, it is brought to the Court to decide.

Sometimes in a court case, you are also asked to decide about validity, that is, whether the patent should have been allowed at all by the PTO. A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art or whether other requirements of patentability

have been met. In other words, a defense to an infringement lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked to consider such things when the patent has already been reviewed by a government examiner. There are several reasons for this. First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant.

In addition, there is, of course, the possibility that mistakes were made or important information overlooked. Examiners have a lot of work to do, and no process is perfect. Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it's important that we provide a chance for someone accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case. The judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent. So it is your primary duty as jurors to resolve any factual disputes and, in some cases such as infringement and validity, to apply the law to those facts.

To prove infringement, the patent holder must

persuade you by what is called a preponderance of the evidence relating to the facts of the case that the patent has been infringed. To prove invalidity, the alleged infringer must persuade you by what is called clear and convincing evidence that the patent is invalid.

The judge in your case will explain these and other terms and provide additional specific instructions at the appropriate time. Good luck with your task, and thank you for your service.

(The video ended.)

THE COURT: All right, members of the jury, back to the instructions. I'm on page 4 if you want to read along as I'm talking.

So someone is said to be infringing a claim of a patent when they, without permission from the patent owner, make, use, import, or sell a product or process practicing the claimed invention within the United States before the term of the patent expires.

A patent owner who believes someone is infringing the exclusive rights of a patent may bring a lawsuit, like this one, to recover damages, which generally means money paid by the infringer to the patent owner.

The patent owner must prove the amount of damages it is entitled to receive as compensation for the infringing acts. A party accused of infringing a patent may

prove that the asserted claims are invalid as a defense to liability.

I will now briefly explain the parties' basic contentions.

Allergan contends that Revance infringes three patent claims in this case based on its manufacture and sales of a product called DAXXIFY.

Revance contends that all of the asserted claims are invalid.

Allergan also contends it is entitled to damages for any asserted patent claim that is not invalid in an amount not less than a reasonable royalty.

Allergan contends that it is entitled to damages in the amount of a reasonable royalty for the remainder of Revance's alleged infringement.

Revance contends that since the claims are invalid, Allergan is not entitled to any damages.

I will give more detailed instructions concerning the invalidity and damages after you have heard all the evidence. At that time, you will be asked to decide several things according to these detailed instructions.

In essence, what you must decide is: One, whether Revance has proven by clear and convincing evidence that each of the asserted patent claims are invalid; and, two, if you find that any asserted patent claim is valid,

then you also have to decide whether Allergan has proven by a preponderance of the evidence the amount of money to which it is entitled to compensate it for Revance's infringement.

The courtroom deputy has distributed the juror notebooks. These notebooks include paper and a pen or possibly a pencil, a copy of the asserted patents, and the meanings of certain terms in the asserted patents that I've already determined.

For a claim term for which I have not provided you with a definition, you should apply the ordinary meaning of that term in the field of the patent. You are bound by your oath to apply my definition of the terms I've construed throughout this case even if you personally disagree with them.

My interpretation of the language of the claims, however, should not be taken as an indication that I have a view regarding any of the issues in dispute. Those issues are yours to decide.

For each issue in the case, either Allergan or Revance bears the burden of proof, which means that it bears the burden of persuading you to find in its favor.

In a patent case such as this one, there are two different burdens of proof: The first is called preponderance of the evidence, and the second is called clear and convincing evidence.

For any issue on which a party bears the burden of proof by a preponderance of the evidence, that party has carried its burden if you find what the party claims is more likely true than not when considered in light of all of the evidence.

To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting the claims of a party with the burden of proof must make the scale tip somewhat towards its side.

Here, Allergan has the burden of proving by a preponderance of the evidence the amount of damages Allergan should receive.

Clear and convincing evidence is evidence that the truth of a fact is highly probable. Proof by clear and convincing evidence is thus a higher burden of proof than proof by a preponderance of the evidence.

Here, Revance has the burden of proving by clear and convincing evidence that the asserted claims are invalid.

If you wish, you may, but are not required to, take notes to help you remember what a witness has said. Notes may be helpful to you, because at the end of the trial, you must make a decision based on what you recall of the evidence. You will not have a written transcript to consult. Therefore, you should pay close attention to the

testimony as it is given.

I do not suggest that you look at your note taking as a substitute for the written transcript. Instead, as you listen to the testimony, keep in mind that you will be relying on your memory of the testimony during your deliberations.

If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Your notes are only a tool to aid your own individual memory, and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence.

Your notes are not evidence and are not a complete outline of the proceedings or a list of the highlights of the trial. Do not use your notes or any other juror's notes as authority to persuade fellow jurors.

During the trial, lots of documents or other physical items may be received into evidence. Therefore, you may wish to make notes about the exhibits, especially their description and number, so that you can refer to those exhibits while you are deliberating.

You will be given a copy of every admitted exhibit to take to the jury room to use during your deliberations.

When we take our recess each day for the lunch

break and when we take our recess each night, please take your notes to the jury room and leave your notes there. Do not take your notes away from court at any time. No one will read your notes but you. Your notes will be destroyed after the trial is over.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received as exhibits, and any facts that are stipulated; that is, formally agreed to by the parties as true.

Any stipulated facts will be read to you during trial. You must treat them as having been proven for purposes of this case.

Certain things are not evidence. I will list those things for you now.

Statements, arguments, and questions and comments by lawyers are not evidence. Exhibits that are identified by a party but not offered and received in evidence are not evidence. Objections are not evidence.

Lawyers have an obligation to their clients to object when they believe that the testimony or exhibits being offered into evidence are not proper under the rules of evidence. You should not be influenced by a lawyer's objection or my ruling on the objection.

If I sustain or uphold the objection to a

question or exhibit, you must ignore the question or exhibit.

If I overrule the objection and allow the matter into evidence, treat the testimony or document like any other evidence.

If I instruct you that some item of evidence is admitted for a limited purpose, you must follow that instruction and consider that evidence for that purpose only. If this occurs during the trial, I will try to clarify this for you at that time.

Testimony and exhibits I exclude or strike from the record and tell you to disregard are not evidence and must not be considered.

During trial, you may be shown charts and animations to help illustrate the testimony of the witnesses. These illustrative exhibits, called demonstrative exhibits, are not admitted into evidence and should not be considered as evidence.

If they do not correctly reflect the facts shown by the evidence in the case, you should disregard these charts and animations and determine the facts from the documents, testimony, or other underlying evidence.

Anything you see or hear about this case outside the courtroom is not evidence and must be disregarded.

Do not consider any testimony or other evidence

that gets struck or excluded. Do not speculate about what a witness might have said or what an exhibit might have shown.

You are to decide this case solely on the evidence presented here in the courtroom.

Finally, some of you may have heard the phrase or terms "direct evidence" or "circumstantial evidence."

Direct evidence is direct proof of a fact, such as testimony by an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

For example, the fact that it snowed overnight could be proven directly as in, "I saw it snow last night"; or circumstantially, as in, "When I went to sleep, the grass was green. When I woke up, there was a foot of snow on the ground."

Do not be concerned about whether evidence is direct evidence or circumstantial evidence. You should consider the way all the evidence is presented to you. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

You are the sole judges of the credibility of the witnesses. "Credibility" means only whether a witness is worthy of belief. You should consider each witness's means of knowledge, strength of memory, and opportunity to

observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it's been contradicted; the witness's biases, prejudice, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

You may believe everything a witness says or only part of it or none of it.

You're also going to hear some testimony from expert witnesses. When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field is someone that we often refer to as an expert witness, and that person is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witnesses, it is up to you to determine the credibility of an expert witness.

In weighing this opinion testimony, you may consider the expert witness's qualifications, the reasons for the expert's opinion, as well as all of the other considerations that you ordinarily apply when you're deciding whether or not to believe a witness's testimony.

You may give the opinion testimony whatever weight, if any, you find it deserves in light of all the evidence in this case. You are free to accept or reject the

testimony of experts just as with any other witness.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing by having what we call a bench conference, which is also sometimes called a sidebar. If that happens, be patient. We are not trying to keep important information from you.

These conferences are necessary for me to fulfill my responsibility to make sure that evidence is presented to you correctly under the law.

And we will, of course, do what we can to keep the number and length of these conferences to a minimum. If you would like to stand or stretch or walk around the jury box while we're at sidebar, you should feel free to do so.

And you should also feel free to do that when witnesses are being changed and nothing is really happening in between witnesses.

I may not always grant an attorney's request for a sidebar. Do not consider whether I grant or deny a request for a conference as any indication of my opinion of the case or what your verdict should be.

Now, a few words about your conduct as jurors.

First, until you've heard all the evidence and retired to the jury room to deliberate after closing arguments, you are not to discuss the case with anyone, not even amongst yourselves during the trial.

If any lawyer, party, or witness does not speak to you when you pass them in the hall, ride the elevator, or the like, remember it is not because they are being rude but because they are not supposed to talk with you or you with them. That is also one of the reasons why you're asked to wear your juror badge.

If anyone should try to talk to you about the case, including a fellow juror, bring it to my attention promptly. There are good reasons for this ban on discussions, the most important being the need for you to keep an open mind throughout the presentation of the evidence.

Second, do not read or listen to anything about this case that is not admitted into evidence. By that I mean if there is a newspaper article or an internet article or television or radio report related to the case, do not read the article or watch or listen to the report.

Third, do not try to do any research or investigate the case on your own. I'm going to elaborate.

During the course of the trial, you must not conduct any independent research about the case, the matters in the case, the technology involved in the case, or the individuals or entities involved in the case.

In other words, do not consult dictionaries or reference materials in print, electronic, or other format or

search websites or blogs on the internet. It is important that you decide this case solely on the evidence presented in the courtroom. Please do not try to find out information from any other sources.

I know that many of you, probably all of you, use cell phones, tablets, e-mail, the internet, social media, and other technology or some combination of that to communicate.

You must not talk to anyone about this case or use these tools to communicate with anyone else about the case or share information about the case. That includes your family and friends.

You may not communicate with anyone about the case on your cell phone, smartphone, through e-mail, your tablet, text messaging, through any blog or website, through any internet chat room, or by way of any other social networking websites. You may not use any similar technology or social media to get or share information about this case even if I've not specifically mentioned them here.

Finally, you should not form any conclusion as to the parties' allegations until all the evidence is in. Keep on open mind until you start your deliberations at the end of the case. You will receive detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision.

The trial will -- I say now begin, but actually it will be after lunch, and it will proceed in the following manner: First, the attorneys for Allergan will make an opening statement to you. Next, an attorney for Revance will make an opening statement.

What is said in the opening statements is not evidence, but it's simply an outline to help you understand what each party expects to show.

After the attorneys have made their opening statements and each party is given an opportunity to present its evidence, plaintiff goes first because it has the burden of proof of damages. Allergan will present its witnesses and other evidence on the issue of damages, and counsel for Revance may cross-examine them.

Following Allergan's case, Revance may present its witnesses and other evidence on the issues of invalidity and damages. Counsel for Allergan may cross-examine witnesses for Revance. Then Allergan will present its witnesses on the issue of invalidity. Counsel for Revance may cross-examine witnesses for Allergan.

The evidence is often introduced piecemeal, meaning all the evidence relating to an issue may not be presented at one time but rather may be presented at different times during the trial. You are to wait until all the evidence comes in before you make any decision. In

other words, keep an open mind throughout the entire trial.

After all the evidence has been presented, I will instruct you on the law and the attorneys will present to you closing arguments to summarize and interpret the evidence in a way that is helpful to their client's position. As with opening statements, closings statements are not evidence. After closing statements are completed, you will retire to the jury room to deliberate on your verdict in this case.

We are going to take a lunch break. I believe lunch of some sort is waiting for you in the jury room. The following days we're going to break for lunch closer to 1:00 than 12:00. Basically, I'm breaking for lunch now because based on how long the attorneys told me their opening statements are going to take, we would have to break for lunch after the plaintiff's opening statement, and it's better to have them back to back.

So we're going to take a 45-minute lunch break. So we will resume at five minutes of 1:00 by this clock.

Can we take the jury out.

(The jury exited the courtroom.)

THE COURT: All right. Everyone can be seated. I have two questions. I just want to double-check. There is a Markman order in the juror notebook?

MR. DITTMANN: The claim construction that Your

Honor provided will be in the notebook.

THE COURT: All right. And only the ones that are still relevant; right?

MR. DITTMANN: Right. We won't include any terms that are not relevant.

THE COURT: Okay. The format in which you put them in the juror notebook -- when we come back, give me a piece of paper that has that format. I'd like to see how they look.

The second thing is at the pretrial conference, we were talking about what I would call the infringement stipulation. The parties said they would try to work it out. I haven't heard anything. Does that mean that you have such a stipulation?

MR. VARUGHESE: Your Honor, we've been negotiating. I think we might be at an impasse.

THE COURT: I'm going to need to tell them in my words if I don't have your words when we resume because they'll watch the video, and we're talking about infringement, and then I give the jury instructions, and all of a sudden, we're not talking about infringement. I'd rather be the first to tell them than have Mr. Dittmann tell them.

If you have a document that has your impasse in it, give it to my clerk and I will perhaps use that. But,

otherwise, I'm going to start off by telling them before the opening statement. Okay?

MR. VARUGHESE: Yes, Your Honor.

MR. DITTMANN: Yes, Your Honor. And, Your Honor, we had responded. We hadn't heard back. So at this point, I think it's going to be something very consistent with what we explained about infringement offense and liability.

THE COURT: If you've got words you have jointly agreed on me using, I prefer to do that. Otherwise, I will do my best based on --

MR. VARUGHESE: Your Honor, Revance is more than happy to defer to Your Honor.

THE COURT: I'm sorry?

MR. VARUGHESE: We're happy to defer to Your Honor.

THE COURT: Mr. Dittmann, if you have something that you think is close to something you all agree on, please give it to my deputy clerk.

We'll be in recess until five to 1:00.

Actually, I have one other thing. Earlier when we were talking about damages and the book of wisdom and the disputed slide, there's a case, *Aqua Shield versus Interpool*, which is at 774 F.3d 766. It's a Federal Circuit case from 2014. I think that's consistent with what I was

saying this morning, but I would certainly give you each an opportunity to look at this and submit some letter before tomorrow morning if you want to do some additional research and sharpen up an issue for me.

All right. We'll be in recess.

(A luncheon recess was taken, after which the following proceedings were had:)

THE COURT: We're going to get the jury and let's get the jury.

Thank you for the construction of the claim terms. Looks fine to me. And I've got the -- what you want me to read the -- to the jury before we start the openings. Thank you for working that out.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone, you may be seated.

Members of the jury, there is something I wanted to explain to you, which is before we had the trial, before today, the parties made an agreement regarding infringement, essentially what we call a stipulation. And so it basically takes the issue of infringement out of the case for you, which is the reason why when I was giving the preliminary jury instructions, I was just talking about validity and damages.

Let me further elaborate. Revance does not

contest that DAXXIFY's current drug substance or drug product satisfy all the limitations of the three patent claims asserted by Allergan, Inc. As a result, you do not need to consider the issue of infringement in this case, separate and apart from your consideration of whether the asserted patent claims may be invalid, because if you find the asserted patent claims are valid, Revance cannot be held liable for infringement.

I guess I would just add if you find that Revance has not proved the asserted patent claims are invalid, then Revance will be liable for infringement. All right?

I wanted to tell you that before the attorneys start talking to you because it is an agreement between the parties. So it's best presented, at least in this instance, by me rather than by them. There may be some other agreements as we go on and that may be presented by one or the other party, but it will be identified as an agreement or stipulation. When there is such a thing, you should take it as being established.

All right. Mr. Dittmann, I recognize you for an opening statement.

MR. DITTMANN: Thank you, Your Honor.

Good afternoon. The past 30 years, my client, Allergan, has been the leading researcher and innovator of

botulinum drug products. This includes this pioneering BOTOX product, which many of you may know is used as a treatment for facial wrinkles.

But BOTOX actually got its start in the late 1980s as a use for cross eyes, and then there was an "a-ha" moment. When the BOTOX was administered to treat the eye problems, wrinkles were reduced. This "a-ha" moment sparked a revolution in botulinum toxin research and decades of development work by Allergan, Inc., and its subsidiaries.

Through those efforts, BOTOX has become a go-to treatment not just for wrinkles, but for a host of significant medical conditions ranging from chronic migraines to severe muscle spasms. And in the process, Allergan scientists have also come up with innovative ways to make new and improved botulinum toxin products. Allergan and its scientists are extremely proud of their hard work and accomplishments. And Allergan has been, and remains, a pioneer in the toxin field.

As a result of its hard work and investment, Allergan has received many patents protecting its innovations in this research field. And this includes three patents protecting some of its most important innovations, each of which is at issue in this case.

This case is about protecting Allergan's years of hard work, investment, and innovations and holding

Revance accountable for its decision to bring to market a drug called DAXXIFY using Allergan's patented inventions without permission from Allergan and without paying Allergan.

Now, I want to be very clear about something right upfront so that there is no doubt in your minds as you listen to the evidence in this case. As you just heard, Revance admits that it uses all three of Allergan's patented inventions to make its DAXXIFY product. You will not hear Revance dispute this at any time during the trial this week.

And even though Revance has so far made more than $270 million in DAXXIFY sales, it has refused so far to pay for that undisputed use of Allergan's patents. In fact, it has refused a pay a single cent since it launched DAXXIFY in 2022 using those Allergan inventions, not a penny. That's not right and that's why Allergan brought this lawsuit.

Allergan is asking you to protect its inventions and the hard work, dedication, and sacrifice by its scientists to hold Revance responsible by having them finally pay a fair and reasonable amount for its undisputed use of Allergan's inventions.

Before we go any further, I want to introduce our team. My name is Eric Dittman. And with me is Isaac Ashkenazi, Melanie Rupert, Carl Minniti, Jeremy Tigan, and a

number of other team members, and we're very proud to be here to represent the plaintiff in this case, Allergan, Inc. And for convenience, I'll refer to Allergan, Inc., and its various subsidiaries and related entities collectively as Allergan.

And also with us today is Dr. Ron Broide, a leading scientist who works for Allergan Aesthetics. You'll hear from Dr. Broide later today.

I want to thank you in advance for your service on the jury in this case. I recognize we're imposing on your time, taking you away from responsibilities and your families, but the work you're going to do here is very important and, frankly, it's what makes the American judicial system great. So Allergan and I want to sincerely thank you at the outset.

So let's start by talking about the Allergan inventions at issue. As I mentioned, these patented inventions deal with ways of making drug products containing what's called botulinum toxins. So what are botulinum toxins? They are the most dangerous molecules on the face of the earth. We see one depicted on the right side of the screen here.

And these toxins are produced by certain bacteria, which we see directly to the left of the toxin. Now, working with these toxins is about the most dangerous

and difficult thing you can do in the pharmaceutical industry. Why? Because the botulinum molecule can cause significant temporary paralysis or even death.

You'll hear from one of the patent inventors that even if minuscule amounts of botulinum toxin ever made it out of the laboratory, it would be enough to wipe out the entire state of California. So dangerous, in fact, that the inventors in this case you'll hear from had to navigate strict national security concerns and even deal directly with the FBI to ensure their projects were safe.

So you may be wondering with these botulinum toxins being so incredibly dangerous, how is it that we're able to use them in patients as a drug?

In the 1980s, a scientist named Dr. Alan Scott realized that the paralysis-causing effects of this dangerous molecule can actually be used to help people in positive ways, to treat patients. Not many believed in him or his work, and that was precisely, again, because this toxin is so incredibly dangerous.

So Dr. Scott's research led him to create a company. And in 1989, a product called -- at the time that was called Oculinum was approved to treat crossed eyes. How did it work? Basically, the toxin paralyzed the eye muscles that were causing the patient's eyes to point in different directions.

So Dr. Scott had this great initial idea. He had determined through small-scale clinical studies that this highly dangerous molecule could be used to help people.

It's important to keep in mind that this is just the first chapter in the story about botulinum toxins and products like BOTOX.

Dr. Scott was a medical doctor. He didn't have the capability himself to manufacture botulinum toxins or put them in drug products that could be used with patients. And in fact, he received his batches of drug for these small studies directly from the U.S. military.

So Dr. Scott needed help pushing forward his crazy idea of using the world's most dangerous drug substance, in fact, the most dangerous substance in the world, period, as a drug therapy. And this is where Allergan comes into the picture.

At this time in the late 1980s and 1990s, Allergan was a smaller, emerging company that was focused on eye care. When Dr. Scott was looking for a drug company to partner with to help him pursue his ideas, Allergan was willing to take a shot that most other companies thought was outrageous.

When everyone else in the world was telling Dr. Scott no, Allergan was the one who believed in him and his idea. And it was Allergan who had the confidence in its

own abilities to bring a drug product like this to new heights.

So Allergan and Dr. Scott, they worked out a deal in the early 1990s and the product Oculinum was renamed BOTOX, a name some of you may have heard. This is the way it should have been done. Allergan asked permission to use Dr. Scott's ideas and they compensated Dr. Scott for those ideas.

But this is just the beginning of the Allergan story. Since it became involved in the early 1990s, Allergan has continued to research and invest in botulinum technologies with tireless efforts of its scientists over the last three decades has led to discovery of many safe and effective uses of that drug, as well as, as we'll hear about, new and innovative ways to make botulinum toxin drug products.

As I mentioned earlier, the cosmetic use for BOTOX is treating facial wrinkles. Allergan was the first company to get approval for that use in 2002. So that approval wasn't obtained for roughly ten years after Allergan started work in the botulinum toxin field.

Why did it take so long? Well, Allergan was trying to harness the world's most dangerous substance, and there was a lot of scrutiny involved in that process.

The FDA was extremely skeptical that such a

dangerous substance could be used safely in a large number of patients across the country. So Allergan needed to perform many clinical studies and provide a lot of information to satisfy the FDA.

Now, again, BOTOX is certainly recognized pretty broadly for being able to be used to treat wrinkles. But what's not as widely known is that BOTOX can be used to treat a very large number of significant medical conditions.

Allergan made a commitment early on to go beyond cosmetics and research as many medical treatments as possible. This includes treatment for chronic migraines, painful neck and back conditions, and stomach issues.

If you've seen ads for BOTOX on TV, you might typically see chronic migraines be referenced. And I'm sure we all know someone who is suffering from debilitating headaches. BOTOX is an important tool for doctors to use for that condition.

When you look at the screen, before BOTOX was approved to treat each and every one of these medical conditions, the FDA required detailed scientific proof that it was safe and effective for each particular treatment. So the approval of every single one of these medical treatments you see on the screen required a great deal of time, investment, and hard work from Allergan and the scientists.

Allergan did that hard work. As a result, BOTOX

is now approved for ten different medical treatments even after it received its approval to treat wrinkles in 2002. Allergan is not done yet. Its research and development efforts continue to this day.

Now, Allergan's continued focus on research and development has resulted in numerous patents. For example, these innovative medical treatments we see on the screen resulted in a number of patents.

But I want to focus now on the specific inventions at issue in this case that you're going to hear about throughout this week. This lawsuit involves three of Allergan's patents which issued from the applications you see depicted on the screen that were filed back in 2000s. And these are separate from the medical use patents that I just mentioned.

The inventions in the patents-at-issue in this case cover new and different ways to make botulinum toxin drug products. They involve a new recipe for such a drug product and new methods for manufacturing it in ways that do not require animal products.

When Dr. Scott and Allergan were working on BOTOX in the late '80s and early '90s, the technology at that time used animal proteins. Specifically, an ingredient similar to cow's milk was used to grow the toxin as part of the manufacturing process. And at that time, even cooked

meat was used to help grow the toxin.

And once you've made the toxin and you put it into a vial so that it could be used to inject into a patient, a substance called albumin, which is another animal protein, was used to keep the toxin stable in the vial. In other words, it was preventing the toxin from breaking apart and degrading while it was getting ready to be used in patients.

Now, the BOTOX that Allergan sells today, that is -- which has been approved as safe and effective for multiple treatments -- is still made using animal proteins. Now, you might wonder, Why would Allergan go through the trouble of coming up with new processes for making botulinum toxin drug products without animal proteins if it has a safe and effective way to do it today?

Allergan is always looking to push the envelope and coming up with new ways to do things and hopefully provide better results. And in this case, the belief was that removing the need for animal products could provide certain benefits, for example, better and more reliable ingredients that could be sourced and reducing costs.

And as the years and the hard work went on, Allergan's efforts paid off. The scientists figured out a new way to make botulinum toxin drug products without the need for animal products.

And in doing so, they came up with a new recipe that works in the body even longer than BOTOX. You're going to hear about the significant benefit a lot during this trial. And I'll come back to it later.

And so patent applications were filed in the 2000s on these inventions, and these are the Allergan inventions that are at issue in this lawsuit. And these animal-free inventions are what Revance uses to make its DAXXIFY product. And it's been doing this without Allergan's permission and without paying Allergan.

Allergan's groundbreaking work was so new and inventive that the United States Patent and Trademark Office granted Allergan three separate patents for these valuable indications. These are the three patents that are going to be talked about and mentioned in this case.

And I'll start by talking about the drug product recipe patent. And to do that, I want to first briefly introduce the inventor of this particular patent. This is Terrence Hunt. He invented the drug product recipe.

Now, Mr. Hunt is not your typical scientist. Instead, he's a bit of a maverick and the type of scientist who's not afraid to speak his mind. His background is very impressive.

He took on AIDS in the 1980s and then eventually turned his focus to dealing with botulinum toxin drug

products. He's an iron worker turned scientist who grew up nearby in South Philly, and I think you'll enjoy hearing his testimony.

Mr. Hunt will show you documents and explain exactly what happened in the years that lead up to his invention. And you'll see that Mr. Hunt performed literally thousands of experiments in connection with his invention. And he succeeded in making a botulinum drug product that did not use animal proteins or any other proteins to achieve stability.

Mr. Hunt's work led to one of the patents at the center of this case which we'll refer to as the '878 patent. We do that because the last three digits of the patent numbers is how we refer to it in short.

As you will learn, this patent covers the formulation or recipe of ingredients of a specific botulinum toxin drug product that can be freeze-dried into a powder and then turned back into a liquid so it could be used in patients.

So this '878 drug recipe patent covers the specific ingredients that go into the drug product recipe to provide what's referred to, again, as stability. And stability, again, just means that the toxin, when it's sitting in the vial, doesn't break apart, doesn't degrade, so it can be used in a patient.

And this can happen, for example, when botulinum molecules, they can stick together, or they can stick to the side of a glass vial while it's being weighted to be used with a patient.

Now, the original way to stabilize the botulinum toxin molecule was to use an animal ingredient I referred to earlier, albumin. BOTOX and a number of other products on the market today use albumin. But Mr. Hunt, working with other Allergen scientists, they came up with a way to avoid needing to use any animal ingredients like albumin.

So as you'll see, this '878 patent covers a new botulinum toxin drug product recipe that requires only two ingredients and no proteins. One is called the surfactant and the other is called a disaccharide. This is a special combination that you're going to hear about throughout this trial.

In addition to providing stability, the recipe for Mr. Hunt's '878 patent allows the drug to have a longer duration of action in the patient's body. Duration, this is just another way of saying, How long does the drug last once it's been administered to the patient?

So, for example, the therapeutic effects of the drug last for six months instead of just being -- working for three months. And you'll learn that this Allergan-patented recipe provides the surprising benefit of

longer duration.

Now, the second inventor you're going to hear from is Ronald Bates. Like Terrence Hunt, he's a former Allergan scientist, and he's coming here to talk about his prior work while at Allergan. He and his colleagues worked in very risky conditions day in, day out to develop a new process for making the botulinum toxin itself.

And as you'll hear more about in this case, Dr. Bates and other Allergan scientists, they were the first to develop innovative methods for making botulinum toxins without using animal proteins, just like Mr. Hunt's drug product recipe. And they accomplished this by using a technique known as chromatography, which you'll learn a lot about throughout this case.

Before Allergan's efforts, chromatography had not been used in the way it was pioneered by Allergan scientists to produce animal-free botulinum toxin. And in doing so, these scientists also figured out how to make extremely pure versions of botulinum toxins that remove a lot of the unwanted contaminants that can be present when the toxin is produced. We may refer to these unwanted contaminants as gunk.

It was this hard work of Dr. Bates, along with other Allergen scientists, that led to the other two patents-at-issue in this case. The first of these patents

is referred to as the '740 patent.

And as you'll hear, this covers Allergan's pioneering method of creating animal-free botulinum toxins using the chromatography technique that I just mentioned.

The other patent you see on the right is called the '748 patent. This covers the unique method of creating extremely pure botulinum toxin using a very specific sequence of chromatography steps. So this second patent is built on and made even better Allergan's first '740 patent.

As I said before, there's no dispute that Revance uses each of the three patents-at-issue in the case that I just talked about. So the only thing you'll need to decide for purposes of the patents is whether they are valid, meaning whether they were granted properly in the first place.

Like all U.S. patents, Allergan's patents were granted by the U.S. Patent and Trademark Office. And this happened only after the experts at the Patent Office rigorously evaluated the inventions claimed in these patent applications. And this happened for a long period of time.

Now, the Patent Office examiners had advanced scientific training in the relevant field. And in reviewing Allergan's patent applications, the Patent Office assessed them against what's called the prior art to determine if they really were covering new inventions.

"Prior art" is simply a term that's used to refer to what was publicly known at the time the invention was made. For example, earlier publications or earlier patents. And the Patent Office specifically considered prior art to determine whether or not what Allergan was claiming as inventions were truly new, useful, and not obvious.

And for each of these three patents, and on three separate occasions, the trained examiners at the Patent Office determined that Allergan's methods and drug product recipes were truly innovations and were deserving of patent protection. So the Patent Office decided to grant Allergan and its scientists all three of the patents we see on the screen.

Under our country's laws, for a period of 20 years from patent filing, no one can use Allergan's inventions without Allergan's permission and without paying Allergan. This is designed to compensate for everything that has to go into a patent, which requires a lot of work and effort.

And after that 20 years is up, anyone is free to use that technology in the patent for free, but not beforehand. And here, the last of Allergan's patents will expire in 2029, about four years from now.

Given the importance of patents to our economy

and promoting innovation in America, the United States patent laws make something very clear. If someone uses Allergan's patents without permission before they expire, they are required to fairly compensate Allergan for that use. That's not just basic fairness. That's the law.

Let's now talk about Revance, the defendant in this case. As you will learn, Revance launched a product called DAXXIFY back in 2022, a few years ago. As I explained, Revance admits that its manufacturing process that it uses to make DAXXIFY, it uses the '740 and '748 manufacturing method. Revance also admits that its DAXXIFY product, the ingredients it used in that product, also uses Mr. Hunt's drug product recipe patent, the '878 patent.

So over the last few years, Revance has sold more than $270 million worth of DAXXIFY products, all of which Revance admits uses Allergan's inventions. Revance did that from building off the back of Allergan's foundational technology. Without Allergan's foundational manufacturing and drug product recipe technology, there would be no DAXXIFY.

Revance went even further. It used Allergan's patented technologies to go after Allergan's BOTOX market. For example, you'll see on the right side of the slide Revance launched a marketing campaign called Break Up With BOTOX. This is an actual Revance advertisement. This isn't

a graphic. This is a Revance advertisement. They have expressly targeted our BOTOX product.

Let me say this right upfront. Allergan is not afraid of competition. It's competed for years with a lot of companies. You'll see evidence in this trial there are other products on the market, including one called Dysport. Over the years, Allergan has competed with Dysport and other products, yet Allergan remains the leader in the field. And it has done so by competing on the merits of its BOTOX product.

Revance may try to suggest Allergan brought this lawsuit because it's afraid of competition or that it wants Revance's DAXXIFY product off the market. As you will learn, that's not true at all. Allergan is not asking for Revance to take DAXXIFY off the market. It's simply asking for fair and reasonable compensation for its undisputed use of Allergan's patents.

Having to compete against Allergan's own technology that it developed and it paid for and it worked on is just simply not fair. Revance has profited very handsomely as a result of using Allergan's patented technology without permission, yet you'll learn that even since being sued by Allergan a few years ago, Revance has refused to pay a dime for its use of those patents. The only way to make this right is for Revance to pay a fair and

reasonable amount of compensation, period.

Under the laws of our country, when a company uses someone else's patent or inventions, they have to pay for that use. They can't just take and use inventions because they want to. All Allergan is asking for in this trial is for Revance to comply with the law, pay a fair and reasonable amount for its undisputed use of Allergan's inventions. So we're asking you, the jury, to hold Revance responsible and accountable for its choices, plain and simple.

Now, instead of taking responsibility, you're going to hear from Revance a lot of excuses. Revance will say that you should ignore the fact that they're using Allergan's patents without permission because the United States Patent Office somehow got it wrong in granting these three patents-at-issue. According to Revance, the Patent Office made three separate mistakes on three separate occasions. It says that the inventions in each and every one of the three Allergan patents would have supposedly been obvious to someone who was working in the field at the time of the inventions.

Let me be clear about something which is important. Revance will not try and tell you that anyone actually publicly disclosed the exact recipe that was developed by Mr. Hunt or the exact methods that were

developed by Dr. Bates and his colleagues before they did their work. Instead, Revance will argue if you went back 15 or 20 years ago to when those inventions were made and took away all the knowledge we have today, it would have been somehow obvious to do what Allergan's inventors did even though no one did publicly disclose the inventions that you're going to hear about in these patents.

To make this argument, Revance is going to focus on a few specific prior art publications. One we'll hear about is a publication that's named Hunt 598. If the name Hunt sounds familiar, that's because this is referring to the same Terrence Hunt who's an inventor of the drug recipe patent. This is the iron worker turned scientist-inventor of the '878 patent.

So Revance is going to actually use one of Mr. Hunt's own publications in an attempt to prove his later patent somehow should be taken away from him. Revance is going to say that Mr. Hunt's '878 patent invention was somehow obvious from his own prior work. They'll basically argue that Mr. Hunt was wasting his time performing thousands of experiments because his invention was really obvious from what he did previously.

Mr. Hunt is going to be here himself and he's going to explain why these two projects were very, very different and that took opposite approaches. For example,

he'll explain his Hunt 598 publication was focused on using these larger protein ingredients, while the '878 drug recipe patent-at-issue in this case, it avoids the need for larger ingredients and, in fact, it does better without them. He figured out a way to make stable product that provides a longer duration of action.

You don't need to take just Mr. Hunt's word for it. The Patent Office and the experts at the Patent Office, they came to the exact same conclusion. The Patent Office expressly considered this Hunt 598 publication that Revance is going to focus on. They looked at the same reference and came to the determination that Mr. Hunt's work in the '878 patent was truly unique and different and, therefore, deserves patent protection.

In fact, nearly all Revance's publications that it is going to use to challenge the three patents in this case, virtually all of them were considered by the Patent Office. And you'll see the Patent Office certainly looked at all the relevant ones that mattered and had before it all the relevant information they're going to tell you about.

In other words, looking at the exact same information that Revance will show you, the experts at the Patent Office determined that there were valid inventions that should be protected by patents. This is why the Patent Office granted Allergan not one, not two, but three

different patents at three different times.

Revance and their experts will talk about those publications, including ones already considered by the Patent Office, that discuss various pieces of botulinum toxin research. They're going to claim that because different pieces were known, you could have somehow put them together in a way that could have led you to arrive at the inventions in this case, and it would have been obvious to do so.

Revance has no choice but to try to reconstruct things that way to put pieces together because, again, it's undisputed that before the work done by Mr. Hunt, Dr. Bates, and their colleagues, no one actually disclosed Allergan's inventive recipes and manufacturing methods. You'll see that.

Of course, Revance is highly motivated to tell you today, 15 to 20 years after Allergan's inventions, that those inventions were somehow obvious back in the relevant time period. That's because the only way they can get away with using Allergan's inventions without paying is to try and convince you that the Patent Office got it wrong three separate times.

Now, pieces of Allergan's inventions were known. We don't dispute that. That should come as no surprise because most inventions are made up of pieces that

individually may have been known, but it's about how you put it together to come up with something new and inventive. And as you'll see, none of Revance's publications put the pieces together in a way to show the invention that Allergan scientists came up with. Allergan scientists did that first.

In fact, each of these publications has important differences from what was on the Allergan patents, differences that Revance hopes you'll miss or ignore, but the Patent Office didn't miss any of these differences. And these differences are critical because, as you'll learn, even small differences in laboratory conditions or approaches can make all the difference in the world when you're talking about a product as sensitive as botulinum toxin.

Allergan figured out, through its scientists, how to put the pieces together in ways that Revance's publications never figured out or even suggested. And that's exactly why the Patent Office concluded, after considering the same information provided by Revance, the Patent Office experts determined that Allergan's patents were valid and inventive.

So later this week, you're also going to hear from some experts brought in by Allergan in this case who are going to respond to Revance's validity challenges. The

first you'll hear from is Dr. Christian Schöneich. He's a leading academic in the field of pharmaceutical drug product development, and he'll explain there's no reason to second-guess the Patent Office and their decision to grant the drug product recipe patent.

Second, you'll hear from Dr. Frank Gessler. He's one of the foremost scientists in the field of manufacturing botulinum toxins.

Now, we were actually just talking about these publications that Revance is going to raise and show you to try to attack the validity of these patents. But when it comes to the manufacturing patents, one of their key publications is by Dr. Gessler himself. Dr. Gessler is going to explain to you why Revance is flat-out wrong about his publication too.

Now, there's something very important to keep in mind when you're considering Revance's arguments that the Patent Office made a mistake in granting Allergan's patents and that the inventions in these patents were somehow invalid. Under the law, Revance needs to prove this to you by clear and convincing evidence. This is because patents are presumed valid.

The judge already gave you some idea of what this clear and convincing evidence standard means. You'll see that Revance cannot come close to providing clear and

convincing evidence that the Patent Office got it wrong three different times. And, again, I want to emphasize this. It's particularly because the Patent Office considered the same information that they're going to show you to try and say the patents are invalid. They certainly can't prove by clear and convincing evidence that the Patent Office got it wrong three different times.

Another excuse you'll hear from Revance is that because Allergan is not currently marketing an animal-free drug on the market, it's okay for Revance to use Allergan's animal-free inventions. The suggestion is if Allergan is not using its animal-free inventions, then maybe Revance should be able to use it for free.

As I told you earlier, Allergan is using its inventions. Allergan is working hard to bring an animal-free drug product to market. And you'll hear about this from Allergan scientist Dr. Broide. He's sitting right over there and you're going to hear from him in about an hour or so.

Dr. Broide will explain that Allergan right now is seeking approval for next-generation animal-free botulinum toxin drug products having a longer duration of action in the body. And these products are built on and use Allergan's inventive work at issue in this case. The company has invested a significant amount of time and effort

developing these products.

Now, Dr. Broide will explain that this product has taken a bit longer than Allergan might have otherwise liked to get this animal-free product to market, but that's because, as we discussed earlier, very early on, Allergan prioritized bringing these new medical treatments of BOTOX to market.

Now, as we saw earlier, Allergan's efforts and focus paid off. There have been nine medical treatments following its approval to treat wrinkles in 2002. These treatments would have come much later, if at all, had Allergan jumped immediately into commercializing these animal-free inventions.

So Allergen's decision to focus on new medical treatments has benefited millions of patients. And while not the initial focus, as we see on the slide, Allergan has been working on its animal-free botulinum toxin drug product at the same time as its medical use work.

But let me be clear. Even if Allergan decided to never use its animal-free technology, it's still Allergan's property until the last of its patents expire in 2029. Allergan's scientists did the work, not Revance. Allergan paid for the work that led to these discoveries, not Revance. It's Allergan's property, and Revance can't just take and use it without Allergan's permission or

paying.

Another excuse you'll hear from Revance is that they added what's called a peptide to their DAXXIFY formulation. And I expect that we'll hear a lot from Revance's attorneys about this peptide. But adding something to Allergan's foundational technology does not change the fact that Revance is still using Allergan's technology.

And you'll see that without Allergan's foundational technology, without its manufacturing methods and drug product recipe, the peptide that Revance added to DAXXIFY means nothing. DAXXIFY exists because of Allergan's foundational technology.

And it's important to think about and keep in mind that Revance has not stopped using Allergan's foundational technology even after it got sued.

If the peptide were enough by itself and Revance didn't need Allergan's inventive technology, Revance could have made a change a long time ago. Why after all these years is Revance still using Allergan's patented technology? The answer is simple. It's important foundational technology.

And keep in mind that Revance had a lot of other choices. There are many things it could have done other than using Allergan's patented technologies to make DAXXIFY.

Revance was free to make a product like BOTOX, a product that the medical community trusts.

And the patents covering how to make BOTOX, they expired a while ago. Botox was and still is a great product. And as I explained earlier, the reward that Allergan earned for inventing this new technology is 20 years of patent protection. Not forever.

After patents expire, anyone is free to use that technology. And using the BOTOX technology is exactly what other competitors in the market have done, but not Revance.

Revance also could have come up with something truly new and different rather than using Allergan's foundational work, but it didn't do that either. Instead, it decided to use Allergan's foundational technology contained in the three patents-at-issue in this case.

While this doesn't change the fact that it's still using Allergan's patents, Revance would also like to claim that its peptide is responsible for DAXXIFY's longer duration of action in patients and that this is what it provides supposedly in the markets, the product's value in the market.

Allergan disagrees and Dr. Broide will explain to you why this is not true. He and his colleagues performed an experiment specifically designed to answer the question of whether the peptide contributes anything to

DAXXIFY's longer duration. And the results you'll see definitively show it does not.

In fact, as you'll see during the course of this trial, this is precisely what Revance told the FDA when seeking approval for its DAXXIFY product. Let me make this clear because it's very important. I want to pause this for a moment.

You'll see that Revance represented in filings made to the FDA that its peptide doesn't have any therapeutic effect at all, much less longer duration of action. In fact, as you will hear, the drug's longer duration of action is due to the special combination, the recipe, of the '878 patent. Namely, the special combination of a disaccharide and a surfactant.

And this is another benefit that Revance has enjoyed by using Allergan's patented technologies.

In short, the only way Revance can get off the hook for infringing Allergan's patents is to prove to you that those patents are invalid. It's a high hurdle for Revance to clear and we're going to show you they can't do it.

So with that, I'm going to turn briefly to the damages, the financial side of the case. And as you'll see, the question here is, What would be adequate to compensate Allergan for Revance's use of the three patents-at-issue?

One thing that's not in dispute is that since 2022, when Revance launched DAXXIFY using Allergan's patented inventions, Revance has made $273 million in product sales. Revance continues to make money selling DAXXIFY using Allergan's patents every single day that goes by.

Allergan is going to ask you to determine what Revance should pay as fair and reasonable compensation for its undisputed use of Allergan's patents. Specifically, we'll ask you to award a reasonable royalty. We'll get into the specifics later, but we'll ask you for a royalty for each patent.

And that royalty would only apply for as long as that patent is in force. After each patent has expired, no royalty will be owed for that patent and, overall, the royalty will be reduced. But the royalties for the remaining patents will continue until each of them expires. And once the last patent expires four years from now in 2029, no royalty at all will be owed.

So taking a step back and looking at this diagram as a whole, which we'll talk about in some detail, when both manufacturing patents are in force, the royalty is as high as 20 percent. And then it drops down to 17.5 percent when only the second manufacturing process patent is in force between 2023 and 2029. And then the drug

product rescue patent, that's 24 percent through 2026.

Now, to be clear, Allergan would be more than justified in asking for a royalty for the percentages that we see laid out on the screen. But the bottom line is we'll ask for a very conservative and fair royalty of 15 percent for the manufacturing patents and 24 percent for the drug recipe patent.

So Revance would be keeping the majority of its product sales. And all of this will be explained in detail by two other experts that Allergan has brought into this case. The first is Dr. Christine Siegwarth, who is a renowned economist. And the other is Dr. Daniela Drago, who is an expert in FDA regulations. They'll provide their opinions about what would be fair compensation to Allergan in this case.

Ladies and gentlemen, over the next few days, you'll see that the Patent Office correctly recognized Allergan's inventions by granting three separate U.S. patents. In doing so, the Patent Office looked carefully at the same information that Revance is going to show you throughout this week.

Now, Revance's counsel may get up here in a moment and try and suggest that something new was presented on this issue. But the evidence will show that the Patent Office had all of the relevant information when it granted

the patents to Allergan that are at issue in this case on three separate occasions.

Revance just went ahead and used these inventions without getting Allergan's permission and without paying Allergan a cent. Revance must now be held accountable for its actions, plain and simple.

Thank you very much for your time and attention.

THE COURT: Thank you, Mr. Dittmann.

Mr. Varughese.

MR. VARUGHESE: Your Honor, may I ask for a brief sidebar.

THE COURT: All right.

(Thereupon, a discussion was held at sidebar.)

THE COURT: All right.

MR. PICKARD: Your Honor, I wanted to bring this issue with this slide. I just heard Mr. Dittmann, while this slide was up there, tell the jury that we are targeting their product and their customers, and I think that plainly puts in play the idea whether or not we are marketing our product.

THE COURT: I don't think so.

MR. DITTMANN: They had that slide previously.

THE COURT: All right. Charge this time to the defendant.

(The discussion at sidebar ended.)

MR. VARUGHESE: Your Honor, may I approach?

THE COURT: Yes.

MR. VARUGHESE: May I proceed?

THE COURT: Yes.

MR. VARUGHESE: Good afternoon, everyone. My name is Dennies Varughese and I represent Revance, and it's my honor.

Before I get started, I have a presentation that I prepared for you, but I thought I'd spend just a few minutes providing some context on our client and Allergan.

We've all heard there's two sides to every story. And you just heard 35 minutes of their side, and it's now my turn to offer you a different perspective.

Let me start by saying, members of the jury, in this case, Allergan is accusing my client, Revance, of something very serious. In essence, they're accusing us of theft, taking something that didn't belong to it and refusing to pay for it.

We take those allegations very seriously. That's why we're standing here before you to defend Revance's reputation. Revance -- and I'm going to share more with you -- is an innovative biotechnology company focused on developing therapeutic and aesthetic products. What Revance does not do is steal other people's intellectual property.

Now, before I go any further, let me make clear the evidence will show you in this case that these three Allergan patents are invalid. The things described in those patents are old, well-known, and obvious.

Now, my esteemed colleague on the other side of the aisle, Mr. Dittmann, downplayed the obvious, shrugged and said obvious. That is the law. You can't just patent stuff that was in the prior art, cobble them together, and call it an invention just because it was never combined together.

If it was obvious to a person of ordinary skill in the art -- I'm going to get into that, and of course you'll hear more from the Judge and the expert scientists this week -- you're not supposed to get a patent. Good patents, I agree, promote the economy. Bad patents stifle the economy.

In short, nothing in those patents were deserving of a United States patent and should never have issued. And that's what invalidity means.

Let me take a moment to explain a few other things because you have a lot coming at you. You've heard about BOTOX, DAXXIFY, these patents, and you might not be familiar with all that stuff. So allow me to provide some context that's important.

First, and this is an undisputed fact, these

patents have nothing to do with BOTOX. They won't dispute that and you'll hear that this week. They talked a lot about BOTOX and what happened in 1989 and before that. These three patents have nothing to do with BOTOX at all.

Second, what these patents do supposedly deal with were these alleged improvements to BOTOX that Mr. Dittmann was talking about. But Allergan to date still has not come out with a product that's an improved BOTOX or that practices these patents.

I'm not here to criticize Allergan or its BOTOX product. What I am here to do is explain why Revance does not owe Allergan any money.

Now, Mr. Dittmann showed you these percentages: 24 percent, 17 and a half, 12 and a half. What he didn't tell you is how much money they were asking for. The last time we heard from them they wanted $140 million out of the 270 that he showed you.

Now, I don't know why he didn't tell you the number. He threw up the rates, percentages in a vacuum. He said we made $270 million since we first started selling this thing three years ago, and Allergan thinks it's reasonable to ask for -- chop off half of it as a royalty? And that's not even taking into account our expenses. That's just from the revenue.

You will hear from our economics experts, and

I'm going to introduce her to you in a bit, but she's going to tell you that's not reasonable.

Allergan in these patents, they claim to have all the answers to somehow improve BOTOX, to make an animal-protein-free, longer lasting botulinum toxin. But our evidence is going to show you that's not true. How do you know? Because they've not done so.

Allergan had, admittedly, close to a 35-year head start, starting in 1989 when BOTOX was first improved. They never improved it to this day. They've never made it longer lasting like Revance's product, which I'm going to discuss with you.

If Allergan had all the answers and invented this great idea, why haven't we seen it? The answer, as the evidence will show you, is that they didn't have answers. They didn't know how to do it, and they didn't invent anything new with these patents that they're asserting in this case.

Revance did have the answers and created its newer, longer-lasting DAXXIFY product, which is a botulinum toxin. DAXXIFY is longer-lasting than BOTOX. But that advantage has nothing to do with these patents.

Mr. Dittmann said they did. What I challenge Allergan to show you in this case is one mention of longer duration of action in any one of those three patents. Those

patents are long. Not a single mention about longer duration of action in those patents.

This lawsuit is extremely concerning to hardworking scientists and employees of Revance. In fact, I'm going to ask Ms. Shellie Hammock to stand up. She's in the courtroom. Ms. Hammock is the company representative of Revance. She joins us from Nashville, Tennessee. And she's here to represent those hardworking men and women at Revance that make Revance such a great company.

At the end of this trial, members of the jury, I'm going to ask you to find these patents invalid and send Allergan away with no damages.

Now, you might be thinking to yourself, and this is a tall ask, asking you as a juror to invalidate a patent. After all, you might not be familiar with these products, these patents, or the science involved here. But that's okay. Let me assure you that what we're asking you to do is a normal part of the U.S. legal system.

As Mr. Dittmann said, I agree, we have the best legal system in the world. And this is how we do things here. Jurors just like you all across our country every day decide these kinds of issues.

Challenging the validity of a patent is a crucial part of this legal system, just as enforcing valid patents. The question of invalidity of Allergan's patents

isn't something that we conjured up out of thin air to get a lawsuit. Here's why. When patent owners like Allergan get patents from a patent examiner, that's just a two-way conversation between the two of them. Third parties like Revance, who may later become accused of infringement, have no say. So, of course, we have to come to court and stand in front of jurors like you to vindicate our rights.

Obviousness is a legitimate defense to infringement. It's not some thin thing as my colleague over there, I think, seemed to suggest. Invalidity is an important part of our process to ensure that bad patents aren't asserted against people and companies like Revance and to ensure the integrity of our legal system.

Members of the jury, I respectfully submit to you that the facts and evidence in this case will prove exactly what I said. But before I get into that evidence, allow me to introduce my team: Deirdre Wells, Byron Pickard, Adam Larock, Nirav Desai, Peter Armenio, Ann Gaza, and Samantha Wilson.

I'm going to cover three topics with you. First, I want to provide some more background on Revance and DAXXIFY and then I'm going to discuss with you the two issues that you're going to be asked to decide in this case: Are Allergan's patents invalid? Should Revance pay any damages?

Let me begin by telling you a little bit more about my client, Revance. As I mentioned, it's a biotechnology company focused on aesthetic therapeutic products. Revance, in my opinion, is a true American story, founded right outside of San Francisco in 2002 with four employees, and it's been growing and brought an amazing product to market. Revance developed, invented, and obtained FDA approval for DAXXIFY, the product that's at the heart of this case.

DAXXIFY is a new and improved BOTOX, and Revance did it and no one else ever has. DAXXIFY is Revance's flagship product. It's hugely important to Revance, and its development and approval was nearly 20 years in the making.

Can Dr. Ruegg stand up.

Dr. Curtis Ruegg you're going to hear from this week. Dr. Ruegg was the lead person responsible for inventing and developing DAXXIFY. He's going to proudly tell you his story, his journey at Revance, and the work he and his colleagues did that led to DAXXIFY. Dr. Ruegg is also going to tell you how he and his colleagues got their own patents for a much more recent technology for their groundbreaking work. They innovated and invented DAXXIFY. They didn't copy.

As you can see here, just like BOTOX, DAXXIFY is used to treat wrinkles on the face, but I do want to

highlight this for you. So you have the active ingredient, the neurotoxin. That's botulinum toxin. This case is not about botulinum toxin. None of these patents cover that. That's been in the world for a hundred years.

But Revance has this PXT. See that script? That's peptide exchange technology. So please remember that. That's going to be very important this week when you're hearing from the scientists. It's what sets DAXXIFY apart. They'll refer to it as the peptide or novel peptide or synthetic peptide.

A few points about this peptide. It's special and exclusive to Revance's DAXXIFY product. Revance has patents that cover it. It's particularly important in setting apart Revance from its competitors. Why is it so important? Well, you're going to see the evidence and hear from the scientists it is the reason why the active ingredient in DAXXIFY, which is a botulinum toxin, lasts longer.

You heard Mr. Dittmann suggest that Revance somehow said contrary to the FDA when we called that an inactive ingredient. Yes, it's an inactive ingredient. Botulinum toxin is the active ingredient. We've all heard of Tylenol ER. Tylenol ER has one active ingredient. But just because the other ingredient is inactive doesn't mean they're not important. How does Tylenol becomes extended

release, ER? With inactive ingredients.

Yes, this peptide doesn't treat wrinkles, but it does help the thing that treats wrinkles last in the body longer, and that's what we're saying, and there's nothing inconsistent about what I'm saying to you and what we said to the FDA.

In addition to treating wrinkles, DAXXIFY is used for medical therapeutic use also. It was recently approved for a serious neck condition called cervical dystonia. It's a very painful, debilitating condition that causes a person's neck to involuntarily spasm, twist, and bend. So DAXXIFY is an important, longer-acting option for these patients also.

Next is Dr. Ramsey. You'll hear from Dr. Joshua Ramsey. He'll explain to you all about how unlike BOTOX and those similar products, how DAXXIFY's peptide reduces what's called diffusion. That's how it works. By reducing diffusion, it helps the drug stay in the body longer. I'm going to quickly have an animation to show you how that works.

Traditional botulinum toxin injection is given over a period of time. It diffuses or spreads away from the target site of action. DAXXIFY, on the other hand, you give an injection and the active ingredient stays localized and centralized for a longer period of time, so the active

ingredient, the toxin, can do its job. It minimizes diffusion and enhances duration. That's what the evidence will show you. The peptide does that. Why is longer duration a big deal? Well, longer-acting means fewer office visits to the doctor and fewer needle jabs, so it's important to people.

I just want to spend a minute offering some additional history beyond what Mr. Dittmann said about the history of all this. This botulinum toxin, the active ingredient to these drugs, was discovered 130 years ago by Belgian scientists after a local food poisoning outbreak. It was experimented on during World War II to find out how lethal it is. But as with most drugs, dangerous substances in highly purified tiny amounts can be effective medicine, and that's what we found here.

So researchers in 1970s started exploring botulinum toxin for medical purposes, and that research led to more research in the '80s where researchers started looking at it for droopy eye. And finally, Dr. Alan Scott -- I know we put Dr. Alan Scott out there, but Dr. Scott never worked for Allergan, did his own research, his own work, and he and his team got approval for botulinum toxin from the FDA for the first time.

That was 1989. And soon thereafter, Allergan bought that product or the company and renamed the product

to BOTOX. Allergan didn't invent it. From that time, late '80s, early '90s, all the way up to 2009, it's almost 20 years, BOTOX and Allergan were the only game in town, the only botulinum toxin product on the market.

And as I said, I'm not here to disparage BOTOX or Allergan. BOTOX was a big hit then, perfectly fine product. But here's the thing: Allergan and BOTOX have been rewarded handsomely to the tune of billions and billions of dollars over the span of the last 35 years and they're still the biggest seller.

And they had a slew of patents that covered their market position until 2009. So they had a bunch of these BOTOX patents. Again, nothing to do with the patents here. All the patents that cover BOTOX, they start expiring in 2009. And the first competitor, Dysport; later in 2009 another competitor, Xeomin; and in 2019, another competitor, Jeuveau.

All four of these products are similar, BOTOX included. They have similar duration of action and they all contain animal products or animal protein. You're going to hear that interchangeably because one of the patents refers to animal protein and the other patent refers to animal product. All four of these products use animal remnants like albumin or other stuff to stabilize it. That's how BOTOX is being used.

Why is that significant? Let's fast-forward to September 8, 2022. That was the big day in Revance's history. That's the day that FDA approved DAXXIFY. DAXXIFY was the fifth to enter, but DAXXIFY was special. No animal products, purely synthetic, first one to do that, and they had longer duration of action and the peptide was a completely new, innovative thing.

As you saw from Mr. Dittmann's comments, what Allergan is doing at this trial is trying to take credit for Revance's groundbreaking work. They're trying to take credit for the longer duration of action. They're trying to minimize the peptide action. They're calling their patents foundational technology when all they do is claim super old stuff, processes that have been around since the '80s and '90s. And you'll hear from some of our experts who will show you that and I'll touch upon that in a bit.

Faced with this new competitor, better, different, superior, what did Allergan do? They sued Revance. So you saw Allergan asserted these three patents, the '878 patent. We call it composition. He called it the recipe patent. It's basically the drug. It's everything put together. And then they have two other patents, the purification and manufacturing patents. Those cover methods of purifying the toxin so it can be put in the drug.

But members of the jury, as you see from the

evidence, these patents claim old stuff. One expired in 2023. I'm going to show you the original applications for these patents were filed back in 2003, 2005 and 2009, 16 and 20 years ago.

More important, what these patents claim to cover is super old methods and composition that were known to all of us. They were in the public domain, what you call prior art. It belongs to all of us. An inventor or company is not allowed to take stuff from the public domain and combine it in a very obvious way and get a 20-year patent to make people pay money to them. That's not how our patent system is supposed to work.

One point you'll hear from some of our experts that FDA was telling people to go animal protein-free in the mid '90s and late '90s. Allergan did not invent the concept of animal-protein free.

I'm going to show you a timeline Mr. Dittmann -- when people called these patents pioneering and foundational. The two unexpired patents, those are the two application dates that led to the patents. 2005 for the '878, the recipe patent. 2009 for the '748, the other manufacturing patent, that goes out to 2021.

2019, Revance publicly announces that it filed an FDA application for DAXXIFY. Two years later, 2021, is when Allergan went and got these two patents in this case.

These applications generated patents initially and kept those applications open. Then they went and filed this patent application in 2021 and sued Revance six months later.

Revance did not copy these patents. Based on this, during this trial, I'd like you to ask yourself two questions. If Allergan really thought they had a great invention, they had invented something, $140 million, half of Revance's revenue worth invention, what took them so long to file for them?

Why haven't they come to market with it yet either? They were the market leader. They were the ones that had all the experience with BOTOX. Why haven't they come up with a longer animal-product free formulation yet if they had invented this?

Now, I want to touch on another point and move on. And I'm going to talk about, yes, we're going to present prior art references, and one of them is called Hunt. And this is a really important point, and the judge will instruct you on this too.

What Allergan's counsel seemed to suggest was, Oh, Revance is trying to use, you know, Mr. Hunt's work against him. No, we're not doing anything like that. The law is we file for patent application, and when that information becomes public, it's free to all of us.

So we had a completely different patent application that Allergan got patents on and it became prior art, but then Allergan went to the well to squeeze out more patents based on those disclosures that belong to all of us already.

So we're not attacking Mr. Hunt. What we're saying is Allergan should not be allowed to do that. And that's the law. And that's why we're able to present it to you and say, look, look at all the disclosures here. Look at all of the overlap with the new patent here. This new patent should not have issued with all the stuff already belonging to us, the public.

With that background, members of the jury, I'd like to preview for you what the evidence will show on the invalidity of these patents.

And you're going to hear much more about this from the judge, but in terms of invalidity, as I mentioned, a patent that should never have issued is invalid. Okay? So the evidence will show that these patents are invalid because they are obvious.

And I'm going to use a couple phrases of art, term-of-art phrases. An invention is obvious, a patent is obvious, if what's patented would have been obvious to a person of ordinary skill in the art at the time of the patent filing.

So I'll talk about -- more about what obvious means, a person of skill means, and prior art.

Patents are reserved for real and actual inventions. They're not supposed to be easy to get because they grant the patent owner the right to exclude or the right to charge money. The requirement that the patent not be obvious puts strong restrictions on the patent owner.

What I heard from Mr. Dittmann was, these -- you know, Revance's counsel is not going to tell me that this was new, that this was the first time someone put this together. But that's not the legal standard.

The legal standard is, did you do something by putting peanut butter and jelly together that anyone could have thought about or a person of ordinary skill in the field? Then we're not going to give you a patent.

And the way you judge that is you see how much of that patent was already known to all of us. And that's what you're going to hear from the scientist experts in this case.

Patent owners have to show that based on what was already known to the public, was free to the public, that they deserve to get a patent. And we're going to show you that these patents are a far cry from that.

And also, it doesn't have to be obvious to ordinary, everyday people like you and me and some of the

people in the courtroom. It only needs to be obvious to a person of ordinary skill in the art. And here's what I mean. The stuff that we're going to be discussing with you this week is going to seem really complicated, and it would be to most people, but it would have been obvious to a pharmaceutical scientist.

That's the relevant level of skill or the lens you have to look through. Would a pharmaceutical scientist looking at Allergan's invention or their patent and comparing it to what was already in the public knowledge think the differences was obvious? That's what you have to judge.

And that's why we have some terrific scientist witnesses who are going to teach you the science and tell you how a person of ordinary skill would have looked at it. It's a hypothetical person. And that person, importantly, is presumed to be aware of the prior art.

And that's how you have to look at it. Obviously, His Honor the judge will teach you a lot more about the law on that.

Now, perhaps -- think of it this way. I'm a huge football fan. I've been watching it for 40 years, my whole life, but for the life of me, I can never understand Xes and Os or how coaches draw plays or how like Peyton Manning or quarterbacks call plays with all the different

jargon. I don't understand it.

But any NFL coach, college coach, or player, easy stuff. You pick it up. It's routine. They process it quickly, they can think through it. They are the person of ordinary skill when it comes to football.

Similarly, pharmaceutical scientists will look at all this stuff that looks complicated in the patent and they will know exactly how a person of ordinary skill will understand it.

Finally, prior art basically is anything that came before the filing of the patents. They can be in the form of press releases, printed publications, textbooks, manuals, other patents, and published patent publications. Pretty much anything that was known to people is prior art.

I just want to revisit what I said earlier. You might wonder throughout this trial -- because Mr. Dittmann talked about the patent examiner and everything that they did, but why would we be here if the Patent Office was the final authority on patents? We wouldn't all be here.

This court is a check and balance against bad patents that issue. And sometimes examiners overlook stuff. Examiners don't have the resources that law firms and companies do. They can't do a scorched-earth search to make sure a patent should have issued.

That's why we have litigations like this every

day. You are the final check and balance against filed patents. You are absolutely entitled to and empowered to second-guess the patent examiner.

With that, let me turn to some of the evidence we'll show you on the invalidity of these patents for obviousness. Let's start with that recipe patent. They're asserting one claim, Claim 6.

And you're going to hear it from Dr. Sury, Dr. Raj Sury. He's our composition expert. He is an accomplished and highly respected researcher from the University of Minnesota. I promise not to spend much time with you at all talking about the technical analysis. That's Dr. Sury's job, but I do want to show you that this is Claim 6.

So Claim 6 references Claim 1. So all the stuff in Claim 1 is incorporated into Claim 6. And it looks like there's a lot of words and a lot of science there. But as you're going to hear from Dr. Sury, it's quite simple.

All the stuff in purple basically goes to being the concept of animal-protein free. And the one teeny, teeny word here in pink, that's a natural sugar, trehalose. We'll get to that. All of this was already disclosed to the public, everything in purple. And you're going to see that from Dr. Sury. And Allergan tacked that on and called it an invention. And that -- it's actually natural.

Dr. Sury is going to show you that a person of ordinary skill in the art would have found all the purple stuff was already taught in this Hunt 2003 publication three years even before Allergan filed these old patents and that this Johnson patent discloses trehalose. And for those reasons, a person of ordinary skill would have combined those two teachings and rendered this claim obvious.

And the point, again, about that examiner, the evidence will not show you that the examiner discussed or analyzed this Hunt/Johnson combination the way Dr. Sury is going to present that to you. You will all be the first people to ever evaluate this patent armed with this critical information.

The examiner didn't discuss this. Never. And we're going to show you. I believe the references were listed on what we call an information disclosure statement, which has several hundred there. But there was no indication from the prosecution history that the examiner ever analyzed this claim.

And that's not uncommon. Again, that's why we have patent litigation.

Let's turn next to the first of the purification patents. Very similar story here. You're going to hear from Dr. Michael Goodnough. Dr. Goodnough joins us from the University of Wisconsin. He is our purification expert.

He's going to show you that the techniques that are important to these purification patents were all well-known.

In fact, Dr. Goodnough, and you're going to hear about it, he did his college thesis in 1994 on the same techniques. 1994. This patent was filed in 2009. So 15 years before, Dr. Goodnough himself was doing this stuff. You'll hear from him.

So let's just take the one claim that they're asserting. It's Claim 8, which, again, is stacked onto Claim 10, and it's the same story as the other claim. All the stuff in purple, the process which is called the chromatography process, and the stuff in pink go to the concept of being animal-product free.

I already told you that the FDA was telling people to go animal-product free and people were already researching long before the patents. And Dr. Goodnough will show you how this chromatography process was all in the prior art.

And combining the notion of two of them, he's going to explain to you, would have been obvious to a pharmaceutical scientist or a person of ordinary skill in the art. And he's going to use these two references to show you.

And like the other claim, again, the examiner of these patents did not have the benefit, like you all do, of

this combination and hearing testimony from our expert, Dr. Michael Goodnough. You'll be the first people to evaluate this patent under that lens.

And then finally, let's turn to the last patent, the '740 patent. This one expired. But just like the other claims, this claim is also stacked together. And the other claims you can group into two parts, the animal-product free part and the chromatography process.

And Dr. Goodnough is going to show you the combination of these three references that render this obvious to a person of ordinary skill. And Dr. Goodnough will explain all that to you. I don't want to waste your time today with a lawyer talking about it.

Now, later today, in a few moments, Allergan is going to put on, on the witness stand, two inventors: Mr. Terrence Hunt and Dr. Ronald Bates. And Allergan is going to tell you how hard they worked, for how many years, and that they worked in a lab.

And I'm sure they're wonderful people and I'm sure they've worked hard, but patents aren't just for hard work. You have to bring something new and special into the world. You have to innovate.

These patents were filed for long after those two individuals even left the company, and Allergan filed for them in 2021.

I do work in my garage for years, I work very hard taking known parts, old manuals, follow them, and assemble them into a car. It doesn't mean I invented a car.

So with that, members of the jury, I hope after you see the evidence in response to question number one, you'll answer yes in Revance's favor.

But with that, I'd like to preview for you the issue of disposing damages. And I'm not raising damages because I'm not suggesting or even implying that you need to reach damages. If you find these patents to be invalid and obvious, there are no damages.

If you reach the issue of damages, the law requires -- and we need to mention a couple of things about it here. Ms. Dana Trexler, you're going to hear from Ms. Trexler, she's from Philadelphia. She's our economist expert and she's going to talk to you about why Allergan's damages number is just out of this world.

If you find the patents are invalid, then all Allergan is entitled to under the law is what we call, and I'll put it in quotes because that's the phrase, "reasonable royalty," a reasonable royalty. And it's based on this idea of Allergan and Revance hypothetically sitting down for a negotiation where both people walk away with something that's reasonable.

Proving the right amount of reasonable royalty

is a very fact-specific inquiry. And it's got to be based on the facts, the specific facts of the case. Now, you're going to hear from Ms. Trexler who will tell you that Allergan's nine-figure and still growing -- they want money all the way out to 2029.

That's what? If my math is right, 40 years after BOTOX? I mean, we still haven't talked about how they had the BOTOX market. And they want money until 2029 from us. And you're going to hear from Ms. Trexler that we made $270 million -- and by "we," I mean Revance, not me -- since our product launched in 2022. You're going to hear evidence that BOTOX has sales like that in three weeks, three weeks' time.

Here are the facts that you're going to hear from Ms. Trexler and others. These patents cover old technology. Revance invented DAXXIFY. DAXXIFY's distinguishing and special features have nothing to do with their patents. It's the peptide and longer duration and other feature for which Revance got its own patents on, recognizing that it was an innovation.

One of Allergan's patents had already expired. And Allergan doesn't have any products that use their patents, that do what they claim to have invented. There's nothing reasonable when we take those things into account about their royalty demand.

Now that you've heard this intro, let me also say this. This trial is really about the story of Revance and DAXXIFY. It's a true American story, entrepreneurial story. A company that started out small, dreamt big, and brought a better, smarter mousetrap to the world. And it's completely sold in the USA. It's an innovative and superior product that Allergan could never develop just by claiming patents.

You're in a new position, members of the jury, to write the ending to that. I think after you hear all the evidence, hear it from the witnesses, and you get to weigh the credibility of Allergan's witnesses versus Revance's witnesses and who's telling the full story and who might not be, my hope is that you will find these patents invalid once you hear all of that.

Before I move on, I just want to introduce for you the remaining experts and witnesses that you'll see from our side that I didn't get a chance to preview. So Jeffrey Dover, Atul Patel, Michael Meagher, and Akhilesh Nagaich.

That, ladies and gentlemen, concludes my opening statement. The way this process works, kind of like today, Allergan is the plaintiff, they get to go first. They'll go and present to you for the next day or so. You'll hear only their side of the story. All I ask is to keep an open mind and give us a chance to tell our side of the story and, of

course, pay careful attention to the evidence.

Thank you for your service and I look forward to putting our case to you.

THE COURT: Thank you, Mr. Varughese.

So, members of the jury, I was telling you before we broke for lunch that the timing is a little bit off today. So what I would like to do is take a ten-minute break now. We'll come back and hear another hour and 15 minutes and take another ten-minute break. It's hard to pay attention for long periods of time. And we'll finish up at 5:00. And so that's the schedule I have in mind.

Can we take the jury out and please be ready to go again in ten minutes.

(The jury exited the courtroom.)

THE COURT: Okay. I'll see you again in ten minutes.

(A recess was taken, after which the following proceedings were had:)

THE COURT: Is your first witness Mr. Hunt?

MR. ASHKENAZI: It's Dr. Ron Broide. While we're waiting, can I hand out binders?

THE COURT: Yes.

Come up here, Dr. Broide.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury,

welcome back.

Mr. Dittmann, or somebody from your side, Mr. Ashkenazi, I take it you're calling Dr. Broide?

MR. ASHKENAZI: Allergan calls Dr. Ron Broide.

THE COURTROOM DEPUTY: Please state and spell your name for the record.

THE WITNESS: Ron Shraga Broide, B-R-O-I-D-E.

RONALD BROIDE, Ph.D.,

called as a witness on behalf of the Plaintiff, was sworn, and testified as follows:

THE COURT: Everyone can be seated. I'm sorry.

DIRECT EXAMINATION

BY MR. ASHKENAZI:

Q. Could you please state your full name for the record.
A. My name is Ron Shraga Broide.
Q. Where do you reside?
A. I currently reside in San Diego, but I'm actually from Jersey, very close by.
Q. Who do you currently work for?
A. I work for Allergan.
Q. What is your job position?
A. I'm an executive director of biological research.
Q. How long have you worked at Allergan?

A. Boy, it's been at least 17 years. In October, it will be 18.

Q. I'd like to briefly go over some of your background. To start, where did you go to school?

A. So I went to school at the University of California in Irvine as an undergrad. I majored in two areas: biology and psychology. And then from there, I continued at University of California, Irvine, where I got my postdoctoral degree in pharmacology.

Q. You mentioned pharmacology. What is pharmacology?

A. So pharmacology is the science of how molecules interact with our bodies, specifically the mechanism which they interact with cells. And sometimes those molecules become drug product, for example, as in this case. So our job is to look at those mechanisms of how the drug products interact with our body.

Q. You majored in science in school. Why did you decide to major in science?

A. It's an interesting story. I was always interested in biology. I loved to solve puzzles, to come up with solutions, and many times in a team environment, so I decided to become a scientist.

Q. What did you do after graduate school?

A. So after graduate school, I went to work for two small biotech companies also in Southern California. And

after that, in 2007 I got hired by Allergan.
Q. So you joined Allergan in 2007. Why did you decide to join Allergan at that time?
A. Well, Allergan gave me a unique opportunity to expand my expertise. So I had been working in the central nervous system, and Allergan gave me the opportunity to now work in the peripheral nervous system. And also I had experience working with neurotoxins at the time, so that gave me the opportunity to expand on that with this particular neurotoxin.
Q. Can you explain a little, what is a neurotoxin?
A. So a neurotoxin can be a molecule or generally is a protein, and these are found naturally throughout the environment. They can come from snakes. They can come from spiders. They can come from shellfish and sometimes bacteria. What they do is they interact with our neurons, hence the neurotoxin, and they modulate them. Many times they inhibit them. Sometimes they inhibit them from firing, as in the case of botulinum neurotoxin.
Q. You mentioned botulinum neurotoxin. What is that?
A. So botulinum neurotoxin is a toxin that comes from bacteria, as you saw. They're called *clostridium botulinum*, these particular bacteria, and they're found in nature many places. It is a large molecule, relatively large molecule that comes from these bacteria, and it basically interacts

with our neurons and particularly our motor neurons and inhibits them from firing on our skeletal muscles, essentially paralyzing them. So if you have something that's spastic and holding strong, it will loosen those muscles.
Q. I'm going to get a little bit more into some of scientific terms. Just to be clear, by inhibiting the neuron, is that in some instances paralyzes it, it paralyzes the muscle?
A. Yes, that's what it does. It paralyzes the neuron which is firing on to the muscle. By doing that, it essentially paralyzes the muscle.
Q. We'll get into that in a little more detail. I want to take us back to -- stay in 2007 where you were. Maybe if you could tell us a little bit about Allergan as an organization in 2007.
A. So Allergan was an ophthalmology company initially. Back in 2007 when I joined, they started getting into more of the BOTOX indications. They obviously had acquired BOTOX some years back and they -- they were working on a lot of these new products at the time.
Q. Let's first start with the term "BOTOX." What is BOTOX?
A. BOTOX is a name that was given to botulinum neurotoxin after Allergan initially acquired it, which was

named Oculinum at the time. They renamed it to BOTOX.
Q. Just to round out your background because I want to get more into detail what we're talking about with BOTOX, what positions have you held at Allergan over the years?
A. So I started out as a senior scientist. I was essentially a lab scientist, a lab bench scientist. I was doing experiments and setting up facility -- core facilities and slowly, I got out of the lab. I started managing people who were doing the research themselves, and that's basically what I do currently.
Q. And do you supervise anyone currently?
A. I do. I supervise a team of about 30 people.
Q. And how have your responsibilities changed over the years with the different positions?
A. As I said, initially, I was a lab scientist. I supervised a few folks, a few scientists. When I started getting out of the lab, I started doing more records, writing bio-sci reports, putting together slide decks. I eventually started working and strategizing on the next generation of neurotoxins. And eventually I was sitting on governance committees that were essentially steering the course of the next-generation neurotoxins and filling up that pipeline.
Q. You mentioned next-generation neurotoxins. What do you mean by that?

A. There are two components, really, to the next-generation neurotoxins: The toxin itself, which is now being done in a more modernized way, a more modernized process, and then there's the formulations that go into formulating these toxins. And so together, when we put these together, they become these next-generation programs that we have.

Q. So let's take ourselves back. I want to focus on BOTOX a little just to get a little bit of background here.

Did you prepare slides to help our conversation today?

A. Yes, I did.

Q. If we could pull up PDX 11-2.

Dr. Broide, can you please explain to us what you're illustrating on this slide right now.

A. Sure. So as you saw before, BOTOX, as a therapeutic, made its beginnings in about the '60, '70s and into '80s, where Dr. Alan Scott -- he was an ophthalmologist. He was looking at ways to treat eye disorders, less invasive ways. He soon realized the potential of botulinum neurotoxin in paralyzing muscles, especially spastic muscles. Those are muscles that are really holding on tight.

So he started experimenting on both strabismus and blepharospasm. These are the first two conditions he was looking at. These are eye conditions, eye disorders.

And then this was about in 1989 when Allergan started coming into the picture.

Allergan was an ophthalmology company. They were making eye drops. Naturally, they were very interested in this product which was helping eye disorders. They were interested in what Dr. Scott was doing. They wanted to help him to develop this drug. So Allergan got into the picture at that time, as you heard. They were helping him manufacture it, and 1991 is when they purchased this from Dr. Scott. At the time it was called Oculinum and they renamed it BOTOX.

Q. I want to take each one of those one at a time. What is spasticity in the muscle?

A. As I mentioned, spasticity is when a muscle is tight and holds on and it is not releasing. Sometimes that can be a constant effect, sometimes it could be a fluctuating effect. That's spasticity.

Q. How does at the time Oculinum, which is now known as BOTOX, how did that help with strabismus?

A. Strabismus is a condition, an eye disorder that's commonly known as cross eye. One eye looks straight ahead and the other eye looks sideways. At the time before botulinum neurotoxin, the way to treat something like this could have been surgery, for example, so a pretty invasive way.

What botulinum neurotoxin soon realized that if you inject minute amounts of that into that spastic muscle that's holding the eye, it loosens that muscle slowly and the eye can look straight ahead.

Q. What is blepharospasm?

A. Blepharospasm is a condition of the eyelid where it blinks really quickly and uncontrollably. It's spasmic muscle that is rapidly, frequently firing. And, again, toxin, if you inject it, minute amounts can help to alleviate that disorder.

Q. Why don't we move to PDX 11-3, please. Thank you.

So I see you added a number of different time points on this slide's bullets. We see a bunch of red bullets.

First, Oculinum gets renamed BOTOX in 1992?

A. That's correct.

Q. What are you showing us here with the red dots?

A. So the red dots represent cosmetic type of treatments that you heard before started coming on board. The glabellar lines in 2002, those are the lines people get between their eyes. Crows feet lines are the lines on the side of the eye and forehead lines. And then more recently in 2024, it's platysma bands, the lines on the neck.

Q. Why don't we turn to PDX 11-4, please. So now I see a whole bunch of blue dots turning up on the slide.

Can you please explain to us, first, what are you indicating with the blue dots?

A. So the blue dots represent medicinal, therapeutic type of indications. And I want to point out that BOTOX is really commonly known as the cosmetic antiwrinkle drug, but you can see from the slide that there are many, many more therapeutic indications out there, treatments for BOTOX that are treating millions and millions of patients, as you can see.

Q. Okay. So let's walk through some of these if we can. Let's start with the year 2000. If we can just highlight that. And it says "cervical dystonia."

Do you see that?

A. Yes.

Q. What is cervical dystonia?

A. So cervical dystonia is a condition where the muscles of the neck and the upper back, basically, are spastic. They cause the person's head to kind of, you know, go like this.

It's a very painful condition. And people just can't go about their lives, they can't drive, they can't do anything, you know, when they're in this condition.

Once again, toxin injections into those muscles help to loosen them up and a person can walk straight, can drive, can go about their daily lives.

Q. Which was the first company to use a neurotoxin to treat cervical dystonia?
A. The first company to do that is Allergan.
Q. And so BOTOX was the first neurotoxin approved by the FDA in clinical trials for treating cervical dystonia?
A. That's correct.
Q. Okay. And that was in the year 2000?
A. 2000.
Q. Okay. Let's shift over a decade now to 2010. And I see it says chronic migraine?
A. Yes.
Q. Can you explain us to how BOTOX helps to treat chronic migraines.
A. So chronic migraine is a very interesting treatment for toxins. As many people know, people with chronic migraines suffer from migraines for at least 15 days of the month or more, sometimes most of the month.

These people are holed up in dark rooms, in their bedroom, with the shades closed because they can't look at bright light, they can't interact with people, they can't interact with their own family members for all that time. It really just steals their life away.

It was found that botulinum neurotoxin treatments along certain areas of the head will alleviate, will lessen the frequency of those chronic migraines so that

people can suddenly come out of the bedroom, so to speak. They can go about their daily lives, interact with their family. It really gives them their life back.

Q. So I wanted to just take one of the treatments that you listed here: Pediatric upper and lower limb spasticity.

Can you please explain to us what that is.

A. Yeah, sure. So these are children, generally, with something like cerebral palsy. It's a condition that hits these kids in their limbs, their limbs become tight, spastic, they can only crawl, they can't walk. Again, their life is stolen from them with this condition.

Toxin injections in those muscles in the limb can help loosen those muscles, and these kids walk and they can now have normal lives.

Q. And I should have asked a little earlier.

Have you worked on any of these new indications for Allergan?

A. I have, yes.

Q. Now, I see you have here the FDA label next to all those blue and red dots.

What do you mean to indicate by those?

A. These are all FDA approved indications, treatments.

Q. So in order to get FDA-approved, do you have to run certain types of studies?

A. Yes, yes. Many, many studies, actually.

Each one of these indications represents years of hard work by not just scientists, by clinicians, by people that work in regulatory.

As you heard, this is one of the most potent proteins known to man, and as such, we have to go through a lot of regulatory hurdles to make sure, number one, it's safe; number two, it's effective for that indication. And all of that takes years, sometimes ten-plus years for just a single indication.

Q. Okay. Now, the studies that are conducted eventually, are those called clinical trials?

A. That's correct.

Q. Okay. How many clinical trials have you run by Allergan for BOTOX over the years?

A. Oh, boy. In the hundreds, many hundreds.

Q. And have you been involved in the development in any of those?

A. I have. I worked with clinical scientists for that.

Q. So let's go back to 2007 again. We could take that down. Thank you.

You joined the company in 2007.

How did you become familiar with the work that was being done on botulinum toxin at the time?

A. Well, when I first joined, I started looking at a lot of the science that had been done. I was reading reports,

looking at data, I was talking to many people. People like Terry Hunt, for example, who had started doing lot of the formulation work.

So I got familiar with that as I went along more and more.

Q. You mentioned Terry Hunt.

Is he also called Terrence Hunt?

A. Terrence Hunt. I call him affectionately Terry, yes.

Q. And who is he?

A. He is one of the smartest botulinum neurotoxin scientists I know. He pioneered a lot of the initial formulations, what we now call the animal-protein free formulations.

He developed a lot of the infrastructure for studying the toxin and studying these formulations. Not much was known back then. You really had to build this up from scratch. So he is definitely a seminal figure in the company's history.

Q. Okay. Now, you talk about these next-generation toxin products.

Have you worked on any of those?

A. I have.

Q. And maybe if you could just tell us a little bit, maybe like a high category, what type of next-generation products you worked on.

A. So our initial product, what we call -- in terms of the toxin, what we call the drug substance one, that's the toxin and manufacturing process that's found in a vial of BOTOX. And this is a spin-down process. That means the toxin is precipitated down to purify it. And it's done with animal proteins as you've heard, et cetera.

What we were starting to do is develop a new manufacturing process developing a drug substance called DS2. That was more of a column purification process. It's a gentler type of process to purify these toxins out. So that's in terms of the toxin.

And then the formulations, right, that we started working on that had the basics that Terry Hunt developed included a surfactant and a trehalose disaccharide, a combination of a sugar and a surfactant.

We started taking those base formulations and expanding on them even more. And this now has become our next-generation platforms.

Q. Okay. So let's take that into a couple of pieces. Let's start with the formulation side of things.

The next-generation platform you said was from Mr. Hunt?

A. That was the foundation of that platform; right.

Q. And that platform has the toxin, the disaccharide, and the surfactant?

A. That's correct.
Q. Okay. And so I'm sure we'll get into those terms, disaccharide and surfactant, a little bit later in the day.
Now, with respect to your work, did you do any work on new formulations?
A. I did. I did.
Q. And are you a formulator yourself?
A. I am not a formulator. I'm a pharmacologist. They formulate. We test the material.
Q. Okay. In terms of your work, did you -- were you -- did you obtain any patents for your work as part of these next-generation products?
A. I did.
Q. Okay. In general, when does the information -- when you file a patent application, how soon after that does the information come into the public domain?
A. Maybe 18 months or so. You file it and then it becomes public.
Q. And that's even before the patent issues; correct?
A. That's correct.
Q. Okay. So now you have -- we're talking about the next-generation formulations. I want to move over to the process side.
You refer to that as -- what is the name of the process right now that Allergan is using for its

next-generation products?
A. It's what we refer to as the DS2 process. And it's now being used in many other products.
Q. When you say being used in many other products, is the DS2 process used for BOTOX?
A. Nope. No, BOTOX, as I mentioned, has DS1. It has the DS1 process.
Q. Okay. So, you know, you mentioned that there's been this work over the years with respect to the formulations and new processes for making toxins.
Why hasn't the organization Allergan immediately commercialized those new products?
A. Well, we were working on many programs, many projects during that early time and, frankly, we just didn't have the bandwidth to work on everything. And so what we focused on -- what the company wanted to focus on was developing BOTOX for new indications, right, to understand the mechanisms better.
So as you saw, we had many indications, and it takes a lot of time and effort just to bring those to market and to help millions of patients before you start, you know, doing anything else. So it was a lot of bandwidth issues.
Q. So where is the company right now with commercial izing these next-generation products that have a different formulation or a longer -- or different process for making

it?
A. Oh, they're going strong. Going very strong. We now have a rich and robust pipeline of programs and products that have both, you know, the foundation of that animal-protein free type of toxins, right, with all these excipients that are built off of Terry's initial foundational work, surfactant and a sugar disaccharide.
Q. For this formulation work that you're working on right now, these next-generation products, does Allergan plan to bring those onto the market?
A. Absolutely.
Q. Okay. Now, for the formulations, are there any properties specific to that formulation work that you -- that are of particular interest? Any properties specific about the formulation that are of interest?
A. Well, we looked for a formulation to help the toxin be both stable as well as efficacious as well as longer duration. So we're looking constantly to getting products that are longer and even longer duration.
Q. And does the formulation that Terrence Hunt -- well, how does the formulation that Terrence Hunt established affect that?
A. So that formulation, as I said, was the basis that gave it a more robust characteristic, the toxin as well as a longer duration.

Q. And that's the toxin plus the surfactant and the disaccharide?
A. That's correct, the combination.
Q. Okay. So let's sort of shift gears now. Let's pause for a moment. And I want to talk about Revance and DAXXIFY, if we can.
While you were working at Allergan, did you personally become aware of a company called Revance?
A. I did.
Q. And did you become aware of DAXXIFY?
A. I did.
Q. And around when was that?
A. Well, DAXXIFY is their drug product that we became aware of once they got approval for it. I think it was around 2023. But it was initially known as DAXI, right, and it was short -- DAXI is short for daxibotulinumtoxin. That's how we initially became aware of it.
Q. And around what time was that again?
A. That was around 2017, if I remember.
Q. Okay. Was there anything in particular about DAXI that you were aware of in 2017 that drew your interest?
A. Well, we knew it was a 150 kilodalton toxin, a smaller toxin. We didn't know a lot about it, but what we did find out was from their publications that they had. They had more and more of these publications and clinical

results that came out.

And eventually, in 2018, is when they published the patent which disclosed that peptide that you keep hearing about.

Q. Okay. This peptide, did it have a code name?

A. Yeah, yeah, it was known by a different code name initially, but then it was known by RPT004.

Q. You said RTP004?

A. RPT, yeah, PT, sorry, 004.

And we also we knew it as what they called a cell-penetrating peptide, CPP.

Q. We have a couple of names here. We have RTP004. We have CPP.

Is it okay if we call that Revance's peptide for the purposes of the conversation?

A. Much better.

Q. What did you think of Revance's peptide when you became aware of it?

A. When we first became aware of it, Revance was actually billing it as a product with a peptide that could be developed into a topical toxin type of formulation that would penetrate the skin. Hence, it was called cell-penetrating peptide. And then they stopped that program, maybe because it wasn't effective, and then we saw the peptide appeared in the formulation which is now an

injectable formulation.
Q. Originally, the peptide was in a cream, topical cream?
A. It was in a topical cream formulation.
Q. And then they used it in their injectable toxin product?
A. That's correct.
Q. And you were able to understand information about the peptide you said from where?
A. From the patent. They published a patent in 2018 that actually disclosed the sequence of that peptide. It was a short peptide.
Q. Okay. Did you do anything yourself to investigate the role that the peptide has in the DAXI product?
A. We did.
Q. Okay. And why did you do that?
A. Well, we were naturally curious. They were claiming that the product -- the drug product had a longer duration and it was primarily due to the peptide that gave it the longer duration. Because we were working on a longer duration product at the time, we were naturally curious to try it out.
Q. And how did you go about trying it out?
A. Well, we did it with a study that used an in vivo animal model. These are live animals we inject to try to

get paralysis.
Q. We're going to get into that in a few minutes. But I just want to make a couple of things clear. Generally, would it be part of your responsibilities to test this kind of peptide in a molecule?
A. Yes, absolutely.
Q. And the study you conducted, did you conduct that study for the purposes of this litigation?
A. No. Again, scientists, we were naturally curious to see what it was doing. We tested it both in animals and we did it analytically as well.
Q. In the binder you have in front of you, if you could turn to the one tab which is JTX 202 in your binder.
Do you recognize that document?
A. I do.
Q. What is that document?
A. This is a report that was published internally about a study we had done testing the cell-penetrating peptide. We call it the Revance peptide. The effects on botulinum neurotoxin in a mouse in vivo study known as the DAS in vivo assay.
Q. Are you an author on this report?
A. I am.
MR. ASHKENAZI: Your Honor, at this time, I move to admit JTX 202 into evidence.

MS. WELLS: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit Number JTX 202 was admitted.)

MR. ASHKENAZI: Can you publish JTX 202 to the jury.

BY MR. ASHKENAZI:

Q. I want to make sure I have things clear on this. What's the title of this report?

A. "Evaluation of Cell-Penetrating Peptide Effects on Botulinum NeurotoxinA Focusing in the Mouse Digit Abduction Score" or what we call the DAS assay.

Q. Let's take a couple of pieces of that. The cell-penetrating peptide, that's the Revance peptide you're talking about?

A. Correct.

Q. I see it says the mouse digit abduction score, DAS assay. What is that in a very, very high level, if you don't mind?

A. So this is our gold standard assay on animals that takes advantage of an animal's startle reflex. Most animals have this. Give you an analogy. If you throw a cat up in the air, it will do this as it's ready to land. It gets startled. These will startle as well and we can score the effects of the toxin on the paralysis with this model, so we

know the muscles that control this paralysis that control the abduction reflex. When we inject toxin in there, we can score the effects on that reflex, 0 being no effect, full splaying of the digits, and then eventually coming to a 4 where we have no reflex whatsoever. So essentially we have a limp limb that we're looking at over here, so 0 to 4.
Q. Why don't we go and take a couple of pieces first. When was this study conducted?
A. This study was conducted in 2020.
Q. Okay. And we see that there the date of the report was October 2020?
A. It was published in October 2020, yes.
Q. Okay. And what was the goal of this report, of this study?
A. So once again, the goal was to test the peptide in various different formulations, to test the effects of that peptide and the formula excipients on the toxin's effect to paralyze that muscle.
Q. How did you know what excipients were in the formulation of DAXXIFY at that time?
A. So as I mentioned before, at the time we saw publications that came out that said that the Revance DAXI product had certain excipients in it. They didn't disclose exactly the level of those excipients, but we knew it had a buffer. We knew it had a sugar in there, a disaccharide.

We knew they had a surfactant, specifically PS20. That was in several different publications. They were in posters as well as papers.
Q. Okay. Now, for the assay that we're using, this DAS assay, mouse assay, were any mice harmed in this study?
A. No, no, not whatsoever. We paralyze their muscle. They eventually go down to baseline where they can move their muscles and then these animals go on their merry way.
Q. Now, with respect to that assay itself, this DAS assay, is that something that Allergan uses regularly?
A. Yes, we do, absolutely, for many, many of our products.
Q. What's the purpose of the use internally at Allergan?
A. We're trying to look at the effects of these new products preclinically on animal models. It's been used over and over again. It's been looked at and compared to clinical data in humans and it's been modelled to that clinical data and it translates quite nicely.
Q. Now let's move into the results of the study, if we can. Can we please pull up Figure 43 in JTX 202. For the record, it's at JTX 202 at page 9.
Dr. Broide, can you please explain to us while we're here generally what we're seeing here in the figure.
A. So this is a time course of the effects of the toxin in the various different formulations on that DAS reflex.

So as I mentioned before, we have a scale that goes from 0 through 4 that you can see that on the vertical axis, the Y axis. And then on the X axis, the horizontal axis, is the time component.

Q. So 0 means no effect or tense; correct?

A. That's correct.

Q. And 4 means full effect, limp. In other words, there's no -- the muscle is paralyzed?

A. Correct.

Q. Okay. Now I see you have four lines here. I just want to walk through them quickly. What's the black line?

A. So the black line is a control formulation for this specific study. For this specific assay, that happened to contain albumin in there. The BSA stands for bovine serum albumin. That's the black line.

Q. And the purpose of the control is what?

A. So we have controls in many of our studies and generally an albumin-containing formulation to compare the other formulations against.

Q. I see the red line here and I see some words: HIS, TREH, and TW20. And can you explain what that red line is.

A. So the red line is three of those components that I was mentioning before that's in that DAXI formulation. The HIS stands for histidine. It's a buffering agent that we have in there. The TREH is trehalose. That's the sugar,

disaccharide specifically. The TW20 stands for Tween 20 or what you hear mentioned polysorbate 20. That's in the red line.

Q. Is that the surfactant?

A. The Tween 20 is a surfactant. The trehalose is the disaccharide.

Q. The red bar has a buffer, a surfactant, and a disaccharide?

A. That's correct.

Q. So let's go to the blue line. The blue line, what's contained in the blue line? What's that formulation being tested there?

A. So the blue line are those three components I just mentioned are in the red plus the addition of the Revance peptide, that CPP peptide.

Q. It has a surfactant, disaccharide, and Revance's peptide; correct?

A. Correct.

Q. Let's go to the green line.

A. The green line has the histidine buffer, the disaccharide, trehalose, but no surfactant there. It only has the CPP peptide.

Q. When I look at this figure, what is it supposed to tell me about in terms how the formulation is formed over time?

A. What you can see is that, first and foremost, the CPP peptide doesn't really offer the advantage that's claimed about efficacy and duration, just that CPP peptide alone; whereas the formulation, the red formulation that doesn't have the CPP peptide, looks very robust. You get duration. And then the blue which has all three of those with the CPP peptide, that peptide doesn't seem to offer any more advantage than just the disaccharide and the Tween 20 combination. If anything, it looks a little bit lower.
Q. You said a little lower. I want to be clear. You're comparing the red line with the blue line; right?
A. I'm comparing the red line to the blue line, the three components I mentioned with or without the CPP peptide.
Q. And the red line does not have the peptide. The blue line has the peptide?
A. That's correct.
Q. And the green line -- I want to be clear about that -- that has the peptide but only the disaccharide, not the surfactant; correct?
A. That's correct.
Q. That 0, what does that mean again?
A. It had no effect. The animal is able to splay digits through that whole time.
Q. When you say "splay its digits," so we're clear, can

you explain what that means?
A. So the animal has a reflex. Basically, we can elicit that reflex. There's no paralysis of that reflex.
Q. Let's move to another figure. Looking at the results in your study, Figure 44, if we can. That would be on JTX 202 at page 10.
What is this figure showing?
A. So this figure, these bars are what we call the area under the curve. If you take all that data you just saw, those curves over time, and you distill it down to a number -- doesn't have units on it. It's just a number that's called an area under the curve and you can see the entirety of that effect represented here on these bars.
Q. And what conclusion can you draw by looking at Figure 44 regarding the CPP peptide or the Revance peptide?
A. Number one, as I mentioned before, the CPP peptide offers no advantage for this formulation over just having a combination of disaccharide or sugar and the surfactant alone. You can see the CPP doesn't add it to in any way. You can elicit a response here with just the sugar and Tween 20 combination without the peptide.
Q. I want to break that down to small pieces to make sure I fully understand.
We've got the red bar. The red bar has the surfactant and the disaccharide; correct?

A. Correct.
Q. And that performs the best in this study?
A. It appears to be, yes.
Q. The blue bar has the same surfactant and disaccharide, but now you're adding in the Revance peptide?
A. That's correct.
Q. And this is supposed to be a formulation to let us understand what the peptide is doing?
A. That is, in a sense, the complete formulation of DAXI.
Q. How does the red bar compare to the blue bar?
A. So let me first say that the statistics -- those are lines that go from one bar to another. Those are statistics that we have -- that we've run for this particular study. The statistical analysis was done primarily to compare the red, the blue, and the green against that control formulation, which is the black.

But we've done other statistics as well. And you can see actually -- and they may not appear over here on this chart. You can see from the red and the blue bar, those arrow bars, that's what you've got to really focus on, those arrow bars are not overlapping each other. And it suggests something. It suggests that it may be different one from the other. In fact, when we run statistics on that, it is different.

Q. This is looking at duration; right?
A. This is looking at the entirety, efficacy and duration.
Q. From this, the conclusion you draw -- what is the conclusion you draw about the CPP peptide?
A. The CPP peptide offers no effect on duration at all. In fact, if anything, it may be slightly detrimental.
Q. When you say "duration," again that's how long --
A. How long the toxin has effect. You saw from that previous figure, it takes a while for it to go down to baseline. That duration is focused on that offset, how long it takes to go back down to baseline.
Q. One more thing from this figure. I see the green bar. Again, the green bar contains just the peptide and just the disaccharide; correct?
A. That's correct.
Q. And it does not have the surfactant; is that accurate?
A. That is accurate.
Q. What can you tell us about how the green formulation works here?
A. As you can see from the previous figure, you see here the green which contains the peptide, just the peptide, just the disaccharide together, has no overall effect, no effect on efficacy, no effect on duration.

MR. ASHKENAZI: If we could take that down, please.

BY MR. ASHKENAZI:

Q. Before we end, if you wouldn't mind telling us a little bit about how you feel about your work at Allergan.

A. I'm very, very proud of my work at Allergan. Everything that we've done to help patients, I'm very proud of. In fact, we sometimes meet with some of these patients actually, even the scientists. People who suffer from spasticity, people who suffer from chronic migraines that are using our product, and it's heartwarming. It really is heartwarming to hear their story, how they have had their life stolen away and how this toxin, this miracle, is now bringing them back to interacting with families, bringing their whole life back. So I'm very proud of the work that we've done.

Q. How do you feel about your work on the next-generation toxin products you're working on at Allergan?

A. Also, I'm extremely proud. We've come a long way. We've come a long way. It's taken quite some time, but these are excellent products that are coming out there.

MR. ASHKENAZI: Your Honor, I pass the witness.

THE COURT: All right. Ms. Wells.

MS. WELLS: Your Honor, may I hand up some

binders?

THE COURT: Yes.

CROSS-EXAMINATION

BY MS. WELLS:

Q. Good afternoon, Dr. Broide. My name is Deirdre Wells and I'm an attorney for Revance. And Allergan's attorney asked you some questions, and if it's okay, I'd like the chance to ask you some questions as well.

A. Of course.

Q. So you spoke a lot about the work that you have done while at Allergan, but just to be clear, you personally did not invent anything in the three Allergan patents that are at issue in this case; correct?

A. That's correct.

Q. And you spoke a lot about the beginning work of BOTOX beginning with Dr. Scott's work in the 1960s, and that wasn't Allergan's work either; right?

A. Dr. Scott had started it. Allergan helped him out.

Q. But Oculinum was the company that developed the formulation or the recipe for the product that eventually became called BOTOX; correct?

A. That's correct.

Q. And Oculinum was also the company that developed the process for making the product that eventually took the name BOTOX; correct?

A. Actually, it was the Shantz process, named after him.
Q. Right. But it wasn't Allergan's process?
A. That's correct.
Q. And the jury has heard a lot about two specific features of botulinum toxin products. They've heard about animal-protein free products with long-lasting duration.
BOTOX is not an animal-protein free product with a long-lasting duration; correct?
A. That's correct.
Q. All right. I'd like to talk a little bit about the testing that you did that you just went over with your -- I'm sorry, Allergan's attorney. And I'd like to take a step back and provide just a little bit of context for the jury for this testing.
So I believe you said that the background for this testing was that you and your team at Allergan had learned that Revance was developing this product called DAXI or DAXXIFY; is that correct?
A. That's correct.
Q. And you learned that DAXXIFY might become the first botulinum toxin product with an extended duration; is that correct?
A. That's correct.
Q. And this extended duration piqued your interest?
A. Yes.

Q. So I think I heard you say you reviewed public sources to try and figure out as much as you could about DAXI and how DAXI was able to get this long lasting effect.
A. Yes.
Q. And I think you said you looked at some of Revance's patents; is that right?
A. Yes.
Q. And you looked at some of Revance's publications?
A. That's correct.
Q. And you were trying to figure out the formulation or the recipe for how to make DAXI. Is that fair?
A. Yes.
Q. And one of the things that you learned was about this peptide?
A. That's correct.
Q. And you learned that the peptide is proprietary to Revance?
A. Yes.
Q. It's something that Revance developed that they owned, that they had --
A. They had a patent on it.
Q. They have their own patents on it?
A. Yeah.
Q. And you also learned that Revance's proprietary peptide may have a variety of functions within the DAXI

product; is that fair?
A. Yes.
Q. It might be a stabilizer, it might help with the adsorption, it might help extend the duration of action?
A. Yes.
Q. And in drug products, a single ingredient can, in fact, have more than one role or function within the product?
A. It's possible.
Q. And of particular relevance to the issues in this case, you learned that the peptide may lower the diffusion from the injection site?
A. It was one of the claims; correct.
Q. And a lower diffusion means that there's less dispersal or spreading of the botulinum toxin in the body?
A. That's correct.
Q. And so it was thought that if there's a lower diffusion or spreading, this might be what leads to DAXXIFY's increased duration of action?
A. It's possible.
Q. Basically, if the peptide is able to sort of hold the botulinum toxin in place so that it doesn't spread and go to other areas of the body, then that botulinum toxin will have a longer duration of action?
A. It's possible, yes.

Q. That was at least one theory?
A. Yes.
Q. And so you wanted to test DAXXIFY to see what was achieving this longer duration, if it was the peptide?
A. That's correct.
Q. I think you said you were naturally curious to try it out?
A. Yes.
Q. But you ran into a little bit of a problem because you couldn't find the exact formulation or recipe that Revance uses to make DAXXIFY?
A. Well, if I may, we saw the ingredients. We've been working in the space for over a decade, many, many years, actually. And so we ranged -- from what we had experience with, we ranged that formulation to be approximate to what DAXXIFY might be.
Q. You made a guess of what DAXXIFY might be?
A. Yes.
Q. But it turns out that you were wrong.
A. Well, we were only off by a couple of percentage points. We now know what that concentration of those different excipients are, different components. We're off by a couple of percentage points.
And I just wanted to add that in this case, in this study, those differences, you know, from our

experience, are essentially meaningless.

Q. Well, let's go through some of the ingredients.

You talked about trehalose. That's the sugar. Do you recall that?

And you got the amount of trehalose wrong in the actual DAXXIFY formulation; correct?

A. Again, by a couple of .01 percentages from DAXXIFY, from my recollection.

Q. You also talked about something called polysorbate 20. I think you called it PS20.

Do you recall that?

A. Correct.

Q. You got the amount of polysorbate 20 wrong that's in actual DAXXIFY?

A. By a couple of points.

Q. And of course we talked about Revance's proprietary peptide.

You got the amount of Revance's proprietary peptide wrong that's in the actual DAXXIFY formulation.

A. Actually, we got the ratio to toxin. We had that information already, so that was actually pretty close to what DAXXIFY's ratio is.

Q. So sitting here today under oath, it's your testimony that the ratio in your testing between polysorbate 20 and Revance's proprietary peptide was pretty close?

A. It's pretty close, the peptide to unit of toxin.
Q. Okay. We'll hear some experts later talk about that claim.
I think you also mentioned histidine, there's an ingredient called histidine in this DAXXIFY. And you got the amount of histidine wrong that's in DAXXIFY?
A. Yeah. Histidine, as I said, we've been in this space for a long time buffering the toxin formulations. The histidine was also relatively close. We used that concentration, the 20 millimolar, for a lot of reasons.
Q. Okay. And you didn't specifically mention it, but you also used something called a potassium phosphate buffer; right?
A. In this particular formulation or this particular study, no.
Q. Oh, that was a different study?
A. Different study.
Q. Okay. And then there's also the concept of pH. That's how basic or acidic a substance is.
And you got the pH wrong compared to the actual DAXXIFY formulation?
A. So the pH -- again, we've been working on this for a long time. The pH for this particular study was at pH 6. The DAXXIFY product, as we learned eventually, is at pH 5.5. It's really close.

I mean, those differences in the grand scheme of toxin world are meaningless.

Q. Okay. pH is on a 14 point scale, though; right?

A. Correct.

Q. So even a point, half a point, is not as small as it may seem?

A. If you go up to 7 and 8, now it's a different pH, definitely a different pH, and it can change the whole concept, the whole makeup of that concept, yeah.

Q. So you'd agree with me, though -- and you're quibbling at the edges about how -- the percentages, but that there were five things in DAXXIFY that you got wrong: The amount of trehalose, the amount of polysorbate 20, the amount of Revance's special peptide, the amount of the histidine, and the pH. Five things; right?

A. Yeah, but let me just say that we may not have had the exact DAXXIFY formulation; right. For the purpose, for the context of this study, which was again to look at the effects of the CPP peptide, the Revance peptide, right, it was close. It was meaningless, right, those differences. And we stand by our results.

Q. That wasn't quite my question, though, sir.

Your study got at least five things wrong between the formulation that you tested and the actual DAXXIFY formulation; correct?

A. Yes, by 2 percentage points.
Q. So let's be perfectly clear.
The testing that you went over with Allergan's attorney, none of that involved the actual DAXXIFY formulation or recipe; correct?
A. No.
Q. I'm sorry, no, that's not correct, or, no, it did not involve the actual --
A. It did not include the actual formulation.
Q. And the study that you went over with Allergan's attorney also wasn't looking at diffusion; correct?
A. That's correct.
Q. And diffusion, again, is that property where you put it in and does it disperse, does it spread?
A. That's correct.
Q. That wasn't what you were looking for there?
A. Not in this particular study.
Q. Okay. So Allergan's attorney also asked you some questions about, I think he called it next-gen products.
Do you recall that?
A. Yes.
Q. And I think what he was really asking about was Allergan's development of an animal-protein free product --
A. That's correct.
Q. -- is that your understanding?

A. Yes.
Q. Okay. Now, Allergan has been working on developing an animal-protein-product-free botulinum toxin product for quite some time. Is that fair to say?
A. Yes.
Q. And it has -- Allergan stopped and started and then stopped again and restarted work on this animal-protein free product; correct?
A. Yes, I explained the reason.
Q. And this stopping and restarting has gone on for decades?
A. I don't know about decades, but it has gone on for some time.
Q. Okay. Well, let's see.
So Allergan started work on an animal-protein free process in 2002; correct?
A. Approximately.
Q. Okay. So that was -- what are we in? 2025. That was 23 years ago; correct?
A. (No audible response.)
Q. Okay. And then Allergan put that animal-protein free work on hold in 2004; correct?
A. From my recollection, yes. Remember that I was not in the company at that time.
Q. Right. And then Allergan decided to restart the work

on animal-protein free three years later, in 2007; correct?
A. Correct.
Q. And then five years after that, in 2012, Allergan again put the animal-protein free work on hold; correct?
A. Just because it was on hold does not mean that we deprioritized that work. That was still a very valuable program with high priority. As I mentioned, we had a lot to do at the time. We just did not have the bandwidth to work on everything.
Q. That wasn't quite my question, though.
The question was: In 2012, Allergan again put the animal-protein free work on hold; correct?
A. (No audible response.)
Q. And then because you're here on the stand testifying about it, presumably, at some point after 2012, Allergan made the decision to restart that animal-protein free work?
A. That's correct. I should say that animal-protein free work was done was still ongoing through the years, just wasn't as robust maybe as it is now.
Q. Now, this is important, so I want to make sure I have this right.
Is it your testimony that Allergan invented an animal-protein free, long-duration product back in the early 2000s but it has needed over 20 years of additional development to finally bring an animal-protein free,

long-duration product to market?
A. As I was mentioning before in my direct testimony, these products take a long time to develop. So you're putting together some dates over here, but I can tell you that this program was very strong, very much in priority, takes some time to develop more and more optimizations on this. It's not something that can be done overnight.
Q. But it's fair to say it's Allergan's position that it filed for a patent in 2005 and it had invented animal-protein free products that have a long duration; right?
A. Correct.
Q. And despite that invention way back in 2005, now 20 years later in 2025, you're still working on the development for an animal-protein free, long-duration product?
A. The development is there. We're just trying to bring these out into the market through clinical trials and everything else. So products are there, but development, as you call it, going into clinics and getting approvals, takes a long time.
Q. During that 20-year time, one of those patents, one of the patents asserted in this case, has actually expired. It ran its entire 20-year lifespan?
A. Yes.

Q. And to this day, Allergan still does not have an animal-protein free, long-duration botulinum toxin product on the market?

A. It's not on the market. It's -- there's one that's actually very close.

Q. But you haven't been able to get an animal-protein free, long-duration botulinum toxin product on the market?

A. Not yet.

Q. Thank you.

THE COURT: Any redirect?

MR. ASHKENAZI: A couple questions, Your Honor.

REDIRECT EXAMINATION

BY MR. ASHKENAZI:

Q. Dr. Broide, do you have the binder in front of you?

A. Yes. This one?

Q. No, the large binder. If you could turn to JTX 59.

MS. WELLS: Objection, Your Honor. Beyond the scope.

MR. ASHKENAZI: Your Honor, there were questions asked about whether he conducted any testing on diffusion. This is their cross binder, and he specifically references it here.

THE COURT: All right. On that basis, I'll allow you to ask him questions about it.

BY MR. ASHKENAZI:

Q. Dr. Broide, what are we seeing here? Do you recognize this document?
A. I do.
Q. Can we please -- is this a document that you are an author on?
A. I am.
MR. ASHKENAZI: Can we please publish this for the jury, JTX 59.
BY MR. ASHKENAZI:
Q. Dr. Broide, what is this document?
A. So this is a poster that was published around 2020 in the dermatology conference that actually goes through some analytical data that we have conducted with the CPP peptide as well as the study I just referenced, the mouse DAS study.
Q. I want to focus on the right-hand side of the screen. It says "DAS assay." And the third bullet, can you please read that into the record.
MS. WELLS: Your Honor, I'm not sure this is in evidence.
MR. ASHKENAZI: Your Honor, I set the foundation. I'd like to move --
THE COURT: I'll admit it.
(Thereupon, Joint Exhibit JTX 59 was admitted.)
MR. ASHKENAZI: Thank you, Your Honor.
THE WITNESS: So this was, by the way, a poster

that was brought up during my deposition. And to the question before about diffusion specifically, we did look at diffusion specifically with that mouse DAS assay but then we ran another assay in a rat where we were injecting specifically into the muscle. This is called the tibialis anterior muscle that controls that reflex. This muscle controls the DAS reflex. When we inject it into these animals, the results that we got, same pattern, same exact pattern that you saw before in the mouse DAS. This suggested to us the diffusion is not responsible for the observed low potency we saw with the CPP peptide. This directly addresses the diffusion question.

BY MR. ASHKENAZI:

Q. In other words, the CPP peptide did not have an effect on diffusion or duration?

A. That's correct. That's correct.

MR. ASHKENAZI: No further questions, Your Honor.

THE COURT: Dr. Broide, thanks. You can step down. Wait there for a second.

Why don't we take the promised ten-minute break I told the jury about. Take the jury out for ten minutes and we'll come back and finish up for the day.

(The jury exited the courtroom.)

THE COURT: We'll be in recess for ten minutes.

(A recess was taken, after which the following proceedings were had:)

THE COURT: Everyone ready to go? Okay. Let's get the jury in. Who's the next witness?

MR. MINNITI: Allergan is going to play deposition designations.

THE COURT: Will that get us through the day?

MR. MINNITI: It should be about 45 minutes.

THE COURT: Might have 15 minutes to fill. Will you come up and introduce them?

MR. MINNITI: I will one by one. And then the exhibits will be admitted thereafter.

THE COURT: You can tell the clerk -- you don't have to tell how the time is divided up. You can tell the deputy clerk at the end of the day.

MR. MINNITI: Sounds good.

(The jury entered the courtroom.)

THE COURT: All right, members of the jury. Welcome back.

Everyone, you may be seated.

I'm informed that we're now going to be playing some depositions. So I wanted to tell you that a deposition is a statement taken from a witness before trial. It's under oath. Notice is given to both sides it's going to occur. Both sides are present and can ask questions of the

witness and the -- so it's played at trial and counts just as much as if the witness was here testifying from the stand because it's a statement under oath from that person. You should treat it the same as you do live testimony.

One other thing is the depositions include a lot of things that turn out not to be important by the time of trial. So you'll see as you go along that things are omitted. A lot of times, there's a running time. You can see the time is moving a lot faster than our time. But the point is that the omissions are by agreement of the parties and were to save time so that only what the parties consider to be important, at least one of the two parties considers to be important, is actually played.

And at this point, both sides have the right to include things in the testimony. So sometimes there may be things that, for example, now where the plaintiff is the one playing it because there's something in it they want to present to you. But if the defendant has something it wants to present to you, it needs to have put it into this also. So it's sometimes unclear. It may be unclear as to why you're hearing this now, but that goes back to what I told you at the beginning. The evidence comes in piecemeal, so listen to everything, and things that may not make all that much sense now should be sorted out at some point.

Okay. Mr. Minniti.

MR. MINNITI: Good afternoon. The first deposition video is from Huong Tran, an Allergan employee who worked with Terrence Hunt.

MR. VARUGHESE: Your Honor, paragraph 64 of the protective order says you have to identify the company with which the witness is associated.

THE COURT: All right. So who is Mr. -- who is Huong Tran employed by?

MR. MINNITI: Allergan, Inc.

THE COURT: All right. Thank you.

(A video was played.)

BY THE ATTORNEY:

Q. -- time today. Could you please state your full name and address for the record.

A. Huong Tran, 2149 Anniversary Lane, Newport Beach, California 92660.

Q. And what is Project 1393?

A. Project 1393, the objective of this project is to develop a nonprotein formulation that stabilize at room temperature if possible.

Q. A nonprotein?

A. Nonprotein formulation.

Q. Of what?

A. Of the neurotoxin.

Q. What neurotoxin?

A. Botulinum toxin type A.
Q. And the goal was to get a nonprotein formulation of botulinum type A that I believe you said was stable at room temperature?
A. That's correct.
Q. When did you begin working on protein formulations at Allergan?
A. When I was in the chemist position, I worked under Terry, and that's when I got involved in the protein formulation.
Q. Is that the first time you've ever done any protein formulation?
A. That's the first time yes.
Q. Who directed your work in 2003?
A. Terrence Hunt, my manager.
Q. So Terrence Hunt directed your work. Did he tell you what exact experiments to conduct?
A. Yes.
Q. So you had no independent decisionmaking in terms of what experiments to conduct?
A. We provided -- I provided in group. I discussed in meetings before we conduct an experiment, but the final decision is Terrence.
Q. Did you discuss what excipients to put into the formulation?

A. At the time, we tried a lot of excipients but still the final decision is to Terrence Hunt's decision. He's the one who decided which excipients that went into the formulations, and I just carried out the experiments as instructed.
Q. And who came up with the goal of that project?
A. I have to defer that questions to Terrence Hunt.
Q. So you don't know who came up with the idea?
A. I have to defer that question to Terrence Hunt.
Q. Why?
A. Because he's the manager. He's my manager at the time. I reported to him. So the project, that's coming out from him. I just worked.
Q. So you don't know whether Terrence Hunt came up with the idea of a protein-free formulation?
A. I don't. I don't know.
Q. So as previously, who communicated to you the idea of making an animal-protein free formulation of botulinum toxin and you said Terrence Hunt. Is that a correct answer?
A. That's the correct answer. He's the one who's communicating to me that the project is to develop a nonprotein formulation that stabilize at room temperatures.
Q. Did he communicate that to you in an e-mail?
A. No.
Q. Was it in a one-on-one conversation?

A. I don't recall.
Q. Was it a meeting?
A. I don't recall.
Q. Did he communicate to you any specifics about what the formulation should contain?
A. I don't recall.
Q. Did he communicate to you that the formulation should contain a surfactant?
A. I don't recall.
Q. Did he communicate to you the idea that the formulation should contain a disaccharide?
A. I don't recall.
Q. Did he communicate to you what pH the formulation should have?
A. I don't recall.
Q. Did he communicate to you that the formulation should have a buffer?
A. I don't recall.
Q. Did he communicate to you any desired potency of the formulation?
A. I don't recall.
Q. Do you know if the work in the patents reflects the work in your notebooks?
A. Yes.
Q. So your answer is the work in the --

A. The work that I did that's leading to the patents, it's in my notebooks.
Q. And who decided what subsequent experiments to perform?
A. Terrence Hunt.
Q. And only Terrence Hunt?
A. Yes, he's the manager of the group.
Q. Welcome back, Ms. Tran. I want to go through the documents in the timeline that you prepared that's Exhibit 1. If we could go to the first tab in Exhibit 2, which is ALGN-0028505, it's under Tab 1.
Is this your notebook?
A. Yes.
Q. And that's your signature where it says author's signature?
A. That's correct.
Q. And you kept this during the course of your employment at Allergan?
A. That's correct.
Q. And the data in it was entered near time -- near or at the time the data was received or the experiments were conducted?
A. That's correct.
Q. If we could go to the -- looks like there's a table of contents on Bates ending 28511. The first entry is on

Project 1340 with the name APF. Does that APF stand for animal-protein free?
A. That's correct.
Q. And next on your timeline you identified Bates ending in 28682 and Experiment 5, if you could go to that page. So this is Experiment 5, correct, on October 22, 2003?
A. That's correct.
Q. And it appears that there are various formulations with a single excipient; is that correct?
A. That's correct.
Q. And who chose these excipients?
A. Terrence Hunt.
Q. And how did you come to know that he wanted to use these excipients?
A. He communicated to us in the meetings.
Q. I just want to understand why Experiment 9 is on this timeline, the significance of it.
A. Okay. It's on this -- Experiment 9 is on this timeline because we just want to show that there was a lot of excipients that we tried at the beginning of the formulations. And those are single excipients.
And also in formulation Experiment 9 we also have two excipients compositions, and from Experiment 9 we see that there was some potency results that we received when we combined the two excipients together. Like, for

instance, Experiment 9101 and 102. So when we combine the toxin trehalose with P188 or K17, we see some potency there.
Q. And again, you didn't select the excipient for the experiment?
A. No.
Q. Terrence Hunt did?
A. That's correct. It's his idea. We only carry out the experiment.
Q. What was it about Exhibit 14 that you're pointing to on your timeline?
A. Experiment 14, do you know, I pointed out on August 26, 2004, we have an experiment and we do have a composition that's provide us the potency after reconstitution. So let's take a look at the Experiment 14033.
Q. And again, Terrence Hunt chose the excipients here?
A. That's correct. I also like to point out the Experiment 14. If you look at Experiment 14058, you can see that the composition is P188 and trehalose and that composition give us the potency recovery from 75 percent.
Q. Did Terrence ever state that he had a target potency he was looking for with the formulations?
A. The data we collected here is to support the claim that he made in those patents, and so we just report the data in those patent. And the expectation is -- I don't

know what his expectation is, but I know that if we have -- if we come up -- if we have a formulation that has potency then it's a good indication that that formulation or that combination of that formulation work.

Q. So you're not aware if he said I want 75 percent recovery?

A. No.

(The video ended.)

MR. MINNITI: Your Honor, at this time plaintiffs move JTX 196 into evidence.

MR. VARUGHESE: No objection, Your Honor.

THE COURT: All right. That is what?

MR. MINNITI: JTX.

THE COURT: What is it?

MR. MINNITI: JTX 196 is a spreadsheet containing certain test formulations analyzed by Terrence Hunt.

THE COURT: All right. Admitted without objection.

(Thereupon, Joint Exhibit JTX 196 was admitted.)

MR. MINNITI: The next video to be played is of Bryan Bullock. Bryan Bullock was an employee of Revance Therapeutics, Inc., at the time of this deposition and a business professional within Revance.

(A video was played.)

BY THE ATTORNEY:
Q. State your name for the record.
A. My name is Bryan Bullock.
Q. Who is your employer?
A. I work at Revance Therapeutics.
Q. What is your current position at Revance?
A. I'm the senior director of marketing for aesthetics.
Q. At the time that you joined Revance in May of 2020, had the formulation for DAXXIFY already been set?
A. Yes.
Q. When you began working at Revance in May of 2020, when did Revance anticipate that DAXI would be launched?
A. November 2020.
Q. And what surveys are you aware of that Revance commissioned that show this market opportunity?
A. Ongoing. Over the last few years, many years, we do market research to characterize the botulinum toxin market, and it's not one survey. There's multiple surveys to understand what's the satisfaction with the current options today.
Q. How does DAXI differentiate itself from those conventional toxins?
A. The primary way is when we talk about the long-lasting results, the mean duration of six months and up to nine months for some patients, but there's a lot of

patients where we're different, but that's how we generally compete against other competitors in the space.

Q. DAXI doesn't use HSA; correct?

A. No.

Q. And is the lack of HSA something that's mentioned in marketing materials?

A. Yes.

Q. I'm going to mark Exhibit 3. This is a document bearing Bates number RAV_DAX-02674751 through 02674773. Are you familiar with this document?

A. Yes.

Q. What is this document?

A. Neuromodulator background.

Q. What was the purpose of this document within Revance's organization?

A. To provide an understanding of the neuromodulator market today or when it was commissioned.

Q. And this is providing an understanding to whom?

A. Revance associates.

Q. I have marked Exhibit Number 4 as Bates number REV_DAX-2675392 through 2675404. First question is, are you familiar with this document?

A. Yes.

Q. And what is this document?

A. This is healthcare professional FAQs for public

service.
Q. What's the point of this document?
A. To provide contextual information guidance to how customer service should respond to healthcare professional questions.
Q. What was your role in preparing this document?
A. To -- my role was to understand potential questions that would be raised or asked by healthcare providers in working with subject matter experts to get the proper response that can be shared.
Q. And then the second bullet point, DAXXIFY is also the only neuromodulator that is made with no animal derivatives or human serum albumin, HSA.
Do you see that?
A. Yes, I see that.
Q. Does the toxin itself in DAXI yield the longer-acting activity over BOTOX?
A. Not to my knowledge.
Q. I'm going to hand you what I'm marking as Exhibit 6 which is a document that does have a Bates number but it's the RVNC Investor Day 2023 deck. Are you familiar with this document?
A. Yes.
Q. What is this document?
A. It's a Revance Investor Day slide PowerPoint

presentation. Looks like printed out.
Q. And this was a PowerPoint presentation that was made available during -- in the Investor Day by Revance that happened in this past September 2023; correct?
A. Yes.
Q. And were you involved in preparing aspects of this presentation?
A. Yes.
Q. And what was the purpose of an investor day 2023?
A. To provide some input on the progress we've seen with DAXXIFY and to make them aware of some recent strategic choices.
Q. If you turn to slide 20, if you look at slide 21, this says duration continues to be the most important factor for consumers when deciding which neuromodulators to use.
Do you see that?
A. Yes, I see where it states that.
Q. Who decided to present this survey information to your investors on Investor Day?
A. Senior leadership.
Q. Turn to the next slide, 22. States how is DAXXIFY different.
Do you see that?
A. Yes, I see where it states that.
Q. And as part of the data or factors provided to

investors, Revance identified no human serum albumin and no animal-derived components as two factors of how DAXXIFY is different; correct?
A. Two of many.
Q. And Revance tries to be truthful and accurate with respect to information that it provides to the general public; correct?
A. Yes.
Q. I'm going to mark as the next exhibit Exhibit 8, document bearing Bates number REV_DAX26787206 through 2687728. Are you familiar with Exhibit 8?
A. Yes.
Q. What does Exhibit 8 represent?
A. It represents DAXXIFY's launch planning PowerPoint presentation in printed format.
Q. This was an internal presentation regarding the DAXXIFY launch?
A. Yes.
Q. So I'd like to turn your attention to slide three, which is on the Bates ending in 208.
A. Okay.
Q. The title of this is "DAXI SWOT," S-W-O-T; correct?
A. Yeah, that's what is states.
Q. And SWOT is short for strengths, weaknesses, opportunities, and threats?

A. Yes.
Q. What's the purpose of a SWOT analysis at Revance as it pertains to DAXI?
A. To understand where's -- to help inform your product strategy, whether it be for launch or something that's already commercialized for growth or sustainability.
Q. So the SWOT, under strengths, the first bullet point listed is longer duration and higher response rates versus existing treatments; correct?
A. Yes, it states that.
Q. If you look at the fourth bullet point under strengths, it states "contained no human- or animal-derived components"; correct?
A. It states that, yes.
Q. So Revance viewed that as a strength for DAXI; correct?
A. And it says that it's captured or categorized here. I think as you're introducing your product and you're working with a target product profile, I think you call out differences. And I think it's stated in this as a difference. But in terms of what the measured or measurable degree of strengths, we found that most providers and patients don't have a clue what HSA or animal derivatives do, let alone what they are, so it's not a basis of competition. And so if we -- here to be showing the

strengths, it's a reflection that we were less mature at the time in understanding what the true strengths of DAXXIFY were. For the sheer convenience factor of being an attribute, it's captured there.

Q. Does Revance continue to identify the fact that there's no human- or animal-derived components in marketing materials regarding DAXI?

A. Certainly, but that's because it's readily identifiable. We lead with duration, but as you've shown or presented in documents, many will try to obfuscate things, how they describe duration, by moving data points around. So it's a very independent, objective difference between one formulation versus another.

Q. Mark as Exhibit 12 document bearing Bates number REV_DAX02687035 through 026807098. Are you familiar with this document in Exhibit 12?

A. Yes.

Q. What is Exhibit 12?

A. It's a DAXI price journey, first chapter price setting.

Q. How is this document used at Revance?

A. This was used as an organizing framework to help us arrive at what price we would set for DAXXIFY.

Q. Is this a prelaunch document?

A. Yes.

Q. What was your involvement in connection with this analysis?

A. Part creator, part refiner.

(The video ended.)

MR. MINNITI: Thank you, Your Honor. Plaintiffs move into evidence JTX 89.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 89 was admitted.)

MR. MINNITI: JTX 91.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 91 was admitted.)

MR. MINNITI: JTX 93.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 93 was admitted.)

MR. MINNITI: PTX 617, Your Honor.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Plaintiff's Exhibit PTX 617 was admitted.)

MR. MINNITI: The next deposition you'll see is of Joanna Stebbins. She is an employee of Revance Therapeutics, Inc., at the time of the deposition.

(A video was played.)

BY THE ATTORNEY:

Q. We're here for your deposition today. I'm Chad Peterman. I'll be questioning you throughout the course of the day. You understand you are here for a deposition?

A. Yes, I do.

Q. What is your current position at Revance?

A. I am the head of commercial marketing strategy and insights.

Q. What is your job function in that role as the head of commercial marketing strategy and insights?

A. I develop all of the forecasts, I work on pricing, and I pull together materials for Board of Directors meetings and investor relations.

Q. What was your first responsibilities with the product that eventually became known as DAXXIFY?

A. It was developing forecast scenarios. It was updating the 10-K filing with market opportunity assessment data and working with investor relations on describing the market opportunity in the neuromodulator market.

Q. Approximately when did you first develop the forecast for DAXI?

A. I started working on the forecast for DAXI probably in January or February, February of 2020.

Q. I want to mark as Exhibit 7 another spreadsheet and

it has the title REV_DAX-02680442 (2023) DAXXIFY business plan account productive method V4.4.2.

Do you recognize this document?

A. Yes, I do.

Q. What is this document at Exhibit 7?

A. It is a quarterly forecast with an upside and a base scenario upside and a base upside and a base scenario and a monthly tab.

Q. Is this a forecast that you had a role in preparing?

A. Yes, it is.

Q. Exhibit Number 9 has the Bates number REV_DAX02680128. Do you have the document in front of you?

A. It's opening. Yes.

Q. What information does it reflect?

A. It reflects various DAXXIFY forecasts, an RHA forecast, and the DAXXIFY therapeutic forecast.

Q. Were you involved in preparing this forecast?

A. Yes, I was.

Q. Do you know approximately when this forecast was prepared?

A. Earlier this year.

Q. Earlier in 2023?

A. Correct.

Q. In Exhibit 9, let's look at the first worksheet. It says, "Scenario one, Revance/BOD forecast."

A. Correct.
Q. What does "Revance/BOD forecast" mean?
A. It is our known stretch forecast. It's the Revance Board of Directors forecast.
Q. We'll take a look at what I'm going to mark as Exhibit 10 which has the Bates number REV_DAX02680682. Let me know when you have the document open, please.
A. It's opening. I can see it.
Q. This appears to be a DAXXIFY therapeutics sales forecast; is that correct?
A. That's correct.
Q. Marking as Exhibit 13 a document bearing Bates number REV_DAX02666789 through 02666868. Have you seen this document before?
A. Yes, I have.
Q. What is this document?
A. It is RT002 pricing assessment PowerPoint presentation dated October 2018.
Q. What is Insight Strategy Advisors?
A. A consulting company.
Q. This is a company hired by Revance?
A. I presume so. It's before my tenure, but yes.
Q. Turning to page 12 of the deck, it's ending in Bates number 02666800. This slide lists the top three most and top three least attractive attributes of RT002 to patients;

correct?
A. That is what this document states, yes.
Q. And if you go down to the fourth characteristic shown on the left, it states "free of all human- and animal-derived proteins"; correct?
A. That is what it states.
Q. And the date reports that 33 percent of the patients rated that characteristic in their top three most attractive attributes; correct?
A. That is what it states.
Q. Welcome back. I'm marking as Exhibit 16 a document that we pulled from Revance's website RVNC Investor Day 2023. Are you familiar with this document?
A. Yes, I am.
Q. And what is this document?
A. This is a presentation that was used during the investors' meeting last week in Italy international.
Q. And did you have any role in compiling this document?
A. I'm one of the individuals who contributed questions on it.
Q. If you turn to slide 66, go to Exhibit 16.
A. Yes.
Q. This slide concerns the cervical dystonia indication; correct?
A. That's correct.

Q. And it indicates that BOTOX has 83 percent share of the U.S. market for cervical dystonia as of 2022?
A. That is correct.
Q. And Revance states that BOTOX has never been seriously challenged by new entrants; is that correct?
A. That is correct.
Q. And is it your understanding that Revance intends to seriously challenge BOTOX in connection with cervical dystonia?
A. My understanding is that Revance is intending and is bringing a product to the market that will make the life of patients better and ease the suffering from cervical dystonia, yes.
Q. And the product that Revance is bringing on is the same product that it sells on the cosmetics side; correct?
A. That is correct.
Q. I've handed you what's been marked Exhibit 22, Bates number REV_DAX-02672548 through 0267261, document entitled "Revance CI Program October 2021 Report."
Do you see this document?
A. I can see the document.
Q. Are you familiar with this document?
A. I am familiar with this document.
Q. What is the document?
A. It is a presentation from Sedulo Group.

Q. Does CI stand for competitive intelligence?
A. Yes, it does.
Q. What's the purpose this presentation?
A. It's to summarize online activity and what competitors are doing and updates on clinical progress on various pipelines, messaging, et cetera.
Q. If you turn to the Bates page ending in 2672554.
A. 26.
Q. It's about two or three pages in ending in 554.
A. Yes.
Q. This cites -- has key overall competitors: Threat matrix.
Do you see that?
A. I can see that, yes.
Q. AbbVie is listed at the top competitor with a number one threat level.
Do you see that?
A. I can see that, yes.
Q. Why is that being listed as the number one threat level?
A. Based on the criteria that this slide lists on the right-hand side, it's based on annual revenue, sales force size, and that's it. Those are the two key factors in differentiation.
Q. And do you personally view AbbVie's BOTOX as the

number one competitive threat to DAXXIFY?
A. It's one of the competitors in the market that has the largest share. It's a competitor.
(The video ended.)
MR. MINNITI: Thank you, Your Honor. Plaintiffs move into evidence JTX 177.
MR. VARUGHESE: No objection Your Honor.
THE COURT: All right admitted without objection.
(Thereupon, Joint Exhibit JTX 177 was admitted.)
MR. MINNITI: Plaintiffs next move in PTX 373.
MR. VARUGHESE: No objection.
THE COURT: Admitted without objection.
(Thereupon, Plaintiff's Exhibit PTX 373 was admitted.)
MR. MINNITI: PTX 617.
MR. VARUGHESE: No objection.
THE COURT: Already admitted.
MR. MINNITI: PTX 634.
MR. VARUGHESE: No objection.
THE COURT: Admitted without objection.
(Thereupon, Plaintiff's Exhibit PTX 634 was admitted.)
MR. MINNITI: PTX 635.
MR. VARUGHESE: No objection.

(Thereupon, Plaintiff's Exhibit PTX 635 was admitted.)

THE COURT: Admitted without objection.

MR. MINNITI: And then PTX 804.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Plaintiff's Exhibit PTX 804 was admitted.)

MR. MINNITI: The next deposition video that will be played is of Chad Lindemann, an employee of AbbVie, Inc. He is vice president, customer marketing.

(A video was played.)

BY THE ATTORNEY:

Q. Please state your name for the record, please.

A. Chad Lindemann.

Q. And just to confirm, what is your current position at Allergan?

A. Vice president of customer marketing for the facial aesthetic products and skin care products.

Q. I'm looking at Exhibit 6, document bearing Bates number ALGN10844340. Mr. Lindemann, tell me when you have the document up.

A. I have it.

Q. Are you familiar with this type of document?

A. Yes.

Q. What is the purpose of this document?
A. This looks to be a long-range planning document similar to some of the others we looked at earlier.
Q. What's the purpose of a long-range planning document?
A. We use that to develop out our strategies year to year and also our financial goals we plan to hit.
Q. On slide 13 on the right-hand side, do you see where it says "notable competitors"?
A. Yes.
Q. What is meant by "notable competitors"?
A. This seems to show, essentially, all U.S. and international neurotoxin competitors to BOTOX. That's my --
Q. Could you identify which are the U.S. neurotoxin competitors to BOTOX Cosmetic in this list?
A. Sure. At the time this was done -- I can see the dates at the bottom -- in 2020 DAXI was yet to be a competitor, not on the market, but you would have Dysport, Galderma, you'd have Xeomin from Merz you would have Jeuveau from Evolus and that would be it.
Q. Mark as Exhibit 7 a document bearing Bates number ALGN1841463 through 1519. Have you seen this type of document before?
A. Yes.
Q. Do you have a chance to review it?
A. I did.

Q. Did that additional review help inform your understanding what the purpose of the document is?
A. Yes.
Q. How does your understanding differ from the prior testimony?
A. This looks to be a document that was created for internal usage given the timing, shortly after the AbbVie acquisition, to educate others throughout the organization on the neurotoxin business, both aesthetically and cosmetically for Allergan based on a lot of the historical information that was provided in here.
Q. Aside from DAXXIFY, are there any other botulinum toxins on the market that claim to last longer than BOTOX Cosmetic?
A. I've heard Jeuveau market that sometimes. I've heard Dysport market themselves as longer lasting sometimes.
Q. What was Dysport's penetration increasing steadily from 2019 to 2021?
A. I'm not sure.
Q. Do you have any understanding what was happening in the marketplace for botulinum toxin products during that time that would have led to an increased market penetration by Dysport?
A. We were -- had COVID in the middle. One thing that did occur that was a difference between Allergan sales force

and Galderma sales force is Allergan kept their reps at home for about six months from March to the fall. Galderma released their reps back in office around May of that year, so that could be a contributing factor.

Q. Why did you decide to price BOTOX Cosmetic differently than BOTOX Therapeutic?

A. I think in the therapeutic world, it's, obviously, everything goes through insurance. They go directly through wholesalers. In the cosmetic space, in my experience, price increases are very sensitive and customers feel those price increases, so we wanted to minimize the disruption to our customers.

(The video ended.)

MR. MINNITI: Next one up, Your Honor, plaintiffs move JTX 158 into evidence.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 158 was admitted.)

MR. MINNITI: Plaintiffs further move into evidence PTX 245.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Plaintiff's Exhibit PTX 245 was admitted.)

MR. MINNITI: The next video is of Jamie

Gonzales, executive director, global commercial development. She is an employee of AbbVie, Inc.

(A video was played.)

BY THE ATTORNEY:

Q. Could you please state your full name for the record.
A. Jamie Gonzales.
Q. Who is your current employer?
A. Allergan Aesthetics.
Q. What is your position?
A. Executive director, global commercial development for the neurotoxin franchise.
Q. I'd like to introduce Exhibit 5 bearing Bates numbers ALGN1844340 through 412. Please let me know when you have the document in front of you.
A. I have the document in front of me.
Q. Do you recognize this document?
A. Yes.
Q. What is this document?
A. It says it's the aesthetics neurotoxin LRP strategy.
Q. What is the purpose of this document?
A. It is to provide the long-range plan of the neurotoxin franchise.
Q. And is this, to the best of your knowledge, document accurate?
A. Yes.

Q. If you could turn to page 57 which bears the Bates stamp ALGN1844396. Below the title in the slide, there is a purple chart. Do you see that?
A. Yes.
Q. Where on this chart of level of differentiation what would you place DAXXIFY?
A. With the claims that DAXXIFY is making, it would be closest to the long-acting product in development.
Q. And then for LAI, you mentioned that the differentiator is the longer duration?
A. Correct.
Q. And does that appeal -- is that a factor that would appeal to a healthcare provider or a patient?
A. To both in different degrees.
Q. Why would it appeal to a healthcare provider?
A. A healthcare provider may like to have an additional product to offer their patients. And then the patient may want something that has a longer duration, so that healthcare provider benefits by being able to offer that to their patient.
Q. Why would the longer duration appeal to a patient?
A. Mm-hmm. That could be for the reason of using the -- the product may -- again, this is in development, may offer their effect of the neurotoxin for a longer period of time and they may appreciate that as a benefit.

Q. Why would that be a benefit?
A. They may feel that they wouldn't have to come into the office as much or they may feel that the formulation itself offers a benefit that they're interested in.
Q. Those are features that distinguish LAI from the BOTOX that's currently being sold on the market?
A. Correct.
Q. So for BoNT/E, you said the distinguishing characteristics were the rapid onset and short duration?
A. Correct.
Q. Why would those features appeal to a healthcare provider?
A. As stated before, that may be bringing in additional patients into their office that have been hesitant to try a toxin that's currently on the market.
Q. Why would these two features appeal to a patient?
A. The trial for the short duration allows them to experience the effects of the treatment and potentially provide them enough of an experience to get them over the hurdles of why they -- their hesitancy or their barriers to trying treatment that they had.
Q. And then for LAI, who are the expected competitors to be when that product launches?
A. Revance DAXI and Galderma QM1014.
Q. I'd like to introduce Exhibit 16 which bears Bates

number ALGN1844413.
A. Okay.
Q. Do you recognize this document?
A. I do.
Q. What is this document?
A. It is the "Long-Acting Toxins and Conjoint Analysis Final Report" November 2020 in *Research Partnership*.
Q. If you turn to page 23 which bears Bates number ALGN1844426, please let me know when you're there.
A. I'm here, slide 23.
Q. And do you see a list of relative importance of attributes?
A. Yes.
Q. Okay. And what are listed as the attributes making up 51 percent of the importance of the attributes in the U.S. market?
A. Price, manufacture, and brand.
(The video ended.)
MR. MINNITI: Your Honor, plaintiffs move into evidence JTX 65.
MR. VARUGHESE: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 65 was admitted.)
MR. MINNITI: Plaintiffs further move into evidence JTX 158.

MR. VARUGHESE: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 158 was admitted.)

MR. MINNITI: Now, the final deposition video we'll be showing is of Hui Xiang. Hui Xiang is the inventor of the '740 patent. He is an employee of AbbVie, Inc.

(A video was played.)

BY THE ATTORNEY:

Q. Can you state your full name for the record, please.

A. My name is Hui Xiang. First name, H-U-I. Last name, X-I-A-N-G.

Q. And it says here you joined Allergan in April 2002; right?

A. Yes.

Q. And what was the position -- what was the position that you joined in 2002?

A. I joined Allergan in 2002 as a scientist.

Q. What products were you working on between 2002 and 2005?

A. When I joined in 2002, you know, we were tasked to improve this BOTOX drug substance manufacturing process that is the precipitation based on manufacturing process derived from Dr. Schantz.

Q. Why was your -- why were you tasked with improving the BOTOX drug substance manufacturing process in 2002?

A. That process was developed in the early '40s and '50s, originally developed in that time frame, and then there are issues in manufacturing at that time, so we were asked to identify opportunities for improvement.

Q. And as part of the improvement, the drug substance manufacturing process improvement work that you were doing in 2002 to 2005, was developing an animal-protein free purification process part of the improvement effort that you were working on?

A. That was on the wish list for the improvement.

Q. And why was your group looking at an animal-protein free purification process?

A. Well, because raw materials are derived from animal sources could potentially increase risk of safety issues because of the viral combination and the BSE/TSE agents.

Q. At the time, were there any regulatory requirements with respect to using animal-derived sources or not using animal-derived sources?

A. There are some guidelines to such as the possible -- you'll go with animal-product-free materials, but I cannot comment whether it's -- I don't have any other comment.

Q. And as part of the improvement work that you were doing on the BOTOX drug substance manufacturing process in 2002 to 2005, were you also looking to eliminate any acid precipitation steps in that process?

A. Well, at that time we wanted to improve the precipitation-based process of, you know -- we started with, you know, those precipitation steps, but eventually because I have the previous experience on chromatography and I took the initiative to further develop a chromatography-based process to purify *clostridium botulinum* and that was my idea at the time, quite physically they are not sure this will work. They basically say, "Yeah, you can try." I took the initiative and I later found I was successful in developing this.

Q. Going to hand you what's been marked as Xiang Exhibit 2 which is a copy of U.S. Patent 7,354,740.

Dr. Xiang, are you familiar with Exhibit 2?

A. Yes.

Q. What is Exhibit 2?

A. It's a patent, U.S. patent.

Q. You're familiar with this patent?

A. I did work related to this patent.

Q. What work did you do with respect to this patent?

A. I developed the animal-product free chromatography-based purification process for *clostridium botulinum* toxin.

Q. And did any of your work suggest that an anion exchange chromatography resin should not be used with a BoNT/A complex?

A. You're asking me did any of my work suggest that anion exchange resin should not be used for BoNT/A complex? Is that your question?
Q. Yeah, for BoNT/A complex purification.
A. For BoNT/A complex purification. Think about it. I recall in earlier studies we noticed some changes of -- we had some issues.
Q. You said there was earlier studies where you noticed some changes or issues?
A. Yes.
Q. Is that what you said? What does that mean?
A. We noticed some unexpected results. I cannot remember the details.
Q. What do you mean, "unexpected results"?
A. With our available analytical tools at the time, we have the methods to assess the BoNT/A complex -- a purified BoNT/A complex. If we see some change, that means either it's purity or stoichiometry or any of those, we would say, yeah, the results. Some of the changes could be -- potentially could be either some impurities present or some changes in terms of the stoichiometries that lose some components or something. It could when any of those.
Q. I'm going to hand you what's been marked as Xiang Exhibit 13. It is a multipage document bearing Bates numbers ALGN0048173. What is Exhibit 13?

A. Exhibit 13 is a slide deck I prepared back in 2015 titled "DS2 Program Overview."
Q. If you turn to page 176, it's a slide titled "DS2 Project 2007 to 2012"; right?
A. The title is "DS2 Project," yes, from 2007 to 2012.
Q. In the first paragraph, it says in 2007, Allergan resumed APF effort to develop the DS2 process with the following course?
A. I see the sentence there.
Q. And I think you had said earlier -- correct me if I'm wrong -- that Allergan resumed this effort because there was new management?
A. New management came in around the 2006-2007 time frame.
Q. And do you recall why new management wanted to resume APF efforts?
A. I don't know why, but we were asked to continue with the APF effort.
Q. But in 2012, Allergan decided to put the DS2 project on hold again?
A. I see that's right.
Q. Do you know why that was done or why that decision was made in 2012 to put the DS2 project on hold?
A. We were told to put the project on hold. I don't know why.

Q. At the time in 2012 when Allergan decided to put the DS2 project on hold, the DS2 project involved animal-product free fermentation and a chromatography-based downstream purified process?
A. When the DS2 project was put on hold in 2012, that process involved animal-product free fermentation process and animal-product free purification process as well. That purification process involves some anion exchange chromatography, cation exchange chromatography, and a hydrophobic interaction chromatography to purify the BoNT/A complex.
Q. Going to head to what's been marked as Xiang Exhibit 14. It's a multipage document bearing Bates numbers ALGN0054939. What is Exhibit 14?
A. Exhibit 14 is a slide deck (inaudible).
Q. Feel free to review it.
A. So Exhibit 14 is a slide deck I prepared in October 2017 titled "DS1 and DS2 Impurity Clearance and the DS Tests Comparison."
Q. And what was the purpose of preparing the slide deck that is Exhibit 14?
A. This slide deck summarizes impurity clearance and the DS test comparison, as the title describes.
Q. So can you turn to Bates page -- last four digits are 947.

A. 947. I'm there, yes.
Q. And the title of that slide is called "DNA Clearance"?
A. I see that.
Q. And there's a kind of a call-out on this page with respect to the DS2 process. Do you see that?
A. A call-out. You refer to that as --
Q. It's a comment bubble.
A. It's a bubble. Yes, I see that.
Q. This says, "DS2 cleared DNA early in the process"?
A. I see that.
Q. And it's referring to the primary purification step; right?
A. Well, that sample is collected after the AEC step. That is after the process for diagram. It is after -- it depends on which process we're talking about, either it's the harvest therapy that is after purification.
Q. So after primary purification for the DS2 process on the anion exchange chromatography column, the eluent coming out of that column was tested?
A. That's correct.
Q. And that eluent had a 0 percent amount of DNA level as shown here on the slide?
A. Yes, I see that.
Q. Do you have any basis to disagree with the data

that's shown here?
A. I see the data as recorded here on the slide. I don't have anything to add.

(The video ended.)

THE COURT: All right. So members of the jury, thank you for your patience. So we're finished for the day.

And before the deputy clerk takes you out, there's three things I need to tell you, one of which is we intend to start at 9:30 tomorrow. So make sure you're back here early enough to get settled and be ready to go at 9:30. We're usually pretty good about starting on time.

The second thing is I want to remind you the instruction I gave you earlier, which is not to do any research on your own. And, you know, you'd heard a lot of things today, and it would be natural not to understand all of them at this point. But this is not like school. You don't get a grade for doing extra homework.

So go home and relax, but whatever you do, don't start looking things up with Google or any other program that you use to find information. And one of the things that's important is that everybody get the same information, and that only happens here in court.

And then the third thing, the last thing, is this. Don't talk to anyone about the case. If you have a spouse or a partner or a parent or a child or somebody at

home, don't start talking to them about the case.

The problem is, you know, people react to what you say, and how people react, it can impact your own thinking about things. And so the only people who are allowed to impact your thinking in this case are your fellow jury members, and they can't do that until the case is set for deliberations.

So don't let anyone start offering you their theories about, you know, anything that's possibly related to this case. And the best way to do that is not to talk to them in the first place about it. So you really have to not do that. Okay?

So can we take the jury out, and we'll see you tomorrow morning.

(The jury exited the courtroom.)

THE COURT: All right. Everyone can be seated.

First off, Mr. Minniti, do you want to move some exhibits in before we forget about it?

MR. MINNITI: Yes, Your Honor. Plaintiffs move into evidence JTX 3.

MR. VARUGHESE: No objection.

THE COURT: All right.

MR. MINNITI: Plaintiff's move into evidence JTX 60A. We'll be entering in an exhibit that excerpts out -- excerpts everything but the four pages of that

document.

MR. VARUGHESE: No objection.

THE COURT: All right. Those two exhibits are admitted without objection.

(Thereupon, Exhibits JTX 3 and JTX 60A were admitted.)

THE COURT: Yes.

MR. MINNITI: And the third exhibit is DTX 20, which involves a certain -- issues related to the ECT that I believe we'd like to raise with Your Honor.

THE COURT: ECT?

MR. MINNITI: The national security concerns --

THE COURT: The control --

MR. MINNITI: Yes, sir.

THE COURT: All right. Well, this would be a good time to raise them.

And I take it, Mr. Varughese, you don't have any objection?

MR. VARUGHESE: No.

THE COURT: That's helpful.

(Thereupon, Defendant's Exhibit DTX 20 was admitted.)

MS. RUPERT: Hi, good afternoon. Melanie Rupert for Allergan. I'm going to talk about ECT again.

So just to kind of set the stage, we wanted to

circle back on this issue because we've discussed it a couple of times before. And we wanted to flag for you that we do anticipate entering a very limited number of exhibits that will need to be placed under seal.

One was used with Hui Xiang today and the other was used with Huong Tran. And we also anticipate that the -- the good news, it will be minimal. And we understand Your Honor's preference to keep the courtroom open.

We've also agreed to excerpt certain documents to avoid sealing the courtroom and that was the JTX 60A.

THE COURT: Okay. Well, that's good. I appreciate that on both sides. I mean, I appreciate your working together to work that out, was what I was trying to say.

MS. RUPERT: Okay. And then to the extent helpful, we can file a motion to seal the small number of exhibits at the end of trial.

THE COURT: Okay. All right. So right now you're just telling me stuff to keep me informed. There's no action item for me to do something?

MS. RUPERT: Well, I do want to apprise you of something else. So tomorrow we will be using some exhibits that have ECT information with Mr. Hunt. And we have discussed that with Revance.

And what we would like to do, subject to Your

Honor's approval, is show the pubically available information, to publish that, but to give the jury the full copy of the exhibit so they can look at it during the testimony.

Revance has said that's fine and we're going to try to speak with them tonight.

THE COURT: Okay. Well, that's fine with me too.

MR. RUPERT: Okay. So how would you like us to do that? Should we give them to the court deputy, those exhibits to be passed out to the jury?

THE COURT: Sorry. I get in trouble if I speak over you.

So I think the best thing -- because I don't -- I prefer not to have parties handing things to the jury members. So -- and I also prefer to make sure that I don't have a champion weightlifter as a deputy clerk.

And so assuming we do not have too heavy of an item, I'd like you to give them to the deputy clerk and she can hand them out whenever you request. Okay?

MS. RUPERT: Thank you, Your Honor. They're two small folders.

THE COURT: Two small folders?

MS. RUPERT: Two small folders.

THE COURT: Okay. That sounds promising.

All right. And anything else?

MS. RUPERT: No. Thank you very much, Your Honor.

THE COURT: Thank you. Okay. And so then I think we -- and so I forget. So I got these four letters that were filed sometime last night after I last looked and before I got up this morning.

What is the deadline for you filing these letters of disputes you want me to resolve in the morning?

MS. GAZA: Your Honor, I believe the objections to opening slides were due at 6:00 p.m. yesterday and that the other objection letters were due at, I believe, 11:00 p.m. last night.

THE COURT: Were they actually filed by 6:00 p.m.?

MS. GAZA: They were not, Your Honor.

THE COURT: Okay. All right. Because I thought I had looked later than that and there was nothing. But that's all right. But I understand you're trying.

So but for present purposes, anything you're filing tonight is supposed to be filed by 11:00 p.m.

MS. GAZA: Correct.

THE COURT: All right. I get up early in the morning.

And then the other thing was just ask

Mr. Dittmann or somebody on your side, what is your expected order of presentation tomorrow, roughly? I take it, have you played all the depositions you plan to play in your case in chief?

MR. DITTMANN: There might be one more, I believe, the deposition designation, which we'll not start tomorrow.

We'll start with Mr. Hunt and then Dr. Bates and then the video, one more video, Dr. Schöneich, Dr. Gessler. Dr. Drago, and then Dr. Siegwarth. Obviously not all tomorrow, but.

THE COURT: Okay. And the way this is going to work is Dr. Schöneich and Dr. Gessler, are they people that you're then going to be recalling?

MR. DITTMANN: Just those two will be rebutting on validity issues.

THE COURT: Okay. All right. Well, that's all helpful.

Is there anything else you want to bring up with me right now?

MR. VARUGHESE: Nothing from me.

MR. DITTMANN: Not currently, although we may have some more issues, but not right now.

THE COURT: Yeah, yeah. Well, I'm hopeful that given time you'll work those things out. But that's all we

have right now.

Okay. Well, thank you. So I'll see you tomorrow morning.

(The proceedings were in recess at 5:18 p.m.)

**C E R T I F I C A T E**

I, Deanna L. Warner, a Registered Professional Reporter, do hereby certify that as such Registered Professional Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$140** [2] - 137:16, 148:8
**$270** [4] - 105:12, 119:15, 137:20, 158:10
**$273** [1] - 132:3

## '

**'40s** [1] - 241:1
**'50s** [1] - 241:2
**'60** [1] - 166:17
**'740** [7] - 17:12, 74:1, 117:1, 117:9, 119:10, 156:5, 240:6
**'748** [4] - 74:2, 117:6, 119:10, 147:21
**'7Os** [1] - 166:17
**'80s** [6] - 44:19, 111:22, 144:18, 145:2, 146:14, 166:17
**'878** [14] - 19:16, 74:2, 114:12, 114:20, 115:11, 115:18, 119:13, 122:14, 122:18, 123:2, 123:12, 131:13, 146:20, 147:21
**'90s** [6] - 44:19, 111:22, 145:2, 146:15, 147:15

## 0

**0** [5] - 183:3, 185:1, 185:5, 187:22, 246:22
**004** [1] - 179:9
**01** [1] - 197:7
**02666800** [1] - 227:24
**02666868** [1] - 227:13
**0267261** [1] - 229:18
**02674773** [1] - 218:9
**026807098** [1] - 223:15

## 1

**1** [6] - 30:12, 70:10, 153:15, 153:16, 213:10, 213:11
**10** [5] - 23:21, 55:24, 155:10, 188:6, 227:6
**10-25** [1] - 5:10
**10-30** [2] - 6:9, 6:16
**10-32** [2] - 6:17, 6:23
**10-5** [1] - 3:24
**10-K** [1] - 225:18
**100** [1] - 4:10
**102** [1] - 215:1
**11** [2] - 31:10, 70:14
**11,147,878** [1] - 73:22
**11,203,748** [1] - 73:22
**11-2** [1] - 166:13
**11-3** [1] - 168:11
**11-4** [1] - 168:24
**11:00** [5] - 37:14, 38:6, 69:20, 252:13, 252:21
**11:22** [1] - 69:21
**12** [8] - 7:8, 23:21, 42:22, 137:14, 223:14, 223:16, 223:18, 227:23
**12:00** [2] - 33:5, 99:13
**12:30** [1] - 33:5
**13** [7] - 16:20, 17:1, 227:12, 233:7, 243:24, 243:25, 244:1
**130** [1] - 144:10
**1340** [1] - 214:1
**1393** [2] - 209:17, 209:18
**14** [14] - 20:13, 20:14, 20:15, 23:21, 69:15, 199:3, 215:9, 215:11, 215:18, 245:13, 245:14, 245:15, 245:17, 245:21
**14033** [1] - 215:15
**14058** [1] - 215:18
**14th** [1] - 1:12
**15** [17] - 6:23, 6:25, 7:8, 7:25, 20:16, 23:21, 28:25, 55:24, 61:24, 122:2, 124:17, 133:5, 155:6, 160:9, 170:16, 207:9
**15-minute** [2] - 23:9, 23:10
**150** [1] - 178:22
**1519** [1] - 233:21
**154** [3] - 9:23, 9:24, 10:16
**158** [4] - 235:15, 235:18, 239:25, 240:3
**16** [6] - 29:2, 70:16, 147:3, 228:11, 228:21, 238:25
**17** [3] - 76:17, 137:14, 162:1
**17-minute** [1] - 74:14
**17.5** [1] - 132:24
**176** [1] - 244:3
**177** [2] - 231:6, 231:10
**18** [4] - 23:21, 84:2, 162:2, 175:17
**196** [3] - 216:10, 216:15, 216:20
**1960s** [1] - 192:16
**1970s** [1] - 144:16
**1980s** [4] - 104:5, 107:14, 108:17, 113:24
**1989** [5] - 107:21, 137:3, 138:9, 144:24, 167:1
**1990s** [3] - 108:17, 109:4, 109:10
**1991** [2] - 3:16, 167:9
**1992** [1] - 168:15
**1994** [2] - 155:4, 155:5
**1996** [1] - 55:25
**1998** [1] - 75:11
**1:00** [5] - 32:23, 32:24, 99:12, 99:19, 101:20

## 2

**2** [6] - 23:20, 200:1, 213:10, 242:12, 242:13, 242:15
**20** [27] - 21:25, 23:21, 76:13, 118:16, 118:21, 122:3, 124:17, 130:7, 132:23, 141:13, 145:3, 147:4, 186:1, 186:2, 186:5, 187:8, 188:21, 197:10, 197:13, 197:24, 198:10, 199:13, 202:24, 203:14, 220:13, 249:8, 249:21
**20-year** [3] - 147:10, 203:22, 203:24
**2000** [4] - 84:2, 169:11, 170:7, 170:8
**2000s** [3] - 111:13, 113:6, 202:24
**2002** [14] - 109:19, 111:2, 128:10, 141:5, 168:20, 201:16, 240:12, 240:16, 240:17, 240:18, 240:20, 240:25, 241:7, 241:24
**2003** [4] - 147:3, 154:3, 210:14, 214:6
**2004** [2] - 201:22, 215:12
**2005** [7] - 147:3, 147:20, 203:9, 203:13, 240:19, 241:7, 241:24
**2006-2007** [1] - 244:13
**2007** [12] - 5:20, 163:1, 163:2, 164:14, 164:16, 164:18, 172:19, 172:21, 202:1, 244:4, 244:5, 244:6
**2009** [7] - 145:2, 145:12, 145:15, 147:3, 147:21, 155:5
**2010** [1] - 170:9
**2011** [1] - 81:14
**2012** [10] - 81:16, 202:3, 202:11, 202:15, 244:4, 244:5, 244:19, 244:23, 245:1, 245:5
**2013** [1] - 5:16
**2014** [2] - 53:17, 101:25
**2015** [1] - 244:1
**2017** [5] - 5:12, 53:17, 178:19, 178:21, 245:18
**2018** [3] - 179:2, 180:10, 227:18
**2019** [3] - 145:16, 147:23, 234:18
**202** [7] - 181:13, 181:25, 182:3, 182:5, 184:20, 184:21, 188:6
**2020** [10] - 183:9, 183:11, 183:12, 205:11, 217:8, 217:11, 217:13, 225:24, 233:16, 239:7
**2021** [6] - 147:22, 147:24, 148:3, 156:25, 229:19, 234:18
**2022** [8] - 14:8, 14:13, 105:15, 119:8, 132:2, 146:2, 158:11, 229:2
**2023** [9] - 132:25, 147:2, 178:15, 219:21, 220:4, 220:9, 226:1, 226:22, 228:13
**2024** [1] - 168:23
**2025** [3] - 1:13, 201:18, 203:14
**2026** [1] - 133:1
**2029** [6] - 118:24, 128:22, 132:19, 132:25, 158:5, 158:8
**208** [1] - 221:20
**21** [3] - 9:22, 23:21, 220:13
**2149** [1] - 209:15
**22** [5] - 29:2, 70:18, 214:6, 220:21, 229:17
**23** [6] - 10:22, 39:11, 70:20, 201:19, 239:8, 239:10
**24** [3] - 133:1, 133:6, 137:14
**24-CV-1411-RGA** [1] - 1:5
**245** [2] - 235:20, 235:23
**25** [1] - 70:23
**25th** [1] - 60:13
**26** [2] - 215:12, 230:8
**2672554** [1] - 230:7
**2675404** [1] - 218:21
**2687728** [1] - 221:11
**26th** [1] - 60:15
**270** [1] - 137:17
**270,000** [1] - 81:17
**28** [1] - 70:25
**28511** [1] - 213:25
**28682** [1] - 214:5
**29** [1] - 84:2

## 3

**3** [5] - 5:16, 23:20, 218:8, 248:20, 249:5
**30** [3] - 8:7, 103:24, 165:12
**32** [2] - 23:21, 60:21
**33** [2] - 23:21, 228:7
**34** [3] - 23:21, 29:2, 61:4
**35** [3] - 29:2, 135:12, 145:9
**35-year** [1] - 138:8
**37** [1] - 23:21
**373** [2] - 231:11, 231:14
**38** [1] - 23:21
**39** [3] - 27:17, 29:12, 29:18
**3rd** [1] - 52:9

## 4

**4** [8] - 23:20, 31:11, 86:12, 183:4, 183:6, 185:2, 185:7, 218:20
**40** [2] - 151:22, 158:6
**41** [3] - 20:5, 23:21, 27:18
**412** [1] - 236:13
**43** [3] - 23:21, 29:17, 184:20
**44** [3] - 23:22, 188:5, 188:15
**45** [2] - 23:6, 207:8
**45-minute** [1] - 99:18
**46** [1] - 13:5

## 5

**5** [4] - 29:18, 214:5, 214:6, 236:12
**5.5** [1] - 198:24
**51** [1] - 239:15
**554** [1] - 230:9
**57** [1] - 237:1
**59** [3] - 204:16, 205:8, 205:23
**598** [3] - 122:10, 123:1, 123:10
**5:00** [2] - 23:4, 160:11
**5:18** [1] - 254:4

## 6

**6** [9] - 19:16, 70:12, 153:7, 153:14, 153:15, 153:16, 198:23, 219:19, 232:20
**600,000** [1] - 81:16
**60A** [3] - 248:24, 249:5, 250:10
**613** [3] - 3:2, 3:7, 8:5
**614** [2] - 3:2, 8:14
**615** [3] - 3:2, 8:17, 16:3
**616** [2] - 3:2, 16:4
**617** [3] - 224:18, 224:21, 231:16
**634** [2] - 231:19, 231:22
**635** [2] - 231:24, 232:1
**64** [1] - 209:4
**65** [2] - 239:20, 239:23
**66** [1] - 228:21
**6:00** [2] - 252:11, 252:15
**6A** [1] - 1:12

## 7

**7** [5] - 23:20, 199:7, 225:25, 226:5, 233:20
**7,354,740** [2] - 73:22, 242:12
**7/21** [1] - 41:3
**727** [1] - 5:17
**75** [2] - 215:20, 216:5
**766** [1] - 101:24
**774** [1] - 101:24
**7:00** [2] - 37:14, 38:6

## 8

**8** [9] - 23:20, 76:3, 146:2, 155:9, 199:7, 221:9, 221:11, 221:13
**804** [2] - 232:4, 232:7
**83** [1] - 229:1
**89** [2] - 224:6, 224:9

## 9

**9** [10] - 23:20, 28:15, 31:11, 184:21, 214:16, 214:18, 214:22, 214:23, 226:11, 226:24
**91** [2] - 224:10, 224:13
**9101** [1] - 215:1
**92660** [1] - 209:16
**93** [2] - 224:14, 224:17
**947** [2] - 245:25, 246:1
**98** [1] - 78:24
**9:00** [4] - 32:23, 32:25, 42:21
**9:30** [5] - 21:2, 23:3, 247:9, 247:10

## A

**a-ha** [2] - 104:5, 104:7
**AbbVie** [7] - 26:8, 26:13, 230:15, 232:10, 234:7, 236:2, 240:6
**AbbVie's** [1] - 230:25
**abduction** [3] - 182:11, 182:17, 183:2
**Abellard** [2] - 33:19, 36:21
**abilities** [1] - 109:1
**ability** [3] - 54:2, 57:10, 62:11
**able** [15] - 4:20, 9:9, 23:7, 35:20, 57:3, 107:13, 110:6, 127:13, 149:8, 180:8, 187:23, 194:3, 195:21, 204:6, 237:19
**absolutely** [4] - 153:2, 177:11, 181:6, 184:11
**abstract** [1] - 80:17
**academic** [2] - 20:1, 126:2
**accept** [2] - 94:15, 94:25
**acceptable** [1] - 16:12
**access** [2] - 22:11
**accident** [1] - 57:20
**accomplish** [2] - 59:22, 81:25
**accomplished** [2] - 116:12, 153:10
**accomplishments** [1] - 104:17
**according** [5] - 5:10, 69:20, 87:21, 94:5, 121:16
**account** [3] - 137:23, 158:24, 226:2
**accountable** [4] - 8:9, 105:1, 121:9, 134:6
**accounts** [1] - 49:10
**accurate** [4] - 190:18, 190:19, 221:5, 236:24
**accused** [5] - 84:22, 85:14, 85:16, 86:25, 140:5
**accusing** [2] - 135:15, 135:16
**achieve** [1] - 114:9
**achieving** [1] - 196:4
**acid** [1] - 241:24
**acidic** [1] - 198:19
**acquire** [1] - 63:20
**acquired** [2] - 164:19, 164:25
**acquiring** [1] - 4:8
**acquisition** [2] - 63:19, 234:8
**act** [2] - 9:14, 76:15
**Act** [1] - 81:13
**acting** [6] - 13:16, 143:12, 144:4, 219:16, 237:8, 239:6
**action** [21] - 83:2, 83:14, 83:17, 84:5, 115:19, 123:6, 127:23, 130:19, 131:11, 131:12, 138:25, 139:2, 143:23, 145:19, 146:6, 146:11, 146:12, 195:4, 195:19, 195:24, 250:20
**actions** [2] - 83:16, 134:6
**active** [7] - 142:1, 142:16, 142:22, 142:23, 143:24, 143:25, 144:9
**activities** [1] - 11:16
**activity** [2] - 219:17, 230:4
**acts** [1] - 86:25
**actual** [10] - 119:25, 150:3, 197:6, 197:14, 197:19, 198:20, 199:24, 200:4, 200:8, 200:9
**Adam** [2] - 25:17, 140:18
**ADAM** [1] - 2:6
**add** [4] - 103:9, 188:19, 196:24, 247:3
**added** [3] - 129:3, 129:11, 168:12
**adding** [3] - 76:22, 129:5, 189:5
**addition** [4] - 85:9, 115:17, 143:7, 186:14
**additional** [7] - 86:7, 102:3, 144:8, 202:24, 234:1, 237:16, 238:13
**address** [1] - 209:14
**addresses** [1] - 206:12
**adequate** [1] - 131:24
**administered** [2] - 104:6, 115:21
**admissibility** [1] - 10:13
**admit** [2] - 181:25, 205:22
**admits** [4] - 105:8, 119:9, 119:11, 119:16
**admitted** [40] - 90:22, 92:7, 92:17, 96:14, 182:2, 182:4, 205:23, 207:12, 216:18, 216:20, 224:8, 224:9, 224:12, 224:13, 224:16, 224:17, 224:20, 224:22, 231:8, 231:10, 231:13, 231:15, 231:18, 231:21, 231:23, 232:2, 232:3, 232:6, 232:8, 235:17, 235:18, 235:22, 235:24, 239:22, 239:23, 240:2, 240:3, 249:4, 249:6, 249:22
**admittedly** [1] - 138:8
**ads** [1] - 110:13
**adsorption** [1] - 195:4
**advance** [2] - 37:13, 106:9
**advanced** [2] - 58:16, 117:21
**advantage** [5] - 138:22, 182:21, 187:2, 187:8, 188:17
**advertisement** [2] - 119:25, 120:1
**advisors** [1] - 227:19
**AEC** [1] - 246:14
**aesthetic** [3] - 135:23, 141:3, 232:19
**aesthetically** [1] - 234:9
**Aesthetics** [2] - 106:7, 236:8
**aesthetics** [2] - 217:7, 236:19
**affect** [2] - 94:6, 177:22
**affectionately** [1] - 173:8
**afraid** [3] - 113:22, 120:4, 120:12
**afternoon** [8] - 23:11, 37:6, 49:25, 103:24, 135:5, 192:5, 209:1, 249:23
**agency** [1] - 78:13
**agent** [3] - 78:19, 78:21, 185:24
**agents** [1] - 241:15
**ages** [1] - 31:8
**Agilent** [2] - 65:16, 66:3
**ago** [14] - 35:5, 44:2, 44:17, 61:20, 61:24, 119:8, 120:23, 122:3, 129:19, 130:4, 137:21, 144:10, 147:4, 201:19
**agree** [10] - 6:17, 14:12, 14:23, 19:3, 36:14, 72:21,

101:18, 136:15, 139:19, 199:10
**agreed** [3] - 91:9, 101:10, 250:9
**agreeing** [1] - 83:9
**agreement** [4] - 102:19, 103:14, 103:18, 208:10
**agreements** [1] - 103:17
**agrees** [1] - 83:11
**ahead** [3] - 134:3, 167:21, 168:4
**aid** [4] - 33:25, 36:3, 36:4, 90:9
**AIDS** [1] - 113:24
**air** [2] - 140:1, 182:23
**aisle** [1] - 136:6
**Ajinomoto** [2] - 26:10, 26:14
**Akhilesh** [2] - 27:10, 159:19
**al** [1] - 1:6
**Alan** [4] - 107:14, 144:19, 144:20, 166:18
**albumin** [10] - 112:4, 115:7, 115:8, 115:10, 145:24, 185:14, 185:15, 185:18, 219:13, 221:1
**albumin-containing** [1] - 185:18
**Alexandria** [1] - 78:11
**ALGN-0028505** [1] - 213:11
**ALGN0048173** [1] - 243:25
**ALGN0054939** [1] - 245:14
**ALGN10844340** [1] - 232:21
**ALGN1841463** [1] - 233:21
**ALGN1844340** [1] - 236:13
**ALGN1844396** [1] - 237:2
**ALGN1844413** [1] - 239:1
**ALGN1844426** [1] - 239:9
**allegations** [2] - 97:21, 135:19
**alleged** [3] - 86:3, 87:15, 137:6
**Allergan** [221] - 3:9, 3:13, 4:1, 4:8, 4:10, 4:18, 5:1, 6:11, 8:21, 12:2, 12:8, 13:14, 17:12, 17:19, 17:23, 21:13, 24:4, 24:5, 24:6, 24:9, 24:13, 26:8, 26:13, 73:10, 73:11, 73:20, 87:5, 87:10, 87:13, 87:17, 88:1, 88:19, 89:10, 89:11, 98:3, 98:12, 98:17, 98:18, 98:20, 103:3, 103:25, 104:9, 104:14, 104:15, 104:17, 104:20, 105:3, 105:4, 105:15, 105:16, 105:18, 106:2, 106:3, 106:5, 106:7, 106:14, 106:16, 108:16, 108:18, 108:20, 108:24, 108:25, 109:3, 109:6, 109:9, 109:11, 109:18, 109:21, 109:22, 110:2, 110:9, 110:24, 110:25, 111:3, 111:21, 112:9, 112:12, 112:16, 113:6, 113:10, 113:13, 115:25, 116:4, 116:5, 116:9, 116:16, 118:5, 118:13, 118:18, 119:4, 120:3, 120:7, 120:8, 120:11, 120:14, 120:23, 121:5, 121:19, 123:25, 125:4, 125:5, 125:8, 125:16, 125:24, 127:9, 127:11, 127:14, 127:15, 127:17, 127:20, 128:3, 128:5, 128:12, 128:16, 128:19, 128:23, 130:6, 130:22, 131:25, 132:7, 133:2, 133:10, 133:14, 134:1, 134:5, 135:10, 135:15, 136:3, 137:7, 137:10, 137:12, 137:21, 138:3, 138:8, 138:13, 138:24, 139:12, 140:2, 144:21, 144:24, 145:1, 145:3, 145:6, 145:7, 146:9, 146:18, 146:19, 147:15, 147:25, 148:7, 149:2, 149:3, 149:7, 153:24, 154:4, 156:14, 156:16, 156:24, 157:19, 157:22, 158:22, 159:7, 159:22, 161:4, 161:22, 161:25, 163:1, 163:2, 163:3, 163:4, 163:6, 164:15, 164:17, 164:25, 165:4, 167:1, 167:3, 167:7, 170:3, 171:17, 172:14, 175:25, 176:11, 177:9, 178:7, 184:10, 184:13, 191:5, 191:6, 191:19, 192:11, 192:12, 192:18, 193:16, 201:2, 201:6, 201:15, 201:21, 201:25, 202:3, 202:11, 202:15, 202:22, 204:1, 207:5, 209:2, 209:9, 210:7, 213:18, 232:17, 234:10, 234:25, 235:1, 236:8, 240:12, 240:17, 244:6, 244:11, 244:19, 245:1, 249:24
**ALLERGAN** [1] - 1:3
**Allergan's** [84] - 5:16, 10:4, 24:14, 24:18, 98:15, 104:24, 105:2, 105:8, 105:13, 105:22, 111:5, 111:12, 112:23, 113:10, 113:11, 116:15, 117:2, 117:9, 117:16, 117:23, 118:10, 118:16, 118:17, 118:23, 119:3, 119:16, 119:17, 119:18, 119:21, 119:22, 120:17, 120:18, 120:21, 121:7, 121:14, 122:5, 124:13, 124:17, 124:20, 124:23, 125:21, 126:18, 127:10, 127:24, 128:8, 128:21, 128:22, 128:24, 128:25, 129:6, 129:7, 129:9, 129:12, 129:15, 129:18, 129:20, 129:25, 130:12, 130:14, 130:17, 131:16, 131:18, 132:2, 132:5, 132:9, 133:18, 134:4, 139:25, 140:24, 148:21, 151:9, 157:16, 158:4, 158:21, 159:12, 192:6, 192:17, 193:2, 193:12, 200:3, 200:10, 200:18, 200:23, 203:8
**Allergan-patented** [1] - 115:25
**Allergen** [2] - 115:9, 116:24
**Allergen's** [1] - 128:14
**alleviate** [2] - 168:10, 170:24
**Alliance** [1] - 55:20
**allow** [10] - 4:24, 12:14, 14:19, 22:11, 82:11, 83:17, 92:3, 136:23, 140:17, 204:24
**allowed** [5] - 84:6, 84:22, 147:9, 149:7, 248:5
**allows** [5] - 14:10, 76:3, 82:23, 115:18, 238:17
**almost** [1] - 145:2
**alone** [4] - 12:19, 187:3, 188:19, 222:24
**alternate** [1] - 8:23
**Alternatively** [1] - 83:13
**Althea** [2] - 26:10, 26:14
**amazing** [1] - 141:6
**ambiguous** [1] - 81:7
**amendments** [1] - 83:12
**America** [2] - 81:13, 119:1
**American** [3] - 106:13, 141:4, 159:3
**Amos** [2] - 46:7, 47:23
**amount** [20] - 6:11, 86:23, 87:12, 87:14, 88:2, 89:11, 105:21, 121:1, 121:7, 127:25, 157:25, 197:5, 197:13, 197:18, 198:6, 199:13, 199:14, 246:22
**amounts** [4] - 107:5, 144:14, 168:2, 168:9
**analogy** [1] - 182:22
**analysis** [5] - 153:12, 189:15, 222:2, 224:2, 239:6
**analyst** [1] - 66:20
**analytical** [2] - 205:13, 243:15
**analytically** [1] - 181:11
**analyzed** [3] - 154:10, 154:19, 216:16
**AND** [1] - 1:2
**Andrews** [2] - 1:12, 21:10
**animal** [81] - 17:13, 111:20, 111:23, 112:4, 112:11, 112:14, 112:19, 112:25, 113:8, 114:9, 115:6, 115:10, 116:11, 116:17, 117:3, 127:9, 127:11, 127:12, 127:16, 127:21, 128:4, 128:13, 128:17, 128:20, 138:5, 145:20, 145:22, 145:23, 146:4, 147:14, 147:16, 148:14, 153:20, 155:13, 155:15, 156:7, 173:12, 174:6, 177:5, 180:25, 184:15, 187:23, 188:2, 193:6, 193:7, 200:23, 201:3, 201:7, 201:15, 201:21, 202:1, 202:4, 202:12, 202:16, 202:17, 202:23, 202:25, 203:10, 203:15, 204:2, 204:6, 211:18, 214:2, 219:12, 221:2, 222:12, 222:23, 223:6, 228:5, 241:7, 241:11, 241:13, 241:17, 241:18, 241:20, 242:20, 245:2, 245:6, 245:7
**animal's** [1] - 182:21

**animal-derived** [6] - 221:2, 222:12, 223:6, 228:5, 241:17, 241:18
**animal-free** [13] - 17:13, 113:8, 116:17, 117:3, 127:9, 127:11, 127:12, 127:16, 127:21, 128:4, 128:13, 128:17, 128:20
**animal-product** [8] - 148:14, 155:13, 155:15, 156:7, 242:20, 245:2, 245:6, 245:7
**animal-product-free** [1] - 241:20
**animal-protein** [25] - 147:16, 153:20, 173:12, 177:5, 193:6, 193:7, 200:23, 201:7, 201:15, 201:21, 202:1, 202:4, 202:12, 202:16, 202:17, 202:23, 202:25, 203:10, 203:15, 204:2, 204:6, 211:18, 214:2, 241:7, 241:11
**animal-protein-free** [1] - 138:5
**animal-protein-product-free** [1] - 201:3
**animals** [6] - 180:25, 181:10, 182:20, 182:21, 184:8, 206:8
**animation** [1] - 143:19
**animations** [2] - 92:15, 92:21
**anion** [4] - 242:23, 243:2, 245:8, 246:19
**Ann** [1] - 140:18
**ANNE** [1] - 2:3
**Anne** [2] - 25:19, 30:10
**anniversary** [1] - 209:15
**announces** [1] - 147:23
**annual** [1] - 230:22
**answer** [24] - 21:18, 22:2, 22:3, 25:25, 30:17, 40:12, 48:11, 50:18, 54:21, 63:2, 63:13, 64:14, 65:1, 66:22, 68:24, 75:16, 129:21, 130:24, 138:14, 157:6, 211:19, 211:20, 212:25
**answered** [17] - 4:15, 5:5, 31:2, 33:21, 39:5, 40:24, 41:18, 43:18, 46:9, 48:22, 51:3, 52:5, 53:11, 56:7, 58:5, 59:4, 59:17
**answers** [6] - 22:8, 29:22, 138:4, 138:13, 138:15, 138:19
**anterior** [1] - 206:6
**antibiotics** [1] - 67:24
**anticipate** [3] - 217:12, 250:3, 250:6
**antiwrinkle** [1] - 169:5
**apart** [5] - 103:5, 112:6, 114:24, 142:9, 142:14
**APF** [5] - 214:1, 244:7, 244:16, 244:18
**apologize** [1] - 65:7
**app** [1] - 69:5
**appeal** [6] - 237:12, 237:13, 237:15, 237:21, 238:11, 238:16
**appear** [4] - 17:6, 26:25, 81:2, 189:19
**APPEARANCES** [1] - 1:15
**Appearances** [1] - 2:1
**appeared** [1] - 179:25
**applicant** [11] - 82:8, 82:13, 82:18, 83:2, 83:8, 83:9, 83:11, 83:13, 83:22, 84:6, 85:8
**applicant's** [3] - 80:1, 82:12, 83:18
**application** [29] - 12:25, 76:13, 76:16, 78:9, 78:17, 79:3, 79:4, 79:7, 79:20, 80:5, 80:21, 81:11, 81:12, 81:18, 81:19, 82:15, 82:22, 82:24, 83:7, 83:12, 83:20, 84:3, 85:13, 147:20, 147:24, 148:3, 148:24, 149:2, 175:15
**applications** [17] - 78:14, 78:20, 78:24, 79:1, 81:10, 81:15, 81:17, 82:8, 83:24, 84:1, 111:12, 113:5, 117:20, 117:23, 147:2, 148:1, 148:2
**applied** [1] - 28:18
**apply** [10] - 17:14, 49:21, 72:14, 72:17, 80:12, 85:24, 88:10, 88:12, 94:21, 132:13
**appointment** [4] - 52:9, 52:10, 52:23, 53:4
**appreciate** [6] - 33:17, 43:16, 73:23, 237:25, 250:12
**apprise** [1] - 250:21
**approach** [1] - 135:1
**approaches** [2] - 122:25, 125:13
**appropriate** [3] - 13:18, 81:20, 86:8
**approval** [13] - 41:3, 109:19, 109:20, 110:22, 111:2, 127:21, 128:10, 131:5, 141:8, 141:13, 144:22, 178:14, 251:1
**approvals** [1] - 203:20
**approved** [9] - 107:22, 110:19, 111:1, 112:10, 143:9, 146:3, 170:4, 171:22, 171:23
**approximate** [1] - 196:15
**April** [1] - 240:12
**Aqua** [1] - 101:23
**architect** [3] - 66:13, 66:18, 66:21
**area** [3] - 67:2, 188:8, 188:12
**areas** [3] - 162:6, 170:24, 195:23
**argue** [3] - 8:25, 122:2, 122:20
**argument** [8] - 7:10, 7:11, 8:25, 12:13, 14:15, 15:18, 19:23, 122:8
**argumentative** [4] - 6:17, 8:10, 8:20, 11:24
**arguments** [6] - 22:23, 85:6, 91:16, 95:24, 99:4, 126:17
**arm** [1] - 47:12
**armed** [1] - 154:12
**Armenio** [2] - 25:18, 140:18
**ARMENIO** [1] - 2:10
**arrive** [2] - 124:7, 223:23
**arrives** [1] - 81:12
**arrow** [2] - 189:21, 189:22
**arrows** [1] - 6:2
**ARSHT** [1] - 1:16
**art** [35] - 18:11, 18:24, 76:22, 79:6, 80:5, 80:7, 80:8, 80:11, 80:13, 81:23, 82:10, 82:14, 82:19, 84:25, 85:7, 117:24, 118:1, 118:5, 122:9, 136:8, 136:12, 147:8, 148:18, 149:3, 149:21, 149:22, 149:24, 150:2, 151:2, 151:17, 152:10, 152:14, 154:2, 155:18, 155:22
**Article** [1] - 76:2
**article** [6] - 9:23, 10:3, 83:5, 96:15, 96:17
**articles** [1] - 80:4
**artists** [1] - 80:8
**arts** [1] - 76:4
**ASHKENAZI** [31] - 1:19, 11:4, 11:14, 12:6, 12:8, 12:22, 14:21, 16:7, 16:15, 16:24, 17:2, 17:8, 160:20, 161:4, 161:15, 181:24, 182:5, 182:7, 191:1, 191:3, 191:23, 204:11, 204:13, 204:19, 204:25, 205:7, 205:9, 205:20, 205:24, 206:13, 206:17
**Ashkenazi** [4] - 14:20, 25:9, 105:25, 161:3
**aside** [1] - 234:12
**aspect** [1] - 45:8
**aspects** [4] - 45:11, 45:13, 80:21, 220:6
**assay** [13] - 181:21, 182:12, 182:18, 182:20, 184:4, 184:5, 184:9, 184:10, 185:13, 205:16, 206:3, 206:4
**assemble** [1] - 157:3
**assembled** [1] - 53:18
**asserted** [16] - 84:23, 87:1, 87:8, 87:11, 87:24, 87:25, 88:6, 88:7, 89:18, 103:3, 103:6, 103:7, 103:10, 140:12, 146:19, 203:23
**Asserted** [1] - 74:4
**asserting** [3] - 138:17, 153:7, 155:9
**assess** [1] - 243:16
**assessed** [1] - 117:23
**assessment** [2] - 225:18, 227:17
**assign** [1] - 7:6
**assigned** [3] - 79:16, 79:19, 84:13
**assigns** [2] - 79:5, 81:20
**associate** [1] - 39:15
**associated** [1] - 209:6
**associates** [1] - 218:19
**assume** [1] - 17:5
**assumed** [1] - 39:16
**assuming** [2] - 7:14, 251:18
**assure** [1] - 139:17
**AstraZeneca** [1] - 39:25
**attached** [2] - 8:21, 9:23
**attack** [1] - 126:11
**attacking** [1] - 149:6
**attempt** [1] - 122:16
**attention** [11] - 19:7, 29:25, 32:3, 57:10, 82:14, 89:25, 96:8, 134:7, 160:1, 160:10, 221:19
**ATTORNEY** [6] - 209:12, 217:1, 225:2, 232:13, 236:4, 240:8
**attorney** [9] - 78:19, 78:21, 98:4, 192:6, 193:12, 200:4, 200:11, 200:18
**attorney's** [1] - 95:17
**attorneys** [11] - 21:15, 25:5, 25:23, 26:4, 26:20, 98:3, 98:9, 99:3, 99:14, 103:13, 129:5
**attractive** [2] - 227:25, 228:8
**attribute** [1] - 223:4
**attributes** [5] - 227:25, 228:9, 239:12, 239:14, 239:15
**Atul** [2] - 27:10, 159:19
**audible** [2] - 201:20, 202:13

**August** [1] - 215:12
**author** [2] - 181:22, 205:5
**author's** [1] - 213:14
**authority** [2] - 90:16, 152:19
**authors** [1] - 76:5
**available** [7] - 23:1, 49:12, 50:5, 77:18, 220:3, 243:15, 251:1
**average** [1] - 76:14
**avoid** [2] - 115:9, 250:10
**avoidance** [1] - 19:14
**avoids** [1] - 123:3
**award** [1] - 132:10
**awarded** [1] - 81:14
**aware** [11] - 151:17, 178:8, 178:10, 178:14, 178:17, 178:21, 179:18, 179:19, 216:5, 217:14, 220:11
**awful** [1] - 57:2
**axis** [4] - 185:2, 185:3

## B

**B&B** [1] - 51:14
**B-R-O-I-D-E** [1] - 161:7
**background** [15] - 5:3, 8:24, 18:23, 74:15, 75:17, 79:6, 80:18, 113:22, 140:21, 149:13, 162:3, 165:2, 166:9, 193:15, 218:13
**bacteria** [5] - 106:24, 163:16, 163:22, 163:23, 163:25
**bad** [5] - 57:5, 57:9, 136:15, 140:11, 152:20
**badge** [1] - 96:6
**badly** [1] - 44:21
**Bahr** [1] - 62:24
**balance** [2] - 152:20, 153:1
**ballpark** [1] - 36:24
**ban** [1] - 96:9
**bands** [1] - 168:23
**bandwidth** [3] - 176:15, 176:22, 202:8
**Banerjee** [1] - 58:4
**banking** [1] - 69:7
**bar** [10] - 186:7, 188:24, 189:4, 189:11, 189:13, 189:20, 190:14
**bargain** [1] - 76:18
**bargainer** [1] - 13:15
**bargaining** [1] - 17:21
**barriers** [1] - 238:20
**bars** [4] - 188:8, 188:13, 189:21, 189:22
**base** [4] - 174:16, 226:6, 226:7
**based** [27] - 3:19, 7:1, 7:11, 19:22, 29:4, 45:5, 45:7, 60:9, 82:17, 87:6, 89:23, 99:14, 101:11, 148:5, 149:4, 150:20, 157:21, 158:1, 230:21, 230:22, 234:10, 240:22, 242:2, 242:5, 242:21, 245:3
**baseline** [3] - 184:7, 190:11, 190:12
**basic** [4] - 79:13, 87:3, 119:5, 198:19
**basics** [2] - 75:21, 174:13
**basis** [6] - 8:23, 47:24, 177:23, 204:23, 222:24, 246:25
**batches** [1] - 108:10
**Bates** [32] - 16:19, 27:3, 116:3, 116:9, 116:23, 122:1, 124:12, 156:16, 213:25, 214:4, 218:9, 218:20, 219:20, 221:10, 221:20, 223:14, 226:11, 227:6, 227:12, 227:23, 229:17, 230:7, 232:20, 233:20, 236:12, 237:1, 238:25, 239:8, 243:24, 245:13, 245:24, 253:8
**Bayada** [2] - 34:5, 35:7
**Beach** [1] - 209:15
**bearing** [9] - 218:9, 221:10, 223:14, 227:12, 232:20, 233:20, 236:12, 243:24, 245:13
**bears** [6] - 88:20, 89:1, 237:1, 238:25, 239:8
**beaten** [1] - 61:17
**became** [9] - 66:20, 109:10, 149:2, 178:13, 178:17, 179:18, 179:19, 192:21, 225:16
**become** [11] - 104:10, 140:5, 162:14, 162:22, 166:6, 171:9, 172:22, 174:17, 178:8, 178:10, 193:20
**becomes** [4] - 77:18, 142:25, 148:25, 175:18
**becoming** [1] - 50:11
**bedroom** [2] - 170:19, 171:1
**beforehand** [1] - 118:23
**began** [1] - 217:11
**begin** [5] - 49:2, 79:13, 98:1, 141:1, 210:6
**beginning** [6] - 7:19, 109:9, 192:15, 192:16, 208:22, 214:20
**beginnings** [1] - 166:17
**begins** [2] - 78:1, 81:11
**behalf** [4] - 4:6, 4:14, 46:15, 161:9
**behind** [1] - 21:3
**Belgian** [1] - 144:11
**belief** [2] - 93:24, 112:18
**believes** [2] - 78:8, 86:19
**belong** [2] - 135:17, 149:4
**belonging** [1] - 149:12
**belongs** [1] - 147:8
**below** [1] - 237:2
**bench** [4] - 53:24, 65:20, 95:4, 165:6
**bend** [1] - 143:12
**benefit** [7] - 113:3, 115:25, 131:15, 155:25, 237:25, 238:1, 238:4
**benefited** [1] - 128:15
**benefits** [2] - 112:20, 237:19
**best** [8] - 72:8, 101:11, 103:15, 139:19, 189:2, 236:23, 248:10, 251:14
**better** [13] - 15:18, 15:19, 45:5, 99:17, 112:18, 112:20, 117:9, 123:4, 146:17, 159:5, 176:18, 179:16, 229:12
**between** [24] - 6:1, 11:7, 11:16, 11:18, 12:10, 16:8, 35:23, 44:24, 59:22, 70:3, 70:21, 76:18, 83:21, 95:16, 103:14, 132:25, 140:4, 168:21, 197:24, 199:24, 223:12, 234:25, 240:18
**beyond** [3] - 110:9, 144:8, 204:17
**bias** [2] - 44:16, 72:24
**biases** [1] - 94:3
**big** [8] - 10:3, 31:21, 34:6, 46:18, 144:4, 145:6, 146:2, 159:4
**biggest** [1] - 145:10
**billing** [1] - 179:20
**billions** [2] - 145:8, 145:9
**binder** [6] - 75:1, 181:12, 181:13, 204:14, 204:16, 204:21
**binders** [2] - 160:21, 192:1
**bio** [1] - 165:18
**bio-sci** [1] - 165:18
**biologic** [1] - 24:1
**biological** [1] - 161:24
**biology** [2] - 162:6, 162:20
**biotech** [1] - 162:25
**biotechnology** [4] - 27:16, 58:21, 135:22, 141:3
**bit** [18] - 23:24, 59:22, 113:21, 128:3, 138:1, 141:1, 146:16, 160:6, 164:6, 164:15, 166:9, 173:23, 175:3, 187:9, 191:5, 193:10, 193:13, 196:9
**BLA** [4] - 11:7, 11:16, 11:17, 12:9
**black** [4] - 185:11, 185:12, 185:15, 189:17
**blepharospasm** [3] - 166:24, 168:5, 168:6
**blinks** [1] - 168:7
**blog** [1] - 97:15
**blogs** [1] - 97:1
**blue** [16] - 168:25, 169:2, 169:3, 171:20, 186:10, 186:11, 186:13, 187:6, 187:11, 187:12, 187:15, 189:4, 189:11, 189:16, 189:20
**Board** [2] - 225:13, 227:4
**board** [2] - 61:7, 168:19
**boards** [1] - 49:11
**bodies** [1] - 162:12
**body** [9] - 12:13, 113:2, 115:19, 127:23, 143:3, 143:18, 162:16, 195:15, 195:23
**Bogush** [1] - 59:2
**BoNT/A** [7] - 242:25, 243:2, 243:4, 243:5, 243:16, 243:17, 245:10
**BoNT/E** [1] - 238:8
**book** [4] - 14:9, 14:11, 15:13, 101:22
**booked** [4] - 38:21, 38:22, 38:24, 51:13
**boss** [1] - 57:23
**botox** [1] - 130:4
**BOTOX** [96] - 13:22, 13:24, 24:9, 27:25, 28:3, 73:13, 104:2, 104:4, 104:6, 104:10, 108:6, 109:5, 109:18, 110:5, 110:7, 110:13, 110:16, 110:18, 110:25, 111:22, 112:9, 113:2, 115:7, 119:22, 119:25, 120:2, 120:9, 128:6, 130:1, 130:3, 130:9, 136:22, 137:1, 137:3, 137:4, 137:6, 137:8, 137:10, 138:4, 138:9, 138:21, 141:10, 141:24, 143:15, 145:1, 145:3, 145:5, 145:6, 145:7, 145:13, 145:14, 145:18, 145:25, 148:13, 158:7, 158:8, 158:12, 164:19, 164:22, 164:23, 164:24,

165:1, 165:3, 166:9, 166:16, 167:11, 167:19, 168:15, 169:4, 169:7, 170:4, 170:12, 172:14, 174:4, 176:5, 176:6, 176:17, 192:15, 192:21, 192:25, 193:7, 219:17, 229:1, 229:4, 229:8, 230:25, 233:12, 233:14, 234:13, 235:5, 235:6, 238:6, 240:21, 240:25, 241:23
**bottom** [3] - 17:5, 133:4, 233:16
**botulinum** [84] - 4:8, 24:2, 24:7, 24:8, 24:12, 27:21, 27:24, 32:1, 73:13, 73:16, 74:5, 104:1, 104:8, 104:15, 106:19, 107:2, 107:5, 107:11, 108:5, 108:8, 109:11, 109:15, 109:21, 111:17, 112:13, 112:24, 113:25, 114:8, 114:16, 115:1, 115:5, 115:12, 116:7, 116:10, 116:17, 116:19, 117:3, 117:7, 124:4, 125:14, 126:8, 127:22, 128:17, 138:5, 138:20, 142:2, 142:3, 142:17, 142:22, 143:21, 144:9, 144:17, 144:22, 145:4, 163:19, 163:20, 163:21, 163:22, 164:24, 166:20, 167:23, 168:1, 170:23, 172:23, 173:10, 181:19, 182:11, 193:5, 193:21, 195:15, 195:22, 195:23, 201:3, 204:2, 204:7, 210:1, 210:3, 211:18, 217:17, 234:12, 234:21, 242:6, 242:22
**bought** [2] - 3:17, 144:25
**bound** [1] - 88:11
**boundaries** [3] - 77:11, 77:15, 81:3
**bovine** [1] - 185:14
**box** [10] - 70:9, 70:11, 70:13, 70:15, 70:17, 70:19, 70:24, 71:1, 71:2, 95:13
**boy** [2] - 162:1, 172:15
**branch** [1] - 81:19
**brand** [1] - 239:17
**Brandywine** [2] - 37:19, 37:21
**Break** [1] - 119:24
**break** [13] - 23:5, 23:9, 23:10, 91:1, 99:10, 99:12, 99:15, 99:18, 114:24, 160:8, 160:9, 188:22, 206:21
**breaking** [2] - 99:13, 112:6
**breakthroughs** [1] - 77:1
**bridge** [1] - 38:13
**brief** [4] - 23:25, 75:16, 80:17, 134:11
**briefly** [4] - 87:3, 113:17, 131:22, 162:3
**bright** [1] - 170:20
**bring** [19] - 15:24, 19:7, 20:12, 29:24, 36:20, 39:14, 74:11, 86:20, 96:8, 105:1, 109:1, 127:15, 134:15, 156:21, 176:20, 177:10, 202:25, 203:17, 253:19
**bringing** [8] - 19:19, 82:14, 128:6, 191:14, 229:11, 229:14, 238:13
**broad** [2] - 58:12, 69:2
**broadly** [1] - 110:6
**BROIDE** [1] - 161:8
**Broide** [21] - 5:19, 16:18, 106:6, 106:8, 127:17, 127:20, 128:2, 130:22, 160:20, 160:23, 161:3, 161:4, 161:7, 161:17, 166:14, 184:22, 192:5, 204:14, 205:1, 205:10, 206:19
**broke** [1] - 160:6
**broken** [1] - 44:15
**brothers** [3] - 52:9, 52:10, 52:25
**brought** [9] - 23:8, 84:18, 105:16, 120:11, 125:24, 133:10, 141:6, 159:5, 206:1
**Bruce** [1] - 39:3
**Bryan** [3] - 216:22, 217:3
**BSA** [1] - 185:14
**BSE/TSE** [1] - 241:15
**bubble** [2] - 246:8, 246:9
**buffer** [6] - 70:21, 183:25, 186:7, 186:20, 198:12, 212:17
**buffering** [2] - 185:24, 198:8
**build** [2] - 60:6, 173:16
**building** [1] - 119:17
**built** [3] - 117:9, 127:23, 177:6
**bulb** [2] - 76:24, 80:24
**bullet** [5] - 6:25, 205:16, 219:11, 222:7, 222:11
**bullets** [2] - 168:13, 168:14
**Bullock** [2] - 216:22
**bullock** [1] - 217:3
**bunch** [3] - 145:12, 168:13, 168:25
**burden** [9] - 88:20, 88:21, 89:1, 89:3, 89:8, 89:10, 89:15, 89:17, 98:11
**burdens** [1] - 88:23
**Business** [1] - 55:19
**business** [8] - 26:3, 26:8, 37:22, 41:21, 49:11, 216:24, 226:1, 234:9
**busy** [1] - 10:24
**but..** [1] - 69:11
**butter** [1] - 150:13
**buying** [1] - 3:15
**BY** [16] - 1:16, 2:10, 161:15, 182:7, 191:3, 192:4, 204:13, 204:25, 205:9, 206:13, 209:12, 217:1, 225:2, 232:13, 236:4, 240:8
**Byler** [1] - 59:15
**Byron** [3] - 4:14, 25:17, 140:17
**BYRON** [1] - 2:7

## C

**Cahill** [1] - 25:18
**CAHILL** [1] - 2:10
**California** [5] - 107:7, 162:5, 162:8, 162:25, 209:16
**call-out** [2] - 246:5, 246:7
**campaign** [1] - 119:24
**cancel** [1] - 34:24
**candor** [1] - 82:12
**cannot** [5] - 51:12, 103:7, 126:25, 241:20, 243:12
**capability** [1] - 108:8
**caption** [1] - 79:24
**captured** [2] - 222:17, 223:4
**car** [2] - 157:3
**card** [3] - 21:23, 22:2, 23:16
**cards** [2] - 23:18, 29:18
**care** [9] - 16:3, 31:6, 31:14, 33:8, 33:9, 36:1, 37:12, 108:19, 232:19
**careful** [1] - 160:1
**carefully** [1] - 133:19
**caregiver** [1] - 37:16
**CARL** [1] - 1:20
**Carl** [2] - 25:9, 105:25
**Carolina** [1] - 46:22
**carried** [2] - 89:3, 211:4
**carry** [1] - 215:7
**case** [150] - 3:12, 4:10, 5:25, 6:13, 8:23, 9:11, 11:9, 15:2, 15:3, 15:12, 18:4, 18:11, 18:19, 18:23, 18:25, 19:4, 19:6, 19:8, 19:15, 19:18, 21:13, 22:12, 22:16, 22:18, 22:20, 23:25, 24:4, 24:17, 24:21, 24:22, 26:21, 28:24, 29:6, 29:16, 45:5, 45:14, 47:5, 47:12, 47:13, 53:17, 53:18, 53:19, 53:20, 53:22, 54:3, 61:15, 61:19, 62:12, 64:14, 64:25, 71:7, 72:12, 73:10, 73:14, 73:21, 74:17, 75:14, 75:15, 75:19, 80:16, 84:20, 85:19, 86:2, 86:6, 87:6, 88:13, 88:19, 88:22, 90:9, 91:13, 92:20, 92:23, 93:3, 94:25, 95:20, 95:24, 96:8, 96:14, 96:16, 96:19, 96:21, 96:22, 96:23, 97:2, 97:9, 97:11, 97:14, 97:18, 97:23, 97:24, 98:15, 99:9, 101:23, 101:25, 102:21, 103:4, 104:23, 104:24, 105:7, 106:2, 106:10, 107:8, 111:10, 111:17, 112:18, 113:15, 114:12, 116:8, 116:14, 116:25, 117:11, 119:7, 123:3, 123:17, 124:8, 125:24, 127:24, 130:15, 131:23, 133:11, 133:15, 134:1, 135:15, 136:2, 138:18, 138:24, 140:15, 140:23, 141:9, 142:2, 147:25, 150:19, 158:2, 160:3, 162:14, 163:19, 192:13, 195:11, 196:24, 203:23, 247:24, 248:1, 248:5, 248:6, 248:10, 253:3
**Case** [1] - 1:5
**cases** [5] - 9:16, 53:14, 54:2, 75:21, 85:23
**cat** [1] - 182:22
**catch** [1] - 12:12
**categories** [1] - 3:21
**categorized** [1] - 222:17
**category** [2] - 58:12, 173:24
**cation** [1] - 245:9
**caucus** [1] - 20:16
**caught** [1] - 8:12
**causes** [1] - 143:11
**causing** [3] - 67:8, 107:15, 107:24
**caution** [1] - 39:9
**cell** [6] - 97:6, 97:14, 179:11, 179:23, 181:18, 182:14
**Cell** [1] - 182:10
**cell-penetrating** [4] - 179:11, 179:23,

181:18, 182:14
**Cell-penetrating** [1] - 182:10
**cells** [1] - 162:13
**cent** [2] - 105:14, 134:5
**center** [2] - 75:12, 114:12
**central** [1] - 163:5
**centralized** [1] - 143:25
**CEOs** [1] - 13:25
**cerebral** [1] - 171:8
**certain** [16] - 14:16, 39:20, 76:8, 83:4, 85:21, 88:7, 91:14, 93:19, 106:23, 112:20, 170:24, 171:24, 183:23, 216:16, 249:9, 250:9
**certainly** [7] - 8:24, 12:16, 102:1, 110:5, 123:18, 127:5, 223:8
**certify** [1] - 254:8
**cervical** [10] - 143:9, 169:12, 169:15, 169:16, 170:2, 170:5, 228:23, 229:2, 229:8, 229:12
**cetera** [2] - 174:6, 230:6
**Chad** [3] - 225:3, 232:10, 232:15
**challenge** [5] - 84:23, 85:16, 123:16, 138:23, 229:8
**challenged** [1] - 229:5
**challenges** [1] - 125:25
**challenging** [2] - 82:8, 139:23
**chambers** [1] - 30:7
**champion** [1] - 251:17
**chance** [7] - 10:15, 22:1, 85:15, 159:18, 159:25, 192:8, 233:24
**change** [7] - 3:23, 59:25, 129:7, 129:19, 130:16, 199:8, 243:17
**changed** [2] - 95:15, 165:13
**changes** [4] - 243:6, 243:9, 243:19, 243:21
**changing** [1] - 8:12
**chapter** [2] - 108:5, 223:19
**characteristic** [3] - 177:24, 228:3, 228:8
**characteristics** [1] - 238:9
**characterize** [1] - 217:17
**charge** [4] - 39:22, 77:10, 134:23, 150:6
**chart** [3] - 189:20, 237:3, 237:5
**charts** [2] - 92:14, 92:21
**chat** [1] - 97:16
**check** [3] - 99:23, 152:20, 153:1
**checked** [1] - 79:3
**chemical** [4] - 45:8, 58:14, 58:17, 64:9
**chemiluminescence** [1] - 66:3
**chemist** [1] - 210:8
**chemistry** [1] - 58:17
**chief** [1] - 253:4
**child** [2] - 31:6, 247:25
**children** [5] - 25:3, 31:8, 33:3, 33:4, 171:7
**children's** [1] - 55:20
**chills** [1] - 67:11
**choice** [1] - 124:10
**choices** [3] - 121:9, 129:24, 220:12
**chop** [1] - 137:22
**chose** [2] - 214:11, 215:16
**Christian** [2] - 27:3, 126:1
**Christine** [2] - 27:4, 133:11
**chromatography** [17] - 66:2, 116:13, 116:15, 117:4, 117:8, 155:12, 155:17, 156:8, 242:4, 242:5, 242:21, 242:24, 245:3, 245:9, 245:10, 246:19
**chromatography-based** [3] - 242:5, 242:21, 245:3
**chromatography-mass** [1] - 66:2
**chronic** [9] - 104:12, 110:11, 110:14, 170:10, 170:13, 170:14, 170:15, 170:25, 191:10
**church** [1] - 44:2
**CI** [2] - 229:19, 230:1
**circle** [1] - 250:1
**Circuit** [1] - 101:24
**circumstances** [1] - 94:5
**circumstantial** [3] - 93:6, 93:8, 93:17
**circumstantially** [1] - 93:13
**cites** [1] - 230:11
**City** [1] - 61:4
**civil** [6] - 21:12, 28:24, 53:20, 53:22, 61:11, 61:19
**Claim** [9] - 19:16, 153:7, 153:14, 153:15, 153:16, 155:9, 155:10
**claim** [25] - 36:18, 77:12, 86:14, 87:11, 87:25, 88:9, 99:25, 102:10, 124:5, 130:18, 138:3, 146:13, 147:1, 147:5, 153:7, 154:7, 154:19, 155:8, 155:10, 155:24, 156:6, 158:23, 198:3, 215:23, 234:13
**claimed** [8] - 60:21, 76:11, 78:23, 80:1, 80:10, 86:17, 117:19, 187:2
**claiming** [4] - 83:8, 118:6, 159:7, 180:17
**claims** [25] - 77:21, 81:1, 81:2, 81:7, 83:5, 83:18, 84:6, 84:24, 87:1, 87:6, 87:8, 87:16, 87:24, 88:15, 89:3, 89:8, 89:18, 103:3, 103:6, 103:7, 103:10, 156:6, 156:7, 195:13, 237:7
**clarify** [1] - 92:10
**class** [1] - 61:8
**Clause** [1] - 76:3
**clear** [34] - 4:17, 7:18, 11:6, 18:17, 20:10, 35:19, 77:14, 82:3, 86:4, 87:23, 88:25, 89:13, 89:14, 89:17, 105:5, 119:2, 121:22, 126:21, 126:24, 126:25, 127:6, 128:19, 131:6, 131:20, 133:2, 136:1, 164:7, 181:3, 182:8, 187:10, 187:18, 187:25, 192:11, 200:2
**clearance** [3] - 245:18, 245:22, 246:3
**cleared** [1] - 246:10
**clearly** [2] - 15:21, 78:4
**CLERK** [1] - 70:8
**clerk** [8] - 21:18, 100:25, 101:19, 207:13, 207:15, 247:7, 251:17, 251:19
**client** [9] - 33:25, 34:22, 34:23, 35:15, 36:4, 103:24, 135:10, 135:15, 141:2
**client's** [1] - 99:5
**clients** [1] - 91:20
**clinical** [11] - 108:2, 110:3, 170:5, 172:11, 172:13, 172:18, 178:25, 184:17, 184:18, 203:18, 230:5
**clinicians** [1] - 172:2
**clinics** [1] - 203:20
**clock** [2] - 69:21, 99:19
**close** [18] - 36:19, 59:20, 60:5, 60:12, 68:15, 72:19, 89:25, 101:18, 126:25, 138:8, 161:20, 197:21, 197:25, 198:1, 198:9, 198:25, 199:20, 204:5
**closed** [1] - 170:19
**closely** [1] - 81:23
**closer** [5] - 36:11, 76:16, 77:23, 79:11, 99:12
**closest** [1] - 237:8
**closing** [6] - 7:9, 22:22, 60:10, 95:23, 99:4, 99:7
**closings** [1] - 99:6
**clostridium** [3] - 163:22, 242:6, 242:21
**clue** [1] - 222:23
**coach** [2] - 152:2
**coaches** [1] - 151:24
**cobble** [1] - 136:8
**code** [2] - 179:5, 179:6
**colleague** [2] - 136:5, 140:9
**colleagues** [8] - 25:9, 25:16, 116:5, 122:1, 124:13, 130:23, 141:19, 141:20
**collected** [2] - 215:23, 246:14
**collectively** [2] - 74:4, 106:4
**college** [2] - 152:2, 155:4
**column** [3] - 174:9, 246:19, 246:20
**combination** [15] - 77:5, 97:7, 115:15, 131:12, 131:13, 154:10, 156:1, 156:10, 174:15, 178:3, 187:9, 188:18, 188:21, 216:4, 241:15
**combine** [2] - 147:10, 215:1
**combined** [3] - 136:9, 154:6, 214:25
**combining** [1] - 155:19
**comfort** [1] - 70:22
**coming** [14] - 7:15, 10:11, 42:24, 69:13, 112:13, 112:17, 116:4, 136:21, 167:1, 168:19, 183:4, 191:22, 211:12, 246:19
**comment** [3] - 241:21, 246:8
**comments** [2] - 91:17, 146:8
**commercial** [5] - 176:23, 225:8, 225:11, 236:1, 236:10
**commercialized** [2] - 176:12, 222:6
**commercializing** [1] - 128:12
**commissioned** [2] - 217:15, 218:17
**commitment** [2] - 18:7, 110:9
**committed** [1] - 6:19
**committees** [1] - 165:21
**commonly** [2] - 167:21, 169:5
**communicate** [10] - 97:8, 97:10, 97:13, 211:23, 212:4, 212:7, 212:10, 212:13, 212:16, 212:19

**communicated** [3] - 83:1, 211:17, 214:15
**communicating** [1] - 211:21
**communication** [1] - 49:12
**community** [1] - 130:2
**companies** [9] - 26:6, 26:17, 27:16, 44:24, 108:21, 120:5, 140:12, 152:23, 162:25
**company** [41] - 3:15, 39:11, 39:17, 39:23, 44:2, 46:15, 46:16, 46:18, 46:20, 46:21, 73:15, 79:18, 84:13, 107:21, 108:18, 108:19, 109:19, 121:2, 127:25, 135:22, 139:6, 139:9, 141:3, 144:25, 147:8, 156:24, 159:4, 164:17, 167:3, 170:1, 170:3, 172:21, 176:16, 176:23, 178:8, 192:19, 192:23, 201:24, 209:5, 227:20, 227:21
**company's** [1] - 173:18
**compare** [4] - 90:10, 185:18, 189:11, 189:15
**compared** [2] - 184:16, 198:20
**comparing** [3] - 151:10, 187:11, 187:12
**comparison** [2] - 245:19, 245:23
**compensate** [5] - 6:11, 88:3, 118:18, 119:4, 131:24
**compensated** [1] - 109:7
**compensation** [5] - 86:24, 120:16, 121:1, 132:8, 133:14
**compete** [2] - 120:18, 218:2
**competed** [2] - 120:4, 120:7
**competing** [2] - 81:15, 120:9
**competition** [4] - 14:25, 120:4, 120:12, 222:25
**competitive** [2] - 230:1, 231:1
**competitor** [7] - 145:15, 145:16, 146:17, 230:15, 231:3, 233:17
**competitors** [12] - 14:24, 130:10, 142:14, 218:2, 230:5, 230:11, 231:2, 233:8, 233:10, 233:12, 233:14, 238:22
**compiling** [1] - 228:18
**complete** [5] - 79:3, 81:18, 82:2, 90:14, 189:9
**completed** [1] - 99:7
**completely** [5] - 15:7, 15:14, 146:7, 149:1, 159:6
**complex** [7] - 242:25, 243:2, 243:4, 243:5, 243:16, 243:17, 245:11
**complicated** [2] - 151:4, 152:7
**complies** [2] - 78:23, 79:4
**comply** [2] - 78:15, 121:6
**component** [1] - 185:4
**components** [9] - 166:1, 185:22, 186:13, 187:13, 196:22, 221:2, 222:13, 223:6, 243:22
**composition** [7] - 77:25, 146:20, 147:6, 153:9, 215:13, 215:19, 215:20
**compositions** [1] - 214:23
**computer** [1] - 81:24
**CONAWAY** [1] - 2:2
**conceive** [1] - 18:15
**concentration** [2] - 196:21, 198:10
**concept** [6] - 147:15, 153:20, 155:13, 198:18, 199:9
**conception** [1] - 78:3
**concern** [1] - 75:16
**concerned** [2] - 3:10, 93:16
**concerning** [2] - 87:19, 139:3
**concerns** [3] - 107:9, 228:23, 249:12
**conclude** [1] - 93:9
**concluded** [1] - 125:19
**concludes** [2] - 82:21, 159:20
**conclusion** [7] - 93:20, 93:21, 97:20, 123:9, 188:14, 190:4, 190:5
**condition** [10] - 110:17, 143:9, 143:10, 167:20, 168:6, 169:16, 169:20, 169:22, 171:8, 171:11
**conditions** [8] - 104:12, 110:8, 110:12, 110:20, 116:6, 125:12, 166:24, 166:25
**conduct** [6] - 95:21, 96:21, 181:7, 210:17, 210:20, 210:22
**conducted** [7] - 172:10, 181:7, 183:8, 183:9, 204:20, 205:13, 213:22
**conference** [8] - 17:17, 20:12, 22:6, 30:3, 95:4, 95:19, 100:10, 205:12
**conferences** [2] - 95:7, 95:11
**confidence** [1] - 108:25
**confidential** [1] - 17:5
**confirm** [1] - 232:16
**confuse** [1] - 15:7
**confused** [1] - 3:5
**congratulations** [1] - 44:6
**Congress** [2] - 76:1, 76:3
**conjoint** [1] - 239:6
**conjured** [1] - 140:1
**connection** [4] - 18:11, 114:7, 224:1, 229:8
**conservative** [2] - 7:7, 133:5
**consider** [10] - 85:4, 85:7, 92:8, 92:25, 93:18, 93:24, 94:19, 95:18, 103:4, 208:11
**consideration** [2] - 70:5, 103:5
**considerations** [1] - 94:21
**considered** [8] - 89:4, 92:13, 92:18, 118:4, 123:10, 123:17, 124:3, 127:4
**considering** [3] - 14:5, 125:20, 126:17
**considers** [1] - 208:12
**consist** [1] - 91:7
**consistent** [3] - 94:2, 101:6, 101:25
**constant** [1] - 167:16
**constantly** [1] - 177:18
**Constitution** [1] - 76:1
**constitutional** [2] - 61:14, 61:16
**construction** [2] - 99:25, 102:10
**construed** [1] - 88:12
**consult** [2] - 89:25, 96:24
**consulting** [1] - 227:20
**consumers** [1] - 220:15
**contain** [7] - 32:1, 81:24, 145:20, 185:14, 212:5, 212:8, 212:11
**contained** [5] - 74:24, 85:21, 130:15, 186:11, 222:12
**containing** [3] - 106:18, 185:18, 216:16
**contains** [2] - 190:14, 190:23
**contaminants** [2] - 116:20, 116:22
**contends** [5] - 87:5, 87:8, 87:10, 87:13, 87:16
**content** [1] - 90:11
**contentions** [1] - 87:4
**contents** [1] - 213:25
**contest** [1] - 103:1
**context** [7] - 9:12, 10:15, 13:19, 135:10, 136:24, 193:13, 199:18
**contextual** [1] - 219:3
**continue** [5] - 46:24, 111:4, 132:17, 223:5, 244:17
**continued** [4] - 2:1, 109:11, 111:5, 162:7
**continues** [2] - 132:4, 220:14
**contradicted** [1] - 94:3
**contrary** [1] - 142:20
**contributed** [1] - 228:19
**contributes** [1] - 130:25
**contributing** [1] - 235:4
**control** [8] - 61:7, 97:25, 183:1, 185:12, 185:16, 189:16, 249:13
**controlling** [1] - 3:3
**controls** [3] - 185:17, 206:6, 206:7
**convenience** [3] - 73:24, 106:3, 223:3
**conventional** [1] - 217:22
**conversation** [5] - 33:12, 140:4, 166:10, 179:15, 211:25
**convince** [1] - 124:21
**convincing** [10] - 86:5, 87:23, 88:25, 89:13, 89:15, 89:18, 126:21, 126:24, 127:1, 127:6
**Conway** [1] - 25:19
**cooked** [1] - 111:25
**coordinator** [1] - 63:20
**copies** [3] - 72:3, 74:9, 75:3
**copy** [6] - 88:6, 90:22, 141:23, 148:5, 242:12, 251:3
**core** [1] - 165:7
**corner** [1] - 84:8
**correct** [119] - 5:14, 40:13, 41:7, 47:7, 48:12, 50:20, 54:23, 58:5, 59:3, 62:25, 63:15, 64:24, 65:13, 66:15, 68:22, 68:25, 168:16, 170:6, 172:12, 175:1, 175:19, 175:20, 178:3, 180:7, 182:16, 185:5, 185:6, 185:9, 186:9, 186:17, 186:18, 187:17, 187:20, 187:21, 188:25, 189:1, 189:6, 190:15, 190:16, 192:13, 192:14, 192:21, 192:22, 192:25, 193:3,

193:8, 193:9, 193:18, 193:19, 193:22, 193:23, 194:9, 194:15, 195:13, 195:16, 196:5, 197:6, 197:12, 199:4, 199:25, 200:5, 200:7, 200:11, 200:12, 200:15, 200:24, 201:8, 201:16, 201:19, 201:22, 202:1, 202:2, 202:4, 202:12, 202:17, 203:12, 206:16, 210:5, 211:19, 211:20, 213:16, 213:19, 213:23, 214:3, 214:6, 214:7, 214:9, 214:10, 215:7, 215:17, 218:3, 220:4, 221:3, 221:7, 221:22, 222:9, 222:13, 222:16, 226:23, 227:1, 227:10, 227:11, 228:1, 228:5, 228:9, 228:24, 228:25, 229:3, 229:5, 229:6, 229:15, 229:16, 237:11, 238:7, 238:10, 244:10, 246:21, 252:22
**correctly** [4] - 4:15, 92:19, 95:9, 133:17
**correspondence** [1] - 83:21
**Cosmetic** [2] - 233:14, 234:14
**cosmetic** [8] - 27:20, 27:24, 39:12, 109:17, 168:18, 169:5, 235:5, 235:9
**cosmetically** [1] - 234:10
**cosmetics** [2] - 110:10, 229:15
**costs** [1] - 112:21
**counsel** [7] - 1:23, 98:13, 98:17, 98:19, 133:22, 148:21, 150:9
**Counsel** [1] - 2:11
**count** [2] - 19:22, 21:2
**country** [3] - 110:2, 121:2, 139:21
**country's** [1] - 118:15
**counts** [1] - 208:1
**County** [1] - 42:4
**couple** [14] - 35:5, 149:21, 157:13, 174:19, 179:12, 181:3, 182:13, 183:7, 196:20, 196:23, 197:7, 197:15, 204:11, 250:2
**course** [19] - 50:8, 58:12, 60:7, 73:7, 85:9, 95:10, 96:20, 124:16, 131:3, 136:12, 140:6, 160:1, 165:22, 184:24, 192:9, 197:16, 213:17, 225:4, 244:8
**COURT** [361] - 1:1, 3:1, 4:12, 4:20, 5:4, 5:8, 5:21, 6:3, 6:22, 7:9, 7:21, 7:24, 8:4, 8:10, 8:13, 9:5, 9:13, 9:20, 9:22, 10:7, 10:20, 11:3, 11:12, 11:20, 12:5, 12:7, 12:11, 12:21, 13:2, 14:2, 14:5, 14:11, 15:17, 16:2, 16:9, 16:13, 16:16, 16:25, 17:3, 17:9, 18:9, 18:20, 19:5, 20:2, 20:10, 21:10, 21:22, 25:12, 25:21, 27:6, 27:11, 30:8, 30:11, 30:15, 30:17, 30:21, 30:25, 31:2, 31:8, 31:12, 31:14, 31:20, 31:23, 32:6, 32:9, 32:14, 32:18, 32:22, 32:24, 33:2, 33:6, 33:14, 33:18, 33:21, 34:4, 34:6, 34:11, 34:18, 34:25, 35:7, 35:16, 35:18, 36:7, 36:10, 36:15, 37:1, 37:4, 37:6, 37:9, 37:15, 37:17, 37:21, 38:1, 38:9, 38:12, 38:14, 38:18, 38:22, 39:3, 39:5, 39:14, 39:23, 40:1, 40:6, 40:8, 40:10, 40:12, 40:15, 40:20, 40:24, 41:4, 41:8, 41:13, 41:18, 41:23, 41:25, 42:3, 42:6, 42:9, 42:13, 42:15, 42:19, 42:22, 43:1, 43:5, 43:7, 43:9, 43:11, 43:17, 43:24, 44:17, 44:20, 44:23, 45:4, 45:11, 45:19, 45:21, 45:23, 46:6, 46:9, 46:14, 46:18, 46:23, 47:3, 47:5, 47:8, 47:16, 47:21, 47:23, 48:4, 48:6, 48:8, 48:11, 48:14, 48:17, 48:20, 48:22, 49:4, 49:7, 49:14, 49:18, 50:6, 50:10, 50:14, 50:18, 50:21, 50:24, 51:3, 51:9, 51:12, 51:15, 51:20, 51:23, 52:3, 52:13, 52:16, 52:18, 52:21, 53:3, 53:6, 53:9, 53:11, 53:14, 53:22, 54:1, 54:5, 54:9, 54:14, 54:17, 54:20, 54:24, 55:2, 55:6, 55:10, 55:13, 56:2, 56:5, 56:7, 56:12, 56:16, 56:23, 57:4, 57:8, 57:12, 57:15, 57:17, 57:25, 58:2, 58:7, 58:10, 58:16, 58:19, 58:23, 58:25, 59:4, 59:9, 59:11, 59:14, 59:17, 59:24, 60:2, 60:7, 60:14, 60:17, 61:1, 61:5, 61:9, 61:11, 61:19, 61:23, 62:2, 62:4, 62:6, 62:10, 62:14, 62:18, 62:20, 62:22, 63:1, 63:6, 63:10, 63:13, 63:16, 63:19, 63:23, 63:25, 64:4, 64:6, 64:11, 64:13, 64:18, 64:22, 64:25, 65:3, 65:6, 65:8, 65:14, 65:21, 66:5, 66:7, 66:11, 66:14, 66:17, 66:22, 67:3, 67:8, 67:12, 67:16, 67:21, 67:25, 68:8, 68:12, 68:15, 68:18, 68:21, 68:23, 69:1, 69:8, 69:12, 70:1, 71:3, 71:5, 71:20, 71:24, 86:11, 99:22, 100:2, 100:6, 100:17, 101:9, 101:14, 101:17, 102:8, 102:15, 134:8, 134:12, 134:14, 134:21, 134:23, 135:2, 135:4, 160:4, 160:15, 160:19, 160:22, 160:25, 161:13, 182:2, 191:24, 192:2, 204:10, 204:23, 205:22, 206:19, 206:25, 207:3, 207:7, 207:9, 207:13, 207:18, 209:7, 209:10, 216:12, 216:14, 216:18, 224:8, 224:12, 224:16, 224:20, 231:8, 231:13, 231:18, 231:21, 232:3, 232:6, 235:17, 235:22, 239:22, 240:2, 247:5, 248:16, 248:22, 249:3, 249:7, 249:11, 249:13, 249:15, 249:20, 250:11, 250:18, 251:7, 251:12, 251:23, 251:25, 252:4, 252:14, 252:17, 252:23, 253:12, 253:17, 253:24
**Court** [4] - 41:3, 84:18, 254:13, 254:13
**court** [13] - 21:11, 62:2, 69:22, 69:25, 71:21, 84:20, 85:12, 85:17, 91:3, 140:6, 152:20, 247:22, 251:10
**COURTROOM** [1] - 161:5
**courtroom** [16] - 22:17, 88:4, 92:24, 93:4, 97:3, 99:21, 102:14, 139:6, 151:1, 160:14, 160:24, 206:24, 207:17, 248:15, 250:8, 250:10
**Courtroom** [1] - 1:12
**cover** [14] - 34:15, 34:16, 34:17, 34:22, 43:2, 43:3, 111:17, 140:20, 142:3, 142:13, 145:14, 146:23, 147:6, 158:15
**coverage** [5] - 8:7, 36:12, 38:5, 38:6
**covered** [2] - 34:16, 145:11
**covering** [4] - 34:1, 35:23, 117:25, 130:3
**covers** [5] - 114:15, 114:20, 115:11, 117:2, 117:6
**COVID** [1] - 234:24
**cow's** [1] - 111:24
**coworker** [1] - 34:1
**CPP** [18] - 179:11, 179:13, 186:15, 186:22, 187:1, 187:3, 187:5, 187:6, 187:13, 188:15, 188:16, 188:19, 190:5, 190:6, 199:19, 205:13, 206:11, 206:14
**crawl** [1] - 171:10
**crazy** [1] - 108:13
**cream** [3] - 180:2, 180:3, 180:4
**create** [1] - 107:20
**created** [3] - 44:5, 138:19, 234:6
**creating** [2] - 117:3, 117:6
**creator** [1] - 224:3
**credibility** [5] - 93:22, 93:23, 94:6, 94:17, 159:12
**credit** [2] - 146:9, 146:11
**criteria** [1] - 230:21
**critical** [2] - 125:11, 154:12
**criticize** [1] - 137:10
**cross** [8] - 19:2, 19:18, 98:14, 98:17, 98:20, 104:5, 167:21, 204:21
**CROSS** [1] - 192:3
**cross-examination** [2] - 19:2, 19:18
**CROSS-EXAMINATION** [1] - 192:3
**cross-examine** [3] - 98:14, 98:17, 98:20
**crossed** [1] - 107:22
**crows** [1] - 168:21
**crucial** [1] - 139:24
**cry** [1] - 150:23
**CSR** [1] - 254:12
**curious** [7] - 49:8, 55:15, 63:19, 180:17, 180:21, 181:9, 196:6
**current** [7] - 49:9, 103:1, 217:6, 217:19, 225:7, 232:16, 236:7

**Curtis** [2] - 27:8, 141:15
**curve** [2] - 188:9, 188:12
**curves** [1] - 188:10
**customer** [3] - 219:4, 232:11, 232:18
**customers** [3] - 134:18, 235:10, 235:12
**cut** [2] - 10:5, 16:21
**cyber** [1] - 42:14

## D

**D.C** [1] - 78:12
**daily** [3] - 62:16, 169:25, 171:2
**damages** [21] - 86:21, 86:24, 87:10, 87:13, 87:17, 87:19, 89:11, 98:12, 98:13, 98:17, 101:22, 102:24, 131:23, 139:12, 140:25, 157:8, 157:10, 157:11, 157:12, 157:17
**Dana** [2] - 27:8, 157:14
**dangerous** [12] - 106:20, 106:25, 107:7, 107:12, 107:16, 107:19, 108:3, 108:13, 108:14, 109:23, 110:1, 144:13
**Daniela** [2] - 27:4, 133:12
**dark** [1] - 170:18
**Daros** [1] - 40:10
**DAS** [11] - 181:20, 182:12, 182:17, 184:4, 184:9, 184:25, 205:14, 205:16, 206:3, 206:7, 206:9
**dash** [1] - 16:21
**data** [15] - 57:18, 173:1, 184:17, 184:18, 188:9, 205:13, 213:20, 213:21, 215:23, 215:25, 220:25, 223:11, 225:19, 246:25, 247:2
**databases** [1] - 81:24
**date** [12] - 11:8, 12:25, 76:13, 79:19, 79:20, 81:13, 83:7, 84:8, 84:10, 137:7, 183:10, 228:7
**dated** [1] - 227:18
**dates** [5] - 12:9, 81:14, 147:20, 203:4, 233:16
**DAVID** [1] - 1:22
**DAXI** [25] - 178:15, 178:16, 178:20, 180:14, 183:22, 185:23, 189:10, 193:17, 194:3, 194:11, 194:25, 217:12, 217:21, 218:3, 219:16, 221:22, 222:3, 222:15, 223:7, 223:19, 225:22, 225:23, 233:16, 238:24
**daxibotulinumtoxin** [1] - 178:16
**DAXXIFY** [92] - 9:25, 10:2, 10:9, 13:20, 13:24, 24:13, 24:14, 27:25, 28:6, 73:16, 87:7, 105:2, 105:9, 105:12, 105:14, 113:9, 119:8, 119:10, 119:11, 119:15, 119:20, 120:13, 120:15, 129:3, 129:12, 129:25, 131:5, 132:2, 132:5, 136:22, 138:20, 138:21, 140:22, 141:8, 141:10, 141:11, 141:17, 141:19, 141:22, 141:24, 142:8, 142:12, 142:17, 143:7, 143:12, 143:23, 146:3, 146:4, 147:24, 158:16, 159:3, 178:5, 178:10, 178:13, 183:20, 193:18, 193:20, 196:3, 196:11, 196:16, 196:17, 197:6, 197:7, 197:14, 197:19, 198:5, 198:6, 198:21, 198:24, 199:12, 199:17, 199:25, 200:4, 217:9, 219:11, 220:11, 220:21, 221:2, 221:17, 223:2, 223:23, 225:16, 226:1, 226:15, 226:16, 227:9, 231:1, 234:12, 237:6, 237:7
**DAXXIFY's** [8] - 103:1, 130:18, 131:1, 143:16, 158:16, 195:19, 197:22, 221:14
**days** [12] - 22:21, 23:14, 31:21, 41:22, 41:23, 42:23, 43:3, 47:5, 47:6, 99:12, 133:16, 170:16
**deadline** [1] - 252:8
**deal** [6] - 106:18, 107:9, 109:4, 110:23, 137:5, 144:4
**dealing** [2] - 47:14, 113:25
**dealings** [1] - 26:3
**Deanna** [2] - 254:7, 254:12
**death** [1] - 107:3
**debate** [1] - 10:20
**debilitating** [2] - 110:15, 143:10
**decade** [2] - 170:9, 196:13
**decades** [4] - 104:8, 109:13, 201:11, 201:12
**decide** [24] - 20:16, 20:24, 24:17, 45:1, 45:4, 72:14, 79:7, 82:1, 84:19, 84:21, 85:19, 87:20, 87:22, 88:1, 88:18, 90:9, 93:3, 97:2, 117:13, 139:22, 140:23, 162:17, 163:2, 235:5
**decided** [10] - 118:12, 128:19, 130:14, 162:22, 201:25, 211:3, 213:3, 220:18, 244:19, 245:1
**decides** [1] - 81:19
**deciding** [3] - 85:18, 94:22, 220:15
**decision** [17] - 45:10, 73:1, 73:9, 81:21, 82:10, 82:25, 89:23, 97:25, 98:25, 105:1, 126:4, 128:14, 202:16, 210:23, 211:2, 244:22
**decisionmaking** [1] - 210:19
**decisions** [2] - 73:7, 82:17
**deck** [8] - 4:21, 219:21, 227:23, 244:1, 245:15, 245:17, 245:20, 245:22
**decks** [1] - 165:18
**dedication** [1] - 105:19
**deed** [3] - 77:8, 77:11, 81:4
**defend** [1] - 135:20
**defendant** [6] - 5:11, 24:10, 73:14, 119:6, 134:24, 208:18
**Defendant** [2] - 1:7, 2:11
**Defendant's** [1] - 249:21
**defendants** [1] - 19:14
**defense** [6] - 11:11, 11:13, 66:20, 85:1, 87:1, 140:8
**defer** [4] - 101:13, 101:15, 211:7, 211:9
**deficient** [1] - 82:25
**defines** [1] - 77:12
**defining** [1] - 77:11
**definitely** [2] - 173:17, 199:8
**definition** [2] - 88:10, 88:12
**definitively** [1] - 131:2
**degrade** [1] - 114:24
**degrading** [1] - 112:7
**degree** [3] - 58:17, 162:9, 222:22
**degrees** [1] - 237:14
**DEIRDRE** [1] - 2:8
**Deirdre** [3] - 25:17, 140:17, 192:5
**DELAWARE** [1] - 1:2
**Delaware** [8] - 53:18, 55:18, 55:19, 55:21, 56:9, 56:13, 60:8, 61:4
**deliberate** [2] - 95:23, 99:8
**deliberated** [2] - 53:20, 53:21
**deliberating** [1] - 90:21
**deliberations** [7] - 22:23, 54:12, 90:6, 90:24, 97:22, 97:25, 248:7
**demand** [1] - 158:25
**demeanor** [1] - 94:4
**demonstrative** [1] - 92:17
**demonstratives** [2] - 16:18, 16:19
**Dennies** [2] - 25:15, 135:6
**DENNIES** [1] - 2:6
**deny** [1] - 95:18
**department** [1] - 39:22
**depicted** [2] - 106:21, 111:13
**deposition** [13] - 16:4, 206:1, 207:6, 207:22, 209:2, 216:23, 224:23, 224:25, 225:3, 225:5, 232:9, 240:4, 253:6
**depositions** [4] - 5:18, 207:22, 208:5, 253:3
**Depot** [1] - 53:24
**depression** [1] - 47:15
**deprioritized** [1] - 202:6
**DEPUTY** [1] - 161:5
**deputy** [8] - 21:18, 88:4, 101:19, 207:15, 247:7, 251:10, 251:17, 251:19
**derivatives** [2] - 219:12, 222:23
**derived** [8] - 221:2, 222:12, 223:6, 228:5, 240:22, 241:13, 241:17, 241:18
**dermatology** [1] - 205:12
**DESAI** [1] - 2:7
**Desai** [2] - 25:17, 140:18
**describe** [4] - 74:13, 77:14, 80:4, 223:11
**described** [2] - 78:22, 136:3
**describes** [3] - 79:17, 80:18, 245:23
**describing** [1] - 225:19
**description** [9] - 23:25, 44:11, 69:3, 80:15, 80:21, 81:4, 82:2, 82:4, 90:20
**deserve** [1] - 150:22
**deserves** [2] - 94:24, 123:14
**deserving** [2] - 118:11, 136:18
**designation** [1] - 253:6

**designations** [1] - 207:6
**designed** [4] - 74:18, 83:12, 118:18, 130:24
**desire** [1] - 67:9
**desired** [1] - 212:19
**despite** [1] - 203:13
**destroyed** [1] - 91:4
**detail** [4] - 132:21, 133:9, 164:13, 165:3
**detailed** [7] - 24:20, 79:22, 80:21, 87:18, 87:21, 97:23, 110:20
**details** [1] - 243:13
**detectors** [1] - 66:3
**determination** [1] - 123:12
**determine** [6] - 81:14, 92:21, 94:17, 117:24, 118:5, 132:7
**determined** [5] - 88:8, 108:2, 118:10, 123:23, 125:21
**determining** [2] - 81:18, 90:11
**detrimental** [1] - 190:7
**develop** [14] - 116:6, 116:10, 159:7, 167:7, 174:7, 203:3, 203:6, 209:19, 211:21, 225:12, 225:21, 233:5, 242:5, 244:7
**developed** [14] - 44:3, 120:19, 121:25, 122:1, 141:7, 173:14, 174:14, 179:21, 192:19, 192:23, 194:19, 241:1, 241:2, 242:20
**developing** [10] - 128:1, 135:23, 141:17, 174:8, 176:16, 193:17, 201:2, 225:17, 241:7, 242:9
**development** [16] - 69:5, 104:9, 111:3, 111:6, 126:3, 141:13, 172:16, 200:23, 202:25, 203:15, 203:17, 203:19, 236:1, 236:10, 237:8, 237:23
**device** [1] - 80:23
**devices** [1] - 22:10
**DI** [1] - 8:14
**diagram** [2] - 132:21, 246:15
**dictionaries** [1] - 96:24
**died** [1] - 52:19
**Diego** [3] - 26:9, 26:14, 161:19
**differ** [1] - 234:4
**difference** [4] - 125:13, 222:21, 223:12, 234:25
**differences** [10] - 125:8, 125:9, 125:10, 125:11, 125:12, 151:11, 196:25, 199:1, 199:20, 222:20
**different** [42] - 34:9, 37:24, 45:9, 55:7, 65:25, 88:23, 98:24, 107:24, 111:1, 111:17, 122:25, 123:13, 124:1, 124:6, 127:2, 127:7, 130:12, 135:13, 146:18, 149:1, 151:25, 165:14, 168:12, 176:24, 176:25, 179:6, 183:16, 184:2, 184:25, 189:23, 189:25, 196:22, 198:16, 198:17, 199:7, 199:8, 218:1, 220:22, 221:3, 237:14
**differentiate** [1] - 217:21
**differentiation** [2] - 230:24, 237:5
**differentiator** [1] - 237:10
**differently** [2] - 89:6, 235:6
**difficult** [2] - 29:10, 107:1
**difficulty** [4] - 29:5, 29:9, 47:13
**diffuses** [1] - 143:22
**diffusion** [14] - 143:17, 143:18, 144:2, 195:11, 195:14, 195:18, 200:11, 200:13, 204:20, 206:2, 206:3, 206:10, 206:12, 206:15
**digit** [2] - 182:11, 182:17
**digits** [6] - 74:1, 114:13, 183:4, 187:23, 187:25, 245:24
**dim** [1] - 75:7
**dime** [1] - 120:24
**dire** [1] - 20:11
**direct** [6] - 32:18, 93:6, 93:7, 93:17, 203:2
**DIRECT** [1] - 161:14
**directed** [2] - 210:14, 210:16
**directions** [1] - 107:25
**directly** [6] - 93:12, 106:24, 107:9, 108:11, 206:12, 235:8
**director** [7] - 39:15, 69:6, 75:12, 161:24, 217:7, 236:1, 236:10
**Directors** [2] - 225:13, 227:4
**disaccharide** [21] - 115:14, 131:14, 174:15, 174:24, 175:3, 177:7, 178:2, 183:25, 186:1, 186:6, 186:8, 186:16, 186:21, 187:8, 187:19, 188:18, 188:25, 189:5, 190:15, 190:24, 212:11
**disagree** [2] - 88:13, 246:25
**disagreeing** [1] - 83:10
**disagreement** [1] - 83:15
**disagrees** [2] - 83:14, 130:22
**disclose** [2] - 122:6, 183:23
**disclosed** [12] - 4:4, 4:11, 4:13, 7:1, 7:14, 12:23, 83:7, 121:24, 124:13, 153:22, 179:3, 180:11
**discloses** [1] - 154:5
**disclosure** [4] - 5:23, 77:3, 82:16, 154:16
**disclosures** [2] - 149:4, 149:9
**discovered** [1] - 144:10
**discoveries** [2] - 76:6, 128:23
**discovery** [1] - 109:13
**discuss** [8] - 9:7, 75:22, 95:24, 124:4, 138:12, 140:22, 154:14, 210:24
**discussed** [7] - 81:8, 82:22, 128:5, 154:9, 210:21, 250:1, 250:24
**discussing** [1] - 151:3
**discussion** [6] - 30:14, 32:12, 63:8, 71:22, 134:13, 134:25
**Discussion** [1] - 51:24
**discussions** [2] - 49:22, 96:10
**disease** [3] - 67:1, 67:4, 67:17
**dismissed** [1] - 71:19
**disorder** [2] - 167:20, 168:10
**disorders** [3] - 166:19, 166:25, 167:5
**disparage** [1] - 145:5
**dispersal** [1] - 195:15
**disperse** [1] - 200:14
**disposing** [1] - 157:8
**dispute** [11] - 11:25, 28:21, 44:24, 45:16, 84:18, 88:17, 105:10, 117:10, 124:24, 132:1, 137:1
**disputed** [1] - 101:23
**disputes** [3] - 75:23, 85:23, 252:9
**disregard** [2] - 92:12, 92:20
**disregarded** [1] - 92:24
**disruption** [1] - 235:11
**distill** [1] - 188:10
**distinct** [1] - 4:18
**distinguish** [1] - 238:5
**distinguishing** [2] - 158:17, 238:8
**distributed** [1] - 88:4
**distributor** [1] - 4:2
**district** [1] - 75:11
**District** [1] - 254:13
**DISTRICT** [2] - 1:1, 1:2
**Dittman** [3] - 4:5, 25:8, 105:24
**DITTMANN** [39] - 1:19, 4:5, 4:25, 5:6, 5:14, 6:21, 7:4, 7:16, 7:22, 8:2, 18:1, 18:10, 20:8, 25:7, 27:2, 31:24, 35:17, 36:11, 40:3, 43:6, 45:20, 47:20, 52:15, 54:7, 54:10, 55:12, 57:14, 58:20, 65:22, 66:4, 68:4, 99:25, 100:4, 101:4, 103:23, 134:22, 253:5, 253:15, 253:22
**Dittmann** [33] - 5:13, 5:22, 6:20, 25:6, 25:12, 27:1, 35:16, 40:1, 45:19, 47:19, 52:14, 54:6, 55:11, 57:12, 62:18, 71:20, 100:22, 101:17, 103:21, 134:8, 134:16, 136:6, 137:7, 137:13, 138:23, 139:19, 142:19, 144:8, 147:17, 150:8, 152:16, 161:2, 253:1
**Dittmann's** [1] - 146:8
**divided** [1] - 207:14
**DNA** [3] - 246:2, 246:10, 246:22
**Docket** [5] - 3:1, 3:6, 8:5, 16:3, 16:4
**doctor** [4] - 67:21, 68:10, 108:7, 144:5
**doctors** [1] - 110:16
**document** [62] - 92:4, 100:24, 181:14, 181:16, 205:2, 205:4, 205:10, 218:8, 218:10, 218:12, 218:14, 218:22, 218:24, 219:2, 219:6, 219:20, 219:22, 219:24, 221:10, 223:14, 223:16, 223:21, 223:24, 226:3, 226:5, 226:12, 227:7, 227:12, 227:14, 227:16, 228:2, 228:11, 228:13, 228:15, 228:18, 229:18, 229:20, 229:21, 229:22, 229:23, 229:24, 232:20, 232:22, 232:24, 233:1, 233:2, 233:4, 233:20, 233:22, 234:2, 234:6, 236:14, 236:15, 236:16, 236:18, 236:20, 236:23, 239:3, 239:5, 243:24, 245:13, 249:1
**documents** [9] - 5:17,

5:18, 90:17, 91:7, 92:22, 114:4, 213:9, 223:10, 250:9
**dollars** [1] - 145:9
**domain** [4] - 77:13, 147:7, 147:9, 175:16
**done** [37] - 4:9, 11:5, 11:11, 11:15, 20:11, 26:8, 26:22, 37:13, 43:13, 56:11, 56:22, 68:16, 69:5, 69:22, 74:12, 109:6, 111:3, 120:9, 124:12, 129:24, 130:10, 138:7, 166:3, 172:23, 172:25, 174:5, 181:18, 189:15, 189:18, 191:7, 191:16, 192:10, 202:18, 203:7, 210:11, 233:15, 244:22
**dots** [6] - 168:17, 168:18, 168:25, 169:2, 169:3, 171:20
**double** [1] - 99:23
**double-check** [1] - 99:23
**doubt** [2] - 19:14, 105:6
**Dover** [4] - 27:9, 42:3, 42:5, 159:19
**down** [19] - 18:4, 23:19, 33:11, 34:11, 43:12, 78:5, 132:23, 157:22, 172:20, 174:4, 174:5, 184:7, 188:10, 188:22, 190:10, 190:12, 191:1, 206:20, 228:3
**downplayed** [1] - 136:6
**downstream** [1] - 245:3
**Dr** [85] - 4:6, 4:16, 4:22, 5:19, 13:13, 14:16, 15:20, 15:21, 106:6, 106:8, 107:14, 107:20, 108:1, 108:7, 108:12, 108:19, 108:24, 109:3, 109:7, 111:21, 116:9, 116:23, 122:1, 124:12, 126:1, 126:6, 126:13, 127:17, 127:20, 128:2, 130:22, 133:11, 133:12, 141:14, 141:15, 141:16, 141:19, 143:14, 144:19, 144:20, 144:21, 153:8, 153:9, 153:13, 153:18, 153:24, 154:1, 154:10, 154:24, 155:3, 155:6, 155:16, 156:2, 156:9, 156:11, 156:16, 160:20, 160:23, 161:3, 161:4, 166:14, 166:18, 167:6, 167:10, 184:22, 192:5, 192:16, 192:18, 204:14, 205:1, 205:10, 206:19, 240:23, 242:13, 253:8, 253:9, 253:10, 253:13
**drafted** [1] - 78:18
**Drago** [3] - 27:5, 133:12, 253:10
**draw** [4] - 151:24, 188:14, 190:4, 190:5
**drawings** [1] - 80:20
**dreamt** [1] - 159:4
**drew** [1] - 178:21
**dried** [1] - 114:17
**drive** [3] - 46:14, 169:21, 169:25
**driver** [1] - 46:12
**driving** [1] - 60:15
**droopy** [1] - 144:19
**drops** [2] - 132:23, 167:4
**drug** [63] - 24:1, 28:3, 28:6, 103:1, 104:1, 105:2, 106:18, 107:13, 108:9, 108:10, 108:13, 108:15, 108:19, 109:1, 109:14, 109:15, 111:18, 112:14, 112:24, 113:16, 113:19, 113:25, 114:8, 114:17, 114:20, 114:21, 115:12, 115:18, 115:20, 115:23, 116:11, 118:10, 119:13, 119:19, 122:12, 123:2, 126:2, 126:5, 127:10, 127:16, 127:22, 128:17, 129:11, 132:25, 133:6, 143:18, 146:21, 146:24, 162:14, 162:15, 167:7, 169:5, 174:2, 174:8, 178:13, 180:18, 195:6, 240:21, 240:25, 241:5, 241:23
**drug's** [1] - 131:11
**drugs** [2] - 144:10, 144:13
**DS** [2] - 245:19, 245:23
**DS1** [3] - 176:6, 176:7, 245:18
**DS2** [17] - 16:13, 174:9, 176:2, 176:5, 244:2, 244:3, 244:5, 244:7, 244:19, 244:23, 245:2, 245:5, 245:18, 246:6, 246:10, 246:18
**DSB** [2] - 34:9, 35:12
**DTX** [2] - 249:8, 249:21
**due** [5] - 56:10, 131:12, 180:19, 252:11, 252:12
**duration** [57] - 10:2, 115:19, 116:1, 123:6, 127:22, 130:19, 131:1, 131:10, 131:12, 138:25, 139:2, 144:2, 144:4, 145:19, 146:6, 146:11, 158:18, 177:18, 177:19, 177:25, 180:18, 180:20, 180:21, 187:3, 187:5, 190:1, 190:3, 190:6, 190:8, 190:11, 190:25, 193:6, 193:8, 193:21, 193:24, 195:4, 195:19, 195:24, 196:4, 202:23, 203:1, 203:10, 203:15, 204:2, 204:7, 206:15, 217:24, 220:14, 222:8, 223:9, 223:11, 237:10, 237:18, 237:21, 238:9, 238:17
**During** [1] - 77:2
**during** [32] - 4:23, 32:24, 49:11, 72:18, 73:3, 73:7, 73:17, 74:6, 82:19, 90:5, 90:17, 90:23, 91:11, 92:9, 92:14, 95:2, 95:25, 96:20, 98:24, 105:10, 113:3, 131:3, 144:12, 148:6, 176:14, 203:22, 206:1, 213:17, 220:3, 228:16, 234:21, 251:3
**duties** [1] - 72:23
**duty** [4] - 72:13, 82:12, 82:13, 85:22
**DX** [1] - 8:17
**Dysport** [7] - 27:25, 120:6, 120:7, 145:15, 233:17, 234:16, 234:23
**Dysport's** [1] - 234:17
**dystonia** [10] - 143:10, 169:12, 169:15, 169:16, 170:2, 170:5, 228:23, 229:2, 229:9, 229:13

## E

**e-mail** [4] - 65:19, 97:6, 97:14, 211:23
**e-mails** [1] - 49:23
**early** [12] - 109:4, 109:10, 110:9, 111:22, 128:5, 145:2, 176:14, 202:23, 241:1, 246:10, 247:10, 252:23
**earned** [1] - 130:6
**earth** [2] - 106:21, 152:23
**ease** [2] - 75:7, 229:12
**easier** [1] - 7:22
**easily** [1] - 67:24
**easy** [2] - 150:4, 152:3
**economics** [1] - 137:25
**economist** [2] - 133:12, 157:15
**economy** [3] - 118:25, 136:15, 136:16
**ECT** [4] - 249:9, 249:11, 249:24, 250:23
**edges** [1] - 199:11
**Edison's** [1] - 76:23
**edits** [1] - 16:11
**educate** [1] - 234:8
**educational** [1] - 55:4
**Educational** [1] - 55:20
**effect** [17] - 131:10, 167:16, 167:17, 183:3, 183:17, 185:5, 185:7, 187:23, 188:13, 190:6, 190:9, 190:24, 190:25, 194:3, 206:15, 237:24
**effective** [9] - 76:16, 83:7, 109:14, 110:21, 112:10, 112:15, 144:14, 172:7, 179:24
**effects** [11] - 107:15, 115:22, 181:19, 182:10, 182:25, 183:3, 183:16, 184:14, 184:24, 199:19, 238:18
**efficacious** [1] - 177:17
**efficacy** [3] - 187:3, 190:2, 190:25
**effort** [8] - 11:25, 118:20, 127:25, 176:20, 241:8, 244:7, 244:11, 244:18
**efforts** [8] - 13:22, 104:10, 109:12, 111:4, 112:23, 116:15, 128:8, 244:16
**either** [14] - 10:11, 45:10, 50:3, 65:18, 69:11, 82:15, 83:9, 88:19, 130:13, 148:12, 192:17, 243:17, 243:20, 246:16
**elaborate** [2] - 96:19, 102:25
**electrical** [2] - 64:9, 76:24
**electrician** [1] - 49:5
**electronic** [4] - 22:10, 78:25, 83:25, 96:25
**element** [1] - 15:2
**elevator** [1] - 96:2
**elicit** [2] - 188:2, 188:20
**eligible** [1] - 60:8
**eliminate** [1] - 241:24
**eluent** [2] - 246:19, 246:22
**embodiment** [1] - 80:22

**embodiments** [1] - 80:22
**emerging** [1] - 108:18
**emery** [2] - 66:9, 68:9
**emphasize** [1] - 127:2
**employed** [6] - 26:3, 28:9, 46:15, 46:16, 66:12, 209:8
**employee** [7] - 39:16, 209:2, 216:22, 224:24, 232:10, 236:2, 240:6
**employees** [2] - 139:4, 141:6
**employer** [3] - 50:1, 217:4, 236:7
**employment** [3] - 49:3, 69:2, 213:18
**employs** [2] - 34:4, 37:18
**empowered** [1] - 153:2
**enable** [1] - 82:4
**end** [12] - 22:5, 24:19, 34:24, 59:22, 81:2, 89:22, 97:23, 97:24, 139:10, 191:4, 207:15, 250:17
**ended** [8] - 86:10, 134:25, 216:8, 224:4, 231:4, 235:13, 239:18, 247:4
**ending** [7] - 159:10, 213:25, 214:4, 221:20, 227:23, 230:7, 230:9
**ends** [1] - 22:15
**energy** [1] - 55:21
**enforce** [1] - 84:14
**enforcing** [1] - 139:24
**engineer** [6] - 42:11, 42:13, 42:14, 58:11, 65:10, 65:11
**engineering** [5] - 58:15, 58:17, 64:10, 65:12, 65:14
**English** [1] - 29:10
**enhance** [1] - 76:21
**enhances** [1] - 144:2
**enjoy** [4] - 61:9, 62:14, 64:11, 114:2
**enjoyed** [1] - 131:16
**ensure** [3] - 107:10, 140:11, 140:13
**enter** [1] - 146:4
**entered** [4] - 102:14, 160:24, 207:17, 213:20
**entering** [2] - 248:24, 250:3
**entire** [3] - 99:1, 107:7, 203:24
**entirely** [1] - 75:15
**entirety** [2] - 188:13, 190:2
**entities** [2] - 96:23, 106:4
**entitled** [9] - 84:23, 86:24, 87:10, 87:13, 87:17, 88:3, 153:2, 157:19, 229:18
**entity** [2] - 4:19, 17:19
**entrants** [1] - 229:5
**entrepreneurial** [1] - 159:3
**entry** [1] - 213:25
**envelope** [1] - 112:16
**environment** [2] - 162:21, 163:14
**equipment** [1] - 65:22
**ER** [3] - 142:23, 143:1
**Eric** [3] - 4:5, 25:7, 105:24
**ERIC** [1] - 1:19
**erred** [1] - 39:8
**especially** [3] - 68:4, 90:19, 166:21
**ESQ** [17] - 1:16, 1:19, 1:19, 1:20, 1:20, 1:21, 1:21, 1:22, 1:22, 2:3, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8, 2:10
**essence** [2] - 87:22, 135:16
**essentially** [12] - 7:7, 8:25, 20:13, 56:17, 102:20, 164:3, 164:12, 165:6, 165:21, 183:5, 197:1, 233:11
**established** [2] - 103:20, 177:21
**esteemed** [1] - 136:5
**et** [3] - 1:6, 174:6, 230:6
**evaluate** [3] - 79:7, 154:12, 156:3
**evaluated** [2] - 78:21, 117:19
**evaluating** [1] - 90:12
**evaluation** [1] - 182:10
**Evans** [1] - 56:5
**evening** [1] - 43:2
**event** [5] - 8:16, 41:2, 43:24, 64:13, 71:14
**eventually** [13] - 61:8, 113:24, 165:19, 165:20, 172:11, 179:2, 183:4, 184:7, 192:20, 192:24, 198:24, 225:16, 242:3
**everyday** [1] - 150:25
**everywhere** [1] - 17:6
**evidence** [116] - 6:12, 9:15, 15:5, 15:6, 15:12, 19:1, 22:21, 45:5, 72:14, 72:19, 73:4, 73:18, 74:7, 86:2, 86:5, 87:20, 87:23, 88:2, 88:24, 88:25, 89:2, 89:5, 89:7, 89:11, 89:13, 89:15, 89:16, 89:18, 89:24, 90:12, 90:13, 90:18, 91:6, 91:14, 91:17, 91:19, 91:22, 91:23, 92:4, 92:5, 92:6, 92:8, 92:12, 92:17, 92:18, 92:20, 92:22, 92:24, 92:25, 93:4, 93:6, 93:7, 93:8, 93:16, 93:17, 93:18, 93:19, 94:5, 94:25, 95:8, 95:22, 96:12, 96:14, 97:2, 97:21, 98:7, 98:11, 98:13, 98:16, 98:21, 98:22, 98:25, 99:2, 99:5, 99:7, 105:7, 120:5, 126:21, 126:24, 127:1, 127:6, 133:24, 136:2, 138:6, 138:15, 140:15, 140:16, 142:15, 144:2, 147:1, 149:14, 149:19, 153:4, 154:9, 157:5, 158:11, 159:11, 160:1, 181:25, 205:19, 208:22, 216:10, 224:6, 231:6, 235:15, 235:20, 239:20, 239:25, 248:20, 248:23
**Evolus** [1] - 233:19
**exact** [8] - 121:24, 121:25, 123:9, 123:21, 196:10, 199:17, 206:8, 210:17
**exactly** [9] - 6:4, 16:6, 77:20, 114:5, 125:19, 130:9, 140:16, 152:8, 183:24
**examination** [2] - 19:2, 19:18
**EXAMINATION** [3] - 161:14, 192:3, 204:12
**examine** [4] - 78:14, 98:14, 98:17, 98:20
**examiner** [27] - 79:5, 79:25, 81:21, 81:23, 82:9, 82:15, 82:17, 82:19, 82:21, 82:24, 83:1, 83:3, 83:4, 83:10, 83:11, 83:16, 83:22, 85:5, 85:7, 140:3, 152:17, 153:3, 154:8, 154:9, 154:14, 154:18, 155:24
**examiner's** [3] - 82:10, 83:13, 83:14
**Examiners** [1] - 85:11
**examiners** [6] - 9:8, 84:16, 117:21, 118:9, 152:21, 152:22
**examining** [2] - 81:20, 82:7
**example** [19] - 3:14, 4:6, 11:10, 13:25, 17:21, 76:23, 83:4, 93:11, 111:6, 112:20, 115:1, 115:22, 118:3, 119:23, 122:25, 162:14, 167:24, 173:2, 208:16
**excellent** [1] - 191:22
**except** [2] - 45:14, 62:15
**exception** [1] - 10:19
**excerpt** [1] - 250:9
**excerpts** [2] - 248:24, 248:25
**exchange** [7] - 83:15, 142:6, 242:24, 243:2, 245:8, 245:9, 246:19
**excipient** [2] - 214:9, 215:3
**excipients** [16] - 177:6, 183:17, 183:19, 183:23, 183:24, 196:22, 210:24, 211:1, 211:3, 214:11, 214:14, 214:20, 214:21, 214:23, 214:25, 215:16
**exciting** [1] - 72:8
**exclude** [2] - 92:11, 150:5
**excluded** [1] - 93:1
**exclusive** [3] - 76:5, 86:20, 142:12
**excuse** [24] - 32:9, 33:7, 33:10, 36:15, 36:18, 36:21, 38:24, 41:13, 43:9, 45:24, 47:4, 47:23, 50:12, 51:15, 52:21, 53:6, 56:16, 57:25, 59:12, 60:18, 68:2, 68:9, 127:8, 129:2
**excused** [6] - 41:3, 41:5, 47:1, 67:12, 68:16, 71:10
**excuses** [1] - 121:12
**executive** [3] - 161:24, 236:1, 236:10
**executives** [1] - 13:25
**exercise** [2] - 20:18, 20:19
**Exhibit** [53] - 182:3, 205:23, 213:10, 215:9, 216:20, 218:8, 218:20, 219:19, 221:9, 221:11, 221:13, 223:14, 223:16, 223:18, 224:9, 224:13, 224:17, 224:21, 225:25, 226:5, 226:11, 226:24, 227:6, 227:12, 228:11, 228:21, 229:17, 231:10, 231:14, 231:22, 232:1, 232:7, 232:20, 233:20, 235:18, 235:23, 236:12, 238:25, 239:23, 240:3, 242:12, 242:13, 242:15, 243:24, 243:25, 244:1, 245:13, 245:14, 245:15, 245:17, 245:21, 249:21
**exhibit** [13] - 8:14, 9:24, 10:14, 17:16, 18:12, 90:23, 92:1, 92:2, 93:2, 221:9, 248:24, 249:8, 251:3
**exhibits** [22] - 3:5, 3:8, 3:22, 5:13, 6:1, 8:21, 17:15, 90:19, 90:21, 91:8, 91:17, 91:21, 92:11, 92:16, 92:17,

207:12, 248:18, 249:3, 250:3, 250:17, 250:22, 251:11
**Exhibits** [1] - 249:5
**exist** [1] - 93:10
**existing** [2] - 13:19, 222:9
**exists** [1] - 129:12
**exited** [4] - 99:21, 160:14, 206:24, 248:15
**expand** [2] - 163:4, 163:9
**expanding** [1] - 174:17
**expect** [7] - 6:12, 6:13, 12:16, 22:22, 23:12, 49:21, 129:4
**expectation** [4] - 14:25, 15:10, 215:25, 216:1
**expectations** [1] - 15:15
**expected** [4] - 14:13, 22:21, 238:22, 253:1
**expects** [1] - 98:8
**expenses** [1] - 137:23
**experience** [15] - 45:6, 45:7, 54:1, 62:11, 62:14, 93:19, 94:12, 148:13, 163:7, 196:14, 197:1, 235:9, 238:18, 238:19, 242:4
**experiencing** [1] - 66:25
**Experiment** [7] - 214:5, 214:6, 214:16, 214:18, 214:22, 214:23, 215:18
**experiment** [9] - 130:24, 210:22, 215:1, 215:4, 215:8, 215:11, 215:12, 215:14, 215:18
**experimented** [1] - 144:12
**experimenting** [1] - 166:23
**experiments** [8] - 114:7, 122:21, 165:7, 210:17, 210:20, 211:4, 213:3, 213:21
**expert** [16] - 4:7, 4:23, 10:4, 10:10, 19:2, 94:10, 94:13, 94:17, 94:19, 133:13, 136:13, 153:9, 154:25, 156:1, 157:16
**expert's** [1] - 94:20
**expertise** [2] - 27:23, 163:5
**experts** [16] - 14:23, 95:1, 117:18, 123:8, 123:22, 124:2, 125:21, 125:24, 133:10, 137:25, 146:15, 147:13, 150:18, 159:17, 198:2, 219:9
**expire** [4] - 118:24, 119:3, 128:21, 130:8
**expired** [6] - 130:4, 132:14, 147:1, 156:5, 158:21, 203:23
**expires** [4] - 77:3, 86:18, 132:17, 132:18
**expiring** [1] - 145:14
**explain** [29] - 9:10, 73:8, 75:20, 78:5, 83:14, 86:6, 87:3, 102:18, 114:4, 122:24, 123:1, 126:3, 126:14, 127:20, 128:2, 130:22, 136:20, 137:11, 143:15, 155:20, 156:12, 163:11, 166:14, 169:1, 170:12, 171:6, 184:22, 185:21, 188:1
**explained** [6] - 5:15, 101:7, 119:9, 130:5, 133:9, 201:9
**exploring** [1] - 144:16
**expressly** [2] - 120:2, 123:10
**extend** [2] - 22:24, 195:4
**extended** [3] - 142:25, 193:21, 193:24
**extent** [1] - 250:15
**extra** [1] - 247:17
**extremely** [6] - 104:16, 109:25, 116:19, 117:7, 139:3, 191:20
**eye** [16] - 104:6, 107:23, 108:19, 144:19, 166:19, 166:25, 167:4, 167:5, 167:20, 167:21, 167:22, 168:3, 168:4, 168:22
**eyelid** [1] - 168:6
**eyes** [4] - 104:5, 107:22, 107:24, 168:21
**eyewitness** [1] - 93:8

**F**

**F.3d** [1] - 101:24
**fabrication** [1] - 46:21
**face** [2] - 106:20, 141:25
**faced** [1] - 146:17
**facial** [3] - 104:3, 109:18, 232:18
**facilities** [1] - 165:7
**facility** [1] - 165:7
**fact** [35] - 5:18, 5:19, 5:23, 11:6, 11:17, 11:20, 12:11, 12:24, 14:22, 17:16, 19:2, 89:14, 93:7, 93:11, 105:13, 107:7, 108:10, 108:14, 121:13, 123:4, 123:15, 125:7, 129:7, 130:16, 131:3, 131:11, 136:25, 139:4, 155:3, 158:1, 189:24, 190:7, 191:8, 195:7, 223:5
**fact-specific** [1] - 158:1
**factor** [4] - 220:14, 223:3, 235:4, 237:12
**factors** [3] - 220:25, 221:2, 230:23
**facts** [20] - 72:14, 72:15, 72:17, 73:2, 85:6, 85:19, 85:24, 86:2, 91:6, 91:8, 91:11, 92:19, 92:21, 93:9, 93:10, 140:15, 158:2, 158:14
**factual** [1] - 85:22
**fair** [22] - 6:10, 6:14, 19:1, 29:5, 45:15, 45:18, 45:25, 54:2, 57:4, 62:11, 105:21, 120:16, 120:20, 120:25, 121:6, 132:8, 133:5, 133:14, 194:11, 195:1, 201:4, 203:8
**fairly** [4] - 20:20, 60:19, 72:24, 119:4
**fairness** [1] - 119:5
**fall** [1] - 235:2
**falls** [2] - 3:21, 79:7
**familiar** [17] - 55:10, 122:11, 136:23, 139:15, 172:22, 173:4, 218:10, 218:22, 219:21, 221:11, 223:15, 228:13, 229:22, 229:23, 232:24, 242:13, 242:17
**familiarize** [2] - 73:18, 74:7
**families** [2] - 106:12, 191:14
**family** [15] - 25:2, 25:3, 25:4, 25:22, 26:3, 26:7, 26:12, 28:9, 28:17, 38:15, 47:9, 59:9, 97:12, 170:21, 171:3
**famous** [1] - 76:23
**fan** [1] - 151:22
**FAQs** [1] - 218:25
**far** [7] - 29:4, 47:1, 47:10, 59:12, 105:11, 105:12, 150:23
**fast** [1] - 146:1
**fast-forward** [1] - 146:1
**faster** [1] - 208:9
**father** [2] - 52:8, 52:19
**favor** [2] - 88:21, 157:6
**FBI** [1] - 107:10
**FDA** [21] - 5:11, 5:15, 5:19, 109:25, 110:4, 110:20, 131:4, 131:9, 133:13, 141:8, 142:20, 143:6, 144:23, 146:3, 147:14, 147:24, 155:14, 170:5, 171:19, 171:22, 171:23
**FDA-approved** [1] - 171:23
**feature** [1] - 158:19
**features** [5] - 158:17, 193:5, 238:5, 238:11, 238:16
**February** [2] - 225:24
**Federal** [1] - 101:24
**federal** [4] - 61:15, 61:16, 75:12, 78:13
**fee** [2] - 77:10, 84:7
**feelings** [1] - 40:3
**feet** [1] - 168:21
**fell** [1] - 53:24
**fellow** [4] - 90:8, 90:16, 96:8, 248:5
**Fenwick** [1] - 37:20
**fermentation** [2] - 245:3, 245:6
**few** [16] - 45:14, 79:1, 95:21, 119:8, 119:14, 120:23, 122:9, 133:16, 135:9, 136:20, 142:11, 156:14, 165:16, 181:2, 217:16
**fewer** [2] - 144:4, 144:5
**field** [17] - 27:20, 78:8, 79:6, 79:24, 81:19, 82:5, 88:11, 94:12, 104:18, 104:21, 109:21, 117:22, 120:8, 121:20, 126:2, 126:7, 150:15
**fields** [1] - 81:23
**fifth** [3] - 70:14, 70:23, 146:4
**Figure** [3] - 184:20, 188:5, 188:14
**figure** [13] - 57:21, 158:4, 173:17, 184:23, 186:23, 188:4, 188:7, 188:8, 190:10, 190:13, 190:22, 194:2, 194:10
**figured** [6] - 20:20, 112:23, 116:18, 123:5, 125:16, 125:18
**figures** [1] - 80:20
**file** [8] - 5:2, 83:22, 83:23, 148:10, 148:24, 175:15, 175:17, 250:16
**filed** [21] - 11:6, 12:24, 76:13, 79:20, 80:5, 84:1, 84:3, 111:13, 113:5, 147:3, 147:23, 148:2, 153:1, 154:4, 155:5, 156:23, 156:24, 203:9, 252:6, 252:14, 252:21
**filing** [15] - 11:8, 11:18, 12:25, 78:10, 78:18, 78:25, 81:13, 81:14, 83:7, 118:16, 149:25, 152:11, 225:18, 252:8, 252:21
**filings** [1] - 131:8

**fill** [2] - 38:2, 207:9
**filling** [1] - 165:22
**fills** [1] - 42:16
**final** [8] - 83:17, 84:5, 152:19, 153:1, 210:22, 211:2, 239:7, 240:4
**finally** [7] - 93:5, 97:20, 105:21, 144:19, 152:10, 156:4, 202:25
**financial** [6] - 39:18, 47:11, 69:6, 69:7, 131:23, 233:6
**fine** [7] - 17:18, 40:18, 62:17, 102:11, 145:6, 251:5, 251:7
**finish** [5] - 36:23, 69:23, 75:2, 160:10, 206:23
**finished** [2] - 68:15, 247:6
**firing** [4] - 163:18, 164:2, 164:11, 168:8
**firm** [5] - 25:8, 25:11, 25:15, 25:18, 25:19
**firms** [5] - 24:25, 25:5, 25:23, 26:4, 152:22
**First** [1] - 85:6
**first** [72] - 3:6, 3:7, 8:17, 14:21, 23:13, 61:1, 61:7, 70:15, 70:17, 70:19, 79:3, 79:14, 79:23, 80:3, 82:23, 84:9, 88:23, 95:22, 98:3, 98:11, 100:22, 108:5, 109:18, 113:17, 116:9, 116:25, 117:9, 117:15, 125:6, 126:1, 133:11, 136:25, 137:20, 138:9, 140:21, 144:23, 145:15, 146:5, 150:10, 154:11, 154:22, 156:2, 159:22, 160:19, 164:22, 166:24, 168:15, 169:1, 170:1, 170:3, 170:4, 172:24, 179:19, 183:7, 187:1, 189:12, 193:20, 209:1, 210:11, 210:13, 213:10, 213:25, 218:21, 222:7, 223:19, 225:15, 225:21, 226:24, 240:10, 244:6, 248:11, 248:17
**fits** [1] - 6:7
**five** [8] - 22:21, 29:22, 99:19, 101:20, 199:12, 199:15, 199:23, 202:3
**flag** [1] - 250:2
**flagship** [1] - 141:12
**flat** [1] - 126:14
**flat-out** [1] - 126:14
**Florida** [1] - 51:7
**fluctuating** [1] - 167:16
**focus** [12] - 111:5, 111:9, 113:25, 122:8, 123:11, 128:9, 128:14, 128:16, 166:8, 176:16, 189:21, 205:15
**focused** [6] - 108:18, 123:1, 135:23, 141:3, 176:15, 190:11
**focusing** [1] - 182:11
**FOGEL** [1] - 75:10
**Fogel** [5] - 8:18, 8:19, 8:22, 9:14, 75:10
**folders** [3] - 251:22, 251:23, 251:24
**folks** [1] - 165:16
**follow** [5] - 9:7, 22:7, 72:21, 92:7, 157:2
**followed** [1] - 65:9
**following** [12] - 21:8, 30:6, 69:24, 79:23, 98:2, 98:15, 99:12, 102:7, 128:10, 160:17, 207:1, 244:8
**follows** [1] - 161:11
**food** [2] - 38:1, 144:11
**foot** [1] - 93:14
**football** [2] - 151:22, 152:5
**FOR** [1] - 1:2
**force** [6] - 132:14, 132:22, 132:25, 230:22, 234:25, 235:1
**forecast** [14] - 225:17, 225:21, 225:23, 226:6, 226:9, 226:16, 226:17, 226:19, 226:25, 227:2, 227:3, 227:4, 227:10
**forecasts** [2] - 225:12, 226:15
**foregoing** [1] - 254:10
**forehead** [1] - 168:22
**foreign** [1] - 28:18
**foreman** [1] - 54:10
**foremost** [2] - 126:7, 187:1
**forever** [1] - 130:7
**forget** [2] - 248:18, 252:5
**form** [6] - 47:14, 78:15, 80:24, 83:23, 97:20, 152:12
**formally** [1] - 91:9
**format** [4] - 96:25, 100:6, 100:8, 221:15
**formed** [1] - 186:24
**former** [2] - 61:15, 116:3
**formerly** [2] - 26:9, 26:14
**formula** [1] - 183:17
**formulate** [1] - 175:9
**formulated** [1] - 78:2
**formulating** [1] - 166:5
**formulation** [66] - 18:5, 114:16, 129:4, 148:14, 173:3, 174:20, 176:25, 177:8, 177:13, 177:15, 177:16, 177:20, 177:21, 177:23, 179:21, 179:25, 180:1, 180:4, 183:20, 185:12, 185:18, 185:23, 186:11, 186:24, 187:4, 188:17, 189:7, 189:9, 189:17, 190:20, 192:20, 194:10, 196:10, 196:15, 197:6, 197:19, 198:14, 198:21, 199:17, 199:24, 199:25, 200:5, 200:9, 209:19, 209:22, 210:2, 210:10, 210:12, 210:25, 211:15, 211:18, 211:22, 212:5, 212:7, 212:11, 212:13, 212:16, 212:20, 214:22, 216:2, 216:3, 216:4, 217:9, 223:13, 238:3
**formulations** [20] - 166:4, 173:12, 173:13, 173:15, 174:12, 174:16, 175:5, 175:22, 176:9, 177:12, 183:16, 184:25, 185:19, 198:8, 210:6, 211:4, 214:8, 214:21, 215:22, 216:16
**formulator** [2] - 175:7, 175:8
**forth** [2] - 70:3, 77:21
**forward** [4] - 14:6, 108:12, 146:1, 160:2
**foundation** [3] - 174:23, 177:4, 205:21
**foundational** [12] - 119:18, 129:6, 129:10, 129:13, 129:16, 129:21, 130:13, 130:14, 146:13, 147:19, 177:7
**founded** [1] - 141:5
**four** [12] - 12:12, 31:12, 33:8, 118:24, 132:18, 141:5, 145:18, 145:23, 185:10, 245:24, 248:25, 252:5
**four-year-old** [1] - 33:8
**Fourier** [1] - 65:24
**fourth** [2] - 222:11, 228:3
**FOX** [1] - 2:5
**Fox** [1] - 25:16
**frame** [2] - 241:2, 244:14
**framework** [1] - 223:22
**franchise** [2] - 236:11, 236:22
**Francisco** [1] - 141:5
**frank** [1] - 126:6
**Frank** [1] - 27:4
**frankly** [2] - 106:13, 176:14
**free** [67] - 17:13, 33:15, 71:18, 77:4, 93:20, 94:25, 95:13, 95:14, 113:8, 116:17, 117:3, 118:21, 118:22, 127:9, 127:11, 127:12, 127:13, 127:16, 127:21, 128:4, 128:13, 128:17, 128:20, 130:1, 130:8, 138:5, 147:14, 147:16, 148:14, 148:25, 150:21, 153:20, 155:13, 155:15, 156:7, 173:12, 177:5, 193:6, 193:7, 200:23, 201:3, 201:7, 201:16, 201:21, 202:1, 202:4, 202:12, 202:16, 202:18, 202:23, 202:25, 203:10, 203:15, 204:2, 204:7, 211:15, 211:18, 214:2, 228:4, 241:7, 241:12, 241:20, 242:20, 245:3, 245:6, 245:7, 245:16
**freeze** [1] - 114:17
**freeze-dried** [1] - 114:17
**frequency** [1] - 170:25
**frequently** [2] - 82:24, 168:8
**Frevert** [3] - 18:7, 19:1, 19:14
**Friday** [15] - 22:22, 22:23, 34:2, 34:13, 34:16, 34:17, 38:7, 38:9, 38:25, 49:19, 49:25, 50:8, 51:17, 51:18
**friend** [3] - 44:2, 44:21, 45:6
**friends** [1] - 97:12
**front** [7] - 20:19, 140:7, 181:12, 204:14, 226:12, 236:14, 236:15
**FTIR** [1] - 65:24
**fulfill** [1] - 95:8
**full** [8] - 159:13, 161:16, 183:3, 185:7, 209:13, 236:5, 240:9, 251:2
**fully** [1] - 188:23
**function** [2] - 195:7, 225:10
**functions** [1] - 194:25
**Furbush** [1] - 68:21

## G

**Galderma** [4] - 233:18, 235:1, 235:2, 238:24
**Gallagher** [1] - 16:5
**game** [2] - 19:1, 145:3
**garage** [1] - 157:1

**Gardens** [1] - 55:18
**gas** [1] - 66:2
**gastrointestinal** [1] - 39:13
**GAZA** [26] - 2:3, 30:10, 32:4, 35:19, 35:25, 36:6, 36:14, 40:7, 41:12, 43:8, 45:22, 47:22, 51:25, 52:17, 54:8, 55:14, 55:23, 56:1, 57:16, 58:24, 62:21, 66:6, 68:6, 252:10, 252:16, 252:22
**Gaza** [14] - 25:19, 30:10, 35:18, 40:6, 43:7, 45:21, 47:21, 52:16, 55:13, 57:15, 58:23, 62:20, 66:5, 140:18
**gears** [1] - 178:4
**gen** [1] - 200:19
**general** [6] - 8:24, 9:13, 20:11, 36:17, 175:14, 221:6
**generally** [7] - 86:21, 163:12, 171:7, 181:3, 184:23, 185:18, 218:1
**generated** [1] - 148:1
**generation** [16] - 127:21, 165:20, 165:22, 165:24, 166:2, 166:6, 173:19, 173:24, 174:18, 174:21, 175:12, 175:22, 176:1, 176:24, 177:9, 191:18
**generic** [2] - 6:5, 12:1
**gentlemen** [2] - 133:16, 159:20
**gentler** [1] - 174:10
**Gessler** [6] - 27:4, 126:6, 126:13, 253:9, 253:13
**given** [12] - 35:7, 49:3, 79:9, 90:1, 90:22, 98:10, 118:25, 143:21, 164:24, 207:24, 234:7, 253:25
**glabellar** [1] - 168:20
**glass** [1] - 115:3
**Glenn** [2] - 53:9, 54:14
**global** [2] - 236:1, 236:10
**glossary** [2] - 74:24, 74:25
**go-to** [1] - 104:10
**goal** [4] - 183:13, 183:15, 210:2, 211:6
**goals** [1] - 233:6
**gold** [1] - 182:20
**GOLDSTEIN** [1] - 2:5
**Goldstein** [1] - 25:16
**Gonzales** [2] - 236:1, 236:6
**Goodnough** [9] - 27:9, 154:24, 155:3, 155:6, 155:16, 156:2, 156:9, 156:11
**Google** [2] - 22:19, 247:19
**GORDON** [1] - 2:10
**Gordon** [1] - 25:18
**governance** [1] - 165:21
**government** [8] - 39:16, 61:16, 74:17, 76:8, 76:19, 77:17, 78:13, 85:5
**grade** [1] - 247:17
**graduate** [2] - 162:23, 162:24
**grand** [1] - 199:1
**grant** [6] - 76:7, 95:17, 95:18, 118:12, 126:4, 150:5
**granted** [6] - 79:8, 113:13, 117:14, 117:17, 123:25, 133:25
**granting** [4] - 77:6, 121:15, 126:18, 133:18
**grants** [1] - 77:9
**graphic** [2] - 5:2, 120:1
**grass** [1] - 93:13
**great** [8] - 8:12, 106:14, 108:1, 110:23, 130:4, 138:14, 139:9, 148:7
**green** [9] - 93:14, 186:19, 186:20, 187:18, 189:16, 190:13, 190:14, 190:20, 190:23
**grew** [1] - 114:1
**ground** [3] - 18:23, 81:5, 93:15
**groundbreaking** [3] - 113:11, 141:22, 146:10
**group** [8] - 33:1, 68:13, 81:21, 156:7, 210:21, 213:7, 229:25, 241:11
**groups** [1] - 55:8
**grow** [2] - 111:24, 112:1
**growing** [2] - 141:6, 158:4
**growth** [1] - 222:6
**guarantee** [3] - 41:8, 51:12, 51:16
**guess** [10] - 8:21, 9:24, 25:25, 35:2, 57:22, 74:20, 103:9, 126:4, 153:3, 196:17
**guidance** [1] - 219:3
**guide** [2] - 72:12, 73:9
**guidelines** [1] - 241:19
**gunk** [1] - 116:22

## H

**H-U-I** [1] - 240:10
**half** [8] - 7:8, 23:5, 137:14, 137:22, 148:8, 199:5
**hall** [1] - 96:2
**halo** [1] - 13:22
**Hammock** [2] - 139:5, 139:6
**hand** [16] - 23:16, 23:20, 71:25, 74:12, 74:20, 84:8, 143:23, 160:21, 191:25, 205:15, 219:19, 230:22, 233:7, 242:11, 243:23, 251:20
**handed** [1] - 229:17
**handful** [1] - 32:5
**handing** [4] - 56:8, 72:2, 75:2, 251:15
**handle** [1] - 35:20
**handout** [1] - 79:15
**hands** [1] - 29:1
**handsomely** [2] - 120:21, 145:8
**Hanover** [1] - 38:13
**happy** [3] - 44:4, 101:13, 101:15
**hard** [18] - 34:2, 45:9, 53:3, 104:16, 104:19, 104:25, 105:19, 110:24, 110:25, 112:22, 116:23, 127:15, 156:17, 156:20, 157:2, 160:9, 172:2
**harder** [1] - 13:15
**hardship** [21] - 23:15, 31:3, 33:22, 35:3, 37:10, 40:25, 41:19, 43:19, 43:22, 46:10, 47:8, 48:23, 51:4, 52:5, 56:8, 56:12, 56:13, 56:17, 59:5, 59:18, 60:21
**hardships** [1] - 36:18
**hardworking** [2] - 139:4, 139:8
**harmed** [2] - 13:19, 184:5
**harness** [1] - 109:23
**Harnessing** [1] - 76:24
**Harris** [2] - 64:23, 66:7
**harvest** [1] - 246:17
**HASTINGS** [1] - 1:18
**Hastings** [1] - 25:8
**head** [7] - 29:22, 138:9, 169:18, 170:24, 225:8, 225:10, 245:12
**headaches** [1] - 110:16
**headquarters** [1] - 78:11
**health** [3] - 33:25, 36:3, 37:12
**healthcare** [9] - 33:24, 218:25, 219:4, 219:8, 237:13, 237:15, 237:16, 237:19, 238:11
**hear** [62] - 3:10, 19:8, 22:18, 45:5, 47:16, 49:4, 72:13, 74:1, 92:23, 94:9, 105:9, 106:8, 107:4, 107:8, 109:14, 111:10, 113:3, 115:15, 116:2, 116:8, 117:2, 121:12, 122:7, 122:9, 125:23, 126:1, 126:6, 127:8, 127:16, 127:18, 129:2, 129:4, 131:11, 136:13, 137:2, 137:25, 141:15, 142:15, 143:14, 145:21, 146:15, 147:13, 149:16, 150:18, 153:8, 153:18, 154:23, 155:3, 155:7, 157:14, 158:3, 158:9, 158:11, 158:14, 159:10, 159:11, 159:15, 159:23, 160:8, 186:2, 191:12, 198:2
**heard** [32] - 14:15, 15:23, 24:22, 24:25, 29:4, 46:19, 87:19, 93:5, 95:22, 100:13, 101:5, 105:7, 109:5, 134:16, 135:11, 135:12, 136:21, 137:16, 142:19, 142:22, 150:8, 159:1, 167:8, 168:19, 172:4, 174:6, 193:4, 193:5, 194:1, 234:15, 247:14
**hearing** [9] - 16:14, 22:13, 29:9, 95:3, 114:2, 142:8, 156:1, 179:4, 208:21
**hearsay** [2] - 10:8, 10:19
**heart** [1] - 141:9
**heartwarming** [2] - 191:11, 191:12
**heavy** [1] - 251:18
**heights** [1] - 109:2
**held** [8] - 8:9, 32:12, 63:8, 71:22, 103:7, 134:5, 134:13, 165:4
**Hello** [1] - 75:10
**hello** [2] - 25:7, 48:8
**help** [26] - 21:15, 43:1, 74:18, 89:21, 92:15, 98:7, 107:16, 108:3, 108:12, 108:20, 112:1, 143:3, 166:10, 167:6, 167:19, 168:9, 169:24, 171:13, 176:21, 177:16, 191:7, 195:3, 195:4, 222:4, 223:22, 234:1
**helped** [2] - 71:15, 192:18
**helpful** [7] - 66:4, 89:22, 94:11, 99:5, 249:20, 250:16, 253:18
**helping** [2] - 167:5, 167:8
**helps** [2] - 143:18, 170:12
**hence** [2] - 163:17, 179:22
**Herbein** [1] - 52:4
**hereby** [1] - 254:8
**herself** [1] - 34:20
**hesitancy** [1] - 238:20
**hesitant** [1] - 238:14
**hi** [1] - 249:23
**high** [6] - 67:2,

131:19, 132:23, 173:24, 182:18, 202:7
**high-risk** [1] - 67:2
**higher** [2] - 89:15, 222:8
**highlight** [2] - 142:1, 169:11
**highlighted** [2] - 79:14, 84:11
**highlights** [1] - 90:15
**highly** [5] - 89:14, 108:3, 124:16, 144:14, 153:10
**hill** [1] - 13:15
**himself** [4] - 108:8, 122:23, 126:13, 155:6
**hints** [1] - 12:17
**hired** [2] - 163:1, 227:21
**HIS** [2] - 185:20, 185:24
**histidine** [8] - 185:24, 186:20, 198:4, 198:5, 198:6, 198:7, 198:9, 199:15
**Historical** [1] - 55:18
**historical** [2] - 80:9, 234:10
**history** [8] - 4:7, 4:8, 83:20, 144:8, 144:9, 146:3, 154:18, 173:18
**hit** [2] - 145:6, 233:6
**hits** [1] - 171:8
**hmm** [4] - 48:16, 50:23, 65:5, 237:22
**HO** [1] - 1:21
**hold** [16] - 10:24, 13:8, 19:10, 54:9, 105:20, 121:8, 195:21, 201:22, 202:4, 202:5, 202:12, 244:20, 244:23, 244:24, 245:2, 245:5
**holder** [1] - 85:25
**holding** [6] - 56:24, 57:1, 104:25, 164:4, 166:22, 168:3
**holds** [1] - 167:15
**holed** [1] - 170:18
**home** [11] - 31:6, 32:5, 33:1, 33:5, 33:25, 36:3, 46:13, 235:1, 247:18, 248:1
**Home** [1] - 53:23
**homework** [1] - 247:17
**honest** [1] - 32:2
**honor** [1] - 135:7
**Honor** [93] - 4:5, 4:25, 5:6, 5:14, 5:22, 6:21, 7:4, 8:6, 9:3, 9:11, 9:21, 10:1, 10:18, 11:2, 11:4, 11:14, 12:6, 12:18, 12:22, 13:11, 14:21, 15:3, 16:1, 16:7, 16:15, 16:24, 17:8, 18:1, 18:21, 19:25, 20:8, 20:9, 30:10, 32:4, 35:17, 36:14, 40:7, 41:12, 43:6, 43:8, 45:20, 45:22, 47:20, 51:25, 52:15, 52:17, 54:7, 54:8, 55:12, 57:14, 57:16, 58:24, 62:19, 62:21, 68:6, 100:1, 100:15, 101:3, 101:4, 101:5, 101:12, 101:13, 101:16, 103:23, 134:10, 134:15, 135:1, 151:19, 181:24, 191:23, 191:25, 204:11, 204:17, 204:19, 205:18, 205:20, 205:24, 206:18, 209:4, 216:9, 216:11, 224:5, 224:18, 231:5, 231:7, 235:14, 239:19, 248:19, 249:10, 251:21, 252:3, 252:10, 252:16
**Honor's** [3] - 9:7, 250:8, 251:1
**Honorable** [1] - 1:11
**hook** [1] - 131:18
**hope** [4] - 69:21, 75:16, 157:4, 159:14
**hopeful** [1] - 253:24
**hopefully** [2] - 41:14, 112:17
**hopes** [1] - 125:9
**hoping** [1] - 20:3
**horizontal** [1] - 185:3
**hospital** [1] - 63:22
**host** [1] - 104:11
**hosting** [1] - 41:1
**hotel** [2] - 38:20, 38:21
**hour** [5] - 23:6, 33:15, 36:23, 127:19, 160:8
**hours** [4] - 32:22, 42:19, 42:22, 49:11
**House** [1] - 55:18
**house** [3] - 41:2, 60:5, 60:10
**HR** [1] - 63:23
**HSA** [4] - 218:3, 218:5, 219:13, 222:23
**huge** [2] - 46:20, 151:22
**hugely** [1] - 141:12
**Hui** [4] - 240:5, 240:10, 250:5
**human** [5] - 219:13, 221:1, 222:12, 223:6, 228:4
**humans** [1] - 184:17
**hundred** [2] - 142:4, 154:17
**hundreds** [2] - 172:15
**Hunt** [44] - 27:3, 113:19, 113:20, 114:4, 114:6, 115:8, 116:3, 121:25, 122:10, 122:11, 122:12, 122:20, 122:23, 123:1, 123:10, 124:12, 148:19, 149:6, 154:3, 156:16, 160:19, 173:2, 173:6, 173:7, 173:8, 174:13, 174:22, 177:20, 177:21, 209:3, 210:15, 210:16, 211:7, 211:9, 211:14, 211:19, 213:5, 213:6, 214:12, 215:6, 215:16, 216:17, 250:23, 253:8
**Hunt's** [2] - 148:22, 211:2
**hunt's** [8] - 114:11, 115:18, 116:11, 119:13, 122:16, 122:18, 123:7, 123:12
**Hunt/Johnson** [1] - 154:10
**Huong** [4] - 209:2, 209:8, 209:15, 250:6
**hurdle** [2] - 19:19, 131:19
**hurdles** [2] - 172:6, 238:20
**husband** [1] - 33:5
**hydrophobic** [1] - 245:10
**hypothetical** [9] - 13:14, 14:4, 14:6, 14:7, 14:23, 15:8, 15:10, 17:22, 151:16
**hypothetically** [1] - 157:22

## I

**idea** [15] - 39:11, 78:3, 108:1, 108:13, 108:25, 126:23, 134:19, 138:14, 157:21, 211:8, 211:15, 211:17, 212:10, 215:7, 242:6
**ideas** [3] - 108:20, 109:7, 109:8
**identifiable** [1] - 223:9
**identified** [6] - 5:12, 5:16, 91:18, 103:18, 214:4, 221:1
**identify** [7] - 3:13, 26:21, 79:24, 209:5, 223:5, 233:13, 241:4
**identifying** [1] - 79:13
**ignore** [3] - 92:1, 121:13, 125:9
**II** [1] - 144:12
**illness** [1] - 34:12
**illumination** [1] - 76:24
**illustrate** [2] - 80:20, 92:15
**illustrating** [1] - 166:15
**illustrative** [1] - 92:16
**images** [2] - 5:11, 5:24
**imagine** [1] - 49:19
**immediate** [9] - 25:2, 25:4, 25:22, 26:2, 26:7, 26:12, 28:9, 28:17
**immediately** [2] - 128:12, 176:11
**impact** [6] - 35:25, 44:23, 54:2, 62:11, 248:3, 248:5
**impartial** [4] - 29:5, 39:9, 54:2, 62:12
**impasse** [2] - 100:16, 100:24
**implies** [2] - 11:10, 11:15
**imply** [1] - 15:4
**implying** [2] - 11:4, 157:9
**import** [1] - 86:16
**importance** [4] - 90:12, 118:25, 239:11, 239:15
**important** [41] - 5:2, 5:4, 5:6, 13:23, 72:23, 76:25, 80:25, 82:10, 85:10, 85:15, 95:6, 96:10, 97:1, 104:22, 106:13, 108:4, 110:16, 121:23, 125:8, 126:16, 129:14, 129:21, 131:6, 136:24, 140:11, 141:12, 142:7, 142:13, 142:15, 142:25, 143:12, 144:6, 147:5, 148:19, 155:2, 202:20, 208:6, 208:12, 208:13, 220:14, 247:21
**importantly** [1] - 151:16
**imposing** [1] - 106:10
**impression** [1] - 44:20
**impressive** [1] - 113:23
**improve** [3] - 138:4, 240:21, 242:1
**improved** [5] - 104:15, 137:8, 138:9, 138:10, 141:10
**improvement** [6] - 241:4, 241:5, 241:6, 241:8, 241:10, 241:22
**improvements** [1] - 137:6
**improving** [1] - 240:24
**impurities** [1] - 243:20
**impurity** [2] - 245:18, 245:22
**IN** [2] - 1:1, 1:2
**inactive** [4] - 142:21, 142:24, 143:1
**inaudible)** [1] - 245:15
**Inc** [29] - 3:13, 4:1, 4:8, 4:10, 4:18, 5:1, 12:2, 12:9, 13:14, 17:23, 21:13, 24:4, 24:6, 26:8, 26:13, 73:10, 73:11, 73:20, 103:3, 104:9, 106:2, 106:3, 209:9, 216:23, 224:25, 232:11, 236:2, 240:6
**INC** [1] - 1:3
**Inc.'s** [1] - 17:12
**inclined** [4] - 14:19, 19:17, 56:16, 68:2
**include** [8] - 76:9, 80:9, 85:20, 88:5, 100:4, 200:9, 208:5,

208:15
**included** [2] - 145:19, 174:14
**includes** [6] - 19:18, 80:17, 97:11, 104:1, 104:21, 110:11
**including** [6] - 23:14, 79:23, 82:4, 96:8, 120:6, 124:3
**incoming** [1] - 83:21
**inconsistent** [2] - 94:2, 143:5
**incorporated** [1] - 153:16
**increase** [1] - 241:14
**increased** [2] - 195:19, 234:22
**increases** [2] - 235:10, 235:11
**increasing** [1] - 234:17
**incredibly** [2] - 107:12, 107:19
**incubation** [1] - 67:17
**Indeed** [1] - 49:10
**independent** [3] - 96:21, 210:19, 223:12
**indicate** [2] - 23:19, 171:21
**indicates** [2] - 77:11, 229:1
**indicating** [2] - 73:4, 169:2
**indication** [7] - 88:16, 95:19, 154:18, 172:7, 172:9, 216:3, 228:23
**indications** [10] - 4:9, 113:14, 164:19, 169:4, 169:7, 171:16, 171:22, 172:1, 176:17, 176:19
**indiscernible** [1] - 17:2
**individual** [3] - 16:22, 20:23, 90:10
**individually** [1] - 125:1
**individuals** [3] - 96:23, 156:24, 228:19
**industry** [1] - 107:2
**Industry** [1] - 55:19
**infer** [2] - 11:21, 93:9
**infestation** [1] - 67:7
**influence** [1] - 72:25
**influenced** [1] - 91:23
**inform** [2] - 222:4, 234:1
**information** [37] - 4:2, 4:3, 74:15, 79:14, 79:22, 81:24, 82:16, 82:18, 82:19, 85:10, 95:6, 97:3, 97:11, 97:18, 110:4, 123:20, 123:22, 125:20, 127:4, 133:20, 133:25, 148:25, 154:13, 154:16, 175:14, 175:16, 180:8, 197:21, 219:3, 220:18, 221:6, 226:14, 234:11, 247:20, 247:21, 250:23, 251:2
**informed** [2] - 207:21, 250:19
**infrared** [1] - 65:25
**infrastructure** [1] - 173:14
**infringed** [1] - 86:3
**infringement** [26] - 6:12, 6:19, 24:11, 84:15, 84:17, 84:18, 84:23, 85:1, 85:15, 85:16, 85:18, 85:23, 85:25, 87:15, 88:3, 100:11, 100:20, 100:21, 101:7, 102:19, 102:21, 103:4, 103:8, 103:11, 140:5, 140:9
**infringer** [2] - 86:4, 86:22
**infringes** [2] - 24:14, 87:5
**infringing** [5] - 86:14, 86:20, 86:25, 131:18
**ingredient** [14] - 111:23, 115:6, 142:1, 142:17, 142:21, 142:22, 142:23, 142:24, 143:24, 144:1, 144:10, 195:6, 198:5
**ingredients** [11] - 112:21, 114:16, 114:21, 115:10, 115:13, 119:12, 123:2, 123:4, 143:1, 196:12, 197:2
**inhibit** [2] - 163:18
**inhibiting** [1] - 164:7
**inhibits** [1] - 164:2
**initial** [7] - 5:11, 5:15, 108:1, 128:16, 173:11, 174:1, 177:6
**initiative** [2] - 242:5, 242:9
**inject** [6] - 112:3, 168:2, 168:9, 180:25, 183:2, 206:7
**injectable** [6] - 13:16, 73:13, 73:16, 74:5, 180:1, 180:5
**injecting** [1] - 206:4
**injection** [4] - 24:3, 143:21, 143:24, 195:12
**injections** [2] - 169:23, 171:12
**inmate** [1] - 61:15
**innovate** [1] - 156:22
**innovated** [1] - 141:22
**innovation** [2] - 119:1, 158:20
**innovations** [4] - 104:21, 104:22, 104:25, 118:11
**innovative** [7] - 104:14, 109:15, 111:7, 116:10, 135:22, 146:7, 159:6
**innovator** [1] - 103:25
**input** [2] - 85:14, 220:10
**inputting** [1] - 57:18
**inquiry** [1] - 158:1
**insect** [1] - 67:5
**insight** [1] - 227:19
**insights** [2] - 225:9, 225:11
**inspect** [1] - 84:4
**inspection** [1] - 77:18
**inspire** [1] - 77:3
**instance** [2] - 103:15, 215:1
**instances** [1] - 164:8
**instead** [6] - 90:3, 113:21, 115:23, 121:11, 122:2, 130:13
**institution** [2] - 56:18, 61:15
**instruct** [7] - 9:12, 72:18, 81:6, 85:20, 92:6, 99:3, 148:20
**instructed** [1] - 211:5
**instruction** [2] - 92:8, 247:13
**instructions** [19] - 8:23, 9:7, 24:20, 71:25, 72:3, 72:4, 72:8, 72:11, 72:19, 72:20, 75:3, 86:7, 86:12, 87:18, 87:21, 97:23, 97:24, 100:20, 102:23
**instructor** [1] - 61:8
**instruments** [3] - 65:17, 65:19, 66:1
**insufficient** [1] - 83:3
**insurance** [1] - 235:8
**integrity** [1] - 140:13
**intellectual** [1] - 135:25
**intelligence** [2] - 66:20, 230:1
**intend** [1] - 247:9
**intending** [2] - 18:22, 229:10
**intends** [1] - 229:7
**interact** [7] - 162:12, 162:13, 162:16, 163:16, 170:20, 170:21, 171:2
**interacting** [1] - 191:14
**interaction** [1] - 245:10
**interacts** [1] - 163:25
**interchangeably** [1] - 145:21
**interest** [4] - 177:14, 177:15, 178:21, 193:24
**interested** [5] - 39:18, 162:19, 167:4, 167:6, 238:4
**interesting** [2] - 162:19, 170:14
**interests** [1] - 94:3
**interfering** [1] - 50:11
**internal** [2] - 221:16, 234:7
**internally** [2] - 181:17, 184:13
**international** [2] - 228:17, 233:12
**internet** [6] - 22:11, 96:15, 97:1, 97:6, 97:16
**interplay** [1] - 13:24
**Interpool** [1] - 101:24
**interpret** [2] - 19:17, 99:4
**interpretation** [1] - 88:15
**interrogatory** [1] - 5:16
**interruption** [1] - 62:16
**interview** [1] - 50:8
**interviews** [1] - 49:12
**intro** [1] - 159:1
**introduce** [13] - 15:5, 18:22, 24:24, 25:1, 74:19, 105:23, 113:18, 138:1, 140:17, 159:16, 207:10, 236:12, 238:25
**introduced** [3] - 14:3, 25:24, 98:21
**introducing** [1] - 222:18
**invalid** [24] - 9:10, 24:16, 24:18, 85:2, 86:5, 87:1, 87:9, 87:11, 87:17, 87:24, 89:19, 103:6, 103:11, 126:20, 127:5, 131:19, 136:3, 139:11, 140:24, 149:18, 149:19, 157:10, 157:18, 159:14
**invalidate** [1] - 139:14
**invalidity** [16] - 6:13, 18:11, 18:16, 18:23, 19:15, 19:18, 86:3, 87:19, 98:16, 98:19, 136:19, 139:25, 140:10, 149:15, 149:17, 153:5
**invasive** [2] - 166:19, 167:24
**invent** [4] - 138:16, 145:1, 147:15, 192:12
**invented** [12] - 77:20, 113:19, 138:13, 141:7, 141:22, 148:8, 148:15, 157:3, 158:16, 158:23, 202:22, 203:9
**inventing** [2] - 130:6, 141:17
**invention** [37] - 76:9, 76:11, 76:20, 76:23, 77:4, 77:14, 77:16, 77:23, 78:2, 78:6, 78:22, 79:6, 79:17, 80:1, 80:10, 80:18, 80:19, 80:22, 80:23, 81:3, 82:2, 84:14, 86:17, 114:6, 114:7, 118:2, 122:18, 122:21, 125:4, 136:9, 148:8, 148:9, 149:22, 151:9, 153:25, 203:13
**inventions** [42] - 77:3, 80:9, 105:2, 105:9, 105:15, 105:18, 105:22, 106:17,

106:18, 111:10, 111:16, 113:6, 113:7, 113:8, 117:19, 117:25, 118:6, 118:17, 119:16, 121:3, 121:4, 121:8, 121:18, 121:21, 122:3, 122:6, 123:23, 124:8, 124:17, 124:18, 124:20, 124:23, 124:25, 126:19, 127:11, 127:12, 127:15, 128:13, 132:3, 133:18, 134:4, 150:4
**inventive** [6] - 113:12, 124:14, 125:2, 125:22, 127:24, 129:18
**inventor** [22] - 76:14, 76:19, 76:20, 77:7, 77:13, 77:20, 78:1, 78:2, 78:4, 78:8, 78:17, 78:22, 84:3, 84:10, 84:12, 84:13, 113:18, 116:2, 122:12, 122:13, 147:8, 240:5
**inventor's** [3] - 79:2, 81:12, 82:2
**inventors** [7] - 3:18, 76:5, 79:18, 107:4, 107:8, 122:5, 156:15
**Invents** [1] - 81:13
**invest** [1] - 109:11
**invested** [1] - 127:25
**investigate** [2] - 96:19, 180:13
**investment** [3] - 104:19, 104:25, 110:24
**investor** [8] - 219:21, 219:25, 220:3, 220:9, 220:19, 225:14, 225:19, 228:12
**investors** [2] - 220:19, 221:1
**investors'** [1] - 228:17
**involuntarily** [1] - 143:11
**involve** [4] - 75:19, 75:21, 111:18, 200:8
**involved** [15] - 28:21, 41:25, 65:23, 96:22, 96:23, 109:10, 109:24, 139:16, 172:16, 200:4, 210:9, 220:6, 226:17, 245:2, 245:6
**involvement** [1] - 224:1
**involves** [3] - 111:11, 245:8, 249:9
**involving** [1] - 24:1
**iron** [2] - 114:1, 122:13
**irrelevant** [1] - 11:8
**Irvine** [2] - 162:6, 162:8
**ISAAC** [1] - 1:19
**Isaac** [2] - 25:9, 105:24
**Island** [1] - 37:20
**issuance** [1] - 84:7
**issue** [37] - 5:24, 12:15, 16:8, 18:3, 33:7, 66:25, 73:11, 73:21, 82:23, 88:19, 89:1, 98:13, 98:19, 98:22, 102:4, 102:21, 103:4, 104:23, 106:17, 111:10, 111:16, 113:7, 116:25, 117:11, 121:16, 123:3, 127:24, 130:15, 131:25, 133:24, 134:1, 134:16, 152:21, 157:8, 157:12, 192:13, 250:1
**issued** [15] - 3:12, 11:8, 13:1, 77:17, 79:21, 79:25, 81:17, 81:22, 84:9, 84:12, 111:12, 136:19, 149:11, 149:18, 152:24
**issues** [21] - 8:8, 11:23, 75:19, 83:16, 85:18, 88:17, 98:16, 110:12, 139:22, 140:23, 175:19, 176:22, 195:10, 241:3, 241:14, 243:7, 243:9, 249:9, 253:16, 253:23
**IT** [2] - 42:11, 42:14
**Italy** [1] - 228:17
**item** [6] - 10:4, 16:22, 18:1, 92:6, 250:20, 251:19
**Item** [4] - 3:6, 8:5, 16:3, 16:4
**items** [1] - 90:18
**Items** [1] - 3:2
**itself** [11] - 4:16, 4:18, 5:23, 15:14, 116:7, 129:17, 166:2, 184:9, 217:21, 219:16, 238:4
**izing** [1] - 176:24

## J

**jabs** [1] - 144:5
**Jack** [1] - 69:4
**Jamie** [2] - 235:25, 236:6
**January** [1] - 225:24
**jargon** [1] - 152:1
**Jeffrey** [2] - 27:9, 159:18
**jelly** [1] - 150:13
**Jeremy** [3] - 25:10, 75:10, 105:25
**JEREMY** [1] - 1:16
**Jersey** [1] - 161:20
**Jeuveau** [4] - 27:25, 145:17, 233:18, 234:15
**Joanna** [1] - 224:24
**job** [23] - 32:20, 32:22, 35:9, 42:9, 49:2, 49:7, 49:10, 52:2, 55:6, 57:3, 57:6, 57:9, 61:5, 75:18, 78:14, 82:1, 82:7, 85:19, 144:1, 153:13, 161:23, 162:15, 225:10
**jobs** [4] - 49:21, 55:14, 55:23, 56:22
**Johnson** [1] - 154:5
**join** [1] - 163:3
**joined** [9] - 163:2, 164:18, 172:21, 172:24, 217:8, 240:12, 240:16, 240:17, 240:20
**joins** [2] - 139:7, 154:24
**Joint** [10] - 182:3, 205:23, 216:20, 224:9, 224:13, 224:17, 231:10, 235:18, 239:23, 240:3
**jointly** [1] - 101:9
**Joshia** [1] - 27:9
**Joshua** [1] - 143:14
**journal** [1] - 83:5
**journey** [2] - 141:18, 223:19
**JTX** [36] - 9:23, 9:24, 10:16, 181:13, 181:25, 182:3, 182:5, 184:20, 184:21, 188:5, 204:16, 205:8, 205:23, 216:10, 216:13, 216:15, 216:20, 224:6, 224:9, 224:10, 224:13, 224:14, 224:17, 231:6, 231:10, 235:15, 235:18, 239:20, 239:23, 239:25, 240:3, 248:20, 248:24, 249:5, 250:10
**judge** [14] - 21:11, 62:4, 73:6, 75:11, 75:20, 81:6, 85:19, 86:6, 126:23, 148:19, 149:17, 150:16, 151:12, 151:19
**JUDGE** [1] - 75:10
**Judge** [5] - 8:18, 8:19, 8:22, 9:14, 136:13
**judges** [2] - 72:16, 93:22
**judging** [1] - 73:2
**judgment** [2] - 10:13, 75:14
**judicial** [2] - 75:12, 106:14
**July** [1] - 1:13
**jumped** [1] - 128:12
**June** [1] - 52:9
**jurisdiction** [1] - 84:16
**juror** [15] - 29:5, 29:16, 47:13, 54:3, 59:5, 62:12, 74:9, 74:10, 74:12, 88:4, 96:6, 96:8, 99:24, 100:7, 139:14
**Juror** [10] - 30:12, 60:21, 70:10, 70:12, 70:14, 70:16, 70:18, 70:20, 70:23, 70:25
**JUROR** [203] - 30:16, 30:20, 30:24, 31:1, 31:5, 31:10, 31:13, 31:16, 31:22, 32:2, 32:8, 32:17, 32:21, 32:23, 33:1, 33:4, 33:13, 33:16, 33:20, 33:24, 34:5, 34:8, 34:14, 34:21, 35:4, 35:10, 35:22, 36:2, 36:9, 36:25, 37:3, 37:5, 37:8, 37:12, 37:16, 37:19, 37:23, 38:4, 38:11, 38:13, 38:16, 38:20, 39:2, 39:4, 39:8, 39:19, 39:25, 40:5, 40:9, 40:11, 40:14, 40:18, 40:23, 41:1, 41:7, 41:17, 41:21, 41:24, 42:2, 42:5, 42:7, 42:11, 42:14, 42:18, 42:21, 42:24, 43:4, 43:10, 43:15, 43:21, 44:1, 44:18, 44:22, 45:1, 45:7, 45:17, 46:5, 46:8, 46:12, 46:16, 46:20, 46:25, 47:4, 47:7, 47:10, 48:3, 48:5, 48:7, 48:10, 48:13, 48:16, 48:19, 48:21, 49:1, 49:6, 49:9, 49:16, 49:25, 50:7, 50:13, 50:17, 50:20, 50:23, 51:2, 51:7, 51:11, 51:14, 51:18, 51:22, 52:8, 52:20, 53:2, 53:5, 53:8, 53:10, 53:13, 53:16, 53:23, 54:4, 54:13, 54:16, 54:19, 54:23, 55:1, 55:4, 55:7, 55:17, 55:25, 56:4, 56:6, 56:10, 56:15, 56:21, 57:1, 57:7, 57:11, 57:21, 58:1, 58:6, 58:9, 58:14, 58:18, 58:22, 59:3, 59:7, 59:10, 59:13, 59:16, 59:20, 60:1, 60:4, 60:12, 60:16, 60:25, 61:3, 61:6, 61:10, 61:13, 61:21, 61:24, 62:3, 62:5, 62:8, 62:13, 62:15, 62:25, 63:5, 63:12, 63:15, 63:18, 63:21, 63:24, 64:3, 64:5, 64:8, 64:12, 64:17, 64:20, 64:24, 65:2, 65:5, 65:7, 65:13, 65:16, 65:24, 66:10, 66:13, 66:16, 66:19, 66:25, 67:6, 67:10, 67:14, 67:19, 67:23, 68:11, 68:14, 68:17, 68:20, 68:22, 68:25, 69:4, 69:10
**juror's** [1] - 90:16
**jurors** [23] - 7:23, 20:5, 20:6, 20:13, 20:14, 36:23, 45:24, 60:20, 69:15, 70:3,

71:9, 71:11, 71:13, 71:19, 72:12, 72:13, 85:22, 90:8, 90:11, 90:16, 95:21, 139:21, 140:7
**JURY** [2] - 1:9, 1:11
**jury** [130] - 7:5, 8:22, 9:8, 9:10, 11:12, 13:23, 17:7, 20:7, 20:19, 20:22, 21:1, 21:4, 21:7, 21:12, 21:15, 21:18, 21:24, 22:15, 22:23, 22:25, 23:7, 24:17, 24:19, 28:24, 29:11, 30:19, 31:3, 33:14, 40:16, 40:24, 41:10, 41:20, 45:12, 46:10, 46:23, 48:15, 48:24, 50:4, 50:22, 51:5, 52:6, 53:12, 53:18, 54:11, 54:25, 56:20, 58:8, 59:18, 60:9, 61:11, 63:3, 63:17, 64:15, 65:4, 66:24, 67:13, 69:9, 70:1, 70:7, 70:11, 70:13, 70:15, 70:17, 70:19, 70:24, 71:1, 71:2, 71:3, 71:4, 71:6, 71:7, 71:24, 71:25, 72:3, 72:4, 72:8, 72:10, 75:3, 75:24, 86:11, 90:8, 90:23, 91:2, 94:11, 95:12, 95:23, 99:8, 99:11, 99:20, 99:21, 100:20, 102:8, 102:9, 102:12, 102:14, 102:15, 102:17, 102:23, 106:10, 121:8, 134:17, 135:14, 139:10, 140:14, 146:25, 149:13, 157:4, 159:9, 160:5, 160:12, 160:14, 160:24, 160:25, 182:6, 193:4, 193:13, 205:8, 206:22, 206:24, 207:4, 207:17, 207:18, 247:5, 248:6, 248:13, 248:15, 251:2, 251:11, 251:15
**justified** [1] - 133:3
**justifies** [1] - 77:6

## K

**K17** [1] - 215:2
**keep** [20] - 23:12, 46:3, 47:17, 77:9, 90:4, 90:7, 95:6, 95:10, 96:11, 97:22, 99:1, 108:4, 112:5, 126:16, 129:14, 129:23, 159:24, 179:3, 250:8, 250:19
**keeping** [1] - 133:8
**Kent** [1] - 42:3
**kept** [3] - 148:1, 213:17, 235:1
**KESSLER** [1] - 2:5
**Kessler** [1] - 25:16
**key** [4] - 12:9, 126:12, 230:11, 230:23
**kids** [3] - 31:6, 171:9, 171:13
**kilodalton** [1] - 178:22
**kind** [15] - 12:19, 31:6, 49:18, 61:5, 63:20, 65:14, 65:22, 67:18, 69:2, 71:11, 159:21, 169:18, 181:4, 246:5, 249:25
**kinds** [2] - 65:25, 139:22
**knocked** [1] - 67:23
**knowledge** [9] - 25:23, 27:24, 76:21, 93:25, 94:10, 122:4, 151:10, 219:18, 236:23
**known** [28] - 26:9, 26:14, 73:13, 80:5, 110:7, 116:13, 118:2, 124:6, 124:23, 125:1, 136:4, 147:6, 150:17, 150:21, 152:14, 155:2, 157:2, 167:18, 167:21, 169:5, 172:5, 173:16, 178:15, 179:6, 179:7, 181:20, 225:16, 227:3
**knows** [3] - 52:23, 77:15, 82:9
**KRYS** [1] - 1:21

## L

**lab** [7] - 65:22, 156:18, 165:6, 165:8, 165:15, 165:17
**label** [1] - 171:19
**laboratory** [3] - 65:17, 107:6, 125:12
**lack** [1] - 218:5
**ladies** [2] - 133:16, 159:20
**LAI** [3] - 237:9, 238:5, 238:22
**laid** [4] - 49:1, 49:4, 49:15, 133:4
**land** [1] - 182:23
**landowner's** [1] - 77:12
**Lane** [1] - 209:15
**language** [1] - 88:15
**large** [8] - 8:18, 36:19, 39:10, 110:1, 110:8, 163:24, 204:16
**larger** [2] - 123:2, 123:3
**largest** [1] - 231:3
**Larock** [2] - 25:17, 140:18
**LAROCK** [1] - 2:6
**last** [35] - 5:15, 6:22, 13:12, 29:19, 31:11, 34:17, 38:5, 39:11, 49:1, 55:8, 60:24, 71:2, 74:1, 93:12, 109:13, 114:13, 115:20, 115:23, 118:23, 119:14, 128:21, 132:18, 137:15, 143:3, 145:9, 156:4, 217:16, 228:17, 234:13, 240:10, 245:24, 247:23, 252:6, 252:13
**lasting** [9] - 138:5, 138:11, 138:20, 138:21, 193:6, 193:8, 194:3, 217:24, 234:16
**lasts** [2] - 76:12, 142:17
**latches** [2] - 11:10, 11:13
**late** [5] - 104:4, 108:17, 111:22, 145:1, 147:15
**latest** [1] - 80:11
**launch** [3] - 221:14, 221:17, 222:5
**launched** [6] - 105:14, 119:7, 119:24, 132:2, 158:11, 217:12
**launches** [1] - 238:23
**law** [32] - 24:20, 25:5, 25:8, 25:11, 25:15, 25:23, 26:4, 61:14, 70:5, 70:6, 72:15, 72:17, 72:21, 73:6, 78:16, 78:23, 82:8, 85:20, 85:24, 95:9, 97:24, 99:3, 119:5, 121:6, 126:20, 136:7, 148:24, 149:8, 151:20, 152:22, 157:12, 157:19
**laws** [4] - 76:2, 118:15, 119:2, 121:2
**lawsuit** [9] - 24:1, 85:2, 86:21, 105:17, 111:11, 113:7, 120:12, 139:3, 140:2
**lawyer** [3] - 52:11, 96:1, 156:13
**lawyer's** [1] - 91:23
**lawyers** [7] - 22:7, 24:24, 75:20, 78:3, 91:17, 91:20, 95:3
**lead** [4] - 23:24, 114:5, 141:16, 223:9
**lead-up** [1] - 23:24
**leader** [2] - 120:8, 148:12
**leadership** [1] - 220:20
**leading** [4] - 103:25, 106:7, 126:2, 213:1
**leads** [3] - 23:13, 93:20, 195:18
**learn** [10] - 22:16, 69:12, 75:21, 114:15, 115:24, 116:13, 119:7, 120:14, 120:22, 125:11
**learned** [8] - 22:16, 193:17, 193:20, 194:13, 194:16, 194:24, 195:11, 198:24
**Learning** [2] - 55:8, 55:22
**learns** [1] - 77:19
**least** [14] - 3:12, 14:18, 17:20, 17:25, 19:22, 23:5, 45:25, 103:15, 162:1, 170:16, 196:1, 199:23, 208:12, 227:25
**leave** [4] - 48:2, 51:7, 69:16, 91:2
**led** [11] - 76:25, 107:20, 109:13, 114:11, 116:24, 124:7, 128:23, 141:19, 144:17, 147:20, 234:22
**left** [6] - 31:16, 79:16, 79:19, 106:24, 156:24, 228:4
**legal** [8] - 73:7, 73:8, 139:18, 139:20, 139:24, 140:13, 150:11, 150:12
**legitimate** [1] - 140:8
**legitimately** [1] - 36:12
**length** [1] - 95:11
**lens** [2] - 151:7, 156:3
**less** [6] - 7:16, 87:12, 131:10, 166:19, 195:14, 223:1
**lessen** [1] - 170:25
**lethal** [1] - 144:13
**letter** [3] - 56:9, 58:3, 102:2
**letters** [3] - 252:5, 252:9, 252:12
**level** [7] - 151:7, 182:18, 183:24, 230:16, 230:20, 237:5, 246:22
**liability** [2] - 87:2, 101:8
**liable** [2] - 103:8, 103:11
**life** [11] - 62:16, 66:18, 76:16, 151:23, 170:22, 171:3, 171:11, 191:13, 191:15, 229:11
**Lifelong** [2] - 55:8, 55:22
**lifespan** [1] - 203:24
**lifetime** [1] - 77:2
**light** [6] - 76:23, 80:24, 84:24, 89:4, 94:24, 170:20
**lights** [1] - 75:7
**likely** [1] - 89:4
**limb** [3] - 171:5, 171:12, 183:6
**limbs** [2] - 171:9
**limitations** [1] - 103:2
**limited** [5] - 20:24, 76:4, 77:6, 92:7, 250:3
**limits** [1] - 77:20
**limp** [2] - 183:6, 185:7
**Lindemann** [3] - 232:10, 232:15, 232:21
**line** [22] - 55:3, 133:4,

185:11, 185:12, 185:15, 185:20, 185:21, 185:22, 186:3, 186:10, 186:11, 186:13, 186:19, 186:20, 187:11, 187:12, 187:15, 187:16, 187:18
**lines** [9] - 39:12, 168:20, 168:21, 168:22, 168:23, 185:10, 189:13
**liquid** [1] - 114:18
**liquor** [1] - 42:1
**list** [8] - 18:12, 52:1, 79:23, 90:14, 91:14, 233:14, 239:11, 241:10
**listed** [8] - 16:23, 80:2, 154:16, 171:5, 222:8, 230:15, 230:19, 239:14
**listen** [7] - 72:6, 72:8, 90:4, 96:13, 96:17, 105:7, 208:23
**listing** [1] - 3:25
**lists** [3] - 58:11, 227:24, 230:21
**literally** [1] - 114:6
**litigation** [2] - 154:21, 181:8
**litigations** [1] - 152:25
**live** [3] - 37:24, 180:25, 208:4
**lives** [4] - 169:21, 169:25, 171:2, 171:14
**living** [2] - 37:19, 37:21
**LLP** [3] - 1:16, 1:18, 25:8
**local** [2] - 53:1, 144:11
**localized** [1] - 143:24
**located** [1] - 85:8
**locations** [1] - 37:24
**long-acting** [3] - 13:16, 237:8, 239:6
**long-duration** [5] - 202:23, 203:1, 203:15, 204:2, 204:7
**long-lasting** [3] - 193:6, 193:8, 217:24
**long-range** [3] - 233:2, 233:4, 236:21
**longer-acting** [3] - 143:12, 144:4, 219:16
**longer-lasting** [2] - 138:20, 138:21
**longest** [1] - 80:16
**look** [34] - 3:4, 13:6, 17:4, 19:10, 44:13, 75:25, 77:23, 79:11, 81:9, 90:2, 100:9, 102:2, 110:18, 149:9, 151:8, 151:18, 152:6, 160:2, 162:15, 168:4, 170:20, 184:14, 186:23, 199:18, 206:2, 215:14, 215:18, 220:13, 222:11, 226:24, 227:5, 251:3
**looked** [15] - 3:25, 8:14, 16:4, 79:25, 123:11, 123:18, 133:19, 151:15, 177:16, 184:16, 194:5, 194:8, 233:3, 252:6, 252:18
**looking** [25] - 3:9, 14:6, 108:19, 112:16, 123:21, 132:20, 144:19, 151:9, 166:19, 166:25, 172:24, 173:1, 177:18, 183:6, 188:4, 188:14, 190:1, 190:2, 200:11, 200:16, 215:22, 232:20, 241:11, 241:24, 247:19
**looks** [14] - 7:15, 79:11, 81:22, 102:11, 152:7, 153:16, 167:21, 167:22, 187:5, 187:9, 213:24, 220:1, 233:2, 234:6
**loosen** [3] - 164:4, 169:24, 171:13
**loosens** [1] - 168:3
**lose** [2] - 47:6, 243:21
**lost** [3] - 15:2, 15:4, 15:11
**loved** [1] - 162:20
**low** [2] - 12:24, 206:11
**lower** [8] - 23:20, 29:1, 171:5, 187:9, 187:10, 195:11, 195:14, 195:17
**LRP** [1] - 236:19
**luck** [3] - 41:15, 60:17, 86:8
**lunch** [10] - 23:5, 90:25, 98:2, 99:10, 99:11, 99:12, 99:13, 99:16, 99:18, 160:6
**luncheon** [1] - 102:6
**lunches** [1] - 23:8
**Lyme** [3] - 67:1, 67:3, 67:17

## M

**ma'am** [5] - 30:23, 32:6, 33:19, 52:4, 63:10
**machine** [1] - 77:24
**magazine** [2] - 10:3, 10:8
**mail** [5] - 65:19, 97:6, 97:14, 211:23
**mails** [1] - 49:23
**main** [3] - 55:3, 79:12, 81:8
**Majewski** [4] - 54:18, 54:19, 54:20, 56:2
**major** [2] - 80:14, 162:18
**majored** [2] - 162:6, 162:17
**majority** [1] - 133:8
**makeup** [1] - 199:9
**man** [4] - 53:23, 62:6, 62:9, 172:5
**management** [5] - 55:5, 69:5, 244:12, 244:13, 244:15
**manager** [5] - 55:9, 210:15, 211:11, 213:7
**managing** [1] - 165:8
**manner** [2] - 94:4, 98:3
**Manning** [1] - 151:25
**manuals** [2] - 152:13, 157:2
**manufacture** [7] - 24:8, 73:12, 77:25, 87:6, 108:8, 167:9, 239:17
**manufacturer** [1] - 4:1
**manufactures** [2] - 24:12, 73:15
**manufacturing** [24] - 6:24, 58:14, 111:19, 111:25, 119:9, 119:11, 119:19, 124:14, 126:8, 126:12, 129:10, 132:22, 132:24, 133:6, 146:23, 147:22, 174:3, 174:8, 240:21, 240:22, 240:25, 241:3, 241:6, 241:23
**March** [1] - 235:2
**Marciano** [1] - 51:1
**mark** [6] - 218:8, 221:9, 223:14, 225:25, 227:5, 233:20
**marked** [5] - 218:20, 229:17, 242:11, 243:23, 245:12
**market** [43] - 105:1, 115:8, 119:22, 120:6, 120:13, 120:15, 127:10, 127:16, 128:4, 128:7, 130:10, 130:21, 141:7, 145:4, 145:12, 148:11, 148:12, 158:8, 176:20, 177:10, 203:1, 203:18, 204:3, 204:4, 204:7, 217:15, 217:17, 218:17, 225:18, 225:20, 229:2, 229:11, 231:2, 233:17, 234:13, 234:15, 234:16, 234:22, 238:6, 238:15, 239:16
**marketing** [10] - 119:24, 127:9, 134:19, 217:7, 218:6, 223:6, 225:8, 225:11, 232:11, 232:18
**marketplace** [1] - 234:21
**markets** [1] - 130:20
**marking** [3] - 219:19, 227:12, 228:11
**Markman** [1] - 99:24
**mass** [1] - 66:2
**material** [2] - 79:14, 175:9
**materials** [7] - 75:1, 96:25, 218:6, 223:7, 225:13, 241:13, 241:20
**math** [1] - 158:6
**matrix** [1] - 230:12
**matter** [10] - 3:16, 3:18, 14:22, 24:15, 36:17, 77:25, 80:10, 92:3, 94:11, 219:9
**mattered** [1] - 123:19
**matters** [2] - 94:15, 96:21
**mature** [1] - 223:1
**maverick** [1] - 113:21
**Meagher** [2] - 27:10, 159:19
**mean** [34] - 13:12, 25:3, 26:24, 34:18, 39:17, 40:15, 42:16, 48:14, 50:21, 54:24, 56:23, 58:7, 58:16, 63:16, 64:15, 65:3, 66:23, 96:15, 100:13, 142:24, 151:3, 157:3, 158:7, 158:10, 165:25, 171:21, 187:22, 199:1, 202:5, 217:24, 227:2, 243:11, 243:14, 250:12
**meaning** [4] - 85:21, 88:10, 98:22, 117:14
**meaningless** [3] - 197:1, 199:2, 199:20
**meanings** [1] - 88:7
**means** [21] - 32:20, 34:23, 65:11, 70:9, 86:22, 88:20, 93:23, 93:25, 114:23, 126:24, 129:12, 136:19, 144:4, 150:2, 174:4, 185:5, 185:7, 188:1, 195:14, 243:17
**meant** [3] - 33:2, 39:16, 233:10
**meantime** [1] - 15:24
**measurable** [1] - 222:21
**measured** [1] - 222:21
**measurements** [1] - 81:5
**meat** [1] - 112:1
**mechanism** [1] - 162:12
**mechanisms** [2] - 162:15, 176:18
**media** [2] - 97:7, 97:18
**Medicaid** [2] - 39:15, 39:20
**medical** [17] - 67:9, 104:12, 108:7, 110:8, 110:10, 110:19, 110:22, 111:1, 111:7, 111:14, 128:6, 128:9, 128:14, 128:18, 130:2, 143:8, 144:17
**medicinal** [1] - 169:3
**medicine** [1] - 144:14
**medicines** [1] - 31:25

**meet** [2] - 82:3, 191:8
**meeting** [2] - 212:2, 228:17
**meetings** [3] - 210:22, 214:15, 225:14
**meets** [1] - 82:22
**Melanie** [3] - 25:9, 105:25, 249:23
**MELANIE** [1] - 1:20
**member** [6] - 25:2, 26:2, 26:7, 26:12, 28:9, 28:17
**members** [26] - 25:4, 25:22, 38:15, 70:1, 71:6, 71:17, 71:24, 72:10, 86:11, 102:15, 102:17, 106:1, 135:14, 139:10, 140:14, 146:25, 149:13, 157:4, 159:9, 160:5, 160:25, 170:21, 207:18, 247:5, 248:6, 251:16
**memory** [3] - 90:5, 90:10, 93:25
**men** [1] - 139:8
**mention** [5] - 43:21, 138:24, 139:1, 157:13, 198:11
**mentioned** [29] - 25:5, 26:17, 26:24, 43:22, 97:19, 106:17, 109:17, 111:15, 113:15, 117:4, 141:2, 149:17, 162:10, 163:20, 165:24, 167:14, 173:6, 176:6, 176:8, 183:21, 185:1, 186:2, 186:14, 187:13, 188:16, 198:4, 202:7, 218:5, 237:9
**mentioning** [2] - 185:23, 203:2
**merits** [1] - 120:9
**merry** [1] - 184:8
**Merz** [1] - 233:18
**messaging** [2] - 97:15, 230:6
**met** [2] - 78:9, 85:1
**method** [6] - 49:9, 80:23, 117:3, 117:6, 119:11, 226:2
**methods** [9] - 111:19, 116:10, 118:10, 121:25, 124:14, 129:10, 146:23, 147:6, 243:16
**mice** [1] - 184:5
**Michael** [5] - 27:9, 27:10, 154:24, 156:2, 159:19
**mid** [1] - 147:15
**middle** [6] - 7:8, 11:16, 23:6, 23:9, 23:10, 234:24
**Middleton** [1] - 37:7
**might** [25] - 15:19, 73:23, 75:5, 82:10, 85:14, 93:2, 100:16, 110:13, 112:12, 128:3, 136:22, 139:13, 139:15, 152:16, 159:13, 193:20, 195:3, 195:4, 195:18, 196:16, 196:17, 207:9, 253:5
**migraine** [2] - 170:10, 170:14
**migraines** [8] - 104:13, 110:11, 110:14, 170:13, 170:16, 170:25, 191:10
**military** [1] - 108:11
**milk** [1] - 111:24
**millimolar** [1] - 198:10
**million** [7] - 105:12, 119:15, 132:3, 137:16, 137:20, 148:8, 158:10
**millions** [4] - 128:15, 169:8, 176:21
**mind** [17] - 36:7, 44:19, 78:1, 78:2, 90:4, 96:11, 97:22, 99:1, 108:4, 113:22, 126:17, 129:15, 129:23, 159:24, 160:11, 182:19, 191:4
**minds** [1] - 105:6
**mine** [1] - 47:14
**minimal** [1] - 250:7
**minimize** [2] - 146:12, 235:11
**minimizes** [1] - 144:1
**minimum** [1] - 95:11
**Minnesota** [1] - 153:11
**MINNITI** [34] - 1:20, 207:5, 207:8, 207:11, 207:16, 209:1, 209:9, 216:9, 216:13, 216:15, 216:21, 224:5, 224:10, 224:14, 224:18, 224:23, 231:5, 231:11, 231:16, 231:19, 231:24, 232:4, 232:9, 235:14, 235:19, 235:25, 239:19, 239:24, 240:4, 248:19, 248:23, 249:8, 249:12, 249:14
**Minniti** [4] - 25:10, 105:25, 208:25, 248:17
**minuscule** [1] - 107:5
**minute** [12] - 10:23, 10:25, 13:8, 19:10, 32:7, 36:8, 144:7, 160:7, 160:9, 168:2, 168:9, 206:21
**minutes** [14] - 20:16, 23:6, 69:20, 99:19, 135:10, 135:12, 160:9, 160:13, 160:16, 181:2, 206:22, 206:25, 207:8, 207:9
**miracle** [1] - 191:13
**miss** [3] - 23:22, 125:9, 125:10
**mistake** [1] - 126:18
**mistakes** [2] - 85:10, 121:17
**model** [2] - 180:25, 182:25
**modelled** [1] - 184:17
**models** [1] - 184:15
**modernized** [2] - 166:3
**modulate** [1] - 163:17
**molecule** [8] - 107:2, 107:16, 108:3, 115:6, 163:12, 163:24, 181:5
**molecules** [4] - 106:20, 115:2, 162:11, 162:13
**mom** [1] - 47:15
**moment** [6] - 104:6, 104:7, 131:7, 133:23, 136:20, 178:5
**moments** [1] - 156:14
**Monday** [5] - 22:24, 23:2, 41:2, 41:5, 41:10
**money** [10] - 38:18, 86:22, 88:2, 132:4, 137:12, 137:15, 147:11, 150:6, 158:4, 158:8
**moniker** [1] - 3:9
**Montana** [6] - 59:21, 59:24, 60:3, 60:8, 60:15, 60:17
**month** [4] - 37:13, 53:5, 170:17
**monthly** [1] - 226:8
**months** [8] - 84:2, 115:23, 115:24, 148:3, 175:17, 217:24, 217:25, 235:2
**morning** [39] - 22:22, 23:10, 25:14, 27:7, 30:15, 30:23, 30:24, 33:19, 37:6, 40:10, 40:22, 41:16, 48:20, 50:16, 51:8, 52:10, 53:9, 54:17, 56:5, 58:4, 59:2, 59:15, 60:23, 62:24, 63:10, 64:2, 64:3, 64:22, 66:9, 68:19, 68:20, 71:15, 102:1, 102:3, 248:14, 252:7, 252:9, 252:24, 254:3
**Morris** [1] - 25:11
**MORRIS** [1] - 1:16
**most** [24] - 3:4, 32:3, 55:15, 66:19, 80:25, 83:24, 96:10, 104:22, 106:20, 106:25, 108:13, 108:14, 108:21, 109:23, 124:25, 144:13, 151:5, 170:17, 172:4, 182:21, 220:14, 222:22, 227:24, 228:8
**Most** [1] - 84:1
**mostly** [1] - 39:18
**motion** [1] - 250:16
**motivated** [1] - 124:16
**motor** [1] - 164:1
**mouse** [7] - 181:20, 182:11, 182:17, 184:5, 205:14, 206:3, 206:9
**mousetrap** [1] - 159:5
**mouthful** [1] - 73:23
**move** [21] - 21:4, 148:16, 159:16, 168:11, 175:22, 181:24, 184:7, 184:19, 188:4, 205:21, 216:10, 224:6, 231:6, 231:11, 235:15, 235:19, 239:19, 239:24, 248:17, 248:19, 248:23
**moved** [3] - 55:22, 60:7, 61:7
**moving** [4] - 59:21, 59:24, 208:9, 223:11
**MR** [155] - 4:5, 4:14, 4:25, 5:6, 5:14, 5:22, 6:21, 7:4, 7:16, 7:22, 8:2, 8:6, 8:11, 9:3, 9:6, 9:18, 9:21, 10:1, 10:18, 11:2, 11:4, 11:14, 11:23, 12:6, 12:8, 12:18, 12:22, 13:11, 14:4, 14:9, 14:21, 16:1, 16:7, 16:11, 16:15, 16:24, 17:2, 17:8, 18:1, 18:10, 18:21, 19:25, 20:8, 20:9, 25:7, 25:14, 27:2, 27:7, 31:24, 35:17, 36:11, 40:3, 43:6, 45:20, 47:20, 52:15, 54:7, 54:10, 55:12, 57:14, 58:20, 62:19, 65:22, 66:4, 68:4, 99:25, 100:4, 100:15, 101:3, 101:4, 101:12, 101:15, 103:23, 134:10, 134:15, 134:22, 135:1, 135:3, 135:5, 160:20, 161:4, 161:15, 181:24, 182:5, 182:7, 191:1, 191:3, 191:23, 204:11, 204:13, 204:19, 204:25, 205:7, 205:9, 205:20, 205:24, 206:13, 206:17, 207:5, 207:8, 207:11, 207:16, 209:1, 209:4, 209:9, 216:9, 216:11, 216:13, 216:15, 216:21, 224:5, 224:7, 224:10, 224:11, 224:14, 224:15, 224:18, 224:19, 224:23, 231:5, 231:7, 231:11, 231:12, 231:16, 231:17, 231:19, 231:20, 231:24, 231:25, 232:4, 232:5, 232:9, 235:14, 235:16, 235:19, 235:21, 235:25, 239:19,

239:21, 239:24, 240:1, 240:4, 248:19, 248:21, 248:23, 249:2, 249:8, 249:12, 249:14, 249:19, 251:9, 253:5, 253:15, 253:21, 253:22
**MS** [36] - 30:10, 32:4, 35:19, 35:25, 36:6, 36:14, 40:7, 41:12, 43:8, 45:22, 47:22, 51:25, 52:17, 54:8, 55:14, 55:23, 56:1, 57:16, 58:24, 62:21, 66:6, 68:6, 182:1, 191:25, 192:4, 204:17, 205:18, 249:23, 250:15, 250:21, 251:21, 251:24, 252:2, 252:10, 252:16, 252:22
**multipage** [2] - 243:24, 245:13
**multiple** [4] - 31:21, 37:22, 112:11, 217:18
**muscle** [16] - 67:10, 104:13, 164:9, 164:11, 164:12, 167:13, 167:14, 168:2, 168:3, 168:8, 183:18, 184:6, 185:8, 206:5, 206:6
**muscles** [12] - 107:23, 164:2, 164:5, 166:21, 166:22, 169:16, 169:23, 171:12, 171:13, 183:1, 184:8
**must** [19] - 8:9, 72:21, 73:9, 76:20, 78:7, 85:25, 86:4, 86:23, 87:22, 89:9, 89:23, 91:12, 92:1, 92:7, 92:13, 92:24, 96:20, 97:9, 134:5

## N

**Nagaich** [2] - 27:10, 159:19
**name** [34] - 3:15, 21:10, 25:7, 25:14, 26:23, 26:24, 27:12, 30:25, 33:19, 34:10, 60:24, 105:24, 109:5, 122:10, 135:6, 161:6, 161:16, 161:17, 164:24, 175:24, 179:5, 179:6, 192:5, 192:24, 209:13, 214:1, 217:2, 217:3, 232:14, 236:5, 240:9, 240:10
**named** [4] - 107:14, 122:10, 165:1, 193:1
**namely** [1] - 131:13
**names** [3] - 27:3, 79:17, 179:12
**Nashville** [1] - 139:7
**national** [2] - 107:9, 249:12
**natural** [3] - 153:21, 153:25, 247:15
**naturally** [6] - 163:13, 167:4, 180:17, 180:21, 181:9, 196:6
**nature** [2] - 80:19, 163:23
**navigate** [1] - 107:8
**near** [2] - 213:20
**nearby** [1] - 114:2
**nearly** [3] - 81:16, 123:15, 141:13
**necessarily** [2] - 26:24, 57:1
**necessary** [2] - 95:2, 95:7
**neck** [5] - 110:12, 143:9, 143:11, 168:23, 169:17
**need** [26] - 5:9, 6:18, 6:20, 9:10, 21:4, 21:5, 22:25, 33:9, 45:24, 50:8, 71:21, 75:4, 75:5, 96:10, 100:17, 103:4, 112:19, 112:25, 117:12, 123:3, 123:7, 129:18, 157:9, 157:13, 247:8, 250:4
**needed** [5] - 71:10, 75:17, 108:12, 110:2, 202:24
**needing** [1] - 115:10
**needle** [1] - 144:5
**needs** [6] - 35:6, 56:22, 78:6, 126:20, 151:1, 208:19
**nefarious** [3] - 11:5, 11:15, 11:21
**nefariously** [1] - 11:11
**nefariousness** [2] - 12:16, 12:18
**negative** [5] - 26:16, 27:15, 28:2, 28:5, 28:12
**negotiating** [1] - 100:16
**negotiation** [9] - 13:14, 14:4, 14:6, 14:8, 14:23, 15:8, 15:10, 17:22, 157:23
**neighbor** [1] - 31:17
**nervous** [2] - 163:5, 163:7
**networking** [1] - 97:17
**neuromodulator** [4] - 218:13, 218:16, 219:12, 225:20
**neuromodulators** [1] - 220:15
**neuron** [2] - 164:8, 164:10
**neurons** [3] - 163:16, 164:1
**neurotoxin** [30] - 24:2, 24:7, 24:9, 24:13, 142:2, 163:10, 163:11, 163:12, 163:17, 163:19, 163:20, 163:21, 164:25, 166:20, 167:23, 168:1, 170:1, 170:4, 170:23, 173:10, 181:20, 209:24, 209:25, 233:12, 233:13, 234:9, 236:11, 236:19, 236:22, 237:24
**neurotoxinA** [1] - 182:11
**neurotoxins** [5] - 163:8, 165:20, 165:22, 165:24, 166:2
**neutral** [1] - 74:18
**never** [16] - 7:14, 12:23, 46:19, 53:19, 125:18, 128:20, 136:9, 136:18, 138:10, 144:21, 149:18, 151:23, 154:14, 159:7, 229:4
**new** [54] - 4:3, 12:2, 13:16, 22:19, 76:22, 77:3, 77:5, 77:24, 78:7, 80:2, 84:24, 104:15, 109:1, 109:15, 111:17, 111:18, 111:19, 112:13, 112:17, 112:24, 113:1, 113:11, 115:11, 116:6, 117:25, 118:6, 125:2, 128:6, 128:14, 130:6, 130:12, 133:23, 138:17, 141:10, 146:7, 146:17, 149:10, 150:10, 156:21, 159:9, 164:21, 171:16, 174:7, 175:5, 176:10, 176:12, 176:17, 184:14, 229:5, 244:12, 244:13, 244:15
**newer** [1] - 138:20
**Newport** [1] - 209:15
**news** [1] - 250:7
**newspaper** [1] - 96:15
**next** [43] - 6:16, 17:15, 22:21, 22:24, 23:2, 41:5, 41:9, 57:20, 59:21, 59:23, 98:4, 127:21, 133:16, 143:14, 154:22, 159:23, 165:19, 165:22, 165:24, 166:2, 166:6, 171:19, 173:19, 173:24, 174:18, 174:21, 175:12, 175:22, 176:1, 176:24, 177:9, 191:18, 200:19, 207:4, 214:4, 216:21, 220:21, 221:9, 224:23, 231:11, 232:9, 235:14, 235:25
**next-gen** [1] - 200:19
**next-generation** [15] - 127:21, 165:22, 165:24, 166:2, 166:6, 173:19, 173:24, 174:18, 174:21, 175:12, 175:22, 176:1, 176:24, 177:9, 191:18
**NFL** [1] - 152:2
**nicely** [1] - 184:18
**NICHOLS** [1] - 1:16
**Nichols** [1] - 25:11
**night** [6] - 5:15, 38:5, 91:1, 93:12, 252:6, 252:13
**nighttime** [1] - 42:25
**nine** [3] - 128:9, 158:4, 217:25
**nine-figure** [1] - 158:4
**Nirav** [2] - 25:17, 140:18
**NIRAV** [1] - 2:7
**nitrogen** [1] - 66:3
**nobody** [5] - 6:5, 32:10, 35:24, 45:13, 60:21
**none** [5] - 39:11, 94:8, 125:3, 142:3, 200:4
**nonobvious** [1] - 84:24
**nonprotein** [5] - 209:19, 209:21, 209:22, 210:2, 211:22
**normal** [5] - 42:19, 49:11, 67:16, 139:18, 171:14
**normally** [1] - 42:10
**notable** [2] - 233:8, 233:10
**note** [1] - 90:2
**notebook** [4] - 99:24, 100:1, 100:7, 213:12
**notebooks** [11] - 74:9, 74:10, 74:12, 74:21, 74:22, 74:25, 75:3, 88:5, 212:23, 213:2
**notes** [15] - 68:23, 89:21, 89:22, 90:7, 90:9, 90:11, 90:13, 90:15, 90:16, 90:19, 91:2, 91:3, 91:4
**nothing** [14] - 69:11, 80:8, 95:15, 129:12, 136:17, 137:1, 137:4, 138:22, 143:4, 145:13, 158:17, 158:24, 252:18, 253:21
**notice** [4] - 5:20, 81:3, 83:2, 207:24
**noticed** [4] - 17:4, 243:6, 243:8, 243:12
**notion** [2] - 13:13, 155:19
**novel** [1] - 142:9
**November** [4] - 5:16, 84:2, 217:13, 239:7
**nuance** [1] - 12:13
**nuclear** [1] - 64:8
**Number** [15] - 28:15, 29:12, 30:12, 70:10, 70:12, 70:14, 70:16, 70:18, 70:20, 70:23, 70:25, 73:22, 182:3, 218:20, 226:11
**number** [45] - 8:17, 21:24, 23:19, 24:6, 70:8, 70:10, 70:13, 79:16, 90:20, 95:11,

106:1, 110:1, 110:8, 111:8, 115:7, 137:19, 157:5, 157:17, 168:12, 172:6, 172:7, 188:11, 188:16, 218:9, 218:20, 219:20, 221:10, 223:14, 226:11, 227:6, 227:12, 227:24, 229:18, 230:15, 230:19, 231:1, 232:21, 233:20, 239:1, 239:8, 250:3, 250:16
**numbered** [1] - 81:1
**numbers** [7] - 73:24, 79:23, 79:24, 114:14, 236:12, 243:25, 245:13
**numerous** [1] - 111:6
**nurse** [4] - 35:12, 35:14, 36:2, 36:3
**nurses** [1] - 36:1

## O

**O'Brien** [1] - 50:16
**oath** [4] - 88:12, 197:23, 207:24, 208:3
**obfuscate** [1] - 223:10
**object** [1] - 91:21
**objection** [47] - 3:8, 3:24, 5:1, 6:8, 6:15, 8:17, 91:24, 91:25, 92:3, 182:1, 182:2, 204:17, 216:11, 216:19, 224:7, 224:8, 224:11, 224:12, 224:15, 224:16, 224:19, 224:20, 231:7, 231:9, 231:12, 231:13, 231:17, 231:20, 231:21, 231:25, 232:3, 232:5, 232:6, 235:16, 235:17, 235:21, 235:22, 239:21, 239:22, 240:1, 240:2, 248:21, 249:2, 249:4, 249:18, 252:12
**objections** [2] - 91:19, 252:10
**objective** [2] - 209:18, 223:12
**objects** [1] - 32:10
**obligation** [1] - 91:20
**observe** [1] - 94:1
**observed** [1] - 206:11
**obtain** [1] - 175:11
**obtained** [3] - 28:18, 109:20, 141:8
**obvious** [28] - 78:7, 80:2, 118:7, 121:20, 122:5, 122:19, 122:22, 124:8, 124:18, 136:4, 136:6, 136:7, 136:11, 147:10, 149:20, 149:22, 149:23, 150:1, 150:7, 150:24, 151:1, 151:5, 151:11, 154:7, 155:20, 156:11, 157:11
**obviously** [6] - 52:18, 71:11, 151:19, 164:19, 235:7, 253:10
**obviousness** [2] - 140:8, 153:6
**occasionally** [1] - 83:25
**occasions** [3] - 118:9, 121:18, 134:2
**occupation** [1] - 58:11
**occur** [4] - 22:21, 29:20, 207:25, 234:25
**occurred** [1] - 84:5
**occurs** [2] - 78:4, 92:9
**October** [7] - 162:1, 183:11, 183:12, 214:6, 227:18, 229:19, 245:18
**Oculinum** [10] - 3:15, 4:1, 107:22, 109:4, 165:1, 167:10, 167:18, 168:15, 192:19, 192:23
**OF** [2] - 1:2, 1:9
**offense** [1] - 101:7
**offer** [8] - 73:17, 74:7, 135:13, 187:2, 187:7, 237:17, 237:19, 237:23
**offered** [2] - 91:18, 91:22
**offering** [3] - 76:10, 144:7, 248:8
**offers** [3] - 188:17, 190:6, 238:4
**Office** [38] - 9:17, 28:10, 28:14, 43:20, 76:15, 78:10, 78:12, 113:12, 117:17, 117:18, 117:21, 117:23, 118:4, 118:10, 118:12, 121:15, 121:17, 123:8, 123:9, 123:18, 123:23, 123:25, 124:4, 124:21, 125:10, 125:19, 125:21, 126:4, 126:18, 127:1, 127:3, 127:7, 133:17, 133:19, 133:25, 152:18
**office** [20] - 34:2, 34:8, 34:9, 34:10, 34:15, 35:10, 35:11, 35:12, 35:20, 83:1, 83:14, 83:15, 83:17, 84:5, 144:4, 235:3, 238:3, 238:14
**Official** [1] - 254:13
**official** [1] - 76:7
**offset** [1] - 190:11
**often** [4] - 78:12, 83:24, 94:13, 98:21
**oil** [1] - 61:3
**old** [8] - 33:8, 136:4, 146:13, 147:1, 147:6, 154:4, 157:2, 158:15
**omissions** [1] - 208:10
**omitted** [1] - 208:8
**omnibus** [1] - 3:7
**once** [9] - 20:11, 20:13, 112:2, 115:20, 132:18, 159:14, 169:23, 178:14, 183:15
**Once** [3] - 77:17, 84:5, 84:12
**oncology** [1] - 39:12
**One** [1] - 82:13
**one** [143] - 3:6, 3:11, 5:19, 6:16, 8:6, 8:8, 8:16, 9:16, 11:23, 16:23, 17:10, 17:15, 18:1, 18:5, 19:12, 20:12, 20:15, 22:7, 22:9, 22:14, 29:3, 30:3, 31:10, 31:11, 32:16, 33:21, 35:13, 35:20, 36:11, 36:12, 36:19, 41:18, 42:24, 43:2, 43:18, 46:22, 48:22, 51:3, 53:17, 53:18, 54:11, 56:21, 66:25, 67:17, 70:10, 70:11, 70:13, 72:25, 78:7, 80:20, 80:22, 84:6, 86:21, 87:22, 88:22, 91:3, 96:5, 98:23, 101:21, 103:17, 106:21, 107:4, 108:24, 110:19, 110:22, 114:11, 115:13, 118:16, 120:6, 121:19, 122:6, 122:9, 122:15, 123:25, 124:13, 126:7, 126:12, 132:1, 138:24, 138:25, 141:11, 142:23, 145:21, 146:5, 147:1, 147:13, 148:18, 153:7, 153:20, 155:8, 156:5, 157:5, 158:21, 167:12, 167:21, 171:4, 172:1, 172:4, 172:6, 173:10, 174:2, 181:13, 188:16, 189:13, 189:24, 190:13, 194:13, 195:7, 195:13, 196:1, 203:22, 204:4, 204:15, 207:11, 208:5, 208:12, 208:16, 211:3, 211:20, 211:25, 217:18, 223:12, 226:25, 228:19, 230:16, 230:19, 231:1, 231:2, 234:24, 235:14, 247:8, 247:20, 250:5, 253:5, 253:9
**one-on-one** [2] - 20:15, 211:25
**ones** [7] - 3:10, 3:11, 20:17, 100:2, 123:19, 124:3, 148:12
**ongoing** [2] - 202:18, 217:16
**online** [3] - 49:10, 78:25, 230:4
**onset** [1] - 238:9
**open** [8] - 69:25, 96:11, 97:22, 99:1, 148:2, 159:24, 227:7, 250:8
**opening** [24] - 3:8, 4:22, 6:14, 8:20, 9:22, 10:17, 10:22, 13:3, 13:5, 13:21, 15:25, 98:4, 98:5, 98:6, 98:9, 99:6, 99:14, 99:16, 101:2, 103:22, 159:20, 226:13, 227:8, 252:11
**openings** [1] - 102:12
**operate** [1] - 19:5
**operates** [1] - 35:11
**operation** [1] - 34:7
**operator** [2] - 61:7, 61:8
**ophthalmologist** [1] - 166:18
**ophthalmology** [2] - 164:17, 167:3
**opinion** [7] - 94:14, 94:16, 94:18, 94:20, 94:23, 95:19, 141:4
**opinions** [9] - 26:17, 27:16, 28:3, 28:6, 28:13, 43:19, 46:3, 58:20, 133:14
**opportunities** [2] - 221:25, 241:4
**opportunity** [10] - 70:4, 93:25, 98:10, 102:2, 163:4, 163:6, 163:9, 217:15, 225:18, 225:20
**opposite** [2] - 89:7, 122:25
**optimizations** [1] - 203:6
**option** [2] - 49:3, 143:12
**options** [1] - 217:19
**order** [6] - 23:7, 81:21, 99:24, 171:23, 209:5, 253:2
**ordinarily** [1] - 94:21
**ordinary** [15] - 78:8, 82:5, 88:10, 136:11, 149:24, 150:14, 150:25, 151:2, 151:15, 152:5, 152:8, 154:2, 154:6, 155:21, 156:11
**organization** [5] - 36:19, 164:16, 176:11, 218:15, 234:8
**organizing** [1] - 223:22
**original** [3] - 82:15, 115:5, 147:2
**originally** [2] - 180:2, 241:2
**Os** [1] - 151:24
**Osher** [2] - 55:8, 55:22

**otherwise** [4] - 15:13, 101:1, 101:10, 128:3
**ought** [3] - 3:13, 17:12, 29:15
**ourselves** [1] - 166:8
**outbreak** [1] - 144:11
**outgoing** [1] - 83:21
**outline** [2] - 90:14, 98:7
**outrageous** [1] - 108:22
**outset** [1] - 106:15
**outside** [6] - 32:6, 36:8, 67:25, 78:11, 92:23, 141:5
**overall** [4] - 83:19, 132:15, 190:24, 230:11
**overcome** [1] - 83:12
**overlap** [1] - 149:10
**overlapping** [1] - 189:22
**overlook** [1] - 152:21
**overlooked** [1] - 85:11
**overlooking** [1] - 9:9
**overnight** [2] - 93:11, 203:7
**overrule** [3] - 6:8, 6:15, 92:3
**Overview** [1] - 244:2
**owe** [1] - 137:12
**owed** [2] - 132:15, 132:19
**Owen** [1] - 46:16
**own** [18] - 11:13, 26:13, 34:10, 46:14, 90:10, 96:19, 109:1, 120:18, 122:16, 122:19, 141:21, 144:21, 144:22, 158:19, 170:21, 194:22, 247:14, 248:3
**owned** [3] - 24:7, 73:12, 194:20
**owner** [9] - 42:1, 76:8, 77:9, 86:15, 86:19, 86:22, 86:23, 150:5, 150:7
**owners** [2] - 140:2, 150:20
**ownership** [1] - 17:20
**owns** [3] - 24:6, 73:11, 73:20

## P

**p.m** [5] - 252:11, 252:13, 252:15, 252:21, 254:4
**P188** [2] - 215:2, 215:19
**page** [17] - 9:24, 79:14, 79:15, 79:23, 80:3, 84:9, 86:12, 184:21, 188:6, 214:5, 227:23, 230:7, 237:1, 239:8, 244:3, 245:24, 246:5
**pages** [2] - 230:9, 248:25
**paid** [9] - 38:18, 46:25, 47:1, 47:2, 86:22, 112:23, 120:19, 128:9, 128:23
**pain** [1] - 67:10
**painful** [3] - 110:12, 143:10, 169:20
**palsy** [1] - 171:8
**panel** [6] - 21:18, 21:21, 70:1, 71:4, 71:6, 71:17
**paper** [6] - 19:11, 79:1, 83:23, 83:25, 88:5, 100:8
**papers** [1] - 184:3
**paragraph** [2] - 209:4, 244:6
**paragraphs** [1] - 81:1
**paralysis** [6] - 107:3, 107:15, 181:1, 182:25, 183:1, 188:3
**paralysis-causing** [1] - 107:15
**paralyze** [2] - 183:18, 184:6
**paralyzed** [2] - 107:23, 185:8
**paralyzes** [4] - 164:8, 164:10, 164:12
**paralyzing** [2] - 164:3, 166:21
**parent** [1] - 247:25
**parents** [1] - 25:3
**part** [22] - 18:6, 18:22, 65:18, 73:2, 80:14, 80:16, 80:25, 82:1, 94:8, 111:24, 139:18, 139:24, 140:11, 156:8, 175:11, 181:4, 220:25, 224:3, 241:5, 241:8, 241:22
**partial** [1] - 45:2
**particular** [20] - 3:17, 10:3, 27:23, 37:17, 54:11, 67:4, 78:1, 80:24, 110:21, 113:18, 163:9, 163:23, 177:14, 178:20, 189:14, 195:10, 198:14, 198:23, 200:17
**particularly** [6] - 3:10, 3:21, 33:8, 127:3, 142:13, 164:1
**parties** [24] - 14:24, 15:15, 16:8, 16:12, 29:15, 45:12, 56:24, 57:5, 70:3, 70:4, 73:17, 73:24, 74:3, 74:6, 74:17, 91:9, 100:12, 102:19, 103:15, 140:4, 208:10, 208:11, 208:12, 251:15
**parties'** [4] - 74:13, 87:3, 89:7, 97:21
**partly** [1] - 14:18
**partner** [2] - 108:20, 247:25
**partnership** [1] - 239:7
**parts** [4] - 79:12, 81:8, 156:7, 157:2
**party** [11] - 84:22, 86:25, 89:1, 89:2, 89:3, 89:8, 91:18, 96:1, 98:8, 98:10, 103:18
**pass** [3] - 76:2, 96:2, 191:23
**passed** [4] - 47:15, 52:8, 70:2, 251:11
**past** [5] - 28:25, 55:24, 83:23, 103:24, 220:4
**Patel** [6] - 27:10, 40:22, 41:13, 41:16, 43:9, 159:19
**Patent** [40] - 9:17, 28:10, 28:13, 43:19, 73:22, 76:15, 78:3, 78:10, 78:12, 113:12, 117:17, 117:18, 117:21, 117:23, 118:4, 118:10, 118:12, 121:15, 121:17, 123:8, 123:9, 123:17, 123:18, 123:23, 123:24, 124:4, 124:21, 125:10, 125:19, 125:21, 126:4, 126:18, 127:1, 127:3, 127:6, 133:17, 133:19, 133:24, 152:18
**patent** [211] - 3:12, 3:22, 6:11, 9:8, 9:10, 11:6, 11:7, 11:8, 13:1, 17:11, 18:5, 19:16, 24:1, 24:10, 28:14, 28:19, 28:22, 43:23, 43:25, 44:1, 44:5, 44:9, 74:2, 74:19, 74:21, 74:24, 75:13, 75:15, 75:20, 76:7, 76:11, 76:12, 76:16, 76:18, 77:2, 77:6, 77:8, 77:12, 77:13, 77:17, 77:19, 77:21, 77:22, 77:25, 78:6, 78:14, 78:18, 78:19, 78:20, 78:24, 79:5, 79:8, 79:9, 79:11, 79:12, 79:16, 79:19, 79:20, 79:21, 80:14, 80:17, 80:25, 81:7, 81:9, 81:11, 81:14, 81:16, 81:21, 82:3, 82:11, 82:23, 83:7, 84:1, 84:7, 84:9, 84:10, 84:12, 84:13, 84:14, 84:21, 84:24, 85:2, 85:4, 85:13, 85:16, 85:21, 85:25, 86:2, 86:5, 86:15, 86:18, 86:19, 86:20, 86:22, 86:23, 86:25, 87:6, 87:11, 87:24, 87:25, 88:11, 88:22, 103:2, 103:6, 103:7, 103:10, 107:4, 113:5, 113:17, 113:18, 114:12, 114:13, 114:15, 114:20, 115:11, 115:18, 117:1, 117:5, 117:6, 117:8, 117:9, 117:19, 117:23, 118:12, 118:16, 118:19, 118:22, 119:2, 119:13, 121:3, 122:13, 122:14, 122:17, 122:18, 123:3, 123:13, 123:14, 126:5, 130:7, 131:13, 132:12, 132:14, 132:15, 132:18, 132:25, 133:1, 133:7, 136:7, 136:14, 136:18, 139:14, 139:23, 140:2, 140:3, 145:22, 146:20, 146:21, 147:10, 147:11, 147:21, 147:22, 148:3, 148:24, 149:1, 149:10, 149:11, 149:18, 149:22, 149:25, 150:5, 150:6, 150:7, 150:15, 150:17, 150:20, 150:22, 151:9, 152:7, 152:13, 152:17, 152:24, 153:3, 153:6, 154:5, 154:12, 154:21, 155:5, 156:3, 156:4, 156:5, 175:15, 175:19, 179:3, 180:10, 194:21, 203:9, 215:25, 240:6, 242:12, 242:16, 242:17, 242:18, 242:19
**patent-at-issue** [1] - 123:3
**patentability** [1] - 84:25
**patentable** [1] - 80:2
**patented** [11] - 105:2, 105:8, 106:17, 115:25, 119:22, 120:21, 129:20, 129:25, 131:16, 132:3, 149:23
**patentee's** [1] - 77:12
**patents** [167] - 6:25, 11:19, 12:3, 12:19, 12:24, 17:21, 24:6, 24:14, 24:15, 24:18, 28:14, 40:4, 58:21, 73:11, 73:21, 73:25, 74:3, 74:4, 74:10, 74:16, 75:22, 75:25, 76:2, 79:25, 80:4, 81:17, 81:22, 84:17, 88:6, 88:7, 104:20, 104:22, 105:13, 111:6, 111:8, 111:12, 111:14, 111:16, 113:13, 113:14, 114:11, 116:25, 117:11, 117:13, 117:16, 118:4, 118:8, 118:13, 118:23, 118:25, 119:3, 120:17, 120:24, 121:14, 121:16, 121:19, 122:7, 123:16, 123:24, 124:1, 125:8, 125:21, 126:11,

126:12, 126:18, 126:19, 126:21, 127:5, 128:21, 130:3, 130:8, 130:15, 130:17, 131:18, 131:19, 131:25, 132:5, 132:9, 132:17, 132:22, 133:6, 133:19, 134:1, 136:3, 136:4, 136:15, 136:17, 136:22, 137:1, 137:4, 137:5, 137:9, 138:3, 138:17, 138:22, 138:25, 139:1, 139:2, 139:11, 139:16, 139:25, 140:3, 140:11, 140:24, 141:21, 142:3, 142:13, 145:11, 145:13, 145:14, 145:21, 146:12, 146:19, 146:22, 146:23, 147:1, 147:3, 147:5, 147:18, 147:19, 147:20, 147:25, 148:1, 148:5, 149:2, 149:4, 149:15, 149:19, 150:3, 150:23, 152:11, 152:13, 152:19, 152:21, 153:2, 153:5, 154:4, 154:23, 155:2, 155:16, 155:25, 156:20, 156:23, 157:10, 157:18, 158:15, 158:18, 158:19, 158:21, 158:23, 159:8, 159:14, 175:11, 192:12, 194:6, 194:22, 203:22, 203:23, 212:22, 213:1, 215:24
**Patents** [1] - 74:4
**patents-at-issue** [7] - 73:21, 111:16, 116:25, 117:11, 121:16, 130:15, 131:25
**patience** [1] - 247:6
**patient** [10] - 95:5, 112:4, 114:25, 115:4, 115:21, 237:13, 237:17, 237:20, 237:21, 238:16
**patient's** [2] - 107:24, 115:19
**patients** [22] - 36:1, 107:13, 107:17, 108:9, 110:2, 112:8, 114:19, 128:15, 130:19, 143:13, 169:8, 176:21, 191:7, 191:8, 217:25, 218:1, 222:23, 227:25, 228:7, 229:12, 237:17, 238:14
**pattern** [2] - 206:8, 206:9
**PAUL** [1] - 1:18
**Paul** [1] - 25:8
**pause** [2] - 131:6, 178:4
**pay** [22] - 32:3, 38:20, 38:21, 39:20, 46:24, 47:6, 57:10, 84:7, 89:25, 105:13, 105:14, 105:21, 120:24, 120:25, 121:3, 121:6, 132:8, 135:18, 140:24, 147:11, 160:1, 160:10
**paying** [6] - 105:3, 113:10, 118:17, 124:20, 129:1, 134:5
**payment** [1] - 69:6
**payroll** [1] - 56:10
**PCI** [2] - 26:9, 26:13
**PDX** [14] - 3:22, 3:24, 5:10, 5:17, 6:9, 6:16, 6:23, 8:7, 16:20, 17:1, 166:13, 168:11, 168:24
**peanut** [1] - 150:13
**pediatric** [1] - 171:5
**pen** [1] - 88:5
**pencil** [1] - 88:6
**pending** [1] - 50:2
**penetrate** [1] - 179:22
**penetrating** [5] - 179:11, 179:23, 181:18, 182:10, 182:14
**penetration** [2] - 234:17, 234:22
**penny** [1] - 105:15
**people** [48] - 20:24, 21:3, 35:9, 36:18, 45:14, 49:22, 52:1, 69:16, 71:12, 72:1, 75:23, 77:9, 85:14, 107:16, 108:3, 140:12, 144:6, 147:11, 147:14, 147:18, 150:25, 151:1, 151:5, 152:14, 154:12, 155:15, 156:2, 156:19, 157:23, 165:8, 165:12, 168:20, 169:20, 170:15, 170:18, 170:20, 171:1, 172:3, 173:1, 191:9, 191:10, 248:2, 248:3, 248:4, 253:13
**people's** [1] - 135:24
**peptide** [82] - 10:2, 10:6, 129:3, 129:5, 129:11, 129:17, 130:18, 130:25, 131:9, 142:6, 142:9, 142:10, 142:11, 143:2, 143:16, 144:3, 146:6, 146:12, 158:18, 179:3, 179:5, 179:11, 179:14, 179:17, 179:20, 179:23, 179:25, 180:2, 180:9, 180:11, 180:12, 180:14, 180:19, 181:5, 181:18, 181:19, 182:10, 182:14, 183:15, 183:17, 186:15, 186:17, 186:22, 187:2, 187:3, 187:5, 187:7, 187:14, 187:15, 187:16, 187:19, 188:15, 188:16, 188:21, 189:5, 189:8, 190:5, 190:6, 190:14, 190:23, 194:14, 194:16, 194:25, 195:11, 195:21, 196:4, 197:17, 197:19, 197:25, 198:1, 199:14, 199:19, 205:13, 206:11, 206:14
**percent** [20] - 4:10, 6:23, 6:25, 7:6, 7:8, 7:25, 39:21, 78:24, 132:23, 132:24, 133:1, 133:5, 133:6, 137:14, 215:20, 216:5, 228:7, 229:1, 239:15, 246:22
**percentage** [3] - 196:20, 196:23, 200:1
**percentages** [5] - 133:3, 137:13, 137:19, 197:7, 199:11
**peremptories** [1] - 20:19
**perfect** [1] - 85:12
**perfectly** [3] - 17:18, 145:6, 200:2
**perform** [3] - 72:23, 110:3, 213:4
**performed** [2] - 114:6, 130:24
**performing** [1] - 122:20
**performs** [1] - 189:2
**perhaps** [2] - 100:25, 151:21
**period** [12] - 13:21, 18:18, 32:25, 76:12, 108:15, 117:20, 118:15, 121:1, 124:19, 143:22, 143:25, 237:24
**periods** [1] - 160:10
**peripheral** [1] - 163:7
**permission** [11] - 84:15, 86:15, 105:3, 109:6, 113:10, 118:17, 119:3, 120:22, 121:14, 128:25, 134:4
**permitted** [1] - 94:14
**person** [27] - 26:24, 42:16, 43:1, 57:17, 57:23, 79:6, 83:6, 84:13, 94:11, 94:13, 136:11, 141:16, 149:24, 150:2, 150:14, 151:2, 151:15, 151:16, 152:4, 152:8, 154:1, 154:6, 155:21, 156:11, 169:24, 208:3
**person's** [2] - 143:11, 169:18
**personal** [1] - 35:4
**personally** [5] - 56:14, 88:13, 178:8, 192:11, 230:25
**personnel** [1] - 67:15
**perspective** [2] - 13:10, 135:13
**persuade** [3] - 86:1, 86:4, 90:16
**persuading** [1] - 88:21
**pertains** [1] - 222:3
**pertinent** [1] - 82:14
**Peter** [2] - 25:18, 140:18
**PETER** [1] - 2:10
**peterman** [1] - 225:4
**Peyton** [1] - 151:24
**pH** [11] - 198:18, 198:20, 198:22, 198:23, 198:24, 199:3, 199:7, 199:8, 199:15, 212:13
**Ph.D** [1] - 161:8
**pharmaceutical** [11] - 27:16, 39:10, 39:17, 39:23, 40:4, 107:1, 126:2, 151:6, 151:8, 152:6, 155:21
**pharmacologist** [1] - 175:8
**pharmacology** [4] - 162:9, 162:10, 162:11
**pharmacy** [1] - 69:11
**phase** [1] - 11:6
**Philadelphia** [1] - 157:15
**Philly** [1] - 114:2
**phone** [5] - 49:13, 50:1, 50:8, 65:19, 97:14
**phones** [1] - 97:6
**phosphate** [1] - 198:12
**photo** [3] - 4:2, 4:4, 4:16
**phrase** [2] - 93:5, 157:20
**phrases** [3] - 85:21, 149:21, 149:22
**physical** [1] - 90:18
**physically** [1] - 242:7
**pick** [1] - 152:3
**PICKARD** [16] - 2:7, 4:14, 5:22, 8:6, 8:11, 10:1, 10:18, 11:2, 13:11, 14:4, 14:9, 16:1, 16:11, 18:21, 19:25, 134:15
**Pickard** [6] - 4:14, 5:21, 14:2, 18:20, 25:17, 140:18
**picking** [2] - 7:13, 22:25
**picture** [5] - 3:25, 5:9, 108:16, 167:2, 167:7
**piece** [2] - 77:8, 100:8
**piecemeal** [2] - 98:21, 208:22
**pieces** [11] - 124:4, 124:6, 124:11, 124:23, 124:25, 125:4, 125:17,

174:19, 182:13, 183:7, 188:22
**pink** [2] - 153:21, 155:12
**pioneer** [1] - 104:18
**pioneered** [2] - 116:16, 173:11
**pioneering** [3] - 104:1, 117:3, 147:18
**pipeline** [2] - 165:23, 177:3
**pipelines** [1] - 230:6
**piqued** [1] - 193:24
**place** [7] - 55:9, 60:2, 85:13, 117:15, 195:22, 237:6, 248:11
**placed** [1] - 250:4
**placement** [1] - 49:11
**places** [2] - 37:22, 163:24
**plain** [2] - 121:9, 134:6
**plainly** [1] - 134:18
**Plaintiff** [3] - 1:4, 1:23, 161:10
**plaintiff** [10] - 3:23, 4:6, 5:10, 24:4, 25:6, 73:10, 98:11, 106:2, 159:22, 208:16
**Plaintiff's** [6] - 224:21, 231:14, 231:22, 232:1, 232:7, 235:23
**plaintiff's** [3] - 19:19, 99:16, 248:23
**plaintiffs** [9] - 216:10, 224:5, 231:5, 231:11, 235:15, 235:19, 239:19, 239:24, 248:19
**plan** [5] - 177:10, 226:2, 233:6, 236:21, 253:3
**planning** [6] - 18:14, 45:25, 60:14, 221:14, 233:2, 233:4
**plants** [2] - 64:9
**plastic** [1] - 53:24
**platform** [3] - 174:21, 174:23, 174:24
**platforms** [1] - 174:18
**platysma** [1] - 168:23
**play** [6] - 10:2, 73:2, 75:6, 134:19, 207:5, 253:3
**played** [12] - 75:9, 208:1, 208:13, 209:11, 216:21, 216:25, 225:1, 232:10, 232:12, 236:3, 240:7, 253:3
**player** [1] - 152:2
**playing** [2] - 207:21, 208:17
**plays** [4] - 13:3, 15:20, 151:24, 151:25
**plenty** [1] - 20:5
**PLLC** [1] - 2:5
**plus** [3] - 172:8, 178:1, 186:14
**point** [32] - 4:19, 8:15, 11:14, 12:22, 13:9, 19:20, 41:12, 44:15, 47:11, 70:2, 72:5, 83:8, 101:6, 107:24, 147:13, 148:16, 148:19, 154:8, 169:4, 199:3, 199:5, 202:15, 208:10, 208:14, 208:24, 215:17, 219:2, 219:11, 222:7, 222:11, 247:16
**pointed** [1] - 215:11
**pointing** [2] - 11:18, 215:9
**points** [7] - 142:11, 168:13, 196:21, 196:23, 197:15, 200:1, 223:11
**poisoning** [2] - 38:2, 144:11
**polysorbate** [5] - 186:2, 197:9, 197:13, 197:24, 199:13
**poor** [1] - 29:8
**pop** [1] - 29:22
**position** [12] - 99:6, 145:12, 159:9, 161:23, 203:8, 210:8, 217:6, 225:7, 232:16, 236:9, 240:15
**positions** [3] - 74:13, 165:4, 165:14
**positive** [6] - 26:16, 27:15, 28:2, 28:5, 28:12, 107:17
**possibility** [2] - 50:11, 85:10
**possible** [12] - 11:21, 23:14, 26:23, 27:13, 29:16, 49:3, 110:11, 195:9, 195:20, 195:25, 209:20, 241:19
**possibly** [6] - 6:6, 14:8, 18:15, 57:11, 88:6, 248:9
**postdoctoral** [1] - 162:9
**poster** [2] - 205:11, 205:25
**posters** [1] - 184:2
**postpone** [1] - 52:22
**potassium** [1] - 198:12
**potency** [8] - 206:11, 212:19, 214:24, 215:2, 215:13, 215:20, 215:21, 216:2
**potent** [1] - 172:4
**potential** [5] - 26:21, 50:1, 71:19, 166:20, 219:7
**potentially** [3] - 238:18, 241:14, 243:20
**powder** [1] - 114:17
**power** [3] - 64:8, 76:2, 76:24
**PowerPoint** [4] - 219:25, 220:2, 221:14, 227:17
**practices** [1] - 137:9
**practicing** [1] - 86:16
**praising** [1] - 9:24
**precipitated** [1] - 174:5
**precipitation** [4] - 240:22, 241:25, 242:2, 242:3
**precipitation-based** [1] - 242:2
**precise** [1] - 81:5
**precisely** [2] - 107:18, 131:4
**preclinically** [1] - 184:15
**preexisting** [1] - 80:7
**prefer** [4] - 71:12, 101:10, 251:15, 251:16
**preference** [1] - 250:8
**prejudice** [2] - 72:24, 94:3
**prelaunch** [1] - 223:24
**preliminary** [4] - 72:11, 72:18, 83:2, 102:22
**premise** [1] - 45:24
**prepare** [3] - 78:9, 78:17, 166:10
**prepared** [9] - 3:3, 19:3, 74:16, 75:6, 135:9, 213:9, 226:20, 244:1, 245:17
**prepares** [1] - 83:9
**preparing** [5] - 219:6, 220:6, 226:9, 226:17, 245:20
**preponderance** [6] - 86:1, 88:2, 88:24, 89:2, 89:11, 89:16
**present** [18] - 23:15, 98:10, 98:12, 98:15, 98:18, 99:3, 116:20, 148:18, 149:8, 154:11, 159:23, 207:25, 208:18, 208:19, 220:18, 243:20, 252:20, 254:9
**presentation** [14] - 22:20, 74:18, 96:11, 135:8, 220:1, 220:2, 220:7, 221:15, 221:16, 227:18, 228:16, 229:25, 230:3, 253:2
**presented** [12] - 10:17, 93:4, 93:18, 95:9, 97:2, 98:23, 99:2, 103:15, 103:17, 133:23, 223:10
**president** [2] - 232:11, 232:18
**press** [1] - 152:12
**prestigious** [1] - 66:17
**presumably** [2] - 35:8, 202:15
**presume** [1] - 227:22
**presumed** [2] - 126:22, 151:17
**presupposition** [1] - 6:19
**pretrial** [2] - 17:17, 100:10
**pretty** [14] - 8:20, 10:15, 10:24, 34:6, 49:23, 60:22, 67:24, 110:5, 152:14, 167:24, 197:21, 197:25, 198:1, 247:11
**prevent** [1] - 76:20
**preventing** [1] - 112:6
**preview** [4] - 7:17, 149:14, 157:7, 159:18
**previous** [4] - 80:3, 190:10, 190:22, 242:4
**previously** [7] - 4:4, 7:1, 79:24, 81:22, 122:22, 134:22, 211:17
**price** [7] - 223:19, 223:23, 235:5, 235:9, 235:10, 239:17
**pricing** [2] - 225:12, 227:17
**primarily** [2] - 180:19, 189:15
**primary** [4] - 85:22, 217:23, 246:12, 246:18
**principle** [1] - 19:6
**principles** [1] - 73:8
**print** [1] - 96:25
**printed** [4] - 84:7, 152:12, 220:1, 221:15
**prioritized** [1] - 128:6
**priority** [3] - 12:25, 202:7, 203:5
**prison** [1] - 61:17
**privacy** [1] - 69:18
**privileged** [1] - 17:5
**probable** [1] - 89:14
**probate** [1] - 52:11
**problem** [11] - 6:10, 6:21, 11:3, 31:21, 37:3, 39:9, 71:13, 77:24, 80:19, 196:9, 248:2
**problems** [1] - 104:7
**proceed** [2] - 98:2, 135:3
**proceeding** [1] - 85:12
**proceedings** [9] - 21:9, 30:7, 69:25, 90:14, 102:7, 160:18, 207:2, 254:4, 254:10
**process** [66] - 17:13, 21:16, 44:2, 48:1, 52:11, 61:6, 69:23, 71:15, 77:25, 78:20, 81:11, 83:19, 85:12, 86:16, 104:13, 109:24, 111:25, 116:7, 119:9, 132:24, 140:11, 152:3, 155:11, 155:12, 155:17, 156:8, 159:21, 166:4, 174:3, 174:4, 174:8, 174:9, 174:10, 175:23, 175:25, 176:2, 176:5, 176:7, 176:25, 192:24, 193:1, 193:2, 201:16, 240:21, 240:22, 240:25,

241:1, 241:6, 241:8, 241:12, 241:23, 241:25, 242:2, 242:6, 242:21, 244:7, 245:4, 245:6, 245:7, 245:8, 246:6, 246:10, 246:15, 246:16, 246:18
**processes** [5] - 44:3, 81:9, 112:13, 146:14, 176:10
**produce** [1] - 116:17
**produced** [2] - 106:23, 116:21
**product** [122] - 13:16, 13:19, 13:24, 24:9, 24:13, 24:14, 28:3, 28:6, 39:12, 39:21, 44:8, 73:13, 73:16, 86:16, 87:7, 103:2, 104:2, 105:9, 107:21, 109:1, 109:4, 111:19, 113:9, 113:16, 113:19, 114:8, 114:17, 114:21, 115:12, 116:12, 118:11, 119:7, 119:12, 119:13, 119:19, 120:2, 120:10, 120:13, 123:5, 125:14, 126:2, 126:5, 127:16, 128:2, 128:4, 128:17, 129:11, 130:1, 130:5, 131:5, 132:4, 133:1, 133:9, 134:18, 134:20, 137:8, 137:11, 138:11, 138:20, 141:7, 141:8, 141:12, 142:12, 144:25, 145:4, 145:7, 145:23, 148:14, 155:13, 155:15, 156:7, 158:11, 159:7, 162:14, 167:5, 174:1, 178:13, 179:20, 180:6, 180:14, 180:18, 180:21, 183:23, 191:11, 192:20, 192:24, 193:7, 193:17, 193:21, 195:1, 195:8, 198:24, 200:23, 201:3, 201:8, 202:23, 203:1, 203:16, 204:2, 204:7, 222:4, 222:18, 222:19, 225:15, 229:11, 229:14, 229:15, 237:8, 237:17, 237:23, 238:23, 241:20, 242:20, 245:2, 245:6, 245:7
**product's** [1] - 130:20
**productive** [1] - 226:2
**products** [64] - 24:2, 24:3, 27:21, 27:25, 31:25, 73:19, 74:5, 104:1, 104:15, 106:18, 108:6, 108:9, 109:16, 111:18, 111:20, 112:14, 112:19, 112:24, 112:25, 114:1, 115:7, 119:15, 120:6, 120:8, 127:22, 127:23, 128:1, 135:23, 139:15, 141:4, 143:16, 145:18, 145:20, 145:23, 146:5, 158:22, 162:15, 164:21, 173:20, 173:25, 175:12, 176:1, 176:3, 176:4, 176:12, 176:24, 177:3, 177:9, 177:18, 184:12, 184:15, 191:18, 191:22, 193:5, 193:6, 195:6, 200:19, 203:3, 203:10, 203:19, 232:19, 234:21, 240:18
**professional** [5] - 32:19, 67:9, 216:24, 218:25, 219:4
**Professional** [2] - 254:7, 254:9
**profile** [1] - 222:19
**profited** [1] - 120:20
**profits** [1] - 15:2
**Program** [1] - 244:2
**program** [7] - 55:4, 55:9, 179:24, 202:7, 203:5, 229:19, 247:19
**programming** [1] - 55:20
**programs** [3] - 166:6, 176:13, 177:3
**progress** [3] - 76:3, 220:10, 230:5
**project** [15] - 16:13, 69:5, 209:17, 209:18, 211:6, 211:12, 211:21, 214:1, 244:19, 244:23, 244:24, 245:2, 245:5
**Project** [2] - 244:4, 244:5
**projects** [3] - 107:10, 122:24, 176:13
**promise** [1] - 153:11
**promised** [1] - 206:21
**promising** [1] - 251:25
**promote** [2] - 76:3, 136:15
**promoting** [1] - 119:1
**promptly** [1] - 96:9
**pronounce** [1] - 60:24
**proof** [12] - 15:9, 88:20, 88:23, 89:2, 89:8, 89:14, 89:15, 89:16, 93:7, 93:9, 98:12, 110:20
**proper** [4] - 7:13, 78:15, 91:22, 219:9
**properly** [1] - 117:14
**properties** [2] - 177:13, 177:14
**property** [10] - 59:21, 60:5, 77:9, 77:10, 77:12, 81:4, 128:21, 128:24, 135:25, 200:13
**proprietary** [5] - 194:16, 194:24, 197:16, 197:18, 197:25
**prosecuting** [1] - 78:20
**prosecution** [4] - 81:10, 83:20, 85:13, 154:18
**prospective** [1] - 49:19
**PROSPECTIVE** [203] - 30:16, 30:20, 30:24, 31:1, 31:5, 31:10, 31:13, 31:16, 31:22, 32:2, 32:8, 32:17, 32:21, 32:23, 33:1, 33:4, 33:13, 33:16, 33:20, 33:24, 34:5, 34:8, 34:14, 34:21, 35:4, 35:10, 35:22, 36:2, 36:9, 36:25, 37:3, 37:5, 37:8, 37:12, 37:16, 37:19, 37:23, 38:4, 38:11, 38:13, 38:16, 38:20, 39:2, 39:4, 39:8, 39:19, 39:25, 40:5, 40:9, 40:11, 40:14, 40:18, 40:23, 41:1, 41:7, 41:17, 41:21, 41:24, 42:2, 42:5, 42:7, 42:11, 42:14, 42:18, 42:21, 42:24, 43:4, 43:10, 43:15, 43:21, 44:1, 44:18, 44:22, 45:1, 45:7, 45:17, 46:5, 46:8, 46:12, 46:16, 46:20, 46:25, 47:4, 47:7, 47:10, 48:3, 48:5, 48:7, 48:10, 48:13, 48:16, 48:19, 48:21, 49:1, 49:6, 49:9, 49:16, 49:25, 50:7, 50:13, 50:17, 50:20, 50:23, 51:2, 51:7, 51:11, 51:14, 51:18, 51:22, 52:8, 52:20, 53:2, 53:5, 53:8, 53:10, 53:13, 53:16, 53:23, 54:4, 54:13, 54:16, 54:19, 54:23, 55:1, 55:4, 55:7, 55:17, 55:25, 56:4, 56:6, 56:10, 56:15, 56:21, 57:1, 57:7, 57:11, 57:21, 58:1, 58:6, 58:9, 58:14, 58:18, 58:22, 59:3, 59:7, 59:10, 59:13, 59:16, 59:20, 60:1, 60:4, 60:12, 60:16, 60:25, 61:3, 61:6, 61:10, 61:13, 61:21, 61:24, 62:3, 62:5, 62:8, 62:13, 62:15, 62:25, 63:5, 63:12, 63:15, 63:18, 63:21, 63:24, 64:3, 64:5, 64:8, 64:12, 64:17, 64:20, 64:24, 65:2, 65:5, 65:7, 65:13, 65:16, 65:24, 66:10, 66:13, 66:16, 66:19, 66:25, 67:6, 67:10, 67:14, 67:19, 67:23, 68:11, 68:14, 68:17, 68:20, 68:22, 68:25, 69:4, 69:10
**protect** [1] - 105:18
**protected** [2] - 61:18, 123:24
**protecting** [3] - 104:20, 104:22, 104:24
**protection** [4] - 77:6, 118:12, 123:14, 130:7
**protective** [1] - 209:5
**protein** [37] - 112:5, 123:2, 138:5, 145:20, 145:22, 147:14, 147:16, 153:20, 163:13, 173:12, 177:5, 193:6, 193:7, 200:23, 201:3, 201:7, 201:15, 201:21, 202:1, 202:4, 202:12, 202:16, 202:17, 202:23, 202:25, 203:10, 203:15, 204:2, 204:6, 210:6, 210:9, 210:11, 211:15, 211:18, 214:2, 241:7, 241:11
**protein-free** [2] - 147:14, 211:15
**proteins** [10] - 111:23, 112:11, 112:14, 114:9, 115:13, 116:11, 172:5, 174:6, 228:5
**proud** [6] - 104:16, 106:1, 191:6, 191:7, 191:15, 191:20
**proudly** [1] - 141:17
**prove** [10] - 15:13, 85:25, 86:3, 86:23, 87:1, 122:16, 126:20, 127:6, 131:18, 140:15
**proved** [1] - 103:10
**proven** [4] - 87:23, 88:1, 91:12, 93:12
**provide** [17] - 74:15, 85:15, 86:7, 110:3, 112:18, 112:19, 114:22, 133:13, 136:23, 140:21, 193:13, 215:13, 218:16, 219:3, 220:10, 236:21, 238:19
**provided** [9] - 82:18, 85:8, 88:9, 100:1, 125:20, 210:21, 220:25, 234:11
**provider** [6] - 46:13, 237:13, 237:15, 237:16, 237:19, 238:12
**providers** [2] - 219:8, 222:22
**provides** [5] - 62:16,

115:25, 123:5, 130:20, 221:6
**providing** [5] - 36:1, 115:17, 126:25, 135:10, 218:18
**proving** [3] - 89:10, 89:17, 157:25
**PS20** [2] - 184:1, 197:10
**psychology** [1] - 162:7
**PT** [1] - 179:9
**PTO** [15] - 78:13, 78:18, 78:24, 79:2, 79:16, 81:9, 81:12, 81:16, 83:21, 84:2, 84:5, 84:9, 84:16, 84:22, 85:8
**PTO's** [2] - 78:25, 79:4
**PTX** [13] - 224:18, 224:21, 231:11, 231:14, 231:16, 231:19, 231:22, 231:24, 232:1, 232:4, 232:7, 235:20, 235:23
**pubically** [1] - 251:1
**public** [19] - 76:21, 77:5, 77:15, 77:18, 81:2, 84:4, 147:7, 147:9, 148:25, 149:12, 150:21, 151:10, 153:23, 175:16, 175:18, 194:1, 218:25, 221:7
**publication** [5] - 122:10, 123:1, 123:10, 126:15, 154:3
**publications** [17] - 118:3, 122:9, 122:16, 123:15, 124:3, 125:3, 125:7, 125:18, 126:10, 126:13, 152:12, 152:13, 178:24, 178:25, 183:22, 184:2, 194:8
**publicly** [4] - 118:2, 121:24, 122:6, 147:23
**publish** [3] - 182:5, 205:7, 251:2
**published** [8] - 83:6, 84:2, 152:13, 179:2, 180:10, 181:17, 183:12, 205:11
**pull** [3] - 166:13, 184:20, 225:13
**pulled** [1] - 228:12
**purchased** [1] - 167:9
**pure** [2] - 116:19, 117:7
**purely** [1] - 146:5
**purification** [15] - 146:23, 154:22, 154:25, 155:2, 174:9, 241:8, 241:12, 242:21, 243:4, 243:5, 245:7, 245:8, 246:12, 246:17, 246:18
**purified** [3] - 144:14, 243:16, 245:4
**purify** [4] - 174:5, 174:10, 242:6, 245:10
**purifying** [1] - 146:24
**purity** [1] - 243:18
**purple** [5] - 153:19, 153:23, 154:2, 155:11, 237:3
**purpose** [14] - 92:7, 92:8, 184:13, 185:16, 199:17, 218:14, 220:9, 222:2, 230:3, 233:1, 233:4, 234:2, 236:20, 245:20
**purposes** [8] - 19:4, 19:7, 91:13, 117:13, 144:17, 179:15, 181:8, 252:20
**pursue** [1] - 108:20
**push** [1] - 112:16
**pushing** [1] - 108:12
**put** [37] - 3:3, 6:3, 6:10, 6:14, 13:6, 13:18, 16:20, 19:8, 21:4, 89:6, 100:6, 108:9, 112:2, 124:6, 124:11, 125:1, 125:3, 125:17, 144:20, 146:22, 146:24, 150:10, 156:15, 157:20, 166:5, 200:13, 201:21, 202:4, 202:11, 208:19, 210:24, 244:19, 244:23, 244:24, 245:1, 245:5
**puts** [3] - 17:25, 134:19, 150:7
**putting** [5] - 11:15, 150:13, 160:3, 165:18, 203:4
**puzzles** [1] - 162:20
**PXT** [1] - 142:5

## Q

**QM1014** [1] - 238:24
**qualifications** [1] - 94:19
**qualified** [3] - 20:13, 20:14, 69:15
**qualify** [1] - 78:6
**quarterbacks** [1] - 151:25
**quarterly** [1] - 226:6
**questioning** [2] - 20:23, 225:4
**questions** [44] - 21:14, 21:17, 21:19, 21:25, 22:5, 22:8, 30:9, 30:17, 31:23, 32:4, 35:16, 40:2, 40:7, 41:18, 43:5, 43:18, 45:19, 47:19, 52:14, 54:5, 55:11, 57:13, 58:5, 58:19, 62:18, 65:21, 66:6, 68:24, 84:17, 91:16, 99:23, 148:7, 192:7, 192:8, 200:19, 204:11, 204:19, 204:24, 206:17, 207:25, 211:7, 219:5, 219:7, 228:19
**quibbling** [1] - 199:11
**quick** [3] - 8:6, 20:20, 64:20
**quickly** [4] - 143:19, 152:4, 168:7, 185:11
**quite** [9] - 59:22, 59:24, 153:18, 184:18, 191:21, 199:22, 201:4, 202:10, 242:7
**quotes** [3] - 8:18, 8:19, 157:20
**quoting** [1] - 9:14

## R

**radio** [1] - 96:16
**raise** [6] - 18:2, 22:2, 23:16, 126:10, 249:10, 249:16
**raised** [4] - 47:11, 47:14, 219:8
**raising** [1] - 157:8
**Raj** [2] - 27:8, 153:9
**Raman** [1] - 65:25
**Ramsey** [3] - 27:9, 143:14, 143:15
**ran** [3] - 196:9, 203:24, 206:4
**range** [8] - 5:17, 6:24, 7:12, 8:1, 8:3, 233:2, 233:4, 236:21
**ranged** [2] - 196:14, 196:15
**ranging** [1] - 104:12
**rapid** [1] - 238:9
**rapidly** [1] - 168:8
**rat** [1] - 206:4
**rated** [1] - 228:8
**rates** [2] - 137:19, 222:8
**rather** [5] - 56:25, 98:23, 100:22, 103:16, 130:12
**ratio** [3] - 197:20, 197:22, 197:24
**RAV_DAX-02674751** [1] - 218:9
**raw** [1] - 241:13
**reach** [3] - 93:20, 157:10, 157:12
**react** [2] - 248:2, 248:3
**read** [14] - 6:6, 19:23, 23:18, 23:19, 24:22, 72:4, 77:19, 86:12, 91:4, 91:11, 96:13, 96:17, 102:12, 205:17
**Read** [1] - 55:18
**readily** [1] - 223:8
**reading** [2] - 72:7, 172:25
**ready** [6] - 70:7, 112:7, 160:12, 182:23, 207:3, 247:10
**real** [3] - 33:7, 56:16, 150:3
**realized** [3] - 107:15, 166:20, 168:1
**really** [29] - 7:5, 12:20, 30:18, 32:2, 34:2, 51:16, 52:22, 57:2, 80:1, 95:15, 117:25, 122:21, 148:7, 148:19, 151:4, 159:2, 166:1, 166:22, 168:7, 169:5, 170:22, 171:3, 173:16, 187:2, 189:21, 191:11, 198:25, 200:22, 248:11
**reason** [9] - 11:22, 52:12, 53:19, 65:8, 102:22, 126:3, 142:16, 201:9, 237:22
**reasonable** [16] - 87:12, 87:14, 94:1, 105:21, 120:16, 121:1, 121:7, 132:8, 132:10, 137:22, 138:2, 157:20, 157:21, 157:24, 157:25, 158:24
**reasonably** [2] - 80:10, 93:19
**reasons** [8] - 71:10, 83:15, 85:6, 94:19, 96:5, 96:9, 154:6, 198:10
**rebut** [1] - 6:13
**rebuttal** [1] - 15:21
**rebutting** [1] - 253:15
**recalling** [2] - 6:4, 253:14
**receive** [3] - 86:24, 89:12, 97:23
**received** [10] - 50:1, 81:16, 90:18, 91:8, 91:18, 104:20, 108:10, 111:2, 213:21, 214:24
**receives** [3] - 79:2, 81:13, 84:10
**receiving** [1] - 81:18
**recent** [3] - 55:15, 141:21, 220:11
**recently** [2] - 143:8, 168:22
**recess** [13] - 21:8, 30:5, 30:6, 69:24, 90:25, 91:1, 101:20, 102:5, 102:6, 160:17, 206:25, 207:1, 254:4
**recipe** [27] - 111:18, 113:1, 113:17, 113:19, 114:16, 114:20, 114:21, 115:12, 115:17, 115:25, 116:12, 119:13, 119:19, 121:24, 122:12, 123:2, 126:5, 129:11, 131:13, 133:7, 146:21, 147:21, 153:6, 192:20, 194:11, 196:10, 200:5
**recipes** [2] - 118:11, 124:14
**recognize** [9] - 26:22, 27:12, 103:21, 106:10, 181:14, 205:2, 226:3, 236:16, 239:3
**recognized** [2] - 110:5, 133:17

**recognizing** [1] - 158:20
**recollection** [2] - 197:8, 201:23
**reconstitution** [1] - 215:14
**reconstruct** [1] - 124:10
**record** [20] - 10:16, 30:13, 30:14, 32:11, 32:13, 32:14, 51:23, 51:24, 63:9, 71:23, 92:12, 161:6, 161:16, 184:21, 205:17, 209:14, 217:2, 232:14, 236:5, 240:9
**recorded** [1] - 247:2
**records** [1] - 165:17
**recover** [1] - 86:21
**recovery** [2] - 215:20, 216:6
**recruitment** [1] - 63:21
**red** [19] - 168:13, 168:17, 168:18, 171:20, 185:20, 185:21, 185:22, 186:2, 186:7, 186:14, 187:4, 187:11, 187:12, 187:15, 188:24, 189:11, 189:16, 189:20
**redirect** [1] - 204:10
**REDIRECT** [1] - 204:12
**redo** [1] - 6:18
**reduced** [2] - 104:7, 132:16
**reduces** [1] - 143:16
**reducing** [2] - 112:21, 143:17
**reemployed** [1] - 50:12
**refer** [19] - 9:20, 17:18, 24:5, 73:25, 74:3, 74:25, 79:9, 80:11, 90:20, 94:13, 106:3, 114:12, 114:14, 116:21, 118:2, 142:9, 175:24, 176:2, 246:7
**reference** [6] - 8:8, 8:19, 11:17, 12:9, 96:25, 123:11
**referenced** [2] - 110:14, 205:14
**references** [11] - 18:8, 18:18, 19:15, 74:21, 80:3, 148:18, 153:15, 154:15, 155:22, 156:10, 204:21
**referred** [5] - 81:10, 83:19, 114:22, 115:6, 117:1
**referring** [3] - 81:5, 122:11, 246:12
**refers** [2] - 145:21, 145:22
**refiner** [1] - 224:3
**refineries** [1] - 64:9
**refinery** [1] - 61:3
**reflect** [2] - 92:19, 226:14
**reflection** [1] - 223:1
**reflects** [2] - 212:22, 226:15
**reflex** [10] - 182:21, 183:2, 183:3, 183:5, 184:25, 188:2, 188:3, 206:6, 206:7
**refused** [3] - 105:12, 105:14, 120:24
**refusing** [1] - 135:18
**regarding** [5] - 88:17, 102:19, 188:15, 221:16, 223:7
**Registered** [2] - 254:7, 254:8
**regularly** [1] - 184:10
**regulations** [2] - 78:24, 133:13
**regulatory** [3] - 172:3, 172:6, 241:16
**reimbursement** [1] - 39:20
**reintroducing** [1] - 15:2
**reject** [5] - 12:13, 82:24, 83:4, 83:17, 94:25
**rejection** [1] - 83:13
**relate** [1] - 74:5
**related** [8] - 3:21, 80:10, 81:23, 96:16, 106:4, 242:18, 248:9, 249:9
**relates** [1] - 81:20
**relating** [5] - 24:6, 76:2, 84:17, 86:2, 98:22
**relations** [2] - 225:14, 225:19
**relative** [1] - 239:11
**relatively** [3] - 45:14, 163:24, 198:9
**relax** [1] - 247:18
**release** [1] - 143:1
**released** [1] - 235:3
**releases** [1] - 152:12
**releasing** [1] - 167:15
**relevance** [2] - 9:25, 195:10
**relevant** [18] - 11:9, 14:3, 14:13, 14:14, 15:1, 15:7, 18:15, 19:21, 39:13, 74:8, 100:3, 100:5, 117:22, 123:19, 123:20, 124:18, 133:25, 151:7
**reliable** [1] - 112:20
**relied** [1] - 3:25
**religious** [1] - 41:2
**rely** [1] - 9:1
**relying** [1] - 90:5
**remainder** [1] - 87:14
**remaining** [2] - 132:17, 159:17
**remains** [2] - 104:17, 120:8
**remember** [12] - 8:15, 29:20, 29:23, 31:18, 62:4, 62:6, 89:21, 96:3, 142:6, 178:19, 201:23, 243:13
**remind** [1] - 247:12
**remnants** [1] - 145:23
**remote** [2] - 65:10, 65:18
**remotely** [1] - 65:18
**remove** [5] - 8:18, 18:12, 18:13, 70:4, 116:19
**removed** [2] - 12:4, 17:7
**removing** [1] - 112:19
**renamed** [5] - 109:4, 144:25, 165:1, 167:11, 168:15
**render** [2] - 9:9, 156:10
**rendered** [1] - 154:7
**renowned** [1] - 133:12
**rent** [2] - 60:5, 77:10
**repair** [6] - 65:17, 65:20, 65:24, 65:25, 66:2
**report** [12] - 4:23, 10:10, 96:16, 96:17, 181:17, 181:22, 182:9, 183:10, 183:13, 215:24, 229:19, 239:7
**reported** [2] - 211:12, 254:9
**reporter** [1] - 71:21
**Reporter** [3] - 254:8, 254:9, 254:13
**reports** [4] - 4:7, 165:18, 172:25, 228:7
**represent** [6] - 106:2, 135:6, 139:8, 168:18, 169:3, 221:13
**representative** [1] - 139:6
**represented** [2] - 131:8, 188:13
**represents** [3] - 76:18, 172:1, 221:14
**reps** [2] - 235:1, 235:3
**reputation** [1] - 135:21
**request** [5] - 34:21, 35:5, 95:17, 95:19, 251:20
**require** [2] - 75:23, 111:20
**required** [7] - 77:14, 84:7, 89:20, 94:15, 110:20, 110:23, 119:4
**requirement** [3] - 70:5, 82:4, 150:6
**requirements** [7] - 78:9, 78:15, 79:4, 82:3, 82:22, 84:25, 241:16
**requires** [5] - 15:14, 82:8, 115:12, 118:19, 157:13
**reschedule** [1] - 50:9
**rescue** [1] - 133:1
**research** [19] - 96:18, 96:21, 102:3, 104:8, 104:21, 107:20, 109:11, 110:10, 111:3, 111:5, 124:5, 144:17, 144:18, 144:21, 161:24, 165:9, 217:17, 239:7, 247:14
**researcher** [2] - 103:25, 153:10
**researchers** [2] - 144:16, 144:18
**researching** [1] - 155:16
**reserve** [1] - 10:13
**reserved** [1] - 150:3
**reside** [2] - 161:18, 161:19
**resin** [2] - 242:24, 243:2
**resolve** [7] - 4:20, 11:25, 16:9, 45:16, 66:1, 85:22, 252:9
**resolves** [2] - 8:5, 17:24
**resolving** [1] - 16:17
**resources** [1] - 152:22
**respect** [9] - 19:16, 82:25, 175:4, 176:9, 184:9, 221:6, 241:17, 242:19, 246:6
**respected** [1] - 153:10
**respectfully** [1] - 140:14
**respective** [1] - 76:6
**respond** [2] - 125:25, 219:4
**responded** [1] - 101:5
**response** [28] - 5:17, 24:23, 25:25, 26:5, 26:11, 26:15, 26:19, 27:14, 27:17, 27:19, 27:22, 28:1, 28:4, 28:7, 28:11, 28:16, 28:20, 28:23, 29:7, 29:13, 30:1, 83:9, 157:5, 188:20, 201:20, 202:13, 219:10, 222:8
**responses** [1] - 83:16
**responsibilities** [4] - 106:11, 165:13, 181:4, 225:15
**responsibility** [2] - 95:8, 121:11
**responsible** [5] - 105:20, 121:9, 130:18, 141:16, 206:10
**rest** [3] - 3:20, 60:20, 71:6
**restart** [2] - 201:25, 202:16
**restarted** [1] - 201:7
**restarting** [1] - 201:10
**restrictions** [1] - 150:7
**result** [4] - 103:3, 104:19, 110:25, 120:21
**resulted** [2] - 111:6, 111:8
**results** [12] - 112:18, 131:1, 179:1, 184:19, 188:4, 199:21, 206:8, 214:24, 217:24, 243:12, 243:14, 243:19
**resume** [3] - 99:19, 100:18, 244:15
**resumed** [2] - 244:7,

244:11
**resumés** [1] - 49:23
**retake** [16] - 30:22, 40:8, 40:20, 46:2, 48:18, 50:14, 50:25, 51:21, 54:14, 56:3, 58:25, 60:18, 63:6, 64:18, 66:7, 69:14
**retire** [1] - 99:8
**retired** [13] - 40:18, 52:1, 52:2, 55:2, 55:3, 61:2, 61:25, 64:6, 64:7, 66:13, 66:15, 95:23
**return** [3] - 20:11, 63:25, 76:19
**REV_DAX-02672548** [1] - 229:18
**REV_DAX-02680442** [1] - 226:1
**REV_DAX-2675392** [1] - 218:21
**REV_DAX02666789** [1] - 227:13
**REV_DAX02680128** [1] - 226:12
**REV_DAX02680682** [1] - 227:6
**REV_DAX02687035** [1] - 223:15
**REV_DAX26787206** [1] - 221:10
**revamp** [1] - 18:14
**REVANCE** [1] - 1:6
**Revance** [190] - 4:2, 4:15, 6:19, 6:23, 8:8, 11:6, 12:17, 12:24, 13:10, 15:18, 18:7, 18:13, 21:3, 21:13, 24:10, 24:12, 24:15, 26:8, 26:13, 73:14, 73:15, 87:5, 87:8, 87:16, 87:23, 88:20, 89:17, 98:4, 98:14, 98:15, 98:18, 98:19, 101:12, 102:25, 103:7, 103:10, 103:11, 105:1, 105:8, 105:10, 105:11, 105:20, 113:8, 117:11, 119:6, 119:7, 119:9, 119:11, 119:14, 119:16, 119:21, 119:24, 119:25, 120:1, 120:11, 120:15, 120:20, 120:23, 120:25, 121:6, 121:8, 121:12, 121:16, 121:23, 122:2, 122:8, 122:15, 122:17, 123:10, 123:22, 124:2, 124:10, 124:16, 125:9, 125:20, 126:10, 126:14, 126:20, 126:25, 127:8, 127:10, 127:12, 128:22, 128:24, 129:2, 129:7, 129:11, 129:15, 129:17, 129:18, 129:20, 129:23, 130:1, 130:10, 130:11, 130:17, 131:4, 131:8, 131:15, 131:17, 131:20, 132:2, 132:3, 132:4, 132:8, 133:8, 133:20, 134:3, 134:5, 135:6, 135:15, 135:21, 135:24, 137:11, 138:19, 139:4, 139:7, 139:8, 139:9, 140:5, 140:12, 140:21, 140:24, 141:2, 141:4, 141:7, 141:10, 141:12, 141:18, 142:5, 142:12, 142:14, 142:19, 146:19, 147:23, 148:3, 148:5, 148:22, 157:22, 158:10, 158:16, 158:19, 159:2, 178:5, 178:8, 179:19, 181:19, 182:14, 183:22, 186:14, 188:15, 189:5, 192:6, 193:17, 194:17, 194:19, 196:11, 199:19, 216:22, 216:24, 217:5, 217:6, 217:8, 217:11, 217:12, 217:14, 218:19, 219:25, 220:3, 221:1, 221:5, 222:2, 222:15, 223:5, 223:21, 224:24, 225:7, 227:3, 227:21, 229:4, 229:7, 229:10, 229:14, 229:19, 238:24, 250:24, 251:5
**Revance's** [37] - 6:11, 9:22, 12:9, 24:14, 87:15, 88:3, 120:13, 123:15, 125:3, 125:17, 125:25, 126:17, 129:5, 131:25, 133:22, 135:21, 138:11, 141:11, 142:12, 146:2, 146:10, 148:9, 150:9, 157:6, 159:12, 179:14, 179:17, 186:16, 194:5, 194:8, 194:24, 197:16, 197:18, 197:25, 199:14, 218:15, 228:12
**Revance/BOD** [2] - 226:25, 227:2
**revenue** [3] - 137:24, 148:9, 230:22
**review** [3] - 233:24, 234:1, 245:16
**reviewed** [2] - 85:5, 194:1
**reviewing** [1] - 117:22
**revisit** [2] - 19:21, 152:15
**revolution** [1] - 104:8
**reward** [1] - 130:5
**rewarded** [1] - 145:8
**RHA** [1] - 226:15
**rich** [1] - 177:3
**Richard** [2] - 1:11, 21:10
**rid** [2] - 6:20, 16:10
**ride** [1] - 96:2
**right-hand** [4] - 84:8, 205:15, 230:22, 233:7
**rights** [6] - 28:22, 61:16, 76:8, 84:10, 86:20, 140:7
**rigorously** [1] - 117:19
**risk** [2] - 67:2, 241:14
**risky** [1] - 116:6
**Robert** [1] - 25:10
**ROBERT** [1] - 1:21
**robust** [4] - 177:3, 177:24, 187:5, 202:19
**role** [11] - 10:1, 10:3, 72:12, 73:6, 180:14, 195:7, 219:6, 219:7, 225:10, 226:9, 228:18
**Ron** [5] - 106:6, 160:20, 161:4, 161:7, 161:17
**Ronald** [3] - 27:3, 116:3, 156:16
**RONALD** [1] - 161:8
**room** [15] - 20:12, 20:23, 22:6, 30:3, 70:22, 90:9, 90:23, 91:2, 95:23, 97:16, 99:8, 99:11, 209:19, 210:3, 211:22
**rooms** [1] - 170:18
**roughly** [3] - 61:23, 109:20, 253:2
**round** [1] - 165:2
**routine** [1] - 152:3
**row** [8] - 70:10, 70:13, 70:15, 70:17, 70:19, 70:24, 71:1, 71:2
**royalties** [1] - 132:16
**royalty** [18] - 6:23, 7:6, 87:12, 87:14, 132:10, 132:11, 132:13, 132:15, 132:16, 132:19, 132:22, 133:3, 133:5, 137:22, 157:21, 157:25, 158:25
**RPR** [1] - 254:12
**RPT** [1] - 179:9
**RPT004** [1] - 179:7
**RT002** [2] - 227:17, 227:25
**RTP004** [2] - 179:8, 179:12
**rude** [1] - 96:3
**ruegg** [1] - 141:16
**Ruegg** [4] - 27:8, 141:14, 141:15, 141:19
**rule** [2] - 3:19, 15:14
**rules** [1] - 91:22
**ruling** [1] - 91:24
**run** [5] - 42:15, 171:23, 172:13, 189:14, 189:24
**running** [1] - 208:8
**Rupert** [3] - 25:9, 105:25, 249:23
**RUPERT** [8] - 1:20, 249:23, 250:15, 250:21, 251:9, 251:21, 251:24, 252:2
**RVNC** [2] - 219:21, 228:12

## S

**sacrifice** [1] - 105:19
**safe** [6] - 107:10, 109:13, 110:21, 112:10, 112:14, 172:7
**safely** [1] - 110:1
**safety** [2] - 61:8, 241:14
**sailing** [1] - 60:20
**sale** [1] - 76:10
**sales** [13] - 13:20, 15:5, 15:6, 15:11, 87:7, 105:12, 132:4, 133:9, 158:12, 227:9, 230:22, 234:25, 235:1
**SAMANTHA** [1] - 2:3
**Samantha** [2] - 25:19, 140:19
**sample** [5] - 74:21, 79:9, 80:16, 84:11, 246:14
**San** [4] - 26:9, 26:13, 141:5, 161:19
**sandwiches** [1] - 23:7
**satisfaction** [1] - 217:19
**satisfy** [3] - 82:13, 103:2, 110:4
**save** [1] - 208:11
**saw** [18] - 9:18, 13:12, 18:3, 52:1, 93:12, 128:8, 146:8, 146:19, 163:22, 166:16, 176:19, 179:24, 183:21, 188:9, 190:9, 196:12, 206:9, 206:11
**scale** [5] - 89:7, 89:9, 108:2, 185:1, 199:3
**scenario** [3] - 226:7, 226:25
**scenarios** [1] - 225:17
**Schantz** [1] - 240:23
**schedule** [9] - 23:12, 23:14, 34:15, 35:13, 35:14, 36:3, 37:13, 160:11
**scheduled** [2] - 33:25, 59:20
**scheduler** [1] - 35:13
**scheduling** [3] - 34:13, 35:21, 36:5
**scheme** [1] - 199:1
**school** [6] - 162:4, 162:5, 162:17, 162:23, 162:24, 247:16
**Schöneich** [4] - 27:4, 126:1, 253:9, 253:13
**sci** [1] - 165:18

**science** [8] - 76:4, 139:16, 151:14, 153:17, 162:11, 162:17, 162:18, 172:25
**scientific** [3] - 110:20, 117:22, 164:7
**scientist** [19] - 106:7, 107:14, 113:20, 113:21, 114:1, 116:4, 122:13, 127:17, 150:18, 151:6, 151:8, 151:13, 155:21, 162:22, 165:5, 165:6, 165:15, 240:17
**scientist-inventor** [1] - 122:13
**scientists** [30] - 3:17, 104:14, 104:16, 105:20, 109:12, 110:24, 112:23, 115:9, 116:9, 116:17, 116:18, 116:24, 118:13, 125:5, 125:16, 126:7, 128:22, 136:13, 139:4, 142:8, 142:16, 144:11, 152:6, 165:16, 172:2, 172:18, 173:11, 181:9, 191:9
**scope** [1] - 204:18
**scorched** [1] - 152:23
**scorched-earth** [1] - 152:23
**score** [4] - 182:12, 182:17, 182:24, 183:3
**Scott** [16] - 107:14, 108:1, 108:7, 108:12, 108:19, 108:24, 109:3, 109:7, 111:21, 144:20, 144:21, 166:18, 167:6, 167:10, 192:18
**Scott's** [3] - 107:20, 109:7, 192:16
**scratch** [1] - 173:17
**screen** [10] - 6:3, 13:7, 106:22, 110:18, 110:23, 111:7, 111:13, 118:14, 133:4, 205:15
**script** [1] - 142:5
**scrutiny** [1] - 109:24
**Seaford** [1] - 37:24
**seal** [2] - 250:4, 250:16
**sealing** [1] - 250:10
**search** [6] - 49:2, 49:7, 79:24, 82:20, 97:1, 152:23
**searched** [1] - 79:25
**seat** [42] - 30:22, 38:25, 40:8, 40:21, 41:16, 43:12, 43:17, 46:2, 48:5, 48:8, 48:18, 50:15, 50:25, 51:1, 51:21, 52:4, 54:15, 54:17, 56:3, 58:25, 60:18, 62:23, 63:1, 63:6, 64:1, 64:19, 64:22, 66:8, 69:14, 70:7, 70:9, 70:10, 70:12, 70:14, 70:17, 70:19, 70:20, 70:24, 71:1, 71:2, 71:5
**seated** [7] - 20:15, 21:22, 99:22, 102:16, 161:13, 207:20, 248:16
**second** [23] - 3:24, 23:23, 53:20, 54:9, 68:1, 70:19, 70:24, 71:1, 71:2, 80:14, 88:24, 96:13, 100:10, 116:2, 117:8, 126:4, 126:6, 132:24, 137:5, 153:3, 206:20, 219:11, 247:12
**second-guess** [2] - 126:4, 153:3
**seconds** [1] - 29:23
**Section** [1] - 76:3
**section** [1] - 80:18
**securing** [1] - 76:4
**security** [3] - 42:14, 107:9, 249:12
**Sedulo** [1] - 229:25
**see** [121] - 6:1, 10:22, 13:2, 13:12, 13:21, 15:19, 21:6, 23:20, 27:14, 27:17, 27:22, 28:1, 28:4, 28:7, 28:15, 28:16, 29:2, 29:12, 29:18, 30:1, 32:10, 41:25, 49:5, 67:9, 68:10, 71:21, 79:3, 92:23, 100:8, 106:21, 106:24, 110:14, 110:23, 111:7, 111:13, 114:6, 115:11, 117:5, 118:13, 119:23, 120:5, 123:18, 124:14, 125:3, 126:25, 128:16, 129:9, 131:1, 131:3, 131:8, 131:23, 133:4, 133:17, 141:24, 142:5, 142:15, 146:25, 150:16, 153:23, 157:5, 159:17, 160:15, 168:12, 168:13, 168:24, 169:6, 169:9, 169:13, 170:10, 171:19, 181:10, 182:17, 183:10, 185:2, 185:10, 185:20, 187:1, 188:12, 188:19, 189:19, 189:20, 190:13, 190:22, 196:3, 201:14, 208:7, 208:9, 214:24, 215:2, 215:18, 219:14, 219:15, 220:16, 220:17, 220:23, 220:24, 224:23, 227:8, 229:20, 229:21, 230:13, 230:14, 230:17, 230:18, 233:7, 233:15, 237:3, 239:11, 243:17, 244:9, 244:21, 246:4, 246:6, 246:9, 246:11, 246:24, 247:2, 248:13, 254:2
**seeing** [2] - 184:23, 205:1
**seeking** [2] - 127:21, 131:5
**seem** [4] - 80:6, 151:4, 187:7, 199:6
**select** [1] - 215:3
**selected** [14] - 30:18, 40:16, 48:15, 50:22, 54:25, 56:19, 58:8, 63:3, 63:16, 64:15, 65:3, 66:23, 69:9, 69:13
**selection** [5] - 20:7, 21:12, 21:16, 50:4, 69:23
**sell** [3] - 24:8, 73:12, 86:16
**seller** [1] - 145:10
**selling** [3] - 76:10, 132:4, 137:20
**sells** [4] - 24:12, 73:16, 112:9, 229:15
**SEMENDYAI** [1] - 1:22
**seminal** [1] - 173:17
**send** [1] - 139:11
**sending** [1] - 49:23
**senior** [5] - 37:19, 37:21, 165:5, 217:7, 220:20
**sense** [4] - 79:10, 80:9, 189:9, 208:24
**sensitive** [2] - 125:14, 235:10
**sent** [1] - 11:25
**sentence** [2] - 53:15, 244:9
**separate** [9] - 103:5, 111:14, 113:13, 118:9, 121:17, 124:22, 133:18, 134:2
**separately** [1] - 35:11
**September** [2] - 146:2, 220:4
**sequence** [2] - 117:8, 180:11
**series** [2] - 17:1, 21:14
**serious** [2] - 135:16, 143:9
**seriously** [3] - 135:19, 229:5, 229:8
**serum** [3] - 185:14, 219:13, 221:1
**serve** [24] - 29:11, 30:19, 31:3, 33:22, 37:10, 40:16, 41:19, 46:10, 46:23, 48:15, 48:24, 50:22, 51:5, 52:5, 54:25, 56:8, 56:19, 58:8, 59:18, 63:3, 63:17, 64:15, 65:4, 66:23
**served** [3] - 28:24, 53:12, 61:11
**service** [7] - 29:16, 36:22, 86:9, 106:9, 160:2, 219:1, 219:4
**services** [1] - 69:7
**serving** [4] - 40:24, 47:13, 59:5, 67:13
**set** [6] - 77:21, 205:20, 217:9, 223:23, 248:6, 249:25
**sets** [1] - 142:8
**setting** [3] - 142:14, 165:7, 223:20
**settled** [2] - 72:1, 247:10
**seven** [4] - 41:22, 41:23, 42:22, 69:20
**seventh** [2] - 70:16, 71:1
**several** [4] - 85:5, 87:21, 154:17, 184:2
**severe** [1] - 104:13
**shades** [1] - 170:19
**Shantz** [1] - 193:1
**share** [5] - 97:11, 97:18, 135:21, 229:1, 231:3
**shared** [1] - 219:10
**sharp** [1] - 23:3
**sharpen** [1] - 102:4
**sheer** [1] - 223:3
**sheet** [1] - 70:2
**shellfish** [1] - 163:15
**Shellie** [1] - 139:5
**Shield** [1] - 101:23
**shift** [3] - 34:1, 170:9, 178:4
**shifting** [1] - 28:8
**shock** [1] - 49:14
**short** [9] - 114:14, 131:17, 136:17, 178:16, 180:12, 221:24, 238:9, 238:17
**shortage** [1] - 67:15
**shorthand** [1] - 254:10
**shortly** [1] - 234:7
**shot** [1] - 108:21
**show** [41] - 9:15, 12:19, 14:17, 74:14, 75:24, 98:8, 114:4, 123:22, 125:4, 126:10, 127:4, 131:2, 131:20, 133:20, 133:24, 136:2, 138:6, 138:15, 138:24, 143:19, 144:3, 146:16, 147:2, 147:17, 149:14, 149:19, 150:20, 150:22, 153:5, 153:13, 154:1, 154:9, 154:15, 155:1, 155:17, 155:22, 156:9, 214:19, 217:15, 233:11, 251:1
**showed** [2] - 137:13, 137:17
**showing** [4] - 168:17, 188:7, 222:25, 240:5
**shown** [8] - 84:8, 92:14, 92:19, 93:2, 223:9, 228:3, 246:23, 247:1

**shows** [1] - 67:18
**Shraga** [2] - 161:7, 161:17
**shrugged** [1] - 136:6
**Siaweleski** [1] - 60:25
**siblings** [1] - 25:3
**side** [30] - 5:21, 13:12, 20:23, 21:3, 30:9, 39:8, 69:17, 69:18, 72:25, 79:15, 79:17, 89:9, 106:21, 115:3, 119:23, 131:23, 135:12, 136:5, 159:18, 159:24, 159:25, 161:2, 168:22, 174:20, 175:23, 205:15, 229:15, 230:22, 233:7, 253:1
**sidebar** [7] - 71:21, 95:5, 95:13, 95:18, 134:11, 134:13, 134:25
**sides** [9] - 45:16, 45:18, 45:25, 89:7, 135:11, 207:24, 207:25, 208:14, 250:12
**sideways** [1] - 167:22
**Siegwarth** [10] - 4:6, 4:16, 4:22, 13:13, 14:16, 15:20, 15:21, 27:4, 133:11, 253:10
**signalling** [1] - 22:2
**signature** [2] - 213:14, 213:15
**significance** [1] - 214:17
**significant** [6] - 104:12, 107:3, 110:8, 113:3, 127:25, 146:1
**similar** [8] - 81:3, 97:17, 111:24, 143:16, 145:18, 145:19, 154:23, 233:3
**similarly** [1] - 152:6
**simple** [6] - 7:18, 7:20, 121:10, 129:21, 134:6, 153:18
**simplified** [1] - 18:4
**simply** [5] - 19:3, 98:7, 118:1, 120:15, 120:20
**sincerely** [1] - 106:14
**Sincock** [1] - 48:20
**single** [8] - 105:14, 110:22, 132:5, 139:1, 172:9, 195:6, 214:9, 214:21
**sit** [6] - 33:11, 36:22, 43:12, 60:8, 68:12, 75:14
**site** [3] - 65:11, 143:23, 195:12
**sitting** [7] - 22:17, 69:16, 114:24, 127:17, 157:22, 165:20, 197:23
**six** [9] - 23:14, 34:9, 43:3, 47:5, 47:6, 115:23, 148:3, 217:24, 235:2
**size** [1] - 230:23
**skeletal** [1] - 164:2
**skeptical** [1] - 109:25
**skill** [15] - 78:8, 82:5, 136:11, 149:24, 150:2, 150:14, 151:2, 151:7, 151:15, 152:5, 152:8, 154:2, 154:6, 155:21, 156:11
**skilled** [1] - 80:13
**skin** [2] - 179:22, 232:19
**sleep** [1] - 93:13
**slew** [1] - 145:11
**slide** [47] - 4:21, 6:1, 6:10, 7:15, 8:7, 9:22, 10:12, 10:22, 10:24, 11:17, 12:1, 12:8, 13:5, 15:25, 16:24, 17:14, 101:23, 119:23, 128:16, 134:16, 134:17, 134:22, 165:18, 166:15, 168:25, 169:6, 219:25, 220:13, 220:21, 221:19, 227:24, 228:21, 228:23, 230:21, 233:7, 237:2, 239:10, 244:1, 244:3, 245:15, 245:17, 245:20, 245:22, 246:2, 246:23, 247:2
**slide's** [1] - 168:13
**slides** [5] - 3:4, 3:13, 8:18, 166:10, 252:11
**slightly** [1] - 190:7
**slots** [1] - 38:3
**slowly** [2] - 165:8, 168:3
**small** [11] - 108:2, 108:10, 125:12, 159:4, 162:25, 188:22, 199:5, 250:16, 251:22, 251:23, 251:24
**small-scale** [1] - 108:2
**smaller** [2] - 108:18, 178:23
**smarter** [1] - 159:5
**smartest** [1] - 173:10
**smartphone** [1] - 97:14
**smooth** [1] - 60:19
**snakes** [1] - 163:14
**snow** [2] - 93:12, 93:14
**snowed** [1] - 93:11
**social** [3] - 97:6, 97:16, 97:18
**Society** [1] - 55:18
**society** [1] - 76:25
**sold** [3] - 119:14, 159:6, 238:6
**sole** [2] - 46:12, 93:22
**solely** [2] - 93:3, 97:2
**solo** [1] - 38:16
**solutions** [1] - 162:21
**solve** [2] - 80:19, 162:20
**solving** [1] - 77:24
**someone** [15] - 6:3, 34:12, 71:17, 78:5, 80:12, 82:5, 85:16, 86:14, 86:19, 94:12, 110:15, 119:2, 121:3, 121:20, 150:10
**someplace** [1] - 69:18
**sometime** [1] - 252:6
**sometimes** [20] - 9:9, 17:18, 29:20, 29:22, 76:21, 79:18, 95:4, 152:21, 162:13, 163:15, 163:18, 167:15, 167:16, 170:17, 172:8, 191:8, 208:15, 208:20, 234:15, 234:16
**Sometimes** [2] - 82:21, 84:20
**somewhat** [1] - 89:9
**somewhere** [6] - 17:1, 35:1, 36:24, 38:12, 42:3, 44:18
**son** [4] - 42:7, 42:9, 42:16, 43:2
**soon** [11] - 22:13, 43:13, 48:1, 49:2, 52:23, 60:22, 75:2, 144:24, 166:20, 168:1, 175:15
**sorry** [12] - 4:25, 33:2, 47:16, 49:4, 52:18, 70:19, 101:14, 161:13, 179:9, 193:12, 200:7, 251:12
**sort** [10] - 3:21, 8:19, 13:21, 49:13, 49:24, 51:10, 63:23, 99:11, 178:4, 195:21
**sorted** [1] - 208:24
**sought** [1] - 18:12
**sound** [2] - 10:7, 36:12
**sounds** [7] - 7:2, 8:10, 32:5, 66:17, 122:11, 207:16, 251:25
**sourced** [1] - 112:21
**sources** [5] - 97:4, 194:2, 241:14, 241:17, 241:18
**South** [2] - 46:22, 114:2
**Southern** [1] - 162:25
**space** [7] - 40:4, 58:21, 70:21, 196:13, 198:7, 218:2, 235:9
**span** [1] - 145:9
**sparked** [1] - 104:7
**spasm** [1] - 143:11
**spasmic** [1] - 168:7
**spasms** [1] - 104:13
**spastic** [5] - 164:4, 166:21, 168:2, 169:17, 171:10
**spasticity** [5] - 167:13, 167:14, 167:17, 171:5, 191:10
**spec** [1] - 66:2
**special** [11] - 23:15, 75:19, 94:11, 115:14, 131:12, 131:13, 142:11, 146:4, 156:21, 158:17, 199:14
**specializes** [1] - 78:19
**specific** [17] - 69:3, 76:12, 77:14, 80:23, 86:7, 111:9, 114:16, 114:21, 117:7, 122:9, 158:1, 158:2, 177:13, 177:14, 185:13, 193:4
**specifically** [15] - 24:2, 58:13, 97:19, 111:23, 118:4, 130:24, 132:9, 162:12, 184:1, 186:1, 198:11, 204:21, 206:2, 206:3, 206:5
**specification** [1] - 80:15
**specifics** [2] - 132:11, 212:4
**spectroscopy** [1] - 66:1
**speculate** [1] - 93:1
**spell** [1] - 161:5
**spend** [3] - 135:9, 144:7, 153:11
**spiders** [1] - 163:15
**spill** [2] - 41:9, 57:9
**spilled** [1] - 41:5
**spin** [1] - 174:4
**spin-down** [1] - 174:4
**splay** [2] - 187:23, 187:25
**splaying** [1] - 183:4
**split** [1] - 7:7
**spoken** [1] - 29:9
**sponsored** [1] - 10:4
**spot** [2] - 67:18, 67:20
**spouse** [2] - 25:3, 247:25
**spread** [2] - 195:22, 200:14
**spreading** [2] - 195:15, 195:18
**spreads** [1] - 143:22
**spreadsheet** [2] - 216:15, 225:25
**squeeze** [1] - 149:3
**stability** [4] - 114:10, 114:22, 114:23, 115:17
**stabilize** [4] - 115:5, 145:24, 209:19, 211:22
**stabilizer** [1] - 195:3
**stable** [4] - 112:5, 123:5, 177:17, 210:3
**stacked** [2] - 155:9, 156:6
**staff** [2] - 69:18, 79:5
**stage** [3] - 67:17, 82:23, 249:25
**stamp** [1] - 237:2
**stand** [12] - 19:9, 94:4, 95:12, 139:5, 140:6, 141:14, 156:15, 199:21, 202:14, 208:2, 214:1, 230:1
**standard** [4] - 126:24, 150:11, 150:12, 182:20
**standing** [1] - 135:20
**stands** [3] - 185:14, 185:24, 186:1
**STARGATT** [1] - 2:2

**start** [34] - 3:6, 22:13, 23:3, 25:6, 30:3, 43:14, 45:25, 49:7, 52:11, 59:7, 72:3, 97:22, 101:1, 102:12, 103:14, 104:4, 106:16, 113:16, 135:14, 138:9, 145:14, 153:6, 162:4, 164:22, 169:11, 174:20, 176:21, 247:9, 247:19, 248:1, 248:8, 253:6, 253:8
**started** [26] - 22:10, 61:7, 109:21, 135:8, 137:20, 144:16, 144:18, 159:4, 164:18, 165:5, 165:8, 165:16, 165:17, 165:19, 166:23, 167:1, 168:19, 172:24, 173:2, 174:13, 174:16, 192:18, 201:6, 201:15, 225:23, 242:2
**starting** [3] - 138:9, 174:7, 247:11
**startle** [2] - 182:21, 182:24
**startled** [1] - 182:24
**starts** [2] - 22:19, 45:14
**State** [3] - 56:9, 56:13, 217:2
**state** [16] - 38:7, 38:10, 53:18, 55:6, 56:17, 76:22, 80:11, 94:14, 107:7, 161:5, 161:16, 209:13, 215:21, 232:14, 236:5, 240:9
**statement** [13] - 3:8, 6:14, 10:17, 13:4, 98:4, 98:5, 99:16, 101:2, 103:22, 154:16, 159:21, 207:23, 208:3
**statements** [8] - 82:16, 91:16, 98:6, 98:10, 99:6, 99:7, 99:15
**States** [12] - 28:10, 28:13, 28:18, 74:16, 75:11, 76:1, 76:8, 86:17, 113:12, 119:1, 121:15, 136:18
**STATES** [1] - 1:1
**states** [13] - 39:21, 220:17, 220:21, 220:24, 221:23, 222:10, 222:12, 222:14, 228:2, 228:4, 228:6, 228:10, 229:4
**statistical** [1] - 189:15
**statistics** [4] - 189:12, 189:13, 189:18, 189:24
**stay** [3] - 31:6, 143:18, 164:14
**stays** [2] - 44:19, 143:24
**steadily** [1] - 234:17
**steal** [1] - 135:24
**steals** [1] - 170:22
**Stebbins** [1] - 224:24
**Steel** [1] - 46:17
**steering** [1] - 165:21
**Stenotype** [1] - 254:10
**step** [7] - 32:6, 67:25, 132:20, 193:12, 206:19, 246:12, 246:14
**stepping** [1] - 36:7
**steps** [3] - 117:8, 241:25, 242:3
**STERNE** [1] - 2:5
**Sterne** [1] - 25:15
**stick** [3] - 7:25, 115:2
**stifle** [1] - 136:15
**still** [18] - 61:25, 79:1, 100:3, 112:11, 128:20, 129:7, 129:20, 130:4, 130:17, 137:7, 145:10, 158:4, 158:7, 202:6, 202:18, 203:14, 204:1, 211:1
**stipulated** [3] - 19:4, 91:9, 91:11
**stipulation** [8] - 18:3, 18:6, 19:11, 19:13, 100:12, 100:14, 102:20, 103:19
**stock** [1] - 26:13
**stoichiometries** [1] - 243:21
**stoichiometry** [1] - 243:18
**stolen** [2] - 171:11, 191:13
**stomach** [1] - 110:12
**stop** [2] - 20:14, 76:9
**stopped** [5] - 51:18, 129:15, 179:23, 201:6, 201:7
**stopping** [1] - 201:10
**store** [3] - 42:1, 42:10, 42:15
**stores** [1] - 44:14
**story** [18] - 5:7, 5:8, 6:7, 108:5, 109:10, 135:12, 141:4, 141:18, 154:23, 155:10, 159:2, 159:3, 159:4, 159:13, 159:24, 159:25, 162:19, 191:12
**strabismus** [3] - 166:23, 167:19, 167:20
**straight** [3] - 167:21, 168:4, 169:24
**strange** [1] - 80:6
**strategic** [1] - 220:11
**strategies** [1] - 233:5
**strategizing** [1] - 165:19
**strategy** [5] - 222:5, 225:8, 225:11, 227:19, 236:19
**strength** [2] - 93:25, 222:15
**strengths** [6] - 221:24, 222:7, 222:12, 222:22, 223:1, 223:2
**stretch** [2] - 95:12, 227:3
**strict** [1] - 107:9
**strike** [2] - 10:11, 92:11
**strikes** [1] - 20:17
**strong** [12] - 26:16, 27:15, 28:2, 28:5, 28:12, 40:3, 58:20, 150:7, 164:4, 177:2, 203:5
**struck** [1] - 93:1
**studies** [9] - 108:2, 108:11, 110:3, 171:24, 171:25, 172:10, 185:17, 243:6, 243:8
**study** [25] - 180:24, 181:7, 181:8, 181:18, 181:20, 183:8, 183:9, 183:14, 184:5, 184:19, 185:13, 188:5, 189:2, 189:14, 196:25, 198:15, 198:16, 198:17, 198:23, 199:18, 199:23, 200:10, 200:17, 205:14
**studying** [2] - 173:15
**stuff** [20] - 32:3, 35:4, 136:8, 136:23, 145:24, 146:14, 147:1, 147:9, 149:11, 151:3, 152:3, 152:7, 152:21, 153:15, 153:19, 154:3, 155:6, 155:11, 155:12, 250:19
**subject** [4] - 80:9, 94:10, 219:9, 250:25
**submission** [4] - 5:11, 5:15, 5:20, 79:5
**submissions** [2] - 5:19, 82:16
**submit** [2] - 102:2, 140:14
**submitted** [1] - 83:24
**subsequent** [1] - 213:3
**subsidiaries** [4] - 24:8, 73:12, 104:9, 106:4
**substance** [13] - 103:1, 108:14, 109:23, 110:1, 112:4, 174:2, 174:8, 198:19, 240:21, 240:25, 241:5, 241:23
**substances** [1] - 144:13
**substitute** [1] - 90:3
**subvert** [1] - 15:14
**succeeded** [1] - 114:8
**successful** [1] - 242:9
**sudden** [2] - 44:4, 100:21
**suddenly** [1] - 171:1
**sued** [5] - 24:9, 120:23, 129:16, 146:18, 148:3
**suffer** [3] - 170:16, 191:9, 191:10
**suffering** [2] - 110:15, 229:12
**sufficiently** [1] - 84:24
**sugar** [8] - 153:21, 174:15, 177:7, 183:25, 185:25, 188:18, 188:20, 197:3
**suggest** [9] - 83:12, 90:2, 120:11, 133:23, 140:10, 142:19, 148:21, 242:23, 243:1
**suggested** [3] - 39:6, 125:18, 206:10
**suggesting** [1] - 157:9
**suggestion** [1] - 127:11
**suggests** [2] - 189:23
**suing** [2] - 53:23, 61:15
**sulfur** [1] - 66:3
**summarize** [3] - 12:12, 99:4, 230:4
**summarizes** [1] - 245:22
**summary** [1] - 80:17
**Sunday** [2] - 38:8, 51:8
**super** [2] - 146:13, 147:6
**superior** [2] - 146:18, 159:6
**supervise** [2] - 165:11, 165:12
**supervised** [1] - 165:16
**support** [3] - 5:12, 32:19, 215:23
**supporting** [1] - 89:8
**supposed** [11] - 8:24, 14:6, 74:17, 80:19, 96:4, 136:14, 147:12, 150:4, 186:23, 189:7, 252:21
**supposedly** [4] - 3:25, 121:19, 130:20, 137:5
**surfactant** [20] - 115:13, 131:14, 174:14, 174:15, 174:25, 175:3, 177:7, 178:1, 184:1, 186:4, 186:5, 186:7, 186:16, 186:21, 187:20, 188:18, 188:25, 189:4, 190:17, 212:8
**surgery** [1] - 167:24
**surprise** [1] - 124:24
**surprising** [1] - 115:25
**survey** [2] - 217:18, 220:18
**surveys** [2] - 217:14, 217:18
**Sury** [6] - 153:8, 153:9, 153:18, 153:24, 154:1, 154:10
**Sury's** [1] - 153:13

**Suryanarayanan** [1] - 27:8
**sustain** [1] - 91:25
**sustainability** [2] - 55:21, 222:6
**swear** [3] - 21:18, 62:9, 71:3
**sworn** [4] - 21:21, 71:4, 72:11, 161:10
**SWOT** [5] - 221:22, 221:24, 222:2, 222:7
**sympathy** [1] - 72:24
**symptoms** [3] - 67:1, 67:8, 67:20
**synthetic** [2] - 142:10, 146:5
**system** [12] - 28:14, 74:19, 77:13, 78:25, 106:14, 139:18, 139:20, 139:24, 140:13, 147:12, 163:6, 163:7
**systems** [1] - 69:6

## T

**tab** [4] - 181:13, 213:10, 213:11, 226:8
**table** [2] - 17:21, 213:24
**tablet** [1] - 97:15
**tablets** [1] - 97:6
**tacked** [1] - 153:24
**talent** [2] - 63:19, 63:20
**tall** [1] - 139:14
**target** [3] - 143:23, 215:21, 222:19
**targeted** [1] - 120:2
**targeting** [1] - 134:17
**task** [2] - 81:25, 86:8
**tasked** [2] - 240:20, 240:24
**taught** [1] - 154:3
**TAYLOR** [1] - 2:2
**teach** [3] - 45:12, 151:14, 151:19
**teachings** [1] - 154:7
**team** [7] - 105:24, 106:1, 140:17, 144:22, 162:21, 165:12, 193:16
**Tech** [1] - 55:21
**technical** [7] - 45:11, 45:13, 81:6, 94:10, 94:12, 94:14, 153:12
**technique** [2] - 116:13, 117:4
**techniques** [2] - 155:1, 155:5
**technologies** [6] - 24:2, 24:7, 109:12, 119:22, 129:25, 131:16
**Technologies** [1] - 65:17
**technology** [33] - 69:2, 74:8, 80:4, 80:7, 80:11, 80:12, 81:19, 96:22, 97:7, 97:17, 111:22, 118:22, 119:18, 119:19, 120:19, 120:22, 128:20, 129:6, 129:8, 129:10, 129:13, 129:16, 129:18, 129:20, 129:22, 130:6, 130:9, 130:14, 141:21, 142:6, 146:13, 158:16
**teeny** [2] - 153:20, 153:21
**television** [1] - 96:16
**temperature** [2] - 209:20, 210:4
**temperatures** [1] - 211:22
**temporary** [1] - 107:3
**ten** [11] - 62:1, 109:20, 111:1, 160:7, 160:9, 160:13, 160:15, 172:8, 206:21, 206:22, 206:25
**ten-minute** [3] - 160:7, 160:9, 206:21
**ten-plus** [1] - 172:8
**tend** [1] - 14:12
**tends** [1] - 10:5
**Tennessee** [1] - 139:7
**tense** [1] - 185:5
**tenure** [1] - 227:22
**term** [7] - 77:23, 86:18, 88:9, 88:11, 118:1, 149:22, 164:22
**term-of-art** [1] - 149:22
**terms** [23] - 5:23, 17:20, 47:10, 74:23, 74:24, 77:15, 81:7, 86:7, 88:7, 88:12, 93:6, 100:5, 102:11, 149:17, 164:7, 174:1, 174:11, 175:2, 175:10, 186:24, 210:19, 222:21, 243:21
**Terrence** [25] - 27:3, 113:19, 116:3, 122:12, 156:16, 173:7, 173:8, 177:20, 177:21, 209:3, 210:15, 210:16, 210:23, 211:2, 211:7, 211:9, 211:14, 211:19, 213:5, 213:6, 214:12, 215:6, 215:16, 215:21, 216:16
**terrific** [1] - 151:13
**Terry** [5] - 173:2, 173:6, 173:8, 174:13, 210:9
**Terry's** [1] - 177:6
**test** [7] - 175:9, 181:4, 183:15, 183:16, 196:3, 216:16, 245:23
**tested** [4] - 181:10, 186:12, 199:24, 246:20
**testified** [1] - 161:10
**testifies** [1] - 8:1
**testifying** [2] - 202:14, 208:2
**testimony** [33] - 4:23, 15:23, 22:17, 73:18, 74:7, 90:1, 90:4, 90:5, 90:12, 91:7, 91:21, 92:4, 92:11, 92:15, 92:22, 92:25, 93:8, 94:1, 94:6, 94:9, 94:18, 94:22, 94:23, 95:1, 114:3, 156:1, 197:23, 202:22, 203:2, 208:4, 208:15, 234:5, 251:4
**testing** [7] - 181:18, 193:11, 193:14, 193:16, 197:24, 200:3, 204:20
**tests** [1] - 245:19
**text** [1] - 97:15
**textbooks** [1] - 152:12
**THE** [372] - 1:1, 1:2, 3:1, 4:12, 4:20, 5:4, 5:8, 5:21, 6:3, 6:22, 7:9, 7:21, 7:24, 8:4, 8:10, 8:13, 9:5, 9:13, 9:20, 9:22, 10:7, 10:20, 11:3, 11:12, 11:20, 12:5, 12:7, 12:11, 12:21, 13:2, 14:2, 14:5, 14:11, 15:17, 16:2, 16:9, 16:13, 16:16, 16:25, 17:3, 17:9, 18:9, 18:20, 19:5, 20:2, 20:10, 21:10, 21:22, 25:12, 25:21, 27:6, 27:11, 30:8, 30:11, 30:15, 30:17, 30:21, 30:25, 31:2, 31:8, 31:12, 31:14, 31:20, 31:23, 32:6, 32:9, 32:14, 32:18, 32:22, 32:24, 33:2, 33:6, 33:14, 33:18, 33:21, 34:4, 34:6, 34:11, 34:18, 34:25, 35:7, 35:16, 35:18, 36:7, 36:10, 36:15, 37:1, 37:4, 37:6, 37:9, 37:15, 37:17, 37:21, 38:1, 38:9, 38:12, 38:14, 38:18, 38:22, 39:3, 39:5, 39:14, 39:23, 40:1, 40:6, 40:8, 40:10, 40:12, 40:15, 40:20, 40:24, 41:4, 41:8, 41:13, 41:18, 41:23, 41:25, 42:3, 42:6, 42:9, 42:13, 42:15, 42:19, 42:22, 43:1, 43:5, 43:7, 43:9, 43:11, 43:17, 43:24, 44:17, 44:20, 44:23, 45:4, 45:11, 45:19, 45:21, 45:23, 46:6, 46:9, 46:14, 46:18, 46:23, 47:3, 47:5, 47:8, 47:16, 47:21, 47:23, 48:4, 48:6, 48:8, 48:11, 48:14, 48:17, 48:20, 48:22, 49:4, 49:7, 49:14, 49:18, 50:6, 50:10, 50:14, 50:18, 50:21, 50:24, 51:3, 51:9, 51:12, 51:15, 51:20, 51:23, 52:3, 52:13, 52:16, 52:18, 52:21, 53:3, 53:6, 53:9, 53:11, 53:14, 53:22, 54:1, 54:5, 54:9, 54:14, 54:17, 54:20, 54:24, 55:2, 55:6, 55:10, 55:13, 56:2, 56:5, 56:7, 56:12, 56:16, 56:23, 57:4, 57:8, 57:12, 57:15, 57:17, 57:25, 58:2, 58:7, 58:10, 58:16, 58:19, 58:23, 58:25, 59:4, 59:9, 59:11, 59:14, 59:17, 59:24, 60:2, 60:7, 60:14, 60:17, 61:1, 61:5, 61:9, 61:11, 61:19, 61:23, 62:2, 62:4, 62:6, 62:10, 62:14, 62:18, 62:20, 62:22, 63:1, 63:6, 63:10, 63:13, 63:16, 63:19, 63:23, 63:25, 64:4, 64:6, 64:11, 64:13, 64:18, 64:22, 64:25, 65:3, 65:6, 65:8, 65:14, 65:21, 66:5, 66:7, 66:11, 66:14, 66:17, 66:22, 67:3, 67:8, 67:12, 67:16, 67:21, 67:25, 68:8, 68:12, 68:15, 68:18, 68:21, 68:23, 69:1, 69:8, 69:12, 70:1, 70:8, 71:3, 71:5, 71:20, 71:24, 86:11, 99:22, 100:2, 100:6, 100:17, 101:9, 101:14, 101:17, 102:8, 102:15, 134:8, 134:12, 134:14, 134:21, 134:23, 135:2, 135:4, 160:4, 160:15, 160:19, 160:22, 160:25, 161:5, 161:7, 161:13, 182:2, 191:24, 192:2, 204:10, 204:23, 205:22, 205:25, 206:19, 206:25, 207:3, 207:7, 207:9, 207:13, 207:18, 209:7, 209:10, 209:12, 216:12, 216:14, 216:18, 217:1, 224:8, 224:12, 224:16, 224:20, 225:2, 231:8, 231:13, 231:18, 231:21, 232:3, 232:6, 232:13, 235:17, 235:22, 236:4, 239:22, 240:2, 240:8, 247:5, 248:16, 248:22, 249:3, 249:7, 249:11, 249:13, 249:15, 249:20, 250:11, 250:18, 251:7, 251:12,

251:23, 251:25, 252:4, 252:14, 252:17, 252:23, 253:12, 253:17, 253:24
**theft** [1] - 135:17
**themselves** [5] - 13:22, 24:25, 69:17, 165:9, 234:16
**theories** [1] - 248:9
**theory** [3] - 10:5, 14:18, 196:1
**therapeutic** [13] - 27:21, 27:24, 115:22, 131:10, 135:23, 141:3, 143:8, 166:16, 169:3, 169:7, 226:16, 235:6, 235:7
**therapeutics** [3] - 216:23, 224:25, 227:9
**THERAPEUTICS** [1] - 1:6
**Therapeutics** [5] - 21:14, 24:10, 26:9, 73:15, 217:5
**therapy** [2] - 108:15, 246:17
**thereafter** [2] - 144:24, 207:12
**therefore** [3] - 89:25, 90:18, 123:13
**Thereupon** [22] - 32:12, 63:8, 71:22, 134:13, 182:3, 205:23, 216:20, 224:9, 224:13, 224:17, 224:21, 231:10, 231:14, 231:22, 232:1, 232:7, 235:18, 235:23, 239:23, 240:3, 249:5, 249:21
**thesis** [1] - 155:4
**they've** [7] - 5:20, 12:23, 79:18, 138:7, 138:10, 156:20, 193:5
**thin** [2] - 140:1, 140:9
**thinking** [3] - 139:13, 248:4, 248:5
**thinks** [1] - 137:21
**third** [8] - 70:18, 70:20, 80:25, 96:18, 140:4, 205:16, 247:23, 249:8
**Thomas** [1] - 76:23
**Thompson** [1] - 30:15
**thousand** [1] - 5:9
**thousands** [2] - 114:7, 122:21
**threat** [4] - 230:11, 230:16, 230:19, 231:1
**threats** [1] - 221:25
**three** [64] - 20:17, 20:24, 31:5, 31:8, 52:11, 70:13, 73:11, 73:20, 74:1, 74:4, 74:9, 76:14, 79:12, 87:5, 103:2, 104:21, 105:8, 109:13, 111:11, 113:13, 113:14, 114:13, 115:24, 117:11, 118:8, 118:9, 118:13, 121:16, 121:17, 121:19, 123:16, 123:25, 124:1, 124:21, 127:2, 127:7, 130:15, 131:25, 133:18, 134:2, 136:2, 137:4, 137:21, 138:25, 140:20, 146:19, 154:4, 156:10, 158:12, 185:22, 186:13, 187:6, 187:13, 192:12, 202:1, 221:19, 227:24, 227:25, 228:8, 230:9, 247:8
**threw** [2] - 53:19, 137:19
**throughout** [12] - 75:1, 88:13, 96:11, 99:1, 111:11, 115:15, 116:14, 133:21, 152:16, 163:13, 225:4, 234:8
**throw** [1] - 182:22
**Thursday** [5] - 34:2, 34:13, 34:16, 49:1, 56:11
**tibialis** [1] - 206:5
**ticks** [2] - 67:6, 67:7
**ties** [1] - 4:18
**Tigan** [2] - 25:10, 105:25
**TIGAN** [2] - 1:16, 62:19
**tight** [3] - 166:22, 167:14, 171:9
**time-limited** [1] - 77:6
**timeline** [8] - 4:17, 11:1, 147:17, 213:9, 214:4, 214:17, 214:19, 215:10
**timing** [2] - 160:6, 234:7
**tiny** [1] - 144:14
**tip** [1] - 89:9
**tireless** [1] - 109:12
**title** [11] - 8:8, 11:24, 39:17, 79:17, 182:9, 221:22, 226:1, 237:2, 244:5, 245:23, 246:2
**titled** [3] - 244:2, 244:3, 245:18
**titles** [2] - 6:17, 6:18
**today** [23] - 18:2, 31:19, 44:25, 102:19, 106:6, 106:8, 112:9, 112:15, 115:8, 122:4, 124:17, 156:13, 156:14, 159:21, 160:7, 166:11, 197:23, 209:13, 217:20, 218:17, 225:3, 247:15, 250:5
**together** [20] - 115:2, 124:7, 124:11, 125:2, 125:4, 125:17, 136:8, 136:10, 146:22, 150:11, 150:13, 156:6, 165:18, 166:5, 166:6, 190:24, 203:4, 214:25, 225:13, 250:13
**tomorrow** [12] - 37:14, 38:7, 52:10, 59:8, 102:3, 247:9, 248:14, 250:22, 253:2, 253:7, 253:11, 254:3
**tonight** [4] - 37:14, 38:6, 251:6, 252:21
**took** [8] - 47:5, 113:24, 122:3, 122:25, 148:9, 192:24, 242:4, 242:8
**tool** [2] - 90:9, 110:16
**tools** [2] - 97:10, 243:15
**top** [4] - 227:24, 227:25, 228:8, 230:15
**topical** [3] - 179:21, 180:2, 180:4
**topics** [2] - 28:8, 140:20
**touch** [2] - 146:16, 148:16
**tough** [1] - 31:7
**toward** [1] - 72:25
**towards** [2] - 38:19, 89:9
**town** [1] - 145:3
**toxin** [96] - 4:8, 27:21, 27:24, 32:1, 73:13, 73:16, 74:5, 104:8, 104:15, 104:18, 106:24, 107:5, 107:19, 107:23, 109:15, 109:21, 111:17, 111:24, 112:1, 112:2, 112:5, 112:6, 112:14, 112:24, 113:25, 114:17, 114:23, 115:6, 115:12, 116:7, 116:17, 116:21, 117:7, 124:5, 125:15, 127:22, 128:17, 138:5, 138:21, 142:2, 142:3, 142:17, 142:22, 143:21, 144:1, 144:9, 144:17, 144:23, 145:4, 146:24, 163:21, 166:2, 168:9, 169:23, 171:12, 172:23, 173:15, 173:20, 174:2, 174:3, 174:5, 174:11, 174:24, 177:16, 177:24, 178:1, 178:22, 178:23, 179:21, 180:5, 182:25, 183:2, 184:24, 190:9, 191:13, 191:18, 193:5, 193:21, 195:15, 195:22, 195:23, 197:20, 198:1, 198:8, 199:2, 201:3, 204:2, 204:7, 210:1, 211:18, 215:2, 217:17, 219:16, 234:21, 238:15, 242:22
**toxin's** [1] - 183:17
**toxins** [19] - 106:19, 106:20, 106:23, 106:25, 107:12, 108:5, 108:8, 116:10, 116:19, 117:3, 126:8, 166:5, 170:15, 174:10, 176:10, 177:5, 217:22, 234:13, 239:6
**Trademark** [8] - 28:10, 28:13, 43:20, 76:15, 78:10, 78:12, 113:12, 117:17
**trades** [1] - 69:4
**traditional** [1] - 143:21
**traffic** [1] - 57:19
**trained** [1] - 118:9
**training** [2] - 94:12, 117:22
**tran** [1] - 213:8
**Tran** [4] - 209:2, 209:8, 209:15, 250:6
**transactions** [1] - 39:18
**transcript** [2] - 89:24, 90:3
**TRANSCRIPT** [1] - 1:9
**transform** [1] - 65:25
**transformed** [1] - 76:25
**translates** [1] - 184:18
**transmitted** [1] - 67:4
**treat** [17] - 91:12, 92:4, 104:6, 107:17, 107:22, 110:6, 110:8, 110:19, 111:2, 128:10, 141:25, 143:2, 166:19, 167:23, 170:2, 170:12, 208:4
**treated** [1] - 44:21
**treating** [4] - 109:18, 143:7, 169:8, 170:5
**treatment** [8] - 68:7, 104:3, 104:11, 110:11, 110:21, 170:14, 238:18, 238:21
**treatments** [15] - 110:10, 110:22, 111:1, 111:7, 112:11, 128:6, 128:9, 128:11, 128:15, 168:18, 169:7, 170:24, 171:4, 171:22, 222:9
**treats** [1] - 143:3
**TREH** [2] - 185:21, 185:25
**trehalose** [11] - 153:21, 154:5, 174:14, 185:25, 186:5, 186:21, 197:3, 197:5, 199:13, 215:2, 215:19
**Trexler** [6] - 27:9,

157:14, 157:15, 158:3, 158:9, 158:15
**TRIAL** [2] - 1:9, 1:11
**trial** [43] - 5:13, 6:1, 16:14, 19:15, 23:2, 23:13, 50:4, 51:16, 73:3, 73:8, 73:17, 74:6, 75:1, 89:23, 90:15, 90:17, 91:5, 91:12, 92:9, 92:14, 95:2, 95:25, 96:20, 98:1, 98:24, 99:1, 102:18, 105:10, 113:4, 115:16, 120:5, 121:6, 131:4, 139:10, 146:9, 148:6, 152:16, 159:2, 207:23, 208:1, 208:7, 238:17, 250:17
**trials** [4] - 170:5, 172:11, 172:13, 203:18
**trick** [1] - 40:15
**tried** [2] - 211:1, 214:20
**tries** [1] - 221:5
**trouble** [3] - 67:7, 112:13, 251:12
**troubleshoot** [1] - 65:18
**truck** [1] - 46:12
**trucks** [1] - 46:14
**true** [8] - 89:4, 91:10, 120:14, 130:23, 138:6, 141:4, 159:3, 223:2
**truly** [4] - 118:6, 118:11, 123:13, 130:12
**trust** [2] - 44:1, 69:10
**trusts** [1] - 130:2
**truth** [1] - 89:14
**truthful** [1] - 221:5
**truthfully** [1] - 21:19
**try** [26] - 23:3, 23:18, 31:17, 38:4, 72:6, 72:8, 92:9, 96:7, 96:18, 97:3, 100:12, 120:11, 121:23, 124:10, 124:20, 126:11, 127:5, 133:23, 180:22, 180:25, 194:2, 196:6, 223:10, 238:14, 242:8, 251:6
**trying** [14] - 63:20, 95:5, 109:23, 146:9, 146:10, 146:11, 148:22, 180:23, 184:14, 194:10, 203:17, 238:21, 250:13, 252:19
**tune** [1] - 145:8
**TUNNELL** [1] - 1:16
**turn** [18] - 131:22, 135:13, 153:4, 154:22, 156:4, 168:24, 181:13, 204:16, 208:6, 220:13, 220:21, 221:19, 228:21, 230:7, 237:1, 239:8, 244:3, 245:24
**turned** [5] - 31:11, 113:25, 114:1, 114:18, 122:13
**turning** [2] - 168:25, 227:23
**turns** [2] - 4:22, 196:19
**TV** [1] - 110:13
**TW20** [2] - 185:21, 186:1
**Tween** [4] - 186:1, 186:5, 187:8, 188:20
**twice** [1] - 26:18
**twist** [1] - 143:11
**two** [59] - 6:1, 9:24, 34:14, 35:12, 43:18, 44:24, 52:9, 52:25, 53:13, 53:14, 53:15, 54:1, 65:25, 67:1, 87:25, 88:22, 99:23, 115:12, 116:24, 122:24, 123:25, 133:10, 135:11, 140:3, 140:4, 140:22, 146:22, 147:19, 147:24, 147:25, 148:6, 154:7, 155:19, 155:22, 156:7, 156:15, 156:24, 162:6, 162:24, 166:1, 166:24, 172:7, 193:4, 208:12, 214:23, 214:25, 221:2, 221:4, 230:9, 230:23, 238:16, 249:3, 251:21, 251:23, 251:24, 253:15
**two-page** [1] - 9:24
**two-way** [1] - 140:3
**Tylenol** [3] - 142:23, 142:25
**type** [11] - 113:21, 168:18, 169:4, 173:24, 174:10, 177:5, 179:21, 210:1, 210:3, 232:24, 233:21
**types** [1] - 171:24
**typical** [1] - 113:20
**typically** [1] - 110:14

## U

**U.S** [13] - 73:21, 108:11, 117:16, 117:17, 133:18, 139:18, 229:2, 233:11, 233:13, 239:16, 242:12, 242:16, 254:13
**U.S.D.C.J** [1] - 1:12
**ultimately** [1] - 20:1
**unclear** [2] - 208:20
**uncommon** [1] - 154:20
**uncontrollably** [1] - 168:7
**Under** [1] - 81:13
**under** [18] - 19:6, 91:22, 95:9, 118:15, 121:2, 126:20, 156:3, 157:19, 188:9, 188:12, 197:23, 207:24, 208:3, 210:8, 213:11, 222:7, 222:11, 250:4
**undercut** [2] - 14:18
**undergrad** [1] - 162:6
**underlying** [1] - 92:22
**understood** [1] - 81:7
**undisclosed** [1] - 4:3
**undisputed** [7] - 105:13, 105:21, 120:16, 121:7, 124:12, 132:9, 136:25
**unemployed** [1] - 66:14
**unexpected** [2] - 243:12, 243:14
**unexpired** [1] - 147:19
**unfortunately** [1] - 16:21
**UNIKEL** [1] - 1:21
**Unikel** [1] - 25:10
**unique** [3] - 117:6, 123:13, 163:4
**unit** [1] - 198:1
**UNITED** [1] - 1:1
**United** [12] - 28:10, 28:13, 28:18, 74:16, 75:11, 76:1, 76:8, 86:17, 113:12, 119:1, 121:15, 136:18
**units** [1] - 188:11
**University** [6] - 56:9, 56:13, 153:11, 154:25, 162:5, 162:8
**unlawful** [1] - 84:15
**unless** [2] - 19:7, 67:14
**unlike** [2] - 85:12, 143:15
**unpatentable** [2] - 83:3, 83:5
**unreasonable** [1] - 94:1
**unwanted** [2] - 116:20, 116:21
**up** [73] - 3:4, 6:3, 6:14, 13:6, 15:24, 16:20, 18:2, 21:7, 22:7, 22:15, 23:24, 24:19, 39:14, 45:12, 47:12, 60:22, 61:17, 65:9, 67:18, 93:14, 94:16, 102:4, 104:14, 112:13, 112:17, 113:1, 114:1, 114:5, 115:9, 118:21, 124:25, 125:2, 125:5, 130:11, 133:22, 134:17, 137:19, 139:5, 140:1, 141:14, 145:2, 148:14, 152:3, 160:10, 160:23, 162:20, 165:7, 165:22, 166:13, 168:25, 169:24, 170:18, 173:16, 182:22, 184:20, 191:25, 199:7, 206:1, 206:23, 207:10, 207:14, 211:6, 211:8, 211:14, 216:2, 217:24, 232:22, 235:14, 239:15, 247:19, 252:7, 252:23, 253:19
**Up** [1] - 119:24
**up..** [1] - 34:24
**updated** [1] - 12:1
**updates** [1] - 230:5
**updating** [1] - 225:18
**upfront** [3] - 7:18, 105:6, 120:3
**uphold** [1] - 91:25
**upper** [4] - 79:15, 84:8, 169:17, 171:5
**upset** [2] - 49:20, 56:19
**upside** [3] - 226:6, 226:7
**USA** [1] - 159:6
**usage** [1] - 234:7
**useful** [5] - 76:4, 76:22, 77:24, 78:7, 118:6
**uses** [14] - 80:23, 84:14, 105:8, 109:14, 113:8, 117:11, 119:2, 119:10, 119:12, 119:16, 121:3, 184:10, 196:11

## V

**V4.4.2** [1] - 226:2
**vacation** [11] - 35:1, 38:11, 38:14, 38:17, 38:19, 38:24, 51:9, 51:13, 59:7, 59:9, 67:1
**vacuum** [1] - 137:19
**VALENTE** [1] - 1:22
**valid** [8] - 81:15, 87:25, 103:7, 117:14, 123:23, 125:22, 126:22, 139:24
**validity** [9] - 11:9, 84:21, 85:18, 85:24, 102:23, 125:25, 126:11, 139:23, 253:16
**valuable** [3] - 77:5, 113:13, 202:6
**value** [3] - 12:19, 12:23, 130:20
**variety** [1] - 194:25
**various** [10] - 3:8, 65:17, 80:20, 106:4, 124:4, 183:16, 184:25, 214:8, 226:15, 230:6
**Varughese** [9] - 25:13, 25:15, 25:21, 27:6, 71:20, 134:9, 135:6, 160:4, 249:17
**VARUGHESE** [38] - 2:6, 9:3, 9:6, 9:18, 9:21, 11:23, 12:18, 20:9, 25:14, 27:7, 100:15, 101:3, 101:12, 101:15,

134:10, 135:1, 135:3, 135:5, 209:4, 216:11, 224:7, 224:11, 224:15, 224:19, 231:7, 231:12, 231:17, 231:20, 231:25, 232:5, 235:16, 235:21, 239:21, 240:1, 248:21, 249:2, 249:19, 253:21
**vehicle** [1] - 60:15
**venire** [1] - 21:21
**ventures** [1] - 16:23
**verdict** [4] - 7:6, 73:4, 95:20, 99:9
**verify** [1] - 61:14
**versions** [1] - 116:19
**versus** [5] - 21:13, 101:23, 159:12, 222:8, 223:13
**vertical** [1] - 185:2
**via** [1] - 66:1
**vial** [5] - 112:3, 112:5, 114:24, 115:3, 174:3
**vice** [2] - 232:11, 232:18
**video** [35] - 3:3, 9:8, 9:19, 9:20, 74:15, 74:16, 74:21, 74:23, 75:4, 75:6, 75:9, 75:16, 75:22, 79:10, 86:10, 100:19, 209:2, 209:11, 216:8, 216:21, 216:25, 224:4, 225:1, 231:4, 232:9, 232:12, 235:13, 235:25, 236:3, 239:18, 240:4, 240:7, 247:4, 253:9
**view** [3] - 44:23, 88:17, 230:25
**viewed** [1] - 222:15
**viewing** [1] - 75:8
**views** [2] - 36:10, 68:3
**vindicate** [1] - 140:7
**violated** [1] - 61:17
**viral** [1] - 241:15
**Virginia** [1] - 78:11
**virtually** [1] - 123:17
**vision** [1] - 29:8
**visit** [1] - 36:3
**visits** [1] - 144:5
**vivo** [3] - 180:24, 181:20
**VLADIMIR** [1] - 1:22
**voir** [1] - 20:11
**volume** [1] - 1:7
**vs** [1] - 1:5

## W

**wait** [2] - 98:24, 206:20
**waiting** [3] - 50:2, 99:11, 160:21
**walk** [7] - 95:12, 157:23, 169:10, 169:24, 171:10, 171:13, 185:11
**walker** [2] - 43:17, 45:23
**wants** [3] - 4:22, 120:12, 208:18
**War** [1] - 144:12
**warner** [1] - 254:7
**Warner** [1] - 254:12
**warning** [1] - 49:16
**Washington** [1] - 78:12
**waste** [1] - 156:12
**wasting** [1] - 122:20
**watch** [3] - 79:10, 96:17, 100:19
**watching** [1] - 151:22
**ways** [11] - 77:8, 104:14, 106:18, 107:17, 109:15, 111:17, 111:19, 112:17, 125:17, 166:19
**weaknesses** [1] - 221:24
**wear** [1] - 96:6
**weaves** [1] - 9:15
**Webb** [3] - 18:8, 19:1, 19:15
**website** [2] - 97:15, 228:12
**websites** [2] - 97:1, 97:17
**week** [27] - 13:13, 22:24, 23:1, 23:2, 34:2, 41:4, 41:9, 41:22, 41:23, 42:23, 49:22, 52:23, 56:11, 57:20, 59:21, 59:23, 69:13, 105:10, 111:11, 125:23, 133:21, 136:14, 137:2, 141:16, 142:7, 151:4, 228:17
**weeks** [3] - 35:5, 67:1, 158:12
**weeks'** [1] - 158:12
**weigh** [1] - 159:11
**weighing** [1] - 94:18
**weight** [2] - 57:22, 94:24
**weighted** [1] - 115:3
**weightlifter** [1] - 251:17
**welcome** [6] - 37:5, 102:16, 161:1, 207:19, 213:8, 228:11
**well-known** [2] - 136:4, 155:2
**wells** [1] - 191:24
**Wells** [3] - 25:17, 140:17, 192:5
**WELLS** [6] - 2:8, 182:1, 191:25, 192:4, 204:17, 205:18
**whatsoever** [3] - 49:17, 183:5, 184:6
**whereas** [1] - 187:4
**whole** [10] - 4:7, 15:2, 66:18, 132:21, 151:23, 168:25, 187:24, 191:15, 199:8, 199:9
**wholesalers** [1] - 235:9
**wholly** [2] - 24:7, 73:12
**widely** [1] - 110:7
**Williams** [1] - 64:4
**willing** [1] - 108:21
**Wilmington** [1] - 46:21
**Wilson** [2] - 25:20, 140:19
**WILSON** [1] - 2:3
**win** [1] - 19:23
**wipe** [1] - 107:6
**Wisconsin** [1] - 154:25
**wisdom** [4] - 14:10, 14:12, 15:13, 101:22
**wish** [3] - 89:20, 90:19, 241:10
**withrow** [1] - 63:11
**witness** [19] - 26:25, 89:21, 93:2, 93:23, 94:4, 94:7, 94:13, 94:17, 95:1, 96:1, 156:15, 160:19, 161:9, 191:23, 207:4, 207:23, 208:1, 208:2, 209:6
**WITNESS** [2] - 161:7, 205:25
**witness's** [5] - 93:24, 94:3, 94:4, 94:19, 94:22
**witnesses** [24] - 19:2, 19:19, 26:21, 26:23, 27:8, 27:13, 73:25, 91:7, 92:16, 93:23, 94:10, 94:16, 95:15, 95:16, 98:12, 98:16, 98:18, 98:19, 98:20, 151:14, 159:11, 159:12, 159:13, 159:17
**witnesses'** [1] - 27:2
**woke** [1] - 93:14
**woman** [1] - 62:7
**women** [1] - 139:8
**wonder** [3] - 85:3, 112:12, 152:16
**wonderful** [1] - 156:19
**wondering** [4] - 17:3, 35:2, 75:14, 107:11
**word** [4] - 38:22, 80:8, 123:7, 153:21
**words** [17] - 5:9, 7:24, 12:12, 85:1, 85:21, 95:21, 96:24, 99:1, 100:18, 101:9, 112:6, 123:21, 153:17, 185:7, 185:20, 206:14
**worker** [2] - 114:1, 122:13
**works** [11] - 39:20, 42:8, 42:16, 77:13, 78:21, 106:7, 113:2, 143:17, 143:20, 159:21, 190:21
**worksheet** [1] - 226:24
**World** [1] - 144:12
**world** [12] - 40:19, 45:15, 108:15, 108:23, 125:13, 139:20, 142:4, 156:22, 157:17, 159:5, 199:2, 235:7
**world's** [2] - 108:13, 109:23
**worth** [2] - 119:15, 148:9
**worthy** [1] - 93:24
**wrapper** [1] - 83:22
**wrappers** [1] - 83:23
**wrapping** [2] - 13:22, 60:22
**wrinkles** [11] - 104:3, 104:7, 104:11, 109:18, 110:6, 111:2, 128:10, 141:25, 143:2, 143:3, 143:7
**write** [2] - 78:5, 159:10
**writing** [2] - 72:5, 165:18
**writings** [1] - 76:6
**written** [7] - 29:10, 80:15, 83:6, 83:9, 83:20, 89:24, 90:3

## X

**X-I-A-N-G** [1] - 240:11
**Xeomin** [3] - 27:25, 145:16, 233:18
**Xeroxed** [1] - 16:21
**Xes** [1] - 151:24
**Xiang** [8] - 240:5, 240:10, 242:11, 242:13, 243:23, 245:12, 250:5

## Y

**year** [7] - 33:8, 169:11, 170:7, 226:21, 233:5, 233:6, 235:3
**years** [60] - 28:25, 39:11, 44:2, 55:24, 61:4, 61:24, 62:1, 76:13, 76:15, 76:17, 103:24, 104:24, 109:20, 112:22, 114:5, 118:16, 118:21, 118:24, 119:8, 119:14, 120:4, 120:7, 120:23, 122:3, 124:17, 129:20, 130:7, 132:18, 137:21, 141:13, 142:4, 144:10, 145:3, 145:9, 147:4, 147:24, 151:22, 154:4, 155:6, 156:17, 157:1, 158:6, 162:1, 164:20, 165:4, 165:14, 172:1, 172:8, 172:14, 176:9, 196:13, 201:19, 202:1, 202:3, 202:18, 202:24, 203:14, 217:16
**yesterday** [1] - 252:11
**yield** [1] - 219:16
**Yolain** [1] - 30:25
**Young** [1] - 25:19
**young** [1] - 33:9
**YOUNG** [1] - 2:2
**yourself** [7] - 5:5,

46:4, 90:8, 139:13, 148:6, 175:7, 180:13
**yourselves** [1] - 95:25

**Z**

**Zborovsky** [2] - 48:9, 48:10