IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., )
)
--------------------Plaintiff, )
) Case No.
vs. ) 21-CV-1411-RGA
)
REVANCE THERAPEUTICS, et al., )
) Volume II
--------------------Defendant. )

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Richard G. Andrews, U.S.D.C.J., and a jury of eight in Courtroom 6A on the 15th of July, 2025.

APPEARANCES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JEREMY TIGAN, ESQ.

-and-

PAUL HASTINGS LLP
BY: ERIC DITTMANN, ESQ.
ISAAC ASHKENAZI, ESQ.
MELANIE RUPERT, ESQ.
CARL MINNITI, ESQ.
KRYS HO, ESQ.
ROBERT UNIKEL, ESQ.
DAVID VALENTE, ESQ.
VLADIMIR SEMENDYAI, ESQ.

Counsel for Plaintiff

(Appearances continued.)

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: ANNE GAZA, ESQ.
SAMANTHA WILSON, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: DENNIES VARUGHESE, ESQ.
ADAM LAROCK, ESQ.
BYRON PICKARD, ESQ.
NIRAV DESAI, ESQ.
DEIRDRE WELLS, ESQ.

-and-

CAHILL GORDON
BY: PETER ARMENIO, ESQ.

Counsel for Defendant

THE COURT: So I got four letters since we finished yesterday which are Docket Items 617, 618, 619, and 620. So let's start with 617 which is Revance's letter. And so Dr. Gessler's demonstratives, is this actually an issue still?

MS. WELLS: I believe so.

MR. MINNITI: Your Honor, I believe you're referencing the fact that Revance now represents they won't put on --

THE COURT: Yes.

MR. MINNITI: Could I approach the bench?

THE COURT: Yes.

MR. MINNITI: The short of it is this, Your Honor. We approached Revance this morning and said we won't put on -- Dr. Gessler provides a manufacturing analysis of a design-around, who then Daniela Drago takes and applies in a regulatory context, who then Dr. Siegwarth takes. If they don't put on a design-around case, we effectively have an unrebutted FDA timeline opinion.

We approached Revance to stipulate unrebutted 15 months and let's move forward from there and we will not put up Dr. Gessler and Dr. Drago. That was rejected. So therefore, we need to put on Dr. Gessler and Dr. Drago.

THE COURT: So Dr. Gessler, he's going to testify about something other than some defense that

defendant says they're not advancing?

MR. MINNITI: I need to unpack because there's a sequence of the reports where I think the nuance is coming.

We go in our opening reports, and Dr. Drago puts on a base case for an FDA delay of 15 months if there were to have been a major change to the manufacturing because in discovery they hadn't put forward what a design-around or an alternative would have been to non-infringing, so that's where we are.

In the middle, they come back and they respond and that's where they say they could have designed around by, essentially, putting animal product in the manufacturing and that would have gotten them out of the patents. That is Dr. Nagaich and, I believe, Dr. Meagher as well. They are now taking out those opinions.

So then where we are is back on our opening, that base case. And we suspect they're going to get up here and they're going to criticize Dr. Drago for having applied in an FDA regulatory sense a base case analysis not specific to a specific design-around that they put forth but rather the core and the foundational technology would have been designed around there would have been this consequence.

THE COURT: Ms. Wells, do you have anything to add?

MS. WELLS: Yes, Your Honor. It's very clear

this issue doesn't come from Dr. Gessler until his reply report and it's very clear he's responding to the opinion of Dr. Meagher about this addition of the animal protein. Dr. Meagher's position is moot. That related to the lost profits issue that Your Honor mooted. It's also subject to a Daubert where they argued that the addition of the animal protein is speculative and doesn't have support, which Your Honor said was moot but then conditionally granted.

Dr. Meagher will not be presenting an opinion on a design-around and we don't think it is appropriate for Dr. Gessler to have a responsive opinion to an opinion that is not in the case anymore.

THE COURT: All right.

MR. MINNITI: May I respond to that?

THE COURT: So can Dr. Gessler say whatever he's going to say without responding to an opinion that's not offered?

MR. MINNITI: Yes. What Dr. Gessler is going to say is these patents go to, again, core and foundational types of manufacturing. If you're going to try to get out of doing the chromatography steps, as we heard yesterday, that could have very unpredictable consequences.

THE COURT: He can offer his opinions without suggesting Revance has ever said anything to the contrary.

MR. MINNITI: That's correct. That's correct.

The last thing I would say we're concerned about is, essentially, we're having the rug pulled out from under us, that rug being the specific design-around that they put on on rebuttal.

And then if Dr. Gessler, when he replies to that, can't come in on our affirmative case --

THE COURT: I'm sorry, I lost the thread. The specific design-around on rebuttal, they said they're not doing that?

MR. MINNITI: Correct. So then the concern is they will get up here and Dr. Drago will testify, and they will criticize her. And we sent an e-mail last night. We said, given that they have withdrawn the opinion we expect they would not criticize Dr. Drago for making an assumption that it would be a major change without that underlying manufacturing analysis.

THE COURT: All right. So I'm going to let you put on Dr. Gessler to say whatever it is that you think will bolster Dr. Drago's opinion, but as far as I can tell from what's being said, it should be given without reference to anything that Revance has said about this.

MR. MINNITI: Understood.

THE COURT: All right. So Dr. Siegwarth, there was some slides, 17-5 to 17-7. When I printed them out, they didn't come out complete. Can someone put up 17-5 up

on the screen. This is the one where you said it's presented without numbers?

MR. ARMENIO: Good morning, Your Honor, Peter Armenio for Revance. We have multiple concerns here. Number one, the numbers as to the time, when does the delay start, when is the cutoff for the doctor's calculation, what are the profit numbers.

THE COURT: So I understand all that. Why is this, Mr. Ashkenazi or whomever, why is this just two lines with lots of dots and no explanation?

MR. ASHKENAZI: She would be providing the explanation. This is an accurate figure. If you want us to put a scale at the top end just to say what the number is, that's fine. Frankly, Your Honor, when it comes down to this, putting more on the slide is sometimes more complicating for people to understand.

THE COURT: I'll allow you to use this slide and she can testify about whatever dates and times go with it.

MR. ARMENIO: We did have a concern, Your Honor, as well with the title. They're calling it a profit boost.

THE COURT: I didn't understand that because that's in some of the other objections, is she apparently used different terminology than she used in her report, but these are not terms of art or at least this isn't. So I don't understand why it really makes any difference. The

substance of what she says is going to be the same; right?

MR. ARMENIO: The concern we have is that it leads the jury to think that Revance would somehow make more profit if they took a license, which is never the case.

THE COURT: That's what cross-examination and even direct examination is about, is bringing out accurate opinions or cloudy on direct with a cross. So I'm not concerned about the various different terminology she uses. So I'm going to overrule that objection too.

So why don't we go to slide 17-6.

MR. ARMENIO: When we look at 17-6, here we have this 2025 focal point --

THE COURT: Yes.

MR. ARMENIO: -- which includes peak market share and planned long-acting injectable. Those are not in the doctor's report, in the doctor's opening report at --

THE COURT: So I thought the long-acting injectable launch, that's something that is at least footnoted in her report, is it not?

MR. ARMENIO: It is not. She mentions long-acting injectable in places in her report, but when we look at the footnote where she explains why she choose 2025 as the focal point, it's 302 in her opening report, "For purposes of this calculation, I cut off Revance's expected profit losses in 2025 due to the expected launch of a

biosimilar to BOTOX which would have had a significant impact on the neurotoxin product space.

"I understand that a biosimilar project for BOTOX is under development through a collaboration between Revance and Mylan and Liatris and at time of the hypothetical negotiation, Mylan was publishing a 2025 launch of the product." And then there's a citation, "That is the one and only reason identified for the '25 date." Not long-acting, not market share, it's just the BOTOX biosimilar.

THE COURT: The BOTOX biosimilar, is that the same as the long-acting injectable or is that something different?

MR. ARMENIO: Totally different.

THE COURT: Okay. Mr. Ashkenazi.

MR. ASHKENAZI: Your Honor, first, we discussed all these during the Daubert and while the citations of her expert report are not on the slide she'll use in front of the jury, we did identify this. If you look at *Georgia-Pacific* factor 15, that's the end of the hypothetical negotiation, and she discussed in her report for a number of pages and a number of paragraphs what goes into that hypothetical negotiation for the other *Georgia-Pacific* factors and she laid out how the biosimilar is referenced in paragraph 1.

THE COURT: So is the biosimilar, because Mr. Armenio just told me it isn't, it's not the same thing as the long-acting injectable launch; right,

MR. ASHKENAZI: So the biosimilar is Revance's biosimilar. The long-acting injectable is Allergan's anticipated launch of their product that would have a longer duration.

THE COURT: So her talking about the biosimilar is not the same thing as her talking about the long-acting injectable; right?

MR. ASHKENAZI: Not in that one footnote, Your Honor, but the rest of the paragraph's talking about the hypothetical negotiation she referenced, the long-acting injectable launch.

THE COURT: That it was planned in 2025?

MR. ASHKENAZI: Yes.

THE COURT: Can you cite me a paragraph where that's said?

MR. ASHKENAZI: Paragraph 112 and paragraph 163, Your Honor.

THE COURT: I don't have her report sitting in front of me. Does paragraph 112 and 163, does she say roughly some version of the long-acting injectable is expected in 2025?

MR. ARMENIO: No, Your Honor. Those paragraphs

are silent as to 2025 focal point. Long-acting injectable is mentioned in various places in the doctor's report. If I could.

THE COURT: Show me paragraph 112 and 163.

MR. ARMENIO: Okay. They have those and they can put it up, if not I can put it up. This is 112.

THE COURT: Hold on a minute. So there it's talking about the longer-lasting toxin product. The only thing she doesn't say there is 2025.

MR. ASHKENAZI: Your Honor, if you go to the citation it says, "Although they're expected to have a long-acting injectable product," when you go to the citation at 199.

THE COURT: Yes.

MR. ASHKENAZI: Whoever has got this on the screen, can we go to the footnote 199.

It's discussing it pushes out page 409, Your Honor. Also paragraph 163 if we can.

THE COURT: So what you're representing is that Lindemann in Exhibit 6 talks about this happening in 2025?

MR. ASHKENAZI: That's what I'm trying to get full confirmation of, Your Honor, but I believe that's correct.

THE COURT: First off, Mr. Armenio, do you know whether this footnote, the limited Exhibit 6, talks about

2025?

MR. ARMENIO: I have no idea, Your Honor. I've never seen that because that's a citation to an unrelated paragraph and I've got a footnote where the doctor expressly says what she based 2025 on, footnote 302, and it doesn't include LAI.

THE COURT: What about paragraph 163?

MR. ASHKENAZI: Your Honor, paragraph 163 just references the LAI. To be clear, this was all discussed during the Daubert hearing. We laid it out.

THE COURT: Yeah, but in the Daubert hearing we weren't talking about disclosure. We were talking methodology and reliability, which is a different thing.

Don't both talk at once. The court reporter's head will explode and I don't want to be hit with it.

In any event, Mr. Armenio, you have the floor.

MR. ARMENIO: If we could put up footnote 302, please. If you want I can put it on the Elmo if you prefer. So this is what I just read. This is foursquare exactly to the doctor's selection of 2025.

THE COURT: Mr. Ashkenazi.

MR. ASHKENAZI: *Georgia-Pacific* factor 15 is the culmination of everything that goes before that in the report. Dr. Siegwarth explains that's the way it is. In the discussion of the 2025 -- anticipated launch of the

long-acting injectable in 2026 has been not a dispute at all, everyone has recognized it, and it was in earlier paragraphs in the *Georgia-Pacific* factor. Whether it was in this footnote or not, for them to say they weren't on notice that she was going to be relying on that as part of their hypothetical negotiation doesn't make any sense, Your Honor.

MR. ARMENIO: Your Honor.

THE COURT: All right. Hold on a minute.

All right. So I'm going to ask that you strike that and she not testify that part of the basis because I don't think -- though I appreciate your effort to connect lots of remote dots, I don't think when she's got a particular footnote saying for purposes of cutting off on this date due to a reason that then that means and she can add in whatever other reasons she wants.

This is a sufficient reason. That's what I think I was saying last week. So but she can't rely on the long-acting injectables launch being in 2025 and 2026 as part of the reason for cutting off that date. All right?

MR. ASHKENAZI: Your Honor, I want to make sure I don't run afoul of what you're saying. She can discuss it as part of the *Georgia-Pacific* factors, just not under the focal point of 2025?

THE COURT: She can say whatever is in her report about long-acting injectables in a general kind of

way affecting the competitive landscape or whatever it is she might have already said, but she can't say that's the reason why she -- one of the reasons why she picked 2025 to make her split. Okay?

MR. ASHKENAZI: Thank you, Your Honor.

MR. ARMENIO: Thank you, Your Honor.

THE COURT: I think that resolves Revance's letter. So I've got Allergan's letter. We've got this *Time Magazine* article and Allergan keeps promising there's some non-hearsay purpose. What is it?

MR. VARUGHESE: I think you meant Revance.

THE COURT: What is it?

MR. VARUGHESE: Dennies Varughese, Your Honor. The *Time Magazine* article is just there to show Dr. Ruegg being recognized for his work.

THE COURT: What difference does that make? This is not people of ordinary skill in the art. This is a popular -- I don't know what the word is, but a general purpose magazine.

MR. VARUGHESE: That's what we want to provide it for. He read it himself. He's going to talk about his bio, his work, and how he was recognized by *Time Magazine*. We're not using that to show the peptide works or anything.

THE COURT: So there was a lot of pride in the work by plaintiffs. So I'll let you have him say in 2023

*Time Magazine* recognized DAXXIFY as one of the best inventions of 2023.

MR. VARUGHESE: Testify to that and we'll put up the exhibit.

THE COURT: Yes.

MR. VARUGHESE: We'll do that, Your Honor.

THE COURT: All right. So then we've also got DTX 627 and 628 which are those two articles from 2014 and 2017 and Dr. Ruegg.

MR. ASHKENAZI: I'm sorry, Your Honor, that's moot now. I apologize. I didn't know we were moving on to the next topic. If we could go back to the *Time Magazine* article for 15 seconds.

THE COURT: Yes.

MR. ASHKENAZI: The concern here is saying that *Time Magazine* recognized it, again, is sort of going to the attempting to assert that somehow some organization recognized this invention as something more than it is but it's not an organization that is skilled in the art.

The implication is going to be that this is somehow being vetted and the process occurred.

MR. DITTMANN: If I may, Your Honor. There's no reason to talk about it other than to try to suggest the peptide has been recognized.

THE COURT: You spent a lot of time yesterday on

Dr. Scott and --

MR. VARUGHESE: Broide, Dr. Broide on the stand.

THE COURT: Maybe him too, but Dr. Scott, the inventor back in 1989. So I'm going to allow this in as the kind of equivalent "pride in my work" and *Time Magazine* has an annual article called "The Best Inventions of the Year" and DAXXIFY was included and I'm very proud of that. But other than -- but that's as far as that goes. All right.

MR. VARUGHESE: There was one other issue. The other issue, we resolved it. We agreed to withdraw the two clinical studies.

THE COURT: That's good.

MR. DITTMANN: Your Honor, there is one important issue that's going to relate to a witness who's coming on very shortly. The next witness I want to raise, we raised it last night to the other side and heard back from them 20 minutes ago.

THE COURT: Tell me what it is.

MR. DITTMANN: Basically, it relates to the opening statements yesterday by Revance and some assertions that were made relating to the filing dates and issue dates of the patents. If you remember, there was a discussion beforehand where we had to have the title of the slide changed, the slide itself was changed.

What we have is some arguments and I'll just

read. One of them was "2019 Revance publicly announces that it filed a FDA application for DAXXIFY. Two years later, 2021, is when Allergan went and got these patents in this case." Continues.

THE COURT: Right, I remember that.

MR. DITTMANN: They went and filed this patent application in 2021 and sued Revance six months later. And then that was made, you know, frankly, worse, Your Honor, by the statement in paragraph -- or sorry, page 149.

So we had a completely different patent application, "we" as in Revance, that Allergan got patents on and became prior art. But then Allergan went to the well to squeeze out more patents based on these disclosures that belonged to all of us already.

Your Honor, the suggestion they're trying to make here has nothing to do with invalidity. It has nothing to do with infringement, which is stipulated. They're trying to suggest that the timing of the filing and the issuance --

THE COURT: I understand what you're saying.

What is it you want to do today that -- there's a reason why you're talking to me.

MR. DITTMANN: Yeah, well, because I suspect they're going to continue this scheme with their cross-examinations and their witnesses. It's highly

confusing and misleading. It has zero to do with invalidity, zero to do with infringement. Even damages, Your Honor.

THE COURT: And so you said it's misleading, and that may be true.

Is it incorrect?

MR. DITTMANN: Yes, factually incorrect. When you start talking about patent applications being filed or suggesting it was filed for the first time. They even said -- and I think they're going to cross this witness who's coming up next -- they said these patents were filed for long after these individuals even left the company, and Allergan filed in 2021.

It's just completely inaccurate.

THE COURT: When did Allergan file them?

MR. DITTMANN: There's no dispute they filed all these applications either in 2003, 2005, 2009.

THE COURT: Well, I think that "filing" can mean two things. It can mean filing for an application or it can mean filing for a particular patent; right?

MR. DITTMANN: Yeah. And that's where the confusion is coming in. They're going to make it seem, and they made it seem like yesterday, that things were just invented more recently and Revance sued on them.

But meanwhile, we have a stipulation where the

parties agree the formulation patents were --

THE COURT: I understand what you're saying.

Mr. Varughese, what do you have to say in response?

MR. VARUGHESE: May I approach, Your Honor?

THE COURT: Yes. And, Mr. Dittmann, you can just hang there if you don't mind.

MR. VARUGHESE: So Mr. Dittmann talked about two different statements I made. The second one had nothing to do with the first one, so let me address that.

Mr. Dittmann, when he was doing his opening, made it seem like because our Hunt prior art reference, which is 102B, had the same inventor as the -- and that was not prior art. So I wanted to clear that up for the jury. So that's why I made that second statement.

The timeline slide is completely inaccurate. I kept saying that what's in these patents are old technology and that, you know --

THE COURT: So the -- I don't think he's injecting a little more broad statements. I mean, he may disagree or he may not, but where are the patent applications for this case?

MR. VARUGHESE: Right here. And they won't dispute that. The two patents filed in 2021.

THE COURT: But why is that relevant?

MR. DITTMANN: And by the way, Your Honor, if I could point out what's really important, what was said, he said we had a completely different patent application that Allergan got patents on and it became prior art.

THE COURT: Okay. So -- Mr. Dittmann, thank you.

Why is that relevant? I mean, I -- you know, I think this has been raised before we started yesterday, and I didn't really expect you to be saying what you were saying.

How is the actual filing date for these patents relevant?

MR. VARUGHESE: Because we want to show the jury that the invention was frozen in time as of the priority date and there was no advance over the prior art.

THE COURT: But that has to do with what the priority date is. When the actual patents were filed, if they have that priority date, is pretty relevant.

MR. VARUGHESE: I don't think so, Your Honor. I mean, Mr. Dittmann kept saying that these are foundational patents, foundational technology, and I think the jury should see the timeline and sequence of events.

THE COURT: Well, so here's what I think, is I don't think there should be anymore references to when these patents were actually filed since the priority dates are not

disputed; right?

MR. VARUGHESE: The priority dates are not disputed, Your Honor.

THE COURT: And so it is -- it serves no purpose and it is just one more confusing thing to be talking about. The patent was filed here. I think we should not talk about that anymore.

And when people talk about it, all they should be saying is they have priority or, you know, the relevant date for purposes of whether it's obvious or not is 2005, 2009, whatever the date may be. All right?

MR. VARUGHESE: We'll accept that, Your Honor.

I have one issue to raise.

THE COURT: Does that resolve, Mr. Dittmann, what you wanted?

MR. DITTMANN: Yes. And I think the other thing, just to make sure we're clear on it also, is the issue dates. These patents were in force before the hypothetical negotiation date so all the suggestions about issues dates, all of this is just -- everything is misleading and confusing.

So we should just talk about the priority dates for prior art and these patents were in force for purposes of damages. We don't need to confuse anymore timelines and inserting Revance's BLA application dates. I think we've

seen it's caused a lot of confusion already.

THE COURT: Okay.

MR. DITTMANN: And we're going to ask eventually, Your Honor, with your permission, we'll file something at some point to ask for a curative instruction on this issue.

THE COURT: Yeah, I think -- I mean, you should go ahead and do whatever you want, but I'm not likely to be giving a curative instruction 48 hours after the thing occurred because it will serve the purpose of reminding the jury of that when, if they don't hear about it again, they're going to forget about it, if they haven't already.

MR. DITTMANN: Yeah.

THE COURT: So but you should go ahead and do whatever you want.

MR. DITTMANN: Understood.

And we had one other issue that we raised last night that we just got a chance to hear back about. Your Honor, it's a little bit confidential information. If we could have a quick -- very quick sidebar on that one?

THE COURT: Do you know what he's talking about, Mr. Varughese?

MR. VARUGHESE: Yes, Your Honor.

THE COURT: All right. Okay. We're going to start charging time here.

(Thereupon, a discussion was held at sidebar.)

MR. DITTMANN: There was a statement in the opening. What he didn't tell you is how much money they're asking. For the last time we heard from them, they wanted 140 million out of what he showed you.

There has been -- at most Siegwarth, Dr. Siegwarth, has said 115 million. We think this may have come from some confidential 408 discussions and we don't want that to happen any further.

We're raising it to be sure we're all sensitive talking about demands we made. Shouldn't be in the record in this case.

THE COURT: Generally speaking, demands are irrelevant. I thought the 140 million -- I understood it when I heard it at the time to be when you do all the math with Dr. Siegwarth, that's what you come out to.

MR. PICKARD: That's not --

THE COURT: I mean, I believe you. But, yeah, there's -- to the extent there's any -- there should be no discussions like that. I mean, I don't think they'll come up again, but, obviously, discussions or anything else.

MR. VARUGHESE: Your Honor, can I clarify that I don't think we were being dishonest. I have no knowledge of any 408 stuff. I don't. I said that number because --

THE COURT: In any event, it's done. But

let's -- and we'll hear from Dr. Siegwarth today. We'll find out -- or I'll find out what her number is. I think you all know. And there should be no discussion of whatever number she puts forwards.

THE COURT: All right. Was there something else, Mr. Varughese, you were saying you wanted to raise while we're here?

MR. VARUGHESE: Your Honor, I don't think it's going to be a curative instruction, but I think we need some guidance for the rest of the case, especially when Mr. Hunt goes on.

I thought the statements Mr. Dittmann said yesterday, that suggests to the jury that an inventor's own prior art can't be used against him, and that's obviously not the law.

THE COURT: I think we agree Mr. Hunt's prior art is, in fact, prior art that should be treated just the same as everything else.

MR. DITTMANN: Hundred percent, as I understand it.

MR. VARUGHESE: We do and trying to get the jury's sympathies is prejudicial.

MR. DITTMANN: I'm not sure what he's referring to because I didn't get anything on this until this morning.

THE COURT: So I appreciated there weren't any

objections yesterday, but doing the objection 24 hours later puts me at a disadvantage because I don't have a great memory of every word that was said and the context, and I didn't study the transcript overnight to get that.

So when the expert comes on, the expert will agree that what Mr. Hunt did is prior art; right? Your expert will say that, his expert will say that.

Let's go and get the jury now.

(The discussion at sidebar ended.)

THE COURT: I'm informed that we're one juror short right now. Is there anything else we can address while we're waiting for the juror?

MR. ASHKENAZI: Your know, I know we -- both parties submitted letters regarding *Aqua Shield*.

Do you want to discuss that?

THE COURT: Sure. Yes. So I read the two letters. What I didn't do was these -- the four exhibits that are referenced DTX 315, 318, 319, and 586, though I think at least two of them were things that were maybe in the opening statement slide yesterday where somebody from Allergan said -- and I'm grossly paraphrasing -- they're not competing with us and -- or -- I don't know, some things that downplayed whatever impact -- what DAXXIFY had on Allergan.

Do you want to show me one of these,

Mr. Armenio, so I have better context?

MR. ARMENIO: Sure, Your Honor. So this is DTX 318 at page 15. This is Carrie Strom, the senior VP of AbbVie, president of global aesthetics.

THE COURT: This is an investor's presentation or an -- yeah, it was like --

MR. ARMENIO: Earnings call.

THE COURT: Earnings call, yes, thank you.

MR. ARMENIO: And so we've got this a little shy of a year after launch of DAXXIFY. And see -- so we have yet to see impact on BOTOX share, and BOTOX will continue to be the clear market leader --

THE COURT: So, thank you, Mr. Armenio.

So one thing that I don't have in my -- so the -- so my recollection from what I've seen is that in the hypothetical negotiation, the difference in profits that Dr. Siegwarth was talking about started in 2021, and yet, DAXXIFY didn't launch until, I think, late in 20 -- I can't remember. November of 2022?

MR. ARMENIO: They got FDA approval in September '22. They did a slow rollout and they were fully launched by September 2023.

THE COURT: And the point is -- or to me is, at the time of the hypothetical negotiation, the expectation or the anticipation was that they would get on the market

sooner than they actually did; right?

MR. ARMENIO: They were hopeful that they would get on sooner than September 2022. They filed the BLA in 2019. So certainly, that FDA process took longer than folks at Revance expected.

But what they did not know and what these investor calls go to is Allergan makes it seem like little DAXXIFY, little Revance thought they were going to go one-on-one and be a Coca-Cola versus Pepsi Cola situation versus they had the established market share.

They were Tesla seven, eight years ago in BDs, and then there was everybody else. And we were just part of the everybody else. We were hoping to be in competition two, three, and four, and what these earnings calls go to show is they confirm and show the reasonableness of that being our state of mind at the time that, yeah, we hoped to get on the market, but we weren't taking on Allergan. We were just trying to get our little piece.

THE COURT: All right. What is the difference between -- so Dr. Siegwarth had some line that she drew on the graph that represented your expected revenues or expected profits going out into 2029 and --

MR. ARMENIO: Hundred percent, Your Honor.

THE COURT: How did that compare to the actual?

MR. ARMENIO: So this is all projected.

Dr. Siegwarth projected what sales might be and projected what sales might be reduced to based on a hypothetical delay which actually occurred in reality. Reality here was there was a delay and she's modeling what would have happened.

THE COURT: So but the -- somewhere in there there's an assumption about before the delay hypothetical she's got an income stream or revenue stream. How does that compare with DAXXIFY's actual income stream or revenue stream?

MR. ARMENIO: They never show it and it will likely be a topic of discussion during cross-examination but they don't show it on this graph. They certainly don't show it on the --

THE COURT: I'm not asking what they show. I'm asking what is -- I take it that DAXXIFY's actual revenues are known. How big of an -- is there, like, a 20 percent difference or 80 percent difference? What kind of -- how far off were the projections?

MR. ARMENIO: I have to trace the graph, Your Honor. I don't want to give an incorrect answer. I have to trace the line of actuality over this to give you a precise number. We can do that.

THE COURT: Do you have a sense, Mr. Ashkenazi?

MR. ASHKENAZI: Your Honor, just to be clear what we're talking about here, what they're trying to put up

is whether BOTOX lost sales to DAXXIFY. Those are the two statements they're talking about. That's not what Dr. Siegwarth is talking about here. It's talking about Revance's projected sales. They said in meet-and-confers and in the letter to the Court that they're using this for the purposes of saying that the parties would not believe at the time of the hypothetical negotiation that they were competitors. That's a falsity. At the time of the hypothetical negotiation, every single document and expert has agreed they believed that they were competitors. To talk about whether BOTOX lost sales to DAXXIFY in 2023 or later after launch is irrelevant because you can't subvert.

THE COURT: All right. So we've got two different hypothetical negotiation dates, but the only one that this is -- is this relevant to the manufacturing patents or just to the formulation patent?

MR. ASHKENAZI: They're arguing it's relevant to everything and whether or not there's competition in the marketplace, Your Honor. Whether or not at the time of either hypothetical negotiation, which are before the launch, the parties would believe they were competitors. And that's what the statements go to. They don't go to anything else.

THE COURT: Do you agree with that, Mr. Armenio?

MR. ARMENIO: So the statements that we're

trying to get in go to the thoughts about competition and potential future competition. Allergan argued that sitting in the negotiation room they would 100 percent think, both parties, that these were head-to-head, direct competitors, DAXXIFY versus BOTOX, and they were not, that was not --

THE COURT: When you say it was or was not, are there documents that predate the hypothetical negotiation that address this issue?

MR. ARMENIO: The documents that go before would be Allergan documents regarding the strength of their market position, their market leading position, of which there are legion.

THE COURT: And Revance is obviously making projections because that's the basis of what Dr. Siegwarth relies on. What did they think?

MR. ARMENIO: They were hopeful to sell, but what we have here, what we're trying to offer these statements for, is to show this was an uncertain negotiation and when you look at the reality of what ensued, that informs the reasonableness of the uncertainty. When you're little Revance with DAXXIFY, you're not thinking you're going to take out the market leader for 30 years, BOTOX. You're hoping you can get a foothold and see what happens. And the CEO and senior VP statements confirm that.

Say we're the market leader. Everyone else is

battling for two, three, and four. These statements confirm that. When we look at the second statement that was in opening, this one, Your Honor, is DTX 315, page 6. We can see from Jeffrey Ryan Stewart, executive VP --

THE COURT: Mr. Armenio, are there any of these statements that occur before DAXXIFY actually launched?

MR. ARMENIO: No. The subject of *Aqua Shield* in our briefing would have been after.

THE COURT: Yes, okay. So the four things we're talking about are after. In the period between 2019 and the launch in, let's say, November of 2022, are there statements by the parties as to what they expected to have happen?

MR. ARMENIO: There are some but they're not as clear as this because Allergan never came out and said we are going to continue to dominate the market and everybody else is going to be competing for two, three, and four. I don't have something in the record where they say that clearly. We do have the after-the-fact statements, we preserved our market share, we kept it away from long-acting, which they meant DAXXIFY in that instance. Everybody else is fighting for two, three, and four. Those statements come in when they're talking to investors after the launch and they're the best evidence to inform.

THE COURT: The investor calls, they're quarterly; right?

MR. ARMENIO: Yes, Your Honor.

THE COURT: So in the 2021, 2022, the first half of the year, obviously, they know DAXXIFY is on the horizon. Is Allergan not speaking about DAXXIFY in its investor presentations? Is nobody asking them about DAXXIFY?

MR. ARMENIO: Not in terms of market share, Your Honor. Not in terms of any specificity.

THE COURT: There is stuff, it's just not as specific as the post-launch information?

MR. ARMENIO: It doesn't talk about actual what's going to happen to the market, what's the market going to look like post-launch. It doesn't have the level of detail. Here --

THE COURT: But I would have thought that on an investor call before the launch somebody would have said, so how do you anticipate DAXXIFY affecting your business. Nobody ever asked that?

MR. ARMENIO: I'm not sure. Your Honor, I don't want to stand up and say yes or no to that question. I'm not sure. We have to remember AbbVie is a $60 billion company. It takes a lot to move the needle on an AbbVie share.

THE COURT: Mr. Ashkenazi, do you have any answer on that?

MR. ASHKENAZI: We saw four or five documents

yesterday going through the deposition designations and videos where the parties recognized there was a slide where Allergan recognized the biggest competitive threat was DAXXIFY. The reality is, and this is from *Aqua Shield*, I'm quoting from *Aqua Shield* at 772, "The District Court's analysis also incorrectly replaces" -- which is what they're trying to do here -- "the inquiry and the working parties' anticipating of what profits would be earned if a royalty of amounts negotiated would have been paid with an inkling of what profits were earned when the IP sale goes on."

That's what they're trying to do here. They don't have any documents. They can't point to anything prior to the launch or any time during the time of the hypothetical negotiation the parties would not consider themselves to be competitors. In every single document in this case, the experts agree they would consider themselves competitors. Now, after the launch what happened in the marketplace is irrelevant because they can't subvert what was actually believed at the time of the hypothetical negotiation.

THE COURT: Do you agree that the statements from the Allergan people post-launch were to the effect of they're not competing with us?

MR. ASHKENAZI: No, I don't. If we go to the heart of it, is this is a competitive marketplace which

everyone has said up until then, this is the neurotoxin marketplace and everybody is competing against each other. What happens is someone comes into the market, they take some sales from us, we take sales from other competitors.

So what is the statement saying? The statement is saying we haven't been overall hurt in terms of the company. It's not saying we're not competing at all in the marketplace. Your Honor, every single document in this case that's part of the hypothetical negotiation says that and they could not provide us with anything. If they had anything at the time of the hypothetical negotiation, that would be fine, but they're not. They're taking after facts and trying to confuse the jury with this.

THE COURT: All right. So here's what I think right now. The jury is going to hear what the actual sales or profits from DAXXIFY were as kind of the royalty base for some calculation. And there's going to be, I think, probably some delta between that and whatever the projections were.

But in terms of the issue that's being raised now, this doesn't have much to do with the projections. It really seems to have to do with whether they're competitors or not, which would go to -- I mean, if they weren't competitors, Allergan would be in a much different position in terms of what their view is in the hypothetical

negotiation because they're not competitors giving the license. Whatever the license is for is just profit to Allergan.

So the problem is I don't know what happened before the hypothetical negotiation date. I haven't seen or I haven't seen to any great extent what it is that Allergan is relying on to say they're competitors. I haven't seen anything, and I'm guessing there really isn't anything to say they're not competitors. But based on what I'm hearing right now, I don't think the competition fact is something that is post-negotiation or hypothetical negotiation statements. I don't think they inform what the parties would have anticipated at the time.

But it's hard for me to say that until I've heard what it is that there is as to what the parties anticipated in time. So what I'd like to do is I assume that Allergan, left to its own devices, is just going to put in whatever it has to show they were competitors and probably mostly through Dr. Siegwarth.

And so I'm right now inclined to exclude the four exhibits that Mr. Armenio is talking about and depending on how this cross-examination goes or what I learn at some point, you can renew this request. But I just can't make a really good decision. I can't make a really good decision, period, but I don't have enough information to say

yeah, go ahead.

I do think there is something to, though I didn't see it in the case, to the idea that the need for post-hypothetical negotiation evidence, the relevance of post-hypothetical negotiation evidence goes up in proportion to the lack of evidence of pre-hypothetical negotiation evidence.

So I need to hear what the pre-hypothetical negotiation evidence is. And until Dr. Siegwarth testifies I'm not -- that's it.

So right now, Mr. Armenio, those four exhibits are out. But at a point in your cross when you think that they should be in, bring it up and we'll talk about it a little bit more. Okay?

MR. ARMENIO: Thank you, Your Honor. They'd either come up in the cross of Dr. Siegwarth or in the direct of our expert Dana Trexler.

THE COURT: Dana Trexler is obviously a lot easier for me because there's time to assess what's happened.

On the other hand if they are -- well, in any event, it is -- it's also the case that if you don't bring it up during Dr. Siegwarth's cross that's not foreclosing you from approaching to bring it up during Ms. Trexler's examination. Okay?

MR. ARMENIO: Thank you, Your Honor.

THE COURT: How are we doing on this juror?

All right. So we have a juror who has not been in contact with us and who is not responding to phone calls and whose location is essentially unknown.

My suggestion would be that -- so we can either wait or we only need six jurors so we could also -- I could also basically strike him, but I wouldn't do that unless both of you said that's what you wanted to do.

The juror we're talking about, I believe, is the one who normally -- the second juror selected. I don't know who that is, actually.

Is that right?

THE COURTROOM DEPUTY: I believe so.

THE COURT: Off the record.

(Thereupon, a discussion was held off the record.)

THE COURT: Back on the record.

Why don't you two talk to each other for just a second and see what you want to do about this. Okay?

MR. DITTMANN: And one quick housekeeping item, very simple, Your Honor. I've seen your preference in some cases is no expert CVs come into evidence, sometimes they come in.

Before I ask anybody, I want to make sure I

understand your feelings on that.

THE COURT: I'm ambivalent. A lot of times they're ANDA cases and they just come in as a matter of course. You know, technically, they shouldn't come in, but when both sides are doing it, it's fine by me.

MR. DITTMANN: Okay. We'll talk and we'll figure it out. Thank you.

MR. VARUGHESE: Should we take a recess to discuss, Your Honor?

THE COURT: Why don't you just discuss it right here. Shouldn't take more than a minute.

(Thereupon, a discussion was held off the record.)

THE COURT: I'm going to take a two-minute recess while you discuss this.

(A recess was taken, after which the following proceedings were had:)

THE COURT: So what do you want to do about the juror?

MR. VARUGHESE: We understood that he was here, Your Honor.

MR. DITTMANN: We just got information that a U.S. Marshal has seen the juror. Just -- secondhand. Someone came in and said a U.S. Marshal saw someone with a hat on and asked where to go, where the jury room is. We

just heard that one minute ago.

THE COURT: Okay.

MR. DITTMANN: What I would say, though, is if that information is wrong and the person is not here, we are a little concerned about timing. We would suggest, if we don't know where the juror is, that we move forward, but hopefully he'll come.

MR. VARUGHESE: Well, our position is to give him till at least 10:30 and not strike the juror until then.

THE COURT: Okay. Well -- all right.

MR. DITTMANN: And also, just to report back, Revance doesn't want CVs to go into evidence, so I assume then that means that you won't have CVs into evidence.

THE COURT: All right. That's fine.

(Thereupon, a discussion was held off the record.)

THE COURT: So we can wait as long as you want to wait. I'm just going to be charging the time equally while we wait. So why don't we -- if we're going to wait until 10:30, why don't I step outside for a while unless there's something else you want to talk about.

MR. DITTMANN: Your Honor, if I could, we'd very much like to proceed with the set. We don't want to be charged time. We're worried about the time with what we have to cover.

THE COURT: Okay. Well, I think I will give him the time. Now Mr. Minniti seems to have more up-to-date information.

MR. MINNITI: The juror was walking around. He's going into chambers now.

MR. DITTMANN: Now we have firsthand evidence.

MR. VALENTE: Your Honor, just one quick housekeeping item.

When are you expecting the final jury instructions?

THE COURT: That's a good question. When are you expecting that I'm expecting those?

MR. VALENTE: Well, at the first pretrial conference, I think you told us Tuesday at 8:00, and the parties are not currently on track for that, if I'm being candid.

THE COURT: Well, that's -- candor is a prime virtue. So what are you on track for?

MR. VALENTE: Any estimates from counsel on the other side?

MR. DESAI: (Inaudible.)

THE COURT: So today is Tuesday.

That's Mr. Desai, right?

MR. DESAI: Yes.

THE COURT: What are you saying you think is a

reasonable time to submit these?

MR. DESAI: Tomorrow at 8:00 p.m.

THE COURT: All right. 8:00 p.m. tomorrow, that's fine. The -- and, in fact, I'm not trying to -- you know, if it gets to be close to 8:00 and you still have progress you can make, any time tomorrow night will be fine.

But it would be better for you to aim at 8:00 because, in my experience, generally you're not ready to do it at 8:00, you need more time. So you've got a few more hours tomorrow night. But we need to be working on them on Thursday. Okay? All right.

MR. VALENTE: Thank you.

THE COURT: Are we ready?

THE CLERK: Yes.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone, you may be seated.

I understand the delay this morning is because of traffic.

A JUROR: Yes.

THE COURT: And sometimes traffic is bad, so my request would be tomorrow morning to leave earlier.

All right. Are we ready, Ms. Rupert?

MS. RUPERT: We are, Your Honor.

So Melanie Rupert for the plaintiffs. We would like to call plaintiff's next witness, Dr. Terrence Hunt.

Your Honor, may I hand up copies of the witness binders?

THE COURT: Sure. Yes.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Terrence Joseph Hunt, T-E-R-R-E-N-C-E, J-O-S-E-P-H, H-U-N-T.

TERRENCE HUNT,

called as a witness on behalf of the Plaintiff, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MS. RUPERT:

Q. So good morning, sir.

A. Good morning.

Q. Can you please state your full name for the jury.

A. Terrence Joseph Hunt.

Q. You have a witness binder up there with you?

A. Yes.

Q. Can you please turn in that binder to what's been marked as JTX 001.

A. I have that.

Q. And what is it?
A. That is a patent, United States Patent 11,147,878 B2.
MS. RUPERT: Your Honor, plaintiffs move JTX 001 into evidence.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 001 was admitted.)
BY MS. RUPERT:
Q. So, Mr. Hunt, do you mind if we refer to this as the '878 patent today?
A. That's fine.
Q. Okay. So let's look at the first page of JTX 001. And look at the section on the upper left side of inventors.
Are you an inventor on this patent?
A. Yes, I'm the sole inventor.
Q. And do you understand that Allergan has accused Revance of infringing this patent?
A. That is my understanding.
Q. And do you understand that Revance alleges that your patent is invalid and never should have been issued by the Patent Office in the first place?
A. That is my understanding.
Q. How does that make you feel?
THE COURT: That's irrelevant.
Go ahead. Ask another question.
BY MS. RUPERT:

Q. So let's talk a little bit about your personal background.
Where did you grow up?
A. My whole family is from South Philadelphia originally. So I was born at the naval hospital, which isn't there anymore. I guess that's aging me.
My father was in the Korean War, so he was in the Air Force and he was overseas. So my mother was living with family for support during that time.
Q. And where did you live in South Philly?
A. Eventually we ended up living with my grandmother who lived over Dockerty's Tap Room.
Q. And how long did you live in South Philly?
A. Until the time I was about -- maybe it's in fourth, fifth grade.
Q. And then where did you go?
A. At that point, like all people in South Philadelphia who want to get out of the city, we moved to the promised land, which was South Jersey.
So my father got a VA loan and bought a house in Pennsauken, which is right next to Camden over there and Montclair.
Q. So at that time, what did you do for work?
A. Well, I mean, as a kid, like, we didn't have a whole lot of money. My dad worked really hard. But you know,

we'd cut grass, shovel snow. And eventually -- I like motorcycles and things, so I was pretty mechanical.

So I got a job at a gas station about the size of a hall in Cherry Hill, New Jersey.

Q. So what led to your decision to go to college?

A. Well, going back to, like, the gas station job, my -- I got in a fight with the boss and quit that job. And then I started hearing these rumors that there's this cute blond that took your job over there, which is kind of weird.

Back then women didn't work in gas stations very much. But my mother came home and said, "There's this really cute girl, but she's from Camden so she might be a little too tough for you. But she took your job."

So just out of curiosity, I drove my Volkswagen over there. I thought I'd have a little fun with her. I knew she'd never find the gas tank because it's under the edge of the --

Anyhow, after she struggled and almost put gas in my windshield wiper, I said, Hey, why don't I take you to the drive-in. And so, you know, a couple years later we were married. And then we -- she got pregnant.

And we were RH incompatible, so the doctors in South Jersey sent us -- they said, "You're going to have to go over to University of Pennsylvania. We can't handle this."

THE COURT: So, Dr. Hunt, let's move a lot closer to the present day. We have a limited amount of time.

THE WITNESS: Sure. I understand.

BY MS. RUPERT:

Q. So, Dr. Hunt, what led to your interest in science?

A. Well, I'd always been very interested in science. All my teachers would comment to my parents that, you know, you've got to get this kid to college somehow. So -- but it was very difficult to do. In the northeast everything was very expensive, and so I just said, "Well, I'll just do construction work and just, you know, pay the bills and that kind of thing."

But the issue there is my daughter was -- she was very premature. And being at the University of Pennsylvania preemie ward really impressed me that -- this technology. And, you know, they had commented, you know, it wasn't that long ago they lost all the babies. You know, they didn't make it through.

But the pharmaceutical companies would generate new drugs and medical devices and so forth. And every year they saved more. So that really impressed upon me that, you know, you -- construction is okay, but you really should go to college and see if I can get into this field somehow and contribute something.

Q. So where did you end up going to college?

A. So what we did was, since it was difficult to do here, my wife had some relatives on the West Coast. And at that time in California, junior college was free. If you bought a parking sticker and paid for your books, pretty much anybody could go to school.

So I went back there -- so we went to California. I did iron work because that's -- and I got a pretty good job doing that down in LA waiting for an opportunity to get into school. And an opportunity came up. There was a break in the work schedule. And I went over to Santa Ana College, which was close to where we were living in Tustin, and signed up for as many classes as I could get.

There was limited time for me to do that. Sooner or later I had to go back to work. They said, "You can't sign for this many units." And we argued about it. But within three semesters, I had an associate's degree with highest honors there, so.

Q. And so what happened after you received your associate's degree?

A. So then a counselor called me over and said like, "What do you want to do? What are you doing here," you know.

And I said, "I'm an iron worker."

And he said, "Let me make some calls."

They called the University of California-Irvine and said, "Look, we've got this kind of nontraditional student. Would you be interested?" I went over there and told them I know all this stuff that you want me to take, biology and all this other. So they said bring in all your references and we'll give you an oral exam.

And they allowed me to challenge the first couple of years, lower division stuff in biology. They put us in graduate housing. We had three kids by then. Put us in graduate housing, which helped a lot. Got all the scholarships and student loans and so forth.

And that's how I got into the University of California-Irvine and finished up their program.

Q. And so how far did you go in your education?

A. Bachelor of science in biology and chemistry. They wanted me to stay on. I've been invited to stay on for graduate work but by that time we were starving to death practically and the kids needed things and cars were breaking down.

So I worked the night shift in a laboratory in Santa Ana. It was U.S. Polymer. They made resins and polymers. And I saw a notice in there for Allergan and they were very good about hiring people as temporary and then converting them to permanent if they worked out. That was kind of their model for bringing in new folks.

Q. Tell us a little bit more about how and when you first came to Allergan.

THE COURT: Actually, what year are we talking about now?

THE WITNESS: That would have been -- when I first started at Allergan, that would have been 1986, '87.

BY MS. RUPERT:

Q. What was your first job at Allergan?

A. So first, I was just a straight up, like, analytical tech. I worked in the analytical lab just crunching samples. Again, it was boring but it was very good training because you've got to be moving all the time. So I got a real good facility with equipment. I already worked with my hands a lot so I didn't have any really issues with that.

Q. When did you first start working on drug formulations?

A. That would have been, like, when I converted over they gave me a permanent position in the discovery area of ocular health. Allergan is an eye business primarily.

So they have an ocular discovery program that they had started not too long before that. And they have multiple divisions. They have a contact lens division, so they have a lot of enzyme cleaning which are proteins, formulations. We were studying tear proteins.

So everything I did in that group was relating

to proteins, either analysis and/or preformulation-type stuff, which is what you do to characterize, which is another word for studying proteins and so forth. That's where I kind of got really deep in the protein area.

Q. How long were you in that division?

A. It was two or two and a half years, I think, there.

Q. Why did you leave?

A. We were concerned about the funding. They might pull the funding because, again, you're always on the bubble with discovering stuff. And some guys called me from Pfizer and said, look, Jonas Salk, the guy who invented the polio vaccine, he had an institute down the road called the Salk Institute and these guys called me and said they're looking for a protein guy, which is right up your alley.

He's trying to develop an AIDS vaccine, and of course, AIDS was a big thing. I said, well, why didn't you guys do it? And they said we're not touching that stuff but you'd probably do it.

So I went down and interviewed and they -- it would involve moving back to the East Coast because their facility, they had a facility in King of Prussia. So we were from this area and that was working out, the grandkids -- we weren't seeing family much and this seemed like really interesting work and I still had the "save the world" mentality.

So I thought it was a good opportunity and I took it.

Q. What took you back to Allergan?

A. After a couple of years doing that, the clinicals didn't seem to be panning out for that approach. We were doing a P24, which is a core protein as opposed to an envelope protein. It didn't seem to be working. And in the meantime, I got a call from one of the VPs at Allergan that knew me from before saying next time you're out here, because I was going back and forth, I want to take you to lunch and talk to you about something.

So I went to lunch with him and he starts describing this thing called Oculinum which turned into BOTOX later. And he said, "We tried working on this, we got a few people involved, they haven't made any progress and they won't even touch it. They don't know how to handle it, they're afraid to deal with it, and we thought maybe you'd be interested. Would you be interested in coming back?"

So the timing was working out and so forth but I said, "What have these guys done so far besides walking around with their sweaters tied around their neck?" Which is mostly what those guys were doing back then. They said essentially, it's nothing. I said we have to start from scratch then, is what you're saying.

Q. When you returned to Allergan, what were your main

responsibilities?
A. The primary thing is to get everything in place, the facilities, the training procedures for personnel, handling procedures, and there's a lot of interaction with the government because botulinum toxin is on the terror watch list, even back then it was. So you couldn't just do whatever you wanted. You had to notify. So we had CDC oversight and the FBI would monitor what we were doing, doing inventories and so forth like that. There was a lot of that and they weren't sure how to handle that. That was primarily it to get established. Once we get established, we start working on the project.
Q. Mr. Hunt, did you bring a demonstrative to help you today?
A. Yes, I did.
MS. RUPERT: Mr. Campos, can you please bring up Mr. Hunt's demonstrative that's PDX 12.
BY MS. RUPERT:
Q. So, Mr. Hunt, what is this photo?
A. So this is the core facility that I put together with the engineering and environmental health and safety. What this is, is a double-airlocked room with negative pressure, meaning if you open the door the air flows in rather than out because you don't want anything to escape from this area.

And you'll see on the left is a biosafety cabinet and the fat guy on the right side there, that's me, Huong Tran, and Julie, I think, is at the capping station. There's a couple of lyophilizers and you can see we're fully gowned and so forth. And this is all because everybody had to be protected from exposure and also the outside area. The reason you can see the photograph is we had a Lexan window installed when we built it so people could observe for safety reasons and also anybody that wanted to view it because nobody was allowed in there unless you had been approved.

THE COURT: What year, approximately, is this?

THE WITNESS: This particular photo would have been 2002, I believe. I can't say for sure.

THE COURT: That's fine.

THE WITNESS: Prior to that we had adopted some radiation laboratories to utilize but they weren't fully qualified facilities for what we were doing. We used those in the early formulation work that we did preformulation. This is one we had established. Now we had facilities that are completely built specifically for handling this material.

BY MS. RUPERT:

Q. Why were all these precautions necessary?

A. Like I said, this is one of the most potent agents

known to man. It's hard to even explain. Nanogram quantities are what you handle when you're making something dosing in the range of BOTOX. You can't handle nanogram quantities and when you start off with a big bulk and you may have enough units there to kill the entire state of California.

Q. In the early 2000s our country went through the attacks of September 11th and the War on Terror. How did that impact your work on botulinum toxin at Allergan?

A. We already had restrictions, and everything ramped up after this. I was heading into work that day because we had made clinical supplies, the first reformulation of BOTOX, and we had clinical supplies sitting in Ireland that were going to be shipped to the United States. So we're scrambling around because there's this pallet somewhere -- we don't know if it's on a plane or at an airport -- that says "botulinum toxin." We knew that would set them off. We didn't know if they would be concerned that was part of this attack or they would destroy the samples.

So we were calling into the FBI and all these other people saying, look, you have to be aware this stuff is floating around out there and we don't know where it is. That's kind of our personal exposure, which was really emphasizing to us everything is going to change now. This is really going to get tight.

Q. So after you rejoined Allergan, what project was your immediate priority?
A. The first thing, they sat me down and said, "Do you think we can reformulate BOTOX?"
Q. What time frame was this?
A. Late '90s, I guess.
Q. What general challenges did you face trying to develop new formulations that contained botulinum neurotoxin?
A. In addition to the safety and handling, there was no information. Nobody knew what to do. The only thing that had been done with this was it had been thrown into albumin, and that was pretty much it. And there wasn't a preformulation package, either, characterizing or studying the mode.
The normal way to develop a drug and the modern considered way to do it is you do a preformulation package. In other words, you study the molecule and determine as best you can what does this like and what does it not like and then you build your formulation around that. If it tends to oxidize, you want to put something that's an antioxidant, for example, rather than just mix things together. The old-fashioned way is mix things together and it works okay. The agencies don't accept that anymore. You have to list every single ingredient, which we call excipients.

Q. What challenges did you face working with the quantities of the molecule itself?
A. First thing is I had to get immunized because I had to handle sharps and large quantities of the stuff. Like I said, we had enough to kill huge numbers of people if it got exposed. I would handle that part in the hood and once that was diluted down properly, I would hand that off for the further processing.
The primary thing is there's so little material involved you can't even see it. You're talking about a couple of nanograms. We don't even have pipets that would deliver micrograms, let alone these quantities. And there was nothing about known interactions between this other than albumin, and nobody knew how albumin worked. It just did.
Q. Taking a step back, just to be clear, Mr. Hunt, did you come up with the formulation for BOTOX?
A. No.
Q. Who did that formulation come from?
A. Dr. Alan Scott.
Q. What ingredients is BOTOX made of?
A. It's botulinum toxin at the dose level you're interested in, 100 units, 250, whatever. Originally it's 100 units with human serum albumin and sodium chloride.
Q. So at a high level, what is human serum albumin or HSA for short?

A. Human serum albumin is a protein. So when you crack an egg in your frying pan, the clear stuff that's around the yolk is almost exclusively water and albumin. As you cook it, it turns white because you're heating it and denaturing it. The albumin likes to be in a globular state but you're opening it up because you're heating it.

And that's the thing we're fighting with the drug. It's the same thing. If you have a protein drug, you don't want it to unfold or change. You want to stabilize that, so that's what we mean by stabilizing it. And human serum albumin is derived from the blood pool. In other words, people go down and donate their blood, and then they fractionate that and get other stuff and also get albumin.

Q. Is it fair to say that human serum albumin is an animal protein?

A. Yes, humans are animals.

Q. How well does HSA work to stabilize bonds?

A. It was an approved drug so it had gone through the process. Of course, this was a long time ago. The scrutiny levels always change. They're always getting tighter and tighter scrutiny and requirements around it. So as I said, a modern drug development, it wouldn't fit into that scheme.

Q. If HSA works, then why did Allergan task you with a reformulation project?

A. Albumin is a ubiquitous protein. It's all over,

meaning it's in all kinds of organisms, like we talked about the chicken albumin. It's all through your body. It's everywhere basically. It does all kinds of things. It carries drugs. It's involved in repair. It helps balance pH of your blood.

So it's got a ton of different functions but it's derived from the blood pool, meaning it's not manufactured. It's taken out of nature, and things in nature tend to vary. Different animals are different. They have different components. People are different, and if you have a blood pool that has one set of people versus another, you can have different contaminants because those folks, their diet is different, a whole host of reasons.

It makes it impossible to study the drug. So like I said, we would have liked to have had a preformulation package where we studied the toxin in various environments, but we couldn't do it because the albumin is there.

So if you use a protein technique to try to look at the botulinum toxin, sorry, albumin is in the way because it's a protein too. So if you do a fluorescent step, for example, like 280 nanometers or something, albumin is going to light up and it's going to blow away your signal of botulinum toxin. So you can't see it.

So you're forced to just put these things

together and try to, you know, make an estimate of what you think is happening.

Q. So, Mr. Hunt, as you set out on this reformulation work, what did you think about your chances of being able to remove HSA from the BOTOX formulation?

A. I wasn't very -- I wasn't thinking we were going to be successful, necessarily. I'd probably be looking for another job.

But again, everybody viewed this as -- including the regulatory bodies, the FDA and so forth. They didn't even want me to change the amount of albumin in there. Like, if you had 500 micrograms and you went to 200 or 700, we weren't sure they would approve it, if they'd say, "No, that's different than what you had before. We don't understand why you have a certain potency with this ratio. So we're not going to allow you to change, so" --

Q. What kind of replacements for albumin did you consider first?

A. Since we lacked, you know, a solid preformulation package, meaning we had no data to say you should probably stabilize against this happening or that, what I did was I said, well, maybe -- let's try to use things that might mimic what HSA is doing.

And those were -- you know, again, HSA, it's a large molecule. It's a protein.

Q. So how big is HSA compared to other proteins?
A. Yeah, it's 66 kilodaltons, which is -- which is pretty large for proteins. I mean, the botulinum toxin is larger than that. But for regular proteins, it's a pretty large molecule.
Q. So did you have any patent applications for that reformulation work under large molecules?
A. Yes.
Q. So please turn in your witness binder to what has been marked as DTX 209.
A. I have that.
Q. Do you recognize this document?
A. Yes.
Q. And what is it?
A. US 2003/0118598A1, a U.S. patent application.
MS. RUPERT: Your Honor, plaintiffs would like to move DTX 209 into evidence.
MR. VARUGHESE: No objection.
THE COURT: Admitted without objection.
(Thereupon, Defendant's Exhibit DTX 209 was admitted.)
BY MS. RUPERT:
Q. So to make it simple, can we refer to this as the Hunt '598 patent today?
A. Sure, yes.

Q. And who is listed --

MR. VARUGHESE: Objection, Your Honor. It's not a patent.

THE WITNESS: I just said that.

MS. RUPERT: I thought I said the application.

THE COURT: I thought you said patent. Earlier you said application. But in any event, the '598 patent application.

MS. RUPERT: Okay. Yeah, we'll call it Hunt '598 and stick with that.

THE COURT: Okay.

BY MS. RUPERT:

Q. All right. So when was your patent application filed?

A. November 5, 2002.

Q. And can you please explain to the jury at a high level what your patent application Hunt '598 is about.

A. This is the -- this is based on the initial work that we focused on, which was use large molecules with the intention that they would mimic human serum albumin stabilizing.

So one of the first ones we looked at was recombinant human albumin.

Q. Okay. So let's turn to page 58 of Hunt '598. And that's paragraph 58 of '598.

What did you say in the first sentence there?
A. "In light of the unique nature of botulinum toxin and the requirements set forth above, the probability of finding a suitable albumin replacement for the human serum albumin used in current botulinum-toxin-containing pharmaceutical compositions must realistically be seen to approach zero."
Q. And why did you say that there?
A. That was what we believed at the time. In other words, essentially everybody in the field was saying that. The regulatory bodies were saying that.
We had some limited data on using some single smaller ingredients and those didn't seem to work. So that was the assessment at that point in time, yes.
Q. So given all these headwinds, why did you even try?
A. That's why they hired me. You know, it was basically -- that was my job. But I mean, there was good reasons to do this.
Because again, what we're trying to -- people are exposed to these drugs and you're using these to treat people. You want the best drug you can possibly make. And there are issues with, you know, animal-derived proteins and proteins in general.
So it was a big challenge, but it was, you know, a justifiable thing to invest in.
Q. So can you give us some examples of the large

macromolecules you discussed in Hunt '598 to potentially reformulate?
A. Yeah. We looked at recombinant albumin. We looked at some very large carbohydrates like hetastarch, H-E-T-A-S-T-A-R-C-H. It's a material that's -- so the reason for that, it's a material that they use as a blood expander.
And that's how -- one of the ways that albumin is used. In other words, if you lost a lot of blood and you went into shock, they need to expand the volume of your blood. And they use albumin for that, but they also use this hetastarch, which is a carbohydrate formulation.
Q. I think earlier in your answer you used the word "recombinant."
So what, at a high level, does recombinant mean?
A. So recombinant means to recombine, basically; right?
And this guy, Herb Loyer, who was, like, a really smart guy and some other people got together and discovered this technology. And Herb Loyer was actually on the board at Allergan so I got to present for him. That was a pretty -- he's a really smart guy.
So here's how it works; right? Everybody has heard of DNA because we all watch the crime shows; right? And usually they're looking for things that are different in, you know, your DNA or your DNA so they can discriminate.

But most of what -- the DNA that's in your body is the same. Like, yours is the same as mine, yours is the same as mine. Like, it's mostly the same because you need to make the same components in your body to keep you going versus -- and to grow and all that stuff.

So a small amount of DNA, what it does is its sole purpose is to generate proteins. So what happens is the DNA -- there's machinery inside the cell called the ribosome. But basically DNA is the code that tells that ribosome what to make.

So as it goes through, it reads it and it pumps out another what I said was in the code, then another, another, another, another. And you end up with a stream of amino acids. That's a protein.

So, for example, if you took the DNA from my -- the DNA from me that says make HSA or make HA, human albumin, and you put it into another cell -- so they put it into another cell, like a plant cell or a bacteria cell or a yeast cell, you plug it into that cell, and the machine doesn't know any different. It just reads whatever DNA it sees.

So as soon as it sees it, it starts making albumin. So you just turned that cell into an albumin machine. So it just starts pumping albumin out. And that's what I mean. They recombined this DNA with that DNA.

Q. So, Mr. Hunt --
A. And so that's extremely valuable because now you can produce a substance that we've -- in a way that doesn't have anything to do with animals or -- or anything.
Q. So did you have a goal to combine these large macromolecules that you just mentioned with any other ingredient?
A. No. I mean, we basically wanted to mimic what the BOTOX formulation was, which was a single ingredient. So that was our initial objective. And that's the way we like to do it anyway. You start simply. You don't just start adding a bunch of things --
Q. So --
A. -- without providing a rationale for why you added that.
Q. So what did you conclude about the large macromolecule ingredients that you discussed in Hunt '598?
A. Well, we had stabilized botulinum toxin in a drug product format utilizing this group of ingredients without any other -- without the requirement of anything else.
Q. And did you ultimately receive a patent on the work in Hunt '598?
A. Yes.
Q. Okay. So we've been talking a lot about using very large ingredients in a formulation. So I want to turn to

another section of your patent now that discusses much smaller ingredients.

So let's pull up paragraph 180 of Hunt '598. And if you can please look at the third sentence of paragraph 180.

Can you read the sentence beginning "The present invention" that we've highlighted on the screen for us?

A. It says: "The present invention excludes from its scope disaccharide, oligosaccharides, with a weight -- accurate molecular weight of less than about 20 kilodaltons."

Q. So what are disaccharides in simple terms?

A. They're made up of sugar, so the sugars in nature. If there's one sugar, it's a monosaccharide. If there's two, it's a disaccharide. And so it's a disaccharide. It's like sucrose, for example.

Q. Would you consider disaccharide to be a relatively large ingredient or a relatively small ingredient?

A. No, it's a small ingredient.

Q. And you gave us a couple examples of disaccharides just now.

What were those?

A. Sucrose, trehalose, maltose.

Q. Sir, can you please explain for the jury what you were telling scientists back in 2003 in paragraph 180 about

disaccharides.
A. That they weren't going to work in this format, to the best of our understanding. That we had not been successful in utilizing in this format. And they -- within the scope of what we were describing here, they were not good candidates.
Q. Okay. So let's talk about why you told scientists to avoid disaccharides because they weren't good candidates.
Let's turn to paragraph 49 of Hunt '598.
And what did you say in the first sentence here?
A. "Furthermore, saccharides, including polysaccharides, are, in general, poor candidates to serve as protein stabilizers."
Q. And in plain English, what does that mean?
A. It means there's well-known reactions with sugars and proteins. So like, when you toast your bread at home, you put it in the toaster and it turns brown, that's because there's a reaction between the sugar and the bread and the proteins.
So what happens is the sugar links up with the protein and they -- and it sticks to it chemically or it chemically sticks to it. And this is not a good thing. It's fine for your toast. It makes the toast taste good; right? And your bagels. But you don't want that to happen in nature or when you're trying -- or in a drug product.

So if you have diabetes; right? You've got glucose, which is a reducing sugar floating around. And that's what happens in there. If you have a low level of sugar, it's kind of -- you get a few linkages where you have proteins in your body with carbohydrates -- I'm sorry, with a sugar stuck to it.

And that will keep on happening. And the more sugar you put on there, the less that protein is able to function the way it's supposed to. Because now it's got all this stuff stuck on it, on the side of it.

So that's why they do your A1C when you go in and get your blood test. Because they want to see how much of that hemoglobin, which is the protein, has sugar stuck on it. Because if there's a lot of it, that means there's an awful lot of sugar. And it's like, lay off the donuts, you know, because you're in trouble here.

But it also becomes a serious illness because now a lot of proteins in your body are being constricted from doing what they're supposed to do because they've got all this sugar stuck all over that them.

And that's exactly what happens in the drug vial. If you put sugars in with a protein to stabilize them, you can use sugar to do that, but there's going to be -- inherently, there's going to be problems at some point, especially if you don't control for moisture and that

kind of stuff.

So while they can be used -- and I was well aware of this because this Maillard reaction has popped up in some other stuff we had at Allergan. And so really, in my mind, like, this is a problem. You have to be well aware that this could happen and you might want to try something else.

Q. So, Mr. Hunt, let's shift gears now and talk about some of your other inventions.

A. Sure.

Q. So we're going to focus now on the work that led to your '878 patent that's at issue in this case that we looked at earlier today.

So what was the name of the particular project that gave rise to your work described in the '878 patent?

A. So what I did, I got in the habit of taking BOTOX and hyphenating and then putting letters so people could understand what I was doing.

So for that one, we called it BOTOX NP, meaning no protein. Whereas before it was not animal, we didn't have any animal-derived ingredients.

Q. And was the NP project also part of your overall BOTOX formulation work?

A. Oh, yeah.

Q. So what was the intended purpose of your NP project?

A. Well, as I stated, we had stabilized utilizing things like albumin macromolecules in a single-ingredient format. But some of those were proteins. And so we wanted to -- again, as I said before, proteins were still problematic.

So we were hoping to get away from that completely so we could also do a better analysis of the BOTOX drug product because it would eliminate all the protein interferences.

Q. So you wanted to stabilize BOTOX without animal proteins?

A. Without any proteins. Nonprotein, no protein at all. No protein from anywhere.

Q. Including animal proteins?

A. Including animal protein, of course.

Q. So what was the inspiration for this work behind the NP project?

A. Again, I mean, again, we'd always kind of been working on it. It's just the nonanimal took priority because we had availability and so forth. You know, there's also practical considerations, can you get the stuff, how much test capacity do you have, and that kind of thing.

So we always had this kind of droning on in the back, but we also thought it was going to be a really hard thing to do because all the evidence that we had seen that had been published and anything we had generated all

indicated this was not going to be easy.

So in the meantime, while we were kind of pushing nonanimal out the door, I was sent to Vienna to do a talk at a meeting there. And while I was there, these pediatricians were showing these videos of these kids that were all contorted. Their muscles were all constricted and they were, like, frozen in these wheelchairs and couldn't move at all, and post-treatment with BOTOX, it was, like, a miracle and these kids are up walking around normal, got big smiles on their faces.

I was impressed with this, but they're using high doses. So the doctors involved, the physicians involved, said, "Terry, we're worried because we're dosing these kids so high. We're worried the albumin will start -- will instigate an immune reaction." Even if it's a human protein, at some point you keep pumping protein in and you're going to have antibodies start attacking, and that's not a good thing to have.

So they were concerned they were going to have to discontinue the therapy and said, "We can't do this. It's going to be a tragedy. These kids are cured and all of the sudden we're going to tell them we have to stop." That really drove home to me we got to get this thing going.

So I went back to the lab when I got back from Austria and I told my guys, "Roll your sleeves down."

Because we don't roll our sleeves up, we roll them down, because we're going to start doing blue-collar science. We're going to crank these things out. I don't care what it takes. We're trying to get this going.
Q. How was the NP project different than that large macromolecule work from Hunt '598 we just discussed?
A. These are -- many of these are very small molecules compared to, essentially, everything in the first patent was a very large molecule. But there was different categories. We still had to stay within the realms of what would be approvable and that kind of thing. We couldn't pick anything we wanted, but there's thousand of these out there. I don't know how many ingredients. There's something called GRAS, which is generally recognized as safe, that could be looked at and see if it's ever been delivered to humans in either food or there's at least a thousand there. It's not really a list. It's kind of a general information thing.
Q. What was the time frame for the start of your NP project?
A. That probably -- again, there's some overlap, but, essentially, it was early 2000s.
Q. And as compared to BOTOX, what potency was your goal?
A. Ultimately, with the drug product, we would have the maximum dosing for whatever the therapy requirements were, but for this, we set a threshold of 50 percent to recovery.

Q. So how did that compare to BOTOX?
A. BOTOX doesn't have a hundred percent recovery. So it's lower than the dosing that's on the label but it was sufficient to read a signal that we had performed some stabilization.
Q. So can you please give us some examples of the categories or types of ingredients that you considered.
A. Yeah, we looked at disaccharides, surfactants, polyols, pegs, these are a bunch of things that have been used before in various forms or derivatives of those. Polyols, I don't know if I said that. Seems like there's a billion of these thing.
Q. What general size of molecules did you focus on for potential use in your NP project?
A. We didn't have a target size or anything. It was like these are low compared -- these are, like, maybe -- I think the largest -- maybe the largest peg is around 3,000 or something, which is much smaller than albumin, for example.
Q. Let's clarify something. I want to go back a little bit. I noticed on the list of ingredients you mentioned for your NP project you mentioned disaccharides. So in your discussion of Hunt '598 just a few minutes ago, you mentioned you told scientists to avoid disaccharides. So when did you start and why did you start exploring

disaccharides as an ingredient as part of your own work?
A. First thing is what I wanted to do is build a really solid experimental design. So when you do an experiment, you want to have controls around how are you looking at all this because you can lead yourself down the yellow brick road if you want just picking that looks good, we'll take that; that looks bad, we'll ignore that. So you want to set up a scheme where you can scientifically and methodically evaluate things.
If we threw disaccharides out, it wouldn't be a full design because everybody knows they're there, they exist, so you can't just ignore them. Plus we figured we could probably eliminate them quickly because everything we had seen showed they were not good, so let's knock them out. That's one of the reasons we tested them upfront because these are going to be gone and we don't have to worry about them anymore.
Q. At that point, did you have any expectation disaccharides would work?
A. No.
Q. Let's talk about the different stages you alluded to as part of your nonprotein study. What type of study did you conduct first?
A. We started off, again, the design I put together to screen through this, we started with single ingredients. So

we called this contribution of elements. So what that means is you start with one thing and then you add something else and you add something else. You don't just throw everything together because then you don't know what the heck you made.

If it works, you go, okay, that's great. We have ten things in there. We don't have a clue which one is doing anything. And, again, the regulatory agencies expect you to explain why is that in there. And if you don't have any data, they're going to say go back and get some. So you want to say this one, this one, that one. If you have an explanation for each one, then you're okay.

Q. For your single-ingredient studies, what would each formulation generally contain?

A. Generally, we would put botulinum toxin in at various doses because we were searching for signal. So it might be high and then a single ingredient by itself at different amounts. So we might do 1 milligram, 10 milligram, 20 milligram, whatever it was, trying to see if we could get any signal anywhere that we were starting to get a hit.

Q. How many approximately potential ingredients did you look at for your single-ingredient studies?

A. I think we did about 120. In 2003 I think we did 120 different formulations. We made about a thousand vials.

Q. What was your takeaway from your single-ingredient studies?

A. This isn't going to work. We didn't get any hits.
Q. After you conducted your single-ingredient studies, what type of studies did you conduct next?
A. Two-ingredient studies.
Q. What's a two-ingredient study?
A. Two ingredients added. So we basically took the same ingredients in the first study that was shown and put those together. So we were getting a lot of 0s in the first column and then we would take those and combine them. The first two we tested, we put those together and keep moving down the list, and change the ratios. We would do 1 to 1, 10 to 1, 1 to 10, for example, trying to find out if you put these together do you get anything.
Q. And you mentioned this already, but what was the purpose of conducting your two-ingredient study?
A. Again, we wanted to find something that would stabilize the toxin and we hadn't been successful with one, so it's a rational way to approach it. Just keep building this thing out and see if we can find something that works.
The other thing you have to remember is we didn't know exactly what was stabilizing things, and these ingredients, especially when they're small, they only have -- they only function certain ways. If you take one thing that provides one function and something that has a different and put them together maybe. Like albumin has got

a lot of function so that's probably why it works because it's got all these different things you can do.

Q. How many different potential ingredients did you consider as part of your two-ingredient study?

A. Between 8 and 900 formulations. That was in the 2004 time frame. And I think about 3,500 vials or so of samples that we actually made, approaching 4,000.

Q. So can you gives examples of the types of ingredients that you tried here, the types you considered?

A. So we have we -- had gotten the disaccharides, so like sucrose and trehalose, for example, and we got 0s for those. And then we take -- we had some surfactants we looked at, in particular P188, and essentially got 0s for that. Then we put those together and we got hits right away.

Q. So the 0s were for the first single-ingredient studies?

A. Single ingredient. In other words, if you take sucrose and you do it as a single ingredient, you're not going to get any recovery. If you take P188, a surfactant, it's another word for detergent, but it's used as an additive for a lot of things, because people add it in food.

Q. If you could just slow down a little bit so the court reporter can get them.

So let's turn in your witness binder to JTX 194

and let's look at the second page of this document. Are you there?
A. I'm waiting for the screen. Where are we going?
Q. JTX 194. It will be up in a second. What is this document?
A. I'm looking at the first page.
Q. Generally what is this document?
A. This is an output from some of the screening studies that we were doing. What we were doing when we made things in what we called full sweep manufactures, meaning we would go into the core facility or whatever we had at the time, and we'd go through the whole process, put the things together or vacuum dry them or if they were liquid samples.
Q. What kind of results are listed on this spreadsheet?
A. Basically, this is a sheet that reports results, potency results.
Q. What experiment number is given in the upper left-hand corner?
A. Experiment 9.
Q. And do you recall whether this document was created in connection with your reformulation project at Allergan?
A. Yes.
Q. And is this the type of document that would typically be created to report potency results?
A. Yes.

Q. Okay. From your understanding, does this document accurately reflect the experimental results from the formulations in example nine you listed here?
A. Yes.
MS. RUPERT: Your Honor, plaintiffs move JTX 194 into evidence.
MR. VARUGHESE: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 194 was admitted.)
MS. RUPERT: Your Honor, may I approach? These are the documents we discussed yesterday that are subject to the --
THE COURT: Are you giving them to my deputy clerk?
MS. RUPERT: These are the ones subject to the security restriction for distribution to the jury. If we could pull up a redacted version on the board. Redacted, there, sorry.
So let's turn to the spreadsheet labeled Experiment 9102 on page 5.
BY MS. RUPERT:
Q. Mr. Hunt, in general what is the formulation that is identified as Experiment 9102?
A. That would have been 250 units of toxin and then expressed in percentages. There's trehalose and P188, so

trehalose is a disaccharide and P188 is a surfactant or detergent.

Q. This was a formulation that was part of your two-ingredient study?

A. Yes.

Q. For the jury, can you briefly explain what a surfactant is.

A. Surfactant is basically -- definition is it's a surface tension reducer. You use it in the laundry. It's got hydrophobic and hydrophilic regions, meaning it will stick to grease and it will stick to water. So if you have grease on your shirt, that's why the detergent or surfactant works, because it can grab the grease and pull it into the water. Whereas if you try to clean grease off with water, it will just -- in this venue, it's doing different things.

Q. Can you see in the middle of this spreadsheet that you have, it's up there on the board in the middle too, we have something labeled the test date?

A. Yes.

Q. What does test date mean?

A. That's the date this particular sample was tested for potency.

Q. Was Experiment 9102 tested?

A. Looks like 5/19/2004.

Q. And what is the title of the column indicated there

all the way over to the right at the bottom labeled?
A. "Percent Recovery."
Q. What does percent recovery indicate?
A. That indicates -- again, it's an expression of potency on how much we put in versus how much we got out. So you put in a hundred units, and if you get everything out, then it's a hundred percent.
Q. And so at a high level, could you just tell the jury, what does the word "potency" mean?
A. So potency is the -- based on a method. And it's actually the definition of the units. And the units are -- they're like -- they mean strength.
So the physician has got to know how strong the medicine is so they can dose it properly. So --
Q. So what percent recovery value is listed there for the BoNT formulation of Experiment 9102?
A. 52 percent.
Q. And what does this percent recovery tell you about a formulation like Experiment 9102 that contained BoNT plus a disaccharide, trehalose here, and a surfactant?
A. That tells us that we've got significant recovery, meaning we've got significant stabilization, especially compared to the 0s we get when we do trehalose alone and the 0s we get when we do P188 alone. And we combine them and you get this level of recovery right off the bat.

Q. All right. So just to summarize then, based on your single-ingredient studies, would a disaccharide alone sufficiently stabilize BoNT?
A. No.
Q. And based on your single-ingredient studies, would a surfactant alone sufficiently stabilize BoNT, or botulinum neurotoxin?
A. No.
Q. And then what happened when you used these two ingredients, disaccharide, trehalose, and a surfactant in combination?
A. Then we got significant stabilization that was above the threshold that we had set for stabilizing.
Q. So at this time, were you aware of anyone else stabilizing BoNT using only a combination of a disaccharide and a surfactant before you did it?
A. No.
Q. Okay. So compared to when you set off on this reformulation project, how surprised were you by these results?
A. I was very surprised by the fact that you could take -- you know, it was two 0s and basically put them together and get this kind of increase in recovery. That was a surprising result.
Q. And so what did you conclude based on the results you

achieved for your two-ingredient studies of this combination of disaccharide and surfactant?
A. That we had achieved our goal, basically establishing a platform for stabilizing botulinum toxin using these combinations of ingredients.
Q. All right. So we're going to turn now to the last set of experiments that we're going to be discussing today from the no-protein project.
Mr. Hunt, after you conducted your two ingredient studies, what type of studies did you do next?
A. We had some expansion. Because again, we're not building recipes. We don't want a book full of recipes. Because that limits you. Because if you only have this at that amount and this at that amount.
We're trying to build a platform, meaning if you take these things and put them together, you'll get a stable drug. And you might have to do some optimizations, but you're there basically. That's what you need to do.
So we did some expansion on that, like we did more ingredients. Like, since we got some of these disaccharides to work, let's add some more surfactants. We also tried different ingredients like polyethylene glycols and other things to see if those combinations would work.
Q. And what was the platform you used when you tested these additional ingredients?

A. Sorry, I didn't hear you.
Q. What was the platform that you used, which two excipients, when you tested these other ingredients?
A. Well --
Q. The combination.
A. Yeah, I don't quite understand the question.
Q. Okay. Let me just move on then.
What experiments did you conduct in expanding the platform from the disaccharide-surfactant combination we just discussed?
A. Yeah. I mean, we added more ingredients, for example, in the dual-combination format. In other words, like I said, we picked additional ingredients to see if they would work the same way. But it'd always have to be a disaccharide and a surfactant. And it didn't. You could put these other things together and get good results as well.
And then we also looked at, okay, we've got that established. Now you want to look at other parameters, like pH for example, because if you take something that works and put it in too low of pH or too high of a pH, it might destroy it and then you'll get -- or improve the recovery.
So we started looking at pH first and the buffers included in that. Because you could get the same pH with a different buffer and maybe get a different result.

So it was more that we had already -- we accomplished our main objective, so we wanted to make that as solid as possible and also as broad as the data that's --
Q. Okay. So let's look at this experimental data in a little more detail. Please turn in your witness binder and look at JTX 196.
And at a high level, what is this document?
A. This is similar to before. This is an output from Experiment 14.
Q. Okay. And what kind of results are shown here?
A. Potency results.
Q. Do you remember whether this document was created in connection with the reformulation project at Allergan?
A. Yes.
Q. And is this the type of document you typically created to record your potency results?
A. Yes.
MS. RUPERT: Okay. I believe this has already been admitted into evidence. So may I approach the court deputy with the copies to give to the jury?
THE COURT: All right.
BY MS. RUPERT:
Q. So, Mr. Hunt, in total, how many experiments did you conduct as part of Experiment 14?
And, Mr. Campos, if you could pull up the

experimental sheet in the redacted form.

So my question was: Roughly, how many experiments did you conduct as part of this work?

A. It depends on how you define "experiment" because the experiment itself is making the samples. Then the samples are sent for various tests.

Potency is one test, but we will also do light chain. There's a bunch of other tests you can do. Because we're looking at different things. It might be the moisture, how much moisture was there, that kind of thing. So --

Q. So can you guess about how many?

A. Probably hundreds. I mean, if you added everything up, probably hundreds. With this many samples, yeah.

Q. All right. So let's turn to the row we've got on the screen up there that's labeled Experiment 14058, which for the jury is five rows up from the blue bar at the bottom.

Mr. Hunt, what ingredients are included in Experiment 14058?

A. It's toxin at 250 units; P188, again, that's the surfactant; and trehalose.

Q. And what -- was the pH recorded for this formulation?

A. I'd have to look. I don't see it here.

Q. Yeah, I think you have to look in your binder. Experiment 14058. It's five rows up.

And, Mr. Campos, if you could pull that on the screen too.
A. It's not on there.
Yes, yes.
Q. Do you see it there?
A. Yes.
Q. And what was it?
A. I think it was 6.7, if I'm reading it right.
Q. And on what date was Experiment 14058 tested?
A. 9/9/2002 -- or, sorry, 2004.
Q. And what percent recovery value is listed for the BoNT formulation of Experiment 14058?
A. 75 percent.
Q. So what, if anything, does this recovered potency value tell you about the disaccharide-surfactant combination?
A. It's more confirmation that that approach works, and then we could modify that as well, potentially, with pH.
Q. All right. So what was your overall conclusion, then, following these platform experiments?
A. That we basically achieved the objective.
Q. And remind us of the objective.
A. Stabilize botulinum toxins without the use of any animal products or macromolecules.
Q. So let's turn back now to the '878 formulation patent

that we discussed at the beginning of your testimony. That's marked JTX 001 in your witness binder.

And is this the patent that you were awarded for the invention we've been discussing?

A. Yes.

Q. And, Mr. Hunt, just a couple questions about this.

Are you proud of your invention?

A. Yeah. I mean, I've been told it's, you know, a solid piece of work. So I don't dwell on it too much. I mean, whatever I do matters.

I was very happy that we had succeeded, and I was more proud of the design of the experiments. I thought that's where the real creativity came in. I never saw somebody else pull something like that together with that kind of rigor involved in it.

And I was very proud of the team. I put together a really solid team. These people volunteered to work under very difficult circumstances, potentially dangerous circumstances even. They volunteered for that. They didn't have to do it.

So I was very proud of them for sure. That's the one aspect I'd say I was most proud of.

Q. So, Mr. Hunt, over the course of your career, about how many patents have you been awarded for your innovations?

A. I think in the U.S., I've been told it's something --

it's 13, 50, something in that range of applications and patents issued and 40 patent families around the world.

I don't know exactly. That's what they tell me.

Q. And, Mr. Hunt, when did you leave Allergan?

A. 2016, I believe.

Q. And after you left Allergan, what did you do next?

A. I got out of California. We basically -- we established ourselves -- we had already been living some -- part-time in Florida.

What I tried to do is focus on family issues. I've been away so much, my wife basically raised the kids by herself. So I was trying to make up for some of that, I guess, and spend more time with the kids and the grandkids. That's primarily what I -- and I get phone calls all the time about this stuff, but I don't really -- I pretty much got out.

This was so stressful and so difficult for such a long period of time, I was really done. I mean, I felt we had accomplished the goals. I didn't feel like anyone else had achieved these things, and so it was time to move on.

Q. Okay. So thank you, Mr. Hunt.

MS. RUPERT: I have no further questions at this time.

THE COURT: All right.

MR. VARUGHESE: May we approach, Your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. VARUGHESE:

Q. Good morning, Mr. Hunt.

A. Good morning.

Q. My name is Dennis Varughese. I am -- before today, I didn't realize you were from Philly. So it's a pleasure to meet you. I am too.

Can we go to Claim 1 of Mr. Hunt's patent.

So you were just discussing this claim; right, Mr. Hunt?

A. I believe so, yes.

Q. So you testified earlier that you didn't invent botulinum toxin; right?

A. That's correct.

Q. And can we go to A.

Do you agree that you knew about the concept of compounding botulinum toxin type A in this category of BOTOX?

A. Could you restate that? I'm sorry.

Q. Sure.

You would agree that you didn't invent the concept of compounding a botulinum toxin type A in an aqueous carrier to make a drug formulation; correct?

A. No.

Q. You don't agree?
A. I agree. Sorry, I missed, the...
Q. I've been told I speak too loud, sorry.
Can you highlight part B, please.
So, Mr. Hunt, I've highlighted that part. You also agree that you didn't invent the concept of the lyophilize compound toxin Type A formulation to make a patent formulation; correct?
A. It was vacuum dried at that point. I did not invent vacuum drying of botulinum toxin. I did not invent the concept of lyophilizing botulinum toxins.
My haphazard formulations. I'm processing.
Q. Understood.
Can you highlight the next step.
Mr. Hunt, you didn't invent surfactants; right?
A. I did not invent surfactants.
Q. And you didn't invent disaccharides?
A. I did not invent disaccharides.
Q. And trehalose is a disaccharide?
A. It is.
Q. Now, earlier you testified about disaccharides with Ms. Rupert. I have a question for you.
When you were starting to do your work that led to this patent, did you feel that disaccharides would be amenable for nonHSA formulations?

A. Would they be inventable?
Q. Amenable.
A. Oh, sorry.
Amenable for what purpose?
Q. For use in nonHSA formulations.
A. Oh, no. I didn't believe they would work, if that's what you mean. I -- there was no evidence to us, whether we generated it internally or externally, that they would be successful stabilizers.
Does that answer your question?
Q. It does.
Do you remember being deposed in this case?
A. Yes.
Q. Do you remember being asked that question?
A. No.
Q. Okay. I'm going to show you a clip of your deposition. And if you could take a look at it.
(A video was played.)
BY THE ATTORNEY:
Q. Why were you looking to use disaccharides in a botulinum toxin formulation that did not use HSA?
A. They had the properties that we thought would be amenable to adapting to a formulation like this.
(The video ended.)
BY MR. VARUGHESE:

Q. Do you remember that now?
A. I guess so. I don't know what "amenable" really means.
Q. You don't know what "amenable" means?
A. It can be a lot of things. We were looking for successfully stabilizing the botulinum toxin, which doesn't mean amenable.
Q. Can you give me your understanding of the word "adsorption"?
A. Adsorption?
Q. Yeah.
A. That's generally something that sticks to a surface, commonly that's what it's referred to.
Q. In this context, it would be like sticking to the walls of the container?
A. It could be that, yes.
Q. During the work that led to your '878 patent, the reason that you were looking to using surfactants was to prevent adsorption of the botulinum toxin to the surface of the containers; correct?
A. We didn't really know what the functions would be. That's what surfactants do. That's one of the things surfactants do. It's not the only thing they do, so that's a possibility.
Q. Wasn't that a reason you were looking at surfactants

in your work?
A. It wasn't the sole reason. Like I said, these things have a host of properties and we were hoping some of those properties would be beneficial. And if they weren't all in one ingredient, we would add another ingredient to add those properties together for sufficient stabilization.
Q. I'm not trying to be combative.
A. I understand.
Q. I wasn't asking if it was the sole reason, but it was a reason that you were looking to be using surfactants, because you knew that they would reduce adsorption?
A. That could be a reason. It could be other reasons too. It also helps stabilize certain proteins and solubility, so it could have been that too. It does that too. That's not adsorption.
Q. I think what I'm trying to show the jury one way or another is when you started your work, you did that work knowing that surfactants in this context could reduce adsorption. It's not something you discovered as part of the work. You knew that going in. I'm trying to see if that's true or not for the jury.
A. No one knew how surfactants interacted with botulinum toxins at that time, and they still don't really know. This information was not -- there was a whole host of reasons you could add things together and surfactants and disaccharides,

you use them to make popsicles too, but it didn't help us figure out how to stabilize botulinum toxin. While those statements have been made and people said that, there was no data to show this stuff.

Q. Wasn't there considerable information out there regarding this issue?

A. A lot of people said this is the problem but, guess what, I don't think it is. That's why things are added to prevent adsorption. Same thing with albumin but there's really not much there to support that. They're just postulating. That's the reason we do experiments, to determine what's successful, not necessarily understanding what all the properties are.

Q. But at that time people knew the surfactants could address the adsorption issue; right?

A. People also knew surfactants could denature the proteins so if you add them, they can get lost as opposed to -- because you can unfold them, they can bind together and aggregate, and they can fall out of solution. Both things are known.

Q. I'm not talking about denaturing.

I want to say we're on a timed trial. I'm trying to ask you some simple questions. If you have further explanations, your lawyer can redirect you.

So I just want to ask that question again. At

the time you started doing your work, people knew that surfactants would reduce the adsorption problem?
A. Could reduce adsorption.
Q. Thank you.
Can we highlight the next limitation.
Mr. Hunt, you didn't come up with the concept of injecting botulinum toxin intramuscularly or subcutaneously; correct?
A. No.
Q. In your patent, the '878 patent, I assume you reviewed it in preparation for your testimony today?
A. Yes.
Q. Did you have any role in writing it up, any part of it?
A. Well, I mean, essentially, I wrote it all except the patent attorneys would construct claims and things based on what the -- I'm not a legal expert. I'm not a patent attorney.
Q. You mean, your work, that was the written description. Not the claim stuff but all the -- where the patent explains what your work was, you wrote that up?
A. The process was I would write up what the invention was from the scientific --
MS. RUPERT: Your Honor, I just want to make sure there's no disclosure of privileged information.

THE COURT: All right. So far I'm not hearing any. So keep going, Dr. Hunt.

BY MR. VARUGHESE:

Q. Mr. Hunt, don't tell me any conversations you've had with the lawyers. I'm trying to figure out how involved you were. The patent has the claims and then has a written description that describes the invention. I want to know what your role was in that material.

A. So I would write it up, here's what I believe is the discovery and how we arrived at it. Here's the data packet that goes with it. They would construct a patent, and we would go back and forth reviewing for various things. But there's things that are considered legal that I would not try to comment on because I'm not an expert in that. Just like attorneys don't understand what I'm doing, I don't understand what anybody with specialized training is doing.

Q. I got it. To your recollection, in that written description of the patent, there's no discussion of duration of action of the botulinum toxin; correct?

A. A discussion of duration, is that?

Q. Yes.

A. I couldn't say for sure if there was or there wasn't. To be honest, you're talking 30 years or something at this point. It was a long time ago.

Q. I thought maybe in your review and preparation for

the trial, do you recall reading anything in that patent?
A. Again, you're talking about constructing it which was a series of versions and I don't -- duration is related to potency. I'm showing higher potency recovery. That means longer duration by definition. If you have higher potency, you have longer duration. So every time I say "potency" you can throw duration on there.
Q. Right. Let me be clear. Maybe my question isn't clear, and that's my fault because I've been asking about drafting.
The patent as it stands today, based on your most recent review, there's no discussion of having a longer duration of action in BOTOX?
A. I believe there's no discussion in there. It's just the potency results. Again, higher recovery means longer duration. That's by default.
Q. I'm going to remind you we're on a timed trial. I'm trying do ask you simpler questions. If you have explanations, Ms. Rupert can give you a chance to do that. I just want to have my questions be really clear for the jury, so I'll ask one more time.
Your patent has no discussion of a longer duration of action in your formulation compared to BOTOX; correct?
A. I don't recall that, no.

Q. And your patent doesn't include any testing data suggesting a longer duration of action than BOTOX; correct?
A. Potency.
Q. Your answer what?
A. Potency is the output. Potency is the length of the duration from that standpoint, but there's no long discussion about it.
Q. There's no testing data, either, about a longer duration of action; right?
A. Potency. Higher potency is an outcome. Longer duration is an outcome of potency. If you get injected with 100 units, you're going to have longer duration than 10. So by default you're -- when you say "potency," that includes the therapeutic effect you're receiving from the drug. I don't talk about onset either.
Q. Right. I didn't ask you about onset. Your patent doesn't include any data saying my stuff here lasts longer than BOTOX; right?
A. No.
Q. Thank you.
Can we go to -- so this is from your patent. This is a list of different surfactants that were known and available at the time; right?
You'd agree with that?
A. Was that a question?

I'm sorry, yes.
Q. And one of the surfactants listed is something called polysorbate 20?
A. Yes.
Q. You're familiar with that?
A. Yes.
Q. And you'd agree polysorbate 20 was known and used before 2004 as an excipient?
A. As an excipient, not with botulinum toxin.
Q. Polysorbate 20 is only mentioned once in this patent; right?
A. I couldn't say that for sure but it's --
Q. That's a tough question to answer. I understand.
A. I believe that could be the case.
Q. There's no actual examples using Polysorbate 20 in your patent; correct?
A. That also may be true.
Q. You used the word "lyophilizing" earlier in your testimony with Ms. Rupert. Do you recall that?
A. Possibly.
Q. Can you explain to the jury what lyophilizing is?
A. Lyophilizing is -- basically, what you're doing is you're removing the water because proteins don't like to be in a water environment, a wet environment, and degradation happens faster in an aqueous environment. So if you dry

them and take all the moisture out, you make a solid cake out of it. Generally, it will have longer storage than if you left it in a liquid format.

So lyophilization is a way to get the water out. So there's a bunch of steps involved, freezing, primary drying, sometimes secondary drying. It's just a process for doing that.

Is that sufficient?

Q. Yes, thank you.

And you would agree that the process of lyophilizing was known before 2004?

A. Yes, absolutely.

Q. One of the ingredients you discussed with Ms. Rupert was trehalose?

A. Yes.

Q. Trehalose is a disaccharide?

A. Yes.

Q. So it was known before 2004 that trehalose -- I'm going to use the word "lyoprotectant." Is that a term of art that you're familiar with?

A. Yes.

Q. Can you explain to the jury what a lyoprotectant is?

A. It's something that supposedly will protect against -- when you run something through the process, that certain ingredients have been identified or it's stated that

they will protect things against that degrading. If you just freeze things, if you just freeze your steak you can -- you don't freeze it right or too many times or at the wrong temperature, you can end up with steak that doesn't taste very good. Same thing with the proteins. There's a lot of generalized statements about what these ingredients do, and one of the terms they use is "lyoprotectant."

Q. So also, is it fair to say that lyophilization can also be called freeze drying? Would you agree with that?

A. No.

Q. You would not agree with that?

A. No.

Q. So going back to my prior question: Before 2004, it was known that trehalose was a lyoprotectant?

A. There was reports that claimed that, yes. I don't know if it's well-established that that's the case, but that's what they said.

Q. Can we bring up DTX 209.

Mr. Hunt, this is your other patent application publication '598 that you discussed with Ms. Rupert?

A. Yes.

Q. You'd agree that recombinant HSA or recombinant human serum albumin is not an animal protein; right?

A. That's correct.

Q. Can we go to paragraph 0049 in this exhibit. Can you

highlight the first sentence.

Do you recall discussing this sentence with Ms. Rupert?

A. Yes.

Q. Okay. And you were saying, the sentence, I guess, you're -- what you said this conveys is saccharides, including polysaccharides, are, in general, poor candidates to serve as protein stabilizers?

A. Yes.

Q. I want to give you a chance to read the -- some of the lines below where it says Maillard reaction.

But my question is: Is that because those saccharides and polysaccharides are considered reducing sugars? Take a look at that and see if you can answer my question.

A. Well, I mean, saccharides -- so monosaccharides, a lot of those are reducing sugars. But polysaccharides can degrade down to reducing sugars or contain impurities, so yes.

Q. So my question -- and I actually added a little bit more to that.

I want you to explain to the jury why that sentence is true. Is it because of this Maillard reaction?

A. Primarily, yes.

Q. Can you explain to the jury exactly how that works or

what the problem is.
A. Yeah. So what I said before -- like I said before, when you toast your bread, it turns brown. It's the same thing.
So the sugars react with, groups on, proteins and they link -- it will chemically link up. Especially with -- reducing sugars are the primary ingredient to have in order to form that reaction.
So again, it's well-known that this happens a lot in drugs. People use sugars to stabilize drugs or small molecules in aspirins and things like that. If there's three MI groups or anything around, which is part of a protein, those will often react.
So people are always on the lookout for this, that this is a problem.
Is that sufficient?
Q. Yes. That was excellent. Thank you.
So is it fair to say that if the sugar is not a reducing sugar, then this problem doesn't exist?
A. Not exactly. Because, see, I ran a raw material group and what I know is these things degrade down into reducing sugars and/or they contain impurities.
So I had a drug that was degrading that supposedly didn't have a reducing sugar in, but it had degraded down to reducing sugars and had impurities. And so

those were sufficient to cause degradation of the drug and the drug was failing.

So you have to couch the statements with the knowledge base. Theoretically, if you never had a reducing sugar, yes, you would not see that reaction.

Q. Got it. And then you would agree that trehalose is not a reducing sugar, right?

A. That's correct.

Q. Can we go to paragraph 180.

Now, you remember discussing this section with Ms. Rupert?

A. Yes.

Q. Okay. And it says: "The present invention excludes from its scope disaccharide, oligosaccharides, and molecular"; right?

A. Yes.

Q. What's an oligosaccharide? Because I don't remember you discussing that.

A. I'm sorry. What was that?

Q. An oligosaccharide, what is that?

A. Oligosaccharide, it just means -- I think they classify it up to ten or up to five or something. There's a limit.

But again, we have saccharides, and as you link them together, the terminology gets bigger. So they're all

polysaccharides once it gets above that. And then there's different qualifications, like what are saccharides -- it's either one or ten -- I'm sorry, five or ten links, as I recall.

And some of this terminology is kind of confusing. I don't know why they even use it.

Q. So I want to try to summarize what your testimony was here so the jury understands.

Are you saying that the formulations in your '598 publication excludes the use of disaccharides? Is that a fair summary of what you're trying to say?

A. Yes.

Q. Okay. Now, we discussed that disaccharide is a sugar. Yes?

A. Yes.

Q. And trehalose is a disaccharide?

A. Correct.

Q. All right. And a polysaccharide is also a sugar?

A. Correct.

Q. So this passage would make sense because a formulation that already has a polysaccharide, which is a sugar, why would it need another sugar, a disaccharide; correct?

A. Well, that -- it could be determined. Because if -- they may have different properties, as we were describing

before. Two different sugars might have different properties.

So the reason we were doing combinations of sugars themselves, two different kinds sugars, was to see if this sugar has one property and another one has another property and then they're added to it.

Q. And do you understand this passage appears in this publication under a heading that says, "Polysaccharide-Containing Pharmaceutical Compositions"?

Do you recall that?

A. No, I do not recall that.

Q. So this is further up the application.

A. I agree.

Q. But in this application, that wasn't the only example. You provided examples of other formulations too; correct?

A. Correct.

Q. And the passage that you covered with Ms. Rupert, this one, is separate. It's a separate example than the one entitled "Recombinant Albumin Botulinum Toxin Pharmaceutical Compositions"; correct?

A. Correct.

Q. Okay. That's at paragraph 153. Do you see that?

And here, this example uses a recombinant HSA; correct?

A. Yes.
Q. And that's animal-protein free, as testified earlier; correct?
A. Yes.
Q. And in this example, there is no such statement that says "don't use a disaccharide"; correct?
A. Not in that particular section, it doesn't appear.
Q. You testified earlier -- and, again, if I'm mischaracterizing your testimony, correct me -- when Ms. Rupert asked you, you were trying to go animal-protein free, you said, no, we wanted to actually go protein-free as an excipient. Is that --
A. For the NP project.
Q. For '878 patent?
A. Yes.
Q. Yeah. So can we go back to Claim 1.
The very first line there, it says: "An animal-protein free method."
Why didn't you just say a protein-free method?
A. I mean, I can't -- I don't know. I mean, it may have just been a typo or the lawyer put it in. I don't know.
Q. A typo? Do you think it should have said --
A. It's still accurate. I mean, either way it's still accurate.
Q. So in this composition that's covered in Claim 1, it

could include nonanimal proteins, correct? It's not a -- not protein free --

A. No, that's not what I meant.

Q. But is that accurate? Could it include nonanimal --

A. I guess. Is it accurate? No. This is a protein-free. So whether the word "animal" is there, I guess, is subject to interpretation on what you mean by that, so.

Q. So if composition had nonanimal proteins and you're saying that doesn't fall within the scope of this claim?

A. No, it does not.

MS. RUPERT: Objection, Your Honor.

THE COURT: I'm going to sustain the objection. Cross-examining a nonexpert about the patent claims is not something we should be doing.

MR. VARUGHESE: Understood, Your Honor.

BY MR. VARUGHESE:

Q. Mr. Hunt, you mentioned that -- and again, correct me if I'm wrong -- you mentioned that FDA was skeptical of changing any amount of albumin that was in BOTOX.

Do you remember saying that?

A. Correct.

Q. Has the FDA approved any product that you made that's covered by the '878 patent?

A. I don't really know. I honestly don't know. I don't

track that stuff anymore.

MR. VARUGHESE: Thank you for your time. I don't have any more questions, Mr. Hunt. Thank you.

THE WITNESS: Thank you.

THE COURT: Thank you.

Is there any redirect, Ms. Rupert?

MS. RUPERT: No redirect, Your Honor.

THE COURT: All right, Dr. Hunt.

I'm sorry. I've been calling you Dr. Hunt. You are Dr. Hunt or is it Mr. Hunt?

THE WITNESS: It's Mr., but they call me doctor in New York, so that's fine.

THE COURT: All right. We're done with you so you can step down. Thank you for your testimony. Watch your step stepping down. Actually, do you mind just sitting here for a second? Because we're going to take a break.

And so can we take the jury out for a 15-minute break.

THE WITNESS: Thank you, Your Honor.

(The jury exited the courtroom.)

THE COURT: All right. So we'll take, as I said, a 15-minute break.

(A recess was taken, after which the following proceedings were had:)

THE COURT: We're ready to go again. Let's be

seated and get the jury.

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back. Everyone, you may be seated.

Ms. Rupert, you may continue.

MS. RUPERT: Thank you, Your Honor.

Can everybody hear me okay? All right.

So at this time, the plaintiffs call Dr. Ronald Bates to the stand.

And, Your Honor, can I hand up copies of the binders and the demonstratives?

THE COURT: Yes.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Ronald Bates, R-O-N-A-L-D, B-A-T-E-S.

RONALD BATES,

called as a witness on behalf of the Plaintiff, was sworn, and testified as follows:

THE COURT: And while he's being sworn, can I see you Mr. Varughese and Ms. Rupert up here. I don't need the court reporter.

(Thereupon, a discussion was held off the

record.)

DIRECT EXAMINATION

BY MS. RUPERT:

Q. Good morning, sir.

A. Good morning.

Q. Can you please state your full name for the jury.

A. Ronald Bates.

Q. And are you currently employed by an Allergan entity?

A. No, I am not.

Q. Were you previously employed by an Allergan entity?

A. Yes. I used to work for Allergan Sales, which was a subsidiary of Allergan, Inc.

Q. And how will you refer to this Allergan entity in your testimony today?

A. Allergan.

Q. So please turn in your binder to what's been marked as JTX 004.

A. Okay.

Q. And do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is the '748 patent.

Q. Do you understand that this is one of the patents that Allergan is accusing Revance of infringing?

A. Yes, I do.

Q. All right.

MS. RUPERT: So, Your Honor, to the extent not already admitted, I move to admit JTX 004 into evidence.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 004 was admitted.)

BY MS. RUPERT:

Q. So, sir, let's look at the section titled "Inventors" in the upper left.

Are you one of the inventors on this patent?

A. Yes, I am.

Q. And what, at a high level, is this patent about?

A. This is Allergan's APF process for making a super pure BoNT/A.

Q. And remind the jury, what is BoNT/A short for?

A. Botulinum neurotoxin type A.

Q. So can you please explain to the jury at a high level what the invention of this patent is.

A. So the invention is using an animal-product-free growth phase, using a plant-based food, and also an animal-product-free separation process that uses specific technology called chromatography to purify BoNT/A in a specific way.

Q. Dr. Bates, did you invent chromatography?

A. No, I did not.

Q. What was new about your use of chromatography to make

an animal-product-free BoNT/A?
A. So the invention is really the use of chromatography in a specific way in an animal-product-free manner to produce a super pure version of BoNT/A.
Q. Are you aware of anyone else who did this, who figured out how to do this, before you and your co-inventors did?
A. No, I do not.
Q. How long have you been using chromatography?
A. I've been using chromatography my entire career, at least 30 years.
Q. So I understand that you'll be using graphics and demonstratives to aid in your testimony today. Who prepared those?
A. I did in consultation with counsel.
Q. So let's start by discussing a little bit about your own background. Can you please briefly describe your education for us.
A. Yes, sure. I got a bachelor of science in chemical engineering from Rensselaer Polytech Institute in 1993 and then I went on to get my Ph.D. in chemical and biochemical engineering from the University of Maryland in Baltimore County, and I got that in 1999.
Q. What was the focus of your Ph.D.?
A. It focused on separation techniques, including

chromatography.
Q. Let's turn to the first slide and discuss a little about your professional experience. What would you say is the common thread for the companies that you have listed here?
A. So all my roles throughout my career have involved separation sciences.
Q. Can you please give us an example of how separation sciences work in terms of what goes in and what comes out.
A. Yeah, sure. So a chemist or someone who has something, they would give me a jar of, say, black tar or stuff that looks like black tar. I would bring it back to my lab, I would purify it, and I would give back white powder or clear liquids.
Q. Let's focus on the entry you have here for Allergan. When were you at Allergan?
A. I was at Allergan from 2007 to 2013.
Q. Why did you go to Allergan?
A. I was interested in learning more about bacteria cells. To date, I had only used mammalian cells and I was also interested in learning more about the BoNT/A molecule itself.
Q. And "BoNT," we're referring to the botulinum neurotoxin?
A. Correct.

Q. Before Allergan, had you worked with botulin neurotoxin at all?
A. I had not worked with it before joining Allergan.
Q. Why were you interested in working with such a dangerous substance?
A. So the bacteria and the molecule itself are very challenging, and being a chemical engineer, I like to be challenged. I was also interested in is there a way we could do this better and safer.
Q. And so why did you, ultimately, leave Allergan?
A. I left for personal reasons. In 2013, my kids were at a certain age and I didn't really want them to grow up in the pressure cooker that is Southern California. And at the same time, I got an offer from Bristol Myers Squibb where I had previously worked in upstate New York, so I decided to move my family to upstate New York.
Q. At the time you joined Allergan, did Allergan sell any products that contain BoNT/A?
A. I believe they sold BOTOX which contains BoNT/A.
Q. If Allergan already had a BoNT/A product on the market that was considered safe and effective, why was it interested in making new ways or developing new ways to make BoNT/A?
A. So Allergan has been the lead innovator in the BoNT/A field but they're not content with just staying as that.

They're always looking for new ways to invent better processes, purer versions of BoNT/A.

Q. What were Allergan's goals in continuing to invent new ways to make BoNT/A?

A. There were four main goals. So Allergan was interested in making a process that was more productive than the existing processes, so essentially making more BoNT/A in less time. They were also interested in making the process safer for their employees. So we were looking to reduce the number of processing steps which would prevent the accidental escape of the BoNT/A into the air, thereby making it safer. We were also looking to continue to make purer versions of BoNT/A. And lastly, we were looking for a consistent source of raw materials, looking to make sure we always had materials that were available.

Q. Let's turn to your next slide, and we're going to discuss the sourcing issues a little more.

What was Allergan's goal in finding a better way to source materials?

A. So Allergan was looking to find a source of raw materials that was always alike and always available.

Q. So looking at the left side of your slide, why did Allergan want to make a source of material that was always alike?

A. So when you're manufacturing a toxin like BoNT/A, you

want to make sure you have a consistent manufacturing process, and your process is only as consistent as the raw material that go into it. So Allergan was looking to find that source of raw materials that was always alike. If I look at the cows on the left side of the screen, I see all cows are not equal. They're not alike, and the animal products that come from those cows are also not alike.
Q. Looking at the right side of your slide, why did Allergan want to find a source of material that was always available?
A. So if you're making pharmaceuticals or drugs, you want to make sure that you always have a supply of those drugs for your patients, and you can't manufacture if you don't have raw materials to do the manufacturing. So Allergan was looking to find a consistent source of raw materials. If I look at the right side of the slide, where you could see 25 cows, you'll see some Xes where there should be cows. Those Xes are instances when the animal-derived product is not available. Those Xes are also supply chain problems.
Q. You just mentioned supply chain problems. Can you give us an analogy to supply chain issues.
A. If you think back four or five years ago, there was a time we couldn't even get household goods like toilet paper due to global supply chain issues.

Q. What could impact the supply chain for animal products?
A. Animal products can be affected or the animals themselves can be affected by natural disaster, civil war in the countries that make exporting those animal products impossible, as well as unforeseen diseases.
Q. Was Allergan to that point concerned about any risk of "mad cow disease" that use of animal products might present?
A. Allergan was aware of "mad cow disease" and there were people at Allergan who were focused on preventing "mad cow disease." We were more looking to find a source of raw materials, from a scientific point of view, that was always alike and always available.
Q. Was Allergan successful in achieving the goals you just described?
A. Yes.
Q. Let's turn, explore more about the work done at Allergan to achieve those goals. When you introduced yourself, you discussed the '748 patent which names you as one of the inventors. Are you aware that there's another patent-in-suit that Allergan is accusing Revance of infringing?
A. Yes.
Q. Let's turn to the next slide, PDX 134, and please

also turn in your witness binder to the document JTX 003.
A. I'm there.
Q. What is it?
A. This is the U.S. Patent '740.
Q. So let's talk about the '740 patent now. Are you a named inventor on this patent?
A. No, I'm not.
Q. Why not?
A. The work that went into this patent was completed prior to me joining Allergan.
Q. Are you familiar with that prior work?
A. Yes, I am.
Q. How did you become familiar with the work that led to the '740 patent?
A. Yeah. So when I joined Allergan, I took it upon myself to read all the available notebooks and data draft reports that was available to catch myself up on what the current state of development was at Allergan.
Q. So please turn in your binder to what's been marked as JTX 15. Let me know when you're there.
A. I'm there.
Q. Do you recognize this document?
A. Yes.
Q. And what is this document?
A. This document is a report entitled "Development of An

Animal-Product-Free Downstream Process for the *Clostridium Botulinum* Neurotoxin Type A Complex."
Q. What is *clostridium botulinum* neurotoxin type A complex in plainer language?
A. This is what I'm calling BoNT/A.
Q. Have you seen this report before?
A. Yes, I have.
Q. When did you first see what was in this report?
A. As I mentioned, when I first joined Allergan, I looked at all the available data and draft reports. A lot of that work is what is summarized in this document.
Q. What, if anything, did this report help you learn?
A. This helped me learn the current state of development Allergan had at that time towards BoNT/A manufacturing.
Q. And why was reviewing this report important for your new role at Allergan?
A. So my new role was to continue to find new and better ways to make Allergan's processes, including the one for BoNT/A. So understanding the current development state is very important. If I'm going to try and improve something, I need to know where we were when I begin.
MS. RUPERT: Your Honor, I'd like to move JTX 15 into evidence.
MR. VARUGHESE: No objection, Your Honor.
THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 15 was admitted.)

BY MS. RUPERT:

Q. We're going to pull up page 2 of that report on the screen.

Dr. Bates, who signed this report?

A. Hui Xiang and myself.

Q. How much, if any, of this report did you review before you signed it?

A. I reviewed all of it.

Q. Who was Hui Xiang?

A. He was a scientist at Allergen.

Q. Who did he report to?

A. He reported directly to me.

Q. Can you please explain to the jury at a high level what the focus of this report was.

A. This was the data that went into the animal-product-free process for manufacturing BoNT/A.

Q. So how does the process in this report that's been marked as JTX 15 compare to Allergan's animal-free process in the '740 patent?

A. They're the same process.

Q. Let's turn to your next slide and talk a little bit more about this invention. What process are you showing here?

A. This is the invention for the '740 patent.

Q. And are you aware of anyone who came up with this process before Allergan?
A. No, I'm not.
Q. Did this process help Allergan achieve the goals that you've been discussing?
A. Yes, it did.
Q. Tell us what was new about Allergan's process.
A. So this was the first process that used an animal-product-free growth phase. Instead of the animal products, they used plant-based food. It also used chromatography in a separation process that was also animal-product free.
Q. All right. So what have you shown in the first two boxes at the top of this slide?
A. So the first two boxes show the growth phase. And it -- where the bacteria that makes BoNT/A uses the plant-based food to grow. And in this example, the plant we're showing is soybeans.
Q. And let's look at the next box.
What have you shown in the third box at the bottom of this slide?
A. So after the growth phase of the process ends, the bacteria burst. And when they burst, everything that's inside the cell gets released into the liquid.
Q. And what was the benefit to Allergan using this --

this plan you've shown, the soybeans, rather than animal product to make BoNT/A here?
A. I'm sorry. Can you repeat the question.
Q. Sure.
What was the benefit to Allergan of using soybeans rather than animal product to make BoNT/A as you've shown here?
A. So soybeans are generally alike and they're readily available.
Q. So let's go to the fourth box.
What have you shown in the fourth box at the bottom of this slide?
A. So after the bacteria burst and you have the dead bacteria and the other stuff in the BoNT/A, you need to purify all that dead bacteria and other stuff away from the BoNT/A.
This fourth box is -- shows that animal-product-free separation process to result in a pure BoNT/A.
Q. Okay. So before we go into more detail about this specific separation process that's a part of Allergan's invention, let's talk about chromatography a bit more generally.
A. Okay.
Q. So what's the gray column that you've shown in this

fourth box?
A. That is a chromatography column.
Q. Okay. So, Dr. Bates, what is the first thing that comes to mind when I say "chromatography"?
A. I think separation.
Q. Okay. So do you have the column up there? DTX -- okay, very good.
So I see you've got a demonstrative up there, a physical demonstrative. It's been marked as DDX 1001.
A. Yes.
Q. Okay. So, Dr. Bates, can you please explain to the jury at a high level how chromatography works.
A. Sure.
So what I'm holding in my hand -- and hopefully you guys can see this through the bag -- are two separate chromatography columns. These are the shells of a chromatography column, okay. These are available commercially from many different vendors, many different shapes and sizes.
The real magic of chromatography, if I could use that word, is when you put -- on the screen you see the gray matrix -- when you put that gray matrix into this chromatography column. So that gray matrix is what I'm going to call a resin. Okay.
And that resin comes in many different types and

many different functions inside one of these chromatography columns. And that is where the separation happens.

If you turn back to my screen, so imagine I have a feed mixture that I'm going to just depict as a cup of different-colored and different-sized balls, okay, just for simplicity.

If I were to take that, feed that cup of balls, and I were to pour it into or pump it into one of these chromatography columns, those balls would separate as they go down the column based on the interaction that --

Q. And is that what you're showing on the screen there, Mr. Bates?

A. As you can see on the screen, as the balls move down the column, they're separated based on the interaction with the resin. And, you know, as you're flowing it down, first the purple balls would come out, then the green balls would come out, and then the red balls.

And occasionally in chromatography, one component doesn't actually come out. On the screen, you can see the yellow balls don't actually come off this resin. That, too, is a form of separation in that those yellow balls are separated from all the other components.

In a simplified way, that's how chromatography works.

Q. So let's turn to your next slide, PDX 1312.

How many types of columns did the inventors ultimately use in Allergan's '740 animal-free process?
A. They used two chromatography columns in the series.
Q. And what's a series?
A. A series means one column right after the other.
Q. What was the first type of column that is used in Allergan's '740 animal-free-process patent?
A. So if you look on the screen, the left-hand side is the first column, and it's called the hydrophobic interaction column.

And that gray stuff we talked about in the last slide, that's resin. In this case, that resin is something called a hydrophobic resin. And it interacts with components coming into it. The components are either water-loving or water-hating.

You can think of it how oil and vinegar interact with water. Oil is hydrophobic, or water-hating. If you pour oil into water, they hate each other, so they're going to separate; right? The oil will sit on top.

So vinegar, which is water-loving, and also the word for that is hydrophilic. There's water-loving. When I take a cup of vinegar and pour it into the water, they mix and they get along real well.

On a hydrophobic interaction chromatography column, that's essentially what's happening; right? The

water-loving is going right through the column because it doesn't like the water-hating like the oil. And that's what sticks to the column.

Q. And can we call this hydrophobic interaction chromatography column, which is kind of a mouthful, can we call that a HIC column for short, HIC?

A. Yes.

Q. All right. So what's the second type of column that is used in Allergan's '740 animal-free-process patent?

A. The second type shown on the right is an ion exchange chromatography column.

Q. And how does an ion exchange chromatography column work?

A. So similar to what we were describing before, that gray matrix is a charged resin. It can be either a positive or negative charge, okay. And it operates, essentially, on the principals of opposites attract.

So negative likes -- negative likes positive and positive likes negative. You can almost think of it like magnets; right? If I had two magnets and the end of the two magnets were the same, when I try to push them together, they're going to want to repel each other; right? Repel each other.

If I turn one around and now I have two opposite sides of the magnets, they're going to want to stick

together. That's the -- essentially, the same principle for an ion exchange chromatography column.

Q. So when the inventors began their work, did they know which columns to use or how many columns to use or in what order?

A. No, they didn't.

Q. And how do you know that?

A. I read the development documents that went into it, and I know the amount of failure -- well, I don't know the number of failures, but I know there were a significant amount of failures that led to this process being developed.

Q. Okay. So we're going to turn to page 27 of the report now. That's marked as JTX 15. I'm going to focus only on Table 9.1.1.

What documents listed here reflect the underlying experimental work that went into the report?

A. So all of the titles that have notebook or looseleaf binder in them, those are the records where all the experiments are captured.

Q. And roughly how many experiments were conducted in connection with this work?

A. Hundreds to thousands of experiments.

Q. So let's turn to your next slide. That's PDX 13-13.

Why were so many experiments conducted during the research that gave rise to Allergan's '740

animal-free-process patent?

A. So let's continue to focus on chromatography.

So chromatography itself is very complicated and unpredictable. So when you're trying to develop a chromatography process, there are a lot of factors you have to take into account.

So you have to look at the different resin types, the different resin chemistries, the different resin sizes, even the column combinations. And then you have to look at which buffers to use, what salt levels work, what pH would give you the desired separation. And you have to do that for each step.

And then once you develop that step, you have to figure out how that step is going to fit into the overall process that has many, many different steps.

And then you also have to look at each of those other steps and make sure that they're all working in harmony to give you that desired outcome.

Q. And so what are you showing up here on the screen?

A. On the screen are -- is an example of some of the input variables for the chromatography. And these are just provided to give people an understanding of the magnitude of the variables that have to be experimentally determined every time you develop a chromatography step.

Q. So do you have a real-life analogy that you could

share with us here?
A. Yeah. So just before lunch, I have a really good one that I like to use.
Suppose I were to give you a bowl of potato-leek soup, okay. So concentrate on the words, not the potato-leek soup. I know everyone is hungry. If I were to tell you take the leeks and the potatoes out of that, you would take your fork and you would pick them up. No problem; right?
If I were to ask you, "Can you get me the flour. Can you get me the pepper. What about the salt out of that soup," you wouldn't be able to do that. Getting the flour back out of the soup is what chromatography does. It gives you that white powder from that cloudy mixture.
Q. So, Dr. Bates, you mentioned earlier that Allergan did not invent chromatography.
So tell us, what was new about Allergan's use of chromatography in its '740 animal-free-process patent?
A. So this was the first time anyone had used chromatography in conjunction with an animal-product-free growth phase and done so in an animal-product-free nature to produce a pure version of BoNT/A.
Q. All right. So let's go back to the goals that we were discussing towards the beginning of your testimony.
Which, if any, of Allergan's goals were

satisfied by the '740 animal-free-process patent?
A. So the '740 -- the process that's in the '740 patent is more productive. It produces more BoNT in less time. It was also safer. There are less processing steps so less chance for the BoNT/A to escape into the air.
It also produced a purer version of BoNT/A than what is commercially available or what was commercially available. And the use of plant-based food gave us a raw material source that was both alike and always available.
Q. So after you learned about the new animal-free process that Allergan had invented, what did you, Dr. Bates, do next?
A. So as I mentioned, Allergan is always interested in pushing innovation forward. And we wanted to find out, could we make BoNT/A even purer?
So I looked at the available data again and I looked at what we could do to make a better process, make BoNT/A even purer, still doing so in an animal-product free manner, and also trying to improve the overall process.
Q. So did your push to find an even more pure form of BoNT have anything to do with FDA requirements for BoNT purity?
A. No. The purity requirements would have been satisfied with the previous versions.
Q. So as you began your experiments to try to make an

even purer form of -- animal-free form of BoNT/A, did you think you were going to succeed?
A. No. You know, when you start development work, you never know if you're going to succeed. You never know what the outcome is when you start. We certainly hoped we would succeed, but no one had ever done it before, so there's no guarantee that we're going to be successful.
Q. So let's turn to your next slide. That's PDX 1314.
Did you ultimately succeed in inventing a process to make an even more pure form of BoNT/A?
A. Yes, we did.
Q. And are you aware of anyone else being able to do this in an animal-free manner before you?
A. No one outside of Allergan was doing this.
Q. So what are you showing on this slide?
A. This is the patent that I referred earlier in my testimony. This is Allergan's '748 patent for the super pure process.
Q. All right. Let's turn to your next slide and talk a little bit more about your work at Allergan that led to this invention we just saw.
So what safety challenges did you face in working with BoNT?
A. Okay. So when you're working with the most dangerous natural toxin on earth, safety is, obviously, a primary

concern.

To begin to work with BoNT -- or actually even before you begin to work with BoNT, you have to go through a three-month vaccination program. And during that time, you also have a very extensive safety training learning about the molecule, the bacteria, and the facility.

And then when you were cleared to work, you'd have to work in a facility that's called BSL-3. And this facility is essentially a room in rooms where the air coming in is filtered, used, and then is filtered again going out. So it's a very controlled room.

And while you're working in that room, you have to work in the bunny suit that you see, a full hazmat suit on the screen, including a powered air-purifying respirator. So the air you breathe is filtered before you breathe it for additional safety.

And if you're working in the purification like I mentioned in chromatography, you have to work in a glove box. And you can think of these isolators and these glove boxes as what you've see on TV where you see people stick their hands in these very long sleeves into a box and then you manipulate things inside that box.

So that's really what an isolator is. So for our work, we have to work in a BSL-3 facility in a hazmat suit with a power air purifier respirator and in a glove

box.
Q. And how dangerous was the information that you were generating as part of this work?
A. Yeah. So the molecule itself was highly toxic, as I mentioned. The information was equally as dangerous. We did not want this information getting into the wrong hands. There were and probably still are requirements on what to do with the information around a toxin like BoNT/A. Let me put it in perspective. So every week I was in my laboratory making BoNT/A, I made enough BoNT/A, per week now, to kill every person in San Francisco, LA, and everywhere in between.
Q. So what challenges did your team face in growing BoNT/A?
A. So growing a bacteria that makes a toxin like BoNT/A is challenging to begin with. The bacteria grows in a non-oxygen environment and we all need oxygen, so we had to make special chambers that were low oxygen in order to grow the bacteria. And then we decided to use a plant-based food source which added another variable, another set of experiments. So we had to do lots and lots of different experiments from different variables to really figure out which conditions stunted the growth of BoNT, on the bacteria that grows BoNT, or promoted the growth of the bacteria.
Q. What challenges did your team face in working with

chromatography to try to increase the purity of BoNT/A?
A. Yeah. So I mean, I just talked about the complexities of chromatography. It's not a plug-and-play operation by any means. So you have to do all the work I mentioned in the isolator in the bunny suit, and on top of that we were trying to develop a process using a completely animal-based food source, so we added yet another variable that had to be investigated and experimentally determined.
Q. Let's turn to your next slide. What are you showing here?
A. This is the process that I was referring to.
Q. And what does this process as a whole result in?
A. This process results in a super pure animal-product-free BoNT/A.
Q. Let's break that down a little bit for the jury. Can you please walk the jury through the new super pure BoNT/A process that you invented?
A. Sure. So the first step in the process is the growth phase where the cells grow in a plant-based food. Again, we're showing soybeans here. After the growth phase, the bacteria bursts, as I mentioned earlier, and all the stuff that's inside the cell, the dead bacteria including the BoNT/A, get released into the liquid. As you can see here, the purity is very low. So there's all the dead bacteria stuff, cellular debris, other whole cell proteins, lipids

nucleic acids, all of that are in this mix with your BoNT/A product.

The next step in the process is we take that low-purity material that I just mentioned and we process it across a series of depth filters. You can think of depth filters as specialized coffee filters. And across that depth filtration step is how we remove a lot of the gunk, that cellular debris, and 80 percent of the nucleic acid to remove the process down.

After this, you can see now we're at about a medium purity. Getting much better but still not ready, not content. We then process that material across two chromatography columns in a series, as I'm showing here, and after the two chromatography columns is what resulted in our super pure BoNT/A.

Q. So let's turn to the next slide. And, Dr. Bates, you just mentioned it. You've been referring to super pure BoNT/A. Can you please explain to the jury what you mean by that specifically.

A. Yeah. So when I say "super pure," I'm really referring to a total nucleic acid level in your product of less than 1 PPM, less than one part of nucleic acid in a million parts of BoNT.

What I've shown on the screen, just to kind of visualize this, is 10,000 dots. Let's pretend those are the

BoNT/A, and on the screen somewhere on the right-hand side is one red dot.

Can we zoom in on that.

So that one red dot? That one red dot is in a sea of 10,000. What I explained is we wanted to do one in a million, so that's a hundred times purer than that.

Q. A hundred times purer than that?

A. A hundred times purer than that one red dot in a sea of 10,000 circles.

Q. Explain to us, what do you mean by nucleic acid?

A. When I said nucleic acid, I'm referring to both DNA as well as RNA.

Q. Let's turn to your next slide. What part of your new process are you showing here?

A. On the screen is the chromatography step, the downstream process I referred to.

Q. What's the column on the left side?

A. The left side is an anion exchange chromatography column. And as I mentioned before, an anion exchange chromatography step has a charged resin, so the gray matrix has a positive charge on it, and it separates -- based on the principle of opposites attract, it separates the negative components from the liquid. That's where the anion exchange comes from.

So if I were to look at the balls -- a couple

balls as I mentioned earlier, all of the positive balls in that cup would go right through column without any traction, whereas the negative ones will slowly go down the column and some will even stick really tight to the column. So that's the principle of anion exchange chromatography.

Q. Dr. Bates, what led you to give anion exchange chromatography a shot here?

A. That's a little bit of a story. So when I first joined Allergan, as I mentioned, I read all the available literature that Allergan had, and in talking with my staff, they did not want to use anion exchange chromatography. They said it wouldn't work. I had to go to my boss, Jennifer Ton, and ask her for permission to convince my staff that we should give it a try.

Q. Why did you go to all the trouble of doing that?

A. So anion exchange chromatography is a very powerful chromatography technique and I didn't want to give up on it without making sure it didn't work.

Q. How does an anion exchange chromatography column help make super pure BoNT?

A. The positive charged matrix or resin will help reduce the levels of the gunk of the DNA and any other cellular debris by, essentially, all the positive will flow through quickly and all the negative will get separated based on the principle of opposites attract.

Q. What column have you shown on the right side?
A. The right side is a cation exchange chromatography column. In a cation exchange chromatography column, the matrix is now negative, so using opposites attract again, it separates positive components from the, in this case, the mixture of purple, yellow, green, and red balls.
Q. Please turn in your binder to what's been marked JTX 14, JTX 18, and JTX 19.
A. JTX 14.
Q. 18.
A. JTX 18.
Q. And 19.
A. And JTX 19.
Q. Do you recognize these documents?
A. Yes, I do.
Q. What are these documents?
A. These documents summarize all the data and experiments that we did to develop Allergan's super pure BoNT/A manufacturing process.
Q. So roughly how many experiments were conducted in connection with your work to increase the purity of BoNT/A?
A. I know it was over hundreds to thousands of different experiments looking at the different types of resins, the different types of conditions we used, the analytics we used.

Q. How many different resins did you try?
A. Dozens and dozens of resins.
Q. Did you experience failures when you did this work?
A. A vast majority of the resins we tried failed.
Q. From the time you started the screening studies to the time you were conducting the initial scale-up studies, how much time did that take?
A. At least six months.
Q. And even after your invention, how long did you continue working on this project generally?
A. So I left in 2013 and I was working on it when I left.
MS. RUPERT: Your Honor, I move to admit JTX 14, JTX 18, and JTX 19 into evidence, please.
MR. VARUGHESE: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibits JTX 14, JTX 18, and JTX 19 were admitted.)
BY MS. RUPERT:
Q. Dr. Bates, just a couple of questions. Let's turn back to the goals we were discussing earlier.
Which, if any, of Allergen's goals were satisfied by the '748 super pure process patent?
A. All four goals were satisfied. The process itself produced a super pure version of BoNT/A, purer than any of

the previous versions. The manufacturing process we developed had far fewer processing steps and no open-handling steps, so no opportunity for the BoNT/A to escape into the air and contaminate our workers, so a much safer process. The process itself was also highly productive. It produced more BoNT/A per unit time than any other process we had. It also used a very consistent source of raw materials so we could ensure that the manufacturing would happen as planned.

Q. So what, if any, high-level differences do you see between Allergan's '740 animal-free manufacturing process that we discussed first and Allergan's '748 super pure manufacturing process that we discussed just now?

A. I see them as two separate, distinct processes. The '748 process built on what was known from '740 but it's a different process. It uses different chromatography resins, it uses different steps, and it results in a much purer version than '740.

Q. Did you ever do any studies to confirm that the manufacturing process of the '748 patent resulted in a more pure protect?

A. Yes, we did a head-to-head comparison of the two processes.

Q. What were the results?

A. The '748 was much more pure than the '740.

Q. So, Dr. Bates, are you proud of your invention?
A. Yes, I am.
Q. Why?
A. So the work that went into this was very, very consuming in time and energy and mental capacity. Working in those bunny suits is not easy. Working in an isolator is not easy. And really we were doing all that not knowing if we were going to succeed. So to go through all that work, all that time, and the pressure that goes around with it and then to succeed and to develop a process that develops a super pure version of BoNT/A and to do so in such a way that our workers are safer and we can do it more economically, more productive, I'm very proud of this invention.
MS. RUPERT: Thank you so much, Dr. Bates. I have no further questions at this time.
THE COURT: All right. Mr. Varughese.
MR. VARUGHESE: May we approach, Your Honor?
THE COURT: Yes.

CROSS-EXAMINATION

BY MR. VARUGHESE:
Q. Good afternoon, Dr. Bates.
A. Good afternoon.
Q. My name is Dennies Varughese and I have a few questions for you.
First, let me ask you when you began your APF or

animal-product-free work, the primary concern was to avoid disease and tad evasion and bloodborne pathogens; correct?
A. When I began my animal-product-free work -- can you repeat the diseases? I'm sorry. I missed what you said.
Q. The rest of the contaminating human, animal viruses and something called prion agents, which I'll probably ask you to explain in a moment, was that -- that was a concern at the time; correct?
A. So there were certain people focused on that at Allergan. My focus was the scientific aspect, which was to develop the process.
Q. Correct. But the motivation for you to develop that process was those concerns that I just described; correct?
A. The motivation from whom?
Q. For you, your team, your company, Allergan.
Wasn't that the reason why you were looking to develop this animal-product-free process?
A. So my motivation when I got to Allergan was to improve upon the '740 process patent. That allowed me to get a super pure version of the BoNT/A molecule.
Q. Can we go to the front of JTX 15.
Do you recognize this?
A. Yes, we just talked about this.
Q. You just discussed it; right?
A. Yes, yes.

Q. And it describes the research that led to your patent?
A. Yes.
Q. Okay.
A. This -- sorry. This document, I believe this talks about the research that went into the '740 patent.
Q. Okay. And then did your '748 build on top of the '740?
A. Yes, it did.
Q. Okay. So at the time of the '740 patent, the work, would you say the motivation there was the risk of contaminating human-animal viruses and prion agents?
A. As I mentioned, there were people at Allergan focusing on making sure these were safer, for sure.
Q. Can we go to the next page. No, the very next page of that exhibit.
Showed that; right? You were an author of this report?
A. Yes.
MS. RUPERT: Let's go to page 5 of 54. And highlight that. Zoom out. This introduction.
Your Honor, I just want to flag some of this report is subject to ECT. That's why I didn't show it on the board. We're filing this exhibit under seal.
MR. VARUGHESE: Your Honor, I don't plan on

showing any toxin recipe here. I just want him looking at the introduction.

MS. RUPERT: I'd ask that we very much limit whatever you show on the board to information that we can confirm is not subject to government security sanctions.

MR. VARUGHESE: Your Honor, I have no intention of showing any numbers or formulas or substances, so.

THE COURT: I mean, is there a reason to show anything at all?

MR. VARUGHESE: Yes. Because this goes to my question that I was asking Dr. Bates in terms of what the motivation was to pursue an animal-product-free --

THE COURT: Just out of abundance of caution, instead of showing it on the screen, why don't you give him a physical copy and go from there.

So members of the jury, the reason why we're having this discussion and the reason why you got some of the exhibits not that long ago that were handed to you rather than shown is there are government regulations that apply to the public disclosure of a very small portion of what's involved in this case.

And so that's the reason why some things are being handled differently. It really has no impact on your -- how you should view anything in the case. But I've heard the neurotoxin is a very dangerous substance and is

subject to at least two different sets of laws that keep various aspects of it confidential.

MR. VARUGHESE: Thank you, Your Honor.

BY MR. VARUGHESE:

Q. So can you, in the binder that Ms. Rupert gave you, just go to JTX 15, if you don't mind, Dr. Bates. That's the same report that we just had up there.

A. I'm there.

Q. And if you go to page 5 or 54, there's a section called Introduction.

A. I am there.

Q. And again, this is a document that you coauthored; correct?

A. Correct.

Q. So I'll read it because we can't publish it to the jury. So I'll read the relevant portion. It's in the second paragraph. The sentence says: "The risk of contaminating human/animal viruses and prion agents of transmissible spongiform encephalopathy or bovine spongiform encephalopathy" -- which is "mad cow"; correct?

A. I believe so.

Q. Okay -- "from these human/animal derived products is a major concern for product safety."

Do you see that? Do you agree that's what that says there?

A. I agree that's what it says.
Q. Okay. The next sentence says: "There are, basically, two complimentary strategies to reduce the risk."
Yes?
A. Yes.
Q. "One: Develop a downstream process which is robust on viruses and TSE/BSE clearance"; right?
A. I see that.
Q. And then number two, which is more relevant here, it says, "Use our animal-product-free materials throughout the manufacturing process."
Correct?
A. I see that, yes.
Q. So what you're saying there is that animal-product-free material is a complementary strategy to reduce the risk of those diseases and contamination; correct?
A. They are -- as this says here, there are two complementary strategies, at least two complementary strategies, and that animal-product free materials would be one of those, yes.
Q. Okay. And earlier you testified that consistent sourcing was a reason for you to go animal-product free.
Do you recall that?
A. Yes.

Q. But you don't say anything about consistent sourcing in this document; correct?
A. I can't say to the entire document. I haven't read it recently, but it's not in this area you're reading here.
Q. You can't point me to one right now; right?
A. I can look through the document if you like, but I don't remember it being there.
Q. Right now, you don't know. You can't point me to -- I certainly don't want you to read the document.
I'm asking: Are you aware of the lack of consistent sourcing here?
A. No, I am not.
Q. Okay. Dr. Bates, you'd agree that there are regulatory guidelines around the world for the preference of animal-product-free manufacturing process; correct?
A. I would agree there are guidelines, yes.
Q. Yeah. And prior to 2009, you'd agree that the pharmaceutical field was already looking for ways to go animal-product free?
A. For molecules that weren't supposed to contain certain pathogens, I believe animal-product free was one path people were taking, yes.
Q. And you'd agree that prior to 2009, which is prior to your '748 patent, there were animal-product-free purification processes for the BoNT known; correct?

A. The '740 patent is prior to '748.
Q. Thank you.
So the answer to my prior question was yes; right?
A. Yes.
Q. So can we go to the '748 patent, Claim 1, please.
So this is Claim 1 of the '748 patent. Do you recognize that?
A. So I'm not a patent attorney. I'm not very good with claims, but I can see what's on the screen. That's number one, yes.
Q. I promise I'm not going to ask you to interpret it. I'm not that cruel, I promise.
A. I would appreciate that.
Q. Starting there, substantially animal-product-free process for utilizing chromatography.
Do you see that?
A. Yes.
Q. You testified earlier you did not invent chromatography; correct?
A. Correct.
Q. Go to A.
Is that a step in the chromatography process?
A. Yes, that's a step of anion exchange chromatography.
Q. You didn't invent that step; right?

A. No, I did not.
Q. Okay. Let me -- that says: "Eluting the bond down approximately 150 kilodalton BoNT/A to provide the first eluent"; correct?
A. Correct.
Q. Can I ask you to do me a favor and explain to the jury what eluting and eluate is so they know what we're talking about?
A. Sure.
So earlier I showed you the chromatography columns and I showed you how the balls in that case travel down the column. They typically travel down the column because something is changing the condition of the mobile phase and making them want to not be on the mobile phase but be in the liquid. And that's why they travel down.
When we're saying eluting, we're saying the material was bound for the column and then we changed the mobile phase, one of the conditions I mentioned that has to be examined experimentally. And as you -- as that happens, they will desorb from the column and come out.
And they'll come out as an eluate, or an elution pool. And that's what we're referring to, I believe, with this statement here.
Q. And if I could summarize that, so eluting basically means removing; is that fair?

A. It's a little bit of an oversimplification. Eluting in this case means, you know, desorbing.

Removing can be a number of different things.

Q. But that's one way of eluting?

A. I would ask to consider removing from what.

Q. That's a fair question back to me, I guess, from something. Well, let me say this.

This step, was it fair to say, means remove the toxin from the anion exchange chromatography column? Is that fair?

A. Yes.

Q. And you didn't invent this step; right?

A. I did not invent elution for anion exchange chromatography.

Q. Step D, it says: "Further contacting the first eluate with a cation exchange chromatography"; correct?

A. Yes.

Q. Okay. Can you just explain to the jury what the difference is between cation exchange and anion exchange in this context.

A. Sure.

So anion exchange has a positively charged matrix. Cation exchange has a negatively charged matrix. And they separate, essentially, oppositely from an ion exchange point of view.

Q. Thank you.
And you didn't invent cation exchange chromatography; correct?
A. I did not.
Q. Let's go to Claim 8 of the '748 patent.
As you were preparing for your testimony, did you review Claim 8, Dr. Bates?
A. Yes.
Q. And so do you see the part that I've highlighted: "No more than 1 part residual nucleic acid per million parts of the botulinum neurotoxin"?
A. Yes.
Q. And you were just testifying about this; correct?
A. Yes.
Q. Okay. So for simplicity for both you and me and for the jury, can I just refer to it as 1 PPP, parts per million?
A. PPM.
Q. PPM, I'm sorry, yeah.
A. Yes.
Q. And you were saying that this means that there's 1 part nucleic acid for a million parts of toxin; correct?
A. Correct.
Q. And that you're referring to it in your testimony as super pure? Super pure?

A. Yes.
Q. And was your testimony that the '748 is super pure, '740 was just pure?
A. Those were the descriptors I used, yes.
Q. Okay. And that was the fact that you were trying to convey to the jury, that '740 patent disclosed a pure sample, but the '748 patent resulted in a super pure sample?
A. There are other differences. I believe I said the two processes themselves are distinctly opposite. They happen to result in a product that is also of different purities.
Q. I apologize. I'm going to ask a much more precise question.
I understand there might be other differences, but is one difference that you testified to that the '740 patent results in a pure sample and the '748 patent results in a super pure sample?
A. Those were the labels I called them, yes.
Q. And that was what you were saying?
A. Yes.
Q. Okay. Well, in this patent, you didn't recall where this 1 PPP came from -- PPM came from; right?
A. I'm sorry. I don't remember being asked about this patent and the 1 PPM.
Q. Do you remember being deposed in this case?

A. Yes.
Q. Okay. And you were under oath there?
A. I'm sorry?
Q. You were under oath during that deposition?
A. I was, yes.
Q. Just like you're under oath here?
A. Correct.
Q. And do you remember being asked: "Do you recall where the limit of less than 1 nanogram of nucleic acid per milligram of neurotoxin came from?"
A. I don't remember that specific question, but...
Q. So I'll ask that question here.
A. Okay.
Q. You didn't know where this limitation came from; right?
A. I don't remember where this goal came from that we were trying to develop to, no.
Q. Thank you. That's great.
So this limit, this less than 1 part per million, was not a goal of your research; right?
A. So this was one of the -- this was one of the product attributes that we were looking to achieve. It wasn't one of the four goals I mentioned earlier, if that's what you're referring to.
Q. Again, I'm going to show you your deposition

testimony which was different than the answer here, if you don't mind.

Can we go to Dr. Bates's deposition question and answer?

MS. RUPERT: Your Honor, improper impeachment. He should give the witness an opportunity to look at the transcript before he plays it.

THE COURT: I'm going to allow it.

(A video was played.)

BY THE ATTORNEY:

Q. The goal was to get it that low?

A. I don't remember the specific numbers of the goals, so I can't comment on that.

(The video ended.)

BY MR. VARUGHESE:

Q. So at least as of that time, going super pure was not a goal of your research; correct?

A. I think the answer is the same. I don't recall what the goal was, and I think I said that, but I don't recall where the 1 PPM came from.

Q. Thank you. I understand.

And then in all the times that you ran this process, you can't think of a time where the sample did not result in less than 1 part per million purity; correct?

A. The '748 process?

Q. Correct.
A. So in our labs when we were running the '748 process as described in the patent, the end result was always less than 1 part per million.
Q. Can we put up the '740 patent.
Dr. Bates, you just testified about this patent as well; correct?
A. Yes.
Q. Now, did you review this patent in preparation for your testimony today?
A. I did not, actually.
Q. You testified about it?
A. I have read it before, though, yes.
Q. Okay. So the '740 patent discusses an APF growth phase; correct?
A. Yes.
Q. And the '740 patent also disclosed an APF purification process using chromatography; correct?
A. Correct.
Q. Dr. Bates, I'd like to focus your attention on example 11. If it helps you this is -- there's a tab labeled JTX 3 in my binder that I gave you. You can look at it here or look at it there.
A. Okay. I'm there.
Q. If you look at Example 11, you see that the title of

this example is "Additional Multicolumn APF Chromatography Processes for Purifying a Botulinum Toxin Complex."

Do you see that?

A. I do. If you could just give me one second to find just to make sure we're looking at the same thing.

Q. Please.

A. Okay. I'm there.

Q. Okay. And then if you go to line 52 there.

A. Okay.

Q. And highlight that. It's highlighted here for you too. It says there, "It was determined that each of the following four additional column combinations provided APF methods for obtaining highly purified botulinum toxin complex as determined by" --

A. SDS page.

Q. Can you tell the jury what that is?

A. It's an analytical technique used to measure purity, among other things. I'm not an expert in analytical technology so I'm not going to try to explain that further.

Q. Again, this is all the '740 patent that came before your '748 patent?

A. Yes.

Q. Let's go to line 62 to 64. This states that "Purifying toxins were further analyzed by techniques including a residual DNA assay."

Do you see that?
A. I do.
Q. My question is, basically, the toxins here were analyzed to see if they were pure or not; correct?
A. The drug substance made using this was analyzed, yes.
Q. The drug substance being the botulinum toxin?
A. The botulinum toxin.
Q. One such technique is a DNA assay that determines how much DNA is in the toxin; correct?
A. Yes.
Q. And this determines how pure the sample is; correct?
A. This is one measurement of purity, yes.
Q. Let's go to the results at Table 6 to get some more information. This can be found on page 30, Doctor. Column 37, line 1.
A. Okay.
Q. And heading here says, "Quality Summary of Toxin Samples Purified by Different APF Processes 1.4 Above"; correct?
A. Yes.
Q. Let's -- I want to look at the results here. Dr. Bates, there's a line here that says, "PicoGreen DNA assay."
Do you see that?
A. Yes.

Q. And that technique measures DNA; right?
A. Yes.
Q. And DNA is nucleic acid?
A. DNA is one type of nucleic acid.
Q. In the context of what we're talking about here, DNA is an impurity; right? It's a nucleic acid impurity?
A. DNA is a nucleic acid and nucleic acids can be considered impurities.
Q. So when we talk about -- when you say super pure, we're talking about getting the DNA or nucleic acids down to super pure levels; right? It's an impurity in this context?
A. Yes.
Q. And you've used this test before; right? It's not a new technique.
A. I'm not an analytical person. I've never run or used these techniques myself.
Q. So if we go to the DNA results on Table 6, it says, "The results were 2 to 6 nanograms per milliliter of DNA"?
A. Yes.
Q. Do you see that?
You'd agree that 2 to 6 nanograms per milliliter is about .002 to .006 parts per million?
A. Now you're testing my math. Nano is ten to the ninth. So ten to the ninth is nano; is that correct?
Q. That's why I'm a lawyer. I don't know that.

A. So I can't comment to that. Sorry, I can't do the math in my head just right now.
Q. I saw you doing some math earlier but this is more complicated probably, so I made a demonstrative of the math with help. I'm going to put it up there for you, give you a minute to see if it's accurate, and if you want I can describe for you the reasoning behind that math.
Can I do that?
A. Okay.
Q. Can we pull up that demonstrative, please. There it is.
Take a look at that and tell me if what I did was right.
A. And I apologize ahead of time if I'm getting this wrong. I believe nanograms are a million milligrams. Like, I think it's -- isn't micro, ten to the minus sixth, and then nano is ten to the minus ninth? I'm looking at the -- and again, not my -- the one, two, three, fourth fraction that says 2 nanograms over a thousand milligrams, is that thousand milligrams for the nanograms or is that for the gram?
Q. Honestly, I don't know.
THE COURT: Why don't we move on to a different topic. If it's important, you can ask one of the experts later.

MR. VARUGHESE: Okay, Your Honor. Absolutely.

THE COURT: I mean, if he doesn't know and you don't know, how is this going to help anybody?

BY MR. VARUGHESE:

Q. If we go back to page 29, column 36, line 57, do you see where it says Q flow through?

A. Yes, I do.

Q. That's not an anion exchange column?

A. Q flow through. Where is this in the document?

Q. Dr. Bates, I'm going to just do all of us a favor and go to my last topic.

A. Okay. Thank you.

Q. Can you go to the binder that's JTX -- in the binder JTX 4, which is the patent. Again, the '748 patent.

A. Yes, I see it.

Q. Okay. I want you to turn to page 27, column 44, starting at line 50.

A. Page -- you said column 27.

Q. Column 44, it's page 27.

A. Column 44. I am there.

Q. Do you recognize this section of the '748 patent?

A. This looks like Example 3.

Q. Can you put it up. Can you highlight line 50 to line 55.

Do you see that?

A. Yes, I do.
Q. We're on the same page here. What's being described here?
A. So it describes a type A neurotoxin being purified from the nontoxic proteins of the complex by a modification of the method of Tse et al.
Q. It says, "In one method of purifying," then it goes on to say that we cite Goodnough MC 1994 thesis; right?
A. Yes.
Q. Do you understand that's Michael Goodnough, Revance's expert in this case?
A. I do now, yes.
Q. And you're citing this thesis; correct?
A. Yes.
Q. And then in the next sentence, if you highlight that, it says, "Botulinum neurotoxin obtained by our IAPF process." It says "our."
What does IAPF stand for?
MS. RUPERT: Your Honor, I'm going to object to this line of questioning. He's pointing to a reference that is not one of the primary obviousness references in this case and I think this line is going to create confusion.
THE COURT: I'm going to overrule the objection.
BY MR. VARUGHESE:
Q. What does IAPF stand for?

A. You're killing me. APF is animal-product free. I is -- I can't remember if it was the '748 or '740 process right now. I'm blanking on it.

Q. I honestly don't know. Does APF stand for animal-product free at least there?

A. Yes.

Q. So you distinguished by "our," when you say "our" are you distinguishing the process that's below to what you cited Dr. Michael Goodnough's thesis for?

A. So, I'm sorry. Can you repeat the question one more time.

Q. When you say "our," that appears after you cite a process from Dr. Michael Goodnough's thesis. When you use "our" in the next sentence, I want to know are you now describing a process that's different than Michael Goodnough's thesis process?

A. I believe by "our" I'm talking about the process described in the patent.

Q. "Our" meaning you and your co-inventors?

A. Allergan, yes.

Q. Allergan, correct. And distinguishing from Dr. Michael Goodnough's process?

A. I mean, I'm not a patent attorney or I don't write patents for a living, but it seems like that is right.

Q. Can we go down in this patent to where the Johnson

patent is cited.

Meanwhile, can you turn to DTX 207 in the binder that I gave you.

A. DTX 207. Yes, I am there.

Q. Have you seen this before?

A. I have not, no.

Q. It's a patent; right?

A. It says U.S. Patent, yes.

Q. Can you identify the inventors on this patent.

A. So the patent inventors are Eric Johnson and Michael C. Goodnough.

Q. And can you read the patent number for the jury, U.S. Patent Number?

A. The patent number is 5,756,468.

Q. And this is in your patent that we were looking at. You see the same patent is cited in your patent?

A. Yes, I see that.

Q. That's Dr. Michael Goodnough's patent?

A. Right here, yes.

MR. VARUGHESE: Your Honor, I'd like to enter this into evidence.

MS. RUPERT: No objection.

THE COURT: All right. Admitted without objection.

(Thereupon, Defendant's Exhibit DTX 207 was

admitted.)
BY MR. VARUGHESE:
Q. So can we go to the comparison slide.
So what I have here is a demonstrative. I'll represent to you that on the left-hand column is that passage that we were looking at from your patent --
A. Okay.
Q. -- describing the chromatography process.
A. Okay.
Q. And I'll represent to you on the right is a passage from that Dr. Goodnough patent that I just pointed you to.
A. Okay.
Q. I just wanted to have you take a look at the similarities.
Can we have the first portion on the '748, please.
So in your patent, you wrote: "Type A neurotoxins purified from the associated nontoxic patents of the complex by modification of the method of Cee, et al."; correct?
A. Yeah.
Q. And would you agree that the corresponding language in Dr. Goodnough's patent is almost verbatim the same?
A. The language looks very similar, yes.
Q. Can I have the next one, please.

So here, I won't read it, but I'll give you and the jury a chance to compare it.

Would you agree that the language in blue between your patent and Dr. Goodnough's patent is nearly verbatim, identical?

A. They look very similar, yes.

Q. Okay. Can we go to the next highlight.

The same thing. Take a look at the portion in green and please let me know if you agree that the language between the two is nearly verbatim, identical.

A. They're similar.

Q. Similar. Would you agree with me it's almost verbatim, identical?

A. So they are in a toxin. I'm assuming that's the neurotoxin but -- so that's what I said, similar.

Q. And so I just want to ask the question. I am not casting any aspersions.

Were you responsible for writing it? Because this seems to me like it's a copy of Dr. Michael Goodnough's patent which came before your patent. It seems like someone copied it into your patent.

I'm not saying you did, but do you have any information about why the language is so starkly similar?

A. No, I do not.

Q. BOTOX doesn't use your process; right?

A. I'm not currently at Allergan and I'm not really privy to the proprietary nature of the commercial BOTOX manufacturing process.
Q. So based on your knowledge, when you were at Allergan, per your knowledge, BOTOX was never made utilizing your '748 process; correct?
A. While I was at Allergan?
Q. At any -- just any awareness that you have.
A. Commercially or clinically or either?
Q. Any -- do you have any knowledge of any time BOTOX was made using your process? If you don't, you don't.
A. I don't.
Q. Okay. And then finally, Dr. Bates, has Allergan, to your knowledge, marketed a product that's made by your '748 process?
A. As I said, I'm not familiar with the proprietary nature of the processes at Allergan, so I really don't feel confident to answer your question.
Q. I swear to you I'm just asking based on your knowledge. So let me ask again.
A. Based on my knowledge, I have no knowledge of AbbVie or Allergan's processes.
Q. Okay. I'm going to ask the question again.
Are you aware of Allergan marketing any product made using your '748 process?

A. No, I am not.
Q. Dr. Bates, thank you very much for your time.
MR. VARUGHESE: That concludes my questions, Your Honor.
MS. RUPERT: Your Honor, if I can just a few questions on redirect.
THE COURT: All right.

REDIRECT EXAMINATION

BY MS. RUPERT:
Q. Hello, Dr. Bates.
A. Hello again.
Q. So if you could turn back to the patent we were just discussing, JTX 004.
A. Okay.
Q. And I believe you were asked a series of questions about some statements in column 44 of that patent that pertained to an Example 3; is that correct?
A. Yes.
Q. All right. Could you please turn back to Example 2 of that patent at column 29.
A. I am there.
Q. Okay. And just take a minute to look at Example 2.
And, Mr. Bates --
A. Yes.
Q. -- does Example 2 provide the information and the

example that describes the invention that's actually claimed in your patent?
A. Yes.
Q. Okay. Do you remember when my colleague across the aisle asked you some questions about what was present in the Allergan report marked JTX 015, which we're not going to pull back up because of the security concerns, about a TSE/BSE statement?
A. Yes.
Q. Okay. So, Dr. Bates, just because you want to do something, does that mean you reasonably thought this could be done?
A. No.
Q. And one final question. Let's turn back to what we've been marked as JTX 004, the '748 patent. If we could turn back to Claim 1.
A. Okay.
Q. And do you remember on your cross-examination you were asked a number of different questions that pulled apart -- pulled out little pieces of what is in Claim 1?
A. Yes.
Q. And can you tell us, just in the looking at Claim 1 and considering all these steps together, what was your invention?
A. The invention was the entire process that result --

that included an APF growth phase, the depth filtration step I mentioned, as well as the two chromatography steps, to result in the less than 1 nucleic acid super pure BoNT/A.

Q. So the invention wasn't just what my colleague pulled out and showed you on the screen?

A. No.

Q. You'd have to consider the combination?

A. The entire process, yes.

MS. RUPERT: All right. No further questions.

THE COURT: All right. Thank you.

Dr. Bates, you're done. And if you can just sit there for a minute while we get the jury out for lunch.

Let's have lunch until 2:00.

(The jury exited the courtroom.)

THE COURT: All right. Dr. Bates, thank you. You may step down. Watch your step.

All right. So I'll see you all at 2:00.

(A luncheon recess was taken, after which the following proceedings were had:)

THE COURT: So we're getting the jury. Who's the next witness?

MR. DITTMANN: We're going to have just one more deposition video and then we're going to have Dr. Christian Schöneich.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone, you may be seated.

Mr. Minniti.

MR. DITTMANN: I'll take care of this one, Your Honor.

So we're going to play one more video for you, and this is by Revance's chief scientific officer, Dr. Conor Gallagher, who was deposed in this case, and this is his video.

THE COURT: About how long is this?

MR. DITTMANN: About 14 minutes, Your Honor.

THE COURT: All right. Let's go.

(A video was played.)

BY THE ATTORNEY:

Q. Please state your name for the record.

A. Conor Gallagher.

Q. Dr. Gallagher, are you currently the vice president of Medical Affairs and Scientific Innovation at Revance Therapeutics, Inc.?

A. Yes.

Q. After you completed your postdoctoral fellowship in 2005, where did you go?

A. So after I completed my postdoctoral fellowship, I joined Allergan Canada.

Q. What Allergan products did you work on at that time?
A. At that time, I was working on BOTOX.
Q. What were your responsibilities as director of global neurotoxin science medical affairs at Allergan?
A. It was primarily understanding the U.S. and global neurotoxin landscape.
Q. What does that mean?
A. Understanding the products that are on the market in the U.S. and being a repository of that knowledge for Allergan.
Q. Would that involve competitive intelligence type of work?
A. It would involve having a knowledge of the clinical profile of botulinum toxins that are currently on -- that were currently on the market in the U.S. at that time.
Q. Were you aware of Revance Therapeutics while you were reporting to Allergan?
A. Yes.
Q. And what did you know about Revance when you were reporting to Allergan?
A. I knew they were developing a topical botulinum toxin and that they were subsequently developing an injectable botulinum toxin.
Q. From approximately 2017 to early 2018, before you left Allergan, is it your understanding that Allergan was

considering Revance to be developing a product that was going to compete with BOTOX?
A. I'd say it would be generally understood that Revance was developing a product that would compete with BOTOX.
Q. From the 2017 to early 2018 time frame, what was your understanding of the product characteristics of RT002, now known as DAXXIFY, that Revance was developing at that time?
A. So my understanding was that that product may have a longer duration of clinical benefit than toxin products that were on the market currently, or currently meaning at that time.
Q. Are you aware of what an animal-protein-free toxin formulation is?
A. Yes.
Q. What is that?
A. My understanding would be that an animal-protein-free toxin composition is a toxin formulation that is manufactured without animal proteins.
Q. And would that include a formulation without serum?
A. In the sense that human serum albumin is a formulation excipient when there are animals, yes.
Q. When you were employed at Allergan, do you have an understanding that there had been work done for APF, protein free, toxin formulations?
A. I was aware of a clinical study that was looking at

an albumin-free form of botulinum toxin, but I am not aware of a wholly animal-free formulation that was being worked on at that time.
Q. Did you have any involvement in this clinical study looking at an albumin-free toxin formulation?
A. When I worked at Allergan Canada, we were instructed to identify potential clinical trial sites for such a project.
Q. You joined Revance Therapeutics in April 2018; is that correct?
A. That is correct.
Q. What are your responsibilities in the role of vice president of medical affairs and scientific innovation?
A. So in this role, I oversee the medical affairs function at Revance. More recently, I have assumed responsibility for the preclinical research and development group, and even more recently of the process development group.
Q. When you joined Revance in 2018 and moving forward for, let's say, the next year or so, what pipeline products are you working on at Revance?
A. For that first year we would have been working on DAXI -- well, RT002, a product that would ultimately become DAXXIFY.
Q. In your document that is marked Exhibit 13, this

document bears the Bates numbers REV_DAX-02663830 through the Bates number ending in 838. The title of this document is "FDA-Approved FAQs for PACs"; is that correct?
A. That is correct.
Q. Have you seen this document or any similar FAQ documents like this before?
A. I have seen FAQ documents in the past.
Q. I'm handing you a document that has been marked Exhibit 14. The document bears the Bates number REV_DAX-02578434 and ends in the Bates numbers 450. The cover slide of this document states, "DaxibotulinumtoxinA for Injection: A Novel Formulation."
Is that correct?
A. That is correct.
Q. Are you familiar with the subject matter that's reflected in this presentation?
A. Yes.
Q. Looking at these puzzle pieces to the formulation, can you identify which one of these you believe yields the longer-duration profile of DAXXIFY?
A. So I believe that the formulation in aggregation -- so the composition of all the elements here is what contributes to the clinical performance of DAXXIFY.
Q. Do you think there's one piece to this puzzle that provides more of a duration benefit than any other?

A. I would have no basis to make a statement like that.
Q. Why does the charge of the peptide matter for the formulation?
A. My understanding would be it relates to bullet point three which says it forms an electrostatic interaction with the negatively charged botulinum neurotoxin.
Q. Why does that matter for the formulation?
A. I am not clear that there is a specific formulation role for that electrostatic interaction.
Q. You were an employee when the BLA was submitted to the FDA; correct?
A. Correct.
Q. To your understanding, at the time of BLA number 761127 was submitted to the FDA for approval of DAXXIFY, was there an intention for RTP004 to exert a therapeutic effect at the intended dose of DAXXIFY?
A. I don't know.
Q. Let's turn back to the FDA approval FAQs document. Please turn to the page ending in Bates 832.
Do you see that there's a Number 2 which states, "Why does the peptide matter?"
A. Yes.
Q. Let me ask: Why does the peptide matter?
A. Because a peptide is an essential component of the overall DAXXIFY formulation.

Q. Do you see in this document it states, "Peptide exchange technology offers multiple advantages"?
A. Yes.
Q. For clarity, does peptide exchange technology refer to RTP004?
A. It is a marketing term referring to RTP004.
Q. So then below on this document there are four bullet points. Do you see that?
A. I do.
Q. The first is, "Preventing adsorption and aggregation of BoNT/A"; is that right?
A. That is correct.
Q. Does that go to the concept of stabilization?
A. Yes.
Q. And then below that there are three additional bullet points. Do you see that?
A. I do.
Q. The first one states, "enhancing the affinity of BoNT/A for cell membranes"; correct?
A. Correct.
Q. The next one states, "Anchoring BoNT/A to its target"; is that correct?
A. That's correct.
Q. And then the last one states, "The peptide may enhance internalization, maximizing the efficiency of

BoNT/A"; is that correct?
A. That's what it says there.
Q. Is the enhancement of the affinity of botulinum toxin type A to cell membranes necessarily connected to a longer-duration profile for DAXXIFY?
A. To my knowledge we have not directly made that connection. Bullet point four says, "May enhance internalization," which is a hypothetical statement regarding what happens to the botulinum toxin after it anchors or binds to the cell membrane.
Q. Does the anchoring or binding to the cell membrane play a role in duration?
A. I couldn't make a direct link between those two.
Q. Sitting here today, do you agree with the statement that RTP004 is believed to be the main reason in extending duration for DAXXIFY?
A. I would believe that it contributes to the profile.
Q. Would you believe it's the main reason?
A. I would have no basis to supporting judgment like that, that is the main reason, relative judgment.
Q. Dr. Gallagher, I'm handing you a document that has been marked Exhibit 22. This document bears the Bates number REV_DAX-00002851. This is section 3.2.A.3.1 of BLA Number 761127; is that correct?
A. That's what it says here.

Q. Can you read the next paragraph in the document out loud.
A. Sure. "RTP004 is an inactive ingredient that is intentionally added to a therapeutic product but that is not intended to exert therapeutic effects at the intended dosage. It has no pharmacological properties at the quantity used in daxibotulinumtoxinA for injection and is not required for activity or function of the toxin itself, only to stabilize it in the final formulation so that it may maintain its activity and functionality throughout the intended shelf life."
Q. Do you have any reason to disagree with that statement?
A. I don't know.
Q. You don't know what?
A. This is a regulatory document. I'm not familiar with FDA language and guidance provided by the FDA.
Q. This is also a factual statement by Revance to the U.S. government that "RTP004 is an inactive ingredient that is intentionally added to a therapeutic product but it is not intended to exert therapeutic effects at the intended dosage. It has no pharmacological quantities at the quantity used in daxibotulinumtoxinA for injection and it's not required for activity or function of the toxin itself, only to stabilize it in the final formulation so that it may

maintain its activity and functionality throughout the intended shelf life."

That factual statement, do you have any reason to disagree with it?

A. I do not have a reason to disagree with that.

(The video ended.)

MR. DITTMANN: Your Honor, we move into evidence PTX 91.

MR. VARUGHESE: No objections, Your Honor.

THE COURT: Admitted without objection.

MR. DITTMANN: PTX 315, PTX 316.

THE COURT: They're all admitted without objection.

(Thereupon, Plaintiff Exhibits PTX 91, PTX 315, and PTX 316 were admitted.)

MR. DITTMANN: Your Honor, for our next witness we call to the stand Dr. Christian Schöneich. May I approach, Your Honor?

THE COURT: Yes.

THE COURTROOM DEPUTY: Could you please state and spell your full name for the record.

THE WITNESS: Christian Schöneich C-H-R-I-S-T-I-A-N S-C-H-O-N-E-I-C-H.

CHRISTIAN SCHÖNEICH,

called as a witness on behalf of the

Plaintiff, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. DITTMANN:

Q. Could you please state your name for the record.

A. Christian Schöneich.

Q. What do you do for a living, Dr. Schöneich?

A. I'm a professor of pharmaceutical chemistry at the University of Kansas. I have about 30-plus years' experience with proteins. I've grown very sticky and small amount of proteins and including botulinum toxin, which I would like to refer to as BoNT.

Q. At a very high level, what is your understanding regarding why you're testifying in this case?

A. I think I will provide an analysis on the BoNT product recipe patent, which is at stake in this trial.

Q. Have you brought any materials with you, Dr. Schöneich?

A. Yes, I brought a binder and I also brought a PowerPoint presentation.

MR. DITTMANN: Roy, can you please bring up Dr. Schöneich's demonstratives, and let's go to PDX 14-2, please.

BY MR. DITTMANN:

Q. Dr. Schöneich, are you offering any opinions in this case?
A. Yes, I will provide a number of opinions.
First, I would like to provide a little background on BoNT, although we have heard of it already so I will be brief. And I would like to explain that Terrence Hunt set out to solve a very difficult problem.
And then I would like to opine on the fact that the invention of Terrence Hunt, especially the combination of ingredients in the patent, provides for a platform for a longer-duration product.
And thirdly, I would like to opine on Claim 6 of the '878 patent, which I understand Revance has argued that it's invalid for obviousness.
Q. Will you be providing all three of these opinions today?
A. No, I'm focused today on the first two opinions, and I will return later in this trial to opine on the third point.
Again, I'm saying Revance is arguing that there are some prior art which renders Claim 6 of the '878 patent invalid for obviousness, but I strongly disagree with that.
Q. Let's, please, bring up the next slide, PDX 14-3.
Dr. Schöneich, could you please explain and briefly summarize your educational background.

A. Yeah. I was raised in Germany so I got my diploma in chemistry in Germany. A diploma in chemistry in Germany is equivalent to a master's in the United States. And I went on to obtain my Ph.D. from Technical University Berlin.
Q. What did you do after you obtained your Ph.D. in chemistry?
A. After that I moved as a postdoctoral researcher to the University of Kansas and I was recruited to the faculty there. I am professor in the Department of Pharmaceutical Chemistry currently and I'm chair of that department since 2005.
Q. And what's your field of study at the University of Kansas?
A. It's generally pharmaceutical chemistry with a focus on drug product formulation.
Q. What is a drug product formulation?
A. Well, we've heard it several times today. I would like to draw the analogy to a cookbook. You simply make a formulation. You have a recipe to make something, which then becomes the formulation.
Q. In addition to your role as a professor, do you have any other responsibilities?
A. Yes. I actively consult with the pharmaceutical industry.
Q. Before this case, have you worked in the field of

botulinum toxin products, drug products?
A. Yes. Through my consulting, I have worked in that field of botulinum toxin, and I'm very well aware with the challenges scientists face in that field.
Q. And have you published in the area of pharmaceutical drug product formulations?
A. Yes. I've published more than 300 articles or book chapters, peer-reviewed, with a major focus on chemical reactions which relate to the stability of drug product formulations.
Q. Have you received any awards for your work in this field?
A. Yes. I was elected teacher of the year from the American Association of Colleges of Pharmacy. I also was elected a fellow to the American Association of Pharmaceutical Scientists.
Q. And have you testified previously before a Court?
A. Yes, I did.
Q. And have you been accepted as an expert in those cases?
A. Yes.
MR. DITTMANN: Your Honor, at this time, Allergan proffers Dr. Christian Schöneich as an expert in pharmaceutical sciences, including the development of drug product formulations.

MR. PICKARD: No objection.

THE COURT: All right. You may continue.

BY MR. DITTMANN:

Q. Let's, please, move to PDX 14-4.

Dr. Schöneich, what's the first issue you'll be discussing today?

A. The first issue, as I mentioned before, I just -- my very brief background on BoNT drug product technology, and then I would like to explain from my point of view that Terrence Hunt set out to solve a very difficult problem.

Q. Let's move to the next slide, PDX 14-5.

And, Dr. Schöneich, can you tell us what we're seeing on this slide.

A. What we see on this slide is actually the BoNT, the toxin molecule, on the left-hand side. It has a couple of different colors for certain reasons.

And on the right-hand side, I've summarized to you, again, all the difficulties working with this. You have seen a few videos, how people had to dress up in these body suits. So the work with these protein is extremely dangerous. These workers had to adhere to very strict precautions.

But then what's really important is these drug products contain an extremely low amount of drugs or toxin in the vials and therefore these formulations are highly

unpredictable.
Q. Let's move to PDX 14-6.
And what are some of the highly unpredictable issues with drug product formulation that you just mentioned?
A. So these are some general pathways by which you can lose this toxin from these recipes or formulations. For better clarity, I've put them in different vials.
You see on the left-hand side a process where the toxin molecule adsorbs or sticks to the glass walls. That's one way to lose that molecule from the formulations.
In the middle vial, you see that the toxin clumps together. That's aggregation. That's another process by which you can lose this toxin from the vials.
On the right-hand side in the vial you see that the toxin molecule physically or chemically breaks apart. And that's another pathway from which you can lose this molecule from these formulations.
Q. The first word in the title is "stability."
Can you please explain what that phrase means.
A. Yeah. I mean, all of these processes relate to the stability. So you can lose the toxin molecule. And in that sense, stability relates to the strength or the potency of the product.
If you lose toxins through any of these

processes, your formulation loses strength or potency, and, ultimately, you will lose therapeutic benefit to the patient.

Q. To just make sure I'm following this correctly, if any of these problems happen that we see on the screen, that means the drug product will not work in the body the way it's supposed to work?

A. That is correct.

Q. And why is it important to have stability in BoNT drug product formulations?

A. Well, as I mentioned before, these formulations contain this very tiny amount of toxin, so you have a very little margin for loss before the formulations come this way.

Q. Okay. Let's turn to the next slide, PDX 14-7.

And could you please explain to us, Dr. Schöneich, what's being depicted here.

A. Yeah, this is a graphic just to show the traditional formulation of one of these BoNT -- the traditional BoNT product. And this is a formulation which contains the toxin which now is, again, presented by these colorful symbols on the top.

And then it has a major ingredient and which is human serum albumin, as we have heard before already.

Q. Before Mr. Hunt's '878 drug product recipe invention,

what had traditionally been the most commonly used ingredient to stabilize BoNT?
A. It's also the fact the human serum albumin, which is depicted by the Xes in that vial.
Q. And remind us, what exactly is albumin?
A. Albumin is a protein which you can add to formulations.
Q. And where does albumin typically come from?
A. It's generally derived from anywhere, so I would say living sources.
Q. And do you see a mention of human serum albumin on the slide? What's that?
A. That is the albumin that's derived from humans and it's generally derived from human cadaver.
Q. Were there any known issues in the early 2000s regarding the use of human serum albumin?
A. Yes. And we have heard previously today already about this. It was regarded as expensive. There was a question whether formulation scientists could identify consistent sources of this ingredient.
And then, ultimately, there was a general trend or motivation to move away from animal-derived products.
Q. And, Dr. Schöneich, isn't human serum albumin what's contained in the BOTOX product that Allergan sells today?
A. Yes. And despite all the issues we hear, the

original formulation, which is BOTOX, which contains human serum albumin, is still a good formulation.

And I think the FDA has scrutinized that formulation repeatedly for safety and also efficacy. But science is always moving forward, so I think that's why we're here for this case, for new development.

Q. Let's please move next to PDX 14-8.

Did Mr. Hunt's '878 invention address the stability problems we've been discussing with BoNT?

A. Yes. Mr. Hunt developed a novel product which had never been done before, the stable formulation, and that formulation was a combination of exactly BoNT with two ingredients. And these are depicted here on that slide in the vial on the right-hand side. That is, the surfactant and the disaccharide.

Q. Now, you just referred to a disaccharide.

Can you briefly explain what that is.

A. Yes. A disaccharide, you have referred to -- people have referred to this as a sugar. It's an ingredient you add to protein formulations in order to assist in maintenance of protein structure. And it can also be added to help the manufacturing process.

Q. And I believe you also mentioned a surfactant.

Can you explain what that is.

A. It's generally a surface active molecule. And

scientists add it to formulations, for example, to prevent the adsorption of proteins from walls or interfaces and so maintain also the protein solution.

Q. Now, do disaccharides and surfactants always work to stabilize a drug product formulation?

A. No, absolutely not. And we have to understand that every pharmaceutical formulation has its own characteristics.

So you have to carefully adapt and calibrate your ingredients to the characteristics of these formulations. Just because one ingredient works in one formulation doesn't mean it has to work in other formulations.

Q. In light of what you just said, do you have any views about Mr. Hunt's '878 drug product recipe invention?

A. Yes. I think it's a very genius recipe. It's a combination of two ingredients with two small ingredients, which basically led to a stable pharmaceutical formulation of toxin.

Q. Is there any other benefit that Mr. Hunt's '878 invention provides?

A. Yes. And as I mentioned before, I think it sets the platform for a long-duration product.

Q. Have you reviewed any documents related to Mr. Hunt's research and development in this case?

A. Oh, yeah. I have reviewed a number of notebooks, data sheets, and also e-mail communications between Mr. Hunt and his staff. And I also reviewed Mr. Hunt's deposition testimony.
Q. And what is your view of the experiments that Mr. Hunt undertook with his team?
A. So from my own personal view, I think Mr. Hunt did a very impressive amount of work in a very short time doing thousands of different experiments under rather difficult conditions, as you've seen.
He achieved this formulation, which is I think, again, a very impressive set of work.
Q. And were you in the courtroom when Mr. Hunt testified about the work that he and his team did together in the early 2000s?
A. Yes.
Q. And was his testimony consistent with your understanding of the research and development work that lead to the '878 patent invention?
A. Yes, absolutely. From my review of this document, it absolutely confirms.
Q. Let's, please, go to PDX 14-9.
Can you tell us, what's the next opinion you're going to provide, Dr. Schöneich?
A. The next opinion is on an unexpected property of

Terrence Hunt's invention.

Q. And what is that unexpected property?

A. That property is that it reduces wrinkles for a longer period of time.

Q. Dr. Schöneich, what's your understanding of why the longer duration issue matters in this case?

A. Well, my understanding -- and I'm not a legal expert, but my understanding is it all boils down to value.

I think there's a big question in this case on whether Terrence Hunt's formulation invention adds value to the formulations that you're talking about here, and in my opinion, it does.

MR. DITTMANN: Let's, please, move to the next slide, Roy, PDX 14-10.

BY MR. DITTMANN:

Q. And, Dr. Schöneich, let's talk about DAXXIFY for a moment so we can orient the jury.

And can you please explain, what are the main ingredients of Revance's DAXXIFY formula?

A. Yes. I would like to start on the left-hand side. You see the toxin molecule. This time it's represented as a blue.

And then you see in the center a disaccharide, trehalose, and a surfactant. And that's the key part of Terrence Hunt's invention.

And then on the right-hand side, we see a peptide. And that peptide has been referred to as RTP004. But I think we also agreed that sometimes yesterday to call it Revance peptide.

Q. Now, when a patient is injected with DAXXIFY, how long does it last?

A. Well, from my understanding from their marketing documents, DAXXIFY lasts about six months.

Q. And let's get right to the bottom line here and then we'll dive into the specifics.

Which of these ingredients, in your opinion, is driving the longer duration-of-action profile?

A. It's my opinion that the two ingredients in the center, the disaccharide and the surfactant, drive the long duration profile.

Q. And so we're clear, do any of these ingredients correspond to Mr. Hunt's '878 drug product recipe invention?

A. Yes. I think I said that these are the key ingredients of Terrence Hunt's invention.

Q. And those are the ingredients along with the toxin that are being boxed in blue; correct?

A. That's the combination of toxin with the two ingredients, yes.

Q. So is it your understanding that Revance uses these ingredients that you're talking about from Mr. Hunt's drug

product recipe patent?
A. I think there is no dispute. And I think Revance's product uses Terrence Hunt's invention with regard to these two ingredients.
Q. Now, there's another ingredient that we see on the slide in DAXI's formula on the right.
What is that?
A. And, again, this is the Revance peptide.
Q. And because DAXI has this peptide in addition to the '878 patent recipe, how can you be sure that the duration benefit we're talking about isn't caused by that peptide?
A. I have reviewed data and also presentations of Revance to the FDA.
Q. So if it's not the peptide, what is it that's driving the longer duration of action in the body?
A. If it's not the peptide then it must be the combination of the toxin with these two ingredients, the disaccharide and surfactant.
Q. The combination you just mentioned, disaccharide and surfactant, do they correspond to the invention set forth in Mr. Hunt's drug product recipe patent?
A. Yes.
Q. Let's turn next to PDX 14-11. Could you please walk the jury through the evidence that you reviewed and mentioned earlier showing that the longer duration of action

is not caused by the peptide.
A. Yes, I first have reviewed several documents, actually two documents, which Revance provided to the FDA, and then I have reviewed data, which actually confirms my opinion that the peptide does not contribute to the longer duration.
Q. Let's jump into these. So please move to PDX 14-12 and I want to start by focusing on the first category of documents, Revance's FDA statements.
A. Is that in my folder?
Q. Turn in the binder you have in front of you to PTX 091.
A. Yeah.
Q. Let me know when you're there.
A. I'm here.
Q. Do you recognize this document?
A. Yeah.
Q. What is it?
A. That is part of the BLA761127 which Revance provided to the FDA, and this document has -- there's a section 3.2.A.3 and it's entitled, "General Information RTP004, Bachem Americas, Inc."
MR. DITTMANN: Your Honor, we move PTX 091 into evidence.
MR. PICKARD: No objection.

THE COURT: Admitted without objection.

(Thereupon, Plaintiff Exhibit PTX 091 was admitted.)

BY MR. DITTMANN:

Q. What is a BLA?

A. A BLA is a biologics license application. And that's an official document which a pharmaceutical company provides to the FDA in order to get approval to market or sell a product.

Q. Why does Revance have to submit a BLA?

A. On general, the FDA wants to confirm that products, biologics products in this case, adhere to quality, safety, and efficacy standards.

Q. So is this document we're looking at here, is this part of Revance's BLA submission to the FDA relating to DAXXIFY?

A. Yes, I understand it.

Q. Is the information provided to the FDA typically maintained as confidential, in your experience?

A. Yes, absolutely. I think it's stated on the bottom of the page.

Q. Do you have any understanding as to whether Revance has an obligation to confirm that all statements it makes to the FDA have to be truthful and accurate?

A. Yes. There's a certification page where Revance or

any other company have to certify that.
Q. Can we please focus on the third paragraph of PTX 091.
Dr. Schöneich, what is Revance stating to the FDA in this document?
A. Revance states that "RTP004 -- again, that's the Revance peptide -- "is an inactive ingredient that is intentionally added to the therapeutic product but it's not intended to exert therapeutic effects at the intended dosages." Revance further states that "This peptide has no pharmacological properties at the quantity used." And further down Revance states, "It is not required for activity or function of the toxin itself."
Q. Why does this matter to your opinion?
A. Well, it matters because if the peptide would have had an effect, then Revance would have not stated to the FDA that it does.
Q. Is this the only portion of the Revance's DAXXIFY drug approval application where Revance represents to the FDA that its peptide does not drive duration, in your view?
A. No, I've reviewed other documents.
Q. Dr. Schöneich, can you please, on that note, turn to DTX 136 in your binder.
A. Yes.
Q. When you have it, please let us know if you recognize

the document?

A. Yeah, I do. I think that is also part of the BLA. This is actually a correspondence between Revance and the FDA. The title of the document reads, "Correspondence Regarding Meetings." And it's section 1.6.3.

Q. Do you see a date on the document?

A. The date of the document is 15th of September, 2016.

MR. DITTMANN: Your Honor, Allergan moves DTX 136 into evidence.

MR. PICKARD: No objection.

THE COURT: Admitted without objection.

(Thereupon, Defendant Exhibit DTX 136 was admitted.)

BY MR. DITTMANN:

Q. Dr. Schöneich, what is Revance stating to the FDA in this portion of the document?

A. Revance makes two very important statements, in my opinion, here. Revance states that "There's no increase of toxin spread/effect with the novel excipient RTP004." And the next paragraph, they are stating this again. They describe two nonclinical studies which they've been conducting and these studies -- in both studies, there was no evidence of an increase of toxins spread and/or effect. In other words, they have looked at both spread and effect.

Q. So I want to be sure I have this right. Looking at

the statements we've been seeing collectively so far, you're saying that Revance represented to the FDA that its peptide does not drive the duration of action?
A. That's how I understand that correspondence with the FDA.
Q. Dr. Schöneich, did Revance provide any evidence in the submission to the FDA to support the statement we're showing here that its peptide does not increase effect?
A. Yes, because those statements they make here are based on the experiments which Revance conducted. There's data in this document.
Q. What type of experiments?
A. These are mouse digit abductor score experiments. And to briefly remind ourselves, I think yesterday Dr. Broide explained those to us. This is where they inject toxin and then they test whether the mouse when it's startled spreads the digits or doesn't spread the digits and scientists give a score between 0 and 4. And Revance did exactly these type of experiments, pretty much the same type of experiments Dr. Broide described with Allergan.
Q. Let's take a look at the Revance mouse DAS studies, which appears a few pages later. So let's go to page 14 of DTX 136 and bring up Figure 5.
Dr. Schöneich, can you please break down for the jury what we're looking at here in this figure.

A. In those figures, basically, Revance compares an injection of toxin with and without the peptide and you see there's no significant difference in the peak it reaches in the score. You see it's slightly above 3. But moreover, there's no difference in duration. Both injections last pretty much the same time.
Q. So am I correct in understanding that this data that Revance submitted to the FDA is showing that the duration in the body is the same regardless of whether you have the peptide or not?
A. Yes.
Q. How did Revance's representations to the FDA impact your opinion, if at all?
A. Well, Revance's data support my opinion.
Q. Thank you, Dr. Schöneich.
So let's turn now to some of the other studies you reviewed. And let's turn to PDX 14-13. Are you aware of any head-to-head studies in a mouse DAS test like we just looked at having been conducted to assess whether Revance's peptide drives duration or not?
A. Yes, I looked at these internal study which has been performed by Allergan and that's exactly the study Dr. Broide described in detail yesterday. I don't know, do I have that in my binder? Yes, this is the bio-201288 study which we saw yesterday.

Q. For the record, are you looking at JTX 202 in your binder?
A. Yes, I am.
Q. And just to confirm, this is the Allergan bio-201288 study?
A. Yes.
Q. And you reviewed this document?
A. Yes.
Q. Were you in the courtroom when Allergan's scientist, Dr. Broide, testified yesterday about this particular study?
A. Yes, I was.
Q. And this is, again, the same Allergan study that Dr. Broide talked about?
A. That's the same study.
Q. Please move to the next slide, PDX 14-14. Can you please explain, Doctor, what you're seeing here?
A. Just to briefly recapitulate, in this experiment Allergan made formulations which contained the Revance peptide and that's the formulation in blue on the right-hand side, and for comparison they made a formulation which did not contain the peptide, and that's the formulation represented by the red data.

When you compare the duration between those two, remind you again the red formulation has no peptide, the blue formulation does have the peptide, there's no increase

of duration. In fact, I will say this: Little less duration.

Q. Dr. Schöneich, to make sure I'm following along, this is another study showing that Revance's peptide doesn't help duration at all?

A. That's correct.

Q. I also want to ask you about can you explain the difference between the green and blue bars?

A. That's a very important result. In the green bar you see an experiment where the formulation contains the Revance peptide but does not contain the surfactant. Remind you again, the combination of disaccharide and surfactant, that's the invention of Terrence Hunt. So the combination of disaccharide and surfactant is not present in the information in the green bar. You see very very minor activity.

Q. Let me make sure I'm following here, Doctor. You're saying if you don't have the combination from Mr. Hunt's drug product patent recipe of both disaccharide and surfactant, if you don't see them both, you're seeing little to no activity?

A. That's correct.

Q. What, if anything, does that tell you about the importance of using the combination for Mr. Hunt's drug product patent recipe?

A. I think it confirmed my opinion that the combination of trehalose and surfactant is what matters and is what drives the new information.

Q. Were you in the courtroom when Mr. Hunt testified earlier today?

A. Yes.

Q. Is your testimony here consistent with what you heard from Mr. Hunt?

A. Mr. Hunt talked about his invention and also his attempts to drive potency in that direction so it's consistent.

Q. Let's, please, bring up Figure 43 of this Allergan study we're looking at. Dr. Schöneich, can you please explain what we're seeing here on the screen?

A. Yeah. That is just a little different presentation of the data. These are the same experiment which we had just seen in the slide before with the different colors.

What is now done is the scientists will try to get the score, which we read from the digits, and the score over time you see on the excerpt, which is the lower excerpt there is days.

And as I mentioned before there is the formulation in red and that's the one which does not contain the Revance peptide, and then there's the formulation in blue and that's the one which does contain the Revance

peptide.

And you clearly see here that there is no longer duration of the formulation which contains the Revance peptide.

Q. Can we please bring up -- we were looking earlier at that Revance study, DTX 136, Figure 5. Can you put it side by side with the Allergan study.

Dr. Schöneich, how does this data from Allergan compare to the data for Revance in the same type of mouse DAS study?

A. I think they are pretty much comparable. I think both companies come to the same conclusion.

Q. So if the peptide in these studies is not contributing to duration, what does that tell us about what is causing the longer duration?

A. That would tell me that it's the combination of the disaccharide and the surfactant which drives the duration.

Q. And please remind us. This combination of the disaccharide and the surfactant is from Mr. Hunt's recipe patent; correct?

A. That's correct.

Q. Dr. Schöneich, were you in the courtroom yesterday when Dr. Broide was questioned by Revance's counsel about whether Revance's test formulation that was used in the Allergan study was an accurate reflection of DAXXIFY?

A. I was in the courtroom and I heard that testimony.
Q. Does the criticism you heard from Revance's counsel yesterday have any bearing on your analysis that Revance's peptide does not drive duration?
A. Well, first of all, I would say that the Allergan formulation contained the same ingredients as the Revance formulation but a slightly different concentration.
But the Allergan study is very well-matched and designed because both the red and the green experiment contain exactly the same thing except for the peptide. And obviously, that even under Revance's conditions, the data were pretty much comparable.
Q. And how, if at all, does this impact your opinions in this case?
A. I think it confirms my opinion. Now we have two independent experiments from two independent sites which confirm the same thing, that the peptide does not lead to prolonged duration.
Q. And what type of test, again, was used for the Allergan and Revance studies?
A. That was the mouse DAS, the digit abductor score.
And I don't want to show you that I've done it before, so especially where the scientists look at the spread of the digits as a result of the toxin.
Q. And in your opinion, would a mouse DAS test be

helpful in determining whether Revance's peptide causes a long duration?

A. Yes. It is a very well-accepted preclinical tool that has been used by various entities, including Allergan, including Revance. And we heard Dr. Broide stating yesterday that it correlates with human performance.

Q. And just to be clear, the mouse DAS study is a study that Revance relied upon in representing to the FDA that its peptide does not drive duration; correct?

A. Yes.

Q. So, Dr. Schöneich, have you considered any further information in developing your opinion that Mr. Hunt's drug product recipe patent has the unexpected property of longer duration of action?

A. Yes. I've considered a couple of theories which have been brought forward, I think, both by Revance and also by one of the experts, I think Dr. Ramsey.

Q. Let's, please, go to PDX 14-15.

And you just mentioned some theories from Dr. Ramsey. Can you please explain what we're seeing here.

A. Yeah, I've grouped them into three groups here. There is -- on the left-hand side, I've called that theory number one. And that basically relates to a formulation between DAXI and the peptide.

And there are some ideas about electrostatic

binding between the peptide and the toxin, between the increased binding of the peptide-DAXI complex to grow on the membranes, and also to promote binding to increase the synaptic terminal. So this is the binary complex theory.

And there is a second theory, which states that duration may be dependent on dosing. And then there's a third theory which says that maybe reduce the fusion can contribute to prolonged duration.

I generally don't agree with these theories. I think we simply don't have enough data to confirm that. So kind of -- that's my analysis.

Q. Do you have an understanding of where all these theories from Dr. Ramsey, where do they come from?

A. I believe they come from this FDA frequently asked question document, which we just saw also in connection with the deposition testimony of Conor Gallagher.

Q. And in your opinion, do any of these theories support that Revance's peptide drives the duration profile of DAXXIFY?

A. I don't think that's the focus. We simply don't have enough data to say that. At this point, they do not support that hypothesis.

Q. Now, in addition to the documents we've just reviewed, have you considered any witness testimony in arriving at your opinion regarding whether Revance's peptide

does or does not drive duration?
A. As a matter of fact, I did consider the testimony of Dr. Conor Gallagher.
Q. Can you please bring up that testimony.
(A video was played.)
BY THE ATTORNEY:
Q. Is the enhancement of the affinity of botulinum toxin type A to cell membranes necessarily connected to a longer duration profile for DAXXIFY?
A. To my knowledge, we have not directly made that connection. Bullet point four says may enhance, which is a hypothetical statement regarding what happens to the botulinum toxin after it anchors or binds to the cell membrane.
Q. Does the anchoring or binding to the cell membrane play a role in duration?
A. I couldn't make a direct link between those two.
(The video ended.)
BY MR. DITTMANN:
Q. Can you please explain how this testimony is relevant to your opinion.
A. I think it supports my opinion because I think it was the chief scientific officer at that time, I forgot his title.
If the chief scientific officer of Revance

itself cannot make a connection between normal duration and these theories, what better person to ask than the chief scientific officer at Revance.

Q. Let's please go to PDX 14-16.

A. Excuse me.

Q. Dr. Schöneich, do you have an understanding of what Revance's position is in this lawsuit relating to its peptide?

A. Well, I think, if I understand correctly -- and again, I'm not a legal expert -- I think Revance believes that the peptide adds value to its formulation. I don't think so.

In my opinions, it's the combination of the disaccharide and the surfactant which adds value to the formulation. That's exactly the combination which was invented by Terrence Hunt and was described in this patent.

Q. Thank you, Dr. Schöneich. I have no further questions at this time, although we're going to see you back again in a couple of days to talk about Claim 6 of Mr. Hunt's drug product recipe patent. Okay?

THE COURT: Thank you, Mr. Dittmann.

Mr. Pickard.

CROSS-EXAMINATION

BY MR. PICKARD:

Q. Good afternoon, Dr. Schöneich.

A. Good afternoon.

MR. PICKARD: Oh, sorry. I need a moment to pass out the binders.

May my colleague approach, Your Honor?

THE COURT: Yes.

BY MR. PICKARD:

Q. Good afternoon, Dr. Schöneich.

A. Good afternoon.

Q. My name is Byron Pickard. I represent Revance. You and I have met before so it's good to see you again.

A. Yeah.

Q. I want to touch briefly on the FDA's statements. I tried to take some careful notes.

You said that Revance represented the peptide does not cause duration. That was your testimony; is that right?

A. My testimony was that Revance stated the peptide -- I can read it -- did not increase spread and/or effect.

Q. Okay. I thought I heard you say it represented that it did not cause duration, and I just want to be clear.

That is not the precise words that Revance said to FDA; correct?

A. Well, I -- if I said so, I think -- I think it does not increase spread and effect. I think that is what I read.

Q. And to the extent you said that, that would be your opinion about what particular words meant; is that fair?
A. Would you ask me this question again?
Q. Yes.
To the extent you said that Revance represented that the peptide did not cause extended duration, that would be your opinion or gloss on other words that Revance had actually stated to the FDA; correct?
A. Well, my opinion is that it doesn't cause increased duration because it doesn't show any prolonged duration. And you saw the data; right?
I know that Revance did these experiments to demonstrate there was no increased spread and no increased effect, and that's exactly what the data showed.
Q. You understand that Revance is going to be offering expert witness testimony from another witness who disagrees with your opinions about what its representations to FDA mean; correct?
A. Possibly. I don't know.
Q. All right. Let's turn a little bit to the question of ingredients and recipes.
I think you said at the beginning that it's important to very carefully craft and calibrate the ingredients and formulations that use these BoNT toxins.
Do I have that right?

A. Yes.
Q. All right. If we could put up Dr. Schöneich's demonstrative 10, please.
What's shown here, these are not all of the ingredients in DAXXIFY; correct?
A. So there's a buffer.
Q. The histidine buffer, you've omitted that; is that right?
A. Yes.
Q. And then that's just because you were trying to show the main ingredients; right?
A. The buffer is there to maintain the pH.
Q. I just want the jury to be clear that we have not shown them all the ingredients in DAXXIFY; correct?
A. That's correct. I omitted the buffer.
Q. I'd like to have you turn to JTX 02. That's that Allergan study that Mr. Broide -- or Dr. Broide testified about yesterday. And if I could direct you to Table 3.1.
What we see here at Table 3.1, these are the ingredients and the formulations that Dr. Broide and his colleagues tested; correct?
A. That's correct.
Q. And it is Formulation 3 that is supposed to be a match to DAXXIFY.
Do I have that right?

A. It's a mimic.
Q. It's a mimic.
It's not an exact mimic; correct?
A. I think I said it has the ingredients, but not at the same -- not all of them at the same concentration as DAXXIFY.
Q. Fair to say this is a study, in your view, that -- where it doesn't matter to have carefully crafted and calibrated the ingredients?
A. Let's put it this way: I think we can talk about them one by one if that makes it easier.
Q. I'm sorry, sir. I have a question pending. I'd like you to answer that question.
Is this an example of your view where it is not important to carefully craft and calibrate the ingredients in the formulation?
A. Well, they have been carefully, let's say, selected based on the type of ingredients. And you, I think, can see if you compare the DAXXIFY that some of them are very close to what is present in DAXXIFY.
Q. And you do agree there are differences in what we see in Formulation 3 with actual DAXXIFY; right?
A. I do, but I also have seen Revance using concentrations as high as 20-milligram of histidine in other formulations.

Q. Doctor, thank you for that. As the judge said at the beginning of the trial, we're on a very tight schedule so we can deliver this case to the jury by Friday, so I'm asking yes-or-no questions. I'd like you to give me yes-or-no answers. And if you need to explain, Mr. Dittmann will ask you some questions on redirect. Okay?
A. Okay.
Q. All right. There are differences between DAXXIFY and what we see in Formulation 3; correct?
A. Correct.
Q. Thank you.
Now, if we go -- this study was done in, I think, in October 2020; is that right? If you go to the first page.
A. Yes.
Q. Okay. So that was before DAXXIFY had been launched on the market; correct?
A. I believe that's correct.
Q. So perhaps a bit understandable why Allergan at that time didn't know what was precisely in DAXXIFY.
Do you agree?
A. At least with regard to some ingredients.
Q. Now, since then, DAXXIFY has launched; correct?
A. That's correct.
Q. And this lawsuit has been pending for more than three

years.

Do you understand that?

A. I am not aware of the time. It could be. It may be.

Q. Well, for your work in this case, you have gotten access to the precise ingredients and commercial specifications for the DAXXIFY process -- the DAXXIFY product; isn't that right?

A. Yes.

Q. And you got that through Allergan's attorneys; is that right?

A. Yes.

Q. Now, despite that, you have not seen any data precisely matching the -- comparing the DAXXIFY formulation to the other samples that are shown in the Allergan study; isn't that right?

A. Not in the Allergan study, but we also have the Revance study.

Q. And you yourself did not try to redo the Allergan study using a precise match to the DAXXIFY product, did you?

A. I didn't.

Q. All right. Let's shift gears a bit. I think I heard you say it's your view that it is the Hunt formulation that is driving the extended duration. Do I have that right?

A. That's my opinion.

Q. Fair to say if you called it a recipe or a cookbook

or something like that?
A. Yes.
Q. It's your testimony that if someone just follows the recipe or that cookbook they will get extended duration. Do I have that right?
A. Well, if somebody would make that formulation which Terrence Hunt made.
Q. Okay. For you to reach that conclusion you need to compare formulations that actually follow the cookbook of Mr. Hunt's patent; right?
A. Yeah. As I said, I've seen also Revance's experiments.
Q. I'm asking you: In order to make a comparison on the duration point, whether it's the patent, Mr. Hunt's patent, you need to see formulations that actually use the ingredients and recipe of the Hunt patent; correct?
A. I would say that would be optimal.
Q. What did you compare that to as part of your analysis to say that it drives duration?
A. Because I think from the data I've shown you at least my interpretation is that the patent doesn't because it hasn't shown any effect.
Q. Let's put JTX 202 back up, please. If we could return to Table 31, Dr. Schöneich, and maybe we can put that up underneath Table 44. The comparison you're making here

between the blue bar and the black bar at least in one instance; right?
A. I made a comparison to red and blue and green.
Q. I just want to understand, none of these formulations that are depicted in either Table 31 or above in Figure 44, none of those are what we would call the prior art; correct?
A. I think that we heard yesterday they had been designed to mimic the Revance formulation.
Q. That's not my question, sir. My question is: None of the formulations shown in Table 31 or depicted in Figure 44, none of those are for prior art formulations; isn't that right?
A. I would say not from publicly available information.
Q. None of these formulations were available in an injectable form as of January 2005; correct?
A. At least in the public domain, I would say.
Q. We could agree that the black bar here, this BSA/SAL, that's not BOTOX?
A. That's not BOTOX.
Q. All right. Let's talk a little bit about the so-called cookbook of Mr. Hunt's patent, if you could turn to Exhibit JTX 1. It's in your cross exam binder if it's not in your direct. That's the '878 patent. I'd like you to look at Claim 6.
A. I'm trying to find it. JTX 1.

Q. If you look in your binder it is the second to last tab.
A. Yeah. I'm there.
Q. What we see here is Claim 6 from the '878 patent; correct?
A. Yes.
Q. Just for the jury's benefit, the way this works, Claim 6 depends from Claim 1 so everything you see in Claim 1, it's part of Claim 6.
Do you understand that?
A. Yes.
Q. All right. Now, if we hone in here on the wherein clause that has the surfactant language for a moment, just above that.
A. Yeah.
Q. Take the highlighting down.
So the claim -- Claim 6 of the '878 patent, it recites a surfactant; correct?
A. Yes.
Q. And the only test data we see on the Allergan study is for a particular surfactant, that polysorbate 20; correct?
A. Yes.
Q. I'd like to turn your attention to column 19, line 25 from this patent.

MR. DITTMANN: Your Honor, I'll object at this point. This was done with another witness and this is going to an issue that is not in this case. There's no 112 issue or infringement issue. It's been stipulated.

MR. PICKARD: Your Honor, may I respond?

THE COURT: I'm going to let him go ahead with his cross-examination. I don't know what he's trying to prove but, you know, I'm going to let him do what he's doing.

BY MR. PICKARD:

Q. Dr. Schöneich, if you look at column 19, lines 25 to about 44, you'll see listed there a series of surfactants. Do you agree?

A. Yes.

Q. If you count them up, it comes out to slightly more than a couple of dozen. Do you agree with that?

A. Do you want me to count?

Q. No, I don't. Does that sound right to you?

A. I can't agree and I can't disagree. It's a number.

Q. The lead-in to that says these are nonlimiting examples. Do you agree?

That's line 25, 25 to 26.

A. Yes.

Q. So the claims of Mr. Hunt's patent cover many surfactants beyond polysorbate 20; correct?

A. Yes.
Q. And the only surfactant for data -- for which data is reported in the Allergen study is that particular surfactant polysorbate 20; correct?
A. I think we know why.
Q. You do not have any data for the surfactants listed here in column 1; correct?
A. Not in the Hunt patent in column 1.
Q. Let's go back to Claim 6. Claim 6, Dr. Schöneich, and step B requires lyophilizing and vacuum drying the compounded formulation; correct?
If you refer back to the Allergan study at Table 31, would you please do that. None of these formulations were either lyophilized or vacuum dried; correct?
A. That's correct, they were frozen and then used afterwards.
Q. That's an example where these formulations failed to follow the cookbook, as you put it, for Mr. Hunt's patent; right?
A. Yeah, they didn't there.
Q. If you look a little bit further down, there's discussion of a powdered formulation in step B as well. Do you see that?
A. Yes.
Q. None of the formulations in the Allergan study

involved powdered formulations; correct?
A. Do you mean the study on the right?
Q. That's correct.
A. Yes.
Q. That's another departure between the cookbook, so-called cookbook, Mr. Hunt's patent, and this Allergan study; right?
A. I see they made it very much simpler on the right and said they just froze.
Q. Those formulations are not powdered; correct?
A. That's correct.
Q. Thank you.
Now, if we jump down a little bit there's a second item below the wherein clause. It has a requirement that there be a certain initial potency. Do you see that?
A. Yes.
Q. There's no reported initial potencies in the formulations of the Allergan study, are there?
A. Where's the -- which tab is that?
Q. That is at JTX 202.
A. I think I'm able to estimate or calculate a number of units of the material.
Q. Well, if we look down to the end of that phrase, that claim phrase here in the '878 patent, Dr. Schöneich, it says "That initial potency determined after reconstitution."

Do you see that in the claim -- Claims 1 and 6?
A. Yes.
Q. None of these formulations in Allergan's study were reconstituted; correct?
A. They didn't have to because they're frozen, thawed.
Q. Exactly.
Now, if you look down here at the bottom, the next phrase, "The powdered formulation has a pH of about 5 to 7.3."
Do you see that?
A. After reconstitution.
Q. Again, these formulations weren't reconstituted so any reported pH values cannot be connected to this patent; correct?
A. They reported, I think, and the study of pH above 6.
Q. None of these formulations --
THE COURT: Hold on a second.
Dr. Schöneich, can you just repeat your last answer.
THE WITNESS: Yes, I think they reported in a poster which also summarizes this study that the pH was 6.
BY MR. PICKARD:
Q. But again, what's required is that the pH be determined after reconstitution and none of these formulations from the Allergan study were reconstituted;

correct?
A. That's correct.
Q. Fair to say that at least what we see here, these are all differences between the so-called cookbook of the Hunt matter and the things that were tested in the Allergan study; correct?
A. The cookbook is for making a formulation which they can store. The one on the right is made for immediate testing.
MR. PICKARD: No further questions, Your Honor.
THE COURT: Anything more, Mr. Dittmann?
MR. DITTMANN: Yes.
Would you please bring up JTX 202 at page 5. Go to Table 31.

REDIRECT EXAMINATION

BY MR. DITTMANN:
Q. Do you recall, Dr. Schöneich, you were trying to explain something about the ingredients here and Mr. Pickard wanted you to answer his question and didn't want you to explain. Do you remember that?
A. Yes.
Q. Can you explain what you wanted to explain about these ingredients?
A. Yeah. And this is with regard to the content and I wanted to explain one by one, so I wanted to focus first on

the CPP, which is the peptide. The peptide was selected by Allergan based on some information they had, I think from a publication. And they selected the amount of .235 microgram of this peptide per unit toxin. And I think if I look at the label of DAXXIFY, this is approximately the amount of toxin which is present in DAXXIFY formulation after reconstitution of .6 milliliters. So I think we are very similar there.

Q. Did you look at Revance's BLA application that it submitted to the FDA in terms of the concentration of ingredients that were used in studies supporting DAXXIFY?

A. Yes.

Let me just also explain the trehalose for a second because after reconstitution, I think, and this is the hundred-unit formulation with 1.2 milliliters, and I don't have the data here so I just try to memorize them correctly. I think the Revance formulation has about 2.7 percent of trehalose so our 2 percent here in this table are pretty similar.

Now, with regard to Tween and histidine, I agree that those contents are different than the actual Revance formulation after reconstitution. But I've seen other data which Revance provided and they're two studies they submitted with the BLA. And I don't know the full title, I think I refer to them as the 2081 and 2082 studies, in which

Revance actually used 20 milligrams of histidine and formula of 5 percent between 20 of properties of the formulations.

Q. Let me make sure I'm following along because that was a lot of information. Are you suggesting that when Allergan used certain ingredients and amounts in its DAS study that you talked about, that those amounts and ingredients are very similar to what Revance itself used in studies that it submitted to the FDA in support of its DAXXIFY application?

A. Yes.

Q. Mr. Pickard just asked you a few question about the Allergan study that looked at Revance's peptide; right?

A. Yes.

Q. But Revance's attorney didn't ask you any questions about the Revance study that shows the exact same thing as the Allergan study; right?

A. Yes.

Q. He didn't bring up that Figure 5 from the study. Remember, we showed when you put them next to each other they show that Allergan and Revance came to the same exact conclusion, that the peptide doesn't drive duration; is that right?

A. Yes.

MR. DITTMANN: Thank you. No further questions.

THE COURT: Dr. Schöneich, thank you. You may step down.

MR. PICKARD: Your Honor, could we be heard on a brief matter on sidebar?

THE COURT: In the meantime, who's the next witness? You're done.

MR. DITTMANN: Our next witness is Dr. Frank Gessler.

(Thereupon, a discussion was held at sidebar.)

THE COURT: Yes.

MR. PICKARD: I suppose I'd like to raise a motion to strike. We heard Dr. Schöneich say these were unexpected results driven by the patent claims and essentially admitted on cross-examination that he did not in the Allergan study analyze any formulations in the scope of the claim and any evidence anywhere else there was comparison to the prior art, let alone the closest prior art. I will say, I don't think Your Honor needs to resolve this now, it will come up in JMOL later. I want to preserve the issue so there would be no doubt we contemporaneously raised it.

THE COURT: Anyway, you have a sidebar to say what you wanted to say. Let's go back to work.

(The discussion at sidebar ended.)

MS. RUPERT: So, Your Honor, at this time plaintiffs would like to call our next witness, Dr. Frank Gessler, to the stand. And, Your Honor, may we hand up

copies of the witness binders?

THE COURT: Yes.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Full name is Frank Andreas Gessler, F-R-A-N-K A-N-D-R-E-A-S G-E-S-S-L-E-R.

FRANK GESSLER,

called as a witness on behalf of the Plaintiff, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MS. RUPERT:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Could you please state your full name for the jury.

A. My name is Frank Andreas Gessler.

Q. Dr. Gessler, can you please tell the jury what your role is in this case.

A. I was asked by Allergan to give my opinion on issues related to the '740 and '748 manufacturing patents.

Q. And for the jury, could you tell us at a high level what the technology does in the '740 and '748 patents relate to?

A. It relates to core aspects of BoNT manufacturing

technology and processes.
Q. What would you consider to be these core aspects?
A. We heard of them before. This would be animal-protein-free process in combination with the chromatography.
Q. So you're going to testify twice during this trial about the Allergan manufacturing patents; correct?
A. Yes, I will.
Q. And so can you please tell the jury what the question you were asked to respond to today was?
A. The focus for today was changing one of these core aspects in the BoNT manufacturing process being a major technical change.
Q. What was your response to this question?
A. It would be a major technical change.
Q. And why are you providing this opinion right now?
A. As I understand, this is information Allergan's damage expert is using.
Q. So let's turn to the demonstratives. I understand you will be using some demonstratives and graphics to aid in your testimony today. Who prepared those?
A. I did in collaboration with counsel.
Q. Let's pull up the first slide, PDX 15-2, and talk a little bit about your educational background.
So can you please walk us through the degrees

you have listed here.
A. Sure. I studied veterinary medicine at Justus Liebig University, graduated there in 1991. I received a Ph.D. in veterinary medicine from Ludwig Maximilian University in Munich. And at Georg August University I got a lecture qualification. That is what is called habilitation and this included a thesis and this was in 2007.
Q. Dr. Gessler, if you could speak slower for the court reporter's benefit.
A. I'm sorry.
Q. Dr. Gessler, what was the subject of your thesis?
A. It was on botulinum production and purification.
Q. So let's turn to the next slide.
Can you please walk us through your current professional positions.
A. In 2005 I founded a small biotech company, miprolab, I'm still managing director of the company. Since 2007 I'm working as university lecturer at the Georg-August University. And in 2023 I cofounded another company, miprocure and I'm acting chief scientific officer at that company.
Q. Can you please tell us about the nature of the work that you do in the companies that you cofounded.
A. Well, it's actually all about neurotoxin, especially BoNT. That's what we're working with. At miprolab we are

manufacturing, producing, and purifying quite a number of different types of botulinum toxins. And at miprocure, we work on the development of pharmaceuticals to treat neuromuscular disorders.

Q. Dr. Gessler, how long have you worked with botulinum toxin or what we're calling BoNT?

A. Probably more than 30 years by now.

Q. And how often do you work with BoNT?

A. So if we're saying today, I would probably work with BoNT on a daily basis.

Q. So in your work with BoNT, have you had any experience in changing the manufacturing process?

A. As I said, we are a contract manufacturer and produce what the customer, the client wants us to do. Sometimes the customer comes up with specifications we have to fulfill and this means we have to change our production process to some extent. So yes, this is something we often do.

Q. And how many types of BoNT do you work on?

A. We work on all types of BoNT from A to G.

Q. So BoNT has A through G different types?

A. Yes. Well, there's a new one being discussed called type H.

Q. So new discoveries of BoNT are still being made?

A. Yeah.

Q. Can you please share an example of one of these

manufacturing process changes you just mentioned for the jury.

A. Yeah. We once had an issue with -- as I said, the customer, they have the specifications. We had to make a change in purification of a certain type. We have to change -- exchange the column, switch the supplier, and this one change really gave us a cascade of changes we have to work through and probably almost cost us two years to get it finally done working again.

Q. Finish your answer, please.

A. That was it. Thank you.

Q. Let's turn to your next slide, PDX 15-4, and talk a little bit more about your experience with BoNT. So what are you showing on the left side of this slide?

A. This we have just seen in Dr. Schöneich's slides. This is BoNT/A, a model of BoNT/A.

Q. Are you going to use this to symbolize BoNT throughout your presentation?

A. Whenever this shows up, we speak about BoNT.

Q. How many scientific papers have you written about BoNT?

A. It's probably more than 25 papers related to BoNT.

Q. What was the focus of your BoNT papers?

A. They cover a rather broad range. They go from detection technology, detection identification of the

toxins. We've been working on replacing the mouse bioassay as a potency test. And we do work on production purification, publish that.

Q. Do you work with any groups or committees that focus on BoNT?

A. Yes, I do. The group you see on the slide, ZEBET, this is a working group of a German federal research institute and they are a working group assessing alternatives for the mouse bioassay for BoNT potency testing. And I also sit on groups on top of the biosafety security risks, especially related to BoNT.

MS. RUPERT: Your Honor, I would like to offer Dr. Frank Gessler as an expert in the field of botulinum toxins including preparation, fermentation, and purification of those toxins.

MS. WELLS: No objection.

THE COURT: All right. You may proceed.

BY MS. RUPERT: Dr. Gessler, were you in the court yesterday when the parties gave their opening statements?

A. Yes, I was.

Q. How was the manufacturing process that Revance uses to make the BoNT/A that goes into its DAXXIFY product described?

A. It was described as an animal-protein-free process.

Q. Just to be clear, Revance uses Allergan's patented

process to make animal-free BoNT/A?
A. That's how I understand it. Revance uses Allergan's patents, yes.
Q. Does Revance use the core aspects of the manufacturing process in the Allergan '740 and '748 patents that you mentioned at the beginning of your testimony?
A. Yes, these are the core technologies and aspects.
Q. So, Dr. Gessler, do you have an opinion on how challenging it would be for Revance to change these core aspects of its manufacturing process?
A. I would focus my reply on the technical expertise side because I'm not on the regulatory side. And I would consider this very challenging. To my understanding, this would have an major impact on the design of the manufacturing process.
Q. Why would making this type of change be so challenging?
A. Because botulinum, botulinum bacteria, are certainly great to work with. I love working with them. But you quickly learn when it comes down to, for example, what you give them to eat, they become pretty picky. So whenever you change an ingredient in this medium they get, this might impact the growth. And if you have an impact on growth then maybe the toxin output is different or the toxin quality changes. And another aspect, if you change the medium, you

also must consider the methods you use for purification and the conditions you use for the purification because you change the starting material.

And yeah, speaking of the purification itself, if you're going to change something in there, this of course has a great impact too. As I said, this is really challenging.

Q. Dr. Gessler, I have just a couple more questions for this round of your testimony. Are you familiar with the term "critical quality attributes"?

A. Yes, I am.

Q. Could we call these CQA for the short?

A. Yes.

Q. What are critical quality attributes or CQAs?

A. These are important qualities of a product. They have to be in a certain range or distribution to be acceptable for the manufacturer or the regulatory bodies.

Q. Would a change to the core aspects of the manufacturing process that we've been discussing, would that have an effect on these critical quality attributes?

A. Yes, it very much could. If you make one change, this might cascade into a range of unpredictable changes.

Q. A manufacturing change would not be as simple as we've been discussing. For example, copying an animal protein into the process and away we go?

A. No, unfortunately not. It's much more difficult.
Q. Dr. Gessler, remind us why are you providing this opinion now.
A. As I understood, this will be information used by Revance's damages expert.
Q. Thank you, Dr. Gessler. We're going to hear from you in a couple of days to hear about the validity of the manufacturing process and the rest of your testimony, but at this time we have no further questions. Thank you.

CROSS-EXAMINATION

BY MS. WELLS:
Q. Hi, Dr. Gessler.
A. Good afternoon.
Q. My name is Deirdre Wells.
MS. WELLS: Your Honor, may we approach with the binders?
THE COURT: Yes.
BY MS. WELLS:
Q. And I'm one of the attorneys for Revance in the case. I heard you say, I think twice, that you're going to testify later in the case, but today's testimony is just for a damages issue; is that correct?
A. Yes.
Q. So if the jury in this case determines that the patents are invalid and damages are zero, they can disregard

your testimony for today?
A. This is rather a legal question.
Q. To your understanding, your testimony today is only for purposes of damages?
A. Yeah.
Q. And you didn't actually make any changes to Revance's manufacturing process; is that correct?
A. That's correct, yes.
Q. And you're not offering as part of your opinions in this case whether there is a change that could be made to Revance's manufacturing process that would be acceptable commercially to either patients or medical professionals; is that correct?
A. I'm not aware of any, that's correct.
MS. WELLS: Thank you.
THE COURT: Thank you.
All right. Any redirect?
MS. RUPERT: No redirect, Your Honor.
THE COURT: All right. So Dr. Gessler, if you just sit there a minute, let's take our afternoon break. 15 minutes. We'll start again roughly quarter of 4:00.
(The jury exited the courtroom.)
THE COURT: All right. You can get down, Doctor. Thank you. All right. We'll be in recess.
(A recess was taken, after which the following

proceedings were had:)

THE COURT: Just before we get the jury, everyone can be seated. The exhibits we handed out pursuant to EARS where we gave one to each juror, should we now be collecting them?

MS. RUPERT: I believe the jury can leave them in courtroom at the end of the day and then at the end of the case we can file a motion.

THE COURT: So I should get them back from the jury?

MS. RUPERT: They shouldn't take them home.

THE COURT: They're not taking anything home, but maybe they shouldn't leave them lying around, either, in the jury room.

MS. RUPERT: I think that would be smart.

THE COURT: We'll collect them when they come back in because at the end of the day, they're going to be eager to go. What were the two exhibit numbers, do you remember?

THE COURTROOM DEPUTY: JTX 194 and JTX 196.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone you can be seated. The two exhibits we handed out, 194 and 196, we'd like to collect them back from you.

All right. We've got one of each from each of you? Okay.

All right. Go ahead, Mr. Minniti.

MR. MINNITI: Your Honor, at this time plaintiff calls Dr. Daniela Drago to the stand.

THE COURT: All right.

THE COURTROOM DEPUTY: Would you, please, state and spell your full name for the record.

THE WITNESS: Daniela Drago, D-A-N-I-E-L-A D-R-A-G-O.

DANIELA DRAGO,
called as a witness on behalf of the
Plaintiff, was sworn, and testified
as follows:

DIRECT EXAMINATION

BY MR. MINNITI:

Q. Good afternoon. Can you please state your name for the record.

A. My name is Daniela Drago.

Q. Dr. Drago, what do you do for a living?

A. I'm a regulatory specialist.

Q. Dr. Drago, at a high level, what is the Food and Drug Administration?

A. It's a federal agency that is responsibile for

assessing and approving medical products in the U.S.
Q. And approximately how many years have you worked in the pharmaceutical industry?
A. I have more than 20 years of experience in regulatory affairs.
Q. Now, Dr. Drago, before we go any further, I just want to briefly discuss the purpose of your testimony today. What is your understanding of why you are providing testimony right now?
A. My testimony is relevant for the damages part of the case.
Q. And have you brought any materials with you today?
A. I have a binder and I have a presentation.
Q. Now, can we please bring up PDX 16, slide 2. Can you please walk the jury through your educational and work background.
A. I have a Ph.D. in chemistry from the Swiss Federal Institute of Technology. I also work in the pharmaceutical industry in regulatory affairs roles. I was an associate professor at the school of medicine at Georgia Washington University where I also directed that regulatory affairs program. This is a post-graduate program for individuals that work at the Food and Drug Administration or in regulatory affairs in the industry. So cumulatively, as I mentioned, I have more than 20 years of experience in this

field.

Q. How do regulatory affairs professionals help pharmaceutical companies navigate the FDA process?

A. Regulatory FDA professionals are responsible for the type of information that companies need to submit to the Food and Drug Administration to demonstrate, for example, that their drug is safe, effective, and manufactured with high quality.

Q. How many times have you personally interacted with the Food and Drug Administration?

A. More than a hundred.

Q. And how many applications for drug approval have you personally worked on?

A. I work with hundreds of regulatory applications.

Q. And, Dr. Drago, do you provide any consulting services to pharmaceutical companies?

A. I do.

Q. What type of services?

A. I also have companies with interactions with the Food and Drug Administration or with their submissions of regulatory applications, and most of my consulting is what is called CMC. It stands for chemistry manufacturing and control, and it has to do with the manufacturing and analytics of drugs.

Q. Have you received any awards for your work in the

field of regulatory affairs?
A. Several awards, including a Regulatory Excellence Award from the Organization of Regulatory Professionals, a Regulatory Leadership Award from the Regulatory Affairs Professional Society, and I've been awarded fellowship status from both those organizations.
MR. MINNITI: Your Honor, at this time Allergan proffers Dr. Daniela Drago as an expert in the field of pharmaceutical regulatory affairs.
MR. VARUGHESE: No objection.
THE COURT: All right. You may proceed.
BY MR. MINNITI:
Q. Can we turn to PDX 16, slide 3.
Dr. Drago, you mentioned a moment ago you were here to provide testimony as part of the damages side of the case. Were you asked to provide an opinion on a specific question?
A. I was asked to answer a very specific question and the question is if Revance chose to no longer use the first and second botulinum toxin manufacturing process patents in June 2019, how much longer would it have taken Revance to submit its DAXXIFY drug approval application with the Food and Drug Administration.
Q. And if we go to the next slide, what is your answer to that question?

A. If Revance would have done so, it would have had a delay to the application and this delay would have been as long as it would have taken Revance to come up with another process plus at least 15 months and up to multiple years.
Q. Now, Dr. Drago, does your opinion in this case relate only to the first and second BoNT manufacturing process patents?
A. Yes.
Q. Were you in the court when Dr. Frank Gessler a few minutes ago provided his opinion on certain manufacturing issues?
A. Yes.
Q. And Dr. Gessler, have you considered Dr. -- apologies.
Dr. Drago, have you considered Dr. Gessler's opinions as part of this case?
A. I have considered Dr. Gessler's opinions.
Q. Okay. Now, let's talk about how you have arrived at this delayed timeline of at least 15 months or more. Why did you consider June 2019 as the date for your regulatory delay analysis?
A. June 19th, as I understand it, it's when Revance had already manufactured the drug substance commercial batch that was used in commercial DAXXIFY.
Q. Focusing on that June 2019 time frame, where was

Revance in the development of DAXXIFY at that time?
A. At that time, Revance had already conducted their pivotal clinical trials.
Q. What are those trials?
A. Those are the most important trials to demonstrate that the drug is safe and effective. And what's important is that the Food and Drug Administration expects that those clinical trials are conducted with a product that is representative of the product that will then be go to the market.
Q. Now, Dr. Drago, in forming your opinions for this case, have you considered whether it would have been significant for Revance to change their manufacturing process in June 2019?
A. Based on my experience, to change the manufacturing process at that point in time would have been -- would have been challenging. And then you heard also from Dr. Gessler that there would have been a lot of technical challenges as well.
Q. Can we please go to PDX 16, slide 5. What are you showing on this slide, Dr. Drago?
A. This slide represents a breakdown of the different steps that Revance would have needed to take if they wanted to stop using Allergan's patents in June 2019.
Q. Have you relied on any particular information to

arrive at this opinion?
A. Besides my own experience and the documents that I reviewed, I also relied on FDA regulatory guidelines.
Q. Now, can you please turn to JTX 184 in your binder.
A. Yes.
Q. What is this document?
A. This is guidance for industry titled, "Comparability of Biotechnological Biological Products, Subject Changes in Their Manufacturing Process."
MR. MINNITI: Your Honor, plaintiff moves JTX 184 into evidence.
MR. PICKARD: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 184 was admitted.)
BY MR. MINNITI:
Q. Dr. Drago, what is an FDA guidance document?
A. It represents the Food and Drug Administration's current thinking on a certain topic.
Q. Can we please go to page 6 of the exhibit and focus on the paragraph under the heading general principles.
And, Dr. Drago, can you please explain what the FDA is talking about here.
A. So when there is a change in the manufacturing process, there is something called a comparability exercise, and the objective of the comparability exercise is to ensure

the quality, safety, and efficacy of the product after the change is maintained.

Q. Did you consider this document and FDA guidance being provided here in your opinions?

A. Yes.

Q. Let's go to slide 17.

And I want to walk through that timeline step by step in a little more detail. Dr. Drago, what is the first regulatory step Revance would have had to have taken to submit a new application to the FDA should it have made a manufacturing change in June 2019?

A. So the first step would be to make a plan, and this would be in the context of the comparability exercise I mentioned just earlier. So the first step of this plan would be to draft and design a comparability protocol.

Q. And approximately how long would this process take?

A. At least a month.

Q. Let's go to the next slide.

And Dr. Drago, what would the next step once Revance had developed a comparability protocol have been?

A. After the protocol, a company in this situation would want to get FDA's feedback on their plan. So they would want to meet and to have agreement with the agency. There are formal meetings with the agency.

Q. Again, we're building on a timeline. How long would

this step have taken?
A. This step would take at least two months depending on the type of meeting.
Q. Moving to the next slide.
After the FDA meeting step, what happens next?
A. Afterwards the company would carry out the plan, execute on the plan in small batches.
Q. How long could this potentially take?
A. This step would take at least seven months. They would need to produce small batches for the drug substance, for the drug product. They would need to look at the chemical, physical, and biological properties and also check what are called stability studies.
Q. Now let's go to PDX 16, slide nine, and focus on now the fourth final step on your slides.
Dr. Drago, what would happen after a company would carry out a small batch plan?
A. The next step would be to manufacture batches under commercial conditions. Those are often called PPQ batches, and this step would have taken them at least five months.
Q. If we go to the next slide.
Dr. Drago, cutting to the bottom line again, if Revance would have decided to pursue a manufacturing change in June 2019, how long would this entire process to have submitted an application to the FDA have taken Revance in

your opinion?
A. It would have taken them at least 15 months and up to multiple years.
Q. And why do you say this process would have taken multiple years beyond the 15 months?
A. Because ideally companies might be able to demonstrate comparability based only on laboratory testing. But if that is not sufficient, if there is uncertainty or the results are not conclusive, then the Food and Drug Administration asks for additional studies. Those can be studies in animals or studies in people and this, obviously, would add more time.
MR. MINNITI: Thank you for your time today, Dr. Drago.
No further questions, Your Honor.
THE COURT: All right. Mr. Pickard, cross-examine.

CROSS-EXAMINATION

BY MR. PICKARD:
Q. Good afternoon, Dr. Drago. Byron Pickard on behalf of Revance. We met about a year ago. It's good to see you again. Just a few questions.
I listened carefully to your direct testimony. You didn't discuss any particular change that Revance would make to its process in arriving at your 15-month opinion,

did you?
A. I mentioned that I'm considering a major change and the technical challenges that we also heard from Dr. Gessler.
Q. Thank you for that. You didn't discuss any particular change that Revance might make; isn't that right?
MR. MINNITI: Your Honor, objection. This goes to some of the issues we've spoken about.
THE COURT: Overruled.
BY MR. PICKARD:
Q. Would you please answer the question, Dr. Drago.
A. I did not discuss the changes.
Q. If we could turn back to the guidance document for a moment, that's JTX 184. This document -- this is the only evidence or authority you offered the jury for your opinion; correct?
A. That is incorrect.
Q. It's the only thing you showed them; isn't that right?
A. When I introduced this document, I clearly stated that what I based my opinion on is my experience, the documents that I reviewed, and the guidance document, including this one.
Q. I don't mean to suggest you don't have expertise or experience. My question is quite narrow. This is the only

evidence or authority you showed the jury; isn't that right?
A. That is correct.
Q. I'd like you to turn to page 1 of the document.
A. Yes.
Q. Okay. Now, if we look down at the second full paragraph in that intro section, do you see that? Highlight the first sentence. What's stated there is that FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities; is that right?
A. That is correct.
Q. And if we look above in that black box, the second sentence reads, "It does not," -- that's referring to this guidance when it says "it"; correct?
A. That is correct.
Q. It says, "It does not create or confer any rights for or on any person and does not operate to bind the FDA or the public"; correct?
A. That is the sentence that is on the page.
Q. And the guidance continues, "You can use as an alternative approach" -- "You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations"; correct?
A. That is correct.
Q. And you did not show the jury any applicable statutes

or regulations, did you?
A. Not today.
Q. If you look at the top of page 1, we see this header contains nonbinding recommendations.
A. Yes.
Q. That appears on every page of this document; isn't that right?
A. That is something that appears on guidance documents.
Q. You agree that FDA was trying to make clear the things in this document were not legal requirements; correct?
A. There is a difference between regulations and guidance documents. As I mentioned, a guidance document reflects the current thinking of the FDA on a certain topic.
MR. PICKARD: Thank you. No further questions.
THE COURT: All right. Any redirect?
MR. MINNITI: No redirect, Your Honor.
THE COURT: Dr. Drago, you may step down. Watch your step.
THE WITNESS: Thank you.
MR. ASHKENAZI: Your Honor, at this time plaintiff calls Dr. Christine Siegwarth.
THE COURT: All right.
THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Christine Siegwarth C-H-R-I-S-T-I-N-E S, as in Sam, I-E-G-W-A-R-T-H.

CHRISTINE SIEGWARTH,

called as a witness on behalf of the Plaintiff, was sworn, and testified as follows:

MR. ASHKENAZI: May I proceed, Your Honor?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. ASHKENAZI:

Q. Good afternoon. Would you please state your full name for the record.

A. Christine Siegwarth.

Q. Have you been retained by one of the parties in this case?

A. Yes, by Allergan, the plaintiff.

Q. Have you prepared any slides to help with your testimony today?

A. I have.

MR. ASHKENAZI: Mr. Campos, can we bring up 17-1.

BY MR. ASHKENAZI:

Q. Dr. Siegwarth, is this the slides you prepared for your testimony today?

A. Correct.

Q. And I'd like the turn to PDX 17-2, please.

MR. ASHKENAZI: Your Honor, apologies. They're going to get a copy of the exhibits.

THE COURT: All right.

BY MR. ASHKENAZI:

Q. Dr. Siegwarth, I'd like to start off with your background, please. Where did you attend college?

A. I got my undergraduate degree from the United States Military Academy at West Point.

Q. What did you do after that, after you graduated from West Point?

A. After that I served in the 101st Military Police Company, 101st Airborne Division at Fort Campbell, Kentucky, and Operation Desert Storm and Desert Shield.

Q. What did you do after your military service?

A. After I finished my service I went to MIT and got my Ph.D. in economics.

Q. After getting your Ph.D. in economics, what did you do?

A. I taught for about five years. I taught economics and statistics at Bentley College -- it's now called Bentley University, and that's in Massachusetts -- and Colgate University in upstate New York. And then in the year 2000 I joined NERA Economic Consulting which is where I still work

today.

Q. What did you do at NERA?

A. At NERA I consult on a variety of economic topics. They include intellectual property, like patents and so on like we have here today. I also consult on antitrust matters and on contract damages matters.

Q. Have you advised any companies on licensing negotiations?

A. I have. I'm often called by one company or another that's involved in a negotiation over a license. I usually don't -- I'm not the one sitting at the table doing the negotiation but I'm the one in the background running the numbers, advising them on strategy, advising on what royalty rate might be the appropriate royalty rate.

MR. ASHKENAZI: Your Honor, at this time, plaintiff proffers Dr. Christine Siegwarth as an expert in the field of economics and patent damages.

MR. ARMENIO: No objection, Your Honor.

THE COURT: You may proceed.

BY MR. ASHKENAZI:

Q. Dr. Siegwarth, could you please tell us at a high level what you're here to testify about today.

A. I'm here to testify about the damages that Revance owes Allergan.

Q. Are you at all addressing the validity of the three

patents in this case?

A. I am not. As a damages expert, I have to assume validity of the patents.

Q. Dr. Siegwarth, what do you understand about the issue of whether DAXXIFY meets all the limitations of both Allergan's asserted formulation or recipe patents and the asserted manufacturing patents?

A. I understand that both sides agree that DAXXIFY does, in fact, as we would say, practice the recipe patents and practice the manufacturing patents.

Q. In general what are the damages that are owed for infringement of the valid patent?

A. So damages must be no less than a reasonable royalty.

Q. Okay. So maybe if we could just take a step back, if you could explain to the jury, what does a reasonable royalty -- what is a reasonable royalty?

A. So a reasonable royalty is, as I said before, is the way that we calculate damages in this kind of case. And what it basically means, royalty is like rent. It's what you pay for the use of property. If I own an apartment building and you want to use one of the apartments, we would get together, we would negotiate, and then at the end of the day you would pay me some rent.

Well, it's the same thing here. Allergan owns some property. It's called intellectual property. It's a

patent, but Revance used that intellectual property and so now Revance owes Allergan some rent or what we would call royalty. The difference though, of course, is that there was no actual negotiation that has taken place. Now we have to determine what that royalty should be.
Q. That's the hypothetical part of this hypothetical negotiation?
A. That's right. That's why we call it a hypothetical negotiation. I have to go back as a damages expert and say what would have been in the companies' mind, what would have been in Allergan's mind and in Revance's mind, what's reasonable in terms of the agreement they would have come to if they actually had negotiated.
Q. And how do you go about determining what would be reasonable?
A. Well, you basically formulate a -- what we call a hypothetical negotiation that looks at the costs and benefits to each side of entering a license agreement.
MR. ASHKENAZI: Mr. Campos, could we please turn to PDX 17-3.
BY MR. ASHKENAZI:
Q. Dr. Siegwarth, at a high level, can you explain what you're showing on this slide?
A. Basically, this is a depiction of what I think the final royalty would have looked like. It's a little

complicated because we have three different patents. They expire at different points in time, but I can break it down pretty simply.

If we look at the bottom line, so you can see -- first of all, if you look at the very bottom you can see a timeline that spans from DAXXIFY launch in 2022 through -- and then if you move to the right when the '740 patent expires, if you keep moving to the right when the '878 patent expires, that's that recipe or formulation patent, and moving all the way to the right when the '748 patent expires in 2029, that's the second of those manufacturing patents.

So that's the timeline we have. If you look across the line at manufacturing in the light green, my opinion is that a reasonable royalty during the very beginning part of the period for the manufacturing patents would have been 15 to 20 percent of sales, and this is always of sales, and then stepping down to somewhere between 12 and a half and 17 and a half percent. That's because the '740 patent expires.

And then if you look on the top, the drug product recipe patent or the formulation patent, it's my opinion that there's a reasonable royalty of 24 percent for that. That's for the '878. And that would go from the launch of DAXXIFY until the '878 patent expires in 2026.

Q. Dr. Siegwarth, I just want to make sure we're clear on a couple of things. First, what I see above in blue that says Revance, that's the amount of sales that Revance would keep and the green is what they would have to pay, this reasonable royalty, to Allergan for the time periods you mentioned?
A. That's correct. You can see the top line there that says a hundred percent, that's a hundred percent of sales. So everything above that royalty is what Revance could keep.
Q. And at the time the '878 patent expires, which is in 2026, Revance would only be paying -- between then and 2029 between 12.5 and 17.5 percent?
A. That's right.
Q. After that, what happens after 2029?
A. After 2029 when the '748 patent expires, there's no more royalty that's owed. At that point, Revance keeps a hundred percent of its revenues for as long as it sells the product.
Q. To the best of your knowledge, how long is Revance planning on selling the products based on the documents you reviewed in this case?
A. The latest document that I saw had a forecast period out to 2034, but at that point it didn't look like -- there wasn't an expectation of sales dipping down, so it very well may be the case that they intend to sell it after 2034 as

well, but I've seen documents out that far.

Q. We can take that down now.

At a high level, can you tell us what considerations went into your analysis for determining the hypothetical negotiation and those reasonable royalty rates you had on the screen.

A. So again, we're talking about a negotiation between two parties, between Allergan on the one hand and Revance on the other. So at a very high level, what are they thinking about? And this is for all the patents that we're talking about. We'll break them down into the specifics.

But generally speaking, Allergan is thinking "I'm being forced here to license to a competitor." In the real world, companies don't generally license to their competitors or certainly don't license except at very, very high rates. You're basically asking a company to give a license and then allow a competitor to use its own technology. That usually doesn't happen.

Here because we're in the world of damages, in this hypothetical negotiation they have to come to an agreement. So Allergan is going to have in its mind "I am not all that motivated to license here. I have to, but I really don't want to. So I'm going to hold out for a really high rate."

On the other hand, Revance knows that the

aspects of these patents that's going to enable Revance to practice are the long-acting duration and the specific manufacturing process that we heard described here that allows them to make an animal-free protein product. And those are two really important things to Revance. So Revance is going to be very motivated to take a license here. And, again, it's going to be willing to pay a fair number -- a fair amount of its sales, at least in the early years, in order to get on the market and get on the market quickly.

Q. What types of documents from a high level did you review to inform your analysis in this case?

A. I looked at a lot of documents in this case. I looked at a lot of internal documents from the companies, I looked at business plans, strategic plans, marketing documents, forecast documents. I looked at documents where the company had prepared documents for third parties like investors, what are they telling the world about their products. Also how are they marketing their products.

I also heard a lot of deposition -- read a lot of deposition testimony from company executives similar to what you saw on some of the videos. I read the expert reports of the various technical experts in this case. And then I used my experience of 25 years working in this field to -- not just working in litigation but also working

directly with companies who are doing this kind of negotiation. What would this negotiation have looked like?

Q. Are you aware that Revance sells DAXXIFY for both cosmetic and therapeutic uses?

A. Yes, I am.

Q. And what, if anything, did you do to account for that as part of your analysis here?

A. Yeah. So typically, and I think it would be the case here that when Revance and Allergan are sitting down to negotiate over each of these patents, they're going to negotiate over any uses of those patents because both parties want to have some certainty. If they're negotiating over the manufacturing patents or negotiating over that '878 patent, no matter exactly how Revance chooses to use it in the future, Revance wants the certainty and Allergan wants the certainty to know what that royalty looks like. So I've considered one negotiation for the manufacturing patents, one negotiation for the recipe patent, the formulation patent, and then you'll see in the royalty base, what a royalty gets applied to. That includes both the cosmetic and therapeutic sales.

Q. Let's focus on just the manufacturing patents, if we, can, for a little while and we'll transition over to the recipe patent.

Let's start off with PDX 17-4 if we can.

Just so we're clear, what is the date of the hypothetical negotiation for the manufacturing patents that you applied?

A. June of 2019.

Q. Okay. Maybe if you could just briefly explain to us what we're seeing in the table, let's start on the Revance side.

A. So this basically lists the major considerations of each side as they're sitting down at this negotiating table. So Revance, what it really cares about is that -- and here we're talking about the manufacturing patents so we're talking about that specific set of processes. You heard about the chromatography. You heard about the various steps in the process. And what they want to make sure they can do is launch on time.

They're sitting here in 2019. They're looking forward to a launch coming up and they want to make sure they don't have delays. We heard all about the various delays, and we'll talk some more about them. But they want to have -- they want to start getting revenue on these products as soon as possible. They don't want to incur any of the risks of trying to design around another process.

We just heard from Dr. Drago about how once you start designing around and submitting to the FDA, you're not exactly sure how long it's going to take, so that's risky

for a company. And by getting -- by starting to launch as soon as possible and not delaying, Revance is going to realize higher profits.

So it wants all that. And it wants to be the first long-acting product to market. That's really important for it as well.

Q. Okay. If we can go to the Allergan side, could you please explain to us how Allergan is going to view this hypothetical negotiation based on the facts you've seen in the case?

A. Yeah. So like I said, Allergan is being asked -- is being forced, really, to license to a competitor. Allergan BOTOX, its BOTOX products, competes directly with -- at least at that time was expected to compete directly with DAXXIFY. Both sides understand that. And Allergan is trying to come out with its own long-acting product so when that comes out, they expect that's going to compete with DAXXIFY, a long-acting product. And Allergan, if it licenses to Revance, is going to lose the opportunity for it to be the first long-acting product in the market because DAXXIFY would have taken that away from them.

Q. I want to follow up on two points. First, you're talking about expected competition. You mean how the parties are viewing competition at the time of the hypothetical negotiation; is that right?

A. That's right. What we try to do as best as possible where we can is to say what would the parties have been thinking in June 2019. We look for documents and evidence around that time to say what would have been in their minds at that point in time. And they would have both expected, and they did both expect, BOTOX and DAXXIFY to compete.

Q. Why don't we take a look at some of the documents that helped inform your opinions in this case. Why don't we start with JTX 93.

MR. ASHKENAZI: Your Honor, I believe JTX 93 has already been admitted into evidence.

THE COURT: Okay.

BY MR. ASHKENAZI:

Q. Dr. Siegwarth, did you consider this document as part of your analysis?

A. I did.

Q. What is the title of this document?

A. "DAXI Price Journey, Price Setting."

Q. Do you know around what year this is from? I'll have it -- I'll get us there. Why don't we turn to the final page, JTX 93.64.

What do we know about this presentation?

A. This presentation was given to the Revance Board of Directors in 2020.

Q. Why don't we look at page JTX 93.40. Dr. Siegwarth,

how did this part of Revance's slide they had gave to the Board of Directors impact your analysis here?

A. So there's kind of a lot on this slide, but this is one of the examples of a Revance forecast that I saw. You can see this is before the launch, just like the hypothetical negotiation would have been before the launch. And if you look below the line that has the dates on it, forget about the bars in the top for a minute, just look towards the bottom. If you look across the line that is purple that says DAXI AES, that is the cosmetic product, the aesthetic product. You can see that as of this time they expected to launch in aesthetics in 2021.

Then if you look at the next slide, that's their therapeutics product, that's DAXI TX. And you can see that as of the time of this forecast, they expected to launch in 2023. So you can see here that as of the time of this forecast, they were still a little bit a ways away from expecting their launch but they -- both of those launches were on the horizon. And you can see if you just do a little bit of math that by 2023, the DAXI products would have been accounted for the majority of the sales of Revance.

So the products at the bottom, one is a filler product and one is a software product. You can see that by 2023 DAXXIFY, the DAXXIFY products were expected to be the

majority of their sales and then growing, you can see the growth going out and you can see the cumulative revenue they expected.

Q. Why does it matter that DAXXIFY was going to be the largest portion of Revance's sales?

A. Well, because for this company, this was really going to be the thing that put them on the map and allowed them to grow. They had other plans as well after this. But you really need to get some revenue in the door to show the market that you can do what your promised to do. This is really important.

Q. I want to go to the next issue you mentioned, which is about competition. Why don't we take a look at JTX 158.

MR. ASHKENAZI: That's already been admitted into evidence as well, Your Honor.

BY MR. ASHKENAZI:

Q. Dr. Siegwarth, did you consider this document as part of your analysis in this case?

A. Yes, I did.

Q. And is this -- what is this document?

A. So this is entitled the aesthetics -- this is an Allergan document entitled "Aesthetics Neurology LRP Strategy."

Q. What does LRP stand for?

A. Long-range plan.

Q. Why don't we turn to page 13 if you can, JTX 158.13. If you can just focus in on the bottom of the screen so we can get the date.

Do you see where it says 2020 aesthetics LRP? Do you see that?

A. Yes, I do.

Q. Is this document dated from 2020?

A. That's correct.

Q. Where does that fall with respect to the hypothetical negotiation?

A. So it's around the time of the hypothetical negotiation and really importantly, it's still before launch of the DAXXIFY product.

Q. I want to focus on the right-hand side of the screen, if we could blow up the right-hand side.

You see a heading "notable competitors"; right? How did that impact -- or what information are we seeing here and how did that factor into your analysis?

A. What you can see here is that Allergan is assessing its competition. And this is, as I said before, ahead of the DAXXIFY launch, so this is their expectations. And they've ranked the competitors. I know it's a little bit small but on the left-hand side you can see those arrows and it says competitor challenge level and the highest competitor challenge is at the top. So the very first

competitor, the highest competitor challenge that they have, is Revance's DAXI product.
Q. Based on this information, how do you believe Allergan would have viewed Revance and specifically the DAXXIFY product at the time of the hypothetical negotiation?
A. You can see they were -- it was -- they were expecting U.S. entry in November of 2020 and even ahead of that entry, they were expecting Revance to be their top competitor, DAXXIFY to be the top competitor of BOTOX.
Q. I want to move to the next slide we have here, JTX 158 at page 14.
Now I see here in the middle it says BOTOX biosimilar. What is that?
A. A biosimilar is like a generic drug. When you go to the pharmacy and let's say your doctor has prescribed Lipitor and that's a branded product but at the pharmacy you might get the generic version, so it's what we call a "me too" product. A biosimilar is not technically exactly the same but it's basically like that. It's like a generic for a biological product like a BOTOX.
Q. Here how did that factor into your analysis here?
A. Well, Allergan is expecting there's going to be a biosimilar that comes out and that it comes out around 2025 or so. You can see that below.
Q. Who is bringing out that biosimilar based on their

view of the market in 2020?
A. Revance and Mylan are going to be bringing out that biosimilar. You can see Mylan has stated a 2025 timeline and Revance reflected on pricing scenarios. It's Mylan and Revance together that are collaborating for the biosimilar.
Q. Revance is planning -- at least as of 2020 the public information was that Revance was planning to bring a biosimilar into the market as well; correct?
A. Correct.
Q. A "me too" BOTOX?
A. Correct. Biosimilar to BOTOX, yes.
Q. If we could please turn to JTX 158 at page 70, please. Go back one page, page 69.
Do you see how at the top it says, "We believe LAI's TPP has the potential to be better than DAXI"?
A. Yes, I do.
Q. What does LAI stand for?
A. LAI is a long-acting injectable. It's the long-acting product that Allergan was developing.
Q. So Allergan is developing a long-acting product. What are they saying about that with respect to DAXXIFY?
A. They are saying that they think that it's going to be better than DAXXIFY.
Q. But that hasn't come out on the market yet; correct?
A. Correct.

Q. Something that's planned for the future; correct?
A. Correct. Planned for the future.
Q. Why don't we turn to, if we can -- we take that down -- PTX 409.
Dr. Siegwarth, I think you may have that in your binder in front of you if you could turn to that there.
A. Yes, I see them.
Q. And have you reviewed this document?
A. Yes, this was part of what I used in my analysis.
MR. ASHKENAZI: Your Honor, I move PTX 409 into evidence.
MR. ARMENIO: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Plaintiff Exhibit PTX 409 was admitted.)
BY MR. ASHKENAZI:
Q. What is the title of this document?
A. This says "Board of Directors Meeting Background, December 6, 2019."
Q. If we could please turn to PTX 409 at page 6.
So this is a slide that's being presented to the Board of Directors; correct?
A. Correct. By Revance to Revance's Board of Directors by its management.
Q. Thank you for that clarification. What are we seeing

on the slide? What are they presenting to the Board of Directors?
A. What it talks about here is it says at the top, "Insufficient model precedent has manufacturers trying to support 30,000 accounts. Revance to stratify accounts and focus on a narrow band." So this is talking about who Revance is planning to target once it comes out with its DAXI product. And as you can see, their strategy is to focus on the Allergan tiers and to focus on the top tiers of accounts, so basically targeting Allergan's top customers.
Q. So I just want to make sure I fully understand. They're analyzing Allergan's customers in the 2020 time period, 2019?
A. That's correct.
Q. And they are saying they're going to be targeting the top tier or top 3,000 accounts of Allergan's customers for BOTOX?
A. Yeah. They say that 75 percent of the revenue is driven by 3,000 accounts and they're going to stratify the accounts and focus on the top accounts.
MR. ASHKENAZI: We can take that down, Mr. Campos. Thank you. Let's turn to JTX 96, please. I believe we can put that up because that's already been admitted into evidence.
BY MR. ASHKENAZI:

Q. Dr. Siegwarth, what's the title of this document?
A. "RT002 Pricing Assessment from October of 2018."
MR. ASHKENAZI: Actually, Your Honor, I want to make sure. I'm not sure if that was admitted into evidence, my note is here -- I'm not sure. I'll move it into evidence now.
MR. ARMENIO: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 96 was admitted.)
BY MR. ASHKENAZI:
Q. This document is dated October 2018; correct?
A. Correct.
Q. This is RT002. Is that Revance's DAXXIFY product before launch?
A. That's the code name they gave to DAXXIFY before launch.
Q. Why don't we go the to JTX 96 at page 33.
And please, if you could explain to us what we're seeing on this slide.
A. Again, this is about expectations, what they expect in the market once Revance launches. And it says, "HCP" -- that's healthcare providers -- "anticipate using DAXXIFY" -- I'll just substitute to be clear -- "in 10 to 12 percent of their toxin patients with share source proportionally across the current brands."

And you can see down below they basically say -- it depends on if they're talking about returning patients or naive patients. A naive patient is it's the first time they ever used a botulinum toxin kind of product -- that Revance, the RT -- sorry, DAXXIFY the RT002 product is going to be get between 10.4 and 12.7 percent. That's what they expect.

Where is it going to come from? It's going to come from three different products. Where is that share going to come from? They expect most of it to come from BOTOX and some from Dysport and some from Xeomin.

Q. We can take that down and take a step back here.

How would the parties thinking about a hypothetical negotiation have come to evaluate the exact numerical value of what they would need in a reasonable royalty rate for the manufacturing patents?

A. It's my opinion that they would have focused on the benefit to Revance, which consisted of the higher profits that Revance would earn as a result of being able to launch immediately rather than facing a delay.

Q. And what delay did you consider as part of your analysis here?

A. So I considered a delay of 12 to 18 months based on the various pieces of testimony that we heard today from the various witnesses.

Q. That included Dr. Drago and Dr. Gessler?

A. That's correct.
Q. Okay. With that in mind, why don't we move to PDX 17-5.
Could you please explain to us how you accounted for that delay as part of your reasonable royalty analysis.
A. So you saw that forecast a little while ago with those different stacked bars that went up. This essentially is that but in a line graph and done on a quarterly basis.
What you see, the green, it comes from a slightly different document, but it essentially is about the same. The green is what they expected their launch to look like using the existing manufacturing process that they were using. And in the hypothetical negotiation, in order to use that, they would need a license. So that's what the green line is. And then if they -- I'm showing here, excuse me, an 18-month delay. I also have the same calculations for the 12-month delay. With an 18-month delay, the purple line is basically exactly the same line except just 18 months further out.
And then what it's showing here, you can see on the vertical axis, these are profits. And so the difference between those lines, essentially that light blue area, that's the profit difference that Revance will earn, something called the profit boost. The profit boost, if Revance is able to launch as soon as it wants versus having

to wait, having to redesign, get a new design, do all the FDA studies that Dr. Drago was talking about, wait for the FDA to approve it. They would have higher profits if they were able to launch as soon as possible. For that in the hypothetical negotiation they need a license.

Q. Let's make sure I get a couple of pieces of that. First, at the time of the hypothetical negotiation, Revance is practicing the manufacturing patents; correct?

A. At the time of the hypothetical negotiation, they're just about ready to practice the patents, yeah.

Q. If they decided that they didn't want to take a license to those patents and they needed to then to not infringe and design around, that would take about 18 months for that calculation you're putting up here?

A. Yeah, 12 to 18 months, and here I'm showing the 18-month variant.

Q. That would mean they would be able to launch that product 18 months later than they thought they would have been able to?

A. That's exactly right.

Q. What you're showing us in the blue in the middle, that's the profits that they would have given up had they not taken the license and decided to design around?

A. That's right. The profits they would give up by choosing to design around another way or the flip side of

it, just another way of looking at it, the profit boost if they get a license, take a license.

Q. Why don't we turn to PDX 17-6.

Tell us, how would the parties have then figured out the rate, that reasonable royalty they would have applied to the manufacturing patents with all of this information?

A. So that profit boost that I just showed you is basically the third bullet item on -- under the Revance benefits. It's the expected higher profits through the life of the patents and beyond. Now, we're only going to look at them for a certain period of time. You saw on the graph through 2029. But that's one of the elements of the benefits to Revance.

And, you know, both sides sitting at the table, Allergan is going to want as much of that benefit as possible. It knows it needs to license to a competitor. It's going to say, hey, I want all of that. And where is Revance going to start? Well, of course, anyone taking a license, paying rent, wants to pay as little as possible. It's just a negotiation. So Revance is going to try and find ways to chip away at that and say no, I don't think I'm going to pay you all of it. This is why.

And what's going to stick? What's going to be a reason Allergan is going to agree to where they both can

meet in the middle? I think 2025 is going to serve as a focal point for that.

Q. Why is that?

A. That's because in 2025, when we think about expectations at the time of the hypothetical negotiation, there's a lot of uncertainty in the marketplace in 2025, in large part because of that biosimilar that I showed you before; right? Mylan and Revance are collaborating. They're looking to come out with a "me too" BOTOX product. The expectations are that's going to come out around 2025, so I think it's reasonable for Mylan -- sorry, for Revance to say past 2025, this market is going to be up in the air so we're not going to pay -- we don't think it's right for us to pay after -- for the profit boost after 2025. We just can't be certain what that profit boost would be.

So looking at that, I think that's the way they would split that profit boost, that Allergan would get the profit boost before 2025 and Revance would keep the profit boost after 2025. I think that's a reasonable place to end up.

Q. I want to talk about how you take that and put that into a numerical royalty rate, a percentage. Why don't we go to PDX 17-7.

Explain to us. I see the royalty rate on the side. If you could explain us to the equation on the

left-hand side.

A. So remember they're going to be paying a royalty -- Revance is going to be paying a royalty on all the sales through the expiration of the patents, through 2029. When I was talking about the profit boost, there I'm just talking about how are they going to split the benefit. But they want to do the calculation over all the sales, typically because that's how a royalty is calculated.

And that's to Revance's benefit. They don't have to pay the profit boost all at once. They get to spread it out over the entire period that they're infringing. So the way you come up with a royalty rate, the way I did, is to take the amount of profit boost through 2025 and divide through by the total sales, Revance sales, through 2029. That gets you the royalty rate on the manufacturing patents.

Q. So we've just did a bunch of calculations here and looking at forecasts. Let's see what that looks like in terms of the number itself. Why don't we go to PDX 17-8.

Here you're simplifying, you're taking all that analysis you've just described and you're putting it into what the royalty rate would be. Can you explain to us what that is?

A. Sure. So when you do the math for the 12-month delay, the royalty rate is 15 percent. When you do the math

for the 18-month delay, the royalty rate is 20 percent. So that's -- royalty rates tend to be round numbers, so that makes sense. So we have 15 to 20 percent.

Now, one thing that I had to consider is that one of the patents -- there's two patents that are manufacturing patents. Remember there was the first one and then the second one built on the first one.

So that first patent expires in 2023. So I said, what would be the adjustment that would be made when you're only paying a royalty on one patent instead of two? And so what I looked at was -- remember the benefit of this patent is to avoid delay. It's a timing issue. So what I said was, what percentage of the timing come from that first patent versus the second patent?

As you can see, the first patent expires pretty quickly, so it's a small amount. What I did was I prorated and took a step down to say after -- there's only the one patent, but a long patent out to 2029. We're going to step down by 2 and a half percent and the royalty is going to be between 12 and a half percent to 17 and a half percent. Up until 2029 when that second patent expires and then there's no more royalty on the manufacturing patents.

Q. To be clear, I think we said this earlier. After 2029 Revance is free to practice Allergan's inventions without having to pay any royalty?

A. Correct. For as long as it sells DAXXIFY.
Q. But that's after 2029, after the patents expire?
A. That's correct.
Q. And the blue is everything else that Revance is getting?
A. That's right. So far we're only talking about one patent, but yes, the rest is everything for Revance.
Q. I want to just take a minute for some housekeeping matters here. You look at PTX 821 through 827 in your binder. These are going to be some of the financials and the calculations you have conducted -- I mean you evaluated. Can you take a moment and look at the documents and I'll ask questions.
A. I just want to be clear. 21 to 27?
Q. PTX 821 through 827.
A. Yes.
Q. Are these the documents that formed the basis for your calculations in this case?
A. Yeah. They're tables that I prepared using the underlying data that I talked about earlier and it shows you the sources for the data as well.
MR. ASHKENAZI: Your Honor, at this time I move PTX 821 through 827 into evidence.
MR. ARMENIO: We object, Your Honor. They're not evidence. They're the doctor's calculations. They're

demonstratives perhaps for the testimony but they're not evidence in the case.

MR. ASHKENAZI: Your Honor, under Rule 1006 they're compilations of the data source, which are pretty long and detailed, and there's no criticism of the subsequent calculations here.

MR. ARMENIO: Counsel is incorrect because these are calculations that the doctor is making of her view of data. It's not a Rule 1000 summary of actual data.

THE COURT: I don't think it's a Rule 1006 summary either. It is her calculations and there's no reason why he can't use them to illustrate whatever it is you want about her calculations.

MR. ASHKENAZI: Your Honor, I'll break this up into pieces.

Can we look at PTX 826, 823, and 827. Those are actual documents that are not just calculations here. We move those into evidence.

THE COURT: Right. So I'm thinking that -- what did you say? 826?

MR. ASHKENAZI: PTX 823, 826, and 827.

MR. ARMENIO: And we continue the objection to all of them. Moreover, Your Honor, they're not on plaintiff's exhibit list. These are not summaries.

THE COURT: Okay. Thank you, Mr. Armenio. Just

looking at them, they don't actually appear to be summaries of documents. They're too voluminous to show in court. The forecast of revenues, for example, 823, which I've already seen one summary that had all the numbers on them and I think these seem to reference it come from one sheet.

So I don't think -- because the arguments here aren't about whether or not Dr. Siegwarth did her math correctly, so I think you will explain what it is she did. I think the underlying math is not actually, I'm going to guess, maybe I learn differently, but I don't think the underlying math is actually of that much interest. Go ahead.

MR. ASHKENAZI: We can move on, Your Honor, at that point.

BY MR. ASHKENAZI:

Q. You did review -- why don't we move on to a different issue right now. Let's move over to the product recipe patents if we can, since we finished already the reasonable royalty rate for the manufacturing patents.

If we could take this down and put up PDX 17-9.

Before we get started, Dr. Siegwarth, just so I have the number in my mind, what was the reasonable royalty rate that you determined would apply to the drug product recipe patent?

A. 24 percent.

Q. And what was the date of the hypothetical negotiation for the that patent?
A. October of 2021.
Q. Would the factors that you referenced earlier still be applicable here for this patent?
A. Some of the same factors. Certainly on the Allergan side, the factors are quite similar.
Q. Okay. Why don't you show us what you're showing here from the Revance side?
A. From the Revance side, this is a different kind of patent as a matter of economics and as a matter of negotiations. That manufacturing process was about the delay and the actual steps in the manufacturing. This is -- as we heard is the recipe and I understand neither side believes there's a way to design around that recipe, and it certainly is not in dispute that DAXXIFY practices that recipe, uses that recipe.
So here the value really comes from the benefits conferred by that recipe, what it gets you in the marketplace. What it got Revance was an opportunity to differentiate itself in a crowded marketplace.
So here the negotiation is in October 2021. That is still before the actual date of launch of the DAXXIFY product but Revance realized that it was going to need to differentiate itself. It's going up against BOTOX

that's very well known, the largest product in its space, and a number of other competitors as well. It was going to be the fifth to this market.

So if you're the fifth and you're just another product like all the rest it's going to be really hard to get sales. So you want to have your own spin on things. You want to have your own differentiation. And differentiation, you're heard this now a number of times, is long duration. That's the differentiation. And it's this patent that would get the long duration, the '878 patent.

So it not only got it the differentiation that allowed it to get sales by being different and unique in the marketplace, but also the first-to-market advantage with the long-acting product.

Q. Why don't we go to PDX 17-10.

I see here where this is the portion of the testimony from Brian Bullock. Can you tell us how this informed your analysis.

A. This is just one example of when -- how Revance over and over acknowledges that one of the things that it's going to do, one of the really important factors in differentiating itself, is to tout its long-duration product. He's asked the question, and remember he's a marketing -- senior marketing executive for Revance, how does DAXXIFY differentiate itself? The primary way, long

lasting results; right? Medium duration of six months. That's the long-lasting results. That's how we compete.
Q. Okay. If we can now look at PTX 335 and it's in your binder, Dr. Siegwarth. Can you let us know if you recognize that document.
A. 335?
Q. Yes.
A. Yes, I do.
Q. Did you consider it as part of your analysis in this case?
A. Yes, I did.
MR. ASHKENAZI: Your Honor, we move into evidence PTX 335.
MR. ARMENIO: No objection, Your Honor.
THE COURT: All right. Admitted without objection.
(Thereupon, Plaintiff Exhibit PTX 335 was admitted.)
BY MR. ASHKENAZI:
Q. This is a Revance document titled "Market Background December 2019"?
A. Correct.
Q. Could we please go to PTX 335 at page 18.
Dr. Siegwarth, I see the title is "DAXI SWOT," and you saw this during one of the deposition testimonies.

What is a SWOT?
A. A SWOT analysis is something that companies tend to do if their -- sometimes they just do it during the course of a product's lifetime, but oftentimes they do it if they're going to launch a product, change a product, get into a new marketplace, that kind of thing, when they're trying the think about big picture, what is the atmosphere we're going into. What's the market. It stands for strengths, weaknesses, opportunities and threats. If anyone has an MBA, MBA students love to do SWOT analysis.
Q. Why don't we take a look at a couple of these entries. Let's start at weakness on the right-hand side. What's the first entry for weakness that Revance is recognizing at this time in 2019?
A. In 2019 they recognize that for DAXXIFY, one of the weaknesses, the top one that they list, is fifth entrant in a highly competitive market.
Q. Let's take a look at the strengths on the left-hand side. And look at the first entry under strengths. What are they saying?
A. One of the strengths of the product is longer duration and higher response rates versus existing treatments.
Q. Let's take a look at the first entry on opportunity which is on the left-hand side. What is that?

A. Fulfill top unmet HCP, healthcare provider, and patient need for a long-lasting product.
Q. We just looked at the top entry for both weaknesses, strengths, and opportunities. How did that inform your analysis here?
A. That's basically what I was saying when I was talking about what Revance would be thinking about at the negotiating table. It's coming into a crowded marketplace, has to differentiate itself. What is its strength? Longer duration. And it's recognized by healthcare providers and patients. They want longer duration too. So it's not surprising that's what they emphasized.
Q. Now, taking this information, let's go to PDX 17-11 if we can.
How did you determine -- you mentioned the rate -- the reasonable royalty rate would be 24 percent. How did you come to that number?
A. What I did is I looked at surveys that were done around the time. These are both before the time of the hypothetical negotiation. Remember this hypothetical negotiation is in 2021. So these are surveys done, one by Allergan, one by Revance, so it's not just one side or the other. Both sides are recognizing. And what they're doing is looking at what's the value of the duration, of the duration element, the duration characteristic.

Q. When you say "the value of duration," the value of duration to what?
A. It's the value of duration to patients and healthcare providers.
Q. And why don't we take a look at some of those surveys. Why don't we turn to JTX 65 which has already been admitted into evidence.
And this is a 2020 document from Allergan; is that correct?
A. Yes, this is the Allergan survey that I was referring to before.
Q. So let's go to JTX 65 at page 13. Is this that survey you referenced from the Allergan side?
A. Correct.
Q. What are we seeing here? What's the takeaway from this?
A. You can see looking at the title this survey shows what the survey firm thought and presented to Allergan is that a longer duration of action is the future innovation most desired by physicians.
Q. If we take a look at the first entry here, what does that entry involve?
A. The very first entry, you can see what they're ranking is all these various innovations, these various product attributes and the very -- the highest one, the very

first one, is longer duration of action.

Q. I want to switch over to PDX 17-12 for a moment.

Is this that same survey you were referring to earlier?

A. That's the same slide we just saw.

Q. If we could advance it. Thank you.

What are you showing us right now?

A. So if we just zoom in to those two bars, that top line there in the survey results, you can see that there are two lines. There's an orange line and a blue line. So the orange is the U.S. and since we're dealing with a U.S. patent and U.S. customers here, that's what I focused on.

What you can see is the survey respondents were asked to rank all of these various attributes first, second, third. What's your first most important, your second, third, fourth? You've all taken surveys like that. In 72 percent of the cases, the ranking was either first, second, or third.

Q. Okay. And how did you take that and come to a number then?

A. So because they're adding up all the firsts, the people who ranked it first, the people who ranked it second, the people who ranked it third, you're going to come up with more than a hundred percent of all of the rankings because everyone gets, like, three votes. So basically what you

have to do is what we call normalize. It's simple. Here, you just divide by three because if you were to add up all the responses, you would get to 300 percent, not 100 percent, so you just divide by three.

Q. Is that a standard economic way of evaluating surveys?

A. It's a standard normalization for this kind of survey.

Q. Based on Allergan's survey, Allergan would have valued duration at 24 percent of the value of the product itself?

A. That's right. 24 percent of the value of the product.

Q. Let's take a look at the next survey, if we could turn to JTX 96 in your binder. We referenced this a little earlier. We can put it on the screen. It's already been admitted into evidence.

This is a Revance document; correct?

A. That's correct.

Q. And I want to frame this again. This is from 2018; correct?

A. That's correct. This is the Revance 2018 survey.

Q. Turn to JTX 96 at page 12.

Is this that other survey that you referenced, the Revance survey?

A. That's correct.
Q. How did that factor into your analysis?
A. Basically, you can do a similar analysis to what I did with the Allergan survey and see what percent of the value are customers looking for from the long-acting, long-duration product or long-duration characteristic, I should say. The trick here, not trick, but the difficulty -- the difference is that there are actually two questions that refer to duration. So you have to do an extra step in the calculation.
Q. What's the question that's being asked in question 11 that's at the bottom of the screen?
A. Yes, you can see it's a little bit small.
Q. Can we blow that up. Thank you.
A. But this is of patients and it says, "From the following list, rank the top five most important factors when considering a new botulinum toxin treatment in terms of importance to you."
Q. Okay. Now, why don't we go to PDX 17-13.
This is that -- sorry, go forward, please, if we can.
This is that same survey we were just looking at?
A. Correct.
Q. And you did that calculation, if we can move forward

in the slide.

So maybe if you could explain us to what the value of duration is based on this survey.

A. Yeah. So like I said, the little bit of a difference with this survey is that there are actually two attributes that relate to duration. One is the length of time that the improvement lasts, but one of the benefits of having an improvement that lasts longer is you have to come and sort of get renewals less frequently, so you have to come back to the office less frequently. So if a treatment lasts three months, then you might have to come four times a year. If the treatment lasts six months, you only come twice a year.

So it is both the length of time the improvement lasts and the frequency of office visits required both relate to long duration. So you have to account for both of those factors. And then because they didn't ask for the top three, they asked for the top five, instead of dividing by three you have to divide by five. So, again, standard normalization technique and you can see that the value of duration from this study is 26 percent of the value.

Q. Okay. So now we have to --

THE COURT: Mr. Ashkenazi, I think we're going to need to break for the day here.

So members of the jury, we're done for the day. There are three things that I'd like to say to you, one of

which is we do intend to start at 9:30 tomorrow so please make every effort to be here on time so that we can start as planned.

Second thing is to remind you not to discuss the case with anyone, not to discuss it with each other. And it's important that you not form -- primary reason why you're not supposed to discuss with each other is you don't want to start to form opinions when you haven't heard all the evidence. And so you can't discuss it with each other. But also don't discuss it with anyone else in person, electronically, by telephone, because discussing it with anyone just defeats the collective jury experience that you'll have when you deliberate.

And then the third thing is not to do any research. There's a lot of information being presented to you. Sometimes you have a temptation you want to look something up, make sure you understood it. You've got to resist that temptation. What you have in your head is what you have. Another two days and some closing arguments, things that may seem cloudy here hopefully will be clarified some. In any event, you're not allowed to supplement what you hear in Court with any extra work. Don't do any extra work.

See you tomorrow morning.

Can we take the jury out, please.

(The jury exited the courtroom.)

THE COURT: Dr. Siegwarth, you can step down.

THE WITNESS: Thank you.

THE COURT: Everyone else can be seated.

So I had a couple of things here, one of which is I'm going to pick on Mr. Desai here just because I think he was speaking about this earlier, but if I'm wrong about who was doing this, I might be. Besides for getting the jury instructions tomorrow, we need the verdict form too.

MR. DESAI: Okay.

THE COURT: All right. Whenever -- I assume Dr. Siegwarth is your last witness in this portion of the case; right?

MR. DITTMANN: Yes, Your Honor.

THE COURT: Okay. So presumably I'm going to get some JMOL on damages when she's finished and basically whenever she's finished, as long as you bring it up at the next break, I'll consider it to be timely that you brought it up whenever they actually finish. So that --

So, Mr. Pickard, you had a little sidebar where you -- besides for making -- trying to preserve the record on unexpected results, you started saying various things like submit a letter briefing. What is it, if anything, that you want to do about that?

MR. PICKARD: Happy to do whatever Your Honor

would like. I think we can address that as part of our trial motions, JMOLs, at an appropriate time. Out of an abundance of caution, I wanted to make a timely -- I think a motion to strike was an imperfect way. I don't think it matters as long as we resolve that issue before the charge conference. We can raise that issue as part of the JMOL.

THE COURT: Raising it -- you're raising it in JMOL where you make an oral presentation. Even if it's meritorious, you're unlikely to win. Okay?

MR. PICKARD: I understand. If Your Honor will receive letters, we'll be happy to submit one.

THE COURT: What were you planning on -- well, if you submit a letter, then they're going to have to submit a letter. And, you know, you made the objection. I have to say I'm not so sure there's any other candidates for BOTOX as being a comparator, and compared to BOTOX, as I understand it, the results were unexpected. So I'm not sure -- so at least based on listening to you for 20 seconds at sidebar, I didn't think that this was likely to be an issue that you were getting a lot of traction on, but it was based on 20 seconds, and I was thinking on other things too.

So if you want to submit a letter, you've got to submit it in some time so they have a chance to respond to it and it's all done pretty soon. So what did you have in mind?

MR. PICKARD: I think we could have something to Your Honor by 8:00 a.m. tomorrow and --

THE COURT: All right. If you submit -- I'm sorry.

MR. PICKARD: I interrupted you. I apologize.

THE COURT: Sometimes it's hard to tell who's interrupting whom. If you submit something by 8:00 a.m. tomorrow, I will give Allergan until 8:00 a.m. Thursday to respond and I'll read whatever it is I get and see whether I'm moved by it. Okay?

MR. PICKARD: Thank you, Your Honor.

THE COURT: Okay. And I guess the only other thing I have written down here which involves Mr. Armenio is whether -- and we're still going through the direct examination of Dr. Siegwarth. Do you think what's been said before somehow puts you in a better position to bring up these things from 2023 to 2024?

MR. ARMENIO: We really don't think at this point we've learned much more on that issue, so I'm inclined, Your Honor, to have this not be an issue tomorrow. What we would seek would be with the direct examination of Ms. Trexler.

THE COURT: Which is presumably a Thursday sort of event?

MR. ARMENIO: I think that's where it's heading,

Your Honor. I think this is an issue -- I'm not planning to raise it with Your Honor tomorrow.

THE COURT: That's a helpful thing to know, so thank you. Okay.

And, Mr. Ashkenazi, I'm guessing that the -- keeping these exhibits out caused you to divert your examination a little bit so you're going to come back and do an alternative way to get an actual explanation of the numbers such as is necessary to do?

MR. ASHKENAZI: Yes, Your Honor.

THE COURT: Okay. All right. Anything you all want to bring up?

MR. DITTMANN: Not on behalf of plaintiff, Your Honor.

MR. ARMENIO: Not from Revance, Your Honor. Thank you.

THE COURT: Thank you. I guess we'll be in recess until tomorrow.

(The proceedings were in recess at 5:15 p.m.)

**C E R T I F I C A T E**

I, Deanna L. Warner, a Registered Professional Reporter, do hereby certify that as such Registered Professional Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$60** [1] - 286:20

## '

**'22** [1] - 280:21
**'25** [1] - 263:8
**'598** [15] - 314:24, 315:7, 315:10, 315:17, 315:24, 315:25, 317:1, 319:17, 319:22, 320:3, 321:9, 326:6, 327:23, 356:20, 360:10
**'740** [35] - 374:4, 374:5, 374:14, 376:20, 376:25, 381:2, 381:7, 382:9, 383:25, 385:18, 386:1, 386:2, 396:11, 396:15, 396:18, 396:25, 398:19, 399:6, 399:8, 399:10, 404:1, 408:3, 408:6, 408:15, 411:5, 411:14, 411:17, 412:20, 418:2, 482:21, 482:23, 488:5, 511:7, 511:20
**'748** [33] - 366:22, 373:20, 387:17, 395:23, 396:12, 396:15, 396:20, 396:25, 399:7, 403:24, 404:1, 404:6, 404:7, 407:5, 408:2, 408:7, 408:16, 410:25, 411:2, 412:21, 416:14, 416:21, 418:2, 420:15, 422:6, 422:14, 422:25, 424:15, 482:21, 482:23, 488:5, 511:10, 512:15
**'87** [1] - 303:6
**'878** [27] - 297:9, 323:12, 323:15, 341:25, 347:17, 350:10, 362:14, 363:24, 437:13, 437:21, 442:25, 444:8, 445:15, 445:20, 446:19, 448:17, 449:10, 472:23, 473:4, 473:17, 476:24, 511:8, 511:24, 511:25, 512:10, 515:13, 538:10
**'90s** [1] - 309:6

## 0

**0** [1] - 454:18
**001** [5] - 296:24, 297:3, 297:6, 297:11, 342:2
**002** [1] - 414:22
**003** [1] - 374:1
**004** [5] - 366:17, 367:3, 367:5, 423:13, 424:15
**0049** [1] - 356:25
**006** [1] - 414:22
**015** [1] - 424:6
**02** [1] - 467:16
**091** [4] - 450:12, 450:23, 451:2, 452:3
**0s** [7] - 330:8, 331:11, 331:13, 331:16, 335:23, 335:24, 336:22

## 1

**1** [36] - 263:25, 329:17, 330:11, 330:12, 344:9, 362:16, 362:25, 391:22, 404:6, 404:7, 407:10, 407:16, 407:22, 408:22, 408:24, 409:9, 409:19, 410:20, 410:24, 411:4, 413:15, 424:16, 424:20, 424:22, 425:3, 472:22, 472:25, 473:8, 473:9, 475:7, 475:8, 477:1, 504:3, 505:3
**1.2** [1] - 479:15
**1.4** [1] - 413:18
**1.6.3** [1] - 453:5
**10** [6] - 329:17, 330:12, 353:12, 467:3, 526:23
**10,000** [3] - 391:25, 392:5, 392:9
**10.4** [1] - 527:6
**100** [5] - 284:3, 310:22, 310:23, 353:12, 544:4
**1000** [1] - 535:9
**1001** [1] - 379:9
**1006** [2] - 535:3, 535:10
**101st** [2] - 507:13, 507:14
**102B** [1] - 273:13
**10:30** [2] - 293:9, 293:20
**11** [3] - 411:21, 411:25, 545:11
**11,147,878** [1] - 297:2
**112** [5] - 264:19, 264:22, 265:4, 265:6, 474:3
**115** [1] - 277:7
**11th** [1] - 308:8
**12** [7] - 306:17, 511:19, 526:23, 527:22, 529:15, 533:20, 544:23
**12-month** [2] - 528:17, 532:24
**12.5** [1] - 512:12
**12.7** [1] - 527:6
**120** [2] - 329:22
**13** [4] - 343:1, 429:25, 521:1, 542:12
**13-13** [1] - 383:23
**1312** [1] - 380:25
**1314** [1] - 387:8
**134** [1] - 373:25
**136** [5] - 452:23, 453:9, 453:12, 454:23, 459:6
**14** [10] - 339:9, 339:24, 394:8, 394:9, 395:13, 395:17, 426:12, 430:9, 454:22, 522:11
**14-10** [1] - 447:14
**14-11** [1] - 449:23
**14-12** [1] - 450:7
**14-13** [1] - 455:17
**14-14** [1] - 456:15
**14-15** [1] - 461:18
**14-16** [1] - 464:4
**14-2** [1] - 436:23
**14-3** [1] - 437:23
**14-4** [1] - 440:4
**14-5** [1] - 440:11
**14-6** [1] - 441:2
**14-7** [1] - 442:15
**14-8** [1] - 444:7
**14-9** [1] - 446:22
**140** [2] - 277:5, 277:14
**14058** [5] - 340:16, 340:19, 340:25, 341:9, 341:12
**149** [1] - 271:9
**15** [21] - 257:21, 258:5, 263:20, 266:22, 269:13, 280:3, 374:20, 375:22, 376:1, 376:19, 383:13, 398:21, 401:6, 491:21, 497:4, 497:19, 502:2, 502:5, 511:17, 532:25, 533:3
**15-2** [1] - 483:23
**15-4** [1] - 486:12
**15-minute** [2] - 364:17, 364:22
**15-month** [1] - 502:25
**150** [1] - 405:3
**153** [1] - 361:23
**158** [3] - 520:13, 522:11, 523:12
**158.13** [1] - 521:1
**15th** [2] - 255:13, 453:7
**16** [4] - 494:14, 496:13, 498:20, 501:14
**163** [6] - 264:19, 264:22, 265:4, 265:18, 266:7, 266:8
**17** [3] - 500:6, 511:19, 533:20
**17-1** [1] - 506:22
**17-10** [1] - 538:15
**17-11** [1] - 541:13
**17-12** [1] - 543:2
**17-13** [1] - 545:19
**17-2** [1] - 507:2
**17-3** [1] - 510:20
**17-4** [1] - 515:25
**17-5** [3] - 260:24, 260:25, 528:3
**17-6** [3] - 262:10, 262:11, 530:3
**17-7** [2] - 260:24, 531:23
**17-8** [1] - 532:19
**17-9** [1] - 536:20
**17.5** [1] - 512:12
**18** [11] - 394:8, 394:10, 394:11, 395:14, 395:17, 527:22, 528:18, 529:13, 529:15, 529:18, 539:23
**18-month** [4] - 528:16, 528:17, 529:16, 533:1
**180** [4] - 320:3, 320:5, 320:25, 359:9
**184** [4] - 499:4, 499:11, 499:14, 503:14
**19** [7] - 394:8, 394:12, 394:13, 395:14, 395:18, 473:24, 474:11
**194** [6] - 331:25, 332:4, 333:5, 333:9, 492:20, 492:24
**196** [3] - 339:6, 492:20, 492:24
**1986** [1] - 303:6
**1989** [1] - 270:4
**199** [2] - 265:13, 265:16
**1991** [1] - 484:3
**1993** [1] - 368:20
**1994** [1] - 417:8
**1999** [1] - 368:23
**19th** [1] - 497:22

## 2

**2** [11] - 376:3, 414:18, 414:21, 415:19, 423:19, 423:22, 423:25, 431:20, 479:18, 494:14, 533:19
**2.7** [1] - 479:18
**20** [21] - 270:17, 280:18, 282:16, 320:10, 329:17, 354:3, 354:7, 354:10, 354:15, 473:21, 474:25, 475:4, 480:1, 480:2, 494:4, 494:25, 511:17, 533:1, 533:3, 549:18, 549:21
**20-milligram** [1] - 468:24
**200** [1] - 313:12
**2000** [1] - 507:24
**2000s** [4] - 308:7, 326:21, 443:15, 446:15
**2002** [2] - 307:14, 315:15
**2003** [3] - 272:17, 320:25, 329:22
**2003/0118598A1** [1] - 314:15
**2004** [6] - 331:5, 341:10, 354:8, 355:11, 355:18, 356:13

**2005** [6] - 272:17, 275:10, 426:23, 438:11, 472:15, 484:16
**2007** [3] - 369:17, 484:7, 484:17
**2009** [4] - 272:17, 275:11, 403:17, 403:23
**2013** [3] - 369:17, 370:11, 395:11
**2014** [1] - 269:8
**2016** [2] - 343:5, 453:7
**2017** [3] - 269:9, 427:24, 428:5
**2018** [8] - 427:24, 428:5, 429:9, 429:19, 526:2, 526:11, 544:20, 544:22
**2019** [18] - 271:1, 281:4, 285:10, 496:21, 497:20, 497:25, 498:14, 498:24, 500:11, 501:24, 516:4, 516:16, 518:3, 524:19, 525:13, 539:21, 540:14, 540:15
**202** [4] - 456:1, 471:23, 476:20, 478:13
**2020** [9] - 469:13, 518:24, 521:4, 521:7, 522:7, 523:1, 523:6, 525:12, 542:8
**2021** [10] - 271:3, 271:7, 272:13, 273:24, 280:17, 286:2, 519:12, 537:3, 537:22, 541:21
**2022** [5] - 280:19, 281:3, 285:11, 286:2, 511:6
**2023** [10] - 268:25, 269:2, 280:22, 283:11, 484:19, 519:16, 519:20, 519:25, 533:8, 550:17
**2024** [1] - 550:17
**2025** [28] - 255:13, 262:12, 262:22, 262:25, 263:6, 264:15, 264:24, 265:1, 265:9, 265:20, 266:1, 266:5, 266:20, 266:25, 267:18, 267:23, 268:3, 522:23, 523:3, 531:1, 531:4, 531:6, 531:10, 531:12, 531:14, 531:18, 531:19, 532:14
**2026** [4] - 267:1, 267:18, 511:25, 512:11
**2029** [12] - 281:22, 511:11, 512:11, 512:14, 512:15, 530:13, 532:4, 532:15, 533:18, 533:21, 533:24, 534:2
**2034** [2] - 512:23, 512:25
**207** [3] - 419:2, 419:4, 419:25
**2081** [1] - 479:25
**2082** [1] - 479:25
**209** [4] - 314:10, 314:17, 314:20, 356:18
**21** [1] - 534:14
**21-CV-1411-RGA** [1] - 255:5
**22** [1] - 433:22
**235** [1] - 479:3
**24** [6] - 279:1, 511:23, 536:25, 541:16, 544:10, 544:12
**25** [7] - 372:17, 473:24, 474:11, 474:22, 486:22, 514:24
**250** [3] - 310:22, 333:24, 340:20
**26** [2] - 474:22, 546:20
**27** [5] - 383:12, 416:16, 416:18, 416:19, 534:14
**280** [1] - 312:22
**29** [2] - 416:5, 423:20
**2:00** [2] - 425:13, 425:17

### 3

**3** [8] - 411:22, 416:22, 423:17, 455:4, 467:23, 468:22, 469:9, 496:13
**3,000** [3] - 327:17, 525:16, 525:19
**3,500** [1] - 331:6
**3.1** [2] - 467:18, 467:19
**3.2.A.3** [1] - 450:21
**3.2.A.3.1** [1] - 433:23
**30** [5] - 284:22, 351:23, 368:11, 413:14, 485:7
**30,000** [1] - 525:5
**30-plus** [1] - 436:10
**300** [2] - 439:7, 544:3
**302** [3] - 262:23, 266:5, 266:17
**31** [5] - 471:24, 472:5, 472:10, 475:13, 478:14
**315** [4] - 279:18, 285:3, 435:11, 435:14
**316** [2] - 435:11, 435:15
**318** [2] - 279:18, 280:3
**319** [1] - 279:18
**33** [1] - 526:17
**335** [5] - 539:3, 539:6, 539:13, 539:17, 539:23
**36** [1] - 416:5
**37** [1] - 413:15

### 4

**4** [2] - 416:14, 454:18
**4,000** [1] - 331:7
**40** [1] - 343:2
**408** [2] - 277:8, 277:24
**409** [5] - 265:17, 524:4, 524:10, 524:14, 524:20
**43** [1] - 458:12
**44** [8] - 416:16, 416:19, 416:20, 423:16, 471:25, 472:5, 472:11, 474:12
**450** [1] - 430:10
**48** [1] - 276:9
**49** [1] - 321:9
**4:00** [1] - 491:21

### 5

**5** [11] - 315:15, 333:20, 399:20, 401:9, 454:23, 459:6, 477:8, 478:13, 480:2, 480:17, 498:20
**5,756,468** [1] - 419:14
**5/19/2004** [1] - 334:24
**50** [4] - 326:25, 343:1, 416:17, 416:23
**500** [1] - 313:12
**52** [2] - 335:17, 412:8
**54** [2] - 399:20, 401:9
**55** [1] - 416:24
**57** [1] - 416:5
**58** [2] - 315:24, 315:25
**586** [1] - 279:18
**5:15** [1] - 551:19

### 6

**6** [24] - 265:20, 265:25, 285:3, 413:13, 414:17, 414:18, 414:21, 437:12, 437:21, 464:19, 472:24, 473:4, 473:8, 473:9, 473:17, 475:9, 477:1, 477:15, 477:21, 479:7, 499:19, 524:19, 524:20
**6.7** [1] - 341:8
**617** [2] - 257:2, 257:3
**618** [1] - 257:2
**619** [1] - 257:2
**62** [1] - 412:23
**620** [1] - 257:3
**627** [1] - 269:8
**628** [1] - 269:8
**64** [1] - 412:23
**65** [2] - 542:6, 542:12
**66** [1] - 314:2
**69** [1] - 523:13
**6A** [1] - 255:12

### 7

**7.3** [1] - 477:9
**70** [1] - 523:12
**700** [1] - 313:12
**72** [1] - 543:16
**75** [2] - 341:13, 525:18
**761127** [2] - 431:14, 433:24
**772** [1] - 287:5

### 8

**8** [3] - 331:5, 407:5, 407:7
**80** [2] - 282:17, 391:8
**821** [3] - 534:9, 534:15, 534:23
**823** [3] - 535:16, 535:21, 536:3
**826** [3] - 535:16, 535:20, 535:21
**827** [5] - 534:9, 534:15, 534:23, 535:16, 535:21
**832** [1] - 431:19
**838** [1] - 430:2
**8:00** [9] - 294:14, 295:2, 295:3, 295:5, 295:7, 295:9, 550:2, 550:7, 550:8

### 9

**9** [1] - 332:19
**9.1.1** [1] - 383:14
**9/9/2002** [1] - 341:10
**900** [1] - 331:5
**91** [2] - 435:8, 435:14
**9102** [5] - 333:20, 333:23, 334:23, 335:16, 335:19
**93** [2] - 518:9, 518:10
**93.40** [1] - 518:25
**93.64** [1] - 518:21
**96** [5] - 525:22, 526:9, 526:17, 544:15, 544:23
**9:30** [1] - 547:1

### A

**a.m** [3] - 550:2, 550:7, 550:8
**A1C** [1] - 322:11
**AbbVie** [4] - 280:4, 286:20, 286:21, 422:21
**abductor** [2] - 454:13, 460:21
**able** [11] - 313:4, 322:8, 385:12, 387:12, 476:21, 502:6, 527:18, 528:25, 529:4, 529:17, 529:19
**absolutely** [6] - 355:12, 416:1, 445:6, 446:20, 446:21, 451:20
**abundance** [2] - 400:13, 549:3
**Academy** [1] - 507:10
**accept** [2] - 275:12, 309:24
**acceptable** [2] - 489:17, 491:11
**accepted** [2] - 439:19,

461:3
**access** [1] - 470:5
**accidental** [1] - 371:11
**accomplished** [2] - 339:1, 343:19
**account** [3] - 384:6, 515:6, 546:15
**accounted** [2] - 519:21, 528:4
**accounts** [7] - 525:5, 525:10, 525:16, 525:19, 525:20
**accurate** [10] - 261:12, 262:6, 320:10, 362:23, 362:24, 363:4, 363:5, 415:6, 451:24, 459:25
**accurately** [1] - 333:2
**accused** [1] - 297:15
**accusing** [2] - 366:24, 373:22
**achieve** [3] - 373:19, 377:4, 409:22
**achieved** [5] - 337:1, 337:3, 341:21, 343:20, 446:11
**achieving** [1] - 373:15
**acid** [13] - 391:8, 391:21, 391:22, 392:10, 392:11, 407:10, 407:22, 409:9, 414:3, 414:4, 414:6, 414:7, 425:3
**acids** [4] - 318:14, 391:1, 414:7, 414:10
**acknowledges** [1] - 538:20
**acting** [27] - 262:15, 262:17, 262:21, 263:9, 263:12, 264:3, 264:5, 264:9, 264:13, 264:23, 265:1, 265:12, 267:1, 267:18, 267:25, 285:20, 484:20, 514:2, 517:5, 517:16, 517:18, 517:20, 523:18, 523:19, 523:20, 538:14, 545:5
**action** [12] - 351:19, 352:13, 352:23, 353:2, 353:9, 448:12, 449:15, 449:25, 454:3, 461:14, 542:19, 543:1
**active** [1] - 444:25
**actively** [1] - 438:23
**activity** [7] - 434:8, 434:10, 434:24, 435:1, 452:13, 457:16, 457:21
**actual** [16] - 274:11, 274:17, 281:24, 282:8, 282:15, 286:10, 288:15, 354:15, 468:22, 479:21, 510:4, 535:9, 535:17, 537:13, 537:23, 551:8
**actuality** [1] - 282:21
**ADAM** [1] - 256:7
**adapt** [1] - 445:9
**adapting** [1] - 346:23
**add** [15] - 258:24, 267:15, 329:2, 329:3, 331:22, 337:21, 348:5, 348:25, 349:17, 443:6, 444:20, 445:1, 502:12, 544:2
**added** [13] - 319:14, 330:6, 338:11, 340:13, 349:8, 357:20, 361:6, 389:20, 390:7, 434:4, 434:20, 444:21, 452:8
**adding** [2] - 319:12, 543:21
**addition** [6] - 259:3, 259:6, 309:10, 438:21, 449:9, 462:23
**additional** [6] - 337:25, 338:13, 388:16, 412:12, 432:15, 502:10
**Additional** [1] - 412:1
**additive** [1] - 331:22
**address** [6] - 273:10, 279:11, 284:8, 349:15, 444:8, 549:1
**addressing** [1] - 508:25
**adds** [3] - 447:10, 464:11, 464:14
**adhere** [2] - 440:21, 451:12
**adjustment** [1] - 533:9
**Administration** [8] - 493:24, 494:23, 495:6, 495:10, 495:20, 496:23, 498:7, 502:10
**Administration's** [1] - 499:17
**admit** [2] - 367:3, 395:13
**Admitted** [2] - 435:10, 499:13
**admitted** [36] - 297:5, 297:6, 314:19, 314:21, 333:8, 333:9, 339:19, 367:3, 367:4, 367:5, 375:25, 376:1, 395:16, 395:18, 419:23, 420:1, 435:12, 435:15, 451:1, 451:3, 453:11, 453:13, 481:12, 499:14, 518:11, 520:14, 524:13, 524:15, 525:24, 526:4, 526:8, 526:9, 539:15, 539:18, 542:7, 544:17
**adopted** [1] - 307:16
**adsorbs** [1] - 441:10
**adsorption** [12] - 347:9, 347:10, 347:19, 348:11, 348:15, 348:19, 349:9, 349:15, 350:2, 350:3, 432:10, 445:2
**advance** [2] - 274:15, 543:6
**advancing** [1] - 258:1
**advantage** [1] - 538:13
**advantages** [1] - 432:2
**advised** [1] - 508:7
**advising** [2] - 508:13
**AES** [1] - 519:10
**aesthetic** [1] - 519:11
**aesthetics** [5] - 280:4, 519:12, 520:21, 520:22, 521:4
**Affairs** [2] - 426:19, 496:4
**affairs** [10] - 427:4, 429:13, 429:14, 494:5, 494:19, 494:21, 494:24, 495:2, 496:1, 496:9
**affected** [2] - 373:3, 373:4
**affecting** [2] - 268:1, 286:16
**affinity** [3] - 432:18, 433:3, 463:7
**afoul** [1] - 267:21
**afraid** [1] - 305:17
**after-the-fact** [1] - 285:18
**afternoon** [13] - 397:21, 397:22, 464:25, 465:1, 465:7, 465:8, 482:14, 482:15, 490:13, 491:20, 493:18, 502:20, 506:12
**afterwards** [2] - 475:16, 501:6
**age** [1] - 370:12
**agencies** [2] - 309:24, 329:7
**agency** [3] - 493:25, 500:23, 500:24
**agents** [4] - 307:25, 398:6, 399:12, 401:18
**aggregate** [1] - 349:19
**aggregation** [3] - 430:21, 432:10, 441:13
**aging** [1] - 298:6
**ago** [13] - 270:17, 281:11, 293:1, 300:18, 311:19, 327:23, 351:24, 372:23, 400:18, 496:14, 497:10, 502:21, 528:6
**agree** [43] - 273:1, 278:16, 279:6, 283:24, 287:16, 287:21, 344:17, 344:22, 345:1, 345:2, 345:6, 353:24, 354:7, 355:10, 356:9, 356:11, 356:22, 359:6, 361:13, 401:24, 402:1, 403:13, 403:16, 403:17, 403:23, 414:21, 420:22, 421:3, 421:9, 421:12, 433:14, 462:9, 468:21, 469:21, 472:17, 474:13, 474:16, 474:19, 474:21, 479:20, 505:9, 509:8, 530:25
**agreed** [3] - 270:10, 283:10, 448:3
**agreement** [4] - 500:23, 510:12, 510:18, 513:21
**ahead** [10] - 276:8, 276:14, 290:1, 297:24, 415:14, 474:6, 493:3, 521:20, 522:7, 536:12
**aid** [2] - 368:13, 483:20
**AIDS** [2] - 304:15, 304:16
**aim** [1] - 295:7
**air** [9] - 306:23, 371:11, 386:5, 388:9, 388:14, 388:15, 388:25, 396:4, 531:12
**Air** [1] - 298:8
**air-purifying** [1] - 388:14
**airborne** [1] - 507:14
**airlocked** [1] - 306:22
**airport** [1] - 308:16
**aisle** [1] - 424:5
**al** [3] - 255:6, 417:6, 420:19
**Alan** [1] - 310:19
**Albumin** [1] - 361:20
**albumin** [49] - 309:12, 310:14, 310:23, 310:24, 311:1, 311:3, 311:5, 311:11, 311:13, 311:14, 311:25, 312:2, 312:17, 312:20, 312:22, 313:11, 313:17, 315:20, 315:23, 316:4, 317:3, 317:8, 317:11, 318:17, 318:23, 318:24, 324:2, 325:14, 327:18, 330:25, 349:9, 356:23, 363:20, 428:20, 429:1, 429:5, 442:24, 443:3, 443:5, 443:6, 443:8, 443:11, 443:13, 443:16, 443:23, 444:2
**albumin-free** [2] - 429:1, 429:5
**alike** [8] - 371:21, 371:24, 372:4, 372:6, 372:7, 373:14, 378:8, 386:9
**alleges** [1] - 297:18
**Allergan** [182] - 268:9, 271:3, 271:11, 271:12, 272:13,

272:15, 274:4, 279:21, 279:24, 281:7, 281:17, 284:2, 284:10, 285:14, 286:4, 287:3, 287:22, 288:24, 289:3, 289:6, 289:17, 297:15, 302:22, 303:2, 303:6, 303:8, 303:19, 305:3, 305:8, 305:25, 308:9, 309:1, 311:23, 317:20, 323:4, 332:21, 339:13, 343:4, 343:6, 366:8, 366:10, 366:11, 366:12, 366:13, 366:15, 366:24, 369:15, 369:16, 369:17, 369:18, 370:1, 370:3, 370:10, 370:17, 370:20, 370:24, 371:5, 371:20, 371:23, 372:3, 372:9, 372:15, 373:7, 373:10, 373:11, 373:15, 373:19, 373:22, 374:10, 374:15, 374:18, 375:9, 375:14, 375:16, 377:2, 377:4, 377:25, 378:5, 385:15, 386:11, 386:13, 387:14, 387:20, 393:9, 393:10, 398:10, 398:15, 398:18, 399:13, 418:20, 418:21, 422:1, 422:5, 422:7, 422:13, 422:17, 422:24, 424:6, 426:25, 427:1, 427:4, 427:10, 427:17, 427:20, 427:25, 428:22, 429:6, 439:23, 443:24, 453:8, 454:20, 455:22, 456:4, 456:12, 456:18, 458:12, 459:7, 459:8, 459:25, 460:5, 460:8, 460:20, 461:4, 467:17, 469:19, 470:14, 470:16, 470:18, 473:20, 475:12, 475:25, 476:6, 476:18, 477:25, 478:5, 479:2, 480:4, 480:11, 480:15, 480:19, 481:13, 482:20, 483:7, 488:5, 496:7, 506:17, 508:24, 509:24, 510:2, 512:5, 513:8, 513:12, 513:21, 515:9, 515:15, 517:7, 517:8, 517:11, 517:12, 517:15, 517:18, 520:22, 521:19, 522:4, 522:22, 523:19, 523:20, 525:9, 530:16, 530:25, 531:17, 537:6, 541:22, 542:8, 542:10, 542:13, 542:18, 544:9, 545:4, 550:8

**ALLERGAN** [1] - 255:3

**Allergan's** [34] - 264:5, 268:8, 367:12, 371:3, 371:18, 375:18, 376:19, 377:7, 378:21, 381:2, 381:7, 382:9, 383:25, 385:17, 385:25, 387:17, 394:18, 396:11, 396:12, 422:22, 456:9, 470:9, 477:3, 483:17, 487:25, 488:2, 498:24, 509:6, 510:11, 525:10, 525:12, 525:16, 533:24, 544:9

**Allergen** [2] - 376:11, 475:3

**Allergen's** [1] - 395:22

**alley** [1] - 304:14

**allow** [5] - 261:17, 270:4, 313:16, 410:8, 513:17

**allowed** [6] - 302:7, 307:10, 398:19, 520:7, 538:12, 547:21

**allows** [1] - 514:4

**alluded** [1] - 328:21

**almost** [6] - 299:18, 311:3, 382:19, 420:23, 421:12, 486:8

**alone** [6] - 310:12, 335:23, 335:24, 336:2, 336:6, 481:15

**alternative** [4] - 258:8, 504:21, 551:8

**alternatives** [1] - 487:9

**ambivalent** [1] - 292:2

**amenable** [7] - 345:25, 346:2, 346:4, 346:23, 347:2, 347:4, 347:7

**American** [2] - 439:14, 439:15

**Americas** [1] - 450:22

**amino** [1] - 318:14

**amount** [18] - 300:2, 313:11, 318:6, 337:14, 363:20, 383:9, 383:11, 436:12, 440:24, 442:12, 446:8, 479:3, 479:5, 512:3, 514:8, 532:13, 533:16

**amounts** [4] - 287:9, 329:17, 480:5, 480:6

**Ana** [2] - 301:12, 302:21

**analogy** [3] - 372:22, 384:25, 438:18

**analysis** [30] - 257:15, 258:19, 260:16, 287:6, 304:1, 324:6, 436:16, 460:3, 462:11, 471:18, 497:21, 513:4, 514:12, 515:7, 518:15, 519:2, 520:18, 521:18, 522:21, 524:9, 527:21, 528:5, 532:21, 538:18, 539:9, 540:2, 540:10, 541:5, 545:2, 545:3

**analytical** [5] - 303:9, 303:10, 412:17, 412:18, 414:15

**analytics** [2] - 394:24, 495:24

**analyze** [1] - 481:13

**analyzed** [3] - 412:24, 413:4, 413:5

**analyzing** [1] - 525:12

**Anchoring** [1] - 432:21

**anchoring** [2] - 433:11, 463:15

**anchors** [2] - 433:10, 463:13

**AND** [1] - 255:2

**ANDA** [1] - 292:3

**Andreas** [2] - 482:5, 482:17

**ANDREAS** [1] - 482:6

**Andrews** [1] - 255:12

**animal** [77] - 258:12, 259:3, 259:6, 311:15, 316:21, 323:20, 323:21, 324:9, 324:13, 324:14, 341:24, 356:23, 362:2, 362:10, 362:18, 363:6, 367:18, 367:20, 368:1, 368:3, 372:6, 372:19, 373:1, 373:3, 373:5, 373:8, 375:1, 376:17, 376:19, 377:9, 377:12, 378:1, 378:6, 378:18, 381:2, 381:7, 382:9, 384:1, 385:18, 385:20, 385:21, 386:1, 386:10, 386:18, 387:1, 387:13, 390:7, 390:14, 396:11, 398:1, 398:3, 398:5, 398:17, 399:12, 400:12, 402:10, 402:15, 402:20, 402:23, 403:15, 403:19, 403:21, 403:24, 404:15, 418:1, 418:5, 428:12, 428:16, 428:18, 429:2, 443:22, 483:4, 487:24, 488:1, 489:24, 514:4

**animal-based** [1] - 390:7

**animal-derived** [4] - 316:21, 323:21, 372:19, 443:22

**animal-free** [9] - 376:19, 381:2, 386:10, 387:1, 387:13, 396:11, 429:2, 488:1, 514:4

**animal-free-process** [5] - 381:7, 382:9, 384:1, 385:18, 386:1

**animal-product** [8] - 377:12, 386:18, 402:20, 402:23, 403:19, 403:21, 418:1, 418:5

**animal-product-free** [20] - 367:18, 367:20, 368:1, 368:3, 375:1, 376:17, 377:9, 378:18, 385:20, 385:21, 390:14, 398:1, 398:3, 398:17, 400:12, 402:10, 402:15, 403:15, 403:24, 404:15

**animal-protein** [3] - 362:2, 362:10, 362:18

**animal-protein-free** [4] - 428:12, 428:16, 483:4, 487:24

**animals** [6] - 311:16, 312:9, 319:4, 373:3, 428:21, 502:11

**anion** [14] - 392:18, 392:19, 392:23, 393:5, 393:6, 393:11, 393:16, 393:19, 404:24, 406:9, 406:13, 406:19, 406:22, 416:8

**ANNE** [1] - 256:3

**announces** [1] - 271:1

**annual** [1] - 270:6

**answer** [19] - 282:20, 286:24, 317:13, 346:10, 353:4, 354:13, 357:14, 404:3, 410:1, 410:4, 410:18, 422:18, 468:13, 477:19, 478:19, 486:10, 496:18, 496:24, 503:11

**answers** [1] - 469:5

**antibodies** [1] - 325:17

**anticipate** [2] - 286:16, 526:22

**anticipated** [4] - 264:6, 266:25, 289:13, 289:16

**anticipating** [1] - 287:8

**anticipation** [1] - 280:25

**antioxidant** [1] - 309:21

**antitrust** [1] - 508:5

**anyhow** [1] - 299:18
**anyway** [2] - 319:11, 481:20
**apart** [2] - 424:20, 441:16
**apartment** [1] - 509:20
**apartments** [1] - 509:21
**APF** [11] - 367:12, 397:25, 411:14, 411:17, 412:1, 412:12, 413:18, 418:1, 418:4, 425:1, 428:23
**apologies** [2] - 497:14, 507:3
**apologize** [4] - 269:11, 408:12, 415:14, 550:5
**appear** [2] - 362:7, 536:1
**APPEARANCES** [1] - 255:15
**Appearances** [1] - 256:1
**applicable** [3] - 504:23, 504:25, 537:5
**application** [23] - 271:2, 271:7, 271:11, 272:19, 274:3, 275:25, 314:15, 315:5, 315:7, 315:8, 315:13, 315:17, 356:19, 361:12, 361:14, 451:6, 452:19, 479:9, 480:8, 496:22, 497:2, 500:10, 501:25
**applications** [8] - 272:8, 272:17, 273:22, 314:6, 343:1, 495:12, 495:14, 495:21
**applied** [4] - 258:18, 515:20, 516:3, 530:6
**applies** [1] - 257:16
**apply** [2] - 400:20, 536:23
**appreciate** [2] - 267:11, 404:14
**appreciated** [1] - 278:25
**approach** [16] - 257:11, 273:5, 305:5, 316:6, 330:18, 333:10, 339:19, 341:17, 343:25, 397:17, 435:18, 465:4, 490:15, 504:21, 504:22
**approached** [2] - 257:14, 257:20
**approaching** [2] - 290:24, 331:7
**appropriate** [3] - 259:10, 508:14, 549:2
**approvable** [1] - 326:11
**approval** [7] - 280:20, 431:14, 431:18, 451:8, 452:19, 495:12, 496:22
**approve** [2] - 313:13, 529:3
**approved** [4] - 307:11, 311:18, 363:23, 430:3
**approving** [1] - 494:1
**April** [1] - 429:9
**Aqua** [4] - 279:14, 285:7, 287:4, 287:5
**aqueous** [2] - 344:24, 354:25
**area** [8] - 303:18, 304:4, 304:22, 306:25, 307:6, 403:4, 439:5, 528:22
**argued** [4] - 259:6, 284:2, 301:16, 437:13
**arguing** [2] - 283:17, 437:20
**arguments** [3] - 270:25, 536:6, 547:19
**Armenio** [12] - 261:4, 264:2, 265:24, 266:16, 280:1, 280:13, 283:24, 285:5, 289:21, 290:11, 535:25, 550:13
**ARMENIO** [44] - 256:11, 261:3, 261:19, 262:2, 262:11, 262:14, 262:20, 263:14, 264:25, 265:5, 266:2, 266:17, 267:7, 268:6, 280:2, 280:7, 280:9, 280:20, 281:2, 281:23, 281:25, 282:10, 282:19, 283:25, 284:9, 284:16, 285:7, 285:13, 286:1, 286:6, 286:10, 286:18, 290:15, 291:1, 508:18, 524:12, 526:7, 534:24, 535:7, 535:22, 539:14, 550:18, 550:25, 551:15
**arrive** [1] - 499:1
**arrived** [2] - 351:10, 497:18
**arriving** [2] - 462:25, 502:25
**arrows** [1] - 521:23
**ARSHT** [1] - 255:16
**art** [19] - 261:24, 268:17, 269:19, 271:12, 273:12, 273:14, 274:4, 274:15, 275:23, 278:14, 278:17, 279:6, 355:20, 437:21, 472:6, 472:11, 481:15, 481:16
**article** [4] - 268:9, 268:14, 269:13, 270:6
**articles** [2] - 269:8, 439:7
**ASHKENAZI** [51] - 255:19, 261:11, 263:16, 264:4, 264:11, 264:16, 264:19, 265:10, 265:15, 265:21, 266:8, 266:22, 267:20, 268:5, 269:10, 269:15, 279:13, 282:24, 283:17, 286:25, 287:24, 505:21, 506:8, 506:11, 506:21, 506:23, 507:3, 507:6, 508:15, 508:20, 510:19, 510:21, 518:10, 518:13, 520:14, 520:16, 524:10, 524:16, 525:21, 525:25, 526:3, 526:10, 534:22, 535:3, 535:14, 535:21, 536:13, 536:15, 539:12, 539:19, 551:10
**Ashkenazi** [7] - 261:9, 263:15, 266:21, 282:23, 286:23, 546:22, 551:5
**aspect** [3] - 342:22, 398:10, 488:25
**aspects** [9] - 401:2, 482:25, 483:2, 483:12, 488:4, 488:7, 488:10, 489:18, 514:1
**aspersions** [1] - 421:17
**aspirins** [1] - 358:11
**assay** [3] - 412:25, 413:8, 413:23
**assert** [1] - 269:17
**asserted** [2] - 509:6, 509:7
**assertions** [1] - 270:20
**assess** [2] - 290:19, 455:19
**assessing** [3] - 487:8, 494:1, 521:19
**assessment** [2] - 316:13, 526:2
**assist** [1] - 444:20
**associate** [1] - 494:19
**associate's** [2] - 301:17, 301:20
**associated** [1] - 420:18
**Association** [2] - 439:14, 439:15
**assume** [5] - 289:16, 293:12, 350:10, 509:2, 548:11
**assumed** [1] - 429:15
**assuming** [1] - 421:14
**assumption** [2] - 260:14, 282:6
**atmosphere** [1] - 540:7
**attack** [1] - 308:19
**attacking** [1] - 325:17
**attacks** [1] - 308:8
**attempting** [1] - 269:17
**attempts** [1] - 458:10
**attend** [1] - 507:8
**attention** [2] - 411:20, 473:24
**ATTORNEY** [4] - 346:19, 410:10, 426:15, 463:6
**attorney** [4] - 350:18, 404:9, 418:23, 480:13
**attorneys** [4] - 350:16, 351:15, 470:9, 490:19
**attract** [4] - 382:17, 392:22, 393:25, 394:4
**attributes** [7] - 409:22, 489:10, 489:14, 489:20, 542:25, 543:14, 546:5
**August** [2] - 484:5, 484:18
**Austria** [1] - 325:25
**author** [1] - 399:17
**authority** [2] - 503:15, 504:1
**availability** [1] - 324:19
**available** [18] - 353:23, 371:15, 371:21, 372:10, 372:19, 373:14, 374:16, 374:17, 375:10, 378:9, 379:17, 386:7, 386:8, 386:9, 386:16, 393:9, 472:13, 472:14
**avoid** [4] - 321:8, 327:24, 398:1, 533:12
**award** [2] - 496:3, 496:4
**awarded** [3] - 342:3, 342:24, 496:5
**awards** [3] - 439:11, 495:25, 496:2
**aware** [20] - 308:21, 323:3, 323:5, 336:14, 368:5, 373:10, 373:21, 377:1, 387:12, 403:10, 422:24, 427:16, 428:12, 428:25, 429:1, 439:3, 455:17, 470:3, 491:14, 515:3
**awareness** [1] - 422:8
**awful** [1] - 322:15
**axis** [1] - 528:21

## B

**B-A-T-E-S** [1] - 365:16
**B2** [1] - 297:2
**babies** [1] - 300:18
**bachelor** [2] - 302:15, 368:19
**Bachem** [1] - 450:22
**background** [11] - 298:2, 368:17,

437:5, 437:25, 440:8, 483:24, 494:16, 507:8, 508:12, 524:18, 539:20
**bacteria** [18] - 318:18, 369:19, 370:6, 377:16, 377:23, 378:13, 378:14, 378:15, 388:6, 389:15, 389:16, 389:19, 389:23, 389:24, 390:21, 390:22, 390:24, 488:18
**bad** [2] - 295:22, 328:7
**bag** [1] - 379:15
**bagels** [1] - 321:24
**balance** [1] - 312:4
**balls** [14] - 380:5, 380:7, 380:9, 380:13, 380:16, 380:17, 380:20, 380:22, 392:25, 393:1, 394:6, 405:11
**Baltimore** [1] - 368:22
**band** [1] - 525:6
**bar** [6] - 340:17, 457:9, 457:15, 472:1, 472:17
**bars** [4] - 457:8, 519:8, 528:7, 543:8
**base** [6] - 258:5, 258:17, 258:19, 288:16, 359:4, 515:19
**based** [40] - 266:5, 271:13, 282:2, 289:9, 315:18, 335:10, 336:1, 336:5, 336:25, 350:16, 352:11, 367:19, 377:10, 377:17, 380:10, 380:14, 386:8, 389:19, 390:7, 390:19, 392:21, 393:24, 422:4, 422:19, 422:21, 454:10, 468:18, 479:2, 498:15, 502:7, 503:21, 512:20, 517:9, 522:3, 522:25, 527:22, 544:9, 546:3, 549:18, 549:21
**basis** [7] - 267:10, 284:14, 431:1, 433:19, 485:10, 528:8, 534:17
**bat** [1] - 335:25
**batch** [2] - 497:23, 501:17
**batches** [4] - 501:7, 501:10, 501:18, 501:19
**Bates** [37] - 365:9, 365:15, 366:7, 367:23, 376:5, 379:3, 379:11, 380:12, 385:15, 386:11, 391:16, 393:6, 395:20, 397:1, 397:14, 397:21, 400:11, 401:6, 403:13, 407:7, 411:6, 411:20, 413:22, 416:10, 422:13, 423:2, 423:10, 423:23, 424:10, 425:11, 425:15, 430:1, 430:2, 430:9, 430:10, 431:19, 433:22
**BATES** [1] - 365:17
**Bates's** [1] - 410:3
**battling** [1] - 285:1
**BDs** [1] - 281:11
**bearing** [1] - 460:3
**bears** [3] - 430:1, 430:9, 433:22
**became** [2] - 271:12, 274:4
**become** [3] - 374:13, 429:23, 488:21
**becomes** [2] - 322:17, 438:20
**beforehand** [1] - 270:23
**began** [4] - 383:3, 386:25, 397:25, 398:3
**begin** [4] - 375:21, 388:2, 388:3, 389:16
**beginning** [7] - 320:6, 342:1, 385:24, 466:22, 469:2, 488:6, 511:16
**behalf** [8] - 296:11, 365:18, 435:25, 482:8, 493:12, 502:20, 506:4, 551:13
**behind** [2] - 324:15, 415:7
**believes** [2] - 464:10, 537:15
**belonged** [1] - 271:14
**below** [8] - 357:11, 418:8, 432:7, 432:15, 476:14, 519:7, 522:24, 527:1
**bench** [1] - 257:11
**beneficial** [1] - 348:4
**benefit** [14] - 377:25, 378:5, 428:9, 430:25, 442:2, 445:20, 449:11, 473:7, 484:9, 527:17, 530:16, 532:6, 532:9, 533:11
**benefits** [5] - 510:18, 530:10, 530:14, 537:18, 546:7
**Bentley** [2] - 507:22
**Berlin** [1] - 438:4
**best** [8] - 269:1, 270:6, 285:23, 309:18, 316:20, 321:3, 512:19, 518:1
**better** [14] - 280:1, 295:7, 324:6, 370:9, 371:1, 371:18, 375:17, 386:17, 391:11, 441:8, 464:2, 523:15, 523:23, 550:16
**between** [37] - 263:4, 281:20, 285:10, 288:18, 310:13, 321:18, 331:5, 389:12, 396:11, 406:19, 421:4, 421:10, 433:13, 446:2, 453:3, 454:18, 456:23, 457:8, 461:24, 462:1, 463:17, 464:1, 469:8, 472:1, 476:5, 478:4, 480:2, 505:12, 511:18, 512:11, 512:12, 513:7, 513:8, 527:6, 528:22, 533:20
**beyond** [3] - 474:25, 502:5, 530:11
**big** [8] - 282:16, 304:16, 308:4, 314:1, 316:23, 325:9, 447:9, 540:7
**bigger** [1] - 359:25
**biggest** [1] - 287:3
**billion** [2] - 286:20, 327:12
**bills** [1] - 300:12
**binary** [1] - 462:4
**bind** [2] - 349:18, 504:17
**binder** [30] - 296:21, 296:23, 314:9, 331:25, 339:5, 340:24, 342:2, 366:16, 374:1, 374:19, 383:18, 394:7, 401:5, 411:22, 416:13, 419:2, 436:20, 450:11, 452:23, 455:24, 456:2, 472:22, 473:1, 494:13, 499:4, 524:6, 534:10, 539:4, 544:15
**binders** [5] - 296:4, 365:11, 465:3, 482:1, 490:16
**binding** [5] - 433:11, 462:1, 462:2, 462:3, 463:15
**binds** [2] - 433:10, 463:13
**bio** [1] - 268:22
**bio-201288** [2] - 455:24, 456:4
**bioassay** [2] - 487:1, 487:9
**biochemical** [1] - 368:21
**biological** [3] - 499:8, 501:12, 522:20
**biologics** [2] - 451:6, 451:12
**biology** [3] - 302:5, 302:8, 302:15
**biosafety** [2] - 307:1, 487:10
**biosimilar** [19] - 263:1, 263:3, 263:10, 263:11, 263:24, 264:1, 264:4, 264:5, 264:8, 522:13, 522:14, 522:18, 522:23, 522:25, 523:3, 523:5, 523:8, 523:11, 531:7
**biotech** [1] - 484:16
**biotechnological** [1] - 499:8
**bit** [28] - 276:19, 290:14, 298:1, 303:1, 327:21, 331:23, 357:20, 368:16, 376:22, 378:22, 387:20, 390:15, 393:8, 406:1, 466:20, 469:19, 470:21, 472:20, 475:21, 476:13, 483:24, 486:13, 519:17, 519:20, 521:22, 545:13, 546:4, 551:7
**BLA** [12] - 275:25, 281:3, 431:10, 431:13, 433:23, 451:5, 451:6, 451:10, 451:15, 453:2, 479:9, 479:24
**BLA761127** [1] - 450:19
**black** [5] - 369:11, 369:12, 472:1, 472:17, 504:12
**blanking** [1] - 418:3
**blond** [1] - 299:8
**blood** [9] - 311:11, 311:12, 312:5, 312:7, 312:11, 317:6, 317:9, 317:11, 322:12
**bloodborne** [1] - 398:2
**blow** [3] - 312:23, 521:15, 545:14
**blue** [16] - 326:2, 340:17, 421:3, 447:22, 448:21, 456:19, 456:25, 457:8, 458:25, 472:1, 472:3, 512:2, 528:22, 529:21, 534:4, 543:10
**blue-collar** [1] - 326:2
**board** [5] - 317:20, 333:17, 334:17, 399:24, 400:4
**Board** [6] - 518:23, 519:2, 524:18, 524:22, 524:23, 525:1
**bodies** [3] - 313:10, 316:10, 489:17
**body** [9] - 312:2, 318:1, 318:4, 322:5, 322:18, 440:20, 442:6, 449:15, 455:9
**boils** [1] - 447:8
**bolster** [1] - 260:19
**bond** [1] - 405:2
**bonds** [1] - 311:17
**BoNT** [51] - 335:16, 335:19, 336:3, 336:6, 336:15, 341:12, 369:23, 386:3, 386:21, 387:23, 388:2, 388:3, 389:23, 389:24, 391:23,

393:20, 403:25, 436:13, 436:16, 437:5, 440:8, 440:14, 442:9, 442:19, 443:2, 444:9, 444:12, 466:24, 482:25, 483:12, 484:25, 485:6, 485:8, 485:10, 485:11, 485:18, 485:19, 485:20, 485:23, 486:13, 486:17, 486:19, 486:21, 486:22, 486:23, 487:5, 487:9, 487:11, 497:6
**BoNT/A** [64] - 367:13, 367:14, 367:21, 368:1, 368:4, 369:21, 370:18, 370:19, 370:20, 370:23, 370:24, 371:2, 371:4, 371:7, 371:11, 371:13, 371:25, 375:5, 375:14, 375:19, 376:17, 377:16, 378:2, 378:6, 378:14, 378:16, 378:19, 385:22, 386:5, 386:6, 386:15, 386:18, 387:1, 387:10, 389:8, 389:10, 389:14, 389:15, 390:1, 390:14, 390:16, 390:23, 391:1, 391:15, 391:18, 392:1, 394:19, 394:21, 395:25, 396:3, 396:6, 397:11, 398:20, 405:3, 425:3, 432:11, 432:19, 432:21, 433:1, 486:16, 487:22, 488:1
**book** [2] - 337:12, 439:7
**books** [1] - 301:5
**boost** [13] - 261:20, 528:24, 530:1, 530:8, 531:14, 531:15, 531:17, 531:18, 531:19, 532:5, 532:10, 532:13
**boring** [1] - 303:11
**born** [1] - 298:5
**boss** [2] - 299:7, 393:12
**BOTOX** [59] - 263:1, 263:4, 263:9, 263:11, 280:11, 283:1, 283:11, 284:5, 284:22, 305:14, 308:3, 308:12, 309:4, 310:16, 310:20, 313:5, 319:9, 323:16, 323:19, 323:23, 324:7, 324:9, 325:8, 326:22, 327:1, 327:2, 344:19, 352:13, 352:23, 353:2, 353:18, 363:20, 370:19, 421:25, 422:2, 422:5, 422:10, 427:2, 428:2, 428:4, 443:24, 444:1, 472:18, 472:19, 517:13, 518:6, 522:9, 522:12, 522:20, 523:10, 523:11, 525:17, 527:10, 531:9, 537:25, 549:15, 549:16
**bottom** [14] - 335:1, 340:17, 377:21, 378:12, 448:9, 451:20, 477:7, 501:22, 511:4, 511:5, 519:9, 519:23, 521:2, 545:12
**botulin** [1] - 370:1
**botulinum** [58] - 306:5, 308:9, 308:17, 309:8, 310:21, 312:20, 312:24, 314:3, 316:2, 316:5, 319:18, 329:14, 336:6, 337:4, 341:23, 344:14, 344:18, 344:23, 345:10, 345:11, 346:21, 347:6, 347:19, 348:22, 349:2, 350:7, 351:19, 354:9, 367:15, 369:23, 375:2, 375:3, 407:11, 412:2, 412:13, 413:6, 413:7, 427:14, 427:21, 427:23, 429:1, 431:6, 433:3, 433:9, 436:12, 439:1, 439:3, 463:7, 463:13, 484:12, 485:2, 485:5, 487:13, 488:18, 496:20, 527:4, 545:17
**Botulinum** [2] - 361:20, 417:16
**botulinum-toxin-containing** [1] - 316:5
**bought** [2] - 298:20, 301:5
**bound** [1] - 405:17
**bovine** [1] - 401:19
**bowl** [1] - 385:4
**box** [11] - 377:19, 377:20, 378:10, 378:11, 378:17, 379:1, 388:19, 388:21, 388:22, 389:1, 504:12
**boxed** [1] - 448:21
**boxes** [3] - 377:14, 377:15, 388:20
**branded** [1] - 522:16
**brands** [1] - 526:25
**bread** [3] - 321:16, 321:18, 358:3
**break** [12] - 301:11, 364:16, 364:18, 364:22, 390:15, 454:24, 491:20, 511:2, 513:11, 535:14, 546:23, 548:18
**breakdown** [1] - 498:22
**breaking** [1] - 302:19
**breaks** [1] - 441:16
**breathe** [2] - 388:15
**Brian** [1] - 538:17
**brick** [1] - 328:5
**brief** [3] - 437:6, 440:8, 481:2
**briefing** [2] - 285:8, 548:23
**briefly** [9] - 334:6, 368:17, 437:25, 444:17, 454:14, 456:17, 465:12, 494:7, 516:5
**bring** [22] - 290:13, 290:22, 290:24, 302:5, 306:13, 306:16, 356:18, 369:12, 436:22, 437:23, 454:23, 458:12, 459:5, 463:4, 478:13, 480:17, 494:14, 506:21, 523:7, 548:17, 550:16, 551:12
**bringing** [4] - 262:6, 302:25, 522:25, 523:2
**Bristol** [1] - 370:14
**broad** [3] - 273:20, 339:3, 486:24
**Broide** [12] - 270:2, 454:15, 454:20, 455:23, 456:10, 456:13, 459:23, 461:5, 467:17, 467:20
**brought** [6] - 436:18, 436:20, 461:16, 494:12, 548:18
**brown** [2] - 321:17, 358:3
**BSA/SAL** [1] - 472:17
**BSL-3** [2] - 388:8, 388:24
**bubble** [1] - 304:9
**buffer** [5] - 338:25, 467:6, 467:7, 467:12, 467:15
**buffers** [2] - 338:24, 384:10
**build** [4] - 309:20, 328:2, 337:15, 399:7
**building** [4] - 330:18, 337:12, 500:25, 509:21
**built** [4] - 307:8, 307:21, 396:15, 533:7
**bulk** [1] - 308:4
**bullet** [6] - 431:4, 432:7, 432:15, 433:7, 463:11, 530:9
**Bullock** [1] - 538:17
**bunch** [5] - 319:12, 327:9, 340:8, 355:5, 532:17
**bunny** [3] - 388:13, 390:5, 397:6
**burst** [3] - 377:23, 378:13
**bursts** [1] - 390:21
**business** [3] - 286:16, 303:19, 514:15
**but..** [1] - 409:11
**BY** [65] - 255:16, 256:11, 296:16, 297:7, 297:25, 300:5, 303:7, 306:18, 307:23, 314:22, 315:12, 333:21, 339:22, 344:3, 346:19, 346:25, 351:3, 363:17, 366:3, 367:6, 376:2, 395:19, 397:20, 401:4, 410:10, 410:15, 416:4, 417:24, 420:2, 423:9, 426:15, 436:5, 436:25, 440:3, 447:15, 451:4, 453:14, 463:6, 463:19, 464:24, 465:6, 474:10, 477:22, 478:16, 482:13, 487:18, 490:11, 490:18, 493:17, 496:12, 499:15, 502:19, 503:10, 506:11, 506:23, 507:6, 508:20, 510:21, 518:13, 520:16, 524:16, 525:25, 526:10, 536:15, 539:19
**Byron** [2] - 465:9, 502:20
**BYRON** [1] - 256:7

## C

**cabinet** [1] - 307:2
**cadaver** [1] - 443:14
**CAHILL** [1] - 256:10
**cake** [1] - 355:1
**calculate** [2] - 476:21, 509:18
**calculated** [1] - 532:8
**calculation** [7] - 261:6, 262:24, 288:17, 529:14, 532:7, 545:10, 545:25
**calculations** [10] - 528:16, 532:17, 534:11, 534:18, 534:25, 535:6, 535:8, 535:11, 535:13, 535:17
**calibrate** [3] - 445:9, 466:23, 468:15
**calibrated** [1] - 468:9
**California** [7] - 301:4, 301:8, 302:1, 302:13, 308:6,

343:7, 370:13
**California-Irvine** [2] - 302:1, 302:13
**Camden** [2] - 298:21, 299:12
**Campbell** [1] - 507:14
**campos** [2] - 341:1, 510:19
**Campos** [4] - 306:16, 339:25, 506:21, 525:22
**Canada** [2] - 426:25, 429:6
**candid** [1] - 294:16
**candidates** [5] - 321:6, 321:8, 321:12, 357:7, 549:15
**candor** [1] - 294:17
**cannot** [2] - 464:1, 477:13
**capacity** [2] - 324:21, 397:5
**capping** [1] - 307:3
**captured** [1] - 383:19
**carbohydrate** [1] - 317:12
**carbohydrates** [2] - 317:4, 322:5
**care** [2] - 326:3, 426:5
**career** [3] - 342:23, 368:10, 369:6
**careful** [1] - 465:13
**carefully** [6] - 445:9, 466:23, 468:8, 468:15, 468:17, 502:23
**cares** [1] - 516:10
**CARL** [1] - 255:20
**Carrie** [1] - 280:3
**carrier** [1] - 344:24
**carries** [1] - 312:4
**carry** [2] - 501:6, 501:17
**cars** [1] - 302:18
**cascade** [2] - 486:7, 489:22
**Case** [1] - 255:5
**case** [69] - 257:18, 258:5, 258:17, 258:19, 259:12, 260:6, 262:4, 271:4, 273:22, 277:12, 278:10, 287:16, 288:8, 290:3, 290:22, 323:12, 346:12, 354:14, 356:16, 381:12, 394:5, 400:21, 400:24, 405:11, 406:2, 408:25, 417:11, 417:22, 426:9, 436:15, 437:2, 438:25, 444:6, 445:25, 447:6, 447:9, 451:12, 460:14, 469:3, 470:4, 474:3, 482:19, 490:19, 490:21, 490:24, 491:10, 492:8, 494:11, 496:16, 497:5, 497:16, 498:12, 506:16, 509:1, 509:18, 512:21, 512:25, 514:12, 514:13, 514:23, 515:8, 517:10, 518:8, 520:18, 534:18, 535:2, 539:10, 547:5, 548:13
**cases** [4] - 291:23, 292:3, 439:20, 543:17
**casting** [1] - 421:17
**catch** [1] - 374:17
**categories** [2] - 326:9, 327:7
**category** [2] - 344:18, 450:8
**cation** [6] - 394:2, 394:3, 406:16, 406:19, 406:23, 407:2
**caused** [4] - 276:1, 449:11, 450:1, 551:6
**causes** [1] - 461:1
**causing** [1] - 459:15
**caution** [2] - 400:13, 549:3
**CDC** [1] - 306:7
**Cee** [1] - 420:19
**cell** [18] - 318:8, 318:17, 318:18, 318:19, 318:23, 377:24, 390:22, 390:25, 432:19, 433:4, 433:10, 433:11, 463:8, 463:13, 463:15
**cells** [3] - 369:20, 390:19
**cellular** [3] - 390:25, 391:8, 393:22
**center** [2] - 447:23, 448:14
**CEO** [1] - 284:24
**certain** [17] - 313:15, 330:23, 348:13, 355:25, 370:12, 398:9, 403:21, 440:16, 476:15, 480:5, 486:5, 489:16, 497:10, 499:18, 505:14, 530:12, 531:15
**certainly** [8] - 281:4, 282:12, 387:5, 403:9, 488:18, 513:15, 537:6, 537:16
**certainty** [3] - 515:12, 515:15, 515:16
**certification** [1] - 451:25
**certify** [2] - 452:1, 551:23
**chain** [6] - 340:8, 372:20, 372:21, 372:22, 372:25, 373:1
**chair** [1] - 438:10
**challenge** [5] - 302:7, 316:23, 521:24, 521:25, 522:1
**challenged** [1] - 370:8
**challenges** [8] - 309:7, 310:1, 387:22, 389:13, 389:25, 439:4, 498:18, 503:3
**challenging** [7] - 370:7, 389:16, 488:9, 488:13, 488:17, 489:7, 498:17
**chambers** [2] - 294:5, 389:18
**chance** [6] - 276:18, 352:19, 357:10, 386:5, 421:2, 549:23
**chances** [1] - 313:4
**change** [34] - 258:6, 260:15, 308:24, 311:9, 311:20, 313:11, 313:16, 330:11, 483:13, 483:15, 485:16, 486:5, 486:6, 486:7, 488:9, 488:16, 488:22, 488:25, 489:3, 489:5, 489:18, 489:21, 489:23, 491:10, 498:13, 498:15, 499:23, 500:2, 500:11, 501:23, 502:24, 503:2, 503:6, 540:5
**changed** [3] - 270:24, 405:17
**changes** [7] - 486:1, 486:7, 488:25, 489:22, 491:6, 499:8, 503:12
**changing** [4] - 363:20, 405:13, 483:11, 485:12
**chapters** [1] - 439:8
**characteristic** [2] - 541:25, 545:6
**characteristics** [3] - 428:6, 445:8, 445:10
**characterize** [1] - 304:2
**characterizing** [1] - 309:14
**charge** [4] - 382:16, 392:21, 431:2, 549:5
**charged** [7] - 293:24, 382:15, 392:20, 393:21, 406:22, 406:23, 431:6
**charging** [2] - 276:25, 293:18
**check** [1] - 501:12
**chemical** [5] - 368:19, 368:21, 370:7, 439:8, 501:12
**chemically** [4] - 321:21, 321:22, 358:6, 441:16
**chemist** [1] - 369:10
**chemistries** [1] - 384:8
**chemistry** [9] - 302:15, 436:9, 438:2, 438:6, 438:10, 438:14, 494:17, 495:22
**Cherry** [1] - 299:4
**chicken** [1] - 312:2
**chief** [5] - 426:8, 463:23, 463:25, 464:2, 484:20
**chip** [1] - 530:22
**chloride** [1] - 310:23
**choose** [1] - 262:22
**chooses** [1] - 515:14
**choosing** [1] - 529:25
**chose** [1] - 496:19
**Christian** [5] - 425:23, 435:17, 435:22, 436:7, 439:23
**CHRISTIAN** [2] - 435:23, 435:24
**Christine** [4] - 505:22, 506:1, 506:14, 508:16
**CHRISTINE** [2] - 506:2, 506:3
**chromatography** [68] - 259:21, 367:21, 367:23, 367:25, 368:2, 368:9, 368:10, 369:1, 377:11, 378:22, 379:2, 379:4, 379:12, 379:16, 379:17, 379:20, 379:23, 380:1, 380:9, 380:18, 380:23, 381:3, 381:24, 382:5, 382:11, 382:12, 383:2, 384:2, 384:3, 384:5, 384:21, 384:24, 385:13, 385:16, 385:18, 385:20, 388:18, 390:1, 390:3, 391:13, 391:14, 392:15, 392:18, 392:20, 393:5, 393:7, 393:11, 393:16, 393:17, 393:19, 394:2, 394:3, 396:16, 404:16, 404:20, 404:23, 404:24, 405:10, 406:9, 406:14, 406:16, 407:3, 411:18, 412:1, 420:8, 425:2, 483:5, 516:13
**circles** [1] - 392:9
**circumstances** [2] - 342:18, 342:19
**citation** [4] - 263:7, 265:11, 265:12, 266:3
**citations** [1] - 263:17
**cite** [3] - 264:17, 417:8, 418:12
**cited** [3] - 418:9, 419:1, 419:16
**citing** [1] - 417:13
**city** [1] - 298:18
**civil** [1] - 373:4
**Claim** [22] - 344:9, 362:16, 362:25, 404:6, 404:7, 407:5, 407:7, 424:16, 424:20, 424:22, 437:12, 437:21, 464:19, 472:24, 473:4, 473:8, 473:9, 473:17, 475:9
**claim** [7] - 344:10,

350:20, 363:10, 473:17, 476:24, 477:1, 481:14
**claimed** [2] - 356:15, 424:1
**Claims** [1] - 477:1
**claims** [6] - 350:16, 351:6, 363:14, 404:10, 474:24, 481:11
**clarification** [1] - 524:25
**clarified** [1] - 547:20
**clarify** [2] - 277:22, 327:20
**clarity** [2] - 432:4, 441:8
**classes** [1] - 301:13
**classify** [1] - 359:22
**clause** [2] - 473:13, 476:14
**clean** [1] - 334:14
**cleaning** [1] - 303:23
**clear** [26] - 258:25, 259:2, 266:9, 273:14, 275:17, 280:12, 282:24, 285:14, 310:15, 311:2, 352:8, 352:9, 352:20, 369:14, 431:8, 448:16, 461:7, 465:20, 467:13, 487:25, 505:9, 512:1, 516:1, 526:23, 533:23, 534:14
**clearance** [1] - 402:7
**cleared** [1] - 388:7
**clearly** [3] - 285:18, 459:2, 503:20
**CLERK** [1] - 295:14
**clerk** [1] - 333:14
**client** [1] - 485:14
**clinical** [11] - 270:11, 308:12, 308:13, 427:13, 428:9, 428:25, 429:4, 429:7, 430:23, 498:3, 498:8
**clinically** [1] - 422:9
**clinicals** [1] - 305:4
**clip** [1] - 346:16
**close** [3] - 295:5, 301:12, 468:19
**closer** [1] - 300:2
**closest** [1] - 481:15
**closing** [1] - 547:19
**clostridium** [2] - 375:1, 375:3
**cloudy** [3] - 262:7, 385:14, 547:20
**clue** [1] - 329:6
**clumps** [1] - 441:13
**CMC** [1] - 495:22
**co** [2] - 368:6, 418:19
**co-inventors** [2] - 368:6, 418:19
**Coast** [1] - 301:3
**coast** [1] - 304:20
**coauthored** [1] - 401:12
**Coca** [1] - 281:9
**Coca-Cola** [1] - 281:9
**code** [3] - 318:9, 318:12, 526:15
**coffee** [1] - 391:6
**cofounded** [2] - 484:19, 484:23
**Cola** [1] - 281:9
**cola** [1] - 281:9
**Colgate** [1] - 507:23
**collaborating** [2] - 523:5, 531:8
**collaboration** [2] - 263:4, 483:22
**collar** [1] - 326:2
**colleague** [3] - 424:4, 425:4, 465:4
**colleagues** [1] - 467:21
**collect** [2] - 492:16, 492:24
**collecting** [1] - 492:5
**collective** [1] - 547:12
**collectively** [1] - 454:1
**College** [2] - 301:12, 507:22
**college** [6] - 299:5, 300:9, 300:24, 301:1, 301:4, 507:8
**Colleges** [1] - 439:14
**colored** [1] - 380:5
**colorful** [1] - 442:21
**colors** [2] - 440:16, 458:17
**Column** [1] - 413:15
**column** [52] - 330:9, 334:25, 378:25, 379:2, 379:6, 379:17, 379:23, 380:10, 380:14, 381:5, 381:6, 381:9, 381:10, 381:25, 382:1, 382:3, 382:5, 382:6, 382:8, 382:11, 382:12, 383:2, 384:9, 392:17, 392:19, 393:2, 393:3, 393:4, 393:19, 394:1, 394:3, 405:12, 405:17, 405:20, 406:9, 412:12, 416:5, 416:8, 416:16, 416:18, 416:19, 416:20, 420:5, 423:16, 423:20, 473:24, 474:11, 475:7, 475:8, 486:6
**columns** [10] - 379:16, 380:2, 380:9, 381:1, 381:3, 383:4, 391:13, 391:14, 405:11
**combative** [1] - 348:7
**combination** [24] - 336:11, 336:15, 337:1, 338:5, 338:9, 338:12, 341:16, 425:7, 437:9, 444:12, 445:17, 448:22, 449:17, 449:19, 457:12, 457:13, 457:18, 457:24, 458:1, 459:16, 459:18, 464:13, 464:15, 483:4
**combinations** [5] - 337:5, 337:23, 361:3, 384:9, 412:12
**combine** [3] - 319:5, 330:9, 335:24
**coming** [9] - 258:3, 270:15, 272:11, 272:22, 305:18, 381:14, 388:9, 516:17, 541:8
**comment** [4] - 300:8, 351:14, 410:13, 415:1
**commented** [1] - 300:17
**commercial** [5] - 422:2, 470:5, 497:23, 497:24, 501:19
**commercially** [5] - 379:18, 386:7, 422:9, 491:12
**committees** [1] - 487:4
**common** [1] - 369:4
**commonly** [2] - 347:13, 443:1
**communications** [1] - 446:2
**companies** [14] - 300:20, 369:4, 459:12, 484:23, 495:3, 495:5, 495:16, 495:19, 502:6, 508:7, 513:14, 514:14, 515:1, 540:2
**companies'** [1] - 510:10
**company** [20] - 272:12, 286:21, 288:7, 398:15, 451:7, 452:1, 484:16, 484:17, 484:19, 484:21, 500:21, 501:6, 501:16, 507:14, 508:9, 513:16, 514:17, 514:21, 517:1, 520:6
**Comparability** [1] - 499:7
**comparability** [6] - 499:24, 499:25, 500:13, 500:15, 500:20, 502:7
**comparable** [2] - 459:11, 460:12
**comparator** [1] - 549:16
**compare** [10] - 281:24, 282:8, 327:1, 376:19, 421:2, 456:23, 459:9, 468:19, 471:9, 471:18
**compared** [8] - 314:1, 326:8, 326:22, 327:16, 335:23, 336:18, 352:23, 549:16
**compares** [1] - 455:1
**comparing** [1] - 470:13
**comparison** [7] - 396:22, 420:3, 456:20, 471:13, 471:25, 472:3, 481:15
**compete** [6] - 428:2, 428:4, 517:14, 517:17, 518:6, 539:2
**competes** [1] - 517:13
**competing** [5] - 279:22, 285:16, 287:23, 288:2, 288:7
**competition** [9] - 281:13, 283:18, 284:1, 284:2, 289:10, 517:23, 517:24, 520:13, 521:20
**competitive** [5] - 268:1, 287:3, 287:25, 427:11, 540:17
**competitor** [10] - 513:13, 513:17, 517:12, 521:24, 521:25, 522:1, 522:9, 530:17
**competitors** [17] - 283:8, 283:10, 283:21, 284:4, 287:15, 287:17, 288:4, 288:22, 288:24, 289:1, 289:7, 289:9, 289:18, 513:15, 521:16, 521:22, 538:2
**compilations** [1] - 535:4
**complementary** [3] - 402:15, 402:19
**complete** [1] - 260:25
**completed** [3] - 374:9, 426:22, 426:24
**completely** [7] - 271:10, 272:14, 273:16, 274:3, 307:21, 324:6, 390:6
**complex** [8] - 375:2, 375:4, 412:2, 412:14, 417:5, 420:19, 462:2, 462:4
**complexities** [1] - 390:3
**complicated** [3] - 384:3, 415:4, 511:1
**complicating** [1] - 261:16
**complimentary** [1] - 402:3
**component** [2] - 380:19, 431:24
**components** [7] - 312:10, 318:4, 380:22, 381:14, 392:23, 394:5
**composition** [4] - 362:25, 363:9, 428:17, 430:22
**compositions** [2] - 316:6, 361:9
**Compositions** [1] - 361:21
**compound** [1] - 345:7
**compounded** [1] - 475:11
**compounding** [2] -

344:18, 344:23
**CONAWAY** [1] - 256:3
**concentrate** [1] - 385:5
**concentration** [3] - 460:7, 468:5, 479:10
**concentrations** [1] - 468:24
**concept** [6] - 344:17, 344:23, 345:6, 345:11, 350:6, 432:13
**concern** [8] - 260:10, 261:19, 262:2, 269:15, 388:1, 398:1, 398:7, 401:23
**concerned** [7] - 260:1, 262:8, 293:5, 304:8, 308:18, 325:19, 373:7
**concerns** [3] - 261:4, 398:13, 424:7
**conclude** [2] - 319:16, 336:25
**concludes** [1] - 423:3
**conclusion** [4] - 341:19, 459:12, 471:8, 480:20
**conclusive** [1] - 502:9
**condition** [1] - 405:13
**conditionally** [1] - 259:8
**conditions** [7] - 389:23, 394:24, 405:18, 446:10, 460:11, 489:2, 501:19
**conduct** [5] - 328:23, 330:3, 338:8, 339:24, 340:3
**conducted** [10] - 330:2, 337:9, 383:20, 383:24, 394:20, 454:10, 455:19, 498:2, 498:8, 534:11
**conducting** [3] - 330:15, 395:6, 453:22
**confer** [1] - 504:16
**conference** [2] - 294:14, 549:6
**conferred** [1] - 537:19
**confers** [1] - 283:4
**confident** [1] - 422:18
**confidential** [4] - 276:19, 277:8, 401:2, 451:19
**confirm** [10] - 281:15, 284:24, 285:1, 396:19, 400:5, 451:11, 451:23, 456:4, 460:17, 462:10
**confirmation** [2] - 265:22, 341:17
**confirmed** [1] - 458:1
**confirms** [3] - 446:21, 450:4, 460:15
**confuse** [2] - 275:24, 288:13
**confusing** [4] - 272:1, 275:5, 275:21, 360:6
**confusion** [3] - 272:22, 276:1, 417:22
**conjunction** [1] - 385:20
**connect** [1] - 267:11
**connected** [3] - 433:4, 463:8, 477:13
**connection** [8] - 332:21, 339:13, 383:21, 394:21, 433:7, 462:15, 463:11, 464:1
**Conor** [4] - 426:8, 426:17, 462:16, 463:3
**consequence** [1] - 258:22
**consequences** [1] - 259:22
**consider** [19] - 287:14, 287:16, 313:18, 320:17, 331:4, 406:5, 425:7, 463:2, 483:2, 488:13, 489:1, 497:20, 500:3, 518:14, 520:17, 527:20, 533:4, 539:9, 548:18
**considerable** [1] - 349:5
**considerations** [3] - 324:20, 513:4, 516:8
**considered** [16] - 309:17, 327:7, 331:9, 351:13, 357:13, 370:21, 414:8, 461:11, 461:15, 462:24, 497:13, 497:15, 497:17, 498:12, 515:17, 527:22
**considering** [4] - 424:23, 428:1, 503:2, 545:17
**consisted** [1] - 527:17
**consistent** [12] - 371:14, 372:1, 372:2, 372:15, 396:7, 402:22, 403:1, 403:11, 443:20, 446:17, 458:7, 458:11
**constricted** [2] - 322:18, 325:6
**construct** [2] - 350:16, 351:11
**constructing** [1] - 352:2
**construction** [2] - 300:12, 300:23
**consult** [3] - 438:23, 508:3, 508:5
**consultation** [1] - 368:15
**Consulting** [1] - 507:25
**consulting** [3] - 439:2, 495:15, 495:21
**consuming** [1] - 397:5
**contact** [2] - 291:4, 303:22
**contacting** [1] - 406:15
**contain** [12] - 329:13, 357:18, 358:22, 370:18, 403:20, 440:24, 442:12, 456:21, 457:11, 458:23, 458:25, 460:10
**contained** [5] - 309:8, 335:19, 443:24, 456:18, 460:6
**container** [1] - 347:15
**containers** [1] - 347:20
**containing** [2] - 316:5, 361:9
**contains** [6] - 370:19, 442:20, 444:1, 457:10, 459:3, 505:4
**contaminants** [1] - 312:12
**contaminate** [1] - 396:4
**contaminating** [3] - 398:5, 399:12, 401:18
**contamination** [1] - 402:16
**contemporaneously** [1] - 481:18
**content** [3] - 370:25, 391:12, 478:24
**contents** [1] - 479:21
**context** [9] - 257:17, 279:3, 280:1, 347:14, 348:18, 406:20, 414:5, 414:11, 500:13
**continue** [10] - 271:24, 280:11, 285:15, 365:5, 371:12, 375:17, 384:2, 395:10, 440:2, 535:22
**continued** [1] - 256:1
**continues** [2] - 271:4, 504:20
**continuing** [1] - 371:3
**contorted** [1] - 325:6
**contract** [2] - 485:13, 508:6
**contrary** [1] - 259:24
**contribute** [3] - 300:25, 450:5, 462:8
**contributes** [2] - 430:23, 433:17
**contributing** [1] - 459:14
**contribution** [1] - 329:1
**control** [2] - 322:25, 495:23
**controlled** [1] - 388:11
**controls** [1] - 328:4
**conversations** [1] - 351:4
**converted** [1] - 303:17
**converting** [1] - 302:24
**convey** [1] - 408:6
**conveys** [1] - 357:6
**convince** [1] - 393:13
**cook** [1] - 311:3
**cookbook** [10] - 438:18, 470:25, 471:4, 471:9, 472:21, 475:18, 476:5, 476:6, 478:4, 478:7
**cooker** [1] - 370:13
**copied** [1] - 421:21
**copies** [4] - 296:3, 339:20, 365:10, 482:1
**copy** [3] - 400:15, 421:19, 507:4
**copying** [1] - 489:24
**core** [12] - 258:21, 259:19, 305:6, 306:20, 332:11, 482:25, 483:2, 483:11, 488:4, 488:7, 488:9, 489:18
**corner** [1] - 332:18
**correct** [171] - 259:25, 260:10, 265:23, 344:15, 344:24, 345:8, 347:20, 350:8, 351:19, 352:24, 353:2, 354:16, 356:24, 359:8, 360:17, 360:19, 360:23, 361:16, 361:17, 361:21, 361:22, 361:25, 362:3, 362:6, 362:9, 363:1, 363:18, 363:22, 369:25, 398:2, 398:8, 398:12, 398:13, 401:13, 401:14, 401:20, 402:12, 402:17, 403:2, 403:15, 403:25, 404:20, 404:21, 405:4, 405:5, 406:16, 407:3, 407:13, 407:22, 407:23, 409:7, 410:17, 410:24, 411:1, 411:7, 411:15, 411:18, 411:19, 413:4, 413:9, 413:11, 413:19, 414:24, 417:13, 418:21, 420:20, 422:6, 423:17, 429:10, 429:11, 430:3, 430:4, 430:13, 430:14, 431:11, 431:12, 432:12, 432:19, 432:20, 432:22, 432:23, 433:1, 433:24, 442:8, 448:21, 455:7, 457:6, 457:22, 459:20, 459:21, 461:9, 465:22, 466:8, 466:18, 467:5, 467:14, 467:15, 467:21, 467:22, 468:3, 469:9, 469:10, 469:17, 469:18, 469:23, 469:24, 471:16, 472:6, 472:15, 473:5, 473:18, 473:22, 474:25, 475:4, 475:7, 475:11, 475:14, 475:15, 476:1, 476:3, 476:10, 476:11,

477:4, 477:14, 478:1, 478:2, 478:6, 483:7, 490:22, 491:7, 491:8, 491:13, 491:14, 503:16, 504:2, 504:11, 504:14, 504:15, 504:18, 504:23, 504:24, 505:11, 507:1, 512:7, 521:8, 523:8, 523:9, 523:11, 523:24, 523:25, 524:1, 524:2, 524:22, 524:23, 525:14, 526:11, 526:12, 528:1, 529:8, 534:1, 534:3, 539:22, 542:9, 542:14, 544:18, 544:19, 544:21, 544:22, 545:1, 545:24
**correctly** [4] - 442:4, 464:9, 479:17, 536:8
**correlates** [1] - 461:6
**correspond** [2] - 448:17, 449:20
**correspondence** [2] - 453:3, 454:4
**Correspondence** [1] - 453:4
**corresponding** [1] - 420:22
**cosmetic** [3] - 515:4, 515:20, 519:10
**cost** [1] - 486:8
**costs** [1] - 510:17
**couch** [1] - 359:3
**counsel** [7] - 255:23, 294:19, 368:15, 459:23, 460:2, 483:22, 535:7
**Counsel** [1] - 256:12
**counselor** [1] - 301:21
**count** [2] - 474:15, 474:17
**countries** [1] - 373:5
**country** [1] - 308:7
**county** [1] - 368:23
**couple** [19] - 299:20, 302:8, 305:4, 307:4, 310:11, 320:20, 342:6, 392:25, 395:20, 440:15, 461:15, 464:19, 474:16, 489:8, 490:7, 512:2, 529:6, 540:11, 548:5
**course** [9] - 292:4, 304:16, 311:19, 324:14, 342:23, 489:5, 510:3, 530:19, 540:3
**Court** [5] - 283:5, 439:17, 547:22, 552:3, 552:3
**COURT** [220] - 255:1, 257:1, 257:10, 257:12, 257:24, 258:23, 259:13, 259:15, 259:23, 260:7, 260:17, 260:23, 261:8, 261:17, 261:21, 262:5, 262:13, 262:17, 263:11, 263:15, 264:1, 264:8, 264:15, 264:17, 264:21, 265:4, 265:7, 265:14, 265:19, 265:24, 266:7, 266:11, 266:21, 267:8, 267:24, 268:7, 268:12, 268:16, 268:24, 269:5, 269:7, 269:14, 269:25, 270:3, 270:12, 270:18, 271:5, 271:20, 272:4, 272:15, 272:18, 273:2, 273:6, 273:19, 273:25, 274:5, 274:16, 274:23, 275:4, 275:14, 276:2, 276:7, 276:14, 276:21, 276:24, 277:13, 277:18, 277:25, 278:5, 278:16, 278:25, 279:10, 279:16, 280:5, 280:8, 280:13, 280:23, 281:19, 281:24, 282:5, 282:14, 282:23, 283:13, 283:24, 284:6, 284:13, 285:5, 285:9, 285:24, 286:2, 286:8, 286:14, 286:23, 287:21, 288:14, 290:18, 291:2, 291:15, 291:18, 292:2, 292:10, 292:14, 292:18, 293:2, 293:10, 293:14, 293:17, 294:1, 294:11, 294:17, 294:22, 294:25, 295:3, 295:13, 295:15, 295:17, 295:22, 296:5, 297:5, 297:23, 300:1, 303:3, 307:12, 307:15, 314:19, 315:6, 315:11, 333:8, 333:13, 339:21, 343:24, 344:1, 351:1, 363:13, 364:5, 364:8, 364:13, 364:21, 364:25, 365:3, 365:12, 365:22, 367:4, 375:25, 395:16, 397:16, 397:18, 400:8, 400:13, 410:8, 415:23, 416:2, 417:23, 419:23, 423:7, 425:10, 425:15, 425:20, 425:25, 426:2, 426:11, 426:13, 435:10, 435:12, 435:19, 440:2, 451:1, 453:11, 464:21, 465:5, 474:6, 477:17, 478:11, 480:24, 481:3, 481:8, 481:20, 482:2, 487:17, 490:17, 491:16, 491:19, 491:23, 492:2, 492:9, 492:12, 492:16, 492:22, 493:6, 496:11, 499:13, 502:16, 503:9, 505:16, 505:18, 505:23, 506:9, 507:5, 508:19, 518:12, 524:13, 526:8, 535:10, 535:19, 535:25, 539:15, 546:22, 548:2, 548:4, 548:11, 548:15, 549:7, 549:12, 550:3, 550:6, 550:12, 550:23, 551:3, 551:11, 551:17
**court** [8] - 266:14, 331:23, 339:19, 365:24, 484:8, 487:18, 497:9, 536:2
**Court's** [1] - 287:5
**courtroom** [14] - 295:16, 364:20, 365:2, 425:14, 426:1, 446:13, 456:9, 458:4, 459:22, 460:1, 491:22, 492:7, 492:21, 548:1
**COURTROOM** [8] - 291:14, 296:6, 365:13, 435:20, 482:3, 492:20, 493:7, 505:24
**Courtroom** [1] - 255:12
**cover** [4] - 293:25, 430:11, 474:24, 486:24
**covered** [3] - 361:18, 362:25, 363:24
**cow** [4] - 373:8, 373:10, 373:12, 401:20
**cows** [5] - 372:5, 372:6, 372:7, 372:17, 372:18
**CPP** [1] - 479:1
**CQA** [1] - 489:12
**CQAs** [1] - 489:14
**crack** [1] - 311:1
**craft** [2] - 466:23, 468:15
**crafted** [1] - 468:8
**crank** [1] - 326:3
**create** [2] - 417:22, 504:16
**created** [4] - 332:20, 332:24, 339:12, 339:16
**creativity** [1] - 342:13
**crime** [1] - 317:23
**critical** [3] - 489:10, 489:14, 489:20
**criticism** [2] - 460:2, 535:5
**criticize** [3] - 258:18, 260:12, 260:14
**cross** [15] - 262:5, 262:7, 271:25, 272:10, 282:11, 289:22, 290:12, 290:16, 290:23, 363:14, 424:18, 472:22, 474:7, 481:12, 502:17
**CROSS** [5] - 344:2, 397:19, 464:23, 490:10, 502:18
**cross-examination** [6] - 262:5, 282:11, 289:22, 424:18, 474:7, 481:12
**CROSS-EXAMINATION** [5] - 344:2, 397:19, 464:23, 490:10, 502:18
**cross-examinations** [1] - 271:25
**cross-examine** [1] - 502:17
**cross-examining** [1] - 363:14
**crowded** [2] - 537:21, 541:8
**cruel** [1] - 404:13
**crunching** [1] - 303:10
**CSR** [1] - 552:2
**culmination** [1] - 266:23
**cumulative** [1] - 520:2
**cumulatively** [1] - 494:24
**cup** [4] - 380:4, 380:7, 381:22, 393:2
**curative** [3] - 276:5, 276:9, 278:9
**cured** [1] - 325:21
**curiosity** [1] - 299:14
**current** [8] - 316:5, 374:18, 375:13, 375:19, 484:14, 499:18, 505:14, 526:25
**customer** [3] - 485:14, 485:15, 486:4
**customers** [5] - 525:10, 525:12, 525:16, 543:12, 545:5
**cut** [2] - 262:24, 299:1
**cute** [2] - 299:8, 299:12
**cutoff** [1] - 261:6
**cutting** [3] - 267:13, 267:19, 501:22
**CVs** [3] - 291:23, 293:12, 293:13

## D

**D-R-A-G-O** [1] - 493:10
**dad** [1] - 298:25
**daily** [1] - 485:10
**damage** [1] - 483:18
**damages** [18] - 272:2, 275:24, 490:5,

490:22, 490:25, 491:4, 494:10, 496:15, 508:6, 508:17, 508:23, 509:2, 509:11, 509:13, 509:18, 510:9, 513:19, 548:16
**Dana** [2] - 290:17, 290:18
**dangerous** [7] - 342:19, 370:5, 387:24, 389:2, 389:5, 400:25, 440:21
**Daniela** [5] - 257:16, 493:5, 493:9, 493:20, 496:8
**DANIELA** [2] - 493:9, 493:11
**DAS** [7] - 454:21, 455:18, 459:10, 460:21, 460:25, 461:7, 480:5
**data** [43] - 313:20, 316:11, 329:9, 339:3, 339:4, 349:4, 351:10, 353:1, 353:8, 353:17, 374:16, 375:10, 376:16, 386:16, 394:17, 446:2, 449:12, 450:4, 454:11, 455:7, 455:14, 456:22, 458:16, 459:8, 459:9, 460:11, 462:10, 462:21, 466:11, 466:14, 470:12, 471:20, 473:20, 475:2, 475:6, 479:16, 479:22, 534:20, 534:21, 535:4, 535:9
**date** [24] - 263:8, 267:14, 267:19, 274:11, 274:15, 274:17, 274:18, 275:10, 275:11, 275:19, 289:5, 294:2, 334:18, 334:20, 334:21, 341:9, 369:20, 453:6, 453:7, 497:20, 516:1, 521:3, 537:1, 537:23
**dated** [2] - 521:7, 526:11
**dates** [11] - 261:18, 270:21, 274:25, 275:2, 275:18, 275:20, 275:22, 275:25, 283:14, 519:7
**Daubert** [4] - 259:6, 263:17, 266:10, 266:11
**daughter** [1] - 300:14
**DAVID** [1] - 255:22
**DAXI** [12] - 429:23, 449:9, 461:24, 462:2, 518:18, 519:10, 519:14, 519:20, 522:2, 523:15, 525:8, 539:24
**DAXI's** [1] - 449:6
**Daxibotulinumtoxin A** [1] - 430:11
**daxibotulinumtoxin A** [2] - 434:7, 434:23
**DAXXIFY** [87] - 269:1, 270:7, 271:2, 279:23, 280:10, 280:18, 281:8, 283:1, 283:11, 284:5, 284:21, 285:6, 285:20, 286:3, 286:4, 286:5, 286:16, 287:4, 288:16, 428:7, 429:24, 430:20, 430:23, 431:14, 431:16, 431:25, 433:5, 433:16, 447:16, 447:19, 448:5, 448:8, 451:16, 452:18, 459:25, 462:19, 463:9, 467:5, 467:14, 467:24, 468:6, 468:19, 468:20, 468:22, 469:8, 469:16, 469:20, 469:23, 470:6, 470:13, 470:19, 479:5, 479:6, 479:11, 480:8, 487:22, 496:22, 497:24, 498:1, 509:5, 509:8, 511:6, 511:25, 515:3, 517:15, 517:18, 517:21, 518:6, 519:25, 520:4, 521:13, 521:21, 522:5, 522:9, 523:21, 523:23, 526:13, 526:15, 526:22, 527:5, 534:1, 537:16, 537:24, 538:25, 540:15
**DAXXIFY's** [2] - 282:8, 282:15
**days** [4] - 458:21, 464:19, 490:7, 547:19
**DDX** [1] - 379:9
**dead** [4] - 378:13, 378:15, 390:22, 390:24
**deal** [1] - 305:17
**dealing** [1] - 543:11
**Deanna** [2] - 551:22, 552:2
**death** [1] - 302:17
**debris** [3] - 390:25, 391:8, 393:23
**December** [2] - 524:19, 539:21
**decided** [5] - 370:15, 389:19, 501:23, 529:11, 529:23
**decision** [3] - 289:24, 289:25, 299:5
**deep** [1] - 304:4
**default** [2] - 352:16, 353:13
**defeats** [1] - 547:12
**Defendant** [3] - 255:7, 256:12, 453:12
**defendant** [1] - 258:1
**Defendant's** [2] - 314:20, 419:25
**defense** [1] - 257:25
**define** [1] - 340:4
**definition** [3] - 334:8, 335:11, 352:5
**degradation** [2] - 354:24, 359:1
**degrade** [2] - 357:18, 358:21
**degraded** [1] - 358:25
**degrading** [2] - 356:1, 358:23
**degree** [3] - 301:17, 301:20, 507:9
**degrees** [1] - 483:25
**Deirdre** [1] - 490:14
**DEIRDRE** [1] - 256:8
**DELAWARE** [1] - 255:2
**delay** [20] - 258:5, 261:5, 282:2, 282:4, 282:6, 295:19, 497:2, 497:21, 527:19, 527:20, 527:22, 528:5, 528:16, 528:17, 532:25, 533:1, 533:12, 537:13
**delayed** [1] - 497:19
**delaying** [1] - 517:2
**delays** [2] - 516:18, 516:19
**deliberate** [1] - 547:13
**deliver** [2] - 310:12, 469:3
**delivered** [1] - 326:15
**delta** [1] - 288:18
**demands** [2] - 277:11, 277:13
**demonstrate** [4] - 466:13, 495:6, 498:5, 502:7
**demonstrative** [8] - 306:13, 306:17, 379:8, 379:9, 415:4, 415:10, 420:4, 467:3
**demonstratives** [7] - 257:4, 365:11, 368:13, 436:23, 483:19, 483:20, 535:1
**denature** [1] - 349:16
**denaturing** [2] - 311:4, 349:21
**Dennies** [2] - 268:13, 397:23
**DENNIES** [1] - 256:6
**Dennis** [1] - 344:6
**department** [2] - 438:9, 438:10
**departure** [1] - 476:5
**dependent** [1] - 462:6
**depict** [1] - 380:4
**depicted** [5] - 442:17, 443:4, 444:13, 472:5, 472:10
**depiction** [1] - 510:24
**deposed** [3] - 346:12, 408:25, 426:9
**deposition** [11] - 287:1, 346:17, 409:4, 409:25, 410:3, 425:23, 446:3, 462:16, 514:20, 514:21, 539:25
**depth** [4] - 391:5, 391:7, 425:1
**DEPUTY** [8] - 291:14, 296:6, 365:13, 435:20, 482:3, 492:20, 493:7, 505:24
**deputy** [2] - 333:13, 339:20
**derivatives** [1] - 327:10
**derived** [10] - 311:11, 312:7, 316:21, 323:21, 372:19, 401:22, 443:9, 443:13, 443:14, 443:22
**DESAI** [5] - 256:8, 294:21, 294:24, 295:2, 548:10
**Desai** [2] - 294:23, 548:6
**describe** [3] - 368:17, 415:7, 453:21
**described** [13] - 323:15, 373:16, 398:13, 411:3, 417:2, 418:18, 454:20, 455:23, 464:16, 487:23, 487:24, 514:3, 532:21
**describes** [4] - 351:7, 399:1, 417:4, 424:1
**describing** [6] - 305:13, 321:5, 360:25, 382:14, 418:15, 420:8
**description** [3] - 350:20, 351:7, 351:18
**descriptors** [1] - 408:4
**Desert** [2] - 507:15
**design** [19] - 257:16, 257:18, 258:7, 258:20, 259:10, 260:3, 260:8, 328:3, 328:11, 328:24, 342:12, 488:14, 500:15, 516:22, 529:1, 529:13, 529:23, 529:25, 537:15
**design-around** [7] - 257:16, 257:18, 258:7, 258:20, 259:10, 260:3, 260:8
**designations** [1] - 287:1
**designed** [4] - 258:11, 258:22, 460:9, 472:8
**designing** [1] - 516:24
**desired** [3] - 384:11, 384:18, 542:20
**desorb** [1] - 405:20
**desorbing** [1] - 406:2
**despite** [2] - 443:25, 470:12
**destroy** [2] - 308:19, 338:22

**detail** [5] - 286:13, 339:5, 378:20, 455:23, 500:8
**detailed** [1] - 535:5
**detection** [2] - 486:25
**detergent** [3] - 331:21, 334:2, 334:12
**determine** [4] - 309:18, 349:12, 510:5, 541:15
**determined** [8] - 360:24, 384:23, 390:8, 412:11, 412:14, 476:25, 477:24, 536:23
**determines** [3] - 413:8, 413:11, 490:24
**determining** [3] - 461:1, 510:14, 513:4
**develop** [14] - 304:15, 309:8, 309:16, 384:4, 384:13, 384:24, 390:6, 394:18, 397:10, 398:11, 398:12, 398:17, 402:6, 409:17
**developed** [4] - 383:11, 396:2, 444:10, 500:20
**developing** [9] - 370:22, 427:21, 427:22, 428:1, 428:4, 428:7, 461:12, 523:19, 523:20
**development** [15] - 263:4, 311:22, 374:18, 375:13, 375:19, 383:8, 387:3, 429:16, 429:17, 439:24, 444:6, 445:25, 446:18, 485:3, 498:1
**Development** [1] - 374:25
**develops** [1] - 397:10
**devices** [2] - 289:17, 300:21
**diabetes** [1] - 322:1
**diet** [1] - 312:13
**difference** [17] - 261:25, 268:16, 280:16, 281:19, 282:17, 406:19, 408:15, 455:3, 455:5, 457:8, 505:12, 510:3, 528:21, 528:23, 545:8, 546:4
**differences** [6] - 396:10, 408:8, 408:14, 468:21, 469:8, 478:4
**different** [85] - 261:23, 262:8, 263:13, 263:14, 266:13, 271:10, 273:9, 274:3, 283:14, 288:24, 312:6, 312:9, 312:10, 312:12, 312:13, 313:14, 317:24, 318:20, 326:5, 326:9, 328:21, 329:16, 329:23, 330:25, 331:2, 331:3, 334:15, 337:22, 338:25, 340:9, 353:22, 360:2, 360:25, 361:1, 361:4, 379:18, 379:25, 380:1, 380:5, 384:7, 384:8, 384:15, 389:21, 389:22, 394:22, 394:23, 394:24, 395:1, 396:16, 396:17, 401:1, 406:3, 408:10, 410:1, 413:18, 415:23, 418:15, 424:19, 440:16, 441:8, 446:9, 458:15, 458:17, 460:7, 479:21, 485:2, 485:20, 488:24, 498:22, 511:1, 511:2, 527:8, 528:7, 528:10, 536:16, 537:10, 538:12
**different-colored** [1] - 380:5
**different-sized** [1] - 380:5
**differentiate** [4] - 537:21, 537:25, 538:25, 541:9
**differentiating** [1] - 538:22
**differentiation** [4] - 538:7, 538:8, 538:9, 538:11
**differently** [2] - 400:23, 536:10
**difficult** [8] - 300:10, 301:2, 342:18, 343:17, 437:7, 440:10, 446:9, 490:1
**difficulties** [1] - 440:18
**difficulty** [1] - 545:8
**digit** [2] - 454:13, 460:21
**digits** [4] - 454:17, 458:19, 460:24
**diluted** [1] - 310:7
**diploma** [2] - 438:1, 438:2
**dipping** [1] - 512:24
**DIRECT** [6] - 296:15, 366:2, 436:4, 482:12, 493:16, 506:10
**direct** [11] - 262:6, 262:7, 284:4, 290:17, 433:13, 463:17, 467:18, 472:23, 502:23, 550:14, 550:21
**directed** [1] - 494:21
**direction** [1] - 458:10
**directly** [6] - 376:13, 433:6, 463:10, 515:1, 517:13, 517:14
**director** [2] - 427:3, 484:17
**Directors** [6] - 518:24, 519:2, 524:18, 524:22, 524:23, 525:2
**disaccharide** [33] - 320:9, 320:15, 320:17, 334:1, 335:20, 336:2, 336:10, 336:15, 337:2, 338:9, 338:15, 341:15, 345:19, 355:16, 359:14, 360:13, 360:16, 360:22, 362:6, 444:15, 444:16, 444:18, 447:23, 448:14, 449:18, 449:19, 457:12, 457:14, 457:19, 459:17, 459:19, 464:14
**disaccharide-surfactant** [2] - 338:9, 341:15
**disaccharides** [20] - 320:12, 320:20, 321:1, 321:8, 327:8, 327:22, 327:24, 328:1, 328:10, 328:19, 331:10, 337:21, 345:17, 345:18, 345:21, 345:24, 346:20, 348:25, 360:10, 445:4
**disadvantage** [1] - 279:2
**disagree** [6] - 273:21, 434:12, 435:4, 435:5, 437:22, 474:19
**disagrees** [1] - 466:16
**disaster** [1] - 373:4
**disclosed** [2] - 408:6, 411:17
**disclosure** [3] - 266:12, 350:25, 400:20
**disclosures** [1] - 271:13
**discontinue** [1] - 325:20
**discovered** [2] - 317:19, 348:19
**discoveries** [1] - 485:23
**discovering** [1] - 304:10
**discovery** [4] - 258:7, 303:18, 303:20, 351:10
**discriminate** [1] - 317:25
**discuss** [16] - 267:21, 279:15, 292:9, 292:10, 292:15, 369:2, 371:17, 494:7, 502:24, 503:5, 503:12, 547:4, 547:5, 547:7, 547:9, 547:10
**discussed** [17] - 263:16, 263:21, 266:9, 317:1, 319:17, 326:6, 333:11, 338:10, 342:1, 355:13, 356:20, 360:13, 373:20, 396:12, 396:13, 398:24, 485:21
**discusses** [2] - 320:1, 411:14
**discussing** [17] - 265:17, 337:7, 342:4, 344:10, 357:2, 359:10, 359:18, 368:16, 377:5, 385:24, 395:21, 423:13, 440:6, 444:9, 489:19, 489:24, 547:11
**discussion** [21] - 266:25, 270:22, 277:1, 278:3, 279:9, 282:11, 291:16, 292:12, 293:15, 327:23, 351:18, 351:20, 352:12, 352:14, 352:22, 353:7, 365:25, 400:17, 475:22, 481:7, 481:22
**discussions** [3] - 277:8, 277:20, 277:21
**disease** [4] - 373:8, 373:10, 373:12, 398:2
**diseases** [3] - 373:6, 398:4, 402:16
**dishonest** [1] - 277:23
**disorders** [1] - 485:4
**dispute** [5] - 267:1, 272:16, 273:24, 449:2, 537:16
**disputed** [2] - 275:1, 275:3
**disregard** [1] - 490:25
**distinct** [1] - 396:14
**distinctly** [1] - 408:9
**distinguished** [1] - 418:7
**distinguishing** [2] - 418:8, 418:21
**distribution** [2] - 333:16, 489:16
**District** [2] - 287:5, 552:3
**DISTRICT** [2] - 255:1, 255:2
**Dittmann** [10] - 273:6, 273:8, 273:11, 274:5, 274:20, 275:14, 278:12, 464:21, 469:5, 478:11
**DITTMANN** [49] - 255:19, 269:22, 270:13, 270:19, 271:6, 271:23, 272:7, 272:16, 272:21, 274:1, 275:16, 276:3, 276:13, 276:16, 277:2, 278:19, 278:23, 291:21, 292:6, 292:22, 293:3, 293:11,

293:22, 294:6, 425:22, 426:5, 426:12, 435:7, 435:11, 435:16, 436:5, 436:22, 436:25, 439:22, 440:3, 447:13, 447:15, 450:23, 451:4, 453:8, 453:14, 463:19, 474:1, 478:12, 478:16, 480:23, 481:5, 548:14, 551:13
**dive** [1] - 448:10
**divert** [1] - 551:6
**divide** [4] - 532:14, 544:2, 544:4, 546:18
**dividing** [1] - 546:17
**Division** [1] - 507:14
**division** [3] - 302:8, 303:22, 304:5
**divisions** [1] - 303:22
**DNA** [26] - 317:23, 317:25, 318:1, 318:6, 318:8, 318:9, 318:15, 318:16, 318:20, 318:25, 392:11, 393:22, 412:25, 413:8, 413:9, 413:22, 414:1, 414:3, 414:4, 414:5, 414:7, 414:10, 414:17, 414:18
**Dockerty's** [1] - 298:12
**Docket** [1] - 257:2
**Doctor** [4] - 413:14, 456:16, 457:17, 491:24
**doctor** [5] - 266:4, 364:11, 469:1, 522:15, 535:8
**doctor's** [6] - 261:6, 262:16, 265:2, 266:20, 534:25
**doctors** [2] - 299:22, 325:12
**document** [81] - 283:9, 287:15, 288:8, 314:12, 332:1, 332:5, 332:7, 332:20, 332:23, 333:1, 339:7, 339:12, 339:15, 366:19, 374:1, 374:22, 374:24, 374:25, 375:11, 399:5, 401:12, 403:2, 403:3, 403:6, 403:9, 416:9, 429:25, 430:1, 430:2, 430:5, 430:8, 430:9, 430:11, 431:18, 432:1, 432:7, 433:21, 433:22, 434:1, 434:16, 446:20, 450:16, 450:20, 451:7, 451:14, 452:5, 453:1, 453:4, 453:6, 453:7, 453:16, 454:11, 456:7, 462:15, 499:6, 499:16, 500:3, 503:13, 503:14, 503:20, 503:22, 504:3, 505:6, 505:10, 505:13, 512:22, 518:14, 518:17, 520:17, 520:20, 520:22, 521:7, 524:8, 524:17, 526:1, 526:11, 528:10, 539:5, 539:20, 542:8, 544:18
**documents** [40] - 284:7, 284:9, 284:10, 286:25, 287:12, 333:11, 383:8, 383:15, 394:14, 394:16, 394:17, 430:6, 430:7, 445:24, 448:8, 450:2, 450:3, 450:9, 452:21, 462:23, 499:2, 503:22, 504:8, 505:8, 505:13, 512:20, 513:1, 514:11, 514:13, 514:14, 514:16, 514:17, 518:3, 518:7, 534:12, 534:17, 535:17, 536:2
**domain** [1] - 472:16
**dominate** [1] - 285:15
**donate** [1] - 311:12
**done** [24] - 277:25, 305:20, 309:12, 343:18, 364:13, 373:18, 385:21, 387:6, 424:12, 425:11, 428:23, 444:11, 458:18, 460:22, 469:12, 474:2, 481:4, 486:9, 497:1, 528:8, 541:18, 541:21, 546:24, 549:24
**donuts** [1] - 322:15
**door** [3] - 306:23, 325:3, 520:9
**dosage** [2] - 434:6, 434:22
**dosages** [1] - 452:10
**dose** [3] - 310:21, 335:14, 431:16
**doses** [2] - 325:12, 329:15
**dosing** [5] - 308:3, 325:13, 326:24, 327:3, 462:6
**dot** [4] - 392:2, 392:4, 392:8
**dots** [3] - 261:10, 267:12, 391:25
**double** [1] - 306:22
**double-airlocked** [1] - 306:22
**doubt** [1] - 481:18
**down** [60] - 261:14, 301:9, 302:19, 304:12, 304:19, 309:3, 310:7, 311:12, 325:25, 326:1, 328:5, 330:11, 331:23, 357:18, 358:21, 358:25, 364:14, 364:15, 380:10, 380:13, 380:15, 390:15, 391:9, 393:3, 405:2, 405:12, 405:15, 414:10, 418:25, 425:16, 447:8, 452:12, 454:24, 473:16, 475:21, 476:13, 476:23, 477:7, 480:25, 488:20, 491:23, 504:5, 505:18, 511:2, 511:18, 512:24, 513:2, 513:11, 515:9, 516:9, 524:4, 525:21, 527:1, 527:11, 533:17, 533:19, 536:20, 548:2, 550:13
**downplayed** [1] - 279:23
**downstream** [3] - 375:1, 392:16, 402:6
**dozen** [1] - 474:16
**dozens** [2] - 395:2
**Dr** [209] - 257:4, 257:15, 257:17, 257:22, 257:23, 257:24, 258:4, 258:14, 258:18, 259:1, 259:3, 259:4, 259:9, 259:11, 259:15, 259:18, 260:5, 260:11, 260:14, 260:18, 260:19, 260:23, 266:24, 268:14, 269:9, 270:1, 270:2, 270:3, 277:7, 277:16, 278:1, 280:17, 281:20, 282:1, 283:3, 284:14, 289:19, 290:9, 290:16, 290:23, 296:2, 300:1, 300:6, 310:19, 351:2, 364:8, 364:9, 364:10, 365:8, 367:23, 376:5, 379:3, 379:11, 385:15, 386:11, 391:16, 393:6, 395:20, 397:1, 397:14, 397:21, 400:11, 401:6, 403:13, 407:7, 410:3, 411:6, 411:20, 413:22, 416:10, 418:9, 418:13, 418:22, 419:18, 420:11, 420:23, 421:4, 421:19, 422:13, 423:2, 423:10, 424:10, 425:11, 425:15, 425:23, 426:8, 426:18, 433:21, 435:17, 436:8, 436:19, 436:23, 437:1, 437:24, 439:23, 440:5, 440:12, 442:17, 443:23, 446:24, 447:5, 447:16, 452:4, 452:22, 453:15, 454:6, 454:15, 454:20, 454:24, 455:15, 455:23, 456:10, 456:13, 457:3, 458:13, 459:8, 459:22, 459:23, 461:5, 461:11, 461:17, 461:20, 462:13, 463:3, 464:6, 464:17, 464:25, 465:7, 467:2, 467:17, 467:20, 471:24, 474:11, 475:9, 476:24, 477:18, 478:17, 480:24, 481:5, 481:10, 481:24, 482:18, 484:8, 484:11, 485:5, 486:15, 487:13, 487:18, 488:8, 489:8, 490:2, 490:6, 490:12, 491:19, 493:5, 493:21, 493:23, 494:6, 495:15, 496:8, 496:14, 497:5, 497:9, 497:13, 497:15, 497:17, 498:11, 498:17, 498:21, 499:16, 499:21, 500:8, 500:19, 501:16, 501:22, 502:14, 502:20, 503:4, 503:11, 505:18, 505:22, 506:24, 507:7, 508:16, 508:21, 509:4, 510:22, 512:1, 516:23, 518:14, 518:25, 520:17, 524:5, 526:1, 527:25, 529:2, 536:7, 536:21, 539:4, 539:24, 548:2, 548:12, 550:15
**draft** [3] - 374:16, 375:10, 500:15
**drafting** [1] - 352:10
**DRAGO** [1] - 493:11
**Drago** [33] - 257:16, 257:22, 257:23, 258:4, 258:18, 260:11, 260:14, 493:5, 493:9, 493:20, 493:21, 493:23, 494:6, 495:15, 496:8, 496:14, 497:5, 497:15, 498:11, 498:21, 499:16, 499:21, 500:8, 500:19, 501:16, 501:22, 502:14, 502:20, 503:11, 505:18, 516:23,

527:25, 529:2
**Drago's** [1] - 260:19
**draw** [1] - 438:18
**dress** [1] - 440:19
**drew** [1] - 281:20
**dried** [2] - 345:9, 475:14
**drive** [9] - 299:20, 448:14, 452:20, 454:3, 458:10, 460:4, 461:9, 463:1, 480:20
**drive-in** [1] - 299:20
**driven** [2] - 481:11, 525:19
**drives** [5] - 455:20, 458:3, 459:17, 462:18, 471:19
**driving** [3] - 448:12, 449:14, 470:23
**droning** [1] - 324:22
**drove** [2] - 299:14, 325:23
**drug** [53] - 303:15, 309:16, 311:8, 311:18, 311:22, 312:14, 316:20, 319:18, 321:25, 322:21, 324:7, 326:23, 337:17, 344:24, 353:14, 358:23, 359:1, 359:2, 413:5, 413:6, 438:15, 438:16, 439:1, 439:6, 439:9, 439:24, 440:8, 440:23, 441:4, 442:6, 442:10, 442:25, 445:5, 445:15, 448:17, 448:25, 449:21, 452:19, 457:19, 457:24, 461:12, 464:20, 495:7, 495:12, 496:22, 497:23, 498:6, 501:10, 501:11, 511:21, 522:14, 536:23
**Drug** [9] - 493:23, 494:23, 495:6, 495:10, 495:20, 496:23, 498:7, 499:17, 502:9
**drugs** [9] - 300:21, 312:4, 316:19, 358:10, 372:11, 372:13, 440:24, 495:24
**dry** [2] - 332:13, 354:25
**drying** [5] - 345:10, 355:6, 356:9, 475:10
**DTX** [17] - 269:8, 279:18, 280:3, 285:3, 314:10, 314:17, 314:20, 356:18, 379:6, 419:2, 419:4, 419:25, 452:23, 453:9, 453:12, 454:23, 459:6
**dual** [1] - 338:12
**dual-combination** [1] - 338:12
**due** [3] - 262:25, 267:14, 372:25
**duration** [89] - 264:7, 351:18, 351:20, 352:3, 352:5, 352:6, 352:7, 352:13, 352:16, 352:23, 353:2, 353:6, 353:9, 353:11, 353:12, 428:9, 430:20, 430:25, 433:5, 433:12, 433:16, 437:11, 445:23, 447:6, 448:12, 448:15, 449:10, 449:15, 449:25, 450:6, 452:20, 454:3, 455:5, 455:8, 455:20, 456:23, 457:1, 457:2, 457:5, 459:3, 459:14, 459:15, 459:17, 460:4, 460:18, 461:2, 461:9, 461:14, 462:6, 462:8, 462:18, 463:1, 463:9, 463:16, 464:1, 465:15, 465:20, 466:6, 466:10, 470:23, 471:4, 471:14, 471:19, 480:20, 514:2, 538:9, 538:10, 538:22, 539:1, 540:22, 541:10, 541:11, 541:24, 541:25, 542:1, 542:2, 542:3, 542:19, 543:1, 544:10, 545:6, 545:9, 546:3, 546:6, 546:15, 546:20
**duration-of-action** [1] - 448:12
**during** [15] - 263:17, 266:10, 282:11, 287:13, 290:23, 290:24, 298:9, 347:17, 383:24, 388:4, 409:4, 483:6, 511:15, 539:25, 540:3
**dwell** [1] - 342:9
**Dysport** [1] - 527:10

## E

**e-mail** [2] - 260:12, 446:2
**eager** [1] - 492:18
**early** [8] - 307:19, 308:7, 326:21, 427:24, 428:5, 443:15, 446:15, 514:8
**earn** [2] - 527:18, 528:23
**earned** [2] - 287:8, 287:10
**earnings** [3] - 280:7, 280:8, 281:14
**EARS** [1] - 492:4
**earth** [1] - 387:25
**easier** [2] - 290:19, 468:11
**east** [1] - 304:20
**easy** [3] - 325:1, 397:6, 397:7
**eat** [1] - 488:21
**Economic** [1] - 507:25
**economic** [2] - 508:3, 544:5
**economically** [1] - 397:12
**economics** [5] - 507:18, 507:19, 507:21, 508:17, 537:11
**ECT** [1] - 399:23
**edge** [1] - 299:17
**education** [2] - 302:14, 368:18
**educational** [3] - 437:25, 483:24, 494:15
**effect** [12] - 287:22, 353:14, 431:15, 452:16, 453:23, 453:24, 454:8, 465:18, 465:24, 466:14, 471:22, 489:20
**effective** [3] - 370:21, 495:7, 498:6
**effectively** [1] - 257:18
**effects** [3] - 434:5, 434:21, 452:9
**efficacy** [3] - 444:4, 451:13, 500:1
**efficiency** [1] - 432:25
**effort** [2] - 267:11, 547:2
**egg** [1] - 311:2
**eight** [2] - 255:12, 281:11
**either** [20] - 272:17, 283:20, 290:16, 291:6, 304:1, 309:14, 326:16, 353:8, 353:15, 360:3, 362:23, 381:14, 382:15, 422:9, 472:5, 475:14, 491:12, 492:13, 535:11, 543:17
**elected** [2] - 439:13, 439:15
**electronically** [1] - 547:11
**electrostatic** [3] - 431:5, 431:9, 461:25
**element** [1] - 541:25
**elements** [3] - 329:1, 430:22, 530:13
**eliminate** [2] - 324:7, 328:13
**Elmo** [1] - 266:18
**eluate** [3] - 405:7, 405:21, 406:16
**eluent** [1] - 405:4
**eluting** [6] - 405:2, 405:7, 405:16, 405:24, 406:1, 406:4
**elution** [2] - 405:21, 406:13
**emphasized** [1] - 541:12
**emphasizing** [1] - 308:24
**employed** [3] - 366:8, 366:10, 428:22
**employee** [1] - 431:10
**employees** [1] - 371:9
**enable** [1] - 514:1
**encephalopathy** [2] - 401:19, 401:20
**end** [13] - 261:13, 263:20, 301:1, 318:13, 356:4, 382:20, 411:3, 476:23, 492:7, 492:17, 509:22, 531:19
**ended** [7] - 279:9, 298:11, 346:24, 410:14, 435:6, 463:18, 481:22
**ending** [2] - 430:2, 431:19
**ends** [2] - 377:22, 430:10
**energy** [1] - 397:5
**enforceable** [1] - 504:9
**engineer** [1] - 370:7
**engineering** [3] - 306:21, 368:20, 368:22
**English** [1] - 321:14
**enhance** [3] - 432:25, 433:7, 463:11
**enhancement** [2] - 433:3, 463:7
**enhancing** [1] - 432:18
**ensued** [1] - 284:19
**ensure** [2] - 396:8, 499:25
**enter** [1] - 419:20
**entered** [4] - 295:16, 365:2, 426:1, 492:21
**entering** [1] - 510:18
**entire** [7] - 308:5, 368:10, 403:3, 424:25, 425:8, 501:24, 532:11
**entities** [1] - 461:4
**entitled** [5] - 361:20, 374:25, 450:21, 520:21, 520:22
**entity** [3] - 366:8, 366:10, 366:13
**entrant** [1] - 540:16
**entries** [1] - 540:12
**entry** [10] - 369:15, 522:7, 522:8, 540:13, 540:19, 540:24, 541:3, 542:21, 542:22, 542:23
**envelope** [1] - 305:7
**environment** [4] - 354:24, 354:25, 389:17
**environmental** [1] - 306:21
**environments** [1] - 312:17
**enzyme** [1] - 303:23
**equal** [1] - 372:6
**equally** [2] - 293:18, 389:5

**equation** [1] - 531:25
**equipment** [1] - 303:13
**equivalent** [2] - 270:5, 438:3
**ERIC** [1] - 255:19
**Eric** [1] - 419:10
**escape** [4] - 306:24, 371:11, 386:5, 396:4
**especially** [9] - 278:10, 322:25, 330:22, 335:22, 358:6, 437:9, 460:23, 484:24, 487:11
**ESQ** [17] - 255:16, 255:19, 255:19, 255:20, 255:20, 255:21, 255:21, 255:22, 255:22, 256:3, 256:4, 256:6, 256:7, 256:7, 256:8, 256:8, 256:11
**essential** [1] - 431:24
**essentially** [20] - 258:12, 260:2, 291:5, 305:23, 316:9, 326:8, 326:21, 331:13, 350:15, 371:7, 381:25, 382:16, 383:1, 388:9, 393:23, 406:24, 481:12, 528:7, 528:10, 528:22
**establish** [1] - 504:9
**established** [7] - 281:10, 306:11, 307:20, 338:19, 343:8, 356:16
**establishing** [1] - 337:3
**estimate** [2] - 313:1, 476:21
**estimates** [1] - 294:19
**et** [3] - 255:6, 417:6, 420:19
**evaluate** [2] - 328:9, 527:13
**evaluated** [1] - 534:11
**evaluating** [1] - 544:5
**evasion** [1] - 398:2
**event** [6] - 266:16, 277:25, 290:22, 315:7, 547:21, 550:24
**events** [1] - 274:22
**eventually** [3] - 276:4, 298:11, 299:1
**everywhere** [2] - 312:3, 389:11
**evidence** [45] - 285:23, 290:4, 290:5, 290:6, 290:7, 290:9, 291:23, 293:12, 293:13, 294:6, 297:4, 314:17, 324:24, 333:6, 339:19, 346:7, 367:3, 375:23, 395:14, 419:21, 435:7, 449:24, 450:24, 453:9, 453:23, 454:6, 481:14, 499:11, 503:15, 504:1, 518:3, 518:11, 520:15, 524:11, 525:24, 526:4, 526:5, 534:23, 534:25, 535:2, 535:18, 539:13, 542:7, 544:17, 547:9
**exact** [4] - 468:3, 480:14, 480:19, 527:13
**exactly** [19] - 266:19, 322:21, 330:21, 343:3, 357:25, 358:20, 443:5, 444:12, 454:19, 455:22, 460:10, 464:15, 466:14, 477:6, 515:14, 516:25, 522:18, 528:18, 529:20
**exam** [2] - 302:6, 472:22
**EXAMINATION** [13] - 296:15, 344:2, 366:2, 397:19, 423:8, 436:4, 464:23, 478:15, 482:12, 490:10, 493:16, 502:18, 506:10
**examination** [11] - 262:5, 262:6, 282:11, 289:22, 290:25, 424:18, 474:7, 481:12, 550:15, 550:21, 551:7
**examinations** [1] - 271:25
**examine** [1] - 502:17
**examined** [1] - 405:19
**examining** [1] - 363:14
**Example** [4] - 423:17, 423:19, 423:22, 423:25
**example** [31] - 309:22, 312:22, 318:15, 320:16, 327:19, 330:12, 331:11, 333:3, 338:12, 338:20, 361:15, 361:19, 361:24, 362:5, 369:8, 377:17, 384:20, 411:21, 411:25, 412:1, 416:22, 424:1, 445:1, 468:14, 475:17, 485:25, 488:20, 489:24, 495:6, 536:3, 538:19
**examples** [8] - 316:25, 320:20, 327:6, 331:8, 354:15, 361:15, 474:21, 519:4
**excellence** [1] - 496:2
**excellent** [1] - 358:17
**except** [4] - 350:15, 460:10, 513:15, 528:18
**excerpt** [2] - 458:20
**exchange** [27] - 382:10, 382:12, 383:2, 392:18, 392:19, 392:24, 393:5, 393:6, 393:11, 393:16, 393:19, 394:2, 394:3, 404:24, 406:9, 406:13, 406:16, 406:19, 406:22, 406:23, 406:25, 407:2, 416:8, 432:2, 432:4, 486:6
**excipient** [5] - 354:8, 354:9, 362:12, 428:21, 453:19
**excipients** [2] - 309:25, 338:3
**exclude** [1] - 289:20
**excludes** [3] - 320:8, 359:13, 360:10
**exclusively** [1] - 311:3
**excuse** [2] - 464:5, 528:15
**execute** [1] - 501:7
**executive** [2] - 285:4, 538:24
**executives** [1] - 514:21
**exercise** [3] - 499:24, 499:25, 500:13
**exert** [4] - 431:15, 434:5, 434:21, 452:9
**Exhibit** [18] - 265:20, 265:25, 297:6, 314:20, 333:9, 367:5, 376:1, 419:25, 429:25, 430:9, 433:22, 451:2, 453:12, 472:22, 499:14, 524:14, 526:9, 539:17
**exhibit** [7] - 269:4, 356:25, 399:16, 399:24, 492:18, 499:19, 535:24
**Exhibits** [2] - 395:17, 435:14
**exhibits** [8] - 279:17, 289:21, 290:11, 400:18, 492:3, 492:23, 507:4, 551:6
**exist** [2] - 328:12, 358:19
**existing** [3] - 371:7, 528:12, 540:22
**exited** [4] - 364:20, 425:14, 491:22, 548:1
**expand** [1] - 317:10
**expander** [1] - 317:7
**expanding** [1] - 338:8
**expansion** [2] - 337:11, 337:19
**expect** [8] - 260:13, 274:9, 329:7, 517:17, 518:6, 526:20, 527:6, 527:9
**expectation** [3] - 280:24, 328:18, 512:24
**expectations** [4] - 521:21, 526:20, 531:5, 531:10
**expected** [17] - 262:24, 262:25, 264:24, 265:11, 281:5, 281:21, 281:22, 285:12, 517:14, 517:23, 518:5, 519:12, 519:15, 519:25, 520:3, 528:11, 530:10
**expecting** [7] - 294:9, 294:12, 519:18, 522:7, 522:8, 522:22
**expects** [1] - 498:7
**expensive** [2] - 300:11, 443:18
**experience** [15] - 295:8, 369:3, 395:3, 436:11, 451:19, 485:12, 486:13, 494:4, 494:25, 498:15, 499:2, 503:21, 503:25, 514:24, 547:12
**Experiment** [7] - 339:9, 339:24, 340:16, 340:19, 340:25, 341:9, 341:12
**experiment** [14] - 328:3, 332:17, 332:19, 333:20, 333:23, 334:23, 335:16, 335:19, 340:4, 340:5, 456:17, 457:10, 458:16, 460:9
**experimental** [5] - 328:3, 333:2, 339:4, 340:1, 383:16
**experimentally** [3] - 384:23, 390:8, 405:19
**experiments** [27] - 337:7, 338:8, 339:23, 340:3, 341:20, 342:12, 349:11, 383:19, 383:20, 383:22, 383:24, 386:25, 389:21, 389:22, 394:18, 394:20, 394:23, 446:5, 446:9, 454:10, 454:12, 454:13, 454:19, 454:20, 460:16, 466:12, 471:12
**expert** [25] - 263:18, 279:5, 279:7, 283:9, 290:17, 291:23, 350:17, 351:14, 412:18, 417:11, 439:19, 439:23, 447:7, 464:10, 466:16, 483:18, 487:13, 490:5, 496:8, 508:16, 509:2, 510:9, 514:22
**expertise** [2] - 488:11, 503:24
**experts** [4] - 287:16, 415:24, 461:17, 514:23

**expiration** [1] - 532:4
**expire** [2] - 511:2, 534:2
**expires** [10] - 511:8, 511:9, 511:11, 511:20, 511:25, 512:10, 512:15, 533:8, 533:15, 533:21
**explain** [50] - 308:1, 315:16, 320:24, 329:8, 334:6, 354:21, 355:22, 357:22, 357:25, 367:16, 376:14, 379:11, 391:18, 392:10, 398:7, 405:6, 406:18, 412:19, 437:6, 437:24, 440:9, 441:20, 442:16, 444:17, 444:24, 447:18, 456:16, 457:7, 458:14, 461:20, 463:20, 469:5, 478:18, 478:20, 478:22, 478:25, 479:13, 499:21, 509:15, 510:22, 516:5, 517:8, 526:18, 528:4, 531:24, 531:25, 532:22, 536:8, 546:2
**explained** [2] - 392:5, 454:15
**explains** [3] - 262:22, 266:24, 350:21
**explanation** [4] - 261:10, 261:12, 329:11, 551:8
**explanations** [2] - 349:24, 352:19
**explode** [1] - 266:15
**explore** [1] - 373:18
**exploring** [1] - 327:25
**exporting** [1] - 373:5
**exposed** [2] - 310:6, 316:19
**exposure** [2] - 307:6, 308:23
**expressed** [1] - 333:25
**expression** [1] - 335:4
**expressly** [1] - 266:4
**extended** [3] - 466:6, 470:23, 471:4
**extending** [1] - 433:15
**extensive** [1] - 388:5
**extent** [6] - 277:19, 289:6, 367:2, 466:1, 466:5, 485:17
**externally** [1] - 346:8
**extra** [3] - 545:10, 547:22
**extremely** [3] - 319:2, 440:20, 440:24
**eye** [1] - 303:19

## F

**face** [6] - 309:7, 310:1, 387:22, 389:13, 389:25, 439:4
**faces** [1] - 325:10
**facilities** [3] - 306:3, 307:18, 307:20
**facility** [9] - 303:13, 304:21, 306:20, 332:11, 388:6, 388:8, 388:9, 388:24
**facing** [1] - 527:19
**fact** [12] - 257:8, 278:17, 285:18, 289:10, 295:4, 336:21, 408:5, 437:8, 443:3, 457:1, 463:2, 509:9
**factor** [6] - 263:20, 266:22, 267:3, 521:18, 522:21, 545:2
**factors** [9] - 263:24, 267:22, 384:5, 537:4, 537:6, 537:7, 538:21, 545:16, 546:16
**facts** [2] - 288:12, 517:9
**factual** [2] - 434:18, 435:3
**factually** [1] - 272:7
**faculty** [1] - 438:8
**failed** [2] - 395:4, 475:17
**failing** [1] - 359:2
**failure** [1] - 383:9
**failures** [3] - 383:10, 383:11, 395:3
**fair** [14] - 311:14, 356:8, 358:18, 360:11, 405:25, 406:6, 406:8, 406:10, 466:2, 468:7, 470:25, 478:3, 514:7, 514:8
**fall** [3] - 349:19, 363:10, 521:9
**falsity** [1] - 283:8
**familiar** [8] - 354:5, 355:20, 374:11, 374:13, 422:16, 430:15, 434:16, 489:9
**families** [1] - 343:2
**family** [5] - 298:4, 298:9, 304:23, 343:10, 370:16
**FAQ** [2] - 430:5, 430:7
**FAQs** [2] - 430:3, 431:18
**far** [10] - 260:19, 270:8, 282:18, 302:14, 305:20, 351:1, 396:2, 454:1, 513:1, 534:6
**fashioned** [1] - 309:23
**faster** [1] - 354:25
**fat** [1] - 307:2
**father** [2] - 298:7, 298:20
**fault** [1] - 352:9
**favor** [2] - 405:6, 416:10
**FBI** [2] - 306:8, 308:20
**FDA** [58] - 257:19, 258:5, 258:19, 271:2, 280:20, 281:4, 313:10, 363:19, 363:23, 386:21, 430:3, 431:11, 431:14, 431:18, 434:17, 444:3, 449:13, 450:3, 450:9, 450:20, 451:8, 451:11, 451:15, 451:18, 451:24, 452:5, 452:16, 452:20, 453:4, 453:15, 454:2, 454:5, 454:7, 455:8, 455:12, 461:8, 462:14, 465:22, 466:8, 466:17, 479:10, 480:8, 495:3, 495:4, 499:3, 499:16, 499:22, 500:3, 500:10, 501:5, 501:25, 504:17, 505:9, 505:14, 516:24, 529:2, 529:3
**FDA's** [3] - 465:12, 500:22, 504:7
**FDA-approved** [1] - 430:3
**federal** [2] - 487:7, 493:25
**Federal** [1] - 494:17
**feed** [2] - 380:4, 380:7
**feedback** [1] - 500:22
**feelings** [1] - 292:1
**fellow** [1] - 439:15
**fellowship** [3] - 426:22, 426:24, 496:5
**felt** [1] - 343:18
**fermentation** [1] - 487:14
**few** [11] - 295:9, 305:15, 322:4, 327:23, 397:23, 423:5, 440:19, 454:22, 480:10, 497:9, 502:22
**fewer** [1] - 396:2
**field** [15] - 300:24, 316:9, 370:25, 403:18, 438:12, 438:25, 439:3, 439:4, 439:12, 487:13, 495:1, 496:1, 496:8, 508:17, 514:24
**fifth** [4] - 298:15, 538:3, 538:4, 540:16
**fight** [1] - 299:7
**fighting** [2] - 285:21, 311:7
**figure** [12] - 261:12, 292:7, 349:2, 351:5, 384:14, 389:22, 454:23, 454:25, 458:12, 472:5, 472:10, 480:17
**Figure** [1] - 459:6
**figured** [3] - 328:12, 368:6, 530:4
**figures** [1] - 455:1
**file** [3] - 272:15, 276:4, 492:8
**filed** [13] - 271:2, 271:6, 272:8, 272:9, 272:11, 272:13, 272:16, 273:24, 274:17, 274:25, 275:6, 281:3, 315:14
**filing** [7] - 270:21, 271:18, 272:18, 272:19, 272:20, 274:11, 399:24
**filler** [1] - 519:23
**filtered** [3] - 388:10, 388:15
**filters** [3] - 391:5, 391:6
**filtration** [2] - 391:7, 425:1
**final** [7] - 294:9, 424:14, 434:9, 434:25, 501:15, 510:25, 518:20
**finally** [2] - 422:13, 486:9
**financials** [1] - 534:10
**fine** [10] - 261:14, 288:12, 292:5, 293:14, 295:4, 295:6, 297:10, 307:15, 321:23, 364:12
**finish** [2] - 486:10, 548:19
**finished** [6] - 257:2, 302:13, 507:17, 536:18, 548:16, 548:17
**firm** [1] - 542:18
**first** [94] - 263:16, 265:24, 272:9, 273:10, 286:2, 294:13, 297:11, 297:20, 302:7, 303:2, 303:6, 303:8, 303:9, 303:15, 308:12, 309:3, 310:3, 313:18, 315:22, 316:1, 321:10, 326:8, 328:2, 328:23, 330:7, 330:8, 330:10, 331:16, 332:6, 338:23, 357:1, 362:17, 369:2, 375:8, 375:9, 377:8, 377:13, 377:15, 379:3, 380:15, 381:6, 381:9, 385:19, 390:18, 393:8, 396:12, 397:25, 405:3, 406:15, 420:15, 429:22, 432:10, 432:18, 437:4, 437:17, 440:5, 440:7, 441:19, 450:2, 450:8, 460:5, 469:14, 478:25, 483:23, 496:19, 497:6, 500:8, 500:12, 500:14, 504:7, 511:5, 512:2, 517:5, 517:20, 517:22, 521:25, 527:3, 529:7, 533:6, 533:7, 533:8, 533:13, 533:15,

538:13, 540:13, 540:19, 540:24, 542:21, 542:23, 543:1, 543:14, 543:15, 543:17, 543:22
**first-to-market** [1] - 538:13
**firsthand** [1] - 294:6
**firsts** [1] - 543:21
**fit** [2] - 311:22, 384:14
**five** [11] - 286:25, 340:17, 340:25, 359:22, 360:3, 372:23, 501:20, 507:21, 545:16, 546:17, 546:18
**flag** [1] - 399:22
**flip** [1] - 529:25
**floating** [2] - 308:22, 322:2
**floor** [1] - 266:16
**Florida** [1] - 343:9
**flour** [2] - 385:10, 385:12
**flow** [3] - 393:23, 416:6, 416:9
**flowing** [1] - 380:15
**flows** [1] - 306:23
**fluorescent** [1] - 312:21
**focal** [5] - 262:12, 262:23, 265:1, 267:23, 531:2
**focus** [28] - 323:11, 327:13, 343:10, 368:24, 369:15, 376:15, 383:13, 384:2, 398:10, 411:20, 438:14, 439:8, 452:2, 462:20, 478:25, 483:11, 486:23, 487:4, 488:11, 499:19, 501:14, 515:22, 521:2, 521:14, 525:6, 525:9, 525:20
**focused** [7] - 315:19, 368:25, 373:11, 398:9, 437:17, 527:16, 543:12
**focusing** [3] - 399:14, 450:8, 497:25
**folder** [1] - 450:10
**folks** [3] - 281:4, 302:25, 312:12
**follow** [3] - 471:9, 475:18, 517:22
**following** [11] - 292:16, 341:20, 364:23, 412:12, 425:19, 442:4, 457:3, 457:17, 480:3, 491:25, 545:16
**follows** [7] - 296:13, 365:20, 436:2, 471:3, 482:10, 493:14, 506:6
**Food** [9] - 493:23, 494:23, 495:6, 495:10, 495:19, 496:22, 498:7, 499:17, 502:9
**food** [9] - 326:16, 331:22, 367:19, 377:10, 377:17, 386:8, 389:19, 390:7, 390:19
**foothold** [1] - 284:23
**footnote** [9] - 262:22, 264:11, 265:16, 265:25, 266:4, 266:5, 266:17, 267:4, 267:13
**footnoted** [1] - 262:19
**FOR** [1] - 255:2
**Force** [1] - 298:8
**force** [2] - 275:18, 275:23
**forced** [3] - 312:25, 513:13, 517:12
**forecast** [7] - 512:22, 514:16, 519:4, 519:15, 519:17, 528:6, 536:3
**forecasts** [1] - 532:18
**foreclosing** [1] - 290:23
**foregoing** [1] - 551:25
**forget** [2] - 276:12, 519:8
**forgot** [1] - 463:23
**fork** [1] - 385:8
**form** [12] - 340:1, 358:8, 380:21, 386:20, 387:1, 387:10, 429:1, 472:15, 547:6, 547:8, 548:9
**formal** [1] - 500:24
**format** [6] - 319:19, 321:2, 321:4, 324:2, 338:12, 355:3
**formed** [1] - 534:17
**forming** [1] - 498:11
**forms** [2] - 327:10, 431:5
**formula** [3] - 447:19, 449:6, 480:1
**formulas** [1] - 400:7
**formulate** [1] - 510:16
**formulation** [92] - 273:1, 283:16, 307:19, 309:20, 310:16, 310:18, 313:5, 317:12, 319:9, 319:25, 323:23, 329:13, 333:22, 334:3, 335:16, 335:19, 340:22, 341:12, 341:25, 344:24, 345:7, 345:8, 346:21, 346:23, 352:23, 360:21, 428:13, 428:17, 428:19, 428:21, 429:2, 429:5, 430:18, 430:21, 431:3, 431:7, 431:8, 431:25, 434:9, 434:25, 438:15, 438:16, 438:19, 438:20, 441:4, 442:1, 442:19, 442:20, 443:19, 444:1, 444:2, 444:4, 444:11, 444:12, 445:5, 445:7, 445:12, 445:18, 446:11, 447:10, 456:19, 456:20, 456:21, 456:24, 456:25, 457:10, 458:23, 458:24, 459:3, 459:24, 460:6, 460:7, 461:23, 464:11, 464:15, 468:16, 470:13, 470:22, 471:6, 472:8, 475:11, 475:22, 477:8, 478:7, 479:6, 479:15, 479:17, 479:22, 509:6, 511:9, 511:22, 515:18
**Formulation** [4] - 430:12, 467:23, 468:22, 469:9
**formulations** [50] - 303:16, 303:24, 309:8, 329:23, 331:5, 333:3, 345:12, 345:25, 346:5, 360:9, 361:15, 428:24, 439:6, 439:10, 439:25, 440:25, 441:7, 441:11, 441:18, 442:10, 442:11, 442:13, 443:7, 444:20, 445:1, 445:11, 445:13, 447:11, 456:18, 466:24, 467:20, 468:25, 471:9, 471:15, 472:4, 472:10, 472:11, 472:14, 475:13, 475:17, 475:25, 476:1, 476:10, 476:18, 477:3, 477:12, 477:16, 477:25, 480:2, 481:13
**Fort** [1] - 507:14
**forth** [13] - 258:20, 300:21, 302:11, 304:3, 305:10, 305:19, 306:9, 307:5, 313:10, 316:3, 324:19, 351:12, 449:20
**forward** [10] - 257:21, 258:7, 293:6, 386:14, 429:19, 444:5, 461:16, 516:17, 545:20, 545:25
**forwards** [1] - 278:4
**foundational** [4] - 258:21, 259:19, 274:20, 274:21
**founded** [1] - 484:16
**four** [19] - 257:1, 279:17, 281:14, 285:1, 285:9, 285:16, 285:21, 286:25, 289:21, 290:11, 371:5, 372:23, 395:24, 409:23, 412:12, 432:7, 433:7, 463:11, 546:11
**foursquare** [1] - 266:19
**fourth** [8] - 298:14, 378:10, 378:11, 378:17, 379:1, 415:18, 501:15, 543:16
**FOX** [1] - 256:6
**fraction** [1] - 415:18
**fractionate** [1] - 311:13
**frame** [6] - 309:5, 326:18, 331:6, 428:5, 497:25, 544:20
**Francisco** [1] - 389:11
**Frank** [4] - 481:5, 482:5, 482:17, 487:13
**frank** [2] - 481:24, 497:9
**FRANK** [2] - 482:6, 482:7
**frankly** [2] - 261:14, 271:8
**free** [58] - 301:4, 362:2, 362:11, 362:18, 362:19, 363:2, 363:6, 367:18, 367:20, 368:1, 368:3, 375:1, 376:17, 376:19, 377:9, 377:12, 378:18, 381:2, 381:7, 382:9, 384:1, 385:18, 385:20, 385:21, 386:1, 386:10, 386:18, 387:1, 387:13, 390:14, 396:11, 398:1, 398:3, 398:17, 400:12, 402:10, 402:15, 402:20, 402:23, 403:15, 403:19, 403:21, 403:24, 404:15, 418:1, 418:5, 428:12, 428:16, 428:24, 429:1, 429:2, 429:5, 483:4, 487:24, 488:1, 514:4, 533:24
**freeze** [4] - 356:2, 356:3, 356:9
**freezing** [1] - 355:5
**frequency** [1] - 546:14
**frequently** [3] - 462:14, 546:9, 546:10
**Friday** [1] - 469:3
**front** [5] - 263:18, 264:22, 398:21, 450:11, 524:6
**froze** [1] - 476:9
**frozen** [4] - 274:14, 325:7, 475:15, 477:5
**frying** [1] - 311:2
**fulfill** [2] - 485:15, 541:1
**full** [18] - 265:22, 296:7, 296:19, 328:11, 332:10, 337:12, 365:14,

366:6, 388:13, 435:21, 479:24, 482:4, 482:5, 482:16, 493:8, 504:5, 505:25, 506:12
**fully** [4] - 280:21, 307:4, 307:17, 525:11
**fun** [1] - 299:15
**function** [8] - 322:9, 330:23, 330:24, 331:1, 429:15, 434:8, 434:24, 452:13
**functionality** [2] - 434:10, 435:1
**functions** [3] - 312:6, 347:21, 380:1
**funding** [2] - 304:8, 304:9
**furthermore** [1] - 321:11
**fusion** [1] - 462:7
**future** [5] - 284:2, 515:15, 524:1, 524:2, 542:19

## G

**G-E-S-S-L-E-R** [1] - 482:6
**Gallagher** [6] - 426:9, 426:17, 426:18, 433:21, 462:16, 463:3
**gas** [5] - 299:3, 299:6, 299:10, 299:16, 299:18
**GAZA** [1] - 256:3
**gears** [2] - 323:8, 470:21
**general** [14] - 267:25, 268:18, 309:7, 316:22, 321:12, 326:17, 327:13, 333:22, 357:7, 441:6, 443:21, 451:11, 499:20, 509:11
**General** [1] - 450:21
**generalized** [1] - 356:6
**generally** [19] - 277:13, 295:8, 326:14, 329:13, 329:14, 332:7, 347:12, 355:2, 378:8, 378:23, 395:10, 428:3, 438:14, 443:9, 443:14, 444:25, 462:9, 513:12, 513:14
**generate** [2] - 300:20, 318:7
**generated** [2] - 324:25, 346:8
**generating** [1] - 389:3
**generic** [3] - 522:14, 522:17, 522:19
**genius** [1] - 445:16
**Georg** [2] - 484:5, 484:18
**Georg-August** [1] - 484:18
**Georgia** [6] - 263:20, 263:24, 266:22, 267:3, 267:22, 494:20
**Georgia-Pacific** [5] - 263:20, 263:24, 266:22, 267:3, 267:22
**German** [1] - 487:7
**Germany** [3] - 438:1, 438:2
**Gessler** [31] - 257:15, 257:22, 257:23, 257:24, 259:1, 259:11, 259:15, 259:18, 260:5, 260:18, 481:6, 481:25, 482:6, 482:17, 482:18, 484:8, 484:11, 485:5, 487:13, 487:18, 488:8, 489:8, 490:2, 490:6, 490:12, 491:19, 497:9, 497:13, 498:17, 503:4, 527:25
**GESSLER** [1] - 482:7
**Gessler's** [3] - 257:4, 497:15, 497:17
**girl** [1] - 299:12
**given** [6] - 260:13, 260:20, 316:14, 332:17, 518:23, 529:22
**glass** [1] - 441:10
**global** [4] - 280:4, 372:25, 427:3, 427:5
**globular** [1] - 311:5
**gloss** [1] - 466:7
**glove** [3] - 388:18, 388:19, 388:25
**glucose** [1] - 322:2
**glycols** [1] - 337:22
**goal** [9] - 319:5, 326:22, 337:3, 371:18, 409:16, 409:20, 410:11, 410:17, 410:19
**goals** [13] - 343:19, 371:3, 371:5, 373:15, 373:19, 377:4, 385:23, 385:25, 395:21, 395:22, 395:24, 409:23, 410:12
**GOLDSTEIN** [1] - 256:6
**Goodnough** [4] - 417:8, 417:10, 419:11, 420:11
**Goodnough's** [7] - 418:9, 418:13, 418:16, 418:22, 419:18, 420:23, 421:19
**goodnough's** [1] - 421:4
**goods** [1] - 372:24
**GORDON** [1] - 256:10
**government** [4] - 306:5, 400:5, 400:19, 434:19
**gowned** [1] - 307:5
**grab** [1] - 334:13
**grade** [1] - 298:15
**graduate** [4] - 302:9, 302:10, 302:17, 494:22
**graduated** [2] - 484:3, 507:11
**gram** [1] - 415:21
**grandkids** [2] - 304:23, 343:13
**grandmother** [1] - 298:11
**granted** [1] - 259:8
**graph** [5] - 281:21, 282:12, 282:19, 528:8, 530:12
**graphic** [1] - 442:18
**graphics** [2] - 368:12, 483:20
**GRAS** [1] - 326:14
**grass** [1] - 299:1
**gray** [7] - 378:25, 379:21, 379:22, 379:23, 381:11, 382:15, 392:20
**grease** [4] - 334:11, 334:12, 334:13, 334:14
**great** [6] - 279:2, 289:6, 329:5, 409:18, 488:19, 489:6
**green** [13] - 380:16, 394:6, 421:9, 457:8, 457:9, 457:15, 460:9, 472:3, 511:14, 512:4, 528:9, 528:11, 528:14
**grossly** [1] - 279:21
**group** [8] - 303:25, 319:19, 358:21, 429:17, 429:18, 487:6, 487:7, 487:8
**grouped** [1] - 461:21
**groups** [5] - 358:5, 358:12, 461:21, 487:4, 487:10
**grow** [8] - 298:3, 318:5, 370:12, 377:17, 389:18, 390:19, 462:2, 520:8
**growing** [3] - 389:13, 389:15, 520:1
**grown** [1] - 436:11
**grows** [2] - 389:16, 389:24
**growth** [14] - 367:19, 377:9, 377:15, 377:22, 385:21, 389:23, 389:24, 390:18, 390:20, 411:14, 425:1, 488:23, 520:2
**guarantee** [1] - 387:7
**guess** [13] - 298:6, 309:6, 340:12, 343:13, 347:2, 349:7, 357:5, 363:5, 363:7, 406:6, 536:10, 550:12, 551:17
**guessing** [2] - 289:8, 551:5
**guidance** [14] - 278:10, 434:17, 499:7, 499:16, 500:3, 503:13, 503:22, 504:8, 504:14, 504:20, 505:8, 505:13
**guidelines** [3] - 403:14, 403:16, 499:3
**gunk** [2] - 391:7, 393:22
**guy** [6] - 304:11, 304:14, 307:2, 317:17, 317:18, 317:21
**guys** [7] - 304:10, 304:13, 304:17, 305:20, 305:22, 325:25, 379:15

## H

**H-E-T-A-S-T-A-R-C-H** [1] - 317:5
**H-U-N-T** [1] - 296:9
**HA** [1] - 318:16
**habilitation** [1] - 484:6
**habit** [1] - 323:16
**half** [7] - 286:2, 304:6, 511:19, 533:19, 533:20
**hall** [1] - 299:4
**hand** [28] - 290:21, 296:3, 310:7, 332:18, 365:10, 379:14, 381:8, 392:1, 420:5, 440:15, 440:17, 441:9, 441:15, 444:14, 447:20, 448:1, 456:19, 461:22, 481:25, 513:8, 513:25, 521:14, 521:15, 521:23, 532:1, 540:12, 540:18, 540:25
**handed** [3] - 400:18, 492:3, 492:24
**handing** [2] - 430:8, 433:21
**handle** [7] - 299:24, 305:16, 306:10, 308:2, 308:3, 310:4, 310:6
**handled** [1] - 400:23
**handling** [4] - 306:3, 307:21, 309:10, 396:3
**hands** [3] - 303:14, 388:21, 389:6
**hang** [1] - 273:7
**haphazard** [1] - 345:12
**happy** [3] - 342:11, 548:25, 549:11
**hard** [6] - 289:14, 298:25, 308:1, 324:23, 538:5, 550:6
**harmony** [1] - 384:18
**HASTINGS** [1] - 255:18
**hat** [1] - 292:25

**hate** [1] - 381:18
**hating** [3] - 381:15, 381:17, 382:2
**hazmat** [2] - 388:13, 388:24
**HCP** [2] - 526:21, 541:1
**head** [9] - 266:15, 284:4, 396:22, 415:2, 455:18, 547:18
**head-to-head** [3] - 284:4, 396:22, 455:18
**header** [1] - 505:3
**heading** [6] - 308:11, 361:8, 413:17, 499:20, 521:16, 550:25
**headwinds** [1] - 316:14
**health** [2] - 303:19, 306:21
**healthcare** [4] - 526:22, 541:1, 541:10, 542:3
**hear** [11] - 276:11, 276:18, 278:1, 288:15, 290:8, 338:1, 365:7, 443:25, 490:6, 490:7, 547:22
**heard** [35] - 259:21, 270:16, 277:4, 277:15, 289:15, 293:1, 317:23, 400:25, 437:5, 438:17, 442:24, 443:17, 458:7, 460:1, 460:2, 461:5, 465:19, 470:21, 472:7, 481:1, 481:10, 483:3, 490:20, 498:17, 503:3, 514:3, 514:20, 516:12, 516:13, 516:18, 516:23, 527:23, 537:14, 538:8, 547:8
**hearing** [5] - 266:10, 266:11, 289:9, 299:8, 351:1
**hearsay** [1] - 268:10
**heart** [1] - 287:25
**heating** [2] - 311:4, 311:6
**heck** [1] - 329:4
**held** [6] - 277:1, 291:16, 292:12, 293:15, 365:25, 481:7
**hello** [2] - 423:10, 423:11
**help** [12] - 306:13, 349:1, 375:12, 377:4, 393:19, 393:21, 415:5, 416:3, 444:22, 457:4, 495:2, 506:18
**helped** [3] - 302:10, 375:13, 518:8
**helpful** [2] - 461:1, 551:3
**helps** [3] - 312:4, 348:13, 411:21
**hemoglobin** [1] - 322:13
**herb** [1] - 317:19
**Herb** [1] - 317:17
**hereby** [1] - 551:23
**herself** [1] - 343:12
**hetastarch** [2] - 317:4, 317:12
**hi** [1] - 490:12
**HIC** [2] - 382:6
**high** [26] - 310:24, 315:16, 317:15, 325:12, 325:14, 329:16, 335:8, 338:21, 339:7, 367:11, 367:16, 376:14, 379:12, 396:10, 436:14, 468:24, 482:22, 493:23, 495:8, 508:21, 510:22, 513:3, 513:9, 513:16, 513:24, 514:11
**high-level** [1] - 396:10
**higher** [9] - 352:4, 352:5, 352:15, 353:10, 517:3, 527:17, 529:3, 530:10, 540:22
**highest** [4] - 301:18, 521:24, 522:1, 542:25
**highlight** [10] - 345:4, 345:14, 350:5, 357:1, 399:21, 412:10, 416:23, 417:15, 421:7, 504:6
**highlighted** [4] - 320:7, 345:5, 407:9, 412:10
**highlighting** [1] - 473:16
**highly** [7] - 271:25, 389:4, 396:5, 412:13, 440:25, 441:3, 540:17
**Hill** [1] - 299:4
**himself** [1] - 268:21
**hired** [1] - 316:15
**hiring** [1] - 302:23
**histidine** [4] - 467:7, 468:24, 479:20, 480:1
**hit** [2] - 266:15, 329:19
**hits** [2] - 330:1, 331:14
**HO** [1] - 255:21
**hold** [4] - 265:7, 267:8, 477:17, 513:23
**holding** [1] - 379:14
**home** [5] - 299:11, 321:16, 325:23, 492:11, 492:12
**hone** [1] - 473:12
**honest** [1] - 351:23
**honestly** [3] - 363:25, 415:22, 418:4
**Honor** [144] - 257:7, 257:14, 258:25, 259:5, 259:8, 261:3, 261:14, 261:19, 263:16, 264:12, 264:20, 264:25, 265:10, 265:18, 265:22, 266:2, 266:8, 267:6, 267:7, 267:20, 268:5, 268:6, 268:13, 269:6, 269:10, 269:22, 270:13, 271:8, 271:15, 272:3, 273:5, 274:1, 274:19, 275:3, 275:12, 276:4, 276:19, 276:23, 277:22, 278:8, 280:2, 281:23, 282:20, 282:24, 283:19, 285:3, 286:1, 286:7, 286:18, 288:8, 290:15, 291:1, 291:22, 292:9, 292:21, 293:22, 294:7, 295:25, 296:3, 297:3, 314:16, 315:2, 333:5, 333:10, 343:25, 350:24, 363:12, 363:16, 364:7, 364:19, 365:6, 365:10, 367:2, 375:22, 375:24, 395:13, 395:15, 397:17, 399:22, 399:25, 400:6, 401:3, 410:5, 416:1, 417:19, 419:20, 423:4, 423:5, 426:6, 426:12, 435:7, 435:9, 435:16, 435:18, 439:22, 450:23, 453:8, 465:4, 474:1, 474:5, 478:10, 481:1, 481:16, 481:23, 481:25, 487:12, 490:15, 491:18, 493:4, 496:7, 499:10, 502:15, 503:7, 505:17, 505:21, 506:8, 507:3, 508:15, 508:18, 518:10, 520:15, 524:10, 524:12, 526:3, 526:7, 534:22, 534:24, 535:3, 535:14, 535:23, 536:13, 539:12, 539:14, 548:14, 548:25, 549:10, 550:2, 550:11, 550:20, 551:1, 551:2, 551:10, 551:14, 551:15
**Honorable** [1] - 255:11
**honors** [1] - 301:18
**hood** [1] - 310:6
**hoped** [2] - 281:16, 387:5
**hopeful** [2] - 281:2, 284:16
**hopefully** [3] - 293:7, 379:14, 547:20
**hoping** [4] - 281:13, 284:23, 324:5, 348:3
**horizon** [2] - 286:3, 519:19
**hospital** [1] - 298:5
**host** [3] - 312:13, 348:3, 348:24
**hours** [3] - 276:9, 279:1, 295:10
**house** [1] - 298:20
**household** [1] - 372:24
**housekeeping** [3] - 291:21, 294:8, 534:8
**housing** [2] - 302:9, 302:10
**HSA** [11] - 310:25, 311:17, 311:23, 313:5, 313:23, 313:24, 314:1, 318:16, 346:21, 356:22, 361:24
**huge** [1] - 310:5
**Hui** [2] - 376:6, 376:10
**human** [22] - 310:23, 310:24, 311:1, 311:10, 311:14, 315:20, 315:23, 316:4, 318:16, 325:15, 356:22, 398:5, 399:12, 428:20, 442:24, 443:3, 443:11, 443:14, 443:16, 443:23, 444:1, 461:6
**human-animal** [1] - 399:12
**human/animal** [2] - 401:18, 401:22
**humans** [3] - 311:16, 326:15, 443:13
**hundred** [14] - 278:19, 281:23, 327:2, 335:6, 335:7, 392:6, 392:7, 392:8, 479:15, 495:11, 512:8, 512:17, 543:24
**hundred-unit** [1] - 479:15
**hundreds** [5] - 340:13, 340:14, 383:22, 394:22, 495:14
**hungry** [1] - 385:6
**HUNT** [1] - 296:10
**Hunt** [44] - 273:12, 296:2, 296:8, 296:20, 300:6, 310:15, 314:24, 315:9, 315:17, 315:24, 317:1, 319:1, 319:17, 319:22, 320:3, 321:9, 326:6, 327:23, 345:5, 345:15, 350:6, 351:4, 356:19, 363:18, 364:3, 364:10, 437:7, 437:9, 440:10, 444:10, 446:2, 446:6, 446:7, 446:13, 457:13, 458:4, 458:8, 458:9, 464:16, 470:22, 471:7, 471:16, 475:8, 478:4

**hunt** [22] - 278:10, 279:6, 297:8, 300:1, 306:13, 306:19, 313:3, 323:8, 333:22, 337:9, 339:23, 340:18, 342:6, 342:23, 343:4, 343:21, 344:4, 344:11, 351:2, 364:8, 364:9, 364:10
**Hunt's** [27] - 306:17, 344:9, 442:25, 444:8, 445:15, 445:20, 445:24, 446:3, 447:1, 447:10, 447:25, 448:17, 448:19, 448:25, 449:3, 449:21, 457:18, 457:24, 459:19, 461:12, 464:20, 471:10, 471:14, 472:21, 474:24, 475:18, 476:6
**hunt's** [1] - 278:16
**Huong** [1] - 307:3
**hurt** [1] - 288:6
**hydrophilic** [2] - 334:10, 381:21
**hydrophobic** [6] - 334:10, 381:9, 381:13, 381:17, 381:24, 382:4
**hyphenating** [1] - 323:17
**hypothesis** [1] - 462:22
**hypothetical** [50] - 263:6, 263:21, 263:23, 264:13, 267:6, 275:19, 280:16, 280:24, 282:2, 282:6, 283:7, 283:9, 283:14, 283:20, 284:7, 287:14, 287:19, 288:9, 288:11, 288:25, 289:5, 289:11, 290:4, 290:5, 290:6, 290:8, 433:8, 463:12, 510:6, 510:8, 510:17, 513:5, 513:20, 516:2, 517:9, 517:25, 519:6, 521:9, 521:11, 522:5, 527:13, 528:13, 529:5, 529:7, 529:9, 531:5, 537:1, 541:20

**I**

**I-E-G-W-A-R-T-H** [1] - 506:2
**IAPF** [3] - 417:16, 417:18, 417:25
**idea** [2] - 266:2, 290:3
**ideally** [1] - 502:6
**ideas** [1] - 461:25
**identical** [3] - 421:5, 421:10, 421:13
**identification** [1] - 486:25
**identified** [3] - 263:8, 333:23, 355:25
**identify** [5] - 263:19, 419:9, 429:7, 430:19, 443:19
**ignore** [2] - 328:7, 328:12
**II** [1] - 255:7
**illness** [1] - 322:17
**illustrate** [1] - 535:12
**imagine** [1] - 380:3
**immediate** [2] - 309:2, 478:8
**immediately** [1] - 527:19
**immune** [1] - 325:15
**immunized** [1] - 310:3
**impact** [14] - 263:2, 279:23, 280:11, 308:9, 373:1, 400:23, 455:12, 460:13, 488:14, 488:23, 489:6, 519:2, 521:17
**impeachment** [1] - 410:5
**imperfect** [1] - 549:4
**implication** [1] - 269:20
**importance** [2] - 457:24, 545:18
**important** [21] - 270:14, 274:2, 375:15, 375:20, 415:24, 440:23, 442:9, 453:17, 457:9, 466:23, 468:15, 489:15, 498:5, 498:6, 514:5, 517:6, 520:11, 538:21, 543:15, 545:16, 547:6
**importantly** [1] - 521:12
**impossible** [2] - 312:14, 373:6
**impressed** [3] - 300:16, 300:22, 325:11
**impressive** [2] - 446:8, 446:12
**improper** [1] - 410:5
**improve** [4] - 338:22, 375:20, 386:19, 398:19
**improvement** [3] - 546:7, 546:8, 546:13
**impurities** [4] - 357:18, 358:22, 358:25, 414:8
**impurity** [3] - 414:6, 414:11
**IN** [2] - 255:1, 255:2
**inaccurate** [2] - 272:14, 273:16
**inactive** [3] - 434:3, 434:19, 452:7
**inaudible** [1] - 294:21
**Inc** [3] - 366:12, 426:20, 450:22
**INC** [1] - 255:3
**inclined** [2] - 289:20, 550:20
**include** [7] - 266:6, 353:1, 353:17, 363:1, 363:4, 428:19, 508:4
**included** [6] - 270:7, 338:24, 340:18, 425:1, 484:7, 527:25
**includes** [3] - 262:14, 353:13, 515:20
**including** [18] - 313:9, 321:11, 324:13, 324:14, 357:7, 368:25, 375:18, 388:14, 390:22, 412:25, 436:12, 439:24, 461:4, 461:5, 487:14, 496:2, 503:23, 504:8
**income** [2] - 282:7, 282:8
**incompatible** [1] - 299:22
**incorrect** [5] - 272:6, 272:7, 282:20, 503:17, 535:7
**incorrectly** [1] - 287:6
**increase** [10] - 336:23, 390:1, 394:21, 453:18, 453:23, 454:8, 456:25, 462:3, 465:18, 465:24
**increased** [4] - 462:2, 466:9, 466:13
**incur** [1] - 516:21
**independent** [2] - 460:16
**indicate** [1] - 335:3
**indicated** [2] - 325:1, 334:25
**indicates** [1] - 335:4
**individuals** [2] - 272:12, 494:22
**industry** [5] - 438:24, 494:3, 494:19, 494:24, 499:7
**inform** [5] - 285:23, 289:12, 514:12, 518:8, 541:4
**information** [37] - 276:19, 286:9, 289:25, 292:22, 293:4, 294:3, 309:11, 326:17, 348:24, 349:5, 350:25, 389:2, 389:5, 389:6, 389:8, 400:4, 413:14, 421:23, 423:25, 450:21, 451:18, 457:15, 458:3, 461:12, 472:13, 479:2, 480:4, 483:17, 490:4, 495:5, 498:25, 521:17, 522:3, 523:7, 530:7, 541:13, 547:15
**informed** [2] - 279:10, 538:18
**informs** [1] - 284:20
**infringe** [1] - 529:13
**infringement** [4] - 271:17, 272:2, 474:4, 509:12
**infringing** [5] - 258:8, 297:16, 366:24, 373:23, 532:12
**ingredient** [38] - 309:25, 319:7, 319:9, 320:18, 320:19, 324:2, 328:1, 329:12, 329:16, 329:21, 329:24, 330:2, 330:4, 330:5, 330:15, 331:4, 331:16, 331:18, 331:19, 334:4, 336:2, 336:5, 337:1, 337:10, 348:5, 358:7, 434:3, 434:19, 442:23, 443:2, 443:20, 444:19, 445:11, 449:5, 452:7, 488:22
**ingredients** [63] - 310:20, 316:12, 319:17, 319:19, 319:25, 320:2, 323:21, 326:13, 327:7, 327:21, 328:25, 329:20, 330:6, 330:7, 330:22, 331:3, 331:8, 336:10, 337:5, 337:20, 337:22, 337:25, 338:3, 338:11, 338:13, 340:18, 355:13, 355:25, 356:6, 437:10, 444:13, 445:10, 445:17, 447:19, 448:11, 448:13, 448:16, 448:19, 448:20, 448:23, 448:25, 449:4, 449:17, 460:6, 466:21, 466:24, 467:5, 467:11, 467:14, 467:20, 468:4, 468:9, 468:15, 468:18, 469:22, 470:5, 471:16, 478:18, 478:23, 479:11, 480:5, 480:6
**inherently** [1] - 322:24
**initial** [6] - 315:18, 319:10, 395:6, 476:15, 476:17, 476:25
**inject** [1] - 454:15
**injectable** [15] - 262:15, 262:18, 262:21, 263:12, 264:3, 264:5, 264:10, 264:14, 264:23, 265:1, 265:12, 267:1, 427:22, 472:15, 523:18
**injectables** [2] - 267:18, 267:25
**injected** [2] - 353:11, 448:5
**injecting** [2] - 273:20, 350:7
**Injection** [1] - 430:12
**injection** [3] - 434:7,

434:23, 455:2
**injections** [1] - 455:5
**inkling** [1] - 287:9
**innovation** [3] - 386:14, 429:13, 542:19
**Innovation** [1] - 426:19
**innovations** [2] - 342:24, 542:24
**innovator** [1] - 370:24
**input** [1] - 384:21
**inquiry** [1] - 287:7
**inserting** [1] - 275:25
**inside** [5] - 318:8, 377:24, 380:1, 388:22, 390:22
**inspiration** [1] - 324:15
**installed** [1] - 307:8
**instance** [2] - 285:20, 472:2
**instances** [1] - 372:18
**instead** [4] - 377:9, 400:14, 533:10, 546:17
**instigate** [1] - 325:15
**institute** [2] - 304:12, 487:8
**Institute** [3] - 304:13, 368:20, 494:18
**instructed** [1] - 429:6
**instruction** [3] - 276:5, 276:9, 278:9
**instructions** [2] - 294:10, 548:9
**Insufficient** [1] - 525:4
**intellectual** [3] - 508:4, 509:25, 510:1
**intelligence** [1] - 427:11
**intend** [2] - 512:25, 547:1
**intended** [10] - 323:25, 431:16, 434:5, 434:11, 434:21, 435:2, 452:9
**intention** [3] - 315:20, 400:6, 431:15
**intentionally** [3] - 434:4, 434:20, 452:8
**interact** [1] - 381:16
**interacted** [2] - 348:22, 495:9
**interaction** [8] - 306:4, 380:10, 380:14, 381:10, 381:24, 382:4, 431:5, 431:9
**interactions** [2] - 310:13, 495:19
**interacts** [1] - 381:13
**interest** [2] - 300:6, 536:11
**interested** [13] - 300:7, 302:3, 305:18, 310:22, 369:19, 369:21, 370:4, 370:8, 370:22, 371:6, 371:8, 386:13
**interesting** [1] - 304:24
**interfaces** [1] - 445:2
**interferences** [1] - 324:8
**internal** [2] - 455:21, 514:14
**internalization** [2] - 432:25, 433:8
**internally** [1] - 346:8
**interpret** [1] - 404:12
**interpretation** [2] - 363:7, 471:21
**interrupted** [1] - 550:5
**interrupting** [1] - 550:7
**interviewed** [1] - 304:19
**intramuscularly** [1] - 350:7
**intro** [1] - 504:6
**introduced** [2] - 373:19, 503:20
**introduction** [2] - 399:21, 400:2
**Introduction** [1] - 401:10
**invalid** [4] - 297:19, 437:14, 437:22, 490:25
**invalidity** [2] - 271:16, 272:2
**invent** [18] - 344:13, 344:22, 345:6, 345:9, 345:10, 345:15, 345:16, 345:17, 345:18, 367:23, 371:1, 371:3, 385:16, 404:19, 404:25, 406:12, 406:13, 407:2
**inventable** [1] - 346:1
**invented** [5] - 272:24, 304:11, 386:11, 390:17, 464:16
**inventing** [1] - 387:9
**invention** [38] - 269:18, 274:14, 320:7, 320:8, 342:4, 342:7, 350:22, 351:7, 359:13, 367:17, 367:18, 368:2, 376:23, 376:25, 378:22, 387:21, 395:9, 397:1, 397:13, 424:1, 424:24, 424:25, 425:4, 437:9, 442:25, 444:8, 445:15, 445:21, 446:19, 447:1, 447:10, 447:25, 448:17, 448:19, 449:3, 449:20, 457:13, 458:9
**inventions** [4] - 269:2, 270:6, 323:9, 533:24
**inventor** [5] - 270:4, 273:13, 297:13, 297:14, 374:6
**inventor's** [1] - 278:13
**inventories** [1] - 306:9
**Inventors** [1] - 367:7
**inventors** [9] - 297:12, 367:9, 368:6, 373:21, 381:1, 383:3, 418:19, 419:9, 419:10
**invest** [1] - 316:24
**investigated** [1] - 390:8
**investor** [4] - 281:7, 285:24, 286:4, 286:15
**investor's** [1] - 280:5
**investors** [2] - 285:22, 514:18
**invited** [1] - 302:16
**involve** [4] - 304:20, 427:11, 427:13, 542:22
**involved** [12] - 305:15, 310:10, 312:4, 325:12, 325:13, 342:15, 351:5, 355:5, 369:6, 400:21, 476:1, 508:10
**involvement** [1] - 429:4
**involves** [1] - 550:13
**ion** [4] - 382:10, 382:12, 383:2, 406:24
**IP** [1] - 287:10
**Ireland** [1] - 308:13
**iron** [2] - 301:8, 301:24
**irrelevant** [4] - 277:14, 283:12, 287:18, 297:23
**Irvine** [2] - 302:1, 302:13
**ISAAC** [1] - 255:19
**isolator** [3] - 388:23, 390:5, 397:6
**isolators** [1] - 388:19
**issuance** [1] - 271:19
**issue** [36] - 257:5, 259:1, 259:5, 270:9, 270:10, 270:14, 270:21, 275:13, 275:18, 276:6, 276:17, 284:8, 288:20, 300:14, 323:12, 349:6, 349:15, 440:5, 440:7, 447:6, 474:3, 474:4, 481:18, 486:3, 490:22, 509:4, 520:12, 533:12, 536:17, 549:5, 549:6, 549:20, 550:19, 550:20, 551:1
**issued** [2] - 297:19, 343:2
**issues** [13] - 275:20, 303:14, 316:21, 343:10, 371:17, 372:22, 372:25, 441:4, 443:15, 443:25, 482:20, 497:11, 503:8
**it'd** [1] - 338:14
**item** [4] - 291:21, 294:8, 476:14, 530:9
**Items** [1] - 257:2
**itself** [23] - 270:24, 310:2, 329:16, 340:5, 369:22, 370:6, 384:3, 389:4, 395:24, 396:5, 434:8, 434:24, 452:13, 464:1, 480:7, 489:4, 532:19, 537:21, 537:25, 538:22, 538:25, 541:9, 544:11

## J

**January** [1] - 472:15
**jar** [1] - 369:11
**Jeffrey** [1] - 285:4
**Jennifer** [1] - 393:13
**JEREMY** [1] - 255:16
**Jersey** [3] - 298:19, 299:4, 299:23
**JMOL** [4] - 481:17, 548:16, 549:6, 549:8
**JMOLs** [1] - 549:2
**job** [9] - 299:3, 299:6, 299:7, 299:9, 299:13, 301:9, 303:8, 313:8, 316:16
**Johnson** [2] - 418:25, 419:10
**joined** [8] - 370:17, 374:15, 375:9, 393:9, 426:25, 429:9, 429:19, 507:25
**joining** [2] - 370:3, 374:10
**Joint** [7] - 297:6, 333:9, 367:5, 376:1, 395:17, 499:14, 526:9
**Jonas** [1] - 304:11
**Joseph** [2] - 296:8, 296:20
**JOSEPH** [1] - 296:9
**journey** [1] - 518:18
**JTX** [67] - 296:24, 297:3, 297:6, 297:11, 331:25, 332:4, 333:5, 333:9, 339:6, 342:2, 366:17, 367:3, 367:5, 374:1, 374:20, 375:22, 376:1, 376:19, 383:13, 394:8, 394:9, 394:11, 394:13, 395:13, 395:14, 395:17, 395:18, 398:21, 401:6, 411:22, 416:13, 416:14, 423:13, 424:6, 424:15, 456:1, 467:16, 471:23, 472:22, 472:25, 476:20, 478:13, 492:20, 499:4, 499:10, 499:14, 503:14, 518:9, 518:10, 518:21, 518:25, 520:13, 521:1, 522:10, 523:12, 525:22, 526:9, 526:17, 542:6, 542:12, 544:15, 544:23
**judge** [1] - 469:1

**judgment** [2] - 433:19, 433:20
**Julie** [1] - 307:3
**July** [1] - 255:13
**jump** [2] - 450:7, 476:13
**June** [10] - 496:21, 497:20, 497:22, 497:25, 498:14, 498:24, 500:11, 501:24, 516:4, 518:3
**junior** [1] - 301:4
**JUROR** [1] - 295:21
**juror** [12] - 279:10, 279:12, 291:2, 291:3, 291:10, 291:11, 292:19, 292:23, 293:6, 293:9, 294:4, 492:4
**jurors** [1] - 291:7
**JURY** [2] - 255:9, 255:11
**jury** [86] - 255:12, 262:3, 263:19, 273:14, 274:13, 274:21, 276:11, 278:13, 279:8, 288:13, 288:15, 292:25, 294:9, 295:16, 295:17, 296:19, 315:16, 320:24, 333:16, 334:6, 335:8, 339:20, 340:17, 348:16, 348:21, 352:21, 354:21, 355:22, 357:22, 357:25, 360:8, 364:17, 364:20, 365:1, 365:2, 365:3, 366:6, 367:14, 367:16, 376:14, 379:12, 390:15, 390:16, 391:18, 400:16, 401:16, 405:7, 406:18, 407:16, 408:6, 412:16, 419:12, 421:2, 425:12, 425:14, 425:20, 426:1, 426:2, 447:17, 449:24, 454:25, 467:13, 469:3, 482:16, 482:18, 482:22, 483:9, 486:2, 490:24, 491:22, 492:2, 492:6, 492:10, 492:14, 492:21, 492:22, 494:15, 503:15, 504:1, 504:25, 509:15, 546:24, 547:12, 547:25, 548:1, 548:9
**jury's** [2] - 278:22, 473:7
**justifiable** [1] - 316:24
**Justus** [1] - 484:2

## K

**Kansas** [3] - 436:10, 438:8, 438:13
**keep** [11] - 318:4, 322:7, 325:16, 330:10, 330:18, 351:2, 401:1, 511:8, 512:4, 512:9, 531:18
**keeping** [1] - 551:6
**keeps** [2] - 268:9, 512:16
**Kentucky** [1] - 507:14
**kept** [3] - 273:17, 274:20, 285:19
**KESSLER** [1] - 256:6
**key** [2] - 447:24, 448:18
**kid** [2] - 298:24, 300:9
**kids** [9] - 302:9, 302:18, 325:5, 325:9, 325:14, 325:21, 343:11, 343:13, 370:11
**kill** [3] - 308:5, 310:5, 389:10
**killing** [1] - 418:1
**kilodalton** [1] - 405:3
**kilodaltons** [2] - 314:2, 320:11
**kind** [35] - 267:25, 270:5, 282:17, 288:16, 299:9, 300:13, 302:2, 302:25, 304:4, 308:23, 313:17, 322:4, 323:1, 324:17, 324:21, 324:22, 325:2, 326:11, 326:17, 332:14, 336:23, 339:10, 340:10, 342:15, 360:5, 382:5, 391:24, 462:11, 509:18, 515:1, 519:3, 527:4, 537:10, 540:6, 544:7
**kinds** [3] - 312:1, 312:3, 361:4
**King** [1] - 304:21
**knock** [1] - 328:14
**knowing** [2] - 348:18, 397:7
**knowledge** [14] - 277:23, 359:4, 422:4, 422:5, 422:10, 422:14, 422:20, 422:21, 427:9, 427:13, 433:6, 463:10, 512:19
**known** [16] - 282:16, 308:1, 310:13, 321:15, 349:20, 353:22, 354:7, 355:11, 355:18, 356:14, 358:9, 396:15, 403:25, 428:7, 443:15, 538:1
**knows** [3] - 328:11, 513:25, 530:17
**Korean** [1] - 298:7
**KRYS** [1] - 255:21

## L

**LA** [2] - 301:9, 389:11
**lab** [3] - 303:10, 325:24, 369:13
**label** [2] - 327:3, 479:5
**labeled** [5] - 333:19, 334:18, 335:1, 340:16, 411:22
**labels** [1] - 408:18
**laboratories** [1] - 307:17
**laboratory** [3] - 302:20, 389:9, 502:7
**labs** [1] - 411:2
**lack** [2] - 290:6, 403:10
**lacked** [1] - 313:19
**LAI** [4] - 266:6, 266:9, 523:17, 523:18
**LAI's** [1] - 523:15
**laid** [2] - 263:24, 266:10
**land** [1] - 298:19
**landscape** [2] - 268:1, 427:6
**language** [8] - 375:4, 420:22, 420:24, 421:3, 421:9, 421:23, 434:17, 473:13
**large** [15] - 310:4, 313:25, 314:3, 314:5, 314:7, 315:19, 316:25, 317:4, 319:5, 319:16, 319:25, 320:18, 326:5, 326:9, 531:7
**larger** [1] - 314:4
**largest** [4] - 327:17, 520:5, 538:1
**LAROCK** [1] - 256:7
**last** [15] - 260:1, 260:12, 267:17, 270:16, 276:17, 277:4, 337:6, 381:11, 416:11, 432:24, 448:6, 455:5, 473:1, 477:18, 548:12
**lasting** [4] - 265:8, 539:1, 539:2, 541:2
**lastly** [1] - 371:13
**lasts** [7] - 353:17, 448:8, 546:7, 546:8, 546:10, 546:12, 546:14
**late** [2] - 280:18, 309:6
**latest** [1] - 512:22
**launch** [41] - 262:18, 262:25, 263:6, 264:3, 264:6, 264:14, 266:25, 267:18, 280:10, 280:18, 283:12, 283:21, 285:11, 285:23, 286:9, 286:12, 286:15, 287:13, 287:17, 287:22, 511:6, 511:25, 516:15, 516:17, 517:1, 519:5, 519:6, 519:12, 519:15, 519:18, 521:12, 521:21, 526:14, 526:16, 527:18, 528:11, 528:25, 529:4, 529:17, 537:23, 540:5
**launched** [4] - 280:22, 285:6, 469:16, 469:23
**launches** [2] - 519:18, 526:21
**laundry** [1] - 334:9
**law** [1] - 278:15
**laws** [1] - 401:1
**lawsuit** [2] - 464:7, 469:25
**lawyer** [3] - 349:24, 362:21, 414:25
**lawyers** [1] - 351:5
**lay** [1] - 322:15
**lead** [5] - 328:5, 370:24, 446:18, 460:17, 474:20
**lead-in** [1] - 474:20
**leader** [3] - 280:12, 284:22, 284:25
**leadership** [1] - 496:4
**leading** [1] - 284:11
**leads** [1] - 262:3
**learn** [5] - 289:22, 375:12, 375:13, 488:20, 536:10
**learned** [2] - 386:10, 550:19
**learning** [3] - 369:19, 369:21, 388:5
**least** [27] - 261:24, 262:18, 279:19, 293:9, 326:16, 368:11, 395:8, 401:1, 402:19, 410:16, 418:5, 469:22, 471:20, 472:1, 472:16, 478:3, 497:4, 497:19, 500:17, 501:2, 501:9, 501:20, 502:2, 514:8, 517:14, 523:6, 549:18
**leave** [6] - 295:23, 304:7, 343:4, 370:10, 492:6, 492:13
**lecture** [1] - 484:5
**lecturer** [1] - 484:18
**led** [11] - 299:5, 300:6, 323:11, 345:23, 347:17, 374:13, 383:11, 387:20, 393:6, 399:1, 445:18
**leek** [2] - 385:4, 385:6
**leeks** [1] - 385:7
**left** [27] - 272:12, 289:17, 297:12, 307:1, 332:18, 343:6, 355:3, 367:8, 370:11, 371:22, 372:5, 381:8, 392:17, 392:18, 395:11, 395:12, 420:5, 427:25, 440:15, 441:9, 447:20, 461:22, 486:14, 521:23, 532:1, 540:18, 540:25
**left-hand** [11] - 332:18, 381:8,

420:5, 440:15, 441:9, 447:20, 461:22, 521:23, 532:1, 540:18, 540:25
**legal** [6] - 350:17, 351:13, 447:7, 464:10, 491:2, 505:10
**legally** [1] - 504:9
**legion** [1] - 284:12
**length** [3] - 353:5, 546:6, 546:13
**lens** [1] - 303:22
**less** [17] - 320:10, 322:8, 371:8, 386:3, 386:4, 391:22, 409:9, 409:19, 410:24, 411:3, 425:3, 457:1, 509:13, 546:9, 546:10
**letter** [8] - 257:3, 268:8, 283:5, 548:23, 549:13, 549:14, 549:22
**letters** [5] - 257:1, 279:14, 279:17, 323:17, 549:11
**level** [24] - 286:12, 310:21, 310:24, 315:17, 317:15, 322:3, 335:8, 335:25, 339:7, 367:11, 367:16, 376:14, 379:12, 391:21, 396:10, 436:14, 482:22, 493:23, 508:22, 510:22, 513:3, 513:9, 514:11, 521:24
**levels** [4] - 311:20, 384:10, 393:22, 414:11
**Lexan** [1] - 307:7
**Liatris** [1] - 263:5
**license** [21] - 262:4, 289:2, 451:6, 508:10, 510:18, 513:13, 513:14, 513:15, 513:17, 513:22, 514:6, 517:12, 528:14, 529:5, 529:12, 529:23, 530:2, 530:17, 530:20
**licenses** [1] - 517:19
**licensing** [1] - 508:7
**Liebig** [1] - 484:2
**life** [4] - 384:25, 434:11, 435:2, 530:10
**lifetime** [1] - 540:4
**light** [6] - 312:23, 316:2, 340:7, 445:14, 511:14, 528:22
**likely** [3] - 276:8, 282:11, 549:19
**limit** [4] - 359:23, 400:3, 409:9, 409:19
**limitation** [2] - 350:5, 409:14
**limitations** [1] - 509:5
**limited** [4] - 265:25, 300:2, 301:14, 316:11
**limits** [1] - 337:13
**Lindemann** [1] - 265:20
**line** [29] - 281:20, 282:21, 362:17, 412:8, 412:23, 413:15, 413:22, 416:5, 416:17, 416:23, 417:20, 417:22, 448:9, 473:24, 474:22, 501:22, 511:4, 511:14, 512:7, 519:7, 519:9, 528:8, 528:15, 528:17, 528:18, 543:9, 543:10
**lines** [5] - 261:9, 357:11, 474:11, 528:22, 543:10
**link** [5] - 358:6, 359:24, 433:13, 463:17
**linkages** [1] - 322:4
**links** [2] - 321:20, 360:3
**lipids** [1] - 390:25
**Lipitor** [1] - 522:16
**liquid** [6] - 332:13, 355:3, 377:24, 390:23, 392:23, 405:15
**liquids** [1] - 369:14
**list** [9] - 306:6, 309:24, 326:17, 327:21, 330:11, 353:22, 535:24, 540:16, 545:16
**listed** [11] - 315:1, 332:14, 333:3, 335:15, 341:11, 354:2, 369:4, 383:15, 474:12, 475:6, 484:1
**listened** [1] - 502:23
**listening** [1] - 549:18
**lists** [1] - 516:8
**literature** [1] - 393:10
**litigation** [1] - 514:25
**live** [2] - 298:10, 298:13
**lived** [1] - 298:12
**living** [8] - 298:8, 298:11, 301:12, 343:8, 418:24, 436:8, 443:10, 493:21
**LLP** [2] - 255:16, 255:18
**loan** [1] - 298:20
**loans** [1] - 302:11
**location** [1] - 291:5
**long-acting** [26] - 262:15, 262:17, 262:21, 263:9, 263:12, 264:3, 264:5, 264:9, 264:13, 264:23, 265:1, 265:12, 267:1, 267:18, 267:25, 285:20, 514:2, 517:5, 517:16, 517:18, 517:20, 523:18, 523:19, 523:20, 538:14, 545:5
**long-duration** [4] - 445:23, 538:22, 545:6
**long-lasting** [2] - 539:2, 541:2
**long-range** [1] - 520:25
**longer-duration** [3] - 430:20, 433:5, 437:11
**longer-lasting** [1] - 265:8
**Look** [1] - 302:2
**look** [82] - 262:11, 262:22, 263:19, 284:19, 285:2, 286:12, 297:11, 297:12, 304:11, 308:21, 312:19, 320:4, 329:21, 332:1, 338:19, 339:4, 339:6, 340:23, 340:24, 346:17, 357:14, 367:7, 372:5, 372:16, 377:19, 381:8, 384:7, 384:10, 384:16, 392:25, 403:6, 410:6, 411:22, 411:23, 411:25, 413:21, 415:12, 420:13, 421:6, 421:8, 423:22, 454:21, 460:23, 472:24, 473:1, 474:11, 475:21, 476:23, 477:7, 479:4, 479:9, 501:11, 504:5, 504:12, 505:3, 511:4, 511:5, 511:13, 511:21, 512:23, 518:3, 518:7, 518:25, 519:7, 519:8, 519:9, 519:13, 520:13, 528:11, 530:11, 534:9, 534:12, 535:16, 539:3, 540:11, 540:18, 540:19, 540:24, 542:5, 542:21, 544:14, 547:16
**looked** [24] - 315:22, 317:3, 323:12, 326:15, 327:8, 331:13, 338:18, 375:10, 386:16, 386:17, 453:24, 455:19, 455:21, 480:11, 510:25, 514:13, 514:14, 514:15, 514:16, 515:2, 533:11, 541:3, 541:18
**looking** [52] - 304:13, 313:7, 317:24, 328:4, 332:6, 338:23, 340:9, 346:20, 347:5, 347:18, 347:25, 348:10, 371:1, 371:9, 371:12, 371:13, 371:14, 371:20, 371:22, 372:3, 372:8, 372:15, 373:12, 394:23, 398:16, 400:1, 403:18, 409:22, 412:5, 415:17, 419:15, 420:6, 424:22, 428:25, 429:5, 430:18, 451:14, 453:25, 454:25, 456:1, 458:13, 459:5, 516:16, 530:1, 531:9, 531:16, 532:18, 536:1, 541:24, 542:17, 545:5, 545:22
**lookout** [1] - 358:14
**looks** [9] - 328:6, 328:7, 334:24, 369:12, 416:22, 420:24, 510:17, 515:16, 532:18
**looseleaf** [1] - 383:17
**lose** [8] - 441:7, 441:11, 441:14, 441:17, 441:22, 441:25, 442:2, 517:19
**loses** [1] - 442:1
**loss** [1] - 442:13
**losses** [1] - 262:25
**lost** [7] - 259:4, 260:7, 283:1, 283:11, 300:18, 317:9, 349:17
**loud** [2] - 345:3, 434:2
**love** [2] - 488:19, 540:10
**loving** [4] - 381:15, 381:20, 381:21, 382:1
**low** [8] - 322:3, 327:16, 338:21, 389:18, 390:24, 391:4, 410:11, 440:24
**low-purity** [1] - 391:4
**lower** [3] - 302:8, 327:3, 458:20
**Loyer** [2] - 317:17, 317:19
**LRP** [3] - 520:22, 520:24, 521:4
**Ludwig** [1] - 484:4
**lunch** [5] - 305:11, 305:12, 385:2, 425:12, 425:13
**luncheon** [1] - 425:18
**lying** [1] - 492:13
**lyophilization** [2] - 355:4, 356:8
**lyophilize** [1] - 345:7
**lyophilized** [1] - 475:14
**lyophilizers** [1] - 307:4
**lyophilizing** [5] - 345:11, 354:18, 354:21, 355:11, 475:10

**Lyophilizing** [1] - 354:22
**lyoprotectant** [4] - 355:19, 355:22, 356:7, 356:14

**M**

**machine** [2] - 318:19, 318:24
**machinery** [1] - 318:8
**macromolecule** [2] - 319:17, 326:6
**macromolecules** [4] - 317:1, 319:6, 324:2, 341:24
**mad** [4] - 373:8, 373:10, 373:11, 401:20
**Magazine** [7] - 268:9, 268:14, 268:22, 269:1, 269:12, 269:16, 270:5
**magazine** [1] - 268:19
**magic** [1] - 379:20
**magnets** [4] - 382:20, 382:21, 382:25
**magnitude** [1] - 384:22
**mail** [2] - 260:12, 446:2
**Maillard** [3] - 323:3, 357:11, 357:23
**main** [8] - 305:25, 339:2, 371:5, 433:15, 433:18, 433:20, 447:18, 467:11
**maintain** [4] - 434:10, 435:1, 445:3, 467:12
**maintained** [2] - 451:19, 500:2
**maintenance** [1] - 444:21
**major** [10] - 258:6, 260:15, 401:23, 439:8, 442:23, 483:12, 483:15, 488:14, 503:2, 516:8
**majority** [3] - 395:4, 519:21, 520:1
**maltose** [1] - 320:23
**mammalian** [1] - 369:20
**man** [1] - 308:1
**management** [1] - 524:24
**managing** [1] - 484:17
**manipulate** [1] - 388:22
**manner** [3] - 368:3, 386:19, 387:13
**manufacture** [2] - 372:13, 501:18
**manufactured** [4] - 312:8, 428:18, 495:7, 497:23
**manufacturer** [2] - 485:13, 489:17
**manufacturers** [1] - 525:4
**manufactures** [1] - 332:10
**manufacturing** [69] - 257:15, 258:6, 258:12, 259:20, 260:16, 283:15, 371:25, 372:1, 372:14, 375:14, 376:17, 394:19, 396:1, 396:8, 396:11, 396:13, 396:20, 402:11, 403:15, 422:3, 444:22, 482:21, 482:25, 483:7, 483:12, 485:1, 485:12, 486:1, 487:21, 488:5, 488:10, 488:15, 489:19, 489:23, 490:8, 491:7, 491:11, 495:22, 495:23, 496:20, 497:6, 497:10, 498:13, 498:15, 499:9, 499:23, 500:11, 501:23, 509:7, 509:10, 511:11, 511:14, 511:16, 514:3, 515:13, 515:17, 515:22, 516:2, 516:11, 527:15, 528:12, 529:8, 530:6, 532:16, 533:6, 533:22, 536:19, 537:12, 537:13
**map** [1] - 520:7
**margin** [1] - 442:13
**marked** [14] - 296:24, 314:10, 342:2, 366:16, 374:19, 376:19, 379:9, 383:13, 394:7, 424:6, 424:15, 429:25, 430:8, 433:22
**market** [38] - 262:14, 263:9, 280:12, 280:25, 281:10, 281:17, 284:10, 284:11, 284:22, 284:25, 285:15, 285:19, 286:6, 286:11, 288:3, 370:21, 427:8, 427:15, 428:10, 451:8, 469:17, 498:10, 514:9, 517:5, 517:20, 520:10, 523:1, 523:8, 523:24, 526:21, 531:12, 538:3, 538:13, 539:20, 540:8, 540:17
**marketed** [1] - 422:14
**marketing** [7] - 422:24, 432:6, 448:7, 514:15, 514:19, 538:24
**marketplace** [11] - 283:19, 287:18, 287:25, 288:2, 288:8, 531:6, 537:20, 537:21, 538:13, 540:6, 541:8
**married** [1] - 299:21
**Marshal** [2] - 292:23, 292:24
**Maryland** [1] - 368:22
**Massachusetts** [1] - 507:23
**master's** [1] - 438:3
**match** [2] - 467:24, 470:19
**matched** [1] - 460:8
**matching** [1] - 470:13
**material** [16] - 307:22, 310:9, 317:5, 317:6, 351:8, 358:20, 371:23, 372:3, 372:9, 386:9, 391:4, 391:12, 402:15, 405:17, 476:22, 489:3
**materials** [13] - 371:14, 371:15, 371:19, 371:21, 372:4, 372:14, 372:16, 373:13, 396:8, 402:10, 402:20, 436:18, 494:12
**math** [12] - 277:15, 414:23, 415:2, 415:3, 415:4, 415:7, 519:20, 532:24, 532:25, 536:7, 536:9, 536:11
**matrix** [9] - 379:22, 379:23, 382:15, 392:20, 393:21, 394:4, 406:23
**matter** [15] - 292:3, 430:15, 431:2, 431:7, 431:21, 431:23, 452:14, 463:2, 468:8, 478:5, 481:2, 515:14, 520:4, 537:11
**matters** [8] - 342:10, 447:6, 452:15, 458:2, 508:6, 534:9, 549:5
**Maximilian** [1] - 484:4
**maximizing** [1] - 432:25
**maximum** [1] - 326:24
**MBA** [2] - 540:10
**MC** [1] - 417:8
**Meagher** [3] - 258:14, 259:3, 259:9
**Meagher's** [1] - 259:4
**mean** [52] - 272:18, 272:19, 272:20, 273:20, 274:7, 274:20, 276:7, 277:18, 277:20, 288:23, 298:24, 311:10, 314:3, 316:16, 317:15, 318:25, 319:8, 321:14, 324:17, 334:20, 335:9, 335:12, 338:11, 340:13, 342:8, 342:9, 343:18, 346:7, 347:7, 350:15, 350:19, 357:16, 362:20, 362:23, 363:7, 390:2, 391:18, 392:10, 400:8, 416:2, 418:23, 424:11, 427:7, 441:21, 445:12, 466:18, 476:2, 503:24, 517:23, 529:17, 534:11
**meaning** [11] - 306:23, 312:1, 312:7, 313:20, 323:19, 332:10, 334:10, 335:22, 337:15, 418:19, 428:10
**means** [21] - 267:14, 293:13, 317:16, 321:15, 322:14, 329:1, 347:3, 347:4, 352:4, 352:15, 359:21, 381:5, 390:4, 405:25, 406:2, 406:8, 407:21, 441:20, 442:6, 485:16, 509:19
**meant** [4] - 268:11, 285:20, 363:3, 466:2
**meantime** [3] - 305:8, 325:2, 481:3
**meanwhile** [2] - 272:25, 419:2
**measure** [1] - 412:17
**measurement** [1] - 413:12
**measures** [1] - 414:1
**mechanical** [1] - 299:2
**Medical** [1] - 426:19
**medical** [6] - 300:21, 427:4, 429:13, 429:14, 491:12, 494:1
**medicine** [4] - 335:14, 484:2, 484:4, 494:20
**medium** [4] - 391:11, 488:22, 488:25, 539:1
**meet** [4] - 283:4, 344:8, 500:23, 531:1
**meet-and-confers** [1] - 283:4
**meeting** [4] - 325:4, 501:3, 501:5, 524:18
**meetings** [2] - 453:5, 500:24
**meets** [1] - 509:5
**MELANIE** [1] - 255:20
**Melanie** [1] - 296:1
**members** [6] - 295:17, 365:3, 400:16, 426:2, 492:22, 546:24
**membrane** [4] - 433:10, 433:11, 463:14, 463:15
**membranes** [4] - 432:19, 433:4, 462:3, 463:8
**memorize** [1] - 479:16
**memory** [1] - 279:3
**mental** [1] - 397:5
**mentality** [1] - 304:25
**mention** [1] - 443:11
**mentioned** [45] - 265:2, 319:6,

327:21, 327:22, 327:24, 330:14, 354:10, 363:18, 363:19, 372:21, 375:9, 385:15, 386:13, 388:18, 389:5, 390:5, 390:21, 391:4, 391:17, 392:19, 393:1, 393:9, 399:13, 405:18, 409:23, 425:2, 440:7, 441:5, 442:11, 444:23, 445:22, 449:19, 449:25, 458:22, 461:19, 486:1, 488:6, 494:25, 496:14, 500:14, 503:2, 505:13, 512:6, 520:12, 541:15
**mentions** [1] - 262:20
**meritorious** [1] - 549:9
**met** [2] - 465:10, 502:21
**method** [6] - 335:10, 362:18, 362:19, 417:6, 417:7, 420:19
**methodically** [1] - 328:8
**methodology** [1] - 266:13
**methods** [2] - 412:13, 489:1
**MI** [1] - 358:12
**Michael** [8] - 417:10, 418:9, 418:13, 418:15, 418:22, 419:11, 419:18, 421:19
**micro** [1] - 415:16
**microgram** [1] - 479:3
**micrograms** [2] - 310:12, 313:12
**middle** [7] - 258:10, 334:16, 334:17, 441:12, 522:12, 529:21, 531:1
**might** [23] - 268:2, 282:1, 282:2, 299:12, 304:8, 313:22, 323:6, 329:15, 329:17, 337:17, 338:21, 340:9, 361:1, 373:8, 408:14, 488:22, 489:22, 502:6, 503:6, 508:14, 522:17, 546:11, 548:8
**Military** [1] - 507:10
**military** [2] - 507:13, 507:16
**milligram** [4] - 329:17, 329:18, 409:10
**milligrams** [4] - 415:15, 415:19, 415:20, 480:1
**milliliter** [2] - 414:18, 414:21
**milliliters** [2] - 479:7, 479:15
**million** [13] - 277:5, 277:7, 277:14, 391:23, 392:6, 407:10, 407:17, 407:22, 409:20, 410:24, 411:4, 414:22, 415:15
**mimic** [7] - 313:23, 315:20, 319:8, 468:1, 468:2, 468:3, 472:8
**mind** [15] - 273:7, 281:16, 297:8, 323:5, 364:15, 379:4, 401:6, 410:2, 510:10, 510:11, 513:21, 528:2, 536:22, 549:25
**minds** [1] - 518:4
**mine** [2] - 318:2, 318:3
**MINNITI** [20] - 255:20, 257:7, 257:11, 257:13, 258:2, 259:14, 259:18, 259:25, 260:10, 260:22, 294:4, 493:4, 493:17, 496:7, 496:12, 499:10, 499:15, 502:13, 503:7, 505:17
**Minniti** [3] - 294:2, 426:4, 493:3
**minor** [1] - 457:15
**minus** [2] - 415:16, 415:17
**minute** [11] - 265:7, 267:8, 292:11, 292:14, 293:1, 415:6, 423:22, 425:12, 491:20, 519:8, 534:8
**minutes** [5] - 270:17, 327:23, 426:12, 491:21, 497:10
**miprocure** [2] - 484:20, 485:2
**miprolab** [2] - 484:16, 484:25
**miracle** [1] - 325:9
**mischaracterizing** [1] - 362:9
**misleading** [3] - 272:1, 272:4, 275:21
**missed** [2] - 345:2, 398:4
**MIT** [1] - 507:17
**mix** [4] - 309:22, 309:23, 381:22, 391:1
**mixture** [3] - 380:4, 385:14, 394:6
**mobile** [3] - 405:13, 405:14, 405:18
**mode** [1] - 309:15
**model** [3] - 302:25, 486:16, 525:4
**modeling** [1] - 282:4
**modern** [2] - 309:16, 311:22
**modification** [2] - 417:5, 420:19
**modify** [1] - 341:18
**moisture** [4] - 322:25, 340:10, 355:1
**molecular** [2] - 320:10, 359:15
**molecule** [18] - 309:18, 310:2, 313:25, 314:5, 326:9, 369:21, 370:6, 388:6, 389:4, 398:20, 440:15, 441:10, 441:11, 441:16, 441:18, 441:22, 444:25, 447:21
**molecules** [6] - 314:7, 315:19, 326:7, 327:13, 358:11, 403:20
**moment** [8] - 398:7, 447:17, 465:2, 473:13, 496:14, 503:14, 534:12, 543:2
**money** [2] - 277:3, 298:25
**monitor** [1] - 306:8
**monosaccharide** [1] - 320:14
**monosaccharides** [1] - 357:16
**Montclair** [1] - 298:22
**month** [2] - 388:4, 500:17
**months** [20] - 257:21, 258:5, 271:7, 395:8, 448:8, 497:4, 497:19, 501:2, 501:9, 501:20, 502:2, 502:5, 527:22, 528:18, 529:13, 529:15, 529:18, 539:1, 546:11, 546:12
**moot** [3] - 259:4, 259:8, 269:11
**mooted** [1] - 259:5
**moreover** [2] - 455:4, 535:23
**morning** [12] - 257:14, 261:3, 278:24, 295:19, 295:23, 296:17, 296:18, 344:4, 344:5, 366:4, 366:5, 547:24
**MORRIS** [1] - 255:16
**most** [13] - 277:6, 307:25, 318:1, 342:22, 352:12, 387:24, 443:1, 495:21, 498:5, 527:9, 542:20, 543:15, 545:16
**mostly** [3] - 289:19, 305:22, 318:3
**mother** [2] - 298:8, 299:11
**motion** [3] - 481:10, 492:8, 549:4
**motions** [1] - 549:2
**motivated** [2] - 513:22, 514:6
**motivation** [6] - 398:12, 398:14, 398:18, 399:11, 400:12, 443:22
**motorcycles** [1] - 299:2
**mouse** [10] - 454:13, 454:16, 454:21, 455:18, 459:9, 460:21, 460:25, 461:7, 487:1, 487:9
**mouthful** [1] - 382:5
**move** [38] - 257:21, 286:21, 293:6, 297:3, 300:1, 314:17, 325:8, 333:5, 338:7, 343:20, 367:3, 370:16, 375:22, 380:13, 395:13, 415:23, 435:7, 440:4, 440:11, 441:2, 443:22, 444:7, 447:13, 450:7, 450:23, 456:15, 511:7, 522:10, 524:10, 526:5, 528:2, 534:22, 535:18, 536:13, 536:16, 536:17, 539:12, 545:25
**moved** [3] - 298:18, 438:7, 550:10
**moves** [2] - 453:8, 499:10
**moving** [9] - 269:11, 303:12, 304:20, 330:10, 429:19, 444:5, 501:4, 511:8, 511:10
**MR** [239] - 257:7, 257:11, 257:13, 258:2, 259:14, 259:18, 259:25, 260:10, 260:22, 261:3, 261:11, 261:19, 262:2, 262:11, 262:14, 262:20, 263:14, 263:16, 264:4, 264:11, 264:16, 264:19, 264:25, 265:5, 265:10, 265:15, 265:21, 266:2, 266:8, 266:17, 266:22, 267:7, 267:20, 268:5, 268:6, 268:11, 268:13, 268:20, 269:3, 269:6, 269:10, 269:15, 269:22, 270:2, 270:9, 270:13, 270:19, 271:6, 271:23, 272:7, 272:16, 272:21, 273:5, 273:8, 273:23, 274:1, 274:13, 274:19, 275:2, 275:12, 275:16, 276:3, 276:13, 276:16, 276:23, 277:2, 277:17, 277:22, 278:8, 278:19, 278:21, 278:23, 279:13, 280:2, 280:7, 280:9, 280:20, 281:2, 281:23, 281:25, 282:10, 282:19, 282:24, 283:17,

283:25, 284:9, 284:16, 285:7, 285:13, 286:1, 286:6, 286:10, 286:18, 286:25, 287:24, 290:15, 291:1, 291:21, 292:6, 292:8, 292:20, 292:22, 293:3, 293:8, 293:11, 293:22, 294:4, 294:6, 294:7, 294:13, 294:19, 294:21, 294:24, 295:2, 295:12, 314:18, 315:2, 333:7, 343:25, 344:3, 346:25, 351:3, 363:16, 363:17, 364:2, 375:24, 395:15, 397:17, 397:20, 399:25, 400:6, 400:10, 401:3, 401:4, 410:15, 416:1, 416:4, 417:24, 419:20, 420:2, 423:3, 425:22, 426:5, 426:12, 435:7, 435:9, 435:11, 435:16, 436:5, 436:22, 436:25, 439:22, 440:1, 440:3, 447:13, 447:15, 450:23, 450:25, 451:4, 453:8, 453:10, 453:14, 463:19, 464:24, 465:2, 465:6, 474:1, 474:5, 474:10, 477:22, 478:10, 478:12, 478:16, 480:23, 481:1, 481:5, 481:9, 493:4, 493:17, 496:7, 496:10, 496:12, 499:10, 499:12, 499:15, 502:13, 502:19, 503:7, 503:10, 505:15, 505:17, 505:21, 506:8, 506:11, 506:21, 506:23, 507:3, 507:6, 508:15, 508:18, 508:20, 510:19, 510:21, 518:10, 518:13, 520:14, 520:16, 524:10, 524:12, 524:16, 525:21, 525:25, 526:3, 526:7, 526:10, 534:22, 534:24, 535:3, 535:7, 535:14, 535:21, 535:22, 536:13, 536:15, 539:12, 539:14, 539:19, 548:10, 548:14, 548:25, 549:10, 550:1, 550:5, 550:11, 550:18, 550:25, 551:10, 551:13, 551:15

**MS** [57] - 257:6, 258:25, 295:25, 296:16, 297:3, 297:7, 297:25, 300:5, 303:7, 306:16, 306:18, 307:23, 314:16, 314:22, 315:5, 315:9, 315:12, 333:5, 333:10, 333:15, 333:21, 339:18, 339:22, 343:22, 350:24, 363:12, 364:7, 365:6, 366:3, 367:2, 367:6, 375:22, 376:2, 395:13, 395:19, 397:14, 399:20, 400:3, 410:5, 417:19, 419:22, 423:5, 423:9, 425:9, 481:23, 482:13, 487:12, 487:16, 487:18, 490:11, 490:15, 490:18, 491:15, 491:18, 492:6, 492:11, 492:15

**multicolumn** [1] - 412:1

**multiple** [6] - 261:4, 303:22, 432:2, 497:4, 502:3, 502:5

**Munich** [1] - 484:5

**muscles** [1] - 325:6

**must** [4] - 316:6, 449:16, 489:1, 509:13

**Myers** [1] - 370:14

**Mylan** [7] - 263:5, 263:6, 523:2, 523:3, 523:4, 531:8, 531:11

## N

**Nagaich** [1] - 258:14

**naive** [2] - 527:3

**name** [22] - 296:7, 296:19, 323:14, 344:6, 365:14, 366:6, 397:23, 426:16, 435:21, 436:6, 465:9, 482:4, 482:5, 482:16, 482:17, 490:14, 493:8, 493:18, 493:20, 505:25, 506:13, 526:15

**named** [1] - 374:6

**names** [1] - 373:20

**Nano** [1] - 414:23

**nano** [2] - 414:24, 415:17

**nanogram** [3] - 308:1, 308:3, 409:9

**nanograms** [6] - 310:11, 414:18, 414:21, 415:15, 415:19, 415:20

**nanometers** [1] - 312:22

**narrow** [2] - 503:25, 525:6

**natural** [2] - 373:4, 387:25

**nature** [9] - 312:8, 312:9, 316:2, 320:13, 321:25, 385:21, 422:2, 422:17, 484:22

**naval** [1] - 298:5

**navigate** [1] - 495:3

**nearly** [2] - 421:4, 421:10

**necessarily** [4] - 313:7, 349:12, 433:4, 463:8

**necessary** [2] - 307:24, 551:9

**neck** [1] - 305:21

**need** [32] - 257:23, 258:2, 275:24, 278:9, 290:3, 290:8, 291:7, 295:9, 295:10, 317:10, 318:3, 337:18, 360:22, 365:23, 375:21, 378:14, 389:17, 465:2, 469:5, 471:8, 471:15, 495:5, 501:10, 501:11, 520:9, 527:14, 528:14, 529:5, 537:25, 541:2, 546:23, 548:9

**needed** [3] - 302:18, 498:23, 529:12

**needle** [1] - 286:21

**needs** [2] - 481:16, 530:17

**negative** [9] - 306:22, 382:16, 382:18, 382:19, 392:23, 393:3, 393:24, 394:4

**negatively** [2] - 406:23, 431:6

**negotiate** [3] - 509:22, 515:10, 515:11

**negotiated** [2] - 287:9, 510:13

**negotiating** [4] - 515:12, 515:13, 516:9, 541:8

**negotiation** [58] - 263:6, 263:21, 263:23, 264:13, 267:6, 275:19, 280:16, 280:24, 283:7, 283:9, 283:14, 283:20, 284:3, 284:7, 284:18, 287:14, 287:20, 288:9, 288:11, 289:1, 289:5, 289:11, 290:4, 290:5, 290:6, 290:9, 508:10, 508:12, 510:4, 510:7, 510:9, 510:17, 513:5, 513:7, 513:20, 515:2, 515:17, 515:18, 516:2, 517:9, 517:25, 519:6, 521:10, 521:12, 522:5, 527:13, 528:13, 529:5, 529:7, 529:9, 530:21, 531:5, 537:1, 537:22, 541:20, 541:21

**negotiations** [2] - 508:8, 537:12

**NERA** [3] - 507:25, 508:2, 508:3

**neurology** [1] - 520:22

**neuromuscular** [1] - 485:4

**neurotoxin** [19] - 263:2, 288:1, 309:9, 336:7, 367:15, 369:24, 370:2, 375:2, 375:3, 400:25, 407:11, 409:10, 417:4, 417:16, 421:15, 427:4, 427:6, 431:6, 484:24

**neurotoxins** [1] - 420:18

**never** [13] - 262:4, 266:3, 282:10, 285:14, 297:19, 299:16, 342:13, 359:4, 387:4, 414:15, 422:5, 444:11

**new** [25] - 300:21, 302:25, 309:8, 367:25, 370:22, 371:1, 371:4, 375:16, 375:17, 377:7, 385:17, 386:10, 390:16, 392:13, 414:14, 444:6, 458:3, 485:21, 485:23, 500:10, 529:1, 540:6, 545:17

**New** [5] - 299:4, 364:12, 370:15, 370:16, 507:24

**next** [65] - 269:12, 270:15, 272:11, 296:2, 298:21, 305:9, 330:3, 337:10, 343:6, 345:14, 350:5, 371:16, 373:25, 376:22, 377:19, 380:25, 383:23, 386:12, 387:8, 387:19, 390:9, 391:3, 391:16, 392:13, 399:15, 402:2, 417:15, 418:14, 420:25, 421:7, 425:21, 429:20, 432:21, 434:1, 435:16, 437:23, 440:11, 442:15, 444:7, 446:23, 446:25, 447:13, 449:23, 453:20, 456:15, 477:8, 480:18, 481:3, 481:5, 481:24, 484:13, 486:12, 496:24, 500:18, 500:19, 501:4, 501:5,

501:18, 501:21, 519:13, 520:12, 522:10, 544:14, 548:18
**NICHOLS** [1] - 255:16
**night** [6] - 260:12, 270:16, 276:18, 295:6, 295:10, 302:20
**nine** [2] - 333:3, 501:14
**ninth** [3] - 414:24, 415:17
**NIRAV** [1] - 256:8
**no-protein** [1] - 337:8
**nobody** [5] - 286:5, 286:17, 307:10, 309:11, 310:14
**non** [3] - 258:8, 268:10, 389:17
**non-hearsay** [1] - 268:10
**non-infringing** [1] - 258:8
**non-oxygen** [1] - 389:17
**nonanimal** [5] - 324:18, 325:3, 363:1, 363:4, 363:9
**nonbinding** [1] - 505:4
**nonclinical** [1] - 453:21
**none** [10] - 472:4, 472:6, 472:9, 472:11, 472:14, 475:13, 475:25, 477:3, 477:16, 477:24
**nonexpert** [1] - 363:14
**nonHSA** [2] - 345:25, 346:5
**nonlimiting** [1] - 474:20
**nonprotein** [2] - 324:11, 328:22
**nontoxic** [2] - 417:5, 420:18
**nontraditional** [1] - 302:2
**normal** [3] - 309:16, 325:9, 464:1
**normalization** [2] - 544:7, 546:19
**normalize** [1] - 544:1
**normally** [1] - 291:11
**northeast** [1] - 300:10
**notable** [1] - 521:16
**note** [2] - 452:22, 526:5
**notebook** [1] - 383:17
**notebooks** [2] - 374:16, 446:1
**notes** [1] - 465:13
**nothing** [5] - 271:16, 273:9, 305:23, 310:13
**notice** [2] - 267:4, 302:22
**noticed** [1] - 327:21
**notify** [1] - 306:7
**Novel** [1] - 430:12
**novel** [2] - 444:10, 453:19
**November** [4] - 280:19, 285:11, 315:15, 522:7
**NP** [9] - 323:19, 323:22, 323:25, 324:16, 326:5, 326:18, 327:14, 327:22, 362:13
**nuance** [1] - 258:3
**nucleic** [16] - 391:1, 391:8, 391:21, 391:22, 392:10, 392:11, 407:10, 407:22, 409:9, 414:3, 414:4, 414:6, 414:7, 414:10, 425:3
**Number** [3] - 419:13, 431:20, 433:24
**number** [34] - 261:5, 261:13, 263:22, 277:24, 278:2, 278:4, 282:22, 332:17, 371:10, 383:10, 402:9, 404:10, 406:3, 419:12, 419:14, 424:19, 430:2, 430:9, 431:13, 433:23, 437:3, 446:1, 461:23, 474:19, 476:21, 485:1, 514:8, 532:19, 536:22, 538:2, 538:8, 541:17, 543:19
**numbers** [13] - 261:2, 261:5, 261:7, 310:5, 400:7, 410:12, 430:1, 430:10, 492:18, 508:13, 533:2, 536:4, 551:9
**numerical** [2] - 527:14, 531:22

**O**

**oath** [3] - 409:2, 409:4, 409:6
**object** [3] - 417:19, 474:1, 534:24
**objection** [39] - 262:9, 279:1, 297:5, 314:18, 314:19, 315:2, 333:7, 333:8, 363:12, 363:13, 367:4, 375:24, 375:25, 395:15, 395:16, 417:23, 419:22, 419:24, 435:10, 435:13, 440:1, 450:25, 451:1, 453:10, 453:11, 487:16, 496:10, 499:12, 499:13, 503:7, 508:18, 524:12, 524:13, 526:7, 526:8, 535:22, 539:14, 539:16, 549:14
**objections** [3] - 261:22, 279:1, 435:9
**objective** [5] - 319:10, 339:2, 341:21, 341:22, 499:25
**obligation** [1] - 451:23
**observe** [1] - 307:8
**obtain** [1] - 438:4
**obtained** [2] - 417:16, 438:5
**obtaining** [1] - 412:13
**obvious** [1] - 275:10
**obviously** [8] - 277:21, 278:14, 284:13, 286:3, 290:18, 387:25, 460:11, 502:11
**obviousness** [3] - 417:21, 437:14, 437:22
**occasionally** [1] - 380:18
**occur** [1] - 285:6
**occurred** [3] - 269:21, 276:10, 282:3
**October** [5] - 469:13, 526:2, 526:11, 537:3, 537:22
**ocular** [2] - 303:19, 303:20
**Oculinum** [1] - 305:13
**OF** [2] - 255:2, 255:9
**offer** [4] - 259:23, 284:17, 370:14, 487:12
**offered** [2] - 259:17, 503:15
**offering** [3] - 437:1, 466:15, 491:9
**offers** [1] - 432:2
**office** [2] - 546:10, 546:14
**Office** [1] - 297:20
**officer** [5] - 426:8, 463:23, 463:25, 464:3, 484:20
**official** [1] - 451:7
**Official** [1] - 552:3
**often** [5] - 358:13, 485:8, 485:17, 501:19, 508:9
**oftentimes** [1] - 540:4
**oil** [5] - 381:16, 381:17, 381:18, 381:19, 382:2
**old** [2] - 273:17, 309:23
**old-fashioned** [1] - 309:23
**oligosaccharide** [2] - 359:17, 359:20
**Oligosaccharide** [1] - 359:21
**oligosaccharides** [2] - 320:9, 359:14
**omitted** [2] - 467:7, 467:15
**once** [12] - 266:14, 306:11, 310:6, 354:10, 360:1, 384:13, 486:3, 500:19, 516:23, 525:7, 526:21, 532:10
**one** [170] - 261:1, 261:5, 263:8, 264:11, 268:3, 269:1, 270:9, 270:13, 271:1, 273:9, 273:10, 275:5, 275:13, 276:17, 276:20, 279:10, 279:25, 280:14, 281:9, 283:14, 285:3, 291:11, 291:21, 293:1, 294:7, 305:8, 307:20, 307:25, 312:11, 315:22, 317:8, 320:14, 323:19, 328:15, 329:2, 329:6, 329:10, 329:11, 330:17, 330:23, 330:24, 340:7, 342:22, 347:22, 348:5, 348:16, 348:22, 352:21, 354:2, 355:13, 356:7, 360:3, 361:5, 361:19, 366:23, 367:9, 373:21, 375:18, 380:1, 380:8, 380:18, 381:5, 382:24, 385:2, 387:6, 387:14, 391:22, 392:2, 392:4, 392:5, 392:8, 402:6, 402:21, 403:5, 403:21, 404:11, 405:18, 406:4, 408:15, 409:21, 409:22, 412:4, 413:8, 413:12, 414:4, 415:18, 415:24, 417:7, 417:21, 418:10, 420:25, 424:14, 425:22, 426:5, 426:7, 430:19, 430:24, 432:18, 432:21, 432:24, 441:11, 442:19, 445:11, 458:23, 458:25, 461:17, 461:23, 468:11, 472:1, 478:8, 478:25, 483:11, 485:21, 485:25, 486:7, 489:21, 490:19, 492:4, 493:1, 503:23, 506:15, 508:9, 508:11, 508:12, 509:21, 513:8, 515:17, 515:18, 519:4, 519:23, 519:24, 523:13, 530:13, 533:4, 533:5, 533:6, 533:7, 533:10, 533:17, 534:6, 536:4, 536:5, 538:19, 538:20, 538:21, 539:25, 540:15, 540:16, 540:21, 541:21, 541:22, 542:25, 543:1, 546:6, 546:7, 546:25, 548:5, 549:11
**one-on-one** [1] - 281:9
**ones** [3] - 315:22,

333:15, 393:3
**onset** [2] - 353:15, 353:16
**open** [2] - 306:23, 396:3
**open-handling** [1] - 396:3
**opening** [11] - 258:4, 258:16, 262:16, 262:23, 270:20, 273:11, 277:3, 279:20, 285:3, 311:6, 487:19
**operate** [1] - 504:17
**operates** [1] - 382:16
**operation** [1] - 390:4
**Operation** [1] - 507:15
**opine** [3] - 437:8, 437:12, 437:18
**opinion** [45] - 257:19, 259:2, 259:9, 259:11, 259:16, 260:13, 260:19, 446:23, 446:25, 447:12, 448:11, 448:13, 450:5, 452:14, 453:18, 455:13, 455:14, 458:1, 460:15, 460:25, 461:12, 462:17, 462:25, 463:21, 463:22, 466:2, 466:7, 466:9, 470:24, 482:20, 483:16, 488:8, 490:3, 496:16, 497:5, 497:10, 499:1, 502:1, 502:25, 503:15, 503:21, 511:15, 511:23, 527:16
**opinions** [17] - 258:15, 259:23, 262:7, 437:1, 437:3, 437:15, 437:17, 460:13, 464:13, 466:17, 491:9, 497:16, 497:17, 498:11, 500:4, 518:8, 547:8
**opportunities** [2] - 540:9, 541:4
**opportunity** [8] - 301:10, 305:1, 396:3, 410:6, 517:19, 537:20, 540:24
**opposed** [2] - 305:6, 349:17
**opposite** [2] - 382:24, 408:9
**oppositely** [1] - 406:24
**opposites** [4] - 382:17, 392:22, 393:25, 394:4
**optimal** [1] - 471:17
**optimizations** [1] - 337:17
**oral** [2] - 302:6, 549:8
**orange** [2] - 543:10, 543:11
**order** [8] - 358:8, 383:5, 389:18, 444:20, 451:8, 471:13, 514:9, 528:13
**ordinary** [1] - 268:17
**organisms** [1] - 312:1
**organization** [3] - 269:17, 269:19, 496:3
**organizations** [1] - 496:6
**orient** [1] - 447:17
**original** [1] - 444:1
**Originally** [1] - 310:22
**originally** [1] - 298:5
**ourselves** [2] - 343:8, 454:14
**outcome** [4] - 353:10, 353:11, 384:18, 387:5
**output** [4] - 332:8, 339:8, 353:5, 488:24
**outside** [3] - 293:20, 307:6, 387:14
**overall** [6] - 288:6, 323:22, 341:19, 384:14, 386:19, 431:25
**overlap** [1] - 326:20
**overnight** [1] - 279:4
**overrule** [2] - 262:9, 417:23
**overruled** [1] - 503:9
**overseas** [1] - 298:8
**oversee** [1] - 429:14
**oversight** [1] - 306:8
**oversimplification** [1] - 406:1
**owed** [2] - 509:11, 512:16
**owes** [2] - 508:24, 510:2
**own** [12] - 278:13, 289:17, 328:1, 368:17, 445:7, 446:7, 499:2, 509:20, 513:17, 517:16, 538:6, 538:7
**owns** [1] - 509:24
**oxidize** [1] - 309:21
**oxygen** [3] - 389:17, 389:18

## P

**p.m** [3] - 295:2, 295:3, 551:19
**P188** [6] - 331:13, 331:20, 333:25, 334:1, 335:24, 340:20
**P24** [1] - 305:6
**Pacific** [5] - 263:20, 263:24, 266:22, 267:3, 267:22
**package** [4] - 309:14, 309:17, 312:16, 313:20
**packet** [1] - 351:10
**PACs** [1] - 430:3
**page** [45] - 265:17, 271:9, 280:3, 285:3, 297:11, 315:24, 332:1, 332:6, 333:20, 376:3, 383:12, 399:15, 399:20, 401:9, 412:15, 413:14, 416:5, 416:16, 416:18, 416:19, 417:2, 431:19, 451:21, 451:25, 454:22, 469:14, 478:13, 499:19, 504:3, 504:19, 505:3, 505:6, 518:21, 518:25, 521:1, 522:11, 523:12, 523:13, 524:20, 526:17, 539:23, 542:12, 544:23
**pages** [2] - 263:22, 454:22
**paid** [2] - 287:9, 301:5
**pallet** [1] - 308:15
**pan** [1] - 311:2
**panning** [1] - 305:5
**paper** [1] - 372:24
**papers** [3] - 486:20, 486:22, 486:23
**paragraph** [25] - 263:25, 264:17, 264:19, 264:22, 265:4, 265:18, 266:4, 266:7, 266:8, 271:9, 315:25, 320:3, 320:5, 320:25, 321:9, 356:25, 359:9, 361:23, 401:17, 434:1, 452:2, 453:20, 499:20, 504:6
**paragraph's** [1] - 264:12
**paragraphs** [3] - 263:22, 264:25, 267:3
**parameters** [1] - 338:19
**paraphrasing** [1] - 279:21
**parents** [1] - 300:8
**parking** [1] - 301:5
**part** [54] - 267:5, 267:10, 267:19, 267:22, 281:12, 288:9, 308:18, 310:6, 323:22, 328:1, 328:22, 331:4, 334:3, 339:24, 340:3, 343:9, 345:4, 345:5, 348:19, 350:13, 358:12, 378:21, 389:3, 391:22, 392:13, 407:9, 407:10, 407:22, 409:19, 410:24, 411:4, 447:24, 450:19, 451:15, 453:2, 471:18, 473:9, 491:9, 494:10, 496:15, 497:16, 510:6, 511:16, 515:7, 518:14, 519:1, 520:17, 524:9, 527:20, 528:5, 531:7, 539:9, 549:1, 549:6
**part-time** [1] - 343:9
**particular** [14] - 267:13, 272:20, 307:13, 323:14, 331:13, 334:21, 362:7, 456:10, 466:2, 473:21, 475:3, 498:25, 502:24, 503:6
**parties** [20] - 273:1, 279:14, 283:6, 283:21, 284:4, 285:12, 287:2, 287:14, 289:12, 289:15, 294:15, 487:19, 506:15, 513:8, 514:17, 515:12, 517:24, 518:2, 527:12, 530:4
**parties'** [1] - 287:7
**parts** [5] - 391:23, 407:10, 407:16, 407:22, 414:22
**pass** [1] - 465:3
**passage** [5] - 360:20, 361:7, 361:18, 420:6, 420:10
**past** [2] - 430:7, 531:12
**Patent** [2] - 297:20, 419:13
**patent** [197] - 271:6, 271:10, 272:8, 272:20, 273:21, 274:3, 275:6, 283:16, 297:2, 297:9, 297:13, 297:16, 297:19, 314:6, 314:15, 314:24, 315:3, 315:6, 315:7, 315:13, 315:17, 319:21, 320:1, 323:12, 323:15, 326:8, 341:25, 342:3, 343:2, 344:9, 345:8, 345:24, 347:17, 350:10, 350:16, 350:17, 350:21, 351:6, 351:11, 351:18, 352:1, 352:11, 352:22, 353:1, 353:16, 353:21, 354:10, 354:16, 356:19, 362:14, 363:14, 363:24, 366:22, 367:9, 367:11, 367:17, 373:20, 373:22, 374:4, 374:5, 374:6, 374:9, 374:14, 376:20, 376:25, 381:7, 382:9, 384:1, 385:18, 386:1, 386:2, 387:16, 387:17, 395:23, 396:20, 398:19, 399:2, 399:6, 399:10, 403:24, 404:1, 404:6, 404:7, 404:9, 407:5, 408:6, 408:7, 408:16, 408:21, 408:24,

411:3, 411:5, 411:6, 411:9, 411:14, 411:17, 412:20, 412:21, 416:14, 416:21, 418:18, 418:23, 418:25, 419:1, 419:7, 419:8, 419:9, 419:10, 419:12, 419:14, 419:15, 419:16, 419:18, 420:6, 420:11, 420:17, 420:23, 421:4, 421:20, 421:21, 423:12, 423:16, 423:20, 424:2, 424:15, 436:17, 437:10, 437:13, 437:21, 446:19, 449:1, 449:10, 449:21, 457:19, 457:25, 459:20, 461:13, 464:16, 464:20, 471:10, 471:14, 471:16, 471:21, 472:21, 472:23, 473:4, 473:17, 473:25, 474:24, 475:8, 475:18, 476:6, 476:24, 477:13, 481:11, 508:17, 509:12, 510:1, 511:7, 511:9, 511:10, 511:20, 511:22, 511:25, 512:10, 512:15, 515:14, 515:18, 515:19, 515:24, 533:8, 533:10, 533:12, 533:14, 533:15, 533:18, 533:21, 534:7, 536:24, 537:2, 537:5, 537:11, 538:10, 543:12

**patent-in-suit** [1] - 373:22

**patented** [1] - 487:25

**patents** [66] - 258:13, 259:19, 270:22, 271:3, 271:11, 271:13, 272:11, 273:1, 273:17, 273:24, 274:4, 274:11, 274:17, 274:21, 274:25, 275:18, 275:23, 283:16, 342:24, 343:2, 366:23, 418:24, 420:18, 482:21, 482:23, 483:7, 488:3, 488:5, 490:25, 496:20, 497:7, 498:24, 508:4, 509:1, 509:3, 509:6, 509:7, 509:9, 509:10, 511:1, 511:12, 511:16, 513:10, 514:1, 515:10, 515:11, 515:13, 515:17, 515:22, 516:2, 516:11, 527:15, 529:8, 529:10, 529:12, 530:6, 530:11, 532:4, 532:16, 533:5, 533:6, 533:22, 534:2, 536:18, 536:19

**path** [1] - 403:22

**pathogens** [2] - 398:2, 403:21

**pathway** [1] - 441:17

**pathways** [1] - 441:6

**patient** [4] - 442:3, 448:5, 527:3, 541:2

**patients** [8] - 372:13, 491:12, 526:24, 527:2, 527:3, 541:11, 542:3, 545:15

**PAUL** [1] - 255:18

**pay** [11] - 300:12, 509:20, 509:23, 512:4, 514:7, 530:20, 530:23, 531:13, 531:14, 532:10, 533:25

**paying** [5] - 512:11, 530:20, 532:2, 532:3, 533:10

**PDX** [38] - 306:17, 373:25, 380:25, 383:23, 387:8, 436:23, 437:23, 440:4, 440:11, 441:2, 442:15, 444:7, 446:22, 447:14, 449:23, 450:7, 455:17, 456:15, 461:18, 464:4, 483:23, 486:12, 494:14, 496:13, 498:20, 501:14, 507:2, 510:20, 515:25, 528:3, 530:3, 531:23, 532:19, 536:20, 538:15, 541:13, 543:2, 545:19

**peak** [2] - 262:14, 455:3

**pediatricians** [1] - 325:5

**peer** [1] - 439:8

**peer-reviewed** [1] - 439:8

**peg** [1] - 327:17

**pegs** [1] - 327:9

**pending** [2] - 468:12, 469:25

**Pennsauken** [1] - 298:21

**Pennsylvania** [2] - 299:24, 300:16

**people** [38] - 261:16, 268:17, 275:8, 287:22, 298:17, 302:23, 305:15, 307:8, 308:21, 310:5, 311:12, 312:10, 312:11, 316:18, 316:20, 317:18, 323:17, 331:22, 342:17, 349:3, 349:7, 349:14, 349:16, 350:1, 358:10, 358:14, 373:11, 384:22, 388:20, 398:9, 399:13, 403:22, 440:19, 444:18, 502:11, 543:22, 543:23

**pepper** [1] - 385:11

**Pepsi** [1] - 281:9

**peptide** [57] - 268:23, 269:24, 431:2, 431:21, 431:23, 431:24, 432:4, 432:24, 448:2, 448:4, 449:8, 449:9, 449:11, 449:14, 449:16, 450:1, 450:5, 452:7, 452:10, 452:15, 452:20, 454:2, 454:8, 455:2, 455:10, 455:20, 456:19, 456:21, 456:24, 456:25, 457:4, 457:11, 458:24, 459:1, 459:4, 459:13, 460:4, 460:10, 460:17, 461:1, 461:9, 461:24, 462:1, 462:2, 462:18, 462:25, 464:8, 464:11, 465:14, 465:17, 466:6, 479:1, 479:4, 480:11, 480:20

**Peptide** [1] - 432:1

**peptide-DAXI** [1] - 462:2

**per** [13] - 389:10, 396:6, 407:10, 407:16, 409:9, 409:19, 410:24, 411:4, 414:18, 414:21, 414:22, 422:5, 479:4

**percent** [45] - 278:19, 281:23, 282:16, 282:17, 284:3, 326:25, 327:2, 335:2, 335:3, 335:7, 335:15, 335:17, 335:18, 341:11, 341:13, 391:8, 479:18, 480:2, 511:17, 511:19, 511:23, 512:8, 512:12, 512:17, 525:18, 526:23, 527:6, 532:25, 533:1, 533:3, 533:19, 533:20, 536:25, 541:16, 543:17, 543:24, 544:3, 544:4, 544:10, 544:12, 545:4, 546:20

**percentage** [2] - 531:22, 533:13

**percentages** [1] - 333:25

**performance** [2] - 430:23, 461:6

**performed** [2] - 327:4, 455:22

**perhaps** [2] - 469:19, 535:1

**period** [9] - 285:10, 289:25, 343:18, 447:4, 511:16, 512:22, 525:13, 530:12, 532:11

**periods** [1] - 512:5

**permanent** [2] - 302:24, 303:18

**permission** [2] - 276:4, 393:13

**person** [6] - 293:4, 389:11, 414:15, 464:2, 504:17, 547:10

**personal** [4] - 298:1, 308:23, 370:11, 446:7

**personally** [2] - 495:9, 495:13

**personnel** [1] - 306:3

**perspective** [1] - 389:9

**pertained** [1] - 423:17

**PETER** [1] - 256:11

**Peter** [1] - 261:3

**Pfizer** [1] - 304:10

**pH** [15] - 312:5, 338:20, 338:21, 338:23, 338:24, 340:22, 341:18, 384:10, 467:12, 477:8, 477:13, 477:15, 477:21, 477:23

**Ph.D** [8] - 368:21, 368:24, 438:4, 438:5, 484:3, 494:17, 507:18, 507:19

**Pharmaceutical** [2] - 361:20, 439:16

**pharmaceutical** [18] - 300:20, 316:5, 361:9, 403:18, 436:9, 438:9, 438:14, 438:23, 439:5, 439:24, 445:7, 445:18, 451:7, 494:3, 494:18, 495:3, 495:16, 496:9

**pharmaceuticals** [2] - 372:11, 485:3

**pharmacological** [3] - 434:6, 434:22, 452:11

**Pharmacy** [1] - 439:14

**pharmacy** [2] - 522:15, 522:16

**phase** [12] - 367:19, 377:9, 377:15, 377:22, 385:21, 390:19, 390:20, 405:14, 405:18, 411:15, 425:1

**Philadelphia** [2] - 298:4, 298:17

**Philly** [3] - 298:10, 298:13, 344:7

**phone** [2] - 291:4, 343:14

**photo** [2] - 306:19, 307:13

**photograph** [1] -

307:7
**phrase** [4] - 441:20, 476:23, 476:24, 477:8
**physical** [3] - 379:9, 400:15, 501:12
**physically** [1] - 441:16
**physician** [1] - 335:13
**physicians** [2] - 325:12, 542:20
**pick** [3] - 326:11, 385:8, 548:6
**PICKARD** [23] - 256:7, 277:17, 440:1, 450:25, 453:10, 464:24, 465:2, 465:6, 474:5, 474:10, 477:22, 478:10, 481:1, 481:9, 499:12, 502:19, 503:10, 505:15, 548:25, 549:10, 550:1, 550:5, 550:11
**Pickard** [7] - 464:22, 465:9, 478:18, 480:10, 502:16, 502:20, 548:20
**picked** [2] - 268:3, 338:13
**picking** [1] - 328:6
**picky** [1] - 488:21
**Picogreen** [1] - 413:22
**picture** [1] - 540:7
**piece** [3] - 281:18, 342:9, 430:24
**pieces** [5] - 424:20, 430:18, 527:23, 529:6, 535:15
**pipeline** [1] - 429:20
**pipets** [1] - 310:11
**pivotal** [1] - 498:3
**place** [4] - 297:20, 306:2, 510:4, 531:19
**places** [2] - 262:21, 265:2
**plain** [1] - 321:14
**plainer** [1] - 375:4
**Plaintiff** [12] - 255:4, 255:23, 296:12, 365:19, 435:14, 436:1, 451:2, 482:9, 493:13, 506:5, 524:14, 539:17
**plaintiff** [6] - 493:4, 499:10, 505:22, 506:17, 508:16, 551:13
**plaintiff's** [2] - 296:2, 535:24
**plaintiffs** [7] - 268:25, 296:1, 297:3, 314:16, 333:5, 365:8, 481:24
**plan** [9] - 378:1, 399:25, 500:12, 500:14, 500:22, 501:6, 501:7, 501:17, 520:25
**plane** [1] - 308:16
**planned** [6] - 262:15, 264:15, 396:9, 524:1, 524:2, 547:3
**planning** [6] - 512:20, 523:6, 523:7, 525:7, 549:12, 551:1
**plans** [3] - 514:15, 520:8
**plant** [8] - 318:18, 367:19, 377:10, 377:17, 386:8, 389:19, 390:19
**plant-based** [6] - 367:19, 377:10, 377:17, 386:8, 389:19, 390:19
**platform** [8] - 337:4, 337:15, 337:24, 338:2, 338:9, 341:20, 437:10, 445:23
**play** [4] - 390:3, 426:7, 433:12, 463:16
**played** [4] - 346:18, 410:9, 426:14, 463:5
**plays** [1] - 410:7
**pleasure** [1] - 344:7
**PLLC** [1] - 256:6
**plug** [2] - 318:19, 390:3
**plug-and-play** [1] - 390:3
**plus** [3] - 328:12, 335:19, 497:4
**Point** [2] - 507:10, 507:12
**point** [37] - 262:12, 262:23, 265:1, 267:23, 274:2, 276:5, 280:23, 287:12, 289:23, 290:12, 298:17, 316:13, 322:25, 325:16, 328:18, 345:9, 351:24, 373:7, 373:13, 403:5, 403:8, 406:25, 431:5, 433:7, 437:19, 440:9, 462:21, 463:11, 471:14, 474:2, 498:16, 512:16, 512:23, 518:5, 531:2, 536:14, 550:19
**pointed** [1] - 420:11
**pointing** [1] - 417:20
**points** [4] - 432:8, 432:16, 511:2, 517:22
**police** [1] - 507:13
**polio** [1] - 304:11
**polyethylene** [1] - 337:22
**Polymer** [1] - 302:21
**polymers** [1] - 302:22
**polyols** [2] - 327:9, 327:11
**polysaccharide** [2] - 360:18, 360:21
**Polysaccharide** [1] - 361:9
**Polysaccharide-containing** [1] - 361:9
**polysaccharides** [5] - 321:11, 357:7, 357:13, 357:17, 360:1
**polysorbate** [5] - 354:3, 354:7, 473:21, 474:25, 475:4
**Polysorbate** [2] - 354:10, 354:15
**Polytech** [1] - 368:20
**pool** [4] - 311:11, 312:7, 312:11, 405:22
**poor** [2] - 321:12, 357:7
**popped** [1] - 323:3
**popsicles** [1] - 349:1
**popular** [1] - 268:18
**portion** [9] - 400:20, 401:16, 420:15, 421:8, 452:18, 453:16, 520:5, 538:16, 548:12
**position** [8] - 259:4, 284:11, 288:24, 293:8, 303:18, 464:7, 550:16
**positions** [1] - 484:15
**positive** [8] - 382:15, 382:18, 382:19, 392:21, 393:1, 393:21, 393:23, 394:5
**positively** [1] - 406:22
**possibility** [1] - 347:24
**possible** [7] - 339:3, 516:21, 517:2, 518:1, 529:4, 530:17, 530:20
**possibly** [3] - 316:20, 354:20, 466:19
**post** [8] - 286:9, 286:12, 287:22, 289:11, 290:4, 290:5, 325:8, 494:22
**post-graduate** [1] - 494:22
**post-hypothetical** [2] - 290:4, 290:5
**post-launch** [3] - 286:9, 286:12, 287:22
**post-negotiation** [1] - 289:11
**post-treatment** [1] - 325:8
**postdoctoral** [3] - 426:22, 426:24, 438:7
**poster** [1] - 477:21
**postulating** [1] - 349:11
**potato** [2] - 385:4, 385:6
**potato-leek** [2] - 385:4, 385:6
**potatoes** [1] - 385:7
**potencies** [1] - 476:17
**potency** [31] - 313:15, 326:22, 332:16, 332:24, 334:22, 335:5, 335:9, 335:10, 339:11, 339:16, 340:7, 341:14, 352:4, 352:5, 352:6, 352:15, 353:3, 353:5, 353:10, 353:11, 353:13, 441:23, 442:1, 458:10, 476:15, 476:25, 487:2, 487:9
**potent** [1] - 307:25
**potential** [6] - 284:2, 327:14, 329:20, 331:3, 429:7, 523:15
**potentially** [4] - 317:1, 341:18, 342:18, 501:8
**pour** [3] - 380:8, 381:18, 381:22
**powder** [2] - 369:14, 385:14
**powdered** [4] - 475:22, 476:1, 476:10, 477:8
**power** [1] - 388:25
**powered** [1] - 388:14
**powerful** [1] - 393:16
**PowerPoint** [1] - 436:21
**pPM** [1] - 407:19
**PPM** [5] - 391:22, 407:18, 408:22, 408:24, 410:20
**PPP** [2] - 407:16, 408:22
**PPQ** [1] - 501:19
**practical** [1] - 324:20
**practically** [1] - 302:18
**practice** [5] - 509:9, 509:10, 514:2, 529:10, 533:24
**practices** [1] - 537:16
**practicing** [1] - 529:8
**pre** [2] - 290:6, 290:8
**pre-hypothetical** [2] - 290:6, 290:8
**precautions** [2] - 307:24, 440:22
**precedent** [1] - 525:4
**precise** [5] - 282:21, 408:12, 465:21, 470:5, 470:19
**precisely** [2] - 469:20, 470:13
**preclinical** [2] - 429:16, 461:3
**predate** [1] - 284:7
**preemie** [1] - 300:16
**prefer** [1] - 266:18
**preference** [2] - 291:22, 403:14
**preformulation** [6] - 304:1, 307:19, 309:14, 309:17, 312:16, 313:19
**preformulation-type** [1] - 304:1
**pregnant** [1] - 299:21
**prejudicial** [1] - 278:22
**premature** [1] - 300:15
**preparation** [4] - 350:11, 351:25, 411:9, 487:14
**prepared** [6] - 368:13, 483:21, 506:18, 506:24, 514:17, 534:19
**preparing** [1] - 407:6
**prescribed** [1] -

522:15
**present** [11] - 300:2, 317:20, 320:6, 320:8, 359:13, 373:9, 424:5, 457:14, 468:20, 479:6, 551:24
**presentation** [9] - 280:5, 430:16, 436:21, 458:15, 486:18, 494:13, 518:22, 518:23, 549:8
**presentations** [2] - 286:5, 449:12
**presented** [5] - 261:2, 442:21, 524:21, 542:18, 547:15
**presenting** [2] - 259:9, 525:1
**preserve** [2] - 481:17, 548:21
**preserved** [1] - 285:19
**president** [3] - 280:4, 426:18, 429:13
**pressure** [3] - 306:22, 370:13, 397:9
**presumably** [2] - 548:15, 550:23
**pretend** [1] - 391:25
**pretrial** [1] - 294:13
**pretty** [19] - 274:18, 299:2, 301:5, 301:9, 309:13, 314:3, 314:4, 317:21, 343:15, 454:19, 455:6, 459:11, 460:12, 479:19, 488:21, 511:3, 533:15, 535:4, 549:24
**prevent** [4] - 347:19, 349:9, 371:10, 445:1
**preventing** [1] - 373:11
**Preventing** [1] - 432:10
**previous** [2] - 386:24, 396:1
**previously** [4] - 366:10, 370:15, 439:17, 443:17
**price** [2] - 518:18
**pricing** [2] - 523:4, 526:2
**pride** [2] - 268:24, 270:5
**primarily** [5] - 303:19, 306:11, 343:14, 357:24, 427:5
**primary** [9] - 306:2, 310:9, 355:5, 358:7, 387:25, 398:1, 417:21, 538:25, 547:6
**prime** [1] - 294:17
**principals** [1] - 382:17
**principle** [4] - 383:1, 392:22, 393:5, 393:25
**principles** [1] - 499:20
**printed** [1] - 260:24
**prion** [3] - 398:6, 399:12, 401:18
**priority** [9] - 274:14, 274:17, 274:18, 274:25, 275:2, 275:9, 275:22, 309:2, 324:18
**privileged** [1] - 350:25
**privy** [1] - 422:2
**probability** [1] - 316:3
**problem** [10] - 289:4, 323:5, 349:7, 350:2, 358:1, 358:15, 358:19, 385:9, 437:7, 440:10
**problematic** [1] - 324:4
**problems** [5] - 322:24, 372:20, 372:21, 442:5, 444:9
**procedures** [2] - 306:3, 306:4
**proceed** [5] - 293:23, 487:17, 496:11, 506:8, 508:19
**proceedings** [6] - 292:17, 364:24, 425:19, 492:1, 551:19, 551:25
**process** [136] - 269:21, 281:4, 311:19, 332:12, 350:22, 355:6, 355:10, 355:24, 367:12, 367:20, 371:6, 371:8, 372:2, 375:1, 376:17, 376:18, 376:19, 376:21, 376:23, 377:2, 377:4, 377:7, 377:8, 377:11, 377:22, 378:18, 378:21, 381:2, 381:7, 382:9, 383:11, 384:1, 384:5, 384:15, 385:18, 386:1, 386:2, 386:11, 386:17, 386:19, 387:10, 387:18, 390:6, 390:11, 390:12, 390:13, 390:17, 390:18, 391:3, 391:4, 391:9, 391:12, 392:14, 392:16, 394:19, 395:23, 395:24, 396:1, 396:5, 396:7, 396:11, 396:13, 396:15, 396:16, 396:20, 397:10, 398:11, 398:13, 398:17, 398:19, 402:6, 402:11, 403:15, 404:16, 404:23, 410:23, 410:25, 411:2, 411:18, 417:17, 418:2, 418:8, 418:13, 418:15, 418:16, 418:17, 418:22, 420:8, 421:25, 422:3, 422:6, 422:11, 422:15, 422:25, 424:25, 425:8, 429:17, 441:9, 441:14, 444:22, 470:6, 483:4, 483:12, 485:12, 485:16, 486:1, 487:21, 487:24, 488:1, 488:5, 488:10, 488:15, 489:19, 489:25, 490:8, 491:7, 491:11, 495:3, 496:20, 497:4, 497:6, 498:14, 498:16, 499:9, 499:24, 500:16, 501:24, 502:4, 502:25, 514:3, 516:14, 516:22, 528:12, 537:12
**processes** [15] - 371:2, 371:7, 375:18, 396:14, 396:23, 403:25, 408:9, 412:2, 413:18, 422:17, 422:22, 441:21, 442:1, 483:1, 516:12
**processing** [5] - 310:8, 345:12, 371:10, 386:4, 396:2
**produce** [5] - 319:3, 368:4, 385:22, 485:13, 501:10
**produced** [3] - 386:6, 395:25, 396:6
**produces** [1] - 386:3
**producing** [1] - 485:1
**product** [135] - 258:12, 263:2, 263:7, 264:6, 265:8, 265:12, 319:19, 321:25, 324:7, 326:23, 363:23, 367:18, 367:20, 368:1, 368:3, 370:20, 372:19, 375:1, 376:17, 377:9, 377:12, 378:2, 378:6, 378:18, 385:20, 385:21, 386:18, 390:14, 391:2, 391:21, 398:1, 398:3, 398:17, 400:12, 401:23, 402:10, 402:15, 402:20, 402:23, 403:15, 403:19, 403:21, 403:24, 404:15, 408:10, 409:21, 418:1, 418:5, 422:14, 422:24, 428:1, 428:4, 428:6, 428:8, 429:23, 434:4, 434:20, 436:17, 437:11, 438:15, 438:16, 439:6, 439:9, 439:25, 440:8, 441:4, 441:24, 442:6, 442:10, 442:20, 442:25, 443:24, 444:10, 445:5, 445:15, 445:23, 448:17, 449:1, 449:3, 449:21, 451:9, 452:8, 457:19, 457:25, 461:13, 464:20, 470:7, 470:19, 487:22, 489:15, 498:8, 498:9, 500:1, 501:11, 511:22, 512:18, 514:4, 517:5, 517:16, 517:18, 517:20, 519:10, 519:11, 519:14, 519:24, 521:13, 522:2, 522:5, 522:16, 522:18, 522:20, 523:19, 523:20, 525:8, 526:13, 527:4, 527:5, 529:18, 531:9, 536:17, 536:23, 537:24, 538:1, 538:5, 538:14, 538:23, 540:5, 540:21, 541:2, 542:25, 544:10, 544:13, 545:6
**product's** [1] - 540:4
**production** [3] - 484:12, 485:16, 487:2
**productive** [4] - 371:6, 386:3, 396:6, 397:13
**products** [30] - 341:24, 370:18, 372:7, 373:2, 373:3, 373:5, 373:8, 377:10, 401:22, 427:1, 427:8, 428:9, 429:20, 439:1, 440:24, 443:22, 451:11, 451:12, 494:1, 499:8, 512:20, 514:19, 516:21, 517:13, 519:20, 519:23, 519:25, 527:8
**professional** [2] - 369:3, 484:15
**Professional** [3] - 496:5, 551:22, 551:24
**professionals** [4] - 491:12, 495:2, 495:4, 496:3
**professor** [4] - 436:9, 438:9, 438:21, 494:20
**proffers** [3] - 439:23, 496:8, 508:16
**profile** [8] - 427:14, 430:20, 433:5, 433:17, 448:12, 448:15, 462:18, 463:9
**profit** [18] - 261:7, 261:20, 262:4, 262:25, 289:2, 528:23, 528:24, 530:1, 530:8, 531:14, 531:15, 531:17, 531:18, 532:5, 532:10, 532:13
**profits** [13] - 259:5, 280:16, 281:22, 287:8, 287:10, 288:16, 517:3,

527:17, 528:21, 529:3, 529:22, 529:24, 530:10
**program** [5] - 302:13, 303:20, 388:4, 494:22
**progress** [2] - 295:6, 305:15
**project** [19] - 263:3, 306:12, 309:1, 311:24, 323:14, 323:22, 323:25, 324:16, 326:5, 326:19, 327:14, 327:22, 332:21, 336:19, 337:8, 339:13, 362:13, 395:10, 429:8
**projected** [4] - 281:25, 282:1, 283:4
**projections** [4] - 282:18, 284:14, 288:19, 288:21
**prolonged** [3] - 460:18, 462:8, 466:10
**promise** [2] - 404:12, 404:13
**promised** [2] - 298:18, 520:10
**promising** [1] - 268:9
**promote** [1] - 462:3
**promoted** [1] - 389:24
**properly** [2] - 310:7, 335:14
**properties** [11] - 346:22, 348:3, 348:4, 348:6, 349:13, 360:25, 361:2, 434:6, 452:11, 480:2, 501:12
**property** [11] - 361:5, 361:6, 446:25, 447:2, 447:3, 461:13, 508:4, 509:20, 509:25, 510:1
**proportion** [1] - 290:5
**proportionally** [1] - 526:24
**proprietary** [2] - 422:2, 422:16
**prorated** [1] - 533:16
**protect** [3] - 355:23, 356:1, 396:21
**protected** [1] - 307:6
**protein** [49] - 259:3, 259:7, 304:4, 304:14, 305:6, 305:7, 311:1, 311:8, 311:15, 311:25, 312:19, 312:21, 313:25, 318:14, 321:12, 321:21, 322:8, 322:13, 322:22, 323:20, 324:8, 324:11, 324:12, 324:14, 325:16, 337:8, 356:23, 357:8, 358:13, 362:2, 362:10, 362:11, 362:18, 362:19, 363:2, 363:6, 428:12, 428:16, 428:23, 440:20, 443:6, 444:20, 444:21, 445:3, 483:4, 487:24, 489:25, 514:4
**protein-free** [3] - 362:11, 362:19, 363:6
**proteins** [32] - 303:23, 303:24, 304:1, 304:3, 314:1, 314:3, 314:4, 316:21, 316:22, 318:7, 321:16, 321:19, 322:5, 322:18, 324:3, 324:4, 324:10, 324:11, 324:13, 348:13, 349:17, 354:23, 356:5, 358:5, 363:1, 363:9, 390:25, 417:5, 428:18, 436:11, 436:12, 445:2
**protocol** [3] - 500:15, 500:20, 500:21
**proud** [8] - 270:7, 342:7, 342:12, 342:16, 342:21, 342:22, 397:1, 397:13
**prove** [1] - 474:8
**provide** [12] - 268:20, 288:10, 405:3, 423:25, 436:16, 437:3, 437:4, 446:24, 454:6, 495:15, 496:15, 496:16
**provided** [10] - 361:15, 384:22, 412:12, 434:17, 450:3, 450:19, 451:18, 479:23, 497:10, 500:4
**provider** [1] - 541:1
**providers** [3] - 526:22, 541:10, 542:4
**provides** [6] - 257:15, 330:24, 430:25, 437:10, 445:21, 451:7
**providing** [6] - 261:11, 319:14, 437:15, 483:16, 490:2, 494:8
**Prussia** [1] - 304:21
**PTX** [23] - 435:8, 435:11, 435:14, 435:15, 450:12, 450:23, 451:2, 452:3, 524:4, 524:10, 524:14, 524:20, 534:9, 534:15, 534:23, 535:16, 535:21, 539:3, 539:13, 539:17, 539:23
**public** [4] - 400:20, 472:16, 504:18, 523:6
**publication** [4] - 356:20, 360:10, 361:8, 479:3
**publicly** [2] - 271:1, 472:13
**publish** [2] - 401:15, 487:3
**published** [3] - 324:25, 439:5, 439:7
**publishing** [1] - 263:6
**pull** [11] - 304:8, 320:3, 333:17, 334:13, 339:25, 341:1, 342:14, 376:3, 415:10, 424:7, 483:23
**pulled** [4] - 260:2, 424:19, 424:20, 425:4
**pump** [1] - 380:8
**pumping** [2] - 318:24, 325:16
**pumps** [1] - 318:11
**pure** [35] - 367:13, 368:4, 378:18, 385:22, 386:20, 387:10, 387:18, 390:13, 390:16, 391:15, 391:17, 391:20, 393:20, 394:18, 395:23, 395:25, 396:12, 396:21, 396:25, 397:11, 398:20, 407:25, 408:2, 408:3, 408:6, 408:7, 408:16, 408:17, 410:16, 413:4, 413:11, 414:9, 414:11, 425:3
**purer** [11] - 371:2, 371:12, 386:6, 386:15, 386:18, 387:1, 392:6, 392:7, 392:8, 395:25, 396:17
**purification** [10] - 388:17, 403:25, 411:18, 484:12, 486:5, 487:3, 487:14, 489:1, 489:2, 489:4
**purified** [4] - 412:13, 413:18, 417:4, 420:18
**purifier** [1] - 388:25
**purify** [3] - 367:21, 369:13, 378:15
**Purifying** [1] - 412:24
**purifying** [4] - 388:14, 412:2, 417:7, 485:1
**purities** [1] - 408:11
**purity** [10] - 386:22, 386:23, 390:1, 390:24, 391:4, 391:11, 394:21, 410:24, 412:17, 413:12
**purple** [4] - 380:16, 394:6, 519:10, 528:17
**purpose** [9] - 268:10, 268:19, 275:4, 276:10, 318:7, 323:25, 330:15, 346:4, 494:7
**purposes** [6] - 262:24, 267:13, 275:10, 275:23, 283:6, 491:4
**pursuant** [1] - 492:3
**pursue** [2] - 400:12, 501:23
**push** [2] - 382:21, 386:20
**pushes** [1] - 265:17
**pushing** [2] - 325:3, 386:14
**put** [64] - 257:9, 257:15, 257:18, 257:22, 257:23, 258:7, 258:20, 260:3, 260:18, 260:25, 261:13, 265:6, 266:17, 266:18, 269:3, 282:25, 289:17, 299:18, 302:8, 302:9, 306:20, 309:21, 312:25, 318:17, 321:17, 322:8, 322:22, 328:24, 329:14, 330:7, 330:10, 330:12, 330:25, 331:14, 332:12, 335:5, 335:6, 336:22, 337:16, 338:16, 338:21, 342:16, 362:21, 379:21, 379:22, 389:8, 411:5, 415:5, 416:23, 441:8, 459:6, 467:2, 468:10, 471:23, 471:24, 475:18, 480:18, 520:7, 525:23, 531:21, 536:20, 544:16
**puts** [4] - 258:4, 278:4, 279:2, 550:16
**putting** [5] - 258:12, 261:15, 323:17, 529:14, 532:21
**puzzle** [2] - 430:18, 430:24

## Q

**qualification** [1] - 484:6
**qualifications** [1] - 360:2
**qualified** [1] - 307:18
**qualities** [1] - 489:15
**quality** [7] - 451:12, 488:24, 489:10, 489:14, 489:20, 495:8, 500:1
**Quality** [1] - 413:17
**quantities** [6] - 308:2, 308:4, 310:2, 310:4, 310:12, 434:22
**quantity** [3] - 434:7, 434:23, 452:11
**quarter** [1] - 491:21
**quarterly** [2] - 285:25, 528:8
**questioned** [1] - 459:23
**questioning** [1] - 417:20
**questions** [28] - 342:6, 343:22, 349:23, 352:18, 352:20,

364:3, 395:20, 397:15, 397:24, 423:3, 423:6, 423:15, 424:5, 424:19, 425:9, 464:18, 469:4, 469:6, 478:10, 480:13, 480:23, 489:8, 490:9, 502:15, 502:22, 505:15, 534:13, 545:9
**quick** [4] - 276:20, 291:21, 294:7
**quickly** [5] - 328:13, 393:24, 488:20, 514:10, 533:16
**quit** [1] - 299:7
**quite** [4] - 338:6, 485:1, 503:25, 537:7
**quoting** [1] - 287:5

## R

**radiation** [1] - 307:17
**raise** [6] - 270:15, 275:13, 278:6, 481:9, 549:6, 551:2
**raised** [7] - 270:16, 274:8, 276:17, 288:20, 343:11, 438:1, 481:19
**raising** [3] - 277:10, 549:7
**ramped** [1] - 308:10
**Ramsey** [3] - 461:17, 461:20, 462:13
**ran** [2] - 358:20, 410:22
**range** [6] - 308:3, 343:1, 486:24, 489:16, 489:22, 520:25
**rank** [2] - 543:14, 545:16
**ranked** [4] - 521:22, 543:22, 543:23
**ranking** [2] - 542:24, 543:17
**rankings** [1] - 543:24
**rate** [16] - 508:14, 513:24, 527:15, 530:5, 531:22, 531:24, 532:12, 532:15, 532:22, 532:25, 533:1, 536:19, 536:23, 541:16
**rates** [4] - 513:5, 513:16, 533:2, 540:22
**rather** [10] - 258:20, 306:23, 309:22, 378:1, 378:6, 400:19, 446:9, 486:24, 491:2, 527:19
**ratio** [1] - 313:15
**rational** [1] - 330:18
**rationale** [1] - 319:14
**ratios** [1] - 330:11
**raw** [10] - 358:20, 371:14, 371:20, 372:2, 372:4, 372:14, 372:15, 373:12, 386:8, 396:8
**reach** [1] - 471:8
**reaches** [1] - 455:3
**react** [2] - 358:5, 358:13
**reaction** [7] - 321:18, 323:3, 325:15, 357:11, 357:23, 358:8, 359:5
**reactions** [2] - 321:15, 439:9
**read** [24] - 266:19, 268:21, 271:1, 279:16, 320:6, 327:4, 357:10, 374:16, 383:8, 393:9, 401:15, 401:16, 403:3, 403:9, 411:13, 419:12, 421:1, 434:1, 458:19, 465:18, 465:25, 514:20, 514:22, 550:9
**readily** [1] - 378:8
**reading** [3] - 341:8, 352:1, 403:4
**reads** [4] - 318:11, 318:20, 453:4, 504:13
**ready** [6] - 295:8, 295:13, 295:24, 364:25, 391:11, 529:10
**real** [6] - 303:13, 342:13, 379:20, 381:23, 384:25, 513:14
**real-life** [1] - 384:25
**realistically** [1] - 316:6
**reality** [4] - 282:3, 284:19, 287:4
**realize** [2] - 344:7, 517:3
**realized** [1] - 537:24
**really** [61] - 261:25, 274:2, 274:9, 288:22, 289:8, 289:24, 298:25, 299:12, 300:16, 300:22, 300:23, 303:14, 304:4, 304:24, 308:23, 308:25, 317:18, 317:21, 323:4, 324:23, 325:23, 326:17, 328:2, 342:17, 343:15, 343:18, 347:2, 347:21, 348:23, 349:10, 352:20, 363:25, 368:2, 370:12, 385:2, 388:23, 389:22, 391:20, 393:4, 397:7, 400:23, 422:1, 422:17, 440:23, 486:7, 489:6, 513:23, 514:5, 516:10, 517:5, 517:12, 520:6, 520:9, 520:11, 521:12, 537:18, 538:5, 538:21, 550:18
**realms** [1] - 326:10
**reason** [32] - 263:8, 267:14, 267:16, 267:19, 268:3, 269:23, 271:22, 307:7, 317:6, 347:18, 347:25, 348:2, 348:9, 348:10, 348:12, 349:11, 361:3, 398:16, 400:8, 400:16, 400:17, 400:22, 402:23, 433:15, 433:18, 433:20, 434:12, 435:3, 435:5, 530:25, 535:12, 547:6
**reasonable** [19] - 295:1, 509:13, 509:15, 509:16, 509:17, 510:12, 510:15, 511:15, 511:23, 512:5, 513:5, 527:14, 528:5, 530:5, 531:11, 531:19, 536:18, 536:22, 541:16
**reasonableness** [2] - 281:15, 284:20
**reasonably** [1] - 424:11
**reasoning** [1] - 415:7
**reasons** [10] - 267:15, 268:3, 307:9, 312:13, 316:17, 328:15, 348:12, 348:24, 370:11, 440:16
**rebuttal** [2] - 260:4, 260:8
**recapitulate** [1] - 456:17
**receive** [2] - 319:21, 549:11
**received** [4] - 301:19, 439:11, 484:3, 495:25
**receiving** [1] - 353:14
**recent** [1] - 352:12
**recently** [4] - 272:24, 403:4, 429:15, 429:17
**recess** [9] - 292:8, 292:15, 292:16, 364:23, 425:18, 491:24, 491:25, 551:18, 551:19
**recipe** [31] - 400:1, 436:17, 438:19, 442:25, 445:15, 445:16, 448:17, 449:1, 449:10, 449:21, 457:19, 457:25, 459:19, 461:13, 464:20, 470:25, 471:4, 471:16, 509:6, 509:9, 511:9, 511:22, 515:18, 515:24, 536:17, 536:24, 537:14, 537:15, 537:17, 537:19
**recipes** [4] - 337:12, 441:7, 466:21
**recites** [1] - 473:18
**recognize** [11] - 314:12, 366:19, 374:22, 394:14, 398:22, 404:8, 416:21, 450:16, 452:25, 539:4, 540:15
**recognized** [11] - 267:2, 268:15, 268:22, 269:1, 269:16, 269:18, 269:24, 287:2, 287:3, 326:14, 541:10
**recognizing** [2] - 540:14, 541:23
**recollection** [2] - 280:15, 351:17
**Recombinant** [1] - 361:20
**recombinant** [8] - 315:23, 317:3, 317:14, 317:15, 317:16, 356:22, 361:24
**recombine** [1] - 317:16
**recombined** [1] - 318:25
**recommendations** [1] - 505:4
**reconstituted** [3] - 477:4, 477:12, 477:25
**reconstitution** [6] - 476:25, 477:11, 477:24, 479:7, 479:14, 479:22
**record** [21] - 277:11, 285:17, 291:15, 291:17, 291:18, 292:13, 293:16, 296:7, 339:16, 365:14, 366:1, 426:16, 435:21, 436:6, 456:1, 482:4, 493:8, 493:19, 505:25, 506:13, 548:21
**recorded** [1] - 340:22
**records** [1] - 383:18
**recovered** [1] - 341:14
**recovery** [13] - 326:25, 327:2, 331:20, 335:3, 335:15, 335:18, 335:21, 335:25, 336:23, 338:22, 341:11, 352:4, 352:15
**Recovery** [1] - 335:2
**recruited** [1] - 438:8
**red** [11] - 380:17, 392:2, 392:4, 392:8, 394:6, 456:22, 456:24, 458:23, 460:9, 472:3
**redacted** [3] - 333:17, 340:1
**redesign** [1] - 529:1
**REDIRECT** [2] - 423:8, 478:15

**redirect** [9] - 349:24, 364:6, 364:7, 423:6, 469:6, 491:17, 491:18, 505:16, 505:17
**redo** [1] - 470:18
**reduce** [9] - 348:11, 348:18, 350:2, 350:3, 371:9, 393:21, 402:3, 402:16, 462:7
**reduced** [1] - 282:2
**reducer** [1] - 334:9
**reduces** [1] - 447:3
**reducing** [11] - 322:2, 357:13, 357:17, 357:18, 358:7, 358:19, 358:22, 358:24, 358:25, 359:4, 359:7
**refer** [9] - 297:8, 314:23, 366:13, 407:16, 432:4, 436:13, 475:12, 479:25, 545:9
**reference** [4] - 260:20, 273:12, 417:20, 536:5
**referenced** [7] - 263:25, 264:13, 279:18, 537:4, 542:13, 544:15, 544:24
**references** [4] - 266:9, 274:24, 302:6, 417:21
**referencing** [1] - 257:8
**referred** [7] - 347:13, 387:16, 392:16, 444:16, 444:18, 444:19, 448:2
**referring** [13] - 278:23, 369:23, 390:11, 391:17, 391:21, 392:11, 405:22, 407:24, 409:24, 432:6, 504:13, 542:10, 543:3
**reflect** [2] - 333:2, 383:15
**reflected** [2] - 430:16, 523:4
**reflection** [1] - 459:25
**reflects** [1] - 505:14
**reformulate** [2] - 309:4, 317:2
**reformulation** [7] - 308:12, 311:24, 313:3, 314:7, 332:21, 336:19, 339:13
**regard** [4] - 449:3, 469:22, 478:24, 479:20
**regarded** [1] - 443:18
**regarding** [9] - 279:14, 284:10, 349:6, 433:9, 436:15, 443:16, 453:5, 462:25, 463:12
**regardless** [1] - 455:9
**regions** [1] - 334:10
**Registered** [2] - 551:22, 551:23
**regular** [1] - 314:4
**regulations** [4] - 400:19, 504:23, 505:1, 505:12
**regulatory** [26] - 257:17, 258:19, 313:10, 316:10, 329:7, 403:14, 434:16, 488:12, 489:17, 493:22, 494:4, 494:19, 494:21, 494:24, 495:2, 495:4, 495:14, 495:21, 496:1, 496:2, 496:3, 496:4, 496:9, 497:20, 499:3, 500:9
**Regulatory** [1] - 496:4
**rejected** [1] - 257:22
**rejoined** [1] - 309:1
**relate** [7] - 270:14, 439:9, 441:21, 482:23, 497:5, 546:6, 546:15
**related** [6] - 259:4, 352:3, 445:24, 482:21, 486:22, 487:11
**relates** [5] - 270:19, 431:4, 441:23, 461:23, 482:25
**relating** [4] - 270:21, 303:25, 451:15, 464:7
**relative** [1] - 433:20
**relatively** [2] - 320:17, 320:18
**relatives** [1] - 301:3
**released** [2] - 377:24, 390:23
**relevance** [1] - 290:4
**relevant** [11] - 273:25, 274:7, 274:12, 274:18, 275:9, 283:15, 283:17, 401:16, 402:9, 463:20, 494:10
**reliability** [1] - 266:13
**relied** [3] - 461:8, 498:25, 499:3
**relies** [1] - 284:15
**rely** [1] - 267:17
**relying** [2] - 267:5, 289:7
**remember** [30] - 270:22, 271:5, 280:19, 286:20, 330:20, 339:12, 346:12, 346:14, 347:1, 359:10, 359:17, 363:21, 403:7, 408:23, 408:25, 409:8, 409:11, 409:16, 410:12, 418:2, 424:4, 424:18, 478:20, 480:18, 492:19, 532:2, 533:6, 533:11, 538:23, 541:20
**remind** [10] - 341:22, 352:17, 367:14, 443:5, 454:14, 456:24, 457:11, 459:18, 490:2, 547:4
**reminding** [1] - 276:10
**remote** [1] - 267:12
**remove** [4] - 313:5, 391:7, 391:9, 406:8
**removing** [4] - 354:23, 405:25, 406:3, 406:5
**renders** [1] - 437:21
**renew** [1] - 289:23
**renewals** [1] - 546:9
**Rensselaer** [1] - 368:20
**rent** [4] - 509:19, 509:23, 510:2, 530:20
**repair** [1] - 312:4
**repeat** [4] - 378:3, 398:4, 418:10, 477:18
**repeatedly** [1] - 444:4
**repel** [2] - 382:22
**replacement** [1] - 316:4
**replacements** [1] - 313:17
**replaces** [1] - 287:6
**replacing** [1] - 487:1
**replies** [1] - 260:5
**reply** [2] - 259:1, 488:11
**report** [32] - 259:2, 261:23, 262:16, 262:19, 262:21, 262:23, 263:18, 263:21, 264:21, 265:2, 266:24, 267:25, 293:11, 332:24, 374:25, 375:6, 375:8, 375:12, 375:15, 376:3, 376:5, 376:7, 376:12, 376:15, 376:18, 383:13, 383:16, 399:18, 399:23, 401:7, 424:6
**reported** [7] - 376:13, 475:3, 476:17, 477:13, 477:15, 477:20, 551:24
**Reporter** [3] - 551:23, 551:24, 552:3
**reporter** [2] - 331:24, 365:24
**reporter's** [2] - 266:14, 484:9
**reporting** [2] - 427:17, 427:20
**reports** [7] - 258:3, 258:4, 332:15, 356:15, 374:17, 375:10, 514:23
**repository** [1] - 427:9
**represent** [3] - 420:5, 420:10, 465:9
**representations** [2] - 455:12, 466:17
**representative** [1] - 498:9
**represented** [7] - 281:21, 447:21, 454:2, 456:22, 465:14, 465:19, 466:5
**representing** [2] - 265:19, 461:8
**represents** [4] - 257:8, 452:19, 498:22, 499:17
**request** [2] - 289:23, 295:23
**required** [5] - 434:8, 434:24, 452:12, 477:23, 546:14
**requirement** [2] - 319:20, 476:14
**requirements** [8] - 311:21, 316:3, 326:24, 386:21, 386:23, 389:7, 504:22, 505:10
**requires** [1] - 475:10
**research** [10] - 383:25, 399:1, 399:6, 409:20, 410:17, 429:16, 445:25, 446:18, 487:7, 547:15
**researcher** [1] - 438:7
**residual** [2] - 407:10, 412:25
**resin** [13] - 379:24, 379:25, 380:15, 380:20, 381:12, 381:13, 382:15, 384:7, 384:8, 392:20, 393:21
**resins** [6] - 302:21, 394:23, 395:1, 395:2, 395:4, 396:16
**resist** [1] - 547:18
**resolve** [3] - 275:14, 481:16, 549:5
**resolved** [1] - 270:10
**resolves** [1] - 268:7
**respect** [2] - 521:9, 523:21
**respirator** [2] - 388:14, 388:25
**respond** [6] - 258:10, 259:14, 474:5, 483:10, 549:23, 550:9
**respondents** [1] - 543:13
**responding** [3] - 259:2, 259:16, 291:4
**response** [3] - 273:4, 483:14, 540:22
**responses** [1] - 544:3
**responsibile** [1] - 493:25
**responsibilities** [5] - 306:1, 427:3, 429:12, 438:22, 504:9
**responsibility** [1] - 429:16
**responsible** [2] - 421:18, 495:4
**responsive** [1] - 259:11
**rest** [6] - 264:12, 278:10, 398:5, 490:8, 534:7, 538:5
**restate** [1] - 344:20
**restriction** [1] - 333:16
**restrictions** [1] - 308:10
**result** [12] - 336:24, 338:25, 378:18, 390:12, 408:10,

410:24, 411:3, 424:25, 425:3, 457:9, 460:24, 527:18
**resulted** [3] - 391:14, 396:20, 408:7
**results** [28] - 332:14, 332:15, 332:16, 332:24, 333:2, 336:20, 336:25, 338:16, 339:10, 339:11, 339:16, 352:15, 390:13, 396:17, 396:24, 408:16, 413:13, 413:21, 414:17, 414:18, 481:11, 502:9, 539:1, 539:2, 543:9, 548:22, 549:17
**retained** [1] - 506:15
**return** [2] - 437:18, 471:24
**returned** [1] - 305:25
**returning** [1] - 527:2
**REV_DAX-00002851** [1] - 433:23
**REV_DAX-02578434** [1] - 430:10
**REV_DAX-02663830** [1] - 430:1
**Revance** [186] - 257:8, 257:14, 257:20, 259:24, 260:21, 261:4, 262:3, 263:5, 268:11, 270:20, 271:1, 271:7, 271:11, 272:24, 281:5, 281:8, 284:13, 284:21, 293:12, 297:16, 297:18, 366:24, 373:22, 426:19, 427:16, 427:19, 428:1, 428:3, 428:7, 429:9, 429:15, 429:19, 429:21, 434:18, 437:13, 437:20, 448:4, 448:24, 449:8, 449:13, 450:3, 450:19, 451:10, 451:22, 451:25, 452:4, 452:6, 452:7, 452:10, 452:12, 452:16, 452:19, 453:3, 453:15, 453:17, 453:18, 454:2, 454:6, 454:10, 454:18, 454:21, 455:1, 455:8, 456:18, 457:10, 458:24, 458:25, 459:3, 459:6, 459:9, 460:6, 460:20, 461:5, 461:8, 461:16, 463:25, 464:3, 464:10, 465:9, 465:14, 465:17, 465:21, 466:5, 466:7, 466:12, 466:15, 468:23, 470:17, 472:8, 479:17, 479:21, 479:23, 480:1, 480:7, 480:14, 480:19, 487:21, 487:25, 488:2, 488:4, 488:9, 490:19, 496:19, 496:21, 497:1, 497:3, 497:22, 498:1, 498:2, 498:13, 498:23, 500:9, 500:20, 501:23, 501:25, 502:21, 502:24, 503:6, 508:23, 510:1, 510:2, 512:3, 512:9, 512:11, 512:16, 512:19, 513:8, 513:25, 514:1, 514:5, 514:6, 515:3, 515:9, 515:14, 515:15, 516:6, 516:10, 517:2, 517:19, 518:23, 519:4, 519:22, 522:4, 522:8, 523:2, 523:4, 523:5, 523:6, 523:7, 524:23, 525:5, 525:7, 526:21, 527:4, 527:17, 527:18, 528:23, 528:25, 529:7, 530:9, 530:14, 530:19, 530:21, 531:8, 531:11, 531:18, 532:3, 532:14, 533:24, 534:4, 534:7, 537:9, 537:10, 537:20, 537:24, 538:19, 538:24, 539:20, 540:13, 541:7, 541:22, 544:18, 544:22, 544:25, 551:15
**REVANCE** [1] - 255:6
**Revance's** [40] - 257:3, 262:24, 264:4, 268:7, 275:25, 283:4, 417:10, 426:8, 447:19, 449:2, 450:9, 451:15, 452:18, 455:12, 455:14, 455:19, 457:4, 459:23, 459:24, 460:2, 460:3, 460:11, 461:1, 462:18, 462:25, 464:7, 471:11, 479:9, 480:11, 480:13, 490:5, 491:6, 491:11, 510:11, 519:1, 520:5, 522:2, 524:23, 526:13, 532:9
**revenue** [6] - 282:7, 282:8, 516:20, 520:2, 520:9, 525:18
**revenues** [4] - 281:21, 282:15, 512:17, 536:3
**review** [8] - 351:25, 352:12, 376:7, 407:7, 411:9, 446:20, 514:12, 536:16
**reviewed** [18] - 350:11, 376:9, 439:8, 445:24, 446:1, 446:3, 449:12, 449:24, 450:2, 450:4, 452:21, 455:17, 456:7, 462:24, 499:3, 503:22, 512:21, 524:8
**reviewing** [2] - 351:12, 375:15
**RH** [1] - 299:22
**ribosome** [2] - 318:9, 318:10
**Richard** [1] - 255:11
**right-hand** [9] - 392:1, 440:17, 441:15, 444:14, 448:1, 456:19, 521:14, 521:15, 540:12
**rights** [1] - 504:16
**rigor** [1] - 342:15
**rise** [2] - 323:15, 383:25
**risk** [5] - 373:7, 399:11, 401:17, 402:3, 402:16
**risks** [2] - 487:11, 516:22
**risky** [1] - 516:25
**RNA** [1] - 392:12
**road** [2] - 304:12, 328:6
**ROBERT** [1] - 255:21
**robust** [1] - 402:6
**role** [11] - 350:13, 351:8, 375:16, 375:17, 429:12, 429:14, 431:9, 433:12, 438:21, 463:16, 482:19
**roles** [2] - 369:6, 494:19
**roll** [3] - 325:25, 326:1
**rollout** [1] - 280:21
**Ronald** [3] - 365:8, 365:15, 366:7
**RONALD** [2] - 365:15, 365:17
**Room** [1] - 298:12
**room** [7] - 284:3, 292:25, 306:22, 388:9, 388:11, 388:12, 492:14
**rooms** [1] - 388:9
**roughly** [5] - 264:23, 340:2, 383:20, 394:20, 491:21
**round** [2] - 489:9, 533:2
**row** [1] - 340:15
**rows** [2] - 340:17, 340:25
**Roy** [2] - 436:22, 447:14
**royalty** [42] - 287:8, 288:16, 508:13, 508:14, 509:13, 509:16, 509:17, 509:19, 510:3, 510:5, 510:25, 511:15, 511:23, 512:5, 512:9, 512:16, 513:5, 515:16, 515:19, 515:20, 527:15, 528:5, 530:5, 531:22, 531:24, 532:2, 532:3, 532:8, 532:12, 532:15, 532:22, 532:25, 533:1, 533:2, 533:10, 533:19, 533:22, 533:25, 536:19, 536:22, 541:16
**RPR** [1] - 552:2
**RT** [1] - 527:5
**RT002** [5] - 428:6, 429:23, 526:2, 526:13, 527:5
**RTP004** [10] - 431:15, 432:5, 432:6, 433:15, 434:3, 434:19, 448:2, 450:21, 452:6, 453:19
**Ruegg** [2] - 268:14, 269:9
**rug** [2] - 260:2, 260:3
**Rule** [3] - 535:3, 535:9, 535:10
**rumors** [1] - 299:8
**run** [3] - 267:21, 355:24, 414:15
**running** [2] - 411:2, 508:12
**Rupert** [15] - 295:24, 296:1, 345:22, 352:19, 354:19, 355:13, 356:20, 357:3, 359:11, 361:18, 362:10, 364:6, 365:5, 365:23, 401:5
**RUPERT** [51] - 255:20, 295:25, 296:16, 297:3, 297:7, 297:25, 300:5, 303:7, 306:16, 306:18, 307:23, 314:16, 314:22, 315:5, 315:9, 315:12, 333:5, 333:10, 333:15, 333:21, 339:18, 339:22, 343:22, 350:24, 363:12, 364:7, 365:6, 366:3, 367:2, 367:6, 375:22, 376:2, 395:13, 395:19, 397:14, 399:20, 400:3, 410:5, 417:19, 419:22, 423:5, 423:9, 425:9, 481:23, 482:13, 487:12, 487:18, 491:18, 492:6, 492:11, 492:15
**Ryan** [1] - 285:4

## S

**S-C-H-O-N-E-I-C-H** [1] - 435:23
**saccharides** [6] -

321:11, 357:6, 357:13, 357:16, 359:24, 360:2
**safe** [4] - 326:14, 370:21, 495:7, 498:6
**safer** [7] - 370:9, 371:9, 371:12, 386:4, 396:5, 397:12, 399:14
**safety** [11] - 306:21, 307:9, 309:10, 387:22, 387:25, 388:5, 388:16, 401:23, 444:4, 451:12, 500:1
**sale** [1] - 287:10
**Sales** [1] - 366:11
**sales** [24] - 282:1, 282:2, 283:1, 283:4, 283:11, 288:4, 288:15, 511:17, 511:18, 512:3, 512:8, 512:24, 514:8, 515:21, 519:21, 520:1, 520:5, 532:3, 532:7, 532:14, 538:6, 538:12
**Salk** [2] - 304:11, 304:12
**salt** [2] - 384:10, 385:11
**Sam** [1] - 506:2
**SAMANTHA** [1] - 256:4
**sample** [7] - 334:21, 408:7, 408:16, 408:17, 410:23, 413:11
**samples** [9] - 303:11, 308:19, 331:6, 332:13, 340:5, 340:14, 413:18, 470:14
**San** [1] - 389:11
**sanctions** [1] - 400:5
**Santa** [2] - 301:12, 302:21
**sat** [1] - 309:3
**satisfied** [4] - 386:1, 386:24, 395:23, 395:24
**satisfies** [1] - 504:22
**save** [1] - 304:24
**saved** [1] - 300:22
**saw** [16] - 286:25, 292:24, 302:22, 342:13, 387:21, 415:3, 455:25, 462:15, 466:11, 512:22, 514:22, 519:4, 528:6, 530:12, 539:25, 543:5
**scale** [2] - 261:13, 395:6
**scale-up** [1] - 395:6
**scenarios** [1] - 523:4
**schedule** [2] - 301:11, 469:2
**scheme** [3] - 271:24, 311:22, 328:8
**scholarships** [1] - 302:11
**school** [3] - 301:6, 301:10, 494:20
**SCHÖNEICH** [1] - 435:24
**Schöneich** [39] - 425:24, 435:17, 435:22, 436:7, 436:8, 436:19, 437:1, 437:24, 439:23, 440:5, 440:12, 442:17, 443:23, 446:24, 447:5, 447:16, 452:4, 452:22, 453:15, 454:6, 454:24, 455:15, 457:3, 458:13, 459:8, 459:22, 461:11, 464:6, 464:17, 464:25, 465:7, 471:24, 474:11, 475:9, 476:24, 477:18, 478:17, 480:24, 481:10
**Schöneich's** [3] - 436:23, 467:2, 486:15
**science** [7] - 300:6, 300:7, 302:15, 326:2, 368:19, 427:4, 444:5
**sciences** [3] - 369:7, 369:9, 439:24
**scientific** [10] - 350:23, 373:13, 398:10, 426:8, 429:13, 463:23, 463:25, 464:3, 484:20, 486:20
**Scientific** [1] - 426:19
**scientifically** [1] - 328:8
**scientist** [2] - 376:11, 456:9
**scientists** [9] - 320:25, 321:7, 327:24, 439:4, 443:19, 445:1, 454:18, 458:18, 460:23
**Scientists** [1] - 439:16
**scope** [5] - 320:9, 321:5, 359:14, 363:10, 481:13
**score** [6] - 454:13, 454:18, 455:4, 458:19, 460:21
**Scott** [3] - 270:1, 270:3, 310:19
**scrambling** [1] - 308:15
**scratch** [1] - 305:24
**screen** [31] - 261:1, 265:16, 320:7, 328:25, 332:3, 340:16, 341:2, 372:5, 376:4, 379:21, 380:3, 380:11, 380:13, 380:19, 381:8, 384:19, 384:20, 388:14, 391:24, 392:1, 392:15, 400:14, 404:10, 425:5, 442:5, 458:14, 513:6, 521:2, 521:14, 544:16, 545:12
**screening** [2] - 332:8, 395:5
**scrutinized** [1] - 444:3
**scrutiny** [2] - 311:19, 311:21
**SDS** [1] - 412:15
**sea** [2] - 392:5, 392:8
**seal** [1] - 399:24
**searching** [1] - 329:15
**seated** [7] - 295:18, 365:1, 365:4, 426:3, 492:3, 492:23, 548:4
**second** [30] - 273:9, 273:15, 285:2, 291:11, 291:20, 332:1, 332:4, 364:16, 382:8, 382:10, 401:17, 412:4, 462:5, 473:1, 476:14, 477:17, 479:14, 496:20, 497:6, 504:5, 504:12, 511:11, 533:7, 533:14, 533:21, 543:14, 543:15, 543:17, 543:22, 547:4
**secondary** [1] - 355:6
**secondhand** [1] - 292:23
**seconds** [3] - 269:13, 549:18, 549:21
**section** [11] - 297:12, 320:1, 359:10, 362:7, 367:7, 401:9, 416:21, 433:23, 450:20, 453:5, 504:6
**security** [4] - 333:16, 400:5, 424:7, 487:11
**see** [149] - 274:22, 280:10, 280:11, 284:23, 285:4, 290:3, 291:20, 300:24, 307:1, 307:4, 307:7, 310:10, 312:24, 322:12, 326:15, 329:18, 330:19, 334:16, 337:23, 338:13, 340:23, 341:5, 348:20, 357:14, 358:20, 359:5, 361:4, 361:23, 365:23, 372:5, 372:17, 375:8, 379:8, 379:15, 379:21, 380:13, 380:20, 388:13, 388:20, 390:23, 391:10, 396:10, 396:14, 401:24, 402:8, 402:13, 404:10, 404:17, 407:9, 411:25, 412:3, 413:1, 413:4, 413:24, 414:20, 415:6, 416:6, 416:15, 416:25, 419:16, 419:17, 425:17, 431:20, 432:1, 432:8, 432:16, 440:14, 441:9, 441:12, 441:15, 442:5, 443:11, 447:21, 447:23, 448:1, 449:5, 453:6, 455:2, 455:4, 457:10, 457:15, 457:20, 458:20, 459:2, 464:18, 465:10, 467:19, 468:18, 468:21, 469:9, 471:15, 473:4, 473:8, 473:20, 474:12, 475:23, 476:8, 476:15, 477:1, 477:10, 478:3, 487:6, 502:21, 504:6, 505:3, 511:4, 511:5, 512:2, 512:7, 515:19, 519:5, 519:11, 519:14, 519:16, 519:19, 519:24, 520:1, 520:2, 521:4, 521:5, 521:16, 521:19, 521:23, 522:6, 522:12, 522:24, 523:3, 523:14, 524:7, 525:8, 527:1, 528:9, 528:20, 531:24, 532:18, 533:15, 538:16, 539:24, 542:17, 542:23, 543:9, 543:13, 545:4, 545:13, 546:19, 547:24, 550:9
**seeing** [12] - 304:23, 440:13, 454:1, 456:16, 457:20, 458:14, 461:20, 516:6, 521:17, 524:25, 526:19, 542:15
**seek** [1] - 550:21
**seem** [9] - 272:22, 272:23, 273:12, 281:7, 305:5, 305:7, 316:12, 536:5, 547:20
**sees** [2] - 318:21, 318:22
**selected** [4] - 291:11, 468:17, 479:1, 479:3
**selection** [1] - 266:20
**sell** [4] - 284:16, 370:17, 451:8, 512:25
**selling** [1] - 512:20
**sells** [4] - 443:24, 512:17, 515:3, 534:1
**SEMENDYAI** [1] - 255:22
**semesters** [1] - 301:17
**senior** [3] - 280:3, 284:24, 538:24
**sense** [7] - 258:19, 267:6, 282:23, 360:20, 428:20, 441:23, 533:3
**sensitive** [1] - 277:10
**sent** [4] - 260:12,

299:23, 325:3, 340:6
**sentence** [15] - 316:1, 320:4, 320:6, 321:10, 357:1, 357:2, 357:5, 357:23, 401:17, 402:2, 417:15, 418:14, 504:7, 504:13, 504:19
**separate** [7] - 361:19, 379:15, 380:9, 381:19, 396:14, 406:24
**separated** [3] - 380:14, 380:22, 393:24
**separates** [3] - 392:21, 392:22, 394:5
**separation** [11] - 367:20, 368:25, 369:7, 369:8, 377:11, 378:18, 378:21, 379:5, 380:2, 380:21, 384:11
**September** [5] - 280:21, 280:22, 281:3, 308:8, 453:7
**sequence** [2] - 258:3, 274:22
**series** [8] - 352:3, 381:3, 381:4, 381:5, 391:5, 391:13, 423:15, 474:12
**serious** [1] - 322:17
**serum** [16] - 310:23, 310:24, 311:1, 311:11, 311:14, 315:20, 316:4, 356:23, 428:19, 428:20, 442:24, 443:3, 443:11, 443:16, 443:23, 444:2
**serve** [4] - 276:10, 321:12, 357:8, 531:1
**served** [1] - 507:13
**serves** [1] - 275:4
**service** [2] - 507:16, 507:17
**services** [2] - 495:16, 495:18
**set** [16] - 293:23, 308:17, 312:11, 313:3, 316:3, 326:25, 328:7, 336:13, 336:18, 337:7, 389:20, 437:7, 440:10, 446:12, 449:20, 516:12
**sets** [2] - 401:1, 445:22
**setting** [1] - 518:18
**seven** [2] - 281:11, 501:9
**several** [3] - 438:17, 450:2, 496:2
**shapes** [1] - 379:19
**share** [11] - 262:15, 263:9, 280:11, 281:10, 285:19, 286:6, 286:22, 385:1, 485:25, 526:24, 527:8
**sharps** [1] - 310:4
**sheet** [3] - 332:15, 340:1, 536:5
**sheets** [1] - 446:2
**shelf** [2] - 434:11, 435:2
**shells** [1] - 379:16
**Shield** [5] - 279:14, 285:7, 287:4, 287:5, 507:15
**shift** [3] - 302:20, 323:8, 470:21
**shipped** [1] - 308:14
**shirt** [1] - 334:12
**shock** [1] - 317:10
**short** [7] - 257:13, 279:11, 310:25, 367:14, 382:6, 446:8, 489:12
**shorthand** [1] - 551:25
**shortly** [1] - 270:15
**shot** [1] - 393:7
**shovel** [1] - 299:1
**show** [30] - 265:4, 268:14, 268:23, 274:13, 279:25, 281:15, 282:10, 282:12, 282:14, 284:18, 289:18, 346:16, 348:16, 349:4, 377:15, 399:23, 400:4, 400:8, 409:25, 442:18, 460:22, 466:10, 467:10, 480:19, 504:25, 520:9, 536:2, 537:8
**showed** [12] - 277:5, 328:14, 399:17, 405:10, 405:11, 425:5, 466:14, 480:18, 503:18, 504:1, 530:8, 531:7
**showing** [27] - 325:5, 352:4, 376:23, 377:18, 380:11, 384:19, 387:15, 390:9, 390:20, 391:13, 392:14, 400:1, 400:7, 400:14, 449:25, 454:8, 455:8, 457:4, 486:14, 498:21, 510:23, 528:15, 528:20, 529:15, 529:21, 537:8, 543:7
**shown** [18] - 330:7, 339:10, 377:13, 377:20, 378:1, 378:7, 378:11, 378:25, 382:10, 391:24, 394:1, 400:19, 467:4, 467:14, 470:14, 471:20, 471:22, 472:10
**shows** [6] - 317:23, 378:17, 480:14, 486:19, 534:20, 542:17
**shy** [1] - 280:9
**side** [49] - 270:16, 294:20, 297:12, 307:2, 322:10, 371:22, 372:5, 372:8, 372:16, 381:8, 392:1, 392:17, 392:18, 394:1, 394:2, 440:15, 440:17, 441:9, 441:15, 444:14, 447:20, 448:1, 456:20, 459:6, 459:7, 461:22, 486:14, 488:12, 496:15, 510:18, 516:7, 516:9, 517:7, 521:14, 521:15, 521:23, 529:25, 531:25, 532:1, 537:7, 537:9, 537:10, 537:14, 540:12, 540:19, 540:25, 541:22, 542:13
**sidebar** [9] - 276:20, 277:1, 279:9, 481:2, 481:7, 481:20, 481:22, 548:20, 549:19
**sides** [6] - 292:5, 382:25, 509:8, 517:15, 530:15, 541:23
**Siegwarth** [37] - 257:17, 260:23, 266:24, 277:6, 277:7, 277:16, 278:1, 280:17, 281:20, 282:1, 283:3, 284:14, 289:19, 290:9, 290:16, 505:22, 506:1, 506:14, 506:24, 507:7, 508:16, 508:21, 509:4, 510:22, 512:1, 518:14, 518:25, 520:17, 524:5, 526:1, 536:7, 536:21, 539:4, 539:24, 548:2, 548:12, 550:15
**SIEGWARTH** [1] - 506:3
**Siegwarth's** [1] - 290:23
**sign** [1] - 301:16
**signal** [4] - 312:23, 327:4, 329:15, 329:19
**signed** [3] - 301:13, 376:5, 376:8
**significant** [7] - 263:1, 335:21, 335:22, 336:12, 383:10, 455:3, 498:13
**silent** [1] - 265:1
**similar** [15] - 339:8, 382:14, 420:24, 421:6, 421:11, 421:12, 421:15, 421:23, 430:5, 479:8, 479:19, 480:7, 514:21, 537:7, 545:3
**similarities** [1] - 420:14
**simple** [6] - 291:22, 314:23, 320:12, 349:23, 489:23, 544:1
**simpler** [2] - 352:18, 476:8
**simplicity** [2] - 380:6, 407:15
**simplified** [1] - 380:23
**simplifying** [1] - 532:20
**simply** [5] - 319:11, 438:18, 462:10, 462:20, 511:3
**single** [18] - 283:9, 287:15, 288:8, 309:25, 316:11, 319:9, 324:2, 328:25, 329:12, 329:16, 329:21, 329:24, 330:2, 331:16, 331:18, 331:19, 336:2, 336:5
**single-ingredient** [8] - 324:2, 329:12, 329:21, 329:24, 330:2, 331:16, 336:2, 336:5
**sit** [4] - 381:19, 425:11, 487:10, 491:20
**sites** [2] - 429:7, 460:16
**sitting** [10] - 264:21, 284:2, 308:13, 364:15, 433:14, 508:11, 515:9, 516:9, 516:16, 530:15
**situation** [2] - 281:9, 500:21
**six** [6] - 271:7, 291:7, 395:8, 448:8, 539:1, 546:12
**sixth** [1] - 415:16
**size** [3] - 299:3, 327:13, 327:15
**sized** [1] - 380:5
**sizes** [2] - 379:19, 384:9
**skeptical** [1] - 363:19
**skill** [1] - 268:17
**skilled** [1] - 269:19
**sleeves** [3] - 325:25, 326:1, 388:21
**slide** [67] - 261:15, 261:17, 262:10, 263:18, 270:23, 270:24, 273:16, 279:20, 287:2, 369:2, 371:16, 371:22, 372:8, 372:16, 373:25, 376:22, 377:14, 377:21, 378:12, 380:25, 381:12, 383:23, 387:8, 387:15, 387:19, 390:9, 391:16, 392:13, 420:3, 430:11, 437:23, 440:11, 440:13, 440:14, 442:15, 443:12, 444:13,

447:14, 449:6, 456:15, 458:17, 483:23, 484:13, 486:12, 486:14, 487:6, 494:14, 496:13, 496:24, 498:20, 498:21, 498:22, 500:6, 500:18, 501:4, 501:14, 501:21, 510:23, 519:1, 519:3, 519:13, 522:10, 524:21, 525:1, 526:19, 543:5, 546:1
**slides** [5] - 260:24, 486:15, 501:15, 506:18, 506:24
**slightly** [4] - 455:4, 460:7, 474:15, 528:10
**slow** [2] - 280:21, 331:23
**slower** [1] - 484:8
**slowly** [1] - 393:3
**small** [16] - 318:6, 320:18, 320:19, 326:7, 330:22, 358:10, 400:20, 436:11, 445:17, 484:16, 501:7, 501:10, 501:17, 521:23, 533:16, 545:13
**smaller** [3] - 316:12, 320:2, 327:18
**smart** [3] - 317:18, 317:21, 492:15
**smiles** [1] - 325:10
**snow** [1] - 299:1
**so-called** [3] - 472:21, 476:6, 478:4
**Society** [1] - 496:5
**sodium** [1] - 310:23
**software** [1] - 519:24
**sold** [1] - 370:19
**sole** [4] - 297:14, 318:7, 348:2, 348:9
**solid** [6] - 313:19, 328:3, 339:2, 342:8, 342:17, 355:1
**solubility** [1] - 348:14
**solution** [2] - 349:19, 445:3
**solve** [2] - 437:7, 440:10
**someone** [7] - 260:25, 288:3, 292:24, 369:10, 421:20, 471:3
**sometimes** [9] - 261:15, 291:23, 295:22, 355:6, 448:3, 485:14, 540:3, 547:16, 550:6
**somewhere** [4] - 282:5, 308:15, 392:1, 511:18
**soon** [6] - 318:22, 516:21, 517:2, 528:25, 529:4, 549:24
**sooner** [3] - 281:1, 281:3, 301:15
**sorry** [31] - 260:7, 269:10, 271:9, 312:20, 322:5, 333:18, 338:1, 341:10, 344:20, 345:2, 345:3, 346:3, 354:1, 359:19, 360:3, 364:9, 378:3, 398:4, 399:5, 407:19, 408:23, 409:3, 415:1, 418:10, 465:2, 468:12, 484:10, 527:5, 531:11, 545:20, 550:4
**sort** [3] - 269:16, 546:8, 550:23
**sound** [1] - 474:18
**soup** [4] - 385:5, 385:6, 385:12, 385:13
**source** [14] - 371:14, 371:19, 371:20, 371:23, 372:4, 372:9, 372:15, 373:12, 386:9, 389:20, 390:7, 396:7, 526:24, 535:4
**sources** [3] - 443:10, 443:20, 534:21
**sourcing** [4] - 371:17, 402:23, 403:1, 403:11
**South** [6] - 298:4, 298:10, 298:13, 298:17, 298:19, 299:23
**southern** [1] - 370:13
**soybeans** [5] - 377:18, 378:1, 378:6, 378:8, 390:20
**space** [2] - 263:2, 538:1
**spans** [1] - 511:6
**speaking** [5] - 277:13, 286:4, 489:4, 513:12, 548:7
**special** [1] - 389:18
**specialist** [1] - 493:22
**specialized** [2] - 351:16, 391:6
**specific** [16] - 258:19, 258:20, 260:3, 260:8, 286:9, 367:20, 367:22, 368:3, 378:21, 409:11, 410:12, 431:8, 496:16, 496:18, 514:2, 516:12
**specifically** [3] - 307:21, 391:19, 522:4
**specifications** [3] - 470:6, 485:15, 486:4
**specificity** [1] - 286:7
**specifics** [2] - 448:10, 513:11
**speculative** [1] - 259:7
**spell** [6] - 296:6, 365:13, 435:21, 482:3, 493:8, 505:24
**spend** [1] - 343:13
**spent** [1] - 269:25
**spin** [1] - 538:6
**split** [3] - 268:4, 531:17, 532:6
**spoken** [1] - 503:8
**spongiform** [2] - 401:19
**spread** [8] - 453:23, 453:24, 454:17, 460:24, 465:18, 465:24, 466:13, 532:11
**spread/effect** [1] - 453:19
**spreads** [1] - 454:17
**spreadsheet** [3] - 332:14, 333:19, 334:16
**squeeze** [1] - 271:13
**Squibb** [1] - 370:14
**stability** [7] - 439:9, 441:19, 441:22, 441:23, 442:9, 444:9, 501:13
**stabilization** [5] - 327:5, 335:22, 336:12, 348:6, 432:13
**stabilize** [16] - 311:9, 311:17, 313:21, 322:22, 324:9, 330:17, 336:3, 336:6, 341:23, 348:13, 349:2, 358:10, 434:9, 434:25, 443:2, 445:5
**stabilized** [2] - 319:18, 324:1
**stabilizers** [3] - 321:13, 346:9, 357:8
**stabilizing** [7] - 311:10, 315:21, 330:21, 336:13, 336:15, 337:4, 347:6
**stable** [3] - 337:16, 444:11, 445:18
**stacked** [1] - 528:7
**staff** [3] - 393:10, 393:14, 446:3
**stages** [1] - 328:21
**stake** [1] - 436:17
**stand** [11] - 270:2, 286:19, 365:9, 417:18, 417:25, 418:4, 435:17, 481:25, 493:5, 520:24, 523:17
**standard** [3] - 544:5, 544:7, 546:18
**standards** [1] - 451:13
**standpoint** [1] - 353:6
**stands** [3] - 352:11, 495:22, 540:8
**STARGATT** [1] - 256:3
**starkly** [1] - 421:23
**start** [34] - 257:3, 261:6, 272:8, 276:25, 303:15, 305:23, 306:12, 308:4, 319:11, 325:14, 325:17, 326:2, 326:18, 327:25, 329:2, 368:16, 387:3, 387:5, 447:20, 450:8, 491:21, 507:7, 515:25, 516:6, 516:20, 516:24, 518:9, 530:19, 540:12, 547:1, 547:2, 547:8
**started** [13] - 274:8, 280:17, 299:8, 303:6, 303:21, 328:24, 328:25, 338:23, 348:17, 350:1, 395:5, 536:21, 548:22
**starting** [6] - 329:19, 345:23, 404:15, 416:17, 489:3, 517:1
**startled** [1] - 454:17
**starts** [3] - 305:12, 318:22, 318:24
**starving** [1] - 302:17
**state** [19] - 281:16, 296:6, 296:19, 308:5, 311:5, 365:13, 366:6, 374:18, 375:13, 375:19, 426:16, 435:20, 436:6, 482:3, 482:16, 493:7, 493:18, 505:24, 506:12
**statement** [18] - 271:9, 273:15, 277:2, 279:20, 285:2, 288:5, 362:5, 405:23, 424:8, 431:1, 433:8, 433:14, 434:13, 434:18, 435:3, 454:7, 463:12
**statements** [27] - 270:20, 273:9, 273:20, 278:12, 283:2, 283:22, 283:25, 284:18, 284:24, 285:1, 285:6, 285:11, 285:18, 285:22, 287:21, 289:12, 349:3, 356:6, 359:3, 423:16, 450:9, 451:23, 453:17, 454:1, 454:9, 465:12, 487:19
**STATES** [1] - 255:1
**states** [12] - 412:23, 430:11, 431:20, 432:1, 432:18, 432:21, 432:24, 452:6, 452:10, 452:12, 453:18, 462:5
**States** [4] - 297:2, 308:14, 438:3, 507:9
**stating** [4] - 452:4, 453:15, 453:20, 461:5
**station** [3] - 299:3, 299:6, 307:3
**stations** [1] - 299:10
**statistics** [1] - 507:22
**status** [1] - 496:6
**statutes** [2] - 504:23, 504:25
**stay** [3] - 302:16, 326:10
**staying** [1] - 370:25
**steak** [2] - 356:2, 356:4

**Stenotype** [1] - 551:25
**step** [48] - 293:20, 310:15, 312:21, 345:14, 364:14, 364:15, 384:12, 384:13, 384:14, 384:24, 390:18, 391:3, 391:7, 392:15, 392:20, 404:23, 404:24, 404:25, 406:8, 406:12, 406:15, 425:1, 425:16, 475:10, 475:22, 480:25, 500:7, 500:8, 500:9, 500:12, 500:14, 500:19, 501:1, 501:2, 501:5, 501:9, 501:15, 501:18, 501:20, 505:18, 505:19, 509:14, 527:11, 533:17, 533:18, 545:10, 548:2
**stepping** [2] - 364:15, 511:18
**steps** [14] - 259:21, 355:5, 371:10, 384:15, 384:17, 386:4, 396:2, 396:3, 396:17, 424:23, 425:2, 498:23, 516:13, 537:13
**STERNE** [1] - 256:6
**Stewart** [1] - 285:4
**stick** [7] - 315:10, 334:11, 382:25, 388:20, 393:4, 530:24
**sticker** [1] - 301:5
**sticking** [1] - 347:14
**sticks** [5] - 321:21, 321:22, 347:12, 382:3, 441:10
**sticky** [1] - 436:11
**still** [20] - 257:5, 295:5, 304:24, 324:4, 326:10, 348:23, 362:23, 386:18, 389:7, 391:11, 444:2, 484:17, 485:23, 507:25, 519:17, 521:12, 537:4, 537:23, 550:14
**stipulate** [1] - 257:20
**stipulated** [2] - 271:17, 474:4
**stipulation** [1] - 272:25
**stop** [2] - 325:22, 498:24
**storage** [1] - 355:2
**store** [1] - 478:8
**Storm** [1] - 507:15
**story** [1] - 393:8
**straight** [1] - 303:9
**strategic** [1] - 514:15
**strategies** [3] - 402:3, 402:19, 402:20
**strategy** [4] - 402:15, 508:13, 520:23, 525:8
**stratify** [2] - 525:5, 525:19
**stream** [5] - 282:7, 282:8, 282:9, 318:13
**strength** [5] - 284:10, 335:12, 441:23, 442:1, 541:9
**strengths** [5] - 540:9, 540:18, 540:19, 540:21, 541:4
**stressful** [1] - 343:17
**strict** [1] - 440:21
**strike** [5] - 267:9, 291:8, 293:9, 481:10, 549:4
**Strom** [1] - 280:3
**strong** [1] - 335:13
**strongly** [1] - 437:22
**structure** [1] - 444:21
**struggled** [1] - 299:18
**stuck** [4] - 322:6, 322:10, 322:13, 322:20
**student** [2] - 302:3, 302:11
**students** [1] - 540:10
**studied** [2] - 312:16, 484:2
**studies** [34] - 270:11, 329:12, 329:21, 329:25, 330:2, 330:3, 330:4, 331:17, 332:8, 336:2, 336:5, 337:1, 337:10, 395:5, 395:6, 396:19, 453:21, 453:22, 454:21, 455:16, 455:18, 459:13, 460:20, 479:11, 479:23, 479:25, 480:7, 501:13, 502:10, 502:11, 529:2
**study** [55] - 279:4, 309:18, 312:14, 328:22, 330:5, 330:7, 330:15, 331:4, 334:4, 428:25, 429:4, 438:12, 455:21, 455:22, 455:24, 456:5, 456:10, 456:12, 456:14, 457:4, 458:13, 459:6, 459:7, 459:10, 459:25, 460:8, 461:7, 467:17, 468:7, 469:12, 470:14, 470:16, 470:17, 470:19, 473:20, 475:3, 475:12, 475:25, 476:2, 476:7, 476:18, 477:3, 477:15, 477:21, 477:25, 478:6, 480:5, 480:11, 480:14, 480:15, 480:17, 481:13, 546:20
**studying** [3] - 303:24, 304:3, 309:14
**stuff** [27] - 277:24, 286:8, 302:4, 302:8, 304:2, 304:10, 304:17, 308:21, 310:4, 311:2, 311:13, 318:5, 322:10, 323:1, 323:4, 324:20, 343:15, 349:4, 350:20, 353:17, 364:1, 369:12, 378:14, 378:15, 381:11, 390:21, 390:25
**stunted** [1] - 389:23
**subcutaneously** [1] - 350:7
**subject** [11] - 259:5, 285:7, 333:11, 333:15, 363:7, 399:23, 400:5, 401:1, 430:15, 484:11, 499:8
**submission** [2] - 451:15, 454:7
**submissions** [1] - 495:20
**submit** [13] - 295:1, 451:10, 495:5, 496:22, 500:10, 548:23, 549:11, 549:13, 549:22, 549:23, 550:3, 550:7
**submitted** [8] - 279:14, 431:10, 431:14, 455:8, 479:10, 479:24, 480:8, 501:25
**submitting** [1] - 516:24
**subsequent** [1] - 535:6
**subsequently** [1] - 427:22
**subsidiary** [1] - 366:12
**substance** [8] - 262:1, 319:3, 370:5, 400:25, 413:5, 413:6, 497:23, 501:10
**substances** [1] - 400:7
**substantially** [1] - 404:15
**substitute** [1] - 526:23
**subvert** [2] - 283:12, 287:18
**succeed** [6] - 387:2, 387:4, 387:6, 387:9, 397:8, 397:10
**succeeded** [1] - 342:11
**successful** [7] - 313:7, 321:4, 330:17, 346:9, 349:12, 373:15, 387:7
**successfully** [1] - 347:6
**sucrose** [4] - 320:16, 320:23, 331:11, 331:19
**sudden** [1] - 325:22
**sued** [2] - 271:7, 272:24
**sufficient** [7] - 267:16, 327:4, 348:6, 355:8, 358:16, 359:1, 502:8
**sufficiently** [2] - 336:3, 336:6
**sugar** [23] - 320:13, 320:14, 321:18, 321:20, 322:2, 322:4, 322:6, 322:8, 322:13, 322:15, 322:20, 322:23, 358:18, 358:19, 358:24, 359:5, 359:7, 360:14, 360:18, 360:22, 361:5, 444:19
**sugars** [14] - 320:13, 321:15, 322:22, 357:14, 357:17, 357:18, 358:5, 358:7, 358:10, 358:22, 358:25, 361:1, 361:4
**suggest** [4] - 269:23, 271:18, 293:5, 503:24
**suggesting** [4] - 259:24, 272:9, 353:2, 480:4
**suggestion** [2] - 271:15, 291:6
**suggestions** [1] - 275:19
**suggests** [1] - 278:13
**suit** [5] - 373:22, 388:13, 388:25, 390:5
**suitable** [1] - 316:4
**suits** [2] - 397:6, 440:20
**summaries** [2] - 535:24, 536:1
**summarize** [5] - 336:1, 360:7, 394:17, 405:24, 437:25
**summarized** [2] - 375:11, 440:17
**summarizes** [1] - 477:21
**summary** [5] - 360:11, 413:17, 535:9, 535:11, 536:4
**super** [24] - 367:12, 368:4, 387:17, 390:13, 390:16, 391:15, 391:17, 391:20, 393:20, 394:18, 395:23, 395:25, 396:12, 397:11, 398:20, 407:25, 408:2, 408:7, 408:17, 410:16, 414:9, 414:11, 425:3
**supplement** [1] - 547:21
**supplier** [1] - 486:6
**supplies** [2] - 308:12, 308:13
**supply** [6] - 372:12, 372:20, 372:21, 372:22, 372:25, 373:1
**support** [9] - 259:7, 298:9, 349:10, 454:7, 455:14,

462:17, 462:21, 480:8, 525:5
**supporting** [2] - 433:19, 479:11
**supports** [1] - 463:22
**suppose** [2] - 385:4, 481:9
**supposed** [6] - 322:9, 322:19, 403:20, 442:7, 467:23, 547:7
**supposedly** [2] - 355:23, 358:24
**surface** [4] - 334:9, 347:12, 347:19, 444:25
**surfactant** [33] - 331:20, 334:1, 334:7, 334:8, 334:12, 335:20, 336:6, 336:10, 336:16, 337:2, 338:9, 338:15, 340:21, 341:15, 444:14, 444:23, 447:24, 448:14, 449:18, 449:20, 457:11, 457:12, 457:14, 457:20, 458:2, 459:17, 459:19, 464:14, 473:13, 473:18, 473:21, 475:2, 475:3
**surfactants** [22] - 327:8, 331:12, 337:21, 345:15, 345:16, 347:18, 347:22, 347:23, 347:25, 348:10, 348:18, 348:22, 348:25, 349:14, 349:16, 350:2, 353:22, 354:2, 445:4, 474:12, 474:25, 475:6
**surprised** [2] - 336:19, 336:21
**surprising** [2] - 336:24, 541:12
**survey** [17] - 542:10, 542:13, 542:17, 542:18, 543:3, 543:9, 543:13, 544:8, 544:9, 544:14, 544:22, 544:24, 544:25, 545:4, 545:22, 546:3, 546:5
**surveys** [5] - 541:18, 541:21, 542:6, 543:16, 544:6
**suspect** [2] - 258:17, 271:23
**sustain** [1] - 363:13
**swear** [1] - 422:19
**sweaters** [1] - 305:21
**sweep** [1] - 332:10
**Swiss** [1] - 494:17
**switch** [2] - 486:6, 543:2
**sworn** [7] - 296:12, 365:19, 365:22, 436:1, 482:9, 493:13, 506:5
**SWOT** [4] - 539:24, 540:1, 540:2, 540:10
**symbolize** [1] - 486:17
**symbols** [1] - 442:21
**sympathies** [1] - 278:22
**synaptic** [1] - 462:4

**T**

**tab** [3] - 411:21, 473:2, 476:19
**Table** [3] - 383:14, 467:18, 467:19
**table** [14] - 413:13, 414:17, 471:24, 471:25, 472:5, 472:10, 475:12, 478:14, 479:18, 508:11, 516:6, 516:9, 530:15, 541:8
**tables** [1] - 534:19
**tad** [1] - 398:2
**takeaway** [2] - 329:24, 542:15
**talks** [4] - 265:20, 265:25, 399:5, 525:3
**tank** [1] - 299:16
**Tap** [1] - 298:12
**tar** [2] - 369:11, 369:12
**target** [3] - 327:15, 432:22, 525:7
**targeting** [2] - 525:10, 525:15
**task** [1] - 311:23
**taste** [2] - 321:23, 356:4
**taught** [2] - 507:21
**TAYLOR** [1] - 256:3
**teacher** [1] - 439:13
**teachers** [1] - 300:8
**team** [7] - 342:16, 342:17, 389:13, 389:25, 398:15, 446:6, 446:14
**tear** [1] - 303:24
**tech** [1] - 303:10
**technical** [6] - 483:13, 483:15, 488:11, 498:18, 503:3, 514:23
**Technical** [1] - 438:4
**technically** [2] - 292:4, 522:18
**technique** [7] - 312:19, 393:17, 412:17, 413:8, 414:1, 414:14, 546:19
**techniques** [3] - 368:25, 412:24, 414:16
**technologies** [1] - 488:7
**technology** [14] - 258:21, 273:17, 274:21, 300:17, 317:19, 367:21, 412:19, 432:2, 432:4, 440:8, 482:23, 483:1, 486:25, 513:18
**Technology** [1] - 494:18
**telephone** [1] - 547:11
**temperature** [1] - 356:4
**temporary** [1] - 302:23
**temptation** [2] - 547:16, 547:18
**ten** [8] - 329:6, 359:22, 360:3, 414:23, 414:24, 415:16, 415:17
**tend** [3] - 312:9, 533:2, 540:2
**tends** [1] - 309:20
**tension** [1] - 334:9
**term** [3] - 355:19, 432:6, 489:10
**terminal** [1] - 462:4
**terminology** [4] - 261:23, 262:8, 359:25, 360:5
**terms** [14] - 261:24, 286:6, 286:7, 288:6, 288:20, 288:25, 320:12, 356:7, 369:9, 400:11, 479:10, 510:12, 532:19, 545:17
**Terrence** [14] - 296:2, 296:8, 296:20, 437:6, 437:9, 440:10, 447:1, 447:10, 447:25, 448:19, 449:3, 457:13, 464:16, 471:7
**TERRENCE** [2] - 296:9, 296:10
**terror** [2] - 306:5, 308:8
**Terry** [1] - 325:13
**Tesla** [1] - 281:11
**test** [13] - 322:12, 324:21, 334:18, 334:20, 340:7, 414:13, 454:16, 455:18, 459:24, 460:19, 460:25, 473:20, 487:2
**tested** [9] - 328:15, 330:10, 334:21, 334:23, 337:24, 338:3, 341:9, 467:21, 478:5
**testified** [20] - 296:12, 344:13, 345:21, 362:2, 362:8, 365:19, 402:22, 404:19, 408:15, 411:6, 411:12, 436:1, 439:17, 446:13, 456:10, 458:4, 467:17, 482:9, 493:13, 506:5
**testifies** [1] - 290:9
**testify** [9] - 257:25, 260:11, 261:18, 267:10, 269:3, 483:6, 490:20, 508:22, 508:23
**testifying** [2] - 407:13, 436:15
**testimonies** [1] - 539:25
**testimony** [46] - 342:1, 350:11, 354:19, 360:7, 362:9, 364:14, 366:14, 368:13, 385:24, 387:17, 407:6, 407:24, 408:2, 410:1, 411:10, 446:4, 446:17, 458:7, 460:1, 462:16, 462:24, 463:2, 463:4, 463:20, 465:15, 465:17, 466:16, 471:3, 483:21, 488:6, 489:9, 490:8, 490:21, 491:1, 491:3, 494:7, 494:9, 494:10, 496:15, 502:23, 506:19, 506:25, 514:21, 527:23, 535:1, 538:17
**testing** [6] - 353:1, 353:8, 414:23, 478:9, 487:10, 502:7
**tests** [2] - 340:6, 340:8
**thawed** [1] - 477:5
**THE** [251] - 255:1, 255:2, 257:1, 257:10, 257:12, 257:24, 258:23, 259:13, 259:15, 259:23, 260:7, 260:17, 260:23, 261:8, 261:17, 261:21, 262:5, 262:13, 262:17, 263:11, 263:15, 264:1, 264:8, 264:15, 264:17, 264:21, 265:4, 265:7, 265:14, 265:19, 265:24, 266:7, 266:11, 266:21, 267:8, 267:24, 268:7, 268:12, 268:16, 268:24, 269:5, 269:7, 269:14, 269:25, 270:3, 270:12, 270:18, 271:5, 271:20, 272:4, 272:15, 272:18, 273:2, 273:6, 273:19, 273:25, 274:5, 274:16, 274:23, 275:4, 275:14, 276:2, 276:7, 276:14, 276:21, 276:24, 277:13, 277:18, 277:25, 278:5, 278:16, 278:25, 279:10, 279:16, 280:5, 280:8, 280:13, 280:23, 281:19, 281:24, 282:5, 282:14, 282:23, 283:13, 283:24, 284:6, 284:13, 285:5, 285:9, 285:24, 286:2, 286:8, 286:14, 286:23, 287:21, 288:14, 290:18, 291:2, 291:14, 291:15, 291:18, 292:2, 292:10,

292:14, 292:18, 293:2, 293:10, 293:14, 293:17, 294:1, 294:11, 294:17, 294:22, 294:25, 295:3, 295:13, 295:14, 295:15, 295:17, 295:22, 296:5, 296:6, 296:8, 297:5, 297:23, 300:1, 300:4, 303:3, 303:5, 307:12, 307:13, 307:15, 307:16, 314:19, 315:4, 315:6, 315:11, 333:8, 333:13, 339:21, 343:24, 344:1, 346:19, 351:1, 363:13, 364:4, 364:5, 364:8, 364:11, 364:13, 364:19, 364:21, 364:25, 365:3, 365:12, 365:13, 365:15, 365:22, 367:4, 375:25, 395:16, 397:16, 397:18, 400:8, 400:13, 410:8, 410:10, 415:23, 416:2, 417:23, 419:23, 423:7, 425:10, 425:15, 425:20, 425:25, 426:2, 426:11, 426:13, 426:15, 435:10, 435:12, 435:19, 435:20, 435:22, 440:2, 451:1, 453:11, 463:6, 464:21, 465:5, 474:6, 477:17, 477:20, 478:11, 480:24, 481:3, 481:8, 481:20, 482:2, 482:3, 482:5, 487:17, 490:17, 491:16, 491:19, 491:23, 492:2, 492:9, 492:12, 492:16, 492:20, 492:22, 493:6, 493:7, 493:9, 496:11, 499:13, 502:16, 503:9, 505:16, 505:18, 505:20, 505:23, 505:24, 506:1, 506:9, 507:5, 508:19, 518:12, 524:13, 526:8, 535:10, 535:19, 535:25, 539:15, 546:22, 548:2, 548:3, 548:4, 548:11, 548:15, 549:7, 549:12, 550:3, 550:6, 550:12, 550:23, 551:3, 551:11, 551:17
**the..** [1] - 345:2
**themselves** [5] - 287:15, 287:16, 361:4, 373:4, 408:9
**theoretically** [1] - 359:4
**theories** [6] - 461:15, 461:19, 462:9, 462:13, 462:17, 464:2
**theory** [4] - 461:22, 462:4, 462:5, 462:7
**therapeutic** [11] - 353:14, 431:15, 434:4, 434:5, 434:20, 434:21, 442:2, 452:8, 452:9, 515:4, 515:21
**Therapeutics** [2] - 426:20, 427:16
**THERAPEUTICS** [1] - 255:6
**therapeutics** [2] - 429:9, 519:14
**therapy** [2] - 325:20, 326:24
**thereby** [1] - 371:11
**therefore** [2] - 257:23, 440:25
**Thereupon** [20] - 277:1, 291:16, 292:12, 293:15, 297:6, 314:20, 333:9, 365:25, 367:5, 376:1, 395:17, 419:25, 435:14, 451:2, 453:12, 481:7, 499:14, 524:14, 526:9, 539:17
**thesis** [7] - 417:8, 417:13, 418:9, 418:13, 418:16, 484:7, 484:11
**they've** [3] - 322:19, 453:21, 521:22
**thinking** [11] - 284:21, 313:6, 499:18, 505:14, 513:9, 513:12, 518:3, 527:12, 535:19, 541:7, 549:21
**third** [12] - 320:4, 377:20, 437:18, 452:2, 462:7, 514:17, 530:9, 543:15, 543:16, 543:18, 543:23, 547:14
**thirdly** [1] - 437:12
**thoughts** [1] - 284:1
**thousand** [5] - 326:12, 326:16, 329:23, 415:19, 415:20
**thousands** [3] - 383:22, 394:22, 446:9
**thread** [2] - 260:7, 369:4
**threat** [1] - 287:3
**threats** [1] - 540:9
**three** [24] - 281:14, 285:1, 285:16, 285:21, 301:17, 302:9, 358:12, 388:4, 415:18, 431:5, 432:15, 437:15, 461:21, 469:25, 508:25, 511:1, 527:8, 543:25, 544:2, 544:4, 546:10, 546:17, 546:18, 546:25
**three-month** [1] - 388:4
**threshold** [2] - 326:25, 336:13
**threw** [1] - 328:10
**throughout** [5] - 369:6, 402:10, 434:10, 435:1, 486:18
**throw** [2] - 329:3, 352:7
**thrown** [1] - 309:12
**Thursday** [3] - 295:11, 550:8, 550:23
**tied** [1] - 305:21
**tier** [1] - 525:16
**tiers** [2] - 525:9
**TIGAN** [1] - 255:16
**tight** [3] - 308:25, 393:4, 469:2
**tighter** [2] - 311:20, 311:21
**timed** [2] - 349:22, 352:17
**timeline** [9] - 257:19, 273:16, 274:22, 497:19, 500:7, 500:25, 511:6, 511:13, 523:3
**timelines** [1] - 275:24
**timely** [2] - 548:18, 549:3
**timing** [5] - 271:18, 293:5, 305:19, 533:12, 533:13
**tiny** [1] - 442:12
**title** [14] - 261:20, 270:23, 334:25, 411:25, 430:2, 441:19, 453:4, 463:24, 479:24, 518:17, 524:17, 526:1, 539:24, 542:17
**titled** [3] - 367:7, 499:7, 539:20
**titles** [1] - 383:17
**toast** [4] - 321:16, 321:23, 358:3
**toaster** [1] - 321:17
**today** [38] - 271:21, 278:1, 294:22, 297:9, 306:14, 314:24, 323:13, 337:7, 344:6, 350:11, 352:11, 366:14, 368:13, 411:10, 433:14, 437:16, 437:17, 438:17, 440:6, 443:17, 443:24, 458:5, 483:10, 483:11, 483:21, 485:9, 491:1, 491:3, 494:7, 494:12, 502:13, 505:2, 506:19, 506:25, 508:1, 508:5, 508:22, 527:23
**today's** [1] - 490:21
**together** [29] - 306:20, 309:22, 309:23, 313:1, 317:18, 328:24, 329:4, 330:8, 330:10, 330:13, 330:25, 331:14, 332:13, 336:23, 337:16, 338:16, 342:14, 342:17, 348:6, 348:25, 349:18, 359:25, 382:21, 383:1, 424:23, 441:13, 446:14, 509:22, 523:5
**toilet** [1] - 372:24
**tomorrow** [13] - 295:2, 295:3, 295:6, 295:10, 295:23, 547:1, 547:24, 548:9, 550:2, 550:8, 550:20, 551:2, 551:18
**ton** [1] - 312:6
**Ton** [1] - 393:13
**took** [11] - 262:4, 281:4, 299:9, 299:13, 305:2, 305:3, 318:15, 324:18, 330:6, 374:15, 533:17
**tool** [1] - 461:3
**top** [28] - 261:13, 377:14, 381:19, 390:5, 399:7, 442:22, 487:10, 505:3, 511:21, 512:7, 519:8, 521:25, 522:8, 522:9, 523:14, 525:3, 525:9, 525:10, 525:16, 525:20, 540:16, 541:1, 541:3, 543:8, 545:16, 546:16, 546:17
**topic** [6] - 269:12, 282:11, 415:24, 416:11, 499:18, 505:14
**topical** [1] - 427:21
**topics** [1] - 508:3
**total** [3] - 339:23, 391:21, 532:14
**totally** [1] - 263:14
**touch** [2] - 305:16, 465:12
**touching** [1] - 304:17
**tough** [2] - 299:13, 354:13
**tout** [1] - 538:22
**towards** [3] - 375:14, 385:24, 519:9
**toxic** [1] - 389:4
**toxin** [91] - 265:8, 306:5, 308:9, 308:17, 310:21, 312:16, 312:20, 312:24, 314:3, 316:2, 316:5, 319:18, 329:14, 330:17, 333:24, 337:4, 340:20, 344:14, 344:18,

344:23, 345:7, 345:10, 346:21, 347:6, 347:19, 349:2, 350:7, 351:19, 354:9, 371:25, 387:25, 389:8, 389:15, 400:1, 406:9, 407:22, 412:2, 412:13, 413:6, 413:7, 413:9, 413:17, 421:14, 427:21, 427:23, 428:9, 428:12, 428:17, 428:24, 429:1, 429:5, 433:3, 433:9, 434:8, 434:24, 436:12, 439:1, 439:3, 440:15, 440:24, 441:7, 441:10, 441:12, 441:14, 441:16, 441:22, 442:12, 442:20, 445:19, 447:21, 448:20, 448:22, 449:17, 452:13, 453:19, 454:16, 455:2, 460:24, 462:1, 463:7, 463:13, 479:4, 479:6, 485:6, 488:24, 496:20, 526:24, 527:4, 545:17
**Toxin** [1] - 361:20
**toxins** [13] - 341:23, 345:11, 348:23, 412:24, 413:3, 427:14, 441:25, 453:23, 466:24, 485:2, 487:1, 487:14, 487:15
**TPP** [1] - 523:15
**trace** [2] - 282:19, 282:21
**track** [3] - 294:15, 294:18, 364:1
**traction** [2] - 393:2, 549:20
**traditional** [2] - 442:18, 442:19
**traditionally** [1] - 443:1
**traffic** [2] - 295:20, 295:22
**tragedy** [1] - 325:21
**training** [4] - 303:11, 306:3, 351:16, 388:5
**Tran** [1] - 307:3
**TRANSCRIPT** [1] - 255:9
**transcript** [2] - 279:4, 410:7
**transition** [1] - 515:23
**transmissible** [1] - 401:19
**travel** [3] - 405:11, 405:12, 405:15
**treat** [2] - 316:19, 485:3
**treated** [1] - 278:17
**treatment** [4] - 325:8, 545:17, 546:10, 546:12
**treatments** [1] - 540:23
**trehalose** [19] - 320:23, 331:11, 333:25, 334:1, 335:20, 335:23, 336:10, 340:21, 345:19, 355:14, 355:16, 355:18, 356:14, 359:6, 360:16, 447:24, 458:2, 479:13, 479:18
**trend** [1] - 443:21
**Trexler** [3] - 290:17, 290:18, 550:22
**Trexler's** [1] - 290:24
**trial** [9] - 349:22, 352:1, 352:17, 429:7, 436:17, 437:18, 469:2, 483:6, 549:2
**TRIAL** [2] - 255:9, 255:11
**trials** [4] - 498:3, 498:4, 498:5, 498:8
**trick** [2] - 545:7
**tried** [6] - 305:14, 331:9, 337:22, 343:10, 395:4, 465:13
**trouble** [2] - 322:16, 393:15
**true** [4] - 272:5, 348:21, 354:17, 357:23
**truthful** [1] - 451:24
**try** [22] - 259:20, 269:23, 312:19, 313:1, 313:22, 316:14, 323:6, 334:14, 351:14, 360:7, 375:20, 382:21, 386:25, 390:1, 393:14, 395:1, 412:19, 458:18, 470:18, 479:16, 518:1, 530:21
**trying** [44] - 265:21, 271:15, 271:18, 278:21, 281:18, 282:25, 284:1, 284:17, 287:7, 287:11, 288:13, 295:4, 304:15, 309:7, 316:18, 321:25, 326:4, 329:18, 330:12, 337:15, 343:12, 348:7, 348:16, 348:20, 349:23, 351:5, 352:18, 360:11, 362:10, 384:4, 386:19, 390:6, 408:5, 409:17, 467:10, 472:25, 474:7, 478:17, 505:9, 516:22, 517:16, 525:4, 540:7, 548:21
**Tse** [1] - 417:6
**TSE/BSE** [2] - 402:7, 424:8
**Tuesday** [2] - 294:14, 294:22
**TUNNELL** [1] - 255:16
**turn** [69] - 296:23, 314:9, 315:24, 319:25, 321:9, 331:25, 333:19, 337:6, 339:5, 340:15, 341:25, 366:16, 369:2, 371:16, 373:18, 373:25, 374:1, 374:19, 376:22, 380:3, 380:25, 382:24, 383:12, 383:23, 387:8, 387:19, 390:9, 391:16, 392:13, 394:7, 395:20, 416:16, 419:2, 423:12, 423:19, 424:14, 424:16, 431:18, 431:19, 442:15, 449:23, 450:11, 452:22, 455:16, 455:17, 466:20, 467:16, 472:21, 473:24, 483:19, 484:13, 486:12, 496:13, 499:4, 503:13, 504:3, 507:2, 510:19, 518:20, 521:1, 523:12, 524:3, 524:6, 524:20, 525:22, 530:3, 542:6, 544:15, 544:23
**turned** [2] - 305:13, 318:23
**turns** [3] - 311:4, 321:17, 358:3
**Tustin** [1] - 301:13
**TV** [1] - 388:20
**tween** [1] - 479:20
**twice** [3] - 483:6, 490:20, 546:12
**two** [85] - 261:9, 269:8, 270:10, 271:2, 272:19, 273:8, 273:24, 279:16, 279:19, 281:14, 283:1, 283:13, 285:1, 285:16, 285:21, 291:19, 292:14, 304:6, 320:15, 330:4, 330:5, 330:6, 330:10, 330:15, 331:4, 334:4, 336:9, 336:22, 337:1, 337:9, 338:2, 361:1, 361:4, 377:13, 377:15, 379:15, 381:3, 382:20, 382:24, 391:12, 391:14, 396:14, 396:22, 401:1, 402:3, 402:9, 402:18, 402:19, 408:9, 415:18, 421:10, 425:2, 433:13, 437:17, 444:12, 445:17, 448:13, 448:22, 449:4, 449:17, 450:3, 453:17, 453:21, 456:23, 460:15, 460:16, 463:17, 479:23, 486:8, 492:18, 492:23, 501:2, 513:8, 514:5, 517:22, 533:5, 533:10, 543:8, 543:10, 545:8, 546:5, 547:19
**two-ingredient** [6] - 330:4, 330:5, 330:15, 331:4, 334:4, 337:1
**two-minute** [1] - 292:14
**TX** [1] - 519:14
**type** [32] - 304:1, 328:22, 330:3, 332:23, 337:10, 339:15, 344:18, 344:23, 367:15, 375:2, 375:3, 381:6, 382:8, 382:10, 414:4, 417:4, 420:17, 427:11, 433:4, 454:12, 454:19, 459:9, 460:19, 463:8, 468:18, 485:22, 486:5, 488:16, 495:5, 495:18, 501:3
**Type** [1] - 345:7
**types** [14] - 259:20, 327:7, 331:8, 331:9, 379:25, 381:1, 384:8, 394:23, 394:24, 485:2, 485:18, 485:19, 485:20, 514:11
**typically** [7] - 332:23, 339:15, 405:12, 443:8, 451:18, 515:8, 532:7
**typo** [2] - 362:21, 362:22

## U

**U.S** [18] - 292:23, 292:24, 302:21, 314:15, 342:25, 374:4, 419:8, 419:12, 427:5, 427:9, 427:15, 434:19, 494:1, 522:7, 543:11, 543:12, 552:3
**U.S.D.C.J** [1] - 255:12
**ubiquitous** [1] - 311:25
**ultimately** [8] - 319:21, 326:23, 370:10, 381:2, 387:9, 429:23, 442:2, 443:21
**uncertain** [1] - 284:18
**uncertainty** [3] - 284:20, 502:8, 531:6
**under** [18] - 260:2, 263:4, 267:22, 299:16, 314:7, 342:18, 361:8, 399:24, 409:2,

409:4, 409:6, 446:9, 460:11, 499:20, 501:18, 530:9, 535:3, 540:19
**undergraduate** [1] - 507:9
**underlying** [5] - 260:15, 383:16, 534:20, 536:9, 536:11
**underneath** [1] - 471:25
**understandable** [1] - 469:19
**understood** [9] - 260:22, 276:16, 277:14, 292:20, 345:13, 363:16, 428:3, 490:4, 547:17
**undertook** [1] - 446:6
**unexpected** [6] - 446:25, 447:2, 461:13, 481:11, 548:22, 549:17
**unfold** [2] - 311:9, 349:18
**unforeseen** [1] - 373:6
**unfortunately** [1] - 490:1
**UNIKEL** [1] - 255:21
**unique** [2] - 316:2, 538:12
**unit** [3] - 396:6, 479:4, 479:15
**United** [4] - 297:2, 308:14, 438:3, 507:9
**UNITED** [1] - 255:1
**units** [11] - 301:16, 308:5, 310:22, 310:23, 333:24, 335:6, 335:11, 340:20, 353:12, 476:22
**university** [1] - 484:18
**University** [16] - 299:24, 300:15, 302:1, 302:12, 368:22, 436:10, 438:4, 438:8, 438:12, 484:3, 484:4, 484:5, 484:19, 494:21, 507:23, 507:24
**unknown** [1] - 291:5
**unless** [3] - 291:8, 293:20, 307:10
**unlikely** [1] - 549:9
**unmet** [1] - 541:1
**unpack** [1] - 258:2
**unpredictable** [5] - 259:22, 384:4, 441:1, 441:3, 489:22
**unrebutted** [2] - 257:19, 257:20
**unrelated** [1] - 266:3
**up** [129] - 257:22, 258:17, 260:11, 260:25, 265:6, 266:17, 269:3, 272:11, 273:14, 277:21, 282:25, 286:19, 288:1, 290:5, 290:13, 290:16, 290:23, 290:24, 294:2, 296:3, 296:21, 298:3, 298:11, 301:1, 301:10, 301:13, 302:13, 303:9, 304:14, 306:16, 308:10, 310:16, 311:6, 312:23, 318:13, 320:3, 320:13, 321:20, 323:3, 325:9, 326:1, 328:8, 332:4, 333:17, 334:17, 339:25, 340:14, 340:16, 340:17, 340:25, 343:12, 350:6, 350:13, 350:21, 350:22, 351:9, 356:4, 356:18, 358:6, 359:22, 361:12, 365:10, 365:23, 370:12, 374:17, 376:3, 377:1, 379:6, 379:8, 384:19, 385:8, 393:17, 395:6, 401:7, 411:5, 415:5, 415:10, 416:23, 424:7, 436:22, 437:23, 440:19, 454:23, 458:12, 459:5, 463:4, 467:2, 471:23, 471:25, 474:15, 478:13, 480:17, 481:17, 481:25, 483:23, 485:15, 486:19, 494:14, 497:3, 497:4, 502:2, 506:21, 516:17, 517:22, 521:15, 525:23, 528:7, 529:14, 529:22, 529:24, 531:12, 531:20, 532:12, 533:20, 535:14, 536:20, 537:25, 543:21, 543:23, 544:2, 545:14, 547:17, 548:17, 548:19, 550:16, 551:12
**up-to-date** [1] - 294:2
**upfront** [1] - 328:15
**upper** [3] - 297:12, 332:17, 367:8
**upstate** [3] - 370:15, 370:16, 507:24
**US** [1] - 314:15
**uses** [14] - 262:8, 361:24, 367:20, 377:16, 396:16, 396:17, 448:24, 449:3, 487:21, 487:25, 488:2, 515:4, 515:11, 537:17
**utilize** [1] - 307:17
**utilizing** [5] - 319:19, 321:4, 324:1, 404:16, 422:5

## V

**VA** [1] - 298:20
**vaccination** [1] - 388:4
**vaccine** [2] - 304:12, 304:15
**vacuum** [5] - 332:13, 345:9, 345:10, 475:10, 475:14
**VALENTE** [5] - 255:22, 294:7, 294:13, 294:19, 295:12
**valid** [1] - 509:12
**validity** [3] - 490:7, 508:25, 509:3
**valuable** [1] - 319:2
**value** [19] - 335:15, 341:11, 341:15, 447:8, 447:10, 464:11, 464:14, 527:14, 537:18, 541:24, 542:1, 542:3, 544:10, 544:12, 545:5, 546:3, 546:19, 546:20
**valued** [1] - 544:10
**values** [1] - 477:13
**variable** [2] - 389:20, 390:7
**variables** [3] - 384:21, 384:23, 389:22
**variant** [1] - 529:16
**variety** [1] - 508:3
**various** [18] - 262:8, 265:2, 312:16, 327:10, 329:14, 340:6, 351:12, 401:2, 461:4, 514:23, 516:13, 516:18, 527:23, 527:24, 542:24, 543:14, 548:22
**VARUGHESE** [50] - 256:6, 268:11, 268:13, 268:20, 269:3, 269:6, 270:2, 270:9, 273:5, 273:8, 273:23, 274:13, 274:19, 275:2, 275:12, 276:23, 277:22, 278:8, 278:21, 292:8, 292:20, 293:8, 314:18, 315:2, 333:7, 343:25, 344:3, 346:25, 351:3, 363:16, 363:17, 364:2, 375:24, 395:15, 397:17, 397:20, 399:25, 400:6, 400:10, 401:3, 401:4, 410:15, 416:1, 416:4, 417:24, 419:20, 420:2, 423:3, 435:9, 496:10
**Varughese** [8] - 268:13, 273:3, 276:22, 278:6, 344:6, 365:23, 397:16, 397:23
**vary** [1] - 312:9
**vast** [1] - 395:4
**vendors** [1] - 379:18
**venue** [1] - 334:15
**verbatim** [4] - 420:23, 421:5, 421:10, 421:13
**verdict** [1] - 548:9
**version** [10] - 264:23, 333:17, 368:4, 385:22, 386:6, 395:25, 396:18, 397:11, 398:20, 522:17
**versions** [5] - 352:3, 371:2, 371:13, 386:24, 396:1
**versus** [9] - 281:9, 281:10, 284:5, 312:11, 318:5, 335:5, 528:25, 533:14, 540:22
**vertical** [1] - 528:21
**veterinary** [2] - 484:2, 484:4
**vetted** [1] - 269:21
**vial** [5] - 322:22, 441:12, 441:15, 443:4, 444:14
**vials** [5] - 329:23, 331:6, 440:25, 441:8, 441:14
**vice** [2] - 426:18, 429:12
**video** [11] - 346:18, 346:24, 410:9, 410:14, 425:23, 426:7, 426:10, 426:14, 435:6, 463:5, 463:18
**videos** [4] - 287:2, 325:5, 440:19, 514:22
**Vienna** [1] - 325:3
**view** [15] - 288:25, 307:9, 373:13, 400:24, 406:25, 440:9, 446:5, 446:7, 452:20, 468:7, 468:14, 470:22, 517:8, 523:1, 535:8
**viewed** [2] - 313:9, 522:4
**viewing** [1] - 517:24
**views** [1] - 445:14
**vinegar** [3] - 381:16, 381:20, 381:22
**virtue** [1] - 294:18
**viruses** [4] - 398:5, 399:12, 401:18, 402:7
**visits** [1] - 546:14
**visualize** [1] - 391:25
**VLADIMIR** [1] - 255:22
**Volkswagen** [1] - 299:14
**volume** [2] - 255:7, 317:10
**voluminous** [1] - 536:2
**volunteered** [2] - 342:17, 342:19
**votes** [1] - 543:25
**VP** [3] - 280:3, 284:24, 285:4
**VPs** [1] - 305:8
**vs** [1] - 255:5

## W

**wait** [7] - 291:7, 293:17, 293:18, 293:19, 529:1, 529:2
**waiting** [3] - 279:12, 301:9, 332:3
**walk** [6] - 390:16, 449:23, 483:25, 484:14, 494:15, 500:7
**walking** [3] - 294:4, 305:20, 325:9
**walls** [3] - 347:15, 441:10, 445:2
**wants** [9] - 267:15, 451:11, 485:14, 515:15, 517:4, 528:25, 530:20
**war** [3] - 298:7, 308:8, 373:4
**ward** [1] - 300:16
**warner** [1] - 551:22
**Warner** [1] - 552:2
**Washington** [1] - 494:20
**watch** [5] - 306:5, 317:23, 364:14, 425:16, 505:18
**water** [17] - 311:3, 334:11, 334:14, 354:23, 354:24, 355:4, 381:15, 381:17, 381:18, 381:20, 381:21, 381:22, 382:1, 382:2
**water-hating** [3] - 381:15, 381:17, 382:2
**water-loving** [4] - 381:15, 381:20, 381:21, 382:1
**ways** [10] - 317:8, 330:23, 370:22, 371:1, 371:4, 375:18, 403:18, 519:17, 530:22
**weakness** [2] - 540:12, 540:13
**weaknesses** [3] - 540:9, 540:16, 541:3
**week** [3] - 267:17, 389:9, 389:10
**weight** [2] - 320:9, 320:10
**weird** [1] - 299:9
**welcome** [4] - 295:18, 365:3, 426:3, 492:23
**well-accepted** [1] - 461:3
**well-established** [1] - 356:16
**well-known** [2] - 321:15, 358:9
**well-matched** [1] - 460:8
**Wells** [1] - 490:14
**WELLS** [8] - 256:8, 257:6, 258:25, 487:16, 490:11, 490:15, 490:18, 491:15
**wells** [1] - 258:23
**West** [3] - 301:3, 507:10, 507:12
**wet** [1] - 354:24
**wheelchairs** [1] - 325:7
**whereas** [3] - 323:20, 334:14, 393:3
**wherein** [2] - 473:12, 476:14
**white** [3] - 311:4, 369:13, 385:14
**whole** [7] - 298:4, 298:24, 312:13, 332:12, 348:24, 390:12, 390:25
**wholly** [1] - 429:2
**wife** [2] - 301:3, 343:11
**willing** [1] - 514:7
**WILSON** [1] - 256:4
**win** [1] - 549:9
**window** [1] - 307:8
**windshield** [1] - 299:19
**wiper** [1] - 299:19
**withdraw** [1] - 270:10
**withdrawn** [1] - 260:13
**WITNESS** [17] - 296:8, 300:4, 303:5, 307:13, 307:16, 315:4, 364:4, 364:11, 364:19, 365:15, 435:22, 477:20, 482:5, 493:9, 505:20, 506:1, 548:3
**witness** [29] - 270:14, 270:15, 272:10, 296:2, 296:3, 296:11, 296:21, 314:9, 331:25, 339:5, 342:2, 365:18, 374:1, 410:6, 425:21, 435:16, 435:25, 462:24, 466:16, 474:2, 481:4, 481:5, 481:24, 482:1, 482:8, 493:12, 506:4, 548:12
**witnesses** [2] - 271:25, 527:24
**women** [1] - 299:10
**word** [13] - 268:18, 279:3, 304:3, 317:13, 331:21, 335:9, 347:8, 354:18, 355:19, 363:6, 379:21, 381:21, 441:19
**words** [11] - 309:18, 311:12, 316:9, 317:9, 331:18, 338:12, 385:5, 453:24, 465:21, 466:2, 466:7
**worker** [1] - 301:24
**workers** [3] - 396:4, 397:12, 440:21
**works** [15] - 268:23, 309:23, 311:23, 317:22, 329:5, 330:19, 331:1, 334:13, 338:20, 341:17, 357:25, 379:12, 380:24, 445:11, 473:7
**world** [6] - 304:25, 343:2, 403:14, 513:14, 513:19, 514:18
**worried** [3] - 293:24, 325:13, 325:14
**worry** [1] - 328:16
**worse** [1] - 271:8
**wrinkles** [1] - 447:3
**write** [3] - 350:22, 351:9, 418:23
**writing** [2] - 350:13, 421:18
**written** [5] - 350:19, 351:6, 351:17, 486:20, 550:13
**wrote** [3] - 350:15, 350:21, 420:17

## X

**Xeomin** [1] - 527:10
**Xes** [4] - 372:17, 372:18, 372:19, 443:4
**Xiang** [2] - 376:6, 376:10

## Y

**year** [14] - 270:6, 280:10, 286:3, 300:21, 303:3, 307:12, 429:20, 429:22, 439:13, 502:21, 507:24, 518:19, 546:11, 546:12
**years** [22] - 271:2, 281:11, 284:22, 299:20, 302:8, 304:6, 305:4, 351:23, 368:11, 372:23, 470:1, 485:7, 486:8, 494:2, 494:4, 494:25, 497:4, 502:3, 502:5, 507:21, 514:9, 514:24
**years'** [1] - 436:10
**yeast** [1] - 318:19
**yellow** [4] - 328:5, 380:20, 380:21, 394:6
**yes-or-no** [2] - 469:4
**yesterday** [22] - 257:2, 259:21, 269:25, 270:20, 272:23, 274:8, 278:13, 279:1, 279:20, 287:1, 333:11, 448:3, 454:14, 455:23, 455:25, 456:10, 459:22, 460:3, 461:6, 467:18, 472:7, 487:18
**yields** [1] - 430:19
**yolk** [1] - 311:3
**York** [4] - 364:12, 370:15, 370:16, 507:24
**YOUNG** [1] - 256:3
**yourself** [3] - 328:5, 373:20, 470:18

## Z

**ZEBET** [1] - 487:6
**zero** [4] - 272:1, 272:2, 316:6, 490:25
**zoom** [3] - 392:3, 399:21, 543:8