IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., | ) |
| | ) |
| --------------------Plaintiff, | ) |
| | ) Case No. |
| vs. | ) 21-CV-1411-RGA |
| | ) |
| REVANCE THERAPEUTICS, et al., | ) |
| | ) Volume III |
| --------------------Defendant. | ) |

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Richard G. Andrews, U.S.D.C.J., and a jury of eight in Courtroom 6A on the 16th of July, 2025.

APPEARANCES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JEREMY TIGAN, ESQ.

-and-

PAUL HASTINGS LLP
BY: ERIC DITTMANN, ESQ.
ISAAC ASHKENAZI, ESQ.
MELANIE RUPERT, ESQ.
CARL MINNITI, ESQ.
KRYS HO, ESQ.
ROBERT UNIKEL, ESQ.
DAVID VALENTE, ESQ.
VLADIMIR SEMENDYAI, ESQ.

Counsel for Plaintiff

(Appearances continued.)

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: ANNE GAZA, ESQ.
SAMANTHA WILSON, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: DENNIES VARUGHESE, ESQ.
ADAM LAROCK, ESQ.
BYRON PICKARD, ESQ.
NIRAV DESAI, ESQ.
DEIRDRE WELLS, ESQ.

-and-

CAHILL GORDON
BY: PETER ARMENIO, ESQ.

Counsel for Defendant

THE COURT: All right. Please be seated. Good morning. So I think I have two letters this morning, one of which was about the motion to strike. And there's going to be a response to that so that's really not up for debate right now.

And then the other is -- I believe it's Allergan's letter Docket Item 623 objecting to three different topics. And one has to do with DTX 136, which, honestly, if I was provided with that, I couldn't figure out what it was.

So what it is -- and anyway, the objection was that Dr. Ramsey doesn't mention it in his expert reports and supposedly only wants to testify on something he heard that Dr. Schöneich said yesterday.

Is that the right state of affairs?

MR. DITTMANN: That's correct, Your Honor. Just for some context, DTX 136, this is one of the FDA correspondence that Dr. Schöneich talked about yesterday, including a Revance mouse study.

THE COURT: Okay.

MR. DITTMANN: And just for some context, Dr. Schöneich, even from his very first expert report, has been discussing Revance's FDA correspondence in mouse DAS studies in all three, including his first report.

So Dr. Ramsey had two rounds of reports that he

could have responded either on FDA correspondence like DTX 136, or, at a minimum, he hasn't said one word anywhere about mouse DAS studies. So he certainly should be able to do so now.

Instead, Revance had Dr. Nagaich, who's also going to testify. He's the one that responded on the FDA correspondence. And just to really kind of drive the point home, even at his deposition of Dr. Ramsey, Revance's own counsel elicited testimony that says, "Dr. Ramsey, do you have any basis to comment on what Revance may have said to the FDA?"

And Dr. Ramsey said, "No, I don't."

So now we're going to have him the first time ever, after hearing from Dr. Schöneich --

THE COURT: All right. I get your point of view.

MR. LAROCK: Adam LaRock for defendants.

THE COURT: Mr. LaRock, thank you. Yes, what's your response?

MR. LAROCK: So how this issue came up is the document DTX 136 was used in Dr. Schöneich's reply report. Dr. Schöneich's reply report never used the Figure 5 of DTX 196 that Dr. Schöneich used during testimony yesterday.

So that was an undisclosed opinion from Dr. Schöneich. Dr. Ramsey was in the courtroom and directly

relates to his opinions and he should have an opportunity to testify.

MR. DITTMANN: And what is disclosed in Dr. Schöneich's reply report, he has the whole range of, it was the FDA correspondence and the reasons for it, and there was no objection to it.

THE COURT: All right. Can somebody put DTX 136 up on the screen for a minute.

All right. And what did Dr. Schöneich testify about yesterday?

MR. DITTMANN: So basically, he sets up the context that there was a question about this -- whether there's an increase of toxin spread and/or effect. And he walked through and said that this is what Revance said in their answer, and it refers to studies in the answer, and then he just, as is in the document, he talked about the studies that are referenced here. This is in his report.

THE COURT: And so this study that Mr. LaRock mentions, this Figure 5, is that the right --

MR. LAROCK: That's right, Your Honor.

THE COURT: So Figure 5 is in his reply report or there's some mention of it in his reply report?

MR. LAROCK: There is not.

THE COURT: Oh, there is not.

MR. DITTMANN: What there is, Your Honor,

because there's a citation about 15 pages where this whole entire back-and-forth from the FDA is happening. And even with the quote that Dr. Schöneich refers to refers to studies. He's just talking about the studies.

THE COURT: What is the overall relevance of this, in any event?

MR. DITTMANN: The relevance is that Revance represented to the FDA that the peptide doesn't provide --

THE COURT: The in-earth business.

MR. DITTMANN: Correct. The really fundamental issue here, Your Honor, is that Dr. Ramsey has never said one word in any of his reports or deposition about mouse DAS studies so we have no idea what he's going to say.

And he was asked in his deposition, again, Do you have any basis --

THE COURT: I heard that the first time.

Do you disagree, Mr. LaRock, that at the deposition the witness had said he had no opinions on this topic?

MR. LAROCK: Well, the witness said he had no opinions about the statements made to FDA. What Dr. Ramsey is going to respond back to is Dr. Schöneich's new opinions now about Figure 5, which was not contained --

THE COURT: Can I see Figure 5?

MR. DITTMANN: It's in the middle of pages cited

by Dr. Schöneich and there was no objection to it yesterday.

THE COURT: Oh, okay. So there was this Figure 5 and then there was a very similar figure which came from where?

MR. DITTMANN: That came from Allergan's study.

THE COURT: That's right. So this is the Revance study, and then there was the, arguably, pretty similar Allergan study; right?

MR. DITTMANN: Correct. And Dr. Ramsey never responded.

THE COURT: And what did Dr. Schöneich say about this?

MR. DITTMANN: He just says that the -- both studies show that, when you look at the peptide, it doesn't add any effect -- it doesn't add anything in terms of therapeutic efficacy. He's been saying that since day one in the reports, and Dr. Ramsey has never addressed that, ever.

THE COURT: So the point about whether or not Dr. Schöneich -- and so, Mr. Dittmann, do -- can you show me in a report -- the expert report of Dr. Schöneich where he came closest to saying something about Figure 5?

MR. DITTMANN: Yes. Bring up that page, Carl.

THE COURT: And while he's doing that, you also said Dr. Nagaich actually does have opinions about this too?

MR. LAROCK: He addressed that, yes, in his reports.

THE COURT: So is he going to be testifying?

MR. LAROCK: He will be testifying today.

THE COURT: So why isn't he just doing this and we don't have to argue about it?

MR. LAROCK: Well, he's an FDA expert and so what the opinion of Dr. Ramsey is going to be is directly responding to what Dr. Schöneich said about Figure 5 and comparing it to the Allergan study and how that relates to the duration of action. That would not be something that an FDA expert could do.

THE COURT: Okay. So this is Footnote 2 to something is where this is disclosed. This is an opinion of Dr. Schöneich?

MR. DITTMANN: Yes. And so if you see here, it comes up the FDA is expressly concerned about whether the peptide causes any increased toxin spread or effect, cites a page range from basically 141, 143 to 144, which is where these studies are referenced. And the answer is at 158. And in between these documents is where the studies and everything is contained.

And again --

THE COURT: Just slow down a minute.

All right. So the sentence to address this

issue Revance subsequently responded, that was sort of the start of what Dr. Schöneich was saying about this, and then he was showing these various graphs to support that point?

MR. DITTMANN: Well, what happened was that Dr. Schöneich puts it in his reply report, then during his deposition, Dr. Ramsey, who has never talked about FDA correspondence and definitely has never talked about mouse DAS, was asked, again, "Do you have any basis to comment on FDA correspondence?"

He says, "I have no basis."

So now they want to come in --

THE COURT: Right. I got that the first two times, Mr. Dittmann.

MR. DITTMANN: Okay. Thank you, Your Honor.

THE COURT: Do you have anything more to say, Mr. LaRock?

MR. LAROCK: Yeah. These pages are not where Figure 5 appears.

MR. DITTMANN: It's right in between.

THE COURT: All right. So I don't think it's a good idea to have Dr. Ramsey coming up and offering opinions that he's never offered before.

And, you know, if Dr. Schöneich went beyond what was in his export report, which I don't really have an opinion about, the time to do something about that was when

he testified, not now. So if that was a reach too far, one wrong doesn't justify another wrong.

And so I'm going to sustain the objection to Dr. Ramsey commenting on -- I guess on what's in DTX 136?

MR. DITTMANN: That's right. DTX 136 just should be out. That's it.

THE COURT: All right. So, Mr. LaRock, that's my ruling on that.

MR. LAROCK: Understood.

THE COURT: So then their next objection has to do with, supposedly, slides 64 to 67 as misstating the law on unexpected properties.

And so, you know, once again, I print these things out but because of the way they're filed or because of my own lack of facility, when they print out, because they're landscape rather than portrait, I don't get all of them.

So I've got Docket Item 623-1, which is including the obviousness statute and then objective evidence, and then the next slide is Table 1 of Hunt, I suppose.

Is that --

MR. DITTMANN: Maybe if Your Honor will bring up one slide to help frame our reference?

THE COURT: Yeah, that would be good.

MR. DITTMANN: Bring up 67.

So this is an example of the sort of problems we have, that there's a recitation of the law, but it's the wrong law. And it talks about --

THE COURT: So what -- so one thing is, I would like the -- I would like -- I would like the slide that has the obviousness statute quoted, I would like that not to be included in the deck.

I have no problem with you asking the expert what's your understanding of obviousness and he gives whatever explanation he wants, because I think that helps frame what his testimony is, but I don't want the -- I wouldn't normally be quoting the statute in jury instructions and I prefer not to have -- you know, have to reconcile different statements that aren't actually in the jury instructions. Okay. So that should be replaced.

And I don't -- I'm not sure about the one that says objective indicia. That seems like a pretty harmless statement. But so, again, but I'd like you to take that out. And, again, you can ask him to explain what he's doing.

So I think that leaves the two slides that are Hunt and then the one with the BOTOX cosmetic. And with them, what you're showing me is something different. You're showing me what -- I have this in front of me.

All right. And so the objection here in part is some suggestion that the claims have to recite duration of action for that to be an unexpected result?

MR. DITTMANN: Yes. So it's about unexpected results, and it appears -- next slide, please -- it appears that Dr. Sury is going to take the position and contend that it's relevant that the claims don't say in them "duration of action."

THE COURT: Well, so the claims literally do not say anything about duration of action; right?

MR. DITTMANN: They don't literally say those words, but that's irrelevant. Unexpected properties don't --

THE COURT: Well, no, so that's kind of what my thinking was, was that you can have unexpected results that are not in the claims.

Meaning, if you have some device, a light bulb, and you replace copper with magnesium and it also lasted three times longer, you don't have to claim it lasts three times longer. You just say, I have -- their light bulb has got magnesium and that it effectively is a big surprise that it lasts longer is objective evidence.

So --

MR. DITTMANN: And there's another problem.

THE COURT: And I take it, though, it's not just

the claims that don't recite a duration of action; actually, the specification doesn't either; right?

MR. DITTMANN: Again, there's going to be a debate about what is or is not related to duration in terms of potency. We're putting that aside, yes. But that's -- like I said, the whole nature of unexpected properties, usually you figure them out later and that's why they're unexpected, surprising.

But they also -- the second prong here, Your Honor, is they're talking about this peptide, whether it materially affects -- Revance's peptide materially affects duration profile and is not claimed.

This is, again, starting to get into this area where we keep hearing things that are suggesting maybe there's not infringement even though it's out of the case.

THE COURT: Well, I'm not worried about that because I actually haven't -- only a patent lawyer would say, oh, I think what they're doing is suggesting there's no infringement here.

MR. DITTMANN: Fair enough. But they shouldn't be talking to an expert about what is or is not claimed.

THE COURT: Well, so if the peptide was the reason for the longer duration of action, the fact that it's not a part of the invention is pretty important; right?

MR. DITTMANN: Well, no. It's -- the issue is,

yes, what causes it, the peptide or not, but whether it's in the claim or not. Once again, unexpected properties, there's no relevance.

THE COURT: But unexpected properties are because of what is claimed, not something that's added in that's not claimed.

So the statement, which I don't think anyone disagrees with, is the peptide is not claimed, that's true, and you all can argue about whether the peptide has any effect; right?

MR. DITTMANN: Actually, there's one more layer to this that maybe will resolve this pretty simply. Dr. Sury does nothing in his reports about the peptide other than refer to other experts. He has one sentence where he says, This is the peptide. It's however many amino acids cites in the article.

And then he refers to Dr. Meagher and Dr. Ramsey for everything about the peptide. He shouldn't be getting up here now and talking about the peptide. He's never talked about it. He doesn't have his own opinions. He just references other experts' opinions.

THE COURT: So the letter I got doesn't really say anything about what I take it you're saying now, it was not disclosed.

MR. DITTMANN: We raised that as well. We

thought that the legal issues could take care of this. We didn't want to put every detail in our letter. But we certainly raised that.

THE COURT: Have I now -- so I think I said what my opinion is about the legal issues. Those two bullet points on the "no nexus" slide don't strike me as being improper or irrelevant, so I'm not --

MR. DITTMANN: The first one is misleading. It suggests because the claims don't recite it, that that matters.

THE COURT: On the other hand, it's also part of the second bullet point, so it's not misleading. Any statement can be used to mislead, but the statement itself is just true.

MR. DITTMANN: How about this, Your Honor. We just stick with the second bullet and take out the first and we'd be done.

THE COURT: I don't know. I've already indicated to Mr. Pickard he's winning, so I'm not sure how much bargaining power you have.

Mr. Pickard, do you want to take out the first one?

MR. PICKARD: I think Your Honor identified this is the factual statement --

MR. DITTMANN: We still have the disclosure

issue, Your Honor.

MR. PICKARD: What he's going to say is simply the jury has heard Dr. Ramsey and Dr. Meagher explained the peptide wraps that together with the --

(Cross-talk.)

THE COURT: Okay. All right. Problem resolved.

So this person who you all keep referring to as Dr. Sury is actually a much longer last name. Is that the way this expert is going to be referred to in front of the jury?

MR. PICKARD: He is. He will almost immediately on the stand say, "My colleagues call me Dr. Sury."

THE COURT: I've heard that line before. I wanted to make sure everybody is fine with that. So you're fine with that, the doctor is fine with that, you're fine with that?

MR. DITTMANN: I'm more than fine with that.

THE COURT: I think then we resolved the second dispute.

So then the third dispute has to do with this argument which I think -- so somebody, maybe Dr. Sury, is he the one who's going to use these exhibits?

MR. VALENTE: They're used with various witnesses.

THE COURT: Remind me who you are. Valente?

MR. VALENTE: David Valente, yes.

THE COURT: I'm sorry. I should, but there's too many of you.

So various people are going to use them for various purposes?

MR. VALENTE: That's our understanding, yes.

THE COURT: You're on the Allergan side?

MR. VALENTE: I'm on the Allergan side. If you want to know exactly what's going to be said, you'll have to exchange me for someone else.

THE COURT: Is your objection to these that they are not -- can't be proven to be prior to the publication date or is it something else?

MR. VALENTE: It's largely that we understand they're going to be used for hearsay purposes, proving the dates, for example, their contents, for their truth.

THE COURT: I would let the experts say the *Physicians' Desk Reference* of 2003 -- what year is that, published 2003? These people are experts. I think it's highly reliable, probably, for most of these, at least if I were -- if push came to shove, I would say that all of these have been on the exhibit list for a while, and the date of publication has not been, so far as I know, questioned and I don't think for most of these can reasonably be questioned.

So I'm willing to accept that something that

says copyright 2000, that would be possibly DTX 196, was published in 2000.

In terms of -- but just because they were published beforehand, depending on what they're being used for and who's using them, there could be other issues. Do you have particular hearsay?

MR. VALENTE: We don't know exactly what they're going to be used for, but we have concerns based on the contents of the documents they're likely to be used for the truth of their contents.

THE COURT: So all right. Well, if you don't have any particular objection beyond that, I guess you're probably going to be having to make objections as we go along.

I mean, we think in the end, all of these are somehow or other related to the defendant's obviousness position; right?

MR. VALENTE: Most of them are, yes.

THE COURT: And the fact of the matter is whether they're patents or publications, if they're prior art, the truth of the matter generally doesn't matter; right? It's just that it's out there.

MR. VALENTE: In their expert reports, they used a lot of statements and documents as though things are true. So we're concerned they're going to do the same thing here.

THE COURT: That's because a lot of times -- that's because, for example, if somebody writes in a paper two years before the relevant date, it would be a really bad idea to do X, X has a history of failure.

Those are hearsay, especially X has a history of failure. Those are literally hearsay but differentiating between their hearsay use and their impact on motivation to combine reasonable expectation of success.

It's a fool's errand trying to say you can use it for this purpose and not that purpose.

Is there something in particular, and you've been preparing for this, that leaps out at you as a really bad use you can give me an idea what you have in mind?

MR. VALENTE: Your Honor, we can look at this a different way. As you noted their experts rely on this under 703 and the experts show they're relying on certain criteria, but the documents don't go into evidence.

That's what we're looking to avoid, the jury going through these reading them for their truth.

THE COURT: I don't interpret the rule the way you do when it says -- I believe what it says is in the discretion of the Court, the hearsay can be presented to the jury. That's not the word they use. More probative -- I forget what the standard is. I'll have to look it up.

But I don't interpret that to be you can talk

about it. You just can't give them the document, when in this kind of case the document's what's really important. So someone wants to offer the *Physicians' Desk Reference,* all 2,000 pages, I'm not going to let that in.

But if they have one page where -- I don't know, I can't imagine, but probably I'm going to let the things that are, essentially, being presented as prior art or background prior art, which is what I assume this is, I'm going to let them into evidence almost certainly because I think the non-hearsay purpose for which they're being admitted, it's important that the jury have them. Okay?

MR. VALENTE: Fair enough.

THE COURT: If there's something going on during the testimony that you need to object to, make an objection, and it will work a lot easier if there's something concrete I'm looking at. Okay?

MR. VALENTE: Thank you, Your Honor.

THE COURT: Thank you, Mr. Valente.

Anything else?

MR ASHKENAZI: Yes, Your Honor. There's one other issue. We will hand a copy, and if we could put it on the screen, JTX 32, opposing counsel said they may reference this during Dr. Siegwarth's cross-examination.

You may recall that during the Daubert hearing, they cross-examined Dr. Siegwarth and discussed this

technical document, this BLA document, and she's not a technical expert.

The reality is that they're going to try to do two things. First is to raise new noninfringement positions or new design-arounds that were never discussed. In fact, they had explicit design-arounds that they had referenced in this document with their experts and they're no longer presenting. Nobody has discussed this document on either side with respect to damages issues, and it's going to cause confusion to cross-examine an economist with a BLA scientific document.

THE COURT: It's hard to tell until you actually see what the cross-examination is because she could be cross-examined about something and say, "I'm an economist. I don't know anything about that." And presumably then the cross-examination will stop. I don't know.

So, Mr. Armenio, do you have anything to add?

MR. ARMENIO: I do, Your Honor. Thank you.

The reason I gave opposing counsel at cross-examination the exhibit in advance was for the security concerns that were mentioned. This is one of those documents. I excerpted it. I wanted them to have disclosure ahead of time. I'll hand it up to the Court.

What this is used for is a very limited purpose, what the parties would be aware of during their hypothetical

negotiation. The doctor has very extensive testimony the parties would negotiate, and I'm trying to bring in and will bring in factors and facts that were available to those parties in their hypothetical negotiation as they bargained over the value of certain things. It's not extensive.

THE COURT: All right. You're not going to be cross-examining her in such a way that she has to keep saying, "I'm not a technical expert"?

MR. ARMENIO: Correct. It would be, is this a fact that would have been available to the parties in a hypothetical negotiation? Is this a fact available to those parties as they negotiate? I'm not going to ask her to interpret scientific documents or the like.

It's, during your hypothetical negotiation that you say occurred, would this have been an available fact to the parties?

MR ASHKENAZI: Your Honor, if I may, two points.

First, no expert has discussed this as being part of the relevance and having any relevance to damages at all. So to say, "Oh, this is a fact that the parties would have been aware of without getting into the scientific meaning of it" is going to be misleading to the jury.

And we saw the questioning during the Daubert hearing. They asked about that -- and I don't want to get into the details of the document -- certain purity

limitations and whatnot, that Dr. Siegwarth is not the person to be questioned about.

The reality is that they're trying to imply a new design-around theory that has never been disclosed in this case and to ask --

THE COURT: So, Mr. Armenio, at no point in this case going forward is your side going to be arguing that there is some design-around, is there?

MR. ARMENIO: The cross-examination is whether the parties need --

Can you go to, please -- to the third page.

MR ASHKENAZI: I don't know if you want to put that up. It's your information, so...

MR. ARMENIO: So when we have it, it's do the parties have awareness of this limit. There's a parts per million --

THE COURT: I heard that part.

So Mr. Ashkenazi says and various people on his side have said or hinted that they don't trust your side -- I'm not talking about you personally or even anyone personally -- that you're not trying to sneak in a design-around theory at some point.

And my impression, from what I heard, is that you're not advancing any design-around theory at all, not just through Dr. Siegwarth, but for the rest of the case;

right?

MR. ARMENIO: Yeah, it's a negotiation. We heard from Dr. Bates the purity sufficient --

THE COURT: So would you answer my question?

MR. ARMENIO: For the bargain, I think they will have in mind possibilities, but no one is advancing a specific design-around.

It's what the parties would have in mind as possibilities as they negotiate the strengths and weaknesses of the patent, what they need or what they don't need, and this is cross-examination to Dr. Siegwarth who didn't consider any of these things.

The reason there isn't a Siegwarth discussion of this is she never looked at the metes and bounds of the patent. We've got a patent that says 1 part per million. We've got an existing FDA specification that says up to 4,000 parts per million. We have expert testimony from Dr. Drago saying you can't change your FDA filing readily, it's a big problem.

And the point here is they don't need to change the FDA filing. It's not a design-around, Your Honor, it's the actual DAXXIFY submitted to the FDA BLA. This isn't a new theoretical hypothetical thing. This is actually DAXXIFY. And they're on notice of DAXXIFY for years. They've been suing DAXXIFY for years. This is the

FDA-approved specification.

So I'm not offering a new hypothetical -- to directly answer Your Honor's question, I'm not offering a hypothetical. I'm not offering a design-around.

THE COURT: So you've got your cross-examination here.

Do any of your people offer an opinion on this subject?

MR. ARMENIO: Right now the opinions came in through Dr. Bates, and I think we might have clarification since he couldn't do the "what does 2.26-nanograms over a milliliter equal." And you asked experts to explain what that number is. That will come in.

And I think that's about it for this particular issue in the case.

THE COURT: Mr. Ashkenazi.

MR ASHKENAZI: Two points. He said multiple times whether they would need or not need. That is a design-around. That is what they're saying. If the argument is what they would need or not need at the time of the hypothetical negotiation, it is a design-around.

Let's be clear. They had experts discussing design-arounds. Dr. Meagher, Dr. --

THE COURT: Yeah, okay, I got that.

Do you have a second point?

MR ASHKENAZI: The second point, Your Honor, is that nobody -- this is not the proper expert to be doing this with. To go into a technical document to now ask questions, do you need or not need this limitation, doesn't make any sense to do with Dr. Siegwarth.

If they wanted to ask questions, they could have asked it of other experts when they were up there. I think it's improper.

THE COURT: I'm going to allow Mr. Armenio to start this, but you object when you think that it's gone beyond what is a reasonable question on cross-examination to ask a damages expert about technical questions, because I do think there's a limit, but I don't think the limit is that I can just blanket say, you can't ask any questions about this, that, or the other thing.

She did bring up -- you know, part of her opinion, at least from the manufacturing patents, is that it's hard to get around this. So, I mean, I think it's in the case.

MR. DITTMANN: Your Honor, if I could be heard on one point more relating to something you remarked on, and that is, what I'm most concerned about is in closings we're going to hear arguments about need or not need that are essentially design-arounds "in different terms." We can't have that.

THE COURT: Well, closing is a long ways off at this point.

MR. DITTMANN: Just wanted to note that.

MR. ARMENIO: Thank you, Your Honor.

THE COURT: All right. So I take it you have more of these you're going to be handing to the jury if you're cross-examining.

Actually, I guess all you really need is to have one for Dr. Siegwarth; right? There's no reason why the jury needs to have this while you're doing it.

MR. ARMENIO: I would offer it, one, to Dr. Siegwarth. There are more copies that can go depending on whether it's admitted into evidence or not. There are enough copies that if it gets admitted into evidence, it could go to the jury. And if it's not, well, then it's just Dr. Siegwarth's copy.

And the reason I would offer it for admission, again, it's what did the parties to the hypothetical negotiation have as facts available to them at the time.

THE COURT: Okay. Well, I'm probably not going to admit it, but any event, hand up a copy.

And let's get the jury and get started.

MR. ARMENIO: Thank you, Your Honor.

MR ASHKENAZI: Your Honor, I'm going to go get some boxes to bring up right now for the podium for

Dr. Siegwarth.

THE COURT: Boxes?

MR ASHKENAZI: Some documents that we're going to be discussing.

THE COURT: All right. Well, go get some boxes.

(A recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back. Sorry for the delay in starting this morning. This is not an excuse, but it's been pointed out to me that the clock here is five minutes slower than actual real time.

So when I do things referring to a clock, I'm referring to that one even though it's a bad clock.

All right. Let's go, Mr. Ashkenazi.

MR ASHKENAZI: Thank you, Your Honor.

Welcome back, Dr. Siegwarth.

THE WITNESS: Thank you.

DIRECT EXAMINATION

BY MR ASHKENAZI:

Q. I want to go back and just remind us where we were yesterday and see if we can kick off. We were talking about the drug product recipe patent, the '878 patent, and you were discussing some surveys.

Do you recall that?

A. Yes, I do.
Q. All right. So we were -- why don't we pull up PDX 17-11. These were the numbers of the two surveys.
Maybe just remind us, bring us back to where we were yesterday.
A. All right. So there were two surveys I reviewed around the time of the hypothetical negotiation. Remember the attribute before the hypothetical negotiation, which happened in 2021?
There was one study by Revance, one study by Allergan, and they showed that between 24 and 26 percent of the value of the DAXXIFY product was -- of the newly introduced product came from duration.
Q. Okay. So both of these surveys predate the October 2021 hypothetical negotiation date; right?
A. That's correct.
Q. Okay. And you showed through the standard calculation you used -- what did you call that?
A. A normalization.
Q. Through that normalization, that these surveys show the value of duration; is that right?
A. The value of duration as a product attribute, as a feature of the product, yeah.
Q. A feature of the product as a whole; is that right?
A. That's right.

Q. Okay, great.

MR ASHKENAZI: Mr. Campos, can we pull up 17-3, please.

BY MR ASHKENAZI:

Q. So can you explain to the jury how you got, ultimately, to your 24 percent royalty for the recipe patents seen here from the results?

A. Yes. So going into the hypothetical negotiation, again, we have Allergan being a very reluctant licensor because they're letting a competitor into the market. We have Revance that really wants this patent for the '878, which is going to allow it to have a long duration product.

Remember, that long duration attribute is what is going to allow it to get a foothold in this marketplace which is -- already has -- they're fifth to market and they're going to be competing against a very well-known name, BOTOX.

So we had the two data points. We had the 26 percent, the 24 percent. So I was conservative. I took the lower of those two. And I believe that a 24 percent royalty of sales would be appropriate to value duration.

Again, it's only going to go through 2026 when the '878 patent expires.

Q. Okay. So just looking at the slide here, that's why we see 24 percent starting at the DAXXIFY launch moving

through -- it's still in effect at the time of the expiration of the '740 patent; correct?
A. That's correct.
Q. So that's why you go until the '878 patent expires; correct?
A. That's right.
Q. Well, what does Revance have to pay on the drug product recipe patent after the expiration of the '878? I just want to make sure we're clear.
A. Yeah. After the 2026 expiration date of the '878, Revance gets to keep all of the sales and it doesn't have to pay anything.
Q. Okay.
A. It still has to pay the manufacturer; right? But it doesn't have to pay anything related to the recipe patent.
Q. Thank you very much.
So with this in mind, maybe if we could switch gears just a little.
You know that Revance is going to be presenting a damages expert, Ms. Dana Trexler; correct?
A. Yes.
Q. Okay. And are you familiar with the royalty methodology she's going to put forth?
A. Yes.
Q. Okay. What did Ms. Trexler do as part of her

analysis in this case?
A. Well, generally speaking, she had a similar approach to mine in terms of a hypothetical negotiation, both parties sitting down, deciding what the value is. She also looked at surveys. She chose different surveys, but she also looked at surveys.
She also did a normalization. The surveys were a little different so the normalization was a bit different, but generally speaking, the same thing. Came up with a value. And then she multiplied that value by the difference in price between DAXXIFY and BOTOX, something that we sometimes call the price premium.
Q. All right. So I just want to make sure I get this straight.
She looks at the surveys and she determines the value appropriate -- as you've put it, the value of the duration attribute to the product as a whole, but then she multiplies that by only the difference in what she calls the price premium between BOTOX and DAXXIFY?
A. That's right.
Q. Okay. And why is -- well, what do you think about that?
A. Yeah, that's just -- that last step is absolutely improper.
Q. And why?

A. First of all, think about what the surveys ask. You saw the survey questions that -- before yesterday. The survey doesn't ask, why are you willing to pay more for DAXXIFY, or why are you willing to pay a higher price for DAXXIFY? It asks, why are you buying a product? Right? It's asking, why are you choosing a particular product? That has to do with the entire sales, not just the price premium.

Second of all, that's sort of technically on the survey side, but when you think about these two parties sitting down at the hypothetical negotiation, they're not just negotiating over whether DAXXIFY is allowed to charge more. They're negotiating over whether or not DAXXIFY is going to be getting a license that allows them to sell the entire product.

And the value to Revance of that long duration feature, again, remember that's to get a foothold in this crowded marketplace, not just so it can charge more. It's so it can make sales at all.

Q. I want to focus on that last point you made, so that Revance could make sales at all. Why do you say that? If you could elaborate a little.

A. We saw yesterday that Revance is thinking about -- remember the SWOT analysis we saw and they said Revance is looking and it said, okay, what is our challenge here? They

called it a threat or a weakness. I think they called it the weakness, is that we're coming into a crowded market space. We're going to be the fifth entrant into the market. We have to differentiate ourselves.

What's our strength? Long duration. That's what sets us apart. And what's the opportunity here? Well, the healthcare providers and the patients understand they want long duration. So it's not just a feature we have but a feature that's desired in the marketplace. So we're going to capitalize on it. We saw Mr. Bullock, the guy in the deposition video clip, say, "How do we go to market? Long duration."

Q. So had Revance not had a longer duration, even if they charged the same price as BOTOX, would they be able to make the same amount of sales?

A. There's no evidence to show they would. In fact, their own analysis shows they were concerned they didn't have something to differentiate themselves. It was going to be a huge challenge for them to keep getting sales, never mind have a price premium.

Q. In general, if you could just sum up, what's your view of Ms. Trexler's opinions? What's your takeaway about the relevance of her opinions to the hypothetical negotiation?

A. Yeah. I think the number she comes up with is just

much too low because she doesn't appreciate the full value of long duration to Revance and she doesn't consider the Allergan side.

Q. Can we put up PTX 596. If you can look at it in your binder, please. If you could put it up on the screen, please.

Did you consider this document as part of your analysis?

A. Yes, I did. I considered this.

Q. And this is the survey that Ms. Trexler uses?

A. Yes. So this contains the survey that Ms. Trexler uses. This is a document in which Allergan is tracking what's going on with DAXXIFY, as one would expect if someone that you think is going to be competing with you comes into the market. So they're studying in 2023 what happened with DAXXIFY. And as a part of that, there's a survey as well.

Q. Why don't we go to PTX 596 at page 24, please.

And, Dr. Siegwarth, what's the title of this slide?

A. "Longer Duration is the Primary Reason HCPs" -- healthcare providers -- "Switch to DAXXIFY."

Q. In your opinion, how does this relate to the difference in DAXXIFY's price over BOTOX?

A. Yeah. This doesn't ask -- this doesn't say longer duration is the primary reason DAXXIFY can charge more. It

says that's why they're switching. That's the full basis of the sale. There's no mention here of being able to charge a higher price.

Q. Let's focus on the longer duration, if we can. This is the left-hand side. And I know the quality is not the best.

What does it say underneath the -- those two bars which are the first bars here in the highest ones?

A. DAXXIFY has a longer duration. That's the top reason to switch to DAXXIFY.

Q. So setting aside the price premium, how does Ms. Trexler use this survey?

A. So the first thing she has to do is a normalization, which those two bars, you might remember yesterday, there was a survey with two bars. One was United States and one was international. In this case, the two bars are a May survey and a June survey. You can see that right underneath the title.

What she does is she looks -- and the normalization is a little bit more complicated because of the way the survey questions were asked. Basically, she normalizes both of those numbers and then averages them and gets a normalized value of duration of 23 percent.

Q. How does that compare to your reasonable royalty rate of 24 percent?

A. Yeah. It confirms, really. The issue with this survey is it's after the time of the hypothetical negotiation, so it wouldn't have been known, but certainly at the time of the 2021 hypothetical negotiation, but it confirms that long duration not only was expected to be a very important driver of sales, in fact, as she shows it is an important driver of sales.
Q. Again, what's the problem? How does Ms. Trexler use this in her analysis? What's her next step?
A. Yes. One problem with the survey is it's after -- this is well after the hypothetical negotiation. But the other -- the really important problem is she takes that 23 percent and she doesn't use that as the value of duration. She then multiplies that by the price premium, the price differential, between BOTOX and DAXXIFY, as if the only value that duration has is in allowing DAXXIFY to charge a higher price. That's not what the evidence shows. It's certainly not what I've seen.
Q. And to focus on one last point, the price premium she's using, that's the price premium at the launch of the product?
A. That's right.
Q. How does that factor into -- do you have a view of this?
A. Well, I mean, price premium, obviously, can change

over time. A company has a choice; right? It can choose to charge a higher price or it can choose to charge a slightly lower price and get more sales. Companies make those kinds of tradeoffs all the time. Do we want to charge $1.50 for something? Maybe not too many people buy that item. Or do we want to make it have a discount, $1.25, and we're going to have more people buy?

That happens with sales in the supermarket all the time; right? It's not just about the price premium. That's not enough to tell you about the value of the product. It's about the total sales.

Q. Would you expect the price premium in general to change over time as a company is in the marketplace for a longer period of time?

A. It certainly can. It certainly can.

MR ASHKENAZI: We can take that down. Thank you very much, Mr. Campos.

BY MR ASHKENAZI:

Q. Dr. Siegwarth, what was the sales cutoff date that you received from the data you received here when you did your royalty analysis?

A. I received data on Revance -- DAXXIFY sales from Revance through May 31, 2025, this year.

Q. So we're clear, that's how much DAXXIFY has sold -- Revance has sold of DAXXIFY through May 31, 2025?

A. That's right.
Q. What is that number?
A. $273 million.
Q. Does that include both cosmetic and therapeutic sales?
A. Yes, it did.
Q. Is that what you used as your royalty base in the analysis?
A. Yes, I did.
Q. In other words, you take the royalty rate and you multiply it by the amount of sales of DAXXIFY; correct?
A. That's right, for the different time periods. The royalty rate was complicated by time period, but yes, generally speaking, that's right.
Q. We're going to do some housekeeping here and I hope you can bear with me a little bit.
Yesterday you explained that the calculations that you did as part of your reasonable royalty analysis for the manufacturing patents; correct?
A. Correct.
Q. Okay. And the calculations you used were from 12 to 18 months?
A. That's right.
Q. Can you briefly explain for us, how did you determine the 12- to 18-month delay you were using in evaluating the

reasonable royalty for the manufacturing patents?

A. Yes. I looked at all the evidence in the case and determined that it would be reasonable -- and, again, these are expectations at the time of the hypothetical negotiation. So it would be reasonable to expect that if, in fact, there was a design-around -- they haven't designed around yet, but if, in fact, there was a possibility of a design-around, there would be at least six months of doing the work to come up with this alternative process manufacturing process, 15 months to put together all the materials needed for the FDA, and then 12 months to get that FDA approval.

So if I look at that at the time of the hypothetical negotiation, compare that -- and assume they would have started right away and compare that to the expected launch date, that would delay them by 12 to 18 months. I'm sorry. That would delay them by 15 months from the expected launch.

And because of the uncertainty, I took a range around that. 15 months is right in between 12 to 18 months because there's expectations, there's a lot of uncertainty so at the negotiating table, Revance, "Oh, we think we could have done it a little quicker."

Allergan says, "Oh, I think it would have taken a little longer. In fact, maybe you wouldn't have ever had

a chance to do it."

That's why it makes sense to do a range when there are uncertainties.

Q. Based on information you've seen, would it be at the higher or lower end of the range?

A. Like I said, think about these two parties negotiating. Allergan has these patents it's quite reluctant to license. Revance needs these patents in order to come in right away, so I think the negotiating pattern here is in Allergen's hands, so anything from the top.

Q. I'm going to look at some of the data you used to perform the analysis, the calculation you did. You have a box in front of you and you have a new binder in front of you.

A. I do.

Q. Can you please confirm that the box contains JTX 178, 849 -- and I think it may be in the binder, actually.

A. 178?

Q. Sorry, it's in the box. Yes, thank you.

A. Can you tell me which number you want?

Q. Sure. JTX 178, 849, 850, and 985.

A. Let me just look at the document numbers.

Q. Yeah, you reviewed these beforehand; right?

A. I did. I reviewed them this morning, but I just want to make sure that what I have up here that -- yes, those are

those four Bates numbers that are a number of different sheets printed out.

Q. And what's contained in these documents?

A. These are the four different Excel files printed out that we received from Revance showing their sales data.

So it was produced at different points in time, so we got different chunks of data covering different time spans. But together, these four cover the data from launch through May 31, 2025, as best we received them.

MR ASHKENAZI: Your Honor, at this time, we move to admit JTX 178, PTX 849, PTX 850, PTX 985.

MR. ARMENIO: No objection, Your Honor.

THE COURT: All right. So there's no objection, but I'm not exactly sure it's going to turn out to be of any use to the jury. So if it turns out the jury needs to have them, they're admitted, they're admitted in any event, but I'm not inclined to think that that actually serves any purpose.

(Thereupon, Exhibits JTX 178, PTX 849, PTX 850, PTX 985 were admitted.)

MR ASHKENAZI: Your Honor, I agree, I just wanted to make sure for purposes later we don't have a problem.

THE COURT: Yes, okay.

BY MR ASHKENAZI:

Q. We're going to go through a couple other quick documents, and I think we could probably do this in your binder. And if you could turn to that second binder.

Could you turn to JTX --

THE COURT: I'm sorry, Mr. Ashkenazi.

MR ASHKENAZI: Yes.

THE COURT: Dr. Siegwarth, the four exhibits that we just admitted, basically, that's all the data you needed to figure out what the sales through May of 2025 are?

THE WITNESS: That's correct.

THE COURT: Okay. Thank you.

BY MR ASHKENAZI:

Q. And that number, again, was 270 --

A. 273 million.

Q. Okay. So let's look at JTX 177 and PTX 635.

And do you recognize those documents?

A. Yes, I do.

Q. And what are they?

A. These are sales -- 177 is some sales data, and it goes through revenue units sold.

And the second one that you asked me about was 635?

Q. Yes.

A. Which is a sales forecast.

Q. Yeah. These are both forecasts; right?

A. Correct.
Q. Okay.
A. Correct.
MR ASHKENAZI: Your Honor, at this time, I move JTX --
THE WITNESS: Well, let me -- just to clarify on the first one, there is one column that's actual and the rest is forecast. Just to be super accurate.
MR ASHKENAZI: Okay.
Your Honor, at this time we'll move JTX 177 and PTX 635 into evidence.
MR. ARMENIO: No objection, Your Honor.
THE COURT: All right. Admitted without objection.
(Thereupon, Exhibits JTX 177 and Exhibit PTX 635 were admitted.)
THE COURT: Dr. Siegwarth, are these forecasts that are prepared by Revance?
THE WITNESS: Correct.
THE COURT: Okay.
BY MR ASHKENAZI:
Q. These are forecasts that you used in order to evaluate what you would -- as part of your calculation for the manufacturing patents you described earlier?
A. That's right. That curve that we saw that I said was

by quarter, this was -- these were the forecasts.
Q. Okay. Now, JTX 174, if we could pull that up, please.
A. Yeah, I just -- oh, okay. It's on the screen. I was going to say do I have --
Q. And what is this document?
A. So this document is the document that allowed me to calculate -- it's one of the documents that allowed me to calculate the profit rate of DAXXIFY.
MR ASHKENAZI: Your Honor, at this time, we'd move JTX 174 into evidence.
MR. ARMENIO: No objection, Your Honor. It's on a hard drive. I don't know how useful it will be, but we don't object.
THE COURT: Well, so it can be displayed now.
So it's admitted without objection.
(Thereupon, Exhibit JTX 174 was admitted.)
BY MR ASHKENAZI:
Q. Again, you used this as part of your calculation to determine the reasonable royalty rate for the manufacturing patents; correct?
A. The manufacturing patents; yes.
Q. Okay. I think we have a couple more to do, and hopefully we'll move quickly.
In your binder, you have seven tabs. They're in

order starting from tab -- PTX 458. And I'll read them into the record: PTX 459, PTX 486, PTX 709, PTX 718, PTX 719, and PTX 720.
A. Yes.
Q. What are those documents?
A. Those are various equity analyst reports. They allow me to calculate the -- what's called the discount rate, which is just part of the calculation that I did.
MR ASHKENAZI: Your Honor, at this time we move those documents into evidence.
MR. ARMENIO: We object for the same basis we discussed previously.
THE COURT: All right. Overruled.
They're admitted into evidence.
(Thereupon, Exhibits PTX 459, PTX 486, PTX 709, PTX 718, PTX 719, and PTX 720 were admitted.)
BY MR ASHKENAZI:
Q. And last, Dr. Siegwarth, if you could look at PTX 821 and 822.
A. Yes.
Q. What are these documents?
A. These are exhibits from my supplemental -- sorry, supplemental report that actually shows the numbers -- remember, there was a fraction that got you to a royalty rate. It was the profits -- the expected profits of the

profit boost through 2025 divided by the total sales through 2029. Total expected sales, I should say, and that's what you see here.

You just see the actual numbers for those.

Q. And can we pull those up, PTX 821 and 822, please.

A. And so here you can see in column A -- so "PV" means present value. If anyone's had a little business or finance background, that's why I need that discount rate, because I need to bring everything back.

You know, a dollar today is not worth a dollar tomorrow. So that's the present value calculation of the profit difference, the profit boost, due to delay through 2025. That's in column A.

Column B is present value of the total revenue. These are all expectations through 2029.

And then you get the royalty rate.

Q. So just to be clear, this is the summation of the calculations that you've done and you've discussed based on the documents that we have just been discussing; correct?

A. That's correct.

Q. Okay. You can take that down. Thank you.

Just a few more questions, Dr. Siegwarth.

First, are you aware of the -- what's been referred to as the *Georgia-Pacific* test or factors?

A. Yes.

Q. How, if at all, did that factor into your analysis here?
A. Yeah, so the *Georgia-Pacific* factors are the set of 15 factors that we, as damages experts, are asked to consider as part of a reasonable royalty calculation.
It comes from a case involving the Georgia-Pacific Paper Company years and years ago.
And I considered all those factors.
Q. Okay. And how did those factors affect your reasonable royalty rates for both the manufacturing patent and the product recipe patent?
A. Yeah, so I don't think I need to go through each and every factor. Some of the factors aren't as relevant to this particular case.
But Factor 15, the last one, talks about a hypothetical negotiation between the parties, which is why I started there as the construct.
Some of the factors talked about considerations on the licensor side, so the patentholder side, Allergan in this case, including, is there competition between the parties -- yes, we've heard about that -- and is it -- what is Allergan's licensing policy? Do they often license in this way to competitors? No.
And then some of the considerations are more on the Revance side of what's going on here. You know, what is

the amount of the profit that is related to the feature at issue? So, for example, the amount of profits from the duration feature, right, that we just -- or from the delay that we just looked at. The importance of the -- whatever it's called -- the advantages and utility of patented features.

Q. And all in, did that change the numerical value for your reasonable royalty rates?

A. No, I mean. That's -- no. That was for the framework that I used. All -- you know, the factors are a little dry so I laid it out more in terms of the hypothetical negotiation of it itself.

But, in general, you know, we can look at these factors, and they're all incorporated into my analysis. So there's no particular reason to boost things up or down as a result of those *Georgia-Pacific* factors.

Q. Thank you for bearing with me through that housekeeping. I just want to bring us back before we end.

Can we please turn to PDX 17-16.

And if you could briefly give us a summary of what we're seeing here so that the jury has an understanding of your analysis before we end.

A. Yeah. So it's my opinion that, for the manufacturing patents, there would have been a royalty of 15 to 20 percent when both patents were in force just after launch.

And then when the first of those two manufacturing patents, that's the '740 and '748, when the first one expires, there would be a stepdown to account for that expiration. And that, through the end of that last manufacturing patent, the royalty would be 12 and a half to 17 and a half percent of sales.

And that, separately, for the drug recipe patent, or sometimes called the formulation patent, there would be a 24 percent royalty based on the value of the duration feature, which I understand is what is -- you know that comes from that drug formulation, from that recipe, from the time of launch until that patent expires, which is in 2026.

So you can see the green is the amount of the royalty that I believe is reasonable to pay Allergan in this situation, for Revance to pay Allergan. And the rest up and to a hundred percent sales, because the royalty is -- these percentages are applied to sales. That's the way royalties work, typically how they work, that the rest of that up to a hundred percent, that all will remain with Revance.

Q. And how much money has Revance made up until May 31, 2025?

A. 273 million.

Q. So that royalty rate would be applied to the 273 million to date through this time period that you have

here, and then -- is that correct?
A. Correct.
MR ASHKENAZI: Okay. Your Honor, I'll pass the witness.
THE COURT: Can I see you and Mr. Armenio at sidebar for a minute.
(Thereupon, a discussion was held off the record.)
MR ASHKENAZI: Your Honor, may I continue?
THE COURT: Yes.
BY MR ASHKENAZI:
Q. Dr. Siegwarth, with the $273 million that Revance has made to date, using your reasonable royalty rates that you've calculated, what would the damages be for this time period up until May 31, 2025?
A. Between 101 and $115 million.
Q. Thank you very much.
MR ASHKENAZI: Your Honor, at this time I'll pass the witness.
THE COURT: All right. Thank you.
Mr. Armenio.
MR. ARMENIO: Thank you, Your Honor.
Your Honor, may I inquire?
THE COURT: Yes.
MR. ARMENIO: Thank you.

CROSS-EXAMINATION

BY MR. ARMENIO:

Q. Good morning, Dr. Siegwarth. Nice to see you again.

A. Good morning.

Q. So I'm going to start with the binder you already have, Doctor. I have a binder with some more exhibits, but I don't want to put you behind a stack of too many binders all at once. So we'll start with the binder that you already have for some questions.

A. Okay.

Q. So first things first, just to orient ourselves, if the patents are invalid, there are no damages; right?

A. That's correct.

Q. And that's true for each of the three patents; right? For each patent, if that patent is invalid, there are no damages for that patent; right?

A. For that patent, yes.

Q. And you agree -- and when we're looking at these patents and what they're worth, Allergan does not practice any of these patents; right?

A. My understand is that they're using them in their long-acting product.

Q. Allergan has never sold a commercial product ever in the 30 years that BOTOX has been on the market that practices any one of these three patents; correct?

A. I agree it's not in its existing BOTOX product.
Q. And so BOTOX has been around, we've heard, since 1989, 1990. We're in 2025. In all that span of 35 years, there's never been a commercial sale by Allergan of any product that practices any one of these three patents; correct?
A. That's my understanding.
Q. And as a result, Allergan has never generated any profits based on any one of these three patents; right?
A. That's my understanding.
Q. Now, in your direct testimony, you talked about royalty rates that you believe Allergan and Revance would have come to during hypothetical negotiations; is that right?
A. That's right.
Q. And you talked about two hypothetical negotiations, in your view, in 2019 and 2021; right?
A. That's right.
Q. And those negotiations are just like they say, a hypothetical. They didn't actually happen; right?
A. Right. Because Revance didn't come and ask for a license. They simply infringed.
Q. So they're not real-world negotiations that happened, they're hypothetical; correct?
A. That's right. That's what the *Georgia-Pacific*

factors ask us to do.

Q. And when you came into court, you did not, with Mr. Ashkenazi, present a real-world license that two parties agreed to in the real world; right?

A. Again, because Revance didn't come and ask for a license. That's right.

Q. So, Doctor, it's a timed trial. I would just ask if you answer my simple questions. If you have more to discuss, your counsel can certainly ask you on redirect.

Do you agree?

A. I'm trying to answer your questions as best as possible.

Q. Great. So in your testimony when you were sitting on the stand yesterday and today, you did not present to the jury a single real-world license agreement negotiated by actual parties; right?

A. That's right.

Q. And there are things -- and you know this because you're an economist. There are actual resources where there are surveys of licenses for different industries where one can look up and see survey data for existing real-world licenses; right?

A. There are such things that exist. They have severe limitations, but I have seen such compilations, yes.

Q. And you didn't bring to the jury a real-world survey

of actual licenses in the pharmaceutical industry; right?
A. Those surveys are --
Q. Not my question, Doctor.
A. I certainly have not because that is not -- that would not be appropriate.
Q. My question: Did you bring to the jury a real-world survey of actual license rates negotiated by parties in the pharmaceutical industry?
Yes or no?
A. I did not.
Q. Now, in your direct testimony, you put together both DAXXIFY Cosmetic and DAXXIFY Therapeutic; right?
A. I'm not sure what you mean by "put together."
Q. You treated them the same for purposes of your royalty rate calculations; right?
A. I believe that the royalty rates that were negotiated would have applied to both the cosmetic and therapeutic, yes.
Q. In the real world, the market for DAXXIFY Therapeutic is different than the market for DAXXIFY Therapeutic; right?
A. I don't know what you mean by "the market for."
Q. DAXXIFY Therapeutic, often covered by insurance, has to go through prescribers, has reimbursement considerations, none of which are typically present for DAXXIFY Cosmetic; correct?

A. I agree with that.

Q. So different real-world concerns for DAXXIFY Therapeutic; right?

A. It's the same product, but yes, there are some different real-world concerns, sure.

Q. And you didn't address these real-world concerns about DAXXIFY Therapeutic in your direct testimony; correct?

A. I certainly looked at -- I didn't address it in my direct testimony. I agree with that.

Q. Thank you. You would agree there are multiple ways to estimate a reasonable royalty in this case; right?

A. I believe I estimated it properly, but there could be alternative ways, yes.

Q. For, example you yourself used two different ways for the manufacturing patents and the formulation patents; right?

A. That's right.

Q. And so in your manufacturing patent analysis, you looked at a cost for time analysis; is that right?

A. A cost of delay, yes.

Q. And in the formulation patent, you did a different analysis; right? And you start to look at why people wanted to buy DAXXIFY; right?

A. The value of the feature, yes.

Q. Okay. And so those are different reasonable royalty

analyses; right?
A. I would agree that they have different -- that they're different in terms of the implementation, yeah.
Q. So there are multiple ways one can estimate a reasonable royalty in this case because you did so yourself; right?
A. Yeah, as a general matter, yeah.
Q. So let's take a look at what you did for the manufacturing patents. Can we put up PDX 17.4 of your slide.
And now, Doctor, when you talked about the reasonable royalty negotiation for the manufacturing patents, this is the slide you showed us; right?
A. That's correct.
Q. And you said this hypothetical negotiation would take place around 2019; right?
A. That's right.
Q. DAXXIFY was not approved until September of 2022; right?
A. That's right.
Q. And if you look at that, that's 39 months; right?
A. That's right.
Q. Dr. Drago, who testified yesterday, talked about a delay of only 15 months; correct?
A. 15 months to get the FDA packet together, yeah.

Q. So let's look at some more things in your slide. In June of 2019, the first manufacturing patent, that's JTX 3 --

Why don't we put that up for a second, orient ourselves.

You remember the first manufacturing patent, the '740 patent, JTX 3?

A. Yes, I do.

Q. That patent was going to expire in 2023; right?

A. Yes, that's right.

Q. So negotiating in 2019 for a patent that's going to not exist anymore in 2023; right?

A. That's right.

Q. And everybody has said once a patent expires, you are 100 percent free to do everything in that patent; correct?

A. Look, I'm not a legal expert, but yeah, that's basically what I understand.

Q. You said that yourself when your counsel asked about the formulation patent. When that expires, we're a hundred percent free to use it; right?

A. Yeah. I don't think I used those words, but yeah, basically.

Q. The same is true here for the first manufacturing patent in 2023. When that expires, my client, Revance, is a hundred percent free to use it with no further charge;

right?
A. That patent, it's still going to be infringing the '748, but yes, the '740.
Q. My question is the '740. Totally free to use it when it expired in 2023; right?
A. Like I said, subject to the fact that it still has the '748 patent. I'm not a legal expert --
MR. ARMENIO: Judge, at this point, I would ask for a little help with encouraging the witness to answer my yes-or-no questions yes or no.
THE COURT: Keep trying.
Dr. Siegwarth, when it's possible to fairly answer the question yes or no, that's the preferred answer.
THE WITNESS: I understand.
BY MR. ARMENIO:
Q. So you agree with me that when the '740 first manufacturing patent expires in 2023, Revance can practice it with no payment whatsoever to Allergan; right?
A. Yes, subject to what I said before.
Q. And you mentioned a second manufacturing patent. Let's pull that up, JTX 4. That didn't exist in 2019 at the first hypothetical negotiation; right?
MR ASHKENAZI: Objection, Your Honor. Can we have a sidebar?
THE COURT: I'm going to sustain the objection.

BY MR. ARMENIO:

Q. This patent was granted on December 21st?

MR ASHKENAZI: Same objection.

THE COURT: That's irrelevant because in the hypothetical negotiation, they know it's coming.

BY MR. ARMENIO:

Q. Dr. Siegwarth, did you do a negotiation at all for a later point in time between 2019 and the formulation patent in 2021?

A. Are you asking if I did a second negotiation for the second manufacturing -- I'm not sure what you're asking. I'm sorry.

Q. Did you do a second hypothetical negotiation analysis for the second manufacturing patent?

MR ASHKENAZI: Objection, Your Honor.

THE COURT: Come over to sidebar for a minute.

(Thereupon, a discussion was held at sidebar.)

THE COURT: So my understanding of the stipulation you all entered into was that you agreed the hypothetical negotiation date is in 2019 for this patent and there was something else, too, about people wouldn't use the fact that you agreed on that date as a basis for challenge. It seems to me like I can't understand what you're doing other than doing what has been agreed you aren't going to do.

MR. ARMENIO: Your Honor, I tried to raise the fact that the second patent didn't exist during the negotiation. You sustained the objection. Now I'm trying to get to the same understanding of there's no discussion in that first negotiation of the second patent.

MR ASHKENAZI: That's not true, Your Honor. We have an agreement that at the date of the hypothetical negotiation both patents from both manufacturing families is the date and there should be no criticism at all.

THE COURT: I don't understand why Mr. Ashkenazi is not right about this.

MR. ARMENIO: That way then there's never a hypothetical negotiation around the patent that didn't exist. It wasn't even filed for at the time of the hypothetical negotiation in 2019.

THE COURT: So I think your side stipulated away that issue. So the law, as I understand it, is that for purposes of this case, they knew the patent was coming and acted accordingly. All right?

MR. ARMENIO: Thank you, Your Honor.

(The discussion at sidebar ended.)

BY MR. ARMENIO:

Q. If we can return, please, to PDX 17.4.

Now, a couple of factors you've mentioned, Doctor. You've got on the left side immediate revenue;

right?
A. Correct.
Q. And you agreed already DAXXIFY did not start selling until after FDA approval in September of 2022; right?
A. In the actual world, that's true, but the expectations were of November of 2020.
Q. My question is: There was no immediate revenue in June of 2019; right?
A. I agree. That refers to the time of launch.
Q. And there was no real revenue in the real world until September of 2022; right?
A. That's right.
Q. Design-around costs are risks. You mentioned those as well. In June of 2019, DAXXIFY had not yet been submitted to the FDA as an application; right?
A. That's my understanding, yes.
Q. And the FDA isn't just a rubber stamp when they get an application like this; right? They can ask for changes. They can make modifications and the like; right?
A. I'm not a regulatory expert.
Q. So Revance could have thought, I'm going to submit this to the FDA. Let's see what the FDA asks me to do. I may have to make adjustments. I may have to make changes to satisfy the FDA; right?
A. Again, that certainly is possible, but I'm not a

regulatory expert.
Q. And now, BOTOX competition, you mentioned that. And when you look at BOTOX competition, you mentioned a couple of times in your direct that Revance would be launching DAXXIFY into a crowded market; right?
A. That's the way it was characterized, yes.
Q. And BOTOX, having been on the market for so long, had a very strong brand; right?
A. I agree with that.
Q. And so it wasn't like Allergan, with its BOTOX, was shaking in its boots that little Revance was going to launch DAXXIFY; right?
A. Allergan was very concerned about Revance's DAXXIFY. You can see -- if you remember on the competitors, it's the top competitor on the list.
Q. Let's take a look at some of the documents.
JTX 65, you discussed this in your direct; right?
A. Correct.
Q. And November of 2020 Allergan report; right?
A. That's right.
Q. And you talked about how that was near enough in time, in your view, to be relevant to the hypothetical negotiation; right?
A. I agree.

Q. Let's turn to page 25 of the exhibit.
We see it has a key insights section; right?
A. I don't have the document. Can I --
Q. It's in your binder.
A. I can just look at it here.
Q. Feel free. JTX 65 and we're on page .0025. But the entire page is up on the screen if you prefer.
A. Okay. I see it.
Q. Now, if you look at the very next page, one of the key insights is longer duration of action is desirable, but how it is achieved is a key consideration; right?
A. I agree that's what it says.
Q. And if we look at the next bullet, price, manufacturer, and brand drive half of the decision-making, and then the bullet most relevant to little Revance, rapid widespread switch of a new LA -- that's long-acting; right?
A. I believe so.
Q. -- LA toxin unlikely if released at a premium by a little-known manufacturer; right?
A. I see that.
Q. And Revance, in 2019, was a little-known manufacturer; right? Never had sold a product?
A. It never had sold a toxin product, that's true. It was selling filler products at the time.
Q. And Revance, you've told us, was going to release at

a price premium its DAXXIFY product; right?
A. That was its expectation at the time of launch, yeah.
Q. So Revance --
A. At the time of the hypothetical negotiation, I should say.
Q. So Revance fell squarely in this bullet point by Allergan in 2020, that rapid widespread switch to a new LA toxin unlikely if released at a premium by a little-known manufacturer.
Revance was a little-known manufacturer and they were going to release DAXXIFY at a price premium; right?
A. I agree with those two aspects, yeah.
Q. And so Allergan itself was saying rapid widespread switch is unlikely; right?
A. I see that.
Q. Let's look a little further up in the document, page .0024.
Allergan actually internally modelled, well, how do we maintain our share against any new entrant? You know, we can see brand. They put themselves all the way on the right. They've got the best brand in BOTOX and everybody knew BOTOX in this area; right?
A. I don't know about everybody, but it certainly had brand recognition. I don't disagree with that.
Q. And here we look at how they can adjust pricing, how

they can adjust the marketing, all to see how they could drive the share lower; right?

The chart on the very bottom of the slide, it's higher share to lower. And they've gone -- they have got baseline is, what, 10 percent maybe of DAXXIFY?

And they show on this slide ways to drive it even lower by talking about increased duration requiring increased dosage and by talking about the manufacturer, the brand, and the price; right?

A. I see the various aspects, and you can see on duration that the share would be higher with a six-month duration than it would have been with a three- to four-month duration.

Q. And we can look at all these ways that Allergan was compromising how to keep DAXXIFY share down; right?

This is an internal document where they're figuring, well, how do we best message minimizing the little-known manufacturer with the premium price product; right?

A. I don't read this document -- this particular slide as being about what Allergan can do to keep DAXI down.

Q. When we look at the slide --

MR ASHKENAZI: Your Honor, he keeps cutting off the witness.

THE COURT: So, Mr. Armenio, you should make

sure that she's finished talking when you start talking again. Okay?
BY MR. ARMENIO:
Q. We can agree this far, I hope, Dr. Siegwarth. In this document on this slide, Allergan is modeling how it can best adjust and reduce the impact from a DAXXIFY launch; right?
A. I disagree. I don't think that's what this shows.
Q. Okay. We can agree that on slide 26 -- if we go back. Make sure what we agree on.
We can agree rapid widespread switch to a new LA toxin, Allergan said it was unlikely in this scenario, released at a premium, which Revance did, by a little-known manufacturer, which Revance is; right?
A. I see that, yes.
Q. Let's take another document that you discussed on your direct. This is JTX 91. In this document, if we look at page 3, and we look at weaknesses.
So Revance itself knew it was going to have a hard time selling; right? They had limited resources and a need to focus on both commercialization and launch, and they had limited awareness among broader HCP community; right?
A. I agree they understood they had some weaknesses, yeah.
Q. And "HCP" in that statement, that's healthcare

provider?
A. I believe so.
Q. Let's take a look at the next document. This is another one you talked about in your direct, JTX 158.
This is another Allergan document; is that right?
A. Yes, it is.
Q. And if we look in this document, we can see on page 3, please, Allergan is explaining how it's going to defend its leadership position against the competitive threat; right? And that's its key priority, defend leadership position.
A. Well, it talks about a couple of different priorities and the challenges that it's going to face, yeah.
Q. One of the key priorities is defend the leadership position against competitive threats; correct?
A. I agree.
Q. Look at the next page.
Allergan explains how it's going to defend its leadership position; right?
A. Well, yes, I mean -- under defend leadership position, the first leadership defense is against DAXI, that's right.
Q. And they were going to implement a Revance competitive strategy; right?

A. Which page? I'm just trying to follow where you are. I'm sorry.
Q. The same page.
A. Yes, I see that.
Q. To the right, it's interesting, one of the things they say is they're going to transition to a portfolio of toxin and formulation offerings; right?
A. I see that.
Q. And if we look in the first major bullet, the second sub bullet, they wanted to innovate in the long-acting and short-acting space; is that right?
A. That's right. That's what I was talking about, that they were intending to bring out a long-acting product. That's right.
Q. So in this document, 2020, they're talking about needing to innovate at Allergan; right?
A. Well, they're talking about a particular innovation that they're doing, yeah.
Q. Innovate and long-acting and rapid onset to address consumer unmet needs; right?
A. Yes, I see that.
Q. So Allergan is saying it acknowledges that consumers had unmet needs, and in 2020, after being on the market for 30-some years, Allergan itself had not met those needs; right?

A. I don't know that you can take all of that from that one statement, but I certainly see where it says consumer unmet needs.
Q. Now let's take a look back at your PDX 4, please.
A. Okay.
Q. One of the things you mentioned is the LAI; is that right?
A. Yes.
Q. And that's a product that still to this day is not approved for commercial sale in the U.S.; is that right?
A. That's my understanding.
Q. Let's look at the next demonstrative you have, PDX 17-5.
Now, this is your explanation with respect to the manufacturing patents; is that right?
A. It was part of my explanation, yes.
Q. And no numbers on this slide at all; right?
A. That's right.
Q. Okay. I don't have a start date on the left side of the slide; right?
A. Right. This is supposed to -- this could be -- it's based on the numbers, but it's supposed to just conceptually show how to think about the difference in profits.
Q. And everything on this slide is a projection; right?
A. Yes, because at the time of the hypothetical

negotiation, that's what they would have had. That's right.
Q. No actual numbers on PDX 17.5, projections only?
A. Exactly. Because at the time of the hypothetical negotiation, they would have been working with their projections. That's exactly right.
Q. And what you did with this slide is you said that the parties would cut things off at the end of 2025; right?
A. From the standpoint of the profit boost, yes, that's where they would split it.
Q. So let's take a look at what that looks like. And it's DDX 7-2. And if we go to the next, 17-3.
So that's your cutoff, Q4 2025; right?
A. That seems about right, yeah.
Q. And so everything in red, you're saying that's all going to Allergan; right? In this negotiation that you're talking about?
A. Well, again, it's going to be calculated as a royalty, but, yes, conceptually, as they're negotiating over how much of the profit boost goes to Allergan versus Revance, that's right.
Q. And you picked that end of 2025 because of the BOTOX biosimilar; right?
A. Yes, because of the changes in the marketplace. That's where I think Revance could have pushed back and said, look, there are going to be changes and we think it

would be fair for us not to be paying for a profit boost during a time when we just don't know what's going to be happening. We think the market is going to be a lot different. That's right.

Q. So let's look at PTX 643. This is -- PTX 643.

Can you turn in your binder to PTX 643, Dr. Siegwarth?

A. Yes.

Q. And is this the document you used for the BOTOX biosimilar?

A. I see mention of the biosimilar in various places. This was one of the documents, yes.

MR. ARMENIO: Your Honor, I move PTX 643 into evidence.

MR ASHKENAZI: No objection.

THE COURT: All right. Admitted without objection.

(Thereupon, Plaintiff's Exhibit PTX 643 was admitted.)

BY MR. ARMENIO:

Q. If you look at the third page, Doctor.

And this document, you relied on it to talk about the BOTOX biosimilar. The quote is: "Our goal is to bring this product to the market by 2025"; right?

A. Yes, I see that.

Q. So that's before -- on or before -- you know, by 2025.

If I'm doing something in Q4 2024, that's by 2025; right?

A. In Q4 in 2025, that's 2025, right. That's the date that they had that -- we see multiple places that 2025 date.

Q. Now, if we look back at your profit split slide, PDX 7-3, in your slide, that that one-year difference -- we can go to DDX 7-4 -- it makes a tremendous difference in the calculation; right?

That one year between Q5 2025 and Q4 2024, there's a lot more green, which is Revance gets to keep, and a lot less red, which you say goes into the Allergan royalty calculation; correct?

A. I agree that if you move that line over there, there is -- there could be different amounts of green and red, yeah.

Q. And the only document that you've ever relied on for where that line is, is PTX 643; right? That's the document you cited for where the line should go; right?

A. I don't have a memory of exactly what I cited. I talk about the biosimilar, you know, numerous places in my analysis, and I've seen a number of different documents that talk -- we saw another one here during trial that talk about 2025 as really being the physical focal point.

Q. And when we look at your calculation, if I pick an even earlier date, your calculation is going to change yet again; right?

A. I agree that if you pick an alternative date, the calculation changes, but I don't think that calculation -- that alternative calculation is correct.

Q. Any earlier profit allocation split date that the jury decides would move the line to the left and significantly lower your proposed royalty rates; correct?

A. Well, significantly. It obviously depends on what alternative date, say, the jury would pick. But I think I feel strongly that the Q4 2025 is the right date.

Q. If we look at DDX 7.5, I've actually depicted out little DDX 7.5. When we look at cutting off the split when the first manufacturing patent expires in Q3 2023, there's almost nothing left in the red for Allergan; right? Very small compared to where we started; right?

A. Mathematically, I don't disagree with you, but I think that's completely unreasonable to ask Allergan to license a competitor -- and the importance of this manufacturing patent to Revance, who's still continuing to, as I understand it, infringe the '748 to this day.

Q. You agree with me that if the jury decides that Q3 2023, when the first manufacturing patent expired, is the right allocation date, then under your calculations using

your methodology, your hypothetical rates would be much, much lower?
A. I agree that if you change that date, that mathematically that's true, but this is completely unreasonable.
Q. That's for the jury to decide; right, Doctor?
A. It's my opinion that it's completely unreasonable.
Q. It's for the jury to decide; right?
A. The jury decides, but you're asking for my opinion.
Q. So when we -- let's look at JTX 3. This is the first manufacturing patent. If we can pull up the Claims 6 and 8 so we can orient ourselves, or page 35.
This is the first manufacturing patent. This is what Revance gets to do for free in Q3 of 2023; right?
A. Again, I'm not a technical expert, so yes, they certainly -- after the expiration of the patent, I understand they can use the patented technology. But also keeping in mind the '748, and I'm not a technical expert to explain the interaction of that.
Q. We can all agree, having sat through the trial so far, Claim 6 of the manufacturing patent talks about an APF process. We all know that means animal-protein free; right?
A. I agree.
Q. And you talked about the importance of being animal-protein free for the manufacturing patents; right?

A. I do.
Q. And Revance gets to be animal-protein free under the first manufacturing patent as of September 2023; right?
A. Again, with that same caveat. You're asking me as a technical expert what they're allowed to do. I certainly don't disagree they're allowed to practice the '740 patent after the expiration, but they're not allowed to practice '748. I'm not a technical expert to be able to dive more into what exactly they'd be allowed to do or not.
Q. You were in court yesterday when Dr. Bates testified; is that right?
A. I was here.
Q. And so did you hear what Dr. Bates had to say, page 385? It's in the transcript, 385, 12 to 16.
THE COURT: So take that down.
So one of my rules, Mr. Armenio, I understand it may be different some places, we don't put up prior testimony during the trial when the transcripts are not final.
MR. ARMENIO: Happy to do it that way, Your Honor.
BY MR. ARMENIO:
Q. You understood that Dr. Bates said that practicing the first manufacturing patent that expired in September of 2023 met the purity requirements of the FDA; right?

A. I remember that testimony generally speaking, yes.
Q. And if we put back up the graph that we saw, DDX 7.4, and go to at DDX 7.5, we can see the effect of that date, Q3 2023; right?
A. Again, mathematically, I don't disagree with you. But it's my opinion that that's completely unreasonable.
Q. In the real world during that period of time from product launch to September 2023, Revance, as a company, did not make any profit at all; right?
A. I don't have those numbers committed to memory.
Q. You didn't come in here and explain that Revance was making a profit as a business during this time where you say they should be paying lots of money to Allergan; right?
A. I mean, sometimes it takes a while to generate a profit as you're launching a new product. But that doesn't mean they're not infringing the patent and they don't have to pay a royalty.
Q. If we have it -- you opined on significant royalty rates, but you didn't even compare those significant royalty rates to whether Revance, as a business, was losing money. That was not part of your direct testimony; correct?
A. That's correct.
Q. Now, you have a stepdown, what you call a stepdown, in your manufacturing royalty; is that right?
A. I do.

Q. But you step down by just 2 and a half percent; is that right?
A. That's right.
Q. So let's take a look at PDX 17-16, just so we can see what we're talking about.
When the first manufacturing patent expires, you only take the manufacturing rate down by 2 and a half percent; right?
A. That's right.
Q. And you keep that remaining rate, which is the majority of the rate, for another six years until 2029; right?
A. That's correct.
Q. That's when the second manufacturing patent expires; true?
A. Correct.
Q. Let's take a look at the second manufacturing patent for a second, JTX 4, so we know what we're talking about. If we go to page 29.
I know you're not a technical expert. I'm not going to ask you technical questions. But we can see what the parties would be negotiating under your hypothetical negotiation is what to pay for the asserted claim, Claim 8; right?
A. Yes. I see that.

Q. That would be the subject of the negotiation for this patent.
A. That's correct.
Q. And what Claim 8 tells us is that it's going to make purified 150 kilodalton with no more than 1 part residual nucleic acid for a million parts of botulinum toxin; right?
A. I see those words.
Q. And that would be the subject of the discussion and negotiation in your hypothetical between Revance and Allergan; right?
A. Well, as I heard the other day, that this is a claim that also refers to Claim 1, so -- but certainly all of that, the relevant parts of this patent, is what they're negotiating over.
Q. So Revance can say, "I don't need that very much."
And Allergan could say, "You need that a lot"; right?
Normal back-and-forth in a licensing negotiation. What I have -- when you've got the property, you want to say it's worth a lot, and when you're being asked to pay for it, you point out that maybe it's not worth that much. Normal back-and-forth; right?
A. I don't disagree that would have been some of the normal back-and-forth.
Q. As part of that normal back-and-forth, Revance,

similar to what we heard from Dr. Broide, would say, "Look, we already got to the FDA requirement of purity with our first manufacturing patent that expires in 2023. We don't want to pay much at all for this next patent."

That could be a reasonable, normal Revance position; right?

A. Look, I assume that both sides in this negotiation are going to be negotiating hard and bringing up all their important points, sure.

Q. And one of the things that Revance would have is it would know exactly what was in the product specification for its own DAXXIFY product; right?

A. I mean, we're talking about 2019, so it would have known what was in the product specification and what its product was looking like at that point in time, yeah.

Q. So Revance would know, for example, how many parts per million of residual nucleic acid the FDA required them to have or not have, since it's an impurity; right?

A. I don't disagree with that. I would assume they would know that.

Q. That would be normal bargaining in a hypothetical negotiation, that one party would bring its actual information on the product specification and say, "I don't want to pay very much, if anything, really, because I don't need this particular claimed feature"; right?

That would be normal back-and-forth based on product specifications; right?

MR ASHKENAZI: Objection, Your Honor. Could we have a sidebar based on the conversation we had earlier this morning.

THE COURT: Not yet.

THE WITNESS: So, look, I don't disagree there would be a normal back-and-forth. As we said, we usually think of the hypothetical negotiation as being an open book so each side knows what the other side knows. But the fact of the matter is we also know that as of today, Revance is still infringing this patent. It's still using this technology.

And so Allergan would expect that Revance needs this technology, it's using it, and that if it wanted to avoid, it would have to design around. And it would push back and say, "That's fine to sit there to say you don't need it, but the fact of the matter is you're using it, and it's our property, and so you have to pay us. It's nice to want to not have to use it, but you're using it."

BY MR. ARMENIO:

Q. So my question was much, much simpler, Doctor.

In a negotiation, a party that's being asked to pay on a patent could bring its product specifications to the discussion and show facts regarding the product

specification to argue for a lower rate; right?
A. Sure. I don't disagree. They're going to -- both sides are going to try as hard as possible. That's what negotiations are.
MR. ARMENIO: Your Honor, may I approach to hand the witness a copy of JTX 32A?
THE COURT: All right.
BY MR. ARMENIO:
Q. Doctor, when you look at JTX 32A, you can see that that's a description of the manufacturing process and process controls for daxibotulinumtoxinA Revance, top of the first page?
A. I believe that's what it says, yes.
Q. And this table of contents and there are a number of unit operations. I'm not going to ask you scientific questions about them, but you can see it's a table of contents included?
A. I see the words "table of contents," yes.
Q. Right. And then it's an excerpt that I've given you.
The unit operation for cation exchange chromatography, that's on JTX 032.0019 to 0020; correct?
A. Yes, I see those two pages.
Q. And we heard all about cation exchange chromatography from Dr. Broide yesterday; right?
A. I think that was from Dr. Bates.

Q. I apologize.

We heard about that from Dr. Bates yesterday; right?

A. Yes, I believe that's correct.

Q. And that was part of his patent, his 2029 patent, cation exchange chromatography; right?

A. That was certainly part of what he was talking about yesterday, yes.

Q. Okay. And if we put the image back up of Dr. Bates's patent, JTX 4, this is where we've got the 1 part per million.

If we look on the second page of the product specification, JTX 032.0020, there's actually a specification for how many parts per million of residual DNA the FDA would allow for DAXXIFY; right?

MR ASHKENAZI: Objection, Your Honor. We're asking an economist to talk about technical issues and to compare numbers, and it seems like counsel is testifying here, not asking.

THE COURT: So I'm okay with it so far.

THE WITNESS: I'm sorry, I'm lost. I don't know what your question was.

BY MR. ARMENIO:

Q. Sure.

If we look at the last page of the exhibit for

the process control for cation exchange chromatography, JTX 32.20, in this process control, this FDA-submitted document for DAXXIFY, there's actually a specific parts per million limit for DAXXIFY residual DNA; right?

A. I mean, I can see the words that are written here, but I'm not a technical expert. I really don't know specifically from a technical standpoint what this refers to.

Q. You can see the words "residual DNA PicoGreen parts per million less than or equal to 4,000"?

THE COURT: All right. So now I'm going to sustain the objection. So I use the rule of thumb if I don't understand it, she doesn't understand it. Okay?

BY MR. ARMENIO:

Q. I'll ask a foundational question.

The Revance party in the hypothetical negotiation would have access to this document; right?

A. Well, this document is dated July 22, 2022. So as of the hypothetical negotiation, I don't assume that they would have access to this document, no.

Q. The Revance party would know what the specifications are in the BLA they submitted to the FDA; right?

A. I certainly agree that they would know what they were doing, but you're asking about this particular document and this is after the hypothetical negotiation.

Q. All right. Revance would know what it's doing; right? And this document, by the date you cite, is before the first manufacturing patent expires; correct?
A. I agree that this document is before the first manufacturing patent expires.
Q. And this document has a -- information that's directly relevant to how many parts per million of residual nucleic acid in the botulinum neurotoxin Claim 8 that they're negotiating over in JTX 4; right?
A. I'm not a scientific expert. And honestly, I don't know whether this reads on what's here one way or another.
Q. You agree that Revance would have full access to its own product specifications, including the part per million of nucleic acid for its own product; right?
A. I agree that Revance would know what it was doing at the time, yes.
MR. ARMENIO: Your Honor, with that foundation, I'd offer JTX 32A into evidence as --
THE COURT: Well, right now I don't think it's actually relevant. But when -- there may be a time when there's some witness who explains it, and then you can bring the subject up again.
MR. ARMENIO: Thank you, Your Honor.
BY MR. ARMENIO:
Q. And let's turn from manufacturing patents. Whether

they're needed or whether they're not needed, we can say, as a final word, parties don't pay in hypothetical negotiations or real ones for things they don't need; right? We can agree on that simple premise?
A. Well, Revance needs to pay a reasonable royalty because they are infringing those patents. So I don't know what other hypothetical world we're in.
Q. In the real world, parties don't pay for what they don't need; right?
A. If there's really something that you don't need, I agree. But in this case, Revance needs the technology. It needs to license those patents.
Q. In the hypothetical negotiation, we're supposed to follow as best we can what would happen in a recreated real-world negotiation where people don't pay for what they don't need; right?
A. Again, but that's not the case that we have here. We have Revance that is still using that '748 process. So they need to license it in the hypothetical.
Q. Revance would feel that it didn't need it; right?
A. Revance hasn't designed an alternative from 2019, the date of the hypothetical negotiation, until now, six years later. So they might make that argument, but it doesn't square with the facts of the real world to say they didn't need it.

Q. It squares with the FDA specification, though; right?
A. As I said, I am not a technical expert. I can't opine on that.
Q. Let's look at PDX 17-9. And this is your formulation patent.
Now, in the formulation patent -- you say this is a second negotiation in October of 2021; right?
A. Correct.
Q. So under this negotiation, Revance is already paying a royalty from June of 2019; right?
A. That's right.
Q. And they paid that royalty --
A. Well, no, they're not, because the actual sales haven't started yet. So they're not actually paying royalty at this point in time.
Q. They already agreed to a royalty as of 2019 --
A. Yes, they did.
Q. -- in your view?
A. Yes, they did.
Q. And part of the reason they paid that royalty, in your view, on a manufacturing patent is so they don't have to change the product; right?
A. That's right, so they don't have to delay. Yep.
Q. Well, here there's a second negotiation where you say that Allergan could come back and ask for more money on the

same product; right?
A. Well, it's a different patent that's being infringed, so, yes, there would be a second negotiation.
Q. And let's compare your slides PDX 17-9, which is the negotiation about the formulation patent, with the prior 17-6, where they were negotiating over -- when they were negotiating over the prior, and let's pull out the Allergan side of it.
The Allergan disadvantages for both of your hypothetical negotiations are exactly the same; right?
A. That's right. The Allergan side is, essentially, the same in both negotiations.
Q. So in your opinion, Revance agreed to 20 percent in June of 2019, and then Allergan comes back in 2021, Revance's product hasn't changed at all, and they ask for another 24 percent with no additional reasons; right?
Because your slides are the same -- the Allergan disadvantage is the same; correct?
A. The reason is that there's now another piece of intellectual property that Revance is infringing. So there is certainly a reason. But what Allergan is still going to be thinking of is, oh, my gosh, we have this competitor that's coming in and now they're infringing something else --
Q. So --

A. -- so we have to negotiate again.
Q. -- DAXXIFY didn't change Allergan in 2019 and 2021, so Allergan is coming back to double-dip the chip and get more money on the same product; right? Without any product change?
A. It's absolutely not double-dipping. It's the fact that starting at that time, Revance is infringing yet another patent.
Q. Now, in your hypothetical negotiation of the formulation patent, you assume that DAXXIFY's duration is due not to its proprietary peptide, but rather to the asserted formulation patent; right?
A. I agree.
Q. And if your assumption about duration being tied to Allergan's patent as opposed to Revance's novel peptide patent, if that assumption is incorrect, your entire royalty rate opinion for the formulation patent is also incorrect; right?
A. Yeah, my royalty rate is based on the long duration, I agree, at least tied to the patent.
Q. And so if the jury doesn't agree with the assumption that Allergan is somehow responsible for the longer duration, then they can disregard your formulation patent analysis completely; right?
Because it's based on a flawed assumption if

that's what the jury decides; right?
A. If what -- my assumption is that, just to be clear, that the '878 patent is necessary for the long duration. It drives the long duration. So, yes, that's my assumption.
Q. And if that assumption is wrong, all your formulation patent royalty rates are wrong; correct?
A. Yeah, that's the -- that's what I understand to be the case, and that's what my analysis is based on.
Q. And you made -- in this assumption, you assume that Revance, in the negotiation with Allergan, would have credited the same assumption. They would have said, "Okay, Allergan. It's all your patent, I'm going to agree to give you the whole 24 percent product attribute of duration to you, Allergan" because, in your view, Revance would just agree with Allergan; correct?
A. No. So I didn't say that the -- and this is why I was trying to be careful in your last answer.
I didn't say that the long duration is only due to the patent. There could be other interacting factors. But the patent is necessary for the long duration. That was my assumption.
Q. And from what you know about the case and your analysis, you know Dr. Ruegg invented the synthetic peptide that Revance puts in DAXXIFY and then to DAXXIFY; right?
A. I certainly remember that there was some mention of

an inventor of the peptide.
Q. And you've read Dr. Ruegg's deposition transcript and all the deposition exhibits; right?
A. I read so many documents I can't recall. I can look back in my reports. I just can't recall a specific one off the top of my head.
MR. ARMENIO: Your Honor, may I approach with a binder with a couple of new exhibits for the witness?
THE COURT: Yes.
MR. ARMENIO: Thank you.
BY MR. ARMENIO:
Q. If you can turn in your binder to JTX 121, Doctor. We saw in this document, which is Ruegg Deposition Exhibit 2, it's actually a paper authored by several authors including Curtis L. Ruegg; right?
Do you see that from the first page?
A. I see that.
Q. And you see from the title he's calling it: "Characterization of Diffusion and Duration of Action in the New Botulinum Toxin Type A Formulation"?
A. I see that.
Q. So Dr. Ruegg had published a paper with data regarding his proprietary peptide and his -- what was then called RT2 formulation; right?
A. Again, I can see -- I'm not a technical expert.

So I can certainly see the title. I don't see the term "peptide" is in the title. So I don't -- I can't really opine any more than what I can see on the page.
Q. Well, let's leave it just with that.
This kind of paper, JTX 121, would be available to Revance in the hypothetical negotiation when discussing duration and negotiating a royalty; right? It would be available?
A. I agree the date is before the hypothetical negotiation. This would have been available to both parties, yeah.
Q. And similarly, we know, if we turn to DTX 521 --
A. I'm sorry, what number?
Q. DTX 521 -- we know that Revance was actually granted a patent on its synthetic peptide; right?
A. Again, you know, I don't know how many times I can say this. I'm not a technical expert. I can see this patent. I can see what it's called. I can't really provide any other information about this patent or characterize it.
Q. And I'm not asking you to, Doctor.
My question of you as an economist is: Based on your opinion, you've given us these hypothetical negotiations, and what I'm trying to do is populate those hypothetical negotiations with real-world documents.
And is DTX 521, the Revance patent, another

document that would have been available in the hypothetical negotiation on the formulation patent since it issued on May 1, 2018?
A. I agree that this predates the hypothetical negotiation and would have been known, yes.
Q. So when Revance comes to the bargaining table about duration, it would have a patent and a published paper at a minimum to support its position; right?
A. Again, I don't know whether this supports its position. It certainly -- these -- I don't disagree that these two documents would have been known at the time of the hypothetical negotiation.
Q. And in contrast, we've heard from Mr. Hunt, his patent, the formulation patent-at-issue in this case, he said it doesn't discuss duration of action in the body; right?
A. I remember that, yes.
Q. Now, in this case, there's been a lot of discussion about Allergan.
Allergan is a many-faceted corporation with lots of entities; right?
A. I agree there are different Allergan entities.
Q. The one that matters for this case, the patent owner, is Allergan, Inc.; is that correct?
A. That's my recollection, yes.

Q. And Allergan, Inc., is the party that should have been in the hypothetical negotiations you've talked about; right?
A. I agree.
Q. Now, in the real world, we know that Allergan, Inc., has actually licensed the patents; right?
A. Internally to its own other Allergan subsidiaries, yes.
Q. So in the real world, not the hypothetical world but in the real world, Allergan, Inc., the patent owner, has licensed the patents; right?
A. To its subsidiaries, yes.
Q. And it has licensed the patent for not just the patent, all the U.S. patents Allergan, Inc., has to Allergan Ireland; right?
A. I think that's how the chain of licensing goes. I don't recall that a hundred percent, but yeah, I believe that's correct.
Q. So Allergan, Inc., licenses all the patents it has, not just the three patents-in-suit, to Allergan Ireland. Allergan Ireland makes BOTOX; right?
A. I think that's how it works, yes.
Q. Let me see if we can do this so everybody can see because Allergan is a little complicated. So let's see if we can -- let's see if we get it right.

So we have Allergan, Inc., is the patent owner and Allergan Ireland is the manufacturer; is that right?
A. To the best of my recollection, that's correct.
Q. And for all of the Allergan, Inc., patents, including the three in this case, Allergan Ireland pays Allergan, Inc., 2 percent; right?
A. I'm going to have to look that up in my report. I don't remember that particular number.
Q. You don't remember the 2 percent number?
A. I don't. Honestly, I remember there was an agreement between them, but I've seen so many numbers in this case I just can't remember.
Q. Looking at your opening report, it's in -- you have it very clearly, and that is the first tab in the new binder I gave you. If you look in that report in paragraph 14, it's on page 8 and spans to page 9. If you take a moment, you can refresh your memory, please.
A. Yes. Thank you. I have refreshed my recollection. That's correct.
Q. So having reviewed the documents and refreshed your memory, you agree Allergan Ireland, the manufacturer, pays Allergan, Inc., the patent owner, 2 percent for all patents it licenses, not just the patents it's using; right? It pays it for 2 percent?
A. Correct.

Q. If we look at next paragraph, Allergan, Inc., actually pays -- excuse me.

Allergan Ireland pays a little bit more. They pay 5 percent to AbbVie U.S., LLC, as distributor; right?

A. Correct.

Q. Okay. And everything that's not in the 5 percent to AbbVie U.S., LLC, the distributor, or the 2 percent royalty to Allergan, Inc., everything else stays behind in Allergan Ireland; right?

A. That's my understanding, yeah.

Q. Now there are tax consequences of this; right? How you allocate moneys between subsidiaries and corporate affiliates, there are significant international tax consequences; right?

A. I mean, there certainly can be. I'm not a transfer pricing or a tax expert.

Q. Great. But we are aware that if a lot of the money, 93 percent of the billions and billions of the dollars of BOTOX sales, are going to Ireland and being taxed by Ireland --

THE COURT: So I'm going to sustain the objection. This is irrelevant.

MR. ARMENIO: Your Honor, it goes to the arm's length nature of the royalty rate.

THE COURT: Okay. Well, I'm going to sustain

the objection that Mr. Ashkenazi stood to raise.

MR. ARMENIO: I'll ask a new question.

BY MR. ARMENIO:

Q. Is it correct, Doctor --

MR ASHKENAZI: Your Honor, can we remove the Elmo slide at this time because that's what this is going towards?

THE COURT: I don't know what it's going to. If we're done, move it. If we're still working on that, you don't need to.

BY MR. ARMENIO:

Q. When we look at this situation between the Allergan entities, the rates that the Allergan entities agree to among each other are supposed to be arm's length transaction rates; right?

A. Again, I'm not a transfer pricing expert, so I don't have specific knowledge of exactly how these rates were determined.

Q. In connection with this case, did you look into AbbVie and its policies that AbbVie itself says it adheres to arm's length principles in intercompany dealings?

MR ASHKENAZI: Objection, Your Honor. Same point. This has nothing to do -- first of all, AbbVie --

THE COURT: So this -- so I'm going to not sustain this objection. Go ahead.

MR ASHKENAZI: If I can, Your Honor. AbbVie is not a party at the hypothetical negotiation at that time. He's talking about policies after the fact and the reality is none of this has anything --

THE COURT: Okay. So Allergan was acquired by AbbVie at some point, which was when?

MR. ARMENIO: 2020.

THE COURT: So 2021 is after that. All right. Go ahead.

BY MR. ARMENIO:

Q. So AbbVie -- did you look into the fact that AbbVie says its intercompany dealings -- and that's what this is, an intercompany dealing between Allergan, Inc.; Allergan Ireland; AbbVie, these are intercompany dealings; right?

A. I agree.

Q. And all of these companies are owned by the umbrella company, AbbVie; right?

A. I think that's how this works.

Q. To comply with laws in the United States and around the world, these rates the companies agree for their intercompany transactions are supposed to be arm's length transaction rates; right?

A. Again, I certainly have heard that term. I'm not a transfer pricing expert. So exactly how that factors in from a legal standpoint, I really can't opine on that.

MR ASHKENAZI: Your Honor, if I can, one more objection. Maybe a sidebar would be appropriate.

We discussed there was a ruling on -- related to the entities in this case where there was an assertion that the Allergan Ireland entity or the AbbVie U.S. entity does not have rights to the patents in this case. Accordingly, this whole analysis is irrelevant and the assertions --

THE COURT: I'm going to overrule the objection.

Mr. Armenio, you may continue.

BY MR. ARMENIO:

Q. So if you look in your binder in the front cover, do you see I've included AbbVie's position on tax?

A. Yes, I see that, our position on tax. Mm-hmm.

Q. Can you take a look at the back page where they talk about tax integrity and compliance, including policy intent, and I'm going to focus on the last two sentences.

A. I see that.

Q. And you don't have any reason to doubt that AbbVie adheres to the arm's length principle in its intercompany dealings in conformity with U.S. and OECD transfer pricing guidelines and local tax laws; right?

A. I have no reason to doubt that statement.

Q. AbbVie follows the law on transfer pricing and arm's length principles in its intercompany dealings; right?

A. Again, I have no -- I have not examined that

question. I'm not a transfer pricing expert to be able to examine that question, but I have no reason to believe that it doesn't.
Q. What that means is this 2 percent that Allergan, Inc., gets paid for all the patents it licenses to Allergan Ireland, not just the three in this case, but all of them, that that 2 percent is an arm's length transaction number in compliance with law; right?
A. Again, I'll say the same thing again. I am not a transfer pricing expert. I certainly see this between related parties, which is completely different than what we're talking about licensing to a competitor, but in terms of the legality of this, I have no reason to dispute this follows whatever guidelines and laws you're talking about.
Q. So in the real world, an arm's length transaction between Allergan Ireland and Allergan, Inc., for all of Allergan's patents, not just the three in this suit, that real-world number is 2 percent; right?
A. Again, I don't dispute that 2 percent. It's completely a different scenario than what we're talking about. I mean, licensing to a competitor versus licensing to a subsidiary that's going to be using the product is completely like apples and oranges.
Q. That's the real-world number, though, that they agreed on, Allergan, Inc., and Allergan Ireland, 2 percent

for all of Allergan's patents, not just the three at issue in this case; right?

A. Yeah, in this setting, yeah.

Q. Thank you, Doctor.

MR. ARMENIO: No further questions, Your Honor.

THE COURT: All right. Mr. Ashkenazi.

REDIRECT EXAMINATION

BY MR ASHKENAZI:

Q. Dr. Siegwarth, on those last questions there, with respect to Allergan Ireland, is that a subsidiary of Allergan, Inc.?

A. That's my understanding, yeah. Again, I'm not an expert on company setup, but yes, that's my understanding.

Q. In other words, Allergan, Inc., owns Allergan Ireland?

A. That's my understanding.

Q. And you said this earlier, but I want to be clear. Allergan, Inc., and Allergan Ireland, therefore, are not competitors; right?

A. That's right.

Q. How does the fact that Revance is a competitor factor into your analysis?

A. Again, first of all, one of the important points here, right, is that Revance infringed this patent without coming and taking a license. And now we're after the fact

saying what if they had come in 2019 or 2021 and said, "We want a license to your patent, Allergan, and we're going to be using that to compete with you," that's a completely different scenario; right?

So then the question is, Okay, what value does that have to you, Revance? And we know what kind of value it has. You're able to come in immediately as soon as possible with the launch and you get this long-duration attribute, which is your primary go-to-market attribute.

And on the Allergan side are going to be holding out for a good-sized royalty because you're forcing us to license directly to you. So that's a completely different scenario than this 2 percent.

Q. And during your cross-examination, you were asked some questions about some internal documents from Allergan; correct?

A. Yes.

Q. And discussing about how Allergan would need to compete with Revance; is that right?

A. That's right.

Q. And why would Allergan be discussing how they would need to compete with Revance?

A. Well, I mean, as most companies do, at least good companies that stay in business, they are looking out to the future and looking at all the threats, right, and saying,

okay, what's coming our way in one year, two years, and how are we going to respond.

Some things we're going to respond to, some things we're not; right? So, I mean, that's -- and we saw that they kept tabs on DAXXIFY even after the launch. So that's how companies -- competitive intelligence.

Q. Okay. Now, you were asked some questions about whether Mr. Hunt said his patent doesn't refer to longer duration.

Do you recall that?

A. Yes.

Q. Okay. But you also heard Mr. Hunt say that the potency results disclosed in his patents did; right?

A. Again, you know, I'm not a technical expert. What I understand is that you need -- that Revance needed that patent for longer duration.

Q. Right. But Mr. Hunt, when he was testifying about his patent, did reference the potency results.

Do you recall that?

A. That's what I remember, yes.

Q. And Revance counsel was careful not to ask you about that; right?

MR ASHKENAZI: Sorry, Your Honor. Thank you.

BY MR ASHKENAZI:

Q. A couple more questions just so we're on the same

page here.

You were asked questions about whether Revance infringes -- well, let's take a step back.

Revance infringes both the '740, the first, and the '748, second, manufacturing patent; correct?

A. That's my understanding, yes.

Q. Now, you were asked some questions about whether they need to practice -- whether they could just practice the first patent, the '740; correct?

A. Correct.

Q. Revance today practices both to the best of your understanding; correct?

A. Yes.

Q. And Revance has a design-around; is that correct? To the best of your knowledge?

A. To the best of my knowledge, no. At least certainly not in terms of what its brought commercially to the market.

Q. At the time of the hypothetical negotiation, if Revance said, "I just want to practice the '740 patent," what would happen?

A. Well, then they would negotiate over that '740 patent, and AbbVie would say, "Yeah, but if you infringe on the '748, you've got to pay us for that too."

You can't just, you know, say that you want to do something. It's what are you actually doing.

Q. I --
A. And so the fact of the matter is here this hypothetical negotiation has to be over both patents because that's what they're actually infringing. So they're due a reasonable royalty.
Q. And if they wanted to practice in 2023, years after they were intending to launch just the '740 patent, they would need to still design around under your analysis; correct?
A. That's right. So if, you know, we have -- I don't think this is likely because I think both Revance and AbbVie would have wanted -- and Allergan would have wanted to settle and, you know, make an agreement on all the manufacturing patents because -- you know, at one point in time, companies don't like to come back and renegotiate over the same patents again and again; right? But if they had, you know, come back later for the '748, then that just pushes the delay out even further; right?
So I think that, you know, looking at one negotiation in 2019 over both of the patents, giving Revance certainty on the manufacturing side, is actually a benefit to Revance the way that I've structured it.
Q. Okay. And just to be clear, both you and Ms. Trexler, what did you say about these Allergan agreements internally between the companies? Are those

comparable?

A. We both agree they're not comparable.

Q. Even Ms. Trexler?

A. Correct. Of course not.

MR ASHKENAZI: No further questions.

THE COURT: Dr. Siegwarth, then you, you may step down. Actually, just hold there for second.

So, members of the jury, we'll take a midmorning break here, 15 minutes.

So can we take the jury out.

(The jury exited the courtroom.)

THE COURT: All right. Everyone may be seated.

Dr. Siegwarth, you can step down. Thank you.

So are there any motions the defendant wants to make at this time? Ms. Wells.

MS. WELLS: Yes, Your Honor. Good morning, afternoon, I'm not sure.

THE COURT: Good morning.

MS. WELLS: So we would ask to move for judgment as a matter of law that Allergan is not entitled to Dr. Siegwarth's 15 to 20 percent reasonable royalty on the manufacturing patents, that's the '740 and '748 patents.

Dr. Siegwarth admits that the 15 to 20 percent royalty corresponds to the entire 280 to 377 million that Revance would have expected to lose in present value profits

from a 12-month or 18-month delay, respectively, in launching DAXXIFY had Revance designed around these patents divided by the total expected revenue for DAXXIFY through patent expiration.

In other words, Dr. Siegwarth's 15 to 20 percent reasonable royalty rate accounts for the entire value of Revance's expected gross profits on the complete DAXXIFY product during her 12- to 18-month delay period.

First, the length of this delay period is speculative, arbitrary, and not supported by the evidence. There's no evidence or testimony regarding what that design-around would allegedly be or how it would cause a 12- to 18-month delay.

Dr. Siegwarth could not have assessed the cost of delay from the design-around without defining or knowing from another witness or evidence in this case what that design-around actually is.

Additionally, Dr. Siegwarth failed to apportion either this rate or her royalty base or tie it in any way to the value of the patented invention, or, as discussed in the case law, the invention's footprint in the marketplace. And she has not asserted that she's using the entire market value rule to justify a royalty based on using the entire market value of the complete accused DAXXIFY product.

Dr. Siegwarth also made no attempt to determine

what portion of the 280 to 377 million expected gross profits are attributed to the patent features within DAXXIFY as opposed to any other non-patented features.

And in this case, there's ample evidence that the non-patented features, such as Revance's proprietary peptide, is a driver of customer demand.

Of course, we know, according to well-established case law, including *VirnetX* the law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology or else establish that its patented technology drove demand for the entire product, and there's simply no evidence here for either of those.

The same amount of the 280 to 377 million would be the same for any change, including a change in the manufacturing location or any change requiring the FDA review process that she points to.

Additionally, Dr. Siegwarth used 2025 as her division date. It's unclear if that's supposed to be a stand-in for the bargaining split or for the apportionment, but either way, had she used a different date, such as the 2023 expiration of the first manufacturing patent, her number would be much lower.

She relies on one document for the 2025 date, and all it says is by 2025. She uses this to make the

assumption that that means Q4 of 2025, changing this to a different quarter within 2025, or Q4 2024, would have a huge impact on the royalty rate.

For the '478 patent, that's the second to expire of the manufacturing patents, Dr. Siegwarth also makes no attempt to show that the incremental value between the first-to-expire '740 patent and the second-to-expire '748 patent.

Dr. Siegwarth makes no attempt to show that her 12.5 to 17.5 percent reasonable royalty rate for just the '478 patent alone, which is only 2.5 percent less than her rate for both manufacturing patents collectively, is due to the incremental value between the '740 and '748 patents.

We know after the '740 patent expired in 2023, or it was found in this case to be invalid, Revance is free to use that method. There's no evidence in the record about the technical or economic value of the difference between what's claimed in the '740 patent and what's claimed in the '748 patent.

In fact, Dr. Siegwarth testified on direct that this change in royalty rate corresponded solely to the percentage of the expected profits that occurred during the life of each asserted manufacturing patent. This relates solely to the expiration dates of the patents and not at all to their individual footprints in the marketplace as

required by the case law.

Based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find that the difference between the inventions in the two manufacturing patents is worth a 12.5 to 17.5 percent royalty.

In addition to the failure to apportion, Dr. Siegwarth also applied a 100 to 0 bargaining split after her 2025 date where 100 percent of Revance's expected gross profits occurring on or before Q4 2025 would be allocated to Allergan and 0 percent of those would be allocated to Revance.

This split is not at all tied to the facts of the case, as Dr. Siegwarth admits. It results in Revance with no more profits than it would have received had it not taken a license and simply designed around the patents. Such a split is, in fact, even worse than the rejected 50/50 Nash bargaining split rejected by case law such as *VirnetX*.

Based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find that the bargaining split would be 100 to 0 or that any of the rates or the royalty base is appropriate in this case.

Revance also moves for judgment as a matter of law that Allergan is not entitled to Dr. Siegwarth's 24 percent reasonable royalty on the '878 patent. That is

the composition or formulation patent.

Here, Dr. Siegwarth relies on surveys to say that DAXXIFY's longer duration of action was really important to customers. Dr. Siegwarth testified that her analysis assumes the longer duration is due to the patents and that it accounts for 24 percent of the value of DAXXIFY. But she then ceded on cross-examination that there may be other things that impact and cause this longer duration.

Based upon the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find that DAXXIFY's longer duration of action was due to the patented features. Additionally, here too, Dr. Siegwarth fails to justify her 100 to 0 bargaining split. Even if the jury were to agree that duration of action accounts for 24 percent of the value of DAXXIFY and that duration of action is due solely to the patented features, Dr. Siegwarth makes no attempt to engage in a bargaining split between the parties as required per *Bernetix*.

Instead, she simply assumes the bargaining split would be 100 to 0 to Allergan and makes no adjustment whatsoever to the 24 percent figure. As discussed with the manufacturing patents, this 100 to 0 split is not at all tied to facts of the case and is worse than the rejected Nash bargaining split.

Based on the evidence, a reasonable jury would

not have a legally sufficient evidentiary basis to find that the bargaining split would be 100 to 0.

Finally, Dr. Siegwarth simply applied her 24 percent to the 273 million total revenue. There's no evidence that Revance would be willing to apply this rate to a total revenue. So, again, based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find that the total revenue is the appropriate royalty base in this case.

Additionally, for all of the asserted patents, Dr. Siegwarth has failed to provide any evidence related to her appropriate reasonable royalty for the therapeutic market. She admitted on cross-examination that the markets are different, but she applies the same rate to both markets. And for the manufacturing patents, she uses only the estimated gross profit for cosmetic sales in the numerator of her equation, and yet she applies it to the therapeutic market.

For the '878 patent, she uses two surveys of the cosmetic market for her 24 percent royalty rate, and there's no evidence in the record of what that rate would be or how it would change for the therapeutic market.

As I said, we know that the cosmetic and therapeutic markets are two separate markets, thus based on the evidence, a reasonable jury would not have a legally

sufficient evidentiary basis to determine the appropriate reasonable royalty for the therapeutic market or to conclude that it should have the same royalty rate as the cosmetic market.

Finally, Revance also moves for judgment as a matter of law that Allergan is not entitled to a finding of secondary considerations or objective indicia of nonobviousness for any of the asserted patents.

For the '740 and '748 manufacturing patents, Allergan did not set forth any evidence of secondary considerations or objective indicia of nonobviousness. Thus, based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis or any evidentiary basis to determine that secondary considerations or objective indicia of nonobviousness support the validity of either of the manufacturing patents.

For the '878 formulation patent, the only secondary consideration or objective indicia of nonobviousness that Allergan set forth any evidence for was unexpected results. That evidence was legally insufficient as explained in Revance's letter motion that was filed this morning. That was Docket Entry 624. We incorporate those reasons into this JMOL as well.

And based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to

determine that secondary considerations or objective indicia of nonobviousness support the validity of the '878 formulation patent.

THE COURT: Thank you, Ms. Wells.

I have one question for plaintiff.

Did you put on any evidence of secondary considerations relating to the two manufacturing patents?

MR. DITTMANN: Yes, Your Honor. We at least put on evidence -- and I defer to my colleague -- in terms of skepticism and things of that sort and the difficulty of processing these inventions and the long-felt need for better processes that came through from both the inventors, as well as Dr. Gessler.

THE COURT: So you say skepticism and long-felt need. Is there more or is that it?

MR. DITTMANN: That and -- you know, that, certainly, was presented and just, obviously, also we have the burden of production, which we did. They still carry the burden of having to --

THE COURT: I'm just asking what do you carry your burden on --

MR. DITTMANN: Yeah, that's all we did on those.

THE COURT: All right. I'm going to deny the motion. We probably need to take a slightly longer break. So why don't we start again in ten minutes.

(A recess was taken, after which the following proceedings were had:)

THE COURT: Let's get the jury.

Mr. Varughese, do you have any depositions you're going to be playing or doing live witness?

MR. VARUGHESE: Live witness. We have one video that's going to be ten minutes.

THE COURT: Before lunch or later?

MR. VARUGHESE: After lunch.

THE COURT: Who are you calling?

MR. VARUGHESE: Dr. Ruegg, our first witness.

THE COURT: Is Dr. Ruegg here? Can he come forward?

MR. VARUGHESE: Yes. Would you like him to come sit in the seat?

THE COURT: As long as he gets there before the jury comes through.

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back.

Everyone else may be seated.

I believe my deputy clerk has some photographs.

You've already done that?

THE COURTROOM DEPUTY: Yes.

THE COURT: Did that back there. All right. So everyone can be seated.

Mr. Varughese.

MR. VARUGHESE: Thank you, Your Honor. Good afternoon. Dennies Varughese for Revance.

THE COURTROOM DEPUTY: Could you please state and spell your full name for the record.

THE WITNESS: My name is Curtis Ruegg. That's spelled C-U-R-T-I-S, last name Ruegg, R-U-E-G-G.

CURTIS RUEGG,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

MR. VARUGHESE: Thank you, Your Honor.

Defendants call their first witness, Dr. Curtis Ruegg, to the stand.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. VARUGHESE:

Q. Good morning, Dr. Ruegg.

A. Good morning.

Q. Will you please introduce yourself to the judge and the jury, please.

A. Yes. My name is Curtis Ruegg.

Q. What field do you currently work in?

A. I'm in the biopharmaceutical industry.

Q. Can you describe what that is?
A. It's the industry where we make new drugs, pharmaceuticals, except in my case we focus on biologic drugs, which is the kind you make in fermentation, make a protein or something.
Q. Is a biologic different than other kinds of drugs?
A. Yeah. The regular drugs are small-molecule drugs. They're a small chemical compound you can synthesize in a chemistry lab. Biologic drugs you have a living organism and the organism do the work to make the drug. Kind of like when you make beer -- I'm a beer fan, I like IPAs, and I love going to the brew houses that have those nice, big, shiny tanks. It's the exact same kind of equipment we use to make biologic drug.
Q. How long have you worked in biopharmaceuticals?
A. I've been -- as a professional, I've been working in the industry for over 30 years, 32 years.
Q. Can you tell the jury a little bit about your background, training, and education.
A. Yes. Born and raised in California, normal middle-class kid, played sports in high school, and found out or figured out I liked biology and chemistry, but I had no idea what to do with those. So I went to college.
And then the first year I went to college -- I was the oldest and the first to go -- my mom got cancer, and

that shook our whole family, and it shook me up a lot. And suddenly I figured out something I wanted to do. I want to make medicines that could help people like my mom, and unfortunately, her cancer progressed and the drugs they had in those days didn't save her, and so my goal was to make better medicines than what they have.

Q. What's the highest level of degree you have?

A. After that first college undergrad, I decided to make better medicines, I needed to learn more, so I went to graduate school and got a Ph.D. in pharmacology just down the road here at Johns Hopkins University School of Medicine.

Q. Where is that?

A. Baltimore.

Q. You said pharmacology. Can you describe for the jury what that is.

A. That's the science of studying how drugs interact with any living organism. Obviously, at Hopkins most of the emphasis was on humans, so we learn how drugs interact with people and how to make medicines and make better medicines.

Q. What was your first job out of college?

A. My first biotech job was with a company called Dendreon. We worked on a totally brand-new immunotherapy to treat cancer patients. That product got improved. It's on the market still called Provenge for prostate cancer.

Q. When was that?
A. I worked at that company from about 1993 to '98.
Q. Do you know why you're here to testify today?
A. As I understand it, I've been asked to come here and describe my experiences working at Revance and working on DAXXIFY.
Q. When did you work at Revance?
A. So I started at Revance in 2006, and then I was there about ten years, and I left in 2016.
Q. Did you leave on bad terms?
A. No, no. It was great terms. It's the longest I've ever worked in any company in my career, and there was so much to do. It was a really exciting time.
Q. Can you tell the jury a little bit about, (A), why you came to Revance in 2006 and a little bit about your understanding of the company at that time and its history, that you're aware of.
A. Yeah. So I already worked at a few companies and worked on some very new things, and it struck me at Revance they had a brand-new technology, a way to put drugs, big drugs, protein drugs, biologic drugs into a formulation and apply it like a lotion on the skin. It's called topical.
And usually protein drugs can only be given with a needle. They can't even be eaten, usually. So this was brand-new and we thought it was going to help a lot of

people not wanting all those needle sticks, and so I joined. I was hired with the title of executive vice president of research and development. My main role and objective was to set up and run drug development activities at Revance.

I was the fifth guy there, fifth person there. There was four folks that had been working together for a couple years: the CEO, chief science officer, a couple scientists. They started the company in a garage in Silicon Valley, that TV-type story, and then they got some more investment from investors. And we got a little bit of a nice lab space and office space, which is where I joined them at.

Q. You mentioned some technology when you first joined. Can you describe for the jury what that technology was.

A. So this Revance drug delivery technology involved the use of the synthetic peptide, a very special peptide, and it would help these large protein drugs cross the skin.

Q. You said initially you were there to work on a lotion?

A. Yeah, yeah. Essentially, this topical product, this lotion-type product that we could just put on the skin, the special peptide would carry the drug through the skin. We were working with botulinum neurotoxin, is one of the lead primary drugs that we wanted to put across the skin and avoid all the needles.

Q. Did you work directly with botulinum toxin?
A. Yes, all along these ten years.
Q. Were you afraid?
A. No. I mean, maybe a little at the beginning, especially when we were working with the really large amounts. I had done my graduate school research on HIV, the AIDS virus, so I got used to handling dangerous substances. But the toxin was kind of next level in terms of all the security clearance. We all had to get fingerprinted for the FBI and pass the security testing.

And federal government controlled these toxins with a select agent program. We had strict inventory and inspection and we had to build this facility that was like nothing else I'd ever seen in terms of all the extra precautions. Even had one weekend all the SWAT team from California show up to do an exercise where they were pretending or simulating that terrorists had taken over the plant and were going to steal the toxin and use it to harm people, that kind of lifestyle a little bit.

But luckily, no one got hurt. We stayed safe, and we invented this new medicine.
Q. What happened with that first lotion project?
A. So we worked on it for quite a while. Ultimately, it didn't pass its final clinical testing, so we stopped working on that.

Q. What did you do next?

A. We had already started -- as part of the topical lotion product, we had done some simple experiments in mice that was to test the product and figure out its potency and its strength. And we noticed that the peptide was making this toxin have a higher potency, higher than we expected.

And we even had the sample that didn't have the peptide but had everything else, and that sample gave the expected potency. So there's something unique about this peptide that was influencing the toxin.

And when we noticed that, we were giving it by injection because that's how the potency test is done. We thought maybe this will be useful in an injectable product, and we should study it some more.

Q. So then after making the decision to investigate it as an injectable, what happened next?

A. So we did these more kind of specific mouse preclinical studies and that was where we would inject the formulation, the botulinum toxin and the peptide and the other inactive ingredients, specifically into muscles in the leg of the mouse. These were sort of known assays of tests like a DAS test, and we compared it to other samples. We compared it even to BOTOX. We compared it to that sample that was all of our ingredients except the peptide.

And we saw this unique, greater duration and

degree of effect, so it lasted longer. The effect lasted longer when we had the peptide in our toxin, compared BOTOX and also compared BOTOX without the peptide, and the peptide was having a unique effect.
Q. There's a binder, Doctor, for you. Would you mind turning to JTX 121?
A. Yes. I'm there.
Q. Do you recognize this document?
A. Yes. This is the scientific paper that we wrote and published in the scientific journal *Commentary* showing the results of these mouse preclinical studies.
Q. Were you involved in this paper?
A. Yes. I'm listed there as an author, helped make manuscript, planned the experiments, and analyzed the results figuring out the conclusions.
MR. VARUGHESE: Your Honor, I move to introduce JTX 121 into evidence.
MR ASHKENAZI: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 121 was admitted.)
MR. VARUGHESE: I just want to highlight from the title to the end of the abstract.
BY MR. VARUGHESE:
Q. So Dr. Ruegg --
MR. VARUGHESE: No, the title and the abstract.

Thank you.
BY MR. VARUGHESE:
Q. -- can you just identify for the jury and read the title and explain to the jury just a summary of what the study showed.
Can you please highlight the first sentence in the abstract.
A. So you can see by the title, "Characterization of Diffusion and Duration of Action of the New Botulinum Toxin Type A Formulation," so that's what we were just talking about.
This new formulation that we were testing, it had reduced diffusion or spread to other muscles away from the injection site and it also had a longer duration of action compared to these other samples like BOTOX.
And this was a new finding. It had never been described before. And so that's why we published it. That's why the journal accepted the article.
Q. Doctor, can you read the first sentence?
A. So it reads: "RT002, an injectable form of botulinum neurotoxin A, BoNT/A, comprised of a purified 150 kilodalton neurotoxin formulated in a novel formulation is designed to limit the extent of diffusion and permit the safe administration of longer-acting doses."
Q. My first question is, what is RT002?

A. So that was our internal audit code for this injectable product. So it's essentially its name.
Q. And do you know what, ultimately, happened to RT002?
A. Well, it eventually became DAXXIFY once it was approved.
Q. So RT002 and DAXXIFY are the same formulation?
A. Yes.
Q. And then, at the very end of the sentence, "limit the cytodiffusion and permit safe administration of longer-acting doses."
Can you explain to the jury why you put that there and what it means.
A. Yes. Because, again, we saw this striking difference when we tested those three samples together in the same experiment. And we saw that the -- this RT002 formulation didn't spread as much. There was less diffusion.
And like we know from all of the approved botulinum neurotoxins that are on the market, and they were in those days when we wrote the paper, one of the side effects -- one of the major side effects and limitations of using all of these was the undesirable spread to other muscles in the face, especially the delicate muscles of the face.
And that would lead to some really unattractive side effects, you know, in terms of paralyzing people's

eyelids and things. And so that was a big deal. But it was just a known kind of limitation of the whole class of those approved drugs. And that's why we were really keen on this finding, that this drug, this formulation, RT002, had less of this spread.

And so it was also a surprise to us, and that's why we reported it here, that it lasted longer. The targeted effect on the target muscle had a longer effect than the other samples, including BOTOX.

Q. Thank you. Can we highlight the last sentence.

Doctor, just take a quick moment to reread that sentence to yourself. I was just hoping you could explain to the rest of us so we understand it what the sentence is here and what you found out with this trial.

A. Yeah. So again, this sentence sort of wraps up or concludes our findings, which is that, you know, there's a superior degree, so it's stronger, and greater efficacy effect and a longer duration of effect at the intended target.

And at the same time, we control that unwanted diffusion or spread to the neighboring muscles and even distant systemic targets. That means we were watching the effect of the toxin in the whole body.

You know, for instance, people -- the mice, they were losing body weight in the other samples because it was

spreading and the legs weren't working as well and the mice weren't able to get food. So these effects were all documented in this scientific paper.

Q. Do you recall how, once this was published, the scientific community -- your scientific community received the results of your findings?

A. Yeah, it was really well received. It was exciting. This journal that published the article is one of the top journals for toxin products and toxin research. It's called *Toxicon*.

And so it was a prestigious journal to get these findings published in, and the community was excited about it.

Q. Can you turn to DTX 520 in your binder.

A. Yes.

Q. Do you recognize this document?

A. Yes. This is a U.S. Patent that I was an inventor on.

Q. You're an inventor on this patent?

A. Yes.

MR. VARUGHESE: Your Honor, I move to enter DTX 520 into evidence.

MR ASHKENAZI: No objection.

THE COURT: Admitted out objection.

(Thereupon, Defendant's Exhibit DTX 520 was

admitted.)

BY MR. VARUGHESE:

Q. Doctor, when was this patent filed? Do you know?

A. So it says down here, line 22, that it was filed on June 25, 2010.

Q. Okay. And when did it issue?

A. So that's up in the upper right corner.

The date of the patent when it issued is May 17, 2016.

Q. And do you know if this was published before the patent issued?

A. Yeah, there's -- just below the file date, there's a prior publication date, and that says December 30, 2010.

Q. And does this patent cover DAXXIFY?

A. Yes.

Q. So someone could make DAXXIFY by reading this patent?

A. Yes. By looking at the examples we show, there's a complete -- all the formulation of DAXXIFY, all the parts that go into it.

Q. Let's go to Example 1.

So can you just describe for the jury what's disclosed here and how someone could make DAXXIFY themselves.

A. So you can see in these couple of paragraphs shown on the screen a list that includes all of the ingredients that

go into the formulation, and including, as you can see highlighted, the toxin. That's the key ingredient. And then a little bit lower, the carrier peptide. It even gives the exact amino acid sequence of peptide. So anyone could go make this sequence.

I used to make peptides. We had a machine in the lab that made peptides. All you do is plug in the sequence, put all your reagents on the machine, and so it would be easy to completely reproduce or make the DAXXIFY formulation based on these instructions.

Q. So what's the active ingredient in DAXXIFY?
A. Botulinum neurotoxin.
Q. Is there any other active ingredient?
A. No.
Q. So the other ingredients are inactive?
A. Yes.
Q. How would you characterize the peptide?
A. The peptide, if you sort of drill down a little, it doesn't paralyze the muscle. So in this case it doesn't qualify as an active ingredient. The botulinum neurotoxin paralyzes muscle. That's our pharmacologic action we're studying.

The peptide influences the toxins. We've seen that. It makes the toxin last longer, the effect of the toxin. It reduces the diffusion or spread of the toxin. So

it affects the pharmacology of the toxin.

And that's a special kind of subcategory of an inactive ingredient sometimes called a functional excipient. Because it has a function, but it's not the active ingredient.

Q. Could we go to the abstract.

Doctor, could you just read the abstract and explain to the jury what that means.

A. So it reads: "This invention relates to botulinum toxin formulations that are stabilized without the use of any pertinacious excipients. The invention also relates to methods of preparing and using such botulinum toxin formulations."

So basically what it's saying is it's talking about the botulinum formulation. This formulation does not have any other proteins. So animal proteins were commonly used pretty much in all of the approved toxins. They use, usually, an animal protein derived from human blood, human serum albumin, or HSA. That's seen in BOTOX. So this was -- this formulation in this invention doesn't have any of those.

It also -- the invention, it says in that second sentence, is talking about methods of use, methods of preparing it, methods of using it, and what this invention could be good for.

Q. Can we go to column 4, line 10 to 16.
Is this -- can you explain to the jury what this is.
A. So this is the part of our list of ingredients that, you know, is describing the peptide. And, in fact, it looks like a lot of gobbledygook there, but the long sequence of letters, RKKRR and so forth, that's the exact single-letter amino acid code for the peptide.
And we have to learn this alphabet, but each one of those letters has a unique representation for one of the 20 natural occurring amino acids. And so, again, this would give you complete instruction on how to make this peptide and discloses its exact chemical composition.
And with that, its exact -- you're going to know a lot about the chemistry of this peptide. It's a very unusual sequence. When I saw it, I'd never seen anything like it. It's highly, highly charged. It's very -- got a very strong positive charge, which means it's going to interact with a lot of things, like the proteins that we're trying to affect in the botulinum neurotoxin.
Q. And then earlier when we were looking at the list of ingredients in DAXXIFY, you mentioned polysorbate 20?
A. Yes, that was one of the other inactive ingredients.
Q. Can you explain what's polysorbate 20 and why you use it?

A. So polysorbate 20 is known as a newer class of chemicals called detergents.

And we all use detergents at home to -- they help us clean our clothes and our dishes and everything else. And they actually have really important roles in drugs and in formulations. They make -- they're easier to work with biology. Because biology is happening all the time as a dance between water and oil, water and fat, and the detergents are the intermediary there.

So in this case, the detergent, polysorbate 20, is being used instead of a protein stabilizer. It can also help -- allow the toxin protein to be comfortable and stable and stay in solution, which is really important for the drug to work. The toxin has to be in the liquid of the drug.

And so that's what the polysorbate 20 does, it keeps it in the liquid of the drug.

Q. Thank you. You can take that down.

Doctor, can you turn to the last tab, I believe it's 521, in your binder.

A. Yes.

Q. Can you -- do you recognize this?

A. Yes. This is another U.S. Patent that I was an inventor on.

Q. Can you just read the number?

A. It's U.S. Patent 9,956,435.

MR. VARUGHESE: Your Honor, I move to enter this into evidence, Exhibit DTX 521.

MR ASHKENAZI: No objection.

THE COURT: Admitted without objection.

(Thereupon, Defendant's Exhibit DTX 521 was admitted.)

BY MR. VARUGHESE:

Q. So this is another patent that you're a named inventor on?

A. Yes.

Q. And when was this patent filed?

A. So the patent was filed, on line 22 there, December 28, 2009.

Q. And when did it issue?

A. It issued on the date in the right corner, May 1, 2018.

Q. Let's go to Example 1, Example 2, and Figure 1.

So can you just tell the jury what Example 1 and Figure 1 in your patent describe.

A. So maybe we'll start with the example, the text on the right there. It just says that this DAS assay -- we talked about these -- this is a mouse assay -- to study the paralysis of botulinum toxin.

So this DAS assay data indicate that a local muscle paralysis caused by the RT003, which we know to be

the RT002 formulation, lasts approximately twice as long as the local muscle paralysis caused by BOTOX.

And that conclusion is based on this figure here on the left side, Figure 1, where you can see three treatments. So these mice were treated three times in a row. And you see it in the box in the right side of the graph, one that says BOTOX 5 units per kilogram and then a different symbol, a darker shaded symbol is for the RT002.

And then there's a plot graph on the Y axis. That's the number of days it lasted. So you can see, for instance, first treatment, BOTOX, the lighter colored bar, about -- I would guess that's 11 days, a little over ten. And then the darker colored bar, RT002, next to the first treatment, 25 days. So that's more than twice as long and so forth.

So that's what this data is showing.

Q. Now, in Example 1, it says RT003.

What's that?

A. Yes, so this was a brief clerical error. We -- I think we talked about it a minute ago, but this code, RT003, was mistakenly used initially when we started working with the injectable. And the code had been the wrong one.

I think we thought we had already used RT002 but we hadn't, so we corrected the mistake and it was forevermore always referred to as RT002, which became

DAXXIFY, and it always had this formulation.
Q. And what does RT stand for?
A. That's for Revance Therapeutics.
MR. VARUGHESE: Can we go to column 4, lines 31 to 39.
BY MR. VARUGHESE:
Q. Once he highlights it, Dr. Ruegg, can you please read it for the jury.
A. Yes.
Q. Starting with "for" to the end.
A. Okay. So the highlighted section: "For instance, in certain embodiments, the compositions may exhibit one or more advantages over conventional injectable botulinum toxin formulations, including, reduced antigenicity, reduced tendency to undergo diffusion into surrounding tissue following injection, increased duration of clinical efficacy or enhanced potency relative to conventional botulinum toxin formulations, faster onset of clinical efficacy, and/or improved stability."
Q. So is this where you're describing the benefits of your invention?
A. Yes.
Q. And this patent covers DAXXIFY?
A. Yes.
Q. And so there's three things in there I'd like you to

elaborate on for the jury: diffusion, increased duration of clinical efficacy, and enhanced potency.

Can you just describe what this is and whether or not those features related to one another.

A. Yeah. So like I said, from our very first -- very first observation, we saw it increased the potency a little bit. We didn't understand why or -- and it wasn't really the right model. It was a potency assay. It wasn't really a paralysis assay like the DAS assay.

Then we did the DAS assay. And that gave us a very clear picture that this formulation had less diffusion, less spread, and it lasted longer. So those two were clear. And they work together so the more targeted dosing leads to longer duration.

The potency of a product is a separate topic. It's like on a separate thermometer that you're reading. It's a different beast. So the potency does not equate to duration. Potency -- you know, I can put in twice as much. I'd have twice the potency of the dose, but it's still -- it's going to last, you know, the same amount of time.

So duration and diffusion are linked and potency is just a separate measurement.

Q. Can we go to Example 2, please. Can you describe for the jury what's being depicted in Example 2, Doctor?

A. So with the highlighted parts, the study involved

these three formulations. I mentioned them earlier as samples. So the BOTOX formulation or sample, the RT002 formulation, named here three, and then a little further down the third sample was the RTT150 and that's the same exact mixture of formulation substances as RT002 except it doesn't have the peptide.

And then you can see down at the bottom here what happened, what was the result. Well, there's decreased tendency of local diffusion of the toxin using the RT002 formulation, and that was true. And it was more decreased diffusion compared to both the other two samples, the sample of the same ingredients except the peptide RTT150 and it was decreased diffusion compared to BOTOX.

Q. And here it's a typo where it says RT003?
A. Every time it says "RT003," there was this unfortunate, very short-lived typo.
Q. So we're on the same page, when this passage talks about RT003, it's talking about DAXXIFY?
A. Yes, this is all about DAXXIFY, otherwise earlier known as RT002.
Q. DAXXIFY is a composition; right? It's a formulation?
A. Yes.
Q. Did you also make the toxin?
A. Yes, I was in charge of the manufacturing process and that included the -- growing the bacteria that makes the

toxin and then purifying the toxin.
Q. At a high level, can you explain to the jury how you manufacture the toxin.
A. Like I said, it's a biopharmaceutical so we have to use a living organism as our kind of factory to produce the toxin. So we use the bacteria, the *clostridium botulinum* bacteria. That's the one where they first discovered the toxin from because it was the naturally occurring bacteria that makes the toxin. We grow it in a big fermenter, like the beer vats, and then we have this huge mixture, very soupy gemish of different proteins and other things like DNA and RNA. It's all a mix in there, cell parts, and we have to get rid of all those because that stuff can't wind up in the pharmaceutical.
So that's why we do the second part of the manufacturing, which is called downstream manufacturing or purification. That's where we're taking the botulinum neurotoxin out of the soup, getting rid of the other ingredients, and just having the pure neurotoxin.
Q. What process did you use to do the purification?
A. When I started working with our outside partner, manufacturing partner, their name is List Labs, they had a process. They had been working with the toxin for many years. They had a lot of the expertise.
So they had a manufacturing process, so we first

made a few batches using that process but that process was kind of based on some very old technology that had been developed decades before by many different botulinum toxin labs, and it was for research purposes, really.

So there was a lot of reasons to improve the process. The old process was very slow, very time consuming, gave terrible recovery or yield, so we didn't make very much toxin. It had steps that were dangerous for the operators and so there's a much better way that was already well known. It was universal, really, in the pharmaceutical industry for purifying drugs and was used in the chemical industry too, still is, still the best purification technology, and that's called chromatography.

Q. Do you see that gigantic Ziploc in front of you? Can you share your thoughts on that with the jury.

A. I don't know if you can see these. These are some examples of small, I'll call them small, chromatography columns. The big ones that we use to purify toxins are on wheels. They come in and they're very heavy so you wheel them around. This is a small one and they have a purpose, too, in the lab.

Basically it's some kind of cylinder. It's a container, and it's got tubing on each end so you can move fluid through the container. In the middle of the container, this one is empty, but in the middle of it is

where you put your chromatography material. It's called a resin or chromatography media. It's like solid particles.

Starts as a powder and then you add it to water. It makes kind of a slushy thing and it stays in there. And you have this special chemistry on these particles in the column, and it's called a stationary phase. And you take the mixture, in our case it's a really ugly-looking soup, of all the ingredients from the bacteria. And you push it into the one end of the column. It flows through there. Moving liquid is called the liquid phase or the mobile phase.

And chromatography is this interaction between the stationary phase and the mobile phase and each one of the ingredients in that soup has its own unique behavior in terms of going back and forth. Sometimes it's stuck to the stationary phase and so it's not flowing and then you'll change a little bit about what liquid you're pushing through there and that will nudge it off the stationary phase and then it's in the mobile phase.

And this, basically, gives you a chance to separate really complicated mixtures into a final pure product that you can use, that you can inject into people safely and you know exactly what it is and there aren't any other impurities or hazardous substances. It's by far the most common universal purification technology.

Q. Thank you. Can you turn to JTX 117 in your binder.

A. Yes.
Q. What is this?
A. This is a U.S.-issued patent, number 9,469,849. I'm the inventor on this patent.
MR. VARUGHESE: Your Honor, I move to enter JTX 117 into evidence.
MR ASHKENAZI: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 117 was admitted.)
BY MR. VARUGHESE:
Q. Quickly describe this patent.
A. So this patent is where we describe the manufacturing process that we use for DAXXIFY, for the active ingredient, the botulinum neurotoxin. And in particular, some of the new chromatography steps that we introduce into the older historical process that List Laboratories used.
Q. So you invented a new process for purification?
A. Yes.
Q. Can we go to column 2 on page 4. About three-fourths of the way down and there's a paragraph that begins with "A more recent approach."
A. So this reads, "A more recent approach involves the use of hydrophobic interaction chromatography, mixed mode and/or ion exchange chromatography to purify botulinum toxin as a complex. See example U.S. Patent Numbers 7,452,697 and

7,354,740 which are hereby incorporated by reference."

Q. What does "incorporated by reference" mean?

A. I learned the patent attorneys do this when they write the patents. We give them the information that is the information about our invention, and I've seen this appear. It's common. It's typical that they will put some references in just to give some idea about what some of the other prior art has been, different related descriptions that are in the public record.

Q. Do you see the U.S. Patent 7,354,740?

A. Yes.

Q. Do you understand that's a patent in this case?

A. I don't memorize these numbers. There's seven digits. If that's what you tell me, yes, I understand what you're saying.

Q. Did you review that patent when coming up with your patented process?

A. Not that I recall. Again, the attorneys identified this reference material. They chose what to put in. They put some things in. I really never understood exactly how they make that decision. I respect their expertise and then they respect mine on the actual science invention I have.

Q. So earlier you talked about the study that you published using DAXXIFY in mice.

A. Yes.

Q. Was DAXXIFY ever tested in human beings?
A. Yes.
Q. Can you summarize for the jury the human being testing.
A. Sure. So after we did all the mouse studies and were very excited by the results, we thought it had promise and deserved to be tested in human volunteers, so I was involved in the first two clinical studies for DAXXIFY, the phase one/phase two study. And after that, we did a bigger phase two study.

And in each of those studies, me and my team made the actual drug product that was used to treat the patients. I participated in all the discussions where we designed how the clinical studies would be conducted and the experimental strategy.

And interestingly, I got to go and visit every one of the clinical sites that was participating in the study. It was actually where patients could come in and the doctors would give them the drug, and my job there was to teach them how to use the drug, specifically how to reconstitute it because it comes in a powder. You have to add your liquid to mix that up and how to make the dilutions to get the right dose. So I got to visit all the sites, interact with all the study staff.

And after we got the results from the clinical

volunteers, again, I was part of the team that discussed the results, trying to figure out what the results mean, what can we say about it, and relate those results back to the same kind of results we were seeing in the mice.

Q. Those clinical studies led to DAXXIFY approval?

A. Those were the first two. I left Revance after the first two studies but the program, obviously, continued and it ended up getting approved.

Q. So DAXXIFY was approved after you left the company, but you learned about the approval?

A. Yes, I continued to follow the story. I'd worked on it for ten years and followed whatever was out in the news media, the press releases, the scientific journal article papers. I even one day was sitting there at my computer and my Google feed that still had a setting for Revance picked up this *Time Magazine* article which said that DAXXIFY was on the list for best inventions, which was kind of a pleasant surprise for me.

I published a lot of papers. I've been an inventor on the patents, but I've always been in the scientific community, the nerd community. So to see it in *Time Magazine*, a mainstream magazine, I thought, "Wow. This is something, I guess, really is important to people and is worthy of mention in this article." I just wish that my parents were still alive to see that. They would have

finally understood something their son did.
Q. So do you remember what year?
A. I think it was 2023, a couple years ago.
Q. I promise just two more quick questions before we wrap up or at least I wrap up with you. During your time at Revance, did you ever interact with plaintiff Allergan?
A. Yeah. I remember two kind of periods. There was a series of meetings we had with them at one point to discuss that topical lotion product, RT001. And our whole goal of meeting with them was to share a lot of detailed information about the product and our data and then with the hope that they might want to possibly be our commercial partner or license the product in some kind of a joint effort business venture.

Nothing happened from that but then we did kind of the exact same thing with RT002 a year or two later. We had clinical data, exciting data, on RT002, the DAXXIFY product, and we had all the discussions, shared all the information, and then they did actually present us with an offer, financial offer.

MR ASHKENAZI: Objection, Your Honor.

THE COURT: So I'll see counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT: So one of the very indistinct outcomes of the meeting --

MR. VARUGHESE: I can withdraw, Your Honor.

THE COURT: Yeah, okay.

MR. VARUGHESE: I was just asking about history. I'll move on to another question.

THE COURT: So the response about a financial offer, can I strike that?

MR. VARUGHESE: Yes.

THE COURT: Okay. Anything else?

MR ASHKENAZI: No.

(The discussion at sidebar ended.)

THE COURT: All right. So the last -- so at the beginning of the case, I said at some point I may strike some testimony and tell you to disregard it.

So the testimony that was just given in the last answer about this second meeting, I'm going to strike that testimony and tell you to disregard it. So that means at some point when you're deliberating, you don't discuss it, try not to think about it, and, you know, it doesn't count as being any kind of testimony. All right.

MR. VARUGHESE: Thank you, Your Honor.

BY MR. VARUGHESE:

Q. So, Dr. Ruegg, my last question is: Could you please just summarize for the jury your time at Revance and the patent that led to DAXXIFY.

A. So, like I mentioned, I think, it was the longest I

have ever worked at any biopharmaceutical company. I loved it there. It was exciting. It was brand new stuff.

And I did all that school training to make new medicine, you know, medicines that would be better than whatever was available at that time. And that's what I got to do at Revance. And I got to build the team.

It was a great, great part of my whole life and certainly of my profession. And I just -- you know, I continue that passion today to try and make new better medicines than what we've got. And that's how we get -- that's how we make progress.

Q. Thank you.

MR. VARUGHESE: Nothing further, Your Honor.

THE COURT: Cross-examination, Mr. Ashkenazi?

MR ASHKENAZI: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR ASHKENAZI:

Q. Dr. Ruegg, you were discussing Revance during your direct examination; correct?

A. Yes.

Q. Okay. Revance is a corporation; correct?

A. Yes.

Q. And they have big offices in Nashville, Tennessee; is that correct?

A. Yes.

Q. And for more than a decade, Revance was a publicly traded company; correct?
A. That sounds about consistent with my recall.
Q. And publicly traded on the New York Stock Exchange; correct?
A. I thought it was NASDAQ.
Q. We can move on. Either one, that's fine.
And Revance is a company that's conducting business all over the world, including Europe, China, and abroad; right?
A. Yeah, I didn't -- it wasn't doing all that while I was there, but I think it continued to grow.
Q. Continued to grow; correct?
A. Yes.
Q. So today, Revance is a company that's conducting business all over the world, including Europe and China; correct?
A. I can't speak directly from my detailed knowledge of that. I know that it recently underwent a merger with another company. So some of the newer activities and scope I really don't -- I haven't followed that.
Q. In fact, I think you just mentioned that Revance was acquired by another company; correct?
A. I do know that, yes.
Q. They were bought out; right?

A. I don't know the details.
Q. Okay. Now, you spoke about your 117 patent earlier today; correct? I apologize. If you could turn to JTX 117. And I believe that's your '849 patent. If we could put that up on the screen.
Now, this is a patent in which you are listed as an inventor on; correct?
A. Yes.
Q. And presumably, you would have read this patent application before it was filed; correct?
A. Yes.
Q. And if there was anything wrong in there, you would have made a note to it or tried to correct it; correct?
A. To the extent of -- if it's content that I am familiar with and know that it's wrong, I would point that out to the attorneys.
Q. If we could turn to JTX 104, on the right-hand side, column 2, lines 40 to 42, please. I'm sorry, JTX 117 at page 4. Apologies. These numbers sometimes get to me.
So we have it up on the screen. And then if we look at lines 40 to 42, I think you discussed this during your direct examination; correct?
A. I'm still waiting to see what you're indicating.
Q. Okay, sure.
Do you see that it says: "These approaches,

however, require additional steps to perform a complete biologically active botulinum toxin protein"?

A. Yes, I see that sentence.

Q. Then right below that, if you can go, you have another paragraph; correct?

"A more recent approach," do you see that on the screen?

A. Yes.

Q. And this is what you discussed, you discussed the more recent approach during your direct examination; correct?

A. Yes.

Q. So in the previous paragraph, you were discussing some ways of making botulinum toxin that required extra steps or weren't as useful as you thought they were; correct?

A. Well, I didn't read that whole section, but that's what this sentence sort of alludes to, I think.

Q. And then as you mentioned during your direct examination, you talked about a more recent approach; correct?

A. Yes.

Q. And that more recent approach was Allergan's patent, as your counsel went over with you; correct?

A. I don't know how these references factor into the

statements because, again, the attorneys put these in. I'm not a patent attorney so that's -- this is the part of the content I rely on the patent attorney for, not me as the inventor.
Q. The patent attorney helps you draft the patent; right?
A. Yeah. They take the lead in drafting the patent because that's their training.
Q. And you don't put the words down yourself, necessarily; right? They are the ones who actually put the words on the page?
A. Yes, they do. I give them the scientific data and then they put the words on the page.
Q. And when you were reviewing it, you reviewed it for accuracy, though; correct?
A. Again, with my focus being on the technical accuracy of the scientific content.
Q. Okay. And here it says: "A more recent approach involves the use of hydrophobic interaction chromatography mixed mode and/or ion exchange chromatography to purify a botulinum toxin as a complex"; correct?
A. That's what it says.
Q. You had no reason to disagree with that when you reviewed your patent application; correct?
A. No.

Q. And you had no reason to disagree with the statement -- I mean with the citation or what's included right after that sentence; right?
A. I just -- like I said, I followed the lead of the patent attorneys. This is their domain.
Q. And you had no reason to disagree with the patent attorneys that a more recent approach involved using Allergan's patents; correct?
A. I'm just going to repeat myself again because you keep asking the same question.
I didn't have a reason to disagree on this topic. They take the lead.
Q. Okay. Thank you. We can take that down. And let's shift gears.
You discussed Revance's peptide during your direct examination; correct?
A. Yes.
Q. Okay. So I want to make sure that we're clear because there's a lot of terminology that's been thrown around.
That's RTP004 is another name for it; correct?
A. That's a product code name that we used for the peptide.
Q. And at Revance, that's also known as a CPP; is that correct?

A. We didn't use that term officially. It was more that's like a legacy literature about the whole class of proteins that are out in nature. So...
Q. So this is a class of proteins called a cell-penetrating peptide; is that correct?
A. That's what I recall CPP refers to.
Q. Right, CPP is a cell-penetrating peptide; is that right?
A. I've seen that appear or that abbreviation used in scientific literature.
Q. And that's been used to categorize the class of peptides in which Revance's peptide RTP004 is a part of; right?
A. Well, the Revance peptide is not the same as the CPP because it has a different configuration, different content. So it's -- I wouldn't call that a CPP. It's also not a naturally occurring sequence.
CPPs, in my experience, were all naturally occurring. They're found in nature. You know, some organism had that sequence in its genes and it made the protein.
Q. Which organism had the sequence in its genes?
A. All kinds of organisms. You know, I don't remember them all.
Q. Was HIV one of those?

A. I think so.
Q. So Revance's peptide came from HIV?
A. No. Like I said --
Q. I just want -- please clarify.
A. Yeah, I'm happy to.
Revance's peptide is a non-naturally occurring sequence. That means you don't find it anywhere in nature. So it's not in the genes and it's not being made into a protein in any organism.
Q. So now let's -- and it's your testimony here that Revance's peptide has never been referred to by Revance as a cell-penetrating peptide?
A. What I said is that I've heard that term used in the general sort of topic of talking about this -- these types of peptides and proteins from a variety of organisms and a variety of a large body of different scientific literature and papers.
It's not how we would -- it was not our go-to name for our peptide. We obviously had a different name.
Q. Do you recall anybody at Revance ever using the name CPP or cell-penetrating peptide?
A. Like I said, I don't. I don't specifically recall that.
Q. Okay. All right. Now, let me ask you, the original product that Revance was pursuing that you were working on,

that was a toxin gel product; is that correct?
A. Well, it had toxin -- it had botulinum neurotoxin in it. This is the RT001 product. There was a gel component to help with attaching it to the skin or, you know, painting it -- spreading it onto the skin.
Q. And I'm just trying to keep my questions short to help move us along here.
That RTP -- that RT001 product was a topical toxin product that was applied to the skin; correct?
A. Yes.
Q. And that product would have the toxin go to the top of the skin, and then the formulation helped move the toxin through the skin; correct?
A. Yes, that was the basic understanding of the mechanism of how it worked.
Q. And the belief at the time was that the peptide helped the toxin move through the skin; correct?
A. Yes.
Q. Okay. I just want to make sure I get that straight.
The peptide was helping it move through the skin; right?
A. When it was applied topically, that was what our understanding was at the time.
Q. Okay. Now, you'll agree with me that that project failed; correct?

A. Like I said, it, ultimately, did not meet its clinical endpoint in clinical trial so we stopped working on it.

Q. Now, the peptide now gets used in the injectable product; correct?

A. Well, it's not a this-then-that because we had already been working on the injectable product for about seven years before the topical failed.

Q. Okay. So the peptide --

A. We were working on both.

Q. The peptide is in the injectable product that we now know today as DAXXIFY?

A. It is in DAXXIFY, yes.

Q. Okay. I think you mentioned this a little earlier. When you were at Revance, you did have communications with people at Allergan; correct?

A. Yes, there were some periods where we had some meetings and exchanged discussions.

Q. At one of those meetings, did you ever meet --

MR. VARUGHESE: Objection, Your Honor. That line of questioning was stricken from my questions.

MR ASHKENAZI: The first line of questioning was not stricken, Your Honor. And he was asked about who he met with. We're not getting into the second.

THE COURT: All right.

BY MR ASHKENAZI:
Q. You met with a person named Terrence Hunt?
A. Yes, I remember.
Q. You're aware that Terrence Hunt is the inventor of the recipe patent in this litigation?
A. I don't specifically remember that. I couldn't really see the screen the other day in the arguments.
Q. Let's talk about DAXXIFY as a product. DAXXIFY and the product that you worked with has a toxin in it; correct?
A. It has botulinum neurotoxin in it.
Q. And it has a disaccharide in it; correct?
A. Yes.
Q. And it has a surfactant in it; right?
A. Do you mean a detergent?
Q. Are you aware of polysorbate 20?
A. Yes.
Q. And you're aware that that's sometimes referred to as a surfactant?
A. I guess so, sometimes. I think of it as a detergent.
Q. But you have heard of it referred to as a surfactant; right?
A. Maybe at some point.
Q. I want to be clear, DAXXIFY has a toxin, a disaccharide, and a surfactant; correct?
A. Yes.

Q. Okay. Now, you did reference this surfactant, this polysorbate 20, as being important to the DAXXIFY formulation; correct?
A. It serves a role, yes. It stabilizes the toxin.
Q. Now, just to be clear, in your patent when you're referring to the data in the patents that you had, that is with respect to this DAXXIFY product, it had the toxin, a surfactant, a disaccharide, and your peptide in it; correct?
A. It had all of those in it, yes.
Q. In other words, the formulations that you were testing in the reports that you were showing us today, those included a disaccharide and a surfactant; correct?
A. Yes.
Q. And to the best of your knowledge, the DAXXIFY product today has a toxin, a disaccharide, and a surfactant; correct?
A. Yes, to the best of my knowledge.
Q. Let's talk about the manufacturing. At no point during your time at Revance were animal-based products used in the manufacture of the toxin; correct?
A. Could you rephrase or restate the question.
Q. Sure. Talking about your time at Revance, at no point in time while you were at Revance were animal products used in the manufacture of toxin.
A. Not that I recall.

Q. And at no point in time during your time at Revance were animal-based products used in the manufacture of the toxin; correct?
A. Didn't you just ask that question? Is it a different -- sounded like the same question.
Q. We can move on. There's a small distinction but it's not necessary.
Let's focus on this. You'll agree with me that it is actually a requirement for working with Revance's peptide that the process be an animal-protein-free process; correct?
A. No.
MR. VARUGHESE: Objection, Your Honor.
(Cross-talk.)
THE COURT: So the objection is overruled.
THE WITNESS: The formulation -- I'm going to wait.
BY MR ASHKENAZI:
Q. Please go.
A. The formulation cannot have any animal protein ingredients besides the neurotoxin protein is the only protein. That's what we need for the peptide.
Q. To be clear, the formulation, the DAXXIFY formulation, in order for it to work, it cannot have any other animal proteins in it; is that correct?

A. In particular because of the legacy of the products that were on the market that all had HSA, human serum albumin, and it's present in a very high quantity compared to the botulinum neurotoxin, so it's going to compete for the peptide. So that's why we can't have those kind of proteins in our formulation, so we had to eliminate those and not rely on animal proteins, any proteins really, except for the neurotoxin.
Q. So you don't want to have any other protein in your product. You cannot have any other protein in your product other than DAXXIFY and Revance's peptide; correct?
A. And all the other inactive ingredients that are in there.
Q. And the other inactive ingredients, the disaccharide, and surfactant?
A. Yeah, the buffer.
MR ASHKENAZI: Your Honor, pass the witness. No further questions.
THE COURT: Anything further?
MR. VARUGHESE: I have no questions for Dr. Ruegg, Your Honor.
THE COURT: Dr. Ruegg, thank you. Can you sit there for a second. We'll have our lunch break.
Is it all right with the jury if we have a half hour instead of 45 minutes?

Half an hour. We'll start again at 1:30 by that clock. Let's take the jury out.

(The jury exited the courtroom.)

THE COURT: All right, Dr. Ruegg, you can step down. Watch your step.

Everyone else, we're in recess for half an hour.

(A recess was taken, after which the following proceedings were had:)

THE COURT: Are we ready to go?

MR. LAROCK: Yes, sir.

THE COURT: Let's get the jury.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone, you may be seated.

Mr. LaRock, you may proceed.

MR. LAROCK: Thank you, Your Honor.

Good afternoon, Doctor.

THE COURTROOM DEPUTY: Could you please state and spell your full name for the record.

THE WITNESS: My name is Dr. Michael Meagher, M-I-C-H-A-E-L M-E-A-G-H-E-R.

MICHAEL MEAGHER,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. LAROCK:

Q. Doctor, please introduce yourself to the jury.

A. I'm sorry?

Q. Please introduce yourself to the jury.

A. My name is Dr. Michael Meagher.

Q. Doctor, what were you asked to do in this case?

A. I was asked to respond to Dr. Schöneich's opinion on the mouse DAS assay.

Q. Have you worked on some demonstratives to assist your testimony today?

A. Yes, I have.

Q. Let's put up DDX 2.1.

Were you in the courtroom, Doctor, to hear Dr. Broide's testimony about the mouse testing Allergan did?

A. Yes, I was.

Q. Were you in the courtroom to here Dr. Schöneich testify about duration-of-action issues?

A. Yes, I was.

Q. Do you have a response to Dr. Schöneich's opinions?

A. Yes, I disagree with his opinion for a couple of reasons.

Q. Have you prepared a demonstrative that summarizes your opinions?

A. Yes, I have.
Q. What is your opinion in this case?
A. Allergan did not test DAXXIFY and then also Allergan's duration of action data is not supported by Dr. Schöneich's conclusions.
Q. Have you prepared a demonstrative that summarizes your professional and educational background?
A. Yes, I have.
Q. Can you describe your qualifications for the jury, please.
A. Yes. I have a Ph.D. in chemical engineering and I have been doing process development, scale-up manufacturing and testing of biologics, for a little over 35 years.
Q. Where were you last employed?
A. My last employment was at St. Jude's Children's Research Hospital and you can see I was there 2011 to 2023. About 11 and a half years at St. Jude's.
Q. What were your responsibilities at St. Jude's?
A. St. Jude's is not your normal hospital. It's a research hospital. And their function, their mission, is to come up with new therapies and new drugs for the treatment of serious childhood illnesses. The faculty there --
These new drugs need to get into clinical trial and these new drugs start with the faculty member. They're the discovering party, and they do small-scale work on a

bench. I collaborate with the faculty member, take their small-scale work, I scale it up and I end up making material for human clinical studies that meets FDA requirements.
Q. How many drugs did you work on at St. Jude's?
A. A lot. I worked on ten different drugs that I'd say involved submissions to the FDA.
You've got to understand that each drug takes about a year to maybe a year and a half to develop, scale up, manufacture, and do the release testing and there's continuing stability testing of the drug. So we were busy.
And just a last comment. Understand, faculty members spend 20 years of their life developing a product. Okay. Every product that comes to me, I'm the immediate bottleneck. Okay. They want it and I get it, and that was something that really focused a lot of my efforts, was trying to get it to them as quickly and safely as possible.
Q. And before conducting a clinical study, what data would you generate?
A. You have to generate animal study data. The issue is we're going into children here, all right. You've got to make sure the product is safe and the product is effective, so you do animal study prior to any human clinical trial.
Q. What kinds of animals did you work on?
A. Mice, guinea pigs, rabbits, and monkeys.
Q. Did you do a study where you gathered data on mice?

A. Yes. Every drug you work on, you need a potency assay. And the purpose of a potency assay, how active is it? Using mice was one of the more common methods to determine the potency of the drug. So the vast majority of the drugs that we worked on, we used mice for our potency assays.

Q. Have you evaluated and interpreted data obtained from mice?

A. Yes, I have.

Q. Do you have any formulation experience?

A. Yes, I do.

Q. What's your formulation development experience?

A. So when you're developing a process for manufacturing, we're starting out -- the faculty has a little bit of data but we need to make sure that the product is stable as we go through the manufacturing process, as we go through making it into a product, which we did there as well, and making sure the product is stable. You're really paying a lot of attention to making sure the drug is stable during product development.

Q. Do you have any experience working on botulinum toxin?

A. Yes. Yes, I have.

Q. What was your experience with botulinum toxin?

A. I worked on fragments of the botulinum toxin. I

worked with the active fragment, but I never worked with the full toxin.

Q. What were you doing with the botulinum toxin?

A. Okay. I was contracted by the Department of Defense, specifically the U.S. Army Medical Research Institute of Infectious Disease, okay, at Fort Detrick, Maryland. They're the -- that's -- I kind of -- they're the Ebola people. They work on Ebola as well.

My job in that was to assist in the development of vaccines against botulism as a countermeasure of bioterrorism. And I also worked on several others, including ricin.

So I developed a vaccine -- developed a process to manufacture a ricin vaccine for clinical studies for the Army as well.

MR. LAROCK: Your Honor, defendants offer Dr. Michael Meagher as an expert in the field of therapeutic protein process development and analysis.

MS. RUPERT: No objection.

THE COURT: All right. You may proceed.

BY MR. LAROCK:

Q. Doctor, do you understand the '878 patent is asserted in this case?

A. Yes, I do.

Q. And do you agree with Dr. Schöneich that the '878

patent is responsible for DAXXIFY's duration of action?
A. I do not agree with Dr. Schöneich.
Q. Did you review the '878 patent in this case?
A. Yes, I did.
Q. And what does the '878 patent cover?
A. The '878 patent, as you probably heard as well, is -- it covers the formulation of the toxin and, basically, improving the shelf life of the toxin. That's the purpose of the '878 patent.
Q. Does the '878 patent say anything about duration of action in the body?
A. No, not at all.
Q. Do the claims of the '878 patent say anything about duration of action in the body?
A. No, not at all.
Q. We heard earlier that the '878 patent relates to potency.
A. Yes.
Q. So how does potency relate to duration?
MS. RUPERT: Your Honor, objection. This is outside the scope of his report.
MR. LAROCK: I'll move on, Your Honor.
THE COURT: Okay.
BY MR. LAROCK:
Q. Did you review the mouse data testing that Allergan

generated?
A. Yes, I did.
Q. And do you agree with Dr. Schöneich, that that data supports his conclusions that the peptide is not responsible for DAXXIFY's duration of action?
A. I don't agree with Dr. Schöneich on his opinion concerning the role of the peptide in DAXXIFY.
Q. Okay. Let's put back up DTX 2.4.
And what was the first problem that you found with Dr. Schöneich's opinion?
A. Again, they didn't test DAXXIFY.
Q. Okay. Have you -- if not DAXXIFY, what did they test?
A. They tested a mimic of DAXXIFY, along with three other formulations.
Q. And how do you know that Allergan did not test DAXXIFY in the mouse data?
A. It states that specifically in the report.
Q. Let's pull up JTX 202, page 4.
Is this the --
A. Yes, this is the introduction from their report. And you can see it's highlighted to say "the exact composition of the formulation has not been disclosed."
So, again, they had to make some guesstimates on what the formulation was.

Q. Did you compare the real DAXXIFY formulation to the Allergan mimic formulation they prepared?
A. Yes.
Q. And what did you find when you did that comparison?
A. Almost every component within DAXXIFY mimic, there were some differences between the two.
Q. Have you prepared a demonstrative to summarize the differences that you found?
A. Yes, I put together a table that kind of summarizes the differences.
Q. Is this the table you prepared?
A. Yes, it is.
Q. So before we go through it, can you explain what the four different columns are that we see?
A. The four columns represent the -- like on the far left, it's just representing the four different elements of the formulation that stuck out to me in terms of different. Again, I was looking for difference.
And then the blue and the orange are just the respective values for Revance followed by Allergan. And then on the far right is -- it's a difference column. I kind of highlighted the differences between the two.
Q. And what is the first difference that you found?
A. I looked at concentration of trehalose and I found that the mimic has up to about eight times less trehalose

than DAXXIFY.
Q. And how did you calculate it? It says -- for the Revance column, it says up to 16 percent.
How did you get that number?
A. Well, it depends upon which version of the product you're looking at. They've got -- but it starts out at about 2.7 percent trehalose. And then when you look at the bulk drug product, it's at 16 percent trehalose.
So that's how I came up with saying the mimic has up to eight times less to bracket.
Q. So depending on the dilutions that you might go through, you might get a slightly different number?
A. Exactly.
Q. And overall, what was the difference in trehalose that you found between DAXXIFY and the mimic formulation that Allergan prepared?
A. Would you repeat the question again? I'm sorry.
Q. Overall, what was the difference that you found in the amount of trehalose in the DAXXIFY and the mimic formulation?
A. Yeah, it ranged up to as much as eight times less trehalose in the Allergan mimic.
Q. What was the second difference you found?
A. Looked at the ratio of polysorbate to peptide, okay. And what we're talking about is I'm looking at -- I looked

at both Revance and I looked at mimic and the ratios of the polysorbates in there.

And when I say "ratio," I'm talking about the amount, okay. A certain amount of weight compared to weight. All right?

And another way to think about it is that -- I like to use the analogy of making chocolate chip cookies. All right? You've got sugar and you've got butter. You've got two cups of sugar, one cup of butter, or a stick of butter. All right? That ratio is important. Okay?

Well, one time I kind of messed up and didn't follow the recipe and I put in two pounds of butter. And when you do that, you end up with a really crispy chocolate chip cookie. The point I'm trying to make is that the ratio is important. That's the analogy I'm trying to make.

So when I looked at DAXXIFY, it's got less polysorbate per peptide of eight parts per one part while the mimic has about 28 parts for one part, meaning that the mimic ratio was three times higher. And that's what they means across the table.

Q. What was the third difference you found?

A. I looked at the concentration of histidine in the formulations. In the case of DAXXIFY, it can range from about 3.3 to 6.7 depending upon the version, where the Allergan formulation had, you know, 20 millimolars.

So you're looking at -- the mimic has three to six times more histidine.
Q. And what was the final and fourth difference you found between DAXXIFY and Allergan's mimic formulation?
A. The mimic is the less acidic. It's at pH 6. And Revance is pH 5.5. So it's a little less acidic.
Q. Do any of these four differences raise a red flag for you?
A. The concentration of trehalose and the ratio of polysorbate to peptide are the ones that I considered to be very important.
Q. What's the role of trehalose in DAXXIFY?
A. Trehalose is a stabilizer, okay. That's its function. I think we heard that.
Q. And so how, if at all, did the different concentrations of trehalose impact your opinion?
A. If Allergan's mimic formulation has less trehalose, it may be less stable. I don't know. And if it's less stable, then you could have issues later on. In particular, with regards to duration of action.
So if it's less stable, there's less toxins. If it's less stable, that could affect the duration of action as compared to actual DAXXIFY. Again, Allergan's report is all about a mimic they generated.
Q. And what about the ratio of polysorbate to peptide?

Why does that raise a red flag for you?
A. Well, because if you look at DAXXIFY -- excuse me -- the Allergan mimic, you can see there's a lot less peptide in relation to the polysorbate. So it may diminish the contribution of the peptide to the formulation in relation to the polysorbate, which will kind of overemphasize its role.
And understand, the reason for the experiment was to look at the role of peptide, okay. Well, they have a lot less peptide in there in relation to polysorbate than DAXXIFY. So we can't -- it's very -- you really can't draw any conclusions about the role of the peptide in the actual DAXXIFY. It's not the same thing.
Q. So given the differences you found, can you draw any conclusions about DAXXIFY from Allergan's mimic?
A. No, I can't draw any conclusions about it.
Q. Let's go back to your summary of your opinions.
What's the second problem you found with Dr. Schöneich's opinions?
A. Well, as it says, I'm concerned -- the duration-of-action data from Allergan is not -- does not support Dr. Schöneich's conclusions.
Q. All right. Let's look at the next slide, which is DDX 2.7.
Can you explain what's shown on this slide.

A. Sure, sure.

The black bar or the black line that you see up there is the control of the experiment done by Allergan. That contains bovine serum albumin and saline.

The red bar is 20 millimolar histidine, 2 percent trehalose, and it's got Tween in it.

The blue bar is their DAXXIFY mimic.

And then the green bar that you see is the DAXXIFY mimic without the polysorbate, is what you see.

Q. So just, can you describe what figures are on the slide JTX -- or DTX 2.7.

A. Well, when you look at the black bar and the blue bar, let me start there, Formulation 1, that's the black bar. If you look at the blue bar, which is called Formulation 3.

When you look at the mean peak DAS values -- and, again, understand, these are not my -- I didn't say this. This comes out of Allergan's report, okay, this is their report. I'm reading their report.

Their report says that the mean peak values between the black bar and that blue bar, kind of purple bar, is they're not significantly different.

Q. So we have figure 4.2, 4.3, and 4.4 on the slide.

Do you understand those are the data that Allergan generated?

A. Yes, yes.
Q. Okay. And I want to look at the black bar and the blue bar. And you already mentioned those?
A. Yes.
Q. And remind us again what the black bar is.
A. The black bar is the control of the experiment. And the blue bar is the DAXXIFY mimic.
Q. And what's contained in the black bar?
A. Again, the black bar has albumin and saline.
Q. And does the black bar contain trehalose?
A. No, it does not.
Q. Does it contain polysorbate?
A. No, it does not.
Q. Remind us again what the blue bar represents.
A. The blue bar represents the DAXXIFY. It's their mimic. And when you look at that, you can see it contains both trehalose and polysorbate. It has both of those components and the peptide.
Q. And according to the report, what was the difference in duration of action between the black bar and the blue bar?
A. There is no significant difference between the black bar and the blue bar. That was the -- as I said, that's pulled from the text below the figure from the Allergan report.

Q. And "no significant difference." Are you able to put that in English for us?
A. Sure. They're the same.
Q. Thank you, Doctor.
If trehalose and the polysorbate were responsible for duration of action, what would you expect the blue bar to be compared to the black bar?
A. I would expect the blue bar to be significantly higher than the black bar.
Q. And is that reflected in the data?
A. No, it is not significantly higher. Again, the statistics, it tells me -- it says they're not significantly different, which means they're the same.
Q. All right. I want to do the same comparison, the red bar to the black back.
A. Okay.
Q. So we already talked about the black bar for a minute.
What's the red bar represent?
A. The red bar is the same as the blue bar except it doesn't contain the peptide. It's just toxin, trehalose, and polysorbate.
Q. So the red bar has trehalose and it has polysorbate?
A. Yes, it does.
Q. But not peptide?

A. But not peptide; correct.
Q. And according to the data that Allergan generated, what's the difference in duration of action between the black bar and the red bar?
A. Not significantly different according to Allergan's report.
Q. And what's that mean in terms of duration of action?
A. They're the same.
Q. Okay. And again, if polysorbate and trehalose were responsible for the duration of action, what would you expect the red bar to be compared to the black?
A. Again, I would expect the red bar to be significantly higher. I don't know how high, but they should be significantly higher.
Q. And we have not yet talked about the green bar. Remind us again what the green bar is.
A. The green bar is the same as the blue bar except that it does not contain polysorbate 20.
Q. Okay. And why would the green bar be lower than the black bar or the red bar and blue bar?
A. The reason being is that the function of polysorbate is to minimize the absorption of the toxin to the surface of the vial. If you remember from Dr. Schöneich's presentation yesterday, he showed three vials on the screen and the one on the far left talked about polysorbate keeping the toxin

from sticking to the glass. If the toxin is sticking to the surface of the vial, it's not getting out of the vial and being injected into the animal. It is captured and stuck to the sides of the vessel. So in that solution is a whole lot less toxin sitting in solution because it's all stuck to the surface of the vile. That's why you put in the polysorbate. You have to have it in there to keep the toxin from sticking.

Q. Does the performance of the green bar tell us anything about Revance's peptide?

A. Nothing at all. No.

Q. To sum it all up, can we derive any meaningful conclusion from the duration data that Allergan has generated?

A. Again, I believe this study is very flawed and you can't really pull any meaningful conclusion to that experiment and attach it to DAXXIFY. Again, they're so far off from what DAXXIFY is.

MR. LAROCK: Pass the witness, Your Honor.

THE COURT: Thank you, Mr. LaRock.

Ms. Rupert.

CROSS-EXAMINATION

BY MS. RUPERT:

Q. Good afternoon, Dr. Meagher.

A. Good afternoon, ma'am.

Q. So, Dr. Meagher, the only study you testified about today is an Allergan study that's marked as JTX 202; correct?
A. Yes.
Q. And you have that in your binder there, in the cross binder. If you can turn to that study. I'd like to take a look more at Table 3.1.
Dr. Meagher, if I understand your testimony correctly, you do not disagree that Formulation 2 contains BoNT, trehalose disaccharide, polysorbate 20, and histidine, the buffer; right?
A. Correct.
Q. Okay. And if I understand your testimony correctly, you also testified that you reviewed the '878 patent; correct?
A. Yes.
Q. And BoNT plus a disaccharide plus surfactant with a buffer is what's in Claim 6 of the '878 patent; right?
A. Yes.
Q. And then looking up on this table, formulations for 2 and 3 used here have the exact same ingredients except Formulation 3 adds a cell-penetrating peptide or CPP?
A. Yes.
Q. And this cell-penetrating peptide, CPP, in Formulation 3 has the same amino acid sequence as Revance's

sequence in DAXXIFY; right?
A. I agree, yes.
Q. And you also don't disagree that Formulation 3 and DAXXIFY contain the same four ingredients; right?
Let's count them up again. Histidine, the buffer; trehalose, the disaccharide; polysorbate 20, the surfactant; and the cell-penetrating peptide.
Do you --
A. I don't disagree.
MS. RUPERT: So Mr. Campos, if you could pull up figure 4.4 on the right here.
BY MS. RUPERT:
Q. Let's look at those together, top and bottom. So you talked a lot on your direct about the black bar on this graph. So I want to talk about the comparisons of the other bars that are listed up there on Table 4.4. So just a few questions about this graph itself here.
So Formulation 2, we just established, is the disaccharide plus surfactant that's identified as Y, the red bar with the BoNT? Okay.
And then Formulation 3 that we just talked about is a disaccharide plus surfactant plus the peptide and that's C, the blue bar?
A. Yeah.
Q. Let's compare at a high level the red bar and blue

bar. The red bar is taller than the blue bar; correct?
A. The red bar is taller than the blue bar but is statistically the same.
Q. The answer to my question is, yes, the red bar is taller than the blue bar. You'd agree with that; right?
A. But the red bar and blue bar are statistically the same.
Q. Sir, I would ask that you answer my question. We're on a timed trial here. Your counsel will have plenty of time to redirect you.
Looking up here with your own eyes, everybody can see this. The red bar is taller than the blue bar; correct?
A. Yes, and it's statistically the same.
Q. Again, I would ask that you limit your answers to my questions. If not, I'm going to ask for the Court's assistance.
Let's look at comparison. We established the red bar is bigger than the blue. Again, the red bar is the formulation with no peptide and the blue is the formulation with the peptide added?
A. Yes.
Q. So the addition of the peptide, at least here, doesn't appear to be helping; right?
A. According to that. Again, as I said --

Q. Okay. Let's take a look now at Formulations 3 and 4. Both Formulations 3 and 4 contain CPP; correct?
A. Yes, they do.
Q. And that's the cell-penetrating peptide?
A. Yes, ma'am.
Q. And the only difference in Table 3.1 between Formulations 3 and 4 is that Formulation 4 does not contain the surfactant. I think you said that on your direct; right?
A. Yes, I did.
Q. Okay. Formulation 4 is represented by the green bar; correct?
A. Yes, ma'am.
Q. And then compared to the three other formulations that appear here, Formulation 4 performed the worst; right?
A. According to this graph, yes.
Q. Yes. And it performed worse than Formulation 2 and Formulation 3, so the red bar and blue bar; right?
A. Well, if you want to look at the statistics, you can compare it to the control. It's lower, yes.
Q. And that is true even though Formulation 4 contains a CPP, a cell-penetrating peptide; right?
A. And it does not contain a critical polysorbate to keep the toxin in solution.
Q. Again, I ask you to answer my questions. Counsel can

redirect you. I will ask my question again.

Formulation 4 is the worst-performing bar even though it contains a CPP, a cell-penetrating peptide; correct?

A. I'll agree that it performs the worst because it's an incomplete formulation.

MS. RUPERT: No further questions.

THE COURT: Any redirect?

MR. LAROCK: No, Your Honor.

THE COURT: Thank you, Dr. Meagher. You're done. Watch your step on your way down.

THE WITNESS: Yes, sir. Thank you, Your Honor.

MR. LAROCK: Your Honor, our next witness is going to be Dr. Joshua Ramsey. We have books, Your Honor.

THE COURT: Yes.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: My name is Joshua Ramsey, J-O-S-H-U-A R-A-M-S-E-Y.

JOSHUA RAMSEY,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. LAROCK:
Q. Good afternoon, Dr. Ramsey.
A. Good afternoon.
Q. Please introduce yourself to the jury.
A. My name is Joshua Ramsey.
Q. What were you asked to do in this case, Doctor?
A. I was asked to respond to a limited portion of Dr. Schöneich's report on the role that the peptide would be playing in DAXXIFY's iteration.
Q. Before we go much further, do you know Dr. Schöneich?
A. I do. Dr. Schöneich was the department chair of pharmaceutical chemistry when I was at the University of Kansas.
Q. Is that the only way you know Dr. Schöneich?
A. Yes. He also wrote me a letter of recommendation for my pharma foundation fellowship. So I know him from that as well.
Q. Were you in the courtroom yesterday to hear him testify about duration-of-action issues in Revance's peptide?
A. Yes, I was.
Q. Do you agree with Dr. Schöneich's opinion that Revance's peptide does not contribute to its duration of action?
A. No, I have a different opinion.

Q. Why do you have a different opinion?
A. Well, my opinion is that the peptide plays a critical role in the duration of effective DAXXIFY and limits the diffusion and results in more uptake of the toxin, the drug.
Diffusion is very much, like we all know, if you were to put a drop of food coloring into a glass of water. You would see the coloring spread out. The same thing happens when a drug goes into the body. In this case, DAXXIFY is limiting that.
Q. Did you prepare demonstratives to assist your testimony today?
A. I did.
Q. Are these those demonstratives?
A. Yes, they are.
Q. Do you have a summary slide that summarizes your professional and educational background?
A. I do.
Q. DDX 3.4.
Can you describe your qualifications to the jury, please.
A. Sure. I have a bachelor's degree in chemical engineering that I earned from Oklahoma State University in 2000. I went on to get a master's degree in chemical engineering at the University of Illinois also in chemical engineering. And then I followed that up with a Ph.D. in

chemical and biomolecular engineering also from the University of Illinois. I did that in 2006.

Q. And what did you do after getting your Ph.D.?

A. After my Ph.D., I went and did a post-doctoral fellowship in pharmaceutical chemistry that I mentioned earlier, which is how I know Dr. Schöneich.

Q. What were you doing as part of your fellowship?

A. As part of my fellowship, I was looking at protein dynamics and how those relate to formulation stability. I also worked in a lab that did a lot of contract work for industry. And so we were helping formulate protein drugs and also gene therapy drugs, so plasma DNA.

Q. After you fellowship, what did you do?

A. After my fellowship, I joined the faculty at Oklahoma State University in chemical engineering and that's where I've been since 2008.

Q. Do you have any teaching responsibilities at Oklahoma State?

A. Yes, I do. I teach traditional chemical engineering courses in process design. I also teach a graduate and undergraduate class in mass transfer. In there, we look at the diffusion of drugs pretty frequently. Lastly, I teach a specialized elective course on drug delivery, and we look at how large drugs like genes and proteins get delivered and how they move around in the body.

Q. Do you teach any courses on cell-penetrating peptides like the Revance peptide?
A. A little bit. The last class that I mentioned, we talk in there about the role cell-penetrating peptides can play in delivery of drugs.
Q. Do you have any research activities at Oklahoma State?
A. I do. I run a research lab, and my lab is interested in large drugs. So we're interested in the design, production, formulation, and, ultimately, in the delivery of those drugs.
Q. Has any of that research involved cell-penetrating peptides?
A. Yes. We had several projects relating to cell-penetrating peptides.
Q. Is there a particular project you'd like to highlight?
A. Well, we have one project that we did for the Department of Defense. We were asked to help design strategies to protect soldiers from exposure to neurotoxin chemical warfare agents.
Q. And in that project, how was the drug being delivered?
A. In that project, we were delivering a protein bioscavenger that basically absorbs the toxins similar to a

sponge. But we needed a way to keep it in the body for a very long period of time.

So our strategy was to use cell-penetrating peptides and cationic polymers, such as polylysine, to form electrostatic complexes with the protein that we were trying to deliver and then targeting that to the red blood cells which have to stay in the body for a long period of time.

MR. LAROCK: Your Honor, defendants move to qualify Dr. Joshua Ramsey as an expert in macromolecular drug delivery and cell peptides.

MR ASHKENAZI: No objection.

THE COURT: You may proceed.

BY MR. LAROCK:

Q. All right. Doctor, I'd like to break down your opinion.

First, what is Revance's peptide?

A. Well, Revance's peptide is a proprietary peptide that was developed by Revance. We saw that this morning. You got to hear a little bit about it. It's often been referred to as RTP004.

Q. Do you have a demonstrative that depicts the peptide?

A. I do. And the demonstrative helps because it shows some of the unique features associated with these peptide -- with this peptide.

The cloudy portion that you see there at the top

of the screen represents the three-dimensional structure of the peptide. And then below that, you see the amino acid sequence that corresponds with this peptide.

And you see a string of lysine residues there in the middle. That's the K. And then out on each end, you see the cell-penetrating peptide portion. And below that, you see the positive signs. And that's meant to represent the strong positive charge that's associated with this peptide.

Q. Now, Doctor, what commercial products utilize Revance's peptide?

A. DAXXIFY uses this peptide.

Q. Do any other commercial products utilize the peptide?

A. No, not that I'm aware of.

Q. Now, you had said earlier that the peptide -- Revance's peptide is central to its duration of action.

A. Yes.

Q. Why is that your opinion?

A. Well, that's my opinion because the literature shows that this peptide limits diffusion and leads to increased uptake of the drug.

Q. And so how is the Revance peptide working?

A. Well, exactly how it's working within the context of what I just said is that it's not known for sure. It's still being studied by Revance. But there are a couple of

ways that it could be working.

And I've prepared some demonstratives on those ways.

Q. Is this the demonstrative you prepared?

A. Yes, it is.

Q. Okay. This is DDX 4.5.

And can you explain what's on the screen,

A. Certainly. This figure shows a simplified version of what's likely to be happening. On the left-hand side, you see the peptide represented by the blue circles with positive signs inside them.

In the middle is the toxin. And again, this is somewhat simplified because in reality, the toxin has positive and negative charges on its surface. In the body, it's overall negatively charged.

And then on the right-hand side, you see the surface of the cell. And the lipid membrane has a negative charge associated with it.

And then I haven't shown all of the proteins that would be on the surface of the cell or the cellular matrix, but that would also be negatively charged.

The other day we heard Dr. Bates, I believe, talking about the ion exchange chromatography that he does, and he mentioned that opposites attract. I think he also used an analogy of two magnets sticking together.

The exact same thing happens here. This positive charge associated with the peptide and negative charge associated with the toxin draws the two together and creates a complex matter that has a positive charge that's going to be drawn to the surface of the cell, again, through electrostatics, thereby limiting diffusion and helping with the uptake of the drug.

Q. Do you have another demonstrative that you'd like to --

A. I do. So this is one way in which the drug could be working. The second way is that the peptide can interact directly with the cell membrane and the proteins on the surface of the cell to create this shield on the outside of this layer of positive charges.

This then recruits in with the toxin, again, through this principle of opposites attract, helping to anchor the protein to the surface, limiting diffusion and, ultimately, leading to increased uptake of the drug.

Q. Now, Doctor, how did you come to your opinion?

A. Well, I came to this opinion because the data and the literature, basically, lead to these two mechanisms. And so I was a little bit surprised that Dr. Schöneich felt that there wasn't data to support my opinion.

Q. Okay. Do you have a witness binder in front of you?

A. I do.

Q. And turn to JTX 121.
And do you recognize that document?
A. I do. This is a paper written by Stone in 2011.
Q. And is this a document you relied upon for your opinions?
A. Yes, it is.
Q. And if we go to the abstract of Stone, what is Stone reporting?
A. Well, so I would draw your attention to the first line of the abstract where Stone talks about studying RT002. And we learned this morning from Dr. Ruegg that this is DAXXIFY.
And the first line notes that this formulation of DAXXIFY was designed to limit the extent of diffusion much like I mentioned and that this then allows the safe administration of longer-acting doses.
Q. Let's go to page 8 of Stone.
And, Doctor, what does Stone conclude?
A. Stone concluded that the notable difference between DAXXIFY and BOTOX is the limited diffusion of DAXXIFY.
Q. And how did -- did Stone attribute that limited diffusion to anything?
A. Yes. I believe on the next slide that I've highlighted an area where Stone attributed the reduced diffusion to interactions between the peptide and the toxin

and possibly the negative charges outside the cell.

So all of those proteins on the outside that I mentioned in the extracellular matrix.

Q. And did Stone comment on the duration of action?

A. Yes. Stone attributed the increase in the duration of effect back to this limited diffusion and the interaction of the peptide.

Q. Let's go to page 9.

Is that what we see here?

A. It is. And Stone also notes that because of this limited diffusion, there's increased efficacy, improved duration, and even the ability to administer larger doses.

MR. LAROCK: Your Honor, move to admit JTX 121.

THE COURT: It's already in evidence.

BY MR. LAROCK:

Q. Doctor, can you turn in your binder to DTX 309.

What is that document?

A. This is a review document that was written by Dowdy in 2023.

Q. And did you rely upon the Dowdy paper in forming your opinions in this case?

A. Yes, I did.

Q. When was Dowdy published?

A. Dowdy was published in 2023.

MR. LAROCK: Your Honor, I'd move to admit

DTX 309 into evidence.

MR ASHKENAZI: No objection.

THE COURT: Admitted without objection.

(Thereupon, Defendant's Exhibit DTX 309 was admitted.)

BY MR. LAROCK:

Q. Is this the Dowdy paper, Doctor?

A. Yes, this is it.

Q. What's the Dowdy paper about?

A. So Dowdy is a review paper which, essentially, sets the literature and data available to try to summarize what was known about DAXXIFY's peptide.

Q. And does Dowdy -- even though it's a review article, does it have its own data in it?

A. It does have its own data. For example, Figure 3 shows some data and shows that if a peptide were bound to a membrane layer representative of the cell, that that recruits in the toxin and decreases the binding of the toxin.

And this is significant because, again, it supports the second mechanism that I demonstrated to the jury through the animation. So it doesn't require the formation of a complex.

Q. And what did Dowdy say about Revance's peptide?

A. Well, Dowdy made a couple of conclusions about the

peptide in light of the data that's here and the additional studies that have been conducted since 2011.

The one thing that Dowdy says is that peptide facilitates conventional uptake of the neurotoxin. Dowdy also says that there is this dose-dependent increase in the amount of intracellular snap 25 cleavage.

And what that represents is that the additional drug that's being delivered to the cytoplasm of the cell where the drug is acting to cleave the snap 25.

Q. And does Dowdy discuss the contribution that Revance's peptide might be playing?

A. Yes. Dowdy attributes this strong -- on my next slide, I think I've highlighted a region.

So it points out that this strong binding -- the strong binding properties of the peptide that enhances cellular uptake of the neurotoxin and increases the cleavage that we just mentioned, that contributes to the longer duration of effect with DAXXIFY.

Q. So Dowdy concluded there was just a longer duration of effects --

A. Yes.

Q. -- from the peptide?

A. Yes.

Q. Thank you, Doctor.

And having looked at the Stone paper and the

Dowdy paper, what's the general takeaway?
A. Well, the general takeaway from these two papers, in addition to all of the data that they're presenting and the studies that they're summarizing, everything points in the same direction, which is that Revance's peptide is playing a role in the duration of effects of DAXXIFY.
Q. And, Doctor, have you reviewed the '878 patent in this case?
A. Yes, I did.
Q. And does the '878 patent say anything about Revance's peptide?
A. No, it doesn't say anything about Revance's peptide.
MR. LAROCK: No further questions, Your Honor.
THE COURT: All right. Mr. Ashkenazi.

CROSS-EXAMINATION

BY MR ASHKENAZI:
Q. Good afternoon.
A. Good afternoon.
Q. You'll agree with me that higher potency does produce higher duration of action; correct?
A. I believe that they're related, yes.
Q. And lower potency produces lower duration of action; correct?
A. Again, I believe they're related, yes.
Q. And I just want to make sure we're clear.

Potency and duration are related when you consider the profile of a drug; correct?
A. Yes, that's correct. The peptide allows for larger doses, which could extend duration.
Q. I just want to make sure we're clear.
You agree with me that potency and duration are often related when one is considering the profile of a drug; correct?
A. They are. Yes, so extended-release formulations, for example, have more drug there that then acts over a longer period of time.
So that extra drug plays a role in the duration.
Q. Now, Dr. Ramsey, the Stone article that you referenced, that only compares BOTOX to RT002; correct?
A. That's correct.
Q. And it does not compare a formulation with the peptide, disaccharide, surfactant to a formulation without the surfactant; correct?
A. That's correct. I don't think that is there like it was in the patent that Dr. Ruegg showed. Stone didn't do that comparison.
Q. It was not in Stone, the reference that you pointed to us today?
A. Right.
Q. And just so we're clear, you do not have any direct

experience with botulinum toxin; correct?
A. No, I don't.
Q. And you're not a regulatory professional; right?
A. No, I'm not.
Q. You're also not an FDA expert; right?
A. No.
Q. And you do not have any basis to comment on what Revance may have said to the FDA; correct?
A. Yes. I'm reluctant to comment on statements that they made. But the data that they present, I understand how to interpret data.
Q. I want to make sure we're clear. You do not have any basis to comment on what Revance may have said to the FDA; correct?
A. That's correct.
Q. Okay.
MR ASHKENAZI: No further questions, Your Honor.
THE COURT: Any redirect?
MR. LAROCK: No, Your Honor.
THE COURT: Okay. Dr. Ramsey, thank you very much. You may step down. Watch your step.
MS. WELLS: Your Honor, for their next witness Revance calls Dr. Akhilesh Nagaich.
THE COURTROOM DEPUTY: Would you please state and spell your full name for the record.

THE WITNESS: Akhilesh Nagaich, A-K-H-I-L-E-S-H. Last name is Nagaich, N-A-G-A-I-C-H.

AKHILESH NAGAICH,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MS. WELLS:

Q. Good afternoon, Dr. Nagaich.

A. Good afternoon.

Q. Could you please introduce yourself to the jury.

A. Yes, my name is Akhilesh Nagaich.

Q. And the jury has heard about a lot of issues in the case. What issues are you here today to talk about?

A. I'm here to discuss how FDA would have understood some of the statements that Revance made regarding control of the peptide in DAXXIFY formulation and what it means for something to be an excipient.

Q. What qualifies you to discuss excipients and FDA communications?

A. I've been working with FDA-related products for over two decades.

Q. Let's take a look at your experience. Have you prepared a slide that sets forth your resumé?

A. Yes.
Q. Could you please describe your educational background.
A. Well, I have a Ph.D. in chemistry.
Q. What did you do after receiving your Ph.D.?
A. I did three total fellowships and I work at the National Institute of Health for about five years.
Q. What did you do after your five years at the National Institute of Health?
A. I joined the FDA.
Q. What is the FDA?
A. FDA is the Food and Drug Administration, the federal agency that is responsible for regulating and approving drug products to be marketed in the U.S.
Q. What was your job while you worked at the FDA?
A. I was a principal investigator and direct quality reviewer.
Q. What were your responsibilities as principal investigator and drug quality reviewer at the FDA?
A. I reviewed certain aspects of the drug and biologic drug applications to ensure safety, efficacy, and product quality.
Q. How long did you work for the FDA?
A. I was there for about eight years.
Q. What did you do after leaving the FDA?

A. I worked at various pharmaceutical and biotech companies.
Q. Are you currently employed?
A. Yes. I'm currently the president of the FDA Insight agency.
Q. What do you do at FDA Insight?
A. I develop strategies, advise clients on product quality issues, and overall the clinical development of drugs and biologics.
Q. Do you still prepare documents for submission to the FDA?
A. Yes, I do.
MS. WELLS: Your Honor, Revance moves to qualify Dr. Nagaich as an expert in regulatory affairs and FDA practices.
MR ASHKENAZI: No objection, Your Honor.
THE COURT: All right. You may proceed.
MS. WELLS: Thank you, Your Honor.
BY MS. WELLS:
Q. Dr. Nagaich, we have heard some discussion throughout this trial about the role of the peptide in DAXXIFY and what Revance and the FDA have said about the peptide. Have you reviewed some of Revance and the FDA's statements regarding the peptide?
A. Yes, I have.

Q. At a high level, what is your opinion about what Revance and the FDA have said about the peptide?
A. Well, both Revance and FDA have said that the peptide is a stabilizing excipient.
Q. Does calling the peptide a stabilizing excipient mean the peptide has no function?
A. No.
Q. Does calling the peptide a stabilizing excipient mean the peptide doesn't play a role in drug delivery?
A. No.
Q. Can stabilizing excipients help the duration of action of a drug?
A. Yes.
Q. Let's look through some of the specific statements. Would you please turn in your binder to JTX 198?
A. Yes.
Q. Do you recognize this document?
A. Yes, I do.
Q. Did you review this document as part of this case in forming your opinions?
A. Yes.
Q. What is this document?
A. This is a section of Revance's BLA that describes what the peptide is.
MS. WELLS: Your Honor, I move to admit JTX 198

into evidence.

THE COURT: I think it may already be in but I'll admit it without objection in case it's not.

BY MS. WELLS:

Q. So if we pull it up on the screen and go to the third paragraph.

I would appreciate, Dr. Nagaich, if we could walk through this together because there's a lot of FDA terms in here. Let's start -- if we can take down the highlight and go to the very first sentence of this paragraph.

So I'm going to read it and I'm going to ask you to help me explain what that means. So it says RTP004, that's Revance's peptide; right?

A. Correct.

Q. So, "Revance's peptide is an inactive ingredient that is intentionally added to a therapeutic product but it is not intended to exert therapeutic effects at the intended dosage."

What does that mean?

A. Well, it means that the peptide does not have a standalone pharmacological activity. In DAXXIFY, the pharmacological activity comes from toxin, and that is paralyzing the muscle -- or excuse me, temporarily paralyzing the muscle or reducing the muscle activity. That

activity comes from the toxin. That's what it means.
Q. And then it says in here that the peptide is intentionally added. What does that mean?
A. So the peptide is intentionally added because it has a different function and that is to stabilize the final formulation of the DAXXIFY so that it maintains its activity and functionality throughout its intended shelf life.
Q. And are you getting that from the last sentence on the screen there?
A. Yes.
Q. So that's what -- this is Revance's statement to the FDA; is that correct?
A. That's correct.
Q. Does JTX 198 say anything else about Revance's peptide?
A. Yes.
Q. I didn't mean to interrupt you.
A. It just says that the peptide actually meets the definition of -- FDA's definition of an excipient.
Q. Let's take a look at the FDA's definition, if you could please turn in your binder to DTX 598.
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. What is DTX 598?

A. This is FDA guidance that provides the definition of an excipient.

Q. And did you rely on this document in forming your opinions in this case?

A. Yes.

MS. WELLS: Your Honor, I move to admit DTX 598 into evidence.

MR ASHKENAZI: No objection.

THE COURT: Admitted without objection.

(Thereupon, Defendant Exhibit DTX 598 was admitted.)

BY MS. WELLS:

Q. If we could please pull that up on the screen and go to the fourth page.

How does the FDA guidance define an excipient?

A. Well, the FDA defines excipients as inactive ingredients that are intentionally added to therapeutic or diagnostic products, but FDA believes that they are not intended to exert therapeutic effects but they may act to improve product delivery, for example, enhancing the absorption or controlling the release of the drug product, the drug substance. That's how it is defined.

Q. So according to the FDA's definition of an excipient, the excipient can still act to improve product delivery, including enhancing absorption or controlling the release of

the drug substance. Is that your understanding?
A. Correct.
Q. Does the FDA's definition of excipient change your opinion about whether the peptide can function to improve drug delivery?
A. No, it can function.
Q. So we talked about Revance's statements. Did the FDA make any statements about the peptide in DAXXIFY?
A. Yes.
Q. Please turn in your binder to JTX 108.
A. Yes.
Q. Did you review this document in forming your opinions in this case?
A. Yes.
Q. And what is this document?
A. This is a written response from FDA to Revance.
MS. WELLS: Your Honor, I move to admit JTX 108 into evidence.
MR ASHKENAZI: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 108 was admitted.)
BY MS. WELLS:
Q. If we could please pull that up and if we could turn to the second page.
Dr. Nagaich, what did the FDA say to Revance

about the peptide?
A. FDA agreed that Revance provided appropriate data to demonstrate the role of the RTP004, that is the peptide, as a stabilizer.
Q. Dr. Nagaich, in summary, what is your opinion about Revance's communications with the FDA about the peptide in DAXXIFY?
A. Well, FDA agreed that the peptide is an excipient and that it acts as a stabilizer.
Q. Have you seen any inconsistencies in Revance's discussion of the role of the peptide in its FDA communications?
A. No.
Q. Have you seen anything that suggests the peptide does not or cannot act to extend duration?
A. No.
MS. WELLS: Your Honor, I pass the witness.
THE COURT: All right. Thank you. Mr. Ashkenazi.

CROSS-EXAMINATION

BY MR ASHKENAZI:
Q. Dr. Nagaich, good afternoon.
A. Good afternoon.
Q. During your testimony you discussed the FDA's guidance and some back-and-forth correspondence with respect

to Revance and the FDA; correct?
A. Right. Correct.
Q. It's your opinion that -- is it your opinion that Revance withheld information from the FDA?
A. No.
Q. Is it your opinion that Revance misled the FDA?
A. No.
Q. So what you're saying is that Revance was honest and complete with the information they submitted to the FDA regarding Revance's peptide; correct?
A. Any sponsor is expected to be honest with the agency.
Q. I just want to make sure that we're clear.
It's your opinion that Revance was honest and complete with the information that they submitted to the FDA regarding Revance's peptide; correct?
A. That would be expected, yes.
Q. Well, let's go back and take a look at your JTX 198. I'd like to revisit that.
MR ASHKENAZI: If we could go to the first page, please, Mr. Campos. And let's take a look at that third paragraph.
BY MR ASHKENAZI:
Q. That's the paragraph you discussed during your direct examination; correct?
A. Right.

Q. Now, you focused on -- I want to look at that last sentence. It refers to -- the last line.
A. Yes.
Q. It says: "Only to stabilize it in the final formulation so that it may maintain its activity and functionality throughout the intended shelf life."
And that's referring to Revance's peptide; correct?
A. That's right.
Q. So shelf life, that's when the product is on the shelf; right?
A. Correct. It's a little bit broader than that. It's not only to the shelf, but after you reconstitute it, the peptide just before delivery or injection. That also is the shelf life. But broadly speaking, yes, shelf life is the shelf life.
Q. Shelf life is shelf life; right?
A. Right.
Q. And shelf life is not in a human; correct?
A. Shelf life is not in the human; right.
Q. So when it says -- when Revance told the FDA only to stabilize it in the final formulation so that it may maintain its activity and functionality through the intended shelf life, that's before it enters a human; correct?
A. Well, this is -- we are looking here at the CMC data.

Anything regarding its clinical effect is not going to be discussed in this document.

Q. So this document is not going to discuss clinical effect at all?

A. Not this section of the CMC. It's not going to discuss it.

Q. So I just want to be clear.

Now, the sentence you pointed us to, when it talks about shelf life, it's talking about the stabilization of the peptide in the drug when it's on the shelf and not in a human; correct?

A. That is correct.

Q. Okay. Let's take a look at other places within that paragraph. I just want to make sure I get that straight.

By the way, when we talk about therapeutic effect, that would be in a human; right?

A. That's right.

Q. Okay. So let's take a look at the first sentence, first line: "It is intentionally added to a therapeutic product, but it is not intended to exert therapeutic effects at the intended dosage."

Do you see that?

A. That's right.

Q. So they're actually referencing what would happen in a human; correct?

A. No. They are trying to justify that by definition, this is an excipient. Because this comes directly from FDA's definition of an excipient.
Q. I just want to be clear.
This paragraph references the fact that it does not have an intended therapeutic effect; right?
A. Could you rephrase?
Q. This sentence we're looking at states that the peptide is not intended to exert therapeutic effects; right?
A. That's right.
Q. They're telling the FDA the excipient is not meant to have a therapeutic effect, which is an effect in a human; correct?
A. They are defining, actually, what an excipient is.
Q. Okay. Let's go on to the next sentence.
It says: "RTP004 -- and now we see it -- has no pharmacological properties."
Do you see that?
A. That's correct.
Q. Pharmacological properties, those are properties they would have in a human; correct?
A. Pharmacological properties in the body in that sense.
Q. In the body?
A. In the body.
Q. Right. Not on the shelf?

A. Not on the shelf, yeah.
Q. Okay. Why don't we go to the next sentence, the next part of the sentence, one line down.
"It is not required for activity or function of the toxin itself"; correct?
A. That's correct.
Q. That's referring to what would happen in the body; correct?
A. That's correct, yes.
Q. Not on the shelf; correct?
A. Right.
Q. Saying that "RTP004 peptide is not required for activity or function of the toxin itself"; correct? I read that correctly?
A. Not -- it is not required for activity or function of the toxin itself, that's correct, yes.
Q. And then they end that sentence with: "Only to stabilize it in the final formulation so that it may maintain its activity and functionality throughout the intended shelf life"; right?
A. That is correct, yes.
Q. And they use the word "only" there, I want to be clear; right?
A. Yeah. They use the word "only," yes, that's right.
Q. And over here in that last part of the sentence

they're talking about the shelf life. They're not talking about the effect in the human body?
A. This is a CMC document and that's -- I think they are -- at this place they are talking about the shelf life, yes.
Q. Now, I want to turn to, if we can --
MR ASHKENAZI: Your Honor, may I approach?
THE COURT: Yes.
BY MR ASHKENAZI:
Q. In the binder that was handed you, you should have PTX 1 -- I'm sorry DTX 136.
Do you see that?
A. Right.
Q. Okay. And DTX 136 is correspondence between the FDA -- discusses correspondence between the FDA and Revance; correct?
A. Yes.
Q. Okay. And you've reviewed this before; right?
A. Yes.
MR ASHKENAZI: Your Honor, just for the sake of completeness, I'll move to admit DTX 136 if it hasn't already been admitted.
MS. WELLS: I believe it was admitted yesterday.
THE COURT: All right. Well, it's either admitted without objection or it's already admitted.

BY MR ASHKENAZI:
Q. Okay. Let's go to page 3, if we can. You see there's a question 3. You can highlight that for us or blow it up. Thank you.
And the question that's being asked to the agency is: "Does the agency agree with the specification and the test methods for the novel excipient RTP004?"
Do you see that?
A. Yes.
Q. And you recall reviewing this; right?
A. Yes.
Q. All right. Now, if we take a look at DTX 136 at page 4, so one page forward, you see at the top there's a response -- I mean there's a statement about what the FDA is concerned about.
It says: "FDA is concerned that this peptide may interact with the negatively charged BoNT/A and increase toxin spread or effect, potentially resulting in an increased or off-target toxin effect."
Do you see that?
A. Yes.
Q. And that was a concern the FDA had that they asked Revance about; correct?
Sorry, I --
A. Yes, I believe so. Yes.

Q. Okay. Let's take a look at the conclusion and the response that Revance had. Let's go to DTX 136 at page 18.

The middle about four lines down you'll see Revance responded: "Therefore, RTP004 does not have any pharmacologic properties and does not contribute to an increase of spread/effect of daxibotulinumtoxinA when administered by injection."

Do you see that?

A. Could you please tell me the Bates number here?

Q. It's page 18 at the bottom right.

A. Page 18 of the document itself?

Q. At the bottom it should have numbers. Do you see it's on the screen? All the way at the bottom right, it says DTX 136?

A. Right. And I can see conclusions there, yes. I see that.

Q. Okay. Did I read that correctly?

A. Yes.

Q. So just to be clear, I'll read it again, because there was a pause and I want to make sure the record is clear.

"RTP004" -- this is what Revance is saying to the FDA in response to their concern -- "does not have any pharmacologic properties and does not contribute to an increase of spread/effect of daxibotulinumtoxinA when

administered by injection"; correct?
A. That's correct.
Q. And that's talking about what is happening in the human; correct?
A. Yes, mm-hmm.
Q. And it's your opinion that Revance did not attempt to mislead or hide anything when submitting -- making this submission to the FDA regarding its peptide; correct?
A. No, there is nothing misleading here.

MR ASHKENAZI: Pass the witness. No further questions.

THE COURT: All right. Anything, Ms. Wells?

MS. WELLS: All right. If we could, please, pull up the document we were just looking at because I think Dr. Nagaich had a little bit more he wanted to say about it.

So if we could go to DTX 136 and page 18. And it's that conclusion paragraph. And I think Allergan's counsel was pointing to the sentence that starts with "therefore." Yes, exactly.

REDIRECT EXAMINATION

BY MS. WELLS:
Q. So this sentence -- in this sentence -- what is Revance saying in this sentence, Dr. Nagaich?
A. I think Revance is trying to respond to agency's concern and telling the agency that the peptide does not

have a pharmacological property and it doesn't contribute to the spread or effect of daxibotulinumtoxinA when administered by injection.
Q. So let's talk about both of those.
So the spread, is that talking about the diffusion that we were talking about before?
A. That's right.
Q. And diffusion -- you've been sitting through this trial; correct? You've heard a lot of the witnesses talking about diffusion and spread; is that right?
A. Right.
Q. So Revance was actually wanting its peptide not to increase diffusion or spread. Is that your understanding?
A. That's correct.
Q. So is what they're saying here completely consistent with everything we've heard during this trial and everything you've read in the FDA communications?
A. Absolutely, yes.
Q. And then the effect, you mentioned before that the effect or the purpose of DAXXIFY is paralysis; correct?
A. That's right.
Q. And is the peptide what's causing that effect, causing the paralysis?
A. No, it's the toxin.
Q. So do you see anything in this statement that's at

all inconsistent with any of Revance's statements to the FDA about the role of the peptide in DAXXIFY?

A. No, absolutely not.

Q. And do you see anything in this statement that's at all inconsistent with the peptide increasing the duration of action of DAXXIFY?

A. Sorry, can you repeat your question?

Q. Sure.

Is there anything in this statement that's inconsistent with the peptide extending the duration of action of DAXXIFY?

A. No, not at all.

MS. WELLS: Thank you. No further questions.

THE COURT: All right, Dr. Nagaich, thank you. You can step down. Watch your step.

THE WITNESS: Thank you.

MS. CONKIN: Good afternoon, Your Honor. Ryan Conkin for Revance. We will play deposition designations now.

THE COURT: Could you just spell your name, by the way?

MS. CONKIN: Yeah. Ryan, R-Y-A-N, Conkin, C-O-N-K-I-N.

THE COURT: Thank you.

MS. CONKIN: May I approach, Your Honor, to pass

out binders?

THE COURT: Yes.

MS. CONKIN: And as a bit of housekeeping before we play this first video, Your Honor, plaintiff has informed us that the first witness's testimony implicates export control concerns. So we believe we'll need to seal the courtroom. However Your Honor would like to handle that.

THE COURT: The first witness whose total testimony is three and a half minutes?

MS. CONKIN: I believe it's the second transcript in the binder, Curtis Monnig.

THE COURT: Okay. What is Mr. Monnig discussing during this? Technical report of some kind?

MS. CONKIN: Yes. He'll be discussing residual DNA testing of Allergan's DS1 and DS2 samples.

THE COURT: All right. So you want me to seal the courtroom and kick all these people out?

MS. CONKIN: I believe so, Your Honor.

THE COURT: It goes against my better judgment because -- but on the other hand, I don't really want to have us all be arrested.

Anyone who's behind the bar, please leave the courtroom, and it will be sealed for some period of time up to ten minutes.

(The courtroom was sealed.)

(The sealed portion of this transcript is filed separately.)

(The courtroom was unsealed.)

THE COURT: All right. You have some more?

MS. CONKIN: Yes, Your Honor. Next we will hear from Jennifer Ton, inventor on the '748 patent. Ms. Ton will testify regarding development of the DS2 process.

MS. GAZA: Your Honor, may I approach?

(A video was played.)

BY THE ATTORNEY:

Q. You were involved in the process to produce high purity, high productivity neurotoxins of both the 900 and the 150 kilodalton toxin?

A. The processes were developed for that.

Q. What was your involvement with the process to produce the 150 kilodalton neurotoxin?

A. My team collaborated to produce the process.

Q. What was your role in producing the process for developing the 150 kilodalton toxin?

A. I established the overall program goals of what this process would look like and worked with my team to achieve those goals.

Q. Okay. And you state that one of the goals was to attempt to get to a more chemically defined medium; correct?

A. Correct.

Q. And why was that a goal?
A. To use materials that have a more rigorous raw material handling such as the soy peptone, as it's been processed, has a very strict level of certain impurities that are present, it's more consistent. The use of animal products can bring in a lot of variety or variability into a process.
Q. When you say "variability," what do you mean?
A. Seasonal changes in cows can make differences in quality of their milk. Therefore, the casein has seasonal variability.
Q. And you stated that one of the goals of the DS2 process was to avoid the use of animal-derived products like casein; correct?
A. One of the goals was to remove animal-derived products from the process to ensure more stringent raw materials and secure the process with better control.
Q. Were there other reasons why the goal was to remove animal-derived products from the process?
A. Sourcing of raw material is simpler if you don't have animal components. You have to consider their variability in their sourcing.
Q. Did you collaborate with the team with respect to the specific quantity of residual nucleic acid that is specified in Claim 8?

A. I do not recall where that nucleic acid concentration was defined as a part of process, more so it was an outcome of the capability of the process.

(The video ended.)

MR. LAROCK: Defendants call Dr. Michael Goodnough to the stand.

THE COURT: All right.

MR. LAROCK: May we approach?

THE COURT: Yes.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Michael C. Goodnough, M-I-C-H-A-E-L, G-O-O-D-N-O-U-G-H.

MICHAEL GOODNOUGH,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. LAROCK:

Q. Good afternoon, Doctor.

A. Good afternoon.

Q. Please introduce yourself to the jury.

A. My name is Dr. Mike Goodnough.

Q. Have you worked on some demonstratives to assist your testimony today?

A. Yes, I have.
Q. Are these those demonstratives on the screen? Are these those demonstratives?
A. Yes, they are.
Q. Doctor, do you understand that the Claim 8 of the '748 patent and Claim 8 of the '740 patent, Allergan's patents, are asserted in this case?
A. Yes, I do.
Q. And what were you asked to do in this case?
A. I was asked to determine whether or not they were obvious or not.
Q. Okay. Let's go to DDX 5.3.
And can you describe to the jury what we have on the left and the right side of the slide.
A. Sure.
On the left-hand side we're talking about the '748 patent. We have Claim 1 at the top and then Claim 8 at the bottom. Claim 8 depends from Claim 1, so that is to say the Claim 8 of the '748 contains everything in Claim 1.
On the right-hand side is the '740 patent. It contains Claims 6 and 8. So what I mean by that, again, is that Claim 8 depends from 6 so everything within Claim 6 is contained within Claim 8.
Q. If we look on the left-hand side of the screen and we look at Claim 1 of the '748 patent, it says "substantially

animal-product-free APF process."
Do you see that?
A. Yes, I do.
Q. What does that mean?
A. It means that the process for Claim 1 of the '748 patent, essentially, does not contain any animal products. That's to say it's animal-product free and you can probably hear me interject animal-protein free in our lines --
Q. Continue.
A. So the -- further into Claim 1, it says it comprises a sample containing the 150 kilodalton of the type A neurotoxin and at least one protein. So the 150 kilodalton protein, as I'm sure you've all heard, is the purified neurotoxin.
Q. And in Claim 1 of the '878 patent, what columns are used?
A. So in Claim 1 of the '748 patent what are claimed here lower down are an anion exchange column and cation exchange column.
Q. And how does the '740 patent differ from the '878 patent?
A. The '740 patent is different in that the chromatographic process is different. So in Claim 6 versus Claim 1 of '748, they are two different chromatographic purification procedures.

And additionally, the '748 patent claims in Claim 8 a final substance that contains no more than one part per million of residual nucleic acids.
Q. And if we look at the '740 patent on the right-hand side of the screen, at the very top it says: "An APF process."
Do you see that?
A. I do.
Q. What does that mean?
A. So an APF process means that the process for purifying the neurotoxin in that particular patent is animal-protein free.
Q. And Claim 6 of the '740 patent, what chromatography process is being described?
A. So the chromatography processes in Claim 6 of the '740 patent contain different chromatography processes and column medias, as you've heard all week long. In particular, this particular process uses the hydrophobic interaction chromatography column, which we'll get to a little bit later on.
Q. And these are the two -- Claim 8 of the '748 patent and Claim 8 of the '740 patent are the two claims that you looked at in this case?
A. That's correct.
Q. What conclusion did you come to?

A. I came to the conclusion that the Claim 8 of the '748 patent is obvious in light of two references which you're going to hear, Malizio and Smelt.

And I also came to the conclusion that the Claim 8 of the '740 patent is obvious in light of combination her FDA guidance and Smelt.

Q. And before we dig into your opinions too much, at a very high level, can you provide a summary of why it's your opinion that Claim 8 of the '748 patent and Claim 8 of the '740 patent is obvious?

A. Yeah. From a very high level, it's my opinion that these claims are obvious in light of the decades' worth of literature that is available in the prior art to persons with skill in the art.

Q. Have you prepared a demonstrative that summarizes your educational and professional background?

A. Yes, I have.

Q. Is this that demonstrative?

A. That is the demonstrative, yes.

Q. Okay. Can you describe your qualifications to the jury?

A. Absolutely.

So I received all of my degrees from the University of Wisconsin at Madison, go Bucky. And in 1986, I received a bachelor of science in bacteriology and

genetics.

Then in 1991, I received a master of science in food microbiology. And then finally, 11 years later, I received a Ph.D. in 1994 in food microbiology.

Q. What was the subject of your Ph.D. work?

A. The subject of my Ph.D. work was characterization and stabilization of botulinum neurotoxins for medical use.

Q. When did you start working with botulinum toxins?

A. I started working with toxins around 1988 or 1990.

Q. And what types of work were you doing for your Ph.D. research?

A. So my Ph.D. dissertation was on a number of different topics, but the primary one was we were working on composition of matter including the neurotoxin, attempting to stabilize it during the manufacturing process.

So what we were doing was a lot of column chromatography to come up with the verified neurotoxins, which are then used in various experiments to try and determine how we could stabilize this material going forward through the manufacturing process.

Q. And what was the goal of the work that you were doing?

A. The goal of the work was to come up with a formulation that would stabilize the neurotoxin. And what we found in the work going forward was that a particular

disaccharide, trehalose specifically, stabilized the neurotoxin during the manufacturing process.
Q. And the work that was described -- well, the work that you were doing for your Ph.D., was that published anywhere?
A. It was, in a number of places. It was, obviously, published in my thesis, but there were also a couple of journal articles in addition to that. And then subsequent to publishing my thesis, we received a patent for some of the processes that we discovered.
Q. After you received your Ph.D., what did you go do?
A. So after I got my degree, I stayed on as a postdoctoral research associate at the University of Wisconsin, Madison. And from there, I ended up becoming an assistant scientist at the University of Wisconsin, Madison.
Q. And while you were at the University of Wisconsin, what was the University of Wisconsin's reputation within the botulinum toxin field?
A. Well, at that point in time, the University of Wisconsin, Madison was the epicenter for research on the botulinum neurotoxins. All of the -- not all of them, but many of the more prominent names in the research field were at the University of Wisconsin, Madison at that time.
Q. And after you left the University of Wisconsin, tell the jury what you went and did.

A. Well, I retired from academic life and went into the private sector. And in 1999, I founded a company called Metabiologics with a couple of co-founders from the university.
Q. And what does Metabiologics do?
A. Metabiologics manufactures for resale research-grade botulinum neurotoxins.
Q. And how many customers does Metabiologics have?
A. Metabiologics probably has over 400 customers right now, including many of the industry leaders around the world.
There are universities, research institutes around the world. All of the big pharma companies buy products from us, including Allergan.
Q. And you said Metabiologics, they sell research-grade toxin?
A. Yes, exclusively research grade.
Q. Please tell the jury what research-grade botulinum toxin is.
A. So research-grade material is material that will never be used in people. We expressly sell this material with the intent that it's for research purposes only and it's never to be used in people.
Pharmaceutical-grade material, on the other hand, is material that is manufactured to a different level

of stringencies. So those people have to meet the FDA guidelines for the manufacture, which are more stringent than the ones that we use at Metabiologics.

Q. Well, what's your current position?

A. My current position is as the executive vice president of Object Pharma.

Q. What is Object Pharma?

A. So Object Pharma is a biotech startup company in California who came in in 2019 and purchased Metabiologics.

Q. And over the course of your career, have you been able to publish on botulinum toxins?

A. I have.

Q. About how many times?

A. Either 20 or 30 articles so far.

Q. And you -- are you an inventor on any patents involving botulinum toxin?

A. Yes. I have five patents related to botulinum toxins to my credit.

Q. And is there any other qualification you'd like to highlight for the jury?

A. I have been a subject matter expert to the U.S. Food and Drug Administration for discussion relating to botulinum neurotoxins and how they're used medically.

Q. And if we take a step back, about how long have you been working with botulinum toxin over your career?

A. Well, you're really going to age me. I have worked with botulinum toxins for over 30 years, closer to 35.

MR. LAROCK: Your Honor, defendants offer. Michael Goodnough as an expert in the field of manufacturing and purifying botulinum toxins.

MS. RUPERT: No objection.

THE COURT: All right. You may continue.

BY MR. LAROCK:

Q. Doctor, you said earlier that Claim 8 of the '748 patent and Claim 8 of the '740 patent in your opinion were obvious.

A. That's correct.

Q. What do you understand "obviousness" to mean?

A. Obviousness, as I understand it, is the concept that from a perspective of a person of ordinary skill in the art, that if there's something in the prior art prior to the date of that claim that relates to that claim and the differences are small enough, then in the eyes of that person of skill in the art, that claim is obvious.

Q. And what do you understand "prior art" to be?

A. Prior art is all of the literature that's available prior to that specific date. And in these cases, it's usually the date of the claim.

Q. And is it your understanding that a patent can be obvious in view of more than one piece of prior art?

A. Yes. I understand that a patent can be obvious in light of multiple pieces of prior art, as long as the person of skill in the art can reasonably combine those and have a reasonable expectation of success once they get combined.
Q. Okay. Let's put back up Mr. Goodnough's demonstratives.
How did you go about analyzing Claim 8 of the '748 patent and Claim 8 of the '740 patent?
A. Well, to determine obviousness, I used the scope and the content of prior art, the level of ordinary skill in the art, differences between the prior art and the patent claims as I just described, and then I also considered secondary considerations of nonobviousness.
Q. And from what perspective did you review the prior art and review the claims?
A. I reviewed the prior art from the perspective of a person of ordinary skill in the art.
Q. And what do you generally understand a person of ordinary skill in the art to be?
A. Well, as I've been told by counsel, a person of ordinary skill in the art is a hypothetical person who's aware of all the prior art at that particular time.
Q. And do you have an opinion on what the qualifications of a person of ordinary skill in the art would be?
A. Yeah. In my mind, a person with ordinary skill in

the art would have, probably, a bachelor's degree, potentially an advanced degree such as a master's or Ph.D., with relevant experience in the field, maybe two to six years of protein purification, toxin purification, if you can find it, and would have an understanding of the various factors involved in the purification of proteins.
Q. And, Doctor, when you finished your Ph.D. work at the University of Wisconsin around 1994, would you have qualified as a person of ordinary skill under this definition?
A. Yes, I do. I am.
Q. Now, when you were looking at our -- at that '878 patent, was there a particular date that you used for your opinion?
A. The '748 patent?
Q. Yes.
A. Yeah, the date was --
Q. Have you prepared a demonstrative?
A. Oh, yeah, I have a demonstrative for that.
So the date is July 13th of 2009.
Q. And how did you use that date?
A. So that priority date is what I used to consider from the person of skill in the art and that's where I considered all the art that came before this particular date.
Q. Okay. So I also want to talk to you about what was

known in the art before July 13, 2009.

To start, we've heard a little bit about it this week. What is botulinum toxin?

A. So botulinum toxin is a protein that is produced by an organism called *Clostridium botulinum*. It's a large protein. It happens to be an enzyme and it is a very potent neurotoxin.

And the neurotoxin itself causes a disease in people and in animals called botulism.

Q. And please tell the jury, how does one go about producing botulinum toxin?

A. So from a high level, the production of botulinum neurotoxin begins with a culturing step where you end up growing an organism in a liquid fermentation broth.

So the broth contains all the foodstuffs, the nutrients that the organism needs to grow, multiply, divide, and produce the protein neurotoxin.

Q. After you produce the neurotoxin, what's the next step in the process?

A. So the next step after the organism is grown and produced the toxin is to separate that toxin from all the other components that are present in there. You're trying to pick out that one particular molecule from the sea of other stuff in there which I'm going to call contaminants or impurities.

Q. Can you describe for a jury what a fermentation step is.
A. The fermentation step, they're actually using the food sources, specifically the protein sources are the most important. Protein sources can be from a couple of different places. They can be animal based. They can come from animals, obviously, or they can come from plants. So the protein sources can come from plants like soybeans as well as from things like casein, which comes from animals.
Q. These animal sources or food sources, are they used in the fermentation process?
A. They are used in the fermentation process, yes.
Q. How does one go about selecting between whether to use animal products as a food source or plant products as a food source for fermentation of botulinum toxin?
A. Remember we were talking a little bit ago about the differences between research grade material and pharmaceutical grade material? So if one is going to be manufacturing botulinum neurotoxin, you have to consider the end use for it.
At Metabiologics, our material is for research purposes only, so we're less concerned about the source of protein in fermentation. From the perspective of someone doing pharmaceutical manufacturing, one would have to do a risk assessment. That is to say, they would have to sit

down and think about what are the risks involved in using an animal-based protein for the food source or completely eliminating that risk and going to a plant-based source instead.

Q. You mentioned a risk assessment. Are there risks with using animal proteins?

A. There very much so are, yes.

Q. Were those risks described in the literature by 2009?

A. Yes, they definitely were.

Q. Do you have a binder in front of you?

A. Yes, I do.

Q. Turn to tab JTX 112. Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. This document is from the U.S. Food and Drug Administration. It's titled "Revised Precautionary Measures to Reduce the Possible Risk of Transmission of Creutzfeldt-Jakob Disease and the New Variant of Creutzfeldt-Jakob Disease by Blood and Blood Products."

Q. Is this a document you relied upon for your opinions in this case?

A. Yes, it is.

Q. When was it published?

A. 1999.

MR. LAROCK: Your Honor, I'd like to move JTX

112 into evidence.

MS. RUPERT: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 112 was admitted.)

MR. LAROCK: Can we publish, Your Honor?

THE COURT: Yeah.

BY MR. LAROCK:

Q. Is this the FDA guidance from 1999, Doctor?

A. Yes, it is.

Q. The title says "Creutzfeldt-Jakob Disease." Can you describe to the jury what that is.

A. I can describe it. I don't think I can spell it. But Creutzfeldt-Jakob disease is a transmissible disease that causes a disease in people that's completely analogous to mad cow disease, which you've probably heard of. The disease is 100 percent fatal 100 percent of the time and the infectious dose for this material is one single particle.

Q. Before we look further at the FDA guidance, what is the FDA guidance about?

A. The FDA guidance is directed towards the pharmaceutical manufacturing industry, and what they're trying to do here is alert the industry that there is a risk of transmission of certain diseases through animal-based products.

Q. Let's look at page 16 of JTX 112.

Doctor, what does the FDA guidance say about animal-containing products?

A. The FDA guidance says because human blood, humans are animals, the use of these particular products carries a risk of transmission of these infectious diseases in addition to the Creutzfeldt-Jakob disease, viruses as well.

Q. How would one by 2009 have understood the FDA guidance from 1999?

A. A person of skill in the art at the time would have understood that the use of these products carried a risk.

Q. As a researcher in the field, by 2009, were you aware of the risks of animal proteins?

A. I very much was, yes.

Q. Were you aware of the FDA guidance from 1999?

A. Yes, I was.

Q. And after the FDA guidance issued, were you involved in discussions with industry with respect to the FDA guidance?

A. Had many conversations with people from the industry, yes.

Q. Was it a topic of conversation within the botulinum toxin field after the FDA guidance came out?

A. It was even before, yes. More so afterwards.

THE COURT: Mr. LaRock, is this a good time to take the afternoon break?

MR. LAROCK: Yes.

THE COURT: Okay. All right. Members of the jury, we'll take a 15-minute break.

(The jury exited the courtroom.)

THE COURT: See you again in 15 minutes.

(A recess was taken, after which the following proceedings were had:)

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back. Everyone, you may be seated.

Mr. LaRock, you may continue.

MR. LAROCK: Thank you, Your Honor.

BY MR. LAROCK:

Q. Welcome back, Doctor.

A. Thank you.

Q. So before the break, we were discussing the FDA guidance. Can you describe what the FDA guidance discusses about animal-derived products.

A. Yes. The FDA guidance discussed the potential risk of there being some type of a transmissible infectious agent in blood and bloodborne products.

Q. What are blood and bloodborne products?

A. Things like albumin, anything derived from plasma, those are animal-based products, basically, and they carry a risk of transmissible disease. In particular, the FDA

guidance was directed towards viruses and these things called prions that cause Creutzfeldt-Jakob disease.
Q. How would one have understood by 2009 what the FDA guidance was telling us?
A. The FDA guidance was directed toward the pharmaceutical industry, the industries that are manufacturing products from these blood-based products, and they're trying to say there is a risk of transmission of these diseases from the use of these products.
Q. Thank you, Doctor. In your binder in front of you, please turn to tab JTX 113.
Do you recognize that document?
A. I do.
Q. What is it?
A. It's a patent. It's titled "Animal-Product-Free System and Process for Purifying a Botulinum Toxin."
Q. Who's the inventor on that patent?
A. The inventor is Hui Xiang.
Q. Is this a document you relied upon to form your opinions in this case?
A. Yes, it is.
Q. When was the document published?
A. In 2005.
Q. Do you know who way Hui Xiang is?
A. Yes, Hui Xiang is an Allergan employee.

MR. LAROCK: Your Honor, I'd like to move JTX 113 into evidence.
MS. RUPERT: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 113 was admitted.)
MR. LAROCK: Can we publish? Thank you.
BY MR. LAROCK:
Q. Doctor, is it okay if we call this the Xiang patent application?
A. That's great.
Q. And let's go to page 10. What does the Xiang patent application say about animal-derived products?
A. The Xiang patent says that the potential risk of acquiring the prion-mediated disease, Creutzfeldt-Jakob disease, and Xiang goes on to say botulinum toxin obtained, purified, or compounded using animal-derived products is a bad thing.
Q. Creutzfeldt-Jakob disease, that's the disease we saw just a few minutes ago?
A. The human version of mad cow disease.
Q. Does the Xiang patent application provide a solution to risks associated with animal-derived products?
A. Yes, they do.
Q. Let's turn to the next page. What's the solution that the Xiang patent application provides?

A. The solution the Xiang patent provides is basically to replace the plant based -- animal-based product with a plant-based product instead. Xiang here recognizes that soy-based products, namely plants, do not carry the same risks the animal-based products do.
Q. Have you prepared a demonstrative that summarizes what was known about animal-derived products by 2009?
A. Yes.
Q. So what was known by 2009 about animal-derived products?
A. What was known by 2009 are a couple of things here. Number one, animal-derived products can carry a risk of disease and transmission from these infectious agents. The second thing is that eliminating these animal products would eliminate the risk altogether.
Q. Have you been in the courtroom this week to hear the testimony by the witnesses?
A. Yes, I have.
Q. Have other witnesses spoke about the risks from animal-derived products?
A. Yes.
Q. And how does that inform your opinion?
A. Well, it informed my opinion because it made it aware that it's more than just me that realizes this is actually real. The fact that the FDA issued this guidance means that

government agencies recognize this as a problem.
Q. Now, you're aware Allergan has an expert in this case; correct?
A. I'm aware.
Q. And that's Frank Gessler?
A. Yes, it is.
Q. Do you understand that Dr. Gessler has said that the risks associated with animal-derived products is theoretical?
A. Yes, I am.
Q. Do you agree with that?
A. No.
Q. Why not?
A. If the risk was theoretical, the U.S. Food and Drug Administration issued a guidance based on theory, and they didn't do that. The guidance was based on the reality that these particular products carry a risk of transmission of these diseases.
Q. By 2009, you were a researcher in the field of botulinum toxin?
A. Yes, I was.
Q. Were you aware of the risks of animal-derived products?
A. Yes, I was.
Q. By 2009 in your own personal work, had you switched

away from using animal-derived products?
A. By 2009 at Metabiologics, which is where I work, we were using both animal drug products and plant drug products. We were starting to dabble in soy-based products. You have to remember the material that is manufactured at Metabiologics is strictly for research purposes only. We knew it was never going to be used in people, so therefore we didn't have to worry about the risk of these.
MS. RUPERT: Your Honor, objection. It was never disclosed that Metabiologics dabbled in soy. This is a new opinion.
THE COURT: This is not an opinion. I'll overrule.
BY MR. LAROCK:
Q. Were you finished, Doctor?
A. I was going to finish the idea that since Metabiologics products are not used in humans, we didn't have to worry about these particular agents in the products we were using.
Q. By 2009, were you consulting with industry in the botulinum toxin space?
A. Yes, I was.
Q. And were you involved in conversations with individuals, industry, and companies in industry about animal-derived products?

A. Yes, I was. I had many conversations with people in industry.
Q. What was your recommendation to the companies?
A. That they eliminate animal-based products and substitute plant-based.
Q. Earlier we had the patent claims on the screen and we saw the concept of the chromatography and heard a little bit about it this week already. So I want to walk through chromatography principles with you before we get further.
A. Okay.
Q. By 2009, why would -- why were researchers in the field purifying botulinum toxin?
A. Well, the whole point in purifying the toxin is to, again, separate it from the contaminating impurities carried over from fermentation.
Q. How were people purifying botulinum toxin?
A. By then, almost everyone was using chromatographic methods for purification.
Q. In your own work, how were you purifying botulinum toxin by 2000?
A. We were exclusively chromatography and specifically what we'll show you here, anionic and cationic chromatography columns.
Q. Anionic and cationic chromatography columns, you said?

A. Yes.
Q. Why were you using those columns?
A. Because they're efficient, simple to use, been used for decades. They've been described in the literature since the '60s for use in purification of botulinum neurotoxin.
Q. Before we get further, do you have an analogy that helps make chromatography a little bit more understandable to us?
A. Yeah. So if you think about your Brita water filter at home, it's got a chromatography column in the middle of it. It's full of activated charcoal. You're dumping in water at the top you hope isn't too contaminated. What happens when it goes through the column of activated charcoal, what comes out the bottom is pure. That's the analogy for chromatography. It's contaminated going in and comes out pure.
Q. Have you prepared a visual aid to help walk us through what chromatography is?
A. Yes, I have.
Q. Is this that visual aid?
A. It is.
Q. DDX 511. So there's a lot on the screen and it might be a little bit overwhelming, so I want to take it one step at a time. I have a pointer here so we can walk through.
There's several numbered items on the screen, 1

through 7, and I want to walk through them all with you. Before we do that, at a very high level, can you explain what's shown on the slide DDX 511.

A. If you take a look at the upper left-hand corner labeled number one, we've got a beaker up there. It's full of liquid. We call it the mobile phase but it's got a bunch of different-colored spheres in there and some squigglies. We're trying to pull out one of those particular items from the mixture. If you go down to the lower right-hand corner, you can see when the process is finished. We ended up with one particular sphere. That is to say, we purified the green ball.

Q. I want to walk through each of the numbered items. What do we have at item number one?

A. Item number one shows a mixture of components in a liquid phase. What we're trying to do is separate the green spheres out. There's a whole bunch of different-colored things in there which are representing impurities which we want to separate from the green spheres.

Q. The green balls are toxins?

A. We're going to call them type A neurotoxin, yes.

Q. What are the pink balls and orange balls?

A. We're going to call them contaminants.

Q. What's happening to item number two?

A. What we're doing at item number two is we're

introducing them to a chromatography column, which you've heard a lot about. The column itself here is a glass cylinder, which you've seen. The chromatography column in this case is packed in the stationary phase. That is to say, it's the stuff that doesn't move in the column, the packing. In this case, it's an anionic exchange column. The anionic exchange column has a positive charge.

You think back to Dr. Bates' testimony early on Monday. He talked about electrostatic charges and how likes repel and opposites attract. What we're doing here is we're trying to pull out contaminants from the mixture in one that have positives charges. The biggest contaminant in the mixture for number one has a negative charge are nucleic acids.

Q. So if I'm understanding you right, so an anionic exchange chromatography column?

A. Yes.

Q. Is packed with what, again?

A. So the resin in there, the stationary phase, is the anionic exchange resin and it carries a net positive charge.

Q. What impurities are being isolated or highlighted or purified at this step?

A. What we're doing here is letting the things that don't have a negative charge flow through and get collected in the beaker in number three. The contaminants and

impurities from one that have a negative charge bind to the positive charge, so the negative attracts to the positive and positive attracts to the negative. What gets stuck to the column and separated from the mixture are the negatively charged contaminants.

Q. You had an example of a negatively charged contaminant?

A. The most common one in this mixture are nucleic acids.

Q. Explain to the jury what's happening in number three.

A. Number three is the eluent, the flow-through is another way to say it, from number two. What we've done is simply collected the stuff from number two which didn't bind to the column.

Q. What would be the contaminants in number three?

A. Other proteins that didn't bind to the column. We pulled the nucleic acids out at this step with other contaminated proteins which may have had a positive charge and didn't bind to the column, flow through the column, so they weren't bound to it, didn't get stuck, so they were washed off the column.

Q. And then item three, the beaker in item three, groups up with number four. What's happening in four?

A. Number four, we're taking that sample, which was number three originally, and pouring it into another column.

In this case, the column shown in number five is a cationic exchange column.

Q. What is a cationic exchange column?

A. The cationic exchange column is completely analogous but opposite to the anionic exchange column. It has a stationary phase that's actually negatively charged, so in this case, things that are positively charged are going to stick to it. What isn't positively charged then washes through and gets collected as impurities in the flasks. Number six is completely analogous to step three.

Q. If we have on DDX 911, what is being bound to the column at step five in cationic exchange?

A. In our representation, the positively charged components of four sticking to it. If you go back to number one and think about the green spheres, that's what we're trying to purify. We're trying to separate the green spheres from other stuff in there. Right now, we have the green spheres painted into a corner, if you will. They're stuck on the column. What we've done is washed the impurities off the column and they're represented in the flask at number six.

Q. Number six is impurities?

A. Correct.

Q. What is number seven?

A. What we do with 5 and 6 is go to number seven with a

different mobile phase. This one has a little bit of sodium chloride in it. What that does is releases the positively charged protein from the column. What we do is wash the column at this particular mobile and you end up in the flask at number seven with the purified green balls.

Q. By 2009, why would one want to do this process with botulinum toxin?

A. So the whole idea here is that if you take that mixture from one, you can separate out the neurotoxin so that 150 kilodalton neurotoxin is what we're representing here with the green spheres. And the idea behind this is you've removed all the impurities. For a protein pharmaceutical, you want it to be as pure as possible. What you're saying to do is clean it up from the fermentation. It's got all kinds of other stuff floating around in there. You're trying to pull the one pharmaceutically relevant active ingredient out of the mixture. What we've done is use anionic exchange and cation exchange chromatography to do just that.

Q. In your answer, you were talking about pulling out one part of the botulinum toxin. What is that part you're referring to?

A. What we did is separated the 150 kilodalton neurotoxin from the toxin complex. The toxin complex as it's produced by the organism is a much larger

oligomolecule, so it's big. It's represented here on the left-hand side.

As the organism manufactures this biologically active molecule in the fermentation, it manufactures it as a toxin complex. So you can see the neurotoxin here is represented by the green U-shaped thing and it is in associate with a bunch of other proteins in the toxin complex. The brown and tan represented here are the complex proteins. So through the use of the chromatography that we just described, you can actually separate that biologically active neurotoxin, the 150 kilodalton neurotoxin, from those complex proteins.

Q. So the left-hand side of the screen, you've got this big blob, for lack of a better word. Can you describe the different parts of this. Some are colored brown, some are lighter shade brown, and some are green.

A. Sure. The complex on the left-hand side is composed of other -- we call them in general non-neurotoxin components. I stayed up late thinking about that. But some of these proteins have other biologic activities. For instance, some of them have hemagglutinin-A properties, which means they coagulate red blood cells. And then there's other non-neurotoxin non-hemagglutinin proteins.

What we're trying to represent here is the toxin complex as it's produced by the organism is a big molecule.

What we're trying to represent on the right is that through the use of an anionic and cationic chromatography, we separated the active neurologic, biologically relevant pharmaceutical from the toxin complex.
Q. You said "actively biologically relevant molecule." Is that what's labeled the core neurotoxin?
A. Yes.
Q. On the right-hand side of the screen it's labeled 150 kDa. Can you describe what that is.
A. In the field, we describe the different molecules based on their molecular weight. "Molecular weight," I just mean size. So the one on the left toxin complex is called the 900 kilodalton. A kilodalton is simply a unit of measure of size, like inches or pounds. So 900 kilodaltons is larger than 150 kilodaltons.
Q. By 2009 were researchers in the field trying to isolate the core neurotoxin from the other components of the botulinum toxin complex you discussed earlier?
A. Yes, they were.
Q. And how were they doing that?
A. They were going doing it using anionic and cationic exchange chromatography.
Q. Why were researchers by 2009 trying to isolate the core neurotoxin?
A. The whole point behind that is it takes X number of

molecules, pieces of neurotoxin, to give a pharmacologically relevant effect. If you're treating wrinkles or a spastic disorder or something like that, maybe you need 10 molecules to do that. If you use 10 molecules of the 150-kilodalton material, you have a much smaller, compact protein load. There isn't nearly as much as if you used the toxin complex shown on the right -- I'm sorry on the left. The molecular weight being so much larger, you're going to use a lot more total protein.

The whole theory behind using smaller amounts of proteins is the less you use, the much lower the chance the person being treated will develop something like an immune response, which you don't want the person to have. The person comes up with some type of immune response, they're refractive to the toxin. You can't treat that particular disease with the toxin anymore, so you want to use as small a quantity as possible. That's why we use 150 kilodalton neurotoxin.

Q. Thank you, Doctor.

Was it described in the literature by 2009 to purify botulinum toxin by chromatography?

A. Yes, it was. Extensively.

Q. And the witness binder in front of you, can you turn to tab JTX 111. Do you have it?

A. Yes, I have it.

Q. Do you recognize that document?
A. Yes, I do.
Q. What is it?
A. So it's titled "Purification and Amino Acid Composition of Type A Botulinum Neurotoxin." It was written by a man named Abudi DasGupta.
Q. Was it a document you relied upon for your analysis?
A. Yes, it is.
Q. When was the document published?
A. 1984.
Q. Who is Abudi DasGupta?
A. Abudi DasGupta was one of the leading figures in the world of botulinum research in the '70s, '80s and '90s. He worked at the University of Wisconsin-Madison, and during my tenure there at the University of Wisconsin-Madison his laboratory was right down the hall from mine. As a matter of fact, one of my best buddies in grad school worked in his laboratory. So our labs were 50 feet apart.
Q. You personally knew Dr. DasGupta?
A. I personally knew Dr. DasGupta, yeah. I can still remember him sitting at his desk in the middle of the Wisconsin winter writing grant proposals with his shoes off.
MR. LAROCK: Your Honor, I'd like to move JTX 111 into evidence.
SPEAKER: No objection, Your Honor.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 111 was admitted.)

BY MR. LAROCK:

Q. Is this the DasGupta paper?

A. Yes, it is.

Q. It is okay for today if I call it the DasGupta paper?

A. Yes.

Q. What is the DasGupta paper about?

A. You can probably find it from the title. It's the purification of type A neurotoxins. This looks complicated. He described a seven-stage process, seven-step process. Once you get into it, if you're a person of skill in the art, it's not that difficult.

What I highlighted here for you are the two critical components. The two critical pieces here are that he used anion exchange chromatography and he used cation exchange chromatography, that's SP Sapodex, in his purification of the type A neurotoxin.

Q. Where do we see in the anion exchange stationary phase and the cation exchange stationary phase before?

A. In the diagram we just went through, one through seven.

Q. Were they also found in the claims of the '748 patent?

A. They absolutely were contained in the claims of the

'748 patent.
Q. Does the DasGupta paper report the results of the purification process?
A. It does.
Q. Let's move to Figure 2. And there's a lot here. So can you tell us what Figure 2 shows?
A. Yeah. So if you look at the figure on the right, it's an analytic technique that's called electrophoresis. If you look at the lane which is inserted with the red box, you can see at about 2.2 centimeters there's a band there. So what you're looking for when you're looking at purified, semi-purified products is the number of bands on this analytic technique. If there are contaminants in the sample, you'll different bands on the gel.
In this case, there's a single band at that particular spot at 2.2 centimeters. That single band means he purified the neurotoxin to homogeneity. He did it.
Q. By "pure neurotoxin," what does that mean in terms of the botulinum toxin complex versus the core neurotoxin?
A. If you go back to the -- trace back to the diagram where we had the complex on one side and the neurotoxin on the other, what he did was he separated the complex proteins from the neurotoxin, so he's just got the 150 kilodalton neurotoxin here.
Q. Thank you, Doctor.

In your witness binder can you turn to DTX 207.
A. Okay.
Q. What is that document?
A. This is a United States Patent. It's titled "Pharmaceutical Compositions of Botulinum Toxin or Botulinum Neurotoxin and Methods of Purification."
Q. Is this a document you replied on for your analysis?
A. Yes, sir, it is.
Q. When was the document published?
A. 1998.
Q. Who are the inventors of the patent that you're looking at?
A. Eric Johnson and myself.
Q. Who is Eric Johnson?
A. Eric Johnson was my dissertation professor in grad school.
Q. You're the other inventor?
A. Yes, I am.
Q. For today's purposes, can I call it the Johnson patent?
A. I wrote it, but you can call it that if you want to.
MR. LAROCK: I'd like to move DTX 207 into evidence.
THE COURT: Admitted without objection.
(Thereupon, Defendant Exhibit DTX 207 was

admitted.)
BY MR. LAROCK:
Q. Is this the Johnson patent, Doctor?
A. It is my patent, yes. It's the Johnson patent.
Q. Let's go to column 3 of the Johnson patent. What does the Johnson patent say about purifying botulinum toxin?
A. So what the Johnson patent describes is the purification of the neurotoxin according to the method of a dude named M.C. Goodnough in 1994 and it describes the use of an ion and cation exchange chromatography.
Q. And we see a citation, Goodnough, M.C., 1994?
A. I see that, yes.
Q. What was that a citation to?
A. My thesis.
Q. So the work in the Johnson patent relates to the work you did for your Ph.D. thesis?
A. It was translated directly, yes.
Q. And we have now a couple of purification steps. Can you describe what those purification steps are for the jury.
A. There's three in there and all three use an ion and cation exchange chromatography.
Q. Where do we see those an anion and cation exchange chromatography?
A. They came from the '748 patent. That's where we see it last.

Q. Did you create this process from scratch?
A. No, I did not. This process was developed through review of the literature. Again, this process has been around for decades. So if you go back and think about DasGupta in '84, there's references that go back even further. So the process has been around for decades.
So this is at that time what we had sort of distilled all the literature down into. This is how we were doing purifications in-house.
Q. In terms of the results of this purification process, how does the Johnson patent report the results?
A. The Johnson patent reports that purified neurotoxin was obtained.
Q. At the top it says, "Essentially, pure type A neurotoxin."
Do you see that?
A. Yes.
Q. What does that mean?
A. It mean that is -- to be essentially pure, the 150 kilodalton neurotoxin has been separated from all those complex proteins. So what we did was to repeat DasGupta's work. There's a couple of things we did different but it's basically the same.
Q. Did you try to get a patent on this purification process?

A. No, we knew we couldn't get a patent on it. The process itself had been in the literature for decades.
Q. If the Johnson patent is not related to this process, what is the Johnson patent directed to?
A. The Johnson patent is directed more towards the thrust of my thesis, which is compositions of matter. So again, we had to purify the neurotoxin to use it in these different compositions of matter. What we were patenting here are these compositions of matter. What we're doing here on the screen is demonstrating how we purified the neurotoxin.
Q. In terms of composition of matter, what did you find?
A. What we found was that certain disaccharides stabilize the neurotoxin during the manufacturing process. One in particular worked quite well, and that was trehalose.
Q. Thank you, Doctor.
Do you know if the Johnson patent has been recognized in the field?
A. I now it has been recognized in field, yes.
Q. How do you know that?
A. Because I reviewed the '748 patent.
Q. How did that inform that it had been recognized in the field?
A. It was cited in the '748 patent.
Q. Have you prepared a demonstrative to describe for the

jury?
A. Yes.
Q. So before you get into it, what's on the left-hand side of the screen?
A. On the left-hand side you can see verbiage from the Johnson patent. On the right-hand you can see verbiage from Allergan's '748 patent.
Q. And Allergan's '748 patent, that's the patent that's asserted in this case?
A. That's correct.
Q. And so how did you know the Allergan '748 patent cited your Johnson patent?
A. Well, it was actually cited in the literature, but as I was reviewing the '748 patent and reading through it, I'm like, I've seen this before. And it turns out that some of the language from the Johnson patent was transferred into the '748 patent almost verbatim.
Q. Did you compare the language between your patent and the '748 in this case?
A. I did.
Q. What's shown on the screen now? This is DDX 5.4.
A. Okay. So if I could draw your attention to the green highlighted text in the Johnson patent, you can compare that directly to the yellow highlighted text in the '748 patent. And I can read it to you but you can probably read it

yourself. It's identical.
Q. And what's next in the purple?
A. So you can continue down these two columns. The purple highlight is comparable to the purple highlight from left to right. You can do the same with the green and go down to the orange, pink at the bottom. The wording is nearly identical.
Q. Remind us again when the Johnson patent was published.
A. The Johnson patent was published in 1998.
Q. Was that before the 2009 date that you were using for your analysis for the '748 patent?
A. Just 11 years.
Q. Thank you.
MR. LAROCK: So I think we're done with that slide. Thank you, Mr. Bell.
BY MR. LAROCK:
Q. Please turn to DDX or DTX 192 in your binder.
A. Okay.
Q. Do you recognize that document?
A. Yes, I do.
Q. What is it?
A. So this is an article that was published by Dr. Gessler. It's titled production and purification of *clostridium botulinum* type C and D neurotoxin.

Q. Who is Frank Gessler?
A. Frank Gessler is Allergan's expert.
Q. Is this a document you relied upon in this case?
A. Yes, it is.
Q. When was the document published?
A. 1999.
Q. Have you personally confirmed that DDX 192 was publicly available before 2009?
A. Yes, I did.
Q. How did you confirm that?
A. I used a database called PubMed and it contains a bunch of articles from many different journals that are peer reviewed. If you do a PubMed search, you can find this document and determine the exact date it was published.
Q. And you certainly did the search.
A. I did. It was published on July 9th of 1999.
Q. And on the top of the Gessler paper there's a journal citation.
A. Yes.
Q. What journal is the Gessler paper in?
A. *Immunology and Medical Microbiology*.
Q. Before that it says FEMS?
A. Yes.
Q. What does FEMS stand for?
A. Couldn't tell you.

Q. Do you know if the *Immunology and Medical Microbiology* journal is a reputable one in the field?
A. Yes, it is. It's peer reviewed.
MR. LAROCK: Your Honor, I'd like to move DTX 192 into evidence.
MS. RUPERT: No objection.
THE COURT: Admitted without objection.
(Thereupon, Defendant Exhibit DTX 192 was admitted.)
BY MR. LAROCK:
Q. Is this the Gessler paper?
A. Yes, it is.
Q. And are you -- do you see Frank Gessler is the author of this paper?
A. Yes.
Q. You're aware he's Allergen's expert in this case?
A. Yes, I am aware.
Q. Let's go to page 3 of the Gessler paper. What does Gessler report for purifying botulinum toxin?
A. Well, Gessler used a different series of chromatographic steps. He, additionally, used hydrophobic interaction chromatography, which we'll describe a little later here. But then he used a couple of different anion exchange chromatography columns for the purification of these neurotoxins.

Q. Are there results that you are reported?
A. Yes, there are.
Q. Let's turn to page 6 of the Gessler paper. And we have Figure 4. Can you describe Figure 4 of the Gessler paper?
A. Yes. So Figure 4 shows another one of those electrophoresis analysis.
Q. There's an annotation of Figure 4 you have?
A. Right.

I was laughing at the court reporter.

Inside the red box you can see this is one particular lane. So if the you read them left to right, it looks like they're in columns, so we call these lanes. In the second lane, the one that has the red box around it, you can see that that lane has a single protein band and it's marked as 144 kilodaltons. What that means is that Gessler purified, in this case, type D neurotoxin and it's demonstrated here in this particular lane.
Q. Thank you, Doctor. Let's turn back to your binder.
A. Okay.
Q. Let's turn to DTX 196. Are you there?
A. Yes.
Q. What is that document?
A. So this is a book chapter. It's titled "Purification of *Clostridium Botulinum* Type A Neurotoxin" and it was

written by Karl Malizio, myself, and Eric Johnson.
Q. Is DTX 196 a copy of your book chapter?
A. Yes, it is.
Q. And you're a coauthor on that book chapter; correct?
A. Yes, I am.
Q. And when did you write that book chapter?
A. In 1999. It was published in 2000.
Q. And you said it was published in 2000?
A. Yes, it was.
Q. When did you submit it for publication?
A. We submitted it early in 2000 and then through the same process of going through the PubMed cycling, it was published on May 23rd of 2000.
Q. How do you know it was, in fact, published?
A. Well, I got a copy of the book and I've got a box full of reprints of the chapter, so I'm pretty sure it's in print.
Q. That occurred before 2009; correct?
A. It was before 2009.
Q. And it was published in 2000?
A. Yes, published in the summer of 2000.
Q. So the DTX 196 was published before the 2009 date that you were using for the '748 patent; correct?
A. That's correct.
Q. Is this a document you relied upon for your analysis

in this case?
A. It is.
MR. LAROCK: Your Honor, at this time I'd like to move DTX 196 into evidence.
MS. RUPERT: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Defendant Exhibit DTX 196 was admitted.)
BY MR. LAROCK:
Q. Is this a paper -- is this a copy of the -- I'll call this the Malizio book chapter. Is that okay?
A. If you have to, yeah. I wrote it.
Q. Is this a copy of the Malizio book chapter?
A. Yes, it is.
Q. Who is Karl Malizio?
A. Karl Malizio was a labmate of mine from the University back in the late '80s, early '90s. He and I went on to cofound Metabiologics in 1999.
Q. Eric Johnson, who is he?
A. He was my dissertation professor during grad school.
Q. Why did you and Karl Malizio and Eric Johnson write the Malizio chapter?
A. In 2000 what we were trying to do was to pull together all of the different methods for purifying type A neurotoxin. What we wanted to do was present this as kind

of a recipe book. The book itself is basically a cookbook. So every chapter is a different recipe on how to do something, and this particular book was about toxins. So they came us to and a said would you write about biotoxins and we said sure. So as you go through this, you'll see this is actually a step-by-step recipe as if you're making a cake.

Q. Let's turn to page 6 and 7. Okay. We've got a lot of stuff that we need to walk through.

Doctor, in a general sense, what's shown on the screen now?

A. So what's shown on the screen right now is basically the recipe. And for people that are skilled in the art, you can actually follow this along. What it shows is the toxin production, the growth which we'll get into, and the different purification steps involved in eventually arriving at a pure type A neurotoxin, 150 kilodalton molecule we're talking about.

Q. In someone wanted by 2000 when this was published to purify botulinum toxin, what would they do?

A. Read the recipe.

Q. Would they follow along the recipe?

A. Yeah. This recipe basically describes the use of an anion and cation exchange chromatography for purification of a type A neurotoxin.

Q. Where do we see an anion and cation exchange chromatography before?
A. Where have we seen it before?
Q. Yes.
A. In the '748 patent.
Q. So we have a number of different steps here in this chromatography process from Malizio. How did you arrive at those steps?
A. So like I said before, what we were trying to show here is what we considered at the time to be the state of the art purification method for type A neurotoxin.
Q. Have you prepared a demonstrative that summarizes -- we looked at a couple of different references -- the state of the art in 2009 about purifying botulinum toxin?
A. This was by 2000, but yes.
Q. Let's put up DDX 515.
So, Doctor, what's shown on the screen now?
A. What's shown on the screen here now are the four articles we already talked about, DasGupta in '84, Johnson in '98, Gessler in '99, and Malizio in 2000.
Q. Doctor, we've been talking about a number of different references. I want to switch gears and talk to you about the patents. Have you prepared a demonstrative that walks through your opinions with respect to Claim 8 of the '748 matter?

A. Yes, I have.
Q. We'll do '748 and first and then I'll do Claim 8 of the '740 second.
So looking at DDX 516, what's on the left-hand side of the screen?
A. On the left-hand side of the screen you can see the two references that are being used here, Malizio and Xiang.
Q. What is on the right-hand side of the screen?
A. On the right-hand side of the screen you can see the '748. In particular, it's Claim 1 of the '748 patent.
Q. Why are we looking at Claim 1 when it's Claim 8 that's asserted?
A. We're looking at Claim 1 because Claim 8 depends upon Claim 1. That is to say that Claim 8 contains everything that is in Claim 1.
Q. How have you organized your opinions?
A. I organized them as a checklist here for you.
Q. So let's walk through each one of these. So starting with Claim 1, '748, we see language at the top that says, "A substantially animal-product-free, APF, process utilizing chromatography for purifying *clostridium botulinum* toxin serum type A BoNT/A."
Where in Malizio is that language found?
A. The purification process described in Malizio from 2.3 to 2.5 to 2.6 to 2.6.2 demonstrates an

animal-product-free purification scheme for type A neurotoxin.

Q. You pointed to 3.2 -- sorry.

You pointed to 2.3, 2.5 and 2.62. Do any of steps in Malizio utilize animal products?

A. None of them do.

Q. That's found in Malizio. Let's keep looking at the next language. We have "A sample comprising approximately 150 kilodalton BoNT/A and at least one impurity protein."

"A process comprising," where in Malizio is that language found?

A. That's found in 2.5. In 2.5 Malizio is taking the toxin complex, that is to say the neurotoxin, 150 kilodalton neurotoxin, and more than one impurity protein and binding it to this particular column which is an anion exchange column but it's actually run in an alkaline pH of 7.9.

Q. What about step 2.5 in Malizio shows this language?

A. So that's Malizio 2.5, step number 1, that's the buffer. And the anion exchange column is number 4, the DEA Sapodex.

Q. What's happening in 2.5?

A. What is happening here is the neurotoxin is being dialyzed in this buffer exchange and then it's going to be subsequently contacted with the columns itself.

Q. And on step 2.5 at a pH of 7.9 -- when the botulinum

toxin comes in contact with the pH of 7.9, what happens?
A. So what happens then is the toxin complex at that particular pH binds to the an anion exchange column. It sticks.
Q. Thank you, Doctor. So that language is found in Malizio. Let's move on to step A. Where is step A of Claim 1 of the '748 patent, where is that found in Malizio?
A. If you look in Malizio at 3.5, you can see language that says the anion exchange column, that's the DEA Sapodex -- so the second highlighted box there next to AEX shows that the an anion exchange column will bind the toxic complex in these conditions.
Q. What about step 3.5 shows the botulinum toxin, the 150 kilodalton, is bound to the anion exchange stationary phase?
A. That's the bottom box, number five of Malizio 3.5. It says that the neurotoxin is eluted so -- if it was washed off -- So if it was washed off, it must have been bound initially.
Q. Thank you, Doctor. So that's found in Malizio. Let's move on to step B. Where in Malizio is step B found?
A. That's also in 3.5, number five at the bottom. It says the neurotoxin is eluted. That is to say it's washed off.
Q. That's Malizio step C. Where in Malizio is step C

found?
A. Step C is found at 3.6.2 where Malizio describes dialyzing in step 1. The toxin gets this particular sodium phosphate buffer. The dialysis is the same thing as contacting the eluent with the buffer.
Q. That's in Malizio. Let's look at step D. Where in Malizio is step D found?
A. Step D says, "further contacting the dialyzed material with cation exchange column." So in Malizio 3.6.2 he describes the use of this particular cation exchange column.
Q. What about step 3.6.2 shows that the botulinum toxin is bound to the cation exchange column?
A. If you go down to step three in 3.6.2, you can see Malizio says the toxin is eluted. That is to say it must have first been bound in order to be eluted.
Q. Thank you, Doctor. So step D is found in Malizio. What about step E? Where is step E found in Malizio?
A. That's also in 3.6.2. Malizio says that the eluted fractions. That is to say you have washed the neurotoxin off of that column using a sodium chloride gradient. Here you can see they eluted the bound toxin.
Q. Thank you, Doctor. So step E is found in Malizio. Turning to step F, where in Malizio is step F?
A. So in step 12 here in Malizio he demonstrates the

pure neurotoxin, that is to say the 150 kilodalton neurotoxin, was shown to be over 98 percent homogeneous. That is to say it's pure.

Q. What type of botulinum toxin complex versus pure neurotoxin is being reported by Malizio?

A. So he's reporting the type A neurotoxin, the 150 kilodalton material.

Q. And where it says MR equals 150 kilodalton, what does that mean?

A. MR is our shorthand in the business for molecular weight. So molecular weight is about 150 kilodalton which we described earlier as being about the size of the purified neurotoxin.

Q. So the Malizio process reports obtaining the 150 kilodalton core complex, core neurotoxin?

A. Yes, he reports the purified neurotoxin.

Q. So step F is found in Malizio. And then the language at the end wherein the composition is essentially free of 900 kilodalton BoNT/A. Before we get into that, what does that mean?

A. Wherein the composition is essentially free of 900, is that the --

Q. Right.

A. That was the material we started with. We started with the big complex and pulled off eluent. What we're

talking about here is when you separate the 150 kilodalton neurotoxin from the 900 kilodaltons of material, you're absolutely purifying and separating it. There is no more of the 900 kilodalton toxin complex.

Q. If Malizio obtained the 100 -- the drug substance obtained from the Malizio process was 150 kilodaltons, what does that mean about the -- strike that.

If the Malizio process resulted in 150-kilodalton toxin, what does that say about the 900-kilodalton complex?

A. That it's been completely removed from the final preparation.

Q. So is the "wherein the composition is essentially free of the 900-kilodalton complex," is that shown in Malizio?

A. It is, where he demonstrates that the 150-kilodalton neurotoxin is greater than 98 percent of the homogeneous. That means all the other core proteins have been removed.

Q. Thank you, Doctor.

Having looked at the different parts of Claim 1, what would a person of ordinary skill conclude about the obviousness of Claim 1?

A. A person of ordinary skill would have concluded that Claim 1 of the '748 patent was obvious in light of Malizio.

Q. Let's go back to Malizio. Let's bring up DTX 196.

How was the botulinum toxin produced in Malizio?
A. So Malizio used a fermentation media that contained animal proteins. The media actually contained casein.
Q. Remind us again. By 2009, what was known about using animal-derived products like casein?
A. What was known was that the use of animal-derived products carried a risk of the presence of these transmissible infectious diseases we talked about. One would have known at this point in time that if you were doing this in a pharmaceutically relevant scenario, you're making a drug to use for people, that you want to substitute this animal-based product for something else like a plant-based product.
Q. By 2009, was there a motivation to combine Malizio's process with Xiang?
A. Yes, the motivation was to combine Malizio with Xiang. Xiang showed that the toxin could be produced in a plant-based, soy-based culture medium while Malizio showed an animal-protein-free purification scheme.
Q. Let's bring up JTX 113 and go to page 10.
Remind us again what Xiang taught by 2009.
A. Xiang taught by 2009 that the use of animal-derived products in the manufacture of pharmaceutical compositions carried a risk, and the risk was the diseases, viruses, and prions. So one would have been compelled, if they're

skilled in the art at the time, to replace the animal-based material from the Malizio article with plant-based material such as Xiang showed here.

Q. Now, would researchers by 2009 have expected to successfully be able to take a purification process like the one in Malizio and combine that with a soy-based animal-protein-free way of producing the toxin?

A. Absolutely. The organism doesn't care what it's growing in as long as it's in the right environment. The protein source is immaterial to the organism.

Q. Will using different protein sources, animal protein versus nonanimal proteins, would that the affect purification and chromatography step?

A. It wouldn't affect the chromatography step at all, no.

Q. Now, Doctor, are you aware that Dr. Gessler, Allergan's expert, has said chromatography is unpredictable?

A. I'm aware of that.

Q. Do you agree?

A. No, I do not.

Q. Why not?

A. Chromatography is a very stable process. It has been described in the literature for decades. It has been used for purification of botulinum neurotoxin for decades. It was rapid, it was efficient, and it was a robust process.

Q. And are you aware that Dr. Gessler has said or believes that chromatography is expensive?
A. I'm aware of that.
Q. Do you agree?
A. No, I do not.
Q. Why not?
A. Chromatography columns, the packing materials, all the reagents that are used in the manufacture of these things are readily available and not expensive at all.
Q. And by 2009 would chromatography be expected to introduce impurities or contaminants into the process?
A. No, chromatography at the time would not have been expected to introduce contaminants.
Q. Why not?
A. Because a person of skill in the art at the time would have understood the use of things like single-use columns. That is to say, you pack it once, use it, throw it away. You're not running the risk of contaminating the next batch by reusing the column. Just chuck it and get rid of it. You can clean the columns if you're so desiring. You can use pharmaceutical-grade agents, filters and buffers and things like that. That's just not a thing.
Q. Thank you, Doctor.
I want to go back to the Xiang patent application, JTX 111 -- JTX 113. And I want to zoom in on

the inventors. And, Doctor, we talked about this before.

Hui Xiang is an inventor on this Xiang patent application?

A. Yes.

Q. Do you know where Hui Xiang was employed?

A. Allergan.

Q. So this is an Allergan patent?

A. Yes, it is.

Q. Does that impact your opinion at all?

A. No, not at all.

Q. Why not?

A. The fact that Hui Xiang is an Allergan employee is immaterial. I looked at the patent and the information that was contained within. It was something that was available to a person of skill in the art since 2009, so it's in the public domain, so it's another piece of prior art.

Q. How do you know it was available by 2009, the Xiang application?

A. Because it has a publication date of October 27, 2005.

Q. Thank you, Doctor.

Let's put up slide 26. I want to look at Claim 8. And this is the claim from the '748 patent that's asserted in this case; right?

A. Correct.

Q. Can you describe what Claim 8 means to a layman?
A. Yeah. I believe the description has been made already this week. What it means is that there's no more than one part per million residual nucleic acid per one million parts of the neurotoxin.
Q. Remind us again what nucleic acids are.
A. Nucleic acids are pieces of genetic material carried over from the fermentation. You think of them as DNA and RNA.
Q. Let's go to DTX 196, page 4.
Doctor, what does Malizio say about nucleic acids?
A. Malizio says this toxin complex is purified and nucleic acids removed by an ion chromatography.
Q. And this is Malizio's book chapter you wrote in 2000?
A. That's correct.
Q. By 2000, what would a person of ordinary skill have understood from Malizio's process?
A. A person of ordinary skill would have understood that if one wants to remove nucleic acid, one would use anion exchange chromatography at an acidic pH.
Q. Does Malizio's process actually use anion exchange chromatography at an acidic pH?
A. Going off memory, I think it's a step.
Q. Let's confirm with DTX, page 6.

What do we see at step 2.3?
A. Step 2.3 shows the use -- this is in Malizio again -- of an anion exchange chromatography at an acidic pH. pH 5.5 is acidic.
Q. Looking at Malizio's disclosure, what would one of skill have understood about the ability of the Malizio process to produce botulinum toxin with nucleic acid levels below one part per million?
A. A person of ordinary skill in the art would have looked at Malizio and seen that he was using an anion exchange chromatography and acidic pH and known that.
Q. As a coauthor, Doctor, of Malizio did you record the amount of nucleic acids in Malizio's book chapter?
A. No, we did not.
Q. Why not?
A. We knew that when we used the anion exchange chromatography that all the nucleic acids are going to be removed. The analogy I give you is when you make coffee in the morning, do you check the filter to see if it removed all the coffee grounds? You don't. They're already there. You just know they're there. So when we use anion exchange chromatography, we know all the nucleic acids are going to be removed every time you do it.
Q. Doctor, do you have any data to support your opinion that Malizio's process would obtain botulinum toxin drug

substance below one part her million residual nucleic acid?
A. Yes, I do.
Q. What is that data from?
A. That data is from Allergan.
Q. Turn to tab JTX 17A. Once you get there, don't say anything about it just yet.
Do you recognize that document?
A. Yes, I recognize this document.
Q. And is it an Allergan document?
A. Yes, it is.
Q. And in a general sense, what types of impurities are being reported in that Allergan document?
A. Nucleic acid.
Q. And is this a document you relied upon for your analysis?
A. Yes, it is.
Q. JTX 17 has already been admitted into evidence.
MR. LAROCK: Your Honor, we sealed the courtroom before for this document. I have a handout that I'd like to give to the jury to follow along. I can't publish it.
THE COURT: All right. Give it to the deputy clerk.
BY MR. LAROCK:
Q. All right. Doctor, can you turn to JTX 17, page 5.
A. Okay.

Q. And you see it says executive summary at the top?
A. I see that.
Q. And what part of that paragraph supports your opinion?
A. If you look at the lower portion of the paragraph, the last four lines, it says that -- I'm not sure how much I can say out loud. I'll read it if you have to stop me.
"These data reveal that GDNA" -- G is genomic, "DNA levels were below the detection limit" -- "BDL" means below the detection limit -- "of approximately 500 picograms per milliliter, a lot less than one part per million for all of the DS2 samples."
Q. Remind us again what DS2 is.
A. DS2 is Allergan's chromatographic purification procedure for botulinum toxin.
Q. What chromatography columns were used in Allergan's DS2 process?
A. Anion exchange and cation exchange columns.
Q. And how do those columns relate to Malizio's process?
A. They're the same columns.
Q. And we say you said 500 pg/ml.
A. Yes.
Q. What is that?
A. An awful lot less than one part per million.
Q. And so how does this information support your

opinion?
A. It supports my opinion that the use of anion exchange chromatography at acidic pH removes all the nucleic acid every time you use it.
Q. By 2009, how would researchers have viewed nucleic acids?
A. They were viewed as contaminants.
Q. Does the literature describe nucleic acids as contaminants by 2009?
A. Contaminants or impurities. It was described that way.
Q. In the witness binder, let's go to DTX 285. Do you recognize that document?
A. I do recognize the document.
Q. What is it?
A. So this is a book chapter that was written by Ron Bates.
Q. Is this a document you relied upon for your analysis?
A. Yes, it is.
Q. When was it published?
A. This was published in 2006.
Q. And how does 2006 relate to the date that you were using for your analysis for Allergan's '748 patent?
A. So the date I used for the '748 patent analysis was 2010. 2009, I'm sorry.

Q. So this reference was published before 2009; correct?
A. That's correct.
MR. LAROCK: Your Honor, I'd like to move DTX 285 into evidence.
MS. RUPERT: No objection.
THE COURT: Admitted without objection.
(Thereupon, Defendant Exhibit DTX 285 was admitted.)
BY MR. LAROCK:
Q. Let's pull up DTX 285. And stop here. Who is Ron Bates?
A. Ron Bates is the author of this particular book chapter and also happens to be an inventor on the '740 patent.
Q. He testified earlier; correct?
A. Yes, he did.
Q. Was he at Allergan at the time of the DTX 285?
A. No. Per Ron Bates' testimony, this was a year before he joined Allergan. You can see here he was working for Bristol Meyers Squibb.
Q. Thank you, Doctor. Let's turn to page 6 of the Bates book. What does the Bates book chapter say about nucleic acids?
A. He says that they're contaminants or impurities. They need to be removed from the desired protein.

Q. What would one have concluded by 2009 about nucleic acids in view of the Bates reference?
A. They needed to be removed.
Q. Now, would a person of ordinary skill in the art in 2009 have a reason to keep around nucleic acids?
A. No.
Q. Would a person of ordinary skill in 2009 know how to remove nucleic acids from a sample?
A. Absolutely. They'd use anion exchange chromatography.
Q. If a sample had nucleic acids in it, what would they do?
A. They'd use an anion exchange chromatography and an acidic pH.
Q. To remove nucleic acids?
A. Every time you use it, it removes nucleic acids.
Q. And the fact that Ron Bates later worked at Allergan, does that inform your opinion at all?
A. No, not at all.
Q. Let's go back to the slides and look at Claim 8. Should be slide 27. Putting everything together, Doctor, looking at the prior art, what would one conclude about Claim 8 of the '748 patent?
A. One would conclude as a person of ordinary skill in the art that Claim 8 was obvious in view of Xiang and

Malizio.

Q. Doctor, you're aware that Dr. Gessler, Allergan's expert, does not believe that Malizio's process will obtain nucleic acid levels below one part per million?

A. I'm aware of that.

Q. Do you agree?

A. No, I do not.

Q. Why not?

A. Allergan's own data shows the use of anion exchange chromatography at an acidic pH removes all the nucleic acid every time you do it.

Q. And, Doctor, are you aware that the Malizio book chapter was in front of the examiner or before the examiner when the examiner was prosecuting the '748 patent?

A. Yes, I'm aware that on the front page of the '748 -- it actually wraps around a cover of the '748 patent. The reference list is extensive, but the Malizio reference is one of these references.

Q. Does that change your opinion at all?

A. No, not at all.

Q. Why not?

A. The Xiang patent was also on the front of this as well and the examiner had literally over a hundred references to read. I mean, that's a lot of reading for one of these patents.

MS. RUPERT: Your Honor, objection. This is outside the scope of his report. He's testifying.

THE COURT: I'm going to overrule it.

BY MR. LAROCK:

Q. Does that inform your opinion at all or impact your opinion at all?

A. Not at all. The fact that these references were on the front of the '748 patent and they were available to the examiner doesn't mean the examiner could have actually pulled these two together. This poor woman had a lot of reading to do for the patent and so the combination may not have been obvious to her. If she had recognized the combination of these two references made Claim 8 obvious, she would have never allowed the patent.

Q. Doctor, are you aware of any skepticism in the field about using anion exchange chromatography by 2009?

A. No.

Q. Are you aware of whether -- are you aware that Dr. Gessler has provided the opinion that persons of ordinary skill by 2009 would not have wanted to use anion exchange chromatography by 2009?

A. I am aware of his opinion, yes.

Q. Do you agree?

A. No, I do not.

Q. Why not?

A. A person of ordinary skill at the time would have recognized there were literally decades of literature references, prior art that demonstrated the use of chromatography, anion exchange chromatography in particular, was extremely useful, extremely help. As a matter of fact, Dr. Gessler used it himself for purification of botulinum neurotoxins.

Q. Now, Doctor, let's look at JTX 212 in your witness binder. What is that document?

A. So this is a United States Patent. The inventor is Luo. And it's titled "Chromatographic Method and System for the Purifying of Botulinum Toxin."

Q. And do you understand that this is a reference that Dr. Gessler has relied upon in this case?

A. Yes, I'm aware.

Q. And you've addressed this reference in your expert report in this case?

A. Yes, I did.

Q. When was the document published?

A. 2008.

MR. LAROCK: Let's move JTX 212 into evidence.

MS. RUPERT: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 212 was admitted.)

BY MR. LAROCK:

Q. Let's go to the slides.
So, Doctor, we have a portion of JTX 212 from column 41 on the screen. Is it your understanding that this is the language that Dr. Gessler has relied upon to say that there is a criticism or a skepticism in the field of using anion exchange chromatography?
A. Yes, I'm aware that this is the language from Luo that he depends upon, yes.
Q. It comes from the Luo, JTX 212?
A. Yes, it does.
Q. Do you agree with Dr. Gessler that this language teaches away or discouraged people from using anion exchange chromatography?
A. I absolutely do not.
Q. Why not?
A. This one statement, the single statement in this patent, is completely unsupported by any data. There's no figures, no gels, no images, nothing to support this particular statement. As a matter of fact, this statement is contraindicated by decades of literature prior to this that say there has never been anything like in the bottom line you can see toxin band changes. It doesn't even describe what those are. Luo does not describe what those toxin band changes are. So no, I don't believe this teaches away from anything. A person skilled in the art at the time

would have recognized the huge body of information prior to it and not believed this was true.
Q. Earlier we saw a couple of references that showed the gels in the lanes that we saw.
A. Yes.
Q. Are there -- is there any gel or lane that shows a band pattern change in the Lou reference?
A. No.
Q. Do you know what is referred to by "toxin band-pattern change" in the Luo reference?
A. Toxin band-pattern change, I believe Lou describes it as a shifting of the band in relative molecular weight to say it's a different size from the use of this technique of anion exchange chromatography and there's no data to show that happened.
Q. No gels that would show that happened?
A. No, gels, figures, nothing.
Q. No data?
A. It's one single unsupported statement.
Q. Doctor, by 2009 how many times had you used anion exchange chromatography?
A. Hundreds if not thousands.
Q. To purify botulinum toxin?
A. To purify botulinum toxin.
Q. And how many band-pattern changes have you seen?

A. It's only been 35 years, but so far none.
Q. None that are attributable to anion exchange?
A. Zero.
Q. So how would a person -- let's put back up to slide 28.
How would a person of ordinary skill in 2009 have understood the statement from Lou?
A. A person of ordinary skill in this particular point in time would not have believed this statement was true.
Q. How does this statement relate to the state of the art by 2009 relating to using chromatography to purify botulinum toxin?
A. This statement would have no bearing on that. The use of anion exchange chromatography at that particular point in time and still today is supported by literally hundreds of references that state this is a very handy, successful technique for the purification of botulinum neurotoxins.
MR. LAROCK: Your Honor, I've got more to go.
THE COURT: I thought you were going to switch to the other patent, so this is a good time to finish for the day.
Members of the jury, we're finished for the day. We will try to start at 9:30 tomorrow morning, so please be here. Before you walk out, I need to remind you not to talk

to anyone about the case or let anyone talk to you about the case for the reasons I said before and not to do any research about the case or look up anything that has a connection to this case. It's important that everything you learn about the case be learned in the courtroom sitting here with your fellow jurors. Have a good night. I'll see you tomorrow. And actually, when you're going out, hand the exhibit back to my deputy clerk.

(The jury exited the courtroom.)

THE COURT: Dr. Goodnough, you can step down. Watch your step.

Everyone else can be seated. I don't see Mr. Desai so he's off working with someone on the plaintiff's side on jury instructions. Good.

I was curious. The testimony I was just hearing about obviousness of the '748 patent, is this the limitation in the dependent claim? Am I understanding that this is supposed to be the inherent result of the process?

MR. VARUGHESE: Yes, Your Honor.

THE COURT: Okay. All right. Is there anything anybody wants to bring up? Plaintiff?

MR. DITTMANN: Not at this time, Your Honor.

THE COURT: Ms. Gaza, yes? What?

MS. GAZA: Good afternoon, Your Honor. Anne Gaza on behalf of Revance. Your Honor, I wanted to raise to

see if we could do a slight additional submission on the *Aqua Shield* issues. You have the parties' letters in front of you.

THE COURT: *Aqua Shield*.

MS. GAZA: Correct.

THE COURT: Okay. Sorry. You heard of Camp Tockwogh? I guess you haven't.

MS. GAZA: So we have the *Aqua Shield* letters that both parties have submitted to Your Honor. There's been additional testimony and evidence that's put in that we think might help inform your consideration.

THE COURT: Okay. So what?

MS. GAZA: We would just propose to submit additional short letters identifying the additional evidence we think would help inform your decision, Your Honor.

THE COURT: Okay. When are you going to do this by?

MS. GAZA: Tomorrow by 8:00 a.m.

MR. ARMENIO: Certainly, this would be relevant to exhibits that would be proffered with Ms. Trexler tomorrow.

MR. DITTMANN: I'm assuming tomorrow these are the exhibits they have now tried a couple of times and you said no and you said we would be able to respond. And it's going to be difficult for us to respond if we get it at

8:00 a.m.

THE COURT: So presumably this is going to come up sometime before we get too far into tomorrow, though. I guess probably the planned order of proceedings is to have Dr. Goodnough and then to have whoever your expert is on the formulation patent and the damages. And Ms. Trexler, I guess she will come after that. She'll be the last person for your side?

MR. VARUGHESE: Yeah. Ms. Trexler is the last person from our side. A few other witnesses in between.

THE COURT: Who else, just for my amusement?

MR. VARUGHESE: Dr. Patel and Dr. Dover.

THE COURT: Dr. Dover. I remember Dr. Patel is a similarly placed --

MR. VARUGHESE: She relies on their opinion, Ms. Trexler does.

MS. GAZA: For timing just so we can have the transcript cites for you from today as well, it will take a while. But we're not trying to delay or burden them so certainly whatever works for you.

MR. DITTMANN: We're also responding to their JMOL motion by 8:00 a.m. tomorrow.

THE COURT: How many lawyers do you have here, Mr. Dittmann?

MR. DITTMANN: There's a lot of lawyers but a

lot happening here.

THE COURT: So why -- have you got something more? My experience is the court reporter usually has the transcript by 7:00, thereabouts. So in any event, you know what you want to say without having the actual transcript cites, I suppose. Why don't you get your letter in by -- no matter how I do this, they end up having to write something overnight.

So, Mr. Dittmann, I'd like to get whatever more input the defendant has. What do you suggest I do to maximize the -- minimize the unfairness to you?

MR. DITTMANN: If they could get it in by 8:00, we can get any responses and keep these letters short. Of course, we've been talking about this a few times.

THE COURT: When you say 8:00, talking p.m. or a.m.?

MR. DITTMANN: p.m. for them, a.m. for us.

THE COURT: I'm just concerned that we're actually putting the main burden on the court reporter here to get this transcript so you have the cites in time. After all, if you're going to argue generally, citations are not that useful.

MS. GAZA: Your Honor, would midnight work for us and 8:00 a.m. for them?

THE COURT: How about 9:00 for you and 8:00 a.m.

for them?

MS. GAZA: I would say absolutely, Your Honor. The only concern I have is some of the same team members will be involved in the 7:00 and 8:00 exchanges and then the 9:00 meet-and-confer and that meet-and-confer usually takes about an hour to an hour and a half. So we're not usually done with that meet-and-confer until 10:30. And Your Honor, as I'm sure you would prefer, I would like to put eyes on the letter before we submit it. Could we do midnight for us and noon for them? We don't think it will come up before noon and hopefully you'd have at least the lunch break, Your Honor.

THE COURT: Here's what I think you need to do, and Ms. Gaza I feel bad because you can't be replaced, but I think you need to get your letter in by 8:00. And if you don't have cites, you don't have cites. You can say whatever it is -- you know what you want to say. I can also get cites from you tomorrow morning. And they can have until midnight to respond.

Is that all right, Mr. Dittmann?

MR. DITTMANN: Thank you, Your Honor. How long will the submissions be?

THE COURT: It's hard to say. I don't know what the defendant wants to say. What's the phrase? Brevity is the soul of? I forget.

How long do you have in mind -- how long of a letter do you have in mind?

MR. ARMENIO: I think it will be brief. I'm just going to mention the specific exhibits we talked about with Dr. Siegwarth today and the specific testimony that links to it.

THE COURT: So by brief, two pages?

MR. ARMENIO: I can do it in two pages if that's what Your Honor would like.

THE COURT: So, Mr. Dittmann, you can write a two-page response. Is there anything else?

MR. ARMENIO: Your Honor, one clarification. My answer wasn't clear. We're relying on inherency, but that's not conclusive. To the extent it's not inherent, there is still general obviousness. The idea of getting to less than one part per million would have been obvious.

THE COURT: I didn't hear any evidence of that. All I heard was Allergan did some testing which is not, presumably, public.

MR. VARUGHESE: I think the evidence was that there was a motivation to go there, this thing is capable of doing it, but then the fact that the Allergan evidence goes to inherency.

MR. LAROCK: There was the Bates reference, Your Honor, that said nucleic acids were impurities.

MS. RUPERT: Your Honor, obviously, we disagree with all these characterizations and arguments, but we can bring that out on cross.

THE COURT: In any event, I will -- part of the reason I brought it up is that I don't think I heard anything that suggested it had a source other than inherency and I'm never happy when I hear about inherency because this is just one more thing to explain to the jury. But if it's necessary, it's necessary. And if you've got other arguments, I guess I'll hear them. In any event, so we're finished for today.

MS. RUPERT: Your Honor, to be clear, inherent anticipation is not an issue in the case.

THE COURT: I understand it's not inherent anticipation but you have inherency and obviousness too.

Thank you for everything and I'm going to give you this. All right. In any event, we're in recess.

(The proceedings were in recess at 5:18 p.m.)

**C E R T I F I C A T E**

I, Deanna L. Warner, a Registered Professional Reporter, do hereby certify that as such Registered Professional Reporter, I was present at and reported in

Stenotype shorthand the above and foregoing proceedings.

/s/ Deanna L. Warner

Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$1.25** [1] - 590:6
**$1.50** [1] - 590:4
**$115** [1] - 603:16
**$273** [2] - 591:3, 603:12

## '

**'478** [2] - 661:4, 661:11
**'60s** [1] - 798:5
**'70s** [1] - 807:13
**'740** [32] - 583:2, 602:2, 610:7, 611:3, 611:4, 611:16, 628:6, 656:4, 656:9, 656:19, 656:21, 657:7, 658:22, 661:7, 661:13, 661:14, 661:18, 665:9, 775:6, 775:20, 776:20, 776:22, 777:4, 777:13, 777:16, 777:22, 778:5, 778:10, 783:10, 784:8, 823:3, 838:13
**'748** [61] - 602:2, 611:3, 611:7, 626:22, 627:18, 628:8, 638:18, 656:5, 656:23, 657:17, 658:22, 661:7, 661:13, 661:19, 665:9, 772:6, 775:6, 775:17, 775:19, 775:25, 776:5, 776:17, 776:24, 777:1, 777:21, 778:1, 778:9, 783:9, 784:8, 785:15, 808:23, 809:1, 811:24, 813:21, 813:24, 814:7, 814:8, 814:11, 814:14, 814:17, 814:19, 814:24, 815:12, 819:23, 822:5, 822:25, 823:2, 823:10, 823:19, 825:7, 828:24, 832:23, 837:23, 837:24, 839:23, 840:14, 840:15, 840:16, 841:8, 846:16
**'80s** [2] - 807:13, 820:17
**'84** [2] - 812:5, 822:19
**'849** [1] - 701:4
**'878** [27] - 580:23, 582:11, 582:23, 583:4, 583:8, 583:10, 642:3, 662:25, 664:19, 665:17, 666:2, 718:22, 718:25, 719:3, 719:5, 719:6, 719:9, 719:10, 719:13, 719:16, 731:14, 731:18, 748:7, 748:10, 776:15, 776:20, 785:12
**'90s** [2] - 807:13, 820:17
**'98** [2] - 671:2, 822:20
**'99** [1] - 822:20

## 0

**0** [7] - 662:8, 662:11, 662:21, 663:13, 663:20, 663:22, 664:2
**0020** [1] - 634:21
**0024** [1] - 617:17
**0025** [1] - 616:6
**032.0019** [1] - 634:21
**032.0020** [1] - 635:13

## 1

**1** [38] - 562:20, 576:15, 631:5, 631:12, 635:10, 645:3, 680:20, 685:15, 685:17, 685:18, 685:19, 686:4, 686:17, 726:13, 765:11, 775:17, 775:18, 775:19, 775:25, 776:5, 776:10, 776:15, 776:17, 776:24, 798:25, 823:10, 823:11, 823:13, 823:14, 823:15, 823:19, 824:18, 825:7, 826:3, 828:20, 828:22, 828:24
**10** [6] - 618:5, 683:1, 793:11, 806:3, 806:4, 829:20
**100** [11] - 610:15, 662:8, 662:9, 662:21, 663:13, 663:20, 663:22, 664:2, 789:16, 828:5
**101** [1] - 603:16
**104** [1] - 701:17
**108** [3] - 758:10, 758:17, 758:21
**10:30** [1] - 850:7
**11** [4] - 686:12, 715:17, 779:3, 815:13
**111** [4] - 806:24, 807:24, 808:2, 831:25
**112** [4] - 788:12, 789:1, 789:4, 789:25
**113** [5] - 792:11, 793:2, 793:5, 829:20, 831:25
**117** [6] - 692:25, 693:6, 693:9, 701:2, 701:3, 701:18
**12** [10] - 591:21, 591:25, 592:11, 592:16, 592:20, 602:5, 628:14, 659:8, 659:12, 826:25
**12-month** [1] - 659:1
**12.5** [2] - 661:10, 662:5
**121** [7] - 643:12, 644:5, 675:6, 675:17, 675:20, 744:1, 745:13
**13** [1] - 786:1
**136** [14] - 555:8, 555:17, 556:2, 556:21, 557:7, 562:4, 562:5, 765:11, 765:14, 765:21, 766:12, 767:2, 767:14, 768:16
**13th** [1] - 785:20
**14** [1] - 647:15
**141** [1] - 560:19
**143** [1] - 560:19
**144** [2] - 560:19, 818:16
**15** [14] - 558:1, 592:10, 592:17, 592:20, 600:4, 600:15, 601:24, 609:24, 609:25, 658:9, 658:21, 658:23, 659:5, 791:5
**15-minute** [1] - 791:3
**150** [26] - 631:5, 676:21, 772:13, 772:16, 772:19, 776:11, 776:12, 803:10, 803:23, 804:11, 805:8, 805:15, 806:17, 809:23, 812:19, 821:17, 824:9, 824:13, 825:14, 827:1, 827:6, 827:8, 827:11, 827:14, 828:1, 828:6
**150-kilodalton** [3] - 806:4, 828:9, 828:16
**158** [2] - 560:20, 620:4
**16** [5] - 628:14, 683:1, 722:3, 722:8, 789:25
**16th** [1] - 553:13
**17** [4] - 602:6, 680:8, 835:17, 835:24
**17-11** [1] - 581:3
**17-16** [2] - 601:19, 630:4
**17-3** [2] - 582:2, 623:11
**17-5** [1] - 622:13
**17-6** [1] - 640:6
**17-9** [2] - 639:4, 640:4
**17.4** [2] - 609:9, 613:23
**17.5** [3] - 623:2, 661:10, 662:5
**174** [3] - 597:2, 597:11, 597:17
**177** [4] - 595:15, 595:19, 596:10, 596:15
**178** [5] - 593:16, 593:18, 593:21, 594:11, 594:19
**17A** [1] - 835:5
**18** [7] - 591:22, 592:17, 592:20, 767:2, 767:10, 767:11, 768:16
**18-month** [4] - 591:25, 659:1, 659:8, 659:13
**192** [4] - 815:18, 816:7, 817:5, 817:8
**196** [9] - 556:23, 570:1, 818:21, 819:2, 819:22, 820:4, 820:7, 828:25, 833:10
**198** [4] - 754:15, 754:25, 756:14, 760:17
**1984** [1] - 807:10
**1986** [1] - 778:24
**1988** [1] - 779:9
**1989** [1] - 605:3
**1990** [2] - 605:3, 779:9
**1991** [1] - 779:2
**1993** [1] - 671:2
**1994** [4] - 779:4, 785:8, 811:9, 811:11
**1998** [2] - 810:10, 815:10
**1999** [9] - 781:2, 788:24, 789:8, 790:8, 790:14, 816:6, 816:16, 819:7, 820:18
**1:30** [1] - 713:1

## 2

**2** [27] - 560:13, 630:1, 630:7, 643:14, 647:6, 647:9, 647:22, 647:24, 648:7, 652:4, 652:7, 652:18, 652:19, 652:25, 654:13, 685:17, 688:23, 688:24, 693:19, 701:18, 726:5, 731:9, 731:20, 732:18, 734:17, 809:5, 809:6
**2,000** [1] - 572:4
**2.1** [1] - 714:14
**2.2** [2] - 809:10, 809:16
**2.26-nanograms** [1] - 577:11
**2.3** [4] - 823:25, 824:4, 834:1, 834:2
**2.4** [1] - 720:8
**2.5** [9] - 661:11, 823:25, 824:4, 824:12, 824:17, 824:18, 824:21, 824:25
**2.6** [1] - 823:25
**2.6.2** [1] - 823:25
**2.62** [1] - 824:4
**2.7** [3] - 722:7, 725:24, 726:11
**20** [20] - 601:24, 640:13, 658:21, 658:23, 659:5, 683:11, 683:22, 683:24, 684:1, 684:10, 684:15, 709:15, 710:2, 716:12, 723:25, 726:5, 729:18,

731:10, 732:6, 782:14
**2000** [16] - 570:1, 570:2, 737:23, 797:20, 819:7, 819:8, 819:11, 819:13, 819:20, 819:21, 820:23, 821:19, 822:15, 822:20, 833:15, 833:17
**2003** [2] - 569:18, 569:19
**2005** [2] - 792:23, 832:20
**2006** [5] - 671:8, 671:15, 738:2, 837:21, 837:22
**2008** [2] - 738:16, 842:20
**2009** [46] - 685:13, 785:20, 786:1, 788:8, 790:7, 790:11, 792:3, 794:7, 794:9, 794:11, 795:19, 795:25, 796:2, 796:20, 797:11, 803:6, 805:16, 805:23, 806:20, 815:11, 816:8, 819:18, 819:19, 819:22, 822:14, 829:4, 829:14, 829:21, 829:22, 830:4, 831:10, 832:15, 832:17, 837:5, 837:9, 837:25, 838:1, 839:1, 839:5, 839:7, 841:16, 841:20, 841:21, 844:20, 845:6, 845:11
**2010** [3] - 680:5, 680:13, 837:25
**2011** [3] - 715:16, 744:3, 747:2
**2016** [2] - 671:9, 680:9
**2018** [2] - 645:3, 685:16
**2019** [20] - 605:17, 609:16, 610:2, 610:11, 611:21, 612:8, 612:20, 613:15, 614:8, 614:14, 616:21, 632:13, 638:21, 639:10, 639:16, 640:14, 641:2, 654:1, 657:20, 782:9
**202** [2] - 720:19, 731:2
**2020** [6] - 614:6, 615:20, 617:7, 621:15, 621:23, 650:7
**2021** [10] - 581:9, 581:15, 589:4, 605:17, 612:9, 639:7, 640:14, 641:2, 650:8, 654:1
**2022** [4] - 609:18, 614:4, 614:11, 636:18
**2023** [21] - 587:15, 610:9, 610:12, 610:24, 611:5, 611:17, 626:15, 626:24, 627:14, 628:3, 628:25, 629:4, 629:8, 632:3, 657:6, 660:22, 661:14, 697:3, 715:16, 745:19, 745:24
**2024** [3] - 625:3, 625:11, 661:2
**2025** [29] - 553:13, 590:23, 590:25, 594:9, 595:9, 599:1, 599:13, 602:22, 603:15, 605:3, 623:7, 623:12, 623:21, 624:24, 625:2, 625:4, 625:5, 625:6, 625:11, 625:25, 626:12, 660:18, 660:24, 660:25, 661:1, 661:2, 662:9, 662:10
**2026** [3] - 582:22, 583:10, 602:13
**2029** [4] - 599:2, 599:15, 630:11, 635:5
**207** [3] - 810:1, 810:22, 810:25
**21-CV-1411-RGA** [1] - 553:5
**212** [5] - 842:8, 842:21, 842:24, 843:2, 843:9
**21st** [1] - 612:2
**22** [3] - 636:18, 680:4, 685:12
**23** [2] - 588:23, 589:13
**23rd** [1] - 819:13
**24** [16] - 581:11, 582:6, 582:19, 582:20, 582:25, 587:17, 588:25, 602:9, 640:16, 642:13, 662:25, 663:6, 663:15, 663:21, 664:4, 664:20
**25** [5] - 616:1, 680:5, 686:14, 747:6, 747:9
**26** [4] - 581:11, 582:19, 619:9, 832:22
**27** [2] - 832:19, 839:21
**270** [1] - 595:13
**273** [4] - 595:14, 602:23, 602:25, 664:4
**28** [3] - 685:13, 723:18, 845:5
**280** [3] - 658:24, 660:1, 660:14
**285** [5] - 837:12, 838:4, 838:7, 838:10, 838:17
**29** [1] - 630:19


## 3


**3** [20] - 610:3, 610:7, 619:18, 620:9, 627:10, 726:15, 731:21, 731:22, 731:25, 732:3, 732:21, 734:1, 734:2, 734:7, 734:18, 746:15, 766:2, 766:3, 811:5, 817:18
**3.1** [2] - 731:7, 734:6
**3.2** [1] - 824:3
**3.3** [1] - 723:24
**3.4** [1] - 737:18
**3.5** [4] - 825:8, 825:13, 825:16, 825:22
**3.6.2** [5] - 826:2, 826:9, 826:12, 826:14, 826:19
**30** [5] - 604:24, 669:17, 680:13, 782:14, 783:2
**30-some** [1] - 621:24
**309** [3] - 745:16, 746:1, 746:4
**31** [6] - 590:23, 590:25, 594:9, 602:21, 603:15, 687:4
**32** [2] - 572:22, 669:17
**32.20** [1] - 636:2
**32A** [3] - 634:6, 634:9, 637:18
**35** [5] - 605:3, 627:12, 715:13, 783:2, 845:1
**377** [3] - 658:24, 660:1, 660:14
**385** [2] - 628:14
**39** [2] - 609:21, 687:5


## 4


**4** [25] - 611:21, 622:4, 630:18, 635:10, 637:9, 683:1, 687:4, 693:19, 701:19, 720:19, 734:1, 734:2, 734:7, 734:11, 734:15, 734:21, 735:2, 766:13, 818:4, 818:6, 818:8, 824:19, 833:10
**4,000** [2] - 576:17, 636:10
**4.2** [1] - 726:23
**4.3** [1] - 726:23
**4.4** [3] - 726:23, 732:11, 732:16
**4.5** [1] - 742:6
**40** [2] - 701:18, 701:21
**400** [1] - 781:9
**41** [1] - 843:3
**42** [2] - 701:18, 701:21
**45** [1] - 712:25
**458** [1] - 598:1
**459** [2] - 598:2, 598:15
**486** [2] - 598:2, 598:15


## 5


**5** [14] - 556:22, 557:19, 557:21, 558:23, 558:24, 559:3, 559:22, 560:9, 561:18, 648:4, 648:6, 686:7, 802:25, 835:24
**5.3** [1] - 775:12
**5.4** [1] - 814:21
**5.5** [2] - 724:6, 834:3
**50** [1] - 807:18
**50/50** [1] - 662:17
**500** [2] - 836:10, 836:21
**511** [2] - 798:22, 799:3
**515** [1] - 822:16
**516** [1] - 823:4
**520** [3] - 679:14, 679:22, 679:25
**521** [6] - 644:12, 644:14, 644:25, 684:19, 685:2, 685:5
**596** [2] - 587:4, 587:17
**598** [4] - 756:21, 756:25, 757:6, 757:10
**5:18** [1] - 852:18


## 6


**6** [15] - 627:11, 627:21, 724:5, 731:18, 775:21, 775:22, 776:23, 777:13, 777:15, 802:25, 818:3, 821:8, 833:25, 838:21
**6.7** [1] - 723:24
**623** [1] - 555:7
**623-1** [1] - 562:18
**624** [1] - 665:22
**635** [4] - 595:15, 595:22, 596:11, 596:15
**64** [1] - 562:11
**643** [6] - 624:5, 624:6, 624:13, 624:18, 625:19
**65** [2] - 615:17, 616:6
**67** [2] - 562:11, 563:1
**6A** [1] - 553:12


## 7


**7** [2] - 799:1, 821:8
**7,354,740** [2] - 694:1, 694:10
**7,452,697** [1] - 693:25
**7-2** [1] - 623:11
**7-3** [1] - 625:8
**7-4** [1] - 625:9
**7.4** [1] - 629:2
**7.5** [3] - 626:13, 626:14, 629:3
**7.9** [3] - 824:16, 824:25, 825:1
**703** [1] - 571:16
**709** [2] - 598:2, 598:15
**718** [2] - 598:2, 598:16
**719** [2] - 598:2, 598:16
**720** [2] - 598:3, 598:16
**7:00** [2] - 849:4, 850:4


## 8


**8** [37] - 627:11, 630:23, 631:4, 637:8, 647:16, 744:17, 773:25, 775:5,

775:6, 775:17, 775:18, 775:19, 775:21, 775:22, 775:23, 777:2, 777:21, 777:22, 778:1, 778:5, 778:9, 783:9, 783:10, 784:7, 784:8, 822:24, 823:2, 823:11, 823:13, 823:14, 832:23, 833:1, 839:20, 839:23, 839:25, 841:13
**821** [2] - 598:18, 599:5
**822** [2] - 598:19, 599:5
**849** [4] - 593:17, 593:21, 594:11, 594:19
**850** [3] - 593:21, 594:11, 594:19
**8:00** [9] - 847:18, 848:1, 848:22, 849:12, 849:15, 849:24, 849:25, 850:4, 850:15

## 9

**9** [2] - 647:16, 745:8
**9,469,849** [1] - 693:3
**9,956,435** [1] - 684:25
**900** [7] - 772:12, 805:13, 805:14, 827:19, 827:21, 828:2, 828:4
**900-kilodalton** [2] - 828:10, 828:14
**91** [1] - 619:17
**911** [1] - 802:11
**93** [1] - 648:18
**98** [2] - 827:2, 828:17
**985** [3] - 593:21, 594:11, 594:20
**9:00** [2] - 849:25, 850:5
**9:30** [1] - 845:24
**9th** [1] - 816:16

## A

**A-K-H-I-L-E-S-H** [1] - 751:1
**a.m** [7] - 847:18, 848:1, 848:22, 849:16, 849:17, 849:24, 849:25
**abbreviation** [1] - 705:9
**AbbVie** [16] - 648:4, 648:7, 649:20, 649:23, 650:1, 650:6, 650:11, 650:14, 650:17, 651:5, 651:18, 651:23, 656:22, 657:11
**AbbVie's** [1] - 651:12
**ability** [2] - 745:12, 834:6
**able** [11] - 556:3, 586:14, 588:2, 628:8, 652:1, 654:7, 679:2, 728:1, 782:11, 830:5, 847:24
**abroad** [1] - 700:10
**absolutely** [11] - 584:23, 641:6, 769:18, 770:3, 778:22, 808:25, 828:3, 830:8, 839:9, 843:14, 850:2
**absorbs** [1] - 739:25
**absorption** [3] - 729:22, 757:21, 757:25
**abstract** [7] - 675:22, 675:25, 676:7, 682:6, 682:7, 744:7, 744:10
**Abudi** [3] - 807:6, 807:11, 807:12
**academic** [1] - 781:1
**accept** [1] - 569:25
**accepted** [1] - 676:18
**access** [3] - 636:17, 636:20, 637:12
**according** [8] - 660:7, 727:19, 729:2, 729:5, 733:25, 734:16, 757:23, 811:8
**accordingly** [2] - 613:19, 651:6
**account** [1] - 602:3
**accounts** [3] - 659:6, 663:6, 663:14
**accuracy** [2] - 703:15, 703:16
**accurate** [1] - 596:8
**accused** [1] - 659:24
**achieve** [1] - 772:21
**achieved** [1] - 616:11
**acid** [19] - 631:6, 632:17, 637:8, 637:14, 681:4, 683:8, 731:25, 741:2, 773:24, 774:1, 807:4, 833:4, 833:20, 834:7, 835:1, 835:13, 837:3, 840:4, 840:10
**acidic** [10] - 724:5, 724:6, 833:21, 833:23, 834:3, 834:4, 834:11, 837:3, 839:14, 840:10
**acids** [23] - 566:15, 683:11, 777:3, 800:14, 801:9, 801:17, 833:6, 833:7, 833:12, 833:14, 834:13, 834:17, 834:22, 837:6, 837:8, 838:23, 839:2, 839:5, 839:8, 839:11, 839:15, 839:16, 851:25
**acknowledges** [1] - 621:22
**acquired** [2] - 650:5, 700:23
**acquiring** [1] - 793:14
**act** [3] - 757:19, 757:24, 759:15
**acted** [1] - 613:19
**acting** [10] - 604:22, 616:16, 621:10, 621:11, 621:13, 621:19, 676:24, 677:10, 744:16, 747:9
**action** [39] - 560:11, 564:3, 564:8, 564:10, 565:1, 565:23, 616:10, 643:19, 645:15, 663:3, 663:11, 663:14, 663:16, 676:9, 676:15, 681:21, 714:19, 715:4, 719:1, 719:11, 719:14, 720:5, 724:20, 724:22, 725:21, 727:20, 728:6, 729:3, 729:7, 729:10, 736:19, 736:24, 741:16, 745:4, 748:20, 748:22, 754:12, 770:6, 770:11
**activated** [2] - 798:11, 798:13
**active** [12] - 681:11, 681:13, 681:20, 682:4, 693:13, 702:2, 717:2, 718:1, 803:17, 804:4, 804:11, 805:3
**actively** [1] - 805:5
**activities** [4] - 672:4, 700:20, 739:6, 804:20
**activity** [11] - 755:22, 755:23, 755:25, 756:1, 756:6, 761:5, 761:23, 764:4, 764:13, 764:15, 764:19
**acts** [2] - 749:10, 759:9
**actual** [17] - 576:22, 580:12, 596:7, 599:4, 606:16, 606:19, 607:1, 607:7, 614:5, 623:2, 632:22, 639:13, 694:22, 695:12, 724:23, 725:12, 849:5
**ADAM** [1] - 554:6
**Adam** [1] - 556:17
**add** [5] - 559:15, 573:17, 692:3, 695:22
**added** [7] - 566:5, 733:21, 755:17, 756:3, 756:4, 757:17, 762:19
**addition** [5] - 662:7, 733:23, 748:3, 780:8, 790:5
**additional** [8] - 640:16, 702:1, 747:1, 747:7, 847:1, 847:10, 847:14
**additionally** [6] - 659:18, 660:18, 663:12, 664:10, 777:1, 817:21
**address** [4] - 560:25, 608:6, 608:8, 621:19
**addressed** [3] - 559:17, 560:1, 842:16
**adds** [1] - 731:22
**adheres** [2] - 649:20, 651:19
**adjust** [3] - 617:25, 618:1, 619:6
**adjustment** [1] - 663:20
**adjustments** [1] - 614:23
**administer** [1] - 745:12
**administered** [3] - 767:7, 768:1, 769:3
**Administration** [4] - 752:12, 782:22, 788:16, 795:15
**administration** [3] - 676:24, 677:9, 744:16
**admission** [1] - 579:17
**admit** [9] - 579:21, 594:11, 745:13, 745:25, 754:25, 755:3, 757:6, 758:17, 765:21
**admits** [2] - 658:23, 662:14
**admitted** [51] - 572:11, 579:13, 579:14, 594:16, 594:20, 595:8, 596:13, 596:16, 597:16, 597:17, 598:14, 598:16, 624:16, 624:19, 664:13, 675:19, 675:20, 679:24, 680:1, 685:4, 685:6, 693:8, 693:9, 746:3, 746:5, 757:9, 757:11, 758:20, 758:21, 765:22, 765:23, 765:25, 789:3, 789:4, 793:4, 793:5, 808:1, 808:2, 810:24, 811:1, 817:7, 817:9, 820:6, 820:8, 835:17, 838:6, 838:8, 842:23, 842:24
**advance** [1] - 573:20
**advanced** [1] - 785:2
**advancing** [2] - 575:24, 576:6
**advantages** [2] - 601:5, 687:13
**advise** [1] - 753:7
**AEX** [1] - 825:10
**affairs** [2] - 555:15, 753:14
**affect** [5] - 600:9, 683:20, 724:22, 830:12, 830:14
**affects** [3] - 565:11, 682:1
**affiliates** [1] - 648:13
**afraid** [1] - 673:3
**afternoon** [18] - 658:17, 668:3,

713:17, 730:24, 730:25, 736:2, 736:3, 748:17, 748:18, 751:10, 751:11, 759:22, 759:23, 770:17, 774:20, 774:21, 790:25, 846:24
**afterwards** [1] - 790:23
**age** [1] - 783:1
**agencies** [1] - 795:1
**agency** [6] - 752:13, 753:5, 760:11, 766:6, 768:25
**agency's** [1] - 768:24
**agent** [2] - 673:12, 791:20
**agents** [4] - 739:21, 794:13, 796:18, 831:21
**ago** [5] - 600:7, 686:20, 697:3, 787:16, 793:19
**agree** [66] - 594:21, 604:18, 605:1, 606:10, 608:1, 608:9, 608:10, 609:2, 611:16, 614:9, 615:9, 615:25, 616:12, 617:12, 619:4, 619:9, 619:10, 619:11, 619:23, 620:17, 625:15, 626:4, 626:23, 627:3, 627:20, 627:23, 636:23, 637:4, 637:12, 637:15, 638:4, 638:11, 641:13, 641:20, 641:21, 642:12, 642:15, 644:9, 645:4, 645:22, 646:4, 647:21, 649:13, 650:15, 650:20, 658:2, 663:14, 707:24, 711:8, 718:25, 719:2, 720:3, 720:6, 732:2, 733:5, 735:5, 736:22, 748:19, 749:6, 766:6, 795:11, 830:19, 831:4, 840:6, 841:23, 843:11
**agreed** [10] - 606:4, 612:19, 612:22, 612:24, 614:3, 639:16, 640:13, 652:25, 759:2, 759:8
**agreement** [4] - 606:15, 613:7, 647:10, 657:13
**agreements** [1] - 657:25
**ahead** [3] - 573:23, 649:25, 650:9
**aid** [2] - 798:17, 798:20
**AIDS** [1] - 673:7
**Akhilesh** [3] - 750:23, 751:1, 751:13
**AKHILESH** [1] - 751:3
**al** [1] - 553:6
**albumin** [5] - 682:19, 712:3, 726:4, 727:9, 791:23
**alert** [1] - 789:22
**alive** [1] - 696:25
**alkaline** [1] - 824:16
**allegedly** [1] - 659:12
**Allergan** [149] - 559:8, 560:10, 569:7, 569:8, 581:11, 582:9, 587:3, 587:12, 592:24, 593:7, 600:19, 602:15, 602:16, 604:19, 604:23, 605:4, 605:8, 605:12, 611:18, 615:10, 615:13, 615:20, 617:7, 617:13, 617:18, 618:14, 618:21, 619:5, 619:12, 620:5, 620:9, 620:19, 621:16, 621:22, 621:24, 623:15, 623:19, 625:13, 626:16, 626:19, 629:13, 631:10, 631:16, 633:14, 639:25, 640:7, 640:9, 640:11, 640:14, 640:17, 640:21, 641:2, 641:3, 641:22, 642:10, 642:12, 642:14, 642:15, 645:19, 645:20, 645:22, 645:24, 646:1, 646:5, 646:7, 646:10, 646:14, 646:19, 646:20, 646:21, 646:24, 647:1, 647:2, 647:4, 647:5, 647:21, 647:22, 648:1, 648:3, 648:8, 649:12, 649:13, 650:5, 650:13, 651:5, 652:4, 652:5, 652:16, 652:25, 653:10, 653:11, 653:14, 653:18, 654:2, 654:10, 654:15, 654:18, 654:21, 657:12, 657:24, 658:20, 662:11, 662:24, 663:20, 665:6, 665:10, 665:19, 697:6, 708:16, 714:16, 715:3, 719:25, 720:16, 721:2, 721:20, 722:16, 722:22, 723:25, 725:3, 725:21, 726:3, 726:25, 727:24, 729:2, 730:13, 731:2, 781:14, 792:25, 795:2, 814:11, 832:6, 832:7, 832:12, 835:4, 835:9, 835:12, 838:17, 838:19, 839:17, 851:18, 851:22
**ALLERGAN** [1] - 553:3
**Allergan's** [27] - 555:7, 559:5, 600:22, 641:15, 652:17, 653:1, 702:23, 704:8, 715:4, 724:4, 724:17, 724:23, 725:15, 726:18, 729:5, 768:17, 771:15, 775:6, 814:7, 814:8, 816:2, 830:17, 836:14, 836:16, 837:23, 840:2, 840:9
**Allergen's** [2] - 593:10, 817:16
**allocate** [1] - 648:12
**allocated** [2] - 662:10, 662:11
**allocation** [2] - 626:7, 626:25
**allow** [6] - 578:9, 582:12, 582:14, 598:6, 635:15, 684:12
**allowed** [8] - 585:12, 597:7, 597:8, 628:5, 628:6, 628:7, 628:9, 841:14
**allowing** [1] - 589:16
**allows** [3] - 585:14, 744:15, 749:3
**alludes** [1] - 702:18
**almost** [6] - 568:11, 572:9, 626:16, 721:5, 797:17, 814:17
**alone** [1] - 661:11
**alphabet** [1] - 683:9
**alternative** [6] - 592:9, 608:13, 626:4, 626:6, 626:11, 638:21
**altogether** [1] - 794:15
**amino** [7] - 566:15, 681:4, 683:8, 683:11, 731:25, 741:2, 807:4
**amount** [12] - 586:15, 591:11, 601:1, 601:2, 602:14, 660:14, 688:20, 722:19, 723:4, 747:6, 834:13
**amounts** [3] - 625:16, 673:6, 806:10
**ample** [1] - 660:4
**amusement** [1] - 848:11
**analogous** [3] - 789:14, 802:4, 802:10
**analogy** [6] - 723:7, 723:15, 742:25, 798:6, 798:15, 834:18
**analyses** [1] - 609:1
**analysis** [34] - 584:1, 585:24, 586:17, 587:8, 589:9, 590:21, 591:8, 591:18, 593:12, 600:1, 601:14, 601:22, 608:18, 608:19, 608:22, 612:13, 625:23, 641:24, 642:8, 642:23, 651:7, 653:22, 657:8, 663:5, 718:18, 807:7, 810:7, 815:12, 818:7, 819:25, 835:15, 837:18, 837:23, 837:24
**analyst** [1] - 598:6
**analytic** [2] - 809:8, 809:13
**analyzed** [1] - 675:14
**analyzing** [1] - 784:7
**anchor** [1] - 743:17
**AND** [1] - 553:2
**Andrews** [1] - 553:12
**animal** [64] - 627:22, 627:25, 628:2, 682:16, 682:18, 710:19, 710:23, 711:2, 711:10, 711:20, 711:25, 712:7, 716:19, 716:22, 730:3, 773:5, 773:13, 773:15, 773:19, 773:21, 776:1, 776:6, 776:7, 776:8, 777:12, 787:6, 787:10, 787:14, 788:2, 788:6, 789:23, 790:2, 790:12, 791:18, 791:24, 792:15, 793:12, 793:16, 793:22, 794:2, 794:5, 794:7, 794:9, 794:12, 794:14, 794:20, 795:8, 795:22, 796:1, 796:3, 796:25, 797:4, 823:20, 824:1, 824:5, 829:3, 829:5, 829:6, 829:12, 829:19, 829:22, 830:1, 830:7, 830:11
**animal-based** [10] - 710:19, 711:2, 788:2, 789:23, 791:24, 794:2, 794:5, 797:4, 829:12, 830:1
**animal-containing** [1] - 790:2
**animal-derived** [18] - 773:13, 773:15, 773:19, 791:18, 793:12, 793:16, 793:22, 794:7, 794:9, 794:12, 794:20, 795:8, 795:22, 796:1, 796:25, 829:5, 829:6, 829:22
**animal-product** [1] - 776:7
**animal-product-free**

[4] - 776:1, 792:15, 823:20, 824:1
**animal-protein** [5] - 627:22, 627:25, 628:2, 776:8, 777:12
**animal-protein-free** [3] - 711:10, 829:19, 830:7
**animals** [5] - 716:23, 786:9, 787:7, 787:9, 790:4
**animation** [1] - 746:22
**anion** [33] - 776:18, 808:16, 808:19, 811:22, 817:23, 821:24, 822:1, 824:15, 824:19, 825:3, 825:9, 825:11, 825:14, 833:20, 833:22, 834:3, 834:10, 834:16, 834:21, 836:18, 837:2, 839:9, 839:13, 840:9, 841:16, 841:20, 842:4, 843:6, 843:12, 844:14, 844:20, 845:2, 845:14
**anionic** [10] - 797:22, 797:24, 800:6, 800:7, 800:15, 800:20, 802:5, 803:18, 805:2, 805:21
**Anne** [1] - 846:24
**ANNE** [1] - 554:3
**annotation** [1] - 818:8
**answer** [17] - 557:15, 560:20, 576:4, 577:3, 606:8, 606:11, 611:9, 611:13, 642:17, 698:15, 733:4, 733:8, 734:25, 803:20, 851:13
**answers** [1] - 733:15
**anticipation** [2] - 852:13, 852:15
**antigenicity** [1] - 687:14
**anyway** [1] - 555:11
**apart** [2] - 586:6, 807:18
**APF** [5] - 627:21, 776:1, 777:5, 777:10, 823:20
**apologies** [1] - 701:19
**apologize** [2] - 635:1, 701:3
**appear** [4] - 694:5, 705:9, 733:24, 734:15
**APPEARANCES** [1] - 553:15
**Appearances** [1] - 554:1
**apples** [1] - 652:23
**application** [11] - 614:15, 614:18, 701:10, 703:24, 793:9, 793:12, 793:21, 793:25, 831:25, 832:3, 832:18
**applications** [1] - 752:21
**applied** [7] - 602:18, 602:24, 607:17, 662:8, 664:3, 707:9, 707:22
**applies** [2] - 664:14, 664:17
**apply** [2] - 664:5, 671:22
**apportion** [3] - 659:18, 660:9, 662:7
**apportionment** [1] - 660:20
**appreciate** [2] - 587:1, 755:7
**approach** [15] - 584:2, 634:5, 643:7, 693:21, 693:22, 702:6, 702:10, 702:20, 702:23, 703:18, 704:7, 765:7, 770:25, 772:8, 774:8
**approaches** [1] - 701:25
**appropriate** [9] - 582:21, 584:16, 607:5, 651:2, 662:22, 664:9, 664:12, 665:1, 759:2
**approval** [4] - 592:12, 614:4, 696:5, 696:10
**approved** [9] - 577:1, 609:18, 622:10, 677:5, 677:17, 678:3, 682:17, 696:8, 696:9
**approving** [1] - 752:13
**Aqua** [2] - 847:2, 847:8
**aqua** [1] - 847:4
**arbitrary** [1] - 659:10
**area** [3] - 565:13, 617:22, 744:24
**arguably** [1] - 559:7
**argue** [4] - 560:6, 566:9, 634:1, 849:21
**arguing** [1] - 575:7
**argument** [3] - 568:21, 577:20, 638:23
**arguments** [4] - 578:23, 709:7, 852:2, 852:10
**arm's** [8] - 648:23, 649:14, 649:21, 650:21, 651:19, 651:23, 652:7, 652:15
**ARMENIO** [54] - 554:10, 573:18, 574:9, 575:9, 575:14, 576:2, 576:5, 577:9, 579:4, 579:11, 579:23, 594:12, 596:12, 597:12, 598:11, 603:22, 603:25, 604:2, 611:8, 611:15, 612:1, 612:6, 613:1, 613:12, 613:20, 613:22, 619:3, 624:13, 624:20, 628:20, 628:22, 633:21, 634:5, 634:8, 635:23, 636:14, 637:17, 637:23, 637:24, 643:7, 643:10, 643:11, 648:23, 649:2, 649:3, 649:11, 650:7, 650:10, 651:10, 653:5, 847:19, 851:3, 851:8, 851:12
**Armenio** [8] - 573:17, 575:6, 578:9, 603:5, 603:21, 618:25, 628:16, 651:9
**Army** [2] - 718:5, 718:15
**arounds** [4] - 573:5, 573:6, 577:23, 578:24
**arrested** [1] - 771:21
**arrive** [1] - 822:7
**arriving** [1] - 821:16
**ARSHT** [1] - 553:16
**art** [44] - 570:21, 572:7, 572:8, 694:8, 778:13, 778:14, 783:15, 783:16, 783:19, 783:20, 783:21, 783:25, 784:2, 784:3, 784:10, 784:11, 784:15, 784:16, 784:17, 784:19, 784:21, 784:22, 784:24, 785:1, 785:23, 785:24, 786:1, 790:9, 808:13, 821:13, 822:11, 822:14, 830:1, 831:15, 832:15, 832:16, 834:9, 839:4, 839:22, 839:25, 842:3, 843:25, 845:11
**article** [10] - 566:16, 676:18, 679:8, 696:13, 696:16, 696:24, 746:13, 749:13, 815:23, 830:2
**articles** [4] - 780:8, 782:14, 816:12, 822:19
**Ashkenazi** [11] - 575:18, 577:16, 580:15, 595:5, 606:3, 613:10, 649:1, 653:6, 699:14, 748:14, 759:19
**ASHKENAZI** [73] - 553:19, 572:20, 574:17, 575:12, 577:17, 578:1, 579:24, 580:3, 580:16, 580:20, 582:2, 582:4, 590:16, 590:18, 594:10, 594:21, 594:25, 595:6, 595:12, 596:4, 596:9, 596:21, 597:10, 597:18, 598:9, 598:17, 603:3, 603:9, 603:11, 603:18, 611:23, 612:3, 612:15, 613:6, 618:23, 624:15, 633:3, 635:16, 649:5, 649:22, 650:1, 651:1, 653:8, 655:23, 655:24, 658:5, 675:18, 679:23, 685:3, 693:7, 697:21, 698:9, 699:15, 699:17, 708:22, 709:1, 711:18, 712:17, 740:11, 746:2, 748:16, 750:17, 753:16, 757:8, 758:19, 759:21, 760:19, 760:22, 765:7, 765:9, 765:20, 766:1, 768:10
**aside** [2] - 565:5, 588:11
**aspects** [3] - 617:12, 618:10, 752:20
**assay** [10] - 685:21, 685:22, 685:24, 688:8, 688:9, 688:10, 714:10, 717:2
**assays** [2] - 674:21, 717:6
**asserted** [11] - 630:23, 641:12, 659:22, 661:23, 664:10, 665:8, 718:22, 775:7, 814:9, 823:12, 832:24
**assertion** [1] - 651:4
**assertions** [1] - 651:7
**assessed** [1] - 659:14
**assessment** [2] - 787:25, 788:5
**assist** [4] - 714:11, 718:9, 737:10, 774:24
**assistance** [1] - 733:17
**assistant** [1] - 780:15
**associate** [2] - 780:13, 804:7
**associated** [7] - 740:23, 741:8, 742:18, 743:2, 743:3, 793:22, 795:8
**assume** [7] - 572:8, 592:14, 632:7, 632:19, 636:19, 641:10, 642:9
**assumes** [2] - 663:5, 663:19
**assuming** [1] - 847:22
**assumption** [11] - 641:14, 641:16, 641:21, 641:25, 642:2, 642:4, 642:5, 642:9, 642:11, 642:21, 661:1
**attach** [1] - 730:17
**attaching** [1] - 707:4
**attempt** [6] - 659:25, 661:6, 661:9, 663:17, 768:6,

772:24
**attempting** [1] - 779:14
**attention** [3] - 717:19, 744:9, 814:22
**attorney** [3] - 703:2, 703:3, 703:5
**ATTORNEY** [1] - 772:10
**attorneys** [6] - 694:3, 694:18, 701:16, 703:1, 704:5, 704:7
**attract** [3] - 742:24, 743:16, 800:10
**attracts** [2] - 801:2, 801:3
**attributable** [1] - 845:2
**attribute** [8] - 581:8, 581:22, 582:13, 584:17, 642:13, 654:9, 744:21
**attributed** [3] - 660:2, 744:24, 745:5
**attributes** [1] - 747:12
**audit** [1] - 677:1
**author** [3] - 675:13, 817:13, 838:12
**authored** [1] - 643:14
**authors** [1] - 643:14
**available** [18] - 574:3, 574:10, 574:11, 574:15, 579:19, 644:5, 644:8, 644:10, 645:1, 699:5, 746:11, 778:13, 783:21, 816:8, 831:9, 832:14, 832:17, 841:8
**averages** [1] - 588:22
**avoid** [4] - 571:18, 633:16, 672:25, 773:13
**aware** [32] - 573:25, 574:21, 599:23, 648:17, 671:17, 709:4, 709:15, 709:17, 741:14, 784:22, 790:11, 790:14, 794:23, 795:2, 795:4, 795:22, 817:16, 817:17, 830:16, 830:18, 831:1, 831:3, 840:2, 840:5, 840:12, 840:15, 841:15, 841:18, 841:22, 842:15, 843:7
**awareness** [2] - 575:15, 619:22
**awful** [1] - 836:24
**axis** [1] - 686:9

## B

**bachelor** [1] - 778:25
**bachelor's** [2] - 737:21, 785:1
**back-and-forth** [8] - 558:2, 631:18, 631:22, 631:24, 631:25, 633:1, 633:8, 759:25
**background** [7] - 572:8, 599:8, 669:19, 715:7, 737:16, 752:3, 778:16
**bacteria** [5] - 689:25, 690:6, 690:7, 690:8, 692:8
**bacteriology** [1] - 778:25
**bad** [6] - 571:3, 571:13, 580:14, 671:10, 793:17, 850:14
**ball** [1] - 799:12
**balls** [4] - 799:20, 799:22, 803:5
**Baltimore** [1] - 670:14
**band** [11] - 809:10, 809:15, 809:16, 818:15, 843:22, 843:24, 844:7, 844:10, 844:11, 844:12, 844:25
**band-pattern** [3] - 844:10, 844:11, 844:25
**bands** [2] - 809:12, 809:14
**bar** [72] - 686:11, 686:13, 726:2, 726:5, 726:7, 726:8, 726:12, 726:13, 726:14, 726:21, 727:2, 727:3, 727:5, 727:6, 727:7, 727:8, 727:9, 727:10, 727:14, 727:15, 727:20, 727:21, 727:23, 728:7, 728:8, 728:9, 728:15, 728:17, 728:19, 728:20, 728:23, 729:4, 729:11, 729:12, 729:15, 729:16, 729:17, 729:19, 729:20, 730:9, 732:14, 732:20, 732:23, 732:25, 733:1, 733:2, 733:4, 733:5, 733:6, 733:12, 733:19, 734:11, 734:18, 735:2, 771:22
**bargain** [1] - 576:5
**bargained** [1] - 574:4
**bargaining** [12] - 567:20, 632:21, 645:6, 660:20, 662:8, 662:18, 662:21, 663:13, 663:17, 663:19, 663:24, 664:2
**bars** [6] - 588:8, 588:14, 588:15, 588:16, 732:16
**base** [4] - 591:7, 659:19, 662:22, 664:9
**based** [50] - 570:8, 593:4, 599:18, 602:9, 605:9, 622:22, 633:1, 633:4, 641:19, 641:25, 642:8, 644:21, 659:23, 662:2, 662:19, 663:9, 663:25, 664:6, 664:24, 665:12, 665:24, 681:10, 686:3, 691:2, 710:19, 711:2, 787:6, 788:2, 788:3, 789:23, 791:24, 792:7, 794:2, 794:3, 794:4, 794:5, 795:15, 795:16, 796:4, 797:4, 797:5, 805:11, 829:12, 829:13, 829:18, 830:1, 830:2, 830:6
**baseline** [1] - 618:5
**basic** [1] - 707:14
**basis** [18] - 556:10, 558:15, 561:8, 561:10, 588:1, 598:11, 612:22, 662:3, 662:20, 663:10, 664:1, 664:8, 665:1, 665:13, 665:14, 665:25, 750:7, 750:13
**batch** [1] - 831:19
**batches** [1] - 691:1
**Bates** [18] - 576:3, 577:10, 594:1, 628:10, 628:13, 628:23, 634:25, 635:2, 742:22, 767:9, 837:17, 838:11, 838:12, 838:21, 838:22, 839:2, 839:17, 851:24
**Bates'** [2] - 800:8, 838:18
**Bates's** [1] - 635:9
**BDL** [1] - 836:9
**beaker** [3] - 799:5, 800:25, 801:22
**bear** [1] - 591:16
**bearing** [2] - 601:17, 845:13
**beast** [1] - 688:17
**became** [2] - 677:4, 686:25
**becoming** [1] - 780:14
**beer** [3] - 669:11, 690:10
**beforehand** [2] - 570:4, 593:23
**beginning** [2] - 673:4, 698:12
**begins** [2] - 693:20, 786:13
**behalf** [6] - 668:9, 713:23, 735:21, 751:4, 774:15, 846:25
**behavior** [1] - 692:13
**behind** [6] - 604:7, 648:8, 771:22, 803:11, 805:25, 806:10
**beings** [1] - 695:1
**belief** [1] - 707:16
**believes** [2] - 757:18, 831:2
**bell** [1] - 815:16
**below** [10] - 680:12, 702:4, 727:24, 741:2, 741:6, 834:8, 835:1, 836:9, 836:10, 840:4
**bench** [1] - 716:1
**benefit** [1] - 657:21
**benefits** [1] - 687:20
**Bernetix** [1] - 663:18
**best** [16] - 588:6, 594:9, 606:11, 617:21, 618:17, 619:6, 638:14, 647:3, 656:11, 656:15, 656:16, 691:12, 696:17, 710:14, 710:17, 807:17
**better** [10] - 666:12, 670:6, 670:9, 670:20, 691:9, 699:4, 699:9, 771:19, 773:17, 804:14
**between** [46] - 560:21, 561:19, 571:7, 581:11, 584:11, 584:19, 589:15, 592:20, 600:16, 600:20, 603:16, 612:8, 625:11, 631:9, 647:11, 648:12, 649:12, 650:13, 652:10, 652:16, 657:25, 661:6, 661:13, 661:17, 662:4, 663:17, 684:8, 692:11, 721:6, 721:22, 722:15, 724:4, 726:21, 727:20, 727:22, 729:3, 734:6, 744:19, 744:25, 765:14, 765:15, 784:11, 787:13, 787:17, 814:18, 848:10
**beyond** [3] - 561:23, 570:12, 578:11
**big** [13] - 564:21, 576:19, 669:12, 671:20, 678:1, 690:9, 691:18, 699:23, 781:13, 804:1, 804:14, 804:25, 827:25
**bigger** [2] - 695:9, 733:19
**biggest** [1] - 800:12
**billions** [2] - 648:18
**bind** [5] - 801:1, 801:13, 801:16, 801:19, 825:11
**binder** [36] - 587:5, 593:13, 593:17, 595:3, 597:25, 604:5, 604:6, 604:8, 616:4, 624:6, 643:8, 643:12, 647:14, 651:11, 675:5, 679:14, 684:19,

692:25, 731:5, 731:6, 743:24, 745:16, 754:15, 756:21, 758:10, 765:10, 771:11, 788:10, 792:10, 806:23, 810:1, 815:18, 818:19, 837:12, 842:9
**binders** [2] - 604:7, 771:1
**binding** [4] - 746:18, 747:14, 747:15, 824:14
**binds** [1] - 825:3
**biologic** [7] - 669:3, 669:6, 669:9, 669:14, 671:21, 752:20, 804:20
**biologically** [5] - 702:2, 804:3, 804:10, 805:3, 805:5
**biologics** [2] - 715:13, 753:9
**biology** [3] - 669:22, 684:7
**biomolecular** [1] - 738:1
**biopharmaceutical** [3] - 668:25, 690:4, 699:1
**biopharmaceuticals** [1] - 669:15
**bioscavenger** [1] - 739:25
**biosimilar** [5] - 623:22, 624:10, 624:11, 624:23, 625:22
**biotech** [3] - 670:22, 753:1, 782:8
**bioterrorism** [1] - 718:11
**biotoxins** [1] - 821:4
**bit** [26] - 584:8, 588:20, 591:16, 648:3, 669:18, 671:14, 671:15, 672:10, 673:19, 681:3, 688:7, 692:16, 717:15, 739:3, 740:19, 743:22, 761:12, 768:15, 771:3, 777:20, 786:2, 787:16, 797:7, 798:7, 798:23, 803:1
**BLA** [5] - 573:1, 573:10, 576:22, 636:22, 754:23
**black** [21] - 726:2, 726:12, 726:13, 726:21, 727:2, 727:5, 727:6, 727:8, 727:9, 727:10, 727:20, 727:22, 728:7, 728:9, 728:15, 728:17, 729:4, 729:11, 729:20, 732:14
**blanket** [1] - 578:14
**blob** [1] - 804:14
**blood** [9] - 682:18, 740:6, 788:19, 790:3, 791:21, 791:22, 792:7, 804:22
**blood-based** [1] - 792:7
**bloodborne** [2] - 791:21, 791:22
**blow** [1] - 766:3
**blue** [27] - 721:19, 726:7, 726:12, 726:14, 726:21, 727:3, 727:7, 727:14, 727:15, 727:20, 727:23, 728:7, 728:8, 728:20, 729:17, 729:20, 732:23, 732:25, 733:1, 733:2, 733:5, 733:6, 733:12, 733:19, 733:20, 734:18, 742:10
**body** [17] - 645:15, 678:23, 678:25, 706:16, 719:11, 719:14, 737:8, 738:25, 740:1, 740:7, 742:14, 763:22, 763:23, 763:24, 764:7, 765:2, 844:1
**BoNT** [3] - 731:10, 731:17, 732:20
**BoNT/A** [5] - 676:21, 766:17, 823:22, 824:9, 827:19
**book** [18] - 633:9, 818:24, 819:2, 819:4, 819:6, 819:15, 820:11, 820:13, 821:1, 821:3, 833:15, 834:13, 837:16, 838:12, 838:22, 840:12
**books** [1] - 735:14
**boost** [6] - 599:1, 599:12, 601:15, 623:8, 623:19, 624:1
**boots** [1] - 615:11
**born** [1] - 669:20
**BOTOX** [34] - 563:23, 582:17, 584:11, 584:19, 586:14, 587:23, 589:15, 604:24, 605:1, 605:2, 615:2, 615:3, 615:7, 615:10, 617:21, 617:22, 623:21, 624:9, 624:23, 646:21, 648:19, 674:23, 675:2, 675:3, 676:15, 678:9, 682:19, 686:2, 686:7, 686:11, 689:2, 689:13, 744:20, 749:14
**bottleneck** [1] - 716:14
**bottom** [12] - 618:3, 689:7, 732:13, 767:10, 767:12, 767:13, 775:18, 798:14, 815:6, 825:16, 825:22, 843:21
**botulinum** [94] - 631:6, 637:8, 643:20, 672:23, 673:1, 674:19, 676:9, 676:20, 677:18, 681:12, 681:20, 682:9, 682:12, 682:15, 683:20, 685:23, 687:13, 687:17, 690:6, 690:17, 691:3, 693:14, 693:24, 702:2, 702:14, 703:21, 707:2, 709:10, 712:4, 717:21, 717:24, 717:25, 718:3, 750:1, 779:7, 779:8, 780:18, 780:21, 781:7, 781:18, 782:11, 782:16, 782:17, 782:22, 782:25, 783:2, 783:5, 786:3, 786:4, 786:5, 786:11, 786:12, 787:15, 787:19, 790:21, 792:16, 793:15, 795:20, 796:21, 797:12, 797:16, 797:19, 798:5, 803:7, 803:21, 805:18, 806:21, 807:5, 807:13, 809:19, 810:5, 811:6, 815:25, 817:19, 818:25, 821:20, 822:14, 823:21, 824:25, 825:13, 826:12, 827:4, 829:1, 830:24, 834:7, 834:25, 836:15, 842:6, 842:12, 844:23, 844:24, 845:12, 845:17
**botulism** [2] - 718:10, 786:9
**bought** [1] - 700:25
**bound** [8] - 746:16, 801:20, 802:11, 825:14, 825:18, 826:13, 826:16, 826:22
**bounds** [1] - 576:14
**bovine** [1] - 726:4
**box** [10] - 593:13, 593:16, 593:19, 686:6, 809:9, 818:11, 818:14, 819:15, 825:10, 825:16
**boxes** [3] - 579:25, 580:2, 580:5
**bracket** [1] - 722:10
**brand** [10] - 615:8, 616:14, 617:20, 617:21, 617:24, 618:9, 670:23, 671:20, 671:25, 699:2
**brand-new** [3] - 670:23, 671:20, 671:25
**break** [8] - 658:9, 666:24, 712:23, 740:14, 790:25, 791:3, 791:16, 850:11
**brevity** [1] - 850:24
**brew** [1] - 669:12
**brief** [3] - 686:19, 851:3, 851:7
**briefly** [2] - 591:24, 601:20
**bring** [22] - 559:23, 562:23, 563:1, 574:2, 574:3, 578:16, 579:25, 581:4, 599:9, 601:18, 606:25, 607:6, 621:13, 624:24, 632:22, 633:24, 637:21, 773:6, 828:25, 829:20, 846:21, 852:3
**bringing** [1] - 632:8
**Bristol** [1] - 838:20
**Brita** [1] - 798:9
**broader** [2] - 619:22, 761:12
**broadly** [1] - 761:15
**broide** [1] - 632:1
**Broide** [1] - 634:24
**Broide's** [1] - 714:16
**broth** [2] - 786:14, 786:15
**brought** [2] - 656:17, 852:5
**brown** [3] - 804:8, 804:15, 804:16
**Bucky** [1] - 778:24
**buddies** [1] - 807:17
**buffer** [8] - 712:16, 731:11, 731:18, 732:6, 824:19, 824:23, 826:4, 826:5
**buffers** [1] - 831:21
**build** [2] - 673:13, 699:6
**bulb** [2] - 564:17, 564:20
**bulk** [1] - 722:8
**bullet** [8] - 567:5, 567:12, 567:16, 616:13, 616:15, 617:6, 621:9, 621:10
**bullock** [1] - 586:10
**bunch** [4] - 799:6, 799:17, 804:7, 816:12
**burden** [5] - 666:18, 666:19, 666:21, 848:19, 849:19
**business** [9] - 558:9, 599:7, 629:12, 629:20, 654:24, 697:13, 700:9, 700:16, 827:10
**busy** [1] - 716:10
**butter** [4] - 723:8, 723:9, 723:10, 723:12
**buy** [4] - 590:5, 590:7, 608:23, 781:13
**buying** [1] - 585:5
**BY** [78] - 553:16,

554:10, 580:20, 582:4, 590:18, 594:25, 595:12, 596:21, 597:18, 598:17, 603:11, 604:2, 611:15, 612:1, 612:6, 613:22, 619:3, 624:20, 628:22, 633:21, 634:8, 635:23, 636:14, 637:24, 643:11, 649:3, 649:11, 650:10, 651:10, 653:8, 655:24, 668:18, 675:23, 676:2, 680:2, 685:7, 687:6, 693:10, 698:21, 699:17, 709:1, 711:18, 714:3, 718:21, 719:24, 730:23, 732:12, 736:1, 740:13, 745:15, 746:6, 748:16, 751:9, 753:19, 755:4, 757:12, 758:22, 759:21, 760:22, 765:9, 766:1, 768:21, 772:10, 774:19, 783:8, 789:7, 791:13, 793:7, 796:14, 808:3, 811:2, 815:17, 817:10, 820:9, 835:23, 838:9, 841:4, 842:25
**BYRON** [1] - 554:7

## C

**C-O-N-K-I-N** [1] - 770:23
**CAHILL** [1] - 554:10
**cake** [1] - 821:7
**calculate** [4] - 597:8, 597:9, 598:7, 722:2
**calculated** [2] - 603:14, 623:17
**calculation** [14] - 581:18, 593:12, 596:23, 597:19, 598:8, 599:11, 600:5, 625:10, 625:14, 626:1, 626:2, 626:5, 626:6
**calculations** [5] - 591:17, 591:21, 599:18, 607:15, 626:25
**California** [3] - 669:20, 673:16, 782:9
**Camp** [1] - 847:6
**Campos** [2] - 732:10, 760:20
**campos** [2] - 582:2, 590:17
**cancer** [4] - 669:25, 670:4, 670:24, 670:25
**cannot** [4] - 711:20, 711:24, 712:10, 759:15
**capability** [1] - 774:3
**capable** [1] - 851:21
**capitalize** [1] - 586:10
**captured** [1] - 730:3
**care** [2] - 567:1, 830:8
**career** [3] - 671:12, 782:10, 782:25
**careful** [2] - 642:17, 655:21
**Carl** [1] - 559:23
**CARL** [1] - 553:20
**carried** [5] - 790:10, 797:14, 829:7, 829:24, 833:7
**carrier** [1] - 681:3
**carries** [2] - 790:4, 800:20
**carry** [7] - 666:18, 666:20, 672:22, 791:24, 794:4, 794:12, 795:17
**case** [87] - 565:15, 572:2, 575:5, 575:7, 575:25, 577:15, 578:19, 584:1, 588:16, 592:2, 600:6, 600:14, 600:20, 608:11, 609:5, 613:18, 638:11, 638:17, 642:8, 642:22, 645:14, 645:18, 645:23, 647:5, 647:11, 649:19, 651:4, 651:6, 652:6, 653:2, 659:16, 659:21, 660:4, 660:8, 661:15, 662:1, 662:14, 662:18, 662:22, 663:23, 664:9, 669:3, 681:19, 684:10, 692:7, 694:12, 698:12, 714:8, 715:2, 718:23, 719:3, 723:23, 736:6, 737:8, 745:21, 748:8, 751:15, 754:19, 755:3, 757:4, 758:13, 775:7, 775:9, 777:23, 788:21, 792:20, 795:3, 800:4, 800:6, 802:1, 802:7, 809:15, 814:9, 814:19, 816:3, 817:16, 818:17, 820:1, 832:24, 842:14, 842:17, 846:1, 846:2, 846:3, 846:4, 846:5, 852:13
**Case** [1] - 553:5
**casein** [5] - 773:10, 773:14, 787:9, 829:3, 829:5
**cases** [1] - 783:22
**categorize** [1] - 705:11
**cation** [17] - 634:20, 634:23, 635:6, 636:1, 776:18, 803:18, 808:16, 808:20, 811:10, 811:21, 811:22, 821:24, 822:1, 826:9, 826:10, 826:13, 836:18
**cationic** [9] - 740:4, 797:22, 797:24, 802:1, 802:3, 802:4, 802:12, 805:2, 805:21
**caused** [2] - 685:25, 686:2
**causes** [4] - 560:18, 566:1, 786:8, 789:14
**causing** [2] - 769:22, 769:23
**caveat** [1] - 628:4
**ceded** [1] - 663:7
**cell** [26] - 690:12, 705:5, 705:7, 706:12, 706:21, 731:22, 731:24, 732:7, 734:4, 734:22, 735:3, 739:1, 739:4, 739:12, 739:15, 740:3, 740:10, 741:6, 742:17, 742:20, 743:5, 743:12, 743:13, 745:1, 746:17, 747:8
**cell-penetrating** [16] - 705:5, 705:7, 706:12, 706:21, 731:22, 731:24, 732:7, 734:4, 734:22, 735:3, 739:1, 739:4, 739:12, 739:15, 740:3, 741:6
**cells** [2] - 740:6, 804:22
**cellular** [2] - 742:20, 747:16
**centimeters** [2] - 809:10, 809:16
**central** [1] - 741:16
**CEO** [1] - 672:7
**certain** [9] - 571:16, 574:5, 574:25, 687:12, 723:4, 752:20, 773:4, 789:23, 813:13
**certainly** [32] - 556:3, 567:3, 572:9, 589:3, 589:18, 590:15, 606:9, 607:4, 608:8, 614:25, 617:23, 622:2, 627:16, 628:5, 631:12, 635:7, 636:23, 640:21, 642:25, 644:1, 645:10, 648:15, 650:23, 652:10, 656:16, 666:17, 699:8, 742:8, 816:15, 847:19, 848:20
**certainty** [1] - 657:21
**certify** [1] - 852:24
**chain** [1] - 646:16
**chair** [1] - 736:11
**challenge** [3] - 585:25, 586:19, 612:22
**challenges** [1] - 620:14
**chance** [3] - 593:1, 692:19, 806:11
**change** [21] - 576:18, 576:20, 589:25, 590:13, 601:7, 626:2, 627:3, 639:22, 641:2, 641:5, 660:15, 660:16, 661:21, 664:22, 692:16, 758:3, 840:19, 844:7, 844:10, 844:11
**changed** [1] - 640:15
**changes** [9] - 614:18, 614:23, 623:23, 623:25, 626:5, 773:9, 843:22, 843:24, 844:25
**changing** [1] - 661:1
**chapter** [15] - 818:24, 819:2, 819:4, 819:6, 819:16, 820:11, 820:13, 820:22, 821:2, 833:15, 834:13, 837:16, 838:13, 838:22, 840:13
**characterization** [3] - 643:19, 676:8, 779:6
**characterizations** [1] - 852:2
**characterize** [2] - 644:19, 681:17
**characterized** [1] - 615:6
**charcoal** [2] - 798:11, 798:14
**charge** [23] - 585:12, 585:18, 587:25, 588:2, 589:17, 590:2, 590:4, 610:25, 683:18, 689:24, 741:8, 742:18, 743:2, 743:3, 743:4, 800:7, 800:13, 800:20, 800:24, 801:1, 801:2, 801:18
**charged** [12] - 586:14, 683:17, 742:15, 742:21, 766:17, 801:5, 801:6, 802:6, 802:7, 802:8, 802:13, 803:3
**charges** [5] - 742:14, 743:14, 745:1, 800:9, 800:12
**chart** [1] - 618:3
**check** [1] - 834:19
**checklist** [1] - 823:17
**chemical** [11] - 669:8, 683:13, 691:12, 715:11, 737:21, 737:23, 737:24, 738:1, 738:15, 738:19, 739:21
**chemically** [1] - 772:24
**chemicals** [1] - 684:2
**chemistry** [7] - 669:9, 669:22, 683:15, 692:5, 736:12, 738:5, 752:4

**chief** [1] - 672:7
**childhood** [1] - 715:22
**children** [1] - 716:20
**Children's** [1] - 715:15
**China** [2] - 700:9, 700:16
**chip** [3] - 641:3, 723:7, 723:14
**chloride** [2] - 803:2, 826:21
**chocolate** [2] - 723:7, 723:13
**choice** [1] - 590:1
**choose** [2] - 590:1, 590:2
**choosing** [1] - 585:6
**chose** [2] - 584:5, 694:19
**chromatographic** [6] - 776:23, 776:24, 797:17, 817:21, 836:14, 842:11
**chromatography** [78] - 634:21, 634:23, 635:6, 636:1, 691:13, 691:17, 692:1, 692:2, 692:11, 693:15, 693:23, 693:24, 703:19, 703:20, 742:23, 777:13, 777:15, 777:16, 777:19, 779:17, 797:7, 797:9, 797:21, 797:23, 797:24, 798:7, 798:10, 798:15, 798:18, 800:1, 800:3, 800:16, 803:18, 804:9, 805:2, 805:22, 806:21, 808:16, 808:17, 811:10, 811:21, 811:23, 817:22, 817:24, 821:24, 822:2, 822:7, 823:21, 830:13, 830:14, 830:17, 830:22, 831:2, 831:7, 831:10, 831:12, 833:14, 833:21, 833:23, 834:3, 834:11, 834:17, 834:22, 836:16, 837:3, 839:10, 839:13, 840:10, 841:16, 841:21, 842:4, 843:6, 843:13, 844:14, 844:21, 845:11, 845:14
**chuck** [1] - 831:19
**chunks** [1] - 594:7
**circles** [1] - 742:10
**citation** [5] - 558:1, 704:2, 811:11, 811:13, 816:18
**citations** [1] - 849:21
**cite** [1] - 637:2
**cited** [6] - 558:25, 625:20, 625:21, 813:24, 814:12, 814:13
**cites** [8] - 560:18, 566:16, 848:18, 849:6, 849:20, 850:16, 850:18
**claim** [10] - 564:19, 566:2, 630:23, 631:11, 783:17, 783:19, 783:23, 832:23, 846:17
**Claim** [59] - 627:21, 630:23, 631:4, 631:12, 637:8, 731:18, 773:25, 775:5, 775:6, 775:17, 775:18, 775:19, 775:22, 775:23, 775:25, 776:5, 776:10, 776:15, 776:17, 776:23, 776:24, 777:2, 777:13, 777:15, 777:21, 777:22, 778:1, 778:5, 778:9, 783:9, 783:10, 784:7, 784:8, 822:24, 823:2, 823:10, 823:11, 823:13, 823:14, 823:15, 823:19, 825:7, 828:20, 828:22, 828:24, 832:23, 833:1, 839:20, 839:23, 839:25, 841:13
**claimed** [10] - 565:12, 565:21, 566:5, 566:6, 566:8, 632:25, 660:10, 661:18, 776:17
**Claims** [2] - 627:11, 775:21
**claims** [15] - 564:2, 564:7, 564:9, 564:16, 565:1, 567:9, 719:13, 777:1, 777:22, 778:12, 784:11, 784:15, 797:6, 808:23, 808:25
**clarification** [2] - 577:10, 851:12
**clarify** [2] - 596:6, 706:4
**class** [8] - 669:21, 678:2, 684:1, 705:2, 705:4, 705:11, 738:21, 739:3
**clean** [3] - 684:4, 803:14, 831:20
**clear** [25] - 577:22, 583:9, 590:24, 599:17, 642:2, 653:17, 657:23, 688:11, 688:12, 704:18, 709:23, 710:5, 711:23, 748:25, 749:5, 749:25, 750:12, 760:12, 762:7, 763:4, 764:23, 767:19, 767:21, 851:13, 852:12
**clearance** [1] - 673:9
**clearly** [1] - 647:14
**cleavage** [2] - 747:6, 747:16
**cleave** [1] - 747:9
**clerical** [1] - 686:19
**clerk** [3] - 667:21, 835:22, 846:8
**client** [1] - 610:24
**clients** [1] - 753:7
**clinical** [20] - 673:24, 687:16, 687:18, 688:2, 695:8, 695:14, 695:17, 695:25, 696:5, 697:17, 708:2, 715:23, 716:3, 716:17, 716:22, 718:14, 753:8, 762:1, 762:3
**clip** [1] - 586:11
**clock** [4] - 580:11, 580:13, 580:14, 713:2
**closer** [1] - 783:2
**closest** [1] - 559:22
**closing** [1] - 579:1
**closings** [1] - 578:22
**Clostridium** [1] - 786:5
**clostridium** [4] - 690:6, 815:25, 818:25, 823:21
**clothes** [1] - 684:4
**cloudy** [1] - 740:25
**CMC** [3] - 761:25, 762:5, 765:3
**co** [1] - 781:3
**co-founders** [1] - 781:3
**coagulate** [1] - 804:22
**coauthor** [2] - 819:4, 834:12
**code** [5] - 677:1, 683:8, 686:20, 686:22, 704:22
**coffee** [2] - 834:18, 834:20
**cofound** [1] - 820:18
**collaborate** [2] - 716:1, 773:23
**collaborated** [1] - 772:17
**colleague** [1] - 666:9
**colleagues** [1] - 568:12
**collected** [3] - 800:24, 801:13, 802:9
**collectively** [1] - 661:12
**college** [4] - 669:23, 669:24, 670:8, 670:21
**colored** [5] - 686:11, 686:13, 799:7, 799:17, 804:15
**coloring** [2] - 737:6, 737:7
**column** [56] - 596:7, 599:6, 599:13, 599:14, 683:1, 687:4, 692:6, 692:9, 693:19, 701:18, 721:21, 722:3, 776:18, 776:19, 777:17, 777:19, 779:16, 798:10, 798:13, 800:1, 800:2, 800:3, 800:5, 800:6, 800:7, 800:16, 801:4, 801:14, 801:16, 801:19, 801:21, 801:25, 802:1, 802:2, 802:3, 802:4, 802:5, 802:12, 802:19, 802:20, 803:3, 803:4, 811:5, 824:15, 824:16, 824:19, 825:3, 825:9, 825:11, 826:9, 826:11, 826:13, 826:21, 831:19, 843:3
**columns** [18] - 691:18, 721:14, 721:15, 776:15, 797:23, 797:24, 798:2, 815:3, 817:24, 818:13, 824:24, 831:7, 831:17, 831:20, 836:16, 836:18, 836:19, 836:20
**combination** [3] - 778:6, 841:11, 841:13
**combine** [5] - 571:8, 784:3, 829:14, 829:16, 830:6
**combined** [1] - 784:4
**comfortable** [1] - 684:12
**coming** [9] - 561:21, 586:2, 612:5, 613:18, 640:23, 641:3, 653:25, 655:1, 694:16
**comment** [7] - 556:10, 561:8, 716:11, 745:4, 750:7, 750:9, 750:13
**commentary** [1] - 675:10
**commenting** [1] - 562:4
**commercial** [6] - 604:23, 605:4, 622:10, 697:12, 741:10, 741:13
**commercialization** [1] - 619:21
**commercially** [1] - 656:17
**committed** [1] - 629:10
**common** [4] - 692:24, 694:6, 717:3, 801:8
**commonly** [1] - 682:16
**communications** [5] - 708:15, 751:21, 759:6, 759:12, 769:17
**community** [6] - 619:22, 679:5, 679:12, 696:21
**compact** [1] - 806:5
**companies** [13] - 590:3, 650:16, 650:20, 654:23, 654:24, 655:6, 657:15, 657:25,

671:18, 753:2, 781:13, 796:24, 797:3
**company** [20] - 590:1, 590:13, 600:7, 629:8, 650:17, 653:13, 670:22, 671:2, 671:12, 671:16, 672:8, 696:9, 699:1, 700:2, 700:8, 700:15, 700:20, 700:23, 781:2, 782:8
**comparable** [3] - 658:1, 658:2, 815:4
**compare** [12] - 588:24, 592:14, 592:15, 629:19, 635:18, 640:4, 721:1, 732:25, 734:20, 749:16, 814:18, 814:23
**compared** [15] - 626:17, 674:22, 674:23, 675:2, 675:3, 676:15, 689:11, 689:13, 712:3, 723:4, 724:23, 728:7, 729:11, 734:14
**compares** [1] - 749:14
**comparing** [1] - 560:10
**comparison** [4] - 721:4, 728:14, 733:18, 749:21
**comparisons** [1] - 732:15
**compelled** [1] - 829:25
**compete** [4] - 654:3, 654:19, 654:22, 712:4
**competing** [2] - 582:16, 587:14
**competition** [3] - 600:20, 615:2, 615:3
**competitive** [4] - 620:10, 620:16, 620:25, 655:6
**competitor** [7] - 582:10, 615:15, 626:20, 640:22, 652:12, 652:21, 653:21
**competitors** [3] - 600:23, 615:14, 653:19
**compilations** [1] - 606:24
**complete** [7] - 659:7, 659:24, 680:18, 683:12, 702:1, 760:9, 760:14
**completely** [18] - 626:19, 627:4, 627:7, 629:6, 641:24, 652:11, 652:20, 652:23, 654:3, 654:12, 681:9, 769:15, 788:2, 789:14, 802:4, 802:10, 828:11, 843:17
**completeness** [1] - 765:21
**complex** [30] - 693:25, 703:21, 743:4, 746:23, 803:24, 804:5, 804:8, 804:12, 804:17, 804:25, 805:4, 805:12, 805:18, 806:6, 809:19, 809:21, 809:22, 812:21, 824:13, 825:2, 825:12, 827:4, 827:15, 827:25, 828:4, 828:10, 828:14, 833:13
**complexes** [1] - 740:5
**compliance** [2] - 651:15, 652:8
**complicated** [5] - 588:20, 591:13, 646:24, 692:20, 808:10
**comply** [1] - 650:19
**component** [2] - 707:3, 721:5
**components** [8] - 727:18, 773:21, 786:22, 799:15, 802:14, 804:19, 805:17, 808:15
**composed** [1] - 804:17
**composition** [10] - 663:1, 683:13, 689:21, 720:22, 779:14, 807:5, 813:12, 827:18, 827:21, 828:13
**compositions** [6] - 687:12, 810:5, 813:6, 813:8, 813:9, 829:23
**compound** [1] - 669:8
**compounded** [1] - 793:16
**comprised** [1] - 676:21
**comprises** [1] - 776:10
**comprising** [2] - 824:8, 824:10
**compromising** [1] - 618:15
**computer** [1] - 696:14
**CONAWAY** [1] - 554:2
**concentration** [4] - 721:24, 723:22, 724:9, 774:1
**concentrations** [1] - 724:16
**concept** [2] - 783:14, 797:7
**conceptually** [2] - 622:22, 623:18
**concern** [4] - 766:22, 767:23, 768:25, 850:3
**concerned** [10] - 560:17, 570:25, 578:22, 586:17, 615:13, 725:20, 766:15, 766:16, 787:22, 849:18
**concerning** [1] - 720:7
**concerns** [6] - 570:8, 573:21, 608:2, 608:5, 608:6, 771:6
**conclude** [5] - 665:2, 744:18, 828:21, 839:22, 839:24
**concluded** [4] - 744:19, 747:19, 828:23, 839:1
**concludes** [1] - 678:16
**conclusion** [8] - 686:3, 730:13, 730:16, 767:1, 768:17, 777:25, 778:1, 778:4
**conclusions** [9] - 675:15, 715:5, 720:4, 725:12, 725:15, 725:16, 725:22, 746:25, 767:15
**conclusive** [1] - 851:14
**concrete** [1] - 572:15
**conditions** [1] - 825:12
**conducted** [2] - 695:14, 747:2
**conducting** [3] - 700:8, 700:15, 716:17
**confer** [3] - 850:5, 850:7
**configuration** [1] - 705:15
**confirm** [3] - 593:16, 816:10, 833:25
**confirmed** [1] - 816:7
**confirms** [2] - 589:1, 589:5
**conformity** [1] - 651:20
**confusion** [1] - 573:10
**CONKIN** [8] - 770:17, 770:22, 770:25, 771:3, 771:10, 771:14, 771:18, 772:5
**Conkin** [2] - 770:18, 770:22
**connection** [2] - 649:19, 846:4
**consequences** [2] - 648:11, 648:14
**conservative** [1] - 582:19
**consider** [8] - 576:12, 587:2, 587:7, 600:5, 749:2, 773:21, 785:22, 787:19
**consideration** [3] - 616:11, 665:18, 847:11
**considerations** [9] - 600:18, 600:24, 607:23, 665:7, 665:11, 665:14, 666:1, 666:7, 784:13
**considered** [6] - 587:9, 600:8, 724:10, 784:12, 785:23, 822:10
**considering** [1] - 749:7
**consistent** [3] - 700:3, 769:15, 773:5
**construct** [1] - 600:17
**consulting** [1] - 796:20
**consumer** [2] - 621:20, 622:2
**consumers** [1] - 621:22
**consuming** [1] - 691:7
**contact** [1] - 825:1
**contacted** [1] - 824:24
**contacting** [2] - 826:5, 826:8
**contain** [10] - 727:10, 727:12, 728:21, 729:18, 732:4, 734:2, 734:7, 734:23, 776:6, 777:16
**contained** [9] - 558:23, 560:22, 594:3, 727:8, 775:23, 808:25, 829:2, 829:3, 832:14
**container** [3] - 691:23, 691:24, 691:25
**containing** [2] - 776:11, 790:2
**contains** [13] - 587:11, 593:16, 726:4, 727:16, 731:9, 734:21, 735:3, 775:19, 775:21, 777:2, 786:15, 816:11, 823:14
**contaminant** [2] - 800:12, 801:7
**contaminants** [13] - 786:24, 799:23, 800:11, 800:25, 801:5, 801:15, 809:13, 831:11, 831:13, 837:7, 837:9, 837:10, 838:24
**contaminated** [3] - 798:12, 798:15, 801:18
**contaminating** [2] - 797:14, 831:18
**contend** [1] - 564:6
**content** [5] - 701:14, 703:3, 703:17, 705:15, 784:10
**contents** [6] - 569:16, 570:9, 570:10, 634:14, 634:17, 634:18
**context** [4] - 555:17, 555:21, 557:12, 741:23
**continue** [7] - 603:9, 651:9, 699:9, 776:9, 783:7, 791:11, 815:3
**continued** [5] - 554:1, 696:7, 696:11, 700:12, 700:13
**continuing** [2] - 626:21, 716:10
**contract** [1] - 738:10
**contracted** [1] - 718:4
**contraindicated** [1] - 843:20
**contrast** [1] - 645:13

**contribute** [4] - 736:23, 767:5, 767:24, 769:1
**contributes** [1] - 747:17
**contribution** [2] - 725:5, 747:10
**control** [9] - 636:1, 636:2, 678:20, 726:3, 727:6, 734:20, 751:17, 771:6, 773:17
**controlled** [1] - 673:11
**controlling** [2] - 757:21, 757:25
**controls** [1] - 634:11
**conventional** [3] - 687:13, 687:17, 747:4
**conversation** [2] - 633:4, 790:21
**conversations** [3] - 790:19, 796:23, 797:1
**cookbook** [1] - 821:1
**cookie** [1] - 723:14
**cookies** [1] - 723:7
**copies** [2] - 579:12, 579:14
**copper** [1] - 564:18
**copy** [8] - 572:21, 579:16, 579:21, 634:6, 819:2, 819:15, 820:10, 820:13
**copyright** [1] - 570:1
**core** [7] - 805:6, 805:17, 805:24, 809:19, 827:15, 828:18
**corner** [5] - 680:7, 685:15, 799:4, 799:9, 802:18
**corporate** [1] - 648:12
**corporation** [2] - 645:20, 699:21
**correct** [185] - 555:16, 558:10, 559:9, 574:9, 581:16, 583:2, 583:3, 583:5, 583:20, 591:11, 591:19, 591:20, 595:10, 596:1, 596:3, 596:19, 597:21, 599:19, 599:20, 603:1, 603:2, 604:13, 604:25, 605:6, 605:24, 607:25, 608:7, 609:14, 609:24, 610:15, 614:2, 615:19, 620:16, 625:14, 626:6, 626:9, 629:21, 629:22, 630:13, 630:16, 631:3, 634:21, 635:4, 637:3, 639:8, 640:18, 642:6, 642:15, 645:24, 646:18, 647:3, 647:19, 647:25, 648:5, 649:4, 654:16, 656:5, 656:9, 656:10, 656:12, 656:14, 657:9, 658:4, 699:19, 699:21, 699:24, 700:2, 700:5, 700:13, 700:17, 700:23, 701:3, 701:7, 701:10, 701:13, 701:22, 702:5, 702:11, 702:16, 702:21, 702:24, 703:15, 703:21, 703:24, 704:8, 704:16, 704:21, 704:25, 705:5, 707:1, 707:9, 707:13, 707:17, 707:25, 708:5, 708:16, 709:9, 709:11, 709:24, 710:3, 710:8, 710:12, 710:16, 710:20, 711:3, 711:11, 711:25, 712:11, 729:1, 731:3, 731:12, 731:15, 733:1, 733:13, 734:2, 734:12, 735:4, 748:20, 748:23, 749:2, 749:3, 749:8, 749:14, 749:15, 749:18, 749:19, 750:1, 750:8, 750:14, 750:15, 755:15, 756:12, 756:13, 758:2, 760:1, 760:2, 760:10, 760:15, 760:24, 761:8, 761:12, 761:19, 761:24, 762:11, 762:12, 762:25, 763:13, 763:19, 763:21, 764:5, 764:6, 764:8, 764:9, 764:10, 764:13, 764:16, 764:21, 765:16, 766:23, 768:1, 768:2, 768:4, 768:8, 769:9, 769:14, 769:20, 772:24, 772:25, 773:14, 777:24, 783:12, 795:3, 802:23, 814:10, 819:4, 819:18, 819:23, 819:24, 832:25, 833:16, 838:1, 838:2, 838:15, 847:5
**corrected** [1] - 686:24
**correctly** [4] - 731:9, 731:13, 764:14, 767:17
**corresponded** [1] - 661:21
**correspondence** [10] - 555:18, 555:23, 556:1, 556:7, 557:5, 561:7, 561:9, 759:25, 765:14, 765:15
**corresponds** [2] - 658:24, 741:3
**cosmetic** [9] - 563:23, 591:4, 607:12, 607:17, 607:24, 664:16, 664:20, 664:23, 665:3
**cost** [3] - 608:19, 608:20, 659:14
**costs** [1] - 614:13
**counsel** [14] - 553:23, 556:9, 572:22, 573:19, 606:9, 610:18, 635:18, 655:21, 697:22, 702:24, 733:9, 734:25, 768:18, 784:20
**Counsel** [1] - 554:11
**count** [2] - 698:18, 732:5
**countermeasure** [1] - 718:10
**couple** [24] - 595:1, 597:23, 613:24, 615:3, 620:13, 643:8, 655:25, 672:7, 680:24, 697:3, 714:22, 741:25, 746:25, 780:7, 781:3, 787:5, 794:11, 811:18, 812:22, 817:23, 822:13, 844:3, 847:23
**course** [5] - 658:4, 660:7, 738:23, 782:10, 849:14
**courses** [2] - 738:20, 739:1
**court** [5] - 606:2, 628:10, 818:10, 849:3, 849:19
**Court** [4] - 571:22, 573:23, 853:4, 853:4
**COURT** [211] - 553:1, 555:1, 555:20, 556:15, 556:18, 557:7, 557:18, 557:21, 557:24, 558:5, 558:9, 558:16, 558:24, 559:2, 559:6, 559:11, 559:19, 559:24, 560:3, 560:5, 560:13, 560:24, 561:12, 561:15, 561:20, 562:7, 562:10, 562:25, 563:5, 564:9, 564:14, 564:25, 565:16, 565:22, 566:4, 566:22, 567:4, 567:11, 567:18, 568:6, 568:13, 568:18, 568:25, 569:2, 569:7, 569:11, 569:17, 570:11, 570:19, 571:1, 571:20, 572:13, 572:18, 573:12, 574:6, 575:6, 575:17, 576:4, 577:5, 577:16, 577:24, 578:9, 579:1, 579:5, 579:20, 580:2, 580:5, 580:9, 594:13, 594:24, 595:5, 595:7, 595:11, 596:13, 596:17, 596:20, 597:15, 598:13, 603:5, 603:10, 603:20, 603:24, 611:11, 611:25, 612:4, 612:16, 612:18, 613:10, 613:16, 618:25, 624:16, 628:15, 633:6, 634:7, 635:20, 636:11, 637:19, 643:9, 648:21, 648:25, 649:8, 649:24, 650:5, 650:8, 651:8, 653:6, 658:6, 658:12, 658:18, 666:4, 666:14, 666:20, 666:23, 667:3, 667:8, 667:10, 667:12, 667:16, 667:19, 667:24, 668:16, 675:19, 679:24, 685:4, 693:8, 697:22, 697:24, 698:2, 698:5, 698:8, 698:11, 699:14, 708:25, 711:15, 712:19, 712:22, 713:4, 713:9, 713:11, 713:13, 718:20, 719:23, 730:20, 735:8, 735:10, 735:15, 740:12, 745:14, 746:3, 748:14, 750:18, 750:20, 753:17, 755:2, 757:9, 758:20, 759:18, 765:8, 765:24, 768:12, 770:14, 770:20, 770:24, 771:2, 771:8, 771:12, 771:16, 771:19, 772:4, 774:7, 774:9, 783:7, 789:3, 789:6, 790:24, 791:2, 791:5, 791:9, 793:4, 796:12, 808:1, 810:24, 817:7, 820:6, 835:21, 838:6, 841:3, 842:23, 845:20, 846:10, 846:20, 846:23, 847:4, 847:6, 847:12, 847:16, 848:2, 848:11, 848:13, 848:23, 849:2, 849:15, 849:18, 849:25, 850:13, 850:23, 851:7, 851:10, 851:17, 852:4, 852:14
**Court's** [1] - 733:16
**courtroom** [20] - 556:25, 580:8, 658:11, 667:18, 713:3, 713:12, 714:15, 714:18,

736:18, 771:7, 771:17, 771:23, 771:25, 772:3, 791:4, 791:8, 794:16, 835:18, 846:5, 846:9
**Courtroom** [1] - 553:12
**COURTROOM** [6] - 667:23, 668:4, 713:18, 735:16, 750:24, 774:10
**cover** [5] - 594:8, 651:11, 680:14, 719:5, 840:16
**covered** [1] - 607:22
**covering** [1] - 594:7
**covers** [2] - 687:23, 719:7
**cow** [2] - 789:15, 793:20
**cows** [1] - 773:9
**CPP** [11] - 704:24, 705:6, 705:7, 705:14, 705:16, 706:21, 731:22, 731:24, 734:2, 734:22, 735:3
**CPPs** [1] - 705:18
**create** [2] - 743:13, 812:1
**creates** [1] - 743:4
**credit** [1] - 782:18
**credited** [1] - 642:11
**Creutzfeldt** [8] - 788:18, 788:19, 789:10, 789:13, 790:6, 792:2, 793:14, 793:18
**Creutzfeldt-Jakob** [8] - 788:18, 788:19, 789:10, 789:13, 790:6, 792:2, 793:14, 793:18
**crispy** [1] - 723:13
**criteria** [1] - 571:17
**critical** [4] - 734:23, 737:2, 808:15
**criticism** [2] - 613:9, 843:5
**CROSS** [4] - 604:1, 699:16, 748:15, 759:20
**Cross** [2] - 568:5, 711:14
**cross** [21] - 572:23, 572:25, 573:10, 573:13, 573:14, 573:16, 573:20, 574:7, 575:9, 576:11, 577:5, 578:11, 579:7, 654:14, 663:7, 664:13, 672:17, 699:14, 730:22, 731:5, 852:3
**CROSS-EXAMINATION** [4] - 604:1, 699:16, 748:15, 759:20
**cross-examination** [13] - 572:23, 573:13, 573:16, 573:20, 575:9, 576:11, 577:5, 578:11, 654:14, 663:7, 664:13, 699:14, 730:22
**cross-examine** [1] - 573:10
**cross-examined** [2] - 572:25, 573:14
**cross-examining** [2] - 574:7, 579:7
**Cross-talk** [2] - 568:5, 711:14
**crowded** [3] - 585:18, 586:2, 615:5
**CSR** [1] - 853:3
**culture** [1] - 829:18
**culturing** [1] - 786:13
**cup** [1] - 723:9
**cups** [1] - 723:9
**curious** [1] - 846:15
**current** [2] - 782:4, 782:5
**CURTIS** [2] - 668:7, 668:8
**Curtis** [5] - 643:15, 668:6, 668:14, 668:23, 771:11
**curve** [1] - 596:25
**customer** [1] - 660:6
**customers** [3] - 663:4, 781:8, 781:9
**cut** [1] - 623:7
**cutoff** [2] - 590:19, 623:12
**cutting** [2] - 618:23, 626:14
**cycling** [1] - 819:12
**cylinder** [2] - 691:22, 800:3
**cytodiffusion** [1] - 677:9
**cytoplasm** [1] - 747:8

## D

**dabble** [1] - 796:4
**dabbled** [1] - 796:10
**damages** [9] - 573:9, 574:19, 578:12, 583:20, 600:4, 603:14, 604:12, 604:16, 848:6
**Dana** [1] - 583:20
**dance** [1] - 684:8
**dangerous** [2] - 673:7, 691:8
**darker** [2] - 686:8, 686:13
**DAS** [11] - 555:23, 556:3, 558:12, 561:8, 674:22, 685:21, 685:24, 688:9, 688:10, 714:10, 726:16
**DasGupta** [11] - 807:6, 807:11, 807:12, 807:19, 807:20, 808:4, 808:6, 808:8, 809:2, 812:5, 822:19
**DasGupta's** [1] - 812:21
**data** [52] - 582:18, 590:20, 590:22, 593:11, 594:5, 594:7, 594:8, 595:8, 595:19, 606:21, 643:22, 685:24, 686:16, 697:11, 697:17, 703:12, 710:6, 715:4, 716:17, 716:19, 716:25, 717:7, 717:15, 719:25, 720:3, 720:17, 725:21, 726:24, 728:10, 729:2, 730:13, 743:20, 743:23, 746:11, 746:14, 746:15, 746:16, 747:1, 748:3, 750:10, 750:11, 759:2, 761:25, 834:24, 835:3, 835:4, 836:8, 840:9, 843:17, 844:14, 844:18
**database** [1] - 816:11
**date** [50] - 569:13, 569:22, 571:3, 581:15, 583:10, 590:19, 592:16, 602:25, 603:13, 612:20, 612:22, 613:7, 613:9, 622:19, 625:5, 625:6, 626:2, 626:4, 626:7, 626:11, 626:12, 626:25, 627:3, 629:3, 637:2, 638:22, 644:9, 660:19, 660:21, 660:24, 662:9, 680:8, 680:12, 680:13, 685:15, 783:16, 783:22, 783:23, 785:13, 785:17, 785:20, 785:21, 785:22, 785:24, 815:11, 816:14, 819:22, 832:19, 837:22, 837:24
**dated** [1] - 636:18
**dates** [2] - 569:16, 661:24
**Daubert** [2] - 572:24, 574:23
**DAVID** [1] - 553:22
**David** [1] - 569:1
**DAXI** [2] - 618:21, 620:22
**daxibotulinumtoxin A** [4] - 634:11, 767:6, 767:25, 769:2
**DAXXIFY** [141] - 576:22, 576:24, 576:25, 581:12, 582:25, 584:11, 584:19, 585:4, 585:5, 585:12, 585:13, 587:13, 587:16, 587:21, 587:25, 588:9, 588:10, 589:15, 589:16, 590:22, 590:24, 590:25, 591:11, 597:9, 607:12, 607:19, 607:20, 607:22, 607:24, 608:2, 608:7, 608:23, 609:18, 614:3, 614:14, 615:5, 615:12, 615:13, 617:1, 617:11, 618:5, 618:15, 619:6, 632:12, 635:15, 636:3, 636:4, 641:2, 642:24, 655:5, 659:2, 659:3, 659:7, 659:24, 660:2, 663:6, 663:15, 671:6, 677:4, 677:6, 680:14, 680:16, 680:18, 680:22, 681:9, 681:11, 683:22, 687:1, 687:23, 689:18, 689:19, 689:21, 693:13, 694:24, 695:1, 695:8, 696:5, 696:9, 696:16, 697:17, 698:24, 708:12, 708:13, 709:8, 709:23, 710:2, 710:7, 710:14, 711:23, 712:11, 715:3, 720:7, 720:11, 720:12, 720:14, 720:17, 721:1, 721:5, 722:1, 722:15, 722:19, 723:16, 723:23, 724:4, 724:12, 724:23, 725:2, 725:11, 725:13, 725:15, 726:7, 726:9, 727:7, 727:15, 730:17, 730:18, 732:1, 732:4, 737:3, 737:9, 741:12, 744:12, 744:14, 744:20, 747:18, 748:6, 751:18, 753:21, 755:22, 756:6, 758:8, 759:7, 769:20, 770:2, 770:6, 770:11
**DAXXIFY's** [8] - 587:23, 641:10, 663:3, 663:11, 719:1, 720:5, 736:9, 746:12
**days** [5] - 670:5, 677:19, 686:10, 686:12, 686:14
**DDX** [19] - 623:11, 625:9, 626:13, 626:14, 629:2, 629:3, 714:14, 725:24, 737:18, 742:6, 775:12, 798:22, 799:3, 802:11, 814:21, 815:18, 816:7, 822:16, 823:4
**DEA** [2] - 824:19, 825:9
**deal** [1] - 678:1

**dealing** [1] - 650:13
**dealings** [5] - 649:21, 650:12, 650:14, 651:20, 651:24
**Deanna** [2] - 852:23, 853:3
**debate** [2] - 555:4, 565:4
**decade** [1] - 700:1
**decades** [10] - 691:3, 751:23, 798:4, 812:4, 812:6, 813:2, 830:23, 830:24, 842:2, 843:20
**decades'** [1] - 778:12
**December** [3] - 612:2, 680:13, 685:13
**decide** [2] - 627:6, 627:8
**decided** [1] - 670:8
**decides** [4] - 626:8, 626:23, 627:9, 642:1
**deciding** [1] - 584:4
**decision** [4] - 616:14, 674:15, 694:21, 847:15
**decision-making** [1] - 616:14
**deck** [1] - 563:8
**decreased** [3] - 689:8, 689:10, 689:13
**decreases** [1] - 746:18
**defend** [5] - 620:10, 620:11, 620:15, 620:19, 620:21
**defendant** [3] - 658:14, 849:10, 850:24
**Defendant** [12] - 553:7, 554:11, 668:10, 713:24, 735:22, 751:5, 757:10, 774:16, 810:25, 817:8, 820:7, 838:7
**defendant's** [1] - 570:16
**Defendant's** [3] - 679:25, 685:5, 746:4
**defendants** [6] - 556:17, 668:14, 718:16, 740:8, 774:5, 783:3
**defense** [1] - 620:22
**Defense** [2] - 718:4, 739:19
**defer** [1] - 666:9
**define** [1] - 757:15
**defined** [3] - 757:22, 772:24, 774:2
**defines** [1] - 757:16
**defining** [2] - 659:15, 763:14
**definitely** [2] - 561:7, 788:9
**definition** [9] - 756:19, 756:20, 757:1, 757:23, 758:3, 763:1, 763:3, 785:10
**degree** [8] - 670:7, 675:1, 678:17, 737:21, 737:23, 780:12, 785:1, 785:2
**degrees** [1] - 778:23
**DEIRDRE** [1] - 554:8
**DELAWARE** [1] - 553:2
**delay** [16] - 580:10, 591:25, 592:16, 592:17, 599:12, 601:3, 608:20, 609:24, 639:23, 657:18, 659:1, 659:8, 659:9, 659:13, 659:15, 848:19
**deliberating** [1] - 698:17
**delicate** [1] - 677:22
**deliver** [1] - 740:6
**delivered** [3] - 738:24, 739:23, 747:8
**delivering** [1] - 739:24
**delivery** [10] - 672:15, 738:23, 739:5, 739:10, 740:10, 754:9, 757:20, 757:24, 758:5, 761:14
**demand** [2] - 660:6, 660:11
**demonstrate** [1] - 759:3
**demonstrated** [3] - 746:21, 818:18, 842:3
**demonstrates** [3] - 823:25, 826:25, 828:16
**demonstrating** [1] - 813:10
**demonstrative** [17] - 622:12, 714:24, 715:6, 721:7, 740:21, 740:22, 742:4, 743:8, 778:15, 778:18, 778:19, 785:18, 785:19, 794:6, 813:25, 822:12, 822:23
**demonstratives** [8] - 714:11, 737:10, 737:13, 742:2, 774:24, 775:2, 775:3, 784:6
**Dendreon** [1] - 670:23
**Dennies** [1] - 668:3
**DENNIES** [1] - 554:6
**deny** [1] - 666:23
**department** [1] - 736:11
**Department** [2] - 718:4, 739:19
**dependent** [2] - 747:5, 846:17
**depicted** [2] - 626:13, 688:24
**depicts** [1] - 740:21
**Deposition** [1] - 643:13
**deposition** [9] - 556:8, 558:12, 558:14, 558:18, 561:6, 586:11, 643:2, 643:3, 770:18
**depositions** [1] - 667:4
**deputy** [3] - 667:21, 835:21, 846:8
**DEPUTY** [6] - 667:23, 668:4, 713:18, 735:16, 750:24, 774:10
**derive** [1] - 730:12
**derived** [20] - 682:18, 773:13, 773:15, 773:19, 791:18, 791:23, 793:12, 793:16, 793:22, 794:7, 794:9, 794:12, 794:20, 795:8, 795:22, 796:1, 796:25, 829:5, 829:6, 829:22
**DESAI** [1] - 554:7
**Desai** [1] - 846:13
**describe** [31] - 669:1, 670:15, 671:5, 672:14, 680:21, 685:19, 688:3, 688:23, 693:11, 693:12, 715:9, 726:10, 737:19, 752:2, 775:13, 778:20, 787:1, 789:11, 789:12, 791:17, 804:14, 805:9, 805:10, 811:19, 813:25, 817:22, 818:4, 833:1, 837:8, 843:23
**described** [14] - 596:24, 676:17, 777:14, 780:3, 784:12, 788:8, 798:4, 804:10, 806:20, 808:11, 823:24, 827:12, 830:23, 837:10
**describes** [7] - 754:23, 811:7, 811:9, 821:23, 826:2, 826:10, 844:11
**describing** [2] - 683:5, 687:20
**description** [2] - 634:10, 833:2
**descriptions** [1] - 694:8
**deserved** [1] - 695:7
**design** [25] - 573:5, 573:6, 575:4, 575:8, 575:22, 575:24, 576:7, 576:21, 577:4, 577:19, 577:21, 577:23, 578:24, 592:6, 592:8, 614:13, 633:16, 656:14, 657:8, 659:12, 659:15, 659:17, 738:20, 739:9, 739:19
**design-around** [16] - 575:4, 575:8, 575:22, 575:24, 576:7, 576:21, 577:4, 577:19, 577:21, 592:6, 592:8, 614:13, 656:14, 659:12, 659:15, 659:17
**design-arounds** [4] - 573:5, 573:6, 577:23, 578:24
**designations** [1] - 770:18
**designed** [7] - 592:6, 638:21, 659:2, 662:16, 676:22, 695:14, 744:14
**desirable** [1] - 616:10
**desired** [2] - 586:9, 838:25
**desiring** [1] - 831:20
**desk** [1] - 807:21
**Desk** [2] - 569:18, 572:3
**detail** [1] - 567:2
**detailed** [2] - 697:10, 700:18
**details** [2] - 574:25, 701:1
**detection** [2] - 836:9, 836:10
**detergent** [3] - 684:10, 709:14, 709:19
**detergents** [3] - 684:2, 684:3, 684:9
**determine** [11] - 591:24, 597:20, 659:25, 665:1, 665:14, 666:1, 717:4, 775:10, 779:19, 784:9, 816:14
**determined** [2] - 592:3, 649:18
**determines** [1] - 584:15
**Detrick** [1] - 718:6
**develop** [3] - 716:8, 753:7, 806:12
**developed** [6] - 691:3, 718:13, 740:18, 772:14, 812:2
**developing** [3] - 716:12, 717:13, 772:19
**development** [9] - 672:3, 672:4, 715:12, 717:12, 717:20, 718:9, 718:18, 753:8, 772:7
**device** [1] - 564:17
**diagnostic** [1] - 757:18
**diagram** [2] - 808:21, 809:20
**dialysis** [1] - 826:4
**dialyzed** [2] - 824:23, 826:8
**dialyzing** [1] - 826:3
**differ** [1] - 776:20
**difference** [24] - 584:10, 584:18, 587:23, 599:12, 622:23, 625:8, 625:9, 661:17, 662:4, 677:13, 721:18, 721:21, 721:23, 722:14, 722:18, 722:23, 723:21, 724:3, 727:19, 727:22, 728:1, 729:3, 734:6, 744:19
**differences** [10] -

721:6, 721:8, 721:10, 721:22, 724:7, 725:14, 773:9, 783:17, 784:11, 787:17
**different** [87] - 555:8, 563:15, 563:24, 571:15, 578:24, 584:5, 584:8, 591:12, 594:1, 594:4, 594:6, 594:7, 606:20, 607:20, 608:2, 608:5, 608:14, 608:21, 608:25, 609:2, 609:3, 620:13, 624:4, 625:16, 625:23, 628:17, 640:2, 645:22, 652:11, 652:20, 654:4, 654:12, 660:21, 661:2, 664:14, 669:6, 686:8, 688:17, 690:11, 691:3, 694:8, 705:15, 706:16, 706:19, 711:5, 716:5, 721:14, 721:16, 721:17, 722:12, 724:15, 726:22, 728:13, 729:5, 736:25, 737:1, 756:5, 776:22, 776:23, 776:24, 777:16, 779:12, 781:25, 787:6, 799:7, 799:17, 803:1, 804:15, 805:10, 809:14, 812:22, 813:8, 816:12, 817:20, 817:23, 820:24, 821:2, 821:16, 822:6, 822:13, 822:22, 828:20, 830:11, 844:13
**different-colored** [2] - 799:7, 799:17
**differential** [1] - 589:15
**differentiate** [2] - 586:4, 586:18
**differentiating** [1] - 571:6
**difficult** [2] - 808:13, 847:25
**difficulty** [1] - 666:10
**diffusion** [30] - 643:19, 676:9, 676:13, 676:23, 677:16, 678:21, 681:25, 687:15, 688:1, 688:11, 688:21, 689:9, 689:11, 689:13, 737:4, 737:5, 738:22, 741:20, 743:6, 743:17, 744:14, 744:20, 744:22, 744:25, 745:6, 745:11, 769:6, 769:8, 769:10, 769:13
**dig** [1] - 778:7
**digits** [1] - 694:14
**dilutions** [2] - 695:22, 722:11
**dimensional** [1] - 741:1
**diminish** [1] - 725:4
**dip** [1] - 641:3
**dipping** [1] - 641:6
**direct** [20] - 605:11, 607:11, 608:7, 608:9, 615:4, 615:17, 619:17, 620:4, 629:21, 661:20, 699:19, 701:22, 702:10, 702:19, 704:16, 732:14, 734:8, 749:25, 752:16, 760:23
**DIRECT** [6] - 580:19, 668:17, 714:2, 735:25, 751:8, 774:18
**directed** [5] - 789:20, 792:1, 792:5, 813:4, 813:5
**direction** [1] - 748:5
**directly** [11] - 556:25, 560:8, 577:3, 637:7, 654:12, 673:1, 700:18, 743:12, 763:2, 811:17, 814:24
**disaccharide** [13] - 709:11, 709:24, 710:8, 710:12, 710:15, 712:14, 731:10, 731:17, 732:6, 732:19, 732:22, 749:17, 780:1
**disaccharides** [1] - 813:13
**disadvantage** [1] - 640:18
**disadvantages** [1] - 640:9
**disagree** [20] - 558:17, 617:24, 619:8, 626:18, 628:6, 629:5, 631:23, 632:19, 633:7, 634:2, 645:10, 703:23, 704:1, 704:6, 704:11, 714:22, 731:9, 732:3, 732:9, 852:1
**disagrees** [1] - 566:8
**disclosed** [8] - 557:3, 560:14, 566:24, 575:4, 655:13, 680:22, 720:23, 796:10
**discloses** [1] - 683:13
**disclosure** [3] - 567:25, 573:23, 834:5
**discount** [3] - 590:6, 598:7, 599:8
**discouraged** [1] - 843:12
**discovered** [2] - 690:7, 780:10
**discovering** [1] - 715:25
**discretion** [1] - 571:22
**discuss** [9] - 606:9, 645:15, 697:8, 698:17, 747:10, 751:16, 751:20, 762:3, 762:6
**discussed** [21] - 572:25, 573:5, 573:8, 574:18, 598:12, 599:18, 615:17, 619:16, 651:3, 659:20, 663:21, 696:1, 701:21, 702:9, 704:15, 759:24, 760:23, 762:2, 791:19, 805:18
**discusses** [2] - 765:15, 791:17
**discussing** [13] - 555:23, 577:22, 580:4, 580:24, 599:19, 644:6, 654:18, 654:21, 699:18, 702:13, 771:12, 771:14, 791:16
**discussion** [13] - 576:13, 603:7, 612:17, 613:4, 613:21, 631:8, 633:25, 645:18, 697:23, 698:10, 753:20, 759:11, 782:22
**discussions** [4] - 695:13, 697:18, 708:18, 790:17
**Disease** [1] - 718:6
**disease** [19] - 786:8, 788:18, 788:19, 789:10, 789:13, 789:14, 789:15, 789:16, 790:6, 791:25, 792:2, 793:14, 793:15, 793:18, 793:20, 794:13, 806:16
**diseases** [6] - 789:23, 790:5, 792:9, 795:18, 829:8, 829:24
**dishes** [1] - 684:4
**disorder** [1] - 806:3
**displayed** [1] - 597:15
**dispute** [4] - 568:19, 568:20, 652:13, 652:19
**disregard** [3] - 641:23, 698:13, 698:16
**dissertation** [3] - 779:12, 810:15, 820:20
**distant** [1] - 678:22
**distilled** [1] - 812:8
**distinction** [1] - 711:6
**distributor** [2] - 648:4, 648:7
**District** [1] - 853:4
**DISTRICT** [2] - 553:1, 553:2
**Dittmann** [6] - 559:20, 561:13, 848:24, 849:9, 850:20, 851:10
**DITTMANN** [44] - 553:19, 555:16, 555:21, 557:3, 557:11, 557:25, 558:7, 558:10, 558:25, 559:5, 559:9, 559:13, 559:23, 560:16, 561:4, 561:14, 561:19, 562:5, 562:23, 563:1, 564:4, 564:11, 564:24, 565:3, 565:20, 565:25, 566:11, 566:25, 567:8, 567:15, 567:25, 568:17, 578:20, 579:3, 666:8, 666:16, 666:22, 846:22, 847:22, 848:21, 848:25, 849:12, 849:17, 850:21
**dive** [1] - 628:8
**divide** [1] - 786:16
**divided** [2] - 599:1, 659:3
**division** [1] - 660:19
**DNA** [8] - 635:14, 636:4, 636:9, 690:11, 738:12, 771:15, 833:8, 836:9
**docket** [1] - 665:22
**Docket** [2] - 555:7, 562:18
**Doctor** [66] - 604:6, 606:7, 607:3, 609:11, 613:25, 624:21, 627:6, 633:22, 634:9, 643:12, 644:20, 649:4, 653:4, 675:5, 676:19, 678:11, 680:3, 682:7, 684:18, 688:24, 713:17, 714:4, 714:8, 714:15, 728:4, 736:6, 740:14, 741:10, 743:19, 744:18, 746:7, 747:24, 748:7, 774:20, 775:5, 785:7, 789:8, 790:1, 791:14, 792:10, 793:8, 796:15, 806:19, 809:25, 811:3, 813:16, 818:19, 822:17, 825:5, 825:20, 826:17, 826:23, 828:19, 830:16, 831:23, 832:1, 832:21, 833:11, 834:12, 835:24, 838:21, 839:21, 840:12, 842:8, 843:2, 844:20
**doctor** [10] - 568:15, 574:1, 718:22, 745:16, 783:9, 821:10, 822:21, 834:24, 840:2, 841:15
**doctoral** [1] - 738:4
**doctors** [1] - 695:19

**document** [89] - 556:21, 557:16, 572:1, 573:1, 573:7, 573:8, 573:11, 574:25, 578:3, 587:7, 587:12, 593:22, 597:6, 597:7, 616:3, 617:16, 618:16, 618:20, 619:5, 619:16, 619:17, 620:3, 620:5, 620:8, 621:15, 624:9, 624:22, 625:18, 625:19, 636:3, 636:17, 636:18, 636:20, 636:24, 637:2, 637:4, 637:6, 643:13, 645:1, 660:24, 675:8, 679:16, 744:2, 744:4, 745:17, 745:18, 754:17, 754:19, 754:22, 756:23, 757:3, 758:12, 758:15, 762:2, 762:3, 765:3, 767:11, 768:14, 788:12, 788:15, 788:20, 792:12, 792:19, 792:22, 807:1, 807:7, 807:9, 810:3, 810:7, 810:9, 815:20, 816:3, 816:5, 816:14, 818:23, 819:25, 835:7, 835:8, 835:9, 835:12, 835:14, 835:19, 837:13, 837:14, 837:18, 842:9, 842:19
**document's** [1] - 572:2
**documented** [1] - 679:3
**documents** [24] - 560:21, 570:9, 570:24, 571:17, 573:22, 574:13, 580:3, 594:3, 595:2, 595:16, 597:8, 598:5, 598:10, 598:21, 599:19, 615:16, 624:12, 625:23, 643:4, 644:24, 645:11, 647:20, 654:15, 753:10
**dollar** [2] - 599:10
**dollars** [1] - 648:18
**domain** [2] - 704:5, 832:16
**done** [15] - 567:17, 592:23, 599:18, 649:9, 667:22, 673:6, 674:3, 674:12, 726:3, 735:11, 801:12, 802:19, 803:17, 815:15, 850:7
**dosage** [3] - 618:8, 755:19, 762:21
**dose** [4] - 688:19, 695:23, 747:5, 789:17
**dose-dependent** [1] - 747:5
**doses** [5] - 676:24, 677:10, 744:16, 745:12, 749:4
**dosing** [1] - 688:13
**double** [2] - 641:3, 641:6
**double-dip** [1] - 641:3
**double-dipping** [1] - 641:6
**doubt** [2] - 651:18, 651:22
**Dover** [2] - 848:12, 848:13
**Dowdy** [16] - 745:18, 745:20, 745:23, 745:24, 746:7, 746:9, 746:10, 746:13, 746:24, 746:25, 747:3, 747:4, 747:10, 747:12, 747:19, 748:1
**down** [40] - 560:24, 584:4, 585:11, 590:16, 599:21, 601:15, 618:15, 618:21, 628:15, 630:1, 630:7, 658:7, 658:13, 660:9, 670:10, 680:4, 681:18, 684:17, 689:4, 689:7, 693:20, 703:9, 704:13, 713:5, 735:11, 740:14, 750:21, 755:9, 764:3, 767:3, 770:15, 776:18, 788:1, 799:9, 807:16, 812:8, 815:3, 815:6, 826:14, 846:10
**downstream** [1] - 690:16
**Dr** [188] - 555:12, 555:14, 555:18, 555:22, 555:25, 556:5, 556:8, 556:9, 556:12, 556:14, 556:21, 556:22, 556:23, 556:25, 557:4, 557:9, 558:3, 558:11, 558:21, 558:22, 559:1, 559:9, 559:11, 559:17, 559:20, 559:21, 559:25, 560:8, 560:9, 560:15, 561:2, 561:5, 561:6, 561:21, 561:23, 562:4, 564:6, 566:13, 566:17, 568:3, 568:8, 568:12, 568:21, 572:23, 572:25, 575:1, 575:25, 576:3, 576:11, 576:18, 577:10, 577:23, 578:5, 579:9, 579:12, 579:16, 580:1, 580:17, 587:18, 590:19, 595:7, 596:17, 598:18, 599:22, 603:12, 604:3, 609:23, 611:12, 612:7, 619:4, 624:7, 628:10, 628:13, 628:23, 632:1, 634:24, 634:25, 635:2, 635:9, 642:23, 643:2, 643:22, 653:9, 658:6, 658:13, 658:21, 658:23, 659:5, 659:14, 659:18, 659:25, 660:18, 661:5, 661:9, 661:20, 662:8, 662:14, 662:24, 663:2, 663:4, 663:12, 663:16, 664:3, 664:11, 666:13, 667:11, 667:12, 668:14, 668:19, 675:24, 687:7, 698:22, 699:18, 712:21, 712:22, 713:4, 713:20, 714:7, 714:9, 714:16, 714:18, 714:21, 715:5, 718:17, 718:25, 719:2, 720:3, 720:6, 720:10, 725:19, 725:22, 729:23, 730:24, 731:1, 731:8, 735:10, 735:14, 736:2, 736:8, 736:10, 736:11, 736:14, 736:22, 738:6, 740:9, 742:22, 743:22, 744:11, 749:13, 749:20, 750:20, 750:23, 751:10, 753:14, 753:20, 755:7, 758:25, 759:5, 759:22, 768:15, 768:23, 770:14, 774:5, 774:23, 795:7, 800:8, 807:19, 807:20, 815:24, 830:16, 831:1, 840:2, 841:19, 842:6, 842:14, 843:4, 843:11, 846:10, 848:5, 848:12, 848:13, 851:5
**draft** [1] - 703:5
**drafting** [1] - 703:7
**Drago** [2] - 576:18, 609:23
**draw** [5] - 725:11, 725:14, 725:16, 744:9, 814:22
**drawn** [1] - 743:5
**draws** [1] - 743:3
**drill** [1] - 681:18
**drive** [5] - 556:7, 597:13, 616:14, 618:2, 618:6
**driver** [3] - 589:6, 589:7, 660:6
**drives** [1] - 642:4
**drop** [1] - 737:6
**drove** [1] - 660:11
**drug** [53] - 580:23, 583:7, 602:7, 602:11, 669:10, 669:14, 672:4, 672:15, 672:22, 678:4, 684:13, 684:14, 684:16, 695:12, 695:19, 695:20, 716:7, 716:10, 717:1, 717:4, 717:19, 722:8, 737:4, 737:8, 738:23, 739:22, 740:10, 741:21, 743:7, 743:10, 743:18, 747:8, 747:9, 749:2, 749:7, 749:10, 749:12, 752:13, 752:19, 752:20, 752:21, 754:9, 754:12, 757:21, 757:22, 758:1, 758:5, 762:10, 796:3, 828:5, 829:11, 834:25
**Drug** [4] - 752:12, 782:22, 788:15, 795:14
**drugs** [33] - 669:2, 669:4, 669:6, 669:7, 669:9, 670:4, 670:17, 670:19, 671:20, 671:21, 671:23, 672:17, 672:24, 678:3, 684:6, 691:11, 715:21, 715:23, 715:24, 716:4, 716:5, 717:5, 738:11, 738:12, 738:22, 738:24, 739:5, 739:9, 739:11, 753:9
**dry** [1] - 601:11
**DS1** [1] - 771:15
**DS2** [7] - 771:15, 772:7, 773:12, 836:12, 836:13, 836:14, 836:17
**DTX** [52] - 555:8, 555:17, 556:2, 556:21, 556:23, 557:7, 562:4, 562:5, 570:1, 644:12, 644:14, 644:25, 679:14, 679:22, 679:25, 685:2, 685:5, 720:8, 726:11, 745:16, 746:1, 746:4, 756:21, 756:25, 757:6, 757:10, 765:11, 765:14, 765:21, 766:12, 767:2, 767:14, 768:16, 810:1, 810:22, 810:25, 815:18, 817:4, 817:8, 818:21, 819:2, 819:22, 820:4, 820:7,

828:25, 833:10, 833:25, 837:12, 838:3, 838:7, 838:10, 838:17
**dude** [1] - 811:9
**due** [8] - 599:12, 641:11, 642:18, 657:4, 661:12, 663:5, 663:11, 663:16
**dumping** [1] - 798:11
**duration** [103] - 560:11, 564:2, 564:7, 564:10, 565:1, 565:4, 565:12, 565:23, 581:13, 581:21, 581:22, 582:12, 582:13, 582:21, 584:17, 585:16, 586:5, 586:8, 586:12, 586:13, 587:2, 587:20, 587:25, 588:4, 588:9, 588:23, 589:5, 589:14, 589:16, 601:3, 602:10, 616:10, 618:7, 618:11, 618:12, 618:13, 641:10, 641:14, 641:19, 641:23, 642:3, 642:4, 642:13, 642:18, 642:20, 643:19, 644:7, 645:7, 645:15, 654:8, 655:9, 655:16, 663:3, 663:5, 663:8, 663:11, 663:14, 663:15, 674:25, 676:9, 676:14, 678:18, 687:16, 688:1, 688:14, 688:18, 688:21, 714:19, 715:4, 719:1, 719:10, 719:14, 719:19, 720:5, 724:20, 724:22, 725:21, 727:20, 728:6, 729:3, 729:7, 729:10, 730:13, 736:19, 736:23, 737:3, 741:16, 745:4, 745:5, 745:12, 747:18, 747:19, 748:6, 748:20, 748:22, 749:1, 749:4, 749:6, 749:12, 754:11, 759:15, 770:5, 770:10
**duration-of-action** [3] - 714:19, 725:21, 736:19
**during** [36] - 556:23, 561:5, 572:13, 572:23, 572:24, 573:25, 574:14, 574:23, 605:13, 613:2, 624:2, 625:24, 628:18, 629:7, 629:12, 654:14, 659:8, 661:22, 697:5, 699:18, 701:21, 702:10, 702:19, 704:15, 710:19, 711:1, 717:20, 759:24, 760:23, 769:16, 771:13, 779:15, 780:2, 807:14, 813:14, 820:20
**dynamics** [1] - 738:9

## E

**early** [3] - 800:8, 819:11, 820:17
**earned** [1] - 737:22
**earth** [1] - 558:9
**easier** [2] - 572:15, 684:6
**easy** [1] - 681:9
**eaten** [1] - 671:24
**Ebola** [2] - 718:7, 718:8
**economic** [1] - 661:17
**economist** [5] - 573:10, 573:14, 606:19, 635:17, 644:21
**education** [1] - 669:19
**educational** [4] - 715:7, 737:16, 752:2, 778:16
**effect** [31] - 557:13, 559:15, 560:18, 566:10, 583:1, 629:3, 675:1, 675:4, 678:8, 678:18, 678:23, 681:24, 745:6, 747:18, 762:1, 762:4, 762:16, 763:6, 763:12, 765:2, 766:18, 766:19, 769:2, 769:19, 769:20, 769:22, 806:2
**effective** [2] - 716:21, 737:3
**effectively** [1] - 564:21
**effects** [10] - 677:20, 677:25, 679:2, 747:20, 748:6, 755:18, 757:19, 762:20, 763:9
**efficacy** [7] - 559:16, 678:17, 687:16, 687:18, 688:2, 745:11, 752:21
**efficient** [2] - 798:3, 830:25
**effort** [1] - 697:13
**efforts** [1] - 716:15
**eight** [6] - 553:12, 721:25, 722:10, 722:21, 723:17, 752:24
**either** [10] - 556:1, 565:2, 573:8, 659:19, 660:13, 660:21, 665:16, 700:7, 765:24, 782:14
**elaborate** [2] - 585:22, 688:1
**elective** [1] - 738:23
**electrophoresis** [2] - 809:8, 818:7
**electrostatic** [2] - 740:5, 800:9
**electrostatics** [1] - 743:6
**elements** [1] - 721:16
**elicited** [1] - 556:9
**eliminate** [3] - 712:6, 794:15, 797:4
**eliminating** [2] - 788:3, 794:14
**Elmo** [1] - 649:6
**eluent** [3] - 801:11, 826:5, 827:25
**eluted** [6] - 825:17, 825:23, 826:15, 826:16, 826:19, 826:22
**embodiments** [1] - 687:12
**emphasis** [1] - 670:19
**employed** [3] - 715:14, 753:3, 832:5
**employee** [2] - 792:25, 832:12
**employment** [1] - 715:15
**empty** [1] - 691:25
**encouraging** [1] - 611:9
**end** [21] - 570:15, 593:5, 601:18, 601:22, 602:4, 623:7, 623:21, 675:22, 677:8, 687:10, 691:23, 692:9, 716:2, 723:13, 741:5, 764:17, 786:13, 787:20, 803:4, 827:18, 849:7
**ended** [6] - 613:21, 696:8, 698:10, 774:4, 780:14, 799:10
**endpoint** [1] - 708:2
**engage** [1] - 663:17
**engineering** [7] - 715:11, 737:22, 737:24, 737:25, 738:1, 738:15, 738:19
**English** [1] - 728:2
**enhanced** [2] - 687:17, 688:2
**enhances** [1] - 747:15
**enhancing** [2] - 757:20, 757:25
**ensure** [2] - 752:21, 773:16
**enter** [3] - 679:21, 685:1, 693:5
**entered** [5] - 580:8, 612:19, 667:18, 713:12, 791:8
**enters** [1] - 761:24
**entire** [10] - 558:2, 585:7, 585:15, 616:7, 641:16, 658:24, 659:6, 659:22, 659:23, 660:12
**entities** [5] - 645:21, 645:22, 649:13, 651:4
**entitled** [3] - 658:20, 662:24, 665:6
**entity** [2] - 651:5
**entrant** [2] - 586:3, 617:19
**entry** [1] - 665:22
**environment** [1] - 830:9
**enzyme** [1] - 786:6
**epicenter** [1] - 780:20
**equal** [2] - 577:12, 636:10
**equals** [1] - 827:8
**equate** [1] - 688:17
**equation** [1] - 664:17
**equipment** [1] - 669:13
**equity** [1] - 598:6
**ERIC** [1] - 553:19
**Eric** [6] - 810:13, 810:14, 810:15, 819:1, 820:19, 820:21
**errand** [1] - 571:9
**error** [1] - 686:19
**especially** [3] - 571:5, 673:5, 677:22
**ESQ** [17] - 553:16, 553:19, 553:19, 553:20, 553:20, 553:21, 553:21, 553:22, 553:22, 554:3, 554:3, 554:6, 554:6, 554:7, 554:7, 554:8, 554:10
**Essentially** [1] - 812:14
**essentially** [11] - 572:7, 578:24, 640:11, 672:20, 677:2, 746:10, 776:6, 812:19, 827:18, 827:21, 828:13
**establish** [1] - 660:11
**established** [4] - 660:8, 732:18, 733:18, 772:20
**estimate** [3] - 608:11, 609:4, 660:10
**estimated** [2] - 608:12, 664:16
**et** [1] - 553:6
**Europe** [2] - 700:9, 700:16
**evaluate** [1] - 596:23
**evaluated** [1] - 717:7
**evaluating** [1] - 591:25
**event** [7] - 558:6, 579:21, 594:16, 849:4, 852:4, 852:10, 852:17
**eventually** [2] - 677:4, 821:16
**evidence** [60] - 562:20, 564:22, 571:17, 572:9, 579:13, 579:14, 586:16, 589:17, 592:2, 596:11, 597:11, 598:10, 598:14, 624:14, 637:18, 659:10,

659:11, 659:16, 660:4, 660:12, 661:16, 662:2, 662:19, 663:9, 663:25, 664:5, 664:6, 664:11, 664:21, 664:25, 665:10, 665:12, 665:19, 665:20, 665:24, 666:6, 666:9, 675:17, 679:22, 685:2, 693:6, 745:14, 746:1, 755:1, 757:7, 758:18, 789:1, 793:2, 807:24, 810:23, 817:5, 820:4, 835:17, 838:4, 842:21, 847:10, 847:14, 851:17, 851:20, 851:22
**evidentiary** [9] - 662:3, 662:20, 663:10, 664:1, 664:8, 665:1, 665:13, 665:14, 665:25
**exact** [11] - 669:13, 681:4, 683:7, 683:13, 683:14, 689:5, 697:16, 720:22, 731:21, 743:1, 816:14
**exactly** [16] - 569:9, 570:7, 594:14, 623:3, 623:5, 625:21, 628:9, 632:11, 640:10, 649:17, 650:24, 692:22, 694:20, 722:13, 741:23, 768:19
**examination** [18] - 572:23, 573:13, 573:16, 573:20, 575:9, 576:11, 577:5, 578:11, 654:14, 663:7, 664:13, 699:14, 699:19, 701:22, 702:10, 702:20, 704:16, 760:24
**EXAMINATION** [13] - 580:19, 604:1, 653:7, 668:17, 699:16, 714:2, 730:22, 735:25, 748:15, 751:8, 759:20, 768:20, 774:18
**examine** [2] - 573:10, 652:2
**examined** [3] - 572:25, 573:14, 651:25
**examiner** [6] - 840:13, 840:14, 840:23, 841:9
**examining** [2] - 574:7, 579:7
**example** [13] - 563:2, 569:16, 571:2, 601:2, 608:14, 632:16, 685:20, 688:23, 693:25, 746:15, 749:10, 757:20, 801:6
**Example** [6] - 680:20, 685:17, 685:18, 686:17, 688:24
**examples** [2] - 680:17, 691:17
**Excel** [1] - 594:4
**except** [8] - 669:3, 674:24, 689:5, 689:12, 712:7, 728:20, 729:17, 731:21
**excerpt** [1] - 634:19
**excerpted** [1] - 573:22
**exchange** [63] - 569:10, 634:20, 634:23, 635:6, 636:1, 693:24, 703:20, 742:23, 776:18, 776:19, 800:6, 800:7, 800:16, 800:20, 802:2, 802:3, 802:4, 802:5, 802:12, 803:18, 805:22, 808:16, 808:17, 808:19, 808:20, 811:10, 811:21, 811:22, 817:24, 821:24, 822:1, 824:15, 824:19, 824:23, 825:3, 825:9, 825:11, 825:14, 826:9, 826:10, 826:13, 833:21, 833:22, 834:3, 834:11, 834:16, 834:21, 836:18, 837:2, 839:9, 839:13, 840:9, 841:16, 841:21, 842:4, 843:6, 843:12, 844:14, 844:21, 845:2, 845:14
**Exchange** [1] - 700:4
**exchanged** [1] - 708:18
**exchanges** [1] - 850:4
**excipient** [17] - 682:3, 751:19, 754:4, 754:5, 754:8, 756:19, 757:2, 757:15, 757:23, 757:24, 758:3, 759:8, 763:2, 763:3, 763:11, 763:14, 766:7
**excipients** [4] - 682:11, 751:20, 754:11, 757:16
**excited** [2] - 679:12, 695:6
**exciting** [4] - 671:13, 679:7, 697:17, 699:2
**exclusively** [2] - 781:17, 797:21
**excuse** [4] - 580:11, 648:2, 725:2, 755:24
**executive** [3] - 672:2, 782:5, 836:1
**exercise** [1] - 673:16
**exert** [4] - 755:18, 757:19, 762:20, 763:9
**exhibit** [6] - 569:22, 573:20, 616:1, 635:25, 687:12, 846:8
**Exhibit** [20] - 596:15, 597:17, 624:18, 643:14, 675:20, 679:25, 685:2, 685:5, 693:9, 746:4, 757:10, 758:21, 789:4, 793:5, 808:2, 810:25, 817:8, 820:7, 838:7, 842:24
**exhibits** [9] - 568:22, 595:7, 598:22, 604:6, 643:3, 643:8, 847:20, 847:23, 851:4
**Exhibits** [3] - 594:19, 596:15, 598:15
**exist** [5] - 606:23, 610:12, 611:21, 613:2, 613:14
**existing** [3] - 576:16, 605:1, 606:21
**exited** [4] - 658:11, 713:3, 791:4, 846:9
**expect** [8] - 587:13, 590:12, 592:5, 633:14, 728:6, 728:8, 729:11, 729:12
**expectation** [3] - 571:8, 617:2, 784:4
**expectations** [4] - 592:4, 592:21, 599:15, 614:6
**expected** [18] - 589:5, 592:16, 592:18, 598:25, 599:2, 658:25, 659:3, 659:7, 660:1, 661:22, 662:9, 674:6, 674:9, 760:11, 760:16, 830:4, 831:10, 831:13
**expensive** [2] - 831:2, 831:9
**experience** [9] - 705:18, 717:10, 717:12, 717:21, 717:24, 750:1, 751:24, 785:3, 849:3
**experiences** [1] - 671:5
**experiment** [5] - 677:15, 725:8, 726:3, 727:6, 730:17
**experimental** [1] - 695:15
**experiments** [3] - 674:3, 675:14, 779:18
**expert** [50] - 555:12, 555:22, 559:21, 560:7, 560:12, 563:9, 565:21, 568:9, 570:23, 573:2, 574:8, 574:18, 576:17, 578:2, 578:12, 583:20, 610:16, 611:7, 614:20, 615:1, 627:15, 627:18, 628:5, 628:8, 630:20, 636:6, 637:10, 639:2, 643:25, 644:17, 648:16, 649:16, 650:24, 652:1, 652:10, 653:13, 655:14, 718:17, 740:9, 750:5, 753:14, 782:21, 783:4, 795:2, 816:2, 817:16, 830:17, 840:3, 842:16, 848:5
**expertise** [2] - 690:24, 694:21
**experts** [10] - 566:14, 569:17, 569:19, 571:15, 571:16, 573:7, 577:12, 577:22, 578:7, 600:4
**experts'** [1] - 566:21
**expiration** [9] - 583:2, 583:8, 583:10, 602:4, 627:16, 628:7, 659:4, 660:22, 661:24
**expire** [4] - 610:9, 661:4, 661:7
**expired** [4] - 611:5, 626:24, 628:24, 661:14
**expires** [14] - 582:23, 583:4, 602:3, 602:12, 610:14, 610:19, 610:24, 611:17, 626:15, 630:6, 630:14, 632:3, 637:3, 637:5
**explain** [20] - 563:20, 577:12, 582:5, 591:24, 627:19, 629:11, 676:4, 677:11, 678:12, 682:8, 683:2, 683:24, 690:2, 721:13, 725:25, 742:7, 755:13, 799:2, 801:10, 852:8
**explained** [3] - 568:3, 591:17, 665:21
**explaining** [1] - 620:9
**explains** [2] - 620:19, 637:21
**explanation** [3] - 563:11, 622:14, 622:16
**explicit** [1] - 573:6
**export** [2] - 561:24, 771:5
**exposure** [1] - 739:20
**expressly** [2] - 560:17, 781:21
**extend** [2] - 749:4, 759:15
**extended** [1] - 749:9
**extended-release** [1] - 749:9
**extending** [1] - 770:10
**extensive** [3] - 574:1, 574:5, 840:17
**extensively** [1] - 806:22

**extent** [4] - 676:23, 701:14, 744:14, 851:14
**extra** [3] - 673:14, 702:14, 749:12
**extracellular** [1] - 745:3
**extremely** [2] - 842:5
**eyelids** [1] - 678:1
**eyes** [3] - 733:11, 783:18, 850:8

## F

**face** [3] - 620:14, 677:22, 677:23
**faceted** [1] - 645:20
**facilitates** [1] - 747:4
**facility** [2] - 562:15, 673:13
**fact** [37] - 565:23, 570:19, 573:5, 574:10, 574:11, 574:15, 574:20, 586:16, 589:6, 592:6, 592:7, 592:25, 611:6, 612:22, 613:2, 633:10, 633:18, 641:6, 650:3, 650:11, 653:21, 653:25, 657:2, 661:20, 662:17, 683:5, 700:22, 763:5, 794:25, 807:17, 819:14, 832:12, 839:17, 841:7, 842:5, 843:19, 851:22
**factor** [6] - 589:23, 600:1, 600:13, 600:15, 653:21, 702:25
**factors** [16] - 574:3, 599:24, 600:3, 600:4, 600:8, 600:9, 600:13, 600:18, 601:10, 601:14, 601:16, 606:1, 613:24, 642:19, 650:24, 785:6
**factory** [1] - 690:5
**facts** [6] - 574:3, 579:19, 633:25, 638:24, 662:13, 663:23
**factual** [1] - 567:24
**faculty** [6] - 715:22, 715:24, 716:1, 716:11, 717:14, 738:14
**failed** [4] - 659:18, 664:11, 707:25, 708:8
**fails** [1] - 663:12
**failure** [3] - 571:4, 571:6, 662:7
**fair** [3] - 565:20, 572:12, 624:1
**fairly** [1] - 611:12
**familiar** [2] - 583:22, 701:15
**families** [1] - 613:8
**family** [1] - 670:1
**fan** [1] - 669:11
**far** [13] - 562:1, 569:23, 619:4, 627:21, 635:20, 692:23, 721:15, 721:21, 729:25, 730:17, 782:14, 845:1, 848:3
**faster** [1] - 687:18
**fat** [1] - 684:8
**fatal** [1] - 789:16
**FBI** [1] - 673:10
**FDA** [107] - 555:17, 555:23, 556:1, 556:6, 556:11, 557:5, 558:2, 558:8, 558:21, 560:7, 560:12, 560:17, 561:6, 561:9, 576:16, 576:18, 576:21, 576:22, 577:1, 592:11, 592:12, 609:25, 614:4, 614:15, 614:17, 614:22, 614:24, 628:25, 632:2, 632:17, 635:15, 636:2, 636:22, 639:1, 660:16, 716:3, 716:6, 750:5, 750:8, 750:13, 751:16, 751:20, 751:22, 752:10, 752:11, 752:12, 752:15, 752:19, 752:23, 752:25, 753:4, 753:6, 753:11, 753:14, 753:22, 754:2, 754:3, 755:8, 756:12, 757:1, 757:15, 757:16, 757:18, 758:7, 758:16, 758:25, 759:2, 759:6, 759:8, 759:11, 760:1, 760:4, 760:6, 760:9, 760:14, 761:21, 763:11, 765:15, 766:14, 766:16, 766:22, 767:23, 768:8, 769:17, 770:1, 778:6, 782:1, 789:8, 789:18, 789:19, 789:20, 790:1, 790:3, 790:7, 790:14, 790:16, 790:17, 790:22, 791:16, 791:17, 791:19, 791:25, 792:3, 792:5, 794:25
**FDA's** [7] - 753:23, 756:19, 756:20, 757:23, 758:3, 759:24, 763:3
**FDA-approved** [1] - 577:1
**FDA-related** [1] - 751:22
**FDA-submitted** [1] - 636:2
**feature** [10] - 581:23, 581:24, 585:17, 586:8, 586:9, 601:1, 601:3, 602:10, 608:24, 632:25
**features** [8] - 601:6, 660:2, 660:3, 660:5, 663:12, 663:16, 688:4, 740:23
**federal** [2] - 673:11, 752:12
**feed** [1] - 696:15
**feet** [1] - 807:18
**fell** [1] - 617:6
**fellow** [1] - 846:6
**fellowship** [6] - 736:16, 738:5, 738:7, 738:8, 738:13, 738:14
**fellowships** [1] - 752:6
**felt** [3] - 666:11, 666:14, 743:22
**FEMS** [2] - 816:22, 816:24
**fermentation** [13] - 669:4, 786:14, 787:1, 787:3, 787:11, 787:12, 787:15, 787:23, 797:15, 803:14, 804:4, 829:2, 833:8
**fermenter** [1] - 690:9
**few** [7] - 599:22, 671:18, 691:1, 732:16, 793:19, 848:10, 849:14
**field** [18] - 668:24, 718:17, 780:18, 780:22, 783:4, 785:3, 790:11, 790:22, 795:19, 797:12, 805:10, 805:16, 813:18, 813:19, 813:23, 817:2, 841:15, 843:5
**fifth** [4] - 582:15, 586:3, 672:5
**Figure** [19] - 556:22, 557:19, 557:21, 558:23, 558:24, 559:3, 559:22, 560:9, 561:18, 685:17, 685:19, 686:4, 746:15, 809:5, 809:6, 818:4, 818:6, 818:8
**figure** [13] - 555:9, 559:3, 565:7, 595:9, 663:21, 674:4, 686:3, 696:2, 726:23, 727:24, 732:11, 742:8, 809:7
**figured** [2] - 669:22, 670:2
**figures** [4] - 726:10, 807:12, 843:18, 844:17
**figuring** [2] - 618:17, 675:15
**file** [1] - 680:12
**filed** [9] - 562:14, 613:14, 665:21, 680:3, 680:4, 685:11, 685:12, 701:10, 772:1
**files** [1] - 594:4
**filing** [2] - 576:18, 576:21
**filler** [1] - 616:24
**filter** [2] - 798:9, 834:19
**filters** [1] - 831:21
**final** [11] - 628:19, 638:2, 673:24, 692:20, 724:3, 756:5, 761:4, 761:22, 764:18, 777:2, 828:11
**finally** [4] - 664:3, 665:5, 697:1, 779:3
**finance** [1] - 599:7
**financial** [2] - 697:20, 698:5
**findings** [3] - 678:16, 679:6, 679:12
**fine** [7] - 568:14, 568:15, 568:17, 633:17, 700:7
**fingerprinted** [1] - 673:9
**finish** [2] - 796:16, 845:21
**finished** [6] - 619:1, 785:7, 796:15, 799:10, 845:23, 852:11
**first** [83] - 555:22, 555:24, 556:13, 558:16, 561:12, 567:8, 567:16, 567:21, 573:4, 574:18, 585:1, 588:8, 588:13, 596:7, 599:23, 602:1, 602:3, 604:11, 610:2, 610:6, 610:23, 611:16, 611:22, 613:5, 620:22, 621:9, 626:15, 626:24, 627:10, 627:13, 628:3, 628:24, 630:6, 632:3, 634:12, 637:3, 637:4, 643:16, 647:14, 649:23, 653:23, 656:4, 656:9, 659:9, 660:22, 661:7, 667:11, 668:14, 669:24, 669:25, 670:8, 670:21, 670:22, 672:13, 673:22, 676:6, 676:19, 676:25, 686:11, 686:13, 688:5, 688:6, 690:7, 690:25, 695:8, 696:6, 696:7, 708:22, 720:9, 721:23, 740:16, 744:9, 744:13, 755:10, 760:19, 762:18, 762:19, 771:4, 771:5, 771:8, 823:2, 826:16
**first-to-expire** [1] - 661:7
**five** [8] - 580:12, 752:7, 752:8, 782:17, 802:1, 802:12, 825:16, 825:22

**flag** [2] - 724:7, 725:1
**flask** [2] - 802:21, 803:4
**flasks** [1] - 802:9
**flawed** [2] - 641:25, 730:15
**floating** [1] - 803:15
**flow** [3] - 800:24, 801:11, 801:19
**flow-through** [1] - 801:11
**flowing** [1] - 692:15
**flows** [1] - 692:9
**fluid** [1] - 691:24
**focal** [1] - 625:25
**focus** [8] - 585:20, 588:4, 589:19, 619:21, 651:16, 669:3, 703:16, 711:8
**focused** [2] - 716:15, 761:1
**folks** [1] - 672:6
**follow** [7] - 621:1, 638:14, 696:11, 723:12, 821:14, 821:22, 835:20
**followed** [5] - 696:12, 700:21, 704:4, 721:20, 737:25
**following** [5] - 580:6, 667:1, 687:16, 713:7, 791:6
**follows** [7] - 651:23, 652:14, 668:11, 713:25, 735:23, 751:6, 774:17
**Food** [4] - 752:12, 782:21, 788:15, 795:14
**food** [9] - 679:2, 737:6, 779:3, 779:4, 787:4, 787:10, 787:14, 787:15, 788:2
**foodstuffs** [1] - 786:15
**fool's** [1] - 571:9
**foothold** [2] - 582:14, 585:17
**Footnote** [1] - 560:13
**footprint** [1] - 659:21
**footprints** [1] - 661:25
**FOR** [1] - 553:2
**force** [1] - 601:25
**forcing** [1] - 654:11
**forecast** [2] - 595:24, 596:8
**forecasts** [4] - 595:25, 596:17, 596:22, 597:1
**foregoing** [1] - 853:1
**forevermore** [1] - 686:25
**forget** [2] - 571:24, 850:25
**form** [3] - 676:20, 740:4, 792:19
**formation** [1] - 746:23
**forming** [4] - 745:20, 754:20, 757:3, 758:12
**formulate** [1] - 738:11
**formulated** [1] - 676:22
**Formulation** [12] - 726:15, 731:9, 731:22, 731:25, 732:3, 732:18, 732:21, 734:7, 734:15, 734:17, 734:18, 734:21
**formulation** [83] - 602:8, 602:11, 608:15, 608:21, 610:19, 612:8, 621:7, 639:4, 639:6, 640:5, 641:10, 641:12, 641:17, 641:23, 642:5, 643:20, 643:24, 645:2, 645:14, 663:1, 665:17, 666:3, 671:21, 674:19, 676:10, 676:12, 676:22, 677:6, 677:15, 678:4, 680:18, 681:1, 681:10, 682:15, 682:20, 686:1, 687:1, 688:11, 689:2, 689:3, 689:5, 689:10, 689:21, 707:12, 710:3, 711:16, 711:20, 711:23, 711:24, 712:6, 717:10, 717:12, 719:7, 720:23, 720:25, 721:1, 721:2, 721:17, 722:15, 722:20, 723:25, 724:4, 724:17, 725:5, 726:13, 733:20, 734:11, 735:2, 735:6, 738:9, 739:10, 744:13, 749:16, 749:17, 751:18, 756:6, 761:5, 761:22, 764:18, 779:24, 848:6
**formulations** [15] - 682:10, 682:13, 684:6, 687:14, 687:18, 689:1, 710:10, 720:15, 723:23, 731:20, 734:1, 734:2, 734:7, 734:14, 749:9
**Fort** [1] - 718:6
**forth** [15] - 558:2, 583:23, 631:18, 631:22, 631:24, 631:25, 633:1, 633:8, 665:10, 665:19, 683:7, 686:15, 692:14, 751:25, 759:25
**forward** [5] - 575:7, 667:13, 766:13, 779:19, 779:25
**foundation** [2] - 637:17, 736:16
**foundational** [1] - 636:15
**founded** [1] - 781:2
**founders** [1] - 781:3
**four** [18] - 594:1, 594:4, 594:8, 595:7, 618:12, 672:6, 721:14, 721:15, 721:16, 724:7, 732:4, 767:3, 801:23, 801:24, 802:14, 822:18, 836:6
**four-month** [1] - 618:12
**fourth** [2] - 724:3, 757:14
**fourths** [1] - 693:19
**FOX** [1] - 554:5
**fraction** [1] - 598:24
**fractions** [1] - 826:20
**fragment** [1] - 718:1
**fragments** [1] - 717:25
**frame** [2] - 562:24, 563:12
**framework** [1] - 601:10
**frank** [1] - 816:2
**Frank** [3] - 795:5, 816:1, 817:13
**free** [23] - 610:15, 610:20, 610:25, 611:4, 616:6, 627:14, 627:22, 627:25, 628:2, 661:15, 711:10, 776:1, 776:7, 776:8, 777:12, 792:15, 823:20, 824:1, 827:18, 827:21, 828:14, 829:19, 830:7
**frequently** [1] - 738:22
**front** [15] - 563:25, 568:9, 593:13, 651:11, 691:14, 743:24, 788:10, 792:10, 806:23, 840:13, 840:15, 840:22, 841:8, 847:2
**full** [12] - 587:1, 588:1, 637:12, 668:5, 713:19, 718:2, 735:17, 750:25, 774:11, 798:11, 799:5, 819:16
**function** [11] - 682:4, 715:20, 724:14, 729:21, 754:6, 756:5, 758:4, 758:6, 764:4, 764:13, 764:15
**functional** [1] - 682:3
**functionality** [4] - 756:7, 761:6, 761:23, 764:19
**fundamental** [1] - 558:10
**future** [1] - 654:25

## G

**G-O-O-D-N-O-U-G-H** [1] - 774:13
**garage** [1] - 672:8
**gathered** [1] - 716:25
**GAZA** [10] - 554:3, 772:8, 846:24, 847:5, 847:8, 847:13, 847:18, 848:17, 849:23, 850:2
**Gaza** [3] - 846:23, 846:25, 850:14
**GDNA** [1] - 836:8
**gears** [3] - 583:18, 704:14, 822:22
**gel** [4] - 707:1, 707:3, 809:14, 844:6
**gels** [4] - 843:18, 844:4, 844:16, 844:17
**gemish** [1] - 690:11
**gene** [1] - 738:12
**general** [11] - 586:21, 590:12, 601:13, 609:7, 706:14, 748:1, 748:2, 804:18, 821:10, 835:11, 851:15
**generally** [7] - 570:21, 584:2, 584:9, 591:14, 629:1, 784:18, 849:21
**generate** [3] - 629:14, 716:18, 716:19
**generated** [6] - 605:8, 720:1, 724:24, 726:25, 729:2, 730:14
**genes** [4] - 705:20, 705:22, 706:8, 738:24
**genetic** [1] - 833:7
**genetics** [1] - 779:1
**genomic** [1] - 836:8
**Georgia** [5] - 599:24, 600:3, 600:7, 601:16, 605:25
**Georgia-Pacific** [5] - 599:24, 600:3, 600:7, 601:16, 605:25
**Gessler** [25] - 666:13, 795:5, 795:7, 815:24, 816:1, 816:2, 816:17, 816:20, 817:11, 817:13, 817:18, 817:19, 817:20, 818:3, 818:4, 818:16, 822:20, 830:16, 831:1, 840:2, 841:19, 842:6, 842:14, 843:4, 843:11
**gigantic** [1] - 691:14
**given** [5] - 634:19, 644:22, 671:23, 698:14, 725:14
**glass** [3] - 730:1, 737:6, 800:2
**go-to** [1] - 706:18
**go-to-market** [1] - 654:9
**goal** [7] - 624:23, 670:5, 697:9, 773:1, 773:18, 779:21, 779:23
**goals** [5] - 772:20, 772:22, 772:23, 773:12, 773:15
**gobbledygook** [1] - 683:6
**GOLDSTEIN** [1] -

554:5
**good-sized** [1] - 654:11
**Goodnough** [8] - 774:6, 774:12, 774:23, 783:4, 811:9, 811:11, 846:10, 848:5
**GOODNOUGH** [1] - 774:14
**Goodnough's** [1] - 784:5
**Google** [1] - 696:15
**GORDON** [1] - 554:10
**gosh** [1] - 640:22
**government** [2] - 673:11, 795:1
**grad** [3] - 807:17, 810:15, 820:20
**grade** [9] - 781:6, 781:15, 781:17, 781:18, 781:20, 781:24, 787:17, 787:18, 831:21
**gradient** [1] - 826:21
**graduate** [3] - 670:10, 673:6, 738:20
**grant** [1] - 807:22
**granted** [2] - 612:2, 644:14
**graph** [6] - 629:2, 686:7, 686:9, 732:15, 732:17, 734:16
**graphs** [1] - 561:3
**great** [7] - 582:1, 606:13, 648:17, 671:11, 699:7, 793:10
**greater** [3] - 674:25, 678:17, 828:17
**green** [23] - 602:14, 625:12, 625:16, 726:8, 729:15, 729:16, 729:17, 729:19, 730:9, 734:11, 799:12, 799:16, 799:19, 799:20, 802:15, 802:16, 802:18, 803:5, 803:11, 804:6, 804:16, 814:22, 815:5
**gross** [4] - 659:7, 660:1, 662:9, 664:16
**grounds** [1] - 834:20
**groups** [1] - 801:22
**grow** [4] - 690:9, 700:12, 700:13, 786:16
**growing** [3] - 689:25, 786:14, 830:9
**grown** [1] - 786:20
**growth** [1] - 821:15
**guess** [10] - 562:4, 570:12, 579:8, 686:12, 696:23, 709:19, 847:7, 848:4, 848:7, 852:10
**guesstimates** [1] - 720:24
**guidance** [24] - 757:1, 757:15, 759:25, 778:6, 789:8, 789:18, 789:19, 789:20, 790:1, 790:3, 790:8, 790:14, 790:16, 790:18, 790:22, 791:17, 791:19, 792:1, 792:4, 792:5, 794:25, 795:15, 795:16
**guidelines** [3] - 651:21, 652:14, 782:2
**guinea** [1] - 716:24
**guy** [2] - 586:10, 672:5

## H

**half** [12] - 602:5, 602:6, 616:14, 630:1, 630:7, 712:24, 713:1, 713:6, 715:17, 716:8, 771:9, 850:6
**hall** [1] - 807:16
**hand** [29] - 567:11, 572:21, 573:23, 579:21, 588:5, 634:5, 701:17, 742:9, 742:16, 771:20, 775:16, 775:20, 775:24, 777:4, 781:25, 799:4, 799:9, 804:2, 804:13, 804:17, 805:8, 814:3, 814:5, 814:6, 823:4, 823:6, 823:8, 823:9, 846:7
**handed** [1] - 765:10
**handing** [1] - 579:6
**handle** [1] - 771:7
**handling** [2] - 673:7, 773:3
**handout** [1] - 835:19
**hands** [1] - 593:10
**handy** [1] - 845:16
**happy** [3] - 628:20, 706:5, 852:7
**hard** [7] - 573:12, 578:18, 597:13, 619:20, 632:8, 634:3, 850:23
**harm** [1] - 673:18
**harmless** [1] - 563:18
**HASTINGS** [1] - 553:18
**hazardous** [1] - 692:23
**HCP** [2] - 619:22, 619:25
**HCPs** [1] - 587:20
**head** [1] - 643:6
**Health** [2] - 752:7, 752:9
**healthcare** [3] - 586:7, 587:21, 619:25
**hear** [12] - 578:23, 628:13, 714:15, 736:18, 740:19, 772:5, 776:8, 778:3, 794:16, 851:17, 852:7, 852:10
**heard** [36] - 555:13, 558:16, 568:3, 568:13, 575:17, 575:23, 576:3, 578:20, 600:21, 605:2, 631:11, 632:1, 634:23, 635:2, 645:13, 650:23, 655:12, 706:13, 709:20, 719:6, 719:16, 724:14, 742:22, 751:14, 753:20, 769:9, 769:16, 776:13, 777:17, 786:2, 789:15, 797:7, 800:2, 847:6, 851:18, 852:5
**hearing** [5] - 556:14, 565:14, 572:24, 574:24, 846:15
**hearsay** [7] - 569:15, 570:6, 571:5, 571:6, 571:7, 571:22, 572:10
**heavy** [1] - 691:19
**held** [3] - 603:7, 612:17, 697:23
**help** [16] - 562:24, 611:9, 670:3, 671:25, 672:17, 684:4, 684:12, 707:4, 707:7, 739:19, 754:11, 755:13, 798:17, 842:5, 847:11, 847:15
**helped** [3] - 675:13, 707:12, 707:17
**helping** [5] - 707:20, 733:24, 738:11, 743:6, 743:16
**helps** [4] - 563:11, 703:5, 740:22, 798:7
**hemagglutinin** [2] - 804:21, 804:23
**hemagglutinin-A** [1] - 804:21
**hereby** [2] - 694:1, 852:24
**hide** [1] - 768:7
**high** [12] - 669:21, 690:2, 712:3, 729:13, 732:25, 754:1, 772:11, 772:12, 778:8, 778:11, 786:12, 799:2
**higher** [16] - 585:4, 588:3, 589:17, 590:2, 593:5, 618:4, 618:11, 674:6, 723:19, 728:9, 728:11, 729:13, 729:14, 748:19, 748:20
**highest** [2] - 588:8, 670:7
**highlight** [9] - 675:21, 676:6, 678:10, 739:17, 755:10, 766:3, 782:20, 815:4
**highlighted** [12] - 681:2, 687:11, 688:25, 720:22, 721:22, 744:24, 747:13, 800:21, 808:14, 814:23, 814:24, 825:10
**highlights** [1] - 687:7
**highly** [3] - 569:20, 683:17
**himself** [1] - 842:6
**hinted** [1] - 575:19
**hired** [1] - 672:2
**histidine** [5] - 723:22, 724:2, 726:5, 731:10, 732:5
**historical** [1] - 693:16
**history** [4] - 571:4, 571:5, 671:16, 698:3
**HIV** [3] - 673:6, 705:25, 706:2
**hmm** [2] - 651:13, 768:5
**HO** [1] - 553:21
**hold** [1] - 658:7
**holding** [1] - 654:10
**home** [3] - 556:8, 684:3, 798:10
**homogeneity** [1] - 809:17
**homogeneous** [2] - 827:2, 828:17
**honest** [3] - 760:8, 760:11, 760:13
**honestly** [3] - 555:9, 637:10, 647:10
**Honor** [139] - 555:16, 557:20, 557:25, 558:11, 561:14, 562:23, 565:10, 567:15, 567:23, 568:1, 571:14, 572:17, 572:20, 573:18, 574:17, 576:21, 578:1, 578:20, 579:4, 579:23, 579:24, 580:16, 594:10, 594:12, 594:21, 596:4, 596:10, 596:12, 597:10, 597:12, 598:9, 603:3, 603:9, 603:18, 603:22, 603:23, 611:23, 612:15, 613:1, 613:6, 613:20, 618:23, 624:13, 628:21, 633:3, 634:5, 635:16, 637:17, 637:23, 643:7, 648:23, 649:5, 649:22, 650:1, 651:1, 653:5, 655:23, 658:16, 666:8, 668:2, 668:13, 675:16, 679:21, 685:1, 693:5, 697:21, 698:1, 698:20, 699:13, 699:15, 708:20, 708:23, 711:13, 712:17, 712:21, 713:16, 718:16, 719:20, 719:22, 730:19, 735:9, 735:12, 735:13, 735:14, 740:8, 745:13, 745:25, 748:13, 750:17, 750:19, 750:22, 753:13,

753:16, 753:18, 754:25, 757:6, 758:17, 758:19, 759:17, 765:7, 765:20, 770:17, 770:25, 771:4, 771:7, 771:18, 772:5, 772:8, 783:3, 788:25, 789:5, 791:12, 793:1, 796:9, 807:23, 807:25, 817:4, 820:3, 820:5, 835:18, 838:3, 841:1, 845:19, 846:19, 846:22, 846:24, 846:25, 847:9, 847:15, 849:23, 850:2, 850:7, 850:12, 850:21, 851:9, 851:12, 851:25, 852:1, 852:12
**Honor's** [1] - 577:3
**Honorable** [1] - 553:11
**hope** [4] - 591:15, 619:4, 697:11, 798:12
**hopefully** [2] - 597:24, 850:11
**hoping** [1] - 678:12
**Hopkins** [2] - 670:11, 670:18
**Hospital** [1] - 715:16
**hospital** [2] - 715:19, 715:20
**hour** [5] - 712:25, 713:1, 713:6, 850:6
**house** [1] - 812:9
**housekeeping** [3] - 591:15, 601:18, 771:3
**houses** [1] - 669:12
**HSA** [2] - 682:19, 712:2
**huge** [4] - 586:19, 661:2, 690:10, 844:1
**Hui** [6] - 792:18, 792:24, 792:25, 832:2, 832:5, 832:12
**human** [20] - 682:18, 695:1, 695:3, 695:7, 712:2, 716:3, 716:22, 761:19, 761:20, 761:24, 762:11, 762:16, 762:25, 763:12, 763:21, 765:2, 768:4, 790:3, 793:20
**humans** [3] - 670:19, 790:3, 796:17
**hundred** [6] - 602:17, 602:20, 610:19, 610:25, 646:17, 840:23
**hundreds** [2] - 844:22, 845:16
**Hunt** [7] - 562:20, 563:23, 655:8, 655:12, 655:17, 709:2, 709:4
**hunt** [1] - 645:13
**hurt** [1] - 673:20
**hydrophobic** [4] - 693:23, 703:19, 777:18, 817:21
**hypothetical** [67] - 573:25, 574:4, 574:11, 574:14, 576:23, 577:2, 577:4, 577:21, 579:18, 581:7, 581:8, 581:15, 582:8, 584:3, 585:11, 586:23, 589:2, 589:4, 589:11, 592:4, 592:14, 600:16, 601:12, 605:13, 605:16, 605:20, 605:24, 609:15, 611:22, 612:5, 612:13, 612:20, 613:7, 613:13, 613:15, 615:23, 617:4, 622:25, 623:3, 627:1, 630:22, 631:9, 632:21, 633:9, 636:16, 636:19, 636:25, 638:2, 638:7, 638:13, 638:19, 638:22, 640:10, 641:9, 644:6, 644:9, 644:22, 644:24, 645:1, 645:4, 645:12, 646:2, 646:9, 650:2, 656:18, 657:3, 784:21

**I**

**idea** [10] - 558:13, 561:21, 571:4, 571:13, 669:23, 694:7, 796:16, 803:8, 803:11, 851:15
**identical** [2] - 815:1, 815:7
**identified** [3] - 567:23, 694:18, 732:19
**identify** [1] - 676:3
**identifying** [1] - 847:14
**III** [1] - 553:7
**Illinois** [2] - 737:24, 738:2
**illnesses** [1] - 715:22
**image** [1] - 635:9
**images** [1] - 843:18
**imagine** [1] - 572:6
**immaterial** [2] - 830:10, 832:13
**immediate** [3] - 613:25, 614:7, 716:13
**immediately** [2] - 568:11, 654:7
**immune** [2] - 806:12, 806:14
**immunology** [1] - 816:21
**Immunology** [1] - 817:1
**immunotherapy** [1] - 670:23
**impact** [7] - 571:7, 619:6, 661:3, 663:8, 724:16, 832:9, 841:5
**implement** [1] - 620:24
**implementation** [1] - 609:3
**implicates** [1] - 771:5
**imply** [1] - 575:3
**importance** [3] - 601:4, 626:20, 627:24
**important** [18] - 565:24, 572:2, 572:11, 589:6, 589:7, 589:12, 632:9, 653:23, 663:4, 684:5, 684:13, 696:23, 710:2, 723:10, 723:15, 724:11, 787:5, 846:4
**impression** [1] - 575:23
**improper** [3] - 567:7, 578:8, 584:24
**improve** [4] - 691:5, 757:20, 757:24, 758:4
**improved** [3] - 670:24, 687:19, 745:11
**improving** [1] - 719:8
**impurities** [16] - 692:23, 773:4, 786:25, 797:14, 799:18, 800:21, 801:1, 802:9, 802:20, 802:22, 803:12, 831:11, 835:11, 837:10, 838:24, 851:25
**impurity** [3] - 632:18, 824:9, 824:14
**IN** [2] - 553:1, 553:2
**in-earth** [1] - 558:9
**in-house** [1] - 812:9
**inactive** [8] - 674:20, 681:15, 682:3, 683:23, 712:12, 712:14, 755:16, 757:16
**Inc** [19] - 645:24, 646:1, 646:5, 646:10, 646:14, 646:19, 647:1, 647:4, 647:6, 647:22, 648:1, 648:8, 650:13, 652:5, 652:16, 652:25, 653:11, 653:14, 653:18
**INC** [1] - 553:3
**inches** [1] - 805:14
**inclined** [1] - 594:17
**include** [1] - 591:4
**included** [6] - 563:8, 634:17, 651:12, 689:25, 704:2, 710:12
**includes** [1] - 680:25
**including** [20] - 555:19, 555:24, 562:19, 600:20, 637:13, 643:15, 647:4, 651:15, 660:8, 660:15, 678:9, 681:1, 687:14, 700:9, 700:16, 718:12, 757:25, 779:14, 781:10, 781:14
**incomplete** [1] - 735:6
**inconsistencies** [1] - 759:10
**inconsistent** [3] - 770:1, 770:5, 770:10
**incorporate** [1] - 665:22
**incorporated** [3] - 601:14, 694:1, 694:2
**incorrect** [2] - 641:16, 641:17
**increase** [7] - 557:13, 745:5, 747:5, 766:17, 767:6, 767:25, 769:13
**increased** [10] - 560:18, 618:7, 618:8, 687:16, 688:1, 688:6, 741:20, 743:18, 745:11, 766:19
**increases** [1] - 747:16
**increasing** [1] - 770:5
**incremental** [2] - 661:6, 661:13
**indicate** [1] - 685:24
**indicated** [1] - 567:19
**indicating** [1] - 701:23
**indicia** [6] - 563:18, 665:7, 665:11, 665:15, 665:18, 666:1
**indistinct** [1] - 697:24
**individual** [1] - 661:25
**individuals** [1] - 796:24
**industries** [2] - 606:20, 792:6
**industry** [18] - 607:1, 607:8, 668:25, 669:2, 669:17, 691:11, 691:12, 738:11, 781:10, 789:21, 789:22, 790:17, 790:19, 792:6, 796:20, 796:24, 797:2
**infectious** [5] - 789:17, 790:5, 791:20, 794:13, 829:8
**Infectious** [1] - 718:6
**influences** [1] - 681:23
**influencing** [1] - 674:10
**inform** [6] - 794:22, 813:22, 839:18, 841:5, 847:11, 847:15
**information** [15] - 575:13, 593:4, 632:23, 637:6, 644:19, 694:4, 694:5, 697:10, 697:19, 760:4, 760:9, 760:14, 832:13, 836:25, 844:1

**informed** [2] - 771:4, 794:23
**infringe** [2] - 626:22, 656:22
**infringed** [3] - 605:22, 640:2, 653:24
**infringement** [2] - 565:15, 565:19
**infringes** [2] - 656:3, 656:4
**infringing** [8] - 611:2, 629:16, 633:12, 638:6, 640:20, 640:23, 641:7, 657:4
**ingredient** [9] - 681:2, 681:11, 681:13, 681:20, 682:3, 682:5, 693:13, 755:16, 803:17
**ingredients** [17] - 674:20, 674:24, 680:25, 681:15, 683:4, 683:22, 683:23, 689:12, 690:19, 692:8, 692:13, 711:21, 712:12, 712:14, 731:21, 732:4, 757:17
**inherency** [5] - 851:13, 851:23, 852:6, 852:7, 852:15
**inherent** [4] - 846:18, 851:14, 852:12, 852:14
**inject** [2] - 674:18, 692:21
**injectable** [9] - 674:13, 674:16, 676:20, 677:2, 686:22, 687:13, 708:4, 708:7, 708:11
**injected** [1] - 730:3
**injection** [7] - 674:12, 676:14, 687:16, 761:14, 767:7, 768:1, 769:3
**innovate** [3] - 621:10, 621:16, 621:19
**innovation** [1] - 621:17
**input** [1] - 849:10
**inquire** [1] - 603:23
**inserted** [1] - 809:9
**inside** [2] - 742:11, 818:11
**Insight** [2] - 753:4, 753:6
**insights** [2] - 616:2, 616:10
**inspection** [1] - 673:13
**instance** [4] - 678:24, 686:11, 687:11, 804:21
**instead** [6] - 556:5, 663:19, 684:11, 712:25, 788:4, 794:3
**Institute** [3] - 718:5, 752:7, 752:9
**institutes** [1] - 781:12
**instruction** [1] - 683:12
**instructions** [4] - 563:14, 563:16, 681:10, 846:14
**insufficient** [1] - 665:20
**insurance** [1] - 607:22
**integrity** [1] - 651:15
**intellectual** [1] - 640:20
**intelligence** [1] - 655:6
**intended** [12] - 678:18, 755:18, 756:7, 757:19, 761:6, 761:23, 762:20, 762:21, 763:6, 763:9, 764:20
**intending** [2] - 621:13, 657:7
**intent** [2] - 651:15, 781:22
**intentionally** [5] - 755:17, 756:3, 756:4, 757:17, 762:19
**interact** [7] - 670:17, 670:19, 683:19, 695:24, 697:6, 743:11, 766:17
**interacting** [1] - 642:19
**interaction** [7] - 627:19, 692:11, 693:23, 703:19, 745:6, 777:19, 817:22
**interactions** [1] - 744:25
**intercompany** [7] - 649:21, 650:12, 650:13, 650:14, 650:21, 651:19, 651:24
**interested** [2] - 739:8, 739:9
**interesting** [1] - 621:5
**interestingly** [1] - 695:16
**interject** [1] - 776:8
**intermediary** [1] - 684:9
**internal** [3] - 618:16, 654:15, 677:1
**internally** [3] - 617:18, 646:7, 657:25
**international** [2] - 588:16, 648:13
**interpret** [4] - 571:20, 571:25, 574:13, 750:11
**interpreted** [1] - 717:7
**interrupt** [1] - 756:17
**intracellular** [1] - 747:6
**introduce** [10] - 668:21, 675:16, 693:15, 714:4, 714:6, 736:4, 751:12, 774:22, 831:11, 831:13
**introduced** [1] - 581:13
**introducing** [1] - 800:1
**introduction** [1] - 720:21
**invalid** [3] - 604:12, 604:15, 661:15
**invented** [3] - 642:23, 673:21, 693:17
**invention** [10] - 565:24, 659:20, 682:9, 682:11, 682:20, 682:22, 682:24, 687:21, 694:5, 694:22
**invention's** [1] - 659:21
**inventions** [3] - 662:4, 666:11, 696:17
**inventor** [18] - 643:1, 679:17, 679:19, 684:23, 685:9, 693:4, 696:20, 701:7, 703:4, 709:4, 772:6, 782:15, 792:17, 792:18, 810:17, 832:2, 838:13, 842:10
**inventors** [3] - 666:12, 810:11, 832:1
**inventory** [1] - 673:12
**investigate** [1] - 674:15
**investigator** [2] - 752:16, 752:19
**investment** [1] - 672:10
**investors** [1] - 672:10
**involved** [14] - 672:15, 675:12, 688:25, 695:7, 704:7, 716:6, 739:12, 772:11, 785:6, 788:1, 790:16, 796:23, 821:16, 850:4
**involvement** [1] - 772:15
**involves** [2] - 693:22, 703:19
**involving** [2] - 600:6, 782:16
**ion** [6] - 693:24, 703:20, 742:23, 811:10, 811:20, 833:14
**IPAs** [1] - 669:11
**Ireland** [18] - 646:15, 646:20, 646:21, 647:2, 647:5, 647:21, 648:3, 648:9, 648:19, 648:20, 650:14, 651:5, 652:6, 652:16, 652:25, 653:10, 653:15, 653:18
**irrelevant** [5] - 564:12, 567:7, 612:4, 648:22, 651:7
**ISAAC** [1] - 553:19
**isolate** [2] - 805:17, 805:23
**isolated** [1] - 800:21
**issue** [16] - 556:20, 558:11, 561:1, 565:25, 568:1, 572:21, 577:15, 589:1, 601:2, 613:17, 645:14, 653:1, 680:6, 685:14, 716:19, 852:13
**issued** [7] - 645:2, 680:8, 680:11, 685:15, 790:16, 794:25, 795:15
**issues** [12] - 567:1, 567:5, 570:5, 573:9, 635:17, 714:19, 724:19, 736:19, 751:14, 751:15, 753:8, 847:2
**Item** [2] - 555:7, 562:18
**item** [7] - 590:5, 799:14, 799:15, 799:24, 799:25, 801:22
**items** [3] - 798:25, 799:8, 799:13
**iteration** [1] - 736:9
**itself** [16] - 567:13, 601:12, 617:13, 619:19, 621:24, 649:20, 732:17, 764:5, 764:13, 764:16, 767:11, 786:8, 800:2, 813:2, 821:1, 824:24

## J

**Jakob** [8] - 788:18, 788:19, 789:10, 789:13, 790:6, 792:2, 793:14, 793:18
**Jennifer** [1] - 772:6
**JEREMY** [1] - 553:16
**JMOL** [2] - 665:23, 848:22
**job** [5] - 670:21, 670:22, 695:19, 718:9, 752:15
**Johns** [1] - 670:11
**Johnson** [26] - 810:13, 810:14, 810:15, 810:19, 811:3, 811:4, 811:5, 811:6, 811:7, 811:15, 812:11, 812:12, 813:3, 813:4, 813:5, 813:17, 814:6, 814:12, 814:16, 814:23, 815:8, 815:10, 819:1, 820:19, 820:21, 822:19
**joined** [6] - 672:1, 672:11, 672:13, 738:14, 752:10, 838:19
**joint** [1] - 697:13
**Joint** [7] - 675:20, 693:9, 758:21, 789:4, 793:5, 808:2, 842:24
**Joshua** [4] - 735:14, 735:18, 736:5, 740:9
**JOSHUA** [2] - 735:19, 735:20
**journal** [9] - 675:10, 676:18, 679:8, 679:11, 696:13, 780:8, 816:17, 816:20, 817:2

**journals** [2] - 679:9, 816:12
**JTX** [74] - 572:22, 593:16, 593:21, 594:11, 594:19, 595:4, 595:15, 596:5, 596:10, 596:15, 597:2, 597:11, 597:17, 610:3, 610:7, 611:21, 615:17, 616:6, 619:17, 620:4, 627:10, 630:18, 634:6, 634:9, 634:21, 635:10, 635:13, 636:2, 637:9, 637:18, 643:12, 644:5, 675:6, 675:17, 675:20, 692:25, 693:5, 693:9, 701:3, 701:17, 701:18, 720:19, 726:11, 731:2, 744:1, 745:13, 754:15, 754:25, 756:14, 758:10, 758:17, 758:21, 760:17, 788:12, 788:25, 789:4, 789:25, 792:11, 793:1, 793:5, 806:24, 807:23, 808:2, 829:20, 831:25, 835:5, 835:17, 835:24, 842:8, 842:21, 842:24, 843:2, 843:9
**Jude's** [5] - 715:15, 715:17, 715:18, 715:19, 716:4
**judge** [2] - 611:8, 668:21
**judgment** [4] - 658:19, 662:23, 665:5, 771:19
**July** [5] - 553:13, 636:18, 785:20, 786:1, 816:16
**June** [7] - 588:17, 610:2, 614:8, 614:14, 639:10, 640:14, 680:5
**jurors** [1] - 846:6
**JURY** [2] - 553:9, 553:11
**jury** [100] - 553:12, 563:13, 563:16, 568:3, 568:10, 571:18, 571:23, 572:11, 574:22, 579:6, 579:10, 579:15, 579:22, 580:8, 580:9, 582:5, 594:15, 601:21, 606:15, 606:25, 607:6, 626:8, 626:11, 626:23, 627:6, 627:8, 627:9, 641:21, 642:1, 658:8, 658:10, 658:11, 662:2, 662:19, 663:9, 663:13, 663:25, 664:7, 664:25, 665:12, 665:24, 667:3, 667:17, 667:18, 667:19, 668:22, 669:18, 670:15, 671:14, 672:14, 676:3, 676:4, 677:11, 680:21, 682:8, 683:2, 685:18, 687:8, 688:1, 688:24, 690:2, 691:15, 695:3, 698:23, 712:24, 713:2, 713:3, 713:11, 713:12, 713:13, 714:4, 714:6, 715:9, 736:4, 737:20, 746:22, 751:12, 751:14, 774:22, 775:13, 778:21, 780:25, 781:18, 782:20, 786:10, 787:1, 789:11, 791:3, 791:4, 791:8, 791:9, 801:10, 811:19, 814:1, 835:20, 845:23, 846:9, 846:14, 852:8
**justify** [4] - 562:2, 659:23, 663:13, 763:1

**K**

**Kansas** [1] - 736:13
**Karl** [4] - 819:1, 820:15, 820:16, 820:21
**kDa** [1] - 805:9
**keen** [1] - 678:3
**keep** [18] - 565:14, 568:7, 574:7, 583:11, 586:19, 611:11, 618:15, 618:21, 625:12, 630:10, 704:10, 707:6, 730:7, 734:24, 740:1, 824:7, 839:5, 849:13
**keeping** [2] - 627:18, 729:25
**keeps** [2] - 618:23, 684:16
**kept** [1] - 655:5
**KESSLER** [1] - 554:5
**key** [6] - 616:2, 616:10, 616:11, 620:11, 620:15, 681:2
**kick** [2] - 580:22, 771:17
**kid** [1] - 669:21
**kilodalton** [27] - 631:5, 676:21, 772:13, 772:16, 772:19, 776:11, 776:12, 803:10, 803:23, 804:11, 805:13, 806:17, 809:23, 812:20, 821:17, 824:9, 824:13, 825:14, 827:1, 827:7, 827:8, 827:11, 827:15, 827:19, 828:1, 828:4
**kilodaltons** [5] - 805:14, 805:15, 818:16, 828:2, 828:6
**kilogram** [1] - 686:7
**kind** [32] - 556:7, 564:14, 572:2, 644:5, 654:6, 669:4, 669:10, 669:13, 673:8, 673:19, 674:17, 678:2, 682:2, 690:5, 691:2, 691:22, 692:4, 696:4, 696:17, 697:7, 697:13, 697:15, 698:19, 712:5, 718:7, 721:9, 721:22, 723:11, 725:6, 726:21, 771:13, 820:25
**kinds** [5] - 590:3, 669:6, 705:23, 716:23, 803:15
**knowing** [1] - 659:15
**knowledge** [6] - 649:17, 656:15, 656:16, 700:18, 710:14, 710:17
**known** [27] - 582:16, 589:3, 616:19, 616:21, 617:8, 617:10, 618:18, 619:13, 632:14, 645:5, 645:11, 674:21, 678:2, 684:1, 689:20, 691:10, 704:24, 741:24, 746:12, 786:1, 794:7, 794:9, 794:11, 829:4, 829:6, 829:9, 834:11
**knows** [2] - 633:10
**KRYS** [1] - 553:21

**L**

**LA** [4] - 616:16, 616:18, 617:7, 619:11
**lab** [7] - 669:9, 672:11, 681:7, 691:21, 738:10, 739:8
**labeled** [3] - 799:5, 805:6, 805:8
**labmate** [1] - 820:16
**Laboratories** [1] - 693:16
**laboratory** [2] - 807:16, 807:18
**Labs** [1] - 690:22
**labs** [2] - 691:4, 807:18
**lack** [2] - 562:15, 804:14
**LAI** [1] - 622:6
**laid** [1] - 601:11
**landscape** [1] - 562:16
**lane** [6] - 809:9, 818:12, 818:14, 818:15, 818:18, 844:6
**lanes** [2] - 818:13, 844:4
**language** [13] - 814:16, 814:18, 823:19, 823:23, 824:8, 824:11, 824:17, 825:5, 825:8, 827:17, 843:4, 843:7, 843:11
**large** [6] - 672:17, 673:5, 706:16, 738:24, 739:9, 786:5
**largely** [1] - 569:14
**larger** [5] - 745:12, 749:3, 803:25, 805:15, 806:8
**LaRock** [10] - 556:17, 556:18, 557:18, 558:17, 561:16, 562:7, 713:15, 730:20, 790:24, 791:11
**LAROCK** [64] - 554:6, 556:17, 556:20, 557:20, 557:23, 558:20, 560:1, 560:4, 560:7, 561:17, 562:9, 713:10, 713:16, 714:3, 718:16, 718:21, 719:22, 719:24, 730:19, 735:9, 735:13, 736:1, 740:8, 740:13, 745:13, 745:15, 745:25, 746:6, 748:13, 750:19, 774:5, 774:8, 774:19, 783:3, 783:8, 788:25, 789:5, 789:7, 791:1, 791:12, 791:13, 793:1, 793:6, 793:7, 796:14, 807:23, 808:3, 810:22, 811:2, 815:15, 815:17, 817:4, 817:10, 820:3, 820:9, 835:18, 835:23, 838:3, 838:9, 841:4, 842:21, 842:25, 845:19, 851:24
**last** [32] - 568:8, 584:23, 585:20, 589:19, 598:18, 600:15, 602:4, 635:25, 642:17, 651:16, 653:9, 668:7, 678:10, 681:24, 684:18, 688:20, 698:11, 698:14, 698:22, 715:14, 715:15, 716:11, 739:3, 751:2, 756:8, 761:1, 761:2, 764:25, 811:25, 836:6, 848:7, 848:9
**lasted** [6] - 564:18, 675:1, 678:7, 686:10, 688:12
**lastly** [1] - 738:22
**lasts** [3] - 564:19, 564:22, 686:1

**late** [2] - 804:19, 820:17
**laughing** [1] - 818:10
**launch** [16] - 582:25, 589:20, 592:16, 592:18, 594:8, 601:25, 602:12, 614:9, 615:11, 617:2, 619:6, 619:21, 629:8, 654:8, 655:5, 657:7
**launching** [3] - 615:4, 629:15, 659:2
**law** [14] - 562:11, 563:3, 563:4, 613:17, 651:23, 652:8, 658:20, 659:21, 660:8, 662:1, 662:18, 662:24, 665:6
**laws** [3] - 650:19, 651:21, 652:14
**lawyer** [1] - 565:17
**lawyers** [2] - 848:23, 848:25
**layer** [3] - 566:11, 743:14, 746:17
**layman** [1] - 833:1
**lead** [6] - 672:23, 677:24, 703:7, 704:4, 704:12, 743:21
**leaders** [1] - 781:10
**leadership** [6] - 620:10, 620:12, 620:15, 620:20, 620:21, 620:22
**leading** [2] - 743:18, 807:12
**leads** [2] - 688:13, 741:20
**leaps** [1] - 571:12
**learn** [4] - 670:9, 670:19, 683:9, 846:5
**learned** [4] - 694:3, 696:10, 744:11, 846:5
**least** [12] - 569:20, 578:17, 592:8, 641:20, 654:23, 656:16, 666:8, 697:5, 733:23, 776:12, 824:9, 850:11
**leave** [3] - 644:4, 671:10, 771:22
**leaves** [1] - 563:22
**leaving** [1] - 752:25
**led** [2] - 696:5, 698:24
**left** [28] - 588:5, 613:25, 622:19, 626:8, 626:16, 671:9, 686:4, 696:6, 696:9, 721:16, 729:25, 742:9, 775:14, 775:16, 775:24, 780:24, 799:4, 804:2, 804:13, 804:17, 805:12, 806:7, 814:3, 814:5, 815:5, 818:12, 823:4, 823:6
**left-hand** [12] - 588:5, 742:9, 775:16, 775:24, 799:4, 804:2, 804:13, 804:17, 814:3, 814:5, 823:4, 823:6
**leg** [1] - 674:21
**legacy** [2] - 705:2, 712:1
**legal** [5] - 567:1, 567:5, 610:16, 611:7, 650:25
**legality** [1] - 652:13
**legally** [9] - 662:3, 662:20, 663:10, 664:1, 664:7, 664:25, 665:13, 665:20, 665:25
**legs** [1] - 679:1
**length** [9] - 648:24, 649:14, 649:21, 650:21, 651:19, 651:24, 652:7, 652:15, 659:9
**less** [27] - 625:13, 636:10, 661:11, 677:16, 678:4, 688:11, 688:12, 721:25, 722:10, 722:21, 723:16, 724:5, 724:6, 724:17, 724:18, 724:21, 724:22, 725:3, 725:10, 730:5, 787:22, 806:11, 836:11, 836:24, 851:15
**letter** [10] - 555:7, 566:22, 567:2, 665:21, 683:7, 736:15, 849:6, 850:9, 850:15, 851:2
**letters** [7] - 555:2, 683:7, 683:10, 847:2, 847:8, 847:14, 849:13
**letting** [2] - 582:10, 800:23
**level** [12] - 670:7, 673:8, 690:2, 732:25, 754:1, 773:4, 778:8, 778:11, 781:25, 784:10, 786:12, 799:2
**levels** [3] - 834:7, 836:9, 840:4
**license** [16] - 585:14, 593:8, 600:22, 605:22, 606:3, 606:6, 606:15, 607:7, 626:20, 638:12, 638:19, 653:25, 654:2, 654:12, 662:16, 697:13
**licensed** [3] - 646:6, 646:11, 646:13
**licenses** [6] - 606:20, 606:22, 607:1, 646:19, 647:23, 652:5
**licensing** [6] - 600:22, 631:18, 646:16, 652:12, 652:21
**licensor** [2] - 582:9, 600:19
**life** [20] - 661:23, 699:7, 716:12, 719:8, 756:7, 761:6, 761:10, 761:15, 761:16, 761:17, 761:19, 761:20, 761:24, 762:9, 764:20, 765:1, 765:4, 781:1
**lifestyle** [1] - 673:19
**light** [8] - 564:17, 564:20, 747:1, 778:2, 778:5, 778:12, 784:2, 828:24
**lighter** [2] - 686:11, 804:16
**likely** [3] - 570:9, 657:11, 742:9
**limit** [10] - 575:15, 578:13, 636:4, 676:23, 677:8, 733:15, 744:14, 836:9, 836:10
**limitation** [3] - 578:4, 678:2, 846:16
**limitations** [3] - 575:1, 606:24, 677:20
**limited** [8] - 573:24, 619:20, 619:22, 736:7, 744:20, 744:21, 745:6, 745:11
**limiting** [3] - 737:9, 743:6, 743:17
**limits** [2] - 737:3, 741:20
**line** [17] - 568:13, 625:15, 625:19, 625:20, 626:8, 680:4, 683:1, 685:12, 708:21, 708:22, 726:2, 744:10, 744:13, 761:2, 762:19, 764:3, 843:22
**lines** [6] - 687:4, 701:18, 701:21, 767:3, 776:8, 836:6
**linked** [1] - 688:21
**links** [1] - 851:6
**lipid** [1] - 742:17
**liquid** [9] - 684:14, 684:16, 692:10, 692:16, 695:22, 786:14, 799:6, 799:16
**List** [2] - 690:22, 693:16
**list** [7] - 569:22, 615:15, 680:25, 683:4, 683:21, 696:17, 840:17
**listed** [3] - 675:13, 701:6, 732:16
**literally** [6] - 564:9, 564:11, 571:6, 840:23, 842:2, 845:15
**literature** [19] - 705:2, 705:10, 706:16, 741:19, 743:21, 746:11, 778:13, 783:21, 788:8, 798:4, 806:20, 812:3, 812:8, 813:2, 814:13, 830:23, 837:8, 842:2, 843:20
**litigation** [1] - 709:5
**little-known** [6] - 616:19, 616:21, 617:8, 617:10, 618:18, 619:13
**live** [2] - 667:5, 667:6
**lived** [1] - 689:16
**living** [3] - 669:9, 670:18, 690:5
**LLC** [2] - 648:4, 648:7
**LLP** [2] - 553:16, 553:18
**load** [1] - 806:5
**local** [4] - 651:21, 685:24, 686:2, 689:9
**location** [1] - 660:16
**long-acting** [5] - 604:22, 616:16, 621:10, 621:13, 621:19
**long-duration** [1] - 654:8
**long-felt** [2] - 666:11, 666:14
**longer-acting** [3] - 676:24, 677:10, 744:16
**longest** [2] - 671:11, 698:25
**look** [102] - 559:14, 571:14, 571:24, 587:4, 592:13, 593:11, 593:22, 595:15, 598:18, 601:13, 606:21, 608:22, 609:8, 609:21, 610:1, 610:16, 615:3, 615:16, 616:5, 616:9, 616:13, 617:16, 617:25, 618:14, 618:22, 619:17, 619:18, 620:3, 620:8, 620:18, 621:9, 622:4, 622:12, 623:10, 623:25, 624:5, 624:21, 625:7, 626:1, 626:13, 626:14, 627:10, 630:4, 630:17, 632:7, 633:7, 634:9, 635:12, 635:25, 639:4, 643:4, 647:7, 647:15, 648:1, 649:12, 649:19, 650:11, 651:11, 651:14, 701:21, 722:7, 725:2, 725:9, 725:23, 726:12, 726:14, 726:16, 727:2, 727:16, 731:7, 732:13, 733:18, 734:1, 734:19, 738:21, 738:23, 751:24, 754:14, 756:20, 760:17, 760:20, 761:1, 762:13, 762:18, 766:12, 767:1, 772:21, 775:24, 775:25,

777:4, 789:18, 789:25, 799:4, 809:7, 809:9, 825:8, 826:6, 832:22, 836:5, 839:20, 842:8, 846:3
**Look** [1] - 632:1
**looked** [19] - 576:14, 584:4, 584:6, 592:2, 601:4, 608:8, 608:19, 721:24, 722:24, 722:25, 723:1, 723:16, 723:22, 747:25, 777:23, 822:13, 828:20, 832:13, 834:10
**looking** [33] - 571:18, 572:16, 582:24, 585:25, 604:18, 632:15, 647:13, 654:24, 654:25, 657:19, 680:17, 683:21, 692:7, 721:18, 722:6, 722:25, 724:1, 731:20, 733:11, 738:8, 761:25, 763:8, 768:14, 785:12, 809:11, 810:12, 823:4, 823:11, 823:13, 824:7, 834:5, 839:22
**looks** [6] - 584:15, 588:19, 623:10, 683:5, 808:10, 818:13
**lose** [1] - 658:25
**losing** [2] - 629:20, 678:25
**lost** [1] - 635:21
**lotion** [6] - 671:22, 672:19, 672:21, 673:22, 674:3, 697:9
**lotion-type** [1] - 672:21
**Lou** [3] - 844:7, 844:11, 845:7
**loud** [1] - 836:7
**love** [1] - 669:12
**loved** [1] - 699:1
**low** [1] - 587:1
**lower** [19] - 582:20, 590:3, 593:5, 618:2, 618:4, 618:7, 626:9, 627:2, 634:1, 660:23, 681:3, 729:19, 734:20, 748:22, 776:18, 799:9, 806:11, 836:5
**luckily** [1] - 673:20
**lunch** [4] - 667:8, 667:9, 712:23, 850:11
**Luo** [5] - 842:11, 843:7, 843:9, 843:23, 844:10
**lysine** [1] - 741:4

## M

**M-E-A-G-H-E-R** [1] - 713:21
**M.C** [2] - 811:9, 811:11
**ma'am** [3] - 730:25, 734:5, 734:13
**machine** [2] - 681:6, 681:8
**macromolecular** [1] - 740:9
**mad** [2] - 789:15, 793:20
**Madison** [7] - 778:24, 780:14, 780:15, 780:20, 780:23, 807:14, 807:15
**Magazine** [2] - 696:16, 696:22
**magazine** [1] - 696:22
**magnesium** [2] - 564:18, 564:21
**magnets** [1] - 742:25
**main** [2] - 672:3, 849:19
**mainstream** [1] - 696:22
**maintain** [4] - 617:19, 761:5, 761:23, 764:19
**maintains** [1] - 756:6
**major** [2] - 621:9, 677:20
**majority** [2] - 630:11, 717:4
**Malizio** [62] - 778:3, 819:1, 820:11, 820:13, 820:15, 820:16, 820:21, 820:22, 822:7, 822:20, 823:7, 823:23, 823:24, 824:5, 824:7, 824:10, 824:12, 824:17, 824:18, 825:6, 825:7, 825:8, 825:16, 825:20, 825:21, 825:25, 826:2, 826:6, 826:7, 826:9, 826:15, 826:17, 826:18, 826:19, 826:23, 826:24, 826:25, 827:5, 827:14, 827:17, 828:5, 828:6, 828:8, 828:15, 828:24, 828:25, 829:1, 829:2, 829:16, 829:18, 830:2, 830:6, 833:11, 833:13, 834:2, 834:6, 834:10, 834:12, 840:1, 840:12, 840:17
**Malizio's** [9] - 829:14, 833:15, 833:18, 833:22, 834:5, 834:13, 834:25, 836:19, 840:3
**man** [1] - 807:6
**manufacture** [9] - 690:3, 710:20, 710:24, 711:2, 716:9, 718:14, 782:2, 829:23, 831:8
**manufactured** [2] - 781:25, 796:5
**manufacturer** [11] - 583:14, 616:14, 616:19, 616:22, 617:9, 617:10, 618:8, 618:18, 619:14, 647:2, 647:21
**manufactures** [3] - 781:6, 804:3, 804:4
**manufacturing** [78] - 578:17, 591:19, 592:1, 592:10, 596:24, 597:20, 597:22, 600:10, 601:23, 602:2, 602:5, 608:15, 608:18, 609:9, 609:12, 610:2, 610:6, 610:23, 611:17, 611:20, 612:11, 612:14, 613:8, 622:15, 626:15, 626:21, 626:24, 627:11, 627:13, 627:21, 627:25, 628:3, 628:24, 629:24, 630:6, 630:7, 630:14, 630:17, 632:3, 634:10, 637:3, 637:5, 637:25, 639:21, 656:5, 657:14, 657:21, 658:22, 660:16, 660:22, 661:5, 661:12, 661:23, 662:5, 663:22, 664:15, 665:9, 665:16, 666:7, 689:24, 690:16, 690:22, 690:25, 693:12, 710:18, 715:12, 717:14, 717:16, 779:15, 779:20, 780:2, 783:4, 787:19, 787:24, 789:21, 792:7, 813:14
**manuscript** [1] - 675:14
**many-faceted** [1] - 645:20
**marked** [2] - 731:2, 818:16
**market** [28] - 582:10, 582:15, 586:2, 586:3, 586:11, 587:15, 604:24, 607:19, 607:20, 607:21, 615:5, 615:7, 621:23, 624:3, 624:24, 654:9, 656:17, 659:22, 659:24, 664:13, 664:18, 664:20, 664:22, 665:2, 665:4, 670:25, 677:18, 712:2
**marketed** [1] - 752:14
**marketing** [1] - 618:1
**marketplace** [7] - 582:14, 585:18, 586:9, 590:13, 623:23, 659:21, 661:25
**markets** [4] - 664:13, 664:15, 664:24
**Maryland** [1] - 718:6
**mass** [1] - 738:21
**master** [1] - 779:2
**master's** [2] - 737:23, 785:2
**material** [24] - 692:1, 694:19, 716:2, 773:3, 773:20, 779:19, 781:20, 781:21, 781:24, 781:25, 787:17, 787:18, 787:21, 789:17, 796:5, 806:5, 826:9, 827:7, 827:24, 828:2, 830:2, 833:7
**materially** [2] - 565:11
**materials** [4] - 592:11, 773:2, 773:17, 831:7
**mathematically** [3] - 626:18, 627:4, 629:5
**matrix** [2] - 742:21, 745:3
**matter** [22] - 570:19, 570:21, 609:7, 633:11, 633:18, 657:2, 658:20, 662:23, 665:6, 743:4, 779:14, 782:21, 807:16, 813:6, 813:8, 813:9, 813:12, 822:25, 842:5, 843:19, 849:7
**matters** [2] - 567:10, 645:23
**maximize** [1] - 849:11
**Meagher** [10] - 566:17, 568:3, 577:23, 713:20, 714:7, 718:17, 730:24, 731:1, 731:8, 735:10
**MEAGHER** [1] - 713:22
**mean** [43] - 570:15, 578:18, 589:25, 601:9, 607:13, 607:21, 620:21, 629:14, 629:16, 632:13, 636:5, 648:15, 652:21, 654:23, 655:4, 673:4, 694:2, 696:2, 704:2, 709:14, 726:16, 726:20, 729:7, 754:5, 754:8, 755:20, 756:3, 756:17, 766:14, 773:8, 775:21, 776:4, 777:9, 783:13, 805:12, 809:18, 812:18, 812:19, 827:9, 827:20, 828:7, 840:24, 841:9
**meaning** [3] - 564:17, 574:22, 723:18
**meaningful** [2] - 730:12, 730:16
**means** [26] - 599:6, 627:22, 652:4, 661:1, 677:12, 678:22, 682:8, 683:18, 698:16,

706:7, 723:20, 728:13, 751:18, 755:13, 755:21, 756:1, 776:5, 777:10, 794:25, 804:22, 809:16, 818:16, 828:18, 833:1, 833:3, 836:9
**meant** [2] - 741:7, 763:11
**measure** [1] - 805:14
**measurement** [1] - 688:22
**measures** [1] - 788:16
**mechanism** [2] - 707:15, 746:21
**mechanisms** [1] - 743:21
**media** [4] - 692:2, 696:13, 829:2, 829:3
**medias** [1] - 777:17
**mediated** [1] - 793:14
**Medical** [3] - 718:5, 816:21, 817:1
**medical** [1] - 779:7
**medically** [1] - 782:23
**Medicine** [1] - 670:12
**medicine** [2] - 673:21, 699:4
**medicines** [7] - 670:3, 670:6, 670:9, 670:20, 699:4, 699:10
**medium** [2] - 772:24, 829:18
**meet** [6] - 708:1, 708:19, 782:1, 850:5, 850:7
**meet-and-confer** [3] - 850:5, 850:7
**meeting** [3] - 697:10, 697:25, 698:15
**meetings** [3] - 697:8, 708:18, 708:19
**meets** [2] - 716:3, 756:18
**MELANIE** [1] - 553:20
**member** [2] - 715:24, 716:1
**members** [9] - 580:9, 658:8, 667:19, 713:13, 716:12, 791:2, 791:9, 845:23, 850:3
**membrane** [3] - 742:17, 743:12, 746:17
**memorize** [1] - 694:13
**memory** [5] - 625:21, 629:10, 647:17, 647:21, 833:24
**mention** [7] - 555:12, 557:22, 588:2, 624:11, 642:25, 696:24, 851:4
**mentioned** [23] - 573:21, 611:20, 613:24, 614:13, 615:2, 615:3, 622:6, 672:13, 683:22, 689:1, 698:25, 700:22, 702:19, 708:14, 727:3, 738:5, 739:3, 742:24, 744:15, 745:3, 747:17, 769:19, 788:5
**mentions** [1] - 557:19
**merger** [1] - 700:19
**message** [1] - 618:17
**messed** [1] - 723:11
**met** [4] - 621:24, 628:25, 708:23, 709:2
**Metabiologics** [14] - 781:3, 781:5, 781:6, 781:8, 781:9, 781:15, 782:3, 782:9, 787:21, 796:2, 796:6, 796:10, 796:17, 820:18
**metes** [1] - 576:14
**method** [4] - 661:16, 811:8, 822:11, 842:11
**methodology** [2] - 583:23, 627:1
**methods** [9] - 682:12, 682:23, 682:24, 717:3, 766:7, 797:18, 810:6, 820:24
**Meyers** [1] - 838:20
**mice** [11] - 674:3, 678:24, 679:1, 686:5, 694:24, 696:4, 716:24, 716:25, 717:3, 717:5, 717:8
**Michael** [6] - 713:20, 714:7, 718:17, 774:5, 774:12, 783:4
**MICHAEL** [4] - 713:21, 713:22, 774:13, 774:14
**microbiology** [2] - 779:3, 779:4
**Microbiology** [2] - 816:21, 817:2
**middle** [9] - 558:25, 669:21, 691:24, 691:25, 741:5, 742:12, 767:3, 798:10, 807:21
**middle-class** [1] - 669:21
**midmorning** [1] - 658:8
**midnight** [3] - 849:23, 850:9, 850:19
**might** [9] - 577:10, 588:14, 638:23, 697:12, 722:11, 722:12, 747:11, 798:22, 847:11
**mike** [1] - 774:23
**milk** [1] - 773:10
**milliliter** [2] - 577:12, 836:11
**millimolar** [1] - 726:5
**millimolars** [1] - 723:25
**million** [30] - 575:16, 576:15, 576:17, 591:3, 595:14, 602:23, 602:25, 603:12, 603:16, 631:6, 632:17, 635:11, 635:14, 636:4, 636:10, 637:7, 637:13, 658:24, 660:1, 660:14, 664:4, 777:3, 833:4, 833:5, 834:8, 835:1, 836:11, 836:24, 840:4, 851:16
**mimic** [22] - 720:14, 721:2, 721:5, 721:25, 722:9, 722:15, 722:19, 722:22, 723:1, 723:18, 723:19, 724:1, 724:4, 724:5, 724:17, 724:24, 725:3, 725:15, 726:7, 726:9, 727:7, 727:16
**mind** [10] - 571:13, 576:6, 576:8, 583:17, 586:20, 627:18, 675:5, 784:25, 851:1, 851:2
**mine** [4] - 584:3, 694:22, 807:16, 820:16
**minimize** [2] - 729:22, 849:11
**minimizing** [1] - 618:17
**minimum** [2] - 556:2, 645:8
**MINNITI** [1] - 553:20
**minute** [6] - 557:8, 560:24, 603:6, 612:16, 686:20, 728:18
**minutes** [9] - 580:12, 658:9, 666:25, 667:7, 712:25, 771:9, 771:24, 791:5, 793:19
**mislead** [2] - 567:13, 768:7
**misleading** [4] - 567:8, 567:12, 574:22, 768:9
**misled** [1] - 760:6
**mission** [1] - 715:20
**misstating** [1] - 562:11
**mistake** [1] - 686:24
**mistakenly** [1] - 686:21
**mix** [2] - 690:12, 695:22
**mixed** [2] - 693:23, 703:20
**mixture** [11] - 689:5, 690:10, 692:7, 799:9, 799:15, 800:11, 800:13, 801:4, 801:8, 803:9, 803:17
**mixtures** [1] - 692:20
**mobile** [6] - 692:10, 692:12, 692:18, 799:6, 803:1, 803:4
**mode** [2] - 693:23, 703:20
**model** [1] - 688:8
**modeling** [1] - 619:5
**modelled** [1] - 617:18
**modifications** [1] - 614:19
**molecular** [6] - 805:11, 806:7, 827:10, 827:11, 844:12
**molecule** [6] - 669:7, 786:23, 804:4, 804:25, 805:5, 821:17
**molecules** [4] - 805:10, 806:1, 806:3, 806:4
**mom** [2] - 669:25, 670:3
**moment** [2] - 647:16, 678:11
**Monday** [1] - 800:9
**money** [6] - 602:21, 629:13, 629:20, 639:25, 641:4, 648:17
**moneys** [1] - 648:12
**monkeys** [1] - 716:24
**Monnig** [2] - 771:11, 771:12
**month** [2] - 618:11, 618:12
**months** [11] - 591:22, 592:8, 592:10, 592:11, 592:17, 592:20, 609:21, 609:24, 609:25
**morning** [17] - 555:2, 580:10, 593:24, 604:3, 604:4, 633:5, 658:16, 658:18, 665:22, 668:19, 668:20, 740:18, 744:11, 834:19, 845:24, 850:18
**MORRIS** [1] - 553:16
**most** [10] - 569:20, 569:24, 570:18, 578:22, 616:15, 654:23, 670:18, 692:24, 787:4, 801:8
**motion** [4] - 555:3, 665:21, 666:24, 848:22
**motions** [1] - 658:14
**motivation** [4] - 571:7, 829:14, 829:16, 851:21
**mouse** [14] - 555:19, 555:23, 556:3, 558:12, 561:7, 674:17, 674:21, 675:11, 685:22, 695:5, 714:10, 714:16, 719:25, 720:17
**move** [44] - 594:10, 596:5, 596:10, 597:11, 597:24, 598:9, 624:13, 625:15, 626:8, 649:9, 658:19, 675:16, 679:21, 685:1, 691:23, 693:5, 698:4, 700:7, 707:7, 707:12, 707:17, 707:20, 711:6, 719:22, 738:25, 740:8, 745:13, 745:25,

754:25, 757:6, 758:17, 765:21, 788:25, 793:1, 800:5, 807:23, 809:5, 810:22, 817:4, 820:4, 825:6, 825:21, 838:3, 842:21
**moves** [3] - 662:23, 665:5, 753:13
**moving** [2] - 582:25, 692:9
**MR** [281] - 555:16, 555:21, 556:17, 556:20, 557:3, 557:11, 557:20, 557:23, 557:25, 558:7, 558:10, 558:20, 558:25, 559:5, 559:9, 559:13, 559:23, 560:1, 560:4, 560:7, 560:16, 561:4, 561:14, 561:17, 561:19, 562:5, 562:9, 562:23, 563:1, 564:4, 564:11, 564:24, 565:3, 565:20, 565:25, 566:11, 566:25, 567:8, 567:15, 567:23, 567:25, 568:2, 568:11, 568:17, 568:23, 569:1, 569:6, 569:8, 569:14, 570:7, 570:18, 570:23, 571:14, 572:12, 572:17, 572:20, 573:18, 574:9, 574:17, 575:9, 575:12, 575:14, 576:2, 576:5, 577:9, 577:17, 578:1, 578:20, 579:3, 579:4, 579:11, 579:23, 579:24, 580:3, 580:16, 580:20, 582:2, 582:4, 590:16, 590:18, 594:10, 594:12, 594:21, 594:25, 595:6, 595:12, 596:4, 596:9, 596:12, 596:21, 597:10, 597:12, 597:18, 598:9, 598:11, 598:17, 603:3, 603:9, 603:11, 603:18, 603:22, 603:25, 604:2, 611:8, 611:15, 611:23, 612:1, 612:3, 612:6, 612:15, 613:1, 613:6, 613:12, 613:20, 613:22, 618:23, 619:3, 624:13, 624:15, 624:20, 628:20, 628:22, 633:3, 633:21, 634:5, 634:8, 635:16, 635:23, 636:14, 637:17, 637:23, 637:24, 643:7, 643:10, 643:11, 648:23, 649:2, 649:3, 649:5, 649:11, 649:22, 650:1, 650:7, 650:10, 651:1, 651:10, 653:5, 653:8, 655:23, 655:24, 658:5, 666:8, 666:16, 666:22, 667:6, 667:9, 667:11, 667:14, 668:2, 668:13, 668:18, 675:16, 675:18, 675:21, 675:23, 675:25, 676:2, 679:21, 679:23, 680:2, 685:1, 685:3, 685:7, 687:4, 687:6, 693:5, 693:7, 693:10, 697:21, 698:1, 698:3, 698:7, 698:9, 698:20, 698:21, 699:13, 699:15, 699:17, 708:20, 708:22, 709:1, 711:13, 711:18, 712:17, 712:20, 713:10, 713:16, 714:3, 718:16, 718:21, 719:22, 719:24, 730:19, 735:9, 735:13, 736:1, 740:8, 740:11, 740:13, 745:13, 745:15, 745:25, 746:2, 746:6, 748:13, 748:16, 750:17, 750:19, 753:16, 757:8, 758:19, 759:21, 760:19, 760:22, 765:7, 765:9, 765:20, 766:1, 768:10, 774:5, 774:8, 774:19, 783:3, 783:8, 788:25, 789:5, 789:7, 791:1, 791:12, 791:13, 793:1, 793:6, 793:7, 796:14, 807:23, 808:3, 810:22, 811:2, 815:15, 815:17, 817:4, 817:10, 820:3, 820:9, 827:8, 827:10, 835:18, 835:23, 838:3, 838:9, 841:4, 842:21, 842:25, 845:19, 846:19, 846:22, 847:19, 847:22, 848:9, 848:12, 848:15, 848:21, 848:25, 849:12, 849:17, 850:21, 851:3, 851:8, 851:12, 851:20, 851:24
**MS** [52] - 658:16, 658:19, 718:19, 719:20, 730:23, 732:10, 732:12, 735:7, 750:22, 751:9, 753:13, 753:18, 753:19, 754:25, 755:4, 757:6, 757:12, 758:17, 758:22, 759:17, 765:23, 768:13, 768:21, 770:13, 770:17, 770:22, 770:25, 771:3, 771:10, 771:14, 771:18, 772:5, 772:8, 783:6, 789:2, 793:3, 796:9, 817:6, 820:5, 838:5, 841:1, 842:22, 846:24, 847:5, 847:8, 847:13, 847:18, 848:17, 849:23, 850:2, 852:1, 852:12
**multiple** [5] - 577:17, 608:10, 609:4, 625:6, 784:2
**multiplied** [1] - 584:10
**multiplies** [2] - 584:18, 589:14
**multiply** [2] - 591:11, 786:16
**muscle** [8] - 678:8, 681:19, 681:21, 685:25, 686:2, 755:24, 755:25
**muscles** [5] - 674:20, 676:13, 677:22, 678:21
**must** [2] - 825:18, 826:15

## N

**N-A-G-A-I-C-H** [1] - 751:2
**Nagaich** [16] - 556:5, 559:25, 750:23, 751:1, 751:2, 751:10, 751:13, 753:14, 753:20, 755:7, 758:25, 759:5, 759:22, 768:15, 768:23, 770:14
**NAGAICH** [1] - 751:3
**name** [25] - 568:8, 582:17, 668:5, 668:6, 668:7, 668:23, 677:2, 690:22, 704:21, 704:22, 706:19, 706:20, 713:19, 713:20, 714:7, 735:17, 735:18, 736:5, 750:25, 751:2, 751:13, 770:20, 774:11, 774:23
**named** [5] - 685:8, 689:3, 709:2, 807:6, 811:9
**namely** [1] - 794:4
**names** [1] - 780:22
**NASDAQ** [1] - 700:6
**Nash** [2] - 662:18, 663:24
**Nashville** [1] - 699:23
**National** [2] - 752:7, 752:8
**natural** [1] - 683:11
**naturally** [4] - 690:8, 705:17, 705:18, 706:6
**nature** [5] - 565:6, 648:24, 705:3, 705:19, 706:7
**near** [1] - 615:22
**nearly** [2] - 806:6, 815:7
**necessarily** [1] - 703:10
**necessary** [5] - 642:3, 642:20, 711:7, 852:9
**need** [49] - 572:14, 575:10, 576:10, 576:20, 577:18, 577:20, 578:4, 578:23, 579:8, 599:8, 599:9, 600:12, 619:21, 631:15, 631:16, 632:25, 633:18, 638:3, 638:9, 638:10, 638:16, 638:19, 638:20, 638:25, 649:10, 654:18, 654:22, 655:15, 656:8, 657:8, 666:11, 666:15, 666:24, 711:22, 715:23, 717:1, 717:15, 771:6, 806:3, 821:9, 838:25, 845:25, 850:13, 850:15
**needed** [8] - 592:11, 595:9, 638:1, 655:15, 670:9, 740:1, 839:3
**needing** [1] - 621:16
**needle** [2] - 671:24, 672:1
**needles** [1] - 672:25
**needs** [12] - 579:10, 593:8, 594:15, 621:20, 621:23, 621:24, 622:3, 633:14, 638:5, 638:11, 638:12, 786:16
**negative** [9] - 742:14, 742:17, 743:2, 745:1, 800:13, 800:24, 801:1, 801:2, 801:3
**negatively** [6] - 742:15, 742:21, 766:17, 801:4, 801:6, 802:6
**negotiate** [5] - 574:2, 574:12, 576:9, 641:1, 656:21
**negotiated** [3] - 606:15, 607:7, 607:16
**negotiating** [14] - 585:12, 585:13, 592:22, 593:7, 593:9, 610:11,

623:18, 630:22, 631:14, 632:8, 637:9, 640:6, 640:7, 644:7
**negotiation** [69] - 574:1, 574:4, 574:11, 574:14, 576:2, 577:21, 579:19, 581:7, 581:8, 581:15, 582:8, 584:3, 585:11, 586:24, 589:3, 589:4, 589:11, 592:5, 592:14, 600:16, 601:12, 609:12, 609:15, 611:22, 612:5, 612:7, 612:10, 612:13, 612:20, 613:3, 613:5, 613:8, 613:13, 613:15, 615:24, 617:4, 623:1, 623:4, 623:15, 630:23, 631:1, 631:9, 631:19, 632:7, 632:22, 633:9, 633:23, 636:17, 636:19, 636:25, 638:13, 638:15, 638:22, 639:7, 639:9, 639:24, 640:3, 640:5, 641:9, 642:10, 644:6, 644:10, 645:2, 645:5, 645:12, 650:2, 656:18, 657:3, 657:20
**negotiations** [11] - 605:13, 605:16, 605:19, 605:23, 634:4, 638:2, 640:10, 640:12, 644:23, 644:24, 646:2
**neighboring** [1] - 678:21
**nerd** [1] - 696:21
**net** [1] - 800:20
**neurologic** [1] - 805:3
**neurotoxin** [87] - 637:8, 672:23, 676:21, 676:22, 681:12, 681:20, 683:20, 690:18, 690:19, 693:14, 707:2, 709:10, 711:21, 712:4, 712:8, 739:20, 747:4, 747:16, 772:16, 776:12, 776:14, 777:11, 779:14, 779:24, 780:2, 786:7, 786:8, 786:13, 786:17, 786:18, 787:19, 798:5, 799:21, 803:9, 803:10, 803:24, 804:5, 804:11, 804:18, 804:23, 805:6, 805:17, 805:24, 806:1, 806:18, 807:5, 808:18, 809:17, 809:18, 809:19, 809:21, 809:23, 809:24, 810:6, 811:8, 812:12, 812:15, 812:20, 813:7, 813:11, 813:14, 815:25, 818:17, 818:25, 820:25, 821:17, 821:25, 822:11, 824:2, 824:13, 824:14, 824:22, 825:17, 825:23, 826:20, 827:1, 827:2, 827:5, 827:6, 827:13, 827:15, 827:16, 828:2, 828:17, 830:24, 833:5
**neurotoxins** [11] - 677:18, 772:12, 779:7, 779:17, 780:21, 781:7, 782:23, 808:10, 817:25, 842:7, 845:18
**never** [30] - 556:22, 558:11, 559:9, 559:17, 561:6, 561:7, 561:22, 566:19, 573:5, 575:4, 576:14, 586:19, 604:23, 605:4, 605:8, 613:12, 616:22, 616:23, 676:16, 683:16, 694:20, 706:11, 718:1, 781:21, 781:23, 796:7, 796:10, 841:14, 843:21, 852:7
**New** [1] - 700:4
**new** [36] - 558:22, 573:4, 573:5, 575:4, 576:23, 577:2, 593:13, 616:16, 617:7, 617:19, 619:11, 629:15, 643:8, 643:20, 647:14, 649:2, 669:2, 670:23, 671:19, 671:20, 671:25, 673:21, 676:9, 676:12, 676:16, 693:15, 693:17, 699:2, 699:3, 699:9, 715:21, 715:23, 715:24, 788:18, 796:11
**newer** [2] - 684:1, 700:20
**newly** [1] - 581:12
**news** [1] - 696:12
**next** [32] - 562:10, 562:20, 564:5, 589:9, 616:9, 616:13, 620:3, 620:18, 622:12, 623:11, 632:4, 648:1, 673:8, 674:1, 674:16, 686:13, 725:23, 735:13, 744:23, 747:12, 750:22, 763:15, 764:2, 772:5, 786:18, 786:20, 793:24, 815:2, 824:8, 825:10, 831:18
**nexus** [1] - 567:6
**nice** [4] - 604:3, 633:19, 669:12, 672:11
**NICHOLS** [1] - 553:16
**night** [1] - 846:6
**NIRAV** [1] - 554:7
**nobody** [2] - 573:8, 578:2
**non** [7] - 572:10, 660:3, 660:5, 706:6, 804:18, 804:23
**non-hearsay** [1] - 572:10
**non-hemagglutinin** [1] - 804:23
**non-naturally** [1] - 706:6
**non-neurotoxin** [2] - 804:18, 804:23
**non-patented** [2] - 660:3, 660:5
**nonanimal** [1] - 830:12
**none** [5] - 607:24, 650:4, 824:6, 845:1, 845:2
**noninfringement** [1] - 573:4
**nonobviousness** [6] - 665:8, 665:11, 665:15, 665:19, 666:2, 784:13
**noon** [2] - 850:10, 850:11
**normal** [10] - 631:18, 631:22, 631:24, 631:25, 632:5, 632:21, 633:1, 633:8, 669:20, 715:19
**normalization** [6] - 581:19, 581:20, 584:7, 584:8, 588:13, 588:20
**normalized** [1] - 588:23
**normalizes** [1] - 588:22
**normally** [1] - 563:13
**notable** [1] - 744:19
**note** [2] - 579:3, 701:13
**noted** [1] - 571:15
**notes** [2] - 744:13, 745:10
**nothing** [10] - 566:13, 626:16, 649:23, 673:14, 697:15, 699:13, 730:11, 768:9, 843:18, 844:17
**notice** [1] - 576:24
**noticed** [2] - 674:5, 674:11
**novel** [3] - 641:15, 676:22, 766:7
**November** [2] - 614:6, 615:20
**nucleic** [35] - 631:6, 632:17, 637:8, 637:14, 773:24, 774:1, 777:3, 800:13, 801:8, 801:17, 833:4, 833:6, 833:7, 833:11, 833:14, 833:20, 834:7, 834:13, 834:17, 834:22, 835:1, 835:13, 837:3, 837:5, 837:8, 838:22, 839:1, 839:5, 839:8, 839:11, 839:15, 839:16, 840:4, 840:10, 851:25
**nudge** [1] - 692:17
**number** [55] - 577:13, 586:25, 591:2, 593:20, 594:1, 595:13, 625:23, 634:14, 644:13, 647:8, 647:9, 652:7, 652:18, 652:24, 660:23, 684:24, 686:10, 693:3, 722:4, 722:12, 767:9, 779:12, 780:6, 794:12, 799:5, 799:14, 799:15, 799:24, 799:25, 800:13, 800:25, 801:10, 801:11, 801:12, 801:13, 801:15, 801:23, 801:24, 801:25, 802:1, 802:10, 802:14, 802:21, 802:22, 802:24, 802:25, 803:5, 805:25, 809:12, 822:6, 822:21, 824:18, 824:19, 825:16, 825:22
**numbered** [2] - 798:25, 799:13
**numbers** [15] - 581:3, 588:22, 593:22, 594:1, 598:23, 599:4, 622:17, 622:22, 623:2, 629:10, 635:18, 647:11, 694:13, 701:19, 767:12
**Numbers** [1] - 693:25
**numerator** [1] - 664:17
**numerical** [1] - 601:7
**numerous** [1] - 625:22
**nutrients** [1] - 786:16

**O**

**object** [4] - 572:14, 578:10, 597:14, 598:11
**Object** [3] - 782:6, 782:7, 782:8
**objecting** [1] - 555:7
**objection** [73] - 555:11, 557:6, 559:1, 562:3, 562:10, 564:1,

569:11, 570:12, 572:14, 594:12, 594:13, 596:12, 596:14, 597:12, 597:16, 611:23, 611:25, 612:3, 612:15, 613:3, 624:15, 624:17, 633:3, 635:16, 636:12, 648:22, 649:1, 649:22, 649:25, 651:2, 651:8, 675:18, 675:19, 679:23, 679:24, 685:3, 685:4, 693:7, 693:8, 697:21, 708:20, 711:13, 711:15, 718:19, 719:20, 740:11, 746:2, 746:3, 753:16, 755:3, 757:8, 757:9, 758:19, 758:20, 765:25, 783:6, 789:2, 789:3, 793:3, 793:4, 796:9, 807:25, 808:1, 810:24, 817:6, 817:7, 820:5, 820:6, 838:5, 838:6, 841:1, 842:22, 842:23
**objections** [1] - 570:13
**objective** [9] - 562:19, 563:18, 564:22, 665:7, 665:11, 665:15, 665:18, 666:1, 672:3
**observation** [1] - 688:6
**obtain** [2] - 834:25, 840:3
**obtained** [5] - 717:7, 793:15, 812:13, 828:5, 828:6
**obtaining** [1] - 827:14
**obvious** [14] - 775:11, 778:2, 778:5, 778:10, 778:12, 783:11, 783:19, 783:25, 784:1, 828:24, 839:25, 841:12, 841:13, 851:16
**obviously** [9] - 589:25, 626:10, 666:17, 670:18, 696:7, 706:19, 780:6, 787:7, 852:1
**obviousness** [11] - 562:19, 563:7, 563:10, 570:16, 783:13, 783:14, 784:9, 828:22, 846:16, 851:15, 852:15
**occurred** [3] - 574:15, 661:22, 819:18
**occurring** [6] - 662:10, 683:11, 690:8, 705:17, 705:19, 706:6
**October** [3] - 581:15, 639:7, 832:19
**OECD** [1] - 651:20
**OF** [2] - 553:2, 553:9
**off-target** [1] - 766:19
**offer** [10] - 572:3, 577:7, 579:11, 579:17, 637:18, 697:20, 698:6, 718:16, 783:3
**offered** [1] - 561:22
**offering** [4] - 561:21, 577:2, 577:3, 577:4
**offerings** [1] - 621:7
**office** [1] - 672:11
**officer** [1] - 672:7
**offices** [1] - 699:23
**Official** [1] - 853:4
**officially** [1] - 705:1
**often** [4] - 600:22, 607:22, 740:19, 749:7
**oil** [1] - 684:8
**Oklahoma** [4] - 737:22, 738:14, 738:17, 739:6
**old** [2] - 691:2, 691:6
**older** [1] - 693:15
**oldest** [1] - 669:25
**oligomolecule** [1] - 804:1
**once** [11] - 562:13, 566:2, 604:8, 610:14, 677:4, 679:4, 687:7, 784:4, 808:12, 831:17, 835:5
**one** [172] - 555:2, 555:8, 555:17, 556:2, 556:6, 558:12, 559:16, 562:1, 562:24, 563:5, 563:17, 563:23, 566:11, 566:14, 567:8, 567:22, 568:22, 572:5, 572:20, 573:21, 576:6, 578:21, 579:9, 579:11, 580:14, 581:10, 587:13, 588:15, 589:10, 589:19, 595:21, 596:7, 597:8, 600:15, 602:3, 604:25, 605:5, 605:9, 606:20, 609:4, 616:9, 620:4, 620:15, 621:5, 622:2, 622:6, 624:12, 625:8, 625:11, 625:24, 628:16, 632:10, 632:22, 637:11, 643:5, 645:23, 651:1, 653:23, 655:1, 657:14, 657:19, 660:24, 666:5, 667:6, 672:23, 673:15, 673:20, 677:19, 677:20, 679:8, 683:9, 683:10, 683:23, 686:7, 686:22, 687:12, 688:4, 690:7, 691:20, 691:25, 692:9, 692:12, 695:17, 696:14, 697:8, 697:24, 700:7, 705:25, 708:19, 717:3, 723:9, 723:11, 723:17, 723:18, 729:24, 739:18, 743:10, 747:3, 749:7, 764:3, 766:13, 772:23, 773:12, 773:15, 776:12, 777:2, 779:13, 783:25, 786:10, 786:23, 787:13, 787:18, 787:24, 789:17, 790:7, 792:3, 794:12, 798:23, 799:5, 799:8, 799:11, 799:14, 799:15, 800:11, 800:13, 801:1, 801:8, 802:15, 803:1, 803:6, 803:9, 803:16, 803:21, 805:12, 807:12, 807:17, 808:21, 809:21, 813:15, 817:2, 818:6, 818:11, 818:14, 823:18, 824:9, 824:14, 829:8, 829:25, 830:6, 833:4, 833:20, 834:5, 834:8, 835:1, 836:11, 836:24, 839:1, 839:22, 839:24, 840:4, 840:18, 840:24, 843:16, 844:19, 851:12, 851:16, 852:8
**one-year** [1] - 625:8
**one/phase** [1] - 695:9
**ones** [6] - 588:8, 638:3, 691:18, 703:10, 724:10, 782:3
**onset** [2] - 621:19, 687:18
**open** [1] - 633:9
**opening** [1] - 647:13
**operation** [1] - 634:20
**operations** [1] - 634:15
**operators** [1] - 691:9
**opine** [3] - 639:3, 644:3, 650:25
**opined** [1] - 629:18
**opinion** [60] - 556:24, 560:8, 560:14, 561:25, 567:5, 577:7, 578:17, 587:22, 601:23, 627:7, 627:9, 629:6, 640:13, 641:17, 644:22, 714:9, 714:22, 715:2, 720:6, 720:10, 724:16, 736:22, 736:25, 737:1, 737:2, 740:15, 741:18, 741:19, 743:19, 743:20, 743:23, 754:1, 758:4, 759:5, 760:3, 760:6, 760:13, 768:6, 778:9, 778:11, 783:10, 784:23, 785:14, 794:22, 794:23, 796:11, 796:12, 832:9, 834:24, 836:4, 837:1, 837:2, 839:18, 840:19, 841:5, 841:6, 841:19, 841:22, 848:15
**opinions** [25] - 557:1, 558:18, 558:21, 558:22, 559:25, 561:21, 566:20, 566:21, 577:9, 586:22, 586:23, 714:21, 714:25, 725:17, 725:19, 744:5, 745:21, 754:20, 757:4, 758:12, 778:7, 788:20, 792:20, 822:24, 823:16
**opportunity** [2] - 557:1, 586:6
**opposed** [2] - 641:15, 660:3
**opposing** [2] - 572:22, 573:19
**opposite** [1] - 802:5
**opposites** [3] - 742:24, 743:16, 800:10
**orange** [3] - 721:19, 799:22, 815:6
**oranges** [1] - 652:23
**order** [6] - 593:8, 596:22, 598:1, 711:24, 826:16, 848:4
**ordinary** [20] - 783:15, 784:10, 784:17, 784:19, 784:21, 784:24, 784:25, 785:9, 828:21, 828:23, 833:17, 833:19, 834:9, 839:4, 839:7, 839:24, 841:20, 842:1, 845:6, 845:8
**organism** [16] - 669:9, 669:10, 670:18, 690:5, 705:20, 705:22, 706:9, 786:5, 786:14, 786:16, 786:20, 803:25, 804:3, 804:25, 830:8, 830:10
**organisms** [2] - 705:23, 706:15
**organized** [2] - 823:16, 823:17
**orient** [3] - 604:11, 610:4, 627:12
**original** [1] - 706:24
**originally** [1] - 801:25
**otherwise** [1] - 689:19
**ourselves** [4] - 586:4, 604:11, 610:5, 627:12
**outcome** [1] - 774:2
**outcomes** [1] - 697:25

**outside** [6] - 690:21, 719:21, 743:13, 745:1, 745:2, 841:2
**overall** [6] - 558:5, 722:14, 722:18, 742:15, 753:8, 772:20
**overemphasize** [1] - 725:6
**overnight** [1] - 849:8
**overrule** [3] - 651:8, 796:13, 841:3
**overruled** [2] - 598:13, 711:15
**overwhelming** [1] - 798:23
**own** [15] - 556:8, 562:15, 566:20, 586:17, 632:12, 637:13, 637:14, 646:7, 692:13, 733:11, 746:14, 746:15, 795:25, 797:19, 840:9
**owned** [1] - 650:16
**owner** [4] - 645:23, 646:10, 647:1, 647:22
**owns** [1] - 653:14

**P**

**p.m** [3] - 849:15, 849:17, 852:18
**Pacific** [5] - 599:24, 600:3, 600:7, 601:16, 605:25
**pack** [1] - 831:17
**packed** [2] - 800:4, 800:18
**packet** [1] - 609:25
**packing** [2] - 800:6, 831:7
**page** [59] - 559:23, 560:19, 572:5, 575:11, 587:17, 616:1, 616:6, 616:7, 616:9, 617:16, 619:18, 620:9, 620:18, 621:1, 621:3, 624:21, 627:12, 628:14, 630:19, 634:12, 635:12, 635:25, 643:16, 644:3, 647:16, 651:14, 656:1, 689:17, 693:19, 701:19, 703:11, 703:13, 720:19, 744:17, 745:8, 757:14, 758:24, 760:19, 766:2, 766:13, 767:2, 767:10, 767:11, 768:16, 789:25, 793:11, 793:24, 817:18, 818:3, 821:8, 829:20, 833:10, 833:25, 835:24, 838:21, 840:15, 851:11
**pages** [7] - 558:1, 558:25, 561:17, 572:4, 634:22, 851:7, 851:8
**paid** [3] - 639:12, 639:20, 652:5
**painted** [1] - 802:18
**painting** [1] - 707:4
**paper** [29] - 571:2, 600:7, 643:14, 643:22, 644:5, 645:7, 675:9, 675:12, 677:19, 679:3, 744:3, 745:20, 746:7, 746:9, 746:10, 747:25, 748:1, 808:4, 808:6, 808:8, 809:2, 816:17, 816:20, 817:11, 817:14, 817:18, 818:3, 818:5, 820:10
**papers** [4] - 696:14, 696:19, 706:17, 748:2
**paragraph** [14] - 647:15, 648:1, 693:20, 702:5, 702:13, 755:6, 755:11, 760:21, 760:23, 762:14, 763:5, 768:17, 836:3, 836:5
**paragraphs** [1] - 680:24
**paralysis** [6] - 685:23, 685:25, 686:2, 688:9, 769:20, 769:23
**paralyze** [1] - 681:19
**paralyzes** [1] - 681:21
**paralyzing** [3] - 677:25, 755:24, 755:25
**parents** [1] - 696:25
**part** [51] - 564:1, 565:24, 567:11, 574:19, 575:17, 576:15, 578:16, 583:25, 587:7, 587:16, 591:18, 596:23, 597:19, 598:8, 600:5, 622:16, 629:21, 631:5, 631:25, 635:5, 635:7, 635:10, 637:13, 639:20, 674:2, 683:4, 690:15, 696:1, 699:7, 703:2, 705:12, 723:17, 723:18, 738:7, 738:8, 754:19, 764:3, 764:25, 774:2, 777:3, 803:21, 833:4, 834:8, 835:1, 836:3, 836:11, 836:24, 840:4, 851:16, 852:4
**participated** [1] - 695:13
**participating** [1] - 695:17
**particle** [1] - 789:17
**particles** [2] - 692:2, 692:5
**particular** [47] - 570:6, 570:12, 571:11, 577:14, 585:6, 600:14, 601:15, 618:20, 621:17, 632:25, 636:24, 647:8, 693:14, 712:1, 724:19, 739:16, 777:11, 777:18, 779:25, 784:22, 785:13, 785:24, 786:23, 790:4, 791:25, 795:17, 796:18, 799:8, 799:11, 803:4, 806:15, 809:16, 813:15, 818:12, 818:18, 821:3, 823:10, 824:15, 825:3, 826:3, 826:10, 838:12, 842:4, 843:19, 845:8, 845:14
**parties** [27] - 573:25, 574:2, 574:4, 574:10, 574:12, 574:16, 574:20, 575:10, 575:15, 576:8, 579:18, 584:3, 585:10, 593:6, 600:16, 600:21, 606:3, 606:16, 607:7, 623:7, 630:22, 638:2, 638:8, 644:11, 652:11, 663:18, 847:9
**parties'** [1] - 847:2
**partner** [3] - 690:21, 690:22, 697:12
**parts** [17] - 575:15, 576:17, 631:6, 631:13, 632:16, 635:14, 636:3, 636:9, 637:7, 680:18, 688:25, 690:12, 723:17, 723:18, 804:15, 828:20, 833:5
**party** [7] - 632:22, 633:23, 636:16, 636:21, 646:1, 650:2, 715:25
**pass** [9] - 603:3, 603:19, 673:10, 673:24, 712:17, 730:19, 759:17, 768:10, 770:25
**passage** [1] - 689:17
**passion** [1] - 699:9
**Patel** [2] - 848:12, 848:13
**Patent** [1] - 693:25
**patent** [285] - 565:17, 576:10, 576:15, 580:23, 582:11, 582:23, 583:2, 583:4, 583:8, 583:15, 600:10, 600:11, 602:5, 602:8, 602:12, 604:15, 604:16, 604:17, 608:18, 608:21, 610:2, 610:6, 610:7, 610:9, 610:11, 610:14, 610:15, 610:19, 610:24, 611:2, 611:7, 611:17, 611:20, 612:2, 612:8, 612:14, 612:20, 613:2, 613:5, 613:13, 613:18, 626:15, 626:21, 626:24, 627:11, 627:13, 627:16, 627:21, 628:3, 628:6, 628:24, 629:16, 630:6, 630:14, 630:17, 631:2, 631:13, 632:3, 632:4, 633:12, 633:24, 635:5, 635:10, 637:3, 637:5, 639:5, 639:6, 639:21, 640:2, 640:5, 641:8, 641:10, 641:12, 641:15, 641:16, 641:17, 641:20, 641:23, 642:3, 642:6, 642:12, 642:19, 642:20, 644:15, 644:18, 644:19, 644:25, 645:2, 645:7, 645:14, 645:23, 646:10, 646:13, 646:14, 647:1, 647:22, 653:24, 654:2, 655:8, 655:16, 655:18, 656:5, 656:9, 656:19, 656:22, 657:7, 659:4, 660:2, 660:22, 661:4, 661:7, 661:8, 661:11, 661:14, 661:18, 661:19, 661:23, 662:25, 663:1, 664:19, 665:17, 666:3, 679:17, 679:19, 680:3, 680:8, 680:11, 680:14, 680:16, 684:22, 684:25, 685:8, 685:11, 685:12, 685:19, 687:23, 693:3, 693:4, 693:11, 693:12, 694:3, 694:10, 694:12, 694:16, 698:24, 701:2, 701:4, 701:6, 701:9, 702:23, 703:2, 703:3, 703:5, 703:7, 703:24, 704:5, 704:6, 709:5, 710:5, 718:22, 719:1, 719:3, 719:5, 719:6, 719:9, 719:10, 719:13, 719:16, 731:14, 731:18, 748:7, 748:10, 749:20, 772:6, 775:6, 775:17, 775:20, 775:25, 776:6, 776:15, 776:17, 776:20,

776:21, 776:22, 777:1, 777:4, 777:11, 777:13, 777:16, 777:21, 777:22, 778:2, 778:5, 778:9, 778:10, 780:9, 783:10, 783:24, 784:1, 784:8, 784:11, 785:13, 785:15, 792:15, 792:17, 793:8, 793:11, 793:13, 793:21, 793:25, 794:1, 797:6, 808:24, 809:1, 810:4, 810:11, 810:20, 811:3, 811:4, 811:5, 811:6, 811:7, 811:15, 811:24, 812:11, 812:12, 812:24, 813:1, 813:3, 813:4, 813:5, 813:17, 813:21, 813:24, 814:6, 814:7, 814:8, 814:11, 814:12, 814:14, 814:16, 814:17, 814:18, 814:23, 814:24, 815:8, 815:10, 815:12, 819:23, 822:5, 823:10, 825:7, 828:24, 831:24, 832:2, 832:7, 832:13, 832:23, 837:23, 837:24, 838:14, 839:23, 840:14, 840:16, 840:22, 841:8, 841:11, 841:14, 842:10, 843:17, 845:21, 846:16, 848:6

**patent-at-issue** [1] - 645:14

**patented** [9] - 601:5, 627:17, 659:20, 660:3, 660:5, 660:11, 663:11, 663:16, 694:17

**patentees** [1] - 660:9

**patentholder** [1] - 600:19

**patenting** [1] - 813:8

**patents** [73] - 570:20, 578:17, 582:7, 591:19, 592:1, 593:7, 593:8, 596:24, 597:21, 597:22, 601:24, 601:25, 602:2, 604:12, 604:14, 604:19, 604:20, 604:25, 605:5, 605:9, 608:15, 609:9, 609:13, 613:8, 622:15, 627:25, 637:25, 638:6, 638:12, 646:6, 646:11, 646:14, 646:19, 646:20, 647:4, 647:22, 647:23, 651:6, 652:5, 652:17, 653:1, 655:13, 657:3, 657:14, 657:16, 657:20, 658:22, 659:2, 661:5, 661:12, 661:13, 661:24, 662:5, 662:16, 663:5, 663:22, 664:10, 664:15, 665:8, 665:9, 665:16, 666:7, 694:4, 696:20, 704:8, 710:6, 775:7, 782:15, 782:17, 822:23, 840:25

**patents-in-suit** [1] - 646:20

**patients** [4] - 586:7, 670:24, 695:13, 695:18

**pattern** [5] - 593:9, 844:7, 844:10, 844:11, 844:25

**PAUL** [1] - 553:18

**pause** [1] - 767:20

**pay** [21] - 583:7, 583:12, 583:14, 583:15, 585:3, 585:4, 602:15, 602:16, 629:17, 630:23, 631:21, 632:4, 632:24, 633:19, 633:24, 638:2, 638:5, 638:8, 638:15, 648:4, 656:23

**paying** [5] - 624:1, 629:13, 639:9, 639:14, 717:19

**payment** [1] - 611:18

**pays** [5] - 647:5, 647:21, 647:24, 648:2, 648:3

**PDX** [11] - 581:3, 601:19, 609:9, 613:23, 622:4, 622:13, 623:2, 625:8, 630:4, 639:4, 640:4

**peak** [2] - 726:16, 726:20

**peer** [2] - 816:12, 817:3

**penetrating** [16] - 705:5, 705:7, 706:12, 706:21, 731:22, 731:24, 732:7, 734:4, 734:22, 735:3, 739:1, 739:4, 739:12, 739:15, 740:3, 741:6

**people** [31] - 569:4, 569:19, 575:18, 577:7, 590:5, 590:7, 608:22, 612:21, 638:15, 670:3, 670:20, 672:1, 673:19, 678:24, 692:21, 696:23, 708:16, 718:8, 771:17, 781:21, 781:23, 782:1, 786:9, 789:14, 790:19, 796:7, 797:1, 797:16, 821:13, 829:11, 843:12

**people's** [1] - 677:25

**peptide** [173] - 558:8, 559:14, 560:18, 565:10, 565:11, 565:22, 566:1, 566:8, 566:9, 566:13, 566:15, 566:18, 566:19, 568:4, 641:11, 641:15, 642:23, 643:1, 643:23, 644:2, 644:15, 660:6, 672:16, 672:22, 674:5, 674:8, 674:10, 674:19, 674:24, 675:2, 675:3, 681:3, 681:4, 681:17, 681:18, 681:23, 683:5, 683:8, 683:12, 683:15, 689:6, 689:12, 704:15, 704:23, 705:5, 705:7, 705:12, 705:14, 706:2, 706:6, 706:11, 706:12, 706:19, 706:21, 707:16, 707:20, 708:4, 708:9, 708:11, 710:8, 711:10, 711:22, 712:5, 712:11, 720:4, 720:7, 722:24, 723:17, 724:10, 724:25, 725:3, 725:5, 725:9, 725:10, 725:12, 727:18, 728:21, 728:25, 729:1, 730:10, 731:22, 731:24, 732:7, 732:22, 733:20, 733:21, 733:23, 734:4, 734:22, 735:3, 736:8, 736:20, 736:23, 737:2, 739:2, 740:16, 740:17, 740:21, 740:23, 740:24, 741:2, 741:3, 741:6, 741:9, 741:11, 741:12, 741:13, 741:15, 741:16, 741:20, 741:22, 742:10, 743:2, 743:11, 744:25, 745:7, 746:12, 746:16, 746:24, 747:1, 747:3, 747:11, 747:15, 747:22, 748:5, 748:11, 748:12, 749:3, 749:17, 751:18, 753:21, 753:22, 753:24, 754:2, 754:3, 754:5, 754:6, 754:8, 754:9, 754:24, 755:14, 755:16, 755:21, 756:2, 756:4, 756:15, 756:18, 758:4, 758:8, 759:1, 759:3, 759:6, 759:8, 759:11, 759:14, 760:10, 760:15, 761:7, 761:14, 762:10, 763:9, 764:12, 766:16, 768:8, 768:25, 769:12, 769:22, 770:2, 770:5, 770:10

**peptides** [10] - 681:6, 681:7, 705:12, 706:15, 739:1, 739:4, 739:13, 739:15, 740:4, 740:10

**peptone** [1] - 773:3

**per** [24] - 575:15, 576:15, 576:17, 632:17, 635:10, 635:14, 636:3, 636:10, 637:7, 637:13, 663:18, 686:7, 723:17, 777:3, 833:4, 834:8, 836:11, 836:24, 838:18, 840:4, 851:16

**percent** [60] - 581:11, 582:6, 582:19, 582:20, 582:25, 588:23, 588:25, 589:13, 601:24, 602:6, 602:9, 602:17, 602:20, 610:15, 610:20, 610:25, 618:5, 630:1, 630:8, 640:13, 640:16, 642:13, 646:17, 647:6, 647:9, 647:22, 647:24, 648:4, 648:6, 648:7, 648:18, 652:4, 652:7, 652:18, 652:19, 652:25, 654:13, 658:21, 658:23, 659:5, 661:10, 661:11, 662:5, 662:9, 662:11, 662:25, 663:6, 663:15, 663:21, 664:4, 664:20, 722:3, 722:7, 722:8, 726:6, 789:16, 827:2, 828:17

**percentage** [1] - 661:22

**percentages** [1] - 602:18

**perform** [2] - 593:12, 702:1

**performance** [1] - 730:9

**performed** [2] - 734:15, 734:17

**performing** [1] - 735:2

**performs** [1] - 735:5

**period** [11] - 590:14, 591:13, 602:25, 603:15, 629:7, 659:8, 659:9, 740:2, 740:7, 749:11,

771:23
**periods** [3] - 591:12, 697:7, 708:17
**permit** [2] - 676:23, 677:9
**person** [37] - 568:7, 575:2, 672:5, 709:2, 783:15, 783:18, 784:2, 784:17, 784:18, 784:20, 784:21, 784:24, 784:25, 785:9, 785:23, 790:9, 806:12, 806:13, 806:14, 808:12, 828:21, 828:23, 831:15, 832:15, 833:17, 833:19, 834:9, 839:4, 839:7, 839:24, 842:1, 843:25, 845:4, 845:6, 845:8, 848:7, 848:10
**personal** [1] - 795:25
**personally** [5] - 575:20, 575:21, 807:19, 807:20, 816:7
**persons** [2] - 778:13, 841:19
**perspective** [4] - 783:15, 784:14, 784:16, 787:23
**pertinacious** [1] - 682:11
**PETER** [1] - 554:10
**pg/ml** [1] - 836:21
**pH** [14] - 724:5, 724:6, 824:16, 824:25, 825:1, 825:3, 833:21, 833:23, 834:3, 834:11, 837:3, 839:14, 840:10
**Ph.D** [17] - 670:10, 715:11, 737:25, 738:3, 738:4, 752:4, 752:5, 779:4, 779:5, 779:6, 779:10, 779:12, 780:4, 780:11, 785:2, 785:7, 811:16
**Pharma** [3] - 782:6, 782:7, 782:8
**pharma** [2] - 736:16, 781:13
**pharmaceutical** [17] - 607:1, 607:8, 690:14, 691:11, 736:12, 738:5, 753:1, 781:24, 787:18, 787:24, 789:21, 792:6, 803:13, 805:4, 810:5, 829:23, 831:21
**pharmaceutical-grade** [2] - 781:24, 831:21
**pharmaceutically** [2] - 803:16, 829:10
**pharmaceuticals** [1] - 669:3
**pharmacologic** [3] - 681:21, 767:5, 767:24
**pharmacological** [6] - 755:22, 755:23, 763:17, 763:20, 763:22, 769:1
**pharmacologically** [1] - 806:1
**pharmacology** [3] - 670:10, 670:15, 682:1
**phase** [19] - 692:6, 692:10, 692:12, 692:15, 692:17, 692:18, 695:8, 695:9, 799:6, 799:16, 800:4, 800:19, 802:6, 803:1, 808:20, 825:15
**phosphate** [1] - 826:4
**photographs** [1] - 667:21
**phrase** [1] - 850:24
**physical** [1] - 625:25
**Physicians'** [2] - 569:18, 572:3
**pick** [4] - 626:1, 626:4, 626:11, 786:23
**Pickard** [2] - 567:19, 567:21
**PICKARD** [4] - 554:7, 567:23, 568:2, 568:11
**picked** [2] - 623:21, 696:15
**picograms** [1] - 836:10
**PicoGreen** [1] - 636:9
**picture** [1] - 688:11
**piece** [3] - 640:19, 783:25, 832:16
**pieces** [4] - 784:2, 806:1, 808:15, 833:7
**pigs** [1] - 716:24
**pink** [2] - 799:22, 815:6
**place** [2] - 609:16, 765:4
**placed** [1] - 848:14
**places** [7] - 624:11, 625:6, 625:22, 628:17, 762:13, 780:6, 787:6
**plaintiff** [4] - 666:5, 697:6, 771:4, 846:21
**Plaintiff** [2] - 553:4, 553:23
**plaintiff's** [1] - 846:14
**Plaintiff's** [1] - 624:18
**planned** [2] - 675:14, 848:4
**plant** [10] - 673:18, 787:14, 788:3, 794:2, 794:3, 796:3, 797:5, 829:13, 829:18, 830:2
**plant-based** [6] - 788:3, 794:3, 797:5, 829:13, 829:18, 830:2
**plants** [3] - 787:7, 787:8, 794:4
**plasma** [2] - 738:12, 791:23
**play** [4] - 739:5, 754:9, 770:18, 771:4
**played** [2] - 669:21, 772:9
**playing** [4] - 667:5, 736:9, 747:11, 748:5
**plays** [2] - 737:2, 749:12
**pleasant** [1] - 696:17
**plenty** [1] - 733:9
**PLLC** [1] - 554:5
**plot** [1] - 686:9
**plug** [1] - 681:7
**plus** [5] - 731:17, 732:19, 732:22
**podium** [1] - 579:25
**point** [39] - 556:7, 556:15, 559:19, 561:3, 567:12, 575:6, 575:22, 576:20, 577:25, 578:1, 578:21, 579:2, 585:20, 589:19, 611:8, 612:8, 617:6, 625:25, 631:21, 632:15, 639:15, 649:23, 650:6, 657:14, 697:8, 698:12, 698:17, 701:15, 709:22, 710:18, 710:23, 711:1, 723:14, 780:19, 797:13, 805:25, 829:9, 845:8, 845:15
**pointed** [5] - 580:11, 749:22, 762:8, 824:3, 824:4
**pointer** [1] - 798:24
**pointing** [1] - 768:18
**points** [10] - 567:6, 574:17, 577:17, 582:18, 594:6, 632:9, 653:23, 660:17, 747:14, 748:4
**policies** [2] - 649:20, 650:3
**policy** [2] - 600:22, 651:15
**polylysine** [1] - 740:4
**polymers** [1] - 740:4
**polysorbate** [28] - 683:22, 683:24, 684:1, 684:10, 684:15, 709:15, 710:2, 722:24, 723:17, 724:10, 724:25, 725:4, 725:6, 725:10, 726:9, 727:12, 727:17, 728:5, 728:22, 728:23, 729:9, 729:18, 729:21, 729:25, 730:6, 731:10, 732:6, 734:23
**polysorbates** [1] - 723:2
**poor** [1] - 841:10
**populate** [1] - 644:23
**portfolio** [1] - 621:6
**portion** [7] - 660:1, 736:7, 740:25, 741:6, 772:1, 836:5, 843:2
**portrait** [1] - 562:16
**position** [14] - 564:6, 570:17, 620:10, 620:12, 620:16, 620:20, 620:22, 632:6, 645:8, 645:10, 651:12, 651:13, 782:4, 782:5
**positions** [1] - 573:4
**positive** [14] - 683:18, 741:7, 741:8, 742:11, 742:14, 743:2, 743:4, 743:14, 800:7, 800:20, 801:2, 801:3, 801:18
**positively** [4] - 802:7, 802:8, 802:13, 803:2
**positives** [1] - 800:12
**possibilities** [2] - 576:6, 576:9
**possibility** [1] - 592:7
**possible** [9] - 606:12, 611:12, 614:25, 634:3, 654:8, 716:16, 788:17, 803:13, 806:17
**possibly** [3] - 570:1, 697:12, 745:1
**post** [1] - 738:4
**post-doctoral** [1] - 738:4
**postdoctoral** [1] - 780:13
**potency** [26] - 565:5, 655:13, 655:18, 674:4, 674:6, 674:9, 674:12, 687:17, 688:2, 688:6, 688:8, 688:15, 688:17, 688:18, 688:19, 688:21, 717:1, 717:2, 717:4, 717:5, 719:17, 719:19, 748:19, 748:22, 749:1, 749:6
**potent** [1] - 786:6
**potential** [2] - 791:19, 793:13
**potentially** [2] - 766:18, 785:2
**pounds** [2] - 723:12, 805:14
**pouring** [1] - 801:25
**powder** [2] - 692:3, 695:21
**power** [1] - 567:20
**practice** [8] - 604:19, 611:17, 628:6, 628:7, 656:8, 656:19, 657:6
**practices** [4] - 604:25, 605:5, 656:11, 753:15
**practicing** [1] - 628:23
**precautionary** [1] - 788:16
**precautions** [1] - 673:15
**preclinical** [2] - 674:18, 675:11
**predate** [1] - 581:14
**predates** [1] - 645:4
**prefer** [3] - 563:14,

616:7, 850:8
**preferred** [1] - 611:13
**premise** [1] - 638:4
**premium** [17] - 584:12, 584:19, 585:8, 586:20, 588:11, 589:14, 589:19, 589:20, 589:25, 590:9, 590:12, 616:18, 617:1, 617:8, 617:11, 618:18, 619:13
**preparation** [1] - 828:12
**prepare** [2] - 737:10, 753:10
**prepared** [17] - 596:18, 714:24, 715:6, 721:2, 721:7, 721:11, 722:16, 742:2, 742:4, 751:25, 778:15, 785:18, 794:6, 798:17, 813:25, 822:12, 822:23
**preparing** [3] - 571:12, 682:12, 682:24
**prescribers** [1] - 607:23
**presence** [1] - 829:7
**present** [14] - 599:7, 599:11, 599:14, 606:3, 606:14, 607:24, 658:25, 697:19, 712:3, 750:10, 773:5, 786:22, 820:25, 852:25
**presentation** [1] - 729:23
**presented** [3] - 571:22, 572:7, 666:17
**presenting** [3] - 573:8, 583:19, 748:3
**president** [3] - 672:2, 753:4, 782:6
**press** [1] - 696:13
**prestigious** [1] - 679:11
**presumably** [4] - 573:15, 701:9, 848:2, 851:19
**pretending** [1] - 673:17
**pretty** [7] - 559:7, 563:18, 565:24, 566:12, 682:17, 738:22, 819:16
**previous** [1] - 702:13
**previously** [1] - 598:12
**price** [25] - 584:11, 584:12, 584:19, 585:4, 585:7, 586:14, 586:20, 587:23, 588:3, 588:11, 589:14, 589:15, 589:17, 589:19, 589:20, 589:25, 590:2, 590:3, 590:9, 590:12, 616:13, 617:1, 617:11, 618:9, 618:18
**pricing** [8] - 617:25, 648:16, 649:16, 650:24, 651:20, 651:23, 652:1, 652:10
**primary** [5] - 587:20, 587:25, 654:9, 672:24, 779:13
**principal** [2] - 752:16, 752:18
**principle** [2] - 651:19, 743:16
**principles** [3] - 649:21, 651:24, 797:9
**print** [3] - 562:13, 562:15, 819:17
**printed** [2] - 594:2, 594:4
**prion** [1] - 793:14
**prion-mediated** [1] - 793:14
**prions** [2] - 792:2, 829:25
**priorities** [2] - 620:13, 620:15
**priority** [2] - 620:11, 785:22
**private** [1] - 781:2
**probative** [1] - 571:23
**problem** [11] - 563:9, 564:24, 568:6, 576:19, 589:8, 589:10, 589:12, 594:23, 720:9, 725:18, 795:1
**problems** [1] - 563:2
**procedure** [1] - 836:15
**procedures** [1] - 776:25
**proceed** [4] - 713:15, 718:20, 740:12, 753:17
**proceedings** [7] - 580:7, 667:2, 713:8, 791:7, 848:4, 852:18, 853:1
**process** [92] - 592:9, 592:10, 627:22, 634:10, 634:11, 636:1, 636:2, 638:18, 660:17, 689:24, 690:20, 690:23, 690:25, 691:1, 691:6, 693:13, 693:16, 693:17, 694:17, 711:10, 715:12, 717:13, 717:16, 718:13, 718:18, 738:20, 772:7, 772:11, 772:15, 772:17, 772:18, 772:21, 773:7, 773:13, 773:16, 773:17, 773:19, 774:2, 774:3, 776:1, 776:5, 776:23, 777:6, 777:10, 777:14, 777:18, 779:15, 779:20, 780:2, 786:19, 787:11, 787:12, 792:16, 799:10, 803:6, 808:11, 809:3, 812:1, 812:2, 812:3, 812:6, 812:10, 812:25, 813:2, 813:3, 813:14, 819:12, 822:7, 823:20, 823:24, 824:10, 827:14, 828:6, 828:8, 829:15, 830:5, 830:22, 830:25, 831:11, 833:18, 833:22, 834:7, 834:25, 836:17, 836:19, 840:3, 846:18
**processed** [1] - 773:4
**processes** [5] - 666:12, 772:14, 777:15, 777:16, 780:10
**processing** [1] - 666:11
**produce** [8] - 690:5, 748:19, 772:11, 772:15, 772:17, 786:17, 786:18, 834:7
**produced** [7] - 594:6, 786:4, 786:21, 803:25, 804:25, 829:1, 829:17
**produces** [1] - 748:22
**producing** [3] - 772:18, 786:11, 830:7
**product** [107] - 580:23, 581:12, 581:13, 581:22, 581:23, 581:24, 582:12, 583:8, 584:17, 585:5, 585:6, 585:15, 589:21, 590:11, 600:11, 604:22, 604:23, 605:1, 605:5, 608:4, 616:22, 616:23, 617:1, 618:18, 621:13, 622:9, 624:24, 629:8, 629:15, 632:11, 632:12, 632:14, 632:15, 632:23, 633:2, 633:24, 633:25, 635:12, 637:13, 637:14, 639:22, 640:1, 640:15, 641:4, 642:13, 652:22, 659:8, 659:24, 660:12, 670:24, 672:20, 672:21, 674:3, 674:4, 674:13, 677:2, 688:15, 692:21, 695:12, 697:9, 697:11, 697:13, 697:18, 704:22, 706:25, 707:1, 707:3, 707:8, 707:9, 707:11, 708:5, 708:7, 708:11, 709:8, 709:9, 710:7, 710:15, 712:10, 716:12, 716:13, 716:21, 717:15, 717:17, 717:18, 717:20, 722:5, 722:8, 752:21, 753:7, 755:17, 757:20, 757:21, 757:24, 761:10, 762:20, 776:1, 776:7, 792:15, 794:2, 794:3, 823:20, 824:1, 829:12, 829:13
**production** [5] - 666:18, 739:10, 786:12, 815:24, 821:15
**productivity** [1] - 772:12
**products** [57] - 616:24, 679:9, 710:19, 710:23, 711:2, 712:1, 741:10, 741:13, 751:22, 752:14, 757:18, 773:6, 773:13, 773:16, 773:19, 776:6, 781:14, 787:14, 788:19, 789:24, 790:2, 790:4, 790:10, 791:18, 791:21, 791:22, 791:24, 792:7, 792:9, 793:12, 793:16, 793:22, 794:4, 794:5, 794:7, 794:10, 794:12, 794:14, 794:20, 795:8, 795:17, 795:23, 796:1, 796:3, 796:4, 796:17, 796:18, 796:25, 797:4, 809:12, 824:5, 829:5, 829:7, 829:23
**profession** [1] - 699:8
**Professional** [2] - 852:23, 852:25
**professional** [5] - 669:16, 715:7, 737:16, 750:3, 778:16
**professor** [2] - 810:15, 820:20
**proffered** [1] - 847:20
**profile** [3] - 565:12, 749:2, 749:7
**profit** [14] - 597:9, 599:1, 599:12, 601:1, 623:8, 623:19, 624:1, 625:7, 626:7, 629:9, 629:12, 629:15, 664:16
**profits** [11] - 598:25, 601:2, 605:9, 622:23, 658:25, 659:7, 660:2, 661:22, 662:10, 662:15
**program** [3] - 673:12, 696:7, 772:20
**progress** [1] - 699:11
**progressed** [1] - 670:4
**project** [6] - 673:22,

707:24, 739:16, 739:18, 739:22, 739:24
**projection** [1] - 622:24
**projections** [2] - 623:2, 623:5
**projects** [1] - 739:14
**prominent** [1] - 780:22
**promise** [2] - 695:6, 697:4
**prong** [1] - 565:9
**proper** [1] - 578:2
**properly** [1] - 608:12
**properties** [13] - 562:12, 564:12, 565:6, 566:2, 566:4, 747:15, 763:17, 763:20, 763:22, 767:5, 767:24, 804:21
**property** [4] - 631:19, 633:19, 640:20, 769:1
**proposals** [1] - 807:22
**propose** [1] - 847:13
**proposed** [1] - 626:9
**proprietary** [4] - 641:11, 643:23, 660:5, 740:17
**prosecuting** [1] - 840:14
**prostate** [1] - 670:25
**protect** [1] - 739:20
**protein** [51] - 627:22, 627:25, 628:2, 669:5, 671:21, 671:23, 672:17, 682:18, 684:11, 684:12, 702:2, 705:21, 706:9, 711:10, 711:20, 711:21, 711:22, 712:9, 712:10, 718:18, 738:8, 738:11, 739:24, 740:5, 743:17, 776:8, 776:12, 776:13, 777:12, 785:4, 786:4, 786:6, 786:17, 787:4, 787:5, 787:8, 787:23, 788:2, 803:3, 803:12, 806:5, 806:9, 818:15, 824:9, 824:14, 829:19, 830:7, 830:10, 830:11, 838:25
**proteins** [31] - 682:16, 683:19, 690:11, 705:3, 705:4, 706:15, 711:25, 712:6, 712:7, 738:24, 742:19, 743:12, 745:2, 785:6, 788:6, 790:12, 801:16, 801:18, 804:7, 804:9, 804:12, 804:20, 804:23, 806:11, 809:22, 812:21, 828:18, 829:3, 830:12
**proven** [1] - 569:12
**Provenge** [1] - 670:25
**provide** [5] - 558:8, 644:18, 664:11, 778:8, 793:21
**provided** [3] - 555:9, 759:2, 841:19
**provider** [1] - 620:1
**providers** [2] - 586:7, 587:21
**provides** [3] - 757:1, 793:25, 794:1
**proving** [1] - 569:15
**PTX** [33] - 587:4, 587:17, 594:11, 594:19, 594:20, 595:15, 596:11, 596:15, 598:1, 598:2, 598:3, 598:15, 598:16, 598:18, 599:5, 624:5, 624:6, 624:13, 624:18, 625:19, 765:11
**public** [3] - 694:9, 832:16, 851:19
**publication** [5] - 569:12, 569:23, 680:13, 819:10, 832:19
**publications** [1] - 570:20
**publicly** [3] - 700:1, 700:4, 816:8
**publish** [4] - 782:11, 789:5, 793:6, 835:20
**published** [39] - 569:19, 570:2, 570:4, 643:22, 645:7, 675:10, 676:17, 679:4, 679:8, 679:12, 680:10, 694:24, 696:19, 745:23, 745:24, 780:4, 780:7, 788:23, 792:22, 807:9, 810:9, 815:9, 815:10, 815:23, 816:5, 816:14, 816:16, 819:7, 819:8, 819:13, 819:14, 819:20, 819:21, 819:22, 821:19, 837:20, 837:21, 838:1, 842:19
**publishing** [1] - 780:9
**PubMed** [3] - 816:11, 816:13, 819:12
**pull** [19] - 581:2, 582:2, 597:2, 599:5, 611:21, 627:11, 640:7, 720:19, 730:16, 732:10, 755:5, 757:13, 758:23, 768:14, 799:8, 800:11, 803:16, 820:23, 838:10
**pulled** [4] - 727:24, 801:17, 827:25, 841:10
**pulling** [1] - 803:20
**purchased** [1] - 782:9
**pure** [12] - 690:19, 692:20, 798:14, 798:16, 803:13, 809:18, 812:14, 812:19, 821:17, 827:1, 827:3, 827:4
**purification** [36] - 690:17, 690:20, 691:13, 692:24, 693:17, 776:25, 785:4, 785:6, 797:18, 798:5, 807:4, 808:10, 808:18, 809:3, 810:6, 811:8, 811:18, 811:19, 812:10, 812:24, 815:24, 817:24, 818:24, 821:16, 821:24, 822:11, 823:24, 824:1, 829:19, 830:5, 830:13, 830:24, 836:14, 842:6, 845:17
**purifications** [1] - 812:9
**purified** [16] - 631:5, 676:21, 776:13, 793:16, 799:11, 800:22, 803:5, 809:11, 809:12, 809:17, 812:12, 813:10, 818:17, 827:12, 827:16, 833:13
**purify** [10] - 691:18, 693:24, 703:20, 802:16, 806:21, 813:7, 821:20, 844:23, 844:24, 845:11
**purifying** [16] - 690:1, 691:11, 777:11, 783:5, 792:16, 797:12, 797:13, 797:16, 797:19, 811:6, 817:19, 820:24, 822:14, 823:21, 828:3, 842:12
**purity** [5] - 574:25, 576:3, 628:25, 632:2, 772:12
**purple** [4] - 726:21, 815:2, 815:4
**purpose** [9] - 571:10, 572:10, 573:24, 594:18, 691:20, 717:2, 719:8, 769:20
**purposes** [10] - 569:5, 569:15, 594:22, 607:14, 613:18, 691:4, 781:22, 787:22, 796:6, 810:19
**pursuing** [1] - 706:25
**push** [3] - 569:21, 633:16, 692:8
**pushed** [1] - 623:24
**pushes** [1] - 657:18
**pushing** [1] - 692:16
**put** [48] - 557:7, 567:2, 572:21, 575:12, 583:23, 584:16, 587:4, 587:5, 592:10, 604:7, 607:11, 607:13, 609:9, 610:4, 617:20, 628:17, 629:2, 635:9, 666:6, 666:8, 671:20, 672:21, 672:24, 677:11, 681:8, 688:18, 692:1, 694:6, 694:19, 694:20, 701:4, 703:1, 703:9, 703:10, 703:13, 714:14, 720:8, 721:9, 723:12, 728:1, 730:6, 737:6, 784:5, 822:16, 832:22, 845:4, 847:10, 850:8
**puts** [2] - 561:5, 642:24
**putting** [3] - 565:5, 839:21, 849:19
**PV** [1] - 599:6

## Q

**Q3** [4] - 626:15, 626:24, 627:14, 629:4
**Q4** [8] - 623:12, 625:3, 625:5, 625:11, 626:12, 661:1, 661:2, 662:10
**Q5** [1] - 625:11
**qualification** [1] - 782:19
**qualifications** [4] - 715:9, 737:19, 778:20, 784:23
**qualified** [1] - 785:9
**qualifies** [1] - 751:20
**qualify** [3] - 681:20, 740:9, 753:13
**quality** [6] - 588:5, 752:16, 752:19, 752:22, 753:8, 773:10
**quantity** [3] - 712:3, 773:24, 806:17
**quarter** [2] - 597:1, 661:2
**questioned** [3] - 569:23, 569:24, 575:2
**questioning** [3] - 574:23, 708:21, 708:22
**questions** [34] - 578:4, 578:6, 578:12, 578:14, 585:2, 588:21, 599:22, 604:9, 606:8, 606:11, 611:10, 630:21, 634:16, 653:5, 653:9, 654:15, 655:7, 655:25, 656:2, 656:7, 658:5, 697:4, 707:6, 708:21, 712:18, 712:20, 732:17, 733:16, 734:25, 735:7, 748:13, 750:17,

768:11, 770:13
**quick** [3] - 595:1, 678:11, 697:4
**quicker** [1] - 592:23
**quickly** [3] - 597:24, 693:11, 716:16
**quite** [3] - 593:7, 673:23, 813:15
**quote** [2] - 558:3, 624:23
**quoted** [1] - 563:7
**quoting** [1] - 563:13

## R

**R-A-M-S-E-Y** [1] - 735:19
**R-U-E-G-G** [1] - 668:7
**rabbits** [1] - 716:24
**raise** [6] - 573:4, 613:1, 649:1, 724:7, 725:1, 846:25
**raised** [3] - 566:25, 567:3, 669:20
**Ramsey** [23] - 555:12, 555:25, 556:8, 556:9, 556:12, 556:25, 558:11, 558:21, 559:9, 559:17, 560:8, 561:6, 561:21, 562:4, 566:17, 568:3, 735:14, 735:18, 736:2, 736:5, 740:9, 749:13, 750:20
**RAMSEY** [1] - 735:20
**range** [6] - 557:4, 560:19, 592:19, 593:2, 593:5, 723:23
**ranged** [1] - 722:21
**rapid** [6] - 616:15, 617:7, 617:13, 619:11, 621:19, 830:25
**rate** [29] - 588:24, 591:10, 591:13, 597:9, 597:20, 598:7, 598:25, 599:8, 599:16, 602:24, 607:15, 630:7, 630:10, 630:11, 634:1, 641:17, 641:19, 648:24, 659:6, 659:19, 661:3, 661:10, 661:12, 661:21, 664:5, 664:14, 664:20, 664:21, 665:3
**rates** [17] - 600:10, 601:8, 603:13, 605:12, 607:7, 607:16, 626:9, 627:1, 629:19, 629:20, 642:6, 649:13, 649:15, 649:17, 650:20, 650:22, 662:22
**rather** [2] - 562:16, 641:11
**ratio** [7] - 722:24, 723:3, 723:10, 723:14, 723:19, 724:9, 724:25
**ratios** [1] - 723:1
**raw** [3] - 773:2, 773:16, 773:20
**reach** [1] - 562:1
**read** [22] - 598:1, 618:20, 643:2, 643:4, 676:3, 676:19, 682:7, 684:24, 687:7, 701:9, 702:17, 755:12, 764:13, 767:17, 767:19, 769:17, 814:25, 818:12, 821:21, 836:7, 840:24
**readily** [2] - 576:18, 831:9
**reading** [7] - 571:19, 680:16, 688:16, 726:19, 814:14, 840:24, 841:11
**reads** [4] - 637:11, 676:20, 682:9, 693:22
**ready** [1] - 713:9
**reagents** [2] - 681:8, 831:8
**real** [28] - 580:12, 605:23, 606:3, 606:4, 606:15, 606:21, 606:25, 607:6, 607:19, 608:2, 608:5, 608:6, 614:10, 629:7, 638:3, 638:8, 638:15, 638:24, 644:24, 646:5, 646:9, 646:10, 652:15, 652:18, 652:24, 721:1, 794:25
**real-world** [13] - 605:23, 606:3, 606:15, 606:21, 606:25, 607:6, 608:2, 608:5, 608:6, 638:15, 644:24, 652:18, 652:24
**reality** [5] - 573:3, 575:3, 650:3, 742:13, 795:16
**realizes** [1] - 794:24
**really** [45] - 555:4, 556:7, 558:10, 561:24, 566:22, 571:3, 571:12, 572:2, 579:8, 582:11, 589:1, 589:12, 625:25, 632:24, 636:6, 638:10, 644:3, 644:18, 650:25, 663:3, 671:13, 673:5, 677:24, 678:3, 679:7, 684:5, 684:13, 688:7, 688:8, 691:4, 691:10, 692:7, 692:20, 694:20, 696:23, 700:21, 709:7, 712:7, 716:15, 717:18, 723:13, 725:11, 730:16, 771:20, 783:1
**reason** [24] - 565:23, 573:19, 576:13, 579:9, 579:17, 587:20, 587:25, 588:9, 601:15, 639:20, 640:19, 640:21, 651:18, 651:22, 652:2, 652:13, 703:23, 704:1, 704:6, 704:11, 725:8, 729:21, 839:5, 852:5
**reasonable** [36] - 571:8, 578:11, 588:24, 591:18, 592:1, 592:3, 592:5, 597:20, 600:5, 600:10, 601:8, 602:15, 603:13, 608:11, 608:25, 609:5, 609:12, 632:5, 638:5, 657:5, 658:21, 659:6, 660:10, 661:10, 662:2, 662:19, 662:25, 663:9, 663:25, 664:7, 664:12, 664:25, 665:2, 665:12, 665:24, 784:4
**reasonably** [2] - 569:24, 784:3
**reasons** [7] - 557:5, 640:16, 665:23, 691:5, 714:23, 773:18, 846:2
**received** [14] - 590:20, 590:22, 594:5, 594:9, 662:15, 679:5, 679:7, 778:23, 778:25, 779:2, 779:4, 780:9, 780:11
**receiving** [1] - 752:5
**recent** [8] - 693:21, 693:22, 702:6, 702:10, 702:20, 702:23, 703:18, 704:7
**recently** [1] - 700:19
**recess** [7] - 580:6, 667:1, 713:6, 713:7, 791:6, 852:17, 852:18
**recipe** [16] - 580:23, 582:6, 583:8, 583:15, 600:11, 602:7, 602:11, 709:5, 723:12, 821:1, 821:2, 821:6, 821:13, 821:21, 821:22, 821:23
**recitation** [1] - 563:3
**recite** [3] - 564:2, 565:1, 567:9
**recognition** [1] - 617:24
**recognize** [16] - 595:16, 675:8, 679:16, 684:21, 744:2, 754:17, 756:23, 788:12, 792:12, 795:1, 807:1, 815:20, 835:7, 835:8, 837:13, 837:14
**recognized** [6] - 813:18, 813:19, 813:22, 841:12, 842:2, 844:1
**recognizes** [1] - 794:3
**recollection** [3] - 645:25, 647:3, 647:18
**recommendation** [2] - 736:15, 797:3
**reconcile** [1] - 563:15
**reconstitute** [2] - 695:21, 761:13
**record** [12] - 598:2, 603:8, 661:16, 664:21, 668:5, 694:9, 713:19, 735:17, 750:25, 767:20, 774:11, 834:12
**recovery** [1] - 691:7
**recreated** [1] - 638:14
**recruits** [2] - 743:15, 746:18
**red** [30] - 623:14, 625:13, 625:16, 626:16, 724:7, 725:1, 726:5, 728:14, 728:19, 728:20, 728:23, 729:4, 729:11, 729:12, 729:20, 732:19, 732:25, 733:1, 733:2, 733:4, 733:6, 733:12, 733:19, 734:18, 740:6, 804:22, 809:9, 818:11, 818:14
**redirect** [5] - 606:9, 733:10, 735:1, 735:8, 750:18
**REDIRECT** [2] - 653:7, 768:20
**reduce** [2] - 619:6, 788:17
**reduced** [4] - 676:13, 687:14, 744:24
**reduces** [1] - 681:25
**reducing** [1] - 755:25
**refer** [2] - 566:14, 655:8
**reference** [17] - 562:24, 572:22, 655:18, 694:1, 694:2, 694:19, 710:1, 749:22, 838:1, 839:2, 840:17, 842:13, 842:16, 844:7, 844:10, 851:24
**Reference** [2] - 569:18, 572:3
**referenced** [4] - 557:17, 560:20, 573:6, 749:14
**references** [16] - 566:21, 694:7, 702:25, 763:5, 778:2, 812:5, 822:13, 822:22, 823:7, 840:18, 840:24, 841:7,

841:13, 842:3, 844:3, 845:16
**referencing** [1] - 762:24
**referred** [8] - 568:9, 599:24, 686:25, 706:11, 709:17, 709:20, 740:19, 844:9
**referring** [7] - 568:7, 580:13, 580:14, 710:6, 761:7, 764:7, 803:22
**refers** [9] - 557:15, 558:3, 566:17, 614:9, 631:12, 636:7, 705:6, 761:2
**reflected** [1] - 728:10
**refractive** [1] - 806:15
**refresh** [1] - 647:17
**refreshed** [2] - 647:18, 647:20
**regarding** [10] - 633:25, 643:23, 659:11, 751:17, 753:23, 760:10, 760:15, 762:1, 768:8, 772:7
**regards** [1] - 724:20
**region** [1] - 747:13
**Registered** [2] - 852:23, 852:24
**regular** [1] - 669:7
**regulating** [1] - 752:13
**regulatory** [4] - 614:20, 615:1, 750:3, 753:14
**reimbursement** [1] - 607:23
**rejected** [3] - 662:17, 662:18, 663:23
**relate** [7] - 587:22, 696:3, 719:19, 738:9, 836:19, 837:22, 845:10
**related** [16] - 565:4, 570:16, 583:15, 601:1, 651:3, 652:11, 664:11, 688:4, 694:8, 748:21, 748:24, 749:1, 749:7, 751:22, 782:17, 813:3
**relates** [8] - 557:1, 560:10, 661:23, 682:9, 682:11, 719:16, 783:17, 811:15
**relating** [5] - 578:21, 666:7, 739:14, 782:22, 845:11
**relation** [3] - 725:4, 725:5, 725:10
**relative** [2] - 687:17, 844:12
**release** [6] - 616:25, 617:11, 716:9, 749:9, 757:21, 757:25
**released** [3] - 616:18, 617:8, 619:13
**releases** [2] - 696:13, 803:2
**relevance** [6] - 558:5, 558:7, 566:3, 574:19, 586:23
**relevant** [15] - 564:7, 571:3, 600:13, 615:23, 616:15, 631:13, 637:7, 637:20, 785:3, 803:16, 805:3, 805:5, 806:2, 829:10, 847:19
**reliable** [1] - 569:20
**relied** [12] - 624:22, 625:18, 744:4, 788:20, 792:19, 807:7, 816:3, 819:25, 835:14, 837:18, 842:14, 843:4
**relies** [3] - 660:24, 663:2, 848:15
**reluctant** [3] - 582:9, 593:8, 750:9
**rely** [5] - 571:15, 703:3, 712:7, 745:20, 757:3
**relying** [2] - 571:16, 851:13
**remain** [1] - 602:20
**remaining** [1] - 630:10
**remarked** [1] - 578:21
**remember** [26] - 581:7, 582:13, 585:17, 585:24, 588:14, 598:24, 610:6, 615:14, 629:1, 642:25, 645:17, 647:8, 647:9, 647:10, 647:12, 655:20, 697:2, 697:7, 705:23, 709:3, 709:6, 729:23, 787:16, 796:5, 807:21, 848:13
**remind** [12] - 568:25, 580:21, 581:4, 727:5, 727:14, 729:16, 815:8, 829:4, 829:21, 833:6, 836:13, 845:25
**remove** [6] - 649:5, 773:15, 773:18, 833:20, 839:8, 839:15
**removed** [9] - 803:12, 828:11, 828:18, 833:14, 834:18, 834:19, 834:23, 838:25, 839:3
**removes** [3] - 837:3, 839:16, 840:10
**renegotiate** [1] - 657:15
**repeat** [4] - 704:9, 722:17, 770:7, 812:21
**repel** [1] - 800:10
**rephrase** [2] - 710:21, 763:7
**replace** [3] - 564:18, 794:2, 830:1
**replaced** [2] - 563:16, 850:14
**replied** [1] - 810:7
**reply** [6] - 556:21, 556:22, 557:4, 557:21, 557:22, 561:5
**report** [35] - 555:22, 555:24, 556:21, 556:22, 557:4, 557:17, 557:21, 557:22, 559:21, 561:5, 561:24, 598:23, 615:20, 647:7, 647:13, 647:15, 719:21, 720:18, 720:21, 724:23, 726:18, 726:19, 726:20, 727:19, 727:25, 729:6, 736:8, 771:13, 809:2, 812:11, 817:19, 841:2, 842:17
**reported** [5] - 678:7, 818:1, 827:5, 835:12, 852:25
**Reporter** [3] - 852:24, 852:25, 853:4
**reporter** [3] - 818:10, 849:3, 849:19
**reporting** [2] - 744:8, 827:6
**reports** [13] - 555:12, 555:25, 558:12, 559:17, 560:2, 566:13, 570:23, 598:6, 643:5, 710:11, 812:12, 827:14, 827:16
**represent** [5] - 721:15, 728:19, 741:7, 804:24, 805:1
**representation** [2] - 683:10, 802:13
**representative** [1] - 746:17
**represented** [7] - 558:8, 734:11, 742:10, 802:20, 804:1, 804:6, 804:8
**representing** [3] - 721:16, 799:18, 803:10
**represents** [4] - 727:14, 727:15, 741:1, 747:7
**reprints** [1] - 819:16
**reproduce** [1] - 681:9
**reputable** [1] - 817:2
**reputation** [1] - 780:17
**require** [2] - 702:1, 746:22
**required** [7] - 632:17, 662:1, 663:18, 702:14, 764:4, 764:12, 764:15
**requirement** [2] - 632:2, 711:9
**requirements** [2] - 628:25, 716:3
**requires** [1] - 660:9
**requiring** [2] - 618:7, 660:16
**reread** [1] - 678:11
**resale** [1] - 781:6
**Research** [2] - 715:16, 718:5
**research** [24] - 672:3, 673:6, 679:9, 691:4, 715:20, 739:6, 739:8, 739:12, 779:11, 780:13, 780:20, 780:22, 781:6, 781:12, 781:15, 781:17, 781:18, 781:20, 781:22, 787:17, 787:21, 796:6, 807:13, 846:3
**research-grade** [4] - 781:6, 781:15, 781:18, 781:20
**researcher** [2] - 790:11, 795:19
**researchers** [5] - 797:11, 805:16, 805:23, 830:4, 837:5
**residual** [11] - 631:5, 632:17, 635:14, 636:4, 636:9, 637:7, 771:14, 773:24, 777:3, 833:4, 835:1
**residues** [1] - 741:4
**resin** [3] - 692:2, 800:19, 800:20
**resolve** [1] - 566:12
**resolved** [2] - 568:6, 568:18
**resources** [2] - 606:19, 619:20
**respect** [10] - 573:9, 622:14, 653:10, 694:21, 694:22, 710:7, 759:25, 773:23, 790:17, 822:24
**respective** [1] - 721:20
**respectively** [1] - 659:1
**respond** [9] - 558:22, 655:2, 655:3, 714:9, 736:7, 768:24, 847:24, 847:25, 850:19
**responded** [5] - 556:1, 556:6, 559:10, 561:1, 767:4
**responding** [2] - 560:9, 848:21
**response** [11] - 555:4, 556:19, 698:5, 714:21, 758:16, 766:14, 767:2, 767:23, 806:13, 806:14, 851:11
**responses** [1] - 849:13
**responsibilities** [3] - 715:18, 738:17, 752:18
**responsible** [6] - 641:22, 719:1, 720:4, 728:6, 729:10, 752:13
**rest** [5] - 575:25, 596:8, 602:16, 602:19, 678:13
**restate** [1] - 710:21
**result** [5] - 564:3, 601:16, 605:8,

689:8, 846:18
**resulted** [1] - 828:8
**resulting** [1] - 766:18
**results** [21] - 564:5, 564:15, 582:7, 655:13, 655:18, 662:14, 665:20, 675:11, 675:15, 679:6, 695:6, 695:25, 696:2, 696:3, 696:4, 737:4, 809:2, 812:10, 812:11, 818:1
**resumé** [1] - 751:25
**retired** [1] - 781:1
**return** [1] - 613:23
**reusing** [1] - 831:19
**REVANCE** [1] - 553:6
**Revance** [177] - 555:19, 556:5, 556:10, 557:14, 558:7, 559:7, 561:1, 581:10, 582:11, 583:7, 583:11, 583:19, 585:16, 585:21, 585:23, 585:24, 586:13, 587:2, 590:22, 590:23, 590:25, 592:22, 593:8, 594:5, 596:18, 600:25, 602:16, 602:20, 602:21, 603:12, 605:12, 605:21, 606:5, 610:24, 611:17, 614:21, 615:4, 615:11, 616:15, 616:21, 616:25, 617:3, 617:6, 617:10, 619:13, 619:14, 619:19, 620:24, 623:20, 623:24, 625:12, 626:21, 627:14, 628:2, 629:8, 629:11, 629:20, 631:9, 631:15, 631:25, 632:5, 632:10, 632:16, 633:11, 633:14, 634:11, 636:16, 636:21, 637:1, 637:12, 637:15, 638:5, 638:11, 638:18, 638:20, 638:21, 639:9, 640:13, 640:20, 641:7, 642:10, 642:14, 642:24, 644:6, 644:14, 644:25, 645:6, 653:21, 653:24, 654:6, 654:19, 654:22, 655:15, 655:21, 656:2, 656:4, 656:11, 656:14, 656:19, 657:11, 657:20, 657:22, 658:25, 659:2, 661:15, 662:12, 662:14, 662:23, 664:5, 665:5, 668:3, 671:5, 671:7, 671:8, 671:15, 671:19, 672:4, 672:15, 687:3, 696:6, 696:15, 697:6, 698:23, 699:6, 699:18, 699:21, 700:1, 700:8, 700:15, 700:22, 704:24, 705:14, 706:11, 706:20, 706:25, 708:15, 710:19, 710:22, 710:23, 711:1, 721:20, 722:3, 723:1, 724:6, 739:2, 740:18, 741:22, 741:25, 750:8, 750:13, 750:23, 751:17, 753:13, 753:22, 753:23, 754:2, 754:3, 758:16, 758:25, 759:2, 760:1, 760:4, 760:6, 760:8, 760:13, 761:21, 765:15, 766:23, 767:2, 767:4, 767:22, 768:6, 768:23, 768:24, 769:12, 770:18, 846:25
**Revance's** [42] - 555:23, 556:8, 565:11, 615:13, 640:15, 641:15, 659:7, 660:5, 662:9, 665:21, 704:15, 705:12, 706:2, 706:6, 706:11, 711:9, 712:11, 730:10, 731:25, 736:19, 736:23, 740:16, 740:17, 741:11, 741:16, 746:24, 747:11, 748:5, 748:10, 748:12, 754:23, 755:14, 755:16, 756:11, 756:14, 758:7, 759:6, 759:10, 760:10, 760:15, 761:7, 770:1
**reveal** [1] - 836:8
**revenue** [9] - 595:20, 599:14, 613:25, 614:7, 614:10, 659:3, 664:4, 664:6, 664:8
**review** [12] - 660:17, 694:16, 719:3, 719:25, 745:18, 746:10, 746:13, 754:19, 758:12, 784:14, 784:15, 812:3
**reviewed** [15] - 581:6, 593:23, 593:24, 647:20, 703:14, 703:24, 731:14, 748:7, 752:20, 753:23, 765:18, 784:16, 813:21, 816:13, 817:3
**reviewer** [2] - 752:17, 752:19
**reviewing** [3] - 703:14, 766:10, 814:14
**revised** [1] - 788:16
**revisit** [1] - 760:18
**Richard** [1] - 553:11
**ricin** [2] - 718:12, 718:14
**rid** [3] - 690:13, 690:18, 831:19
**right-hand** [9] - 701:17, 742:16, 775:20, 777:4, 799:9, 805:8, 814:6, 823:8, 823:9
**rights** [1] - 651:6
**rigorous** [1] - 773:2
**risk** [20] - 787:25, 788:3, 788:5, 788:17, 789:22, 790:4, 790:10, 791:19, 791:25, 792:8, 793:13, 794:12, 794:15, 795:14, 795:17, 796:8, 829:7, 829:24, 831:18
**risks** [10] - 614:13, 788:1, 788:5, 788:8, 790:12, 793:22, 794:5, 794:19, 795:8, 795:22
**RKKRR** [1] - 683:7
**RNA** [2] - 690:12, 833:9
**road** [1] - 670:11
**ROBERT** [1] - 553:21
**robust** [1] - 830:25
**role** [18] - 672:3, 710:4, 720:7, 724:12, 725:7, 725:9, 725:12, 736:8, 737:3, 739:4, 748:6, 749:12, 753:21, 754:9, 759:3, 759:11, 770:2, 772:18
**roles** [1] - 684:5
**Ron** [5] - 837:16, 838:10, 838:12, 838:18, 839:17
**rounds** [1] - 555:25
**row** [1] - 686:6
**royalties** [1] - 602:18
**royalty** [68] - 582:6, 582:21, 583:22, 588:24, 590:21, 591:7, 591:10, 591:13, 591:18, 592:1, 597:20, 598:24, 599:16, 600:5, 600:10, 601:8, 601:24, 602:5, 602:9, 602:15, 602:17, 602:24, 603:13, 605:12, 607:15, 607:16, 608:11, 608:25, 609:5, 609:12, 623:18, 625:13, 626:9, 629:17, 629:18, 629:19, 629:24, 638:5, 639:10, 639:12, 639:14, 639:16, 639:20, 641:16, 641:19, 642:6, 644:7, 648:7, 648:24, 654:11, 657:5, 658:21, 658:24, 659:6, 659:19, 659:23, 660:9, 661:3, 661:10, 661:21, 662:6, 662:22, 662:25, 664:9, 664:12, 664:20, 665:2, 665:3
**RPR** [1] - 853:3
**RT** [1] - 687:2
**RT001** [3] - 697:9, 707:3, 707:8
**RT002** [19] - 676:20, 676:25, 677:3, 677:6, 677:15, 678:4, 686:1, 686:8, 686:13, 686:23, 686:25, 689:2, 689:5, 689:9, 689:20, 697:16, 697:17, 744:10, 749:14
**RT003** [6] - 685:25, 686:17, 686:20, 689:14, 689:15, 689:18
**RT2** [1] - 643:24
**RTP** [1] - 707:8
**RTP004** [10] - 704:21, 705:12, 740:20, 755:13, 759:3, 763:16, 764:12, 766:7, 767:4, 767:22
**RTT150** [2] - 689:4, 689:12
**rubber** [1] - 614:17
**RUEGG** [1] - 668:8
**Ruegg** [20] - 642:23, 643:13, 643:15, 643:22, 667:11, 667:12, 668:6, 668:7, 668:15, 668:19, 668:23, 675:24, 687:7, 698:22, 699:18, 712:21, 712:22, 713:4, 744:11, 749:20
**Ruegg's** [1] - 643:2
**rule** [3] - 571:20, 636:12, 659:23
**rules** [1] - 628:16
**ruling** [2] - 562:8, 651:3
**run** [3] - 672:4, 739:8, 824:16
**running** [1] - 831:18
**RUPERT** [18] - 553:20, 718:19, 719:20, 730:23, 732:10, 732:12, 735:7, 783:6, 789:2, 793:3, 796:9, 817:6, 820:5, 838:5, 841:1, 842:22, 852:1, 852:12
**Rupert** [1] - 730:21
**Ryan** [2] - 770:17, 770:22
**RYAN** [1] - 770:22

## S


**safe** [5] - 673:20, 676:23, 677:9, 716:21, 744:15
**safely** [2] - 692:22, 716:16
**safety** [1] - 752:21
**sake** [1] - 765:20
**sale** [3] - 588:2, 605:4, 622:10
**sales** [29] - 582:21, 583:11, 585:7, 585:19, 585:21, 586:15, 586:19, 589:6, 589:7, 590:3, 590:8, 590:11, 590:19, 590:22, 591:5, 591:11, 594:5, 595:9, 595:19, 595:24, 599:1, 599:2, 602:6, 602:17, 602:18, 639:13, 648:19, 664:16
**saline** [2] - 726:4, 727:9
**SAMANTHA** [1] - 554:3
**sample** [12] - 674:7, 674:8, 674:23, 689:2, 689:4, 689:11, 776:11, 801:24, 809:14, 824:8, 839:8, 839:11
**samples** [9] - 674:22, 676:15, 677:14, 678:9, 678:25, 689:2, 689:11, 771:15, 836:12
**Sapodex** [3] - 808:17, 824:20, 825:10
**sat** [1] - 627:20
**satisfy** [1] - 614:24
**save** [1] - 670:5
**saw** [20] - 574:23, 585:2, 585:23, 585:24, 586:10, 596:25, 625:24, 629:2, 643:13, 655:4, 674:25, 677:13, 677:15, 683:16, 688:6, 740:18, 793:18, 797:7, 844:3, 844:4
**scale** [5] - 715:12, 715:25, 716:2, 716:8
**scale-up** [1] - 715:12
**scenario** [5] - 619:12, 652:20, 654:4, 654:13, 829:10
**scheme** [2] - 824:1, 829:19
**school** [7] - 669:21, 670:10, 673:6, 699:3, 807:17, 810:16, 820:20
**School** [1] - 670:11
**Schöneich** [27] - 555:14, 555:18, 555:22, 556:14, 556:23, 556:25, 557:9, 558:3, 559:1, 559:11, 559:20, 559:21, 560:9, 560:15, 561:2, 561:5, 561:23, 714:18, 718:25, 719:2, 720:3, 720:6, 736:10, 736:11, 736:14, 738:6, 743:22
**Schöneich's** [13] - 556:21, 556:22, 557:4, 558:22, 714:9, 714:21, 715:5, 720:10, 725:19, 725:22, 729:23, 736:8, 736:22
**science** [5] - 670:17, 672:7, 694:22, 778:25, 779:2
**scientific** [16] - 573:11, 574:13, 574:21, 634:15, 637:10, 675:9, 675:10, 679:3, 679:5, 696:13, 696:21, 703:12, 703:17, 705:10, 706:16
**scientist** [1] - 780:15
**scientists** [1] - 672:8
**scope** [4] - 700:20, 719:21, 784:9, 841:2
**scratch** [1] - 812:1
**screen** [37] - 557:8, 572:22, 587:5, 597:4, 616:7, 680:25, 701:5, 701:20, 702:7, 709:7, 729:24, 741:1, 742:7, 755:5, 756:9, 757:13, 767:13, 775:2, 775:24, 777:5, 797:6, 798:22, 798:25, 804:13, 805:8, 813:10, 814:4, 814:21, 821:11, 821:12, 822:17, 822:18, 823:5, 823:6, 823:8, 823:9, 843:3
**sea** [1] - 786:23
**seal** [2] - 771:6, 771:16
**sealed** [4] - 771:23, 771:25, 772:1, 835:18
**search** [2] - 816:13, 816:15
**seasonal** [2] - 773:9, 773:10
**seat** [1] - 667:15
**seated** [7] - 555:1, 658:12, 667:20, 667:25, 713:14, 791:10, 846:12
**second** [44] - 565:9, 567:12, 567:16, 568:18, 577:25, 578:1, 585:9, 595:3, 595:21, 610:4, 611:20, 612:10, 612:11, 612:13, 612:14, 613:2, 613:5, 621:9, 630:14, 630:17, 630:18, 635:12, 639:7, 639:24, 640:3, 656:5, 658:7, 661:4, 661:7, 682:22, 690:15, 698:15, 708:24, 712:23, 722:23, 725:18, 743:11, 746:21, 758:24, 771:10, 794:14, 818:14, 823:3, 825:10
**second-to-expire** [1] - 661:7
**secondary** [7] - 665:7, 665:10, 665:14, 665:18, 666:1, 666:6, 784:12
**section** [5] - 616:2, 687:11, 702:17, 754:23, 762:5
**sector** [1] - 781:2
**secure** [1] - 773:17
**security** [3] - 573:21, 673:9, 673:10
**see** [147] - 558:24, 560:16, 573:13, 580:22, 582:25, 588:17, 599:3, 599:4, 599:6, 602:14, 603:5, 604:3, 606:21, 614:22, 615:14, 616:2, 616:8, 616:20, 617:15, 617:20, 618:1, 618:10, 619:15, 620:8, 621:4, 621:8, 621:21, 622:2, 624:11, 624:25, 625:6, 629:3, 630:4, 630:21, 630:25, 631:7, 634:9, 634:16, 634:18, 634:22, 636:5, 636:9, 643:16, 643:17, 643:18, 643:21, 643:25, 644:1, 644:3, 644:17, 644:18, 646:23, 646:24, 646:25, 651:12, 651:13, 651:17, 652:10, 676:8, 680:24, 681:1, 686:4, 686:6, 686:10, 689:7, 691:14, 691:16, 693:25, 694:10, 696:21, 696:25, 697:22, 701:23, 701:25, 702:3, 702:6, 709:7, 715:16, 720:22, 721:14, 725:3, 726:2, 726:8, 726:9, 727:16, 733:12, 737:7, 740:25, 741:2, 741:4, 741:6, 741:7, 742:10, 742:16, 745:9, 762:22, 763:16, 763:18, 765:12, 766:2, 766:8, 766:13, 766:20, 767:3, 767:8, 767:12, 767:15, 769:25, 770:4, 776:2, 777:7, 791:5, 799:10, 804:5, 808:19, 809:10, 811:11, 811:12, 811:22, 811:24, 812:16, 814:5, 814:6, 817:13, 818:11, 818:15, 821:5, 822:1, 823:6, 823:9, 823:19, 825:8, 826:14, 826:22, 834:1, 834:19, 836:1, 836:2, 838:19, 843:22, 846:6, 846:12, 847:1
**seeing** [2] - 601:21, 696:4
**select** [1] - 673:12
**selecting** [1] - 787:13
**sell** [3] - 585:14, 781:15, 781:21
**selling** [3] - 614:3, 616:24, 619:20
**SEMENDYAI** [1] - 553:22
**semi** [1] - 809:12
**semi-purified** [1] - 809:12
**sense** [5] - 578:5, 593:2, 763:22, 821:10, 835:11
**sentence** [28] - 560:25, 566:14, 676:6, 676:19, 677:8, 678:10, 678:12, 678:13, 678:15, 682:23, 702:3, 702:18, 704:3, 755:10, 756:8, 761:2, 762:8, 762:18, 763:8, 763:15, 764:2, 764:3, 764:17, 764:25, 768:18, 768:22, 768:23
**sentences** [1] - 651:16
**separate** [13] - 664:24, 688:15, 688:16, 688:22, 692:20, 786:21, 797:14, 799:16, 799:19, 802:16, 803:9, 804:10, 828:1
**separated** [5] - 801:4, 803:23, 805:3, 809:22, 812:20
**separately** [2] - 602:7, 772:2
**separating** [1] - 828:3
**September** [6] - 609:18, 614:4, 614:11, 628:3, 628:24, 629:8
**sequence** [12] - 681:4, 681:5, 681:8, 683:6, 683:16, 705:17, 705:20, 705:22, 706:7, 731:25, 732:1, 741:3
**series** [2] - 697:8, 817:20

**serious** [1] - 715:22
**serum** [4] - 682:19, 712:2, 726:4, 823:22
**serves** [2] - 594:17, 710:4
**set** [4] - 600:3, 665:10, 665:19, 672:4
**sets** [4] - 557:11, 586:6, 746:10, 751:25
**setting** [3] - 588:11, 653:3, 696:15
**settle** [1] - 657:13
**setup** [1] - 653:13
**seven** [9] - 597:25, 694:13, 708:8, 802:24, 802:25, 803:5, 808:11, 808:22
**seven-stage** [1] - 808:11
**seven-step** [1] - 808:11
**several** [4] - 643:14, 718:11, 739:14, 798:25
**severe** [1] - 606:23
**shade** [1] - 804:16
**shaded** [1] - 686:8
**shaking** [1] - 615:11
**shaped** [1] - 804:6
**share** [7] - 617:19, 618:2, 618:4, 618:11, 618:15, 691:15, 697:10
**shared** [1] - 697:18
**sheets** [1] - 594:2
**shelf** [22] - 719:8, 756:7, 761:6, 761:10, 761:11, 761:13, 761:15, 761:16, 761:17, 761:19, 761:20, 761:24, 762:9, 762:10, 763:25, 764:1, 764:10, 764:20, 765:1, 765:4
**shield** [2] - 743:13, 847:4
**Shield** [2] - 847:2, 847:8
**shift** [1] - 704:14
**shifting** [1] - 844:12
**shiny** [1] - 669:13
**shoes** [1] - 807:22
**shook** [2] - 670:1
**short** [5] - 621:11, 689:16, 707:6, 847:14, 849:13
**short-acting** [1] - 621:11
**short-lived** [1] - 689:16
**shorthand** [2] - 827:10, 853:1
**shove** [1] - 569:21
**show** [16] - 559:14, 559:20, 571:16, 581:20, 586:16, 618:6, 622:23, 633:25, 661:6, 661:9, 673:16, 680:17, 797:22, 822:9, 844:14, 844:16
**showed** [10] - 581:11, 581:17, 609:13, 676:5, 729:24, 749:20, 829:17, 829:18, 830:3, 844:3
**showing** [7] - 561:3, 563:24, 563:25, 594:5, 675:10, 686:16, 710:11
**shown** [13] - 680:24, 725:25, 742:19, 799:3, 802:1, 806:7, 814:21, 821:10, 821:12, 822:17, 822:18, 827:2, 828:14
**shows** [21] - 586:17, 589:6, 589:17, 598:23, 619:8, 740:22, 741:19, 742:8, 746:16, 799:15, 809:6, 818:6, 821:14, 824:17, 825:11, 825:13, 826:12, 834:2, 840:9, 844:6
**side** [48] - 569:7, 569:8, 573:9, 575:7, 575:19, 585:10, 587:3, 588:5, 600:19, 600:25, 613:16, 613:25, 622:19, 633:10, 640:8, 640:11, 654:10, 657:21, 677:19, 677:20, 677:25, 686:4, 686:6, 701:17, 742:9, 742:16, 775:14, 775:16, 775:20, 775:24, 777:5, 804:2, 804:13, 804:17, 805:8, 809:21, 814:4, 814:5, 823:5, 823:6, 823:8, 823:9, 846:14, 848:8, 848:10
**sidebar** [10] - 603:6, 611:24, 612:16, 612:17, 613:21, 633:4, 651:2, 697:22, 697:23, 698:10
**sides** [3] - 632:7, 634:3, 730:4
**Siegwarth** [42] - 572:25, 575:1, 575:25, 576:11, 576:13, 578:5, 579:9, 579:12, 580:1, 580:17, 587:18, 590:19, 595:7, 596:17, 598:18, 599:22, 603:12, 604:3, 611:12, 612:7, 619:4, 624:7, 653:9, 658:6, 658:13, 658:23, 659:14, 659:18, 659:25, 660:18, 661:5, 661:9, 661:20, 662:8, 662:14, 663:2, 663:4, 663:12, 663:16, 664:3, 664:11, 851:5
**Siegwarth's** [5] - 572:23, 579:16, 658:21, 659:5, 662:24
**significant** [6] - 629:18, 629:19, 648:13, 727:22, 728:1, 746:20
**significantly** [9] - 626:9, 626:10, 726:22, 728:8, 728:11, 728:12, 729:5, 729:12, 729:14
**signs** [2] - 741:7, 742:11
**Silicon** [1] - 672:8
**similar** [5] - 559:3, 559:8, 584:2, 632:1, 739:25
**similarly** [2] - 644:12, 848:14
**simple** [4] - 606:8, 638:4, 674:3, 798:3
**simpler** [2] - 633:22, 773:20
**simplified** [2] - 742:8, 742:13
**simply** [9] - 566:12, 568:2, 605:22, 660:12, 662:16, 663:19, 664:3, 801:13, 805:13
**simulating** [1] - 673:17
**single** [9] - 606:15, 683:7, 789:17, 809:15, 809:16, 818:15, 831:16, 843:16, 844:19
**single-letter** [1] - 683:7
**single-use** [1] - 831:16
**sit** [4] - 633:17, 667:15, 712:22, 787:25
**site** [1] - 676:14
**sites** [2] - 695:17, 695:23
**sitting** [8] - 584:4, 585:11, 606:13, 696:14, 730:5, 769:8, 807:21, 846:5
**situation** [2] - 602:16, 649:12
**six** [9] - 592:8, 618:11, 630:11, 638:22, 724:2, 785:4, 802:10, 802:21, 802:22
**six-month** [1] - 618:11
**size** [4] - 805:12, 805:14, 827:12, 844:13
**sized** [1] - 654:11
**skepticism** [4] - 666:10, 666:14, 841:15, 843:5
**skill** [29] - 778:14, 783:15, 783:18, 784:3, 784:10, 784:17, 784:19, 784:21, 784:24, 784:25, 785:9, 785:23, 790:9, 808:12, 828:21, 828:23, 831:15, 832:15, 833:17, 833:19, 834:6, 834:9, 839:4, 839:7, 839:24, 841:20, 842:1, 845:6, 845:8
**skilled** [3] - 821:13, 830:1, 843:25
**skin** [12] - 671:22, 672:17, 672:21, 672:22, 672:24, 707:4, 707:5, 707:9, 707:12, 707:13, 707:17, 707:21
**slide** [37] - 562:20, 562:24, 563:6, 564:5, 567:6, 582:24, 587:19, 609:10, 609:13, 610:1, 618:3, 618:6, 618:20, 618:22, 619:5, 619:9, 622:17, 622:20, 622:24, 623:6, 625:7, 625:8, 649:6, 725:23, 725:25, 726:11, 726:23, 737:15, 744:23, 747:13, 751:25, 775:14, 799:3, 815:16, 832:22, 839:21, 845:4
**slides** [6] - 562:11, 563:22, 640:4, 640:17, 839:20, 843:1
**slight** [1] - 847:1
**slightly** [3] - 590:2, 666:24, 722:12
**slow** [2] - 560:24, 691:6
**slower** [1] - 580:12
**slushy** [1] - 692:4
**small** [11] - 626:17, 669:7, 669:8, 691:17, 691:20, 711:6, 715:25, 716:2, 783:18, 806:16
**small-molecule** [1] - 669:7
**small-scale** [2] - 715:25, 716:2
**smaller** [2] - 806:5, 806:10
**Smelt** [2] - 778:3, 778:6
**snap** [2] - 747:6, 747:9
**sneak** [1] - 575:21
**so..** [2] - 575:13, 705:3
**sodium** [3] - 803:1, 826:3, 826:21
**sold** [6] - 590:24, 590:25, 595:20, 604:23, 616:22, 616:23
**soldiers** [1] - 739:20
**solely** [3] - 661:21, 661:24, 663:16
**solid** [1] - 692:2
**solution** [7] - 684:13,

730:4, 730:5, 734:24, 793:21, 793:24, 794:1
**someone** [8] - 569:10, 572:3, 587:13, 680:16, 680:22, 787:23, 821:19, 846:13
**sometime** [1] - 848:3
**sometimes** [8] - 584:12, 602:8, 629:14, 682:3, 692:14, 701:19, 709:17, 709:19
**somewhat** [1] - 742:13
**son** [1] - 697:1
**soon** [1] - 654:7
**sorry** [21] - 569:2, 580:10, 592:17, 593:19, 595:5, 598:22, 612:12, 621:2, 635:21, 644:13, 655:23, 701:18, 714:5, 722:17, 765:11, 766:24, 770:7, 806:7, 824:3, 837:25, 847:6
**sort** [10] - 561:1, 563:2, 585:9, 666:10, 674:21, 678:15, 681:18, 702:18, 706:14, 812:7
**soul** [1] - 850:25
**sounded** [1] - 711:5
**sounds** [1] - 700:3
**soup** [3] - 690:18, 692:7, 692:13
**soupy** [1] - 690:11
**source** [7] - 787:14, 787:15, 787:22, 788:2, 788:3, 830:10, 852:6
**sources** [7] - 787:4, 787:5, 787:8, 787:10, 830:11
**sourcing** [2] - 773:20, 773:22
**soy** [6] - 773:3, 794:4, 796:4, 796:10, 829:18, 830:6
**soy-based** [4] - 794:4, 796:4, 829:18, 830:6
**soybeans** [1] - 787:8
**SP** [1] - 808:17
**space** [5] - 586:3, 621:11, 672:11, 796:21
**span** [1] - 605:3
**spans** [2] - 594:8, 647:16
**spastic** [1] - 806:2
**SPEAKER** [1] - 807:25
**speaking** [5] - 584:2, 584:9, 591:14, 629:1, 761:15
**special** [4] - 672:16, 672:22, 682:2, 692:5
**specialized** [1] - 738:23
**specific** [10] - 576:7, 636:3, 643:5, 649:17, 674:17, 754:14, 773:24, 783:22, 851:4, 851:5
**specifically** [10] - 636:7, 674:20, 695:20, 706:22, 709:6, 718:5, 720:18, 780:1, 787:4, 797:21
**specification** [11] - 565:2, 576:16, 577:1, 632:11, 632:14, 632:23, 634:1, 635:13, 635:14, 639:1, 766:6
**specifications** [4] - 633:2, 633:24, 636:21, 637:13
**specified** [1] - 773:24
**speculative** [1] - 659:10
**spell** [7] - 668:5, 713:19, 735:16, 750:25, 770:20, 774:10, 789:12
**spelled** [1] - 668:7
**spend** [1] - 716:12
**sphere** [1] - 799:11
**spheres** [7] - 799:7, 799:17, 799:19, 802:15, 802:17, 802:18, 803:11
**split** [16] - 623:9, 625:7, 626:7, 626:14, 660:20, 662:8, 662:13, 662:17, 662:18, 662:21, 663:13, 663:17, 663:19, 663:22, 663:24, 664:2
**sponge** [1] - 740:1
**sponsor** [1] - 760:11
**sports** [1] - 669:21
**spot** [1] - 809:16
**spread** [15] - 557:13, 560:18, 676:13, 677:16, 677:21, 678:5, 678:21, 681:25, 688:12, 737:7, 766:18, 769:2, 769:5, 769:10, 769:13
**spread/effect** [2] - 767:6, 767:25
**spreading** [2] - 679:1, 707:5
**square** [1] - 638:24
**squarely** [1] - 617:6
**squares** [1] - 639:1
**Squibb** [1] - 838:20
**squigglies** [1] - 799:7
**St** [5] - 715:15, 715:17, 715:18, 715:19, 716:4
**stability** [3] - 687:19, 716:10, 738:9
**stabilization** [2] - 762:9, 779:7
**stabilize** [8] - 756:5, 761:4, 761:22, 764:18, 779:15, 779:19, 779:24, 813:14
**stabilized** [2] - 682:10, 780:1
**stabilizer** [4] - 684:11, 724:13, 759:4, 759:9
**stabilizes** [1] - 710:4
**stabilizing** [4] - 754:4, 754:5, 754:8, 754:11
**stable** [9] - 684:12, 717:16, 717:18, 717:19, 724:18, 724:19, 724:21, 724:22, 830:22
**stack** [1] - 604:7
**staff** [1] - 695:24
**stage** [1] - 808:11
**stamp** [1] - 614:17
**stand** [7] - 568:12, 606:14, 660:20, 668:15, 687:2, 774:6, 816:24
**stand-in** [1] - 660:20
**standalone** [1] - 755:22
**standard** [2] - 571:24, 581:17
**standpoint** [3] - 623:8, 636:7, 650:25
**STARGATT** [1] - 554:2
**start** [17] - 561:2, 578:10, 604:5, 604:8, 608:22, 614:3, 619:1, 622:19, 666:25, 685:20, 713:1, 715:24, 726:13, 755:9, 779:8, 786:2, 845:24
**started** [13] - 579:22, 592:15, 600:17, 626:17, 639:14, 671:8, 672:8, 674:2, 686:21, 690:21, 779:9, 827:24
**starting** [9] - 565:13, 580:10, 582:25, 598:1, 641:7, 687:10, 717:14, 796:4, 823:18
**starts** [3] - 692:3, 722:6, 768:18
**startup** [1] - 782:8
**state** [11] - 555:15, 668:4, 713:18, 735:16, 750:24, 772:23, 774:10, 822:10, 822:13, 845:10, 845:16
**State** [4] - 737:22, 738:15, 738:18, 739:7
**statement** [23] - 563:19, 566:7, 567:13, 567:24, 619:25, 622:2, 651:22, 704:2, 756:11, 766:14, 769:25, 770:4, 770:9, 843:16, 843:19, 844:19, 845:7, 845:9, 845:10, 845:13
**statements** [11] - 558:21, 563:15, 570:24, 703:1, 750:9, 751:17, 753:23, 754:14, 758:7, 758:8, 770:1
**STATES** [1] - 553:1
**states** [2] - 720:18, 763:8
**States** [4] - 588:15, 650:19, 810:4, 842:10
**stationary** [10] - 692:6, 692:12, 692:15, 692:17, 800:4, 800:19, 802:6, 808:19, 808:20, 825:14
**statistically** [3] - 733:3, 733:6, 733:14
**statistics** [2] - 728:12, 734:19
**statute** [3] - 562:19, 563:7, 563:13
**stay** [3] - 654:24, 684:13, 740:7
**stayed** [3] - 673:20, 780:12, 804:19
**stays** [2] - 648:8, 692:4
**steal** [1] - 673:18
**Stenotype** [1] - 853:1
**step** [59] - 584:23, 589:9, 630:1, 656:3, 658:7, 658:13, 713:4, 713:5, 735:11, 750:21, 770:15, 782:24, 786:13, 786:19, 786:20, 787:1, 787:3, 798:23, 800:22, 801:17, 802:10, 802:12, 808:11, 821:6, 824:17, 824:18, 824:25, 825:6, 825:13, 825:21, 825:25, 826:2, 826:3, 826:6, 826:7, 826:8, 826:12, 826:14, 826:17, 826:18, 826:23, 826:24, 826:25, 827:17, 830:13, 830:14, 833:24, 834:1, 834:2, 846:10, 846:11
**step-by-step** [1] - 821:6
**stepdown** [3] - 602:3, 629:23
**steps** [11] - 691:8, 693:15, 702:1, 702:15, 811:18, 811:19, 817:21, 821:16, 822:6, 822:8, 824:5
**STERNE** [1] - 554:5
**stick** [3] - 567:16, 723:9, 802:8
**sticking** [5] - 730:1, 730:8, 742:25, 802:14
**sticks** [2] - 672:1, 825:4
**still** [27] - 567:25, 583:1, 583:14, 611:2, 611:6, 622:9, 626:21, 633:12, 638:18, 640:21, 649:9, 657:8,

666:18, 670:25, 688:19, 691:12, 696:15, 696:25, 701:23, 741:25, 753:10, 757:24, 807:20, 845:15, 851:15
**stipulated** [1] - 613:16
**stipulation** [1] - 612:19
**Stock** [1] - 700:4
**Stone** [16] - 744:3, 744:7, 744:10, 744:17, 744:18, 744:19, 744:21, 744:24, 745:4, 745:5, 745:10, 747:25, 749:13, 749:20, 749:22
**stood** [1] - 649:1
**stop** [3] - 573:16, 836:7, 838:10
**stopped** [2] - 673:24, 708:2
**story** [2] - 672:9, 696:11
**straight** [3] - 584:14, 707:19, 762:14
**strategies** [2] - 739:20, 753:7
**strategy** [3] - 620:25, 695:15, 740:3
**strength** [2] - 586:5, 674:5
**strengths** [1] - 576:9
**stricken** [2] - 708:21, 708:23
**strict** [2] - 673:12, 773:4
**strictly** [1] - 796:6
**strike** [6] - 555:3, 567:6, 698:6, 698:12, 698:15, 828:7
**striking** [1] - 677:13
**string** [1] - 741:4
**stringencies** [1] - 782:1
**stringent** [2] - 773:16, 782:2
**strong** [6] - 615:8, 683:18, 741:8, 747:12, 747:14, 747:15
**stronger** [1] - 678:17
**strongly** [1] - 626:12
**struck** [1] - 671:19
**structure** [1] - 741:1
**structured** [1] - 657:22
**stuck** [7] - 692:14, 721:17, 730:3, 730:5, 801:3, 801:20, 802:19
**studied** [1] - 741:25
**studies** [22] - 555:24, 556:3, 557:15, 557:17, 558:4, 558:13, 559:14, 560:20, 560:21, 674:18, 675:11, 695:5, 695:8, 695:11, 695:14, 696:5, 696:7, 716:3, 718:14, 747:2, 748:4
**study** [25] - 555:19, 557:18, 559:5, 559:7, 559:8, 560:10, 581:10, 674:14, 676:5, 685:22, 688:25, 694:23, 695:9, 695:10, 695:18, 695:24, 716:17, 716:19, 716:22, 716:25, 730:15, 731:1, 731:2, 731:6
**studying** [4] - 587:15, 670:17, 681:22, 744:10
**stuff** [8] - 690:13, 699:2, 786:24, 800:5, 801:13, 802:17, 803:15, 821:9
**sub** [1] - 621:10
**subcategory** [1] - 682:2
**subject** [9] - 577:8, 611:6, 611:19, 631:1, 631:8, 637:22, 779:5, 779:6, 782:21
**submission** [3] - 753:10, 768:8, 847:1
**submissions** [2] - 716:6, 850:22
**submit** [4] - 614:21, 819:10, 847:13, 850:9
**submitted** [8] - 576:22, 614:15, 636:2, 636:22, 760:9, 760:14, 819:11, 847:9
**submitting** [1] - 768:7
**subsequent** [1] - 780:8
**subsequently** [2] - 561:1, 824:24
**subsidiaries** [3] - 646:7, 646:12, 648:12
**subsidiary** [2] - 652:22, 653:10
**substance** [5] - 757:22, 758:1, 777:2, 828:5, 835:1
**substances** [3] - 673:7, 689:5, 692:23
**substantially** [2] - 775:25, 823:20
**substitute** [2] - 797:5, 829:11
**success** [2] - 571:8, 784:4
**successful** [1] - 845:17
**successfully** [1] - 830:5
**suddenly** [1] - 670:2
**sufficient** [9] - 576:3, 662:3, 662:20, 663:10, 664:1, 664:7, 665:1, 665:13, 665:25
**sugar** [2] - 723:8, 723:9
**suggest** [1] - 849:10
**suggested** [1] - 852:6
**suggesting** [2] - 565:14, 565:18
**suggestion** [1] - 564:2
**suggests** [2] - 567:9, 759:14
**suing** [1] - 576:25
**suit** [2] - 646:20, 652:17
**sum** [2] - 586:21, 730:12
**summarize** [4] - 695:3, 698:23, 721:7, 746:11
**summarizes** [7] - 714:24, 715:6, 721:9, 737:15, 778:15, 794:6, 822:12
**summarizing** [1] - 748:4
**summary** [7] - 601:20, 676:4, 725:17, 737:15, 759:5, 778:8, 836:1
**summation** [1] - 599:17
**summer** [1] - 819:21
**super** [1] - 596:8
**superior** [1] - 678:17
**supermarket** [1] - 590:8
**supplemental** [2] - 598:22, 598:23
**support** [9] - 561:3, 645:8, 665:15, 666:2, 725:22, 743:23, 834:24, 836:25, 843:18
**supported** [3] - 659:10, 715:4, 845:15
**supports** [5] - 645:9, 720:4, 746:21, 836:3, 837:2
**suppose** [2] - 562:21, 849:6
**supposed** [7] - 622:21, 622:22, 638:13, 649:14, 650:21, 660:19, 846:18
**supposedly** [2] - 555:13, 562:11
**surface** [9] - 729:22, 730:2, 730:6, 742:14, 742:17, 742:20, 743:5, 743:13, 743:17
**surfactant** [16] - 709:13, 709:18, 709:20, 709:24, 710:1, 710:8, 710:12, 710:15, 712:15, 731:17, 732:7, 732:19, 732:22, 734:8, 749:17, 749:18
**surprise** [3] - 564:21, 678:6, 696:18
**surprised** [1] - 743:22
**surprising** [1] - 565:8
**surrounding** [1] - 687:15
**survey** [16] - 585:2, 585:3, 585:10, 587:10, 587:11, 587:16, 588:12, 588:15, 588:17, 588:21, 589:2, 589:10, 606:21, 606:25, 607:7
**surveys** [15] - 580:24, 581:3, 581:6, 581:14, 581:20, 584:5, 584:6, 584:7, 584:15, 585:1, 606:20, 607:2, 663:2, 664:19
**Sury** [5] - 564:6, 566:13, 568:8, 568:12, 568:21
**sustain** [6] - 562:3, 611:25, 636:12, 648:21, 648:25, 649:25
**sustained** [1] - 613:3
**SWAT** [1] - 673:15
**switch** [9] - 583:17, 587:21, 588:10, 616:16, 617:7, 617:14, 619:11, 822:22, 845:20
**switched** [1] - 795:25
**switching** [1] - 588:1
**sworn** [5] - 668:10, 713:24, 735:22, 751:5, 774:16
**SWOT** [1] - 585:24
**symbol** [2] - 686:8
**synthesize** [1] - 669:8
**synthetic** [3] - 642:23, 644:15, 672:16
**system** [2] - 792:16, 842:11
**systemic** [1] - 678:22

**T**

**tab** [7] - 598:1, 647:14, 684:18, 788:12, 792:11, 806:24, 835:5
**table** [12] - 592:22, 634:14, 634:16, 634:18, 645:6, 721:9, 721:11, 723:20, 731:7, 731:20, 732:16, 734:6
**Table** [1] - 562:20
**tabs** [2] - 597:25, 655:5
**takeaway** [3] - 586:22, 748:1, 748:2
**talks** [7] - 563:4, 600:15, 620:13, 627:21, 689:17, 744:10, 762:9
**taller** [4] - 733:1, 733:2, 733:5, 733:12
**tan** [1] - 804:8
**tanks** [1] - 669:13
**target** [3] - 678:8, 678:19, 766:19
**targeted** [2] - 678:8, 688:13
**targeting** [1] - 740:6
**targets** [1] - 678:22
**taught** [2] - 829:21,

829:22
**tax** [7] - 648:11, 648:13, 648:16, 651:12, 651:13, 651:15, 651:21
**taxed** [1] - 648:19
**TAYLOR** [1] - 554:2
**teach** [5] - 695:20, 738:19, 738:20, 738:22, 739:1
**teaches** [2] - 843:12, 843:24
**teaching** [1] - 738:17
**team** [8] - 673:15, 695:11, 696:1, 699:6, 772:17, 772:21, 773:23, 850:3
**technical** [21] - 573:1, 573:2, 574:8, 578:3, 578:12, 627:15, 627:18, 628:5, 628:8, 630:20, 630:21, 635:17, 636:6, 636:7, 639:2, 643:25, 644:17, 655:14, 661:17, 703:16, 771:13
**technically** [1] - 585:9
**technique** [4] - 809:8, 809:13, 844:13, 845:17
**technology** [13] - 627:17, 633:13, 633:15, 638:11, 660:10, 660:11, 671:20, 672:13, 672:14, 672:15, 691:2, 691:13, 692:24
**temporarily** [1] - 755:24
**ten** [8] - 666:25, 667:7, 671:9, 673:2, 686:12, 696:12, 716:5, 771:24
**tendency** [2] - 687:15, 689:9
**Tennessee** [1] - 699:23
**tenure** [1] - 807:15
**term** [4] - 644:2, 650:23, 705:1, 706:13
**terminology** [1] - 704:19
**terms** [22] - 559:15, 565:4, 570:3, 578:24, 584:3, 601:11, 609:3, 652:12, 656:17, 666:9, 671:10, 671:11, 673:8, 673:14, 677:25, 692:14, 721:17, 729:7, 755:9, 809:18, 812:10, 813:12
**Terrence** [2] - 709:2, 709:4
**terrible** [1] - 691:7
**terrorists** [1] - 673:17
**test** [9] - 599:24, 674:4, 674:12, 674:22, 715:3, 720:11, 720:13, 720:16, 766:7
**tested** [4] - 677:14, 695:1, 695:7, 720:14
**testified** [13] - 562:1, 609:23, 628:10, 661:20, 663:4, 668:10, 713:24, 731:1, 731:14, 735:22, 751:5, 774:16, 838:15
**testify** [8] - 555:13, 556:6, 557:2, 557:9, 671:3, 714:19, 736:19, 772:7
**testifying** [5] - 560:3, 560:4, 635:18, 655:17, 841:2
**testimony** [35] - 556:9, 556:23, 563:12, 572:14, 574:1, 576:17, 605:11, 606:13, 607:11, 608:7, 608:9, 628:18, 629:1, 629:21, 659:11, 698:13, 698:14, 698:16, 698:19, 706:10, 714:12, 714:16, 731:8, 731:13, 737:11, 759:24, 771:5, 771:9, 774:25, 794:17, 800:8, 838:18, 846:15, 847:10, 851:5
**testing** [12] - 673:10, 673:24, 676:12, 695:4, 710:11, 714:16, 715:13, 716:9, 716:10, 719:25, 771:15, 851:18
**tests** [1] - 674:21
**text** [4] - 685:20, 727:24, 814:23, 814:24
**THE** [234] - 553:1, 553:2, 555:1, 555:20, 556:15, 556:18, 557:7, 557:18, 557:21, 557:24, 558:5, 558:9, 558:16, 558:24, 559:2, 559:6, 559:11, 559:19, 559:24, 560:3, 560:5, 560:13, 560:24, 561:12, 561:15, 561:20, 562:7, 562:10, 562:25, 563:5, 564:9, 564:14, 564:25, 565:16, 565:22, 566:4, 566:22, 567:4, 567:11, 567:18, 568:6, 568:13, 568:18, 568:25, 569:2, 569:7, 569:11, 569:17, 570:11, 570:19, 571:1, 571:20, 572:13, 572:18, 573:12, 574:6, 575:6, 575:17, 576:4, 577:5, 577:16, 577:24, 578:9, 579:1, 579:5, 579:20, 580:2, 580:5, 580:9, 580:18, 594:13, 594:24, 595:5, 595:7, 595:10, 595:11, 596:6, 596:13, 596:17, 596:19, 596:20, 597:15, 598:13, 603:5, 603:10, 603:20, 603:24, 611:11, 611:14, 611:25, 612:4, 612:16, 612:18, 613:10, 613:16, 618:25, 624:16, 628:15, 633:6, 633:7, 634:7, 635:20, 635:21, 636:11, 637:19, 643:9, 648:21, 648:25, 649:8, 649:24, 650:5, 650:8, 651:8, 653:6, 658:6, 658:12, 658:18, 666:4, 666:14, 666:20, 666:23, 667:3, 667:8, 667:10, 667:12, 667:16, 667:19, 667:23, 667:24, 668:4, 668:6, 668:16, 675:19, 679:24, 685:4, 693:8, 697:22, 697:24, 698:2, 698:5, 698:8, 698:11, 699:14, 708:25, 711:15, 711:16, 712:19, 712:22, 713:4, 713:9, 713:11, 713:13, 713:18, 713:20, 718:20, 719:23, 730:20, 735:8, 735:10, 735:12, 735:15, 735:16, 735:18, 740:12, 745:14, 746:3, 748:14, 750:18, 750:20, 750:24, 751:1, 753:17, 755:2, 757:9, 758:20, 759:18, 765:8, 765:24, 768:12, 770:14, 770:16, 770:20, 770:24, 771:2, 771:8, 771:12, 771:16, 771:19, 772:4, 772:10, 774:7, 774:9, 774:10, 774:12, 783:7, 789:3, 789:6, 790:24, 791:2, 791:5, 791:9, 793:4, 796:12, 808:1, 810:24, 817:7, 820:6, 835:21, 838:6, 841:3, 842:23, 845:20, 846:10, 846:20, 846:23, 847:4, 847:6, 847:12, 847:16, 848:2, 848:11, 848:13, 848:23, 849:2, 849:15, 849:18, 849:25, 850:13, 850:23, 851:7, 851:10, 851:17, 852:4, 852:14
**themselves** [3] - 586:18, 617:20, 680:23
**theoretical** [3] - 576:23, 795:9, 795:14
**theory** [5] - 575:4, 575:22, 575:24, 795:15, 806:10
**Therapeutic** [1] - 608:7
**therapeutic** [24] - 559:16, 591:4, 607:12, 607:17, 607:19, 607:20, 607:22, 608:3, 664:12, 664:18, 664:22, 664:24, 665:2, 718:17, 755:17, 755:18, 757:17, 757:19, 762:15, 762:19, 762:20, 763:6, 763:9, 763:12
**Therapeutics** [1] - 687:3
**THERAPEUTICS** [1] - 553:6
**therapies** [1] - 715:21
**therapy** [1] - 738:12
**thereabouts** [1] - 849:4
**thereby** [1] - 743:6
**therefore** [5] - 653:18, 767:4, 768:19, 773:10, 796:7
**Thereupon** [23] - 594:19, 596:15, 597:17, 598:15, 603:7, 612:17, 624:18, 675:20, 679:25, 685:5, 693:9, 697:23, 746:4, 757:10, 758:21, 789:4, 793:5, 808:2, 810:25, 817:8, 820:7, 838:7, 842:24
**thermometer** [1] - 688:16
**thesis** [5] - 780:7, 780:9, 811:14, 811:16, 813:6
**they've** [5] - 576:25, 617:21, 618:4, 722:6, 798:4
**thinking** [4] - 564:15, 585:23, 640:22, 804:19
**third** [7] - 568:20, 575:11, 624:21, 689:4, 723:21, 755:5, 760:20
**this-then-that** [1] -

708:6
**thoughts** [1] - 691:15
**thousands** [1] - 844:22
**threat** [2] - 586:1, 620:11
**threats** [2] - 620:16, 654:25
**three** [40] - 555:7, 555:24, 564:19, 604:14, 604:25, 605:5, 605:9, 618:12, 646:20, 647:5, 652:6, 652:17, 653:1, 677:14, 686:4, 686:5, 687:25, 689:1, 689:3, 693:19, 720:14, 723:19, 724:1, 729:24, 734:14, 741:1, 752:6, 771:9, 800:25, 801:10, 801:11, 801:15, 801:22, 801:25, 802:10, 811:20, 826:14
**three-dimensional** [1] - 741:1
**three-fourths** [1] - 693:19
**throughout** [4] - 753:20, 756:7, 761:6, 764:19
**throw** [1] - 831:17
**thrown** [1] - 704:19
**thrust** [1] - 813:6
**thumb** [1] - 636:12
**tie** [1] - 659:19
**tied** [4] - 641:14, 641:20, 662:13, 663:23
**TIGAN** [1] - 553:16
**timed** [2] - 606:7, 733:9
**timing** [1] - 848:17
**tissue** [1] - 687:15
**title** [12] - 587:18, 588:18, 643:18, 644:1, 644:2, 672:2, 675:22, 675:25, 676:4, 676:8, 789:10, 808:9
**titled** [7] - 788:16, 792:15, 807:4, 810:4, 815:24, 818:24, 842:11
**Tockwogh** [1] - 847:7
**today** [23] - 560:4, 599:10, 606:14, 633:11, 656:11, 671:3, 699:9, 700:15, 701:3, 708:12, 710:11, 710:15, 714:12, 731:2, 737:11, 749:23, 751:15, 774:25, 808:6, 845:15, 848:18, 851:5, 852:11
**today's** [1] - 810:19
**together** [17] - 568:4, 592:10, 594:8, 607:11, 607:13, 609:25, 672:6, 677:14, 688:13, 721:9, 732:13, 742:25, 743:3, 755:8, 820:24, 839:21, 841:10
**tomorrow** [9] - 599:11, 845:24, 846:7, 847:18, 847:21, 847:22, 848:3, 848:22, 850:18
**Ton** [1] - 772:6
**ton** [1] - 772:6
**took** [2] - 582:19, 592:19
**top** [17] - 588:9, 593:10, 615:15, 634:11, 643:6, 679:8, 707:11, 732:13, 740:25, 766:13, 775:17, 777:5, 798:12, 812:14, 816:17, 823:19, 836:1
**topic** [5] - 558:19, 688:15, 704:12, 706:14, 790:21
**topical** [6] - 671:22, 672:20, 674:2, 697:9, 707:8, 708:8
**topically** [1] - 707:22
**topics** [2] - 555:8, 779:13
**total** [11] - 590:11, 599:1, 599:2, 599:14, 659:3, 664:4, 664:6, 664:8, 752:6, 771:8, 806:9
**totally** [2] - 611:4, 670:23
**toward** [1] - 792:5
**towards** [4] - 649:7, 789:20, 792:1, 813:5
**toxic** [1] - 825:11
**Toxicon** [1] - 679:10
**toxin** [163] - 557:13, 560:18, 616:18, 616:23, 617:8, 619:12, 621:7, 631:6, 643:20, 673:1, 673:8, 673:18, 674:6, 674:10, 674:19, 675:2, 676:9, 678:23, 679:9, 681:2, 681:24, 681:25, 682:1, 682:10, 682:12, 684:12, 684:14, 685:23, 687:13, 687:17, 689:9, 689:23, 690:1, 690:3, 690:6, 690:8, 690:9, 690:23, 691:3, 691:8, 693:24, 702:2, 702:14, 703:21, 707:1, 707:2, 707:9, 707:11, 707:12, 707:17, 709:9, 709:23, 710:4, 710:7, 710:15, 710:20, 710:24, 711:3, 717:22, 717:24, 717:25, 718:2, 718:3, 719:7, 719:8, 728:21, 729:22, 729:25, 730:1, 730:5, 730:7, 734:24, 737:4, 742:12, 742:13, 743:3, 743:15, 744:25, 746:18, 746:19, 750:1, 755:23, 756:1, 764:5, 764:13, 764:16, 766:18, 766:19, 769:24, 772:13, 772:19, 780:18, 781:16, 781:19, 782:16, 782:25, 785:4, 786:3, 786:4, 786:11, 786:21, 787:15, 790:22, 792:16, 793:15, 795:20, 796:21, 797:12, 797:13, 797:16, 797:20, 803:7, 803:21, 803:24, 804:5, 804:7, 804:24, 805:4, 805:12, 805:18, 806:6, 806:15, 806:16, 806:21, 809:19, 810:5, 811:6, 817:19, 821:14, 821:20, 822:14, 823:21, 824:13, 825:1, 825:2, 825:13, 826:3, 826:12, 826:15, 826:22, 827:4, 828:4, 828:9, 829:1, 829:17, 830:7, 833:13, 834:7, 834:25, 836:15, 842:12, 843:22, 843:24, 844:9, 844:11, 844:23, 844:24, 845:12
**toxins** [14] - 673:11, 681:23, 682:17, 691:18, 724:21, 739:25, 779:8, 779:9, 782:11, 782:17, 783:2, 783:5, 799:20, 821:3
**trace** [1] - 809:20
**tracking** [1] - 587:12
**traded** [2] - 700:2, 700:4
**tradeoffs** [1] - 590:4
**traditional** [1] - 738:19
**training** [3] - 669:19, 699:3, 703:8
**transaction** [4] - 649:14, 650:22, 652:7, 652:15
**transactions** [1] - 650:21
**TRANSCRIPT** [1] - 553:9
**transcript** [8] - 628:14, 643:2, 771:11, 772:1, 848:18, 849:4, 849:5, 849:20
**transcripts** [1] - 628:18
**transfer** [8] - 648:15, 649:16, 650:24, 651:20, 651:23, 652:1, 652:10, 738:21
**transferred** [1] - 814:16
**transition** [1] - 621:6
**translated** [1] - 811:17
**transmissible** [4] - 789:13, 791:20, 791:25, 829:8
**transmission** [6] - 788:17, 789:23, 790:5, 792:8, 794:13, 795:17
**treat** [3] - 670:24, 695:12, 806:15
**treated** [3] - 607:14, 686:5, 806:12
**treating** [1] - 806:2
**treatment** [3] - 686:11, 686:14, 715:21
**treatments** [1] - 686:5
**trehalose** [23] - 721:24, 721:25, 722:7, 722:8, 722:14, 722:19, 722:22, 724:9, 724:12, 724:13, 724:16, 724:17, 726:6, 727:10, 727:17, 728:5, 728:21, 728:23, 729:9, 731:10, 732:6, 780:1, 813:15
**tremendous** [1] - 625:9
**Trexler** [12] - 583:20, 583:25, 587:10, 587:11, 588:12, 589:8, 657:24, 658:3, 847:20, 848:6, 848:9, 848:16
**Trexler's** [1] - 586:22
**TRIAL** [2] - 553:9, 553:11
**trial** [12] - 606:7, 625:24, 627:20, 628:18, 678:14, 708:2, 715:23, 716:22, 733:9, 753:21, 769:9, 769:16
**tried** [3] - 613:1, 701:13, 847:23
**true** [14] - 566:8, 567:14, 570:24, 604:14, 610:23, 613:6, 614:5, 616:23, 627:4, 630:15, 689:10, 734:21, 844:2, 845:9
**trust** [1] - 575:19
**truth** [4] - 569:16, 570:10, 570:21, 571:19
**try** [8] - 573:3, 634:3, 698:18, 699:9, 746:11, 779:18, 812:24, 845:24
**trying** [35] - 571:9, 574:2, 575:3, 575:21, 606:11, 611:11, 613:3, 621:1, 642:17,

644:23, 683:20, 696:2, 707:6, 716:16, 723:14, 723:15, 740:5, 763:1, 768:24, 786:22, 789:22, 792:8, 799:8, 799:16, 800:11, 802:16, 803:16, 804:24, 805:1, 805:16, 805:23, 820:23, 822:9, 848:19
**tubing** [1] - 691:23
**TUNNELL** [1] - 553:16
**turn** [35] - 594:14, 595:3, 595:4, 601:19, 616:1, 624:6, 637:25, 643:12, 644:12, 679:14, 684:18, 692:25, 701:3, 701:17, 731:6, 744:1, 745:16, 754:15, 756:21, 758:10, 758:23, 765:6, 788:12, 792:11, 793:24, 806:23, 810:1, 815:18, 818:3, 818:19, 818:21, 821:8, 835:5, 835:24, 838:21
**turning** [2] - 675:6, 826:24
**turns** [2] - 594:15, 814:15
**TV** [1] - 672:9
**TV-type** [1] - 672:9
**Tween** [1] - 726:6
**twice** [4] - 686:1, 686:14, 688:18, 688:19
**two** [69] - 555:2, 555:25, 561:12, 563:22, 567:5, 571:3, 573:4, 574:17, 577:17, 581:3, 581:6, 582:18, 582:20, 585:10, 588:7, 588:14, 588:15, 588:16, 593:6, 602:1, 605:16, 606:3, 608:14, 617:12, 634:22, 645:11, 651:16, 655:1, 662:4, 664:19, 664:24, 666:7, 688:12, 689:11, 695:8, 695:9, 695:10, 696:6, 696:7, 697:4, 697:7, 697:16, 721:6, 721:22, 723:9, 723:12, 742:25, 743:3, 743:21, 748:2, 751:23, 776:24, 777:21, 777:22, 778:2, 785:3, 799:24, 799:25, 801:12, 801:13, 808:14, 808:15, 815:3, 823:7, 841:10, 841:13, 851:7, 851:8, 851:11
**two-page** [1] - 851:11
**type** [23] - 643:20, 672:9, 672:21, 676:10, 776:11, 791:20, 799:21, 806:14, 807:5, 808:10, 808:18, 812:14, 815:25, 818:17, 818:25, 820:24, 821:17, 821:25, 822:11, 823:22, 824:1, 827:4, 827:6
**types** [3] - 706:14, 779:10, 835:11
**typical** [1] - 694:6
**typically** [2] - 602:19, 607:24
**typo** [2] - 689:14, 689:16

## U

**U-shaped** [1] - 804:6
**U.S** [17] - 622:10, 646:14, 648:4, 648:7, 651:5, 651:20, 679:17, 684:22, 684:25, 693:25, 694:10, 718:5, 752:14, 782:21, 788:15, 795:14, 853:4
**U.S.-issued** [1] - 693:3
**U.S.D.C.J** [1] - 553:12
**ugly** [1] - 692:7
**ugly-looking** [1] - 692:7
**ultimately** [6] - 582:6, 673:23, 677:3, 708:1, 739:10, 743:18
**umbrella** [1] - 650:16
**unattractive** [1] - 677:24
**uncertainties** [1] - 593:3
**uncertainty** [2] - 592:19, 592:21
**unclear** [1] - 660:19
**under** [8] - 571:16, 620:21, 626:25, 628:2, 630:22, 639:9, 657:8, 785:9
**undergo** [1] - 687:15
**undergrad** [1] - 670:8
**undergraduate** [1] - 738:21
**underneath** [2] - 588:7, 588:17
**understandable** [1] - 798:7
**understood** [14] - 562:9, 619:23, 628:23, 694:20, 697:1, 751:16, 790:7, 790:10, 792:3, 831:16, 833:18, 833:19, 834:6, 845:7
**underwent** [1] - 700:19
**undesirable** [1] - 677:21
**undisclosed** [1] - 556:24
**unexpected** [10] - 562:12, 564:3, 564:4, 564:12, 564:15, 565:6, 565:8, 566:2, 566:4, 665:20
**unfairness** [1] - 849:11
**unfortunate** [1] - 689:16
**unfortunately** [1] - 670:4
**UNIKEL** [1] - 553:21
**unique** [6] - 674:9, 674:25, 675:4, 683:10, 692:13, 740:23
**unit** [3] - 634:15, 634:20, 805:13
**United** [4] - 588:15, 650:19, 810:4, 842:10
**UNITED** [1] - 553:1
**units** [2] - 595:20, 686:7
**universal** [2] - 691:10, 692:24
**universities** [1] - 781:12
**University** [18] - 670:11, 736:12, 737:22, 737:24, 738:2, 738:15, 778:24, 780:13, 780:15, 780:16, 780:17, 780:19, 780:23, 780:24, 785:8, 807:14, 807:15, 820:17
**university** [1] - 781:4
**unlikely** [4] - 616:18, 617:8, 617:14, 619:12
**unmet** [3] - 621:20, 621:23, 622:3
**unpredictable** [1] - 830:17
**unreasonable** [4] - 626:19, 627:5, 627:7, 629:6
**unsealed** [1] - 772:3
**unsupported** [2] - 843:17, 844:19
**unusual** [1] - 683:16
**unwanted** [1] - 678:20
**up** [114] - 555:4, 556:20, 557:8, 557:11, 559:23, 560:17, 561:21, 562:23, 563:1, 566:19, 571:24, 573:23, 575:13, 576:16, 578:7, 578:16, 579:21, 579:25, 581:2, 582:2, 584:9, 586:21, 586:25, 587:4, 587:5, 592:9, 593:25, 597:2, 599:5, 601:15, 602:16, 602:19, 602:21, 603:15, 606:21, 609:9, 610:4, 611:21, 616:7, 617:16, 627:11, 628:17, 629:2, 632:8, 635:9, 637:22, 647:7, 670:1, 672:4, 673:16, 678:15, 680:7, 690:13, 694:16, 695:22, 696:8, 696:16, 697:5, 701:5, 701:20, 714:14, 715:12, 715:21, 716:2, 716:9, 720:8, 720:19, 721:25, 722:3, 722:9, 722:10, 722:21, 723:11, 723:13, 726:2, 730:12, 731:20, 732:5, 732:10, 732:16, 733:11, 737:25, 755:5, 757:13, 758:23, 766:4, 768:14, 771:23, 779:17, 779:23, 780:14, 784:5, 786:13, 799:5, 799:10, 801:23, 803:4, 803:14, 804:19, 806:14, 822:16, 828:25, 829:20, 832:22, 838:10, 845:4, 846:3, 846:21, 848:3, 849:7, 850:10, 852:5
**upper** [2] - 680:7, 799:4
**uptake** [6] - 737:4, 741:21, 743:7, 743:18, 747:4, 747:16
**useful** [5] - 597:13, 674:13, 702:15, 842:5, 849:22
**uses** [7] - 587:10, 587:12, 660:25, 664:15, 664:19, 741:12, 777:18
**utility** [1] - 601:5
**utilize** [3] - 741:10, 741:13, 824:5
**utilizing** [1] - 823:20

## V

**vaccine** [2] - 718:13, 718:14
**vaccines** [1] - 718:10
**VALENTE** [12] - 553:22, 568:23, 569:1, 569:6, 569:8, 569:14, 570:7, 570:18, 570:23, 571:14, 572:12, 572:17
**Valente** [3] - 568:25, 569:1, 572:18
**validity** [2] - 665:15, 666:2
**Valley** [1] - 672:9
**value** [35] - 574:5,

581:12, 581:21, 581:22, 582:21, 584:4, 584:10, 584:16, 585:16, 587:1, 588:23, 589:13, 589:16, 590:10, 599:7, 599:11, 599:14, 601:7, 602:9, 608:24, 654:5, 654:6, 658:25, 659:6, 659:20, 659:23, 659:24, 660:10, 661:6, 661:13, 661:17, 663:6, 663:15
**values** [3] - 721:20, 726:16, 726:20
**variability** [4] - 773:6, 773:8, 773:11, 773:21
**variant** [1] - 788:18
**variety** [3] - 706:15, 706:16, 773:6
**various** [11] - 561:3, 568:23, 569:4, 569:5, 575:18, 598:6, 618:10, 624:11, 753:1, 779:18, 785:6
**Varughese** [3] - 667:4, 668:1, 668:3
**VARUGHESE** [35] - 554:6, 667:6, 667:9, 667:11, 667:14, 668:2, 668:13, 668:18, 675:16, 675:21, 675:23, 675:25, 676:2, 679:21, 680:2, 685:1, 685:7, 687:4, 687:6, 693:5, 693:10, 698:1, 698:3, 698:7, 698:20, 698:21, 699:13, 708:20, 711:13, 712:20, 846:19, 848:9, 848:12, 848:15, 851:20
**vast** [1] - 717:4
**vats** [1] - 690:10
**venture** [1] - 697:14
**verbatim** [1] - 814:17
**verbiage** [2] - 814:5, 814:6
**verified** [1] - 779:17
**version** [4] - 722:5, 723:24, 742:8, 793:20
**versus** [6] - 623:19, 652:21, 776:23, 809:19, 827:4, 830:12
**vessel** [1] - 730:4
**vial** [3] - 729:23, 730:2
**vials** [1] - 729:24
**vice** [2] - 672:2, 782:5
**video** [5] - 586:11, 667:6, 771:4, 772:9, 774:4
**view** [11] - 556:16, 586:22, 589:23, 605:17, 615:23, 639:18, 639:21, 642:14, 783:25, 839:2, 839:25
**viewed** [2] - 837:5, 837:7
**vile** [1] - 730:6
**VirnetX** [2] - 660:8, 662:18
**virus** [1] - 673:7
**viruses** [3] - 790:6, 792:1, 829:24
**visit** [2] - 695:16, 695:23
**visual** [2] - 798:17, 798:20
**VLADIMIR** [1] - 553:22
**Volume** [1] - 553:7
**volunteers** [2] - 695:7, 696:1
**vs** [1] - 553:5

**W**

**wait** [1] - 711:17
**waiting** [1] - 701:23
**walk** [9] - 755:8, 797:8, 798:17, 798:24, 799:1, 799:13, 821:9, 823:18, 845:25
**walked** [1] - 557:14
**walks** [1] - 822:24
**wants** [8] - 555:13, 563:11, 572:3, 582:11, 658:14, 833:20, 846:21, 850:24
**warfare** [1] - 739:21
**warner** [1] - 852:23
**Warner** [1] - 853:3
**wash** [1] - 803:3
**washed** [6] - 801:21, 802:19, 825:17, 825:18, 825:23, 826:20
**washes** [1] - 802:8
**watch** [5] - 713:5, 735:11, 750:21, 770:15, 846:11
**watching** [1] - 678:22
**water** [6] - 684:8, 692:3, 737:6, 798:9, 798:12
**ways** [10] - 579:1, 608:10, 608:13, 608:14, 609:4, 618:6, 618:14, 702:14, 742:1, 742:3
**weakness** [2] - 586:1, 586:2
**weaknesses** [3] - 576:9, 619:18, 619:23
**week** [5] - 777:17, 786:3, 794:16, 797:8, 833:3
**weekend** [1] - 673:15
**weight** [9] - 678:25, 723:4, 723:5, 805:11, 806:8, 827:11, 844:12
**welcome** [6] - 580:9, 580:17, 667:19, 713:14, 791:9, 791:14
**well-established** [1] - 660:8
**well-known** [1] - 582:16
**WELLS** [19] - 554:8, 658:16, 658:19, 750:22, 751:9, 753:13, 753:18, 753:19, 754:25, 755:4, 757:6, 757:12, 758:17, 758:22, 759:17, 765:23, 768:13, 768:21, 770:13
**wells** [3] - 658:15, 666:4, 768:12
**whatnot** [1] - 575:1
**whatsoever** [2] - 611:18, 663:21
**wheel** [1] - 691:19
**wheels** [1] - 691:19
**wherein** [3] - 827:18, 827:21, 828:13
**whole** [20] - 557:4, 558:1, 565:6, 581:24, 584:17, 642:13, 651:7, 670:1, 678:2, 678:23, 697:9, 699:7, 702:17, 705:2, 730:4, 797:13, 799:17, 803:8, 805:25, 806:10
**widespread** [4] - 616:16, 617:7, 617:13, 619:11
**willing** [4] - 569:25, 585:3, 585:4, 664:5
**WILSON** [1] - 554:3
**wind** [1] - 690:13
**winning** [1] - 567:19
**winter** [1] - 807:22
**Wisconsin** [11] - 778:24, 780:14, 780:15, 780:16, 780:20, 780:23, 780:24, 785:8, 807:14, 807:15, 807:22
**Wisconsin's** [1] - 780:17
**Wisconsin-Madison** [2] - 807:14, 807:15
**wish** [1] - 696:24
**withdraw** [1] - 698:1
**withheld** [1] - 760:4
**WITNESS** [15] - 580:18, 595:10, 596:6, 596:19, 611:14, 633:7, 635:21, 668:6, 711:16, 713:20, 735:12, 735:18, 751:1, 770:16, 774:12
**witness** [31] - 558:18, 558:20, 603:4, 603:19, 611:9, 618:24, 634:6, 637:21, 643:8, 659:16, 667:5, 667:6, 667:11, 668:9, 668:14, 712:17, 713:23, 730:19, 735:13, 735:21, 743:24, 750:22, 751:4, 759:17, 768:10, 771:8, 774:15, 806:23, 810:1, 837:12, 842:8
**witness's** [1] - 771:5
**witnesses** [5] - 568:24, 769:9, 794:17, 794:19, 848:10
**woman** [1] - 841:10
**word** [7] - 556:2, 558:12, 571:23, 638:2, 764:22, 764:24, 804:14
**wording** [1] - 815:6
**words** [13] - 564:12, 591:10, 610:21, 631:7, 634:18, 636:5, 636:9, 653:14, 659:5, 703:9, 703:11, 703:13, 710:10
**works** [3] - 646:22, 650:18, 848:20
**world** [32] - 605:23, 606:3, 606:4, 606:15, 606:21, 606:25, 607:6, 607:19, 608:2, 608:5, 608:6, 614:5, 614:10, 629:7, 638:7, 638:8, 638:15, 638:24, 644:24, 646:5, 646:9, 646:10, 650:20, 652:15, 652:18, 652:24, 700:9, 700:16, 781:11, 781:13, 807:13
**worried** [1] - 565:16
**worry** [2] - 796:8, 796:18
**worse** [3] - 662:17, 663:23, 734:17
**worst** [3] - 734:15, 735:2, 735:5
**worst-performing** [1] - 735:2
**worth** [6] - 599:10, 604:19, 631:20, 631:21, 662:5, 778:12
**worthy** [1] - 696:24
**wow** [1] - 696:22
**wrap** [2] - 697:5
**wraps** [3] - 568:4, 678:15, 840:16
**wrinkles** [1] - 806:2
**write** [6] - 694:4, 819:6, 820:21, 821:4, 849:7, 851:10
**writes** [1] - 571:2
**writing** [1] - 807:22
**written** [7] - 636:5, 744:3, 745:18, 758:16, 807:5, 819:1, 837:16
**wrote** [6] - 675:9, 677:19, 736:15, 810:21, 820:12, 833:15

## X

**Xiang** [26] - 792:18, 792:24, 792:25, 793:8, 793:11, 793:13, 793:15, 793:21, 793:25, 794:1, 794:3, 823:7, 829:15, 829:17, 829:21, 829:22, 830:3, 831:24, 832:2, 832:5, 832:12, 832:17, 839:25, 840:22

## Y

**year** [11] - 569:18, 590:23, 625:8, 625:11, 655:1, 669:24, 697:2, 697:16, 716:8, 838:18
**years** [32] - 571:3, 576:24, 576:25, 600:7, 604:24, 605:3, 621:24, 630:11, 638:22, 655:1, 657:6, 669:17, 671:9, 672:7, 673:2, 690:24, 696:12, 697:3, 708:8, 715:13, 715:17, 716:12, 752:7, 752:8, 752:24, 779:3, 783:2, 785:4, 815:13, 845:1
**yellow** [1] - 814:24
**yes-or-no** [1] - 611:10
**yesterday** [20] - 555:14, 555:18, 556:23, 557:10, 559:1, 580:22, 581:5, 585:2, 585:23, 588:14, 591:17, 606:14, 609:23, 628:10, 634:24, 635:2, 635:8, 729:24, 736:18, 765:23
**yield** [1] - 691:7
**York** [1] - 700:4
**YOUNG** [1] - 554:2
**yourself** [12] - 608:14, 609:5, 610:18, 668:21, 678:12, 703:9, 714:4, 714:6, 736:4, 751:12, 774:22, 815:1

## Z

**Zero** [1] - 845:3
**Ziploc** [1] - 691:14
**zoom** [1] - 831:25