IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., --------------------Plaintiff, vs. REVANCE THERAPEUTICS, et al., --------------------Defendant. | ) Case No. 21-CV-1411-RGA ) Volume IV |

# TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Richard G. Andrews, U.S.D.C.J., and a jury of eight in Courtroom 6A on the 17th of July, 2025.

APPEARANCES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JEREMY TIGAN, ESQ.

-and-

PAUL HASTINGS LLP
BY: ERIC DITTMANN, ESQ.
ISAAC ASHKENAZI, ESQ.
MELANIE RUPERT, ESQ.
CARL MINNITI, ESQ.
KRYS HO, ESQ.
ROBERT UNIKEL, ESQ.
DAVID VALENTE, ESQ.
VLADIMIR SEMENDYAI, ESQ.

Counsel for Plaintiff

(Appearances continued.)

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: ANNE GAZA, ESQ.
SAMANTHA WILSON, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: DENNIES VARUGHESE, ESQ.
ADAM LAROCK, ESQ.
BYRON PICKARD, ESQ.
NIRAV DESAI, ESQ.
DEIRDRE WELLS, ESQ.

-and-

CAHILL GORDON
BY: PETER ARMENIO, ESQ.

Counsel for Defendant

THE COURT: So I got a draft of documents which it seemed to me like the one I addressed first. And the only one I can address right now is Docket Item 630, which is Allergan's objections to some of Revance's disclosure of exhibits and demonstratives.

Does the group of exhibits that are first listed include -- actually, if someone would put up the demonstrative exhibits 10.8 through 10.11, that would probably help me understand what all these exhibits are supposed to show.

So thank you for showing me that. What is the theory as to how this evidence impacts the hypothetical negotiation?

MR. ARMENIO: Good morning, Your Honor. Peter Armenio for Revance. This goes to our *Aqua Shield* submission, Your Honor.

THE COURT: I understand that. What's the logic? How would you argue to the jury this impacts damage analysis?

MR. ARMENIO: The way we see it, Your Honor, is going into the hypothetical negotiation at that time through evidence that was submitted to the Court, what they're really like -- the parties were uncertain how the market was going to shake out. We had an entrenched player in BOTOX and Allergan. We had a new upstart that was going to try

premium price, didn't have relationships with doctors and the like. It was uncertain to what extent they would compete.

This was not Coca-Cola versus Pepsi. This was Coca-Cola, maybe some regional water company. They didn't know how to what extent they would compete at all. It was uncertainty and what happens, these investors' statements by Allergen after the hypothetical negotiation confirmed that Revance was worried we might not be able to compete because of these problems. And as Allergan felt pretty confident, we're the market leader, we're really going to be able to maintain that position, especially against a little-known manufacturer with a price premium.

THE COURT: What you're saying is since the *Georgia-Pacific* factor and kind of the logical factor is the negotiation -- hypothetical negotiation would consider what impact Revance's entry would have on Allergan's related companies and, ultimately, on Allergan, I guess, that this was uncertain at the time, and so we'd substitute, if the jury believes your evidence, what it turned out to be for what they thought it was at the time?

MR. ARMENIO: I think it helps inform it. I don't know that it's a direct substitute. Certainly, all the contemporaneous documents about what people were thinking at the time of the hypothetical negotiation would

be relevant to consider, since there was uncertainty. We believe under *Aqua Shield* that the later statements confirming what actually happened help show the reasonableness of what people were thinking at the time.

This goes to show those concerns that Revance expressed about being too small, not knowing doctors, not having resources. Those were reasonable, well-founded concerns as after-negotiation documents show.

THE COURT: But they're in the record already as something that I think Revance was saying either before or right around the time of the hypothetical negotiation; right?

MR. ARMENIO: There is a record. We made that for Your Honor because Your Honor asked to point to me where there is uncertainty about competition. This is JTX 91.

THE COURT: So the answer is yes?

MR. ARMENIO: Yes, Your Honor.

THE COURT: All right. And basically, all the substantive evidence that backs up these slides that are elicited in your letter, do they all rise and fall as a group?

MR. ARMENIO: They do, Your Honor. They all go to show reality with respect to the thoughts and the uncertainty of competition and they inform the reasonableness of Revance's worries that they wouldn't be

able to compete in this market and Allergan's sense of strength and security that as entrenched market leader, DAXXIFY would not be a problem at all.

This is also the document we showed Your Honor on the last discussion. It's DTX 318 at page 15. This is probably the most directly correlative to the parties' uncertainty at the time of the hypothetical negotiation on whether they could --

THE COURT: This is from 2023?

MR. ARMENIO: Yes, Your Honor, July 27th earnings call 2023, Your Honor.

THE COURT: So, Mr. Ashkenazi, do you have anything to say in response?

MR. ASHKENAZI: Couple of points, Your Honor. I'm going to take these in reverse in the letter that we submitted last night because I think the third one may make this easy.

Ms. Trexler, who's going to be testifying, who they're trying to use these documents through, explicitly stated that the parties -- and this is a quote in our report we had in our letter. It's from --

THE COURT: Which of the many letters are you talking about?

MR. ASHKENAZI: I apologize, Your Honor. I don't have the DI number on me.

THE COURT: When about did you file it?

MR. ASHKENAZI: I'd say about 3:00 or 4:00 this morning.

THE COURT: Okay. So I've got a docket item -- basically, I have two letters. One you filed yesterday at 8:00 that you left blanks in, then you filed an amended letter that had the blanks filled in. Is that the letter you're talking about?

MR. ASHKENAZI: Those are Revance's letters and then there would be a response to that.

THE COURT: So there's an Allergan letter that has a first, second, and third. That's it?

MR. ASHKENAZI: Yes.

THE COURT: Okay.

MR. ASHKENAZI: I'm focusing on the third, four lines down, starts at the end of the sentence. Ms. Trexler stated in her report explicitly the parties would approach the hypothetical negotiation as competitors. That was her opinion. She didn't say there would be uncertainty about competition. She didn't raise any of those issues in her report.

To come here now and say, We're going to have uncertainty, I'll get into the *Aqua Shield* stuff --

THE COURT: Thank you, Mr. Ashkenazi.

So here's what I think, which is, first off, I

don't think the evidence that Revance is proposing that, essentially, says Allergan held its share -- or yesterday I think we saw made more profits year over year.

I don't think that really says much of anything about whether or not Allergan and Revance are competitors in any particular sense. I mean, particularly the year over year. The market is growing, people can compete, and they can all make more profits, or at least more sales.

And I haven't sensed from the evidence of what occurred before that there was, you know, a split of opinion as about to what impact Revance would have. Maybe they'd be, I don't know, in some area that did not -- made them a noncompetitor.

So I don't think the evidence -- the subsequent evidence is very probative as to whether they are or not a competitor. I think it's misleading or essentially misleading and, essentially, a side show as to that question of what they thought at the time of the hypothetical negotiations.

I think its probative value is substantially outweighed by its risk of confusion and essentially misleading the jury as to what the issue is, and so I'm just going to exclude it all. All right?

MR. ASHKENAZI: Thank you, Your Honor.

MR. ARMENIO: Thank you, Your Honor.

THE COURT: Okay. So there was something else in the letter, though I've now lost track of -- Docket Item 630. There was also something about DTX 430 and 413. Can someone show me DTX 430.

Mr. Desai, where does -- actually, someone just show me DTX 431 while we're also on this topic.

MR. DESAI: Your Honor, this is a summary of a spreadsheet that is -- looks like 20,000 pages printed out. We're trying to find a way to streamline, but it's all -- it's just data, summary data.

THE COURT: That's 431 you're showing me?

MR. DESAI: This is 431.

THE COURT: 431?

MR. DESAI: DTX 431.

THE COURT: Show me again 430. What did you say about that?

MR. DESAI: This one is citing the two spreadsheets. It's transaction level sales data. I think the other side's issue is not with respect to the data itself but maybe something that's in the footnote.

THE COURT: So the footnote, that would be the first thing to go because that's not a summary. That's something else. If they get rid of the footnote, are you okay?

MR. ASHKENAZI: Your Honor, we had the same

problem on our side. When we tried to use similar documents with Dr. Siegwarth, they objected to use of those documents. In fact, I think putting the footnote to the side for a second, you'll recognize the problem with that.

They objected to Dr. Siegwarth using similar summary compilations of data and we could put it up on the screen and we did, but we were told we couldn't have them admitted --

THE COURT: Mr. Ashkenazi, the way it was presented to me then did not seem like a summary of voluminous data. I rule on these things as they're presented.

Mr. Desai is representing this in particular about the other, but maybe about this too. He said it's a summary of two spreadsheets. He hasn't said what the spreadsheets are supposed to be, at least for this one. But it does sound like a summary of voluminous data here.

MR. ASHKENAZI: Your Honor, we discussed on the screen the jury is to have two sheets we discussed during Dr. Siegwarth's testimony, during that small portion in the morning yesterday. Those could be admitted, we'll allow these two to be admitted excluding that footnote, and you said no.

THE COURT: Let me see. Is it possible to show me one of the two exhibits that you are saying are

comparable that I excluded?

MR. DESAI: PTX 8123, I think, is one which the underlying document there is a single page and there's another one printed out as 30 pages. We thought it was a little bit of a different situation. We're willing to work through this, but we think the easiest way to do this is to redact the footnote.

THE COURT: Hold on a minute, Mr. Desai. This is forecasted revenue, which I thought did come off, as Mr. Desai said, a single spreadsheet. That was said yesterday.

Can we put back on the screen the Revance exhibit.

Those are actual sales. They're not exactly the same thing. So what's DI -- DX 430 again? And those are actual sales too.

So you can have forecasted revenue on a single spreadsheet. It's a lot harder to -- and, in fact, that's what I thought you were going to do yesterday. I thought based on what I've seen before there was some single spreadsheet that had forecasted sales. Maybe I was wrong. So I'm going to say to Revance get rid of the footnote and I think these meet the requirements of Rule 1006.

So I'm going to allow them to use them. If you think that it's helpful to your side, Mr. Ashkenazi, to show

Ms. Trexler your summaries and ask her whether she agrees with them, I don't mind you trying to -- I don't mind, I guess that's not very legal. It's okay if you try to use them and --

Can I just see again what you had up there?

MR. DESAI: PTX 823.

THE COURT: Yes, thank you.

MR. ASHKENAZI: Your Honor, as I mentioned --

THE COURT: So really, this is a different thing; right? I mean, it is a spreadsheet and a spreadsheet, but what's the spreadsheet of? It's a really completely different thing; right?

MR. ASHKENAZI: The second one is a 30-page spreadsheet, Your Honor. I don't have that PTX number you referenced. The second exhibit that you --

MR. DESAI: So on this, my notes are that this cites to two different documents. One is an Excel spreadsheet that prints out as a single page. One is an Excel spreadsheet that -- we printed it under in 30 pages.

MR. ASHKENAZI: That's my point, Your Honor. For complicated financials at 30-something pages, a one-page summary is preferably acceptable. And there's been no challenge to the veracity of the data.

MR. DESAI: I mean, DTX 431 prints out as 20,000 pages and --

THE COURT: Well, right. So yours are in, Mr. Desai. I'm just trying to figure out now whether some kind of fairness or something should cause me to reflect.

So this comes from a one-page sheet that I'm looking at; right? Can we see the other one? And this comes from a 30-page printout?

MR. DESAI: Your Honor, I think what I'm referring to is the sources at the bottom there.

THE COURT: Yes.

MR. DESAI: Yeah. That's -- those two documents, one prints out as --

MR. ASHKENAZI: They're two documents. But that's the point.

THE COURT: Well, those documents themselves are summaries; right?

MR. ASHKENAZI: They're documents produced by Revance of these forecasts.

THE COURT: Well, I didn't prevent you from entering the two documents into evidence, did I?

MR. ASHKENAZI: No. The documents were entered into evidence. I'm just -- the summary, the compilation of the data to make it easy for the jury, which we believe -- again, if these weren't complicated financials, Your Honor, it would be a different story.

Just figured we -- if they were going to object

to the complicated financials being summarized like that, a 20,000-page document is different than a 30-page. But 30 pages is still voluminous when it comes to financial spreadsheets. At least I have a problem with it.

THE COURT: What I'm thinking about now is how is this exhibit and the other one from Dr. Siegwarth that is Exhibit 6A in her denomination. How are those two different?

MR. ASHKENAZI: These are the forecasts, Your Honor. And apologies, I'm having a hard time seeing it from here. I think one was for two different -- she took two different forecasts, Your Honor, to provide her evaluation.

THE COURT: You mean, in other words, one is based on one set of forecasts and the other is based on a different set of forecasts?

MR. ASHKENAZI: I believe so, Your Honor.

THE COURT: And then she averaged them together somehow or what?

MR. ASHKENAZI: I don't want to say exactly how she did that, but yes she --

MR. DESAI: But, Your Honor, I think she applied this discount factor at the end so that this was more reflecting her opinions, which was the issue that we had.

The data itself is just data, but on the right-hand side there, there's a reflection of her opinion.

Similar to the footnote issue --

MR. ASHKENAZI: It's a calculation using --

THE COURT: All right. So here's what I'm going to do. All right. And Ms. Trexler, she's not in the room right now; right?

MR. DESAI: No.

THE COURT: All right. Well, so it may or may not be proper cross-examination, but you can use Exhibit 6B to cross-examine her as to whether she agrees, not necessarily with the theory behind it but the numbers that are in this exhibit, or whether she saw it and didn't disagree with it.

And I'll apply a generous standard to admitting it into evidence through her.

MR. ASHKENAZI: Thank you, Your Honor.

THE COURT: And it looks like the way you have it here, it's good. It has no footnotes.

Mr. Desai, if -- your two exhibits, the one I said get rid of the footnote, I think that one has footnotes. Get rid of them.

All right. So does that resolve that?

MR. ASHKENAZI: I think so, Your Honor, thank you.

THE COURT: All right. Well, so I need a little more time to read all these *Aqua Shield* letters, even though

I guess I've kind of resolved that. So I don't think I need a little more time.

Is there anything else I need to do right now?

MR. ASHKENAZI: I don't think so, Your Honor. I think that was it for this morning.

MR. ARMENIO: Not from our side, Your Honor.

THE COURT: All right. And so we've got Dr. Goodnough on the stand and then we're going to have your other technical expert and two medical doctors and then we're going to have Ms. Trexler.

And somewhere in there you --

MR. PICKARD: That's the current plan. It's a time management issue. We may need to make some adjustments on the fly. We'll let everyone know.

THE COURT: All right. Well, I guess we'll be in recess until 9:30.

Oh, actually, so we gave the jury the construction of certain claim terms. To date, I haven't heard a single reference to any of these.

Do you think that anything's going to happen today or tomorrow that is likely to involve someone referring to any of my constructions?

MR. DITTMANN: Your Honor, nothing comes to mind that would be central. Yes, you're right.

MR. PICKARD: I think that's right.

THE COURT: Okay. All right. Thank you.

(A recess was taken, after which the following proceedings were had:)

THE COURT: I'm informed in real life it's after 9:30 so let's get the jury. Dr. Goodnough can come back and sit down.

My staff reminded me we had the clock repaired in the last couple of weeks.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back.

You may be seated.

Mr. Larock, you may continue.

MR. LAROCK: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. LAROCK:

Q. Good morning, Doctor.

A. Good morning.

Q. Do you recall yesterday we were talking about slide 28, DDX 528?

A. Yes, I do.

Q. And remind us again what -- whether you believe that there was any discouragement by 2009 for using anion exchange chromatography to purify botulinum toxin.

A. There was no discouragement before 2009.

Q. And why is that your view?
A. That's my view because prior to 2009, there had been decades worth of literature that supported the use of chromatography, specifically anion exchange chromatography, for the use of purification of botulinum neurotoxin.
Q. And are you aware that Dr. Gessler has taken the position that Revance's patent attorneys have acknowledged that there was a discouragement of using anion exchange chromatography columns by 2009?
A. Yes, I am aware of that.
Q. Do you agree with Dr. Gessler on this point?
A. No, I do not.
Q. Why not?
A. Well, just because, as I said, there had been decades' worth of literature prior to this time that used anion exchange chromatography successfully for the use of purification of botulinum toxins.

As a matter of fact, both Dr. Gessler and I have actually published on the use of anion exchange chromatography purification of type A botulinum neurotoxin.
Q. And, Doctor, I want to switch gears and talk about secondary considerations of nonobviousness for the '748 patent.

Are you aware of any secondary considerations of nonobviousness for the '748 patent?

A. No, I'm not.
Q. Can we go to slide 29, please.
Doctor, having looked at the prior art and secondary considerations, what's your opinion about Claim 8 of the '748 patent?
A. Claim 8 of the '748 patent was obvious in view of Gessler, the FDA guidance, and Smelt.
Q. All right. I want to turn our attention to Claim 8 of the '740 patent.
If you could remind us again what your position is on that patent.
A. My position is that Claim 8 of the '740 patent would have been obvious in view of the combination of Gessler, FDA guidance, and Smelt.
Q. Let's go to slide 30, please.
And, Doctor, can you explain what's on DDX 530.
A. Yes. So what you can see on the left is a copy of the patent, including the priority date of September 25, 2003.
And on the right-hand side, you can see the claims, Claim 6 and Claims 8. Claim 8 is claimed in this particular proceeding. Claim 8 is dependent upon Claim 6. And it's -- everything within Claim 6 is contained within Claim 8.
Q. And on this slide, it's highlighted September 25,

2003, but was there a date that was important for your analysis for this patent?

A. Yes. I considered all the prior art that was available to a person of skill in the art prior to that date.

Q. I want to go back for one second to slide 28, please. Oh, sorry, 29.

Having looked at the prior art and secondary considerations, what's your opinion about Claim 8 of the '748 patent?

A. My opinion is that Claim 8 of the '748 patent was obvious due to Gessler, FDA Guidance, and Smelt.

Q. Oh, sorry, I was asking the question about Claim 8 of the '748 patent.

A. Oh, I'm sorry, '748. I misheard.

Claim 8 of the '748 patent was obvious in view of Malizio and Xiang.

Q. Okay. Thank you, Doctor.

Now if we go to slide 30, please, the one we were on before.

Is there a date that was important for your analysis? And this is now the '740 patent, the other patent that's in the case.

Was there a date that was important for your analysis?

A. Thank you. I missed the gear shift.

September 25, 2023, is the date that I considered as the date where a person of skill in the art would have known all the prior art prior to that.

Q. And how did you use that date, September 25, 2003?

A. I considered my position of obviousness and I considered the available art prior to that date.

Q. Now, yesterday we talked about animal-derived products and plant-derived products that are used to make botulinum toxins.

A. Yeah.

Q. And we looked at the FDA guidance document from 1999 and we looked at the Xiang patent application.

Which of those references is still available by September 25, 2003?

A. The FDA guidance from 1999.

Q. And that was published in 1999 --

A. Yes.

Q. -- the FDA guidance?

By 2003, would a person of ordinary skill know how to produce botulinum toxin without using animal proteins?

A. Yes.

Q. Was that described in the literature?

A. It was described in the literature.

Q. By 2003?
A. Yes, prior to 2003.
Q. Turn in your witness binder to DTX 202, please.
A. Okay.
Q. Do you recognize that document?
A. Yes, I do.
Q. What is it?
A. So this is a document that was published by Smelt. It's titled "Growth in Toxin Formation By *Clostridium Botulinum* at Low pH Values."
Q. And when was the document published?
A. 1982.
Q. And have you confirmed that the document was actually published by 1982?
A. Yes, I have.
Q. Is this a document you relied upon for your analysis?
A. Yes, it is.
MR. LAROCK: Your Honor, I'd like to move DTX 202 into evidence.
MS. RUPERT: No objection.
THE COURT: Admitted without objection.
(Thereupon, Defendant's Exhibit DTX 202 was admitted.)
BY MR. LAROCK:
Q. Is this the Smelt reference we were just discussing,

Doctor?
A. Yes, it is.
Q. What was the Smelt publication about?
A. So the Smelt publication dealt with the growth of *clostridium botulinum* in a plant-based growth medium, specifically soybean-based.
What they were trying to do in this research was determine what's the lowest pH that the organism can actually grow, reproduce, and produce toxin. This was more like a microbiology study to see what the extremes were that the organism could grow and produce toxins.
Q. Go to page 2.
How in the Smelt paper -- how is the botulinum toxin produced?
A. If you think back to where we were talking about fermentation and the culture where the organism grows and produces the toxin, in this case Smelt used plant-based proteins and specifically soybean-based proteins for these experiments.
Q. And does Smelt say anything about the results that they obtained from using soy-based proteins to make botulinum toxin?
A. Yeah. As a matter of fact, they found in some cases the growth was a thousandfold and they were actually producing hundreds of LT50s. That's a measure of the toxin

in some of these plant-based growth mediums.
Q. Go to page 4 of DTX 202.
Dr. Smelt says viable count is increased approximately a thousandfold. Can you describe what that means.
A. What that means is the organism actually is growing in -- in an animal-free product, specifically soybeans.
Q. So from the Smelt paper, what would a person of ordinary skill by 2003 conclude?
A. A person of ordinary skill would have concluded from Smelt that the use of plant-based material for the growth of botulinum toxin and the toxin formation was obvious.
Q. Does the Smelt paper say anything about the reproducibility of the growth they saw?
A. They mentioned the reproducibility in some cases in their experiments was a little spotty, which is to be expected because they're trying to determine what the lowest pH is this organism would grow and produce toxin. So one would expect to see some failures in there because you're right on the very cutting edge of where the organism can grow and can't grow.
Q. Does any part of the Smelt process use animal proteins?
A. As a matter of fact, there is a small portion of it. When they were producing the organisms they were going to

seed into these various soybean-based experiments with different pHes, they used animal-based proteins to produce those organisms.

What they did was they grew the organisms up in the animal-based material and then they separated them from the animal-based growth medium. That actually watched them three different times in water before they used minute amounts of the organisms to, essentially, seed the different experiments.

Q. And in the process of seeding the different experiments, what would be the amount of animal proteins they're taking from the animal-protein-based starting culture into the soy-based cultures?

A. Negligible. There was nothing in there.

Q. Doctor, I want to talk about chromatography. We heard yesterday about hydrophobic interaction chromatography.

A. Yes.

Q. Was hydrophobic interaction chromatography described in the literature for purifying botulinum toxin by 2003?

A. Yes, it was.

Q. And is there a reference that describes the use of hydrophobic interaction chromatography to purify botulinum toxin before 2003?

A. Yes. As a matter of fact, the one we use is by

Dr. Gessler.

MR. LAROCK: Let's bring up DTX 192.

BY MR. LAROCK:

Q. And this is Figure 1 from Gessler. Remind us again what the purification process reported in Dr. Gessler's paper, Gessler 1999, is.

A. Dr. Gessler reported the use of hydrophobic interaction chromatography column, that's the second box down from the top, followed by two different anion exchange columns, and eventually finished up with something called size exclusion column.

Q. By 2003, were there advantages -- had any advantages been reported for using hydrophobic interaction chromatography to purify botulinum toxin?

A. Yes. Dr. Gessler reported that hydrophobic interaction chromatography was superior to the use of ion exchange chromatography for the first step in the botulinum toxin purification.

MR. LAROCK: And, Mr. Bell, can we go to page 6. It's the right-hand column, first full paragraph.

BY MR. LAROCK:

Q. Doctor, you said that Dr. Gessler had reported that hydrophobic interaction had been superior to anion exchange chromatography.

A. Yes, that's what he reported.

MS. RUPERT: Your Honor, objection. This is not actually Gessler. I believe this is Smelt.

MR. LAROCK: Okay. Let's go to DTX 192. This is Smelt. There we go. Page 6, first full paragraph, right column, by the second sentence starting with "accordingly."

BY MR. LAROCK:

Q. Doctor, we've highlighted the second sentence of Dr. Gessler's paper and it says: "This technique is superior to initial ion exchange chromatography."

And he's referring to the previous sentence that refers to hydrophobic interaction chromatography?

A. That's correct.

Q. Thank you, Doctor.

So by 2003, what would a person of ordinary skill have understood about using hydrophobic interaction chromatography to purify botulinum toxin?

A. By 2003, a person of ordinary skill would have understood that the use of hydrophobic interaction chromatography as an initial step was superior to using ion exchange.

Q. I also want to talk to you about your opinions with respect to Claim 8 of the '740 patent. Let's go to Slide 32, please. So we have DDX 532.

Dr. Goodnough, can you explain what's on the left-hand side of the screen.

A. On the left-hand side of the screen, you can see the three references we've been talking about: Gessler, FDA guidance, and Smelt. On the right-hand side, you can see the '740 patent, Claims 6 and 8, Claim 8 again, depends on Claim 6.
Q. How did --
(Cross-talk.)
BY MR. LAROCK:
Q. -- with respect to the '740. It's a checklist?
A. Yes.
Q. So let's start at the top of Claim 6. It says an APF process for purifying a biologically active botulinum toxin, the process comprising the steps of. Where in Gessler DTX 192 is that language found?
A. On page 3, you can see Gessler's chromatography process is completely animal-protein free.
Q. You're referring to Figure 1?
A. Figure 1 on page 3, that's correct.
Q. Let's move on to step A. If we look at step A -- I want to pause here for a second.
Can you explain what step A of Claim 6 of the '740 patent means?
A. Claim A actually refers to the use of animal-protein-free fermentation process. And Dr. Gessler does not use an animal-protein-free fermentation medium.

His is actually animal-product containing. However, a person skilled in the art at the time would have recognized this and would have looked through the FDA guidance, the one from 1999 we were talking about, and known there was a risk of potentially infectious diseases from the use of animal products. So one of skill in the art at the time would have known to substitute something else for it. If they were looking for a no-risk approach to the production, they would've substituted plant-based material.
Q. Doctor, by 2003, what would a researcher have concluded about step A of Claim 6 of the '740 patent?
A. A researcher would have concluded that step A would have been obvious in light of the FDA guidance from 1999.
Q. And the language in Claim 6, it refers to a biologically active botulinum toxin?
A. That's correct.
Q. What types of botulinum toxins were purified in the Gessler paper?
A. Dr. Gessler purified types C and D botulinum toxin.
Q. Are types C and D botulinum toxin biologically active botulinum toxins?
A. Yes, they are.
Q. Thank you. Let's move on to step B. Where in Gessler's paper is step B found?
A. Step B says "conditioning the clarified culture."

What that means is he's exchanging buffers, and he describes this on page 3 where he explained this buffer is exchanged for this particular buffer system.

Q. This is part of Figure 1 --

A. I'm sorry. Yes, this is part of Figure 1.

Q. -- of DTX 192?

A. Yes.

Q. So step B is not new. Let's move on to step C. Where in the Gessler paper was step C found?

A. Gessler describes contacting the hydrophobic interaction column resin where he says the hydrophobic concentrate was applied to the column, on top box there. That's on PTX 192 on page 3.

Q. And you're looking at page 3 and page 6?

A. Correct. So page 6 actually says hydrophobic interaction chromatography was used as a first step and again claimed this technique was superior to initial ion exchange chromatography.

Q. Step C is not new. Let's move on to step D wherein -- that's ahead a slide.

Where in Gessler's paper is step D found?

A. Step D describes washing impurities of the HIC column. What Gessler describes in DTX 192, page 3, is that he equilibrated this particular column. What he means by "equilibrated" is that he was continuously running buffer

through there. By doing that, he was washing the column, essentially removing any purities that did not bind to the column by doing the equilibration.

Further on, he actually states there was no toxin detected in the fractions involved in this column. What that means, basically, is that the toxin is stuck to the column, so once the toxin is bound to the column, you can continue to run the buffer through it and remove any of the impurities that don't bind to the column. You're, essentially, washing the impurities off.

Q. Okay. So step D is not new. Let's move on and advance the slide to step E.

Where in Gessler's paper is step E found?

A. Again, DTX 192, page 3, describes the botulinum toxin from the HIC column. And you can see that highlighted below where he says the toxin was eluted with a linear gradient. That was, essentially, Claim E.

Q. Okay. So step E is not new. Let's move on to step F.

Where in Gessler's paper is step F found?

A. So this goes back a bit further where we were talking about Gessler describes the material as being dialyzed, that is to say, conditioned. The material that came off the HIC column is going to subsequently be applied to the next column in line, which is anion exchange column.

So he's basically just dialyzing those fractions. He's conditioning the eluent.
Q. And you were looking at page 3 of Dr. Gessler's paper, DTX 192?
A. Yes, I am.
Q. So step F is not new. Let's move on to step G.
Where in Dr. Gessler's paper is step G found?
A. So G says loading an ion exchange column. And what Gessler describes here on page 3 of DTX 192 is that the dialyzed fractions were further purified on the anion exchange column.
What that means is he put these fractions that had been dialyzed on the column. He's essentially loading the column with these fractions.
Q. And what anion exchange column was reported in the Dr. Gessler's paper from 1999?
A. So the anion exchange column specifically they used, it's just a brand name. It's called the SOURCE 30 Q.
Q. And is SOURCE 30 Q, is that an anion exchange column?
A. Yes, it is.
Q. G is not new. Move -- let's move on to step H.
Where in the Gessler paper is step H found?
A. So on page 3, again, if Gessler -- he reports that the column's equilibrated. Again, we talked about this earlier. What he's essentially doing is washing the

impurities off the column.

Again, it goes back to what we were talking about with the HIC column. The materials are loaded on there, and the buffer continued to run through the column so what he's doing is anything that doesn't bind to the column gets washed off of it.

Q. Step H is not new. Let's move to the last step, step I. Let's take this one in parts.

The first part of step I is diluting the botulinum toxin from the ion exchange column.

Is that language found in the Gessler paper?

A. Yes, it is. The DTX 192 on page 5, the first sentence that's highlighted says: "At pH 6, the next step, the BoNT, the toxin, is eluted as a single peak." So that means that he actually diluted purified neurotoxins from that particular column.

Q. And step I continues. The remainder of that language says: "Thereby obtaining a purified biologically active botulinum toxin through a process for purifying a botulinum toxin, which is a substantially APF purification process."

Is that language found in the Gessler paper?

A. Yes. Again, if you go back to the page 5 of that reference, he reports that he obtained a biologically active toxin through a process that was APF. There was no animal proteins used in the process.

Q. So that language is not new either to the '740 patent. So let's move -- well, so what we've seen thus far is looking at Claim 6, by 2003, what would a person of ordinary skill have understood looking at the limitation of Claim 6 in view of the Gessler paper, FDA guidance, and Smelt?
A. The person of skill in the art would have recognized that this particular claim was obvious in light of those three references: Gessler, FDA guidance, and Smelt.
Q. Okay. If we look at Claim 8, Claim 8 depends from Claim 6.
Can you explain what Claim 8 means?
A. Sure. So Dr. Gessler purified type C and D neurotoxin and Claim 8 is specific to type A neurotoxin.
Q. And by 2003, would a person of ordinary skill have a reasonable expectation of combining Gessler's paper, FDA guidance, and Smelt to arrive at Claim 6?
A. To arrive at Claim 6, absolutely, yes. A person of skill in the art at the time would have recognized those three documents and been able to combine them to come up with Claim 6 in the '740 patent.
Q. So Claim 8, remind us again what Claim 8 says.
A. Claim 8 is specific to a type A botulinum neurotoxin.
Q. And remind us what types of botulinum toxin were produced in the Gessler paper.

A. Dr. Gessler purified types C and D neurotoxins.
Q. Though by 2003, would -- were researchers working on purifying botulinum toxin type A?
A. Yes, they were. They were working on the FDA-approved serotype at that time.
Q. So was there a reason to also try to work on botulinum toxin type A?
A. Yeah, that specifically is the reason. Since type A was the only serotype of toxin approved by the FDA at the time, researchers would have been motivated to try and purify type A neurotoxin as well.
Q. Okay. Would researchers by 2003 have an expectation that they could take a purification process like the one in Dr. Gessler's paper that used C and D botulinum toxin, did they have an expectation that that would work for type A botulinum toxin also?
A. Yeah, a person with skill in the art would have recognized that while C and D are actually different serotypes of botulinum toxin type A, all of the different serotypes are all very closely related. They have very similar structures, similar amino acid sequences.
So, yeah, a person would have recognized and they probably would have from that column.
Q. And the similarities between type C and D botulinum toxin and type A botulinum toxin, had that been described in

the literature by 2003?
A. It had been, yes.
Q. In the witness binder in front of you, please turn to tab DTX 381.
A. Okay.
Q. Do you recognize that document?
A. I do.
Q. What is it?
A. So this is a journal article published by Whelan. It's titled, "The Complete Amino Acid Sequence of the *Clostridium Botulinum* Type E Neurotoxin Derived by Nucleotide Sequence Analysis of the Encoding Gene."
Q. Doctor, is this a document you relied upon for your analysis?
A. Yes, it is.
Q. And when was it published?
A. This was published in 1992.
Q. And have you personally confirmed that this was published by 1992?
A. Yes, I have.
MR. LAROCK: Your Honor, I'd like to move DTX 381 into evidence.
MS. RUPERT: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Defendant's Exhibit DTX 381 was

admitted.)

MR. LAROCK: May we publish?

BY MR. LAROCK:

Q. Is this the Whelan reference we were just discussing, Doctor?

A. Yes, it is.

Q. And what is the -- just generally before we get into it, what was the Whelan reference about?

A. So the Whelan reference is basically about sequencing the genome and coding the particular neurotoxin. Here they're studying type E neurotoxin.

Back in the early '90s, this is how the neurotoxin was discovered, was through the nucleotide sequencing.

Q. Okay. Let's look at the abstract on the first page of DTX 381.

And looking at the abstract, we see it says: "Alignment of all characterized neurotoxin sequences (BoNT/A, BoNT/C, BoNT/D, BoNT/E, and TeTx) shows them to be composed of highly conserved amino acid sequences."

Doctor, can you explain what that means?

A. I can. And just as an aside, TeTx is tetanus toxin. It's very closely related to botulinum toxins.

But what this statement says is that the amino acid sequences of all of these different serotypes,

including tetanus toxin, are very highly conserved. And that means that they're very similar to each other. They're a little bit different, which makes them different serotypes, but they're very highly conserved.

Q. And so with highly conserved amino acid sequences between type A, type C, type D, and type E toxin, what would one conclude about the hydrophobicity of those toxins?

A. So what one would have concluded from this is that the -- since the amino acid sequences are so similar, one would conclude -- a person of skill in the art would have concluded that the hydrophobic regions were also highly conserved between these different types of toxin. And it turns out that they are.

Q. So, Doctor, how does this relate to whether or not type A toxin, type C toxin, type D toxin, and type E toxin can be used on a hydrophobic interaction chromatography column?

A. So a person of skill in the art would have combined these two, Gessler and this, to realize that, well, it worked really well for type C and D, I bet it's going to work for A. It turns out it did.

Q. So if we go back to Claim 8, by 2003, what would a person of ordinary skill have understood from Gessler's paper, FDA guidance, and Smelt about Claim 8?

A. A person of skill in the art at the time would have

realized that the combination of Gessler, FDA guidance, and Smelt that Claim 8 was obvious.
Q. Now, Doctor, are you aware that when the patent examiner was reviewing the '740 patent and it was issuing from the Patent Office, that the patent examiner was aware of Dr. Gessler's reference?
A. Yes, I'm aware that the patent examiner was aware of Dr. Gessler's reference. Yes.
Q. And does that change your opinion about obviousness in this case?
A. No, it does not.
Q. Why not?
A. Because the patent examiner was not aware of the FDA guidance and Smelt. They were aware of Dr. Gessler's reference, but they weren't aware of the other two.
So a person of skill in the art would have been able to combine those three to come up with the obviousness claim here.
Q. Okay. Did you also look at any secondary considerations of nonobviousness with respect to the '740 patent?
A. I did.
Q. Are you aware of any secondary considerations of nonobviousness for the '740 patent?
A. No, I'm not.

Q. Okay. If we put up slide 47 -- 46.
Okay. Doctor, what would one by 2003 have concluded about Claim 8 of the '740 patent?
A. So a person of skill in the art at the time would have realized that Claim 8 of the '740 patent would have been obvious in light of Gessler, the FDA guidance, and Smelt.
MR. LAROCK: Pass the witness, Your Honor.
THE COURT: All right.

CROSS-EXAMINATION

BY MS. RUPERT:
Q. Good morning, Dr. Goodnough.
A. Good morning, Attorney Rupert.
Q. So, Dr. Goodnough, you testified today about two Allergan patents; correct?
A. Correct.
Q. And specifically, you testified about Allergan's '740 and '748 patents?
A. Yes, ma'am.
Q. Is it your opinion that Allergan's '740 and '748 patents are invalid because they are obvious?
A. Yes.
Q. So, Dr. Goodnough, both Allergan's '740 and '748 patents are about animal-protein-free methods; correct?
A. Correct.

Q. And in terms of manufacturing BoNT without animal products, no one, no one did it before Allergan; correct?
A. Botulinum toxins had been purified from animal-protein-free media prior to Allergan.
Q. All right. So, sir, you were deposed in this case; correct?
A. Yes.
Q. And that deposition was on May 31st of 2024?
A. I believe so.
Q. And at that deposition, you were asked questions and you testified under that same oath to tell the truth, and you've sworn that same oath today -- or yesterday; correct?
A. Correct.
Q. All right. So we're going to turn to your deposition transcript. We're going to look at page 248, lines 17 to 20. And let's look at what you said in your deposition.
MS. RUPERT: Roy, could you please play the video.
(A video was played.)
BY THE ATTORNEY:
Q. But in terms the actual manufacturing of the botulinum (audio interruption) before Allergan did; right?
A. I'm not aware of anybody who did, no.
(The video ended.)

BY MS. RUPERT:
Q. And that was your sworn testimony in this case; right, sir?
A. That was. I was not aware of anybody who did it commercially.
Q. Let's move on. Yesterday you used the phrase "teach away" when discussing certain prior art references. Do you recall that?
A. Yes.
Q. And you understand that teaching away means that a particular reference teaches skilled people what not to do; correct?
A. I'm sorry. Could you repeat that, please.
Q. Sure. Teaching away means that a particular reference teaches skilled people what not to do; correct?
A. Yes, that's what I believe teaching away means.
Q. So yesterday and even a little earlier today Revance's lawyer showed you this portion of the Xiang '697 patent -- let's pull that up on the screen -- which I think you called Luo, describing example 16. Do you remember that?
A. Yes, I do.
Q. And this statement says: "We carried out an experiment which determined that anion exchange column chromatography, such as Q sepharose and DEAE sepharose

resins, should not be used in column chromatography purification because such columns can cause the toxin band pattern to change."

Correct? That's what it says?

A. That's what it says, yes.

Q. And after you read the statement, you very clearly told the jury that you do not believe this teaches away from using the anion exchange step. Do you recall that?

A. I do.

Q. Before this trial, you did read this paragraph from Example 16 of the '697 patent as actually trying to teach away from the use of anion exchange chromatography, didn't you?

A. Yes. I believe I said it did try to teach away.

Q. You said it did try to teach away; correct?

A. I believe it did try.

Q. In fact, are you aware as part of your work in this case that Revance itself told the Patent Office that this same paragraph that we have up here on the screen, Example 16 of the '697 patent, teaches away from adding an anion exchange step for toxin purification?

Are you aware that Revance said that too?

A. I am aware.

Q. Let's pull Revance's statement up on the screen. Let me show PTX 433A.

Sir, do you recognize this document?
A. I actually do not.
Q. Okay. Well, I will remind you, you considered this document as part of your analysis.
A. There were a lot of documents, ma'am.
MS. RUPERT: I'm going to move to admit PTX 433A.
MR. LAROCK: No objection.
THE COURT: All right. Admitted without objection.
(Thereupon, Plaintiff's Exhibit PTX 433A was admitted.)
BY MS. RUPERT:
Q. Sir, you reviewed and you were asked about this particular document prior to trial. Do you remember that?
A. Vaguely.
Q. I'm sorry?
A. Vaguely.
Q. So this document relates to a patent application that Revance filed with the Patent Office; correct?
A. Yes.
Q. And the title of Revance's patent application is "Methods and Systems For Purifying Noncomplex Botulinum Neurotoxin"; correct?
A. Correct.

Q. The applicant here is listed as Revance?
A. Yes.
Q. The inventor is listed as Curtis Ruegg?
A. Yes, it is.
Q. And that's the same Curtis Ruegg that provided testimony yesterday?
A. Yes, it is.
Q. And this document is titled "Response Amendment"; correct?
A. Yes, it is.
Q. And you understand that this is a document that Revance submitted with the Patent Office in connection with a patent application that Revance had filed; correct?
A. Correct.
Q. And specifically, you understand that this is a response that Revance submitted to the Patent Office when it rejected one of Revance's patent applications seeking to use anion exchange chromatography; right?
A. Yes.
Q. And do you see in the middle of this page a paragraph is reproduced? We'll pull that paragraph up on the screen and I'm going the read the first paragraph -- or the first sentence of this paragraph into the record.

It states: "We carried out an experiment which determined that anion exchange column chromatography such as

Q sepharose and DEAE sepharose resin should not be used in a toxin column chromatography purification because such columns can cause the band pattern to change."

Right? I read that correctly?

A. Yes, you did.

Q. This was the same paragraph from Example 16 we just looked at that says anion exchange column chromatography should not be used; right?

A. Correct.

Q. And this is what Revance was citing to the Patent Office, correct?

A. Yes, ma'am.

Q. So let's turn to page 8 of this document and please look at the first full sentence of that paragraph.

And do you see there that Revance very clearly told the U.S. Patent Office about the paragraph in Example 16 of Xiang '697 in the sentence starting "moreover"?

Do you see that there?

A. Yes, I do.

Q. I'm going to read what Revance told the Patent Office: "Moreover, paragraph 0476, Example 16, actually teaches away from adding an anion exchange step for toxin purification."

That's what Revance said to the Patent Office;

right?
A. I believe that's a statement from their attorney, yes.
Q. So before you testified yesterday, you were actually aware that Revance explicitly told the Patent Office when trying to get a patent of its own that Example 16 of Xiang '697 actually teaches away from adding an anion exchange step for toxin purification; right? You knew that?
A. This statement does not teach away from the use of anion exchange chromatography.
Q. You were aware that Revance had made the statement to the Patent Office before providing your testimony; correct?
A. I'm aware that Revance's patent attorney made the statement. Yes, ma'am.
Q. You're also aware that the patent claim that Revance was trying to get issued when it made this statement to the Patent Office actually used a sequence of anion exchange followed by cation exchange to purify BoNT/A; correct?
A. That statement was made by their attorney, yes.
Q. If you look further down on this page, do you see the statement that begins "based on this statement"?
Do you see that there?
A. Yes.
Q. And this full sentence from Revance to the Patent Office reads: "Based on this statement, a person of skill

would be discouraged from adding an anion exchange step in combination with a cation exchange step."
Right?
A. I see that, ma'am.
Q. According to Revance itself in statements made to the Patent Office in an effort to get patent protection years, years after Allergan stated very clearly that a person of skill in the art would be discouraged from adding an anion exchange step in combination with a cation exchange step to purify BoNT/A; isn't that right?
A. That statement is, but it's not correct.
Q. Sir, you told the jury yesterday that there were decades of literature demonstrating that anion exchange chromatography was extremely useful. I'm sure you'll recall that, yes?
A. Yes, I do.
Q. But it appears that Revance interpreted Xiang '697 to be discouraging scientists from using AEX in combination with in CES; right? Because that's what Revance explicitly told the Patent Office.
A. That statement was made by their patent attorney and not by a scientist.
Q. Thank you, sir. Let's turn to another document.
Dr. Goodnough, is it your opinion that after reading the three references you focused on during your

direct testimony that the invention in the '740 patent would have been obvious to an ordinary scientist and therefore the patent's invalid; correct?
A. Correct.
Q. Is that your opinion?
Let's turn to those references now. We're going to discuss all three of them one by one that you say makes the invention obvious.
So, Dr. Goodnough, you testified today regarding an FDA guidance. I think we've marked that as exhibit JTX 112; correct?
A. Correct.
Q. And that document was published in 1989?
A. '99, yes.
Q. If I refer to this document as FDA guidance 1999, is that okay with you?
A. Yes, fine.
Q. So FDA guidance 1999 is the first reference you pointed to to claim the '748 patent was obvious; right?
A. Correct.
Q. And the FDA guidance 1999 does not discuss the manufacture of BoNT anywhere, does it?
A. No, it doesn't.
Q. And, in fact, the FDA guidance 1999 does not mention BoNT anywhere at all; correct?

A. No, it does not.
Q. So to be clear, manufacturing of BoNT/A is what's claimed in Claim 8 of the '740 patent; right?
A. That's correct.
Q. And the FDA guidance also does not mandate that animal proteins be removed from drug products; right?
A. It doesn't mandate.
Q. Yesterday do you remember providing testimony about the label name for plasma direct products that can be found at number 2 on page 14? Do you see that?
A. I do.
Q. I want to look at the first part of that sentence in 2 so it's clear for the jury.
The labeling you pointed to was about plasma-derived products other than albumin; right?
A. That's what the statement says, yes.
Q. And albumin is used in BOTOX; correct?
A. It is.
Q. And, in fact, the FDA guidance 1999 also says that even in countries where "mad cow" disease had been found, drug products manufactured with animal proteins had never, never been reported to transmit the disease to humans; correct?
A. That's correct. That's the low-risk approach.
Q. Okay. So let's talk a little bit about risk. You

testified yesterday about what an ordinary scientist would have believed in 2003 about the risk of using animal products; correct?
A. I did, yes.
Q. But you would agree that in 2003, many drugs still used a wide range of raw materials from animals; right?
A. That's correct.
Q. And, in fact, still today many drugs use raw materials from animals?
A. They do. They're at risk.
Q. So, Dr. Goodnough, has albumin ever been known to transmit a viral disease?
A. To my knowledge, no.
Q. And you also testified a little bit yesterday about an ordinary scientist in 2003 and what they would have understood about a risk of what's called -- keep it simple -- "mad cow" disease; is that right? BSE --
A. It depends --
Q. Yes. All right. In May 2002, you were not aware of any cases of "mad cow" disease having been reported in the U.S. at all; right?
A. No.
Q. Okay. Let's turn then to Smelt.
So that is the second reference you relied on to argue that the invention of the '740 patent was obvious;

right?
A. Yes.
Q. Let's get Smelt up here. It's exhibit DTX 202.
And Smelt is titled -- I think you went over just a few minutes ago -- "Growth and Toxin Information by *Clostridium Botulinum* at Low pH Values"; right?
A. That's correct.
Q. We're going to call this Smelt 1982 for short?
A. Sure.
Q. Okay. So the scientists in Smelt 1982 made no attempt to purify BoNT, did they?
A. No. They were just determining whether or not the organisms would grow and produce toxin.
Q. Yeah. And Smelt 1982 was evaluating the potential of growth in canned foods; right?
A. At low pHes, yes.
Q. Okay. So it was a food safety study?
A. It was.
Q. The spores in the BoNT bacteria in Smelt 1982 were obtained in a cooked meat medium; right?
A. Correct.
Q. And cooked meat medium contains animal proteins; correct?
A. That's correct.
Q. And the spores of the BoNT bacteria in Smelt 1982

were attained on what's called neopeptone and agar; is that right?
A. That's correct, yes.
Q. Okay. Neopeptone and agar also contains animal proteins?
A. It does.
Q. Okay. And Smelt 1982 grew its BoNT culture in what's called Reinforced Clostridial Medium.
And we'll call that RCM for short; right?
A. Sure.
Q. And RCM also contains animal proteins; correct?
A. It does.
Q. Okay. So we just went through three different places in Smelt 1982 where animal proteins are used; correct?
A. Correct.
Q. And an APF process is what's claimed in Claim 8 of the '740 patent; correct?
A. That's correct.
Q. Okay. So I want to turn to a portion of Smelt. Let's look at, I guess it would be, page 79. Yes, okay.
I believe that you said on your direct testimony that the growth in Smelt was just a little bit spotty. I think that's how you characterized it; is that right?
A. I think that's what -- yeah, I think that's what I said.

Q. Okay. Well, I think Smelt itself actually says something a little stronger. Right there, Smelt actually says: "The present growth experiments were not always reproducible"; right?
A. Correct.
Q. So let's turn to your third publication that you're relying on to support your opinion that the '740 patent is obvious.
And if we can pull up Gessler DTX 192. Okay. We've got it there.
So this is a publication by Gessler and Böhnel from 1999; correct?
A. Correct.
Q. Okay. And the title of this document is: "Production and Purification of Clostridium Botulinum Type C and D Neurotoxin"; correct?
A. That's correct.
Q. And we can refer to this as Gessler 1999?
A. Mm-hmm.
Q. And I think you just acknowledged this in your direct testimony. Gessler 1999 is a reference. It was something the examiners at the U.S. Patent Office reviewed when they were deciding whether to award the '740 patent to Allergan; right?
A. That's correct.

Q. Okay. And you mentioned the patent examiner knew about it so I want to talk about that just a little bit more for the jury. So if we could turn in your binder to JTX 10A.

All right. This is an excerpt -- let me know when you're there.

A. I don't have any JTX.

Q. JTX 10A? Okay. We're going to hand up the cross binders then. My bad. I'm sorry.

MS. RUPERT: Your Honor, may we approach?

THE COURT: Yes.

BY MS. RUPERT:

Q. If you could just turn in your binder to JTX 10A and let me know when you're there.

A. I'm there.

Q. Okay. So this is an excerpt from the prosecution history of the '740 patent; correct?

A. JTX 110.

Q. Yes. It's the prosecution history of the '740 patent; correct?

A. Not in my binder.

Q. JTX 10A?

A. Oh. You said 10A?

Q. Yeah.

A. JTX 10 is a copy of my thesis.

Q. We'll get to that later.
A. Okay. So I'm there, yes.
Q. Okay. All right. So this is an excerpt of the prosecution history of the '740 patent; correct?
A. Yes.
Q. All right. And at a high level, the prosecution history, just for the jury's benefit, is kind of the back-and-forth with the Patent Office when you're getting a patent issued; right? You'd agree with that?
A. I would agree with that, yes.
Q. Okay. But I guess to clarify, you were never a patent examiner; right, sir?
A. No, I'm not a lawyer.
Q. Okay. So the document we're looking at is called the Notice of Allowance; right, sir?
A. I'll take your word for it.
Q. Okay. Well, does it say Notice of Allowance on it? I guess we could pull it up on the screen too.
A. Yeah, I see it in the upper left-hand corner now, yes. Thank you.
Q. All right. And here, if we go to the next page, the Patent Office is providing its reasons, turn one more page, for -- yes -- providing its reason of allowance kind of in the paragraph kind of halfway down that page; right?
So I want to look at what the examiner said here

about Gessler, et al. And if you look at the bottom of this page, it states there: "Specifically addressing Gessler and the chromatography he used, Gessler, et al., do not teach an animal-protein-free process of purifying a biologically active botulinum toxin using a botulinum toxin fermentation culture substantially free of animal products."

And then he goes on to say: "Purified by hydrophobic interaction chromatography and anion exchange chromatography"; correct?

A. I see that. I disagree with it.

Q. But the examiner, in issuing this patent, actually specifically called out the chromatography methods that Gessler used and said they were different; right?

A. Different, yes.

Q. So after reviewing Gessler 1999, the U.S. Patent Office still awarded the '740 patent to Allergan; right?

A. It did.

Q. Okay. So let's go back to Gessler and look at the second sentence of the abstract. So if we could pull DTX 192 back up. And I think you mentioned this a little bit on your direct.

Gessler 1999 is reporting a method for the production and purification of BoNT/C and D; right?

A. Correct.

Q. Gessler 1999 does not mention BoNT/A at all; correct?

A. That's correct.
Q. And just to remind the jurors, BoNT/A is not BoNT/C or BoNT/D; correct?
A. It's not C or D, but it's very similar.
Q. And Gessler 1999 does not mention growing BoNT/A; right?
A. Gessler '99 does not, no. Gessler is specific to C and D.
Q. Right. And Gessler does not mention purifying BoNT/A at all; right?
A. No, it does not.
Q. And BoNT/A is what's claimed in Claim 8 of the '740 patent; right?
A. That's correct.
Q. Okay. So let's look at page 362 of Gessler 1999. And we're going to look at Section 2.5 called Toxin Production.
And there, it's stated that the bacteria used to make the BoNT in Gessler in 1999 was grown in cooked meat medium; right?
A. Correct.
Q. So not hard to tell that's an animal protein; correct?
A. That's correct.
Q. All right. And then the bacteria used to make the

BoNT in Gessler '99 was also grown in a media that contained something called casein?

And casein is an animal protein too; right?

A. Casein is an animal-based protein, yes.

Q. Yeah. It's made out of milk; correct?

A. That's correct.

Q. Okay. So Gessler 1999 does not disclose BoNT/A or the removal of animal products; correct?

A. That's correct.

Q. And the APF process is what's claimed in Claim 8 of the '740 patent; right?

A. That's correct.

Q. Okay. So now we're going to turn to another document in your binder, what's been marked as JTX 117.

Just let me know when you're there.

A. Okay. I'm there.

Q. Okay. Have you seen this document before?

A. Yes, I have.

Q. And what is it?

A. It's a U.S. Patent.

Q. Okay. And what's the patent number you've got there?

A. The patent number ends in '849.

MS. RUPERT: Okay. Your Honor, I'd like to move to admit JTX 117.

MR. LAROCK: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 117 was admitted.)

MS. RUPERT: All right. And also just to take a step back, I'd like to move for admission of JTX 10A.

MR. LAROCK: No objection.

THE COURT: Admitted without objection.

(Thereupon, Joint Exhibit JTX 10A was admitted.)

BY MS. RUPERT:

Q. Okay. So turning back to JTX 117, I believe you said it's U.S. Patent Number 9,469,849. Is that what we heard?

A. Yes, that's what it is.

Q. Okay. So who's the applicant listed on this patent?

A. Revance.

Q. And who's the inventor on this patent?

A. Curtis Ruegg.

Q. Okay. So Revance applied for this patent; correct?

A. Yes.

Q. And what's the title of Revance's patent here?

A. "Methods and Systems for Purifying Noncomplex Botulinum Neurotoxin."

Q. And do you know what purification method was used in Revance's patent here?

A. Yes.

Q. And what is it generally?

A. Generally, chromatography purification.

Q. Okay. And when was this patent issued?
A. In 2016.
Q. Okay. So Revance was actually able to obtain a patent on what you described as the very old process of chromatography as recently as 2016; right?
MR. LAROCK: Objection, Your Honor. This patent is not at issue in this case.
THE COURT: All right.
MS. RUPERT: Your Honor, this patent actually goes to some issues that were placed squarely at issue in Dr. Goodnough's testimony and I'd like to proceed.
THE COURT: The objection is overruled.
BY MS. RUPERT:
Q. So let's go to column 2 and look at lines 2 -- column 2, lines 43 to 47 of JTX 117.
Do you see that? We've got it up there.
A. I see it, yes.
Q. Okay. And there in Revance's own patent Revance cites to Allergan's '740 animal free patent; right?
A. Mm-hmm.
Q. And, in fact, Revance cites to Allergen's own '740 animal-free patent as a more recent approach that involves the use of chromatography to purify botulinum toxin; right?
A. That's correct.
Q. And then Revance goes on to actually incorporate

Allergan's entire patent by reference in its own patent; correct?
A. Yeah. I'm not a lawyer, but I'll take your word for it.
Q. The words say "'740 patent which are hereby incorporated by reference"; right?
A. That's correct.
Q. Let's go to column 8 of this patent and look at lines 22 to 24 up on the screen here.
And there in Revance's own patent, Revance again cites to Allergan's own '740 animal-free patent; right?
A. That's correct.
Q. And, in fact, Revance cites to Allergan's own animal-free patent, '740 patent. And its animal-product-free fermentation procedures using BoNT cultures; correct?
A. That's correct.
Q. And then Revance, again, incorporates Allergan's entire patent by reference in its own patent; right?
A. Yes.
Q. So it's fair to say that Revance is citing Allergan's contribution here; correct?
A. Yes, that's correct.
Q. Dr. Goodnough, do you think Revance's citation of Allergan's patents here is copying?

A. No. It's just a citation.
Q. Let's go on to a different Allergan patent. Let's turn to your opinions on the '748 patent.
Dr. Goodnough, is it your opinion that after reading the two references you discussed on your direct that the invention of the '748 patent would have been obvious to an ordinary scientist?
A. Yes, it is.
Q. And that's your opinion because it would have been obvious to an ordinary scientist that the '748 patent would have been invalid; correct?
A. That's correct.
Q. The first reference you talked about today is something called Malizio 2000?
A. Yes. Carl Malizio is a lab mate of mine.
Q. And you are the named coauthor on Malizio 2000; right?
A. That's correct.
Q. So the Malizio 2000 reference was also something that the examiners at the U.S. Patent Office reviewed when they were deciding whether to award the '748 patent to Allergen; right?
A. That's correct.
Q. And after considering Malizio, the Patent Office concluded the invention of the '748 patent was new and not

obvious and awarded the '748 patent to Allergan; right?
A. That's correct.
Q. Okay. So after reviewing the Malizio -- strike that.
The process you used in Malizio 2000 was not animal-protein free; right?
A. The purification process was animal-protein free.
Q. So let me ask you that question again, sir.
The process you used in Malizio was not animal-protein free; correct?
A. The purification process was animal-protein free, ma'am.
Q. So -- but you would not agree with me that the process was animal-free; is that correct?
A. The process described in Malizio did use animal products as the fermentation medium, yes.
Q. Let's go back to your deposition in this case. Okay, sir?
A. Sure.
Q. You were deposed again in this case, to remind the jury, on May 31, 2024; right?
A. Yes.
Q. And at the deposition, you were asked questions and you testified under the same oath to tell the truth that you swore to tell today; right?
A. Correct.

Q. We're going to turn now to your deposition. We're going to go to page 122, lines 8 through 12.

MS. RUPERT: And if could you please play what Dr. Goodnough said in response to this question at his deposition.

(A video was played.)

BY THE ATTORNEY:

Q. (Audio interruption) -- 2000 is not animal-protein free; right?

THE WITNESS: It is not animal-protein free.

(The video ended.)

BY MS. RUPERT:

Q. So let's move on. Let's turn to page 27 of Malizio 2000 and let's look at the end of the first paragraph under introduction.

So at the end of that first paragraph, you and your coauthor state: "The procedures described in Malizio 2000 are not those used for preparation of botulinum toxin for medical use."

Right?

A. That's correct. At the time, the preparation for medical use were -- were purified using a different purification method.

Q. The methods described in Malizio 2000 were not approved by the FDA for production of a pharmaceutical toxin

right?
A. In 2000, no, they weren't.
Q. Let's pull up your demonstratives from yesterday. That's DTX 517.
And I believe you described this, what's shown here, as your recipe in your Malizio cookbook; right?
A. That's correct.
Q. I noticed here in your slide on the right you crossed off "substantially animal-product-free process" in the Claim 1 of the '748 patent; right?
A. That's correct.
Q. I think you might have skipped the first step in your recipe, Dr. Goodnough. If we zoom in to 2.1 right there and look at that step -- we're going to make this a little bit more clear. Why don't we pull up the actual exhibit. It was fuzzy in what you showed.
If we look at this step, it clearly states that you used casein in your process; right?
A. The production of the neurotoxin was done on an animal product-containing medium. But the purification process was animal-protein free.
Q. But you used, as we can see right here with our own eyes, an animal protein in the media as part of your entire recipe?
A. For the toxin production, ma'am, yes.

Q. And you don't suggest anywhere in Malizio 2000 that animal proteins should not be used in the manufacture of botulinum bacteria; right?
A. Yes, this was describing research production.
Q. And you also testified yesterday that the level of residual nucleic acid in Claim 8 -- maybe it was today -- is obvious given certain statements made in Malizio 2000; right?
A. That's correct.
Q. But you don't report anywhere in the Malizio publication the amount of nucleic acid in the BoNT that was made using the process you describe in Malizio 2000; right?
A. No, we don't.
Q. Let's turn now briefly to Xiang 669. That's the second publication you're relying on to support your opinion that the '748 patent is obvious. Let's pull that up here. And that is exhibit -- I think it's JTX 004. Let's look at that. No, it's not. There we go.
We're going to talk about this for a little while now. Xiang 669, it's the publication of Allergan's '740 patent that you testified about earlier today; right?
A. That's correct.
Q. So Xiang or Allergan's '740 patent was something the examiners at the Patent Office did review when they were deciding whether to award the '748 patent to Allergan;

right?
A. Yes. It's in the references.
Q. And after considering Xiang 669, the Patent Office concluded the invention of the '748 patent was new and not obvious and they awarded the patent to Allergan; right?
A. That's correct.
Q. So Allergan's '669 patent application, which is also the '740 patent, does not disclose a process where 150 kDa BoNT/A is purified via binding to an AEX column followed by a CEX column; correct?
A. That's correct.
Q. And the use of an AEX column followed by a CEX column is what's claimed in Claim 8 of the '748 patent; right?
A. That's correct.
Q. So now we're going to switch topics a little bit. We're going to talk about residual nucleic acid. That's the DNA, RNA.
MS. RUPERT: Let's bring up, if you could, Mr. Campos, Claim 8 of the '748 patent.
BY MS. RUPERT:
Q. In Claim 8 of the '748 patent that we've got up there, it says that BoNT that is made using its process contains no more than one part of residual nucleic acid per million parts of the botulinum neurotoxin; correct?
A. That's correct.

Q. Dr. Goodnough, just to level set here, if chromatography is being used to purify a given material, the purity of what goes into the column is going to impact the purity of what comes out of the column; correct?
A. That is true, yes.
Q. And the conditions that are used in the columns can also impact the purity of the end product; right?
A. That's true, yes.
Q. And you would agree that parts of the BoNT manufacturing process other than AEX chromatography actually do remove a lot of nucleic acid; correct?
A. That's correct.
Q. For example, something called depth filters, we referred to them as coffee filters, those do remove a lot of nucleic acids as part of the removal of cell debris; right?
A. That's correct.
Q. And other techniques, too, used in the purification process like precipitation and centrifugation can also remove a lot of nucleic acids; right?
A. That's correct.
Q. So, Dr. Goodnough, in this case, you haven't conducted any analysis of the levels of residual nucleic acids after purification by various manufacturing processes that utilize anion exchange chromatography; right?
A. We have not. We didn't have to.

Q. You didn't have to?
A. No.
Q. And likewise you just knew; right?
A. Yeah. The literature stated --
(Cross-talk.)
BY MS. RUPERT:
Q. And likewise you'd agree that you have not shown that various manufacturing processes achieve a level of 1 nanogram or less residual nucleic acid for 1 milligram of toxin; right?
A. That's correct.
Q. That amount I gave, to kind of translate it, 1 nanogram or less of residual nucleic acid per 1 milligram of toxin, that's equal to 1 PPM that we have up there on the claim; right?
A. That's correct.
Q. So you haven't done that analysis.
And then, in fact, the only place, the only place that you could actually find a level of less than 1 PPM to point to was in Allergan's own internal documents which we have marked as JTX 17; right?
A. That's correct.
Q. So let's pull JTX 17 back up on the screen. I'm only going to show the first page here so we can avoid sealing the courtroom again.

But this process here that we pulled up, this refers to the use of DS2; right?
A. That's correct.
Q. And I believe you testified yesterday that DS2 is Allergan's own chromatographic purification procedure for botulinum toxin; right?
A. That's correct.
Q. And that's the process of Allergan's invention; right?
A. The chromatographic purification.
Q. Yes. That's the process --
So just to be clear for the jury, the only documents with actual numbers that you are pointing to in this case for your argument that using an AEX will also result in less than 1 PPM of residual nucleic acids, they are highly confidential, restricted access, internal Allergan documents that use the process of '748 patent itself; right?
A. That's correct.
Q. So just a few more references and then we'll be done.
Dr. Goodnough, you testified today -- actually it was yesterday -- regarding U.S. Patent Number 5,756,468; right?
A. Yes.
Q. And we can agree to call this the Johnson '468

patent; correct?
A. That's correct.
Q. And I think you testified to one of the inventions of the Johnson '468 patent; correct?
A. Yes, I am.
Q. So the Johnson '468 patent, just to keep this clear for the jury because I think it's getting jumbled, that is not one of the five records you relied on today in coming to your opinion that Allergan's manufacturing patents are invalid; right?
A. It's a reference I relied upon yesterday, yes.
Q. Well, it's not part of your primary obviousness combinations, is it?
A. No, it's not.
Q. Okay. So let's turn to column 3 of the '468 patent and focus on lines 22 to 27. All right.
Okay. So you're reporting there that you used casein to grow your BoNT culture; is that right?
A. That's correct.
Q. Okay. So the BoNT in Johnson '468 was grown using animal proteins; right?
A. That's correct.
Q. And you don't say anywhere in the Johnson '468 patent that an ordinary scientist should not use animal proteins to manufacture BoNT bacteria, do you?

A. No. We were doing research production here, not pharmaceutical-grade production.
Q. Okay. So in this patent in 1996, you weren't seeking to avoid animal proteins; right?
A. No. We were doing research.
Q. Okay. And, in fact, almost all of your work was done using casein, which as we've been confirming throughout the day, that's an animal protein; right?
A. Most of my work was researched-based, yes.
Q. So, Dr. Goodnough, you didn't measure or report the levels of residual nucleic acids that were present in the BoNT made by your process in the '468 patent, did you?
A. No, we really didn't adhere to the process but we knew the nucleic acid was there.
Q. Okay. But you didn't report any particular level of nucleic acids; right?
A. No, we did not.
Q. Okay. So in reading this, an ordinary scientist would not see any level of nucleic acids below 1 PPM reported; right?
A. There was nothing reported, ma'am.
Q. Okay. And so let's pull up a demonstrative you used yesterday, DDX 5.14.
Okay. So in this demonstrative, you showed your patent on the left and Allergan's patent on the right;

right?
A. That's correct.
Q. Okay. So but sitting here today, you're not offering an opinion that the Johnson '468 process on the left, which does use animal proteins, is the same as the process of Allergan's '748, which does not use animal proteins; are you?
A. The purification processes are identical, ma'am.
Q. I'm saying, though -- what I'm saying is: You're not actually offering an opinion here that a process that uses animal proteins is identical to a process that does not; correct?
A. What I'm stating here is that the purification --
Q. Sir, I'd ask that you answer my question.
MR. LAROCK: She keeps interrupting him, Your Honor.
BY MS. RUPERT:
Q. This is the time --
THE COURT: So you can't cut him off because we can't write down two people speaking at once. So let him finish the answer.
MS. RUPERT: Okay. I can move on.
THE COURT: Okay.
BY MS. RUPERT:
Q. Okay. So looking at this reference, this is what you

showed the jury yesterday. And on the left here, I actually didn't see citations, but there are snippets here from the Johnson '468 patent; right?
A. Yes, they are.
Q. Okay. And you don't disagree that the Johnson '468 was actually cited in the '748 patent specification; right?
A. It was cited.
Q. It was. So let's go look at where that was cited. So if you could pull up the '748 patent and we can look at column 45, lines 25 to 26.
Okay. And Johnson's cited right there; right?
A. That's correct.
Q. Okay. And then the portion of Johnson that you show on your slide -- and maybe we can zoom out and share that. Yeah, let's just go up a little bit. Yep. And maybe the prior paragraph too. That's perfect.
Okay. So the portions of Johnson that you cited on your slide, some of those are actually contained in the paragraph immediately preceding the citation to Johnson; right?
A. Mm-hmm.
Q. Okay. But in your slide, you actually didn't include the Johnson citation, did you?
A. No, I did not.
Q. Even though they were just ten lines away; correct?

A. I did not, no.
Q. Okay. All right. So, sir, I just want to talk a little bit about your thesis since we've mentioned it. Your thesis is not one of the five references you relied on today in coming to your opinion that Allergan's manufacturing patents are invalid; right?
A. No, it's not.
Q. Okay. And in your thesis, you didn't use animal-free protein media; right?
A. Nope, it was strictly research grade.
Q. Okay. And you also don't suggest in your thesis there are any disadvantages to using animals proteins in the manufacture of BoNT, do you?
A. Not for research, ma'am, there aren't.
Q. And you also didn't report on any levels of residual nucleic acids following the chromatography process in your thesis; right?
A. No, I did not.
Q. Okay. Last reference.
So, Dr. Goodnough, on direct, you testified regarding a reference called DasGupta, which was JTX 111; right?
A. I did, yes.
Q. And DasGupta is also not one of the five references you relied on today in coming to your opinion that

Allergan's manufacturing patents are invalid; right?
A. No, ma'am, it's just prior art.
Q. Okay. So if we go to page 416 of DasGupta and look at the culture medium he uses, he uses animal proteins in his process; right?
A. He does. He's working with research grade too.
Q. And DasGupta does not report the levels of nucleic acids in the product resulting from his process; correct?
A. No, I don't believe he did.
MS. RUPERT: Okay. I have no further questions.
THE COURT: All right. Mr. Larock, any redirect?
MR. LAROCK: Yes, please.

REDIRECT EXAMINATION

BY MR. LAROCK:
Q. All right. Doctor, you were asked on cross-examination about your use of animal proteins in preparing botulinum toxin; correct?
A. Yes, I was.
Q. Have you published on the use of animal proteins?
A. Multiple times, yes.
Q. Let's pull up JTX 123.
And while that's happening, you've also published on the risks associated with animal products --
A. Yes, I have publishing on that as well.

Q. And, Doctor, can you see the slide on the screen?
A. Yes, I can.
Q. "Stabilization of Botulinum Toxin Type A During Lyophilization."
And you're an author?
A. Yes, I am.
Q. Do you recall this reference?
A. Yes, I do.
Q. When was it published?
A. 1992.
Q. All right. Let's --
MS. RUPERT: Your Honor, this is outside the scope of his report.
MR. LAROCK: She repeatedly brought up Dr. Goodnough's use of animal proteins in his thesis and this Johnson patent --
MS. RUPERT: He has not offered any opinions --
THE COURT: You've got to let him finish talking.
MS. RUPERT: Sorry, Your Honor.
THE COURT: So what's the relevance of this?
MR. LAROCK: I think that she was trying to suggest that Dr. Goodnough doesn't actually believe that a person of ordinary skill should move away from animal proteins because he kept using animal proteins.

THE COURT: All right. I'll allow you for the limited purpose that you just offered.

MR. LAROCK: Let's go to the last page of JTX 123. One back. And zoom in on the last paragraph. The last full paragraph, so one up. Highlight the first sentence.

BY MR. LAROCK:

Q. So, Doctor, this was a paper that you authored in 1992?

A. Yes, it is.

Q. And can you read the first sentence for us?

A. Yes. "Although HSA, human serum albumin, is currently used in commercial practice and may be desirable to use another protein, or lower excipient and ingredient for toxic stabilization since certain unknown contaminants may be present in the human blood protein."

Q. And what were you trying to convey with that sentence?

A. I was trying to convey the idea that seven years before the FDA pointed it out that it was well known in the scientific community that there was a risk from using animal-based products, and that risk is that there are certain contaminants in those products.

And if you use them in the manufacture of pharmaceutical-grade material, there is a risk that you're

going to carry them through into the final product.

And again, I go back to the idea that -- the idea being that Creutzfeldt-Jakob disease, which was described at length in this proceeding, the infectious dose of that is one single particle. One.

MR. LAROCK: Your Honor, I'd like to move JTX 123 into evidence.

THE COURT: For the limited purpose that I've allowed it, which was to show that he made this statement a long time ago, I'm not going to admit it for that.

MR. LAROCK: Okay.

BY MR. LAROCK:

Q. So Doctor, why did you continue to use animal proteins even after the statement that you made in 1992?

A. Well, basically, because what I was continuing to do from that point on was still research with respect to research manufacture for botulinum toxins.

We know they're not going to be used in people, so there's no risk in using animal-based products for the production of those materials.

Q. And on cross-examination, you were also asked about the Xiang patent application; correct?

A. Correct.

Q. That was JTX 113. Let's bring that up.

And you were asked about prior art processes

that you were able to obtain or not able to obtain 1 part per million residual nucleic acid; correct?

A. Correct.

Q. Let's go to Example 11. It's on page 29.

So this is the Xiang patent application that you used?

A. That's correct.

Q. That was prior art to Allergan's '748 patent?

A. Yes, it is.

Q. What's shown in Example 11 here?

A. Example 11 shows the use of anion exchange chromatography and cation exchange chromatography.

MS. RUPERT: Your Honor, objection. This is also outside the scope of his report. And I believe he's trying to get back in some math that they had agreed to drop in his demonstratives.

So I would object to this as something we've already resolved and also an opinion outside the scope of his report.

MR. LAROCK: They've opened the door, Your Honor, on cross-examination repeatedly asking him whether there were prior art processes that were able to obtain 1 part per million residual nucleic acids.

MS. RUPERT: And if he had that opinion, he should have included it in his report.

THE COURT: All right. Well, it did come up on cross-examination and I'm going to allow it.
BY MR. LAROCK:
Q. So in paragraph 27 -- or sorry, 274, there's a reference in -- three lines up from the bottom: "APF methods for obtaining highly purified botulinum toxin complex."
So these are APF methods, Doctor?
A. Correct.
Q. And this is in the Xiang patent application that's prior art to Allergan's '748 patent; correct?
A. Yes, it is.
Q. And what's shown here in Example 11 in terms of how the botulinum toxin is being purified?
A. Anion exchange chromatography and cation exchange chromatography.
Q. So it's chromatography methods?
A. Chromatograph, yes.
Q. Let's zoom in on the second item. There's butyl, Q, and then SP. Do you see that?
A. Yes, I see that.
Q. What is Q?
A. Q is an anion exchange column.
Q. That's an anion exchange column. What is SP?
A. SP is an cation exchange column.

Q. So a anion exchange column in Q to a cation exchange column in SP?
A. That's correct.
Q. And those are the same columns that are used in Allergan's '748 patent; correct?
A. Yes, they are.
Q. If you look at paragraph 279, last sentence it says, "The results were summarized in Table 6."
Those are the results of these purification processes?
A. That's correct.
Q. So if you bring up Table 6. This is Table 6 titled, "Quality Summary of Toxin Samples Purified by Different APF Processes 1.4 Above."
MS. RUPERT: Your Honor, I'd like to renew my objection. This, again, is far outside the scope of his report. We objected to demonstratives about this. They dropped the objections. As he's testified and he hasn't done any of these calculations before. He also testified to that in direct. This is fully new in the moment right now and I don't think he should be able to testify about it.
THE COURT: Mr. Larock, what do you have to say about that?
MR. LAROCK: Your Honor, this goes to the cross-examination where he said no prior art methods or

questions whether prior art methods were able to obtain residual nucleic acids below one part per million.

MS. RUPERT: I think he gave clear a no.

THE COURT: I'm going to allow it. The objection is overruled.

BY MR. LAROCK:

Q. So in the middle of the Table 6 we see PicoGreen DNA assay. Doctor, what is that?

A. A PicoGreen assay is just a dye-based assay. It's a resin acid we use to quantitate the amount of nucleic acids that are present.

Q. And DNA is looking at what or the DNA assay is looking at what?

A. The DNA assay is looking for residual nucleic acids.

Q. If we follow that row across it says 2 to 6 NG/ML. Do you see that?

A. I do.

Q. What is NG/ML?

A. NG/ML is the amount of residual nucleic acids that are actually being detected or quantitated in the examples shown before this.

Q. NG stands for what?

A. Nanograms.

Q. And slash ML stands for what?

A. Per milliliter.

Q. This is 2 to 6 nanograms per milliliter?
A. Correct.
Q. How does that relate to the part per million?
A. It's completely analogous to the math we saw with Dr. Bates's testimony. This is actually 0.002 parts per million and 0.006 parts per million. That is to say three orders of magnitude, 10, 100, 1,000 times less than one part per million.
Q. So to summarize, we have the Xiang patent application that was published before Allergan's '748 patent?
A. Correct.
Q. And the APF process using anion exchange chromatography, cation exchange chromatography, that gets well below one part per million residual nucleic acid?
A. Much less than one part per million.
MR. LAROCK: No further questions, Your Honor.
THE COURT: All right. Do you want to ask anything more, Ms. Rupert?
MS. RUPERT: Your Honor, can we pull this up on the screen.

RECROSS-EXAMINATION

BY MS. RUPERT:
Q. So, sir, I believe you testified -- here we go. You provided a little bit of testimony just now on your redirect about a certain calculation you saw in the patent, so I'd

like to walk through that. We got this map that you did up here to get to these low amounts you said were reached. But I want to look at this because I think -- because I have some follow-up questions for you on it. Just a second. Let's do this on the fly.

So essentially, if you look at the patent itself and this Table 1, I think, where you got the 2 to 4 amounts from, actually it was Table 6, the lower end of the concentration. If we could pull up the '748 patent next to this table. The '748 patent.

MS. RUPERT: Is that possible, Roy, to get the '748 patent up there?

BY MS. RUPERT:

Q. So let's go to Table 6 where you found the amount you used in this calculation here. I think it was 2 nanograms, the lower end of the concentration in Table 6; is that correct, sir?

A. 2 nanograms per milliliter.

Q. Let's talk about that per milliliter. Per milliliter of what?

A. Whatever the buffer was. I assume it's water.

Q. Yeah, per milliliter of water. What does parts per million stand for?

A. Parts per million of.

Q. BoNT; right?

A. Toxins.
Q. Let's look at your calculation and pull the demonstrative up on the screen again. We have 2 nanograms there on the top per 1 milliliter of water; right?
A. That's correct.
Q. We have nucleic acids in water; that's true?
And then multiply it to get to this PPM amount, I believe, by the density of water; that's correct?
Right?
A. That's I what used.
Q. And convert the grams to milligrams there; right?
A. That's correct.
Q. So parts per million, I think you testified, is parts of BoNT; right? Per million parts of BoNT?
Sir, looking at this equation I only see water. Where is the BoNT?
A. I'm assuming in that assay that you're assaying the toxin.
Q. You're assuming, but there's nothing that indicates that you are assaying it; right?
A. You're giving the results of that example above, which was chromatographic purification of something. I'm assuming you're assaying what came out of the purification procedure.
Q. You're assuming, but you don't know. And in truth,

when we look at the calculation, it's only in water; right?
A. I'm assuming you're assaying the parts per million of the toxin because that's what you're describing in the example above.
Q. But your calculation itself uses water. There's no toxin in the calculation.
A. The assumption is in the report that's in that table.
Q. And it's only an assumption, sir; correct?
A. It's my opinion that you're assaying the toxin.
Q. With no basis. You can't point to the toxin; right? There's no toxin in your calculation.
A. No, there's no toxin in the calculation.
MS. RUPERT: No further questions.
THE COURT: Dr. Goodnough, thank you. You may step down. Watch your step.
MR. PICKARD: Your Honor, we call Dr. Suryanarayanan.
THE COURTROOM DEPUTY: Would you please state and spell your full name for the record.
THE WITNESS: Raj Suryanarayanan, R-A-J S-U-R-Y-A-N-A-R-A-Y-A-N-A-N.

RAJ SURYANARAYANAN,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. PICKARD:

Q. Good morning, Doctor.

THE COURT: Mr. Pickard, good morning. Just making sure the court reporter knows who you are.

MR. PICKARD: Byron Pickard on behalf of Revance.

BY MR. PICKARD:

Q. Good morning, Doctor. Could you please identify yourself for the jury.

A. Yes. My name is Raj Suryanarayanan. I go by Sury.

Q. May we refer to you today as Dr. Sury?

A. Yes, that would be fine.

Q. Thank you. Dr. Sury, did you bring any items with you to assist with your testimony?

A. Yes, I did.

Q. What were those, what are those?

A. Those are the explanations for my --

Q. The slide presentation we see here?

A. Yes.

Q. At a high level could you tell the jury what you're prepared to discuss today?

A. I'm here to enter my opinion that Claim 6 of the '878 patent is invalid as obvious.

Q. All right. If we could go to the next slide. Could

you preview for the jury what you plan to discuss during your testimony today, please.
A. Sure. So I have three things. The first one is my qualifications and background. And then the obviousness of Claim 6 of the '878 patent and then, finally, my rebuttal to Dr. Schoneich's validity opinions and opinions on unexpected results.
Q. You're talking about different patents than we just heard from Dr. Goodnough; right?
A. Repeat the question.
Q. We're talking about a different patent than we just heard from Dr. Goodnough; correct?
A. That's correct, yes.
Q. That's the '878 patent?
A. That's the '878 patent.
Q. Can you briefly remind the jury what the '878 patent is about.
A. If we look at the highlighted section on the right column, the '878 patent is concerned with that animal-protein-free method to stabilize the botulinum toxin, and this composition comprises of a surfactant and a disaccharide and this final product would be suitable for intramuscular or subcutaneous administration.
Q. Let's touch a little bit on your qualifications and background, Dr. Sury. What area of science have you focused

your work in?
A. I have focused my work on what is referred to as pharmaceutical material science. And this area is concerned with the science behind converting a drug substance into a pharmaceutical drug product such as a tablet, capsule, or injection.
Q. About how long have you been working in the field?
A. I've been working for about 45 years.
Q. Where are you employed today?
A. I am a professor and head of the Department of Pharmaceutics at the University of Minnesota in Minneapolis.
Q. Do you maintain a research laboratory there?
A. Yes, I do.
Q. What's the focus of the work inside that lab?
A. My lab is mainly concerned with the bromating of formulation science. We are interested in the science behind converting a drug substance into a drug product.
Q. And have you published in the area of pharmaceutical material science?
A. Yes, I have.
Q. What do we see here, Doctor?
A. I have over 200 peer-reviewed publications, and what we have here is some recent representative examples from work in the area of formulations.
Q. How does your research in the field of pharmaceutics

relate to the '878 patent?
A. The '878 patent is concerned with converting the toxin into an injectable product, and my research is also concerned with the science behind converting a drug substance into a drug product.
Q. In your experience, have you done work on injectables?
A. Yes, we have.
Q. Has that work included work with large proteins?
A. Yes, it has.
MR. PICKARD: Your Honor, we offer Dr. Sury as an expert in the area of pharmaceutic formulation development and protein formulations.
MR. DITTMANN: Your Honor, we have an issue relating to the POSA definition of person of ordinary skill in the art that would come out in terms of Dr. Sury's experience. But for this broad purpose that was stated, we don't have an objection.
THE COURT: You may proceed.
BY MR. PICKARD:
Q. Doctor, if we could turn to the second item in the topic you plan to discuss, can you tell the jury what that is.
A. Yes. This is the obviousness of Claim 6 of the '878 patent.

Q. Can you go to the next slide.
Briefly explain to the jury what you considered in doing your obviousness analysis.
A. The obviousness analysis has four components. The first one is to see the level of ordinary skill in the art. And the second one would be the scope and content of the prior art. The third is differences between the prior art and the patent claims. And finally, objective indicia of nonobviousness.
Q. Let's start with the first one, the level of ordinary skill in the art. Perhaps we can start with the time period which that perspective was done.
A. It was done within the time period of October 2005 when the provisional application was filed.
Q. That date's a little bit later than the invention date; correct?
A. Yes.
Q. What do you know the invention date to be?
A. About a year later.
Q. Is there any difference in the level of skill in the art as between October 2005 and the invention date you just mentioned?
A. No, there is not.
Q. In your view, what is the appropriate level of skill in the art in that time period?

A. The skill in the art is outlined here. I just read the high points. The first one would be POSA would have an advanced degree such as a master's or Ph.D. It would be in a variety of areas including biochemistry, pharmaceutical science, or related discipline. The person would have several years of experience with protein compositions and it would include the preparation and purification, catheterization, and finally the formulation of such compositions. If the POSA has a lower level of pharma education, that would be compensated by a longer period of experience.

MR. PICKARD: If you can move ahead, Mr. Bell. See these two items are highlighted --

THE COURT: I'm sorry. Before you go on.

Do you think you meet the definition that you've just given of being a person of ordinary skill in the art?

THE WITNESS: Yes, I do.

BY MR. PICKARD:

Q. Two of the next items are highlighted. Can we discuss those together?

A. Yes.

Q. All right. So what did you do next in your obviousness analysis, Doctor?

A. I looked at the prior art in this area and then looked at the difference between the patent claims and the

prior art.
Q. Were there any references, in particular, that you considered in that analysis?
A. Yes, two references that I considered are in the stream here. On the left is the Hunt publication and on the right is the Johnson patent.
Q. Just for the jury's benefit, the Hunt reference has been admitted as DTX 209; is that right?
A. That's correct.
Q. If you could turn to DTX 468, please.
Do you recognize that?
A. Did you say 468?
Q. Sorry. DTX 207.
A. 207 is the Johnson patent.
Q. That's the Johnson reference you just mentioned?
A. Yes, it is.
MR. PICKARD: Your Honor, we move DTX 207 into evidence.
MR. DITTMANN: That one might be in already, but no objection.
THE COURT: They're admitted if they haven't already been.
(Thereupon, Defendant's Exhibit DTX 207 was admitted.)
BY MR. PICKARD:

Q. Let's focus on Hunt for a moment. When do you understand the Hunt reference published?
A. June of 2003.
Q. And when was Hunt filed?
A. Hunt was filed November of 2002.
Q. Thank you.
If you can look to the Johnson reference. When did the Johnson reference publish?
A. 1998.
Q. Thank you.
And of those dates, how do they relate to the filing date of the '878 patent?
A. They were both done before the '878 patent.
Q. And with respect to the invention date of that patent?
A. They were both before that date.
Q. And you understand that the Hunt and Johnson reference -- do they qualify as prior art, to your understanding?
A. I believe they qualify.
Q. You were present when Mr. Terrence Hunt testified, I believe, on Tuesday; correct?
A. I was present when Mr. Hunt testified.
Q. So the Hunt publication we see here, is that the same Hunt, to your understanding?

A. Yes, it is the same Mr. Hunt.
Q. Do you understand whether it's appropriate to use an inventor's own work as prior art?
A. Yes. I understand an inventor's own prior art can be used to invalidate later work.
Q. Thank you for that.
For the sake of completeness, are you aware of whether Hunt and Johnson are listed on the face of the '878 patent?
A. I believe they are listed.
MR. PICKARD: If we can pull up JTX 01, please.
BY MR. PICKARD:
Q. Do you recognize this document, Dr. Sury?
A. Yes, I do.
Q. What is that?
A. This is the front page of the '878 patent.
MR. PICKARD: If you look in the right hand and zoom out a little bit, Mr. Bell.
BY MR. PICKARD:
Q. If you look at references cited.
Do you see that?
A. Yes, I do.
Q. What do you understand that list of items under references cited to be?
A. These refer to the references that are considered by

the inventor.

Q. Now, if you look at the bottom, if you look at the second page of the patent, you'll see additional references.

A. I do.

Q. And it continues to page -- the following page. What do we see here, Dr. Sury?

A. Huge list of references.

Q. All right. I don't want you to share the dates, but do you understand for about how long the '878 patent was in prosecution?

A. I believe that it was a few months.

Q. And in your -- did you review --

MR. DITTMANN: Your Honor, I'm sorry. I'll object.

THE COURT: So I think it's irrelevant, so I'm going to sustain the objection.

MR. PICKARD: We'll move on.

MR. DITTMANN: Thank you, Your Honor.

BY MR. PICKARD:

Q. You understand that Hunt and Johnson were cited on the face of the patent; correct?

A. Yes.

Q. Let's turn to what the Hunt reference is about. At a high level, let's summarize it.

In your review of the Hunt reference, did you

determine whether it disclosed the elements of the '878 patent?
A. Yes, it did.
Q. What do we see here, Doctor?
A. What we have here highlighted in purple is all the elements of '878 that were referenced in the earlier Hunt publication.
Q. Are you prepared to step the jury through your analysis as to how each of those claim features we found in the Hunt reference?
A. Yes, I am.
Q. We'll do that in a moment.
Some of the claim is not highlighted. Did you find those elements in your review of the prior art?
A. Yes.
Q. So what --
A. What was not highlighted earlier is now highlighted in pink. It is the use of disaccharide and specifically the use of trehalose in the Johnson patent.
Q. So at a high level for the jury, what is the Hunt prior art reference about?
A. The Hunt prior art reference is about a botulinum toxin formulation that is free of animal-derived proteins and it consist of the toxin and recombinant albumin.
Q. What is recombinant albumin?

A. Recombinant albumin is albumin that has been prepared using bacteria from general cancers.
Q. Did the Hunt prior art reference, did it report an investigation of the stability of the compositions that are described there?
A. Yes, it did.
Q. You'll see here at example 3, what's disclosed in the Hunt here?
A. What is disclosed here is the stability of the formulation that has been stored at minus five degrees centigrade, so it's under freezing conditions and -- for six months and then the product was reconstituted and the potency was determined.
Q. If you turn to Johnson. What is the Johnson prior art reference about, Dr. Sury?
A. There are two key features in the Johnson reference. Our highlight talks about the use of trehalose in the formulation leading to the activity of more than 80 percent, so higher than.
And the bottom highlight talk about the fact that by adding trehalose, you get an increased shelf life at a higher temperature. For example, the product can now be stable for up to six months at 37 degrees centigrade.
Q. Did you see anything else in Hunt in your review in terms of its stability reports? Sorry, Johnson.

A. So what we have here highlighted in Table 2 of Johnson is the stability of the toxin when used with BSA and trehalose. If you look at the bottom part of the highlight, at 37 degrees centigrade following storage 125 days, you'll get a reliability of 90 percent, reflecting a very high stability of the protein even when stored at a fairly high temperature.
Q. There's several references to BSA. What is BSA that we see here in Table 2?
A. BSA is bovine serum albumin.
Q. And how does bovine serum albumin relate to human serum albumin?
A. Bovine serum albumin is albumin that is obtained from cows. Human serum albumin refers to albumin where the human is the source.
Q. Hunt's composition, I think you said, is recombinant albumin?
A. Correct.
Q. How does Hunt's use of recombinant albumin inform your opinion in view of the Johnson reference of the reported use of the animal-derived albumin?
A. So when we look at the bovine serum albumin versus the recombinant human serum albumin, we do expect some structural differences. But with respect to their properties of stabilizer of protein, we expect them to be

substantially similar.
Q. Let's turn to the topic of motivation to combine and take that down for a moment.
Why, in your view, would a person of skill in the art have combined Hunt with Johnson?
A. As we saw earlier, Hunt provides data for stability, but the constraint is the product would have to be stored under freezing conditions. And Hunt's formulation contains recombinant human serum albumin.
On the other hand, Johnson has shown room temperature stability for the albumin-containing toxin formulation. And the way Johnson accomplished that was using trehalose, which is a material that has a long history of being used for protein stabilization.
Q. And what do you base your view on that there's a long history of the use of trehalose as a stabilizer?
A. For this purpose if you look at the literature, there is a seminal publication that Carpenter put out in 1996 which talks about the stabilizers used to freeze-dry protein formulations.
Q. Dr. Sury, if you could turn to DTX 179, please.
A. I'm there.
Q. Do you recognize that?
A. Yes, this is the Carpenter publication.
Q. The one you just mentioned a moment ago?

A. Yes.

MR. PICKARD: Your Honor, we move into evidence DTX 179.

MR. DITTMANN: No objection.

THE COURT: Admitted without objection.

(Thereupon, Defendant Exhibit DTX 179 was admitted.)

BY MR. PICKARD:

Q. Can you the show where in Carpenter you found support for your opinion that there was a long history of trehalose being used as a stabilizer?

A. Sure. So the title of this article is "How to Design Stable Lyophilized Protein Formulation," "lyophilized" meaning freeze-dried protein formulations. When we make this protein formulations, because the protein can be destabilized during the freeze-drying process, we need stabilizers. And the upper highlight talks about the numerous compounds that were tested, and among them disaccharides were found to be the most effective stabilizers.

And the bottom highlight talks about within the disaccharides, the main products are sucralose and trehalose, and these compounds have been observed to be effective at protecting proteins during freezing and also during the drying stage. In other words, during the entire

freeze-drying cycle. The references here talk about substances that scientists have achieved using this, true.

THE COURT: Mr. Pickard, this may not be the best time. Should we take our midmorning break now? Or if you have a couple of questions then it would be better.

MR. PICKARD: I've have three or four questions on this topic and then a break would be perfect.

BY MR. PICKARD:

Q. Dr. Sury, why, in your view, would the ability to store botulinum toxin formulations at higher temperatures have been beneficial?

A. If we follow Hunt's and idea and have the formulation stored under freezing, we run into the challenge of maintaining cold chain. The product would have to be always stored frozen. It would have to be transported frozen. So the cold chain can pose a challenge with respect to maintaining the stability.

The improvement provided by Johnson enables us to store the product at room temperature. Now we have much more flexibility with respect to the transport, manufacture, and use of the product. The fact that the product can withstand even a higher temperature of 37 means if during transport, if the product accidently undergoes an excursion in temperature, if there's any raise in temperature, the product will continue to be stable because of the stability.

Q. Have you formed an opinion whether a skilled person would have had a reasonable expectation of success in combining Hunt and Johnson?
A. Yes, I do.
Q. And what is your basis for that conclusion?
A. This conclusion is based on the fact that trehalose has a long history of being an effective stabilizer of protein formulations, so a person skilled in the art would be motivated to use it as a stabilizer.

THE COURT: Members of the jury, we'll take a 15-minute break. Let's take a the jury out.

(The jury exited the courtroom.)

THE COURT: Everyone please be seated. Dr. Sury, you can step down.

I just want to address something now so as what I'm thinking of doing, what I should be doing. There's time to actually do it, which is Dr. Goodnough, the testimony at the end, there was some dispute about -- with his nanogram calculation. I let it in even though my understanding was that this is actually not disclosed in his reports; is that right?

MS. RUPERT: That's correct.

THE COURT: Is that right?

MR. VARUGHESE: Yes, that's right.

THE COURT: So I'm going to let -- so I let it

in because I thought the cross-examination had raised it in a way that it would be fair to let it in. But I'm perfectly prepared to let the plaintiff have their expert, who's going to testify later, testify on the same thing, which I presume the expert didn't write in a report either. And so I wanted to say this now so that plaintiff had a chance to talk with whichever the relevant expert is. And so that's what I'm planning on doing.

MR. VARUGHESE: Absolutely, Your Honor. I want to make a note that the subject matter was presented to Dr. Bates, too, during his testimony.

THE COURT: All right.

MS. RUPERT: Thank you, Your Honor.

THE COURT: All right. Thank you. We'll be in recess until whenever I told the jury to come back.

(A recess was taken, after which the following proceedings were had:)

THE COURT: Let's get the jury.

This is not directed at you in particular, Mr. Pickard. You just happen to be the one standing there. I do want to reemphasize two things, one of which is to encourage your witnesses to talk in a measured tone; two, to make sure, because the attorneys control it a lot more than the witness does, you don't talk over the witness. And I guess, three, that the -- whatever list of words you've

given the court reporter as vocabulary that would be helpful to know, and maybe I don't give a big enough requirement at the beginning, there's still a lot of words that are being used that are not on the list that are not things that are in the ordinary wheelhouse of most English speakers who are not technically trained. Just try to keep that in mind, please.

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back. Everyone you may be seated.

Mr. Pickard, you may continue.

BY MR. PICKARD:

Q. Dr. Sury, before the break, you were talking about your opinions on motivation to combine and the reasonable expectation of success, and you had mentioned stability reports at temperatures in Johnson and in Hunt. And I believe your testimony was the 5 degrees centigrade in Hunt and 37 degrees centigrade in Johnson. For the jury's benefit, can you relate those centigrade temperatures to Farenheit?

A. Mr. Hunt's was minus 5 degrees freezing so about 20 degrees Farenheit approximately. And 37 degrees centigrade would be about close to body temperature, about a hundred degrees Fahrenheit. That is the range we are talking about.

Q. To circle back, briefly, on some of your background

and experiences, do you have hands-on experience with botulinum toxin?
A. I do.
Q. What kind of protein is the botulinum toxin?
A. It's a very toxic protein. It's a large molecule.
Q. And do you have experience working on large molecules and injectables?
A. Yes, I do.
Q. Does that include large proteins?
A. Yes, it does.
Q. About how many of those have you worked on?
A. Probably ten or so.
Q. Does the toxicity of the botulinum toxin matter in terms of your experience as it relates to the '878?
A. In terms of my opinions, it does not. From a practical point of view, obviously, you have to take precautions when you are dealing with such a protein.
Q. If we could go back to the slide presentation where you left off.
Now, Dr. Sury, you said earlier that you were prepared to show the jury where the elements are met by the prior art. Can we do that now?
A. Sure.
Q. What do we see here?
A. What we see here is the preamble, the

animal-protein-free method to stabilize the botulinum neurotoxin and that comprises of.

Q. What is meant by "animal-protein free"?

A. What that means is that none of the components should have an animal source.

Q. Where did you find this first element of an animal-protein-free method in the Hunt publication?

A. If you look at Mr. Hunt's paragraph 93, which is the left side upper highlight, the upper highlight talks about the composition which is free of animal-derived protein. And then Mr. Hunt talks about one embodiment of the invention being a toxin composition wherein the primary stabilizer is a recombinant albumin, so recombinant albumin referring to an animal-free protein.

Q. I was going to encourage you to slow down a little bit because you're using some big words and I want the jury to understand what you're saying. Please continue.

A. So the second example, too, which is the lower highlight in the left panel, talks about the toxin where the pharmaceutical composition consists of RHSA. RHSA is referring to recombinant human serum albumin.

Q. We discussed a moment ago recombinant HSA. What does the Hunt article say about animal-protein free in that context?

A. If we look at the right column, paragraph 101 states

that, "'Animal-protein free' means the absence of blood derived from blood or other animal-derived products or compounds." The bottom highlight gives an example of an animal-protein-free pharmaceutical composition which comprises of botulinum toxin and a recombinantly made albumin or other recombinantly made stabilizer excipient. The "recombinant" is the key word.

Q. According to the '878 patent, what does it say about recombinant proteins?

A. The '878 patent says that an animal protein recombinantly produced from a microorganism is excluded from the term "animal-derived product or compound."

Q. Does Claim 6, therefore, preclude the use of recombinant serum albumin?

A. It does not.

Q. Why is that?

A. Because it's considered animal free.

Q. Go to slide 28. I see the word "comprising" highlighted here. Why is that, Doctor?

A. The word "comprising" alludes to whatever composition we may have but it doesn't restrict it to just those components. The word "comprising" gives the flexibility to add more components if needed to the system.

Q. What did you determine in your comparison of the preamble of Claim 6 we see here with the prior art?

A. The prior art covers the preamble here.
Q. May we strike through that?
A. Yes, please.
Q. All right. Let's turn to the next element, please. That would be what we have here, step A.
What's recited in step A, Dr. Sury?
A. Step A, the highlighted portion, talks about compounding an aqueous carrier with two or more nonanimal-derived nonprotein excipients.
Q. What does "compounding" mean?
A. In the context of this discussion, "compounding" is, essentially, meaning mixing the toxin with the other excipients in the formulation.
Q. What is an aqueous carrier?
A. Aqueous carrier essentially refers to water as the medium or solvent.
Q. Did you find a teaching or disclosure of compounding with an aqueous carrier in the prior art Hunt?
A. Yes, I did.
Q. Show the jury where that is, please.
A. If we look at the left column, the first two highlights talk about the purification of the botulinum toxin and the final highlight talks about the complex being redissolved in a solution containing saline. So essentially, it is dissolving the toxin in salt water, water

containing sodium chloride.
Q. On the right here there is a mention of a nonanimal-derived, nonprotein excipient. What does that mean?
A. What that means is that the excipients or additives we are going to use in the formulation, they should not be from an animal source and they should be not proteins.
Q. And what did you find Hunt disclosed in terms of compounding with at least two or more nonanimal-derived, nonprotein excipients?
A. So the Table 1 on the left column is from the prior art. And if you could look at the green highlights. The green highlights are talking about the ingredients that have been added to make the product. They call them excipients.
So there is sodium chloride, octinoid, paraben, zinc chloride, and P80. All of these are nonprotein, nonanimal-derived materials.
Q. All right. So what did you conclude in terms of what we see here in terms of step A relative to the disclosure in the prior art Hunt?
A. They're all met by the earlier part.
Q. So may we strike through that?
A. Yes, please.
Q. Let's turn to the next element of Claim 6, if we may. We've got your step E.

What's recited there, Doctor?
A. Here, we are referring to a lyophilization or freeze-drying process of the compounded formulation so that we convert the liquid into a dry powder, and this powder is going to have stability.
Q. What did Hunt disclose in terms of lyophilization?
A. In paragraph 4 of Hunt, we see that for storage stability and convenience of handling, the composition can be formulated as lyophilized. A synonym for that is freeze-drying or vacuum-dried powder.
Q. And so what did you conclude in terms of whether the prior art Hunt taught relative to step B of Claim 6?
A. They are all addressed in the prior art.
Q. All right. May we strike through that?
A. Yes, please.
Q. All right. Let's move ahead to step C, what we've marked as step C.
What is recited here, Doctor?
A. We're looking at the highlights. What we have here are nonanimal-derived, nonprotein excipients. And specifically, a surfactant and a disaccharide selected from the group consisting of trehalose sugars.
Q. Now, Claim 6, which depends from this, it limits that disaccharide to trehalose; correct?
A. Yes, that's correct.

Q. Let's start with the surfactant.
Why would one want to include a surfactant in a botulinum toxin formulation?
A. The surfactant has a stabilizing function so we use surfactants to stabilize the protein.
Q. Does Hunt -- the prior art Hunt, does that disclose the use of a surfactant?
A. Yes. If you look at the last column that's been highlighted in Table 1, the P80 here is referring to polysorbate 80, which is a surfactant.
Q. So in your view, what did the prior art teach with respect to the surfactant of what we've marked here as Element C in Claim 6?
A. The use of a surfactant has been pointed out in prior art.
Q. All right. May we strike through that?
A. Yes, please.
Q. All right. Now let's shift gears a little bit and we'll focus on the disaccharide or trehalose limitation of the claim.
Where did you find that in the art?
A. That was from the Johnson reference.
Q. And where did you find that in the Johnson reference, Doctor?
A. So looking at the left column, the first highlight

talks about the use of trehalose provided for the improved recovery of the toxin following freeze-drying. As we can see here, the use of trehalose increased the recovery to more than 80 percent.

And the second highlight in the column talks about how the addition of trehalose increased the shelf life at a higher storage temperature, up to 37 degrees centigrade up to six months.

Q. What did you determine the disclosure of the prior art to be relative to the disaccharide trehalose limitation of Claim 6?

A. The use of trehalose to stabilize the botulinum toxin has been addressed by Johnson.

Q. All right. May we strike through that?

A. Yes.

Q. Let's turn to the next element.

What's recited here, Doctor?

A. What we have here is the initial formulation retaining the initial potency of at least about 50 percent of the maximum potency.

Q. What is meant by "potency"?

A. The potency is, essentially, a measure of the activity or strength of the protein.

Q. And what is "initial potency"?

A. The initial potency would be the potency after the

protein has been made.
Q. Now, the claim says an initial potency of at least about 50 percent.
Can you explain what that means?
A. Oh, yeah. So what is meant here is that we have gotten the protein made and then we are going to make it into a powder formulation by dissolving it, adding the excipients, and freeze-drying it.
These -- after doing these processes, the formulation should retain at least 50 percent of the maximum potency.
Q. And what did Hunt disclose concerning the initial potency of its recombinant HSA formulations?
A. So if we look, we have three examples here, paragraphs 226, 27, and 29. Each of them has that potency value.
Formulation B was 96 percent at initial potency. Form C was 100 percent. And Formulation E was 116 percent. Meaning, Hunt had already accomplished these potencies in the earlier publication.
Q. And what would a skilled person have understood from those data?
A. That it is possible to accomplish these potencies with the formulation.
Q. So in terms of step D that we see here in Claim 6,

what did you conclude Hunt disclosed?
A. The prior art has disclosed the ability to retain these potencies.
Q. All right. So may we strike through that?
A. Yes.
Q. All right. Let's turn to the next step.
What do we see here, Doctor?
A. Once we have made the powder, the next step is to reconstitute the powder. The powder can be reconstituted with normal saline or water. And the pH of that should be from about 5 to about 7.3. It gives the pH.
Q. And did you determine whether Hunt provided that element?
A. Yes, I did.
Q. Where do we find that?
A. This is in paragraph 124 of Hunt where the pharmaceutical composition disclosed a pH between of 5 and 7.3 on reconstitution, which is identical to what is in '878.
Q. So may we strike through that element as well?
A. Yes.
Q. Okay. The next step in the claim, Doctor.
What is recited here, if you may?
A. Here the -- after the powder formulation has been made, it should be suitable for intramuscular or

subcutaneous administration after it is reconstituted.
Q. What did you determine in your examination of Hunt relative to that element?
A. So the paragraph 206 on the highlighted part of the left column says that the neurotoxin may be reconstituted before administering it. And paragraph 206 and 207 talks about the preferred embodiment being the composition suitable for intramuscular or subcutaneous administration to that subject.
Q. And so did you determine whether Hunt disclosed that limitation?
A. Yes.
Q. And may we, therefore, strike through it?
A. Yes.
Q. All right. The last step, I believe.
What's recited here in what we have in step G?
A. So now when we look at that powder formulation, it should be animal-protein free and it should be polysaccharide free.
Q. And you've already mentioned what animal-protein free means and how Hunt disclosed that.
What are polysaccharides?
A. Polysaccharides are what we refer to as complex carbohydrates. So essentially, they are made up of stringing together molecules, for example, of sugar.

Examples would be starch is a polysaccharide, so this is a polysaccharide.

Q. And did Hunt disclose that element?

A. Yes, Hunt did. So if we look at Table 1 and we look at all the components of the formulation, there is no polysaccharide here.

Q. And so did you form an opinion whether Hunt disclosed what we see here as element G in Claim 6?

A. Yes, I did.

Q. And what was your determination?

A. That the Hunt publication discloses this element.

Q. May we strike through that?

A. Yes.

Q. All right. So if we zoom out a bit and we look at the entirety of Claim 6 of the '878 patent, could you summarize for the jury what you stepped them through?

A. What I've concluded is that Claim 6 is obvious over Hunt and Johnson.

Q. Do Hunt and Johnson collectively teach all of the elements or disclose all of the elements of Claim 6?

A. Yes.

Q. On that particular point, I understand that you understand that Dr. Schöneich is going to be testifying later; correct?

A. Yes.

Q. And does he disagree with you on this conclusion?
A. To my knowledge, he does not disagree with this conclusion.
Q. All right. Let's shift gears a bit. The final topic, rebuttal to Dr. Schöneich.
What do you understand Dr. Schöneich's criticisms of your opinions to be?
A. Dr. Schöneich's criticism can be -- there are three. First of all, it is that Hunt allegedly excludes using disaccharides. The second one is that a skilled person would have included Johnson's use of methionine. And finally, a skilled person would only give the same level of issued potency as the patent by including all ingredients and kinds of recombinant HSA compositions.
Q. All right. Are you prepared to explain to the jury how you respond to these criticisms?
A. Yes, I do.
Q. Let's start with the first one.
Do you agree that Hunt completely excludes the use of disaccharides?
A. No, I do not.
Q. Why is that?
A. So if we, again, go back to the Hunt publication, what we are seeing is that there are certain embodiments where the use of a disaccharide would be allowed. If you

look at paragraph 153, what it requires is the toxin is the active ingredient and recombinant albumin.

So under that embodiment, the use of a disaccharide would be possible.

But if you look at the right side, 175 and 180, that there would be some constraints with respect to the use of disaccharide.

So I have used that embodiment on the left side.

Q. And the embodiment on the right, did you apply that in your obviousness analysis?

A. I did.

Q. All right. Were you in the courtroom when Mr. Hunt testified on Tuesday?

A. Yes, I was.

Q. And did you hear Mr. Hunt testify he agreed that the recombinant HSA example of his publication did not have a statement excluding disaccharides?

A. Yes, I was.

Q. And does that align with your view of the Hunt prior art reference?

A. Yes, it does.

Q. Now, Dr. Sury, I'd like you to look at a statement in Hunt, if you go to slide 59.

What do we see here?

A. The upper highlight says that it is known that

pharmaceutical composition containing a protein active ingredient is inherently unstable if the protein formulation comprises a saccharide. But on here, saccharide referring to something glucose.

And the second highlight talks about the proteins and the glucose, which are not retractive from the well-known Maillard reaction due to the reducing nature of glucose.

Q. Will trehalose undergo the Maillard reaction?

A. Trehalose will not.

Q. Why is that?

A. Because unlike glucose, trehalose is not a reducing sugar.

Q. So the statement we see here about the Maillard reaction, is that applicable to trehalose in your view?

A. It is not applicable to trehalose.

Q. Now, there's a mention in this portion of the Hunt reference of the nonreducing sugars.

Do you see that?

A. Yes.

Q. What is your view of that statement in Hunt, that nonreducing sugars have been mostly unsuccessful?

A. Yeah, that statement, contrary to large and rich body of literature we have where the two sugars that have been used to stabilize proteins, sucrose and trehalose, are both

nonreducing sugars. And they are the first line of stabilizers used in commercial protein formulations.
Q. If we can turn to Dr. Schöneich's second criticism. Very briefly explain what that is for the jury.
A. Dr. Schöneich, I believe, is of the opinion that a skilled person would have also included methionine in the formulation.
Q. Do you agree with Dr. Schöneich's point about methionine?
A. Not entirely because what we see here is that the BSA plus trehalose plus methionine, which is the highlighted portion, shows that formulation if you take 37 degrees, it is 90 percent recovery after 60 days. If we move up a little bit and look at BSA plus trehalose, that combination after 45 days, it retains 90 percent potency, reflecting the fact that trehalose alone is able to exert the stabilizing effect on the protein.
Q. If you'd like to turn to the third criticism from Dr. Schöneich, if we may. What do you understand his point to be?
A. That a skilled person would get the same level of initial potency as Hunt by including all the ingredients of Hunt's recombinant compositions.
Q. How do you respond to that criticism, Dr. Sury?
A. I have not opined that we need to remove any of these

components of the formulation in order to get a stable formulation.

Q. What about the statement claims allows you to arrive at that opinion?

A. Because the claim clearly says the formulation comprises of, reflecting that the language allows the addition of other components to the formulation.

Q. Having addressed those three criticisms, do you understand there to be any other areas of disagreement between you and Dr. Schöneich?

A. There is just one other aspect.

Q. What is that, Doctor?

A. That was the last one. That was not -- I didn't opine on it but he had an opinion about which I have some comments.

Q. We'll come back to that. Can we talk a little bit about objective indicia. Were you present when Dr. Schöneich testified about unexpected results of Claim 6 in the '878 patent?

A. Yes, I was.

Q. Do you understand that evidence of unexpected results to be something you can consider in the obviousness analysis?

A. Yes.

Q. Did you do that?

A. Yes, I did.
Q. What is your understanding regarding the objective indicia needing to have a nexus to the claims?
A. What I understand is that the claim should be directly related to the observations in the patent. The claims cannot be related to something that is not discussed in the patent.
Q. And do you disagree with Dr. Schöneich and his opinion that the claims drive extended duration of action?
A. I disagree.
Q. And why is that?
A. Because I do not think that the patent had any information about the duration of action.
Q. What do you consider the closest prior art to the '878 to be?
A. That would be the Hunt publication.
Q. Why do you consider the prior art Hunt to be the closest prior art to the '878 patent?
A. Two reasons. First of all, Hunt also uses recombinant HSA, and we also have the use of the surfactant in the Hunt patent.
Q. To put that in simple terms, the prior art Hunt, is it animal-protein free?
A. Yes, it is.
Q. And is the '878 patent also animal-protein free?

A. Yes.
Q. And to your understanding, did Dr. Schöneich compare any animal-protein-free prior art to Claim 6 of the '878 patent?
A. I believe he compared it to an animal-protein-free-containing combination.
Q. I'm sorry. He did not?
A. He did not.
Q. Thank you.
To your understanding, what did Dr. Schöneich compare the DAXXIFY duration of action to?
A. I believe he compared it to the commercial BOTOX formulation.
Q. Does the commercial BOTOX formulation contain animal products?
A. Yes, it does.
Q. All right. In your review of the '878 patent, did you see any mention of extended duration of action?
A. I did not.
Q. Does that include a review of the claim itself?
A. Yes.
Q. Does it also include a review of the specification of the patent?
A. Yes.
Q. What do you understand to drive the extended duration

of action in the DAXXIFY product?
A. I believe --
MR. DITTMANN: Your Honor, I object. This is an opinion we talked about that he doesn't have. He just repeated what the other expert said.
BY MR. PICKARD:
Q. You were present yesterday when Dr. Ramsey and others testified?
A. Yes, I was.
Q. Did you hear testimony about what drives the duration of action in DAXXIFY?
A. Yes, I did.
Q. Did you consider that in forming your obviousness opinions?
A. That directly was not related, but what I understood from that testimony is that the peptide materially helps the duration profile and it's claimed in the patent.
Q. Slow down and speak up a little bit.
We have a bullet here. Why does it matter in your view that the peptide is not claimed in Claim 6 of the '878?
MR. DITTMANN: I object, Your Honor. This is a legal conclusion about what's in claims.
MR. PICKARD: I'll move on.
BY MR. PICKARD:

Q. Is the peptide of the DAXXIFY product claimed anywhere in Claim 6?
A. It is not.
Q. So what is your ultimate conclusion as to Claim 6 of the '878 patent in view of everything that we've just discussed today, Doctor?
A. It is that Claim 6 is obvious over Hunt and Johnson.
MR. PICKARD: I pass the witness.
THE COURT: All right. Thank you. Mr. Dittmann.
MR. DITTMANN: May I approach, Your Honor.
THE COURT: Yes.

CROSS-EXAMINATION

BY MR. DITTMANN:
Q. Good to see you again, Dr. Sury.
A. Good to see you.
Q. Dr. Sury, you were asked by Revance's counsel whether you had hands-on experience working with botulinum toxins. Do you recall that?
A. Yes, I do.
Q. But it's correct that your first direct experience with botulinum toxins was in connection with this case; right?
A. I believe it's correct, yes.
Q. You have never worked on developing botulinum toxin

formulations; right?
A. That's correct.
Q. No toxin work at all, much less any work on botulinum toxins; right?
A. Yeah, I have not worked on toxins.
Q. In fact, you've never had any work related to toxin formulations, period; right?
A. That's a fair statement.
Q. In your entire career?
A. Yes.
Q. During your direct testimony, you noted this definition of a person of ordinary skill in the art. Do you recall that?
A. Yes.
Q. Your definition does not require any experience working with botulinum toxin formulations; am I right?
A. That's correct.
Q. If the person of ordinary skill in the art must have at least some botulinum toxin formulation experience, then you don't qualify; right?
MR. PICKARD: Objection. Calls for a legal conclusion.
THE COURT: I don't think it's being presented as a fact. So overruled. You should answer the question.
THE WITNESS: Repeat the question.

BY MR. DITTMANN:

Q. If a person of ordinary skill in the art must have at least some botulinum toxin formulation experience, then you don't qualify?

A. According to my definition, the person doesn't have to have any. If your definition states that a person should have botulinum toxin experience, I would not qualify. That's correct.

Q. I want to make sure this is clear. If the person of ordinary skill in the art has to have at least some botulinum toxin formulation experience, then you don't qualify?

A. Yes.

Q. This is because, again, you've never ever worked in any toxin formulation field; correct?

A. That's correct.

Q. Now, you rely on Mr. Hunt's '598 reference and the Johnson '468 reference to opine that Claim 6 of the '878 drug product recipe patent is invalid; correct?

A. That's correct.

Q. I want to start by talking about how it is that this specific combination of references was arrived at.

Now, you did not look comprehensively at the marketed BoNT formulations in 2005 in providing your opinions in this case; correct?

A. I did not.
Q. What you did for the context of analyzing this patent is you started by focusing on Hunt '598; right?
A. Yes.
Q. And you started with Hunt '598 because it was provided to you by Revance's lawyers; right?
A. Yes, it was provided to me by the lawyers.
Q. You did not identify the Hunt '598 reference on your own; right?
A. I did not.
Q. Is it fair to say that you focused on the portions of Hunt '598 that relate to your opinions and you did not do a very in-depth evaluation of that document?
A. Are you referring to the in-depth evaluation of '598?
Q. That's correct.
A. I did the evaluation to the extent needed to arrive at my conclusion.
Q. You didn't do an in-depth evaluation of the very primary reference you're relying on to try to take away Hunt's patent; am I right?
A. I drew the conclusion based on looking at the '598 patent, and my opinion does not change.
Q. You looked at parts of the Hunt '598 reference that your counsel gave to you; right?
A. I looked at the entire document.

Q. You looked at it but is it fair to say that you focused on the portions of Hunt '598 that relate to your opinions and did not do a very in-depth evaluation of that document?

Do you agree with that?

A. I would have a little bit of difficulty with that characterization.

Q. Dr. Sury, I took your deposition in this case; right?

A. Yes.

Q. Do you recall me asking you that question during your deposition?

A. I don't remember that. If you say so.

Q. Let's refresh your memory.

MR. DITTMANN: Roy, please bring up page 46, 19 to 25.

(A video was played.)

BY THE ATTORNEY:

Q. Is it fair to say you focused on portions of Hunt '598 that relate to your opinions?

A. I went through the patent, but the kind of question you're asking is a very in-depth evaluation of the document. That's not something I did.

(A video was played.)

BY MR. DITTMANN:

Q. Dr. Sury, you also did not identify on your own the

Johnson '468 reference; am I right?
A. Johnson '468 was provided to me by counsel.
Q. It was provided to you by counsel?
A. Yes.
Q. Let's talk about your opinion that Hunt '598 and Johnson '468 supposedly renders Mr. Hunt's invention obvious. You just talked a bit about Dr. Schöneich earlier.
Do you remember that during your direct testimony?
A. Yes.
Q. You understand that Dr. Schöneich disagrees with your opinion about obviousness; right?
A. Yes.
Q. You know he's coming back to respond to your opinions here; right?
A. I expect so.
MR. DITTMANN: So now, just for some context to help level-set, can we please bring up JTX 1. This is Mr. Hunt's drug recipe patent. If we turn to Claim 6, Roy.
BY MR. DITTMANN:
Q. Let me know when you have it, Doctor.
A. Yeah.
Q. We have it on the screen for you.
A. Yeah.
Q. So Claim 6 requires a disaccharide ingredient called

trehalose; right?
A. Yes.
Q. And Claim 6 of the '878 patent also requires that the formulation be polysaccharide free; right?
A. Yes.
Q. Got to have both of those things?
A. Yes.
Q. Got to have a disaccharide and you've got to exclude polysaccharides; right?
A. Yes.
Q. With that, let's turn to Hunt '598, DTX 209, and let's bring up paragraph 180. You talked about this paragraph during your direct testimony; right, Doctor?
A. Yeah.
Q. I think I heard you say that you understood Mr. Hunt to say that he didn't exclude disaccharides. Do you recall saying that?
A. Yes.
Q. I think you may have misheard Mr. Hunt. But why don't we take a look at this ourselves and see where we end up.
Paragraph 180 of Hunt '598 is discussing a preferred polysaccharide for use in the composition; correct?
A. Mm-hmm.

Q. That's a yes?
A. Yes.
Q. You agree with me that a disaccharide is distinct from a polysaccharide; correct?
A. Yes.
Q. They are two different types of molecules that have two different types of chemical structures; right?
A. "Polysaccharide" is a very broad term that encompasses many terms. That is a general term. "Disaccharide" essentially means two.
Q. Hunt '598 actually distinguishes between disaccharides and polysaccharides; correct?
A. Where does he do that? Can point me?
Q. Why don't we just play your deposition.
MR. DITTMANN: Roy, page 70, lines 15 to 17.
(A video was played.)
BY THE ATTORNEY:
Q. Hunt actually distinguishes between polysaccharides and disaccharides; correct?
A. Yes.
(The video ended.)
BY MR. DITTMANN:
Q. Thank you, Dr. Sury. What you said there is correct is because those molecules are distinct and different types of molecules; right?

A. Like I said, disaccharides is two sugars. Poly is many.
Q. Let's, please, bring back up paragraph 180 from Hunt '598 and I want to focus on the third sentence, Dr. Sury, which states, "The present invention excludes from its scope disaccharide oligosaccharide with weight average molecular weight of less than 20 kilodaltons."
Do you see that?
A. Yes, I do.
Q. You agree that an indirect conclusion one can draw from that sentence is that the present invention of Hunt '598 is not covering disaccharides; correct?
A. This is an extremely confusing sentence for me.
Q. Why don't we then clear it up.
MR. DITTMANN: Roy, can you please play from Dr. Sury's deposition page 78, 17 to 79.
MR. PICKARD: Your Honor, I don't think he's laid the predicate for that.
THE COURT: I think I agree with Mr. Pickard. Keep asking the questions.
BY MR. DITTMANN:
Q. Can you confirm for me, Doctor -- I'm just asking this reference in this paragraph is that the present invention excludes from its scope disaccharides.
Do you agree with that?

A. If you stop right there, I agree with that. But then there is a following word, "oligosaccharide." So the way the sentence is structured --
Q. Doctor, I'm sorry. It's really hard -- if you can just answer my question. You agree with me. I asked you a question, if the answer is yes and if you have something to add, your counsel can elicit that.
A. May you repeat the question.
Q. Can you confirm for me, Doctor, the reference we're seeing in paragraph 180 says that the present invention excludes from its scope disaccharides.
A. At that point if you stop, yes.
Q. Thank you. Let's take a look at another portion of Hunt '598.
THE COURT: I'm sorry, does the whole sentence -- what is an oligosaccharide?
THE WITNESS: Oligosaccharide is anything that has many sugar molecules. If I take many sugar molecules it will form an oligosaccharide. I have just two it will be a disaccharide.
THE COURT: What's the difference between an oligosaccharide and polysaccharide?
THE WITNESS: We can consider them synonyms.
THE COURT: Are disaccharides sometimes considered to be polysaccharides?

THE WITNESS: Not really. Monosaccharide, one; disaccharide, two; trisaccharide three; many sugars polysaccharide, oligosaccharide, and so on. So these words are almost contradicting with each other.

THE COURT: Thank you.

BY MR. DITTMANN:

Q. I think I have another paragraph that should bring clarity here. Let's take a look at paragraph 49 of Hunt '598. And I want to focus on the --

First of all, let me ask you. You talked about paragraph 49 during your direct testimony; correct?

A. Yes.

Q. So I want to focus on the third sentence we see here which I'll read: "Much work has been dedicated to mostly unsuccessful attempts at preventing this protein saccharide reaction by, for example, reduction of moisture or use of nonreducing sugars."

Do you see that?

A. Yes, I do.

Q. Hunt '598 teaches that the use of nonreducing sugars has been mostly unsuccessful; correct?

A. That is what the statement is saying.

Q. I think you heard during your direct testimony, you said trehalose is not a reducing sugar; is that correct?

A. That's correct.

Q. But trehalose is, in fact, a nonreducing sugar; wouldn't you agree?
A. Trehalose is a nonreducing sugar.
Q. Trehalose is a nonreducing sugar; correct?
A. Yes.
Q. So Hunt '598 is saying in the paragraph that the use of nonreducing sugars like trehalose has been mostly unsuccessful; correct?
A. That is what the statement says.
Q. That's the opposite of what the '878 patent is about; right? The '878 patent is about using trehalose to stabilize the toxin; correct?
A. By the time this patent came about, people had already had a long history of success with --
MR. DITTMANN: I'll move to strike, Your Honor, as nonresponsive.
THE COURT: So, Dr. Sury, can you repeat the question but answer the question that he asks.
THE WITNESS: I'm sorry.
BY MR. DITTMANN:
Q. What we just saw, Hunt '598 avoiding the use of trehalose, that's the opposite of what the '878 patent says; right? If '878 patent is about --
THE COURT: You just asked three questions, Mr. Dittmann. Ask one question. You might get a yes-or-no

answer.

BY MR. DITTMANN:

Q. The '878 patent is about using trehalose; correct, to stabilize?

A. Yes.

Q. That's the opposite of what the Hunt '598 patent is saying; correct? Yes or no?

A. Yes.

Q. Can we please bring up Claim 6 of the '878 patent. I have that on the right side of the screen and I want to have paragraph 180 from Hunt '598 on the left.

So now, Dr. Sury, you'll agree with me, again, we talked earlier. Claim 6 requires a polysaccharide-free formulation; right?

MR. DITTMANN: If we can highlight that, Roy, in Claim 6, "polysaccharide free" towards the bottom.

THE WITNESS: Yes.

BY MR. DITTMANN:

Q. And now, Hunt '598 on the left, if you look at the beginning of paragraph 180, it's talking about a preferred polysaccharide; right?

A. Yes.

Q. Hunt '598 prefers polysaccharides; correct?

A. That includes a disaccharide.

Q. I'm asking, Hunt '598 prefers the use of

polysaccharides; correct? Yes or no?
A. What you've highlighted, yes.
Q. Okay. So Hunt '598 is also saying to do the opposite of Claim 6 when it comes to polysaccharides; correct?
A. What you are showing? Yes, I agree.
Q. So, Dr. Sury, you testified earlier that the list of references on the cover of Mr. Hunt's '878 patent, I think you said, it's what -- it shows what the inventors considered; right?
A. Yes.
Q. Let's talk about who else considered those references. So now is it correct that you considered the documents exchanged with the Patent Office that led to the issuance of the '878 patent; is that right?
A. I did consider them.
Q. And this is called the file history of the '878 patent; is that right?
A. Yes.
Q. Please, take a look in your binder at JTX 008A. This is one of the documents from that file history that you reviewed. Take your time and let me know when you're there.
A. That's all the list of documents, correct.
Q. And the title of this document is "Information Disclosure Statement by Applicant"; correct?
A. Yes.

MR. DITTMANN: Your Honor, we move into evidence JTX 008A.

MR. PICKARD: No objection.

THE COURT: All right. Admitted without objection.

(Thereupon, Joint Exhibit JTX 008A was admitted.)

BY MR. DITTMANN:

Q. Do you understand an Information Disclosure Statement to be a document that's filed with the Patent Office by applicants to disclose relevant prior art?

A. Yes.

MR. DITTMANN: Let's please turn to page 226 of JTX 8A. Bring that up on the screen, Roy. I want to take a look at reference number 6.

BY MR. DITTMANN:

Q. Do you see that, Dr. Sury?

A. I do.

Q. This is the Hunt '598 reference; right?

A. Yes.

Q. In the second to last page of the document, if we can pull that up, we see towards the bottom there's a reference to the examiner at the Patent Office, Albert N. Navarro.

Do you use that?

A. On page 240; right?

Q. Correct.
A. I see that.
Q. And we see that there's an electronic signature next to his name; correct?
A. Examiner's -- yeah.
Q. Right next to that, we can see on the right there's a reference to date considered; right?
A. Yes.
Q. This reflects that Examiner Navarro considered the contents of this information disclosure statement; correct?
A. Yes.
Q. And that includes Hunt '598, like we just talked about; right?
A. Yes, it does.
Q. Now, the other reference you rely upon to come up with your obviousness opinion besides Hunt '598 is Johnson '468; right?
A. Yes.
Q. So let's take a look at page 223 of this document we're looking at and focus on Reference 7.
And you see that's Johnson '468; right?
A. Yes.
Q. So the examiner also considered Johnson '468; right?
A. Yes.
Q. There's more than just the inventors disclosing what

they considered.

The examiner considered both of your references that were given to you by your counsel; correct?

A. Yes.

Q. Now, Johnson '468, that's the reference that involved the use of albumin from cows; is that right?

A. Yes.

Q. Okay. That's what I thought it was. So let's shift gears a bit then, and I want to turn to DTX 179.

And I believe you referenced this during your testimony as the Carpenter 1997 reference; is that right?

A. Yes.

Q. Now, first, I want to make sure we're on the same page.

You agree this Carpenter 1997 reference is not part of your obviousness ground, which is Hunt '598 and Johnson '468; right?

A. Yes.

Q. And you rely -- strike that.

Carpenter 1997 doesn't discuss any botulinum toxin formulations; right?

A. I have not read the entire patent with the goal of finding toxins, so I don't know the answer.

Q. You didn't read the full Carpenter 1997 either?

A. I read the full '97 publication. I just don't recall

them alluding to toxins.
Q. And you probably don't recall that because, again, you've never had the occasion to work with botulinum toxins, so you would never have consulted Carpenter for that reason; right?
A. That would be one reason, yes.
Q. Let's please turn to page 6 of Carpenter 1997 and go to the top right portion where it states: "Every protein has unique physiochemical properties and, hence, unique stabilization requirements."
Do you see that?
A. Yes, yes, I do.
Q. You broadly agree with this statement from Carpenter 1997; correct?
A. Yes.
Q. Let's please take a look at the third sentence in that same paragraph, which states: "The formulation will have to be customized for every protein drug."
Do you see that?
A. Yes, I do.
Q. You also broadly agree with this statement from Carpenter 1997; correct?
A. Yes.
Q. Would you please turn in your binder to DTX 180.
A. I'm there.

Q. The front cover of this document shows this is a book chapter from Dr. John F. Carpenter; right?
A. Yes.
Q. And this is the same John F. Carpenter who authored the 1997 Carpenter reference we were just discussing; right?
A. Yes.
Q. Let's go to page 13 of that exhibit. And I want to look under the header "Rational Design of Stable Lyophilized Formulations."
Do you see that?
A. Yes.
Q. The second sentence here states: "Acceptable protein stability can be achieved readily using excipients and processing methods that are well known to someone, to use a legal term, skilled in the art of protein formulations."
Do you see that?
A. Yes, I do.
Q. Dr. Carpenter kept going. And in the next sentence, Dr. Carpenter states that: "Clearly, however, the specific application of such compounds and processes to a given protein drug product and/or class of proteins often can be patented."
Do you see that?
A. Yes.
Q. Dr. Sury, that's exactly what Mr. Hunt and Allergan

did with respect to the '878 patent; right?
A. I am not an expert in this field, so.
Q. Now, Dr. Sury, you didn't say much about Revance's peptide during your direct examination, but I did hear you talk about the language of Claim 6 of the '878 patent not including an express reference to duration of action.
Do you recall that?
A. Yes.
Q. And you were in the courtroom, I think you testified, when Mr. Hunt presented his views regarding what was covered in his patent?
A. Yes.
Q. You're aware that an unexpected property like the longer duration of action does not need to appear in the words of a patent claim; right?
A. I do not know that.
Q. You don't know that? Why were you talking about the claim?
A. No. What should or should not appear, I do not know. All I said was that I did not see duration of action in the document.
Q. Thank you, Doctor.
Now, Claim 6 of the '878 patent does refer to a combination of disaccharide and a surfactant; correct?
A. Yes.

Q. And you understand that Allergan's position is that its this combination of ingredients for Mr. Hunt's patented recipe that provides a longer duration of action; right?
A. I heard that, yes.
Q. So then let's turn back to a bit to the subject we were talking about earlier about what the Patent Office actually considered when it granted Mr. Hunt his patent. Okay?
And to do that, I want to take a look at what Mr. Hunt originally submitted to the Patent Office back in 2005. So to do that, let's bring up JTX 6. And you can take a look, Dr. Sury, but we have it up on the screen.
If you can just confirm for me -- and feel free to look at whatever you'd like to look at --
A. I understand.
Q. -- but this is the -- what's referred to as the '126 provisional patent application filed by Mr. Hunt; right?
A. I see the provisional patent application at the top, yes.
Q. And you see the numbers 60/725126? Do you see that?
A. Where is it?
Q. And maybe we can bring up that number, Roy, so you can see it.
A. It's -- is it stamped? 60/725126, yeah, it's stamped. I see that.

Q. Thank you.

And you actually referred to this patent application in your first expert report submitted in this case; correct?

A. Yes.

MR. DITTMANN: Your Honor, plaintiffs move into evidence JTX 6.

MR. PICKARD: No objection.

THE COURT: All right. Admitted without objection.

(Thereupon, Joint Exhibit JTX 6 was admitted.)

BY MR. DITTMANN:

Q. So, Dr. Sury, JTX 6, this is Mr. Hunt's '126 provisional patent application that eventually led to the issuance of the '878 patent; right?

A. Yes.

Q. And this '126 provisional patent application was filed way back in October of 2005; right?

A. Yes.

Q. And this was years before the patent applications were filed in 2009 that were discussed by Dr. Ruegg yesterday; right?

A. Yes.

MR. DITTMANN: Roy, please bring up PTX 989.

BY MR. DITTMANN:

Q. Now, do you see the '126 provisional patent application is listed on the first page of this document over on the left side in the middle?

Do you see that, where it says "priority data"?

A. Excuse me, what document is this?

Q. This is PTX 989. And I have it up on the screen for you. It might be easier to see.

A. Okay.

Q. And do you see in the middle where there's reference to the same '126 patent provisional application by Mr. Hunt; right?

And for the record, this is a patent publication WO 2007/041664.

Do you see that?

A. Yes.

Q. So Mr. Hunt's original 2005 patent application was made public, as we see here, by April 12, 2007; right?

A. Mm-hmm. Yeah.

Q. Yes? Thank you.

Before we talk about Mr. Hunt's 2005 application, I want to also take a quick detour to the '878 drug product recipe patent and confirm one thing. Okay?

So let's bring up PTX 1 and go to column 1, lines 18 to 20.

And we see here more towards the bottom of this

paragraph, the text of the '126 provisional patent application is incorporated by reference in its entirety in the '878 patent; right?
A. Yes.
Q. So the contents of the '126 provisional patent application are also a part of the '878 patent itself; right?
A. Okay.
Q. Now, did you hear Dr. Ruegg testify that you have this incorporation by reference to make the Patent Office aware of certain prior art? Did you hear him testify about that?
A. I don't remember this part.
Q. Well, let's take a look at what this provisional patent application discloses. So bring up JTX 6, please. And let's go to page 21, line 14.
And do you see that there's a paragraph starting: "What is needed therefore"?
Do you see that, Dr. Sury?
A. Yes.
Q. The inventor of the '126 provisional application explained here the long-felt need for a BoNT formulation that was stabilized by a nonprotein excipient; correct?
A. Yes.
Q. And this need would include stabilizing a BoNT

formulation without the use of albumin; correct?

A. Yes.

Q. Let's now talk about what Mr. Hunt said regarding how this long-felt need was met in the '126 provisional patent application filed in October 2005.

Dr. Sury, do you agree that the '126 provisional application discloses three formulations containing the disaccharide trehalose and a poloxamer 188 surfactant having initial potency of at least 50 percent; correct?

A. Are you referring to a specific document?

Q. I'm just asking that question, which I asked you at your deposition.

A. I answered, yes, I agree. I just don't remember the specific details of what I spoke in my definition.

Q. Okay. So it's fair to say you don't recall anything different today; right?

A. Yeah.

Q. Let's please turn to page 52 and bring up lines 30 to 32.

In addition to poloxamer 188, the '126 provisional patent application discloses that other poloxamers are within the scope of the present invention; correct?

A. Yes.

Q. Let's now move to the top of page 52.

The inventors are representing here that when you substitute polysorbate for a poloxamer surfactant, you get similar results; right?
A. Where are they making that statement?
Q. Taking a look at the top of page 52. And if you remember, I asked you at your deposition: "The inventors are representing that when you substitute polysorbate for a poloxamer, you get similar results; right"?
A. If I said that in deposition, I agree. I just don't remember it.
Q. Why don't we just confirm. If you can play deposition page 208, lines 15 to 18.
MR. PICKARD: Your Honor, I don't think there's a basis for impeachment here --
MR. DITTMANN: I'm refreshing his recollection.
THE COURT: No, that's not the way you refresh recollection. So I'm going to sustain the objection.
BY MR. DITTMANN:
Q. So Mr. Hunt's 2005 application is making clear it doesn't matter so much which surfactant is being used to stabilize the toxin as long as you have one; right?
A. If you have done work with two surfactants, you cannot generalize it to all surfactants.
Q. If you did more than two, you could; right?
A. That's a judgment call.

Q. And you heard Mr. Hunt testify that he looked at more than two surfactants; right?
A. I do not remember that.
MR. DITTMANN: Okay. So will you please bring up Dr. Sury's slide demonstrative DDX 6.37.
BY MR. DITTMANN:
Q. Dr. Sury, if you remember this, this is when you were walking through and striking off parts of Mr. Hunt's invention or striking through it.
A. Yes.
Q. And you were talking -- in connection with this slide, you were talking about Hunt '598 allegedly teaching the use of a surfactant to stabilize the toxin; right?
A. Yes.
Q. If we can go to the next slide, 6.38, and here's where you talk about, where you say Hunt '598 disclosed the use of a surfactant as an ingredient to stabilize a toxin; correct?
A. Yes.
Q. We see the amount of surfactant disclosed in Hunt '598. It's 0.04 micrograms of the surfactant; right?
A. Yes.
Q. Can we agree that's a tiny amount?
A. Yes, it is a small amount. In this context it would be adequate.

Q. Dr. Sury, isn't that in fact at the level of what you would consider impurities in a formulation?
A. No, I would not.
Q. Your testimony is that 40 nanograms or .04 micrograms is not at an impurity level; is that your testimony?
A. My testimony is if you have deliberately added this amount of polysorbate and it exerts the function needed, it is an excipient in the formulation.
Q. Isn't it correct, Dr. Sury, that the function of surfactant here is to be used with the recombinant HSA, not the toxin; isn't that right?
A. The surfactant can function independently.
Q. Dr. Sury, you've never ever worked with a toxin formulation that contained albumin of any type; right?
A. That's correct.
Q. And that includes recombinant albumin; right?
A. That's correct.
Q. So you'd have no idea whether or why you need to use a surfactant with recombinant albumin; correct?
A. I know the use of surfactants in protein formulations.
Q. Again, you wouldn't know whether a surfactant is being used here because of the recombinant albumin or to stabilize the toxin because you've never done anything like this in your career?

A. I have not done this composition, I agree.
Q. I want to focus, again, on the Hunt '598 and Johnson '468 references from your obviousness combination. So if we can go back to the original 2005 application from Mr. Hunt, JTX 6. Let's go to page 4, line 16.
Do you see here a reference to the Hunt '598 publication we've been discussing?
A. Yes.
Q. So this Hunt '598 reference was discussed in the original 2005 application that was submitted to the Patent Office with respect to the '878 patent; right?
A. Yes.
Q. And this, again, is the same Hunt '598 reference that you rely on in contending that the '878 patent should be taken away; correct?
A. Yes.
Q. Now, the '126 provisional application at line 16 states that Hunt '598 "disclosed the use of various excipients such as recombinant albumin, collagen, or a starch to stabilize a botulinum toxin present in a pharmaceutical composition."
Do you see that?
A. Yes.
Q. This is the same recombinant albumin from Hunt '598 that you discussed during your direct testimony; right?

A. Yes.
Q. So the original 2005 patent application by Mr. Hunt is expressly discussing the Hunt '598 reference; right?
A. Yes.
Q. The recombinant albumin and human serum albumin in BOTOX is the same in your view; right?
A. Very similar.
Q. The only difference is how you make the ingredient; right?
A. Yeah, because of the difference in method, there will be a small structural difference.
Q. Let's turn to page 5, line 14. And Mr. Hunt's 2005 original application states, "Unfortunately, despite the known stabilizing effects, significant drawbacks exist to the use of protein excipients such as albumin or gelatin in the pharmaceutical composition. For example, albumin and gelatin are expensive and increasingly difficult to obtain."
Do you see that?
A. Yes.
Q. Here the '126 provisional patent application is making statements relating to the challenges of protein excipients that include the protein excipients discussed in Hunt '598; is that fair?
A. Yes.
Q. This statement about the challenges of using the Hunt

'598 reference was presented in Mr. Hunt's original 2005 application that led to his drug recipe patent; right?
A. Yes.
Q. Please turn to page 13 of the document. On line 19 there's a reference to the Johnson '468 reference; right?
A. Yes.
Q. And then this is the very same Johnson '468 reference that you rely upon in combination with Hunt '598 to assert obviousness; right?
A. Yes.
Q. This is, again, the reference talking about albumin from cows; right?
A. Yes.
Q. From the 1990s; right?
A. Yes.
Q. And so this Johnson '468 reference, like the Hunt '598 reference, was also discussed in the application that was submitted to the Patent Office that led to the '878 patent; right?
A. It was discussed, yes.
Q. So, Dr. Sury, you agree that Hunt '598 and Johnson '468 were presented to the Patent Office and were expressly discussed and then the Patent Office granted the '878 patent; right?
A. Yes, but in different context. I talked about it

differently from the way you're presenting it.
Q. I'm sure your counsel will clear that right up.
Now, the Patent Office reached a different conclusion than you did; right? The decided that Mr. Hunt should receive a patent for his invention; right?
A. Yes.
Q. But you're here in this case years later only after Revance has been sued for patent infringement making an argument that you say Mr. Hunt should have his invention taken away; is that right?
A. Yes.
Q. Based on two references that were provided to you by Revance's lawyers; right?
A. Plus other things.
Q. And you're doing this despite the fact that, Dr. Sury, your very first direct experience with botulinum toxin formulations was in this case; right?
A. Yes.
Q. And again, you've never worked on formulating toxin formulations of any kind; right?
A. Yes.
Q. And in fact, you haven't performed any work relating to toxin formulations in your entire career; am I right?
A. Yes.
MR. DITTMANN: Thank you, Dr. Sury. No further

questions.

THE COURT: All right. Mr. Pickard. Any redirect?

REDIRECT EXAMINATION

BY MR. PICKARD:

Q. Dr. Sury, I'd like to talk a little bit about the prosecution of the '878 patent. Mr. Dittmann just showed you some statements about Hunt and Johnson. Do you recall that?

A. Yes, I do.

Q. Those were statements that Allergan made about the prior art; correct?

A. Yes.

Q. In your review of the prosecution history of the '878 patent, did you see the Patent Office apply Hunt and Johnson as a grounds of obviousness against that application?

A. I did not.

Q. Let's try to put in context what happened during the prosecution, if we can turn to the '878 patent for a moment, JTX 1, I think we touched on this during your direct a little bit.

There was prior art listed on the face of the patent; correct?

A. Yes.

Q. And if you could point out to the jury where that

begins, please.

A. If we look at the left column right at the bottom, it starts there and then it moves to the right column and then --

Q. That's just the first page; correct?

A. And there are following pages.

Q. You said there's references on the following pages; is that right?

Let's turn to page 2 of the document. What do we see here, Doctor?

A. Full page of references.

MR. PICKARD: Zoom out a little bit, Mr. Bell.

BY MR. PICKARD:

Q. The entire page is a list of references?

A. Yes.

Q. Is that all of it?

A. No, there is -- then we go to page 3. It's filled with references.

MR. DITTMANN: Your Honor, I'll object again. Dr. Sury in his deposition said he has no idea what the Patent Office considered, no idea whatsoever.

THE COURT: It's overruled.

BY MR. PICKARD:

Q. What do we see here, Dr. Sury?

A. On page 3, it's filled with references.

Q. Are there additional references besides that?
A. Page 4 has a half page.
Q. I think we touched on this briefly. I don't want you to talk about particular dates.
About how long was this patent application under examination before it issued?
THE COURT: I think I already sustained the objection to that question and I don't think anything that's happened is going to change my mind about that.
BY MR. PICKARD:
Q. If we could turn to Hunt '598 for a moment. Mr. Dittmann showed you paragraph 180 there.
Hunt '598 has multiple examples; is that your understanding?
A. Yes.
Q. And paragraph 180, is that part of the example that you're relying on for your obviousness combinations?
A. No.
Q. That is part -- if you show the jury, you can zoom up a little and go back to paragraph 173 or so and show that.
Can you point out to the jury what example that was, 175? What example does paragraph 180 appear in, Dr. Sury?
A. Sorry. Can you repeat the question.
Q. Can you tell the jury which example from the '598

Hunt reference does paragraph 180 relate to.
A. In the '878?
Q. No, I'm sorry. We're turning to the Hunt prior art reference, '598. If you're having trouble, that is DTX 209.
A. So.
Q. Now that you're there, to set the stage again, Mr. Dittmann asked you several questions about paragraph 180 in the '598 prior art Hunt reference; correct?
A. Yes, he did.
Q. My question is that paragraph, does it appear in an example that you have applied in your obviousness opinion?
A. It does not.
Q. Could you show the jury which example that is? Just to be clear, which example paragraph 180 relates to.
A. 180 relates to a preferred polysaccharide in the present composition comprising a polarity of glucose monomers.
Q. If you can refer back to paragraph 183 in the '598 Hunt reference. Let me know when you're there.
A. Yes, I'm there.
Q. What example do we see there?
A. Paragraph 183 refers to --
Q. I probably misspoke. I meant to direct you to 153. I apologize.
What example do we see here, Dr. Sury?

A. Here it is talking about the use of recombinant albumin.
Q. And is this example the same as the example that Mr. Dittmann showed you in discussing paragraph 180?
A. Paragraph 180 deals with the use of a polysaccharide for use.
Q. When we look at paragraph 153 my question is, is that the same example of the polysaccharide example you mentioned just a moment ago?
A. 153 is recovery versus regular albumin. 180 is about polysaccharide. It's a different example.
Q. Different example?
A. Yes.
Q. And the example you applied is the example that begins at paragraph 153; is that right?
A. That's correct.
Q. You can put up Claim 6 of the '878 patent for a moment. Mr. Dittmann made a point about the amount of surfactant that was disclosed in the prior art Hunt reference.
Do you remember that?
A. Yes, I do.
Q. If you look at the surfactant limitation of Claim 1, do you see any requirement about amounts of surfactant that is required?

A. I do not.

Q. The questions you received today from Mr. Dittmann, did it cause you to question your conclusions about the obviousness of Claim 6?

A. It did not.

MR. PICKARD: No further questions, Your Honor.

THE COURT: All right. Thank you, Dr. Sury. You're done. You can step down. Actually, just sit there for a minute.

Members of the jury, we're going to take lunch because, according to my computer, it's actually 12:57. In any event, using this clock or using whatever clock you have because you won't have access to the clock, we'll take a 45-minute break for lunch. Keep track of time and I'll see you soon.

(The jury exited the courtroom.)

THE COURT: All right. Dr. Sury, watch your step. You're done. Thank you.

So I just want to point out I'm not aware of any evidence that the length of time that it takes to evaluate a patent is an indication of its quality. So that's one thing. And the second is, the jury has no perspective on which to evaluate that issue, so even if someone said here's some evidence, it's just confusing and I think potentially misleading to the jury. That's the reason why I kept

excluding that.

Okay. All right. I'll see you in 45 minutes.

(A recess was taken, after which the following proceedings were had:)

THE COURT: I expect to hand out the draft jury instructions and verdict form at the next break and once we finish for the day, we'll take a brief recess and then have a jury instruction conference and try to get all that worked out. Okay?

MS. GAZA: Your Honor, if I may, before we have our next witness, we wanted to read in one of the admitted facts. And we have a clicker for the slides if that's okay for the witness to use.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. We're ready to continue. Everyone may be seated.

Ms. Gaza.

MS. GAZA: Good afternoon, Your Honor, members of the jury. Anne Gaza on behalf of Revance. I'm here to read in an admitted fact. This is something that both parties have stipulated is admitted.

"Revance's DAXXIFY product competes in the aesthetic market in the United States with Galderma's Dysport, Mertz's Xeomin, and Evolus's Jeuveau."

Thank you.

THE COURT: All right. Mr. Desai.

MR. DESAI: Thank you, Your Honor. Defendants call our next witness, Ms. Dana Trexler. We've handed up some exhibits already.

THE COURTROOM DEPUTY: Please state and spell your full name for the record.

THE WITNESS: Dana Trexler, D-A-N-A, Trexler, T-R-E-X-L-E-R.

DANA TREXLER,

called as a witness on behalf of the Defendant, was sworn, and testified as follows:

DIRECT EXAMINATION

BY MR. DESAI:

Q. Good afternoon, Ms. Trexler.

A. Good afternoon.

Q. Ms. Trexler, will you please introduce yourself to the jury.

A. My name is Dana Trexler and I work with a consulting company by the name of Stout.

Q. And, Ms. Trexler, have you prepared some demonstratives to assist with your testimony today?

A. Yes, I have.

Q. And you have a clicker up there to control the slides?
A. I do.
Q. Ms. Trexler, please tell us where you're employed.
A. I work at Stout, which is a consulting firm. It has three pillars: Disputes, claims, and investigations, which is the group that I'm part of. And then it has an investment banking group and an evaluation group.
Q. And what are your roles and responsibilities at Stout?
A. I co-lead Stout's intellectual property disputes and valuations practice. I'm a managing director at the firm and I spend my time doing forensic accounting work that is focused on litigation in calculating damages at trials such as this one, and I specialize in intellectual property damages such as patent disputes.
Q. So will you, please, describe your educational background.
A. I received my bachelor of sciences degree from Bucknell University in accounting and then I went on to get my master's in business administration from the Wharton School at the University of Pennsylvania in Philadelphia.
Q. Do you have any credentials? And if so, what are they?
A. I'm a certified public accountant, a CPA, and I'm

also certified in financial forensics which is an additional qualification for CPAs who do fraud and forensic work and dispute work such as like in this case.

Q. And is all your professional experience with Stout?

A. No, it's not. I started my career with Coopers and Lybrand which at the time was one of the big six. They merged with Price Waterhouse Coopers and became PwC. So the first three years of my career I spent on the audit staff, meaning I was working with companies, mainly pharmaceutical companies and healthcare companies, to audit their financial statements. And then I shifted over into PwC's forensic services practice, which is the type of work I do today. And then I was with some other smaller region firms doing the same type of work.

Q. Do you have a witness binder there in front of you?

A. Yes, I do.

MR. DESAI: Your Honor, Revance proffers Ms. Trexler as an expert in patent damages.

MR. DITTMANN: No objection.

THE COURT: You may proceed.

BY MR. DESAI:

Q. Ms. Trexler, what were you asked to do in this case?

A. I was asked to do two things: First, analyze Dr. Siegwarth's opinions; second, to determine the appropriate reasonable royalty damages in this case.

Q. As part of your analysis, did you make any assumptions?
A. I did, yes. First, I have to assume that the patents are valid. If the patents are found to be invalid, there would be no damages and we don't get to this part of the case.
Q. Okay. And what type of information did you consider in your analysis?
A. The materials that I considered included documents that were filed with and issued by the Court. I considered the documents that have been provided in this case by both Allergan, Inc., and Revance. I considered deposition testimony and the exhibits thereto. I read expert reports and I've been sitting in trial just as you have and I have heard what you've heard. And then I held discussions with the Revance experts as well as individuals from Revance. And then lastly, I and my team, we did some independent research to identify information in the public domain. We pulled publicly available financial statements to gather information from that.
Q. You mentioned that you reviewed Dr. Siegwarth's damages opinions and testimony; is that right?
A. Yes.
Q. Can you provide the jury with a summary of your opinions compared to Dr. Siegwarth's.

A. Yes. So if you look at the screen, I'll start with the formulation patents. It's my opinion that the royalty rate would range between 1.75 percent and 3.5 percent. And the reason for the difference there is the 3.5 percent doesn't take into account that the parties dispute the cause of duration. As we'll discuss later, I think it's much more appropriate to consider the fact that Allergan believes it's the patents that provide for that cause of extended duration and Revance believes it's the peptide and they have to negotiate that, and we'll talk about how I do that.

When you compare my rates to those of Dr. Siegwarth, hers is much higher, 24 percent. In my opinion, that's not reasonable and I'll explain why.

If we switch over to the manufacturing patents, it's my opinion that rate would be 1.4 percent and that's compared to Dr. Siegwarth's rate of approximately 15 to 20 percent depending on a 12-month delay or 18-month delay.

Q. Let's start with the first assignment that you mentioned, responding to Dr. Siegwarth's reasonable royalty opinions. Can you -- first, stepping back, can you remind the jury what reasonable royalties damages are and how they are determined?

A. Reasonable royalty damages, as you've heard, we assume that there is a hypothetical negotiation between the parties. And there are a few assumptions that need to be

made there. One, we have to assume that there is a willing licensor and willing licensee sitting at the table and they will reach an agreement. Two, we also assume that unlike the real world, both parties would know what the other side knows. In a typical negotiation in the real world, people keep their cards close to their vest. Here, everybody's cards are face up on the table.
Q. So you described the hypothetical negotiation as being between a willing licensor and licensee. Why is that?
A. It's necessary so that we can focus on the value of the benefits that the parties are negotiating for. And in this case, the benefit of the manufacturing patents is APF. The benefits of the formulation patents is the extended duration of effect. And if you don't have a willing licensor and willing licensee, you wouldn't be focused on isolating that value and that's extremely important. Other things would come into play.
Q. And you said you were here yesterday and the day before when Dr. Siegwarth was testifying?
A. Yes.
Q. Do you agree with her testimony regarding the hypothetical negotiation between Allergan and Revance in this case?
A. No. She described Allergan as a reluctant licensor and she said that Allergan, Inc., was being forced to

license these patents to Revance and that's contrary to the construct of a hypothetical negotiation.

Q. So if she made that assumption, what was the effect on her analysis?

A. It's one cause of the overstatement of her royalty rates.

Q. Are there any other underlying assumptions the calculation requires?

A. I have to assume that the patent is valid and used by Revance.

Q. Did you hear Dr. Siegwarth testifying that a reasonable royalty is like paying rent?

A. I did.

Q. Did you agree with that analogy?

A. I do. I often use that analogy.

Q. Did you agree with her description of it?

A. I agree with her description of it, but not her application of it.

So she described that, you know, if you think about the apartment that you're trying to rent, you're only willing to pay for that apartment. The way in which she did her analysis, and I'll talk to you about the flaws I see in her analysis, but, essentially, the result of it is you get to use the one apartment but you have to pay for every apartment in the building. And that's not right.

Q. So in this case, did you use the same hypothetical negotiation dates as Dr. Siegwarth did?
A. Yes, I did.
Q. Okay. And which parties do you assume are negotiating with one another?
A. I assume it's Allergan, Inc., and Revance who are at the table.
Q. Is Allergan, Inc., the entity that manufactures and sells BOTOX?
A. So Allergan, Inc., is the company that owns the patents they do not manufacture and sell BOTOX. There are affiliated companies with Allergan, Inc., who manufacture and sell BOTOX. But those two are not direct competitors.
Q. And who are those entities?
A. Those entities are Allergan, Inc., and Allergan U.S.A Sales.
Q. I'm sorry, you misspoke.
Did you mean to say Allergan, Inc.?
A. No. I meant to say Allergan Ireland is the manufacturing entity and Allergan U.S. Sales is the sales arm.
Q. And then are the parties that manufacture and sell BOTOX parties in this case?
A. No, they are not.
Q. So what is the economic relationship between

Allergan, Inc., the plaintiff here, and its affiliates that actually make and sell BOTOX?

A. I understand from Dr. Siegwarth that the financial relationship between them is that Allergan, Inc., the plaintiff in this case, receives a 2 percent royalty on BOTOX sales.

Q. So did you hear Dr. Siegwarth's testimony about the competitive relationship between Allergan, Inc., and Revance?

A. Yes, I did.

Q. And did you agree with her testimony?

A. I don't agree with the way she characterized the way the parties would view competition between them.

MR. ASHKENAZI: Objection, Your Honor. Can we have a sidebar.

THE COURT: All right.

(Thereupon, a discussion was held at sidebar.)

MR. ASHKENAZI: During the pretrial conference, we had a discussion about the part of Ms. Trexler's second supplemental report that tries to argue that the negotiation would be different. Right now, up until now, she's properly characterized the relationship between the parties, which is fine. But anything further about how it would change the fact that they would be considered competitors at the time of the hypothetical negotiation should not be done. That

was the portion of her report that was stricken. And in fact, as you may recall, I read nothing in her opening report in this case. Her rebuttal report explicitly said the parties would approach this hypothetical negotiation as competitors. Right now if question that was asked --

MR. DESAI: I don't remember if that portion was actually stricken or ultimately stricken, but she's not planning to go further than what she talked about here. It is fair to describe that Allergan, Inc. --

THE COURT: The premise -- the last question is fine and then we move on to something else.

(The discussion at sidebar ended.)

BY MR. DESAI:

Q. All right. Ms. Trexler, just a little housekeeping here. You have a binder in front of you there?

A. Yes.

Q. And could you turn to DTX 24 in your binder.

A. Okay.

Q. All right. And do you recognize that document?

A. I do, yes. This is the LAI scenario planning from May 2021. And this is an Allergan Aesthetics document.

Q. Okay. And did you consider that as part of your analysis?

A. Yes, I did.

Q. And can you turn to DTX 314, please.

A. Yes.
Q. And do you recognize that document?
A. Yes. This is an AbbVie document. It's the 2022 annual report on Form 10-K.
Q. Okay. And have you created an illustration that relies on those documents for your presentation here today?
A. Yes, I have.
MR. DESAI: All right. Your Honor, defendants move into evidence DTX 24 and DTX 314.
MR. ASHKENAZI: No objection, Your Honor.
THE COURT: All right. DTX 314 looks like it's 200 pages long. I assume that there's probably only going to be a page or two that's actually relevant?
MR. DESAI: Actually, it just supports the illustration that Ms. Trexler is going to go through.
THE COURT: Okay. Well, I reserve the right to strike most of it, but whatever you use will stay in.
MR. DESAI: Understood.
(Thereupon, Defendant's Exhibits DTX 24 and DTX 314 were admitted.)
BY MR. DESAI:
Q. Can you describe what you're displaying here in this illustration?
A. Yes. What this document shows is BOTOX U.S. Cosmetic sales from 2009 through 2022. Those are what the bars are

that go across.

And what's layered in here is the entry of each of the new competitors that compete with BOTOX. And you just heard the undisputed fact that was read in that laid out those competitors. And what you can see is that BOTOX sales, for the most part, continue to rise after the entry of each new competitor.

So if we look at Dysport entering the market in 2009, you can see 2010 sales are higher and they continue to rise. Xeomin comes in in 2011. Sales are higher in 2012. Jeuveau comes in in 2019.

Now, of course there's a dip in 2020, but that was market-wide because people couldn't go into the doctors' offices to get their injections.

And then '21 and '22, the market continues to grow. The reason for this is because the market for these products is unsaturated.

What I mean by that is there's room for growth. And what the parties have found, and would know at the hypothetical negotiation, is that each new entrant into the market, it draws new patients in. So this market is continuing to grow and bring new people into the office.

And it makes sense because you have more people advertising these types of products that get people curious, and then they ask their dermatologist or, you know,

healthcare provider about them.
Q. All right. So let's move to the first assignment that you mentioned and talk specifically about the formulation patent in this case.
Will you please remind the jury of Dr. Siegwarth's underlying premise for her hypothetical negotiation analysis.
A. Yes. So the underlying premise that Dr. Siegwarth assumes, and she told you this yesterday, is she assumes that it is the formulation patents that provide the benefit of extended duration.
Q. And do you agree with that assumption?
A. Well, we've heard testimony that there's a big dispute in this case about whether it's the peptide or it's the patents that provide for the extended duration of effect. And I think Dr. Siegwarth should have accounted for that in her analysis at the hypothetical negotiation.
And you heard from Dr. Maegher and Dr. Ramsey, some testimony on this. Dr. Maegher said that the formulation patents do not recite extended duration. And Dr. Ramsey said that he believes it is the peptide that provides for extended duration.
So there's a dispute over the parties as to the benefit that they're even negotiating for and whether or not it's in the patent, and Dr. Siegwarth fails to account for

that in her analyses.
Q. So if the jury finds that the formulation patent does not cause extended duration, how is Dr. Siegwarth's reasonable royalty opinion impacted?
A. Well, it's unrelated to the benefit that she assumed was derived from the formulation patents. And that would mean that the royalty rate would have to go to zero because Revance isn't going to pay for a benefit that it doesn't get.
And what would be left for the formulation patents is they would still be APF. And so you would then need to look to the royalty rate for APF. But they would only pay for that benefit once.
Q. All right. So putting aside the dispute between the parties over the cause of this, of longer duration, what was Dr. Siegwarth's methodology for this patent?
A. So the way she determines the methodology is she looks at two different data points that she has for price premium and she looks at two data points she pulled from surveys about customer preference for the extended duration of effect.
And she adds all of these percentages up and divides by four to come to her 24 percent royalty rate.
Q. All right. So have you prepared an illustration that shows the critique that you have of Dr. Siegwarth's

analysis?

A. Yeah. So if we look at the screen, there are three main errors that I want to talk to you about in her analysis.

The first is she misapplies the price premium methodology. She incorrectly calculates price premium two to be 29 percent. And I'll show you how she made that mistake. And then she ignores the dispute over the cause of extended duration in determining her final rate.

And I can walk you through each one of these.

Q. Okay. Before that, before we do that, can I just do a little more housekeeping.

A. Of course.

Q. Okay. So could you turn in your binder to JTX 78.

A. Yes.

Q. And do you recognize that document?

A. I do. This is the "Allergan Aesthetics Facial Injectables ETU: Neurotoxin Final Report."

Q. And did you consider that as part of your analysis?

A. I do.

Q. Can you also please turn to JTX 211.

A. Okay.

Q. And do you recognize that document?

A. I do. This is Revance's DAXXIFY pulse survey KX Advisories dated August 14, 2023.

Q. And did you consider that as part of your analysis?
A. Yes.
Q. And then one more -- two more, sorry.
DTX 430A, do you recognize that document?
A. Yes, I do.
Q. And did you consider it as part of your analysis?
A. Yes.
Q. And the last one, DTX 431A.
A. Okay.
Q. And do you recognize that document?
A. Yes.
Q. And did you consider that as part of your analysis in the case?
A. Yes, I do.
Q. All right. And you've created an illustration based on that that we'll see at some point here.
MR. DESAI: Your Honor, we move into evidence JTX 78, JTX 211, DTX 430A and DTX 431A.
MR. ASHKENAZI: No objection, Your Honor.
THE COURT: All right. Admitted without objection.
(Thereupon, Exhibits JTX 78, JTX 211, DTX 430A and DTX 431A were admitted.)
BY MR. DESAI:
Q. So turning to your first point here, what -- why do

you take issue with how Dr. Siegwarth applied the price premium methodology?

A. The issue with the way she applies this methodology is she's averaging two different things. You can't average unlike things. So let me walk you through this.

If you look, she has price premium 1 and 2 in the top two boxes. And then she has survey 1 and 2 in the bottom two boxes. If you look at the price premium and think about it, that represents dollars.

The percentage price premium shows the combined dollar value of the unique DAXXIFY features, but not each one's contribution. What do I mean by that?

The price premium is the amount that the parties -- or that customers are willing to pay for the extra benefits they get from DAXXIFY, one being an additional three months of duration of effect.

But that's not the only unique benefit. Dr. Siegwarth told you there's APF. That's another one. And then there are several others that I will show you. She attributes a hundred percent of the benefit to the duration of effect, that the added duration of effective -- and she doesn't -- and then she does -- makes the same mistake in her manufacturing patent calculations.

So that's what price premium is.

Preference for duration, customer preference

surveys measure each feature's contribution, but not the dollar value. And so she's taken two unlike things and created an average, and that's meaningless. So her 24 percent really doesn't mean anything. It was a math exercise, but you can't, you know, average two different things.

Q. Is it like apples and oranges?

A. It is.

Q. What should Dr. Siegwarth have done to properly apply the price premium methodology?

A. What she should have done is multiply the price premium by the preference for duration to come up with a royalty rate. Let me break that down a little bit. If you think about the price premium being the additional amount that people are paying for a list of unique benefits that DAXXIFY has, we need to determine what percentage of that premium goes to each one of the benefits. That's what the customer surveys tell us because we know what the healthcare providers are looking for when selecting and recommending a neurotoxin to use, a neurotoxin product, and what patients are considering when they select that.

So by multiplying them together, it allows you to tease out what piece of the price premium goes to duration and you can also do this to look at the piece that goes to APF, those two benefits, which is what the

negotiations are over.
Q. Why is it necessary to determine the portion of the price premium that relates to these benefits?
A. If we go to the next slide, I think I can illustrate this better. If you think about the standard BOTOX product, DAXXIFY has many of those same features which include -- if you click here -- safety, effectively minimizes fine lines and wrinkles. I mean, that's why people are using these products in the cosmetic industry or for cosmetic purposes. Provides a natural look.

Duration of effect. But your standard duration of effect for the BOTOX and the other competitors, aside from DAXXIFY that we talked about, is on average 3 months.

The reason it's necessary to tease out the price premium is if you look here, you have the premium. The premium which is what people pay for the added benefits DAXXIFY has, and there's a bunch of unique benefits here. If we look at the ones we're focused on, it is the percentage of the price premium related to duration, the percentage related to APF. That's what these two negotiations are about.

The rest of the price premium goes to other DAXXIFY unique features that include a better safety profile, superior wrinkle reduction, and the peptide excipient formula. We're not negotiating over that

technology, so we can't pick up the piece of the price premium that relates to them. We have to apportion them. This is called "apportionment" in my world.

Q. Did Dr. Siegwarth apportion the price premium?

A. No, she doesn't. She takes the entirety of it and assumes it goes to duration.

Q. Let's move on to your next criticism, the -- to remind you what your second criticism was, Dr. Siegwarth incorrectly calculates the price premium?

A. Yes, thank you.

So the next issue we have is when Dr. Siegwarth calculated her price premium 2, that's the only one I take issue with, is her 29 percent. The way she came up with that is she compared DAXXIFY's list price to BOTOX's net price. If you think about DAXXIFY's list price, it's like a list price on the car. That's what's on the sticker, but we know we're not paying what's on that sticker. There could be manufacturer rebates, there could be dealer rebates, and if you're like me, you sit behind that desk with the person you're negotiating with and you talk them down. "I saw it at this dealer over there and they gave me a better deal," so you talk them down off of that list price. That's what the BOTOX net price is. It's after the discounts.

So she compared an undiscounted DAXXIFY price to the BOTOX net price and that overstates the price premium.

So to fix that, you need to compare list price to list price. And so when I do that, it reduces the price premium to 17 and a half percent.

And when you think about it, that also makes sense when you look at her price premium 1, 17 percent. That's what Allergan's expectation was. She took that from an Allergan document. So when you do the corrected calculation, that 17 and a half percent is in line with what Allergan's expectations were.

Q. And now that's just the corrected price premium. What do you do with a corrected price premium?

A. So what you would do then to correct this calculation is you need to replace her 29 percent with the 17 and a half percent and so now you have a price premium that if you take an average, it's 17.25 percent. I don't think we need to get that precise. If you take the preference for durations that she pulled from her surveys and you put them together, you would get a rate that's much closer to 5 percent, a little less, not 24 percent like she put forward.

Q. So does Dr. Siegwarth's price premium methodology require any further correction after that?

A. I mean, that would basically fix her math. So it takes her data points and instead of averaging unlike things, you multiply them together after correcting for the price premium calculation error.

Q. And you mentioned previously that Dr. Siegwarth does not take into consideration that there's a dispute between the parties over the cause of duration. Does that impact the rate that you came up with?
A. If you think about the construct of a hypothetical negotiation, you have two parties they are required to reach an agreement as willing licensor and willing licensee. And you have one party that steadfastly believes the extended duration of effect comes from the patents and then you have Revance that steadfastly believes that that benefit of duration comes from their peptide.
They can't both sit in their corners and say I'm right, you're wrong. They have to negotiate. In this case, to me, it seems very reasonable that they would compromise and agree to meet in the middle. To the extent that that would happen, that 5 percent recalculated royalty rate would cut in half to 2 and a half percent.
Q. You recognize that dispute in your analysis?
A. I do, yes.
Q. Does Dr. Siegwarth?
A. She doesn't acknowledge the dispute over the cause of the extended duration effect.
Q. Let's move on from the formulation patent and move to the two manufacturing patents. For these patents, can you please remind the jury of Dr. Siegwarth's methodology for

those patents.
A. Yes, so she showed you a slide that put forward a methodology where she looks at what she called the profit boost through 2025, and she divides total sales through 2029 to come up with her royalty rate.
First issue -- first thing I take issue with is calling the numerator, the top line item, a profit boost. It's not a profit boost. This is the difference in profits that would result for a delay. To me, when I read that, it implies that they get extra by licensing the patent. It's the effect that any delay to market would have on them.
Q. And to be clear, this is a different methodology for these patents than Dr. Siegwarth applied; is that right?
A. It is, yes. She could have I applied the methodology, the price premium methodology, that I just talked to you about? She could have applied that for analyzing the hypothetical negotiation for the manufacturing patents by just looking at customer preference for APF.
Q. So then focusing on the methodology that she does use here, what are the issues that you identified?
A. So there are three issues that I identify and I'll walk you through them. The first is she has an unsupported delay period. She overstates Revance's profit margins. And then she improperly incorporates the expiration of the '740 patent.

Q. Let's focus in on that first point there, unsupported delay period. What are the issues with Dr. Siegwarth selecting the delay period?
A. Dr. Siegwarth talked to you about a 12- to 18-month delay period that she based on expert testimony of Dr. Drago and Dr. Gessler who you heard. But the problem with this is the alternative that Revance would move to is undefined, and if it's undefined, it's not possible to determine what the delay period would be and what the effect is. What I heard those experts say is they assumed this would be a major change. If it's not a major change, the delay could be different.

The second problem with this methodology is it's not tied to the benefit of an APF manufacturing process and it's also not tied to evidence in the record about any potential delay or fear for a delay. So this methodology doesn't make sense to me, given the facts in this case.

And I have an analogy I can provide to you. It's like trying to figure out how long a detour is going to take if you don't know your destination, you don't know the route you were planning on taking, and you're not even sure if you're driving, flying, biking or walking. So it's impossible to determine how long that detour will take if you don't have the inputs into it.
Q. All right. Can we move to your next point. I

believe it has to do with Dr. Siegwarth's use of gross profit.

Can you explain to the jury, what was the problem there?

A. So if you think about her formula, she had the numerator which she called the profit boost. To come up with the profit that would be at risk of not going to market, going to market with a delay, she used gross profit to come up with that. And to me it needed to be an operating profit, and I'll explain the differences between these.

So what gross profit margin is, is if you think of your sales as 100 percent, you deduct from that only the cost of goods sold, which are things like the cost of materials to make DAXXIFY, the vials to package it, and the direct labor associated with that and then some direct overhead. So you're taking out the cost of the product, essentially. That's what gross profit margin is, and this was based on Revance's sales projections. These were their expectations.

But the problem is she ignores other costs that are required in order to make these sales, the biggest of which is sales and marketing. And sales and marketing are critical to selling these products. You need people to go out into the doctor's offices, explain to them the benefits

of DAXXIFY, why they want to carry it, why they want to recommend it to patients, and you also need to advertise to patients to let them know about the product. So by ignoring the sales and marketing expense, Dr. Siegwarth has overstated that top number in her calculation, which overstates her manufacturing patent royalty rate.

What she should have used is an operating profit margin that takes the sales and marketing into account, and that would be 45 percent, not the 87 percent she includes. Because if you look here, cost of goods sold is 13 percent, sales and marketing are 42 percent. That's a big piece of the puzzle to ignore and assume that you could make sales of DAXXIFY without it.

Q. And you mention that you've been here every day for the trial. Did you see testimony that supports the importance of a sales and marketing team?

A. I did. Allergan's Mr. Lindemann testified by video on that very first day when they were playing the video clips. He's part of Allergan's sales and marketing department, and he explained that during COVID that was -- they saw a decline in BOTOX's market share to Dysport and they asked him what the cause of that was, and he said one of the causes could be that Galderma, who is -- Dysport is their product, Galderma let their salespeople back out into the market before Allergan let theirs back in. So

Galderma's salespeople were able to make headway with the doctors and the patients to push Dysport over BOTOX. It's a really important part, even for an established product, which BOTOX is the market leader, to have your sales force in these doctors' offices.

Q. How does her exclusion of sales and marketing costs impact her analysis?

A. It significantly overstates it, even under her methodology.

Q. Let's move on to the next criticism that you raise. What was the issue with the expiration of the '740 patent?

A. So Dr. Siegwarth made an adjustment that you may recall. She took her royalty rate from 20 percent down to 17 and a half percent, so she reduced it 2 and a half percent after the first manufacturing patent expired. And so to me, that says the value of APF is 2 and a half percent.

She's already told you what the first patent is worth, and yet she's still charging for the second patent 17 and a half percent all the way through the end of expiration in 2029, and that doesn't make sense to me.

Q. How did she determine that the second patent should be at that rate?

A. Her calculation, the amount up top is also driven by the time period that she picked. And she determined that

sales would be impacted and she calculated the profits through December 2025. And you may recall this, it was shown yesterday. She had a graph and if you shift that graph over to an earlier time period, her rate would shrink. The amount of the profits in that numerator would shrink.

The problem with her 2025 date is, one, it's based on the assumption of a launch of a biosimilar product that Revance was working on in conjunction with Mylan, and she assumes that would happen by the end of 2025. If you look at the documents she actually relied on, it was a press release that Mylan put out talking about this. But it said their goal was to have for this to happen before 2025, so if you take that and shift everything back a year, her numerator shrinks and her rate comes down.

The other problem is let's think about a biosimilar product. This means it's a product that is similar in composition to BOTOX. BOTOX is not APF. They're negotiating at the hypothetical negotiation for APF. That's what the manufacturing patents relate to. And if she's basing her date on a BOTOX biosimilar that isn't APF, it's in no way tied to the benefit they're negotiating for or the patents themselves, and so that also doesn't make sense to me.

Q. Thank you, Ms. Trexler. Let's move on to your second assignment. Can you tell the jury what that was about.

A. Sure. So I was asked to identify the flaws that I see in Dr. Siegwarth's analysis in both hypothetical negotiations. I then perform my own analysis of what I think the reasonable royalty rates are under each of the negotiations.
Q. Okay. And how does your analysis differ from Dr. Siegwarth's?
A. I used the price premium methodology. That makes a lot of sense. I used the same methodology for each of the negotiations, and I apply it properly. I apportion.
Q. And what information did you rely on to perform your analysis?
A. I also relied on survey data. I used different surveys than those that Dr. Siegwarth put forward because I'm really focused on the unique benefits because that's what relates to the price premium, and that's the piece I'm trying to apportion down to extended duration of effect and APF.
Q. And did you hear Dr. Siegwarth criticize your use of surveys based -- because they don't ask why people would pay more?
A. Yes, I heard that.
Q. So do her surveys ask that question?
A. No, they don't, and they don't need to because I'm figuring out by this methodology. I'm looking at how much

they pay in total, how much more they pay for the unique features. What the surveys are telling me is what weight the customers put on these unique features. By properly applying the methodology, price premium times the customer preference, it takes care of that.

Q. Okay. And then before we go through your analysis here, why did you perform this analysis? Damages is Allergan's burden.

A. So like I stated in the beginning, damages only come into play if you find the patents to be valid. When I looked at the way in which Dr. Siegwarth analyzed the hypothetical negotiation, her methodologies, and identified the errors that I identified, I then recalculated or I then performed an analysis to determine what I find an appropriate reasonable royalty rate and the damages that flow from it in the event that liability is found here.

Q. Can you tell the jury about the surveys you relied on.

A. Yes. Do we need to do housekeeping?

Q. Actually, JTX 211 is already in evidence.

A. That makes things easy.

So this survey is a DAXXIFY pulse survey conducted by KX Advisors August 14, 2023. And what this is looking at is the percentage of healthcare providers who rank DAXXIFY superior to the first choice acting toxin.

This survey is actually looking at those unique benefits of DAXXIFY and what they like above and beyond the standard benefits that you get from a BOTOX or any of the other competitors. When I look at the survey, you can see the top line item is duration of effect, and you have 73 percent of healthcare providers who rank DAXXIFY superior to their first choice acting toxin selecting that as the reason.

But my analysis doesn't stop there because you have to look at duration of effect over all of the other unique benefits, and if you look at the percentages, they add up to more than a hundred. So we have to do what's called normalizing. So to take that 73 percent and normalize it so it's out of a hundred, I have to divide it by 430 percent, which is what you get if you would add each of the benefits that the healthcare providers see, the percentages you have here, if you add them up. And Dr. Siegwarth talked to you about normalizing as well.

When I do that, I identify from this survey that the benefit of the extended duration of effect, the additional three months, is 17 percent. And remember, it's the additional three months that we're negotiating over for these patents.

Q. And I think you have another survey. We do need to do some housekeeping here. Can you turn to your binder in

tab JTX 164.
A. Yes, I'm there.
Q. And do you recognize that document?
A. I do. This is Allergan Aesthetics DAXXIFY launch tracker main quantity study report with a June 30, 2023, date, and it's referred to May and June waves with HCPs, which is healthcare providers.
Q. And you considered that as part of your analysis here?
A. I did.
MR. DESAI: Your Honor, defendants move into evidence JTX 164.
MR. ASHKENAZI: No objection, Your Honor.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 164 was admitted.)
BY MR. DESAI:
Q. Can you tell us about your analysis of this survey.
A. This survey was conducted -- and I have two data points that I can get out of this. It was conducted in May and June which is helpful, and it's looking at the reasons for switching from other NTX products to DAXXIFY.
If you look at the first set of bars, you can see that DAXXIFY has a longer duration, was ranked 65 and 64 percent in May and June respectively. There are a lot of other attributes of DAXXIFY that cause switching, but you

will see DAXXIFY is free of human serum and albumin and HSA was also studied and raised as a reason here. So you can see that it was 21 percent and 25 percent in May and June respectively.

I have the same issue with this survey that I have to normalize the data because the percentages add up to more than a hundred. When I normalize, DAXXIFY has a longer duration portion for May and June, that is 23.7 percent for May and 22.6 percent for June. And I do the same thing for HSA-free. I get 7.7 percent for May and 8.8 percent for June.

Q. And then how do you use the survey results to determine your reasonable royalty for the manufacturing patents?

A. At this point, I take the data points that I have from the surveys for duration of effect and I average them, and I do the same thing for the APF, I average them. When I do that, I determined that 21 -- 20.1 percent of features are related to duration, so roughly 20 percent of the price premium goes to duration. And then 8.2 percent goes to APF and HSA free. And then the blue bar that you see here, that 71.8 percent, that relates to all the other unique attributes of DAXXIFY that aren't at issue at either of the hypothetical negotiations.

Q. Can you summarize for the jury your ultimate opinions

of reasonable royalties based on -- for both the formulation patent and manufacturing patents.

A. Yes. So let's start with the formulation patents. If I start with the 17 and a half percent price premium, which is the corrected price premium that I used, and I multiply it by the preference for duration of 20 percent that we got from those customers surveys, that gives me a royalty rate of 3 and a half percent.

Q. I see you have the rate considering dispute. Can you explain what that means.

A. Sure. So that's what we talked about. We have each party saying something different about what causes the extended duration of effect, and I believe that the way the parties would resolve this dispute at the hypothetical negotiation would be to meet in the middle. And I feel that is reasonable because they both believe a hundred percent in their own position, so they would have to meet in the middle to reach an agreement. When you consider that dispute, the royalty rate would be 1.75 percent.

Q. Let's wrap it up for the jury to summarize your opinions that you've expressed here.

A. Actually, let me walk through the manufacturing patent rates.

Q. Sorry.

A. That's okay.

So the manufacturing patent rate opinion, it's calculated the same way. It's the 17 and a half percent price premium times the preference for an APF product of 8.2 percent. That gives me a 1.4 percent royalty rate, and there is no adjustment needed after that because the parties don't dispute that the manufacturing patents provide the benefit of APF.

Q. Okay. So if I understand, your formulation patent rate is adjusted considering the dispute between the parties but the manufacturing patent rate is not?

A. Yes, that's correct. There's just different factors in the hypothetical negotiations, and this dispute is one in the formulation patents.

Q. So you were taking these rates -- how do you calculate the ultimate reasonable royalties?

A. So if we -- to calculate the ultimate reasonable royalties, you take the sales of DAXXIFY times the reasonable royalty rate that it came up with at each negotiation, and that will give you the damages. Now, through May 31, 2025, Revance has sold $273 million of DAXXIFY product. That is through May 31, 2025. They continue to make sales, and so for each new sale you would also multiply that by the royalty rate. So damages would be ongoing.

Q. All right. And then can you walk the jury through

your final numbers.
A. Yes. So if we look at the final numbers, I'm going to start with this. Not recognizing the dispute for duration, the manufacturing patents royalty rate would be 1.4 percent which gives you damages of $3,828,065. The rate for the formulation patents is 3.5 percent which gives you damages of $9,570,163. And if both patents are found to be valid, you put them together and the total rate would be 4.9 percent, and that would give you damages of $13,398,228.
Q. And that's only if the dispute is not recognized; is that right?
A. That's correct.
Q. And what if the dispute is recognized?
A. If the dispute is recognized, the royalty rate of the manufacturing patents remains the same and damages remain the same. It's $3,828,065.
If you recognize the dispute on the formulation patents, the rate is 1.75 percent of sales and your damages are $4,785,081.
If you find both patents to be valid, the reasonable royalty rate would be 3.15 percent, and the total damages are $8,613,146.
Q. Are your royalty rates reasonable in your opinion?
A. Yes, they are. They fit the evidence in the case, they show that there are many standard features and benefits

of the BOTOX product that DAXXIFY has, and then there are multiple, many unique features. And we valued the percentage that patients valued the duration and the APF and were able to apportion properly.

Q. All right. And these numbers here reflect the multiplication you showed on the previous slide?

A. Yes.

Q. Can you go back to the previous slide. The 273 million there, that's Revance sales; correct? Not profits?

A. That is sales, yes.

Q. All right. How do your rates compare to Dr. Siegwarth's? How do your calculations compare to Dr. Siegwarth?

A. My calculations, I mean, she was asking for 101- to $115 million. Mine are much more reasonable because I've apportioned. I properly applied the methodology. I've applied methodologies that relate to the facts in this case. And when you look at the effect on the royalty rates, hers are significantly overstated and unreasonable.

Q. So what is it that causes her rates to be unreasonable?

A. So there are a few fundamental issues. We've talked about them, but it really starts with the way she analyzed the hypothetical negotiation. And I think the most helpful thing would be if we could pull up her demonstratives that

set up the premise for the hypothetical negotiation for each negotiation side by side or on the same screen.

MR. DESAI: Mr. Bell, can you bring up PDX 174 and 179.

BY MR. DESAI:

Q. What's described here?

A. So the top box with the date of June 2019, that's her assumptions for the hypothetical negotiation for the manufacturing patents, and then the bottom one with the October 2021 date are her assumptions of the hypothetical negotiation for the formulation patents.

And if you just look at the titles of each of the columns here, she has "Revance Benefits" and "Allergan Disadvantages." It's a very one-sided way to look at it. She doesn't consider there are also advantages to Allergan. Allergan has never practiced these patents. They haven't monetized them. Some are old. One of the manufacturing patents is already expired. This is an opportunity for Allergan to make some money on their patented technology by licensing to Revance, and she doesn't consider the advantage. She just looks at what she calls disadvantages.

The second thing is there's double counting, and she's double charging Revance between the October or June 2019 negotiation for the manufacturing patents and the October 2021 patents. If you look under the Revance

benefits, she has first-to-market advantage. She also has that under the October 2021.

If you go over to the Allergan disadvantages, she has BOTOX competition with DAXXIFY. That's also in the October 2021 negotiation. She has long-acting injectable competition with DAXXIFY. She also has that under the October 2021 negotiation. And then she has loss of long-acting injectable first-to-market advantage under both.

If Revance is sitting at the table in October 2021 and Allergan is putting forward these advantages to them and disadvantages to Allergan, Inc., Revance is going to say, "I already paid you for those advantages in June of 2019. We're sitting here in October 2021, and you think I'm going to pay you again?" She's double dipping.

Q. So you've identified a number of flaws in Dr. Siegwarth's analysis. Can you sill illustrate for the jury what the impact of that is.

A. Yes. The easiest way to do this is probably looking at -- if I remember correctly, it's her last slide that stacks her rates. This one, thank you.

So if you look at this, Dr. Siegwarth presented the blue part as the portion of sales. These are sales. That's what the hundred percent represents. The blue part is the portion of sales that Revance gets to keep, so she

looks like, well, we're just taking the green part.

But that's not really true because, first of all, after the '748 patent expires in 2029, that's the second-to-expire manufacturing patent, Allergan is not entitled to any royalty. So you have to chop off anything that's to the right. So now we're left with the relevant time period.

But what she left out of this and didn't tell you is, and we talked about it, these are sales dollars or hundred percent of sales. But in order to make sales, you have to incur the cost to manufacture the product or you have nothing to sell. That was 13 percent. We also know that there's a sales and marketing expenses that she ignored, which were 42 percent. That's 55 percent or $0.55 of every sales dollar that has to go to being able to sell the product.

If you use that hundred percent down to the -- to take out the 55 percent of costs in 2022 and 2023, there is a very tiny blue sliver. And if you do the math and take the high end of the 20 percent royalty rate and the 24 percent, that's 44. You add 55 percent of cost to that, that gets you to 99. So they are leaving Allergan with one penny of every sales dollar, and that's not reasonable.

And you can see how this extends forward. The other piece you have to recognize in that box where it says

drug product recipe, the formulation patents have expired so if we can block out that piece, that piece is also not available. They wouldn't pay a royalty, so they get to keep those sales anyway.

So it's really the tiny blue sliver. That's what's left of Allergan sales if you would accept Dr. Siegwarth's royalty ratings, and to me, that's not reasonable, especially considering we're not negotiating for the standard features of a BOTOX product. We're negotiating for the unique attributes and only two of them.

Q. So just so clarify, under Dr. Siegwarth's analysis, how much is left for Revance?

A. If you look at the first two years and you take the 44 percent royalty rate, it's 1 percent. If you take the 15 percent, she's leaving 6 percent. That's not reasonable.

Q. Thank you, Ms. Trexler.

MR. DESAI: Pass the witness.

THE COURT: Ms. Trexler, I take it in the next-to-last answer when you were talking about Allergan's sales, you actually meant Revance's sales; right?

THE WITNESS: Yes, I did mean Revance sales. Thank you, Your Honor, if I misspoke. The chart I was looking at, they were Revance sales, not Allergan.

THE COURT: All right. Mr. Ashkenazi.

CROSS-EXAMINATION

BY MR. ASHKENAZI:
Q. Good afternoon, Ms. Trexler.
A. Good afternoon.
Q. You mentioned you were here during Dr. Siegwarth's testimony; correct?
A. Yes.
Q. And do you remember how Revance's counsel used this machine over here to draw some pictures regarding the Allergan entities?
A. Yes.
Q. And you discussed those Allergan entities earlier in your testimony; correct?
A. Yes, I did.
Q. And he said the picture showed a few different Allergan companies that are involved in BOTOX and licenses between those companies; correct?
A. Yes.
Q. And he seemed to be suggesting that maybe these intraorganization royalties would be relevant to the hypothetical negotiation between Allergan and Revance; correct?
A. Yes.
Q. But you do realize that the Allergan companies internally are not competitors; right?
A. I recognize that Allergan, Inc., who's at the

hypothetical negotiation, and Revance aren't competitors.
Q. Are not competitors?
A. No, Allergan, Inc., does not sell a product.
Q. It's your testimony here today that Allergan, Inc., is not -- that the entities that are part of the hypothetical negotiation are not competitors?
A. That is correct. Allergan, Inc., can't be a competitor to Revance. Allergan, Inc., doesn't sell a product. Allergan, Inc., owns the patents.

MR. ASHKENAZI: Your Honor, I move to strike that testimony as inconsistent with her expert reports, and I didn't elicit it. She said it without me asking the question. If we go back to the testimony I said, she looked at the agreements and the internal Allergan companies are not competitors. And Ms. Trexler herself just decided to say Allergan and Revance are not competitors.

THE COURT: Mr. Desai.

MR. DESAI: She said Allergan, Inc., and Revance are not direct competitors.

THE COURT: That's what she said. I guess the question I have is, was that responsive to Mr. Ashkenazi's question?

MR. DESAI: I think it was.

THE COURT: All right. I'll tell you what. I don't think it was responsive because I think the question

that the witness was being asked was comparing one Allergan company to another, so I think actually Mr. Ashkenazi is right. So I'm going to strike that answer.

So put it out of your mind and don't consider it any further.

Mr. Ashkenazi, you can ask your original question again if you want.

THE WITNESS: Apologies if I misunderstood.

BY MR. ASHKENAZI:

Q. Ms. Trexler, you'll agree with me the Allergan companies internally are not competitors?

THE COURT: With each other.

THE WITNESS: It might be helpful if you give me -- there are many Allergan -- just so we don't get into a misunderstanding, if you could say Inc., Ireland, USA, and Revance.

BY MR. ASHKENAZI:

Q. You reviewed a number of licenses between the Allergan entities; correct?

A. Yes, the licenses between Allergan, Inc., and Allergan Ireland and U.S.A.

Q. And in fact, you determined that those agreements, those Allergan agreements, were not comparable agreements to the ones Allergan would be entering into as part of the hypothetical negotiation; correct?

A. Yes, to be a comparable agreement they would be -- they would help me form my royalty rate and because there were some differences, I didn't find them to be comparable agreements. It's a relevant data point that I discuss in my report.
Q. You found them to be not comparable?
A. They are not comparable to the hypothetical negotiation.
Q. In fact, you found them to be not technically or economically comparable; correct?
A. Correct. Because Dr. Siegwarth testified that those rates were for use of all of the Allergan BOTOX patents and that's not what we're negotiating for. We're negotiating for three patents.
MR. ASHKENAZI: Your Honor, I'd ask that the witness please limit her answers to yes or no, if possible.
THE COURT: Ask another question. I think that could easily be a fair response to what you were asking.
BY MR. ASHKENAZI:
Q. Just to be clear, you found out that -- you determined that those agreements are not probative of the hypothetical negotiation; correct?
A. That's correct. I would not -- they're not comparable enough for me to determine my royalty rate based off of them.

Q. But you say you considered them as part of your analysis in this case?
A. I did, yes. They're in my report and Dr. Siegwarth also put them in her testimony as well.
Q. Because agreements that the parties enter into, according to you, are relevant; right?
A. I'm sorry, relevant or irrelevant?
Q. Relevant.
A. Could you ask your question again.
Q. How about we do this. Why don't we take a look at some agreements that Revance has entered into.
MR. ASHKENAZI: Your Honor, may we approach with a binder?
THE COURT: All right.
BY MR. ASHKENAZI:
Q. Ms. Trexler, if you open the binder to the first page of the binder, you'll see there Revance's SEC filing.
Do you see that?
A. Yes, I do.
Q. We can put that up on the screen, please.
Ms. Trexler, just so we're clear, an SEC -- this is an SEC filing or --
MR. DESAI: Objection, Your Honor. This seems to be outside the scope of what we discussed on direct.
THE COURT: Can I see counsel at sidebar.

(Thereupon, a discussion was held at sidebar.)

THE COURT: My sense from the questions, Mr. Ashkenazi, you're getting ready to ask her about agreements Revance has entered into with third parties which certainly seems to be something that Dr. Siegwarth didn't address. Is that where you're going?

MR. ASHKENAZI: Your Honor, I am going to be asking about the agreements Revance entered into with a third party, but they brought up license agreements relating to toxins and asked Dr. Siegwarth about agreements that Allergan had to employ, that that was somehow relevant to the hypothetical negotiation.

THE COURT: So the only agreements I heard them asking about was the internal Allergan agreements. They didn't ask about any other agreements.

MR. ASHKENAZI: If you ask about the Allergan agreements, we should have the full information about the Revance agreements.

THE COURT: This is just irrelevant because she's presumably said or will say they're not comparable. So noncomparable agreements shouldn't be discussed.

MR. ASHKENAZI: But nonetheless they entered -- asked questions about the internal Allergan agreements to put the number before the jury to imply that 2 percent would have been sufficient. It's only fair for the jury to hear

the same toxin agreements as Revance. These are --

THE COURT: Actually, I don't think it's fair because Dr. Siegwarth didn't rely on them and Ms. Trexler hasn't relied on them and, presumably, counsel is not going to be arguing in closing that they have some significance, so it's a road to nowhere and it's a road that brings in improper stuff while you're going to nowhere. I'm not going to allow it.

MR. ASHKENAZI: The one thing they kept bringing up is the fact that there's a 2 percent intercompany agreement between Allergan, Inc., and Allergan Ireland.

MR. DESAI: I want to ask questions about --

MR. ASHKENAZI: They kept repeatedly stating that it's only fair for the jury to understand what Revance has with other people to put the 2 percent into context.

THE COURT: If you have an agreement between Revance Therapeutics and Revance, Inc., I might listen to it. But Revance and third parties, it's irrelevant evidence. To the extent their evidence was irrelevant, you meeting it with more irrelevant evidence is not the solution.

MR. VARUGHESE: Your Honor, one clarification, that 2 percent number was in both expert reports.

THE COURT: Just because things are in the reports doesn't mean they are suitable for being presented

in front of the jury. But let's not waste time on this. Let's go back.

And, Mr. Ashkenazi, go on to something else. I don't want to hear anything about agreements between Revance and third parties that are not comparable.

MR. ASHKENAZI: I understand, Your Honor. Thank you.

THE COURT: Okay.

(The discussion at sidebar ended.)

BY MR. ASHKENAZI:

Q. Can we please pull up PTX 335.

And, Dr. Siegwarth, if you need it it's in your binder.

A. I'm Ms. Trexler.

Q. I apologize.

A. I'm sorry. What was PTX 335 you said?

Q. I'm sorry. JTX 158.

A. Okay. I'm there.

Q. Now, you actually agree with Dr. Siegwarth in this case that Allergan and Revance would approach the hypothetical negotiation as competitors; correct?

A. I agree that Allergan, Inc., would have the interests of its related entities Allergan Ireland and Allergan U.S. Sales in mind at the hypothetical negotiation.

Q. Okay. And if we could go to JTX 158 at page 13,

please. You did review this slide; correct?
A. Okay, I'm there. Yes.
Q. Okay. And over here we see that Revance is listed as the highest competitor challenge level for Allergan at this time; correct?
A. Yes, I would say this is for the Allergan entities that sell -- manufacture and sell BOTOX.
Q. And they're listed as a notable competitor; correct?
A. Yes.
Q. Okay. Now if we could please go to -- pull up your slide DDX 10.7, please. Were you actually trying to suggest that Revance somehow did Allergan a favor by infringing Allergan's patents to launch a new competitive product?
THE COURT: So I'm going to strike that as argumentative.
BY MR. ASHKENAZI:
Q. You brought up this slide, did you not?
A. I did, yes.
Q. And did you not -- was it your assertion that each time there was an entrant of a new product that Allergan somehow benefited from that?
A. It's not my assertion. There's evidence all over the record that the parties and Allergan -- a lot of Allergan documents talk about how entrance of a new competitor into the market helps to grow the market. There's added

awareness.
Q. So a competitor entering in the market, according to you, is a benefit to Allergan?
A. It can be. You have more companies advertising this type of product, which brings new patients into the market. And even some of the surveys that Dr. Siegwarth relies upon, there was acknowledgment of new patients into the market. This is not a saturated market. This is a market where there is room for growth because there are a lot more people who could be using the product.
Q. Just to be clear, between the year 2009 and 2013, Allergan was getting increasingly additional treatment indications for BOTOX; correct?
A. I don't remember the dates. I know Allergan continued to get new indications. I believe there was testimony on that on the first day or two of trial.
Q. In fact, there have been close to a dozen new indications since Allergan has acquired BOTOX; correct?
A. I don't remember how many. I know it was discussed at trial.
Q. And relates to things like migraines. Allergan conducted clinical trials and brought BOTOX to help treat patients for migraines; right?
A. I recall that testimony, yes.
Q. And that happened on the timeline you're showing us

here on the slide; correct?
A. I don't remember when that approval happened.
Q. In fact, Allergan got a number of other additional treatments approved by the FDA for their BOTOX product; correct?
A. They did. I don't recall the timelines, but yes. Except this slide is reflecting cosmetic sales, so those other indications for migraines and the other to treat diseases is not reflected on this. I am just looking at the cosmetic market sales on this slide so those other indications don't come into play.
Q. Okay. Do you understand that Allergan got four indications for use in the cosmetic market?
A. I don't recall.
Q. You don't recall when those indications came into effect, do you?
A. I don't have that information in front of me. I wouldn't have the dates memorized.
Q. You wouldn't know that they occur on this timeline over here; correct?
A. I would need information. Like I said, I don't have the dates when Allergan got approval for cosmetic uses of its product.
Q. You didn't factor that into the consideration of your analysis here; correct?

A. I would say I had all of that information in front of me when forming my opinion. I just don't have it in front of me right now so I can't tell you when this happened. I have tens of thousands of pages of documents in this case. I just don't have them memorized.
Q. You were discussing the market here for BOTOX cosmetic sales; correct?
A. I am, yes.
Q. But you didn't think to look at what -- when Allergan got indications to help treat or help additional people for the cosmetic purposes; is that right?
A. No.
Q. You didn't indicate it on this slide, did you?
A. It's not on this slide. This slide is a recreation of one of Allergan's documents.
Q. Thank you.
Now, Ms. Trexler, I want to make sure I have this right. You are aware that Revance infringes Allergan's patents to make and sell DAXXIFY; correct?
A. I'm aware that Revance uses the Allergan patents.
Q. All three patents; correct?
A. That is my understanding as a nonlawyer.
Q. The '740 patent and the '748 patent, so two manufacturing patents here in this case; correct?
MR. DESAI: Objection, Your Honor. We have had

a lot of discussion about this.

MR. ASHKENAZI: I'll move on to the next question, Your Honor.

BY MR. ASHKENAZI:

Q. The point I'm trying to make is Revance has not until today attempted to use a different manufacturing process for its DAXXIFY product; correct?

MR. DESAI: Objection, Your Honor. This is outside the scope.

THE COURT: I'm going to allow it.

THE WITNESS: I don't know what Revance has done behind the scenes. I'm unaware sitting here of a change in their process or product.

BY MR. ASHKENAZI:

Q. Why don't we pull up DDX 10-42. Now, this is a slide you used during your direct examination; correct?

A. Yes.

Q. And you told the jury that the royalty should be only 1.4 percent for the manufacturing patents and if you look on the left-hand side, 3.5 percent for the formulation patent; is that correct?

A. Yes, that's correct.

Q. And that's because you multiplied survey results by the price premium; is that right?

A. Yes, that's correct.

Q. To be clear, the price premium you used in comparing the price -- withdrawn. I'll make that a little clearer.
The price premium you used was comparing the price that Revance used for DAXXIFY to the price of BOTOX at the time of commercial launch of DAXXIFY; correct?
A. I believe it was at the time of commercial launch, and that's also consistent with what Allergan's expectations were prior to launch. That's the 17 percent Dr. Siegwarth used. And then the actual was 17 and a half. So we're in the same ballpark.
Q. You didn't consider any opinions about -- or you didn't consider what the price premium would be throughout the lifetime of the patents in this case; correct?
A. I'm looking at what the parties expected around the date of the hypothetical negotiation and what actually happened at launch.
Q. Well, I want to be clear. The price premium you used is the price premium at launch when DAXXIFY is first selling the product into the market; correct?
A. Yes, that's the 17 and a half percent.
Q. And that price premium can change over time; correct?
A. Sure.
Q. And these patents, some of them, the last manufacturing patent goes out until 2029; correct?
A. Yes, that's correct.

Q. And you did not consider what the price premium would be during that entire time period of the life of the '748 patent; correct?
A. I didn't adjust it because there was no information that suggested that price premium would change one way or the other.
Q. You didn't evaluate it one way or the other, did you?
A. There was nothing to evaluate in the record.
Q. You didn't consider the price premium that would occur between the time of launch and the expiration of the formulation patent; correct?
A. I have no information in the record that either Allergan -- any of the Allergan entities or Revance was predicting a change in that price premium. So it would be inappropriate for me to make an adjustment just because I said so or because I thought it might change.
I would need evidence in order to make that change. And if there were evidence, I would have considered it and factored that into my calculations.
Q. I just want to be clear.
If Revance decided -- and you would agree that Revance is the one who decides what the price premium would be; correct?
A. Yes, Revance decides its own price.
Q. And if Revance decided to price their product at the

same as BOTOX at launch so they could gain market share or get into the market, according to you, the royalty rate would be zero; correct?

A. No, I would use a different methodology. That's contrary to the facts in this case. And each hypothetical negotiation has to look at the facts and the matter.

In this case, the parties anticipated a price premium of approximately 17 percent. The actual launch was a price premium of 17 and a half percent. And Dr. Siegwarth acknowledges that.

What you're putting forward is a different fact pattern. And if I had a different fact pattern, I would need to come up with a different methodology. Here we have a very solid methodology based on the fact that there was expected to be and was a price premium.

Q. So let's take a look at your left-hand side. You say: "Not recognizing duration dispute."

That means that you are acknowledging that for that left-hand side that the formulation patent contributes to the longer duration of action of DAXXIFY; correct?

A. No.

Q. I'm just saying for that left-hand side of the screen, you're not making that assumption.

A. No, I'm -- the assumption that's been made is that the parties dispute this. You have Allergan, Inc., saying

it's my patents that give you the extended three-month duration. And Revance is saying, no, it's not, it's my peptide.

But they're negotiating and I'm recognizing that there's this dispute between the parties. Each party thinks they're a hundred percent right. And how I think it's reasonable to resolve that at the negotiation is that they meet in the middle.

Q. Ms. Trexler, I'm only focusing -- if you could look --

MR. ASHKENAZI: Maybe if we can highlight it, it will help Ms. Trexler.

BY MR. ASHKENAZI:

Q. You say not recognizing duration dispute in that left-hand side.

Do you see that?

A. Yes.

Q. I want to focus on just that.

A. Okay.

Q. For that purpose, it's your assertion for just this column, these two columns, that the parties would recognize that the formulation patents contribute to DAXXIFY's longer duration of action; correct?

A. This would be if the jury determines, after hearing everything in this case, for the first time it's a hundred

percent decided that there is duration associated with these patents, then you would look to that rate.

But at the hypothetical negotiation, nobody would know that. There would be this fundamental dispute between the parties. And my recommendation is that the parties would meet in the middle to say, I know what you think, I know what you think, and we need to compromise.

Q. Ms. Trexler -- and I appreciate it. My question was actually just a small piece. You answered it and then you continued on. You'll have an opportunity with your counsel to further elaborate if you so feel the need to.

So the left-hand side is making the assumption that the formulation patents contribute to the longer duration of action for just the left-hand side of that column; correct?

A. I disagree with the way that you're phrasing it.

Q. Okay.

A. It's not assuming a hundred percent. It's just saying that's before you factor in this dispute of the hypothetical negotiation.

Q. Okay. But you will agree with me that DAXXIFY promotes one of the main differences for DAXXIFY is its longer duration of action; correct?

A. I agree that DAXXIFY promotes longer duration of action, yes.

Q. Okay. And in fact, you looked at some surveys; correct?
A. I did, yes.
Q. And you found out from one of your surveys that HCPs ranked increased duration of effect as 20 percent of the relative contribution to DAXXIFY; correct?
A. Yes, that's correct. And that's what my rate is based on.
Q. And just so we're clear, also, for the animal-protein free, you would say that would be 8 percent; correct?
A. It's not an 8 percent rate or a 20 percent rate. That's the relative contribution to the price premium.
Q. It's the relative contribution to DAXXIFY; correct?
A. No. It's the relative contribution of the additional features that DAXXIFY has. It's not the relative contribution of the entire product of DAXXIFY because there are all of those standard features that are offered by the other competitive products on the market.
I am focused on the unique attributes.
Q. Okay. So now that we've got that straight, I want to make sure we're all clear on it.
It's your assertion that duration of action on the left-hand side, which would be attributed for this purpose at 3.5 percent, is only worth $1.5 million; correct?
A. It's worth -- if you don't recognize the dispute, the

rate is 3.5 percent. The $9.6 million is based on sales up through May 31, 2025.

That number would continue going up with each sale of DAXXIFY going forward.

Q. So let's break that up.

Revance made 273 million in sales to date when you created this slide; correct?

A. Yes, since launch.

Q. And from that $273 million in sales, you're valuing the formulation patent with duration at only 9.5 million; is that accurate?

A. It's not that I'm valuing it. That's what the damages are that -- when you apply the royalty rate. The value of extended duration is in the royalty rates that I've put forward.

The dollars that flow from it, it's the royalty amount that gets paid, and that royalty amount is ongoing.

Q. Now, let's take a look at the manufacturing patents.

You're saying that the use -- you are -- you were here during Dr. Ruegg's testimony?

A. Yes, I was.

Q. And you understand that he testified that the DAXXIFY peptide is incompatible with formulations that are not APF, animal-protein free?

A. I don't remember the specific testimony because I'm

not a technical person.

Q. Okay. Well, I just want to make sure I understand.

For the manufacturing patents, it's your assertion that the royalty rate should be 1.4 percent; right?

A. Yes.

Q. And that's the -- these are the patents that cover the process of making DAXXIFY; correct?

A. I don't know if it covers the entire process, but it covers a portion of the process. These manufacturing patents, I understand, relate to the manufacture of the product.

Q. All right. And you're saying that would only be worth $3.8 million on $273 million in sales; correct?

A. So again, the $3.8 million are the damages to date. The rate is 1.4 percent. And that's consistent with the value that customers place on having an APF product. And we saw that in the surveys.

Q. And you found -- you'll agree with me that DAXXIFY is advertised as being animal-protein free; correct?

A. Yes, it is.

Q. That's one of the differentiating features of DAXXIFY; correct?

A. Yes, it's one of many.

Q. Longer duration and APF are differentiating features

of DAXXIFY in this marketplace; correct?
A. Those are two of many of the unique features to DAXXIFY.
Q. And the number that you gave to the jury is for the patents that cover those processes, those features, 3.5, $8.6 million for Allergan and 2 -- out of $273 million in sales that Revance made; is that correct?
A. I'm sorry. You lost me.
Q. Sure.
A. 8.6 million. Where is that coming from?
Q. On the right-hand side of the screen. It's the number that you assert is the proper reasonable royalty calculation here.
You say that Allergan should only get $8.6 million for use of its inventions on $273 million of sales that Revance made; correct?
A. Again, that $8.6 million would be the royalty owed to Allergan should the patents be found to be valid based on sales through May 31, 2025. That number continues to go up as sales of DAXXIFY go up.
MR. ASHKENAZI: Pass the witness, Your Honor.
THE COURT: All right. Redirect?
MR. DESAI: No redirect, Your Honor.
THE COURT: All right. Ms. Trexler, thank you very much. You may step down.

I guess we should probably have our afternoon break. So can we take the jury out for 15 minutes.

(The jury exited the courtroom.)

THE COURT: All right. Ms. Trexler, you can step down whenever you like.

Were you still calling your two medical doctors?

MR. DESAI: We're not.

THE COURT: Okay. That's what I thought.

All right. So we'll take a recess and should be sending the jury instructions and verdict form out, and we'll be back in 15 minutes or less.

(A recess was taken, after which the following proceedings were had:)

MS. RUPERT: Your Honor, with respect to the 50(a) issues, we think it might make sense to present just one of the issues now, that's this inherency issue, as it might moot an issue going forward.

But obviously, we're happy to --

THE COURT: Inherency strikes me as very weak, but I'm not going to grant you judgment on it.

MS. RUPERT: Okay. Thank you, Your Honor.

(The jury entered the courtroom.)

THE COURT: All right. Welcome back, everyone. We're ready to proceed.

Ms. Rupert.

Actually, I guess, though, maybe they didn't say it. The defense has rested their case; right?

MS. WELLS: The defendants rest their case.

THE COURT: Okay. All right. So now we're on to the plaintiff here.

Ms. Rupert.

MS. RUPERT: Good afternoon, everyone. The plaintiffs would like to call their next witness, Dr. Frank Gessler, back to the stand.

And, Your Honor, can we hand up copies of the witness binders?

THE COURT: Yes.

Dr. Gessler, you remain sworn from when you testified before. Okay?

THE WITNESS: Yes, sir.

DIRECT EXAMINATION

BY MS. RUPERT:

Q. Welcome back, sir. Can you please state your name again for the record.

A. Thank you. My name is Frank Andreas Gessler.

Q. And can you please remind the jury of your role in this case.

A. I'm an expert witness on behalf of Allergan.

Q. And can you please remind us of your area of expertise.

A. It's on botulinum neurotoxin production purification.
Q. And what opinions are you going to be discussing in this portion of your testimony?
A. It's going to be my opinions in response to Revance's argument that certain claims of the '740 and the '748 patent are invalid for obviousness.
Q. And can you please tell the jury, what is the conclusion that you've reached?
A. I came to the conclusion that both patents are valid.
Q. So let's start with the '740 patent. And please turn in your binder to a document marked JTX 003.
If we can pull that up on the screen too.
Sir, do you recognize that document?
A. Yes, I do.
Q. And what is it?
A. This is the '740 patent.
Q. All right. So let's turn to your first slide.
Dr. Gessler, were you in the courtroom when Revance's expert, Dr. Goodnough, testified that Allergan's '740 patent was invalid as obvious?
A. Yes, I was.
Q. And do you agree with Dr. Goodnough's opinion?
A. No, unfortunately, I can't.
Q. Why do you disagree with Dr. Goodnough?
A. It is my opinion that the '740 animal-free-process

patent is not obvious.

It's my understanding that Allergan scientists were the first to come up with this animal-protein-free process, so I disagree that this invention would have been obvious to an ordinary person -- ordinary scientist at that time.

Q. So let's turn to your next slide and discuss your opinions about the '740 patent at a high level.

Could you tell us, what is the basis for your opinion that Allergan's '740 patent is valid?

A. As I understand it, Revance has not shown by clear and convincing evidence that the '740 patent is invalid as obvious. And it is my understanding that this is a very high burden.

So at the time of the invention, a person of ordinary skill would not have been motivated to combine the publications cited by Revance, and the same person would not have had a reasonable expectation of success in achieving Allergan's animal-free process to make BoNT/A.

Q. Let's go to your next slide.

Sir, what is the invention of the '740 patent?

A. Allergan's inventions were the first to come up with an animal-free process for making BoNT/A, and they applied for a patent on it.

Q. And what is this key date that you've identified here

on the slide?
A. The key date is September 25, 2003.
Q. And why does this date matter?
A. Because that's an important date for us. We cannot take today's knowledge, what we know today, of the invention or be available to us related to this. We'd have to put ourselves in a time machine, go back to the time, go back to 2003, and see what was available to the ordinary scientist at that time. And then that's what we can take to consider if it's obvious or not.
Q. So let's turn to your next slide and talk a little more about Allergan's first invention.
So what patent claims are you showing here?
A. This slide shows Claims 6 and Claim 8 of the patent.
Q. And why are you showing these two claims together?
A. These are the claims Revance is arguing are invalid. And Claim 8 -- I was asked to give my opinion on Claim 8, and this claim refers to Claim 6. So that's why both claims are on the slide.
Q. And why have you highlighted certain words in these claims?
A. These are key words for my assessment. They are words on the -- they focus on the process and on important steps of the process.
Q. Let's take these highlighted terms one at a time.

Let's turn to your next slide.
And what parts of Claims 6 and 8 are you highlighting in blue here?
A. This shows Claims 6 and Claim 8.
Q. And what is shown in blue in Claim 6 and Claim 8?
A. This is the biologically active botulinum toxin in Claim 6. And it's further specified as botulinum toxin type A in Claim 8.
Q. And just to remind everyone, are we calling the botulinum toxin "BoNT/A" for short?
A. Yeah, that's what we call it.
Q. And let's turn to your next slide and talk a little more about BoNT. Did Allergan discover BoNT?
A. No, they didn't.
Q. Turning to what you have on the screen, what have you shown here?
A. These are the seven different types of BoNT which were known in 2003.
Q. How are these different types of BoNT named?
A. They are named by letters and they are named A to G.
Q. How many of these different types of BoNT do you work with at miprolap?
A. We work with seven types of BoNT.
Q. Looking at your slide, are these the precise structures of all these different types of BoNT?

A. We are still learning what the molecular structure of the molecules is, so these are simple illustrations to show the molecules are different.

Q. Let's turn to your next slide. And what are you highlighting in yellow here?

A. This is the APF process I'm highlighting.

Q. What does APF stand for?

A. APF stands for animal-protein free.

Q. Let's turn to your next slide. Before Allergan's invention, how had BoNT/A been made?

A. BoNT has always been made with animal proteins. This could be proteins from milk -- we heard about casein earlier -- this could be meat proteins as well. It's what was used to produce or grow *clostridium botulinum* and to produce the toxin. So this is actually the old and traditional way of making BoNT.

Q. So before Allergan's invention, why do you think that no one else had come up a new way of growing BoNT/A without using animal proteins?

A. Because during the -- we have heard quite a lot about the complex nutrient requirements of this bacteria. So they are difficult to grow and you have, besides that, to consider the requirements in terms of the incubation temperature, pH, so many factors which need to be considered. So even if somebody at that time would have

thought this is possible at all, to grow it without animal proteins, it wouldn't have been straightforward.

Q. Let's turn to your next slide. Can you please explain to the jury what you are showing overall here?

A. This shows overall the animal-protein-free process of producing BoNT/A.

Q. And what part of Allergan's process are you showing on the left side of the slide in Box 1?

A. On the left side, Box 1, we see that Allergan scientists surprisingly found out that *clostridium botulinum* grows very well in plant media. It produces the toxin in this medium.

Q. What part of Allergan's process are you showing on the right side of the slide in Box 2?

A. On the right side we see that the toxin, which is obtained in the first process, can be purified again in the animal-protein-free process by chromatography.

Q. So let's turn to your next slide. And what part of Allergan's invention are you focused on here?

A. This shows that Allergan was the first to introduce chromatography in this animal-protein-free process.

Q. Did Allergan invent chromatography?

A. No, that's something they didn't invent.

Q. What has Allergan done with chromatography that is new?

A. That's actually bringing the two-step chromatography process into animal-protein-free process.
Q. What are you highlighting in blue and green on the slide?
A. These are the two different techniques, the two different columns they use in their invention.
Q. How did Allergan combine these columns as part of the process?
A. They started with the first process, the hydrophobic chromatography, followed by the second column.
Q. Do these two columns separate BoNT in two different ways?
A. They do. They are different techniques in separating BoNT.
Q. Let's go to your next slide. What are you showing here?
A. This shows what we've seen in the slide before, these two columns we have seen. This is the hydrophobic interaction column first, and we've seen this process before in another presentation. You see that the -- in the beaker we've got the fluid which gets on to the column and there are those different-colored beads. And we get a partially purified material out, and this partially purified material goes on the second column, the ion exchange column, where we then get the purified product.

Q. Is it predictable whether a chromatography will work at all?
A. No, this is highly unpredictable. This is done by assay or a run-by-run basis.
Q. In your opinion, would it have been obvious for an ordinary scientist to use chromatography the way the inventors did?
A. No, it wouldn't. Allergan was the first to introduce this process, this chromatography into the animal-free process.
Q. Let's turn to your next slide. Dr. Gessler, were you in the room when Dr. Goodnough discussed the three references that he claimed would have led an ordinary scientist in 2003 to the invention of Claim 8 of the '740 patent?
A. Yes, I was.
Q. And do you agree with Dr. Goodnough?
A. No, I can't agree with Dr. Goodnough.
Q. So what were the three references that Dr. Goodnough pointed to in claiming that the '740 patent was obvious?
A. These were FDA guidance 1999, Smelt 1982, and Gessler 1999 as they are shown here.
Q. So let's take a look at each of the references one at a time and turn to your next slide. And please also turn in your binder to the document marked JTX 112.

A. Yes.
Q. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is FDA guidance 1999, the guidance document by FDA.
Q. And let's turn to your next slide. What in general is FDA guidance 1999 about?
A. It's all about human blood donors. That's the topic of that guideline.
Q. And what is the FDA guidance 1999 saying at the top of your slide?
A. They give recommendations on donor referral.
Q. What, if anything, does the FDA guidance 1999 say about making BoNT/A?
A. They don't talk about BoNT/A at all.
Q. What, if anything, does FDA guidance 1999 say about removing animal products from a manufacturing products?
A. Again, that's an issue they don't cover. They only address the aspect of proper sourcing.
Q. How does the FDA guidance 1999 compare to Allergan's animal-free manufacturing process?
A. The FDA guidance document is a document on human blood donations, human blood donors, and Allergan's process is a process about removing protein, so completely different

thing.
Q. Let's turn in your binder to the document marked JTX 114. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is "Prions: Mayhem and management."
Q. When was this document published?
A. This was published in May 2002.
Q. Let's turn to your next slide. What are you highlighting from on this slide?
A. This is a quote from this publication and it says, "A considerable number of biopharmaceuticals manufactured today" -- means 2002 -- "still use a wide range of raw materials sourced from animal byproducts."
Q. Are animal products still used in pharmaceuticals today?
A. They are still pretty common today.
Q. And, Dr. Gessler, did you hear Dr. Goodnough testify today regarding BSE, TSE, and "mad cow" disease?
A. Yes, I did.
Q. In 2003 how many cases were there actually of "mad cow" disease being passed to humans from the use of animal products in the manufacture of a drug?
A. There was no reported case.
Q. And remind us. What is the most common

animal-protein food source to make BoNT?
A. This is a milk protein I spoke of earlier, the casein.
Q. Is using casein, the milk product, in drugs considered risky for humans?
A. No, it's not.
Q. Let's turn to the next reference Revance is relying on now. And also turn in your binder to the document marked DTX 202.
And do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is the Smelt 1982.
Q. So let's turn to your next slide. And can you please tell us, what was Smelt 1982 generally about?
A. Smelt 1982 is a food safety study. There's also the concern, especially in canned foods as you see here, that there's a risk that botulinum might grow and produce bacteria. So that's what this publication is about.
Q. Is this the same reason our parents told us to avoid those big swollen cans when we were kids?
A. Exactly, that's the reason.
Q. What, if anything, did Smelt 1982 say about BoNT manufacturing?
A. They don't speak about BoNT manufacturing at all.

Q. So let's turn to your next slide. Would the scientists in Smelt 1982 try to encourage the growth of BoNT?
A. No, their intention is to stop BoNT growing.
Q. So what does Smelt 1982 say about the results of its experiments as you've highlighted here on this slide?
A. They identified that *clostridium botulinum* and BoNT does not grow well on plant media, as you can see here.
Q. And how would an ordinary scientist understand this statement?
A. The ordinary scientist would have understood that plant media is not suitable for BoNT manufacturing.
Q. How does Smelt 1982 compare to Allergan's first manufacturing process?
A. This is something completely different. Whereas the scientists in Smelt 1982, their intention was to lower the risk, to minimize the growth of *clostridium botulinum*, that's one aspect. The other aspect is they found that it doesn't grow well on plant media.
And Allergan on the other side, they wanted to maximize the growth. They wanted maximum output in their production. That's one thing. The other thing is they obviously invented how *clostridium botulinum* can grow very well on plant media.
Q. After reading Smelt 1982, would an ordinary scientist

in 2003 have expected to be able to manufacture BoNT without using animal proteins?
A. No.
Q. So let's turn to the third and last reference Revance is relying on for the '740 patent and turn to your next slide. And also please look in your binder to the document marked DTX 192.
A. I've got it.
Q. And, sir, do you recognize this document?
A. I certainly do.
Q. Remind us, who are the authors of Gessler 1999?
A. A colleague of mine and myself.
Q. In what period of your career did you conduct this research in Gessler 1999?
A. This was along with the work I did for my thesis.
Q. Before we talk about the specifics of your reference, let's talk about how the U.S. Patent Office viewed it. Please turn in your binder to the document marked JTX 10A.
A. Yeah.
Q. All right. What is that?
A. This is part of the communication between Allergan and the Patent Office during the patent application.
Q. And did you consider this document as part of your analysis?
A. Yes, I did.

Q. Was Gessler 1999 something that the examiners at the U.S. Patent Office reviewed when they were deciding to grant the patent to Allergan?
A. Yes, they reviewed it.
Q. I think we can turn to the next slide. So what did the Patent Office say here regarding Gessler 1999 and the part that you highlighted in your slide in yellow?
A. They concluded that in my publication I do not teach an animal-protein-free process for purifying biologically active botulinum toxin. And therefore, the claims are allowable over this publication.
Q. So the Patent Office knew about your publication but they went ahead and awarded Allergan the '740 patent anyway?
A. Yes, they did.
Q. Do you agree with the Patent Office's statement about your reference?
A. Yes, they're correct. It's an animal process we used.
Q. Let's turn to your next slide and turn back to the reference itself. What was Gessler 1999 generally about?
A. It's about production purification of the *clostridium botulinum* type C and D neurotoxin. These are other toxin types than the type A we talked so much about.
Q. Why were you making these types of BoNT?
A. We wanted to use the toxins to generate antibodies.

Q. Let's turn to your next slide. Can you please explain to the jury at a high level the difference between BoNT/C and D, which are the ones in your publication, and BoNT/A, which is at the center of our invention here.
A. These are different molecules. Type C and D and BoNT/A, as you see here, they have a different structure, different molecular structure. And this structure on one hand leads to different functional aspects of the molecule. This is why type C and E, for example, are especially toxic to animals like birds and cows and BoNT/A is toxic humans.
Q. Dr. Gessler, were you in the courtroom during Dr. Goodnough's testimony?
A. Yes, I was.
Q. Did you hear him discuss a reference DTX 381, if we could pull that up?
A. Yes, I did.
Q. That was the Whelan reference; correct?
A. That's correct.
Q. And you understand that Dr. Goodnough's opinion is that this reference suggests that BoNT/A and BoNT/C and BoNT/D are so similar that they could be interchangeable?
A. That's what I understand.
Q. Do you agree with him?
A. No, I don't.
Q. Why is that?

A. Because there are parts within the molecule that are conserved among the types but they do also vary to a great extent. And I guess that's one sort of complication too.

Q. Let's look at the last sentence in the abstract there. It's the second-to-last sentence of the abstract, I'm sorry, the one starting with "alignment." And that states, "Alignment of all characterized neurotoxin sequences shows them to be composed," and they're citing BoNT/A, BoNT/C, BoNT/D, BoNT/E --

MS. WELLS: Objection, Your Honor. Undisclosed expert testimony.

MS. RUPERT: Your Honor, I believe you told us earlier we could rebut the undisclosed expert testimony Dr. Goodnough provided and this was given as part of that testimony in his redirect.

THE COURT: I was talking about the nanogram stuff. Is this that?

MS. RUPERT: This goes to the difference in the serum types.

THE COURT: I'm going to sustain the objection.

BY MS. RUPERT:

Q. So I'll ask you a very general question then. Sir, do you believe that there is, overall, little similarity between amino acid sequences of BoNT/A, C, and D?

A. Yes, there are little differences between these

molecules and that's what caused, for example, for the varying susceptibility I just talked about, being toxic to animals and being toxic to humans.
Q. Would an ordinary scientist have expected that the same chromatography that was used to purify BoNT/C and D to work with BoNT/A?
A. No, as I said, chromatography is unpredictable process, so what we know when we do the purification for type C and D does not translate to a process for type A.
Q. Would these different properties impact how the molecules bind to the column?
A. Yes, they certainly do. They have -- different bind to the column. You have the different bind to the column. The process is different.
Q. Let's turn to your next slide. And can you tell us, was the process that you used in Gessler 1999 to make BoNT/C and D an animal-free process?
A. No. As you can see on the slide, we used animal products. We used cooked meat medium as well as casein to contribute to bacteria.
Q. Did you consider removing these animal products when you were doing the work described in Gessler 1999?
A. No, we didn't.
Q. Why didn't you ever consider removing the animal products?

A. We knew from our experience and from browsing through the literature that animal proteins are the best option to go for the toxin production, so we didn't think about changing it.
Q. So when, if at all, did you first consider removing animal products in your own processes for making BoNT?
A. It was probably in the mid to late 2000s when we came across Allergan's patent.
Q. How does Gessler 1999 compare to Allergan's animal-free manufacturing process?
A. Gessler 1999 is, first of all, an animal process. We use, as you see, the animal protein on one hand, and we did purify different toxin types.
Q. Dr. Gessler, just to clarify, to have an animal-free process, would it have just been a matter of swapping in some sort of plant media for the animal media that you used in Gessler 1999?
A. No, would have been definitely far more complicated.
Q. Far more complicated why?
A. Because of the overall process. If you make a change in one part of the process, you kind of cascade a range of other changes throughout the process.
Q. So how could changing the fermentation media impact the chromatography process?
A. Yeah. This is very likely because as I mentioned

before, you have the different binding properties to the column and you've got different ingredients which might compete at the column. So the process is completely different, and what you have to do is go in the hard work and just do it and see if it works.

Q. What were your conclusions with respect to the validity of Allergan's '740 patent?

A. It's my understanding that the references mentioned wouldn't have led to Allergan's animal-free process.

Q. Would reading these three publications that Revance relies on, the ones we just discussed, have made the invention obvious to an ordinary scientist in 2003?

A. No, it definitely wouldn't and that's probably why nobody came up with this invention before Allergan did.

Q. So I'd like to turn back to some more of Dr. Goodnough's testimony. This does relate to the nucleic acid issue we discussed this morning.

Dr. Gessler, do you understand that Dr. Goodnough was asked about a specific process in Example 11 of Xiang '669?

A. Yes.

Q. If we could pull up JTX 113 and go to Example 11.

A. Yes.

Q. If we could pull up Example 11 and look at the second process that's identified there, it's 276. Can you explain

what process is shown in the portion that's been highlighted on the screen in the second step.
A. This shows a chromatography process.
Q. How does it differ from the process that's used in the '748 patent?
A. Well, what you see here is the process starts with a butyl column, which is a hydrophobic interaction column, and then come in an anion exchange column, but the method is completely different. This method is a flowthrough method and in the '748 we run it in binding mode. So it looks like the same column and it is the same column but nevertheless the purification is completely different. Completely different method.
Q. Sir, could you switch from one to the other?
A. No, you definitely can't.
Q. Sir, does this disclosure change anything about your opinion on the validity of the '748 which we'll discuss next?
A. No, it doesn't.
Q. Dr. Gessler, sticking with this patent for a minute, were you in the courtroom when Dr. Goodnough testified that he had conducted some calculations to determine PPM based on some numbers provided in Sample 6 of Example 11?
A. Yes, I was.
Q. I believe when we were discussing this with

Dr. Goodnough he referred to the '740 patent as Xiang '669; right?
A. Correct.
Q. We'll do that here for clarity. Let's talk about his calculations a little more now. So Claim 8 of the '748 patent is about 1 PPM of residual nucleic acid per million parts of BoNT?
A. That's correct.
Q. And that makes sense because Claim 8 of that patent is about a process for purifying BoNT; right?
A. That's correct.
Q. Let's bring up the equation -- it's an annotation of Dr. Goodnough's equation and -- show it on the screen. That is DTX 4.47A.
Dr. Gessler, if you look at the ratio on the left, this is the 2 nanograms that was taken from Table 6 of Xiang '669; right?
A. That's correct.
Q. Looking at this table, what was the lowest amount -- looking at Table 6 if we could pull that up, what was the lowest amount of DNA that Dr. Goodnough could have chosen?
A. This was 2 nanograms.
Q. So I noticed in this table it actually lists DNA. What is DNA?
A. DNA is part of the nucleic acid. There are other

parts as well.
Q. So is RNA also accounted for here?
A. No, it's not. It's an assay for the detection of DNA only.
Q. So the amount in Table 6 -- could we pull up Table 6 really quickly of Xiang '669 so we're all clear. We'll come back to the equation.
So there's Table 6. You can see there's 2 to 6 nanograms per mil, and it states there it's a PicoGreen DNA assay; right?
A. That's correct.
Q. So RNA is not included there; right?
A. Single-stranded RNA is not included.
Q. This PicoGreen DNA assay would only account for some of the nucleic acids present in the sample?
A. That's correct.
Q. Not all of them?
A. That's correct.
Q. Let's go back to the slide.
MS. RUPERT: My apologies, Mr. Campos.
BY MS. RUPERT:
Q. So we talked about the 2 nanograms just now. What was 2 nanograms in according to Dr. Goodnough's calculation?
A. So water, actually.
Q. And so that's why we labeled the denominator here as

1 milliliter of water; right?
A. Correct, yes.
Q. And Dr. Goodnough multiplied this amount by the density of the water, which is one mil per gram?
A. Yes.
Q. Why do you think he multiplied by the density of water there?
A. Because water was in the denominator in the first place so you would need to account for that.
Q. And then he multiplied by that factor in the middle to convert grams to milligrams?
A. That's right.
Q. Dr. Gessler, as we just discussed, how is the residual nucleic acid described in Claim 8 of the '748 patent? In terms of parts of what to what?
A. It's speaks of nucleic acid related to BoNT.
Q. But in looking at Dr. Goodnough's calculation, and like the old saying, where's the BoNT?
A. Exactly. That's definitely missing.
Q. To summarize, what, if anything, can you conclude from Dr. Goodnough's calculation?
A. We can't conclude anything in the view of Claim 8.
Q. Okay. And in looking at the specification of the '740 patent, which we've been discussing, does it disclose anywhere the amount of residual nucleic acid to result from

that process?

A. The '748, you said.

Q. The '740 patent --

A. No --

(Cross-talk.)

THE COURT: There's a certain amount of talking over and you have to control it so that doesn't happen. Okay?

MS. RUPERT: Okay. I'm sorry, Your Honor. I know I have limited time, but I will slow down.

THE COURT: Talking over doesn't help.

MS. RUPERT: I understand.

BY MS. RUPERT:

Q. Okay. So let's turn to the second patent that you were asked to consider, the '748 manufacturing patent, which we've been discussing right now in the context of the nucleic acids.

A. Yep.

Q. Okay. So let's turn in your binder to what's been marked as JTX 004.

And do you recognize this document?

A. Yes, I do.

Q. And what is it?

A. This is the '748 patent.

Q. And so let's go to your next slide.

So, Dr. Gessler, you were in the courtroom when Dr. Goodnough testified that Allergan's '748 patent was invalid as obvious.

A. Yes, I was.

Q. And do you agree with Dr. Goodnough's opinion?

A. No, I can't agree with Dr. Goodnough's opinion.

Q. And why do you disagree with Dr. Goodnough?

A. So because it's my opinion that the '748 super pure patent is not obvious. Allergan's scientists were the first to come up with this super pure process, and that's why I disagree that this invention would have been obvious to an ordinary scientist, given what was known at that time.

Q. Okay. So let's turn to your next slide.

And can you please let us know at a high level what the basis is for your opinion that Allergan's '748 patent is invalid -- or is valid. I'm sorry, I misspoke.

The basis for your opinion that Allergan's '748 patent is valid.

A. Well, it's the same we've already seen before in the '740. So for the '748 patent, again, Revance has not shown by clear and convincing evidence that the '748 patent is invalid as obvious.

Again, this is a very high burden. And at the time of the invention, the person of ordinary skill would not have been motivated to combine the publications cited by

Revance. And that same person would not have had reasonable expectation of success in achieving Allergan's process --

Q. Let's turn to your next slide.

THE COURT: Doctor, could you repeat the last few words.

THE WITNESS: So the ordinary scientist would not have had a reasonable expectation of success to achieve Allergan's process in making super pure BoNT/A.

BY MS. RUPERT:

Q. Okay. So we're on the next slide.

At a high level, what is the invention of the '748 patent?

A. Allergan scientists invented a process, an animal-protein-free process, to purify super pure BoNT/A.

Q. And can you please explain to the jury what you mean by "super pure."

A. Earlier this week, Dr. Bates coined this term, and I find it pretty good because it explains that with this process, they managed to remove almost hundred percent of the nucleic acids, get down to the 1 PPM we just talked about.

And this really shows that it gives you a very, very pure BoNT/A at the end. So super pure is very fitting.

Q. And what is the key date you listed on this slide?

A. This is July 13, 2009.

Q. And so let's turn to your next slide and discuss a little more about Allergan's second invention.

What kinds of things are you showing here?

A. This shows Claims 8 and -- Claim 8. Claim 1 and Claim 8.

Q. Claim 1 and Claim 8.

And why are you showing these two claims together?

A. Because I was asked for opinion on the obviousness of Claim 8, and Claim 8 refers to Claim 1. That's why both claims are shown.

Q. And why have you highlighted certain words in these claims?

A. These are key terms within both claims, which are reported from my assessment.

Q. All right. So let's take each of the terms one at a time and turn to your next slide.

What are you highlighting in yellow here?

A. So this is, again, the animal-product-free process.

Q. And let's turn to your next slide.

What is shown in Figure 1A on the left of the slide?

A. On the left side, you see the nonAPF process. This is the old -- the conventional way of producing BoNT.

Q. And how is that process referred to on this slide?

A. This is a nonAPF process.
Q. And then what is shown in Figure 1B in the middle of the slide?
A. This is the IAPF process, which is shown as a workflow on that figure and also described as Example 2 on the right side.
Q. So what does "IAPF" stand for?
A. IAPF stands for improved animal-protein free.
Q. And how does Example 2, which you've shown on the right side of your slide, describe the process that is shown in Figure 1B?
A. It's actually the same.
Q. And can you walk through those steps for us that you've highlighted here.
A. Yeah, this shows the overall process, which starts from culturing, fermenting the bacteria, purifying them by chromatography, and finally the finish of the product.
Q. And so how does this process overall compare to an animal free process of Claim 8 of the '748 patent?
A. This describes the process of Claim 8.
Q. So let's turn to your next slide.
And what have you highlighted in blue here?
A. This is the 150 kilodalton BoNT/A toxin.
Q. And what is -- I'm so sorry. I though you were done.
Are you finished?

A. Now I'm finished, yeah.
Q. Okay. So what is 150 kilodalton BoNT/A?
A. That's the biologically active part of the toxin.
Q. So let's go to your next slide.
And what are you highlighting in purple and orange here?
A. So this are the two specific chromatography steps, which in this invention were introduced into this animal-protein-free process. The anion exchange and the cation exchange, the two columns separated by different -- separated by different nodes.
Q. So let's turn to your next slide.
And at a very high level, what are you showing here?
A. This shows what we have seen on the slide before it. It shows that you take the solution, pour it on the first column. This is the anion exchange column. It runs it through and the -- you get it separated, you get, in the end, partially purified toxin. And this goes on to the next column, which is cation exchange column. Again, separates molecules based on the charge. And at the end of this process, you get the super pure BoNT/A.
Q. So let's turn back just for a minute to the AEX column that you mentioned.
How would you describe Allergan's discovery that

AEX could be used to make BoNT/A?
A. It was actually surprising.
Q. And why was that surprising?
A. Because there was information out that this process might impact your toxin quality.
Q. So we'll come back to that point a little bit later. Let's go to your next slide.
And what are you highlighting in gray here?
A. This shows within Claim 8 that they managed to purify BoNT and to -- into a purity that there is no more than one part residual nucleic acid per million parts of botulinum neurotoxin, which is the 1 PPM.
So they got the nucleic acids below 1 PPM.
Q. And exactly how low is this level of residual nucleic acids?
A. This is very, very low.
Q. Before Allergan, who, if anyone, was able to achieve this level -- this lower level of residual nucleic acids?
A. As far as I know, nobody did before Allergan.
Q. Okay. Let's go to your next slide.
Now, can you please explain to the jury at a very high level how the steps in Allergan's super pure '748 patent all work together to reduce the level of residual nucleic acids.
A. This shows that all the steps are needed to get down

to that low level of nucleic acids. So as you see here, you've got the culture and you filter the culture. So this filter you are using already contributes to reducing the nucleic acids.

And then you run those two columns, the AX and the CX column, and they, too, further reduce the amount of nucleic acid. So all these steps work together so that you finally get this super pure BoNT/A.

Q. So let's turn to your next slide.

What factors would impact the level of nucleic acids that remain after the chromatography process?

A. So all the factors which have impact on the process itself can, of course, have an impact on the level of nucleic acids. And you see here if you were coming up, this could be the column you use that talked about the resin, the buffers, the combinations of the column you use, just to mention a few of all of these factors which go into that process.

Q. So let's turn to your next slide.

And what part of the super pure patent, this '748 patent, have you shown here?

A. This, again, shows the overall process in Example 2. So we have the culturing and fermentation where we grow the bacteria and reduce the toxin. We've got the depth filtration, which as you can see here, already contributes

to remove up to about 80 percent of the nucleic acids.

And you've got the purification on the two columns, the anion exchange and cation exchange chromatography.

Q. All right. So let's turn now to Revance's obviousness allegations in this case for the '748 patent and your responses to them. So, Dr. Gessler, if we could turn to your next slide.

Were you in the room when Dr. Goodnough discussed the references he claimed would have led an ordinary scientist in 2009 to the invention of Claim 8 of the '748 patent?

A. Yes, I was.

Q. Do you agree with him?

A. No, I can't agree with him.

Q. And what were those two references that Dr. Goodnough discussed?

A. They were Malizio 2000 and Xiang '669.

Q. So let's go through each of those now. Turn to your next slide. And please turn in your binder to DTX 196.

Do you recognize this document?

A. Yes, I do.

Q. And what is it?

A. This is Malizio 2000.

Q. And was Malizio 2000 something that the U.S.

examiners at the Patent Office reviewed when they were deciding whether to award the '748 patent to Allergan?
A. Yes, they were aware of it.
Q. And what does the process used in Malizio 2000 describe generally?
A. It's a process of purifying BoNT/A but not for medical use.
Q. And so the Patent Office knew about Malizio 2000 but went ahead and awarded the patent to Allergan anyway?
A. Yes, they did.
Q. Okay. Let's turn to your next slide.
Is the process -- and turn to the next slide.
Does the process to make BoNT in Malizio 2000 contain animal protein?
A. Yes, it does. As we can see from the slide, they used casein.
Q. So let's turn to your next slide.
As highlighted here, what column did Malizio use for chromatography in Section 3.5?
A. Malizio used a DEAE sephadex column, which is an anion exchange chromatography.
Q. As highlighted here in Section 3.6, what additional potential columns for chromatography does Malizio 2000 mention?
A. If there was a need to eliminate for that trace

contaminants, they recommended to use a carbohydrate-binding affinity gel followed by a sephadex chromatography.

Q. So how does Malizio 2000 compare to Allergan's super pure manufacturing process?

A. Malizio 2000 is an animal protein process. And this process does not require the use of an anion exchange column followed by a cation exchange column.

Q. So how much residual nucleic acids did Malizio 2000 say was left in his BoNT?

A. We don't know.

Q. Does Malizio 2000 provide a specific number for the amount of residual nucleic acids --

A. No, they don't.

Q. Would an ordinary scientist take that to mean there's no milk at all?

A. No.

Q. And by that, I mean residual nucleic acids.

All right. So let's turn to the second publication Revance is also relying on. Let's turn to slide -- there we go -- and talk about Xiang '669.

Do you recognize this document?

A. Yes, I do.

Q. And if you could turn in your binder to JTX 115 -- or 113.

So what is the Xiang '669 publication?

A. Xiang 669 is the publication which was later issued as the '740 patent.
Q. And if we could turn to the next slide. So the Xiang '669 and Allergan's '740 animal-free patent are the same; correct?
A. Yes, they are.
Q. Does Xiang '669 or the '740 patent have a process to obtain a super pure product that removes nearly a hundred percent of the residual nucleic acids?
A. No, they don't disclose that.
Q. And was the '740 patent or Xiang '669 something the U.S. examiners at the Patent Office reviewed when deciding to award the patent to Allergan?
A. Yes, they did.
Q. Okay. So let's turn to your next slide. You can skip that one.
So how did the process in Xiang '669 differ from Allergan's super pure manufacturing process invention?
A. As we see here on this slide, these are two completely different chromatography processes. While Xiang '669, the '740, uses the hydrophobic interaction followed by the ion exchange column or anion exchange column, the super pure patent has a completely different process. They use an anion exchange column followed by a cation exchange column.
Q. In your opinion, would an ordinary scientist in 2009

after reading Xiang '669 have considered doing what the inventors of the '740 patent did and use an AEX column followed by a CEX column to purify BoNT/A?
A. No. There would be no motivation to do so.
Q. Why not?
A. Because before this information came out on the anion exchange process by the Allergan scientists, Allergan was warned against using anion exchange chromatography.
Q. Where was this warning?
A. This was Example 16 of an Allergan patent.
Q. So please turn in your binder to what's been marked JTX 212. And do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is the '697 patent or as we call the Example 16 patent.
Q. So when was the Example 16 patent published?
A. This was published in 2008. That's the issue date. 2006.
MS. RUPERT: Your Honor, I'm not sure if it was admitted but I move to admit JTX 212 into evidence.
MS. WELLS: No objection.
THE COURT: Admitted without objection.
(Thereupon, Joint Exhibit JTX 212 was admitted.)
BY MS. RUPERT:

Q. We talked about this before but what did Allergan say in Example 16 about using AEX with BoNT?
A. They said that anion exchange column should not be used in toxin chromatographic purification because what they found out is this might cause the toxin band pattern change.
Q. How would a toxin band pattern change or what could it indicate to an ordinary scientist?
A. This could indicate that you get a bad toxin quality, that the biological activity of the toxin might be compromised.
Q. How would an ordinary scientist have viewed this statement, Example 16?
A. The ordinary scientist would come to the conclusion that anion exchange chromatography is not a way to go for purifying BoNT.
Q. I think you used the term "teaching away" later or earlier. In your view, would Example 16 teach away from the use of anion exchange chromatography?
A. It teaches away from anion exchange chromatography.
Q. So let's go to your last slide, your summary of opinions. I'll ask you, in the meantime, what is your opinion with respect to the validity of Allergan's '748 patent?
A. It's my understanding this patent is valid because it's not obvious.

Q. Would reading the two publications that Revance relies on, the ones we just discussed, have made the invention obvious to an ordinary scientist?
A. No, it didn't. Again, this is the reason that nobody came up with this invention before Allergan did.
MS. RUPERT: Thank you, Dr. Gessler. I have no further questions at this time.
THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MS. WELLS:
Q. Good afternoon, Dr. Gessler. Nice to see you again. Deirdre Wells. I'm one of the attorneys for Revance,
A. Good afternoon, again.
Q. We're getting to the end of trial and we've had a lot of information and documents over the last four days to the jury. I'm going to focus my questions on a few key issues. Okay?
A. Perfect.
Q. I'd like to start by talking about the '748 patent.
A. Sure.
Q. Just to make sure everyone is on the same page, that's the patent that has the anion exchange chromatography and the cation chromatography; right?
A. That's correct.
Q. Now, I think I heard that it's your testimony that a

skilled toxin researcher in 2009 would not have wanted to use anion chromatography to purify botulinum toxin; is that right? Is that your testimony you just gave with Allergan's attorney?
A. This was what I said, that if you are in the manufacturing process you would step away from anion exchange chromatography before that date.
Q. Okay. But you agree that there was anion exchange chromatography before that date; right?
A. Sure, no doubt.
Q. And there was cation exchange chromatography before that date?
A. Yep. Long time.
Q. Allergan didn't invent any of those?
A. They invented many things, but not chromatography.
Q. In fact, anion exchange chromatography is one of the most common botulinum toxin purification methods since at least the 1990s; right?
A. I wouldn't say it's one of the most common but it was a technique used in -- was a technique published with anion exchange chromatography. That's correct.
Q. It was a technique that was commonly used; right?
A. So this comes down to what you mean by "common."
Q. A lot of people used it?
A. People used it.

Q. A lot of people used it?
A. And a lot of people, even more people, used other methods.
Q. It wasn't the only method but --
A. Sure.
Q. -- it was a method that a lot of people chose to use?
A. Yes.
Q. In fact, you yourself have used anion chromatography to purify botulinum toxins since the 1990s; correct?
A. As we've seen in the publication, I used the anion exchange chromatography as a step in purifying type C and D.
Q. And you consider yourself to be a skilled toxin researcher?
A. I consider myself to be an ordinary scientist in that field.
Q. But you weren't taught away from using anion exchange chromatography?
A. That's correct. Because I didn't have a manufacturing process in mind, I didn't worry about bad changes.
Q. You yourself used anion exchange chromatography during the period of time that you're telling the jury somebody of skill would have been taught don't use that type of chromatography?
A. A skilled person in the manufacturing field.

Q. I'm not sure that quite answered my question. You yourself, sir, were using anion exchange chromatography during the period of time that you're telling the jury a skilled artisan would have been taught away from using that type of chromatography?
A. I used anion exchange chromatography in that time.
Q. And you weren't the only one; right?
A. That's correct.
Q. Other scientists have been using anion chromatography to purify botulinum toxin for decades?
A. Well, I wouldn't say decades but they've used it.
Q. Since at least the 1990s; right? So the '90s, the 2000s, the 2010s, now we're in the 2020s?
A. If you come up to date, yes. I thought you were counting back from the priority date.
Q. Understood. Well before the priority date?
For example, the Johnson patent that Dr. Goodnough discussed uses anion chromatography to purify botulinum toxin; correct?
A. They have an anion exchange step.
Q. And Dr. Goodnough's thesis used anion chromatography to purify botulinum toxin.
A. There was an anion exchange step in that as well.
Q. That was published in 1994, so again, well before the priority date for this patent?

THE COURT: The witness is nodding his head yes.
BY MS. WELLS:
Q. In fact, the jury was actually able to hear from Dr. Goodnough yesterday afternoon about his use of anion chromatography; right?
A. Yes, they did.
Q. Were you in the courtroom for that testimony?
A. Yes, I was.
Q. And he testified that he has had no contamination issues using anion chromatography; correct?
A. That's what he said.
Q. And you agree that Dr. Goodnough has considerable experience in the field of botulinum toxin research; right?
A. I don't deny that.
Q. Switching gears just a bit, Allergan's attorney was talking to you about the Xiang '669 piece of prior art. Do you recall that?
A. Yes, I do.
Q. And she asked you some questions about the 2 to 6 nanograms per milliliter calculation. Do you remember that?
A. Yes, I do.
Q. And I believe that you discussed that the residual DNA that we saw in that picogram entry, that's in water; is that your testimony?
A. That's what I concluded from the calculation.

Q. It's not just water; right?
A. It's in a buffer solution most likely.
Q. That solution also includes toxin; right?
A. Yes.
Q. And that toxin --
(Cross-talk.)
BY MS. WELLS:
Q. Finish your answer, please.
A. Presume it contains toxin but it was after the purification.
Q. And that toxin is BoNT, botulinum toxin?
A. It's a botulinum toxin purification so there should be BoNT in there.
Q. And in particular it's botulinum toxin type A; right?
A. That's correct. It's type A.
Q. The same toxin that is in the claim asserted in this case from the '748 patent; correct?
A. In terms of the same type, that's correct.
Q. All right. I'm going to switch gears a little bit and switch to the other patent that you talked about, the '740 patent. And again, to make sure we're on the same page, this is a patent that had the hydrophobic and the ion exchange chromatography; right?
A. Correct.
Q. And ion exchange chromatography, that is sort of

the -- let me rephrase that for you.

So the anion exchange chromatography and the cation chromatography we've been talking about, those are types of ion exchange chromatography; right?

A. That's correct, yes.

Q. And again, you don't dispute that Allergan did not invent any of these types of chromatography; right?

A. Correct.

Q. And you don't dispute that the hydrophobic chromatography and ion exchange chromatography were well known before Allergan's '740 patent; right?

A. As general individual separation technologies, yes.

Q. But for both patents I think I heard you dispute that skilled toxin researchers would have been motivated or encouraged to make animal-protein-free botulinum toxin; was that your testimony?

A. Yes, that was my testimony.

Q. I'd like to talk a little bit about the animal-protein free aspect.

A. Sure.

Q. You agree that by 2003 it was known that there was a potential risk of contamination associated with using animal-derived products in the manufacture of toxins; correct?

A. There was a risk, a theoretical risk, which you would

have put in balance with the other risks of the processes.
Q. There was a risk. It was known by 2003 that there was this risk of potential contamination if you're using animal-protein-free products; correct?
A. Theoretical risk, yes.
Q. And I'm saying 2003 because that's before any of the Allergan patents asserted in this case were filed; right?
A. Yeah.
Q. And you would agree that if you don't use animal proteins, you would completely eliminate that risk; right?
A. This risk would be out.
Q. And in addition to the contamination risk, we also heard testimony throughout the trial there were other reasons to go animal-protein free; right?
A. Yes.
Q. For example, we heard about the consistent sourcing. Do you recall that testimony?
A. Yes, I do.
Q. And we heard some about how different cows make different proteins. Do you recall that?
A. That's what Dr. Bates told us, yes. And I think even Mr. Hunt said something about if the animal's diet changes the proteins might change?
Q. And there were issues raised about the availability of animal products and animal proteins. Do you recall that

testimony?
A. I recall this as well.
Q. In fact, every other witness who testified in this trial about animal-protein free other than yourself, sir, has said there was a reason to go animal-protein free; isn't that right?
A. I would agree to what I previously said, that we heard there have been reasons to go animal-protein free, but there are also reasons to go animal protein and this is why this has to be balanced.
Q. Okay. Let's just walk through a couple of the witnesses. We heard from Dr. Bates. Do you recall that testimony?
A. I do.
Q. And he said that there were reasons to go animal-protein free. Did you hear that testimony?
A. Yes, I heard it.
Q. And we heard from Ms. Ton. Do you recall that she was one of the videos that was shown?
A. Yeah.
Q. And Ms. Ton said that there was reasons to go animal-protein free?
A. Yes.
Q. And we heard from Dr. Xiang. That was, again, one of the videos?

A. Yeah.
Q. And Dr. Xiang said there were reasons to go animal-protein free?
A. Yeah.
Q. And we heard from Mr. Hunt. Do you recall that testimony?
A. Yes.
Q. And Mr. Hunt said there were reasons to go animal-protein free?
A. Yes.
Q. And then we heard from Dr. Goodnough. Do you recall that testimony?
A. Yes, I do.
Q. And Dr. Goodnough said there were reasons to go animal-protein free. So we've heard from at least five other witnesses in this case saying that there were reasons to go animal-protein free; isn't that right?
A. That's correct. In summary, that's correct.
Q. And the products that we're talking about in this case are pharmaceutical products for human use; right?
A. That's correct.
Q. But you yourself, sir, have not worked to develop a pharmaceutical product for human use; correct?
A. That's not completely correct. I've been involved in the development of BoNT.

Q. But not for the U.S. market; correct?
A. Not for the U.S. market, that's correct.
Q. So you don't have any -- you've not worked to prepare a pharmaceutical intended for human use that would need to pass FDA review; is that fair?
A. Yeah, that's correct probably.
Q. And the other witnesses that the jury has heard talk about animal-protein free, Dr. Bates, Ms. Ton, Dr. Xiang, Mr. Hunt, and Dr. Goodnough, they've all worked to develop pharmaceutical products for human use in the United States; correct?
A. Yes, they did.
Q. So on the one hand, the jury has heard from you, who has no experience developing a pharmaceutical product for human use in the United States, saying there would be no reason to go animal-protein free; right?
A. When you put it this way, yes.
Q. And then on the other hand, the jury has heard from at least five witnesses who do have work developing pharmaceutical products for human use in the United States saying that there would be a reason to go animal-protein free; correct?
A. That's correct.
Q. And you understand, sir, that, ultimately, it will be up to the jury to decide which testimony to credit on this

issue?
A. And no doubt, that's the job of the jury.
MS. WELLS: I pass the witness.

REDIRECT EXAMINATION

BY MS. RUPERT:
Q. Dr. Gessler, I have just two questions. So on your cross-examination, Revance's attorney referenced the Goodnough thesis; correct?
A. Yes, they he did.
Q. And Goodnough used animal proteins in the process?
A. Yes, he did.
Q. And she referenced the Johnson patent on your cross?
A. Right.
Q. The Johnson patent uses animal proteins?
A. They use animal proteins as well.
MS. RUPERT: No further questions.
THE COURT: Dr. Gessler, you may step down. Watch your step.
MR. DITTMANN: Your Honor, at this time plaintiff calls back to the stand Dr. Christian Schöneich.
THE COURT: All right.
THE WITNESS: There is a binder here. Is that mine?
THE COURT: Don't worry about the binder, somebody will take it away. Dr. Schöneich, you remain sworn

from when you testified before. Okay?

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. DITTMANN:

Q. Welcome back, Dr. Schöneich.

A. Thank you.

Q. Have you brought any materials with you today?

A. Yes, I have brought a binder and also a PowerPoint presentation.

Q. Can you please remind the jury of your background and experience.

A. Briefly, I have a Ph.D. in chemistry and I have experienced in drug product formulations.

MR. DITTMANN: Can you please bring up PDX 19-2 from Dr. Schöneich's slides.

BY MR. DITTMANN:

Q. Dr. Schöneich, why are you testifying for the second time in this case?

A. Well, just to remind everyone, I have been testifying before on Terrence Hunt's invention and opinion that the two ingredients, the disaccharide and the surfactant, provide a platform for a longer-duration product. What I want to do today is to present an opinion of Claim 6 on the '878 patent and present an opinion that this claim is valid and not obvious.

Q. Are you responding to any of Revance's experts on this issue?
A. Yes, I'm responding to Dr. Sury. His argument was that Claim 6 of the '878 patent is obvious in view of two references, the Hunt '598 reference and the Johnson '460.
Q. Were you in the courtroom when Dr. Sury testified earlier today?
A. Yes, I was.
Q. Do you agree with his opinions concerning the validity of Claim 6 of the '878 patent?
A. No, I don't agree. I think an ordinary scientist would not have combined these two reference and arrived at the conclusion that the claim is invalid for obviousness.
Q. Move to PDX 19-3. Can you explain for the jury, Dr. Schöneich, what you're showing on this slide?
A. Just to put everybody on the same place, these are the two references which Dr. Sury put forward, Hunt '598 and the Johnson '468, and he argued that an ordinary scientist would combine those to arrive at the conclusion that the '878 patent is obvious and invalid.
Q. Please move to PDX 19-4. What are you showing on this slide?
A. This is just to ground ourselves again. I would like to reiterate that work with the BoNT/A drug product is very dangerous. We have seen this multiple times now, that

scientists had to adhere to strict precautions. You have seen the pictures and videos. What is critical is that these products contain very, very low amounts of toxin in the vials. So again, I would like to reiterate that this leaves you with very little margin of loss. They're highly unpredictable, these formulations.

Q. We heard Dr. Sury earlier today testify that he doesn't have any experience working with botulinum toxin formulations. Do you yourself have experience working with botulinum toxin formulations?

A. Yes, I do.

Q. Do you understand, Dr. Schöneich, the hypothetical person of ordinary skill in the art is an important part of the nonobviousness analysis?

A. I do understand that.

Q. Dr. Schöneich, in applying your opinions on this issue, can you describe the person of ordinary skill in the art that you believe is appropriate here.

A. My definition of a person of ordinary skill in the art would be a person with an advanced degree such as a bachelors of science and about 5 to 10 years' experience in protein compositions, including compositions which contain BoNT toxin.

Q. Did you consider the '878 patent in reaching your opinion here?

A. Yes, I considered the '878 from that point of view.
Q. Which is about botulinum toxin formulations; correct?
A. Yes.
Q. Dr. Schöneich, the fact that you do have experience with botulinum toxin formulations, how does that inform your opinions in this case?
A. Well, I think that puts me in the proper position to evaluate these claims from the viewpoint of a person of ordinary skill in the art. I know the challenges which scientists face in this area and the problems working and analyzing formulations in this area.
Q. Let's please go to PDX 19-5. Can you explain what we're seeing on this slide, Doctor.
A. Again, for recollection, you see on the left-hand side Claim 6 of the '878 patent and on the right-hand side, you have seen the slide before, I'm putting up the formulation which contains the combination of the toxin with the two other ingredients, the surfactant and disaccharide, and that's exactly the basis for Terrence Hunt's invention.
Q. Can you please remind us, do disaccharides and surfactants always work to stabilize pharmaceutical formulations?
A. No, absolutely not. I've mentioned before that every pharmaceutical formulation has its own characteristics and you have to carefully adapt or calibrate your ingredients to

these characteristics. The important point is just because one ingredient works in one formulation, that doesn't mean it has to work in another formulation.

Q. Can you please bring up DTX 209 and go to paragraph 58. This is the Hunt '598 publication. And I want to focus on the first sentence.

Can you tell us about what we're seeing on the screen here.

A. That is an important statement. The first sentence reads, just reading the highlighted aspects, "In light of the unique nature of botulinum toxin, the probability of finding a suitable albumin replacement for the human serum albumin used in compositions might realistically be seen to approach zero."

Q. In your opinion, what would an ordinary scientist take away from this statement from Hunt '598?

A. In my opinion, the ordinary scientist would first take away that the formulation of human serum albumin is the gold standard and we have seen this a couple of times. But the ordinary scientist would also take away that there was significant skepticism in the field that even a replacement formulation could be developed which does not contain human serum albumin.

Q. In light of the statement we see here, in your opinion, why would a scientist in the early 2000s have even

considered an alternative to the gold standard of albumin derived?

A. There's a very general reason. Science is always moving forward. People always like to develop.

More specifically, I think I presented you some reasons before. There was an issue with cost. Human serum albumin was considered expensive. There was the problem of the consistent sourcing we heard before, and of course there was the general motivation to move away from animal-derived products.

Q. Given these issues with albumin, are you aware of any publications that an ordinary scientist would have looked at to address those issues?

A. Yeah. An ordinary scientist would have looked to Hunt '598, which presents a number of options to move to a formulation which doesn't contain human serum albumin.

Q. Let's please go to PDX 19-6. What's being shown in this slide?

A. On the left-hand side we see Terrence Hunt but more importantly, in the middle you see a number of options which Terrence Hunt shows in his '598 publication. These are all viable options.

What you see immediately is none of them would lead to a combination of a disaccharide and a surfactant. And importantly, Terrence Hunt also points out on the

right-hand side in the red area a component or an ingredient which you should not have used.

Q. Why does it matter that so many options were discussed in Hunt '598?

A. It matters because, again, Revance's expert, Dr. Sury, has concluded that an ordinary scientist reading Hunt '598 would arrive at the combination of a disaccharide with a surfactant, but that's absolutely not the case.

Q. Let's move to PDX 19-7. And let's talk about the ingredient on the right that Mr. Hunt said not to use before he invented his '878 patent. What was that ingredient?

A. This is the disaccharide.

Q. This is the same disaccharide that is claimed in the drug product recipe patent?

A. Yes, it is.

Q. What do you take away from the fact that Mr. Hunt said do not use disaccharides in the Hunt '598 reference?

A. Well, I want to step back a moment and say Terrence Hunt was one of the world authorities in one drug product formulation. If Terrence Hunt tells an ordinary scientist not to use a disaccharide, I think an ordinary scientist would take that advice seriously and not use it.

Q. Can we please bring up paragraph 180 of the Hunt '598 reference. What's being shown here?

A. That is paragraph 180 of the Hunt '598 application,

and Terrence Hunt basically writes here that the present invention excludes from its scope disaccharides. He couldn't be clearer about it. He does not want scientists to use disaccharides.

THE COURT: Dr. Schöneich, I asked this question of an expert on the other side. What's a disaccharide, oligosaccharide?

THE WITNESS: We start with a monosaccharide has one sugar, and then you make a disaccharide with two sugars. Oligosaccharides start a little later, five sugars and higher, I would say.

THE COURT: Is there a comma missing here or something? When the two words are together, what sense does that make to have a 2 saccharide, 5 saccharide?

THE WITNESS: I think I don't understand the question.

MR. DITTMANN: Maybe can I try a question, Your Honor.

THE COURT: Go ahead, Mr. Dittmann.

BY MR. DITTMANN:

Q. Is there something, Dr. Schöneich, about the fact that we're avoiding substances with a molecular weight of less than 20 kilodaltons? Does that tell you what they're referring to here?

A. Yes. Basically he wants to avoid any type of

saccharide that has a molecular weight less than 20 kilodalton.

THE COURT: Does that mean the way you would read the sentence is the present invention excludes any saccharide other than a monosaccharide?

THE WITNESS: It excludes monosaccharide as well, but he specifically tells disaccharide because that's a common formulation ingredient in other formulations.

BY MR. DITTMANN:

Q. Dr. Schöneich, would you agree the sentence he's saying that if a saccharide is less than 20 kilodalton, it's not to be used?

A. Yes.

Q. Did you hear Dr. Sury say this statement was somehow only in the context of polysaccharide-containing formulations?

A. I heard him saying this but I disagree because that statement of the disaccharide doesn't -- he doesn't write the present paragraph. He says the present invention, which for an ordinary scientist would be in the entire patent.

Q. To your understanding, are there other statements in Hunt '598 that point away from using disaccharides?

A. They have multiple statements.

Q. Can you also bring up paragraph 49 from the Hunt '598 reference.

And what's your view, Dr. Schöneich, as to why a POSA would have been dissuaded from using a disaccharide based on this paragraph?

A. I'd like to explain a little bit. Terrence Hunt is right that a pharmaceutical composition containing a protein-active ingredient such as BoNT is inherently unstable. The protein formulation comprises a saccharide, and he explains a little further.

Now he associates that statement with a Maillard reaction and we know that a Maillard reaction usually involves reducing sugars. You heard Terrence Hunt testifying a few days ago that even nonreducing sugars were a problem because they either contained impurities or they could be degraded to reducing sugars. So clearly Terrence Hunt tells us that there was a problem also with nonreducing sugars in these formulations.

Q. These nonreducing sugars that are causing problems, is trehalose one of them?

A. Yes.

Q. Why does any of this matter to your opinion, Dr. Schöneich?

A. Well, it matters because, again, these statements such as given here and those we've previously talked about would actively dissuade a formulation scientist or an ordinary scientist to use disaccharides.

Q. Can we also bring up the first two sentences of paragraph 189.

Dr. Schöneich, how many times does Mr. Hunt raise the concerns with disaccharides in the Hunt '598 reference?

A. You see he raises himself in this patent application at least three times. You see paragraph 49, paragraph 180, and paragraph 189. So basically this type of statement is all over the place. Terrence Hunt tells people not to use disaccharide.

Q. Let's now go to PDX 19-8. What's being shown here, Doctor?

A. Terrence Hunt has shown on the left-hand side the '598 application and on the right-hand side we see the '878 application which is at stake here. It's very important to understand for all of us that on the left-hand side in Hunt '598, Terrence Hunt excludes disaccharides from his compositions. But in the '878 patent which is shown on the right, he tells people to use a disaccharide. So the two patents really tell you opposite things. So I think we can't say that '598 leads you to use disaccharide. These two patents tell the opposite thing.

Q. Were you in the courtroom earlier this week when Mr. Hunt testified about his statements in Hunt '598 that exclude disaccharides?

A. Yes.
Q. Was that testimony consistent or inconsistent with your reading of the 2003 Hunt '598 reference?
A. That is absolutely consistent with my reading.
Q. Now, Dr. Schöneich, let's transition to discussing the options that Hunt '598 tells you you should follow.
A. Yes, I have a slide. And basically have the highlights here together.
I've just told you that Hunt '598 tells you not to use disaccharides whereas '878 tells you to use disaccharides. Now let's look at polysaccharides and these are highlighted in blue. Now, in the Hunt '598 application, Terrence Hunt tells us that you can use polysaccharides, but in the '878 application, he tells us his formulation should be polysaccharide-free. So we have another group of opposites here which tells us that, really, '598 application cannot lead to the '878.
Q. Let me make sure I'm following. You're saying that Hunt '598 tells you to use polysaccharides but not use disaccharides. And you're saying the drug product recipe patent says do the exact opposite for both ingredients?
A. That's correct.
Q. Just to confirm, is a polysaccharide ingredient different than a disaccharide ingredient?
A. Yeah, they are absolutely different.

Q. Please bring up paragraph 175 of Hunt '598. What's being shown here, Dr. Schöneich?
A. Here this is the paragraph where Terrence Hunt tells that in his invention in this paragraph, he surprisingly found a suitable replacement for albumin and that he discovered that particularly high-molecular-weight polysaccharides can function as neurotoxin stabilizers.
Q. Was this discovery described by Mr. Hunt in his earlier Hunt '598 reference different from the disaccharide and surfactant combination in the drug product recipe patent?
A. That's correct. Yes, it's different.
Q. Let's move to PDX 9-11 and talk about the next option that Mr. Hunt said an ordinary scientist could use to stabilize BoNT. Can you tell us what you see here.
A. Yes, we see in the next here recombinant albumin.
Q. What is recombinant albumin?
A. Let me step back again. We have heard a lot about albumin, animal-derived albumin, and we also heard recombinant albumin is a protein made in a test tube through recombinant DNA technology. And usually recombinant proteins are meant to be the same as animal-derived proteins.
Q. Can we turn to the next slide, PDX 19-12. What are you showing here?

A. Just for illustration, on the left-hand side I show you the gold standard formulation. That is the one with the animal derived, the human serum albumin, and you see where the red symbols here. And on the right-hand side, I will show you the replacement. Now you see the red symbols are replaced by some kind of orange-pink symbols and they represent the recombinant human serum albumin. The formulations look pretty analogous, but there's a very important difference here.
Q. What would an ordinary scientist take away from Hunt '598's disclosures about recombinant albumin?
A. The ordinary scientist would take away that now we have a regular option. We can use recombinant human serum albumin to stabilize botulinum products in order to obtain an animal-protein-free combination.
Q. Just to confirm, recombinant albumin has the same structure as human serum albumin?
A. Pretty much, yes.
Q. Let's move to the next section of your presentation and turn to PDX 19-13. Can you tell us about recombinant gelatin.
A. Hunt then went ahead and developed other options. One of them is recombinant gelatin. Gelatin is a protein you can add to formulations for stabilizing them and you can make them recombinant in a test tube pretty much like

recombinant albumin. So that's here another viable option to make another stable drug product formulation.

Q. Go back to Hunt '598 and bring up paragraph 119. And what does this paragraph from Hunt '598 say about recombinant gelatin, Dr. Schöneich?

A. That is the part of the invention which Hunt describes his discovery that you can use recombinant gelatin to stabilize formulation, and I think that's a pretty good option to go for.

Q. Let's go PDX 19-14. And we see here next, what is recombinant collagen?

A. It is another protein which you can use to stabilize protein formulations. And again, Hunt makes it recombinantly. He makes it in a test tube. That's why it's animal-protein free. And now we have seen another option to make animal-protein-free stable product.

Q. What would an ordinary scientist take away from Hunt '598's discussion of recombinant collagen and gelatin?

A. Ordinary scientists together with the other statements were first going to take away that now there were several options and that going the path of making recombinant proteins could be a very good one to obtain a stable bond.

Q. How would you compare the discoveries that Mr. Hunt made that you just discussed with his disaccharides and

surfactant combination in the drug product recipe patent?

A. These are totally different ingredients so they're different.

MR. DITTMANN: Your Honor, I just wanted to check with you because I see we're at 5:00.

THE COURT: I want you to finish your direct because I think you're nearly there.

MR. DITTMANN: Yes, sir. I am.

BY MR. DITTMANN:

Q. Dr. Schöneich, do you have an opinion about whether Hunt '598 discloses or suggests a BoNT drug product formulation that comprises a disaccharide and surfactant?

A. There's absolutely no indication that Hunt '598 describes a formulation which contains a disaccharide and a surfactant. We have seen that Hunt '598 excludes those.

Q. Did you hear Dr. Sury testify about whether the Patent Office had considered Hunt '598?

A. I heard that testimony.

Q. Did you hear Dr. Sury acknowledge that the original application for the '878 patent both expressly discusses the contents of Hunt '598 and explains that it's different from the '878 patent?

A. Yes, I heard that testimony.

Q. How does that impact your opinion?

A. That's a very important opinion to me of the Patent

Office because Dr. Sury had put forward the basic assumption that an ordinary scientist would combine these two references but the Patent Office pretty much had rejected Dr. Sury's argument. I had arrived at this analysis independently, but it was nice to see it was confirmed.

Q. So I also want to briefly talk about Johnson '468. You understand this is the other reference Dr. Sury relies upon?

A. Yes.

Q. Is it correct Johnson '468 was also considered by the Patent Office?

A. Yes, it was.

Q. It was also discussed and addressed in the original application Mr. Hunt filed in 2005?

A. Yes, it was.

Q. Could you please bring up Table 2 of Johnson '468. What's being shown on the screen?

A. Here you see some formulations of BoNT with some other ingredient, such as, for example, BSA.

Q. What's BSA?

A. BSA stands for bovine serum albumin. Basically that's an albumin which is derived from a cow.

Q. Let's go to the next slide.

Dr. Schöneich, do you have an opinion whether an ordinary scientist would have looked to Johnson '468 to try

and fill in the disaccharide gap from Hunt '598?

A. No, I don't think an ordinary scientist would have done that because the motivation for the '878 patent is an animal-protein-free formulation, so why would a scientist look to an animal-containing formulation? That does not make sense in my opinion.

Q. One last slide for you, PDX 19-16. Can you please state again to the jury what your opinion is with respect to Claim 6 of the '878 patent.

A. So my opinion is that Claim 6 of the '878 patent is valid, it's not obvious, and we have seen a couple of reasons why. And they are, again, shown on the slide here. Hunt '598 tells exactly the opposite compared to the '878 patent, so there's no point, there's no place in the '598 application which leads you to a combination of disaccharide and surfactant.

MR. DITTMANN: Thank you, Dr. Schöneich. No further questions at this time.

THE COURT: All right. So members of the jury, we're going to finish for the day here.

Mr. Dittmann, am I correct in thinking that you anticipate Dr. Schöneich is your last witness?

MR. DITTMANN: Yes, Your Honor.

THE COURT: Okay. So members of the jury, let me just tell you where we are. I think we're very close to

the end here. Perhaps all we have left is cross-examination of Dr. Schöneich and, you know, I'd be surprised if we need more than a half an hour of testimony tomorrow morning.

So the plan, at least my plan for tomorrow, is we will start at 9:30. We'll take whatever testimony there is still to take, we'll have a brief recess, and then we will go into my final jury instructions and closing argument. And I haven't actually talked with the lawyers yet about how long the closing arguments are going to be, but you'll get the case sometime around about lunchtime, particularly if you consider lunchtime to have a very broad scope from 11:30 to 1:30. And once you get the case, it will be yours to deliberate.

So in any event, that's -- I like to tell jurors what's happening because I don't want to be like the airport and you never know why the airplane is late. I think we're on time and that's the schedule.

So I do want to remind you overnight not to talk to anyone about the case or to let anyone talk to you. That's until you get the case to deliberate. You can't talk to anyone about it. When you get it to deliberate, you can talk to each other about it until you get a verdict.

And then the second thing is not to do any research or try to look up anything on your own. One of the things that the lawyers are supposed to be doing, I suppose

one of the things I'm supposed to be doing in the jury instructions, is giving you a clearer idea of the law you're going to be applying. But one of the things for the attorneys in closing arguments is they're supposed to be putting together for you their views as to what has been proved here and why they should win. So get a good night's sleep.

I guess there's one other thing I want to put in your mind. You don't need to do anything about it now. When you get the case for deliberation, we will stay as late as you want to stay. So if, hypothetically, it gets close to 5:00 tomorrow but you say, if we stay another hour I think we'll have a verdict, we'll all be happy to stay for that hour. On the other hand, if you get to 4:30 and say, we'd really like to sleep on this over the weekend, you can do that too. I just wanted to give that to the extent that you want to think about what your commitments are tomorrow or Monday that you could discuss with each other tomorrow if you need to about what you want to do. So thank you very much.

Can we take the jury out.

(The jury exited the courtroom.)

THE COURT: Dr. Schöneich, thank you. You can step down.

Mr. Pickard.

MR. PICKARD: I was going to suggest perhaps we need to remind Dr. Schöneich he's on cross.

THE COURT: I don't think he is yet.

MR. PICKARD: Fair enough.

THE COURT: So why don't we do this, if it's okay. We've been -- why don't we take a ten-minute break. We'll come back, have the JMOLs, and then we'll discuss the jury instructions and the verdict form. All right.

(A recess was taken, after which the following proceedings were had:)

THE COURT: We probably ought to do the JMOLs first. Have a seat. Whoever on the plaintiff's side is going to do this, should do this.

MS. RUPERT: So good afternoon, Your Honor. Melanie Rupert on behalf of plaintiff Allergan.

At the outset, Allergan has a motion that is not the usual pro forma Rule 50(a) motion. Allergan is moving for judgement as a matter of law pursuant to several -- Federal Rules of Procedure 50(a) that Revance cannot prove obviousness of Claim 8 of the '748 patent based on its sole alleged combination of Malizio and Xiang '669.

Specifically, Revance has not offered sufficient evidence from which a reasonable jury could find that the 1 PMM requirement of Claim 8 was inherently present in the prior art references of the specific prior art combination.

So let's pull up Claim 8 of the '748 patent on the screen. So Revance must establish obviousness of all limitations of Claim 8 of the '748 patent, including the one part residual nucleic acid per one million parts of botulinum toxin limitation by clear and convincing evidence.

The only position Revance has presented at trial in their experts' reports to invalidate this 1 PPM limitation is inherency. As Your Honor knows, inherency is a very high bar, requiring proof that the limitation necessarily results in the specific prior art being relied upon. Here, Revance has failed to meet its burden to present a prima facie case of inherency for this limitation. There is no evidence in the record at all that establishes inherency here based on the obviousness combination that Revance has selected.

So first, Revance chose to rely on Malizio to disclose this limitation, but Dr. Goodnough admitted that Malizio does not expressly disclose the residual nucleic acid quantity at all, let alone at the required levels.

Second, Revance has relied solely on Allergan's own highly confidential, restricted access, internal reporting showing that its specific implementation of its new invention of the '748 patent of AEX and CEX chromatography resulting in the 1 PPM limitation. Revance has failed to establish that the variables in the specific

implementation that gave rise to Allergan's internal reporting correspond to any of the variables of Malizio, let alone all of the many variables. Revance thus fails to meet their burden to demonstrate by clear and convincing evidence that the limitation necessarily flows from Malizio.

Third, Revance then turned to arguing that this limitation is inherently disclosed in Example 11 of Xiang '669, a brand new theory that was not disclosed in any of Revance's expert reports. But this argument also fails because Dr. Goodnough admitted that the specific implementation used by Allergan actually implemented the new process of the Allergan '748 patent, not the process of Xiang '669. Thus, Revance fails to offer a key piece of proof that's required for use of the Allergan reported data. Revance has offered no proof whatsoever to establish that Allergan's data is credible evidence of inherency as either Xiang '669 or Malizio.

The only other thing offered by Revance and Goodnough as prove of inherency is Goodnough's calculations based on the data from Example 11 of Xiang '669. But as was made clear on Dr. Goodnough's redirect as well as the testimony of Dr. Gessler, those calculations were based on parts per million of water and not parts per million of botulinum toxin as the claim requires. In fact, Dr. Goodnough admitted his calculation and the underlying

data nowhere mentions botulinum toxin as all.

As such, Revance has failed to carry its burden on this limitation requiring one part residual nucleic acid per one million parts of botulinum toxin necessarily flows from the disclosure of Xiang '669, and Revance has nothing else left. Dr. Goodnough admitted on cross-examination he has not conducted any analysis of levels of residual nucleic acids after purification by various manufacturing processes that utilized anion exchange chromatography. And likewise, he admitted that he had not shown that various manufacturing processes achieve a level of 1 PPM of residual nucleic acids per million parts of toxin.

Accordingly, Revance has no evidence sufficient to reasonably support a jury finding that either Malizio, Xiang '669, or these two references in combination necessarily or inherently satisfy the 1 PPM requirement of Claim 8 of the '748 patent. Therefore, we respectfully submit that Allergan is entitled to judgment as a matter of law under Rule 50(a) of the  Federal Rules of Civil Procedure that Revance had failed to carry its burden to show by clear and convincing evidence that Claim 8 of the '748 patent is invalid as obvious.

And at a minimum, Your Honor, if the Court is not inclined to grant's Allergan's motions now, we could brief this issue further tonight.

THE COURT: Are you done with your JMOLs?

MS. RUPERT: No. I'm going to turn it over to my colleague, Mr. Vlad Semendyai. Thank you, Your Honor.

MR. SEMENDYAI: Good afternoon, Your Honor.

THE COURT: Good afternoon. And what's your name?

MR. SEMENDYAI: May name is Vladimir Semendyai S-E-M-E-N-D-Y-A-I, V-L-A-D-I-M-I-R. May I proceed, Your Honor?

THE COURT: Yes.

MR. SEMENDYAI: Thank you, Your Honor.

You just heard my colleague, Ms. Rupert, move for judgment as a matter of law on inherency as to Claim 8. I would like to cover additional motions for under Rule 50(a) on a few additional grounds for that patent as well as validity of the '740 and '878 patents and the level of POSA and damages.

As for the '748 patent, Allergan respectfully moves for judgment as a matter of law that Revance has not proven Claim 8 of the '748 patent is invalid by clear and convincing evidence for the additional reason that neither the Malizio nor the Xiang '669 references on which Revance relies disclose all elements of the claim.

Malizio does not disclose an APF process and further does not suggest removing animal products from its

process. And Xiang '669 does not disclose a process that proceeds by binding the botulinum toxin from an AEX chromatography column followed by a CEX column.

Revance also has not proved that the asserted combination of Malizio and Xiang teaches or suggests every limitation of Claim 8 of the '748 patent in view of the knowledge of a POSA, and Revance has failed to show a motivation to combine Malizio or Xiang because Xiang 697/LUO, which is exhibit JTX-212 in this case, taught away from using an anion exchange column, that is the AEX column, for the purification of BoNT.

The record also shows that Revance has told -- Revance has agreed to this. Revance has not offered sufficient evidence to contradict the disclosures of JTX 212 and has not otherwise shown that a POSA would have reasonably expected an AEX column to work in a BoNT manufacturing process.

Now, going back to the 1 PPM limitation briefly, Revance has not proffered any motivation to pursue such a low amount of residual nucleic acid, particularly when Revance has not and cannot dispute that decades-old manufacturing processes already meet regulatory guidelines on impurities. Revance also has not offered sufficient evidence from which a reasonable jury could conclude that there was a reasonable expectation of succeeding in

achieving such a low amount of nucleic acid.

I would like to turn to the '740 patent. Allergan moves for judgment as a matter of law that Revance has not proven by clear and convincing evidence that Claim 8 of the '740 patent is invalid as obvious. The Gessler '99, Smelt '82, and the FDA guidance references on which Revance relies do not disclose all elements of the claimed nondisclosed APF manufacturing process, and the FDA guidance is not related to manufacturing at all. It is a guidance to human blood donors.

Smelt '82 is a food safety study. It has nothing to do with purifying BoNT, and Smelt '82 does not disclose growing the BoNT bacteria initially using animal products.

Gessler '99 is a reference by Allergan's own expert, Dr. Gessler, that uses animal products to grow BoNT/C and D, not BoNT/A as we heard Dr. Gessler testify today.

Revance also has not proven by clear and convincing evidence that the asserted combination of FDA guidance, Smelt, and Gessler teach or disclose every -- teach or suggest every limitation of that claim and in view of the knowledge of a POSA.

Additionally, Revance has failed to carry its burden of proving a motivation to combine these references.

The FDA guidance does not suggest removing animal products from manufacturing processes and does not disclose any manufacturing at all, as I just mentioned.

Turning to Smelt '82, any growth results it discloses from using soy as a food source for BoNT bacteria that I referenced were not reproducible and Revance has not introduced sufficient evidence to the contrary.

As for Gessler '99, that reference discloses manufacturing a different BoNT type. It is C and D, as I mentioned earlier, and, again, as Dr. Gessler recently said instead of BoNT type A. And Revance has not sufficiently shown that a POSA would have been motivated to consider such different manufacturing processes when working on manufacturing botulinum toxin type A.

Furthermore, Revance has not offered sufficient evidence from which any reasonable jury could determine a motivation to combine in view of the knowledge of a POSA that BoNT has been manufactured using animal products for decades. The potential risk of manufacturing botulinum toxin in animal products would not have led a POSA to reinvent the wheel, particularly in view of the following two facts: There's no dispute that BoNT toxins are still to this day commonly manufactured using animal products, and, two, Revance experts admitted that no one has ever contracted "mad cow" disease with the use of animal proteins

in manufacturing drug products.

Revance also has failed to carry its burden to prove a reasonable expectation of success. As the record evidence demonstrates, growing botulinum toxin and using chromatography to purify it are not straightforward processes and they don't guarantee success. Different variables, including column order, pH, type of resin, and many many others, all need to be considered. And there's no evidence in the record from which a reasonable jury could conclude that using the same columns for purifying BoNT type C and D would also work for purifying type A given the different structures and functions of the different types of botulinum toxin types.

I'd like to now turn to the '878 patent. Allergan also respectfully moves for judgment as a matter of law that Revance formulation expert Dr. Raj Sury does not qualify as a person of ordinary skill in the art with respect to Claim 6 of the '878 patent. Dr. Sury has no experience with botulinum toxins, as he admitted on the stand today. Dr. Sury agrees that if the definition of a POSA requires botulinum toxin formulation experience, that he would not qualify as a POSA. Therefore, none of Dr. Sury's testimony can be considered in support of Revance invalidity defense as to Claim 6 of the '878 patent.

Based on the remaining evidence in this case, a

reasonable juror can only conclude that a POSA at the relevant date for the '878 patent must have toxin experience. That is because, as Revance cannot meaningfully dispute, in a highly regulated industry the unique challenges posed by botulinum toxins the definition of a POSA would necessarily include botulinum toxin experience.

There can also be no reasonable dispute that the entire '878 patent is directed to addressing the unique issues posed by BoNT toxins in terms of how to formulate them as drug products. Revance has not offered sufficient evidence from which a reasonable jury could conclude the relevant art is anything but botulinum toxin drug product, as the '878 patent makes abundantly clear. Moreover, it is yet another basis to grant judgement as a matter of law that the '878 has not been shown to be invalid because their case rests on the opinions of Dr. Sury, who is not a POSA.

Next, Allergan moves for judgment as a matter of law that Revance has not proven by clear and convincing evidence that Claim 6 of the '878 patent is invalid as obvious in view of Hunt '598 and Johnson '468. Neither the Hunt '598 nor Johnson '468 references disclose all the limitations in the claim.

Hunt '598 does not disclose an animal-protein-free BoNT formulation with a sufficient amount of surfactant ingredient that a POSA would have

understood Hunt '598 to teach the use of that surfactant ingredient for purposes of stabilizing BoNT. It is also undisputed that Hunt '598 does not disclose the trehalose disaccharide ingredient.

And it is further undisputed that Johnson '468 discloses only formulations that include animal proteins, again, as we heard today, such as bovine proteins, for example. Revance has made no showing of reasonable expectation of success of combining these two references to achieve a stable APF botulinum toxin formulation according to Claim 6 of the '878 patent.

Indeed, even if we consider Dr. Sury's testimony, he just testified earlier today that Revance has failed to put forth an opinion on reasonable expectation of success, which is fatal to their invalidity defense and counterclaim as to the '878 patent. The asserted combination of Hunt '598 and Johnson '468 does not in combination teach or suggest every limitation of that claim, of Claim 6, in view of the knowledge of a POSA, and the reference is teaching away from that claim. Revance has also failed to show motivation to combine Hunt '598 and Johnson '468.

Plaintiff also moves for judgment as a matter of law that Revance has not proven by clear and convincing evidence that there were no unexpected results, mainly

longer duration of action. Allergan has carried its burden of production showing unexpected results such as with the mouse DAS data from both Allergan and Revance. In response, Revance has not carried its burden of rebutting this evidence.

The only conclusion that a reasonable juror can draw from the evidence in this trial is that the combination of disaccharide and surfactant ingredients claimed in the '878 patent drive duration and that Revance's RTP004 peptide does not contribute to the duration profile of DAXXIFY, an undisputed infringing embodiment of Claim 6 of the '878 patent. All the evidence weighs in favor of Allergan on this issue.

Lastly, Your Honor, I would like to turn to damages. We also respectfully move for judgment as a matter of law that Allergan is entitled to no less than a reasonable royalty, which is 15 to 20 percent, and the 24 percent that Dr. Siegwarth opined yesterday because Dr. Trexler's damages have been speculative, arbitrary and not supported by the evidence in the record, and her damages theory is invalid for four reasons.

First, Dr. Trexler bases her damages opinion on certain surveys that seek to measure consumer demand for certain BoNT product features. By adopting this approach, Dr. Trexler has failed to properly evaluate the value of all

Allergan's inventions, which include not only a formulation claim but also two manufacturing claims. In other words, Dr. Trexler's damages model does not account for the value of manufacturing the product using Allergan's patented methods.

Second, Dr. Trexler's opinion is also arbitrary because it assumes the parties would have agreed to arbitrarily split the difference by dividing the reasonable royalty in half. Dr. Trexler's approach is a classic example of the 50/50 Nash bargaining solution that is not tied to the facts of this case and which the Federal Circuit has squarely rejected in *VirnetX*.

Third, Dr. Trexler further artificially lowers the damages award by relying on surveys that are evaluating the value of a given product attribute to the overall sales price of the product and multiplying by an arbitrary price premium. This is an arbitrary approach because the surveys on which Dr. Trexler relies were not evaluating the value of the product attribute as a percentage of the price premium, but rather were evaluating the value of the attribute to the overall product.

And fourth, the price premium that Dr. Trexler used was only the premium at the time of DAXXIFY's launch instead of what the parties would have expected the premium to be at the time of the hypothetical negotiation over the

life of Allergan's asserted patents. Therefore Dr. Trexler's approach is speculative, arbitrary, inconsistent with governing law, and unsupported by substantial evidence. As such, Allergan believes it is entitled to judgment as a matter of law on this issue and the other issues Ms. Rupert and I discussed.

Thank you, Your Honor.

THE COURT: Thank you.

Yes, Ms. Rupert. Why are you standing up?

MS. RUPERT: Just if I may, Your Honor, we understand you're leaning towards not granting our Rule 50(a) motion on the inherency issue but we would appreciate the opportunity to brief this tonight to streamline issues for the jury instructions.

THE COURT: Let me hold that thought.

I'm sorry, is it Mr. Semendyai?

MR. SEMENDYAI: Semendyai (pronouncing).

THE COURT: Thank you very much for your presentation. Why don't you all sit down for a second.

I have one question for Revance, which is do you think you have shown the inherency of the one part per million limitation?

MS. WELLS: Yes, Your Honor. So we actually have multiple arguments on that. We have the inherency argument and all of the evidence that is in the record shows

that each time this is run, you get less than one part per million.

THE COURT: The main part being that Allergan ran seven tests and got below detectable limits on all of them.

MS. WELLS: There's the Allergan data. There's also the Malizio itself says that nucleic acids are removed. The Bates book chapter that was discussed says that all nucleic acids need to be removed, and then there's also that Xiang '669 publication which has the 2 to 6 nanograms per milliliter and there was testimony on that as well.

We believe the less than one part per million would have been obvious to a skilled artisan and is likely an inherent characteristic. If you do the steps of the claim, you will inherently get less than one part her million and the evidence shows no instance in which that was run and you don't get one part per million.

THE COURT: So I'm --

MS. WELLS: I misspoke. The evidence shows no evidence that it was run and you don't get less than one part per million.

THE COURT: The record will reflect whatever it is you meant. I said earlier I'm pretty dubious about this but if the plaintiff wants to write me a memo tonight, they can, but I'm going to deny the JMOL and give the jury a

chance to take all these arguments, the more serious arguments and the less serious arguments, and I've heard less arguments than what I just heard. So that's resolved.

So I think we talked about this in the pretrial conference. I want to make sure the closing arguments are not going to have deposition clips or transcripts of testimony in them; right?

MR. DITTMANN: You're correct, Your Honor.

THE COURT: And, yes, Ms. Wilson.

MS. WILSON: Your Honor, you may be getting to that. We were hoping to discuss the time.

THE COURT: Thank you. That was the other thing or I think the length of the closing arguments because I usually leave that open and I think I left it open in this case too.

Mr. Dittmann and Ms. Wilson, who's speaking on your behalf?

MR. WILSON: I'll be speaking.

THE COURT: Have you all talked to each other about it?

MR. DITTMANN: The only thing we've got, Your Honor, is guidance that it would be we present and they present and we reserve five minutes for rebuttal, equal time for all. I don't think we've come to an agreement on the exact amount of time.

THE COURT: I think we ought to resolve that now. Let me make an opening bid and you tell me your reaction. I think 45 minutes a side is enough.

MR. DITTMANN: Perfect.

MS. WILSON: That's exactly what we have in mind, Your Honor.

If I may indulge Your Honor for one qualification from defendant's perspective, with the three rounds of closings, we would propose that Allergan's five-minute closing be limited to the issue of damages so that both parties are going last in closings on the issue on which they bear the burden.

MR. DITTMANN: We did discuss that already, Your Honor, at the final pretrial conference and at that time, you gave the guidance that plaintiff would go first, whatever the time is, minus five minutes. Defendants go for their allotted time, we go for five. That's it.

THE COURT: I believe what Mr. Dittmann says because that's my reaction to what you say right now. That's how I tend to remember things. I say, what would I do? If someone says you addressed this before, I assume I did the same thing. And I think it's fair that the plaintiff -- I mean, the whole point of five minutes is rebuttal.

And particularly on obviousness, you know, I

assume that's probably what most of the rebuttal is going to be about, but it could be about damages too, and so I'm going to stick with that, and they can address whatever they want in rebuttal. Okay?

MS. WILSON: Understood.

MR. DITTMANN: Thank you, Your Honor.

THE COURT: Thank you.

And I guess I would say, Ms. Wilson, I can't remember which one it was you wanted. You wanted their rebuttal to be limited to --

MS. WILSON: To damages, their reply -- rebuttal.

THE COURT: Yes. So I think particularly when they're at -- I don't want to say they're at somewhat of a disadvantage. It's kind of awkward to go first on the thing you don't have the burden of proof on, so I think that's fair to give them the opportunity to respond to something that for whatever reason they didn't anticipate or they knew about but didn't think you'd highlight. It will be 40, 45, 5. Thank you.

All right? So one other thing -- and this is just before we get to the jury instructions -- the pieces of prior art that are offered as combinations, I take it we are actually all agreed that those things are prior art; right?

MR. DITTMANN: Yes, Your Honor.

THE COURT: And so I changed in the jury

instructions to just make that as a statement rather than a contention because I don't think there's any actual dispute. And if you hadn't agreed, I probably would have granted my own JMOL that they are prior art. I have a higher success rate on my own JMOL.

Let's look at the jury instructions. Hopefully, we do what we need to do. One thing I noticed, I hadn't thought about this before -- this is not on what you have. This is the only thing I have that you don't have. I'm going to change the caption so it has Revance Therapeutics in it.

MS. RUPERT: Your Honor, one point of clarification. We want to do what's most helpful for the Court in submitting any kind of memo on the 50(a) motion. Does the Court still want us to submit an additional motion tonight? Would that be helpful?

THE COURT: I don't think it would be helpful to me. Maybe it will be helpful to you. I'm perfectly happy if you don't submit anything more but if you want to submit something more, go ahead. But if you have better things to do tonight --

MR. ARMENIO: I would ask Your Honor, that puts an onus on us to wait and respond to whatever they have while we're also trying to get ready for closing.

THE COURT: I don't think you're really

listening because you recognize you don't have to respond. Haven't I telegraphed that?

MR. ARMENIO: Yes, Your Honor. Thank you, Your Honor.

MS. RUPERT: Thank you, Your Honor.

THE COURT: So I'm going to change the caption so it only has Revance in it. Okay?

So the final jury instructions, my suggestion is I'll just go through and we can see whether you object or don't object to each page. And if you see a typo or some other thing, feel free to bring that up because we've been making changes and stuff happens.

MR. UNIKEL: May I interrupt? Would it be okay if Mr. Dittmann were to go and begin working on his closing arguments --

THE COURT: I don't think Mr. Varughese has decided to stick around. I was surprised to see him here in the first place.

Yes, Mr. Dittman, go and work on your argument. Make it a beauty.

MR. DITTMANN: Thank you.

THE COURT: Remind me, sir, what your name is.

MR. UNIKEL: Robert Unikel.

THE COURT: So are there any objections to page 1?

MR. UNIKEL: None for Allergan, Your Honor.

MR. ARMENIO: None for Revance, Your Honor.

THE COURT: Page 2.

MR. UNIKEL: None for Allergan.

MR. ARMENIO: None for Revance, Your Honor.

THE COURT: Page 3.

MR. UNIKEL: Your Honor, Allergan has one issue to raise on this. The last sentence of the first paragraph where it says "Revance contends that since all the claims are invalid, Allergan is not entitled to any damages," I recognize this is citing Revance's contention. We would ask "since" be changed to "if."

THE COURT: I'm going to change that to say "Revance contends all the claims are invalid and therefore Allergan is not entitled to any damages."

MR. UNIKEL: Thank you, Your Honor.

THE COURT: Anything from you, Mr. Armenio?

MR. ARMENIO: Nothing from Revance on that page.

THE COURT: And somebody, Mr. Tigan, perhaps, are you a scribe here that's making the changes?

MR. TIGAN: We will make them and submit them to the other --

THE COURT: Bring that up when we're done here again, how many changes there are or things that's still up in the air, but act like you're going to have to do it or

take notes like you're going to have to.

Okay. I think we're on burdens of proof, page 4.

MR. UNIKEL: Your Honor, Allergan does object to the recitation of the clear and convincing evidence standard in the Court's proposed instruction. Allergan's original proposal --

THE COURT: You want the abiding language?

MR. UNIKEL: Yes, Your Honor.

THE COURT: I'm not going to do that. That's confusing. Nobody understands that. This is language that I've regularly given and it appears to pass muster, and it seems to reflect what the actual standard is. So I'm going to overrule that objection.

Mr. Armenio, do you have any objections?

MR. ARMENIO: No objection, Your Honor.

MR. UNIKEL: Your Honor, if I may. One additional potential clarification in light of the Court's ruling on that. We might propose at the end of the clear and convincing evidence passage to then say, "The clear and convincing evidence standard applies because a patent is presumed valid."

THE COURT: No. All right. They don't need to know why standards apply. So that's the reason why I don't give that kind of instruction.

MR. UNIKEL: Just for the record, if I may, nowhere in the instructions have we said anywhere even once that the patents are presumed valid, which I think is an accurate principle of law.

THE COURT: But it's not an accurate principle of law that helps the jury. The only thing they need to know is they have proof on clear and convincing evidence, so I reject the need to put that in.

All right. We're on to page 5. Any objections there?

MR. ARMENIO: No objections from Revance, Your Honor.

MR. UNIKEL: No objections from Allergan, Your Honor.

THE COURT: Page 6.

MR. UNIKEL: No objections from Allergan, Your Honor.

MR. ARMENIO: No objections from Revance, Your Honor.

THE COURT: All right. Page 7.

MR. UNIKEL: No objections from Allergan, Your Honor.

MR. ARMENIO: No objections from Revance, Your Honor.

THE COURT: Page 8.

MR. UNIKEL: On this, Your Honor, we've made an agreement between the parties that affects a part of this instruction and then some additional instructions as we go later.

THE COURT: Okay.

MR. UNIKEL: We are in agreement -- correct me if I'm wrong, Counsel -- that the last two sentences on page 9 which read: "An important consideration when determining whether a reference inherently discloses a previously unknown property of something is whether that property is unexpected, although all properties of something are inherently part of that thing. If a property is found to be unexpectedly present, then the property may be nonobvious."

THE COURT: Both sides would like me to strike those two sentences?

MR. ARMENIO: Yes, Your Honor.

THE COURT: Okay. All right. Anything else?

MR. UNIKEL: No, Your Honor, not as to that instruction.

THE COURT: Mr. Armenio.

MR. ARMENIO: It's not worth the Court's time. No, Your Honor, nothing from Revance.

THE COURT: Okay. We're on to page 11 and the instruction on prior art.

MR. UNIKEL: Yes, Your Honor. Allergan does have one objection here. In our proposal, we had suggested instead of the exhibit numbers to just include a reference to what the actual shortcut is.

THE COURT: The reason why I put the exhibit numbers is the jury is going to get a box of stuff and they're going to have trouble finding this stuff if they don't have the exhibit numbers. What is the harm of giving them the exhibit numbers?

MR. UNIKEL: The concern I have, Your Honor, is that to include it in the instruction makes it seem almost a directive that they should go find them and read them, whereas if there's no instruction, they're supposed go and find and read other evidence which is relevant to the other instructions as well.

THE COURT: I don't think that's what a normal -- an ordinary person would take away from that. And, again, it's something in various cases, including criminal cases I've done before when there's just a lot of evidence.

Does anyone want to turn off their phone, whatever that is?

So anything else on --

MR. ARMENIO: Yes, Your Honor. On the prior art on page 11, Revance would like the position it was put into

the opening argument from Allergan about using Mr. Hunt's prior publication as prior art to Mr. Hunt's patent and that was criticized as being improper. So the sentence we would suggest for the Court's consideration we would like to add is the following sentence: "The fact that Dr. Xiang or Mr. Hunt is named on a prior art reference above does not change one way or the other its status as prior art or its availability for use in your obviousness analysis."

MR. UNIKEL: Your Honor, Allergan would object to that and I would note that in opening, the suggestion was only made that Mr. Hunt was the inventor on the prior art and would be here to explain the difference between the prior art and his existing patent.

MR. ARMENIO: We believe it went further than that. The cite is page 122 of the trial transcript, lines 5 to 25. If Your Honor would like, we can put it on the screen.

THE COURT: That's not necessary.

MR. UNIKEL: Your Honor, we believe that would tip the scales in terms of how Hunt should be treated one direction or another.

THE COURT: I don't actually agree with that either, but here's what I'm going to do because I'm going to be listening to closing argument. I don't think anyone is going to say that in closing argument, Mr. Armenio, but if

someone says something that comes close to that, remind me and I will give a supplemental instruction. I guess that would be Mr. Unikel.

MR. UNIKEL: I've been called worse, Your Honor.

THE COURT: Too many new people. I'm pretty sure Mr. Dittmann is not going to be doing this but make sure he gets -- somebody gets the word that they shouldn't be doing that and if so, I will take some action upon request.

MR ARMENIO: Understood, Your Honor.

THE COURT: How about page 12?

MR. ARMENIO: Nothing from Revance, Your Honor.

MR. UNIKEL: I think there was only one question that we were going to check together, whether the '878 was correct at October 5th, 2005, or whether it should be October 6th, 2005, but we're in agreement that it should be the same date. We'll let the Court know. We just wanted to make sure it was the exact date.

THE COURT: Basically, we're going to hopefully finalize the instruction tonight. If you both agree it's October 6th, when you have the chance just change it to October 6th.

MR. UNIKEL: Understood, Your Honor.

THE COURT: All right. What about page 13?

MR. ARMENIO: Nothing from Revance, Your Honor.

MR. UNIKEL: Nothing from Allergan, Your Honor.

THE COURT: Thank you. Page 14.

MR. ARMENIO: On page 14 for Revance, we don't believe there's been support in the record for long-felt need, number one, or skepticism, number three.

MR. UNIKEL: We believe evidence has been submitted on those, Your Honor, and that the jury is entitled to that instruction.

THE COURT: Well, I'm --

MR. ARMENIO: We did a word search for "skepticism," Your Honor. We didn't find "skepticism," "skeptical." The only time skepticism came up in the whole trial was saying there wasn't evidence of it.

THE COURT: I do remember hearing some version of the word "skepticism" at some point. I thought I heard it today, too. But I have heard it sometime before and I certainly heard it when Mr. Dittmann said so, but that's not what I'm thinking of at the time. He said it when I was asking what secondary considerations you have. I think I already heard it. I just thought it was kind of thin.

MR. UNIKEL: Your Honor, if I may, Mr. Hunt testified about how other people told him this couldn't be done. They expressed their surprise. They expressed that they didn't think he should be pursuing some of these, like the sugar. You heard Dr. Bates talk about the fact that

even his own boss --

THE COURT: I'm going go leave it. If it turns out there's no evidence of it, then I expect the jury probably won't be moved by it.

So is there anything else, Mr. Armenio?

MR. ARMENIO: I would just note for the record, Your Honor, we already filed a letter and brief regarding number two. I note it to preserve what's in the letter.

THE COURT: That's perfectly fair. We're on to damages.

MR. UNIKEL: Your Honor, if I may, there was an instruction we both agreed to add before we get to damages.

THE COURT: What one was that?

MR. UNIKEL: That was the practicing your own patent is not a defense to infringement instruction with one modification.

THE COURT: That was one of the last ones to hit the cutting room floor because it was about defense to infringement and infringement is not an issue in the case. But if you both want it back in, I'll put it back in.

MR. UNIKEL: We made the agreement on that, Your Honor. That was part of the reason.

THE COURT: Okay.

MR. UNIKEL: If I may, I agree infringement is not an issue but there have been a variety of discussions of

patents.

THE COURT: That's fine. So you want it to follow -- you want it to be where?

MR. UNIKEL: I believe it should go after the objective indicia of nonobviousness and before the damages.

THE COURT: Do you agree in that location, Mr. Armenio?

MR. ARMENIO: I would probably put it after claim interpretation and before we get to invalidity. This is where I think it would more naturally go.

THE COURT: The problem is it doesn't naturally go anywhere because it's talking about infringement and infringement is not in the case.

MR. UNIKEL: It seemed to create confusion upfront because of that very reason, Your Honor. We felt that before damages was the right place for it to go, as they were about to then hear the instructions about damages.

THE COURT: Okay. I'll stick it in as 5.5.

MR. ARMENIO: The instruction we agreed to, Your Honor, was the modification of the one previously submitted to the Court.

THE COURT: Do you have any writing rather than reading and having me try to write down what you read?

MR. UNIKEL: I have a copy with a handwritten scribble-out.

THE COURT: I'd like to -- let me see if I can read it, if you can bring it forward.

MR. ARMENIO: May I approach, Your Honor?

THE COURT: Please.

MR. UNIKEL: Thank you.

THE COURT: So basically you have what you submitted before with the third sentence crossed out?

MR. UNIKEL: Correct, Your Honor.

THE COURT: Okay. We'll put it in.

MR. UNIKEL: Your Honor, as I considered what you just told us, and Counsel I haven't run this by you, would it make sense to say "liability" rather than "infringement" there so as to not confuse the jury?

THE COURT: That might work. That might be better.

What do you think, Mr. Armenio?

MR. ARMENIO: I have to see it in writing again.

THE COURT: Come up here.

MR. ARMENIO: Apologize, Your Honor.

THE COURT: That's all right. So the word "infringement" -- so here it says liable, which would fit with what Mr. Unikel was saying.

MR. UNIKEL: Correct.

THE COURT: So we could just say, "The existence of one of those patents does not constitute a defense of

liability of someone else's patent," period, and get rid of this fragment?

MR. ARMENIO: (Inaudible.)

THE COURT: That could be no evidence of no liability said like a lawyer. (Inaudible).

"The existence of one's own patent does not constitute a defense to liability for infringement of someone else's patent," period. And then the next sentence and fourth sentence as they were originally written.

MR. UNIKEL: Then the title, I think, would be Defense to Liability instead of infringement as the title --

THE COURT: Thank you. Helpful to have cooperation. All right.

So we were turning to damages before that digression. What about page 15?

MR. ARMENIO: Nothing from Revance, Your Honor.

MR. UNIKEL: Nothing from Allergan, Your Honor.

THE COURT: What about page 16?

MR. ARMENIO: Nothing from Revance, Your Honor.

MR. UNIKEL: Nothing from Allergan, Your Honor.

THE COURT: What about the instruction that's on page 17?

MR. ARMENIO: Nothing from Revance, Your Honor.

MR. UNIKEL: We do have language we agreed to.

MR. ARMENIO: On 18 there's going to be an

agreed change.

THE COURT: What is it?

MR. ARMENIO: If we look at the sixth line up.

THE COURT: Okay. The one that has noninfringing alternatives in it -- no, specifically the cost.

MR. ARMENIO: On 18, so the full sentence starts on the seventh line up. "A price for a hypothetical license may appropriately be based on considerations of" and the parties propose jointly to Your Honor to add the following words: "The parties's" -- possessive -- "hypothetical negotiation over" and then the sentence continues.

THE COURT: I'm writing here. So what you're saying is insert so it reads "Based on the consideration of the parties' hypothetical negotiation of the cost and availability."

MR. ARMENIO: Over the costs and availability, yes, Your Honor.

THE COURT: Over. Instead "of the," "over." So the sentence would be "A price for a hypothetical license may appropriately be based on consideration of the parties' hypothetical negotiation over the cost and availability" blah, blah, blah.

That takes care of 18 on those two pages?

MR. UNIKEL: Correct, Your Honor.

THE COURT: Just for my law clerk's benefit, there were no objections while you were out of the courtroom.

Page 19.

MR. ARMENIO: We've got one agreed change at the end, Your Honor. After "businesspeople and parties jointly" we propose to insert "willingly negotiating a license."

THE COURT: "Willingly negotiating a license"?

MR. ARMENIO: Yes, Your Honor.

THE COURT: Okay. So you're both good on that. We're practically home free here.

Any objections on the rest of it?

MR. UNIKEL: No further objections from Allergan, Your Honor.

MR. ARMENIO: None from Revance, Your Honor.

THE COURT: Normally I don't give people a whole hour and a half to think about it, but I commend you all for working together to try to improve it. I don't even remember ever actually seeing that, but then again, I don't always get a lot of opportunity for that. Maybe there's a lesson for me here.

Okay. The verdict form.

MR. UNIKEL: Allergan does have one additional question in light of -- to add, to request adding, Your Honor.

THE COURT: Yes.

MR. UNIKEL: On the form, so under findings of invalidity under formulation claim, I've shown this question already to opposing counsel, but I'll give them a copy of it as well. May I approach to hand you the text of the question?

THE COURT: Sure.

MR. UNIKEL: Here are three copies of it.

THE COURT: Okay. I understand the question or I understand why the question might be asked.

MR. UNIKEL: May I read it for the record, Your Honor?

THE COURT: Sure.

MR. UNIKEL: The question we're requesting is "For the purposes of Claim 6 of the '878 formulation patent, do you find a person of ordinary skill in the art must have real-world experience in the field of botulinum toxins?"

MR. ARMENIO: Your Honor, we object to the inclusion of that question. I think the instruction, the agreed instruction in 5.3 on person of ordinary skill in the art, covers the issue thoroughly and there's no objection by either side to that instruction in 5.3.

MR. UNIKEL: The instruction says that the jury must decide what the ordinary level of skill in the art is and provides the factors for determining that. It does not

state what the person of ordinary skill in the art is.

It is a fact dispute in the case about what are the qualifications of a person of ordinary skill in the art and in particular whether that person must have real-world experience in the field of botulinum toxins. Since that is a fact question that's been presented to the jury for consideration, there's been testimony about it, and I believe it has to be presented to the jury for resolution. Otherwise, the direction of the instructions that they must find the level of ordinary skill in the art --

THE COURT: We're not asking that question for the other two claims. So they must find -- yeah, they must find. That doesn't mean I have to ask them about it.

But that being said, my main concern about asking this question really is that I -- this is like a special interrogatory. Everything else is, I don't know, interrogatory, in effect, about the claims. So my concern would be that this highlights the argument the plaintiff is making, which I expect to hear in closing argument.

MR. UNIKEL: Your Honor, the difficulty comes that, obviously, as you heard in the 50(a) motions, we have moved as a matter of law for insufficiency of evidence in the absence of Dr. Sury's testimony.

THE COURT: Yeah, you have. So for what it's worth, I think it's a fact question for the jury as to

whether what the person of ordinary skill in the art is and --

MR. UNIKEL: We agree with you, Your Honor. That's the reason for the question.

MR. ARMENIO: We object to it because it's directive. It's not a general finding of what do you find -- who do you find a person of ordinary skill in the art to be, which I don't see on verdict forms often. I don't know if Your Honor has such a question.

THE COURT: I've never seen it before, but honestly, there's hardly ever a dispute about it, so there's no reason to be asking it.

MR. ARMENIO: The way it is here it pushes Allergan's view of the case.

THE COURT: I understand, Mr. Armenio, what you're saying. I mean, you can say more if you'd like but -- actually, I shouldn't cut you off. You may say something helpful.

MR. ARMENIO: When we look at it, the patent they have is a formulation patent. Doesn't matter if it's toxin, virus.

THE COURT: Now you're arguing the merits of the question.

MR. ARMENIO: What I slide it to is when you've got a special interrogatory like that in the form of a

verdict question, you're pushing one side of the case in front of the jury and highlighting it to them, and that's prejudicial to the other side of the case where we don't have a balancing special interrogatory to say, for example, is it sufficient for a formulation patent for a person to have 30 years of formulation experience? We could ask that. That would be a directed, pushing towards a question. Neither one of them is especially fair.

THE COURT: Okay. I have some amount of sympathies for what -- that's the wrong phrase.

I have some modest appreciation, I think, of what Mr. Armenio just said and there's certainly been cases where I asked special interrogatories --

MR. UNIKEL: Your Honor, if I may.

THE COURT: -- but they blended in better with the other questions than we're talking here.

MR. UNIKEL: The concern, Your Honor, is that this is a live dispute where there have been swords crossed in the testimony and it -- it does have to be resolved as a factual predicate for the obviousness case.

THE COURT: But, you know, I think the way the law works is depending on the result, the result of the general question will tell me what the answer to this specific question is.

MR. UNIKEL: Perhaps, Your Honor, that's the

problem, is it will leave open the question. For example, if there was a finding of obviousness and it credited Dr. Sury with being a person of ordinary skill in the art and he was not a person of ordinary skill in the art, then there would be a problem with the verdict.

THE COURT: But if they find that it's obvious, then they've also found he is a person of ordinary skill in the art, and that's a factual question, and your challenge later on will be to the legal question, not to the factual question.

MR. UNIKEL: Not necessarily, Your Honor. The problem is they could rely on a variety of different things if they wanted to find the claims obvious. The question is whether they do it properly or not. Obviousness is a question of law that is based on answers to factual questions.

One of the critical factual questions we state in the instructions is you must find the level of ordinary skill in the art, and now we're asking the question that's directed to what's in the instructions.

THE COURT: Mr. Unikel, you make a persuasive argument, but I'm going to not do it because I think on balance, the gain from the question is outweighed by the risk that it favors your side over the defendant. So I'm not going to change that, even though I appreciate that it's

a reasonable request.

Is there anything else?

MR. UNIKEL: If I may ask a subsequent question. If the jury should come back with a finding of obviousness, I may at least ask the Court to deliver the question of whether or not they would find that a person of ordinary skill in the art had this requirement to make clear whether or not they were crediting --

THE COURT: No. I really think they can't find for defendant unless they find he is a person of ordinary skill. And if they find for you, then as a factual matter, it's going to be a bulletproof verdict because there's evidence going both ways on whether he's a person of ordinary skill. And the law is that -- I believe the law is that I have to credit the verdict winner as winning on all the subsidiary facts.

So in any event, I'm not going to do it. I appreciate the argument. You preserved the issue.

Is there anything else about the verdict form?

MR. UNIKEL: One last, Your Honor, on behalf of Allergan. We would object to the final question number 5 asking for the total reasonable royalty amount, given I do believe it may invite some inconsistent verdict problems we may not be able to resolve.

THE COURT: Let's say the jury says -- let's say

we have that question and they answer the various percentages. How do I turn that into a judgment?

MR. UNIKEL: Understood, Your Honor. There is an agreed royalty base here, so the percentages would be applied to the royalty base. And there's admissions from both experts that the royalties have to continue in the future.

THE COURT: No, no. I have no problem that the questions if there are royalties there establish royalties going into the future.

Right, Mr. Armenio?

MR. ARMENIO: That certainly would be a factor in post-trial briefing if there were an ongoing royalty. I'd certainly be considering that carefully, the royalty rates, and we need the royalty rates. There's a 2023 patent expiring, there's a 2026, 2029. I think we need a total number.

THE COURT: If there's inconsistency, that's a question to -- I guess what I'd say is while there's no reason to try to confuse the jury, the risk of inconsistent verdicts shouldn't, I think, drive what the verdict form looks like. And I think -- I don't think it will be a problem. I don't think it very likely to be a problem.

So I think -- so I think this will answer the questions that will, if plaintiff wins, not only establish a

lump sum through May of 2025 but at least some true-up process to whenever the actual final judgment in this case will be. I wouldn't want to be that -- and will certainly provide a basis for motions about whether or not that rate should be adopted for after the final judgment. So in any event, I'm going to decline to do that too.

Is there anything else?

MR. UNIKEL: Nothing further from Allergan, Your Honor.

MR. ARMENIO: Nothing further from Revance on the verdict form, Your Honor.

We have one question for clarification of how you want us to use or not to use one exhibit in closing. We don't want to create any problems. It's Exhibit JTX 123. It was discussed in redirect examination of Dr. Goodnough when it came up about his use of nonanimal protein processes.

THE COURT: Is it in evidence?

MR. ARMENIO: Your Honor didn't want it in evidence. You allowed him to discuss it --

THE COURT: This is prior to the -- prior consistent statement?

MR. ARMENIO: Correct. And you said we can use it for a limited purpose. We want to make sure we follow what Your Honor wants.

THE COURT: I think the prior consistent statement up on the screen -- thank you for bringing that up -- that doesn't mean that who's ever making the argument can't say the expert was attacked for this but you saw he said it 20 years ago.

MR. ARMENIO: It's okay if we say the witness said he put it in a prior paper? We don't show it, but we leave it at that. He mentioned it --

THE COURT: That's the -- was -- I view the statement as a prior consistent statement after some suggestion that he's making this up. So you can bring in the fact he made the prior consistent statement, but I think the fact that he made it doesn't appear in the article. Okay?

MR. ARMENIO: So he made a prior consistent statement in a scientific paper, period?

THE COURT: Yeah, something like that.

MR. ARMENIO: Thank you, Your Honor.

THE COURT: All right. Are we done?

MR. ARMENIO: Nothing further from Revance, Your Honor.

THE COURT: Here's what I think we'll do. We'll hold on a minute. We will try making the changes we agreed to overrule or whatever and send you PDF copies of the two documents later tonight.

Should I be sending them to Ms. Wilson and Mr. Tigan?

MR. TIGAN: Yes, Your Honor. Thank you.

THE COURT: Ms. Gaza, do you get a copy too?

MS. GAZA: Yes, please, Your Honor.

THE COURT: So we'll send them out. And what I'd like is at some point after you get them for very alert Mr. Unikel and Mr. Armenio or whoever they trust to delegate this to, to look at it, make sure that everything I said we would do has been done, and let me know. And then when we've got a final, then I'm going ask Mr. Tigan to make 20 copies and bring it with him tomorrow.

MR. TIGAN: I can do that, Your Honor, yes.

THE COURT: Thank you very much. I do sincerely appreciate the efforts of the two attorneys who have been speaking and whoever on their team has been helping resolve these things.

All right. We'll be in recess.

(The proceedings were in recess at 6:30 p.m.)

**C E R T I F I C A T E**

I, Deanna L. Warner, a Registered Professional Reporter, do hereby certify that as such Registered Professional Reporter, I was present at and reported in

Stenotype shorthand the above and foregoing proceedings.

Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$0.55** [1] - 1059:14
**$115** [1] - 1056:15
**$13,398,228** [1] - 1055:9
**$273** [5] - 1054:20, 1080:9, 1081:14, 1082:6, 1082:15
**$3,828,065** [2] - 1055:5, 1055:16
**$4,785,081** [1] - 1055:19
**$8,613,146** [1] - 1055:22
**$9,570,163** [1] - 1055:7

## '

**'126** [13] - 1001:16, 1002:13, 1002:17, 1003:1, 1003:10, 1004:1, 1004:5, 1004:21, 1005:4, 1005:6, 1005:20, 1009:17, 1010:20
**'21** [1] - 1031:15
**'22** [1] - 1031:15
**'460** [1] - 1135:5
**'468** [34] - 924:25, 925:4, 925:6, 925:15, 925:20, 925:23, 926:12, 927:4, 928:3, 928:5, 983:18, 986:1, 986:2, 986:6, 996:17, 996:21, 996:23, 997:5, 997:17, 1009:3, 1011:5, 1011:7, 1011:16, 1011:22, 1135:18, 1150:6, 1150:10, 1150:16, 1150:25, 1163:20, 1163:21, 1164:5, 1164:17, 1164:22
**'598** [95] - 983:17, 984:3, 984:5, 984:8, 984:12, 984:14, 984:21, 984:23, 985:2, 985:19, 986:5, 987:11, 987:22, 988:11, 989:4, 989:12, 990:14, 991:9, 991:20, 992:6, 992:21, 993:6, 993:11, 993:19, 993:23, 993:25, 994:3, 995:19, 996:12, 996:16, 997:16, 1007:12, 1007:16, 1007:21, 1009:2, 1009:6, 1009:9, 1009:13, 1009:18, 1009:24, 1010:3, 1010:23, 1011:1, 1011:8, 1011:17, 1011:21, 1015:11, 1015:13, 1015:25, 1016:4, 1016:8, 1016:18, 1135:5, 1135:17, 1138:5, 1138:16, 1139:15, 1139:21, 1140:4, 1140:7, 1140:17, 1140:23, 1140:25, 1142:22, 1142:24, 1144:4, 1144:14, 1144:17, 1144:21, 1144:24, 1145:3, 1145:6, 1145:9, 1145:12, 1145:16, 1145:19, 1146:1, 1146:9, 1148:3, 1148:4, 1149:11, 1149:13, 1149:15, 1149:17, 1149:21, 1151:1, 1151:13, 1151:14, 1163:20, 1163:21, 1163:23, 1164:1, 1164:3, 1164:17, 1164:21
**'669** [25] - 921:7, 1103:20, 1105:1, 1105:17, 1106:6, 1116:18, 1118:20, 1118:25, 1119:4, 1119:7, 1119:11, 1119:17, 1119:21, 1120:1, 1126:16, 1154:21, 1156:8, 1156:13, 1156:17, 1156:20, 1157:5, 1157:15, 1158:22, 1159:1, 1168:10
**'697** [7] - 895:18, 896:11, 896:20, 899:17, 900:7, 901:17, 1120:15
**'740** [70] - 872:9, 872:12, 873:22, 880:22, 881:4, 881:9, 881:22, 882:11, 887:1, 887:21, 892:4, 892:20, 892:24, 893:3, 893:5, 893:17, 893:20, 893:23, 902:1, 903:3, 904:25, 906:17, 907:7, 907:23, 908:17, 908:19, 909:4, 910:16, 911:12, 912:11, 914:19, 914:21, 915:5, 915:11, 915:14, 920:21, 920:23, 921:8, 1042:24, 1046:11, 1072:23, 1085:5, 1085:10, 1085:16, 1085:20, 1085:25, 1086:8, 1086:10, 1086:12, 1086:21, 1092:14, 1092:20, 1097:5, 1098:13, 1103:7, 1105:1, 1107:24, 1108:3, 1109:20, 1119:2, 1119:4, 1119:7, 1119:11, 1119:21, 1120:2, 1127:21, 1128:11, 1158:16, 1160:2, 1160:5
**'748** [75] - 871:22, 871:25, 872:5, 872:6, 873:10, 873:11, 873:14, 873:15, 873:16, 893:18, 893:20, 893:23, 902:19, 916:3, 916:6, 916:10, 916:21, 916:25, 917:1, 919:10, 920:16, 920:25, 921:4, 921:13, 921:19, 921:21, 924:17, 927:6, 928:6, 928:9, 934:8, 935:11, 936:5, 938:10, 939:9, 939:10, 939:12, 1059:3, 1072:23, 1075:2, 1085:5, 1104:5, 1104:10, 1104:17, 1105:5, 1107:14, 1108:2, 1108:15, 1108:24, 1109:2, 1109:8, 1109:15, 1109:17, 1109:20, 1109:21, 1110:12, 1112:19, 1114:22, 1115:21, 1116:6, 1116:12, 1117:2, 1121:22, 1122:19, 1127:17, 1154:20, 1155:1, 1155:3, 1155:23, 1156:12, 1157:17, 1157:22, 1158:18, 1158:20, 1159:6
**'82** [4] - 1160:6, 1160:11, 1160:12, 1161:4
**'849** [1] - 912:22
**'878** [90] - 942:23, 943:5, 943:14, 943:15, 943:16, 943:19, 945:1, 945:2, 945:24, 949:12, 949:13, 950:8, 950:16, 951:9, 952:1, 952:6, 961:14, 963:8, 963:10, 970:19, 972:15, 977:19, 978:15, 978:18, 978:25, 979:3, 979:17, 980:21, 981:5, 983:18, 987:3, 992:10, 992:11, 992:22, 992:23, 993:3, 993:9, 994:7, 994:14, 994:16, 1000:1, 1000:5, 1000:23, 1002:15, 1003:21, 1004:3, 1004:6, 1009:11, 1009:14, 1011:18, 1011:23, 1013:7, 1013:14, 1013:19, 1016:2, 1017:17, 1134:23, 1135:4, 1135:10, 1135:20, 1136:24, 1137:1, 1137:15, 1140:11, 1144:14, 1144:18, 1145:10, 1145:14, 1145:17, 1149:20, 1149:22, 1151:3, 1151:9, 1151:10, 1151:13, 1158:16, 1162:14, 1162:18, 1162:24, 1163:2, 1163:8, 1163:13, 1163:15, 1163:19, 1164:11, 1164:16, 1165:9, 1165:11, 1180:14, 1188:15
**'90s** [2] - 890:12, 1125:12
**'97** [1] - 997:25
**'99** [6] - 902:14, 911:7, 912:1, 1160:5, 1160:15, 1161:8
**'Animal** [1] - 963:1
**'Animal-protein** [1] - 963:1

## 0

**0.002** [1] - 938:5
**0.006** [1] - 938:6
**0.04** [1] - 1007:21
**003** [1] - 1085:11
**004** [2] - 920:17, 1108:20
**008A** [3] - 994:19, 995:2, 995:6
**01** [1] - 950:11
**04** [1] - 1008:4
**0476** [1] - 899:22

## 1

**1** [47] - 879:4, 881:17, 881:18, 883:4, 883:5, 919:10, 923:9, 923:13, 923:14, 923:20, 924:15, 926:19, 934:1, 934:23, 939:7, 940:4, 965:11, 967:9, 972:4, 986:18, 1003:23, 1013:20, 1017:23, 1036:6, 1036:7, 1040:5, 1060:14, 1090:8, 1090:9, 1105:6, 1107:1, 1110:20, 1111:4, 1111:6, 1111:10, 1114:12, 1114:13, 1154:23, 1155:7, 1155:24, 1157:11, 1157:16, 1159:18, 1173:25
**1,000** [1] - 938:7
**1.4** [7] - 936:14, 1024:15, 1054:4, 1055:5, 1073:19, 1081:4, 1081:16
**1.5** [1] - 1079:24
**1.75** [3] - 1024:3, 1053:19, 1055:18
**10** [3] - 908:25, 938:7, 1136:21
**10-42** [1] - 1073:15
**10-K** [1] - 1030:4
**10.11** [1] - 856:8
**10.7** [1] - 1069:11
**10.8** [1] - 856:8
**100** [3] - 938:7, 969:18, 1044:13

**1006** [1] - 864:23
**101** [2] - 962:25, 1056:14
**10A** [8] - 908:4, 908:8, 908:13, 908:22, 908:23, 913:4, 913:7, 1097:18
**11** [12] - 934:4, 934:10, 934:11, 935:13, 1103:20, 1103:22, 1103:24, 1104:23, 1156:7, 1156:20, 1177:24, 1178:25
**110** [1] - 908:18
**111** [1] - 929:21
**112** [2] - 902:11, 1092:25
**113** [3] - 933:24, 1103:22, 1118:24
**114** [1] - 1094:3
**115** [1] - 1118:23
**116** [1] - 969:18
**117** [5] - 912:14, 912:24, 913:2, 913:9, 914:15
**119** [1] - 1148:3
**11:30** [1] - 1152:12
**12** [4] - 918:2, 1003:17, 1043:4, 1180:11
**12-month** [1] - 1024:17
**122** [2] - 918:2, 1179:15
**123** [4] - 930:22, 932:4, 933:7, 1195:14
**124** [1] - 970:16
**125** [1] - 954:4
**12:57** [1] - 1018:11
**13** [7] - 999:7, 1011:4, 1045:10, 1059:12, 1068:25, 1110:25, 1180:24
**14** [7] - 903:10, 1004:16, 1010:12, 1034:25, 1049:23, 1181:2, 1181:3
**15** [9] - 859:5, 988:15, 1006:12, 1024:16, 1060:14, 1083:2, 1083:11, 1165:17, 1185:15
**15-minute** [1] - 958:11
**150** [3] - 921:8, 1112:23, 1113:2
**153** [5] - 974:1, 1016:23, 1017:7, 1017:10, 1017:15
**158** [2] - 1068:17, 1068:25
**16** [16] - 895:20, 896:11, 896:20, 899:6, 899:17, 899:22, 900:6, 1009:5, 1009:17, 1120:10, 1120:15, 1120:17, 1121:2, 1121:12, 1121:17, 1185:18
**164** [3] - 1051:1, 1051:12, 1051:15
**17** [20] - 894:15, 923:21, 923:23, 988:15, 989:16, 1040:3, 1040:5, 1040:8, 1040:13, 1046:14, 1046:19, 1050:21, 1053:4, 1054:2, 1074:8, 1074:9, 1074:20, 1076:8, 1076:9, 1185:22
**17.25** [1] - 1040:15
**173** [1] - 1015:20
**174** [1] - 1057:3
**175** [3] - 974:5, 1015:22, 1146:1
**179** [5] - 955:21, 956:3, 956:6, 997:9, 1057:4
**17th** [1] - 854:13
**18** [5] - 1003:24, 1006:12, 1185:25, 1186:7, 1186:24
**18-month** [2] - 1024:17, 1043:4
**180** [21] - 974:5, 987:12, 987:22, 989:3, 990:10, 993:11, 993:20, 998:24, 1015:12, 1015:16, 1015:22, 1016:1, 1016:7, 1016:14, 1016:15, 1017:4, 1017:5, 1017:10, 1140:23, 1140:25, 1144:7
**183** [2] - 1016:18, 1016:22
**188** [2] - 1005:8, 1005:20
**189** [2] - 1144:2, 1144:8
**19** [3] - 985:14, 1011:4, 1187:4
**19-12** [1] - 1146:24
**19-13** [1] - 1147:20
**19-14** [1] - 1148:10
**19-16** [1] - 1151:7
**19-2** [1] - 1134:14
**19-3** [1] - 1135:14
**19-4** [1] - 1135:21
**19-5** [1] - 1137:12
**19-6** [1] - 1139:17
**19-7** [1] - 1140:9
**19-8** [1] - 1144:11
**192** [13] - 879:2, 880:3, 881:14, 883:6, 883:13, 883:23, 884:14, 885:4, 885:9, 886:12, 907:9, 910:20, 1097:7
**196** [1] - 1116:20
**1982** [19] - 875:12, 875:14, 905:8, 905:10, 905:14, 905:19, 905:25, 906:7, 906:14, 1092:21, 1095:13, 1095:15, 1095:16, 1095:23, 1096:2, 1096:5, 1096:13, 1096:16, 1096:25
**1989** [1] - 902:13
**1990s** [4] - 1011:14, 1123:18, 1124:9, 1125:12
**1992** [5] - 889:17, 889:19, 931:10, 932:9, 933:14
**1994** [1] - 1125:24
**1996** [2] - 926:3, 955:18
**1997** [8] - 997:11, 997:15, 997:20, 997:24, 998:7, 998:14, 998:22, 999:5
**1998** [1] - 949:9
**1999** [40] - 874:12, 874:16, 874:17, 879:6, 882:4, 882:13, 885:16, 902:15, 902:18, 902:21, 902:24, 903:19, 907:12, 907:18, 907:21, 910:15, 910:22, 910:25, 911:5, 911:15, 911:19, 912:7, 1092:21, 1092:22, 1093:5, 1093:8, 1093:11, 1093:14, 1093:17, 1093:21, 1097:11, 1097:14, 1098:1, 1098:6, 1098:20, 1101:16, 1101:22, 1102:9, 1102:11, 1102:17
**1:30** [1] - 1152:12
**1A** [1] - 1111:21
**1B** [2] - 1112:2, 1112:11

## 2

**2** [41] - 876:12, 903:10, 903:13, 914:14, 914:15, 937:15, 938:1, 939:7, 939:15, 939:18, 940:3, 954:1, 954:9, 1014:9, 1028:5, 1036:6, 1036:7, 1039:12, 1041:17, 1046:14, 1046:16, 1066:24, 1067:10, 1067:15, 1067:23, 1082:6, 1090:14, 1105:16, 1105:22, 1106:8, 1106:22, 1106:23, 1112:5, 1112:9, 1115:22, 1126:19, 1141:14, 1150:16, 1168:10, 1174:3
**2.1** [1] - 919:13
**2.5** [1] - 911:16
**20** [17] - 894:16, 960:21, 989:7, 1003:24, 1024:16, 1046:13, 1052:19, 1053:6, 1059:20, 1079:5, 1079:11, 1141:23, 1142:1, 1142:11, 1165:17, 1196:5, 1197:11
**20,000** [2] - 862:8, 865:24
**20,000-page** [1] - 867:2
**20.1** [1] - 1052:18
**200** [2] - 944:22, 1030:12
**2000** [23] - 916:14, 916:16, 916:19, 917:4, 918:8, 918:14, 918:18, 918:24, 919:2, 920:1, 920:7, 920:12, 1116:18, 1116:24, 1116:25, 1117:4, 1117:8, 1117:13, 1117:23, 1118:3, 1118:5, 1118:8, 1118:11
**2000s** [3] - 1102:7, 1125:13, 1138:25
**2002** [4] - 904:19, 949:5, 1094:8, 1094:13
**2003** [36] - 872:19, 873:1, 874:5, 874:15, 874:20, 875:1, 875:2, 877:9, 878:20, 878:24, 879:12, 880:14, 880:17, 882:10, 887:3, 887:15, 888:2, 888:12, 889:1, 891:22, 893:2, 904:2, 904:5, 904:15, 949:3, 1087:2, 1087:8, 1088:18, 1092:14, 1094:21, 1097:1, 1103:12, 1128:21, 1129:2, 1129:6, 1145:3
**2005** [17] - 946:13, 946:21, 983:24, 1001:11, 1002:18, 1003:16, 1003:20, 1005:5, 1006:19, 1009:4, 1009:10, 1010:2, 1010:12, 1011:1, 1150:14, 1180:15, 1180:16
**2006** [1] - 1120:19
**2007** [1] - 1003:17
**2007/041664** [1] - 1003:13
**2008** [1] - 1120:18
**2009** [12] - 870:23, 870:25, 871:2, 871:9, 1002:21, 1030:25, 1031:9, 1070:11, 1110:25, 1116:11, 1119:25, 1123:1
**2010** [1] - 1031:9
**2010s** [1] - 1125:13
**2011** [1] - 1031:10
**2012** [1] - 1031:10
**2013** [1] - 1070:11
**2016** [2] - 914:2, 914:5
**2019** [4] - 1031:11, 1057:7, 1057:24, 1058:13
**202** [6] - 875:3, 875:19, 875:22, 877:2, 905:3, 1095:9
**2020** [1] - 1031:12
**2020s** [1] - 1125:13
**2021** [8] - 1029:21, 1057:10, 1057:25, 1058:2, 1058:5,

1058:7, 1058:10, 1058:14
**2022** [3] - 1030:3, 1030:25, 1059:18
**2023** [8] - 859:9, 859:11, 874:2, 1034:25, 1049:23, 1051:5, 1059:18, 1194:15
**2024** [2] - 894:8, 917:20
**2025** [11] - 854:13, 1042:4, 1047:2, 1047:6, 1047:9, 1047:12, 1054:20, 1054:21, 1080:2, 1082:19, 1195:1
**2026** [1] - 1194:16
**2029** [5] - 1042:4, 1046:21, 1059:3, 1074:24, 1194:16
**206** [2] - 971:4, 971:6
**207** [5] - 948:13, 948:14, 948:17, 948:23, 971:6
**208** [1] - 1006:12
**209** [4] - 948:8, 987:11, 1016:4, 1138:4
**21** [3] - 1004:16, 1052:3, 1052:18
**21-CV-1411-RGA** [1] - 854:5
**211** [4] - 1034:21, 1035:18, 1035:22, 1049:20
**212** [4] - 1120:12, 1120:21, 1120:24, 1159:14
**22** [2] - 915:9, 925:16
**22.6** [1] - 1052:9
**223** [1] - 996:19
**226** [2] - 969:15, 995:13
**23.7** [1] - 1052:8
**24** [10] - 915:9, 1024:12, 1029:17, 1030:9, 1030:19, 1033:23, 1037:4, 1040:19, 1059:21, 1165:18
**240** [1] - 995:25
**248** [1] - 894:15
**25** [10] - 872:18, 872:25, 874:2, 874:5, 874:15, 928:10, 985:15, 1052:3, 1087:2, 1179:16
**26** [1] - 928:10
**27** [4] - 918:13, 925:16, 935:4, 969:15
**273** [2] - 1056:8, 1080:6
**274** [1] - 935:4
**276** [1] - 1103:25
**279** [1] - 936:7
**27th** [1] - 859:10
**28** [3] - 870:20, 873:6, 963:18
**29** [7] - 872:2, 873:7, 934:4, 969:15, 1034:7, 1039:13, 1040:13

## 3

**3** [17] - 881:15, 881:18, 883:2, 883:13, 883:14, 883:23, 884:14, 885:3, 885:9, 885:23, 925:15, 953:7, 1014:17, 1014:25, 1038:13, 1053:8, 1174:6
**3.15** [1] - 1055:21
**3.5** [8] - 1024:3, 1024:4, 1055:6, 1073:20, 1079:24, 1080:1, 1082:5, 1117:19
**3.6** [1] - 1117:22
**3.8** [2] - 1081:14, 1081:15
**30** [10] - 864:4, 865:19, 867:3, 872:15, 873:19, 885:18, 885:19, 1005:18, 1051:5, 1191:6
**30-page** [3] - 865:13, 866:6, 867:2
**30-something** [1] - 865:21
**31** [5] - 917:20, 1054:20, 1054:21, 1080:2, 1082:19
**314** [4] - 1029:25, 1030:9, 1030:11, 1030:20
**318** [1] - 859:5
**31st** [1] - 894:8
**32** [2] - 880:23, 1005:19
**335** [2] - 1068:11, 1068:16
**362** [1] - 911:15
**37** [7] - 953:23, 954:4, 957:22, 960:18, 960:22, 968:7, 976:12
**381** [5] - 889:4, 889:22, 889:25, 890:16, 1099:14
**3:00** [1] - 860:2

## 4

**4** [6] - 877:2, 939:7, 966:7, 1009:5, 1015:2, 1175:3
**4.47A** [1] - 1105:14
**4.9** [1] - 1055:9
**40** [2] - 1008:4, 1171:18
**413** [1] - 862:3
**416** [1] - 930:3
**42** [2] - 1045:11, 1059:14
**43** [1] - 914:15
**430** [5] - 862:3, 862:4, 862:15, 864:15, 1050:15
**430A** [3] - 1035:4, 1035:18, 1035:22
**431** [6] - 862:6, 862:11, 862:12, 862:13, 862:14, 865:24
**431A** [3] - 1035:8, 1035:18, 1035:23
**433A** [3] - 896:25, 897:7, 897:11
**44** [2] - 1059:21, 1060:14
**45** [7] - 928:10, 944:8, 976:15, 1019:2, 1045:9, 1170:3, 1171:18
**45-minute** [1] - 1018:14
**46** [2] - 893:1, 985:14
**468** [2] - 948:10, 948:12
**47** [2] - 893:1, 914:15
**49** [4] - 991:8, 991:11, 1142:24, 1144:7
**4:00** [1] - 860:2
**4:30** [1] - 1153:14

## 5

**5** [15] - 886:12, 886:22, 960:17, 960:21, 970:11, 970:17, 1010:12, 1040:18, 1041:16, 1136:21, 1141:14, 1171:19, 1176:9, 1179:15, 1193:21
**5,756,468** [1] - 924:22
**5.14** [1] - 926:23
**5.3** [2] - 1188:20, 1188:22
**5.5** [1] - 1183:18
**50** [4] - 968:19, 969:3, 969:10, 1005:9
**50(a** [8] - 1083:15, 1154:17, 1154:19, 1157:19, 1158:15, 1167:12, 1172:14, 1189:21
**50/50** [1] - 1166:10
**517** [1] - 919:4
**52** [3] - 1005:18, 1005:25, 1006:5
**528** [1] - 870:20
**530** [1] - 872:16
**532** [1] - 880:23
**55** [3] - 1059:14, 1059:18, 1059:21
**58** [1] - 1138:5
**59** [1] - 974:23
**598's** [2] - 1147:11, 1148:18
**5:00** [2] - 1149:5, 1153:12
**5th** [1] - 1180:15

## 6

**6** [100] - 872:21, 872:22, 872:23, 879:19, 880:4, 881:4, 881:5, 881:11, 881:21, 882:11, 882:14, 883:14, 883:15, 886:13, 887:3, 887:5, 887:11, 887:17, 887:18, 887:21, 936:8, 936:12, 937:7, 937:15, 938:1, 939:8, 939:14, 939:16, 942:23, 943:5, 945:24, 963:13, 963:25, 965:24, 966:12, 966:23, 967:13, 968:11, 969:25, 972:8, 972:15, 972:17, 972:20, 977:18, 979:3, 980:20, 981:2, 981:4, 981:7, 983:18, 986:19, 986:25, 987:3, 993:9, 993:13, 993:16, 994:4, 995:15, 998:7, 1000:5, 1000:23, 1001:11, 1002:7, 1002:11, 1002:13, 1004:15, 1009:5, 1017:17, 1018:4, 1060:15, 1087:14, 1087:18, 1088:2, 1088:4, 1088:5, 1088:7, 1104:23, 1105:16, 1105:20, 1106:5, 1106:8, 1126:19, 1134:23, 1135:4, 1135:10, 1137:15, 1151:9, 1151:10, 1162:18, 1162:24, 1163:19, 1164:11, 1164:19, 1165:11, 1168:10, 1176:15, 1188:15
**6.37** [1] - 1007:5
**6.38** [1] - 1007:15
**60** [1] - 976:13
**60/725126** [2] - 1001:20, 1001:24
**630** [2] - 856:3, 862:3
**64** [1] - 1051:23
**65** [1] - 1051:23
**669** [4] - 920:14, 920:20, 921:3, 1119:1
**697/LUO** [1] - 1159:9
**6:30** [1] - 1197:19
**6A** [2] - 854:12, 867:7
**6B** [1] - 868:8
**6th** [3] - 1180:16, 1180:21, 1180:22

## 7

**7** [2] - 996:20, 1176:20
**7.3** [2] - 970:11, 970:18
**7.7** [1] - 1052:10
**70** [1] - 988:15
**71.8** [1] - 1052:22
**73** [2] - 1050:6, 1050:13
**78** [4] - 989:16, 1034:14, 1035:18, 1035:22
**79** [2] - 906:20, 989:16

## 8

**8** [73] - 872:4, 872:6, 872:8, 872:12, 872:21, 872:22, 872:24, 873:9, 873:11, 873:13, 873:16, 880:22, 881:4, 887:10, 887:12, 887:14, 887:22, 887:23, 891:22, 891:24, 892:2, 893:3, 893:5, 899:13, 903:3, 906:16, 911:12, 912:10, 915:8, 918:2, 920:6, 921:13, 921:19, 921:21, 1079:10, 1079:11, 1087:14, 1087:17, 1088:2, 1088:4, 1088:5, 1088:8, 1092:14, 1105:5, 1105:9, 1107:14, 1107:22, 1111:4, 1111:5, 1111:6, 1111:10, 1112:19, 1112:20, 1114:9, 1116:11, 1154:20, 1154:24, 1155:1, 1155:3, 1157:17, 1157:21, 1158:13, 1158:20, 1159:6, 1160:4, 1176:25
**8.2** [2] - 1052:20, 1054:4
**8.6** [4] - 1082:6, 1082:10, 1082:15, 1082:17
**8.8** [1] - 1052:10
**80** [4] - 953:18, 967:10, 968:4, 1116:1
**8123** [1] - 864:2
**823** [1] - 865:6
**87** [1] - 1045:9
**8:00** [1] - 860:6
**8A** [1] - 995:14

## 9

**9** [1] - 1177:8
**9,469,849** [1] - 913:10
**9-11** [1] - 1146:13
**9.5** [1] - 1080:10
**9.6** [1] - 1080:1
**90** [3] - 954:5, 976:13, 976:15
**91** [1] - 858:15
**93** [1] - 962:8
**96** [1] - 969:17
**989** [2] - 1002:24, 1003:6
**99** [1] - 1059:22
**9:30** [3] - 869:16, 870:5, 1152:5

## A

**AbbVie** [1] - 1030:3
**abiding** [1] - 1175:8
**ability** [2] - 957:9, 970:2
**able** [19] - 857:9, 857:11, 859:1, 887:20, 892:17, 914:3, 934:1, 934:22, 936:21, 937:1, 976:16, 1046:1, 1056:4, 1059:15, 1097:1, 1114:17, 1126:3, 1193:24
**absence** [2] - 963:1, 1189:23
**absolutely** [7] - 887:18, 959:9, 1137:23, 1140:8, 1145:4, 1145:25, 1149:13
**abstract** [5] - 890:15, 890:17, 910:19, 1100:4, 1100:5
**abundantly** [1] - 1163:13
**accept** [1] - 1060:6
**acceptable** [2] - 865:22, 999:12
**access** [3] - 924:16, 1018:13, 1155:21
**accidently** [1] - 957:23
**accomplish** [1] - 969:23
**accomplished** [2] - 955:12, 969:19
**according** [9] - 901:5, 963:8, 983:5, 1018:11, 1065:6, 1070:2, 1076:2, 1106:23, 1164:10
**accordingly** [2] - 880:5, 1157:13
**account** [6] - 1024:5, 1032:25, 1045:8, 1106:14, 1107:9, 1166:3
**accountant** [1] - 1021:25
**accounted** [2] - 1032:16, 1106:2
**accounting** [2] - 1021:13, 1021:20
**accurate** [3] - 1080:11, 1176:4, 1176:5
**achieve** [5] - 923:8, 1110:7, 1114:17, 1157:11, 1164:10
**achieved** [2] - 957:2, 999:13
**achieving** [3] - 1086:18, 1110:2, 1160:1
**acid** [31] - 888:21, 889:10, 890:20, 890:25, 891:5, 891:9, 920:6, 920:11, 921:16, 921:23, 922:11, 923:9, 923:13, 926:14, 934:2, 937:10, 938:14, 1100:24, 1103:17, 1105:6, 1105:25, 1107:14, 1107:16, 1107:25, 1114:11, 1115:7, 1155:4, 1155:19, 1157:3, 1159:20, 1160:1
**acids** [35] - 922:15, 922:19, 922:23, 924:15, 926:11, 926:16, 926:19, 929:16, 930:8, 934:23, 937:2, 937:10, 937:14, 937:19, 940:6, 1106:15, 1108:17, 1110:20, 1114:13, 1114:15, 1114:18, 1114:24, 1115:1, 1115:4, 1115:11, 1115:14, 1116:1, 1118:8, 1118:12, 1118:17, 1119:9, 1157:8, 1157:11, 1168:7, 1168:9
**acknowledge** [2] - 1041:21, 1149:19
**acknowledged** [2] - 871:7, 907:20
**acknowledges** [1] - 1076:10
**acknowledging** [1] - 1076:18
**acknowledgment** [1] - 1070:7
**acquired** [1] - 1070:18
**act** [1] - 1174:25
**acting** [4] - 1049:25, 1050:7, 1058:5, 1058:8
**action** [18] - 978:9, 978:13, 979:11, 979:18, 980:1, 980:11, 1000:6, 1000:14, 1000:20, 1001:3, 1076:20, 1077:23, 1078:14, 1078:23, 1078:25, 1079:22, 1165:1, 1180:8
**active** [12] - 881:12, 882:15, 882:20, 886:18, 886:23, 910:5, 974:2, 975:1, 1088:6, 1098:10, 1113:3, 1143:6
**actively** [1] - 1143:24
**activity** [3] - 953:18, 968:23, 1121:9
**actual** [11] - 864:14, 864:16, 894:21, 919:15, 924:13, 1074:9, 1076:8, 1172:2, 1175:13, 1178:4, 1195:2
**ADAM** [1] - 855:6
**adapt** [1] - 1137:25
**add** [12] - 963:23, 990:7, 1050:12, 1050:15, 1050:17, 1052:6, 1059:21, 1147:24, 1179:4, 1182:12, 1186:10, 1187:24
**added** [5] - 965:14, 1008:6, 1036:21, 1038:16, 1069:25
**adding** [8] - 896:20, 899:23, 900:7, 901:1, 901:8, 953:21, 969:7, 1187:24
**addition** [4] - 968:6, 977:7, 1005:20, 1129:12
**additional** [19] - 951:3, 1015:1, 1022:1, 1036:16, 1037:14, 1050:21, 1050:22, 1070:12, 1071:3, 1072:10, 1079:14, 1117:22, 1158:14, 1158:15, 1158:21, 1172:15, 1175:18, 1177:3, 1187:23
**additionally** [1] - 1160:24
**additives** [1] - 965:5
**address** [6] - 856:3, 958:15, 1066:6, 1093:20, 1139:13, 1171:3
**addressed** [6] - 856:2, 966:13, 968:13, 977:8, 1150:13, 1170:21
**addressing** [2] - 910:2, 1163:8
**adds** [1] - 1033:22
**adequate** [1] - 1007:25
**adhere** [2] - 926:13, 1136:1
**adjust** [1] - 1075:4
**adjusted** [1] - 1054:9
**adjustment** [3] - 1046:12, 1054:5, 1075:15
**adjustments** [1] - 869:13
**administering** [1] - 971:6
**administration** [4] - 943:23, 971:1, 971:8, 1021:21
**admission** [1] - 913:4
**admissions** [1] - 1194:5
**admit** [4] - 897:6, 912:24, 933:10, 1120:21
**admitted** [40] - 863:8, 863:21, 863:22, 875:21, 875:23, 889:24, 890:1, 897:9, 897:12, 913:1, 913:2, 913:6, 913:7, 948:8, 948:21, 948:24, 956:5, 956:7, 995:4, 995:7, 1002:9, 1002:11, 1019:11, 1019:21, 1019:22, 1030:20, 1035:20, 1035:23, 1051:14, 1051:15, 1120:21, 1120:23, 1120:24, 1155:17, 1156:10, 1156:25, 1157:6, 1157:10, 1161:24, 1162:19
**admitting** [1] - 868:13
**adopted** [1] - 1195:5
**adopting** [1] - 1165:24

**advance** [1] - 884:12
**advanced** [2] - 947:3, 1136:20
**advantage** [3] - 1057:21, 1058:1, 1058:8
**advantages** [5] - 879:12, 1057:15, 1058:11, 1058:13
**advertise** [1] - 1045:2
**advertised** [1] - 1081:20
**advertising** [2] - 1031:24, 1070:4
**advice** [1] - 1140:22
**Advisories** [1] - 1034:25
**Advisors** [1] - 1049:23
**aesthetic** [1] - 1019:24
**Aesthetics** [3] - 1029:21, 1034:17, 1051:4
**AEX** [13] - 901:18, 921:9, 921:12, 922:10, 924:14, 1113:23, 1114:1, 1120:2, 1121:2, 1155:23, 1159:2, 1159:10, 1159:16
**affects** [1] - 1177:2
**affiliated** [1] - 1027:12
**affiliates** [1] - 1028:1
**affinity** [1] - 1118:2
**after-negotiation** [1] - 858:8
**afternoon** [13] - 1019:19, 1020:17, 1020:18, 1061:2, 1061:3, 1083:1, 1084:7, 1122:11, 1122:13, 1126:4, 1154:14, 1158:4, 1158:5
**agar** [2] - 906:1, 906:4
**ago** [7] - 905:5, 933:10, 955:25, 962:22, 1017:9, 1143:12, 1196:5
**agree** [66] - 871:11, 904:5, 909:9, 909:10, 917:12, 922:9, 923:7, 924:25, 973:19, 976:8, 985:5, 988:3, 989:10, 989:19, 989:25, 990:1, 990:5, 992:2, 993:12, 994:5, 997:15, 998:13, 998:21, 1005:6, 1005:13, 1006:9, 1007:23, 1009:1, 1011:21, 1025:21, 1026:14, 1026:16, 1026:17, 1028:11, 1028:12, 1032:12, 1041:15, 1063:10, 1068:19, 1068:22, 1075:21, 1078:21, 1078:24, 1081:19, 1085:22, 1092:17, 1092:18, 1098:15, 1099:23, 1109:5, 1109:6, 1116:14, 1116:15, 1123:8, 1126:12, 1128:21, 1129:9, 1130:7, 1135:9, 1135:11, 1142:10, 1179:22, 1180:20, 1182:24, 1183:6, 1190:3
**agreed** [14] - 934:15, 974:15, 1159:13, 1166:7, 1171:23, 1172:3, 1182:12, 1183:19, 1185:24, 1186:1, 1187:5, 1188:20, 1194:4, 1196:23
**agreement** [11] - 1025:3, 1041:7, 1053:18, 1064:1, 1067:11, 1067:16, 1169:24, 1177:2, 1177:6, 1180:16, 1182:21
**agreements** [21] - 1062:14, 1063:22, 1063:23, 1064:4, 1064:21, 1065:5, 1065:11, 1066:4, 1066:8, 1066:9, 1066:10, 1066:13, 1066:14, 1066:15, 1066:17, 1066:18, 1066:21, 1066:23, 1067:1, 1068:4
**agrees** [3] - 865:1, 868:9, 1162:20
**ahead** [8] - 883:20, 947:12, 966:16, 1098:13, 1117:9, 1141:19, 1147:22, 1172:20
**air** [1] - 1174:25
**airplane** [1] - 1152:16
**airport** [1] - 1152:15
**al** [3] - 854:6, 910:1, 910:3
**Albert** [1] - 995:23
**albumin** [67] - 903:15, 903:17, 904:11, 932:12, 952:24, 952:25, 953:1, 954:10, 954:11, 954:12, 954:13, 954:14, 954:17, 954:19, 954:21, 954:22, 954:23, 955:9, 955:11, 962:13, 962:21, 963:6, 963:14, 974:2, 997:6, 1005:1, 1008:14, 1008:16, 1008:19, 1008:23, 1009:19, 1009:24, 1010:5, 1010:15, 1010:16, 1011:11, 1017:2, 1017:10, 1052:1, 1138:12, 1138:13, 1138:18, 1138:23, 1139:1, 1139:7, 1139:11, 1139:16, 1146:5, 1146:16, 1146:17, 1146:19, 1146:20, 1147:3, 1147:7, 1147:11, 1147:14, 1147:16, 1147:17, 1148:1, 1150:21, 1150:22
**albumin-containing** [1] - 955:11
**alert** [1] - 1197:7
**align** [1] - 974:19
**alignment** [1] - 1100:6
**Alignment** [2] - 890:18, 1100:7
**allegations** [1] - 1116:6
**alleged** [1] - 1154:21
**allegedly** [2] - 973:9, 1007:12
**allergan** [1] - 1123:14
**ALLERGAN** [1] - 854:3
**Allergan** [173] - 856:25, 857:10, 857:18, 860:11, 861:2, 861:5, 893:15, 894:2, 894:4, 894:22, 901:7, 907:23, 910:16, 916:2, 917:1, 920:25, 921:5, 924:17, 999:25, 1013:11, 1023:12, 1024:7, 1025:22, 1025:24, 1025:25, 1027:6, 1027:8, 1027:10, 1027:12, 1027:15, 1027:18, 1027:19, 1027:20, 1028:1, 1028:4, 1028:8, 1029:9, 1029:21, 1034:17, 1040:7, 1045:25, 1051:4, 1057:13, 1057:15, 1057:16, 1057:19, 1058:3, 1058:10, 1058:11, 1059:4, 1059:22, 1060:6, 1060:23, 1061:9, 1061:11, 1061:15, 1061:20, 1061:23, 1061:25, 1062:3, 1062:4, 1062:7, 1062:8, 1062:9, 1062:14, 1062:16, 1062:18, 1063:1, 1063:10, 1063:14, 1063:19, 1063:20, 1063:21, 1063:23, 1063:24, 1064:12, 1066:11, 1066:14, 1066:16, 1066:23, 1067:11, 1068:20, 1068:22, 1068:23, 1069:4, 1069:6, 1069:12, 1069:20, 1069:23, 1070:3, 1070:12, 1070:14, 1070:18, 1070:21, 1071:3, 1071:12, 1071:22, 1072:9, 1072:20, 1075:13, 1076:25, 1082:6, 1082:14, 1082:18, 1084:23, 1086:2, 1088:13, 1090:9, 1090:20, 1090:22, 1090:24, 1091:7, 1092:8, 1096:20, 1097:21, 1098:3, 1098:13, 1103:14, 1110:13, 1114:17, 1114:19, 1117:2, 1117:9, 1119:13, 1120:7, 1120:10, 1121:1, 1122:5, 1128:6, 1129:7, 1154:15, 1154:16, 1154:17, 1156:11, 1156:12, 1156:14, 1157:18, 1158:18, 1160:3, 1162:15, 1163:17, 1165:1, 1165:3, 1165:12, 1165:16, 1167:4, 1168:3, 1168:6, 1174:1, 1174:4, 1174:7, 1174:10, 1174:15, 1175:4, 1176:13, 1176:16, 1176:21, 1178:1, 1179:1, 1179:9, 1181:1, 1185:17, 1185:20, 1187:14, 1187:23, 1193:21, 1195:8
**Allergan's** [83] - 856:4, 857:17, 859:1, 893:17, 893:20, 893:23, 914:19, 915:1, 915:11, 915:13, 915:18, 915:21, 915:25, 920:20, 920:23, 921:7, 923:20, 924:5, 924:8, 925:9, 926:25, 927:6, 929:5, 930:1, 934:8, 935:11, 936:5, 938:10, 1001:1, 1040:6, 1040:9, 1045:17, 1045:19, 1049:8, 1060:19, 1069:13, 1072:15, 1072:18, 1074:7, 1085:19, 1086:10, 1086:19, 1086:22, 1087:12, 1089:9, 1089:17, 1090:7, 1090:13, 1090:19, 1093:21, 1093:24, 1096:13, 1102:8, 1102:9, 1103:7, 1103:9, 1109:2, 1109:9, 1109:15, 1109:17, 1110:2, 1110:8, 1111:2, 1113:25, 1114:22, 1118:3, 1119:4, 1119:18, 1121:22, 1123:3, 1126:15, 1128:11, 1155:20, 1156:1, 1156:16, 1157:24, 1160:15, 1166:1, 1166:4, 1167:1, 1170:9, 1175:6, 1190:14
**Allergen** [2] - 857:8, 916:21
**Allergen's** [1] - 914:21
**allotted** [1] - 1170:17
**allow** [7] - 863:21, 864:24, 932:1, 935:2, 937:4, 1067:8, 1073:10

**allowable** [1] - 1098:11
**Allowance** [2] - 909:15, 909:17
**allowance** [1] - 909:23
**allowed** [3] - 933:9, 973:25, 1195:20
**allows** [3] - 977:3, 977:6, 1037:22
**alludes** [1] - 963:20
**alluding** [1] - 998:1
**almost** [4] - 926:6, 991:4, 1110:19, 1178:11
**alone** [3] - 976:16, 1155:19, 1156:3
**alternative** [2] - 1043:7, 1139:1
**alternatives** [1] - 1186:5
**amended** [1] - 860:6
**Amendment** [1] - 898:8
**amino** [7] - 888:21, 889:10, 890:20, 890:24, 891:5, 891:9, 1100:24
**amount** [32] - 878:11, 920:11, 923:12, 937:10, 937:19, 939:14, 940:7, 1007:20, 1007:23, 1007:24, 1008:7, 1017:18, 1036:13, 1037:14, 1046:24, 1047:5, 1080:17, 1105:19, 1105:21, 1106:5, 1107:3, 1107:25, 1108:6, 1115:6, 1118:12, 1159:20, 1160:1, 1163:25, 1169:25, 1191:9, 1193:22
**amounts** [5] - 878:8, 939:2, 939:7, 1017:24, 1136:3
**analogous** [2] - 938:4, 1147:8
**analogy** [3] - 1026:14, 1026:15, 1043:18
**analyses** [1] - 1033:1
**analysis** [52] - 856:19, 873:2, 873:22, 873:25, 875:16, 889:12, 889:14, 897:4, 922:22, 923:17, 946:3, 946:4, 947:23, 948:3, 952:9, 974:10, 977:23, 1023:1, 1023:8, 1026:4, 1026:22, 1026:23, 1029:23, 1032:7, 1032:17, 1034:1, 1034:4, 1034:19, 1035:1, 1035:6, 1035:12, 1041:18, 1046:7, 1048:2, 1048:3, 1048:6, 1048:12, 1049:6, 1049:7, 1049:14, 1050:9, 1051:8, 1051:17, 1058:17, 1060:11, 1065:2, 1071:25, 1097:24, 1136:14, 1150:4, 1157:7, 1179:8
**analyze** [1] - 1022:23
**analyzed** [2] - 1049:11, 1056:23
**analyzing** [3] - 984:2, 1042:17, 1137:11
**AND** [1] - 854:2
**Andreas** [1] - 1084:20
**Andrews** [1] - 854:12
**animal** [178] - 874:8, 874:21, 877:7, 877:22, 878:2, 878:5, 878:6, 878:11, 878:12, 881:16, 881:24, 881:25, 882:1, 882:5, 886:24, 893:24, 894:1, 894:4, 903:6, 903:21, 904:2, 905:22, 906:4, 906:11, 906:14, 910:4, 910:6, 911:22, 912:3, 912:4, 912:8, 914:19, 914:22, 915:11, 915:14, 915:15, 917:5, 917:6, 917:9, 917:10, 917:13, 917:14, 918:8, 918:10, 919:9, 919:20, 919:21, 919:23, 920:2, 925:21, 925:24, 926:4, 926:8, 927:5, 927:6, 927:11, 929:8, 930:4, 930:17, 930:20, 930:24, 931:15, 931:24, 931:25, 932:22, 933:13, 933:19, 943:20, 952:23, 954:21, 962:1, 962:3, 962:5, 962:7, 962:10, 962:14, 962:23, 963:2, 963:4, 963:10, 963:12, 963:17, 965:7, 971:18, 971:20, 978:23, 978:25, 979:3, 979:6, 979:14, 1079:9, 1080:24, 1081:20, 1085:25, 1086:3, 1086:19, 1086:23, 1089:8, 1089:11, 1089:19, 1090:1, 1090:5, 1090:17, 1090:21, 1091:2, 1092:9, 1093:18, 1093:22, 1094:14, 1094:15, 1094:22, 1095:1, 1097:2, 1098:9, 1098:17, 1101:17, 1101:18, 1101:21, 1101:24, 1102:2, 1102:6, 1102:10, 1102:11, 1102:12, 1102:14, 1102:16, 1103:9, 1110:14, 1111:19, 1112:8, 1112:19, 1113:9, 1117:14, 1118:5, 1119:4, 1128:15, 1128:19, 1128:23, 1129:4, 1129:9, 1129:14, 1129:25, 1130:4, 1130:5, 1130:8, 1130:9, 1130:16, 1130:22, 1131:3, 1131:9, 1131:15, 1131:17, 1132:8, 1132:16, 1132:21, 1133:10, 1133:14, 1133:15, 1139:9, 1146:19, 1146:22, 1147:3, 1147:15, 1148:15, 1148:16, 1151:4, 1151:5, 1158:25, 1160:13, 1160:16, 1161:1, 1161:18, 1161:20, 1161:23, 1161:25, 1163:24, 1164:6
**animal's** [1] - 1129:22
**animal-based** [6] - 878:2, 878:5, 878:6, 912:4, 932:22, 933:19
**animal-containing** [1] - 1151:5
**animal-derived** [10] - 874:8, 952:23, 954:21, 962:10, 963:2, 963:12, 1128:23, 1139:9, 1146:19, 1146:22
**animal-free** [16] - 877:7, 914:22, 915:11, 915:14, 917:13, 929:8, 962:14, 1086:19, 1086:23, 1092:9, 1093:22, 1101:17, 1102:10, 1102:14, 1103:9, 1119:4
**animal-free-process** [1] - 1085:25
**animal-product** [1] - 882:1
**animal-product-free** [3] - 915:15, 919:9, 1111:19
**animal-protein** [35] - 881:16, 917:5, 917:6, 917:9, 917:10, 918:8, 918:10, 919:21, 962:3, 962:23, 971:18, 971:20, 978:23, 978:25, 1079:9, 1080:24, 1081:20, 1089:8, 1095:1, 1112:8, 1128:19, 1129:14, 1130:4, 1130:5, 1130:8, 1130:16, 1130:22, 1131:3, 1131:9, 1131:15, 1131:17, 1132:8, 1132:16, 1132:21, 1148:15
**animal-protein-based** [1] - 878:12
**animal-protein-free** [24] - 881:24, 881:25, 893:24, 894:4, 910:4, 943:20, 962:1, 962:7, 963:4, 979:3, 1086:3, 1090:5, 1090:17, 1090:21, 1091:2, 1098:9, 1110:14, 1113:9, 1128:15, 1129:4, 1147:15, 1148:16, 1151:4, 1163:24
**animal-protein-free-containing** [1] - 979:6
**animals** [5] - 904:6, 904:9, 929:12, 1099:10, 1101:3
**anion** [70] - 870:23, 871:4, 871:8, 871:16, 871:19, 879:9, 879:23, 884:25, 885:10, 885:15, 885:17, 885:19, 895:24, 896:8, 896:12, 896:20, 898:18, 898:25, 899:7, 899:23, 900:7, 900:10, 900:17, 901:1, 901:8, 901:13, 910:8, 922:24, 934:11, 935:15, 935:23, 935:24, 936:1, 938:12, 1104:8, 1113:9, 1113:17, 1116:3, 1117:21, 1118:6, 1119:22, 1119:24, 1120:6, 1120:8, 1121:3, 1121:14, 1121:18, 1121:19, 1122:22, 1123:2, 1123:6, 1123:8, 1123:16, 1123:20, 1124:8, 1124:10, 1124:16, 1124:21, 1125:2, 1125:6, 1125:9, 1125:18, 1125:20, 1125:21, 1125:23, 1126:4, 1126:10, 1128:2, 1157:9, 1159:10
**Anne** [1] - 1019:20
**ANNE** [1] - 855:3
**annotation** [1] - 1105:12
**annual** [1] - 1030:4
**answer** [15] - 858:16, 927:14, 927:21, 982:24, 990:5, 990:6, 992:18, 993:1, 997:23, 1060:19, 1063:3, 1127:8, 1191:23, 1194:1, 1194:24
**answered** [3] - 1005:13, 1078:9, 1125:1
**answers** [2] - 1064:16, 1192:15
**antibodies** [1] - 1098:25
**anticipate** [2] - 1151:22, 1171:17

**anticipated** [1] - 1076:7
**anyway** [3] - 1060:4, 1098:13, 1117:9
**apartment** [4] - 1026:20, 1026:21, 1026:24, 1026:25
**APF** [36] - 881:11, 886:20, 886:24, 906:16, 912:10, 935:5, 935:8, 936:13, 938:12, 1025:12, 1033:11, 1033:12, 1036:18, 1037:25, 1038:20, 1042:18, 1043:14, 1046:16, 1047:17, 1047:18, 1047:20, 1048:18, 1052:17, 1052:20, 1054:3, 1054:7, 1056:3, 1080:23, 1081:17, 1081:25, 1089:6, 1089:7, 1089:8, 1158:24, 1160:8, 1164:10
**apologies** [3] - 867:10, 1063:8, 1106:20
**apologize** [4] - 859:24, 1016:24, 1068:15, 1184:19
**appear** [5] - 1000:14, 1000:19, 1015:22, 1016:10, 1196:13
**Appearances** [1] - 855:1
**APPEARANCES** [1] - 854:15
**apples** [1] - 1037:7
**applicable** [2] - 975:15, 975:16
**applicant** [3] - 898:1, 913:12, 994:24
**applicants** [1] - 995:11
**application** [50] - 874:13, 897:19, 897:22, 898:13, 921:7, 933:22, 934:5, 935:10, 938:9, 946:14, 999:20, 1001:17, 1001:18, 1002:3, 1002:14, 1002:17, 1003:2, 1003:10, 1003:16, 1003:21, 1004:2, 1004:6, 1004:15, 1004:21, 1005:5, 1005:7, 1005:21, 1006:19, 1009:4, 1009:10, 1009:17, 1010:2, 1010:13, 1010:20, 1011:2, 1011:17, 1013:16, 1015:5, 1026:18, 1097:22, 1140:25, 1144:6, 1144:14, 1144:15, 1145:12, 1145:14, 1145:16, 1149:20, 1150:14, 1151:15
**applications** [2] - 898:17, 1002:20
**applied** [14] - 867:21, 883:12, 884:24, 913:16, 1016:11, 1017:14, 1036:1, 1042:13, 1042:14, 1042:16, 1056:16, 1056:17, 1086:23, 1194:5
**applies** [2] - 1036:3, 1175:21
**apply** [7] - 868:13, 974:9, 1013:15, 1037:9, 1048:10, 1080:13, 1175:24
**applying** [3] - 1049:4, 1136:16, 1153:3
**apportion** [5] - 1039:2, 1039:4, 1048:10, 1048:17, 1056:4
**apportioned** [1] - 1056:16
**apportionment** [1] - 1039:3
**appreciate** [5] - 1078:8, 1167:12, 1192:25, 1193:18, 1197:15
**appreciation** [1] - 1191:11
**approach** [16] - 860:17, 882:8, 903:24, 908:10, 914:22, 981:11, 1029:4, 1065:12, 1068:20, 1138:14, 1165:24, 1166:9, 1166:17, 1167:2, 1184:3, 1188:5
**appropriate** [6] - 946:24, 950:2, 1022:25, 1024:7, 1049:15, 1136:18
**appropriately** [2] - 1186:9, 1186:21
**approval** [2] - 1071:2, 1071:22
**approved** [4] - 888:5, 888:9, 918:25, 1071:4
**April** [1] - 1003:17
**Aqua** [4] - 856:15, 858:2, 860:23, 868:25
**aqueous** [4] - 964:8, 964:14, 964:15, 964:18
**arbitrarily** [1] - 1166:8
**arbitrary** [5] - 1165:19, 1166:6, 1166:16, 1166:17, 1167:2
**area** [11] - 861:12, 943:25, 944:3, 944:18, 944:24, 945:12, 947:24, 1084:24, 1137:10, 1137:11, 1140:1
**areas** [2] - 947:4, 977:9
**argue** [3] - 856:18, 904:25, 1028:20
**argued** [1] - 1135:18
**arguing** [4] - 1067:5, 1087:16, 1156:6, 1190:22
**argument** [17] - 924:14, 1012:9, 1085:5, 1135:3, 1150:4, 1152:8, 1156:9, 1167:25, 1173:19, 1179:1, 1179:24, 1179:25, 1189:18, 1189:19, 1192:22, 1193:18, 1196:3
**argumentative** [1] - 1069:15
**arguments** [10] - 1152:9, 1153:4, 1167:24, 1169:1, 1169:2, 1169:3, 1169:5, 1169:13, 1173:15
**arm** [1] - 1027:21
**Armenio** [12] - 856:15, 1174:17, 1175:15, 1177:21, 1179:25, 1182:5, 1183:7, 1184:16, 1190:15, 1191:12, 1194:11, 1197:8
**ARMENIO** [58] - 855:10, 856:14, 856:20, 857:22, 858:13, 858:17, 858:22, 859:10, 861:25, 869:6, 1172:22, 1173:3, 1174:2, 1174:5, 1174:18, 1175:16, 1176:11, 1176:18, 1176:23, 1177:17, 1177:22, 1178:24, 1179:14, 1180:10, 1180:12, 1180:25, 1181:3, 1181:10, 1182:6, 1183:8, 1183:19, 1184:3, 1184:17, 1184:19, 1185:3, 1185:16, 1185:19, 1185:23, 1185:25, 1186:3, 1186:7, 1186:17, 1187:5, 1187:9, 1187:15, 1188:18, 1190:5, 1190:13, 1190:19, 1190:24, 1194:12, 1195:10, 1195:19, 1195:23, 1196:6, 1196:15, 1196:18, 1196:20
**arrive** [6] - 887:17, 887:18, 977:3, 984:16, 1135:19, 1140:7
**arrived** [3] - 983:22, 1135:12, 1150:4
**ARSHT** [1] - 854:16
**art** [112] - 872:3, 873:3, 873:4, 873:8, 874:3, 874:4, 874:7, 882:2, 882:6, 887:7, 887:19, 888:17, 891:10, 891:18, 891:25, 892:16, 893:4, 895:7, 901:8, 930:2, 933:25, 934:8, 934:22, 935:11, 936:25, 937:1, 945:16, 946:5, 946:7, 946:11, 946:21, 946:25, 947:1, 947:16, 947:24, 948:1, 949:18, 950:3, 950:4, 952:14, 952:21, 952:22, 953:3, 953:15, 955:5, 958:8, 961:22, 963:25, 964:1, 964:18, 965:12, 965:20, 966:12, 966:13, 967:6, 967:11, 967:15, 967:21, 968:10, 970:2, 974:20, 978:14, 978:17, 978:18, 978:22, 979:3, 982:12, 982:18, 983:2, 983:10, 995:11, 999:15, 1004:11, 1013:12, 1013:22, 1016:3, 1016:8, 1017:19, 1126:16, 1136:13, 1136:18, 1136:20, 1137:9, 1154:25, 1155:10, 1162:17, 1163:12, 1171:22, 1171:23, 1172:4, 1177:25, 1178:24, 1179:2, 1179:6, 1179:7, 1179:11, 1179:13, 1188:16, 1188:21, 1188:24, 1189:1, 1189:3, 1189:10, 1190:1, 1190:8, 1192:3, 1192:4, 1192:8, 1192:19, 1193:7
**article** [4] - 889:9, 956:12, 962:23, 1196:13
**artificially** [1] - 1166:13
**artisan** [2] - 1125:4, 1168:13
**ASHKENAZI** [50] - 854:19, 859:14, 859:24, 860:2, 860:9, 860:13, 860:15, 861:24, 862:25, 863:18, 865:8, 865:13, 865:20, 866:12, 866:16, 866:20, 867:9, 867:16, 867:19, 868:2, 868:15, 868:22, 869:4, 1028:14, 1028:18, 1030:10, 1035:19, 1051:13, 1061:1, 1062:10, 1063:9, 1063:17, 1064:15, 1064:19, 1065:12, 1065:15, 1066:7, 1066:16, 1066:22, 1067:9, 1067:13, 1068:6, 1068:10, 1069:16, 1073:2, 1073:4, 1073:14, 1077:11, 1077:13, 1082:21
**Ashkenazi** [9] - 859:12, 860:24,

863:9, 864:25, 1060:24, 1063:2, 1063:6, 1066:3, 1068:3
**Ashkenazi's** [1] - 1062:21
**aside** [3] - 890:22, 1033:14, 1038:12
**aspect** [5] - 977:11, 1093:20, 1096:18, 1128:19
**aspects** [2] - 1099:8, 1138:10
**assay** [10] - 937:8, 937:9, 937:12, 937:14, 940:17, 1092:4, 1106:3, 1106:10, 1106:14
**assaying** [5] - 940:17, 940:20, 940:23, 941:2, 941:9
**assert** [2] - 1011:8, 1082:12
**asserted** [6] - 1127:16, 1129:7, 1159:4, 1160:20, 1164:16, 1167:1
**assertion** [5] - 1069:19, 1069:22, 1077:20, 1079:22, 1081:4
**assessment** [2] - 1087:22, 1111:15
**assignment** [3] - 1024:18, 1032:2, 1047:25
**assist** [2] - 942:15, 1020:24
**associated** [4] - 930:24, 1044:16, 1078:1, 1128:22
**associates** [1] - 1143:9
**assume** [12] - 939:21, 1023:3, 1024:24, 1025:1, 1025:3, 1026:9, 1027:4, 1027:6, 1030:12, 1045:12, 1170:21, 1171:1
**assumed** [2] - 1033:5, 1043:10
**assumes** [5] - 1032:9, 1039:6, 1047:9, 1166:7
**assuming** [6] - 940:17, 940:19, 940:23, 940:25, 941:2, 1078:18
**assumption** [9] - 941:7, 941:8, 1026:3, 1032:12, 1047:7, 1076:23, 1076:24, 1078:12, 1150:1
**assumptions** [5] - 1023:2, 1024:25, 1026:7, 1057:8, 1057:10
**attacked** [1] - 1196:4
**attained** [1] - 906:1
**attempt** [1] - 905:11
**attempted** [1] - 1073:6
**attempts** [1] - 991:15
**attention** [1] - 872:8
**attorney** [7] - 900:2, 900:13, 900:19, 901:21, 1123:4, 1126:15, 1133:7
**ATTORNEY** [4] - 894:20, 918:7, 985:17, 988:17
**Attorney** [1] - 893:13
**attorneys** [5] - 871:7, 959:23, 1122:12, 1153:4, 1197:15
**attribute** [3] - 1166:15, 1166:19, 1166:20
**attributed** [1] - 1079:23
**attributes** [5] - 1036:20, 1051:25, 1052:23, 1060:10, 1079:19
**Audio** [1] - 918:8
**audio** [1] - 894:22
**audit** [2] - 1022:8, 1022:10
**August** [2] - 1034:25, 1049:23
**author** [1] - 931:5
**authored** [2] - 932:8, 999:4
**authorities** [1] - 1140:19
**authors** [1] - 1097:11
**availability** [5] - 1129:24, 1179:8, 1186:16, 1186:17, 1186:22
**available** [7] - 873:4, 874:7, 874:14, 1023:19, 1060:3, 1087:6, 1087:8
**average** [8] - 989:6, 1036:4, 1037:3, 1037:5, 1038:13, 1040:15, 1052:16, 1052:17
**averaged** [1] - 867:17
**averaging** [2] - 1036:4, 1040:23
**avoid** [4] - 923:24, 926:4, 1095:20, 1141:25
**avoiding** [2] - 992:21, 1141:22
**award** [6] - 907:23, 916:21, 920:25, 1117:2, 1119:13, 1166:14
**awarded** [5] - 910:16, 917:1, 921:5, 1098:13, 1117:9
**aware** [29] - 871:6, 871:10, 871:24, 892:3, 892:5, 892:7, 892:13, 892:14, 892:15, 892:23, 894:24, 895:4, 896:17, 896:22, 896:23, 900:5, 900:11, 900:13, 900:15, 904:19, 950:7, 1000:13, 1004:11, 1018:19, 1072:18, 1072:20, 1117:3, 1139:11
**awareness** [1] - 1070:1
**awkward** [1] - 1171:14
**AX** [1] - 1115:5

**B**

**bachelor** [1] - 1021:19
**bachelors** [1] - 1136:21
**back-and-forth** [1] - 909:8
**background** [5] - 943:4, 943:25, 960:25, 1021:18, 1134:10
**backs** [1] - 858:19
**bacteria** [14] - 905:19, 905:25, 911:18, 911:25, 920:3, 925:25, 953:2, 1089:21, 1095:19, 1101:20, 1112:16, 1115:24, 1160:13, 1161:5
**bad** [3] - 908:9, 1121:8, 1124:19
**balance** [2] - 1129:1, 1192:23
**balanced** [1] - 1130:10
**balancing** [1] - 1191:4
**ballpark** [1] - 1074:10
**band** [4] - 896:2, 899:3, 1121:5, 1121:6
**banking** [1] - 1021:8
**bar** [2] - 1052:21, 1155:9
**bargaining** [1] - 1166:10
**bars** [2] - 1030:25, 1051:22
**base** [3] - 955:15, 1194:4, 1194:5
**based** [50] - 864:20, 867:14, 876:5, 876:6, 876:17, 876:18, 876:21, 877:1, 877:11, 878:1, 878:2, 878:5, 878:6, 878:12, 878:13, 882:9, 900:21, 900:25, 912:4, 926:9, 932:22, 933:19, 937:9, 958:6, 984:21, 1012:12, 1035:15, 1043:5, 1044:19, 1047:7, 1048:20, 1053:1, 1064:24, 1076:14, 1079:8, 1080:1, 1082:18, 1104:22, 1113:21, 1143:3, 1154:20, 1155:14, 1156:20, 1156:22, 1162:25, 1186:9, 1186:14, 1186:21, 1192:15
**bases** [1] - 1165:22
**basic** [1] - 1150:1
**basing** [1] - 1047:20
**basis** [10] - 941:10, 958:5, 1006:14, 1086:9, 1092:4, 1109:15, 1109:17, 1137:19, 1163:14, 1195:4
**Bates** [7] - 959:11, 1110:17, 1129:21, 1130:12, 1132:8, 1168:8, 1181:25
**Bates's** [1] - 938:5
**beads** [1] - 1091:22
**beaker** [1] - 1091:20
**bear** [1] - 1170:12
**beauty** [1] - 1173:20
**became** [1] - 1022:7
**begin** [1] - 1173:14
**beginning** [3] - 960:3, 993:20, 1049:9
**begins** [3] - 900:21, 1014:1, 1017:15
**behalf** [8] - 941:23, 942:6, 1019:20, 1020:11, 1084:23, 1154:15, 1169:17, 1193:20
**behind** [6] - 868:10, 944:4, 944:17, 945:4, 1039:19, 1073:12
**believes** [7] - 857:20, 1024:7, 1024:9, 1032:21, 1041:8, 1041:10, 1167:4
**bell** [5] - 879:19, 947:12, 950:18, 1014:12, 1057:3
**below** [6] - 884:15, 926:19, 937:2, 938:14, 1114:13, 1168:4
**beneficial** [1] - 957:11
**benefit** [18] - 909:7, 948:7, 960:19, 1025:12, 1032:10, 1032:24, 1033:5, 1033:8, 1033:13, 1036:17, 1036:20, 1041:10, 1043:14, 1047:21, 1050:20, 1054:7, 1070:3, 1187:1
**benefited** [1] - 1069:21
**benefits** [18] - 1025:11, 1025:13, 1036:15, 1037:15, 1037:17, 1037:25, 1038:3, 1038:16, 1038:17, 1044:25, 1048:15, 1050:2, 1050:3, 1050:11, 1050:16, 1055:25, 1057:13, 1058:1
**best** [2] - 957:4, 1102:2
**bet** [1] - 891:20
**better** [7] - 957:5, 1038:5, 1038:23, 1039:21, 1172:20, 1184:15, 1191:15
**between** [42] - 888:24, 891:6, 891:12, 946:7, 946:21, 947:25, 970:17, 977:10, 988:11, 988:18, 990:21, 1024:3, 1024:24,

1025:9, 1025:22, 1027:25, 1028:4, 1028:8, 1028:13, 1028:22, 1033:14, 1041:2, 1044:10, 1054:9, 1057:23, 1061:16, 1061:20, 1063:18, 1063:20, 1067:11, 1067:16, 1068:4, 1070:11, 1075:10, 1077:5, 1078:5, 1097:21, 1099:2, 1100:24, 1100:25, 1177:2, 1179:12
**beyond** [1] - 1050:2
**bid** [1] - 1170:2
**big** [6] - 960:2, 962:16, 1022:6, 1032:13, 1045:11, 1095:21
**biggest** [1] - 1044:22
**biking** [1] - 1043:22
**bind** [6] - 884:2, 884:9, 886:5, 1101:11, 1101:12, 1101:13
**binder** [30] - 875:3, 889:3, 908:3, 908:13, 908:21, 912:14, 994:19, 998:24, 1022:15, 1029:15, 1029:17, 1034:14, 1050:25, 1065:13, 1065:16, 1065:17, 1068:13, 1085:11, 1092:25, 1094:2, 1095:8, 1097:6, 1097:18, 1108:19, 1116:20, 1118:23, 1120:11, 1133:22, 1133:24, 1134:8
**binders** [2] - 908:9, 1084:11
**binding** [5] - 921:9, 1103:1, 1104:10, 1118:1, 1159:2
**biochemistry** [1] - 947:4
**biological** [1] - 1121:9
**biologically** [9] - 881:12, 882:15, 882:20, 886:18, 886:23, 910:4, 1088:6, 1098:9, 1113:3
**biopharmaceuticals** [1] - 1094:12
**biosimilar** [3] - 1047:7, 1047:16, 1047:20
**birds** [1] - 1099:10
**bit** [36] - 864:5, 884:21, 891:3, 903:25, 904:14, 906:22, 908:2, 910:21, 919:14, 921:15, 928:15, 929:3, 938:24, 943:24, 946:15, 950:18, 962:16, 967:18, 972:14, 973:4, 976:14, 977:16, 980:18, 985:6, 986:7, 997:9, 1001:5, 1013:6, 1013:21, 1014:12, 1037:13, 1114:6, 1126:15, 1127:19, 1128:18, 1143:4
**blah** [3] - 1186:23
**blanks** [2] - 860:6, 860:7
**blended** [1] - 1191:15
**block** [1] - 1060:2
**blood** [7] - 932:16, 963:1, 963:2, 1093:9, 1093:24, 1160:10
**blue** [10] - 1052:21, 1058:23, 1058:24, 1059:19, 1060:5, 1088:3, 1088:5, 1091:3, 1112:22, 1145:12
**body** [2] - 960:23, 975:23
**bond** [1] - 1148:23
**BoNT** [79] - 886:14, 894:1, 902:22, 902:25, 905:11, 905:19, 905:25, 906:7, 911:19, 912:1, 915:15, 920:11, 921:22, 922:9, 925:18, 925:20, 925:25, 926:12, 929:13, 939:25, 940:14, 940:16, 983:24, 1004:22, 1004:25, 1088:13, 1088:17, 1088:19, 1088:21, 1088:23, 1088:25, 1089:11, 1089:16, 1091:11, 1091:14, 1095:1, 1095:23, 1095:25, 1096:3, 1096:4, 1096:7, 1096:12, 1097:1, 1098:24, 1102:6, 1105:7, 1105:10, 1107:16, 1107:18, 1111:24, 1114:10, 1117:13, 1118:9, 1121:2, 1121:15, 1127:11, 1127:13, 1131:25, 1136:23, 1143:6, 1146:15, 1149:11, 1150:18, 1159:11, 1159:16, 1160:12, 1160:13, 1161:5, 1161:9, 1161:11, 1161:18, 1161:22, 1162:10, 1163:9, 1163:24, 1164:2, 1165:24
**BoNT/A** [38] - 890:19, 900:18, 901:10, 903:2, 910:25, 911:2, 911:5, 911:9, 911:12, 912:7, 921:9, 1086:19, 1086:23, 1088:10, 1089:10, 1089:18, 1090:6, 1093:15, 1093:16, 1099:4, 1099:6, 1099:10, 1099:20, 1100:8, 1100:24, 1101:6, 1110:8, 1110:14, 1110:23, 1112:23, 1113:2, 1113:22, 1114:1, 1115:8, 1117:6, 1120:3, 1135:24, 1160:17
**BoNT/C** [9] - 890:19, 910:23, 911:2, 1099:3, 1099:20, 1100:9, 1101:5, 1101:16, 1160:17
**BoNT/D** [4] - 890:19, 911:3, 1099:21, 1100:9
**BoNT/E** [2] - 890:19, 1100:9
**book** [2] - 999:1, 1168:8
**boost** [4] - 1042:4, 1042:7, 1042:8, 1044:6
**boss** [1] - 1182:1
**BOTOX** [37] - 856:24, 903:17, 979:12, 979:14, 1010:6, 1027:9, 1027:11, 1027:13, 1027:23, 1028:2, 1028:6, 1030:24, 1031:3, 1031:5, 1038:5, 1038:12, 1039:23, 1039:25, 1046:2, 1046:4, 1047:17, 1047:20, 1050:3, 1056:1, 1058:4, 1060:9, 1061:15, 1064:12, 1069:7, 1070:13, 1070:18, 1070:22, 1071:4, 1072:6, 1074:4, 1076:1
**BOTOX's** [2] - 1039:14, 1045:21
**bottom** [14] - 866:8, 910:1, 935:5, 951:2, 953:20, 954:3, 956:21, 963:3, 993:16, 995:22, 1003:25, 1014:2, 1036:8, 1057:9
**Botulinum** [2] - 875:10, 897:23
**botulinum** [124] - 870:24, 871:5, 871:17, 871:20, 874:10, 874:21, 876:5, 876:13, 876:22, 877:12, 878:20, 878:23, 879:14, 879:17, 880:16, 881:12, 882:15, 882:17, 882:19, 882:20, 882:21, 884:14, 886:10, 886:19, 887:23, 887:24, 888:3, 888:7, 888:14, 888:16, 888:19, 888:24, 888:25, 889:11, 890:23, 894:3, 894:22, 905:6, 907:15, 910:5, 913:20, 914:23, 918:18, 920:3, 921:24, 924:6, 930:18, 931:3, 933:17, 935:6, 935:14, 943:20, 952:22, 957:10, 961:2, 961:4, 961:13, 962:1, 963:5, 964:22, 967:3, 968:12, 981:18, 981:22, 981:25, 982:3, 982:16, 982:19, 983:3, 983:7, 983:11, 997:20, 998:3, 1009:20, 1012:16, 1085:1, 1088:6, 1088:7, 1088:10, 1089:14, 1090:10, 1095:18, 1096:7, 1096:17, 1096:23, 1098:10, 1098:22, 1114:11, 1123:2, 1123:17, 1124:9, 1125:10, 1125:19, 1125:22, 1126:13, 1127:11, 1127:12, 1127:14, 1128:15, 1136:8, 1136:10, 1137:2, 1137:5, 1138:11, 1147:14, 1155:5, 1156:24, 1157:1, 1157:4, 1159:2, 1161:14, 1161:19, 1162:4, 1162:13, 1162:19, 1162:21, 1163:5, 1163:6, 1163:12, 1164:10, 1188:17, 1189:5
**bound** [1] - 884:7
**bovine** [6] - 954:10, 954:11, 954:13, 954:22, 1150:21, 1164:7
**Box** [3] - 1090:8, 1090:9, 1090:14
**box** [5] - 879:8, 883:12, 1057:7, 1059:25, 1178:6
**boxes** [2] - 1036:7, 1036:8
**brand** [2] - 885:18, 1156:8
**break** [10] - 957:4, 957:7, 958:11, 960:13, 1018:14, 1019:6, 1037:13, 1080:5, 1083:2, 1154:6
**brief** [5] - 1019:7, 1152:6, 1157:25, 1167:13, 1182:7
**briefing** [1] - 1194:13
**briefly** [9] - 920:14, 943:16, 946:2, 960:25, 976:4, 1015:3, 1134:12, 1150:6, 1159:18
**bring** [35] - 879:2, 921:18, 933:24, 936:12, 942:14, 985:14, 986:18, 987:12, 989:3, 991:7, 993:9, 995:14, 1001:11, 1001:22, 1002:24,

1003:23, 1004:15, 1005:18, 1007:4, 1031:22, 1057:3, 1105:12, 1134:14, 1138:4, 1140:23, 1142:24, 1144:1, 1146:1, 1148:3, 1150:16, 1173:11, 1174:23, 1184:2, 1196:11, 1197:12
**bringing** [3] - 1067:9, 1091:1, 1196:2
**brings** [2] - 1067:6, 1070:5
**broad** [3] - 945:17, 988:8, 1152:11
**broadly** [2] - 998:13, 998:21
**bromating** [1] - 944:15
**brought** [6] - 931:14, 1066:9, 1069:17, 1070:22, 1134:7, 1134:8
**browsing** [1] - 1102:1
**BSA** [9] - 954:2, 954:8, 954:10, 976:10, 976:14, 1150:19, 1150:20, 1150:21
**BSE** [2] - 904:17, 1094:19
**Bucknell** [1] - 1021:20
**buffer** [7] - 883:2, 883:3, 883:25, 884:8, 886:4, 939:21, 1127:2
**buffers** [2] - 883:1, 1115:16
**building** [1] - 1026:25
**bullet** [1] - 980:19
**bulletproof** [1] - 1193:12
**bunch** [1] - 1038:17
**burden** [13] - 1049:8, 1086:14, 1109:23, 1155:11, 1156:4, 1157:2, 1157:20, 1160:25, 1162:2, 1165:1, 1165:4, 1170:12, 1171:15
**burdens** [1] - 1175:2
**business** [1] - 1021:21
**businesspeople** [1] - 1187:6
**butyl** [2] - 935:19, 1104:7
**BY** [96] - 854:16, 855:10, 870:16, 875:24, 879:3, 879:21, 880:6, 881:8, 890:3, 893:11, 894:20, 895:1, 897:13, 908:12, 913:8, 914:13, 918:7, 918:12, 921:20, 923:6, 927:17, 927:24, 930:15, 932:7, 933:12, 935:3, 937:6, 938:22, 939:13, 942:2, 942:8, 945:20, 947:18, 948:25, 950:12, 950:19, 951:19, 956:8, 957:8, 960:12, 980:6, 980:25, 981:14, 983:1, 985:17, 985:24, 986:20, 988:17, 988:22, 989:21, 991:6, 992:20, 993:2, 993:18, 995:8, 995:16, 1002:12, 1002:25, 1006:18, 1007:6, 1013:5, 1014:13, 1014:23, 1015:10, 1020:16, 1022:21, 1029:13, 1030:21, 1035:24, 1051:16, 1057:5, 1061:1, 1063:9, 1063:17, 1064:19, 1065:15, 1068:10, 1069:16, 1073:4, 1073:14, 1077:13, 1084:17, 1100:21, 1106:21, 1108:13, 1110:9, 1120:25, 1122:10, 1126:2, 1127:7, 1133:5, 1134:4, 1134:16, 1141:20, 1142:9, 1149:9
**byproducts** [1] - 1094:14
**Byron** [1] - 942:6
**BYRON** [1] - 855:7
**Böhnel** [1] - 907:11

## C

**CAHILL** [1] - 855:10
**calculate** [2] - 1054:15, 1054:16
**calculated** [3] - 1039:12, 1047:1, 1054:2
**calculates** [2] - 1034:6, 1039:9
**calculating** [1] - 1021:14
**calculation** [23] - 868:2, 938:25, 939:15, 940:2, 941:1, 941:5, 941:6, 941:11, 941:12, 958:19, 1026:8, 1040:8, 1040:12, 1040:25, 1045:5, 1046:24, 1082:13, 1106:23, 1107:17, 1107:21, 1126:20, 1126:25, 1156:25
**calculations** [9] - 936:19, 1036:23, 1056:12, 1056:14, 1075:19, 1104:22, 1105:5, 1156:19, 1156:22
**calibrate** [1] - 1137:25
**Campos** [1] - 921:19
**campos** [1] - 1106:20
**cancers** [1] - 953:2
**canned** [2] - 905:15, 1095:17
**cannot** [7] - 978:6, 1006:23, 1087:4, 1145:17, 1154:19, 1159:21, 1163:3
**cans** [1] - 1095:21
**capsule** [1] - 944:5
**caption** [2] - 1172:10, 1173:6
**car** [1] - 1039:16
**carbohydrate** [1] - 1118:1
**carbohydrate-binding** [1] - 1118:1
**carbohydrates** [1] - 971:24
**cards** [2] - 1025:6, 1025:7
**care** [2] - 1049:5, 1186:24
**career** [6] - 982:9, 1008:25, 1012:23, 1022:5, 1022:8, 1097:13
**carefully** [2] - 1137:25, 1194:14
**Carl** [1] - 916:15
**CARL** [1] - 854:20
**Carpenter** [16] - 955:18, 955:24, 956:9, 997:11, 997:15, 997:20, 997:24, 998:4, 998:7, 998:13, 998:22, 999:2, 999:4, 999:5, 999:18, 999:19
**carried** [4] - 895:23, 898:24, 1165:1, 1165:4
**carrier** [4] - 964:8, 964:14, 964:15, 964:18
**carry** [6] - 933:1, 1045:1, 1157:2, 1157:20, 1160:24, 1162:2
**cascade** [1] - 1102:21
**case** [74] - 873:23, 876:17, 892:10, 894:5, 895:2, 896:18, 914:7, 917:16, 917:19, 922:21, 924:14, 981:22, 983:25, 985:8, 1002:4, 1012:7, 1012:17, 1022:3, 1022:22, 1022:25, 1023:6, 1023:11, 1025:12, 1025:23, 1027:1, 1027:23, 1028:5, 1029:3, 1032:4, 1032:14, 1035:13, 1041:13, 1043:17, 1055:24, 1056:17, 1065:2, 1068:20, 1072:4, 1072:24, 1074:13, 1076:5, 1076:7, 1077:25, 1084:2, 1084:3, 1084:22, 1094:24, 1116:6, 1127:17, 1129:7, 1131:16, 1131:20, 1134:18, 1137:6, 1140:8, 1152:10, 1152:12, 1152:19, 1152:20, 1153:10, 1155:12, 1159:9, 1162:25, 1163:15, 1166:11, 1169:15, 1182:19, 1183:13, 1189:2, 1190:14, 1191:1, 1191:3, 1191:20, 1195:2
**Case** [1] - 854:5
**casein** [10] - 912:2, 912:3, 919:18, 925:18, 926:7, 1089:12, 1095:3, 1095:4, 1101:19, 1117:16
**Casein** [1] - 912:4
**cases** [7] - 876:23, 877:15, 904:20, 1094:21, 1178:18, 1178:19, 1191:12
**catheterization** [1] - 947:8
**cation** [16] - 900:18, 901:2, 901:9, 934:12, 935:15, 935:25, 936:1, 938:13, 1113:10, 1113:20, 1116:3, 1118:7, 1119:24, 1122:23, 1123:11, 1128:3
**caused** [1] - 1101:1
**causes** [3] - 1045:23, 1053:12, 1056:20
**causing** [1] - 1143:17
**cell** [1] - 922:15
**center** [1] - 1099:4
**centigrade** [8] - 953:11, 953:23, 954:4, 960:17, 960:18, 960:19, 960:22, 968:7
**central** [1] - 869:24
**centrifugation** [1] - 922:18
**certain** [14] - 869:18, 895:7, 920:7, 932:15, 932:23, 938:25, 973:24, 1004:11, 1085:5, 1087:20, 1108:6, 1111:12, 1165:23, 1165:24
**certainly** [9] - 857:23, 1066:5, 1097:10, 1101:12, 1181:17, 1191:12, 1194:12, 1194:14, 1195:3
**certified** [2] - 1021:25, 1022:1
**certify** [1] - 1197:24
**CES** [1] - 901:19
**CEX** [5] - 921:10, 921:12, 1120:3, 1155:23, 1159:3
**chain** [2] - 957:14, 957:16
**challenge** [5] - 865:23, 957:13, 957:16, 1069:4, 1192:8
**challenges** [4] - 1010:21, 1010:25, 1137:9, 1163:5
**chance** [3] - 959:6,

1169:1, 1180:21
**change** [27] - 892:9, 896:3, 899:3, 984:22, 1015:9, 1028:23, 1043:11, 1073:12, 1074:21, 1075:5, 1075:14, 1075:16, 1075:18, 1102:20, 1104:16, 1121:5, 1121:6, 1129:23, 1172:10, 1173:6, 1174:13, 1179:7, 1180:21, 1186:1, 1187:5, 1192:25
**changed** [2] - 1171:25, 1174:12
**changes** [7] - 1102:22, 1124:20, 1129:22, 1173:12, 1174:20, 1174:24, 1196:23
**changing** [2] - 1102:4, 1102:23
**chapter** [2] - 999:2, 1168:8
**characteristic** [1] - 1168:14
**characteristics** [2] - 1137:24, 1138:1
**characterization** [1] - 985:7
**characterized** [5] - 890:18, 906:23, 1028:12, 1028:22, 1100:7
**charge** [1] - 1113:21
**charging** [2] - 1046:19, 1057:23
**chart** [1] - 1060:22
**check** [2] - 1149:5, 1180:14
**checklist** [1] - 881:9
**chemical** [1] - 988:7
**chemistry** [1] - 1134:12
**chloride** [3] - 965:1, 965:15, 965:16
**choice** [2] - 1049:25, 1050:7
**chop** [1] - 1059:5
**chose** [2] - 1124:6, 1155:16
**chosen** [1] - 1105:21
**Christian** [1] - 1133:20
**chromatograph** [1] - 935:18
**chromatographic** [4] - 924:5, 924:10, 940:22, 1121:4
**chromatography** [110] - 870:24, 871:4, 871:9, 871:16, 871:20, 878:15, 878:17, 878:19, 878:23, 879:8, 879:14, 879:16, 879:17, 879:24, 880:9, 880:11, 880:16, 880:19, 881:15, 883:16, 883:18, 891:16, 895:25, 896:1, 896:12, 898:18, 898:25, 899:2, 899:7, 900:10, 901:14, 910:3, 910:8, 910:9, 910:12, 913:25, 914:5, 914:23, 922:2, 922:10, 922:24, 929:16, 934:12, 935:15, 935:16, 935:17, 938:13, 1090:17, 1090:21, 1090:22, 1090:24, 1091:1, 1091:10, 1092:1, 1092:6, 1092:9, 1101:5, 1101:7, 1102:24, 1104:3, 1112:17, 1113:7, 1115:11, 1116:4, 1117:19, 1117:21, 1117:23, 1118:2, 1119:20, 1120:8, 1121:14, 1121:18, 1121:19, 1122:22, 1122:23, 1123:2, 1123:7, 1123:9, 1123:11, 1123:15, 1123:16, 1123:21, 1124:8, 1124:11, 1124:17, 1124:21, 1124:24, 1125:2, 1125:5, 1125:6, 1125:9, 1125:18, 1125:21, 1126:5, 1126:10, 1127:23, 1127:25, 1128:2, 1128:3, 1128:4, 1128:7, 1128:10, 1155:24, 1157:9, 1159:3, 1162:5
**circle** [1] - 960:25
**Circuit** [1] - 1166:11
**citation** [4] - 915:24, 916:1, 928:19, 928:23
**citations** [1] - 928:2
**cite** [1] - 1179:15
**cited** [10] - 928:6, 928:7, 928:8, 928:11, 928:17, 950:20, 950:24, 951:20, 1086:17, 1109:25
**cites** [5] - 865:17, 914:19, 914:21, 915:11, 915:13
**citing** [5] - 862:17, 899:10, 915:21, 1100:8, 1174:11
**civil** [1] - 1157:19
**Claim** [131] - 872:4, 872:6, 872:8, 872:12, 872:21, 872:22, 872:23, 872:24, 873:9, 873:11, 873:13, 873:16, 880:22, 881:4, 881:5, 881:11, 881:21, 882:11, 882:14, 884:17, 887:3, 887:5, 887:10, 887:11, 887:12, 887:14, 887:17, 887:18, 887:21, 887:22, 887:23, 891:22, 891:24, 892:2, 893:3, 893:5, 903:3, 906:16, 911:12, 912:10, 919:9, 920:6, 921:13, 921:19, 921:21, 942:23, 943:5, 945:24, 963:13, 963:25, 965:24, 966:12, 966:23, 967:13, 968:11, 969:25, 972:8, 972:15, 972:17, 972:20, 977:18, 979:3, 980:20, 981:2, 981:4, 981:7, 983:18, 986:19, 986:25, 987:3, 993:9, 993:13, 993:16, 994:4, 1000:5, 1000:23, 1017:17, 1017:23, 1018:4, 1087:14, 1087:17, 1087:18, 1088:4, 1088:5, 1088:7, 1088:8, 1092:14, 1105:5, 1105:9, 1107:14, 1107:22, 1111:4, 1111:5, 1111:6, 1111:10, 1112:19, 1112:20, 1114:9, 1116:11, 1134:23, 1135:4, 1135:10, 1137:15, 1151:9, 1151:10, 1154:20, 1154:24, 1155:1, 1155:3, 1157:17, 1157:21, 1158:13, 1158:20, 1159:6, 1160:4, 1162:18, 1162:24, 1163:19, 1164:11, 1164:19, 1165:11, 1188:15
**claim** [32] - 869:18, 872:21, 881:23, 887:8, 892:18, 900:15, 902:19, 923:15, 952:9, 952:13, 967:20, 969:2, 970:22, 977:5, 978:4, 979:20, 1000:15, 1000:18, 1087:18, 1127:16, 1134:24, 1135:13, 1156:24, 1158:23, 1160:22, 1163:22, 1164:18, 1164:20, 1166:2, 1168:15, 1183:9, 1188:3
**claimed** [15] - 872:21, 883:17, 903:3, 906:16, 911:12, 912:10, 921:13, 980:17, 980:20, 981:1, 1092:13, 1116:10, 1140:13, 1160:7, 1165:8
**claiming** [1] - 1092:20
**claims** [27] - 872:21, 946:8, 947:25, 977:3, 978:3, 978:6, 978:9, 980:23, 1021:6, 1085:5, 1087:13, 1087:15, 1087:16, 1087:18, 1087:21, 1098:10, 1111:7, 1111:11, 1111:13, 1111:14, 1137:8, 1166:2, 1174:9, 1174:14, 1189:12, 1189:17, 1192:13
**Claims** [6] - 872:21, 881:4, 1087:14, 1088:2, 1088:4, 1111:4
**clarification** [4] - 1067:22, 1172:13, 1175:18, 1195:12
**clarified** [1] - 882:25
**clarify** [3] - 909:11, 1060:11, 1102:14
**clarity** [2] - 991:8, 1105:4
**class** [1] - 999:21
**classic** [1] - 1166:9
**clear** [38] - 903:2, 903:13, 919:15, 924:12, 925:6, 937:3, 983:9, 989:14, 1006:19, 1012:2, 1016:14, 1042:12, 1064:20, 1065:21, 1070:11, 1074:1, 1074:17, 1075:20, 1079:9, 1079:21, 1086:11, 1106:6, 1109:21, 1155:5, 1156:4, 1156:21, 1157:21, 1158:20, 1160:4, 1160:19, 1163:13, 1163:18, 1164:24, 1175:5, 1175:19, 1175:20, 1176:7, 1193:7
**clearer** [3] - 1074:2, 1141:3, 1153:2
**clearly** [7] - 896:6, 899:15, 901:7, 919:17, 977:5, 999:19, 1143:14
**clerk's** [1] - 1187:1
**click** [1] - 1038:7
**clicker** [2] - 1019:12, 1021:1
**clinical** [1] - 1070:22
**clips** [2] - 1045:19, 1169:6
**clock** [4] - 870:7, 1018:12, 1018:13
**close** [6] - 960:23, 1025:6, 1070:17, 1151:25, 1153:11, 1180:1
**closely** [2] - 888:20, 890:23
**closer** [1] - 1040:18
**closest** [2] - 978:14, 978:18
**closing** [13] - 1067:5, 1152:7, 1152:9, 1153:4, 1169:5, 1169:13, 1170:10, 1172:24, 1173:14, 1179:24, 1179:25,

1189:19, 1195:13
**closings** [2] - 1170:9, 1170:11
**Clostridial** [1] - 906:8
**Clostridium** [2] - 875:9, 907:15
**clostridium** [9] - 876:5, 889:11, 905:6, 1089:14, 1090:10, 1096:7, 1096:17, 1096:23, 1098:21
**co** [1] - 1021:11
**co-lead** [1] - 1021:11
**coauthor** [2] - 916:16, 918:17
**Coca** [2] - 857:4, 857:5
**Coca-Cola** [2] - 857:4, 857:5
**coding** [1] - 890:10
**coffee** [1] - 922:14
**coined** [1] - 1110:17
**Cola** [2] - 857:4, 857:5
**cold** [2] - 957:14, 957:16
**collagen** [3] - 1009:19, 1148:11, 1148:18
**colleague** [3] - 1097:12, 1158:3, 1158:12
**collectively** [1] - 972:19
**colored** [1] - 1091:22
**column** [107] - 879:8, 879:11, 879:20, 880:5, 883:11, 883:12, 883:23, 883:24, 884:1, 884:3, 884:5, 884:7, 884:9, 884:15, 884:24, 884:25, 885:8, 885:11, 885:13, 885:14, 885:15, 885:17, 885:19, 886:1, 886:3, 886:4, 886:5, 886:10, 886:16, 888:23, 891:17, 895:24, 896:1, 898:25, 899:2, 899:7, 914:14, 914:15, 915:8, 921:9, 921:10, 921:12, 922:3, 922:4, 925:15, 928:10, 935:23, 935:24, 935:25, 936:1, 936:2, 943:19, 962:25, 964:21, 965:11, 967:8, 967:25, 968:5, 971:5, 1003:23, 1014:2, 1014:3, 1077:21, 1078:15, 1091:10, 1091:19, 1091:21, 1091:24, 1101:11, 1101:13, 1103:2, 1103:3, 1104:7, 1104:8, 1104:11, 1113:17, 1113:20, 1113:24, 1115:6, 1115:15, 1115:16, 1117:18, 1117:20, 1118:6, 1118:7, 1119:22, 1119:24, 1120:2, 1120:3, 1121:3, 1159:3, 1159:10, 1159:16, 1162:7
**column's** [1] - 885:24
**columns** [17] - 871:9, 879:10, 896:2, 899:3, 922:6, 936:4, 1057:13, 1077:21, 1091:6, 1091:7, 1091:11, 1091:18, 1113:10, 1115:5, 1116:3, 1117:23, 1162:10
**combination** [28] - 872:13, 892:1, 901:2, 901:9, 901:18, 976:14, 979:6, 983:22, 1000:24, 1001:2, 1009:3, 1011:8, 1137:17, 1139:24, 1140:7, 1146:10, 1147:15, 1149:1, 1151:15, 1154:21, 1154:25, 1155:14, 1157:15, 1159:5, 1160:20, 1164:17, 1164:18, 1165:7
**combinations** [4] - 925:13, 1015:17, 1115:16, 1171:22
**combine** [13] - 887:20, 892:17, 955:2, 960:14, 1086:16, 1091:7, 1109:25, 1135:19, 1150:2, 1159:8, 1160:25, 1161:17, 1164:21
**combined** [4] - 891:18, 955:5, 1036:10, 1135:12
**combining** [3] - 887:16, 958:3, 1164:9
**coming** [6] - 925:8, 929:5, 929:25, 986:14, 1082:10, 1115:14
**comma** [1] - 1141:12
**commend** [1] - 1187:17
**comments** [1] - 977:15
**commercial** [6] - 932:13, 976:2, 979:12, 979:14, 1074:5, 1074:6
**commercially** [1] - 895:5
**commitments** [1] - 1153:17
**common** [6] - 1094:17, 1094:25, 1123:17, 1123:19, 1123:23, 1142:8
**commonly** [2] - 1123:22, 1161:23
**communication** [1] - 1097:21
**community** [1] - 932:21
**companies** [11] - 857:18, 1022:9, 1022:10, 1027:12, 1061:15, 1061:16, 1061:23, 1062:14, 1063:11, 1070:4
**company** [4] - 857:5, 1020:22, 1027:10, 1063:2
**comparable** [10] - 864:1, 1063:23, 1064:1, 1064:3, 1064:6, 1064:7, 1064:10, 1064:24, 1066:20, 1068:5
**compare** [12] - 979:2, 979:11, 1024:11, 1040:1, 1056:11, 1056:12, 1093:21, 1096:13, 1102:9, 1112:18, 1118:3, 1148:24
**compared** [7] - 979:5, 979:12, 1023:25, 1024:16, 1039:14, 1039:24, 1151:13
**comparing** [3] - 1063:1, 1074:1, 1074:3
**comparison** [1] - 963:24
**compensated** [1] - 947:10
**compete** [7] - 857:3, 857:6, 857:9, 859:1, 861:7, 1031:3, 1103:3
**competes** [1] - 1019:23
**competition** [6] - 858:15, 858:24, 860:20, 1028:13, 1058:4, 1058:6
**competitive** [3] - 1028:8, 1069:13, 1079:18
**competitor** [7] - 861:16, 1031:7, 1062:8, 1069:4, 1069:8, 1069:24, 1070:2
**competitors** [18] - 860:18, 861:5, 1027:13, 1028:24, 1029:5, 1031:3, 1031:5, 1038:12, 1050:4, 1061:24, 1062:1, 1062:2, 1062:6, 1062:15, 1062:16, 1062:19, 1063:11, 1068:21
**compilation** [1] - 866:21
**compilations** [1] - 863:6
**complete** [1] - 889:10
**completely** [14] - 865:12, 881:16, 938:4, 973:19, 1093:25, 1096:15, 1103:3, 1104:9, 1104:12, 1119:20, 1119:23, 1129:10, 1131:24
**completeness** [1] - 950:7
**complex** [4] - 935:7, 964:23, 971:23, 1089:21
**complicated** [5] - 865:21, 866:23, 867:1, 1102:18, 1102:19
**complication** [1] - 1100:3
**component** [1] - 1140:1
**components** [7] - 946:4, 962:4, 963:22, 963:23, 972:5, 977:1, 977:7
**composed** [2] - 890:20, 1100:8
**composition** [18] - 943:21, 954:16, 962:10, 962:12, 962:20, 963:4, 963:20, 966:8, 970:17, 971:7, 975:1, 987:23, 1009:1, 1009:21, 1010:16, 1016:16, 1047:17, 1143:5
**compositions** [9] - 947:6, 947:9, 953:4, 973:14, 976:23, 1136:22, 1138:13, 1144:18
**compound** [1] - 963:12
**compounded** [1] - 966:3
**compounding** [5] - 964:8, 964:10, 964:11, 964:17, 965:9
**compounds** [4] - 956:18, 956:23, 963:3, 999:20
**comprehensively** [1] - 983:23
**comprises** [7] - 943:21, 962:2, 963:5, 975:3, 977:6, 1143:7, 1149:12
**comprising** [5] - 881:13, 963:18, 963:20, 963:22, 1016:16
**compromise** [2] - 1041:14, 1078:7
**compromised** [1] - 1121:10
**computer** [1] - 1018:11
**CONAWAY** [1] - 855:2
**concentrate** [1] - 883:12
**concentration** [2] - 939:9, 939:16
**concern** [5] - 1095:17, 1178:10, 1189:14, 1189:17, 1191:17
**concerned** [5] - 943:19, 944:3, 944:15, 945:2, 945:4
**concerning** [2] - 969:12, 1135:9
**concerns** [3] - 858:5, 858:8, 1144:4

**conclude** [12] - 877:9, 891:7, 891:10, 965:18, 966:11, 970:1, 1107:20, 1107:22, 1159:24, 1162:10, 1163:1, 1163:11
**concluded** [12] - 877:10, 882:11, 882:12, 891:8, 891:11, 893:3, 916:25, 921:4, 972:17, 1098:8, 1126:25, 1140:6
**conclusion** [17] - 958:5, 958:6, 973:1, 973:3, 980:23, 981:4, 982:22, 984:17, 984:21, 989:10, 1012:4, 1085:8, 1085:9, 1121:13, 1135:13, 1135:19, 1165:6
**conclusions** [2] - 1018:3, 1103:6
**conditioned** [1] - 884:23
**conditioning** [2] - 882:25, 885:2
**conditions** [3] - 922:6, 953:11, 955:8
**conduct** [1] - 1097:13
**conducted** [7] - 922:22, 1049:23, 1051:18, 1051:19, 1070:22, 1104:22, 1157:7
**conference** [4] - 1019:8, 1028:18, 1169:5, 1170:14
**confident** [1] - 857:10
**confidential** [2] - 924:16, 1155:21
**confirm** [7] - 989:22, 990:9, 1001:13, 1003:22, 1006:11, 1145:23, 1147:16
**confirmed** [4] - 857:8, 875:13, 889:18, 1150:5
**confirming** [2] - 858:3, 926:7
**confuse** [2] - 1184:13, 1194:20
**confusing** [3] - 989:13, 1018:24, 1175:11
**confusion** [2] - 861:21, 1183:14
**conjunction** [1] - 1047:8
**connection** [3] - 898:12, 981:22, 1007:11
**conserved** [6] - 890:20, 891:1, 891:4, 891:5, 891:12, 1100:2
**consider** [37] - 857:16, 858:1, 977:22, 978:14, 978:17, 980:13, 990:23, 994:15, 1008:2, 1023:7, 1024:7, 1029:22, 1034:19, 1035:1, 1035:6, 1035:12, 1053:18, 1057:15, 1057:20, 1063:4, 1074:11, 1074:12, 1075:1, 1075:9, 1087:9, 1089:23, 1097:23, 1101:21, 1101:24, 1102:5, 1108:15, 1124:12, 1124:14, 1136:24, 1152:11, 1161:12, 1164:12
**considerable** [2] - 1094:12, 1126:12
**consideration** [7] - 1041:2, 1071:24, 1177:8, 1179:4, 1186:14, 1186:21, 1189:7
**considerations** [8] - 871:22, 871:24, 872:4, 873:9, 892:20, 892:23, 1181:19, 1186:9
**considered** [39] - 873:3, 874:3, 874:6, 874:7, 897:3, 946:2, 948:3, 948:4, 950:25, 963:17, 990:25, 994:9, 994:11, 994:12, 996:7, 996:9, 996:23, 997:1, 997:2, 1001:7, 1014:21, 1023:9, 1023:10, 1023:12, 1028:24, 1051:8, 1065:1, 1075:18, 1089:25, 1095:5, 1120:1, 1137:1, 1139:1, 1139:7, 1149:17, 1150:10, 1162:8, 1162:23, 1184:10
**considering** [7] - 916:24, 921:3, 1037:21, 1053:9, 1054:9, 1060:8, 1194:14
**consist** [1] - 952:24
**consistent** [11] - 1074:7, 1081:16, 1129:16, 1139:8, 1145:2, 1145:4, 1195:22, 1196:1, 1196:10, 1196:12, 1196:15
**consisting** [1] - 966:22
**consists** [1] - 962:20
**constitute** [2] - 1184:25, 1185:7
**constraint** [1] - 955:7
**constraints** [1] - 974:6
**construct** [2] - 1026:2, 1041:5
**construction** [1] - 869:18
**constructions** [1] - 869:22
**consulted** [1] - 998:4
**consulting** [2] - 1020:21, 1021:5
**consumer** [1] - 1165:23
**contacting** [1] - 883:10
**contain** [6] - 979:14, 1117:14, 1136:3, 1136:22, 1138:22, 1139:16
**contained** [5] - 872:23, 912:1, 928:18, 1008:14, 1143:13
**containing** [11] - 882:1, 919:20, 955:11, 964:24, 965:1, 975:1, 979:6, 1005:7, 1142:15, 1143:5, 1151:5
**contains** [8] - 905:22, 906:4, 906:11, 921:23, 955:8, 1127:9, 1137:17, 1149:14
**contaminants** [3] - 932:15, 932:23, 1118:1
**contamination** [4] - 1126:9, 1128:22, 1129:3, 1129:12
**contemporaneous** [1] - 857:24
**contending** [1] - 1009:14
**contends** [2] - 1174:9, 1174:14
**content** [1] - 946:6
**contention** [2] - 1172:2, 1174:11
**contents** [3] - 996:10, 1004:5, 1149:21
**context** [10] - 962:24, 964:11, 984:2, 986:17, 1007:24, 1011:25, 1013:18, 1067:15, 1108:16, 1142:15
**continue** [12] - 870:13, 884:8, 933:13, 957:25, 960:11, 962:17, 1019:16, 1031:6, 1031:9, 1054:22, 1080:3, 1194:6
**continued** [4] - 855:1, 886:4, 1070:15, 1078:10
**continues** [5] - 886:17, 951:5, 1031:15, 1082:19, 1186:12
**continuing** [2] - 933:15, 1031:22
**continuously** [1] - 883:25
**contracted** [1] - 1161:25
**contradict** [1] - 1159:14
**contradicting** [1] - 991:4
**contrary** [4] - 975:23, 1026:1, 1076:5, 1161:7
**contribute** [4] - 1077:22, 1078:13, 1101:20, 1165:10
**contributes** [3] - 1076:19, 1115:3, 1115:25
**contribution** [8] - 915:22, 1036:12, 1037:1, 1079:6, 1079:12, 1079:13, 1079:14, 1079:16
**control** [3] - 959:23, 1021:1, 1108:7
**convenience** [1] - 966:8
**conventional** [1] - 1111:24
**convert** [3] - 940:11, 966:4, 1107:11
**converting** [4] - 944:4, 944:17, 945:2, 945:4
**convey** [2] - 932:17, 932:19
**convincing** [14] - 1086:12, 1109:21, 1155:5, 1156:4, 1157:21, 1158:21, 1160:4, 1160:20, 1163:18, 1164:24, 1175:5, 1175:20, 1175:21, 1176:7
**cookbook** [1] - 919:6
**cooked** [4] - 905:20, 905:22, 911:19, 1101:19
**cooperation** [1] - 1185:13
**Coopers** [2] - 1022:5, 1022:7
**copies** [4] - 1084:10, 1188:8, 1196:24, 1197:12
**copy** [5] - 872:17, 908:25, 1183:24, 1188:4, 1197:4
**copying** [1] - 915:25
**corner** [1] - 909:19
**corners** [1] - 1041:12
**correct** [318] - 880:12, 881:18, 882:16, 883:15, 893:15, 893:16, 893:24, 893:25, 894:2, 894:6, 894:12, 894:13, 895:12, 895:15, 896:4, 896:15, 897:20, 897:24, 897:25, 898:9, 898:13, 898:14, 899:9, 899:11, 900:12, 900:18, 901:11, 902:3, 902:4, 902:11, 902:12, 902:20, 902:25, 903:4, 903:17, 903:23, 903:24, 904:3, 904:7, 905:7, 905:21, 905:23, 905:24, 906:3, 906:11, 906:14, 906:15, 906:17, 906:18, 907:5, 907:12, 907:13, 907:16, 907:17, 907:25, 908:17, 908:20, 909:4, 910:9, 910:24, 910:25, 911:1,

911:3, 911:14, 911:21, 911:23, 911:24, 912:5, 912:6, 912:8, 912:9, 912:12, 913:16, 914:24, 915:2, 915:7, 915:12, 915:16, 915:17, 915:22, 915:23, 916:11, 916:12, 916:18, 916:23, 917:2, 917:9, 917:13, 917:25, 918:21, 919:7, 919:11, 920:9, 920:22, 921:6, 921:10, 921:11, 921:14, 921:24, 921:25, 922:4, 922:11, 922:12, 922:16, 922:20, 923:11, 923:16, 923:22, 924:3, 924:7, 924:19, 925:1, 925:2, 925:4, 925:19, 925:22, 927:2, 927:12, 928:12, 928:25, 930:8, 930:18, 933:22, 933:23, 934:2, 934:3, 934:7, 935:9, 935:11, 936:3, 936:5, 936:11, 938:2, 938:11, 939:17, 940:5, 940:8, 940:12, 941:8, 943:12, 943:13, 946:16, 948:9, 949:22, 951:21, 954:18, 958:22, 966:24, 966:25, 972:24, 981:21, 981:24, 982:2, 982:17, 983:8, 983:15, 983:16, 983:19, 983:20, 983:25, 984:15, 987:24, 988:4, 988:12, 988:19, 988:23, 989:12, 991:11, 991:21, 991:24, 991:25, 992:4, 992:8, 992:12, 993:3, 993:7, 993:23, 994:1, 994:4, 994:12, 994:22, 994:24, 996:1, 996:4, 996:10, 997:3, 998:14, 998:22, 1000:24, 1002:4, 1004:23, 1005:1, 1005:9, 1005:23, 1007:18, 1008:9, 1008:15, 1008:17, 1008:19, 1009:15, 1013:12, 1013:23, 1014:5, 1016:8, 1017:16, 1040:12, 1054:11, 1055:12, 1056:9, 1061:5, 1061:12, 1061:16, 1061:21, 1062:7, 1063:19, 1063:25, 1064:10, 1064:11, 1064:22, 1064:23, 1068:21, 1069:1, 1069:5, 1069:8, 1070:13, 1070:18, 1071:1, 1071:5, 1071:20, 1071:25, 1072:7, 1072:19, 1072:21, 1072:24, 1073:7, 1073:16, 1073:21, 1073:22, 1073:25, 1074:5, 1074:13, 1074:19, 1074:21, 1074:24, 1074:25, 1075:3, 1075:11, 1075:23, 1076:3, 1076:20, 1077:23, 1078:15, 1078:23, 1079:2, 1079:6, 1079:7, 1079:10, 1079:13, 1079:24, 1080:7, 1081:8, 1081:14, 1081:20, 1081:23, 1082:1, 1082:7, 1082:16, 1098:17, 1099:17, 1099:18, 1105:3, 1105:8, 1105:11, 1105:18, 1106:11, 1106:16, 1106:18, 1107:2, 1119:5, 1122:24, 1123:21, 1124:9, 1124:18, 1125:8, 1125:19, 1126:10, 1127:15, 1127:17, 1127:18, 1127:24, 1128:5, 1128:8, 1128:24, 1129:4, 1131:18, 1131:21, 1131:23, 1131:24, 1132:1, 1132:2, 1132:6, 1132:11, 1132:22, 1132:23, 1133:8, 1137:2, 1145:22, 1146:12, 1150:10, 1151:21, 1169:8, 1177:6, 1180:15, 1184:8, 1184:23, 1186:25, 1195:23

**corrected** [4] - 1040:7, 1040:10, 1040:11, 1053:5

**correcting** [1] - 1040:24

**correction** [1] - 1040:21

**correctly** [2] - 899:4, 1058:20

**correlative** [1] - 859:6

**correspond** [1] - 1156:2

**cosmetic** [9] - 1030:24, 1038:9, 1071:7, 1071:10, 1071:13, 1071:22, 1072:7, 1072:11

**cost** [10] - 1044:14, 1044:17, 1045:10, 1059:11, 1059:21, 1139:6, 1186:6, 1186:15, 1186:22

**costs** [4] - 1044:21, 1046:6, 1059:18, 1186:17

**counsel** [14] - 854:23, 981:17, 984:24, 986:2, 986:3, 990:7, 997:3, 1012:2, 1061:7, 1065:25, 1067:4, 1078:10, 1184:11, 1188:4

**Counsel** [2] - 855:11, 1177:7

**count** [1] - 877:3

**counterclaim** [1] - 1164:16

**counting** [2] - 1057:22, 1125:15

**countries** [1] - 903:20

**couple** [6] - 859:14, 870:8, 957:5, 1130:11, 1138:19, 1151:11

**course** [4] - 1031:12, 1034:13, 1115:13, 1139:8

**Court** [10] - 856:22, 1023:10, 1157:23, 1172:14, 1172:15, 1180:17, 1183:21, 1193:5, 1198:4, 1198:4

**COURT** [263] - 854:1, 856:1, 856:17, 857:14, 858:9, 858:16, 858:18, 859:9, 859:12, 859:22, 860:1, 860:4, 860:11, 860:14, 860:24, 862:1, 862:11, 862:13, 862:15, 862:21, 863:9, 863:24, 864:8, 865:7, 865:9, 866:1, 866:9, 866:14, 866:18, 867:5, 867:13, 867:17, 868:3, 868:7, 868:16, 868:24, 869:7, 869:15, 870:1, 870:4, 870:10, 875:21, 889:24, 893:9, 897:9, 908:11, 913:1, 913:6, 914:8, 914:12, 927:19, 927:23, 930:11, 931:18, 931:21, 932:1, 933:8, 935:1, 936:22, 937:4, 938:17, 941:14, 942:4, 945:19, 947:14, 948:21, 951:15, 956:5, 957:3, 958:10, 958:13, 958:23, 958:25, 959:12, 959:14, 959:18, 960:9, 981:9, 981:12, 982:23, 989:19, 990:15, 990:21, 990:24, 991:5, 992:17, 992:24, 995:4, 1002:9, 1006:16, 1013:2, 1014:22, 1015:7, 1018:7, 1018:17, 1019:5, 1019:15, 1020:2, 1022:20, 1028:16, 1029:10, 1030:11, 1030:16, 1035:20, 1051:14, 1060:18, 1060:24, 1062:17, 1062:20, 1062:24, 1063:12, 1064:17, 1065:14, 1065:25, 1066:2, 1066:13, 1066:19, 1067:2, 1067:16, 1067:24, 1068:8, 1069:14, 1073:10, 1082:22, 1082:24, 1083:4, 1083:8, 1083:19, 1083:23, 1084:4, 1084:12, 1100:16, 1100:20, 1108:6, 1108:11, 1110:4, 1120:23, 1122:8, 1126:1, 1133:17, 1133:21, 1133:24, 1141:5, 1141:12, 1141:19, 1142:3, 1149:6, 1151:19, 1151:24, 1153:23, 1154:3, 1154:5, 1154:11, 1158:1, 1158:5, 1158:10, 1167:8, 1167:15, 1167:18, 1168:3, 1168:18, 1168:22, 1169:9, 1169:12, 1169:19, 1170:1, 1170:18, 1171:7, 1171:12, 1171:25, 1172:17, 1172:25, 1173:6, 1173:16, 1173:22, 1173:24, 1174:3, 1174:6, 1174:13, 1174:17, 1174:19, 1174:23, 1175:8, 1175:10, 1175:23, 1176:5, 1176:15, 1176:20, 1176:25, 1177:5, 1177:15, 1177:18, 1177:21, 1177:24, 1178:5, 1178:16, 1179:18, 1179:22, 1180:5, 1180:11, 1180:19, 1180:24, 1181:2, 1181:9, 1181:14, 1182:2, 1182:9, 1182:13, 1182:17, 1182:23, 1183:2, 1183:6, 1183:11, 1183:18, 1183:22, 1184:1, 1184:4, 1184:6, 1184:9, 1184:14, 1184:18, 1184:20, 1184:24, 1185:4, 1185:12, 1185:18, 1185:21, 1186:2, 1186:4, 1186:13, 1186:19, 1187:1, 1187:8, 1187:10, 1187:16, 1188:1, 1188:7, 1188:9, 1188:13, 1189:11, 1189:24, 1190:10, 1190:15, 1190:22, 1191:9, 1191:15, 1191:21, 1192:6, 1192:21, 1193:9, 1193:25, 1194:8,

1194:18, 1195:18, 1195:21, 1196:1, 1196:9, 1196:17, 1196:19, 1196:22, 1197:4, 1197:6, 1197:14
**court** [2] - 942:5, 960:1
**Court's** [4] - 1175:6, 1175:18, 1177:22, 1179:4
**courtroom** [19] - 870:9, 923:25, 958:12, 960:8, 974:12, 1000:9, 1018:16, 1019:14, 1083:3, 1083:22, 1085:18, 1099:11, 1104:21, 1109:1, 1126:7, 1135:6, 1144:23, 1153:22, 1187:3
**COURTROOM** [2] - 941:18, 1020:6
**Courtroom** [1] - 854:12
**cover** [6] - 994:7, 999:1, 1081:7, 1082:5, 1093:19, 1158:14
**covered** [1] - 1000:10
**covering** [1] - 989:12
**covers** [4] - 964:1, 1081:9, 1081:10, 1188:21
**COVID** [1] - 1045:20
**cow** [7] - 903:20, 904:17, 904:20, 1094:19, 1094:22, 1150:22, 1161:25
**cows** [5] - 954:14, 997:6, 1011:12, 1099:10, 1129:19
**CPA** [1] - 1021:25
**CPAs** [1] - 1022:2
**create** [2] - 1183:14, 1195:14
**created** [4] - 1030:5, 1035:15, 1037:3, 1080:7
**credentials** [1] - 1021:23
**credible** [1] - 1156:16
**credit** [2] - 1132:25, 1193:15
**credited** [1] - 1192:2
**crediting** [1] - 1193:8
**Creutzfeldt** [1] - 933:3
**Creutzfeldt-Jakob** [1] - 933:3
**criminal** [1] - 1178:19
**critical** [3] - 1044:24, 1136:2, 1192:17
**criticism** [7] - 973:8, 976:3, 976:18, 976:24, 1039:7, 1039:8, 1046:10
**criticisms** [3] - 973:7, 973:16, 977:8
**criticize** [1] - 1048:19
**criticized** [1] - 1179:3
**critique** [1] - 1033:25
**cross** [16] - 868:8, 868:9, 908:8, 930:17, 933:21, 934:21, 935:2, 936:25, 959:1, 1108:5, 1122:8, 1133:7, 1133:12, 1152:1, 1154:2, 1157:6
**Cross** [3] - 881:7, 923:5, 1127:6
**CROSS** [4] - 893:10, 981:13, 1060:25, 1122:9
**cross-examination** [11] - 868:8, 930:17, 933:21, 934:21, 935:2, 936:25, 959:1, 1122:8, 1133:7, 1152:1, 1157:6
**CROSS-EXAMINATION** [4] - 893:10, 981:13, 1060:25, 1122:9
**cross-examine** [1] - 868:9
**Cross-talk** [3] - 881:7, 923:5, 1127:6
**cross-talk** [1] - 1108:5
**crossed** [3] - 919:8, 1184:7, 1191:18
**CSR** [1] - 1198:3
**culture** [9] - 876:16, 878:13, 882:25, 906:7, 910:6, 925:18, 930:4, 1115:2
**cultures** [2] - 878:13, 915:16
**culturing** [2] - 1112:16, 1115:23
**curious** [1] - 1031:24
**current** [1] - 869:12
**Curtis** [3] - 898:3, 898:5, 913:15
**customer** [5] - 1033:20, 1036:25, 1037:18, 1042:18, 1049:4
**customers** [4] - 1036:14, 1049:3, 1053:7, 1081:17
**customized** [1] - 998:18
**cut** [3] - 927:19, 1041:17, 1190:17
**cutting** [2] - 877:20, 1182:18
**CX** [1] - 1115:6
**cycle** [1] - 957:1

## D

**damage** [1] - 856:18
**damages** [39] - 1021:14, 1021:16, 1022:18, 1022:25, 1023:5, 1023:22, 1024:21, 1024:23, 1049:7, 1049:9, 1049:15, 1054:19, 1054:23, 1055:5, 1055:7, 1055:9, 1055:15, 1055:18, 1055:22, 1080:13, 1081:15, 1158:17, 1165:15, 1165:19, 1165:20, 1165:22, 1166:3, 1166:14, 1170:10, 1171:2, 1171:11, 1174:10, 1174:15, 1182:10, 1182:12, 1183:5, 1183:16, 1183:17, 1185:14
**Dana** [3] - 1020:4, 1020:8, 1020:21
**DANA** [2] - 1020:8, 1020:10
**dangerous** [1] - 1135:25
**DAS** [1] - 1165:3
**DasGupta** [4] - 929:21, 929:24, 930:3, 930:7
**data** [28] - 862:10, 862:18, 862:19, 863:6, 863:11, 863:17, 865:23, 866:22, 867:24, 955:6, 969:22, 1003:4, 1033:18, 1033:19, 1040:23, 1048:13, 1051:18, 1052:6, 1052:15, 1064:4, 1156:14, 1156:16, 1156:20, 1157:1, 1165:3, 1168:6
**date** [41] - 869:18, 872:18, 873:1, 873:5, 873:21, 873:24, 874:2, 874:3, 874:5, 874:7, 946:16, 946:18, 946:21, 949:12, 949:14, 949:16, 996:7, 1047:6, 1047:20, 1051:6, 1057:7, 1057:10, 1074:15, 1080:6, 1081:15, 1086:25, 1087:2, 1087:3, 1087:4, 1110:24, 1120:18, 1123:7, 1123:9, 1123:12, 1125:14, 1125:15, 1125:16, 1125:25, 1163:2, 1180:17, 1180:18
**date's** [1] - 946:15
**dated** [1] - 1034:25
**dates** [7] - 949:11, 951:8, 1015:4, 1027:2, 1070:14, 1071:18, 1071:22
**DAVID** [1] - 854:22
**DAXXIFY** [56] - 859:3, 979:11, 980:1, 980:11, 981:1, 1019:23, 1034:24, 1036:11, 1036:15, 1037:16, 1038:6, 1038:13, 1038:17, 1038:23, 1039:24, 1044:15, 1045:1, 1045:13, 1049:22, 1049:25, 1050:2, 1050:6, 1051:4, 1051:21, 1051:23, 1051:25, 1052:1, 1052:7, 1052:23, 1054:17, 1054:21, 1056:1, 1058:4, 1058:6, 1072:19, 1073:7, 1074:4, 1074:5, 1074:18, 1076:20, 1078:21, 1078:22, 1078:24, 1079:6, 1079:13, 1079:15, 1079:16, 1080:4, 1080:22, 1081:8, 1081:19, 1081:23, 1082:1, 1082:3, 1082:20, 1165:10
**DAXXIFY's** [4] - 1039:14, 1039:15, 1077:22, 1166:23
**days** [5] - 954:4, 976:13, 976:15, 1122:15, 1143:12
**DDX** [7] - 870:20, 872:16, 880:23, 926:23, 1007:5, 1069:11, 1073:15
**DEAE** [3] - 895:25, 899:1, 1117:20
**deal** [1] - 1039:21
**dealer** [2] - 1039:18, 1039:21
**dealing** [1] - 961:17
**deals** [1] - 1017:5
**dealt** [1] - 876:4
**Deanna** [2] - 1197:23, 1198:3
**debris** [1] - 922:15
**decades** [6] - 871:3, 901:13, 1125:10, 1125:11, 1159:21, 1161:19
**decades'** [1] - 871:15
**decades-old** [1] - 1159:21
**December** [1] - 1047:2
**decide** [2] - 1132:25, 1188:24
**decided** [6] - 1012:4, 1062:15, 1075:21, 1075:25, 1078:1, 1173:17
**decides** [2] - 1075:22, 1075:24
**deciding** [6] - 907:23, 916:21, 920:25, 1098:2, 1117:2, 1119:12
**decline** [2] - 1045:21, 1195:6
**dedicated** [1] - 991:14
**deduct** [1] - 1044:13
**Defendant** [5] - 854:7, 855:11, 941:24, 956:6, 1020:12
**defendant** [2] - 1192:24, 1193:10
**defendant's** [1] - 1170:8
**Defendant's** [4] - 875:22, 889:25, 948:23, 1030:19
**defendants** [5] - 1020:3, 1030:8, 1051:11, 1084:3, 1170:16
**defense** [8] - 1084:2, 1162:24, 1164:15,

1182:15, 1182:18, 1184:25, 1185:7, 1185:11
**definitely** [4] - 1102:18, 1103:13, 1104:15, 1107:19
**definition** [10] - 945:15, 947:15, 982:12, 982:15, 983:5, 983:6, 1005:14, 1136:19, 1162:20, 1163:5
**degraded** [1] - 1143:14
**degree** [3] - 947:3, 1021:19, 1136:20
**degrees** [11] - 953:10, 953:23, 954:4, 960:17, 960:18, 960:21, 960:22, 960:24, 968:7, 976:12
**DEIRDRE** [1] - 855:8
**Deirdre** [1] - 1122:12
**DELAWARE** [1] - 854:2
**delay** [13] - 1024:17, 1042:9, 1042:11, 1042:23, 1043:2, 1043:3, 1043:5, 1043:9, 1043:11, 1043:16, 1044:8
**delegate** [1] - 1197:8
**deliberate** [3] - 1152:13, 1152:20, 1152:21
**deliberately** [1] - 1008:6
**deliberation** [1] - 1153:10
**deliver** [1] - 1193:5
**demand** [1] - 1165:23
**demonstrate** [1] - 1156:4
**demonstrates** [1] - 1162:4
**demonstrating** [1] - 901:13
**demonstrative** [5] - 856:8, 926:22, 926:24, 940:3, 1007:5
**demonstratives** [6] - 856:5, 919:3, 934:16, 936:17, 1020:24, 1056:25
**DENNIES** [1] - 855:6
**denomination** [1] - 867:7
**denominator** [2] - 1106:25, 1107:8
**density** [3] - 940:8, 1107:4, 1107:6
**deny** [2] - 1126:14, 1168:25
**department** [2] - 944:10, 1045:20
**dependent** [1] - 872:22
**deposed** [2] - 894:5, 917:19
**deposition** [19] - 894:8, 894:10, 894:14, 894:16, 917:16, 917:22, 918:1, 918:5, 985:8, 985:11, 988:14, 989:16, 1005:12, 1006:6, 1006:9, 1006:12, 1014:20, 1023:12, 1169:6
**depth** [7] - 922:13, 984:13, 984:14, 984:18, 985:3, 985:21, 1115:24
**DEPUTY** [2] - 941:18, 1020:6
**derived** [23] - 874:8, 874:9, 889:11, 903:15, 952:23, 954:21, 962:10, 963:2, 963:12, 964:9, 965:3, 965:9, 965:17, 966:20, 1033:6, 1128:23, 1139:2, 1139:9, 1146:19, 1146:22, 1147:3, 1150:22
**dermatologist** [1] - 1031:25
**DESAI** [38] - 855:7, 862:7, 862:12, 862:14, 862:17, 864:2, 865:6, 865:16, 865:24, 866:7, 866:10, 867:21, 868:6, 1020:3, 1020:16, 1022:17, 1022:21, 1029:6, 1029:13, 1030:8, 1030:14, 1030:18, 1030:21, 1035:17, 1035:24, 1051:11, 1051:16, 1057:3, 1057:5, 1060:17, 1062:18, 1062:23, 1065:23, 1067:12, 1072:25, 1073:8, 1082:23, 1083:7
**Desai** [8] - 862:5, 863:13, 864:8, 864:10, 866:2, 868:18, 1020:2, 1062:17
**describe** [9] - 877:4, 920:12, 1021:17, 1029:9, 1030:22, 1112:10, 1113:25, 1117:5, 1136:17
**described** [19] - 874:24, 874:25, 878:19, 888:25, 914:4, 917:14, 918:17, 918:24, 919:5, 933:4, 953:5, 1025:8, 1025:24, 1026:19, 1057:6, 1101:22, 1107:14, 1112:5, 1146:8
**describes** [11] - 878:22, 883:1, 883:10, 883:22, 883:23, 884:14, 884:22, 885:9, 1112:20, 1148:7, 1149:14
**describing** [3] - 895:20, 920:4, 941:3
**description** [2] - 1026:16, 1026:17
**design** [2] - 956:12, 999:8
**desirable** [1] - 932:13
**desk** [1] - 1039:19
**despite** [2] - 1010:13, 1012:15
**destabilized** [1] - 956:16
**destination** [1] - 1043:20
**details** [1] - 1005:14
**detectable** [1] - 1168:4
**detected** [2] - 884:5, 937:20
**detection** [1] - 1106:3
**determination** [1] - 972:10
**determine** [19] - 876:8, 877:17, 952:1, 963:24, 968:9, 970:12, 971:2, 971:10, 1022:24, 1037:16, 1038:2, 1043:8, 1043:23, 1046:22, 1049:14, 1052:13, 1064:24, 1104:22, 1161:16
**determined** [8] - 895:24, 898:25, 953:13, 1024:22, 1046:25, 1052:18, 1063:22, 1064:21
**determines** [2] - 1033:17, 1077:24
**determining** [4] - 905:12, 1034:9, 1177:9, 1188:25
**detour** [3] - 1003:21, 1043:19, 1043:23
**develop** [3] - 1131:22, 1132:9, 1139:4
**developed** [2] - 1138:22, 1147:22
**developing** [3] - 981:25, 1132:14, 1132:19
**development** [2] - 945:13, 1131:25
**DI** [2] - 859:25, 864:15
**dialyzed** [3] - 884:22, 885:10, 885:13
**dialyzing** [1] - 885:1
**diet** [1] - 1129:22
**differ** [3] - 1048:6, 1104:4, 1119:17
**difference** [13] - 946:20, 947:25, 990:21, 1010:8, 1010:10, 1010:11, 1024:4, 1042:8, 1099:2, 1100:18, 1147:9, 1166:8, 1179:12
**differences** [6] - 946:7, 954:24, 1044:10, 1064:3, 1078:22, 1100:25
**different** [98] - 864:5, 865:9, 865:12, 865:17, 866:24, 867:2, 867:8, 867:11, 867:12, 867:15, 878:2, 878:7, 878:8, 878:10, 879:9, 888:18, 888:19, 890:25, 891:3, 891:12, 906:13, 910:13, 910:14, 916:2, 918:22, 936:13, 943:8, 943:11, 988:6, 988:7, 988:24, 1005:16, 1011:25, 1012:3, 1017:11, 1017:12, 1028:21, 1033:18, 1036:4, 1037:5, 1042:12, 1043:12, 1048:13, 1053:12, 1054:11, 1061:14, 1073:6, 1076:4, 1076:11, 1076:12, 1076:13, 1088:17, 1088:19, 1088:21, 1088:25, 1089:3, 1091:5, 1091:6, 1091:11, 1091:13, 1091:22, 1093:25, 1096:15, 1099:5, 1099:6, 1099:7, 1099:8, 1101:10, 1101:12, 1101:13, 1101:14, 1102:13, 1103:1, 1103:2, 1103:4, 1104:9, 1104:12, 1104:13, 1113:10, 1113:11, 1119:20, 1119:23, 1129:19, 1129:20, 1145:24, 1145:25, 1146:9, 1146:12, 1149:2, 1149:3, 1149:21, 1161:9, 1161:13, 1162:6, 1162:12, 1192:12
**different-colored** [1] - 1091:22
**differentiating** [2] - 1081:22, 1081:25
**differently** [1] - 1012:1
**difficult** [2] - 1010:17, 1089:22
**difficulty** [2] - 985:6, 1189:20
**digression** [1] - 1185:15
**diluted** [1] - 886:15
**diluting** [1] - 886:9
**dip** [1] - 1031:12
**dipping** [1] - 1058:15
**DIRECT** [5] - 870:15, 942:1, 1020:15, 1084:16, 1134:3
**direct** [27] - 857:23, 902:1, 903:9, 906:21, 907:20, 910:21, 916:5, 929:20, 936:20, 981:21, 982:11, 986:8, 987:13, 991:11, 991:23, 1000:4, 1009:25, 1012:16, 1013:20, 1016:23, 1027:13, 1044:16, 1062:19, 1065:24, 1073:16,

1149:6
**directed** [4] - 959:19, 1163:8, 1191:7, 1192:20
**direction** [2] - 1179:21, 1189:9
**directive** [2] - 1178:12, 1190:6
**directly** [3] - 859:6, 978:5, 980:15
**director** [1] - 1021:12
**disaccharide** [42] - 943:22, 952:18, 966:21, 966:24, 967:19, 968:10, 973:25, 974:4, 974:7, 986:25, 987:8, 988:3, 988:10, 989:6, 990:20, 991:2, 993:24, 1000:24, 1005:8, 1134:21, 1137:18, 1139:24, 1140:7, 1140:12, 1140:13, 1140:21, 1141:6, 1141:9, 1142:7, 1142:18, 1143:2, 1144:10, 1144:19, 1144:21, 1145:24, 1146:9, 1149:12, 1149:14, 1151:1, 1151:15, 1164:4, 1165:8
**disaccharides** [26] - 956:19, 956:22, 973:10, 973:20, 974:17, 987:16, 988:12, 988:19, 989:1, 989:12, 989:24, 990:11, 990:24, 1137:20, 1140:17, 1141:2, 1141:4, 1142:22, 1143:25, 1144:4, 1144:17, 1144:25, 1145:10, 1145:11, 1145:20, 1148:25
**disadvantage** [1] - 1171:14
**disadvantages** [5] - 929:12, 1057:14, 1057:21, 1058:3, 1058:11
**disagree** [13] - 868:12, 910:10, 928:5, 973:1, 973:2, 978:8, 978:10, 1078:16, 1085:24, 1086:4, 1109:7, 1109:11, 1142:17
**disagreement** [1] - 977:9
**disagrees** [1] - 986:11
**discipline** [1] - 947:5
**disclose** [22] - 912:7, 921:8, 966:6, 967:6, 969:12, 972:3, 972:20, 995:11, 1107:24, 1119:10, 1155:17, 1155:18, 1158:23, 1158:24, 1159:1, 1160:7, 1160:13, 1160:21, 1161:2, 1163:21, 1163:23, 1164:3
**disclosed** [17] - 952:1, 953:7, 953:9, 958:20, 965:8, 970:1, 970:2, 970:17, 971:10, 971:21, 972:7, 1007:16, 1007:20, 1009:18, 1017:19, 1156:7, 1156:8
**discloses** [9] - 972:11, 1004:15, 1005:7, 1005:21, 1149:11, 1161:5, 1161:8, 1164:6, 1177:9
**disclosing** [1] - 996:25
**disclosure** [9] - 856:4, 964:17, 965:19, 968:9, 994:24, 995:9, 996:10, 1104:16, 1157:5
**disclosures** [2] - 1147:11, 1159:14
**discount** [1] - 867:22
**discounts** [1] - 1039:23
**discouraged** [2] - 901:1, 901:8
**discouragement** [3] - 870:23, 870:25, 871:8
**discouraging** [1] - 901:18
**discover** [1] - 1088:13
**discovered** [2] - 890:13, 1146:6
**discoveries** [1] - 1148:24
**discovery** [3] - 1113:25, 1146:8, 1148:7
**discuss** [18] - 902:7, 902:21, 942:22, 943:1, 945:22, 947:20, 997:20, 1024:6, 1064:4, 1086:7, 1099:14, 1104:17, 1111:1, 1153:18, 1154:7, 1169:11, 1170:13, 1195:20
**discussed** [32] - 863:18, 863:19, 916:5, 962:22, 978:6, 981:6, 1002:21, 1009:9, 1009:25, 1010:22, 1011:17, 1011:20, 1011:23, 1061:11, 1065:24, 1066:21, 1070:19, 1092:12, 1103:11, 1103:17, 1107:13, 1116:10, 1116:17, 1122:2, 1125:18, 1126:22, 1140:4, 1148:25, 1150:13, 1167:6, 1168:8, 1195:15
**discusses** [1] - 1149:20
**discussing** [14] - 875:25, 890:4, 895:7, 987:22, 999:5, 1009:7, 1010:3, 1017:4, 1072:6, 1085:2, 1104:25, 1107:24, 1108:16, 1145:5
**discussion** [9] - 859:5, 964:11, 1028:17, 1028:19, 1029:12, 1066:1, 1068:9, 1073:1, 1148:18
**discussions** [2] - 1023:15, 1182:25
**disease** [9] - 903:20, 903:22, 904:12, 904:17, 904:20, 933:3, 1094:19, 1094:22, 1161:25
**diseases** [2] - 882:5, 1071:9
**displaying** [1] - 1030:22
**dispute** [39] - 958:18, 1022:3, 1024:5, 1032:14, 1032:23, 1033:14, 1034:8, 1041:2, 1041:18, 1041:21, 1053:9, 1053:14, 1053:18, 1054:6, 1054:9, 1054:12, 1055:3, 1055:10, 1055:13, 1055:14, 1055:17, 1076:17, 1076:25, 1077:5, 1077:14, 1078:4, 1078:19, 1079:25, 1128:6, 1128:9, 1128:13, 1159:21, 1161:22, 1163:4, 1163:7, 1172:2, 1189:2, 1190:11, 1191:18
**disputes** [3] - 1021:6, 1021:11, 1021:16
**dissolving** [2] - 964:25, 969:7
**dissuade** [1] - 1143:24
**dissuaded** [1] - 1143:2
**distinct** [2] - 988:3, 988:24
**distinguishes** [2] - 988:11, 988:18
**DISTRICT** [2] - 854:1, 854:2
**District** [1] - 1198:4
**Dittman** [1] - 1173:19
**Dittmann** [15] - 981:10, 992:25, 1013:7, 1015:12, 1016:7, 1017:4, 1017:18, 1018:2, 1141:19, 1151:21, 1169:16, 1170:18, 1173:14, 1180:6, 1181:17
**DITTMANN** [60] - 854:19, 869:23, 945:14, 948:19, 951:13, 951:18, 956:4, 980:3, 980:22, 981:11, 981:14, 983:1, 985:14, 985:24, 986:17, 986:20, 988:15, 988:22, 989:15, 989:21, 991:6, 992:15, 992:20, 993:2, 993:15, 993:18, 995:1, 995:8, 995:13, 995:16, 1002:6, 1002:12, 1002:24, 1002:25, 1006:15, 1006:18, 1007:4, 1007:6, 1012:25, 1014:19, 1022:19, 1133:19, 1134:4, 1134:14, 1134:16, 1141:17, 1141:20, 1142:9, 1149:4, 1149:8, 1149:9, 1151:17, 1151:23, 1169:8, 1169:21, 1170:4, 1170:13, 1171:6, 1171:24, 1173:21
**divide** [1] - 1050:14
**divides** [2] - 1033:23, 1042:4
**dividing** [1] - 1166:8
**DNA** [14] - 921:17, 937:7, 937:12, 937:14, 1105:21, 1105:24, 1105:23, 1105:25, 1106:3, 1106:9, 1106:14, 1126:23, 1146:21
**docket** [1] - 860:4
**Docket** [2] - 856:3, 862:2
**Doctor** [41] - 870:17, 871:21, 872:16, 873:18, 876:1, 879:22, 880:7, 880:13, 890:5, 891:14, 892:3, 930:16, 931:1, 932:8, 933:13, 935:8, 937:8, 942:3, 942:9, 944:21, 947:23, 952:4, 963:19, 966:1, 966:18, 967:24, 968:17, 970:7, 970:22, 977:12, 981:6, 986:21, 987:13, 989:22, 990:4, 990:9, 1000:22, 1014:10, 1110:4, 1137:13, 1144:12
**doctor** [7] - 872:3, 878:15, 882:10, 889:13, 890:21, 893:2, 945:21
**doctor's** [1] - 1044:25
**doctors** [5] - 857:1, 858:6, 869:9, 1046:2, 1083:6
**doctors'** [2] - 1031:13, 1046:5
**document** [72] - 859:4, 864:3, 867:2, 874:12, 875:5, 875:8, 875:11, 875:13, 875:16, 889:6, 889:13, 897:1, 897:4, 897:15, 897:19, 898:8, 898:11,

899:13, 901:23, 902:13, 902:15, 907:14, 909:14, 912:13, 912:17, 950:13, 984:13, 984:25, 985:4, 985:21, 994:23, 995:10, 995:21, 996:19, 999:1, 1000:21, 1003:2, 1003:5, 1005:10, 1011:4, 1014:9, 1029:19, 1029:21, 1030:2, 1030:3, 1030:24, 1034:16, 1034:23, 1035:4, 1035:10, 1040:7, 1051:3, 1085:11, 1085:13, 1092:25, 1093:2, 1093:5, 1093:23, 1094:2, 1094:3, 1094:7, 1095:8, 1095:10, 1097:6, 1097:9, 1097:18, 1097:23, 1108:21, 1116:21, 1118:21, 1120:12
**documents** [30] - 856:1, 857:24, 858:8, 859:19, 863:1, 863:2, 865:17, 866:11, 866:12, 866:14, 866:16, 866:19, 866:20, 887:20, 897:5, 923:20, 924:13, 924:17, 994:13, 994:20, 994:22, 1023:9, 1023:11, 1030:6, 1047:10, 1069:24, 1072:4, 1072:15, 1122:15, 1196:25
**dollar** [4] - 1036:11, 1037:2, 1059:15, 1059:23
**dollars** [3] - 1036:9, 1059:9, 1080:16
**domain** [1] - 1023:18
**donations** [1] - 1093:24
**done** [28] - 919:19, 923:17, 924:20, 926:6, 936:19, 945:6, 946:12, 946:13, 949:13, 1006:22, 1008:24, 1009:1, 1018:8, 1018:18, 1028:25, 1037:9, 1037:11, 1073:11, 1090:24, 1092:3, 1112:24, 1151:3, 1158:1, 1174:23, 1178:19, 1181:23, 1196:19, 1197:10
**donor** [1] - 1093:13
**donors** [3] - 1093:9, 1093:24, 1160:10
**door** [1] - 934:20
**dose** [1] - 933:4
**double** [3] - 1057:22, 1057:23, 1058:15
**doubt** [2] - 1123:10, 1133:2
**down** [29] - 860:16, 870:6, 879:9, 900:20, 909:24, 927:20, 941:15, 955:3, 958:14, 962:15, 980:18, 1018:8, 1037:13, 1039:20, 1039:22, 1046:13, 1047:14, 1048:17, 1059:17, 1082:25, 1083:5, 1108:10, 1110:20, 1114:25, 1123:23, 1133:17, 1153:24, 1167:19, 1183:23
**dozen** [1] - 1070:17
**Dr** [312] - 863:2, 863:5, 863:20, 867:6, 869:8, 870:5, 871:6, 871:11, 871:18, 877:3, 879:1, 879:5, 879:7, 879:15, 879:22, 880:8, 880:24, 881:24, 882:19, 885:3, 885:7, 885:16, 887:13, 888:1, 888:14, 892:6, 892:8, 892:14, 893:12, 893:14, 893:23, 901:24, 902:9, 904:11, 914:11, 915:24, 916:4, 918:4, 919:13, 922:1, 922:21, 924:21, 926:10, 929:20, 931:15, 931:23, 938:5, 941:14, 941:17, 942:12, 942:14, 943:6, 943:9, 943:12, 943:25, 945:11, 945:16, 950:13, 951:6, 953:15, 955:21, 957:9, 958:14, 958:17, 959:11, 960:13, 961:20, 964:6, 972:23, 973:5, 973:6, 973:8, 974:22, 976:3, 976:5, 976:8, 976:19, 976:24, 977:10, 977:18, 978:8, 979:2, 979:10, 980:7, 981:15, 981:17, 985:8, 985:25, 986:7, 986:11, 988:23, 989:4, 989:16, 992:17, 993:12, 994:6, 995:17, 999:2, 999:18, 999:19, 999:25, 1000:3, 1001:12, 1002:13, 1002:21, 1004:9, 1004:19, 1005:6, 1007:5, 1007:7, 1008:1, 1008:9, 1008:13, 1011:21, 1012:16, 1012:25, 1013:6, 1014:20, 1014:24, 1015:23, 1016:25, 1018:7, 1018:17, 1022:24, 1023:21, 1023:25, 1024:12, 1024:16, 1024:19, 1025:19, 1026:11, 1027:2, 1028:3, 1028:7, 1032:6, 1032:8, 1032:16, 1032:18, 1032:19, 1032:21, 1032:25, 1033:3, 1033:16, 1033:25, 1036:1, 1036:18, 1037:9, 1039:4, 1039:8, 1039:11, 1040:20, 1041:1, 1041:20, 1041:25, 1042:13, 1043:2, 1043:4, 1043:5, 1043:6, 1044:1, 1045:4, 1046:12, 1048:2, 1048:7, 1048:14, 1048:19, 1049:11, 1050:18, 1056:12, 1056:13, 1058:17, 1058:22, 1060:7, 1060:11, 1061:4, 1064:11, 1065:3, 1066:5, 1066:10, 1067:3, 1068:12, 1068:19, 1070:6, 1074:8, 1076:9, 1080:20, 1084:8, 1084:13, 1085:18, 1085:19, 1085:22, 1085:24, 1092:11, 1092:12, 1092:17, 1092:18, 1092:19, 1094:18, 1099:11, 1099:12, 1099:19, 1100:14, 1102:14, 1103:16, 1103:18, 1103:19, 1104:20, 1104:21, 1105:1, 1105:13, 1105:15, 1105:21, 1106:23, 1107:3, 1107:13, 1107:17, 1107:21, 1109:1, 1109:2, 1109:5, 1109:6, 1109:7, 1110:17, 1116:7, 1116:9, 1116:16, 1122:6, 1122:11, 1125:18, 1125:21, 1126:4, 1126:12, 1129:21, 1130:12, 1130:24, 1131:2, 1131:11, 1131:14, 1132:8, 1132:9, 1133:6, 1133:17, 1133:20, 1133:25, 1134:5, 1134:15, 1134:17, 1135:3, 1135:6, 1135:15, 1135:17, 1136:7, 1136:12, 1136:16, 1137:4, 1140:6, 1141:5, 1141:21, 1142:10, 1142:14, 1143:1, 1143:21, 1144:3, 1145:5, 1146:2, 1148:5, 1149:10, 1149:16, 1149:19, 1150:1, 1150:4, 1150:7, 1150:24, 1151:17, 1151:22, 1152:2, 1153:23, 1154:2, 1155:17, 1156:10, 1156:21, 1156:22, 1156:25, 1157:6, 1160:16, 1160:17, 1161:10, 1162:16, 1162:18, 1162:20, 1162:23, 1163:16, 1164:12, 1165:18, 1165:19, 1165:22, 1165:25, 1166:3, 1166:6, 1166:9, 1166:13, 1166:18, 1166:22, 1167:2, 1179:5, 1181:25, 1189:23, 1192:3, 1195:15
**draft** [2] - 856:1, 1019:5
**Drago** [1] - 1043:5
**draw** [3] - 989:10, 1061:8, 1165:7
**drawbacks** [1] - 1010:14
**draws** [1] - 1031:21
**drew** [1] - 984:21
**dried** [2] - 956:14, 966:10
**drive** [4] - 978:9, 979:25, 1165:9, 1194:21
**driven** [1] - 1046:24
**drives** [1] - 980:10
**driving** [1] - 1043:22
**drop** [1] - 934:15
**dropped** [1] - 936:18
**drug** [28] - 903:6, 903:21, 944:4, 944:5, 944:17, 945:4, 945:5, 983:19, 986:19, 998:18, 999:21, 1003:22, 1011:2, 1060:1, 1094:23, 1134:13, 1135:24, 1140:14, 1140:19, 1145:20, 1146:10, 1148:2, 1149:1, 1149:11, 1162:1, 1163:10, 1163:12
**drugs** [3] - 904:5, 904:8, 1095:4
**dry** [2] - 955:19, 966:4
**drying** [7] - 956:16, 956:25, 957:1, 966:3, 966:10, 968:2, 969:8
**DS2** [2] - 924:2, 924:4
**DTX** [58] - 859:5, 862:3, 862:4, 862:6, 862:14, 865:24, 875:3, 875:19, 875:22, 877:2, 879:2, 880:3, 881:13, 883:6, 883:23, 884:14, 885:4, 885:9, 886:12, 889:4, 889:22, 889:25, 890:16, 905:3, 907:9, 910:20, 919:4, 948:8, 948:10, 948:13, 948:17, 948:23,

955:21, 956:3, 956:6, 987:11, 997:9, 998:24, 1016:4, 1029:17, 1029:25, 1030:9, 1030:11, 1030:19, 1030:20, 1035:4, 1035:8, 1035:18, 1035:22, 1035:23, 1095:9, 1097:7, 1099:14, 1105:14, 1116:20, 1138:4
**dubious** [1] - 1168:23
**due** [2] - 873:12, 975:7
**duration** [67] - 978:9, 978:13, 979:11, 979:18, 979:25, 980:10, 980:17, 1000:6, 1000:14, 1000:20, 1001:3, 1024:6, 1024:8, 1025:14, 1032:11, 1032:15, 1032:20, 1032:22, 1033:3, 1033:15, 1033:20, 1034:9, 1036:16, 1036:20, 1036:21, 1036:25, 1037:12, 1037:24, 1038:11, 1038:19, 1039:6, 1041:3, 1041:9, 1041:11, 1041:22, 1048:17, 1050:5, 1050:10, 1050:20, 1051:23, 1052:8, 1052:16, 1052:19, 1052:20, 1053:6, 1053:13, 1055:4, 1056:3, 1076:17, 1076:20, 1077:2, 1077:14, 1077:23, 1078:1, 1078:14, 1078:23, 1078:24, 1079:5, 1079:22, 1080:10, 1080:14, 1081:25, 1134:22, 1165:1, 1165:9, 1165:10
**durations** [1] - 1040:16
**during** [33] - 863:19, 863:20, 901:25, 931:3, 943:1, 956:16, 956:24, 956:25, 957:22, 959:11, 982:11, 985:10, 986:8, 987:13, 991:11, 991:23, 997:10, 1000:4, 1009:25, 1013:18, 1013:20, 1028:18, 1045:20, 1061:4, 1073:16, 1075:2, 1080:20, 1089:20, 1097:22, 1099:11, 1124:22, 1125:3
**DX** [1] - 864:15
**dye** [1] - 937:9
**dye-based** [1] - 937:9
**Dysport** [5] - 1019:25, 1031:8, 1045:21, 1045:23, 1046:2

## E

**early** [2] - 890:12, 1138:25
**earnings** [1] - 859:11
**easier** [1] - 1003:7
**easiest** [2] - 864:6, 1058:19
**easily** [1] - 1064:18
**easy** [3] - 859:17, 866:22, 1049:21
**economic** [1] - 1027:25
**economically** [1] - 1064:10
**edge** [1] - 877:20
**education** [1] - 947:10
**educational** [1] - 1021:17
**effect** [23] - 976:17, 1025:14, 1026:3, 1032:16, 1033:21, 1036:16, 1036:21, 1038:11, 1038:12, 1041:9, 1041:22, 1042:11, 1043:9, 1048:17, 1050:5, 1050:10, 1050:20, 1052:16, 1053:13, 1056:18, 1071:16, 1079:5, 1189:17
**effective** [4] - 956:19, 956:24, 958:7, 1036:21
**effectively** [1] - 1038:7
**effects** [1] - 1010:14
**effort** [1] - 901:6
**efforts** [1] - 1197:15
**eight** [1] - 854:12
**either** [11] - 858:10, 887:1, 959:5, 997:24, 1052:23, 1075:12, 1143:13, 1156:16, 1157:14, 1179:23, 1188:22
**elaborate** [1] - 1078:11
**electronic** [1] - 996:3
**element** [11] - 962:6, 964:4, 965:24, 967:13, 968:16, 970:13, 970:20, 971:3, 972:3, 972:8, 972:11
**elements** [8] - 952:1, 952:6, 952:14, 961:21, 972:20, 1158:23, 1160:7
**elicit** [2] - 990:7, 1062:12
**elicited** [1] - 858:20
**eliminate** [2] - 1117:25, 1129:10
**eluent** [1] - 885:2
**eluted** [2] - 884:16, 886:14
**embodiment** [6] - 962:11, 971:7, 974:3, 974:8, 974:9, 1165:11
**embodiments** [1] - 973:24
**employ** [1] - 1066:11
**employed** [2] - 944:9, 1021:4
**enables** [1] - 957:18
**encoding** [1] - 889:12
**encompasses** [1] - 988:9
**encourage** [3] - 959:22, 962:15, 1096:2
**encouraged** [1] - 1128:15
**end** [19] - 860:16, 867:22, 918:14, 918:16, 922:7, 939:8, 939:16, 958:18, 987:20, 1046:20, 1047:9, 1059:20, 1110:23, 1113:19, 1113:21, 1122:14, 1152:1, 1175:19, 1187:6
**ended** [5] - 894:25, 918:11, 988:21, 1029:12, 1068:9
**ends** [1] - 912:22
**English** [1] - 960:5
**enter** [2] - 942:23, 1065:5
**entered** [9] - 866:20, 870:9, 960:8, 1019:14, 1065:11, 1066:4, 1066:8, 1066:22, 1083:22
**entering** [4] - 866:19, 1031:8, 1063:24, 1070:2
**entire** [14] - 915:1, 915:19, 919:23, 956:25, 982:9, 984:25, 997:22, 1012:23, 1014:14, 1075:2, 1079:16, 1081:9, 1142:20, 1163:8
**entirely** [1] - 976:10
**entirety** [3] - 972:15, 1004:2, 1039:5
**entities** [9] - 1027:14, 1027:15, 1061:9, 1061:11, 1062:5, 1063:19, 1068:23, 1069:6, 1075:13
**entitled** [7] - 1059:5, 1157:18, 1165:16, 1167:5, 1174:10, 1174:15, 1181:8
**entity** [2] - 1027:8, 1027:20
**entrance** [1] - 1069:24
**entrant** [2] - 1031:20, 1069:20
**entrenched** [2] - 856:24, 859:2
**entry** [4] - 857:17, 1031:2, 1031:6, 1126:23
**equal** [2] - 923:14, 1169:23
**equation** [4] - 940:15, 1105:12, 1105:13, 1106:7
**equilibrated** [3] - 883:24, 883:25, 885:24
**equilibration** [1] - 884:3
**ERIC** [1] - 854:19
**error** [1] - 1040:25
**errors** [2] - 1034:3, 1049:13
**especially** [5] - 857:12, 1060:8, 1095:17, 1099:9, 1191:8
**ESQ** [17] - 854:16, 854:19, 854:19, 854:20, 854:20, 854:21, 854:21, 854:22, 854:22, 855:3, 855:3, 855:6, 855:6, 855:7, 855:7, 855:8, 855:10
**essentially** [19] - 861:2, 861:16, 861:17, 861:21, 878:8, 884:2, 884:10, 884:17, 885:13, 885:25, 939:6, 964:12, 964:15, 964:25, 968:22, 971:24, 988:10, 1026:23, 1044:18
**establish** [5] - 1155:2, 1155:25, 1156:15, 1194:9, 1194:25
**established** [1] - 1046:3
**establishes** [1] - 1155:13
**et** [3] - 854:6, 910:1, 910:3
**ETU** [1] - 1034:18
**evaluate** [6] - 1018:20, 1018:23, 1075:7, 1075:8, 1137:8, 1165:25
**evaluating** [4] - 905:14, 1166:14, 1166:18, 1166:20
**evaluation** [8] - 867:12, 984:13, 984:14, 984:16, 984:18, 985:3, 985:21, 1021:8
**event** [5] - 1018:12, 1049:16, 1152:14, 1193:17, 1195:6
**eventually** [2] - 879:10, 1002:14
**evidence** [79] - 856:12, 856:22, 857:20, 858:19, 861:1, 861:9, 861:14, 861:15, 866:19, 866:21, 868:14, 875:19, 889:22, 933:7, 948:18, 956:2, 977:21, 995:1, 1002:7, 1018:20, 1018:24, 1030:9, 1035:17, 1043:15, 1049:20, 1051:12, 1055:24, 1067:19, 1067:20, 1069:22, 1075:17, 1075:18, 1086:12, 1109:21, 1120:21, 1154:23, 1155:5, 1155:13, 1156:4, 1156:16, 1157:13, 1157:21,

1158:21, 1159:14, 1159:24, 1160:4, 1160:20, 1161:7, 1161:16, 1162:4, 1162:9, 1162:25, 1163:11, 1163:19, 1164:25, 1165:5, 1165:7, 1165:12, 1165:20, 1167:4, 1167:25, 1168:16, 1168:19, 1168:20, 1175:5, 1175:20, 1175:21, 1176:7, 1178:14, 1178:20, 1181:6, 1181:13, 1182:3, 1185:4, 1189:22, 1193:13, 1195:18, 1195:20
**Evolus's** [1] - 1019:25
**exact** [3] - 1145:21, 1169:25, 1180:18
**exactly** [9] - 864:14, 867:19, 999:25, 1095:22, 1107:19, 1114:14, 1137:19, 1151:13, 1170:5
**examination** [16] - 868:8, 930:17, 933:21, 934:21, 935:2, 936:25, 959:1, 971:2, 1000:4, 1015:6, 1073:16, 1122:8, 1133:7, 1152:1, 1157:6, 1195:15
**EXAMINATION** [13] - 870:15, 893:10, 930:14, 938:21, 942:1, 981:13, 1013:4, 1020:15, 1060:25, 1084:16, 1122:9, 1133:4, 1134:3
**examine** [1] - 868:9
**examiner** [11] - 892:4, 892:5, 892:7, 892:13, 908:1, 909:12, 909:25, 910:11, 995:23, 996:23, 997:2
**Examiner** [1] - 996:9
**examiner's** [1] - 996:5
**examiners** [6] - 907:22, 916:20, 920:24, 1098:1, 1117:1, 1119:12
**Example** [19] - 934:4, 934:10, 934:11, 935:13, 1103:19, 1103:22, 1103:24, 1104:23, 1112:5, 1112:9, 1115:22, 1120:10, 1120:15, 1120:17, 1121:2, 1121:12, 1121:17, 1156:7, 1156:20
**example** [44] - 895:20, 896:11, 896:19, 899:6, 899:17, 899:22, 900:6, 922:13, 940:21, 941:4, 953:7, 953:22, 962:18, 963:3, 971:25, 974:16, 991:16, 1010:16, 1015:16, 1015:21, 1015:22, 1015:25, 1016:11, 1016:13, 1016:14, 1016:21, 1016:25, 1017:3, 1017:8, 1017:11, 1017:12, 1017:14, 1099:9, 1101:1, 1125:17, 1129:16, 1150:19, 1164:8, 1166:10, 1191:4, 1192:1
**examples** [5] - 937:20, 944:23, 969:14, 972:1, 1015:13
**Excel** [2] - 865:17, 865:19
**except** [1] - 1071:7
**excerpt** [3] - 908:5, 908:16, 909:3
**exchange** [89] - 870:24, 871:4, 871:8, 871:16, 871:19, 879:9, 879:17, 879:23, 880:9, 880:20, 883:18, 884:25, 885:8, 885:11, 885:15, 885:17, 885:19, 886:10, 895:24, 896:8, 896:12, 896:21, 898:18, 898:25, 899:7, 899:23, 900:7, 900:10, 900:17, 900:18, 901:1, 901:2, 901:9, 901:13, 910:8, 922:24, 934:11, 934:12, 935:15, 935:23, 935:24, 935:25, 936:1, 938:12, 938:13, 1091:24, 1104:8, 1113:9, 1113:10, 1113:17, 1113:20, 1116:3, 1117:21, 1118:6, 1118:7, 1119:22, 1119:24, 1120:7, 1120:8, 1121:3, 1121:14, 1121:18, 1121:19, 1122:22, 1123:7, 1123:8, 1123:11, 1123:16, 1123:21, 1124:11, 1124:16, 1124:21, 1125:2, 1125:6, 1125:20, 1125:23, 1127:23, 1127:25, 1128:2, 1128:4, 1128:10, 1157:9, 1159:10
**exchanged** [2] - 883:2, 994:13
**exchanging** [1] - 883:1
**excipient** [6] - 932:14, 963:6, 965:3, 1004:23, 1008:8, 1038:25
**excipients** [12] - 964:9, 964:13, 965:5, 965:10, 965:14, 966:20, 969:8, 999:13, 1009:19, 1010:15, 1010:22
**exclude** [4] - 861:23, 987:8, 987:16, 1144:25
**excluded** [2] - 864:1, 963:11
**excludes** [10] - 973:9, 973:19, 989:5, 989:24, 990:11, 1141:2, 1142:4, 1142:6, 1144:17, 1149:15
**excluding** [3] - 863:22, 974:17, 1019:1
**exclusion** [2] - 879:11, 1046:6
**excursion** [1] - 957:23
**excuse** [1] - 1003:5
**exercise** [1] - 1037:5
**exert** [1] - 976:16
**exerts** [1] - 1008:7
**exhibit** [15] - 864:13, 865:15, 867:6, 868:11, 902:10, 905:3, 919:15, 920:17, 999:7, 1159:9, 1178:3, 1178:5, 1178:8, 1178:9, 1195:13
**Exhibit** [14] - 867:7, 868:8, 875:22, 889:25, 897:11, 913:2, 913:7, 948:23, 956:6, 995:6, 1002:11, 1051:15, 1120:24, 1195:14
**Exhibits** [2] - 1030:19, 1035:22
**exhibits** [8] - 856:5, 856:6, 856:8, 856:9, 863:25, 868:18, 1020:5, 1023:13
**exist** [1] - 1010:14
**existence** [2] - 1184:24, 1185:6
**existing** [1] - 1179:13
**exited** [4] - 958:12, 1018:16, 1083:3, 1153:22
**expect** [7] - 877:19, 954:23, 954:25, 986:16, 1019:5, 1182:3, 1189:19
**expectation** [13] - 887:16, 888:12, 888:15, 958:2, 960:15, 1040:6, 1086:18, 1110:2, 1110:7, 1159:25, 1162:3, 1164:9, 1164:14
**expectations** [3] - 1040:9, 1044:20, 1074:7
**expected** [7] - 877:17, 1074:14, 1076:15, 1097:1, 1101:4, 1159:16, 1166:24
**expense** [1] - 1045:4
**expenses** [1] - 1059:13
**expensive** [2] - 1010:17, 1139:7
**experience** [31] - 945:6, 945:17, 947:6, 947:11, 961:1, 961:6, 961:14, 981:18, 981:21, 982:15, 982:19, 983:3, 983:7, 983:11, 1012:16, 1022:4, 1102:1, 1126:13, 1132:14, 1134:11, 1136:8, 1136:9, 1136:21, 1137:4, 1162:19, 1162:21, 1163:3, 1163:6, 1188:17, 1189:5, 1191:6
**experienced** [1] - 1134:13
**experiences** [1] - 961:1
**experiment** [2] - 895:24, 898:24
**experiments** [7] - 876:19, 877:16, 878:1, 878:9, 878:11, 907:3, 1096:6
**expert** [23] - 869:9, 945:12, 959:3, 959:5, 959:7, 980:5, 1000:2, 1002:3, 1022:18, 1023:13, 1043:5, 1062:11, 1067:23, 1084:23, 1085:19, 1100:11, 1100:13, 1140:5, 1141:6, 1156:9, 1160:16, 1162:16, 1196:4
**expertise** [1] - 1084:25
**experts** [5] - 1023:16, 1043:10, 1135:1, 1161:24, 1194:6
**experts'** [1] - 1155:7
**expiration** [4] - 1042:24, 1046:11, 1046:20, 1075:10
**expire** [1] - 1059:4
**expired** [3] - 1046:15, 1057:18, 1060:1
**expires** [1] - 1059:3
**expiring** [1] - 1194:16
**explain** [23] - 872:16, 880:24, 881:21, 887:12, 890:21, 946:2, 969:4, 973:15, 976:4, 1024:13, 1044:3, 1044:10, 1044:25, 1053:10, 1090:4, 1099:2, 1103:25, 1110:15, 1114:21, 1135:14, 1137:12, 1143:4, 1179:12
**explained** [3] - 883:2, 1004:22, 1045:20
**explains** [3] - 1110:18, 1143:8, 1149:21
**explanations** [1] - 942:18
**explicitly** [5] - 859:19, 860:17, 900:5,

901:19, 1029:3
**express** [1] - 1000:6
**expressed** [4] - 858:6, 1053:21, 1181:23
**expressly** [4] - 1010:3, 1011:22, 1149:20, 1155:18
**extended** [19] - 978:9, 979:18, 979:25, 1024:8, 1025:13, 1032:11, 1032:15, 1032:20, 1032:22, 1033:3, 1033:20, 1034:9, 1041:8, 1041:22, 1048:17, 1050:20, 1053:13, 1077:1, 1080:14
**extends** [1] - 1059:24
**extent** [7] - 857:2, 857:6, 984:16, 1041:15, 1067:19, 1100:3, 1153:16
**extra** [2] - 1036:15, 1042:10
**extremely** [3] - 901:14, 989:13, 1025:16
**extremes** [1] - 876:10
**eyes** [1] - 919:23

**F**

**face** [5] - 950:8, 951:21, 1013:22, 1025:7, 1137:10
**facial** [1] - 1034:17
**facie** [1] - 1155:12
**fact** [53] - 863:3, 864:18, 871:18, 876:23, 877:24, 878:25, 896:17, 902:24, 903:19, 904:8, 914:21, 915:13, 923:18, 926:6, 953:20, 957:21, 958:6, 976:16, 982:6, 982:24, 992:1, 1008:1, 1012:15, 1012:22, 1019:21, 1024:7, 1028:24, 1029:2, 1031:4, 1063:22, 1064:9, 1067:10, 1070:17, 1071:3, 1076:11, 1076:12, 1076:14, 1079:1, 1123:16, 1124:8, 1126:3, 1130:3, 1137:4, 1140:16, 1141:21, 1156:24, 1179:5, 1181:25, 1189:2, 1189:6, 1189:25, 1196:12, 1196:13
**factor** [7] - 857:15, 867:22, 1071:24, 1078:19, 1107:10, 1194:12
**factored** [1] - 1075:19
**factors** [6] - 1054:11, 1089:24, 1115:10, 1115:12, 1115:17, 1188:25
**facts** [8] - 1019:12, 1043:17, 1056:17, 1076:5, 1076:6, 1161:22, 1166:11, 1193:16
**factual** [6] - 1191:20, 1192:8, 1192:9, 1192:15, 1192:17, 1193:11
**Fahrenheit** [1] - 960:24
**failed** [10] - 1155:11, 1155:25, 1157:2, 1157:20, 1159:7, 1160:24, 1162:2, 1164:14, 1164:21, 1165:25
**fails** [4] - 1032:25, 1156:3, 1156:9, 1156:13
**failures** [1] - 877:19
**fair** [19] - 915:21, 959:2, 982:8, 984:11, 985:1, 985:18, 1005:15, 1010:23, 1029:9, 1064:18, 1066:25, 1067:2, 1067:14, 1132:5, 1154:4, 1170:22, 1171:16, 1182:9, 1191:8
**fairly** [1] - 954:6
**fairness** [1] - 866:3
**fall** [1] - 858:20
**far** [5] - 887:2, 936:16, 1102:18, 1102:19, 1114:19
**Farenheit** [2] - 960:20, 960:22
**fatal** [1] - 1164:15
**favor** [2] - 1069:12, 1165:12
**favors** [1] - 1192:24
**FDA** [42] - 872:7, 872:13, 873:12, 874:12, 874:16, 874:19, 881:2, 882:3, 882:13, 887:5, 887:9, 887:16, 888:5, 888:9, 891:24, 892:1, 892:13, 893:6, 902:10, 902:15, 902:18, 902:21, 902:24, 903:5, 903:19, 918:25, 932:20, 1071:4, 1092:21, 1093:5, 1093:6, 1093:8, 1093:11, 1093:14, 1093:17, 1093:21, 1093:23, 1132:5, 1160:6, 1160:8, 1160:20, 1161:1
**FDA-approved** [1] - 888:5
**fear** [1] - 1043:16
**feature's** [1] - 1037:1
**features** [18] - 952:9, 953:16, 1036:11, 1038:6, 1038:23, 1049:2, 1049:3, 1052:18, 1055:25, 1056:2, 1060:9, 1079:15, 1079:17, 1081:22, 1081:25, 1082:2, 1082:5, 1165:24
**Federal** [1] - 1166:11
**federal** [2] - 1154:19, 1157:19
**felt** [5] - 857:10, 1004:22, 1005:4, 1181:4, 1183:15
**fermentation** [8] - 876:16, 881:24, 881:25, 910:5, 915:15, 917:15, 1102:23, 1115:23
**fermenting** [1] - 1112:16
**few** [11] - 905:5, 924:20, 951:11, 1024:25, 1056:22, 1061:14, 1110:5, 1115:17, 1122:16, 1143:12, 1158:15
**field** [10] - 944:7, 944:25, 983:15, 1000:2, 1124:15, 1124:25, 1126:13, 1138:21, 1188:17, 1189:5
**Figure** [7] - 879:4, 881:17, 883:4, 883:5, 1111:21, 1112:2, 1112:11
**figure** [4] - 866:2, 881:18, 1043:19, 1112:5
**figured** [1] - 866:25
**figuring** [1] - 1048:25
**file** [3] - 860:1, 994:16, 994:20
**filed** [16] - 860:5, 860:6, 897:20, 898:13, 946:14, 949:4, 949:5, 995:10, 1001:17, 1002:18, 1002:21, 1005:5, 1023:10, 1129:7, 1150:14, 1182:7
**filing** [3] - 949:12, 1065:17, 1065:22
**fill** [1] - 1151:1
**filled** [3] - 860:7, 1014:17, 1014:25
**filter** [2] - 1115:2, 1115:3
**filters** [2] - 922:13, 922:14
**filtration** [1] - 1115:25
**final** [15] - 933:1, 943:22, 964:23, 973:4, 1034:9, 1034:18, 1055:1, 1055:2, 1152:7, 1170:14, 1173:8, 1193:21, 1195:2, 1195:5, 1197:11
**finalize** [1] - 1180:20
**finally** [6] - 943:5, 946:8, 947:8, 973:12, 1112:17, 1115:8
**financial** [5] - 867:3, 1022:1, 1022:10, 1023:19, 1028:3
**financials** [3] - 865:21, 866:23, 867:1
**findings** [1] - 1188:2
**fine** [6] - 902:17, 942:13, 1028:23, 1029:11, 1038:7, 1183:2
**finish** [7] - 927:21, 931:18, 1019:7, 1112:17, 1127:8, 1149:6, 1151:20
**finished** [3] - 879:10, 1112:25, 1113:1
**firm** [2] - 1021:5, 1021:12
**firms** [1] - 1022:13
**first** [94] - 856:2, 856:6, 860:12, 860:25, 862:22, 879:17, 879:20, 880:4, 883:16, 886:9, 886:12, 890:15, 898:22, 899:14, 902:18, 903:12, 916:13, 918:14, 918:16, 919:12, 923:24, 932:5, 932:11, 943:3, 946:5, 946:10, 947:2, 962:6, 964:21, 967:25, 973:9, 973:18, 976:1, 978:19, 981:21, 991:10, 997:13, 1002:3, 1003:2, 1012:16, 1014:5, 1022:8, 1023:3, 1024:18, 1024:20, 1032:2, 1034:5, 1035:25, 1042:6, 1042:22, 1043:1, 1045:18, 1046:15, 1046:18, 1049:25, 1050:7, 1051:22, 1058:1, 1058:8, 1059:2, 1060:13, 1065:16, 1070:16, 1074:18, 1077:25, 1085:17, 1086:3, 1086:22, 1087:12, 1090:16, 1090:20, 1091:9, 1091:19, 1092:8, 1096:13, 1102:5, 1102:11, 1107:8, 1109:9, 1113:16, 1138:6, 1138:9, 1138:17, 1144:1, 1148:20, 1154:12, 1155:16, 1165:22, 1170:15, 1171:14, 1173:18, 1174:8
**First** [1] - 1022:23
**first-to-market** [2] - 1058:1, 1058:8
**fit** [2] - 1055:24, 1184:21
**fitting** [1] - 1110:23
**five** [12] - 925:8, 929:4, 929:24, 953:10, 1131:15, 1132:19, 1141:10, 1169:23, 1170:10, 1170:16, 1170:17, 1170:23

**five-minute** [1] - 1170:10
**fix** [2] - 1040:1, 1040:22
**flaws** [3] - 1026:22, 1048:1, 1058:16
**flexibility** [2] - 957:20, 963:22
**floor** [1] - 1182:18
**flow** [2] - 1049:16, 1080:16
**flows** [2] - 1156:5, 1157:4
**flowthrough** [1] - 1104:9
**fluid** [1] - 1091:21
**fly** [2] - 869:14, 939:5
**flying** [1] - 1043:22
**focus** [15] - 925:16, 944:14, 949:1, 967:19, 989:4, 991:9, 991:13, 996:20, 1009:2, 1025:10, 1043:1, 1077:18, 1087:23, 1122:16, 1138:5
**focused** [12] - 901:25, 943:25, 944:2, 984:11, 985:2, 985:18, 1021:14, 1025:15, 1038:18, 1048:15, 1079:19, 1090:19
**focusing** [4] - 860:15, 984:3, 1042:19, 1077:9
**follow** [6] - 937:15, 939:4, 957:12, 1145:6, 1183:3, 1195:24
**follow-up** [1] - 939:4
**followed** [11] - 879:9, 900:18, 921:9, 921:12, 1091:10, 1118:2, 1118:7, 1119:21, 1119:24, 1120:3, 1159:3
**following** [16] - 870:2, 929:16, 951:5, 954:4, 959:16, 968:2, 990:2, 1014:6, 1014:7, 1019:3, 1083:12, 1145:18, 1154:9, 1161:21, 1179:5, 1186:10
**follows** [2] - 941:25, 1020:13
**food** [5] - 905:17, 1095:1, 1095:16, 1160:11, 1161:5
**foods** [2] - 905:15, 1095:17
**footnote** [9] - 862:20, 862:21, 862:23, 863:3, 863:22, 864:7, 864:22, 868:1, 868:19
**footnotes** [2] - 868:17, 868:20
**FOR** [1] - 854:2
**force** [1] - 1046:4
**forced** [1] - 1025:25
**forecasted** [3] - 864:9, 864:17, 864:21
**forecasts** [5] - 866:17, 867:9, 867:12, 867:14, 867:15
**foregoing** [1] - 1198:1
**forensic** [3] - 1021:13, 1022:2, 1022:11
**forensics** [1] - 1022:1
**Form** [1] - 1030:4
**form** [13] - 969:18, 972:7, 990:19, 1019:6, 1064:2, 1083:10, 1154:8, 1187:22, 1188:2, 1190:25, 1193:19, 1194:21, 1195:11
**forma** [1] - 1154:17
**formation** [1] - 877:12
**Formation** [1] - 875:9
**formed** [1] - 958:1
**forming** [2] - 980:13, 1072:2
**forms** [1] - 1190:8
**formula** [2] - 1038:25, 1044:5
**formulate** [1] - 1163:9
**formulated** [1] - 966:9
**formulating** [1] - 1012:19
**Formulation** [1] - 969:18
**formulation** [95] - 944:16, 945:12, 947:8, 952:23, 953:10, 953:18, 955:8, 955:12, 956:13, 957:12, 964:13, 965:6, 966:3, 967:3, 968:18, 969:7, 969:10, 969:17, 969:24, 970:24, 971:17, 972:5, 975:2, 976:7, 976:12, 977:1, 977:2, 977:5, 977:7, 979:13, 979:14, 982:19, 983:3, 983:11, 983:15, 987:4, 993:14, 998:17, 1004:22, 1005:1, 1008:2, 1008:8, 1008:14, 1024:2, 1025:13, 1032:4, 1032:10, 1032:20, 1033:2, 1033:6, 1033:10, 1041:23, 1053:1, 1053:3, 1054:8, 1054:13, 1055:6, 1055:17, 1057:11, 1060:1, 1073:20, 1075:11, 1076:19, 1077:22, 1078:13, 1080:10, 1137:17, 1137:24, 1138:2, 1138:3, 1138:18, 1138:22, 1139:16, 1140:20, 1142:8, 1143:7, 1143:24, 1145:14, 1147:2, 1148:2, 1148:8, 1149:12, 1149:14, 1151:4, 1151:5, 1162:16, 1162:21, 1163:24, 1164:10, 1166:1, 1188:3, 1188:15, 1190:20, 1191:5, 1191:6
**formulations** [38] - 944:24, 945:13, 955:20, 956:14, 956:15, 957:10, 958:8, 969:13, 976:2, 982:1, 982:7, 982:16, 983:24, 997:21, 999:9, 999:15, 1005:7, 1008:21, 1012:17, 1012:20, 1012:23, 1080:23, 1134:13, 1136:6, 1136:9, 1136:10, 1137:2, 1137:5, 1137:11, 1137:22, 1142:8, 1142:16, 1143:16, 1147:8, 1147:24, 1148:13, 1150:18, 1164:6
**forth** [2] - 909:8, 1164:14
**forward** [13] - 1040:19, 1042:2, 1048:14, 1058:10, 1059:24, 1076:11, 1080:4, 1080:15, 1083:17, 1135:17, 1139:4, 1150:1, 1184:2
**founded** [1] - 858:7
**four** [7] - 860:15, 946:4, 957:6, 1033:23, 1071:12, 1122:15, 1165:21
**fourth** [2] - 1166:22, 1185:9
**FOX** [1] - 855:5
**fractions** [5] - 884:5, 885:2, 885:10, 885:12, 885:14
**fragment** [1] - 1185:2
**frank** [1] - 1084:8
**Frank** [1] - 1084:20
**fraud** [1] - 1022:2
**free** [96] - 877:7, 881:16, 881:24, 881:25, 893:24, 894:4, 910:4, 910:6, 914:19, 914:22, 915:11, 915:14, 915:15, 917:5, 917:6, 917:9, 917:10, 917:13, 918:9, 918:10, 919:9, 919:21, 929:8, 943:20, 952:23, 962:1, 962:3, 962:7, 962:10, 962:14, 962:23, 963:4, 963:17, 971:18, 971:19, 971:20, 978:23, 978:25, 979:3, 979:6, 987:4, 993:13, 993:16, 1001:13, 1052:1, 1052:10, 1052:21, 1079:10, 1080:24, 1081:20, 1085:25, 1086:3, 1086:19, 1086:23, 1089:8, 1090:5, 1090:17, 1090:21, 1091:2, 1092:9, 1093:22, 1098:9, 1101:17, 1102:10, 1102:14, 1103:9, 1110:14, 1111:19, 1112:8, 1112:19, 1113:9, 1119:4, 1128:15, 1128:19, 1129:4, 1129:14, 1130:4, 1130:5, 1130:8, 1130:16, 1130:22, 1131:3, 1131:9, 1131:15, 1131:17, 1132:8, 1132:16, 1132:22, 1145:15, 1147:15, 1148:15, 1148:16, 1151:4, 1163:24, 1173:11, 1187:11
**free'** [1] - 963:1
**freeze** [8] - 955:19, 956:14, 956:16, 957:1, 966:3, 966:10, 968:2, 969:8
**freeze-dried** [1] - 956:14
**freeze-dry** [1] - 955:19
**freeze-drying** [6] - 956:16, 957:1, 966:3, 966:10, 968:2, 969:8
**freezing** [5] - 953:11, 955:8, 956:24, 957:13, 960:21
**front** [10] - 889:3, 950:16, 999:1, 1022:15, 1029:15, 1068:1, 1071:17, 1072:1, 1072:2, 1191:2
**frozen** [2] - 957:15
**full** [12] - 879:20, 880:4, 899:14, 900:24, 932:5, 941:19, 997:24, 997:25, 1014:11, 1020:7, 1066:17, 1186:7
**fully** [1] - 936:20
**function** [5] - 967:4, 1008:7, 1008:9, 1008:12, 1146:7
**functional** [1] - 1099:8
**functions** [1] - 1162:12
**fundamental** [2] - 1056:22, 1078:4
**furthermore** [1] - 1161:15
**future** [2] - 1194:7, 1194:10
**fuzzy** [1] - 919:16

## G

**gain** [2] - 1076:1, 1192:23
**Galderma** [2] - 1045:23, 1045:24
**Galderma's** [2] - 1019:24, 1046:1
**gap** [1] - 1151:1
**gather** [1] - 1023:19

**GAZA** [4] - 855:3, 1019:10, 1019:19, 1197:5
**Gaza** [3] - 1019:18, 1019:20, 1197:4
**gear** [1] - 874:1
**gears** [6] - 871:21, 967:18, 973:4, 997:9, 1126:15, 1127:19
**gel** [1] - 1118:2
**gelatin** [8] - 1010:15, 1010:17, 1147:21, 1147:23, 1148:5, 1148:7, 1148:18
**gene** [1] - 889:12
**general** [9] - 953:2, 988:9, 1093:7, 1100:22, 1128:12, 1139:3, 1139:9, 1190:6, 1191:23
**generalize** [1] - 1006:23
**generally** [6] - 890:7, 913:24, 913:25, 1095:15, 1098:20, 1117:5
**generate** [1] - 1098:25
**generous** [1] - 868:13
**genome** [1] - 890:10
**Georgia** [1] - 857:15
**Georgia-Pacific** [1] - 857:15
**Gessler** [92] - 871:6, 871:11, 871:18, 872:7, 872:13, 873:12, 879:1, 879:4, 879:6, 879:7, 879:15, 879:22, 880:2, 881:2, 881:13, 881:24, 882:18, 882:19, 883:9, 883:10, 883:23, 884:22, 885:9, 885:22, 885:23, 886:11, 886:21, 887:5, 887:9, 887:13, 887:25, 888:1, 891:19, 892:1, 893:6, 907:9, 907:11, 907:18, 907:21, 910:1, 910:2, 910:3, 910:13, 910:15, 910:18, 910:22, 910:25, 911:5, 911:7, 911:9, 911:15, 911:19, 912:1, 912:7, 1043:6, 1084:9, 1084:13, 1084:20, 1085:18, 1092:11, 1092:21, 1094:18, 1097:11, 1097:14, 1098:1, 1098:6, 1098:20, 1099:11, 1101:16, 1101:22, 1102:9, 1102:11, 1102:14, 1102:17, 1103:18, 1104:20, 1105:15, 1107:13, 1109:1, 1116:7, 1122:6, 1122:11, 1133:6, 1133:17, 1156:22, 1160:5, 1160:15, 1160:16, 1160:17, 1160:21, 1161:8, 1161:10
**gessler** [1] - 911:7
**Gessler's** [16] - 879:5, 880:8, 881:15, 882:24, 883:21, 884:13, 884:20, 885:3, 885:7, 885:16, 887:16, 888:14, 891:23, 892:6, 892:8, 892:14
**given** [15] - 920:7, 922:2, 947:16, 960:1, 997:3, 999:20, 1043:17, 1100:14, 1109:12, 1139:11, 1143:23, 1162:11, 1166:15, 1175:12, 1193:22
**glucose** [5] - 975:4, 975:6, 975:8, 975:12, 1016:16
**goal** [2] - 997:22, 1047:12
**gold** [3] - 1138:19, 1139:1, 1147:2
**GOLDSTEIN** [1] - 855:5
**Goodnough** [54] - 869:8, 870:5, 880:24, 893:12, 893:14, 893:23, 901:24, 902:9, 904:11, 915:24, 916:4, 918:4, 919:13, 922:1, 922:21, 924:21, 926:10, 929:20, 931:23, 941:14, 943:9, 943:12, 958:17, 1085:19, 1085:24, 1092:12, 1092:17, 1092:18, 1092:19, 1094:18, 1100:14, 1103:19, 1104:21, 1105:1, 1105:21, 1107:3, 1109:2, 1109:7, 1116:9, 1116:16, 1125:18, 1126:4, 1126:12, 1131:11, 1131:14, 1132:9, 1133:8, 1133:10, 1155:17, 1156:10, 1156:19, 1156:25, 1157:6, 1195:15
**Goodnough's** [15] - 914:11, 931:15, 1085:22, 1099:12, 1099:19, 1103:16, 1105:13, 1106:23, 1107:17, 1107:21, 1109:5, 1109:6, 1125:21, 1156:19, 1156:21
**goods** [2] - 1044:14, 1045:10
**GORDON** [1] - 855:10
**governing** [1] - 1167:3
**grade** [4] - 926:2, 929:10, 930:6, 932:25
**gradient** [1] - 884:16
**gram** [1] - 1107:4
**grams** [2] - 940:11, 1107:11
**grant** [3] - 1083:20, 1098:2, 1163:14
**grant's** [1] - 1157:24
**granted** [3] - 1001:7, 1011:23, 1172:3
**granting** [1] - 1167:11
**graph** [2] - 1047:3, 1047:4
**gray** [1] - 1114:8
**great** [1] - 1100:2
**green** [4] - 965:12, 965:13, 1059:1, 1091:3
**grew** [2] - 878:4, 906:7
**gross** [4] - 1044:1, 1044:8, 1044:12, 1044:18
**ground** [2] - 997:16, 1135:23
**grounds** [2] - 1013:16, 1158:15
**group** [7] - 856:6, 858:21, 966:22, 1021:7, 1021:8, 1145:15
**grow** [19] - 876:9, 876:11, 877:18, 877:21, 905:13, 925:18, 1031:16, 1031:22, 1069:25, 1089:14, 1089:22, 1090:1, 1095:18, 1096:8, 1096:19, 1096:23, 1115:23, 1160:16
**growing** [7] - 861:7, 877:6, 911:5, 1089:18, 1096:4, 1160:13, 1162:4
**grown** [3] - 911:19, 912:1, 925:20
**grows** [2] - 876:16, 1090:11
**Growth** [2] - 875:9, 905:5
**growth** [16] - 876:4, 876:5, 876:24, 877:1, 877:11, 877:14, 878:6, 905:15, 906:22, 907:3, 1031:18, 1070:9, 1096:2, 1096:17, 1096:21, 1161:4
**guarantee** [1] - 1162:6
**guess** [16] - 857:18, 865:3, 869:1, 869:15, 906:20, 909:11, 909:18, 959:25, 1062:20, 1083:1, 1084:1, 1100:3, 1153:8, 1171:8, 1180:2, 1194:19
**guidance** [38] - 872:7, 872:14, 874:12, 874:16, 874:19, 881:3, 882:3, 882:13, 887:5, 887:9, 887:17, 891:24, 892:1, 892:14, 893:6, 902:10, 902:15, 902:18, 902:21, 902:24, 903:5, 903:19, 1092:21, 1093:5, 1093:8, 1093:11, 1093:14, 1093:17, 1093:21, 1093:23, 1160:6, 1160:8, 1160:9, 1160:21, 1161:1, 1169:22, 1170:15
**Guidance** [1] - 873:12
**guideline** [1] - 1093:10
**guidelines** [1] - 1159:22

## H

**half** [19] - 1015:2, 1040:3, 1040:8, 1040:13, 1041:17, 1046:14, 1046:16, 1046:20, 1053:4, 1053:8, 1054:2, 1074:9, 1074:20, 1076:9, 1152:3, 1166:9, 1187:17
**halfway** [1] - 909:24
**hand** [36] - 867:25, 872:20, 879:20, 880:25, 881:1, 881:3, 908:8, 909:19, 950:17, 955:10, 1019:5, 1073:20, 1076:16, 1076:19, 1076:22, 1077:15, 1078:12, 1078:14, 1079:23, 1082:11, 1084:10, 1099:8, 1102:12, 1132:13, 1132:18, 1137:14, 1137:15, 1139:19, 1140:1, 1144:13, 1144:14, 1144:16, 1147:1, 1147:4, 1153:14, 1188:5
**handed** [1] - 1020:4
**handling** [1] - 966:8
**hands** [2] - 961:1, 981:18
**hands-on** [2] - 961:1, 981:18
**handwritten** [1] - 1183:24
**happy** [3] - 1083:18, 1153:13, 1172:18
**hard** [4] - 867:10, 911:22, 990:4, 1103:4
**harder** [1] - 864:18
**hardly** [1] - 1190:11
**harm** [1] - 1178:8
**HASTINGS** [1] - 854:18
**HCPs** [2] - 1051:6, 1079:4
**head** [2] - 944:10, 1126:1
**header** [1] - 999:8
**headway** [1] - 1046:1
**healthcare** [7] - 1022:10, 1032:1,

1037:18, 1049:24, 1050:6, 1050:16, 1051:7
**hear** [19] - 974:15, 980:10, 1000:4, 1004:9, 1004:11, 1026:11, 1028:7, 1048:19, 1066:25, 1068:4, 1094:18, 1099:14, 1126:3, 1130:16, 1142:14, 1149:16, 1149:19, 1183:17, 1189:19
**heard** [56] - 869:19, 878:16, 913:10, 943:9, 943:12, 987:15, 991:23, 1001:4, 1007:1, 1023:15, 1024:23, 1031:4, 1032:13, 1032:18, 1043:6, 1043:9, 1048:22, 1066:13, 1089:12, 1089:20, 1122:25, 1128:13, 1129:13, 1129:16, 1129:19, 1130:8, 1130:12, 1130:17, 1130:18, 1130:24, 1131:5, 1131:11, 1131:15, 1132:7, 1132:13, 1132:18, 1136:7, 1139:8, 1142:17, 1143:11, 1146:18, 1146:19, 1149:18, 1149:23, 1158:12, 1160:17, 1164:7, 1169:2, 1169:3, 1181:15, 1181:16, 1181:17, 1181:20, 1181:25, 1189:21
**hearing** [2] - 1077:24, 1181:14
**held** [4] - 861:2, 1023:15, 1028:17, 1066:1
**help** [9] - 856:9, 858:3, 986:18, 1064:2, 1070:22, 1072:10, 1077:12, 1108:11
**helpful** [11] - 864:25, 960:1, 1051:20, 1056:24, 1063:13, 1172:13, 1172:16, 1172:17, 1172:18, 1185:12, 1190:18
**helping** [1] - 1197:16
**helps** [4] - 857:22, 980:16, 1069:25, 1176:6
**hence** [1] - 998:9
**hereby** [2] - 915:5, 1197:24
**herself** [1] - 1062:15
**HIC** [4] - 883:22, 884:15, 884:23, 886:3
**high** [18] - 909:6, 942:21, 947:2, 951:24, 952:20, 954:5, 954:6, 1059:20, 1086:8, 1086:14, 1099:2, 1109:14, 1109:23, 1110:11, 1113:13, 1114:22, 1146:6, 1155:9
**high-molecular-weight** [1] - 1146:6
**higher** [10] - 953:19, 953:22, 957:10, 957:22, 968:7, 1024:12, 1031:9, 1031:10, 1141:11, 1172:4
**highest** [1] - 1069:4
**highlight** [18] - 932:5, 953:17, 953:20, 954:3, 956:17, 956:21, 962:9, 962:19, 963:3, 964:23, 967:25, 968:5, 974:25, 975:5, 993:15, 1077:11, 1171:18
**highlighted** [30] - 872:25, 880:7, 884:15, 886:13, 943:18, 947:13, 947:19, 952:5, 952:13, 952:17, 954:1, 963:19, 964:7, 967:9, 971:4, 976:11, 994:2, 1087:20, 1087:25, 1096:6, 1098:7, 1104:1, 1111:12, 1112:14, 1112:22, 1117:18, 1117:22, 1138:10, 1145:12
**highlighting** [9] - 1088:3, 1089:5, 1089:6, 1091:3, 1094:10, 1111:18, 1113:5, 1114:8, 1191:2
**highlights** [6] - 964:22, 965:12, 965:13, 966:19, 1145:8, 1189:18
**highly** [11] - 890:20, 891:1, 891:4, 891:5, 891:11, 924:16, 935:6, 1092:3, 1136:5, 1155:21, 1163:4
**himself** [1] - 1144:6
**history** [12] - 908:17, 908:19, 909:4, 909:7, 955:13, 955:16, 956:10, 958:7, 992:14, 994:16, 994:20, 1013:14
**hit** [1] - 1182:17
**hmm** [5] - 907:19, 914:20, 928:21, 987:25, 1003:18
**HO** [1] - 854:21
**hold** [3] - 864:8, 1167:15, 1196:23
**home** [1] - 1187:11
**honestly** [1] - 1190:11
**Honor** [205] - 856:14, 856:16, 856:20, 858:14, 858:17, 858:22, 859:4, 859:10, 859:11, 859:14, 859:24, 861:24, 861:25, 862:7, 862:25, 863:18, 865:8, 865:14, 865:20, 866:7, 866:23, 867:10, 867:12, 867:16, 867:21, 868:15, 868:22, 869:4, 869:6, 869:23, 870:14, 875:18, 880:1, 889:21, 889:23, 893:8, 908:10, 912:23, 914:6, 914:9, 927:16, 931:12, 931:20, 933:6, 934:13, 934:21, 936:15, 936:24, 938:16, 938:19, 941:16, 945:11, 945:14, 948:17, 951:13, 951:18, 956:2, 959:9, 959:13, 980:3, 980:22, 981:11, 989:17, 992:15, 995:1, 1002:6, 1006:13, 1014:19, 1018:6, 1019:10, 1019:19, 1020:3, 1022:17, 1028:14, 1030:8, 1030:10, 1035:17, 1035:19, 1051:11, 1051:13, 1060:22, 1062:10, 1064:15, 1065:12, 1065:23, 1066:7, 1067:22, 1068:6, 1072:25, 1073:3, 1073:8, 1082:21, 1082:23, 1083:14, 1083:21, 1084:10, 1100:10, 1100:12, 1108:9, 1120:20, 1133:19, 1141:18, 1149:4, 1151:23, 1154:14, 1155:8, 1157:23, 1158:3, 1158:4, 1158:9, 1158:11, 1165:14, 1167:7, 1167:10, 1167:23, 1169:8, 1169:10, 1169:22, 1170:6, 1170:7, 1170:14, 1171:6, 1171:24, 1172:12, 1172:22, 1173:3, 1173:4, 1173:5, 1174:1, 1174:2, 1174:5, 1174:7, 1174:16, 1175:4, 1175:9, 1175:16, 1175:17, 1176:12, 1176:14, 1176:17, 1176:19, 1176:22, 1176:24, 1177:1, 1177:17, 1177:19, 1177:23, 1178:1, 1178:10, 1178:24, 1179:9, 1179:16, 1179:19, 1180:4, 1180:10, 1180:12, 1180:23, 1180:25, 1181:1, 1181:7, 1181:11, 1181:21, 1182:7, 1182:11, 1182:22, 1183:15, 1183:20, 1184:3, 1184:8, 1184:10, 1184:19, 1185:16, 1185:17, 1185:19, 1185:20, 1185:23, 1186:10, 1186:18, 1186:25, 1187:6, 1187:9, 1187:14, 1187:15, 1187:25, 1188:12, 1188:18, 1189:20, 1190:3, 1190:9, 1191:14, 1191:17, 1191:25, 1192:11, 1193:20, 1194:3, 1195:9, 1195:11, 1195:19, 1195:25, 1196:18, 1196:21, 1197:3, 1197:5, 1197:13
**Honorable** [1] - 854:11
**hopefully** [2] - 1172:6, 1180:19
**hoping** [1] - 1169:11
**hour** [4] - 1152:3, 1153:12, 1153:14, 1187:17
**housekeeping** [4] - 1029:14, 1034:12, 1049:19, 1050:25
**HSA** [10] - 932:12, 962:22, 969:13, 973:14, 974:16, 978:20, 1008:10, 1052:1, 1052:10, 1052:21
**HSA-free** [1] - 1052:10
**huge** [1] - 951:7
**human** [29] - 932:12, 932:16, 954:11, 954:14, 954:23, 955:9, 962:21, 1010:5, 1052:1, 1093:9, 1093:23, 1093:24, 1131:20, 1131:23, 1132:4, 1132:10, 1132:15, 1132:20, 1138:12, 1138:18, 1138:22, 1139:6, 1139:16, 1147:3, 1147:7, 1147:13, 1147:17, 1160:10
**humans** [5] - 903:22, 1094:22, 1095:5, 1099:10, 1101:3
**hundred** [14] - 960:23, 1036:20, 1050:12, 1050:14, 1052:7, 1053:16, 1058:24, 1059:10, 1059:17, 1077:6, 1077:25, 1078:18, 1110:19, 1119:8
**hundreds** [1] - 876:25
**Hunt** [209] - 948:5, 948:7, 949:1, 949:2, 949:4, 949:5, 949:17, 949:21, 949:23, 949:24, 949:25, 950:1, 950:8, 951:20, 951:23, 951:25, 952:6, 952:10,

952:20, 952:22, 953:3, 953:8, 953:24, 955:5, 955:6, 958:3, 960:16, 960:17, 962:7, 962:11, 962:23, 964:18, 965:8, 965:20, 966:6, 966:7, 966:12, 967:6, 969:12, 969:19, 970:1, 970:12, 970:16, 971:2, 971:10, 971:21, 972:3, 972:4, 972:7, 972:11, 972:18, 972:19, 973:9, 973:19, 973:23, 974:12, 974:15, 974:19, 974:23, 975:17, 975:21, 976:22, 978:16, 978:17, 978:19, 978:21, 978:22, 981:7, 984:3, 984:5, 984:8, 984:12, 984:23, 985:2, 985:18, 986:5, 987:11, 987:15, 987:19, 987:22, 988:11, 988:18, 989:3, 989:11, 990:14, 991:8, 991:20, 992:6, 992:21, 993:6, 993:11, 993:19, 993:23, 993:25, 994:3, 995:19, 996:12, 996:16, 997:16, 999:25, 1000:10, 1001:7, 1001:10, 1001:17, 1003:10, 1005:3, 1007:1, 1007:12, 1007:16, 1007:20, 1009:2, 1009:4, 1009:6, 1009:9, 1009:13, 1009:18, 1009:24, 1010:2, 1010:3, 1010:23, 1010:25, 1011:8, 1011:16, 1011:21, 1012:4, 1012:9, 1013:8, 1013:15, 1015:11, 1015:13, 1016:1, 1016:3, 1016:8, 1016:19, 1017:19, 1129:22, 1131:5, 1131:8, 1132:9, 1135:5, 1135:17, 1138:5, 1138:16, 1139:15, 1139:19, 1139:21, 1139:25, 1140:4, 1140:7, 1140:10, 1140:16, 1140:17, 1140:19, 1140:20, 1140:23, 1140:25, 1141:1, 1142:22, 1142:24, 1143:4, 1143:11, 1143:15, 1144:3, 1144:4, 1144:9, 1144:13, 1144:16, 1144:17, 1144:24, 1145:3, 1145:6, 1145:9, 1145:12, 1145:13, 1145:19, 1146:1, 1146:3, 1146:8, 1146:9, 1146:14, 1147:10, 1147:22, 1148:3, 1148:4, 1148:6, 1148:13, 1148:17, 1148:24, 1149:11, 1149:13, 1149:15, 1149:17, 1149:21, 1150:14, 1151:1, 1151:13, 1163:20, 1163:21, 1163:23, 1164:1, 1164:3, 1164:17, 1164:21, 1179:6, 1179:11, 1179:20, 1181:21

**hunt's** [1] - 954:16

**Hunt's** [23] - 954:19, 955:8, 957:12, 960:21, 962:8, 976:23, 983:17, 984:20, 986:6, 986:19, 994:7, 1001:2, 1002:13, 1003:16, 1003:20, 1006:19, 1007:8, 1010:12, 1011:1, 1134:20, 1137:19, 1179:1, 1179:2

**hydrophobic** [22] - 878:16, 878:19, 878:23, 879:7, 879:13, 879:15, 879:23, 880:11, 880:15, 880:18, 883:10, 883:11, 883:15, 891:11, 891:16, 910:8, 1091:9, 1091:18, 1104:7, 1119:21, 1127:22, 1128:9

**hydrophobicity** [1] - 891:7

**hypothetical** [51] - 856:12, 856:21, 857:8, 857:16, 857:25, 858:11, 859:7, 860:18, 861:18, 1024:24, 1025:8, 1025:22, 1026:2, 1027:1, 1028:25, 1029:4, 1031:20, 1032:6, 1032:17, 1041:5, 1042:17, 1047:18, 1048:2, 1049:12, 1052:24, 1053:14, 1054:12, 1056:24, 1057:1, 1057:8, 1057:10, 1061:20, 1062:1, 1062:6, 1063:25, 1064:7, 1064:22, 1066:12, 1068:21, 1068:24, 1074:15, 1076:5, 1078:3, 1078:20, 1136:12, 1166:25, 1186:8, 1186:11, 1186:15, 1186:20, 1186:22

**hypothetically** [1] - 1153:11

## I

**IAPF** [3] - 1112:4, 1112:7, 1112:8

**idea** [8] - 932:19, 933:2, 933:3, 957:12, 1008:18, 1014:20, 1014:21, 1153:2

**identical** [3] - 927:8, 927:11, 970:18

**identified** [7] - 1042:20, 1049:12, 1049:13, 1058:16, 1086:25, 1096:7, 1103:25

**identify** [7] - 942:9, 984:8, 985:25, 1023:18, 1042:21, 1048:1, 1050:19

**ignore** [1] - 1045:12

**ignored** [1] - 1059:14

**ignores** [2] - 1034:8, 1044:21

**ignoring** [1] - 1045:3

**illustrate** [2] - 1038:4, 1058:17

**illustration** [6] - 1030:5, 1030:15, 1030:23, 1033:24, 1035:15, 1147:1

**illustrations** [1] - 1089:2

**immediately** [2] - 928:19, 1139:23

**impact** [14] - 857:17, 861:11, 922:3, 922:7, 1041:3, 1046:7, 1058:18, 1101:10, 1102:23, 1114:5, 1115:10, 1115:12, 1115:13, 1149:24

**impacted** [2] - 1033:4, 1047:1

**impacts** [2] - 856:12, 856:18

**impeachment** [1] - 1006:14

**implementation** [3] - 1155:22, 1156:1, 1156:11

**implemented** [1] - 1156:11

**implies** [1] - 1042:10

**imply** [1] - 1066:24

**importance** [1] - 1045:16

**important** [14] - 873:1, 873:21, 873:24, 1025:16, 1046:3, 1087:4, 1087:23, 1136:13, 1138:1, 1138:9, 1144:15, 1147:9, 1149:25, 1177:8

**importantly** [2] - 1139:20, 1139:25

**impossible** [1] - 1043:23

**improper** [2] - 1067:7, 1179:3

**improperly** [1] - 1042:24

**improve** [1] - 1187:18

**improved** [2] - 968:1, 1112:8

**improvement** [1] - 957:18

**impurities** [7] - 883:22, 884:9, 884:10, 886:1, 1008:2, 1143:13, 1159:23

**impurity** [1] - 1008:5

**IN** [2] - 854:1, 854:2

**in-depth** [5] - 984:13, 984:14, 984:18, 985:3, 985:21

**inappropriate** [1] - 1075:15

**inaudible** [1] - 1185:3

**inaudible)** [1] - 1185:5

**INC** [1] - 854:3

**Inc** [26] - 1023:12, 1025:25, 1027:6, 1027:8, 1027:10, 1027:12, 1027:15, 1027:18, 1028:1, 1028:4, 1028:8, 1029:9, 1058:11, 1061:25, 1062:3, 1062:4, 1062:7, 1062:8, 1062:9, 1062:18, 1063:15, 1063:20, 1067:11, 1067:17, 1068:22, 1076:25

**inclined** [1] - 1157:24

**include** [16] - 856:7, 928:22, 947:7, 961:9, 967:2, 979:20, 979:22, 1004:25, 1010:22, 1038:6, 1038:23, 1163:6, 1164:6, 1166:1, 1178:3, 1178:11

**included** [7] - 934:25, 945:9, 973:11, 976:6, 1023:9, 1106:12, 1106:13

**includes** [5] - 993:24, 996:12, 1008:16, 1045:9, 1127:3

**including** [10] - 872:18, 891:1, 947:4, 973:13, 976:22, 1000:6, 1136:22, 1155:3, 1162:7, 1178:18

**inclusion** [1] - 1188:19

**incompatible** [1] - 1080:23

**inconsistency** [1] - 1194:18

**inconsistent** [5] - 1062:11, 1145:2, 1167:3, 1193:23, 1194:20

**incorporate** [1] - 914:25

**incorporated** [2] - 915:6, 1004:2

**incorporates** [2] - 915:18, 1042:24

**incorporation** [1] - 1004:10

**incorrectly** [2] -

1034:6, 1039:9
**increased** [5] - 877:3, 953:21, 968:3, 968:6, 1079:5
**increasingly** [2] - 1010:17, 1070:12
**incubation** [1] - 1089:23
**incur** [1] - 1059:11
**indeed** [1] - 1164:12
**independent** [1] - 1023:17
**independently** [2] - 1008:12, 1150:5
**indicate** [3] - 1072:13, 1121:7, 1121:8
**indicates** [1] - 940:19
**indication** [2] - 1018:21, 1149:13
**indications** [8] - 1070:13, 1070:15, 1070:18, 1071:8, 1071:11, 1071:13, 1071:15, 1072:10
**indicia** [4] - 946:8, 977:17, 978:3, 1183:5
**indirect** [1] - 989:10
**individual** [1] - 1128:12
**individuals** [1] - 1023:16
**indulge** [1] - 1170:7
**industry** [2] - 1038:9, 1163:4
**infectious** [2] - 882:5, 933:4
**inform** [4] - 857:22, 858:24, 954:19, 1137:5
**information** [18] - 905:5, 978:13, 994:23, 995:9, 996:10, 1023:7, 1023:18, 1023:20, 1048:11, 1066:17, 1071:17, 1071:21, 1072:1, 1075:4, 1075:12, 1114:4, 1120:6, 1122:15
**informed** [1] - 870:4
**infringement** [11] - 1012:8, 1182:15, 1182:19, 1182:24, 1183:12, 1183:13, 1184:13, 1184:21, 1185:7, 1185:11
**infringes** [1] - 1072:18
**infringing** [2] - 1069:12, 1165:11
**ingredient** [18] - 932:14, 974:2, 975:2, 986:25, 1007:17, 1010:8, 1138:2, 1140:1, 1140:10, 1140:11, 1142:8, 1143:6, 1145:23, 1145:24, 1150:19, 1163:25, 1164:2, 1164:4
**ingredients** [11] - 965:13, 973:13, 976:22, 1001:2, 1103:2, 1134:21, 1137:18, 1137:25, 1145:21, 1149:2, 1165:8
**inherency** [12] - 1083:16, 1083:19, 1155:8, 1155:12, 1155:14, 1156:16, 1156:19, 1158:13, 1167:12, 1167:21, 1167:24
**inherent** [1] - 1168:14
**inherently** [8] - 975:2, 1143:6, 1154:24, 1156:7, 1157:16, 1168:15, 1177:9, 1177:12
**initial** [12] - 880:9, 880:19, 883:17, 968:18, 968:19, 968:24, 968:25, 969:2, 969:12, 969:17, 976:22, 1005:9
**injectable** [3] - 945:3, 1058:5, 1058:8
**injectables** [3] - 945:7, 961:7, 1034:18
**injection** [1] - 944:6
**injections** [1] - 1031:14
**inputs** [1] - 1043:24
**insert** [2] - 1186:14, 1187:7
**inside** [1] - 944:14
**instance** [1] - 1168:16
**instead** [6] - 1040:23, 1161:11, 1166:24, 1178:3, 1185:11, 1186:19
**instruction** [19] - 1019:8, 1175:6, 1175:25, 1177:3, 1177:20, 1177:25, 1178:11, 1178:13, 1180:2, 1180:20, 1181:8, 1182:12, 1182:15, 1183:19, 1185:21, 1188:19, 1188:20, 1188:22, 1188:23
**instructions** [17] - 1019:6, 1083:10, 1152:7, 1153:2, 1154:8, 1167:14, 1171:21, 1172:1, 1172:6, 1173:8, 1176:2, 1177:3, 1178:15, 1183:17, 1189:9, 1192:18, 1192:20
**insufficiency** [1] - 1189:22
**intellectual** [2] - 1021:11, 1021:15
**intended** [1] - 1132:4
**intention** [2] - 1096:4, 1096:16
**interaction** [17] - 878:16, 878:19, 878:23, 879:8, 879:13, 879:16, 879:23, 880:11, 880:15, 880:18, 883:11, 883:16, 891:16, 910:8, 1091:19, 1104:7, 1119:21
**interchangeable** [1] - 1099:21
**intercompany** [1] - 1067:10
**interested** [1] - 944:16
**interests** [1] - 1068:22
**internal** [7] - 923:20, 924:16, 1062:14, 1066:14, 1066:23, 1155:21, 1156:1
**internally** [2] - 1061:24, 1063:11
**interpretation** [1] - 1183:9
**interpreted** [1] - 901:17
**interrogatories** [1] - 1191:13
**interrogatory** [4] - 1189:16, 1189:17, 1190:25, 1191:4
**interrupt** [1] - 1173:13
**interrupting** [1] - 927:15
**interruption** [2] - 894:22, 918:8
**intramuscular** [3] - 943:23, 970:25, 971:8
**intraorganization** [1] - 1061:19
**introduce** [3] - 1020:19, 1090:20, 1092:8
**introduced** [2] - 1113:8, 1161:7
**introduction** [1] - 918:15
**invalid** [26] - 893:21, 902:3, 916:11, 925:10, 929:6, 930:1, 942:24, 983:19, 1023:4, 1085:6, 1085:20, 1086:12, 1087:16, 1109:3, 1109:16, 1109:22, 1135:13, 1135:20, 1157:22, 1158:20, 1160:5, 1163:15, 1163:19, 1165:21, 1174:10, 1174:14
**invalidate** [2] - 950:5, 1155:7
**invalidity** [4] - 1162:24, 1164:15, 1183:9, 1188:3
**invent** [4] - 1090:22, 1090:23, 1123:14, 1128:7
**invented** [4] - 1096:23, 1110:13, 1123:15, 1140:11
**invention** [51] - 902:1, 902:8, 904:25, 916:6, 916:25, 921:4, 924:8, 946:15, 946:18, 946:21, 949:14, 962:12, 986:6, 989:5, 989:11, 989:24, 990:10, 1005:22, 1007:9, 1012:5, 1012:9, 1086:4, 1086:15, 1086:21, 1087:5, 1087:12, 1089:10, 1089:17, 1090:19, 1091:6, 1092:14, 1099:4, 1103:12, 1103:14, 1109:11, 1109:24, 1110:11, 1111:2, 1113:8, 1116:11, 1119:18, 1122:3, 1122:5, 1134:20, 1137:19, 1141:2, 1142:4, 1142:19, 1146:4, 1148:6, 1155:23
**inventions** [4] - 925:3, 1082:15, 1086:22, 1166:1
**inventor** [5] - 898:3, 913:14, 951:1, 1004:21, 1179:11
**inventor's** [2] - 950:3, 950:4
**inventors** [6] - 994:8, 996:25, 1006:1, 1006:6, 1092:7, 1120:2
**investigation** [1] - 953:4
**investigations** [1] - 1021:6
**investment** [1] - 1021:8
**investors'** [1] - 857:7
**invite** [1] - 1193:23
**involve** [1] - 869:21
**involved** [4] - 884:5, 997:5, 1061:15, 1131:24
**involves** [2] - 914:22, 1143:11
**ion** [12] - 879:16, 880:9, 880:19, 883:17, 885:8, 886:10, 1091:24, 1119:22, 1127:22, 1127:25, 1128:4, 1128:10
**Ireland** [5] - 1027:19, 1063:15, 1063:21, 1067:11, 1068:23
**irrelevant** [6] - 951:15, 1065:7, 1066:19, 1067:18, 1067:19, 1067:20
**ISAAC** [1] - 854:19
**isolating** [1] - 1025:16
**issuance** [2] - 994:14, 1002:15
**issue** [38] - 861:22, 862:19, 867:23, 868:1, 869:13, 914:7, 914:10, 945:14, 1018:23, 1036:1, 1036:3, 1039:11, 1039:13, 1042:6, 1046:11, 1052:5, 1052:23, 1083:16, 1083:17, 1093:19, 1103:17, 1120:18, 1133:1, 1135:2, 1136:17, 1139:6, 1157:25, 1165:13, 1167:5,

1167:12, 1170:10, 1170:11, 1174:7, 1182:19, 1182:25, 1188:21, 1193:18
**issued** [7] - 900:16, 909:9, 914:1, 973:13, 1015:6, 1023:10, 1119:1
**issues** [16] - 860:20, 914:10, 1042:20, 1042:21, 1043:2, 1056:22, 1083:15, 1083:16, 1122:16, 1126:10, 1129:24, 1139:11, 1139:13, 1163:9, 1167:6, 1167:13
**issuing** [2] - 892:4, 910:11
**Item** [2] - 856:3, 862:2
**item** [5] - 860:4, 935:19, 945:21, 1042:7, 1050:5
**items** [4] - 942:14, 947:13, 947:19, 950:23
**itself** [13] - 862:20, 867:24, 896:18, 901:5, 907:1, 924:18, 939:6, 941:5, 979:20, 1004:6, 1098:20, 1115:13, 1168:7
**IV** [1] - 854:7

## J

**Jakob** [1] - 933:3
**JEREMY** [1] - 854:16
**Jeuveau** [2] - 1019:25, 1031:11
**JMOL** [3] - 1168:25, 1172:4, 1172:5
**JMOLs** [3] - 1154:7, 1154:11, 1158:1
**job** [1] - 1133:2
**john** [1] - 999:2
**John** [1] - 999:4
**Johnson** [71] - 924:25, 925:4, 925:6, 925:20, 925:23, 927:4, 928:3, 928:5, 928:13, 928:17, 928:19, 928:23, 931:16, 948:6, 948:14, 948:15, 949:7, 949:8, 949:17, 950:8, 951:20, 952:19, 953:14, 953:16, 953:25, 954:2, 954:20, 955:5, 955:10, 955:12, 957:18, 958:3, 960:16, 960:18, 967:22, 967:23, 968:13, 972:18, 972:19, 981:7, 983:18, 986:1, 986:2, 986:6, 996:16, 996:21, 996:23, 997:5, 997:17, 1009:2, 1011:5, 1011:7, 1011:16, 1011:21, 1013:8, 1013:15, 1125:17, 1133:12, 1133:14, 1135:5, 1135:18, 1150:6, 1150:10, 1150:16, 1150:25, 1163:20, 1163:21, 1164:5, 1164:17, 1164:22
**Johnson's** [2] - 928:11, 973:11
**Joint** [6] - 913:2, 913:7, 995:6, 1002:11, 1051:15, 1120:24
**jointly** [2] - 1186:10, 1187:6
**journal** [1] - 889:9
**JTX** [61] - 858:15, 902:10, 908:3, 908:7, 908:8, 908:13, 908:18, 908:22, 908:25, 912:14, 912:24, 913:2, 913:4, 913:7, 913:9, 914:15, 920:17, 923:21, 923:23, 929:21, 930:22, 932:4, 933:7, 933:24, 950:11, 986:18, 994:19, 995:2, 995:6, 995:14, 1001:11, 1002:7, 1002:11, 1002:13, 1004:15, 1009:5, 1013:20, 1034:14, 1034:21, 1035:18, 1035:22, 1049:20, 1051:1, 1051:12, 1051:15, 1068:17, 1068:25, 1085:11, 1092:25, 1094:2, 1097:18, 1103:22, 1108:20, 1118:23, 1120:12, 1120:21, 1120:24, 1159:14, 1195:14
**JTX-212** [1] - 1159:9
**judgement** [2] - 1154:18, 1163:14
**judgment** [14] - 1006:25, 1083:20, 1157:18, 1158:13, 1158:19, 1160:3, 1162:15, 1163:17, 1164:23, 1165:15, 1167:5, 1194:2, 1195:2, 1195:5
**July** [3] - 854:13, 859:10, 1110:25
**jumbled** [1] - 925:7
**June** [12] - 949:3, 1051:5, 1051:6, 1051:20, 1051:24, 1052:3, 1052:8, 1052:9, 1052:11, 1057:7, 1057:24, 1058:13
**juror** [2] - 1163:1, 1165:6
**jurors** [2] - 911:2, 1152:14
**JURY** [2] - 854:9, 854:11
**jury** [127] - 854:12, 856:18, 857:20, 861:22, 863:19, 866:22, 869:17, 870:5, 870:9, 870:10, 896:7, 901:12, 903:13, 908:3, 917:20, 924:12, 925:7, 928:1, 942:10, 942:21, 943:1, 943:16, 945:22, 946:2, 952:8, 952:20, 958:10, 958:11, 958:12, 959:15, 959:18, 960:8, 960:9, 961:21, 962:16, 964:20, 972:16, 973:15, 976:4, 1013:25, 1015:19, 1015:21, 1015:25, 1016:13, 1018:10, 1018:16, 1018:22, 1018:25, 1019:5, 1019:8, 1019:14, 1019:15, 1019:20, 1020:20, 1023:24, 1024:21, 1032:5, 1033:2, 1041:25, 1044:3, 1047:25, 1049:17, 1052:25, 1053:20, 1054:25, 1058:18, 1066:24, 1066:25, 1067:14, 1068:1, 1073:18, 1077:24, 1082:4, 1083:2, 1083:3, 1083:10, 1083:22, 1084:21, 1085:7, 1090:4, 1099:2, 1110:15, 1114:21, 1122:16, 1124:22, 1125:3, 1126:3, 1132:7, 1132:13, 1132:18, 1132:25, 1133:2, 1134:10, 1135:14, 1151:8, 1151:19, 1151:24, 1152:7, 1153:1, 1153:21, 1153:22, 1154:8, 1154:23, 1157:14, 1159:24, 1161:16, 1162:9, 1163:11, 1167:14, 1168:25, 1171:21, 1171:25, 1172:6, 1173:8, 1176:6, 1178:6, 1181:7, 1182:3, 1184:13, 1188:23, 1189:6, 1189:8, 1189:25, 1191:2, 1193:4, 1193:25, 1194:20
**jury's** [3] - 909:7, 948:7, 960:18

## K

**kDa** [1] - 921:8
**keep** [8] - 904:16, 925:6, 960:6, 989:20, 1018:14, 1025:6, 1058:25, 1060:3
**keeps** [1] - 927:15
**kept** [5] - 931:25, 999:18, 1018:25, 1067:9, 1067:13
**KESSLER** [1] - 855:5
**key** [9] - 953:16, 963:7, 1086:25, 1087:2, 1087:22, 1110:24, 1111:14, 1122:16, 1156:13
**kids** [1] - 1095:21
**kilodalton** [4] - 1112:23, 1113:2, 1142:2, 1142:11
**kilodaltons** [2] - 989:7, 1141:23
**kind** [16] - 857:15, 866:3, 869:1, 909:7, 909:23, 909:24, 923:12, 961:4, 985:20, 1012:20, 1102:21, 1147:6, 1171:14, 1172:14, 1175:25, 1181:20
**kinds** [2] - 973:14, 1111:3
**knowing** [1] - 858:6
**knowledge** [7] - 904:13, 973:2, 1087:5, 1159:7, 1160:23, 1161:17, 1164:19
**known** [15] - 857:12, 874:4, 882:4, 882:7, 904:11, 932:20, 974:25, 975:7, 999:14, 1010:14, 1088:18, 1109:12, 1128:11, 1128:21, 1129:2
**knows** [3] - 942:5, 1025:5, 1155:8
**KRYS** [1] - 854:21
**KX** [2] - 1034:24, 1049:23

## L

**lab** [3] - 916:15, 944:14, 944:15
**label** [1] - 903:9
**labeled** [1] - 1106:25
**labeling** [1] - 903:14
**labor** [1] - 1044:16
**laboratory** [1] - 944:12
**LAI** [1] - 1029:20
**laid** [2] - 989:18, 1031:4
**language** [11] - 881:14, 882:14, 886:11, 886:17, 886:21, 887:1, 977:6, 1000:5, 1175:8, 1175:11, 1185:24
**large** [5] - 945:9, 961:5, 961:6, 961:9, 975:23
**Larock** [3] - 870:13, 930:11, 936:22
**LAROCK** [35] - 855:6, 870:14, 870:16, 875:18, 875:24, 879:2, 879:3,

879:19, 879:21, 880:3, 880:6, 881:8, 889:21, 890:2, 890:3, 893:8, 897:8, 912:25, 913:5, 914:6, 927:15, 930:13, 930:15, 931:14, 931:22, 932:3, 932:7, 933:6, 933:11, 933:12, 934:20, 935:3, 936:24, 937:6, 938:16
**last** [31] - 859:5, 859:16, 870:8, 886:7, 929:19, 932:3, 932:4, 932:5, 936:7, 967:8, 971:15, 977:13, 995:21, 1029:10, 1035:8, 1058:20, 1060:19, 1074:23, 1097:4, 1100:4, 1100:5, 1110:4, 1121:20, 1122:15, 1151:7, 1151:22, 1170:11, 1174:8, 1177:7, 1182:17, 1193:20
**lastly** [2] - 1023:17, 1165:14
**late** [3] - 1102:7, 1152:16, 1153:10
**launch** [13] - 1047:7, 1051:4, 1069:13, 1074:5, 1074:6, 1074:8, 1074:16, 1074:18, 1075:10, 1076:1, 1076:8, 1080:8, 1166:23
**law** [21] - 1153:2, 1154:18, 1157:19, 1158:13, 1158:19, 1160:3, 1162:16, 1163:14, 1163:18, 1164:24, 1165:16, 1167:3, 1167:5, 1176:4, 1176:6, 1187:1, 1189:22, 1191:22, 1192:15, 1193:14
**lawyer** [4] - 895:18, 909:13, 915:3, 1185:5
**lawyers** [5] - 984:6, 984:7, 1012:13, 1152:8, 1152:25
**layered** [1] - 1031:2
**lead** [3] - 1021:11, 1139:24, 1145:17
**leader** [3] - 857:11, 859:2, 1046:4
**leading** [1] - 953:18
**leads** [3] - 1099:8, 1144:21, 1151:15
**leaning** [1] - 1167:11
**learning** [1] - 1089:1
**least** [19] - 861:8, 863:16, 867:4, 965:9, 968:19, 969:2, 969:10, 982:19, 983:3, 983:10, 1005:9, 1123:18, 1125:12, 1131:15, 1132:19, 1144:7, 1152:4, 1193:5, 1195:1
**leave** [4] - 1169:14, 1182:2, 1192:1, 1196:8
**leaves** [1] - 1136:5
**leaving** [2] - 1059:22, 1060:15
**led** [8] - 994:13, 1002:14, 1011:2, 1011:18, 1092:13, 1103:9, 1116:10, 1161:20
**left** [48] - 860:6, 872:17, 880:25, 881:1, 909:19, 926:25, 927:4, 928:1, 948:5, 961:19, 962:9, 962:19, 964:21, 965:11, 967:25, 971:5, 974:8, 993:11, 993:19, 1003:3, 1014:2, 1033:10, 1059:6, 1059:8, 1060:6, 1060:12, 1073:20, 1076:16, 1076:19, 1076:22, 1077:15, 1078:12, 1078:14, 1079:23, 1090:8, 1090:9, 1105:16, 1111:21, 1111:23, 1118:9, 1137:14, 1139:19, 1144:13, 1144:16, 1147:1, 1152:1, 1157:6, 1169:14
**left-hand** [16] - 880:25, 881:1, 909:19, 1073:20, 1076:16, 1076:19, 1076:22, 1077:15, 1078:12, 1078:14, 1079:23, 1137:14, 1139:19, 1144:13, 1144:16, 1147:1
**legal** [5] - 865:3, 980:23, 982:21, 999:15, 1192:9
**length** [3] - 933:4, 1018:20, 1169:13
**less** [20] - 923:9, 923:13, 923:19, 924:15, 938:7, 938:15, 982:3, 989:7, 1040:19, 1083:11, 1141:23, 1142:1, 1142:11, 1165:16, 1168:1, 1168:12, 1168:15, 1168:20, 1169:2, 1169:3
**lesson** [1] - 1187:21
**letter** [9] - 858:20, 859:15, 859:21, 860:7, 860:11, 862:2, 1182:7, 1182:8
**letters** [5] - 859:22, 860:5, 860:9, 868:25, 1088:20
**level** [40] - 862:18, 909:6, 920:5, 922:1, 923:8, 923:19, 926:15, 926:19, 942:21, 946:5, 946:10, 946:20, 946:24, 947:9, 951:24, 952:20, 973:12, 976:21, 986:18, 1008:1, 1008:5, 1069:4, 1086:8, 1099:2, 1109:14, 1110:11, 1113:13, 1114:14, 1114:18, 1114:22, 1114:23, 1115:1, 1115:10, 1115:13, 1157:11, 1158:16, 1188:24, 1189:10, 1192:18
**level-set** [1] - 986:18
**levels** [6] - 922:22, 926:11, 929:15, 930:7, 1155:19, 1157:7
**liability** [6] - 1049:16, 1184:12, 1185:1, 1185:5, 1185:7, 1185:11
**liable** [1] - 1184:21
**license** [6] - 1026:1, 1066:9, 1186:8, 1186:20, 1187:7, 1187:8
**licensee** [4] - 1025:2, 1025:9, 1025:15, 1041:7
**licenses** [3] - 1061:15, 1063:18, 1063:20
**licensing** [2] - 1042:10, 1057:20
**licensor** [5] - 1025:2, 1025:9, 1025:15, 1025:24, 1041:7
**life** [5] - 870:4, 953:21, 968:6, 1075:2, 1167:1
**lifetime** [1] - 1074:13
**light** [7] - 882:13, 887:8, 893:6, 1138:10, 1138:24, 1175:18, 1187:24
**likely** [5] - 869:21, 1102:25, 1127:2, 1168:13, 1194:23
**likewise** [3] - 923:3, 923:7, 1157:9
**limit** [1] - 1064:16
**limitation** [19] - 887:4, 967:19, 968:10, 971:11, 1017:23, 1155:5, 1155:8, 1155:9, 1155:12, 1155:17, 1155:24, 1156:5, 1156:7, 1157:3, 1159:6, 1159:18, 1160:22, 1164:18, 1167:22
**limitations** [2] - 1155:3, 1163:22
**limited** [6] - 932:2, 933:8, 1108:10, 1170:10, 1171:10, 1195:24
**limits** [2] - 966:23, 1168:4
**Lindemann** [1] - 1045:17
**line** [12] - 884:25, 976:1, 1004:16, 1009:5, 1009:17, 1010:12, 1011:4, 1040:8, 1042:7, 1050:5, 1186:3, 1186:8
**linear** [1] - 884:16
**lines** [16] - 860:16, 894:15, 914:14, 914:15, 915:9, 918:2, 925:16, 928:10, 928:25, 935:5, 988:15, 1003:24, 1005:18, 1006:12, 1038:7, 1179:15
**liquid** [1] - 966:4
**list** [14] - 950:23, 951:7, 959:25, 960:4, 994:6, 994:22, 1014:14, 1037:15, 1039:14, 1039:15, 1039:16, 1039:22, 1040:1
**listed** [11] - 856:6, 898:1, 898:3, 913:12, 950:8, 950:10, 1003:2, 1013:22, 1069:3, 1069:8, 1110:24
**listen** [1] - 1067:17
**listening** [2] - 1173:1, 1179:24
**lists** [1] - 1105:23
**literature** [11] - 871:3, 871:15, 874:24, 874:25, 878:20, 889:1, 901:13, 923:4, 955:17, 975:24, 1102:2
**litigation** [1] - 1021:14
**little-known** [1] - 857:12
**live** [1] - 1191:18
**LLP** [2] - 854:16, 854:18
**loaded** [1] - 886:3
**loading** [2] - 885:8, 885:13
**location** [1] - 1183:6
**logic** [1] - 856:18
**logical** [1] - 857:15
**long-acting** [2] - 1058:5, 1058:8
**long-felt** [3] - 1004:22, 1005:4, 1181:4
**longer-duration** [1] - 1134:22
**look** [116] - 881:19, 887:10, 890:15, 892:19, 894:15, 894:16, 899:14, 900:20, 903:12, 906:20, 909:25, 910:1, 910:18, 911:15, 911:16, 914:14, 915:8, 918:14, 919:14, 919:17, 920:17, 928:8, 928:9, 930:3, 936:7, 939:3, 939:6, 940:2, 941:1, 943:18, 949:7, 950:17, 950:20,

951:2, 954:3, 954:22, 955:17, 962:8, 962:25, 964:21, 965:12, 967:8, 969:14, 971:17, 972:4, 972:14, 974:1, 974:5, 974:22, 976:14, 983:23, 987:20, 990:13, 991:8, 993:19, 994:19, 995:15, 996:19, 998:16, 999:8, 1001:9, 1001:12, 1001:14, 1004:14, 1006:5, 1014:2, 1017:7, 1017:23, 1024:1, 1031:8, 1033:12, 1034:2, 1036:6, 1036:8, 1037:24, 1038:10, 1038:15, 1038:18, 1040:5, 1045:10, 1047:10, 1050:4, 1050:10, 1050:11, 1051:22, 1055:2, 1056:18, 1057:12, 1057:14, 1057:25, 1058:22, 1060:13, 1065:10, 1072:9, 1073:19, 1076:6, 1076:16, 1077:10, 1078:2, 1080:18, 1092:23, 1097:6, 1100:4, 1103:24, 1105:15, 1145:11, 1147:8, 1151:5, 1152:24, 1172:6, 1186:3, 1190:19, 1197:9
**looked** [18] - 872:3, 873:8, 874:12, 874:13, 882:3, 899:7, 947:24, 947:25, 984:23, 984:25, 985:1, 1007:1, 1049:11, 1062:13, 1079:1, 1139:12, 1139:14, 1150:25
**looking** [32] - 866:5, 882:8, 883:14, 885:3, 887:3, 887:4, 890:17, 909:14, 927:25, 937:12, 937:13, 937:14, 940:15, 966:19, 967:25, 984:21, 996:20, 1037:19, 1042:18, 1048:25, 1049:24, 1050:1, 1051:20, 1058:19, 1060:23, 1071:9, 1074:14, 1088:24, 1105:19, 1105:20, 1107:17, 1107:23
**looks** [10] - 862:8, 868:16, 1030:11, 1033:18, 1033:19, 1042:3, 1057:21, 1059:1, 1104:10, 1194:22
**loss** [2] - 1058:7, 1136:5
**lost** [2] - 862:2, 1082:8
**low** [10] - 903:24, 905:6, 905:16, 939:2, 1114:14, 1114:16, 1115:1, 1136:3, 1159:20, 1160:1
**Low** [1] - 875:10
**low-risk** [1] - 903:24
**lower** [7] - 932:14, 939:8, 939:16, 947:9, 962:18, 1096:16, 1114:18
**lowers** [1] - 1166:13
**lowest** [4] - 876:8, 877:17, 1105:19, 1105:21
**LT50s** [1] - 876:25
**lump** [1] - 1195:1
**lunch** [2] - 1018:10, 1018:14
**lunchtime** [2] - 1152:10, 1152:11
**Luo** [1] - 895:20
**Lybrand** [1] - 1022:6
**lyophilization** [3] - 931:4, 966:2, 966:6
**lyophilized** [4] - 956:13, 966:9, 999:8

## M

**ma'am** [11] - 893:19, 897:5, 899:12, 900:14, 901:4, 917:11, 919:25, 926:21, 927:8, 929:14, 930:2
**machine** [2] - 1061:8, 1087:7
**mad** [6] - 903:20, 904:17, 904:20, 1094:19, 1094:21, 1161:25
**Maegher** [2] - 1032:18, 1032:19
**magnitude** [1] - 938:7
**Maillard** [5] - 975:7, 975:9, 975:14, 1143:9, 1143:10
**main** [6] - 956:22, 1034:3, 1051:5, 1078:22, 1168:3, 1189:14
**maintain** [2] - 857:12, 944:12
**maintaining** [2] - 957:14, 957:17
**major** [2] - 1043:10, 1043:11
**Malizio** [43] - 873:17, 916:14, 916:15, 916:16, 916:19, 916:24, 917:3, 917:4, 917:8, 917:14, 918:13, 918:17, 918:24, 919:6, 920:1, 920:7, 920:10, 920:12, 1116:18, 1116:24, 1116:25, 1117:4, 1117:8, 1117:13, 1117:18, 1117:20, 1117:23, 1118:3, 1118:5, 1118:8, 1118:11, 1154:21, 1155:16, 1155:18, 1156:2, 1156:5, 1156:17, 1157:14, 1158:22, 1158:24, 1159:5, 1159:8, 1168:7
**managed** [2] - 1110:19, 1114:9
**management** [2] - 869:13, 1094:6
**managing** [1] - 1021:12
**mandate** [2] - 903:5, 903:7
**manufacture** [16] - 902:22, 920:2, 925:25, 929:13, 932:24, 933:17, 957:20, 1027:11, 1027:12, 1027:22, 1059:11, 1069:7, 1081:11, 1094:23, 1097:1, 1128:23
**manufactured** [4] - 903:21, 1094:12, 1161:18, 1161:23
**manufacturer** [2] - 857:13, 1039:18
**manufactures** [1] - 1027:8
**manufacturing** [66] - 894:1, 894:21, 903:2, 922:10, 922:23, 923:8, 925:9, 929:5, 930:1, 1024:14, 1025:12, 1027:20, 1036:23, 1041:24, 1042:17, 1043:14, 1045:6, 1046:15, 1047:19, 1052:13, 1053:2, 1053:22, 1054:1, 1054:6, 1054:10, 1055:4, 1055:15, 1057:9, 1057:17, 1057:24, 1059:4, 1072:24, 1073:6, 1073:19, 1074:24, 1080:18, 1081:3, 1081:10, 1093:18, 1093:22, 1095:24, 1095:25, 1096:12, 1096:14, 1102:10, 1108:15, 1118:4, 1119:18, 1123:6, 1124:19, 1124:25, 1157:8, 1157:10, 1159:17, 1159:22, 1160:8, 1160:9, 1161:2, 1161:3, 1161:9, 1161:13, 1161:14, 1161:19, 1162:1, 1166:2, 1166:4
**map** [1] - 939:1
**margin** [4] - 1044:12, 1044:18, 1045:8, 1136:5
**margins** [1] - 1042:23
**marked** [13] - 902:10, 912:14, 923:21, 966:17, 967:12, 1085:11, 1092:25, 1094:2, 1095:8, 1097:7, 1097:18, 1108:20, 1120:11
**market** [36] - 856:23, 857:11, 859:1, 859:2, 861:7, 1019:24, 1031:8, 1031:13, 1031:15, 1031:16, 1031:21, 1042:11, 1044:8, 1045:21, 1045:25, 1046:4, 1058:1, 1058:8, 1069:25, 1070:2, 1070:5, 1070:7, 1070:8, 1071:10, 1071:13, 1072:6, 1074:19, 1076:1, 1076:2, 1079:18, 1132:1, 1132:2
**market-wide** [1] - 1031:13
**marketed** [1] - 983:24
**marketing** [9] - 1044:23, 1045:4, 1045:8, 1045:11, 1045:16, 1045:19, 1046:6, 1059:13
**marketplace** [1] - 1082:1
**master's** [2] - 947:3, 1021:21
**mate** [1] - 916:15
**material** [12] - 877:11, 878:5, 882:9, 884:22, 884:23, 922:2, 932:25, 944:3, 944:19, 955:13, 1091:23
**materially** [1] - 980:16
**materials** [9] - 886:3, 904:6, 904:9, 933:20, 965:17, 1023:9, 1044:15, 1094:14, 1134:7
**math** [5] - 934:15, 938:4, 1037:4, 1040:22, 1059:19
**matter** [27] - 871:18, 876:23, 877:24, 878:25, 959:10, 961:13, 980:19, 1006:20, 1076:6, 1087:3, 1102:15, 1140:3, 1143:20, 1154:18, 1157:18, 1158:13, 1158:19, 1160:3, 1162:15, 1163:14, 1163:17, 1164:23, 1165:15, 1167:5, 1189:22, 1190:20, 1193:11
**matters** [2] - 1140:5, 1143:22
**maximize** [1] - 1096:21
**maximum** [3] - 968:20, 969:10, 1096:21
**mayhem** [1] - 1094:6
**mean** [26] - 861:6, 865:10, 865:24, 867:13, 964:10, 965:4, 1027:18, 1031:18, 1033:7, 1036:12, 1037:4, 1038:8, 1040:22,

1056:14, 1060:21, 1067:25, 1110:15, 1118:14, 1118:17, 1123:23, 1138:2, 1142:3, 1170:23, 1189:13, 1190:16, 1196:3
**meaning** [4] - 956:14, 964:12, 969:19, 1022:9
**meaningfully** [1] - 1163:3
**meaningless** [1] - 1037:3
**means** [25] - 877:5, 877:6, 881:22, 883:1, 883:24, 884:6, 885:12, 886:15, 887:12, 890:21, 891:2, 895:10, 895:14, 895:16, 957:22, 962:4, 963:1, 965:5, 969:4, 971:21, 988:10, 1047:16, 1053:10, 1076:18, 1094:13
**meant** [8] - 962:3, 968:21, 969:5, 1016:23, 1027:19, 1060:20, 1146:22, 1168:23
**meantime** [1] - 1121:21
**measure** [5] - 876:25, 926:10, 968:22, 1037:1, 1165:23
**measured** [1] - 959:22
**meat** [5] - 905:20, 905:22, 911:19, 1089:13, 1101:19
**media** [12] - 894:4, 912:1, 919:23, 929:9, 1090:11, 1096:8, 1096:12, 1096:19, 1096:24, 1102:16, 1102:23
**medical** [5] - 869:9, 918:19, 918:22, 1083:6, 1117:7
**medium** [12] - 876:5, 878:6, 881:25, 905:20, 905:22, 911:20, 917:15, 919:20, 930:4, 964:16, 1090:12, 1101:19
**Medium** [1] - 906:8
**mediums** [1] - 877:1
**meet** [10] - 864:23, 947:15, 1041:15, 1053:15, 1053:17, 1077:8, 1078:6, 1155:11, 1156:3, 1159:22
**meeting** [1] - 1067:20
**MELANIE** [1] - 854:20
**Melanie** [1] - 1154:15
**members** [8] - 870:10, 958:10, 960:9, 1018:10, 1019:15, 1019:19, 1151:19, 1151:24
**memo** [2] - 1168:24, 1172:14
**memorized** [2] - 1071:18, 1072:5
**memory** [1] - 985:13
**mention** [10] - 902:24, 910:25, 911:5, 911:9, 965:2, 975:17, 979:18, 1045:14, 1115:17, 1117:24
**mentioned** [23] - 865:8, 877:15, 908:1, 910:20, 929:3, 946:22, 948:15, 955:25, 960:15, 971:20, 1017:8, 1023:21, 1024:19, 1032:3, 1041:1, 1061:4, 1102:25, 1103:8, 1113:24, 1137:23, 1161:3, 1161:10, 1196:8
**mentions** [1] - 1157:1
**merged** [1] - 1022:7
**merits** [1] - 1190:22
**Mertz's** [1] - 1019:25
**met** [3] - 961:21, 965:21, 1005:4
**methionine** [4] - 973:11, 976:6, 976:9, 976:11
**method** [13] - 910:22, 913:21, 918:23, 943:20, 962:1, 962:7, 1010:10, 1104:8, 1104:9, 1104:13, 1124:4, 1124:6
**methodologies** [2] - 1049:12, 1056:17
**methodology** [24] - 1033:16, 1033:17, 1034:6, 1036:2, 1036:3, 1037:10, 1040:20, 1041:25, 1042:3, 1042:12, 1042:15, 1042:19, 1043:13, 1043:16, 1046:9, 1048:8, 1048:9, 1048:25, 1049:4, 1056:16, 1076:4, 1076:13, 1076:14
**methods** [13] - 893:24, 910:12, 913:19, 918:24, 935:6, 935:8, 935:17, 936:25, 937:1, 999:14, 1123:17, 1124:3, 1166:5
**Methods** [1] - 897:23
**microbiology** [1] - 876:10
**micrograms** [2] - 1007:21, 1008:4
**microorganism** [1] - 963:11
**mid** [1] - 1102:7
**middle** [12] - 898:20, 937:7, 1003:3, 1003:9, 1041:15, 1053:15, 1053:17, 1077:8, 1078:6, 1107:10, 1112:2, 1139:20
**midmorning** [1] - 957:4
**might** [21] - 857:9, 919:12, 948:19, 992:25, 1003:7, 1063:13, 1067:17, 1075:16, 1083:15, 1083:17, 1095:18, 1103:2, 1114:5, 1121:5, 1121:9, 1129:23, 1138:13, 1175:19, 1184:14, 1188:10
**migraines** [3] - 1070:21, 1070:23, 1071:8
**mil** [2] - 1106:9, 1107:4
**milk** [5] - 912:5, 1089:12, 1095:2, 1095:4, 1118:15
**milligram** [2] - 923:9, 923:13
**milligrams** [2] - 940:11, 1107:11
**milliliter** [10] - 937:25, 938:1, 939:18, 939:19, 939:22, 940:4, 1107:1, 1126:20, 1168:11
**million** [45] - 921:24, 934:2, 934:23, 937:2, 938:3, 938:6, 938:8, 938:14, 938:15, 939:23, 939:24, 940:13, 940:14, 941:2, 1054:20, 1056:9, 1056:15, 1079:24, 1080:1, 1080:6, 1080:9, 1080:10, 1081:14, 1081:15, 1082:6, 1082:10, 1082:15, 1082:17, 1105:6, 1114:11, 1155:4, 1156:23, 1157:4, 1157:12, 1167:22, 1168:2, 1168:12, 1168:16, 1168:17, 1168:21
**mind** [10] - 865:2, 869:23, 960:6, 1015:9, 1063:4, 1068:24, 1124:19, 1153:9, 1170:6
**mine** [4] - 916:15, 1056:15, 1097:12, 1133:23
**minimize** [1] - 1096:17
**minimizes** [1] - 1038:7
**minimum** [1] - 1157:23
**Minneapolis** [1] - 944:11
**Minnesota** [1] - 944:11
**MINNITI** [1] - 854:20
**minus** [3] - 953:10, 960:21, 1170:16
**minute** [8] - 864:8, 878:7, 1018:9, 1104:20, 1113:23, 1154:6, 1170:10, 1196:23
**minutes** [8] - 905:5, 1019:2, 1083:2, 1083:11, 1169:23, 1170:3, 1170:16, 1170:23
**miprolap** [1] - 1088:22
**misapplies** [1] - 1034:5
**misheard** [2] - 873:15, 987:19
**misleading** [4] - 861:16, 861:17, 861:22, 1018:25
**missed** [1] - 874:1
**missing** [2] - 1107:19, 1141:12
**misspoke** [5] - 1016:23, 1027:17, 1060:22, 1109:16, 1168:19
**mistake** [2] - 1034:8, 1036:22
**misunderstanding** [1] - 1063:15
**misunderstood** [1] - 1063:8
**mixing** [1] - 964:12
**ML** [1] - 937:24
**mode** [1] - 1104:10
**model** [1] - 1166:3
**modest** [1] - 1191:11
**modification** [2] - 1182:16, 1183:20
**moisture** [1] - 991:16
**molecular** [6] - 989:6, 1089:1, 1099:7, 1141:22, 1142:1, 1146:6
**molecule** [3] - 961:5, 1099:8, 1100:1
**molecules** [13] - 961:6, 971:25, 988:6, 988:24, 988:25, 990:18, 1089:2, 1089:3, 1099:5, 1101:1, 1101:11, 1113:21
**moment** [11] - 936:20, 949:1, 952:12, 955:3, 955:25, 962:22, 1013:19, 1015:11, 1017:9, 1017:18, 1140:18
**Monday** [1] - 1153:18
**monetized** [1] - 1057:17
**money** [1] - 1057:19
**monomers** [1] - 1016:17
**monosaccharide** [4] - 991:1, 1141:8, 1142:5, 1142:6
**month** [1] - 1077:1
**months** [8] - 951:11, 953:12, 953:23, 968:8, 1036:16, 1038:13, 1050:21, 1050:22
**moot** [1] - 1083:17
**moreover** [3] - 899:18, 899:22, 1163:13
**morning** [13] - 856:14, 860:3, 863:21, 869:5, 870:17, 870:18, 893:12, 893:13, 942:3,

942:4, 942:9, 1103:17, 1152:3
**MORRIS** [1] - 854:16
**most** [13] - 859:6, 926:9, 956:19, 960:5, 1030:17, 1031:6, 1056:24, 1094:25, 1123:17, 1123:19, 1127:2, 1171:1, 1172:13
**mostly** [4] - 975:22, 991:14, 991:21, 992:7
**motion** [5] - 1154:16, 1154:17, 1167:12, 1172:14, 1172:15
**motions** [4] - 1157:24, 1158:14, 1189:21, 1195:4
**motivated** [6] - 888:10, 958:9, 1086:16, 1109:25, 1128:14, 1161:12
**motivation** [10] - 955:2, 960:14, 1120:4, 1139:9, 1151:3, 1159:8, 1159:19, 1160:25, 1161:17, 1164:21
**mouse** [1] - 1165:3
**move** [56] - 875:18, 881:19, 882:23, 883:8, 883:19, 884:11, 884:18, 885:6, 885:21, 886:7, 887:2, 889:21, 895:6, 897:6, 912:23, 913:4, 918:13, 927:22, 931:24, 933:6, 947:12, 948:17, 951:17, 956:2, 966:16, 976:13, 980:24, 992:15, 995:1, 1002:6, 1005:25, 1029:11, 1030:9, 1032:2, 1035:17, 1039:7, 1041:23, 1043:7, 1043:25, 1046:10, 1047:24, 1051:11, 1062:10, 1073:2, 1120:21, 1135:14, 1135:21, 1139:9, 1139:15, 1140:9, 1146:13, 1147:19, 1158:12, 1165:15
**moved** [2] - 1182:4, 1189:22
**moves** [6] - 1014:3, 1158:19, 1160:3, 1162:15, 1163:17, 1164:23
**moving** [2] - 1139:4, 1154:17
**MR** [346] - 856:14, 856:20, 857:22, 858:13, 858:17, 858:22, 859:10, 859:14, 859:24, 860:2, 860:9, 860:13, 860:15, 861:24, 861:25, 862:7, 862:12, 862:14, 862:17, 862:25, 863:18, 864:2, 865:6, 865:8, 865:13, 865:16, 865:20, 865:24, 866:7, 866:10, 866:12, 866:16, 866:20, 867:9, 867:16, 867:19, 867:21, 868:2, 868:6, 868:15, 868:22, 869:4, 869:6, 869:12, 869:23, 869:25, 870:14, 870:16, 875:18, 875:24, 879:2, 879:3, 879:19, 879:21, 880:3, 880:6, 881:8, 889:21, 890:2, 890:3, 893:8, 897:8, 912:25, 913:5, 914:6, 927:15, 930:13, 930:15, 931:14, 931:22, 932:3, 932:7, 933:6, 933:11, 933:12, 934:20, 935:3, 936:24, 937:6, 938:16, 941:16, 942:2, 942:6, 942:8, 945:11, 945:14, 945:20, 947:12, 947:18, 948:17, 948:19, 948:25, 950:11, 950:12, 950:17, 950:19, 951:13, 951:17, 951:18, 951:19, 956:2, 956:4, 956:8, 957:6, 957:8, 958:24, 959:9, 960:12, 980:3, 980:6, 980:22, 980:24, 980:25, 981:8, 981:11, 981:14, 982:21, 983:1, 985:14, 985:24, 986:17, 986:20, 988:15, 988:22, 989:15, 989:17, 989:21, 991:6, 992:15, 992:20, 993:2, 993:15, 993:18, 995:1, 995:3, 995:8, 995:13, 995:16, 1002:6, 1002:8, 1002:12, 1002:24, 1002:25, 1006:13, 1006:15, 1006:18, 1007:4, 1007:6, 1012:25, 1013:5, 1014:12, 1014:13, 1014:19, 1014:23, 1015:10, 1018:6, 1020:3, 1020:16, 1022:17, 1022:19, 1022:21, 1028:14, 1028:18, 1029:6, 1029:13, 1030:8, 1030:10, 1030:14, 1030:18, 1030:21, 1035:17, 1035:19, 1035:24, 1051:11, 1051:13, 1051:16, 1057:3, 1057:5, 1060:17, 1061:1, 1062:10, 1062:18, 1062:23, 1063:9, 1063:17, 1064:15, 1064:19, 1065:12, 1065:15, 1065:23, 1066:7, 1066:16, 1066:22, 1067:9, 1067:12, 1067:13, 1067:22, 1068:6, 1068:10, 1069:16, 1072:25, 1073:2, 1073:4, 1073:8, 1073:14, 1077:11, 1077:13, 1082:21, 1082:23, 1083:7, 1133:19, 1134:4, 1134:14, 1134:16, 1141:17, 1141:20, 1142:9, 1149:4, 1149:8, 1149:9, 1151:17, 1151:23, 1154:1, 1154:4, 1158:4, 1158:7, 1158:11, 1167:17, 1169:8, 1169:18, 1169:21, 1170:4, 1170:13, 1171:6, 1171:24, 1172:22, 1173:3, 1173:13, 1173:21, 1173:23, 1174:1, 1174:2, 1174:4, 1174:5, 1174:7, 1174:16, 1174:18, 1174:21, 1175:4, 1175:9, 1175:16, 1175:17, 1176:1, 1176:11, 1176:13, 1176:16, 1176:18, 1176:21, 1176:23, 1177:1, 1177:6, 1177:17, 1177:19, 1177:22, 1178:1, 1178:10, 1178:24, 1179:9, 1179:14, 1179:19, 1180:4, 1180:10, 1180:12, 1180:13, 1180:23, 1180:25, 1181:1, 1181:3, 1181:6, 1181:10, 1181:21, 1182:6, 1182:11, 1182:14, 1182:21, 1182:24, 1183:4, 1183:8, 1183:14, 1183:19, 1183:24, 1184:3, 1184:5, 1184:8, 1184:10, 1184:17, 1184:19, 1184:23, 1185:3, 1185:10, 1185:16, 1185:17, 1185:19, 1185:20, 1185:23, 1185:24, 1185:25, 1186:3, 1186:7, 1186:17, 1186:25, 1187:5, 1187:9, 1187:13, 1187:15, 1187:23, 1188:2, 1188:8, 1188:11, 1188:14, 1188:18, 1188:23, 1189:20, 1190:3, 1190:5, 1190:13, 1190:19, 1190:24, 1191:14, 1191:17, 1191:25, 1192:11, 1193:3, 1193:20, 1194:3, 1194:12, 1195:8, 1195:10, 1195:19, 1195:23, 1196:6, 1196:15, 1196:18, 1196:20, 1197:3, 1197:13
**MS** [78] - 875:20, 880:1, 889:23, 893:11, 894:17, 895:1, 897:6, 897:13, 908:10, 908:12, 912:23, 913:3, 913:8, 914:9, 914:13, 918:3, 918:12, 921:18, 921:20, 923:6, 927:17, 927:22, 927:24, 930:10, 931:12, 931:17, 931:20, 934:13, 934:24, 936:15, 937:3, 938:19, 938:22, 939:11, 939:13, 941:13, 958:22, 959:13, 1019:10, 1019:19, 1083:14, 1083:21, 1084:3, 1084:7, 1084:17, 1100:10, 1100:12, 1100:18, 1100:21, 1106:20, 1106:21, 1108:9, 1108:12, 1108:13, 1110:9, 1120:20, 1120:22, 1120:25, 1122:6, 1122:10, 1126:2, 1127:7, 1133:3, 1133:5, 1133:16, 1154:14, 1158:2, 1167:10, 1167:23, 1168:6, 1168:19, 1169:10, 1170:5, 1171:5, 1171:11, 1172:12, 1173:5, 1197:5
**multiple** [6] - 930:21, 1015:13, 1056:2, 1135:25, 1142:23, 1167:24
**multiplication** [1] - 1056:6
**multiplied** [4] - 1073:23, 1107:3, 1107:6, 1107:10
**multiply** [5] - 940:7, 1037:11, 1040:24, 1053:6, 1054:23
**multiplying** [2] - 1037:22, 1166:16
**must** [11] - 982:18, 983:2, 1155:2, 1163:2, 1188:16, 1188:24, 1189:4, 1189:9, 1189:12, 1192:18
**muster** [1] - 1175:12
**Mylan** [2] - 1047:8, 1047:11

## N

**name** [13] - 885:18, 903:9, 941:19,

942:11, 996:4, 1020:7, 1020:21, 1020:22, 1084:18, 1084:20, 1158:6, 1158:7, 1173:22
**named** [5] - 916:16, 1088:19, 1088:20, 1179:6
**nanogram** [4] - 923:9, 923:13, 958:18, 1100:16
**nanograms** [13] - 937:23, 938:1, 939:15, 939:18, 940:3, 1008:4, 1105:16, 1105:22, 1106:9, 1106:22, 1106:23, 1126:20, 1168:10
**nash** [1] - 1166:10
**natural** [1] - 1038:10
**naturally** [2] - 1183:10, 1183:11
**nature** [2] - 975:7, 1138:11
**Navarro** [2] - 995:23, 996:9
**nearly** [2] - 1119:8, 1149:7
**necessarily** [7] - 868:10, 1155:10, 1156:5, 1157:4, 1157:16, 1163:6, 1192:11
**necessary** [4] - 1025:10, 1038:2, 1038:14, 1179:18
**need** [45] - 868:24, 869:1, 869:3, 869:13, 956:16, 976:25, 1000:14, 1004:22, 1004:25, 1005:4, 1008:18, 1024:25, 1033:12, 1037:16, 1040:1, 1040:13, 1040:15, 1044:24, 1045:2, 1048:24, 1049:19, 1050:24, 1068:12, 1071:21, 1075:17, 1076:13, 1078:7, 1078:11, 1089:24, 1107:9, 1117:25, 1132:4, 1152:2, 1153:9, 1153:19, 1154:2, 1162:8, 1168:9, 1172:7, 1175:23, 1176:6, 1176:8, 1181:5, 1194:15, 1194:16
**needed** [7] - 963:23, 984:16, 1004:18, 1008:7, 1044:9, 1054:5, 1114:25
**needing** [1] - 978:3
**negligible** [1] - 878:14
**negotiate** [2] - 1024:10, 1041:13
**negotiating** [15] - 1025:11, 1027:5, 1032:24, 1038:25, 1039:20, 1047:18, 1047:21, 1050:22, 1060:8, 1060:9, 1064:13, 1077:4, 1187:7, 1187:8
**negotiation** [54] - 856:13, 856:21, 857:8, 857:16, 857:25, 858:8, 858:11, 859:7, 860:18, 1024:24, 1025:5, 1025:8, 1025:22, 1026:2, 1027:2, 1028:20, 1028:25, 1029:4, 1031:20, 1032:7, 1032:17, 1041:6, 1042:17, 1047:18, 1049:12, 1053:15, 1054:19, 1056:24, 1057:1, 1057:2, 1057:8, 1057:11, 1057:24, 1058:5, 1058:7, 1061:20, 1062:1, 1062:6, 1063:25, 1064:8, 1064:22, 1066:12, 1068:21, 1068:24, 1074:15, 1076:6, 1077:7, 1078:3, 1078:20, 1166:25, 1186:12, 1186:15, 1186:22
**negotiations** [8] - 861:19, 1038:1, 1038:21, 1048:3, 1048:5, 1048:10, 1052:24, 1054:12
**neopeptone** [2] - 906:1, 906:4
**net** [3] - 1039:14, 1039:23, 1039:25
**Neurotoxin** [1] - 897:24
**neurotoxin** [25] - 871:5, 871:20, 887:14, 887:23, 888:11, 889:11, 890:10, 890:11, 890:13, 890:18, 907:16, 913:20, 919:19, 921:24, 962:2, 971:5, 1034:18, 1037:20, 1085:1, 1098:22, 1100:7, 1114:12, 1146:7
**neurotoxins** [2] - 886:15, 888:1
**never** [14] - 903:21, 903:22, 909:11, 981:25, 982:6, 983:14, 998:3, 998:4, 1008:13, 1008:24, 1012:19, 1057:16, 1152:16, 1190:10
**nevertheless** [1] - 1104:11
**new** [31] - 856:25, 883:8, 883:19, 884:11, 884:18, 885:6, 885:21, 886:7, 887:1, 916:25, 921:4, 936:20, 1031:3, 1031:7, 1031:20, 1031:21, 1031:22, 1054:22, 1069:13, 1069:20, 1069:24, 1070:5, 1070:7, 1070:15, 1070:17, 1089:18, 1090:25, 1155:23, 1156:8, 1156:11, 1180:5
**next** [82] - 884:24, 886:13, 909:21, 939:9, 942:25, 946:1, 947:19, 947:22, 964:4, 965:24, 968:16, 970:6, 970:8, 970:22, 996:3, 996:6, 999:18, 1007:15, 1019:6, 1019:11, 1020:4, 1038:4, 1039:7, 1039:11, 1043:25, 1046:10, 1060:19, 1073:2, 1084:8, 1086:7, 1086:20, 1087:11, 1088:1, 1088:12, 1089:4, 1089:9, 1090:3, 1090:18, 1091:15, 1092:11, 1092:24, 1093:7, 1094:9, 1095:7, 1095:14, 1096:1, 1097:5, 1098:5, 1098:19, 1099:1, 1101:15, 1104:18, 1108:25, 1109:13, 1110:3, 1110:10, 1111:1, 1111:17, 1111:20, 1112:21, 1113:4, 1113:12, 1113:19, 1114:7, 1114:20, 1115:9, 1115:19, 1116:8, 1116:20, 1117:11, 1117:12, 1117:17, 1119:3, 1119:15, 1146:13, 1146:16, 1146:24, 1147:19, 1148:10, 1150:23, 1163:17, 1185:8
**next-to-last** [1] - 1060:19
**nexus** [1] - 978:3
**NG** [1] - 937:22
**NG/ML** [3] - 937:15, 937:18, 937:19
**nice** [2] - 1122:11, 1150:5
**NICHOLS** [1] - 854:16
**night** [1] - 859:16
**night's** [1] - 1153:6
**NIRAV** [1] - 855:7
**no-risk** [1] - 882:8
**nobody** [5] - 1078:3, 1103:14, 1114:19, 1122:4, 1175:11
**nodes** [1] - 1113:11
**nonanimal** [6] - 964:9, 965:3, 965:9, 965:17, 966:20, 1195:16
**nonanimal-derived** [5] - 964:9, 965:3, 965:9, 965:17, 966:20
**nonAPF** [2] - 1111:23, 1112:1
**noncomparable** [1] - 1066:21
**noncompetitor** [1] - 861:13
**noncomplex** [1] - 913:19
**Noncomplex** [1] - 897:23
**nondisclosed** [1] - 1160:8
**none** [8] - 962:4, 1139:23, 1162:22, 1174:1, 1174:2, 1174:4, 1174:5, 1187:15
**nonetheless** [1] - 1066:22
**noninfringing** [1] - 1186:5
**nonlawyer** [1] - 1072:22
**nonobvious** [1] - 1177:14
**nonobviousness** [7] - 871:22, 871:25, 892:20, 892:24, 946:9, 1136:14, 1183:5
**nonprotein** [6] - 964:9, 965:3, 965:10, 965:16, 966:20, 1004:23
**nonreducing** [12] - 975:18, 975:22, 976:1, 991:17, 991:20, 992:1, 992:3, 992:4, 992:7, 1143:12, 1143:15, 1143:17
**nonresponsive** [1] - 992:16
**normal** [2] - 970:10, 1178:17
**normalize** [3] - 1050:14, 1052:6, 1052:7
**normalizing** [2] - 1050:13, 1050:18
**normally** [1] - 1187:16
**notable** [1] - 1069:8
**note** [4] - 959:10, 1179:10, 1182:6, 1182:8
**noted** [1] - 982:11
**notes** [2] - 865:16, 1175:1
**nothing** [22] - 869:23, 878:14, 926:21, 940:19, 1029:2, 1059:12, 1075:8, 1157:5, 1160:12, 1174:18, 1177:23, 1180:12, 1180:25, 1181:1, 1185:16, 1185:17, 1185:19, 1185:20, 1185:23, 1195:8, 1195:10, 1196:20
**Notice** [2] - 909:15, 909:17
**noticed** [3] - 919:8, 1105:23, 1172:7
**November** [1] - 949:5
**nowhere** [4] - 1067:6, 1067:7, 1157:1,

1176:2
**NTX** [1] - 1051:21
**nucleic** [58] - 920:6, 920:11, 921:16, 921:23, 922:11, 922:15, 922:19, 922:22, 923:9, 923:13, 924:15, 926:11, 926:14, 926:16, 926:19, 929:16, 930:7, 934:2, 934:23, 937:2, 937:10, 937:14, 937:19, 938:14, 940:6, 1103:16, 1105:6, 1105:25, 1106:15, 1107:14, 1107:16, 1107:25, 1108:17, 1110:20, 1114:11, 1114:13, 1114:14, 1114:18, 1114:24, 1115:1, 1115:4, 1115:7, 1115:10, 1115:14, 1116:1, 1118:8, 1118:12, 1118:17, 1119:9, 1155:4, 1155:18, 1157:3, 1157:7, 1157:11, 1159:20, 1160:1, 1168:7, 1168:9
**nucleotide** [2] - 889:12, 890:13
**number** [26] - 859:25, 865:14, 903:10, 912:21, 912:22, 995:15, 1001:22, 1045:5, 1058:16, 1063:18, 1066:24, 1067:23, 1071:3, 1080:3, 1082:4, 1082:12, 1082:19, 1094:12, 1118:11, 1139:15, 1139:20, 1181:5, 1182:8, 1193:21, 1194:17
**Number** [2] - 913:10, 924:22
**numbers** [11] - 868:10, 924:13, 1001:20, 1055:1, 1055:2, 1056:5, 1104:23, 1178:3, 1178:6, 1178:8, 1178:9
**numerator** [4] - 1042:7, 1044:6, 1047:5, 1047:14
**numerous** [1] - 956:18
**nutrient** [1] - 1089:21

## O

**oath** [3] - 894:11, 894:12, 917:23
**object** [13] - 866:25, 934:17, 951:14, 980:3, 980:22, 1014:19, 1173:9, 1173:10, 1175:4, 1179:9, 1188:18, 1190:5, 1193:21
**objected** [3] - 863:2, 863:5, 936:17
**objection** [46] - 875:20, 875:21, 880:1, 889:23, 889:24, 897:8, 897:10, 912:25, 913:1, 913:5, 913:6, 914:6, 914:12, 934:13, 936:16, 937:5, 945:18, 948:20, 951:16, 956:4, 956:5, 982:21, 995:3, 995:5, 1002:8, 1002:10, 1006:17, 1015:8, 1022:19, 1028:14, 1030:10, 1035:19, 1035:21, 1051:13, 1051:14, 1065:23, 1072:25, 1073:8, 1100:10, 1100:20, 1120:22, 1120:23, 1175:14, 1175:16, 1178:2, 1188:21
**objections** [14] - 856:4, 936:18, 1173:24, 1175:15, 1176:9, 1176:11, 1176:13, 1176:16, 1176:18, 1176:21, 1176:23, 1187:2, 1187:12, 1187:13
**objective** [4] - 946:8, 977:17, 978:2, 1183:5
**observations** [1] - 978:5
**observed** [1] - 956:23
**obtain** [9] - 914:3, 934:1, 934:22, 937:1, 1010:17, 1119:8, 1147:14, 1148:22
**obtained** [5] - 876:21, 886:23, 905:20, 954:13, 1090:16
**obtaining** [2] - 886:18, 935:6
**obvious** [49] - 872:6, 872:13, 873:12, 873:16, 877:12, 882:13, 887:8, 892:2, 893:6, 893:21, 902:2, 902:8, 902:19, 904:25, 907:8, 916:6, 916:10, 917:1, 920:7, 920:16, 921:5, 942:24, 972:17, 981:7, 986:7, 1085:20, 1086:1, 1086:5, 1086:13, 1087:10, 1092:5, 1092:20, 1103:12, 1109:3, 1109:9, 1109:11, 1109:22, 1121:25, 1122:3, 1134:25, 1135:4, 1135:20, 1151:11, 1157:22, 1160:5, 1163:20, 1168:13, 1192:6, 1192:13
**obviously** [4] - 961:16, 1083:18, 1096:23, 1189:21
**obviousness** [34] - 874:6, 892:9, 892:17, 925:12, 943:4, 945:24, 946:3, 946:4, 947:23, 974:10, 977:22, 980:13, 986:12, 996:16, 997:16, 1009:3, 1011:9, 1013:16, 1015:17, 1016:11, 1018:4, 1085:6, 1111:9, 1116:6, 1135:13, 1154:20, 1155:2, 1155:14, 1170:25, 1179:8, 1191:20, 1192:2, 1192:14, 1193:4
**occasion** [1] - 998:3
**occur** [2] - 1071:19, 1075:10
**occurred** [1] - 861:10
**octinoid** [1] - 965:15
**October** [16] - 946:13, 946:21, 1002:18, 1005:5, 1057:10, 1057:23, 1057:25, 1058:2, 1058:5, 1058:7, 1058:10, 1058:14, 1180:15, 1180:16, 1180:21, 1180:22
**OF** [2] - 854:2, 854:9
**offer** [2] - 945:11, 1156:13
**offered** [11] - 931:17, 932:2, 1079:17, 1154:22, 1156:15, 1156:18, 1159:13, 1159:23, 1161:15, 1163:10, 1171:22
**offering** [2] - 927:3, 927:10
**office** [2] - 1012:3, 1031:22
**Office** [47] - 892:5, 896:18, 897:20, 898:12, 898:16, 899:11, 899:16, 899:22, 899:25, 900:5, 900:12, 900:17, 900:25, 901:6, 901:20, 907:22, 909:8, 909:22, 910:16, 916:20, 916:24, 920:24, 921:3, 994:13, 995:10, 995:23, 1001:6, 1001:10, 1004:10, 1009:11, 1011:18, 1011:22, 1011:23, 1013:15, 1014:21, 1097:17, 1097:22, 1098:2, 1098:6, 1098:12, 1117:1, 1117:8, 1119:12, 1149:17, 1150:1, 1150:3, 1150:11
**Office's** [1] - 1098:15
**offices** [3] - 1031:14, 1044:25, 1046:5
**Official** [1] - 1198:4
**often** [3] - 999:21, 1026:15, 1190:8
**old** [6] - 914:4, 1057:17, 1089:15, 1107:18, 1111:24, 1159:21
**oligosaccharide** [8] - 989:6, 990:2, 990:16, 990:17, 990:19, 990:22, 991:3, 1141:7
**oligosaccharides** [1] - 1141:10
**once** [7] - 884:7, 927:20, 970:8, 1019:6, 1033:13, 1152:12, 1176:2
**one** [185] - 856:2, 856:3, 859:16, 860:5, 862:17, 863:16, 863:25, 864:2, 864:4, 865:13, 865:17, 865:18, 865:21, 866:4, 866:5, 866:11, 867:6, 867:11, 867:13, 867:14, 868:18, 868:19, 873:6, 873:19, 877:18, 878:25, 882:3, 882:6, 886:8, 888:13, 891:7, 891:8, 891:9, 893:2, 894:2, 898:17, 902:7, 909:22, 921:23, 925:3, 925:8, 929:4, 929:24, 932:4, 932:5, 933:5, 937:2, 938:7, 938:14, 938:15, 943:3, 946:5, 946:6, 946:10, 947:2, 948:19, 955:25, 959:20, 959:21, 962:11, 967:2, 973:10, 973:18, 977:11, 977:13, 989:10, 991:1, 992:25, 994:20, 998:6, 1003:22, 1006:21, 1018:21, 1019:11, 1021:15, 1022:6, 1025:1, 1026:5, 1026:24, 1027:5, 1034:10, 1035:3, 1035:8, 1036:15, 1036:18, 1037:17, 1039:12, 1041:8, 1045:22, 1047:6, 1054:12, 1057:9, 1057:14, 1057:17, 1058:21, 1059:22, 1063:1, 1067:9, 1067:22, 1072:15, 1075:5, 1075:7, 1075:22, 1078:22, 1079:4, 1081:22, 1081:24, 1083:16, 1087:25, 1089:18, 1092:23, 1096:18, 1096:22, 1099:7, 1100:3, 1100:6, 1102:12, 1102:21, 1104:14, 1107:4, 1111:16,

1114:10, 1119:16, 1122:12, 1123:16, 1123:19, 1125:7, 1130:19, 1130:24, 1132:13, 1138:2, 1140:19, 1141:9, 1143:18, 1147:2, 1147:23, 1148:22, 1151:7, 1152:24, 1153:1, 1153:3, 1153:8, 1155:3, 1155:4, 1157:3, 1157:4, 1161:24, 1167:20, 1167:21, 1168:1, 1168:12, 1168:15, 1168:17, 1168:20, 1170:7, 1171:9, 1171:20, 1172:7, 1172:12, 1174:7, 1175:17, 1178:2, 1179:7, 1179:20, 1180:13, 1181:5, 1182:13, 1182:15, 1182:17, 1183:20, 1184:25, 1186:4, 1187:5, 1187:23, 1191:1, 1191:8, 1192:17, 1193:20, 1195:12, 1195:13

**one's** [2] - 1036:12, 1185:6

**one-page** [2] - 865:21, 866:4

**one-sided** [1] - 1057:14

**ones** [6] - 1038:18, 1063:24, 1099:3, 1103:11, 1122:2, 1182:17

**ongoing** [3] - 1054:24, 1080:17, 1194:13

**onus** [1] - 1172:23

**open** [4] - 1065:16, 1169:14, 1192:1

**opened** [1] - 934:20

**opening** [4] - 1029:2, 1170:2, 1179:1, 1179:10

**operating** [2] - 1044:10, 1045:7

**opine** [2] - 977:14, 983:18

**opined** [2] - 976:25, 1165:18

**opinion** [77] - 860:19, 861:10, 867:25, 872:4, 873:9, 873:11, 892:9, 893:20, 901:24, 902:5, 907:7, 916:4, 916:9, 920:15, 925:9, 927:4, 927:10, 929:5, 929:25, 934:18, 934:24, 941:9, 942:23, 954:20, 956:10, 958:1, 972:7, 976:5, 977:4, 977:14, 978:9, 980:4, 984:22, 986:5, 986:12, 996:16, 1016:11, 1024:2, 1024:13, 1024:15, 1033:4, 1054:1, 1055:23, 1072:2, 1085:22, 1085:25, 1086:10, 1087:17, 1092:5, 1099:19, 1104:17, 1109:5, 1109:6, 1109:8, 1109:15, 1109:17, 1111:9, 1119:25, 1121:22, 1134:20, 1134:23, 1134:24, 1136:25, 1138:15, 1138:17, 1138:25, 1143:20, 1149:10, 1149:24, 1149:25, 1150:24, 1151:6, 1151:8, 1151:10, 1164:14, 1165:22, 1166:6

**opinions** [30] - 867:23, 880:21, 916:3, 931:17, 943:6, 960:14, 961:15, 973:7, 980:14, 983:25, 984:12, 985:3, 985:19, 986:14, 1022:24, 1023:22, 1023:25, 1024:20, 1052:25, 1053:21, 1074:11, 1085:2, 1085:4, 1086:8, 1121:21, 1135:9, 1136:16, 1137:6, 1163:16

**opportunity** [5] - 1057:18, 1078:10, 1167:13, 1171:16, 1187:20

**opposing** [1] - 1188:4

**opposite** [8] - 992:10, 992:22, 993:6, 994:3, 1144:20, 1144:22, 1145:21, 1151:13

**opposites** [1] - 1145:16

**option** [6] - 1102:2, 1146:13, 1147:13, 1148:1, 1148:9, 1148:15

**options** [7] - 1139:15, 1139:20, 1139:22, 1140:3, 1145:6, 1147:22, 1148:21

**orange** [2] - 1113:6, 1147:6

**orange-pink** [1] - 1147:6

**oranges** [1] - 1037:7

**order** [6] - 977:1, 1044:22, 1059:10, 1075:17, 1147:14, 1162:7

**orders** [1] - 938:7

**ordinary** [88] - 874:20, 877:9, 877:10, 880:14, 880:17, 887:4, 887:15, 891:23, 902:2, 904:1, 904:15, 916:7, 916:10, 925:24, 926:18, 931:24, 945:15, 946:5, 946:10, 947:16, 960:5, 982:12, 982:18, 983:2, 983:10, 1086:5, 1086:16, 1087:8, 1092:6, 1092:13, 1096:9, 1096:11, 1096:25, 1101:4, 1103:12, 1109:12, 1109:24, 1110:6, 1116:11, 1118:14, 1119:25, 1121:7, 1121:11, 1121:13, 1122:3, 1124:14, 1135:11, 1135:18, 1136:13, 1136:17, 1136:19, 1137:9, 1138:15, 1138:17, 1138:20, 1139:12, 1139:14, 1140:6, 1140:20, 1140:21, 1142:20, 1143:25, 1146:14, 1147:10, 1147:12, 1148:17, 1148:19, 1150:2, 1150:25, 1151:2, 1162:17, 1178:17, 1188:16, 1188:20, 1188:24, 1189:1, 1189:3, 1189:10, 1190:1, 1190:7, 1192:3, 1192:4, 1192:7, 1192:18, 1193:6, 1193:10, 1193:14

**organism** [6] - 876:8, 876:11, 876:16, 877:6, 877:18, 877:20

**organisms** [5] - 877:25, 878:3, 878:4, 878:8, 905:13

**original** [10] - 1003:16, 1009:4, 1009:10, 1010:2, 1010:13, 1011:1, 1063:6, 1149:19, 1150:13, 1175:6

**originally** [2] - 1001:10, 1185:9

**otherwise** [2] - 1159:15, 1189:9

**ought** [2] - 1154:11, 1170:1

**ourselves** [3] - 987:20, 1087:7, 1135:23

**outlined** [1] - 947:1

**output** [1] - 1096:21

**outset** [1] - 1154:16

**outside** [6] - 931:12, 934:14, 934:18, 936:16, 1065:24, 1073:9

**outweighed** [2] - 861:21, 1192:23

**overall** [9] - 1090:4, 1090:5, 1100:23, 1102:20, 1112:15, 1112:18, 1115:22, 1166:15, 1166:21

**overhead** [1] - 1044:17

**overnight** [1] - 1152:18

**overrule** [2] - 1175:14, 1196:24

**overruled** [4] - 914:12, 937:5, 982:24, 1014:22

**overstated** [2] - 1045:5, 1056:19

**overstatement** [1] - 1026:5

**overstates** [4] - 1039:25, 1042:23, 1045:6, 1046:8

**owed** [1] - 1082:17

**own** [28] - 900:6, 914:18, 914:21, 915:1, 915:10, 915:11, 915:13, 915:19, 919:22, 923:20, 924:5, 950:3, 950:4, 984:9, 985:25, 1048:3, 1053:17, 1075:24, 1102:6, 1137:24, 1152:24, 1155:21, 1160:15, 1172:4, 1172:5, 1182:1, 1182:14, 1185:6

**owns** [2] - 1027:10, 1062:9

## P

**p.m** [1] - 1197:19

**P80** [2] - 965:16, 967:9

**Pacific** [1] - 857:15

**package** [1] - 1044:15

**page** [99] - 859:5, 864:3, 865:18, 865:21, 866:4, 876:12, 877:2, 879:19, 880:4, 881:15, 881:18, 883:2, 883:13, 883:14, 883:15, 883:23, 884:14, 885:3, 885:9, 885:23, 886:12, 886:22, 890:15, 894:15, 898:20, 899:13, 900:20, 903:10, 906:20, 909:21, 909:22, 909:24, 910:2, 911:15, 918:2, 918:13, 923:24, 930:3, 932:3, 934:4, 950:16, 951:3, 951:5, 985:14, 988:15, 989:16, 995:13, 995:21, 995:25, 996:19, 997:14, 998:7, 999:7, 1003:2, 1004:16, 1005:18, 1005:25, 1006:5, 1006:12, 1009:5, 1010:12, 1011:4, 1014:5, 1014:9, 1014:11, 1014:14, 1014:17, 1014:25, 1015:2, 1030:13, 1065:16, 1068:25, 1122:21, 1127:22, 1173:10, 1173:25, 1174:3, 1174:6, 1174:18, 1175:3, 1176:9, 1176:15,

1176:20, 1176:25, 1177:8, 1177:24, 1178:25, 1179:15, 1180:11, 1180:24, 1181:2, 1181:3, 1185:15, 1185:18, 1185:22, 1187:4
**pages** [11] - 862:8, 864:4, 865:19, 865:21, 865:25, 867:3, 1014:6, 1014:7, 1030:12, 1072:4, 1186:24
**paid** [2] - 1058:12, 1080:17
**panel** [1] - 962:19
**paper** [25] - 876:13, 877:8, 877:13, 879:6, 880:8, 882:18, 882:24, 883:9, 883:21, 884:13, 884:20, 885:4, 885:7, 885:16, 885:22, 886:11, 886:21, 887:5, 887:16, 887:25, 888:14, 891:24, 932:8, 1196:7, 1196:16
**paraben** [1] - 965:15
**paragraph** [73] - 879:20, 880:4, 896:10, 896:19, 898:20, 898:21, 898:22, 898:23, 899:6, 899:14, 899:16, 899:22, 909:24, 918:14, 918:16, 928:16, 928:19, 932:4, 932:5, 935:4, 936:7, 962:8, 962:25, 966:7, 970:16, 971:4, 971:6, 974:1, 987:12, 987:13, 987:22, 989:3, 989:23, 990:10, 991:7, 991:8, 991:11, 992:6, 993:11, 993:20, 998:17, 1004:1, 1004:17, 1015:12, 1015:16, 1015:20, 1015:22, 1016:1, 1016:7, 1016:10, 1016:14, 1016:18, 1016:22, 1017:4, 1017:5, 1017:7, 1017:15, 1138:4, 1140:23, 1140:25, 1142:19, 1142:24, 1143:3, 1144:2, 1144:7, 1144:8, 1146:1, 1146:3, 1146:4, 1148:3, 1148:4, 1174:8
**paragraphs** [1] - 969:15
**parents** [1] - 1095:20
**part** [72] - 877:22, 883:4, 883:5, 886:9, 896:17, 897:4, 903:12, 919:23, 921:23, 922:15, 925:12, 934:1, 934:23, 937:2, 938:3, 938:7, 938:14, 938:15, 954:3, 965:21, 971:4, 997:16, 1004:6, 1004:13, 1015:16, 1015:19, 1021:7, 1023:1, 1023:5, 1028:19, 1029:22, 1031:6, 1034:19, 1035:1, 1035:6, 1035:12, 1045:19, 1046:3, 1051:8, 1058:23, 1058:24, 1059:1, 1062:5, 1063:24, 1065:1, 1090:7, 1090:13, 1090:18, 1091:7, 1097:21, 1097:23, 1098:7, 1100:14, 1102:21, 1105:25, 1113:3, 1114:11, 1115:20, 1136:13, 1148:6, 1155:4, 1157:3, 1167:21, 1168:1, 1168:3, 1168:12, 1168:15, 1168:17, 1168:21, 1177:2, 1177:12, 1182:22
**partially** [3] - 1091:22, 1091:23, 1113:19
**particle** [1] - 933:5
**particular** [18] - 861:6, 863:13, 872:22, 883:3, 883:24, 886:16, 887:8, 890:10, 895:11, 895:14, 897:15, 926:15, 948:2, 959:19, 972:22, 1015:4, 1127:14, 1189:4
**particularly** [7] - 861:6, 1146:6, 1152:11, 1159:20, 1161:21, 1170:25, 1171:12
**parties** [41] - 856:23, 859:20, 860:17, 1019:22, 1024:5, 1024:25, 1025:4, 1025:11, 1027:4, 1027:22, 1027:23, 1028:13, 1028:22, 1029:4, 1031:19, 1032:23, 1033:15, 1036:14, 1041:3, 1041:6, 1053:14, 1054:5, 1054:9, 1065:5, 1066:4, 1067:18, 1068:5, 1069:23, 1074:14, 1076:7, 1076:25, 1077:5, 1077:21, 1078:5, 1078:6, 1166:7, 1166:24, 1170:11, 1177:2, 1186:10, 1187:6
**parties'** [3] - 859:6, 1186:15, 1186:21
**parties's** [1] - 1186:11
**parts** [24] - 886:8, 921:24, 922:9, 938:5, 938:6, 939:22, 939:24, 940:13, 940:14, 941:2, 984:23, 1007:8, 1088:2, 1100:1, 1105:7, 1106:1, 1107:15, 1114:11, 1155:4, 1156:23, 1157:4, 1157:12
**party** [4] - 1041:8, 1053:12, 1066:9, 1077:5
**pass** [7] - 893:8, 981:8, 1060:17, 1082:21, 1132:5, 1133:3, 1175:12
**passage** [1] - 1175:20
**passed** [1] - 1094:22
**Patent** [50] - 892:5, 896:18, 897:20, 898:12, 898:16, 899:10, 899:16, 899:21, 899:25, 900:5, 900:12, 900:17, 900:24, 901:6, 901:20, 907:22, 909:8, 909:22, 910:15, 913:10, 916:20, 916:24, 920:24, 921:3, 924:22, 994:13, 995:10, 995:23, 1001:6, 1001:10, 1004:10, 1009:10, 1011:18, 1011:22, 1011:23, 1013:15, 1014:21, 1097:17, 1097:22, 1098:2, 1098:6, 1098:12, 1098:15, 1117:1, 1117:8, 1119:12, 1149:17, 1149:25, 1150:3, 1150:11
**patent** [391] - 871:7, 871:23, 871:25, 872:5, 872:6, 872:9, 872:11, 872:12, 872:18, 873:2, 873:10, 873:11, 873:14, 873:16, 873:22, 874:13, 880:22, 881:4, 881:22, 882:11, 887:2, 887:21, 892:3, 892:4, 892:5, 892:7, 892:13, 892:21, 892:24, 893:3, 893:5, 895:19, 896:11, 896:20, 897:19, 897:22, 898:13, 898:17, 900:6, 900:13, 900:15, 901:6, 901:21, 902:1, 902:19, 903:3, 904:25, 906:17, 907:7, 907:23, 908:1, 908:17, 908:20, 909:4, 909:9, 909:12, 910:11, 910:16, 911:13, 912:11, 912:20, 912:21, 912:22, 913:12, 913:14, 913:16, 913:18, 913:22, 914:1, 914:4, 914:6, 914:9, 914:18, 914:19, 914:22, 915:1, 915:5, 915:8, 915:10, 915:11, 915:14, 915:19, 916:2, 916:3, 916:6, 916:10, 916:21, 916:25, 917:1, 919:10, 920:16, 920:21, 920:23, 920:25, 921:4, 921:5, 921:7, 921:8, 921:13, 921:19, 921:21, 924:17, 925:1, 925:4, 925:6, 925:15, 925:23, 926:3, 926:12, 926:25, 928:3, 928:6, 928:9, 931:16, 933:22, 934:5, 934:8, 935:10, 935:11, 936:5, 938:9, 938:10, 938:25, 939:6, 939:9, 939:10, 939:12, 942:24, 943:5, 943:11, 943:14, 943:15, 943:16, 943:19, 945:1, 945:2, 945:25, 946:8, 947:25, 948:6, 948:14, 949:12, 949:13, 949:15, 950:9, 950:16, 951:3, 951:9, 951:21, 952:2, 952:19, 963:8, 963:10, 972:15, 973:13, 977:19, 978:5, 978:7, 978:12, 978:18, 978:21, 978:25, 979:4, 979:17, 979:23, 980:17, 981:5, 983:19, 984:2, 984:20, 984:22, 985:20, 986:19, 987:3, 992:10, 992:11, 992:13, 992:22, 992:23, 993:3, 993:6, 993:9, 994:7, 994:14, 994:17, 997:22, 1000:1, 1000:5, 1000:11, 1000:15, 1000:23, 1001:7, 1001:17, 1001:18, 1002:2, 1002:14, 1002:15, 1002:17, 1002:20, 1003:1, 1003:10, 1003:12, 1003:16, 1003:22, 1004:1, 1004:3, 1004:5, 1004:6, 1004:15, 1005:4, 1005:21, 1009:11, 1009:14, 1010:2, 1010:20, 1011:2, 1011:19, 1011:24, 1012:3, 1012:5, 1012:8, 1013:7,

1013:15, 1013:19, 1013:23, 1015:5, 1017:17, 1018:21, 1021:16, 1022:18, 1026:9, 1032:4, 1032:25, 1033:2, 1033:16, 1036:23, 1041:23, 1042:10, 1042:25, 1045:6, 1046:11, 1046:15, 1046:18, 1046:19, 1046:22, 1053:2, 1053:23, 1054:1, 1054:8, 1054:10, 1059:3, 1059:4, 1072:23, 1073:20, 1074:24, 1075:3, 1075:11, 1076:19, 1080:10, 1085:5, 1085:10, 1085:16, 1085:20, 1086:1, 1086:8, 1086:10, 1086:12, 1086:21, 1086:24, 1087:13, 1087:14, 1092:15, 1092:20, 1097:5, 1097:22, 1098:3, 1098:13, 1102:8, 1103:7, 1104:5, 1104:20, 1105:1, 1105:6, 1105:9, 1107:15, 1107:24, 1108:3, 1108:14, 1108:15, 1108:24, 1109:2, 1109:9, 1109:16, 1109:18, 1109:20, 1109:21, 1110:12, 1112:19, 1114:23, 1115:20, 1115:21, 1116:6, 1116:12, 1117:2, 1117:9, 1119:2, 1119:4, 1119:7, 1119:11, 1119:13, 1119:23, 1120:2, 1120:10, 1120:15, 1120:16, 1120:17, 1121:23, 1121:24, 1122:19, 1122:22, 1125:17, 1125:25, 1127:17, 1127:20, 1127:21, 1127:22, 1128:11, 1133:12, 1133:14, 1134:23, 1135:4, 1135:10, 1135:20, 1136:24, 1137:15, 1140:11, 1140:14, 1142:20, 1144:6, 1144:18, 1145:21, 1146:11, 1149:1, 1149:20, 1149:22, 1151:3, 1151:9, 1151:10, 1151:14, 1154:20, 1155:1, 1155:3, 1155:23, 1156:12, 1157:17, 1157:22, 1158:15, 1158:18, 1158:20, 1159:6, 1160:2, 1160:5, 1162:14, 1162:18, 1162:24, 1163:2, 1163:8, 1163:13, 1163:19, 1164:11, 1164:16, 1165:9, 1165:12, 1175:21, 1179:2, 1179:13, 1182:15, 1185:1, 1185:6, 1185:8, 1188:15, 1190:19, 1190:20, 1191:5, 1194:15

**patent's** [1] - 902:3

**patented** [4] - 999:22, 1001:2, 1057:19, 1166:4

**patents** [82] - 893:15, 893:18, 893:21, 893:24, 915:25, 925:9, 929:6, 930:1, 943:8, 1023:3, 1023:4, 1024:2, 1024:8, 1024:14, 1025:12, 1025:13, 1026:1, 1027:11, 1032:10, 1032:15, 1032:20, 1033:6, 1033:11, 1041:9, 1041:24, 1042:1, 1042:13, 1042:18, 1047:19, 1047:22, 1049:10, 1050:23, 1052:14, 1053:2, 1053:3, 1054:6, 1054:13, 1055:4, 1055:6, 1055:7, 1055:15, 1055:18, 1055:20, 1057:9, 1057:11, 1057:16, 1057:18, 1057:24, 1057:25, 1060:1, 1062:9, 1064:12, 1064:14, 1069:13, 1072:19, 1072:20, 1072:21, 1072:24, 1073:19, 1074:13, 1074:23, 1077:1, 1077:22, 1078:2, 1078:13, 1080:18, 1081:3, 1081:7, 1081:11, 1082:5, 1082:18, 1085:9, 1128:13, 1129:7, 1144:20, 1144:22, 1158:16, 1167:1, 1176:3, 1183:1, 1184:25

**path** [1] - 1148:21

**patients** [9] - 1031:21, 1037:20, 1045:2, 1045:3, 1046:2, 1056:3, 1070:5, 1070:7, 1070:23

**pattern** [6] - 896:3, 899:3, 1076:12, 1121:5, 1121:6

**PAUL** [1] - 854:18

**pause** [1] - 881:20

**pay** [11] - 1026:21, 1026:24, 1033:8, 1033:13, 1036:14, 1038:16, 1048:20, 1049:1, 1058:14, 1060:3

**paying** [3] - 1026:12, 1037:15, 1039:17

**PDF** [1] - 1196:24

**PDX** [13] - 1057:3, 1134:14, 1135:14, 1135:21, 1137:12, 1139:17, 1140:9, 1144:11, 1146:13, 1146:24, 1147:20, 1148:10, 1151:7

**peak** [1] - 886:14

**peer** [1] - 944:22

**peer-reviewed** [1] - 944:22

**Pennsylvania** [1] - 1021:22

**penny** [1] - 1059:23

**people** [33] - 857:24, 858:4, 861:7, 895:11, 895:15, 927:20, 933:18, 992:13, 1025:5, 1031:13, 1031:22, 1031:23, 1031:24, 1037:15, 1038:8, 1038:16, 1044:24, 1048:20, 1067:15, 1070:9, 1072:10, 1123:24, 1123:25, 1124:1, 1124:2, 1124:6, 1139:4, 1144:9, 1144:19, 1180:5, 1181:22, 1187:16

**Pepsi** [1] - 857:4

**peptide** [12] - 980:16, 980:20, 981:1, 1000:4, 1024:9, 1032:14, 1032:21, 1038:24, 1041:11, 1077:3, 1080:23, 1165:9

**per** [39] - 921:23, 923:13, 934:2, 934:23, 937:2, 937:25, 938:1, 938:3, 938:5, 938:6, 938:8, 938:14, 938:15, 939:18, 939:19, 939:22, 939:24, 940:4, 940:13, 940:14, 941:2, 1105:6, 1106:9, 1107:4, 1114:11, 1126:20, 1155:4, 1156:23, 1157:4, 1157:12, 1167:21, 1168:1, 1168:10, 1168:12, 1168:17, 1168:21

**percent** [112] - 953:18, 954:5, 968:4, 968:19, 969:3, 969:10, 969:17, 969:18, 976:13, 976:15, 1005:9, 1024:3, 1024:4, 1024:12, 1024:15, 1024:17, 1028:5, 1033:23, 1034:7, 1036:20, 1037:4, 1039:13, 1040:3, 1040:5, 1040:8, 1040:13, 1040:14, 1040:15, 1040:18, 1040:19, 1041:16, 1041:17, 1044:13, 1045:9, 1045:10, 1045:11, 1046:13, 1046:14, 1046:15, 1046:17, 1046:20, 1050:6, 1050:13, 1050:15, 1050:21, 1051:24, 1052:3, 1052:8, 1052:9, 1052:10, 1052:18, 1052:19, 1052:20, 1052:22, 1053:4, 1053:6, 1053:8, 1053:16, 1053:19, 1054:2, 1054:4, 1055:5, 1055:6, 1055:9, 1055:18, 1055:21, 1058:24, 1059:10, 1059:12, 1059:14, 1059:17, 1059:18, 1059:20, 1059:21, 1060:14, 1060:15, 1066:24, 1067:10, 1067:15, 1067:23, 1073:19, 1073:20, 1074:8, 1074:20, 1076:8, 1076:9, 1077:6, 1078:1, 1078:18, 1079:5, 1079:10, 1079:11, 1079:24, 1080:1, 1081:4, 1081:16, 1110:19, 1116:1, 1119:9, 1165:17, 1165:18

**percentage** [7] - 1036:10, 1037:16, 1038:19, 1038:20, 1049:24, 1056:3, 1166:19

**percentages** [6] - 1033:22, 1050:11, 1050:17, 1052:6, 1194:2, 1194:4

**perfect** [4] - 928:16, 957:7, 1122:18, 1170:4

**perfectly** [3] - 959:2, 1172:18, 1182:9

**perform** [3] - 1048:3, 1048:11, 1049:7

**performed** [2] - 1012:22, 1049:14

**perhaps** [5] - 946:11, 1152:1, 1154:1, 1174:19, 1191:25

**period** [20] - 946:11, 946:13, 946:25, 947:10, 982:7, 1042:23, 1043:2, 1043:3, 1043:5, 1043:9, 1046:25, 1047:4, 1059:7, 1075:2, 1097:13, 1124:22, 1125:3, 1185:1, 1185:8, 1196:16

**person** [69] - 873:4, 874:3, 874:20, 877:8, 877:10, 880:14, 880:17, 882:2, 887:3, 887:7, 887:15, 887:18, 888:17, 888:22, 891:10, 891:18, 891:23, 891:25, 892:16, 893:4, 900:25, 901:7, 931:24, 945:15, 947:5, 947:16, 955:4, 958:1, 958:8, 969:21, 973:10, 973:12, 976:6,

976:21, 982:12, 982:18, 983:2, 983:5, 983:6, 983:9, 1039:19, 1081:1, 1086:5, 1086:15, 1086:17, 1109:24, 1110:1, 1124:25, 1136:13, 1136:17, 1136:19, 1136:20, 1137:8, 1162:17, 1178:17, 1188:16, 1188:20, 1189:1, 1189:3, 1189:4, 1190:1, 1190:7, 1191:5, 1192:3, 1192:4, 1192:7, 1193:6, 1193:10, 1193:13
**personally** [1] - 889:18
**perspective** [3] - 946:12, 1018:22, 1170:8
**persuasive** [1] - 1192:21
**PETER** [1] - 855:10
**Peter** [1] - 856:14
**pH** [10] - 875:10, 876:8, 877:18, 886:13, 905:6, 970:10, 970:11, 970:17, 1089:24, 1162:7
**Ph.D** [2] - 947:3, 1134:12
**pharma** [1] - 947:9
**pharmaceutic** [1] - 945:12
**pharmaceutical** [23] - 918:25, 926:2, 932:25, 944:3, 944:5, 944:18, 947:4, 962:20, 963:4, 970:17, 975:1, 1009:21, 1010:16, 1022:9, 1131:20, 1131:23, 1132:4, 1132:10, 1132:14, 1132:20, 1137:21, 1137:24, 1143:5
**pharmaceutical-grade** [2] - 926:2, 932:25
**pharmaceuticals** [1] - 1094:15
**pharmaceutics** [2] - 944:11, 944:25
**pHes** [2] - 878:2, 905:16
**Philadelphia** [1] - 1021:22
**phone** [1] - 1178:21
**phrase** [2] - 895:6, 1191:10
**phrasing** [1] - 1078:16
**physiochemical** [1] - 998:9
**pick** [1] - 1039:1
**PICKARD** [41] - 855:7, 869:12, 869:25, 941:16, 942:2, 942:6, 942:8, 945:11, 945:20, 947:12, 947:18, 948:17, 948:25, 950:11, 950:12, 950:17, 950:19, 951:17, 951:19, 956:2, 956:8, 957:6, 957:8, 960:12, 980:6, 980:24, 980:25, 981:8, 982:21, 989:17, 995:3, 1002:8, 1006:13, 1013:5, 1014:12, 1014:13, 1014:23, 1015:10, 1018:6, 1154:1, 1154:4
**Pickard** [8] - 942:4, 942:6, 957:3, 959:20, 960:11, 989:19, 1013:2, 1153:25
**picked** [1] - 1046:25
**picogram** [1] - 1126:23
**PicoGreen** [4] - 937:7, 937:9, 1106:9, 1106:14
**picture** [1] - 1061:14
**pictures** [2] - 1061:8, 1136:2
**piece** [11] - 1037:23, 1037:24, 1039:1, 1045:11, 1048:16, 1059:25, 1060:2, 1078:9, 1126:16, 1156:13
**pieces** [1] - 1171:21
**pillars** [1] - 1021:6
**pink** [2] - 952:18, 1147:6
**place** [9] - 923:18, 923:19, 1081:17, 1107:9, 1135:16, 1144:9, 1151:14, 1173:18, 1183:16
**placed** [1] - 914:10
**places** [1] - 906:13
**Plaintiff** [2] - 854:4, 854:23
**plaintiff** [13] - 959:3, 959:6, 1028:1, 1028:5, 1084:5, 1133:20, 1154:15, 1164:23, 1168:24, 1170:15, 1170:23, 1189:18, 1194:25
**Plaintiff's** [1] - 897:11
**plaintiff's** [1] - 1154:12
**plaintiffs** [2] - 1002:6, 1084:8
**plan** [5] - 869:12, 943:1, 945:22, 1152:4
**planning** [4] - 959:8, 1029:8, 1029:20, 1043:21
**plant** [12] - 874:9, 876:5, 876:17, 877:1, 877:11, 882:9, 1090:11, 1096:8, 1096:12, 1096:19, 1096:24, 1102:16
**plant-based** [5] - 876:5, 876:17, 877:1, 877:11, 882:9
**plant-derived** [1] - 874:9
**plasma** [2] - 903:9, 903:15
**plasma-derived** [1] - 903:15
**platform** [1] - 1134:22
**play** [8] - 894:17, 918:3, 988:14, 989:15, 1006:11, 1025:17, 1049:10, 1071:11
**played** [5] - 894:19, 918:6, 985:16, 985:23, 988:16
**player** [1] - 856:24
**playing** [1] - 1045:18
**PLLC** [1] - 855:5
**plus** [4] - 976:11, 976:14, 1012:14
**PMM** [1] - 1154:24
**point** [33] - 858:14, 865:20, 866:13, 871:11, 923:20, 933:16, 941:10, 961:16, 972:22, 976:8, 976:19, 988:13, 990:12, 1013:25, 1015:21, 1017:18, 1018:19, 1035:16, 1035:25, 1043:1, 1043:25, 1052:15, 1064:4, 1073:5, 1114:6, 1137:1, 1138:1, 1142:22, 1151:14, 1170:23, 1172:12, 1181:15, 1197:7
**pointed** [5] - 902:19, 903:14, 932:20, 967:14, 1092:20
**pointing** [1] - 924:13
**points** [8] - 859:14, 947:2, 1033:18, 1033:19, 1040:23, 1051:19, 1052:15, 1139:25
**polarity** [1] - 1016:16
**poloxamer** [4] - 1005:8, 1005:20, 1006:2, 1006:8
**poloxamers** [1] - 1005:22
**poly** [1] - 989:1
**polysaccharide** [20] - 971:19, 972:1, 972:2, 972:6, 987:4, 987:23, 988:4, 988:8, 990:22, 991:3, 993:13, 993:16, 993:21, 1016:15, 1017:5, 1017:8, 1017:11, 1142:15, 1145:15, 1145:23
**polysaccharide-containing** [1] - 1142:15
**polysaccharide-free** [2] - 993:13, 1145:15
**polysaccharides** [13] - 971:22, 971:23, 987:9, 988:12, 988:18, 990:25, 993:23, 994:1, 994:4, 1145:11, 1145:13, 1145:19, 1146:7
**polysorbate** [4] - 967:10, 1006:2, 1006:7, 1008:7
**portion** [19] - 863:20, 877:24, 895:18, 906:19, 928:13, 964:7, 975:17, 976:12, 990:13, 998:8, 1029:1, 1029:6, 1038:2, 1052:8, 1058:23, 1058:25, 1081:10, 1085:3, 1104:1
**portions** [4] - 928:17, 984:11, 985:2, 985:18
**POSA** [18] - 945:15, 947:2, 947:9, 1143:2, 1158:16, 1159:7, 1159:15, 1160:23, 1161:12, 1161:17, 1161:20, 1162:21, 1162:22, 1163:1, 1163:6, 1163:16, 1163:25, 1164:19
**pose** [1] - 957:16
**posed** [2] - 1163:5, 1163:9
**position** [10] - 857:12, 871:7, 872:10, 872:12, 874:6, 1001:1, 1053:17, 1137:7, 1155:6, 1178:25
**possessive** [1] - 1186:11
**possible** [7] - 863:24, 939:11, 969:23, 974:4, 1043:8, 1064:16, 1090:1
**post** [1] - 1194:13
**post-trial** [1] - 1194:13
**potencies** [3] - 969:19, 969:23, 970:3
**potency** [17] - 953:13, 968:19, 968:20, 968:21, 968:22, 968:24, 968:25, 969:2, 969:11, 969:13, 969:15, 969:17, 973:13, 976:15, 976:22, 1005:9
**potential** [7] - 905:14, 1043:16, 1117:23, 1128:22, 1129:3, 1161:19, 1175:18
**potentially** [2] - 882:5, 1018:24
**pour** [1] - 1113:16
**powder** [9] - 966:4, 966:10, 969:7, 970:8, 970:9, 970:24, 971:17
**PowerPoint** [1] - 1134:8
**PPM** [15] - 923:14, 923:20, 924:15, 926:19, 940:7,

1104:22, 1105:6, 1110:20, 1114:12, 1114:13, 1155:7, 1155:24, 1157:11, 1157:16, 1159:18
**practical** [1] - 961:16
**practically** [1] - 1187:11
**practice** [3] - 932:13, 1021:12, 1022:12
**practiced** [1] - 1057:16
**practicing** [1] - 1182:14
**preamble** [3] - 961:25, 963:25, 964:1
**precautions** [2] - 961:17, 1136:1
**preceding** [1] - 928:19
**precipitation** [1] - 922:18
**precise** [2] - 1040:16, 1088:24
**preclude** [1] - 963:13
**predicate** [2] - 989:18, 1191:20
**predictable** [1] - 1092:1
**predicting** [1] - 1075:14
**preferably** [1] - 865:22
**preference** [9] - 1033:20, 1036:25, 1037:12, 1040:16, 1042:18, 1049:5, 1053:6, 1054:3
**preferred** [4] - 971:7, 987:23, 993:20, 1016:15
**prefers** [2] - 993:23, 993:25
**prejudicial** [1] - 1191:3
**premise** [4] - 1029:10, 1032:6, 1032:8, 1057:1
**premium** [63] - 857:1, 857:13, 1033:19, 1034:5, 1034:6, 1036:2, 1036:6, 1036:8, 1036:10, 1036:13, 1036:24, 1037:10, 1037:12, 1037:14, 1037:17, 1037:23, 1038:3, 1038:15, 1038:16, 1038:19, 1038:22, 1039:2, 1039:4, 1039:9, 1039:12, 1039:25, 1040:2, 1040:5, 1040:10, 1040:11, 1040:14, 1040:20, 1040:25, 1042:15, 1048:8, 1048:16, 1049:4, 1052:20, 1053:4, 1053:5, 1054:3, 1073:24, 1074:1, 1074:3, 1074:12, 1074:17, 1074:18, 1074:21, 1075:1, 1075:5, 1075:9, 1075:14, 1075:22, 1076:8, 1076:9, 1076:15, 1079:12, 1166:17, 1166:19, 1166:22, 1166:23, 1166:24
**preparation** [3] - 918:18, 918:21, 947:7
**prepare** [1] - 1132:3
**prepared** [8] - 942:22, 952:8, 953:1, 959:3, 961:21, 973:15, 1020:23, 1033:24
**preparing** [1] - 930:18
**present** [29] - 907:3, 926:11, 932:16, 937:11, 949:21, 949:23, 977:17, 980:7, 989:5, 989:11, 989:23, 990:10, 1005:22, 1009:20, 1016:16, 1083:15, 1106:15, 1134:23, 1134:24, 1141:1, 1142:4, 1142:19, 1154:24, 1155:12, 1169:22, 1169:23, 1177:13, 1197:25
**presentation** [7] - 942:19, 961:18, 1030:6, 1091:20, 1134:9, 1147:19, 1167:19
**presented** [13] - 863:10, 863:12, 959:10, 982:23, 1000:10, 1011:1, 1011:22, 1058:22, 1067:25, 1139:5, 1155:6, 1189:6, 1189:8
**presenting** [1] - 1012:1
**presents** [1] - 1139:15
**preserve** [1] - 1182:8
**preserved** [1] - 1193:18
**press** [1] - 1047:10
**presumably** [2] - 1066:20, 1067:4
**presume** [2] - 959:4, 1127:9
**presumed** [2] - 1175:22, 1176:3
**pretrial** [3] - 1028:18, 1169:4, 1170:14
**pretty** [10] - 857:10, 1094:17, 1110:18, 1147:8, 1147:18, 1147:25, 1148:8, 1150:3, 1168:23, 1180:5
**prevent** [1] - 866:18
**preventing** [1] - 991:15
**preview** [1] - 943:1
**previous** [3] - 880:10, 1056:6, 1056:8
**previously** [5] - 1041:1, 1130:7, 1143:23, 1177:10, 1183:20
**price** [76] - 857:1, 857:13, 1033:18, 1034:5, 1034:6, 1036:1, 1036:6, 1036:8, 1036:10, 1036:13, 1036:24, 1037:10, 1037:11, 1037:14, 1037:23, 1038:3, 1038:14, 1038:19, 1038:22, 1039:1, 1039:4, 1039:9, 1039:12, 1039:14, 1039:15, 1039:16, 1039:22, 1039:23, 1039:24, 1039:25, 1040:1, 1040:2, 1040:5, 1040:10, 1040:11, 1040:14, 1040:20, 1040:25, 1042:15, 1048:8, 1048:16, 1049:4, 1052:19, 1053:4, 1053:5, 1054:3, 1073:24, 1074:1, 1074:2, 1074:3, 1074:4, 1074:12, 1074:17, 1074:18, 1074:21, 1075:1, 1075:5, 1075:9, 1075:14, 1075:22, 1075:24, 1075:25, 1076:7, 1076:9, 1076:15, 1079:12, 1166:16, 1166:19, 1166:22, 1186:8, 1186:20
**Price** [1] - 1022:7
**prima** [1] - 1155:12
**primary** [3] - 925:12, 962:12, 984:19
**principle** [2] - 1176:4, 1176:5
**printed** [3] - 862:8, 864:4, 865:19
**printout** [1] - 866:6
**prints** [3] - 865:18, 865:24, 866:11
**prions** [1] - 1094:6
**priority** [5] - 872:18, 1003:4, 1125:15, 1125:16, 1125:25
**pro** [1] - 1154:17
**probability** [1] - 1138:11
**probative** [3] - 861:15, 861:20, 1064:21
**problem** [20] - 859:3, 863:1, 863:4, 867:4, 1043:6, 1043:13, 1044:4, 1044:21, 1047:6, 1047:15, 1139:7, 1143:13, 1143:15, 1183:11, 1192:1, 1192:5, 1192:12, 1194:8, 1194:23
**problems** [5] - 857:10, 1137:10, 1143:17, 1193:23, 1195:14
**procedure** [4] - 924:5, 940:24, 1154:19, 1157:20
**procedures** [2] - 915:15, 918:17
**proceed** [5] - 914:11, 945:19, 1022:20, 1083:24, 1158:8
**proceeding** [2] - 872:22, 933:4
**proceedings** [7] - 870:3, 959:17, 1019:4, 1083:13, 1154:10, 1197:19, 1198:1
**proceeds** [1] - 1159:2
**process** [146] - 877:22, 878:10, 879:5, 881:12, 881:13, 881:16, 881:24, 886:19, 886:20, 886:24, 886:25, 888:13, 906:16, 910:4, 912:10, 914:4, 917:4, 917:6, 917:8, 917:10, 917:13, 917:14, 919:9, 919:18, 919:21, 920:12, 921:8, 921:22, 922:10, 922:18, 924:1, 924:8, 924:11, 924:17, 926:12, 926:13, 927:4, 927:5, 927:10, 927:11, 929:16, 930:5, 930:8, 938:12, 956:16, 966:3, 1043:14, 1073:6, 1073:13, 1081:8, 1081:9, 1081:10, 1085:25, 1086:4, 1086:19, 1086:23, 1087:23, 1087:24, 1089:6, 1090:5, 1090:7, 1090:13, 1090:16, 1090:17, 1090:21, 1091:2, 1091:8, 1091:9, 1091:19, 1092:9, 1092:10, 1093:22, 1093:24, 1093:25, 1096:14, 1098:9, 1098:17, 1101:8, 1101:9, 1101:14, 1101:16, 1101:17, 1102:10, 1102:11, 1102:15, 1102:20, 1102:21, 1102:22, 1102:24, 1103:3, 1103:9, 1103:19, 1103:25, 1104:1, 1104:3, 1104:4, 1104:6, 1105:10, 1108:1, 1109:10, 1110:2, 1110:8, 1110:13, 1110:14, 1110:19, 1111:19, 1111:23, 1111:25, 1112:1, 1112:4, 1112:10, 1112:15, 1112:18, 1112:19, 1112:20, 1113:9, 1113:22, 1114:4, 1115:11, 1115:12, 1115:18, 1115:22, 1117:4, 1117:6, 1117:12, 1117:13, 1118:4, 1118:5, 1118:6, 1119:7, 1119:17, 1119:18, 1119:23, 1120:7, 1123:6, 1124:19, 1133:10, 1156:12, 1158:24,

1159:1, 1159:17, 1160:8, 1195:2
**processes** [20] - 922:23, 923:8, 927:8, 933:25, 934:22, 936:10, 936:14, 969:9, 999:20, 1082:5, 1102:6, 1119:20, 1129:1, 1157:8, 1157:11, 1159:22, 1161:2, 1161:13, 1162:6, 1195:17
**processing** [1] - 999:14
**produce** [9] - 874:21, 876:9, 876:11, 877:18, 878:2, 905:13, 1089:14, 1089:15, 1095:18
**produced** [4] - 866:16, 876:14, 887:25, 963:11
**produces** [2] - 876:17, 1090:11
**producing** [4] - 876:25, 877:25, 1090:6, 1111:24
**product** [86] - 877:7, 882:1, 915:15, 919:9, 919:20, 922:7, 930:8, 933:1, 943:22, 944:5, 944:17, 945:3, 945:5, 953:12, 953:22, 955:7, 957:14, 957:19, 957:21, 957:23, 957:25, 963:12, 965:14, 980:1, 981:1, 983:19, 999:21, 1003:22, 1019:23, 1037:20, 1038:5, 1044:17, 1045:3, 1045:24, 1046:3, 1047:7, 1047:16, 1054:3, 1054:21, 1056:1, 1059:11, 1059:16, 1060:1, 1060:9, 1062:3, 1062:9, 1069:13, 1069:20, 1070:5, 1070:10, 1071:4, 1071:23, 1073:7, 1073:13, 1074:19, 1075:25, 1079:16, 1081:12, 1081:17, 1091:25, 1095:4, 1111:19, 1112:17, 1119:8, 1131:23, 1132:14, 1134:13, 1134:22, 1135:24, 1140:14, 1140:19, 1145:20, 1146:10, 1148:2, 1148:16, 1149:1, 1149:11, 1163:12, 1165:24, 1166:4, 1166:15, 1166:16, 1166:19, 1166:21
**product-containing** [1] - 919:20
**production** [15] - 882:8, 907:15, 910:23, 918:25, 919:19, 919:25, 920:4, 926:1, 926:2, 933:20, 1085:1, 1096:22, 1098:21, 1102:3, 1165:2
**Production** [1] - 911:17
**products** [52] - 874:9, 882:6, 894:2, 903:6, 903:9, 903:15, 903:21, 904:3, 910:6, 912:8, 917:15, 930:24, 932:22, 932:23, 933:19, 956:22, 963:2, 979:15, 1031:17, 1031:24, 1038:9, 1044:24, 1051:21, 1079:18, 1093:18, 1094:15, 1094:23, 1101:19, 1101:21, 1101:25, 1102:6, 1128:23, 1129:4, 1129:25, 1131:19, 1131:20, 1132:10, 1132:20, 1136:3, 1139:10, 1147:14, 1158:25, 1160:14, 1160:16, 1161:1, 1161:18, 1161:20, 1161:23, 1162:1, 1163:10
**Professional** [2] - 1197:23, 1197:25
**professional** [1] - 1022:4
**professor** [1] - 944:10
**proffered** [1] - 1159:19
**proffers** [1] - 1022:17
**profile** [3] - 980:17, 1038:24, 1165:10
**profit** [12] - 1042:3, 1042:7, 1042:8, 1042:23, 1044:2, 1044:6, 1044:7, 1044:8, 1044:10, 1044:12, 1044:18, 1045:7
**profits** [6] - 861:3, 861:8, 1042:8, 1047:1, 1047:5, 1056:9
**projections** [1] - 1044:19
**promotes** [2] - 1078:22, 1078:24
**pronouncing)** [1] - 1167:17
**proof** [6] - 1155:9, 1156:14, 1156:15, 1171:15, 1175:2, 1176:7
**proper** [4] - 868:8, 1082:12, 1093:20, 1137:7
**properly** [8] - 1028:21, 1037:9, 1048:10, 1049:3, 1056:4, 1056:16, 1165:25, 1192:14
**properties** [5] - 954:25, 998:9, 1101:10, 1103:1, 1177:11
**property** [7] - 1000:13, 1021:11, 1021:15, 1177:10, 1177:11, 1177:12, 1177:13
**proposal** [2] - 1175:7, 1178:2
**propose** [4] - 1170:9, 1175:19, 1186:10, 1187:7
**proposed** [1] - 1175:6
**proposing** [1] - 861:1
**prosecution** [8] - 908:16, 908:19, 909:4, 909:6, 951:10, 1013:7, 1013:14, 1013:19
**protecting** [1] - 956:24
**protection** [1] - 901:6
**protein** [119] - 878:12, 881:16, 881:24, 881:25, 893:24, 894:4, 910:4, 911:22, 912:3, 912:4, 917:5, 917:6, 917:9, 917:10, 918:8, 918:10, 919:21, 919:23, 926:8, 929:9, 932:14, 932:16, 943:20, 945:13, 947:6, 954:6, 954:25, 955:14, 955:19, 956:13, 956:14, 956:15, 958:8, 961:4, 961:5, 961:17, 962:1, 962:3, 962:7, 962:10, 962:14, 962:23, 963:1, 963:4, 963:10, 967:5, 968:23, 969:1, 969:6, 971:18, 971:20, 975:1, 975:2, 976:2, 976:17, 978:23, 978:25, 979:3, 979:6, 991:15, 998:8, 998:18, 999:12, 999:15, 999:21, 1008:20, 1010:15, 1010:21, 1010:22, 1079:9, 1080:24, 1081:20, 1086:3, 1089:8, 1090:5, 1090:17, 1090:21, 1091:2, 1093:25, 1095:1, 1095:2, 1098:9, 1102:12, 1110:14, 1112:8, 1113:9, 1117:14, 1118:5, 1128:15, 1128:19, 1129:4, 1129:14, 1130:4, 1130:5, 1130:8, 1130:9, 1130:16, 1130:22, 1131:3, 1131:9, 1131:15, 1131:17, 1132:8, 1132:16, 1132:21, 1136:22, 1143:6, 1143:7, 1146:20, 1147:15, 1147:23, 1148:12, 1148:13, 1148:15, 1148:16, 1151:4, 1163:24, 1195:16
**protein-active** [1] - 1143:6
**proteins** [58] - 874:22, 876:18, 876:21, 877:23, 878:2, 878:11, 886:25, 903:6, 903:21, 905:22, 906:5, 906:11, 906:14, 920:2, 925:21, 925:24, 926:4, 927:5, 927:6, 927:11, 929:12, 930:4, 930:17, 930:20, 931:15, 931:25, 933:14, 945:9, 952:23, 956:24, 961:9, 963:9, 965:7, 975:6, 975:25, 999:21, 1089:11, 1089:12, 1089:13, 1089:19, 1090:2, 1097:2, 1102:2, 1129:10, 1129:20, 1129:23, 1129:25, 1133:10, 1133:14, 1133:15, 1146:22, 1146:23, 1148:22, 1161:25, 1164:6, 1164:7
**prove** [3] - 1154:19, 1156:19, 1162:3
**proved** [2] - 1153:6, 1159:4
**proven** [5] - 1158:20, 1160:4, 1160:19, 1163:18, 1164:24
**provide** [10] - 867:12, 1023:24, 1024:8, 1032:10, 1032:15, 1043:18, 1054:6, 1118:11, 1134:21, 1195:4
**provided** [13] - 898:5, 938:24, 957:18, 968:1, 970:12, 984:6, 984:7, 986:2, 986:3, 1012:12, 1023:11, 1100:14, 1104:23
**provider** [1] - 1032:1
**providers** [5] - 1037:19, 1049:24, 1050:6, 1050:16, 1051:7
**provides** [5] - 955:6, 1001:3, 1032:22, 1038:10, 1188:25
**providing** [5] - 900:12, 903:8, 909:22, 909:23, 983:24
**proving** [1] - 1160:25
**provisional** [16] - 946:14, 1001:17, 1001:18, 1002:14, 1002:17, 1003:1, 1003:10, 1004:1, 1004:5, 1004:14, 1004:21, 1005:4, 1005:6, 1005:21, 1009:17, 1010:20
**PTX** [12] - 864:2, 865:6, 865:14, 883:13, 896:25,

897:6, 897:11, 1002:24, 1003:6, 1003:23, 1068:11, 1068:16
**public** [3] - 1003:17, 1021:25, 1023:18
**publication** [35] - 876:3, 876:4, 907:6, 907:11, 920:11, 920:15, 920:20, 948:5, 949:24, 952:7, 955:18, 955:24, 962:7, 969:20, 972:11, 973:23, 974:16, 978:16, 997:25, 1003:12, 1009:7, 1094:11, 1095:19, 1098:8, 1098:11, 1098:12, 1099:3, 1118:19, 1118:25, 1119:1, 1124:10, 1138:5, 1139:21, 1168:10, 1179:2
**publications** [6] - 944:22, 1086:17, 1103:10, 1109:25, 1122:1, 1139:12
**publicly** [1] - 1023:19
**publish** [2] - 890:2, 949:8
**published** [22] - 871:19, 874:17, 875:8, 875:11, 875:14, 889:9, 889:16, 889:17, 889:19, 902:13, 930:20, 930:24, 931:9, 938:10, 944:18, 949:2, 1094:7, 1094:8, 1120:17, 1120:18, 1123:20, 1125:24
**publishing** [1] - 930:25
**pull** [29] - 895:19, 896:24, 898:21, 907:9, 909:18, 910:19, 919:3, 919:15, 920:16, 923:23, 926:22, 928:9, 930:22, 938:19, 939:9, 940:2, 950:11, 995:22, 1056:25, 1068:11, 1069:10, 1073:15, 1085:12, 1099:15, 1103:22, 1103:24, 1105:20, 1106:5, 1155:1
**pulled** [4] - 924:1, 1023:19, 1033:19, 1040:17
**pulse** [2] - 1034:24, 1049:22
**pure** [15] - 1109:8, 1109:10, 1110:8, 1110:14, 1110:16, 1110:23, 1113:22, 1114:22, 1115:8, 1115:20, 1118:4, 1119:8, 1119:18, 1119:23
**purification** [42] - 871:5, 871:17, 871:20, 879:5, 879:18, 886:20, 888:13, 896:2, 896:21, 899:2, 899:24, 900:8, 907:15, 910:23, 913:21, 913:25, 917:6, 917:10, 918:23, 919:20, 922:17, 922:23, 924:5, 924:10, 927:8, 927:13, 936:9, 940:22, 940:23, 947:7, 964:22, 1085:1, 1098:21, 1101:8, 1104:12, 1116:2, 1121:4, 1123:17, 1127:10, 1127:12, 1157:8, 1159:11
**purified** [19] - 882:17, 882:19, 885:10, 886:15, 886:18, 887:13, 888:1, 894:3, 910:7, 918:22, 921:9, 935:6, 935:14, 936:13, 1090:16, 1091:23, 1091:25, 1113:19
**purify** [21] - 870:24, 878:23, 879:14, 880:16, 888:11, 900:18, 901:10, 905:11, 914:23, 922:2, 1101:5, 1102:13, 1110:14, 1114:9, 1120:3, 1123:2, 1124:9, 1125:10, 1125:18, 1125:22, 1162:5
**purifying** [16] - 878:20, 881:12, 886:19, 888:3, 910:4, 911:9, 913:19, 1098:9, 1105:10, 1112:16, 1117:6, 1121:15, 1124:11, 1160:12, 1162:10, 1162:11
**Purifying** [1] - 897:23
**purities** [1] - 884:2
**purity** [4] - 922:3, 922:4, 922:7, 1114:10
**purple** [2] - 952:5, 1113:5
**purpose** [7] - 932:2, 933:8, 945:17, 955:17, 1077:20, 1079:24, 1195:24
**purposes** [4] - 1038:9, 1072:11, 1164:2, 1188:15
**pursuant** [1] - 1154:18
**pursue** [1] - 1159:19
**pursuing** [1] - 1181:24
**push** [1] - 1046:2
**pushes** [1] - 1190:13
**pushing** [2] - 1191:1, 1191:7
**put** [38] - 856:7, 863:6, 864:12, 885:12, 893:1, 955:18, 978:22, 1013:18, 1017:17, 1040:17, 1040:19, 1042:2, 1047:11, 1048:14, 1049:3, 1055:8, 1063:4, 1065:4, 1065:20, 1066:24, 1067:15, 1080:15, 1087:6, 1129:1, 1132:17, 1135:16, 1135:17, 1150:1, 1153:8, 1164:14, 1176:8, 1178:5, 1178:25, 1179:16, 1182:20, 1183:8, 1184:9, 1196:7
**puts** [2] - 1137:7, 1172:22
**putting** [6] - 863:3, 1033:14, 1058:10, 1076:11, 1137:16, 1153:5
**puzzle** [1] - 1045:12
**PwC** [1] - 1022:7
**PwC's** [1] - 1022:11

**Q**

**qualification** [2] - 1022:2, 1170:8
**qualifications** [3] - 943:4, 943:24, 1189:3
**qualify** [8] - 949:18, 949:20, 982:20, 983:4, 983:7, 983:12, 1162:17, 1162:22
**Quality** [1] - 936:13
**quality** [3] - 1018:21, 1114:5, 1121:8
**quantitate** [1] - 937:10
**quantitated** [1] - 937:20
**quantity** [2] - 1051:5, 1155:19
**questions** [29] - 894:10, 917:22, 930:10, 937:1, 938:16, 939:4, 941:13, 957:5, 957:6, 989:20, 992:24, 1013:1, 1016:7, 1018:2, 1018:6, 1066:2, 1066:23, 1067:12, 1122:7, 1122:16, 1126:19, 1133:6, 1133:16, 1151:18, 1191:16, 1192:16, 1192:17, 1194:9, 1194:25
**quick** [1] - 1003:21
**quickly** [1] - 1106:6
**quite** [2] - 1089:20, 1125:1
**quote** [2] - 859:20, 1094:11

**R**

**raise** [5] - 860:20, 957:24, 1046:10, 1144:4, 1174:8
**raised** [3] - 959:1, 1052:2, 1129:24
**raises** [1] - 1144:6
**Raj** [3] - 941:20, 942:11, 1162:16
**RAJ** [2] - 941:20, 941:22
**Ramsey** [3] - 980:7, 1032:18, 1032:21
**ran** [1] - 1168:4
**range** [5] - 904:6, 960:24, 1024:3, 1094:13, 1102:21
**rank** [2] - 1049:25, 1050:6
**ranked** [2] - 1051:23, 1079:5
**rate** [48] - 1024:3, 1024:15, 1024:16, 1033:7, 1033:12, 1033:23, 1034:9, 1037:13, 1040:18, 1041:4, 1041:16, 1042:5, 1045:6, 1046:13, 1046:23, 1047:4, 1047:14, 1049:15, 1053:8, 1053:9, 1053:19, 1054:1, 1054:4, 1054:9, 1054:10, 1054:18, 1054:23, 1055:4, 1055:5, 1055:8, 1055:14, 1055:18, 1055:21, 1059:20, 1060:14, 1064:2, 1064:24, 1076:2, 1078:2, 1079:7, 1079:11, 1080:1, 1080:13, 1081:4, 1081:16, 1172:5, 1195:4
**rates** [14] - 1024:11, 1026:6, 1048:4, 1053:23, 1054:14, 1055:23, 1056:11, 1056:18, 1056:20, 1058:21, 1064:12, 1080:14, 1194:15
**rather** [4] - 1166:20, 1172:1, 1183:22, 1184:12
**ratings** [1] - 1060:7
**ratio** [1] - 1105:15
**rational** [1] - 999:8
**raw** [3] - 904:6, 904:8, 1094:13
**RCM** [2] - 906:9, 906:11
**reach** [3] - 1025:3, 1041:6, 1053:18
**reached** [3] - 939:2, 1012:3, 1085:8
**reaching** [1] - 1136:24
**reaction** [8] - 975:7, 975:9, 975:15, 991:16, 1143:10, 1170:3, 1170:19
**read** [25] - 868:25, 896:6, 896:10, 898:22, 899:4, 899:21, 932:11, 947:1, 991:14, 997:22, 997:24, 997:25, 1019:11, 1019:21, 1023:13,

1029:2, 1031:4, 1042:9, 1142:4, 1177:8, 1178:12, 1178:14, 1183:23, 1184:2, 1188:11
**readily** [1] - 999:13
**reading** [12] - 901:25, 916:5, 926:18, 1096:25, 1103:10, 1120:1, 1122:1, 1138:10, 1140:6, 1145:3, 1145:4, 1183:23
**reads** [3] - 900:25, 1138:10, 1186:14
**ready** [4] - 1019:16, 1066:3, 1083:24, 1172:24
**real** [5] - 870:4, 1025:4, 1025:5, 1188:17, 1189:4
**real-world** [2] - 1188:17, 1189:4
**realistically** [1] - 1138:13
**reality** [1] - 858:23
**realize** [2] - 891:19, 1061:23
**realized** [2] - 892:1, 893:5
**really** [23] - 856:23, 857:11, 861:4, 865:9, 865:11, 891:20, 926:13, 990:4, 991:1, 1037:4, 1046:3, 1048:15, 1056:23, 1059:2, 1060:5, 1106:6, 1110:22, 1144:20, 1145:16, 1153:15, 1172:25, 1189:15, 1193:9
**reason** [27] - 888:6, 888:8, 909:23, 998:4, 998:6, 1018:25, 1024:4, 1031:16, 1038:14, 1050:8, 1052:2, 1095:20, 1095:22, 1122:4, 1130:5, 1132:16, 1132:21, 1139:3, 1158:21, 1171:17, 1175:24, 1178:5, 1182:22, 1183:15, 1190:4, 1190:12, 1194:20
**reasonable** [47] - 858:7, 887:16, 958:2, 960:14, 1022:25, 1024:13, 1024:19, 1024:21, 1024:23, 1026:12, 1033:4, 1041:14, 1048:4, 1049:15, 1052:13, 1053:1, 1053:16, 1054:15, 1054:16, 1054:18, 1055:21, 1055:23, 1056:15, 1059:23, 1060:8, 1060:15, 1077:7, 1082:12, 1086:18, 1110:1, 1110:7, 1154:23, 1159:24, 1159:25, 1161:16, 1162:3, 1162:9, 1163:1, 1163:7, 1163:11, 1164:8, 1164:14, 1165:6, 1165:17, 1166:8, 1193:1, 1193:22
**reasonableness** [2] - 858:4, 858:25
**reasonably** [2] - 1157:14, 1159:16
**reasons** [15] - 909:22, 978:19, 1051:20, 1129:14, 1130:8, 1130:9, 1130:15, 1130:21, 1131:2, 1131:8, 1131:14, 1131:16, 1139:6, 1151:12, 1165:21
**rebates** [2] - 1039:18
**rebut** [1] - 1100:13
**rebuttal** [9] - 943:5, 973:5, 1029:3, 1169:23, 1170:24, 1171:1, 1171:4, 1171:10, 1171:11
**rebutting** [1] - 1165:4
**recalculated** [2] - 1041:16, 1049:13
**receive** [1] - 1012:5
**received** [2] - 1018:2, 1021:19
**receives** [1] - 1028:5
**recent** [2] - 914:22, 944:23
**recently** [2] - 914:5, 1161:10
**recess** [12] - 869:16, 870:2, 959:15, 959:16, 1019:3, 1019:7, 1083:9, 1083:12, 1152:6, 1154:9, 1197:18, 1197:19
**recipe** [13] - 919:6, 919:13, 919:24, 983:19, 986:19, 1001:3, 1003:22, 1011:2, 1060:1, 1140:14, 1145:20, 1146:10, 1149:1
**recitation** [1] - 1175:5
**recite** [1] - 1032:20
**recited** [6] - 964:6, 966:1, 966:18, 968:17, 970:23, 971:16
**recognize** [31] - 863:4, 875:5, 889:6, 897:1, 948:11, 950:13, 955:23, 1029:19, 1030:2, 1034:16, 1034:23, 1035:4, 1035:10, 1041:18, 1051:3, 1055:17, 1059:25, 1061:25, 1077:21, 1079:25, 1085:13, 1093:2, 1094:3, 1095:10, 1097:9, 1108:21, 1116:21, 1118:21, 1120:12, 1173:1, 1174:11
**recognized** [8] - 882:2, 887:7, 887:19, 888:18, 888:22, 1055:10, 1055:13, 1055:14
**recognizing** [4] - 1055:3, 1076:17, 1077:4, 1077:14
**recollection** [3] - 1006:15, 1006:17, 1137:14
**recombinant** [46] - 952:24, 952:25, 953:1, 954:16, 954:19, 954:23, 955:9, 962:13, 962:21, 962:22, 963:7, 963:9, 963:14, 969:13, 973:14, 974:2, 974:16, 976:23, 978:20, 1008:10, 1008:16, 1008:19, 1008:23, 1009:19, 1009:24, 1010:5, 1017:1, 1146:16, 1146:17, 1146:20, 1146:21, 1147:7, 1147:11, 1147:13, 1147:16, 1147:20, 1147:23, 1147:25, 1148:1, 1148:5, 1148:7, 1148:11, 1148:18, 1148:22
**recombinantly** [4] - 963:5, 963:6, 963:11, 1148:14
**recommend** [1] - 1045:2
**recommendation** [1] - 1078:5
**recommendations** [1] - 1093:13
**recommended** [1] - 1118:1
**recommending** [1] - 1037:19
**reconstitute** [1] - 970:9
**reconstituted** [4] - 953:12, 970:9, 971:1, 971:5
**reconstitution** [1] - 970:18
**record** [22] - 858:9, 858:13, 898:23, 941:19, 1003:12, 1020:7, 1043:15, 1069:23, 1075:8, 1075:12, 1084:19, 1155:13, 1159:12, 1162:3, 1162:9, 1165:20, 1167:25, 1168:22, 1176:1, 1181:4, 1182:6, 1188:11
**records** [1] - 925:8
**recovery** [4] - 968:2, 968:3, 976:13, 1017:10
**recreation** [1] - 1072:14
**RECROSS** [1] - 938:21
**RECROSS-EXAMINATION** [1] - 938:21
**red** [3] - 1140:1, 1147:4, 1147:5
**redact** [1] - 864:7
**redirect** [8] - 930:12, 938:24, 1013:3, 1082:22, 1082:23, 1100:15, 1156:21, 1195:15
**REDIRECT** [3] - 930:14, 1013:4, 1133:4
**redissolved** [1] - 964:24
**reduce** [3] - 1114:23, 1115:6, 1115:24
**reduced** [1] - 1046:14
**reduces** [1] - 1040:2
**reducing** [6] - 975:7, 975:12, 991:24, 1115:3, 1143:11, 1143:14
**reduction** [2] - 991:16, 1038:24
**reemphasize** [1] - 959:21
**refer** [7] - 902:15, 907:18, 942:12, 950:25, 971:23, 1000:23, 1016:18
**reference** [105] - 869:19, 875:25, 878:22, 886:23, 890:4, 890:8, 890:9, 892:6, 892:8, 892:15, 895:11, 895:15, 902:18, 904:24, 907:21, 915:1, 915:6, 915:19, 916:13, 916:19, 925:11, 927:25, 929:19, 929:21, 931:7, 935:5, 948:7, 948:15, 949:2, 949:7, 949:8, 949:18, 951:23, 951:25, 952:10, 952:21, 952:22, 953:3, 953:15, 953:16, 954:20, 967:22, 967:23, 974:20, 975:18, 983:17, 983:18, 984:8, 984:19, 984:23, 986:1, 989:23, 990:9, 995:15, 995:19, 995:22, 996:7, 996:15, 997:5, 997:11, 997:15, 999:5, 1000:6, 1003:9, 1004:2, 1004:10, 1009:6, 1009:9, 1009:13, 1010:3, 1011:1, 1011:5, 1011:7, 1011:11, 1011:16, 1011:17, 1016:1, 1016:4, 1016:8, 1016:19, 1017:20, 1095:7, 1097:4, 1097:16, 1098:16, 1098:20, 1099:14, 1099:17, 1099:20, 1135:5, 1135:12, 1140:17, 1140:24,

1142:25, 1144:5, 1145:3, 1146:9, 1150:7, 1160:15, 1161:8, 1164:20, 1177:9, 1178:3, 1179:6
**Reference** [1] - 996:20
**referenced** [6] - 865:15, 952:6, 997:10, 1133:7, 1133:12, 1161:6
**references** [48] - 874:14, 881:2, 887:9, 895:7, 901:25, 902:6, 916:5, 921:2, 924:20, 929:4, 929:24, 948:2, 948:4, 950:20, 950:24, 950:25, 951:3, 951:7, 954:8, 957:1, 983:22, 994:7, 994:12, 997:2, 1009:3, 1012:12, 1014:7, 1014:11, 1014:14, 1014:18, 1014:25, 1015:1, 1092:13, 1092:19, 1092:23, 1103:8, 1116:10, 1116:16, 1135:5, 1135:17, 1150:3, 1154:25, 1157:15, 1158:22, 1160:6, 1160:25, 1163:21, 1164:9
**referral** [1] - 1093:13
**referred** [7] - 922:14, 944:2, 1001:16, 1002:2, 1051:6, 1105:1, 1111:25
**referring** [12] - 866:8, 869:22, 880:10, 881:17, 962:14, 962:21, 966:2, 967:9, 975:3, 984:14, 1005:10, 1141:24
**refers** [9] - 880:11, 881:23, 882:14, 924:2, 954:14, 964:15, 1016:22, 1087:18, 1111:10
**reflect** [4] - 866:3, 1056:5, 1168:22, 1175:13
**reflected** [1] - 1071:9
**reflecting** [5] - 867:23, 954:5, 976:15, 977:6, 1071:7
**reflection** [1] - 867:25
**reflects** [1] - 996:9
**refresh** [2] - 985:13, 1006:16
**refreshing** [1] - 1006:15
**regarding** [11] - 902:9, 924:22, 929:21, 978:2, 1000:10, 1005:3, 1025:21, 1061:8, 1094:19, 1098:6, 1182:7
**region** [1] - 1022:13
**regional** [1] - 857:5
**regions** [1] - 891:11
**Registered** [2] - 1197:23, 1197:24
**regular** [2] - 1017:10, 1147:13
**regularly** [1] - 1175:12
**regulated** [1] - 1163:4
**regulatory** [1] - 1159:22
**Reinforced** [1] - 906:8
**reinvent** [1] - 1161:21
**reiterate** [2] - 1135:24, 1136:4
**reject** [1] - 1176:8
**rejected** [3] - 898:17, 1150:3, 1166:12
**relate** [14] - 891:14, 938:3, 945:1, 949:11, 954:11, 960:19, 984:12, 985:2, 985:19, 1016:1, 1047:19, 1056:17, 1081:11, 1103:16
**related** [15] - 857:17, 888:20, 890:23, 947:5, 978:5, 978:6, 980:15, 982:6, 1038:19, 1038:20, 1052:19, 1068:23, 1087:6, 1107:16, 1160:9
**relates** [9] - 897:19, 961:14, 1016:14, 1016:15, 1038:3, 1039:2, 1048:16, 1052:22, 1070:21
**relating** [4] - 945:15, 1010:21, 1012:22, 1066:9
**relationship** [4] - 1027:25, 1028:4, 1028:8, 1028:22
**relationships** [1] - 857:1
**relative** [9] - 965:19, 966:12, 968:10, 971:3, 1079:6, 1079:12, 1079:13, 1079:14, 1079:15
**release** [1] - 1047:11
**relevance** [1] - 931:21
**relevant** [14] - 858:1, 959:7, 995:11, 1030:13, 1059:6, 1061:19, 1064:4, 1065:6, 1065:7, 1065:8, 1066:11, 1163:2, 1163:12, 1178:14
**reliability** [1] - 954:5
**relied** [13] - 875:16, 889:13, 904:24, 925:8, 925:11, 929:4, 929:25, 1047:10, 1048:13, 1049:17, 1067:4, 1155:10, 1155:20
**relies** [8] - 1030:6, 1070:6, 1103:11, 1122:2, 1150:7, 1158:23, 1160:7, 1166:18
**reluctant** [1] - 1025:24
**rely** [9] - 983:17, 996:15, 997:19, 1009:14, 1011:8, 1048:11, 1067:3, 1155:16, 1192:12
**relying** [8] - 907:7, 920:15, 984:19, 1015:17, 1095:7, 1097:5, 1118:19, 1166:14
**remain** [4] - 1055:15, 1084:13, 1115:11, 1133:25
**remainder** [1] - 886:17
**remaining** [1] - 1162:25
**remains** [1] - 1055:15
**remember** [25] - 895:20, 897:15, 903:8, 985:12, 986:8, 1004:13, 1005:13, 1006:6, 1006:10, 1007:3, 1007:7, 1017:21, 1029:6, 1050:21, 1058:20, 1061:7, 1070:14, 1070:19, 1071:2, 1080:25, 1126:20, 1170:20, 1171:9, 1181:14, 1187:19
**remind** [25] - 870:22, 872:10, 879:4, 887:22, 887:24, 897:3, 911:2, 917:19, 943:16, 1024:20, 1032:5, 1039:8, 1041:25, 1084:21, 1084:24, 1088:9, 1094:25, 1097:11, 1134:10, 1134:19, 1137:20, 1152:18, 1154:2, 1173:22, 1180:1
**reminded** [1] - 870:7
**removal** [2] - 912:8, 922:15
**remove** [7] - 884:8, 922:11, 922:14, 922:19, 976:25, 1110:19, 1116:1
**removed** [3] - 903:6, 1168:7, 1168:9
**removes** [1] - 1119:8
**removing** [8] - 884:2, 1093:18, 1093:25, 1101:21, 1101:24, 1102:5, 1158:25, 1161:1
**renders** [1] - 986:6
**renew** [1] - 936:15
**rent** [2] - 1026:12, 1026:20
**repaired** [1] - 870:7
**repeat** [7] - 895:13, 943:10, 982:25, 990:8, 992:17, 1015:24, 1110:4
**repeated** [1] - 980:5
**repeatedly** [3] - 931:14, 934:21, 1067:13
**rephrase** [1] - 1128:1
**replace** [1] - 1040:13
**replaced** [1] - 1147:6
**replacement** [4] - 1138:12, 1138:21, 1146:5, 1147:5
**reply** [1] - 1171:11
**report** [26] - 859:20, 860:17, 860:21, 920:10, 926:10, 926:15, 929:15, 930:7, 931:13, 934:14, 934:19, 934:25, 936:17, 941:7, 953:3, 959:5, 1002:3, 1028:20, 1029:1, 1029:3, 1030:4, 1034:18, 1051:5, 1064:5, 1065:3
**reported** [16] - 879:5, 879:7, 879:13, 879:15, 879:22, 879:25, 885:15, 903:22, 904:20, 926:20, 926:21, 954:21, 1094:24, 1111:15, 1156:14, 1197:25
**Reporter** [3] - 1197:24, 1197:25, 1198:4
**reporter** [2] - 942:5, 960:1
**reporting** [4] - 910:22, 925:17, 1155:22, 1156:2
**reports** [11] - 885:23, 886:23, 953:25, 958:20, 960:16, 1023:13, 1062:11, 1067:23, 1067:25, 1155:7, 1156:9
**represent** [1] - 1147:7
**representative** [1] - 944:23
**representing** [3] - 863:13, 1006:1, 1006:7
**represents** [2] - 1036:9, 1058:24
**reproduce** [1] - 876:9
**reproduced** [1] - 898:21
**reproducibility** [2] - 877:14, 877:15
**reproducible** [2] - 907:4, 1161:6
**request** [3] - 1180:9, 1187:24, 1193:1
**requesting** [1] - 1188:14
**require** [3] - 982:15, 1040:21, 1118:6
**required** [5] - 1017:25, 1041:6, 1044:22, 1155:19, 1156:14
**requirement** [5] - 960:2, 1017:24, 1154:24, 1157:16, 1193:7
**requirements** [4] - 864:23, 998:10, 1089:21, 1089:23
**requires** [7] - 974:1, 986:25, 987:3, 993:13, 1026:8, 1156:24, 1162:21
**requiring** [2] - 1155:9, 1157:3

**research** [16] - 876:7, 920:4, 926:1, 926:5, 929:10, 929:14, 930:6, 933:16, 933:17, 944:12, 944:25, 945:3, 1023:18, 1097:14, 1126:13, 1152:24
**researched** [1] - 926:9
**researched-based** [1] - 926:9
**researcher** [4] - 882:10, 882:12, 1123:1, 1124:13
**researchers** [4] - 888:2, 888:10, 888:12, 1128:14
**reserve** [2] - 1030:16, 1169:23
**residual** [33] - 920:6, 921:16, 921:23, 922:22, 923:9, 923:13, 924:15, 926:11, 929:15, 934:2, 934:23, 937:2, 937:14, 937:19, 938:14, 1105:6, 1107:14, 1107:25, 1114:11, 1114:14, 1114:18, 1114:23, 1118:8, 1118:12, 1118:17, 1119:9, 1126:22, 1155:4, 1155:18, 1157:3, 1157:7, 1157:11, 1159:20
**resin** [5] - 883:11, 899:1, 937:10, 1115:15, 1162:7
**resins** [1] - 896:1
**resolution** [1] - 1189:8
**resolve** [6] - 868:21, 1053:14, 1077:7, 1170:1, 1193:24, 1197:16
**resolved** [4] - 869:1, 934:18, 1169:3, 1191:19
**resources** [1] - 858:7
**respect** [19] - 858:23, 862:19, 880:22, 881:9, 892:20, 933:16, 949:14, 954:24, 957:16, 957:20, 967:12, 974:6, 1000:1, 1009:11, 1083:14, 1103:6, 1121:22, 1151:8, 1162:18
**respectfully** [4] - 1157:17, 1158:18, 1162:15, 1165:15
**respectively** [2] - 1051:24, 1052:4
**respond** [6] - 973:16, 976:24, 986:14, 1171:16, 1172:23, 1173:1
**responding** [3] - 1024:19, 1135:1, 1135:3
**response** [7] - 859:13, 860:10, 898:16, 918:4, 1064:18, 1085:4, 1165:3
**Response** [1] - 898:8
**responses** [1] - 1116:7
**responsibilities** [1] - 1021:9
**responsive** [2] - 1062:21, 1062:25
**rest** [3] - 1038:22, 1084:3, 1187:12
**rested** [1] - 1084:2
**restrict** [1] - 963:21
**restricted** [2] - 924:16, 1155:21
**rests** [1] - 1163:16
**result** [6] - 924:15, 1026:23, 1042:9, 1107:25, 1191:22
**resulting** [2] - 930:8, 1155:24
**results** [16] - 876:20, 936:8, 936:9, 940:21, 943:7, 977:18, 977:21, 1006:3, 1006:8, 1052:12, 1073:23, 1096:5, 1155:10, 1161:4, 1164:25, 1165:2
**retain** [2] - 969:10, 970:2
**retaining** [1] - 968:19
**retains** [1] - 976:15
**retractive** [1] - 975:6
**Revance** [181] - 856:15, 857:9, 858:5, 858:10, 861:1, 861:5, 861:11, 864:12, 864:22, 866:17, 896:18, 896:22, 897:20, 898:1, 898:12, 898:13, 898:16, 899:10, 899:15, 899:21, 899:25, 900:5, 900:11, 900:15, 900:24, 901:5, 901:17, 901:19, 913:13, 913:16, 914:3, 914:18, 914:21, 914:25, 915:10, 915:13, 915:18, 915:21, 942:7, 1012:8, 1019:20, 1022:17, 1023:12, 1023:16, 1024:9, 1025:22, 1026:1, 1026:10, 1027:6, 1028:9, 1033:8, 1041:10, 1043:7, 1047:8, 1054:20, 1056:9, 1057:13, 1057:20, 1057:23, 1057:25, 1058:9, 1058:12, 1058:25, 1060:12, 1060:21, 1060:23, 1061:20, 1062:1, 1062:8, 1062:16, 1062:18, 1063:16, 1065:11, 1066:4, 1066:8, 1066:18, 1067:1, 1067:14, 1067:17, 1067:18, 1068:4, 1068:20, 1069:3, 1069:12, 1072:18, 1072:20, 1073:5, 1073:11, 1074:4, 1075:13, 1075:21, 1075:22, 1075:24, 1075:25, 1077:2, 1080:6, 1082:7, 1082:16, 1086:11, 1086:17, 1087:16, 1095:7, 1097:4, 1103:10, 1109:20, 1110:1, 1118:19, 1122:1, 1122:12, 1154:19, 1154:22, 1155:2, 1155:6, 1155:11, 1155:15, 1155:16, 1155:20, 1155:24, 1156:3, 1156:6, 1156:13, 1156:15, 1156:18, 1157:2, 1157:5, 1157:13, 1157:20, 1158:19, 1158:22, 1159:4, 1159:7, 1159:12, 1159:13, 1159:19, 1159:21, 1159:23, 1160:3, 1160:6, 1160:19, 1160:24, 1161:6, 1161:11, 1161:15, 1161:24, 1162:2, 1162:16, 1162:23, 1163:3, 1163:10, 1163:18, 1164:8, 1164:13, 1164:20, 1164:24, 1165:3, 1165:4, 1167:20, 1172:10, 1173:7, 1174:2, 1174:5, 1174:9, 1174:14, 1174:18, 1176:11, 1176:18, 1176:23, 1177:23, 1178:25, 1180:12, 1180:25, 1181:3, 1185:16, 1185:19, 1185:23, 1187:15, 1195:10, 1196:20
**REVANCE** [1] - 854:6
**Revance's** [35] - 856:4, 857:17, 858:25, 860:9, 871:7, 895:18, 896:24, 897:22, 898:17, 900:13, 913:18, 913:22, 914:18, 915:10, 915:24, 981:17, 984:6, 1000:3, 1012:13, 1019:23, 1034:24, 1042:23, 1044:19, 1060:20, 1061:7, 1065:17, 1085:4, 1085:19, 1116:5, 1133:7, 1135:1, 1140:5, 1156:9, 1165:9, 1174:11
**revenue** [2] - 864:9, 864:17
**reverse** [1] - 859:15
**review** [11] - 920:24, 951:12, 951:25, 952:14, 953:24, 979:17, 979:20, 979:22, 1013:14, 1069:1, 1132:5
**reviewed** [11] - 897:14, 907:22, 916:20, 944:22, 994:21, 1023:21, 1063:18, 1098:2, 1098:4, 1117:1, 1119:12
**reviewing** [3] - 892:4, 910:15, 917:3
**RHSA** [2] - 962:20
**rich** [1] - 975:23
**Richard** [1] - 854:11
**rid** [5] - 862:23, 864:22, 868:19, 868:20, 1185:1
**right-hand** [9] - 867:25, 872:20, 879:20, 881:3, 1082:11, 1137:15, 1140:1, 1144:14, 1147:4
**rise** [4] - 858:20, 1031:6, 1031:10, 1156:1
**risk** [27] - 861:21, 882:4, 882:8, 903:24, 903:25, 904:2, 904:10, 904:16, 932:21, 932:22, 932:25, 933:19, 1044:7, 1095:18, 1096:17, 1128:22, 1128:25, 1129:2, 1129:3, 1129:5, 1129:10, 1129:11, 1129:12, 1161:19, 1192:24, 1194:20
**risks** [2] - 930:24, 1129:1
**risky** [1] - 1095:5
**RNA** [4] - 921:17, 1106:2, 1106:12, 1106:13
**road** [2] - 1067:6
**ROBERT** [1] - 854:21
**Robert** [1] - 1173:23
**role** [1] - 1084:21
**roles** [1] - 1021:9
**room** [8] - 868:4, 955:10, 957:19, 1031:18, 1070:9, 1092:12, 1116:9, 1182:18
**roughly** [1] - 1052:19
**rounds** [1] - 1170:9
**route** [1] - 1043:21
**row** [1] - 937:15
**Roy** [9] - 894:17, 939:11, 985:14, 986:19, 988:15, 989:15, 993:15, 995:14, 1001:22
**roy** [1] - 1002:24
**royalties** [8] - 1024:21, 1053:1, 1054:15, 1054:17, 1061:19, 1194:6, 1194:9
**royalty** [53] - 1022:25, 1024:2, 1024:19, 1024:23, 1026:5, 1026:12, 1028:5, 1033:4, 1033:7,

1033:12, 1033:23, 1037:13, 1041:16, 1042:5, 1045:6, 1046:13, 1048:4, 1049:15, 1052:13, 1053:8, 1053:19, 1054:4, 1054:18, 1054:23, 1055:4, 1055:14, 1055:21, 1055:23, 1056:18, 1059:5, 1059:20, 1060:3, 1060:7, 1060:14, 1064:2, 1064:24, 1073:18, 1076:2, 1080:13, 1080:14, 1080:16, 1080:17, 1081:4, 1082:12, 1082:17, 1165:17, 1166:9, 1193:22, 1194:4, 1194:5, 1194:13, 1194:14, 1194:15
**RPR** [1] - 1198:3
**RTP004** [1] - 1165:9
**Ruegg** [5] - 898:3, 898:5, 913:15, 1002:21, 1004:9
**Ruegg's** [1] - 1080:20
**rule** [1] - 863:11
**Rule** [5] - 864:23, 1154:17, 1157:19, 1158:14, 1167:11
**rules** [2] - 1154:19, 1157:19
**ruling** [1] - 1175:19
**run** [11] - 884:8, 886:4, 957:13, 1092:4, 1104:10, 1115:5, 1168:1, 1168:17, 1168:20, 1184:11
**run-by-run** [1] - 1092:4
**running** [1] - 883:25
**runs** [1] - 1113:17
**Rupert** [8] - 893:13, 938:18, 1083:25, 1084:6, 1154:15, 1158:12, 1167:6, 1167:9
**RUPERT** [62] - 854:20, 875:20, 880:1, 889:23, 893:11, 894:17, 895:1, 897:6, 897:13, 908:10, 908:12, 912:23, 913:3, 913:8, 914:9, 914:13, 918:3, 918:12, 921:18, 921:20, 923:6, 927:17, 927:22, 927:24, 930:10, 931:12, 931:17, 931:20, 934:13, 934:24, 936:15, 937:3, 938:19, 938:22, 939:11, 939:13, 941:13, 958:22, 959:13, 1083:14, 1083:21, 1084:7, 1084:17, 1100:12, 1100:18, 1100:21, 1106:20, 1106:21, 1108:9, 1108:12, 1108:13, 1110:9, 1120:20, 1120:25, 1122:6, 1133:5, 1133:16, 1154:14, 1158:2, 1167:10, 1172:12, 1173:5

## S

**S-U-R-Y-A-N-A-R-A-Y-A-N-A-N** [1] - 941:21
**saccharide** [9] - 975:3, 991:15, 1141:14, 1142:1, 1142:5, 1142:11, 1143:7
**safety** [5] - 905:17, 1038:7, 1038:23, 1095:16, 1160:11
**sake** [1] - 950:7
**sale** [2] - 1054:22, 1080:4
**Sales** [2] - 1027:16, 1027:20
**sales** [59] - 861:8, 862:18, 864:14, 864:16, 864:21, 1027:20, 1028:6, 1030:25, 1031:6, 1031:9, 1031:10, 1042:4, 1044:13, 1044:19, 1044:22, 1044:23, 1045:4, 1045:8, 1045:11, 1045:12, 1045:16, 1045:19, 1046:4, 1046:6, 1047:1, 1054:17, 1054:22, 1055:18, 1056:9, 1056:10, 1058:23, 1058:25, 1059:9, 1059:10, 1059:13, 1059:15, 1059:23, 1060:4, 1060:6, 1060:20, 1060:21, 1060:23, 1068:24, 1071:7, 1071:10, 1072:7, 1080:1, 1080:6, 1080:9, 1081:14, 1082:7, 1082:16, 1082:19, 1082:20, 1166:15
**salespeople** [2] - 1045:24, 1046:1
**saline** [2] - 964:24, 970:10
**salt** [1] - 964:25
**SAMANTHA** [1] - 855:3
**sample** [2] - 1104:23, 1106:15
**samples** [1] - 936:13
**satisfy** [1] - 1157:16
**saturated** [1] - 1070:8
**saw** [12] - 861:3, 868:11, 877:14, 938:4, 938:25, 955:6, 992:21, 1039:20, 1045:21, 1081:18, 1126:23, 1196:4
**scales** [1] - 1179:20
**scenario** [1] - 1029:20
**scenes** [1] - 1073:12
**schedule** [1] - 1152:17
**Schoneich's** [1] - 943:6
**School** [1] - 1021:22
**Schöneich** [35] - 972:23, 973:5, 976:5, 976:19, 977:10, 977:18, 978:8, 979:2, 979:10, 986:7, 986:11, 1133:20, 1133:25, 1134:5, 1134:17, 1135:15, 1136:12, 1136:16, 1137:4, 1141:5, 1141:21, 1142:10, 1143:1, 1143:21, 1144:3, 1145:5, 1146:2, 1148:5, 1149:10, 1150:24, 1151:17, 1151:22, 1152:2, 1153:23, 1154:2
**Schöneich's** [5] - 973:6, 973:8, 976:3, 976:8, 1134:15
**science** [10] - 943:25, 944:3, 944:4, 944:16, 944:19, 945:4, 947:5, 1136:21, 1139:3
**sciences** [1] - 1021:19
**scientific** [2] - 932:21, 1196:16
**scientist** [49] - 901:22, 902:2, 904:1, 904:15, 916:7, 916:10, 925:24, 926:18, 1086:5, 1087:8, 1092:6, 1092:14, 1096:9, 1096:11, 1096:25, 1101:4, 1103:12, 1109:12, 1110:6, 1116:11, 1118:14, 1119:25, 1121:7, 1121:11, 1121:13, 1122:3, 1124:14, 1135:11, 1135:18, 1138:15, 1138:17, 1138:20, 1138:25, 1139:12, 1139:14, 1140:6, 1140:20, 1140:21, 1142:20, 1143:24, 1143:25, 1146:14, 1147:10, 1147:12, 1148:17, 1150:2, 1150:25, 1151:2, 1151:4
**scientists** [15] - 901:18, 905:10, 957:2, 1086:2, 1090:10, 1096:2, 1096:16, 1109:9, 1110:13, 1120:7, 1125:9, 1136:1, 1137:10, 1141:3, 1148:19
**scope** [13] - 931:13, 934:14, 934:18, 936:16, 946:6, 989:5, 989:24, 990:11, 1005:22, 1065:24, 1073:9, 1141:2, 1152:12
**screen** [35] - 863:7, 863:19, 864:12, 880:25, 881:1, 895:19, 896:19, 896:24, 898:21, 909:18, 915:9, 923:23, 931:1, 938:20, 940:3, 986:23, 993:10, 995:14, 1001:12, 1003:6, 1024:1, 1034:2, 1057:2, 1065:20, 1076:23, 1082:11, 1085:12, 1088:15, 1104:2, 1105:13, 1138:8, 1150:17, 1155:2, 1179:17, 1196:2
**scribble** [1] - 1183:25
**scribble-out** [1] - 1183:25
**scribe** [1] - 1174:20
**sealing** [1] - 923:24
**search** [1] - 1181:10
**seat** [1] - 1154:12
**seated** [4] - 870:12, 958:13, 960:10, 1019:17
**SEC** [3] - 1065:17, 1065:21, 1065:22
**second** [47] - 860:12, 863:4, 865:13, 865:15, 873:6, 879:8, 880:5, 880:7, 881:20, 904:24, 910:19, 920:15, 935:19, 939:4, 945:21, 946:6, 951:3, 962:18, 968:5, 973:10, 975:5, 976:3, 995:21, 999:12, 1018:22, 1022:24, 1028:19, 1039:8, 1043:13, 1046:19, 1046:22, 1047:24, 1057:22, 1059:4, 1091:10, 1091:24, 1100:5, 1103:24, 1104:2, 1108:14, 1111:2, 1118:18, 1134:17, 1152:23, 1155:20, 1166:6, 1167:19
**second-to-expire** [1] - 1059:4
**second-to-last** [1] - 1100:5
**secondary** [7] - 871:22, 871:24, 872:4, 873:8, 892:19, 892:23, 1181:19
**section** [2] - 943:18, 1147:19
**Section** [3] - 911:16, 1117:19, 1117:22
**security** [1] - 859:2
**see** [164] - 856:20, 863:24, 865:5, 866:5, 872:17, 872:20, 876:10, 877:19, 881:1, 881:3, 881:15,

884:15, 890:17, 898:20, 899:15, 899:19, 900:20, 900:22, 901:4, 903:10, 909:19, 910:10, 914:16, 914:17, 919:22, 926:19, 928:2, 931:1, 935:20, 935:21, 937:7, 937:16, 940:15, 942:19, 944:21, 946:5, 947:13, 949:24, 950:21, 951:3, 951:6, 952:4, 953:7, 953:24, 954:9, 961:24, 961:25, 963:18, 963:25, 965:19, 966:7, 968:3, 969:25, 970:7, 972:8, 974:24, 975:14, 975:19, 976:10, 979:18, 981:15, 981:16, 987:20, 989:8, 991:13, 991:18, 995:17, 995:22, 996:2, 996:3, 996:6, 996:21, 998:11, 998:19, 999:10, 999:16, 999:23, 1000:20, 1001:18, 1001:20, 1001:23, 1001:25, 1003:1, 1003:4, 1003:7, 1003:9, 1003:14, 1003:17, 1003:25, 1004:17, 1004:19, 1007:20, 1009:6, 1009:22, 1010:18, 1013:15, 1014:10, 1014:24, 1016:21, 1016:25, 1017:24, 1018:14, 1019:2, 1026:22, 1031:5, 1031:9, 1035:16, 1045:15, 1048:2, 1050:4, 1050:16, 1051:23, 1052:1, 1052:3, 1052:21, 1053:9, 1059:24, 1065:17, 1065:18, 1065:25, 1069:3, 1077:16, 1087:8, 1090:9, 1090:15, 1091:20, 1095:17, 1096:8, 1099:6, 1101:18, 1102:12, 1103:5, 1104:6, 1106:8, 1111:23, 1115:1, 1115:14, 1115:25, 1117:15, 1119:19, 1122:11, 1137:14, 1138:24, 1139:19, 1139:20, 1139:23, 1144:6, 1144:7, 1144:14, 1146:15, 1146:16, 1147:3, 1147:5, 1148:10, 1149:5, 1150:5, 1150:18, 1173:9, 1173:10, 1173:17, 1184:1, 1184:17, 1190:8

**seed** [2] - 878:1, 878:8
**seeding** [1] - 878:10
**seeing** [6] - 867:10, 973:24, 990:10, 1137:13, 1138:7, 1187:19
**seek** [1] - 1165:23
**seeking** [2] - 898:17, 926:3
**seem** [2] - 863:10, 1178:11
**select** [1] - 1037:21
**selected** [2] - 966:21, 1155:15
**selecting** [3] - 1037:19, 1043:3, 1050:7
**sell** [11] - 1027:11, 1027:13, 1027:22, 1028:2, 1059:12, 1059:15, 1062:3, 1062:8, 1069:7, 1072:19
**selling** [2] - 1044:24, 1074:18
**sells** [1] - 1027:9
**Semendyai** [4] - 1158:3, 1158:7, 1167:16, 1167:17
**SEMENDYAI** [6] - 854:22, 1158:4, 1158:7, 1158:8, 1158:11, 1167:17
**seminal** [1] - 955:18
**send** [2] - 1196:24, 1197:6
**sending** [2] - 1083:10, 1197:1
**sense** [14] - 859:1, 861:6, 1031:23, 1040:5, 1043:17, 1046:21, 1047:22, 1048:9, 1066:2, 1083:15, 1105:9, 1141:13, 1151:6, 1184:12
**sensed** [1] - 861:9
**sentence** [39] - 860:16, 880:5, 880:7, 880:10, 886:13, 898:23, 899:14, 899:17, 900:24, 903:12, 910:19, 932:6, 932:11, 932:18, 936:7, 989:4, 989:11, 989:13, 990:3, 990:16, 991:13, 998:16, 999:12, 999:18, 1100:4, 1100:5, 1138:6, 1138:9, 1142:4, 1142:10, 1174:8, 1179:3, 1179:5, 1184:7, 1185:8, 1185:9, 1186:7, 1186:12, 1186:20
**sentences** [3] - 1144:1, 1177:7, 1177:16
**separate** [1] - 1091:11
**separated** [4] - 878:5, 1113:10, 1113:11, 1113:18
**separates** [1] - 1113:20
**separating** [1] - 1091:13
**separation** [1] - 1128:12
**sephadex** [2] - 1117:20, 1118:2
**sepharose** [4] - 895:25, 899:1
**September** [6] - 872:18, 872:25, 874:2, 874:5, 874:15, 1087:2
**sequence** [3] - 889:10, 889:12, 900:17
**sequences** [8] - 888:21, 890:18, 890:20, 890:25, 891:5, 891:9, 1100:7, 1100:24
**sequencing** [2] - 890:9, 890:14
**serious** [2] - 1169:1, 1169:2
**seriously** [1] - 1140:22
**serotype** [2] - 888:5, 888:9
**serotypes** [4] - 888:19, 888:20, 890:25, 891:4
**serum** [24] - 932:12, 954:10, 954:11, 954:12, 954:13, 954:14, 954:22, 954:23, 955:9, 962:21, 963:14, 1010:5, 1052:1, 1100:19, 1138:12, 1138:18, 1138:23, 1139:6, 1139:16, 1147:3, 1147:7, 1147:13, 1147:17, 1150:21
**services** [1] - 1022:12
**set** [7] - 867:14, 867:15, 922:1, 986:18, 1016:6, 1051:22, 1057:1
**seven** [4] - 932:19, 1088:17, 1088:23, 1168:4
**seventh** [1] - 1186:8
**several** [6] - 947:6, 954:8, 1016:7, 1036:19, 1148:21, 1154:18
**shake** [1] - 856:24
**share** [5] - 861:2, 928:14, 951:8, 1045:21, 1076:1
**sheet** [1] - 866:4
**sheets** [1] - 863:19
**shelf** [2] - 953:21, 968:6
**Shield** [4] - 856:15, 858:2, 860:23, 868:25
**shift** [6] - 874:1, 967:18, 973:4, 997:8, 1047:3, 1047:13
**shifted** [1] - 1022:11
**short** [3] - 905:8, 906:9, 1088:10
**shortcut** [1] - 1178:4
**shorthand** [1] - 1198:1
**show** [32] - 856:10, 858:3, 858:5, 858:8, 858:23, 861:17, 862:4, 862:6, 862:15, 863:24, 864:25, 896:25, 923:24, 928:13, 933:9, 956:9, 961:21, 964:20, 1015:19, 1015:20, 1016:13, 1034:7, 1036:19, 1055:25, 1089:2, 1105:13, 1147:1, 1147:5, 1157:21, 1159:7, 1164:21, 1196:7
**showed** [11] - 859:4, 895:18, 919:16, 926:24, 928:1, 1013:7, 1015:12, 1017:4, 1042:2, 1056:6, 1061:14
**showing** [19] - 856:11, 862:11, 994:5, 1070:25, 1087:13, 1087:15, 1090:4, 1090:7, 1090:13, 1091:15, 1111:3, 1111:7, 1113:13, 1135:15, 1135:21, 1146:25, 1155:22, 1164:8, 1165:2
**shown** [35] - 919:5, 923:7, 934:10, 935:13, 937:21, 955:10, 1047:3, 1086:11, 1088:5, 1088:16, 1092:22, 1104:1, 1109:20, 1111:11, 1111:21, 1112:2, 1112:4, 1112:9, 1112:10, 1115:21, 1130:19, 1139:17, 1140:24, 1144:11, 1144:13, 1144:18, 1146:2, 1150:17, 1151:12, 1157:10, 1159:15, 1161:12, 1163:15, 1167:21, 1188:3
**shows** [28] - 890:19, 934:11, 976:12, 994:8, 999:1, 1030:24, 1033:25, 1036:10, 1087:14, 1088:4, 1090:5, 1090:20, 1091:17, 1100:8, 1104:3, 1110:22, 1111:4, 1112:15, 1113:15, 1113:16, 1114:9, 1114:25, 1115:22, 1139:21, 1159:12, 1167:25, 1168:16, 1168:19
**shrink** [2] - 1047:4, 1047:5
**shrinks** [1] - 1047:14
**side** [51] - 861:17, 863:1, 863:3, 864:25, 867:25,

869:6, 872:20, 880:25, 881:1, 881:3, 962:9, 974:5, 974:8, 993:10, 1003:3, 1025:4, 1057:2, 1073:20, 1076:16, 1076:19, 1076:22, 1077:15, 1078:12, 1078:14, 1079:23, 1082:11, 1090:8, 1090:9, 1090:14, 1090:15, 1096:20, 1111:23, 1112:6, 1112:10, 1137:15, 1139:19, 1140:1, 1141:6, 1144:13, 1144:14, 1144:16, 1147:1, 1147:4, 1154:12, 1170:3, 1188:22, 1191:1, 1191:3, 1192:24
**side's** [1] - 862:19
**sidebar** [6] - 1028:15, 1028:17, 1029:12, 1065:25, 1066:1, 1068:9
**sided** [1] - 1057:14
**sides** [1] - 1177:15
**Siegwarth** [41] - 863:2, 863:5, 867:6, 1024:12, 1025:19, 1026:11, 1027:2, 1028:3, 1032:8, 1032:16, 1032:25, 1036:1, 1036:18, 1037:9, 1039:4, 1039:8, 1039:11, 1041:1, 1041:20, 1042:13, 1043:2, 1043:4, 1045:4, 1046:12, 1048:14, 1048:19, 1049:11, 1050:18, 1056:13, 1058:22, 1064:11, 1065:3, 1066:5, 1066:10, 1067:3, 1068:12, 1068:19, 1070:6, 1074:8, 1076:9, 1165:18
**Siegwarth's** [21] - 863:20, 1022:24, 1023:21, 1023:25, 1024:16, 1024:19, 1028:7, 1032:6, 1033:3, 1033:16, 1033:25, 1040:20, 1041:25, 1044:1, 1048:2, 1048:7, 1056:12, 1058:17, 1060:7, 1060:11, 1061:4
**signature** [1] - 996:3
**significance** [1] - 1067:5
**significant** [2] - 1010:14, 1138:21
**significantly** [2] - 1046:8, 1056:19
**sill** [1] - 1058:17
**similar** [14] - 863:1, 863:5, 868:1, 888:21, 891:2, 891:9, 911:4, 955:1, 1006:3, 1006:8, 1010:7, 1047:17, 1099:21
**similarities** [1] - 888:24
**similarity** [1] - 1100:23
**simple** [3] - 904:17, 978:22, 1089:2
**sincerely** [1] - 1197:14
**single** [9] - 864:3, 864:10, 864:17, 864:20, 865:18, 869:19, 886:14, 933:5, 1106:13
**single-stranded** [1] - 1106:13
**sit** [5] - 870:6, 1018:8, 1039:19, 1041:12, 1167:19
**sitting** [6] - 927:3, 1023:14, 1025:2, 1058:9, 1058:13, 1073:12
**situation** [1] - 864:5
**six** [4] - 953:11, 953:23, 968:8, 1022:6
**sixth** [1] - 1186:3
**size** [1] - 879:11
**skeptical** [1] - 1181:12
**skepticism** [6] - 1138:21, 1181:5, 1181:11, 1181:12, 1181:15
**skill** [57] - 873:4, 874:3, 874:20, 877:9, 877:10, 880:15, 880:17, 882:6, 887:4, 887:7, 887:15, 887:19, 888:17, 891:10, 891:18, 891:23, 891:25, 892:16, 893:4, 900:25, 901:8, 931:24, 945:15, 946:5, 946:11, 946:20, 946:24, 947:1, 947:16, 955:4, 982:12, 982:18, 983:2, 983:10, 1086:16, 1109:24, 1124:23, 1136:13, 1136:17, 1136:19, 1137:9, 1162:17, 1188:16, 1188:20, 1188:24, 1189:1, 1189:3, 1189:10, 1190:1, 1190:7, 1192:3, 1192:4, 1192:7, 1192:19, 1193:7, 1193:11, 1193:14
**skilled** [17] - 882:2, 895:11, 895:15, 958:1, 958:8, 969:21, 973:10, 973:12, 976:6, 976:21, 999:15, 1123:1, 1124:12, 1124:25, 1125:4, 1128:14, 1168:13
**skip** [1] - 1119:16
**skipped** [1] - 919:12
**slash** [1] - 937:24
**sleep** [2] - 1153:7, 1153:15
**slide** [117] - 870:19, 872:2, 872:15, 872:25, 873:6, 873:19, 883:20, 884:12, 893:1, 919:8, 928:14, 928:18, 928:22, 931:1, 942:19, 942:25, 946:1, 961:18, 963:18, 974:23, 1007:5, 1007:12, 1007:15, 1038:4, 1042:2, 1056:6, 1056:8, 1058:20, 1069:1, 1069:11, 1069:17, 1071:1, 1071:7, 1071:10, 1072:13, 1072:14, 1073:15, 1080:7, 1085:17, 1086:7, 1086:20, 1087:1, 1087:11, 1087:14, 1087:19, 1088:1, 1088:12, 1088:24, 1089:4, 1089:9, 1090:3, 1090:8, 1090:14, 1090:18, 1091:4, 1091:15, 1091:17, 1092:11, 1092:24, 1093:7, 1093:12, 1094:9, 1094:10, 1095:14, 1096:1, 1096:6, 1097:6, 1098:5, 1098:7, 1098:19, 1099:1, 1101:15, 1101:18, 1106:19, 1108:25, 1109:13, 1110:3, 1110:10, 1110:24, 1111:1, 1111:17, 1111:20, 1111:22, 1111:25, 1112:3, 1112:10, 1112:21, 1113:4, 1113:12, 1113:15, 1114:7, 1114:20, 1115:9, 1115:19, 1116:8, 1116:20, 1117:11, 1117:12, 1117:15, 1117:17, 1118:20, 1119:3, 1119:15, 1119:19, 1121:20, 1135:15, 1135:22, 1137:13, 1137:16, 1139:18, 1145:7, 1146:24, 1150:23, 1151:7, 1151:12, 1190:24
**Slide** [1] - 880:22
**slides** [4] - 858:19, 1019:12, 1021:2, 1134:15
**sliver** [2] - 1059:19, 1060:5
**slow** [3] - 962:15, 980:18, 1108:10
**small** [6] - 858:6, 863:20, 877:24, 1007:24, 1010:11, 1078:9
**smaller** [1] - 1022:13
**Smelt** [54] - 872:7, 872:14, 873:12, 875:8, 875:25, 876:3, 876:4, 876:13, 876:17, 876:20, 877:3, 877:8, 877:11, 877:13, 877:22, 880:2, 880:4, 881:3, 887:6, 887:9, 887:17, 891:24, 892:2, 892:14, 893:7, 904:23, 905:3, 905:4, 905:8, 905:10, 905:14, 905:19, 905:25, 906:7, 906:14, 906:19, 906:22, 907:1, 907:2, 1092:21, 1095:13, 1095:15, 1095:16, 1095:23, 1096:2, 1096:5, 1096:13, 1096:16, 1096:25, 1160:6, 1160:11, 1160:12, 1160:21, 1161:4
**snippets** [1] - 928:2
**sodium** [2] - 965:1, 965:15
**sold** [3] - 1044:14, 1045:10, 1054:20
**sole** [1] - 1154:20
**solely** [1] - 1155:20
**solid** [1] - 1076:14
**solution** [6] - 964:24, 1067:21, 1113:16, 1127:2, 1127:3, 1166:10
**solvent** [1] - 964:16
**someone** [10] - 856:7, 862:4, 862:5, 869:21, 999:14, 1018:23, 1170:21, 1180:1, 1185:1, 1185:8
**sometime** [2] - 1152:10, 1181:16
**sometimes** [1] - 990:24
**somewhat** [1] - 1171:13
**somewhere** [1] - 869:11
**soon** [1] - 1018:15
**sorry** [31] - 873:7, 873:13, 873:15, 883:5, 895:13, 897:17, 908:9, 931:20, 935:4, 947:14, 948:13, 951:13, 953:25, 979:7, 990:4, 990:15, 992:19, 1015:24, 1016:3, 1027:17, 1035:3, 1053:24, 1065:7, 1068:16, 1068:17, 1082:8, 1100:6, 1108:9, 1109:16, 1112:24, 1167:16
**sort** [3] - 1100:3, 1102:16, 1127:25
**sound** [1] - 863:17
**SOURCE** [2] - 885:18, 885:19

**source** [5] - 954:15, 962:5, 965:7, 1095:1, 1161:5
**sourced** [1] - 1094:14
**sources** [1] - 866:8
**sourcing** [3] - 1093:20, 1129:16, 1139:8
**soy** [3] - 876:21, 878:13, 1161:5
**soy-based** [2] - 876:21, 878:13
**soybean** [3] - 876:6, 876:18, 878:1
**soybean-based** [3] - 876:6, 876:18, 878:1
**soybeans** [1] - 877:7
**SP** [4] - 935:20, 935:24, 935:25, 936:2
**speakers** [1] - 960:5
**speaking** [4] - 927:20, 1169:16, 1169:18, 1197:16
**speaks** [1] - 1107:16
**special** [4] - 1189:16, 1190:25, 1191:4, 1191:13
**specialize** [1] - 1021:15
**specific** [17] - 887:14, 887:23, 911:7, 983:22, 999:19, 1005:10, 1005:14, 1080:25, 1103:19, 1113:7, 1118:11, 1154:25, 1155:10, 1155:22, 1155:25, 1156:10, 1191:24
**specifically** [17] - 871:4, 876:6, 876:18, 877:7, 885:17, 888:8, 893:17, 898:15, 910:2, 910:12, 952:18, 966:21, 1032:3, 1139:5, 1142:7, 1154:22, 1186:5
**specification** [3] - 928:6, 979:22, 1107:23
**specifics** [1] - 1097:16
**specified** [1] - 1088:7
**speculative** [2] - 1165:19, 1167:2
**spell** [2] - 941:19, 1020:6
**spend** [1] - 1021:13
**spent** [1] - 1022:8
**split** [2] - 861:10, 1166:8
**spores** [2] - 905:19, 905:25
**spotty** [2] - 877:16, 906:22
**spreadsheet** [10] - 862:8, 864:10, 864:18, 864:21, 865:10, 865:11, 865:14, 865:18, 865:19
**spreadsheets** [4] - 862:18, 863:15, 863:16, 867:4
**squarely** [2] - 914:10, 1166:12
**stability** [13] - 953:4, 953:9, 953:25, 954:2, 954:6, 955:6, 955:11, 957:17, 957:25, 960:15, 966:5, 966:8, 999:13
**stabilization** [4] - 931:3, 932:15, 955:14, 998:10
**stabilize** [17] - 943:20, 962:1, 967:5, 968:12, 975:25, 992:12, 993:4, 1006:21, 1007:13, 1007:17, 1008:24, 1009:20, 1137:21, 1146:15, 1147:14, 1148:8, 1148:12
**stabilized** [1] - 1004:23
**stabilizer** [7] - 954:25, 955:16, 956:11, 958:7, 958:9, 962:13, 963:6
**stabilizers** [5] - 955:19, 956:17, 956:20, 976:2, 1146:7
**stabilizing** [6] - 967:4, 976:16, 1004:25, 1010:14, 1147:24, 1164:2
**stable** [9] - 953:23, 956:13, 957:25, 977:1, 999:8, 1148:2, 1148:16, 1148:23, 1164:10
**stacks** [1] - 1058:21
**staff** [2] - 870:7, 1022:8
**stage** [2] - 956:25, 1016:6
**stake** [1] - 1144:15
**stamped** [2] - 1001:24, 1001:25
**stand** [7] - 869:8, 939:23, 1084:9, 1089:7, 1112:7, 1133:20, 1162:20
**standard** [13] - 868:13, 1038:5, 1038:11, 1050:3, 1055:25, 1060:9, 1079:17, 1138:19, 1139:1, 1147:2, 1175:5, 1175:13, 1175:21
**standards** [1] - 1175:24
**standing** [2] - 959:20, 1167:9
**stands** [5] - 937:22, 937:24, 1089:8, 1112:8, 1150:21
**starch** [2] - 972:1, 1009:20
**STARGATT** [1] - 855:2
**start** [16] - 881:11, 946:10, 946:11, 967:1, 973:18, 983:21, 1024:1, 1024:18, 1053:3, 1053:4, 1055:3, 1085:10, 1122:19, 1141:8, 1141:10, 1152:5
**started** [4] - 984:3, 984:5, 1022:5, 1091:9
**starting** [5] - 878:12, 880:5, 899:17, 1004:18, 1100:6
**starts** [6] - 860:16, 1014:3, 1056:23, 1104:6, 1112:15, 1186:7
**state** [7] - 918:17, 941:18, 1020:6, 1084:18, 1151:8, 1189:1, 1192:17
**statement** [51] - 890:24, 895:23, 896:6, 896:24, 900:2, 900:9, 900:11, 900:14, 900:16, 900:19, 900:21, 900:25, 901:11, 901:21, 903:16, 933:9, 933:14, 974:17, 974:22, 975:14, 975:21, 975:23, 977:3, 982:8, 991:22, 992:9, 994:24, 995:9, 996:10, 998:13, 998:21, 1006:4, 1010:25, 1096:10, 1098:15, 1121:12, 1138:9, 1138:16, 1138:24, 1142:14, 1142:18, 1143:9, 1144:8, 1172:1, 1195:22, 1196:2, 1196:10, 1196:12, 1196:16
**statements** [14] - 857:7, 858:2, 901:5, 920:7, 1010:21, 1013:8, 1013:11, 1022:11, 1023:19, 1142:21, 1142:23, 1143:22, 1144:24, 1148:20
**States** [4] - 1019:24, 1132:10, 1132:15, 1132:20
**STATES** [1] - 854:1
**states** [15] - 884:4, 898:24, 910:2, 919:17, 962:25, 983:6, 989:5, 998:8, 998:17, 999:12, 999:19, 1009:18, 1010:13, 1100:7, 1106:9
**stating** [2] - 927:13, 1067:13
**status** [1] - 1179:7
**stay** [5] - 1030:17, 1153:10, 1153:11, 1153:12, 1153:13
**steadfastly** [2] - 1041:8, 1041:10
**Stenotype** [1] - 1198:1
**step** [80] - 879:17, 880:19, 881:19, 881:21, 882:11, 882:12, 882:23, 882:24, 882:25, 883:8, 883:9, 883:16, 883:19, 883:21, 883:22, 884:11, 884:12, 884:13, 884:18, 884:19, 884:20, 885:6, 885:7, 885:21, 885:22, 886:7, 886:8, 886:9, 886:13, 886:17, 896:8, 896:21, 899:23, 900:8, 901:1, 901:2, 901:9, 913:4, 919:12, 919:14, 919:17, 941:15, 952:8, 958:14, 964:5, 964:6, 964:7, 965:19, 965:25, 966:12, 966:16, 966:17, 969:25, 970:6, 970:8, 970:22, 971:15, 971:16, 1018:8, 1018:18, 1082:25, 1083:5, 1091:1, 1104:2, 1123:6, 1124:11, 1125:20, 1125:23, 1133:17, 1133:18, 1140:18, 1146:18, 1153:24
**stepped** [1] - 972:16
**stepping** [1] - 1024:20
**steps** [8] - 881:13, 1087:24, 1112:13, 1113:7, 1114:22, 1114:25, 1115:7, 1168:14
**STERNE** [1] - 855:5
**stick** [3] - 1171:3, 1173:17, 1183:18
**sticker** [2] - 1039:16, 1039:17
**sticking** [1] - 1104:20
**still** [18] - 867:3, 874:14, 904:5, 904:8, 910:16, 933:16, 960:3, 1033:11, 1046:19, 1083:6, 1089:1, 1094:13, 1094:15, 1094:17, 1152:6, 1161:22, 1172:15, 1174:24
**stipulated** [1] - 1019:22
**stop** [4] - 990:1, 990:12, 1050:9, 1096:4
**storage** [3] - 954:4, 966:7, 968:7
**store** [2] - 957:10, 957:19
**stored** [5] - 953:10, 954:6, 955:7, 957:13, 957:15
**story** [1] - 866:24
**Stout** [4] - 1020:22, 1021:5, 1021:10, 1022:4
**Stout's** [1] - 1021:11
**straight** [1] - 1079:20
**straightforward** [2] -

1090:2, 1162:5
**stranded** [1] - 1106:13
**stream** [1] - 948:5
**streamline** [2] - 862:9, 1167:13
**strength** [2] - 859:2, 968:23
**stricken** [3] - 1029:1, 1029:7
**strict** [1] - 1136:1
**strictly** [1] - 929:10
**strike** [17] - 917:3, 964:2, 965:22, 966:14, 967:16, 968:14, 970:4, 970:20, 971:13, 972:12, 992:15, 997:19, 1030:17, 1062:10, 1063:3, 1069:14, 1177:15
**strikes** [1] - 1083:19
**striking** [2] - 1007:8, 1007:9
**stringing** [1] - 971:25
**stronger** [1] - 907:2
**structural** [2] - 954:24, 1010:11
**structure** [5] - 1089:1, 1099:6, 1099:7, 1147:17
**structured** [1] - 990:3
**structures** [4] - 888:21, 988:7, 1088:25, 1162:12
**stuck** [1] - 884:6
**studied** [1] - 1052:2
**study** [5] - 876:10, 905:17, 1051:5, 1095:16, 1160:11
**studying** [1] - 890:11
**stuff** [6] - 860:23, 1067:7, 1100:17, 1173:12, 1178:6, 1178:7
**subcutaneous** [3] - 943:23, 971:1, 971:8
**subject** [3] - 959:10, 971:9, 1001:5
**submission** [1] - 856:16
**submit** [5] - 1157:18, 1172:15, 1172:19, 1174:21
**submitted** [11] - 856:22, 859:16, 898:12, 898:16, 1001:10, 1002:3, 1009:10, 1011:18, 1181:7, 1183:20, 1184:7
**submitting** [1] - 1172:14
**subsequent** [2] - 861:14, 1193:3
**subsequently** [1] - 884:24
**subsidiary** [1] - 1193:16
**substance** [3] - 944:4, 944:17, 945:5
**substances** [2] - 957:2, 1141:22
**substantial** [1] - 1167:4
**substantially** [5] - 861:20, 886:20, 910:6, 919:9, 955:1
**substantive** [1] - 858:19
**substitute** [5] - 857:19, 857:23, 882:7, 1006:2, 1006:7
**substituted** [1] - 882:9
**succeeding** [1] - 1159:25
**success** [11] - 958:2, 960:15, 992:14, 1086:18, 1110:2, 1110:7, 1162:3, 1162:6, 1164:9, 1164:15, 1172:4
**successfully** [1] - 871:16
**sucralose** [1] - 956:22
**sucrose** [1] - 975:25
**sued** [1] - 1012:8
**sufficient** [10] - 1066:25, 1154:22, 1157:13, 1159:14, 1159:23, 1161:7, 1161:15, 1163:10, 1163:24, 1191:5
**sufficiently** [1] - 1161:11
**sugar** [10] - 971:25, 975:13, 990:18, 991:24, 992:1, 992:3, 992:4, 1141:9, 1181:25
**sugars** [17] - 966:22, 975:18, 975:22, 975:24, 976:1, 989:1, 991:2, 991:17, 991:20, 992:7, 1141:9, 1141:10, 1143:11, 1143:12, 1143:14, 1143:16, 1143:17
**suggest** [10] - 920:1, 929:11, 931:23, 1069:11, 1154:1, 1158:25, 1160:22, 1161:1, 1164:18, 1179:4
**suggested** [2] - 1075:5, 1178:2
**suggesting** [1] - 1061:18
**suggestion** [3] - 1173:8, 1179:10, 1196:11
**suggests** [3] - 1099:20, 1149:11, 1159:5
**suitable** [7] - 943:22, 970:25, 971:8, 1067:25, 1096:12, 1138:12, 1146:5
**sum** [1] - 1195:1
**summaries** [2] - 865:1, 866:15
**summarize** [6] - 938:9, 951:24, 972:16, 1052:25, 1053:20, 1107:20
**summarized** [2] - 867:1, 936:8
**summary** [13] - 862:7, 862:10, 862:22, 863:6, 863:10, 863:15, 863:17, 865:22, 866:21, 936:13, 1023:24, 1121:20, 1131:18
**super** [14] - 1109:8, 1109:10, 1110:8, 1110:14, 1110:16, 1110:23, 1113:22, 1114:22, 1115:8, 1115:20, 1118:3, 1119:8, 1119:18, 1119:22
**superior** [8] - 879:16, 879:23, 880:9, 880:19, 883:17, 1038:24, 1049:25, 1050:6
**supplemental** [2] - 1028:20, 1180:2
**support** [6] - 907:7, 920:15, 956:9, 1157:14, 1162:23, 1181:4
**supported** [2] - 871:3, 1165:20
**supports** [2] - 1030:14, 1045:15
**suppose** [1] - 1152:25
**supposed** [6] - 856:10, 863:16, 1152:25, 1153:1, 1153:4, 1178:13
**supposedly** [1] - 986:6
**surfactant** [37] - 943:21, 966:21, 967:1, 967:2, 967:4, 967:7, 967:10, 967:12, 967:14, 978:20, 1000:24, 1005:8, 1006:2, 1006:20, 1007:13, 1007:17, 1007:20, 1007:21, 1008:10, 1008:12, 1008:19, 1008:22, 1017:19, 1017:23, 1017:24, 1134:21, 1137:18, 1139:24, 1140:8, 1146:10, 1149:1, 1149:12, 1149:15, 1151:16, 1163:25, 1164:1, 1165:8
**surfactants** [6] - 967:5, 1006:22, 1006:23, 1007:2, 1008:20, 1137:21
**surprise** [1] - 1181:23
**surprised** [2] - 1152:2, 1173:17
**surprising** [2] - 1114:2, 1114:3
**surprisingly** [2] - 1090:10, 1146:4
**survey** [14] - 1034:24, 1036:7, 1048:13, 1049:22, 1050:1, 1050:4, 1050:19, 1050:24, 1051:17, 1051:18, 1052:5, 1052:12, 1073:23
**surveys** [18] - 1033:20, 1037:1, 1037:18, 1040:17, 1048:14, 1048:20, 1048:23, 1049:2, 1049:17, 1052:16, 1053:7, 1070:6, 1079:1, 1079:4, 1081:18, 1165:23, 1166:14, 1166:17
**Sury** [61] - 942:11, 942:12, 942:14, 943:25, 945:11, 950:13, 951:6, 953:15, 955:21, 957:9, 958:14, 960:13, 961:20, 964:6, 974:22, 976:24, 981:15, 981:17, 985:8, 985:25, 988:23, 989:4, 992:17, 993:12, 994:6, 995:17, 999:25, 1000:3, 1001:12, 1002:13, 1004:19, 1005:6, 1007:7, 1008:1, 1008:9, 1008:13, 1011:21, 1012:16, 1012:25, 1013:6, 1014:20, 1014:24, 1015:23, 1016:25, 1018:7, 1018:17, 1135:3, 1135:6, 1135:17, 1136:7, 1140:6, 1142:14, 1149:16, 1149:19, 1150:1, 1150:7, 1162:16, 1162:18, 1162:20, 1163:16, 1192:3
**Sury's** [7] - 945:16, 989:16, 1007:5, 1150:4, 1162:23, 1164:12, 1189:23
**Suryanarayanan** [3] - 941:17, 941:20, 942:11
**SURYANARAYANAN** [1] - 941:22
**susceptibility** [1] - 1101:2
**sustain** [3] - 951:16, 1006:17, 1100:20
**sustained** [1] - 1015:7
**swapping** [1] - 1102:15
**switch** [6] - 871:21, 921:15, 1024:14, 1104:14, 1127:19, 1127:20
**switching** [3] - 1051:21, 1051:25, 1126:15
**swollen** [1] - 1095:21
**swords** [1] - 1191:18
**swore** [1] - 917:24
**sworn** [6] - 894:12, 895:2, 941:24, 1020:12, 1084:13, 1133:25
**symbols** [3] - 1147:4, 1147:5, 1147:6
**sympathies** [1] - 1191:10
**synonym** [1] - 966:9
**synonyms** [1] - 990:23

**system** [2] - 883:3, 963:23
**systems** [1] - 913:19
**Systems** [1] - 897:23

## T

**T-R-E-X-L-E-R** [1] - 1020:9
**tab** [2] - 889:4, 1051:1
**table** [13] - 936:8, 936:12, 937:7, 939:8, 939:10, 941:7, 1025:2, 1025:7, 1027:7, 1058:9, 1105:19, 1105:23
**Table** [14] - 939:7, 939:14, 939:16, 954:1, 954:9, 965:11, 967:9, 972:4, 1105:16, 1105:20, 1106:5, 1106:8, 1150:16
**tablet** [1] - 944:5
**talks** [13] - 953:17, 955:19, 956:17, 956:21, 962:9, 962:11, 962:19, 964:7, 964:23, 968:1, 968:5, 971:6, 975:5
**taught** [5] - 966:12, 1124:16, 1124:23, 1125:4, 1159:9
**TAYLOR** [1] - 855:2
**teach** [14] - 895:6, 896:11, 896:14, 896:15, 900:9, 910:3, 967:11, 972:19, 1098:8, 1121:17, 1160:21, 1160:22, 1164:1, 1164:18
**teaches** [9] - 895:11, 895:15, 896:7, 896:20, 899:23, 900:7, 991:20, 1121:19, 1159:5
**teaching** [7] - 895:10, 895:14, 895:16, 964:17, 1007:12, 1121:16, 1164:20
**team** [3] - 1023:17, 1045:16, 1197:16
**tease** [2] - 1037:23, 1038:14
**technical** [2] - 869:9, 1081:1
**technically** [2] - 960:6, 1064:9
**technique** [5] - 880:8, 883:17, 1123:20, 1123:22
**techniques** [3] - 922:17, 1091:5, 1091:13
**technologies** [1] - 1128:12
**technology** [3] - 1039:1, 1057:19, 1146:21
**telegraphed** [1] - 1173:2
**temperature** [10] - 953:22, 954:7, 955:11, 957:19, 957:22, 957:24, 960:23, 968:7, 1089:24
**temperatures** [3] - 957:10, 960:16, 960:19
**ten** [3] - 928:25, 961:12, 1154:6
**ten-minute** [1] - 1154:6
**tend** [1] - 1170:20
**tens** [1] - 1072:4
**term** [6] - 963:12, 988:8, 988:9, 999:15, 1110:17, 1121:16
**terms** [24] - 869:18, 894:1, 894:21, 935:13, 945:16, 953:25, 961:14, 961:15, 965:8, 965:18, 965:19, 966:6, 966:11, 969:25, 978:22, 988:9, 1087:25, 1089:23, 1107:15, 1111:14, 1111:16, 1127:18, 1163:9, 1179:20
**Terrence** [17] - 949:21, 1134:20, 1137:19, 1139:19, 1139:21, 1139:25, 1140:18, 1140:20, 1141:1, 1143:4, 1143:11, 1143:14, 1144:9, 1144:13, 1144:17, 1145:13, 1146:3
**test** [3] - 1146:20, 1147:25, 1148:14
**tested** [1] - 956:18
**testified** [41] - 893:14, 893:17, 894:11, 900:4, 902:9, 904:1, 904:14, 917:23, 920:5, 920:21, 924:4, 924:21, 925:3, 929:20, 936:18, 936:19, 938:23, 940:13, 941:24, 949:21, 949:23, 974:13, 977:18, 980:8, 994:6, 1000:9, 1020:12, 1045:17, 1064:11, 1080:22, 1084:14, 1085:19, 1104:21, 1109:2, 1126:9, 1130:3, 1134:1, 1135:6, 1144:24, 1164:13, 1181:22
**testify** [11] - 936:21, 959:4, 974:15, 1004:9, 1004:11, 1007:1, 1094:18, 1136:7, 1149:16, 1160:17
**testifying** [7] - 859:18, 972:23, 1025:19, 1026:11, 1134:17, 1134:19, 1143:12
**testimony** [81] - 863:20, 895:2, 898:6, 900:12, 902:1, 903:8, 906:21, 907:21, 914:11, 938:5, 938:24, 942:15, 943:2, 958:17, 959:11, 960:17, 980:10, 980:16, 982:11, 986:9, 987:13, 991:11, 991:23, 997:11, 1008:4, 1008:5, 1008:6, 1009:25, 1020:24, 1023:13, 1023:22, 1025:21, 1028:7, 1028:11, 1032:13, 1032:19, 1043:5, 1045:15, 1061:5, 1061:12, 1062:4, 1062:11, 1062:13, 1065:4, 1070:16, 1070:24, 1080:20, 1080:25, 1085:3, 1099:12, 1100:11, 1100:13, 1100:15, 1103:16, 1122:25, 1123:3, 1126:7, 1126:24, 1128:16, 1128:17, 1129:13, 1129:17, 1130:1, 1130:13, 1130:16, 1131:6, 1131:12, 1132:25, 1145:2, 1149:18, 1149:23, 1152:3, 1152:5, 1156:22, 1162:23, 1164:13, 1168:11, 1169:7, 1189:7, 1189:23, 1191:19
**tests** [1] - 1168:4
**tetanus** [2] - 890:22, 891:1
**TeTx** [2] - 890:19, 890:22
**text** [2] - 1004:1, 1188:5
**THE** [291] - 854:1, 854:2, 856:1, 856:17, 857:14, 858:9, 858:16, 858:18, 859:9, 859:12, 859:22, 860:1, 860:4, 860:11, 860:14, 860:24, 862:1, 862:11, 862:13, 862:15, 862:21, 863:9, 863:24, 864:8, 865:7, 865:9, 866:1, 866:9, 866:14, 866:18, 867:5, 867:13, 867:17, 868:3, 868:7, 868:16, 868:24, 869:7, 869:15, 870:1, 870:4, 870:10, 875:21, 889:24, 893:9, 894:20, 897:9, 908:11, 913:1, 913:6, 914:8, 914:12, 918:7, 918:10, 927:19, 927:23, 930:11, 931:18, 931:21, 932:1, 933:8, 935:1, 936:22, 937:4, 938:17, 941:14, 941:18, 941:20, 942:4, 945:19, 947:14, 947:17, 948:21, 951:15, 956:5, 957:3, 958:10, 958:13, 958:23, 958:25, 959:12, 959:14, 959:18, 960:9, 981:9, 981:12, 982:23, 982:25, 985:17, 988:17, 989:19, 990:15, 990:17, 990:21, 990:23, 990:24, 991:1, 991:5, 992:17, 992:19, 992:24, 993:17, 995:4, 1002:9, 1006:16, 1013:2, 1014:22, 1015:7, 1018:7, 1018:17, 1019:5, 1019:15, 1020:2, 1020:6, 1020:8, 1022:20, 1028:16, 1029:10, 1030:11, 1030:16, 1035:20, 1051:14, 1060:18, 1060:21, 1060:24, 1062:17, 1062:20, 1062:24, 1063:8, 1063:12, 1063:13, 1064:17, 1065:14, 1065:25, 1066:2, 1066:13, 1066:19, 1067:2, 1067:16, 1067:24, 1068:8, 1069:14, 1073:10, 1073:11, 1082:22, 1082:24, 1083:4, 1083:8, 1083:19, 1083:23, 1084:4, 1084:12, 1084:15, 1100:16, 1100:20, 1108:6, 1108:11, 1110:4, 1110:6, 1120:23, 1122:8, 1126:1, 1133:17, 1133:21, 1133:22, 1133:24, 1134:2, 1141:5, 1141:8, 1141:12, 1141:15, 1141:19, 1142:3, 1142:6, 1149:6, 1151:19, 1151:24, 1153:23, 1154:3, 1154:5, 1154:11, 1158:1, 1158:5, 1158:10, 1167:8, 1167:15, 1167:18, 1168:3, 1168:18, 1168:22, 1169:9, 1169:12, 1169:19, 1170:1, 1170:18, 1171:7, 1171:12, 1171:25, 1172:17, 1172:25, 1173:6, 1173:16, 1173:22, 1173:24, 1174:3, 1174:6, 1174:13, 1174:17,

1174:19, 1174:23, 1175:8, 1175:10, 1175:23, 1176:5, 1176:15, 1176:20, 1176:25, 1177:5, 1177:15, 1177:18, 1177:21, 1177:24, 1178:5, 1178:16, 1179:18, 1179:22, 1180:5, 1180:11, 1180:19, 1180:24, 1181:2, 1181:9, 1181:14, 1182:2, 1182:9, 1182:13, 1182:17, 1182:23, 1183:2, 1183:6, 1183:11, 1183:18, 1183:22, 1184:1, 1184:4, 1184:6, 1184:9, 1184:14, 1184:18, 1184:20, 1184:24, 1185:4, 1185:12, 1185:18, 1185:21, 1186:2, 1186:4, 1186:13, 1186:19, 1187:1, 1187:8, 1187:10, 1187:16, 1188:1, 1188:7, 1188:9, 1188:13, 1189:11, 1189:24, 1190:10, 1190:15, 1190:22, 1191:9, 1191:15, 1191:21, 1192:6, 1192:21, 1193:9, 1193:25, 1194:8, 1194:18, 1195:18, 1195:21, 1196:1, 1196:9, 1196:17, 1196:19, 1196:22, 1197:4, 1197:6, 1197:14

**theirs** [1] - 1045:25

**themselves** [2] - 866:14, 1047:22

**theoretical** [2] - 1128:25, 1129:5

**theory** [4] - 856:12, 868:10, 1156:8, 1165:21

**THERAPEUTICS** [1] - 854:6

**Therapeutics** [2] - 1067:17, 1172:10

**thereby** [1] - 886:18

**therefore** [9] - 902:2, 963:13, 971:13, 1004:18, 1098:10, 1157:17, 1162:22, 1167:1, 1174:14

**thereto** [1] - 1023:13

**Thereupon** [15] - 875:22, 889:25, 897:11, 913:2, 913:7, 948:23, 956:6, 995:6, 1002:11, 1028:17, 1030:19, 1035:22, 1051:15, 1066:1, 1120:24

**thesis** [10] - 908:25, 929:3, 929:4, 929:8, 929:11, 929:17, 931:15, 1097:15, 1125:21, 1133:8

**they've** [4] - 934:20, 1125:11, 1132:9, 1192:7

**thin** [1] - 1181:20

**thinking** [6] - 857:25, 858:4, 867:5, 958:16, 1151:21, 1181:18

**thinks** [1] - 1077:5

**third** [17] - 859:16, 860:12, 860:15, 907:6, 946:7, 976:18, 989:4, 991:13, 998:16, 1066:4, 1066:9, 1067:18, 1068:5, 1097:4, 1156:6, 1166:13, 1184:7

**thoroughly** [1] - 1188:21

**thoughts** [1] - 858:23

**thousandfold** [2] - 876:24, 877:4

**thousands** [1] - 1072:4

**three** [36] - 878:7, 881:2, 887:9, 887:20, 892:17, 901:25, 902:7, 906:13, 935:5, 938:6, 943:3, 957:6, 959:25, 969:14, 973:8, 977:8, 991:2, 992:24, 1005:7, 1021:6, 1022:8, 1034:2, 1036:16, 1042:21, 1050:21, 1050:22, 1064:14, 1072:21, 1077:1, 1092:12, 1092:19, 1103:10, 1144:7, 1170:8, 1181:5, 1188:8

**three-month** [1] - 1077:1

**throughout** [4] - 926:7, 1074:12, 1102:22, 1129:13

**tied** [4] - 1043:14, 1043:15, 1047:21, 1166:11

**Tigan** [3] - 1174:19, 1197:2, 1197:11

**TIGAN** [4] - 854:16, 1174:21, 1197:3, 1197:13

**timeline** [2] - 1070:25, 1071:19

**timelines** [1] - 1071:6

**tiny** [3] - 1007:23, 1059:19, 1060:5

**tip** [1] - 1179:20

**title** [7] - 897:22, 907:14, 913:18, 956:12, 994:23, 1185:10, 1185:11

**titled** [5] - 875:9, 889:10, 898:8, 905:4, 936:12

**titles** [1] - 1057:12

**today** [41] - 869:21, 893:14, 894:12, 895:17, 902:9, 904:8, 916:13, 917:24, 920:6, 920:21, 924:21, 925:8, 927:3, 929:4, 929:25, 942:12, 942:22, 943:2, 944:9, 981:6, 1005:16, 1018:2, 1020:24, 1022:12, 1030:6, 1062:4, 1073:6, 1087:5, 1094:13, 1094:16, 1094:17, 1094:19, 1134:7, 1134:23, 1135:7, 1136:7, 1160:18, 1162:20, 1164:7, 1164:13, 1181:16

**today's** [1] - 1087:5

**together** [17] - 867:17, 947:20, 971:25, 1037:22, 1040:17, 1040:24, 1055:8, 1087:15, 1111:8, 1114:23, 1115:7, 1141:13, 1145:8, 1148:19, 1153:5, 1180:14, 1187:18

**tomorrow** [7] - 869:21, 1152:3, 1152:4, 1153:12, 1153:17, 1153:18, 1197:12

**ton** [3] - 1130:18, 1130:21, 1132:8

**tone** [1] - 959:22

**tonight** [7] - 1157:25, 1167:13, 1168:24, 1172:16, 1172:21, 1180:20, 1196:25

**took** [4] - 867:11, 985:8, 1040:6, 1046:13

**top** [15] - 879:9, 881:11, 883:12, 940:4, 998:8, 1001:18, 1005:25, 1006:5, 1036:7, 1042:7, 1045:5, 1046:24, 1050:5, 1057:7, 1093:11

**topic** [6] - 862:6, 945:22, 955:2, 957:7, 973:5, 1093:9

**topics** [1] - 921:15

**total** [6] - 1042:4, 1049:1, 1055:8, 1055:21, 1193:22, 1194:16

**totally** [1] - 1149:2

**touch** [1] - 943:24

**touched** [2] - 1013:20, 1015:3

**towards** [5] - 993:16, 995:22, 1003:25, 1167:11, 1191:7

**toxic** [6] - 932:15, 961:5, 1099:9, 1099:10, 1101:2, 1101:3

**toxicity** [1] - 961:13

**Toxin** [2] - 875:9, 911:16

**toxin** [180] - 870:24, 874:21, 876:9, 876:14, 876:17, 876:22, 876:25, 877:12, 877:18, 878:20, 878:24, 879:14, 879:18, 880:16, 881:12, 882:15, 882:19, 882:20, 884:5, 884:6, 884:7, 884:14, 884:16, 886:10, 886:14, 886:19, 886:20, 886:24, 887:24, 888:3, 888:7, 888:9, 888:14, 888:16, 888:19, 888:25, 890:22, 891:1, 891:6, 891:12, 891:15, 896:2, 896:21, 899:2, 899:23, 900:8, 905:5, 905:13, 910:5, 914:23, 918:18, 918:25, 919:25, 923:10, 923:14, 924:6, 930:18, 931:3, 935:6, 935:14, 936:13, 940:18, 941:3, 941:6, 941:9, 941:10, 941:11, 941:12, 943:20, 945:3, 952:23, 952:24, 954:2, 955:11, 957:10, 961:2, 961:4, 961:13, 962:12, 962:19, 963:5, 964:12, 964:23, 964:25, 967:3, 968:2, 968:12, 974:1, 981:25, 982:3, 982:6, 982:16, 982:19, 983:3, 983:7, 983:11, 983:15, 992:12, 997:21, 1006:21, 1007:13, 1007:17, 1008:11, 1008:13, 1008:24, 1009:20, 1012:17, 1012:19, 1012:23, 1049:25, 1050:7, 1067:1, 1088:6, 1088:7, 1088:10, 1089:15, 1090:11, 1090:15, 1098:10, 1098:22, 1102:3, 1102:13, 1112:23, 1113:3, 1113:19, 1114:5, 1115:24, 1121:4, 1121:5, 1121:6, 1121:8, 1121:9, 1123:1, 1123:2, 1123:17, 1124:12, 1125:10, 1125:19, 1125:22, 1126:13, 1127:3, 1127:5, 1127:9, 1127:11, 1127:12, 1127:14, 1127:16, 1128:14, 1128:15, 1136:3, 1136:8, 1136:10, 1136:23, 1137:2, 1137:5, 1137:17, 1138:11, 1155:5, 1156:24, 1157:1, 1157:4,

1157:12, 1159:2, 1161:14, 1161:20, 1162:4, 1162:13, 1162:21, 1163:2, 1163:6, 1163:12, 1164:10, 1190:21
**toxins** [26] - 871:17, 874:10, 876:11, 882:17, 882:21, 890:23, 891:7, 894:3, 933:17, 981:18, 981:22, 982:4, 982:5, 997:23, 998:1, 998:3, 1066:10, 1098:25, 1124:9, 1128:23, 1161:22, 1162:19, 1163:5, 1163:9, 1188:17, 1189:5
**Toxins** [1] - 940:1
**trace** [1] - 1117:25
**track** [2] - 862:2, 1018:14
**tracker** [1] - 1051:5
**traditional** [1] - 1089:16
**trained** [1] - 960:6
**transaction** [1] - 862:18
**transcript** [2] - 894:15, 1179:15
**TRANSCRIPT** [1] - 854:9
**transcripts** [1] - 1169:6
**transition** [1] - 1145:5
**translate** [2] - 923:12, 1101:9
**transmit** [2] - 903:22, 904:12
**transport** [2] - 957:20, 957:23
**transported** [1] - 957:15
**treat** [3] - 1070:22, 1071:8, 1072:10
**treated** [1] - 1179:20
**treatment** [1] - 1070:12
**treatments** [1] - 1071:4
**Trehalose** [1] - 992:4
**trehalose** [37] - 952:19, 953:17, 953:21, 954:3, 955:13, 955:16, 956:10, 956:23, 958:6, 966:22, 966:24, 967:19, 968:1, 968:3, 968:6, 968:10, 968:12, 975:9, 975:10, 975:12, 975:15, 975:16, 975:25, 976:11, 976:14, 976:16, 987:1, 991:24, 992:1, 992:3, 992:7, 992:11, 992:22, 993:3, 1005:8, 1143:18, 1164:3
**TREXLER** [1] - 1020:10
**Trexler** [38] - 859:18, 860:16, 865:1, 868:4, 869:10, 1020:4, 1020:8, 1020:17, 1020:19, 1020:21, 1020:23, 1021:4, 1022:18, 1022:22, 1029:14, 1030:15, 1047:24, 1060:16, 1060:18, 1061:2, 1062:15, 1063:10, 1065:16, 1065:21, 1067:3, 1068:14, 1072:17, 1077:9, 1077:12, 1078:8, 1082:24, 1083:4, 1165:22, 1165:25, 1166:13, 1166:18, 1166:22
**Trexler's** [6] - 1028:19, 1165:19, 1166:3, 1166:6, 1166:9, 1167:2
**TRIAL** [2] - 854:9, 854:11
**trial** [14] - 896:10, 897:15, 1023:14, 1045:15, 1070:16, 1070:20, 1122:14, 1129:13, 1130:4, 1155:6, 1165:7, 1179:15, 1181:13, 1194:13
**trials** [2] - 1021:14, 1070:22
**tried** [1] - 863:1
**tries** [1] - 1028:20
**trisaccharide** [1] - 991:2
**trouble** [2] - 1016:4, 1178:7
**true** [6] - 922:5, 922:8, 940:6, 957:2, 1059:2, 1195:1
**true-up** [1] - 1195:1
**trust** [1] - 1197:8
**truth** [3] - 894:11, 917:23, 940:25
**try** [19] - 856:25, 865:3, 888:6, 888:10, 896:14, 896:15, 896:16, 960:6, 984:19, 1013:18, 1019:8, 1096:2, 1141:17, 1150:25, 1152:24, 1183:23, 1187:18, 1194:20, 1196:23
**trying** [19] - 859:19, 862:9, 865:2, 866:2, 876:7, 877:17, 896:11, 900:6, 900:16, 931:22, 932:17, 932:19, 934:15, 1026:20, 1043:19, 1048:17, 1069:11, 1073:5, 1172:24
**TSE** [1] - 1094:19
**tube** [3] - 1146:20, 1147:25, 1148:14
**Tuesday** [2] - 949:22, 974:13
**TUNNELL** [1] - 854:16
**turn** [111] - 872:8, 875:3, 889:3, 894:14, 899:13, 901:23, 902:6, 904:23, 906:19, 907:6, 908:3, 908:13, 909:22, 912:13, 916:3, 918:1, 918:13, 920:14, 925:15, 945:21, 948:10, 951:23, 953:14, 955:2, 955:21, 964:4, 965:24, 968:16, 970:6, 976:3, 976:18, 986:19, 987:11, 995:13, 997:9, 998:7, 998:24, 1001:5, 1005:18, 1010:12, 1011:4, 1013:19, 1014:9, 1015:11, 1029:17, 1029:25, 1034:14, 1034:21, 1050:25, 1085:10, 1085:17, 1086:7, 1087:11, 1088:1, 1088:12, 1089:4, 1089:9, 1090:3, 1090:18, 1092:11, 1092:24, 1093:7, 1094:2, 1094:9, 1095:7, 1095:8, 1095:14, 1096:1, 1097:4, 1097:5, 1097:18, 1098:5, 1098:19, 1099:1, 1101:15, 1103:15, 1108:14, 1108:19, 1109:13, 1110:3, 1111:1, 1111:17, 1111:20, 1112:21, 1113:12, 1113:23, 1115:9, 1115:19, 1116:5, 1116:7, 1116:19, 1116:20, 1117:11, 1117:12, 1117:17, 1118:18, 1118:19, 1118:23, 1119:3, 1119:15, 1120:11, 1146:24, 1147:20, 1158:2, 1160:2, 1162:14, 1165:14, 1178:21, 1194:2
**turned** [2] - 857:20, 1156:6
**turning** [6] - 913:9, 1016:3, 1035:25, 1088:15, 1161:4, 1185:14
**turns** [3] - 891:13, 891:21, 1182:2
**two** [106] - 860:5, 862:17, 863:15, 863:19, 863:22, 863:25, 865:17, 866:10, 866:12, 866:19, 867:7, 867:11, 868:18, 869:9, 879:9, 891:19, 892:15, 893:14, 916:5, 927:20, 947:13, 947:19, 948:4, 953:16, 959:21, 959:22, 964:8, 964:21, 965:9, 975:24, 978:19, 988:6, 988:7, 988:10, 989:1, 990:19, 991:2, 1006:22, 1006:24, 1007:2, 1012:12, 1022:23, 1025:3, 1027:13, 1030:13, 1033:18, 1033:19, 1034:6, 1035:3, 1036:4, 1036:7, 1036:8, 1037:2, 1037:5, 1037:25, 1038:20, 1041:6, 1041:24, 1051:18, 1060:10, 1060:13, 1070:16, 1072:23, 1077:21, 1082:2, 1083:6, 1087:15, 1091:1, 1091:5, 1091:11, 1091:18, 1111:7, 1113:7, 1113:10, 1115:5, 1116:2, 1116:16, 1119:19, 1122:1, 1133:6, 1134:20, 1135:4, 1135:12, 1135:17, 1137:18, 1141:9, 1141:13, 1144:1, 1144:19, 1144:22, 1150:2, 1157:15, 1161:22, 1161:24, 1164:9, 1166:2, 1177:7, 1177:16, 1182:8, 1186:24, 1189:12, 1196:24, 1197:15
**two-step** [1] - 1091:1
**type** [51] - 871:20, 887:13, 887:14, 887:23, 888:3, 888:7, 888:8, 888:11, 888:15, 888:19, 888:24, 888:25, 889:11, 890:11, 891:6, 891:15, 891:20, 907:15, 931:3, 1008:14, 1022:12, 1022:14, 1023:7, 1070:5, 1088:8, 1098:22, 1098:23, 1099:5, 1099:9, 1101:9, 1124:11, 1124:23, 1125:5, 1127:14, 1127:15, 1127:18, 1141:25, 1144:8, 1161:9, 1161:11, 1161:14, 1162:7, 1162:10, 1162:11
**types** [24] - 882:17, 882:19, 882:20, 887:24, 888:1, 891:12, 988:6, 988:7, 988:24, 1031:24, 1088:17, 1088:19, 1088:21, 1088:23, 1088:25, 1098:23, 1098:24, 1100:2, 1100:19, 1102:13, 1128:4, 1128:7, 1162:12, 1162:13
**typical** [1] - 1025:5

**typo** [1] - 1173:10

## U

**U.S** [18] - 899:16, 904:21, 907:22, 910:15, 912:20, 913:10, 916:20, 924:22, 1027:20, 1030:24, 1068:23, 1097:17, 1098:2, 1116:25, 1119:12, 1132:1, 1132:2, 1198:4
**U.S.A** [2] - 1027:15, 1063:21
**U.S.D.C.J** [1] - 854:12
**ultimate** [4] - 981:4, 1052:25, 1054:15, 1054:16
**ultimately** [3] - 857:18, 1029:7, 1132:24
**unaware** [1] - 1073:12
**uncertain** [3] - 856:23, 857:2, 857:19
**uncertainty** [7] - 857:7, 858:1, 858:15, 858:24, 859:7, 860:19, 860:23
**undefined** [2] - 1043:7, 1043:8
**under** [23] - 858:2, 865:19, 894:11, 917:23, 918:14, 950:23, 953:11, 955:8, 957:13, 974:3, 999:8, 1015:5, 1046:8, 1048:4, 1057:25, 1058:2, 1058:6, 1058:8, 1060:11, 1157:19, 1158:14, 1188:2, 1188:3
**undergo** [1] - 975:9
**undergoes** [1] - 957:23
**underlying** [5] - 864:3, 1026:7, 1032:6, 1032:8, 1156:25
**understood** [16] - 880:15, 880:18, 887:4, 891:23, 904:16, 969:21, 980:15, 987:15, 1030:18, 1096:11, 1125:16, 1164:1, 1171:5, 1180:10, 1180:23, 1194:3
**undisclosed** [2] - 1100:10, 1100:13
**undiscounted** [1] - 1039:24
**undisputed** [4] - 1031:4, 1164:3, 1164:5, 1165:11
**unexpected** [7] - 943:6, 977:18, 977:21, 1000:13, 1164:25, 1165:2, 1177:11
**unexpectedly** [1] - 1177:13
**unfortunately** [1] - 1085:23
**Unfortunately** [1] - 1010:13
**UNIKEL** [60] - 854:21, 1173:13, 1173:23, 1174:1, 1174:4, 1174:7, 1174:16, 1175:4, 1175:9, 1175:17, 1176:1, 1176:13, 1176:16, 1176:21, 1177:1, 1177:6, 1177:19, 1178:1, 1178:10, 1179:9, 1179:19, 1180:4, 1180:13, 1180:23, 1181:1, 1181:6, 1181:21, 1182:11, 1182:14, 1182:21, 1182:24, 1183:4, 1183:14, 1183:24, 1184:5, 1184:8, 1184:10, 1184:23, 1185:10, 1185:17, 1185:20, 1185:24, 1186:25, 1187:13, 1187:23, 1188:2, 1188:8, 1188:11, 1188:14, 1188:23, 1189:20, 1190:3, 1191:14, 1191:17, 1191:25, 1192:11, 1193:3, 1193:20, 1194:3, 1195:8
**Unikel** [5] - 1173:23, 1180:3, 1184:22, 1192:21, 1197:8
**unique** [20] - 998:9, 1036:11, 1036:17, 1037:15, 1038:17, 1038:23, 1048:15, 1049:1, 1049:3, 1050:1, 1050:11, 1052:22, 1056:2, 1060:10, 1079:19, 1082:2, 1138:11, 1163:4, 1163:8
**United** [4] - 1019:24, 1132:10, 1132:15, 1132:20
**UNITED** [1] - 854:1
**University** [3] - 944:11, 1021:20, 1021:22
**unknown** [2] - 932:15, 1177:10
**unless** [1] - 1193:10
**unlike** [5] - 975:12, 1025:3, 1036:5, 1037:2, 1040:23
**unpredictable** [3] - 1092:3, 1101:7, 1136:6
**unreasonable** [2] - 1056:19, 1056:21
**unrelated** [1] - 1033:5
**unsaturated** [1] - 1031:17
**unstable** [2] - 975:2, 1143:7
**unsuccessful** [4] - 975:22, 991:15, 991:21, 992:8
**unsupported** [3] - 1042:22, 1043:1, 1167:3
**up** [150] - 856:7, 858:19, 863:6, 865:5, 878:4, 879:2, 879:10, 887:20, 892:17, 893:1, 895:19, 896:19, 896:24, 898:21, 905:3, 907:9, 908:8, 909:18, 910:20, 914:16, 915:9, 919:3, 919:15, 920:16, 921:18, 921:21, 923:14, 923:23, 924:1, 926:22, 928:9, 928:15, 930:22, 931:14, 932:5, 933:24, 935:1, 935:5, 936:12, 938:19, 939:1, 939:4, 939:9, 939:12, 940:3, 950:11, 953:23, 968:7, 968:8, 971:24, 976:13, 980:18, 985:14, 986:18, 987:12, 987:21, 989:3, 989:14, 993:9, 995:14, 995:22, 996:15, 1001:11, 1001:12, 1001:22, 1002:24, 1003:6, 1003:23, 1004:15, 1005:18, 1007:5, 1012:2, 1015:19, 1017:17, 1020:4, 1021:1, 1025:7, 1028:21, 1033:22, 1037:12, 1039:1, 1039:13, 1041:4, 1042:5, 1044:6, 1044:9, 1046:24, 1050:12, 1050:17, 1052:6, 1053:20, 1054:18, 1056:25, 1057:1, 1057:3, 1065:20, 1066:9, 1067:10, 1068:11, 1069:10, 1069:17, 1073:15, 1076:13, 1080:1, 1080:3, 1080:5, 1082:19, 1082:20, 1084:10, 1085:12, 1086:3, 1086:22, 1089:18, 1099:15, 1103:14, 1103:22, 1103:24, 1105:12, 1105:20, 1106:5, 1109:10, 1115:14, 1116:1, 1122:5, 1125:14, 1132:25, 1134:14, 1137:16, 1138:4, 1140:23, 1142:24, 1144:1, 1146:1, 1148:3, 1150:16, 1152:24, 1155:1, 1167:9, 1173:11, 1174:23, 1174:24, 1181:12, 1184:18, 1186:3, 1186:8, 1195:1, 1195:16, 1196:2, 1196:3, 1196:11
**upfront** [1] - 1183:15
**upper** [5] - 909:19, 956:17, 962:9, 974:25
**upstart** [1] - 856:25
**USA** [1] - 1063:15
**useful** [1] - 901:14
**uses** [11] - 927:10, 930:4, 941:5, 978:19, 1071:22, 1072:20, 1119:21, 1125:18, 1133:14, 1160:16
**usual** [1] - 1154:17
**utilize** [1] - 922:24
**utilized** [1] - 1157:9

## V

**V-L-A-D-I-M-I-R** [1] - 1158:8
**vacuum** [1] - 966:10
**vacuum-dried** [1] - 966:10
**vaguely** [2] - 897:16, 897:18
**VALENTE** [1] - 854:22
**valid** [15] - 1023:4, 1026:9, 1049:10, 1055:8, 1055:20, 1082:18, 1085:9, 1086:10, 1109:16, 1109:18, 1121:24, 1134:24, 1151:11, 1175:22, 1176:3
**validity** [6] - 943:6, 1103:7, 1104:17, 1121:22, 1135:10, 1158:16
**valuations** [1] - 1021:12
**value** [14] - 861:20, 969:16, 1025:10, 1025:16, 1036:11, 1037:2, 1046:16, 1080:14, 1081:17, 1165:25, 1166:3, 1166:15, 1166:18, 1166:20
**valued** [2] - 1056:2, 1056:3
**Values** [1] - 875:10
**values** [1] - 905:6
**valuing** [2] - 1080:9, 1080:12
**variables** [4] - 1155:25, 1156:2, 1156:3, 1162:7
**variety** [3] - 947:4, 1182:25, 1192:12
**various** [8] - 878:1, 922:23, 923:8, 1009:18, 1157:8, 1157:10, 1178:18, 1194:1
**VARUGHESE** [4] - 855:6, 958:24, 959:9, 1067:22
**Varughese** [1] - 1173:16
**vary** [1] - 1100:2
**varying** [1] - 1101:2
**veracity** [1] - 865:23

**verdict** [15] - 1019:6, 1083:10, 1152:22, 1153:13, 1154:8, 1187:22, 1190:8, 1191:1, 1192:5, 1193:12, 1193:15, 1193:19, 1193:23, 1194:21, 1195:11
**verdicts** [1] - 1194:21
**version** [1] - 1181:14
**versus** [3] - 857:4, 954:22, 1017:10
**vest** [1] - 1025:6
**via** [1] - 921:9
**viable** [3] - 877:3, 1139:22, 1148:1
**vials** [2] - 1044:15, 1136:4
**video** [11] - 894:18, 894:19, 894:25, 918:6, 918:11, 985:16, 985:23, 988:16, 988:21, 1045:17, 1045:18
**videos** [3] - 1130:19, 1130:25, 1136:2
**view** [33] - 871:1, 871:2, 872:6, 872:13, 873:16, 887:5, 946:24, 954:20, 955:4, 955:15, 957:9, 961:16, 967:11, 974:19, 975:15, 975:21, 980:20, 981:5, 1010:6, 1028:13, 1107:22, 1121:17, 1135:4, 1137:1, 1143:1, 1159:6, 1160:22, 1161:17, 1161:21, 1163:20, 1164:19, 1190:14, 1196:9
**viewed** [2] - 1097:17, 1121:11
**viewpoint** [1] - 1137:8
**views** [2] - 1000:10, 1153:5
**viral** [1] - 904:12
**VirnetX** [1] - 1166:12
**virus** [1] - 1190:21
**Vlad** [1] - 1158:3
**VLADIMIR** [1] - 854:22
**Vladimir** [1] - 1158:7
**vocabulary** [1] - 960:1
**Volume** [1] - 854:7
**voluminous** [3] - 863:11, 863:17, 867:3
**vs** [1] - 854:5

## W

**wait** [1] - 1172:23
**walk** [8] - 939:1, 1034:10, 1036:5, 1042:22, 1053:22, 1054:25, 1112:13, 1130:11
**walking** [2] - 1007:8, 1043:22
**wants** [3] - 1141:25, 1168:24, 1195:25
**warned** [1] - 1120:8
**warner** [1] - 1197:23
**Warner** [1] - 1198:3
**warning** [1] - 1120:9
**washed** [1] - 886:6
**washing** [4] - 883:22, 884:1, 884:10, 885:25
**waste** [1] - 1068:1
**watch** [3] - 941:15, 1018:17, 1133:18
**watched** [1] - 878:6
**water** [22] - 857:5, 878:7, 939:21, 939:22, 940:4, 940:6, 940:8, 940:15, 941:1, 941:5, 964:15, 964:25, 970:10, 1106:24, 1107:1, 1107:4, 1107:7, 1107:8, 1126:23, 1127:1, 1156:23
**Waterhouse** [1] - 1022:7
**waves** [1] - 1051:6
**ways** [2] - 1091:12, 1193:13
**weak** [1] - 1083:19
**week** [2] - 1110:17, 1144:23
**weekend** [1] - 1153:15
**weeks** [1] - 870:8
**weighs** [1] - 1165:12
**weight** [6] - 989:6, 989:7, 1049:2, 1141:22, 1142:1, 1146:6
**welcome** [6] - 870:11, 960:9, 1019:16, 1083:23, 1084:18, 1134:5
**well-founded** [1] - 858:7
**well-known** [1] - 975:7
**Wells** [1] - 1122:12
**WELLS** [11] - 855:8, 1084:3, 1100:10, 1120:22, 1122:10, 1126:2, 1127:7, 1133:3, 1167:23, 1168:6, 1168:19
**Wharton** [1] - 1021:21
**whatsoever** [2] - 1014:21, 1156:15
**wheel** [1] - 1161:21
**wheelhouse** [1] - 960:5
**Whelan** [5] - 889:9, 890:4, 890:8, 890:9, 1099:17
**whereas** [3] - 1096:15, 1145:10, 1178:13
**wherein** [2] - 883:20, 962:12
**whichever** [1] - 959:7
**whole** [4] - 990:15, 1170:23, 1181:12, 1187:16
**wide** [3] - 904:6, 1031:13, 1094:13
**willing** [10] - 864:5, 1025:1, 1025:2, 1025:9, 1025:14, 1025:15, 1026:21, 1036:14, 1041:7
**willingly** [2] - 1187:7, 1187:8
**Wilson** [4] - 1169:9, 1169:16, 1171:8, 1197:1
**WILSON** [6] - 855:3, 1169:10, 1169:18, 1170:5, 1171:5, 1171:11
**win** [1] - 1153:6
**winner** [1] - 1193:15
**winning** [1] - 1193:15
**wins** [1] - 1194:25
**withdrawn** [1] - 1074:2
**withstand** [1] - 957:22
**witness** [24] - 875:3, 889:3, 893:8, 941:23, 959:24, 981:8, 1019:11, 1019:13, 1020:4, 1020:11, 1022:15, 1060:17, 1063:1, 1064:16, 1082:21, 1084:8, 1084:11, 1084:23, 1126:1, 1130:3, 1133:3, 1151:22, 1196:6
**WITNESS** [21] - 918:10, 941:20, 947:17, 982:25, 990:17, 990:23, 991:1, 992:19, 993:17, 1020:8, 1060:21, 1063:8, 1063:13, 1073:11, 1084:15, 1110:6, 1133:22, 1134:2, 1141:8, 1141:15, 1142:6
**witnesses** [5] - 959:22, 1130:12, 1131:16, 1132:7, 1132:19
**WO** [1] - 1003:13
**word** [11] - 909:16, 915:3, 963:7, 963:18, 963:20, 963:22, 990:2, 1180:7, 1181:10, 1181:15, 1184:20
**words** [16] - 867:13, 915:5, 956:25, 959:25, 960:3, 962:16, 991:3, 1000:15, 1087:20, 1087:22, 1087:23, 1110:5, 1111:12, 1141:13, 1166:2, 1186:11
**workflow** [1] - 1112:5
**works** [3] - 1103:5, 1138:2, 1191:22
**world** [6] - 1025:4, 1025:5, 1039:3, 1140:19, 1188:17, 1189:4
**worried** [1] - 857:9
**worries** [1] - 858:25
**worry** [2] - 1124:19, 1133:24
**worse** [1] - 1180:4
**worth** [8] - 871:3, 871:15, 1046:19, 1079:24, 1079:25, 1081:14, 1177:22, 1189:25
**would've** [1] - 882:9
**wrap** [1] - 1053:20
**wrinkle** [1] - 1038:24
**wrinkles** [1] - 1038:8
**write** [5] - 927:20, 959:5, 1142:18, 1168:24, 1183:23
**writes** [1] - 1141:1
**writing** [3] - 1183:22, 1184:17, 1186:13
**written** [1] - 1185:9

## X

**Xeomin** [2] - 1019:25, 1031:10
**Xiang** [46] - 873:17, 874:13, 895:18, 899:17, 900:6, 901:17, 920:14, 920:20, 920:23, 921:3, 933:22, 934:5, 935:10, 938:9, 1103:20, 1105:1, 1105:17, 1106:6, 1116:18, 1118:20, 1118:25, 1119:1, 1119:3, 1119:7, 1119:11, 1119:17, 1119:20, 1120:1, 1126:16, 1130:24, 1131:2, 1132:8, 1154:21, 1156:7, 1156:13, 1156:17, 1156:20, 1157:5, 1157:15, 1158:22, 1159:1, 1159:5, 1159:8, 1168:10, 1179:5

## Y

**year** [7] - 861:3, 861:6, 861:7, 946:19, 1047:13, 1070:11
**years** [11] - 901:6, 901:7, 932:19, 944:8, 947:6, 1002:20, 1012:7, 1022:8, 1060:13, 1191:6, 1196:5
**years'** [1] - 1136:21
**yellow** [3] - 1089:5, 1098:7, 1111:18
**yes-or-no** [1] - 992:25
**yesterday** [31] - 860:5, 861:2, 863:21, 864:11, 864:19, 870:19, 874:8, 878:16, 894:12, 895:6, 895:17, 898:6, 900:4, 901:12, 903:8, 904:1, 904:14, 919:3, 920:5, 924:4, 924:22, 925:11, 926:23, 928:1, 980:7, 1002:22, 1025:18, 1032:9, 1047:3, 1126:4, 1165:18

**YOUNG** [1] - 855:2
**yourself** [9] - 942:10, 1020:19, 1124:8, 1124:12, 1124:21, 1125:2, 1130:4, 1131:22, 1136:9

## Z

**zero** [3] - 1033:7, 1076:3, 1138:14
**zinc** [1] - 965:16
**zoom** [8] - 919:13, 928:14, 932:4, 935:19, 950:18, 972:14, 1014:12, 1015:19