IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLERGAN, INC., | ) | |
| | ) | |
| --------------------Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 21-CV-1411-RGA |
| | ) | |
| REVANCE THERAPEUTICS, et al., | ) | |
| | ) | Volume V |
| --------------------Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL

JURY TRIAL had before the Honorable Richard G. Andrews, U.S.D.C.J., and a jury of eight in Courtroom 6A on the 18th of July, 2025.

APPEARANCES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY: JEREMY TIGAN, ESQ.

-and-

PAUL HASTINGS LLP
BY: ERIC DITTMANN, ESQ.
ISAAC ASHKENAZI, ESQ.
MELANIE RUPERT, ESQ.
CARL MINNITI, ESQ.
KRYS HO, ESQ.
ROBERT UNIKEL, ESQ.
DAVID VALENTE, ESQ.
VLADIMIR SEMENDYAI, ESQ.

Counsel for Plaintiff

(Appearances continued.)

YOUNG, CONAWAY, STARGATT & TAYLOR
BY: ANNE GAZA, ESQ.
SAMANTHA WILSON, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX PLLC
BY: DENNIES VARUGHESE, ESQ.
ADAM LAROCK, ESQ.
BYRON PICKARD, ESQ.
NIRAV DESAI, ESQ.
DEIRDRE WELLS, ESQ.

-and-

CAHILL GORDON
BY: PETER ARMENIO, ESQ.

Counsel for Defendant

THE COURT: Let's get the jury.

My plan would be whenever the cross-examination finishes, to take a five-minute break so everybody gets set up for the closing arguments and digests what, if anything, happened this morning.

Otherwise, we're all good; right?

MR. DITTMANN: Yes, Your Honor.

THE COURT: Dr. Schöneich was on the stand, I believe.

Come forward, sir.

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back.

Everyone else, you may be seated.

Mr. Pickard, you may cross-examine.

CROSS-EXAMINATION

BY MR. PICKARD:

Q. Good morning, Doctor.

A. Good morning.

Q. Doctor, I think it's safe to say that just about everyone is eager to get this case in the hands of the jury, so I have just a few yes-or-no questions that I hope won't take very long.

Because we had a break from yesterday to today, perhaps we can start by reorienting the jury on where we left things off yesterday.

Does that sound fair?
A. Sounds good.
Q. All right. So yesterday you testified, and that was in response to Dr. Sury's testimony; right?
A. Yes.
Q. And you were sitting in the courtroom when Dr. Sury testified.
Do I have that right?
A. Yes.
Q. So you saw Dr. Sury walk the jury through the prior art. And that, again, was the prior art Hunt and the Johnson patent. And he showed the jury where each and every element of Claim 6 was shown by the prior art.
You saw that; right?
A. While I walked them through, yes.
Q. I'm sorry, I did not understand that.
A. Did you say he walked them through or me?
Q. Oh, no, I'm talking about only Dr. Sury.
Dr. Sury stepped the jury through the prior art and showed them where the prior art showed all the elements of Claim 6.
You were here for that; right?
A. Yes.
Q. Now, the bottom line for your testimony yesterday is that you and Dr. Sury just disagree about the validity of

Claim 6 of the '878; is that right?
A. Yes.
Q. Dr. Sury says Claim 6 is invalid and you say it's valid; right?
A. Yes.
Q. All right. Let's see if we can establish some common ground.
Yesterday you told the jury that an ordinary scientist would have looked to the Hunt '598, that's the prior art Hunt application, which presents a number of options to move to a formulation that does not contain human serum albumin; right?
A. Yes.
Q. And you agree that human serum albumin, that's an animal protein; right?
A. Animal or from living sources, yes.
Q. Thank you.
And that prior art, Hunt, it provided a number of ways to get rid of that animal protein, that human serum albumin; right?
A. Yes.
Q. Now, Dr. Sury, he also said that skilled scientists would have looked to that earlier Hunt reference for ways to get rid of the animal proteins.
Remember that?

A.     Do you mean the Hunt '598 --
Q.     Yes.
A.     Yes.
Q.     The Hunt prior art, thank you.
Mr. Bell, if we could put up DDX 6.17 please.
And when Dr. Sury testified to the jury, he had this summary slide up.
Do you remember that?
A.     I believe he had that.
Q.     And what he told the jury was that everything we see here in purple, that was what Hunt disclosed; right?
A.     Well, Hunt disclosed that you could not use a disaccharide.
Q.     Yeah, that's not quite my question.  We're talking now just about Dr. Sury's testimony so we can orient the jury.
Dr. Sury told the jury and showed them that these were the elements in purple that, in his view, Hunt disclosed; right?
A.     That's Dr. Sury's opinion, yes.
Q.     And the thing -- the main thing missing from Hunt was that trehalose from Claim 6; right?
A.     As I said, trehalose is not allowed in Hunt.
Q.     We'll get to that in a little bit.
Hunt did not have trehalose in Dr. Sury's

opinion; right?
A. Hunt '598 disallows trehalose.
Q. It was the Johnson reference that Dr. Sury pointed to for the trehalose; correct?
A. The Johnson contains trehalose, but an animal-derived protein.
Q. Thank you.
Now, this is the summary slide Dr. Sury actually went through and showed the jury exactly where in Hunt and Johnson everything we see here colored was, in fact, shown; correct?
A. Again, I say there's no allowance of trehalose. And other things may be allowed, but no allowance trehalose.
Q. I'm not trying to get you to adopt what Dr. Sury said. I'm saying, that's what Dr. Sury said and you know that because you were present; right?
A. That's what he said.
Q. Thank you.
Now, your dispute with Dr. Sury is about whether you can really combine Hunt and Johnson. Is that, essentially, your position?
A. My dispute is that -- my opinion is you would not combine Hunt and Johnson to arrive at the formulation of the '878 patent.
Q. Thank you for that.

But you didn't tell the jury that Dr. Sury was wrong when he pointed to elements and showed them how they were actually present in Hunt and Johnson together; correct?

A. I think my opinion shows that basically you will not arrive at the combination of trehalose and surfactant looking at the two references.

I had no chance to talk to the jury.

Q. I'm sorry. I'm not asking that.

A. So yeah, maybe I misunderstood.

Q. Maybe I'm being a bit too colloquial.

When I say you spoke to the jury, I'm referring to your testimony yesterday under oath, just so we're clear.

But you didn't tell the jury that there was a missing element in Dr. Sury's testimony; right?

A. Do you mean the trehalose is a missing element?

Q. I'm sorry. Lets see if we can get a level set.

A. Yeah.

Q. All right. It is Dr. Sury's testimony that the combination of Hunt and Johnson disclosed all of the elements of Claim 6; correct?

A. That's his opinion, yes.

Q. But you don't dispute that; right? Your dispute is about whether you're just combining them. Isn't that right?

A. You know, I think it almost comes down to a legal question. So I stay with my answer. I simply tell you my

opinion is you would not combine these two references to arrive at the combination of trehalose and surfactant.
Q. Great. I think we're in agreement.
Your position is you just wouldn't combine them.
There's no dispute that all the elements are there; correct?
A. Well, the names of compounds of ingredients show up in these patents.
Q. Let's shift gears a little bit. I want to talk about the motivation to combine.
If we could put up DDX 6.19.
All right. This was a slide that Dr. Sury showed the jury yesterday.
Do you remember that?
A. Yes.
Q. What we see here is a callout from the Hunt prior art reference; correct?
A. Yes.
Q. And Dr. Sury pointed out to the jury that what Hunt reported for its formulations was stability at very low temperatures; correct?
A. At below freezing temperatures.
Q. Right. And we see that with the minus 5 degrees C there. That's below freezing; right?
A. Yes.

Q. You don't dispute that?
A. No.
Q. If we could go to the next -- 6.19, Mr. Belle. Oh, sorry, 6.20.
All right. We see a call out here of the Johnson prior art reference; right, Doctor?
A. Yes.
Q. Again, Dr. Sury showed this to the jury yesterday; correct?
A. Yes.
Q. And what Johnson reports was stability but at higher temperatures like 37 degrees celsius; correct?
A. He reports that yes, up to six months.
Q. Stability at 37 degrees at six months; correct?
A. Yes.
Q. Now 37 degrees, that's almost 100 degrees Fahrenheit; right?
A. I think it's in that area.
Q. 98.6 or so?
A. Yeah.
Q. You don't dispute that's what Hunt actually disclosed; correct?
A. Hunt discloses 37 degrees.
Q. You also heard Dr. Sury explain to the jury that skilled people would have wanted to extend Hunt's low

temperature stability to the higher temp stability disclosed in Johnson; correct?
A. You know, if you got up to 37 degrees, that's actually more an accelerated stability study, but it shows you something you can interpret, yeah.
Q. If you can get stability at higher temps, you agree there's a benefit because you don't need to keep the formulation frozen; right?
A. I can agree with that.
Q. That means you can keep the formulation in a normal room temperature storage space; right?
A. For example.
Q. And you could transport these formulations without using refrigerated vehicles and other measures to keep them cold?
A. The transportation may cause other issues, but you can store them.
Q. As far as we see here, you don't disagree with the basic facts of Dr. Sury when he showed the jury why you would combine Johnson and Hunt?
A. Again, I don't think you should because Johnson contains massive amounts of an animal-derived protein. So from the beginning I think that's excluded. That has not been the motivation of Hunt.
Q. Let's talk about what's actually in Hunt. You agree

that the Hunt prior art reference discloses a number of different examples; right?
A. Yes.
MR. PICKARD: So Mr. Bell, if we could pull up PDX 19.6 please.
BY MR. PICKARD:
Q. This is a slide you showed the jury yesterday?
A. Yes.
MR. PICKARD: Mr. Bell, if you could blow up the blue column box there. Thank you.
BY MR. PICKARD:
Q. Here we see four different examples that the Hunt prior art reference put out to the public; right?
A. Yes.
Q. And all four of these examples, they don't have animal protein, do they?
A. They don't.
Q. So Hunt presented at least four different ways of getting rid of animal proteins; right?
A. Yes.
Q. Now, yesterday you talked about -- I think you used the word "skepticism." Do you remember that?
A. Yes.
Q. And I think you said that there was skepticism in the field that there could even be a replacement formulation

developed that did not contain human serum albumin. That was your testimony?

A. Yes, I think that's Hunt's description in that '598 application.

Q. That skepticism was in the prior art itself, wasn't it?

A. I think that skepticism carried over to the time when scientists tried to begin working to see whether they could replace human serum albumin.

Q. But the same reference that you say provided skepticism provided four different solutions to get rid of the animal proteins, didn't it?

A. Yes, but I think there's skepticism at the beginning, before you do the experiments.

Q. These four examples, you agree that ordinary scientists would have known about all four of them by 2003; correct?

A. I would say not in the combination, sorry.

Q. I'm just talking about Hunt. We're setting aside the combination. You agree Hunt was published about 2003; right?

A. Yes.

Q. That was before the '878 patent; right?

A. Yes.

Q. And so you agree that skilled scientists would have

known about all four of these ways of getting rid of animal protein before the '878 patent; isn't that right?
A. Technically yes --
Q. Thank you.
A. -- but I think the '878 patent contains a reference to the provisional patent, which was published in 2005.
Q. I appreciate your desire to explain things, but again, we're on a tight schedule. We're here to get the case to the jury and Mr. Dittmann will have an opportunity to ask you questions.
All that was before the '878 patent, four ways of getting rid of animal protein; right?
A. Yes.
Q. All right. So you're not trying to tell the jury that ordinary scientists remained skeptical after Johnson showed how to get rid of animal proteins well before the '878 patent, are you?
A. Well, certainly Hunt offered some solutions. Maybe skepticism was reduced. But as I said before, there was skepticism at the beginning.
Q. Now, the recombinant albumin example here, that was the example that Dr. Sury relied on for his opinions; correct?
A. I think he did.
Q. And just to make things clear for the jury,

recombinant albumin, that's a nonanimal protein; right?
A. Right. Correct.
Q. If we can put up DTX 209, please.
This is the Hunt reference, Dr. Schöneich; right?
A. Yes.
Q. And I'd like to put up paragraph 153, please.
You recognize this as the part of Hunt where the recombinant albumin example appears?
A. That's one paragraph, yes.
Q. And that example begins at paragraph 153; right?
A. That's where it is, yeah.
Q. If you look at the first line, it says an embodiment of any invention. Do you see that?
A. Yes.
Q. The word "embodiment," that's just the way patent lawyers would call an example. Do you agree?
A. I think for me it means it's an example just contained in the patent, yeah.
Q. All right. So that example, the recombinant albumin example, begins at paragraph 153 and it extends to paragraph 174. If you need to look at it, you should have it in your binder there.
A. This is, again, which number, please?
Q. This is DTX 209, Doctor.

A. Yes, it does.
Q. All right. So I think we've established the example that Dr. Sury was relying on begins at paragraph 153 and extends to paragraph 174 and on; correct?
A. Yes.
MR. PICKARD: If we could go to paragraph 174, Mr. Bell, and zoom out a little bit so we can see 175 as well. Thank you.
BY MR. PICKARD:
Q. Now, the example that Dr. Sury relies on, it ends at 174, and the next example is what's called out here is the polysaccharide-containing pharmaceutical composition.
Do you see that?
A. Yes. Yes.
Q. Thank you. And that's a different example than the one Dr. Sury relied on; correct?
A. Yes.
Q. And we know that because it says in the first phrase of 175, "in another embodiment"; right?
A. Yes.
Q. Again, "embodiment" is just an example; correct?
A. Yes.
MR. PICKARD: You can take that down Mr. Bell. I'd like to show Dr. Schöneich PDX 9-6, please. If we could blow up the red box.

BY MR. PICKARD:
Q. You showed this to the jury yesterday?
A. Yeah.
Q. I just want to get clear on a few things. We can agree that Hunt doesn't actually say "don't use disaccharides" in those words; right?
A. Can you go to the paragraph? I can cite it.
Q. My question is the words "don't use disaccharides," they don't appear in Hunt. Can we agree on that?
A. I would like to see the paragraph then I can tell you.
Q. Doctor, I'm not asking you about a particular paragraph. I'm asking about the slide you showed the jury.
MR. DITTMANN: I'll object, Your Honor. He's trying to answer the question.
THE COURT: I think the question you asked, it's a fair response to look at the document and see exactly what it says.
MR. PICKARD: I'm inviting him to look at it. I had understood him to be asking me for the paragraph.
BY MR. PICKARD:
Q. You showed this to the jury right, Dr. Schöneich?
A. Yes.
Q. And you agree the words "don't use disaccharides," they don't appear in Hunt?

A. Basically it says disaccharides are excluded, and for an ordinary scientist means don't use them.
Q. We can take that down.
Yesterday you told the jury there were statements in Hunt that would dissuade people from using disaccharides like trehalose; right?
A. Yes.
Q. And you told the jury that statements like those were all over Hunt. Do you remember that?
A. I showed you three examples.
Q. And all three of those examples you showed the jury, none of them appear in the example of recombinant albumin Dr. Sury was relying on, do they?
A. You're asking if the words "disaccharide" appear in the paragraph?
Q. I think a moment ago you showed the jury three examples that dissuaded the use of trehalose that were, in your words, all over Hunt; correct?
A. Yes.
Q. And those three things you showed the jury, none of them appear in the recombinant albumin sample Dr. Sury relied on; correct?
A. No, but Hunt tells the present invention excludes disaccharides and for an ordinary scientist this means the entire invention, entire patent.

Q. Doctor, I'm asking yes-or-no questions. The three things you show the jury about dissuading people from the use of disaccharides, none of them appear in the example of the recombinant albumin; correct?
A. Let me see. This is, again, paragraph 153? I don't see the word "disaccharides" in paragraphs 153 to 174.
Q. Thank you. So to summarize, yesterday you told the jury, in essence, that statements meaning, in essence, don't use disaccharides, they were all over Hunt; right?
A. Yes.
Q. But you didn't show the jury even one example of such a statement that appears in the embodiment or example Dr. Sury relied on, did you?
A. Well, Hunt, I think, had a sufficient number of statements which teach an ordinary scientist not to use disaccharides. And I said before, that's true for the entire invention.
Q. None of those statements appear in the example that Dr. Sury relied on, did they?
A. In paragraphs 153 through 174, I don't see the word "disaccharide."
Q. Thank you.
THE COURT: Any redirect?
MR. DITTMANN: Yes.

REDIRECT EXAMINATION

BY MR. DITTMANN:
Q. Good morning, Dr. Schöneich.
A. Good morning.
Q. Do you recall you were asked about any skepticism regarding whether you could remove any animal proteins? Do you recall being asked about that?
A. Yes.
Q. There was also skepticism about whether you could remove all proteins, animal or otherwise; correct?
MR. PICKARD: Objection. Scope, undisclosed opinion.
THE COURT: I'm going to overrule the objection.
THE WITNESS: I believe so.
BY MR. DITTMANN:
Q. Did you hear Dr. Sury acknowledge that obtaining a stable formulation that had no proteins at all was a long-felt need in the field?
A. I heard him ay that.
Q. Hunt '598 did not achieve that long-felt need of removing all proteins; correct?
A. That's correct.
Q. Did the '878 drug product recipe patent come up with a way to address that long-felt need?
A. Yes.
Q. You were also asked if Hunt '598 excluded

disaccharides in the context of recombinant albumin examples from very specific paragraphs.

Do you recall that?

A. Yes.

Q. You weren't asked about paragraph 49; right?

A. Yes.

Q. We talked about paragraph 49 yesterday; right?

A. Yes.

Q. Does paragraph 49 come from a general section of the patent that applies to all embodiments?

A. It does. It generally teaches the problem of using any sugars.

MR. DITTMANN: Thank you, Your Honor, Doctor. No further questions.

THE COURT: Dr. Schöneich, thank you, you're done. Please step down and watch your step.

THE WITNESS: Yes.

THE COURT: Mr. Dittmann, do you rest?

MR. DITTMANN: Yes, Your Honor, plaintiff rests.

THE COURT: All right. And defendant, are you done?

MR. PICKARD: We are, Your Honor.

THE COURT: All right. So members of the jury, I'm going to ask my deputy clerk to hand out the final jury instructions. I'm going to read most of them to you, she's

going to hand out the verdict form also, and that's going to take 20, 25 minutes.

When we're done -- when I'm done reading out the jury instructions, or most of them, we'll take a short break so the parties can get set up for closing arguments. That's what we're going to do.

All right. So I think you all have the written copies of the jury instructions.

So members of the jury, now is the time for me to instruct you about the law you must follow in deciding this case. Please listen very carefully to everything I say.

In following my instructions, you must follow all of them, including the instructions I gave you at the beginning of the trial, which you have a copy of, and during the trial. Do not single out some and ignore others. They are all important. You will have this written copy of the instructions with you in the jury room also, and you will have a verdict form which will list the questions that you must answer to decide the case.

So I'm going to start by explaining a couple of rules that apply in every civil case and then I'm going to explain the rules that you must use in evaluating particular testimony and evidence. That's going to be pretty brief. Then I will explain the position of the parties and the law

you will apply in this case. And finally I will explain the rules you must follow during your deliberations in the jury room and the possible verdicts you may return.

The last thing about the rules for deliberation, I'm not going to do that right now. I'm going to do that after the attorneys have done their closing arguments.

So you must make your decision based only on the evidence you saw and heard here in the courtroom. Do not let rumor, suspicions, or anything else you may have seen or heard outside of the courtroom encourage your decision in any way. The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition testimony that's been played to you or read to you, the exhibits that I allowed into evidence, and any facts that the parties agree to by stipulation, and any facts that I've instructed you to accept as true, which I actually don't think there were any. Nothing else is evidence. Make your decision based only on the evidence as I've defined it here and nothing else.

So as you know, Allergan has asserted infringement of three patent claims in this case, Claim 8 of the '740 patent, Claim 8 of the '748 patent, and Claim 6 of the '878 patent. Revance contends all the claims are invalid. Revance does not contest that DAXXIFY's current drug substance or drug product satisfies all the limitations

of the three patent claims asserted by Allergan, Inc.

Allergan contends it is entitled to an amount of damages not less than a reasonable royalty for any asserted patent claim that you determine is not invalid.  Revance contends all the claims are invalid and, therefore, Allergan is not entitled to any damages.

In this case you must decide two issues:  One, whether Revance has proven by clear and convincing evidence that any of Allergan's asserted patent claims are invalid for obviousness in view of the prior art; and, two, to the extent you determine that any asserted patent claim is not invalid, the amount of damages that Allergan has proven by a preponderance of the evidence it is entitled to receive from Revance to compensate for Revance's infringement of Allergan's claims.

In any legal action, and this is something I think I told you more or less in the opening instructions but I'm going to repeat them here, facts must be proven by a required standard of evidence known as the burden of proof. In a patent case such as this one, there are two different burdens of proof that are used.  The first is called the preponderance of the evidence standard.  The second is called the clear and convincing evidence standard.

Allergan must prove its claim for damages by a preponderance of the evidence.  When a party has the burden

of proof by a preponderance of the evidence, it means you must be persuaded what the party seeks to prove is more probably true than not.

Revance has the burden of proving its claim that the asserted patent claims are invalid by clear and convincing evidence. Clear and convincing evidence is evidence that the truth of a fact is highly probable. Proof by clear and convincing evidence is a higher burden of proof than proof by a preponderance of the evidence.

So the patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. The patent claims Allergan asserted against Revance in this case are Claim 8 of the '740 patent, Claim 8 of the '748 patent, and Claim 6 of the '878 patent.

To know what a claim covers, the claim sets forth in words a set of requirements. Each claim sets forth its requirements in a single sentence. The requirements of a claim are often referred to as claim elements or claim limitations. The scope of a patent is assessed claim by claim.

There are two types of patent claims: Independent claims and dependent claims. The three asserted claims in this case are each dependent claims. A dependant claim does not itself recite all the limitations of the

claim, but refers to another claim for some of its limitations. In this way, the claim depends on another claim.

A dependent claim incorporates all the limitations of the claim to which it refers. A dependent claim then adds its own additional limitations. To determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim to which it refers. Here, for example, Claim 6 of the '878 patent depends on Claim 1 of that patent. Therefore, a product that meets all the limitations of both dependent Claim 6 and Claim 1 is covered by dependent Claim 6.

It is my job as the judge to determine the meaning of the claim language from these patents that need interpretation. I determined the meaning of certain claim terms, and my definition of those claim terms were provided in your juror notebooks. You must accept my definition of these words in the claim as being correct. For any words in a claim for which I've not provided you with a definition, you should apply the ordinary and customary meaning as understood by a person of ordinary skill in the art. Okay.

So now we're moving to obviousness. Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is not obvious in light of what came before.

Even though an invention may not identically disclose or describe what was made by the inventor, in order to be patentable, the invention must not have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Revance may establish that a patent claim is invalid for obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention someone would have had at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and, if present, so-called objective evidence or secondary considerations, which I will describe shortly.

Do not use hindsight. Consider only what was known at the time of the invention. Keep in mind the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is

obvious, you may, but are not required to, find obviousness. If you find that at the time of the claimed invention there was a reason that would have prompted a person of ordinary skill in the field of technology of the patent to combine the known elements in a way the claimed invention does, taking into account such factors as, one, whether the claimed invention was merely the predictable result of using the prior art elements according to their known functions;

two, whether the claimed invention provides an obvious solution to a known problem in the relevant field;

three, whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

four, whether the prior art teaches away from combining elements in the claimed invention;

five, whether it would have been obvious to try the combination of elements such as when there is a design need or market pressure to solve a problem and there are a finite number of identified predictable solutions;

and six, whether the change resulted more from design incentives or other forces.

To find that prior art has rendered the invention obvious, you must find that it provided a reasonable expectation of success. Obviousness to try is not sufficient in unpredictable technologies.

In comparing the scope and content of each prior art reference to a patent claim, you may find that inherency may supply a claim element that is otherwise missing from the explicit disclosure of a prior art reference. Inherent presence of an element so found by you may be used in your evaluation of whether the claimed invention would have been obvious in the prior art in view of the prior art, because to rely on inherency to establish the existence of a claimed element of the prior art in the obviousness analysis, that element necessarily must be present in or the natural result of the combination of elements explicitly disclosed by the prior art.

Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from an explicit disclosure is not sufficient to find inherency. However, if the disclosure is sufficient to show that the natural result flowing from the explicit disclosure would result from the claim element in question, inherency may be found. In making your determination on obviousness, you must consider each of the patent claims separately and individually.

Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is not obvious in light of the art that came before the patented invention. That which came before is referred to as prior

art.

The following items are prior art to the '740 patent: The Smelt reference, DTX 202; the FDA guidance 1999, which is JTX 112; the Gessler reference, which is DTX 192.

The following items are prior art to the '748 patent: The Malizio reference, DTX 196; and the Xiang reference JTX 113.

The following items are prior art to the '878 patent: The Johnson patent, which is DTX 207; and the Hunt patent publication, which is DTX 209.

By the way, I give you those exhibit numbers just to make it easier if you want to look at them to find them in the large collection of exhibits you're going to get.

All right. So obviousness is determined as the date of invention. In this case the parties agree the date of invention for the asserted claim of the '740 patent is September 25, 2003; the date for the asserted claim of the '878 patent is October 6, 2005; and the date for the asserted claim of the '748 patent is July 13, 2009.

To determine the obviousness of the invention, you must determine the level of ordinary skill in the field of the invention at the time of the invention. In deciding what the level of ordinary skill is, you should consider all

the evidence introduced in trial, including but not limited to the level of education and experience of the inventor and other persons actively working in the field, the type of problems encountered in the field, prior art solutions to those problems, the rapidity with which innovations are made in the field, and the sophistication of technology. The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant. The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve a problem.

In making your assessment of whether a claimed invention is obvious or not, you must take into account any objective evidence that may shed light on the obviousness or not of the claimed invention. In patent law we typically refer to this type of evidence as objective indicia of nonobviousness. No factor alone is dispositive and you must consider the nonobviousness of the invention as a whole. Factors of objective indicia of nonobviousness include:

One, was there a long-felt need for a solution to the problem facing the inventors which was satisfied by the claimed invention;

two, did the claimed invention achieved unexpectedly superior results from the closest prior art;

and, three, did others in the field express skepticism of the feasibility of making the claimed

invention.

Answering all or some of these questions yes may suggest, but does not require, a finding that the claim was not obvious. These factors are relevant only if there was a connection or nexus between the factor and the invention covered by the patent claims. Even if you conclude that some of the above indicators have been established, those factors should be considered along with all the other evidence in the case in determining whether Revance has proven by clear and convincing evidence the claimed invention would have been obvious.

The existence of one's own patent does not constitute a defense to liability for infringement of someone else's patent. A patent grants only the right to exclude others and confers no right on its holder to make, use, or sell any product. The fact that Revance sought and obtained patents does not preclude a finding that Revance may be liable for infringing the Allergan patents.

I'm moving on to damages now. If you find that any asserted claims are not invalid, then Allergan is entitled to damages. If you find that the asserted claims are invalid, do not consider damages at all. By instructing you on damages, I am not suggesting which party should win this case on any issue.

The damages you award must be adequate to

compensate Allergan for infringement of any valid patent. You may not add anything to the amount of damages to punish Revance or to set an example. You may not add anything to the amount of damages for interest.

Allergan has the burden to establish the amount of its damages by a preponderance of the evidence. While Allergan is not required to prove the amount of the damages to a mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork. You must be careful to ensure that you damages award is no more and no less than the value of the patented invention. In this case, Allergan seeks damages in the form of reasonable royalty.

In determining the amount of damages, if you find the claims not to be invalid, the parties agree the calculation of damages begin when Revance launched DAXXIFY for commercial sale in December of 2022.

I will now explain the concept of reasonable royalty in more detail. The royalty is a payment made to a patentholder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patentholder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first

began. The parties agree that the following hypothetical negotiation dates apply: For the '740 patent and '748 patent, June of 2019; for the '878 patent, October of 2021.

In considering the hypothetical negotiation, you should focus on what the expectations of the patentholder and the alleged infringer would have been had they entered into agreement at that time and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believe the patent is valid and infringed and that both parties were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty either party would have preferred. Damages are not based on a hindsight evaluation of what happened but on what the parties to the hypothetical license negotiation would have agreed on at the time of the negotiation.

Evidence relevant to the negotiation is not necessarily limited to facts that occurred on or before the date of the hypothetical negotiation. You may also consider information the parties would have foreseen or estimated during the hypothetical negotiation which may, under certain circumstances, include evidence of usage after infringement started, profits earned by the infringer, and proven

noninfringing alternatives.

The reasonable royalty award must be based on the value attributable to the patented invention. When the infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by the patented feature. The ultimate combination of a royalty base and royalty rate must reflect the value attributable to the infringing features of the product.

This requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action. A price for the hypothetical license may appropriately be based on consideration of the parties' hypothetical negotiation over the cost and availability of noninfringing alternatives and the potential infringer's cost savings, opportunity cost in foregoing a license.

Specifically, the cost of the -- sorry, the costs the infringer would incur to produce a noninfringing product are relevant to the reasonable royalty for a license to sell a product covered by the patent. If avoiding the patent would be difficult, expensive, and time consuming the amount the infringer would be willing to pay for a license would likely be greater.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors you may consider in making your determination are:

One, the value that the claimed invention contributes to the accused products;

two, the value that factors other than the claimed invention attribute to the accused products;

three, comparable license agreements such as those covering the use of the claimed invention or similar technology.

No one factor is dispositive and you can and should consider the evidence that's been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty Revance would have been willing to pay and Allergan would have been willing to accept, acting as normally prudent businesspeople willingly negotiating a license.

The rest of the instructions concern deliberations, and I'm not going to give them now. I'd like to take a short break. Can we take the jury out for, essentially, five minutes.

(The jury exited the courtroom.)

THE COURT: Are there any objections to the instructions as read so far?

MR. DITTMANN: No, Your Honor.

MR. VARUGHESE: Not from us, Your Honor.

MS. WELLS: Your Honor, would now be a good time for move for a JMOL?

THE COURT: It wouldn't. Why don't we do it when the jury starts to deliberate.

(A recess was taken, after which the following proceedings were had:)

THE COURT: We think the technical difficulties are solved. Let's get the jury.

(The jury entered the courtroom.)

THE COURT: Members of the jury, welcome back. Everyone, you may be seated.

Members of the jury, there were some technical problems which needed to be solved relating to presentation before we could continue. I'm sorry. That's the reason for the delay.

Mr. Dittmann.

MR. DITTMANN: Thank you, Your Honor.

Good morning. This case is about holding Revance accountable for its decision to use Allergan's inventions without permission and without any payment to Allergan. The laws of this country do not allow Revance to

simply take and use Allergan's inventions without fairly paying, but at every turn, Revance chose to do what was best for Revance, Allergan's patent rights be damned.

In this trial, you heard Revance tell you something very different than what they told the Food and Drug Administration. You've heard them say some very different things than what they told the United States Patent and Trademark Office. Ask yourself, have you found their case to be credible?

It's now up you to hold Revance accountable, make clear that there are financial consequences to Revance's decisions, and make clear that the hard work and sacrifice of Mr. Hunt, Dr. Bates, and other Allergan scientists in perhaps the most dangerous environment possible cannot be simply tossed aside for Revance's self-interest.

Now, you've heard a lot of evidence and testimony over the past week. What I want to do, I want to cut through some of the noise and I'm going to look at four critical facts that are actually not disputed in this case. These are very important facts to keep in mind.

Undisputed fact number one, the United States Patent Office granted Allergan three different patents on three separate occasions covering the three patents-at-issue. Revance wants you to believe that it's

just a coincidence that the Patent Office swung and missed three different times on three different occasions with respect to the patents asserted in this case. Do you buy that the Patent Office messed up three different times?

One of these patents covers the formulation or recipe for animal-protein-free botulinum toxin products, and you heard about the painstaking process that Mr. Hunt undertook with literally thousands of experiments. And two of these patents cover specific methods for manufacturing animal-protein-free methods of making botulinum toxin. It's these three patents that were granted by the Patent Office after carefully considering a great deal of prior art. And that includes references like Hunt ''598 and Johnson '468 that Revance focuses on with respect to Mr. Hunt's patent.

The bottom line is this. Revance wants you to second-guess the experts at the Patent Office who already considered virtually all of the prior art that Revance showed you. And I can tell you that they certainly considered, the Patent Office, all the references that mattered. That means the Patent Office considered all the relevant information, and you saw how much they considered just on the face of the patents themselves. The experts at the Patent Office found Allergan's formulations and method inventions to be new and not obvious and therefore deserving of patent protection.

Undisputed fact number two. Revance uses the inventions in all three of Allergan's patents in its DAXXIFY product. Revance does not dispute that it uses the '878 formulation patent. Revance does not dispute that its manufacturing methods use the '740 and '748 manufacturing patents. Think of it, every single dose that Revance has ever put in the marketplace and sold has been using Allergan's inventions and they're continuing to do this every day, including today, using Allergan's inventions without paying a cent. That's not right.

Undisputed fact number three. Revance has not stopped using Allergan's three patents even after being sued by Allergan. If Allergan's technology in its patents is super old and not useful and not valuable like Revance is claiming, why don't they just simply stop using it? It doesn't make any sense, does it? If Revance really doesn't think these inventions have any value, really think it's old and useless, just stop doing it.

Why doesn't Revance stop doing it? Because it's foundational technology that they need. Actions speak louder than words. No matter what Revance says to you here in this courtroom, in the real world Revance can't and won't stop using Allergan's patented technology. Again, it needs that technology for DAXXIFY to work.

And it's critical to remember what's happening

out there in the real world, which leads us to undisputed fact number four. Revance has already made $273 million in DAXXIFY product sales, its admitted flagship product using Allergan's three inventions. Think of that. Taking in $273 million and you don't dispute you're using someone else's technology. Yet Revance hasn't paid, not one penny, to Allergan.

The laws of this country and basic fairness require that Revance pay at least a fair and reasonable royalty to Allergan for its use of its patent. Revance made the choice to use Allergan's property, its patented inventions, to launch DAXXIFY ahead of Allergan's animal-protein-free longer-duration products and it continues to benefit from that technology as we sit here today. The rent is now due. Revance must pay fairly for its use of Allergan's patents.

How does Revance try and get out of the situation? Over the past few days, Revance has gone to great lengths to try to distract you from those four core undisputed facts that we submit are what you need to focus on to resolve this case. They've thrown out these distractions in the hope that you'll give them a free pass on the unauthorized use of Allergan's inventions. Let me explain why you should disregard each and every one of these distractions and excuses.

Revance first asks you to find, again, all three of the patents in this case invalid for obviousness. That right there is how they're trying to get out of accountability. They assert that Allergan's patents and the innovations of Mr. Hunt, Dr. Bates, and their colleagues are a fiction that should never have been granted by the Patent Office.

Those arguments simply hold no water, and let's get right to the heart of what Revance is asserting. Revance does not dispute that no one came up with the same animal-protein-free drug product recipe that Mr. Hunt did before he did his work related to the '878 patent. Instead, Revance is trying to stitch together an argument. They're basically saying take Mr. Hunt's separate invention, an entirely different formulation product, and that's the Hunt '598 reference, we talked about this week, and combine it with a formulation that has ingredients from cows.

Does that argument make any sense to you? Think back to Dr. Sury's testimony from yesterday. He admitted, among other things, that Mr. Hunt's 2003 invention and the drug product recipe invention in this case were opposites, opposites. Disaccharides in Hunt '878, no disaccharides in Hunt '598. Polysaccharides in Hunt '598, no polysaccharides in the drug product recipe invention at issue in this case. Even Carpenter, who Dr. Sury mentioned yesterday, expressly

recognized that inventions like this one were worthy of patent protection.

Of course, Mr. Hunt spoke to you about his journey to arrive at the '878 drug product recipe patent, and this is a journey that Dr. Sury could have never taken. Why? He has never worked one day on botulinum toxin drug products. You heard him. In his entire career, not one day. What's he doing here?

As we saw, whether you believe Mr. Hunt, who's sitting right here in the courtroom and who worked on botulinum toxin products for decades, or do you believe Revance and Dr. Sury, now at Revance's 11th hour of accountability? By the way, Dr. Sury even admitted that he's not a person of ordinary skill in the art if you define that as requiring you to be in the botulinum toxin field. Of course, that's what this case is about and this is a reason you can dismiss Dr. Sury's opinions alone.

Revance also does not assert that it came up with the same animal-free methods that are disclosed in the manufacturing patents we see on the screen. Once again, it's not disputed that no one ever did develop the manufacturing process before Dr. Bates and his colleagues did.

Think about what you saw here at trial. Remember the testimony from Dr. Goodnough, those

misrepresentations and half-truths he told you that were exposed on cross-examination. Think about whether his testimony came off in the end as credible. Remember the math equation he showed you, the problem? Dr. Goodnough actually came into this courtroom and attempted to claim that he arrived at the one parts per million number in the '748 patent without even considering whether the toxin's involved in his calculation. That's when my colleague asked Dr. Goodnough, where's the BoNT? He simply didn't account for it.

Revance -- the third -- let's call a spade a spade. Revance is taking a completely different position now than they took before the Patent Office. They said a particular reference taught away from something there but are now telling you here the exact opposite. It's the very same reference but taking the exact opposite position. That's simply not credible.

So Revance tries to tell you that the Patent Office got it wrong on three separate occasions with respect to all three of the patents-at-issue because the inventions were allegedly obvious. They want you to find that when the Patent Office considered Hunt '598 as well as Johnson '468, Gessler '99, and many more references, they concluded that despite all that prior art, Allergan's inventions were new and not obvious, those patent examiners actually made

mistakes in each and every one of these instances, all three.

To be clear, Revance points to seven references to try and prove obviousness. These are the references we see here. The most important five references were presented to the Patent Office considered by the skilled scientist patent examiners.

Now, we saw that Hunt '598 and Johnson '468 were actually in -- described and distinguished in Mr. Hunt's 2005 patent application that led to the '878 patent. Dr. Sury's references were right in front of the examiner in the actual application, described and distinguished. You saw that the Patent Office expressly discussed, among other things, why Gessler 1999 does not teach the invention in the '740 patent.

So now these two references we have left that weren't admitted and considered by the Patent Office, Smelt is the canned food reference. Enough said. The FDA guidance is about human blood donors and not about botulinum toxins, so when you boil it down, Revance is asking you to consider the exact same information that the Patent Office considered. They want you to say the Patent Office made three mistakes on three separate occasions.

Patents issued by the U.S. Patent Office cannot be swept aside so easily. Claims of invalidity can't be

used like a "get out of jail free" card. In the laws of our country, a patent is not issued until a patent examiner has done the work, they have examined the patent, considered the prior art, and determined what is claimed is really new and not obvious.

And it's Revance's burden to prove otherwise by clear and convincing evidence. As you'll see in the jury instructions, this requires Revance to prove to you with a high probability that each of the three patents would have been obvious. Very importantly, as the judge will explain to you, Revance must prove to you by clear and convincing evidence that each of Allergan's inventions was not obvious based on everything we know today. Rather, we have to focus on what was known when these patents were applied for 15 or 20 years ago.

In this trial, Revance has tried to point to various pieces of botulinum toxin research and various references. They intended to stitch them all together in various ways alleging the inventions at issue were obvious. They said surfactants were known, disaccharides were separately known, chromatography was individually known. They had Dr. Goodnough and Dr. Sury read lines scratching off the invention saying they were obvious.

The critical fact, again, is that nobody knew how to put the pieces together until Allergan's inventors

did it. They did it first. No one else did it before them. It wasn't obvious.

No one figured out the right combinations and how to put together all the possibilities until Allergan scientists did. They were the first, and these inventions, as we heard, provided very significant benefits, including things like higher potency and longer duration and the ability the make animal-protein-free toxins as well as super pure versions of those toxins.

And by the way, it's worth noting and taking a moment that these patents, the inventors, are not just some faceless cogs in a corporate wheel. You heard live testimony from Mr. Hunt and Dr. Bates. They testified about the significant years of hard work, about the dangerous situations they had to work in day in and day out, and about the ingenuity and innovation it took to complete the projects and achieve success. According to Revance, you can just toss all that hard work and innovation to the side, but the evidence doesn't support what Revance is saying. It doesn't support them discarding what Mr. Hunt did with years of experiments to come up with his invention.

During the trial, you may have possibly gotten the misimpression at times that Revance was first for something in this case. That's just plainly not true and a distraction. All of Allergan's work occurred before Revance

did, frankly, anything in this field.

Dr. Ruegg, for example, talked about that he got patents over DAXXIFY. To be very clear, Revance's patents are not prior art to anything in this case. All of Allergan's inventive work was done well before anything done by Revance that matters to this case. In fact, Dr. Ruegg admitted that Allergan's foundational platform and Mr. Hunt's drug product recipe patent is the only way DAXXIFY can work. He testified that if a protein like albumin was present, the peptide wouldn't do anything. If there's another way to make DAXXIFY without using Allergan's inventions, again, think about why would Revance do that? They keep using our foundational technology because they need it for their peptide to work.

As you heard in the jury instructions, the fact that Revance has its own patents is not a defense to liability. It's not relevant to this case. Revance, I'm sure they certainly expect others to respect their patents. We're just asking for the same treatment here.

Revance tries to throw up a smokescreen by focusing a lot of time and effort on its peptide, but this is just another very deliberate attempt to distract. I want you to ask yourselves, what's the point of this entire peptide debate? The peptide is totally irrelevant to infringement. That's not disputed by Revance.

And in fact, the peptide is a complete sideshow that has nothing to do whatsoever with Allergan's manufacturing methods that Revance admits it's using. Every one of Revance's witnesses admit that the peptide is simply an addition to the core formulation of a disaccharide and surfactant from Mr. Hunt's invention that the peptide needs to be able to work in the first place. So that Revance adds a peptide to Allergan's inventions does not mean that Revance is not infringing. They are.

To be clear, Revance admits that it uses Allergan's inventions despite the presence of the peptide and the peptide also certainly has nothing to do with invalidity. It did not exist until years after the relevant patent dates in this case.

Now, again, Revance has been trying to confuse talking about its own patents, but you'll notice that Revance is not even claiming that the peptide or any of its patents are prior art in this case, and that's because they indisputably are not.

Let's talk about duration for a moment, and you heard a lot about it during this trial. The '878 drug recipe patent provides a necessary platform that provides the stability to have a longer duration of action. DAXXIFY cannot obtain longer duration without using the '878 combination of ingredients, whether the peptide is there or

not.

As Mr. Hunt explained, the '878 patent disclosed a stable formulation having improved potency, which provides the longer duration of action, and that's all in the '878 patent. And that value should be recognized in the royalty percentage that I'll talk to you about a little bit later today.

But let's be crystal clear about what the evidence showed in this case. Mr. Hunt's combination, the special secret sauce, the disaccharide and the surfactant, that's what causes the longer duration of action. All the evidence in this case supports that conclusion, but I want to discuss two very important pieces of evidence on this issue.

First, Revance's FDA statements are definitive. They told the public and they told the FDA that the peptide is an inactive ingredient and it's not intended to exert therapeutic effects. Revance's position on the FDA statement, forget what you just saw. When we said the peptide was inactive, we didn't mean that. When we said the peptide has no therapeutic effects, we didn't mean that either. Ask yourself, again, is that credible?

Second, the actual data supports reaching this conclusion. I'll submit to you there are two and only two studies in evidence in this case that answer the question

about Revance's peptide. One was conducted by Allergan which we see on the left. This is the study that Dr. Broide and his colleagues conducted. It's sound science and the study was specifically designed to answer what would happen if you added Revance's peptide to Mr. Hunt's drug product recipe patent.

The answer: The peptide does nothing for duration. So DAXXIFY's longer duration-of-action profile is based on Mr. Hunt's foundational platform.

The other study we see on the right, who's that from? Revance. Look at those figures. Allergan and Revance's studies, they line up. Hard evidence that the peptide does nothing for duration.

Revance has absolutely nothing to say, you didn't hear one word, not even one, from Revance about its mouse DAS study on the right. They didn't even address it ever during this trial.

What's more, what we did hear from Revance was some contentions about, well, maybe Allergan's study doesn't have the exact proportion of ingredients as DAXXIFY. Guess what? Revance used very similar concentrations in their mouse DAS study that they went to great lengths to avoid talking about and they're hoping you'll just sweep it under the rug and forget about it.

They use those same concentrations or similar

concentrations with the FDA submissions for DAXXIFY. That proves that the Allergan study is relevant to DAXXIFY just like their studies that they submitted to the FDA is in the same or similar concentration of ingredients is relevant to DAXXIFY. It's not credible to suggest otherwise.

Instead, all we hear from Revance, a bunch of hypotheticals, bunch of high-level theories, but they never showed you any data. Think about that. Where is the hard data? They don't have any. They have theories.

By the way, Revance's own chief scientific officer, Conor Gallagher, you heard him testify with respect to Revance's theories. There's no direct link between the peptide and duration of action. Revance's own chief scientific officer told you what Revance is trying to sell you in this court can't be used to link to duration.

You don't have to take my word for it. Look at what Revance told the FDA and what it submitted to the FDA and what it's telling you in this case compared to what it's telling the FDA. They're not consistent.

Now, finally, Revance tries to divert your attention by suggesting that Allergan is somehow not entitled to enforce its patents because it hasn't yet gotten FDA approval or brought to market an animal-free product with longer duration. First and foremost, the evidence has shown that Revance is a hundred percent wrong to suggest

that, because as we saw in this trial, Allergan is bringing animal-protein-free longer-duration products. They're bringing them to market and working on it as we speak. We see that on this timeline.

But perhaps more importantly, under this law and basic common sense, it doesn't matter. Even if Allergan wasn't pursuing its inventions today, it's still their inventions and Revance can't just take those inventions without permission and without paying at least fair compensation. It's like someone breaking into your house that you built and staying in one of your guest bedrooms and then saying they don't have to pay you because you're not using the guest room right now. It's your room. Doesn't make sense, and it's not permitted by any law.

Ultimately, the evidence Revance used and continued to use shows they're using Allergan's inventions without permission and Revance's unauthorized use of those inventions is really what has allowed it to get this first-to-market advantage over Allergan itself, the holder of the intellectual property rights. Again, the rent is due and Revance must pay for the same unauthorized use of Allergan's property that allowed it to gain the competitive advantage in the first place.

The question for you now is how much should Revance pay as a reasonable royalty to compensate Allergan

for this undisputed use of their patents and continuing use of their inventions? On this you heard from our expert Dr. Siegwarth as well as Ms. Trexler for Revance.

And the way to figure out a reasonable royalty that makes sense in this case is to consider a hypothetical negotiation that would occur between Allergan and Revance, and this was at the time that Revance first started using Allergan's inventions without permission. Dr. Siegwarth went into great detail on this issue. She explained and showed you that the evidence established the following, that Allergan would have been in the incredible position of having to grant a license for its longer-duration and animal-protein-free inventions to the very company that it saw as BOTOX's greatest competitive threat.

Again, Allergan was and is working to develop its own competitive products, so allowing a competitor like Revance to come in first would have been been a significant issue for Allergan. Allergan simply would not have licensed to Revance on terms that did not pay Allergan a very significant royalty amount.

And Dr. Siegwarth, she further showed you how and why Revance needed Allergan's patented inventions to launch its products and as we have seen now, those inventions are necessary for DAXXIFY to be able to be marketed and used. If Revance would have delayed coming out

with its product because of Allergan's patents, whether because they couldn't come out at all or had to make some changes to their product, it would have significantly delayed their launch and that's part of the reason for our royalty request.

At the hypothetical negotiation, Revance would need a license and would have been willing to pay a significant royalty rate to make sure that it could launch its DAXXIFY product in the first few years of the product's life. Remember, this was Revance's flagship product. This was the product that was allowing Revance to make a splash in the botulinum toxin market.

With this in mind, Dr. Siegwarth took you through her methodology for calculating a reasonable royalty on the formulation patent. And using both Allergan and Revance surveys to determine the value of the longer duration of action that's tied to the '878 invention, Dr. Siegwarth explained why a reasonable royalty with respect to the formulation patent is 24 percent.

Dr. Siegwarth then carefully took you through her methodology for calculating a reasonable royalty for the manufacturing patents. It was 15 percent. As she explained, if Revance wanted to change its process to avoid using either of Allergan's manufacturing patents, it would have taken at least 12 to 18 months between redesign

efforts, FDA approvals, and product rollouts.

And Dr. Siegwarth showed you based on Revance's own sales projection data why the reasonable royalty for manufacturing patents would have been 15 to 20 percent for the period both patents were enforced, and 12 and a half to 17 and a half percent when only the '748 patent was enforced. To be conservative, a 15 percent royalty for both patents is a reasonable number to use for damages. That's what Allergan's asking for in this case, 15 percent for these patents.

You might recall that Ms. Trexler tried to criticize Dr. Siegwarth for not specifying or addressing any specific alternative designs. Members of the jury, the reason Dr. Siegwarth didn't address any specific alternative design is that Revance didn't provide any. They didn't even suggest one was possible. Throughout this trial, Revance has never even hinted at any specific change or alternative to its products to avoid Allergan's inventions. Nothing they could have done to maintain the longer duration they want, animal-protein-free formulations they want while avoiding Allergan's patents, no suggestion, not one. Because DAXXIFY needed Allergan's inventions to have the benefits they wanted.

Regardless, again, any change would have taken a lot of effort, cost a lot of money to implement. So when

you look at it, Dr. Siegwarth, her royalty is actually very conservative because in actuality, it could have taken Revance a lot longer than 12 to 18 months to be able to come up and design and develop an alternative using Allergan's inventions.

Taking a step back now and taking a look at what this all means in practice, from the launch of DAXXIFY until the '878 patent expires in 2026, Revance must pay 24 percent until the '878 patent expires for the formulation patent. For the manufacturing patent, from the launch of DAXXIFY until the expiration of the '748 in 2029, that's 15 percent for using the manufacturing invention.

As you can see, during the period of the royalties, Revance is still keeping the majority of its product sale revenues. Even if it could not make any of that revenue, none of it, if it was not using Allergan's invention to make and sell its product, it simply couldn't do it without using those inventions.

Just to give you some perspective here, in Revance's world it would only have to pay Allergan 1.4 percent to use Allergan's animal-protein-free manufacturing inventions and as little as 1.75 percent to use Allergan's drug product recipe patent. A survey used by Revance's own damages expert provides the duration drives more than 23 percent of the reason why people switch to

DAXXIFY. It's the longer duration.

These numbers don't even come close to fairly accounting for the rent that is owed to Allergan for the value contributed by Allergan's patents. How do we know this is true? Because Revance's own expert, Ms. Trexler, showed you. This is her slide and in it she clearly showed that longer duration accounts for 20.1 of the value of DAXXIFY. Animal-protein free accounts for additional 8.2 percent of the value of DAXXIFY. According to Dr. Trexler's own analysis, those two product features account for more than 28 percent of the value of DAXXIFY. And Revance unquestionably uses Allergan's inventions to get a longer duration, animal-protein-free drug product. Again, Revance hasn't suggested a single alternative to using those inventions.

Now, of course, Ms. Trexler, she arbitrarily applies her own calculated 28 percent value only to something she refers to as the price premium of DAXXIFY. She's referring to the difference in price between DAXXIFY and BOTOX. This doesn't make any sense at all. Revance could not sell the entire product if it didn't use Allergan's inventions. If Revance had to stop using Allergan's inventions, it would have no product and get $0 in sales, so the correct price to use for the royalty is the entire price of DAXXIFY. It's common sense and that's

exactly what Revance makes when it sells a DAXXIFY product.

So if you think about it, in the end, Ms. Trexler's 28 percent, if you ignore this arbitrary price premium adjustment, it's relatively close to what Dr. Siegwarth says, which is a combined 39 percent, 24 percent for drug product recipe, 15 percent for manufacturing patents.

Now, members of the jury, I want to take a look, next, at the verdict form you're going to see later today. First three questions are very simple. I won't talk about those, but I want to just walk through the last two questions. And this relates to --

We'll start with Question 4 which is findings on damages. What's the fair and reasonable amount that Revance should pay for infringing Allergan, Inc.'s, rights?

On the subject, here's what we know. Revance uses our patents. They don't dispute that. Both sides agree there are 273 million in DAXXIFY product sales. You heard from Dr. Siegwarth and she walked you through her analysis of what she believes should be paid out of the 273 million to Allergan as fair compensation.

So let's take that analysis and apply it to this verdict form, and members of the jury, you may want to grab your pens for this because the form may seem a little complicated but we're going to work through it together and

there's some times where you have to refer back to numbers that you calculate in later steps.

So Question 4 on the verdict form asks you to find the fair and reasonable royalty rate that Revance should pay to Allergan for Revance's use of Allergan's patents. How should you go about doing that? Here's what I suggest, though of course it's entirely up to you. This is what you're here to decide, and we trust and respect your judgment, whatever that is in this case.

What Allergan believes is the fair and just thing to do is to follow Dr. Siegwarth's analysis. If you recall, she testified about the royalty percentages that in her opinion she believes to be fair compensation. So with respect to the '878 patent, Claim 6, 24 percent is what Dr. Siegwarth opined when she was here earlier this week. So that's the first item that goes in the first blank space.

From there we have to apply that percentage to a specific dollar amount that Revance owes Allergan for its use of the '878 patent. For this, recall there's no dispute, it's 273 million. This is the entire sales to date. From that if you multiply those together, you come to roughly $65.5 million and I would suggest this one might be good to write down in your notebook because we're going to use it again in a moment.

I'm going to do similar calculations for the two

manufacturing patents. You heard the '740 patent expired in September 2023, so this next questions asks you for a royalty rate for the two manufacturing patents that existed until September 2023. As I explained a short time ago, according to Dr. Siegwarth, 15 percent would be the appropriate royalty rate.

And during this period of time through September 2023, Revance sold $66 million in roughly the first year or so in sales. If you take 15 percent of 66 million, you end up with 9.9 million would be the number for the first manufacturing patent. This would be helpful to write down as well.

The last royalty rate you have to determine is for the '748 patent, the second manufacturing patent. For that, just like we saw earlier, the conservative rate we're using even though we could ask for a higher rate is 15 percent. We apply that for the period of sales that are from September 2023 to the expiration of this patent in 2029. You're looking at 207 million in sales. So with that, we would end up with an approximate $31 million for the '748 patent that we would write down in our notebooks.

Then you will then move to Question 5. After you've done Question 4, Question 5 asks that you write down a separate answer and this is asking for the total, the total reasonable royalty dollar amount you find that Revance

needs to pay Allergan.

All this means is we have to add up those three dollar amounts, those totals that we wrote down in the notebook. So we take 65.5, 9.9, and 31 million and it comes to $106.4 million is the number we would suggest you write down as the answer to Question Number 5 because, again, that is the just, fair, and reasonable compensation Revance should pay to Allergan for its use of Allergan's inventions.

At this time, counsel for Revance is going to come up and have a chance to speak with you now. I'll have one more chance to talk with you a little bit later just for a few minutes before you deliberate, and I just want to take the opportunity now again to thank you so much for your time and attention.

THE COURT: All right. Thank you, Mr. Dittmann.

So members of the jury, while the defendant gets organized, you know, feel free to stand up. Or just sit there. Okay?

MR. VARUGHESE: Members of the jury, good morning. Dennies Varughese for Revance. It's been a long week. Thanks for bearing with us.

Since my opening statement to you on Monday, you've heard a lot of argument, a lot of testimony, a lot of information, a lot of facts. This is my opportunity and time to try to piece it all together for you.

The first thing I told you on Monday was that we took Allergan's accusations very seriously, allegations that we copied their invention or stole their IP. And I told you then that we were going to provide clear and convincing evidence that that's not true.

I believe we carried that burden, and I'm going to get into it and summarize it for you. The reason why that's not true is because Allergan's patents are invalid. They take and stack things that are in the prior art. It's like they took yellow and blue, but they never squeezed out the green. There's no magic. There's no special sauce.

Now, Mr. Dittmann, who I like a lot, he tried to downplay obviousness and used colorful words like "get out of jail" or "excuses." That's not true. First thing I told you, obviousness is a legitimate defense to infringement. And the judge instructed you in detail about obviousness. It's a real defense that applies in this case.

And they said something else. He's like, Do you really think the examiner swung and missed three times? The examiner made mistakes and we've highlighted them. Had the examiner seen the Hunt/Johnson combination, the Malizio/Xiang combination, the Gessler/FDA guidance/Smelt combination, this patent shouldn't have issued.

And you heard objective evidence and testimony from independent experts, preeminent experts, like

Dr. Goodnough and Dr. Sury.

"Prior art," I told you on Monday, is going to be a term you hear a lot. You probably heard it a thousand times this week. Prior art is human knowledge, stuff that was known free and clear to use by anyone, you, me, Revance. It's stuff that belongs in the public domain that cannot be captured in the patent. That's why we didn't take anybody's stuff.

I also acknowledged from the start that you might wonder why you're being asked to second-guess the examiner. That's your role as jurors. It's essential. Because you're the critical check and balance against bad patents.

Like I said, good patents are good for the economy; bad patents are bad for the economy. It stifles innovation and advancement.

You're the check against them. You, unlike the examiner, you're the ones that get to hear every witness, review every piece of evidence, and consider every argument. The examiner didn't have nearly as much information as you got in this trial.

That's why we have these trials. Your careful reconsideration of the evidence is vital to the integrity of our patent system and our economy. The system is designed to protect true innovation, not to award recycled old ideas

or hinder progress and advancement.

On Monday, I told you that my team and I came here to defend Revance's reputation and to defend the hard -- nearly 20 years of hard work by Revance scientists who actually did squeeze out green. They advanced the science of botulinum toxins through DAXXIFY.

They, not Allergan, actually improved on BOTOX, took the prior art and made it better, and that's what we get patents for.

Now, you heard them say over and over again, the recipe patent, the recipe patent. Their words, not mine. My question to you: Where's the cake? Those recipes, those patents were filed in 2003, 2005, 2009. And here we're still hearing, oh, well, it's in the works. We invented it. It's in the works. It's coming. Where's the cake?

The Revance employees like Dr. Ruegg are hardworking individuals committed to real innovation. And for me and my team, they are standing in front of you asking for fair and equitable justice.

We ask you to look carefully at the evidence when you deliberate and ask for the same. These patents were already known, available to the public, obvious to someone skilled in the art.

If you conclude, as we have, that the evidence shows these patents would have been obvious, therefore

should never have been granted, then it's your duty to revoke them.

Revance did not take anyone, especially not Allergan's, intellectual property. Revance built on top of what was known and made it better. These patents are obvious. The Judge gave you detailed instructions on what that means and you'll see it from the evidence.

There are two questions we're asking you to decide here. I presented them in my opening argument. The answer to the first question: Are Allergan's patents invalid? We're going to ask that you find yes. The second question: Should Revance have to pay any damages? I request that you find no.

Before we turn to the evidence, I want to talk to you about two, sort of, themes that emerged through trial and I want to highlight for you here. One was this trial was an exercise in what I call show or tell. We have one side, Allergan, telling you a lot. They say a lot. They're thin on the show part. We, Revance, showed you everything we told you. And I'll show you what that means.

We talked about duration. We heard a lot about duration. You heard about it from counsel. Here's why it's important. Duration goes to two issues in this case. That is the only way Allergan can try to make out a claim that their patents are not obvious because they're trying to say,

well, we have this surprising duration.

I tell you, their experts mistakenly testified that their patent is responsible for duration, but not a shred of evidence. They're also opposed to justifying this gigantic number that they're trying to -- people like DAXXIFY because it has a longer duration of action. It's an advantage that DAXXIFY has, and they want to take credit for it, like I told you they would.

But here's what we saw at trial, okay. You had four BOTOX and three other competitors. These guys are all similar. They have a shorter duration of action than DAXXIFY and they contain animal proteins.

The Revance scientists introduced DAXXIFY in 2022. DAXXIFY comes on and has advantages. Longer duration, it's important. Like I told you on Monday, longer duration means fewer office visits, fewer needle jabs.

You saw this. The reason for it is, unlike BOTOX and the other "me toos," DAXXIFY's substance doesn't diffuse as much. It stays at the target site of action.

And you heard from Dr. Ruegg it's the novel peptide that he incorporated into this that Revance owns. Dr. Ruegg invented DAXXIFY. He and his colleagues. And I'm not saying that on defensive terms. That's not what I'm saying.

The reason I bring up that point, and I don't

mean to get confused by what was said, is I'm showing you that it was them that actually invented something. These patents, the fact that they've never invented -- brought to market something shows that all they did was take the prior art the way it's frozen in time in 2003, 2005, and 2009 and never advanced the ball. They just stuck the prior art together and said it's ours.

You heard from Dr. Ruegg, how proud he was of the work that he did and recognition that he got from *Time Magazine*. He mentioned one of the hospital inventions of 2023.

Revance and DAXXIFY did what inventions of patents do. And you've heard a lot about Mr. Hunt and Dr. Bates as inventors. They're fine people. We saw them in court. They're wonderful people. We're not here to attack them. We're here to challenge the patents. And these patents don't belong to them. They belong to Allergan.

What Allergan did here, they took information in the prior art, things like animal-product free. That was known since the early '90s and '80s. There was all types of motivations, regulations, the FDA telling people. The idea of going animal-protein free was well known.

Now, you heard them question Dr. Goodnough with, I don't know, these weird questions. And they put some

articles -- or patents or articles in front of him and said, Why isn't -- you know, this isn't animal-product free. And they kept saying, well, that's because that's for research work. That was for research grade. Yeah, they didn't need the animal-product free because it's for research grade because I'm just doing research. I'm not giving it to humans.

And then when he had a chance to explain himself, he told you that it's -- in the early '90s, he had published a paper saying that for pharmaceutical grade for human consumption you should go animal-product free. That concept is not something that Allergan invented.

As I mentioned, Revance and DAXXIFY actually did improve on BOTOX. They're the only ones to do so. DAXXIFY was the first ever FDA-approved animal-product-free botulinum toxin. It was an improvement over BOTOX. It was longer acting. It was cleaner, purely synthetic, no animal products. It reduced diffusion and had its own novel peptide that helped accomplish.

This foundational technology that they keep talking about, it's the prior art. Yeah, the prior art was foundational. Only God creates from scratch; right? We have to build on what we learn others do.

But what's in the prior art, it should be free for us to use and build on top of it the way Revance did.

They should not be able to hold prior art hostage.

Now, remember, a lot of telling, showing. Let me show you why the peptide is responsible. That's Dr. Ruegg's study. Back in 2011 -- and here it is in black and white. Longer acting diffusion.

Long before this case and this litigation, Dr. Ruegg published that paper. And we showed that to you. I don't know. Mr. Dittmann said we didn't have any hard facts or hard science. That looks like hard science to me. Or hard data, I think is what he said.

It's from the same study, controlling the unwanted diffusion, longer duration of effect. This is one of his patents. He presented that to you. Let's take a look at that patent. And this was from 2010, 15 years ago, long before this litigation.

He and his colleagues disclosed to the world their secret sauce. Said here's the peptide sequence, we have a patent on it, we're going to disclose it because that's what happens. Inventors reveal their secrets and get a patent. And they did in the patent document.

He talked to you about his other patent that covers DAXXIFY. Again, a separate patent, United States government document. In black and white, increased duration, less tendency to undergo diffusion, increased tendency for local diffusion compared to BOTOX and this

other RTT150.

That was being tested, DAXXIFY, which had the peptide, and the same DAXXIFY formulation without the peptide. And this data showed that it was the peptide that was responsible for the longer duration of action. Again, it looks like hard data to me.

This is confirmatory evidence that Revance's novel peptide is what is causing the longer duration of action.

And this is also from his patent. It shows definitively that the peptide is responsible for the longer duration of action. It looks like hard data to me.

Now, this was -- we talked about -- oh, I talked about two things. So this is the show and tell part. The other thing is you're going to hear, when they do tell you stuff, they're going to tell you parts of the story, bits and pieces. They won't tell you the whole story. And I'm going to try to fill those gaps for you.

Mr. Dittmann said, "Well, Revance told the FDA that the peptide is an inactive ingredient." We did. Because it is. You've heard from Dr. Ruegg, and I think I mentioned this example. Tylenol ER only has one active ingredient, acetaminophen.

However, there's all these other inactive ingredients. Just because they're inactive doesn't mean

they're not important. That makes it longer acting. The peptide is an inactive ingredient that helps the toxin work better. There's nothing dishonest about that. I don't know why they're bringing this up.

You'll recall back on Monday I said, "We have longer duration. We're the only ones to do it. We invented it." And I said, "Allergan is going to try to take credit for it." Throughout trial, that's what they did.

But they don't have a shred of evidence. They tell you they invented it, but they can't show you. Why? It's not in their patents.

I asked Mr. Hunt. Now, he's an inventor and I'm sure he's a very smart guy, but he's not an expert in this case. He doesn't offer opinions. So all he said, he just said, well, potency equals duration.

Dr. Ruegg countered that, but his testimony on that doesn't matter. There's no evidence here that potency equals duration. But I also asked him, in your patent is there any testing of duration, any data for duration? Do you even mention duration in your patent? He's like, no. But, hmm, it's got to be. That's not evidence.

Instead, they have this. You heard from Dr. Broide who's an Allergan employee, also not an expert here. In 2020, he made, like, a mock DAXXIFY based on publicly known literature and presented some data where he

says, well, no, the peptide is not responsible for the longer duration of action.

And on cross-examination, we showed that that was wrong. In fact, his testing was flawed and he got at least five things wrong that suggested there's no weight to be given to the study. Right?

First of all, it was the wrong amount of trehalose. It was the wrong amount of polysorbate 20. The wrong ratio of polysorbate 20 to peptide. The wrong amount of histidine. The wrong amount of pH.

And beyond those mistakes, I'm wondering, why did they have to make some prototype in 2020? Right? You heard from Mr. Dittmann that Mr. Hunt made thousands of experiments.

Why didn't he test duration on one of those thousands of experiments; right? Why did he do experiments from the time -- on a product from the time when they filed the patents? Filed these patents in 2005 and 2009 respectively. Why didn't they do testing then? I don't know.

The problem is -- the reason is they didn't invent anything, just prior art.

Slide 19, please.

So take a look at this. Look at the weight of the evidence. I'm showing you. I'm telling you. Okay. To

believe Allergan, that it was their patents and not Revance's novel technology that was responsible for duration, you'd have to take Allergan's word for it and disbelieve multiple experts who said the opposite, and then believe them based on no real credible evidence.

So with that, let me turn to invalidity. Turning to the patents, we saw three patents:  Two manufacturing patents, formulation patent.

Let's start with the '748 patent.  This is the first of the purification patents.  You heard from Dr. Michael Goodnough, the University of Wisconsin.  He's a preeminent expert in the purification of botulinum toxin. He's been doing it for well over 30 years.

He showed you -- so these patents claim a process called chromatography to purify the toxin.  He showed you that chromatography and all the steps that they have going back way to 1984 have been used.

Well, what do they do?  Well, they took that same chromatography that everyone used, anion, anion exchange and all that stuff, everything in purple, and Allergan stacked the concept of animal-product free on to it.

Dr. Michael Goodnough showed you everything here in the purple and pink is in the Malizio and Xiang references.  Everything was actually in Malizio, all the

purple stuff, and the only thing that Xiang supplied was the concept of animal-product free.

Based on everything you heard so far this week, can we legitimately say that as of 2003 the concept of animal-product free was not known to a person of skill in the art? Really? Dr. Goodnough gave you all the reasons why someone would combine the teachings of Malizio and Xiang with a reasonable expectation of success. He said people would know your going animal-product free eliminates the risk of disease. People did not want to use animal proteins. There were regulatory guidelines at the time to go animal-product free. Easy substitution, easy success.

Members of the jury, let me reiterate the point. This is not easy for you or me. I'm talking about a person of ordinary skill in the art, a pharmaceutical formulation scientist. Remember that analogy I told you about a football coach being able to read playbooks but football fans can't? We're talking about would a person of ordinary skill in the art -- would have reason to go animal-product free. That person -- we're going to talk more about the hypothetical person is presumed to be aware, the law presumes them to be aware, of all the relevant art.

Finally, you see the Allergan '748 patent here and we have Dr. Goodnough's patent. I was the one doing the questioning here. You see they just copied large chunks.

It's one thing to cite. In school we write a research paper and have a bibliography and say, "I learned this thing about elephants from *Encyclopedia Britannica* in my studies" so you don't plagiarize. You certainly don't copy stuff, and when you do you certainly don't say "our process," "obtained by our process" when you verbatim copied it.

They try to accuse us of copying. They put -- this is one of Dr. Ruegg's patents on this patent. For one, this patent is not at issue. But Dr. Ruegg cited the '740 patent. Well, Dr. Ruegg, he's the inventor. He said he had no idea. It was the patent attorneys. And I asked him under oath, "Did you ever read that patent?" He's like "I don't remember reading it." Revance didn't copy anything. There's nothing to copy. They don't have a cake. We still have a recipe, apparently.

So Revance's defense comes from their -- Allergan's rebuttal comes from their expert Dr. Gessler. He argues that there was no reason to go APF as of 2003 and 2005 even though all the other witnesses say otherwise, including their inventors, elicited testimony from them that it was known. And Dr. Goodnough said there were plenty of reasons to go APF. All of the other witnesses had FDA experience. Dr. Gessler has zero.

One of the limitations is that this process, when we run the chromatography process, you get less than

one part per million nucleic acid. But Allergan is wrong that that's not obvious. The overwhelming evidence that Dr. Goodnough provided to you shows that when you run that reaction, it's just automatic it gets to that level. There's nothing magical about it. When you run the known chromatography process that everyone knew and run it for a certain amount of time, it's like it has -- it digests all the -- removes all the nucleic acid. It's automatic. It's inherent.

Next, Dr. Gessler says that people would have been discouraged from using anion chromatography. He said they would be discouraged. However, he was never discouraged. Dr. Goodnough was not discouraged and they both used it, and Dr. Goodnough said he used anion chromatography hundreds of times if not thousands and never saw any problems. This is in line with decades of anion chromatography being used in the literature. No one was discouraged, certainly not a POSA.

And then, another distraction. They are trying to somehow say that Revance was taking inconsistent positions. This patent has nothing to do with the patents in this case. Different patent attorney, different patents, different claims, different reference point, different examiner, different setting. And if Revance's other patent attorneys, wasn't me, if their other patent attorneys said

something about Luo you should have some context as to why they said it. You can't just throw it out there and act like it has relevance in this case. Another distraction.

Let's turn to the second of the two purification patents, the '740. I'm not going to spend too much time on this. It's pretty much the same issues as with the '748. Same chromatography process, the concept of being animal-product free, but this an older patent from 2003. But all these references are pertinent, as Dr. Goodnough showed you.

Next, we showed you every single step was in the prior art. There was nothing new here. We also showed you -- 38, please -- all the reasons why a POSA would have put these teachings together to come up with this claim. Gessler teaches the chromatography process. The FDA guidance tells you to go animal-product free, and the Smelt paper tells you how to go animal-product free. They're all interrelated disciplines and a person of ordinary skill in the art in this field had all the information available to it. This patent is also obvious.

I do want to make one point about this. So here the '740 patent recites a botulinum toxin type A -- I'm sorry, the prior art taught types C and D whereas the claims are to type A, and you heard from Dr. Goodnough that they're completely similar and there's no real meaningful difference

between the two.

And Dr. Goodnough gave you another reason why a person of skill would have easily done Type A, because that's the only one that was FDA approved at the time. So it would have been the best known and the one that's safest, so there's nothing special about this. So Dr. Gessler and Allergan are wrong about this point as well.

Finally, let's turn to the last one, the recipe patent, the composition of matter. Dr. Sury showed you that everything here, all the different steps and components, were taught in the Hunt reference, and the one little thing where they added trehalose was the Johnson reference. And both references deal with the same kind of thing, protein compositions. Botulinum toxin, yeah, it's dangerous, but it's just a protein.

And a point about Dr. Sury. You heard today Allergan's counsel try to discredit him by saying that he's not a person of ordinary skill in the art and trying to drive the unremarkable fact that he might never have worked with botulinum toxin. Another distraction. Botulinum toxin is just a protein like any other protein, principles are the same other than the danger. You have to take special precautions, but in terms of the science, formulating them, how you put different ingredients together, it's like saying you only drove a Toyota, you never drove a Honda, you don't

know how to drive a Honda. No. A protein is a protein. And Dr. Sury has worked nearly 45 or 50 years in protein pharmaceutical compositions.

And first and foremost, he told the judge yes, I'm a person of skill in the art. He's a pharmaceutical chemist with decades of experience, head of the department of pharmaceutics and a professor at the University of Minnesota, Ph.D. in pharmaceutics. He's been doing scientific research for 50 years. He published over 200 scientific articles. He has experience working with large proteins just like botulinum toxin. He, sitting on that stand, spoke honestly, accurately, genuinely, and with commanding knowledge of the developing science, make no mistake about that.

Other than that, a person of skill is a hypothetical person. I previewed this for you on Monday. It's not an actual person, it's a legal construct, what we call it. It's a legal thing that we use to analyze obviousness. It's a hypothetical person presumed to be aware of all the relevant science, and that's science. When you're talking about something like pharmaceuticals, can involve different things.

And that's why Revance, we brought several highly qualified, highly renowned experts to talk to you about the toxin, to talk to you about protein process, to

talk to you about drug delivery with peptides, to talk to you about FDA. We brought them all. All the testimony informs how a person of ordinary skill would think about these inventions. That's why we provided you with as much information as we needed to.

So here's what Dr. Sury showed you. 99 percent of the claim is in Hunt and the trehalose is in Johnson. Dr. Sury told you that trehalose had a long history of success in protein formulations. You heard my colleague question Dr. Schöneich earlier. Dr. Sury showed you where Hunt and Johnson had all the elements and this morning Dr. Schöneich testified that he did not disagree with Dr. Sury about that basic fact. That's not controversial because Dr. Schöneich's criticism apparently was about motivation to combine Hunt and Johnson.

Let's talk about that. Let's talk about motivation. Dr. Sury showed you how Hunt was good formulation but only had stability at below freezing temperatures. And Dr. Sury showed you how Johnson, which had that trehalose, it got stability all the way up to 98.6 degrees Fahrenheit.

At this point, Dr. Schöneich, he agreed with those basic facts and he agreed there was benefit to getting stability at high temperatures. You can store these things at room temperature. You don't have to keep the cold chain

going and you don't have to freeze them. That's all the motivation you need to combine the teachings of the Hunt and Johnson.

Counsel threw another distraction in when he said when you combine the teachings of an animal-product free with the teachings of something that uses cow, uses bovine serum albumin, I don't think it's just cow. But yeah, the art, there was motivation in the art to go animal-product free, so someone who was dealing with bovine serum albumin and read the FDA book that said go animal-product free, why wouldn't they look to a reference that was animal-product free? Again, free and clear to all of us in the prior art, in the public domain. It defies logic to think somebody wouldn't combine these two, particularly a person of skill in the art.

Now, again, only half truths. Dr. Schöneich's primary argument for saying somebody wouldn't combine these two teachings is this one sentence: "The present invention excludes from its scope disaccharide." Trehalose is a disaccharide.

Now, Mr. Pickard presented him with his own testimony, with his own slides, that said that reference talks about four different formulations. Now, what they didn't tell you is this sentence comes from a section called polysaccharide formulations. That's not what Dr. Sury was

relying on. Polysaccharide is a fancy -- it's a stabilizer to stabilize compositions. That sentence comes from a section called polysaccharide formulations. Dr. Sury's testimony was based on a completely different formulation that uses recombinant has, an animal-free formulation. That was a basis. And this section doesn't say boo about excluding disaccharides.

Now, I'm going to move on from invalidity in a moment. I just want to say a few things. I think I alluded to this. Sometimes patent examiners make mistakes or overlook things. That's exactly the case here. You have had the benefit of understanding the Hunt/Johnson combination as Dr. Sury explained to you. You've had the benefit of the Xiang/Malizio combination as Dr. Goodnough explained to you. You've had the benefit of the Gessler/FDA guidance/Smelt combination as Dr. Goodnough explained to you. You're the first people to see and hear this evidence. So of course our system relies on you to hear that and revoke bad patents.

Now, as I mentioned in my opening, and as the judge instructed you, if you find these patents are invalid you don't even reach the question of damages. There are no damages because there's no liability. You heard from the judge at the start of the case that it was Allergan's burden to prove damages, not ours.

However, we brought Ms. Trexler here because to the extent that you don't find the patents invalid, we wanted to expose and highlight for you some critical flaws in Dr. Siegwarth and Allergan's analysis and why they didn't carry the burden for damages.

First of all, someone can correct me if I'm wrong. Mr. Dittmann put up a number 106, 106 million. He didn't share a number in his opening and Dr. Siegwarth testified -- I believe she said 115. The number is already changing.

Ms. Trexler told you they didn't carry the burden. She highlighted the flaws in Dr. Siegwarth's analysis. And then she showed you if you were to apply it what the right numbers would be. But let me just take a step back. You heard a little bit about this, the reasonable royalty, emphasis on the word "reasonable"; right? That matters, not just any royalty.

Reasonable royalty is rooted -- and Ms. Trexler explained this to you -- in the hypothetical negotiation where you have a willing licensor and a licensee.

Let me just pause there. Willing. Willing. What did you hear from Dr. Siegwarth and I think maybe from Mr. Dittmann? That Allergan was a reluctant licensor. That's the wrong law. That's not -- you haven't even -- you have to look at it from the perspective of a willing

licensor.

That's where the reasonableness comes from. Dr. Siegwarth told you over and over again, Allergan is a reluctant licensor and we want to play hard ball. That's not the proper analysis. So right off the bat she's wrong.

The question is when -- hypothetically, when Revance and Allergan sit across the table, arm's length, willing and reasonable, what do the numbers look like when they walk away? And I'm going to show you -- it's a little jarring for me how out of touch with reality Allergan's numbers here.

First, this is what she testified to. I think the number changed. And I acknowledge that. And I remade these slides last night.

When we stack her royalties together, she wants 24 percent of DAXXIFY's sales, almost half. Sales, not profit. That's going to be important in a moment.

Now, Ms. Trexler spent quite a bit of time telling you all the reasons why she was wrong, I'm not going to rehash that. But in short, what Ms. Trexler said was Dr. Siegwarth's analysis in the numbers, they fail to tie the damages to the actual benefits of -- or alleged benefits of the patents. Okay.

She's asking -- they keep saying, The rent's due. Got to pay the rent. The rent's due. But what she's

trying to do is give me a room but she wants me to pay rent for all the other rooms in the whole building. Ms. Trexler explained that to you.

This is what a reasonable royalty looks like. And Ms. Trexler, unlike Dr. Siegwarth, went through the proper analysis and explained to you these numbers.

Now, back when Ms. Trexler was testifying and put this number up -- and I'm going to ask, if I may, members of the jury, please write down these numbers so you can remember it. 1.4 percent for the manufacturing patents. 1.75 for the formulation patent. 3.15 combined.

And I say, again, I think the number should be zero. But it's your prerogative. I don't get to decide.

Now, Allergan seemed to suggest that that $8 million was not big enough for them. And this is a running royalty. And they get it and it continues to grow every day. Now, that number is just based on figures through May.

All right. Let's take a look at this. You saw some version of it today when Dr. Siegwarth presented this to you. And Ms. Trexler broke down for you all the wrong things here in Dr. Siegwarth's analysis.

First and foremost, this -- and again, another distraction. Look at all this blue. The impression that Allergan wanted to give you was that look at all this stuff that Revance gets to keep. And guess what? After the

expiration of the 2029 patent, Revance gets to keep a hundred percent. Well, golly, Revance gets to keep its own money? Wow.

Okay. So Ms. Trexler dispelled that irrelevant distraction and she said, This is the right analysis. Okay. And then let's take a look at it. So Allergan wants everything in the green. But Allergan and Dr. Siegwarth don't account -- next slide -- for the 13 percent that it cost Revance for the goods and raw materials and overhead.

We've all heard the saying it takes money to make money. All right. Revance has to spend that amount for its overhead.

Next, Allergan and Dr. Siegwarth don't take into account the 42 percent that Revance has to spend on sales reps to sell it. How are they going to sell it if they don't go to doctors' offices and places like that and hospitals and make people aware? That costs money.

So that leaves -- that blue strip right there is what Allergan and Dr. Siegwarth thinks is reasonable, for Revance to be left with, that. But let me show you how unreasonable this is in another way.

Think of this as every dollar that Revance makes on DAXXIFY. The next slide. Right off the bat, they want 44 percent. I understand it's a little bit lower, but you get the idea. 115 will turn into 44 percent. And right off

the bat they want 40 percent. The next slide.

But they don't account for that. And, next, they don't account for that. And so Dr. Siegwarth and Allergan are standing in front of you in this court saying that green sliver, which is $0.01, members of the jury, $0.01 on the dollar is a reasonable royalty.

Does that make sense to you? It doesn't look reasonable to me.

Now, let me just say this. 62. You saw this before, the verdict form. These are the questions you'll be asked for each patent.

Claim 6, we ask you to find in favor of Revance and find it invalid. The next slide.

Claim 8, the '740 patent, we ask you find for Revance. The next slide.

Claim 8 of the '740 patent, we ask that you find in favor of Revance. The next slide.

We ask that you award Allergan $0 just like I asked you on Monday, you send them away with no money from Revance.

Finally, I just want to say this is the last time I'll have the opportunity to address you. I appreciate your attention. Mr. Dittmann will get a chance to reply and talk to you for a few more minutes, but I won't.

I'd just ask that you give careful consideration

to the arguments and evidence that my team worked very hard this week to put in front of you all.

We really appreciate your attention and, of course, we appreciate your service. Thank you.

THE COURT: All right. Thank you, Mr. Varughese.

If anybody wants to stand up, Mr. Dittmann is limited to five minutes here so -- but he doesn't have to start right away, so.

All right. Apparently they'd rather get it over with. Why don't you -- when you're ready begin.

MR. DITTMANN: When you go back in the jury room in a few minutes and sit down with the verdict form, you'll see that there are two and only two issues that you need to decide in this case: First, whether Revance has proved that each of Allergan's three patents are obvious by clear and convincing evidence; and second, the amount of damages owed.

You don't have to decide whether or not Revance infringes each of Allergan's three patents because their infringement is an undisputed fact. You just heard Revance's counsel acknowledge this. And so you don't need to decide infringement because it's undeniable and more -- most importantly, undisputed.

Now, Revance has to assert patent invalidity based on obviousness because it's undeniable that no one did

what the inventors in this case did before they did their work.

And it's important to keep in mind that the burden here of proving obviousness is clear and convincing evidence. They must prove by such evidence that the trained examiners at the Patent Office got it wrong again three separate times on three separate occasions. Three separate times.

And this is a high burden of proof that we submit they can't come close to satisfying. And especially because, again, the examiners had the same information that Revance has shown you in this case to attack these patents.

We just heard Revance's counsel claim that Hunt '598 and Johnson '468 was somehow not considered by the Patent Office. With all due respect, this is incredible to say. Dr. Sury admitted those references were disclosed in the very patent application Mr. Hunt filed in 2005.

MR. VARUGHESE: Your Honor, I think he misstated what I said. I didn't say that.

THE COURT: All right. Well, members of the jury, it's your memory as to what people said. This is just now the argument portion. And so if you think that Mr. Varughese said something, okay, and if you don't think he said something, okay.

And, Mr. Dittmann, you can continue.

MR. DITTMANN: Well, that just makes it simpler. So we do have an agreement that the Patent Office considered those two references. And these are the trained examiners with the relevant scientific experience. And just like the Patent Office considered Gessler 1999 expressly in official Patent Office documents explaining why the '740 patent was an invention over Gessler 1999.

And the reality is, again, that nobody actually did combine all the various elements that Revance is trying to stitch together before Mr. Hunt, Dr. Bates, and their teams did the work, certainly not Dr. Sury or Goodnough or any other witnesses you heard in this case can tell you otherwise.

And, in fact, Dr. Sury, again, we learned, had never done anything in his entire career in the botulinum toxin space.

Mr. Hunt, Dr. Bates, and their teams created the formulation in manufacturing technology that allowed for this animal-protein free, longer duration technology. And these formulations had higher potency, which created a longer duration of action.

And Mr. Hunt did the test for that and it's in his patent. Without Allergan's inventions, there is no DAXXIFY product. It wouldn't work.

So when you get the verdict form and looking at

the obviousness question, we would ask that you check no. There's certainly not been clear and convincing evidence shown by Revance to overturn the Patent Office's decision.

You then proceed to damages. And again, the royalty rate we're requesting, 24 percent formulation, 15 percent for the manufacturing patents. Those are the exact percentages, the exact numbers that I told you when I first talked to you on Monday. Those numbers have not changed.

And after all, even Revance's own expert, Ms. Trexler, we didn't hear any disagreement that she used the 28 percent for both patents. She just did her arbitrary price premium analysis. If you don't apply her arbitrary analysis, the parties are not that far off in terms of the royalty rates.

So there are only two issues, again, you have to deal with: Obviousness and damages. And when you're doing this, I want you, again, to really keep this firmly in mind.

Despite Revance's argument that we're talking about that the technology is allegedly super old and not useful, Revance continues to use that technology in its DAXXIFY product. They've been using it for years and they're still doing it today.

If the inventions are so meaningless, like they assert, why are they still using it? Why did they use it in

the first place? If the inventions were easy to get rid of, if they're useless, if they're old, use something else.

But they didn't do it because it's valuable and they know it. Actions speak louder than words. They haven't stopped using the inventions because they need them.

And contrary to what you heard just a short time ago, Allergan is the only party in this case that provided studies directly addressing whether or not what's causing this duration of action is Mr. Hunt's invention.

And, in fact, the studies that we submitted to you included one of Revance's own mouse DAS studies, which, again, we still haven't heard one word from Revance about this entire trial, including just now.

So it's in your hands now to decide and to tell Revance that they can't just use an invention because they want to and not have to pay at least fair compensation for doing so. So we ask that you provide a verdict in favor of our client Allergan, Inc.

And we, again, thank you so much for your time and attention.

THE COURT: Thank you, Mr. Dittmann.

All right. Members of the jury, I have a few more instructions. So I'm going to finish up by explaining some things about your deliberations in the jury room and your possible verdict.

Once you start deliberating, do not talk to the jury officer -- or sometimes I call it the court security officer -- or to me or to anyone else except each other about the case.

If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The jury officer will give it to me and I will respond as soon as I can.

But you should understand that I usually have to talk to the lawyers before I can respond, so it sometimes takes more time than you expect for me to get back to you.

Any questions or messages normally should be sent to me through your foreperson who, by custom of this court, is the juror seated in the first row in the first seat, who I see chuckling. Thank you for your service.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you're split four to four, six to two, or whatever your vote happens to be. Your vote should stay secret until you're finished.

Your verdict must represent the considered judgment of each juror. In order for a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty as jurors to consult with one

another and to deliberate with a view towards reaching agreement if you can do so without superseding your ultimate individual judgment.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your views and change your opinions if convinced that they are erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinions of your fellow jurors or for the purpose of returning a verdict.

You are the judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A verdict form has been prepared for you. You saw it from both attorneys in their closings.

The verdict form asks you a series of questions about the parties' claims. Unless you are directed otherwise in the form of the verdict, you must answer all the questions posed and you must agree on each answer, all of you.

When you have reached a unanimous agreement as to your verdict, you will return your verdict to the courtroom deputy.

It is proper to add the caution that nothing

said in these instructions and nothing in the form of the verdict is meant to suggest or convey in any way or manner any hint as to what verdict I think you should find. Determining what the verdict shall be is your sole and exclusive duty and responsibility.

So now that the evidence is in and the arguments are completed, you're going to be free to talk about the case in the jury room. In fact, it is your duty to talk to each other about the evidence and make every reasonable effort you can to reach a unanimous agreement. Talk to each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with.

In the end, your vote must be exactly that, your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one is going to be allowed to hear your discussions in the jury room and no record will be made of

what you say so you should all feel free to speak your minds. Listen carefully to what the other jurors have to say and then decide for your yourself.

During your deliberations you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media such as cell phone, tablet, or computer; the internet; any text or instant messaging service or social network platforms including, X, Twitter, Snapchat, Instagram Facebook, Tik Tok, LinkedIn, WhatsApp, YouTube or the like to communicate to anyone any information about the case. You must also not conduct any research about the case until I accept your verdict.

In other words, if we were not clear enough, you cannot talk to anyone on the phone, correspond with anyone, electronically communicate with anyone or research anything about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

Let me finish by repeating something I think I've said to you earlier. Nothing that I have said or done during this trial was or is meant to influence your decision in any way. You must decide the case yourself based on the evidence presented.

Can we have the court security officer come forward.

(The court security officer was sworn.)

THE COURT: All right. Sir, you can take the jury out to the jury room.

(The jury exited the courtroom.)

THE COURT: All right. Everyone can be seated.

Ms. Wells, how long do you think your JMOL is going to last?

MS. WELLS: Two minutes.

THE COURT: Okay. Come on up and do it.

MR. VARUGHESE: Would you like us to turn this back?

THE COURT: It probably would be helpful. Thank you.

MS. WELLS: Your Honor, Revance moves for JMOL that Claim 8 of the '748 patent is invalid.

Each element of Claim 1 and Claim 8 would have been obvious in view of Malizio and Xiang '669, and there was a motivation to combine Malizio and Xiang '669 as shown, for example, by the references themselves to arrive at the claimed invention.

There also would have been a reasonable expectation of success in combining Malizio and Xiang '669 to arrive at the claimed invention. The obviousness on Claim 8 of the '748 patent was discussed in detail by Dr. Goodnough.

Based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find the claim would not have been obvious.

Revance also moves for JMOL that Claim 8 of the '740 patent is invalid.

Each element of Claim 6 and Claim 8 would have been obvious in view of Gessler, FDA guidance, and Smelt. And there was a motivation to combine them to arrive at the claimed invention as shown, for example, by the references themselves as well as other testimony, including the testimony of Dr. Xiang, Ms. Ton, Mr. Hunt, and Dr. Goodnough, as well as the Whalen reference.

There also would have been a reasonable expectation of success in combining Gessler, FDA guidance, and Smelt to arrive at the claimed invention. The obviousness of Claim 8 of the '740 patent was discussed in detail by Dr. Goodnough.

Based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find the claim would not have been obvious.

Revance also moves for JMOL that Claim 6 of the '878 patent is invalid.

Each element of Claim 1 and Claim 6 would have been obvious in view of Hunt and Johnson. There was a motivation to combine Hunt and Johnson to arrive at the

claimed invention as shown, for example, by Johnson as well as Carpenter.

There also would have been a reasonable expectation of success in combining Hunt and Johnson to arrive at the claimed invention. The obviousness of Claim 6 of the '878 patent was discussed in detail by Dr. Sury.

Based on the evidence, a reasonable jury would not have a legally sufficient evidentiary basis to find the claim would not have been obvious.

Finally, Revance renews its motions for JMOL related to damages and objective indicia of nonobviousness.

THE COURT: All right. Thank you very much, Ms. Wells. I will deny that.

So I think it's probably the case, but make sure that the deputy clerk has contact information where, if we get a note or a verdict, she can reach you without fail.

And if we do get a note or a question or something that's something other than the verdict, I authorize the deputy clerk to read it to you, whoever is on the other end of the communication, or perhaps it's an e-mail. However it is, she can tell you what it is so that while you're coming back to court, you can be thinking about what the appropriate response might be.

And maybe we'll have a verdict today, but if they don't have a verdict today, without fail, before they

go home, I will see them in court at the end of the day to remind them of the things that I've reminded them of every day. So at least one attorney for each side needs to be available if we get to that time.

Are there any other questions or things people want to bring up?

MR. DITTMANN: Nothing from plaintiffs, Your Honor.

MR. VARUGHESE: Nothing from defendants.

THE COURT: Okay. Thank you. And we'll standby to see what happens here.

(A recess was taken, after which the following proceedings were had:)

THE COURT: So we've got a note from the jury dated -- it has the time 2:40 p.m.

"May we see the demonstratives from Dana Trexler and Christine Siegwarth?"

So who's going to address this?

MR. DITTMANN: I will, Your Honor, for plaintiff. So our position is this is not only, I guess, contrary to the instructions given to the jury but also the federal rules of evidence so we would object to sharing demonstratives.

THE COURT: Are you relying on a particular federal rule of evidence?

MR. DITTMANN: I can get that in a moment. My brain is swimming right now.

THE COURT: That was just a test.

MR. ARMENIO: We're supportive of giving the jury what they're asking for. We have previously exchanged the demonstratives before they were used by the experts. They've all been vetted and have citations to the evidence in them, so we would be willing to give them to the jury.

THE COURT: Are you relying on any particular rule of evidence?

MR. ARMENIO: No, Your Honor.

THE COURT: So continuing legal education, there's a new rule effective December 1 of 2024. This is Rule 107. And it calls the demonstratives illustrative aids. And it says under 107(b), "An illustrative aid is not evidence and must not be provided to the jury during deliberations unless, one, all parties consent or, two, the Court for good cause orders otherwise." I heard plaintiff not consent so that knocks that one out, and I don't really think there's good cause. In any event, while I can understand why jury would want it and I can understand why a party might say, yeah, give it to them, in the absence of consent, it's probably not really likely to happen.

So do you want me to write a note on here and send it back to them that says roughly no, or do you want me

to -- I did say in the preliminary jury instructions that -- something about this. Does anybody actually have those with them? All right. I've got a copy too. Let me see something.

So paragraph 5 on page 9 -- not paragraph 5. It's number 5 under "Evidence" says "During trial you may be shown charts and animations to help illustrate the testimony of the witnesses. These illustrative exhibits, called demonstratives exhibit, are not admitted into evidence and should not be considered as evidence." So it doesn't actually say you won't get them.

All right. So what I actually propose to write is something that would be "No, the demonstratives are not evidence." The only thing I'm debating is whether I should say "see preliminary jury instructions page 9, number 5." I don't know whether that would seem like I'm being helpful or being a smart jerk. Do you all have any opinion on that subject?

MR. VARUGHESE: Your Honor, I think that suggestion would work. We don't want the jury to think it was the parties that refused. If it comes from the Court, then no harm, no foul, no prejudice to either side.

MR. DITTMANN: I certainly agree with that. I don't have strong feel feelings, Your Honor. Whatever you think is best is fine with me.

THE COURT: I'm going to write "See preliminary jury instructions page 9, number 5" and I'll write my name. So I'm doing all this on the presumption that you're happy to have me send this note back to the jury rather than to have them march out here and have me tell them that. Am I correct in that assumption?

MR. DITTMANN: Yes, Your Honor.

MR. VARUGHESE: Yes.

THE COURT: Okay. Well, then, is there anything else to do right now?

MR. DITTMANN: Not on behalf of plaintiff.

MR. VARUGHESE: Not from Revance.

THE COURT: Okay. In that case I'm going to give this to the deputy clerk to make a copy and send it back. We'll be in recess and maybe we'll hear something else before too long.

(A recess was taken, after which the following proceedings were had:)

THE COURT: We have a verdict, so we're going to get the jury.

(The jury entered the courtroom.)

THE COURT: All right. Members of the jury, welcome back. Everyone you may be seated.

Am I correct, Mr. Foreperson, that you have reached a verdict?

THE FOREPERSON: Yes, Your Honor.

THE COURT: All right. So I'm going to ask the deputy clerk to go over and get the verdict from you.

And I guess I should also ask, Mr. Foreperson, this verdict is unanimous?

THE FOREPERSON: Yes, Your Honor it is.

THE COURT: Okay. Thank you. So I'm now opening it to do what's called ensuring regularity of form. I'm not entirely sure what that means, though I think if it did not have the regulatory of form I would probably recognize it.

All right. I think it has regularity of form.

So what I'm going to do now is called publishing it, because lawyers and judges like to use words that don't really make sense. But what that means is the deputy clerk is going to read it out loud.

I want you to listen carefully because when it's over you may be asked do you individually agree with the verdict as read.

All right. Can we publish the verdict.

THE COURTROOM DEPUTY: Yes, Your Honor.

"We the jury unanimously agree to the answers to the following questions and return them under the instructions of this Court as our verdict in this case.

"Findings on invalidity, formulation claim.

"Question 1: Has the defendant Revance proven by clear and convincing evidence that the following asserted claim is invalid as obvious as of the invention date, Claim 6 of the '878 patent?

"No, in favor of plaintiff Allergan.

"Manufacturing claims: Claim 8 of the '740 patent.

"Question 2: Has defendant Revance proven by clear and convincing evidence that the following asserted claim is invalid as obvious as of the invention date Claim 8 of the '740 patent?

"No, in favor of plaintiff Allergan.

"Manufacturing claims: Claim 8 of the '748 patent.

"Question 3: Has defendant Revance proven by clear and convincing evidence that the following asserted claim is invalid as obvious as of the invention date Claim 8 of the '748 patent?

"No, in favor of plaintiff Allergan.

"Findings on damages.

"Question 4: What is the reasonable royalty rate that you find plaintiff Allergan, Inc. has proven by a preponderance of the evidence it is entitled to?

"Formulation claim:

"Claim 6 of the '878 patent: 15 percent.

"Manufacturing claims: Claim 8 of the '740 patent and Claim 8 of the '748 patent until September 25, 2023, expiration of the '740 patent: 12 percent.

"Manufacturing claim: Claim 8 of the '748 patent from September 25, 2023, through the expiration of the '748 patent: 4 percent.

"Question 5: What is the total reasonable royalty amount that you find plaintiff Allergan, Inc., has proven by a preponderance of the evidence it is entitled to through the end of May 2025?

"$56 million."

THE COURT: All right. Are there any requests by the parties?

MR. VARUGHESE: Your Honor, on behalf of Revance we ask the jury be polled.

THE COURT: All right. So let's poll the jury.

THE COURTROOM DEPUTY: Juror Number 1, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes, it is.

THE COURTROOM DEPUTY: Juror Number 2, is the two is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 3, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 4, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 5, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 6, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 7, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURTROOM DEPUTY: Juror Number 8, is the verdict as read the verdict you have agreed upon?

A JUROR: Yes.

THE COURT: Okay. So the polling indicates unanimity, so I'm going to ask the clerk to file the verdict. I'm going to discharge the jurors.

Before I do that, I do want to thank you on behalf of the Court and on the parties -- on behalf of the parties for your service this week.

It does take, essentially, a week out of your life when you probably could be doing something else, but it is necessary for our system of justice to work to have people who are willing to serve as jurors and to pay

attention during very difficult technical testimony since that's the way we resolve patent disputes. And you've answered the call, and we all appreciate that.

I'm going to have the deputy clerk take you out. I have to talk to the lawyers for one minute, but if you're still here after a minute, I'm going to come back and I'd like to personally thank you. You don't have to wait around for me. That's up to you.

Can we take the jury out, please.

(The jury exited the courtroom.)

THE COURT: All right. So you can all be seated.

Two things. One, I did want to thank you for your cooperation and efforts to put this case on in the time allotted, and I also I think you as a group have represented the legal system well.

Second thing is this. I would like the plaintiff to prepare a judgment consistent with Rule 58(b) reflecting the verdict and anything else that you would want to have in a final judgment. I expect there will be some motions to amend the judgment but I would like to have a judgment in place.

Mr. Dittmann, if I asked you to do that by Monday, could you do that?

MR. DITTMANN: No problem, Your Honor.

THE COURT: And do run it by the defendant before you file it. Okay?

MR. DITTMANN: Yes, sir.

THE COURT: All right. Thank you very much. You all have a nice weekend. We'll be in recess.

(The proceedings were in recess at 4:12 p.m.)

**C E R T I F I C A T E**

I, Deanna L. Warner, a Registered Professional Reporter, do hereby certify that as such Registered Professional Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings.

Deanna L. Warner, RPR, CSR
Official Court Reporter
U.S. District Court

## $

**$0.01** [2] - 1286:5, 1286:6
**$273** [2] - 1239:2, 1239:5
**$31** [1] - 1259:20
**$56** [1] - 1305:11
**$66** [1] - 1259:8

## '

**''598** [1] - 1237:13
**'468** [4] - 1237:13, 1242:22, 1243:8, 1288:14
**'598** [12] - 1203:9, 1204:1, 1205:2, 1211:3, 1218:19, 1218:25, 1240:16, 1240:23, 1242:22, 1243:8, 1288:14
**'669** [3] - 1296:17, 1296:18, 1296:22
**'740** [20] - 1221:22, 1223:14, 1228:2, 1228:18, 1232:2, 1238:5, 1243:15, 1259:1, 1274:9, 1276:5, 1276:22, 1286:14, 1286:16, 1289:6, 1297:5, 1297:16, 1304:6, 1304:11, 1305:1, 1305:3
**'748** [21] - 1221:22, 1223:15, 1228:6, 1228:21, 1232:2, 1238:5, 1242:7, 1254:6, 1255:11, 1259:14, 1259:21, 1272:9, 1273:23, 1276:6, 1296:15, 1296:24, 1304:13, 1304:18, 1305:2, 1305:4, 1305:6
**'80s** [1] - 1266:21
**'878** [32] - 1203:1, 1205:24, 1211:23, 1212:2, 1212:5, 1212:11, 1212:17, 1218:22, 1221:23, 1223:15, 1224:9, 1228:9, 1228:20, 1232:3, 1238:3, 1240:12, 1240:22, 1241:4, 1243:10, 1247:21, 1247:24, 1248:2, 1248:4, 1253:17, 1255:8, 1255:9, 1258:14, 1258:19, 1297:22, 1298:6, 1304:4, 1304:25
**'90s** [2] - 1266:21, 1267:9
**'99** [1] - 1242:23

## 0

**0** [2] - 1256:23, 1286:18

## 1

**1** [7] - 1224:10, 1224:12, 1296:16, 1297:23, 1300:13, 1304:1, 1305:17
**1.4** [2] - 1255:21, 1284:10
**1.75** [2] - 1255:22, 1284:11
**100** [1] - 1208:16
**106** [2] - 1282:7
**106.4** [1] - 1260:5
**107** [1] - 1300:14
**107(b** [1] - 1300:15
**112** [1] - 1228:4
**113** [1] - 1228:8
**115** [2] - 1282:9, 1285:25
**11th** [1] - 1241:12
**12** [4] - 1253:25, 1254:5, 1255:3, 1305:3
**13** [2] - 1228:21, 1285:8
**15** [13] - 1244:14, 1253:22, 1254:4, 1254:7, 1254:9, 1255:11, 1257:6, 1259:5, 1259:9, 1259:17, 1268:14, 1290:6, 1304:25
**153** [7] - 1213:7, 1213:11, 1213:21, 1214:3, 1217:5, 1217:6, 1217:20
**17** [1] - 1254:6
**174** [6] - 1213:22, 1214:4, 1214:6, 1214:11, 1217:6, 1217:20
**175** [2] - 1214:7, 1214:19
**18** [2] - 1253:25, 1255:3
**18th** [1] - 1199:13
**19** [1] - 1271:23
**19.6** [1] - 1210:5
**192** [1] - 1228:5
**196** [1] - 1228:7
**1984** [1] - 1272:17
**1999** [4] - 1228:4, 1243:14, 1289:5, 1289:7

## 2

**2** [2] - 1304:8, 1305:20
**20** [6] - 1220:2, 1244:15, 1254:4, 1263:4, 1271:8, 1271:9
**20.1** [1] - 1256:7
**200** [1] - 1278:9
**2003** [9] - 1211:16, 1211:20, 1228:19, 1240:20, 1263:13, 1266:5, 1273:4, 1274:18, 1276:8
**2005** [8] - 1212:6, 1228:20, 1243:10, 1263:13, 1266:5, 1271:18, 1274:19, 1288:17
**2009** [4] - 1228:21, 1263:13, 1266:5, 1271:18
**2010** [1] - 1268:14
**2011** [1] - 1268:4
**2019** [1] - 1232:3
**202** [1] - 1228:3
**2020** [2] - 1270:24, 1271:12
**2021** [1] - 1232:3
**2022** [2] - 1231:18, 1265:14
**2023** [7] - 1259:2, 1259:4, 1259:8, 1259:18, 1266:11, 1305:3, 1305:5
**2024** [1] - 1300:13
**2025** [2] - 1199:13, 1305:10
**2026** [1] - 1255:8
**2029** [3] - 1255:11, 1259:19, 1285:1
**207** [2] - 1228:10, 1259:19
**209** [3] - 1213:3, 1213:25, 1228:11
**21-CV-1411-RGA** [1] - 1199:5
**23** [1] - 1255:25
**24** [6] - 1253:19, 1255:8, 1257:6, 1258:14, 1283:16, 1290:5
**25** [4] - 1220:2, 1228:19, 1305:2, 1305:5
**273** [3] - 1257:18, 1257:20, 1258:20
**28** [4] - 1256:11, 1256:17, 1257:3, 1290:12
**2:40** [1] - 1299:15

## 3

**3** [2] - 1304:15, 1305:23
**3.15** [1] - 1284:11
**30** [1] - 1272:13
**31** [1] - 1260:4
**37** [5] - 1208:12, 1208:14, 1208:16, 1208:23, 1209:3
**38** [1] - 1276:13
**39** [1] - 1257:5

## 4

**4** [6] - 1257:13, 1258:3, 1259:23, 1304:21, 1305:6, 1306:1
**40** [1] - 1286:1
**42** [1] - 1285:14
**44** [2] - 1285:24, 1285:25
**45** [1] - 1278:2
**49** [3] - 1219:5, 1219:7, 1219:9
**4:12** [1] - 1308:6

## 5

**5** [11] - 1207:23, 1259:22, 1259:23, 1260:6, 1301:5, 1301:6, 1301:15, 1302:2, 1305:7, 1306:4
**50** [2] - 1278:2, 1278:9
**58(b** [1] - 1307:18

## 6

**6** [21] - 1202:13, 1202:21, 1203:1, 1203:3, 1204:22, 1206:20, 1221:22, 1223:15, 1224:9, 1224:12, 1228:20, 1258:14, 1286:12, 1297:6, 1297:21, 1297:23, 1298:5, 1304:4, 1304:25, 1306:7
**6.17** [1] - 1204:5
**6.19** [2] - 1207:11, 1208:3
**6.20** [1] - 1208:4
**62** [1] - 1286:9
**65.5** [2] - 1258:22, 1260:4
**66** [1] - 1259:9
**6A** [1] - 1199:12

## 7

**7** [1] - 1306:10

## 8

**8** [21] - 1221:21, 1221:22, 1223:14, 1284:14, 1286:14, 1286:16, 1296:15, 1296:16, 1296:24, 1297:4, 1297:6, 1297:16, 1304:6, 1304:10, 1304:13, 1304:17, 1305:1, 1305:2, 1305:4, 1306:13
**8.2** [1] - 1256:9

## 9

**9** [3] - 1301:5, 1301:15, 1302:2
**9-6** [1] - 1214:24
**9.9** [2] - 1259:10, 1260:4
**98.6** [2] - 1208:19, 1279:21
**99** [1] - 1279:6

## A

**ability** [1] - 1245:8
**able** [5] - 1247:7, 1252:24, 1255:3, 1268:1, 1273:17
**absence** [1] - 1300:22
**absolutely** [1] - 1249:14

**accelerated** [1] - 1209:4
**accept** [4] - 1221:16, 1224:17, 1234:18, 1295:13
**accomplish** [1] - 1267:19
**according** [4] - 1226:8, 1245:17, 1256:9, 1259:5
**account** [8] - 1226:6, 1229:12, 1242:9, 1256:11, 1285:8, 1285:14, 1286:2, 1286:3
**accountability** [2] - 1240:4, 1241:13
**accountable** [2] - 1235:23, 1236:10
**accounting** [1] - 1256:3
**accounts** [2] - 1256:7, 1256:8
**accurately** [1] - 1278:12
**accusations** [1] - 1261:2
**accuse** [1] - 1274:7
**accused** [2] - 1234:7, 1234:9
**acetaminophen** [1] - 1269:23
**achieve** [2] - 1218:19, 1245:17
**achieved** [1] - 1229:22
**acid** [2] - 1275:1, 1275:8
**acknowledge** [3] - 1218:15, 1283:13, 1287:21
**acknowledged** [1] - 1262:9
**act** [1] - 1276:2
**acted** [1] - 1232:7
**acting** [4] - 1234:18, 1267:17, 1268:5, 1270:1
**action** [17] - 1222:16, 1233:13, 1247:23, 1248:4, 1248:11, 1249:8, 1250:13, 1253:17, 1265:6, 1265:11, 1265:19, 1269:5, 1269:9, 1269:12, 1271:2, 1289:21, 1291:9
**actions** [2] - 1238:20, 1291:4
**active** [1] - 1269:22
**actively** [1] - 1229:3
**actual** [4] - 1243:12, 1248:23, 1278:17, 1283:22
**actuality** [1] - 1255:2
**ADAM** [1] - 1200:7
**add** [4] - 1231:2, 1231:3, 1260:2, 1293:25
**added** [3] - 1233:6, 1249:5, 1277:12
**addition** [1] - 1247:5
**additional** [2] - 1224:6, 1256:8
**address** [5] - 1218:23, 1249:16, 1254:14, 1286:22, 1299:18
**addressing** [2] - 1254:12, 1291:8
**adds** [2] - 1224:6, 1247:7
**adequate** [1] - 1230:25
**adequately** [1] - 1233:11
**adjustment** [1] - 1257:4
**Administration** [1] - 1236:6
**admit** [1] - 1247:4
**admits** [2] - 1247:3, 1247:10
**admitted** [7] - 1239:3, 1240:19, 1241:13, 1243:17, 1246:7, 1288:16, 1301:9
**adopt** [1] - 1205:14
**advanced** [2] - 1263:5, 1266:6
**advancement** [2] - 1262:16, 1263:1
**advantage** [3] - 1251:19, 1251:23, 1265:7
**advantages** [1] - 1265:14
**ago** [5] - 1216:16, 1244:15, 1259:4, 1268:14, 1291:7
**agree** [21] - 1203:14, 1209:6, 1209:9, 1209:25, 1211:15, 1211:20, 1211:25, 1213:17, 1215:5, 1215:9, 1215:24, 1221:15, 1228:17, 1231:16, 1232:1, 1257:18, 1292:23, 1293:20, 1301:23, 1303:18, 1303:22
**agreed** [12] - 1231:24, 1232:17, 1279:22, 1279:23, 1305:18, 1305:21, 1305:24, 1306:2, 1306:5, 1306:8, 1306:11, 1306:14
**agreement** [8] - 1207:3, 1232:7, 1232:11, 1289:2, 1293:2, 1293:22, 1294:10, 1294:22
**agreements** [1] - 1234:10
**ahead** [1] - 1239:12
**aid** [1] - 1300:15
**aids** [1] - 1300:15
**al** [1] - 1199:6
**albumin** [16] - 1203:12, 1203:14, 1203:20, 1211:1, 1211:9, 1212:21, 1213:1, 1213:9, 1213:20, 1216:12, 1216:21, 1217:4, 1219:1, 1246:10, 1280:7, 1280:10
**allegations** [1] - 1261:2
**alleged** [3] - 1231:23, 1232:6, 1283:22
**allegedly** [2] - 1242:21, 1290:20
**alleging** [1] - 1244:19
**ALLERGAN** [1] - 1199:3
**Allergan** [76] - 1221:20, 1222:1, 1222:2, 1222:5, 1222:12, 1222:24, 1223:13, 1230:18, 1230:20, 1231:1, 1231:5, 1231:7, 1231:13, 1234:18, 1235:25, 1236:13, 1236:23, 1238:13, 1239:7, 1239:10, 1245:4, 1249:1, 1249:11, 1250:2, 1250:21, 1251:1, 1251:6, 1251:19, 1251:25, 1252:6, 1252:11, 1252:15, 1252:18, 1252:19, 1253:15, 1255:20, 1256:3, 1257:15, 1257:21, 1258:5, 1258:10, 1258:18, 1260:1, 1260:8, 1263:7, 1264:18, 1264:24, 1266:18, 1266:19, 1267:12, 1270:7, 1270:23, 1272:1, 1272:21, 1273:23, 1275:1, 1277:7, 1282:23, 1283:3, 1283:7, 1284:14, 1284:24, 1285:6, 1285:7, 1285:13, 1285:19, 1286:4, 1286:18, 1291:7, 1291:18, 1304:5, 1304:12, 1304:19, 1304:22, 1305:8
**Allergan's** [62] - 1222:9, 1222:15, 1235:23, 1236:1, 1236:3, 1237:23, 1238:2, 1238:8, 1238:9, 1238:12, 1238:13, 1238:23, 1239:4, 1239:11, 1239:12, 1239:16, 1239:23, 1240:4, 1242:24, 1244:12, 1244:25, 1245:25, 1246:5, 1246:7, 1246:11, 1247:2, 1247:8, 1247:11, 1249:19, 1251:16, 1251:22, 1252:8, 1252:22, 1253:1, 1253:24, 1254:9, 1254:18, 1254:21, 1254:22, 1255:4, 1255:16, 1255:21, 1255:23, 1256:4, 1256:12, 1256:22, 1256:23, 1258:5, 1260:8, 1261:2, 1261:8, 1264:4, 1264:10, 1272:3, 1274:17, 1277:17, 1281:24, 1282:4, 1283:10, 1287:16, 1287:19, 1289:23
**allotted** [1] - 1307:15
**allow** [1] - 1235:25
**allowance** [2] - 1205:12, 1205:13
**allowed** [8] - 1204:23, 1205:13, 1221:14, 1233:12, 1251:18, 1251:22, 1289:18, 1294:24
**allowing** [2] - 1252:16, 1253:11
**alluded** [1] - 1281:9
**almost** [3] - 1206:24, 1208:16, 1283:16
**alone** [2] - 1229:16, 1241:17
**alternative** [5] - 1254:13, 1254:14, 1254:17, 1255:4, 1256:14
**alternatives** [2] - 1233:1, 1233:16
**amend** [1] - 1307:21
**amount** [21] - 1222:2, 1222:12, 1231:2, 1231:4, 1231:5, 1231:7, 1231:15, 1231:22, 1233:24, 1252:20, 1257:14, 1258:18, 1259:25, 1271:7, 1271:8, 1271:9, 1271:10, 1275:7, 1285:11, 1287:17, 1305:8
**amounts** [2] - 1209:22, 1260:3
**analogy** [1] - 1273:16
**analysis** [14] - 1227:9, 1256:10, 1257:20, 1257:22, 1258:11, 1282:4, 1282:13, 1283:5, 1283:21, 1284:6, 1284:21, 1285:5, 1290:13, 1290:14
**analyze** [1] - 1278:18
**AND** [1] - 1199:2
**Andrews** [1] - 1199:12
**animal** [51] - 1203:15, 1203:16, 1203:19, 1203:24, 1205:5, 1209:22, 1210:16, 1210:19, 1211:12, 1212:1, 1212:12, 1212:16, 1218:5, 1218:9, 1237:6, 1237:10, 1239:13, 1240:11, 1241:19, 1245:8, 1250:23, 1251:2, 1252:13, 1254:20, 1255:21, 1256:8, 1256:13, 1265:12, 1266:20, 1266:23, 1267:2, 1267:5, 1267:11, 1267:15, 1267:17, 1272:21, 1273:2, 1273:5, 1273:9, 1273:10, 1273:12, 1273:19, 1276:8, 1276:16, 1276:17, 1280:5, 1280:9, 1280:11, 1280:12, 1281:5, 1289:19

**animal-derived** [2] - 1205:5, 1209:22
**animal-free** [3] - 1241:19, 1250:23, 1281:5
**animal-product** [17] - 1266:20, 1267:2, 1267:5, 1267:11, 1272:21, 1273:2, 1273:5, 1273:9, 1273:12, 1273:19, 1276:8, 1276:16, 1276:17, 1280:5, 1280:9, 1280:11, 1280:12
**animal-product-free** [1] - 1267:15
**animal-protein** [3] - 1256:8, 1266:23, 1289:19
**animal-protein-free** [10] - 1237:6, 1237:10, 1239:13, 1240:11, 1245:8, 1251:2, 1252:13, 1254:20, 1255:21, 1256:13
**animations** [1] - 1301:7
**anion** [5] - 1272:19, 1275:11, 1275:14, 1275:16
**ANNE** [1] - 1200:3
**answer** [11] - 1206:25, 1215:15, 1220:20, 1248:25, 1249:4, 1249:7, 1259:24, 1260:6, 1264:10, 1293:19, 1293:20
**answered** [1] - 1307:3
**answering** [1] - 1230:2
**answers** [1] - 1303:22
**APF** [2] - 1274:18, 1274:22
**appear** [7] - 1215:9, 1215:25, 1216:12, 1216:14, 1216:21, 1217:3, 1217:18
**APPEARANCES** [1] - 1199:15
**Appearances** [1] - 1200:1
**application** [5] - 1203:10, 1211:4, 1243:10, 1243:12, 1288:17
**applied** [1] - 1244:14
**applies** [3] - 1219:10, 1256:17, 1261:17
**apply** [9] - 1220:22, 1221:1, 1224:20, 1232:2, 1257:22, 1258:17, 1259:17, 1282:13, 1290:13
**appreciate** [5] - 1212:7, 1286:22, 1287:3, 1287:4, 1307:3
**appropriate** [2] - 1259:6, 1298:23
**appropriately** [1] - 1233:14
**approval** [1] - 1250:23
**approvals** [1] - 1254:1
**approved** [2] - 1267:15, 1277:4
**approximate** [1] - 1259:20
**arbitrarily** [1] - 1256:16
**arbitrary** [3] - 1257:3, 1290:12, 1290:13
**area** [1] - 1208:18
**argues** [1] - 1274:18
**argument** [8] - 1240:13, 1240:18, 1260:23, 1262:19, 1264:9, 1280:17, 1288:22, 1290:19
**arguments** [6] - 1201:4, 1220:5, 1221:6, 1240:8, 1287:1, 1294:6
**arm's** [1] - 1283:7
**ARMENIO** [3] - 1200:11, 1300:4, 1300:11
**arrive** [10] - 1205:23, 1206:5, 1207:2, 1241:4, 1296:19, 1296:23, 1297:8, 1297:15, 1297:25, 1298:5
**arrived** [1] - 1242:6
**ARSHT** [1] - 1199:16
**art** [70] - 1202:11, 1202:13, 1202:19, 1202:20, 1203:10, 1203:18, 1204:4, 1207:16, 1208:6, 1210:1, 1210:13, 1211:5, 1222:10, 1224:21, 1225:15, 1225:22, 1225:24, 1226:8, 1226:11, 1226:14, 1226:22, 1227:2, 1227:4, 1227:7, 1227:9, 1227:12, 1227:24, 1228:1, 1228:2, 1228:6, 1228:9, 1229:4, 1229:7, 1229:23, 1237:12, 1237:17, 1241:14, 1242:24, 1244:4, 1246:4, 1247:18, 1261:9, 1262:2, 1262:4, 1263:8, 1263:23, 1266:5, 1266:6, 1266:20, 1267:21, 1267:24, 1268:1, 1271:22, 1273:6, 1273:15, 1273:19, 1273:22, 1276:12, 1276:19, 1276:23, 1277:18, 1278:5, 1280:8, 1280:13, 1280:15
**articles** [3] - 1267:1, 1278:10
**ASHKENAZI** [1] - 1199:19
**aside** [3] - 1211:19, 1236:15, 1243:25
**assert** [4] - 1240:4, 1241:18, 1287:24, 1290:25
**asserted** [17] - 1221:20, 1222:1, 1222:3, 1222:9, 1222:11, 1223:5, 1223:13, 1223:23, 1228:18, 1228:19, 1228:21, 1230:20, 1230:21, 1237:3, 1304:2, 1304:9, 1304:16
**asserting** [1] - 1240:9
**assessed** [1] - 1223:20
**assessment** [1] - 1229:11
**assume** [1] - 1232:8
**assumption** [1] - 1302:6
**attack** [2] - 1266:16, 1288:12
**attempt** [1] - 1246:22
**attempted** [1] - 1242:5
**attention** [6] - 1250:21, 1260:14, 1286:23, 1287:3, 1291:20, 1307:1
**attorney** [2] - 1275:22, 1299:3
**attorneys** [5] - 1221:6, 1274:11, 1275:25, 1293:16
**attributable** [2] - 1233:3, 1233:8
**attribute** [1] - 1234:9
**authorize** [1] - 1298:19
**automatic** [2] - 1275:4, 1275:8
**availability** [1] - 1233:16
**available** [4] - 1234:2, 1263:22, 1276:19, 1299:4
**avoid** [4] - 1233:12, 1249:22, 1253:23, 1254:18
**avoiding** [2] - 1233:22, 1254:21
**award** [6] - 1230:25, 1231:9, 1231:12, 1233:2, 1262:25, 1286:18
**aware** [4] - 1273:21, 1273:22, 1278:20, 1285:17
**ay** [1] - 1218:18


## B


**bad** [4] - 1262:12, 1262:15, 1281:19
**balance** [1] - 1262:12
**ball** [2] - 1266:6, 1283:4
**base** [1] - 1233:7
**based** [19] - 1221:7, 1221:18, 1231:11, 1232:15, 1233:2, 1233:14, 1244:13, 1249:9, 1254:2, 1270:24, 1272:5, 1273:3, 1281:4, 1284:17, 1287:25, 1295:22, 1297:1, 1297:18, 1298:7
**basic** [5] - 1209:19, 1239:8, 1251:6, 1279:13, 1279:23
**basis** [4] - 1281:6, 1297:2, 1297:19, 1298:8
**bat** [3] - 1283:5, 1285:23, 1286:1
**Bates** [7] - 1236:13, 1240:5, 1241:22, 1245:13, 1266:14, 1289:10, 1289:17
**bearing** [1] - 1260:21
**bedrooms** [1] - 1251:11
**began** [2] - 1232:1, 1234:3
**begin** [3] - 1211:8, 1231:17, 1287:11
**beginning** [4] - 1209:23, 1211:13, 1212:20, 1220:15
**begins** [3] - 1213:11, 1213:21, 1214:3
**behalf** [4] - 1302:11, 1305:14, 1306:20
**believes** [3] - 1257:20, 1258:10, 1258:13
**bell** [5] - 1204:5, 1210:4, 1210:9, 1214:7, 1214:23
**belle** [1] - 1208:3
**belong** [2] - 1266:17
**belongs** [1] - 1262:6
**below** [3] - 1207:22, 1207:24, 1279:18
**benefit** [6] - 1209:7, 1239:14, 1279:23, 1281:12, 1281:14, 1281:15
**benefits** [4] - 1245:6, 1254:23, 1283:22
**best** [4] - 1236:2, 1277:5, 1294:14, 1301:25
**better** [3] - 1263:8, 1264:5, 1270:3
**between** [7] - 1225:15, 1230:5, 1250:12, 1252:6, 1253:25, 1256:19, 1277:1
**beyond** [1] - 1271:11
**bibliography** [1] - 1274:2
**big** [1] - 1284:15
**binder** [1] - 1213:23
**bit** [9] - 1204:24, 1206:10, 1207:9, 1214:7, 1248:6, 1260:11, 1282:15, 1283:18, 1285:24
**bits** [1] - 1269:16
**black** [2] - 1268:4, 1268:23
**blank** [1] - 1258:16
**blocks** [1] - 1225:23
**blood** [1] - 1243:19
**blow** [2] - 1210:9, 1214:25
**blue** [4] - 1210:10, 1261:10, 1284:23, 1285:18
**boil** [1] - 1243:20
**BoNT** [1] - 1242:9
**boo** [1] - 1281:6
**book** [1] - 1280:10

**BOTOX** [7] - 1256:20, 1263:7, 1265:10, 1265:18, 1267:14, 1267:16, 1268:25
**BOTOX's** [1] - 1252:14
**bottom** [2] - 1202:24, 1237:15
**botulinum** [17] - 1237:6, 1237:10, 1241:6, 1241:11, 1241:15, 1243:19, 1244:17, 1253:12, 1263:6, 1267:16, 1272:12, 1276:22, 1277:14, 1277:20, 1278:11, 1289:15
**bovine** [2] - 1280:7, 1280:9
**box** [2] - 1210:10, 1214:25
**brain** [1] - 1300:2
**break** [4] - 1201:3, 1201:23, 1220:4, 1234:23
**breaking** [1] - 1251:10
**brief** [1] - 1220:24
**bring** [2] - 1265:25, 1299:6
**bringing** [3] - 1251:1, 1251:3, 1270:4
**Britannica** [1] - 1274:3
**Broide** [2] - 1249:2, 1270:23
**broke** [1] - 1284:20
**brought** [5] - 1250:23, 1266:3, 1278:23, 1279:2, 1282:1
**build** [2] - 1267:23, 1267:25
**building** [2] - 1225:23, 1284:2
**built** [2] - 1251:11, 1264:4
**bunch** [2] - 1250:6, 1250:7
**burden** [12] - 1222:19, 1222:25, 1223:4, 1223:8, 1231:5, 1244:6, 1261:6, 1281:24, 1282:5, 1282:12, 1288:4, 1288:9
**burdens** [1] - 1222:21
**businesspeople** [1] - 1234:19
**buy** [1] - 1237:3
**BY** [10] - 1199:16, 1200:11, 1201:16, 1210:6, 1210:11, 1214:9, 1215:1, 1215:21, 1218:1, 1218:14
**BYRON** [1] - 1200:7

## C

**CAHILL** [1] - 1200:10
**cake** [3] - 1263:12, 1263:15, 1274:14
**calculate** [1] - 1258:2
**calculated** [1] - 1256:17
**calculating** [2] - 1253:14, 1253:21
**calculation** [2] - 1231:17, 1242:8
**calculations** [1] - 1258:25
**callout** [1] - 1207:16
**canned** [1] - 1243:18
**cannot** [5] - 1236:15, 1243:24, 1247:24, 1262:6, 1295:15
**captured** [1] - 1262:7
**card** [1] - 1244:1
**career** [2] - 1241:7, 1289:15
**careful** [3] - 1231:11, 1262:22, 1286:25
**carefully** [7] - 1220:11, 1237:12, 1253:20, 1263:20, 1294:11, 1295:2, 1303:17
**CARL** [1] - 1199:20
**Carpenter** [2] - 1240:25, 1298:2
**carried** [2] - 1211:7, 1261:6
**carry** [2] - 1282:5, 1282:11
**case** [67] - 1201:20, 1212:9, 1220:11, 1220:20, 1220:22, 1221:1, 1221:11, 1221:21, 1222:7, 1222:20, 1223:14, 1223:24, 1228:17, 1230:9, 1230:24, 1231:13, 1234:15, 1235:22, 1236:9, 1236:20, 1237:3, 1239:21, 1240:2, 1240:21, 1240:24, 1241:16, 1245:24, 1246:4, 1246:6, 1246:17, 1247:14, 1247:18, 1248:9, 1248:12, 1248:25, 1250:18, 1252:5, 1254:9, 1258:9, 1261:17, 1264:23, 1268:6, 1270:14, 1275:22, 1276:3, 1281:11, 1281:24, 1287:15, 1288:1, 1288:12, 1289:12, 1291:7, 1292:4, 1293:4, 1293:14, 1294:8, 1294:18, 1295:6, 1295:11, 1295:12, 1295:17, 1295:22, 1298:14, 1302:13, 1303:24, 1307:14
**Case** [1] - 1199:5
**causes** [1] - 1248:11
**causing** [2] - 1269:8, 1291:8
**caution** [1] - 1293:25
**cell** [1] - 1295:7
**celsius** [1] - 1208:12
**cent** [1] - 1238:10
**certain** [4] - 1224:15, 1227:15, 1232:23, 1275:7
**certainly** [10] - 1212:18, 1237:18, 1246:18, 1247:12, 1274:4, 1274:5, 1275:18, 1289:11, 1290:2, 1301:23
**certainty** [1] - 1231:9
**certify** [1] - 1308:11
**chain** [1] - 1279:25
**challenge** [1] - 1266:16
**chance** [5] - 1206:7, 1260:10, 1260:11, 1267:8, 1286:23
**change** [7] - 1226:20, 1253:23, 1254:17, 1254:24, 1293:8, 1294:15, 1294:17
**changed** [2] - 1283:13, 1290:9
**changes** [1] - 1253:3
**changing** [1] - 1282:10
**charts** [1] - 1301:7
**check** [3] - 1262:12, 1262:17, 1290:1
**chemist** [1] - 1278:6
**chief** [2] - 1250:10, 1250:13
**choice** [1] - 1239:11
**chose** [1] - 1236:2
**Christine** [1] - 1299:17
**chromatography** [11] - 1244:21, 1272:15, 1272:16, 1272:19, 1274:25, 1275:6, 1275:11, 1275:15, 1275:17, 1276:7, 1276:15
**chuckling** [1] - 1292:15
**chunks** [1] - 1273:25
**circumstances** [1] - 1232:24
**citations** [1] - 1300:7
**cite** [2] - 1215:7, 1274:1
**cited** [1] - 1274:9
**civil** [1] - 1220:22
**Claim** [42] - 1202:13, 1202:21, 1203:1, 1203:3, 1204:22, 1206:20, 1221:21, 1221:22, 1223:14, 1223:15, 1224:9, 1224:10, 1224:12, 1258:14, 1286:12, 1286:14, 1286:16, 1296:15, 1296:16, 1296:24, 1297:4, 1297:6, 1297:16, 1297:21, 1297:23, 1298:5, 1304:4, 1304:6, 1304:10, 1304:13, 1304:17, 1304:25, 1305:1, 1305:2, 1305:4
**claim** [51] - 1222:4, 1222:11, 1222:24, 1223:4, 1223:16, 1223:17, 1223:19, 1223:20, 1223:21, 1223:25, 1224:1, 1224:2, 1224:3, 1224:4, 1224:5, 1224:6, 1224:7, 1224:8, 1224:14, 1224:15, 1224:16, 1224:18, 1224:19, 1225:6, 1227:2, 1227:3, 1227:18, 1228:18, 1228:19, 1228:21, 1230:3, 1242:5, 1264:24, 1272:14, 1276:14, 1279:7, 1288:13, 1297:3, 1297:20, 1298:9, 1303:25, 1304:3, 1304:10, 1304:17, 1304:24, 1305:4
**claimed** [32] - 1224:24, 1225:8, 1225:11, 1225:16, 1225:21, 1225:25, 1226:2, 1226:5, 1226:7, 1226:9, 1226:12, 1226:15, 1227:6, 1227:8, 1227:23, 1229:11, 1229:14, 1229:21, 1229:22, 1229:25, 1230:10, 1231:22, 1234:6, 1234:9, 1234:11, 1244:4, 1296:20, 1296:23, 1297:9, 1297:15, 1298:1, 1298:5
**claiming** [2] - 1238:15, 1247:17
**claims** [28] - 1221:21, 1221:23, 1222:1, 1222:5, 1222:9, 1222:15, 1223:5, 1223:10, 1223:11, 1223:12, 1223:13, 1223:22, 1223:23, 1223:24, 1227:21, 1230:6, 1230:20, 1230:21, 1231:16, 1243:25, 1275:23, 1276:23, 1293:18, 1304:6, 1304:13, 1305:1
**cleaner** [1] - 1267:17
**clear** [28] - 1206:12, 1212:25, 1215:4, 1222:8, 1222:23, 1223:5, 1223:6, 1223:8, 1225:7, 1230:10, 1236:11, 1236:12, 1243:3, 1244:7, 1244:11, 1246:3, 1247:10, 1248:8, 1261:4, 1262:5, 1280:12, 1287:16, 1288:4, 1290:2, 1295:14, 1304:2, 1304:9, 1304:16
**clearly** [1] - 1256:6
**clerk** [8] - 1219:24, 1298:15, 1298:19, 1302:14, 1303:3, 1303:15, 1306:17, 1307:4
**client** [1] - 1291:18
**close** [3] - 1256:2, 1257:4, 1288:10
**closest** [1] - 1229:23

**closing** [3] - 1201:4, 1220:5, 1221:6
**closings** [1] - 1293:16
**coach** [1] - 1273:17
**cogs** [1] - 1245:12
**coincidence** [1] - 1237:1
**cold** [2] - 1209:15, 1279:25
**colleague** [2] - 1242:8, 1279:9
**colleagues** [5] - 1240:5, 1241:22, 1249:3, 1265:22, 1268:16
**collection** [1] - 1228:14
**colloquial** [1] - 1206:10
**colored** [1] - 1205:10
**colorful** [1] - 1261:13
**column** [1] - 1210:10
**combination** [16] - 1206:5, 1206:19, 1207:2, 1211:18, 1211:20, 1226:17, 1227:11, 1233:7, 1247:25, 1248:9, 1261:21, 1261:22, 1261:23, 1281:13, 1281:14, 1281:16
**combinations** [1] - 1245:3
**combine** [18] - 1205:20, 1205:23, 1207:1, 1207:4, 1207:10, 1209:20, 1226:4, 1240:16, 1273:7, 1279:15, 1280:2, 1280:5, 1280:14, 1280:17, 1289:9, 1296:18, 1297:8, 1297:25
**combined** [2] - 1257:5, 1284:11
**combining** [6] - 1206:23, 1226:12, 1226:15, 1296:22, 1297:14, 1298:4
**coming** [3] - 1252:25, 1263:15, 1298:22
**commanding** [1] - 1278:13
**commercial** [1] - 1231:18
**committed** [1] - 1263:17
**common** [4] - 1203:6, 1229:10, 1251:6, 1256:25
**communicate** [3] - 1295:5, 1295:11, 1295:16
**communication** [1] - 1298:20
**company** [1] - 1252:13
**comparable** [1] - 1234:10
**compared** [2] - 1250:18, 1268:25
**comparing** [1] - 1227:1
**compensate** [3] - 1222:14, 1231:1, 1251:25
**compensation** [5] - 1251:10, 1257:21, 1258:13, 1260:7, 1291:16
**competitive** [3] - 1251:22, 1252:14, 1252:16
**competitor** [1] - 1252:16
**competitors** [1] - 1265:10
**complete** [2] - 1245:16, 1247:1
**completed** [1] - 1294:7
**completely** [3] - 1242:12, 1276:25, 1281:4
**complicated** [1] - 1257:25
**components** [1] - 1277:10
**composition** [2] - 1214:12, 1277:9
**compositions** [3] - 1277:14, 1278:3, 1281:2
**compounds** [1] - 1207:7
**computer** [1] - 1295:7
**CONAWAY** [1] - 1200:3
**concentration** [1] - 1250:4
**concentrations** [3] - 1249:21, 1249:25, 1250:1
**concept** [6] - 1231:19, 1267:12, 1272:21, 1273:2, 1273:4, 1276:7
**concern** [1] - 1234:21
**conclude** [2] - 1230:6, 1263:24
**concluded** [1] - 1242:23
**conclusion** [2] - 1248:12, 1248:24
**conduct** [1] - 1295:12
**conducted** [2] - 1249:1, 1249:3
**confers** [1] - 1230:15
**confirmatory** [1] - 1269:7
**confuse** [1] - 1247:15
**confused** [1] - 1266:1
**connection** [1] - 1230:5
**Conor** [1] - 1250:11
**conscience** [1] - 1294:23
**consent** [3] - 1300:17, 1300:19, 1300:23
**consequences** [1] - 1236:11
**conservative** [3] - 1254:7, 1255:2, 1259:15
**consider** [14] - 1225:12, 1225:19, 1227:20, 1228:25, 1229:17, 1230:22, 1232:21, 1234:2, 1234:4, 1234:14, 1234:15, 1243:21, 1252:5, 1262:19
**consideration** [3] - 1233:15, 1286:25, 1293:5
**considerations** [1] - 1225:17
**considered** [15] - 1230:8, 1237:17, 1237:19, 1237:20, 1237:21, 1242:22, 1243:6, 1243:17, 1243:22, 1244:3, 1288:14, 1289:2, 1289:5, 1292:21, 1301:10
**considering** [4] - 1225:25, 1232:4, 1237:12, 1242:7
**consistent** [2] - 1250:19, 1307:18
**constitute** [1] - 1230:13
**construct** [1] - 1278:17
**consult** [1] - 1292:25
**consuming** [1] - 1233:23
**consumption** [1] - 1267:11
**contact** [1] - 1298:15
**contain** [3] - 1203:11, 1211:1, 1265:12
**contained** [1] - 1213:19
**containing** [1] - 1214:12
**contains** [3] - 1205:5, 1209:22, 1212:5
**contends** [3] - 1221:23, 1222:2, 1222:5
**content** [2] - 1225:14, 1227:1
**contentions** [1] - 1249:19
**contest** [1] - 1221:24
**context** [2] - 1219:1, 1276:1
**continue** [2] - 1235:18, 1288:25
**continued** [2] - 1200:1, 1251:16
**continues** [3] - 1239:14, 1284:16, 1290:21
**continuing** [3] - 1238:8, 1252:1, 1300:12
**contrary** [2] - 1291:6, 1299:21
**contributed** [1] - 1256:4
**contributes** [1] - 1234:7
**controlling** [1] - 1268:11
**controversial** [1] - 1279:13
**convey** [1] - 1294:2
**conviction** [1] - 1293:10
**convinced** [2] - 1293:9, 1294:15
**convincing** [16] - 1222:8, 1222:23, 1223:6, 1223:8, 1225:7, 1230:10, 1244:7, 1244:11, 1261:4, 1287:17, 1288:4, 1290:2, 1304:2, 1304:9, 1304:16
**cooperation** [1] - 1307:14
**copied** [3] - 1261:3, 1273:25, 1274:6
**copies** [1] - 1220:8
**copy** [7] - 1220:15, 1220:17, 1274:4, 1274:13, 1274:14, 1301:3, 1302:14
**copying** [1] - 1274:7
**core** [2] - 1239:19, 1247:5
**corporate** [1] - 1245:12
**correct** [29] - 1205:4, 1205:11, 1206:3, 1206:20, 1207:6, 1207:17, 1207:21, 1208:9, 1208:12, 1208:14, 1208:22, 1209:2, 1211:17, 1212:23, 1213:2, 1214:4, 1214:16, 1214:21, 1216:18, 1216:22, 1217:4, 1218:9, 1218:20, 1218:21, 1224:18, 1256:24, 1282:6, 1302:6, 1302:24
**correspond** [1] - 1295:15
**cost** [6] - 1233:16, 1233:17, 1233:19, 1254:25, 1285:9
**costly** [1] - 1233:13
**costs** [2] - 1233:20, 1285:17
**counsel** [7] - 1199:23, 1260:9, 1264:22, 1277:17, 1280:4, 1287:21, 1288:13
**Counsel** [1] - 1200:12
**countered** [1] - 1270:16
**country** [3] - 1235:25, 1239:8, 1244:2
**couple** [1] - 1220:21
**course** [8] - 1233:13, 1241:3, 1241:16, 1256:16, 1258:7, 1281:18, 1287:4, 1293:7
**court** [9] - 1250:15, 1266:15, 1286:4, 1292:2, 1292:14, 1295:24, 1296:1, 1298:22, 1299:1
**Court** [6] - 1300:18, 1301:21, 1303:24, 1306:20, 1308:16, 1308:16
**COURT** [43] - 1199:1, 1201:1, 1201:8, 1201:12, 1215:16, 1217:23, 1218:12, 1219:15, 1219:18, 1219:20, 1219:23,

1235:1, 1235:7, 1235:11, 1235:14, 1260:15, 1287:5, 1288:20, 1291:21, 1296:2, 1296:5, 1296:9, 1296:12, 1298:12, 1299:10, 1299:14, 1299:24, 1300:3, 1300:9, 1300:12, 1302:1, 1302:9, 1302:13, 1302:19, 1302:22, 1303:2, 1303:7, 1305:12, 1305:16, 1306:16, 1307:11, 1308:1, 1308:4
**courtroom** [13] - 1201:11, 1202:6, 1221:8, 1221:10, 1234:25, 1235:13, 1238:22, 1241:10, 1242:5, 1293:24, 1296:4, 1302:21, 1307:10
**Courtroom** [1] - 1199:12
**COURTROOM** [9] - 1303:21, 1305:17, 1305:20, 1305:23, 1306:1, 1306:4, 1306:7, 1306:10, 1306:13
**cover** [1] - 1237:9
**covered** [3] - 1224:12, 1230:6, 1233:22
**covering** [2] - 1234:11, 1236:24
**covers** [5] - 1223:13, 1223:16, 1224:7, 1237:5, 1268:22
**cow** [2] - 1280:6, 1280:7
**cows** [1] - 1240:17
**created** [2] - 1289:17, 1289:20
**creates** [1] - 1267:22
**creativity** [1] - 1229:10
**credible** [6] - 1236:9, 1242:3, 1242:17, 1248:22, 1250:5, 1272:5
**credit** [2] - 1265:7, 1270:7
**critical** [5] - 1236:20, 1238:25, 1244:24, 1262:12, 1282:3
**criticism** [1] - 1279:14
**criticize** [1] - 1254:12
**cross** [4] - 1201:2, 1201:14, 1242:2, 1271:3
**CROSS** [1] - 1201:15
**cross-examination** [3] - 1201:2, 1242:2, 1271:3
**CROSS-EXAMINATION** [1] - 1201:15
**cross-examine** [1] - 1201:14
**crystal** [1] - 1248:8
**CSR** [1] - 1308:15
**current** [1] - 1221:24
**custom** [1] - 1292:13
**customary** [1] - 1224:20
**cut** [1] - 1236:19

## D

**damages** [35] - 1222:3, 1222:6, 1222:12, 1222:24, 1230:19, 1230:21, 1230:22, 1230:23, 1230:25, 1231:2, 1231:4, 1231:6, 1231:7, 1231:9, 1231:10, 1231:12, 1231:14, 1231:15, 1231:17, 1232:15, 1254:8, 1255:24, 1257:14, 1264:12, 1281:22, 1281:23, 1281:25, 1282:5, 1283:22, 1287:17, 1290:4, 1290:17, 1298:11, 1304:20
**damned** [1] - 1236:3
**Dana** [1] - 1299:16
**danger** [1] - 1277:22
**dangerous** [3] - 1236:14, 1245:14, 1277:14
**DAS** [3] - 1249:16, 1249:22, 1291:11
**data** [10] - 1248:23, 1250:8, 1250:9, 1254:3, 1268:10, 1269:4, 1269:6, 1269:12, 1270:19, 1270:25
**date** [9] - 1228:17, 1228:19, 1228:20, 1232:21, 1258:21, 1304:3, 1304:10, 1304:17
**dated** [1] - 1299:15
**dates** [2] - 1232:2, 1247:14
**DAVID** [1] - 1199:22
**DAXXIFY** [44] - 1231:17, 1238:2, 1238:24, 1239:3, 1239:12, 1246:3, 1246:9, 1246:11, 1247:23, 1249:20, 1250:1, 1250:2, 1250:5, 1252:24, 1253:9, 1254:22, 1255:7, 1255:10, 1256:1, 1256:8, 1256:9, 1256:11, 1256:18, 1256:19, 1256:25, 1257:1, 1257:18, 1263:6, 1265:6, 1265:7, 1265:12, 1265:13, 1265:14, 1265:22, 1266:12, 1267:13, 1267:14, 1268:22, 1269:2, 1269:3, 1270:24, 1285:23, 1289:24, 1290:22
**DAXXIFY's** [4] - 1221:24, 1249:8, 1265:18, 1283:16
**days** [1] - 1239:18
**DDX** [2] - 1204:5, 1207:11
**deal** [3] - 1237:12, 1277:13, 1290:17
**dealing** [1] - 1280:9
**Deanna** [2] - 1308:10, 1308:15
**debate** [1] - 1246:24
**debating** [1] - 1301:14
**decades** [3] - 1241:11, 1275:16, 1278:6
**December** [2] - 1231:18, 1300:13
**decide** [12] - 1220:20, 1222:7, 1258:8, 1264:9, 1284:13, 1287:15, 1287:18, 1287:22, 1291:14, 1293:4, 1295:3, 1295:22
**deciding** [2] - 1220:10, 1228:24
**decision** [6] - 1221:7, 1221:10, 1221:18, 1235:23, 1290:3, 1295:21
**decisions** [1] - 1236:12
**decreased** [1] - 1234:17
**defend** [2] - 1263:3
**Defendant** [2] - 1199:7, 1200:12
**defendant** [6] - 1219:20, 1260:16, 1304:1, 1304:8, 1304:15, 1308:1
**defendant's** [1] - 1233:12
**defendants** [1] - 1299:9
**defense** [5] - 1230:13, 1246:16, 1261:15, 1261:17, 1274:16
**defensive** [1] - 1265:23
**defies** [1] - 1280:13
**define** [2] - 1223:12, 1241:14
**defined** [1] - 1221:19
**definition** [3] - 1224:16, 1224:17, 1224:19
**definitive** [1] - 1248:15
**definitively** [1] - 1269:11
**degrees** [8] - 1207:23, 1208:12, 1208:14, 1208:16, 1208:23, 1209:3, 1279:21
**DEIRDRE** [1] - 1200:8
**DELAWARE** [1] - 1199:2
**delay** [1] - 1235:19
**delayed** [2] - 1252:25, 1253:4
**deliberate** [5] - 1235:8, 1246:22, 1260:12, 1263:21, 1293:1
**deliberating** [1] - 1292:1
**deliberation** [1] - 1221:4
**deliberations** [7] - 1221:2, 1234:22, 1291:24, 1293:7, 1295:4, 1295:18, 1300:17
**delivery** [1] - 1279:1
**demonstratives** [6] - 1299:16, 1299:23, 1300:6, 1300:14, 1301:9, 1301:13
**Dennies** [1] - 1260:20
**DENNIES** [1] - 1200:6
**deny** [1] - 1298:13
**department** [1] - 1278:6
**dependant** [1] - 1223:24
**dependent** [8] - 1223:23, 1223:24, 1224:4, 1224:5, 1224:7, 1224:8, 1224:11, 1224:12
**deposition** [1] - 1221:13
**DEPUTY** [9] - 1303:21, 1305:17, 1305:20, 1305:23, 1306:1, 1306:4, 1306:7, 1306:10, 1306:13
**deputy** [8] - 1219:24, 1293:24, 1298:15, 1298:19, 1302:14, 1303:3, 1303:15, 1307:4
**derived** [2] - 1205:5, 1209:22
**DESAI** [1] - 1200:8
**describe** [2] - 1225:2, 1225:17
**described** [2] - 1243:9, 1243:12
**description** [1] - 1211:3
**deserving** [1] - 1237:24
**design** [4] - 1226:17, 1226:21, 1254:15, 1255:4
**designed** [2] - 1249:4, 1262:24
**designs** [1] - 1254:13
**desirability** [1] - 1226:12
**desire** [1] - 1212:7
**despite** [3] - 1242:24, 1247:11, 1290:19
**detail** [6] - 1231:20, 1252:9, 1261:16, 1296:24, 1297:17, 1298:6
**detailed** [1] - 1264:6
**determination** [3] - 1227:20, 1233:5, 1234:5
**determine** [9] - 1222:4, 1222:11, 1224:7, 1224:13, 1228:22, 1228:23, 1232:12, 1253:16, 1259:13
**determined** [4] - 1224:15, 1228:16, 1229:8, 1244:4
**determining** [6] - 1225:11, 1230:9,

1231:15, 1232:8, 1234:1, 1294:4
**develop** [3] - 1241:21, 1252:15, 1255:4
**developed** [1] - 1211:1
**developing** [1] - 1278:13
**device** [1] - 1295:7
**difference** [2] - 1256:19, 1276:25
**differences** [2] - 1225:15, 1294:14
**different** [26] - 1210:2, 1210:12, 1210:18, 1211:11, 1214:15, 1222:20, 1233:13, 1236:5, 1236:7, 1236:23, 1237:2, 1237:4, 1240:15, 1242:12, 1275:22, 1275:23, 1275:24, 1277:10, 1277:24, 1278:22, 1280:23, 1281:4
**differently** [1] - 1294:18
**difficult** [2] - 1233:23, 1307:1
**difficulties** [1] - 1235:11
**diffusion** [5] - 1267:18, 1268:5, 1268:12, 1268:24, 1268:25
**digests** [2] - 1201:4, 1275:7
**direct** [1] - 1250:12
**directed** [1] - 1293:18
**directly** [1] - 1291:8
**disaccharide** [7] - 1204:13, 1216:14, 1217:21, 1247:5, 1248:10, 1280:19, 1280:20
**disaccharides** [15] - 1215:6, 1215:8, 1215:24, 1216:1, 1216:6, 1216:24, 1217:3, 1217:6, 1217:9, 1217:16, 1219:1, 1240:22, 1244:20, 1281:7
**disagree** [3] - 1202:25, 1209:18, 1279:12
**disagreement** [1] - 1290:11
**disallows** [1] - 1205:2
**disbelieve** [1] - 1272:4
**discarding** [1] - 1245:20
**discharge** [1] - 1306:18
**disciplines** [1] - 1276:18
**disclose** [2] - 1225:2, 1268:18
**disclosed** [11] - 1204:11, 1204:12, 1204:19, 1206:19, 1208:22, 1209:1, 1227:11, 1241:19, 1248:2, 1268:16, 1288:16
**discloses** [2] - 1208:23, 1210:1
**disclosure** [4] - 1227:4, 1227:15, 1227:16, 1227:18
**discouraged** [5] - 1275:11, 1275:12, 1275:13, 1275:18
**discredit** [1] - 1277:17
**discuss** [2] - 1248:13, 1295:17
**discussed** [4] - 1243:13, 1296:24, 1297:16, 1298:6
**discussions** [1] - 1294:25
**disease** [1] - 1273:10
**dishonest** [1] - 1270:3
**dismiss** [1] - 1241:17
**dispelled** [1] - 1285:4
**dispositive** [2] - 1229:16, 1234:13
**dispute** [13] - 1205:19, 1205:22, 1206:22, 1207:5, 1208:1, 1208:21, 1238:3, 1238:4, 1239:5, 1240:10, 1257:17, 1258:20
**disputed** [3] - 1236:20, 1241:21, 1246:25
**disputes** [1] - 1307:2
**disregard** [1] - 1239:24
**dissuade** [1] - 1216:5
**dissuaded** [1] - 1216:17
**dissuading** [1] - 1217:2
**distinguished** [2] - 1243:9, 1243:12
**distract** [2] - 1239:19, 1246:22
**distraction** [7] - 1245:25, 1275:19, 1276:3, 1277:20, 1280:4, 1284:23, 1285:5
**distractions** [2] - 1239:22, 1239:25
**DISTRICT** [2] - 1199:1, 1199:2
**District** [1] - 1308:16
**Dittmann** [15] - 1212:9, 1219:18, 1235:20, 1260:15, 1261:12, 1268:8, 1269:19, 1271:13, 1282:7, 1282:23, 1286:23, 1287:7, 1288:25, 1291:21, 1307:23
**DITTMANN** [20] - 1199:19, 1201:7, 1215:14, 1217:24, 1218:1, 1218:14, 1219:13, 1219:19, 1235:3, 1235:21, 1287:12, 1289:1, 1299:7, 1299:19, 1300:1, 1301:23, 1302:7, 1302:11, 1307:25, 1308:3
**divert** [1] - 1250:20
**Doctor** [4] - 1201:17, 1208:6, 1213:25, 1219:13
**doctor** [3] - 1201:19, 1215:12, 1217:1
**doctors'** [1] - 1285:16
**document** [3] - 1215:17, 1268:20, 1268:23
**documents** [1] - 1289:6
**dollar** [5] - 1258:18, 1259:25, 1260:3, 1285:22, 1286:6
**domain** [2] - 1262:6, 1280:13
**done** [13] - 1219:16, 1219:21, 1220:3, 1221:6, 1244:3, 1246:5, 1254:19, 1259:23, 1277:3, 1289:15, 1295:20
**donors** [1] - 1243:19
**dose** [1] - 1238:6
**down** [17] - 1206:24, 1214:23, 1216:3, 1219:16, 1243:20, 1258:23, 1259:12, 1259:21, 1259:23, 1260:3, 1260:6, 1284:9, 1284:20, 1287:13, 1292:6, 1292:16, 1292:18
**downplay** [1] - 1261:13
**Dr** [149] - 1201:8, 1202:4, 1202:6, 1202:10, 1202:18, 1202:19, 1202:25, 1203:3, 1203:22, 1204:6, 1204:15, 1204:17, 1204:20, 1204:25, 1205:3, 1205:8, 1205:14, 1205:15, 1205:19, 1206:1, 1206:14, 1206:18, 1207:12, 1207:19, 1208:8, 1208:24, 1209:19, 1212:22, 1213:4, 1214:3, 1214:10, 1214:16, 1214:24, 1215:22, 1216:13, 1216:21, 1217:13, 1217:19, 1218:2, 1218:15, 1219:15, 1236:13, 1240:5, 1240:19, 1240:25, 1241:5, 1241:12, 1241:13, 1241:17, 1241:22, 1241:25, 1242:4, 1242:9, 1243:11, 1244:22, 1245:13, 1246:2, 1246:6, 1249:2, 1252:3, 1252:8, 1252:21, 1253:13, 1253:18, 1253:20, 1254:2, 1254:12, 1254:14, 1255:1, 1256:10, 1257:5, 1257:19, 1258:11, 1258:15, 1259:5, 1262:1, 1263:16, 1265:20, 1265:22, 1266:8, 1266:14, 1266:24, 1268:4, 1268:7, 1269:21, 1270:16, 1270:23, 1272:11, 1272:23, 1273:6, 1273:24, 1274:8, 1274:9, 1274:10, 1274:17, 1274:21, 1274:23, 1275:3, 1275:10, 1275:13, 1275:14, 1276:9, 1276:24, 1277:2, 1277:6, 1277:9, 1277:16, 1278:2, 1279:6, 1279:8, 1279:10, 1279:12, 1279:13, 1279:14, 1279:17, 1279:19, 1279:22, 1280:16, 1280:25, 1281:3, 1281:13, 1281:14, 1281:16, 1282:4, 1282:8, 1282:12, 1282:22, 1283:3, 1283:21, 1284:5, 1284:19, 1284:21, 1285:7, 1285:13, 1285:19, 1286:3, 1288:16, 1289:10, 1289:11, 1289:14, 1289:17, 1296:25, 1297:11, 1297:12, 1297:17, 1298:6
**drive** [2] - 1277:19, 1278:1
**drives** [1] - 1255:24
**drove** [2] - 1277:25
**drug** [15] - 1218:22, 1221:25, 1240:11, 1240:21, 1240:24, 1241:4, 1241:6, 1246:8, 1247:21, 1249:5, 1255:23, 1256:13, 1257:6, 1279:1
**Drug** [1] - 1236:6
**DTX** [7] - 1213:3, 1213:25, 1228:3, 1228:4, 1228:7, 1228:10, 1228:11
**due** [5] - 1239:15, 1251:20, 1283:25, 1288:15
**duration** [47] - 1239:13, 1245:7, 1247:20, 1247:23, 1247:24, 1248:4, 1248:11, 1249:8, 1249:13, 1250:13, 1250:15, 1250:24, 1251:2, 1252:12, 1253:17, 1254:19, 1255:24, 1256:1, 1256:7, 1256:13, 1264:21, 1264:22, 1264:23, 1265:1, 1265:3, 1265:6, 1265:11, 1265:15, 1265:16, 1268:12, 1268:24, 1269:5, 1269:8, 1269:12, 1270:6, 1270:15, 1270:18, 1270:19, 1270:20, 1271:2, 1271:15, 1272:3,

1289:19, 1289:21, 1291:9
**duration-of-action** [1] - 1249:8
**during** [14] - 1220:15, 1221:2, 1232:23, 1245:22, 1247:21, 1249:17, 1255:13, 1259:7, 1295:4, 1295:18, 1295:21, 1300:16, 1301:6, 1307:1
**duty** [4] - 1264:1, 1292:25, 1294:5, 1294:8

## E

**e-mail** [1] - 1298:21
**eager** [1] - 1201:20
**early** [2] - 1266:21, 1267:9
**earned** [1] - 1232:25
**easier** [1] - 1228:13
**easily** [2] - 1243:25, 1277:3
**easy** [4] - 1273:12, 1273:14, 1291:1
**economy** [3] - 1262:15, 1262:24
**education** [2] - 1229:2, 1300:12
**effect** [2] - 1268:12, 1293:10
**effective** [1] - 1300:13
**effects** [2] - 1248:18, 1248:21
**effort** [3] - 1246:21, 1254:25, 1294:10
**efforts** [2] - 1254:1, 1307:14
**eight** [1] - 1199:12
**either** [4] - 1232:14, 1248:22, 1253:24, 1301:22
**electronic** [1] - 1295:6
**electronically** [1] - 1295:16
**element** [12] - 1202:13, 1206:14, 1206:15, 1225:21, 1227:3, 1227:5, 1227:9, 1227:10, 1227:18, 1296:16, 1297:6, 1297:23
**elements** [14] - 1202:20, 1204:18, 1206:2, 1206:20, 1207:5, 1223:19, 1226:5, 1226:8, 1226:12, 1226:15, 1226:17, 1227:11, 1279:11, 1289:9
**elephants** [1] - 1274:3
**elicited** [1] - 1274:20
**eliminates** [1] - 1273:9
**embodiment** [5] - 1213:13, 1213:16, 1214:19, 1214:21, 1217:12
**embodiments** [1] - 1219:10
**emerged** [1] - 1264:15
**emphasis** [1] - 1282:16
**employee** [1] - 1270:23
**employees** [1] - 1263:16
**encountered** [1] - 1229:4
**encourage** [1] - 1221:10
**Encyclopedia** [1] - 1274:3
**end** [9] - 1223:11, 1242:3, 1257:2, 1259:10, 1259:20, 1294:20, 1298:20, 1299:1, 1305:10
**ends** [1] - 1214:10
**enforce** [1] - 1250:22
**enforced** [2] - 1254:5, 1254:7
**ensure** [1] - 1231:11
**ensuring** [1] - 1303:8
**enter** [1] - 1232:10
**entered** [4] - 1201:11, 1232:6, 1235:13, 1302:21
**entire** [10] - 1216:25, 1217:17, 1241:7, 1246:23, 1256:21, 1256:25, 1258:20, 1289:15, 1291:13
**entirely** [3] - 1240:15, 1258:7, 1303:9
**entitled** [9] - 1222:2, 1222:6, 1222:13, 1224:23, 1227:22, 1230:21, 1250:22, 1304:23, 1305:9
**environment** [1] - 1236:14
**equals** [2] - 1270:15, 1270:18
**equation** [1] - 1242:4
**equitable** [1] - 1263:19
**ER** [1] - 1269:22
**ERIC** [1] - 1199:19
**erroneous** [1] - 1293:9
**especially** [2] - 1264:3, 1288:10
**ESQ** [16] - 1199:16, 1199:19, 1199:19, 1199:20, 1199:20, 1199:21, 1199:21, 1199:22, 1200:3, 1200:4, 1200:6, 1200:7, 1200:7, 1200:8, 1200:8, 1200:11
**essence** [2] - 1217:8
**essential** [1] - 1262:11
**essentially** [3] - 1205:21, 1234:24, 1306:22
**establish** [4] - 1203:6, 1225:6, 1227:8, 1231:5
**established** [4] - 1214:2, 1227:13, 1230:7, 1252:10
**estimated** [1] - 1232:22
**et** [1] - 1199:6
**evaluating** [1] - 1220:23
**evaluation** [2] - 1227:6, 1232:15
**event** [1] - 1300:20
**evidence** [86] - 1220:24, 1221:8, 1221:11, 1221:14, 1221:18, 1222:8, 1222:13, 1222:19, 1222:22, 1222:23, 1222:25, 1223:1, 1223:6, 1223:7, 1223:8, 1223:9, 1225:8, 1225:17, 1229:1, 1229:13, 1229:15, 1230:9, 1230:10, 1231:6, 1232:19, 1232:24, 1234:14, 1236:17, 1244:7, 1244:12, 1245:19, 1248:9, 1248:12, 1248:13, 1248:25, 1249:12, 1250:24, 1251:15, 1252:10, 1261:5, 1261:24, 1262:19, 1262:23, 1263:20, 1263:24, 1264:7, 1264:14, 1265:4, 1269:7, 1270:9, 1270:17, 1270:21, 1271:25, 1272:5, 1275:2, 1281:17, 1287:1, 1287:17, 1288:5, 1290:2, 1293:6, 1293:11, 1293:14, 1294:6, 1294:9, 1295:23, 1297:1, 1297:18, 1298:7, 1299:22, 1299:25, 1300:7, 1300:10, 1300:16, 1301:6, 1301:9, 1301:10, 1301:14, 1304:2, 1304:9, 1304:16, 1304:23, 1305:9
**evidentiary** [3] - 1297:2, 1297:19, 1298:8
**exact** [6] - 1242:15, 1242:16, 1243:21, 1249:20, 1290:7
**exactly** [5] - 1205:9, 1215:17, 1257:1, 1281:11, 1294:20
**examination** [3] - 1201:2, 1242:2, 1271:3
**EXAMINATION** [2] - 1201:15, 1217:25
**examine** [2] - 1201:14, 1293:8
**examined** [1] - 1244:3
**examiner** [9] - 1243:11, 1244:2, 1261:19, 1261:20, 1261:21, 1262:11, 1262:18, 1262:20, 1275:24
**examiners** [6] - 1242:25, 1243:7, 1281:10, 1288:6, 1288:11, 1289:3
**example** [27] - 1209:12, 1212:21, 1212:22, 1213:9, 1213:11, 1213:17, 1213:18, 1213:20, 1213:21, 1214:2, 1214:10, 1214:11, 1214:15, 1214:21, 1216:12, 1217:3, 1217:11, 1217:12, 1217:18, 1224:9, 1231:3, 1246:2, 1269:22, 1292:17, 1296:19, 1297:9, 1298:1
**examples** [8] - 1210:2, 1210:12, 1210:15, 1211:15, 1216:10, 1216:11, 1216:17, 1219:1
**except** [1] - 1292:3
**exchange** [2] - 1231:21, 1272:20
**exchanged** [1] - 1300:5
**exclude** [1] - 1230:15
**excluded** [3] - 1209:23, 1216:1, 1218:25
**excludes** [2] - 1216:23, 1280:19
**excluding** [1] - 1281:7
**exclusive** [1] - 1294:5
**excuses** [2] - 1239:25, 1261:14
**exercise** [1] - 1264:17
**exert** [1] - 1248:17
**exhibit** [2] - 1228:12, 1301:9
**exhibits** [3] - 1221:14, 1228:14, 1301:8
**exist** [1] - 1247:13
**existed** [1] - 1259:3
**existence** [3] - 1225:21, 1227:8, 1230:12
**exited** [3] - 1234:25, 1296:4, 1307:10
**expect** [3] - 1246:18, 1292:11, 1307:20
**expectation** [5] - 1226:24, 1273:8, 1296:22, 1297:14, 1298:4
**expectations** [1] - 1232:5
**expensive** [1] - 1233:23
**experience** [5] - 1229:2, 1274:23, 1278:6, 1278:10, 1289:4
**experiments** [6] - 1211:14, 1237:8, 1245:21, 1271:14, 1271:16
**expert** [8] - 1252:2, 1255:24, 1256:5, 1270:13, 1270:23, 1272:12, 1274:17, 1290:10
**experts** [8] - 1237:16, 1237:22, 1261:25, 1265:2, 1272:4, 1278:24, 1300:6
**expiration** [5] -

1255:11, 1259:18, 1285:1, 1305:3, 1305:5
**expired** [1] - 1259:1
**expires** [2] - 1255:8, 1255:9
**explain** [9] - 1208:24, 1212:7, 1220:23, 1220:25, 1221:1, 1231:19, 1239:24, 1244:10, 1267:8
**explained** [11] - 1248:2, 1252:9, 1253:18, 1253:23, 1259:4, 1281:13, 1281:15, 1281:16, 1282:19, 1284:3, 1284:6
**explaining** [3] - 1220:21, 1289:6, 1291:23
**explicit** [3] - 1227:4, 1227:15, 1227:18
**explicitly** [1] - 1227:11
**expose** [1] - 1282:3
**exposed** [1] - 1242:2
**express** [1] - 1229:24
**expressly** [3] - 1240:25, 1243:13, 1289:5
**extend** [1] - 1208:25
**extends** [2] - 1213:21, 1214:4
**extent** [2] - 1222:11, 1282:2

## F

**face** [1] - 1237:22
**Facebook** [1] - 1295:10
**faceless** [1] - 1245:12
**facing** [1] - 1229:20
**fact** [20] - 1205:10, 1223:7, 1227:14, 1230:16, 1236:22, 1238:1, 1238:11, 1239:2, 1244:24, 1246:6, 1246:15, 1247:1, 1266:3, 1271:4, 1277:19, 1279:13, 1287:20, 1289:14, 1291:10, 1294:8
**factor** [3] - 1229:16, 1230:5, 1234:13
**factors** [8] - 1226:6, 1229:18, 1230:4, 1230:8, 1234:4, 1234:8, 1234:15, 1234:16
**facts** [13] - 1209:19, 1221:15, 1221:16, 1222:18, 1232:20, 1234:2, 1236:20, 1236:21, 1239:20, 1260:24, 1268:9, 1279:23, 1293:13
**Fahrenheit** [2] - 1208:16, 1279:21
**fail** [3] - 1283:21, 1298:16, 1298:25
**fair** [12] - 1202:1, 1215:17, 1239:9, 1251:9, 1257:14, 1257:21, 1258:4, 1258:10, 1258:13, 1260:7, 1263:19, 1291:16
**fairly** [3] - 1236:1, 1239:15, 1256:2
**fairness** [1] - 1239:8
**fancy** [1] - 1281:1
**fans** [1] - 1273:18
**far** [4] - 1209:18, 1235:2, 1273:3, 1290:14
**favor** [6] - 1286:12, 1286:17, 1291:17, 1304:5, 1304:12, 1304:19
**FDA** [22] - 1228:3, 1243:18, 1248:15, 1248:16, 1248:18, 1250:1, 1250:3, 1250:17, 1250:19, 1250:23, 1254:1, 1266:22, 1267:15, 1269:19, 1274:22, 1276:15, 1277:4, 1279:2, 1280:10, 1297:7, 1297:14
**FDA-approved** [1] - 1267:15
**feasibility** [1] - 1229:25
**feature** [1] - 1233:6
**features** [3] - 1233:5, 1233:8, 1256:10
**federal** [2] - 1299:22, 1299:25
**feelings** [1] - 1301:24
**fellow** [4] - 1293:6, 1293:11, 1294:13, 1295:18
**felt** [4] - 1218:17, 1218:19, 1218:23, 1229:19
**few** [9] - 1201:21, 1215:4, 1239:18, 1253:9, 1260:12, 1281:9, 1286:24, 1287:13, 1291:22
**fewer** [2] - 1265:16
**fiction** [1] - 1240:6
**field** [15] - 1210:25, 1218:17, 1225:4, 1225:9, 1225:13, 1226:4, 1226:10, 1228:23, 1229:3, 1229:4, 1229:6, 1229:24, 1241:15, 1246:1, 1276:19
**figure** [1] - 1252:4
**figured** [1] - 1245:3
**figures** [2] - 1249:11, 1284:17
**file** [2] - 1306:17, 1308:2
**filed** [4] - 1263:13, 1271:17, 1271:18, 1288:17
**fill** [1] - 1269:18
**final** [2] - 1219:24, 1307:20
**finally** [6] - 1221:1, 1250:20, 1273:23, 1277:8, 1286:21, 1298:10
**financial** [1] - 1236:11
**findings** [3] - 1257:13, 1303:25, 1304:20
**fine** [2] - 1266:14, 1301:25
**finish** [2] - 1291:23, 1295:19
**finished** [1] - 1292:20
**finishes** [1] - 1201:3
**finite** [1] - 1226:19
**firmly** [1] - 1290:18
**first** [37] - 1213:13, 1214:18, 1222:21, 1231:25, 1240:1, 1245:1, 1245:5, 1245:23, 1247:7, 1248:15, 1250:24, 1251:19, 1251:23, 1252:7, 1252:17, 1253:9, 1257:10, 1258:16, 1259:9, 1259:11, 1261:1, 1261:14, 1264:10, 1267:15, 1271:7, 1272:10, 1278:4, 1281:17, 1282:6, 1283:12, 1284:22, 1287:15, 1290:8, 1291:1, 1292:14
**first-to-market** [1] - 1251:19
**five** [6] - 1201:3, 1226:16, 1234:24, 1243:5, 1271:5, 1287:8
**five-minute** [1] - 1201:3
**flagship** [2] - 1239:3, 1253:10
**flawed** [1] - 1271:4
**flaws** [2] - 1282:3, 1282:12
**flowing** [1] - 1227:17
**focus** [3] - 1232:5, 1239:20, 1244:13
**focuses** [1] - 1237:14
**focusing** [1] - 1246:21
**follow** [4] - 1220:10, 1220:13, 1221:2, 1258:11
**following** [13] - 1220:13, 1228:2, 1228:6, 1228:9, 1232:1, 1235:9, 1252:10, 1299:12, 1302:17, 1303:23, 1304:2, 1304:9, 1304:16
**food** [1] - 1243:18
**Food** [1] - 1236:5
**football** [2] - 1273:17
**FOR** [1] - 1199:2
**forces** [1] - 1226:21
**foregoing** [2] - 1233:18, 1308:13
**foremost** [3] - 1250:24, 1278:4, 1284:22
**foreperson** [3] - 1292:13, 1302:24, 1303:4
**FOREPERSON** [2] - 1303:1, 1303:6
**foreseen** [1] - 1232:22
**forget** [1] - 1248:19
**forgot** [1] - 1249:24
**form** [17] - 1220:1, 1220:19, 1231:14, 1257:9, 1257:23, 1257:24, 1258:3, 1286:10, 1287:13, 1289:25, 1293:15, 1293:17, 1293:19, 1294:1, 1303:8, 1303:10, 1303:12
**formulating** [1] - 1277:23
**formulation** [26] - 1203:11, 1205:23, 1209:8, 1209:10, 1210:25, 1218:16, 1237:5, 1238:4, 1240:15, 1240:17, 1247:5, 1248:3, 1253:15, 1253:19, 1255:9, 1269:3, 1272:8, 1273:15, 1279:18, 1281:4, 1281:5, 1284:11, 1289:18, 1290:5, 1303:25, 1304:24
**formulations** [9] - 1207:20, 1209:13, 1237:23, 1254:20, 1279:9, 1280:23, 1280:25, 1281:3, 1289:20
**forth** [2] - 1223:17
**forward** [2] - 1201:10, 1295:25
**foul** [1] - 1301:22
**foundational** [6] - 1238:20, 1246:7, 1246:13, 1249:9, 1267:20, 1267:22
**four** [16] - 1210:12, 1210:15, 1210:18, 1211:11, 1211:15, 1211:16, 1212:1, 1212:11, 1226:14, 1236:19, 1239:2, 1239:19, 1265:10, 1280:23, 1292:18, 1292:19
**FOX** [1] - 1200:6
**frankly** [1] - 1246:1
**free** [42] - 1237:6, 1237:10, 1239:13, 1239:22, 1240:11, 1241:19, 1244:1, 1245:8, 1250:23, 1251:2, 1252:13, 1254:20, 1255:21, 1256:8, 1256:13, 1260:17, 1262:5, 1266:20, 1266:23, 1267:2, 1267:5, 1267:11, 1267:15, 1267:24, 1272:21, 1273:2, 1273:5, 1273:9, 1273:12, 1273:20, 1276:8, 1276:16, 1276:17, 1280:6, 1280:9, 1280:11, 1280:12, 1281:5, 1289:19, 1294:7, 1295:1
**freeze** [1] - 1280:1
**freezing** [3] - 1207:22, 1207:24, 1279:18

**front** [5] - 1243:11, 1263:18, 1267:1, 1286:4, 1287:2
**frozen** [2] - 1209:8, 1266:5
**functions** [1] - 1226:8

## G

**gain** [1] - 1251:22
**Gallagher** [1] - 1250:11
**gaps** [1] - 1269:18
**GAZA** [1] - 1200:3
**gears** [1] - 1207:9
**general** [1] - 1219:9
**generally** [1] - 1219:11
**genuinely** [1] - 1278:12
**Gessler** [12] - 1228:4, 1242:23, 1243:14, 1274:17, 1274:23, 1275:10, 1276:15, 1277:6, 1289:5, 1289:7, 1297:7, 1297:14
**Gessler/FDA** [2] - 1261:22, 1281:15
**gigantic** [1] - 1265:5
**given** [2] - 1271:6, 1299:21
**God** [1] - 1267:22
**GOLDSTEIN** [1] - 1200:6
**golly** [1] - 1285:2
**Goodnough** [22] - 1241:25, 1242:4, 1242:9, 1244:22, 1262:1, 1266:24, 1272:11, 1272:23, 1273:6, 1274:21, 1275:3, 1275:13, 1275:14, 1276:9, 1276:24, 1277:2, 1281:14, 1281:16, 1289:11, 1296:25, 1297:12, 1297:17
**Goodnough's** [1] - 1273:24
**goods** [1] - 1285:9
**GORDON** [1] - 1200:10
**government** [1] - 1268:23
**grab** [1] - 1257:23
**grade** [3] - 1267:4, 1267:5, 1267:10
**grant** [1] - 1252:12
**granted** [4] - 1236:23, 1237:11, 1240:6, 1264:1
**grants** [1] - 1230:14
**great** [5] - 1207:3, 1237:12, 1239:19, 1249:22, 1252:9
**greater** [1] - 1233:25
**greatest** [1] - 1252:14
**green** [4] - 1261:11, 1263:5, 1285:7, 1286:5
**ground** [1] - 1203:7
**group** [1] - 1307:15
**grow** [1] - 1284:16
**guess** [6] - 1237:16, 1249:20, 1262:10, 1284:25, 1299:20, 1303:4
**guesswork** [1] - 1231:11
**guest** [2] - 1251:11, 1251:13
**guidance** [5] - 1228:3, 1243:19, 1276:16, 1297:7, 1297:14
**guidance/smelt** [2] - 1261:22, 1281:16
**guidelines** [1] - 1273:11
**guy** [1] - 1270:13
**guys** [1] - 1265:10

## H

**half** [5] - 1242:1, 1254:5, 1254:6, 1280:16, 1283:16
**half-truths** [1] - 1242:1
**hand** [2] - 1219:24, 1220:1
**hands** [2] - 1201:20, 1291:14
**happy** [1] - 1302:3
**hard** [15] - 1236:12, 1245:14, 1245:18, 1249:12, 1250:8, 1263:4, 1268:8, 1268:9, 1268:10, 1269:6, 1269:12, 1283:4, 1287:1
**hardworking** [1] - 1263:17
**harm** [1] - 1301:22
**HASTINGS** [1] - 1199:18
**head** [1] - 1278:6
**hear** [13] - 1218:15, 1249:15, 1249:18, 1250:6, 1262:3, 1262:18, 1269:15, 1281:17, 1281:18, 1282:22, 1290:11, 1294:24, 1302:15
**heard** [44] - 1208:24, 1218:18, 1221:8, 1221:10, 1236:4, 1236:6, 1236:17, 1237:7, 1241:7, 1245:6, 1245:12, 1246:15, 1247:21, 1250:11, 1252:2, 1257:19, 1259:1, 1260:23, 1261:24, 1262:3, 1263:10, 1264:21, 1264:22, 1265:20, 1266:8, 1266:13, 1266:24, 1269:21, 1270:22, 1271:13, 1272:10, 1273:3, 1276:24, 1277:16, 1279:9, 1281:23, 1282:15, 1285:10, 1287:20, 1288:13, 1289:12, 1291:6, 1291:12, 1300:18
**hearing** [1] - 1263:14
**heart** [1] - 1240:9
**help** [1] - 1301:7
**helped** [1] - 1267:19
**helpful** [3] - 1259:11, 1296:12, 1301:16
**helps** [1] - 1270:2
**hereby** [1] - 1308:11
**hesitate** [2] - 1293:8, 1294:15
**high** [4] - 1244:9, 1250:7, 1279:24, 1288:9
**high-level** [1] - 1250:7
**higher** [7] - 1208:11, 1209:1, 1209:6, 1223:8, 1245:7, 1259:16, 1289:20
**highlight** [2] - 1264:16, 1282:3
**highlighted** [2] - 1261:20, 1282:12
**highly** [3] - 1223:7, 1278:24
**himself** [1] - 1267:9
**hinder** [1] - 1263:1
**hindsight** [2] - 1225:19, 1232:15
**hint** [1] - 1294:3
**hinted** [1] - 1254:17
**histidine** [1] - 1271:10
**history** [1] - 1279:8
**hmm** [1] - 1270:21
**HO** [1] - 1199:21
**hold** [3] - 1236:10, 1240:8, 1268:1
**holder** [2] - 1230:15, 1251:19
**holding** [1] - 1235:22
**home** [1] - 1299:1
**Honda** [2] - 1277:25, 1278:1
**honest** [1] - 1293:10
**honestly** [2] - 1278:12, 1294:22
**Honor** [22] - 1201:7, 1215:14, 1219:13, 1219:19, 1219:22, 1235:3, 1235:4, 1235:5, 1235:21, 1288:18, 1296:14, 1299:8, 1299:19, 1300:11, 1301:19, 1301:24, 1302:7, 1303:1, 1303:6, 1303:21, 1305:14, 1307:25
**Honorable** [1] - 1199:11
**hope** [2] - 1201:21, 1239:22
**hoping** [1] - 1249:23
**hospital** [1] - 1266:10
**hospitals** [1] - 1285:17
**hostage** [1] - 1268:1
**hour** [1] - 1241:12
**house** [1] - 1251:10
**human** [8] - 1203:11, 1203:14, 1203:19, 1211:1, 1211:9, 1243:19, 1262:4, 1267:11
**humans** [1] - 1267:7
**hundred** [2] - 1250:25, 1285:2
**hundreds** [1] - 1275:15
**Hunt** [80] - 1202:11, 1203:9, 1203:10, 1203:18, 1203:23, 1204:1, 1204:4, 1204:11, 1204:12, 1204:18, 1204:21, 1204:23, 1204:25, 1205:2, 1205:9, 1205:20, 1205:23, 1206:3, 1206:19, 1207:16, 1207:19, 1208:21, 1208:23, 1209:20, 1209:24, 1209:25, 1210:1, 1210:12, 1210:18, 1211:19, 1211:20, 1212:18, 1213:4, 1213:8, 1215:5, 1215:9, 1215:25, 1216:5, 1216:9, 1216:18, 1216:23, 1217:9, 1217:14, 1218:19, 1218:25, 1228:10, 1236:13, 1237:7, 1237:13, 1240:5, 1240:11, 1240:15, 1240:22, 1240:23, 1241:3, 1241:9, 1242:22, 1243:8, 1245:13, 1245:20, 1248:2, 1266:13, 1270:12, 1271:13, 1277:11, 1279:7, 1279:11, 1279:15, 1279:17, 1280:2, 1288:13, 1288:17, 1289:10, 1289:17, 1289:22, 1297:11, 1297:24, 1297:25, 1298:4
**Hunt's** [12] - 1208:25, 1211:3, 1237:14, 1240:14, 1240:20, 1243:9, 1246:8, 1247:6, 1248:9, 1249:5, 1249:9, 1291:9
**Hunt/Johnson** [2] - 1261:21, 1281:12
**hypothetical** [15] - 1231:24, 1232:1, 1232:4, 1232:13, 1232:16, 1232:21, 1232:23, 1233:14, 1233:15, 1252:5, 1253:6, 1273:21, 1278:16, 1278:19, 1282:19
**hypothetically** [1] - 1283:6
**hypotheticals** [1] - 1250:7

## I

**idea** [3] - 1266:22, 1274:11, 1285:25
**ideas** [1] - 1262:25
**identically** [1] - 1225:1
**identified** [1] - 1226:19
**ignore** [2] - 1220:16, 1257:3

**illustrate** [1] - 1301:7
**illustrative** [3] - 1300:14, 1300:15, 1301:8
**impartial** [1] - 1293:5
**implement** [1] - 1254:25
**important** [11] - 1220:17, 1223:11, 1236:21, 1243:5, 1248:13, 1264:23, 1265:15, 1270:1, 1283:17, 1288:3, 1294:21
**importantly** [3] - 1244:10, 1251:5, 1287:23
**impression** [1] - 1284:23
**improve** [1] - 1267:14
**improved** [2] - 1248:3, 1263:7
**improvement** [1] - 1267:16
**IN** [2] - 1199:1, 1199:2
**inactive** [6] - 1248:17, 1248:20, 1269:20, 1269:24, 1269:25, 1270:2
**Inc** [4] - 1222:1, 1291:18, 1304:22, 1305:8
**INC** [1] - 1199:3
**Inc.'s** [1] - 1257:15
**incentives** [1] - 1226:21
**include** [2] - 1229:18, 1232:24
**included** [1] - 1291:11
**includes** [2] - 1221:11, 1237:13
**including** [9] - 1220:14, 1221:13, 1229:1, 1238:9, 1245:6, 1274:20, 1291:13, 1295:9, 1297:10
**inconsistent** [1] - 1275:20
**incorporated** [1] - 1265:21
**incorporates** [1] - 1224:4
**increased** [3] - 1234:16, 1268:23, 1268:24
**incredible** [2] - 1252:11, 1288:15
**incur** [1] - 1233:20
**independent** [2] - 1223:23, 1261:25
**indicates** [1] - 1306:16
**indicators** [1] - 1230:7
**indicia** [3] - 1229:15, 1229:18, 1298:11
**indisputably** [1] - 1247:19
**individual** [1] - 1293:3
**individually** [3] - 1227:21, 1244:21, 1303:18
**individuals** [1] - 1263:17
**influence** [1] - 1295:21
**information** [12] - 1232:22, 1237:21, 1243:21, 1260:24, 1262:20, 1266:19, 1276:19, 1279:5, 1288:11, 1295:5, 1295:11, 1298:15
**informs** [1] - 1279:3
**infringed** [1] - 1232:9
**infringement** [12] - 1221:21, 1222:14, 1230:13, 1231:1, 1231:25, 1232:24, 1233:12, 1234:3, 1246:25, 1261:15, 1287:20, 1287:22
**infringer** [5] - 1231:24, 1232:6, 1232:25, 1233:20, 1233:24
**infringer's** [1] - 1233:17
**infringes** [1] - 1287:19
**infringing** [5] - 1230:18, 1233:4, 1233:8, 1247:9, 1257:15
**ingenuity** [1] - 1245:16
**ingredient** [4] - 1248:17, 1269:20, 1269:23, 1270:2
**ingredients** [7] - 1207:7, 1240:17, 1247:25, 1249:20, 1250:4, 1269:25, 1277:24
**inherency** [5] - 1227:2, 1227:8, 1227:13, 1227:16, 1227:19
**inherent** [2] - 1227:4, 1275:9
**innovation** [5] - 1245:16, 1245:18, 1262:16, 1262:25, 1263:17
**innovations** [2] - 1229:5, 1240:5
**Instagram** [1] - 1295:9
**instances** [1] - 1243:1
**instant** [1] - 1295:8
**instead** [3] - 1240:12, 1250:6, 1270:22
**instruct** [1] - 1220:10
**instructed** [3] - 1221:16, 1261:16, 1281:21
**instructing** [1] - 1230:22
**instructions** [19] - 1219:25, 1220:4, 1220:8, 1220:13, 1220:14, 1220:18, 1222:17, 1234:21, 1235:2, 1244:8, 1246:15, 1264:6, 1291:23, 1294:1, 1299:21, 1301:1, 1301:15, 1302:2, 1303:24
**integrity** [1] - 1262:23
**intellectual** [2] - 1251:20, 1264:4
**intended** [2] - 1244:18, 1248:17
**interest** [3] - 1231:4, 1236:16, 1293:14
**internet** [1] - 1295:8
**interpret** [1] - 1209:5
**interpretation** [1] - 1224:15
**interrelated** [1] - 1276:18
**introduced** [2] - 1229:1, 1265:13
**invalid** [23] - 1203:3, 1221:24, 1222:4, 1222:5, 1222:9, 1222:12, 1223:5, 1225:7, 1230:20, 1230:22, 1231:16, 1240:2, 1261:8, 1264:11, 1281:21, 1282:2, 1286:13, 1296:15, 1297:5, 1297:22, 1304:3, 1304:10, 1304:17
**invalidity** [6] - 1243:25, 1247:13, 1272:6, 1281:8, 1287:24, 1303:25
**invent** [1] - 1271:22
**invented** [7] - 1263:14, 1265:22, 1266:2, 1266:3, 1267:12, 1270:6, 1270:10
**invention** [72] - 1213:14, 1216:23, 1216:25, 1217:17, 1224:24, 1225:1, 1225:3, 1225:5, 1225:8, 1225:10, 1225:11, 1225:13, 1225:14, 1225:16, 1225:20, 1225:21, 1225:25, 1226:2, 1226:5, 1226:7, 1226:9, 1226:13, 1226:15, 1226:23, 1227:6, 1227:23, 1227:25, 1228:17, 1228:18, 1228:22, 1228:24, 1229:12, 1229:14, 1229:17, 1229:21, 1229:22, 1230:1, 1230:5, 1230:11, 1231:13, 1231:22, 1233:3, 1234:6, 1234:9, 1234:11, 1240:14, 1240:20, 1240:21, 1240:24, 1243:14, 1244:23, 1245:21, 1247:6, 1253:17, 1255:12, 1255:17, 1255:18, 1261:3, 1280:18, 1289:7, 1291:9, 1291:15, 1296:20, 1296:23, 1297:9, 1297:15, 1298:1, 1298:5, 1304:3, 1304:10, 1304:17
**inventions** [46] - 1225:23, 1235:24, 1236:1, 1237:24, 1238:2, 1238:8, 1238:9, 1238:17, 1239:4, 1239:12, 1239:23, 1241:1, 1242:20, 1242:24, 1244:12, 1244:19, 1245:5, 1246:12, 1247:8, 1247:11, 1251:7, 1251:8, 1251:16, 1251:18, 1252:2, 1252:8, 1252:13, 1252:22, 1252:24, 1254:18, 1254:22, 1255:5, 1255:22, 1256:12, 1256:15, 1256:22, 1256:23, 1260:8, 1266:10, 1266:12, 1279:4, 1289:23, 1290:24, 1291:1, 1291:5
**inventive** [1] - 1246:5
**inventor** [4] - 1225:2, 1229:2, 1270:12, 1274:10
**inventors** [7] - 1229:20, 1244:25, 1245:11, 1266:14, 1268:19, 1274:20, 1288:1
**inviting** [1] - 1215:19
**involve** [1] - 1278:22
**involved** [1] - 1242:8
**IP** [1] - 1261:3
**irrelevant** [2] - 1246:24, 1285:4
**ISAAC** [1] - 1199:19
**issue** [9] - 1230:24, 1236:25, 1240:24, 1242:20, 1244:19, 1248:14, 1252:9, 1252:18, 1274:9
**issued** [3] - 1243:24, 1244:2, 1261:23
**issues** [6] - 1209:16, 1222:7, 1264:23, 1276:6, 1287:14, 1290:16
**item** [1] - 1258:16
**items** [3] - 1228:2, 1228:6, 1228:9
**itself** [3] - 1211:5, 1223:25, 1251:19

## J

**jabs** [1] - 1265:16
**jail** [2] - 1244:1, 1261:14
**jarring** [1] - 1283:10
**JEREMY** [1] - 1199:16
**jerk** [1] - 1301:17
**JMOL** [6] - 1235:6, 1296:6, 1296:14, 1297:4, 1297:21, 1298:10
**job** [1] - 1224:13
**Johnson** [29] - 1202:12, 1205:3, 1205:5, 1205:10, 1205:20, 1205:23, 1206:3, 1206:19, 1208:6, 1208:11, 1209:2, 1209:20, 1209:21, 1212:15, 1228:10, 1237:13,

1242:22, 1243:8, 1277:12, 1279:7, 1279:11, 1279:15, 1279:19, 1280:3, 1288:14, 1297:24, 1297:25, 1298:1, 1298:4
**journey** [2] - 1241:4, 1241:5
**JTX** [2] - 1228:4, 1228:8
**Judge** [1] - 1264:6
**judge** [6] - 1224:13, 1244:10, 1261:16, 1278:4, 1281:21, 1281:24
**judges** [2] - 1293:13, 1303:14
**judgment** [7] - 1258:9, 1292:22, 1293:3, 1307:18, 1307:20, 1307:21, 1307:22
**July** [2] - 1199:13, 1228:21
**June** [1] - 1232:3
**juror** [8] - 1224:17, 1292:14, 1292:22, 1292:23, 1305:20, 1305:23, 1306:4, 1306:13
**Juror** [4] - 1305:17, 1306:1, 1306:7, 1306:10
**JUROR** [8] - 1305:19, 1305:22, 1305:25, 1306:3, 1306:6, 1306:9, 1306:12, 1306:15
**jurors** [11] - 1262:11, 1292:25, 1293:6, 1293:12, 1294:13, 1294:16, 1294:18, 1295:2, 1295:18, 1306:18, 1306:25
**JURY** [2] - 1199:9, 1199:11
**jury** [99] - 1199:12, 1201:1, 1201:11, 1201:12, 1201:20, 1201:24, 1202:10, 1202:12, 1202:19, 1203:8, 1204:6, 1204:10, 1204:16, 1204:17, 1205:9, 1206:1, 1206:7, 1206:11, 1206:13, 1207:13, 1207:19, 1208:8, 1208:24, 1209:19, 1210:7, 1212:9, 1212:14, 1212:25, 1215:2, 1215:13, 1215:22, 1216:4, 1216:8, 1216:11, 1216:16, 1216:20, 1217:2, 1217:8, 1217:11, 1219:23, 1219:24, 1220:4, 1220:8, 1220:9, 1220:18, 1221:2, 1234:23, 1234:25, 1235:8, 1235:12, 1235:13, 1235:14, 1235:16, 1244:7, 1246:15, 1254:13, 1257:8, 1257:23, 1260:16, 1260:19, 1273:13, 1284:9, 1286:5, 1287:12, 1288:21, 1291:22, 1291:24, 1292:2, 1292:7, 1292:22, 1294:8, 1294:25, 1295:17, 1296:3, 1296:4, 1297:1, 1297:18, 1298:7, 1299:14, 1299:21, 1300:5, 1300:8, 1300:16, 1300:21, 1301:1, 1301:15, 1301:20, 1302:2, 1302:4, 1302:20, 1302:21, 1302:22, 1303:22, 1305:15, 1305:16, 1307:9, 1307:10
**justice** [2] - 1263:19, 1306:24
**justifying** [1] - 1265:4


## K


**keep** [15] - 1209:7, 1209:10, 1209:14, 1225:20, 1236:21, 1246:13, 1267:20, 1279:25, 1283:24, 1284:25, 1285:1, 1285:2, 1288:3, 1290:18, 1294:12
**keeping** [1] - 1255:14
**kept** [1] - 1267:3
**KESSLER** [1] - 1200:6
**kind** [1] - 1277:13
**kinds** [1] - 1234:4
**knocks** [1] - 1300:19
**knowledge** [2] - 1262:4, 1278:13
**known** [22] - 1211:16, 1212:1, 1222:19, 1225:20, 1226:5, 1226:8, 1226:10, 1234:2, 1244:14, 1244:20, 1244:21, 1262:5, 1263:22, 1264:5, 1266:21, 1266:23, 1270:25, 1273:5, 1274:21, 1275:5, 1277:5
**KRYS** [1] - 1199:21


## L


**language** [1] - 1224:14
**large** [3] - 1228:14, 1273:25, 1278:10
**LAROCK** [1] - 1200:7
**last** [7] - 1221:4, 1257:11, 1259:13, 1277:8, 1283:14, 1286:21, 1296:7
**launch** [6] - 1239:12, 1252:23, 1253:4, 1253:8, 1255:7, 1255:10
**launched** [1] - 1231:17
**law** [7] - 1220:10, 1220:25, 1229:14, 1251:5, 1251:14, 1273:21, 1282:24
**laws** [5] - 1224:23, 1227:22, 1235:25, 1239:8, 1244:1
**lawyers** [4] - 1213:17, 1292:10, 1303:14, 1307:5
**leads** [1] - 1239:1
**learn** [1] - 1267:23
**learned** [2] - 1274:2, 1289:14
**least** [7] - 1210:18, 1239:9, 1251:9, 1253:25, 1271:5, 1291:16, 1299:3
**leaves** [1] - 1285:18
**led** [1] - 1243:10
**left** [4] - 1201:25, 1243:16, 1249:2, 1285:20
**legal** [6] - 1206:24, 1222:16, 1278:17, 1278:18, 1300:12, 1307:16
**legally** [3] - 1297:2, 1297:19, 1298:8
**legitimate** [1] - 1261:15
**legitimately** [1] - 1273:4
**length** [1] - 1283:7
**lengths** [2] - 1239:19, 1249:22
**less** [5] - 1222:3, 1222:17, 1231:12, 1268:24, 1274:25
**level** [7] - 1206:16, 1225:12, 1228:23, 1228:25, 1229:2, 1250:7, 1275:4
**liability** [3] - 1230:13, 1246:17, 1281:23
**liable** [1] - 1230:18
**license** [9] - 1232:17, 1233:14, 1233:18, 1233:21, 1233:24, 1234:10, 1234:20, 1252:12, 1253:7
**licensed** [1] - 1252:18
**licensee** [1] - 1282:20
**licensor** [4] - 1282:20, 1282:23, 1283:1, 1283:4
**life** [2] - 1253:10, 1306:23
**light** [3] - 1224:24, 1227:24, 1229:13
**likely** [2] - 1233:25, 1300:23
**limitations** [8] - 1221:25, 1223:20, 1223:25, 1224:2, 1224:5, 1224:6, 1224:11, 1274:24
**limited** [3] - 1229:1, 1232:20, 1287:8
**line** [5] - 1202:24, 1213:13, 1237:15, 1249:12, 1275:16
**lines** [1] - 1244:22
**link** [2] - 1250:12, 1250:15
**LinkedIn** [1] - 1295:10
**list** [1] - 1220:19
**listen** [5] - 1220:11, 1294:11, 1294:12, 1295:2, 1303:17
**literally** [1] - 1237:8
**literature** [2] - 1270:25, 1275:17
**litigation** [2] - 1268:6, 1268:15
**live** [1] - 1245:12
**living** [1] - 1203:16
**LLP** [2] - 1199:16, 1199:18
**local** [1] - 1268:25
**logic** [1] - 1280:14
**long-felt** [4] - 1218:17, 1218:19, 1218:23, 1229:19
**longer-duration** [3] - 1239:13, 1251:2, 1252:12
**look** [24] - 1213:13, 1213:22, 1215:17, 1215:19, 1224:8, 1228:13, 1236:19, 1249:11, 1250:16, 1255:1, 1255:6, 1257:8, 1263:20, 1268:14, 1271:24, 1280:11, 1282:25, 1283:8, 1284:18, 1284:23, 1284:24, 1285:6, 1286:7
**looked** [2] - 1203:9, 1203:23
**looking** [3] - 1206:6, 1259:19, 1289:25
**looks** [4] - 1268:9, 1269:6, 1269:12, 1284:4
**loud** [1] - 1303:16
**louder** [2] - 1238:21, 1291:4
**low** [2] - 1207:20, 1208:25
**lower** [1] - 1285:24
**Luo** [1] - 1276:1


## M


**Magazine** [1] - 1266:10
**magic** [1] - 1261:11
**magical** [1] - 1275:5
**mail** [1] - 1298:21
**main** [1] - 1204:21
**maintain** [1] - 1254:19
**majority** [1] - 1255:14
**Malizio** [7] - 1228:7, 1272:24, 1272:25, 1273:7, 1296:17, 1296:18, 1296:22
**Malizio/Xiang** [1] - 1261:22
**manner** [1] - 1294:2
**manufacturing** [25] - 1237:9, 1238:5, 1241:20, 1241:22, 1247:3, 1253:22, 1253:24, 1254:4, 1255:10, 1255:12, 1255:22, 1257:7, 1259:1, 1259:3, 1259:11, 1259:14, 1272:8, 1284:10,

1289:18, 1290:6, 1304:6, 1304:13, 1305:1, 1305:4
**march** [1] - 1302:5
**market** [6] - 1226:18, 1250:23, 1251:3, 1251:19, 1253:12, 1266:4
**marketed** [1] - 1252:25
**marketplace** [1] - 1238:7
**massive** [1] - 1209:22
**materials** [1] - 1285:9
**math** [1] - 1242:4
**mathematical** [1] - 1231:8
**matter** [4] - 1238:21, 1251:6, 1270:17, 1277:9
**mattered** [1] - 1237:20
**matters** [2] - 1246:6, 1282:17
**mean** [7] - 1204:1, 1206:15, 1247:8, 1248:20, 1248:21, 1266:1, 1269:25
**meaning** [4] - 1217:8, 1224:14, 1224:15, 1224:20
**meaningful** [1] - 1276:25
**meaningless** [1] - 1290:24
**means** [14] - 1209:10, 1213:18, 1216:2, 1216:24, 1223:1, 1237:20, 1255:7, 1260:2, 1264:7, 1264:20, 1265:16, 1295:6, 1303:9, 1303:15
**meant** [2] - 1294:2, 1295:21
**measures** [1] - 1209:14
**measuring** [1] - 1233:5
**media** [1] - 1295:7
**meets** [1] - 1224:11
**MELANIE** [1] - 1199:20
**members** [16] - 1201:12, 1219:23, 1220:9, 1235:14, 1235:16, 1254:13, 1257:8, 1257:23, 1260:16, 1260:19, 1273:13, 1284:9, 1286:5, 1288:20, 1291:22, 1302:22
**memory** [1] - 1288:21
**mention** [1] - 1270:20
**mentioned** [5] - 1240:25, 1266:10, 1267:13, 1269:22, 1281:20
**mere** [1] - 1227:14
**merely** [1] - 1226:7
**messages** [3] - 1292:5, 1292:12, 1292:16
**messaging** [1] - 1295:8
**messed** [1] - 1237:4
**met** [1] - 1233:11
**method** [1] - 1237:23
**methodology** [2] - 1253:14, 1253:21
**methods** [5] - 1237:9, 1237:10, 1238:5, 1241:19, 1247:3
**Michael** [2] - 1272:11, 1272:23
**might** [6] - 1254:11, 1258:22, 1262:10, 1277:19, 1298:23, 1300:22
**million** [18] - 1239:2, 1239:5, 1242:6, 1257:18, 1257:21, 1258:20, 1258:22, 1259:8, 1259:10, 1259:19, 1259:20, 1260:4, 1260:5, 1275:1, 1282:7, 1284:15, 1305:11
**mind** [9] - 1225:20, 1234:16, 1236:21, 1253:13, 1288:3, 1290:18, 1294:12, 1294:15, 1294:17
**minds** [1] - 1295:2
**mine** [1] - 1263:11
**Minnesota** [1] - 1278:8
**MINNITI** [1] - 1199:20
**minus** [1] - 1207:23
**minute** [3] - 1201:3, 1307:5, 1307:6
**minutes** [7] - 1220:2, 1234:24, 1260:12, 1286:24, 1287:8, 1287:13, 1296:8
**misimpression** [1] - 1245:23
**misrepresentations** [1] - 1242:1
**missed** [2] - 1237:1, 1261:19
**missing** [4] - 1204:21, 1206:14, 1206:15, 1227:3
**misstated** [1] - 1288:18
**mistake** [1] - 1278:14
**mistakenly** [1] - 1265:2
**mistakes** [5] - 1243:1, 1243:23, 1261:20, 1271:11, 1281:10
**misunderstood** [1] - 1206:9
**mock** [1] - 1270:24
**moment** [7] - 1216:16, 1245:11, 1247:20, 1258:24, 1281:9, 1283:17, 1300:1
**Monday** [10] - 1260:22, 1261:1, 1262:2, 1263:2, 1265:15, 1270:5, 1278:16, 1286:19, 1290:8, 1307:24
**money** [6] - 1254:25, 1285:3, 1285:10, 1285:11, 1285:17, 1286:19
**months** [4] - 1208:13, 1208:14, 1253:25, 1255:3
**morning** [8] - 1201:5, 1201:17, 1201:18, 1218:2, 1218:3, 1235:22, 1260:20, 1279:11
**MORRIS** [1] - 1199:16
**most** [6] - 1219:25, 1220:4, 1225:23, 1236:14, 1243:5, 1287:23
**motions** [2] - 1298:10, 1307:21
**motivation** [9] - 1207:10, 1209:24, 1279:15, 1279:17, 1280:2, 1280:8, 1296:18, 1297:8, 1297:25
**motivations** [1] - 1266:22
**mouse** [3] - 1249:16, 1249:22, 1291:11
**move** [4] - 1203:11, 1235:6, 1259:22, 1281:8
**moves** [3] - 1296:14, 1297:4, 1297:21
**moving** [2] - 1224:22, 1230:19
**MR** [43] - 1201:7, 1201:16, 1210:4, 1210:6, 1210:9, 1210:11, 1214:6, 1214:9, 1214:23, 1215:1, 1215:14, 1215:19, 1215:21, 1217:24, 1218:1, 1218:10, 1218:14, 1219:13, 1219:19, 1219:22, 1235:3, 1235:4, 1235:21, 1260:19, 1287:12, 1288:18, 1289:1, 1296:10, 1299:7, 1299:9, 1299:19, 1300:1, 1300:4, 1300:11, 1301:19, 1301:23, 1302:7, 1302:8, 1302:11, 1302:12, 1305:14, 1307:25, 1308:3
**MS** [3] - 1235:5, 1296:8, 1296:14
**multiple** [1] - 1272:4
**multiply** [1] - 1258:21
**must** [42] - 1220:10, 1220:13, 1220:20, 1220:23, 1221:2, 1221:7, 1222:7, 1222:18, 1222:24, 1223:2, 1224:17, 1225:3, 1225:12, 1226:23, 1227:10, 1227:20, 1228:23, 1229:12, 1229:16, 1230:25, 1231:8, 1231:11, 1232:8, 1232:12, 1233:2, 1233:7, 1239:15, 1244:11, 1251:21, 1255:8, 1288:5, 1292:5, 1292:21, 1292:24, 1293:4, 1293:19, 1293:20, 1294:20, 1295:4, 1295:12, 1295:22, 1300:16

## N

**name** [1] - 1302:2
**names** [1] - 1207:7
**natural** [2] - 1227:10, 1227:17
**nearly** [3] - 1262:20, 1263:4, 1278:2
**necessarily** [3] - 1225:22, 1227:10, 1232:20
**necessary** [5] - 1224:7, 1247:22, 1252:24, 1292:23, 1306:24
**need** [17] - 1209:7, 1213:22, 1218:17, 1218:19, 1218:23, 1224:14, 1226:18, 1229:19, 1238:20, 1239:20, 1246:14, 1253:7, 1267:4, 1280:2, 1287:14, 1287:21, 1291:5
**needed** [4] - 1235:17, 1252:22, 1254:22, 1279:5
**needle** [1] - 1265:16
**needs** [4] - 1238:23, 1247:6, 1260:1, 1299:3
**negotiating** [1] - 1234:19
**negotiation** [13] - 1231:24, 1232:2, 1232:4, 1232:14, 1232:17, 1232:18, 1232:19, 1232:21, 1232:23, 1233:15, 1252:6, 1253:6, 1282:19
**negotiations** [1] - 1232:8
**network** [1] - 1295:9
**never** [15] - 1240:6, 1241:5, 1241:6, 1250:7, 1254:17, 1261:10, 1264:1, 1266:3, 1266:6, 1275:12, 1275:15, 1277:19, 1277:25, 1289:15, 1292:16
**new** [5] - 1237:24, 1242:24, 1244:4, 1276:12, 1300:13
**next** [14] - 1208:3, 1214:11, 1257:9, 1259:2, 1275:10, 1276:11, 1285:8, 1285:13, 1285:23, 1286:1, 1286:2, 1286:13, 1286:15, 1286:17
**nexus** [1] - 1230:5
**nice** [1] - 1308:5
**NICHOLS** [1] - 1199:16
**night** [1] - 1283:14
**NIRAV** [1] - 1200:8
**nobody** [2] - 1244:24, 1289:8

**noise** [1] - 1236:19
**nonanimal** [1] - 1213:1
**none** [5] - 1216:12, 1216:20, 1217:3, 1217:18, 1255:16
**noninfringing** [3] - 1233:1, 1233:16, 1233:20
**nonobviousness** [4] - 1229:16, 1229:17, 1229:18, 1298:11
**normal** [1] - 1209:10
**normally** [2] - 1234:19, 1292:12
**note** [5] - 1298:16, 1298:17, 1299:14, 1300:24, 1302:4
**notebook** [2] - 1258:23, 1260:4
**notebooks** [2] - 1224:17, 1259:21
**nothing** [19] - 1221:17, 1221:19, 1247:2, 1247:12, 1249:7, 1249:13, 1249:14, 1254:18, 1270:3, 1274:14, 1275:5, 1275:21, 1276:12, 1277:6, 1293:25, 1294:1, 1295:20, 1299:7, 1299:9
**notice** [1] - 1247:16
**noting** [1] - 1245:10
**novel** [4] - 1265:20, 1267:18, 1269:8, 1272:2
**nucleic** [2] - 1275:1, 1275:8
**Number** [8] - 1305:17, 1305:20, 1305:23, 1306:1, 1306:4, 1306:7, 1306:10, 1306:13
**number** [26] - 1203:10, 1203:18, 1210:1, 1213:24, 1217:14, 1226:19, 1236:22, 1238:1, 1238:11, 1239:2, 1242:6, 1254:8, 1259:10, 1260:5, 1260:6, 1265:5, 1282:7, 1282:8, 1282:9, 1283:13, 1284:8, 1284:12, 1284:17, 1301:6, 1301:15, 1302:2
**numbered** [1] - 1223:10
**numbers** [11] - 1228:12, 1256:2, 1258:1, 1282:14, 1283:8, 1283:11, 1283:21, 1284:6, 1284:9, 1290:7, 1290:8

## O

**oath** [3] - 1206:12, 1221:12, 1274:12
**object** [2] - 1215:14, 1299:22
**objection** [2] - 1218:10, 1218:12
**objections** [1] - 1235:1
**objective** [6] - 1225:16, 1229:13, 1229:15, 1229:18, 1261:24, 1298:11
**obtain** [1] - 1247:24
**obtained** [2] - 1230:17, 1274:5
**obtaining** [1] - 1218:15
**obvious** [38] - 1224:24, 1225:3, 1225:8, 1225:12, 1226:1, 1226:10, 1226:16, 1226:23, 1227:7, 1227:24, 1229:12, 1230:4, 1230:11, 1237:24, 1242:21, 1242:25, 1244:5, 1244:10, 1244:12, 1244:19, 1244:23, 1245:2, 1263:22, 1263:25, 1264:6, 1264:25, 1275:2, 1276:20, 1287:16, 1296:17, 1297:3, 1297:7, 1297:20, 1297:24, 1298:9, 1304:3, 1304:10, 1304:17
**obviousness** [24] - 1222:10, 1224:22, 1225:7, 1225:22, 1226:1, 1226:24, 1227:9, 1227:20, 1228:16, 1228:22, 1229:13, 1240:2, 1243:4, 1261:13, 1261:15, 1261:16, 1278:19, 1287:25, 1288:4, 1290:1, 1290:17, 1296:23, 1297:16, 1298:5
**occasions** [5] - 1236:24, 1237:2, 1242:19, 1243:23, 1288:7
**occur** [1] - 1252:6
**occurred** [2] - 1232:20, 1245:25
**October** [2] - 1228:20, 1232:3
**OF** [2] - 1199:2, 1199:9
**offer** [1] - 1270:14
**offered** [1] - 1212:18
**Office** [24] - 1236:8, 1236:23, 1237:1, 1237:4, 1237:11, 1237:16, 1237:19, 1237:20, 1237:23, 1240:7, 1242:13, 1242:19, 1242:22, 1243:6, 1243:13, 1243:17, 1243:21, 1243:22, 1243:24, 1288:6, 1288:15, 1289:2, 1289:5, 1289:6
**office** [2] - 1250:14, 1265:16
**Office's** [1] - 1290:3
**officer** [7] - 1250:11, 1292:2, 1292:3, 1292:7, 1295:24, 1296:1
**offices** [1] - 1285:16
**Official** [1] - 1308:16
**official** [1] - 1289:5
**often** [1] - 1223:19
**old** [5] - 1238:14, 1238:17, 1262:25, 1290:20, 1291:2
**older** [1] - 1276:8
**once** [2] - 1241:20, 1292:1
**one** [61] - 1213:10, 1214:16, 1217:11, 1222:7, 1222:20, 1226:6, 1229:19, 1234:6, 1234:13, 1236:22, 1237:5, 1239:6, 1239:24, 1240:10, 1241:1, 1241:6, 1241:7, 1241:21, 1242:6, 1243:1, 1245:1, 1245:3, 1247:4, 1249:1, 1249:15, 1251:11, 1254:16, 1254:21, 1258:22, 1260:11, 1264:16, 1264:17, 1266:10, 1268:12, 1269:22, 1271:15, 1273:24, 1274:1, 1274:8, 1274:24, 1275:1, 1275:17, 1276:21, 1277:4, 1277:5, 1277:8, 1277:11, 1280:18, 1287:25, 1291:11, 1291:12, 1292:16, 1292:25, 1294:24, 1299:3, 1300:17, 1300:19, 1307:5, 1307:13
**one's** [1] - 1230:12
**ones** [3] - 1262:18, 1267:14, 1270:6
**open** [1] - 1294:12
**opening** [6] - 1222:17, 1260:22, 1264:9, 1281:20, 1282:8, 1303:8
**opined** [1] - 1258:15
**opinion** [9] - 1204:20, 1205:1, 1205:22, 1206:4, 1206:21, 1207:1, 1218:11, 1258:13, 1301:17
**opinions** [5] - 1212:22, 1241:17, 1270:14, 1293:8, 1293:11
**opportunity** [5] - 1212:9, 1233:17, 1260:13, 1260:24, 1286:22
**opposed** [1] - 1265:4
**opposite** [3] - 1242:15, 1242:16, 1272:4
**opposites** [2] - 1240:21, 1240:22
**options** [1] - 1203:11
**order** [2] - 1225:2, 1292:22
**orders** [1] - 1300:18
**ordinary** [23] - 1203:8, 1211:15, 1212:15, 1216:2, 1216:24, 1217:15, 1224:20, 1224:21, 1225:4, 1225:9, 1225:12, 1226:3, 1228:23, 1228:25, 1229:7, 1229:9, 1241:14, 1273:15, 1273:18, 1276:18, 1277:18, 1279:3
**organized** [1] - 1260:17
**orient** [1] - 1204:15
**original** [1] - 1294:16
**otherwise** [9] - 1201:6, 1218:9, 1227:3, 1244:6, 1250:5, 1274:19, 1289:13, 1293:19, 1300:18
**outside** [1] - 1221:10
**overhead** [2] - 1285:9, 1285:12
**overlook** [1] - 1281:11
**overrule** [1] - 1218:12
**overturn** [1] - 1290:3
**overwhelming** [1] - 1275:2
**owed** [2] - 1256:3, 1287:17
**owes** [1] - 1258:18
**own** [19] - 1224:6, 1230:12, 1246:16, 1247:16, 1250:10, 1250:13, 1252:16, 1254:3, 1255:24, 1256:5, 1256:10, 1256:17, 1267:18, 1280:21, 1280:22, 1285:2, 1290:10, 1291:11, 1294:21
**owns** [1] - 1265:21

## P

**p.m** [2] - 1299:15, 1308:6
**page** [3] - 1301:5, 1301:15, 1302:2
**paid** [2] - 1239:6, 1257:20
**painstaking** [1] - 1237:7
**paper** [5] - 1267:10, 1268:7, 1274:1, 1276:17, 1292:6
**paragraph** [19] - 1213:7, 1213:10, 1213:11, 1213:21, 1214:3, 1214:4, 1214:6, 1215:7, 1215:10, 1215:13, 1215:20, 1216:15, 1217:5, 1219:5, 1219:7, 1219:9, 1301:5
**paragraphs** [3] - 1217:6, 1217:20, 1219:2
**part** [5] - 1213:8, 1253:4, 1264:19,

1269:14, 1275:1
**particular** [5] - 1215:12, 1220:23, 1242:14, 1299:24, 1300:9
**particularly** [1] - 1280:15
**parties** [17] - 1220:5, 1220:25, 1221:15, 1228:17, 1231:16, 1232:1, 1232:9, 1232:10, 1232:16, 1232:22, 1234:3, 1290:14, 1300:17, 1301:21, 1305:13, 1306:20, 1306:21
**parties'** [2] - 1233:15, 1293:18
**parts** [2] - 1242:6, 1269:16
**party** [6] - 1222:25, 1223:2, 1230:23, 1232:14, 1291:7, 1300:22
**pass** [1] - 1239:22
**past** [2] - 1236:18, 1239:18
**patent** [165] - 1202:12, 1205:24, 1211:23, 1212:2, 1212:5, 1212:6, 1212:11, 1212:17, 1213:16, 1213:19, 1216:25, 1218:22, 1219:10, 1221:21, 1221:22, 1221:23, 1222:1, 1222:4, 1222:9, 1222:11, 1222:20, 1223:5, 1223:10, 1223:11, 1223:12, 1223:13, 1223:14, 1223:15, 1223:20, 1223:22, 1224:10, 1224:23, 1224:24, 1225:5, 1225:6, 1225:10, 1226:4, 1227:2, 1227:21, 1227:22, 1227:23, 1228:3, 1228:7, 1228:10, 1228:11, 1228:18, 1228:20, 1228:21, 1229:14, 1230:6, 1230:12, 1230:14, 1231:1, 1232:2, 1232:3, 1232:9, 1233:22, 1233:23, 1236:3, 1237:14, 1237:25, 1238:4, 1239:10, 1240:12, 1241:2, 1241:4, 1242:7, 1242:25, 1243:7, 1243:10, 1243:15, 1244:2, 1244:3, 1246:8, 1247:14, 1247:22, 1248:2, 1248:5, 1249:6, 1253:15, 1253:19, 1254:6, 1255:8, 1255:9, 1255:10, 1255:23, 1258:14, 1258:19, 1259:1, 1259:11, 1259:14, 1259:18, 1259:21, 1261:23, 1262:7, 1262:24, 1263:11, 1265:3, 1268:14, 1268:18, 1268:20, 1268:21, 1268:22, 1269:10, 1270:18, 1270:20, 1272:8, 1272:9, 1273:23, 1273:24, 1274:8, 1274:9, 1274:10, 1274:11, 1274:12, 1275:21, 1275:22, 1275:24, 1275:25, 1276:8, 1276:20, 1276:22, 1277:9, 1281:10, 1284:11, 1285:1, 1286:11, 1286:14, 1286:16, 1287:24, 1288:17, 1289:6, 1289:23, 1296:15, 1296:24, 1297:5, 1297:16, 1297:22, 1298:6, 1304:4, 1304:7, 1304:11, 1304:14, 1304:18, 1304:25, 1305:2, 1305:3, 1305:5, 1305:6, 1307:2
**Patent** [25] - 1236:8, 1236:23, 1237:1, 1237:4, 1237:11, 1237:16, 1237:19, 1237:20, 1237:23, 1240:6, 1242:13, 1242:18, 1242:22, 1243:6, 1243:13, 1243:17, 1243:21, 1243:22, 1243:24, 1288:6, 1288:15, 1289:2, 1289:5, 1289:6, 1290:3
**patentable** [1] - 1225:3
**patented** [9] - 1227:24, 1231:13, 1233:3, 1233:4, 1233:6, 1233:10, 1238:23, 1239:11, 1252:22
**patentee** [1] - 1233:11
**patentholder** [3] - 1231:21, 1231:23, 1232:5
**patents** [86] - 1207:8, 1224:14, 1230:17, 1230:18, 1236:23, 1236:25, 1237:3, 1237:5, 1237:9, 1237:11, 1237:22, 1238:2, 1238:6, 1238:12, 1238:13, 1239:16, 1240:2, 1240:4, 1241:20, 1242:20, 1243:24, 1244:9, 1244:14, 1245:11, 1246:3, 1246:16, 1246:18, 1247:16, 1247:18, 1250:22, 1252:1, 1253:1, 1253:22, 1253:24, 1254:4, 1254:5, 1254:8, 1254:10, 1254:21, 1256:4, 1257:7, 1257:17, 1258:6, 1259:1, 1259:3, 1261:8, 1262:13, 1262:14, 1262:15, 1263:9, 1263:13, 1263:21, 1263:25, 1264:5, 1264:10, 1264:25, 1266:3, 1266:13, 1266:16, 1266:17, 1267:1, 1268:13, 1270:11, 1271:18, 1272:1, 1272:7, 1272:8, 1272:10, 1272:14, 1274:8, 1275:21, 1275:22, 1276:5, 1281:19, 1281:21, 1282:2, 1283:23, 1284:10, 1287:16, 1287:19, 1288:12, 1290:6, 1290:12
**patents-at-issue** [2] - 1236:25, 1242:20
**PAUL** [1] - 1199:18
**pause** [1] - 1282:21
**pay** [20] - 1233:24, 1234:17, 1239:9, 1239:15, 1251:12, 1251:21, 1251:25, 1252:19, 1253:7, 1255:8, 1255:20, 1257:15, 1258:5, 1260:1, 1260:8, 1264:12, 1283:25, 1284:1, 1291:16, 1306:25
**paying** [3] - 1236:2, 1238:10, 1251:9
**payment** [3] - 1231:20, 1231:23, 1235:24
**PDX** [2] - 1210:5, 1214:24
**penny** [1] - 1239:6
**pens** [1] - 1257:24
**people** [16] - 1208:25, 1216:5, 1217:2, 1255:25, 1265:5, 1266:14, 1266:15, 1266:22, 1273:8, 1273:10, 1275:10, 1281:17, 1285:17, 1288:21, 1299:5, 1306:25
**peptide** [34] - 1246:10, 1246:14, 1246:21, 1246:24, 1247:1, 1247:4, 1247:6, 1247:8, 1247:11, 1247:12, 1247:17, 1247:25, 1248:16, 1248:20, 1248:21, 1249:1, 1249:5, 1249:7, 1249:13, 1250:13, 1265:21, 1267:19, 1268:3, 1268:17, 1269:3, 1269:4, 1269:8, 1269:11, 1269:20, 1270:2, 1271:1, 1271:9
**peptides** [1] - 1279:1
**per** [2] - 1242:6, 1275:1
**percent** [38] - 1250:25, 1253:19, 1253:22, 1254:4, 1254:6, 1254:7, 1254:9, 1255:8, 1255:11, 1255:21, 1255:22, 1255:25, 1256:9, 1256:11, 1256:17, 1257:3, 1257:5, 1257:6, 1258:14, 1259:5, 1259:9, 1259:17, 1279:6, 1283:16, 1284:10, 1285:2, 1285:8, 1285:14, 1285:24, 1285:25, 1286:1, 1290:5, 1290:6, 1290:12, 1304:25, 1305:3, 1305:6
**percentage** [2] - 1248:6, 1258:17
**percentages** [2] - 1258:12, 1290:7
**perhaps** [4] - 1201:24, 1236:14, 1251:5, 1298:20
**period** [4] - 1254:5, 1255:13, 1259:7, 1259:17
**permission** [4] - 1235:24, 1251:9, 1251:17, 1252:8
**permitted** [1] - 1251:14
**person** [25] - 1224:21, 1224:23, 1225:4, 1225:9, 1226:3, 1227:22, 1229:7, 1229:9, 1241:14, 1273:5, 1273:14, 1273:18, 1273:20, 1273:21, 1276:18, 1277:3, 1277:18, 1278:5, 1278:15, 1278:16, 1278:17, 1278:19, 1279:3, 1280:15
**personally** [1] - 1307:7
**persons** [1] - 1229:3
**perspective** [2] - 1255:19, 1282:25
**persuaded** [1] - 1223:2
**pertinent** [1] - 1276:9
**PETER** [1] - 1200:11
**pH** [1] - 1271:10
**Ph.D** [1] - 1278:8
**pharmaceutical** [5] - 1214:12, 1267:10, 1273:15, 1278:3, 1278:5
**pharmaceuticals** [1] - 1278:21
**pharmaceutics** [2] - 1278:7, 1278:8
**phone** [2] - 1295:7, 1295:15
**phrase** [1] - 1214:18
**PICKARD** [14] - 1200:7, 1201:16, 1210:4, 1210:6, 1210:9, 1210:11, 1214:6, 1214:9, 1214:23, 1215:1, 1215:19, 1215:21, 1218:10, 1219:22
**Pickard** [1] - 1280:21

**pickard** [1] - 1201:14
**piece** [3] - 1260:25, 1262:19, 1292:6
**pieces** [4] - 1244:17, 1244:25, 1248:13, 1269:17
**pink** [1] - 1272:24
**place** [5] - 1231:25, 1247:7, 1251:23, 1291:1, 1307:22
**places** [1] - 1285:16
**plagiarize** [1] - 1274:4
**plainly** [1] - 1245:24
**Plaintiff** [2] - 1199:4, 1199:23
**plaintiff** [10] - 1219:19, 1299:20, 1300:18, 1302:11, 1304:5, 1304:12, 1304:19, 1304:22, 1305:8, 1307:18
**plaintiffs** [1] - 1299:7
**plan** [1] - 1201:2
**platform** [3] - 1246:7, 1247:22, 1249:9
**platforms** [1] - 1295:9
**play** [1] - 1283:4
**playbooks** [1] - 1273:17
**played** [1] - 1221:13
**plenty** [1] - 1274:21
**PLLC** [1] - 1200:6
**point** [9] - 1244:16, 1246:23, 1265:25, 1273:13, 1275:23, 1276:21, 1277:7, 1277:16, 1279:22
**pointed** [3] - 1205:3, 1206:2, 1207:19
**points** [1] - 1243:3
**poll** [1] - 1305:16
**polled** [1] - 1305:15
**polling** [1] - 1306:16
**polysaccharide** [4] - 1214:12, 1280:25, 1281:1, 1281:3
**polysaccharide-containing** [1] - 1214:12
**polysaccharides** [2] - 1240:23
**polysorbate** [2] - 1271:8, 1271:9
**portion** [1] - 1288:22
**POSA** [2] - 1275:18, 1276:13
**posed** [1] - 1293:20
**position** [9] - 1205:21, 1207:4, 1220:25, 1242:12, 1242:16, 1248:18, 1252:11, 1294:16, 1299:20
**positions** [1] - 1275:21
**possibilities** [2] - 1227:14, 1245:4
**possible** [5] - 1221:3, 1231:10, 1236:15, 1254:16, 1291:25
**possibly** [1] - 1245:22
**potency** [5] - 1245:7, 1248:3, 1270:15, 1270:17, 1289:20
**potential** [1] - 1233:17
**practice** [1] - 1255:7
**precautions** [1] - 1277:23
**precision** [1] - 1231:8
**preclude** [1] - 1230:17
**predictable** [2] - 1226:7, 1226:19
**preeminent** [2] - 1261:25, 1272:12
**preferred** [1] - 1232:15
**prejudice** [1] - 1301:22
**preliminary** [3] - 1301:1, 1301:15, 1302:1
**premium** [3] - 1256:18, 1257:4, 1290:13
**prepare** [1] - 1307:18
**prepared** [1] - 1293:15
**preponderance** [8] - 1222:13, 1222:22, 1222:25, 1223:1, 1223:9, 1231:6, 1304:23, 1305:9
**prerogative** [1] - 1284:13
**presence** [2] - 1227:5, 1247:11
**present** [8] - 1205:16, 1206:3, 1216:23, 1225:16, 1227:10, 1246:10, 1280:18, 1308:12
**presentation** [1] - 1235:17
**presented** [9] - 1210:18, 1234:14, 1243:5, 1264:9, 1268:13, 1270:25, 1280:21, 1284:19, 1295:23
**presents** [1] - 1203:10
**pressure** [1] - 1226:18
**presumed** [3] - 1229:7, 1273:21, 1278:19
**presumes** [1] - 1273:22
**presumption** [1] - 1302:3
**pretty** [2] - 1220:24, 1276:6
**previewed** [1] - 1278:16
**previously** [1] - 1300:5
**price** [7] - 1233:13, 1256:18, 1256:19, 1256:24, 1256:25, 1257:3, 1290:13
**primary** [1] - 1280:17
**principles** [1] - 1277:21
**probabilities** [1] - 1227:14
**probability** [1] - 1244:9
**probable** [1] - 1223:7
**problem** [8] - 1219:11, 1226:10, 1226:18, 1229:10, 1229:20, 1242:4, 1271:21, 1307:25
**problems** [4] - 1229:4, 1229:5, 1235:17, 1275:16
**proceed** [1] - 1290:4
**proceedings** [5] - 1235:10, 1299:13, 1302:18, 1308:6, 1308:13
**process** [12] - 1237:7, 1241:22, 1253:23, 1272:15, 1274:5, 1274:6, 1274:24, 1274:25, 1275:6, 1276:7, 1276:15, 1278:25
**produce** [1] - 1233:20
**product** [55] - 1218:22, 1221:25, 1224:11, 1230:16, 1233:9, 1233:21, 1233:22, 1238:3, 1239:3, 1240:11, 1240:15, 1240:21, 1240:24, 1241:4, 1246:8, 1249:5, 1250:23, 1253:1, 1253:3, 1253:9, 1253:10, 1253:11, 1254:1, 1255:15, 1255:17, 1255:23, 1256:10, 1256:13, 1256:21, 1256:23, 1257:1, 1257:6, 1257:18, 1266:20, 1267:2, 1267:5, 1267:11, 1267:15, 1271:17, 1272:21, 1273:2, 1273:5, 1273:9, 1273:12, 1273:19, 1276:8, 1276:16, 1276:17, 1280:5, 1280:9, 1280:11, 1280:12, 1289:24, 1290:22
**product's** [1] - 1253:9
**products** [12] - 1233:4, 1234:7, 1234:9, 1237:6, 1239:13, 1241:7, 1241:11, 1251:2, 1252:16, 1252:23, 1254:18, 1267:18
**Professional** [2] - 1308:10, 1308:12
**professor** [1] - 1278:7
**profile** [1] - 1249:8
**profit** [1] - 1283:17
**profits** [1] - 1232:25
**progress** [1] - 1263:1
**projection** [1] - 1254:3
**projects** [1] - 1245:17
**prompted** [1] - 1226:3
**proof** [7] - 1222:19, 1222:21, 1223:1, 1223:7, 1223:8, 1223:9, 1288:9
**proper** [3] - 1283:5, 1284:6, 1293:25
**property** [4] - 1239:11, 1251:20, 1251:22, 1264:4
**proportion** [1] - 1249:20
**propose** [1] - 1301:12
**protect** [1] - 1262:25
**protection** [2] - 1237:25, 1241:2
**protein** [31] - 1203:15, 1203:19, 1205:6, 1209:22, 1210:16, 1212:2, 1212:12, 1213:1, 1237:6, 1237:10, 1239:13, 1240:11, 1245:8, 1246:9, 1251:2, 1252:13, 1254:20, 1255:21, 1256:8, 1256:13, 1266:23, 1277:13, 1277:15, 1277:21, 1278:1, 1278:2, 1278:25, 1279:9, 1289:19
**proteins** [11] - 1203:24, 1210:19, 1211:12, 1212:16, 1218:5, 1218:9, 1218:16, 1218:20, 1265:12, 1273:11, 1278:11
**prototype** [1] - 1271:12
**proud** [1] - 1266:8
**prove** [11] - 1222:24, 1223:2, 1225:22, 1231:7, 1231:8, 1243:4, 1244:6, 1244:8, 1244:11, 1281:25, 1288:5
**proved** [1] - 1287:15
**proven** [10] - 1222:8, 1222:12, 1222:18, 1230:10, 1232:25, 1304:1, 1304:8, 1304:15, 1304:22, 1305:9
**proves** [1] - 1250:2
**provide** [4] - 1254:15, 1261:4, 1291:17, 1295:5
**provided** [11] - 1203:18, 1211:10, 1211:11, 1224:16, 1224:19, 1226:23, 1245:6, 1275:3, 1279:4, 1291:7, 1300:16
**provides** [5] - 1226:9, 1247:22, 1248:3, 1255:24
**proving** [2] - 1223:4, 1288:4
**provisional** [1] - 1212:6
**prudent** [1] - 1234:19
**public** [5] - 1210:13, 1248:16, 1262:6, 1263:22, 1280:13
**publication** [1] - 1228:11
**publicly** [1] - 1270:25
**publish** [1] - 1303:20
**published** [5] - 1211:20, 1212:6, 1267:10, 1268:7, 1278:9
**publishing** [1] - 1303:13
**pull** [1] - 1210:4
**punish** [1] - 1231:2
**pure** [1] - 1245:9
**purely** [1] - 1267:17

**purification** [3] - 1272:10, 1272:12, 1276:4
**purify** [1] - 1272:15
**purple** [5] - 1204:11, 1204:18, 1272:20, 1272:24, 1273:1
**purpose** [1] - 1293:12
**pursuing** [1] - 1251:7
**put** [16] - 1204:5, 1207:11, 1210:13, 1213:3, 1213:7, 1238:7, 1244:25, 1245:4, 1266:25, 1274:7, 1276:14, 1277:24, 1282:7, 1284:8, 1287:2, 1307:14

## Q

**qualified** [1] - 1278:24
**questioning** [1] - 1273:25
**questions** [18] - 1201:21, 1212:10, 1217:1, 1219:14, 1220:19, 1230:2, 1257:10, 1257:12, 1259:2, 1264:8, 1266:25, 1286:10, 1292:5, 1292:12, 1293:17, 1293:20, 1299:5, 1303:23
**quite** [2] - 1204:14, 1283:18

## R

**rapidity** [1] - 1229:5
**rate** [10] - 1233:7, 1253:8, 1258:4, 1259:3, 1259:6, 1259:13, 1259:15, 1259:16, 1290:5, 1304:22
**rates** [1] - 1290:15
**rather** [3] - 1244:13, 1287:10, 1302:4
**ratio** [1] - 1271:9
**raw** [1] - 1285:9
**re** [1] - 1293:8
**re-examine** [1] - 1293:8
**reach** [4] - 1281:22, 1294:10, 1294:21, 1298:16
**reached** [2] - 1293:22, 1302:25
**reaching** [2] - 1248:23, 1293:1
**reaction** [1] - 1275:4
**read** [18] - 1219:25, 1221:14, 1235:2, 1244:22, 1273:17, 1274:12, 1280:10, 1298:19, 1303:16, 1303:19, 1305:18, 1305:21, 1305:24, 1306:2, 1306:5, 1306:8, 1306:11, 1306:14
**reading** [2] - 1220:3, 1274:13
**ready** [1] - 1287:11
**real** [6] - 1238:22, 1239:1, 1261:17, 1263:17, 1272:5, 1276:25
**reality** [2] - 1283:10, 1289:8
**really** [12] - 1205:20, 1238:16, 1238:17, 1244:4, 1251:18, 1261:19, 1273:6, 1287:3, 1290:18, 1300:19, 1300:23, 1303:15
**reason** [13] - 1226:3, 1235:18, 1241:17, 1253:4, 1254:14, 1255:25, 1261:7, 1265:17, 1265:25, 1271:21, 1273:19, 1274:18, 1277:2
**reasonable** [40] - 1222:3, 1226:24, 1231:9, 1231:14, 1231:19, 1231:22, 1232:12, 1233:2, 1233:21, 1234:1, 1239:9, 1251:25, 1252:4, 1253:14, 1253:18, 1253:21, 1254:3, 1254:8, 1257:14, 1258:4, 1259:25, 1260:7, 1273:8, 1282:16, 1282:18, 1283:8, 1284:4, 1285:19, 1286:6, 1286:8, 1294:9, 1296:21, 1297:1, 1297:13, 1297:18, 1298:3, 1298:7, 1304:21, 1305:7
**reasonableness** [1] - 1283:2
**reasonably** [2] - 1229:8, 1232:7
**reasons** [4] - 1273:6, 1274:22, 1276:13, 1283:19
**rebuttal** [1] - 1274:17
**receive** [1] - 1222:13
**recess** [6] - 1235:9, 1299:12, 1302:15, 1302:17, 1308:5, 1308:6
**recipe** [15] - 1218:22, 1237:6, 1240:11, 1240:21, 1240:24, 1241:4, 1246:8, 1247:22, 1249:6, 1255:23, 1257:6, 1263:11, 1274:15, 1277:8
**recipes** [1] - 1263:12
**recite** [1] - 1223:25
**recites** [1] - 1276:22
**recognition** [1] - 1266:9
**recognize** [2] - 1213:8, 1303:11
**recognized** [2] - 1241:1, 1248:5
**recombinant** [9] - 1212:21, 1213:1, 1213:9, 1213:20, 1216:12, 1216:21, 1217:4, 1219:1, 1281:5
**reconsideration** [1] - 1262:23
**record** [1] - 1294:25
**recycled** [1] - 1262:25
**red** [1] - 1214:25
**redesign** [1] - 1253:25
**redirect** [1] - 1217:23
**REDIRECT** [1] - 1217:25
**reduced** [2] - 1212:19, 1267:18
**refer** [2] - 1229:15, 1258:1
**reference** [25] - 1203:23, 1205:3, 1207:17, 1208:6, 1210:1, 1210:13, 1211:10, 1212:5, 1213:4, 1227:2, 1227:4, 1228:3, 1228:4, 1228:7, 1228:8, 1240:16, 1242:14, 1242:16, 1243:18, 1275:23, 1277:11, 1277:12, 1280:11, 1280:22, 1297:12
**references** [18] - 1206:6, 1207:1, 1237:13, 1237:19, 1242:23, 1243:3, 1243:4, 1243:5, 1243:11, 1243:16, 1244:18, 1272:25, 1276:9, 1277:13, 1288:16, 1289:3, 1296:19, 1297:9
**referred** [2] - 1223:19, 1227:25
**referring** [2] - 1206:11, 1256:19
**refers** [4] - 1224:1, 1224:5, 1224:9, 1256:18
**reflect** [1] - 1233:7
**reflecting** [1] - 1307:19
**refrigerated** [1] - 1209:14
**refused** [1] - 1301:21
**regarding** [1] - 1218:5
**regardless** [1] - 1254:24
**Registered** [2] - 1308:10, 1308:11
**regularity** [2] - 1303:8, 1303:12
**regulations** [1] - 1266:22
**regulatory** [2] - 1273:11, 1303:10
**rehash** [1] - 1283:20
**reiterate** [1] - 1273:13
**related** [2] - 1240:12, 1298:11
**relates** [1] - 1257:12
**relating** [1] - 1235:17
**relatively** [1] - 1257:4
**relevance** [1] - 1276:3
**relevant** [13] - 1226:10, 1229:8, 1230:4, 1232:19, 1233:21, 1237:21, 1246:17, 1247:13, 1250:2, 1250:4, 1273:22, 1278:20, 1289:4
**relied** [5] - 1212:22, 1214:16, 1216:22, 1217:13, 1217:19
**relies** [2] - 1214:10, 1281:18
**reluctant** [2] - 1282:23, 1283:4
**rely** [2] - 1225:23, 1227:8
**relying** [5] - 1214:3, 1216:13, 1281:1, 1299:24, 1300:9
**remade** [1] - 1283:13
**remained** [1] - 1212:15
**remember** [13] - 1203:25, 1204:8, 1207:14, 1210:22, 1216:9, 1238:25, 1241:25, 1242:3, 1253:10, 1268:2, 1273:16, 1274:13, 1284:10
**remind** [1] - 1299:2
**reminded** [1] - 1299:2
**remove** [2] - 1218:5, 1218:9
**removes** [1] - 1275:8
**removing** [1] - 1218:20
**rendered** [1] - 1226:22
**renews** [1] - 1298:10
**renowned** [1] - 1278:24
**rent** [5] - 1239:15, 1251:20, 1256:3, 1283:25, 1284:1
**rent's** [2] - 1283:24, 1283:25
**reorienting** [1] - 1201:24
**repeat** [1] - 1222:18
**repeating** [1] - 1295:19
**replace** [1] - 1211:9
**replacement** [1] - 1210:25
**reply** [1] - 1286:23
**reported** [2] - 1207:20, 1308:12
**Reporter** [3] - 1308:11, 1308:12, 1308:16
**reports** [2] - 1208:11, 1208:13
**represent** [1] - 1292:21
**represented** [1] - 1307:15
**reps** [1] - 1285:15
**reputation** [1] - 1263:3
**request** [2] - 1253:5, 1264:13
**requesting** [1] - 1290:5
**requests** [1] - 1305:12
**require** [2] - 1230:3, 1239:9
**required** [3] - 1222:19,

1226:1, 1231:7
**requirement** [1] - 1233:10
**requirements** [3] - 1223:17, 1223:18
**requires** [2] - 1233:5, 1244:8
**requiring** [1] - 1241:15
**research** [9] - 1244:17, 1267:3, 1267:4, 1267:5, 1267:6, 1274:1, 1278:9, 1295:12, 1295:16
**resolve** [2] - 1239:21, 1307:2
**respect** [9] - 1237:3, 1237:14, 1242:19, 1246:18, 1250:11, 1253:19, 1258:8, 1258:14, 1288:15
**respectfully** [1] - 1294:11
**respectively** [1] - 1271:19
**respond** [2] - 1292:8, 1292:10
**response** [3] - 1202:4, 1215:17, 1298:23
**responsibility** [1] - 1294:5
**responsible** [6] - 1265:3, 1268:3, 1269:5, 1269:11, 1271:1, 1272:2
**rest** [2] - 1219:18, 1234:21
**rests** [1] - 1219:19
**result** [5] - 1226:7, 1227:10, 1227:15, 1227:17, 1227:18
**resulted** [2] - 1226:20, 1232:13
**results** [1] - 1229:23
**retain** [1] - 1265:19
**return** [4] - 1221:3, 1292:22, 1293:23, 1303:23
**returning** [1] - 1293:12
**REVANCE** [1] - 1199:6
**Revance** [162] - 1221:23, 1221:24, 1222:4, 1222:8, 1222:14, 1223:4, 1223:13, 1225:6, 1230:9, 1230:16, 1230:17, 1231:3, 1231:17, 1234:17, 1235:23, 1235:25, 1236:2, 1236:3, 1236:4, 1236:10, 1236:25, 1237:14, 1237:15, 1237:17, 1238:1, 1238:3, 1238:4, 1238:6, 1238:11, 1238:14, 1238:16, 1238:19, 1238:21, 1238:22, 1239:2, 1239:6, 1239:9, 1239:10, 1239:15, 1239:17, 1239:18, 1240:1, 1240:9, 1240:10, 1240:13, 1241:12, 1241:18, 1242:11, 1242:12, 1242:18, 1243:3, 1243:20, 1244:8, 1244:11, 1244:16, 1245:17, 1245:19, 1245:23, 1245:25, 1246:6, 1246:12, 1246:16, 1246:17, 1246:20, 1246:25, 1247:3, 1247:7, 1247:9, 1247:10, 1247:15, 1247:17, 1249:11, 1249:14, 1249:15, 1249:18, 1249:21, 1250:6, 1250:14, 1250:17, 1250:20, 1250:25, 1251:8, 1251:15, 1251:21, 1251:25, 1252:3, 1252:6, 1252:7, 1252:17, 1252:19, 1252:22, 1252:25, 1253:6, 1253:11, 1253:16, 1253:23, 1254:15, 1254:16, 1255:3, 1255:8, 1255:14, 1256:12, 1256:14, 1256:20, 1256:22, 1257:1, 1257:14, 1257:16, 1258:4, 1258:18, 1259:8, 1259:25, 1260:7, 1260:9, 1260:20, 1262:5, 1263:4, 1263:16, 1264:3, 1264:4, 1264:12, 1264:19, 1265:13, 1265:21, 1266:12, 1267:13, 1267:25, 1269:19, 1274:13, 1275:20, 1278:23, 1283:7, 1284:25, 1285:1, 1285:2, 1285:9, 1285:11, 1285:14, 1285:20, 1285:22, 1286:12, 1286:15, 1286:17, 1286:20, 1287:15, 1287:18, 1287:24, 1288:12, 1289:9, 1290:3, 1290:21, 1291:12, 1291:15, 1296:14, 1297:4, 1297:21, 1298:10, 1302:12, 1304:1, 1304:8, 1304:15, 1305:14
**Revance's** [32] - 1222:14, 1236:12, 1236:15, 1241:12, 1244:6, 1246:3, 1247:4, 1248:15, 1248:18, 1249:1, 1249:5, 1249:12, 1250:10, 1250:12, 1250:13, 1251:17, 1253:10, 1254:2, 1255:20, 1255:24, 1256:5, 1258:5, 1263:3, 1269:7, 1272:2, 1274:16, 1275:24, 1287:21, 1288:13, 1290:10, 1290:19, 1291:11
**reveal** [1] - 1268:19
**revenue** [1] - 1255:16
**revenues** [1] - 1255:15
**review** [1] - 1262:19
**revoke** [2] - 1264:2, 1281:19
**Richard** [1] - 1199:11
**rid** [8] - 1203:19, 1203:24, 1210:19, 1211:11, 1212:1, 1212:12, 1212:16, 1291:1
**rights** [3] - 1236:3, 1251:20, 1257:15
**risk** [1] - 1273:10
**ROBERT** [1] - 1199:21
**role** [1] - 1262:11
**rollouts** [1] - 1254:1
**room** [13] - 1209:11, 1220:18, 1221:3, 1251:13, 1279:25, 1284:1, 1287:12, 1291:24, 1294:8, 1294:25, 1295:18, 1296:3
**rooms** [1] - 1284:2
**rooted** [1] - 1282:18
**roughly** [3] - 1258:22, 1259:8, 1300:25
**row** [1] - 1292:14
**royalties** [2] - 1255:14, 1283:15
**royalty** [45] - 1222:3, 1231:14, 1231:20, 1231:22, 1231:23, 1232:12, 1232:13, 1232:14, 1233:2, 1233:7, 1233:21, 1234:1, 1234:17, 1239:10, 1248:5, 1251:25, 1252:4, 1252:20, 1253:5, 1253:8, 1253:14, 1253:18, 1253:21, 1254:3, 1254:7, 1255:1, 1256:24, 1258:4, 1258:12, 1259:3, 1259:6, 1259:13, 1259:25, 1282:16, 1282:17, 1282:18, 1284:4, 1284:16, 1286:6, 1290:5, 1290:15, 1304:21, 1305:8
**RPR** [1] - 1308:15
**RTT150** [1] - 1269:1
**Ruegg** [11] - 1246:2, 1246:6, 1263:16, 1265:20, 1265:22, 1266:8, 1268:7, 1269:21, 1270:16, 1274:9, 1274:10
**Ruegg's** [2] - 1268:4, 1274:8
**rug** [1] - 1249:24
**rule** [3] - 1299:25, 1300:10, 1300:13
**Rule** [2] - 1300:14, 1307:18
**rules** [5] - 1220:22, 1220:23, 1221:2, 1221:4, 1299:22
**rumor** [1] - 1221:9
**run** [5] - 1274:25, 1275:3, 1275:5, 1275:6, 1308:1
**running** [1] - 1284:15
**RUPERT** [1] - 1199:20


## S


**sacrifice** [1] - 1236:13
**safe** [1] - 1201:19
**safest** [1] - 1277:5
**sale** [2] - 1231:18, 1255:15
**sales** [11] - 1239:3, 1254:3, 1256:24, 1257:18, 1258:20, 1259:9, 1259:17, 1259:19, 1283:16, 1285:14
**SAMANTHA** [1] - 1200:4
**sample** [1] - 1216:21
**satisfied** [1] - 1229:20
**satisfies** [1] - 1221:25
**satisfying** [1] - 1288:10
**sauce** [3] - 1248:10, 1261:11, 1268:17
**savings** [1] - 1233:17
**saw** [20] - 1202:10, 1202:14, 1221:8, 1237:21, 1241:9, 1241:24, 1243:8, 1243:13, 1248:19, 1251:1, 1252:14, 1259:15, 1265:9, 1265:17, 1266:14, 1272:7, 1275:16, 1284:18, 1286:9, 1293:16
**schedule** [1] - 1212:8
**school** [1] - 1274:1
**Schöneich** [9] - 1201:8, 1213:4, 1214:24, 1215:22, 1218:2, 1219:15, 1279:10, 1279:12, 1279:22
**Schöneich's** [2] - 1279:14, 1280:16
**science** [8] - 1249:3, 1263:6, 1268:9, 1277:23, 1278:13, 1278:20
**scientific** [5] - 1250:10, 1250:14, 1278:9, 1278:10, 1289:4
**scientist** [6] - 1203:9, 1216:2, 1216:24, 1217:15, 1243:6, 1273:16
**scientists** [9] - 1203:22, 1211:8, 1211:16, 1211:25, 1212:15, 1236:14, 1245:5, 1263:4, 1265:13
**scope** [5] - 1218:10, 1223:20, 1225:14, 1227:1, 1280:19
**scratch** [1] - 1267:22
**scratching** [1] - 1244:22
**screen** [1] - 1241:20

**seat** [1] - 1292:15
**seated** [6] - 1201:13, 1235:15, 1292:14, 1296:5, 1302:23, 1307:12
**second** [9] - 1222:22, 1237:16, 1248:23, 1259:14, 1262:10, 1264:11, 1276:4, 1287:17, 1307:17
**second-guess** [2] - 1237:16, 1262:10
**secondary** [1] - 1225:17
**secret** [3] - 1248:10, 1268:17, 1292:20
**secrets** [1] - 1268:19
**section** [4] - 1219:9, 1280:24, 1281:3, 1281:6
**security** [3] - 1292:2, 1295:24, 1296:1
**see** [39] - 1203:6, 1204:10, 1205:10, 1206:16, 1207:16, 1207:23, 1208:5, 1209:18, 1210:12, 1211:8, 1213:14, 1214:7, 1214:13, 1215:10, 1215:17, 1217:5, 1217:6, 1217:20, 1241:20, 1243:5, 1244:7, 1249:2, 1249:10, 1251:4, 1255:13, 1257:9, 1264:7, 1273:23, 1273:25, 1281:17, 1287:13, 1292:15, 1294:18, 1299:1, 1299:11, 1299:16, 1301:3, 1301:15, 1302:1
**seek** [1] - 1293:14
**seeks** [2] - 1223:2, 1231:13
**seem** [2] - 1257:24, 1301:16
**self** [1] - 1236:16
**self-interest** [1] - 1236:16
**sell** [8] - 1230:16, 1231:21, 1233:22, 1250:14, 1255:17, 1256:21, 1285:15
**sells** [1] - 1257:1
**send** [4] - 1286:19, 1300:25, 1302:4, 1302:14
**sense** [10] - 1229:10, 1238:16, 1240:18, 1251:6, 1251:14, 1252:5, 1256:20, 1256:25, 1286:7, 1303:15
**sent** [1] - 1292:13
**sentence** [4] - 1223:18, 1280:18, 1280:24, 1281:2
**sentences** [1] - 1223:10
**separate** [9] - 1236:24, 1240:14, 1242:19, 1243:23, 1259:24, 1268:22, 1288:7
**separately** [2] - 1227:21, 1244:21
**September** [7] - 1228:19, 1259:2, 1259:4, 1259:8, 1259:18, 1305:2, 1305:5
**sequence** [1] - 1268:17
**series** [1] - 1293:17
**seriously** [1] - 1261:2
**serum** [7] - 1203:12, 1203:14, 1203:19, 1211:1, 1211:9, 1280:7, 1280:10
**serve** [1] - 1306:25
**service** [4] - 1287:4, 1292:15, 1295:8, 1306:21
**set** [5] - 1201:3, 1206:16, 1220:5, 1223:17, 1231:3
**sets** [2] - 1223:16, 1223:17
**setting** [2] - 1211:19, 1275:24
**seven** [1] - 1243:3
**several** [1] - 1278:23
**shall** [1] - 1294:4
**share** [1] - 1282:8
**sharing** [1] - 1299:22
**shed** [1] - 1229:13
**shift** [1] - 1207:9
**short** [5] - 1220:4, 1234:23, 1259:4, 1283:20, 1291:6
**shorter** [1] - 1265:11
**shorthand** [1] - 1308:13
**shortly** [1] - 1225:18
**show** [13] - 1207:7, 1214:24, 1217:2, 1217:11, 1227:17, 1264:17, 1264:19, 1264:20, 1268:3, 1269:14, 1270:10, 1283:9, 1285:20
**showed** [43] - 1202:12, 1202:20, 1204:17, 1205:9, 1206:2, 1207:13, 1208:8, 1209:19, 1210:7, 1212:16, 1215:2, 1215:13, 1215:22, 1216:10, 1216:11, 1216:16, 1216:20, 1237:18, 1242:4, 1248:9, 1250:8, 1252:10, 1252:21, 1254:2, 1256:6, 1264:19, 1268:7, 1269:4, 1271:3, 1272:14, 1272:16, 1272:23, 1276:10, 1276:11, 1276:12, 1277:9, 1279:6, 1279:10, 1279:17, 1279:19, 1282:13
**showing** [4] - 1225:7, 1266:1, 1268:2, 1271:25
**shown** [9] - 1202:13, 1205:10, 1250:25, 1288:12, 1290:3, 1296:18, 1297:9, 1298:1, 1301:7
**shows** [8] - 1206:4, 1209:4, 1233:11, 1251:16, 1263:25, 1266:4, 1269:10, 1275:3
**shred** [2] - 1265:4, 1270:9
**side** [4] - 1245:18, 1264:18, 1299:3, 1301:22
**sides** [1] - 1257:17
**sideshow** [1] - 1247:1
**Siegwarth** [25] - 1252:3, 1252:8, 1252:21, 1253:13, 1253:18, 1253:20, 1254:2, 1254:12, 1254:14, 1255:1, 1257:5, 1257:19, 1258:15, 1259:5, 1282:4, 1282:8, 1282:22, 1283:3, 1284:5, 1284:19, 1285:7, 1285:13, 1285:19, 1286:3, 1299:17
**Siegwarth's** [4] - 1258:11, 1282:12, 1283:21, 1284:21
**sign** [1] - 1292:6
**significant** [5] - 1245:6, 1245:14, 1252:17, 1252:20, 1253:8
**significantly** [1] - 1253:3
**similar** [7] - 1234:11, 1249:21, 1249:25, 1250:4, 1258:25, 1265:11, 1276:25
**simple** [1] - 1257:10
**simpler** [1] - 1289:1
**simply** [11] - 1206:25, 1232:14, 1236:1, 1236:15, 1238:15, 1240:8, 1242:9, 1242:17, 1247:4, 1252:18, 1255:17
**single** [5] - 1220:16, 1223:18, 1238:6, 1256:14, 1276:11
**sit** [4] - 1239:14, 1260:17, 1283:7, 1287:13
**site** [1] - 1265:19
**sitting** [3] - 1202:6, 1241:10, 1278:11
**situation** [1] - 1239:18
**situations** [1] - 1245:15
**six** [4] - 1208:13, 1208:14, 1226:20, 1292:19
**skeptical** [1] - 1212:15
**skepticism** [11] - 1210:22, 1210:24, 1211:5, 1211:7, 1211:11, 1211:13, 1212:19, 1212:20, 1218:4, 1218:8, 1229:25
**skill** [20] - 1224:21, 1225:4, 1225:9, 1225:12, 1226:4, 1228:23, 1228:25, 1229:7, 1229:9, 1241:14, 1273:5, 1273:15, 1273:19, 1276:18, 1277:3, 1277:18, 1278:5, 1278:15, 1279:3, 1280:15
**skilled** [5] - 1203:22, 1208:25, 1211:25, 1243:6, 1263:23
**slide** [13] - 1204:7, 1205:8, 1207:12, 1210:7, 1215:13, 1256:6, 1271:23, 1285:8, 1285:23, 1286:1, 1286:13, 1286:15, 1286:17
**slides** [2] - 1280:22, 1283:14
**sliver** [1] - 1286:5
**smart** [2] - 1270:13, 1301:17
**Smelt** [5] - 1228:3, 1243:17, 1276:16, 1297:7, 1297:15
**smokescreen** [1] - 1246:20
**Snapchat** [1] - 1295:9
**so-called** [1] - 1225:16
**social** [1] - 1295:8
**sold** [2] - 1238:7, 1259:8
**sole** [2] - 1293:13, 1294:4
**solely** [1] - 1293:11
**solution** [2] - 1226:10, 1229:19
**solutions** [4] - 1211:11, 1212:18, 1226:19, 1229:4
**solve** [2] - 1226:18, 1229:10
**solved** [2] - 1235:12, 1235:17
**someone** [8] - 1225:13, 1230:14, 1239:5, 1251:10, 1263:23, 1273:7, 1280:9, 1282:6
**sometimes** [3] - 1281:10, 1292:2, 1292:10
**soon** [1] - 1292:8
**sophistication** [1] - 1229:6
**sorry** [8] - 1202:16, 1206:8, 1206:16, 1208:4, 1211:18, 1233:19, 1235:18, 1276:23
**sort** [1] - 1264:15
**sought** [1] - 1230:16
**sound** [2] - 1202:1, 1249:3
**sounds** [1] - 1202:2
**sources** [1] - 1203:16
**space** [3] - 1209:11, 1258:16, 1289:16
**spade** [2] - 1242:11, 1242:12
**special** [4] - 1248:10, 1261:11, 1277:6,

1277:22
**specific** [6] - 1219:2, 1237:9, 1254:13, 1254:14, 1254:17, 1258:18
**specifically** [2] - 1233:19, 1249:4
**specifying** [1] - 1254:12
**speculative** [1] - 1231:10
**spend** [3] - 1276:5, 1285:11, 1285:14
**spent** [1] - 1283:18
**splash** [1] - 1253:11
**split** [1] - 1292:18
**squeeze** [1] - 1263:5
**squeezed** [1] - 1261:10
**stability** [11] - 1207:20, 1208:11, 1208:14, 1209:1, 1209:4, 1209:6, 1247:23, 1279:18, 1279:20, 1279:24
**stabilize** [1] - 1281:2
**stabilizer** [1] - 1281:1
**stable** [2] - 1218:16, 1248:3
**stack** [2] - 1261:9, 1283:15
**stacked** [1] - 1272:21
**stand** [5] - 1201:8, 1260:17, 1278:12, 1287:7, 1292:17
**standard** [3] - 1222:19, 1222:22, 1222:23
**standby** [1] - 1299:10
**standing** [2] - 1263:18, 1286:4
**STARGATT** [1] - 1200:3
**start** [8] - 1201:24, 1220:21, 1257:13, 1262:9, 1272:9, 1281:24, 1287:9, 1292:1
**started** [2] - 1232:25, 1252:7
**starts** [1] - 1235:8
**statement** [3] - 1217:12, 1248:19, 1260:22
**statements** [6] - 1216:5, 1216:8, 1217:8, 1217:15, 1217:18, 1248:15
**STATES** [1] - 1199:1
**States** [3] - 1236:7, 1236:22, 1268:22
**stay** [2] - 1206:25, 1292:20
**staying** [1] - 1251:11
**stays** [1] - 1265:19
**Stenotype** [1] - 1308:13
**step** [5] - 1219:16, 1255:6, 1276:11, 1282:15
**stepped** [1] - 1202:19
**steps** [3] - 1258:2, 1272:16, 1277:10
**STERNE** [1] - 1200:6
**stifles** [1] - 1262:15
**still** [8] - 1251:7, 1255:14, 1263:14, 1274:14, 1290:23, 1290:25, 1291:12, 1307:6
**stipulation** [1] - 1221:15
**stitch** [3] - 1240:13, 1244:18, 1289:10
**stole** [1] - 1261:3
**stop** [5] - 1238:15, 1238:18, 1238:19, 1238:23, 1256:22
**stopped** [2] - 1238:12, 1291:5
**storage** [1] - 1209:11
**store** [2] - 1209:17, 1279:24
**story** [2] - 1269:16, 1269:17
**strip** [1] - 1285:18
**strong** [1] - 1301:24
**stuck** [1] - 1266:6
**studies** [7] - 1248:25, 1249:12, 1250:3, 1274:3, 1291:8, 1291:10, 1291:11
**study** [11] - 1209:4, 1249:2, 1249:4, 1249:10, 1249:16, 1249:19, 1249:22, 1250:2, 1268:4, 1268:11, 1271:6
**stuff** [8] - 1262:4, 1262:6, 1262:8, 1269:16, 1272:20, 1273:1, 1274:4, 1284:24
**subject** [2] - 1257:16, 1301:18
**submissions** [1] - 1250:1
**submit** [3] - 1239:20, 1248:24, 1288:10
**submitted** [3] - 1250:3, 1250:17, 1291:10
**substance** [2] - 1221:25, 1265:18
**substitution** [1] - 1273:12
**success** [8] - 1226:24, 1245:17, 1273:8, 1273:12, 1279:9, 1296:22, 1297:14, 1298:4
**sued** [1] - 1238:12
**sufficient** [7] - 1217:14, 1226:25, 1227:16, 1227:17, 1297:2, 1297:19, 1298:8
**sugars** [1] - 1219:12
**suggest** [9] - 1230:3, 1250:5, 1250:25, 1254:16, 1258:7, 1258:22, 1260:5, 1284:14, 1294:2
**suggested** [2] - 1256:14, 1271:5
**suggesting** [2] - 1230:23, 1250:21
**suggestion** [2] - 1254:21, 1301:20
**suggests** [1] - 1226:11
**summarize** [2] - 1217:7, 1261:7
**summary** [2] - 1204:7, 1205:8
**super** [3] - 1238:14, 1245:8, 1290:20
**superior** [1] - 1229:23
**superseding** [1] - 1293:2
**supplied** [1] - 1273:1
**supply** [1] - 1227:3
**support** [2] - 1245:19, 1245:20
**supportive** [1] - 1300:4
**supports** [2] - 1248:12, 1248:23
**surfactant** [4] - 1206:5, 1207:2, 1247:6, 1248:10
**surfactants** [1] - 1244:20
**surprising** [1] - 1265:1
**surrender** [1] - 1293:9
**survey** [1] - 1255:23
**surveys** [1] - 1253:16
**Sury** [50] - 1202:6, 1202:10, 1202:18, 1202:19, 1202:25, 1203:3, 1203:22, 1204:6, 1204:17, 1205:3, 1205:8, 1205:14, 1205:15, 1205:19, 1206:1, 1207:12, 1207:19, 1208:8, 1208:24, 1209:19, 1212:22, 1214:3, 1214:10, 1214:16, 1216:13, 1216:21, 1217:13, 1217:19, 1218:15, 1240:25, 1241:5, 1241:12, 1241:13, 1244:22, 1262:1, 1277:9, 1277:16, 1278:2, 1279:6, 1279:8, 1279:10, 1279:13, 1279:17, 1279:19, 1280:25, 1281:13, 1288:16, 1289:11, 1289:14, 1298:6
**Sury's** [10] - 1202:4, 1204:15, 1204:20, 1204:25, 1206:14, 1206:18, 1240:19, 1241:17, 1243:11, 1281:3
**suspicions** [1] - 1221:9
**sweep** [1] - 1249:23
**swept** [1] - 1243:25
**swimming** [1] - 1300:2
**switch** [1] - 1255:25
**sworn** [1] - 1296:1
**swung** [2] - 1237:1, 1261:19
**synthetic** [1] - 1267:17
**system** [5] - 1262:24, 1281:18, 1306:24, 1307:16

## T

**table** [1] - 1283:7
**tablet** [1] - 1295:7
**talks** [1] - 1280:23
**target** [1] - 1265:19
**taught** [3] - 1242:14, 1276:23, 1277:11
**TAYLOR** [1] - 1200:3
**teach** [2] - 1217:15, 1243:14
**teaches** [4] - 1219:11, 1226:11, 1226:14, 1276:15
**teachings** [6] - 1273:7, 1276:14, 1280:2, 1280:5, 1280:6, 1280:18
**team** [3] - 1263:2, 1263:18, 1287:1
**teams** [2] - 1289:11, 1289:17
**technical** [3] - 1235:11, 1235:16, 1307:1
**technically** [1] - 1212:3
**technologies** [1] - 1226:25
**technology** [19] - 1225:4, 1225:9, 1226:4, 1229:6, 1233:11, 1234:12, 1238:13, 1238:20, 1238:23, 1238:24, 1239:6, 1239:14, 1246:13, 1267:20, 1272:2, 1289:18, 1289:19, 1290:20, 1290:21
**temp** [1] - 1209:1
**temperature** [3] - 1209:1, 1209:11, 1279:25
**temperatures** [5] - 1207:21, 1207:22, 1208:12, 1279:19, 1279:24
**temps** [1] - 1209:6
**tendency** [2] - 1268:24, 1268:25
**term** [1] - 1262:3
**terms** [6] - 1224:16, 1252:19, 1265:23, 1277:23, 1290:14
**test** [3] - 1271:15, 1289:22, 1300:3
**tested** [1] - 1269:2
**testified** [10] - 1202:3, 1202:7, 1204:6, 1245:13, 1246:9, 1258:12, 1265:2, 1279:12, 1282:9, 1283:12
**testify** [1] - 1250:11
**testifying** [2] - 1221:12, 1284:7
**testimony** [25] - 1202:4, 1202:24, 1204:15, 1206:12, 1206:14, 1206:18, 1211:2, 1220:24, 1221:13, 1236:18,

1240:19, 1241:25, 1242:3, 1245:13, 1260:23, 1261:24, 1270:16, 1274:20, 1279:2, 1280:22, 1281:4, 1297:10, 1297:11, 1301:7, 1307:1
**testing** [3] - 1270:19, 1271:4, 1271:19
**text** [1] - 1295:8
**THE** [57] - 1199:1, 1199:2, 1201:1, 1201:8, 1201:12, 1215:16, 1217:23, 1218:12, 1218:13, 1219:15, 1219:17, 1219:18, 1219:20, 1219:23, 1235:1, 1235:7, 1235:11, 1235:14, 1260:15, 1287:5, 1288:20, 1291:21, 1296:2, 1296:5, 1296:9, 1296:12, 1298:12, 1299:10, 1299:14, 1299:24, 1300:3, 1300:9, 1300:12, 1302:1, 1302:9, 1302:13, 1302:19, 1302:22, 1303:1, 1303:2, 1303:6, 1303:7, 1303:21, 1305:12, 1305:16, 1305:17, 1305:20, 1305:23, 1306:1, 1306:4, 1306:7, 1306:10, 1306:13, 1306:16, 1307:11, 1308:1, 1308:4
**themes** [1] - 1264:15
**themselves** [3] - 1237:22, 1296:19, 1297:10
**theories** [3] - 1250:7, 1250:9, 1250:12
**therapeutic** [2] - 1248:18, 1248:21
**THERAPEUTICS** [1] - 1199:6
**therefore** [4] - 1222:5, 1224:10, 1237:24, 1263:25
**they've** [4] - 1239:21, 1266:3, 1290:22, 1300:7
**thin** [1] - 1264:19
**thinking** [1] - 1298:22
**thinks** [1] - 1285:19
**third** [1] - 1242:11
**thousand** [1] - 1262:3
**thousands** [4] - 1237:8, 1271:13, 1271:16, 1275:15
**threat** [1] - 1252:14
**three** [39] - 1216:10, 1216:11, 1216:16, 1216:20, 1217:1, 1221:21, 1222:1, 1223:23, 1226:11, 1229:24, 1234:10, 1236:23, 1236:24, 1237:2, 1237:4, 1237:11, 1238:2, 1238:11, 1238:12, 1239:4, 1240:1, 1242:19, 1242:20, 1243:2, 1243:23, 1244:9, 1257:10, 1260:2, 1261:19, 1265:10, 1272:7, 1287:16, 1287:19, 1288:6, 1288:7
**threw** [1] - 1280:4
**throughout** [2] - 1254:16, 1270:8
**throw** [2] - 1246:20, 1276:2
**thrown** [1] - 1239:21
**tie** [1] - 1283:21
**tied** [1] - 1253:17
**TIGAN** [1] - 1199:16
**tight** [1] - 1212:8
**Tik** [1] - 1295:10
**timeline** [1] - 1251:4
**today** [12] - 1201:23, 1238:9, 1239:15, 1244:13, 1248:7, 1251:7, 1257:9, 1277:16, 1284:19, 1290:23, 1298:24, 1298:25
**together** [13] - 1206:3, 1240:13, 1244:18, 1244:25, 1245:4, 1257:25, 1258:21, 1260:25, 1266:7, 1276:14, 1277:24, 1283:15, 1289:10
**Tok** [1] - 1295:10
**ton** [1] - 1297:11
**took** [9] - 1242:13, 1245:16, 1253:13, 1253:20, 1261:2, 1261:10, 1263:8, 1266:19, 1272:18
**toos** [1] - 1265:18
**top** [2] - 1264:4, 1267:25
**toss** [1] - 1245:18
**tossed** [1] - 1236:15
**total** [3] - 1259:24, 1259:25, 1305:7
**totally** [1] - 1246:24
**totals** [1] - 1260:3
**touch** [1] - 1283:10
**towards** [1] - 1293:1
**toxin** [18] - 1237:6, 1237:10, 1241:6, 1241:11, 1241:15, 1244:17, 1253:12, 1267:16, 1270:2, 1272:12, 1272:15, 1276:22, 1277:14, 1277:20, 1278:11, 1278:25, 1289:16
**toxins** [5] - 1242:7, 1243:20, 1245:8, 1245:9, 1263:6
**Toyota** [1] - 1277:25
**Trademark** [1] - 1236:8
**trained** [2] - 1288:5, 1289:3
**TRANSCRIPT** [1] - 1199:9
**transport** [1] - 1209:13
**transportation** [1] - 1209:16
**treatment** [1] - 1246:19
**trehalose** [19] - 1204:22, 1204:23, 1204:25, 1205:2, 1205:4, 1205:5, 1205:12, 1205:13, 1206:5, 1206:15, 1207:2, 1216:6, 1216:17, 1271:8, 1277:12, 1279:7, 1279:8, 1279:20, 1280:19
**Trexler** [16] - 1252:3, 1254:11, 1256:5, 1256:16, 1282:1, 1282:11, 1282:18, 1283:18, 1283:20, 1284:2, 1284:5, 1284:7, 1284:20, 1285:4, 1290:11, 1299:16
**Trexler's** [2] - 1256:10, 1257:3
**trial** [19] - 1220:15, 1220:16, 1229:1, 1236:4, 1241:24, 1244:16, 1245:22, 1247:21, 1249:17, 1251:1, 1254:16, 1262:21, 1264:15, 1264:16, 1265:9, 1270:8, 1291:13, 1295:21, 1301:6
**TRIAL** [2] - 1199:9, 1199:11
**trials** [1] - 1262:22
**tried** [4] - 1211:8, 1244:16, 1254:11, 1261:12
**tries** [3] - 1242:18, 1246:20, 1250:20
**true** [9] - 1217:16, 1221:16, 1223:3, 1245:24, 1256:5, 1261:5, 1261:8, 1261:14, 1262:25
**trust** [1] - 1258:8
**truth** [2] - 1223:7, 1293:14
**truths** [2] - 1242:1, 1280:16
**try** [12] - 1226:16, 1226:24, 1239:17, 1239:19, 1243:4, 1260:25, 1264:24, 1269:18, 1270:7, 1274:7, 1277:17, 1294:14
**trying** [13] - 1205:14, 1212:14, 1215:15, 1240:3, 1240:13, 1247:15, 1250:14, 1264:25, 1265:5, 1275:19, 1277:18, 1284:1, 1289:9
**TUNNELL** [1] - 1199:16
**turn** [7] - 1236:2, 1264:14, 1272:6, 1276:4, 1277:8, 1285:25, 1296:10
**turning** [1] - 1272:7
**Twitter** [1] - 1295:9
**two** [37] - 1206:6, 1207:1, 1222:7, 1222:10, 1222:20, 1223:22, 1226:9, 1229:22, 1234:8, 1237:8, 1238:1, 1243:16, 1248:13, 1248:24, 1256:10, 1257:11, 1258:25, 1259:3, 1264:8, 1264:15, 1264:23, 1269:14, 1272:7, 1276:4, 1277:1, 1280:14, 1280:18, 1287:14, 1289:3, 1290:16, 1292:19, 1296:8, 1300:17, 1305:21, 1307:13
**Tylenol** [1] - 1269:22
**type** [4] - 1229:3, 1229:15, 1276:22, 1276:24
**Type** [1] - 1277:3
**types** [3] - 1223:22, 1266:21, 1276:23
**typically** [1] - 1229:14


## U


**U.S** [2] - 1243:24, 1308:16
**U.S.D.C.J** [1] - 1199:12
**ultimate** [2] - 1233:6, 1293:2
**ultimately** [1] - 1251:15
**unanimity** [1] - 1306:17
**unanimous** [5] - 1292:24, 1293:22, 1294:10, 1294:21, 1303:5
**unanimously** [1] - 1303:22
**unauthorized** [3] - 1239:23, 1251:17, 1251:21
**undeniable** [2] - 1287:22, 1287:25
**under** [11] - 1206:12, 1221:12, 1224:22, 1227:22, 1232:23, 1249:23, 1251:5, 1274:12, 1300:15, 1301:6, 1303:23
**undergo** [1] - 1268:24
**understood** [2] - 1215:20, 1224:21
**undertook** [1] - 1237:8
**undisclosed** [1] - 1218:10
**undisputed** [8] - 1236:22, 1238:1, 1238:11, 1239:1, 1239:20, 1252:1, 1287:20, 1287:23
**unexpectedly** [1] - 1229:23
**UNIKEL** [1] - 1199:21
**United** [3] - 1236:7, 1236:22, 1268:22
**UNITED** [1] - 1199:1
**University** [2] -

1272:11, 1278:7
**unless** [2] - 1293:18, 1300:17
**unlike** [3] - 1262:17, 1265:17, 1284:5
**unpatented** [1] - 1233:4
**unpredictable** [1] - 1226:25
**unquestionably** [1] - 1256:12
**unreasonable** [1] - 1285:21
**unremarkable** [1] - 1277:19
**unwanted** [1] - 1268:12
**up** [39] - 1201:4, 1204:5, 1204:7, 1207:7, 1207:11, 1208:13, 1209:3, 1210:4, 1210:9, 1213:3, 1213:7, 1214:25, 1218:22, 1220:5, 1236:10, 1237:4, 1240:10, 1241:18, 1245:21, 1246:20, 1249:12, 1255:4, 1258:7, 1259:10, 1259:20, 1260:2, 1260:10, 1260:17, 1265:25, 1270:4, 1276:14, 1279:20, 1282:7, 1284:8, 1287:7, 1291:23, 1296:9, 1299:6, 1307:8
**usage** [1] - 1232:24
**useful** [2] - 1238:14, 1290:21
**useless** [2] - 1238:18, 1291:2
**uses** [8] - 1238:1, 1238:3, 1247:10, 1256:12, 1257:17, 1280:6, 1281:5

## V

**VALENTE** [1] - 1199:22
**valid** [3] - 1203:4, 1231:1, 1232:9
**validity** [1] - 1202:25
**valuable** [2] - 1238:14, 1291:3
**value** [15] - 1231:12, 1233:3, 1233:5, 1233:6, 1233:8, 1234:6, 1234:8, 1238:17, 1248:5, 1253:16, 1256:4, 1256:7, 1256:9, 1256:11, 1256:17
**valuing** [1] - 1233:10
**various** [4] - 1244:17, 1244:19, 1289:9
**Varughese** [3] - 1260:20, 1287:6, 1288:23
**VARUGHESE** [10] - 1200:6, 1235:4, 1260:19, 1288:18, 1296:10, 1299:9, 1301:19, 1302:8, 1302:12, 1305:14
**vehicles** [1] - 1209:14
**verbatim** [1] - 1274:6
**verdict** [53] - 1220:1, 1220:19, 1257:9, 1257:23, 1258:3, 1286:10, 1287:13, 1289:25, 1291:17, 1291:25, 1292:21, 1292:23, 1292:24, 1293:12, 1293:15, 1293:17, 1293:19, 1293:23, 1294:2, 1294:3, 1294:4, 1295:13, 1298:16, 1298:18, 1298:24, 1298:25, 1302:19, 1302:25, 1303:3, 1303:5, 1303:19, 1303:20, 1303:24, 1305:18, 1305:21, 1305:24, 1306:2, 1306:5, 1306:8, 1306:11, 1306:14, 1306:18, 1307:19
**verdicts** [1] - 1221:3
**version** [1] - 1284:19
**versions** [1] - 1245:9
**vetted** [1] - 1300:7
**view** [7] - 1204:18, 1222:10, 1227:7, 1293:1, 1296:17, 1297:7, 1297:24
**views** [2] - 1293:8, 1294:12
**virtually** [1] - 1237:17
**visits** [1] - 1265:16
**vital** [1] - 1262:23
**Volume** [1] - 1199:7
**vote** [4] - 1292:19, 1292:20, 1294:20, 1294:21
**votes** [1] - 1292:17
**vs** [1] - 1199:5

## W

**wait** [1] - 1307:7
**walk** [3] - 1202:10, 1257:11, 1283:9
**walked** [3] - 1202:15, 1202:17, 1257:19
**wants** [6] - 1236:25, 1237:15, 1283:15, 1284:1, 1285:6, 1287:7
**warner** [1] - 1308:10
**Warner** [1] - 1308:15
**watch** [1] - 1219:16
**water** [1] - 1240:8
**ways** [6] - 1203:19, 1203:23, 1210:18, 1212:1, 1212:11, 1244:19
**week** [9] - 1236:18, 1240:16, 1258:15, 1260:21, 1262:4, 1273:3, 1287:2, 1306:21, 1306:22
**weekend** [1] - 1308:5
**weight** [3] - 1271:5, 1271:24, 1293:10
**weird** [1] - 1266:25
**welcome** [3] - 1201:12, 1235:14, 1302:23
**wells** [2] - 1296:6, 1298:13
**WELLS** [4] - 1200:8, 1235:5, 1296:8, 1296:14
**Whalen** [1] - 1297:12
**WhatsApp** [1] - 1295:10
**whatsoever** [1] - 1247:2
**wheel** [1] - 1245:12
**whereas** [1] - 1276:23
**white** [2] - 1268:5, 1268:23
**whole** [3] - 1229:17, 1269:17, 1284:2
**willing** [12] - 1232:10, 1233:24, 1234:17, 1234:18, 1253:7, 1282:20, 1282:21, 1282:25, 1283:8, 1300:8, 1306:25
**willingly** [1] - 1234:19
**WILSON** [1] - 1200:4
**win** [1] - 1230:23
**Wisconsin** [1] - 1272:11
**WITNESS** [2] - 1218:13, 1219:17
**witness** [1] - 1262:18
**witnesses** [6] - 1221:12, 1247:4, 1274:19, 1274:22, 1289:12, 1301:8
**wonder** [1] - 1262:10
**wonderful** [1] - 1266:15
**wondering** [1] - 1271:11
**word** [9] - 1210:22, 1213:16, 1217:6, 1217:20, 1249:15, 1250:16, 1272:3, 1282:16, 1291:12
**words** [15] - 1215:6, 1215:8, 1215:24, 1216:14, 1216:18, 1223:12, 1223:17, 1224:18, 1238:21, 1261:13, 1263:11, 1291:4, 1295:14, 1303:14
**works** [2] - 1263:14, 1263:15
**world** [4] - 1238:22, 1239:1, 1255:20, 1268:16
**worth** [1] - 1245:10
**worthy** [1] - 1241:1
**wow** [1] - 1285:3
**write** [14] - 1258:23, 1259:12, 1259:21, 1259:23, 1260:5, 1274:1, 1284:9, 1292:6, 1292:16, 1292:18, 1300:24, 1301:12, 1302:1, 1302:2
**written** [2] - 1220:7, 1220:17
**wrote** [1] - 1260:3

## X

**Xiang** [8] - 1228:7, 1272:24, 1273:1, 1273:7, 1296:17, 1296:18, 1296:22, 1297:11
**Xiang/Malizio** [1] - 1281:14

## Y

**year** [1] - 1259:9
**years** [11] - 1244:15, 1245:14, 1245:20, 1247:13, 1253:9, 1263:4, 1268:14, 1272:13, 1278:2, 1278:9, 1290:22
**yellow** [1] - 1261:10
**yes-or-no** [2] - 1201:21, 1217:1
**yesterday** [16] - 1201:23, 1201:25, 1202:3, 1202:24, 1203:8, 1206:12, 1207:13, 1208:8, 1210:7, 1210:21, 1215:2, 1216:4, 1217:7, 1219:7, 1240:19, 1240:25
**YOUNG** [1] - 1200:3
**yourself** [5] - 1236:8, 1248:22, 1293:4, 1295:3, 1295:22
**yourselves** [1] - 1246:23
**YouTube** [1] - 1295:10

## Z

**zero** [2] - 1274:23, 1284:13
**zoom** [1] - 1214:7