**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| Allergan, Inc., <br><br> *Plaintiff*, <br><br> v. <br><br> Revance Therapeutics, Inc. and <br> PCI San Diego, Inc., <br><br> *Defendants*. | C.A. No. 21-1411-RGA-LDH |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR POST-TRIAL RELIEF**

*Of Counsel:*

Eric W. Dittmann
Melanie R. Rupert
Isaac S. Ashkenazi
Krystina L. Ho
Carl J. Minniti III
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 499-6000

Karthik R. Kasaraneni
Vladimir J. Semendyai
David M. Valente
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

November 12, 2025

MORRIS, NICHOLS, ARSHT & TUNNEL LLP
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jtigan@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Allergan, Inc.*

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ...................................................................................................... 2

    A.  The Post-Verdict Economic Circumstances
    Support the Jury-Determined Ongoing Royalty Rates .......................................... 2

    B.  Revance's Rehashing of Its JMOL
    Challenges to the Ongoing Royalty Should Be Rejected ...................................... 5

    C.  The Ongoing Royalty Must Compensate
    Allergan for the Entirety of Revance's Infringement ........................................... 6

        1.  The Ongoing Royalty Should Cover Therapeutic Sales ............................ 6

        2.  The Ongoing Royalty Should Cover Revance's Infringing
        Domestic Manufacture of Daxxify for Foreign Distribution ...................... 8

        3.  The Ongoing Royalty Should Cover Revance's Successors-in-Interest... 10

    D.  Prejudgment Interest at the Prime Rate, Compounded
    Quarterly, Best Compensates Allergan for Revance's Infringement.................... 11

    E.  The Court Should Award Allergan Supplemental
    Damages and Post-Judgment Interest at the Statutory Rate ................................. 12

III.  CONCLUSION.................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    2025 WL 2661540 (D. Del. Sept. 17, 2025)................................................................12

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
    97 F.4th 854 (Fed. Cir. 2024) .......................................................................................9

*Brunswick Corp. v. United States*,
    36 Fed. Cl. 204 (1996) ...............................................................................................4, 5

*Horphag Rsch. Ltd. v. Consac Indus., Inc.*,
    116 F.3d 1450 (Fed. Cir. 1997).....................................................................................10

*Mondis Tech. Ltd. v. Chimei Innolux Corp.*,
    2012 WL 1554645 (E.D. Tex. Apr. 30, 2012)...............................................................10

*Ponzini v. PrimeCare Med., Inc.*,
    269 F. Supp. 3d 444 (M.D. Pa. 2017), *aff'd in part, vacated in part on other
    grounds sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019).........6

*Radio Steel & Manufacturing Co. v. MTD Products, Inc.*,
    788 F.2d 1554 (Fed. Cir. 1986).....................................................................................4

*Scott Paper Co. v. Moore Bus. Forms, Inc.*,
    594 F. Supp. 1051 (D. Del. 1984).................................................................................11

*Sentegra, LLC v. Azend Grp. Corp.*,
    No. 16-cv-00263 (D. Colo. July 12, 2017) (Ex. 3) .......................................................11

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
    2022 WL 3973499 (D. Del. Aug. 31, 2022) ..............................................................11, 12

*Syntrix Biosystems, Inc. v. Illumina, Inc.*,
    No. 3:10-cv-05870 (W.D. Wash. July 1, 2013) (Ex. 4) ...............................................11

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
    939 F.2d 1540 (Fed. Cir. 1991).....................................................................................12

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    2019 WL 4346502 (D. Del. Sept. 12, 2019) .................................................................12

ii

**Statutes**

35 U.S.C. § 284 ..............................................................................................................................10

## I.    INTRODUCTION

Revance's opposition rehashes many of the same arguments Revance made in its JMOL motion.  (D.I. 670.)  Allergan previously addressed those arguments in its opposition (D.I. 690), explaining that Revance comes nowhere close to satisfying the demanding standards for JMOL, new trial, or remittitur in view of the ample record evidence supporting the jury's verdict.  When stripped of needless repetition, Revance's brief raises only three discrete questions:  (1) whether the post-verdict economic circumstances support an ongoing royalty at the jury-determined royalty rates if there is no longer a price difference between Botox® and Daxxify, and when the last of the asserted patents expires in four years; (2) whether an ongoing royalty should include Revance's therapeutic sales and revenue from foreign partners, and extend to Revance's successors-in-interest; and (3) whether prejudgment interest should be awarded at the Court's commonly used prime rate, compounded quarterly.  The answer to all three questions is yes.

*First*, whether a price difference (the so-called "price premium") currently exists between Botox® and Daxxify is irrelevant to the damages calculus, as Dr. Siegwarth's post-verdict royalty analysis does not focus on that price premium.  Instead, her analysis is based on post-launch survey data and an updated cost-of-delay analysis, both of which support maintaining the jury's rates.  Revance and Ms. Trexler, in contrast, wholly ignore this survey data.  Revance also fails to address Dr. Siegwarth's position that its reliance on the '878 and '748 patents has only increased since Daxxify has become its best-selling product, and would thus be willing to accept at least the jury-determined royalty rates at the post-verdict hypothetical negotiation.  Instead, Revance relies on inapposite case law that actually supports adopting the jury's rates.

*Second*, Revance's attempts to exclude its therapeutic sales, foreign-partner revenue, and successors-in-interest from the ongoing royalty award contradict its positions at trial and, in fact, demonstrate a need to extend the ongoing royalty to Revance's successors-in-interest.  Revance

itself included Daxxify sales for therapeutic purposes and Revance's revenue from foreign partners in the royalty base that both parties presented to the jury.  Such sales properly measure Revance's domestic infringing acts of making and selling Daxxify in the United States.  The ongoing royalty must likewise extend to Revance's potential successors to prevent any gamesmanship that could allow Revance to escape its royalty obligations.

*Finally*, none of Revance's arguments justifies departing from this Court's common practice of awarding prejudgment interest at the prime rate, compounded quarterly.  Far from being a windfall, such an award would properly compensate Allegan for Revance's infringement. Any recent changes in the prime rate, when viewed in historical context, have no impact on this Court's sound discretion in choosing the prime rate as the best compensatory option.

## II.    ARGUMENT

### A.    The Post-Verdict Economic Circumstances Support the Jury-Determined Ongoing Royalty Rates

Outside of repeating its JMOL arguments (addressed below and in D.I. 670), Revance raises only two challenges to Dr. Siegwarth's post-verdict hypothetical negotiation analysis and Allergan's request for an ongoing royalty at the jury-determined rates.  Both challenges fail.

*First*, Revance asserts that Dr. Siegwarth purportedly "reli[es] on a DAXXIFY price premium that no longer exists."  (Opp. 7 (citing D.I. 673, Ex. 1 ("Siegwarth Op. Decl."), ¶ 45); *see* Opp. 10-11.)  But Dr. Siegwarth does not tie her post-verdict analysis to Daxxify's price premium.  (*See* Ex. 1 ("Siegwarth Reply Decl.") ¶¶ 10, 13.[1])  Instead, she undertakes a cost-of-delay analysis (*id.*), explaining that any attempted design-around would be "prohibitively high at the post-judgment hypothetical negotiation" (Siegwarth Op. Decl., ¶¶ 43-45).  She also relies on

---

[1]    Direct "Ex." citations herein refer to the exhibits attached to the supporting Declaration of Vladimir J. Semendyai, dated November 12, 2025, and filed concurrently herewith.

two "post-launch" surveys that measure "the relative value of Daxxify's duration" at 17% and 23%, and the value of "being APF" at approximately 8%, "which exceed the jury's 15 percent" and "4 percent" rates.  (*Id.*, ¶¶ 40, 45.)  Revance does not address these arguments in its brief,[2] nor explain why Allergan would agree to license the asserted patents to Revance "for free simply because Revance is pricing Daxxify at parity with [Botox®]."  (Siegwarth Reply Decl. ¶ 13.)  Moreover, Revance's request for its jury-rejected royalty rates (Opp. 7) is contradicted by Ms. Trexler's trial testimony that, absent a price premium, she "would use a different methodology" because her proposed royalty rates are necessarily "based on the fact that there . . . was a price premium" (Tr. 1075:20-1076:15; *see also* Siegwarth Reply Decl., ¶ 13).  Thus, the "only supported royalty rates in the record remain those" awarded by the jury.  (Opp. 7.)

*Second*, Revance contends that the time remaining before the expiration of the '878 patent (14 months)[3] and '748 patent (four years) is too short to justify the jury's awarded royalty rates.  (Opp. 9-10.)  But Ms. Trexler provides neither any analysis supporting this attorney argument nor any other rebuttal to Dr. Siegwarth on this issue.  In contrast, and patent duration notwithstanding, Dr. Siegwarth explains why Revance would still seek to license both patents to have the ability "to continue to sell Daxxify and to further advance Daxxify in the marketplace," which Revance would "stand to lose without a license."  (Siegwarth Op. Decl., ¶ 32.)  This risk to Revance is particularly acute, as shown by trial testimony confirming that Daxxify "accounted for the majority of" Revance's sales even before the verdict, and those sales are "growing." (Tr. 519:13-520:11; *see also, e.g.*, Tr. 513:25-514:10, 626:18-22 (describing importance of

---

[2]    Ms. Trexler briefly mentions Dr. Siegwarth's surveys in her declaration, but only to argue that the survey percentages must be applied to the "Price Premium $0."  (D.I. 689, Ex. 1, ¶ 19.)

[3]    The '878 patent expires not "in 11 months" (Opp. 10), but 14 months after the July 2025 post-verdict hypothetical negotiation on September 21, 2026.

3

Allergan's patents to Revance).)  Far from offering "unsupported" analysis (Opp. 10), Dr. Siegwarth relies on Revance's sales data to show the extent of Revance's potential loss absent a license from Allergan (Siegwarth Op. Decl., ¶¶ 32, 36, Ex. 1).

Revance's reliance (Opp. 10) on *Brunswick Corp. v. United States*, 36 Fed. Cl. 204 (1996), and *Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 788 F.2d 1554 (Fed. Cir. 1986), is misplaced.[4]  Neither case involved a post-verdict hypothetical negotiation or ongoing royalties.  *Brunswick* was an opinion by the U.S. Court of Federal Claims involving an entirely different technology (camouflage screens) and alleged infringement by the U.S. government, not a market competitor.  *See* 36 Fed. Cl. at 207-08, 210.  Likewise, the simple wheelbarrow technology in *Radio Steel* is incomparable to the complex and dangerous BoNT technology here. *See* 788 F.2d at 1555.  Moreover, the portion of *Radio Steel* that Revance quotes is dicta from the Federal Circuit's recitation of certain underlying district court findings that were not reviewed on appeal.  *See id.* at 1556-57.  In any event, the *Radio Steel* court was concerned that the patentee sought "to collect unreasonably high royalties" from sales to a third party with whom the patentee "had been unable to establish a" business relationship.  *Id.*  No such concern exists here.

Rather than undermining the jury's awarded royalty rates, Revance's cited authority actually supports maintaining them.  For example, the parties' post-verdict hypothetical negotiation here would still have occurred "well before patent expiration." *Brunswick*, 36 Fed. Cl. at 214.  Likewise, Revance "chose to infringe rather than attempt to design around the patent or wait for its expiration," and Revance's "need for" Allergan's inventions is "imminent" for Revance to maintain even its existing market position.  *Id.*  (*Cf.* Siegwarth Op. Decl., ¶ 32.)

---

[4]     Unless otherwise indicated, all emphasis has been added, and all internal citations, footnotes, and quotation marks have been omitted.

Moreover, in *Brunswick,* a patent with a "duration of over seven years" was found to "strongly favo[r] the award of a high royalty rate" of 17%. 36 Fed. Cl. at 214, 220. Here, the jury's 15% and 4% royalty rates are similarly appropriate, where the last of the asserted patents does not expire for four years. Moreover, the jury already decided that Revance should have been paying these rates all along, and should continue paying them for future infringement. (D.I. 636 at 5.) Revance admits that a jury's royalty rates are a proper starting point for determining the ongoing royalty (Opp. 12), and identifies no reason why, in view of the jury's verdict, different royalty rates should suddenly be negotiated now, when Allergan's patents have become only more valuable to Revance. (*See* Siegwarth Op. Decl. ¶ 32; Siegwarth Reply Decl., ¶ 12.)

## B. Revance's Rehashing of Its JMOL Challenges to the Ongoing Royalty Should Be Rejected

The remainder of Revance's challenges to Allergan's requested ongoing royalty parrot its JMOL arguments (*see* Opp. 4-6, 7, 8-11 (citing D.I. 670 at 12-13, 15-19, 21-22)) and should be rejected for the same reasons Allergan identified in its opposition (*see generally* D.I. 690). For example, Revance's invalidity arguments as to the Formulation Claim (Opp. 4-5) apply the wrong standard for obviousness (D.I. 690 at 4-5), ignore substantial evidence of no motivation to combine (*id.* at 5-8), omit any mention of reasonable expectation of success (*id.* at 8-9), and fail to overcome Allergan's substantial evidence of objective indicia of nonobviousness (*id.* at 9-11).

Similarly, Revance's mantra that Daxxify's longer duration is caused by its peptide (Opp. 5-6, 8) and Revance's belated attacks on Dr. Siegwarth's apportionment methodology (*id.* at 6, 10-11) ignore the trial record (*see* D.I. 690 at 16-20). These were factual disputes resolved by the jury, and substantial evidence Allergan introduced at trial supports the jury's verdict. (*Id.*)

Finally, Revance complains that the '748 patent has "little to no value" because Revance could practice the now-expired '740 patent to satisfy "FDA purity requirements." (Opp. 9; *see*

5

*also id.* at 6.)  But as Allergan explained, Dr. Siegwarth's pre- and post-verdict analyses focus on those patents' contributions to the cost of delay, not on the differences between their patented features.  (D.I. 690 at 22-23.)  Revance would incur a "more costly" delay if it tried to design around only the '748 patent (*id.* at 23) because Revance is "already generating millions of dollars in Daxxify sales each month" (including by practicing the '740 patent) and would not want to risk that revenue, even temporarily.  (Siegwarth Op. Decl. ¶¶ 13, 43-44.)  Avoiding that cost of delay *is* Revance's "business reaso[n] to maintain DAXXIFY in the market."  (Opp. 12.)[5]

### C. The Ongoing Royalty Must Compensate Allergan for the Entirety of Revance's Infringement

#### 1. The Ongoing Royalty Should Cover Therapeutic Sales

Revance's attempt to exclude infringing Daxxify sales for therapeutic purposes is untimely and misstates the record.  At the outset, and although Revance argued at the Rule 50(a) stage that there was purportedly no "sufficient evidentiary basis [for a jury] to determine the appropriate reasonable royalty for the therapeutic market" (Tr. 664:10-665:4), Revance did not renew this argument in its post-trial JMOL motion (*see generally* D.I. 670).  This argument was thus abandoned.  *See Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 536-38 & n.56 (M.D. Pa. 2017), *aff'd in part, vacated in part on other grounds sub nom. Ponzini v. Monroe Cnty.*, 789 F. App'x 313 (3d Cir. 2019) (holding that, even if issue is raised in Rule 50(a) motion, defendants "have abandoned this issue by failure to brief it" in their Rule 50(b) motion) (citing *State Farm Mut. Auto. Ins. Co. v. Lincow*, 444 F. App'x 617, 620 (3d Cir. 2011)).

---

[5]    Revance provides no explanation or authority for its request for the Court to "ignore Allergan's discussion of" Revance's continued "willful infringement." (Opp. 11-12.)  Revance's choice to continue infringing is certainly relevant to the post-verdict hypothetical negotiation, and supports at least maintaining the ongoing royalty rates awarded by the jury.  (*See, e.g.*, Siegwarth Op. Decl. ¶ 13.)  Moreover, Revance's argument that its continued infringement should not impact the resolution of its JMOL motion (Opp. 12) belongs in that motion, not here.

In any event, Revance wrongly claims that the awarded "royalty rates are 'solely based on data relating to the [Daxxify] cosmetics market.'" (Opp. 6-7.)  As Dr. Siegwarth explained, her proposed royalty rates for both past and ongoing infringement "includ[e] both the cosmetic and therapeutic sales" of Daxxify because, at the hypothetical negotiation, the parties would have "negotiate[d] over *any* uses of [the asserted] patents." (Tr. 515:3-21; *see also* Tr. 518:25-519:22 (considering Daxxify's therapeutic market as part of the cost-of-delay analysis), 607:11-18 (explaining that the negotiated royalty rates "would have applied to both the cosmetic and therapeutic" markets); Siegwarth Reply Decl. ¶¶ 10-12.)  This makes sense, because "[i]t's the same [Daxxify] product" that infringes, whether for cosmetic or therapeutic purposes. (Tr. 608:4-7.)  Contrary to Revance's claims, Dr. Siegwarth did not leave "unconsidered" the "different real world concerns" of the Daxxify therapeutic market. (Opp. 7 (citing Tr. 607:19-608:9).)  In fact, she testified on cross-examination that she "certainly looked at" those concerns. (Tr. 608:6-9.)  Dr. Siegwarth also considered evidence that the longer duration Daxxify achieved by using Allergan's inventions was "a top unmet need" for therapeutics. (Siegwarth Reply Decl. ¶¶ 10-11 & n.19 (citing Siegwarth Op. Rpt., ¶ 129; Ex. 2 at PTX-450.0032).)

Moreover, the royalty base both Dr. Siegwarth and Ms. Trexler repeatedly presented to the jury indisputably included therapeutic Daxxify sales. (*See, e.g.*, Tr. 590:19-591:9 (Dr. Siegwarth's "royalty base" was "$273 million" in Daxxify sales, "includ[ing] both cosmetic and therapeutic sales"); Tr. 1054:14-24 (Ms. Trexler's royalties calculated on "$273 million of DAXXIFY product" sales); *see also* Tr. 595:7-24, 602:21-603:2, 1056:5-10, 1081:13-18, 1082:4-20; Siegwarth Reply Decl. ¶ 11.)  Ms. Trexler also testified that the royalties calculated from that all-inclusive royalty base should be "ongoing." (Tr. 1080:5-17; *see also* D.I. 672 at 8.)  At trial, Revance never objected to including therapeutic sales in the royalty base, and instead

cross-examined Dr. Siegwarth about the therapeutic market.  (*See* Tr. 607:11-608:9)  Indeed, Ms. Trexler never offered a separate royalty rate for therapeutic sales, or questioned the propriety of including such sales in her royalty base, after the Court ruled that therapeutic sales are "in the case."  (D.I. 477, 25:12-27:3; *see also* Siegwarth Reply Decl. ¶ 11.)  Therapeutic sales were properly before the jury, and it is too late for Revance to exclude them now.

### 2.    The Ongoing Royalty Should Cover Revance's Infringing Domestic Manufacture of Daxxify for Foreign Distribution

Revance's attempts to shield a significant portion of its infringing domestic activity from an ongoing royalty award misapprehend Allergan's request.  Allergan is not seeking "an extraterritorial windfall" here.  (Opp. 15.)  As Revance readily concedes, the "infringing acts in this case" include at least "Revance's use of certain [of Allergan's patented] methods in the manufacture of" Daxxify.  (*Id.* at 14.)  Despite its hand-waving concerning "generalized statements about U.S. manufacture" (*id.* at 13), Revance does not (and cannot) dispute that all Daxxify products (including ones sold to foreign partners) are manufactured in the United States. Thus, all of Revance's revenue from its U.S. infringement—including from transfer sales, price supplements, royalties, milestone payments, or anything else—reflects "the domestic value of that domestic" infringing manufacture.  (*Id.* at 14.)

Revance also never disputes that its Daxxify sales to foreign partners occur in the United States.  (*See* Opp. 14-15.)  Tellingly, at trial, Revance itself presented Daxxify sales that included foreign-partner sales as a basis for domestic infringement damages.  (D.I. 672 at 18.) Ms. Trexler likewise admits she included sales to Revance's foreign partner Teoxane in her pre-trial damages analysis, and never distinguished between Revance's revenue from foreign partners or domestic customers at trial.  (D.I. 689, Ex. 1, ¶ 25 n.26; *see* Opp. 13.)  Accordingly, "[a] separate" post-verdict *Georgia-Pacific* analysis for foreign-partner sales (Opp. 15) is not

needed here, where one was not needed pre-trial to measure the value of Revance's domestic infringement.  And as Dr. Siegwarth explains, there is "no economic justification" to treat such foreign-partner sales any differently post-trial.  (Siegwarth Reply Decl. ¶ 15-16 & n.35.)

Revance's reliance (Opp. 13-14) on *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024), is misplaced.  In relevant part, the claims in *Brumfield* were directed to making a computer readable medium ("CRM"), but the damages analysis was based on the "software itself."  97 F.4th at 879-80.  The Federal Circuit explained that "software" is distinct from "a particular copy of it on a CRM," and faulted the damages expert for "not start[ing] from an act of 'infringement'—making a claimed CRM (or method)—in asserting the required causal connection to the foreign conduct for which the proposal seeks royalty damages."  *Id.* at 880.  But the Court recognized that the "domestic making" of the CRMs (like Daxxify here) "could be infringing . . . and properly subject to a royalty."  *Id.*; *see id.* at 872 ("making-and-supplying[] actions" could be infringing "domestic conduct").  Dr. Siegwarth's analysis properly "focus[es] on 'the infringement,'" which includes Daxxify's domestic manufacture, and does not seek "values beyond that of practicing the patent."  *Id.* at 877, 878-79.  (*Cf.* Siegwarth Op. Decl. ¶¶ 21, 28.)  Accordingly, she showed that Revance's revenue from foreign partners "increas[es] the value of the domestic infringement" by allowing Revance to profit from its infringing domestic manufacture.  *Brumfield*, 97 F.4th at 877.  (*Cf.* Siegwarth Op. Decl. ¶¶ 21, 28.)

Revance's argument that the type of payment its foreign partners make to purchase U.S.-made Daxxify should somehow alter the analysis also fails.  At the outset, Revance appears to concede that "the domestic transfer of" Daxxify (*i.e.*, the initial transfer sales) is properly within the scope of an ongoing royalty.  (Opp. 15.)  But Revance seeks to exclude from the ongoing royalty "partner royalties, price supplements, and sales-related milestones" on the basis

that those payments are "divorced from any domestic infringing use by Revance." (Opp. 15.) Revance is wrong. As Revance itself admits, those types of payments for Daxxify are merely the result of "contractual considerations." (*Id.*) Whether Revance's partners pay for Daxxify in a lump sum or over time does not alter the fact that they still pay for Daxxify manufactured in the United States by infringing Allergan's patents. In contrast, accepting Revance's argument would allow it to pay no ongoing royalty at all, as Revance could transfer Daxxify to its partners at no initial cost and receive payment solely through partner royalties, price supplements, and sales-related milestones. Allergan would not negotiate such an ongoing royalty (*see* Siegwarth Reply Decl. ¶ 16), which would undermine the compensatory purpose of 35 U.S.C. § 284.

### 3. The Ongoing Royalty Should Cover Revance's Successors-in-Interest

Revance's attempt to limit any ongoing royalty from reaching its successors should be enough to "suggest [it] intends to circumvent its [royalty] obligations through restructuring." (Opp. 16.) Revance has already been acquired by Crown Laboratories (D.I. 674, Ex. 27) and could engage in additional restructuring, particularly if it could avoid paying an ongoing royalty by doing so. Indeed, given the supposed "general rule . . . that a corporation that purchases the assets of another does not thereby assume the obligations of its predecessor" (*id.* (quoting *Horphag Rsch. Ltd. v. Consac Indus., Inc.*, 116 F.3d 1450, 1454 (Fed. Cir. 1997)),[6] Revance's successors must be required at the outset to assume Revance's ongoing royalty obligations. Without this requirement, if Revance "changes legal status or sells a portion of its business," it "would eviscerate the purpose of ongoing royalties as a remedy" for continued infringement by Daxxify's manufacture and sale, making it "a nullity." *Mondis Tech. Ltd. v. Chimei Innolux*

---

[6]    *Horphag* reversed a district court's decision adding a company's successors-in-interest to an already-issued injunction in an already-closed case. 116 F.3d at 1453-54. *Horphag* does not suggest that this Court cannot award an ongoing royalty post-trial against successors-in-interest.

10

*Corp.*, 2012 WL 1554645, at *6-7 (E.D. Tex. Apr. 30, 2012); *see* Final Judgment at 1, *Sentegra, LLC v. Azend Grp. Corp.*, No. 16-cv-00263 (D. Colo. July 12, 2017) (Ex. 3) (including "successors and assigns" in ongoing royalty award); Amended Judgment ¶ 9, *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. 3:10-cv-05870 (W.D. Wash. July 1, 2013) (Ex. 4) (same).

Revance's argument that a potential successor-in-interest should not be bound by an ongoing royalty award because they are not a party to the post-verdict hypothetical negotiation (Opp. 16) misses the mark. Allergan is seeking an ongoing royalty for infringement by Revance, not some "unknown successors-in-interest" (*id.*), and thus those future parties need not be part of the post-verdict hypothetical negotiation. The jury already determined "the appropriate ongoing royalty rate" for the infringement, so there is no guesswork here. Allergan merely asks that any successors be required to assume Revance's obligations for that continued infringement.

### D. Prejudgment Interest at the Prime Rate, Compounded Quarterly, Best Compensates Allergan for Revance's Infringement

Revance spills much ink arguing that Allergan would receive a "windfall," while Revance would be penalized, if the Court awards prejudgment interest at the prime rate, compounded quarterly. (Opp. 17-21.) But Revance does not explain why this is so, when "the prime rate, compounded quarterly, best compensates a patentee." *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 2022 WL 3973499, at *4 (D. Del. Aug. 31, 2022). (*Cf.* D.I. 672 at 22-23.) Even during and immediately after the COVID-19 pandemic, when Revance claims the prime rate had spiked (Opp. 19-20),[7] this Court and others in this

---

[7] Revance selects a conveniently short period for its so-called "historic norms" analysis. (Opp. 19-20.) Allergan notes, for example, the prime rate was nearly as high in 2006 (8.25%) as in 2023 (8.5%), and significantly exceeded those levels in 2000 (9.5%), 1989 (11.5%), and 1981 (20.5%). (Siegwarth Reply Decl. ¶¶ 5.) Yet courts still calculated prejudgment interest at the prime rate during those times as the "the fairest method" to "compensate the patent owner." *E.g.*, *Scott Paper Co. v. Moore Bus. Forms, Inc.*, 594 F. Supp. 1051, 1083 (D. Del. 1984).

District continued to award prejudgment interest at the prime rate, compounded quarterly. *See, e.g.*, *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 2025 WL 2661540, at *1 (D. Del. Sept. 17, 2025); *Sunoco*, 2022 WL 3973499, at *4.

Revance argues that the prime rate should not apply because Allergan's "borrowing cost" may have been lower. (Opp. 19-21.) But Ms. Trexler's calculations of Allergan's borrowing costs are inaccurate. (*See* Siegwarth Reply Decl. ¶¶ 6-7.) In any event, "it is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *see Vectura Ltd. v. GlaxoSmithKline LLC*, 2019 WL 4346502, at *2 (D. Del. Sept. 12, 2019) (adopting prime rate despite "Plaintiff's low borrowing rate"). Tellingly, even Ms. Trexler never suggests that the prime rate is inappropriate to compensate Allergan (*cf.* D.I. 689, Ex. 1, ¶ 9), leaving only Revance's attorney argument for this point. And in fact, Revance's own cited authority recognizes that the prime rate "is often used as a benchmark." (Siegwarth Reply Decl. ¶ 4; D.I. 689, Ex. 5.) The Court should follow the "most common" practice "in this District" (Opp. 19) and award Allergan prejudgment interest at the prime rate, compounded quarterly.

### E. The Court Should Award Allergan Supplemental Damages and Post-Judgment Interest at the Statutory Rate

Revance does not dispute that post-judgment interest is mandated by statute. Revance also does not independently dispute that supplemental damages are appropriate, relying solely on its JMOL motion arguments. Because there is no plausible basis for JMOL or a new trial (*see* D.I. 690 at 14-25), and for the reasons in Allergan's opening brief (D.I. 672 at 20-22, 24-25), the Court should award Allergan supplemental damages and post-judgment interest as requested.

## III. CONCLUSION

Allergan respectfully requests that the Court grant Allergan's motion for post-trial relief.

MORRIS, NICHOLS, ARSHT & TUNNEL LLP

*Of Counsel*:

*/s/ Anthony D. Raucci*

Eric W. Dittmann
Melanie R. Rupert
Isaac S. Ashkenazi
Krystina L. Ho
Carl J. Minniti III
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jtigan@morrisnichols.com
araucci@morrisnichols.com

Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
(312) 499-6000

*Attorneys for Plaintiff Allergan, Inc.*

Karthik R. Kasaraneni
Vladimir J. Semendyai
David M. Valente
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
(202) 551-1700

November 12, 2025

13

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 12, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire                                         *VIA ELECTRONIC MAIL*
Samantha G. Wilson, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Defendants Revance*
*Therapeutics, Inc. and PCI San Diego, Inc.*

Dennies Varughese, Pharm. D.                                    *VIA ELECTRONIC MAIL*
Eldora L. Ellison, Ph.D.
Adam C. LaRock, Esquire
Olga A. Partington, Ph.D.
Ryan E. Conkin, Esquire
Anna G. Phillips, Esquire
Sasha S. Rao, Esquire
Marsha Rose Gillentine, Ph.D.
Nirav N. Desai, Esquire
Christopher M. Gallo, Ph.D.
Tyler C. Liu, Esquire
Adil B. Moghal, Ph.D.
Louis P. Panzica, Jr., Esquire
Byron L. Pickard, Esquire
Deirdre M. Wells, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC  20005
*Attorneys for Defendants Revance*
*Therapeutics, Inc. and PCI San Diego, Inc.*

Peter J. Armenio, Esquire
Andrew Solomon, Esquire
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY  10005
*Attorneys for Defendants Revance*
*Therapeutics, Inc. and PCI San Diego, Inc.*

*VIA ELECTRONIC MAIL*

*/s/ Anthony D. Raucci*

Anthony D. Raucci (#5948)

2