# EXHIBIT 1

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration
Silver Spring, MD 20993

IND 129198

**MEETING REQUEST-
WRITTEN RESPONSES**

Revance Therapeutics, Inc.
Attention: Sita Malhi
Manager, Regulatory Affairs
7555 Gateway Blvd.
Newark, CA 94560

Dear Ms. Malhi:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act for daxibotulinumtoxinA for injection.

We also refer to your submission dated June 15, 2018, containing a meeting request. The purpose of the requested meeting was to seek guidance on requirements for a waiver request for a bioavailability study or a Maximal Usage Trial (MUsT) for the daxibotulinumtoxinA.

Further reference is made to our Meeting Granted letter dated June 28, 2018, wherein we stated that written responses to your questions would be provided in lieu of a meeting.

The enclosed document constitutes our written responses to the questions contained in your June 12, 2018 background package.

If you have any questions, call Barbara Gould, Chief, Project Management Staff at (301) 796-4224.

Sincerely,

*{See appended electronic signature page}*

Kendall A. Marcus, MD
Director
Division of Dermatology and Dental Products
Office of Drug Evaluation III
Center for Drug Evaluation and Research

Enclosure:
Written Responses

Reference ID: 4313858

EXHIBIT
tabbies
Drago
4
MG 5/8/24

C.A. No. 21-1411-RGA-LDH
Joint Trial Exhibit
JTX-108

REV_DAX-00000587

OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

## WRITTEN RESPONSES

| | |
|---|---|
| **Meeting Type:** | C |
| **Meeting Category:** | Guidance |
| **Application Number:** | IND 129198 |
| **Product Name:** | daxibotulinumtoxinA for injection |
| **Proposed Indication:** | Treatment for temporary improvement in the appearance of moderate to severe glabellar lines with corrugator and/or procerus muscle activity in adults |
| **Sponsor:** | Revance Therapeutics, Inc. |
| **Regulatory Pathway:** | 351(a) of the Public Health Service Act |

## 1.0 BACKGROUND

The purpose of this meeting is to discuss written guidance on requirements for a waiver request for a bioavailability study or a Maximal Usage Trial (MUsT) for the novel excipient RTP004, a peptide, used in the daxibotulinumtoxinA injection formulation.

## 2.0 QUESTIONS AND RESPONSES

### 2.1. Chemistry, Manufacturing and Contols (CMC)

***Question 3:***

Recently, Revance responded to the FDA request to provide product quality information to demonstrate the use of RTP004 as an excipient in DaxibotulinumtoxinA drug product formulation [Reference SN0032, Section 1.11.1]. Does the Agency agree that Revance provided sufficient data to establish the role of RTP004 as a stabilizer?

***FDA Response to Question 3:***

Your study reports provide information to show that RTP004 peptide reduces adsorption of daxibotulinumtoxinA to containers and RTP004 stabilizes daxibotulinumtoxinA from thermal denaturation by increasing the Tm and decreasing the aggregation rate. We agree that you provided appropriate data to demonstrate the role of RTP004 as a stabilizer.

### 2.2. Nonclinical

***Question 2:***

AT the Agency's request, Revance has developed a highly sensitive PK bioanalytical assay for measuring the novel excipient RTP004, using state-of-the-art high resolution mass



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

[redacted]

***FDA Response to Question 2:***

RTP004 is a synthetic 35-amino acid polypeptide enriched in lysine. The toxicity of RTP004 has been thoroughly characterized in a 6-month repeat dose intramuscular study in rats. No RTP004-related effects (1 mg/kg QW) were noted on any parameter tested. Its potential genotoxicity was evaluated in the standard ICH genetic toxicity battery. From a nonclinical perspective, we agree that Revance has provided sufficient data to show no safety signal for the RTP004 excipient in the daxibotulinumtoxinA drug product. Therefore, there is no need for additional nonclinical studies, including a rat PK study. .

## 2.3. Clinical Pharmacology

***Question 1:***

Revance's proprietary peptide (RTP004) used in daxibotulinumtoxinA for injection (DAXI for injection) meets the definition for a novel excipient. Based on the totality of data from non-clinical, clinical and CMC, the novel excipient RTP004 is deemed to lack pharmacological activity and only functions as a stabilizer in DAXI for injection drug product formulation. Subsequent to Revance's last discussion with the Agency [Reference ID: 3946069, End of Phase 2 Meeting/Pre-IND Meeting Minutes], pharmaceutical development studies were conducted to demonstrate RTP004's role as a stabilizer in the to-be-marketed drug product formulation [Reference SN0032, REP_DEV_2081, and REP_DEV_2082], and nonclinical data were generated to support the lack of pharmacological activity. Additionally, placebo data from the Phase 3 clinical studies provide further evidence of RTP004's lack of pharmacological activity. DAXI for injection is



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

a locally acting intramuscular (IM) injection and thus having limited systemic exposure compared to an IV injection.

a) Because RTP004 is pharmacologically inactive with limited systemic exposure, Revance believes that there is no requirement to provide human PK data for this novel excipient in the BLA. Does the Agency agree?

b) If the Agency would still require human PK data for the novel excipient, could the Agency elaborate on the reasons why?

***<u>FDA Response to Question 1:</u>***
We agree that human PK data for RTP004 is not required in filing of your BLA for the glabellar lines indication.

***<u>Question 4:</u>***
In the EoPII meeting minutes [Reference ID: 3946069], FDA advised Revance to request a waiver for a Maximal Usage Trial (MUsT) for the active ingredient DaxibotulinumtoxinA and another one for the novel excipient RTP004. However, it is Revance's interpretation of FDA Guidance's that Maximal Usage Trials are only relevant for topical administrations. Revance is instead planning to request a waiver for a human bioavailability study instead of a waiver for a Maximal Usage Trial for both DaxibotulinumtoxinA and RTP004.

Does the FDA concur?

***<u>FDA Response to Question 4:</u>***
We agree with your plan to submit waiver requests for conducting human bioavailability studies. We will review your submission on determine whether the waiver requests would be granted or not for your proposed dose and indication.

***<u>Question 5:</u>***
All available information as presented in the Company Position for Question 1 and 2 support that it will be unlikely that RTP004 peptide is detectable even when using the latest state-of-the-art MS instrument at even higher doses than the proposed human dose. As the rat study has not yet read out and in the unlikely scenario the MS instrument would be sensitive enough, Revance would like to take the opportunity to ask a general question about potential PK study design to study a novel excipient. Revance's understanding of a design of a human bioavailability study for a local acting intramuscular administration is to measure the systemic blood or serum levels after a single dose. The design would entail using the to-be marketed dose (40 Units) injected in the glabellar lines using the final drug product formulation. Also, Revance would like to highlight that the Phase III pivotal studies for Glabellar Lines are finalized and there is no possibility for a population PK sub study.

Does FDA concur?



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

***FDA Response to Question 5:***

As a general comment, we usually recommend sponsor characterize PK profile of each active component following single dose and multiple dose administrations and human PK data after administration using the to-be-marketed formulation product is needed to support the marketing approval and labeling. Considering the dose and dosing frequency of your product for the treatment of glabellar lines, the potential for systemic accumulation is low for RTP004; therefore, your proposal to characterize the bioavailability after a single dose appears to be reasonable.

***Question 6:***

Revance is planning to send FDA the request for the waivers for the bioavailability studies 4 to 6 months before the submission of the BLA. However, transferring the method to a GLP laboratory has shown to be challenging as this new technology is not extensively or routinely used. Unfortunately, this has already caused some delay, and the timeline is still uncertain.

As there are no PDUFA timelines for these types of submissions, Revance would like to understand if it is acceptable to submit the BLA if the waivers are still under review and not yet granted by FDA, without receiving a Refusal To File. Additionally, in CFR 320 it does mention that a waiver request could be submitted with the BLA, and we would like to understand if this would be an option.

a) Does FDA agree if Revance has the correct interpretation of the timing of a waiver request?

b) Does the waiver request for the bioavailability study have to be granted by FDA before the BLA submission or can it be part of the BLA?

***FDA Response to Question 6:***

We recommend that you submit your waiver request to the IND as early as possible for our review. If the waiver(s) are still under review by the time when you submit your BLA, you need to include the waiver requests to support filing of your BLA. If the waivers are granted prior to your BLA submission, you still need to include the waiver requests along with the granted letter in the BLA.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

## 3.0 ADMINISTRATIVE COMMENTS

### PREA REQUIREMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of the criteria apply at this time to your application, you are exempt from these requirements. Please include a statement that confirms this finding, along with a reference to this communication, as part of the pediatric section (1.9 for eCTD submissions) of your application. If there are any changes to your development plans that would cause your application to trigger PREA, your exempt status would change.

### DATA STANDARDS FOR STUDIES

Under section 745A(a) of the FD&C Act, electronic submissions "shall be submitted in such electronic format as specified by [FDA]." FDA has determined that study data contained in electronic submissions (i.e., NDAs, BLAs, ANDAs and INDs) must be in a format that the Agency can process, review, and archive. Currently, the Agency can process, review, and archive electronic submissions of clinical and nonclinical study data that use the standards specified in the Data Standards Catalog (Catalog) (See http://www.fda.gov/forindustry/datastandards/studydatastandards/default.htm).

On December 17, 2014, FDA issued final guidance, *Providing Electronic Submissions in Electronic Format--- Standardized Study Data* (http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM292334.pdf). This guidance describes the submission types, the standardized study data requirements, and when standardized study data will be required. Further, it describes the availability of implementation support in the form of a technical specifications document, Study Data Technical Conformance Guide (Conformance Guide) (See http://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM384744.pdf), as well as email access to the eData Team (cder-edata@fda.hhs.gov) for specific questions related to study data standards. Standardized study data will be required in marketing application submissions for clinical and nonclinical studies that start on or after December 17, 2016. Standardized study data will be required in commercial IND application submissions for clinical and nonclinical studies that start on or after December 17, 2017. CDER has produced a *Study Data Standards Resources* web page that provides specifications for sponsors regarding implementation and submission of clinical and nonclinical study data in a standardized format. This web page will be updated regularly to reflect CDER's growing experience in order to meet the needs of its reviewers.

Although the submission of study data in conformance to the standards listed in the FDA Data Standards Catalog will not be required in studies that start before December 17, 2016, CDER



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

strongly encourages IND sponsors to use the FDA supported data standards for the submission of IND applications and marketing applications. The implementation of data standards should occur as early as possible in the product development lifecycle, so that data standards are accounted for in the design, conduct, and analysis of clinical and nonclinical studies. For clinical and nonclinical studies, IND sponsors should include a plan (e.g., in the IND) describing the submission of standardized study data to FDA. This study data standardization plan (see the Conformance Guide) will assist FDA in identifying potential data standardization issues early in the development program.

Additional information can be found at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

For general toxicology, supporting nonclinical toxicokinetic, and carcinogenicity studies, CDER encourages sponsors to use Standards for the Exchange of Nonclinical Data (SEND) and submit sample or test data sets before implementation becomes required. CDER will provide feedback to sponsors on the suitability of these test data sets. Information about submitting a test submission can be found here: http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm174459.htm

## LABORATORY TEST UNITS FOR CLINICAL TRIALS

CDER strongly encourages IND sponsors to identify the laboratory test units that will be reported in clinical trials that support applications for investigational new drugs and product registration. Although Système International (SI) units may be the standard reporting mechanism globally, dual reporting of a reasonable subset of laboratory tests in U.S. conventional units and SI units might be necessary to minimize conversion needs during review. Identification of units to be used for laboratory tests in clinical trials and solicitation of input from the review divisions should occur as early as possible in the development process. For more information, please see the FDA website entitled, Study Data Standards Resources and the CDER/CBER Position on Use of SI Units for Lab Tests website found at https://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM587505.pdf.

## SECURE EMAIL COMMUNICATIONS

Secure email is required for all email communications from FDA when confidential information (e.g., trade secrets, manufacturing, or patient information) is included in the message. To receive email communications from FDA that include confidential information (e.g., information requests, labeling revisions, courtesy copies of letters), you must establish secure email. To establish secure email with FDA, send an email request to SecureEmail@fda.hhs.gov. Please note that secure email may not be used for formal regulatory submissions to applications (except for 7-day safety reports for INDs not in eCTD format).



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

**PATIENT-FOCUSED ENDPOINTS**

An important component of patient-focused drug development is describing the patient's perspective of treatment benefit in labeling based on data from patient-focused outcome measures [e.g., patient-reported outcome (PRO) measures]. Therefore, early in product development, we encourage sponsors to consider incorporating well-defined and reliable patient-focused outcome measures as key efficacy endpoints in clinical trials, when appropriate, and to discuss those measures with the Agency in advance of confirmatory trials. For additional information, refer to FDA's guidance for industry *Patient-Reported Outcome Measures: Use in Medical Product Development to Support Claims*, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM193282.pdf.

**NEW PROTOCOLS AND CHANGES TO PROTOCOLS**

To ensure that the Division is aware of your continued drug development plans and to facilitate successful interactions with the Division, including provision of advice and timely responses to your questions, we request that the cover letter for all new phase 2 or phase 3 protocol submissions to your IND or changes to these protocols include the following information:

1. Study phase
2. Statement of whether the study is intended to support marketing and/or labeling changes
3. Study objectives (e.g., dose finding)
4. Population
5. A brief description of the study design (e.g., placebo or active controlled)
6. Specific concerns for which you anticipate the Division will have comments
7. For changes to protocols only, also include the following information:
    - A brief summary of the substantive change(s) to the protocol (e.g., changes to endpoint measures, dose, and/or population)
    - Other significant changes
    - Proposed implementation date

We recommend you consider requesting a meeting to facilitate discussion of multiple and/or complex issues.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

---

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

---

/s/

---

KENDALL A MARCUS
08/29/2018