**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br>Plaintiff,<br>v.<br>Revance Therapeutics, Inc. and PCI San Diego, Inc.,<br>Defendants. | **REDACTED - PUBLIC VERSION**<br>C.A. No. 21-1411-RGA-LDH<br>[redacted] |

**Declaration of Vladimir J. Semendyai in Support of Plaintiff's**
**<u>Reply Brief in Support of Its Motion for Post-Trial Relief</u>**

I, Vladimir J. Semendyai, hereby declare as follows:

1. I am an attorney admitted to practice before this Court *pro hac vice* and a member of the law firm Paul Hastings, LLP, counsel for Plaintiff Allergan, Inc., in connection with the above-captioned matter. As such, I am familiar with the facts and circumstances surrounding this litigation, and I submit this Declaration in support of Plaintiff's Reply Brief in Support of its Motion for Post-Trial Relief.

2. Attached hereto as **Exhibit 1** is a true and correct copy of the Reply Declaration of Christine Siegwarth, Ph.D., filed under seal in support of Plaintiff's Reply Brief in Support of its Motion for Post-Trial Relief, dated November 12, 2025.

3. Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from PTX-450, an August 18, 2019 presentation prepared by Kaiser Associates titled "Understanding the Value of Daxi's Therapeutic Franchise." PTX-450 was designated "HIGHLY

**CONFIDENTIAL VERSION FILED - 11/12/25**
**REDACTED VERSION FILED - 11/25/25**

CONFIDENTIAL – COUNSEL EYES ONLY." Accordingly, Exhibit 2 is being filed under seal.

4. Attached hereto as **Exhibit 3** is a true and correct copy of Final Judgment, *Sentegra, LLC v. Azend Grp. Corp.*, No. 16-cv-00263 (D. Colo. July 12, 2017) (ECF 31), downloaded by me on November 11, 2025, from the official CM/ECF Document Filing System of the U.S. District Court for the District of Colorado.

5. Attached hereto as **Exhibit 4** is a true and correct copy of Amended Judgment, *Syntrix Biosystems, Inc. v. Illumina, Inc.*, No. 3:10-cv-05870 (W.D. Wash. July 1, 2013) (ECF 359), downloaded by me on November 11, 2025, from the official CM/ECF Document Filing System of the U.S. District Court for the Western District of Washington.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 12, 2025

*/s/ Vladimir J. Semendyai*
Vladimir J. Semendyai
Paul Hastings LLP

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 12, 2025, upon the following in the manner indicated:

Anne Shea Gaza, Esquire *VIA ELECTRONIC MAIL*
Samantha G. Wilson, Esquire
Daniel G. Mackrides, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*

Dennies Varughese, Pharm. D. *VIA ELECTRONIC MAIL*
Eldora L. Ellison, Ph.D.
Adam C. LaRock, Esquire
Olga A. Partington, Ph.D.
Ryan E. Conkin, Esquire
Anna G. Phillips, Esquire
Sasha S. Rao, Esquire
Marsha Rose Gillentine, Ph.D.
Nirav N. Desai, Esquire
Christopher M. Gallo, Ph.D.
Tyler C. Liu, Esquire
Adil B. Moghal, Ph.D.
Louis P. Panzica, Jr., Esquire
Byron L. Pickard, Esquire
Deirdre M. Wells, Esquire
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1101 K Street, NW, 10th Floor
Washington, DC 20005
*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*

Peter J. Armenio, Esquire
Andrew Solomon, Esquire
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*

*VIA ELECTRONIC MAIL*

*/s/ Anthony D. Raucci*

Anthony D. Raucci (#5948)

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Revance Therapeutics, Inc. and<br>PCI San Diego, Inc.,<br><br>*Defendants*. | Civil Action No. 21-1411-RGA<br><br>[redacted] |

**REPLY DECLARATION OF CHRISTINE SIEGWARTH, PH.D.**

November 12, 2025

[redacted]

I, Christine Siegwarth, declare as follows:

1. I have been asked by counsel for Allergan to respond to issues raised by Defendants ("Revance") via Defendants' Answering Brief in Opposition to Plaintiff's Motion for Post-Trial Relief and the Declaration of Dana Trexler, CPA/CFF, dated October 27, 2025.[1]

2. Having reviewed the Trexler Declaration, the opinions which I previously reached, and which were described in the Siegwarth Declaration remain unchanged.[2]

### I. The Prime Rate Provides an Economically Relevant Basis for the Calculation of Prejudgment Interest

3. In the Siegwarth Declaration, I calculated prejudgment interest of [redacted] through July 24, 2025, by applying the U.S. prime rate, compounded quarterly, to the total prejudgment damages owed to Allergan from December 1, 2022 through July 24, 2025.[3] In Revance's Opposition to Allergan's Motion for Post-Trial Relief, Revance states that it "acknowledges that the prime rate, compounded quarterly, has previously been recognized as the most common in this District."[4] Additionally, Ms. Trexler agrees with my calculation of prejudgment interest "[i]f the Court decides to award prejudgment interest at the prime rate, compounded quarterly."[5]

4. Even so, Revance asserts that "Allergan's demand for prejudgment interest at the prime rate would produce a windfall for Allergan" because "the prime rate exceeded recent historical norms" and have been at "at historically anomalous rates."[6] I disagree with Revance's representation of the prime rate, which is also at odds with the sources cited in

1 Declaration of Dana Trexler, CPA/CFF, October 27, 2025 ("Trexler Declaration"); Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Post-Trial Relief, October 27, 2025 ("Revance's Opposition to Allergan's Motion for Post-Trial Relief").

2 Declaration of Christine Siegwarth, Ph.D. in Support of Allergan's Motion for Supplemental Damages, Prejudgment and Post-Judgment Interest, and Ongoing Royalty, September 12, 2025 ("Siegwarth Declaration").

3 Siegwarth Declaration, ¶¶ 7, 57, Exhibit 2.

4 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 19.

5 Trexler Declaration, ¶ 8.

6 Revance's Opposition to Allergan's Motion for Post-Trial Relief, pp. 3, 19, 21.



[redacted]

Revance's opposition brief. Specifically, Revance references an article entitled "A Primer on the Prime Rate," authored by Matt Kelley, Portfolio Strategy Manager at ESL Federal Credit Union, which states:[7]

- "The target federal funds rate, which is set by the Fed, serves as the basis for the prime rate […] That means that when the Fed raises interest rates, the prime rate also goes up."
- "The prime rate is the rate at which individual banks and credit unions lend to their customers, including large corporations. It is often used as a benchmark for other loans like credit card and small-business loans."
- "The prime rate is generally the lowest rate of interest in which money may be borrowed commercially."
- "Because the prime rate is so closely tied to the Federal Funds Rate, changes in the prime rate are reflective of the Fed's position on the economy."

5. That is, according to ESL Federal Credit Union, the prime rate serves as the starting point for many interest-bearing financial products and typically adjusts in response to prevailing economic conditions in the U.S. Revance asserts that "Allergan asks this Court to apply a prime rate that exceeds recent historic norms."[8] Revance's assertion is based on data extending back to December 1, 2017.[9] However, there is no economic basis for ignoring earlier data on the prevailing prime rate, which demonstrate that the prime rate in fact fluctuates significantly over time in response to economic conditions (*see* **Figure 1** below). For example, as illustrated below, the prime rate was 9.5 percent for most of 2000 and it reached 20.5 percent in 1981. These historical data demonstrate that the

7 Declaration of Anne Shea Gaza in Support of Defendants' Answering Brief in Opposition to Plaintiff's Motion for Post-Trial Relief, October 27, 2025 ("Gaza Declaration"), Exhibit 5. *See also* Kelley, Matt, "A Primer on the Prime Rate," *ESL Federal Credit Union*, available at https://www.esl.org/resources-tools/educational-resources/understanding-the-prime-rate, accessed on November 6, 2025.

8 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 19.

9 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 19.



[redacted]

recent prime rates have not been at "historically anomalous" levels.[10]

**Figure 1: U.S. Prime Rate, 1955-2025[11]**




6. Revance further asserts that "Allergan's actual borrowing cost was significantly lower [than the prime rate]."[12] Specifically, Revance claims that Allergan's average long-term borrowing cost was 3.42 percent, 3.57 percent, and 4.05 percent in 2022, 2023, and 2024, respectively.[13] Ms. Trexler calculated these estimates of Allergan's borrowing cost based on "AbbVie's reporting of long-term debt in its 2022, 2023, and 2024 Form 10-K."[14] However, Ms. Trexler's calculation of "AbbVie's annual weighted average effective interest rate" is not an appropriate method for determining Allergan's actual borrowing costs during the infringement period, making any comparison of Ms. Trexler's estimated interest rate and the prime rate uninformative and irrelevant.[15]

---

10 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 21.

11 "Bank Prime Loan Rate (DPRIME)," *Board of Governors of the Federal Reserve System (US)*, retrieved from FRED, Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/DPRIME, accessed November 6, 2025.

12 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 19.

13 Revance's Opposition to Allergan's Motion for Post-Trial Relief, p. 20.

14 Trexler Declaration, ¶ 9 and Trexler Exhibit 1.1.

15 Trexler Declaration, ¶ 9.



[redacted]

7. The fundamental flaw in Ms. Trexler's methodology is that she calculates an average interest rate across AbbVie's entire long-term debt portfolio with no consideration of when AbbVie's long-term debt was first issued or the differences in borrowing terms across AbbVie's debt portfolio. By failing to determine AbbVie's actual borrowing cost on new debt at a time when interest rates were rising, Ms. Trexler underestimates the interest rates that Allergan faced during the infringement period. That is, Ms. Trexler's calculations fail to accurately reflect Allergan's actual borrowing costs during the infringement period and are therefore uninformative and irrelevant for the calculation of prejudgment interest.

## II. Ms. Trexler's Post-Verdict Royalty Analysis Is Inconsistent with the Post-Verdict Economic Circumstances and Contradicts the Testimony She Presented to the Jury

### A. The Parties at the Post-Verdict Hypothetical Negotiation Would Have Negotiated One Set of Royalty Rates Covering Daxxify Sales for Both Cosmetic and Therapeutic Uses

8. In her declaration, Ms. Trexler appears to offer several opinions that are contrary to the economic expectations of the parties at the post-verdict hypothetical negotiation and contradict the testimony she presented to the jury at trial.

9. First, Ms. Trexler asserts that "the reasonable royalty rates presented at trial do not support a post-judgment royalty rate for the therapeutics market in the U.S."[16] In particular, Ms. Trexler claims that "the basis for Dr. Siegwarth's reasonable royalty rates […] was limited to information relating only to the cosmetics market in the U.S" and that the information presented at trial was "specific to preferences, sales, and pricing in the U.S. cosmetics market."[17] I disagree.

10. Ms. Trexler fails to acknowledge that I used a cost of delay methodology to determine a reasonable royalty for the '748 Patent that did not rely on Daxxify's price premium

16 Trexler Declaration, ¶ 22.

17 Trexler Declaration, ¶ 21.



[redacted]

relative to Botox Cosmetic.[18] Instead, my methodology estimated the temporary profit loss that Revance would have had to incur had it decided to pursue a non-infringing alternative instead of obtaining a license to the '748 Patent. This analysis was based on projections of Daxxify sales for both cosmetic and therapeutic uses from around the time of the pre-launch hypothetical negotiation. Moreover, with respect to the '878 Patent, I discussed in my opening report a 2019 presentation prepared by Kaiser Associates reporting that "duration ranked as a top unmet need across all Tx indications."[19] As such, Ms. Trexler is incorrect to assert that my reasonable royalty analysis was "limited to information relating only to the cosmetics market in the U.S."[20]

11. Likewise, I have reviewed the trial transcripts, and at no point in her trial testimony did Ms. Trexler indicate that her royalty rate opinions would only apply to cosmetic sales of Daxxify in the U.S. Instead, Ms. Trexler told the jury that damages are simply calculated by multiplying the reasonable royalty rate with total Daxxify sales irrespective of how the product is ultimately used. In fact, Ms. Trexler and I both used the same royalty base in our calculations: total Daxxify sales of approximately $273 million through May 31, 2025, which included both cosmetic and therapeutic sales.[21] Ms. Trexler is now opining that "additional analysis of the *Georgia-Pacific* factors" are required to "support a post-judgment royalty rate."[22] Yet, Ms. Trexler has not provided any such analysis, which would contradict her opinion at trial.

12. As I testified at trial, as an economic matter, Allergan and Revance would not negotiate separate royalty rates for cosmetic and therapeutic uses.[23] At the post-judgment hypothetical negotiation, cosmetic sales would account for the vast majority of total

---

[18] Expert Report of Christine S. Meyer, Ph.D., December 15, 2023 ("Siegwarth Damages Report"), ¶¶ 165-172, Exhibits 6A-6E.

[19] Siegwarth Damages Report, ¶ 129; PTX-450.0032. *See* Declaration of Vladimir Semendyai, November 12, 2025, Exhibit 2.

[20] Trexler Declaration, ¶ 21.

[21] Transcript of Jury Trial, *Allergen, Inc., vs. Revance Therapeutics, Inc., et al.*, United States District Court for the District of Delaware, Case No. 24-CV-1411-RGA, ("Trial Tr."), July 16, 2025, 602:14-603:2; Trial Tr., July 17, 2025, 1054:14-24. *See also* Siegwarth Declaration, ¶¶ 4-6, Exhibit 1.

[22] Trexler Declaration, ¶ 22.

[23] Trial Tr., July 15, 2025, 515:6-21.



[redacted]

current and forecasted Daxxify sales.[24] While Revance maintains that Daxxify has a significant commercial opportunity with respect to therapeutic uses, cosmetic sales will most likely continue as Daxxify's primary source of revenue in the years before the expiration of the '878 Patent, which expires on September 21, 2026, and the '748 Patent, which expires on July 13, 2029. As such, the parties' economic considerations regarding cosmetic sales would likely be top of mind for Allergan and Revance at the post-judgment hypothetical negotiation. Compared to a pre-launch hypothetical negotiation, Revance would be a highly motivated licensee as it has not identified an economically viable non-infringing alternative it could turn to in the absence of the hypothetical license.[25] On balance, the *Georgia-Pacific* factors suggest a slight upward impact on the jury determined royalty rates.[26] As I stated in my post-trial declaration, it is my opinion that "Allergan is entitled to ongoing royalty rates that are no less than the royalty rates already determined by the jury: 15 percent for the '878 Patent and four percent for the '748 Patent (*i.e.*, totaling 19 percent from July 25, 2025 through the September 21, 2026 expiration of the '878 Patent followed by 4 percent from September 22, 2025 through the July 13, 2029 expiration of the '748 Patent)."[27]

13. The Trexler Declaration also appears to contradict Ms. Trexler's trial testimony regarding whether a royalty rate can be based on Daxxify's price premium relative to Botox Cosmetic in a situation where such a price premium does not exist (*i.e.*, when Daxxify and Botox Cosmetic are priced the same). At trial, Ms. Trexler testified that an appropriate royalty rate would not be zero if Revance were to price Daxxify at parity to Botox Cosmetic (in which case the price premium would be zero).[28] In fact, Ms. Trexler testified that in such a situation, she "would use a different methodology."[29] In her

---

24 JTX-093.0040. *See also* Expert Report of Christine S. Meyer, Ph.D., June 19, 2025 ("Second Siegwarth Supplemental Report"), Exhibits 24, 26A, 26B; Siegwarth Declaration, Exhibit 1.

25 Siegwarth Declaration, ¶¶ 43-44, 46.

26 Siegwarth Declaration, ¶ 56.

27 Siegwarth Declaration, ¶ 56.

28 Trial Tr., July 17, 2025, 1075:1-1076:15.

29 Trial Tr., July 17, 2025, 1075:25-1076:15.



[redacted]

declaration, Ms. Trexler now asserts that "[a]s the price premium in the post-judgment hypothetical negotiation would be reduced, if not zero, a downward adjustment to the reasonable royalty rates I presented at trial would also be appropriate"[30] and that "Price Premium $0 x % Apportionment based on Surveys = $0."[31] That is, Ms. Trexler is advancing a methodology for determining a reasonable royalty that she admitted would be inappropriate in a scenario in which Revance decides to align the pricing of Daxxify with that of Botox Cosmetic to boost its sales of Daxxify.[32] Indeed, if Daxxify's current price premium is "$0," that further supports my opinion that Ms. Trexler's price-premium-based royalty opinions are inappropriate and unreasonable. Allergan would certainly not agree at the post-verdict hypothetical negotiation to license its infringed '748 Patent and the '786 Patent to a direct competitor such as Revance for free simply because Revance is pricing Daxxify at parity with Botox Cosmetic. Thus, rather than evaluating the economic considerations of the parties at the post-judgment negotiation, Ms. Trexler is now advancing her flawed methodology for determining a relevant royalty rate, which is in direct opposition to her trial testimony. My methodology, on the other hand, which is not tied to the price premium, properly accounts for the post-verdict economic considerations of both parties.

### B. The Parties at the Post-Verdict Hypothetical Negotiation Would Have Negotiated One Set of Royalty Rates to Cover Domestic Daxxify Sales to Both Domestic and Foreign Revance Partners

14. Similarly, Allergan and Revance would not negotiate separate royalty rates for Daxxify sales to Revance's domestic customers and Revance's transfer sales of Daxxify product manufactured in the U.S. to its foreign partners. At the time of the post-judgment hypothetical negotiation, Revance's U.S. sales to domestic customers account for the vast majority of total Daxxify sales.[33] As such, the parties' economic considerations regarding

---

30 Trexler Declaration, ¶ 19, FN 18.

31 Trexler Declaration, ¶ 19, FN 19.

32 Siegwarth Declaration, ¶ 36.

33 Out of over [redacted] of Daxxify total sales through July 24, 2025, Revance appears to have made only two sales to its international partners: [redacted] of Daxxify sold to Shanghai Fosun Pharmaceutical Industrial Development Co., Ltd., and [redacted] of Daxxify sold to Teoxane SA. Siegwarth Declaration, ¶¶ 4-6, 21, FNs 26-27.



[redacted]

Daxxify sales to Revance's domestic customers would likely be top of mind for Allergan and Revance at the post-judgment hypothetical negotiation, and the parties would seek to negotiate a single set of royalty rates which would be applied to any Daxxify revenue, including Revance's transfer sales of Daxxify to foreign partners, and any royalties, price supplements, and/or milestone payments received by Revance on those partners' Daxxify sales.

15. Ms. Trexler also opines that Daxxify product manufactured in the United States and sold overseas requires "a separate analysis under the *Georgia-Pacific* framework … to determine any royalty rates for those sales."[34] Yet, Ms. Trexler also acknowledges that "[f]or the purposes of trial, [she] included [redacted] of foreign sales to Teoxane in [her] calculation of Revance's royalty base."[35] That is, Ms. Trexler presented at trial her damages opinions using total Daxxify sales through May 31, 2025, including Revance's transfer sales of Daxxify product manufactured in the United States for sale in international markets, by applying the same royalty rates to all sales of Daxxify. Ms. Trexler's evaluation of the post-judgment hypothetical negotiation is inappropriate and unsupported, as Ms. Trexler appears to revise and revert her opinions rather than updating her royalty analysis based on the changed economic circumstances of the parties at an approximately July 24, 2025 negotiation date. But I see no economic justification offered in Ms. Trexler's declaration for treating domestic transfer sales to Revance's international customers made through May 31, 2025, differently from domestic transfer sales to Revance's international customers made after that date.

16. Similarly, it makes no economic sense to treat revenue Revance receives from the initial transfer sales any differently from revenue Revance receives from royalties, price supplements, and milestones that it earns from the infringing products. Allergan would not agree to such a license at the post-verdict hypothetical negation because Revance could renegotiate and restructure its supply agreements with foreign partners to require no upfront transfer payments and instead receive its payment for Daxxify through

---

34 Trexler Declaration, ¶ 25.

35 Trexler Declaration, FN 26.



[redacted]

royalties, price supplements, and milestone payments. As that would reduce the royalty Revance owes to Allergan on these sales to $0, Allergan would not agree to this approach. Ms. Trexler does not consider these post-verdict economic realities.[36] I have considered these realities in my analysis, on the other hand, and I believe the same royalty rates should apply to all U.S. sales of Daxxify, regardless of the country of origin of the customer.[37]

17. As such, my opinions regarding damages, prejudgment interest, post-judgment interest, and ongoing royalties have not changed after reviewing the Trexler Declaration.

I declare under penalty of perjury that the forgoing is true and correct.

Signed this 12th day of November, 2025.



Christine Siegwarth, Ph.D.

[36] Ms. Trexler further asserts that "[t]he foreign market, the demand for the patented features in the relevant geographic area, pricing, profitability, and the economics of Revance's licensing arrangements with its Foreign Partners would all have to be considered in a hypothetical negotiation." *See* Trexler Declaration, ¶ 25. Yet, Ms. Trexler fails to recognize that the agreements between Revance and its foreign partners set out the financial payments that Revance will receive from U.S. manufactured Daxxify products sold in those markets.

[37] Siegwarth Declaration, ¶ 21.



[redacted]

# Exhibit 2

EXHIBIT 10
Sanders
10/24/2023
Reported by: Michael P. Hensley, RDR
CA CSR #14114

KAISER ASSOCIATES

# Understanding the Value of Daxi's Therapeutic Franchise

Final Consolidated Findings
Confidential, Revance Therapeutics
28 August 2019

revance®
REMARKABLE SCIENCE. ENDURING PERFORMANCE.®

[redacted]

C.A. No. 21-1411-RGA-LDH
Plaintiffs' Trial Exhibit
PTX-450

# Table of Contents


**03** Introduction

**09** Target Product Profiles

**29** Executive Summary of Key Findings

**53** LRP Implications

**59** Cross-Program Strategic Assessment

**78** Detailed Quantitative Findings

*79* *Movement Disorders: Cervical Dystonia (CD) and Spasticity*

*112* *Plantar Fasciitis (PF)*

*133* *High Frequency Episodic Migraine (HFEM)*

*162* *Payer Research*

**184** Next Steps

**186** Appendix: Interim Qualitative Findings




[redacted]

# Summary of Key Findings: Market Drivers

*Market Opportunity, Channel Dynamics, Drivers of Choice, Unmet Needs and Competitive Intensity*

## Summary of Key Findings: Market Opportunity and Channel Dynamics

1. The total **2019 US market opportunity for Daxi** across CD, Spasticity, PF and HFE Migraine is [redacted]
   - This represents **BoNT sales in movement disorders**, the entirety of the **specialist-treated market for Tier 1-3 therapies in PF** and current **CGRP / off-label BoNT sales in HFE Migraine**
   - **HFEM represents the largest market opportunity for Daxi at** [redacted] **followed by PF at** [redacted]; the magnitude of PF market size vs. Q2-2019 LRP assumptions stems from a shift to include Tier 1 & 2 patients as addressable
     - The size of the market opportunity for HFEM and PF is also largely driven by **high prevalence rates** vs. movement disorders
     - However, lower end-of-line treatment rates drive the number of addressable patients in these indications closer to CD/LS
   - **HFEM is also the fastest growing market, with a projected CAGR ('19 – '36) of** [redacted] due to entrance new CGRP treatments in the next 5-10 years; followed by Spasticity at [redacted] **CAGRS for ULS and LLS respectively**
     - **PF and CD will experience lower levels of growth** in the next 10+ years with projected CAGRs of [redacted]
   - While **CD and Spasticity represent smaller markets, BoNT class penetration is highest in these indications**, at [redacted] in CD and [redacted] ULS which may accelerate the ramp of Daxi sales in CD / Spasticity markets
2. Across all indications, patient volume is **highly concentrated in the top 2-3 deciles**; consolidation is highest in [redacted] **where >70% of patients are treated by just 20% of providers**
   - Due to high degrees of consolidation and treatment of patients across 2+ Daxi clinical programs, [redacted] **represent the most attractive channels for Revance to pursue** in therapeutic commercial deployment
     - In addition to the high patient volume flowing through these channels, both specialties are **comfortable injecting BoNTs** for patients with CD, Spasticity, Migraine [redacted], and off-label for Plantar Fasciitis [redacted]



[redacted]

## Summary of Key Findings: Drivers of Choice and Unmet Needs

3 Across all indications, outside of table stakes drivers of choice, efficacy and safety, **duration and costs to patients rank as the most important attributes** for providers selecting treatment options

- Apart from these top ranking attributes and table stakes, **onset of effect is a leading secondary attribute in PF and HFEM specifically**, where **faster reduction of pain** is an important benefit to patients
- Notably, **product cost incurred by the practice** is of **low importance to providers**, which magnifies the importance of payers' reactions to Daxi's pricing strategy and direct contracting with payers for Tx indications
  - Provider apathy towards list price **elevates Payers as the most critical stakeholders**, as they determine both patient copay amounts and imposed utilization management restrictions at various price points

4 Following trends in attribute importance, **duration ranked as a top unmet need across all Tx indications**

- Severity of this unmet need is greatest in mvmt. disorders, and **most acutely felt in Spasticity**, where strict payer-imposed quantity limits often **prevent patients from receiving adequate dosing**, effectively shortening duration
  - In PF, the desire for longer duration treatments stems from the shorter length of pain reduction achieved by current standard of care Tx in Tier 2; **steroid injections, the most ubiquitous Tier 2 therapy last just 1-3 months for a majority of patients**
  - **Patient discomfort** upon receiving 31 injections every three months **drives the need for duration in HFEM**
- **In PF and HFEM, Daxi addresses the top unmet need** articulated by providers – accessibility of treatment options
  - Simply **acquiring FDA approval and subsequent payer coverage** addresses the most severe unmet need for these indications

## Summary of Key Finding: Competitive Intensity

5 **In-class BoNT competition for Daxi is expected to be most severe in** [redacted], due to the long-established history of multiple BoNT brands approved for these indications

6 **Economic competitive intensity will be highest for Daxi in** [redacted], driven by the abundance of low-cost, Tier 1 and Tier 2 treatments that are effective for a majority of patients

- However, Daxi's unique MoA and comparable clinical efficacy to Tier 3 options combined with status as the only FDA labeled BoNT **lessen the overall competitive threat in** [redacted]

7 **Overall competitive intensity is highest in** [redacted], **due to the multifaceted threats** Daxi will likely face

- In today's market, SubQ CGRP's pose the greatest challenge, but there is potential for highly **effective and preferred CGRPs** with **oral and intravenous (IV)** routes of administration to disrupt the market
- In a peak, steady-state market post-Daxi launch, Kaiser projects **CGRPs will capture** [redacted] **market share** in the moderate case with **BoNTs capturing** [redacted]
  - In the downside scenario, in which CGRPs exhibit positive real-world clinical outcomes, **the CGRP class could capture** [redacted] **market share in HFE migraine**
- **The risk of Abbvie / Allergan choosing to pursue an FDA label** for HFEM ahead of Daxi's launch in HFEM, further heightens the degree of competitive intensity in this market

## Summary of Key Findings: Daxi Value Proposition

*Daxi value to providers, Daxi value to payers*

## Summary of Key Findings: Daxi's Value Proposition to Providers

1. Across all researched indications, Daxi is **positively received by providers** and expected to be commonly used for each patient population, **assuming all endpoints and characteristics from the TPP are confirmed** in clinical trials
   - Daxi's **6-month duration** addresses providers' highest unmet need for [redacted] indications; this significantly longer duration is the core element of Daxi's unique **value proposition, and differentiates it from the crowded "me too" BoNT market**
   - **In PF**, Daxi would be the **first on-label BoNT** in a crowded but primarily cash pay market; Daxi's differentiated MoA is attractive to providers as it offers **another (likely) payer-covered treatment option to patients at the 1st, 2nd, and 3rd tiers**
     - Specifically for Tier 2 patients, Daxi serves as **a longer-acting, non-steroid alterative for pain management**; at the 3rd tier, Daxi **provides a viable and minimally invasive treatment** in comparison to traditional options such as a fasciotomy
   - Daxi's value in **HFEM** will be driven by its status as the **first on-label BoNT** for a patient pop. with **known clinical benefits from BoNT treatment**; providers expressed their desire to use BoNTs for HFEM today, with accessibility posing as the largest barrier
2. **High projected market shares and expected use of Daxi** from Kaiser's qualitative and quantitative market research with providers **validate Daxi's value proposition** across therapeutic indications
   - Even in CD and Spasticity, Daxi's most BoNT-competitive markets due to high proliferation of BoNT use and availability of BoNT brands, Daxi is expected to **capture an impressive** [redacted] market share at peak, respectively
   - Similarly, providers predict Daxi will perform exceedingly well in PF and HFEM markets as a result of their anticipated first-BoNT-to-market, on-label status, receiving [redacted] **of the market**, respectively
3. As another tailwind, providers are **relatively apathetic to Daxi's list price** and are willing to inject Daxi at 100U prices upwards of [redacted]; however, physicians commonly **expect Daxi's annual price point to roughly equal that of Botox**
   - Importantly, physicians in qual. and quant. research expressed a **high sensitivity to the cost of their patients' copays**; this suggests providers are **more sensitive to prices determined by insurance coverage** rather than product WAC



[redacted]

# Summary of Key Findings: Daxi Value Proposition to Payers

4 Similar to providers, payers recognize Daxi's value, with [redacted] **of plans expecting to cover Daxi at annual price parity to Botox** ($960, $900, $900 and $640 100U vials) in CD, ULS, PF, and HFEM, respectively

- Qualitative interviews with payers confirm high interest in Daxi's TPP for each of these conditions, leading to a **high likelihood to cover Daxi at a wide range of price points**

5 Despite positive anticipated coverage outcomes, payers will likely **impose a variety of utilization management (UM)** techniques on Daxi depending on its price

- Quantitative research with payers suggests that these restrictions are typically imposed incrementally at **annual price points that represent key cost milestones** relative to standard of care (e.g., annual price parity to Botox, 20% discount to CGRP)
- For CD and Spasticity, Daxi's prior authorization or step therapy requirements will be compared to **current on-market BoNTs** (e.g., Botox, Dysport); additionally, it is possible that Daxi will face challenges with competitors' existing preferred contracts
- **Lack of covered Tier 3 therapies aside from fasciotomy in PF leads to very lenient UM of Daxi** even at high price points, as there is often **no clear price benchmark**, and at most price points, payers prefer Daxi's TPP to high-cost surgical treatments
- In HFEM, Daxi will likely be subject to plan specific UM depending on their **coverage policies of CGRPs or off-label BoNTs**
  - Future scenarios are possible in which CGRPs triumph as the standard of care at the 2nd line of defense, **forcing patients to step-through CGRP treatment prior to becoming eligible for Daxi treatment;** however, these scenarios are unlikely at Daxi 100U vial price points <$850
  - Similarly, if **Allergan pursues a HFEM indication** the **threat of preferred contracting increases** and will immediately create a potential pricing war and subsequent coverage challenges



[redacted]

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Michael J. Watanabe**

Civil Action No. 16–cv–00263–MJW

SENTEGRA, LLC,

Plaintiff,

v.

AZEND GROUP CORPORATION,

Defendant.

---

## FINAL JUDGMENT

---

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order for Final Judgment signed by the Honorable Michael J. Watanabe on July 11, 2017 , incorporated herein by reference, it is

ORDERED that Final Judgment shall enter in favor of the Plaintiff Sentegra, LLC and against Defendant Azend Group Corporation, including its successors and assigns, agents and officers, for wilfully infringing on U.S. Patent Nos. 8,707,627 and 7,920,904. Plaintiff is awarded $51,353.00 for past damages based upon a $1.00 per infringing unit sold, or approximately a 1.4% ongoing royalty. Since this court has found willful infringement, the Plaintiff Sentegra, LLC's damages are trebled to $154,059.00 [$51,353.00 x 3 = $154,059.00] pursuant to 35 U.S.C. § 284. Plaintiff Sentegra, LLC is also awarded prejudgment interest in the amount of $850.52 pursuant to 35 U.S.C. § 284 based on damages of $51,353.00, using the U.S. Treasury bill rate as described in 28 U.S.C. § 1961 and computed from February 4, 2016 through the date of this Final Judgment. Post judgment interest shall accrue as provided for by law, currently set at 1.23%. This court certifies this judgment as a Final Judgment pursuant to Fed. R. Civ. P. 54(b), finding no just reason for delay.

Dated at Denver, Colorado this 12th day of July, 2017.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK

s/ S. Grimm
S. Grimm, Deputy Clerk

# Exhibit 4

THE HONORABLE BENJAMIN SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SYNTRIX BIOSYSTEMS, INC.
a Delaware corporation

*Plaintiff/Counter-Defendant*

v.

ILLUMINA, INC.,
a Delaware Corporation

*Defendant/Counter-Plaintiff*

Case No. 3:10-cv-05870-BHS

**AMENDED JUDGMENT IN A CIVIL ACTION**

This Amended Judgment supersedes and replaces the Judgment entered on June 19, 2013 (Doc. No. 356).

The Court has ordered that:

1. Plaintiff Syntrix Biosystems, Inc., recover from Defendant Illumina, Inc., 1) the total amount of one hundred fifteen million, one hundred six thousand, one hundred five dollars ($115,106,105), which is the verdict amount of ninety-five million, seven hundred ninety-five

thousand, five hundred seven dollars ($95,795,507); prejudgment interest in the amount of seven million, two hundred thousand, four hundred dollars ($7,200,400) through June 5, 2013, plus fourteen days at the daily rate of five thousand, one hundred ninety-five dollars ($5,195), which is seventy two thousand, seven hundred thirty dollars ($72,730); and supplemental damages in the amount of twelve million, thirty-seven thousand, four hundred sixty-eight dollars ($12,037,468) ("Supplemental Damages"), and 2) an ongoing royalty at the rate of 8% per infringing sale.

2.a "Infringing Products" shall include (i) all BeadChip products (including BeadChip kits and BeadChips sold separately from kits) for which infringement was found and damages were assessed either at trial or included within the calculation of Supplemental Damages ("Existing BeadChip Products"), (ii) any BeadChip products (including BeadChip kits and BeadChips sold separately from kits) first sold on or after March 15, 2013 that are not colorably different from Existing BeadChip Products, (iii) any BeadChip product described in 2.a(i) and 2.a(ii) manufactured or assembled outside the United States if such BeadChip product is sold within or imported into the United States, and (iv) any BeadChip product described in 2.a(i) and 2.a(ii) that is manufactured or assembled outside the United States if Illumina's activities nevertheless constitute infringement pursuant to 35 U.S.C. § 271(f).

2.b "Infringing sales" shall mean sales of the "Infringing Products." If the Infringing Product sold is a BeadChip kit, the royalty shall apply to the entire price of the BeadChip kits.

3.a Illumina's obligation to pay damages assessed pursuant to trial proceedings and ongoing royalties as set forth in this Amended Judgment is stayed until the Court rules on the motion for stay of execution to be filed by Illumina under the Revised Agreed Proposed Briefing Schedule (Doc. No. 340).

3.b Illumina's obligation to pay ongoing royalties associated with this Amended Judgment is effective as of March 15, 2013 and expires upon the expiration of the '682 Patent.[1] Ongoing royalty payments made under this Amended Judgment shall be escrowed either (a) with this Court until this Amended Judgment becomes final and not subject to further appeal, in which case the escrowed funds and any interest on such escrowed funds will be released to the prevailing party, or (b) pursuant to other arrangements to which the parties may agree. If this Amended Judgment becomes final and not subject to further appeal, Illumina shall make ongoing royalty payments directly to Syntrix.

4. Royalties shall be paid on all sales based on shipments during the fiscal quarter and shall be accompanied by an accounting of all Infringing Product sales that were shipped during the fiscal quarter. Royalty payments shall be made no later than the 30th day following the close of the fiscal quarter. Royalty payments for any fiscal quarters ending before the entry date of this Amended Judgment shall be made within 30 days of the entry of this Amended Judgment. Thereafter, royalty payments shall be made within 30 days of the end of the subsequent fiscal quarters. If the 30th day following the end of a fiscal quarter or the entry of this Amended Judgment is a Saturday, Sunday, or holiday, then the payment is due on the next business day.

5. The first royalty payment should also include all royalties for all sales of Infringing Products that were previously not accounted for in the damages assessment presented at trial and in the supplemental damages awarded by the Court. Notwithstanding the previous sentence, royalties

[1] This obligation is subject to any superseding court order issued after the date of this Amended Judgment by this Court on any post-judgment motion or by an appellate court on appeal.

shall not be assessed on any shipments resulting from any orders upon which damages were assessed at trial or included within the calculation of supplemental damages.

6. Illumina shall keep complete, true, and accurate books of account and records, including, but not limited to, units and dollar amounts of sales for Infringing Products, for the purpose of determining the royalty amounts payable. Illumina shall certify compliance with this Amended Judgment annually 60 days after the close of its fiscal year and ensure that the quarterly royalty payments for the preceding fiscal year are in accordance with this Amended Judgment. Such certification shall be accompanied with any underpayments for the preceding four fiscal quarters. If Illumina's certification process reveals an underpayment in excess of five percent (5%) of the amount owed over the course of Illumina's fiscal year, Illumina shall pay interest on the unpaid royalties at a rate equal to the mid-point between the 3-month Treasury bill rate and the prime rate, compounded quarterly.

7. Syntrix shall have the right, upon reasonable notice and at its expense, to direct an independent accounting firm to inspect and audit the relevant accounting and sales books and records, including but not limited to, the units and dollar amounts of sales for each Infringing Product. The audit may be made once per year and may cover any period, after March 15, 2013, within the previous four completed fiscal years prior to the audit, provided that such period has not been previously audited. Illumina shall have the right to examine the results, findings, and supporting data from the audit. In the event an audit reveals an underpayment, Illumina shall remit payment of such amount to Syntrix within thirty (30) days of receiving written notice of such underpayment. In addition, if any such audit reveals an underpayment in excess of five percent (5%) of the amount owed for the period audited, Illumina shall pay the reasonable fees and expenses

actually incurred relating to the audit as well as interest on the unpaid royalties at a rate equal to the mid-point between the 3-month Treasury bill rate and the prime rate, compounded quarterly, which Illumina shall pay to Syntrix within thirty (30) days of notice from Syntrix to Illumina. If the audit discloses an overpayment, Syntrix shall credit Illumina the overpayment amount for future payments. If the overpayment exceeds the royalty amount owed by Illumina at the expiration of this Amended Judgment, Syntrix shall refund Illumina the amount of overpayment in excess of Illumina's owed royalties within thirty (30) days.

8. Syntrix and Illumina shall meet and confer in good faith in an attempt to resolve all disputes that may arise under this Amended Judgment. The Court specifically retains jurisdiction to enforce, modify, or terminate its Amended Judgment as the equities may require, and to adopt procedures for resolution of any dispute under this Amended Judgment.

9. These terms are binding on Syntrix and Illumina, as well as their successors or assignees.

10. All notices of any asserted breach or any other asserted dispute under the terms of this Amended Judgment shall be in writing and shall be deemed given when sent by (a) prepaid, registered or certified mail, addressed to the party at the notification address provided by each party, or (b) by private courier, service signature for delivery required, addressed to the party at the notification address provided by each party. Each party shall provide its notification address within seven (7) days of the entry of this Amended Judgment. Each party may change such notification address from time to time by notice so given.

11. The damages awarded in this Amended Judgment shall accrue post-judgment interest pursuant to 28 U.S.C. § 1961 from the date the original Judgment was entered on June 19, 2013.

This action was:

Tried by a jury with Judge Benjamin H. Settle presiding, and the jury has rendered a verdict.

DATED this 1 day of ~~June~~ July, 2013.

HONORABLE BENJAMIN H. SETTLE
United States District Judge