**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allergan, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Revance Therapeutics, Inc. and PCI San Diego, Inc.,<br><br>Defendants. | C.A. No. 21-1411-RGA-LDH<br><br>[redacted]<br><br>REDACTED - PUBLIC VERSION<br>Filed: December 2, 2025 |

**EXHIBITS 5-8 TO DEFENDANTS' UNOPPOSED MOTION TO SEAL PORTIONS OF CONFIDENTIAL TRIAL EXHIBITS SUBJECT TO EXPORT CONTROL REGULATIONS**


Of Counsel:

Dennies Varughese, Pharm. D.
Adam C. LaRock
Byron L. Pickard
Nirav N. Desai
Deirdre M. Wells
Anna G. Phillips
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600

Peter J. Armenio
Andrew Solomon
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*


Dated: November 21, 2025

# EXHIBIT 5

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Food and Drug Administration
Silver Spring, MD 20993

IND 129198

**MEETING REQUEST-**
**WRITTEN RESPONSES**

Revance Therapeutics, Inc.
Attention: Sita Malhi
Manager, Regulatory Affairs
7555 Gateway Blvd.
Newark, CA 94560

Dear Ms. Malhi:

Please refer to your Investigational New Drug Application (IND) submitted under section 505(i) of the Federal Food, Drug, and Cosmetic Act for daxibotulinumtoxinA for injection.

We also refer to your submission dated June 15, 2018, containing a meeting request. The purpose of the requested meeting was to seek guidance on requirements for a waiver request for a bioavailability study or a Maximal Usage Trial (MUsT) for the daxibotulinumtoxinA.

Further reference is made to our Meeting Granted letter dated June 28, 2018, wherein we stated that written responses to your questions would be provided in lieu of a meeting.

The enclosed document constitutes our written responses to the questions contained in your June 12, 2018 background package.

If you have any questions, call Barbara Gould, Chief, Project Management Staff at (301) 796-4224.

Sincerely,

*{See appended electronic signature page}*

Kendall A. Marcus, MD
Director
Division of Dermatology and Dental Products
Office of Drug Evaluation III
Center for Drug Evaluation and Research

Enclosure:
Written Responses

EXHIBIT
Drago
4
MC 5/8/24



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

C.A. No. 21-1411-RGA-LDH
Joint Trial Exhibit
JTX-108

FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

**WRITTEN RESPONSES**

| | |
|---|---|
| **Meeting Type:** | C |
| **Meeting Category:** | Guidance |
| **Application Number:** | IND 129198 |
| **Product Name:** | daxibotulinumtoxinA for injection |
| **Proposed Indication:** | Treatment for temporary improvement in the appearance of moderate to severe glabellar lines with corrugator and/or procerus muscle activity in adults |
| **Sponsor:** | Revance Therapeutics, Inc. |
| **Regulatory Pathway:** | 351(a) of the Public Health Service Act |

## 1.0 BACKGROUND

The purpose of this meeting is to discuss written guidance on requirements for a waiver request for a bioavailability study or a Maximal Usage Trial (MUsT) for the novel excipient RTP004, a peptide, used in the daxibotulinumtoxinA injection formulation.

## 2.0 QUESTIONS AND RESPONSES

### 2.1. Chemistry, Manufacturing and Contols (CMC)

***Question 3:***
Recently, Revance responded to the FDA request to provide product quality information to demonstrate the use of RTP004 as an excipient in DaxibotulinumtoxinA drug product formulation [Reference SN0032, Section 1.11.1]. Does the Agency agree that Revance provided sufficient data to establish the role of RTP004 as a stabilizer?

***FDA Response to Question 3:***
Your study reports provide information to show that RTP004 peptide reduces adsorption of daxibotulinumtoxinA to containers and RTP004 stabilizes daxibotulinumtoxinA from thermal denaturation by increasing the Tm and decreasing the aggregation rate. We agree that you provided appropriate data to demonstrate the role of RTP004 as a stabilizer.

### 2.2. Nonclinical

***Question 2:***
AT the Agency's request, Revance has developed a highly sensitive PK bioanalytical assay for measuring the novel excipient RTP004, using state-of-the-art high resolution mass

[redacted]

*FDA Response to Question 2:*
RTP004 is a synthetic 35-amino acid polypeptide enriched in lysine. The toxicity of RTP004 has been thoroughly characterized in a 6-month repeat dose intramuscular study in rats. No RTP004-related effects (1 mg/kg QW) were noted on any parameter tested. Its potential genotoxicity was evaluated in the standard ICH genetic toxicity battery. From a nonclinical perspective, we agree that Revance has provided sufficient data to show no safety signal for the RTP004 excipient in the daxibotulinumtoxinA drug product. Therefore, there is no need for additional nonclinical studies, including a rat PK study. .

## 2.3. Clinical Pharmacology

*Question 1:*
Revance's proprietary peptide (RTP004) used in daxibotulinumtoxinA for injection (DAXI for injection) meets the definition for a novel excipient. Based on the totality of data from non-clinical, clinical and CMC, the novel excipient RTP004 is deemed to lack pharmacological activity and only functions as a stabilizer in DAXI for injection drug product formulation. Subsequent to Revance's last discussion with the Agency [Reference ID: 3946069, End of Phase 2 Meeting/Pre-IND Meeting Minutes], pharmaceutical development studies were conducted to demonstrate RTP004's role as a stabilizer in the to-be-marketed drug product formulation [Reference SN0032, REP_DEV_2081, and REP_DEV_2082], and nonclinical data were generated to support the lack of pharmacological activity. Additionally, placebo data from the Phase 3 clinical studies provide further evidence of RTP004's lack of pharmacological activity. DAXI for injection is



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

a locally acting intramuscular (IM) injection and thus having limited systemic exposure compared to an IV injection.

a) Because RTP004 is pharmacologically inactive with limited systemic exposure, Revance believes that there is no requirement to provide human PK data for this novel excipient in the BLA. Does the Agency agree?

b) If the Agency would still require human PK data for the novel excipient, could the Agency elaborate on the reasons why?

***FDA Response to Question 1:***
We agree that human PK data for RTP004 is not required in filing of your BLA for the glabellar lines indication.

***Question 4:***
In the EoPII meeting minutes [Reference ID: 3946069], FDA advised Revance to request a waiver for a Maximal Usage Trial (MUsT) for the active ingredient DaxibotulinumtoxinA and another one for the novel excipient RTP004. However, it is Revance's interpretation of FDA Guidance's that Maximal Usage Trials are only relevant for topical administrations. Revance is instead planning to request a waiver for a human bioavailability study instead of a waiver for a Maximal Usage Trial for both DaxibotulinumtoxinA and RTP004.

Does the FDA concur?

***FDA Response to Question 4:***
We agree with your plan to submit waiver requests for conducting human bioavailability studies. We will review your submission on determine whether the waiver requests would be granted or not for your proposed dose and indication.

***Question 5:***
All available information as presented in the Company Position for Question 1 and 2 support that it will be unlikely that RTP004 peptide is detectable even when using the latest state-of-the-art MS instrument at even higher doses than the proposed human dose. As the rat study has not yet read out and in the unlikely scenario the MS instrument would be sensitive enough, Revance would like to take the opportunity to ask a general question about potential PK study design to study a novel excipient. Revance's understanding of a design of a human bioavailability study for a local acting intramuscular administration is to measure the systemic blood or serum levels after a single dose. The design would entail using the to-be marketed dose (40 Units) injected in the glabellar lines using the final drug product formulation. Also, Revance would like to highlight that the Phase III pivotal studies for Glabellar Lines are finalized and there is no possibility for a population PK sub study.

Does FDA concur?



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

***FDA Response to Question 5:***
As a general comment, we usually recommend sponsor characterize PK profile of each active component following single dose and multiple dose administrations and human PK data after administration using the to-be-marketed formulation product is needed to support the marketing approval and labeling. Considering the dose and dosing frequency of your product for the treatment of glabellar lines, the potential for systemic accumulation is low for RTP004; therefore, your proposal to characterize the bioavailability after a single dose appears to be reasonable.

***Question 6:***
Revance is planning to send FDA the request for the waivers for the bioavailability studies 4 to 6 months before the submission of the BLA. However, transferring the method to a GLP laboratory has shown to be challenging as this new technology is not extensively or routinely used. Unfortunately, this has already caused some delay, and the timeline is still uncertain.

As there are no PDUFA timelines for these types of submissions, Revance would like to understand if it is acceptable to submit the BLA if the waivers are still under review and not yet granted by FDA, without receiving a Refusal To File. Additionally, in CFR 320 it does mention that a waiver request could be submitted with the BLA, and we would like to understand if this would be an option.

a) Does FDA agree if Revance has the correct interpretation of the timing of a waiver request?

b) Does the waiver request for the bioavailability study have to be granted by FDA before the BLA submission or can it be part of the BLA?

***FDA Response to Question 6:***
We recommend that you submit your waiver request to the IND as early as possible for our review. If the waiver(s) are still under review by the time when you submit your BLA, you need to include the waiver requests to support filing of your BLA. If the waivers are granted prior to your BLA submission, you still need to include the waiver requests along with the granted letter in the BLA.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

## 3.0 ADMINISTRATIVE COMMENTS

### PREA REQUIREMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of the criteria apply at this time to your application, you are exempt from these requirements. Please include a statement that confirms this finding, along with a reference to this communication, as part of the pediatric section (1.9 for eCTD submissions) of your application. If there are any changes to your development plans that would cause your application to trigger PREA, your exempt status would change.

### DATA STANDARDS FOR STUDIES

Under section 745A(a) of the FD&C Act, electronic submissions "shall be submitted in such electronic format as specified by [FDA]." FDA has determined that study data contained in electronic submissions (i.e., NDAs, BLAs, ANDAs and INDs) must be in a format that the Agency can process, review, and archive. Currently, the Agency can process, review, and archive electronic submissions of clinical and nonclinical study data that use the standards specified in the Data Standards Catalog (Catalog) (See http://www.fda.gov/forindustry/datastandards/studydatastandards/default.htm).

On December 17, 2014, FDA issued final guidance, *Providing Electronic Submissions in Electronic Format--- Standardized Study Data* (http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM292334.pdf). This guidance describes the submission types, the standardized study data requirements, and when standardized study data will be required. Further, it describes the availability of implementation support in the form of a technical specifications document, Study Data Technical Conformance Guide (Conformance Guide) (See http://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM384744.pdf), as well as email access to the eData Team (cder-edata@fda.hhs.gov) for specific questions related to study data standards. Standardized study data will be required in marketing application submissions for clinical and nonclinical studies that start on or after December 17, 2016. Standardized study data will be required in commercial IND application submissions for clinical and nonclinical studies that start on or after December 17, 2017. CDER has produced a *Study Data Standards Resources* web page that provides specifications for sponsors regarding implementation and submission of clinical and nonclinical study data in a standardized format. This web page will be updated regularly to reflect CDER's growing experience in order to meet the needs of its reviewers.

Although the submission of study data in conformance to the standards listed in the FDA Data Standards Catalog will not be required in studies that start before December 17, 2016, CDER



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

strongly encourages IND sponsors to use the FDA supported data standards for the submission of IND applications and marketing applications. The implementation of data standards should occur as early as possible in the product development lifecycle, so that data standards are accounted for in the design, conduct, and analysis of clinical and nonclinical studies. For clinical and nonclinical studies, IND sponsors should include a plan (e.g., in the IND) describing the submission of standardized study data to FDA. This study data standardization plan (see the Conformance Guide) will assist FDA in identifying potential data standardization issues early in the development program.

Additional information can be found at http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm248635.htm.

For general toxicology, supporting nonclinical toxicokinetic, and carcinogenicity studies, CDER encourages sponsors to use Standards for the Exchange of Nonclinical Data (SEND) and submit sample or test data sets before implementation becomes required. CDER will provide feedback to sponsors on the suitability of these test data sets. Information about submitting a test submission can be found here: http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/ucm174459.htm

**LABORATORY TEST UNITS FOR CLINICAL TRIALS**

CDER strongly encourages IND sponsors to identify the laboratory test units that will be reported in clinical trials that support applications for investigational new drugs and product registration. Although Système International (SI) units may be the standard reporting mechanism globally, dual reporting of a reasonable subset of laboratory tests in U.S. conventional units and SI units might be necessary to minimize conversion needs during review. Identification of units to be used for laboratory tests in clinical trials and solicitation of input from the review divisions should occur as early as possible in the development process. For more information, please see the FDA website entitled, Study Data Standards Resources and the CDER/CBER Position on Use of SI Units for Lab Tests website found at https://www.fda.gov/downloads/ForIndustry/DataStandards/StudyDataStandards/UCM587505.pdf.

**SECURE EMAIL COMMUNICATIONS**

Secure email is required for all email communications from FDA when confidential information (e.g., trade secrets, manufacturing, or patient information) is included in the message. To receive email communications from FDA that include confidential information (e.g., information requests, labeling revisions, courtesy copies of letters), you must establish secure email. To establish secure email with FDA, send an email request to SecureEmail@fda.hhs.gov. Please note that secure email may not be used for formal regulatory submissions to applications (except for 7-day safety reports for INDs not in eCTD format).



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

## PATIENT-FOCUSED ENDPOINTS

An important component of patient-focused drug development is describing the patient's perspective of treatment benefit in labeling based on data from patient-focused outcome measures [e.g., patient-reported outcome (PRO) measures]. Therefore, early in product development, we encourage sponsors to consider incorporating well-defined and reliable patient-focused outcome measures as key efficacy endpoints in clinical trials, when appropriate, and to discuss those measures with the Agency in advance of confirmatory trials. For additional information, refer to FDA's guidance for industry *Patient-Reported Outcome Measures: Use in Medical Product Development to Support Claims*, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM193282.pdf.

## NEW PROTOCOLS AND CHANGES TO PROTOCOLS

To ensure that the Division is aware of your continued drug development plans and to facilitate successful interactions with the Division, including provision of advice and timely responses to your questions, we request that the cover letter for all new phase 2 or phase 3 protocol submissions to your IND or changes to these protocols include the following information:

1. Study phase
2. Statement of whether the study is intended to support marketing and/or labeling changes
3. Study objectives (e.g., dose finding)
4. Population
5. A brief description of the study design (e.g., placebo or active controlled)
6. Specific concerns for which you anticipate the Division will have comments
7. For changes to protocols only, also include the following information:
    - A brief summary of the substantive change(s) to the protocol (e.g., changes to endpoint measures, dose, and/or population)
    - Other significant changes
    - Proposed implementation date

We recommend you consider requesting a meeting to facilitate discussion of multiple and/or complex issues.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

---

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

---

/s/

---

KENDALL A MARCUS
08/29/2018

Reference ID: 4313858

OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

# EXHIBIT 6

## 3.2.A.3 GENERAL INFORMATION [RTP004, BACHEM AMERICAS, INC.]

The proprietary peptide, RTP004 Acetate (RTP004), is a custom material made exclusively for Revance Therapeutics, Inc. RTP004 is a single chain synthetic peptide consisting of 35 L-amino acids, which is used in the final drug product (DP) formulation as a stabilizer of the active ingredient DaxibotulinumtoxinA. RTP004 meets the definition of new (novel) excipient as defined in *FDA Guidance-Nonclinical Studies for the Safety Evaluation of Pharmaceutical Excipients (May 2005)*:

"…the phrase new excipients means any inactive ingredients that are intentionally added to therapeutic and diagnostic products, but that: (1) we believe are not intended to exert therapeutic effects at the intended dosage, although they may act to improve product delivery (e.g., enhance absorption or control release of the drug substance); and (2) are not fully qualified by existing safety data with respect to the currently proposed level of exposure, duration of exposure, or route of administration."

RTP004 is an inactive ingredient that is intentionally added to a therapeutic product but it is not intended to exert therapeutic effects at the intended dosage, it has no pharmacological properties at the quantity used in DaxibotulinumtoxinA for Injection, and it is not required for activity or function of the toxin itself, only to stabilize it in the final formulation so that it may maintain its activity and functionality throughout the intended shelf life.

Toxicology studies to assess pharmacological activity have been performed according to ICH guidance for industry *S7A Safety Pharmacology Studies for Human Pharmaceuticals* and are presented in Module 2.4 and 2.6. In summary, RTP004 produced no muscle paralysis or any adverse effects and was considered to show no pharmacological activity. The toxicology studies demonstrated no RTP004-related adverse toxicities, no central nervous system (CNS) effects, and no evidence of muscle damage. The development of anti-RTP004 antibodies showed an overall low immunogenic potential. The perinatal/postnatal reproductive study demonstrated no adverse toxicity to dams or adverse developmental effects or reproductive toxicities in the F1 generation of rats.

### 3.2.A.3.1 Structure

The completed chemical sequence of RTP004 is provided in Figure 1.

Protein transduction domain (PTD) domains are indicated with an underline.

**Figure 1: Chemical Sequence of RTP004**

| |
|---|
| **H-Arg-Lys-Lys-Arg-Arg-Gln-Arg-Arg-Arg-Gly-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Gly-Arg-Lys-Lys-Arg-Arg-Gln-Arg-Arg-Arg-OH** |

The following studies were conducted to demonstrate that the molecule performs as a stabilizer of the active ingredient:



Allergan v Revance
31
Bernardo
9/27/23 CY 14316

OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00002851
C.A. No. 21-1411-RGA-LDH
Joint Trial Exhibit
JTX-198
JTX-198.0001

- [redacted]
- [redacted]

Data from these studies demonstrate that RTP004, a fully characterized novel excipient, functions as a stabilizer in the DaxibotulinumtoxinA for Injection formulation by two different mechanisms, namely surface adsorption and thermal-induced aggregation.

### 3.2.A.3.2 General Properties - Physiochemical Properties

RTP004 is presented as a white to yellowish lyophilized cake within a stoppered and sealed amber, USP Type 1 glass vial. The cake requires reconstitution with formulation buffer solution, as described in Section 3.2.P.3.3, prior to use. The peptide chain is composed of arginine, glutamine, glycine, and lysine residues. All lots of RTP004 are required to be ≥ 90% pure peptide and to have ≤ 10.0% total impurities. The general properties of RTP004 are the following:

- Molecular Formula: $C_{200}H_{396}N_{92}O_{38}$
- Molecular Weight: 4698 ± 2
- Counter-Ion: Acetate (AcOH)
- Isoelectric Point: 13.05



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00002852
JTX-198.0002

# EXHIBIT 7

## 1.6.3. CORRESPONDENCE REGARDING MEETINGS

### 1.6.3.1 Introduction

The purpose of this document is to provide Revance's response to the Agency's Type B Meeting Minutes dated June 15, 2016 (Reference ID: 3946069). The meeting minutes were received following the pre-IND/End-of-Phase 2 teleconference held on June 8, 2016 at 11am (ET)/ 8am (PT).

The Agency's comments and any meeting discussion are presented in italics followed by Revance's responses. Revance acknowledges the Agency's responses to question 4, the Pharmacology/Toxicology Comment, and the Administrative Comments; these responses/comments are not discussed further in this document.

Note, BoNT/A refers to botulinum toxin and botulinum toxin type A, respectively.

### 1.6.3.2 Chemistry, Manufacturing and Controls (CMC)

**Question 1:**

***Does the Agency agree that the current specification and test methods (release and stability) for the drug substance are sufficient to support the Phase 3 clinical program?***

***Agency Response:*** *No. The FDA does not agree that the current specifications and test methods (release and stability) for the drug substance provided in Table 19 are sufficient to support the Phase 3 clinical program. The control strategy should include the followings:*

*1. A method such as RP-HPLC or ion exchange chromatography should be included to control for product variants (deamidation or oxidation) and product related impurities.*
*2. Identification of individual impurities.*
*3. The drug substance stability specification should include tests for drug substance identity, and toxin A concentration.*
*4. The Bioburden specification of $< 10^3$ CFU/mL for aerobic microbial count and $< 10^2$ CFU/mL for total molds and yeasts count is too high. Microbial levels can negatively impact product quality because they can lead to production of impurities such as proteases that can degrade the product. The bioburden specification should be lowed to around 10 CFU per 10 ml for total aerobic microbial count and total molds and yeast count. In addition, bioburden should be measured after significant hold times for all process intermediates, and bioburden should be measured prior to all 0.2 µm filtration steps.*

**Revance Response:**

The current specification, including the associated test methods for the drug substance to support the initiation of Phase 3 studies has been provided in IND 126126 with Serial Number 0016 to include the following FDA requests:



TRIAL EXHIBIT
DTX-136
C.A. No. 21-1411-RGA-LDH

OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001141

DTX-136.0001

1. Test method for charge heterogeneity for control of product variants and product related impurities
2. Test methods for the identification of individual impurities
3. Toxin A identity and concentration of daxibotulinumtoxinA during stability
4. Limits for total aerobic microbial count and total yeasts and molds count updated to ≤ 1 CFU/mL

**Question 2:**

***Does the Agency agree that the specification and test methods (release and stability) for the drug product are sufficient to support the Phase 3 clinical programs?***

***Agency Response:*** *No. The FDA does not agree that the current specifications and test methods (release and stability) for the drug product in Table 22 are sufficient to support the Phase 3 clinical program.*

*The drug product release and stability specifications should include tests for reconstitution time. Drug product stability should include tests for toxin A identity and quantity, trehalose dihydrate content, particulate matter (after reconstitution), container closure integrity, and bacteria endotoxin. Container closure integrity and bacteria endotoxin can be tested at end of stability.*

***Meeting Discussion:***

*The Agency stated that per the ICH guidance Q5C: Stability Testing of Biotechnological/ Biological Products, additives (e.g., stabilizers, preservatives) or excipients need to be monitored during the stability program. However, the sponsor does not have to test at every time point for trehalose dehydrate content (stabilizer); the sponsor can test at the beginning and at the end of the stability testing period.*

*Other botulinum toxin products test for sugar content (stabilizer) at release and stability.*

**Revance Response:**

The current specification, including test methods for the drug product to support the initiation of Phase 3 studies for the 50 U/vial is provided with this IND to include the following FDA requests:

1. Testing for Reconstitution Time at release and at each stability timepoint for both storage conditions
2. Toxin A identity and toxin quantity on stability
3. Trehalose dihydrate content test method with testing on stability at beginning and end of study
4. Particulate matter after reconstitution at selected stability timepoint for both storage conditions
5. Container closure integrity testing on stability replacing sterility testing to be performed every 12 months and at the end of stability study for both storage conditions



OUTSIDE COUNSEL EYES ONLY PURSUANT TO LOCAL RULE 26.2
SUBJECT TO EAR

6. Bacterial endotoxins testing at release and at the end of stability study for both storage conditions

The proposed commercial presentation of the drug product with 50 U of daxibotulinumtoxinA per vial is under development to align with the proposed 40 U dose for the treatment of glabellar lines.

***Agency Response:*** *Product Quality General Comment*

*Due to the high variability of the mouse $LD_{50}$ potency bioassay, the method should include a reference standard. The drug product potency should be expressed relative to the reference standard. The LD50 assay should also contain a suitability control for the parallelism of the dose response curves of the drug product and reference standard. This will better control the variability associated with the bioassay and more accurately quantify product potency.*

**Revance Response:**

The $LD_{50}$ potency bioassay utilized for testing of DaxibotulinumtoxinA for Injection includes a reference standard and the potency is expressed relative to the reference standard. The method also contains suitable control for the parallelism of the dose response curves to better control the variability of the methodology to present more accurate results.

**Question 3:**

***Does the Agency agree with the specification and test methods for the novel excipient RTP004?***

***Agency Response:*** *It appears that the claimed function of RTP004 is inconsistent in your two IND applications 100053 and 126126. In IND 100053 you claimed RTP004 is an active ingredient that acts as a transdermal delivery enhancer for BoNT/A topical gel, while in this PIND you claim it is an excipient. Please note that an excipient is an ingredient added intentionally to the drug substance which should not have pharmacological properties in the quantity used. See (ICH Q6B). You will need to conduct appropriate studies to support your claim that RTP004 is an inactive ingredient (excipient) in the formulation of your drug product, DaxibotulinumtoxinA for Injection, and not an active pharmaceutical ingredient (API).*

***Meeting Discussion:***

*The sponsor proposed animal study assessments (i.e. LD50 and muscle paralysis in mice) to provide data to support their claim that RTP004 is an inactive ingredient in their drug product formulation. The Agency stated that the sponsor should submit their proposal to the IND for review. The Agency expressed concern that the proposed assessments are gross measurements that may not acceptably address the issue.*

*It is well known that BoNT/A has a conserved motif with high density of negatively charged amino acids on surface. RTP004 is a positive charged polybasic peptide with many positive*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001143

DTX-136.0003

*charged amino acids (Arg and Lys). Polybasic peptides have been used to enhance transmembrane transport of associated proteins. FDA is concerned that this peptide may interact with the negative charged BoNT/A and increase toxin spread or effect, potentially resulting in increased or off-target toxin effects. Therefore, you will need to conduct appropriate studies to provide assurance that RTP004 does not increase toxin spread or effect.*

***Meeting Discussion:***

*The sponsor proposed animal study assessments (i.e., degree of muscle paralysis or physical presence of toxins at neighboring/distal sites) to provide data to address the potential for enhanced spread of toxin to off-site/distal sites. The Agency stated that the sponsor should submit their proposal to the IND for review. The Agency expressed concern that the degree of paralysis is a gross measurement that may not specifically address the issue. In addition, it is not clear how the physical presence of toxin at neighboring/distal sites would be evaluated.*

**Revance Response:**

Introduction

Revance acknowledges the claimed function of the novel excipient RTP004 (inactive ingredient) is different between the IND applications for DaxibotulinumtoxinA Topical Gel and DaxibotulinumtoxinA for Injection.

Revance has consistently described RTP004 as an inactive ingredient in DaxibotulinumtoxinA Topical Gel (please refer to most recent submission on this topic, SN 0041, submitted on October 28, 2010 for IND 100053). Results from a recently completed phase 3 clinical trial for lateral canthal lines RT002-CL038 were conclusive that the DaxibotulinumtoxinA Topical Gel formulation, when compared with placebo, did not demonstrate any incremental efficacy as evaluated by the co-primary composite endpoint and therefore, did not support the function of RTP004 as a penetration enhancer of daxibotulinumtoxinA for this indication as used in this study. An amendment to IND 100053 Serial Number 0117 was submitted recently providing a study summary for RT001-CL038.

The novel excipient RTP004 is an inactive ingredient (excipient) in DaxibotulinumtoxinA for Injection as noted in the Type B, pre IND/End-of-Phase 2 Briefing Document. An excipient can have different functions dependent on the drug substance, dosage form and route of administration of the drug product. For example, polysorbates are used as a surfactant in soap, as a solubilizer in mouthwash, as an emulsifier in foods and oral liquid medications, and as a stabilizer in injectable medications.

Experiments conducted during formulation development of DaxibotulinumtoxinA for Injection, have confirmed the function of RTP004 as a stabilizer for the drug substance daxibotulinumtoxinA. Appropriate studies have been conducted to support the claim that RTP004 is an inactive ingredient as defined in the FDA Guidance: Nonclinical Studies for the Safety Evaluation of Pharmaceutical Excipients (May 2005). In the nonclinical studies, the lack of pharmacological properties with DaxibotulinumtoxinA for Injection as well as confirmation of no increase of spread/effect of daxibotulinumtoxinA has been clearly demonstrated. In addition, an analysis from the phase 2 randomized, double-blind, dose ranging, active and placebo controlled, multi-center clinical trial (RT002-CL002) confirms no increase in adverse events,



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001145

DTX-136.0005

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001146
DTX-136.0006

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001147

DTX-136.0007

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001148
DTX-136.0008

[redacted]

b) No Increase of Toxin Spread/Effect with the Novel Excipient RTP004

Two nonclinical studies have been conducted to assess the impact of RTP004 on increase of toxin spread/effect following intramuscular injection. These studies used animal models for whole-body autoradiography and digital abduction scoring and in both studies there was no evidence of an increase of toxin spread and/or effect. Study summaries are provided in the [redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001149

DTX-136.0009

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001150

DTX-136.0010

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001151

DTX-136.0011

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001152

DTX-136.0012

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001153

**Figure 5: DAS Results LSB-DAS-12-14-15**




[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001154
DTX-136.0014

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001156

DTX-136.0016

[redacted]



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

of quantitation (0.78 mcg/mL) in all samples analyzed by LC-MS/MS including those samples collected 2 to 3 minutes post dose. Further studies to determine the half-life in muscle tissue are being conducted and will be submitted to the FDA when available.

Conclusion

As described in the previous paragraphs, the 14 different nonclinical studies clearly demonstrate that there is no evidence of pharmacological properties for RTP004 in either single or repeat-dose studies in multiple species, all of which included an extensive assessment of effects from RTP004 exposure. Therefore, RTP004 does not have any pharmacologic properties and does not contribute to an increase of spread/effect of daxibotulinumtoxinA when administered by injection. Furthermore, there was no evidence of an increase in spread in the phase 2 randomized, double-blind, dose ranging, active and placebo controlled, multi-center clinical trial (RT002-CL002) that evaluated the safety, efficacy and duration of effect of DaxibotulinumtoxinA for Injection for the treatment of glabellar lines. Laboratory studies conducted have confirmed that the novel excipient, RTP004 functions as a stabilizer in the drug product DaxibotulinumtoxinA for Injection. In addition, the proposed trials in the phase 3 clinical program will monitor efficacy and safety of DaxibotulinumtoxinA for Injection.

### 1.6.3.3 Clinical

**Question 5:**

***Does the Agency agree with Revance's proposal to request and receive a waiver for the requirement of the pediatric study plan?***

***Agency Response:*** *Under the Food and Drug Administration Safety and Innovation Act (FDASIA), you must submit an Initial Pediatric Study Plan (iPSP) within 60 days of an End of Phase (EOP2) meeting. The PSP must contain an outline of the pediatric study or studies that you plan to conduct (including, to the extent practicable study objectives and design, age groups, relevant endpoints, and statistical approach); any request for a deferral, partial waiver, or waiver, if applicable, along with any supporting documentation, and any previously negotiated pediatric plans with other regulatory authorities. The PSP should be submitted in PDF and Word format. Failure to include an agreed iPSP with a marketing application could result in a refuse to file action.*

*For the indication of glabellar lines, a waiver from conducting pediatric studies may be reasonable.*

**Revance Response:**

The waiver from conduct of pediatric studies is included with this IND in Section 1.9.1.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

**Question 6:**

*Does the Agency agree that the Phase 3 development plan of two adequate and well-controlled clinical trials (1620301, 1620302) and an open-label multi-treatment trial (1620303) support the proposed indication for DaxibotulinumtoxinA for Injection?*

*Specifically, Revance seeks the Agency's comments on the following:*
*a. The protocol design for the Phase 3 trials including the study population, assessments, and endpoints*
*b. The adequacy of the planned analysis to demonstrate the effectiveness and safety for the Phase 3 trials, including:*
*i. Is the statistical analysis of the primary efficacy variable satisfactory?*
*ii. Are the analyses of the secondary variables acceptable?*
*iii. Is the analysis of safety satisfactory?*

**Agency Response:**

***a.*** *We have the following comments regarding Protocols 1620301 and 1620302:*

***Study Design***

*You proposed to conduct 2 randomized, double-blind, placebo-controlled, multi-center, singledose, Phase 3 trials (1620301, 1620302) enrolling a total of 600 subjects with moderate to severe glabellar lines randomized in a 2:1 ratio to DaxibotulinumtoxinA for Injection 40 U or placebo.*

*You intend to evaluate subjects at the study site at Weeks 2, 4, 8, 12, 16, 20, 24, 28, 32, and 36 or until the Investigator Global Assessment-Facial Wrinkle Severity (IGA-FWS) score of that subject returns to baseline.*

*The role of the peptide needs to be determined, as it will fundamentally impact your study designs.*

**Revance Response:**

Given that RTP004 is a novel excipient (inactive ingredient) and functions as a stabilizer for the drug substance daxibotulinumtoxinA in the drug product, the role of peptide has no impact to the study designs for our proposed Phase 3 Clinical Program. For further details, refer to the response by Revance to Question 3.

***Agency Response: Study Population***

*You propose to enroll subjects 18 to 65 years of age who have moderate (2) or severe (3) glabellar lines at maximum frown based on the Investigator Global Assessment-Facial Wrinkle Scale (IGA-FWS).*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

*Because patients older than 65 years of age are likely to be treated with your product, we recommend that you modify the entry criteria to allow enrollment of subjects in this age group in order to obtain safety and efficacy information in this population.*

**Revance Response:**

Revance agrees that since patients older than age 65 are likely to be treated with DaxibotulinumtoxinA for Injection. Following the recommendation, Revance has modified to extend the upper age limit of the entry criteria to 75 years of age for the pivotal phase 3 trials (160301 and 160302). To capture safety information on this population, the subjects to be enrolled in the long-term safety trial (1620303) will be 18 years of age and older.

***Agency Response: Endpoints***

*Primary efficacy endpoints*

*For Phase 3 trials 1620301 and 160302, you propose a composite primary efficacy endpoint of proportion of subjects who achieve a score of 0 or 1 (none or mild) and a two-point improvement from baseline in glabellar lines severity on investigator assessment (IGS-FWS) and patient assessment (PFWS) scales, at maximum contraction (frown), at Week 4. This primary endpoint is acceptable. However we have the following comments regarding proposed IGAFWS: The scale contains 4 categories of disease severity (none, mild, moderate and severe) however; it does not contain morphologic descriptors (Table 10 and Appendix C) for each level of disease severity. We recommend that you include clinically relevant morphologic descriptions consistent with each level of disease severity in order to minimize inter and intrarater variability.*

*Given that assessments of glabellar line severity require subjective judgment, we recommend you include a photonumeric guide with examples of each grade of disease severity that can be provided to investigators and subjects as an assessment aid to minimize inter-observer variability. The photonumeric guide should be cognitively debriefed with expert clinicians and subjects to ensure the photographs are appropriate representations of each severity category.*

*Based on a preliminary review of the evidence dossier, it appears that the Investigator's Global Assessment of Facial Wrinkle Severity (IGA-FWS) and the Patient Facial Wrinkle Severity (PFWS) may be acceptable for use as primary (composite) endpoint in the planned phase 3 studies of daxibotulinumtoxinA. Content validity for the two instruments (IGA-FWS and the PFWS) appears to be reasonably established and clinicians and subjects can adequately understand and interpret the item(s) in the respective instruments. We have not conducted an indepth review of the results of the psychometric study at this time. We will provide additional comments at the time of the IND submission.*

**Revance Response:**

Revance agrees to include the clinically relevant morphologic descriptors with the IGA-FWS consistent with each level of disease severity in order to minimize inter- and intra-rater variability and are included in the phase 3 protocol 1620301 in Section 5.3.5.1.



OUTSIDE COUNSEL EYES ONLY PURSUANT TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001160

DTX-136.0020

A photonumeric guide with examples of each grade of disease severity will be utilized in the conduct of the Phase 3 Program for both the investigator and the subjects. These training tools are included with the psychometric study dossier in Section 5.3.5.4.

Both the morphologic descriptors and the photonumeric guide were included in the investigator training for the RT002-CL002 phase 2 clinical trial.

***Agency Response:*** *Secondary Efficacy Endpoints*

*Duration of Response will be compared using sequential analyses for the secondary efficacy endpoint of subjects who achieve a score of 0 or 1 (none or mild) on the IGA-FWS. Additional secondary endpoints include sequential analysis of the primary endpoint and sequential analysis of the one point responder on IGA-FWS change from baseline.*

*Your proposed secondary efficacy endpoints include:*

*1. Sequential Analysis of Responders for Duration of Effect*

*For duration of effect, a responder is defined as a subject who achieves score of 0 or 1 (none or mild) on the IGA-FWS scale at the time point of evaluation. These responders will be summarized with descriptive statistics for each treatment group at the Follow-up Visits (Weeks 4, 8, 12, 16, 20, 24, 28, 32) and Final Evaluation Visit (Week 24, 28, 32, or 36, as appropriate) or Early Discontinuation Visit, if applicable.*

*See response under comments regarding b(ii) below.*

***Meeting Discussion:***

*The Agency noted that traditionally, duration of effect has not been included in labeling for botulinum toxin products for treatment of glabellar lines. The sponsor referenced Dysport labeling. The Agency noted that Dysport labeling states that "Treatment with Dysport reduced the severity of glabellar lines for up to four months," and that the labeling does not make a statement regarding "duration of effect". The Agency noted that the sponsor could submit a proposal along with rationale for consideration.*

*The addition of a query of subjects by investigators regarding their impression about whether they received daxibotulinumtoxinA or placebo could instill unnecessary bias in the assessments by both the investigator and subject, therefore this request from FDA has not been included in the phase 3 clinical program.*

*2. Sequential Analyses of the Primary Endpoint*

*Sequential testing of the responder rates will be conducted beginning at Week 8, and continuing onto Weeks 12, 16, 20, 24, 28, and 32 or until the comparison at a particular time period fails to be statistically significant for a two-sided p-value of 0.017.*

*See response to b(ii) below.*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

*3. Sequential Analyses of IGA-FWS*

*DaxibotulinumtoxinA will be compared to placebo at each visit starting at Week 4 using the greater than or equal to one-point change in IGA-FWS. These responders will be summarized with descriptive statistics for each treatment group at the Follow-up Visits (Weeks 4, 8, 12, 16, 20, 24, 28, 32) and Final Evaluation Visit (Week 24, 28, 32, or 36, as appropriate) or Early Discontinuation Visit, if applicable.*

*Because one point improvement on IGA-FWS may not be considered clinically meaningful change, this secondary endpoint will not be acceptable for labeling.*

*Also, see response to b(ii) below.*

**Revance Response:**

The feedback from FDA has been considered. We have modified the secondary endpoints and added a Type I Error Control Plan that employs a hierarchical approach in combination with a Hochberg-Bonferroni (HB) test procedure for multiple comparisons. That is, endpoints are prioritized in stages for group comparisons, with endpoints having the same priority being tested using the HB method. The treatment differences within a given stage won't be assessed for significance unless there is a significance for at least an endpoint in the previous stage.

The proposed secondary endpoints included with protocol 1620301 are as follows:

- Time to return to or worse than baseline on both IGA-FWS and PFWS
- Time to return to or worse than baseline on both IGA-FWS and PFWS scales of those in the daxibotulinumtoxinA group who are responders for the primary efficacy endpoint (Estimation only)
- Time to return to 2 or 3 (moderate or severe) on both IGA-FWS and PFWS scales
- Time to return to 2 or 3 (moderate or severe) on both IGA-FWS and PFWS scales of those in the daxibotulinumtoxinA group who are responders for the primary endpoint (Estimation only)
- Proportion of subjects who achieve an improvement of at least two points on both IGA-FWS and PFWS concurrently (abbreviated as "2-point composite response") at Weeks 2, 8, 12, 16, 20, and 24
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on IGA-FWS at each visit from Week 2 to Week 24
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on PFWS at each visit from Week 2 to Week 24
- Proportion of subjects who achieve an improvement of at least one point on both IGA-FWS and PFWS concurrently (abbreviated henceforth as "1-point composite response") at each visit from Week 2 to Week 24



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

- Proportion of subjects who achieve a score of ≥ 1 (i.e., improved, much improved, or very much improved) on the investigator's assessment of GAIS at each visit from Week 2 to Week 24
- Proportion of subjects who achieve a score of ≥ 1 (i.e., improved, much improved, or very much improved) on the subject's self-assessment of GAIS at each visit from Week 2 to Week 24

Note that all secondary endpoints defined are based on assessments at maximum frown.

Efficacy Analysis – Secondary Endpoints

Duration of response (time to relapse) will be evaluated via the secondary efficacy endpoints that are in the form of time-to-first-event. For these endpoints, the status of either having an event or no event will be determined for each post-baseline visits. The first event will be considered as occurred at time 0 if there is an event at all post-baseline visits up to Week 4 (i.e., no sign of improvement up to Week 4). Taking into account the variability in treatment effect, all available assessments on visits following the latest of the "no-event" Weeks 1, 2 and 4 will be used to determine time of the first event. For example, when there is no event on Week 4, assessments from Week 8 onward will be used to determine the first event time regardless of the event status on Weeks 1 and 2. The time (in weeks) since treatment (Baseline, Day 0) to the first event/censorship will be calculated using the actual visit dates. Determination of events and event/censor time will be based on observed data only. No imputation of missing data will be performed for these endpoints.

Kaplan-Meier survival curves will be plotted by treatment group for each time-to-event endpoint. Point estimates of median duration and 95% CI's will be determined. Log-rank tests will be used for treatment group comparisons. KM survival curves and median durations will also be provided for the two time-to-event endpoints of the subjects in the DaxibotulinumtoxinA group who are 2-point composite responders at Week 4.

Duration of reduction in severity will be evaluated by secondary efficacy endpoints that are in the form of proportion of subjects having a response using various response definitions (see Section 7.3 Study Endpoints). For each endpoint at each visit, the proportion of subjects with a response will be compared between treatment groups using the CMH test stratified by the study site. P-values based on both 1- and 2-sided tests will be provided. Point estimates for the difference in proportion between treatment groups and CI's at both 90% and 95% level will be computed.

Type I Error Control

To control the Type I error rate, secondary efficacy endpoints will be prioritized and a hierarchical testing approach (or gate-keeping rules) will be used. Some endpoints are closely related and of similar priority, in which case a Hochberg-Bonferroni multiple comparison procedure (Hochberg 1988) will be used at that stage of hierarchy.

The two time-to-first-event endpoints that are limited to the responders for the primary efficacy endpoint in the daxibotulinumtoxinA group (see Section 7.3 Study Endpoints) are for the purpose of describing the distribution of response duration and for estimating the median duration of response. Therefore, they will not be part of the Type I Error Control Plan.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001163

DTX-136.0023

**Stage 1**. The following endpoints will be tested concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05.

- Time to return to, or worse than, baseline on both IGA-FWS and PFWS scales
- Time to return to moderate or severe on both IGA-FWS and PFWS scales

Stage 1 is defined as successful if the daxibotulinumtoxinA group is declared statistically significantly better than the placebo group for at least one of the two endpoints.

**Stage 2.1**. If Stage 1 is successful, the following endpoints at Week 2 will be tested (1-sided) concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05.

- Proportion of subjects who achieve a 2-point composite response
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on IGA-FWS
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on PFWS

Stage 2.1 is defined as successful if the daxibotulinumtoxinA group is declared statistically significantly better than the placebo group for at least one of the three endpoints.

**Stage 2.2**. If Stage 2.1 is successful, the following endpoints at Week 4 will be tested (1-sided) concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05. (Note: 2-point composite response at Week 4 is the primary efficacy endpoint.)

- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on IGA-FWS
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on PFWS

Stage 2.2 is defined as successful if the daxibotulinumtoxinA group is declared statistically significantly better than the placebo group for at least one of the two endpoints.

**Stage 2.3**. If Stage 2.2 is successful, the following endpoints at Week 8 (excluding the endpoint that is not significant at Week 4 in Stage 2.2) will be tested (1-sided) concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05.

- Proportion of subjects who achieve 2-point composite response
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on IGA-FWS
- Proportion of subjects who achieve a score of 0 or 1 (none or mild) on PFWS

Stage 2.3 is defined as successful if the daxibotulinumtoxinA group is declared statistically significantly better than the placebo group for at least one of the three endpoints.

**Stages 2.4 to 2.7**. Following the same principle performed at Stage 2.3, testing the three endpoints (2-point composite response, none/mild on IGA-FWS, and none/mild on PFWS) concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05 at visits from Week 12 to Week 24 sequentially will only be conducted if the Stage at the previous visit is successful. Note that endpoints that are not significant at a given visit will be excluded for the Stages at later visits.

**Stages 3.1 to 3.7**. If Stage 2.7 is successful, the following three endpoints will be tested (1-sided) concurrently using the Hochberg-Bonferroni procedure at an overall α level of 0.05 at each visit starting at Week 2 and sequentially until Week 24.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001164

DTX-136.0024

- Proportion of 1-point composite responders on both IGA-FWS and PFWS
- Proportion of subjects who achieve a score of ≥ 1 on the investigator's assessment of GAIS
- Proportion of subjects who achieve a score of ≥ 1 on the subject's self-assessment of GAIS

The Stage at a given visit is defined as successful if the daxibotulinumtoxinA group is declared statistically significantly better than the placebo group for at least one of the three endpoints. The tests included in a Stage will be performed only if the previous Stage (visit) is successful. Endpoints that are not significant in a Stage (visit) will be excluded from the next Stage (visit) onward.

This hierarchical testing procedure, in combination with the Hochberg-Bonferroni adjustment for multiplicity, results in strong control of the Type I error rate of 0.05 within each Stage. The procedure controls the overall Type I error rate among all secondary endpoints included in the Type I Error Control Plan at ≤ 0.05 under any set of null hypotheses such that the null hypothesis is assumed for one endpoint at a stage; the null hypothesis is also assumed for all other endpoints within the stage.

The protocol for the first pivotal phase 3 trial is located in Section 5.3.5.1.

***Agency Response:***

*Unblinding is a significant concern in trials for botulinum toxin drug products for the improvement in the appearance of facial lines. Therefore, results of review of photographs at maximum contraction by a masked, independent committee of experts using the investigator static scale should be provided as a secondary endpoint. In addition, we recommend that investigators query subjects regarding their impression about whether they received daxibotulinumtoxinA or placebo.*

**Revance Response:**

Revance will be collecting photographs at maximum contraction reviewed by blinded/masked independent panel, as a visual support to the secondary end points, IGA-FWS and PFWS. These photographs will be made available at the end of the study and will be included as an exploratory efficacy endpoint. In addition, the investigators will not query the subjects on their impressions of treatment received due to the potential bias that could be instilled in the assessments by both the subjects and the investigator.

***Agency Response: Safety monitoring***

*Your proposed safety monitoring includes in following*

- *Clinical laboratory tests (hematology, chemistry, urinalysis)*
- *Urine pregnancy test (UPT) for women of child-bearing potential (WOCBP)*
- *Serum antibody tests for daxibotulinumtoxinA and RTP004 peptide*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR
REV_DAX-00001165
DTX-136.0025

- *Injection Site Evaluation*
- *Cranial nerves II–VII assessment*
- *Evaluation of Facial Muscle Strength*
- *12-lead ECG*
- *Concomitant medications*
- *Collection of adverse events (AEs)*
- *Distant spread of toxin query*
- *Vital Signs*

*We recommend that you conduct your Week 1 assessment at the study site rather than by telephone.*

*We acknowledge that you plan to collect blood samples for evaluation of anti-drug antibodies (ADA) for both peptide RTP004 and daxibotulinumtoxinA in your Phase 3 trials. We recommend that in the immunogenicity assessment of your product, if the test result is positive for ADA, you should characterize the neutralizing activity of the ADA. During your product development, you should evaluate the impact of immunogenicity on efficacy and safety. We may have additional comments on the blood sampling scheme for immunogenicity assessment after your protocol submission. Refer to the following guidance for more information:*
*http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM192750.pdf*
*http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM338856.pdf*

**Revance Response:**

Revance agrees to the recommendation and the Week 1 assessment will be conducted at the study site. This change is included in the phase 3 protocol 1620301 in Section 5.3.5.1.

As recommended by FDA, if any results from immunogenicity assessment are positive for anti-drug antibodies for either RTP004 or daxibotulinumtoxinA, the neutralizing activity will be characterized. The impact of immunogenicity on efficacy and safety is under development for DaxibotulinumtoxinA for Injection based on FDA Guidance for Industry: Assay Development and Validation for Immunogenicity Testing of Therapeutic Protein Products and FDA Guidance for Industry: Immunogenicity Assessment for Therapeutic Protein Products.

***Agency Response: Study Design – Protocol 1620303***

*Drug products for the temporary improvement of upper facial lines have the potential for chronic intermittent use; therefore, you should establish the long-term safety of the drug product in the proposed population at the proposed dose. Long-term controlled trial data are preferred over open-label extension safety data because of the difficulty in interpreting adverse events data in the absence of a concurrent control. Consider modifying the study design to include an initial 6-month double- blind period followed by an open-label treatment period.*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001166

DTX-136.0026

**Revance Response:**

Revance will include the roll-over of subjects from the two pivotal phase 3 trials, 1620301 and 1620302 into the long-term safety study, 1620303, to provide a 6-month double-blind period followed by an open-label treatment period.

***Agency Response: Study Design – Protocol 1620301 and 1620302***

*i) Your proposed primary analysis method for the primary endpoint of using the Cochran Mantel Haenszel test stratified by analysis center appears reasonable.*

*ii)*

- *You proposed to test each of your three secondary as well as two of your tertiary endpoints at several sequential time points (i.e., 7 or more timepoints), and allocated α of 0.017 for each set of endpoints. While results for secondary endpoints can be included in the labeling, note that secondary endpoints intended for labeling should be clinically relevant, limited in number along with adjustment for multiplicity.*
- *It might be reasonable to report the proportion of responders for your planned secondary endpoints at each time point, and obtaining an estimate for the time to relapse might be clinically meaningful; however, results from a formal statistical testing at several sequential timepoints might not be useful for interpreting study findings as results would depend on the criteria of "relapse", method of handling of missing data, as well as the number of subjects and responders available at each subsequent timepoint.*

***Meeting Discussion:***

*The sponsor inquired whether the criteria for "relapse" can be defined as a subject's return to his/her baseline assessment at the time of treatment. In response, the Agency noted that for the maintenance period, information regarding subjects who remain responders is useful. Therefore, the sponsor may consider "loss of response" as the complement of "success" to provide useful information.*

- *Although you plan to formally test two of your tertiary endpoints (the Primary Global Aesthetic Improvement Scale (GAIS), and Primary Patient-Facial Wrinkle Severity Assessment (PFWS), the objective of conducting a formal hypothesis testing for these tertiary endpoints is not clear as tertiary endpoints are generally not intended for labeling. Further, under your current proposal, there is no α left to test for your two tertiary endpoints, and consequently, it would be difficult to interpret your study findings in terms of statistical significance for your analyses of the tertiary endpoints.*

*iii) The analysis of safety appears reasonable. Additional comments may be provided after submission of the Phase 3 protocols to the IND.*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

**Revance Response:**

The feedback from FDA on the statistical analysis for the two proposed phase 3 clinical trials has been considered and the proposed statistical analysis for the secondary endpoints are included in the first pivotal phase 3 trial protocol in Section 5.3.5.1.

Included in the currently proposed secondary endpoints are time-to-event endpoints with the "relapse" events defined in the following two ways:

- Return to baseline on both IGA-FWS and PFWS
- Return to Moderate or Severe on both IGA-FWS and PFWS.

In addition, we have dropped use of the term "tertiary endpoints" and called those endpoints not listed as either primary or secondary as exploratory to be clear that the objectives of analyzing these endpoints are to explore potential signals.

**Question 7:**

***Revance intends to evaluate approximately 2000 subjects in the Phase 3 clinical program and provide data from at least 600 subjects treated for a minimum duration of 6 months and 100 subjects with repeat doses of at least 1 year at the time of BLA filing. Does the Agency agree with:***

***1. The size of the safety database***

***2. The proposal to monitor the long term safety of multiple treatments***

***3. The timing of submission for safety population?***



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001168

DTX-136.0028

***Agency Response: Size of Safety Database***

*You propose to enroll a total of 600 subjects in two placebo-controlled Phase 3 trials (1620301 and 1260302) of whom 400 subjects will be treated with a single dose of your product. You propose to enroll up to 1500 subjects in an open-label Study 1620303 of whom 1100 subjects will be treated with a single treatment and 400 subjects will be treated with up to three treatments. Because the treatment of upper facial lines are aesthetic indications and the risk-benefit assessment for these indications differs from that for indications such as blepharospasm, cervical dystonia, migraine, or spasticity, the minimum number of subjects described in ICH E1A may not be sufficient to allow assessment of the risk versus the benefit for the indications of upper facial lines, conditions with minimal morbidity. Because your product is intended for temporary improvement of glabellar lines and repeated use is anticipated, information about the safety of repeated use of your product will be needed. The number of subjects (up to 400) who will be treated with multiple treatments and the maximal number of treatments (up to 3 treatments) may not be sufficient to adequately characterize the long term safety of your product.*

**Revance Response:**

Revance will take into consideration the guidance provided by FDA for the size of the safety database. The protocol for the long-term safety trial, 1620303, will be submitted to this IND in the future.

***Agency Response: Long-Term Safety monitoring***

*Your proposed safety monitoring includes the following*

- *Clinical laboratory tests (hematology, chemistry, urinalysis)*
- *Urine pregnancy test (UPT) for women of child-bearing potential (WOCBP)*
- *Serum antibody tests for daxibotulinumtoxinA and RTP004 peptide*
- *Injection Site Evaluation*
- *Cranial nerves II–VII assessment*
- *Evaluation of Facial Muscle Strength*
- *Concomitant medications*
- *Collection of adverse events (AEs)*
- *Distant spread of toxin query*
- *Vital Signs*

*We recommend that you modify your systemic safety monitoring to include an assessment of coagulation at screening/baseline (PT) and cardiac safety monitoring. In addition, we recommend that you conduct your Week 1 assessment at the study site rather than by telephone. Additional comments regarding your neurologic safety evaluation may be provided at the time of your IND submission.*



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001169

DTX-136.0029

*You state that "Subjects at select centers who receive three treatments will have a Final Evaluation Visit four weeks after the final treatment." Based on the duration of action of your product, all subjects should be followed for at least 12 weeks after their final dose.*

*Define the minimal dosing interval between treatments (e.g. at least 3 months between treatments).*

**Revance Response:**

The systemic safety monitoring has been modified as requested by FDA with the following changes:

- Inclusion of prothrombin time (PT) testing at the screening/baseline visit.
- Week 1 assessment will be conducted at the study site rather than by phone call
- Subjects will be followed for 12 weeks after their final dose

The long-term safety population will include subjects from GL1 and GL2 where cardiac monitoring is included, it is not necessary to include cardiac safety in the long-term safety trial considering the difficulty of interpreting the cardiac safety with no concurrent control. In addition, upon IM administration, the botulinum toxin molecule is too large (150 kDa) to enter ion channels and is not expected to affect the QT interval (Rubin et al, 2009).

A minimal dosing interval will not be defined in the protocol for the 1620303 trial. To inform the product label, the minimal dosing interval will be defined based on the efficacy results from the pivotal phase 3 trials.

***Agency Response: Timing of submission for safety population***

*The intent of the sub-question #3, "the timing of submission for safety population," is not clear. The content of BLA should be substantially complete at the time of submission. Data from longterm safety trials should be provided at the time of initial submission of the BLA.*

**Revance Response:**

Revance will take into consideration the guidance provided by FDA in preparation for the BLA submission for DaxibotulinumtoxinA for Injection.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

### 1.6.3.4 References

Aoki, K.R., 1999. Preclinical update on BOTOX_ (botulinum toxin type A)-purified neurotoxin complex relative to other botulinum neurotoxin preparations. Eur. J. Neurol. 6, S3–S10.

Aoki, K.R., 2001. A comparison of the safety margins of botulinum neurotoxin serotypes A, B, and F in mice. Toxicon 39, 1815–1820.

Morbiato, L., Carli, L., Johnson, E.A., Montecucco, C., Molgo, J., Rossetto, O., 2007. Neuromuscular paralysis and recovery in mice injected with botulinum neurotoxins A and C. Eur. J. Neurosci. 25, 2697–2704.

Rubin M., Dover J., Maas C., Nestor M., 2009. An Analysis of Safety Data form Five Phase III Clinical Trials on the Use of Botulinum Neurotoxin Type A-ABO for the Treatment of Glabellar Lines. Aesthet. Surg. J; 29, S50-56.

Sugiyama, H., Brenner, S.L., Dasgupta, B.R., 1975. Detection of Clostridium botulinum toxin by local paralysis elicited with intramuscular challenge. Appl. Microbiol. 30, 420–423.

Wilder-Kofie, T.D., Luquez, C., Adler, M., Dykes, J.K., Coleman, J.D., Maslanka, S.E., 2011. An alternative in vivo method to refine the mouse bioassay for botulinum toxin detection. Comp. Med. 61, 235–242.



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00001171

DTX-136.0031

# EXHIBIT 8

## 3.2.A.3 GENERAL INFORMATION [RTP004, BACHEM AMERICAS, INC.]

The proprietary peptide, RTP004 Acetate (RTP004), is a custom material made exclusively for Revance Therapeutics, Inc. RTP004 is a single chain synthetic peptide consisting of 35 L-amino acids, which is used in the final drug product (DP) formulation as a stabilizer of the active ingredient DaxibotulinumtoxinA. RTP004 meets the definition of new (novel) excipient as defined in *FDA Guidance-Nonclinical Studies for the Safety Evaluation of Pharmaceutical Excipients (May 2005)*:

"...the phrase new excipients means any inactive ingredients that are intentionally added to therapeutic and diagnostic products, but that: (1) we believe are not intended to exert therapeutic effects at the intended dosage, although they may act to improve product delivery (e.g., enhance absorption or control release of the drug substance); and (2) are not fully qualified by existing safety data with respect to the currently proposed level of exposure, duration of exposure, or route of administration."

RTP004 is an inactive ingredient that is intentionally added to a therapeutic product but it is not intended to exert therapeutic effects at the intended dosage, it has no pharmacological properties at the quantity used in DaxibotulinumtoxinA for Injection, and it is not required for activity or function of the toxin itself, only to stabilize it in the final formulation so that it may maintain its activity and functionality throughout the intended shelf life.

Toxicology studies to assess pharmacological activity have been performed according to ICH guidance for industry *S7A Safety Pharmacology Studies for Human Pharmaceuticals* and are presented in Module 2.4 and 2.6. In summary, RTP004 produced no muscle paralysis or any adverse effects and was considered to show no pharmacological activity. The toxicology studies demonstrated no RTP004-related adverse toxicities, no central nervous system (CNS) effects, and no evidence of muscle damage. The development of anti-RTP004 antibodies showed an overall low immunogenic potential. The perinatal/postnatal reproductive study demonstrated no adverse toxicity to dams or adverse developmental effects or reproductive toxicities in the F1 generation of rats.

### 3.2.A.3.1 Structure

The completed chemical sequence of RTP004 is provided in Figure 1.

Protein transduction domain (PTD) domains are indicated with an underline.

**Figure 1: Chemical Sequence of RTP004**

**H-Arg-Lys-Lys-Arg-Arg-Gln-Arg-Arg-Arg-Gly-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Lys-Gly-Arg-Lys-Lys-Arg-Arg-Gln-Arg-Arg-Arg-OH**

The following studies were conducted to demonstrate that the molecule performs as a stabilizer of the active ingredient:



Allergan v Revance
31
Bernardo
9/27/23 CY 14316

OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

REV_DAX-00002851

C.A. No. 21-1411-RGA-LDH
Paintiffs' Trial Exhibit
PTX-091

PTX-091.0001

- [redacted]
- [redacted]

Data from these studies demonstrate that RTP004, a fully characterized novel excipient, functions as a stabilizer in the DaxibotulinumtoxinA for Injection formulation by two different mechanisms, namely surface adsorption and thermal-induced aggregation.

### 3.2.A.3.2 General Properties - Physiochemical Properties

RTP004 is presented as a white to yellowish lyophilized cake within a stoppered and sealed amber, USP Type 1 glass vial. The cake requires reconstitution with formulation buffer solution, as described in Section 3.2.P.3.3, prior to use. The peptide chain is composed of arginine, glutamine, glycine, and lysine residues. All lots of RTP004 are required to be ≥ 90% pure peptide and to have ≤ 10.0% total impurities. The general properties of RTP004 are the following:

- Molecular Formula: $C_{200}H_{396}N_{92}O_{38}$
- Molecular Weight: 4698 ± 2
- Counter-Ion: Acetate (AcOH)
- Isoelectric Point: 13.05



OUTSIDE COUNSEL EYES ONLY PURSUANT
TO LOCAL RULE 26.2
SUBJECT TO EAR

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 21, 2025, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Jeremy A. Tigan
Anthony D. Raucci
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899
jtigan@morrisnichols.com
araucci@morrisnichols.com

Candace Polster
Robert Unikel
PAUL HASTINGS LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60606
candacepolster@paulhastings.com
robertunikel@paulhastings.com

Eric W. Dittmann
Chad J. Peterman
Melanie R. Rupert
Bruce M. Wexler
Ashley N. Mays-Williams, Ph.D.
Krystina L. Ho, Ph.D.
Carl J. Minniti, III
Isaac S. Ashkenazi
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

Felix A. Eyzaguirre
PAUL HASTINGS LLP
600 Travis Street, 58th Floor
Houston, Texas 77002
felixeyzaguirre@paulhastings.com

Karthik R. Kasaraneni
David M. Valente
Amanda K. Taylor
Vladimir J. Semendyai
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
karthikkasaraneni@paulhastings.com
davidvalente@paulhastings.com
amandataylor@paulhastings.com
vladimirsemendyai@paulhastings.com

*Attorneys for Plaintiff*

Dated: November 21, 2025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Anne Shea Gaza (No. 4093)
Samantha G. Wilson (No. 5816)
Daniel G. Mackrides (No. 7230)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
agaza@ycst.com
swilson@ycst.com
dmackrides@ycst.com

*Attorneys for Defendants Revance Therapeutics, Inc. and PCI San Diego, Inc.*